UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .   Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .   USX Tower – 54th Floor
                            .   600 Grant Street
                            .   Pittsburgh, PA 15219
              Debtors.      .
                            .   April 1, 2008
. . . . . . . . . . . .     .   9:08 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

                          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


Audio Operator:           Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  BERNARD BAILOR, ESQ.
                                 PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

                            Caplin & Drysdale, Chartered
                            By:  ELIHU INSELBUCH, ESQ.
                            375 Park Avenue, #3505
                            New York, NY  10152

For the Debtors:            ARPC
                            By:  AMY BROCKMAN, ESQ.

For W.R. Grace:             W.R. Grace
                            By:  MARK SHELNITZ, ESQ.
                                 JAY HUGHES, ESQ.
                                 WILLIAM CORCORAN, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                  By:  GREGORY HOROWITZ, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For the                     Stroock & Stroock & Lavan
Unsecured Creditors'        By:  KENNETH PASQUALE, ESQ.
Committee:                       ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

For the Property
Damage Committee:           Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                                 SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe<br>   LLP<br>By:  ROGER FRANKEL, ESQ.<br>     ANTHONY KIM, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| | STB<br>By:  STERLING MARSHALL, ESQ. |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br>   LLP<br>By: DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Sealed Air:                NERA Economic Consulting
                               By:  STEPHANIE PLANCICH
                               1166 Avenue of the Americas
                               28th Floor
                               New York, NY  10036

For W.R. Grace:                NERA
                               By:  ELENA ZAPRYANOVA
                                    LINDA SHEN

For Serengeti:                 Vinson & Elkins, LLP
                               By:  ARI BERMAN, ESQ.
                               Trammell Crow Center
                               2001 Ross Avenue, Suite 3700
                               Dallas, TX  75201

                               By:  BILLAL SIKANDER

For Silver Point
Capital:                       Silver Point Capital
                               By:  JOHN KU

For the Debtors:               Pachulski, Stang, Ziehl &Jones
                               By:  JAMES O'NEILL, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For the Unsecured             Strook & Strook & Lavan
Creditors' Committee:         By:  LEWIS KRUGER, ESQ.
                              180 Maiden Lane
                              New York, NY 10038

For Ad Hoc Committee:         Weil, Gotshal & Manges
                              By:  M. JARRAD WRIGHT, ESQ.
                              1300 Eye Street NW, Suite 900
                              Washington, D.C.  20005

For Official Committee        Kramer Levin Naftalis & Frankel
of Equity Holders:               LLP
                              By:  PHILLIP BENTLEY, ESQ.
                              919 Third Avenue
                              New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

```
TELEPHONIC APPEARANCES (CONT'D):

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            ELIZABETH DEVINE, ESQ.

For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  DAVID J. PARSONS, ESQ.
                                 VAN J. HOOKER, ESQ.
                                 SANDER L. ESSERMAN, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201

For Fireman's Fund:         Stevens & Lee, P.C.
                            By:  JOHN DEMMY, ESQ.
                                 DAVID R. BEANE, ESQ.
                            1105 North Market Street, 7th Fl.
                            Wilmington, DE  19801

For Owens-Illinois:         McCarter & English
                            By:  DANIEL SILVER, ESQ.
                            Renaissance Centre, 405 N. King St.
                            Wilmington, DE  19801

For David T. Austern:       Piper Jaffray & Co.
                            By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  MATTHEW RUSSELL, ESQ.
                                 ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>    JOSHUA CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044<br><br>Kirkland & Ellis, LLP<br>By:  ELLEN AHERN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601<br><br>Kirkland & Ellis, LLP<br>By:  DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For W.R. Grace: | Cohn Whitesell & Goldberg, LLP<br>By:  NATHAN SOUCY, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For CNA: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker &<br>  Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones, LLP<br>By:  TIMOTHY P. CAIRNS, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>    JEANNA RICKARDS, ESQ.<br>    JAMES WEHNER, ESQ.<br>    LESLIE KELLEHER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the Asbestos Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |

TELEPHONIC APPEARANCES (CONT'D):

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer              Gleser
& Gleser:                    By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Pepsi:                   Butler Rubin Salfarelli & Boyd, LLP
                             By:  KIRK T. HARTLEY, ESQ.
                             70 West Madison Street
                             Suite 1800
                             Chicago, IL  60602

For Official Committee       Duane Morris, LLP
of Unsecured Creditors:      By:  MICHAEL LASTOWSKI, ESQ.
                             1100 North Market Street, Suite 1200
                             Wilmington, DE  19801-1246

For Official Committee       Brandi Law Firm
of Asbestos Property         By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:            44 Montgomery St., Suite 1050
                             San Francisco, CA  94104

For the State of CA,         Hahn & Hessen, LLP
Dept. of Gen. Services:      By:  CHRISTINA J. KANG, ESQ.
                             488 Madison Avenue, 14th Fl.
                             New York, NY  10022

For Baron & Budd,            Hogan Firm Attorneys at Law
et al.:                      By:  DANIEL K. HOGAN, ESQ.
                             1311 Delaware Avenue
                             Wilmington, DE  19801

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Royal Insurance:         Wilson Elser Moskowitz Edelman
                                & Dicker, LLP
                             By:  CATHERINE CHEN, ESQ.
                                  150 East 42nd Street
                                  New York, NY  10017

For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216

For London Market           Mendes & Mount, LLP
Companies:                  By:  ALEXANDER MUELLER, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019-6829

For Official Committee      LECG
of Asbestos Property        By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee      Richardson Patrick Westbrook &
of Asbestos Property          Brickman, P.C.
Claimants:                  By:  EDWARD J. WESTBROOK, ESQ.
                            174 East Bay Street
                            Charleston, SC  29401

For Ivory Investment:       Ivory Investment
                            By:  DHANANJAY PATWARDHAN

For Linden Advisors:        Linden Advisors, LP
                            By:  CRAIG GILBERT

For O'Conner:               O'Conner
                            By:  John R. Wollen

For Credit Suisse           Credit Suisse First Boston
First Boston:               By:  TIM McARDLE

For King Street             King Street Capital Management, LLC
Capital Management,         By:  KIM CHRISTENSEN, ESQ.
LLC:

For the Blackstone          The Blackstone Group
Group:                      By:  JOHN O'CONNELL

For Dune Capital Mgmt:      Dune Capital Management
                            By:  GUY BARON

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anchorage Advisors:     Anchorage Advisors
                            By:  JONATHAN LEWINSOHN

For Lehman Brothers:        Lehman Brothers
                            By:  ANDREW CHAN

For Caxton Associates:      Caxton Associates, LLC
                            By:  JAMES RIEGER

For Dow Jones               Dow Jones News Wires
News Wires:                 By:  PEG BRICKLEY

For Citadel Investment      Citadel Investment Group
Group:                      By:  BEAU HARBOUR

For Durham Asset            Durham Asset Management
Management:                 By:  JEFFREY A. ROSENKRANZ

For Murray Capital          Murray Capital Management, Inc.
Management                  By:  MARTI MURRAY

For Korn Capital, LLC:      Korn Capital, LLC
                            By:  STEPHANIE KWONG

For Irwin H. Zandman:       Irwin H. Zandman
                            By:  IRWIN H. ZANDMAN

For Venor Capital:          MICHAEL SCOTT, ESQ.
                            Washington, DC

For Asbestos Claimants:     Brayton Purcell, LLP
                            By:  CHRISTINA SKUBIC, ESQ.
                            222 Rush Landing Road
                            Novato, CA  94948

For Halcyon Asset
Management LLC:             Halcyon Asset Management, LLC
                            By:  JOHN GREENE

TELEPHONIC APPEARANCES (CONT'D)

For The Scotts Co.:        Vorys, Sater, Seymour and Pease,
                              LLP
                           By:  MATTHEW DAIKER, ESQ.
                           52 East Gay Street
                           P.O. Box 1008
                           Columbus, OH  43216

For Private Investors:     WILLIAM M. WAGNER

For Bank of New York:      ANDREW HAIN, ESQ.


For WR Grace
Shareholder:               Tocqueville Asset Management
                           By:  PETER SHAWN

For Christopher M.         Cohn Whitesell & Goldberg, LLP
Candon:                    By:  CHRISTOPHER M. CANDON, ESQ.
                           101 Arch Street
                           Boston, MA  02110


For Deutsche Bank:         MATT DOHENY

DebtWire:                  SETH BURNDY

For CNA Insurance:         Goodwin Proctor, LLP
                           By:  BRIAN MUKHERJEE, ESQ.
                           Exchange Place
                           53 State Street
                           Boston, MA  02109


For In Propra Persona:     Old Lane Law Office
                           By:  Rajeev Narang, Esq.

**J&J COURT TRANSCRIBERS, INC.**

# I N D E X

**WITNESSES FOR ACC/FCR:**                                    **PAGE**

DR. ARNOLD BRODY
   Direct Examination by Mr. Bailor               24
   Cross Examination by Mr. Bernick               76
   Redirect Examination by Mr. Bailor            122
   Recross Examination by Mr. Mullady            132
   Recross Examination by Mr. Bernick            137


**EXHIBITS**                                                  **EVD.**
ACC/FCR-274 Dr. Brody's slides (Demonstrative only)   76

Exh. 2161   Summary of Deposition of Ray Harron          150
Exh. 2162   Summary of Deposition of Andrew Harron       150
Exh. 2163   Summary of Deposition of James Ballard       151
Exh. 2164   Summary of Deposition of Dominic Gaziano     151
Exh. 2165   Summary of Deposition of Dr. Oaks            151
Exh. 2166   Summary of Deposition of Lucas               151
Exh. 2168   Summary of Deposition of Alvin Schonfeld     151
Exh. 2172   Summary of Dep. of Dr. Richard Levine        152
Exh. 2173   Summary of Deposition of Dr. Philip Lucas    152
Exh. 2174   Summary of Deposition of Dr. Oaks            152
Exh. 2176   Summary of Deposition of Dr. Segarra         153
Exh. 2178   Summary of Deposition of Dr. Segarra         153
Exh. 2181   Summary of Deposition of Charles Foster      153
Exh. 2183   Summary of Deposition of Heath Mason         153


GX-143      Document                                     154
GX-135      Document                                     154
GX-139      Document                                     154
GX-140      Document                                     154
GX-142      Document                                     154
GX-146      Document                                     154
GX-147      Document                                     154
GX-148      Document                                     154
GX-150      Document                                     154
GX-151      Document                                     154

**I N D E X** (Contd')

| **EXHIBITS** | | **EVD.** |
|---|---|---|
| GX-261/265 | Documents | 154 |
| GX-269/271 | Documents | 154 |
| GX-322 | Document | 154 |
| GX-323 | Document | 154 |
| GX-479 | Document | 154 |

1              THE COURT:    Please be seated.  Folks, I know it's

2  very hot in here.  I started complaining about it yesterday.

3  Apparently it's a building-wide problem that they're looking

4  into that I can't do anything about.  I've asked people to try

5  to go purchase some fans that may help in the meantime.  I

6  strongly suggest you take off your jackets, because otherwise

7  it's going to be very uncomfortable and I may divest myself of

8  my robe at some point.  So, yes, I know, that's really scary,

9  but nonetheless it may happen because it really gets unbearably

10  hot until the building figures something out.  So, please, I

11  don't want anybody passing out from heat stroke.  So, please,

12  make yourselves comfortable.

13          Oh, I guess I should call the case, first.

14          MR. BERNICK:  Yes, we should probably do that.

15          THE COURT: All right.  This is the continuation of

16  the personal injury estimation trial on W.R. Grace, 01-1139.

17          Lucky participants by phone today, I suppose, James

18  Rieger, James O'Neill, Kim Christiansen, Ari Berman, Matt

19  Doheny, Shayne Spencer, Alex Mueller, Francis Monaco, Robert

20  Guttmann, James Wehner, Walter Slocombe, Jeanna Rickards, Peter

21  Lockwood, Mark Hurford, Leslie Kelleher, Michael Davis, Bernard

22  Bailor, Christina Kang, Michael Lastowski, Seth Brumby, Matthew

23  Daiker, Daniel Silver, Catherine Chen, Debra Felder, Marti

24  Murray, Christopher Candon, John Phillips, John Ku, David

25  Turetsky, Robert Horkovich, Matthew Kramer, Theodore

**J&J COURT TRANSCRIBERS, INC.**

1  Tacconelli, Lewis Kruger, Natalie Ramsey, Jonathan Brownstein,

2  Jason Solganick, Janet Baer, Darrell Scott, David Beane,

3  Elizabeth Devine, Alan Madian, Martin Dies, Terrance Edwards,

4  Christina Skubic, Peter Shawn, Edward Westbrook, Scott Baena,

5  Jay Sakalo, Rajeev Narang, Beau Harbour, Matthew Russell, David

6  Parsons, Brian Mukherjee, Guy Baron, Andrew Chan, Daniel

7  Speights and Andrew Craig.  I'll take entries in court, please,

8  give me one second here.  Okay, thank you.

9          MR. BERNICK:  David Bernick for Grace.

10          MS. HARDING:  Barbara Harding for Grace.

11          MR. McMILLAN:  Scott McMillan for Grace.

12          MR. HOROWITZ:  Greg Horowitz for the Equity

13  Committee.

14          MR. PASQUALE:  Ken Pasquale for the Unsecured

15  Creditors Committee.

16          MR. FINCH:  Nathan Finch for the Asbestos Claimants

17  Committee.

18          MR. BAILOR:  Bernard Bailor for the Asbestos

19  Claimants Committee.

20          MR. INSELBUCH:  Elihu Inselbuch for the Asbestos

21  Creditors Committee.

22          MR. MULLADY:  Ray Mullady for the FCR.

23          MR. ANSBRO:  Good morning, Your Honor, John Ansbro

24  for the FCR.

25          MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

1  for the FCR.

2           THE COURT:  Mr. Finch.

3           MR. FINCH:  Yes.  Before we proceed with Dr. Brody's

4  testimony, I just want to make one statement for the record

5  with respect to ACC-34.  That's the document from the Halpain

6  file, related to the Halpain file.

7           THE COURT:  Yes.

8           MR. FINCH:  The Halpain file itself is in evidence as

9  ACC-472.  It was one of the files that Dr. Florence testified

10 was selected to be reviewed by the Celotex trust and by

11 Exponent.

12          That document, ACC-472 clearly shows that materials

13 were withheld on the last page of the document and the two

14 pages from the back.  ACC Exhibit 34 is clearly the materials

15 that were withheld.  ACC Exhibit 34 contains information that

16 is relevant to Mr. Halpain's work with asbestos and

17 specifically asbestos Zonolite and whether he was a mixer or

18 not.  We can argue later what, if any, inferences should be

19 drawn from that and the Court will decide that.  But, the

20 arguments do not affect the relevance of the document.  That's

21 the position I want to be placed on the record with respect to

22 that document.

23          THE COURT:  All right.  Mr. Bernick.

24          MR. BERNICK:  If that was -- I'm sorry, if the

25 purpose of that was to make a statement on the record, I

believe it's identical to the same statement that was made

about 45 times yesterday.  And I don't think that that really

has changed the picture.  They argue that it's relevance, the

question is what's the foundation for the document, or the

basis on which relevance can be assessed.  So, Mr. Finch has

made a statement about the providence of the document and the

like, I had no notice of the fact this morning this would be

raised yet again.  We are in the process of tracking down

something of the history of what happened to that document and

I'm not prepared to address it today.  But, I think the Court

already has ruled, repeatedly, that there has to be further

foundation before that document can come in.  It's been

proffered, that's the state of the record and at the time I'm

in a position to respond with more information, I'll be anxious

to do so.

MR. FINCH:  With respect to the foundation, I think

there's no dispute, Your Honor, the document is authentic and

there's no dispute that ACC-34 is referenced, or at least the

letters are referenced in the last page of the Halpain file.

That's the foundational argument.

THE COURT:  I don't see a foundation issue.  It seems

that the letters are referenced in the last page of the

document, I think the question is, from the perspective of

whether or not the Zonolite was actually an asbestos containing

product because there were Zonolite products that were not

1  asbestos containing and the issue, I thought, was whether or

2  not the document was not considered in the process of review

3  because of the asbestos containing nature of the product, and

4  the validity of the information in the document itself, and we

5  don't have the witness here who actually excluded that

6  consideration.  We simply don't know why it was not considered.

7        MR. FINCH:  Okay, well, the point is, it wasn't

8  considered, Your Honor, and whatever inferences can be drawn

9  from that document are there to be drawn.

10        THE COURT:  I think Mr. Bernick conceded that for

11  purposes of saying that the information was not considered, he

12  has no problem with agreeing that the information was not

13  considered.  He made that agreement yesterday and I also agree

14  that the information wasn't considered.  Whatever the

15  information was, it wasn't considered.  That's clear.

16        If that's the purpose for the introduction of the

17  document, to say here's a document that wasn't considered,

18  okay, but the truth of the matter within the document is

19  another issue, and as to that, I sustain the objection, right

20  now.  There is no foundation for me with respect to the truth.

21        MR. FINCH:  Well, for the purposes of the document

22  wasn't considered and what the document says on its face, we do

23  offer Exhibit 34.

24        THE COURT:  But that's the problem, because what the

25  document says on its face and why it wasn't considered, you

1  need a foundation for.  The fact that it wasn't considered is

2  clear, everyone agrees to that, but why it wasn't considered,

3  you need a witness to explain.

4         MR. FINCH:  Your Honor, what the document says is

5  also clear.  There's no dispute about what the document says

6  and there's also no dispute about what Exponent's procedures

7  were.  Ms. Anderson testified to that.

8         THE COURT:  That's right.

9         MR. FINCH:  Whatever inferences can be drawn from

10  that or not drawn from that are already -- the facts

11  establishing that are in the record.  We would offer Exhibit 34

12  for the purposes that I stated.

13         THE COURT:  You did offer it yesterday.

14         MR. FINCH:  Yes.

15         THE COURT:  Okay.  And I said that subject to your

16  connecting it up, I would withhold the rulings.  You have the

17  opportunity to get a witness here to explain why it was

18  withheld or why it was not considered.  That's what I mean to

19  say.

20         MR. FINCH:  All right.  I offer it at this time, Your

21  Honor.  Are you sustaining the objection with respect to it?

22         THE COURT:  I am making the same ruling that I made

23  yesterday.  You've given me nothing new.  I agree that the

24  information was not considered, in order to tell me why it was

25  not considered and to have any inferences drawn from that, you

1  need to lay a foundation.

2          MR. FINCH:  We think an adequate foundation has been

3  laid as to what the document says and that it was not

4  considered and that there are inferences that can be drawn from

5  those two facts and, therefore, we offer it for that purpose.

6          THE COURT:  All right.

7          MR. BERNICK:  Your Honor, this really, I think, is

8  not appropriate.  We are now spending yet more time on a matter

9  as to which there was a --

10          MR. FINCH:  I --

11          MR. BERNICK:  Excuse me.  There's a dirth of

12  information yesterday, there's a dirth of information today.

13          COURT CLERK:  Can you move closer to the microphone.

14          MR. BERNICK:  There's a dirth of information today.

15  I've made a representation to the Court about what we're

16  prepared to do.  While Mr. Inselbuch and Mr. Finch have a

17  conversation --

18          THE COURT:  Pardon me, gentlemen, you can't talk over

19  each other.

20          MR. BERNICK:  -- about the instructions for the day,

21  I would like to get on with the witness who we were told was

22  only available this morning, and get it done.  And if they then

23  want to argue about this some more, they can argue about it

24  some more.  I would think that it's relatively simple.  As Your

25  Honor has indicated, we agree that the document was not

**J&J COURT TRANSCRIBERS, INC.**

1  considered.  The circumstances surrounding that are unclear.

2  The probative value of that document already has been addressed

3  in part by Dr. Florence from the stand, as if the document was

4  not considered and should have been considered and that is that

5  he had it before him.  So, that amount of testimony has been

6  taken.

7           With respect to what the document actually says,

8  which is the purpose of the proffer, not as to whether it

9  should have been considered but what the document actually

10 says, there's nothing further we can do because we have no

11 witness who can pin down exactly what that product was, for

12 that matter, exactly what the deposition said.  That was a

13 summary by a lawyer, of a deposition.  We don't have the

14 deposition before the Court.  So there are a variety of facts

15 that are out there and we are wasting time.

16          THE COURT:  All right.  I've already ruled.  To the

17 extent that the offer is that the document was not considered,

18 I accept the offer for that purpose and that purpose only as to

19 why, you need a foundation and to make a connection, and the

20 deposition was not offered and is not part of the record.

21 Exhibit 34, however, is the offer and I've made the rulings

22 with respect to that.

23          Let me make a note so I know what --

24          MR. FINCH:  One final statement, Your Honor, for the

25 record.  The document on its face, 472, says privileged

1  document information and one can draw the conclusion from that

2  that it was pulled out of the file on privilege grounds.

3          MR. BERNICK:  Of course, it can be and, of course,

4  the inference that Mr. Inselbuch is anxious that Mr. Finch draw

5  to the Court is that there's some kind of, you know, secreting

6  of documents, so that they're not divulged and that's exactly

7  the kind of inference that we object to.  This is just an

8  effort to try to create some coloration here, without

9  foundation.  The process of putting these files together, Your

10  Honor, was a process that they initiated because they wanted to

11  conduct discovery with respect to lawyers files.  And they were

12  permitted to conduct that discovery, indeed, with our agreement

13  as to non-waiver.  So, they got those documents, they got them

14  actually a long time ago and the question of whether they

15  connected up with this particular file was apparently something

16  that didn't even dawn on the ACC and the FCR until sometime

17  within the recent past, otherwise, presumably, they would have

18  brought it to the attention of the Court in connection with the

19  expert reports.

20          So, there's a long deep history of who knew what when

21  with respect to this document.  I've instructed our people to

22  put together that history so it's fully before the Court.

23  Until such time as that occurs and there are facts that are

24  known and are ascertainable, I believe it is inappropriate for

25  counsel to make these veiled suggestions, that in some fashion

1  the privilege has been improperly asserted, it was not

2  improperly asserted or improperly maintained.  It was not

3  improperly maintained, indeed, it was specifically preserved

4  when those files were produced over our 408 objection.

5       So, all this stuff, all this -- what we're sitting

6  here talking about this morning is an attempt without

7  foundation to make some color in this record, instead of

8  getting on with the evidence.

9       MR. FINCH:  Your Honor, we've made our position

10  clear, we've offered the document and my understanding is,

11  you're not accepting the document other than to -- for the

12  purposes stated on the record.  At this time, the ACC --

13       THE COURT:  And I'm not accepting a re-offer.  I made

14  rulings yesterday.  I don't understand the process by which a

15  Court makes rulings and then you come back into court and you

16  reargue the same rulings that the Court made yesterday.  I

17  mean, I'm not an appellate court for my own rulings.  So, this

18  isn't a proper trial procedure either, Mr. Finch.

19       MR. FINCH:  Thank you, Your Honor.  At this time,

20  with the consent of the debtors, the Asbestos Claimants

21  Committee calls Dr. Arnold Brody, and my partner Bernard Bailor

22  will be presenting that witness.

23       MR. BERNICK:  The debtor Grace has consented to

24  calling Mr. -- Dr. Brody, excuse me, out of order, to

25  accommodate his schedule.  We are not resting and I'm assuming

Brody - Direct                           24

1  that there's an agreement that by his being called out of

2  order, we're not waiving any kinds of rights as to the

3  admissibility of the evidence or with respect to whether his

4  testimony is within the scope, or whether our case can be

5  complete in the fashion that was originally intended to be

6  completed.

7          MR. FINCH:  That's agreed, Your Honor.  They're not

8  resting and we're not asking them to waive any of their rights.

9          THE COURT:  All right.

10          MR. MULLADY:  Also agreed to by the FCR.

11          THE COURT:  All right, thank you.  Dr. Brody.  If

12  you'd be sworn, sir, please.

13          COURT CLERK:  Please raise your right hand.

14              DR. ARNOLD BRODY, ACC WITNESS, SWORN

15                      DIRECT EXAMINATION

16  BY MR. BAILOR:

17  Q    Good morning, doctor.

18  A    Good morning.

19  Q    Will you please state your full name for the record.

20  A    It is Arnold R. Brody, B-r-o-d-y.

21  Q    And what is your present address?

22  A    It's the North Carolina State University, the Department

23  of Molecular Biomedical Sciences.

24          MR. BAILOR:  Your Honor, we are offering Dr. Brody as

25  our initial witness.  He will explain to the Court the disease

**J&J COURT TRANSCRIBERS, INC.**

Brody - Direct                              25

1 processes related to asbestos, which will serve as a foundation

2 for later testimony.

3          I would also note for the Court that some of his

4 testimony will be somewhat technical in nature and we invite

5 the Court, at any time, to interrupt for any further

6 explanations if things get a little too technical.

7          THE COURT:  All right, thank you.

8 Q    Dr. Brody, what is your present position at North Carolina

9 State University?

10 A    I'm a professor as I say, in the Department of Molecular

11 and Biomedical Sciences.

12 Q    And what does the Department of Molecular and Biomedical

13 Science do?

14 A    Well, we have, mostly basic science research.  We're

15 carrying out work that's supported by the National Institutes

16 of Health to understand a whole variety of different sorts of

17 diseases.

18 Q    And how long have you been at North Carolina State

19 University?

20 A    About a year and a half now.

21          MR. BAILOR:  May I approach, Your Honor?

22          THE COURT:  Yes, sir.

23          THE WITNESS:  I think I've got these, Bernie.

24          MR. BAILOR:  This is updated.

25          THE WITNESS:  Oh, okay.  Updated.

Brody - Direct                                    26

1          THE COURT:  Mr. Bailor, I think I'm going to need

2 one, too.

3          MR. BAILOR:  Oh, I'm sorry.

4          THE WITNESS:  You can have this one, I think I know

5 what's in it.

6          THE COURT:  That's okay, sir.  They may want you to

7 refer to it.

8          MR. BERNICK:  I don't know if that's the updated one

9 or not.

10          MR. BAILOR:  I'm sorry, Your Honor.

11          THE COURT:  That's all right, thank you.

12 Q    Dr. Brody, I've handed you a document that's marked

13 AC/FCR, I believe 274, is that correct?

14 A    271.

15 Q    I'm sorry, 271.  Could you please identify that for the

16 Court?

17 A    Yes.  That's my current curriculum vitae.

18 Q    Okay.  Could we have --

19          THE COURT:  Mr. Bailor, excuse me.

20                        (Pause)

21          MR. BAILOR:  Could we have ACC/FCR-835, first page?

22 Q    Dr. Brody, could you explain to the Court your educational

23 background?

24 A    Sure.  Starting at the bottom of that particular slide,

25 you can see actually, it's a -- I don't know where you got the

**J&J COURT TRANSCRIBERS, INC.**

1  BA, but I got a BS, which is a Bachelor of Science degree at

2  Colorado State and that was in Zoology, which is the study of

3  animals.   Then I went to the University of Illinois where I

4  received a Master of Science degree and that was in vertebrate

5  anatomy, that includes animal and human anatomy, which is how

6  our parts all fit together and how they function.

7           Then I went back to Colorado to do a PhD, doctorate

8  in cell biology and every living thing is made of cells, we

9  need to understand how cells function.   Every disease has a

10 target cell from which that disease develops and cell

11 biologists, like myself study cell biology in that context.

12          The big word there "ultra-structural cytology" means

13 the study of cell using what's called an electron microscope.

14 This is a kind of microscope that magnifies things hundreds of

15 thousands of times and that's the research tool that I was

16 trained in at Colorado State.

17 Q    Could we have the next page, please.   Could you describe

18 for the Court your professional experience?

19 A    Right.   So, actually, after I did my PhD, I did three

20 years of post-doctoral study at Ohio State University.   That's

21 not on there, but a post-doctoral fellowship means that's where

22 one finds out if their temperament and their intelligence is

23 suited for a research laboratory.   That worked out fine and I

24 went to the University of Vermont.

25          So, my first professional assignment, my first

1  academic position was as an assistant professor at the

2  University of Vermont and that would appear down at the bottom

3  of that slide.  I was there for six years and then I went to

4  the National Institute of Environmental Health Sciences and

5  that's what appears at the bottom there, and that was a

6  position with the federal government and I was the head of the

7  lone pathology laboratory there for, as you can see, for 15

8  years.  Rose through the ranks to a level of what was called

9  professor, within the National Institutes of Health

10          I then, in 1993, received an offer to go to the

11  Pathology Department at Tulane University Medical Center in New

12  Orleans.  I was there starting in 1993 and then in 1999 I was

13  promoted to the vice chairman of the department.  So, I was the

14  vice chairman of the Pathology Department in the Medical School

15  at Tulane University from 1999 to 2005, and I say 2005 because

16  that's when Hurricane Katrina came through.  And Hurricane

17  Katrina blew a lot of things out of the city including us.  And

18  it was in 2006, then, that I went to North Carolina State

19  University and accepted a professorship there which is where I

20  currently am doing my work.

21          MR. BAILOR:  Can we have the next slide, please?

22  Q    The next slide indicates some other positions you have

23  held.  Could you please describe these to the Court?

24  A    Well, the top one, that's when I was at the National

25  Institutes of Health, that is the position that I held and that

1 was the head of that group, and pathology is the study of

2 disease, and, of course, pulmonary means the lungs and that's

3 where my focus has been.

4          When I was at Tulane University, I organized what's

5 called a lung biology program, and that was in the Center for

6 Bio-Environmental Research.

7          MR. BAILOR:  Can we have the next page, please?  Q

8      Could you explain your editorial positions?

9 A    So, this is a list of what are called biomedical journals.

10 These are journals that I publish in and these are journals

11 where I've been asked to sit on the editorial boards to review

12 the work of others.  So, whenever I send my work in for

13 publication, it, of course, is reviewed by a series of

14 scientists and editors and by the same token I'm asked to serve

15 in that review capacity as well and this is the list of some of

16 the journals on which I serve on the editorial boards.

17 Q    Now, Dr. Brody, have you done work specifically related to

18 asbestos and its affects on the human body?

19 A    Yes, certainly.  When I was at the University of Vermont,

20 we had a visitor to the department and his name was Dr. Wagner,

21 Chris Wagner, it's W-a-g-n-e-r.  I don't know if you've heard

22 about Dr. Wagner yet in this court, but -- have you, actually?

23 Q    No, we have not, doctor.

24 A    Okay.  So, Dr. Wagner discovered in 1960 that asbestos

25 causes mesothelioma, this cancer that we've heard so much

1  about.  Dr. Wagner saw the work that I was doing, using an

2  electron microscope and he invited me to come and work with him

3  in Wales, in the United Kingdom.  This was a great opportunity

4  for my career and for my family, to go and visit and work with

5  Dr. Wagner.  And he showed me at that time that all of the

6  asbestos varieties cause all of the diseases; asbestosis, lung

7  cancer, mesothelioma.  And he had developed an animal model.

8  He showed that you could use rats to understand human disease

9  and this, of course, scientists across the world use animal

10 models, but this was my first opportunity to use an animal

11 model to understand human disease.

12         So, when I went back to the National Institutes of

13 Health, that's where I started my own research program using

14 these animal models to understand human disease, based on a lot

15 of what I had learned personally from Dr. Wagner.

16 Q    All right.  Have you published in the area of asbestos and

17 disease?

18 A    Yeah, sure.  If you look at my CV I list 146 peer-reviewed

19 papers and 50 book chapters, and of the 146 peer-reviewed

20 papers, probably 100 or so of them deal directly with asbestos.

21 The others relate to lung disease and diseases caused by other

22 agents, other than asbestos.  The 50 book chapters are almost

23 entirely related to asbestos and how asbestos causes disease.

24 Q    Have you previously testified as an expert in court with

25 respect to asbestos-related diseases?

Brody - Direct                                    31

1  A    Many times.  Many times, sure.

2  Q    Can you give us an estimate?

3  A    Well, I had one case in 1989, and I had a few cases in the

4  years thereafter, from '96 or '97 or so, I've been testifying

5  mostly for plaintiffs, I would say about once or twice a month,

6  since '96/'97.  As I say, mostly for plaintiffs, but I've

7  testified for a number of manufacturers, as well.  I heard the

8  word Celotex in court, I testified for the Celotex Corporation

9  in their bankruptcy hearings in Florida.  I've testified for a

10 number of other asbestos manufacturers as well, over the years,

11 but typically I testify for plaintiffs.

12        But my testimony is how asbestos causes disease, of

13 course.

14        MR. BAILOR:  Your Honor, at this point we would

15 tender Dr. Brody as an expert in cellular and molecular biology

16 and how asbestos affects the human body on a cellular and on a

17 molecular level.

18        MR. BERNICK:  No objection.

19        THE COURT:  The witness is accepted as an expert in

20 that field.

21 Q    Dr. Brody, have you prepared a series of slides that will

22 help you explain how asbestos affects the human body?

23 A    I have a series of slides that I've used in many

24 courtrooms before.  They are slides, most of them are pictures

25 that I've taken with various microscopes over the years.  I

Brody - Direct                                          32

1  have used many of these slides in medical school lectures and

2  various universities where I've lectured in this country and

3  around the world, and I put together a group for this

4  courtroom, sure.

5          MR. BAILOR:  Your Honor, Dr. Brody has indicated to

6  me that the presentation would probably be a little clearer and

7  a little more effective if he would be able to borrow the

8  portable mic and go near the screen to point out various things

9  that he will show on the slides.

10          THE COURT:  That's fine.

11          MR. BAILOR:  All right.  Could we get the portable

12  mic?

13                          (Pause)

14          THE WITNESS:  Is it on right now?

15          THE COURT:  Yes.

16          THE WITNESS:  Is that all right, Your Honor?

17          THE COURT:  Yes.  Yes, sir, thank you.

18          THE WITNESS:  May I stand here, then, Your Honor?

19          THE COURT:  Wherever you're comfortable.

20  Q    Okay.  We have put on the screen ACC/FCR Exhibit 274. Can

21  you explain what ACC/FCR 274 is?

22  A    Sure.  So, what I'd like to start with, Your Honor, is

23  this diagram that really just acts as a map.  It gives us a map

24  for where the asbestos diseases develop.

25          So, for example, when you take a breath, the air

1  comes down this tube that we call the trachea or windpipe and

2  you can feel the top of that in your Adams apple, that's the

3  top of your trachea.  You take a breath and the air comes down

4  into these tubes that are called conducting airways because

5  they conduct air down into the lung.  Now, the diseases caused

6  by asbestos as I say, we can use this diagram as a map.  The

7  first disease that you come to is actually found in the

8  airways, in those conducting airways and that's called lung

9  cancer.  So, lung cancer develops in the walls of these tubes.

10          Typically, lung cancer develops in cigarette smokers.

11  If a cigarette smoker is exposed to asbestos, they're much more

12  likely to get the disease than if they smoke alone, or if

13  they're exposed to asbestos alone.  In fact, there's a synergy,

14  there's an actual multiplication of the effect.  So, it's not

15  just adding the risk of getting the lung cancer from smoking

16  and the risk from getting asbestos alone, you multiply that

17  risk.

18          Out in the gas exchange area of the lung, which we'll

19  look at more closely in a minute, is the disease asbestosis.

20  Asbestosis, scar tissue in the lung, from inhaling asbestos.

21          MR. BERNICK:  I'm sorry, could that be indicated

22  again, with the pointer?

23          THE WITNESS:  I'm sorry?

24          THE COURT:  Could you --

25          MR. BERNICK:  Show the little light, I missed the

1  little light.

2           THE WITNESS:  Yes.  That's in the gas exchange area

3  round -- throughout the gas exchange area.

4           MR. BERNICK:  I got it, I got it.

5  A    This black line that runs around the outside of the lung

6  is called the pleura, p-l-e-u-r-a.  A very thin membrane, Saran

7  Wrap thin membrane.  Wraps around the outside the lungs, makes

8  the lungs airtight, like balloons.

9           There are two diseases that develop at the pleura.

10  One is another scar tissue disease, much like asbestosis but

11  it's located just underneath that thin line, that pleura, and

12  its called pleural plaque or pleural fibrosis.  If it's pleural

13  plaque, it's scarring in sort of concise patches.  If it's

14  pleural fibrosis, it's spread around the lung.  But it's scar

15  tissue, it's the result of an injury and just like asbestosis,

16  it's scar tissue from inhaling asbestos.

17           And then there is a layer of cells that line the

18  outside of the lung and those cells are called mesothelial

19  cells.

20           THE COURT:  I'm sorry, one second, please.  Would you

21  show me, please, on the diagram again?

22           THE WITNESS:  Yes.  There's a layer of cells that

23  line the outside of the pleura, it's a complete sheet of cells

24  lining the whole outside of the pleura, those cells are called

25  mesothelial cells.

1          THE COURT:  All right, thank you.

2   A    If somebody has a mesothelioma, it means they have a

3   cancer of those mesothelial cells.

4          Now, I use diagrams a lot when I lecture and I use

5   various diagrams from textbooks, but it's good to be able to

6   see what these things actually look like.  So, if we go to the

7   next slide, I'll be able to show you.  So -- the lighting is

8   not very good in here, but --

9          THE COURT:  We can turn the lights down, if you like.

10         THE WITNESS:  I mean, the slides will show up better,

11  if it's not difficult to do.  Ah, see that?  Brilliant.  Thank

12  you, Your Honor.

13         THE COURT:  All right.  Can everybody -- can you see

14  your notes, do you need to see your notes?

15         MR. BERNICK:  I can see that the doctor was much

16  younger then.

17         THE COURT:  We were asking about notes.

18         THE WITNESS:  We actually noticed.

19         MR. BAILOR:  Weren't we all.

20         THE WITNESS:  That's actually my purview as to

21  whether I was younger or not.

22  A    Actually, I had this microscope right up until Hurricane

23  Katrina, so you can see how long I had this microscope and this

24  is called an electron microscope and I can take a piece of

25  tissue as small as a period at the end of a sentence, or as big

1  as this pointer I'm holding, put that tissue into this door

2  right here, electrons come down from the top of the chamber.

3  Inside this chamber is a vacuum, electrons come down, strike

4  the tissue that I've put inside the chamber and an image then

5  is recreated.  An image of the surface of the sample is

6  recreated in front of me.  And just off of the screen is a

7  camera, so I can take a permanent image of whatever it is I'm

8  looking at.

9          So, if you back up to the previous slide for a

10 second, and I cut a piece of tissue out of the lung and you can

11 see the pleura running over the top, and you can see the

12 airways going up into the lung, and I cut this out, and I put

13 it into the microscope -- go ahead -- and I take a picture of

14 it -- next slide -- this is what your lung looks like.  Your

15 lung looks like a sponge, you can see the airways going up into

16 the lung, this is that very thin pleura that I was telling you

17 about that runs over the surface of the lung and now, of

18 course, it's cut across so you can see what it looks like

19 inside.  When you take a breath, the air comes into these

20 airways, spreads out into the small airspaces that we have and

21 this is where we exchange oxygen and carbon dioxide.  I'll talk

22 about that just a bit more in a minute.

23         Lung cancer, again, develops in the walls of these

24 tubes, asbestosis out here in the gas exchange area, pleural

25 plaque, pleural fibrosis, just under the pleura, and

1  mesothelioma out here on the surface and the mesothelial cells

2  that line the outside of the lung.

3        Now, I'd like to spend just a minute talking about a

4  couple of the defense mechanisms that we have.  We all walk

5  around the streets of Pittsburgh or wherever we are, we face

6  bacteria, pollen grain, various kinds of dusts, a few asbestos

7  fibers in the air and we have to clear those from the lung.

8  So, we have a very effective set of defense mechanisms that

9  help us do that, and I'll show you a little bit about them.

10       Our defense mechanisms really start with these nose

11 hairs that we have and the moisture in the back of our throats,

12 that's all part of the defense against inhaled particles.  If

13 we look at the surface of our airways, anywhere along the

14 surface of our airways, and I focus the microscope anywhere

15 along our airways, and I'm going to fill the screen with what's

16 in the red spot.  So, in other words, I'm going to -- I didn't

17 ask you to do that, would you back up for a second.  Thanks for

18 anticipating, though.

19       So, what I want you to know is that the screen is

20 going to be filled with what's in the red spot, and it could be

21 anywhere along any of our conducting airways.  Okay, so thank

22 you, please go to the next slide.  So, I'm filling the screen

23 now and you see this says human bronchial and a bronchial is a

24 small airway and our airways are lined by these little hairlike

25 structures, they're not hairs at all, they're extensions of the

1   cell surface and these little hairs are called cilia and

2   they're constantly beating in a wavelike synchronous fashion

3   so that if something lands on the surface of our cilia, it'll

4   get swept up to our mouth where we can swallow it or spit it

5   out.

6           Now, notice that there are some cells here that do

7   not have cilia and those cells make mucus, and unless you have

8   a cold or you're a heavy smoker, or you have some airway

9   irritation like I do from something, you don't think much about

10  mucus, but your airways are constantly making mucus, the cilia

11  are constantly sweeping it up to your mouth where you can

12  swallow it or spit it out.

13          Now, there's a size marker in the lower right hand

14  corner, the microscope is always telling us how big and small

15  these things are.  So, this bar says 10, with a little sign

16  there that means microns, so I want you to understand how big a

17  micron is, because at magnifications of thousands of times,

18  it's easy to see 10 microns, but you need to understand how big

19  a micron is.  So, if I can do that for you, if you take your

20  thumb and your forefinger and you make a little space that you

21  can just barely see through with your naked eye, you've made

22  just about one millimeter.  Now, if you take that millimeter

23  and divide it one thousand times, you've made one thousands

24  microns.  Okay?  So, that means you can fit one thousand

25  microns into a millimeter and you can just barely see one

1 thousand microns.  Now, that means, with your naked eye you

2 can't see 10 microns, you need a microscope to, of course,

3 magnify it many thousands of times.

4        So, whenever we have an electron micrograph like this

5 and we want to know how big or small something is, we take in

6 our minds eye, we take this little bar and stand it up next to

7 a cilium and you will see that the cilia are about eight

8 microns long.  And that's a typical human cilium and that's a

9 typical rat cilium.  Our cilia and the cilia of rats and mice

10 and guinea pigs and horses are all working the same and doing

11 the same thing.

12        And I also ought to point out now that if a rat or a

13 mouse were running about around here, you'd be doing exactly

14 what you and I are doing, inhaling and exhaling the room air,

15 using exactly these same structures that I'm talking about.

16        Okay.  If you'd back up for a second please.  I'm

17 going to now go past this structure of mucus and cilia and all

18 of our airways are very much the same, we call that the muco --

19 for mucus -- ciliary escalator, because it escalates things up

20 to our mouth.  So, that whole defense combination we call the

21 mucociliary escalator.  So, I'm going to go back past the

22 mucociliary escalator, out into the gas exchange area of the

23 lung, because many fibers go right past the escalator and land

24 out here in the gas exchange area of the lung, so I want to

25 show you the cells that interact with the fibers.

1          When I started my work, we knew that asbestos caused

2    all these diseases.  I've told you I worked with Dr. Wagner,

3    but we didn't know answers to simple questions like, well,

4    where did the fibers go?  We know they go in the lung but where

5    in the lung do they go, where are they deposited?  And then how

6    do the fibers interact with the various cells of the lung, and

7    then when they interact with them, how do they injure those

8    cells of the lung?  And those are the kinds of questions that

9    I've been asking over the years.  At that level.

10         Now, today, I'm working at the molecular level.  That

11   means the genetic level, the genes that drive these diseases.

12   So, let's go, then, out into the gas exchange area and so,

13   please, go ahead then, next slide, we'll go past the escalator,

14   next slide, and out into the gas exchange.  You can see this is

15   the end of one of those airways, and we're moving now out into

16   the gas exchange area and we're looking at a few of the

17   hundreds of millions of airspaces that make up our lungs.  Each

18   one of these little airspaces, I like for instructional

19   purposes, like to think of as individual rooms.  Sort of like

20   this room without a ceiling where it has the walls around it.

21   It has a carpet lining the floor and we'll see that we have a

22   kind of cell that lines our floors of our airspaces just like a

23   carpet.  Notice that when I opened some of these airspaces up

24   -- and you maybe can see it better on your screen -- I opened

25   up some little holes in the walls and you can see these little

1 holes in the walls, run through the walls, those are called

2 capillaries; small blood vessels.  All the blood in our bodies

3 has to run through our lungs.  This is where we're exchanging

4 oxygen and carbon dioxide, right in these spaces.  So you take

5 a breath, the air from the room with about 20 percent oxygen

6 goes flowing into these airspaces, the blood that's running

7 through the walls picks up the oxygen from the room air and

8 gives out the carbon dioxide that we've made in our muscles and

9 our brain and we exhale.  And, of course, that's going on all

10 the time.

11        If you think about what's going on in the floors and

12 the walls, if you were to cut through the floors and the walls

13 you'd see the plumbing and you'd see the electricity and you'd

14 see all the conduits running through the floors and the walls,

15 and that's exactly the same as what's going on in the walls of

16 these airspaces.  The blood is running through these small

17 channels, there are nerve endings running through, there is

18 fluid flowing through these walls, and it's a constant process

19 that is part of our normal function.

20        Now, of course, this is all normal, I have just a

21 couple more slides in normal and then I'll show you what

22 happens when asbestos gets in there.

23        So, the next slide, I'm going to take us into a

24 single human airspace.  And basically what you're going to be

25 doing is kind of hanging over the room, no ceiling as I say,

1 and looking down on the carpet, on the rug.  And the carpet in

2 our lungs is made up of a series of, I guess sort of like

3 carpet squares, different individual cells, they're not square

4 of course, but let me show you what that looks like.  So, now

5 we're looking into a single human airspace.  It could be any

6 one of our airspaces.  And I'm outlining for you here a single

7 cell that makes up that carpet, but nature, as I say, doesn't

8 make squares very well, it makes smooth surfaces, so this would

9 be like a carpet oval next to another big oddly shaped cell and

10 then another one over here and another one, so we have this

11 patchwork of hundreds of millions of cells.

12         Now, just to give you a size perspective, from this

13 side of the cell to this side of a cell, is about 40 microns.

14 So, obviously, we can't see with our naked eye the individual

15 cells that make up our airspaces.  We have to have microscopes

16 to be able to see them.

17         Now, these cells that are sitting here on the floor,

18 all of these cells that line our airspaces are called

19 epithelial cells, epithelial, e-p-i-t-h-e-l-i-a-l, epithelial

20 cells cover surfaces.  So, your skin is an epitheliam, we call

21 it an epidermis.  But our skin is an epitheliam, the cells that

22 cover our airspaces are epithelial cells.  So, we have these

23 big flat epithelial cells that allow oxygen and carbon dioxide

24 to move in and out of them as the blood transmits the gases

25 from the blood that's flowing under.  Then we have these

1  epithelial cells, and you can see these cells have sort of like

2  bumps all over them and they're kind of short and squatty.

3  These epithelial cells provide a repair mechanism.  So, if the

4  big flat cells get injured by asbestos, or infection or for any

5  reason, these smaller cells with the bumps start to divide and

6  take their place.  So, we have this very effective repair

7  mechanism in each of our airspaces.

8         Now, I have one more cell to show you that's normal

9  and that cell is called a macrophage, m-a-c-r-o-p-h-a-g-e, one

10 word, macrophage; "macro" means big and "phage" means eater.

11 These cells are the big eaters of the lung.  They patrol our

12 airspace surfaces.  We humans have, and rats and mice have

13 about one or two of these macrophages sitting in our airspaces

14 under normal conditions.  Let's see what they look like.  I'm

15 going to focus the microscope right down on the carpet and

16 remember the cell with the bumps all over it -- go ahead to the

17 next slide -- and now there's the cell with the bumps all over

18 it.  So, you can see that I've magnified this again, here's the

19 carpet down here, and now there are two other actors.  There's

20 this cell that's kind of ruffled and not going anywhere, then

21 there's this cell with the tail end and a front end and I know

22 it's going in this direction because it has these, what are

23 called false feed or pseudo pods sticking out in front.

24         Now, I caught this cell in the act when it was going

25 after this pollen grain right here.  Now, this airspace once

1 belonged to somebody who was killed in a motorcycle accident.

2 I was on the medical examiner's autopsy call and I went in to

3 prepare this person's lung so it could be studied with an

4 electron microscope and as I was going from airspace to

5 airspace and taking various pictures, I saw these cells, these

6 macrophages, guarding, essentially, our airspace surfaces.  We

7 don't want any kind of toxic particles on our gas exchange

8 surfaces.  So, these cells can detect the presence, through

9 chemical signals, the presence of foreign agents.  In my

10 laboratory we discovered the chemical signal that attracts

11 macrophages to asbestos fibers.  And I'll show you that the

12 macrophages are constantly trying to clean up the asbestos that

13 lands down here on the airspace surfaces.

14         And so you've seen all the cells, now you need to see

15 it to understand what happens when asbestos gets into the lung

16 and so, therefore, we can go to the next slide and talk about

17 asbestos.

18         Now, you can see this says chrysotile asbestos fiber

19 bundle.  And it's a bundle because that means that there are a

20 lot of fibers stuck together, in a bundle.  And let's look at

21 the size marker so you get a feel for that.  Down in the lower

22 right-hand corner, this little marker right here, represents

23 1.0 microns.  So, this is a one micron bar and you can see one

24 micron pretty easily because I've magnified it 4,300 times.

25 So, it's easy to see one micron.

1          Now, I'm showing you chrysotile, but I mean, I've

2    used amosite, chrysitolite, chrysotile in my work, I use mostly

3    chrysotile because it's what's used most in the world.  It's

4    about 90, 95 percent of the world's use has been chrysotile.

5    All of the asbestos varieties cause all of the asbestos-induced

6    diseases.

7          When I started working with Dr. Wagner, he was using

8    chrysotile in his model systems and so -- and he showed me the

9    design of the systems to be used to make the aerosols for the

10   animal experiments.  So, I basically continued that process

11   right through to today.  But be sure we understand, I've used

12   amosite and chrysitolite in my work as well, but I'm going to

13   show you what's going on using chrysotile as an example.

14         Now, chrysotile comes in an infinite variety of

15   shapes and sizes and you can see that there are some short

16   fibers and long fibers.  If you were to put the micron bar on

17   this fiber, it would probably be about seven or eight microns

18   long.  While these fibers can go off endlessly, hundreds of

19   microns long.  Some of these fibers are straight and some are

20   curly and some are thin, extraordinarily thin.  You can see

21   this one passing right through the micron bar, is one-tenth of

22   one micron.  So, my point is, that there is an infinite variety

23   of shapes and sizes and it's constantly changing.  As the

24   fibers fracture off of the bundles, they become smaller and

25   smaller.

1           Now, if all of the fibers were to remain bound in a

2    bundle, and the light were just right and it were floating by,

3    it would look like a speck of dust, these bundles.  If it all

4    remained as a bundle, it wouldn't get past the conducting

5    airways, too big.  If you can see it with your naked eye, it's

6    too big to get past the conducting airways.  It's these fibers

7    that are fracturing off of the bundles, those are the ones that

8    are getting down into the areas of the lung where the asbestos

9    diseases develop.

10           And what I'm going to show you in the next couple of

11   slides are some slides from a couple of experiments of the many

12   hundreds that I've done over the years, where I've taken rats

13   and exposed them for a very brief time and when I say brief, I

14   mean I put them in chambers about six feet high, four feet

15   wide, and these are exposure chambers in which the animals are

16   placed in cages in the chamber, a generator, an asbestos

17   generator at the top of the chamber makes it very dusty inside

18   the chamber.  The animals then can inhale the dust for an hour,

19   for days, or weeks or months, whatever I decide the time should

20   be.  I can expose them for a single hour and take them out of

21   the chamber right after that, give the animals an overdose of

22   anesthetic, of course, the animals don't wake up from that, and

23   then I can show you exactly where fibers land in the first hour

24   of exposure.

25           I can take another group of animals and look at them

1  hours later, days later, weeks later or months later, and again

2  that's what a number of my papers are all about, is explaining

3  this process.  I wrote a chapter in a book called, "A Month in

4  the Life of an Inhaled Asbestos Fiber".  So, I mean it's

5  tongue-in-cheek, but that's how you get to follow this process.

6  You, obviously, cannot do that in people.

7          By the time people come to the clinic it's typically

8  decades after they've been exposed, and so you don't get to

9  follow the process in people, you have to follow it in the

10  accepted animal models.  And when I say accepted animal models,

11  that's an important point because the work that I've described

12  is in the open medical literature, it's been vetted by my

13  colleagues and my peers and it passes the muster of the

14  National Institutes of Health because all of my work is

15  supported by the National Institutes of Health to do this work

16  on understanding the disease sufficiently to develop

17  treatments.  There are no effective treatments for any of the

18  asbestos-related diseases.

19          So, let's go to the next slide and look at one of

20  these model systems that I've been using.  Now, this is the

21  lung of a rat.  This is the end of the airway where it opens

22  into the gas exchange area, and this, of course, is one of

23  millions of these spots around the lung.  I'm just showing you

24  one for this purpose.  And I'm going to focus the microscope

25  right on this spot, immediately after a single hour of

1    exposure.  Now, it's not my goal to bring these animals to the

2    clinic.  If I keep exposing these animals for months and years,

3    they will eventually come to the clinic, all of them will get

4    asbestosis, some of them will get lung cancer and fewer of them

5    will get mesothelioma.  That's been shown, that's been written

6    over and over again.  That's not my goal.  I couldn't get

7    funded to do that.  What I had to do, and what I've done, is

8    sort out the processes at the cellular and molecular level, the

9    genetic level.

10          But, let's start by looking at what happens and then

11   we'll go to the molecular level.  So, I'm going to focus on

12   this spot right here immediately after a single hour of

13   exposure.  So, I focus the microscope right here, take a

14   picture -- next slide -- and there it is now.  And remember the

15   fibers that we saw sitting out on the dish, some of them were

16   curly, some of them were straight, some of them were long, you

17   can see a long fiber here.  And this is a 10 micron bar.  So,

18   you can see this fiber is about 10 microns, this one is

19   probably 20 microns.  In other words, there is a size

20   restricted group of fibers sitting down on the carpet.

21   Remember that epithelial carpet I showed you in the human

22   airspace.  Same thing.   This is now the rat, here are the

23   capillaries, those tubes running underneath the carpet, and you

24   can see the asbestos fibers sitting on the carpet.

25          Now, it's one of those things where we'd expose the

1  animals now and I'm working late at night in the microscope

2  room and I'm going from airspace to airspace after this

3  exposure and I said, I don't think anybody has ever seen this

4  before, and what I'm saying is that what I saw was that the sum

5  proportion of the fibers were being covered by the carpet

6  cells.  These cells, these epithelial cells that make up this

7  carpet that covers all of our airspaces were actively coming up

8  over the fibers and shoving them under the carpet.

9          Now, I'm telling you this in two minutes and, of

10  course, it took me years to work all this out and prove it to

11  my colleagues that this was happening and write a series of

12  papers to prove that this was the case, but what's happening

13  is, you can in fact see some of the fibers disappearing here,

14  you can see others disappearing here, and if we go to the next

15  slide, please, you'll see it even more dramatically, you can

16  see there's a fiber here that's partway out, this of course is

17  another animal, another experiment, there's an airspace here,

18  another airspace.  And there's a little bit of a fiber sticking

19  out, there's a small bundle of fibers here.  There are a group

20  of fibers here.  Some are covered by the epithelium and some

21  you can see.  There's a fiber here that's completely covered by

22  the epithelium, all you can see is its electron shadow.

23          Now, perhaps you've noticed some of these structures

24  here that look like doughnuts.  These are your red blood cells.

25  Red blood cells in rats and mice and people and every other air

1  breathing mammal, look like this, they look like doughnuts

2  because they have a depression in the center, not a hole but a

3  depression, and red blood cells from this side of the cell to

4  this side of the cell are about five microns across.  That's

5  our red blood cells, rat, mice, again air breathing mammals,

6  this is the size of the red blood cell that works.  And so,

7  it's been conserved through evolution and we can see those red

8  blood cells here as they are marching through this capillary

9  when I caught them flowing through the capillary and you can

10 see another group of red blood cells flowing down this way, you

11 can see that some of the fibers are being taken up and others

12 are sitting here and the macrophages will be coming along and

13 picking up these fibers, and the point now that I want to make

14 is that this is a very dynamic process.  All we can do is look

15 at snapshots of this over time and fill in the spaces and work

16 out the history.

17         What you have to recall, if you will, is that every

18 time there is an exposure, every time a person inhales asbestos

19 dust, some proportion of those fibers can land in the airways,

20 those ciliated airways.  Some proportion of those fibers get

21 down on the carpet as everyone can see.  Some proportion of

22 those fibers get picked up by the carpet cells and shoved under

23 the carpet.  And then the story goes on because some proportion

24 of those then can get to the pleura and cause mesothelioma.

25         So, the fibers that land in the airways are the ones

1  that contribute to participate in lung cancer formation.  The

2  fibers that you see here that are getting picked up and shoving

3  under the carpet and that remain in that area under the carpet,

4  those are the fibers that contribute to the development of

5  asbestosis.

6          The fibers that are transported beyond these sites

7  that I'm going to go to next, are the ones that contribute to

8  mesothelioma.  Okay?  And so, every time there's an exposure,

9  we have this proportional distribution of the fibers into the

10  different compartments of the lung.

11          Now, I didn't tell you about another compartment,

12  this compartment where these fibers are being transported to,

13  underneath the carpet, I told you there's blood there, but I

14  neglected to tell you that there's also what's called

15  connective tissue there.  Now, if you take your skin and you

16  pinch it, hopefully, it'll pop back.  It pops back because we

17  have this elastic connective tissue that runs through our

18  bodies, and gives us this flexibility and strength.  This same

19  elastic tissue runs through the walls of our airspaces.

20          So, when you take a breath the airspaces expand, when

21  you release the breath, the elastic tissue brings that space

22  back to its normal size.

23          In a person who has asbestosis, what happens is,

24  these fibers that are being inserted under the carpet, are

25  causing injury to the surrounding cells.  These cells that you

1  see here are being injured.  We've shown that, other

2  investigators have demonstrated that, these cells are being

3  injured.  We know that because they start to divide, they leak,

4  they allow fluids to come into the airspaces.  When there's

5  injury we make scar tissue.  If you took asbestos and shoved it

6  under your skin, you'd get a scar under your skin, because of

7  the injury that's been produced by the asbestos fibers.  Same

8  thing in the walls of the airspaces.  When there's injury in a

9  particular area, there's a cell called a fibroblast,

10 f-i-b-r-o-b-l-a-s-t.  Fibroblasts make connective tissue.  They

11 make the normal connective tissue that we all need, and those

12 cells make scar tissue in the face of injury.

13         So, when you have multiple exposures over time; now

14 for asbestosis typically requires long term, occupational

15 exposure, high levels of exposure, typically for decades, to

16 bring a person to the clinic with asbestosis.

17         Asbestosis starts as soon as those fibers start

18 making scar tissue, that's called microscopic asbestosis and

19 that's what the animals are getting because I only give them a

20 very brief exposure, it's enough for them to start getting a

21 scar tissue response, but as I say I don't bring them to the

22 end stage.  But, a person who has asbestosis, that means

23 there's been multiple microscopic injuries time after time

24 after time, which our body responds to by making scar issue and

25 all that adds up to this disease asbestosis.

1           And I'll show you what that looks like in a minute.

2 But, the point I want to make here is, I want to get the fibers

3 now, the proportion of fibers, out of this area to the pleura

4 because it's the fibers that get to the pleura that, of course,

5 cause mesothelioma.

6           Now, you see that the fibers are moving into what's

7 called the fluid flow of the lung.  You can see some of these

8 fibers actually getting into the capillaries and I've

9 demonstrated that, other investigators have shown that fibers

10 get into the blood flow, you can actually see that happening

11 here, but we have another kind of fluid flow in the lung.  And

12 that fluid flow in the lung is called lymph, l-y-m-p-h.  And

13 maybe you've heard -- I'm sure you've heard of the lymph nodes,

14 and lymph fluids.  Lymph is a clear fluid that runs head to toe

15 in our bodies.  Wherever blood flows there is lymph flowing

16 around the blood flow.  And there are two main functions for

17 lymph flow.  One is to carry cells of the immune system and

18 that's why if you're getting a cold or you're fighting an

19 infection you might feel your armpits swell, or the side of

20 your neck get uncomfortable, because the lymph that's flowing

21 there is being filtered by lymph nodes that are collecting

22 inflammatory cells, cells that are fighting the infection and

23 so, you feel it.

24           The other function is to help control pressure in our

25 blood flow system.  So, you can actually move fluids between

1  the blood and the lymph and that's a very important function.

2          But, going back to the first function of carrying

3  cells of the immune system, not only does it carry cells of the

4  immune system, but it turns out that lymph can carry asbestos

5  fibers.  Now, how do we know that?

6          We know that because some investigators, not me, but

7  some investigators said, if in fact, there's asbestos in lymph

8  fluid, then we should be able to find it in the lymph notes,

9  these filters, and, in fact, that's what they did.  They found

10 lymph and let's -- if we go to the next slide, I'll show you

11 what the lymph flow in the lung looks like.  This is the

12 pattern of lymph flow in the lung.  And let me just explain,

13 this is -- I don't know if you're familiar with Netter

14 diagrams, Your Honor.

15         THE COURT:  No.

16         THE WITNESS:  Okay.  So, this is Dr. Netter, you can

17 see in the lower right-hand corner, Dr. Netter is an M.D., who

18 fortunately for the rest of us decided to be a biomedical

19 illustrator and what he's done is, he's given us atlases of the

20 human body in health and disease, and I'll use a few Netter

21 diagrams as I'm doing this.  This is the first one and this is

22 the lymphatic pathways in the lung and these very fine vessels

23 that you see represent part of the lymphatic flow that ends at

24 the pleura.  You see this network that ends at the pleura and

25 this network as a result of these very fine vessels that are

1   flowing out towards the pleura.

2           Now, if you'll back up to the previous slide, this is

3   where the lymphatic flow in the lung starts, at the walls of

4   the airspaces.  In the walls of the airspaces, you can see

5   there are capillaries, and then surrounding the capillaries is

6   this fluid flow that collects into these vessels that you see

7   in the next slide, please.

8           Okay.  So, it's sort of like these are -- what Dr.

9   Netter is showing you are the collecting tubes that carry the

10  lymph to the pleura.  Okay.  Now, these little green blobs that

11  you see surrounding the lung, those are some of the lymph nodes

12  that we have.  And as I say, investigators have found asbestos

13  collecting in these lymph nodes because these are fibers that

14  have collected in the lymph fluid and I showed you how those

15  fibers first get there, because they land on the surface, get

16  picked up by the lymph.

17          Interestingly enough, we have these lymph nodes in

18  our peritoneal cavity which holds, of course, our stomach and

19  our intestines, they're call mesenteric lymph nodes and

20  investigators have found asbestos fibers in the mesenteric

21  lymph nodes because they're part of this circulation.  In other

22  words, all of the lymphatic pathways are tied together in some

23  way or another, just like our vascular, our blood system.

24          Okay.  Now, what I'm going to do now is, again, let

25  me remind you, so we have lung cancer in the walls of the

1  airways, we have asbestosis out here in the gas exchange and

2  mesothelioma out here, and now there's one more diagram I want

3  to show you regarding transport -- next slide please.  So, this

4  is a diagram that an investigator that I worked with for years,

5  he was the chairman of the Pathology Department at Vermont and

6  I knew him then, he put together a chapter to help explain this

7  concept of migration of fibers to the pleura.  So, he has this

8  area now in diagram that I've been describing to you, he has a

9  fiber coming in, inhaled, the fiber lands in the airspaces like

10  I showed you, and then you see he's got this little fiber, just

11  the end of it sticking out, and if you back up two more slides,

12  remember this picture I took right here with the fibers

13  sticking out, now the investigator didn't mean to draw this

14  particular fiber, it just so happens we're talking about

15  exactly the same thing.  So, if you go ahead, then, to the one

16  we had, and so now he's got the fiber here and he says

17  lymphatic fiber transport to the pleura and he's got now the

18  channel showing the fiber transport to the pleura and he's

19  showing a normal mesothelium, that means there's a single layer

20  of cells and then he has these various reactions that we're

21  going to talk about in just a second, how these fibers then can

22  cause mesothelioma out here.

23        Okay.  Next slide.  Okay -- skip that one, please.

24  Okay.  So, I told you the macrophages are trying to pick up

25  whatever lands there, you can see there are one, two, three,

1  four, five macrophages, they're sharing fibers with one

2  another, this is a 10 micron bar and this is a constant.  I

3  mean, we've done studies where macrophages have been collected

4  from the lungs of workers decades after they've been exposed

5  and you can still find macrophages with asbestos fibers in

6  them, because the macrophages are constantly trying to clean

7  out what doesn't belong in the lung.  And these macrophages can

8  actually live, not only in the airspace, but in the spaces

9  underneath the epithelium, they move through that connective

10  tissue space, pick up fibers, carry the fibers up and out of

11  the lung.

12          Okay, next.  Now, this is the clinical picture, sort

13  of the end stage, asbestos and pleural fibrosis and I just

14  wanted to show you that for a minute.  So, this is decades

15  after long-term occupational exposure, such that you can see

16  the scar tissue, this white material in the background, you can

17  see the scar tissue with your naked eye.  If I took a little

18  piece of lung up here where you cannot see the scar tissue with

19  your naked eye and put it under the microscope, I'd show you

20  scar tissue that you couldn't even see with an X-ray.  But the

21  point is, there are all different levels of scar tissue and

22  it's happening in varying points around the body, at different

23  times and then finally it can bring some people to the clinic

24  with clinical asbestosis and pleural fibrosis.  Now, you see

25  that means there's also -- this is not cancer out here at the

1 pleura, this is scar tissue at the pleura.

2        Okay, next.  Let's skip this one, it's the same

3 thing.  Okay.  Now, this is lung cancer.  And, this is, again,

4 a Netter diagram.  And this is the cancer and it is confined at

5 this point mostly to the central regions of the lung which is

6 where they start, because they start as I told you in the walls

7 of the airspaces -- I'm sorry, the airways, the conducting

8 airways.

9        Now, we always talk about target cells for disease.

10 Every disease has a target cell.  The target cell for

11 asbestosis is the fibroblast, that cell that makes scar tissue.

12 That's a pretty simple concept to understand.  If that cell is

13 surrounded by injury or it has injured itself, it makes scar

14 tissue; asbestosis, if it's caused by asbestos.

15        The target cell for lung cancer are those cells that

16 make up the mucociliary escalator.  Now, you saw them early on

17 this morning, I showed you the cells that make up the

18 mucociliary escalator.

19        The cells that make mucus cells are the target cell

20 for lung cancer, and I'm going to explain a bit more about that

21 in a minute.  The target cell for mesothelioma is out here on

22 the surface of the pleura.  Now, this is a normal pleura, this

23 is the way a pleura should look, thin, shiny, Saran Wrap thin,

24 to be moist, it has to be moist so that when a person breathes,

25 when we breathe it rubs against the inside of our chest cavity

1  where there's another layer of pleura just inside of our ribs,

2  and as long as everything is fine we don't pay any attention to

3  that because it's moist and it's lubricated and that is what is

4  supposed to be going on all the time.  And as I say, this is a

5  normal pleura.  Okay, so this cancer developed from and I'm

6  going to say now a single cell, and I'll explain how that works

7  in just a minute.

8          All right.  Let's go to the next slide.  Now, this is

9  a mesothelioma.  This is the Netter diagram.  You can actually

10 see Dr. Netter's name kind of faded over here.  Now, here the

11 lung is quite normal, and that's not at all unusual in

12 mesotheliomas, and I'll explain that in a second.  But, here

13 you can see the pleura is dramatically thickened, and now it's

14 dramatically thickened with cancer cells.  And the reason I say

15 it's not unusual to see a mesothelioma with a normal lung --

16 with a normal appearing lung is, because many cases of

17 mesothelioma develop from very brief exposures, low dose

18 exposures, and so you don't see a lot of other asbestos-induced

19 diseases at the same time.

20          You may or may not, I mean, you know, if a -- you

21 know, these are all dose-response diseases.  The more one is

22 exposed, the more likely they are to get a disease.  If a

23 person's in a setting where they can get asbestosis, they're

24 more likely to get mesothelioma, but that doesn't mean if you

25 don't have these other diseases, you cannot get mesothelioma

1  from asbestos.  That's not true.

2          Okay, so now what I'm going to do for the rest of the

3  time -- and I have like five or six more slides -- is I want to

4  explain how asbestos acts as a carcinogen, a cancer causing

5  agent, and this is true both for lung cancer and mesothelioma.

6  The concepts are the same.  The target cell is different.  The

7  concept is the same.

8          Okay.  Let's go to the next slide, please, and I'll

9  do that.  Now, this is a -- the cover of a proceedings of a

10 meeting that I was at a few years ago.  The topic of the

11 meeting was how fibers cause cancer, carcino, cancer, genesis,

12 formation, carcinogenesis; big word for cancer formation.  As I

13 say, I gave a talk about some of the stuff I've been telling

14 you about today, and I showed you that cells can pick up

15 fibers.  You already saw that.  But we haven't talked about and

16 you cannot talk about carcinogenesis unless you talk about the

17 molecular aspects, because that means your genes.  Cancer is a

18 genetic disease, so I'm going to give you the simplest

19 definition of cancer, and then I'll come back and explain.

20         Cancer is the loss of control of cell growth.  Let me

21 say it again, so we'd be sure we have it.  Cancer is the loss

22 of control of cell growth.  If I took a piece of your skin and

23 I put it under a microscope, I can predict that about ten

24 percent of your skin cells are growing, because you're always

25 losing skin scales, and you have to replace them all the time.

Brody - Direct                                      61

1 So you have about ten percent of your skin cells are growing to
2 replace -- normal replacement.

3        Your GI tract.  You're always moving things through.
4 We're replacing about 40 -- 50 percent of our cells at any
5 given point in time in our GI tract; normal replacement.  Our
6 lung and our liver, one percent, a very low background rate of
7 replacement.  We don't expect to replace a lot of our lung and
8 our liver cells at a rapid rate normally.

9        If you fall down and scrape your skin away, you'll
10 get a very rapid replacement of that skin.  Forty percent or so
11 -- or 30 percent of those cells around the wound start to
12 divide to make new skin cells, then when the wound is closed,
13 they go back to the normal rate.  That's all -- everything I've
14 told you about cell growth, that's all normal.  That's what's
15 supposed to be happening.

16        Humans have about 20,000 or so genes.  We have about
17 20,000 genes, and you can see what a few of them do -- a few of
18 our genes do.  You just look at different hair color, eye
19 color, skin color, stature, all those things that are
20 controlled by genes.  You can see that that's just what a few
21 of our genes do.  Most of our genes -- most of our gene
22 products you don't get to see.  We make liver enzymes all the
23 time.  We're making various enzymes to protect ourselves
24 against oxygen radicals.  We have a whole set of genes making
25 this fantastic waterproof skin that we have.  So we have a

**J&J COURT TRANSCRIBERS, INC.**

Brody - Direct                                    62

1  large series of genes and, of course, a lot of functions.  All

2  of our bodily functions are controlled by genes including cell

3  growth.

4         So we have about 100 of those 20,000 some odd genes

5  -- 100 of them are dedicated to controlling cell growth.  Some

6  of them have pretty obvious names like tumor suppressor genes.

7  And I'll say a little bit more about those in a minute.  We

8  have a whole series of growth control genes, as I say, about

9  100 of them.  And I told you that cancer is the loss of the

10 control of cell growth.

11        Cancer develops when there are errors or mistakes in

12 a set of growth control genes.  Okay?  So cancer is a loss of

13 control of cell growth.  Cancer develops when there are errors,

14 mutations, mistakes, whatever you want to call them, in a set

15 of genes -- not one gene, not two, not -- three is not enough.

16 Four is probably not enough.  I wish I could tell you exactly

17 how many it takes, and I wish I could tell you just which ones

18 it takes, and that, I'll tell you now, is one of the biggest

19 problems we have in cancer biology today is the fact that in

20 any given individual it takes a different set of genes to be

21 injured for that person to get a cancer.  That's why there's no

22 set standard I can give you for how many asbestos fibers it

23 takes, how many separate errors it takes.  Nobody can do that,

24 because it's different for different people.

25        What we do know is that asbestos is a carcinogen.

**J&J COURT TRANSCRIBERS, INC.**

1  That means it's a cancer causing agent.  That means it can

2  cause errors in genes that control cell growth.  It also --

3  it's a complete carcinogen.  You don't need any other agents.

4  Now, it happens to work very well, unfortunately, with

5  cigarette smoke, which has a whole other bunch of carcinogens

6  in it, so there it can be a co-carcinogen, but asbestos in

7  forming mesothelioma is a complete carcinogen.  You don't need

8  anything else.

9           Okay, so in the rest of the time today I want to show

10 you how asbestos acts as a carcinogen, as a cancer causing

11 agent.  And one of the ways we do that is by taking cells out

12 of the body.  We can take cells out of humans, animals, put

13 them in a dish, give them the right nutrients, and those cells

14 will grow and multiply.  You get millions of cells in a dish,

15 and then you can add the carcinogens or the agent you want to

16 test.  You can just add to those cells and see what happens and

17 follow the molecular biology of those cells.

18          On the cover of this proceedings there are two cells,

19 and you can see there's one cell here, and you can see there's

20 another cell over here.  And we've added fibers to these cells,

21 and you can see that there's a long fiber and some short

22 fibers, and those fibers are collected around the center circle

23 in the cell.  That center circle is called the nucleus, and the

24 nucleus of our cells contains all of our DNA.  DNA, of course,

25 means our genetic material.

1        Notice how the fibers are excluded from the nucleus,

2   and that's a good thing, of course, because our DNA is in the

3   nucleus.  We have this nuclear membrane.  You can actually see

4   this sort of bulge around the outside of the nucleus.  That

5   nuclear membrane protects our DNA, and that, as I say, is a

6   good thing.  That's an important defense mechanism that we

7   have.

8        One of the things we've known for a long time in

9   biology is that when cells divide, they lose that nuclear

10  protective membrane.  And, in fact, we know that when a cell is

11  dividing, it's more likely to become a cancer cell.  So we

12  asked in my laboratory what would happen if we add asbestos

13  when the cells are dividing.  And I'll show you the results of

14  that, but let me show you just a little bit about normal cell

15  division first.  We go to the next slide.

16       So this is cell division without any kinds of fibers

17  in it, and let me show you what happens when cells divide

18  normally.  So here are three cells; one, two, three.  The two

19  cells on the outside are not dividing.  The nucleus is intact.

20  All the DNA has been stained blue, so you can see it.  The cell

21  in the center has received a signal to divide.  Now, that could

22  mean a number of different things.  It could be the cell next

23  to the wound where the skin's been scraped away, and your serum

24  starts leaking in there, and all kinds of growth factors are in

25  our serum to control cell growth, and the cells around the

1  wound start to grow, or these cells are in a dish, so I've

2  added a growth hormone.

3         However -- whatever the reason is, these -- this

4  cell's dividing, and I know that, because all of the DNA is

5  condensed into these white threads called chromosomes.

6  Chromosomes are bands of condensed DNA.  Now, the whole object

7  here is to make two cells just like the original.  Scrape your

8  skin away.  You want cells to grow back just like the ones that

9  got scraped away.  The only way you can do that is by making

10  perfect copies of all of your genes.  So, let me show you what

11  your chromosomes look like.  Next slide.

12         We have 23 -- humans have 23 pairs of chromosomes.

13  You got one chromosome from your mother, one from your father.

14  Notice that there are light and dark bands on each of the

15  chromosomes.  Those light and dark bands are where your genes

16  are.  Now, some of those bands may have a thousand genes

17  crammed in there.  Some of them may have just a few.  Each of

18  our genes must be on the correct chromosome in the correct

19  place on that chromosome.  No mixing and matching allowed for

20  the distribution of our genes on our chromosomes.  So when I

21  say you have to make perfect copy, when I say you have to

22  reproduce your genes, I'm not kidding.  That's exactly what we

23  have to do.

24         Now, in the next slide we finish this normal cell

25  division where here the cell has received a signal to divide.

Brody - Direct                                66

1  You can see the chromosomes forming.  They're stained purple.

2  They have collected, and here they are undergoing faithful

3  reproduction.  If the cells undergo faithful reproduction,

4  you'll get two what are called daughter cells just like the

5  original.  That's what you hope for every time.

6          Now, let's go to the next slide and see what happens

7  when you have a carcinogen in the mix here.  Now, this is from

8  -- this particular experiment is from a paper that was

9  published from my laboratory.  And then in the next one I'll

10  show you another example.  Over here in Panel A -- now, again,

11  you know, I'm showing you these one or two cells at a time, but

12  we're talking about these going on in millions of cells around

13  the dish.  We're just picturing a couple of them for examples.

14          Over here in Panel A you can see a cell that's

15  dividing.  You can see half of the chromosomes gone to one

16  side, half to the other, and that's exactly what you'd hope for

17  to get to new daughter cells.  Over here in Panel A you can see

18  there are fibers.  There's a long fiber, longer.  There's a --

19  so from this side of the cell to this side of the cell is about

20  40 microns, so these are 30 micron fibers.  This is a 5 micron

21  fiber.  Most of the DNA is moved to its respective location,

22  but some of the DNA is bound to the surface of the fibers.

23          Now, that results in a condition called aneuploidy as

24  you see in the upper right-hand corner here.  Aneuploidy means

25  abnormal chromosome separation.  Let's look at one more example

1  of that, and this is my next to the last slide.  Next slide.

2  And now these are mesothelial cells, and over here on the right

3  is a mesothelial cell with no fibers after the chromosomes have

4  moved to one side, half to the other again.  That's just what

5  you'd hope for.  Over here there are two cells, and there's a

6  chrysotile asbestos fiber that is spanning the two cells and

7  has bound some DNA.  And again this is now aneuploidy produced

8  in mesothelial cells by chrysotile.

9          Okay.  The point here is that this is DNA damage.

10  This is not cancer.  Aneuploid cells are not cancer cells.

11  Aneuploidy opens the door.  Aneuploid cells are more likely to

12  become cancer cells.  When I say it opens the door, you have to

13  open many doors before a cancer develops.  So what I'm talking

14  about now is, in a person who has a cancer what we know is that

15  you must have a series of genetic errors over time.  And let me

16  just say this one more thing about genetic damage and then I'll

17  summarize this whole thing of cancer.

18          Asbestos acts as a carcinogen in two major ways.  One

19  is that it binds DNA, and you can see that.  I just showed you

20  that in two slides.  And so now here's some DNA that's not in

21  its respective position on the chromosome.  Now, if that can be

22  passed on to the daughter cells, that opens the door a little

23  wider.  In other words, if this aneuploid cell can divide and

24  pass on the error, the door opens a little wider, particularly

25  if the genes that are on this DNA are growth control genes that

1 keep the standards of growth control where they should be.  So

2 asbestos acts as a binding agent for DNA.

3          Asbestos also generates oxygen radicals.  Now, oxygen

4 radicals are short-lived chemical compounds that are throughout

5 our body and every living body all the time.  We have a set of

6 antioxidants that keep our oxygen molecules exactly at the

7 levels they should be, and if they get a little higher, we

8 start making more antioxidants to knock them down.  But, oxygen

9 radicals are known as very efficient ways -- the production of

10 oxygen radicals is a very efficient way to produce genetic

11 damage.  Oxygen radicals damage DNA.  They're the main way that

12 cigarette smoke causes genetic damage, through the production

13 of oxygen radicals.  That's one of the main ways it does that.

14 All the asbestos varieties generate oxygen radicals from their

15 surfaces.  So adjacent to these fibers -- the same time the DNA

16 is binding to the surface of the fiber, the fiber can generate

17 oxygen radicals and further damage the DNA.

18          Okay.  Let's go to the final slide.  All right.  So

19 I'm going to -- with this slide I want to summarize this issue

20 of cancer formation.  And I know you're familiar with this

21 issue of latency; time from first exposure until the time the

22 person comes to the clinic.  What I want to -- hope to do here

23 is have you understand what's happening related to cancer

24 formation in that latency.  With asbestosis it's actually

25 pretty easy to understand what's going on in those decades of

1  latency.  What all that means is you get this micro-injury

2  after micro-injury wherever a fiber hits up against the cell,

3  causes membrane damage.  The fibroblast responds by making scar

4  tissue over and over and over with what -- new fibers are

5  coming in as well as the fibers that have been left in the lung

6  as a legacy of the exposure.  All those -- that's going on all

7  the time.

8            For lung cancer and for mesothelioma, different

9  story, and let me try to explain that here.  So here's a layer

10  of cells -- single layer --

11            THE COURT:  Wait.  I'm sorry.  Excuse me.  I

12  misunderstood.  That was the asbestosis you were describing.

13            THE WITNESS:  That's correct.

14            THE COURT:  I'm sorry.  Okay.  Thank you.

15            THE WITNESS:  Right, the micro-injuries that add up

16  the scar responses.

17            THE COURT:  Scar responses.  Okay.

18            THE WITNESS:  Yes.

19            THE COURT:  Thank you.

20  A    Right.  Okay.  Now, we're talking -- now we're back to

21  cancer, and here's a single layer of cells.  And this is what

22  mesothelial cells look like, but if you just think of them as

23  airway lining cells, same concept.  Single layer of epithelial

24  cells.  And then the artist has given us these lightening

25  bolts, and it says DNA damage.  I mean lightening doesn't -- as

1 far as I know, it doesn't cause DNA damage.  It just means

2 something from the environment.  Something has come in from the

3 environment, is able to reach the target cell.

4          Now, here the target cell is dividing, and I know

5 that because you can see the chromosome.  You don't see the

6 individual chromosomes of a cell unless it's dividing, when

7 those -- when the DNA is condensing into those chromosomes.

8 Now, one -- and then he has the cell dividing, and he has one

9 daughter cell going off in this upper left-hand direction and

10 the cell is dying, and that is exactly what you hope for.  One,

11 the major fate of aneuploid cells is to die, and that is the

12 main reason why most of us do not get cancer.  We do not get

13 cancer because our cells with genetic errors die.  Now, they

14 die, because we have -- and, of course, if they die, that means

15 they can't pass on their genetic errors.  That's a good thing.

16 The main reason they die is because we have a set of genes that

17 respond when there's DNA damage to send ourselves down that --

18 down what's called a suicide pathway.  It's actually a cell

19 death pathway that has evolved, and it's the same pathway in

20 rodents and horses and monkeys and people that destroy cells

21 with genetic errors.

22          Now, here's where I raise the issue of what happens

23 if the genes that are damaged are the genes that control cell

24 death, and now they can't send that cell down that pathway it's

25 supposed to go?  So that's one example of a genetic error that

1  wouldn't be in our favor.

2          Now, so then the artist also has -- and the other

3  daughter cell with its chromosomes going in the other

4  direction, and it's able to live.  It's not going down that

5  suicide pathway, and it's able to live.  Now, you see the

6  artist has this tumorigenesis or cancer formation, and he has

7  this tumor with a whole bunch of oddly shaped cells going

8  through these cell divisions.  The time from this first

9  daughter cell after DNA damage to the time the tumorigenesis

10 forms, the division between this cell with the first damage and

11 the development of the tumor is the latency period.  So what

12 you have to give me here for the rest of the discussion is this

13 30 to 50 or 60 years, whatever it might be, between the

14 development of this first daughter cell and the cancer.  So

15 what's going on in that latency period?

16         So what you have to do is picture this cell with an

17 error.  See, it has DNA damage, and it's sitting there either

18 in our airway or the surface of the pleura with an error, and

19 it gets hit again.  Another carcinogen, another asbestos fiber

20 hits that cell again, gets a second error, and it starts to

21 divide; two cells, four cells, six cells.  Four of them go down

22 the suicide pathway, but two of them are still sitting there

23 with two errors.  Okay?  Those cells can divide.  Our cells

24 divide every 35/40 days or so.

25         Cells divide again, two cells, four cells, eight

1  cells.  Most of them die, because they have errors.  Now you

2  have several cells sitting out on the surface, it's another

3  error however many years later.  It could be ten years later.

4  It gets hit again.  It gets another error.  One of those cells

5  or another of those cells gets another error.  Now it's got

6  four separate genetic errors, and it starts to divide; two

7  cells, four cells, eight cells, 16.  Thirteen or a dozen of

8  them get recognized by our immune system, which is very good at

9  picking up potential cancer cells, kills those cells, but you

10 still have a bunch of cells -- now they're at various places

11 around the pleura or in the airway.

12          Now, fast forward to 35 or 40 years, there's a cell

13 which was the progeny of one of those groups, and it's sitting

14 there now, one cell with six or seven errors.  It gets another

15 one.  It gets an eighth separate genetic error, which for that

16 cell in that person was sufficient to produce a cancer, and it

17 starts to grow, and that's what the artist is showing you here.

18 That's why he's made them all the same color, is because they

19 all came from that same cell with a set of genetic errors which

20 for that person was sufficient to allow the cancer to develop.

21          And the next person, he might have twice as many

22 genetic errors and never get a cancer, just because it's a

23 different set of errors or because that person's defense

24 mechanisms were that much better.  And then finally this grows

25 out and brings that person to the clinic.  Those are all the

1  slides I have, Your Honor.

2          THE COURT:  Thank you.

3                  (Pause)

4  BY MR. BAILOR:

5  Q    Doctor, could you tell the Court if you had a block of

6  asbestos, say chrysotile, the size of a sugar cube, how many

7  fibers would that be?

8  A    Oh, well, you know, I can't tell you exactly.  It really

9  depends on how tightly packed it is, but you could probably

10 easily get a billion or so fibers into a sugar cube if they

11 were packed.

12 Q    Is all of your testimony that you gave here today so far

13 based on reliable, widely accepted scientific principles?

14 A    Yes.

15 Q    And it's based on your own personal life's research?

16 A    Well, most of it is, sure.  I obviously draw from others

17 as well, which is -- a scientist must do.

18          MR. BAILOR:  Thank you very much, doctor.  I'll pass

19 the witness.

20          THE WITNESS:  You're welcome.

21          THE COURT:  Mr. Mullady, does the FCR have questions?

22          MR. MULLADY:  No, Your Honor.

23          THE COURT:  All right.  Shall we take a ten-minute

24 recess, and then we'll start on cross examination?

25          MR. BERNICK:  Sure.

1          THE COURT:  All right.  We'll be in recess for ten

2    minutes.

3                         (Recess)

4          THE COURT:  Please be seated.

5                         (Pause)

6          THE COURT:  Mr. Bailor.

7          MR. BAILOR:  Your Honor, I'd like to offer at this

8    time Exhibit ACC/FCR-271 -- that's Dr. Brody's CV -- and

9    ACC/FCR-274, the slides he used to explain his testimony.

10         MR. BERNICK:  Yes, we would object to both of those.

11   The CV does not come in under Rule 702, 703 is not

12   independently admissible.  It's simply foundation for his

13   credentials, and, therefore, his testimony.  It's not a piece

14   of evidence itself and it contains much hearsay.

15         Secondly, with regard to the demonstratives, they

16   came in.  They were used for demonstrative purposes.  There

17   would've been 100 foundational questions regarding exactly what

18   fiber types were involved in these different demonstrations,

19   exactly what kinds of cells, who took the pictures, when they

20   took the pictures.  In order to establish the predicates that

21   these are, in fact, photographs that meet the requirement for

22   the admission of photographs, because that's what they are.  So

23   they're just at this point, unless there is some further

24   foundation -- and at this point I would object to going back

25   over the whole testimony to provide it.  Until there's further

1  foundation, they cannot be admissible as photographs, which is

2  what they are.  They would only be admissible as

3  demonstratives, because they aid the testimony of the witness.

4         THE COURT:  You're not offering them for anything

5  other than demonstratives.

6         MR. BAILOR:  They're only offered as demonstratives.

7  And with respect to the hearsay objection to his CV, the author

8  of the CV is sitting on the witness stand.

9         THE COURT:  Well, yes, he is.  The document itself is

10 not the substantive evidence.  The witness' testimony is.

11 Nonetheless, I -- what I believe I have been doing is accepting

12 these simply for purposes of my own recollection when I get to

13 looking at the evidence, not for purposes of substantive

14 evidence.  Of course, the curriculum vitae, just like the

15 expert reports, are not the evidence, the witness' testimony

16 is.  So, in that sense, 271 is not admissible as a substantive

17 document, but the witness has been very clear about his

18 background, and the slides that you showed I think illustrate

19 quite clearly what the witness' qualifications are.  So in that

20 sense 271 is cumulative and not -- doesn't really add anything

21 to the witness' testimony, so I won't accept it as substantive

22 evidence, but it will be available in the event that I need it

23 for purposes of refreshing recollection.  And I -- Mr. Bernick,

24 I don't think you'd have an objection to use it for that

25 purpose, would you?

1          MR. BERNICK:  No, not at all.

2          MR. BAILOR:  Your Honor, we would like 271 in as

3 substantive.

4          THE COURT:  It is not substantive evidence.  It

5 cannot be admitted for that purpose.  If you want to ask the

6 witness every question about every entry on it, you may do so,

7 but it is not substantive evidence.

8          MR. BAILOR:  I don't think we want to spend that

9 time.  Thank you, Your Honor.

10          THE COURT:  With respect to 274, I will accept it as

11 demonstrative and only for purposes of demonstrative evidence.

12 Let me make a note, please.

13          MR. BERNICK:  Thank you, Your Honor.  Is my

14 microphone on?

15          THE COURT:  It is, yes.

16          MR. BERNICK:  Okay.  Thank you.

17          THE COURT:  Just a minute though, please.

18          MR. BERNICK:  Sure.

19                     (Pause)

20          THE COURT:  All right, Mr. Bernick, thank you.

21          MR. BERNICK:  Thank you, Your Honor.

22                  CROSS EXAMINATION

23 BY MR. BERNICK:

24 Q    Good morning, doctor.  I want to start out by asking you

25 some general questions with respect to two diseases or two

Brody - Cross/Bernick                                    77

1  kinds of disease that I believe that you've discussed; one is

2  fibrosis and the other is cancer.  And, actually, you talked

3  about two different kinds of cancer.  You talked about lung

4  cancer, and you talked about mesothelioma, correct?

5  A     Yes.

6  Q     And would you agree with me that those are two different

7  types of disease?

8  A     Certainly.

9  Q     Okay.  And just to go through very, very briefly, some of

10 the characteristics that you've highlighted that illustrate why

11 they're different, I think you said that fibrosis has as a

12 target cell the fibroblast?

13 A     Correct.

14 Q     And the function of the fibroblast in the body is

15 basically to lay down fibrous tissue, correct?

16 A     Right.

17 Q     That's what they are.  Right?  They -- I'm sorry -- they

18 assist in the process of creating that fibrous tissue,

19 corrrect?

20 A     Right.

21 Q     Is it true that almost any kind of solid foreign body

22 introduced into the human body that persists over time will

23 ultimately be surrounded by fibroblasts and fibrous tissue?

24 A     No question about it.  Asbestos is very good at doing

25 that.  There are different degrees to which the fibroblast

1  responds, but what you say is true.

2  Q    Is it also true that the reason the fibroblasts are

3  recruited and the reason that that fibrous tissue is laid down

4  is it's one of the body's defense mechanisms?

5  A    That's right.

6  Q    And is it also true that the system that's involved in

7  that reaction by the body is the immune system?

8  A    Well, it can be.  I mean, the immune system can be

9  involved in the -- in that process.  Sure --

10  Q    Well --

11  A    -- not necessarily.

12  A    Well, but there is no other system that recruits these

13  cells in response to the inflammatory reaction that takes place

14  when the body is introduced other than the immune system.  It's

15  the innate immune system, correct?

16  A    No, that's not correct.  Fibroblasts can produce

17  structures that attract other fibroblasts, so I'm not sure

18  where you got that.  The only --

19  Q    Well, what recruits the fibroblast to begin with to the

20  site?

21  A    Well, certainly, the immune system can be -- is involved.

22  No, excuse me.  The immune system is involved in many cases,

23  but you said it's the only one, and I've corrected you.  That's

24  all.

25  Q    Isn't it true that the innate immune system is involved in

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                          79

1  each and every case where foreign material is introduced into

2  the human body?

3  A     You know, I don't know why you say each and every case,

4  you know.

5  Q     I'm sorry.  My intentions and my motives are not really

6  relevant.  I just asked you a question.  Isn't it true that in

7  each and every case where a foreign material is introduced into

8  the human body the immune system becomes activated?

9  A     I just don't know that that's true.  I mean, it may be,

10  but I can't answer it with enough authority to agree.  I just

11  don't know.

12  Q     Okay.  You would agree with me though that this is

13  defensive; that is, the walling off process?

14  A     Correct.

15  Q     And would you also agree with me that it is possible over

16  time for this reaction to become stable or quiet?

17  A     Sure.

18  Q     Let's talk a little bit about cancer.  I think you told us

19  that in -- there are different target cells that are involved

20  in cancer --

21  A     Right.

22  Q     -- correct?

23  A     Right.

24  Q     And we also know that when we have cancer, we have tumors

25  that are formed, right?

Brody - Cross/Bernick                    80

1  A    Right.

2  Q    And is it true that with respect to cancers not every

3  foreign material that's introduced into the body and persists

4  causes cancer, correct?

5  A    True.

6  Q    It has to be carcinogenic?

7  A    That's right.

8  Q    Is it also true that -- I think you testified to this, and

9  I found it a particularly clear statement as well as many of

10 the other statements that you've made -- that cancer is

11 characterized by not stability but by a loss of control over

12 cell growth?

13 A    That's fine.

14 Q    Okay.  Now, with these differences in mind, I want to talk

15 a little bit about your own experience.  Isn't it true that

16 your research has focused on fibrosis?

17 A    Largely, that's true, although my work also has focused on

18 cell growth and cancer formation, but largely what you say is

19 true.

20 Q    In fact, isn't it true that the website that you have had

21 at Tulane as recently as 2001, that that website focused

22 specifically on your work concerning fibrosis and fibrogenesis?

23 A    Probably, sure.

24 Q    Well, do you remember one way or the other?

25 A    I -- you know, I'd have to go back and look, but I'm sure

Brody - Cross/Bernick                    81

1  it also stated my --

2  Q    Excuse me.  I just want to ask you whether you remember --

3          MR. BAILOR:  Could we have the witness complete his

4  answer?

5          MR. BERNICK:  No, it's not responsive.

6          THE COURT:  Pardon me.  Address me not the witness,

7  please.  I think the answer first was a yes or no, and then

8  yes, the witness may explain his answer.  So, doctor, if you

9  could answer yes or no, please, then you may explain your

10 answer.

11         THE WITNESS:  Sure.

12 A    I don't remember everything it says.  I'd have to read it,

13 and it may very well have gone into my work with control of

14 cell growth.  But, I'm sure I did focus on fibrosis, because

15 that's what I've been focusing on for most of my career.

16 Q    I want to show you Exhibit 763 and ask whether this is a

17 copy of your website at Tulane when you were there as Professor

18 and Vice Chairman and Chief of Lung Biology?

19 A    Yes.

20 Q    And do we see that when it talks about your interests, you

21 talk about research ongoing in the laboratories of the Lung

22 Biology Program is focused on the biochemical and molecular

23 mechanisms that mediate fibroproliferative lung disease caused

24 by inhaling environmental agents.  Do you see that?

25 A    Sure.

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                               82

1  Q    And do you see you then go on to talk about what that

2  proliferation is; that it's a scarring process, lung damage

3  results and cellular proliferation, the two hallmarks

4  ultimately of pulmonary fibrosis, correct?

5  A    Absolutely, and along with these papers that are listed

6  here which deal with tumor necrosis factor and control of cell

7  growth.  Sure.

8  Q    Dr. Brody, isn't it true that you nowhere in your website

9  hold yourself out as being an expert in carcinogensis?

10 A    I don't hold myself out as an expert in anything on my

11 website.  This is the work that I do.  That's all.

12      MR. BERNICK:  Your Honor, again, I would ask that the

13 witness try to be responsive to my questions.  I asked him a

14 very simple question.  Does his website anywhere hold himself

15 -- him out as being an expert in carcinogenesis?

16      THE COURT:  That was responsive.  He said it doesn't

17 hold himself out as an expert in anything on the website.

18      THE WITNESS:  Yes, thank you, Your Honor.

19      THE COURT:  That was responsive.

20      THE WITNESS:  Thank you, Your Honor.

21      MR. BERNICK:  Well, it's not -- again, would you

22 instruct the witness that it's not up to him to express

23 appreciation to the Court either.

24                    (Laughter)

25      THE COURT:  That is a given, sir.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                        83

1  Q    Okay.  But, Dr. Brody, is there anywhere in any of the

2  presentations that you have made, any article that you have

3  published where you present yourself to your peers as being an

4  expert in carcinogenesis?

5  A    It's sort of the same answer.  I don't hold myself out to

6  my peers as an expert in anything.  They'll decide what I'm an

7  expert in by what I write and what I say.

8  Q    Okay.  So that's fine, which would then mean that when you

9  attend conferences, you're never introduced as an expert in

10 carcinogenesis?

11 A    I don't think I've ever been introduced as an expert in

12 anything.  I -- you know, this is just not the lingo,

13 jingoism that we use.

14 Q    Okay.  Have you ever said that you are an expert in the

15 field of oncology?

16 A    Same answer.

17 Q    Have you ever said that you're an expert in the field of

18 fibrogenesis?  Have you ever said that?

19 A    Maybe in court I have.

20 Q    You've never said that to your -- you've never said that

21 to peers or to people with whom -- to whom you're introduced in

22 scientific circles that you are an expert in fibrogenesis?  You

23 never said that?

24 A    You know, I'm just trying to think of the setting.  If I'm

25 in a study section in the anti-age, and we go around the table

Brody - Cross/Bernick                                                84

1   and we're asked what our expertise is, then I certainly

2   would've said that.  Sure.

3   Q    Okay.  You would've said that your expert is in

4   fibrogenesis, and did you ever in the context of the very

5   roundtable discussion that you've just now talked about said, I

6   am an expert in carcinogenesis?

7   A    Probably not.

8   Q    Okay.  Now, I want to talk a little bit about something

9   else, which is that in this same website, you talk about your

10  focus on fibrogenesis, and in particular you deal with the

11  biochemical and molecular mechanisms that mediate

12  fibroproliferative lung disease, right?

13  A    Yes.

14  Q    And so when we talk about your particular area and

15  focusing on fibrosis, you're a person who has looked into the

16  mechanisms, correct?

17  A    That's right.

18  Q    Well, let's talk a little bit about mechanisms.  First of

19  all, talk about the mechanism for fibrosis.  You've described

20  that mechanism for fibrosis in many, many papers, correct?

21  A    Yes.

22  Q    And in that mechanism -- and I know that I'm going to be

23  grossly oversimplifying what you've said, but just bear with me

24  for a second to see if I at least get the direction kind right.

25  You, first of all, talk about the inhalation of the fibers,

Brody - Cross/Bernick                        85

1  right?

2  A    Yes.

3  Q    Then you talk about their transport to tissue, right?

4  A    Right.

5  Q    Then you talk about their -- the reactions of cells that

6  assist in the transportation.  For example, you've talked about

7  macro -- I always thought they were macro -- when I read it, I

8  thought it was macrophage (pronouncing).  It's macrophage?

9  A    Either way.

10  Q    Okay.  And macrophages are those gobbling up cells, and

11  they also serve the function of not only gobbling things up but

12  moving them along.  Right?

13  A    Right.

14  Q    So they're part of the transportive process.  Correct?

15  A    Sure.

16  Q    And any time -- any time you have a foreign material

17  introduced into the human body, the macrophages will be

18  recruited, and they'll try to gobble it up no matter how big it

19  is.

20  A    True.

21  Q    Okay.  And then, ultimately, the macrophages plus other

22  means of transportation will take the material to a target or

23  to an area, and at that area you will have a cellular or tissue

24  reaction.  Right?

25  A    That's fine.

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                              86

1  Q    So far so good?

2  A    That's close, yes.

3  Q    Okay.  That's good enough for this morning.  And what I

4  have said, that basic transportation system works for all

5  asbestos fiber types, that is chrysitolite, amphiboles --

6  amosite, chrysitolite, chrysotile?

7  A    Correct.

8  Q    And it works for all amounts of fiber albeit the amount

9  can affect how far it gets transported.  Correct?

10 A    True.

11 Q    Okay.  Now, would you also agree with me that when it

12 comes to the mechanism with respect to fibrosis, that it's very

13 difficult to study this mechanism in people?

14 A    True.

15 Q    So that what you do is you set up a series of animal and

16 laboratory experiments that are designed to see if you can

17 watch this mechanism observe the mechanism at work.  Correct?

18 A    Right.

19 Q    And is it true that in those animals -- and indeed that's

20 the focus of your research.  You're not a person -- you're not

21 an M.D., correct?

22 A    Right.

23 Q    And your -- the focus of your work is not examining

24 patients in the clinical setting, correct?

25 A    Right.


**J&J COURT TRANSCRIBERS, INC.**

1  Q    You're the person who is in the lab looking for a

2  different line of research that takes you into mechanisms that

3  may not actually be observable clinically.  Fair?

4  A    Fair.

5  Q    Okay, and, Dr. Brody, when you're in that laboratory and

6  you have those animals or you have cells, you don't get

7  anywhere unless you use enough of the material to get some kind

8  of response.  Correct?

9  A    Right.

10 Q    And, therefore, when you do the experiments that you've

11 talked about and you've taken pictures of, some of which you've

12 now shown here in court, you're talking about experiments with

13 animals that by and large involve very high doses or

14 concentrations of asbestos.  Correct?

15 A    Well, it's not doses or concentrations.  It's high

16 concentrations, but it's actually quite a small dose, because

17 they're exposed for a short time.

18 Q    Okay, so short duration, high concentration.  Correct?

19 A    Correct.

20 Q    Fair enough.  Right?

21 A    Right.

22 Q    Okay.  And when you have this cell, this in the petri dish

23 and you put a fiber right by the cell, that's kind of, you

24 know, you're placing it right in proximity to the very kinds of

25 materials where you want to see if that little cell binds to

Brody - Cross/Bernick                    88

1  the fiber.  Right?

2  A    Exactly.

3  Q    Okay.  So you really -- you're idealizing the proximity of

4  those fibers to those cells at precisely the time that they're

5  dividing, so you can see if the cell's right there, will that

6  chromosomal material will adhere to the fiber?  Correct?

7  A    Exactly.

8  Q    Okay, and you've shown us pictures taken at the time where

9  that adheres.  Now, true enough that many, many different kinds

10 of biological materials will adhere to fibers?

11 A    Certainly.

12 Q    And indeed they'll adhere to fibers of all different kinds

13 -- all different kinds and types.  Correct?

14 A    Sure.

15 Q    So would you agree with me that what you've observed in

16 the laboratory with respect to cells and what you've observed

17 in the laboratory with respect to animals; that is, the

18 recruitment of these different things, are -- well, let me just

19 ask with respect to cells, first of all.  Would you agree with

20 me that the photographs that you took showing the binding

21 effect, that doesn't show -- the photographs themselves don't

22 show a binding effect that is specific to any particular type

23 of asbestos.  Correct?

24 A    I agree.

25 Q    Would you also agree that it's also not specific even to

Brody - Cross/Bernick                    89

1  asbestos, that you could take the same photographs and show the

2  same kind of binding effect with respect to other materials

3  that are not asbestos form?

4  A    I agree.

5  Q    In fact, you could find that binding effect with respect

6  to glass fibers.  Correct?

7  A    Sure.

8  Q    Okay.  And, in fact, that binding effect -- the very fact

9  that you've seen binding effects between proteins and foreign

10  materials is again a feature of the body that is very, very

11  generalized.  We see that really all over the place in many

12  different contexts.  Correct?

13  A    Sure, that's why you have to do a series of different

14  kinds of experiments; cellular, animal, and epidemiology.

15  Q    Okay.  We're going to get to exactly that sequence, but I

16  just wanted to begin with respect to the cell work.  Let's talk

17  a little bit about animals.  When you observe the fibrosis that

18  you see in animals, that fibrosis is again not necessarily

19  specific to asbestos.  Correct?

20  A    Well, I mean it is, because I gave him asbestos, but what

21  you mean is that response can occur with -- from agents other

22  than asbestos.

23  Q    Right.

24  A    A few others, sure.

25  Q    Okay.  So now let's deal with one more general point with

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                                    90

1  respect to the mechanism of fibrosis.  We covered a lot of

2  different things here, but one thing I want to get to, I take

3  it that your belief and -- not just your belief, your

4  assessment today is that when it comes to the mechanism of

5  fibrosis with respect to asbestos, that is well-established.

6  Would you agree with that or not?

7  A    Yes.

8  Q    Indeed you say that pretty much in the expert report that

9  you filed in connection with this case.  Correct?

10  A    I don't remember if I said that, but it -- but it's true.

11  It is.

12  Q    Well, and if that's true, that's something that's only

13  happened in the last few years, because not so long ago you

14  represented that the -- or you wrote that the mechanisms by

15  which asbestos causes fibrosis remain unclear.  That's been

16  your position in your published papers, correct?

17  A    And it still is if you're dealing at a specific level.  In

18  other words, you're talking apples and oranges.  So there are

19  many different levels to understand a process.  So if I want to

20  tell you do I know the complete set of genes that must be up

21  regulated for scar tissue to result, no, I'll tell you that we

22  have other things to learn, and that's what I'm saying in a

23  paper like that.

24  Q    Yes, well, showing you Exhibit 766, which is a paper where

25  the lead author was a Neil Mishra, and it was written as

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                    91

1  recently as 1997, this -- the statement appear here that, "The

2  mechanisms by which asbestos causes fibrosis remain unclear.  A

3  number of studies in recent years probing the molecular and

4  cellular responses to asbestos by cells in vivo" -- that's in

5  the animals.  Right?

6  A    Right.

7  Q    " -- and in vitro" -- which means in those little lab

8  dishes.  Right?

9  A    Right.

10 Q    " -- featured generation of activated oxygen species on

11 the surface of the fibers..." and it goes on to talk about a

12 variety of different kinds of mechanisms that might be

13 involved, but there's nowhere in the paper that it says that

14 the fibrogenic reaction to asbestos -- the mechanism for that

15 is well-established.  Correct?

16 A    These are different levels.  What you're doing is you're

17 taking a scientific paper where it's very wise to be cautious

18 and to make sure that the reader knows that there's a lot more

19 to learn.  But I can tell you a lot about how the process is,

20 and there are many features that are well-established.  That's

21 all.

22 Q    Okay.  I'm not fighting that.  I'm just going to ask you

23 -- all my questions are going to ask you not what you would say

24 in a court of law but what you would say to your scientific

25 colleagues.  And my question to you just very openly now that

Brody - Cross/Bernick                    92

1  you've testified exactly as I -- as you have is, isn't it true

2  that you have not and would not represent in a scientific

3  context -- in a scientific context that the mechanism by which

4  fibrogenesis takes place with respect to asbestos is

5  well-established?

6  A    That's a very good question, I give you that.  And what I

7  need to make clear is that it depends on the question that's

8  being asked.  If you're asking me do we know that fibroblast

9  makes scar tissue, and that macrophages make agents that cause

10 fibroblast to make scar tissue, I'd say that's

11 well-established, and I'll say that to anybody in any

12 scientific conference.  But when I write a scientific paper

13 like that, look at this paper you're talking about here.  This

14 is P-53 expression.  This is one of these tumor suppressor

15 proteins that we're learning about.  We don't know its role in

16 fibrogenesis, and that's not well-established, and that's why

17 that -- that's why you have to say that.  So I don't say

18 exactly the same things in papers that I say in the courtrooms

19 regarding what's known and what's not known as far as the

20 overall influence or the overall impact of what we know.  It --

21 there are separate questions that must be asked to get separate

22 answers.

23 Q    Is it true that you nowhere in your report in this case

24 make any kind of statement or any kind of indication to the

25 effect that the mechanisms which -- by which asbestos causes

**J&J COURT TRANSCRIBERS, INC.**

1  fibrosis remain unclear?  You can't find that language or

2  anything even remotely like it in your report, correct?

3  A    I'm sure you're right.

4  Q    Okay.  In fact, when you testify -- you testify in

5  literally hundreds of cases, correct?

6  A    Yes.

7  Q    And isn't it true that on direct examination in those

8  cases you never tell the Court and you never tell the jury that

9  the mechanisms by which asbestos leads to fibrosis remain

10 unclear.  You never make that statement, correct?

11 A    And it's because I'm not asked the questions at the level

12 where things are not yet well-established.  In other words,

13 what I'm telling you and what I've told this Court is

14 well-established.  We're at a level that's well-established,

15 but --

16 Q    Everything that you've told the Court -- everything that

17 you told the Court on direct examination, everything is

18 well-established, Dr. Brody?

19 A    Well, excuse me, at least in the fibrosis arena.  I

20 already told the Judge the things that I wish I could tell you

21 about the genes that are involved and the number of genes, and

22 there are many questions yet to be answered in this field.

23 Q    Oh, boy.  In fact, is it -- I'm just going to ask you the

24 same question again.  Is it your testimony that everything that

25 you've told the Court on direct examination, not just some

Brody - Cross/Bernick                                94

1  things, everything that you told the Court on direct

2  examination is well-established?  Is that your testimony?

3          MR. BAILOR:  Objection.  Asked, answered, and

4  argumentative.

5          THE COURT:  It may be argumentative.  I'm not sure

6  it's been asked and answered.  It was asked, but I don't think

7  it was answered.  But, I think it's a question about which the

8  Court actually does need an answer, so I'm going to overrule

9  the objection.

10 Q   Is the question clear in your mind, Dr. Brody?

11 A   Yes.

12 Q   Are you representing to the Court that everything that you

13 told the Court on direct examination was well-established?

14 A   In the fibrogenesis sphere, I would say at the level we

15 were talking, yes.  In the carcinogenesis sphere, I would say

16 no, there are a number of questions yet to be asked --

17 answered.

18         THE COURT:  Wait, Mr. Bernick.  Pardon me just a

19 second.

20                      (Pause)

21         THE COURT:  I'm sorry, Mr. Bernick.  Go ahead.

22         MR. BERNICK:  Thank you very much, Your Honor.

23 Q   Let's talk a little bit about -- I get the benefit of

24 different answers.  I'm okay.  Let's talk about the mechanisms

25 for cancer.  I believe you told us that for cancer to develop

Brody - Cross/Bernick                    95

1  as a result of asbestos, there must be some genetic impact, and

2  I use that "impact" word loosely.  That's probably not very

3  scientific but --

4  A    Genetic damage might be better.

5  Q    Damage.  That you also need to have as a result of that

6  genetic damage an error created.  Right?

7  A    That's right.

8  Q    And I believe you then were very careful and proper to

9  point out that the creation of an error is not enough, because

10 God bless our immune systems are such that they react to

11 genetically different cells by doing all kinds of things to

12 make them die?

13 A    Well, yes, and it's not just the immune system, but --

14 but, yes, all right.  We do a number of things to produce cells

15 that die.

16 Q    Okay.  So not only must the error be created, but the cell

17 must survive including surviving the defense systems.  Correct?

18 A    That's right.

19 Q    And not only must a cell survive, you were then very

20 careful to point out it must then also divide.  Right?

21 A    Correct.

22 Q    And when it divides, the error must continue.  Right?

23 A    It must be passed on, yes, that's right.

24 Q    And then you said that in order to generate cancer, I

25 believe your words were, there have to be a large number of

Brody - Cross/Bernick                                96

1  errors.

2  A    Well, I don't know if I used large, but maybe.

3  Q    Well --

4  A    I mean, it could be --

5  Q    -- I don't want you to be -- do you remember giving a

6  deposition of this case on the 8th of October 2007, at Page 75

7  you were asked specifically at Line 18; "You have to have a

8  large number of these errors in the cells -- of errors in the

9  cells to cause it.  Correct?"  "Right."

10  A    Well, that's your words --

11        MR. BAILOR:  Yes.

12  A    -- large, not mine.

13        MR. BAILOR:  Could we have the complete answer,

14  please?

15        MR. BERNICK:  Well, sure, he can read -- you can read

16  as much --

17  Q    Dr. Brody, if you want to read the rest of the answer,

18  you're more than welcome to.  The point is that yes, the

19  questioner, which was not me, said "large", and you said,

20  "right."  Now, by right do you mean no it wasn't large, or

21  right, it was large?

22  A    What I mean is there's a better word than large.  That's

23  all, and you'd need a number that we don't know.  So that's why

24  I --

25  Q    That's not what you said at the time, correct, Dr. Brody?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I didn't say large.  I was just being complacent.

2  Agreeable.  How about that?

3  Q    Agreeable and complacent?

4  A    Yes.

5        MR. BAILOR:  Your Honor, I object, and I'd like the

6  full answer read under the rule of completeness.  That's

7  mandated by the evidentiary rules.

8        MR. BERNICK:  I'll be happy to -- if counsel wants

9  it, I'll read it again.

10        "I think you used the phrase a significant error in

11  cells -- a significant error in the cells typically is not

12  enough to cause mesothelioma.  You have to have a large number

13  of errors in the cells to cause it.  Correct?"

14        And the answer is; "Right."  And then you go on to

15  say --

16  "A    That is why your question in a -- of a single day of

17  Trimolite in a series of exposures to chrysitolite makes that

18  Trimolite exposure more significant than if it's all the person

19  had.  That's why I say -- that's why I say that is the --

20  right, that's why I say if that's all the person had, that

21  wouldn't be sufficient to produce enough errors.  But, in the

22  scheme of things, like I say, that exposure to Trimolite is as

23  significant as any other day to any other fiber."  Is that your

24  complete answer?

25  A    Yeah, and I'm -- I don't really care to quibble about the

Brody - Cross/Bernick                        98

1  word large.  It's just that it's a -- it's just a bit

2  imprecise.  I mean we don't know how many there are.  So that's

3  fine.

4  Q    Okay.  And then not only must there be a large number of

5  errors, but something that you didn't quite mention.  The

6  errors have to be the right kind of errors.  Correct?

7  A    Well, I said for that person.  Sure.  I said that.

8  Q    Well, they have to be the right kind of errors to lead to

9  uncontrolled growth.  Right?

10 A    Right.  So the right kind would be errors in genes that

11 control cell growth sufficient for that person.  I believe

12 that's what I told the Court.

13 Q    Okay.  And you don't have any idea at this point exactly

14 what those errors are.  Correct?

15 A    No.  No.  I mean we can name some that we know that we can

16 expect to be damaged in a mesothelioma, but the sequence or the

17 combination I can't tell you.  Nobody can tell you.

18 Q    Well, you don't actually know of any particular error --

19 genetic error that is, in fact, the cause of mesothelioma.  Do

20 you?

21 A    That's right.  That is correct.

22 Q    And you also don't know how large the number of errors

23 must be.  Correct?

24 A    Right.  I mean, they're different for different people.

25 In other words, I can give you a list of genes that we expect

J&J COURT TRANSCRIBERS, INC.

1 to be damaged in mesothelial cells, but the precise number and

2 the combination is different for different people.

3 Q    Well, no, let's be clear.  You can't tell me a single

4 genetic error that is a necessary condition for the induction

5 or for the creation of mesothelioma.  Can you?

6 A    That I'm 100 percent sure?  No.

7 Q    Okay.  In fact, you've never even published an idea of

8 what that genetic defect would be that is empirically based.

9 Correct?

10 A    I haven't.  A number of others have.

11 Q    Now, the error must be passed on.  We're not sure what

12 error it is, so it's kind of hard to say which one must be

13 passed on.  Divide; there has to be division.  Clearly, there

14 has to be division, otherwise, it doesn't continue on.  Right?

15 A    Right.

16 Q    So that's pretty easy to say, and that's pretty easy to

17 say.  The cell must survive.  How the cell survives; that is,

18 when the cell survives and does not survive, science doesn't

19 know the answer to that either.  Correct?

20 A    There are a set of genes that we know will make it more

21 likely that the cell survives, but it's the same issue.  That's

22 part of the number of questions that we have.

23 Q    And, of course, we don't know which error is created, and

24 the actual way -- exactly how the fiber causes genetic damage

25 you don't know.  Correct?

                        Brody - Cross/Bernick                    100

1  A     Well, there are two ways that are now accepted, but, you

2  know, that's part of -- it's a theory.  It's a theory that's

3  undergoing extensive experimental observation.

4  Q     But it's not proven, correct?  We don't know exactly how

5  asbestos fiber caused genetic damage, correct?

6  A     We know that asbestos binds DNA, and we know that it

7  generates oxygen radicals.  Those are two -- well, I mean, you

8  know, you can't pooh pooh that, because we know that those are

9  very important -- we know that those are very important

10 mechanisms for producing cancers.  Now, can you watch that

11 happen in a given individual?  No, you don't get to do that.

12 So I just want us to be sure we're clear on what scientists

13 believe is happening through their experimental observation and

14 what we're absolutely able to prove in a given individual.

15 Q     You can see binding.  Right?

16 A     Yes.

17 Q     And you know from the chemistry that there's a production

18 of oxygen radicals.  Right?

19 A     And we know that oxygen radicals damage DNA.  Sure.

20 Q     But, in the case of asbestos you don't know which, if

21 either one, of those possible theories actually is true.

22 Correct?

23 A     In a given individual, that's right.

24 Q     Well, in any individual.  Correct?

25 A     Well, you can't -- you know, here's the point.  If you --

Brody - Cross/Bernick                    101

1  Q    I'm sorry.

2          MR. BAILOR:  Let -- could he let the witness complete

3  the answer?

4          MR. BERNICK:  I'd like to have --

5          THE COURT:  Pardon me.

6          MR. BERNICK:  I tried once, and I'm asking again.  I

7  mean actually, I've tried twice.  I'm asking for a third time

8  whether he can tell me that either one of these has actually

9  been proven, and then he gave me the answer, well, in any

10 individual, and I said, well, no, in anybody.  And I think that

11 I'm entitled to an answer to that question.

12         THE COURT:  Doctor, if you could, if it's possible to

13 answer yes or no, and if it's not possible to say I can't

14 answer yes or no, and then wait for a follow up question, that

15 would be helpful, please.

16         THE WITNESS:  Thank you.

17 A    I can't answer yes or no, and the reason I can't is,

18 because we know a lot about what asbestos fibers do as far as

19 binding DNA and generating oxygen radicals and damaging DNA.

20 So I don't believe it's fair to dismiss that likelihood as the

21 cause.  So if you say I know the cause, I'm telling you that I

22 can't go to an individual and say that's what happened in that

23 individual, but it's most likely that this is what occurred in

24 that person.

25 Q    Well, again, I want to get past an individual, because I

                    **J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                    102

1  know that that's what you are generally testifying in the

2  context of an individual case.  This is not -- this case is not

3  about an individual.  It's about these diseases generally, and

4  I'm just going to ask you the question again.  Can you tell me

5  yes or no whether it has been proven that either one of the

6  theories that have been advanced and articulated by you for how

7  asbestos causes genetic damage -- that either one of those

8  theories has actually been proven with respect to human beings?

9  A    Not to the level that I -- that it probably will be at

10 some point in time.  That's the best that we have right now.

11 Q    And I'm not being dismissive.  I'm simply asking for the

12 state of what the evidence is.  In fact, isn't it true that as

13 recently as this year, researchers with respect to the asbestos

14 exposure in the causation of pleural mesothelioma have said in

15 clear language -- and this is Exhibit 762; "Although there is a

16 clear link between exposure to asbestos in mesothelioma, and

17 asbestos is known to be both clastogenic and cytotoxic to

18 mesothelial cells, the mechanisms of causation of MPM; that is,

19 malignant pleural mesothelioma, remain largely unknown."  Is

20 that an accurate statement of the status of science?

21 A    Yes, I think that's fine.

22 Q    Okay.  Now, I want to turn now from talking about

23 mechanisms to talking about something else.  We've talked about

24 mechanisms, and we've talked about the fact that mechanisms

25 with respect to cancer -- and that's what I -- all my questions

Brody - Cross/Bernick                              103

1  now are going to focus on, cancer.  We talked about mechanisms

2  and the fact that mechanisms are -- use data from animal

3  studies and lab studies, among other things, correct?

4  A    Yes.

5  Q    Okay.  And we know that there are other people who study

6  the actual what I'll call endpoints, which is kind of a

7  scientific term that deals with people who are sick.  There are

8  people in this area who focus on studying the clinical

9  presentations of people.  Correct?

10  A    Right.

11  Q    And that includes the discipline of epidemiology.  Right?

12  A    Yes.

13  Q    Now, epidemiologists can't see what's actually happening

14  inside of people, but they can observe whether they're sick or

15  not and make comparisons to see whether people who are exposed

16  to asbestos more often get sick with mesothelioma than people

17  who are not exposed to asbestos but are otherwise comparable

18  folks.  Right?

19  A    Right.

20  Q    Okay, and you are not an epidemiologist.  Correct?

21  A    That's right.

22  Q    And you do not hold yourself out to the scientific world

23  or the legal world as being a person who is expert in

24  epidemiology.  Correct?

25  A    Not at all.

Brody - Cross/Bernick                    104

1  Q    Now when it comes to the relationship between mechanism

2  and epidemiology -- I want to ask you a few questions about

3  that -- is it true that there are a series of criteria that are

4  well-accepted in the fields of science, criteria for when can

5  you say that something causes something else?

6  A    So -- I'm sorry.  Ask the question again, please.

7  Q    In the field of science for people to say that something

8  causes something else, isn't it true that there are a series of

9  criteria that are often used to say, well, when do we know that

10 something causes something else?

11 A    Yes.

12 Q    And the Bradford-Hill criteria are very well-known

13 criteria in that respect.  Correct?

14 A    I agree.

15 Q    In fact, you yourself in the context of your testimony at

16 some trial -- I forget which one it was -- relatively recently

17 actually cited the Bradford-Hill criteria.  Correct?

18 A    Yes.

19 Q    Okay, and one of the Bradford-Hill criteria is biological

20 plausibility.  Correct?

21 A    Yes.

22 Q    And yet we know -- and this goes back to the days when the

23 Surgeon General first announced in the first report that

24 cigarettes caused disease.  At that time the mechanism by which

25 cigarettes caused cancer was not known.  Fair?

1  A    I agree.

2  Q    Okay.  And yet the Surgeon General still concluded that

3  there was causation, because the statistical proofs -- the

4  epidemiology was very strong.  Correct?

5  A    Sure.

6  Q    Okay.  So now when we come to the relationship in terms of

7  your work on mechanism, between mechanism and epidemiology

8  isn't it true that to be able to say cause; that is, something

9  causes something else, that epi is required?

10 A    Yes.

11 Q    Isn't it also true that in order for your mechanisms or

12 possible mechanisms or statements about mechanisms to be

13 verified, they must meet the test of epidemiology.  Correct?

14 A    I agree.

15 Q    Okay.  Let's talk a little bit about some of the things

16 that you've said and other things that you suggested concerning

17 the effects of fibers in the human body.  And again I want to

18 focus very carefully on what it is that you said about how

19 asbestos fibers cause lung cancer and mesothelioma.  That's

20 where we're going.  That's what we're talking about.  Okay?

21 A    Yes.

22 Q    We're not talking about the fibrosis anymore.  We're just

23 talking about the lung cancers and the mesotheliomas.  Let's

24 see if we can agree on what we know about people, people who

25 have been exposed to any asbestos fibers.  And I'm going back

Brody - Cross/Bernick                    106

1  to your statement here that when you talked about exposures

2  with respect to your experiments, your experiments are

3  experiments that are borne out.  Your work applies to any

4  asbestos fiber and any amount.  That's what you're looking for

5  in your mechanisms.  Correct?

6  A    Again, it depends on the questions you're asking, but as a

7  general principle, yes.

8  Q    That's the focus of your research.  Correct?  The research

9  that you yourself have conducted is research that works with --

10 at the level of cells and how cells interact, and that work

11 applies to any asbestos kind and any amount.  Correct?

12 A    Well, as I say, any asbestos fiber type I agree with.  Any

13 amount, I'm not sure that's true.  It depends on the question

14 you're asking.

15 Q    Oh, well, that's with respect to all of the direct

16 examination testimony that you gave this morning.  Was that

17 limited to some particular amount of asbestos fiber?

18 A    Well, you know, if all we're dealing with is background,

19 no.  If all we're dealing with is, you know, high-level

20 insulator-type exposures, no.  I mean -- so, yes, I mean it

21 cuts across a wide range, but I just don't like the broad

22 statements that include everything.  That's all.

23 Q    Well, I understand that, but in your direct examination

24 you made no limitation in your testimony based either on fiber

25 type or on amount.  Correct?

Brody - Cross/Bernick                    107

1  A    No, I agree.

2  Q    Okay, and was it true that your own research, the research

3  that you actually conducted and displayed here in court this

4  morning, that is research that doesn't distinguish between

5  fiber type and it doesn't distinguish between fiber amount,

6  correct?

7  A    Well, again, I didn't distinguish it for the discussion

8  today, but there are specific questions that could be asked if

9  there are different amounts of exposures.

10 Q    I know.  I'm going to ask you a lot of them.

11 A    Okay.

12 Q    But in terms of the research that you presented here, that

13 was research that doesn't distinguish kind of fiber, or amount

14 of fiber, correct?

15 A    Well, I agree with you already on a kind of fiber.

16 Q    Right.

17 A    But I am taking some issue with the issue of amount,

18 because as I say, amount can have a lot of difference in the

19 rate of disease.  It can have a lot of different -- but I --

20 and I didn't talk about that today --

21 Q    Yes, I know --

22 A    It depends -- okay.  It depends on the question that I'm

23 asked.  So --

24 Q    Well, when you --

25 A    -- I was giving a general statement about what asbestos

1 does.

2 Q    Fair enough.  When you talked about the transportation of

3 fibers using macrophages in the lymphatic system, that's not

4 specific and not limited by either the type of asbestos or the

5 amount, correct?

6 A    Correct.

7 Q    When you talk about how fibers -- how fibers actually get

8 bound to chromosomal material, that's testimony and that's

9 research that's not focused on any particular fiber or amount

10 of fiber, correct?

11 A    Correct.

12 Q    And when you talk about the induction of errors; that is,

13 the mechanism by which errors are induced, that's not specific

14 to fiber type and it's not specific to amount, correct?

15 A    I agree.

16 Q    Oh.  Okay.  Now, when we get to the question of disease

17 that is not the mechanism but the end point in people, when we

18 get to this area, that's an area where type and amount make a

19 big difference, correct?

20 A    Sure.

21 Q    Okay.  Let's see if we can agree on how your research

22 intersects with -- you talked about endpoints this morning,

23 didn't you?  You talked about people getting sick with cancer,

24 both lung cancer and mesothelioma, correct?

25 A    Of course.

Brody - Cross/Bernick                    109

1  Q    Let's talk a little bit more carefully about how your

2  testimony regarding mechanism intersects with real live people

3  and with whether they get sick or not for just a moment.  And I

4  think we're going to have a lot of agreement on this, at least

5  I hope, but that's what I'm aiming for, so maybe before the

6  lunch hour here we'll smile and agree.  First of all, with

7  respect to background, there is background asbestos, is there

8  not?

9  A    Yes.

10 Q    And background asbestos literally is fibers that are in

11 our environment, all around us, although more so probably when

12 you're in the city versus the country, correct?

13 A    Yes.

14 Q    Okay.  And isn't it true that the calculations of the

15 number of asbestos fibers that will be found in the lungs of

16 people who don't have an occupational or a derivative of

17 occupational exposure, the number of those fibers per gram of

18 tissue ranges up to about a million fibers per gram of lung

19 tissue?

20 A    That's on the high side, but yes.

21 Q    Well, that's the figure that was published by Dr. Churd

22 (phonetic), correct?

23 A    Correct.

24 Q    Okay.  And isn't it true that there are roughly 40 grams

25 of lung tissue for each person, correct?

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                    110

1  A    No.  It's way more than that.  It's -- there are 454 grams

2  in a pound, and we have about four pounds of lungs.

3  Q    Maybe I'm talking about the alveolar tissue, where the

4  material tends to concentrate.  I've seen -- you tell me if I'm

5  wrong --

6  A    I just did.

7  Q    You -- well, you're just going to correct me here -- I've

8  seen figures that say that they're upwards of 14 (sic) million

9  fibers for a human lung, or is it more than that?

10 A    Oh, it can be more than that.  I mean, it really depends

11 on how much tissue you're -- I mean, but that's not a lot of

12 fibers.  Remember, you can get a billion into a sugar cube, so

13 --

14 Q    Well, but this morning you were showing us how even one

15 little fiber can go ahead and create that binding, and, you

16 know, cleave the -- you know, the chromosomes, and basically

17 mess things up.

18 A    Sure.

19 Q    So, I now want to know, based upon the observation of

20 people, isn't it true that background asbestos in people's

21 lungs has been shown not to cause cancer.  You don't believe

22 that that causal relationship exists, correct?

23 A    Correct.

24 Q    Okay.  Now, let's go a little bit above the background to

25 the PEL, the occupational limit of .1 -- is it .1 fiber years?

**J&J COURT TRANSCRIBERS, INC.**

1  A     .1 fiber per c.c.

2  Q     Fiber per c.c.  So, you'd have to multiply that out to get

3  a total unburdened.  But that's the PEL.  Isn't it true that

4  the same thing applies; that is, that it's not shown to cause

5  disease?

6  A     Well, you'd have to ask an epidemiologist.  As far as I

7  know, that's not been shown to cause disease, but it's not been

8  shown to be safe, either.  So, I mean, it doesn't say that will

9  not cause disease.

10 Q     Well, didn't you ask this question and give this answer in

11 a trial that took place in April of '03 involving a case with

12 Lorillard, as you testified as follows.  "And there are no

13 studies that show that there is an increased risk of

14 mesothelioma at the .1 level.  That's true, is it not?"  And

15 your answer was; "To my knowledge that's true."  Was that your

16 testimony under oath at that time?

17 A     And I just said that.  I've just said exactly that.  There

18 are no studies that show that that level causes mesothelioma,

19 and there are also no studies that show that to be a safe level

20 guaranteeing it will not cause disease.

21 Q     Well, there are no guarantees in life.  I'm simply asking

22 whether there are no studies that show causation of disease at

23 that level?

24 A     I agree.

25 Q     Okay.  Now, let's talk about a couple more, and then we'll

Brody - Cross/Bernick                                    112

1  almost be done.  Let's talk about fibers that are less than

2  five microns.  Is that the right --

3  A    That's fine.

4  Q    Okay.  Less than five microns long.  They'll still cause

5  all that binding, and it can cause fibrosis, correct?

6  A    Yes.

7  Q    But when it comes to the induction of cancer, isn't it

8  true that some of the most reputable scientists in the country

9  in this area have concluded that fibers less than five microns

10 have not been shown to cause disease?

11 A    Well, some have shown that, and said that, yes.  I

12 disagree.  I think that five micron fibers are less dangerous,

13 but I don't see how you can exonerate them.  So, if you put 5.1

14 microns that cause disease and 4.9 does not, I mean, you know,

15 that makes no sense.  So, in other words, longer fibers are

16 more dangerous.  I agree with that absolutely.  But you can't

17 exonerate fibers less than five microns.

18 Q    I'm not asking you about exoneration.  I'm not asking

19 whether something is guaranteed, lock solid to be safe.  That

20 has nothing to do with my question.  I asked you a very simple

21 question.  Isn't it true that some of the most reputable

22 scientists in the country have concluded science does not

23 demonstrate disease caused by fibers that are less than five

24 microns long?

25 A    A few people have said that.  Yes, sir.

Brody - Cross/Bernick                    113

1  Q    A few people?  Isn't it true that reports prepared for the

2  ATSDR, which is one of the most prestigious organizations in

3  the country dealing with the effects of toxic materials on

4  people, has made that pronouncement?

5  A    Well, it's a report.  I don't know if it's a

6  pronouncement.

7  Q    Have you read the report?

8  A    I've seen it, and I'm sure it says that in there.  But

9  that's fine.  I just don't see how you can draw that

10  conclusion.

11  Q    Who wrote that report?

12  A    I'm not sure who wrote it.

13  Q    What?

14  A    I'm not sure who wrote it.

15  Q    Are you sure that you read it?

16  A    I have seen parts of it.

17  Q    Well, I didn't -- okay.  Did you read that part of the

18  report that bears directly on the question that I asked you?

19  A    I think so.

20  Q    You think so, or you're not sure, or you are sure?

21  A    You know, I read a lot of things.  I don't remember

22  precisely reading that.  It's been brought up to me a number of

23  times in the past.  I'm sure that it -- I wouldn't surprised

24  that it says that.

25  Q    It's been brought to you in the context of litigation?

**J&J COURT TRANSCRIBERS, INC.**

1   A    Yes.

2   Q    Okay.  And even though it's been brought up in the context

3   of litigation where you've been confronted with this under

4   oath, you've never taken the time to go back and actually read

5   the document to see what it says, much less figure out whether

6   it's correct?

7              MR. BAILOR:  Objection.  Argumentative.

8   Q    Well, have you gone back since the issue was raised and

9   read the document to see what it actually said about fibers

10  less than five microns?

11  A    No.  And because somebody --

12  Q    Okay.

13  A    -- brings something up to me, I don't have to go running

14  back and read it.  I read what I --

15  Q    No --

16  A    -- think is important to me.

17  Q    Oh, sure.  And this was of no consequence?  The fact that

18  the ASTDR wrote a report that completely disagreed with you was

19  of no consequence?

20  A    So -- the fact that their --

21  Q    What about the EP -- I'm sorry.  I'll withdraw that.  What

22  about the EPA?  What does the EPA -- are you familiar with the

23  Berman and Crump report?

24  A    I've seen parts of that, as well.

25  Q    Have you read the Berman and Crump report, Dr. Brody?

1 A    Not from front to back.  It's the same discussion.  This

2 is a report that's out there.  It's been out there for years.

3 It's not EPA policy.  Those scientists believe that short

4 fibers don't cause disease, or at least some of them do, and I

5 say that that makes no sense.  You cannot exclude a population

6 of fibers that has been shown to bind membranes, bind DNA,

7 participate in disease.  I don't -- that's not been explained

8 to me by anyone how those fibers can be excluded.  Just because

9 they write a report doesn't make it true.

10 Q    But you don't even know what the basis for the report is

11 because you haven't read it, correct?

12 A    I've read some of it, but that's -- you know, I read the

13 science.  I read the papers.  There were papers by JMG Davis

14 that show that short fibers cause less disease than long

15 fibers.  I agree with that.  That's in the published scientific

16 --

17 Q    I didn't ask you about that.

18 A    Excuse me.

19 Q    I asked you about the EPA.

20       MR. BAILOR:  Objection.  Could we have the witness

21 complete his answer?

22       THE COURT:  I think you do need to give him an

23 opportunity to complete his answer, Mr. Bernick.

24       MR. BERNICK:  But then can we have, then, an answer

25 to my question, as well?

1          THE COURT:  He did answer your question.  He said it

2   had -- he disagrees with the study that indicates that a fiber

3   less than five microns long cannot cause disease.  He has not

4   fully read the studies, but to the extent that he is aware of

5   them, he disagrees with them.  Is --

6          MR. BERNICK:  Yes, but then I asked him whether he

7   had read the support for the position in the document, and he

8   didn't answer that question.

9          THE COURT:  Okay.  I apologize.

10          MR. BERNICK:  He went on to talk about another study

11   that I didn't even ask him about.

12          THE COURT:  All right.  I apologize.  Could you

13   answer that question, please, doctor?

14   Q    So, the question to you is, Dr. Brody, did you actually

15   read the EPA study and the ATSDR study to find out what the

16   basis was for the position that was taken, which is that

17   science had not shown harm; that is, disease, below five

18   microns?

19   A    I haven't read specifically what they were after, but one

20   of the papers that they use is that Davis paper to -- that I

21   was telling you about.  There are a lot of papers that show

22   that --

23          MR. BERNICK:  Again, Your Honor, this is, again -- he

24   says no, but then, one of the papers that they talk about --

25   well, if he says no, then how would he know what papers they

Brody - Cross/Bernick                     117

1  even refer to?

2              THE WITNESS:  Well, I'm telling you about papers that

3  are important in this field.  You want to --

4              MR. BERNICK:  I didn't ask you about papers that were

5  important -- Your Honor, could you please instruct the witness

6  --

7              THE COURT:  All right.  Gentlemen, you --

8              UNIDENTIFIED ATTORNEY:  Objection.

9              THE COURT:  Gentlemen, you may not argue with each

10  other.  It's a question and answer, not a debate.

11              MR. BERNICK:  Right.

12              THE COURT:  Doctor, I think you've answered his

13  question.  If you have another question, put it to the witness,

14  but please do not argue with the witness.

15  Q    Isn't it true that when it comes to -- well, let me ask

16  you about another comparison.

17                        (Pause)

18  Q    We have -- let's do it this way.  This is the

19  concentration, and we're going to go up the scale.  So, we have

20  a certain concentration that's background, right?  We just

21  talked about that?

22  A    Yes.

23  Q    Then we have another concentration that's in excess of

24  background.  That's the PEL, right?

25  A    Yes.

Brody - Cross/Bernick                    118

1  Q    Now, people have asked the question of, is there a

2  threshold; that is, an amount of exposure that is necessary for

3  there to be disease?

4         MR. BAILOR:  Objection, Your Honor.  This has gone

5  beyond the scope of direct.

6         MR. BERNICK:  Not at all.  The witness offered

7  specific opinions about how all these little different fibers

8  that he was talking about actually are responsible for the

9  causation of disease.

10        THE COURT:  He did opine that there are fibers that

11  will essentially split from the bundle of various intensities,

12  sizes, dimensions that will cause disease, so I think it is

13  within the scope.  You can proceed.

14        MR. BERNICK:  Yes.  And this will, I think, be fairly

15  brief, and then I'll be done except for an area that relates to

16  his involvement in the litigation.

17  Q    Now, the question of whether there is a threshold; that

18  is, an amount that's necessary for there to be causation of

19  lung cancer or meso from asbestos, that question has been asked

20  over the years, correct?

21  A    Yes.

22  Q    Okay.  And isn't it true that you don't know of what the

23  threshold is, you don't have an idea of what the threshold is,

24  correct?

25  A    I don't think anyone does.

1 Q    Right.  So that today the question of what the threshold

2 is; that is, how much exposure there must be before you get

3 sick is still an unanswered question.  Fair?

4 A    Right, because it's different for different people.  Sure.

5 Q    Well, but it's -- there's no threshold that's actually

6 been specified for -- even for a group of people, correct?

7 A    I agree.

8 Q    Okay.  So, now, this additional amount above background,

9 the kind of additional contribution above background that's

10 necessary to cause disease, you've never calculated that, and

11 you don't know of anybody else who has calculated it, correct?

12 A    Right.

13 Q    And indeed, in terms of the epidemiology, even the

14 epidemiology doesn't tell you how much additional contribution

15 of asbestos is necessary to be causal, correct?

16 A    Right.  I mean, we know that there's dose response, but as

17 far as specific amounts, you can't say.

18 Q    Okay.  And is it also true that when it comes to the issue

19 of when you actually go back and take a look at the whole issue

20 of low dose causation, would you agree with me that the issue

21 of low dose causation is one where -- was one -- the long-term

22 effects of low chronic exposures or repeated peak above

23 background exposures to asbestos has not been defined in human

24 populations, would you agree with that?

25 A    Yes.  I would say that's right.

Brody - Cross/Bernick                              120

1  Q    Okay.  And little is known about the effects of low

2  chronic exposures on mesothelioma prevalence.  Would you agree

3  with that?

4  A    Well, right.  I mean, that's generally true.  There

5  certainly are cases that show low dose exposures, but as a

6  general principle what you say is true.

7  Q    Right.  And case reports are, again, on the scale of the

8  quality of evidence.  Case reports don't rise to the level that

9  epidemiology does.  Fair?

10 A    I agree.

11 Q    Okay.  Now, the last area, and then I'll be done, and

12 maybe we can take a break for lunch.  The expert report that

13 you filed in this case is approximately five pages long?

14 A    I think so.

15 Q    And I don't think it has a single citation in it, does it?

16 A    I don't believe so.

17 Q    Is it true that that little five-page report is something

18 that you use in every case in which you appear and testify?

19 A    I call it a generic report.  Yes.

20 Q    Generic report.  That's fair.  And isn't it true that

21 therefore to prepare for any given case -- I mean, before you

22 came in here today you almost didn't really have to do any

23 preparation, correct?

24 A    This is my own work.  I know it, yes.

25 Q    Okay.  So, you can stand up there for an hour-and-a-half

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                    121

1  without a single question and go through those slides without a

2  single note, and you say exactly the same thing that you've

3  said twice a month in Court for the last 13 years, correct?

4  A    And I can stand up in front of a medical school class

5  without any notes either and tell them what I think they should

6  know.

7              MR. BERNICK:  Move to strike as not responsive.

8  Could I ask -- have the witness answer the question, please?

9              THE COURT:  All right.  It's stricken.  Would you

10  please answer the question, doctor?

11              THE WITNESS:  Sure.

12  Q    Is the answer to my question yes?

13  A    Yes.

14  Q    Okay.  In fact, you've been testifying, I think, for

15  approximately 13 years on a twice-a-month basis, correct?

16  A    Well, the last ten years, certainly.  Yes.

17  Q    Okay.  And have you ever told us, or disclosed to anybody

18  in the litigation context what percentage of your income today,

19  or the last, say, five years, what percentage of your income

20  comes from work that you do on litigation versus work that you

21  do as a faculty member?

22  A    Well, if it's asked, I tell them.

23  Q    So, what's the percentage?

24  A    It's about 50 percent, 60 percent.

25  Q    Okay.  Now, I think you testified on direct examination

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                              122

1 that most of the time you testify for individual plaintiffs,

2 but from time to time you've testified for manufacturers, and I

3 think you mentioned Celotex, correct?

4 A    Right.

5 Q    But in fact, when you've testified for manufacturers,

6 that's been in the context of bankruptcy cases, right?

7 A    That's -- or insurance litigation, yes.

8 Q    Okay.  So, when it comes to actually testifying about the

9 causation of disease in any individual personal injury case, is

10 it true that in all of those instances you've testified for the

11 plaintiff?

12 A    Yes.

13         MR. BERNICK:  Your Honor, I think that I have no

14 further questions, and I will pass the witness.

15         THE COURT:  All right.  Mr. Bailor?

16         MR. HOROWITZ:  Your Honor --

17         THE COURT:  Oh, I'm sorry.

18         MR. HOROWITZ:  -- Greg Horowitz for the Equity

19 Committee.  We don't have any questions.  I just wanted -- a

20 reminder that in the future we may have a few questions.

21         THE COURT:  Yes, sir.  Thank you.  I apologize.

22         UNIDENTIFIED ATTORNEY:  The same for the unsecured

23 creditors.

24         THE COURT:  All right, sir.  Thank you.  Mr. Bailor?

25         MR. BAILOR:  Anybody else?

1                    REDIRECT EXAMINATION

2  BY MR. BAILOR:

3  Q    Dr. Brody --

4              THE CLERK:  Please state your name for the record.

5              MR. BAILOR:  Oh, I'm sorry.  Bernard Bailor for the

6  Asbestos Claimants' Committee.

7  Q    Can you explain to the Court the exact mechanism on the

8  molecular level that smoking causes cancer?

9  A    Well, I wish I could, Your Honor.  I mean, it --

10             MR. BERNICK:  Your Honor, I believe that this goes

11 beyond the scope of his expertise.  If he wants to offer

12 himself as an expert in that area I'd be happy to cross examine

13 him on that.

14             THE COURT:  I think the witness has said he'd be

15 happy if he could, but he can't.  So -- is that correct,

16 doctor?

17             THE WITNESS:  Well, it's the same -- it's the same

18 issue.  In other words, we know there are genetic errors --

19             MR. BERNICK:  Your Honor, he's now volunteering that

20 it's the same issue.  He is now stepping his toe in the water

21 of how we prove and deal with the causation of cancer from

22 cigarette smoke, and that is a new and different area, and I'm

23 happy if he goes into it, but I will cross examine him in that

24 area.

25             THE COURT:  Mr. Bailor, I understood where you were

Brody - Redirect                               124

1  going go to go with this.  I don't think it's where Mr. Bernick

2  intended that you go with this, but I got the point.  Do you

3  wish to pursue this area, or do you want to go down another

4  road?

5          MR. BAILOR:  Okay.  Let me withdraw the question.

6  Q    And, in fact, there are literally hundreds, if not

7  thousands of carcinogens; is that not true?

8  A    That's right.

9  Q    And, in fact, the exact mechanism that works on the

10 molecular level that causes cancer from any one of those

11 carcinogens is not yet known?

12         MR. BERNICK:  Objection.  There's a total lack of

13 foundation for that question without qualifying this man as an

14 expert with respect to all of those different carcinogens.

15         MR. BAILOR:  I disagree.  We spent a lot of time on

16 cross examination about the fact that there's no knowledge

17 about the mechanisms by which asbestos goes.  In fact, that is

18 true with respect for all cancers.

19         MR. BERNICK:  And again, if the witness were

20 qualified to address the issue and had addressed the issue,

21 that's fair game, but he has not been qualified on that at all.

22 Indeed, he has disavowed that expertise, and I did not raise

23 the question of what has been established or not established

24 with respect to any material other than asbestos.

25         THE COURT:  I think that's true.  I think you're

Brody - Redirect                              125

1  opening up a door.  If you want to pursue it, that's fine, but

2  we'll take a recess for lunch and let Mr. Bernick go at it.  So

3  --

4          MR. BAILOR:  Okay.  I'll withdraw the question.

5  Q    Doctor, have you written papers about cancer and the

6  carcinogen process?

7  A    Yes.

8  Q    Do you know how many, roughly?

9  A    I would say about a dozen, maybe ten papers or so.  I'd

10 have to go back and count.  But starting in the middle 80s,

11 with the work, the in vitro work, and then we produced lung

12 cancers, and just recently published a paper, it came out in

13 2007, on gene expression in mesothelial cells.

14 Q    And have you been invited as a guest at mesothelioma

15 conferences?

16 A    Yes.  I gave a talk at the International Mesothelioma

17 Conference last year in Chicago.

18 Q    You were shown on cross examination, a paper marked G --

19 Grace Exhibit 766 dealing with the p53 tumor suppressor

20 protein.  Does that tumor suppressor protein play a role in the

21 cancer suppression?

22         MR. BERNICK:  Which cancer suppression; tobacco or

23 asbestos?

24         MR. BAILOR:  Any cancer.

25         MR. BERNICK:  Well then, I object.

1  Q    Does this paper deal with the suppression of cancer

2  tumors?

3  A    Yes.

4  Q    You mentioned that you -- I'm sorry -- I thought I heard

5  an objection.  You mentioned that you cannot tell what level of

6  exposure will cause a cancer in an individual.  Could you

7  explain to the Court why you cannot tell that?

8  A    Well, the reason is that it's so different for different

9  people.  In other words, their susceptibilities, genetic

10 susceptibilities control whether a person gets a cancer or not.

11 I mean -- and this p53 suppressor protein is a good example of

12 that.  In 50 percent of all mesotheliomas, that p53 gene is

13 mutated.  Now, that gene stops cells from dividing.  If that's

14 a gene that gets damaged, then those cells are going -- can go

15 on and form tumors.  Now, in some people they are more

16 susceptible to getting p53 injuries than others.  It's the same

17 in cigarette smoking and in asbestos exposures.

18      MR. BERNICK:  Objection to the -- strike the answer

19 with regard to cigarette smoking, otherwise I'll have to go

20 down the road.

21      THE COURT:  All right.  Cigarette smoking, at this

22 point in time, as far as I know, is not the issue that we're

23 facing, so fine, we'll strike it with respect to cigarette

24 smoking, although I believe that was illustrative.  Go ahead,

25 Mr. Bailor.

1          MR. BAILOR:  Okay.

2  Q    Is it true, doctor, that evaluating whether or not a

3  cancer, an asbestos-induced -- a cancer was caused by asbestos

4  in an individual is going to require an in-depth evaluation of

5  the particular facts and circumstances related to that

6  individual?

7          MR. BERNICK:  Objection.  Lack of foundation.

8          THE COURT:  I'm sorry.  Would you restate it for me,

9  please?

10  Q    Is it true, doctor, that in determining whether or not

11  asbestos caused a particular cancer in an individual, that is

12  going to depend on an in-depth analysis of the facts and

13  circumstances related to that individual?

14          MR. BERNICK:  Objection.  Lack of foundation.  It's

15  also -- I won't make the leading objection -- there's no

16  foundation for that question.

17          THE COURT:  Well, I think there is a foundation based

18  on the witness' testimony.  Overruled.

19  A    Yes.  In other words, you'd need to go back and see what

20  that person was exposed to, and that would allow you to draw

21  conclusions about the cause of that person's disease.

22  Q    All right.  Now, how many cells must be impacted by

23  asbestos fiber, or be impacted -- strike that.  How many cells

24  would be impacted by a day of asbestos exposure in a particular

25  individual?

1      MR. BERNICK:  Objection.  Complete lack of

2  foundation.

3      THE COURT:  That's sustained.

4  Q   Now, the asbestos fibers you have studied include

5  chrysotile?

6  A   Yes.

7  Q   All right.  Do you agree that chrysotile can cause

8  mesothelioma?

9  A   Yes.

10 Q   You mentioned earlier that there must be continuous impact

11 of the fibers on the cells for causing cancers and mesothelioma

12 --

13      MR. BERNICK:  Objection.  I believe that's what the

14 record reflects.  Lack of foundation.

15      MR. BAILOR:  I believe the testimony is in the

16 record.

17      THE COURT:  I don't think that's exactly what the

18 witness said, but he can explain it.

19 Q   That one fiber won't do it, but it will take an impact of

20 some number of fibers?

21      MR. BERNICK:  Well, I --

22      THE COURT:  That's a different question, Mr. Bailor.

23 Do you want to ask the witness which question you want him to

24 answer, please.  Restate the question.

25 Q   Okay.  Do you agree, doctor, that it takes a number of

**J&J COURT TRANSCRIBERS, INC.**

Brody - Redirect                                    129

1  fibers to induce mesothelioma in an individual?

2  A    Yes.  So, what happens is, every time there's an exposure

3  some proportion of the fibers reach the target site.  Now, a

4  single fiber can cause a genetic error, but it's -- it takes

5  multiple fibers to increase the likelihood of that event.

6  Q    All right.  And is it true that with respect to

7  mesothelioma that low doses can cause mesothelioma?

8            MR. BERNICK:  I'm going to object.  First of all,

9  it's leading, although I've not made that objection in an

10 effort to get things done.  Secondly, what exactly does counsel

11 mean by a low dose?  We've already had testimony in this area,

12 and I think that if we're going to have a question, there's got

13 to be some dose.

14 Q    Do you believe a dose level at the PEL level could cause

15 mesothelioma?

16           MR. BERNICK:  Objection.  Asked and answered.

17           THE COURT:  I think it was asked on cross exam, but

18 this is redirect.  If it's laying a foundation for a next

19 question we can go into it.  You can ask it.  Go ahead, doctor.

20 A    Well, the -- as I said, the PEL level has not been shown

21 to cause disease, but you couldn't rule it out.  It could.  I

22 mean, it's a level above background, and it could cause

23 disease, and --

24           MR. BERNICK:  Objection.  Move to strike as being

25 based on speculation.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Sustained.

2  Q    Have you reviewed case reports involving low dose

3  exposures causing mesothelioma?

4  A    I've seen case reports, yes.

5  Q    And can you recall what kinds of levels were described in

6  there as being low dose?

7  A    Well, these would be doses that would be -- like, for

8  example, take home exposures or environmental exposures?  I

9  can't give you a dose because I don't know, and I don't know

10 that the papers actually come up with a dose, but those would

11 be relative to an occupational setting, low dose.

12 Q    Okay.  Now, the Berman and Crump article was mentioned on

13 cross examination.  Do you know how many of the studies in the

14 Berman and Crump article that were relied upon by Berman and

15 Crump had actual exposure information?

16 A    I don't know.

17         MR. BAILOR:  Can I have a moment?

18                   (Pause)

19 Q    You mentioned on cross examination the Bradford-Hill

20 criteria.  Did you state that biological plausibility was one

21 of the Bradford-Hill criteria?

22 A    Well, we didn't get into that, but it certainly is.  I

23 mean, that's where my work and the work of other scientists

24 like myself enter into those criteria -- is it plausible to

25 think that -- or to state that asbestos doing what it does adds

1  to the epidemiologic effect.  And -- sure.

2  Q    In your view is it biologically plausible for chrysotile

3  to cause mesothelioma?

4  A    Yes.

5  Q    In your view is it biologically plausible for fibers less

6  than five microns to cause mesothelioma?

7            MR. BERNICK:  Objection.  It is leading.

8            THE COURT:  Sustained.

9  Q    Do you have a view with whether or not fibers of less than

10  five microns can cause mesothelioma?

11  A    Yes, I do have an opinion.

12  Q    And would you please tell the Court what that view is?

13  A    Yes.  My opinion is that fibers less than five microns can

14  bind DNA, cause all of the changes that fibers cause, but

15  they're not as effective in doing so.  But if you have a lot of

16  them, and there are a number of small fibers around, they can

17  do whatever fibers do.  There's just no way to exclude them.

18  Q    Does that --

19            MR. BERNICK:  Move to strike the answer.  It has not

20  been responsive.  He didn't answer the question.

21            MR. BAILOR:  That was clearly responsive, Your Honor.

22            THE COURT:  It was responsive.  I believe the

23  question is going to be whether or not that is a view that

24  meets the criteria of the witness' expertise within his

25  scientific community, Mr. Bailor, and that is what I don't

Brody - Mullady                         132

1  know.

2  Q    Is that view shared by others in your scientific

3  community?

4         MR. BERNICK:  Objection.  Lack of foundation.  I

5  mean, who are these folks?  You know --

6         MR. BAILOR:  Ah, come on, Your Honor.  This is

7  getting a little absurd.

8         THE COURT:  He has been qualified as an expert, and

9  to be qualified as an expert you have to have an expert

10 community, so if you will restate the question to define it

11 within the expert community, Mr. Bailor, I think we'll get past

12 it.

13 Q    Doctor, is that view shared by others in your expert

14 community of cellular and molecular biology?

15 A    Yes.  The majority of scientists who deal with fibers

16 consider all the fiber lengths to be biologically active, and

17 we agree that long fibers are more dangerous than short fibers,

18 but I would say very few people would be willing to exclude

19 short fibers.  It just doesn't make any sense.

20        MR. BAILOR:  No further questions, Your Honor.

21        THE COURT:  Mr. Mullady?

22        MR. BERNICK:  Yes, I -- oh.  Sorry.

23                          EXAMINATION

24 BY MR. MULLADY:

25 Q    Good morning, Dr. Brody.  I represent the representative

**J&J COURT TRANSCRIBERS, INC.**

Brody - Mullady                                      133

1 for future asbestos personal injury claimants.

2          THE CLERK:  Please state your name for the record.

3          MR. MULLADY:  Raymond Mullady for the FCR.

4 Q    Doctor --

5          MR. MULLADY:  Can I have the ELMO, please?

6 Q    On cross examination Mr. Bernick showed you this article

7 from -- this February 28, 2008 article entitled "Asbestos

8 Exposure Predicts Cell Cycle Control Gene Promoter Methylation

9 in Pleural Mesothelioma."  Do you recall that?

10         THE COURT:  Exhibit 762 for the record.

11         MR. MULLADY:  GX-762.  Correct, Your Honor.

12 Q    Do you recall that --

13 A    Yes --

14 Q    -- line of questions?

15 A    Yes.  I haven't seen that.  It looked like a fascinating

16 new piece of work.

17 Q    And I believe Mr. Bernick read you this sentence that I've

18 bracketed here.  "Although there is a clear link between

19 exposure to asbestos and mesothelioma, and asbestos is known to

20 be both clastogenic and cytotoxic to mesothelial cells, the

21 mechanisms of causation of MPM -- that's malignant pleural

22 mesothelioma -- remain largely unknown."  Do you recall him

23 reading that to you?

24 A    Yes.

25 Q    The next sentence reads, does it not, "However, there is a

Brody - Mullady                                        134

1    rapidly emerging literature that describes inactivation of a

2    diverse array of tumor suppressor genes via promoter DNA CPG

3    methylation in MPM, malignant pleural mesothelioma, although

4    the ideology of these alterations remains unclear." Did I read

5    that correctly?

6    A    Yes.

7    Q    Sir, can you tell the Court what -- first of all, what

8    tumor suppressor genes are and their role in carcinogenesis?

9    A    Sure.  A good example is this p53 gene that we wrote

10   about.  In fact, it was the molecule of the year in 1993,

11   meaning that it's known to play a major role in biology.  And

12   these are the kinds of genes in which these methylation defects

13   can occur.  And that's what these people are writing about.  In

14   other words, they are moving the field another step closer to

15   understanding how you can cause errors in a tumor suppressor

16   gene, which stops cells with errors from passing on those

17   errors.

18   Q    And, sir, what is meant by the authors here that asbestos

19   is known to be both clastogenic and cytotoxic?

20   A    Um-hmm.

21   Q    Can you deal with those one at a time.  First,

22   clastogenic?

23   A    Sure.  Clastogenic is what I showed the Court, actually.

24   Clastogenic means damage to DNA, and when that DNA is in a

25   chromosomal form.  And so, you saw the DNA binding to the

1  fibers, and that's clastogenic damage.  Now, cytotoxic is a

2  general term meaning causes cell death.

3  Q    And these authors, as you can see here, have data that

4  suggest in their view a novel tumorogenic mechanism of action

5  of asbestos.  Did I read that correctly?

6  A    Yes.

7  Q    Sir, can you tell the Court what -- first of all, what

8  tumor suppressor genes are, and their role in carcinogenesis?

9  A    Sure.  A good example is this p53 gene that we wrote

10 about.  In fact, it was the molecule of the year in 1993,

11 meaning that it's known to play a major role in biology.  And

12 these are the kinds of genes in which these methylation defects

13 can occur.  And that's what these people are writing about.  In

14 other words, they are moving the field another step closer to

15 understanding how you can cause errors in a tumor suppressor

16 gene, which stops cells with errors from passing on those

17 errors.

18 Q    And, sir, what is meant by the authors here that asbestos

19 is known to be both clastogenic and cytotoxic?

20 A    Um-hmm.

21 Q    Can you deal with those one at a time.  First,

22 clastogenic?

23 A    Sure.  Clastogenic is what I showed the Court, actually.

24 Clastogenic means damage to DNA, and when that DNA is in a

25 chromosomal form.  And so, you saw the DNA binding to the

Brody - Mullady                              136

1 fibers, and that's clastogenic damage.  Now, cytotoxic is a

2 general term meaning causes cell death.

3 Q    And these authors, as you can see here, have data that

4 suggest in their view a novel tumorogenic mechanism of action

5 of asbestos.  Did I read that correctly?

6 A    Yes.

7 Q    Now, you have not read this paper, so I won't take you

8 further into it, but that's just to set the stage for a couple

9 of statements at the back of this paper that I do think bear on

10 your direct examination, but I'll ask you if you agree with

11 that or not?

12          MR. BERNICK:  Well, how can he agree with it if --

13 well -- go ahead.  Go ahead.

14          THE WITNESS:  Gee, thanks.

15          MR. BERNICK:  Do you want to -- it might be

16 appropriate to give the good doctor time to read the paper if

17 you're going to examine him on it.

18          MR. MULLADY:  Oh, I don't think he'll need to read

19 the whole paper to agree with this statement.

20 Q    Doctor, you tell me if you disagree.  On Page 13 of this

21 exhibit the authors write, "Asbestos exposure is associated

22 with chronic inflammation and the physical presence of asbestos

23 fibers at the interface of the mesothelial membrane and the

24 lung induces a dose dependent cycle of death and regrowth of

25 mesothelial cells in the area of fiber deposition."  Is that

1  statement consistent or inconsistent with your direct

2  examination this morning?

3  A    This is exactly what I showed the Court.

4  Q    And can you remind the Court where you demonstrated that

5  principle in your direct examination?

6  A    Right.  Well, the first point is physical presence of the

7  fibers at the interface of the mesothelial membrane.  So,

8  that's when I got the fibers out to the pleura by way of the

9  lymphatics.  And then -- if you put that back up?  I don't have

10  it in front of me, so --

11              MR. MULLADY:  I'm sorry.

12  A    And then the next point, induce a dose dependent cycle of

13  death and regrowth.  Right.  So, what happens is the cells that

14  are dying by way of programmed cell death that I told you about

15  through these after certain genes are damaged, and then

16  regrowth of the cells that remain alive.  I mean, cancer is the

17  most insipid form of natural selection.  You know, the cells

18  that are amenable to death die, and then those with errors that

19  can pass on those errors are the ones that do so, and those are

20  the ones that cause the tumors.

21  Q    Thank you, sir.  And finally, the authors here, on Page

22  14, state, as they did earlier, that "Additionally, asbestos

23  fibers are known to be clastogenic and lead to genotoxic

24  damage."  And we've already discussed that, correct?

25  A    Yes.

1  Q    And they go on to say, "In tumors with higher asbestos

2  fiber burden may be induced to grow faster, possibly leading to

3  the preferential selection of clones with silenced cell cycle

4  control tumor suppressor genes."  Can you explain what they are

5  saying there in layman's terms?

6  A    Sure.  Okay.  So, we know clastogenic and genotoxic.

7  Those are the -- that's really the DNA damage that we talked

8  about.  Tumors with higher asbestos fiber burden, this is a

9  sort of dose response.  In other words, the more cells that you

10 have with these errors, the more likely you are to have one

11 that gets away.  And that's the final point leading to the

12 preferential selection of clones and silenced cells cycles.

13 So, these are the damage to specific genes that control the

14 cell cycle.  The more fibers that are there, the more likely

15 these events are to occur.

16          MR. MULLADY:  No further questions.  Thank you, sir.

17          THE WITNESS:  You're welcome.

18          THE COURT:  Mr. Bernick?

19                    RECROSS EXAMINATION

20 BY MR. BERNICK:

21 Q    Well, you know the gig here, Dr. Brody.  I get one more

22 little shot at you, and then we'll set you free here.  We had,

23 in the -- I believe that Mr. Bailor drew your attention to the

24 p53 study, which was Exhibit 766.  And that did talk about p53.

25 That's also the study where the lead author, and you joined in,

Brody - Recross/Bernick                    139

1  also made the statement that, "the mechanism by which asbestos

2  causes fibrosis remains unclear."  That was exactly the same

3  article --

4          MR. BAILOR:  Objection.  This has been asked and

5  answered.  This is recross.

6          MR. BERNICK:  No.  I'm providing the linkage that

7  counsel declined to provide, which is that this is -- this very

8  paper is the one that recited that the mechanisms were unclear

9  and then reiterated that at the end of the paper.

10          THE COURT:  All right.  It's recross.  It's on this

11  article.  Let's just get it done.

12  Q    The same article, right?

13  A    Yes.

14  Q    Okay.  And at the end of the summary section it says,

15  "Activation of p53 and the dual functions of PCNA as a DNA

16  receptor and repair protein suggest that DNA repair and

17  increased cell proliferation are two distinct responses to

18  asbestos fibers in the lung.  This paper doesn't purport to say

19  that it's been proven that the p53 gene actually is

20  responsible, and damage to it is responsible for tumor genesis,

21  does it?

22  A    Well, it doesn't say that here, but it's certainly been

23  shown in a number of other studies.

24  Q    Could you --

25          MR. BERNICK:  Your Honor, again --

Brody - Recross/Bernick                    140

1          THE COURT:  Doctor, if you could just answer yes or

2    no, please?

3    A    Correct.  It doesn't say that.  We're appropriately

4    cautious.

5    Q    And then we got to this paper here, which is 762, and this

6    doesn't have anything to do -- counsel asked you questions

7    about p53, this paper, which is ten years later, doesn't even

8    mention p53, correct?

9    A    Well, it says tumor suppressor genes, and --

10   Q    I asked you whether --

11          MR. BAILOR:  Objection, Your Honor.  He hasn't read

12   the paper.

13          MR. MULLADY:  I join the objection.

14          THE COURT:  Well, he was asked about a great deal of

15   this paper.  If he hasn't read it he can certainly state that

16   fact.

17   Q    This doesn't mention anything -- doesn't say the letters

18   or numbers p53, does it?

19   A    I don't know.  I haven't looked in the references.  It

20   does say tumor suppressor protein, so I'd be surprised if they

21   don't reference p53.  But as I said, I haven't read it, so I

22   can't tell you.

23   Q    You haven't read this paper, either?

24   A    Well, what do you mean, either?

25   Q    Well, you haven't -- well, this -- I think the Court knows

**J&J COURT TRANSCRIBERS, INC.**

1  what I mean by that.  I --

2           MR. BAILOR:  Objection.

3           THE COURT:  Sustained.

4           MR. BAILOR:  Move to strike.

5           THE COURT:  Sustained.  Stricken.  Please don't argue

6  with the witness.

7  Q    When counsel took you through the first sentence, and then

8  said, oh, but there's more, and then he took you through half

9  the last sentence on the first page, it says, "These data

10 suggest --"  It doesn't say prove, correct?

11 A    Just like I use suggest.  That's right.

12 Q    "A novel tumorogenic mechanism of action of asbestos."

13 And then he didn't read on.  "And may contribute to the

14 understanding of precisely how asbestos exposure influences the

15 ideology and clinical course of malignant mesothelioma."

16 That's what the rest of that sentence said, correct?

17 A    Sure.  That's where we are.

18 Q    And not only that, but then counsel read from Page 13,

19 that recited a lot of different facts, or a lot of different

20 pieces of information about mechanism, and he got to a part of

21 it, and then he left off a lot of different statements about

22 activities, and insults, and cytotoxicity, and -- what was the

23 other --

24           MR. BAILOR:  I'm going to object to form here.  Could

25 we just ask the question?

Brody - Recross/Bernick                    142

1  Q    There were references -- clastogenic and cyto --

2          THE COURT:  That's sustained.

3  Q    Clastogenic --

4          MR. BAILOR:  There's an objection that's been

5  sustained, Mr. Bernick.

6          MR. BERNICK:  Fine.  I'll withdraw the question.

7  Q    Clastogenic and cytotoxic referred to effects on cells,

8  correct?

9  A    And DNA.

10 Q    And DNA.  And to say that something is cytotoxic does not

11 mean that it's necessarily carcinogenic, correct?

12 A    Right.  Separating those two.  Clastogenic deals with DNA,

13 and cytotoxic with the cell.  That's right.

14 Q    Okay.  And clastogenic doesn't necessarily mean it's

15 carcinogenic, correct?

16 A    That's true.

17 Q    Okay.  So, when you -- and when you said, in answer to a

18 prior question, what is your opinion concerning whether fibers

19 less than five microns cause or could cause mesothelioma, you

20 gave a long answer that ended in the words biologically active.

21 Do you remember that?

22 A    Yes.

23 Q    And the fact that a material is biologically active does

24 not necessarily mean that it's carcinogenic, correct?

25 A    True.

**J&J COURT TRANSCRIBERS, INC.**

Brody - Recross/Bernick                           143

1  Q    Okay.  In fact, biological activity is a very general term

2  that's designed to refer to the fact that a substance occasions

3  some kind of response by the human body, correct?

4  A    Right.

5  Q    Okay.  So, on the question, just so we're clear, are you

6  stating as an expert -- as an expert here in Court, that fibers

7  less than five microns have been proven to cause not biological

8  activity only, but proven to cause mesothelioma?

9  A    The same as any other fiber.  You can say the same thing.

10 You've been taunting me all day about what shows disease and

11 what doesn't.  Asbestos causes mesothelioma.  My opinion is

12 that you can't exclude a specific fiber length.  That's my

13 opinion.

14 Q    Okay.  I didn't ask --

15        THE COURT:  Is the answer, Doctor, no, it hasn't been

16 scientifically proven, but your opinion differs in that you

17 think it does, nonetheless?

18        THE WITNESS:  No, not exactly, Your Honor.  The point

19 is that asbestos has been shown to cause mesothelioma.  There

20 are some scientists who say that if asbestos is less than five

21 microns it doesn't cause it.  And that's -- I disagree with

22 that.  Asbestos causes it.

23 Q    But I think -- if I can rephrase, or re-put what I think

24 the Court was drawing as a distinction, which is what I maybe

25 inartfully asked you.  Would you agree that science has not

Brody - Recross/Bernick                    144

1  proven, has not demonstrated that fibers less than five microns

2  in length actually do cause mesothelioma?  Would you agree with

3  that?

4  A    I agree with that, and that fibers less than five microns

5  can't be excluded either.  That's not been demonstrated either.

6  And it's asbestos, so -- you know, my feeling is it can't be

7  excluded.

8  Q    Now, you did make reference to the fact that, well, you

9  know, different people may react differently, that is, there

10  may be case reports of people who got sick because individuals

11  may react differently and have different responses to asbestos.

12  Do you recall that?

13  A    Well, they do.  Sure.

14  Q    Okay.  Well, in point of fact, it's not within the purview

15  of your expertise to examine individuals, correct?

16  A    Of course not.

17  Q    Okay.  It's not within the purview of your expertise to

18  testify based upon individual clinical experience, correct?

19  A    Right.

20  Q    Okay.  And, in fact, isn't it true that you have never

21  actually done an assessment based upon your expertise of what,

22  in fact, did cause mesothelioma in a given individual, correct?

23          MR. BAILOR:  Objection.  Beyond the scope.

24          MR. BERNICK:  This is exactly his line of

25  questioning.

1           THE COURT:  I think this is within the scope.  You're

2  asking him particularly about causes, and I think this fits.

3  I've kind of lost track where we were, frankly, with what was

4  on redirect.  So, I apologize if it's outside the scope, but I

5  think it's a fair statement within his expertise, so I'm going

6  to let it go.

7  Q    So, the question, Dr. Brody, is, isn't it true that it

8  does not fall within the purview of your expertise to express

9  any opinion regarding what actually did or did not cause

10  mesothelioma in a given individual?

11  A    Well, I haven't done that in a clinical sense other than

12  review the pathology.  I mean, I've reviewed a number of

13  pathology slides of individuals, and working with the

14  pathologists making -- helping to make a diagnosis, but that's

15  not what I would do in litigation, and that's not what I would

16  do in a hospital setting.

17  Q    Okay.  And by the same token, you don't know whether there

18  is a -- you don't know whether different reactions by different

19  people, if there are different reactions by different people,

20  you don't know whether, in fact, they do have a basis in the

21  genetic make up of individuals, correct?

22  A    Well, nobody can predict susceptibility.  We know it's

23  there.  Just look at what happens when you line up 100 people

24  and expose them to the same thing.  Some of them get disease

25  and some of them do not.  And that's based on their genetics.

1  But I, nor anyone else now, can go and predict just what the

2  basis of that susceptibility is.

3  Q    Well, but in point of fact, to say that it's genetic

4  susceptibility that creates a risk factor for disease is

5  something that requires scientific proof.  You can't just

6  assume that that's the case just because a smaller number of

7  people get sick, correct?

8  A    Well, genetic susceptibility is an established concept.

9  We're not going to argue about that, I'm sure.

10  Q    Well, the question is whether it has been established that

11  there is genetic susceptibility to mesothelioma.  I've never

12  heard of a paper that expresses the scientific view that

13  genetic susceptibility has been proven for mesothelioma.

14  A    Oh.  Well, you've missed the boat, then.

15  Q    Okay.

16  A    Let me tell you about that.  All right?  If I may?

17  There's --

18  Q    No, I'm going to ask you --

19          MR. BAILOR:  Objection.  Let him complete his answer.

20          THE COURT:  No.  You may ask about this if we get

21  into it, because this is on recross, and frankly, this is

22  outside the scope of the redirect.

23          MR. BERNICK:  I'll withdraw the question.  That's all

24  I have, Your Honor.

25          THE COURT:  Mr. Bailor, do you want to follow this

1 line?

2          MR. BAILOR:  I don't think so, Your Honor.  I think

3 we can excuse the witness.

4          THE COURT:  Mr. Mullady?

5          MR. MULLADY:  Nothing further from the FCR.  Thank

6 you.

7          THE COURT:  All right.  Doctor, thank you.  You're

8 excused.

9          THE WITNESS:  Thanks.

10          THE COURT:  All right.  We will be in recess until

11 1:30.  Make it 1:40 so that you can have time to get back up.

12 Thank you.

13                    (Recess)

14          THE CLERK:  The Court will come to order.

15          THE COURT:  Be seated.

16                    (Pause)

17          THE COURT:  Mr. Bernick?

18          MR. BERNICK:  Yes, Your Honor.  Your Honor, I think

19 we have three matters of business to take up this afternoon.

20 First is the proffer of the remaining evidence in Grace's case.

21 Second is a discussion of the scheduling going forward.

22 Actually, I think we have agreed to switch that to last.  So,

23 the second order of business would be the motions that have

24 been filed with respect to Messrs. Krause and Snyder.  Peter

25 Krause, as you know, is a -- one of the principal claimant's

1  lawyers in the case, and he was deposed.  Mr. Snyder, actually

2  a former player on the right side of the courtroom, on the

3  defense side.  But he recently -- or actually a few years ago

4  went off and became a testimonial expert for claimants in the

5  asbestos litigation, and he's been proffered as an expert

6  witness, and we have a motion with respect to him, and both of

7  those will be able to review the deposition testimony that was

8  taken in connection with their testimony over the last several

9  weeks.  And then finally is scheduling.

10        So, I think that the least controversial matter is

11 the proffer of the remaining evidence in our case, and we have

12 a series of things to proffer.  We've discussed this among

13 counsel, and I believe that we have agreement that there aren't

14 objections to these.  They comprise summaries of depositions,

15 and then some of the documents that were used in connection

16 with the depositions.  The summaries are depositions that

17 already have been offered into Evidence, and then others that

18 have not been offered into Evidence.  All of the summaries have

19 citations to the underlying testimony, so if Your Honor wishes

20 to consider any additional testimony that's referred to, that's

21 obviously available to the Court.

22        With respect to the depositions that have -- or, the

23 testimony that has not yet been proffered to the Court, we

24 understand that the ACC and the FCR have reserved their right

25 to offer in counter-designations to any of the matters that are

1  set forth in the summaries as part of their case as a pre-

2  condition of their being prepared to proceed with the summaries

3  here this afternoon.

4        So, with that said -- and I guess there's one other

5  item of clarification.  Some of the summaries are of prior

6  testimony that relate to the assertion of a Fifth Amendment

7  privilege -- Fifth Amendment right with respect to the witness

8  subsequently, that is to say we have a series of doctor

9  witnesses who have taken the Fifth and their summaries both

10 comprise their assertion of the Fifth, and additionally other

11 testimony that they've given on prior occasions that we would

12 then tender to the Court in order to support our request that

13 the inference be drawn by the Court from the fact that the

14 Fifth Amendment right has been asserted, that the testimony

15 that they would otherwise have offered would be the same as

16 what had been offered before.  We want to be clear that the

17 evidence is being proffered by Grace.  Obviously Grace is

18 adverse to the ACC and the FCR, but we're not seeking to have

19 an inference drawn that in some fashion the ACC or the FCR were

20 instrumental or operative in connection with the assertion of

21 privilege.  It's not an inference that is adverse to the ACC

22 and the FCR.  It's an inference that's adverse to the witness,

23 so that the assertion of the Fifth Amendment does not have the

24 affect of foreclosing testimony that would otherwise be

25 forthcoming in the case.

1         And with that clarification, I think I'll just go

2 through the summaries and offer each one.  Do you want to have

3 the doors closed?  Is that --

4         THE COURT:  Is there a problem?

5         AUDIO OPERATOR:  Maybe the inside doors, if you don't

6 want to hear the noise we can shut the outside --

7                        (Pause)

8         UNIDENTIFIED ATTORNEY:  Highest and best use.

9         MR. BERNICK:  There's a very important discussion

10 that's going on outside on the bench.  So, with all of that

11 said, and in case any of it's unclear I know it will be

12 clarified before we're done here, the first offer we would make

13 is Exhibit 2161, which is a summary with respect to the

14 testimony of Dr. Ray Harron.  The video -- or, the deposition

15 was played on January 24 of 2008 in --

16         MR. FINCH:  David, do you have an extra set of the

17 summaries in Court so I can follow along?

18         UNIDENTIFIED ATTORNEY:  Nate, I've got it.

19         THE COURT:  I did not bring the set back.  Are these

20 the same as the set you gave me earlier?  Because if so, I'll

21 just go get them.

22         MR. BERNICK:  Well, here's the Court copy.

23         UNIDENTIFIED ATTORNEY:  We're fine.  But thank you.

24         MR. BERNICK:  For Court.

25         THE COURT:  Okay.

1          UNIDENTIFIED ATTORNEY:  Now we have two.

2          THE COURT:  Thank you.

3          MR. BERNICK:  That was designed to be plain enough so

4   that I wouldn't forget it, but it didn't work.  So, the first

5   offer would be Exhibit 2161, which, as I indicated, is the

6   summary with respect to the deposition of Ray Harron played on

7   January 24 of '08.  We would offer that.

8          THE COURT:  Any objection?

9          MR. FINCH:  No, Your Honor.

10          UNIDENTIFIED ATTORNEY:  No, Your Honor.

11          THE COURT:  The next one is the summary for Andrew

12   Harron, and that is Exhibit 2162.  That was not previously

13   played, but we would offer the summary.

14          THE COURT:  Any objection?

15          MR. FINCH:  No, Your Honor.

16          MR. MULLADY:  None.

17          THE COURT:  It's admitted.

18          MR. BERNICK:  The same with respect to James Ballard,

19   2163, summary played on January 24 of '08.  That is the

20   deposition played at that time.  We would offer 2163.

21          MR. FINCH:  No objection.

22          MR. MULLADY:  No objection.

23          MR. BERNICK:  Dominic Gaziano, G-a-z-i-a-n-o,

24   deposition played January 24, summary is 2164.  We would offer

25   it.

1          MR. FINCH:  No objection.

2          MR. MULLADY:  No objection.

3          THE COURT:  It's admitted.  2162 is admitted, as

4 well.  I don't know if I -- oh, wait.  Excuse me one second.

5 I'm sorry.  Ballard is 2163, correct?

6          MR. BERNICK:  That's correct.

7          THE COURT:  All right.  That's admitted.  I don't

8 think I said so.

9          MR. BERNICK:  Gaziano is 2164.  We would also offer

10 the summary of Oaks, 2165.

11          THE COURT:  Any objection?

12          MR. FINCH:  No objection.

13          MR. MULLADY:  No objection.

14          THE COURT:  One second.  It's admitted.

15          MR. BERNICK:  Lucas, 2166, which was -- the

16 deposition was played on January 24 of '08.  We would offer

17 that.

18          MR. FINCH:  No objection.

19          MR. MULLADY:  No objection.

20          THE COURT:  It's admitted.

21          MR. BERNICK:  Schonfeld, 2168, we offer that.

22          MR. FINCH:  No objection.

23          MR. MULLADY:  No objection.

24          THE COURT:  Admitted.

25          MR. BERNICK:  Dr. Richard Levine, which was read on

**J&J COURT TRANSCRIBERS, INC.**

1  January 24 of '08.  We would offer the summary, which is 2172.

2            MR. FINCH:  No objection.

3            MR. MULLADY:  No objection.

4            THE COURT:  Admitted.

5            MR. BERNICK:  Dr. Philip Lucas, deposition played

6  January 24 of '08.  We offer the summary 2173.

7            THE COURT:  Is that -- that's different from 2166?

8            UNIDENTIFIED SPEAKER:  Yes.

9            MR. BERNICK:  Yes, it is.

10           THE COURT:  All right.  I'm sorry.  This is 2173?

11           MR. BERNICK:  Yes.

12           THE COURT:  All right.  Any objection?

13           MR. FINCH:  No objection, Your Honor.

14           MR. MULLADY:  No objection.

15           THE COURT:  Admitted.

16           MR. BERNICK:  Then we have 2174, which is Oaks,

17 again, another Oaks, 2174.  We offer that.

18           MR. FINCH:  Another -- you mean --

19           MR. BERNICK:  It's different --

20           MR. FINCH:  It's the same guy, different --

21           MR. BERNICK:  Yes.

22           MR. FINCH:  -- stuff?  No objection, Your Honor.

23           MR. MULLADY:  No objection.

24           THE COURT:  Admitted.

25           MR. BERNICK:  Segarra.  The summary is 2176.  We

1 offer that.

2           MR. FINCH:  No objection.

3           MR. MULLADY:  No objection.

4           THE COURT:  Admitted.

5           MR. BERNICK:  Another Segarra, another summary, 2178.

6 We offer that.

7           MR. FINCH:  No objection.

8           MR. MULLADY:  No objection.

9           THE COURT:  Admitted.

10           MR. BERNICK:  The next one is a summary for

11 deposition of Charles Foster, played on January 24 of '08.

12 That's 2181.  We would offer that.

13           MR. FINCH:  No objection.

14           MR. MULLADY:  No objection.

15           THE COURT:  Give me a second here, please.  It was

16 played when?  I'm sorry.

17           MR. BERNICK:  January 24, '08.

18           THE COURT:  Okay.  It's admitted.

19           MR. BERNICK:  The next one is Heath Mason, deposition

20 played January 24 of '08.  The summary is 2183.  We would offer

21 that.

22           MR. FINCH:  No objection.

23           MR. MULLADY:  No objection.

24           THE COURT:  Admitted.

25           MR. BERNICK:  Additionally, we would offer the

1 following exhibits which have been reviewed with counsel and we

2 believe to be without objection, and I'm just going to read

3 them in slowly as a sequence, Your Honor.  They are GX-135,

4 139, 140, 142, 146, 147, 148, 150, 151, 261 through 265, 269

5 through 271, 322, 323 and 479.  We would offer all of those

6 exhibits, plus 143.  Okay.  We would offer that, as well.

7          MR. FINCH:  No objection.

8          THE COURT:  Are they in a binder somewhere?

9          MR. MULLADY:  No objection.

10          UNIDENTIFIED SPEAKER:  We kept them together with the

11 dep designations that we were going to offer, but we can put

12 them in a binder for you, Your Honor.

13          MR. BERNICK:  And let's just do that so we could

14 label it, Your Honor, as exhibits in connection with the dep

15 summaries.

16          THE COURT:  All right.  They're admitted.

17          MR. BERNICK:  And with that, and subject to the

18 reservation that Your Honor -- we were considering whether

19 there needed to be reservations, and in that respect thought

20 back on objections that had been raised with respect to Your

21 Honor, and whether any of them, if granted, might be cured by

22 our calling a witness.  And we think that there may be one or

23 two.  For the most part Your Honor has allowed evidence in

24 subject to deciding the objections later on, so we have made

25 the record.  But there are a couple areas where that's not so,

1  so I want to make sure that I reserve our right to put in

2  additional evidence in the event that Your Honor has determined

3  that for some reason we didn't create an appropriate foundation

4  and we need to create that foundation.  Subject to that caveat,

5  we would rest our case-in-chief for the estimation.

6        THE COURT:  Okay.  I think it would be better if the

7  witnesses are available to put that foundation in so that I've

8  got the whole record and can get through this process.  What I

9  don't want to do is find out that some objection is going to be

10 sustained, you think there's a cure, and I have to reopen this

11 case four months or five months from now.

12       MR. BERNICK:  I don't think that -- I understand

13 that, but I think that Your Honor has ruled on -- there are

14 objections that Your Honor ruled on with regard to foundation,

15 whether somebody could rely upon something.  And Your Honor let

16 the testimony in, but then said you may decide later on that

17 you want to hear more.  And we -- if you do decide that, we

18 will make those people available.  But right now we don't see

19 that Your Honor has told us to or that we need to.

20       THE COURT:  I see.

21       MR. BERNICK:  So, there's no point in our extending

22 the case on the basis of the possibility that Your Honor may

23 reconsider down the road.  But I do think that -- and it may

24 well be this just turns out to be a non-issue, but before the

25 -- all of the evidence closes, you know, we'll be sure to raise

1 the issue again to see if there's somebody else that Your Honor

2 would need to hear from.

3          THE COURT:  All right.

4          MR. FINCH:  Your Honor, we object to resting with a

5 reservation of rights.  A Court always has the power to reopen

6 a case at a party's request, but it's our position that if the

7 debtor rests, the debtor rests.  The debtor made the choice as

8 to what witnesses it would present and what testimony it would

9 elicit from them.  And it's our position that he cannot rest

10 the case subject to a reservation to recall a witness if, later

11 on, he wishes he had.  So, while he may make the motion at the

12 proper time, but I don't think there's any -- any authority for

13 resting subject to a reservation of rights.

14          MR. BERNICK:  Well, that's not -- it really has

15 nothing to do with what I've just said.  We're not choosing

16 about who we're going to call or not call.  The Court has said

17 that you may wish to hear from additional witnesses, and in

18 that circumstance we will be providing those witnesses.  And if

19 that's something that the Court feels is not necessary, we

20 won't.  It's not at our election.  It's at the Court's

21 election.  I just want to make sure that we haven't waived.

22          MR. FINCH:  Your Honor, we object to resting with a

23 reservation of rights.  They either rest, or they don't rest.

24          THE COURT:  I think the issue is this.  If I have

25 stated that I thought that a foundation had been satisfied, but

1  then determined, in looking at the record, that it had not, but

2  the problem is that I admitted the evidence and then conclude

3  later that I shouldn't have had, the problem is that I will

4  have created error on the record because somebody relied on a

5  document that I have now said I thought there was a foundation

6  for, but there wasn't.  And how do you handle it?  That's the

7  issue.  I think, Mr. Bernick is trying to get to, it's going to

8  apply to all of you.  I hope not to have to reverse those kinds

9  of decisions, but if I do have to reverse that kind of a

10  decision, I think that as to all of you the issue would be do I

11  give you an opportunity to lay the foundation if another

12  witness has relied on it, and I think in good conscience I'd

13  have to say yes.  I'd give whoever the party is the opportunity

14  to lay the appropriate foundation in some fashion if that

15  happens and we get there.

16          MR. FINCH:  Your Honor, that's true, and that's up to

17  the Court.  But it's up to the Court to decide at the proper

18  time --

19          THE COURT:  Right.

20          MR. FINCH:  -- not now.  You cannot rest with a

21  reservation of rights.  I've never heard of that.

22          THE COURT:  Well -- and I agree.  You don't rest with

23  a reservation of rights, but that's what I understand the issue

24  to be.  I think it's a fairness issue on behalf of the Court,

25  since I have told you all that I'm making rulings as we go

1 along to control the process of the trial, but that I'm going

2 to consider all the evidence at the end.  And I think that's

3 the problem that you all face in the context of this, and I

4 certainly don't intend to step on anybody's evidentiary rights

5 as we go through this process, so -- okay.

6        MR. BERNICK:  So, I think with that, the next order

7 of business is -- well, do you want to deal with the scheduling

8 now and just get it --

9        MR. FINCH:  No, no.  Has the debtor rested?

10       MR. BERNICK:  I just told you exactly what I did.  If

11 there's something else that you'd like to take up, feel free to

12 make another request of the Court, but --

13       MR. FINCH:  Your Honor, if the debtor has rested, the

14 ACC and the FCR would make a motion pursuant to Rule 52(c) for

15 partial judgment as -- a judgment on partial finding as a

16 matter of law.  It's our position that in an estimation for

17 purposes of 524(g) under the Bankruptcy Code, that the thing to

18 be estimated is the cost that the debtor would incur going

19 forward if it had either passed the asbestos claims through

20 unscathed and unimpaired, or if it had stayed in the tort

21 system.  That is what the -- we believe the controlling case

22 law requires one to estimate.  And as was very clear from Dr.

23 Florence's testimony yesterday, there's not a shred of evidence

24 in the record as to what the debtor's expected liability for

25 pending and future asbestos claims would be in the tort system

1  had it either not gone into bankruptcy or had it passed the

2  claims through.  So, we request a partial judgment on --

3  judgment as a matter of law and partial findings pursuant to

4  Rule 52(c).

5          MR. BERNICK:  I don't believe that Rule 52(c) even

6  has application in connection with an estimation proceeding.

7  Your Honor is going to issue a decision on that matter.  I

8  don't even know it takes the form of a judgment.  I don't know

9  who the parties to the judgment would be.  So -- but in any

10  event, we disagree with the legal position that's been asserted

11  by the ACC and the FCR for all the same reasons that were set

12  forth in the trial briefs.  And I understand that they may

13  choose to make their record, but I don't think that there's

14  anything further that would be required of the Court at this

15  time.

16          MR. MULLADY:  And for the record, Your Honor, the FCR

17  joins the motion made by the ACC.

18          MR. BERNICK:  So, with respect to scheduling --

19          THE COURT:  Wait --

20          MR. FINCH:  Excuse me.  Could we have a ruling on our

21  motion?

22          THE COURT:  Yes.

23          MR. FINCH:  I know you've ruled, Mr. Bernick.

24                      (Laughter)

25          THE COURT:  The motion is denied.  As I had indicated

1  earlier, I am going to consider all of the evidence at the end
2  of the case.  I think that the cases, to date, have looked at
3  an uncontested, in the sense of the issue that you've raised,
4  proceeding.  I have gone back and tried to look at every
5  estimation case that involves a mass tort.  I cannot find one
6  that looks at the issues in the fashion that the debtor has
7  crafted them exactly.  There is a changing landscape out there
8  with respect to what mass tort litigation may be as of a time
9  in the past, I think as of the time post-petition for this
10 debtor, but nonetheless, as of a time in the past, and that
11 past is obviously not the present.  And that will, I think,
12 apply going forward into the future, and that will definitely
13 affect, I believe, the estimation for future claims.  The cases
14 say that although you'd make the estimation for present claims
15 obviously as they're pending in the tort system as of the time,
16 and the cases do, at this point in time, focus on what the
17 debtor's liabilities would have been in the tort system.  They
18 also recognize that as to future claims you have to take
19 account of what that changing landscape would be.  And as a
20 result, I think there are some changes to what past cases have
21 looked at because there is a recognized and acknowledged change
22 in what that landscape has been.  And as a result, I am not
23 satisfied that what has gone on in all cases in the past is
24 what the world should be, or is.  Not just should be, but, in
25 fact, is at this time.  So, I'm overruling that motion.  I'm

1 going to hear all the evidence, and then I'm going to figure it

2 all out at the end.

3          MR. FINCH:  May I make one statement for the record,

4 Your Honor?

5          THE COURT:  Yes.

6          MR. FINCH:  The debtors also did not put on any

7 evidence of what, if any, changes there have been in tort law

8 or tort procedures since the bankruptcy petition date, and I

9 would ask the Court to revisit its review of the Owens Corning

10 decision, where the issue was squarely addressed what is it to

11 be estimated, the liability of the debtor in the tort system,

12 or the liability of the debtor assuming claims qualification

13 procedures that may be very different from the tort system that

14 could be adopted by a trust.  That issue was the number one

15 issue addressed and decided by Judge Fullam in the Owens

16 Corning case, and he squarely held that the thing to be

17 estimated is what is the future cost to resolve pending and

18 future claims in the tort system, not under some kind of

19 alternative hypothetical regime using very different criteria

20 than what the debtor had applied historically.

21          MR. BERNICK:  You know, Your Honor, we can go through

22 this.  We have briefs that run to a hundred pages.  That is,

23 a), a misreading of that case, b), that case never raised and

24 never considered the structure of the Bankruptcy Code and what

25 the Bankruptcy Code requires before a claim either a present or

1 a future claim can be paid at all.  It may be that they teed up

2 these issues, that is the ACC and FCR teed up these issues in

3 connection with other cases where the parties took different

4 positions, but they're not this case.  In this case the Court

5 has been totally clear that Your Honor, is going to decide

6 these matters as they are presented to the Court and based upon

7 the law and the facts.

8         And to have an argument about what Judge Fullam

9 decided when these matters were not placed before the Court is

10 really kind of an irrelevance.  And in fact it presumes that

11 the Court is not an independent Court here and won't consider

12 this case based upon the law and the record that's presented

13 here.  And so to keep on arguing as we constantly hear now,

14 well, what's happened in other cases doesn't really advance the

15 cause.  It certainly doesn't advance the cause of getting this

16 case complete.

17         If we're going to have a full argument, as we did in

18 opening statement in connection with the law and what the facts

19 are, I'm more than happy to do that.  But to have this

20 continuing dialogue where at every point in order to, quote,

21 make their record, they got to get up and say oh, well, you

22 know, gee, the cases have been decided the other way around, I

23 just don't really think is a very productive use of our time

24 with all due respect to the fact that we're now at the resting

25 of our case.

1            THE COURT:  Well, stare decisis principles have in

2  fact governed the principles of jurisprudence in this country

3  for a very long time, Mr. Bernick.  So I'm not necessarily

4  prepared to set them all aside.  But nonetheless, I do think

5  that this case has taken off on a tangent of its own and I am

6  going to hear all of the evidence and decide it at the end.  So

7  the motion is denied.

8            MR. FINCH:  Thank you, Your Honor.

9            MR. BERNICK:  Thank you, Your Honor.  Now, with

10  respect to the trial time we have a major, major issue.  What

11  we have done, and what I'm putting up on the monitor here is

12  we've tried to figure out based upon -- both sides have

13  exchanged not only lists, but estimates of the time that it

14  will take to complete testimony.  And Your Honor underscored, I

15  think, at our request at the conclusion of proceedings last

16  week that we should get a list -- a real list of the witnesses

17  that they're actually going to call.

18            And so we've now been given that list.  There are a

19  couple of people who have been taken off.  But basically what

20  we have here is the current list together with the time

21  estimates that have been provided, some of them with respect to

22  some witnesses.  All we have are their designations, for

23  example, of our people's depositions and we haven't really had

24  the opportunity to see how much we're going to have to

25  designate in response.  So it's not a perfect situation.

1          But the bottom line really is quite clear which is

2    that based upon their list and the estimates of time we won't

3    even get through their case in chief, to say nothing of our

4    rebuttal or any surrebuttal they might have within all of the

5    trial days that have been allotted.  It's just not going to

6    happen.  And we had a very extended discussion at the behest of

7    the ACC and the FCR before this trial began, the thrust of

8    which was how can we be sure that this case is going to be

9    completed on time?  Complete with injunctions and warnings that

10   counsel for the ACC were not going to be available beyond a

11   certain point in June.  And I think our position was that we

12   could make it happen, we can get this case done, we don't have

13   to have a formal clock, but we can get the case done.

14         It now appears that perhaps our position was ill-

15   advised.  Because what's happened is that we're done with our

16   case in chief within a period of less than seven days and we

17   now have upwards of 11 perhaps 12 or 13 days that they've

18   reserved for the presentation of their evidence.  This is

19   simply not workable.  And either they don't intend to finish

20   within the trial days that are allotted, or they're not telling

21   us what their real list is and how long these people are

22   actually going to take.  Either way we shouldn't have to be

23   wrestling with the burden of either problem.

24         We should have a schedule from them that calls it the

25   way that it is.  Either they're going to be done much sooner

1 and they're not going to call these witnesses, all of them or

2 they're not going to take as long as they've said, which I'm

3 skeptical of given the time estimates that they've given for

4 cross, or we're going to need more trial time, in which case

5 they ought to make themselves available for that trial time.

6          Now, my client's vast overwhelming preference is that

7 we stick within the trial schedule.  I'm sure that that's the

8 Court's preference as well.  But I can't -- I don't think it is

9 correct, fair, appropriate that we have to prepare for all of

10 these witnesses when they're not going to be called or prepare

11 for long deposition designations when they're not going to be

12 used and deal with the uncertainty of what this trial schedule

13 is going to be like.  It's got to stop.

14          And what I would ask the Court request of the ACC and

15 the FCR is they go back to their drawing boards between now and

16 next Monday and come up with a real list of witnesses and a

17 real schedule so that we can get this case back on track.

18 Because right now it's not even close.  And the debtor has not

19 worked this way.  We gave them a definite list.  No more, no

20 less, we finished on schedule.

21          THE COURT:  Well, I ordered a definite list to be

22 given to you last Friday.

23          MR. BERNICK:  What?

24          THE COURT:  I ordered them to give you a definite

25 list last Friday.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. BERNICK:  This is it.

2           UNIDENTIFIED ATTORNEY:  No.

3           MR. FINCH:  No, that's not what we gave him, Your

4  Honor.

5           MR. BERNICK:  Well, this is -- well, I believe this

6  is absolutely the best and most current information that we

7  have.

8           MR. FINCH:  No.  We certainly didn't have Mr. Longo's

9  testimony on June 3rd and 4th.  Let me back up, Your Honor.

10          MR. BERNICK:  No, no.  You have Longo -- we put the

11 dates in driven by the time estimates.  These are not the dates

12 that you all had because you didn't consider the time period

13 that had been allotted for the examination of any of these

14 people.  You artificially had everybody crammed in to a shorter

15 period of time.  It's not going to happen because the time

16 estimates and the scope of testimony that you all have proposed

17 is completely out of sync with the calendar.  That's the

18 problem

19          THE COURT:  All right.  Let me start from the

20 beginning.  Is this the accurate list of witnesses that you

21 expect to call?

22          MR. FINCH:  We -- yes, Your Honor, but we never

23 intended to read the deposition testimony in open court of Mr.

24 Hughes or Mr. Beber or anyone else.  We had intended to proceed

25 by summaries and in handing out the depositions for the Court

1  for the record so the debtor can object or do whatever it wants

2  to with that.  But we were going to proceed with respect to

3  those depositions the way they just proceeded this afternoon

4  with respect to some of the doctors who testified by

5  deposition.  So that's not going to take any -- we shouldn't

6  take any courtroom time.  Secondly, I think --

7          UNIDENTIFIED ATTORNEY:  Two days.  That takes care of

8  two days.

9          MR. FINCH:  That takes care of two days on this.  I

10  think that --

11          MR. BERNICK:  So now we're to June 3rd.

12          UNIDENTIFIED ATTORNEY:  Can we finish?

13          MR. FINCH:  May I please continue, Your Honor?  We

14  had our first witness Dr. Brody.  I had not anticipated that we

15  would finish in time with him today to bring Dr. Welch in, so

16  that's my fault that Dr. Welch is not here this afternoon.  But

17  our next two witnesses are Dr. Roggli who's available on the

18  7th only, and Dr. Welch who's available on the 7th and 8th.  So

19  we would have Dr. Roggli's direct examination and cross

20  examination on the 7th and Dr. Welch's direct examination.  And

21  I don't know whether we would finish the cross on the 7th or

22  not.

23          On the 8th there would be the testimony from an

24  industrial hygienist Steven Hays.  And then as to the next two

25  witnesses are Marshal Shapo and Steven Snyder.  And it is --

1 that is the order in which we will present them, although the

2 one caveat to that is Mr. Snyder is available on the 9th and

3 the 14th only and not on the 15th.  And so we very well may

4 decide that Mr. Shapo may be a rebuttal witness or a

5 surrebuttal witness rather than a direct case witness.  And so

6 I would anticipate that we would get to Mr. Krause on the 14th.

7        I don't think we need to call Mr. Radecki at all.

8 Mr. Radecki is being proffered for solely for purposes of the

9 discount rate and the inflation factor for one of our -- the

10 discount rate for two of our experts and inflation factor for

11 one.  I don't think there's going to be any big dispute.  This

12 case is not going to turn on which discount rate a witness use.

13 I would hope that we could work out a stipulation on the

14 discount rate with the debtor.

15        And it was my intention or my thought that on the

16 15th of April we would put Dr. Peterson on.  His testimony, I

17 assume, would take a day like Dr. Florence's.  The 16th of

18 April would be Ms. Biggs.  And then on the 5th of May we would

19 finish our case with Mr. Longo and Mr. Myer and Mr. Stallard.

20        MR. BERNICK:  All in one day?

21        MR. FINCH:  Well, perhaps it would spill over to the

22 6th, but I think we would basically be done by the 6th of May.

23        MR. BERNICK:  Well, first of all, that's not the

24 list.  That's now an amended list.  I'm very happy to have it

25 amended.  But what I would ask the Court to do is to have them

1  put that down in writing so we can see where it ends up and

2  we're still going to have a problem with time.  There is a

3  rebuttal case.  And the rebuttal case is not an insignificant

4  case.  And that's not just our doing, it's their doing as well.

5  So all I ask Your Honor is that they come up with a schedule

6  that's a real world schedule.  It's very helpful to know that

7  Mr. Shapo will be a rebuttal witness if he's called, that Mr.

8  Radecki doesn't need to testify.

9        MR. MULLADY:  Well, just to clarify, that decision

10  hasn't been made yet about Professor Shapo.  He's an FCR

11  witness.  The present intention is that he will be here

12  testifying April 9th.  I think what Mr. Finch said accurately

13  is that it's possible that he will be pulled and submitted as a

14  surreply witness.

15        THE COURT:  Yes.  That's what he said.

16        MR. MULLADY:  Okay.  Thank you.

17        MR. BERNICK:  That is precisely the problem.  They're

18  still trying to figure out what they want to do, and they're

19  doing it at our expense.  We gave them committed lists and we

20  met with them, and we met them, and that saved them a ton of

21  work in the process.  We chopped off all kinds of witnesses.

22  We need the same treatment and response, and we would ask that

23  revised list be submitted by Friday that shows that we are in

24  fact going to finish this case by the 4th.  And if we're not

25  going to finish the case by the 4th, then we need to take up

1  next Monday what's going to happen with the balance of the

2  case.  We can't have the case continue to spill along at the

3  convenience of, or subject to the schedules of counsel.

4          THE COURT:  By the 4th of June?

5          MR. BERNICK:  No.  Yes.  That was the plan.  By the

6  4th of June.

7          THE COURT:  Okay.  I'm sorry.  I just lost whether

8  you were talking about the ACC/FCR case they said May 6th or

9  whether you were talking the entire case.  I just wasn't --

10         MR. BERNICK:  The entire case --

11         THE COURT:  Okay.

12         MR. BERNICK:  -- is supposed to be done by the 4th of

13  June.

14         THE COURT:  All right.  I think the concept of

15  getting a final list is what I had ordered earlier.  So, yes --

16         MR. FINCH:  And we gave them that list, Your Honor.

17  We gave them that list.  We filed it on March the -- last

18  Friday.  Whatever day that was.

19         MR. BERNICK:  So for -- three days we now see that

20  it's already changed.

21         MR. FINCH:  No.  The only thing that has changed is

22  we told you -- it wasn't a change, we told you that we didn't

23  intend to read the Hughes and Beber material to the Court.  And

24  the only change is the possibility solely based on --

25         THE COURT:  All right.  Folks, you know this really

1  is not a discussion you ought to have to have here in court.

2  This is really a discussion that you folks ought to be having

3  on your own.  I honestly don't know what it is that I'm going

4  to add to this except that it seems to me that if they're

5  telling you they're going to be done by May 6th they should be

6  done by May 6th.  And yes, you should get a final witness list

7  and an order so that you can adequately prepare cross

8  examination.

9       MR. BERNICK:  Yes.  Unless we have -- unfortunately,

10 unless we have these discussions before the Court it just

11 doesn't get done.

12      THE COURT:  Well, I'm ordering it to get done.  I

13 mean, you folks talk to each other about everything else.  Why

14 don't you talk to each other about schedules?

15      MR. FINCH:  We filed a list that -- the order of

16 witnesses is what he put up there.  The time estimates and the

17 time that he showed up there is very different from our

18 conception of the list.

19      THE COURT:  All right.  Then get together about the

20 time estimates.  Because, you know, folks, you've been doing

21 this a long time.  You ought to know by now.  Dr. Peterson has

22 testified in how many asbestos estimation cases?  At least a

23 half a dozen.  You ought to know by now how long your case is

24 going to take with him.

25      MR. FINCH:  We do.

1          THE COURT:  Well then talk to each other about it so

2    that it shouldn't be an issue.  Both for direct and cross you

3    ought to know how long the cases are going to take for these

4    doctors.  And if it's going to be a one day/one doctor deal

5    then say that and we'll know.

6          MR. HOROWITZ:  Your Honor, Greg Horowitz for the

7    equity committee.  Since you mentioned the getting together on

8    time estimates I want to make one thing clear.  Nobody has

9    talked to the equity committee about any estimates of time that

10   we would have for cross.  We do intend to cross some of these

11   witnesses.  Notwithstanding what Mr. Bernick put up that is not

12   a complete list of the time estimates as far as we're

13   concerned.  And we've never seen any of these estimates.  We

14   have not been involved in any of these discussions we think we

15   should be.

16         THE COURT:  Fine.  I'm ordering all counsel for all

17   parties, that includes the creditors' committee, to get

18   together as soon as today's hearing is adjourned.  You are not

19   free to leave this courtroom until you have come together on a

20   schedule of all witnesses, how long it will take to do the

21   direct and cross.  If you miss your planes, so be it.

22   Hopefully that will be a time period which will be meaningful

23   to you so that you can get out of town on time.  Okay.  Next,

24   Mr. Bernick.

25         MR. BERNICK:  Yes.  We have motions that are pending

1  with respect to Messrs. Krause and Snyder.  And I've got some

2  summaries to show the Court in order to facilitate the

3  consideration of what as predicted turns out to be a rather

4  twisted set of tales and issues.

5          MR. FINCH:  Your Honor, may we ask that the motions

6  be limited to 20 minutes per side per motion in limine?

7          MR. BERNICK:  I'd be happy to do that except the last

8  time that happened we followed the limit and they went 15

9  minutes over because they had more people who wanted to talk.

10  That is a request that I'm happy to accommodate if it actually

11  applies to both sides.

12          MR. FINCH:  It will.

13          THE COURT:  Okay.

14          MR. FINCH:  And I had requested of Mr. Bernick as a

15  personal courtesy that we do Snyder first.

16          MR. BERNICK:  Okay.  We'll take up Mr. Snyder first.

17          THE COURT:  I'm sorry.  What's the request?  You want

18  to do 20 minutes per side per witness?

19          MR. BERNICK:  Correct.

20          THE COURT:  So 20 on Snyder --

21          MR. FINCH:  And then 20 on Krause.

22          MR. BERNICK:  I have to say, Your Honor, I'm not

23  going to take 40 minutes to talk about both of these people.

24  So I'm happy to do it any way the Court pleases.

25          THE COURT:  It doesn't matter to me, Mr. Bernick.

**J&J COURT TRANSCRIBERS, INC.**

1  That's fine.

2         MR. BERNICK:  Okay.  Your Honor, with respect to Mr.

3  Snyder, there's a question of how to put an awful lot into a

4  relatively small package.  But essentially Mr. Snyder is former

5  defense counsel for <u>Fibreboard</u> and then for a period of time

6  the <u>Owens Corning Corporation</u>.  He was a very active lawyer

7  defending those clients for many, many years in litigation all

8  over the United States.  At a point, Owens Corning decided to

9  enter into what they called the National Settlement Program.

10  That included <u>Fibreboard</u>.  And at that point the litigation

11  business for those two entities wound down considerably.  That

12  was also the period of time when the Supreme Court was being

13  asked to consider global class action settlements with respect

14  to those companies.

15         Ultimately Owens Corning never really emerged from

16  the process of being involved in the National Settlement

17  Program.  When the Supreme Court overturned those decisions

18  that underpinned the settlements, Owens Corning was essentially

19  left with trying to keep on maintaining the National Settlement

20  Program.  It didn't work and Owens Corning went into

21  bankruptcy.  As kind of a transition Mr. Snyder, really coming

22  out of the loss of a major asbestos case called <u>Kozey</u> in

23  Mississippi in the late 1990's, decided to take on

24  representation of Owens Corning against the tobacco industry.

25  The proceeds from that settlement being proceeds that would go

1   to people probably of whom some of them were also asbestos

2   claimants.  But be that as it may his career took a major

3   change.  And from that point going forward into the 2000's Mr.

4   Snyder has acted in a variety of capacities both as expert

5   witness and as counsel in various capacities for people who

6   represent or who are the interests of personal injury

7   claimants.

8           For the Court's information, Mr. Snyder is counsel

9   for Flintkote in connection with the Flintkote litigation out

10  in California.  So in one of his roles he has taken on the task

11  of being an expert witness in this case for either the ACC or

12  the FCR.  I think it's for the ACC.  And he has offered a very,

13  very extensive report as an expert, but then also as a fact

14  witness.  And in that expert report he essentially goes through

15  chapter and verse in a tremendous level of detail of the ins

16  and outs of how <u>Owens Corning</u> and <u>Fibreboard</u> defended their

17  cases.  And he has a whole bunch of observations about what

18  worked and what did not work, and basically the bottom line is

19  that nothing worked.  And they had to pay to get rid of their

20  liability and they did pay to get rid of their liability.  And

21  to try to defend the cases on any other kind of basis would

22  have been fruitless and non-economic.  And he then brings to

23  bear all of that wisdom and accumulated learning to say that

24  well, the same thing would have happened to Grace.

25          If Grace had stayed in the tort system that they also

**J&J COURT TRANSCRIBERS, INC.**

1 would not have been able to defend themselves through

2 aggressive litigation, that they had overwhelming liability and

3 that any and all things that could ever have been tried they

4 tried.  They didn't work and so Grace was essentially in the

5 soup.  And he offers the opinion that things have not really

6 changed all that much since that time per his own observation.

7        So we have not taken his deposition as a fact

8 witness.  And the reason that we didn't do that was -- or that

9 we took that decision was that Mr. Krause was propounded as

10 being the test case for the fact witness so Mr. Krause's

11 deposition was taken.

12        So we come before the Court in connection with Mr.

13 Snyder with the basic proposition that we should not burden Mr.

14 Snyder with the necessity of appearing in this court.  And the

15 reason for that -- and for that matter testifying as a fact

16 witness.  But the matter that we have actually raised today is

17 his testimony as an expert.

18        And the reason for that is that Mr. Snyder really has

19 nothing to say as an expert that is either a) -- is other than

20 either a) opinions on what the law is.  And we don't believe

21 it's appropriate for any expert to come in and talk about what

22 the law is.  That's for Your Honor to decide.  And Number 2 to

23 revisit on an anecdotal basis his forays and his battles in the

24 asbestos tort system on behalf of other clients by way of

25 saying that's support his testimony as an expert but the same

1 thing is true of Grace.  We don't believe that that, that is

2 the latter, is proper expert testimony no way, shape or form.

3         Mr. Snyder, of course, has reviewed certain documents

4 that relate to Grace, but he has not lived through the process

5 himself, he is not conversant in the process as he would be as

6 a fact witness, and the question then becomes as an expert does

7 he now develop the capacity to take this incredible detailed

8 history of what he did for these two companies and transpose it

9 onto Grace, a different company to talk about what would have

10 happened if Grace never went into Chapter 11.  And the answer

11 to that is clearly no.  And this then gets to what I hope will

12 be a fairly succinct presentation.  T.J., do you have slide 20

13 and 21?

14         T.J.:  For?

15         MR. BERNICK:  I think it's probably for the omnibus

16 show.  Okay, we'll just do it on ELMO.  That's all right.  The

17 first thing to notice about Mr. Snyder is that his testimony in

18 this -- he testifies in the area of basically how people

19 behaved in the tort system.  Claiming behavior.  And that may

20 strike the Court as being a little bit familiar because that is

21 almost exactly the same subject matter that Dr. Peterson

22 testifies about.  And for that matter Dr. Biggs test -- Ms.

23 Biggs testifies about.  That is what the claiming behavior has

24 been and what it will be.

25         Now, when it comes to claiming behavior we know that

1  that is a fairly extended process.  We say that they're both

2  pre and post bankruptcy.  There are many different variables

3  that drive it and the like, and we take issue with Dr. Peterson

4  because he attempts to create trends without actually doing the

5  work to find out what happens to the variables in the past and

6  will they continue going forward in the future.  So we say with

7  Dr. Peterson who confronts exactly the same testimony but on

8  the basis of data and -- of questionable value, but data and on

9  the basis of some kind of procedure we take issue with whether

10  his process really rises to the level of being sufficiently

11  systematic and consistent and reliable that it's scientific and

12  that it passes Daubert.

13         We show that it doesn't have predictive value.  We

14  show that it's not dependent upon an object of analysis but

15  instead assumptions that he makes that drive, the performance

16  of his model.  But be that as it may Dr. Peterson confronts

17  exactly the same subject matter, but at least purports to bring

18  to bear a systematic approach.  The same thing cannot be said

19  of Mr. Snyder.  Mr. Snyder does no systematic review of

20  gathering of data.  Does no systematic analysis of data,

21  quantifies absolutely nothing.  So he's taking the same subject

22  matter and he's actually taking a step down rather than a step

23  up or a step even sideways.

24         And his testimony at the deposition was quite clear

25  about this.  No systematic method.  He believes himself to have

1  observed asbestos filing trends and very claim values over time

2  while comparing these trends and values to the phenomenon

3  within the tort system.  And the key, he does not use a

4  systematic effort not to collect data.  This is right out of

5  his deposition.  Why?  I asked him well, how is it that you're

6  really different from Dr. Peterson?  And the answer is that he

7  also likes to talk about the law and economics of the law

8  within the mass tort context.  And he uses his method to reach

9  conclusion about the behavior of lawyers and parties based upon

10 his opinion of the economic consequences of decision.

11      So he likes to talk also about economics which is

12 what Dr. Peterson does, but he has no economic structure that

13 he brings to bear.  So what does it mean when he says, well,

14 I'm talking about the economics?  And the answer is you know

15 what, I know what makes people tick.  I know what they're

16 motivations are.  That is exactly his words is that he knows

17 what the actual motivations are.  And yet -- we then asked

18 well, what's the test?  What's the objective test of whether

19 you know other people's motivations?

20      And he says, and this is very telling -- I wish we

21 had it on video -- a very telling question because he says you

22 know what I've given serious thought to what works and what

23 does not work in this litigation because he's, a) attempted to

24 understand the tort system, b) applied creative solutions, and

25 c) tested the limits of the motivations of the players and the

1  scarcity of resources and funds.

2          That is his -- I must have asked him three different

3  times what is the objective test.  And the best thing that he

4  can do is go back and candidly say well, if I take a look at my

5  own career what is, you know, what kind of stands out?  And the

6  answer is well, I pushed the limits and I was a creative guy

7  and I tried to understand things.

8          So if that's the test and that's the measure is that

9  really a methodology at all?  Things that he did not review.

10 He did not review any of the claims files.  He has no -- none

11 of the claims files data.  He did not make any assessment to

12 the quantitative contribution of the factors important to the

13 settlement process with respect to any monetary portion that

14 Grace played.  That is, he talks about the settlement process,

15 but he has no analysis that actually takes that settlement

16 process and shows how it drives claim value.

17         And then what about his expertise?  The expertise

18 that he brings to bear.  And Mr. Snyder is a colorful guy and

19 he had very colorful testimony.  Why is his expertise different

20 from other asbestos lawyers?  You know, why is he any

21 different?  And the answer is, quote, I just have a lot more

22 moss on my back I think.  I've just been around a long time and

23 have seen a lot of things.

24         What about the facts and analysis underwriting his

25 report?  He says they're based upon 26 or 27 years of just

1 doing it.  And again, what distinguished him?  Quote, I pushed

2 maybe the limits of the litigation a little bit more vigorously

3 and hopefully more creatively than some others.  That's his

4 expertise.  He's an in the trenches lawyer.  That means he's

5 going to come into this court and basically offer an opinion on

6 20, 30 years of Grace litigation as a, quote, expert.

7        What about the reliance materials and methodology

8 related to his opinions on motivation, because he's addressing

9 motivation?  I think it's etched on my face as well as my mind.

10 It has to do with my, you know, the size of my belt.  Which is

11 not inconsiderable, but he wears it well.  It is as a matter,

12 you know, what my blood pressure reading is at any given time.

13 And you almost get the sense that the guy is not just being

14 candid he's being dismissive.  If he doesn't want to come in,

15 if he can't come in and offer truly objectively driven

16 testimony, what he brings in its place is almost demeaning of

17 the idea of being an expert witness.

18        What is the standard of basis on which the quality of

19 Snyder's work can be judged?  He says, quote, I talk about

20 practical outcomes in the litigation.  I haven't tried to throw

21 any academic construct around any of this.  Well, that's

22 exactly the problem.  He may call it academic, but you need to

23 be able to testify as an expert, you need to have a construct.

24 That's the whole idea of having principles and reliable and

25 reproduceable methodology is that there has to be a constrict

1  so it's not construct so it's not simply a matter of your say-

2  so.

3         How does he talk about his own methodologies?  Well,

4  quote, one of my methodologies was simple economics.  What

5  incentivized people to do things?  Money, marketplace forces.

6  I guess that's a methodology.  Part of the method was, quote,

7  basic rules of economic supply and demand negotiation of price.

8  Well, those are easy to say.  They're undoubtedly true in a

9  very broad sense.  That doesn't constitute a methodology for

10  actually analyzing claims behavior on an objective and reliable

11  basis.

12         He then says, further I think it's, you know, basic

13  accounting and bookkeeping and a smattering of economics.

14  There's nothing you wouldn't get in the first two years of

15  undergraduate school.  That made me feel comfortable because I

16  like to think that I can do the same thing as Mr. Snyder based

17  upon my experience.  But I don't think it's appropriate to

18  bring some other person in who's like one of the other lawyers

19  in this court and have them occupy a special status as an

20  expert.  That's not what we're here for.  And he admits he's

21  neither an economist nor an accountant.

22         So we really have almost what would be an

23  entertaining piece in a legal magazine, maybe the American

24  Lawyer will get involved in this, that of all places where ipse

25  dixit should not come into place.  Our federal courts involved

1  in sophisticated type cases as we have here.  And what do we

2  have?  We have an expert that gets up there in bold colors and

3  with bold bravado says hey, you know, I'm a heavy guy.  I'm a

4  guy who has been through this, and I got a lot of experience.

5  I'm going to tell it the way that it is.

6          That is not appropriate for expert testimony and it

7  actually shows to a certain extent disrespect for the rules

8  that have evolved over a long period of time now under Daubert

9  and are incorporated in Rule 702 and 703 of the Federal Rules

10  of Evidence.  So we would move for the exclusion of Mr. Snyder

11  as an expert witness based upon his own testimony in this

12  deposition.

13          MR. FINCH:  Your Honor, my partner Walter Slocombe

14  will argue this for the ACC.  Mr. Slocombe is a member of the

15  bar of the District of Columbia.

16          THE COURT:  All right.  Thank you.

17          MR. SLOCOMBE:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. SLOCOMBE:  As Nate Finch just said, my name is

20  Walter Slocombe and I represent the ACC.

21          As you know, Your Honor, the position of the ACC and

22  the FCR is that the issue in this case is ultimately what Grace

23  would have had to pay if it had still been subject to suit

24  rather than been in bankruptcy.

25          THE COURT:  Yes.  But how does that have anything to

1  do with what Owens would have had to pay if it had still been

2  subject to suit and not in the bankruptcy?

3       MR. SLOCOMBE:  Mr. Snyder's testimony is not contrary

4  to what Mr. Bernick said primarily about what happened with

5  Owens Corning or Fiberglass -- <u>Fibreboard</u>.  Sorry.  It is about

6  how the system worked, how it worked for Grace with specific

7  reference to Grace's experience.  He didn't represent Grace,

8  but he knows a lot about what happened to Grace.  He also knows

9  a lot about what happened --

10      THE COURT:  How does he know what happened to Grace

11 other than how anybody knows what happened to Grace in terms of

12 reading about things in the newspaper and so forth if he didn't

13 represent Grace and didn't work for Grace?

14      MR. SLOCOMBE:  Let me address that, Your Honor.  He

15 talks in his report, and he will talk when he testifies about

16 how he knows what happened to Grace.  Some of it was Grace was

17 co-defendant.  Some of it were cases.  This is a man with a

18 quarter century experience in this very specialized field.

19      THE COURT:  It doesn't matter.  You're talking now

20 about his fact component.  I'm talking about his expert

21 component.  And if he knows what happened to Grace because

22 Grace was subject to a lawsuit and either settled out or

23 suffered an adverse verdict and he was an attorney and has fact

24 knowledge that's a different issue.  We're talking about his

25 expertise right now.

1          MR. SLOCOMBE:  Of course his expertise involves

2    facts.  Indeed.  Part of Mr. Bernick's objection is it doesn't

3    involve facts.  He will explain how he knows these things about

4    Grace.  Mr. Bernick is free to cross examine him and if he

5    doesn't think that's appropriate basis he can do that.

6          THE COURT:  I'm trying to look at either the Kumho

7    Tire or the Daubert standards with respect to Mr. Snyder.  I

8    can't understand from looking at his report what type of

9    methodology whether you want to call it scientific, legal,

10   practical, based on one of their expertise.  What is the

11   methodology that he's using that can be put up on a screen that

12   another expert in his field -- because frankly I don't even

13   know what the field is in which he's claiming an expertise.

14   But whatever it is how's it going to be replicable and where is

15   it peer review?  Where is it studied?  What is it that the

16   expertise is supposed to do that's going to inform this Court

17   about something other than legal conclusions?  Because that's

18   what I can't pick up from this report.

19         MR. SLOCOMBE:  I understand.  The cases are clear

20   that experts can testify from practical knowledge.

21         THE COURT:  Absolutely.

22         MR. SLOCOMBE:  And practical knowledge is acquired by

23   experience and observation.  And it's not just about the things

24   you worked on directly, it's about the things you learned in

25   the course of acquiring that practical experience.  That's what

1 Mr. Snyder will testify to.  That's what been authored.  It is

2 in the cases clear that people, including lawyers, can testify

3 as to practices, customs, and standards in an industry.  That

4 even includes specialized areas of the law.  Lord knows

5 asbestos litigation is a specialized area of the law.  That's

6 the expertise he brings, that's the methodology he applies.

7           THE COURT:  But that's not what his report is about.

8 He's talking about people's motivations.  The fact that he

9 actually knows what drove settlements.  He's basically telling

10 me that as a psychologist without having interviewed anybody,

11 talked to anybody, produced a report, indicated that there is,

12 you know, a specific person that he interviewed that he can say

13 people either settled, litigated, went to trial, didn't because

14 of particular factors which by the way are also not identified.

15 So how is anybody going to replicate this information even

16 based on specialized knowledge?  I'm having a great deal of

17 difficulty understanding how what Mr. Snyder -- and I don't

18 challenge his 26 or 27 years of asbestos litigation practice.

19           MR. SLOCOMBE:  I understand.

20           THE COURT:  That's not the issue.  What the concern

21 is in order to have an expert testify it has to do something to

22 inform the Court as to a process on some issue that's going to

23 be helpful.  What's he going to give me that's helpful, because

24 I don't even understand the basis for what it is that he's

25 going to be testifying about.  Because he makes a lot of

1  pronouncements, but I don't understand the expertise upon which

2  those pronouncements are based.  If what he's going to say to

3  me is, I practiced law for 26 years and therefore I know people

4  settle cases, I'll accept that as a premise of judicial notice

5  without the need to produce a witness.

6       MR. SLOCOMBE:  We understand that.  Let's take one

7  example.  Grace has suggested in this case that there are a lot

8  of what they like to call scientific factors.  They're

9  liability filters.  But if only they got a chance to present

10 these in court and in a fair court they would have been able,

11 not just to win, but to get summary judgment or <u>Daubertize</u> all

12 the other experts.

13      One of the things which is most important about Mr.

14 Snyder's testimony is he will explain that these are not new

15 defenses, these are not new ideas, these are things which have

16 been tried.  Sometimes they work, but often they don't work.

17 And that's based on specific experience, specific observation

18 just like any other kind of a practical expert would bring into

19 court.

20      THE COURT:  I must have missed something.  I'm sorry.

21 I do not recall a witness for Grace, and I mean, I read these

22 reports months ago, so if I did, I apologize.  Please point it

23 out to me.  I do not recall an expert for Grace opining that if

24 Grace were still in the tort system they could have presented

25 what you're calling new defenses.  I don't think Grace used

1  that term either, but new defenses in a court in a tort system

2  and obtained summary judgment.  I do not recall that statement

3  by a witness, I do not recall that conclusion, and I don't

4  recall that argument.  So where is it?  Because if that's the

5  basis for the testimony and that's not in Grace's paper I don't

6  see how that's going to form the basis for an expert opinion.

7  So point me to where Grace made that assertion first.

8          MR. SLOCOMBE:  Your Honor, has raised -- first of

9  all, it's been made repeatedly that they settled cases without

10 merit, that the world would be very different because now

11 they're under Federal Rules of Evidence rather than State Rules

12 of Evidence.  Those statements have been made by Mr. Bernick,

13 and Your Honor has actually pointed out a major problem with

14 their case.  The issue in this case is not whether they have

15 epidemiologists and doctors and industrial hygienists who will

16 testify on their side of the case.  Their position if -- it

17 seems to me the logic of Dr. Florence's analysis and Dr.

18 Anderson's, is that because of these things they will be able

19 to prevail in ways that they haven't been able to prevail in

20 the past and therefore they won't be able to settle.

21         THE COURT:  And therefore they --

22         MR. SLOCOMBE:  They won't need to settle because

23 they'll be able to win.  If you don't reach that conclusion the

24 logic doesn't link to how that affects their liability.  Their

25 liability would ultimately be decided in court.  It might be

1  decided in a variety of ways in court.  What Mr. Snyder will

2  show is that the attempt to protect themselves by these

3  arguments if they brought in the exact same technical

4  specialists they brought here -- not obviously Dr. Florence,

5  but the other people who are the underpinning for their

6  position -- they would be able to limit their liability.

7            It is an essential element of that, and I agree, they

8  put on very -- they've asserted it, but they put on very little

9  evidence to establish it.  And what we're going to show, in

10 part, not just through Mr. Snyder but through other witnesses,

11 is that that is not a realistic description of how any tort

12 system, any court, state or federal would receive that

13 evidence.  And that's an important part of his reports.

14           He goes into considerable detail on how many of these

15 things have been tried in the past.  I'm not saying that

16 they're claiming they were new.  They are claiming that they

17 never had a fair opportunity to present them.  And that, I

18 think, is one of the central parts of Mr. Snyder's testimony.

19 Now, we've heard snip -- I'm sorry.

20           THE COURT:  But Mr. Snyder isn't opining anything

21 with respect to the facts as to what Grace did or didn't have

22 an opportunity to do in his expert analysis.  In his fact

23 analysis if he's going to say Grace was a co-defendant in, you

24 know, pick a number, 130 cases and they did have an opportunity

25 to present this defense and they didn't, they settled, okay.

1  But that's a fact.

2          What you're telling me is that he is going to say

3  something like, in my representation of <u>Owens Corning</u> and

4  <u>Fibreboard</u>, I know that because we went to trial in X number of

5  cases, and these were the factors that we attempted to prove

6  and we lost, that if Grace were attempting to prove the same

7  things Grace would lose.  You can't make that assertion.  These

8  are jury trials.  Juries try cases and decide things in favor

9  of people and against people for all kinds of reasons.  They

10  may not like the color of your hair and decide against you if

11  they choose to.  I mean, you know, and I'm not being diminutive

12  of the jury trial system.  It's just the reality.  You don't

13  always know what the cause and effect in a jury trial is

14  anymore than you know the cause and effect in the settlement.

15  So what good is that type of testimony going to do?  Number

16  one.

17          Number two, the cases in the bankruptcy system that

18  look at this are very clear that I need a correlation between

19  the industry in order to make this type of evidence relevant.

20  How does Grace's industry correlate to Owens Corning's

21  industry?

22          MR. SLOCOMBE:  They're very similar types of cases.

23          THE COURT:  Well, I don't --

24          MR. SLOCOMBE:  I understand.

25          THE COURT:  -- know that I can agree with that.  Nor

**J&J COURT TRANSCRIBERS, INC.**

1 can I assume that the product, because Owens product, for the

2 large part as I recall correctly, was generally a dry blown

3 dust product and Grace's is not necessarily always dry blown

4 dust product. The places in which they were used was not the

5 same. The method of delivery was not the same. The types of

6 employees involved was not the same. So unless there is going

7 to be some assertion that the industries are the same I don't

8 see how this is going to work.

9        MR. SLOCOMBE: They are both companies who made

10 products which were sold broadly through the construction

11 industry.

12        THE COURT: Yes.

13        MR. SLOCOMBE: It's certainly true they're different

14 products --

15        THE COURT: Yes.

16        MR. SLOCOMBE: -- and they are at least allegedly

17 different in their composition. But the point is that he will

18 present -- under <u>Daubert</u> we're entitled to bring forward

19 experts including, I submit, practical experts with experience

20 in the relevant field in which there is an issue of how that

21 field operates. Now, the issue is not whether their testimony

22 is obviously correct. We think it is. Undoubtedly the other

23 side will say it's not.

24        THE COURT: No, it's the question of what have you

25 done to show that it's reliable and that it fits the facts of

1  this case?  That's the issue.

2          MR. SLOCOMBE:  Under the cases reliability in a non-

3  technical, non-scientific area --

4          THE COURT:  But this is a technical area.  If it's

5  not I don't need the expertise.

6          MR. SLOCOMBE:  He's not going to be testifying to the

7  composition and to the -- all the cell biology or medical.

8          THE COURT:  No.  Technical in a legal area.  Legal

9  process area.

10          MR. SLOCOMBE:  It's technical in the sense that it's

11  a complicated area of the law and it's an area in which real

12  world experience is a very important element in understanding

13  the issues in this case.  He brings the real world experience.

14  And the cases are clear that the test under Daubert in any area

15  but obviously geared to -- the test of reliability under

16  Daubert is a flexible test depending on the area in which the

17  expert is offering to testify.

18          THE COURT:  Yes.

19          MR. SLOCOMBE:  Obviously.  And they are also clear

20  that the issue is good grounds for his opinion.

21          THE COURT:  Well, no, it's more than that.

22          MR. SLOCOMBE:  It's whether or not -- I have the

23  language here.  It's whether or not they apply -- in Kumho Tire

24  it's whether the expert employees in the courtroom the same

25  level of intellectual rigor that characterizes the practice of

1  an expert in the relevant field.

2          THE COURT:  Right.

3          MR. SLOCOMBE:  And for a lawyer, an experienced

4  observer and participant in the tort system, he will bring that

5  kind of a perspective.  He will explain why he -- as I submit

6  he does in the reports, but obviously what counts is what he

7  says in court.  He will explain the basis for his opinions and

8  for his conclusions.  He will explain how they link up to

9  Grace's alleged differences from other defendants.  That's the

10 basis for his opinion, and that's the basis which makes it

11 reliable.  And that is indeed his methodology.

12         THE COURT:  That's not a methodology.  I mean, just

13 because he says I formed an opinion doesn't mean that he has a

14 methodology behind it.

15         MR. SLOCOMBE:  No.  Of course it doesn't.  But what

16 it does show is that he has a system which he has developed for

17 analyzing how players behave in the tort system.

18         THE COURT:  Well, that's what I'm looking for, and

19 that's what I don't see in the reports.  What is that system?

20         MR. SLOCOMBE:  We heard some snippets from his

21 deposition that Mr. Bernick read.

22         THE COURT:  Well, all I heard from -- all I got out

23 of what I heard from Mr. Bernick is that it's about the

24 suspender's approach.  And that does not a system make.

25         MR. SLOCOMBE:  I'm sorry.

1          THE COURT:  A belt and suspenders approach.  We all

2     have that.  I mean, gee, I know it when I see it.  That's not a

3     methodology.

4          MR. SLOCOMBE:  No.  But he talks even in his

5     deposition about some of the bases of his opinion and his

6     experience.  He says he's looked at hundreds of files and

7     talked to hundreds of plaintiff's lawyers over the years.  He's

8     obviously talked to lots of defendant's lawyers because he was

9     one.  He's read hundreds of plaintiff's depositions.  He's

10    spent endless hours with coordinating -- in coordinating judges

11    conferences.  He's negotiated for major defendants.  He served

12    on the board of the asbestos claims facility which managed the

13    defense for a large group of major defendants.

14          Now, that's not just experience that's a basis on

15    which to form judgments about how the system works.  And that's

16    what he will bring to the process and that's why his experience

17    and his expertise will be valuable to the Court.

18          THE COURT:  About what system?  I mean, about a

19    settlement system, about the court system in the state of

20    Texas?  About the court system in the state of Illinois?  About

21    the federal district court in a particular district?  I mean,

22    they're all -- about a jury system in Canada?  I mean, what

23    system?

24          MR. SLOCOMBE:  Sure.  There are important differences

25    from jurisdiction to jurisdiction.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. SLOCOMBE:  There are important similarities as

3  well.

4          THE COURT:  Well, sometimes.  But his report doesn't

5  tell me what system, how he's analyzed it, what methodology

6  he's applied, how I make the translation between what he's

7  looked at and this case, how Grace was even involved, if it

8  was.  And if it wasn't where the parallel is between what he's

9  looked at and Grace.  That's the problem.  He's opining about

10  things that we as lawyers, all of us, can opine about.  Yes.

11  But he hasn't identified anything that brings a level of

12  expertise and a system that can be replicated by anybody else

13  given the same practical experience that this gentleman has

14  looking at the same level of cases and the same type of

15  information that would inform his opinion.  There is no

16  methodology described behind what he's doing whatsoever except

17  to say I've been involved in the system and therefore I'm

18  qualified to express an opinion.

19          MR. SLOCOMBE:  With respect, Your Honor, I think it's

20  more than just I've been involved.  It's that he has been a

21  major figure and a major player.  He has had an opportunity

22  which I don't think any of us in the room actually have had to

23  understand -- as lawyers to understand how the reality of this

24  process works.  He's also had the opportunity to observe how

25  the settlement process works, why defendants settle, why

1  plaintiffs settle.

2          THE COURT:  Now, he's going to tell me why people

3  settle?

4          MR. SLOCOMBE:  He's going to tell you not what's in

5  their head except the fairly obvious proposition that

6  presumably the defendants want to minimize the cost to

7  themselves of proceeding with the -- of handling their asbestos

8  claims.  And he will explain --

9          THE COURT:  And on the other hand that the plaintiffs

10  want to eliminate the risk that they may lose and therefore

11  they're going to get more money out of the settlement than they

12  might have gotten had they gone to trial.

13          MR. SLOCOMBE:  But one of his important factual --

14  and I don't mean factual in the sense of an issue in this

15  particular case, but one of the important factual points he

16  brings to the process that I think nobody else does -- I mean

17  as far as I know nobody in this courtroom could bring -- is he

18  can recount and explain how some of these theories, what Mr.

19  Bernick calls his liability filters, have been attempted in the

20  past, why they have not -- why they sometimes work, but

21  economically they turn into a mistake for the people who try

22  it.  That's an important piece of information to have before

23  the Court as to how the system works in actual practice --

24          THE COURT:  Pardon me.  He's going to tell me, for

25  example, that before Owens went into the national settlement

1 | program it decided to litigate X number of cases and used a

2 | particular litigation filter that Mr. Bernick has identified on

3 | this record --

4 |         MR. SLOCOMBE:  No.  No, no.

5 |         THE COURT:  -- and that it failed.  And as a result

6 | Owens before the juries that Owens was before was found liable

7 | and had to pay X dollars and then somehow that that's going to

8 | translate into the fact that if Grace with its products and

9 | different plaintiffs in different jurisdictions had had the

10 | same defense under different circumstances the verdicts would

11 | have been the same?

12 |         MR. SLOCOMBE:  I don't think he's going to say the

13 | verdicts would have been the same.  I think he is going to say

14 | if you've seen other defendants, many of whom made these same

15 | arguments about their products were unique and they were much

16 | less dangerous than anybody else's, he's going to show from his

17 | own experience and from the experience of others that aside

18 | from instances in which Grace which did try some cases, aside

19 | from cases in which Grace tried these defenses what happened to

20 | other people.

21 |       Now, it's a fair inference if some defendants try a

22 | defense and it doesn't work that it's going to be a problem --

23 | it doesn't work all the time, and the issue is not whether it

24 | works ever, it's whether it works all the time and makes a

25 | fundamental difference in the total cost to resolving the

1   cases.  He's going to show that it is a fair inference from the

2   experience of other broadly similar defendants that where we're

3   trying to make an estimate of what would happen if Grace did

4   this in the future, which they're going to have to do if

5   they're -- if in this construct where they're not in bankruptcy

6   give the Court some basis for understanding what would likely

7   happen.

8          THE COURT:  The basis that this Court would like to

9   see is to what would likely happen is what happened to Grace.

10  If you want me to know what the likely outcome of Grace

11  litigating in the future is, tell me what the outcome was of

12  Grace litigating in the past with its own products, in its own

13  jurisdictions, and the juries that Grace would have dealt with

14  -- would it has had to contend with.

15         What happened to <u>Owens</u>, what happened to <u>Federal</u>

16  <u>Mogul</u>, what happened to any of the other asbestos defendants

17  has absolutely no bearing on what may have or did or would or

18  could happen to Grace.  That's one reason why every single case

19  comes up as a different case.  The products are different, the

20  claimants may not be different, sometimes they are.  It depends

21  on a lot of factors.  The industries are not the same, the

22  factors are not the same.  It is not a parallel to simply say

23  that because a particular defendant lost a particular defense

24  that all defendants for all time would lose or win.

25         MR. SLOCOMBE:  No, but --

1          MR. BERNICK:  Your Honor, I note that they're now

2    significantly past their 20 minutes.

3          THE COURT:  They are, Mr. Bernick.  It's my fault.

4    I've been asking the questions.  I haven't given him --

5          MR. SLOCOMBE:  Your Honor, I'll be guided by you in

6    terms of how long you want to continue.

7          THE COURT:  I'll shut up and let you make your

8    argument.  I'll give you ten minutes to make your argument.

9          MR. SLOCOMBE:  Well, I think -- that's very kind of

10   you, but I think basically we've laid out the central points.

11   Let me just make a couple of other comments.  That he has

12   explained it in his reports and indeed in his deposition, the

13   basis on which he draws his conclusions with respect to the

14   issue Your Honor just raised.  Certainly it's true each

15   individual case is unique in some sense.  But there are also

16   similarities.

17          And one of the points that Mr. Snyder makes in his

18   report is that one of the facts about this huge deluge of

19   asbestos cases is it is in fact the case that as a result of

20   experience, lawyers on both sides and indeed the defendants

21   were able to understand that there were patterns.  And he will

22   present and explain what those patterns are.

23          Now, it may well be that there are important

24   differences.  He can explain whether those differences in his

25   view, in his experience are significant in the projecting of

1   what would happen to Grace in the system.

2           THE COURT:  Patterns, I'm sorry, in what sense?

3           MR. SLOCOMBE:  Patterns of how cases came out, why it

4   was that participants in the system on both sides were able to

5   make reasonable valuations of what these cases were worth, of

6   what the risks both sides faced if they went to trial, and of

7   what the incentives were either to go to trial in some cases or

8   indeed to settle.  Just on a factual point he will also make

9   the point that Grace was in some of the same cases which he had

10  direct experience, that there would be the same plaintiffs

11  making more or less the same arguments.  He's worked in

12  jurisdictions all over the country.  He hasn't obviously worked

13  in every jurisdiction, but he's worked in enough to have a

14  general sense of how the system operates across the country and

15  indeed of what the important jurisdictional differences are.

16          And that broadly there were patterns which were

17  important to understanding how the system worked.  Quite apart

18  from the merits of what he will show, this approach to

19  receiving expert witnesses is well established in the cases in

20  the areas of people like Mr. Snyder who are not technicians

21  either in the sense of being engineers or natural or even

22  social sciences.  I think that's the basis.

23          I appreciate the extra time.

24          THE COURT:  All right, thank you.

25          MR. SLOCOMBE:  Thank you.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Your Honor, I just had a couple very

2     short comments because I know that we're trying to keep to a

3     time limit here.  And I want to focus on the reliability prong

4     of Daubert.  The reliability prong of Daubert articulated

5     obviously first in the Daubert case was also affirmed in the

6     Kumho Tire case.  There's no different standard in the so-

7     called non-technical areas.  Also affirmed in the Joiner case,

8     Joiner v General Electric.  And the fact that a given expertise

9     may arise from practical knowledge doesn't mean that it thereby

10    qualifies for Daubert on the basis of a looser principle.

11          Now, practical knowledge may be involved in

12    expertise, but for the expertise to be the appropriate subject

13    of testimony before the Court it still has to follow -- it has

14    to comply with the reliability prong.  And the essence of the

15    reliability prong is that there be a stateable methodology

16    that's consistently applied such that it can be judged --

17    replicated and judged and there be objective standards on the

18    basis of which the expert's testimony can be assessed so that

19    the testimony doesn't simply come down to the classical ipse

20    dixit.  Those are -- that's the bedrock of Daubert. And that

21    bedrock is pretty much completely ignored in the argument that

22    just got made, and that bedrock was openly flouted by Mr.

23    Snyder.

24          I tried to give Your Honor in very short form a

25    couple of the more colorful things, although again the color

1  was all his not mine.  But I just want to read two very short

2  excerpts, because I asked these questions flat out.  I asked

3  the question, are there any objective standards on the basis of

4  which the quality of your work as an expert can be judged?  Not

5  even leading.  I just asked him flat out.  He says, you know, I

6  -- if you wanted to define what kinds of standards you're

7  talking about I might be able to answer that.  In other words,

8  I've got to give him the standards.

9       But you know, what I have is a resume of what I've

10 done, the things that I've accomplished, and some of the things

11 that I failed to accomplish in my practice, all which has

12 brought me up against a lot of the big issues in this

13 litigation.  And as I say in my report, you know, I talk about

14 the practical outcomes of litigation I haven't tried to throw

15 an academic construct around any of this.  Well, where was the

16 standard?  I said again, my question is, can you tell me a

17 single objective standard on the basis of which your work can

18 be judged?  And his answer now is give me the standard and I'll

19 tell you whether it applies.

20      So he just asks him flat out just to tell us what the

21 basics are and they're not there.  And that's when he starts

22 talking about, gees, well, you know, I negotiated, I was very

23 instrumental in the very first mandatory class global

24 settlement in the asbestos litigation.  And again, we don't

25 quarrel with the idea that he was a very dedicated and

1   resourceful defense lawyer, but that does not mean that he is

2   applying a methodology that is appropriate for him to testify.

3   His qualifications as a trial lawyer are not enough.  He has

4   got to have the methodology.

5        And this is what he had to say about Dr. Peterson who

6   he acknowledged that he really addressed the same issue as.  I

7   said Dr. Peterson, in describing and analyzing claiming and

8   resolution behavior works with data.  That is, how many claims

9   were filed, what they were resolved for, and how many are

10  projected to be filed in the future and what they'll be

11  resolved for.  And incidentally, this individual Mr. Snyder,

12  had not reviewed any of the claims files.

13       But I said, you're familiar with that.  Correct?  And

14  he says, I've seen his reports.  And the question that I've

15  been asked is, now when you say that you don't believe that Dr.

16  Peterson focuses on motivation.  Because Mr. Snyder says he's a

17  motivation guy.  And he then says, and this is Mr. Snyder

18  again, I think Dr. Peterson applies a methodology to try to

19  quantify the consequences of motivation.  I don't think Dr.

20  Peterson has ever settled an asbestos case.  I don't think he's

21  ever taken a client through bankruptcy.  I don't think he's

22  ever counseled a client, you know, try to put together an

23  understanding of the litigation to come up with a solution for

24  a client.

25       Question.  So you believe that your work is

1  incremental to his in the sense that you are more familiar with

2  the motivations of the players.  His answer, I think I'm more

3  familiar with the well springs of the motivation and the kinds

4  of things that people respond to on sort of on the ground.  I

5  think his -- he and others like him like Dr. Florence, focus

6  more on the, you know, predicting outcomes at the time.

7         Question.  The facts that you're dealing with, the

8  motivations and the well springs of those motivations, are

9  those facts gathered pursuant to any methodology in your

10  report?  Answer.  Those facts are based upon -- I'm trying to

11  count now, give me a minute, 26, 27 years experience just doing

12  it.  And that just captures the essence of the thing.  I didn't

13  put words in his mouth.  I asked him the straight Daubert/Kumho

14  Tire questions straight up.  He can give any answer he wants,

15  and these are his own words.  And he disqualifies himself.

16         MR. SLOCOMBE:  Let me just, if I may, make one simple

17  point.  Much of our discussion with Your Honor and with Mr.

18  Bernick has been our assertions and your questions about what

19  he will and won't say.  There is authority in this circuit for

20  the proposition that before making a Daubert determination the

21  Court should have an opportunity to hear from the expert, not

22  from the lawyers describing what the expert is going to say.  I

23  think the best evidence of what Mr. Snyder's testimony will be

24  based on, the method he uses to formulate that will be what he

25  has to say.  And that, I think, is a factor which should be

1  dominant in making this decision.  That is, he will come,

2  present his information, Mr. Bernick will have an opportunity

3  to question his methodology, Your Honor, will have an

4  opportunity to see if his methodology passes the test of being

5  based on good grounds, and that will be the appropriate time to

6  make a decision.

7          THE COURT:  Well, I can, of course, have a <u>Daubert</u>

8  hearing to determine whether or not the <u>Daubert</u> standards are

9  satisfied.  And I'm just not even convinced with Mr. Snyder

10  that I need to go that far, frankly, because he does not have a

11  methodology and that seems to me to be very clear in his

12  report.  He has not articulated one, the deposition transcripts

13  don't articulate one, and how he's going to testify to one now

14  when he's had at least two opportunities to do that, one in his

15  report, and one in the depositions and he has not articulated

16  one, is beyond me.  I don't see how he's going to come up with

17  one now when he hasn't articulated one before.  So I simply

18  don't see how that is going to be the possibility.

19          I think the bottom line is this.  An expert witness

20  to be helpful to the -- an expert witness to be qualified at

21  all to offer an expert opinion has to do something that is

22  going to be of assistance to the Court.  And what I am still

23  missing is where this Court is going to be assisted in the

24  process.  He clearly is not going to be able to offer an

25  opinion as to what motivates people because he's not qualified

1 to do that.  He's not a psychologist, he doesn't have the

2 training and he basically concedes that in his report.

3          To the extent that he wants to testify as to why

4 people settle cases he clearly cannot do that because he can't

5 testify as to why a person has an intent to do something else.

6 He's going to have to bring those people here to do it because

7 he's not an expert in why people particularly settle specific

8 cases.  That's outside the realm of the expertise and not

9 relevant in any event to the particular issue that's before

10 this Court.

11          In terms of what the tort system was doing back in

12 2001 when Grace filed the bankruptcy, if that is what I am to

13 judge -- if that's what the ACC's theory is, I should be

14 looking at what would have happened to Grace in 2001 if Grace

15 were still in the tort system and these claims should have been

16 litigated in the tort system.  If his report said, you know, in

17 the tort system at that time, Meso cases in the state of

18 Louisiana, if going to verdict were essentially in this range

19 and a number was coming in and settled were in this range and

20 therefore Grace had X number of claims filed in that state and

21 therefore applying some mathematical formula or litigation

22 factor discount I could expect that this would be the outcome,

23 I could understand that a lawyer could apply a litigation risk

24 discount and come up with that kind of a mathematical type of

25 principle or litigation risk principle.  But his report has

1 nothing to do with that.  I don't understand what it is that

2 his report is supposed to assist the Court in doing.

3 　　　　MR. SLOCOMBE:  It is supposed to assist the Court in

4 understanding how practical decisions are made and what the

5 experience of Grace and other companies with similar -- in

6 similarly situated cases how they managed those cases.  He's

7 not a psychologist.  He doesn't and he's not -- when he talks

8 about motivation I think it's clear he's talking about the

9 incentive to try to settle to dispose of the cases on the most

10 favorable economic terms.  He doesn't know the -- he doesn't

11 purport to know the inner workings of their mind.  And also if

12 I could just --

13 　　　　THE COURT:  But let me stop right there.  Because

14 that underlays another faulty premise in this report.  There's

15 nothing in the report that indicates to me that he has done any

16 type of analysis to see how companies were in similarly

17 situated circumstances to that of W.R. Grace.  And I can assure

18 you having now sat on, I'm not sure how many, 15, 20 asbestos

19 related conglomerates, I am not familiar with anyone whose

20 prelitigation circumstances would be similar to another.  So

21 I'm not sure where that circumstance comes up.  Their financial

22 reports were not the same.  Some are listed companies, some are

23 not.  Some had investment grade securities coming in and going

24 out of bankruptcy, others don't even come close.

25 　　　　How is this Court going to judge what was a similar

1 circumstance within that company's picture to determine whether

2 the company is similarly situated so as to know whether the

3 decisions made by the board in handling particular asbestos

4 litigation or settlements is the same?  His report doesn't even

5 come close to addressing those factors.

6       MR. SLOCOMBE:  Your Honor, I think with respect that

7 it does say that in a sense the similarities outweigh the

8 differences.  And he will explain the respect in which that is

9 true.  It is certainly an issue whether Grace's experience in

10 the past is relevant to its experience in the future.  And it's

11 relevant whether other companies' experience is instructive as

12 to Grace's experience.  But that's what he's going to talk

13 about.

14       THE COURT:  But his report does not go into that, at

15 least as I recall, if it does show me.  He talks to a certain

16 extent about Owens and Fibreboard, as I recall.

17       MR. SLOCOMBE:  He talks about the ACF.

18       MR. BERNICK:  The ACF isn't even a company.

19       MR. SLOCOMBE:  The ACF was a consortium of companies.

20       THE COURT:  Well, it was a --

21       MR. SLOCOMBE:  And that exposed him to the experience

22 of individual companies in a wide -- a wide range of individual

23 companies.

24       THE COURT:  Okay.  But that talked about a particular

25 aspect of the companies and why they decided to handle their

1  asbestos claims in a particular way before the NSP's and some

2  of the other programs came into being.  That has nothing to do

3  with whether the companies were situated in such a way that

4  they made a determination to handle their litigation strategies

5  the same way.

6          I'm sorry.  The more I hear about this, the less

7  likely I think that Mr. Snyder is qualified to express an

8  opinion on this topic.

9          MR. SLOCOMBE:  Well, we would --

10          THE COURT:  And his report clearly does not cover all

11  of the corporate factors that a company would go through to

12  make a determination on its own prepetition as to whether or

13  not it will handle a settlement strategy overall in a

14  particular way.

15          MR. SLOCOMBE:  Your Honor, we would like to move to

16  hold an evidentiary hearing with Mr. Snyder here which will

17  have an opportunity to -- not to present his testimony

18  obviously, but to have an opportunity for him, not me or not

19  Mr. Bernick to describe what it is that is his methodology and

20  to give you an opportunity -- to give Your Honor an opportunity

21  to ask the questions which are obviously very important ones.

22          MR. BERNICK:  Your Honor --

23          THE COURT:  That's fine.  I will permit that as part

24  of your time in trial.  Because I've already -- from what I can

25  see and this argument which has now taken an hour and a half,

1 and I've read the reports, and I've heard the argument and I've

2 read the briefs.  I cannot see how this is going to be of

3 assistance and I do not see how the gentleman has the

4 qualifications to express the opinion that you're asking that

5 he express, nor do I see how he meets the <u>Kumho Tire</u>, and I'll

6 limit it to <u>Kumho Tire</u> because I think you're asking for a

7 person experienced in the profession as opposed to someone who

8 would meet the scientific type of qualifications that <u>Daubert</u>

9 would qualify for.

10          MR. SLOCOMBE:  Exactly.

11          THE COURT:  I do not see that he fits within those

12 standards.  So I will permit you to bring him in as the first

13 person that you choose to call.  I think it should be limited

14 to one hour on direct and an hour on cross examination, because

15 if you can't do it in that time frame you're not going to get

16 it done.

17          MR. SLOCOMBE:  Could we do this at the beginning of

18 the time when he's scheduled to appear?

19          THE COURT:  No.  I want it done first.  Because I

20 need to make a determination, and to the extent that somebody's

21 going to decide whether or not they do need to prepare for

22 cross examination I think it should come in at that time.

23          MR. SLOCOMBE:  We'll obviously have to talk to him

24 about his availability and so on.

25          THE COURT:  Oh, I see, availability of the witness.

1  I apologize.  I hadn't thought about that.  All right.  Yes,

2  you can do it as the first part of his testimony.  But he may

3  not be able to testify.

4       MR. SLOCOMBE:  We understand that.  We certainly do

5  understand that, Your Honor.

6       THE COURT:  All right.  And if I decide that he

7  cannot testify I'm going to strike it all.

8       MR. SLOCOMBE:  Of course.

9       MR. BERNICK:  Your Honor, I think you've decided what

10 you're going to do.  I would only stress that we took his

11 depositions specifically against the backdrop of an objection

12 to his appearance --

13      THE COURT:  Yes.

14      MR. BERNICK:  -- in order to create the record that

15 we have now created and set before the Court.  And usually,

16 yeah, you can have _Daubert_ hearings, but they do take place on

17 a basis where it's not right in the middle of trial and we have

18 to get ready for his testimony and create yet another hole in

19 the schedule.  I would have thought that after all that Your

20 Honor has said that maybe the ACC would consider whether it is

21 worth the candle.

22      And I would have thought that maybe the best way to

23 assure that Mr. Snyder also believe it's worth the candle is in

24 fact to have them bring him in separately.  So that right now

25 there's no cost to them whatsoever of bringing Mr. Snyder in as

1  part of the first part of his examination.  The only cost on

2  them -- the only cost is with respect to Court time and us.

3  And I just don't think that that's really fair.  Given all

4  that Your Honor has said why don't they listen and figure out

5  whether they really want to do all of this with Mr. Snyder's

6  time and with the Court's time and our time instead of

7  bargaining for what is essentially, you know, a position where

8  they got nothing to lose.

9        THE COURT:  All I am going to permit, I mean, you

10 folks can work out the schedule, Mr. Bernick.  I am sympathetic

11 to that.  I do not see a basis for his testimony for the

12 reasons I've expressed.  So I am sympathetic to that.  All I am

13 going to permit at the outset of his testimony if that's when

14 he's called is the <u>Daubert</u> hearing.  That's it.  First.  So

15 that's what you need to prepare for.  And to the extent that he

16 is permitted to testify it will not be right after I say he can

17 testify that you will call him.  There will at least be a day,

18 if not more.  You tell me how much time you need before he is

19 called to testify.

20       MR. BERNICK:  I appreciate that.  It won't take me

21 too long.

22       MR. FINCH:  Your Honor, we've also listed Mr. Snyder

23 as a fact witness.  So to the extent he has facts that are

24 relevant to our case would you suggest that we put them on

25 during the <u>Daubert</u> hearing?

1          THE COURT:  No.  I think we need a separate Daubert

2  hearing which is just on Daubert.  That's what the purpose of

3  it is.  And then if you call him as a fact witness do it as

4  part of your case in chief after the Daubert hearing is over.

5          MR. BERNICK:  Thank you, Your Honor.

6          MR. SLOCOMBE:  Thank you, Judge.

7          THE COURT:  All right.  The argument with respect to

8  Mr. Krause.

9          MR. BERNICK:  Yes, Your Honor.  And I've got a series

10  of slides here that I hope will again organize things because

11  this is more factually complex.

12          You'll recall that Mr. Krause is one of the lead

13  trial lawyers involved in these cases.  He tends to specialize

14  in cases that are the higher value meso and lung cancer cases.

15          MR. FINCH:  Your Honor, I would just note for the

16  record that pressing all cases to verdict to how a settlement

17  value is paid by Grace in mesothelioma cases compared in size

18  to judgment returned in favor --

19          THE COURT:  You're reading something.  I don't know

20  what you're reading.

21          MR. FINCH:  On the scree he's got four columns there.

22  The second one we have withdrawn as a topic for any testimony

23  from Mr. Krause.

24          MR. BERNICK:  Well, that was not one of the topics

25  that was withdrawn by letter.  If you want to withdraw it now,

**J&J COURT TRANSCRIBERS, INC.**

1 that's fine.  What was withdrawn is what happened to verdict

2 values between 2001 and two thousand --

3          THE COURT:  Could we get through the argument?  You

4 folks interrupt each other.  I have no clue what you're talking

5 about.  Could we do it in some fashion that makes sense?  When

6 Mr. Bernick gets to a slide, could you inform me?  Because

7 otherwise you interrupt each other.  I lose my train of

8 thought.  You lose the sense of the argument and I don't know

9 what you're talking about.  So if we could just take it in some

10 orderly fashion, it would really be helpful.

11          MR. FINCH:  I'm sorry, Your Honor.  I saw the slide

12 and thought before Mr. Bernick proceeded that he would like to

13 know that we have withdrawn Mr. Krause as a witness for the

14 second topic there.  I thought I did it in my letter but I've

15 sent a lot of letters to Mr. Bernick and maybe this one missed

16 that point.  I apologize to the Court and I apologize to Mr.

17 Bernick.

18          THE COURT:  Okay.  Mr. Bernick, I think that was for

19 your edification.  If that's helpful to you, fine.  Please

20 proceed.

21          MR. BERNICK:  Yes, it is helpful and I certainly do

22 appreciate that.

23          These slides, incidentally, were all circulated I

24 think about three weeks ago in anticipation of the omnibus

25 hearing in March.  So I don't think that there is anything

1  that's particularly new here.  But what I tried to do is to

2  figure out an easy way to get at the range of different kinds

3  of facts that Mr. Krause apparently intends to testify about if

4  asked.  And the way that I did it is to try to organize his

5  testimony into four areas which I will now reduce to three.

6  And the three areas are Grace's pre-petition settlements as how

7  that was done.  The completeness of the PIQ responses because

8  you'll recall that the position taken by the ACC and the FCR is

9  that in some fashion the PIQ responses shouldn't be used or

10 have limited value because the information was not available at

11 the time that they were filled out.  And then what is the

12 appropriate legal standard?  That is what actually takes place

13 in trials and in litigation in state court when it comes to the

14 legal standard that's actually imposed.

15       So I use that as the rubric and then what I've done

16 now is to first of all tell you that as predicted because Mr.

17 Krause is a lawyer and has been called, not by his clients but

18 has been requested to appear by the ACC and the FCR, he does

19 not have the approval of his clients to testify about matters

20 that may be confidential or privileged just to them.

21       In the context of this deposition, at one point there

22 were no less than three different lawyers, both present in the

23 room and then on the phone, all of whom were speaking to the

24 issue of whether Mr. Krause would be permitted to testify in

25 response to my questions.  Initially it was Ms. Ramsey but Ms.

1  Ramsey represented not Mr. Krause but his firm.  Ms. Ramsey did

2  not represent -- I'm sorry, his firm -- and did not represent

3  the Baron & Budd firm because Mr. Krause once was at Baron &

4  Budd and a lot of the questions, indeed his description of

5  testimony, includes his time while at Baron & Budd.

6        So we had Ms. Ramsey there in person, but Mr.

7  Esserman got on the phone.  Mr. Rich got on the phone from

8  Baron & Budd and there was an individual I never heard of

9  before who said that he was a business lawyer for Baron & Budd

10 and he got on the phone, too, all of whom were anxious to be

11 able to assert privileges and provide instruction to Mr. Krause

12 and what he could testify and not testify about.

13       There were a total as we counted 39 questions as to

14 which there was an instruction not to answer.  And there were

15 an additional four as to which the instruction was you can only

16 answer yes or no.

17       But the problems with privilege actually even

18 pre-dated the deposition and relate to our ability to get

19 access to those facts which are necessary to cross examine Mr.

20 Krause.  So what I've done is to take each one of these topics

21 and basically use the topics to frame the issue as to which

22 there will be cross examination and then ask are we getting

23 appropriate discovery with respect to that issue, or are we

24 being shut down because as predicted privilege assertions are

25 turning this process into Swiss cheese?

1          So, with respect to Grace's pre-petition settlements,

2    the ACC and the FCR take the position that these settlements

3    were freely negotiated.  Now, as you know, our view of the

4    matter is we have not placed that at issue.  This is their

5    case.  They want to place this at issue.  It doesn't respond to

6    any part of our case.  We're not seeking to say anything about

7    the settlements in terms of what really represented an

8    admission of liability or not.  We've made that clear.  We've

9    not created that issue.  Your Honor has now heard all of our

10   evidence.  We have not placed that at issue.

11         This is their position as part of their case.  They

12   want to bring in Mr. Krause to assert all kinds of things about

13   the settlements.  Now, of course, we believe that's barred by

14   Rule 408, but we know that we've argued that matter to Your

15   Honor and Your Honor is going to reserve decision on that till

16   later on in the case.

17         So they now want to talk about whether these

18   settlements that they are placing at issue were really freely

19   negotiated and the essence of what Mr. Krause is going to say

20   is oh, I had such a great working relationship with the Grace

21   people and they could walk away or they could stay, it just

22   depended upon them.

23         Our position is very different.  Our position is that

24   the settlements now -- that the settlements are being placed at

25   issue.  We are going to talk about them and we're going to say

1 that they were driven by factors other than the merits and cost

2 Grace far more than its legal share.  We will show the Court

3 that there was a money machine here, and the reason these cases

4 were settled was not necessarily that either Grace wanted to

5 avoid trial, that was a principle concern in many cases, and

6 based on the jurisdictions that were selected and how the cases

7 were run. but from the plaintiffs' side, why do the plaintiffs

8 want to settle all these cases?  If the cases were so valuable

9 at trial, weren't they obliged to pursue all those cases to

10 trial?  And the answer is not that they thought that they were

11 going to lose, but that they thought that if they took the

12 cases to trial with all the defendants there, they would then

13 be limited in their total recovery to the amount of the

14 verdict, less insolvencies and subject to joint and several

15 liability.  Whereas if they picked people off one at a time,

16 there is no limit on the amount of money that they could

17 recover in settlement.

18        So a case that might be a $4 million meso case at

19 trial, now turns into an eight or $10 million meso case on the

20 basis of settlements.

21        So our position is not that our settlements were

22 driven by the merits or driven by cost, or for that matter that

23 their's were either, it was driven by a system, a system of

24 operation that had been developed over the years and was a

25 total money machine based upon the ability to name the same

companies again and again and again.  They named -- Waters &

Krause named Grace in nine out of ten cases.  They had a 90

percent propensity as if Grace were the same as <u>Johns Manville</u>.

They named 20 to 40 other companies on a regular basis the same

way in nine out of ten cases -- maybe it was 15 -- in nine out

of ten cases.

        So when you get this huge spike at the end of the

1990s, the huge spike of claims was not just Grace and wasn't

driven by Grace's share, several share of liability, it was

driven by the whole idea that the more people you can name, the

more people you can settle with, the more money that there is

to be made.

        So we've got a real issue now about the marketplace

that they assert is there.  What really is the nature of that

marketplace?  What factors drove Grace's settlements?  What

factors drove the settlements -- not from Grace's point of view

alone, but from their point of view?  This is not a one-way

street.

        Well, what happens?  We asked for documents.

Document request number one.  We asked the Court for permission

to make these requests and get responses by the depositions; we

did that.  Documents relating to the adoption of, or impact of,

or changes to the settlement criteria for settlements entered

into between claimants he represents and Grace.  That is how

are these criteria developed and what was the impact that they

1 had for settlements?

2         And, of course, the answer is the documents are

3 independently privileged as attorney work product and the only

4 thing that they're going to be giving us are actual copies of

5 the settlement agreements.  Well, actual copies of the

6 settlement agreements don't give you the context in which the

7 settlements were reached.  It obviously doesn't tell us from

8 the claimants' side of the equation what was the negotiation.

9 This is a negotiated resolution, meeting of the minds.  They

10 say it was free.  We say no, it's not.  What were all of the

11 facts, not just the facts that they want to talk?  So we got

12 shut down on that.

13         Then what happened at the deposition?

14         THE COURT:  Wait, excuse me.  The work product

15 privilege isn't the client's privilege to assert, is it?

16         MR. BERNICK:  It is -- the work product privilege may

17 or may not be the client's to assert.  I think that there's

18 probably a legitimate interest that the client has in work

19 product that it has paid for.  I'm not going to get in between

20 on that.  All I know was that the instruction was given.  And,

21 remember, this is the same Waters & Krause that said we're not

22 going to subject ourselves to the jurisdiction of this Court on

23 these issues.  "If you want to compel production of these

24 documents," they said, "you've got to go down to Texas and

25 we'll talk about this in Dallas."  But this was the position

1  that was taken.

2          What about the testimony as to which the instructions

3  were being given?  All of these areas were foreclosed from

4  inquiry.  Re: internal documents, memoranda, or work product

5  relating to the value of individual cases and claims against

6  Grace, or the relative strength or weakness of the proof

7  against a given defendant and why plaintiffs would ask for more

8  or less against that defendant.  That is to say if they

9  believed that the settlements were all fair, appropriate and

10  merits driven, well, let's see it from their point of view.  No

11  questions permitted.

12          The amounts Grace and other defendants paid in

13  settlement were due to a series of factors.  He admits that.

14  But Krause allows discovery only as to the settlements

15  themselves, the aggregate and total numbers of settling

16  defendants.  They say -- they assert -- indeed Dr. Peterson

17  said -- "Grace only paid its several share."  That's what he

18  says in his report and that's what he says in his testimony,

19  and that's what they say here.  Fair is fair, freely negotiated

20  and you pay only your share.  Well, we don't think that that's

21  true at all.  We think that we are being asked to pay other

22  people's shares again and again and they were being asked to

23  pay our share again and again.  So we asked, tell us what the

24  several shares were.  What did we pay versus everybody else?

25  It was shut down.

1          The existence of Baron & Budd material reflecting

2     from an internal perspective what the objectives and process

3     were for a settlement.  Just flat-out, open-ended question,

4     tell us your side of the equation now that you want us to tell

5     you our side of the equation.  That was shut down.

6          Documentation of how joint and several liability,

7     punitive damages and consolidation would impact the settlement

8     process.  Again, because we believe that they created this

9     system, it was designed to force us to pay for more than our

10    share.  We want to know the same thing from their side.

11         Decision-making process for which cases went to trial

12    and which were settled at Baron & Budd.  And that's the whole

13    question of again what actually determined trial status?  What

14    was the process?  That was shut down.

15         Reasons why Waters & Krause settled asbestos claims

16    against Grace.  They want that from us.  They've gotten our

17    privileged documents.  We want it from them.

18         Mr. Krause's own thought process resolving claims

19    against Grace from 1999 to 2001, we don't get to inquire on

20    that.  So Mr. Krause takes the stand.  He gives essentially

21    just the settlement agreements themselves.  And then he simply

22    says, "It is my general experience" -- and this is his

23    testimony -- "It is my general experience that Grace settled

24    for Grace.  That they had the opportunity to go to trial or

25    settle and these settlements were fairly negotiated and

1 represented the parties' respective views on the cheapest way

2 to resolve the litigation."  He just says that and I can't

3 cross examine him on their side of the coin.  It's a one-way

4 street.

5         Pressing all cases to verdict.  They say that they

6 don't want to get into this, but I think the real reason that

7 they don't want to get into it actually is also germane to the

8 first question.  I want to touch on it very, very briefly.

9         What happened in this deposition that was the most

10 telling thing is that it turns out that Mr. Krause, when he was

11 at Baron & Budd, was involved in a situation that was hugely

12 notorious.  Hugely notorious.  It made the national news.  It

13 was a big event.  And the big event was that somebody within

14 the Baron & Budd organization inadvertently produced what was

15 called a deposition preparation memo.  And I can't tell you the

16 content of the memo because I was told in no uncertain terms

17 during the deposition that that was a privileged document even

18 though it's been published in newspapers around the country and

19 is in the hands of probably every asbestos defendant in the

20 country.  And the people who chose to talk about the content of

21 the document or use it were the subject of efforts in Dallas to

22 have them disbarred and disciplined because it was a violation

23 of the ethical rules.  And that position was asserted to me in

24 the deposition, so I'm not going to say one word about the

25 memo.

**J&J COURT TRANSCRIBERS, INC.**

1           What I am going to tell the Court is that during the

2    late 1997 time period, that memo came out.  There was

3    aggressive discovery that was conducted against the Baron &

4    Budd firm to find out -- I'm not going to get into that so we

5    don't have to close the courtroom -- there was an aggressive

6    effort to find out from Baron & Budd what evidence was tainted

7    as a result of the use of this document and to the extent that

8    it was used.  And there were lawyers, including lawyers from

9    Grace, who sought that discovery.  And, you know, all hell

10   broke loose.  There were subpoenas.  There were court

11   proceedings.  There were threats of disbarment.  It was a mess.

12   And in the middle of it was Baron & Budd and it also included

13   Mr. Krause.  And I'm not suggesting Mr. Krause did anything

14   inappropriate whatsoever.  I have no evidence of that at all.

15   But he was the guy who was doing business with W.R. Grace and

16   W.R. Grace's lawyers were out there trying to get this

17   discovery.  So what all of a sudden happens?  Da, da, da, da.

18   We got ten cases that are going to trial against W.R. Grace and

19   we're not going to settle them.  And it's absolutely totally

20   clear from Mr. Krause's deposition that that was precisely the

21   decision that was taken by Baron & Budd was as a retaliatory

22   move against W.R. Grace seeking this discovery.

23          Two sets of cases went to trial.  One set was won by

24   Grace, the other set was lost.  And when it came time to

25   settle, the set that was tried and lost by Grace, the

1  settlements were very substantial settlements.  And on top of

2  those settlements, just to make sure that Grace got the

3  message, there was a request that Grace no longer conduct any

4  kind of discovery into these matters and that it no longer use

5  the outside lawyer that had represented W.R. Grace in

6  connection with the effort to obtain this discovery.  And the

7  messenger for that determination and the person who negotiated

8  that settlement was Peter Krause.  Now, that is hugely fair

9  game on the proposition that this is all nice and fair and a

10 bunch of guys sitting around kind of doing business on the

11 basis of the merits, it gives life to the whole thing.

12       Needless to say, I was not permitted to get into any

13 of the facts that relate to this.  This is when all the Baron &

14 Budd people got on the telephone.

15       The third area -- and I'll try to wind this up -- PIQ

16 responds completeness.  And Your Honor well knows what the

17 issue is here.  They say the questionnaires were incomplete due

18 to the bankruptcy stay.  We couldn't fill them out.  We say

19 they were unimpaired by the bankruptcy process in filling out

20 those portions that are the most germane portions to the

21 estimate, i.e., what it was that the individual claimant

22 believes that he or she was exposed to.  The bankruptcy stay

23 doesn't limit the access of the lawyer to his or her own client

24 and it doesn't limit discovery with respect to medical records.

25 The only thing that it limits is discovery with respect to

1 Grace, and even there during the entire pendency of the

2 bankruptcy, the document, the depository that Grace has

3 maintained in Cambridge for years and years and years remained

4 open.

5          So we have an issue now.  They've taken a potshot at

6 the PIQ and they now want to say, oh, well, they were

7 incomplete.  Our position is that they were totally free to

8 conduct whatever discovery they wanted relating to their own

9 client and what their own client did as well as what Grace

10 products were aware.  So we have the issue, what information

11 regarding exposure was available outside the bankruptcy and how

12 was it affected, if at all, by the bankruptcy?  Now, once again

13 we asked questions; documents referring or discussing any topic

14 contained in the Waters & Krause discovery responses.  These

15 were the discovery responses to our discovery request that

16 asked how you did it.

17          You remember what happened with that, Your Honor, is

18 that it was enormously contentious and we ultimately agreed to

19 walk away from getting any further answers to those discoveries

20 at their request.  They now want to have somebody come in and

21 testify to exactly the same subject matter that they didn't

22 want to give us evidence on before.  So, of course, we asked

23 well, tell us what you have relating to those discovery

24 responses.  That was turned down.  Tell us the manner in which

25 the attachments to the PIQ's were gathered and selected.  That

1  was turned down.  And there are documents that relate to that

2  at Baron & Budd.  In fact, I think that there is a memo that

3  was given to Mr. Krause shortly before his deposition on that

4  subject and it wasn't revealed.

5         They say all these documents that you wanted were not

6  available.  They actually assert -- he says, "They were not

7  available to us until later in the tort litigation process."

8  That's what they've insisted.  So we've asked a simple

9  question, "Tell us when the following information became

10 'available' to you, i.e., what was your client exposed to, when

11 and where"?  So we say, "How during the prosecution of personal

12 injury cases you or any firm of which you were a member learned

13 of claimants' asbestos exposure against Grace or other

14 defendants, when such information became available and from

15 what sources such information was obtained?"  All privileged,

16 all shut down with the exception that they'll tell us the

17 exhibits that they've actually used in litigation.

18        All documents relating to interviews of or the

19 receipt of information from claimants.  Again, because we

20 believe that in the course of the intake interviews, they

21 interviewed their own clients and learned all the stuff about

22 where the product was and what the exposures were.  We've never

23 received the intake memos.  So we asked for that.  They say,

24 "No, you're not going to get that."

25        So here's all the testimony that was foreclosed.

1 Documents at his firm that would tell Grace how the PIQ's were

2 filled out.  Now, he was foreclosed from saying anything more

3 than yes or no about whether he would have access to the

4 interviews with firm clients.  Same thing with respect to

5 whether witnesses were asked about product ID at the time of

6 the intake interview.  Internal documentation of the substance

7 to which the claimant was exposed and the sources.  We don't

8 get that.  How subsequent information relating to claimant

9 exposure was captured after the initial intake interview.  We

10 don't get that.  Intake procedure and deposition prep at Waters

11 & Krause and Baron & Budd.  No.  Contents of Baron & Budd data

12 base which we knew was filled out because that's what we

13 learned but we never got the data base.  No.  Content and

14 variation on Baron & Budd intake form, adequacy, et cetera, et

15 cetera, et cetera.

16          I mean we can go on and on and on.  All of these

17 different things that are sources of information that would say

18 when was the information available when they assert that it

19 wasn't available to them in connection with this case.  We

20 don't get any of it.  We just have to rely upon his say-so.

21          Notwithstanding that, I would have to say we did get

22 general testimony that on the bottom line conclusion, without

23 the ability to cross examine on anything else, it was actually

24 very revealing.  The sources of information that were

25 identified by Mr. Krause on the question of claimant exposure

1    were first of all the claimant herself or himself, and so I

2    asked, "Well, did the stay prevent you from talking with your

3    own clients"?  His answer is, "My understanding is the stay

4    does not prevent me from communicating with my clients, that's

5    correct."

6        "People who work with the clients, why does the stay

7    prevent them from talking with people who work with the

8    clients?"  Answer is, "That ability, no.  I think I'd be able

9    to do that if it were required."  The fact of the matter is

10   they just decided not to do it.

11       Grace documents, Grace historical records of

12   litigation files, "Why can't they get that?"  Answer is, "I

13   would say correct.  I don't have the evidence of that because I

14   haven't attempted in the course of this."  That is he hadn't

15   even attempted to go to the depository to look to see what was

16   in the depository.

17       Third-party records.  He hasn't looked into the

18   question of whether he could initiate discovery in some

19   proceeding.  "It's probably fair.  I haven't researched the

20   issue."

21       Impact of the bankruptcy on the ability to gather

22   exposure evidence.  This was the bottom line.  It was,

23   "You don't have any personal knowledge.  You don't have any

24   evidence that you can point to that says that the bankruptcy

25   stay in the Grace case has actually limited your ability to

1  obtain access to exposure information with regard to Grace

2  products." And there's an objection. Answer, "With respect to

3  the bankruptcy, I'm not a bankruptcy practitioner. I haven't

4  researched or attempted that, so I don't know the answer

5  there."

6         So, to the extent that Mr. Krause had personal

7  knowledge, he had no personal knowledge. Of all the things

8  that they've insisted again and again and again and again and

9  again about how they couldn't fill out the PIQ's and the PIQ's

10 can't be used because they were shut down by the bankruptcy,

11 that's poppycock. And out of his own mouth he admitted that

12 from his own personal point of view it's poppycock.

13        That when we want to get the documents from their

14 files that confirm that when the statement is made that it

15 wasn't available, it's false. We are just totally and

16 completely shut down.

17        So, it was our position, Your Honor, that Mr. Krause

18 we don't believe has appropriate testimony to offer, but if

19 he's going to testify he should be subject to cross examination

20 like any other witness. And the privilege, however well taken

21 or poorly taken that privilege might be, the privilege cannot

22 be invoked by a third party or protected by the ACC and the FCR

23 at the expense of our cross examination. It is not our

24 decision to bring this individual, it is theirs and they can't

25 simultaneously say, oh, well, he's here for the ACC-FCR, he's

1  not here for the clients so he doesn't have to testify to what

2  the clients want, but he can testify to what we want and Grace

3  just has to live with it.  That's just not right.

4       Now, I know Your Honor has said that when an

5  individual shows up and takes the stand at trial, you know,

6  you're going to have the ability to ask them to do or tell them

7  to do what needs to be done.  But I asked the question, Why do

8  we have to go through this?  They're either going to produce

9  -- Mr. Krause, if he's sitting here, can't violate an

10 attorney/client privilege by saying, okay, I'm going to comply

11 with Your Honor's order.  He can't do that.  He doesn't have

12 his client here.  He can't do that.

13      So, we're going to have this very ugly kind of scene

14 where the witness is going to say something.  We're going to

15 seek to cross examine.  He'll say I can't answer, and then

16 we're going to have a huge argument about what it is that we're

17 going to do with his testimony.  Why should we go through with

18 that?  If they want to produce him, he's going to have to

19 testify about the matters that are implicated by his testimony.

20 Give us the documents.  We'll cross examine him.  If he's not

21 going to give us the documents, we shouldn't have to go through

22 the Court's time and effort here to go through this process of

23 trying to hash out who it is that's getting what and who is

24 entitled to what.

25      THE COURT:  Mr. Krause, as I understand it,

1 represents and represented people with mesothelioma and lung

2 cancers who at the time that Grace filed bankruptcy, at least,

3 the 2001 period, were probably in many instances an extremis.

4 Is it not the case that at this point in time a search of his

5 files would probably reveal that as to many -- or I don't know

6 about many -- but at least some of the clients about which he

7 might be offering testimony at this point in time, they

8 probably have died?

9         MR. BERNICK:  Yes.  Most of them have passed away.

10 And, in fact, what we have from Mr. Krause is that he

11 essentially gave us the files as those files were produced to

12 the other side during the litigation.  And to the extent that

13 the files therefore contained interrogatory answers, the

14 interrogatory answers were updated and have the information

15 that they have and those have been provided to us.

16         So as we sit here today, with respect to probably all

17 of the people that we're talking about in the case of his firm,

18 we have the litigation file in whatever condition it was, and

19 we have as of the time that it was completed.  And then

20 presumably they used that to fill out the questionnaire.  And

21 we would say, of course, is that there's nothing that prevented

22 them from filling out the questionnaire.  The bankruptcy stay

23 didn't stop it.

24         At the same time, there are documents that we know

25 are in their files that would reflect what information is

1 available to the firm.  They take the position that the firm

2 didn't have the information necessary to fill out the PIQ.

3 They say it was not available to us.  Well, available to them

4 is available in whatever shape or form.  So, particularly with

5 respect to people who are deceased, they got whatever

6 information they got at the time of intake or interviews and we

7 should know what that is because if we had the intake or

8 interview form, we can see whether it contains a statement

9 regarding asbestos exposure to Grace or not.  That's what

10 they've refused to give us.

11          THE COURT:  But what I'm getting at is where is the

12 attorney/client privilege or work product privilege to the

13 extent that it is still asserted by a client who is deceased

14 applicable?

15          MR. BERNICK:  I don't know, Your Honor, and I'm sure

16 that we could look into that, but we would have to to be able

17 to pick up with that, we would have to go down and litigate

18 before whatever Court has jurisdiction over Mr. Krause's

19 client.  I don't know that this Court has jurisdiction -- this

20 Court has jurisdiction over Mr. Krause's clients to the extent

21 that they are claimants.

22          THE COURT:  Right.

23          MR. BERNICK:  But I don't know whether if they are

24 not claimants -- I guess if they're claimants and they filed

25 the claims, yeah, the individuals would have to be subject to

1 the Court's jurisdiction as well.  That wouldn't be true of

2 many of the claims, that is claims -- you're focused on that

3 last issue.  I'm focused also on the tort history before --

4          THE COURT:  So am I.

5          MR. BERNICK:  -- the pending claims.

6          THE COURT:  To the extent that Waters --

7          MR. BERNICK:  The closed claims.

8          THE COURT:  Yes.  To the extent that Waters & Krause

9 is saying I can't produce a file because it's subject to an

10 attorney/client privilege, but there is no client, how is there

11 an attorney/client privilege?

12          MR. BERNICK:  I don't know.  All I know is that with

13 respect to the closed claims, I then go back to the issue about

14 whether this Court has jurisdiction, in which case if we wanted

15 to get closure on that issue, we would have to go back to

16 whoever their client, now deceased, is part of a closed claim,

17 subject to jurisdiction.

18          MR. FINCH:  Your Honor, the privilege survives the

19 death of the client and becomes the property of the estate.

20          THE COURT:  Well, then you've got a problem because

21 to the extent that Mr. Krause cannot be subject to cross

22 examination as to the issues that are going to be relevant to

23 get behind his testimony, Mr. Krause is not going to be able to

24 testify.  So I indicated --

25          MR. FINCH:  Your Honor, I --

1          THE COURT:  -- this early.  It was an issue that we

2     addressed many, many months ago, and it hasn't changed.

3          MR. FINCH:  Your Honor, but none of the testimony

4     that we would elicit from Mr. Krause would be based on

5     privilege or confidential information.  When I was a child --

6          THE COURT:  But it's cross examination, Mr. Finch.

7     Credibility and the ability of a witness to perceive particular

8     events and the ability to assess his judgment in determining

9     whether the settlement history that he is explaining is or

10    isn't accurate and credible, may very well depend on that, and

11    that is proper cross examination.

12         MR. FINCH:  Your Honor, we are not asking Mr. Krause

13    to explain the settlement history.  When I was a child there

14    was a radio show I used to listen to all the time called The

15    Rest of the Story with Paul Harvey, and you haven't heard the

16    rest of the story as to what Mr. Krause will testify to and how

17    this will work.  This is a slide Mr. Bernick put on the board.

18         THE COURT:  Which, by they way, I'll need copies at

19    some point so I can refer to what this is about.

20         Go ahead, Mr. Finch.

21         MR. FINCH:  The theme of my argument is the rest of

22    the story.  Mr. Bernick says Grace's position that settlements

23    were driven by factors other than the merits and cost Grace far

24    more than its legal share.  There's been absolutely no evidence

25    in the record.  He's rested his case.  There's no evidence in

1   the record at all as to what factors drove Grace settlements.

2           THE COURT:  Right.  That's what he said.  That it's

3   not an issue in the debtor's case --

4           MR. FINCH:  Right.

5           THE COURT:  -- but you're going to make it an issue

6   by putting on a witness who's going to say that they were

7   freely negotiated.

8           MR. FINCH:  Right.  But Mr. Krause is not going to

9   testify as to what was going through the minds of the party.

10  He will testify to the criteria that Grace told him that his

11  clients had to meet before they got paid money.  You heard Dr.

12  Florence testify yesterday that when he is forecasting future

13  tort system costs one of the things he takes into consideration

14  is the criteria that a defendant uses to resolve cases, either

15  explicitly if he has settlement agreements, or if he doesn't --

16  if it's a black box as he put it, he can see the outcome of

17  that.  And what Grace has posited to you in its direct case is

18  a set of criteria for paying money.  We would only have to pay

19  money if certain criteria were met.  That a meso victim was a

20  mixer or installer, for example.  We are entitled to respond to

21  that by showing the criteria that, in fact, in the real world

22  they actually applied very different criteria.  We're not

23  getting into with Mr. Krause the reasons why Grace did things,

24  or the reasons why Mr. Krause did things, it's certainly not a

25  waiver of his client's privilege nor is it proper subject for

1 cross examination.  If I were to ask him questions like did you

2 ever start trials in cases where Grace is a remaining defendant

3 at trial?  How many times?  What type of evidence would you put

4 on the exhibit list or offer into evidence in trials in which

5 Grace is a defendant?  What evidence did you introduce in

6 trials about exposure issues?  Were you permitted in trials to

7 put on expert testimony on causation and exposure?  Describe

8 that evidence.

9          THE COURT:  But if Grace asks for him to produce

10 those documents, he's going to have to produce them.

11          MR. FINCH:  He's certainly did produce those

12 documents.

13          THE COURT:  Okay.  And that's what he -- pardon me.

14 That's what he said that he would produce because that's

15 information that he produced pursuant to the litigation

16 already.

17          MR. FINCH:  He produced over a hundred boxes of

18 documents --

19          THE COURT:  All right.

20          MR. FINCH:  -- to Grace just in response to the

21 document request two weeks ago.  He produced all of the

22 settlement agreements he had between Grace and he produced all

23 of the exhibits he ever used in trials against Grace.  He

24 produced all the depositions of his clients who had

25 mesothelioma and lung cancer cases from the time he joined the

1  firm until Grace went into bankruptcy.  He said I've got a

2  hundred boxes of documents down here in Texas that are

3  combinations of depositions, discovery responses, all the stuff

4  we think you already have but we'll reproduce it.  You can come

5  down and look.  And Mr. Bernick said, "We do not wish to

6  receive those materials from Mr. Krause."  That is the material

7  that he needs to effectively cross examine Mr. Krause.  It is

8  not a waiver of the attorney/client privilege if -- under Mr.

9  Bernick's theory, anytime a client who is represented by a

10 lawyer takes the stand and testifies, he thereby waives the

11 attorney/client privilege and the work product as to everything

12 he discussed with his lawyer and that just can't possibly be

13 the case because lawyers walk into court and do things all the

14 time in open court.  I make arguments on behalf of my client to

15 Your Honor.  I introduce evidence in trials.  I elicit

16 testimony from witnesses.  That can't possibly be a waiver of

17 the asbestos claimants' committee's attorney/client privilege

18 or work product doctrine.  It's just not.  There's absolutely

19 no case that stands for that proposition.

20         And so basically there's no difference between me

21 putting Mr. Krause on the stand and eliciting the type of

22 questions I just read you about what he did in trials where

23 Grace is a defendant and then the follow-up question is, "Were

24 there ever situations where Grace offered to pay your client

25 money before the case got to judgment?"  "Yes, there were."

1  "Could you describe for me what Grace said to you?  That what

2  criteria you had to meet before it would pay you money."  That

3  goes directly to the criteria point on here.

4          What Grace told Mr. Krause and what the objective

5  criteria were, doesn't invade anybody's privilege.  Doesn't

6  require privileged information to cross examine.  It is no

7  different than if Mr. Inselbuch put me on the stand and said,

8  Mr. Finch, could you describe how to try a securities fraud

9  case?  What kind of evidence do you put in the record?  What

10 type of documents do you use?  Have you ever had discussions

11 about settling a securities fraud case with, you know, X, Y, Z

12 defendant?  Or probably in the past ten years more likely an

13 asbestos estimation case, I think I have some experience in how

14 to try one of those.  But by no means if I describe what I do

15 in open court, or what I told the other side and what the other

16 side told me, that neither waives a privilege, implicates a

17 privilege, or implicates the work product doctrine.  I mean

18 lawyers go to seminars all the time and talk about how they try

19 cases, particular types of cases.  How you try an intellectual

20 property case.  How you try -- how they tried a toxic tort

21 case.  Mr. Bernick gives speeches on how to try toxic tort

22 cases.  That doesn't -- I'm sure his clients would not believe

23 that that waives the privilege as to all of his work product in

24 those cases.

25         So to ask Mr. Krause about the documents he puts in

1  evidence and the materials does not waive the privilege or

2  implicate any privilege.

3        I think with respect to the whole questionnaire

4  issue, Mr. Bernick is either misunderstanding or

5  mis-describing our position.  We are not putting on Mr. Krause

6  to have him offer excuses about why the questionnaire wasn't

7  complete.  The questionnaires are complete to the best of his

8  ability.  And even Mr. Bernick recognized that the

9  questionnaires were not going to be the full evidence available

10 on a claim.  In a hearing -- I'm putting this -- quoting this

11 from our brief because I don't have the transcript of the

12 hearing here, if I do, you know, Mr. Walker could probably find

13 it but I don't want to take the time to do it -- in a hearing

14 in August of 2006 Mr. Bernick described what the questionnaire

15 evidence would be and how it would be used by the experts and

16 what he says is, "As of this point in time, there will be

17 claims that were very mature.  Lots of information.  There will

18 be claims that even were settled.  There will be a lot of

19 claims that were immature.  That's just the way that is and the

20 estimation will have to deal with each of those claims

21 differently.  You don't take all the claims that were pending

22 as of April 1, 2001 and then attempt to make them all the same

23 by saying we're now going to give everybody the opportunity to

24 come forward and try to conduct a discovery that maybe they

25 would have liked to conduct to find out whether their claim was

1  good, bad, or indifferent.  All you have is a snapshot and you

2  take it as it is.  All the questionnaires did was ask people

3  what evidence they had to support their claims and it

4  deliberately froze them there."

5          And so what Mr. Krause is going to do is answer

6  questions like were there instances in which your client in a

7  mesothelioma or lung cancer case was no longer alive at the

8  time you received the PIQ?  Does the PIQ ask you to provide

9  your expert witness reports on causation and exposure that you

10 would use in a trial involving Grace?  Does the PIQ ask you to

11 identify the fact witnesses that you would call in a trial

12 involving Grace?  Does the PIQ ask you to identify every

13 exhibit you would offer into evidence and you had historically

14 offered into evidence in a trial involving Grace?  Does it ask

15 you to even to try to predict what evidence you might use in a

16 case involving a particular person?  I submit, a) that doesn't

17 invade the privilege for him to say the questionnaire didn't

18 ask me that.  And, b) to the extent he's testifying about what

19 trials he had with Grace prior to the time it went into

20 bankruptcy, what he did in those trials certainly doesn't

21 implicate any privileged or work product communications.

22         Finally, on the last piece of the rest of the story,

23 and, Mr. Bernick, you may want to clear the courtroom for this

24 one since you opened the door with this slide.

25         MR. BERNICK:  Well, I don't have to clear the court

1   that's -- I don't know what you're -- I don't know why we would

2   have to clear the court.

3          MR. FINCH:  Okay, I'm fine with not clearing the

4   court.  This is a slide where Mr. Bernick quotes a memo to

5   Mendes & Mount.  This is a letter from -- I happen to know

6   because Mr. Bernick sent to me the letter that backed up this

7   slide.  He kindly sent that to me and other people in advance.

8          THE COURT:  This is not a slide Mr. Bernick showed.

9          MR. FINCH:  Yes, it was.

10          THE COURT:  I did not --

11          MR. BERNICK:  I did show the slide.  I described

12   generically without getting into that letter.  I agree with Mr.

13   Finch that I technically opened the door.  It sounds to me like

14   Mr. Finch really wants to go through the door.

15          THE COURT:  I'm sorry.  If this slide was shown, I

16   don't have either a recollection of it or a note.  So I must

17   have been looking at Mr. Bernick --

18          MR. BERNICK:  Well, then I'll withdraw it.

19          MR. FINCH:  It was -- do you withdraw all the

20   commentary about the Baron & Budd --

21          MR. BERNICK:  No, I'm not going to -- this is --

22          THE COURT:  He did talk about Baron & Budd but I did

23   not see the slide.

24          MR. FINCH:  Yes.  And referenced this slide.

25          MR. BERNICK:  No, I did not.

1        MR. FINCH:  He had this slide.  It was shown in open

2    court.

3        MR. BERNICK:  I'm not going to argue with him, Your

4    Honor.  When he's done I'll respond to it.

5        MR. FINCH:  It was shown in open court.  It's quoting

6    from a letter from Mr. Hughes to Mendes & Mount which is

7    counsel to Lloyds of London which is now Equitas and --

8        THE COURT:  Okay.  I apologize but I have not seen

9    this slide.

10        MR. BERNICK:  I did not read from that letter, and,

11    Mr. Finch, if you read from the letter it is your own decision

12    and I can't take responsibility for the consequences of what

13    you're doing.

14        THE COURT:  I did not have copies of the slides, Mr.

15    Finch, and this slide, as I recall, was not shown.  Just so

16    it's clear.  So if you want to read from it --

17        MR. FINCH:  Your Honor, this slide was shown but --

18        THE COURT:  Okay.  I should have had them marked; I

19    did not.

20        UNIDENTIFIED SPEAKER:  I think he handed up the

21    slide.

22        MR. FINCH:  I think he handed up the slide, Your

23    Honor.

24        THE COURT:  He has handed up copies.  I have not seen

25    them.

1          MR. FINCH:  But he handed --

2          MR. BERNICK:  I don't think I handed up the copies

3 yet either.

4          THE COURT:  I do not have copies of the slides

5 either.  So I don't have copies and I have not seen this slide.

6 So if it was shown, I apologize but I have not seen this slide.

7          MR. FINCH:  With respect to the Baron & Budd

8 memorandum, the fact is that Baron & Budd has never been

9 sanctioned for that.  There was an internal investigation.

10 There have been lawsuits about this which have been dismissed.

11 Mr. Krause's testimony is very clear that nothing was ever

12 demonstrated that memo was used in any way to prepare any

13 witness that had testified in any trial that he was involved in

14 and the fact is that Grace settled those cases, the Baron &

15 Budd cases, on terms that were very favorable compared to their

16 historical settlements in Texas.

17          So, whatever the implication Mr. Bernick wants you to

18 draw about the settlements were driven by factors other than

19 the merits, there's been no evidence in the record as to that.

20 The ACC and FCR case will put on the evidence that Grace's

21 settlement history is a settlement history.  Whatever factors

22 drove that, or whatever the factors drove -- we believe that

23 that's the best source of data for projecting the future cost.

24 If on his response case he wants to put on testimony to open

25 the door to the reasons why -- you know, if Grace wants to put

1  Mr. Hughes up there and say I think these cases were all crap

2  and I settled them because the tort system was broken, they

3  didn't put a shred of that evidence on in their direct case and

4  they're done with their direct case.  And I don't think they

5  can attack the settlement history anymore based on the record

6  as it currently exists.  There is absolutely not a shred of

7  evidence as to the bona fides or lack of bona fides that the

8  settlement -- Dr. Florence certainly treated those 258 closed

9  mesothelioma claims as valid settlements.  He didn't make any

10  dispersions of them.  And so as the state of the record is

11  right now, there's absolutely no evidence as to Grace's

12  position.  It's just void.  And Mr. Krause is not going to

13  testify about what was in people's head when they settled the

14  cases.  He's going to testify about this is what Grace told me.

15  This is what I told it.  That is basic non-opinion fact

16  testimony from someone who was personally involved in the

17  situation.  And the reason the criteria are relevant is, I

18  believe, as you can see it was discussed by Dr. Florence, and

19  you'll hear more about it from Ms. Biggs and Dr. Peterson.

20          And so with that, I think, you know, Mr. Krause's

21  testimony is clearly relevant.  It's clearly admissible.  There

22  will be no privilege implications for his testimony.  If after

23  the end of my direct examination you believe that there were --

24  and I'll be very careful to frame my questions in a way that

25  don't draw privilege objections and I don't think the scope of

1 any cross would -- any kind of conceivably relevant cross

2 within the scope of my direct would implicate privilege

3 matters.  It just is not proper cross examination if a client

4 or a lawyer takes the stand and testifies as to facts as to

5 what they did in open court or if say a merger case a lawyer

6 who was involved in a deal testifies about what the parties

7 were talking about on the deal points, that certainly doesn't

8 waive the privilege as between him and his client and it's not

9 fair cross examination to get behind the statements back and

10 forth.

11         So with that, Your Honor, I think it's proper

12 testimony.  I think the motion in limine is not well founded

13 and I will reserve whatever time I have remaining.

14         MR. MULLADY:  The FCR joins the comments.  No

15 additional argument by us.

16         THE COURT:  All right.  Mr. Bernick.

17         MR. BERNICK:  Very briefly, Your Honor.

18         This is very interesting to listen to all the

19 protestations and what we're going to do and how I've never

20 heard of this before and blink away the reality of what we have

21 here which is relatively simple.

22         You can't proffer a witness to testify to a subject

23 matter and then say well, I'm going to frame my questions in a

24 way such that I don't open the door to privilege even though

25 that I know that what your position is with respect to the same

1  subject matter will inevitably open that door.

2        So what we have is the ACC and the FCR purportedly

3  serving the interests or representing the interests of

4  claimants.  The claimants then assert through their counsel

5  privileges that constrain the scope of cross examination.  I've

6  never heard of that before.  It is an unusual situation.  You

7  generally don't have lawyers take the stand and testify about

8  anything.  You don't even have them take the stand to talk

9  about what they did in litigation with rare exceptions.  And

10 you certainly don't have them take the stand and talk about

11 settlements.  That's very unusual.  If you put somebody on the

12 stand to talk about settlements, the subject matter of the

13 settlements is fair game and you can't control the cross

14 examination by saying well, I didn't actually ask him that

15 question in that particular way.  So Mr. Finch says, Well, as

16 the description, in fact, indicates, Mr. Krause, what did Grace

17 tell you the exposure criteria were?  And the description says

18 just that.  What did Grace tell you the settlement criteria

19 would be?  And Mr. Krause will say, Well, I said X, Y and Z.

20 And the argument will be it's all admissions.  They're all

21 statements by Grace so it all comes in and why does that

22 implicate any privilege of Mr. Krause because after all what

23 Grace told him.

24        But the issue really is were the settlement criteria

25 set by Grace or not?  Mr. Krause may say yes, they were.  They

1  told me this.  His files may show exactly the opposite.  Now,

2  they had access to all of our files because we agreed to make

3  our settlement files available in order to avoid litigating the

4  408 issue during the discovery phase, relying then upon this

5  trial to flush out the question of whether it would be

6  admissible.  So they got all of our files and they really

7  wanted our files and they moved to compel our files in the

8  worse possible way and they got them.

9       So now they want to have a witness take the stand up

10  here, talk about what our files have said as produced in

11  discovery, provide his characterization of one side of the

12  conversation using their files, but now when it comes to the

13  truth that we may seek to explore on cross examination, the

14  answer is we can't get it.  And it doesn't even pass the --

15  that makes a mockery of the idea of having a level playing

16  field.

17       So the idea that they can control this problem by

18  walking through the grimp and mire of privilege and taking the

19  rights steps so that they don't "open the door" when they know

20  that we can't cross examine because we don't have access to the

21  information because we asked for it and it's not been produced,

22  is illusory.

23       You know, when it comes to the documents that were

24  asked for, we asked specifically for those documents.  We took

25  literally the description that they offered and we said give us

1 the documents and they said no.  Another area was with respect

2 to Mr. Krause is we asked for, with respect to the negotiation

3 process, we asked for what the sides considered during the

4 negotiations.  That is what was really the to and fro.  And

5 interestingly Mr. Finch says again, Well, we don't really need

6 necessarily to get into that, we'll just say did Grace enter

7 into the settlement?  Yes.  And that will be up to Grace to say

8 why.  And that's certainly true.

9        Now, the argument was made that somehow Grace has

10 closed its case and not put in its evidence and somehow there's

11 a -- this is ridiculous.  We have not depended for our

12 estimation on any aspect of the actual settlement process

13 itself.  They are now getting into it.  We have a very robust

14 response to it.  But it's their deal.  And the best example of

15 how this works out is the example that unfortunately involves

16 Mr. Krause where they put us to trial, notwithstanding the

17 interests of their own client in settling it.  They decided for

18 their own firm reasons to put us against the wall at the trial

19 and nothing could be clearer.  And what do they want?  Well,

20 Mr. Finch says, Oh, this was all very nice and innocent.  You

21 know, there was an internal investigation.  Did we ever get to

22 see the internal investigation?  He says it's there.  I asked

23 Mr. Krause that question.  Shut down.  Couldn't be answered.

24        There was never any sanctions of Baron & Budd.  Well,

25 why weren't there sanctions of Baron & Budd?  Because of all

1   the steps that were taken down in Dallas court that put people

2   in very, very substantial concern of what was going to happen

3   to them, I asked Mr. Krause questions about that.  That was

4   shut down.

5            He says, The settlement was really very remarkably

6   favorable to Grace.  What do they have to complain about?

7   After they got taken to trial and the verdicts came in, oh, it

8   was not a big deal.  They got a great favorable settlement.

9   Well, that's easy for Mr. Finch to say but that isn't a subject

10  of discovery in cross examination.  Was the settlement a

11  favorable settlement?  Grace says, No, it wasn't a favorable

12  settlement.  Well, they know that, but what does Mr. Krause's

13  own files say?  Does their witness believe it was a favorable

14  settlement or not?  Well, I can't conduct inquiry into that

15  because the witness is hiding behind -- or the witness is

16  invoking a privilege that the ACC and the FCR are hiding

17  behind.

18           So this is just -- it's gamesmanship.  It's not going

19  to work.  We know it's not going to work.  It's going to be

20  agonizing.  You take the discussion today, it's going to be

21  multiplied at ten different times.

22           We have the PIQ's.  The PIQ's.  Well, we got all the

23  PIQ's and Mr. Bernick said, Well, yeah, some of these cases

24  were immature.  Yes, they were immature in the sense that we

25  didn't have expert reports and they were not on the eve of

1 trial, many of them.  But what Mr. Finch fails to appreciate

2 and what we have made clear during our case is that when we

3 actually put the PIQ's to work and we took the information from

4 them, we only worked with certain information, i.e., that

5 information that should have been in the possession of the

6 claimant or the law firm day one when the case was filed, which

7 is what did they say their job was and what product did they

8 say their exposure was?  That's what we did in order precisely

9 to avoid any issue about whether the claim was mature.

10          They've now come back and said -- and Mr. Krause's

11 description, Well, the information was not available to us.

12 That information was not available to us.  So we then conducted

13 the discovery.  We said tell us when it became available to

14 you.  You say it wasn't, we believe it was.  We can't get the

15 answer to that question.

16          So in each and every case there is plainly -- we

17 served the discovery.  It's right on point.  It focused on

18 their own description.  We got shut down.  In any ordinary case

19 if this matter were at issue, this Court would resolve the

20 privilege issues.  It would resolve them as a pre-condition of

21 their being any kind of testimony so that the Court could

22 determine before the testimony occurred what would be fair and

23 appropriate cross examination.

24          The way it stands now, that's going to be impossible

25 because they've asserted the privilege with respect to matters

1  as to which the clients aren't even present before the Court.

2           So, yeah, this is unusual but the unusual nature of

3  it is a fact of their creation.

4           Last point is that Mr. Finch says, Well, you know,

5  the litigation files were all made available.  Yeah, after the

6  close of discovery and on the eve of the deposition of Mr.

7  Krause we made a request and we made the request, it was a

8  fairly broad request, relating to his potential testimony as a

9  fact witness.  They didn't give us virtually anything that we

10 asked for, but they then saw this as an opportunity to somehow

11 open the door anew -- this is literally weeks ago long after

12 the discovery cutoff has occurred by dumping on us a hundred

13 boxes of documents literally days before the deposition.  And,

14 yeah, I said, you know what? I can't possibly begin to do a

15 thing with those litigation files.  This is an effort to back

16 into this case long after everything has been done.  A

17 so-called new record of what these cases were really like.  As

18 a practical matter, that was a gesture that was -- as most of

19 the arguments that have been made here this afternoon -- it was

20 a strategic gesture.  All that we want is a fair opportunity to

21 conduct cross examination.  All that we're getting are

22 privileged assertions and gamesmanship that we can't possibly

23 get resolved in a sensible fashion in the middle of trial.

24           MR. FINCH:  Brief response, Your Honor.  With respect

25 to his -- Mr. Bernick's assertion that it was late in the day

1  when the hundred boxes of documents were delivered.  The fact

2  is we've listed Peter Krause as a witness for over two years.

3  They could have put a subpoena on Peter Krause three days after

4  we listed him as a witness -- or ten days.  They didn't wait --

5  they waited until October of 2007 to even bother to put a

6  document subpoena on Mr. Krause.  Then after Mr. Krause quite

7  properly objected to it because the subpoena was a blunderbuss

8  and asked questions that clearly invaded any kind of privilege

9  or work product that is protections his client may have, they

10  didn't even -- they didn't attempt to enforce the subpoena in

11  any way, shape, or form.  They didn't even bother to meet and

12  confer with Ms. Ramsey about the scope of the requests.

13         So then we negotiate a procedure where Mr. Krause

14  would be served with a "document request" which is not

15  available against a non-party.  He complied with the document

16  request to the best of his ability by producing what he could,

17  which was a huge volume of material, and now Mr. Bernick

18  complains that it was late in the day that it landed on his

19  doorsteps.  I suggest to you that the fault is all of Mr.

20  Bernick's.

21         Now, Mr. Bernick also said, "Oh, this settlement --

22  this Baron & Budd settlement was a terrible deal for Grace."

23  Let me read to you what they said at the time.

24         MR. BERNICK:  This is a document that still has a

25  privilege status and it's not to be displayed in open court.

**J&J COURT TRANSCRIBERS, INC.**

1 Yeah, I don't even know what makes you say that.

2          MR. FINCH:  Your Honor, let me --

3          MR. BERNICK:  I didn't read any -- this is an

4 outrageous --

5          MR. FINCH:  Mr. Bernick --

6          MR. BERNICK:  This is an outrageous procedure for

7 counsel to --

8          MR. FINCH:  Mr. --

9          MR. BERNICK:  -- make such free use --

10          MR. FINCH:  Mr. Bernick --

11          THE COURT:  Gentlemen, you know what?  It really

12 doesn't matter.  It's outside the scope, I think, of the

13 argument that's being made here anyway, isn't it?

14          MR. FINCH:  He just made the assertion that the

15 settlement was a bad deal for Grace.

16          THE COURT:  No.  What he said was that in the event

17 that Grace decides to make that position known at trial that it

18 is a bad deal.  That they can't cross examine Mr. Krause on

19 that view because they can't get his documents to find out

20 whether in Mr. Krause's file there would be support for that

21 contention.  That's what he said.

22          MR. FINCH:  But the point is we are not putting on

23 Mr. Krause to testify about whether Grace thought the deal was

24 a good deal, or a bad deal, or any kind of deal.  We're putting

25 on Mr. Krause to testify about what the objective criteria were

1  and what the deal was.

2        THE COURT:  But the problem that he's raising is

3  this.  Let's say you say to -- I don't know the specific

4  questions -- hypothetically.  You're going to say to Mr.

5  Krause, what criteria did you get from Grace before you could

6  present a client for settlement of a meso case and he's going

7  to say Grace wanted the meso clients to meet the following four

8  criteria; A, B, C, D.  End of story.  That's it.  That's all

9  you ask him.  On cross examination Mr. Bernick is going to say,

10 who came up with the criteria?  And he's going to say, Grace

11 did.  Mr. Bernick is going to say I want to see your file

12 because Grace's point of view is you came up with the criteria

13 13 years ago in a particular case, or claim, or whatever, and

14 Grace has only been using them ever since.  So I want to see

15 your files back 13 years ago to support that view.  And he

16 can't get them because there will be an assertion that those

17 files are protected by the attorney/client privilege.

18        MR. FINCH:  He can certainly get all of the --

19 everything that Waters & Krause told Grace about what those

20 criteria should be.  He's produced that.  This is the back and

21 forth settlement correspondence.  Our position is that a

22 settlement agreement is a contract and there is a course of

23 dealing between the parties and you don't look behind the

24 course of dealing to figure out what the contract is worth or

25 what it means.  It just --

1          THE COURT:  Well, then I don't need to know what the
2    criteria were that he was presented with.
3          MR. FINCH:  We need to know what the criteria were to
4    show that Grace's criteria historically differ from the
5    criteria that they're asking you to assume would be operative
6    in the future going forward forever from all time.
7          THE COURT:  Then if Grace wants to attack that by
8    saying going forward these are going to be the criteria that
9    Grace is coming up with because Grace was using somebody else's
10   criteria even though you assert that they were Grace's
11   criteria, I mean that's going to be, isn't it, a defense?
12         MR. FINCH:  Your Honor, the criteria is the criteria.
13   However they came to be.  The settlement history is the
14   settlement history.  We believe we are entitled to show through
15   competent fact witness testimony and otherwise that Grace's
16   historical criteria differ from the criteria that it is asking
17   you to assume will exist from now until the end of time as part
18   of its estimation case.  We are not attacking the settlement
19   history.  It is Grace that said they would attack the
20   settlement history, but they haven't.  And so if they want to
21   open the door in their case by doing that, they can do so.  But
22   we are not opening a door to anybody's privileged
23   communications and it is simply not the case that -- if I
24   represented Mr. Inselbuch and he got hit by a bus and we
25   settled the case and there somehow became a dispute over

1  whether the settlement was binding and he wanted to put me on

2  the stand in that dispute and an arbitrator was deciding

3  whether there was a binding settlement or not, I could testify

4  about my course of dealing with the defense counsel, the people

5  who represented the bus company that ran over Mr. Inselbuch,

6  and without waiving any kind of privilege that would exist

7  between the two of us, that's just black letter privilege law.

8         And so Mr. Bernick's assertion or suggestion that if

9  Mr. Krause testifies as to what Grace told him, he is waiving

10  the privilege and/or Grace needs the -- his privilege documents

11  to cross examine that, that's just false.  The scope of the

12  testimony is what did Grace say to you?  What did Grace -- what

13  evidence did you put -- what materials did you put into

14  evidence in a trial against Grace?  The cross examination of

15  that, the scope of that cross examination is cabined by the

16  scope of the direct and it doesn't open the door.

17         THE COURT:  Well, the trial issues, I think, are

18  somewhat different because to the extent that there is a trial,

19  there's going to be a record.  The issue is settlements, I

20  think.  Because the settlement criteria are the different issue

21  because you're talking now about a back and forth that occurred

22  and if the issue is what were the criteria and Grace has some

23  different view about what the criteria were, the issue is how

24  do I cross examine on the criteria?  And if the point is Mr.

25  Krause says the criteria were A, B, C, and the issue is well,

1  in every case did you meet those criteria, and let me see that

2  you did in order to settle --

3          MR. FINCH:  He's certainly not going to say in every

4  case he met those criteria.  In some of those cases he didn't

5  meet the criteria and he didn't get any money.  The point is

6  that the criteria were the criteria.  We are just putting on

7  his testimony solely to show at the end of the day when the

8  parties had a meeting of the minds and agreed to resolve a

9  mesothelioma case or lung cancer case prior to trial, that

10  generally speaking it was on the basis of some proof of

11  exposure to a Grace product and proof that the guy had

12  mesothelioma and not anything other than that.  That's the

13  thrust of the testimony and how that came to be in terms of the

14  internal motivations or what people were thinking when they

15  said things to each other is not, a) within the scope of that

16  direct; or, b) implicated by the direct.

17          I think, Your Honor, that there just -- there's

18  absolutely no basis for --

19          THE COURT:  Well, if that's --

20          MR. BERNICK:  Your Honor, I --

21          THE COURT:  You know, if that's what it's going to be

22  limited to on the meso issues, I'm not sure you need a witness.

23          MR. BERNICK:  Let me make a suggestion.

24          MR. FINCH:  Well, we haven't got any evidence in the

25  record of it so far and Grace hasn't agreed to stipulate to

1  that.  And there are areas of his testimony that go obviously

2  beyond that which would include the putting into evidence in

3  cases involving Grace at trial as to which there can't be a

4  privileged --

5          THE COURT:  Well, let's --

6          MR. BERNICK:  Of course, there is because if the

7  purpose is to show what actually happened at trials that went

8  to verdict, we have a record of what happened at trials that

9  went to verdict.  I'm not sure what the relevance of that is to

10 like 99.999 percent of the settlements, but that can be easily

11 made a matter of record in the case.  That is not the purpose

12 for Mr. Krause testifying.  He wants to go beyond the four

13 corners of the trial records and make comments on how that

14 related to the settlement process and it's the settlement

15 process that creates all these problems.  It's the reason why

16 we moved under Rule 408.  If all they want to do is to get into

17 evidence what would be in evidence if you had a contract case,

18 which is the contract, the settlement contract, well, the

19 contract is the contract.  The settlement document is the

20 settlement document.  Nobody can quarrel about what's in the

21 four corners of the document.  But here the purpose of the

22 proffer is different.  It is not to show what the deal was.  It

23 is then to tee up the circumstances leading up to the deal,

24 including their assertion that the criteria were different so

25 that that ought to call into doubt the criteria that we now

1  argue for even though the context is entirely different.  That

2  Grace agreed to those criteria.  That Grace indeed proposed

3  those criteria.  As soon as you get beyond the four corners of

4  the contract, which is the settlement agreement, there's going

5  to be massive dispute about what occurred and why it occurred.

6  They may say, oh, it's hunky-dory.  Grace will say, as they

7  already have said in deposition -- that we were over a barrel.

8  We didn't have any choice in the system.  This is the way that

9  it worked.

10         So you can't have it both ways.  If you want the

11 settlements, we don't need a witness for the settlements.  The

12 settlements are the settlements.  But if you want to go beyond

13 the four corners of the settlements, the place at issue, the

14 circumstances under which those settlements arose, you can't

15 cut it so finely.  You've got to let the stuff come in and --

16         MR. FINCH:  Your Honor --

17         MR. BERNICK:  -- that's where we have the problem.

18         MR. FINCH:  -- may I respond to that?

19         In a breach of contract case, let's assume that the

20 Court finds that a contract is ambiguous.  Then extrinsic

21 evidence of the contract would be relevant and admissible

22 testimony.

23         THE COURT:  Oh, sure, but these settlements aren't

24 ambiguous and nobody is contending that they are.

25         MR. FINCH:  No, but the -- I'm not contending that

1 they are either, but the point is that you could -- if -- I'm

2 using it for as an example -- that if you were fighting about

3 the meaning of the contract, which here we're not fighting

4 about the meaning of the contract, you could put on testimony

5 from the people who negotiated the contract to describe what

6 they said to each other without waiving the privilege as to

7 each of them as their clients if it was lawyers that negotiated

8 the deal.

9 　　　　MR. BERNICK:  Not if the terms at issue were

10 negotiated by the lawyers.

11 　　　　THE COURT:  I think you're going to be getting into a

12 problem.

13 　　　　Mr. Finch, look, to the extent that Mr. Krause is a

14 fact witness, I'm going to let you call him.  But to the extent

15 that there is an issue that involves a privilege and he asserts

16 it, I'm going to strike the testimony.

17 　　　　MR. FINCH:  I understand that.  That's fine, Your

18 Honor.

19 　　　　THE COURT:  So I would suggest -- and, you know, if

20 it takes a voir dire, I'm not going to get the whole way

21 through his direct if it's going to be an issue where he's

22 going to testify for four hours and then the first question is

23 going to involve striking his testimony.  So if there's going

24 to be a voir dire right at the outset, we're going to do it

25 then because I'm not going to listen for four hours or however

1   long to the testimony and then find out that it's all going to

2   be stricken.

3          MR. FINCH:  Your Honor, I wasn't planning to proffer

4   Mr. Krause as an expert.

5          THE COURT:  I understand.  I understand that.  But

6   the problem is this, if there is going to be an objection that

7   indicates some privilege issue and Mr. Krause is going to

8   assert that he will not answer a question on cross as a result

9   of an assertion of a privilege, we're going to find that out up

10  front.  We are not going to go through hours of testimony only

11  to find out at the end that I'm going to be striking a whole

12  day's worth of testimony.  I'm not going to do that.

13         So I suggest --

14         MR. FINCH:  Understood, Your Honor.

15         THE COURT:  I suggest that you sit down with Mr.

16  Krause and work out the list of questions and you show them to

17  Mr. Bernick in advance because otherwise -- I'm serious, I know

18  this is an unusual request.

19         MR. FINCH:  No, the reason that I smiled, Your Honor,

20  is that I had considered that very thing in advance of this

21  hearing and decided not to do it because upon looking at my

22  questions, they were -- some of them were rather inartfully

23  drawn because I dictated them to one of my partners in a car on

24  the way home.  So they're not the most crystal-clear.  But I

25  think that that may be a way to proceed.

1          THE COURT:  Well, all right.  I'm not suggesting that
2    you can't modify a question, you know, period.  But
3    nonetheless, it seems to me that to the extent that you know in
4    advance that this issue is going to come up -- and I think it
5    will -- we might as well know early on in the process where
6    it's coming so that the first time it's going to come up we can
7    address the issue.

8          MR. FINCH:  Thank you, Your Honor.

9          MR. BERNICK:  And again, we will obviously make our
10   best effort to try to make this work.  Those questions though
11   not only have to be assessed against the backdrop of the
12   anticipated cross examination, they now have to be assessed
13   against the backdrop of whether the same information as to
14   which they're now going to allow questions to be asked were the
15   subject of instructions not to answer at the deposition and
16   document requests that were not responded to.

17         In other words, that they now say, oh, well, gee,
18   we'll let you get into X.  We took Mr. Krause's deposition.  We
19   did conduct the discovery in advance with the Court's approval
20   and pursuant to a process that the Court agreed, and the
21   documents haven't been produced.

22         MR. FINCH:  Your Honor --

23         THE COURT:  Well -- wait.  The issue may be that at
24   this point in time Mr. Krause knows what those questions are.
25   He has certainly had an opportunity by now to consult with

1  clients to find out whether there is a concern about an

2  attorney/client privilege as to any of those questions.  Mr.

3  Finch, you are to contact him to find out whether he has made

4  that inquiry of his clients.  If not, he is ordered to make

5  that inquiry of his clients and find out whether, in fact, his

6  clients are asserting that attorney/client privilege.  It is

7  after all -- or work product to the extent that's what it is --

8  it is after all the client's privilege, not his.  Therefore, he

9  will find out whether the client wishes to assert that

10 privilege and if the client wishes to assert it, whether or not

11 the client will waive it.  And if that means 3,000 clients,

12 he's to contact them all.  So that when we get to this issue at

13 trial, we have an indication of what this is.  That's an order.

14 He's to do it before he's called as a witness.  It is the

15 client's privilege, not his.

16        MR. FINCH:  We'll do our best, Your Honor.

17        THE COURT:  All right.

18        MR. BERNICK:  I think that that's all we had this

19 afternoon.

20        MR. FINCH:  Your Honor, in light of the ruling with

21 respect to --

22        THE COURT:  No.  You must get the scheduling fixed

23 because I don't trust you folks not to do it.  So unless you're

24 going to, you know, under oath tell me that you'll get a

25 scheduling order done by tomorrow.  If you tell me you'll get

1  it done by tomorrow and I can trust you, I'll let you go.

2           MR. FINCH:  You mean the schedule -- the only

3  question is we'd like a minute to confer with ourselves and

4  call witnesses re their availability.  I'm pretty sure Mr.

5  Snyder is available on the 9th of -- what month are we in?

6           MR. BERNICK:  Find out if he's going to be available

7  thereafter.

8           MR. FINCH:  Yeah.  I understand.  But before we go

9  lock ourselves in a room with the other side, can we have a

10 short period of time --

11          THE COURT:  Oh, sure.

12          MR. FINCH:  -- to discuss it among ourselves and then

13 try to reach some --

14          THE COURT:  So you want two days instead of one day.

15          MR. FINCH:  No.  I fully intend to leave here this

16 evening.  I don't think this should take that long.

17          THE COURT:  Oh, all right.  Yes, that's fine.

18          MR. BERNICK:  We'll be in the same town also, I

19 think, tomorrow.

20          UNIDENTIFIED SPEAKER:  We'll be in Washington

21 tomorrow.

22          MR. BERNICK:  I'm sorry?

23          UNIDENTIFIED SPEAKER:  We'll be in Washington.

24          THE COURT:  Look, Friday is fine if you can get it

25 done by Friday.  That's when Mr. Bernick, I think, was asking

1  so that they can prepare.  That's all right with me.

2          MR. FINCH:  We'll certainly get it done by Friday.

3          THE COURT:  All right.  That's fine with me.  If you

4  can get it done by Friday.  But I do expect that I will get a

5  scheduling order submitted -- or a schedule, I should say,

6  submitted by Friday.  I don't need it in the form of an order.

7          MR. FINCH:  I appreciate Your Honor's guidance on

8  that.

9          THE COURT:  That's a promise by everybody, correct?

10         MR. FINCH:  Yes.  Yes, Your Honor.

11         THE COURT:  All right.  Okay.  We're adjourned.

12         MR. FINCH:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MR. BERNICK:  These are the slides --

15         THE COURT:  All right.  Thank you.  Mr. Finch, I've

16  been given copies of the slides with the one deleted that I

17  said had not been shown or if it had I had not seen.

18                      * * * * *

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, ELAINE HOWELL, PATRICIA REPKO, TAMMY DeRISI, KIMBERLY UPSHUR and PATRICIA A. KONTURA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Elaine Howell

ELAINE HOWELL


/s/ Patricia Repko

PATRICIA REPKO


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Patricia A. Kontura

PATRICIA A. KONTURA

J&J COURT TRANSCRIBERS, INC.


                              April 7, 2008


**J&J COURT TRANSCRIBERS, INC.**