UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
              Debtors.    .
                          .    March 26, 2008
. . . . . . . . . . . . ..     8:38 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>     NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| For the Debtors: | ARPC<br>By:  AMY BROCKMAN, ESQ. |
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>     JAY HUGHES, ESQ.<br>     WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the Equity Committee: | Kramer Levin Naftalis & Frankel<br>By:  GREGORY HOROWITZ, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>     ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property Damage Committee: | Bilzin Sumberg Baena Price & Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>     SCOTT BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |

**J&J COURT TRANSCRIBERS, INC.**

3

APPEARANCES (CONT'D):

```
For the Ad Hoc            Dewey & LeBoeuf, LLP
Committee of Equity       By:  JENNIFER WHITENER, ESQ.
Sec. Holders:             125 West 55th Street
                          New York, NY  10019


For the Future            Orrick, Herrington & Sutcliffe
Claimants                    LLP
Representatives:          By:  ROGER FRANKEL, ESQ.
                               ANTHONY KIM, ESQ.
                               RAYMOND MULLADY, ESQ.
                               JOHN ANSBRO, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701


For Maryland Casualty:    Connelly Bove Lodge & Hutz, LLP
                          By:  JEFFREY WISLER, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Wilmington, DE  19899


For Maryland Casualty:    Eckert Seamans Cherin & Mellott, LLC
                          By:  EDWARD LONGOSZ, II, ESQ.
                          1747 Pennsylvania Avenue, N.W.
                          Suite 1200
                          Washington, D.C.  20006


                          STB
                          By:  STERLING MARSHALL, ESQ.

For Sealed Air:           Skadden, Arps, Slate, Meagher & Flom,
                             LLP
                          By: DAVID TURETSKY, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Sealed Air:             NERA Economic Consulting
                            By:  STEPHANIE PLANCICH
                            1166 Avenue of the Americas
                            28th Floor
                            New York, NY  10036

For W.R. Grace:             NERA
                            By:  ELENA ZAPRYANOVA
                                 LINDA SHEN

For Serengeti:              Vinson & Elkins, LLP
                            By:  ARI BERMAN, ESQ.
                            Trammell Crow Center
                            2001 Ross Avenue, Suite 3700
                            Dallas, TX  75201

For Serengeti:              By:  BILLAL SIKANDER

For Silver Point
Capital:                    Silver Point Capital
                            By:  JOHN KU

For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For the Unsecured           Strook & Strook & Lavan
Creditors' Committee:       By:  LEWIS KRUGER, ESQ.
                            180 Maiden Lane
                            New York, NY 10038

For Ad Hoc Committee:       Weil, Gotshal & Manges
                            By:  M. JARRAD WRIGHT, ESQ.
                            1300 Eye Street NW, Suite 900
                            Washington, D.C.  20005

For Official Committee      Kramer Levin Naftalis & Frankel
of Equity Holders:           LLP
                            By:  PHILLIP BENTLEY, ESQ.
                            919 Third Avenue
                            New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee        Dies & Hile, LLP
of Asbestos Property          By:  MARTIN DIES, ESQ.
Damage Claimants:             1601 Rio Grande, Suite 330
                              Austin, TX  78701

                              ELIZABETH DEVINE, ESQ.

For Various Claimant          Stutzman, Bromberg, Esserman & Plifka
Firms:                        By:  DAVID J. PARSONS, ESQ.
                                   VAN J. HOOKER, ESQ.
                                   SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201

For Fireman's Fund:           Stevens & Lee, P.C.
                              By:  JOHN DEMMY, ESQ.
                                   DAVID R. BEANE, ESQ.
                              1105 North Market Street, 7th Fl.
                              Wilmington, DE  19801

For Owens-Illinois:           McCarter & English
                              By:  DANIEL SILVER, ESQ.
                              Renaissance Centre, 405 N. King St.
                              Wilmington, DE  19801

For David T. Austern:         Piper Jaffray & Co.
                              By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864

For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  MATTHEW RUSSELL, ESQ.
                                   ROBERT GUTTMANN, ESQ.
                                   MICHAEL DAVIS, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe,<br>   LLP<br>By:  DEBRA FELDER, ESQ.<br>     JOSHUA CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044<br><br>Kirkland & Ellis, LLP<br>By:  ELLEN AHERN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601<br><br>Kirkland & Ellis, LLP<br>By:  DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |
| For State of Montana<br>Department of<br>Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186

For W.R. Grace:             Cohn Whitesell & Goldberg, LLP
                            By:  NATHAN SOUCY, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For W.R. Grace:             Pachulski, Stang, Ziehl & Jones, LLP
                            By:  TIMOTHY P. CAIRNS, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  WALTER SLOCOMBE, ESQ.
                                 BERNARD BAILOR, ESQ.
                                 JEANNA RICKARDS, ESQ.
                                 JAMES WEHNER, ESQ.
                                 LESLIE KELLEHER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                           Wall Street Plaza
                           New York, NY  10005


For Pepsi:                 Butler Rubin Salfarelli & Boyd, LLP
                           By:  KIRK T. HARTLEY, ESQ.
                           70 West Madison Street
                           Suite 1800
                           Chicago, IL  60602


For Official Committee     Duane Morris, LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246


For Official Committee     Brandi Law Firm
of Asbestos Property       By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:          44 Montgomery St., Suite 1050
                           San Francisco, CA  94104


For the State of CA,       Hahn & Hessen, LLP
Dept. of Gen. Services:    By:  CHRISTINA J. KANG, ESQ.
                           488 Madison Avenue, 14th Fl.
                           New York, NY  10022


For Baron & Budd,          Hogan Firm Attorneys at Law
et al.:                    By:  DANIEL K. HOGAN, ESQ.
                           1311 Delaware Avenue
                           Wilmington, DE  19801


For the PD Committee:      Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924


For Royal Insurance:       Wilson Elser Moskowitz Edelman
                             & Dicker, LLP
                           By:  CATHERINE CHEN, ESQ.
                                150 East 42nd Street
                                New York, NY  10017


For David T. Austern:      Piper Jaffray & Co.
                           By:  JASON SOLGANICK


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216

For London Market           Mendes & Mount, LLP
Companies:                  By:  ALEXANDER MUELLER, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019-6829

For Official Committee      LECG
of Asbestos Property        By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee      Richardson Patrick Westbrook &
of Asbestos Property          Brickman, P.C.
Claimants:                  By:  EDWARD J. WESTBROOK, ESQ.
                            174 East Bay Street
                            Charleston, SC  29401

For Ivory Investment:       Ivory Investment
                            By:  DHANANJAY PATWARDHAN

For Linden Advisors:        Linden Advisors, LP
                            By:  CRAIG GILBERT

For O'Conner:               O'Conner
                            By:  John R. Wollen

For Credit Suisse           Credit Suisse First Boston
First Boston:               By:  TIM McARDLE

For King Street             King Street Capital Management, LLC
Capital Management,         By:  KIM CHRISTENSEN, ESQ.
LLC:

For the Blackstone          The Blackstone Group
Group:                      By:  JOHN O'CONNELL

For Dune Capital Mgmt:      Dune Capital Management
                            By:  GUY BARON

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anchorage Advisors:    Anchorage Advisors
                           By:   JONATHAN LEWINSOHN

For Lehman Brothers:       Lehman Brothers
                           By:   ANDREW CHAN

For Caxton Associates:     Caxton Associates, LLC
                           By:   JAMES RIEGER

For Dow Jones              Dow Jones News Wires
News Wires:                By:   PEG BRICKLEY

For Citadel Investment     Citadel Investment Group
Group:                     By:   BEAU HARBOUR

For Durham Asset           Durham Asset Management
Management:                By:   JEFFREY A. ROSENKRANZ

For Murray Capital         Murray Capital Management, Inc.
Management                 By:   MARTI MURRAY

For Korn Capital, LLC:     Korn Capital, LLC
                           By:   STEPHANIE KWONG

For Irwin H. Zandman:      Irwin H. Zandman
                           By:   IRWIN H. ZANDMAN

For Venor Capital:         MICHAEL SCOTT, ESQ.
                           Washington, DC


For Asbestos Claimants:    Brayton Purcell, LLP
                           By:   CHRISTINA SKUBIC, ESQ.
                           222 Rush Landing Road
                           Novato, CA  94948


For Halcyon Asset
Management LLC:            Halcyon Asset Management, LLC
                           By:   JOHN GREENE

TELEPHONIC APPEARANCES (CONT'D)

For The Scotts Co.:          Vorys, Sater, Seymour and Pease,
                                LLP
                             By:  MATTHEW DAIKER, ESQ.
                             52 East Gay Street
                             P.O. Box 1008
                             Columbus, OH  43216

For Private Investors:    WILLIAM M. WAGNER

For Bank of New York:     ANDREW HAIN, ESQ.


For WR Grace
Shareholder:                 Tocqueville Asset Management
                             By:  PETER SHAWN

12

## I N D E X

**WITNESS FOR THE DEBTOR**                              **PAGE**

  Dr. Elizabeth Anderson
    Direct Examination by Mr. Bernick          33
    Voir Dire Examination by Mr. Mullady       41
    Continued Direct Examination by Mr. Bernick   48
    Cross Examination by Mr. Mullady          115
    Cross Examination by Mr. Finch            210
    Redirect Examination by Mr. Bernick       233
    Recross Examination by Mr. Mullady        252


**EXHIBITS**                                            **EVD.**

  GG-2276   Summaries                         114
  GG-2277   Summaries                         114
  GG-2279   Summaries                         114
  GG-2282   Summaries                         114
  GG-2291   Summaries                         114
  GG-2292   Summaries                         114
  GG-2293   Summaries                         114
  GG-2294   Summaries                         114
  GG-2295   Summaries                         114
  GG-2296   Summaries                         114

  GX-155                                       268

1          THE COURT:  Good morning, please be seated.  This is

2    the continuation of the personal injury estimation trial in

3    W.R. Grace, 01-1139.  Participants by phone, Alex Mueller,

4    James Reiger, Matt Doheny, Theodore Tacconelli, Michael Davis,

5    Francis Monaco, Matthew Russell, Shayne Spencer, Lewis Kruger,

6    James Wehner, Elihu Inselbuch, Walter Slocumbe, Leslie

7    Kelleher, Peter Lockwood, Bernard Bailor, Guy Baron, Ari

8    Berman, Michael Lastowski, Janet Baer, Marti Murray, Jason

9    Solganick, Debra Felder, Nathan Soucy, Natalie Ramsey, Terrence

10   Edwards, Daniel Silver, Edward Westbrook, Kim Christensen,

11   William Wagner, Andrew Hain, Andrew Craig, David Parsons, Ken

12   Pasquale, Martin Dies, Peter Shawn, Jonathan Brownstein, Scott

13   Baena, Darrell Scott, Jay Sakalo, David Turetsky, Timothy

14   Cairns, Elizabeth Devine, Michael Scott, John Phillips, Daniel

15   Speights, Matthew Kramer, Christina Skubic, Mark Hurford, Beau

16   Harbour, Jeanna Rickards, Robert Guttmann, Christina Kang,

17   Catherine Chen, Alan Madian, David Beane, John Greene, Matthew

18   Daiker, John Ku, Andrew Chan, William Corcoran, Robert

19   Horkovich.

20        I'll take entries in Court for the court reporter,

21   please.  Good morning.

22        MR. BERNICK:  Good morning, Your Honor, David Bernick

23   for Grace.

24        MR. McMILLAN:  Good morning, Your Honor, Scott

25   McMillan for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. AHERN:  Good morning, Ellen Ahern for Grace.

2          MS. HARDING:  Barbara Harding for Grace.

3          MR. FINCH:  Nathan Finch for the ACC, Your Honor.

4          MR. INSELBUCH:  Elihu Inselbuch for the ACC.

5          MR. MULLADY:  Good morning, Your Honor, Raymond

6  Mullady for the FCR.

7          MR. ANSBRO:  John Ansbro for the FCR.

8          MR. KIM:  Anthony Kim for the FCR.

9          MS. KRIEGER:  Good morning, Your Honor, Arlene

10  Krieger for the Unsecured Creditors.

11          MR. KRAMER:  Good morning, Your Honor, Matt Kramer

12  for the PD Committee.

13          MR. HOROWITZ:  Good morning, Your Honor, Greg

14  Horowitz for the Official Equity Committee.

15          MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

16  for the FCR.

17          THE COURT:  Give me one second, Mr. Bernick, please.

18                    (Pause)

19          THE COURT:  Folks, I had my staff up this morning.

20  Mr. Finch, did you explain to people about the microphones by

21  any chance?

22          MR. FINCH:  Not yet, Your Honor,

23          THE COURT:  Okay.  Looking at the microphone issue

24  and your conferences, it turns out in trying to get the system

25  fixed so that we don't have the feedback, apparently what's

**J&J COURT TRANSCRIBERS, INC.**

1  happened is that the microphones are now very sensitive, so in

2  order to have conferences that are not picked up, you have to

3  do one of two things; either hold the push button, that little

4  button that makes the light go off the entire time that you're

5  doing your conference, which is virtually impossible, or it

6  works if you simply turn the microphones, all of them, at your

7  table around, so that they face the opposite direction while

8  you're doing your conference because they're conical mikes and

9  as a result they will not pick up the sound while you're doing

10 the conference.  We tested it this morning and the other table

11 can't hear while you're talking, while you turn the microphones

12 around.  So, I think that will protect all of you.  If you will

13 take that effort this morning.

14        MR. BERNICK:  I appreciate that.  Your Honor, it

15 reminds me many, many years ago we tried the San Juan DuPont

16 Plaza fire case in San Juan, Puerto Rico and there were so many

17 defendants in the case that they built a special jury box that

18 isolated the jury so that you didn't have to have all the

19 lawyers going up for a side conference.  They put microphones

20 on all the tables and you had to activate them.  So, what would

21 happen, in the middle of the testimony somebody in the vast

22 hoards of the defense lawyers would want to object, so they

23 would pull the microphone forward and activate it, but of

24 course, when they did it, the swizzle stick would squeak and so

25 there's this squeak objection.  But this is -- I appreciate

1  this is a much better system under any set of circumstances.  I

2  think we'll just have to deal with it.

3             THE COURT:  All right.

4             MR. BERNICK:  Your Honor, in terms of what we have

5  today, we obviously have Dr. Anderson's testimony, which will

6  take the bulk of the day and we'll begin with that.  We had

7  planned on offering into evidence a series of summaries.  These

8  are summaries of deposition testimony, picking up on Your

9  Honor's suggestion to that effect, as well as case law that

10 says that that's very appropriate.

11            We've had some difficulty in trying to reach

12 resolution with the ACC and the FCR concerning the use of these

13 summaries and mostly it's general issues that have been raised

14 concerning whether it's appropriate to have these kind of

15 summaries.

16            What I would propose and what I've already told Mr.

17 Mullady and Mr. Finch, is that it might be worthwhile if Your

18 Honor were to simply glance through these at some point during

19 the day and then really give us feedback on whether this is

20 useful.  If it's not useful and you'd rather just have the

21 depositions read in, we've got the designations and the

22 counters and all the rest of that, we can do it that way.  We

23 would very, very much prefer to do it this way because it's

24 much more meaningful, but if Your Honor doesn't find it to be

25 useful, it's not worth going to the step then of arguing the

1  issues about admissibility.  We'd be prepared to defer to

2  whatever it is that Your Honor finds to be most appropriate.

3        So, these are 1006 summaries, based upon the

4  deposition testimony.  I don't believe that there's really an

5  issue about whether the excerpts that we are summarizing are

6  appropriately excerpted, there are issues about whether the

7  process is appropriate; that is, whether you can do this.  They

8  would also like to have their counter designations in some

9  fashion included and they're not.

10       And then there's a specific issue with respect to

11 invocation of the Fifth Amendment which we can take up as well.

12 So, what I suggest, we just tender these to the Court.  Your

13 Honor can flip through and let us know.  If it is something

14 that you believe would be appropriate, then we can take up the

15 issue later on this afternoon of the objections that have been

16 lodged specifically to these and proceed accordingly, and that

17 would take some time this afternoon.

18       THE COURT:  All right.  Let me make sure I

19 understand.  What you're going to give me is a summary of a

20 deposition; that is, an excerpt from the deposition that is

21 like a question and answer by line that the debtors intend to

22 use but does not have the counter designations from the other

23 side.

24       MR. BERNICK:  Yes.

25       THE COURT:  And the purpose is simply to see whether

1  this is an appropriate process.  If it is, then the other side

2  wants to do the same process?

3        MR. FINCH:  Correct, Your Honor.

4        MR. BERNICK:  And if you could just flip on the ELMO

5  very briefly, I'll just give you an example.

6        THE COURT:  All right.

7        MR. BERNICK:  But the idea is that there are

8  excerpts, they're also listed by topics and we tried to make

9  the topics non-argumentative so that they are simply topics.

10 Obviously, the summary itself are our summary, it's not their

11 summary, is there a -- there we go.  And if they want to make

12 their own summaries and submit their own summaries, we wouldn't

13 have a problem with that.  We don't think it's appropriate, if

14 we're tendering our summary, that we have to include their

15 designations because it's our summary.  So, they can do their

16 own summary if they want, we have no issue with that if they

17 want to put that in.

18        But Your Honor can see that with respect to Ray

19 Harron, we have the exposure topic, testimony in prior cases,

20 testimony in this case.  This presents the Fifth Amendment

21 issue which we're happy to argue, but that's essentially how

22 they work, is a topic, a Q&A and then in the prior case, and a

23 Q&A in this case.  If we took another example, here you have --

24 this is Dr. Gaziano's testimony regarding diagnostic practices.

25 Here are the different topics and then here are the quotes from

1  the deposition, including the cites.

2       So, we think it's a much more useful way of digesting

3  a lot of information that otherwise would take a lot of time to

4  present to the Court.  We have case law to support the

5  proposition that this is totally appropriate.  But, again, our

6  guiding principle in the first instance is whether Your Honor

7  would find it to be more useful than simply taking three hours

8  to play all these depositions and encounters.

9       THE COURT:  All right.  And then the question then

10  is, are all of the summaries by Q&A, in Q&A format, they are

11  not somebody's summary of the witness' testimony, they are

12  actually Q&As?

13       MR. BERNICK:  In some cases, they're in Q&As and in

14  some cases -- you can see right here, just the statement does

15  not quote, exclude, so it is an effort to capture the essence

16  of the words and we are prepared to demonstrate in each case,

17  that that is the appropriate -- no objection has been made that

18  says, well, you've got that wrong.  They've said that they're

19  too busy doing other things.  I don't want to get into that.

20  They've been coming here with 14 --

21       MR. MULLADY:  That's not right, Your Honor.

22       MR. BERNICK:  -- well, we've got the e-mails, 14

23  lawyers everyday sitting here in court and they can't work on

24  this.  They're giving us their own designations for their case

25  that hasn't even started.  I won't get into that, the point is

1 that there's no issue that's been raised concerning the

2 accuracy of any of the excerpts that have been made.

3          But, again, we can argue about that this afternoon.

4 The threshold issue is whether this is more useful to the Court

5 than reading the depositions.  So, if we have to read the

6 depositions, we will read all the depositions.  It'll take

7 three and a half or four hours, we're basically talking about

8 pushing back the closing of our case a day.

9          THE COURT:  All right.

10          MR. MULLADY:  May I be heard, Your Honor?

11          THE COURT:  Yes, sir.

12          MR. MULLADY:  I'd be happy to fully address this

13 issue this afternoon, Your Honor.  I didn't want to take the

14 Court's time or delay the witness presentation.  But I do think

15 it's important for the Court to know that we made a proposal

16 last night to Grace which we think satisfies both our concern

17 about these being improper Rule 1006 summaries because they

18 attempt to summarize deposition that has already been admitted

19 into evidence in some cases and in other cases, is the subject

20 of fully designated deposition testimony which has not been

21 offered, where our counter designations are there.

22          But, the proposal we made was, if the purpose of this

23 is to assist the Court and to streamline Your Honor's review

24 and to make it easier for you to get through all of this, these

25 can be demonstrative exhibits which can be offered as

1  demonstratives, not in evidence under Rule 1006 and then the

2  full deposition designations that both sides spent a lot of

3  time this weekend working on, including counter designations

4  and a discussion about whether exhibits should go in, all of

5  that should just go into evidence and then Your Honor can have

6  the demonstratives to assist you in identifying what the debtor

7  feels is important testimony for you to review and we could do

8  the same thing when we get to our case.

9          THE COURT:  Doesn't that work?

10         MR. BERNICK:  No.  It doesn't work for two reasons.

11 First of all, they've made a lot of counter designations.  We

12 gave them this stuff Saturday night, so the idea that they

13 didn't know this was happening is ridiculous.

14         Secondly, with respect to the demonstratives, the

15 demonstratives will not be part of the record.  And what will

16 be part of the record is the depositions.  And then what we

17 have to do is actually read the deposition testimony into the

18 record.  So, we're talking about three and a half or four

19 hours.

20         THE COURT:  Well, can't I accept the written

21 depositions without having them read into the record?  I mean,

22 I can read them myself.

23         MR. BERNICK:  Well, but --

24         MR. MULLADY:  Of course you can.

25         MR. BERNICK:  Excuse me.  The summary will not be --

1  Your Honor, you would have to incorporate -- if you were to

2  write any opinion, you'd have to incorporate, you'd have to go

3  back and actually read this stuff.  The depositions --

4          THE COURT:  I would expect to read this stuff.

5          MR. BERNICK:  Yes, but if we don't play it -- Your

6  Honor expressed a concern that if we don't play it, we're

7  postponing issues of admissibility and we don't really know

8  what's there.  This way you have only those portions that we

9  want to use.  And if there are issues about admissibility, they

10  get raised with respect to a handful of summaries.  These

11  summaries are not voluminous and we can go through and deal

12  with the objections, if there are objections, as to the

13  admissibility of the evidence very, very quickly.  And Your

14  Honor then knows exactly what is of relevance in those

15  depositions.  Otherwise, I believe that what Your Honor has

16  observed is that the problem is that you will then get, and

17  we'll have the same kind of issue with respect to the Grace

18  depositions as well, a bunch of transcripts and nobody really

19  knows what is in and what is out, and they are characterized

20  differently and the issue of what's admissible and not has been

21  deferred.  The whole idea of doing these summaries is precisely

22  to focus on the what counts.  And, again, if they want to do

23  their own, we have no issue with that.

24          Now, I said what's useful to the Court is our

25  benchmark because if Your Honor doesn't find it useful, then

1  we'll go back the other way.  But, as a matter of what's

2  admissible under the rules, this is plainly admissible under

3  the rules.  1006 doesn't say you can't summarize deposition

4  testimony or any other kind of evidence.  Your Honor actually

5  suggested that we do down this road on January the 23rd in the

6  course of a hearing and we have since looked into the case law

7  and there's case law squarely on point that says you can do

8  this.  So, when they came back and said last night, after they

9  didn't have time to deal with this issue on a substantive

10  basis, and said, well, why don't you just take demonstratives.

11  That's another way of saying, no, you can't get it into

12  evidence.  And if that's their position, it's not really a

13  compromise at all, we could always have it tendered in as a

14  demonstrative, we didn't need their permission to do that.  So,

15  if this is going to happen as a piece of evidence, let them

16  come back and say as a piece of evidence, you know, we will do

17  this, if you will permit us to do our own summaries of counter

18  designations, no quarrel with that.  But the idea that because

19  they're too busy, we can't tender on a totally legitimate

20  basis, the essence of these depositions which will otherwise

21  take hours and then deal with the relevance issues, I think is

22  wrong and I want these summaries to be part of the record for

23  all purposes in the case.  And I think we're entitled to make

24  that proffer.

25           THE COURT:  Okay.  I will take a look over the lunch

1 recess at whether or not what has been submitted is helpful.  I

2 have not ever looked at the concept of a summary of deposition

3 testimony.  I just have never been presented with that issue.

4 Frankly, if it's helpful, it's probably a great way to proceed

5 because there are numerous depositions in the case and if it

6 works, and if it's admissible, it would probably be a good way

7 to proceed.  Whether it is admissible, I don't know, and have

8 you done briefs on this issue, because if you have, I haven't

9 seen them?

10        MR. MULLADY:  Well, Your Honor -- we haven't briefed

11 it, Your Honor, but we did last night, when I communicated with

12 Mr. Bernick's team about this issue, we had an ALR citation in

13 front of us and cases from a number of circuits saying that

14 these are not admissible for purposes of summarizing deposition

15 testimony.  And we'll have those authorities this afternoon, if

16 Your Honor would like to hear about them.

17        I want to make one other point, which is that

18 yesterday, Mr. Bernick offered into evidence, without

19 objection, with our express agreement, certain summaries that

20 we did not find objectionable.  And so, the notion that we --

21 you know, we've been too busy to focus on this, or give

22 attention to the request by the debtors, you know, is just a

23 false charge.

24        And, Your Honor, I really wish we could elevate the

25 level of the discourse in this courtroom to what is actually

1 occurring in these discussions with counsel, which have been

2 very amicable.  I had two very nice conversations last night

3 with Mr. Bernick's team, he was not on the phone, I understand

4 he was preparing Dr. Anderson, as I was trying to, but the

5 point is, we did work with them to try to resolve this issue.

6 We're not too busy for the matters that Mr. Bernick would like

7 to bring before the Court.  We've never been so and it's unfair

8 for him to say that repeatedly.  Thank you.

9         THE COURT:  Okay.

10        MR. BERNICK:  Well, you know, Your Honor, I have to

11 say that Mr. Mullady is absolutely misrepresenting the tone of

12 the dialogue.  The tone of the dialogue, and we have the

13 e-mails and we can show it to the Court --

14        THE COURT:  It's okay.

15        MR. BERNICK:  -- is that they didn't want to talk

16 with us.

17        THE COURT:  Folks.  Gentlemen, it's fine.  I will

18 look at these over the lunch recess and make a determination as

19 to whether, first of all it's helpful.  I am not over the lunch

20 recess going to do legal research on this issue.  I am trying

21 in this case to get four opinions out in the next two weeks and

22 as a result, what I'm going to be doing, in addition to looking

23 at this, is working with my two law clerks to try to get two of

24 those opinions out, hopefully tomorrow, if I can.  So, that is

25 how I'm going to be spending my lunch recess in this case, not

1 working on this issue.  I already have plans for what I'm doing

2 over the lunch hour today.  So, that's -- I will take a look at

3 this to see whether it's helpful

4     With respect to a brief, if you can give me some

5 citations for this afternoon, I will be happy to hear argument

6 if you can do it this afternoon, but I am not going to be

7 looking at those citations today, I can assure you.  Between

8 now and when you're back before me for the next round of trial

9 issues, I will give you a ruling, but I will not be doing it

10 today, I guarantee.  It will not be today.

11     MR. BERNICK:  Okay.  Well, then Your Honor, we will

12 give you the citations right now.    Which is 304 --

13     THE COURT:  I'm sorry, 304 --

14     MR. BERNICK:  F.3rd. 237.

15     THE COURT:  All right.

16     MR. BERNICK:  It's a Third Circuit decision, 2002,

17 <u>United States v. Velasquez</u> and Headnotes 1 and 2 deal with this

18 issue.  There are other citations that we can supply.

19     Your Honor, this is -- after today, there are only

20 two pieces of evidence left in our case, which is Dr. Florence

21 on Monday, and this.

22     THE COURT:  Yes.

23     MR. BERNICK:  So, if we can't do it this way, we are

24 talking really about probably using Monday in order to deal

25 with this issue and then call Dr. Florence on Tuesday, in which

1  case we're not talking about pushing our resting back to

2  Tuesday afternoon.  If that's the way this goes, that's fine,

3  but this did not have to occur.  We raised this over the

4  weekend, on Saturday, and we've repeatedly asked for the

5  opportunity to meet and confer and we were told repeatedly that

6  they were not available for this.

7        And at the same time, we are getting deposition

8  designations as part of their case.  They've still got 12

9  people here today, sitting here in court, instead of working on

10 this.  And this, I don't think, is the way to proceed here.  If

11 we're going to have to finish our case, we need their resources

12 available to respond.

13       MR. MULLADY:  We've responded.

14       THE COURT:  Okay.  I will, as I said, take a look at

15 this.  Mr. Mullady, do you have a cite because if so I'll have

16 law clerks right now who are probably listening in and if not

17 I'm going to take a two second recess to give them the cites.

18       MR. MULLADY:  I do not, Your Honor.  They're back at

19 our work room.  I can have them for you in half an hour.

20       THE COURT:  Fine.  Get somebody to do them and as

21 soon as you have the cites, I will get a law clerk to take a

22 look at these cases.

23       MR. MULLADY:  Yes, ma'am.

24       THE COURT:  One second please.  And maybe I can give

25 you a ruling later.  All right.  There's one binder or two

1 binders?

2          MR. BERNICK:  There's two binders; one for the Court

3 and one for Your Honor.  And they're just behind each of the

4 individual tabs.

5          THE COURT:  They're duplicates?

6          MR. BERNICK:  They're duplicates, that's correct.

7          THE COURT:  Okay.  Thank you.  Jan, let me have the

8 other one so I can give it to Mona, please.  Thank you.

9          MR. BERNICK:  The other matter that we had scheduled

10 to be taken up this afternoon is the arguments on the Rule 408

11 issue.

12          THE COURT:  Yes.

13          MR. BERNICK:  We would like to do that.  It's the

14 same kind of problem.  Pertains to our witness on Monday.

15 We're going to be prepared to do that, I believe we'll be able

16 to finish Dr. Anderson in time to be able to do these things,

17 although the 106 issue is -- well, I think we can probably get

18 it done.  So, that's our goal today and then we would do Dr.

19 Anderson on Monday and we would rest.

20          THE COURT:  Dr. Florence?

21          MR. BERNICK:  Not Anderson.  Dr. Anderson today, Dr.

22 Florence on Monday, and then rest.

23          THE COURT:  Yes.  Okay.

24          MR. BERNICK:  So, with that, unless there's other

25 business the Court would like to take up, we'll call Dr.

1  Anderson to the stand.

2          THE COURT:  Anything before Dr. Anderson?  All right.

3  Dr. Anderson.

4          MR. BERNICK:  Oh, one last -- I'm sorry.  ZAI, we

5  should also talk about this afternoon.  We got a boat trip and

6  a vacation that are taking two people who want to be part of

7  the property damage argument out on May and on June, so we, for

8  some reason can't seem to get people to show up for the ZAI

9  hearing.   This is on the issue of the bar date.

10          THE COURT:  Oh.

11          MR. BERNICK:  I got a conflict because I have to be

12  in court for an argument that's been scheduled for three months

13  on April 22, payable on April 21.  On April 22, Your Honor

14  can't do it, so you gave us a date at the end of May.  Mr.

15  Baena has got a vacation planned.  You then gave us another

16  date for the early part of June, Mr. Westbrook has got a boat

17  trip and this thing is really being --

18          THE COURT:  Why couldn't I do it on April 22?

19          MR. BERNICK:  I don't know.

20          THE COURT:  I thought it was just April 21 because

21  you were here on the omnibus?

22          MS. BAER:  Your Honor, we asked about April 22 and

23  you indicated that you have, I think, the Federal Mogul -- not

24  Federal Mogul, Flintkote disclosure statement hearing in

25  Delaware, and so it was a very full day.

1              THE COURT:  Okay.   Just --

2              MR. BERNICK:  Yes.  That, I can tell Your Honor will

3    be -- I'm going to argue part of that, if not -- well --

4              THE COURT:  How long is that going to take?

5              MR. BERNICK:  I don't think -- I mean, that really

6    has got a couple issues, it's not a dink, dink, dink, dink,

7    through the disclosure statement.  There are legal issues that

8    I think are going to be raised.

9              THE COURT:  Yes.

10             MR. BERNICK:  So, I don't think that that's going to

11   take all that long.  How much time did you have that down for?

12             THE COURT:  I don't think I have access to my

13   Delaware calendar here.  Let me see.

14             MR. BERNICK:  I just wanted to flag it to Your Honor

15   so that --

16             THE COURT:  What I know is, that I have to leave

17   court that day by 1:30 in order to catch the only flight out

18   that I was able to get home that day.  So --

19             MR. BERNICK:  Flintkote is set for nine o'clock or --

20             THE COURT:  Pardon me just a minute.

21                         (Pause)

22             THE COURT:  It looks like Flintkote is scheduled at

23   9:30 and I think the parties told me that it was going to take

24   a about two hours to argue, is that a good estimate?

25             MR. BERNICK:  I don't think it should take that long,

1 but I mean, I know that our argument will not last that long.

2 There are --

3          THE COURT:  All right.  So, if I schedule -- and how

4 long will ZAI take?

5          MR. BERNICK:  I think that ZAI will probably take an

6 -- well, given the way things usually go, it'll take an hour

7 and a half.  But the -- Your Honor has been through all the

8 stuff before on ZAI, so I think actually it might be -- I know

9 that we can arrange to have our side available on Flintkote

10 earlier in the morning, if we could start at nine or something

11 like that.

12          THE COURT:  I've got things starting at 8:30 and

13 there are rules -- Chapter 13 issues -- Owens.  There's

14 something scheduled in ABB or in Combustion, I think there are

15 two things scheduled in Owens.  I don't think we're going to

16 get started on Flintkote before 9:30.

17          MR. BERNICK:  I think I can get rid of that one.

18          THE COURT:  Okay.  Well --

19          MR. BERNICK:  I don't know what the schedule may be.

20          THE COURT:  Okay.  I just don't think we're going to

21 get started on Flintkote before 9:30.  So, if we say until

22 11:30 on Flintkote, and I put ZAI on at 11:30, but I have to

23 leave at 1:30.  So, I can give you --

24          MR. BERNICK:  I think that that should -- oh, that

25 would be -- well, how about if we raise that with Baena and

1  Westbrook and who is the other guy, Scott?

2           THE COURT:  Mr. Baena and Mr. Westbrook, are you on

3  the phone?  All right.

4           MR. BERNICK:  I think somebody from Mr. Baena's

5  office is here.

6           THE COURT:  That's the debtor's cite.  The ACC or FCR

7  is coming back later with the cite.  If you can turn your thing

8  on, as soon they do it, I'll let you know.

9           MR. BERNICK:  That's fine.

10           MR. KRAMER:  Your Honor, Matt Kramer, I'll check with

11  them during the next break.

12           THE COURT:  All right.

13           MR. KRAMER:  And see if that works for them.

14           THE COURT:  Okay.  Thank you.

15           MR. BERNICK:  And then we'll check with Scott --

16           MS. HARDING;  Darrell Scott.

17           MR. BERNICK:  Darrell Scott, yes.

18           THE COURT:  Okay.  Well, temporarily, I'll put ZAI on

19  at 11:30 on April 22nd then.  And Ms. Baer can do the notice if

20  everybody agrees and if not, will you let me know?

21           MS. BAER:  I will.

22           THE COURT:  Okay.

23           MR. BERNICK:  These are our Rule 1006 cases, Your

24  Honor.  Copies.  We've given a copy to the other side.

25           THE COURT:  Oh.  I'm not sure Mona has her speaker on

Anderson - Direct                          33

1  yet.  Mona, if you have your speaker on, can you come back in,

2  there are copies of cases here for you?

3          MR. BERNICK:  With that, I think we're prepared to

4  call Dr. Anderson to the stand, if Your Honor would like to

5  proceed.

6          THE COURT:  All right.  Dr. Anderson.

7          THE CLERK:  Please stand and raise your right hand.

8       DR. ELIZABETH ANDERSON, DEBTOR'S WITNESS, SWORN

9          THE CLERK:  You may be seated.  Please speak into the

10 microphone.

11                     DIRECT EXAMINATION

12 BY MR. BERNICK:

13 Q    Good morning, Dr. Anderson.  We apologize for -- we

14 apologize for the delay in the elevator and then making you sit

15 through scheduling matters, but we'll get to your testimony

16 now.

17          Could you tell the Court briefly what it is that you

18 are here to address this morning?

19 A    Yes.  Your Honor, I am here to address the essential

20 question of whether exposures to Grace products have caused the

21 diseases that the claimants have introduced.

22 Q    Okay.  With that as an introduction, could you tell us a

23 little bit about your educational background and we would show

24 at this point Demonstrative 2264.  Go ahead, Dr. Anderson.

25 A    Yes.  My academic training began at the College of William

                 **J&J COURT TRANSCRIBERS, INC.**

1    and Mary where I was a pre-med student planning to go to

2    medical school, in my fourth year.  I decided to not do that,

3    but I had equivalent training in biology and chemistry and

4    chose chemistry as my major.  I was solicited by fellowship to

5    go to the University of Virginia to continue in the training in

6    organic chemistry, mechanistic organic chemistry, where I

7    completed my Masters Degree work.  And during that time I

8    taught the pre-med sections of the laboratories in organic

9    chemistry, and continued my academic training under a Defense

10   Department fellowship which dictated that I do my research at a

11   military base in concert with an academic institution.

12   Completed by Ph.D. work in 1970.

13   Q    Thank you.  The Court has heard about risk assessment

14   already in this trial and, indeed, heard very specifically from

15   Dr. Joseph Rodricks.  Do you know Dr. Rodricks?

16   A    Yes.  Dr. Rodricks and I were colleagues as early as the

17   mid-70s.  He was the functional head of the risk assessment

18   activities at the FDA, Food Drug Administration, and I was the

19   counterpart at EPA.

20   Q    How far back, and maybe you've already identified that,

21   but how far back do you go in the field of risk assessment?

22   And I don't mean to ask embarrassing questions, but it's

23   designed to find out what the extent of your background is.

24   A    Yes.  I go back to origins of the first applications of

25   risk assessment, to judgments about environmental agents,

1  incorporating for the first time in 1975 the concepts of

2  exposure, past, current and future exposures, to understand the

3  potential for disease causation.

4  Q    Did your experience include a series of years spent at the

5  EPA, the Environmental Protection Administration?

6  A    Yes.  As soon as I was released from my Defense Department

7  fellowship obligations, I went directly to EPA in its first

8  year of operation --

9  Q    I'm going to show you --

10  A    -- in 1971.

11  Q    I'm sorry.  I want to show you Demonstrative 2265 and ask

12  you whether that would help you go through your activities at

13  the EPA relating to risk assessment?

14  A    Yes.  And, in the early years, I had begun working with

15  the then administrator Bill Ruckelshaus on a series of issues

16  involving carcinogens.  It was a period of time in the nation's

17  history where there was thought to be an epidemic of cancer

18  caused by environmental agents.  So, the focus at EPA in 1971

19  was on suspect carcinogenic agents.  We worked on a series of

20  pesticides, became aware of a series of air pollutants where

21  there were tumors in animals or humans and we had pursued a

22  policy of zero tolerance because the application of safety

23  factors and threshold levels for safety for carcinogens had not

24  been accepted and the origin of that policy came from the Food,

25  Drug and Cosmetic Act, the Delaney clause, which it said if

Anderson - Direct                              36

1 there were tumors in animals or humans there was no tolerable

2 risk.

3          Trying to follow that policy at EPA had not worked

4 and I was asked to direct the first committee to address a

5 functional cancer policy.  That was in the fall of 1975.  I was

6 the executive director of that committee.  We reported at the

7 first use of risk assessment and risk management that had ever

8 been reported or adopted by any agency in the United States.

9          That policy called for, for the first time, if you

10 can imagine, exposure assessment, does response modeling, in

11 addition to what had been done in the past.  The concept of

12 evaluating how likely an agent is to be a carcinogen based on

13 human data supplemented by animal studies.  These first

14 guidelines called for a systematic approach to evaluating the

15 weight of evidence and exposure and likelihood of risk to human

16 populations.  It also called for creating a group within the

17 agency to carry out these responsibilities.

