# ATTACHMENT A

10/05/87  15:57  P. 2

FROM ATTNY GEN SUP CT

**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**FILED**
OCT 5 1987
U.S. Court of Appeals
Fourth Circuit

---

No. 85-2169

---

GREENVILLE COUNTY
SCHOOL DISTRICT,

             Plaintiff-Appellee,

  v.

UNITED STATES GYPSUM COMPANY;
W. R. GRACE COMPANY; NATIONAL
GYPSUM COMPANY,

             Defendant-Appellant,

and

PROKO INDUSTRIES, INC.; UNION
CARBIDE CORPORATION,

             Defendant,

  v.

CAREY CANADA, INC.,

             Third-Party Defendant.

---

No. 86-3534

---

GREENVILLE COUNTY
SCHOOL DISTRICT,

             Plaintiff-Appellant,

  v.

UNITED STATES GYPSUM COMPANY;
W. R. GRACE COMPANY; NATIONAL
GYPSUM COMPANY,

             Defendant-Appellee,

and

FROM ATTNY GEN SUP CT    10/05/87 15:58    P. 3

PROKO INDUSTRIES, INC.; UNION
CARBIDE CORPORATION,

Defendant,

v.

CAREY CANADA, INC.,

Third Party Defendant.

---

No. 86-3541

---

GREENVILLE COUNTY
SCHOOL DISTRICT,

Plaintiff-Appellee

v.

UNITED STATES GYPSUM
COMPANY; W. R. GRACE
COMPANY; NATIONAL GYPSUM
COMPANY,

Defendant-Appellant

and

PROKO INDUSTRIES, INC.;
UNION CARBIDE CORPORATION,

Defendant,

v.

CAREY CANADA, INC.,

Third Party Defendant.

---

On appeal from the United States District Court for the District
of South Carolina, at Greenville. William W. Wilkins, Jr.,
Circuit Judge. (CA-82-3142).

---

Argued: November 13, 1986        Decided:    October 5, 1987

---

Before PHILLIPS and SPROUSE, Circuit Judges, and BOYLE, United
States District Judge for the Eastern District of North Carolina,
sitting by designation.

2

---

Jill A. Douthett; Richard P. Brown, Jr. (Frank L. Corrado, Jr.;
David J. Manogue; Morgan, Lewis & Brockius; Edwin P. Martin;.
Turner, Padget, Graham & Laney, P.A.; Lawrence T. Hoyle, Jr.;
Hoyle, Morris & Kerr; P. Michael Duffy; Morris, Duffy & Boone;
Shepard M. Remis; Stephen E. Neel; Goodwin, Proctor & Hoar; F.
Barron Grier, III; Richardson, Plowden, Grier & Howser on brief)
for Appellants; Edward J. Westbrook (Terry E. Richardson, Jr.;
Blatt & Fales; Daniel A. Speights on brief) for Appellee.

FROM ATTNY GEN SUP CT    10/05/87 15:59    P. 5

PER CURIAM:

Four public-school districts[1] brought separate products liability actions against numerous manufacturers of construction materials containing asbestos.  Three of the manufacturers named as defendants in each of the actions--United States Gypsum Company, W. R. Grace & Co., and National Gypsum Company (the Companies)--collectively executed a settlement agreement with the four school districts.  The Companies now appeal from the district court's order directing specific performance of that agreement.  We affirm.

I

A.

The Companies manufactured construction products containing asbestos until the mid-1970s.  Their products were installed to fireproof the school districts' buildings.  The Greenville County School District brought suit against the Companies in 1982, demanding damages and reimbursement for the costs of removing asbestos products from its buildings.  The three other school districts filed similar actions against the Companies.  All of the school districts were represented by the same South Carolina law firm that represented Greenville.

---

[1] The school districts are: (1) the Greenville County (South Carolina) School District; (2) the Richland County (South Carolina) School District One; (3) the Montgomery County (Alabama) Board of Education; and (4) the School Board of Amelia County, Virginia.