18          I founded and directed that group, it was called the

19 Carcinogen Assessment Group and rapidly, after the success of

20 that group, I founded the Exposure Assessment Group, the

21 Productive Effects Group, and the expanded office for all of

22 the risk assessment activities.  I directed that office for ten

23 years and I am co-author of EPA cancer policy with the then

24 administrator Russell Train.  It was published in the Journal

25 of the National Cancer Institute.  We performed hundreds of

Anderson - Direct                              37

1  risk assessment.  I co-authored those risk assessments during

2  that period.

3  Q    Thank you.  I want to ask you about -- turning to

4  Demonstrative 2266.  There's been a reference made, I believe,

5  by Dr. Rodricks, concerning the red book.  Could you tell us

6  about the red book and what your involvement, if any, in the

7  red book was?

8  A    Yes.  The EPA experience had formed a lightening rod for

9  discussions about using dose response extrapolations, exposure

10 assessment and estimation of risk for public policy decisions.

11 It was one of the major, I would say, stimulus, for the

12 convening of the National Academy's Committee to address the

13 appropriateness of these policies, could risk assessment and

14 risk management work on a broader basis, and by that time my

15 group at EPA had published more than 150 risk assessments.  So,

16 we were very far down the road.  This committee and this

17 publication, to which I was an advisor and visited many times

18 because our work was one of the cornerstones of their

19 deliberations, is the landmark book that's established the

20 paradigm for risk assessment.  It's cited all the time, cited

21 by parties and interested organizations all over the world and

22 in many subsequent National Academy documents.

23 Q    Thank you.  Turning to Demonstrative 2006, which is also a

24 demonstrative that we used in connection with Dr. Rodricks

25 testimony, could you tell us briefly how it is that the science

1  of risk assessment has evolved, particularly in the last two or

2  three decades?

3  A    Yes, I can.  I often think of risk assessment as

4  originating with Koch's principles.  These principles sought to

5  answer questions of causation for infectious disease, isolating

6  the organism from the host, cultivating the organism and then

7  reinserting it in the host and if the host responded to the

8  original disease, causation was established.

9       Also, going on pre-1964, in the public health

10 regulatory communities were these simplistic safety factor

11 approaches that established no observed effect levels or other

12 means of establishing a level that was regarded as safe and in

13 the scientific community, there were early observational

14 studies we call case reports in epidemiology that addressed the

15 results that some medical doctors had diagnosed in their

16 patients, certain diseases that might be associated with

17 occupational exposures.

18      By 1964, we were seeing several different things

19 happening.  One of the critical events in 1964 was the

20 publication of the Bradford Hill criteria which for the first

21 time gave a real structure to what was expected of epidemiology

22 studies if they were going to establish causality between the

23 agent and the disease and these principles addressed

24 consistency across the studies, the temporal issues and other

25 issues.

1        These principles promptly became useful, as I
2   understand, to the interface of judicial use, which is not my
3   field, but I understand that structure was useful.  But they
4   were useful in other ways, because they stimulated the conduct
5   of structured epidemiology studies.  So, studies became more
6   structured, they became more useful in many different ways.  Of
7   course, human data still remain the best source of information.
8   But following the regulatory approach of what I call the Public
9   Health Agency approach, during the 70s is just what I've
10  discussed.  We've encountered the situation with suspect
11  carcinogens and the rejection by the scientific community of
12  just willy-nilly applying safety factors.  And so the
13  quantitative based risk assessment process was established.
14  But, here were see a divergence between what Public Health
15  Agencies were doing to carry out their missions to be
16  preemptive and protective and what was really called for in
17  establishing causality.  So, it's been an interesting period
18  and interesting that I've been able to participate in a good
19  deal of it.
20  Q    Well, let's talk a little bit about that divergence.  I
21  know we're going to return to it later, but since you've
22  mentioned it, what exactly was the divergence that you just
23  referred to that began to evolve in the 1970s?
24  A    Yes.  The process of risk assessment that was defined by
25  EPA in 1975 simply sought to answer two questions.  How likely

1   is an agent to cause disease or if a disease is already caused,

2   what is the dose that -- what is the circumstance that might

3   have caused the disease or if a disease is -- if a dose is

4   current, would you expect that there might be impacts on

5   populations in the future.

6          In that case, the Public Health Agencies essentially

7   have to fill data gaps and the red book that I mentioned

8   earlier details those gaps and calls them inference judgments.

9   So when, for example, the EPA did their risk assessments when I

10  was there, we followed guidelines and said where the science

11  stops we will fill the gaps with very precautionary

12  assumptions.  So, we were seeking to establish plausible upper

13  bounds on risk, recognizing that the risk could be considerably

14  less, even approaching zero, but to make decisions to preempt

15  and protect the public.  It's a very different process from

16  establishing causality which is -- as I understand, causality

17  needs to be science based and not inference judgment based.

18  Q    Okay.  And I know that we're going to return to that.

19  Turning to slide, or Demonstrative 2267, have you been involved

20  in developing literature in the field of risk assessment?

21  A    Yes, I have.  I have published, I have participated in

22  founding the leading society in risk assessment.  I served as

23  its president from 1984 to 1985.  I have held other posts in

24  that society, but I think the most exciting one has been as

25  editor and chief of the journal, Risk Analysis and

1  International Journal which I think is undeniably the leading

2  journal in the field of risk assessment.

3         It has a world-wide circulation of 4,000.  It goes to

4  about 80 countries and its board and its editorial staff are

5  made up of scientists from the academic communities,

6  governmental bodies, and international representatives in the

7  private sector.  It is ranked high in the impact factor and

8  it's also ranked very high in the social science citation

9  index.  We've been as high as number two of 65 journals, I

10  believe, within the last six years and as high as number four,

11  more recently listed in the Interdisciplinary and Mathematics

12  citation index.

13         MR. BERNICK:  Your Honor, at this time, we would

14  proffer Dr. Anderson as an expert in the field of the risk

15  assessment of toxic agents or potentially toxic and toxic

16  agents, including specifically asbestos.

17         MR. MULLADY:  Brief voir dire, Your Honor?

18         THE COURT:  Yes.

19                    VOIR DIRE EXAMINATION

20  BY MR. MULLADY:

21  Q    Good morning, Dr. Anderson.

22  A    Good morning.

23  Q    Your doctoral degree is in organic chemistry, is that

24  correct?

25  A    Yes.  Mechanistic organic chemistry.

1 Q    Your expertise in risk assessment, as I understand it from

2 your CV, has been in the context of regulatory and legal

3 matters, is that right?

4 A    I think it's in the scientific context of evaluating

5 multi-disciplinary information to address issues of how likely

6 an agent is to cause disease, to address issues of dose

7 response characteristics; that is, at what level could that

8 disease occur and then to address issues of exposure and then

9 to wed the two, to address the essential questions of how

10 likely is there to be an association between that exposure and

11 disease.

12 Q    May I see 433 please?  Exhibit 433 on the screen here is a

13 copy of your CV which I believe you appended to one of your

14 expert reports in this case.  And I was reading from the second

15 sentence in the first paragraph which says, "She specializes,"

16 referring to you, "in risk assessment as a basis for addressing

17 the complex problems that arise in the context of regulatory

18 and legal matters, related to health and the environment for

19 national, international companies and governments."  Is that

20 accurate?

21        MR. BERNICK:  Your Honor, I don't believe that's

22 proper impeachment.

23        THE COURT:  I --

24        MR. BERNICK:  There's nothing that's inconsistent

25 about that.

1          THE COURT:  This witness can answer the question if

2    it's coming from hers.  I'm not sure it's inconsistent, but I'm

3    sure the witness can answer this question.

4    Q    Is that an accurate statement of your credentials, ma'am?

5    A    Well, I don't think any single declarative sentence can

6    accurately reflect my credentials.  I think this sentence

7    reflects some of what I've done.

8    Q    Now, you have no formal medical training, is that right,

9    ma'am?

10   A    I have not been to medical school, if that's what you're

11   asking me.  No.

12   Q    Yes.  You also have no legal training, correct?

13   A    Correct.

14   Q    And you're not an industrial hygienist, right?

15   A    I am not an industrial hygienist.

16   Q    And you're not a bio-statistician, correct?

17   A    I've had courses in statistics.  I have used statistics in

18   my work, but I would not say I'm a bio-statistician.

19   Q    Okay.  And as I understand it, none of the risk

20   assessments that you've done, that have dealt with asbestos,

21   have been published in a peer-reviewed journal, is that right?

22   A    That's wrong.

23   Q    That's wrong?  What risk assessments on asbestos that

24   you've done have been published in peer-reviewed journals?

25   A    Risk assessment has many steps.  I would say the work that

1  I did at EPA passes more scrutiny than the several -- in our

2  journal we have three to four peer reviewers.  So the work I

3  did at EPA was certainly carefully scrutinized.  I did the risk

4  assessment work on the first issue of Ingestion of Asbestos

5  over a period of time in the 70s, from '73 to '78, to determine

6  whether or not amosite from reserved mining might be a

7  causative agent of any health issues for people who consumed

8  the water from Lake Superior.

9          In 1978, I was co-author of the first risk assessment

10  work for EPA's air programs.  In 1980 -- late 84, I believe, is

11  the date, I was responsible for commissioning the work with Dr.

12  Nicholson to do the cancer chapter for the 1986 publication of

13  EPA's risk assessment.

14          MR. MULLADY:  Excuse me, Your Honor, but --

15          THE WITNESS:  I'm getting there.

16          MR. MULLADY:  Excuse me, ma'am.  I believe the

17  question, Your Honor, was very simply, have any of her risk

18  assessments been published in a peer-reviewed journal.

19  A    I'm getting there.  I said these --

20      Q    Well, that was the question.

21  A    -- these risk assessments that I'm a part of received far

22  more scrutiny than just a risk assessment journal.  So, to

23  dismiss them is not appropriate.  But in my resume', you will

24  see that I published one of the earliest papers, if not the

25  earliest papers, inspecting a part of the risk assessment

1  process which is the proposed six different mechanisms of

2  action, very critical to both the hazard identification and to

3  exposure and dose response.

4           Later, within the next year, I published comparative

5  risk assessment investigating the risk associated with asbestos

6  in place and asbestos removal.  So, it was a comparative risk

7  assessment.  So, those two --

8  Q    And what peer-reviewed journal was that published in,

9  ma'am?

10 A    Pardon.  Yes --

11           MR. BERNICK:  Excuse me.

12       Q    No --

13 A    It's on my resume'.

14           MR. BERNICK:  Excuse me.  She said she can answer the

15 question.  She's already given you two examples, we're now onto

16 the third.  If you want to ask what journal it's been published

17 in, Your Honor, she can -- that's a follow up question.  He

18 shouldn't be interrupting the witness.

19           THE COURT:  I think you did ask, so I think she

20 should be entitled to answer the question.

21 Q    I'm sorry, ma'am, have you finished your answer?

22 A    Yes.  I was just citing these publications.  They're on my

23 resume' and they were peer-reviewed journals and they were some

24 of the first work done in risk assessment on asbestos, both on

25 mechanisms of action, one of the very important questions to

1 risk assessment, and one on full comparative risk assessments

2 in particular circumstances on asbestos exposures and disease.

3 Q    I asked you the same -- well, my partner, Garret Rasmussen

4 or Mr. Slocum, I can't remember which, asked you this same

5 question at your deposition.  Can we take a look at Pages 27 to

6 28, please.  Let's go back up a little bit further in the text.

7 A    I was speaking to the EPA risk assessments.

8 Q    Excuse me, ma'am, I haven't asked you a question yet.

9 A    That they were not published -- well, you put this in

10 front of me.

11 Q    I'm about to ask you a question and then I'll be happy to

12 listen to your answer.  At deposition, were asked the following

13 question; "Do any of your publications attempt to assess

14 whether exposure to asbestos caused an individual's illness?"

15 And your answer was; "I have worked with asbestos and risk

16 assessment since the earliest days at EPA starting in the

17 1970s.  One does not generally publish a risk assessment and I

18 don't think I have attempted to publish any of my risk

19 assessments that have dealt with asbestos."  I'm sorry, the

20 question was -- and let's go further in, so we see the full

21 context here.  The question is a publication that addresses

22 whether exposure to asbestos caused an individual's illness as

23 opposed to assessments of the risk to a general population.

24 And you asked, "When you say published, what do you mean?"

25 And, the question was;  "Well, let's start out, published in a

Anderson - Voir Dire/Mullady                    47

1 peer-reviewed journal?"  And your answer was; "No, I don't

2 think I have published any of my risk assessments in a

3 peer-reviewed journal.  All of my risk assessments address risk

4 to individuals as well as risk most all, risk to individuals as

5 well as a risk to populations."  Was that the testimony that

6 you gave in deposition, ma'am?

7 A    Yes, and he was asking me about the EPA risk assessments

8 and I was explaining that those risk assessments normally are

9 not published in peer-reviewed journals.  Today I'm saying,

10 those risk assessments are under more scrutiny than articles in

11 peer-reviewed journals because they are read by so many

12 different parties and scrutinized by so many scientists.

13 Q    Thank you, ma'am.

14 A    And, he had my resume', so he certainly knew my

15 publications otherwise.

16         MR. MULLADY:  I think we understand your answer.

17 Thank you, ma'am.  No objection to the proffer.

18         MR. BERNICK:  Nate?  I take it from Mr. Finch's

19 shaking his head that you don't -- the ACC does not have an

20 objection.

21         MR. FINCH:  No, objection to the proffer.

22         MR. BERNICK:  Thank you.

23         THE COURT:  All right.  The witness may express an

24 expert opinion as proffered.

25              CONTINUED DIRECT EXAMINATION

1 BY MR. BERNICK:

2 Q    Dr. Anderson, could you just tell us -- and we're going to

3 get right to the risk assessment that we're going to be talking

4 about in this case here, on the very next questions -- but

5 could you just tell us what the basic elements of a risk

6 assessment are as a general matter, and I'd like to show

7 Demonstrative 2268.

8 A    Yes.  I think as I said earlier, the first question is,

9 can an agent cause disease and, of course, we know asbestos in

10 certain situations considering fiber size and type, can

11 absolutely cause disease.  The dose response assessment is the

12 next critical step, that's been discussed, I think here.

13 Exposure assessment is then the evaluation of the cumulative

14 exposure that individuals and populations receive and the

15 fourth step is the characterization, wedding all the previous

16 three steps together to address the essential question and in

17 this case, are exposures to Grace product groups responsible

18 for claimants' disease.

19 Q    Thank you.  Now, we've already heard from Dr. Lees.  Did

20 he participate in the risk assessment that was associated, or

21 that's been done for Grace in this case?

22 A    Yes, he did.

23 Q    Okay.  And just indicate for the Court where you're going

24 generally, what role, if any, did you play, what was the nature

25 of your role in connection with the risk assessment that was

1  done for purposes of this case?

2  A    My role, I suppose is, I integrated the information from

3  the first part of exposure assessment, the concentration data

4  from the industrial hygiene studies I received from Dr. Lees.

5  I added the frequency and duration portions of the exposure

6  assessment to arrive at a cumulative exposure.  Dr. Moolgavkar

7  has discussed, I believe the dose response characteristics for

8  asbestos and has identified certain levels that I've called

9  benchmarks, so I could have the benchmarks for the risk

10 characterization.  I have then gone forward to evaluate the

11 cumulative exposures for groupings, we call nature of exposure

12 groups, and then compared their exposures to Dr. Moolgavkar's

13 benchmarks.

14          I have then organized the outcome of that comparison

15 to pass that outcome on for the next analysis which I

16 understand is Dr. Florence's analysis.

17 Q    Thank you.  I want to show you what we have as a

18 demonstrative, and we've put it in the form of a big magnetic

19 board, Your Honor, we will also tender the demonstrative as a

20 slide or a smaller version of this after it's completed, as

21 2296, for its files.

22          UNIDENTIFIED MALE SPEAKER:  What was the number for

23 that, Dave?

24          MR. BERNICK:  2296.

25 Q    But, Dr. Anderson, looking to the portion of 2296 that's

1  displayed on the magnetic board, does this show the sequence

2  of, or the different steps of the risk assessment that you

3  participated in, in connection with this case?

4  A    Yes, it does.  As I said, the concentration information

5  for the exposed claimants' groupings was provided, analyzed and

6  provided to me by Dr. Lees.  I performed the -- I completed the

7  exposure assessment by using his concentration values.  I added

8  the exposure frequency and duration to arrive at cumulative

9  exposures of dose and then I compared those cumulative

10 exposures of dose to benchmarks from Dr. Moolgavkar's work and

11 from the literature that he used to define benchmarks for

12 comparison.

13 Q    Okay.  This formula that appears at the top of 2296,

14 concentration times exposure frequency times duration equals

15 dose, and then to proceed to look at dose response and then to

16 risk, is that a sequence and a formula that is unique to this

17 case?

18 A    No, it is not.  This has been the sequence and formula, if

19 you will, that has been consistently used since the origins of

20 risk assessment in my background since 1976, codified in the

21 four steps by the National Academy in 1983.

22 Q    Okay.  Let's begin with the first part of that formula,

23 which is dose, the calculation of dose.  Turning to Exhibit

24 2270, could you explain for us the central question that was

25 addressed in the risk assessment for this case, as concerns the

1 calculation of dose?

2 A    Yes.  The central question is how our accepted methods,

3 used to calculate the doses resulting from exposure to Grace

4 products and the ingredients of that analysis are listed here,

5 the concentration multiplied by the frequency, by the duration

6 of exposures, provide the cumulative exposure for the

7 individual or the claimant group.

8 A    Okay.  Now, we've already heard from Dr. Lees but I want

9 to talk first of all about the concentration part of it and ask

10 you just to give the Court an overview of what it is that Dr.

11 Lees did as you understood it, in order to provide a foundation

12 for how it is that you then pick up from his work and what you

13 did with it.  So could you just give the Court a very brief

14 overview of your understanding of what it is that Dr. Lees did?

15 A    Well, Dr. Less did several things.  The first thing he did

16 is, he defined or he flushed out the exposure definitions for

17 the nature of exposure Categories A through E.

18 Q    Okay.  Let's show 2269 and I want to ask you whether 2269

19 reflects the basic categories that Dr. Lees worked with?

20 A    It does and the Category A is the category of individuals

21 who mixed Grace products.  Category B, category of individuals

22 who were in areas to exercise their trade by removing or

23 cutting Grace products.  The C category is the category of

24 individuals involved in installing Grace products.  D is a

25 person at a site where these products were being used, but they

Anderson - Direct                                          52

1  were not in the room with, they were out of the line of sight,

2  most likely with the products in it.  Category E would be an

3  individual in the space when the products were being either

4  applied or sprayed.

5  Q    Now, in this chart it emphasizes that these are all job

6  activities that were analyzed as concerns Grace products.  For

7  purposes of the work, the risk assessment that was done in this

8  case, did you or others working with you analyze the exposures

9  that the claimants had with respect to -- or industrial hygiene

10 data that was available with respect to job activities relating

11 to non-Grace products?

12 A    No.  We did not have information relating to non-Grace

13 products.  So, we were focused on what exposure did these

14 particular claimants have from Grace products, per se.

15 Q    Okay.  Now, as an example, Dr. Lees talked about the fact

16 that when it came to the personal installation we have a person

17 who is spraying, what kind of product that Grace was being

18 analyzed when it came to the asbestos containing mixture being

19 sprayed from a hose?

20 A    Grace had fireproofing products that were being sprayed

21 and I understand from Dr. Lees that they were using a wet

22 method of application for their products.

23 Q    That's exactly what I was going to get to.  In connection

24 with the work that was done to do the risk assessment in this

25 case, did you all focus not on the wet application -- not only

1 on the wet application pertaining to Grace product, but did you

2 also analyze dry applications of other kinds of products?

3 A    Dr. Lees is aware of the differences between the dry

4 applications which were not Grace products as I understand it,

5 and the wet application of Grace products.  We also analyzed --

6 or he analyzed the exposure data and we used that to analyze

7 further through the exposure duration and frequency the

8 exposures to individuals who were painting on or troweling on

9 Grace products.

10 Q    Okay.  But when you carried through the industrial hygiene

11 data, was that the data that related to the wet application or

12 the dry application done by others?

13 A    His work was related to the Grace installation per se.

14 The wet application.

15 Q    Okay.  Now, what kinds of values, what kinds of values did

16 Dr. Lees calculate after having reviewed the industrial hygiene

17 data with respect to these different job activities?  What kind

18 of calculations did he do?

19 A    Well, he first of all defined the exposure for the

20 categories.  He gathered the data, he qualified the data and he

21 provided his time weighted average mean concentrations by two

22 analyses.  One was what he called a stratified analysis where

23 he took each study and averaged the study to get the mean of

24 the study and he averaged them across the studies and the other

25 was what is, I think he referred to as a meta analysis when he

1 averaged all the values across all the studies.  So, he

2 provided all of this to me.

3 Q    Okay.  Now, you just reused the word "mean", in talking

4 about a mean concentration, and mean also appears on the

5 overall exhibit, which is 2269.  Let's deal with this question

6 of the mean concentration.  Tell us whether or not industrial

7 hygiene data that is generally available in risk assessment,

8 tell us whether or not industrial hygiene data reflects to

9 varying degrees, variability, variability.

10 A    Well, certainly it does because industrial hygienists

11 collect their data on different days and different places when

12 environmental factors are changing, and there are variations in

13 those factors.  There will be some other variations in

14 collection methods and analytical methods and even in the way

15 some individuals work with the products.

16 Q    Showing you 2271, does this capture some of the reasons

17 why or the drivers for variations, and what kinds of effects

18 they can have on concentration values?

19          MR. MULLADY:  Objection, leading.

20          MR. BERNICK:  That's fine.

21 Q    Could you explain, please, Dr. Anderson, what it is that

22 Exhibit 2271, the demonstrative, reflects as concerns

23 variation?

24          MR. MULLADY:  Objection, leading.

25          THE COURT:  No, it is not leading.  Explain what the

1  slide reflects.  It is leading.  If anything.  You can correct

2  the statement, thank you, not leading.

3  Q    Go ahead, Dr. Anderson.

4              THE COURT:  You can answer.

5              THE WITNESS:  May I?

6              THE COURT:  Yes, please.

7  Q    Go ahead.

8  A    Well, I think the question is, why is that variation

9  measured data, and we've always dealt with this.  We dealt with

10 this very overtly at EPA in the early years when we were trying

11 to measure for the first time environmental data and use it for

12 exposure assessment.  We quickly found that we had variation in

13 sample technique, analytical technique, different people may

14 apply or do something as a receptor that's different from

15 another person, and we found that environmental variables were

16 very essential.  Which way the wind is blowing and where the

17 samples are taken, with respect to humidity, and open windows.

18 It's very difficult to get just samples that are not widely

19 influenced by these factors.

20             At the end of the day, I know that Dr. Lees has

21 stated that the environmental variables predominate by far.

22 From my experience I would agree with him, that's what I've

23 seen in the data that I've seen collected over the last 30

24 years.

25 Q    Now, Exhibit 2269 reflects that in the work that was done

Anderson - Direct                              56

1 on concentration, the concentration data -- and I think you've

2 indicated the same thing -- focused on -- a mean was calculated

3 for the concentration data, is that accurate?

4 A    That is accurate.

5 Q    Okay.  Now, tell us why it is that the mean is something

6 that is of value, or that is the step that we're talking about

7 here, in the risk assessment, tell us why it is that the mean

8 is used.

9 A    Well, the mean is used and has been used, as I said, for

10 the last 30 years as the predominate way to capture

11 concentration in a risk assessment and that is because over a

12 long period of time, and that is for long term exposures, over

13 a long period of time, with the predominance of environmental

14 factors, they will cancel out.  If a person is doing the same

15 activity repeatedly, always a receptor and the same location

16 repeatedly, the variables and the environmental data will

17 cancel out and the person will be exposed over a long period of

18 time to that mean value.  So, that's why we've always used the

19 mean value for those kinds of analysis.

20 Q    Let's take a case where we have a factory that's emitting

21 a certain material of interest and we want to know what kind of

22 concentration for that material exists right at the border of

23 the factory, right at the fence line.  Could you give me an

24 example of a factor that would produce variability in the

25 results, but would tend to cancel out over time?

1   A    Wind.

2   Q    I'm sorry?

3   A    Wind.

4   Q    Explain for us why it is that wind is one of those

5   variables.

6   A    Well, wind patterns are definable variables and over time,

7   if we have a monitor at a fence line and we have variable data

8   over a long enough period of time, all those variable in the

9   wind pattern, will be captured.

10  Q    Okay.

11  A    And that is why long term monitoring for air, for example,

12  is encouraged over short term monitoring.

13  Q    Okay.  And if the wind pattern tends to predominate; that

14  is, that overwhelmingly it's always in one direction, what

15  happens to that fact as time evolves?  What happens --

16          THE COURT:  I'm sorry, would you restate that?

17  Q    If there's a predominating direction for the wind, how

18  does that emerge over the long term?

19  A    Well, the concentration data that are collected will

20  eventually come to a mean concentration that will reflect the

21  predominance of that wind pattern.  But in different times and

22  different days, that's going to change.

23  Q    I want you to look at 2272 and we can show it on the

24  screen and ask whether this would assist you in explaining what

25  you've just described regarding variability and a mean over the

1  long term, would that help you describe that to the Court?

2          MR. MULLADY:  Objection, foundation.  Your Honor, I

3  think with this witness we haven't yet heard that she created

4  these slides and that they would assist her in her testimony.

5          MR. BERNICK:  Well, I just asked her the latter and

6  it's irrelevant whether she created the slides.  You can cover

7  that on cross examination.  The foundation is whether it would

8  assist the Court.

9          THE COURT:  I think that is the foundation question,

10  whether it would assist, and that is the question he just posed

11  to the witness.  So, I need an answer to that question before I

12  can rule on the -- before there is an objection.  You may

13  answer.

14          THE WITNESS:  All right.  What we see here is --

15          MR. BERNICK:  No, no, no.

16          THE COURT:  Answer yes, or no.  Whether it will

17  assist you.

18  Q   Mr. Mullady is raising issues about the admissibility of

19  your testimony, so I want to just ask you, tell us whether this

20  demonstrative would assist you in explaining to the Court your

21  testimony regarding the mean?

22  A   I believe it will.

23          MR. BERNICK:  Okay.  And could you -- Your Honor, may

24  I have the witness address the Demonstrative 2272 for the

25  Court?

1          THE COURT:  Yes.

2          MR. BERNICK:  Thank you.

3  Q    Go ahead, Dr. Anderson.

4  A    Yes.  I think what this helps us do is, we see on the

5  left-hand side the exposure variability.  If we were thinking

6  of that monitor at the fence line, we will see some days lower

7  exposures, some days a higher exposure and in the short term,

8  we see guidance from EPA that says, you can't really use those

9  data to characterize long term.  And if we're dealing with

10  short term risk assessments, we sometimes, depending on the

11  circumstance, use our professional judgment as to whether we

12  have to reflect that variation in short term cases, whether

13  it's acute or whether it's short term meaning very few events

14  over a long period of time.

15          But as we go across the bottom to the long term, what

16  we find is that those variable converge to the mean, that that

17  receptor, staying there long enough is the constant.  So that

18  receptor will get over time that mean concentration.

19  Q    I want to stop you right now and just focus on what you've

20  just said.  This receptor; that is, the person whose exposure

21  you're measuring, is a constant.  Tell us what you mean when

22  you say that person as a receptor is a constant over the long

23  term.

24  A    If that receptor is in a particular place, doing a

25  particular activity with respect to a product, or living in a

Anderson - Direct                                    60

1  particular place with respect to a source, a factory, they

2  become a constant because they capture, they don't change what

3  they're doing, what changes around them that influences the

4  variability, the overwhelming variability, are these

5  environmental factors that cancel out as the person stays there

6  a long time.

7  Q    What have you indicated -- first let me just ask you, in

8  order to satisfy Mr. Mullady, did you or did you not

9  participate in the creation of this slide?

10  A    Yes, I did.

11  Q    What about the word "receptor", was that your word or

12  somebody else's word?

13  A    That's my word.

14  Q    Okay.  What about the word "mean", was that your word or

15  somebody else's word?

16  A    That is my word.

17  Q    What about all the words on this slide, are they your

18  words or somebody else's words?

19  A    Those are my words.

20  Q    Okay.  Now, what is indicated at the right-hand side when

21  you talk about the use of the product, the composition of the

22  product and the proximity up to the product?

23  A    Very specific to the evaluation in this case, we have the

24  use of the product, meaning the person who is spraying, or the

25  person who is mixing, or the bottom individuals and the

1 categories that are bystanders to other applications, we have

2 them at a proximity to the product application.  These become

3 constant factors.  The composition of the product is going to

4 also be a constant factor as we take the exposures from that as

5 the source, as if it were the factory.

6 Q    That's fine.  Now, on the basis of this, could you tell

7 me, this analysis that you've gone through, do you have

8 experience and familiarity with what the -- well, let me take

9 -- let me strike that and go back.  You've said that the EPA

10 has now been involved in risk assessment for more than 30

11 years?

12 A    Starting in 1976.

13 Q    Okay.  And you've said that at the EPA you've participated

14 in literally hundreds of risk assessments?

15 A    Yes, I did.

16 Q    Okay.  Tell us whether the EPA, whether you're familiar

17 with what the EPA has said by way of guidance on this very

18 subject?

19 A    Well, the guidance on this subject comes from the logic

20 behind what I just discussed and the guidance consistently says

21 that the mean is the appropriate value to use when assessing

22 concentrations at the maximum exposed point under the Clean Air

23 Act.  It says the mean is the appropriate concentration for

24 evaluating site wide data when an individual has potential to

25 be exposed to variable data over that site.  The mean

Anderson - Direct                                62

1  concentration is used in EPA's pesticide programs for the same

2  reasons, for the application and use of pesticides.  We see

3  this use of the mean based on the logic I just described, and

4  it's prevalent in EPA guidance.

5  Q    Showing you 2217, are there particular documents that have

6  reflected the EPA's guidance?

7  A    Yes, there are.  I think this is just one of many

8  excerpts.  Here we see from the 1992 risk assessment guidance

9  for superfund sites, the average concentration is most

10 representative of the concentration that would be contacted at

11 a site over time.  On the right-hand column we see that in the

12 EPA 1986 risk assessment, that the average concentrations were

13 used from the epidemiology studies in order to construct what

14 is still used -- this is the document I spoke of earlier --

15 what is still used by EPA as the dose response characterization

16 for asbestos.

17 Q    Thank you.  Showing you 2274, could you explain how this

18 bears upon the same subject?

19 A    Yes.  There has been -- this is a directive from the

20 deputy administrator of EPA that was issued in 1992, warning

21 against the overuse of maximums and suggesting that leaving

22 values at their mean is more appropriate.  Because if we

23 maximize everything we vastly -- we create a community of

24 numbers that have no relevance to the populations and that's

25 essentially what this is saying.

1  Q    I'll take you back to 2272 for a moment, if we could do

2  that, PJ.   What if you had a -- I believe what you've done here

3  is a risk assessment that is -- or reconstructing as the risk

4  assessment relating to long term exposures?

5  A    Yes.

6  Q   What if you had a totally different mission in this case,

7  what if your mission in this case was not to talk about risk

8  over the long term, but to talk about risk for somebody who had

9  only very sporadic exposure to the product, would you follow

10 the same approach?

11 A    No, if they're over or under these either short-term

12 exposures or a few short-term events, I would probably express

13 both an average concentration and a maximum concentration,

14 because they're still on this left-hand part of the curve.

15 They have not had time enough to converge to the exposure of

16 the mean concentration.

17 Q    I'm showing you 2273.  Does this relate to the same

18 subject?

19 A    Yes.

20 Q    And could you just give a short explanation of how 2273

21 bears upon your testimony in this case?

22 A    Well, it's a demonstration of what we've been discussing.

23 In this particular case we're not talking about the short-term

24 exposures on the left.  The concentration and duration factors

25 have been set to very long-term maximums, so the risk

Anderson - Direct                    64

1  assessment is dealing with -- the risk assessment exposure work

2  is dealing with chronic exposure, and the only appropriate

3  metric is the average concentration.

4  Q    Why is it that you focused on long-term exposure?  That is

5  to say -- we're going to talk about what you've done with

6  duration and cumulative exposure.  Why is it that you keep on

7  focusing on the long-term?  What is that -- what, if any,

8  relationship does that have to the kind of dose that you're

9  calculating?

10 A    In this particular case I thought it important to set up a

11 maximum screen.  Not to try to come to realistic factors, but

12 that's essentially the first question.  If we assume maximums;

13 that is, not just EPA's Exposure Factors Handbook maximum --

14 recommended maximum of 25 years for an occupation but 45.  If

15 we assume constant exposure over a full day, every day, eight

16 hours a day for that 45 occupational lifetime, we're talking

17 about 11,250 days or 90,000 hours of exposure.  So we are

18 clearly as far out on the long-term exposure curve as we can

19 get with any reasonable -- unreasonable, actually, assignment

20 of occupational exposures.

21 Q    Go back to 2272 for a moment.  If we now assume that the

22 long-term is 45 years, is there any sense from your point of

23 view in assuming that for 45 years a person was constantly -- a

24 constant person at the site was constantly exposed to the

25 maximal wind pattern, maximal exposure circumstance that might

1  exist from time to time.  Is there any merit to that kind of

2  approach?

3  A    I think it's inconceivable that that person could be at

4  the wrong place at the wrong time all of the time for 45 years.

5  Q    So let's take, for example, wind.  If the wind is in the

6  direction such that say from the spray -- the spray is always

7  in -- is in your face, would that be on a given day?

8  A    Yes.

9  Q    Would that be the high concentration or the low

10 concentration?

11 A    That would be the high concentration.

12 Q    Is there any sense in assuming that wherever that person

13 is for 45 years the wind is kind of following them around, so

14 it's always in their face?

15 A    No.

16 Q    Let's show 2275 to get to the point at which you enter

17 into this process.  We have Dr. Lees, who has the product

18 descriptions, the definitions, and gives you the mean

19 concentrations.  What is it that you decided to do with the

20 mean concentrations?

21 A    Yes, for each of the nature of exposure categories defined

22 on the left-hand side that we discussed earlier, I selected the

23 highest mean value from Dr. Lees' analysis to assign to each of

24 those categories for each product type.

25 Q    Thank you.  And do we now -- are we now in the position --

1  we're taking off the magnet boards.  We see a summary of what

2  was done when it comes to concentration; that is, that we had

3  Categories A through E that Dr. Lee defined them, that Dr. Lee

4  gave you the mean concentrations, and then again what is it

5  that you did with the mean concentrations, which one did you

6  use to choose -- did you choose to use?

7  A    I chose to use the highest, because he presented two means

8  of evaluating his data.  I chose the highest from whichever the

9  data set was.

10  Q    Thank you.  Let's talk about frequency and duration.

11  Could you just describe in general terms what now -- how now

12  the risk assessment proceeds, what the next steps are in

13  general terms, and then we'll focus on how you implemented

14  those stages?

15  A    Yes.  To get to the cumulative exposure assessment I

16  needed to take his maximum concentrations and then ask the

17  question how much frequency of exposure would an individual in

18  these categories get and over what time period.  So those were

19  the next two steps in my analysis.

20  Q    Okay.  Could you just describe in your own words -- well,

21  let me just put it this way.  Tell us whether there was a

22  specific analysis that was done in order to provide the factual

23  predicate for your calculations.

24  A    Well, I did several levels of analysis.  Initially, I

25  thought it would be very important to really characterize how

1  often a Grace product might be in a building that a person

2  would contact or how often events might occur, or, in fact, how

3  many buildings actually have these kinds of products.  And for

4  the bi-standard categories, the D's and E's, how often would

5  they -- if they are visiting a site, how often are they likely

6  to overlap with an exposure circumstance at a site, and I did

7  those analyses, and they're reported in my report.

8          But, eventually, I decided that the most important

9  thing in this analysis is to make this a very conservative

10  screening analysis, meaning if I set all the parameters very

11  high, I could be very certain that there would be a low

12  probability that anybody would be exposed to anything any high

13  than those values.  So I have chosen in the screening analysis

14  that I have really used this final set of assumptions.

15  Q    Let's focus, first of all, on exposures to different kinds

16  of products.  I'm going to show you 2276 and ask you whether

17  this accurately summarizes the work that people working for you

18  did in order to analyze what products were available to the

19  marketplace over time; that is, what Grace products were

20  available over time to the marketplace.

21  A    Yes, this is a display.  If we look down the left-hand

22  side, we see the Grace product types, the vermiculite-only

23  products, then the next category of vermiculite with chrysotile

24  added, then the category of chrysotile-only products, and then

25  combined post-construction.  What the bars going across show is

1 the lifetime of those products in commerce, and what we did

2 with these data was to choose for any one year the maximum

3 concentration that any one in any of the nature of exposure

4 categories could've had to any of these products.

5           In other words, that person had a choice of getting

6 the highest exposure to any one of these products in that year,

7 and here I have chosen to illustrate that with the max to a D

8 exposure -- Category D in 1953 from acoustical plaster.  That

9 turned out in 1953 to be the highest exposure for a mean TWA

10 value used over the period of 250 days in the year for that

11 person in D exposure category.

12 Q    So the analysis that you've just talked about, you get the

13 products out there in use over time, you then figure out the

14 maximum by year.  Am I right from what you just said --

15 A    Yes.

16 Q    -- that this is done not for all categories together but

17 for each category separately?

18 A    Correct.

19 Q    Okay.  Now, what was the next step?  After you've done

20 that with the products, what was the next step?

21 A    The next step was to incrementally take 45-year rolling

22 blocks of exposure starting in 1920 when the first products

23 appeared and to calculate for each of the A, B, C, and D

24 categories blocks of 45 years of exposure that had three

25 maximums.  We maximized in the beginning the mean highest

Anderson - Direct                                    69

1  concentration.  We allow that person to be exposed to any one

2  of the products in a single year that had the highest

3  concentration for that year, and we maximized that

4  concentration for all days in that year.  Then we had the

5  rolling block of 45 years going forward through 2007, and then

6  we chose the highest one of those 45-year blocks to

7  characterize the exposure to that exposure -- nature of

8  exposure category individual group.

9  Q    I'm showing you 2277.  Does that chart summarize the data

10  that was used in the application of the parameters that you

11  just described?

12  A    Yes, it does.  It shows at the top the historical data of

13  when the products were on the market.  Next it shows an

14  illustration of the 45-year going forward blocks; 1920, 1965,

15  1921, 1966.  The last block of years going out in the analysis,

16  1963 to 2007.  So we have a cumulative exposure here of 100

17  percent of the time for frequency for every person for 250 days

18  -- occupational days in a year for a 45-year life span to not

19  only the highest mean concentration, but the highest mean

20  concentration to any product in the year.

21  Q    I'm showing you 2278.  Does this now reflect the inputs to

22  the does calculation formula that you used; that is, which

23  concentrations were selected, which frequency of exposure was

24  selected, and which duration was selected?

25  A    Yes, it does.  The frequency was set to 100 percent for

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Direct                               70

1 every day, 250 days per year.  I've already discussed the

2 concentration.  And the duration was set to an occupational

3 extreme upper bound of 45 years to the highest exposure product

4 for each year within the 45-year block, and then we chose the

5 maximum of the 45-year blocks to characterize the group.

6 Q    And I want to talk about conservatism; that is, you said

7 that you wanted to take a conservative approach.  Have you --

8 do we have a series of slides that go through the different

9 respects in which this approach is conservative?