FROM ATTNY GEN SUP CT        10/05/87 16:00      P. 6

On August 1, 1984, the school districts and the Companies signed a preliminary agreement "to diligently engage in settlement negotiations."  The agreement provided that the district court presiding over the Greenville case would supervise the preliminary negotiations.  The court granted a continuance in that litigation, pending the outcome of the negotiations.

The parties executed the settlement agreement at issue in this appeal on October 31, following three months of negotiations.[2]  The agreement required the Companies to establish a settlement fund[3] and granted the school districts a unilateral

---

[2]  As originally executed, the settlement agreement included plaintiff/school districts in five separate actions against the Companies.  One of the plaintiffs later withdrew from the settlement process, however, leaving the four above-listed school districts subject to the agreement.

[3]  The agreement provided "[t]he fund shall consist of a settlement sum equal to _____ for every $1.00 of verified abatement costs incurred by the plaintiffs for asbestos abatement of defendants' asbestos-containing material in the buildings involved in the school cases ["verified abatement costs"] including the costs of inspection, evaluation, encapsulation, removal, and replacement of defendants' products."  The percentage of the established costs that would be paid was redacted from the documents before the district court and here on appeal.

The agreement further provided that:

> At such time as verified abatement costs for any of the plaintiffs' buildings have been determined in plaintiff's favor, the settlement sum for that building shall be deposited in an interest-bearing account in a bank or other financial institution mutually agreed to by the parties . . . .

5

FROM ATTNY GEN SUP CT        10/05/87 16:01    P. 7

six-month option to accept the fund.[4]  It also gave the district court supervisory authority over the settlement process.

In structuring the funding provision, the parties contemplated that the Companies would not be liable for abatement costs of asbestos products they did not manufacture.  The Companies thus had no obligation to contribute into the settlement fund until the school districts produced product-identification evidence showing that the Companies had manufactured the products in question.  Further, the Companies' specific dollar liability could not be fixed until the school districts submitted evidence of the actual or projected costs of abating the Companies' products.  The parties therefore structured elaborate procedures for establishing product identification and a simple plan for verifying abatement costs.

The agreement's product-identification procedures required that the school districts submit evidence to the Companies identifying the origin of the asbestos products that had been installed in the various school buildings.  The

---

[4] Section C (paragraph 7) of the agreement provided:

> Plaintiffs shall have the option at the end of six (6) months from the date of this agreement to accept the settlement . . . or to reject the settlement and to thereupon continue with litigation of their cases.

6

FROM ATTNY GEN SUP CT    LT SUP GEN ATTNY MORF    10/05/87 16:02    P. 8

Companies' products could be identified in a number of ways[5]--

[5] Section B (paragraph 1) of the agreement provided in part:

> (1) [The school districts] may verify the identity and quantity of the asbestos-containing materials as being a product of one of the defendants by submitting as many of the following as they reasonably can at the time of the submission:

> a.    invoices or equivalent from a defendant or a third party showing the sale of a product of one of the defendants for use in plaintiffs' buildings;

> b.    other records of defendants showing sales of a product of one of the defendants for use in plaintiffs' buildings;

> c.    statements under oath based upon personal knowledge from persons directly involved in installation in the subject buildings or supply of materials for installation in the subject buildings that the material installed was a product manufactured or sold by one or more of the defendants, without the necessity of proving which of the defendants' products is involved...

> d.    statements under oath based upon personal knowledge other than the specifications from persons involved in the design of the subject buildings that the material installed was a product manufactured or sold by one or more of the defendants, without the necessity of proving which of the defendants' products is involved [statements that the material installed was a product manufactured or sold by the defendants or by another manufacturer do not constitute a "statement" under this subparagraph but are comparable to subparagraph (h)];

> e.    any other documentation or

7

some more definitive than others.  The agreement accordingly assigned varying probative values to each of several available categories of product-identification evidence.