10 A    (No verbal response from the witness.)

11 Q    You have to respond.

12 A    I'm sorry.  I didn't hear you.

13 Q    I said, do you have a series of slides that explain the

14 different respects in which this approach that you took was

15 conservative?

16 A    Yes, I do.

17 Q    Okay.  For purposes of kind of keeping the Court

18 remembering the part of this slide that matters, we have for

19 frequency exposure 100 percent and for duration 45 years,

20 highest exposure product for each year, and the maximum of any

21 45-year period.  Those -- that's the -- those are the

22 parameters that you've chosen?

23 A    Yes.

24 Q    I'm showing you Slide 2279.  Could you explain how -- is

25 this one of the slides that relates to the conservatism of your

1  approach?

2  A    Yes.

3  Q    Could you explain to the Court how this slide relates to

4  the conservatism of your approach?

5  A    Yes.   In -- on the right-hand side just thinking now of

6  the frequency duration assumption wetted, we have 90,000 hours

7  for the individual claimants for exposure to Grace products.

8  Q    Now, where did that 90,000 come from?  This is Category B?

9  A    This is Category B, but we used it for everybody.

10 Q    Okay.

11 A    So we're taking Category B as an illustration and one

12 sub-group of occupational individuals in Category B would be in

13 the custodial maintenance trade.  In earlier work we've done

14 using data from the literature we find estimates of the hours

15 that custodial workers actually contact asbestos-containing

16 materials in buildings, and that number is 8,100.  And for the

17 same kind of workers coming in contact with VAI attic

18 insulation, we find that number is 692.  So in a very careful

19 analysis of how much contact there would actually be, we see

20 that by choosing for screening purposes the 90,000 hours for

21 this particular example, we have been extremely conservative

22 and have set a very high screen.

23 Q    Now for the Court's benefit, V refers to vermiculite?

24 A    That's right.

25 Q    Well, we've referred obviously to Zonolite.  So it's ZAI

1  and VAI are the same thing?

2  A    Yes.

3  Q    Okay.  Now, let's turn to Slide 2280, and on 2280 in order

4  to talk about conservatism we've included 100 percent and 45

5  years as the reminders of the approach that you used?

6  A    That's right.

7  Q    Could you explain what information you have, if any, as

8  reflected on this chart that reflects the conservatism of those

9  benchmarks; that is, 100 percent for 45 years?

10 A    Well, yes.  Again for the exposure frequency in earlier

11 work we find the building maintenance worker actually is in

12 contact with the ACM material 16 percent of the time, for attic

13 insulation, VAI, Zonolite, 1 percent of the time.  And also an

14 analysis we did in one of our early -- one of the earlier

15 analysis I mentioned before, is we found that if we used

16 published data, that the trawled-on and sprayed-on products for

17 those product categories, even if we assumed that all

18 trawled-on/sprayed-on products were Grace products, which

19 they're not, would be in only 20 percent of the buildings.

20        So here all of this cancels that, because we have

21 assumed 100 percent exposure.  So every building -- every time

22 one of these maintenance workers goes to a building, it is a

23 building with Grace products, not the 20 percent, and they're

24 not spending 1 percent of the time, they're spending 100

25 percent of the time, eight hours a day, five days a week, in

1  contact with the source of exposure depending on their labor

2  category.

3  Q    What about the 45 years, what, if any, comparisons did you

4  do in order to analyze the conservatism of the 45-year

5  parameter?

6  A    Yes, I mentioned earlier that EPA's guidance in the

7  Exposure Factors Handbook is for a maximum of 25 years, and

8  it's interesting when -- and I think we will discuss this

9  later, but when I reviewed -- our team reviewed the information

10  from the PIQs, we found that for those who reported the time

11  periods, the duration, we found that 100 percent were under 50

12  years, 98 percent under 45 years, and interestingly enough, 54

13  percent, the EPA number, under 25 years, and 27 percent under

14  10 years.  So this means that there's every indication that

15  we're vastly overestimating, and intentionally so, because we

16  set it up as a very conservative screen, the cumulative

17  exposures for individuals in these nature of exposure

18  categories.

19  Q    Now, this is for the A and C categories?

20  A    That's for A and C.

21  Q    And when you say 27 percent under 10 years, was that under

22  10 years of exposure to a Grace product or under 10 years of

23  exposure to all asbestos products?

24  A    It was under 10 years of exposure to Grace products.

25  Q    Okay.  Now, incidentally --

Anderson - Direct                           74

1  A    Well --

2          THE COURT:  Oh, wait.  Pardon me.  I'm sorry.  I

3  misunderstood.  Just a minute until I correct my note, please.

4                    (Pause)

5          THE COURT:  Okay.  Thank you.

6  A    I should add that in the review of the questionnaires we

7  accepted if someone self-identified as an AC, that they were

8  exposed to the Grace product.  And so, yes, we are assuming

9  that they're exposed to Grace products in the PIQ review.

10 Q    Okay.  But, do you actually know whether they were exposed

11 to Grace products alone or other products?

12 A    No.

13 Q    Okay.

14 A    No.

15 Q    Now, do you have one more slide that related to the

16 conservatism analysis?

17         MR. BERNICK:  Can we show the Court 2281?

18 Q    Could you explain how this slide relates to conservatism?

19 A    Well, first of all, as I've said, we don't give these

20 claimants any time to do anything else but be exposed to Grace

21 products, because this a full working lifetime of 11,250 days,

22 90,000 hours, and yet we know they had other exposures, which I

23 can talk about later.

24         Secondly, we -- if we worked with any non-Grace

25 product or non-exposed to a Grace product, of course, they had

1  no time to have that exposure, because they're -- all of

2  they're exposure time has been consumed.  And if they worked

3  less than the 11,250 days, of course, their exposures would

4  decline.  And we've seen the less-than hours in an earlier

5  exhibit.

6  Q    So put simply, you've assumed 45 years, eight hours a day

7  exposure to Grace product.  If it turns out that they worked

8  with other products, then what effect, if any, would that have

9  on -- what would that tell you about the duration that you've

10 assumed and the dose that results from it?

11 A    If they worked with other Grace products, of course,

12 then --

13 Q    But not -- of a non --

14 A    I mean other non-Grace product -- sorry -- in other

15 occupations.  Then -- or if they worked in other occupations

16 and had no other exposure, the number of hours would go down,

17 therefore, the cumulative exposure concentrations that have

18 been presented in this analysis would be lessened accordingly.

19 Q    On the basis of all the work that was then done with the

20 approaches you've described to the Court, did you, in fact,

21 come up with a maximum cumulative exposure for each of the

22 different categories?

23 A    Yes, I did.

24 Q    I want to show you Exhibit 2282 and have you explain that

25 to the Court.

1          MR. FINCH:  Objection, Your Honor.  This data is

2    based on the PCM/PCME conversations.  I'm going to object on

3    lack of foundation and hearsay grounds.

4          MR. MULLADY:  Join

5          THE COURT:  Mr. Bernick.

6          MR. BERNICK:  Well, I'll respond to that as follows.

7    First of all, this witness has testified that she took the mean

8    concentration calculations from Dr. Lees and used those for

9    purposes of her analysis.  She has not expressed an opinion

10   that is the same or different from Dr. Lees' opinion.  Your

11   Honor resolved that issue in connection with Dr. Lees' opinion

12   and overruled it.

13         So all of the -- for them to come out and say, oh,

14   well, this witness here, who hasn't even expressed an opinion

15   on the matter, is using Dr. Lees' data is now subject to an

16   objection that you previously overruled with respect to Dr.

17   Lees, I don't understand where that comes from.  So they can

18   make the objection, but it's already been overruled, and I'm

19   not going to go back over each element of Dr. Lees' analysis

20   with this witness she's relying on.  Now, I can bring that out

21   if you'd like.

22         MR. FINCH:  Your Honor, I stand on the objection even

23   though the prior objection is overruled.  I believe that's in

24   error.  To protect my client's interest and their rights, I

25   stand on the objection that any testimony from this witness

1  that is based on Dr. Lees' estimates, which in turn are based

2  on the PCM to PCME conversions are, (a) objectionable, because

3  neither Ms. Anderson nor Dr. Lees with an S has the expertise

4  or the foundation to make those conversions, and secondly that

5  they're hearsay.  That's the basis of the objection.  I

6  understand the Court has overruled the objection with respect

7  to Dr. Lees with an S, but I need to preserve the objection

8  with respect to this witness as well.

9          MR. MULLADY:  Joined by the FCR.

10          MR. BERNICK:  Your Honor, I -- not only did Your

11  Honor overrule it, you overruled it after Dr. Lees with an S

12  testified very specifically about how the conversion was done,

13  and that he not only participated in the conversion, but

14  they're making something sound like a big deal that's a piece

15  of arithmetic.  But be that as it may, if their purpose is to

16  preserve their record as having made the objection, I don't

17  have any problem with that, but --

18          THE COURT:  All right.  The -- I think the objections

19  have a different purpose.  With respect to Dr. Lees, Dr. Lees

20  testified that he participated in designing what the conversion

21  was about and for, and I think the objection is different with

22  respect to that.  The objection as to this witness using that

23  data I think is objectionable for a different reason.  But I

24  think at this point in time the objection's also going to be

25  overruled.

Anderson - Direct                    78

1          I'm going to take a look at all of this when I get

2   all of the evidence into the case and analyze at that point in

3   time how it all goes.  But nonetheless, for now we're going to

4   finish this trial with all the witnesses here, so that in the

5   event that I do at some point have to reconsider any of this,

6   I've at least got the evidence on the record.

7          So that you understand, I do not believe that I'm

8   going to reverse this decision when I see all the evidence, but

9   nonetheless, for now it's overruled.  And in the event that I

10  think I'm wrong when I do have all the evidence, I will on my

11  own reconsider whether it's appropriate.  So it's overruled.

12          MR. BERNICK:  Let me just ask, so that I'm sure that

13  my record is also good down the road.

14  BY MR. BERNICK:

15  Q    Dr. Anderson, tell us whether or not you relied upon the

16  concentrations determined -- the concentration calculations

17  determined by Dr. Lees.

18  A    Yes, I relied on the concentration values that he

19  provided, and, in fact, one can't really proceed with a risk

20  assessment in any other way.  If we look at the guidance that's

21  in the IRIS database at EPA, it cautions against not making

22  corrections.  So while I wouldn't make them myself, I don't

23  proceed with an asbestos-type risk assessment, unless this

24  factor has been taken into account by someone qualified to do

25  that work.

1 Q    Is it customary for you in your field of expertise of risk

2 assessment to -- strike that.  Is the kind of information --

3 the information that you got from Dr. Lees regarding

4 concentration calculations including an adjustment for PCM and

5 PCME, is that the kind of information that is reliable --

6 considered to be reliable by people like yourself in the field

7 of risk assessment?

8 A    Yes, it is.

9 Q    Okay, and in Dr. Lees' case do you have any issue in your

10 mind whatsoever concerning the qualifications and expertise of

11 Dr. Lees to perform the mean concentration determinations?

12 A    No.

13 Q    Do you have any issue about the propriety of his decision

14 to in-turn rely upon a person who is expert in materials fiber

15 analysis who actually go look in the microscope once, go look

16 in the microscope twice to make the calculation?

17 A    This is routine -- routinely done in the world of risk

18 assessment for asbestos.

19 Q    Thank you.  Now I'd like to turn to Exhibit 2282 and have

20 you explain to the Court what it is that Exhibit 2282 reflects.

21 A    These are the resulting screening values that we have been

22 speaking of presented here for screening purposes for each of

23 the nature of exposure categories, with emphasis on the fact

24 that they are very high screens, meaning very, very

25 conservative screens, and at the bottom of this slide there's

1  the repetition of the frequency and duration assumptions.

2  Q    Let me just ask, does Exhibit 2282 accurately summarize

3  the data that you have generated regarding the cumulative doses

4  for each of the categories there displayed, A through --

5  A    Yes, it does.

6  Q    Does this then bring us to the conclusion of the work on

7  your risk assessment up through dose?

8  A    Yes.

9  Q    Okay, and do we now see in Exhibit 2296 a summary of the

10  work that has taken place that brings you to the different

11  doses that we have as displayed under the first column?

12  A    Yes, it does.

13          MR. BERNICK:  Now, Your Honor, I have I think

14  probably about 15 minutes left in the direct examination.  I

15  can complete it, or if Your Honor would feel more comfortable

16  taking a morning break, either way is fine.

17          THE COURT:  Isn't it only eleven o'clock?

18          MR. BERNICK:  Yes.

19          THE COURT:  You want to take a recess?

20          MR. BERNICK:  I don't want to take a recess.  I'm

21  prepared to go -- take it to the end, but I just --

22          THE COURT:  I think -- why don't you finish, and then

23  we'll take a short recess and let the -- we'll take a recess

24  before cross.

25          MR. BERNICK:  Okay.  Fine.

1 BY MR. BERNICK:

2 Q    What is the next step in the analysis, the risk assessment

3 analysis?

4 A    Well, of course, it's the risk characterization question

5 of what do these mean.  Do these -- what do these mean in terms

6 of the nature of exposure categories of claimants as far as

7 answering that initial question that I proposed?  Did they get

8 their illness from exposure to a Grace product?

9 Q    I'm showing you 2283.  Could you explain exactly why the

10 issue is framed in the way or question is framed in the way

11 reflected on 2283?

12 A    Yes, and the question really is exactly this question,

13 what does science say about the significance of doses resulting

14 from exposure to Grace products.

15 Q    In order to answer that question, I see that the next step

16 is reflected in 2269.  Just to compare the doses to these

17 benchmarks, could you describe in your own terms what is

18 involved in that exercise?

19 A    Yes, as I spoke of earlier, we spoke of the Koch

20 principles.  We spoke of the world of epidemiology and dose

21 response, and I know that this Court has heard from Dr.

22 Moolgavkar who works in this particular field, and the concept

23 of having now these cumulative exposures and asking this

24 essential question really is what does it mean in terms of

25 disease causation or these high levels, low levels, how can we

Anderson - Direct                                    82

1  compare them to some benchmarks that might give us guidance as

2  to their significance.

3  Q    What benchmarks did you use?

4  A    I used benchmarks from Dr. Moolgavkar's analysis, and I

5  think I emphasized in my deposition that I have the utmost

6  confidence in Dr. Moolgavkar, but there's a long history here.

7  There's a longer history than just his opinions, because this

8  work has been evolving over many, many years, and his work is

9  the essential work that brings all of this literature together,

10 but we find a great deal of support in the literature for his

11 work.

12 Q    Have you offered an independent opinion with respect to

13 the epidemiology, or are you relying upon Dr. Moolgavkar's

14 work?

15 A    I'm relying on Dr. Moolgavkar's work.

16 Q    I'm showing you 2262.  Is this --

17      MR. BERNICK:  I believe, Your Honor, it may actually

18 already be in evidence under a different number.

19 Q    But are these the benchmarks -- from what Dr. Moolgavkar,

20 but are these the benchmarks that you used in the course of

21 your analysis?

22 A    Yes, they are.

23 Q    Okay.  Now, Dr. Moolgavkar talked about the fact that

24 there were not reliable data -- observational data that was

25 gathered below 15 -- a burden of 15 fibers per mil per year.

1 Are you familiar with the 15 fiber per mil -- fiber per mil per

2 year concept?

3 A    Yes, I am.

4 Q    Okay, and he then further observed that once you get below

5 15, you're in, therefore, a range of the unobserved, and then

6 below 2.8, which came from the auto workers study or the auto

7 mechanics study, you were in a range of risk, in a sense,

8 affirmatively not being seen.  Now, I don't want to ask you

9 about the details of those different numbers.  I simply want to

10 ask you are you familiar with those basic concepts?  That is a

11 range of observed data -- reliably-observed data, a range where

12 there isn't reliable observational data, and then an area where

13 there is reliable observational data, but it doesn't show a

14 risk.

15 A    Yes, I am, and we have spoken of this concept since 1976.

16 Q    I want to show --

17 A    The range of observation --

18 Q    Wait.  Let me interrupt you for just a second --

19 A    Yes.

20 Q    -- and just put on the board 2284, which I believe already

21 has been used by Dr. Moolgavkar, but I'm -- my focus with you

22 is to simply have you, as you were beginning to say, provide

23 the historical regulatory perspective.  That's what I want you

24 to comment on, is the regulatory side of what is illustrated in

25 that chart.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I spoke earlier on the earlier slide of the

2  divergence between evidence of causality and evidence that is a

3  preemptive public health policy-based approach.  And here the

4  first one of these curves was drawn when I was at EPA in 1976.

5  Conceptually, we see with agents an observed range from human

6  studies, sometimes only animal studies, but the important thing

7  is as we leave that range of observation, we regard that range

8  as science based.

9           As we go downward, EPA to this day -- and we created

10  this curve in 1976 as a means of establishing a plausible upper

11  bound on the risk, meaning the real risk could be less even

12  approaching zero, and we put that label on every document that

13  we wrote at EPA when I was there.  And I think the other

14  important thing is I've observed the use of this generic

15  approach by the National Academy of Sciences and the Institute

16  of Medicine.  I was familiar with and commented on some of

17  their work, and an example of that work is the Gulf War

18  veterans study where they actually made distinctions about

19  establishing causality from exposure for those individuals and

20  chose to use only the observed range for that work.

21  Q    Thank you.  And that gets back to the difference between

22  science --

23  A    That's right.

24  Q    -- and the regulatory guidance or rule?

25  A    That's right, and the inference judgments that I used to

Anderson - Direct                                          85

1  fill gaps, so that rule making can go forward.

2  Q     Thank you.  I want to now turn to how it is that you used

3  -- if we could go back to 2262, you said that you used Dr.

4  Moolgavkar's benchmarks.  I want to talk about how it is that

5  you applied or used those benchmarks by reference to the

6  cumulative doses that you determine in part on the basis of Dr.

7  Lees' with an S work.  And I want to show you Exhibit 2285 and

8  ask you whether this would assist you in explaining to the

9  Court the comparison that you did.  The answer to that is yes

10 or no.

11 A     Yes, I think it will assist us.

12 Q     Okay, so now could you explain how -- what it is that is

13 reflected in 2285?

14 A     Yes, the values that we saw earlier and which are

15 displayed here as the dose cumulative exposure values can now

16 be compared to these benchmarks to give us some guidance as to

17 what they mean.  We see for the A category an accedence of

18 these conservative screens of the 15.  We see for the B

19 category an accedence of no benchmark.  For the C category the

20 maximum is a 12, so it's below the 15.  It's in the zone of

21 inference.  It's above the relative risk, a modeled calculation

22 for Libby Fibers, but it's -- well, let's move on to D.  D and

23 E are very small exposures relative to the benchmarks, and they

24 are under all of the benchmarks.

25 Q     Okay.  This compare --

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Direct                    86

1  A    And I should note that the 3.2 number is a mixed fiber

2  number that includes chrysitolite, which is the most potent of

3  the fibers and is not in the Grace product, so I don't take

4  that benchmark to be particularly useful.

5  Q    That's the one that's --

6          THE COURT:  Which one?  I'm sorry.  Which one.  I'm

7  sorry?

8          THE WITNESS:  Three point two.

9          THE COURT:  Point two.

10         THE WITNESS:  It's referred to as meso-relative risk

11 to mixed fibers.

12         THE COURT:  Okay.

13         THE WITNESS:  My understanding from speaking with Dr.

14 Moolgavkar is that's taken from --

15         MR. MULLADY:  Objection, Your Honor.

16         THE WITNESS:  -- an EPA --

17         MR. MULLADY:  Objection, Your Honor, the witness is

18 about to tell us about a conversation she had with Dr.

19 Moolgavkar about these fiber concentrations.  That's hearsay.

20         THE COURT:  She is, but --

21         MR. BERNICK:  No, it --

22         THE COURT:  -- Dr. Moolgavkar's already made that

23 same statement yesterday on the stand.

24         MR. BERNICK:  Right, but it's -- she's an expert.

25         THE COURT:  He also testified to that same fact on

1  the stand yesterday.  The record will substantiate that.  He

2  made the same statement on the stand yesterday.

3          MR. BERNICK:  Right.

4  BY MR. BERNICK:

5  Q    Just to review briefly, we have marked here the 2.8, which

6  he said came from the auto workers study or the risk was not

7  observed, the relative risk calculation -- relative risk of 2

8  with respect to mixed fibers, the 3.2, the working lifetime

9  exposure, the OSHA fell 4.5, the relative risk of 2 for --

10  based on modeling for Libby fibers and meso, 15 which is the

11  lowest observed average exposure for meso, and then ranging way

12  up to asbestosis threshold, chrysotile, relative risk of 2 and

13  the like.  Now, does Exhibit 2285 accurately summarize the

14  comparative data that you used in connection with benchmarking

15  the dose -- the cumulative doses with respect to the five

16  categories?

17  A    Yes, it does.

18  Q    I want to turn to ask you and show you 2286.  Could you

19  explain, based upon the comparison that you did, what

20  determinations you made with respect to the exposures as

21  determined in accordance with your risk assessment?  What

22  assessment did you make with respect to the exposures of people

23  who worked in occupations A, B, C, D, and E?  What decision or

24  what determination did you make?

25  A    Well, I found unequivocally that people in Categories B,

1  D, and E are well below all of the benchmarks and need not be

2  considered further.  The Categories A and C claimants I have

3  suggested should be further evaluated despite the fact that the

4  C category is below the observed benchmark, and they have

5  passed through -- if we want to call this a screening exercise,

6  those two categories have passed through for further analysis

7  but not B, D, and E.

8  Q    I want to take the last step now that we see on the board,

9  2296, which we see it's called Risk for Claimants.  Why is it

10 that risk assessment goes beyond the comparison of calculated

11 doses in benchmarks?  Why is it that the risk assessment takes

12 another step?

13 A    I'm not sure I understand the question.

14 Q    Yes.  Well, why do we have another step to take here?

15 A    Oh.

16 Q    Why another step?

17 A    Well, I mean the important issue, as I understand it, is

18 what are the merits of these claims going forward, and the

19 information that I have now provided, as I understand it, will

20 go into a claims review analysis for further evaluation.  So

21 the results of this analysis now go to the claims reviewers and

22 Dr. Florence.

23 Q    So we're talking about a risk for a population of people.

24 A    That's right.

25 Q    Okay.  Now, in order to get into this area could you tell

1   the Court whether or not at your direction the PIQs -- a

2   certain number of PIQs and a certain number of closed claims

3   were reviewed?

4   A    Yes, they were.

5   Q    Okay, and showing you 2289, does this reflect -- 2289

6   first.  Does this reflect the claims that were reviewed by

7   people in your organization at your direction for purposes of

8   figuring out what categories they belong?

9   A    Yes.

10  Q    Okay, and we have 15 hundred 96 mesothelioma claims, 32

11  lung cancer claims, 115 laryngeal cancer claims, 152

12  non-malignant disease claims, and then with respect to the

13  closed claims, 350 mesothelioma claims, is that right?

14  A    That's correct.

15  Q    Okay.  Now was there a procedure -- were there procedures

16  established for purposes of this review?

17  A    Yes, there were very strict procedures established with

18  the team who did the review?

19  Q    Showing you 2288, does this slide -- would this slide

20  assist you in explaining the procedures or the steps that were

21  taken in order to conduct this review?

22  A    Yes, it does.  We first needed to and did design a

23  protocol to insure the proper assignment of claimants to the

24  nature of exposure categories that would be consistent with Dr.

25  Lees' definitions of exposure.

1  Q    Okay.  Let's -- Dr. Lees' defined the categories on the

2  basis of those definitions looked for corresponding industrial

3  hygiene data, and then in order -- and then in doing the claims

4  review to find out what categories people belonged in, tell us

5  why it was important for the same definitions to be used; that

6  is, not just the definitions that somebody else might think of

7  like a claimant or a worker or anybody, but why was it

8  important to use Dr. Lees' definitions in reviewing the claim

9  files?

10 A    Because we were assigning these claimants to a nature of

11 exposure category, and he had defined that category and

12 collected the data, analyzed the data, and presented the data.

13 So the two had to mesh.  They had to be identical, as close as

14 we could get them.

15 Q    Okay.  Why don't you continue to go on and talk about the

16 steps that were undertaken thereafter in connection with the

17 review?

18 A    Well, next the review team was identified, obviously

19 choosing people with appropriate experience and credentials.

20 We established training sessions.  We established quality

21 control procedures.  We had double review.  And the actual

22 claims review proceeded along the following lines.  Obviously,

23 the claims were inconsistent, and there were times when things

24 were not quite as simple as other times, but we, first of all,

25 accepted the self-identified claimants.  If they checked the

1  box that they were asked to check, A, B, C, D, or E, we

2  accepted that.  If they checked more than one box, we elevated

3  their exposures to the highest exposure category.  So they'd

4  become an A or C instead of if they checked all boxes.

5       If a claimant did not self-identify, then we bent

6  over backwards to review the attached materials referred to

7  here as best evidence.  We wanted to try as hard as we could to

8  classify the claimants from that attached material.  So we did

9  review the attachments, and we looked for identifying

10 statements of what kind of product they were exposed to, how

11 they were exposed, and over what durations.

12 Q    Okay.

13 A    If, in fact, there was insufficient information after all

14 of the review we called it insufficient, allocated it to

15 insufficient category, and I've already mentioned always

16 elevating to the highest category if they mentioned several

17 possible exposures.

18 Q    I want to focus on one particular feature, which you've

19 just talked about, and use Slide 2290 to do that.

20      MR. BERNICK:  Could you show 2290, PJ?

21 Q    There have been questions asked about, well, what if

22 somebody says here's what my job was, and so I -- and I want

23 you to explain how it is that you figured out what category a

24 claimant belonged in, where they had actually checked off the

25 box on the form or not checked off the box on the form.

Anderson - Direct                                    92

1 A    Well, if they checked off the box on the form, we call

2 that the claimant's identified the nature of exposure.  We did

3 not question that.  If they checked the box, we accepted it.

4 Q    Or if their lawyer checked the box, and they signed off on

5 it?

6 A    That's right.

7 Q    Okay.

8 A    Whoever checked the box, it was accepted.  We then went to

9 the attached materials where there was no self-identification,

10 and we reviewed the claimant's information that was attached.

11 And I think I've discussed some of the elements of that review.

12 If there were inconsistencies, if there were questions, we had

13 a key senior team to help answer those questions about what had

14 been found.

15 Q    Okay.  Showing you 2291, based upon the results that came

16 from this review process, were you later able to compare and

17 see whether there was a significant difference between the

18 self-identifieds and the best evidence claimants when it came

19 to these different categories?  And just explain 2291, if you

20 would.

21 A    Yes, on the left-hand side there is a pie chart that shows

22 the percentages of nature of exposure categories that the

23 self-identified claimants fell into.  So we see 77 percent of

24 the B, D, and E, 19 percent fell into the A/C category, and 4

25 percent into the other category.  On the right-hand side we see

Anderson - Direct                                    93

1  a pie chart that reflected what I'm referring to as the best

2  evidence.   This means there was no self-identification.

3          We had to go to the attached materials and analyze

4  the attached materials in order to assign a nature of exposure

5  category, and we see here the very similar results.   We had 90

6  -- 79 percent B, D, and E's versus 77.   The A's and C's turned

7  out to be pretty much identical, and the opposite two percent

8  difference.   So this gave us confidence that we had a pattern

9  that was evolving and was repeated in the best evidence review.

10 Q    Okay.   Is 2291 an accurate summary of the data that exists

11 on that subject?

12 A    Yes, it is.

13 Q    Turning to 2292, what did you find out after the -- let me

14 just ask, did you have the opportunity to look at the results

15 of the review to gather further information about how these --

16 how these claimants based upon their attachments compared to

17 the benchmarks that applied to your work?

18 A    Yes, and this slide summarizes that work.   We did the same

19 kind of review for the lung cancer claimants and the -- for the

20 laryngeal cancer claimants, and we find the results of those

21 analyses all were below the benchmarks --

22 Q    Okay.   Well, let's be --

23 A    -- they did not exceed the benchmarks.

24 Q    Let's be clear about this.   Were you able to -- this slide

25 reflects a comparison between the results of your review, on

1 the one hand, and the benchmarks on the other.  Were you able

2 to make that comparison with respect to all people who made

3 claims that you reviewed for lung cancer; that is, is the

4 comparison one that you were able to make for all the claimants

5 that you looked at?

6 A    Yes, we could -- well, I don't recall how many did not

7 provide sufficient information.

8 Q    Okay, so this is where they had sufficient information to

9 make --

10 A    Well, we had sufficient information, yes.

11 Q    Okay.

12 A    We did the very same thing we did with the other reviews.

13 Q    Okay, and you said all claims did not exceed benchmarks

14 with respect to both lung cancer and laryngeal cancer?

15 A    That's right.  And you'll recall that those are very high

16 benchmarks on Dr. Moolgavkar's benchmark chart.

17 Q    What did you find out with respect to their status as

18 smokers?

19 A    Well, we found, of course, there's a confounder with

20 smoking, and we found that all of the lung cancer claimants but

21 one was a smoker, and about 90 percent of the claimants who

22 claimed laryngeal cancer were smokers.

23 Q    Could you tell us to what extent -- strike that.  2292,

24 does it accurately summarize the data that you gathered with

25 respect to the comparison of claimants to benchmarks on lung

1  cancer and laryngeal cancer?

2  A     Yes.

3  Q     And also their smoking status?

4  A     Yes.

5  Q     Okay.  Turning to 2293, let's turn to mesothelioma and

6  mesothelioma for people in Categories A and C, the ones that

7  passed through the filter.  Could you tell us in cases where it

8  was possible to make the determination based upon the data that

9  you had how the A -- the mesothelioma claimants who fell into

10 Categories A and C, how they compared with the benchmarks?

11 A     Yes, this was interesting because for those claimants who

12 gave us information about that duration of exposure, we were

13 able to adjust the duration from 45 years to the number of

14 years they gave us and, of course, then we had to go back to

15 that rolling average, those tables, and select for that time

16 period that they gave us, what the exposures would be.  But in

17 essence what we find for the A's and C's is that 98 percent are

18 lower than 15 fibers per mil year, and 16 percent are lower,

19 and that's the benchmark that's at the bottom of the range of

20 observation.  And we found 69 percent are lower than the 8.9

21 fibers per mil year.

22 Q     What about --

23 A     So that's just one adjustment from the very high screening

24 values we used.  All of the others are in here, the 100 percent

25 exposure, frequency 250 days a year.  The only adjustment is

1 just the duration adjustments we could claim.

2 Q    I want to make that very clear.  You went back to the

3 PIQs, and based on the review you looked to the people who had

4 fallen into Categories A and C and had mesothelioma, and where

5 the information regarding duration was available you

6 substituted in your risk assessment calculation the actual

7 duration as reflected in PIQ?

8 A    Correct.

9 Q    But, when it came to the other assumptions that you made;

10 that is, regarding the product that they were exposed to where

11 you maximized the product concentration and the very -- and the

12 other assumptions that you used, did you change those

13 conservative assumptions to be in a sense actual based upon the

14 PIQ data, or did you continue to make those other conservative

15 assumptions?

16        MR. MULLADY:  Your Honor, objection.

17 A    Continued to make all of the other conservative --

18        MR. MULLADY:  Objection, Your Honor.  Excuse me.

19 I've been pretty tolerant of the leading up to this point, but

20 this is a very important area of the case.  I think we just

21 heard Mr. Bernick testify for about five minutes.

22        MR. BERNICK:  Well, actually, if you want to have the

23 record read back, the witness said exactly the same point; that

24 is, that she had kept the other matters constant, and I wanted

25 to make sure that the details of that were evident to the

Anderson - Direct                                97

1  Court.

2      Q    Happy to have the question rephrased, so that she can

3  explain exactly what it is that you meant when you said in

4  response to my prior question that you altered the duration

5  alone.  Just explain to the Court what you meant.

6  A    All right.  The only thing that we could glean from the

7  questionnaire data that could be useful to this analysis that

8  would alter the analysis in any way was the duration

9  information.  So we altered the 45 years to match the actual

10 years that the claimants provided for us.  We continued to use

11 all of the other conservative assumptions, and the only other

12 thing we did is to match -- for those years they claimed, we

13 have to go back to that rolling, instead of 45-year, that time

14 period, select the highest value for the year -- for each year

15 in the time period and do that analysis.  All of the other

16 maximum values were retained, nothing else is adjusted.

17 Q    Okay.  On the basis of this analysis what conclusion did

18 you reach with respect to the A/C claimants?

19 A    I concluded that on the -- I wrote this to -- on the

20 right-hand side that there's a very high probability that many

21 or most of the A's and C's that we are saying should be further

22 valued actually are generously passed through the screen and

23 passed on for further evaluation, because we see here just the

24 impact of the alteration of one very conservative factor.

25 Q    Let's -- go ahead.  Let's turn to 2294.  Does this slide

1 now relate to the B, D, and E mesothelioma claimants?

2 A    Yes, it does.

3 Q    And could you tell us what it is that this slide reflects?

4 A    All right.  This slide is a similar analysis.  This is for

5 the B's, D's, and E's, and in those claimant questionnaires

6 where they gave us their duration of exposure, we did the very

7 same thing.  We went back and took that duration of exposure,

8 went to the data tables for the history of the products that

9 were in trades of commerce during that block of identified

10 years, again selected the highest value for each year in the

11 identified block, did the rolling average, and kept the highest

12 value for those claimants.  And we altered absolutely nothing

13 else.

14      We kept all of the maximum values, and what you see

15 here is a shifting of the numbers downward; a hundred percent

16 or less than the background -- I mean less than the benchmark

17 except background, and I made a very similar conclusion here

18 but an opposite one, and that is a very low probability, and no

19 scientific evidence whatsoever that any of these B's, D's, and

20 E's would exceed the benchmarks.

21 Q    Okay, and does 2294 accurately summarize the data that

22 came from that comparison?

23 A    Yes, it does.

24 Q    Turning to 2295, did you also look to see -- you had --

25 you told us that you assumed that people spent their entire

1  lives -- working lives eight hours a day working with Grace

2  product.  Based upon your review of the PIQs, what did you find

3  about what the actual evidence showed?

4  A    Well, in the PIQs I found that 94 percent of the claimants

5  in Category A and C asserted other claims against other

6  entities, and 93 percent of the B's, D's, and E's asserted

7  claims against other entities.  So this tells me that the 45

8  years is certainly too much.  If they were doing other

9  occupations, they could not have had that much exposure most

10 likely.

11 Q    And what would that have done to your cumulative

12 calculations by category if they actually had factored in this

13 actual data?

14 A    Well, if they left the workforce of exposure to Grace

15 products and went into the workforce of exposure to other

16 products, these numbers would be lowered in a commensurate way.

17 Q    Were you able to make this comparison or derive these data

18 with respect to all the claimants that you looked at; that's

19 all the mesothelioma claimants?

20 A    I can't recall, but I think most of them that we reviewed

21 did provide -- we were able to make this comparison.

22 Q    Okay.  Let's go back to then our board, 2296.

23         THE COURT:  Mr. Bernick --

24         MR. BERNICK:  Yes.

25         THE COURT:  -- you said 15 minutes 40 minutes ago.  I

Anderson - Direct                    100

1  think what we're going to do is take the recess if you're going

2  to be much longer.  How long are you going to be?

3          MR. BERNICK:  Is it really that bad, Your Honor?

4          THE COURT:  Yes, it is.

5          MR. BERNICK:  Well, I apologize.  I have this

6  question.  The last strip, and I've got three questions.

7          THE COURT:  All right.  We'll finish.

8          MR. BERNICK:  I know if I didn't make a

9  representation about how much longer it would take --

10 Q    Are we now in a position to peel off the last magnet and

11 show the balance of the assessments that you did as reflected

12 now in 2296?

13 A    Yes.

14 Q    Okay.  And what conclusion did you reach with respect to

15 Categories A and C when it came -- comes to the evidence that

16 came from the PIQ review?

17 A    Yes, I alluded to earlier, we have suggested that there's

18 some scientific evidence that those claims should be further

19 reviewed.  For the B's, D's, and E's, we found no such

20 evidence.

21 Q    Okay.  Question 1; have you reached any conclusion as to

22 whether the process that you followed in conducting your risk

23 assessment analysis complies with accepted methods for

24 assessing whether there's scientific support for the claims

25 that have been made against Grace and that you reviewed?

Anderson - Direct                    101

1  A    Yes, this is certainly accepted scientific methodology.

2  Q    Are you aware of any other accepted or any other accepted

3  or reliable scientific method for determining whether claims --

4  asbestos claims or claims of exposure and causation from

5  asbestos, whether they are supported by reliable science?  Is

6  there any other accepted or reliable method for reaching that

7  assessment?

8  A    I am under -- I'm unaware of any other method that would

9  allow one to answer that essential question I posed in the

10 beginning, and that is our -- the claimants exposure groups

11 getting their disease from Grace product exposure.  Without

12 doing this assessment, I have no idea alternatively how any

13 methodology can answer that question.

14 Q    Okay.  With respect to the claims that fall into

15 Categories B, D, and E, do you have an opinion on whether there

16 is reliable science supporting those claims of disease as being

17 caused in whole or in part by exposure to Grace asbestos?  Do

18 you have an opinion?

19         THE COURT:  We -- I'm sorry.

20         MR. MULLADY:  Objection for --

21         THE COURT:  We --

22         MR. MULLADY:  Objection for the record, Your Honor.

23         THE COURT:  Will you read the question for me again,

24 please?

25         MR. BERNICK:  Yes.

1 Q    Do you have an opinion about whether there is reliable

2 science to support the proposition that the claims falling into

3 B, D, and E were caused in part or in whole by exposure to

4 Grace asbestos?  Do you have an opinion?

5 A    Yes, I do.

6 Q    And what is your opinion?

7           MR. MULLADY:  Objection.  For the record, Your Honor,

8 the objection is to foundation.  This witness is -- and this

9 will be borne out on cross examination.  But for the record,

10 the opinion is incompetent and without foundation, because the

11 witness has not worked with any actual exposure data from any

12 actual Grace claimants in this case.  She has not taken time

13 waited average exposure samples, or I should say Dr. Lees did

14 not take time waited average exposure samples from any actual

15 Grace claimants.  She's not been presented with that data.

16           She has been provided with instead the results of

17 point-in-time studies and a very -- of a very small number of

18 studies done by Dr. Lees of other workers in the vicinity of

19 Grace products at different times who were not claimants in

20 this case.  Average or mean values were taken by Dr. Lees from

21 those limited numbers of studies and provided to the witness.

22 She has in turn then used that data to make judgments about the

23 merits of actual claimants' cases on the basis of that evidence

24 and not the evidence submitted by the claimants themselves

25 insofar as their time waited average exposures and quantitative

Anderson - Direct                                  103

1  metrics are concerned.

2         I could make -- I could say a lot more about this

3  issue, but I think that's the essence of the foundational

4  objection to the offer of this opinion.

5         MR. BERNICK:  Well, the foundational objection would

6  be properly lodged, although I didn't hear it, under Rule 702

7  and 703 of the Federal Rules of Evidence.  Now, I asked the

8  witness a very simple question in order to address any

9  remaining or any -- just to address the objection.

10 BY MR. BERNICK:

11 Q    In all the work that you did in coming to the point where

12 you were about to answer the question that I just asked you, I

13 take it from your testimony that you relied upon Dr. Lees'

14 work, Dr. Moolgavkar's work, and you relied upon the PIQ

15 analysis.  Is that right?