---

[5] (Cont.)  information such as construction change orders, letters from architects to contractors, etc. which reasonably demonstrates that the material installed was a product manufactured or sold by one or more of the defendants, without the necessity of proving which of the defendants' products is involved...

      f.  specifications designating the use of defendants' products in plaintiffs' buildings;

      g.  microscopy or other scientific reports on samples from plaintiffs' buildings stating that the material tested is, in the examiner's opinion, consistent with the formula for any of the defendants' products;

      h.  specifications designating the use of defendants' products or their equal in plaintiffs' buildings;

      i.  documentation or information that the material in question is an asbestos-containing acoustical plaster or fireproofing product of the type mixed in a slurry prior to application.

The parties agreed that certain forms of evidence would be considered dispositive of product-identification issues.[6] Other categories of evidence would be considered sufficient under the agreement unless the Companies produced contrary product-identification evidence variously required to be "clear and convincing" or "preponderant."[7]  If the Companies produced

---

[6] Section B (paragraph 2) of the agreement provided:

The submission of the information set forth in either subparagraph (a) or (b) shall constitute sufficient product identification as to the defendants, but only to that portion of the building in which that material could have been reasonably installed.

[7] Section B paragraphs (3), (4) and (5) provide:

(3) The submission of the information set forth in any combination of two of subparagraphs (c), (d), (e), (f), or (g) shall also constitute sufficient product identification as to defendants, but only to the portion of the building in which the material could have been reasonably installed, unless defendants produce clear and convincing contrary evidence.

(4) The submission of the information set forth in any of subparagraphs (c), (d), (e), (f), or (g) shall constitute sufficient product identification as to defendants but only to the portion of the building in which the material could have been reasonably installed, unless the defendants produce preponderant contrary evidence.

(5) The submission of the information set forth in subparagraphs (h) or (i) shall constitute sufficient product identification so long as bulk samples are available to defendants, unless the defendants produce preponderant contrary information.

9

FROM ATTNY GEN SUP CT      10/05/87 16:05      P. 11

contrary evidence, the agreement imposed the general obligation
on all parties to attempt to resolve the dispute among
themselves, but if no accord was reached within 15 days, the
matter was to be referred to an arbitrator.[8]  If the Companies
failed to produce contrary evidence, however, the school
districts' otherwise non-dispositive evidence would be considered
sufficient.

Prompt submissions both of evidence by the school
districts and of responses by the Companies were critical to the
operation of the settlement.  The school districts had only six
months from the execution of the agreement (October 31, 1984) to
decide whether to accept the settlement or to reject the
settlement and proceed with litigation.[9]

In January 1985, Greenville County submitted voluminous
product-identification evidence concerning thirty-one school
buildings.  In that same month, Richland County presented the

---

[8]  In this respect, Section B (paragraph 8) of the
agreement provided:

> (8) At any time before it is
> concluded that the parties cannot agree
> on product identification, either party
> may submit additional information for
> consideration by the other party.  In
> the event that the parties cannot agree
> about product identification or quantity
> on the basis of the information
> submitted by both parties, the dispute
> shall be submitted to arbitration ....

[9]  The school districts' option originally was scheduled
to expire on April 30, 1985--six months after the execution of
the settlement ageement.  The parties later agreed to extend the
option until June 7, 1985.

ᄅᄂ  ᄆ  90:91 ᄂ8/90/01      ᄂ0 ᗡ∩S N∃⅁ ⅄NⱵⱵⱵ WOⱵℲ

Companies with product-identification evidence regarding the
seven school buildings for which it had asserted claims.
Montgomery County submitted its product-identification materials
in February 1985, and in April 1985, the Companies received
massive quantities of evidence from Amelia County.[10]

After receiving and evaluating the school districts'
evidence, the Companies indicated that they would dispute
product-identification for many of the submitted claims.  They
nevertheless refused to disclose their positions on the evidence
and did not seek negotiations to resolve the disputes.  The
Companies produced no contrary product-identification evidence
for the school districts' review.  Instead, they demanded
additional evidence--much of which was not in the school
districts' possession.  The Companies neither established a
settlement fund nor contributed any money toward resolving the
school districts' claims.