16 A    That's correct.

17 Q    Okay, and I just want you to tell me whether the work and

18 the materials that you relied upon for purposes of offering an

19 opinion on whether these claims are supported by reliable

20 science, are those materials and is that -- are they the kind

21 of information and evidence that people within the field of

22 risk assessment find to be reliable for purposes of offering

23 opinions of doing scientific work in that area?

24 A    Absolutely.

25 Q    Okay.  Is there any respect in which you believe that the

1  materials that you've relied upon don't satisfy that

2  requirement; that is, the requirement that they be the kind of

3  materials that experts within your field find reliable for

4  purposes of their expert work?

5  A    I found them reliable.  It's what I would expect, and I

6  would not have used them otherwise.

7  Q    Thank you.  And based upon that foundation and based upon

8  the work that you have done, could you tell us what your

9  opinion is as to whether there is reliable science as to claims

10  falling within A and C -- whether there is reliable science to

11  say that those claims of injury were caused by Grace exposure

12  either in part or in whole?  Is there such reliable science?

13            MR. MULLADY:  Objection.

14  A    For A's and C's --

15            THE COURT:  Just a minute.  I believe that this would

16  go to the weight not to the admissibility.  Once again, I'm

17  going to have to consider all of this when I get all of this

18  testimony in and have an opportunity to look at the entire

19  record, but I -- so for now I'm going to overrule it.  I

20  believe this will go to weight not admissibility.

21            MR. MULLADY:  Your Honor, just one more statement for

22  the record --

23            THE COURT:  Yes.

24            MR. MULLADY:  -- to clarify our position.  The

25  objection is not to under Rule 702 and 703 in the sense that

1 the witness cannot rely on the opinions of these other experts.

2 It is not -- that is not the basis for the objection.  The

3 basis for the objection is that the work of these other experts

4 does not put this witness in a position to draw the conclusions

5 that she is drawing.  In effect, the underlying predicate for

6 the opinion she's giving is incompetent to deliver the result

7 that she wants to present before the Court.

8             THE COURT:  Your --

9             MR. BERNICK:  There's no such things as --

10             THE COURT:  Your objection, if I understand it,

11 essentially is going to the medical condition of the particular

12 claimants involved.  If I understand what you're saying, you're

13 attempting, I think, to get to whether or not each individual

14 claimant has a condition that is founded on a Grace product?

15             MR. MULLADY:  Not exactly, Your Honor.

16             THE COURT:  No.  Okay.

17             MR. MULLADY:  This more goes to the issue of

18 exposure.

19             THE COURT:  All right.

20             MR. MULLADY:  The exposure estimates that she's using

21 are averages of exposure TWA fiber concentrations gathered by

22 Dr. Lees from a limited sample of observations of people who

23 work around -- who have worked around Grace products.  It's our

24 position that in order to express a competent opinion on

25 causation in this case, whatever witnesses Grace would tender

1  this opinion through, would have to testify that on the basis

2  of actual quantitative data from actual claimants and a review

3  of those claimants' actual exposure histories, there is or

4  there is not scientific causation.  We do not have that from

5  this witness, and we certainly didn't hear it from Dr. Lees or

6  Dr. Moolgavkar, and that's the basis for our objection.

7           MR. BERNICK:  Yes, well, the interesting thing is,

8  Your Honor, that this is an argument that -- this is an

9  argument in part is -- reflects an issue of their own creation.

10 We asked them for all of what they had to support these claims.

11 This witness' people were given the results of that request.

12 Your Honor will well-recall how arduous our efforts were to

13 find anything else.

14          In this particular case we have industrial hygiene

15 data that describes the categories.  We take exactly the

16 definition for those categories that was used to collect that

17 or organize that industrial hygiene data, and then her people

18 go and review the PIQs where the PIQs say I was an X, then we

19 take it at face.  Where they say -- don't say it, we then

20 review the attachments to see what category they've fallen in.

21          What counsel's argument says is that you can't -- you

22 don't even have -- you know, it's not a question of competent

23 evidence.  It has nothing to do with the issue of competence.

24 The question is whether it is probative evidence, relevant

25 evidence that you have an industrial hygienist who has studied

Anderson - Direct                                107

1  and gathered data with respect to what is definitionally the

2  same exposure, or whether in every single asbestos case you

3  have to have somebody -- industrial hygienist that was there at

4  the time and walked around with each individual claimant to get

5  their particular exposure at the time.

6          Now, he may say, well, that's what really is

7  necessary to do an industrial hygiene analysis.  Maybe that's

8  what he wants to say.  It's completely different from what

9  they've said in every other context, which is that none of this

10 really matters scientifically.

11         But that would be a position that would go to the

12 weight of the industrial hygiene data for its application to

13 this group of people.  It does not go to admissibility, and not

14 only that, it's completely impossible and a farfetched notion

15 of relevance, but whatever it is, it's a question of probative

16 value.  It is not a question of admissibility.  Admissibility

17 is governed completely and utterly by Rule 702 and 703.

18         This witness was qualified as an expert with respect

19 to risk assessment.  She has now said that the basis of her

20 opinion is the information that was provided by the industrial

21 hygienist; 702 and 703 govern the totality of that equation.

22 So I just don't understand what it is that the objection is,

23 but I'd like to get the witness' answer to my question finally,

24 so that we can go on and conclude.

25         THE COURT:  Well, I understand the basis for the

Anderson - Direct                                    108

1   objection.  I think, however, you know, the -- as we keep

2   talking in this case about the sauce for the goose and sauce

3   for the gander, well, it's going to be a problem on the other

4   side, too.  So I know your evidence isn't going to come in the

5   same way, but nonetheless, at some point in time these

6   claimants have to prove exposure.

7          And at this point in time these plants don't operate

8   with this product in place anymore, so we're going to have a

9   trust at some point, folks, that have to pay claims, and I'm

10  here to tell you at this point the evidence is in.  The PIQs

11  are finished.  The X-rays have been submitted, and this Court's

12  order was very clear, the current claims don't get a second

13  bite at this apple.

14         MR. FINCH:  I join in Mr. Mullady's objection.  I

15  would note for the record though that the personal injury

16  questionnaires do not ask the claimants to identify who their

17  testifying experts would be as an industrial hygienist for the

18  purposes of working up an individual exposure assessment for

19  that individual person.  None of your orders ordered them to --

20         THE COURT:  That's correct.

21         MR. FINCH:  -- identify their testifying experts.

22  That is an individual exposure assessment question --

23         THE COURT:  Yes, it is.

24         MR. FINCH:  -- that would be at issue in an

25  individual case.

Anderson - Direct                                        109

1          THE COURT:  Yes, it would.

2          MR. FINCH:  Our basic objection is the relevance of

3    risk-based population estimates are relevant to the question of

4    individual causation in each individual case as to which no

5    plaintiff has been required to put on their causation proof

6    through the questionnaires.  That's the basis for the

7    objection.

8          MR. BERNICK:  I'd be happy to debate -- I'm sorry.

9          THE COURT:  The individuals have not been required to

10   produce that type -- that level of witness identification.

11   They have been required to file their proofs of claim and to

12   address the information by way of discovery in response to the

13   PIQs, and this Court's orders have been very clear with respect

14   to the fact that they have been required to provide that

15   information.  The objections are noted.  I still believe this

16   is going to go to weight.  Nonetheless, I am going to take this

17   -- as I said before, when I get the whole record, I will take a

18   look at all of these objections in the context when I have a

19   chance to take a look at the whole record.  Mr. Mullady.

20         MR. MULLADY:  Yes, Your Honor.  Respectfully, I do

21   respect the Court's ruling.  One additional basis for my

22   objection.  We represent the future claimants in this case, as

23   the Court is aware.  Our future claimants, of course, did not

24   submit information in the form of PIQs.

25         THE COURT:  Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MULLADY:  We, therefore, would object to the

2     admissibility of this evidence as to us in its entirety, and

3     failing that -- well, we would object on that basis and

4     principally under Rule 403, because whatever probative value

5     that evidence would have as to future claimants is greatly

6     outweighed by the prejudicial effect of using, for example,

7     mean averages of exposures taken from actual claimants and

8     applying those averages to screen current claimants which are

9     then extrapolated to exclude the claims and disallow in effect

10    the claims of thousands of future claimants.

11          THE COURT:  Now, wait.

12          MR. BERNICK:  Now, yes.

13          THE COURT:  First of all, I am in no way disallowing

14    any future client's claims or current -- future demand holders'

15    claims.  We've had that information on this record for quite

16    some time.  That's premise number one.  Premise --

17          MR. MULLADY:  I said in effect.  I'm sorry.

18          THE COURT:  Premise number two is that you're here

19    representing those people who obviously are currently alive.

20    Whether or not they know that they have a particular asbestos

21    disease, they are alive.  They had to have worked or been

22    exposed to a Grace product, and this evidence is as clearly

23    relevant to them as it is to a current claim holder.  And

24    that's why you're here, Mr. Mullady.  You stand in their shoes,

25    and every bit of discovery work you did is for their benefit.

Anderson - Direct                        111

1  So the fact that they are not here and don't know that they may

2  exist right now, that's why you're here, sir, and as a result,

3  your work is clearly as relevant, and you stand in their shoes,

4  and that objection is overruled on that basis.  Mr. Bernick.

5          MR. BERNICK:  Yes, I'm tempted to respond

6  substantively.

7          THE COURT:  You don't need to respond.  You just won

8  that objection temporarily --

9          MR. BERNICK:  Yes, I --

10         THE COURT:  -- and if there's an issue down the road,

11 you'll brief it.

12         MR. BERNICK:  Well, we'll -- we're looking forward to

13 getting into that so --

14         THE COURT:  All right.  You may answer it, doctor.

15         MR. BERNICK:  So, can I get some --

16 BY MR. BERNICK:

17 Q    Dr. Anderson, the question is whether in your view as to

18 Categories B, D, and E --

19         THE COURT:  No, it was to A and C, actually.

20 Q    Okay.  Well, to A and C -- I happened to begin with A and

21 C.  I'm going to get to all of them.  What is your opinion on

22 whether there is reliable science to support -- based upon the

23 information that you have to support the proposition that their

24 diseases may have been caused in part or in whole by exposure

25 to Grace asbestos?

1  A    For the A's and C's, as I've said before, I think I have

2  been very generous, but I have said that those claims should be

3  evaluated further.  That there is some reliable scientific

4  evidence that points in that direction.

5  Q    Okay.  Same question with respect to B, D, and E.

6  A    For B's, D's, and E's, the cumulative exposure values --

7  the maximum of cumulative exposure values are so small.  They

8  are so very small as to not exceed any benchmark.  I do not

9  think there is such evidence, and I do not think they need to

10 be considered in the next evaluation.

11            MR. BERNICK:  Thank you.  Now, Your Honor, I do --

12            THE COURT:  Does that mean, doctor, that your view is

13 that there is no reliable scientific evidence to support the

14 proposition that exposure to Grace's product caused any

15 person's disease in Categories B, D and E?

16            THE WITNESS:  That's correct.

17            THE COURT:  Thank you.

18            MR. BERNICK:  Your Honor, I -- just -- maybe we can

19 take up the issue after lunch, but I would tender as summaries,

20 and I think established the predicate from the witness already

21 on the Rule 1006 requirements for Exhibits 2276, 2277, 2279,

22 228 --

23            THE COURT:  Wait.  I'm sorry.  2276, 2277?

24            MR. BERNICK:  2279, 2282 and 2291 to 96.  I'd ask

25 that each and every case, whether the exhibit -- and I only

1 picked out the ones that reflect the data -- whether they

2 accurately reflected the data that she had mustered relating to

3 the topic reflected in the exhibit.  So, we would make that

4 proffer.  I don't know if there's an objection now, or if you'd

5 like to take that up after the break.  Either way is fine.

6           UNIDENTIFIED ATTORNEY:  After the break.

7           MR. BERNICK:  And subject to that we would pass the

8 witness.

9           THE COURT:  All right.  We'll return with the

10 question of admissibility of 2276, 77, 79, 82, 91 through 96

11 after lunch.  And --

12           MR. BERNICK:  I would note that my examination this

13 morning, after we factor in about 25 minutes of colloquy,

14 lasted for about an hour and 50 minutes --

15           UNIDENTIFIED ATTORNEY:  Two hours and ten minutes.

16           THE COURT:  Two hours and ten minutes.

17           MR. BERNICK:  Well, after you take into consideration

18 the 20 minutes that we just spent on one objection and the voir

19 dire, which took ten minutes.

20           UNIDENTIFIED ATTORNEY:  Congratulations.

21           THE COURT:  All right.  We will be in recess until

22 1 p.m.

23           MR. BERNICK:  Thank you, Your Honor.

24           THE COURT:  Do you have your case cite --

25                     (Recess)


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  -- come to order.

2          THE COURT:  Please be seated.  Mr. Bernick?

3          MR. BERNICK:  Yes.  I think -- we've given the other

4    side the --

5          THE CLERK:  Mr. Bernick, talk into the mic, please.

6          MR. BERNICK:  Yes.  I'm sorry.  We've given the other

7    side the opportunity to take a look at Exhibits 2276, 77, 79,

8    82, 91 and -- 91 through 96, which are proffered as summaries

9    under Rule 1006.  I'm told that beyond preserving -- making and

10   therefore preserving the prior objection that was lodged as to

11   the conversion from PCM to PCME, that with that exception there

12   is no objection to the proffer, and therefore we would ask to

13   have those admitted, and ask Your Honor to, again, overrule the

14   objection that now is being made for preserving the record to

15   the -- to anything that's based in any way, shape, or form

16   under the -- on PCM conversion.

17         THE COURT:  All right.  Well, Exhibits 2276, 77, 79,

18   82, 91 through 96 are admitted.  I have previously overruled

19   that objection, but as I indicated I am going to be looking at

20   all of these objections, every objection, when I get the whole

21   transcript and the case ready for decision.

22         MR. BERNICK:  There are two other small matters

23   before Mr. Mullady starts his cross examination of Dr. Anderson

24   -- I think you may want to help move things along -- with

25   respect to scheduling the ZAI hearing, I am told by Mr. Kramer

**J&J COURT TRANSCRIBERS, INC.**

1  that Mr. Baena is available on the 22nd, as is Mr. Scott.

2  Messages have been left with Mr. Westbrook's office.

3  Apparently Mr. Westbrook has an enviable schedule, because he's

4  on vacation today, as well.  So -- but people are optimistic

5  that he'll be able to respond promptly and will be able to do

6  this on the 22nd.  My proposal would be that we schedule it on

7  that basis, and if it turns out that Mr. Westbrook is not

8  available on that date, that we'll let the Court know, and then

9  I guess we'll have to have a short call to try to schedule an

10  alternative date.

11          THE COURT:  All right.  That's fine.

12          MR. BERNICK:  With respect to Rule 1006, I know that

13  Your Honor has received our cases and the other side's cases.

14  Mr. Ansbro gave me another case, U.S. v. Goss (phonetic), which

15  --

16          THE COURT:  Yes.  I just looked a it.

17          MR. BERNICK:  -- which we'd be happy -- that's the

18  case where there -- the underlying evidence for the summary was

19  excluded on hearsay grounds, and essentially you couldn't

20  revive it.  But be that as it may, we have not had an

21  opportunity to otherwise look at this case, but that's not a

22  problem.  So, we're happy to take Your Honor's ruling.

23          THE COURT:  All right.  Let's finish the evidence.

24  I'll deal with the issues of Rule 1006 and the 408 issue after

25  the witness is finished today.  Do you have any other questions

1 for Dr. Anderson?

2          MR. BERNICK:  No, we don't.  We would now pass the

3 witness.

4          THE COURT:  All right.  Mr. Mullady?

5          MR. MULLADY:  Thank you, Mr. Bernick.

6                    CROSS EXAMINATION

7 BY MR. MULLADY:

8 Q    Good afternoon, Dr. Anderson.

9 A    Good afternoon.

10 Q    I want to begin by reviewing the sequence of your analysis

11 for your disposition of mesothelioma claims.  And I've put on

12 the ELMO here the same exhibit that we have in the exploded

13 version in front of you.  As I understand what you did, you put

14 all the PIQ claimants into these five categories, A through E,

15 correct?

16 A    Not exactly.

17 Q    All right.  Well, they were assigned either by

18 self-identification, or by review of their underlying back-up

19 material, they were assigned a category?

20 A    Yes, to the extent that was possible.

21 Q    To the extent possible.

22 A    Yes.

23 Q    Thank you.  And then, in terms of the duration of their

24 exposure, you have assumed a 45-year full occupational exposure

25 of the highest exposure product for the maximum of any 45-year

1  period, correct?

2  A    That's correct.

3  Q    And you've concluded, on the basis of your entire

4  analysis, not just the two pieces that I articulated, that it

5  is not scientifically plausible that for anyone in the B, D,

6  and E categories, with 45 years of exposure to Grace asbestos

7  products to have contracted mesothelioma from that exposure.

8  Did I understand that correctly?

9  A    I think that's, in essence, what I said.  But the first

10  part of your question you said "anyone", and I'm addressing

11  these exposure -- nature of exposure categories, and -- but I

12  think the answer is yes, if I understand your question.

13  Q    Very good.  Now, you also discussed this exhibit, 2291,

14  which I have placed on the ELMO, which you told us was the

15  percentage breakdown of mesothelioma claimants by nature of

16  exposure, the self-identified versus those who were placed into

17  the B, D, and E, or A and C, or F categories on the basis of

18  best evidence, correct?

19  A    That's correct.

20  Q    And you told us that the results are similar, 77 percent

21  for the self-identified in B, D, and E, and 79 percent for the

22  best evidence in B, D, and E, correct?

23  A    That's right.

24  Q    So, what you've got here is you've allocated 77 to 79

25  percent of all Grace mesothelioma claimants in these categories

Anderson - Cross/Mullady                    118

1  B, D, and E, where according to you they could not plausibly

2  have contracted mesothelioma, is that right?

3  A    No.  I didn't say they couldn't plausibly have attracted

4  (sic) mesothelioma.  I said the scientific evidence that they

5  contracted it from exposure to Grace products is not there,

6  there's no such evidence.

7  Q    It would have been scientifically implausible for anyone

8  in these categories to have contracted mesothelioma from Grace

9  product exposure, right?

10 A    For these exposures I said that that is the reliable

11 scientific evidence, and I've said that there is no scientific

12 evidence that I have that would suggest that that would not be

13 the case.

14 Q    Yet --

15 A    It would be a very low probability event that someone

16 would be at a more extreme exposure to a Grace product than has

17 been displayed in this analysis.

18 Q    Yet --

19 A    For those categories.

20 Q    I'm sorry.

21 A    Sorry.

22 Q    I don't mean to step on your answers.  Yet, 77 to 79

23 percent of these mesothelioma claimants against Grace who

24 you've put into these -- into this category, who put the -- or

25 who put themselves there, have mesothelioma, correct?

1  A    I didn't -- they were labeled as such.  I'm not a

2  physician.  I did not diagnose them.

3  Q    Well, recognizing that you did not diagnose them, if 79

4  percent of them have mesothelioma, and you've assumed 45 years

5  of continuous occupational exposure to asbestos, and you've

6  considered as part of your analysis that even if it wasn't

7  Grace exposure, you would assume it was Grace exposure?  This

8  79 percent of people have mesothelioma, which, in your view,

9  was not occupationally related to asbestos exposure?

10            MR. BERNICK:  Objection to the form of the question.

11  It's about three or four questions, more of an argument than a

12  question.

13            THE COURT:  No.  I think that's proper cross.

14  Overruled.

15  Q    Do I have that right, ma'am?

16  A    I didn't quite -- what is the exact question?

17  Q    I'm asking you if you've concluded that 79 -- 77 to 79

18  percent of all of the people with mesothelioma who have claimed

19  against Grace, that it's scientifically implausible that they

20  got that mesothelioma exposure from 45 years of occupational

21  exposure to asbestos -- Grace asbestos?

22  A    That's not correct.

23  Q    Why is that incorrect?

24  A    I said that it's implausible that they got their

25  mesothelioma from 45 years of exposure, eight hours a day,

Anderson - Cross/Mullady                    120

1 every day, to a Grace product.

2 Q    Right.  But, where the plaintiffs had evidence of exposure

3 to non-Grace asbestos, you've concluded that it was all Grace

4 exposure, have you not?

5         MR. BERNICK:  Objection to the form of the question.

6 A    I don't quite understand the question.

7 Q    One of the conservative, as you've coined it in your

8 reports, aspects of your analysis, I thought, was that you

9 assumed that a claimant had exposure to Grace asbestos for the

10 entire course of his working life, even if he had exposure to

11 non-Grace asbestos, correct?

12 A    I think we're getting it a little bit twisted.  I said

13 that I did not take a discounting value for buildings that

14 might have had -- or for situations that might have involved

15 non-Grace products.  I didn't scale the values down by assuming

16 that only 20 percent of the buildings had non -- had -- only 20

17 percent of the buildings had even sprayed on or troweled on

18 products and 80 percent didn't.  So, I could have scaled back,

19 saying, you know, it's a probability that people didn't go

20 every day to one of those 20 percent buildings, but I didn't.

21 It would also have been conceivable to collect information to

22 try to get what was Grace's share of that 20 percent.  I did

23 not do that, either.  So, if you mean that in this analysis I

24 assumed for these job categories that for that occupational

25 category it was a Grace exposure, that's correct.

1  Q    Continuously over 45 years?

2  A    That's right.

3  Q    Okay.  And despite that continuous exposure over 45 years

4  to Grace asbestos, counting no other exposures to anybody

5  else's asbestos, it's your view that 77 to 79 percent of these

6  people cannot scientifically plausibly claim that they got

7  their mesothelioma from that exposure?

8           MR. BERNICK:  I'm going to object to the form of the

9  question.

10  Q    Is that right?

11           MR. BERNICK:  Excuse me.  Object to the form of the

12  question.  If the question is whether her analysis assumes all

13  exposure to Grace asbestos, I understand that.  If the question

14  is her analysis assumes all exposure to Grace asbestos plus

15  whatever other asbestos exposure was, that's a different

16  question.  And I think we have to be clear in asking the

17  witness which hypothetical or which assumption we're asking her

18  to verify.

19           MR. MULLADY:  I don't think it's unclear at all.  And

20  the witness hasn't told me she didn't understand the question.

21  A    Well, I -- what I wanted to be clear --

22        Q    Excuse me.  I think there's a motion pending.

23           THE COURT:  Okay.  I think you need to restate the

24  question to make sure that it is clear which question you're

25  asking her, because I think in the process of her prior answer

**J&J COURT TRANSCRIBERS, INC.**

1  it did get a little muddled.  I'm not sure your question did,

2  but I think --

3          MR. MULLADY:  I'd be happy to rephrase it, Your

4  Honor.

5          THE COURT:  All right.

6  Q    Dr. Anderson, you've assumed for the Grace mesothelioma

7  claimants that for the 45 years that they have worked in the

8  construction trades, they have worked around Grace asbestos --

9  well, strike that.  Let me start over.  You've assumed that for

10 the 45 years of occupational experience of these construction

11 workers who have made claims against Grace that their only

12 asbestos exposure has been to Grace products, is that correct?

13 A    That's --

14 Q    Occupationally.

15 A    I have not addressed what other asbestos exposures they

16 may have had, and if that's the point of confusion -- this

17 analysis deals with the concentration data that comes from

18 these job categories that goes into my analysis without

19 discounting the possibility that some of these products could

20 have been non-Grace products.  These claimants may have had

21 other alternative exposures.  I did not deal with other

22 alterative exposures.

23 Q    But I thought you assumed that for the exposures -- for

24 the jobs that they were performing for the life of their

25 employment, that to the extent they had exposure to asbestos it

1 was Grace asbestos, am I wrong about that?

2 A    For this nature of exposure categories in this analysis,

3 we were analyzing the job-specific exposure concentration data,

4 the exposure frequency duration for these jobs for those

5 categories.  That's correct.

6 Q    Okay.  You've been doing consulting work for W.R. Grace

7 for over 20 years, is that right, Dr. Anderson?

8 A    I have had some -- I have worked for W.R. Grace

9 periodically at one point, and then not for a long period of

10 time at another point, so --

11 Q    Fair enough.  I think you told us at deposition that the

12 first case that you worked on many years ago was the school

13 class action case in the late 1980s?

14 A    Yes.  I did that, and then many, many, many years elapsed

15 before I worked for W.R. Grace again.

16 Q    In addition to working on that case for Grace, you've

17 worked on the ZAI attic insulation case, correct?

18 A    That's right.

19 Q    You've worked on the environmental cost recovery case for

20 Grace?

21 A    Correct.

22 Q    And now you're working for Grace on this estimation case,

23 is that right?

24 A    Yes.

25 Q    Other than Grace, as I understand it you've done

1  asbestos-related consulting work for the big three automakers;

2  Ford, Daimler-Chrysler, and GM, is that right?

3  A    Yes.

4  Q    You've never been retained by an individual asbestos

5  plaintiff or plaintiff attorney in an asbestos case, or offered

6  testimony in an asbestos personal injury case at the request of

7  a plaintiff's attorney, is that correct?

8  A    No, I haven't.  I've never been asked.

9  Q    Is it fair to say that all of your asbestos-related work

10 for litigation purposes has been done for defendants, and none

11 of it has been done for plaintiffs?

12 A    No.

13 Q    It's not fair to say, or that's true?

14 A    That's not true.  I did litigation-related work on

15 asbestos while I was at EPA, and that's not for defendants, so

16 I don't know how you classified it.  But I was very active in

17 the Reserve Mining case, which was an early -- the earliest, I

18 think, environmental case involving asbestos exposure,

19 particularly by ingestion.

20 Q    If I confine my question to your private practice, would

21 that be a correct statement?

22 A    Then -- would you ask me the question again?

23 Q    Yes.

24 A    Sorry.

25 Q    That in your non-governmental private consulting practice

Anderson - Cross/Mullady                          125

1  you've never undertaken to consult for the plaintiff's side of

2  an asbestos matter, is that correct?

3  A    I said I've never been asked.  That's correct.

4  Q    And you never -- okay.  Fair enough.  Something, as I

5  understand it, you've also never done for Grace before this

6  estimation proceeding is to use risk assessment to opine in an

7  individual personal injury asbestos case that a plaintiff

8  bringing a claim against Grace did or did not have a

9  meritorious claim, is that correct?

10 A    That's correct.

11 Q    Do you agree, doctor, that the point of all risk

12 assessment modeling is to determine population risk, not

13 individual risk?

14 A    No.

15 Q    Did you review the expert reports of Dr. Peter Lees in

16 this case?

17 A    Yes, I did.

18         MR. MULLADY:  Can we have ACC/FCR-535, please?

19         MR. BERNICK:  Do we have a copy of any of these

20 exhibits that you're going to use?

21         MR. MULLADY:  Jim?  Sorry.

22         THE COURT:  What's the exhibit number, please?

23         MR. MULLADY:  535.

24         THE COURT:  All right.

25         MR. BERNICK:  Can we get a bunch of them, so we don't

1 have to keep on doing this?

2          MR. MULLADY:  We can give you the deck.  Give one to

3 the Court.  Thank you.

4 Q    What we have on the screen, Dr. Anderson, Dr. Lees' -- I'm

5 looking for the date --

6          MR. BERNICK:  Can we get the rest?  I'm sorry.

7          MR. MULLADY:  I'm sorry.  We didn't have the -- okay.

8          MR. BERNICK:  Okay.  Go ahead.  I'm sorry.  Go ahead.

9 Q    We have Dr. Lees' July rebuttal report to the report of

10 Steven Hays (phonetic) on the screen.  At Page 6 Dr. Lees

11 writes in response to something Mr. Hays had said, "The point

12 of all risk assessment modeling, and in particular that

13 conducted by others as part of this case," and he's referring

14 to the estimation case, "is to determine population risk, not

15 individual risk.  Thus, the appropriate exposure assessment is

16 for the population, not individuals."

17          MR. BERNICK:  Your Honor, I would object to this line

18 of examination.  First of all, there can't be impeachment

19 because it's not her statement.  Second, if it's offered for

20 the truth of the matter asserted in the report, that's

21 improper.  And further, it violates the stipulation.  Under the

22 stipulation in this case, whatever it is that the witness has

23 reviewed but not relied upon cannot be used for any purpose in

24 connection with the examination of the witness.  I don't think

25 it's been established that she relied upon this report.

1    MR. MULLADY:  That grossly overstates the

2 stipulation, Your Honor.  In no way --

3    MR. BERNICK:  Well, let's get the stipulation,

4 because I believe that's exactly --

5    MR. MULLADY:  Mr. Bernick?  Excuse me.  There is no

6 limitation on the use of impeachment material in cross

7 examination of experts.

8    THE COURT:  Well, that may be, but this is not proper

9 impeachment.  This isn't this witness' statement, so you can't

10 impeach her with somebody else's statement.

11    MR. MULLADY:  Fine.  I'll move on, Your Honor.  Thank

12 you.

13 Q    Have you read the trial testimony of your former

14 colleague, Dr. Rodricks, in this case?

15 A    No, I haven't.

16 Q    Are you aware of what Dr. Rodricks' views are with respect

17 to risk assessment?

18 A    I'm sorry.  I'm not quite hearing you.  Am I aware of?

19 Q    I'm sorry.  Are you aware of Dr. Rodricks' testimony about

20 the use of risk assessment that he gave in this trial, in this

21 proceeding?

22 A    I'm not entirely aware of exactly what he said.  I've

23 known Dr. Rodricks for so many years.  We've served on so many

24 panels together, I know his views.  I can probably imagine what

25 he said, but I have not seen the transcript.

1  Q    Do you agree with the general proposition that regulatory

2  risk-based standards are not useful to evaluate disease

3  causation in particular individuals?

4  A    Not as a declarative sentence, and I can tell you why.  It

5  is useful and proper to use the approaches and guidelines of

6  public health agencies if you can -- if you are seeking to rule

7  out a risk; that is, you would calculate the upper-bound risk,

8  and if the risks don't exceed that, then you know that you

9  don't have a risk.  But if they are lower than that, you can't

10 use the public health agencies' approaches to define a real

11 risk because they are overstatements.  But if your risk is

12 lower than that, you can be quite certain that you're not

13 dealing with a risk.  And I did something similar here with the

14 screening exercise.

15 Q    Do you agree that to assess disease causation in an

16 individual you have to look at that specific individual's

17 exposure?

18 A    Well, not necessarily, because if an individual -- I mean,

19 everybody would like to know exactly all the details of every

20 situation, whether it's an individual or a population.  It's

21 usually not possible.  But in this exercise the analysis

22 addressed exposure to jobs, job categories.  If an individual

23 is in one of these job categories, I think it's a fair

24 appraisal of the data, fair analysis of the data to say if this

25 person is in this job, this would be the likely exposure to

1  that person if they had the long-term exposure, and so forth.

2  Q    All right.  Well, we're going to spend some time on that

3  in a few minutes.  Let me ask you first, though, before we get

4  to that, about the methods that you used to review and comment

5  on the information submitted by the mesothelioma claimants

6  against Grace.

7  A    Okay.

8  Q    As I understand it from your report, you reviewed

9  materials submitted by 1596 people who have filed claims

10  against Grace alleging that they developed mesothelioma because

11  of exposure to asbestos in Grace products, correct?

12  A    That's right.

13          MR. MULLADY:  And could we have ACC/FCR-432, please?

14  Actually, we don't need that.  You can take that down.

15  Q    The material that you reviewed, as I understand it,

16  consisted of PIQs that were submitted by the claimants, along

17  with any attachments and supporting material, correct?

18  A    We did review that, yes.

19  Q    Yes.

20          MR. MULLADY:  Could we go to the ELMO, please?

21  Q    Now, before I get into my questions about your analysis of

22  that data, I want to get something -- make something perfectly

23  clear for the record that I saw -- that you had actually given

24  us on this C, orhart 2291, which is on the ELMO, and that is

25  that 66 percent of the mesothelioma claimants against Grace did

Anderson - Cross/Mullady                    130

1  not provide sufficient information to put them into a nature of

2  exposure category.  Is that correct?

3  A    That's correct.

4  Q    So, your analysis concerns less than half, specifically,

5  44 percent of the mesothelioma claimants who have brought their

6  claims in this bankruptcy case against Grace.  Is that correct?

7  A    The slide says that 66 percent of those claimants did not

8  provide sufficient information to be classified.

9  Q    So, 66 percent of the data that would have been -- strike

10  that.  And then your procedure was, if a mesothelioma claimant

11  identified a nature of exposure code for his direct exposure in

12  Part 3 of the PIQ, that you accepted that definition as an

13  accurate determination of his nature of exposure?

14  A    That's right.

15          MR. BERNICK:  Let me -- if they filled out the form

16  that way, or what was the --

17          MR. MULLADY:  I'll repeat the question.

18          MR. BERNICK:  I'm sorry.

19          MR. MULLADY:  For counsel's benefit I'll repeat the

20  question.

21          MR. BERNICK:  Thank you.

22  Q    If a meso claimant identified a nature of exposure code

23  for his direct exposure in Part 3 of the PIQ, you accepted that

24  identification as an accurate determination of his nature of

25  exposure?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I put -- that person would have gone into that nature of

2  exposure category.  I didn't say it was accurate.  I said we

3  didn't second guess what the SEF identifiers checked.  We

4  didn't try to prove or disprove that they checked the correct

5  box.

6  Q    Understood.  I just want to make sure -- let's go to

7  ACC/FCR-432 to your report.

8          UNIDENTIFIED SPEAKER:  It's off the ELMO.

9          MR. MULLADY:  This ELMO versus big screen is the

10 aptitude test in this courtroom for the lawyers, and we all

11 fail it.

12 Q    We have your report on the screen.

13         UNIDENTIFIED ATTORNEY:  Speak for yourself.

14 A    Which of my reports?

15 Q    This is the July 31 report, I believe --

16 A    Okay.

17 Q    -- is that correct?  And I want to look at Page 11, where

18 I took the language from the question I just asked you.  Only

19 363 of the 1596 mesothelioma claimants identified a nature of

20 exposure code for their direct exposure in Part 3 of the PIQ.

21 That wasn't what I was looking for.  I'm looking for --

22              (Pause)

23         MR. BERNICK:  You may try the paragraph right above

24 that one.  I thought that had a -- "I did not further review

25 the materials submitted.  I accepted the state of exposure

1  categories."

2          MR. MULLADY:  Well, that wasn't exactly the language

3  that I -- but let's move on past this point.

4  Q    Is it correct that if there was a code identified you did

5  not further review the materials submitted by these claimants,

6  and you accepted the nature of exposure category they

7  identified in support of their claims.  Is that correct?

8  A    That's right.

9  Q    All right.  Now, in assigning the remaining 1233 claimants

10 to the nature of exposure categories on the basis of the

11 material in the PIQs and attachments, you instructed your team

12 to use their best judgment and take a series of steps which are

13 set out on the slide I'll bring up now, which is ACC/FCR-432.

14 It's part of your July report, third paragraph.  Okay.  If the

15 exposure -- these are the three steps you told your reviewers

16 to use, correct?  And one of which was to examine the PIQ --

17         MR. MULLADY:  We need to see all three steps.  Let's

18 go to Paragraph 4.  I think that's what I'm looking for.

19 Q    "Examine the PIQ and all attachments for any information

20 regarding the nature of exposure to Grace products in order to

21 assign the claimant to an appropriate category.  If the

22 description provided included the relevant keywords, such as

23 mix, remove, cut or install, or otherwise provided information

24 that could be reasonably -- could be reasonably interpreted to

25 mean that the claimant engaged in these activities, the

1 appropriate nature of exposure was checked." Did I read that

2 correctly?

3 A    Yes.

4 Q    So, the PIQs asked the claimants to provide information

5 -- strike that.  The PIQs did ask claimants to provide

6 information on non-Grace exposure, as well as Grace exposure,

7 correct?

8 A    I think, yes.

9 Q    And I think you told us on direct that your task was to

10 look for the Grace exposure and consider that, and that you

11 didn't consider the non-Grace exposure, but let's take a look

12 at one of the PIQs just to get a reference point for where this

13 question was asked about non-Grace exposure.

14           MR. MULLADY:  Can we have ACC/FCR-3017?

15           MR. BERNICK:  I don't understand the preparatory

16 statement made by counsel, but if it -- if it's not material to

17 the question, I guess I don't have an objection.

18           THE COURT:  I'm sorry.  What exhibit is this, please?

19           MR. BERNICK:  There was a preparatory statement made

20 by counsel as an introduction to showing this particular

21 document, and I didn't understand the preparatory statement,

22 but if it doesn't have anything to do with the question that's

23 now going to be asked, I guess it's not a problem.  It's a

24 little bit confusing.

25           THE COURT:  What exhibit are we looking at, please?

1          MR. MULLADY:  I'll begin again.

2  Q    Did you tell us on direct examination, Dr. Anderson, that

3  you did not consider the claimant's non-Grace exposure in

4  performing your analysis?

5          MR. BERNICK:  Objection to the form of the question.

6  A    Well, I mean, it was not part of the analysis, but I did

7  present some information in my report, and I mentioned today

8  those claimants that had filed other claims claiming other

9  exposures.

10 Q    But the instructions you gave to your reviewers were to

11 look for evidence of exposure to Grace asbestos-containing

12 products and only Grace asbestos products, correct?

13 A    Well, the whole -- as I defined the initial question

14 today, the question was, did these claimants have the

15 mesothelioma disease from exposure to a Grace product group,

16 and that is the question I sought to answer.

17 Q    All right.  And where I was a minute ago I was asking --

18 about to ask you about the questionnaire's inquiry about

19 non-Grace exposure.  Even though the PIQs asked the claimants

20 to provide information on non-Grace exposure, that was not

21 considered by you in assigning a claimant to a nature of

22 exposure category, correct?

23 A    That's correct, because the nature of exposure categories

24 were specifically to Grace products.

25 Q    So, in the case of the claimant who submitted the PIQ

1 that's on the screen, which is ACC/FCR-3017, Section 3, or Part

2 3, would have been the place where he would have identified

3 himself, or not, into one of the PIQ categories, correct?  I

4 have the wrong section.

5          MR. BERNICK:  Well, I also -- I mean, I -- we have

6 not received any notice of this before.  It is a very

7 substantial document.  I'll note that there were objections to

8 our proffering any of these PIQ responses into evidence, and we

9 now have one that's being shown to the witness --

10          MR. MULLADY:  I haven't offered it.

11          MR. BERNICK:  I don't -- I'm sorry?

12          MR. MULLADY:  I haven't offered it, and I don't

13 intend to.

14          MR. BERNICK:  Well, I don't understand on what basis

15 it's coming before the witness.  It's not an impeachment

16 document.

17          THE COURT:  How can she use it if you're not offering

18 it?

19          MR. MULLADY:  No.  It's marked for identification

20 purposes, and we're using it to establish a reference point for

21 her analysis.  It's --

22          THE COURT:  Okay.  I don't know where we're going.

23 Let's just get the evidence in and find out what we're doing

24 with this.

25          MR. MULLADY:  Okay.

Anderson - Cross/Mullady                136

1  Q    So, this particular claimant identified --

2            THE COURT:  What section are we looking at?

3            MR. BERNICK:  Could we make sure --

4            MR. MULLADY:  We're in Part 3 of the PIQ.

5            THE COURT:  All right.

6            MR. MULLADY:  This is the PIQ of John Wiesniewski,

7  (phonetic), Sr.

8  Q    And Mr. Wiesniewski, as his direct exposure to Grace

9  asbestos-containing products, lists his nature of exposure as D

10  and E.  Do you see that?