After discussing the lack of progress toward settlement
and the approaching option deadline of April 30, 1985, the
parties scheduled a mid-April meeting.  At the meeting, the
Companies were unprepared to discuss the schools individually and
produced no contrary product-identification evidence.  The
parties agreed, however, to extend the school districts' option

---

[10] The parties subsequently agreed to defer abatement
cost procedures.  However, at the time of the subsequent
agreement the Companies had already received abatement cost
evidence for many individual school buildings.  These submissions
were within the original six-month option period.

until May 31 on the condition that the Companies provide a preliminary statement of their position on the Greenville submissions by April 26 and on the other school districts shortly thereafter. They later extended the option to June 7, 1985.

The Companies submitted preliminary statements for the majority of buildings in each of the four school districts by June 5. Their statements, however, provided no basis on which the school districts could estimate the amount the Companies would contribute into the settlement fund. Although the Companies indicated their willingness to admit product identification "in part" for many school buildings, they neither defined "in part" nor identified the contrary evidence they would produce. Instead, they demanded additional evidence and indicated that they would submit contrary evidence with respect to some schools at an unspecified future date. Counsel for the school districts telephoned the district court on June 7 and informed it that the settlement had not been "consummated."[11]

Approximately one month later, with no intervening settlement negotiations or evidentiary exchanges, the school districts moved for specific performance of the settlement agreement. They contended that their previously submitted product-identification evidence should be considered sufficient under the agreement because the time had expired for the Companies to submit contrary evidence. The school districts also asserted that the only remaining matter was to fix the Companies'

---

[11] June 7 was the date on which the district court had instructed the attorneys to report on the status of the settlement negotiations.

12

P.14    80:91 28/50/01    10 AUS NE9 ANTTA WOA7

abatement cost liability. The Companies responded that the
expiration of the option period automatically rendered the
agreement a nullity and, alternatively, that the school districts
rejected the settlement in their June 7 communication to the
court.

After an extensive evidentiary hearing, the district
court granted the school districts' motion. It found that the
settlement agreement constituted a binding contract. Moreover,
although the agreement set no express timetable for the
evidentiary transfers, the court found that the Companies'
obligation to act promptly within the time frame of the school
districts' option was implied in the contract. "Otherwise," the
court stated, the school districts "would gain nothing by
participating in the settlement process and would have no basis
upon which to intelligently exercise their option to accept the
settlement." The court also concluded that since the Companies
had failed to produce any contrary product-identification
evidence, "[t]he issues of product identification [were] deemed
established as dictated by the terms of the settlement
agreement."[12] The court then referred all outstanding abatement
cost issues to arbitration.[13]

---

[12] This ruling precluded the Companies at arbitration
from challenging the school districts' product-identification
evidence with contrary evidence.

[13] The settlement agreement prescribed no specific
mechanics for the selection of an arbitrator. It simply provided
that if the parties could not agree on an arbitrator, one would
be selected by the Chief Judge of the United States Court of

13

On appeal, the Companies contend that the school districts never exercised their option and that the agreement expired before the school districts moved for specific performance. They also argue that the agreement specified no time limit for their production of contrary evidence. Furthermore, the Companies challenge the scope of the court's remedy, which precluded them from presenting contrary product-identification evidence to the arbitrator and from nominating to the list of arbitrator candidates.

The school districts contend that the Companies were required to furnish their contrary evidence, if any, during the option period. Citing South Carolina law, they assert that the Companies prevented the exercise of the option by failing to produce contrary evidence, and therefore forfeited any right to

---

13 (Cont.) Appeals for the Fourth Circuit. On January 8, 1985, however, the parties entered into a supplemental agreement whereby each would submit a list of five arbitrator nominees from which they would select a mutually acceptable candidate. The supplemental agreement required each party to produce its list of names by January 16, and it contemplated that an arbitrator would be chosen by January 23. On January 16, the school districts submitted their list of nominees to the Companies. The Companies, however, failed to submit the required list until March 11, and there were no ensuing negotiations on the arbitrator question. At the evidentiary hearing, the Companies' counsel, who was responsible for designating the Companies' arbitrator list, testified that after he received the school districts' list he was called out of the office on business and had thereafter suffered a death in his family, all of which rendered him unable to submit a list prior to March 11. The district court ruled that the Companies' failure to supply their list in a timely manner precluded consideration of their belatedly presented nominees. It ordered the Companies to choose the arbitrator from the school districts' list.