11  A    I see that that's what this seems to say.

12            MR. BERNICK:  What page are we on?  I'm sorry.  Okay.

13  I'll find it.  I'll find it.

14  Q    Now let's go to Part 5 on Page 11.  This is the section

15  asking the PIQ claimant about his exposure to non-Grace

16  asbestos-containing products.  And you see here where Mr.

17  Wiesniewski identified his exposure at site of exposure one the

18  nature of exposure he listed was A.  Do you see that?

19  A    I see that.

20  Q    He was a mixer of asbestos-containing products?

21            MR. BERNICK:  Non-Grace --

22  Q    Non-Grace.  Correct?

23  A    I can't know, because this is an entire file.  This would

24  appear, just from this much information out of a whole file, to

25  say that he was an A when he was working with Johns Manville

1 products, I suppose, but that's pure speculation because I

2 can't sit here and review this whole file.

3 Q    Of course.  And I'm not going to quiz you about this file.

4 The purpose of -- my question is to understand your process.

5 Your process would have been that your reviewers would not have

6 considered this A designation by Mr. Wiesniewski for his

7 non-Grace exposure in determining what category to place Mr.

8 Wiesniewski for purposes of this case, correct?

9          MR. BERNICK:  For --

10 A    Well, I can't say that without seeing the whole file,

11 certainly not with this line that says he was a sprayer with

12 the Johns Manville product.  I don't know what else is in this

13 file.

14 Q    Okay.  We can take this down.  And would you agree with

15 me, Dr. Lees -- excuse me -- Dr. Anderson, that the data that

16 you got from Dr. Lees also only deals with exposure to Grace

17 products?

18 A    That was the intention.

19 Q    All right.  Now, I want to ask you now about your use of

20 Dr. Moolgavkar's doubling dose benchmarks.  You understood

21 those benchmarks to represent levels of exposure that, by

22 themselves, would be sufficient to cause disease, correct?

23 A    No.

24 Q    Okay.  Let's take a look at your report -- let me ask a

25 predicate question.  Would you agree with me that some of Dr.

1  Moolgavkar's benchmarks, such as the 3.2 fiber years for mixed

2  asbestos fibers, that that benchmark represents a level of

3  exposure where the relative risk would be two?  In other words,

4  referencing a doubling dose of the amount of asbestos necessary

5  to cause mesothelioma.

6  A    I believe, first of all, that's misidentified.  I don't

7  believe that benchmark is Dr. Moolgavkar's, but I would like to

8  get back to my benchmark.  I think that's the mixed fiber

9  benchmark --

10  Q    Yes.

11  A    -- that came from the EPA analysis, and not from Dr.

12  Moolgavkar.  And I believe I previously stated that that one is

13  not an appropriate benchmark, really, because it contains

14  chrysolite fibers that are known to be greatly more potent

15  than the tremolite and chrysotile fibers that we are dealing

16  with here.

17  Q    All right.  I heard you say that on direct.  I'm simply

18  asking you if that benchmark represents mesothelioma with a

19  relative risk of two.

20  A    I think that was calculated by EPA from their data with

21  the mixed fibers, but I don't have the benchmarks here.  Just a

22  minute.  Let me find them.

23                          (Pause)

24            MR. BERNICK:  That would be -- you need an exhibit

25  number, Dr. Anderson?  Or --

1          THE WITNESS:  Yes.  It was on the exhibits, so I can

2   find it, perhaps.

3   Q    I don't know if this is the one you're looking for, Dr.

4   Anderson, but I've put GG-2285 on the ELMO.  This is the

5   comparison of screening to benchmarks.

6   A    Yes.  And that is the one --

7   Q    All right.  And you see --

8   A    -- that I mentioned earlier.

9   Q    Yes.  And you see where, on this slide that you prepared

10  --

11  A    Um-hmm.

12  Q    -- for us, you have the 3.2, and then you say meso, RR,

13  that means relative risk, correct?

14  A    Relative risk of two.  I just wanted to be absolutely

15  certain.  That's taken from the EPA analysis --

16  Q    Right.

17  A    -- for the mixed fibers that contain chrysitolite.

18  Q    Let's go to Dr. Anderson's report at Page 8, please, the

19  July report.

20          MR. BERNICK:  Is that 432?

21          MR. MULLADY:  432.

22  Q    You addressed benchmarks on this page of your July report,

23  and I'd like to refer you to the section of benchmarks under

24  the heading relative risk, RR of two.  And for the record, what

25  we have here are four benchmarks, correct?

1  A    Yes.

2  Q    Four different diseases in different fiber types, correct?

3  A    Yes.

4  Q    And let's go up to the paragraph that leads in this

5  section.  A number of these levels were taken from Dr.

6  Moolgavkar's review of relevant epidemiological literature, and

7  his analysis of dose response relationships.

8  A    Correct.

9  Q    Do you know how many of the RR of two benchmarks that we

10 just referenced were taken from Dr. Moolgavkar's review of the

11 relevant epi literature, and his analysis of dose response

12 relationships?

13 A    Yes.  I think so.  He did the Libby fibers work -- the 8.9

14 came from his work.  I am not certain that he did the original

15 work, or if he was reviewing and agreeing with the work of

16 others for the benchmark 79.0 and 100 to 278.  I think those

17 have been previously mentioned by others, and I think he

18 derived his own, as well.

19 Q    Now, a doubling of the risk, am I correct that that

20 implies that the probability of the disease being caused by the

21 exposure is greater than 50 percent, that is, it is more likely

22 than not that the disease was caused by the exposure?

23       MR. BERNICK:  Objection to form.  What disease?

24 A    That is a theoretical statement when you're in this -- and

25 I'll tell you why.  When you're in the inference zone that I

1 spoke about earlier, the only way to calculate that relative

2 risk of two is to assume some shape to the dose response curve.

3 And I mentioned earlier that in 1976 when we adopted that

4 linear non-threshold curve, and this whole concept of

5 extrapolating outside of a range where we had actual

6 information, it was novel at the time.  We said it was a

7 default approach to establish an upper bound on the risk, so to

8 use these modeling exercises to establish a relative risk of

9 two in those zones does have inherent uncertainties that are

10 modeled that are not based on scientific information but must

11 rely on modeling information, an assumed shape to the model.

12          MR. MULLADY:  Sorry.  I did it again.  Can we have

13 ACC/FCR-431, please?

14          UNIDENTIFIED ATTORNEY:  Which one is that?

15          MR. MULLADY:  This is the June report of Dr.

16 Anderson, at Page 4.

17 Q    This is the supplemental report that you did in this case.

18 You had three reports for the estimation proceedings, as I

19 understand it.  And --

20 A    I'm sorry.  Which report is this?

21 Q    This is the June report, Dr. Anderson.  And in this report

22 you gave us some background on relative risk, which we see

23 here.  You give us a definition, and then you tell us what a

24 doubling of the risk implies.  I believe it's beginning with

25 the sentence "As Dr. Suresh Moolgavkar indicated in his expert

1  report, the standard linear relative excess risk model used by

2  EPA for lung cancer --"  No, that's not what I was looking for.

3                              (Pause)

4  Q    Ah.  I'm sorry.  The paragraph before this.  "A relative

5  risk greater than two is equivalent to the excess risk from the

6  exposure being greater than the risk without the exposure."

7  First of all, is that a true statement?

8  A    That is generally true in the abstract, and if you go down

9  to just where you were, you will see what I'm talking about,

10  where it says using models employed by EPA at the very bottom

11  of that page, the first thing outside that observed range that

12  I say there, and quoting what he did, is that he assumed a no

13  threshold dose response model, and that's what I was trying to

14  address.  Yes, conceptually that's what a relative risk of two

15  is.  How one gets there when they must rely on an assumed shape

16  to a model that we know is not confirmed, is not scientifically

17  confirmed, adds that degree of uncertainty to that relative

18  risk of two.

19  Q    Sure.

20  A    One is a definition of the relative risk of two, and I

21  just spoke to, in some cases, what one must do to make that

22  calculation.

23  Q    Right.  And right after the sentence I just read, you

24  wrote in your report, and I quote, "It implies that the

25  probability of the disease being caused by the exposure is

1  greater than 50 percent, i.e., it is more likely than not that

2  the disease was caused by the exposure." Did I read that

3  correctly?

4  A    Conceptually that's correct.

5  Q    Now, I want to turn back to your July report, 432, at Page

6  9, where you talk about the B, D, and E claimants' exposure.

7  And you say that, "Furthermore, these exposures have not been

8  demonstrated scientifically to contribute to the risk of

9  disease even when added to other significant exposures." That

10 was your opinion, correct?

11 A    That's right.

12 Q    Now, let's go to table -- the figures in table section of

13 this report to Figure 2.  And in this Figure 2 you show the

14 estimated cumulative exposures for B, D, and E claimants --

15 excuse me -- you show the estimated cumulative exposure for

16 mesothelioma claimants who provided sufficient information on

17 exposure in the B, D, and E categories to Grace products.

18 Correct?

19 A    That's right.

20 Q    Now, in Figure 2 you have not added any other, quote,

21 significant exposures, or, quote, other significant exposures,

22 to these claimants' Grace exposures.  Isn't that right?

23 A    That's correct.

24 Q    Okay.  In fact, nowhere in your analysis have you taken

25 the B, D, and E claimants' cumulative exposures to Grace

Anderson - Cross/Mullady                    144

1  products and added in exposures to any non-Grace products.  Is

2  that correct?

3  A    That's correct, because I was addressing the specific

4  question that I stated earlier, what are the exposure to the

5  Grace product groups, and could they have been associated with

6  disease causation?  And what I said earlier is, when we found

7  that these levels are so low, so very, very low under such

8  extreme assumptions, it would be highly unlikely that these

9  very small incremental amounts would be meaningful in the

10 context of any kind of causal relationship.

11            MR. MULLADY:  All right.  Thank you, Dr. Anderson,

12 but Your Honor, I would move to strike everything after the

13 witness answered my question yes.

14            THE COURT:  No.  She's entitled to explain her

15 answer.  That's denied.

16 Q    All right.  Now, Dr. Anderson, I want to talk to you about

17 the concept of substantial contributing factor.  Substantial

18 contributing factor to you means that there is enough exposure

19 to have made a convincing case that the exposure was just that,

20 that it could cause the disease, or substantially contribute to

21 the causation of disease.  Is that correct?

22            MR. BERNICK:  Objection to the form of the question.

23 You've got at least two different questions in there.

24            THE WITNESS:  What I have said --

25            THE COURT:  I'm sorry.  I believe the objection is

1  sustained.  I think you do have a compound question.  Rephrase,

2  please.

3  Q    Does substantial contributing factor to you, Doctor, mean

4  that there's enough exposure to have made a convincing case

5  that the exposure could cause disease or substantially

6  contribute to the causation of disease?

7  A    May I give you a three-fold answer?  The first is, I think

8  the substantial contributing factor is something I've heard in

9  the legal context, not in the scientific context, so I -- I

10  don't speak to that issue legally.  I'm not an attorney.

11  Secondly, in the scientific context what I have said is I know

12  when we can observe information.  I mentioned that the National

13  Academy of Sciences committees convened under the Institute of

14  Medicine, routinely do this.  They consider that observed

15  range, and they quote this.  They get their protocol before

16  they start these studies, and I mentioned one study.  When

17  you're in that observed range, we have observed from, if the

18  studies are consistent, good epidemiology studies, well

19  conducted, well designed, and if we observe the relationship we

20  have a scientific basis for then saying that there is an

21  association between the exposure and the effect.  As we depart

22  from that observed range into the range of inference,

23  particularly down in very, very low ends of that range, that

24  can't be said.  So, I don't know if that can answer your

25  question, but that's kind of my three-part answer.

1  Q    Well, assuming, hypothetically, that Dr. Moolgavkar's

2  doubling dose benchmarks represent a level of exposure that

3  would be sufficient by itself to cause disease, then logically,

4  some level of exposure less than the benchmark level could

5  contribute to the disease, could it not?

6          MR. BERNICK:  Objection to the form of the question.

7          THE COURT:  What's the objection?

8          MR. BERNICK:  Objection to the form of the question.

9  I mean, the first part of it was that assuming the doubling of

10 dose means that it can cause, then I think logically something

11 less than that could contribute.  I don't know what the -- what

12 the question asks for.  What kind of logic are we talking

13 about?  Are we talking about science?  Are we talking about

14 logic?  Are we talking about data?  And what does he now mean

15 by contribute?  He's started out with a legal term, substantial

16 contribution.  The witness says she doesn't deal in substantial

17 contribution.  What does he mean by contribute?

18         THE COURT:  Wait.  That was a different question.

19 This is a doubling dose question.  But --

20         MR. BERNICK:  But he then said -- presumably that

21 means, or logically that means that something less than the

22 doubling dose could contribute --

23         THE COURT:  Contribute.  Yes.

24         MR. BERNICK:  And that's the problem, is could

25 contribute.  And why is it logical?  Or is he asking a pure

1  logic question, or is it based upon the witness's scientific --

2  I mean, what is it?

3             THE COURT:  All right.

4             MR. MULLADY:  I'll rephrase the question and try to

5  put it in scientific terms as a non-scientist.

6  Q    If the doubling dose benchmarks represent a level of

7  exposure that would be sufficient to be the sole cause of

8  disease, then isn't it scientifically plausible that some less

9  -- some exposure less than the benchmark could contribute

10 substantially to the cause of that disease?

11 A    I think I can agree with the first part of what you've

12 said, because I've just said the doubling dose information,

13 conceptually the first statement that you read to me is

14 correct.  In fact, when we are forced to make, or when Dr.

15 Moolgavkar is forced to make doubling dose calculations and

16 inference part of the knowledge base that we have, and he must

17 employ this linear non-threshold model, the first part of your

18 statement is uncertain.  I mean, we can't assume that that's

19 the exact level at which we would assume a disease to occur.

20 And if you're asking me if a very small amount as I've defined

21 and found in this analysis for the B, C and D -- I mean, sorry,

22 the B, D and E categories would be substantially contributing,

23 I think from this analysis we see as we even get the additional

24 duration data that we have such very, very low exposures that I

25 think it's highly improbable that they can make any

1 contribution.  And that's been my testimony before.

2 Q    I want you to assume, nonetheless, hypothetically --

3 hypothetically, that a Court could find that a two percent

4 contribution to a claimant's risk of disease is sufficient for

5 legal liability.  All right?  That's the hypothetical

6 assumption I'm asking you to make for purposes of my questions

7 only.  With that assumption, I want to look at Dr. Moolgavkar's

8 benchmark of three -- or, the benchmark of 3.2 fiber years for

9 the doubling dose for mesothelioma for chrysotile and amphibole

10 fibers.

11          MR. MULLADY:  Can we have ACC/FCR-432, the July

12 report, at Page 8, please?

13 Q    Two percent of the 3.2 fiber years benchmark would be .064

14 fiber years.  I've done the math.  Does that sound about right?

15 A    I'm sorry?

16 Q    Two percent of 3.2 fiber years I've calculated as .064

17 fiber years.  I would represent to you that's the way the math

18 comes out.  Does that sound right to you?

19          MR. BERNICK:  Is it zero point six four?

20          MR. MULLADY:  Yes.

21          THE WITNESS:  I don't have a calculator --

22          MR. BERNICK:  That can't be right.

23          MR. MULLADY:  .064.  I can't read my own notes.

24 .064.

25 A    I don't know what you're asking me.  First of all, I've

1 said that that benchmark is -- they are just for completeness

2 sake.  It doesn't apply in this case because of the

3 chrysitolite term, and I have said in my deposition, and I feel

4 very strongly as a scientist that in the abstract I can't make

5 statements about some --

6 Q    I haven't asked you your question yet, ma'am.

7 A    Well, you asked -- I thought you asked me if that

8 percentage --

9 Q    I've just asked you if the math -- if you will accept my

10 math, that two percent of 3.2 is .064.  And then I'm going to

11 ask you a question.

12 A    I hate to tell you this, but I virtually never accept

13 somebody telling me something.  I don't have a calculator here.

14 If someone -- have we verified that?

15      MR. BERNICK:  For purposes of this question, Dr.

16 Anderson, we'll stipulate that Mr. Mullady did the calculation

17 right so we can proceed.

18      MR. MULLADY:  Even though I couldn't say it --

19      MR. BERNICK:  Even if you couldn't say it, .064

20 sounds like it is two percent of 3.2.

21      THE WITNESS:  Okay.

22      MR. MULLADY:  I think it is.  All right.

23 Q    So, let's look at your Figure 2, and I will have a

24 question for you in a minute, I promise.  Let's go to Figure 2

25 from your July report.  Each one of these bars represents your

1  estimate of the number of B, D, and E claimants that fall

2  within each of the cumulative exposure ranges, correct?

3           MR. BERNICK:  As of the time of the report or today?

4           MR. MULLADY:  As of the time of the report.

5  Q    Is that correct?

6  A    That's right.

7  Q    All right.  And there are 330 B, D, and E claimants total

8  represented in this figure, right?

9  A    I think that's right.

10 Q    Okay.  Now, based on your calculations, all claimants to

11 the right of this first bar here, so beginning with the number

12 57, and adding all of these individuals across the graph, have

13 exposures of greater than .1 fiber years, correct?

14 A    I'm sorry.  Where are you?

15 Q    All of the people to the right of this first bar here,

16 beginning with this group in the --

17 A    All right.

18 Q    -- in the .1 to .2 range, and all the way down, have

19 exposures greater than .1, is that right?

20 A    That's right.

21 Q    Okay.  So, if a Court were to accept .064 fiber years as

22 sufficient to be a substantially contributing factor, that

23 would pull in all of the B, D, and E claimants on your chart to

24 the right of the first bar?  72 percent of these claimants, by

25 my math.  Would that be correct?

1  A    I don't see how you're getting there at all.

2  Q    Well, I'm just asking you for purposes of my hypothetical

3  question.  If a Court were to determine that .064 fiber years,

4  which is two percent of the benchmark of 3.2, is sufficient to

5  be considered a substantial contributing factor for

6  mesothelioma causation, that that would bring into the mix, as

7  opposed to excluding them, 72 percent of the B, D, and E

8  claimants on whose -- who you've identified in this chart?

9          MR. BERNICK:  Your Honor, we'd let the witness

10 answer, but --

11 A    That's --

12         MR. BERNICK:  Go ahead, answer.

13 A    That's so incredibly unlikely --

14 Q    I'm not asking you to agree with the hypothetical.  I'm

15 just asking you if that would be the result if the hypothetical

16 assumptions were correct.

17 A    I -- I think that giving me an implausible hypothetical

18 and asking me to agree with it is not something I'm comfortable

19 doing.

20 Q    Maybe --

21 A    To me it makes no scientific sense to form that

22 hypothetical because you're talking about, one, a benchmark

23 that doesn't apply to the data; and two, a two percent part of

24 that benchmark.  And, first of all I've said that even a

25 doubling dose is not something that I consider in the abstract

1 a causal benchmark.  I've presented them all because when

2 they're outside the observed range the modeling that's

3 necessary renders a great degree of uncertainty.  I think all

4 of this in the aggregate, as we depart from the observed range

5 and goes down does provide information.  I think to say

6 hypothetically that a two percent of a doubling dose number in

7 the inference zone would be a substantial contributing factor

8 is highly unlikely.

9 Q    Well, but --

10         MR. BERNICK:  I don't think the witness has answered

11 the question.  I really think that if you go back and take a

12 look at the chart you made a -- just made a mistake in looking

13 at that number.  It's .06.

14         THE COURT:  It's .064, not .64.

15         UNIDENTIFIED ATTORNEY:  That would pick up a hundred

16 percent.

17         THE COURT:  Yes.  He corrected that.  But then I

18 don't think he corrected it on -- in his question.

19         MR. BERNICK:  The chart -- the chart says greater

20 than zero and less than .1.  So, all of it --

21         MR. MULLADY:  Yes.

22         MR. BERNICK:  -- would be within that first bar --

23         MR. MULLADY:  That's correct, Mr. Bernick.  Correct.

24 They would all -- it would be a hundred percent.

25 Q    Doctor, on the two percent I think you've told us that you

1  don't -- you're not here to tell the Court what the legal

2  standard is for substantial contributing factor, correct?

3  A    I said that I know what I would regard as a scientist to

4  have contributed or not.

5  Q    I didn't ask you that.  I asked you whether you're here to

6  express a view on the legal standard for substantial

7  contributing factor causation, and you're not, correct?

8  A    I can express scientific opinions and not express any

9  legal standards.

10 Q    All right.  And so, you can't express an opinion that a

11 two percent standard is or is not reasonable.  That's not just

12 something you're here and capable of discussing if that is --

13 A    I said --

14 Q    -- a legal standard?

15 A    I said scientifically I find it implausible.

16 Q    Fair enough.  All right.  Now, I'd like to look at just

17 three slides that review the criteria on which you conclude

18 that certain claimants don't have merit against Grace.  And the

19 purpose of these next slides is to -- for me and the Court to

20 get a clear understanding of how you determined that these B,

21 D, and E claimants' claims were not meritorious.  So, let's

22 have FCD-104, please.  All right.  At the top we say "non-

23 meritorious claim?"  Meaning, the construct here is this is a

24 claim that you and your staff at Exponent are being asked to

25 consider and rule either in or out on the basis of the evidence

1 before you.  In the case of this first person we have a

2 claimant, and we'll -- first of all we're going to assume that

3 Dr. Moolgavkar's doubling dose benchmark for mesothelioma of

4 3.2 fiber years is correct.  And I understand --

5 A    Everything about that is wrong.

6 Q    I understand you disagree with that, but again --

7 A    It's not his benchmark, and it's a doubling dose for

8 fibers that don't apply in this case.

9 Q    All right.

10                      (Pause)

11 Q    Yes.  Just to clarify this issue of the 3.2 fiber years

12 benchmark, let's bring up your June report, at Page 5.  And

13 I'll just make sure we have a clear record on this.  You say at

14 the top of the page, "I used these values, as well as 3.2 fiber

15 years, a value calculated by Dr. Moolgavkar using a potency

16 determined by EPA to reflect both chrysotile and amphibole

17 fibers as benchmarks at which the risk of mesothelioma

18 doubles."  Did I read that correctly?

19 A    Sir, where are you?

20 Q    It's highlighted on the screen for your ease of reference.

21         MR. BERNICK:  What exhibit is that?  Which exhibit is

22 that?

23         MR. MULLADY:  431.

24         MR. BERNICK:  431?

25 Q    Do you see the highlighted language there, Dr. Anderson?

Anderson - Cross/Mullady                    155

1  A    Yes.

2  Q    Okay.

3        MR. BERNICK:   What page is it?

4  Q    The value was calculated by Dr. Moolgavkar, but what

5  you're saying is that he used a potency determined by EPA?

6  A    That's right.

7  Q    Okay.

8  A    And that's that linear non-threshold for the mixed fibers.

9  Q    But Dr. Moolgavkar calculated it?  So, just so that's

10  clear --

11  A    I don't recall whether EPA calculated it in their

12  lifetime, or whether Dr. Moolgavkar re-calculated it here.  I

13  say he calculated it, and I don't remember exactly, but it's

14  the EPA dose response curve.

15  Q    All right.  Let's go back to the hypothetical here.

16  Assuming that the doubling dose benchmark of 3.2 is correct,

17  it's the correct doubling dose benchmark to use, and you had a

18  claimant who had a working career of 45 years, all with Grace

19  products at an annual level sufficient to reach the 3.2

20  benchmark.  As I understand how you did your analysis, you

21  would not have regarded this claim as non-meritorious and not

22  warranting any further consideration.  This would be a claim

23  that would warrant further consideration.  Is that correct?

24  A    That's not correct.

25  Q    Why is that incorrect?

**J&J COURT TRANSCRIBERS, INC.**

1  A    What I said is I regarded all the benchmarks, particularly

2  giving weight to the ones in the observed range, and the others

3  to give a full spectrum of what had been available from the

4  dose response modeling including this with all mixed fibers.

5  And I said, as we depart from that observed range, the

6  benchmarks become less convincing that there is any risk

7  associated with the low level exposures.  And then I said that

8  the exposures to the B, C, and D categories were below all of

9  the benchmarks, so I was -- and I said in my deposition that as

10  we departed from the 15 fiber years, we became less and less

11  certain.  But I didn't draw a bright line at any one of the

12  benchmarks, and certainly not at this one.

13      We happen to be well below it, but this is not the most

14  appropriate benchmark by any means because of the contamination

15  by the chrysitolite fibers.

16  Q    So, you would have excluded this claimant?  This would be

17  a claim that you would not give further consideration to?

18          THE COURT:  Mr. Mullady, I'm sorry, but I'm confused.

19  Are you asking her whether she would have considered this as

20  part of the statistics that she was calculating to put into her

21  cumulative exposures?  Or are you asking her whether if she

22  were somebody doing a claims review and on an individual basis

23  she would be looking at this individual as somebody on an

24  individual basis to get further review?  I'm confused as to

25  what you're asking.

1          MR. MULLADY:  I'm asking her if the exposure that was

2   used for Category B, D, and E, if the -- if the dose, if you

3   will, was 3.2, and it was at the benchmark, would that claim

4   have passed through the filter such that there would be some

5   reliable evidence or some reliable science that it would -- it

6   should be considered further, or would it not make it through

7   the screen under the theory that there's no such evidence?

8          THE COURT:  But she isn't doing an individual claims

9   analysis.  She's doing population screening.

10          MR. MULLADY:  Right.  Well, for purposes of the

11  population screening, then.

12          MR. BERNICK:  Your Honor, could I -- could I be just

13  heard at sidebar for just half a moment so that we can continue

14  here?  But -- just for a moment?

15          THE COURT:  Yes.  Counsel approach the bench.

16          (Off the record discussion at sidebar)

17  Q   Okay.  Dr. Anderson, I apologize for that delay.  Going

18  back to -- I want to go back to your report, because I want to

19  put this in the terminology that you used in your report.  At

20  Page 9 --

21          MR. BERNICK:  The same report, 431?

22          MR. MULLADY:  Actually, this is the July report,

23  which is 432.

24          MR. BERNICK:  432.

25          MR. MULLADY:  Sorry.

1  Q    Okay.  Do you see where you write, in the second to last

2  paragraph here, Dr. Anderson, "For the benchmark signifying the

3  exposure at which the mesothelioma relative risk equals two, no

4  values for the B, D, or E claimants exceed 3.2 fiber millimeter

5  years, and exposure derived using EPA's value for potency,

6  which does not distinguish between chrysotile and amphibole

7  fibers."  And then, down further in this, the next paragraph --

8          MR. BERNICK:  For completeness could you read the

9  very next sentence?

10          MR. MULLADY:  Of course.

11  Q    "All the values are clearly below the doubling doses for

12  chrysotile and Libby amphibole of 79 and 8.9 fiber years,

13  respectively."  Okay?  "Based on these observations I conclude

14  that it is scientifically implausible that disease in Exposure

15  Categories B, D, or E can be attributed to exposure to any

16  Grace asbestos containing product.  As demonstrated above, for

17  claimants reporting exposure solely in categories B, D, or E,

18  it cannot be determined in a scientifically sound manner that

19  they had sufficient cumulative exposures from a Grace product

20  to cause disease.  Furthermore, these exposures have not been

21  demonstrated scientifically to contribute to the risk of

22  disease, even when added to other significant exposures.

23  Therefore, I conclude that these claims do not have merit, and

24  should not be considered further."  Now, going back to my

25  hypothetical, what I'm asking you is, since we have B, D, and E

1 in the range of that doubling dose, it is not below it, as you

2 say in your report.  It is at it.  Would that have been a claim

3 that does not have merit and should not be considered further?

4 A    Well, first of all, we're not at it.  We're below it.

5 Second of all, that is not the -- I mean, I didn't take just

6 one benchmark.  I've already said that's a benchmark, it's the

7 lowest one.  It came from the EPA dose response data that

8 contained chrysitolite.  If we look to the other benchmarks

9 that were here, I was discussing all the benchmarks, and I was

10 discussing the relative risk.  I don't know where that is now.

11 But I was discussing the relative risk from the Libby data,

12 which would be applicable to the products that contained VAI

13 only, and I was discussing the 78 number, close to 80, which is

14 applicable to the chrysotile, and if you mix, for some of the

15 products that were mixed between the two, the potency would lie

16 somewhere between there, so the more appropriate comparison

17 would be to the 80 for the VAI -- I mean, to the 8.9 for the

18 VAI, to the 80 for the chrysotile only products, and these are

19 mixtures, and to the somewhere in between, probably around 40

20 for the products that are mixed between the Libby vermiculite

21 and the chrysotile.  And so, I probably would have it -- in

22 your hypothetical I probably would have said that there's no

23 such evidence.

24 Q    Okay.  Let me ask you this, Doctor, and this kind of goes

25 back to where I started my cross examination on the assumption

1  you made about a continuous 45-year history of exposure, even

2  where you didn't have that evidence you did that to be

3  conservative.  I understand that's your opinion.

4  A    That's right.

5  Q    In the case of a worker, or let's say a group, a

6  designation, a category, if you had a certain period of

7  exposure to Grace products that was above the doubling dose

8  threshold, clearly comfortably above it, and you assumed --

9  strike that.

10          MR. MULLADY:  Let's go to FC-105.

11 Q    This is a little busy, this chart, and I'm going to walk

12 you through it.  We're trying to determine here how you would

13 have treated a claimant with exposure to non-Grace asbestos at

14 some point in his career, and Grace products.

15     What I've done here is asked you to assume that we have a

16 claimant who had an average TWA of .06, and he works 45 years

17 with Grace products and only Grace products.  Now, his

18 cumulative exposure would only be 2.7 fiber years, which is 45

19 times .06.  Does that make sense to you?

20 A    Well, first of all, this analysis is for these groups

21 exposed in these labor categories to Grace products.

22 Q    Right.

23 A    And if they got exposed to something else they didn't have

24 the 45 years for the Grace product.

25 Q    Okay.  Well, if they got exposed to something else,

1  though, you would assume that they had full occupational

2  exposure to Grace during that period of time, correct?

3  A    Well, if they -- if they got --

4        MR. BERNICK:  I'm sorry.  The question is that --

5  you're asking her whether if it's true that, in fact, they were

6  exposed to non-Grace product --

7        MR. MULLADY:  Right.

8        MR. BERNICK:  -- she nonetheless analyzes them as

9  being exposed for 45 years only to Grace products.

10       MR. MULLADY:  Yes.

11 Q    That's what you did, right?

12 A    What are you asking me?  I assumed that they got exposed

13 to these -- in these nature of exposure job categories only to

14 Grace products for 45 years --

15 Q    For 45 years.

16 A    -- in order to answer the question of how likely is it

17 that the Grace product exposure categories caused their

18 illness.

19 Q    Okay.  And in this hypothetical there's a nine-year period

20 when we don't know what he's doing, and his -- but his overall

21 exposure is below your benchmark, and I would assume that for

22 this person if he were a category you would say there's no such

23 evidence and he doesn't pass through your filter?  Correct?

24       MR. BERNICK:  Given the question that was being

25 posed, that question then cannot be asked.  Your Honor, this is

Anderson - Cross/Mullady                    162

1  about the fifth time that he's been through it.  If you make an

2  assumption of 45 years it excludes everything else.  If you

3  then want to include something else, you can't make the

4  assumption anymore.  This is why these slides --

5             MR. MULLADY:  That's what the next slide is.

6             MR. BERNICK: -- are a waste of our time.

7             MR. MULLADY:  They're not a waste of anybody's time.

8             THE COURT:  Well, that's what this slide is, too.

9  This witness has been very clear that she is assuming,

10 regardless of the fact that some individuals have acknowledged

11 that they have worked for other companies, filed claims against

12 other companies, had exposures to asbestos from other

13 companies, that in making these job description categories in

14 order to figure out whether Grace's product could have caused

15 the disease that the claimants are claiming against Grace, that

16 she assumed that they were exposed only to Grace's product

17 within those categories for 45 years.  That -- she said that at

18 least 15 times on the record.  So, the assumption that they

19 could have worked for anybody else in that 45-year period is

20 inconsistent with her assumptions.  Unless you want to say they

21 had a longer work history than 45 years, in which case all the

22 math changes.

23 Q    If you knew that the total cumulative exposure for a

24 category was above the doubling dose benchmark, but you also

25 knew that the Grace exposure represented -- embedded within

1  that total was below the benchmark, would it be your view that

2  the Grace exposure was a substantially contributing factor?

3  A    I think what I said earlier is exactly what I think is

4  appropriate.  This analysis was about looking specifically at

5  how -- at a very, very high screen value the Grace product

6  exposures could contribute.  Where anything was close, as in

7  the A's and C's, we said review on a case by case basis.  At

8  that point, it would be appropriate to look at other exposures.

9         In a hypothetical in the abstract, (1) this isn't an

10 individual review and (2) we could go through any number of

11 hypotheticals but that's just not going to help us and it

12 wasn't the subject of my analysis.  I have said that somewhere

13 else at some appropriate time these should be looked at on a

14 case by case basis.  And that's not what I was doing.

15 Q    Let me ask you about your use of Dr. Lees' work.  You told

16 us on direct examination you relied on data developed by Dr.

17 Lees, correct?

18 A    That is correct.

19 Q    You, yourself, however did not measure airborne asbestos

20 concentrations from application of Grace products in activities

21 such as spray on fireproofing.

22 A    No, I didn't and the hundreds and hundreds of risk

23 assessments I've done, I have not been the one to measure.

24 It's the usual circumstance.

25 Q    And you can't tell us about any site where you've ever

1 been to where Grace asbestos containing material was being used

2 by workers in the course of their jobs, correct?

3 A    Not that I recall.

4 Q    All right.  Now you used Dr. Lees' figures for

5 concentration of asbestos that workers would be subject to as

6 shown in your July report Table 1, correct?

7 A    I used -- I think I -- I think I heard what you said.  I

8 used Dr. Lees' TWA mean concentrations as a source of the

9 concentration term in my analysis.  That is correct.

10 Q    Let's take a look at how you used Dr. Lees' data.  Can we

11 go to your Table 4 in Exhibit 432?

12 A    Which report are you at?

13 Q    July 31.  I want to -- first of all let's go to the top.

14 This is Table 4, this is the screening level maximum asbestos

15 cumulative exposure by category of exposure and product type.

16 Correct?

17 A    This is correct.  This is one of my other analysis.  I

18 said that I did several levels of analysis.

19 Q    Yes.

20 A    And this is one of the other levels of analysis.  The

21 screening level values I've presented here today were the most

22 extreme upper bound assumption values.

23 Q    Okay.  You have a category here vermiculite and

24 chrysotile.  My question for you is do you know how many

25 studies Dr. Lees relied on for all the products in the mixed

1 vermiculite and chrysotile category?

2 A    I don't know how many.  I assume that Dr. Lees has

3 testified.  I don't recall exactly.

4 Q    If I were to represent to you that Dr. Lees only had seven

5 studies from ten work sites, would that sound about correct?

6        MR. BERNICK:  Object to the form of the question.

7 He's asking her to assume as a fact that that's what he said.

8 Object to the form of the question.  It purports to recite the

9 testimony of the witness.  I don't think it does so correctly.

10 If wants to have the witness assume that statement, I don't

11 have a problem with it.

12 Q    All right.  I'd ask you to assume that the data that Dr.

13 Lees provided for this product category consisted of seven

14 studies from ten sites, okay?

15 A    I don't like to assume anything about someone else's data.

16 It's in his report and I mean what are you going to ask me

17 about it?

18 Q    In the Monokote III test that Dr. Lees used, do you know

19 how many building measurements were taken in?  How many

20 buildings he took measurements from?

21 A    You are asking me to recite data from his report and I

22 don't' recall the data from his report.

23 Q    I'm just asking you if you know.

24 A    I just don't recall.

25 Q    I would represent to you and ask you to assume

1  hypothetically that it was ten buildings from which he took

2  measurements for Monokote III, okay?

3  A    That's a pretty good data base.

4  Q    Well Monokote III was used in thousands of buildings,

5  wasn't it?

6  A    I think what you are trying to ask me is could it be

7  representative to have --

8  Q    No, I asked you if Monokote III was used in thousands of

9  buildings?

10 A    I know it was widely used.  I don't know how many

11 buildings.

12 Q    Okay.  And Zonolite acoustical plaster was also used in

13 thousands of buildings, wasn't it?

14 A    That's correct.

15 Q    Same thing for Grace insulating cement, correct?

16 A    Large numbers of buildings.  I don't know how many.

17 Q    Do you know if Grace had any kind of a systematic or

18 scientific process to select the sites at which exposure data

19 was collected and then provided to Dr. Lees?

20 A    I believe that was in Dr. Lees -- that's in his purview

21 not mine.

22 Q    Okay, you don't know if they did or they didn't.

23 A    I don't recall.

24 Q    Okay.  I mean and do you know whether they, Grace,

25 randomly selected the sites?

1  A    I think you are asking me a lot of questions about Dr.

2  Lees report.

3         MR. BERNICK:  Objection, asks -- excuse me --

4  objection.  We all know what the answer -- she's already said

5  what she did and what she didn't do.

6         THE COURT:  Well --

7         MR. MULLADY:  She could know that they randomly

8  selected the sites.  I don't know that.

9         THE COURT:  You can keep asking her information about

10 Dr. Lees' reports, but I think her answer is since she's read

11 them but she doesn't really have -- she doesn't know

12 specifically what he did.  But you can keep asking.  She's read

13 the report.  She may know, she many not know.  You can answer

14 if you know Dr. Anderson.

15 A    I don't recall exactly how many buildings.  I can tell you

16 what I do recall.  We very often had very little information.

17 We are trying to characterize not these individuals that you

18 keep talking about, but these job categories.  This is about a

19 job specific or a site specific exposure.  Often the only thing

20 we can do is simulate but --

21        THE COURT:  No.

22 Q    But I didn't ask you that, ma'am.

23        MR. BERNICK:  Excuse me.  Let her finish the answer.

24        MR. MULLADY:  Well we're never going to complete this

25 examination.

1         MR. BERNICK:  This may be true but for other reasons.

2    I think the witness is entitled to the courtesy of being -- of

3    not being interrupted.

4         THE COURT:  No, in this instance, Mr. Mullady is

5    correct.  The question was whether or not Grace had a

6    scientific way of choosing the data selected to give to Dr.

7    Lees.  She either knows or she doesn't know.  It's an either I

8    do know or I don't know.

9         Dr. Anderson, if you could just answer if you do or

10   don't know please and then maybe we can move on from there.

11   A    I don't know exactly how they chose the buildings.

12   Q    Thank you.  Can we have ACC/FCR-3015 please?  I want to

13   ask you if you've seen a particular -- if you are familiar with

14   a particular sample of Dr. Lees' data.  This is, this exhibit,

15   I would represent to you ma'am, is one of the ten measurements

16   that Dr. Lees relied on for his exposure averages in -- for his

17   exposure averages in this case.  This is the cover page for the

18   study and then there's a second page that has the data,

19   September 28, 1970.  The laboratory is Werby Labs.  There are a

20   list of samples and LA is a reference to the building from

21   which the samples came.

22        Are you familiar with this particular data set that

23   Dr. Lees supplied to you?

24   A    No.

25        MR. BERNICK:  I object.

1          THE COURT:  She said she's not familiar with it.  The

2    objection is overruled.

3    Q    Now, and I would represent to you -- strike that.  Don't

4    take this exhibit down.  I want to talk to you now about Dr.