14

object to the schools' delay in exercising it.[14]    They reason that their product identification was sufficient under the agreement when the Companies failed to respond to their submissions with contrary evidence.    They contend that they timely exercised their option to adopt the settlement based on this product-identification evidence.    The district court agreed, holding:

> Defendants [could not] force Plaintiff to reject the settlement by refusing to supply any contradictory evidence, thereby depriving Plaintiff of the opportunity to make an informed decision on whether to accept the settlement. The agreement clearly provides that Plaintiff's submissions on product identification are sufficient "unless" Defendants produce contrary evidence. Defendants repeatedly failed to produce such evidence. Defendants may not seize upon their own dilatory conduct and unilaterally assert that the settlement agreement was terminated when the time to submit contrary evidence expired.
>
> Accordingly, the Court finds the deadline for Defendants presenting their contrary evidence has passed. The issues of product identification are hereby deemed established as dictated by the terms of the settlement agreement.

---

[14] South Carolina law imposes on a contracting party the good faith obligation not to deprive the other party of the benefit of its bargain. See Wilkins v. Howe Grain & Mercantile Co., 96 S.E. 678, 680 (S.C. 1918). Moreover, a party to a contract who hinders or otherwise prevents timely performance by the other party cannot take advantage of the delay it has caused. See Shannon v. Freeman, 109 S.E. 406, 409 (S.C. 1921). The school districts maintain that under these settled principles the Companies' failure to produce contrary product-identification evidence or create a settlement fund by June 7 excused the schools from exercising their option on that date.

B.

The overriding principle governing our consideration of this appeal is that a district court has inherent equitable authority to enforce integrated agreements to settle litigation pending before it. Ozyagcilar v. Davis, 701 F.2d 306, 308 (4th Cir. 1983); Millner v. Norfolk & Western Railway, 643 F.2d 1005, 1009 (4th Cir. 1981). The parties reinforced that principle in this case by specifically agreeing to grant the court authority to oversee the settlement procedures. In our view, the district court's enforcement of the settlement agreement was a reasonable exercise both of its inherent equitable discretion and of the authority to supervise the agreement that the parties expressly vested in it. See Ozyagcilar v. Davis, 701 F.2d at 308; Millner v. Norfolk & Western Ry., 643 F.2d at 1009; Wood v. Virginia Hauling Co., 528 F.2d 423, 425 (4th Cir. 1975); see also SEC v. Moss, 644 F.2d 313, 316 (4th Cir. 1981), cert. denied, 455 U.S. 1023 (1982).

In reaching that determination, we first conclude that the Companies breached their obligations under the agreement by acting in a manner that was inconsistent with a bona fide attempt to resolve product-identification disputes and with the implied duty of good faith and fair dealing. See Tharpe v. G.E. Moore Co., 174 S.E.2d 397, 399 (S.C. 1970) (a covenant of good faith and fair dealing is implied in every contract). The district court found that the Companies deliberately failed to finalize product identification prior to June 7 and frustrated the

16

81.9   21:91  28/50/01   10 AUS N39 ANITA WOAA

schools' ability to exercise their option. This finding is not clearly erroneous. The record amply supports the conclusion that the Companies breached both their specific and implied duties by steadfastly refusing to negotiate or otherwise respond meaningfully to the school districts' evidentiary submissions. The Companies' conduct during the option period demonstrates that they regarded the agreement's evidentiary-exchange process as little more than a gratuitous discovery device. The schools submitted voluminous product-identification materials,[15] but the Companies, rather than responding with contrary evidence, repeatedly demanded additional evidence--even when faced with the immediate running of the option. In our view, the district court correctly held that the Companies' misconduct excused the school districts from exercising the option by June 7.[16]

It is true that the agreement specified no time frame either for the school districts to submit their evidence to the

---

[15] The four school districts collectively were required to collect, assemble, and submit product-identification evidence within the option period for approximately 140 individual buildings.