5    Lees' average exposures for the A through E PIQ categories.

6    A    Okay.

7    Q    First of all, as I understand it neither you nor Dr. Lees

8    analyzed the actual TWA exposure to Grace products for any

9    individual claimant.  Is that correct?

10   A    That was not the point of the analysis, correct.

11   Q    And you didn't have any individual claimant TWA exposure

12   data from which to calculate the claimant's exposure?

13          MR. BERNICK:  Well, if the question is does she have

14   any individual claimant's TWA data, I understand that.  If the

15   question is whether that -- if the question, I believe, assumes

16   that it was part of her process to require that, then I think

17   that that is contrary to her testimony, so I object to the form

18   of the question.

19          THE COURT:  I believe that the question is contrary

20   to her testimony.  She did have PIQs available.  She has stated

21   that.

22          MR. MULLADY: Okay, fine.

23   Q    What you did, Dr. Anderson, was you calculated cumulative

24   average exposure values drawn from Dr. Lees average values,

25   correct?

1  A    No.   That's not correct.   I calculated maximum cumulative

2  exposures.

3  Q    Maximum cumulative exposures.  Let's go to 432, Table 11.

4  A    And I would like to tell you that I know there is one typo

5  mistake in one report where that was referred to as an average

6  cumulative -- average cumulative exposure and I apologize for

7  that error but these are maximum cumulative exposures using

8  average concentrations, average mean concentrations.

9  Q    The averages were supplied to you by Dr. Lees?

10 A    That's correct.

11 Q    Let's look at one of Dr. Lees' -- let's look at Table 11.

12          MR. BERNICK:  Where's this from?

13          MR. MULLADY:   432.

14          MR. BERNICK:   432, what page?

15          MR. MULLADY:   It's Table 1.  Do we know the page?  I

16 don't know that these pages are actually numbered in the back.

17 We're using tables, I don't think there are page numbers.

18          MR. BERNICK: Okay.  Go ahead.  I'm sorry.

19 Q    Okay.  Now are you telling us that -- can we have the

20 title of this first of all?  These are eight hour time weighted

21 average concentrations in fibers per millimeter, PCME, by

22 category of exposure and product type, correct?

23 A    Right.  And this is from my report, correct?

24 Q    From your report.

25 A    Right.

1  Q     Directing your attention to spray fireproofing on Table 1.

2  You have a TWA average of 0.3 -- excuse me, 0.033 -- 0.0338, do

3  you see that?

4  A     Yes.

5  Q     This is the average TWA for everyone in Category D for

6  that product, correct?

7  A     That's correct.

8  Q     That's not the maximum exposure for that group, it's the

9  average, correct?

10 A     This is the mean concentration which is one factor in

11 determining the cumulative exposure.

12 Q     And mean is another word for average, right?

13 A     That's correct.   For the concentration term.

14 Q     Yes.   Now PIQ Category D, like all the PIQ categories

15 encompasses a variety of distinct jobs.   Would you agree with

16 that?

17 A     It could be a variety of different people who happen to be

18 in this space, yes.

19 Q     Doing different jobs.

20 A     That's right.

21 Q     All right.   So for example, Category C you have both

22 sprayers and helpers in that category, right?

23 A     In Category C you have people who applied the product.   I

24 don't know about the helpers, it depends on what they were

25 doing.

1 Q    Okay.  Were you here when Dr. Lees was testifying about

2 sprayers and helpers?

3 A    No, I wasn't.

4 Q    Okay.  All right.  Now as I understand your analysis, you

5 are assuming that individuals who work in these PIQ categories

6 will have exposures that may vary from day to day or even from

7 year to year, but over time all individual TWA exposures will

8 converge to the average TWA exposures for everyone in the PIQ

9 category.  Is that correct?

10 A    For the job.  It's not for the people, it's for that job.

11 For what they are doing or for that space in proximity to a

12 variety of activities.  It's where they are with respect to

13 what's going on in the space.

14 Q    Well when you say job, you mean a mixer, a remover or

15 cutter, an installer.

16 A    That's right.

17 Q    An out-of-sight person or an in-a-space person.

18 A    That's right.  So it's for someone in a particular

19 proximity or someone in that job category.

20 Q    Now what, Dr. Anderson, what if any assumptions did you

21 make in calculating that the TWA exposures of individual

22 workers in these categories were converged to the average

23 exposure for all workers in the category?

24         MR. BERNICK:  Objection to the form of the question.

25 She just got done answering.

1           THE COURT:  I didn't understand that she calculated

2    the TWA means.  I thought she was provided with the TWA means.

3           MR. BERNICK:  She just got done saying it's for a

4    category.  You are assuming that she went backwards from

5    individuals and then finds the mean with respect to individuals

6    and she's testified on direct and on cross examination

7    precisely to the contrary.

8           THE COURT:  Just for purposes of making sure that I

9    understand the testimony, the question is what if any

10   assumptions did she make regarding the TWAs of individuals.  I

11   believe that doesn't fairly state the evidence.  But just so

12   I'm clear that that is in fact not what she did.

13          MR. MULLADY:  I'll go back and lay a foundation.

14   Q    What did you do with the average cumulative exposure

15   values that Dr. Lees provided to you?

16   A    I think that's exactly what I've talked about all morning.

17   I used the average, his maximum average TWA concentrations, for

18   the particular nature of exposure categories to define exposure

19   for that category.  That's for the claimants in that --

20   Q    You defined exposure for that category, using the average

21   that was provided to you by Dr. Lees?

22   A    The maximum mean concentration.

23   Q    Right.  And in order to use that average, you had to make

24   an assumption, didn't you, that despite the very nature of what

25   these people in these categories were doing from day to day

Anderson - Cross/Mullady                    174

1  that over time the exposure will be at that or around the

2  average?

3  A    Yes.  And I gave a fairly lengthy discussion about that

4  why that is the generally accepted way to do it and why I think

5  that's appropriate.

6  Q    Now in doing it that way though didn't you have to assume

7  that there was no aspect of a worker's exposure on any given

8  day that could be used to predict what that worker's exposure

9  would be on any subsequent day?

10        MR. BERNICK:  Object.  I'm sorry, can I have the

11  question read back please?

12        THE COURT:  Can you repeat, Mr. Mullady, otherwise

13  it's going to take us ten minutes.

14        MR. MULLADY:  Sure.  Anything to speed it along Your

15  Honor.

16  Q    In doing what you did you had to make an assumption,

17  didn't you that there is no aspect of a worker's exposure on

18  any given day that could be used to predict that worker's

19  exposure on any subsequent day?

20  A    I --

21        MR. BERNICK:  I'm sorry.  I object to the form of the

22  question.

23        THE COURT:  I think that is not a summary of what the

24  witness has testified to.

25        MR. BERNICK:  It's almost nothing --

1          MR. MULLADY:  I realize that we haven't gotten into

2    this yet.  I'm asking her if that's an assumption that she had

3    to make to use an average.

4    A    What I had to do to use an average is -- was one that I

5    had 11,250 days of exposure.  If two days happened to be

6    implemental in somebody's 1,250 in this category it would be

7    immaterial and the whole point was to discuss the large

8    influence of environmental factors on measurements so that over

9    time those factors cancel out and we get a good measurement for

10   that particular nature of exposure category.

11         So to single out two days would not have made a

12   difference to my analysis, if that's what you are asking me.

13   One individual.

14   Q    That's not exactly what I'm asking.  Let me see if I can

15   go at it this way.  You, on direct, I believe you discussed the

16   concept of environmental variability, correct?

17   A    That's right.

18   Q    And you used wind as an example.

19   A    That's right.

20   Q    There is also something known as inter-worker variability,

21   correct?  Are you familiar with that term?

22   A    As what?

23   Q    Inter-worker variability.

24   A    I said that there could be some variability amongst

25   workers, and that the environmental factor vastly made the

1  difference.

2  Q    Well let's test that.  For example, some people are right

3  handed and some people are left handed and some people are tall

4  and some people are short.  Correct?

5  A    Correct.

6  Q    Those are qualities in a person that are going to persist

7  over time.  Correct?

8  A    I think that Dr. Lees, as I understand, addressed that

9  issue.

10  Q    Yes, he did discuss that.  And I think he said the

11  differences between workers might effect exposure.  Do you

12  agree with that?

13  A    In a very minor way and over a long period of time the

14  environmental factors vastly swamp the slight variations in the

15  workers.

16  Q    So if there was a circumstance, hypothetically where right

17  handed workers were exposed to more asbestos, something about

18  the right-handedness in how the job was performed causing them

19  to be exposed more, that would no longer be random.  That would

20  persist over time, correct?

21  A    Yes, and I said that that would make very little

22  difference to this entire category of exposures and that the

23  environmental variation would be backed by the dominant factor.

24  That would be -- pardon.

25  Q    Unlike the person, I believe you said it's inconceivable

1  -- on direct, I think you said it's inconceivable that someone

2  would be in the wrong place at the wrong time for 45 years.

3  But it wouldn't be inconceivable for someone that had the

4  characteristic like right-handedness to have an exposure that's

5  much different than other workers for an entire 45 year working

6  career.  Most people are right handed.

7  A    You would have to convince somebody else that this is

8  going to make very much difference.  We are talking about

9  exposure to a job category.  We are not talking about

10  individuals.  We are talking about a long period of time and

11  we're talking about a dominant kinds of parameters that cause

12  the variability in data.  I don't think right-handedness and

13  left-handedness are going to put -- to make that mean differ.

14        If you have some odd individual who happens to be

15  somewhere way out on a curb, it's not going to change this

16  categorical definition at all.  And I said in some of my final

17  analysis that it would be a very low probability event given

18  all of the considerations that went into the analysis that

19  anyone in a B, C or D would experience anything on that far end

20  of the curve.

21  Q    All right, well, let's talk about what workers are doing

22  in the real world.  I notice on GG-2271 which we have on the

23  ELMO here you've identified as environmental variables,

24  variation by sampling location, job and time.  Why was -- why

25  is job an environmental variable?  If I'm a sprayer, why would

1  my being a sprayer be subject to the same sort of environmental

2  variability as the blowing of the wind?

3  A    Well in this particular case I was thinking of variability

4  around different kinds of positioning of people in these job

5  categories that they can be different but they are going to

6  move around to converge and they are totally random.  There is

7  not going to be any systematic way that would cause a bias in

8  that information.

9  Q    You believe it's going to be totally random on a day to

10  day basis whether --

11  A    Random over --

12  Q    -- a sprayer becomes a helper for example?

13  A    -- wait, what was the last part of that?

14  Q    Whether a sprayer becomes a helper.  That's a random event

15  that could change from day to day?

16  A    Well I mean, again, I'm defining exposures for these job

17  categories.  Now if someone is an A for part of 45 years and

18  they change and they become a different category they are going

19  to have different exposures.  But again this isn't an

20  individual exposure.

21  Q    I'm sorry.  I don't think I made myself clear in my

22  question.  I apologize for that.  I'm asking you to focus in on

23  variability within a category, within a category, within B, D

24  and E.  We have a number of different jobs being performed by

25  workers of different skill abilities in different -- sometimes

1  in different trades.   Is that correct?

2  A    That's correct.   Certainly in the B, D and E for

3  bystanders they can be different again, but there are different

4  trades involved.   Perhaps in the Bs.

5  Q    In order for your assumption to be corrected over time the

6  exposures of people within this category will converge to the

7  mean, you have to -- these workers have to be independent.   It

8  has to be completely random from day to day which of these

9  activities and which of these exposures they're getting,

10 correct?

11         MR. BERNICK:   Objection. That's an assumption.

12 Q    That's an assumption that you have had to make to conclude

13 that it converges to the mean?

14         MR. BERNICK:   Objection to the form of the question.

15 First of all the word independent.   I don't believe there's

16 been any dialogue on that, no definition of it, no use of it.

17 And then the second part of the question is you have to assume

18 that there is complete randomness.   I don't know what that has

19 to do with the first part of the question and therefore object

20 to the form of the question.

21         THE COURT:   You've got words in there that have

22 introduced new elements that have not been part of the

23 discussion.   And you've got a compound question because you

24 added the word correct, question mark, before you asked the

25 next part several times.   If you want to rephrase and break it

1 down into parts, fine.

2            MR. MULLADY:  Okay.

3 Q    Let's -- let me ask you this doctor.  In your expert

4 reports you cited your general reference material, the things

5 you've used and relied upon in reaching your opinions in this

6 case.  Have you cited us in your reports to any studies or

7 articles that would substantiate the proposition that over time

8 workers' asbestos exposures are going to converge to the

9 average for the category or general type of work that they do?

10 A    What I have cited is roughly 20 or 30 years of experience

11 dealing with the variety of environmental data sets, in air,

12 with pesticides, in water, at waste sites, for different jobs

13 for different situations.  We sometimes even build simulated

14 chambers just to have an environment where we can measure what

15 the experience for a particular job or person engaged in an

16 activity might be.  These are totally acceptable ways to make

17 these judgments.

18            In this case we are defining the likely exposure to

19 these individuals in these categories given a body of

20 information.  It's for the category and you keep asking me

21 about individuals.  So I don't know what you are asking me to

22 respond to otherwise.  I guess I don't understand your

23 question.

24 Q    Isn't it the case that certain workers doing certain tasks

25 that by virtue of inter-worker variability subject them to

1  higher than average exposures?  Isn't it the case that their

2  exposures are not going to converge to the average over time?

3          MR. BERNICK:  I'm sorry.  I understand the second

4  part of the question that there are other people who will never

5  converge to the average?

6          MR. MULLADY:  Correct, because they are always going

7  to be above the average.

8  A    I think within these job categories there is no evidence

9  that I have that that individual that I said earlier is in the

10 wrong place at the wrong time all the time.  I showed the

11 distribution of the data and I said I find it highly unlikely

12 that there is someone far out on that distribution data that

13 gets exposed to the highest level all the time.

14         Now if they are, some people don't converge entirely

15 to the mean.  If there are a few exceptions it's not going to

16 change this analysis.

17 Q    Can you cite to me any literature for the proposition that

18 there is convergence to the individual cumulative exposure --

19 excuse me, can you cite to me any literature supporting the

20 proposition or containing any data supporting the proposition

21 that there is convergence of individual cumulative exposures to

22 the overall mean for any occupational groups who have been

23 studied for asbestos exposure?

24         MR. BERNICK:  That again is now -- so it's specific

25 to asbestos and its research demonstrating that with respect to

1  an asbestos group there is convergence on the mean?

2              MR. MULLADY:  Yes, that's what I'm asking.

3  Q    If you can cite to me any literature that would support

4  the proposition that there is convergence to the average over

5  time?

6  A    I can cite certainly literature for any containment over

7  time that has supported, and I already have, that has supported

8  the concept that over time when you are trying to measure what

9  the exposure is to a job, any job, whether it's these jobs or

10 other jobs that it is the approved scientific method over time

11 to observe over a long enough period of time.  And this has

12 been observed that the variables cancel and in fact you can

13 define that over a long enough period of time that the mean

14 concentration is the most acceptable way to define a

15 concentration for that job category.

16 Q    Okay.  We talked about how each PIQ has different jobs

17 included within -- each PIQ category has different jobs

18 included within that category.  You have agreed with that,

19 correct?

20 A    Some of then, yes, do.

21 Q    And each job has a TWA exposure associated with it.  Would

22 you agree with that?

23 A    Not necessarily because they were in these areas.  Like

24 the Category B when someone is cutting to put in an electric

25 wire or cutting to put in a piece of plumbing equipment, it's

1  not as if they are highly variable jobs.  The data that we have

2  is Peter Lees domain to characterize those exposures for that

3  entire job category.

4  Q    Right.  I understand why over time workers in a job, doing

5  a job, a specific job, will have their exposures converge to

6  the mean for that job.  But what I don't understand is how over

7  time workers' exposures in a category will converge to the

8  average of that category.  Can you explain that?

9  A    Because workers who are -- the nature of exposure

10 categories are of like activities.

11 Q    They are of like activities?

12 A    That's right.  And the Category D with the person at the

13 site, they can be doing different things but if they are the

14 same distance from the activity, they are going to experience

15 the same exposures.  Likewise, someone in the space.  If they

16 are in the space they are going to experience like exposures

17 from the activities that are going on in the space even though

18 they may be doing a variety of different things.

19       So these categories are designed to capture like

20 exposures.  That's why they are nature of exposure categories.

21 Q    Are you aware that the data that Dr. Lees provided you

22 show that for sprayers and helpers within the same job

23 category, there was a factor of three to six fold difference in

24 exposure in the samples that he provided to you?  Are you aware

25 of that?

Anderson - Cross/Mullady                184

1  A    I'm not sure what -- you are speaking of variability in

2  his data.  Is that what you are speaking of?

3  Q    I'm speaking of TWA exposure measurements for sprayers and

4  helpers in the same job category where the exposure values for

5  sprayers were three to six times higher than exposure values

6  for helpers.  Are you aware of that data?

7  A    I have not discussed specifically that data with Dr. Lees.

8  And I don't know that you are representing it exactly the way

9  he intended in his analysis.  So I have relied on him for the

10 analysis.

11 Q    But your view would be that over time because the sprayers

12 and the helpers are in the same job category that their

13 exposures will converge to the average for that category.

14 A    That's right.

15 Q    Not necessarily to the average of the job they are doing?

16        MR. BERNICK:  Objection to the form of the question.

17 Objection to the form of the question.  The question is just

18 because they are in their jobs that they will converge --

19        MR. FINCH:  Your Honor, I think Mr. Bernick's

20 objection to form is sufficient.

21        MR. BERNICK:  No, to the contrary.  We've now been

22 over this like -- this is not to be a question of whether the

23 question can be reformulated the ninth time in order to urge a

24 proposition on the witness that has already been answered eight

25 times.  And that question talked about job categories.  It

1  didn't talk about actual job experience.

2          THE COURT:  I --

3          MR. MULLADY:  That was the last question on the

4  subject, Your Honor.  I'm ready to move on to another area.

5          THE COURT:  We didn't get an answer first of all or a

6  ruling.  First of all this witness doesn't need to be coached.

7  She's doing fine on her own.

8          MR. MULLADY:  Totally agree.

9          THE COURT:  Secondly, I don't think, Mr. Bernick,

10 that I always need a long explanation, but I occasionally do.

11 But I think I can ask for it when I do so we can make

12 objections and state the specifics of the objection and then if

13 I need argument -- this applies to all of you -- I'll ask for

14 it so that we don't have that problem.

15          With respect to this one, this objection, I don't

16 know if you are going to remember this question because frankly

17 I don't.  But nonetheless the objection is overruled.  I think

18 you can reask this question.  I'm not sure you remember it, Dr.

19 Anderson.  If you do, you can answer it.

20 A    I don't think I know what the question is.

21          THE COURT:  All right.

22 Q    I think the question was simply, assuming that I

23 represented the Lees data accurately, it would be your view

24 that the cumulative average exposures for the sprayers would

25 converge -- strike that.  Assuming I've represented the Lees

1  data accurately, it would be your view that notwithstanding the

2  disparity in the TWA measurements between sprayers and helpers,

3  that over time the exposure of helpers and the exposures of

4  sprayers would both converge to the average for that group.

5  A    Again, may I answer your question in three parts?  One, I

6  do not think I should be asked to reevaluate Dr. Lees data.

7  One, I'm not an industrial hygienist.  Two, he's presented his

8  data so I don't know why I should be asked to assume certain

9  things about it.  And, three, I am very accustomed to seeing

10 highly, highly variable environmental data.  Sometimes the data

11 can go from zero to very, very high values.  So you see wide

12 variations in data.  The whole point is to have some

13 representative sites and you don't have to sample every

14 building or every situation that representative data to define

15 what is going on in that particular category.

16       Beyond that, I can not unravel Dr. Lees work.  I

17 think he was here for you to ask him those questions.  And I

18 have known him for many years.  I have the highest regard for

19 his work.  He is a very respected industrial hygienist and I

20 have the confidence to use his work.

21 Q    Well, let me ask you about --

22       THE COURT:  And for the record, if I recall correctly

23 it was either Dr. Lees or Dr. Moolgavkar, and I apologize

24 offhand I don't recall which, who indicated specifically the

25 variation because it was not all three to six times.  In some

1  instances it was two and two and a half times that that was

2  well within the range of categorizing categories together for

3  sprayers and helpers, and that he himself did not think it

4  inappropriate to put those categories of sprayers and helpers

5  together.  So this witness is quite correct that from her point

6  of view that Dr. Lees' on testimony was that from his point of

7  view he had appropriately characterized the evidence.  So I

8  just want the record to reflect that the witness in that

9  respect I don't think was being asked to reevaluate Dr. Lees'

10  data, but should know that Dr. Lees' own view of his own

11  analysis was different from what is being represented.  You can

12  continue.

13  Q    All right, well, let's discuss whether in your view Dr.

14  Lees gave you the true average, the correct average to use for

15  your work.  Did you check to see whether Dr. Lees calculated

16  the standard error for the averages he reported to you?

17          MR. BERNICK:  I object to the prefatory statement.

18  Let's see if he did it the right way and then he went on to say

19  a standard deviation thereby assuming in his question that the

20  standard deviation was necessary in order to figure out whether

21  it was done the right way.

22          MR. MULLADY:  Let me rephrase it.

23          THE COURT:  All right.

24  Q    Dr. Anderson, did you check to see whether Dr. Lees

25  calculated the standard error for the averages he reported to

1 you?

2 A    No, I didn't.

3 Q    Can we have ACC/FCR-307?

4 A    And I should add that is not material to the way I would

5 use this data.

6 Q    No, I didn't ask you that ma'am and I would move to strike

7 that statement.

8          THE COURT:  No, I will not have it stricken because

9 Dr. Lees also testified that it would not be customary

10 depending on the use of the data to make that calculation.

11 Q    Let's see 3007.  This is the Judicial Reference Manual on

12 Scientific Evidence.  Are you familiar with that work?

13 A    What?

14 Q    Are you familiar with the Judicial Reference Manual on

15 Scientific Evidence?

16          MR. BERNICK:  I would object to that question being

17 asked as a yes or no answer, but depending on what the answer

18 is.

19 A    I'm not fully familiar with this document and I'm

20 certainly not going to comment on a sentence out of the middle

21 out of context.

22 Q    It has the definition of standard error.  Let me ask you,

23 without reference to this, what do you understand --

24          MR. BERNICK:  Your Honor, can we take it off the

25 screen.  There was a vigorous objection to my getting into

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Mullady                189

1 experts with experts, specifically Dr. Roberts that has

2 anything to do with the law and on voir dire, voir dire here I

3 guess, Mr. Mullady was at pains to point out that this witness

4 didn't have expertise in the law and in fact they've objected

5 with respect to all of our witnesses to commenting on that.

6        MR. MULLADY:  It has nothing to do with the law, Your

7 Honor.  I really think.  If you could just relax and wait for

8 the questions, this would go a lot faster.

9        THE COURT:  It probably would.  You can ask the

10 witness what her understanding is.

11 Q    What is your understanding of what standard error means?

12        THE COURT:  If she has one.

13        MR. MULLADY:  Well I'll ask a foundation question.

14 Q    You have some understanding of statistics and you apply

15 statistical principles in your work, correct?

16 A    I use regularly outcomes of statistical analysis and I

17 have some familiarity with the statistical analysis.  So I

18 don't know, what are you trying to ask me?

19 Q    Well I'm asking you what your understanding of standard

20 error is.  Are you familiar with that concept in statistics?

21 A    Not specifically just standard error.  I'm familiar with

22 at various times for various reasons needing to put confidence

23 and it rolls around let's say epidemiology outcomes.

24 Q    Are you familiar with standard error being a tool that is

25 used for analyzing the reliability of an average?

**J&J COURT TRANSCRIBERS, INC.**

1  A    It depends upon why you would do that.  You wouldn't do

2  that for purposes that I use these data because of what I just

3  discussed.  Using mean and variables cancel because of the long

4  term assumptions I'm making.  So I would not have used any

5  information about ranges around these data sets because as I

6  say I've seen such broad, broad variability in environmental

7  data.  It's routine that you do see very broad variation.

8        And the question is when one uses it in risk

9  assessment, how do you account for it.  And if it's a short

10  term exposure as I discussed before I do one thing.  If it's a

11  long term exposure as I've done here, it's quite a different

12  matter and that's why the mean is very appropriate to long term

13  exposure risk assessment.

14  Q    I understand that's your opinion.

15  A    It's not only my opinion.  It is a documented method of

16  operation in the whole risk analysis world.

17  Q    Would your opinion hold on -- I think you said there

18  wouldn't be any reason to calculate standard error on the basis

19  of what Dr. Lees provided to you.  Would you still hold that

20  view if I were to represent to you that Dr. Lees based his

21  Category E exposures for Vermiculite and Chrysotile products on

22  only five observations?

23  A    I think these are questions for Dr. Lees.  I've used his

24  analysis and he is the industrial hygienist.  And I think he

25  had used the data that are available.  I think he used all of

1   the data that are available.  I think he qualified it before he

2   used it and I think his analysis are sound and I should ask to

3   channel your questions to him about his data sets.

4             MR. MULLADY:  Just one more question and then, Your

5   Honor, I will be ready to move to a different area, if the

6   Court would like to take your afternoon recess, we can do that.

7   Q    Is it fair to say, ma'am, that because you didn't check to

8   see if Dr. Lees, Dr. Lees with an S, calculated the standard

9   error, you do not know whether the estimate of the average for

10  his Category E exposures has a large sampling error?

11            MR. BERNICK:  Objection, lack of foundation.

12            THE COURT:  No, I don't think so.  Overruled.

13  A    If you are talking about variability in his data, I have

14  said that I have seen very large variability.  It's routine in

15  environmental data sets.  These are industrial hygiene data

16  taken specifically in at job sites and circumstances that are

17  mimicking these nature of exposure categories.  There's going

18  to be some variation, I would expect it.

19  Q    You -- excuse me, I'm sorry.

20  A    But because of the long term assumption I've made and the

21  nature of the exposure category definitions and the fact that

22  I'm characterizing the exposure for those categories, not for

23  any individual who happened to be some odd outlier, but for the

24  category I would not have used any standard deviation

25  measurements.  That's why they are not asked for in this kind

1  of analysis and not asked for in environmental risk assessment

2  when we're dealing with long term exposures.

3  Q     You have done nothing to determine whether his Category E

4  exposures has a sampling error or doesn't.  Is that fair?

5          MR. BERNICK:  Done nothing independently of Dr. Lees?

6          MR. MULLADY:  Yes.

7  A     You think I should have independently have reevaluated his

8  data to see if he has a standard error in his data?

9  Q     You are changing my question.  All I asked you was did you

10 do any work to determine whether his exposures, his Category E

11 exposures, has a sampling error?  Yes or no?

12 A     I did not redo Dr. Lees' work, no.

13 Q     You didn't redo his work is a little broader than what I

14 asked you.  I asked you if you performed any statistical

15 analysis to determine whether there is a sampling error in his

16 average for Category E?  Did you do that?

17 A     I have not redone his work.  I've accepted his highest

18 mean concentrations.  I think I've made that statement before.

19         MR. MULLADY:  Thank you.  Your Honor, I'm ready to

20 move to a different area.  Would you like to take a break?

21         THE COURT:  Yes, we'll take a ten minute recess.

22         MR. BERNICK:  Can we have an estimate from counsel

23 for the ACC/FCR about how much longer they are going to do?

24         THE COURT:  Yes.

25         MR. MULLADY:  We can do that in about five minutes.

1          MR. BERNICK:  Thank you.

2  (Recess)

3          THE COURT:  Mr. Mullady.

4          MR. BERNICK:  Do we have an estimate?

5  Q    Dr. Anderson, the last question I asked you related to the

6  subject of --

7  A    I'm sorry, I have a loud breeze about me.

8          THE COURT:  It's going off.

9  A    Okay.  I'm not hearing you very well.

10  Q    I'll try to speak louder.  Okay, I'm sorry.  Just

11  continuing briefly on this issue of Category E and the

12  observations that Dr. Lees used that were reported up to you

13  for that category, I'll represent to you that he only had five

14  observations and that these five observations were short term.

15  One hour, one day, in other words eight hour TWA averages on

16  the samples that he took.

17          Do you have an opinion that those five samples is

18  enough to give you an accurate average to use for your

19  analysis?

20  A    Well, there certainly can be.  And evidently Dr. Lees, who

21  is far more experienced in the meaning of industrial hygiene

22  data than I, thought they were.  Sometimes we don't even have

23  that many samples and it depends on the nature and quality of

24  work and I relied on him for those data that I subsequently

25  used.

                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    Isn't it true though that the only way to -- the way to

2  determine whether that is a proper sample or not is to conduct

3  a statistical sampling error analysis?

4  A    No, that wouldn't tell me anything except you know the

5  variability of the data one way or the other.  And I've already

6  said variability is dealt with by my assumption of 11,250 days

7  and that the reasons for the variability cancel out over time.

8  So that's why I didn't ask him for it and that's why I didn't

9  look to see if he did it because it doesn't matter.  It doesn't

10 change the mean.  It just means we're getting a statement of

11 deviation around the mean and it wouldn't change my work at

12 all.

13 Q    I think we're talking about two different things and it's

14 probably my fault for not being clear.  I'm not asking you

15 about variability among the exposures that would then converge

16 to the average.

17 A    I thought you were talking about the data.

18 Q    I am talking about the data but I'm not talking about the

19 data in the sense of variability of data.  I'm asking you about

20 whether the average that you were given to work with was the

21 proper average to use.  In other words, was it derived through

22 a proper process of having enough samples so that statistically

23 the average isn't subject to a large sampling error?  That's

24 what I'm asking you about?

25 A    Did you ask Dr. Lees about this?  This is really his area,

1 but as for my experience being the recipient of data for many

2 years we're trying to characterize in the case of the E,

3 someone who is in the space with activities going on where

4 asbestos is being used.  It's being applied, it's being

5 installed or something is going on there.  So within that space

6 we have information about someone who could be there passing

7 through, who could be there for a longer time.

8         We have assumed that that person is in that space as

9 a professional bystander.  That someone is in that space for 45

10 years, 11,250 days in the year and I think that regardless of

11 the variability in the data and also regardless of -- well, he

12 qualified the data he had.  You seem to be saying that you

13 don't agree that he qualified it correctly or you don't think

14 he had enough samples.  But these are the data.  These are

15 historic data and it's his purview to characterize this

16 information and he thought that his data were perfectly usable.

17 And I think you have to discuss it with him.

18 Q    Well, we tried to get into that with him a little bit.  I

19 think there was an objection and we were directed to discuss

20 some of this with you.  But leaving that aside.

21         MR. BERNICK:  Move to strike the statement.

22         MR. MULLADY: I think Mr. Rasmussen, my partner, asked

23 some questions of Dr. Lees about this and was, an objection was

24 raised.

25         MR. BERNICK:  I do agree --

1          THE COURT:  This is not the area, I believe, that was

2    inquired of Dr. Lees and in which the objection was sustained.

3    I don't believe that is the case.

4          MR. BERNICK:  In any event, Your Honor, whether it

5    happened it is not an appropriate subject for commentary by

6    counsel.

7          THE COURT:  Well that's true too.  And I believe that

8    the issue was her use of the data that was going to be inquired

9    of this witness, not how Dr. Lees characterized the data.

10   Q    Let me just try this, Dr. Anderson, how this relates to

11   your work is as follows.  Would you agree with me that if

12   hypothetically five samples for Category E was too few a number

13   of samples to derive the true average of the exposures

14   cumulatively for workers in that category because that was

15   subject to a large sampling error statistically, isn't it true

16   that that would compromise the scientific reliability of the

17   average that you've used for Category E for purposes of your

18   analysis?

19         MR. BERNICK:  Objection to the form of the question.

20   This is --

21         MR. MULLADY:  We have the objection.

22         MR. BERNICK:  Objection to the form of the question.

23   What does true average mean?  Is that a statistical term?  Is

24   it a scientific term?  Can we clarify what that question means?

25         MR. MULLADY:  The proper average, the correct average

1 to use.

2        MR. BERNICK:  For what?  Again this is a setup for

3 somebody else to come in and talk about true average and I

4 think you ought to ask the witness a fair and open question so

5 that she understands what it is that he's getting at.

6        THE COURT:  I don't know what true average means.  I

7 just don't know what that means.

8        MR. MULLADY:  I'll try the question again.

9 Q    I want you to assume hypothetically Dr. Anderson that Dr.

10 Lees use of five samples for Category E subjected those samples

11 to a large sampling error.  Do you agree that if those -- if

12 that average drawn from a sample set with a large sampling

13 error is not a proper average to use, that that affects your

14 use of that average for purposes of ruling claims as either

15 meritorious or not?

16        MR. BERNICK:  I think if you are going to ask that

17 there is a lack of foundation.  We now have this characterized

18 as a sampling issue.  If this witness agrees that this should

19 have been a sampling effort, I think that's an appropriate

20 question.

21        MR. MULLADY:  That's what this has been about for the

22 last 30 minutes.

23        MR. BERNICK:  No, sorry.  You've assumed in your

24 questions, because you have another expert, that this is a

25 sampling issue, that is, that there was an effort to sample and

1  presumably come up with some representative number.  You

2  haven't established to this witness that that has anything to

3  do with her understanding of how this should be done.  So I

4  think that there's a lack of foundation for that question.

5  Q    You accepted Dr. Lees average for Category E that he gave

6  you, correct?

7  A    That's correct.

8  Q    All right.  But you didn't test to see whether it was

9  subject to a sampling error, correct?

10 A    No, I didn't test any of his data to see if it was subject

11 to a sampling error.

12 Q    If it was subject to a sampling error, it was the wrong

13 average to have given you, wasn't it?

14        MR. BERNICK:  Objection to the form of the question

15 and foundation.

16 A    I think that there is a basic flaw in what you are asking.

17 And that flaw is you want me to assume something detrimental to

18 Dr. Lees when he's not here to answer the question about his

19 data, when he's not here to answer that question either.  And

20 about the number of samples.  Well, it depends very much on how

21 the samples are taken, where they are taken, and how

22 representative they are.

23        I was not the one who made those judgments.  Those

24 are Dr. Lees' judgments.  If I were to go back and sit with

25 him, you know, that would be a different matter.  If he had

1  thought that he didn't have representative data, that it was

2  not useful, I don't think he would have given it to me.

3        And the second thing is that the data are what they

4  are.  We have these data for products to evaluate and sometimes

5  we don't have the luxury of going back and collecting

6  additional data.  So these are the data we have.  He thought

7  that they were perfectly good data for this purpose.  He did

8  his analysis and he gave them to me.  I do not think it's

9  within my domain to go back and reanalyze his data.  And I

10  don't think that I am comfortable answering hypothetical

11  questions about his data.

12  Q    If the mean that he gave you for Category E has a large

13  error, then using that mean could result in erroneous analysis

14  by you, correct?

15  A    I have no reason to think that his data had a large error.

16  Q    But if they did, that could result in erroneous analysis

17  by you, correct?

18        MR. BERNICK:  Objection to the form of the question

19  and it lacks foundation.

20        THE COURT:  This is a hypothetical question and I

21  believe the witness has said she has no basis on which to

22  assume that there is any such error. But she is an expert and

23  she is -- it is proper to ask her a hypothetical question.  If

24  you will lay the assumptions on which you want her to answer

25  your hypothetical question, and do it properly so that we can

1  get through it without any objections, she will answer your

2  question.

3          MR. MULLADY:  I thought I did that but I'll try

4  again.

5  Q    The average that Dr. Lees reported to you has a large

6  sampling error and using that average could result in erroneous

7  analysis by you for the Category E claimants?

8  A    Let me answer this way.  In any risk analysis work if the

9  underlying data have serious flaws then they will be reflected

10  in the next step in the analysis.  I have no reason to think

11  that Dr. Lees data had any such flaw.

12  Q    Thank you.  I want to ask you now about PCM and PCME.

13  You, as I understand it, do not use the PCM measurements from

14  Dr. Lees report as your exposure levels for the Grace

15  claimants, correct?

16  A    That's correct.  That has been traditional in all of the

17  EPA risk assessments that are done.

18  Q    You instead use conversions of those measurements and do

19  what Dr. Lees calls PCM equivalents or PCME, correct?

20  A    Yes.  And that's proper and it's stated in the EPA IRIS

21  file that if you are going to deal with the dose response

22  information that's supplied in that file that the proper

23  attention should be given to the representativeness of PCM

24  measurements when they are taken in environmental situations.

25  Q    The PCM measurements are reductions of the fiber counts

1  observed through PCM which is phase contrast microscopy to

2  eliminate from the fiber counts the fibers that are not

3  asbestos, right?

4  A    It's routine in environmental -- when samples are taken in

5  environmental circumstances.  I can explain this to you.

6  Because PCM measures all the fibers whether they are asbestos

7  or not.  When the original epidemiology studies were done in

8  the asbestos rich environments where production was going on

9  with asbestos products, it is thought that the PCM

10 measurements, that that metric and those environments were

11 predominantly asbestos.

12         We now know when we move to environmental

13 environments we get varying levels of asbestos but PCM sees all

14 of the fibers in those environments.  And the only way to make

15 the adjustment and to use EPA's work is to compare apples and

16 apples.  So the PCM values need to be adjusted and the way they

17 are adjusted is to use TEM to see how many of those fibers are

18 asbestos and how many are not for a particular circumstance,

19 and then do some conversion.

20 Q    Okay.

21 A    That's typical of what is done.

22 Q    I think you told us on direct that it's your view that

23 EPA's Integrated Risk Information System, which goes by the

24 acronym IRIS, requires a conversion from PCM to PCME.

25 A    And I said it says to use with caution PCM data when it's

1  collected in an environmental circumstance.

2  Q    Can we have 3019 please?

3  A    And I know this language, I wrote it.  I had a large part

4  in dealing with this and I did asbestos risk assessments for

5  years and one has to make these conversions.  And the work that

6  was commissioned by EPA, the Berman & Crump report they

7  emphasize the importance of these.  This is just routine.  It's

8  very simplistic.

9  Q    Let's look at some of your language from the IRIS report.

10  A    It says, Use With Caution.

11            MR. BERNICK:  Do we have that document?

12            MR. MULLADY:  3019, you should.

13            MR. BERNICK:  We have 3018.

14            MR. MULLADY:  Sorry.

15  Q    Let's go to Page 6.

16  A    What are we looking at?

17  Q    We're at Page 6 of the IRIS report, Roman II, Letter C,

18  Paragraph 3.  "Risks have been calculated for males and females

19  according to smoking habits for a variety of exposure

20  scenarios.  The unit risk value is calculated for the additive

21  combined risk of lung cancer and mesothelioma and is calculated

22  as a composite value for males and females."  We're skipping

23  down.

24            I really meant to read the second paragraph here

25  where it is talking about the unit risk and how it's measured.

1  "The unit risk is based on fiber counts made by phase contrast

2  microscopy PCM and should not be applied directly to

3  measurements made by other analytical techniques.  The unit

4  risk uses PCM fibers because the measurements made in the

5  occupational environment uses this method."

6  A    That's what I just said.

7  Q    Okay.  And it also says at the top of Page 7, "Likewise,

8  the correlation between PCM fiber counts and TEM fiber counts

9  is very uncertain and no generally applicable conversion factor

10 exists for these two measurements."  Do you agree with that

11 statement?

12 A    That's correct and that's why you need to do it for each

13 environmental circumstance to get an appropriate conversion for

14 that circumstance if possible.