[16] The Companies argue nonetheless that the school districts expressly rejected the settlement. They rely upon the June 7, 1985, telephone conversation in which the school districts advised the trial court that the settlement agreement had not been "consummated." The court observed, however, that it had ordered the parties to report to it on June 7 concerning the status of the negotiations and had instructed them to be ready for trial in the event that the settlement negotiations failed. The court found that the school districts' communication was not a rejection of the agreement but the litigation status report it had ordered, and we cannot say that it was clearly erroneous in its finding.

17

FROM ATTNY GEN SUP CT    10/05/87 16:13   P.19

Companies or for the Companies' submission of contrary evidence to the school districts. The schools simply were given six months from October 31, 1984, to decide whether to accept the amounts contributed according to the procedures described in the agreement. The courts of South Carolina, however, apply the traditional common law rule that in the absence of express agreement, the time for actions to be taken under a contract is a reasonable time. See Cloniger v. Cloniger, 193 S.E.2d 647, 651 (S.C. 1973); Oxweld Acetylene Co. v. Davis, 106 S.E. 157, 159 (S.C. 1921); cf. S.C. Code Ann. 36-2-309(1) (Law. Co-op. 1976) (adopting U.C.C. 2-309(1): "The time for shipment or delivery or any other action under a contract if not . . . agreed upon shall be a reasonable time.") Our review of the circumstances, the contract itself, and the school districts' performance of their obligations convinces us that the option period presented a reasonable calendar for the execution of product-identification procedures.

The record demonstrates that the Companies had adequate time to assemble and submit contrary product-identification evidence prior to and within the option period. The parties in the Greenville case had engaged in discovery for over a year and a half and were on the eve of trial when settlement negotiations began. The Richland litigation was commenced six months before the Greenville case and the Richland parties had undertaken substantial discovery before executing the settlement agreement. The Montgomery case was filed in July 1983--over one year before

02 'd    bl:9I   28/90/0I    12 dNS N39 AN11B WOᴚℲ

settlement negotiations began--and the parties had exchanged
numerous interrogatories and requests for the production of
documents.  The production of contrary evidence for these cases
would have involved little more than transferring materials the
Companies' already had obtained--a minimal burden.[17]    It is true
that the parties engaged in no discovery in the Amelia case prior
to executing the settlement agreement.  Amelia County nonetheless
submitted substantial quantities of product-identification
evidence to the Companies more than two months before the
extended option deadline.  The Companies' idleness in the other
three cases prompts the reasonable conclusion that even if they
had more time to respond to the Amelia submissions, they would
not have done so.  In summary, the district court acted within
the terms of the contract and within the bounds of its remedial
discretion in concluding that the school districts' product-
identification evidence was sufficient under the agreement and in
precluding the Companies from introducing product-identification
evidence at arbitration.

The Companies next argue that the district court abused
its discretion in ordering the Companies to choose an arbitrator
to resolve the outstanding abatement cost issues exclusively from
the school districts' list of arbitrator nominees.  The Companies

---

[17] Testifying at the evidentiary hearing, counsel for the
Companies conceded that contrary product-identification evidence
had been assembled in preparation for trial in the Greenville and
Richland cases well before the execution of the settlement
agreement.

FROM ATTNY GEN SUP CT   10/05/87 16:15   P.21

failed to submit their list of arbitrator candidates by
January 16, 1985--the date on which the list was due under the
parties' supplemental agreement.[18]   At the hearing before the
district court, counsel for the Companies testified that after he
received the school districts' list he had been called out of the
office on business and family matters.   Counsel offered this as
an excuse for the Companies' failure to submit their list of
arbitrators by January 16.   The Companies, however, did not
receive the school districts' list until January 16 and counsel,
by his own admission, was not called out of the office until
after that date.   We find no abuse of discretion in this action
by the district court.