15 Q    Let's look at 3020, the Berman & Crump article that you

16 referenced a moment ago.  The final draft of the EPA paper.

17 Let's go to Page 5.2 at the bottom under the heading, Human

18 Epidemiological Studies.

19           THE COURT:  What's the exhibit please?

20           MR. MULLADY:  ACC/FCR-3020.

21 Q    You cited this paper I think in your report, Doctor,

22 correct?

23 A    I don't recall whether it's cited in this report or not.

24 I can look.

25 Q    Well, that's okay.  I just want to read you some language

1  from this.

2  A    I mean I have cited this work.

3  Q    Right.

4         MR. BERNICK:  What page are we on?

5         MR. MULLADY:  5.2.

6  Q    It says, "Impinger measurements are sometimes related to

7  fiber counts based on PCM using side by side measurements of

8  total dust and fiber counts collected during a relatively brief

9  period of time."  And there's a citation to the Dement article

10 from 1983 and McDonald.

11        "However, the correlation between fiber counts and

12 total dust is sometimes poor within a plant, i.e. a single

13 study environment."

14 A    I'm sorry, where are you reading?

15 Q    We have it on the screen.  It's highlighted at the bottom

16 here.

17 A    Oh, I don't have it on my screen.  Are you moving to Page

18 53?

19 Q    Your screen doesn't have what's on this screen?

20        THE COURT:  It does.  Where the yellow is

21 highlighted.

22 A    Where are you?  What you just read that in continued.

23 Q    I'll start again.  I'm just reading the highlighted

24 language on the screen.  "However the correlation between fiber

25 counts and total dust is sometimes poor within a plant, i.e. a

1  single study environment and generally poor between plants.

2  See for example U.S. EPA 1986.  Thus, conversions based on

3  limited sets of -- limited sets of paired measurements are of

4  questionable validity."  Do you agree with that statement?

5  A    Well, I think we have to see what they are talking about.

6  They tell you dust, they could be talking about asbestos by

7  weight and I don't know.

8  Q    Well, isn't it true that OSHA regulations require

9  analytical laboratories to use PCM or an equivalent method for

10  collecting and analyzing fiber samples?

11  A    Yes, and they go on to make provisions for making the

12  conversion when appropriate, using, I think it's method 7204

13  for TEM measurements to adjust PCM to PCME.  I've given you the

14  logic.  Sometimes you can only understand things if you -- if

15  you understand the logic behind them.  And PCM was the method

16  that was available in these old epidemiology studies.  So it

17  was the metric that was used in the dose response work in the

18  1986 EPA risk assessment.

19       When we moved beyond those times when PCM was used

20  and we start to use TEM we find that when we get in these mixed

21  environmental environments we can be measuring on no asbestos.

22  We can be measuring one percent.  So you have to make some

23  adjustments and you have to make -- there has to be some

24  judgment about those environments and that's why the IRIS file

25  says use with caution.  But if you are in certain environments,

1 you need to at least test your data to see if you are measuring

2 predominantly asbestos or something else.  And if you are going

3 to use the data quite seriously in an analysis like this, it's

4 absolutely essential to make the conversion because otherwise

5 you don't know what you are counting.

6 Q    But if the measurements or the conversions are based on

7 limited samples of paired measurements such as between plants,

8 they are of questionable validity?

9 A    Well this is talking about --

10        MR. BERNICK:  Objection.

11 A    -- between plants and total dust and I'm not sure but this

12 could be talking about mass weight rather than particles on --

13 I mean, you've given me this one excerpt.  And I suspect that

14 is what they are talking about.  Also PCM between plants, they

15 could be talking about just variable measurements between

16 plants which would not be surprising which is an entirely

17 different topic.  Would you expect the same PCM measurements in

18 one facility doing one kind of work compared to another

19 facility doing a different kind of work?

20 Q    Let's go to 3018.  I want to pull up the OSHA regulation.

21 This is 29 CFR Section 1926.1101.

22        THE COURT:  Mr. Mullady, I apologize.  I didn't get

23 the exhibit number.

24        MR. MULLADY:  It's ACC/FCR 3018.

25        THE COURT:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay, this is the OSHA regulation.  Can we explode it a

2 little bit so it's readable.  Okay, 1926.1101, Construction, at

3 the top here.

4          THE COURT:  This is the new one?

5          MR. MULLADY:  Yes.

6 Q    Construction, Alteration, Repair, Maintenance et cetera.

7 I want to go down and refer you to the section Appendix A, OSHA

8 Reference Method Mandatory.  "This mandatory appendix specifies

9 the procedure for analyzing air samples for asbestos and

10 specifies quality control procedures that must be implemented

11 by laboratories performing the analysis.  The sampling and

12 analytical methods described below represent the elements of

13 the available monitoring methods such as Appendix B of this

14 regulation.  The most current version of the OSHA method id-160

15 or the most current version of the NIOSH method 7400.  All

16 employers who are required to conduct air monitoring under

17 Paragraph F of the standard are required to utilize analytical

18 laboratories that use this procedure or an equivalent method

19 for collecting and analyzing samples."  Did I read that

20 correctly?

21 A    Yes, you did.

22 Q    Now these options listed here, Appendix B of OSHA,

23 Appendix B OSHA, Method id-160 and NIOSH method 7400 are all

24 PCM methods, aren't they?

25 A    I am not an expert on OSHA methods so I can't tell you

1  exactly the numbers, but I do know that in mixed environment

2  following the logic that I've just described that OSHA makes a

3  provision and I believe it's 7204 for conversion when you are

4  in these mixed environments.  So I don't know.  You can read me

5  all of the OSHA regulations but it's not exactly my field.

6  Q    I understand and I understand that --

7  A    I do know the logic and I do know that OSHA has the same

8  provisions as EPA does.  The same logic because it only makes

9  sense.

10 Q    Let's go to the third page of this document.  "A great

11 deal of experience is required to routinely and correctly

12 perform differential counting.  It is discouraged unless it is

13 legally necessary."  Do you see that?

14 A    Yes, I see that.

15 Q    What is your understanding of what is meant by

16 differential counting?

17 A    I think that for you to give me one sentence at a time

18 from OSHA regulations isn't helpful.  Because it would have to

19 be read in context.  Because I know the logic that OSHA uses.

20 I know the logic that EPA uses and to read me one sentence at a

21 time I think can be very misleading.

22 Q    Well let's -- and I don't want to mislead and I will read

23 more because -- and maybe that's necessary to put this in

24 context.  At the top of this page it reads as follows.  "As

25 previously mentioned in Section 1.3 PCM does not provide

1 positive confirmation of asbestos fibers.  Alternate

2 differential counting techniques should be used if

3 discrimination is desirable.  Differential counting may include

4 primary discrimination based on morphology, polarized light

5 analysis fibers or modification of PCM data by scanning

6 electron or transmission electron microscopy."

7          I'll stop there for a second.  Transmission electron

8 microscopy is also known as TEM, correct?

9 A    Correct.

10 Q    Then it goes on to say, the regulation does, "A great deal

11 of experience is required to routinely and correctly perform

12 differential counting.  It is discouraged unless it is legally

13 necessary.  Then only if a fiber is obviously not asbestos

14 should it be excluded from the count.  Further discussion of

15 this technique can be found in reference 8.10."  That is OSHA's

16 position, correct?

17 A    I would not characterize this as the totality of OSHA's

18 position because there is something wrong here that is

19 discouraged unless it is legally necessary.  I know that -- I

20 know the logic that OSHA uses and there is something wrong.

21 I'm not seeing the entire regulation.  I don't know about the

22 date.  But I do know that there is the same logic at OSHA as

23 there is at EPA, and that is when you are in a mixed

24 environment you do need -- and when you do need to do risk

25 assessment work and you do need to know if you are counting

1  asbestos fibers they need to be converted to PCME.

2  Q    Thank you.

3         MR. MULLADY:  I'll pass the witness.

4         THE COURT:  Pardon me, Mr. Mullady.  I'd like to ask

5  the witness a question based on the OSHA regulation.  I know

6  Dr. Anderson, you don't profess to be an expert in the OSHA

7  regulations.  I understand that, but is the policy not

8  consistent with the EPA policy that you are looking for the

9  maximum possible counts so that you can ensure public health?

10        DR. ANDERSON:  Yes, but if it's not asbestos fibers

11 there is a provision made for using the TEM to find out if you

12 are dealing with an asbestos fiber or if you are dealing -- PCM

13 can just count all kinds of fibers beside a road when people

14 are doing roadwork and there can be virtually none or none as

15 far as asbestos counts are concerned.

16        So once you know the environment you are dealing

17 with, then maybe you don't need to use it.  But if you are

18 going to try to identify what's asbestos it's essential to use

19 some method that can identify it when you are not in an

20 asbestos rich environment.  And when you are in construction

21 trades and transportation trades you can have a predominance of

22 other kinds of fibers that would be seen by PCM.

23        THE COURT:  All right, thank you.  Mr. Mullady, do

24 you have any follow up based on my question to the witness?

25        MR. MULLADY:  No, I think to the extent we would have

1  any more inquiry on that Mr. Finch is quite capable of

2  following up.

3           THE COURT:  All right, thank you.  Mr. Finch.

4           MR. FINCH:  Nathan Finch for the Asbestos Claimant's

5  Committee.

6                    CROSS EXAMINATION

7  BY MR. FINCH:

8  Q    Just one follow up.  Dr. Anderson, you are not a

9  microscopy expert and you are not professing an expertise in

10 that area, correct?

11 A    That's correct.  And I have looked through these

12 microscopes and I do know what microscopists do.

13 Q    You were asked some questions by Mr. Mullady about the

14 review of the person injury questionnaires.  Do you recall

15 those questions, that Exponent did?

16 A    Yes.

17 Q    Okay, is it correct that unless someone either in their

18 questionnaire or their questionnaire attachments said that they

19 personally mixed or personally installed a Grace containing

20 product they would have been put in the B, D or E categories?

21 A    Not necessarily.  You are saying if they didn't self-

22 identify as an A or C.

23 Q    In review of the backup materials you couldn't tell if

24 they were an A or in a C, then they would most likely have been

25 in the B, D, or E category.

1          MR. BERNICK:  Objection to the form of the question.

2    A    No.  I don't think so at all.  I think we -- there was

3    equal weight to end up in any one of the categories from the

4    background review of the materials.  It just depended on what

5    was in the background review.  There was no bias as to if they

6    didn't self-identify then they weren't going to be -- to have

7    an opportunity to be placed in an A category.  That was not the

8    approach.

9    Q    I think you misunderstood my question.

10   A    I'm sorry.

11   Q    If someone said, let's say that they are an electrician

12   and they didn't say that they personally mixed or personally

13   installed a Grace containing product then they would be

14   categorized as someone who is in a space or in a site or

15   removed or cut the product a B, D or E, correct?

16         MR. BERNICK:  Again, I'm objecting, I'm sorry, object

17   to that form of the question.  You are saying that they

18   identify a job title but they don't have anything in the backup

19   that relates to or talks about their actual, what other

20   category they would fall into in terms of contact with

21   asbestos?

22   A    Is that the question?

23   Q    They identify themselves as an electrician and they don't

24   have anything further.

25   A    We did not classify anyone according to just a job title.

1  Q    Okay.  Could you turn to your July 31st expert report?

2  It's in the notebook up there but it's ACC/FCR-432.  Page 12.

3  So if the PIQ or the attachments included the relevant key word

4  such as mix or move, cut or install, you would put them in the

5  appropriate category, correct?

6  A    That's correct.

7  Q    So if someone said that they mixed Grace Zonolite plaster,

8  then they should have been put in the Category A, correct?

9  A    If the rest of the materials, you know, supported that.  I

10 mean the whole file had to be read, but if that's what the file

11 said in its totality that's where they would have been placed.

12 And if they had two job experiences.  Let's say they were at

13 some point at a site where something was being done but at

14 another time they actually were a mixer and that's what the

15 totality of the materials, the backup materials said, and if

16 they also identified they had been exposed to a Grace product,

17 they would have been elevated to the highest exposure category.

18 Q    Okay, if there was insufficient information from which to

19 tell whether they were an A through an E, then you categorized

20 the people with insufficient information in the same ratio as

21 if they did have information, correct?

22 A    I think if I understand your question correctly, the

23 answer is no.  If they had information and they were clearly

24 either an A or E, and we didn't know which one we put them in

25 the A.  We wouldn't have put them in insufficient and that is

Anderson - Cross/Finch                                214

1  if the information showed through other factors that they were

2  exposed to a Grace product and the whole file supported the

3  information, not just some word that was not supported by other

4  information in the file, or there were contradictions in the

5  file or that kind of thing.  But no, we wouldn't have put them

6  in insufficient merely because at one point they did one job

7  and at another point they did another job.  If they were

8  exposed to --

9  Q    If they were a construction laborer and they said that

10 they were in the vicinity of someone who was mixing Monokote,

11 then they would not be treated as a mixer or installer,

12 correct?  They would be put either at a site or at a space?

13 A    I think that has to be --

14 Q    Well, could --

15 A    I think I can't generalize.  It would depend on the file.

16       MR. BERNICK:  Your Honor, the protocol was being

17 displayed to the witness in the court and all of a sudden, the

18 screen went blank.

19       MR. FINCH:  We put the screen back up.  Sorry.

20 BY MR. FINCH:

21 Q    Would you -- you also reviewed about 350 closed, settled

22 mesothelioma claims, is that correct, Exponent did?

23 A    Exponent did.  They're not in my report.

24 Q    But they did that for purposes of Dr. Florence's later

25 analysis, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I understand that they are going to be provided to him.  I

2  don't really know very much about them.

3  Q    Okay, obviously, the settled mesothelioma claims don't

4  have questionnaires, correct?

5  A    I believe that's correct.

6  Q    Okay, so in that case what the Exponent people did is they

7  reviewed whatever materials Grace provided to them and put the

8  person in the appropriate A through E classification, correct?

9  A    That's my understanding.

10  Q    And they were supposed to use the same protocol for

11  reviewing the settled claims files as for reviewing the

12  questionnaires in terms of whether someone was a mixer or an

13  installer or one of the other categories, correct?

14          MR. BERNICK:  I'm sorry, Your Honor.  At this point

15  the witness is being asked about work that her firm didn't do

16  and I don't believe that she is relying on them.  If I am

17  mistaken about that, I'd like to know, but I think --

18          MR. FINCH:  That's not correct.

19  BY MR. FINCH:

20  Q    Dr. Anderson, your firm did review 350 settled

21  mesothelioma questionnaires, correct?

22  A    I have said they did but it's not part of my report and

23  it's not part of my analysis.

24  Q    Do you know to the extent to which Dr. Florence relied on

25  that review of the settled claims?

1  A    No.

2           MR. BERNICK:  Object.

3  BY MR. FINCH:

4  Q   If a document in the settled claims file said the worker

5  personally mixed a Grace asbestos product, they should have

6  been categorized as an A, correct?

7           MR. BERNICK:  Objection to the form of the question

8  and foundation and it goes beyond the scope of this witness's

9  testimony and her opinions in this case and he's now seeking to

10  get this witness to comment on work that may or may not have

11  been done in connection with Dr. Florence's work.  He should

12  ask the question of Dr. Florence and not ask this witness to

13  express opinions that he can then use to impeach --

14           THE COURT:  I think what I said earlier was I would

15  take the objection in a short summary of the basis for it.  I

16  don't need the argument, I think, unless I ask for it.  Mr.

17  Finch, I think the witness has said she doesn't know how this

18  was done.

19           MR. FINCH:  Your Honor, Dr. Florence also said he

20  didn't know how this was done.  It was her firm that did the

21  work.

22           THE COURT:  Well, that doesn't mean you know

23  everything that's happening in your firm.  Sometimes it would

24  be nice if you did.  If you want to lay a foundation, fine, but

25  so far --

BY MR. FINCH:

Q    Okay, would you agree with me that the Exponent people reviewed whatever documents Grace gave them for reviewing the settled mesothelioma claims files?

MR. BERNICK:  I object to this question.  It's going beyond the scope of my examination and any other cross.  He's seeking to use this witness now to express opinions that go beyond the scope of her appearance here.  If he wants to call her as part of his case, he can do that but he doesn't do it on our time as --

MR. FINCH:  I'm not asking her to express an opinion. I'm asking her did they do this or did they not do this.

THE COURT:  You can ask her if she knows.

BY MR. FINCH:

Q    Do you know if they did this?

A    I said I am aware that some closed claims were reviewed. I did not include the analysis in my report.  I don't know the results of those analyses.

Q    And you're aware that the same people who reviewed -- the same people at Exponent who reviewed the questionnaires also reviewed the claims -- the closed claim files?

A    That's right.

Q    And they were given the same protocols?

A    As far as I understand it.

Q    Do you have a big, fat notebook in front of you, Dr.

1 Anderson?  On direct examination you were asked about Dr.

2 Moolgavkar's 3.2 benchmark, do you recall that?

3 A    Yes.

4 Q    Okay, and you said that was based on the all fibers

5 calculation from the 1986 EPA Airborne Asbestos Health

6 Assessment update document?

7 A    I think that Dr. Moolgavkar has discussed this in detail

8 in his report.  I prefer to rely on him for that analysis.

9 Q    Could you turn your book to Grace Exhibit 188?  It's also

10 ACC/FCR 298.  Are you familiar with this document?

11 A    Yes, I am.

12 Q    It was authored by Dr. William Nicholson under contract

13 for the EPA?

14 A    Yes.

15 Q    This is the same William Nicholson who published projected

16 future mesothelioma incidence in the United States paper in

17 1982?

18 A    Yes, it is.

19 Q    Could you turn to Page 90?  You understand that -- you see

20 the table at the top there, Dr. Anderson?

21 A    Yes.

22 Q    You understand that K Sub-M is the relative potency factor

23 for various types of asbestos fiber?

24 A    It's a potency constant.

25 Q    It's a potency constant.  And the 1.0 times ten to the

1 minus eight is the all fibers constant, correct?

2 A    I'm not sure that that's correct because what Dr.

3 Nicholson did to derive his dose -- I don't think that's

4 correct.

5 Q    You testified on direct that you thought that the 3.2

6 benchmark wasn't appropriate because it included chrysitolite,

7 correct?

8 A    That came from Dr. Moolgavkar.  My understanding is --

9 what you're looking at is the data table that has the summary

10 of the four studies that Dr. Nicholson used to merge the

11 studies to get K Sub-M for mesothelioma from these four studies

12 and then he used the K Sub-M ratio to the K Sub-L to use the

13 other -- these were the only studies he could qualify for the

14 meso analysis.  So then he used the ratio to the K Sub-L to go

15 back and pick up the other studies so he used ten studies and

16 he used one dose response curve and it was from that EPA dose

17 response curve that I believe this three point number was

18 derived and Dr. Moolgavkar has discussed that.

19 Q    Okay, you don't know whether the --

20 A    He didn't use one study out of one of the four studies

21 that was used as the basis for the derivation of the single

22 curve that Dr. Nicholson presented that's in the EPA IRIS --

23 the basis for the EPA IRIS file.

24 Q    The basis for the EPA IRIS is the 1.0 times ten to the

25 minus eight.  That's within the EPA, correct?

1  A    No.

2  Q    That's not what the EPA used?

3  A    No, this is a summary of the four studies that were used

4  to derive the K Sub-M factor for EPA's dose response work and

5  then the ratio was used -- Dr. Nicholson derived only one dose

6  response curve for cancer for all fiber types.

7  Q    Isn't it true that the average value of K Sub-M in the

8  1986 EPA paper is thus 1.0 times ten to the minus eight?

9  A    No.

10  Q    Would you turn to Page --

11  A    What you're talking about -- you're trying to take the

12  parameter, the single parameter and equate it to the dose

13  response curve that Dr. Suresh Moolgavkar used in his analysis

14  and that EPA has used for years for the dose response curving.

15  What he was doing was a doubling of risk using that curve which

16  is based on all of these studies to derive that --

17  Q    I understand that, but --

18  A    And so you have to ask him about what he did.  It's his --

19  Q    Okay well, I asked Dr. Moolgavkar what he did yesterday

20  and we'll move on.  Would you agree with me that this table on

21  page 90 shows a K Sub-M for insulation workers that is higher

22  than 1.0 times ten to the minus eight, correct?

23  A    I think he displays all of his K Sub-M for the four

24  studies that he used here so --

25  Q    And would you agree with me that 1.5 times ten to the

1 minus eight is a higher potency factor than 1.0 times ten to

2 the minus eight?

3 A    This isn't a potency factor.  It's a constant that's used

4 in the equation.

5 Q    Would you agree that it's a larger constant?

6 A    Yes, it's a larger constant.

7 Q    Okay, and would you -- do you agree that the insulator

8 cohort that is referenced there with the potency constant was

9 exposed only to chrysotile and amosite fibers and not to

10 chrysitolite?

11 A    I'm going to ask you to have this discussion with Dr.

12 Moolgavkar.  This is what is in his expert report.  It is not

13 in my expert report.  I relied entirely on his work and I'm not

14 going to get into his dose response work in my testimony.

15 Q    Okay well, you have the document in front of you.  Could

16 you turn to Page 13 in the 1986 EPA document?  You are familiar

17 with this document because you have relied upon it from time to

18 time in your own work, correct?

19 A    Yes, and I also commissioned the work and I was director

20 of the office when the work was done but that doesn't mean that

21 I presumed to do the dose response work myself and I'm not

22 going to redo Dr. Moolgavkar's work.  And if you asked him

23 about it yesterday, you have his answers.

24 Q    Could you turn to Page -- the bottom -- it talks -- the

25 study of U.S. and Canadian insulation workers by Selikoff, do

1 you see that, 3.2 mortality associated with asbestos exposure?

2 A    I'm not sure where you are.

3 Q    Bottom of the document.  The study of U.S. and Canadian

4 insulation workers by Selikoff, et al.

5 A    Yes.

6 Q    Okay, the last sentence on the page reads, "The mortality

7 experience of 17,800 asbestos insulation workers was studied

8 prospectively from January 1, 1967 through December 31st, 1976.

9 The workers were exposed primarily to chrysotile prior to 1940,

10 to chrysotile and amosite from 1940 through 1965 and largely to

11 chrysotile thereafter.  No chrysitolite is known to have been

12 used in the U.S. insulation materials.  Selikoff, et al.,

13 1970."  You don't dispute the facts as stated in this 1986 EPA

14 document, do you?

15 A    This is one of ten studies that Dr. Nicholson used to

16 derive his merge to curve for -- for his cancer dose response

17 curve.  Now as I've said, I'm not going to discuss Dr.

18 Moolgavkar's dose response work.  I think you had him here

19 yesterday to ask him his questions.  He has characterized this

20 work in his report.  He has characterized this 3.2 as

21 containing chrysitolite.  My understanding is that the relative

22 risk of two was calculated from this very conservative EPA dose

23 response curve that's an upper bound.  And as I said earlier,

24 there are a host of factors to be discussed when one wants to

25 discuss this relative risk factor and I've already listed a

1  number of them.  As to the dose response work, I am certainly

2  deferring to Dr. Moolgavkar.

3  Q    But you are saying that you believe the 3.2 dose response

4  isn't applicable here?

5  A    Yes.

6  Q    Because you believe it contains chrysitolite.  And I'm

7  pointing out to you that the insulation potency factor is

8  higher than the one that Dr. Moolgavkar used and it's a cohort

9  of people that were not exposed to chrysitolite, correct?

10 A    Dr. Nicholson did not derive his dose --

11         MR. BERNICK:  Objection.  Objection to -- I'm sorry,

12 Dr. Anderson.  I object to the form of the question.  It's

13 compound and it assumes a record with regard to Dr.

14 Moolgavkar's testimony that's not been before this witness.

15         THE COURT:  No, I think that's not what it assumes.

16 I think the basic question which was based on this document

17 which I think the witness did not answer which is whether or

18 not she accepts the proposition that's stated in this document

19 and that's really the appropriate question.

20         MR. FINCH:  That's the question.

21         THE COURT:  Let's go back to that question.

22         MR. BERNICK:  So what statement are we talking about?

23         THE COURT:  The statement on Pages --

24 BY MR. FINCH:

25 Q    Do you accept the proposition, that the insulator cohort

1  of the study by Selikoff from 1967 to 1976, "that these workers

2  were exposed primarily to chrysotile products to 1940, to

3  chrysotile and amosite from 1940 through 1965 and largely to

4  chrysotile thereafter, no chrysitolite is known to have been

5  used in the U.S. insulation material."  Do you accept that

6  factual statement in this document, Dr. Anderson?

7              MR. BERNICK:  Objection, lack of foundation.

8              THE WITNESS:  I said -- you've read it correctly but

9  Dr. Nicholson used ten studies to derive a common dose response

10  curve.

11  BY MR. FINCH:

12  Q    Dr. Nicholson didn't use --

13  A    And I don't see what bearing that has --

14  Q    Dr. Nicholson used the four studies in here, correct?

15  A    But then he derived a ratio so that he could go back and

16  pick up the other studies to complete his dose response work.

17  Dr. Moolgavkar has discussed this in detail in his report and I

18  don't wish -- I don't want to and I don't feel it necessary for

19  me to try to invade his territory.  But you read that statement

20  correctly.

21  Q    And you don't dispute that it's factually accurate?

22              MR. BERNICK:  It's the same question that he's now

23  put to her four different times --

24              THE WITNESS:  You read the statement --

25              MR. BERNICK:  -- and there's no foundation for it now

1  and there wasn't foundation for it before.

2           THE COURT:  Well, I don't know the foundation for it.

3  I don't know whether she has any personal knowledge of the

4  facts.  So if she does, she can answer the question.  If she

5  has no personal knowledge of the facts, she'll state so.  Dr.

6  Anderson, do you have any personal knowledge of the facts

7  within this report?

8           THE WITNESS:  I do and I know that he's reading

9  correctly one summary statement from one of the ten studies

10 that were eventually used.  And I said that the eventual dose

11 response work involved a number of studies and that's what Dr.

12 Moolgavkar -- that's his specialty and that's what he has

13 discussed and it is not my specialty.

14 BY MR. FINCH:

15 Q    All right, this is a graphic that -- would you put the

16 ELMO on please?

17          UNIDENTIFIED SPEAKER:  I'm sorry, what?

18          MR. FINCH:  Put the ELMO on please?

19 BY MR. FINCH:

20 Q    Dr. Anderson, this is one of the graphics that Mr. Bernick

21 showed you, is that correct?

22 A    Yes.

23 Q    Okay, you have various what you call benchmarks on the

24 right-hand side here, correct?

25 A    Yes, and they are truncated because there are ones that

Anderson - Cross/Finch                                    226

1  are higher.

2  Q    Right, the scale is broken on the right-hand side, right?

3  A    Right.

4  Q    Now, in your view, someone who has been exposed -- is it

5  correct that someone who has mesothelioma, who has been exposed

6  to cumulative fiber years of exposure to Grace asbestos of 17,

7  that their mesothelioma could have resulted from that exposure

8  to the Grace products?

9          MR. BERNICK:  Objection to the form of the question.

10         THE WITNESS:  No, that's not what this analysis

11 shows.  What I said is using these screening analysis

12 techniques -- now, later on I looked at the information I had

13 and I saw that just by adjusting even one parameter which was

14 the duration from the PIQ's, you see very different patterns

15 emerge.  But I said using a very severe upper bound

16 conservative screen, that I would recommend that the A's and

17 the C's be further analyzed.

18 Q    Okay, so it's at least possible that those -- that you

19 would admit that those could have been caused by exposure to

20 Grace asbestos?

21         MR. BERNICK:  Objection.  Calls for speculation, lack

22 of foundation.

23         THE WITNESS:  I was not addressing causality.  This

24 is a screening process and what I have said is there could be

25 some reliable scientific information behind these claims and

1  they should be looked at further.

2  BY MR. FINCH:

3  Q    Okay, what about -- do you believe that -- is it your

4  opinion that someone who is exposed to 4.5 fiber years of

5  exposure to Grace asbestos that that person's mesothelioma

6  could not under any circumstances be attributed to the Grace

7  asbestos exposure?

8              MR. BERNICK:  Objection.  What person are we talking

9  about?

10             THE COURT:  Yes.

11             MR. FINCH:  A hypothetical person.

12             MR. BERNICK:  A hypothetical person under what

13  particular circumstances?

14             MR. FINCH:  Your Honor, may I get an answer to my

15  question?

16             MR. BERNICK:  Your Honor, I really --

17             THE COURT:  No, you can get a ruling on the

18  objection.  Gentlemen, both of you have to stop this.  All of

19  you have to stop it.  The ruling on the objection is that the

20  objection is sustained.  The hypothetical at this point does

21  not fit the facts.  You may restate the question.

22  BY MR. FINCH:

23  Q    Dr. Anderson, is it your view that someone who is exposed

24  to 4.5 fiber years cumulative exposure to Grace products does

25  not have a scientifically plausible claim that their

1 mesothelioma was caused by the Grace exposure?

2 A    All right, if we take this completely away from my

3 analysis because I did not do individual analysis, I am not

4 trying to establish causality.  I was trying to establish a

5 viable screen at a very severe upper bound conservative level

6 from the analysis.  But if you ask me if I think that someone,

7 anyone with this kind of exposure has -- what did you say?

8 Q    Has a mesothelioma that has a scientifically valid claim

9 that their mesothelioma could have been caused by exposure to

10 Grace asbestos.

11         MR. BERNICK:  I object to the form of the question.

12         THE COURT:  That's sustained.

13         THE WITNESS:  Certainly not.

14         THE COURT:  It's sustained.  This witness is not

15 doing individual causation analysis.  There is no foundation on

16 this record for that.

17 BY MR. FINCH:

18 Q    Okay, so in your view someone who has 4.5 fiber years of

19 exposure to Grace asbestos and has mesothelioma, that person

20 cannot scientifically, validly attribute their mesothelioma to

21 the Grace exposure?

22 A    I said I was willing to answer in the abstract.  That's

23 not the subject of my analysis.  But we are on the inference

24 part of that curve.  I presented all of these benchmarks to

25 give a feel for just how low these values are or how high they

1  are.  I had the benchmarks and then I assembled the data.  But

2  when you're speaking of these very low levels that are vastly

3  lower than the observed range, I can tell you what, I think,

4  that is, that we are getting very far away from the scientific

5  basis for making that judgment.  And that's what I've said in

6  my deposition.  I'm being consistent.

7        But this is not -- I'm not doing individual causality

8  analysis in this work I've done.  I'm looking again --

9  Q    So you're not doing -- you're not offering any opinion

10 that someone with any particular exposure to Grace products,

11 that their mesothelioma couldn't have been caused by that

12 exposure?

13       MR. BERNICK:  Objection to the form of the question.

14 Are we talking about a specific individual?  Are we talking

15 about individuals within a group?

16       MR. FINCH:  Any individual.

17       MR. BERNICK:  I don't think that addresses the issue.

18 Your Honor, at this point I think this witness has been here

19 for a long time.  This is argumentative --

20       MR. FINCH:  Your Honor, this is an argumentative

21 objection.  He should either object to form or not object to

22 form.

23       THE COURT:  Mr. Finch, the witness has testified

24 repetitiously that she has been doing analyses within

25 categories, that she is not looking at individual analyses --

1          MR. FINCH:  Okay, let me ask three more questions.

2  BY MR. FINCH:

3  Q    You have something called OSHA PEL on there as a

4  benchmark, correct?

5  A    Yes.

6  Q    Is it your view that the OSHA PEL is -- that there is no

7  excess risk of mesothelioma from exposure to asbestos at that

8  level?

9  A    Using public health protective risk analysis, there have

10 been some statements, hypothetical statements of risk

11 associated with that.  They're not that high.  It's what OSHA

12 accepts.  What I have said is that if we're dealing with

13 scientific-based information, we would need to be above the

14 observed range, about 25 fibers per milliliter year.  And as we

15 go down that curve, the competence that there is any

16 association becomes less and this is very low on that

17 competence curve.  So I'm not establishing causality.  I was

18 providing this information for a screen and against that screen

19 I was using an exceptionally severe set of assumptions.  And so

20 I think you are -- I don't think I can answer individual claim

21 questions.

22          The second part of that answer has to be, for any

23 individual claim, I think one must look at, if anyone is doing

24 this which I am not as far as risk analysis is concerned, you'd

25 have to look at the whole set of circumstances, how long a

**J&J COURT TRANSCRIBERS, INC.**

1  person has been exposed, what are the alternative exposures.

2  And just to say if someone was exposed at 4.5 and the inference

3  zone of a hypothetical dose response curve where the curve is

4  uncertain in the inference zone anyway and it's uncertain by

5  factors -- Nicholson said factor of 20 on either side -- I

6  don't think that this OSHA number is created to establish

7  causality.  That's my view.

8  Q    Are you aware that OSHA's preamble to the regulation

9  states that OSHA's risk assessment also show that reducing

10  exposures to 0.1 fiber per cc would reduce excess cancer risk

11  to 3.4 per 1,000 workers?

12  A    That is -- that's what I was talking about earlier when I

13  talked about the divergence between causality and

14  inference-based judgments.  OSHA is speaking as a public health

15  protective agency.  They're charged with protecting worker

16  health.  They're using the same precautionary dose response

17  curves I used at EPA and that's what they mean.  They're

18  reading that value off of this hypothetical default curve that

19  I described earlier that I described as a plausible upper bound

20  on the risk, meaning the risk could be considerably lower even

21  approaching zero.

22        So they're saying if I go down that curve somewhat

23  more, I would get a smaller number.  But, in fact, we don't

24  know that there's any cancer caused, or mesothelioma or any

25  cancer, caused on this linear non threshold curve.  And the

Anderson - Cross/Finch                               232

1  desire in all of risk analysis for carcinogens now is to

2  understand the mechanisms of action so that we can better

3  describe the slow dose range.  So these are hypothetical upper

4  bound risk estimates and that's all they are.

5  Q    And you didn't make any attempt to analyze causation on an

6  individual claimant level, correct?

7  A    Correct.

8  Q    And you did not -- you didn't make any attempt to estimate

9  any exposure to asbestos that these individuals would have had

10 from sources other than Grace, correct?

11 A    That's correct.

12         MR. BERNICK:  Objection.

13         THE WITNESS:  I made note in my expert report only of

14 alternative claims and then also I did make note of those

15 claimants that I particularly made the assertion that they were

16 exposed in shipyards.

17 BY MR. FINCH:

18 Q    Okay, if the category B claimants showed cumulative

19 asbestos exposure of 4.5 fiber years, would you have concluded

20 that those claims in that category should be subject to further

21 review?

22         MR. BERNICK:  I'm sorry, could I have the question

23 read again?

24 BY MR. FINCH:

25 Q    If the category B claimants showed that they had

1  cumulative exposure to Grace products of 4.5 fiber years, would

2  you have concluded that those claims in that category should be

3  subject to further review to determine whether Grace --

4           MR. BERNICK:  Objection.

5           MR. FINCH:  -- could have caused their mesothelioma?

6           MR. BERNICK:  Objection to the form of the question.

7  Is he asking about if there was one person in the category or

8  whether the mean dose in that category was 4.5?

9  BY MR. FINCH:

10 Q    If the mean dose in that category was 4.5 instead of 2.1.

11 A    It would depend on the product, the product mix and a view

12 of all the benchmarks.  I wouldn't do it necessarily just

13 because -- that's if you're exposed to the OSHA standard for 45

14 years and that does not mean that OSHA has set a standard, that

15 they think, in an occupational setting would cause

16 mesothelioma, nor do I.  But I think before that judgment could

17 be made, one would have to look at the entire nature of

18 exposure category, what the product is that one is being

19 exposed to and make judgments against all of the benchmarks.

20 But probably not.

21          MR. BERNICK:  Your Honor, at this point I would note

22 that Mr. Finch has now doubled his 15 minutes and their

23 estimate of two and a half hours is wrong by 35 minutes and

24 they have now doubled the time that I spent on direct

25 examination and I'm concerned about finishing today.

1          MR. FINCH:  Your Honor, I don't have any more

2    questions.

3          THE COURT:  Redirect?

4          MR. BERNICK:  Let's do a couple of things here this

5    afternoon quickly.  Could I have the ELMO on please for just a

6    moment?  Thank you very much.

7                    REDIRECT EXAMINATION

8    BY MR. BERNICK:

9    Q    Referring you to that same table which is contained in

10   GX-188 that had the K-M factors that Mr. Finch talked about, he

11   asked you a lot about this one here which is insulation workers

12   which is 1.5 times ten to the minus eight, do you recall that?

13   A    Yes.

14   Q    And if we take a look at the insulation workers and in

15   fact the description that Mr. Finch directed you to, it was at

16   Section 3.2, and the continuing on or the continuing language

17   on Page 14 was, "These workers were exposed primarily to

18   chrysotile prior to 1940, to chrysotile and amosite or from

19   1940 to 1965, and largely to chrysotile thereafter."  You see

20   where it refers to exposure to chrysotile and amosite for 25

21   years?

22   A    Yes.

23   Q    Does that or does not include the war years?

24   A    It does.

25   Q    And were the insulators -- tell us what role, if any, the

1  insulators played during the war years in terms of their work

2  on insulation.

3              MR. FINCH:  Objection.  Lack of foundation.

4              MR. BERNICK:  You opened the door.

5              MR. FINCH:  No, you objected on lack of foundation.

6  He did not lay a foundation that she studied the insulator

7  population to know what they were doing during World War II.

8  Dr. Selikoff and Dr. Nicholson did that work, not this witness.

9              THE COURT:  You can ask her if she has knowledge of

10  the facts.  If she does, we'll go forward.  If she doesn't, we

11  won't.

12  BY MR. BERNICK:

13  Q    Do you know about that, whether the insulators were

14  involved in the war effort?

15  A    Certainly they were.

16  Q    Thank you.  Now, Mr. Finch didn't ask you any questions

17  about the proportion of chrysotile and amosite that the

18  insulators were exposed to, did he?

19  A    No, he didn't.

20  Q    Do you know what the proportion is?

21  A    I don't know exactly but I believe it was --

22  Q    If you don't -- it's up to you.  I'm not asking you to

23  speculate.  If you know, you know.  If you don't, you don't.

24  A    I don't know exactly.

25  Q    Did he ask you to compare the proportion of amosite that

1  these folks were exposed to for 25 years with the proportion of

2  any amphibole that was in Grace's product?  Did he ask you to

3  do that comparison?

4  A    No.

5  Q    Is that something that's within the scope of your

6  testimony or work in this case?

7  A    It could be.

8  Q    That is, to make those detailed comparisons of how much --

9  A    No.

10 Q    Now, he then didn't ask you about this figure of the table

11 which is the cement factory workers.  He wanted to point out

12 that 1.5 was greater than 1?  Remember he asked you that

13 question?

14 A    Yes.

15 Q    He didn't take you down to this one.  Which is bigger, 1.2

16 times ten to the minus seven or any of these numbers times ten

17 to the minus eight?

18 A    The 1.2 times ten to the minus seven, of course.

19 Q    Of all the studied data, of all the K-M factors, which one

20 actually is the largest factor of the set?

21 A    The one for the cement factor workers.

22 Q    If we go back to GX-188 and Section 3.9.14, we see in this

23 table here where it talked about that vector, there was

24 citation, "Cement Factory Workers, Finkelstein 1983," do you

25 see that?

1  A    Yes.

2  Q    Is there also a Page 76 then, a reference to Finkelstein

3  1983 and the asbestos cement products?

4  A    Yes.

5  Q    Is there a description that appears here as to whether

6  chrysitolite was involved in the study that produced the

7  largest K-M factor?