In their final argument, the Companies assert that the
district court judge should have disqualified himself because he
participated in an ex parte telephone conversation with the
school districts' attorney.   The conversation in question was the
school districts' June 7 communication that the settlement had
not been consummated.   The Companies contend that recusal was
mandatory under 28 U.S.C. § 455(b)(1) because the trial judge
received "personal knowledge of disputed evidentiary facts" in
that conversation.[19]   Such knowledge, they assert, violated the

---

[18]   See supra note 12.

[19]   28 U.S.C. § 455(b)(1) provides:

(b) He [any justice, judge, or
magistrate of the United States]
shall ... disqualify himself in the
following circumstances:

20

10/05/87 16:16    P.22

FROM ATTNY GEN SUP CT

statute and resulted in the denial of their due process right to an impartial decisionmaker. We disagree.

The fact that the settlement had not been consummated by June 7 is not the type of "personal knowledge" that implicates 28 U.S.C. § 455(b)(1).[20]  See In re Beard, 811 F.2d 818, 829 n.16 (4th Cir. 1987). Section 455(b)(1) requires recusal only when disputed evidentiary information comes from an extrajudicial source. See United States v. Widgery, 778 F.2d 325, 328 (7th Cir. 1985). "Knowledge acquired by the judge while he performs judicial duties does not constitute grounds for disqualification [under Section 455(b)(1)]." United States v. Coven, 662 F.2d 162, 168 (2d Cir. 1981), cert. denied, 456 U.S. 916 (1982) (citing United States v. Grinnell Corp., 384 U.S. 563, 583 (1966)). Here, the district court judge was acting within the scope of his judicial capacity as well as the supervisory authority conferred on him by the parties' agreement when he

---

[19] (Cont.)
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning a proceeding.

28 U.S.C. § 455(b)(1)(1982).

[20] The precise contents of the June 7 conversation were relayed almost immediately by oral communication and subsequent letter to the Companies' attorneys. All parties received a copy of the plaintiffs' letter dated June 10, which formally apprised the court that "the parties were unable to consummate the settlement by June 7, 1985."

FROM ATTNY GEN SUP CT     10/05/87 16:17     P.23

spoke to the school districts' counsel on June 7. Participation in this telephone conversation did not require him to recuse himself because it was within his judicial responsibilities to be informed of the status of the pending settlement.[21]

## II.

In an action consolidated with the principal appeal, the Greenville County School District appeals from the district court's award to it of only minimal prejudgment interest[22] on a separately settled claim against the United States Gypsum Company (USG). The court computed interest from the date USG was informed of the amount of Greenville's claim against it. Greenville contends that it should have received interest from the date it paid to have USG's asbestos products removed from its school building. We find that the district court accurately

---

[21] The Companies' due process argument is premised on the allegation that the trial judge "formed preconceived notions about what had occurred between the parties" from two conversations it had with the school districts' attorneys. Without articulating what those "preconceived notions" were or how they affected the conduct or outcome of the proceedings, the Companies maintain that "such preconceptions would necessarily find their way into the evidentiary hearing and into the district court's factual findings and order." We find no merit in these vague apprehensions of unfairness.

[22] The court awarded Greenville $363.88, representing forty-four days of accrued prejudgment interest at the rate of 11.19%. Greenville asserts that the award should have extended back one year to the date it paid a contractor to remove asbestos products from the Mauldin Elementary School.

applied South Carolina law relating to the calculation of prejudgment interest.[23]    Accordingly, we affirm its award.


AFFIRMED


---

[23] Greenville was entitled to prejudgment interest as a matter of law from the date its claim against USG became "liquidated." Leaphart v. National Surety Co., 166 S.E. 415, 421 (S.C. 1932). Its action began as a straight-forward products liability suit in tort seeking unliquidated compensatory and punitive damages against four (later expanded to six) companies. At the time it was filed, and at the time USG's asbestos products were removed, none of the defendants nor Greenville itself knew the extent or amount of the claims that ultimately would be asserted. Moreover, Greenville did not know which of its claims would be contested. Until Greenville specified the extent and amount of its claim against USG, its case retained the character of a tort action seeking unliquidated recoveries from all defendants. We agree with the district court that until that time, Greenville's claim against USG was not liquidated.

23