8  A    Yes, it was.

9  Q    Is that consistent or inconsistent with the testimony that

10 you earlier provided based upon the advice that you had

11 received from Dr. Moolgavkar?

12 A    It's consistent with the advice from Dr. Moolgavkar.

13 Q    Let's talk about another detailed item.  With respect to

14 ACC/FCR 3020, do you recall being directed by Mr. Mullady to

15 the bottom of Page 52 where he read, quote --

16              THE COURT:  I'm sorry, what exhibit is this please?

17              MR. BERNICK:  This is ACC/FCR 3020, Your Honor.

18              THE COURT:  Thank you.

19 BY MR. BERNICK:

20 Q    He read the quote that says, "However, the correlation

21 between fiber counts and total dust is sometimes poor within

22 the plant, i.e., a single study environment, and generally poor

23 between plants," and there's a citation to EPA publication in

24 1986.  Do you see that this paragraph relates to samples

25 collected prior to the mid 1960's were often analyzed by

Anderson - Redirect/Bernick                          238

1  measuring total dust in units of millions of particles per

2  cubic feet using impingers or thermal precipitators, do you see

3  that?

4  A    Yes.

5  Q    Does that have any relationship to the broader statement

6  that appears below?

7  A    Certainly.

8  Q    What is that relationship?

9  A    Well, it means that the fibers collected earlier by the

10  impinger technique is the measurement.  I wasn't quite sure

11  because I didn't read that.  But it means that that's the basis

12  for the discrepancy.

13  Q    Yes.  I'd like to take you back to a couple other small

14  things and then ask you a couple of broader questions.  Where

15  you have --

16           MR. BERNICK:  This is kind of a little bit

17  interesting if I could approach the witness, Your Honor?

18           THE COURT:  Yes.

19  BY MR. BERNICK:

20  Q    Mr. Mullady started out his examination and he said, You

21  have assumed, have you not, 45 years of Grace exposure and you

22  then observed that in whatever category it was, maybe it was

23  more general, but when it came to a category, 77 percent of the

24  people had mesothelioma.  And he asked you whether you had in

25  some fashion considered whether a logical explanation for all

**J&J COURT TRANSCRIBERS, INC.**

1 of this mesothelioma was the assumed 45 years of Grace

2 exposure.  Do you remember that line of questioning?

3 A    Yes.

4 Q    Okay, the -- your analysis, does it work from the

5 observation of meso back to Grace exposure or does it work the

6 other way around, that is, the observation of Grace exposure

7 and the question of whether it could cause that level of

8 mesothelioma?

9 A    Certainly, the latter was the subject of my analysis.

10          MR. MULLADY:  Objection to the leading -- objection

11 to the leading nature --

12          MR. BERNICK:  It's not leading at all.  I asked for

13 two alternatives.

14          THE COURT:  I'm sorry, Mr. Mullady --

15          MR. MULLADY:  Could I make my objection?

16          THE COURT:  Yes, please.  I didn't hear you.  I'm

17 sorry.

18          MR. MULLADY:  I object to leading the witness.

19          MR. BERNICK:  Your Honor, I asked for two

20 explanations.  It either goes this way or that way.  Two picks.

21          THE COURT:  I don't think that's leading.  But if it

22 is, I think at this point in the day, Mr. Mullady, I'm too

23 tired to know.  So I'm overruling the objection.  I don't

24 believe it's a leading question.  But if it is, frankly, Mr.

25 Bernick would be able to restate it and this witness would be

Anderson - Redirect/Bernick                    240

1  able to figure it out anyway.  So at this point I'm going to

2  assume that --

3          MR. MULLADY:  At this point, that's true, Your Honor.

4          THE COURT:  -- that the witness will be able to

5  answer that question.

6          MR. MULLADY:  Now that we've had it laid out for her,

7  I'm sure she could.

8          THE COURT:  Go ahead and answer, Dr. Anderson.

9          THE WITNESS:  Yeah.

10 BY MR. BERNICK:

11 Q    Which way does your analysis go?

12 A    Well, the whole subject was the first question I stated

13 which is, could the exposures to Grace products be responsible

14 for the mesothelioma?

15 Q    If we had the observations that we have a high rate of

16 mesothelioma and we wanted to work the other way around, what,

17 if any, other factors could be present in your view that might

18 provide an alternative explanation for the mesothelioma, an

19 alternative to exposure to Grace products?

20 A    Well, certainly exposure to other products.

21 Q    Now, that then leads to my next set of questions.  Mr.

22 Mullady and, I believe, Mr. Finch, principally Mr. Mullady,

23 said well, if we assume 45 years of exposure to Grace products

24 and that is what you assumed for purposes of your analysis, you

25 address the question of whether, based upon your analysis and

J&J COURT TRANSCRIBERS, INC.

1  the cumulative doses, you answered the question whether that

2  provided a reliable scientific evidence that Grace exposure

3  caused disease in whole or in part, do you remember your

4  testimony, as to whether the -- based upon the cumulative doses

5  over 45 years, whether under your analysis there was reliable

6  science to say that Grace caused disease either in whole or in

7  part, do you remember that?

8  A    Yes.

9  Q    And I think we know what your conclusion was.  What was

10  your conclusion as to whether there was reliable scientific

11  evidence in support of that proposition?

12  A    That there's no such evidence for B, D's and E's.

13  Q    Now, I want you to assume that it's not 45 years of Grace

14  exposure.  I now want you to assume a different case which is

15  there's non-Grace exposure as well.  What would that do to the

16  cumulative doses that you analyzed?

17  A    It would proportionally reduce those cumulative doses

18  because we would be subtracting years from Grace exposure.

19  Q    Now tell me, if we're reducing the cumulative doses, what,

20  if anything, will that do to the possibility or probability

21  that Grace asbestos caused the diseases at issue in whole or in

22  part in categories B, D and E?

23  A    It would decrease the cumulative exposure levels

24  proportional to the number of years that are subtracted from

25  the 45 years.

1  Q    And what effect, if any, would that have on the

2  probability that Grace exposure could cause those diseases?

3  A    It would make it even less probable.

4  Q    Now I believe you said, and I just want to be clear, that

5  when it came to this question of whether Grace exposure was 45

6  years or not, your model did, in fact, assume 45 years?

7  A    Correct.

8  Q    I want to show Exhibit 2215 if we could.  That is the

9  wrong exhibit.  The right one is 2295.  Sorry, T.J.  What is it

10 that you actually found when you went to the actual PIQ data

11 that was available?  Did you find that the exposure was, in

12 fact, exclusively to Grace or did you find otherwise?

13 A    I found otherwise as I explained when we discussed this

14 slide.

15 Q    And what again would that do if we now look at the PIQ

16 data itself, what would that do to the possibility that the

17 Grace exposure caused disease?

18 A    It would make it less probable because for every year that

19 these claimants worked in another environment, and 94, 93

20 percent of them said that they did not get Grace exposure.

21 They were in a different environment and worked getting some

22 other type of exposure.

23 Q    Okay, now I want to show you, if we could go back to the

24 ELMO for just a moment, ACC/FCR 3017 which was the PIQ file for

25 one of the claimants and I believe it was Mr. Mullady who

Anderson - Redirect/Bernick                    243

1  directed your attention to the fact that, indeed, when it came

2  to Grace exposure, this individual was a D and an E for

3  approximately eight years, do you see that?

4  A    Yes.

5  Q    Okay now, based upon the way that your model works, based

6  upon -- we have an individual who specifies on the claim form

7  that he is a D or an E --

8  A    -- for nine years.

9  Q    -- for nine years, how would that individual have been

10 treated under the model, under your assumed model?

11 A    He would have been treated as if he had 45 years of

12 exposure instead of nine years of exposure.

13 Q    And in point of fact when we take a look at the non-Grace

14 exposure, he says that he worked for two years as a category A

15 for Johns Manville and then he worked as a D and an E for

16 Container Corp in Philadelphia, do you see that?

17 A    Yes.

18 Q    If we now assume again that because a statement appears in

19 the body of the PIQ that is accurate, with respect to this

20 individual, would your model have been conservative or would

21 your model have cut against it?

22 A    It would have been highly, highly conservative because we

23 now reduce the years that he was exposed -- he was available to

24 have been exposed, and by his own admission, he was only

25 exposed nine years to Grace product.

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Redirect/Bernick                    244

1  Q    A detailed question, it was pointed out on cross

2  examination that in about 66 percent of the cases there was

3  insufficient information that put people into categories, do

4  you recall those questions?

5  A    Yes.

6  Q    Do you know with respect to those people whether they

7  simply did not have evidence or whether they simply chose not

8  to disclose it, do you know one way or the other?

9  A    I don't.

10         MR. FINCH:  Objection.  Lack of foundation.

11         MR. BERNICK:  I just asked do you know.

12         THE WITNESS:  And I said we couldn't know.

13 BY MR. BERNICK:

14 Q    I want to talk about individuals for just a moment.  A lot

15 of questions that related to individuals in different ways.  I

16 want to make sure that we have the testimony clear.  As I

17 understand it, you take the top line of your chart 2296, we

18 have a job category or an exposure category leading to a mean

19 concentration which you max out leading to a dose and you then

20 have the benchmarks up here.  We're not yet at the last column

21 which are the claims review, at this point in your analysis, do

22 we have any individuals in the picture at all?

23 A    No.

24 Q    Now we go to the last column and we do the claims review.

25 Does that claims review relate to real world individuals?

1  A    Yes.

2  Q    Okay.  With respect to those individuals, what was the

3  purpose of doing the individual claims review?  What was the

4  purpose of focusing on individuals at that point?

5  A    Because we were fitting together the nature of exposure

6  categories in those exposures now and the cumulative exposure

7  with the individuals from the PIQ so they could be placed into

8  the categories.

9  Q    Based upon your expertise in risk assessment, tell us

10 whether the scientific analysis that you had done for each of

11 these different categories, tell us whether or not it applied

12 to the individuals who after the claim file review were placed

13 in those categories.  Did it apply to them?

14 A    It applied to them once they were in the category because

15 then they were in the category with the job exposure.

16 Q    Now we know from your direct examination, I believe, that

17 after you did all that, you went back and considered the

18 question of whether your treatment of those individuals, that

19 is, whether your model as applied to all those individuals was

20 conservative or not?

21 A    That's correct.

22 Q    And part of that was to look for individual data.  Could

23 we go back to 2280?  Tell us whether -- explain to us how, if

24 at all, Exhibit 2280 bears on how, if at all, it shows how

25 looking at individual data relates to your analysis.

1 Q    Well, we've already seen from the PIQ that as soon as we

2 start to look at individual data, we find lower duration of

3 exposure.  As soon as we did any analysis with the individuals

4 in category E who were maintenance workers or in building

5 maintenance categories, we found that they were exposed 16

6 percent of a lifetime instead of -- I mean 16 percent of a

7 working lifetime rather than  -- I mean 16 percent of 250 days

8 a year rather than 100 percent, and one percent in the case of

9 maintenance workers dealing with VAI insulation.  So --

10 Q    If we focus on the individuals that we actually have here,

11 the PIQ individuals --

12 A    And then in the PIQ we find --

13 Q    Just let me put a question to you.  What effect, if any,

14 in consideration of individual data have on your analysis when

15 you look at the PIQ data relating to duration in categories A

16 and C?

17 A    Well, as I would expect, as soon as we start to look at

18 individual data, these very high screens go down.  We see here

19 from the PIQ data the duration that we assume to be 100 percent

20 falls down rapidly, 98 percent are under 45 years, 54 percent

21 under 25 years.  So we see that these screening levels that

22 have established would go down as we get individual data and

23 would become lower levels, therefore, even further removed from

24 benchmarks.

25 Q    Let me ask you a very specific question.  If it turns out

Anderson - Redirect/Bernick                                    247

1  that the individual data for any particular individual is

2  inconsistent with what you assume in the model, does that mean

3  that the model itself is wrong?

4  A    No.

5  Q    Why not?

6  A    What that would likely mean from what we know from long

7  term experience and what we know from this exercise and what we

8  know from these very high upper bound assumptions, individual

9  data in all likelihood is going to make the cumulative exposure

10  for that individual far lower than the cumulative exposure that

11  I have created by these extreme assumptions for these nature of

12  exposure categories.

13  Q    Now, I want you to -- I want to put a chart up and push

14  you on that a little bit.  I want to show you what we've marked

15  as Exhibit 2300 for demonstrative purposes.

16            MR. BERNICK:  Have we given it to the other folks?

17            UNIDENTIFIED SPEAKER:  Yes, I did give it to them.

18            MR. BERNICK:  And T.J. has it?  Could we please

19  display that?

20  BY MR. BERNICK:

21  Q    I want to take a look at this chart for a moment and put a

22  question to you.  A lot of questions were asked of well, what

23  if it turned out that somebody in B, D or E was higher than the

24  mean would predict, do you remember that, those kinds of

25  questions?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I do.

2  Q    Okay, is it possible that we could have in categories B, D

3  and E some individual that on analysis turns out to have been

4  the guy who was like, you know, always got the rain cloud over

5  his head, is always -- the asbestos is always with the wind

6  into his face, could we have possibly an individual, maybe more

7  than one individual like that?

8  A    I think I said earlier that it would, in my view, be a

9  very low probability event but certainly, anything is possible,

10  and it's possible.

11  Q    Okay, and under your analysis because you look at the

12  mean, if that possibility is actual, that's one person who got

13  included in B that shouldn't have been included in B, right?

14  A    Right.

15  Q    Okay.  Now, tell us whether or not the same is true with

16  respect to A and C.  Tell us whether there's a possibility that

17  with respect to the people who are in A and C can swell the

18  amount of that group, whether they were included even though

19  their exposures were far lower than the mean, is that also a

20  possibility?

21  A    I said earlier that that's a high probability.

22  Q    Well, first of all, is it a possibility?

23  A    It's a possibility.

24  Q    Okay.  Now, do we know whether that possibility is real?

25  A    Yes, we think it's in all likelihood because we see that

Anderson - Redirect/Bernick                    249

1 we have several vectors that point that way and they were

2 displayed earlier, particularly in the duration data.

3 Q    And that would be 2293 if we could show that briefly.  Is

4 this one of the charts that is when you actually looked at the

5 individual duration data, keeping all of your other, you know,

6 max, max, max where it is, how does that -- how does this

7 relate in the question of whether there are people in category

8 A who may not really belong in an analysis that says maybe 15

9 fiber years?

10 A    Yes, I think this is a very important consideration.  We

11 see here that we have 98 percent of A's and C's are now under

12 the 15 fiber mil years where the scientific evidence ceases.

13 And we find that 69 percent are under the 8.9 Libby fiber based

14 doubling of risk.  And actually, these numbers are probably, in

15 many cases, more appropriately related to what would be

16 somewhere between the 80 benchmark for chrysotile and the 8.9

17 for the Libby amphibole fibers.  So it would probably be in the

18 range of about 40.  So I think here we see we have 69 percent

19 of these A's and C's going for further analysis who probably,

20 in all honesty, did not get their mesothelioma from these

21 exposures.  But we're pushing those forward.

22 Q    You were asked last seria, you were asked questions about

23 it, tell us where it is written that you should be looking for

24 long term exposures, you should be looking towards the mean, do

25 you remember those questions?

1  A    Yes.

2  Q    I want to show again 22 -- refer to your experience, 30

3  years of experience, I want to ask you a question about a

4  publication and ask you whether this has any relationship to

5  the experience that you've just described.  I want to show

6  2217.  We showed this on your direct examination --

7  A    Yes.

8  Q    -- which was EPA guidances and documents.

9  A    Yes.

10  Q    What, if any, relationship does that have to the

11  experience that you recited with regard to using the mean?

12  A    Well, I cited long term experience.  I founded EPA's

13  exposure group.  It was the first exposure group founded.  And

14  in the very beginning a lot of our work was with air

15  measurements and then we moved to pesticide applicator and

16  those issues and then to superfund site and those issues.  And

17  we learned from experience from large data sets that the

18  average concentration is the most representative, particularly

19  for long term exposures.

20  Q    Now, finally, as part of the same examination, I've got a

21  couple more questions and we're done.  You were asked a bunch

22  of questions about sampling, that if you wanted to do a true

23  average, that somehow there had to be a proper sampling done.

24  Now, if we are talking about a site that exists today, we

25  wanted to characterize the site today, tell us whether or not

1 in terms of what the concentrations are, et cetera, et cetera,

2 et cetera.  If we're looking at a site today where we can go

3 ahead and do the sampling, is it or is it not desirable from

4 your point of view to have a thorough going sampling effort?

5 A    It certainly is and it depends on the particular

6 situation.  If it's air sampling, long term annual monitors are

7 placed around sources to monitor the variables over a long

8 period of time because short term samples do not reflect the

9 long term mean.

10 Q    But now, what if you're in a situation where, you know,

11 you're at the EPA or your not at the EPA but you got a site

12 that's a very, very old site and people no longer work there at

13 the jobs they used to have, they're trying to figure out what

14 their exposures were, is there any way that you can kind of

15 historically take yourself back in a little time capsule and go

16 and do a sampling analysis?

17 A    No, we can't do that.

18 Q    Is there anywhere that you know where EPA or any other

19 convention within the field of risk assessment says that before

20 you can calculate an average with respect to past exposures

21 where the sampling is no longer possible, that before you can

22 put pen to paper and calculate an average, you have to have a

23 proper statistically deviated whatever sample?  Is there any

24 requirement that says you've got to have that in order to do

25 your average?

**J&J COURT TRANSCRIBERS, INC.**

1  A    No.

2  Q    If it were true that EPA or anybody else could not

3  characterize past exposures where the work is no longer being

4  done without a statistical representative sample, would people

5  be able to do the work of figuring out risk associated with

6  past exposures?

7  A    No.

8  Q    If individuals who wanted to get compensation on the

9  theory that they were over exposed, couldn't get compensation

10 unless they get to do a true average based upon sampling, they

11 were exposed back in the 50s and 60s or maybe in the early 70s,

12 could they get compensation if somebody were to require that

13 they did a true statistically, significant deviated sample?

14         MR. MULLADY:  Your Honor, objection.  I think now

15 we're really far afield from the line of questions from which

16 this redirect is supposed to be emanating.

17         MR. BERNICK:  To the contrary.

18         THE COURT:  It's argumentative, Mr. Bernick.

19         MR. BERNICK:  It is a little bit argumentative and on

20 that note, I'll rest my question.

21         THE COURT:  All right.  Mr. Mullady?

22         MR. MULLADY:  Yes, just one question.

23                    RECROSS EXAMINATION

24 BY MR. MULLADY:

25 Q    I'll ask it from here, Dr. Anderson.  You had no long term

1 data from Dr. Lees, did you, to work with?

2 A    He was creating eight-hour annual averages -- TWA

3 averages.

4 Q    Right, single day point in time averages taken by him.

5         MR. BERNICK:  Objection, objection.  Creating a

6 single point average, I don't understand that question.

7         THE WITNESS:  He was creating eight-hour mean

8 averages because of the nature of the work.  I was using them

9 to generate long term frequency and duration.  He was not

10 trying to measure -- conceptually, I think I know what you're

11 trying to address.  He's not trying to measure, conceptually, a

12 measurement from a facility that was operating over time.  He

13 was trying to capture in a job category where people work on a

14 daily basis an eight-hour time-weighted average and he had a

15 number of data sets, in some cases, many data sets, in some

16 cases, fewer, to capture that.

17         So we were trying to do an industrial hygiene study

18 here, not a long term average environmental monitoring study.

19 So here it's appropriate for him to try to capture as best he

20 can what those exposures are in an occupational setting

21 averaged as an eight-hour time-weighted average.

22         MR. MULLADY:  Nothing further.

23         THE COURT:  Mr. Finch?

24         MR. FINCH:  Nothing, Your Honor.

25         THE COURT:  Mr. Bernick?

1          MR. BERNICK:  I have nothing further.

2          THE COURT:  You're excused, Doctor, thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right, folks, you told me you needed

5  to leave at five.  It's five to five.

6          MR. BERNICK:  This is true, Your Honor.  I guess

7  there are only two items to cover, potentially cover, and we're

8  not going to have time to do it now I suppose, but I'm not sure

9  exactly what we can do.

10          THE COURT:  Well, let me address --

11          MR. BERNICK:  The 408 -- sure.

12          THE COURT:  Let me address the Rule 1006.  I did have

13  a chance to take a look at that.  This is what I think the

14  outcome about the 1006 ought to be.  The cases, except for the

15  one from Texas, all seem to address writings and documents that

16  are admissible in and of themselves in some fashion.  The Texas

17  cases, the only one that actually, I think, addresses

18  testimonial evidence, at least it's the only one I had a chance

19  to look at -- if there are others out there, then I just didn't

20  get to them all.  I didn't get to them all, so I have to say

21  that, but to the extent that it addresses the testimonial

22  issue, it seems to me that the analysis ought to be, if there

23  are others out there and somebody can point me in a different

24  direction if I'm headed in the wrong one, that the testimony

25  itself should be admissible and probably admitted, otherwise

1  you've got a hearsay problem.  And so probably, the depositions

2  have to come in anyway.  Once they're in, frankly, I don't have

3  any problem with the summaries because I think you are going to

4  summarize those anyway, either by way of proposed findings of

5  fact and conclusions of law or statements in your briefs

6  anyhow.  And that's just the reality.  That's what's going to

7  happen.  So I think the summaries would actually be helpful.

8          And the format of the summaries where you take the

9  topics that you think will be of relevance in your particular

10  theory of the case and summarize what witness -- witnesses you

11  think should be relevant and put together the collection of

12  exhibits, depositions, trial testimony, whatever the

13  substantive exhibits are that you think would be relevant to

14  those points actually is very helpful.  That would be helpful.

15          The difficulty may be that if it's depositions that

16  you're summarizing because of the hearsay problem, I think that

17  deposition probably has to be in evidence anyway.  As to the

18  documents and writings, I don't think those have to be actually

19  admitted.  They simply have to be admissible and you folks have

20  already been through those documents so you've probably got a

21  view as to whether they are or are not admissible.

22          But I think that's the issue and the way I've got to

23  focus on it.  So I don't think it's going to save much time in

24  terms of looking at the deposition testimony.  I have to either

25  read it to the extent that you want to submit it.  If you can

1  eliminate portions of it -- frankly, if somebody is taking the

2  Fifth Amendment and it's nothing but a question and then an

3  assertion of the Fifth, I don't know why I need to read that

4  except to identify the witness.  You know, there's no evidence

5  before me in that sense.  Now, there may be inferences that can

6  be drawn and if you want the assertion of the inference later,

7  it appears, I think, you can simply point that out.  But why we

8  have to play a whole deposition transcript simply to watch

9  somebody take the Fifth, I don't know why I need to do that.  I

10  had enough Grand Jury experience watching people take the

11  Fifth.  I know what that's like.  I don't really need to spend

12  a whole day doing that, frankly.

13       But to the extent that you want to play a smattering

14  of the deposition just so there's a, you know, an

15  identification of the witness, I don't have any problem doing

16  that if that's valuable to you.  If you want me to sit there

17  and watch the witnesses take the Fifth, fine, you know, I'll do

18  it.  My time is your time.

19       MR. BERNICK:  We don't want to do any of that,

20  frankly.  With respect to the Fifth Amendment, we do want the

21  adverse inference and the way to do it, of course, is to submit

22  evidence --

23       THE COURT:  Right.

24       MR. BERNICK:  -- evidence is prior testimony so we've

25  got that there.  I guess, given Your Honor's ruling, the

1  question is do we want to -- I guess we -- do you want us to

2  spend three hours playing this stuff?  Now, we, again, we have

3  no interest in that, but in order to be able to get the

4  testimony in evidence, Your Honor said before that you wanted

5  to have it take place real time in court.

6       THE COURT:  Yes, the reason for that is I know what

7  will happen.  If it's not done in court, it's going to sit back

8  there until I have an opportunity to get to it and that will

9  probably delay things.  And frankly, it seems to me that if --

10  and it will also force you to focus your energies on what

11  portions of these transcripts you actually think I need to see

12  rather than having me simply go through and read, you know,

13  lots of objections that are meaningless and lots of arguments

14  on the deposition transcripts that I really don't need to read

15  because you don't -- it's not really something that you're

16  going to offer.

17       So I think you folks can spend the time whittling

18  down the depositions to what you want me to actually either see

19  by video or read here.  I don't care which.  But I think it

20  should be done in court.  And then to the extent that the

21  depositions are admitted and the documents are admitted, I'm

22  happy to take the summaries thereafter.  The evidence will be

23  in.  I think Rule 1006 will provide for it.  That everybody can

24  do it, I think you'll be doing it anyway as part of your

25  proposed findings of fact and conclusions of law.  So whichever

1  way it comes, I think will be fine.

2          MR. BERNICK:  Okay, so that then leaves us with the

3  Rule 408 issue and the question of what to do on Monday.

4          MR. MULLADY:  Excuse me, could I just get a

5  clarification of the Court's ruling?  I'm sorry, David.

6  There's something I'm just unclear about.  If the premise of

7  Your Honor's ruling is that for the summaries to be offered,

8  the underlying evidence has to be admitted --

9          THE COURT:  With respect to the deposition

10 transcripts.

11         MR. MULLADY:  Correct.

12         THE COURT:  Yes.

13         MR. MULLADY:  Some of these summaries refer to

14 depositions taken in other cases.

15         MR. BERNICK:  That's solely for purposes of the

16 adverse inference.  And for purpose of the adverse inference,

17 the testimony does not actually have to be admissible evidence.

18 That's what the rule says.  But you can argue that later on

19 with respect to people who take the Fifth Amendment, we'll have

20 to -- if you want to take issue with that, we can argue that --

21         MR. MULLADY:  That was --

22         MR. BERNICK:  I'm sorry, the bulk --

23         MR. MULLADY:  I was asking the Court for

24 clarification on that aspect of your ruling.

25         THE COURT:  Okay, Mr. Mullady, I'm sorry, in the

1  little bit of time I have, I'm not familiar with the fact that

2  some of these are coming up in other cases.  I think Mr.

3  Bernick has accurately stated the premise, but if you need to

4  brief that, then, you know, brief it.  My view right now is why

5  don't you see if you can't work through that particular issue

6  and see what we can do?  I think as -- I don't want a hearsay

7  problem, okay?

8          MR. MULLADY:  Understood.

9          THE COURT:  I want to get past the hearsay problem

10  with respect to the depositions.  I don't think that hearsay

11  problem exists because of the rule where the documents,

12  writings and recordings only have to be admissible in the Third

13  Circuit, not admitted.  I think the deposition issue is a

14  different issue because of the hearsay problem.

15          MR. BERNICK:  The difficult -- that's fine, Your

16  Honor.  We -- the deposition designation process has been under

17  way for some time.  If they wanted to move in limine on the

18  depositions, they should have done it a long time ago.  I'm

19  only reacting to Your Honor's invitation -- not invitation, but

20  suggestion that they may have the opportunity to brief.  This

21  matter is up.  It's a today thing, so --

22          THE COURT:  No, only with respect to the adverse

23  inference.  I don't know whether -- I don't know how that will

24  work with respect to a deposition in another case in the

25  adverse inference, that's all.

1          MR. BERNICK:  So we have on Monday -- we have only

2  one live witness left, that's Dr. Florence.

3          THE COURT:  All right.

4          MR. BERNICK:  And we were going to call him on Monday

5  and rest.  It sounds to me like we're not going to be able to

6  rest because we have to do this process.  And I don't know, I

7  would always be optimistic and assume that there won't be very

8  much to be read, but right now the designations take in excess,

9  I think it's like two and a half or three hours.  So the

10 question then becomes, do we do the depositions and argue Rule

11 408 on Monday or do we call Dr. Florence, put him on and off

12 and then do the depositions?  But the problem is Rule 408.

13 What I would suggest is that we try to figure that out amongst

14 ourselves.

15         THE COURT:  That's fine.

16         MR. BERNICK:  But in any event, it doesn't seem to me

17 that -- and I don't want to put Dr. Florence in the position

18 where we do the doctors and then he can't finish or whatever,

19 and I don't know if he may have a scheduling issue or not.  In

20 any event, it will be either one or the other, either the

21 doctors or Dr. Florence and I'm assuming that we'll argue Rule

22 408 at some point during the day on Monday in any event if

23 that's appropriate from Your Honor's point of view.

24         MR. INSELBUCH:  I would think the 408 argument has to

25 be before the Florence testimony.

1    MR. BERNICK:  I would have said so too and we

2 intended to try to do that today, but -- and I think Your Honor

3 set what, 20 minutes aside on Rule 408?

4    THE COURT:  Yes.

5    MR. INSELBUCH:  We can do that Monday.  If the Court

6 start early, we could start earlier.

7    MR. BERNICK:  I don't --

8    THE COURT:  But I think the problem is you don't want

9 to bring Dr. Florence in the event that there's a ruling that

10 says he can't testify unless you can defer him till Tuesday.

11    MR. BERNICK:  That's not my concern.

12    THE COURT:  Okay.

13    MR. BERNICK:  My concern is that if we're going to be

14 doctor stuff in these depositions anyhow, maybe the better idea

15 is to argue Rule 408 on Monday, do the doctor stuff, and then

16 call Florence on Tuesday.  And that's why I say we can just --

17    MR. INSELBUCH:  I have no objection to that, Your

18 Honor, just so long as -- we have one witness that's only

19 available on April 1st, however, as I told you.

20    MR. BERNICK:  Well, that's the problem is that I

21 don't --

22    THE COURT:  Can we take that witness out of turn?

23 You don't know?  Because of Dr. Florence?

24    MR. BERNICK:  The answer to that is no, and the

25 reason is that this schedule has been hammered out and if Dr.

1  Florence is, in fact, available on Monday, we --

2          THE COURT:  Can we do the deposition readings and the

3  408 argument at a later date?

4          MR. INSELBUCH:  No.

5          THE COURT:  Do Dr. Florence Monday subject to

6  objections --

7          MR. INSELBUCH:  No.

8          THE COURT:  --  do your witness Tuesday?

9          MR. INSELBUCH:  No.  We need Your Honor to rule on,

10 at least in part with respect to 408 before we deal with Dr.

11 Florence.  But what I would suggest we could do is we could do

12 the 408 argument at the beginning, we could have Dr. Florence

13 on Monday and the deposition exercise that Mr. Bernick is

14 talking about is one that could be inserted at any time.  It's

15 not something that's time-sensitive.  We have a witness that

16 must go Tuesday.

17         MR. BERNICK:  Who is that?

18         UNIDENTIFIED ATTORNEY:  Brody.

19         MR. INSELBUCH:  Brody.

20         MR. BERNICK:  I don't have a problem with that.  If

21 they want to do it --

22         MR. INSELBUCH:  If we take Brody when we can have

23 Brody, then we will certainly find time to do Mr. Bernick's

24 depositions however we work out that process.

25         THE COURT:  The following week.

1          MR. BERNICK:  Well, Your Honor, I'm happy to

2   accommodate Dr. Brody.  I've never met the guy, happy to

3   accommodate that.  I do not want the doctor stuff to slip.  So

4   if we can do Brody on Tuesday morning or whatever, I want to do

5   the doctor stuff Tuesday after and I want to get it done.

6          THE COURT:  Well --

7          MR. INSELBUCH:  We have no problem with that.

8          THE COURT:  -- how long is Dr. Brody going to take?

9          UNIDENTIFIED ATTORNEY:  -- on direct.

10          MR. FINCH:  I would guess two to two and a half

11   hours, Your Honor.

12          UNIDENTIFIED ATTORNEY:  On direct.

13          THE COURT:  That means he's going to be all day.  So

14   it just means he's going to be all day.

15          MR. INSELBUCH:  It may be that Mr. Bernick won't have

16   any smart questions.

17          MR. BERNICK:  We got an estimate for Dr. Brody for

18   one hour.

19          THE COURT:  It doesn't matter.  It means he's going

20   to be all day.  Let's just face it.  Every doctor is going to

21   take all day.  That's just the way it's going to be.

22          MR. BERNICK:  Well, Your Honor, I'm very -- you know,

23   at that point we may then need the Court's intervention because

24   we are not going to finish this trial in any way, shape or form

25   by the time that Mr. Inselbuch and Mr. Finch --

1          THE COURT:  This is my ruling.  I have you folks for

2  as long as I need you.  I don't care who else has you next.

3  That's my rule.  You folks are with me until you're done and I

4  don't care if it takes until next year.  You are here for every

5  single day that I need you until we're finished.  That's my

6  order.  And you will be held in contempt if you're not present

7  on the days that I need you.  We're started.  We're going to

8  finish this.  That's it.  You make whatever other plans you

9  need to make with any other Court.  I will accommodate personal

10  schedules.  I will accommodate weddings, deaths and births and

11  occasionally a vacation if they're accompanied with a wedding,

12  a death and a birth.  That's it.  Anything else, you're mine.

13          MR. BERNICK:  That's fine, Your Honor.  So we will

14  confer and we will under any set of circumstances do Rule 408

15  before we hear testimony from Dr. Florence which is --

16          THE COURT:  All right, so we'll do 408 and Dr.

17  Florence Monday.  We will do Dr. Brody Tuesday and we will then

18  revert to the debtor's case on Monday, April 7th, and start

19  back with the doctors.  That will give you time perhaps to

20  limit these deposition issues anyway.  And I don't like to take

21  the things out of turn either but that's just how we'll do it.

22          MR. INSELBUCH:  That's fine.

23          THE COURT:  And the debtor -- and I take it that the

24  ACC and the FCR will agree that the debtor does not have to

25  rest before you can put your witness on.

1          MR. INSELBUCH:  Of course, Your Honor.

2          THE COURT:  I want to hear it from the FCR too.

3          UNIDENTIFIED ATTORNEY:  Say yes.

4          MR. MULLADY:  Yes.

5          THE COURT:  Thank you.

6          MR. BERNICK:  And we're tentatively on for the 22nd

7  for ZAI subject to hearing about the --

8          THE COURT:  Correct.

9          MR. BERNICK:  -- hearing about Mr. --

10          THE COURT:  -- Westbrook.

11          MR. BERNICK:  -- Westbrook's other vacation plans?

12          THE COURT:  Yes, sir.  Okay, so --

13          MR. BERNICK:  Okay, I think that that's it, Your

14  Honor.

15          THE COURT:  All right, so we're adjourned until

16  Monday.  Do you want to start earlier on Monday than nine?

17          MR. BERNICK:  I don't think so and --

18          THE COURT:  To start with the 408 argument, do you

19  want to start at --

20          MR. BERNICK:  We'd be happy to start with the 408

21  argument at nine or earlier.  We're all going to be here.

22          MR. INSELBUCH:  Whatever time Your Honor is

23  comfortable with.  We're all here the night before.

24          THE COURT:  I live here.  It's the people coming in

25  from the west --

1          MR. INSELBUCH:  I understand that, Your Honor.

2          THE COURT:  -- you know, that's the problem.

3          MR. INSELBUCH:  We're here the night before.  You

4 just tell us when you want us here.  As you have said, you own

5 us.

6          THE COURT:  Well, okay, but I want you not sleepy

7 too.  Okay, you want to start at 8:30 --

8          MR. BERNICK:  That's the first time I've ever heard

9 Elihu say that.

10          THE COURT:  I don't know if -- you know, if 8:30

11 helps, I'll have my staff in at 8:30.  If it doesn't help, then

12 we'll start at nine.  You tell me.

13          MR. FINCH:  There's one other housekeeping matter --

14          THE COURT:  Wait.  I want an answer.

15          MR. FINCH:  Sorry.  Oh, sure.

16          THE COURT:  8:30 or nine, folks?

17          UNIDENTIFIED ATTORNEY:  Mr. Bernick?

18          THE COURT:  8:30 or nine on Monday, Mr. Bernick?

19          MR. BERNICK:  8:30 is fine.

20          THE COURT:  Fine, we'll start at 8:30 --

21          MR. INSELBUCH:  8:30.

22          THE COURT:  -- and we'll start with the argument,

23 okay.

24          MR. BERNICK:  The other thing is we have spent a long

25 time trying to develop order.  As part of our case, we gave

1  them an order well in advance and we have stuck to it

2  absolutely religiously.  Today I don't know what their witness

3  order is beyond Mr. Brody -- Dr. Brody.  I heard Ms. Welch but

4  I don't know whether she's going to be available now the

5  following --

6          THE COURT:  Okay, get them a witness --

7          MR. BERNICK:  And they've given us a list of 20

8  people --

9          THE COURT:  Get a witness order, folks, please to --

10          MR. BERNICK:  A real one.

11          MR. FINCH:  Your Honor, we filed our witness order on

12  March the 14th which is our best estimate of the witnesses we

13  would call and the order.  We will confer to see if there are

14  any changes based on the fact that the debtor finishes his

15  case.

16          THE COURT:  Okay, update it because you know the

17  debtor is going to finish but for these depositions on Monday.

18          MR. FINCH:  I understand that.

19          THE COURT:  So update it at least -- today is

20  Wednesday.  Update that witness list not later than Friday if

21  there are going to be any changes.

22          MR. BERNICK:  Just to be clear with my point, it's

23  not just the order.  It's who they're really going to call.  We

24  gave them a tight list so they didn't have to go to the

25  exercise of preparing for a lot of people who are never going

**J&J COURT TRANSCRIBERS, INC.**

1  to appear.

2            THE COURT:  Okay, that's fair.

3            MR. BERNICK:  And right now their list goes on.

4            THE COURT:  That's fair.  Get the list down to who

5  you're really calling by Friday.

6            MR. INSELBUCH:  Yes, ma'am.

7            THE COURT:  Thank you.  Okay, Mr. Finch?

8            MR. FINCH:  There was one further housekeeping

9  matter.

10           THE COURT:  All right.

11           MR. FINCH:  Yesterday in connection with --

12           THE COURT CLERK:  Please use the microphone.

13           MR. FINCH:  Nathan Finch for the ACC.  Yesterday in

14  connection with admitting the summary charts as to which there

15  was no objections, I -- rule of completeness, a particular

16  exhibit ought to come into evidence with the summary charts

17  about the Manville trust data, about doctors.  Mr. Bernick has

18  agreed.  There's no objection to that exhibit.  I'd like to

19  offer into evidence -- the document has been marked as Grace

20  Exhibit 155 and tender that to the Court.

21           THE COURT:  All right.

22           MR. BERNICK:  We have no objection to that.

23           THE COURT:  Okay, I'll take it.  And this is just

24  another exhibit that does not require a witness, is that

25  correct?

1          MR. BERNICK:  That's correct.

2          MR. FINCH:  This is a business record of the Manville

3  trust.  It doesn't require a witness.

4          THE COURT:  All right, thank you.  It's admitted.

5          MR. FINCH:  Thank you.

6          THE COURT:  Okay, anything else, folks?

7          UNIDENTIFIED ATTORNEY:  No.

8          THE COURT:  All right, drive safely please.

9          MR. FINCH:  Thank you, Your Honor.

10          THE COURT:  I have no sway with any police officers,

11  let me tell you.

12                          * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, ELAINE HOWELL, PAT REPKO, TAMMY DeRISI, LYNN SCHMITZ and MARY L. POLITO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above entitled matter, and to the best of our ability.


/s/ Elaine Howell

ELAINE HOWELL


/s/ Pat Repko

PAT REPKO


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Lynn Schmitz

LYNN SCHMITZ


/s/ Mary L. Polito                    DATE: March 31, 2008

MARY L. POLITO

J&J COURT TRANSCRIBERS, INC.