OWENSBORO, KY

# CHICAGO TITLE INSURANCE COMPANY

9510 Ormsby Station Road, Suite 103, Louisville, KY 40223
(502)585-5135  FAX (502)584-3619

## SCHEDULE A

File No.:    510495
Loan No.:

Commitment No.: 510495

1.  Effective Date:    July 25, 2007 at 08:00 AM

2.  Policy or Policies to be issued:

    Amount

    (a) ___X___ Owner's Policy          ( ALTA 2006 Owners Policy  )
        Proposed Insured:
        TO BE DETERMINED

    (b) _____ Loan Policy            ( ALTA 2006 Loan Policy  )
        Proposed Insured:

3.  The estate or interest in the land described or referred to in this Commitment is Fee Simple.

4.  Title to the Fee Simple estate or interest in the land is at the Effective Date vested in:

    Lot 2 and Lot 5:  W. R. Grace & Co., a Connecticut corporation (now known as W.R. Grace & Co.-Conn.)
    Lot 1:  W.R. Grace & Co.-Conn., a Connecticut corporation

5.  The land referred to in the Commitment is described as follows:
    Located in Daviess County, Kentucky and being more particularly described of Exhbiit A attached hereto.

ALTA Commitment - 2006

(510495.PFD/510495/8)

## EXHIBIT A

Located in Daviess County, Kentucky:

Being all of Lot 1, Lot 2 and Lot 5 as shown on Minor Subdivision Plat for W.R. Grace recorded November 28, 1994 in Plat Book 23, pages 335 and 336 in the office of the Clerk of Daviess County, Kentucky;

TOGETHER WITH non-exclusive easements appurtenant to the above described land as more particularly described and set forth in the following instruments:

1. Reciprocal Easement Agreement between W.R. Grace & Co.-Conn. and Specialty Paperboard/Endura, Inc. recorded in Deed Book 638, page 277, said records;
2. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 304, re-recorded in Deed Book 641, page 257, said records;
3. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 323, re-recorded in Deed Book 641, page 277, said records;
4. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 224, said records; and
5. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 239, said records.

Lot 2 and Lot 5:  Being the remainder of property conveyed to W.R. Grace & Co., by Deed dated April 18, 1958, recorded in Deed Book 274, page 203, LESS AND EXCEPT conveyances in Deed Book 281, page 640; Deed Book 340, page 191; Deed Book 413, page 301; Deed Book 619, page 528; Deed Book 623, page 860; Deed Book 638, page 273; and Deed Book 643, page 219, in the office of the Clerk of Daviess County, Kentucky;

Lot 1: Being the same parcel of land conveyed to W.R. Grace & Co.-Conn., by Deed dated July 20, 2000, recorded in Deed Book 722, page 745, said records.

OWENSBORO, KY

# EXHIBIT A

Located in Daviess County, Kentucky:

Being all of Lot 1, Lot 2 and Lot 5 as shown on Minor Subdivision Plat for W.R. Grace recorded November 28, 1994 in Plat Book 23, pages 335 and 336 in the office of the Clerk of Daviess County, Kentucky;

TOGETHER WITH non-exclusive easements appurtenant to the above described land as more particularly described and set forth in the following instruments:

1. Reciprocal Easement Agreement between W.R. Grace & Co.-Conn. and Specialty Paperboard/Endura, Inc. recorded in Deed Book 638, page 277, said records;
2. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 304, re-recorded in Deed Book 641, page 257, said records;
3. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 323, re-recorded in Deed Book 641, page 277, said records;
4. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 224, said records; and
5. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 239, said records.

Lot 2 and Lot 5:  Being the remainder of property conveyed to W.R. Grace & Co., by Deed dated April 18, 1958, recorded in Deed Book 274, page 203, LESS AND EXCEPT conveyances in Deed Book 281, page 640; Deed Book 340, page 191; Deed Book 413, page 301; Deed Book 619, page 528; Deed Book 623, page 860; Deed Book 638, page 273; and Deed Book 643, page 219, in the office of the Clerk of Daviess County, Kentucky;

Lot 1: Being the same parcel of land conveyed to W.R. Grace & Co.-Conn., by Deed dated July 20, 2000, recorded in Deed Book 722, page 745, said records.

RECORD BOUNDARY DESCRIPTION                                          **OWENSBORO, KY**
PER D.B. 722, PG. 745;
P.B. 21, PG. 307 AND 308

TRACT 1 - 9.109 ACRES MORE OR LESS

Being a 9.109 acre, more or less, tract located within the bounds of a 142.94 acre, more or less,
tract conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess
County Industrial Foundation, Inc., a Kentucky corporation, by deed dated April 18, 1958, and of
record in Deed Book 274, Page 203 and said tract recorded in Plat Book 21, Page 307 and 308
all in the Office of the County Court Clerk of Daviess County, Kentucky and more particularly
described as follows:

BEGINNING at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes East
along the North right-of-way line of US Highway 60 a distance of 1764.41 feet and North 66
degrees 01 minutes 23 seconds West a distance of 1388.3 feet from the SE corner of the WR
Grace 142.94th acre tract as recorded in Deed Book 274, Page 203 (at the North right-of-way line
of US Highway 60) on the common line of WR Grace and Owensboro Sand and Gravel
Company as recorded in Deed Book 467, Page 254-259; thence North 66 degrees 01 minutes 23
seconds West a distance of 494.33 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence
South 25 degrees 29 minutes 26 seconds West a distance of 139.68 feet (measured) to a 5/8-inch
rebar with LS Cap 2566; thence, North 64 degrees 25 minutes 06 seconds West a distance of
261.80 feet (measured) to a 5/8-inch rebar with LS Cap 2566 at the top of the bank of the Ohio
River; thence, continuing North 64 degrees 25 minutes 06 seconds West a distance of 155.00
feet(calculated) to the low water mark of the Ohio River as referenced in Deed Book 274, Page
203; thence, North 24 degrees 30 minutes 00 seconds East along the low water mark of the Ohio
River as referenced in Deed Book 274, Page 203 a distance of 495.73 feet; thence, South 63
degrees 15 minutes 44 seconds East a distance of 108.00 feet (calculated) to a 5/8-inch rebar
with LS Cap 2566 being at the top of the bank of the Ohio River; thence, continuing South 63
degrees 15 minutes 44 seconds East a distance of 356.73 feet (measured) to a 5/8-inch rebar with
LS Cap 2566; thence, North 25 degrees 17 minutes 05 seconds East a distance of 188.91 feet
(measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 61 degrees 51 minutes 18
seconds East a distance of 10.92 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence,
South 28 degrees 19 minutes 22 seconds West a distance of 187.62 feet (measured) to a 5/8-inch
rebar with LS Cap 2566; thence, South 64 degrees 18 minutes 51 seconds East a distance of
210.14 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 26 degrees 40
minutes 14 seconds East a distance of 108.68 feet (measured) to a 5/8-inch rebar with LS Cap
2566; thence, South 64 degrees 50 minutes 44 seconds East a distance of 185.92 feet (measured)
to a 5/8-inch rebar with LS Cap 2566; thence, South 01 degrees 14 minutes 52 seconds West a
distance of 96.93 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 25
degrees 22 minutes 14 seconds West a distance of 353.03 feet (measured) to THE PLACE OF
BEGINNING containing 9.109 acres more or less.

OWENSBORO, KY

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

LOT 2 – 8.72 ACRES

More or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR Grace & Company, a Connecticut Corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky Corp., by deed dated April 18, 1968 and/or recorded in Deed Book 274, Page 203 as recorded in the Office of the County Court Clerk of Daviess County, Kentucky and being more particularly described as follows:

Beginning at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page 191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 15 seconds West a distance of 411.14 feet from the SE corner of the WR Grace's 142.94n acre tract as recorded in Deed Book 274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 487, Pages 254-256) being common to the SW corner of Tract 3 as recorded in minor subdivision Plat Book 23, Page 170-171; thence, North 27 degrees 57 minutes 06 seconds East and along the common line of said Tract 3 a distance of 1,071.87 feet to a point in Parcel 10D as recorded in Deed Book 623, Page 860 and at a point of a temporary right-of-way as recorded in Deed Book 276, Page 6; thence, South 64 degrees 10 minutes 56 seconds East along said right-of-way and easement a distance of 298.90 feet to a point on the north Kentucky DOT right-of-way line as recorded in Deed Book 623, Page 860; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 10.90 feet along said Kentucky DOT right-of-way line; thence, South 64 degrees 13 minutes 34 seconds East (measured) a distance of 15.00 feet along said Kentucky DOT right-of-way line; thence, South 23 degrees 17 minutes 04 seconds West (measured) and South 25 degrees 56 minutes 31 seconds West (record) a distance of 230.22 feet (record and measured) along Kentucky DOT right-of-way line; thence, South 23 degrees 19 minutes 12 seconds West (measured) and South 26 degrees 00 minutes 39 seconds West (record) a distance of 350.32 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 100.00 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 23 degrees 29 minutes 00 seconds West (measured) and South 26 degrees 10 minutes 27 seconds West (record) a distance of 250.20 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 130.01 feet along said Kentucky DOT right-of-way line to a point at the NE corner of a 51.49 acre tract; thence, North 64 degrees 12 minutes 15 seconds West a distance of 369.74 feet along the north line of a 51.49 acre tract to the PLACE OF BEGINNING containing 8.72 acres more or less.

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

LOT 5 - 54.33 ACRES

# OWENSBORO, KY

Being a 54.33 acre tract more or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky corp., by Deed dated April 18, 1988 and/or recorded in Deed Book 274, Page 203 as recorded in the office of the County Court Clerk of Daviess County, Kentucky and being more particularly described as follows:

Commencing at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page 191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 16 seconds West a distance of 411.14 feet from the SE corner of the WR Grace's 142.94ñ acre tract as recorded in Deed Book 274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Pages 254-256) being common to the SE corner of Tract 3 as recorded in Minor Subdivision Plat Book 23, Page 170-171; thence, North 27 degrees 57 minutes 06 seconds East along the easterly line of said Lot Number 3 a distance of 1,071.87 feet; thence, South 64 degrees 10 minutes 58 seconds East a distance of 298.90 feet to a point on the northeasterly right-of-way line of Kentucky DOT right-of-way take as recorded in Deed Book 623, Page 360; thence, North 25 degrees 46 minutes 26 seconds East continuing along said Kentucky DOT right-of-way line a distance of 82.00 feet to the PLACE OF BEGINNING; thence, North 71 degrees 08 minutes 14 seconds West and along the common line of Lot 4 a distance of 161.63 feet; thence, North 64 degrees 29 minutes 59 seconds West a distance of 630.05 feet along the common line of said Lot 4 to a point on a curve being concave to the southwest through a central angle of 94 degrees 31 minutes 02 seconds with a radius of 58.49 feet through a chord bearing of North 72 degrees 37 minutes 57 seconds West with a chord distance of 85.91 feet with a arc length of 96.49 feet along the common line of said Lot 4; thence, North 84 degrees 58 minutes 58 seconds West a distance of 349.63 feet along the common line of said Lot 4 to a curve being concave to the southwest with a central angle of 45 degrees 07 minutes 28 seconds with a radius of 78.11 feet through a chord bearing of North 87 degrees 32 minutes 41 seconds West with a chord distance of 59.94 feet along the common line of said Lot 4; thence, South 85 degrees 44 minutes 51 seconds West a distance of 70.41 feet to a point on the common line of Lot 1 as recorded in Plat Book 21, Page 307-308; thence, North 01 degrees 14 minutes 52 seconds East a distance of 68.97 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 50 minutes 44 seconds West a distance of 165.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 25 degrees 40 minutes 14 seconds West a distance of 106.68 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 16 minutes 51 seconds West a distance of 210.14 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 28 degrees 19 minutes 22 seconds East a distance of 187.62 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 61 degrees 51 minutes 18 seconds West a distance of 10.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 25 degrees 17 minutes 05 seconds West a distance of 189.41 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 63 degrees 15 minutes 44 seconds West a distance of 356.73 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, continuing North 63 degrees 15 minutes 44 seconds West a distance of 106.00 feet more or less along the common line of said Lot 1 to the low water mark on the Ohio River; thence, leaving said common line of Lot 1, North 25 degrees 49 minutes 19 seconds East along the low water mark of the Ohio River a distance of 415.62 feet; thence, North 20 degrees 05 minutes 00 seconds East along the low water mark of the Ohio River a distance of 753.00 feet; thence, North 21 degrees 45 minutes 00 seconds East along the low water mark of the Ohio River a distance of 272.74 feet to its point of intersection with the extended centerline of Yellow Creek; thence, North 95 degrees 46 minutes 26 seconds East a distance of 325.94 feet along the meanderings of Yellow Creek; thence, South 70 degrees 03 minutes 14 seconds East a distance of 114.10 feet along the meanderings of Yellow Creek; thence, South 35 degrees 24 minutes 35 seconds East a distance of 80.47 feet along the meanderings of Yellow Creek; thence, South 02 degrees 55 minutes 00 seconds West a distance of 242.83 feet along the meanderings of Yellow Creek; thence, South 24 degrees 57 minutes 05 seconds East a distance of 198.02 feet along the meanderings of Yellow Creek; thence, South 53 degrees 07 minutes 13 seconds East a distance of 161.62 feet along the meanderings of Yellow Creek; thence, South 72 degrees 22 minutes 17 seconds East a distance of 389.77 feet along the meanderings of Yellow Creek; thence, South 00 degrees 26 minutes 49 seconds West a distance of 97.73 feet along the meanderings of Yellow Creek; thence, South 40 degrees 30 minutes 00 seconds East a distance of 110.00 feet; thence South 78 degrees 10 minutes 54 seconds East a distance of 289.63 feet along the meanderings of Yellow Creek; thence, South 35 degrees 17 minutes 41 seconds East a distance of 77.14 feet along the meanderings of Yellow Creek; thence, South 18 degrees 27 minutes 00 seconds East a distance of 189.27 feet along the meanderings of Yellow Creek; thence, South 30 degrees 00 minutes 00 seconds West a distance of 98.00 feet along the meanderings of Yellow Creek; thence, South 50 degrees 27 minutes 01 seconds West a distance of 187.31 feet along the meanderings of Yellow Creek; thence, South 23 degrees 39 minutes 44 seconds West a distance of 66.62 feet along the meanderings of Yellow Creek; thence, South 33 degrees 50 minutes 32 seconds East a distance of 160.39 feet along the meanderings of Yellow Creek; thence, South 22 degrees 50 minutes 35 seconds East a distance of 92.18 feet; thence, South 06 degrees 45 minutes 08 seconds East a distance of 72.08 feet along the meanderings of Yellow Creek; thence, South 66 degrees 27 minutes 37 seconds East a distance of 162.44 feet along the meanderings of Yellow Creek; thence North 67 degrees 50 minutes 28 seconds East a distance of 244.36 feet along the meanderings of Yellow Creek to a point on the northeasterly right-of-way of Kentucky DOT right-of-way line; thence, South 25 degrees 24 minutes 13 seconds West (measured) and South 26 degrees 05 minutes 44 seconds West (record) a distance of 176.63 feet (measured); thence, South 25 degrees 40 minutes 55 seconds West (measured) and South 26 degrees 22 minutes 28 seconds West (record) along said Kentucky DOT right-of-way line a distance of 72.33 feet; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 26 degrees 27 minutes 53 seconds West (record) a distance of 254.28 feet (measured) to the PLACE OF BEGINNING containing 54.33 acres more or less.

**OWENSBORO, KY**

**SCHEDULE B - SECTION II**
**EXCEPTIONS**

File No.: 510495

Commitment No.: 510495

3.  Subject to the rights of the United States of America, State of Kentucky, the municipality and the Public, in and to any portion of the Land lying within the bed of the Ohio River.

4.  Exception of sand and gravel lying between the low water mark and the thread (middle) of the Ohio River adjacent to the insured Land, as contained in deeds recorded in Deed Book 274, pages 200 and 203, said records.

5.  Right of way and easement for public road to Daviess County, Kentucky recorded in Deed Book 276, page 6, said records.

6.  Easement to Kentucky Utilities Company recorded in Deed Book 278, page 1, said records.

7.  Easement to Louisville, Henderson and St. Louis Railway Company for spur track right of way recorded in Deed Book 278, page 271, said records.

8.  Easements and/or control of access contained in deeds to the Commonwealth of Kentucky for the use and benefit of the Department of Highways recorded in Deed Book 281, page 640; Deed Book 340, page 191; and Deed Book 623, page 860, said records.

9.  Warranty Deeds of Flowage Easements to The United States of America recorded in Deed Book 379, pages 449 and 454, said records.

10. Right of way to East Daviess County Water Association, Inc. recorded in Deed Book 413, page 305, said records.

11. Conditions, stipulations, restrictions, easements or other matters shown on:
    (a) approved Minor Subdivision Plat recorded December 11, 1992 in Plat Book 21, pages 307 and 308;
    (b) approved Minor Subdivision Plat recorded June 13, 1994 in Plat Book 23, pages 170 and 171;
    (c) approved minor Subdivision Plat recorded November 28, 1994 in Plat Book 23, pages 335 and 336.

12. Pipe Rack Line Easement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 560, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

(510495.PFD/510495/7)

OWENSBORO, KY

**SCHEDULE B - SECTION II**
**EXCEPTIONS**
(Continued)

File No.: 510495

Commitment No.: 510495

13. Fire Water Line Easement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 573, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

14. Electric Line Easement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 586, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

15. Storm Sewer Line Easement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 598, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

16. Water Line Easement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 610, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

17. Reciprocal Easement Agreement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 619, page 533, said records.

18. Right of way to Western Kentucky Gas Company recorded in Deed Book 637, page 68, said records.

19. Easement Agreement to Big Rivers Electric Corporation recorded in Deed Book 637, page 402, said records.

20. Reciprocal Easement Agreement between W.R. Grace & Co.-Conn. and Specialty Paperboard/Endura, Inc. recorded in Deed Book 638, page 277, said records, and terms and conditions and rights of others in and to appurtenant easements described therein.

21. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 304, re-recorded in Deed Book 641, page 257, said records, and terms and conditions and rights of others in and to appurtenant easements described therein.

22. Multiple Easement Agreement between Specialty Paperboard/Endura, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 638, page 323, re-recorded in Deed Book 641, page 277, said records, and terms and conditions and rights of others in and to appurtenant easements described therein.

23. Multiple Easement Agreement between W. R. Grace & Co.-Conn. and Specialty Paperboard/Endura, Inc. recorded in Deed Book 638, page 356, re-recorded in Deed Book 641, page 303, said records.

24. Multiple Easement Agreement between W. R. Grace & Co.-Conn. and Specialty Paperboard/Endura, Inc. recorded in Deed Book 638, page 383, re-recorded in Deed Book 641, page 334, said records.

25. Easement Agreement between Hampshire Chemical Corp. and W.R. Grace & Co.-Conn. recorded in Deed Book 643, page 201, said records (burden on Lot 1 for the benefit of Lots 5 and 2 and other property).

26. Non-Exclusive Easements to Bellsouth Telecommunications recorded in Deed Book 643, pages 336 and 344, said records.

27. Non-Exclusive Right of way Permit to Western Kentucky Gas Company recorded in Deed Book 643, page 352, said records.

continued

ALTA Commitment - 2006

(510495.PFD/510495/10)

OWENSBORO, KY

**SCHEDULE B - SECTION II**
**EXCEPTIONS**
(Continued)

File No.: 510495

Commitment No.: 510495

28. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 224, said records, and terms and conditions and rights of others in and to appurtenant easements described therein.

29. Multiple Easement Agreement between Polypore Group, Inc. and W. R. Grace & Co.-Conn. recorded in Deed Book 643, page 239, said records, and terms and conditions and rights of others in and to appurtenant easements described therein.

30. Multiple Easement Agreement between W. R. Grace & Co.-Conn. and Polypore Group, Inc. recorded in Deed Book 643, page 259, said records.

31. Multiple Easement Agreement between W. R. Grace & Co.-Conn. and Polypore Group, Inc. recorded in Deed Book 643, page 303, said records.

32. Certificate of Land Use Restriction recorded in Misc. Book 152, page 930, said records.

33. Declaration of Restrictions recorded in Deed Book 800, page 800, said records.

34. Rights of riparian owners in and to the free and unobstructed flow of the water of Yellow Creek.

35. State, County, and School taxes for the year 2007 and subsequent years, not yet due and payable.

NOTE:
SHOWN FOR INFORMATION ONLY:
TAX INFORMATION

Lot 5 and Lot 2 (combined): Tax parcel 72-61
2006 State, County and School taxes, amount due $1,648.20, PAID.
Assessed Value:  $184,300

Lot 1:  Tax parcel #72-64
2006 State, County and School taxes, amount due $11,570.87, PAID
Assessed value:  $1,260,300

** 2001 taxes delinquent; face amount $2,640.33, now due in the total amount of $6,299.83

NOTE:  2002 Tangible taxes also delinquent in the total amount of $4,150.l44

**END OF SCHEDULE B - SECTION II**

ALTA Commitment - 2006

(510495.PFD/510495/10)

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Owensboro, KY

| Site Name and Location | 5513 US Highway 60 East Owensboro, KY | 5513 US Highway 60 East Owensboro, KY |
|---|---|---|
| Name of Order/Type of Permit | Declaration of Restrictions, Book 800, Page 800 | Operations and Maintenance (O&M) Plan (Chapter 3 of Corrective Action Plan Implementation Report as approved by KEPPC August 14, 2006) |
| ID Number | Not Applicable | Not Applicable |
| Expiration Date | Not Applicable | Not Applicable |
| Regulatory Information | Kentucky Environmental and Public Protection Cabinet Manager Superfund Branch 14 Reilly Road Frankfort, KY 40601 502-564-6716 | Kentucky Environmental and Public Protection Manager Superfund Branch 14 Reilly Road Frankfort, KY 40601 502-564-6716 |
| Notice Requirements | The Owner shall provide written notice to the Cabinet at least fifteen (15) calendar days prior to sale, assignment, or lease of the Property or any portion thereof, setting forth the name, address, and telephone number of the anticipated new owner, assignee, or lessee. | The Owner shall provide written notice to the Cabinet at least fifteen (15) calendar days prior to sale, assignment, or lease of the Property or any portion thereof, setting forth the name, address, and telephone number of the anticipated new owner, assignee, or lessee. |

## EXHIBIT B-8 - Travelers Rest, SC

Current Owner of Site:  W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:
   1)  Groundwater Monitoring Wells
   2)  Miscellaneous scrap office furniture
   3)  Miscellaneous scrap manufacturing equipment

Schedule of Permitted Title Exceptions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts:    (Subject to discussions with ELT)        None

Access Agreements:      None

Schedule of Orders and Permits:  Attached

Tenancy:    Grace will occupy a portion of the Travelers Rest facility through 3/31/08.

Monetary Liens:  None

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:  None

TRAVELERS REST, SC

**A.L.T.A. COMMITMENT**
**CHICAGO TITLE INSURANCE COMPANY**
3700 Forest Drive, Suite 201, Columbia, SC  29204
Issued by: Babb & Brown, 505 West Butler Road, Greenville, SC 29607
**SCHEDULE A**

Office File Number 07-1131

Commitment Number

07-1131

1.    Effective Date:  07/17/07 at 08:00 AM

2.    Policy or Policies to be issued:                                          Amount

      a.  ALTA OWNER'S POLICY, Form ALTA Own. Policy (10/17/92)        $TBD
         Proposed Insured:

         W.R. Grace & Co. - Conn.

      b.  ALTA LOAN POLICY, Form (6-17-06)                             $TBD
         Proposed Insured:

         TBD

3.    The estate or interest in the land described or referred to in this Commitment is fee simple.

4.    Title to the fee simple estate or interest in the land is at the Effective Date vested in:

      W.R. Grace & Co. - Conn.

5.    The Land referred to in this Commitment is described as follows:

Parcel 1 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 5.46 acres, more or less, and being the identical tract of land conveyed to Universal Zonolite Insulation Company by deed of Edgar B. League dated August 3, 1946, said deed having been recorded on 08/07/1946 in the ROD Office for Greenville County in Deed Book 297 at Page 59.

Parcel 2 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 1.46 acres, more or less, and being the identical tract of land conveyed to Zonolite Company by deed of Edgar B. League dated 03/18/1949, said deed having been recorded on 03/18/1949 in the ROD Office for Greenville County in Deed Book 376 at Page 1.

Parcel 3 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 5.65 acres, more or less, and being the identical tract of land conveyed to Zonolite Company by deed of Edgar B. League dated 01/04/1950, said deed having been recorded on 01/26/1950 in the ROD Office for Greenville County in Deed Book 401 at Page 257.

F.  1895

**TRAVELERS REST, SC**

Parcel 4 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 36.05 acres, more or less, and being the identical tract of land conveyed to Zonolite Company by deed of Edgar B. League dated 12/31/1951, said deed having been recorded on 12/31/1951 in the ROD Office for Greenville County in Deed Book 448 at Page 180.

Parcel 5 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 8.70 acres, more or less, and being the identical tract of land conveyed to Zonolite Company by deed of WG Addis dated 06/19/1950, and having been recorded on 06/27/1950 in the ROD Office for Greenville County in Deed Book 412 at Page 318.

Parcel 6 -
All that certain piece, parcel or tract of land lying and being in the State of South Carolina, County of Greenville, Paris Mountain Township, and containing 0.30 acres, more or less, and being the identical tract of land conveyed to Universal Zonolite Insulation Company by deed of FS Moody dated 08/1946 and having been recorded on 09/16/1946 in the ROD Office for Greenville County in Deed Book 299 at Page 93.

Tax Map # 0474000100200

Less however,

All that certain piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, lying along the southerly edge of the Roe Ford Road - S.C. Highway S-88, containing 9.112 acres, according to plat of survey entitled "Survey for Furman University", prepared by C.O. Riddle Surveying Co., Inc. dated 5/26/00 and recorded in the Office of the Register of Deeds for Greenville County in Plat Book 48-M at Page 34. Reference is hereby made to said plat for a metes and bounds description thereof.

Portion of Tax Map #0474000100200

**TRAVELERS REST, SC**

PROPERTY DESCRIPTION
TRACT A

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a nail (found) being located approximately 179' from the intersection with Roe Ford Road, said nail also being located on the southernmost right of way of White Horse Road (a.k.a. U.S. Highway 25), thence along said right–of–way N 34 17 58 E for 992.60 feet to a 1/2" rebar (set), thence N 55 41 47 W for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 280.00 feet to a 1/2" rebar (set), thence S 55 41 47 E for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 264.37 feet to a 1/2" rebar (set), thence leaving said right–of–way and continuing along a joint property line with Randolph R. Mathena S 09 56 41 E for 534.83 feet to a 1/2" rebar (set), thence N 81 33 19 E for 324.54 feet to a 2" open top iron pin (found), thence N 43 16 03 E for 218.80 feet to a 1/2" rebar (set), thence leaving said joint property line and continuing along a joint property line with Lyla Addis Haggard, Et Al S 52 39 07 E for 514.98 feet to a 2" open top iron pin (found), thence leaving said joint property line and continuing along a joint property line with Howard B. Addis, Et Al S 18 33 45 W for 357.98 feet to a 2" open top iron pin (found), thence S 48 29 23 E for 361.59 feet to a 3/4" crimp top iron pin (found) being located on the northernmost right–of–way of Roe Ford Road, thence along said right–of–way S 80 47 35 W for 906.81 feet to a 1/2" rebar (set), thence S 80 45 44 W for 789.10 feet to a 1/2" rebar (set), thence along a curve to the right having a length of 65.11 feet, a radius of 750.96 feet and a chord bearing and distance of S 81 57 02 W for 65.09 feet to a 1/2" rebar (set), thence leaving said right–of–way and continuing along a joint property line with Furman University N 39 54 57 W for 71.18 feet to a concrete monument (found), thence N 51 34 35 W for 270.07 feet to a nail (found) being the point of beginning.  Said tract contains 34.686 acres.

PROPERTY DESCRIPTION
TRACT B

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a 5/8" rebar (found) being located approximately 1278 feet from the intersection with White Horse Road (a.k.a. U.S. Highway 25) said rebar also being located on the southernmost right–of–way of Roe Ford Road, thence along said right–of–way N 80 47 35 E for 984.94 feet to a 5/8" rebar (set), thence leaving said right–of–way and continuing along a joint property line with Furman University Foundation I S 66 22 15 E for 23.04 feet to a concrete monument (found), thence leaving said joint property line and continuing along a joint property line with Edgefield Subdivision S 43 13 58 W for 495.77 feet to a 5/8" rebar (set), thence S 36 03 35 W for 363.69 feet to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University S 84 00 00 W for 436.38 feet (passing through a 2" open top iron pin (found) at 414.13 feet) to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University Foundation I N 03 36 32 E for 171.24 feet to a 5/8" rebar (set), thence N 02 19 42 E for 100.27 feet to a 5/8" rebar (bent) (found), thence N 04 10 42 W for 282.14 feet to a 5/8" rebar (found) being the point of beginning. Said tract contains 9.050 acres.

**TRAVELERS REST, SC**

**A.L.T.A. COMMITMENT**
**CHICAGO TITLE INSURANCE COMPANY**
**SCHEDULE B - Section 2**

Commitment Number 07-1131

Exceptions

7.   Taxes and assessments for the year 2007, and subsequent years, which are a lien but are not yet due and payable.

8.   Affidavit of Name Change dated 2/21/89 recorded in the ROD Office for Greenville County in Book 1353 at Page 548.

10.  General Warranty Deed from W.R. Grace & Co. - Conn. to The Furman University Foundation, Inc. dated 05/18/04 recorded in the ROD Office for Greenville County in Deed Book 2089 at Page 1065 and re-recorded 06/16/04 in the ROD Office for Greenville County in Deed Book 2093 at Page 1044.

11.  Right of Way for Roads located on property as shown on plat.

12.  Right of Way for G&N Railroad as shown on plat.

14.  Riparian rights incident to the premises.

15.  Rights of upper and lower riparian owners in and to the waters of creeks or branches crossing or adjoining the property, and the natural flow thereof, free from diminution or pollution.

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Travelers Rest, SC

| | |
|---|---|
| Site Name and Location | 830 SC Highway 25 Bypass<br>Travelers Rest, SC |
| Name of Order/Type of Permit | Land Application Permit |
| ID Number | ND0082309 |
| Expiration Date | September 30, 2012 |
| Regulatory Information | SC Department of Health and Environmental Control<br>Southeast District<br>Industrial, Agricultural, and Storm Water Permitting Division<br>Bureau of Water<br>2600 Bull Street<br>Columbia, SC 29201<br>803-898-4300 |
| Notice Requirements | Part II.L.3: Permit is not transferable except after written notice to SCDHEC/Bureau of Water/NPDES Administration. The current permittee must notify SCDHEC at least 30 days in advance of the proposed transfer date.<br>The notice must include a written agreement between the existing and new permittees containing a specific date for transfer of permit responsibility, coverage, and liability between them.<br>Permits are non-transferable except with prior consent of SCDHEC. This is considered a minor modification and does not require public notice. |

## EXHIBIT B-9 - Waterloo, NY (Brewer Road Landfill)

Current Owner of Site:  W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:
    1) 20,000 gallon leachate storage tank
    2) leachate collection system (pump station and associated piping)
    3) groundwater monitoring wells

Schedule of Permitted Title Exceptions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts: (Subject to discussions with ELT)
    1) 9/14/93 Engineering Services Agreement - O'Brien & Gere

Access Agreements:     None

Schedule of Orders and Permits:  Attached

Monetary Liens:  None

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:
    1) Cost recovery litigation related to W. R. Grace & Co. - Conn. v. Zotos International, Inc.

WATERLOO, NY

---

*Issued By:*
**TICOR TITLE INSURANCE COMPANY**                                    Schedule A

---

REV1                                                    No: | 8507-26077 |

Effective Date:    August 1, 2007    *REV1*

1.  Policy or Policies to be issued:

    OWNER'S POLICY:        ALTA OWNER'S POLICY (6/17/06)              $  (TO BE DETERMINED)
    Proposed Insured:
    TBA


    LOAN POLICY:
    Proposed Insured:
    N/A


2.  The estate or interest in the land described or referred to herein and which is covered by this Commitment is a
    FEE SIMPLE

    and at the Effective Date of this Commitment is vested in:
                            (SEE NEXT PAGE)


3.  The land referred to in this Commitment is described as follows:
    Address:      Brewer Road
    Town:         Waterloo
    County:       Seneca
    State:        NY

    Tax Account No.: 10-1-72

    *(Legal Description Continued on Attached Page)*

WATERLOO, NY

| *Issued By:* | |
|---|---|
| **TICOR TITLE INSURANCE COMPANY** | **Schedule A** (cont'd) |

No: 5507-25077

2. The estate or interest in the land described in this Commitment is, at the Effective Date, vested in (cont'd):

W.R. Grace & Co. - Conn

- by -

1) Warranty Deed made by Evans Chemetics, Inc. to W.R. Grace & Co. dated December 28, 1978 and recorded in the Seneca County Clerk's Office January 8, 1979 in Liber 381 of Deeds at page 256.

2) Note: W.R. Grace & Co. was merged into W.R. Grace & Co. - Conn by plan of merger dated May 25, 1988 and filed in the State of Connecticut on May 25, 1988.

WATERLOO, NY

*Issued By:*
**TICOR TITLE INSURANCE COMPANY**                                    Schedule A   (cont'd)

No:    5507-25077

The land referred to in this Commitment is described as follows:

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Waterloo, County of Seneca, State of New York, being part of Lot 81 of the old Township of Junius, described as follows:

Beginning at a point in the apparent centerline of Brewer Road at the southwest corner of lands owned by Julius and Emilie Jahns and running thence South 82 degrees 51 minutes East along the fence line a distance of 631.3 feet to an iron pipe; thence North 6 degrees 38 minutes East a distance of 272.2 feet to an iron pipe; thence North 83 degrees 31 minutes 15 seconds West a distance of 759.2 feet to a point in the apparent centerline of Brewer Road; thence South 21 degrees 53 minutes 30 seconds West along the apparent centerline of Brewer Road a distance of 272.2 feet to the point of beginning and containing 4.889 acres of land.

WATERLOO, NY

*Issued By:*

**TICOR TITLE INSURANCE COMPANY**

Schedule B, Section 2

No: | 5507-25077

## EXCEPTIONS

H   1.   Any facts that would be disclosed by an accurate survey or inspection of the land.

I   2.   The exact acreage of the premises is not insured.

J   3.   Subject to Declaration of Covenants and Restrictions recorded November 3, 1988 in Liber 447 of Deeds at page 48.

K   4.   The Easement granted to Empire Gas & Electric Company and recorded in Liber 162 of Deeds at page 161 on September 17, 1930.

L   5.   The Easement granted to New York State Electric & Gas Corporation and recorded in Liber 508 of Deeds at page 259 on September 10, 1993.

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Waterloo, NY - Brewer Road Landfill

| Site Name and Location | Brewer Road<br>Waterloo, NY | Brewer Road<br>Waterloo, NY |
|---|---|---|
| Name of Order/Type of Permit | New York State Order on Consent | City of Auburn Wastewater Discharge Permit |
| ID Number | #B8-0033-8407 | 2006-07 |
| Expiration Date | Not Applicable | June 5, 2009 |
| Regulatory Information | New York State Department of Environmental Conservation<br>Region 8<br>Charlotte Theobald<br>6274 East Avon-Lima Road<br>Avon, NY 14414<br>585-226-5354 | Department of Municipal Utilities<br>Bruce Ross<br>Memorial City Hall<br>24 South Street<br>Auburn, NY 13021-3832<br>315-255-4180 |
| Notice Requirements | XXXII. If Respondent proposes to convey the whole or any part of its ownership in the Site, Respondent shall, not less than 30 days prior to consummation of such proposed conveyance, notify the Department in writing of the identity of the transferee and of the nature and date of the proposed conveyance.<br><br>In advance of such proposed conveyance, Respondent shall notify the transferee in writing, with a copy to the Department, of the applicability of this Order. | 10. Limitation on Permit Transfer - Wastewater discharge permits are issued to a specific User for a specific operation and are not assignable to another User or transferable to any other location without the prior written approval of the City.<br><br>Sale by a User shall obligate the purchaser to seek prior written approval of the City for continued discharge to the POTW. |

## EXHIBIT B-10 - Woburn, MA

Current Owner of Site: W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:
1) Groundwater recovery and monitoring wells and small building which houses the groundwater pump-and-treat system

Schedule of Permitted Title Exceptions:  See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:  See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts: (Subject to discussions with ELT)
1) 5/31/05 Master Services Agreement - GeoTrans, Inc.
2) 7/14/06 Master Services Agreement - Groundwater and Environmental Services, Inc.

Access Agreements: None

Schedule of Orders and Permits:  Attached

Monetary Liens: None

Right of First Refusal or Option to Purchase: None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:
1) Lawsuit captioned W. R. Grace & Co. - Conn. v. Cummings Properties, LLC, Civil Action No. MISC 317002, regarding Cummings claim that it has acquired portion of Grace-owned property by adverse possession. Lawsuit dismissed without prejudice in October 2007. Tolling Agreement signed 10/17/07 provides that either Grace or Cummings may re-institute lawsuit in future.

**WOBURN, MA**

Issued By:

| CHICAGO TITLE INSURANCE COMPANY | Schedule A |

**COMMITMENT FOR TITLE INSURANCE**

No: 2751-25235

Effective Date:    July 23, 2007

1.  Policy or Policies to be issued:

OWNER'S POLICY:      ALTA OWNER'S (10-17-92)                     $ (TO BE DETERMINED)
Proposed Insured:

LOAN POLICY:
Proposed Insured:
N/A

2.  The estate or interest in the land described or referred to herein and which is covered by this Commitment is a
FEE SIMPLE

and at the Effective Date of this Commitment is vested in:
W.R. Grace & Co.- Conn., a Connecticut Corporation

3.  The land referred to in this Commitment is known as:

Address:      369 Washington Street
City/Town:    Woburn
County:       Middlesex
State:        MA
Lot No.:      ~
Subdivision:  ~

(Legal Description Continued on Attached Page)

WOBURN, MA

*Issued By:*
**CHICAGO TITLE INSURANCE COMPANY**                                    Schedule A  (cont'd)

**COMMITMENT FOR TITLE INSURANCE**                          No:    2751-25235
ALTA Standard Form (1966)

The land referred to in this Commitment is described as follows:

A certain parcel of land with the buildings and partially completed buildings thereon situated in Woburn, in said County of Middlesex, being shown on plan entitled "Plan of Land, Woburn, Mass." dated May 11, 1957, by Harry R. Feldman, Inc., engineers, recorded withtheh Middlesex South District Registry of Deeds, Book 8957, Page 65, and being further bounded and describing as shown on said planas follows:

| | |
|---|---|
| WESTERLY | by said Washington Street, by three bounds totaling five hundred sixty-eight and 36/100 (568.36) feet; |
| NORTHERLY | by land now or formerly of Carlson, one thousand forty-six and 75/100 (1046.74) feet; |
| NORTHEASTERLY | by land of owners unknown, two hundred thirty-two (232) feet; |
| SOUTHEASTERLY | by land of owners unknown, two hundred eighty-six and 97/100 (286.97) feet; |
| NORTHEASTERLY | by land of owners unknown, one hundred two (102) feet, said line being through the center line of a brook; and |
| SOUTHERLY | by land now or formerly of Anderson, by two bounds totaling nine hundred and eighty-three and 10/100 (983.10) feet. |

EXCEPTING from the foregoing, the following parcel as conveyed to William S. Cummings by Deed recorded with said Registry of Deeds in Book 12113, Page 232:

Traingular parcel of land in Woburn, Middlesx County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| EASTERLY | by land of William S. Cummings and Joyce M. Cummings one hundred two (102.00) feet, N 23° 35' 33" W; |
| SOUTHWESTERLY | one hundred twenty-eight and 32/100 (128.32) feet, S 87° 37' 58" E; |
| SOUTHWESTERLY | eight and 24/100 (8.24) feet S 87° 59' 29" E; and |
| NORTHWESTERLY | one hundred twenty-nine and 88/100 (129.88) feet, by land of W. R. Grace & Co. |

the foregoing parcel is a portion of land of Grantor in Woburn, Middlesex south, Massachusetts shown on an

ACA3 6/96              SMS                                    SAS    08/10/07    10:05:09

WOBURN, MA

Issued By:

CHICAGO TITLE INSURANCE COMPANY                   Schedule A   (cont'd)

COMMITMENT FOR TITLE INSURANCE
· ALTA Standard Form (1966)                     No:    2751-25235

The land referred to in this Commitment is described as follows:

unrecorded plan of land on Washington St. in Woburn, Mass., dated August 24, 1971, surveyed for William S. Cummings, Dana F. Perkins & Sons, Inc., Civil Engineers and Surveyors, Reading, Mass. and marked on said plan "parcel to be acquired from W. R. Grace & Co."

NOTE: As hereinafter used "recorded" shall mean "recorded with the Middlesex South District Registry of Deeds."

ACK3 5/86          5K3                    SAS   08/10/07   10:09:09

WOBURN, MA

Issued By:

CHICAGO TITLE INSURANCE COMPANY

Schedule B, Section 2

COMMITMENT FOR TITLE INSURANCE

No:   2751-25235

## EXCEPTIONS

9.  Taking of the Massachusetts Dpearment of Public Works dated December 126, 1986 and recorded in Bopok 17762, Page 391.

10. Taking by the Massachusetts Department of Public Works dated December 16, 1986 and recorded in Book 17762, Page 401.

11. Taking by the Massachusetts Department of Public Works dated May 24, 2989 and recorded in Book 19879, Page 356.

12. Terms and provisions of a Joint Easement Agreement between Anderson Estates, Inc. and W.R. Grace company and New England Telephone and Telegraph Company, dated June 4, 1992 and recorded in Book 22105, Page 493.

13. Rights of others in and to the uninterrupted flow of the brook as referred to in the description sheet annexed.

NOTE: While specifically excluded from coverage hereunder, the records at the Middlesex South District Registry of Deeds reveal the following matters:

a. Order of Conditions under Massachusetts Wetlands Protection Act issued to Cannonie Environmental Services, Corp., (DEP File No. 348-261) and recorded in Book 21966, Page 509, as affected by a Certifiate of Compliance recorded in Book 29411, Page 190.

b. Order of Conditions under Massachusetts Department of Environmental Protection , (DEP File No. 348-590) and recorded in Book 46339, Page 82.

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Woburn, MA

| Site Name and Location | 359 Washington Street Woburn, MA | 359 Washington Street Woburn, MA |
|---|---|---|
| Name of Order/Type of Permit | Consent Decree | Consent Decree |
| ID Number | 91-11807MA | I-90-1035 |
| Expiration Date | Not Applicable | Not Applicable. Order applied to pilot test work already completed. However, Grace is required to provide a copy of the order to any subsequent owners or successors before ownership rights are transferred. |
| Regulatory Information | USEPA Region 1<br>Joseph Lemay<br>Remedial Project Manager<br>10 Congress Street<br>Mail Code HBO<br>Boston, MA 02203-0001<br>617-918-1323<br><br>Massachusetts Department of Environmental Protection**<br>Jennifer McWeeney<br>Project Manager<br>One Winter Street, 7th Floor<br>Boston, MA 02108<br>617-292-5530<br><br>**Note: Site is considered adequately regulated under MCP; however, any correspondence with USEPA regarding the Consent Decree should be copied to MassDEP. | USEPA Region 1<br>Joseph Lemay<br>Remedial Project Manager<br>10 Congress Street<br>Mail Code HBO<br>Boston, MA 02203-0001<br>617-918-1323<br><br>Massachusetts Department of Environmental Protection**<br>Jennifer McWeeney<br>Project Manager<br>One Winter Street, 7th Floor<br>Boston, MA 02108<br>617-292-5530<br><br>**Note: Site is considered adequately regulated under MCP; however, any correspondence with USEPA regarding the Consent Decree should be copied to MassDEP. |
| Notice Requirements | V. General Provisions 6c: Any Settling Defendant that owns an interest in property included in the Site and any Successor-in-Title shall within thirty (30) days prior to conveyance of such interest, give written notice of this Consent Decree to the grantee and written notice of the proposed conveyance, including name and address of the grantee, and the date on which notice of this Consent Decree was given to the grantee. In the event of any such conveyance, the Settling Defendant's obligations under this Consent Decree shall continue to be met by the Settling Defendant and, subject to approval by the United States, in consultation with the Commonwealth, by the grantee. | V. General Provisions 6c: Any Settling Defendant that owns an interest in property included in the Site and any Successor-in-Title shall within thirty (30) days prior to conveyance of such interest, give written notice of this Consent Decree to the grantee and written notice of the proposed conveyance, including name and address of the grantee, and the date on which notice of this Consent Decree was given to the grantee. In the event of any such conveyance, the Settling Defendant's obligations under this Consent Decree shall continue to be met by the Settling Defendant and, subject to approval by the United States, in consultation with the Commonwealth, by the grantee. |

## EXHIBIT C

LIABILITY TRANSFER  QUALIFIED SETTLEMENT FUND TRUST AGREEMENT

**Exhibit C**

## LIABILITY TRANSFER QUALIFIED SETTLEMENT FUND
## TRUST AGREEMENT

**THIS TRUST AGREEMENT** is made and entered into as of _____, 2008, by and between W. R. Grace & Co. - Conn. ("Grace"), Environmental Liability Transfer, Inc. ("ELT") and de maximis, inc. ("Trustee").    Grace, ELT and the Trustee are hereinafter collectively referred to as the "Parties."

### RECITALS

WHEREAS, Grace, and certain of its subsidiaries, and ELT and certain of its Affiliates, have entered into a Liability Transfer Agreement (the "LTA") dated February ___, 2008; and

WHEREAS, pursuant to the terms of the LTA, ELT has agreed to establish the LTA Qualified Settlement Fund Trust (the "Trust"); and

WHEREAS, ELT has agreed to fund the Trust; and

WHEREAS, the Parties to this Trust Agreement acknowledge and agree that the funds in the Trust and all earnings thereon (the "Trust Funds") are to be held, administered, and distributed solely in accordance with the provisions of this Trust Agreement; and

WHEREAS, the Trust is intended to qualify as a Qualified Settlement Fund within the meaning of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder; and

WHEREAS, on April 2, 2001, Grace filed for Chapter 11 Bankruptcy relief with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, this Trust shall not be effective until the Bankruptcy Court has entered an order approving and authorizing Grace and ELT to enter into the LTA and this Trust Agreement, which order has become final and unappealable.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency which is hereby acknowledged by the Parties, it is agreed as follows:

1.    DEFINITIONS.

"Affiliate" means, with respect to any specified person or other entity, a person or other entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the person or other entity specified.

"Control" of a specified entity means the direct or indirect possession of the power to direct or cause the direction of the management and policies of such person or other entity.

"Premium" means the sum paid to an insurance company for a pollution legal liability insurance policy (if desired by ELT) providing coverage related to ELT's indemnity obligations as provided in Section 5.3 of the LTA.

"Properties" means the real property identified on Attachment A hereto.

"Qualifying Expenditures" means Premium and Clean-up Costs.

"Required Documentation" means a certificate signed by ELT's project manager for the remediation of Property, certifying that the Qualifying Expenditures have been incurred, together with copies of any relevant contracts, invoices or other materials evidencing the nature and description of the Qualifying Expenditure.

All capitalized terms used but not defined in this Trust Agreement shall have the same respective meanings as set forth in the LTA.

## 2.    NAME AND PURPOSE OF THE TRUST.

This Trust shall be known as the LTA Qualified Settlement Fund Trust (the "Trust"). The purpose of the Trust is to provide funds which may be used solely to pay or reimburse ELT or its designated payee for Qualified Expenditures or to reimburse Premiums. To fulfill these purposes, the Trustee shall thoroughly familiarize itself with the nature of the claims asserted against Grace by the United States Environmental Protection Agency and/or state regulatory agencies (the "Environmental Authorities") relating to the alleged releases or threatened releases of hazardous substances at or from the Properties, the nature and scope of the alleged releases or threatened releases, the location and description of the Properties and any actual or proposed investigation and remedial activity undertaken, or to be undertaken, by ELT and its Affiliates to remediate the actual releases or threatened releases, to ensure that any cost or expense submitted by ELT to the Trustee for payment is a Qualified Expenditure. Each of Grace and ELT shall, upon request of the Trustee, provide the Trustee with any and all information or materials that the Trustee may reasonably request to familiarize itself with its obligations under this Trust Agreement.

The purpose of the Trust is limited to the matters set forth herein, and this Trust Agreement shall not be construed to confer upon the Trustee any authority not expressly set forth herein.

The Trust Funds shall not be the property of ELT. The establishment of the Trust and the transfer of funds into the Trust is intended to place such funds beyond ELT's possession and control, subject to the satisfaction of the terms and conditions of this Trust Agreement.

Upon funding of the Trust, ELT shall have a contingent reversionary right (the "Contingent Right") in the Trust giving ELT the right to return of a portion or all of the Trust Funds only in accordance with the terms and conditions of this Trust Agreement.

It is intended that this Trust be a qualified settlement fund under Internal Revenue Code Section 468B and the regulations promulgated thereunder and taxable as a so-called complex trust to which Internal Revenue Code Sections 661, 662 and 663 apply and not as a partnership, corporation or grantor trust, that is, a trust whose property is deemed to be owned by one or more grantors or other persons pursuant to one or more of Internal Revenue Code Sections 671 through 678. ELT and/or the Trustee, as designated herein, shall file all income tax returns and required statements, make any elections with respect to and for the Trust on the assumption that it is a qualified settlement fund pursuant to Internal Revenue Code Section 468B, and comply in all other respects with the requirements of Internal Revenue Code Section 468B and the regulations promulgated thereunder, unless and until it is determined or Trustee otherwise has reason to believe the Trust is other than a qualified settlement fund. In the event this Trust is determined, or is, in the sole judgment of Trustee, at risk of being determined to be other than a trust which is taxable as such a complex trust and it is prudent to reorganize the Trust so that it shall be such a complex trust, then Trustee is authorized to execute such amendment to this Trust, restatements of this Trust, a new trust declaration, instruments of assignment, plans of reorganization and other documents as are appropriate to enable the Trust or a successor to the assets of the Trust to be a trust which is taxable as such a complex trust; provided always, that in no event shall any such reorganization change the purposes hereof, divert the assets of this Trust to purposes other than the original purposes set forth herein or enlarge the powers or responsibilities of Trustee. Payment of all taxes relating to the Trust Funds, if any, shall be made with the assets of the Trust.

3.    CONTRIBUTION TO THE TRUST.

(a)    The Trust shall be solely funded by ELT. All funds paid into the Trust shall be held and distributed from the Trust as provided in this Trust Agreement. Other than earnings on funds in the Trust, no Party shall deposit any other funds into the Trust, or cause any other funds to be deposited into the Trust. The Trust Funds shall not be commingled with any other funds. The Trust shall be funded as follows:

(i)    Initial Payment into Trust. Within one hundred and eighty (180) days of the Effective Date of the LTA, ELT shall transfer into the Trust the sum of Two Million Five Hundred Thousand Dollars ($2,500,000).

(ii)    Deposit of Sale Proceeds. Upon sale of any Property, that portion of sale proceeds as determined pursuant to Paragraph 3 of the LTA shall be deposited into the Trust. Deposits to the Trust shall cease when the sum of Trust deposits totals Eleven Million Dollars ($11 Million).

4.    SECURITY INTEREST.

ELT and the Trustee hereby grant to Grace a continuing security interest in and lien upon the Trust, and all the Trust Funds, for the purpose of securing ELT's and its Affiliates' indemnity obligations as provided at Section 5.1 of the LTA.  The LTA describes the events of default and remedies available to Grace in the event of a default by ELT or its Affiliates of such obligations, and such provisions are incorporated herein by reference.  The Parties shall cooperate to make all filings and take all other actions that Grace may reasonably request in order to confirm, verify and perfect the security interest granted hereunder.  In the event that prior to the termination of this trust, Grace becomes a debtor in a Chapter 7 bankruptcy case, then any remaining funds in the Trust shall remain in the Trust subject to distributions under Paragraph 5 and Termination under paragraph 6(i) or 6(ii), and Trustee shall have the authority to and will release the lien.

5.    PAYMENT FROM THE TRUST.

During the term of this Trust, the Trustee shall make distributions from the Trust Funds only in one of the following ways:

(a)    ELT may from time to time submit to the Trustee a request for funds from the Trust for payment or reimbursement of Qualifying Expenditures.  The Trustee shall make distributions to ELT, or ELT's designated payee, with respect to Qualifying Expenditures only as follows:

       (i)    Prior to making any such distribution, ELT shall have presented Required Documentation to the Trustee to substantiate that Qualifying Expenditures have been paid or incurred by ELT.

       (ii)    Upon receipt of the Required Documentation, the Trustee shall, within five (5) business days, review the documentation to verify that Qualifying Expenditures were paid or incurred by ELT.  The Trustee may request further information from ELT regarding the claimed expenditure in order to verify such expenditure as is reasonable.  Distributions to ELT or its designated payee shall be made with ten (10) days of receipt of verified Required Documents.

       (iii)    Receipt and approval of the Required Documentation shall constitute conclusive proof that Qualified Expenditures have been paid or incurred by ELT.

(b)    If the Trustee receives from Grace and ELT their joint written instruction as to the distribution of the Trust Funds, or a portion thereof, the Trustee shall distribute from the Trust Funds the amount or amounts specified in such joint written instruction as specified therein.

(c)      If ELT establishes to the reasonable satisfaction of the Trustee that the Trust contains funds disproportionate to the amounts needed to complete the Clean Up, then the Trustee shall distribute to ELT from the Trust Funds the difference between the Trust Fund balance and an amount equal to 150% of the estimated cost to complete the Clean Up.

(d)      If the Trustee receives from ELT certified copies of notifications of completion of remediation issued by the appropriate Environmental Authorities indicating that ELT has fulfilled all of Grace's legal, statutory and regulatory obligations in respect of each of the Properties, excluding Guanica PR, the Trustee shall promptly liquidate any assets of the Trust and distribute to ELT any Trust Funds remaining to ELT, and Grace, ELT and the Trustee shall cooperate to close the Trust and terminate the Trust Agreement.

6.      TERMINATION OF THE TRUST.

The Trust shall remain in existence until the first to occur of the following: (i) the Trust Funds are exhausted; (ii) the Trustee has received from ELT certified copies of notifications of completion of remediation issued by the appropriate Environmental Authorities indicating that ELT has fulfilled all of Grace's legal, statutory and regulatory obligations in respect of each of the Properties, excluding Guanica PR; or (iii) Grace and ELT give joint instructions to the Trustee that it be terminated. On such occurrence, the Trustee shall promptly liquidate any assets of the Trust, and distribute to ELT any funds remaining in the Trust, and the Parties shall cooperate to close the Trust and terminate this Trust Agreement.

7.      ALTERATIONS, AMENDMENTS, AND RENOVATION.

This Trust Agreement may be altered, amended, or revoked from time to time by an instrument in writing executed by all of the Parties and approved by the Bankruptcy Court.

8.      TRUST FUNDS MANAGEMENT.

The Trustee shall deposit the principal and income of the Trust and keep the Trust Funds invested in one or more of the following money market or other short-term investment funds:    (i) AAA-rated funds whose underlying securities consist solely of direct US Treasury obligations; (ii) AAA-rated funds having both direct US Treasury obligations and repurchase agreements whose underlying securities consist of US Treasury obligations; (iii) AAA-rated funds consisting of direct US Treasury obligations, repurchase agreements secured by US Treasury obligations; and direct and indirect US Government Agency obligations and (iv) AAA-rated fund consisting of direct and indirect US Government Agency obligations. Such investments shall be made in accordance with reasonable guidelines and directions provided to the Trustee by Grace and ELT. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Trust. In investing, reinvesting, exchanging and selling

the assets of the Trust Funds, the Trustee shall discharge its duty with respect to the Trust Funds in the primary interest of the accomplishment of the purposes and objectives of this Trust Agreement. The Trustee, upon the request of ELT and Grace, and at their sole expense, may engage the services of an investment advisor or manager. The Trustee shall not be personally liable for any action or inaction taken in good faith reliance on the advice of such advisor or manager, nor for delegation in good faith of investment decision-making authority to such advisor or manager. The Trustee shall keep or arrange to be kept an accounting of all contributions to and disbursements from the Trust Funds. The Trustee is not responsible for any loss of income or principal with respect to any investments made in accordance with this Trust Agreement except for its negligence or willful misconduct.

9.    EXPRESS POWERS OF TRUSTEE.

Without limiting the powers and discretion conferred upon the Trustee by any other provisions of this Trust Agreement or by law, the Trustee is expressly authorized and empowered as follows, subject to the limitations provided for herein:

(a)    Payment of Expenses of Administration. To incur and pay any and all fees and expenses upon or connected with the administration of the Trust. No such payments shall be made using assets of the Trust. ELT shall reimburse the Trustee for all such fees and expenses. Notwithstanding the foregoing, payment of all taxes relating to the Trust shall be made with assets of the Trust.

(b)    Preservation of Principal. Notwithstanding any other provision in this Trust Agreement, at all times during the term of this Trust Agreement, to hold, invest and reinvest the assets of the Trust Funds, in accordance with Section 8 hereof, in a manner designed to preserve the accrued income and principal of the Trust Funds for the purposes of the Trust.

(c)    Execution of Documents or Transfer. At the direction of ELT, and, as required by this Trust Agreement, Grace, to make, execute, acknowledge and deliver any and all documents of transfer and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(d)    Litigation. To institute and defend litigation on behalf of and in the name of the Trust if requested to do so by Grace and ELT and upon mutual agreement regarding reimbursement of the expenses thereof with Grace and ELT.

(e)    Authority of Trustee. To do any and all other acts which Grace and ELT shall deem proper to effectuate the purpose of this Trust Agreement and to exercise the powers specifically conferred upon them by this Trust Agreement.

(f)    Discretion in Exercise of Powers. To do any and all other acts which it shall deem proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon it by this Trust Agreement.

10.    ADVICE OF COUNSEL.

The Trustee may from time to time consult with its own counsel with respect to any question arising as to this Trust Agreement. The Trustee shall be fully protected, to the extent permitted by law, except for its gross negligence or willful misconduct resulting in non-compliance with laws, regulations and/or this Trust Agreement, in acting in reliance upon the advice of counsel and shall be reimbursed for its reasonable legal fees.

11.    TRUSTEE COMPENSATION.

Trustee shall be entitled to reasonable compensation for its services as a Trustee under this Trust Agreement, including reimbursement for expenses reasonably incurred by it in the performance of its duties as Trustee. Fees of the Trustee shall be in accordance with a schedule of such fees attached as Attachment B. No payments of such fees shall be made using assets of the Trust. ELT shall have full responsibility for payment of such fees.

12.    RESIGNATIONS AND APPOINTMENT OF TRUSTEE.

(a)    The Trustee may resign at any time by delivering its resignation, in writing, to Grace and ELT, such resignation to take effect ten days after receipt by those parties.

(b)    Grace and ELT may remove the Trustee at any time, by delivering joint notice of such removal in writing to Trustee, such removal to take effect ten days thereafter.

(c)    In the event of the bankruptcy, insolvency, death, disability, resignation or removal, as provided above, of the then Trustee, a successor Trustee: (1) shall become Trustee, (2) shall have all of the rights, powers, duties, authority, and privileges as if initially named as a Trustee hereunder; and (3) shall thereupon be vested with title to the Trust without the necessity of any conveyance or instrument.

(d)    Any new successor Trustee shall be designated by Grace and ELT.

(e)    Acceptance of appointment as a new successor Trustee shall be in writing and shall be effective upon delivery to Grace and ELT.

13.    INSTRUCTIONS TO THE TRUSTEE.

Notwithstanding any provision herein to the contrary, the Trustee is hereby directed to do the following in addition to other duties set forth in other provisions in this Trust Agreement:

(a)    Quarterly Reports.  Have prepared quarterly financial reports describing the manner in which all of the assets of the Trust Funds are then invested and the current market value of such assets, as well as the obligations, income, and expenses related to the Trust Funds. Copies of such reports shall be transmitted in writing to

Grace and ELT.

(b)    Annual Statements.    Have prepared annual financial statements describing the manner in which all of the assets of the Trust Funds are then invested and the current market value of such assets, as well as the obligations, income, and expenses related to the Trust Funds and annual IRS and similar state forms for the Trust Funds. All financial statements shall be prepared on an annual accrual basis, and shall be in accordance with Generally Accepted Accounting Principles, applied on a consistent basis. Copies of such statements shall be transmitted in writing to Grace and ELT.

(c)    Counsel. Advise, consult and confer with and otherwise inform Grace and ELT with respect to matters arising out of this Trust Agreement, administration of the Trust Funds, or any other matter which the Trustee, in its discretion, deems appropriate to bring to the attention of Grace and ELT or about which Grace or ELT inquire.

(d)    Records. Maintain records of all actions taken by the Trustee with respect to matters arising out of this Trust Agreement or administration of the Trust. Copies of said records shall be provided to Grace and ELT upon request and upon termination of this Trust said records shall be transmitted, together with all other records of the Trustee, to ELT.

14.    INDEMNIFICATION.

(a)    Indemnity. The Trustee acts as Trustee only and not personally. For any contract, obligation of liability made or incurred by the Trustee in good faith, all persons shall look solely to the Trust and not the Trustee personally. The Trustee shall not incur any liability personal or corporate, of any nature in connection with any act or omission, made in good faith, of the Trustee or Grace or ELT in the administration of the Trust or otherwise pursuant to this Trust Agreement. The Trustee shall be indemnified and held harmless by the Trust and jointly and severally by Grace and ELT. This indemnification and hold harmless provision shall cover all expenses reasonably incurred by the Trustee in defense of the aforementioned acts or omissions of the Trustee or Grace or ELT. Except for the payment of all expenses reasonably incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Trustee had reasonable cause to believe that the conduct in question was unlawful.

(b)    Survival. This section shall survive the termination of the Trust.

15.    INTERESTS NOT ASSIGNABLE OR SUBJECT TO CLAIMS OR CREDITORS.

Any interest of Grace in the Trust shall not be subject to anticipation or assignment or subject to the claims of any creditor of Grace, and any interest reserved to Grace or ELT shall be made available to Grace and ELT only upon termination of this Trust pursuant to Section 6 herein.

16.    CHOICE OF LAW.

This Trust Agreement shall be administered, construed, and enforced according to the laws of the State of Delaware.

17.    INTERPRETATION.

As used in this Trust Agreement, words in the singular include the plural and words in the plural include the singular.  The descriptive heading for each Section and Subsection of this Trust Agreement shall not affect the interpretation or the legal efficacy of this Trust Agreement.

18.    SEPARATE DOCUMENTS.

This Trust Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.    NOTICE.

In the event any party hereto shall desire or is required to give notice to any other party hereto, then such notice shall be in writing addressed to the party who is to receive such notice, and sent to the following addresses:

W. R. Grace & Co. - Conn.

Corporate Secretary
W. R. Grace & Co.
7500 Grace Drive
Columbia, Maryland  21044
Tel:  410.531.4000
Fax:  410.531.4367

de maximis, inc.

Trust Administrator
de maximis, inc.
450 Montbrook Lane
Knoxville, TN  37919
Tel: (865) 691-5052
Fax: (865) 691-6485

Environmental Liability Transfer, Inc.
1650 Des Peres Road, Suite 306
Saint Louis, MO  63131
Tel: (314) 775-0500
Fax: (314) 775-0503

20.    PERFORMANCE BY REMEDIUM GROUP, INC.

Any rights or obligations of Grace hereunder may be exercised, performed or fulfilled by Remedium Group, Inc., a subsidiary of Grace and one of the parties to the LTA.

21.    CONTINUING JURISDICTION OF BANKRUPTCY COURT.

Any other provision of this Trust Agreement to the contrary notwithstanding, this Trust Agreement shall be subject to the continuing jurisdiction of the Bankruptcy Court, or upon withdrawal of the court's reference, the U.S. District Court of the District of Delaware.

IN WITNESS WHEREOF, this Trust Agreement has been read and signed in duplicate originals by the duly authorized representatives of the Parties as of the date first set forth above.

W. R. GRACE & CO. - CONN.                    de maximis, inc., Trustee

By: _____              By: _____
        Name:                                        Name:
        Title:                                         Title:

ENVIRONMENTAL LIABILITY
TRANSFER, INC.

By: _____
        Name:
        Title:

Attachment A
Property Descriptions

Atlanta, GA
Charleston, SC
Fort Pierce, FL
Guanica, PR
Joplin, MO
Memphis, TN
Owensboro, KY
Travelers Rest, SC
Waterloo, NY
Wobum, MA

**ATLANTA, GA**

## LEGAL DESCRIPTION

*TRACT 1*

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 86 AND 87 OF THE 14TH FF DISTRICT, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD (100' RIGHT-OF-WAY) AND THE NORTHWESTERLY RIGHT-OF-WAY OF PHILLIP LEE DRIVE (100' RIGHT-OF-WAY); THENCE ALONG THE SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD 90.49 FEET LONG A CURVE TO THE RIGHT HAVING A RADIUS OF 669.25 FEET AND A CHORD BEARING NORTH 42 DEGREES 43 MINUTES 29 SECONDS EAST, 90.42 FEET;
THENCE CONTINUING NORTH 46 DEGREES 35 MINUTES 54 SECONDS EAST, 623.26 FEET TO THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD;
THENCE 788.00 FEET ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 783.80 FEET AND A CHORD BEARING SOUTH 10 DEGREES 46 SECONDS EAST, 753.53 FEET;
THENCE CONTINUING SOUTH 40 DEGREES 20 MINUTES 06 SECONDS EAST, 246.80 FEET TO A #4 REBAR, FOUND;
THENCE DEPARTING THE SAID SOUTHWESTERLY RIGHT-OF-WAY SOUTH 52 DEGREES 55 MINUTES 28 SECONDS WEST, 388.56 FEET TO A ¾" IRON PIPE, FOUND;
THENCE ALONG THE NORTHEASTERLY RIGHT-OF-WAY OF PHILLIP LEE ROAD NORTH 37 DEGREES 05 MINUTES 00 SECONDS WEST, 837.25 FEET TO THE POINT OF BEGINNING. .
CONTAINING 9.75 ACRES OF LAND, MORE OR LESS.

*TRACT 2*

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 86 OF THE 14TH FF DISTRICT, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING FROM THE INTERSECTION OF THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD (100' RIGHT-OF-WAY) AND THE NORTHWESTERLY RIGHT-OF-WAY OF PHILLIP LEE DRIVE (100' RIGHT-OF-WAY); THENCE ALONG THE SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD 90.49 FEET LONG A CURVE TO THE RIGHT HAVING A RADIUS OF 669.25 FEET AND A CHORD BEARING NORTH 42 DEGREES 43 MINUTES 29 SECONDS EAST, 90.42 FEET;
THENCE DEPARTING SAID SOUTHEASTERLY RIGHT-OF-WAY NORTH 43 DEGREES 24 MINUTES 06 SECONDS WEST, 100.00 FEET TO THE NORTHWESTERLY ATLANTIC COAST LINE RAILROAD RIGHT-OF-WAY, ALSO BEING THE POINT OF BEGINNING;

FROM SAID POINT OF BEGINNING, THENCE 4.71 FEET ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 769.25 FEET AND A CHORD BEARING SOUTH 46 DEGREES 25 MINUTES 23 SECONDS WEST, 4.71 FEET TO THE POINT OF BEGINNING;
THENCE DEPARTING THE SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD NORTH 36 DEGREES 51 MINUTES 17 W, 522.01 FEET TO THE TOP OF BANK OF THE CHATTAHOOCHEE RIVER;
THENCE CONTINUING ALONG THE TOP OF BANK OF THE CHATTAHOOCHEE RIVER 336.21 FEET HAVING A CHORD NORTH 49 DEGREES 32 MINUTES 37 SECONDS EAST, 333.40 FEET;
THENCE SOUTH 38 DEGREES 51 MINUTES 17 SECONDS EAST, 502.80 FEET TO A #4 REBAR, FOUND IN THE SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD;
THENCE ALONG THE SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF THE ATLANTIC COAST LINE RAILROAD SOUTH 46 DEGREES 35 MINUTES 54 SECONDS WEST, 330.34 FEET TO THE POINT OF BEGINNING.
CONTAINING 3.92 ACRES OF LAND, MORE OR LESS.

CHARLESTON, SC

LEGAL DESCRIPTION
TRACT A

     ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND SITUATE,
LYING AND BEING IN THE CITY OF CHARLESTON, CHARLESTON COUNTY,
SOUTH CAROLINA DESIGNATED AS TRACT A ON AN ALTA/ACSM LAND
TITLE SURVEY BY THOMAS V. BESSENT, PLS DATED SEPTEMBER 21, 2007
MORE PARTICULARLY DESCRIBED WITH RESPECT TO SAID SURVEY AS
FOLLOWS:
     BEGINNING AT A 5/8" REBAR AT THE INTERSECTION OF THE
SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD
AND THE NORTHERLY RIGHT—OF—WAY LINE OF HERBERT STREET
(S—10—132), BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;
     THENCE WESTERLY ALONG SAID NORTHERLY RIGHT—OF—WAY
S70'09'03"W 894.69' TO A 5/8" REBAR AT THE SOUTHEASTERLY CORNER
OF PROPERTY OF J. ROY GIBSON; THENCE ALONG SAID PROPERTY
N15'25'57"W 331.00' TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID
PROPERTY S72'08'43"W 252.28 TO A 3/4" IRON PIPE; THENCE ALONG
THE EASTERLY RIGHT—OF—WAY LINE OF HARMON STREET (S—10—293)
THE FOLLOWING THREE COURSES AND DISTANCES: N 15'58'17" W 110.19'
TO A RAILROAD SPIKE; S73'59'34"W 19.96' TO A RAILROAD SPIKE;
N15'53'46"W 362.78' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF
CHARLESTON CONSTRUCTORS INC. N69'08'45"E 272.42 TO A 5/8" REBAR;
THENCE CONTINUING ALONG SAID PROPERTY N24'47'39"W 136.84' TO A
5/8" REBAR; THENCE ALONG PROPERTY OF C AND A RENTALS LLC
N68'43'44"E 353.25' TO A 1" IRON PIPE; THENCE ALONG THE
SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD
S47'05'00"E 1081.79' TO A 5/8" REBAR BEING THE POINT OF BEGINNING
OF THIS DESCRIPTION;
     CONTAINED WITHIN SAID BOUNDS 16.466 ACRES.

Title No.:  430703201

**FT. PIERCE, FL**

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

PARCEL A:

That part of the Northeast quarter of the Southeast quarter of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, bounded as follows:

On the East by the west right of way line of the Florida East Coast Railway Company; on the West by the West boundary of the Northeast quarter of the Southeast quarter of said Section 33; on the North by a line parallel to and 91.4 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of said Section 33; on the South by a line parallel to and 424.6 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of Section 33.

PARCEL B:

Parcel 1:

To locate point of beginning, commence on the West bank of the Indian River at a stake marking the Northeast corner of the South 1/3 of Lot 1 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida; from this stake run due South 2 chains and 9 links and set a stake; thence run West parallel with the land line to the West line of the Dixie Highway so-called, which is the point of beginning of the tract herein described; thence continue on said line from the point of beginning to a point which is 22 chains and 50 links West of the second stake mentioned in this description; run thence North 2 chains 9 links to a stake; run thence West to the subdivision line between the East and West halves of Section 33, run thence South along said subdivision line to the center of Section 33; run thence East 20 chains more or less to the line dividing Lots 3 and 4 of Section 33; run thence South parallel with the land lines to a point due West of the Southwest corner of the land formerly owned by John L. Howard; being the Southwest corner of the Howard fence; also being the Southwest corner of the land described as Lot 1 and the North 2 acres of Lot 2 in Section 34, Township 34 South, Range 40 East; proceed thence South 2 chains 9 links; run thence East parallel with the land lines to the West line of the Dixie Highway so-called; thence Northerly along the West boundary line of the Dixie Highway to the point of beginning;

EXCEPTING, from the foregoing Parcel B Parcel 1 description the following three parcels, to-wit:

A. That parcel conveyed from the Robbins & Graham Company to the Indian River Guano Company, said conveyance being recorded in Deed Book 97, page 327, in the office of the Clerk of the Circuit Court of St. Lucie County, Florida, more particularly described as follows:
Starting at a rock monument at the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East; run thence South on the lot line dividing Government Lots 3 and 4 of said section, a distance of 91.4 feet to an iron Pipe Monument which is the point of beginning of the tract of land hereby conveyed. From said point of beginning, continue South along said lot line a distance of 333.2 feet to a rock monument on the South line of a certain tract of land described in a deed from F.D. Reynolds et al, to East Coast Lumber and Supply Company, which deed is recorded in Deed Book 80, page 12, of the Public Records of St. Lucie County, Florida; thence run east along the south line of the tract of land conveyed by said deed a distance of 1009 feet to a pipe monument, which is the Southeast corner of the tract of land conveyed by said deed from Reynolds to East Coast Lumber and Supply Company and which point is located on the west line of the right of way of the Old Dixie Highway and now known as State Road #140; thence run northerly along the west line of said State Road #140 a distance of 355.4 feet to a pipe monument; thence run west parallel with the lot line to the point of beginning.

B. That parcel conveyed from East Coast Lumber and Supply Company to Antonio M. Peres, et ux, said conveyance being recorded in Deed Book 136, page 261, of the Public Records of St. Lucie County, Florida, as amended by that conveyance from the aforesaid grantor to the aforesaid grantees, said amended conveyance being recorded in Deed Book 149, page 3, of the Public Records of St. Lucie County, Florida, said amended conveyance being more particularly described as follows: From a conquina rock at Northwest corner of the NW

ALTA Commitment -1966

1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run north on the quarter line for a distance of 1735.9 feet from coquina rock, run thence East for a distance of 588 feet to center line of the present New Dixie Highway, being 66 feet wide and known as State Road #5 (formerly #4) and U.S. Highway #1, run thence southeasterly with the center line of said present Dixie Highway for a distance of 1832.8 feet to a point which is the center of said present Dixie Highway, said point being 109.8 feet west of the northwest corner of the NE 1/4 of SE 1/4 of said Section 33, Township 34 South, Range 40 East, run thence West 1204.2 feet to the point of beginning.

C. That parcel conveyed from East Coast Lumber and Supply Company, to G. Bloodworth, J. Logan Bloodworth, G. Ernest Bloodworth, partners, operating and doing business as Cherokee Products Company, said conveyance being recorded in Deed Book 117, page 150, of the Public Records of St. Lucie County, Florida, said land being described as follows:
From a coquina rock at NW corner of NW 1/4 of SE 1/4 run north on 1/4 line for a distance of 1735.9 feet to coquina rock; run thence east for a distance of 588.0 feet to center line of new Dixie Highway for point of beginning; from point of beginning run east 433.3 feet to a monument, run thence 137.95 feet to a coquina rock, run thence east 591.5 feet to a concrete monument, which is 33 feet west of center line of Old Dixie Highway, run thence in a southeasterly direction paralleling the center line of Old Dixie Highway and being 33 feet west of center for a distance of 984.0 feet to a point, thence run north 89 degrees 30 minutes west 950.0 feet to center of New Dixie Highway, run thence in a northwesterly direction with center line of New Dixie Highway for a distance of 1127.8 feet to point of beginning.

Parcel 2:

From the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run South 91.4 feet to a pipe; run thence South 89 degrees and 30 minutes East for a distance of 901.8 feet to a point in the center of the Old Dixie Highway for the point of beginning.  From this point of beginning run North 19 degrees and 38 minutes west following the center of Old Dixie Highway for a distance of 800 feet to a point; run thence South 89 degrees and 30 minutes east for a distance of 96 feet to the west line of the right of way of the Florida East Coast Railway; run thence South 20 degrees and 14 minutes East along the west line of the right of way of the said Florida East Coast Railway 803.5 feet to a point; run thence North 89 degrees and 30 minutes west for a distance of 105.4 feet to the point of beginning; said land lying and being in St. Lucie County, Florida.

LESS AND EXCEPTING from the foregoing Parcel B Parcel 2 description the following 2 parcels, to-wit:

A. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company, on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way), on the North by a Westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:
Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.
On the South by a line that is 60 feet south of and parallel to the aforementioned North line.

B. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company; on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way); on the South by a westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:  Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, Public Records of St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly

along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.

On the North by a line that is 202.06 feet North (as measured along the West right of way line of the Florida East Coast Railway) of the South line and that is 201.62 feet North (as measured along the East right of way line of Old Dixie Highway) on the South line.

**GUANICA, PUERTO RICO**

The land referred to in the Commitment is located at the Carenero Ward of the Municipality of Guánica, Puerto Rico, identified for purposes of recordation as Parcel Number 428, recorded at folio 207, volume 15 of Guánica, Registry of Property of Puerto Rico, Section of San Germán.

## LEGAL DESCRIPTION PARCEL NO. 428

BEGINNING AT POINT 1 LOCATED AT THE CORNER OF THE PROPERTY; THENCE N49°56'23"E, IN A DISTANCE OF 91.87M TO POINT 2, IN BOUNDARY WITH P.R.I.D.C.O.; THENCE S71°03'06"E, IN A DISTANCE OF 548.53M TO POINT 3, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S03°35'39"W, IN A DISTANCE OF 197.24M TO POINT 4, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N86°24'21"W, IN A DISTANCE OF 67.66M TO POINT 5, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 62.20M TO POINT 6, IN BOUNDARY WITH P.R.E.P.A.; THENCE S86°24'21"E, IN A DISTANCE OF 87.66M TO POINT 7, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 258.73M TO POINT 8,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S83°17'19"W, IN A DISTANCE OF 649.10M TO POINT 9,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N13°20'07"E, IN A DISTANCE OF 102.27M TO POINT 10,IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE S82°40'36"W, IN A DISTANCE OF 99.23M TO POINT 11, IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE N13°04'32"E, IN A DISTANCE OF 20.61M TO POINT 12, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°17'38"E, IN A DISTANCE OF 16.85M TO POINT 13, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N15°46'08"E, IN A DISTANCE OF 20.03M TO POINT 14, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°56'19"E, IN A DISTANCE OF 19.33M TO POINT 15, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°25'40"E, IN A DISTANCE OF 42.02M TO POINT 16, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°44'37"E, IN A DISTANCE OF 29.95M TO POINT 17, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N15°23'39"E, IN A DISTANCE OF 33.08M TO POINT 18, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°11'08"E, IN A DISTANCE OF 34.23M TO POINT 19,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°59'50"E, IN A DISTANCE OF 15.24M TO POINT 20, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°57'54"E, IN A DISTANCE OF 22.77M TO POINT 21, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°50'56"E, IN A DISTANCE OF 42.36M TO POINT 22, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°08'55"E, IN A DISTANCE OF 11.59M TO POINT 23, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'13"E, IN A DISTANCE OF 35.11M TO POINT 24, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'08"E, IN A DISTANCE OF 44.92M TO POINT 25, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°33'45"E, IN A DISTANCE OF 39.61M TO POINT 26, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°56'28"E, IN A DISTANCE OF 31.63M TO POINT 27, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°27'28"E, IN A DISTANCE OF 39.03M TO POINT 28, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°31'19"E, IN A DISTANCE OF 33.35M TO POINT 29, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°49'04"E, IN A DISTANCE OF 26.27M TO POINT 30, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N10°22'19"E, IN A DISTANCE OF 20.95M TO POINT 31, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N03°55'08"E, IN A DISTANCE OF 34.59M TO POINT 32,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N02°25'47"W, IN A DISTANCE OF 20.56M TO POINT 33, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N08°17'03"W, IN A DISTANCE OF 15.21M TO POINT 1,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; WICH IS THE POINT OF BEGINNING. HAVING AN AREA OF 418348.5403 SQ. MTS. 106.4393 CUERDAS

JOPLIN, MO

Issued By:
**Chicago Title Insurance Company**                                    Schedule A (continued)

Order No:    020072997

5. THE LAND REFERRED TO IN THIS COMMITMENT IS DESCRIBED AS FOLLOWS (continued):

A tract of land in the North half of the fractional Section 2, Township 27 North, Range 32 West, Jasper County, Missouri, being more particularly described as follows:

Commencing at an iron pin found at the NW corner of Section 2, Township 27 North, Range 32 West, Jasper County, Missouri; thence North 88 degrees 52 minutes 43 seconds East, 1309.54 feet along the North line of Section 2; thence South 00 degrees 23 minutes 28 seconds East, 30.00 feet to a 5/8 inch iron pin set on the North right of way line of a county road at the point of beginning; thence South 00 degrees 23 minutes 28 seconds East, 2526.90 feet to a 5/8 inch iron pin set on the East/West half section line of said section 2; thence North 89 degrees 15 minutes 56 seconds East 2639.57 feet to a 1/2 inch iron pin found at the Southeast corner of the Southeast corner of the West half of Lot One in the Northeast Quarter of Fractional Section 2; thence North 00 degrees 18 minutes 37 seconds West; 1114.44 feet along the East line of the West half of Lot One in the Northeast Quarter of Fractional Section 2 to a 1 1/4 rod; thence North 88 degrees 54 minutes 07 seconds East, 208.71 feet to a set 5/8 inch iron pin; thence North 00 degrees 12 minutes 11 seconds West, 208.71 feet to a found 1/2 inch iron pin on the South line of Lot 2 in the Northeast Quarter of Fractional Section 2; thence North 89 degrees 17 minutes 41 seconds East, 416.80 feet along the South line of said Lot 2 to a set 5/8 inch iron pin; thence North 00 degrees 39 minutes 58 seconds West, 626.19 feet to a set 5/8 inch iron pin; thence North 88 degrees 52 minutes 43 seconds East, 652.94 feet to a 5/8 inch iron pin set on the West right of way line of State Highway "AA"; thence 385.73 feet along the West right of way line of State Highway "AA" on a curve to the left with a radius of 1869.86 feet, a central angle of 11 degrees 49 minutes 09 seconds and a long chord distance of 385.04 feet on a bearing of North 04 degrees 13 minutes 21 seconds West to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 115.60 feet to a set 5/8 inch iron pin; thence South 00 degrees 26 minutes 44 seconds East, 9.00 feet to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 348.00 feet to a set 5/8 inch iron pin; thence North 00 degrees 26 minutes 44 seconds West, 9.00 feet to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 143.33 feet to a set 5/8 inch iron pin; thence North 00 degrees 23 minutes 21 seconds West, 214.00 feet to a 5/8 inch iron pin set on the South right of way line of a county road; thence South 88 degrees 52 minutes 43 seconds West, 438.00 feet along said right of way to a set 5/8 inch iron pin; thence South 00 degrees 23 minutes 21 seconds East, 596.33 feet to a set 5/8 inch iron pin; thence South 89 degrees 01 minutes 12 seconds West, 194.72 feet to a set 5/8 inch iron pin; thence North 00 degrees 19 minutes 40 seconds West, 595.86 feet to a 5/8 inch iron pin set on the South right of way line of a county road; thence South 88 degrees 52 minutes 43 seconds West, 2652.73 feet along said right of way to the point of beginning, EXCEPT the Missouri Pacific Railroad right of way, and EXCEPT commencing at an iron pin found at the Northwest corner of said Section 2, thence North 88 degrees 52 minutes 43 seconds East, 3921.89 feet along the North line of Section 2, thence South 01 degrees 07 minutes 17 seconds East, 30.00 feet to an iron pin set on the South right of way line of a county road and true point of beginning, thence North 88 degrees 52 minutes 43 seconds East, 40.00 feet along said right of way to an iron pin found at the Northeast corner of the tract, thence South 00 degrees 19 minutes 40 seconds East, 595.86 feet to an iron pin found at the Southeast corner of the tract, thence South 89 degrees 01 minutes 12 seconds West, 40.00 feet to an iron pin set at the Southwest corner of the tract, thence North 00 degrees 19 minutes 40 seconds West, 595.76 feet to the point of beginning.

**MEMPHIS, TN**

PROPERTY DESCRIPTION

BEING A SURVEY OF PART OF THE W.R. GRACE & CO. — CONN. PROPERTY
AS RECORDED IN BOOK 5879, PAGE 362 AT THE SHELBY COUNTY
REGISTER'S OFFICE, LOCATED IN SHELBY COUNTY, TENNESSEE AND BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE ARCADIAN FERTILIZER,
L.P. PROPERTY (INSTRUMENT CV–2812), SAID POINT ALSO LIES ON THE
EAST LINE OF OLD MILLINGTON ROAD (60.00 FOOT WIDE PUBLIC RIGHT–OF–
WAY), SAID POINT BEING S19°51'16"W A DISTANCE OF 113.13 FEET
FROM A FOUND IRON PIN AT AN ANGLE POINT ON THE WEST LINE OF THE
SAID ARCADIAN FERTILIZER, L.P. PROPERTY, SAID POINT OF BEGINNING
HAVING A TENNESSEE STATE PLANE COORDINATE OF (N 368278.4240 – E
784168.7474); THENCE S80°11'43"E ALONG A SOUTH LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 634.47 FEET TO A
FOUND ION PIN; THENCE N57°00'54"E AND CONTINUING ALONG A SOUTH
LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF
1004.02 FEET TO A POINT; THENCE S80°44'39"E AND CONTINUING
ALONG A SOUTH LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY
A DISTANCE OF 121.09 FEET TO A POINT; THENCE S9°37'18"W AND
CONTINUING ALONG A SOUTH LINE OF THE SAID ARCADIAN FERTILIZER,
L.P. PROPERTY A DISTANCE OF 642.67 FEET TO A POINT; THENCE
S78°55'12"E AND CONTINUING ALONG A SOUTH LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 113.25 FEET TO A
POINT FOUND IRON PIN; THENCE N10°53'01"E AND CONTINUING ALONG A
SOUTH LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY A
DISTANCE OF 51.53 FEET TO A FOUND IRON PIN; THENCE S80°12'58"E
AND CONTINUING ALONG A SOUTH LINE OF THE SAID ARCADIAN
FERTILIZER, L.P. PROPERTY A DISTANCE OF 834.69 FEET TO A FOUND
IRON PIN AT THE SOUTHEAST CORNER OF THE SAID ARCADIAN FERTILIZER,
L.P. PROPERTY; THENCE N8°10'34"E ALONG A EAST LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 869.06 FEET TO A
FOUND IRON PIN; THENCE S80°53'50"E ALONG A EAST LINE OF THE
SAID ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 114.47 FEET
TO A POINT; THENCE N6°54'31"E ALONG A EAST LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 1069.08 FEET TO
THE NORTHEAST CORNER OF THE SAID ARCADIAN FERTILIZER, L.P.
PROPERTY (N 369854.3035 – E 786956.8820), SAID POINT LIES ON THE
SOUTH LINE OF THE ANNA E. HAYES PROPERTY (PROBATE COURT BOOK 212,
PAGE 330); THENCE S81°18'39"E ALONG THE SOUTH LINE OF THE SAID
HAYES PROPERTY AND ALONG THE SOUTH LINE OF THE MEMPHIS
INTERNATIONAL MOTORSPORTS PARK, INC. PROPERTY (INSTRUMENT Y8–
5194) A DISTANCE OF 2610.19 FEET TO FOUND CONCRETE MONUMENT (N
369458.4672 – E 789538.8870); THENCE S10°22'47"W A DISTANCE OF
165.50 FEET TO A FOUND IRON PIN ON THE NORTHWEST RIGHT–OF–WAY
LINE OF THE ILLINOIS CENTRAL RAILROAD (100.00 FEET NORTHWEST OF
THE CENTERLINE OF THE EASTERN MOST TRACK); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 1499.12 FEET TO A FOUND IRON PIN; THENCE
N40°26'00"W A DISTANCE OF 50.00 FEET TO A POINT ON THE
NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(150.00 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 975.41 FEET TO A POINT; THENCE
S79°56'02"E A DISTANCE OF 64.80 FEET TO A POINT ON THE
NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(100.00 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 1848.26 FEET TO A FOUND IRON PIN; THENCE
S40°26'00"E A DISTANCE OF 17.50 FEET TO A POINT ON THE
NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(82.50 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT–OF–WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 60.00 FEET TO A POINT (N 366661.1447 – E
786442.1264), SAID POINT BEING THE NORTHEAST CORNER OF THE
RICHARD C. ROWE AND DONNA M. ROWE PROPERTY (INSTRUMENT AZ–8886);
THENCE N79°57'40"W ALONG THE NORTH LINE OF THE SAID ROWE
PROPERTY A DISTANCE OF 2598.79 FEET TO THE NORTHWEST CORNER OF
THE SAID ROWE PROPERTY, SAID POINT ALSO LIES ON THE EAST LINE OF
SAID OLD MILLINGTON ROAD (N 367114.1513 – E 783883.1253); THENCE
N1°02'16"E ALONG THE EAST LINE OF OLD MILLINGTON ROAD A
DISTANCE OF 265.47 FEET TO A FOUND IRON PIN AT A POINT OF
CURVATURE; THENCE CONTINUING ALONG THE EAST LINE OF OLD
MILLINGTON ROAD ALONG A 770.00 FOOT RADIUS CURVE TO THE RIGHT AN
ARC DISTANCE OF 252.88 FEET (CHORD N10°26'46"E 251.74 FEET) TO
A FOUND IRON PIN AT THE POINT OF TANGENCY; THENCE N19°51'16"E
AND CONTINUING ALONG THE EAST LINE OF OLD MILLINGTON ROAD A
DISTANCE OF 692.43 FEET TO THE POINT OF BEGINNING AND CONTAINING
7,917,431 SQUARE FEET, OR 181.759 ACRES.

RECORD BOUNDARY DESCRIPTION
PER D.B. 722, PG. 745;
P.B. 21, PG. 307 AND 308

**OWENSBORO, KY**

TRACT 1 - 9.109 ACRES MORE OR LESS

Being a 9.109 acre, more or less, tract located within the bounds of a 142.94 acre, more or less, tract conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky corporation, by deed dated April 16, 1956, and of record in Deed Book 274, Page 203 and said tract recorded in Plat Book 21, Page 307 and 308 all in the Office of the County Court Clerk of Daviess County, Kentucky and more particularly described as follows:

BEGINNING at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes East along the North right-of-way line of US Highway 60 a distance of 1764.41 feet and North 66 degrees 01 minutes 23 seconds West a distance of 1389.3 feet from the SE corner of the WR Grace 142.94h acre tract as recorded in Deed Book 274, Page 203 (at the North right-of-way line of US Highway 60) on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Page 254-259; thence North 66 degrees 01 minutes 23 seconds West a distance of 494.33 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence South 25 degrees 29 minutes 26 seconds West a distance of 139.68 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 25 minutes 06 seconds West a distance of 261.60 feet (measured) to a 5/8-inch rebar with LS Cap 2566 at the top of the bank of the Ohio River; thence, continuing North 64 degrees 25 minutes 06 seconds West a distance of 155.00 feet(calculated) to the low water mark of the Ohio River as referenced in Deed Book 274, Page 203; thence, North 24 degrees 30 minutes 00 seconds East along the low water mark of the Ohio River as referenced in Deed Book 274, Page 203 a distance of 495.73 feet; thence, South 63 degrees 15 minutes 44 seconds East a distance of 155.00 feet (calculated) to a 5/8-inch rebar with LS Cap 2566 being at the top of the bank of the Ohio River; thence, continuing South 63 degrees 15 minutes 44 seconds East a distance of 356.73 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 25 degrees 17 minutes 05 seconds East a distance of 166.91 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 61 degrees 51 minutes 18 seconds East a distance of 10.92 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 28 degrees 19 minutes 22 seconds West a distance of 167.62 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 64 degrees 16 minutes 51 seconds East a distance of 210.14 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 28 degrees 40 minutes 14 seconds East a distance of 106.68 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 64 degrees 50 minutes 44 seconds East a distance of 185.92 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 01 degrees 14 minutes 52 seconds West a distance of 96.93 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 25 degrees 22 minutes 14 seconds West a distance of 353.03 feet (measured) to THE PLACE OF BEGINNING containing 9.109 acres more or less.

OWENSBORO, KY

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

LOT 2 - 8.72 ACRES

More or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR Grace & Company, a Connecticut Corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky Corp., by deed dated April 18, 1958 and/or recorded in Deed Book 274, Page 203 as recorded in the Office of the County Court Clerk of Daviess County, Kentucky and being more particularly described as follows:

Beginning at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page 191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 15 seconds West a distance of 411.14 feet from the SE corner of the WR Grace's 142.946 acre tract as recorded in Deed Book 274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Pages 254-259) being common to the SW corner of Tract 3 as recorded in minor subdivision Plat Book 23, Page 170-171; thence, North 27 degrees 57 minutes 06 seconds East and along the common line of said Tract 3 a distance of 1,071.87 feet to a point in Parcel 10D as recorded in Deed Book 623, Page 660 and at a point of a temporary right-of-way as recorded in Deed Book 278, Page 6; thence, South 64 degrees 10 minutes 56 seconds East along said right-of-way and easement a distance of 298.90 feet to a point on the north Kentucky DOT right-of-way line as recorded in Deed Book 623, Page 660; thence, South 26 degrees 27 minutes 53 seconds West (record) a distance of 10.90 feet along said Kentucky DOT right-of-way line; thence, South 64 degrees 19 minutes 34 seconds East (measured) a distance of 350.32 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 23 degrees 17 minutes 04 seconds West (measured) and South 25 degrees 56 minutes 31 seconds West (record) a distance of 230.22 feet (record and measured) along Kentucky DOT right-of-way line; thence, South 23 degrees 19 minutes 12 seconds West (measured) and South 26 degrees 00 minutes 39 seconds West (record) a distance of 350.32 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 100.00 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 23 degrees 29 minutes 00 seconds West (measured) and South 26 degrees 10 minutes 27 seconds West (record) a distance of 250.20 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 130.01 feet along said Kentucky DOT right-of-way line to a point at the NE corner of a 51.49 acre tract; thence, North 64 degrees 12 minutes 15 seconds West a distance of 389.74 feet along the north line of a 51.49 acre tract to the PLACE OF BEGINNING containing 8.72 acres more or less.

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

**OWENSBORO, KY**

LOT 5 – 54.33 ACRES

Being a 54.33 acre tract more or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky corp., by Deed dated April 16, 1958 and/or recorded in Deed Book 274, Page 203 as recorded in the office of the County Court Clerk of Daviess County, Kentucky and being more particularly described as follows:

Commencing at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page 191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 15 seconds West a distance of 411.14 feet from the SE corner of the WR Grace's 142.94h acre tract as recorded in Deed Book 274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Pages 254-259) being common to the SE corner of Tract 3 as recorded in Minor Subdivision Plat Book 23, Page 170-171; thence, North 27 degrees 57 minutes 08 seconds East along the easterly line of said Lot Number 3 a distance of 1,071.87 feet; thence, South 64 degrees 10 minutes 56 seconds East a distance of 293.90 feet to a point on the northeasterly right-of-way line of Kentucky DOT right-of-way take as recorded in Deed Book 823, Page 860; thence, North 26 degrees 46 minutes 28 seconds East continuing along said Kentucky DOT right-of-way line a distance of 82.00 feet to the PLACE OF BEGINNING; thence, North 71 degrees 08 minutes 14 seconds West and along the common line of Lot 4 a distance of 181.63 feet; thence, North 64 degrees 29 minutes 59 seconds West a distance of 630.08 feet along the common line of said Lot 4 to a point on a curve being concave to the southwest through a central angle of 94 degrees 31 minutes 02 seconds with a radius of 58.49 feet through a chord bearing of North 72 degrees 37 minutes 57 seconds West with a chord distance of 85.91 feet with a arc length of 96.49 feet along the common line of said Lot 4; thence, North 64 degrees 58 minutes 58 seconds West a distance of 349.63 feet along the common line of said Lot 4 to a curve being concave to the southwest with a central angle of 45 degrees 07 minutes 26 seconds with a radius of 78.11 feet through a chord bearing of North 87 degrees 32 minutes 41 seconds West a chord distance of 59.94 feet along the common line of said Lot 4; thence, South 65 degrees 44 minutes 51 seconds West a distance of 70.41 feet to a point on the common line of Lot 1 as recorded in Plat Book 21, Page 307-308; thence, North 01 degrees 14 minutes 52 seconds East a distance of 68.97 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 50 minutes 44 seconds West a distance of 185.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 26 degrees 40 minutes 14 seconds West a distance of 106.58 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 16 minutes 51 seconds West a distance of 210.14 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 26 degrees 19 minutes 22 seconds East a distance of 187.62 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 61 degrees 51 minutes 18 seconds West a distance of 10.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 28 degrees 17 minutes 05 seconds West a distance of 188.91 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 63 degrees 15 minutes 44 seconds West a distance of 356.73 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, continuing North 63 degrees 15 minutes 44 seconds West a distance of 106.00 feet more or less along the common line of said Lot 1 to the low water mark on the Ohio River; thence, leaving said common line of Lot 1, North 26 degrees 49 minutes 19 seconds East along the low water mark of the Ohio River a distance of 415.82 feet; thence, North 20 degrees 05 minutes 00 seconds East along the low water mark of the Ohio River a distance of 753.00 feet; thence, North 21 degrees 45 minutes 00 seconds East along the low water mark of the Ohio River a distance of 272.74 feet to its point of intersection with the extended centerline of Yellow Creek; thence, North 85 degrees 46 minutes 28 seconds East a distance of 325.94 feet along the meanderings of Yellow Creek; thence, South 70 degrees 09 minutes 14 seconds East a distance of 114.10 feet along the meanderings of Yellow Creek; thence, South 35 degrees 24 minutes 35 seconds East a distance of 80.47 feet along the meanderings of Yellow Creek; thence, South 02 degrees 56 minutes 40 seconds West a distance of 242.83 feet along the meanderings of Yellow Creek; thence, South 24 degrees 57 minutes 05 seconds East a distance of 198.02 feet along the meanderings of Yellow creek; thence, South 53 degrees 07 minutes 13 seconds East a distance of 161.62 feet along the meanderings of Yellow Creek; thence, South 72 degrees 22 minutes 17 seconds East a distance of 389.77 feet along the meanderings of Yellow Creek; thence, South 00 degrees 26 minutes 49 seconds West a distance of 97.73 feet along the meanderings of Yellow Creek; thence, South 40 degrees 30 minutes 00 seconds East a distance of 110.00 feet; thence South 78 degrees 10 minutes 54 seconds East a distance of 269.53 feet along the meanderings of Yellow Creek; thence, South 35 degrees 17 minutes 41 seconds East a distance of 77.14 feet along the meanderings of Yellow Creek; thence, South 16 degrees 27 minutes 00 seconds East a distance of 185.27 feet along the meanderings of Yellow Creek; thence, South 30 degrees 00 minutes 00 seconds West a distance of 98.00 feet along the meanderings of Yellow Creek; thence, South 50 degrees 27 minutes 01 seconds West a distance of 187.31 feet along the meanderings of Yellow Creek; thence, South 23 degrees 39 minutes 44 seconds West a distance of 68.62 feet along the meanderings of Yellow Creek; thence, South 33 degrees 50 minutes 32 seconds East a distance of 150.39 feet along the meanderings of Yellow Creek; thence, South 22 degrees 50 minutes 35 seconds East a distance of 92.18 feet; thence, South 08 degrees 45 minutes 06 seconds East a distance of 72.06 feet along the meanderings of Yellow Creek; thence, South 66 degrees 27 minutes 37 seconds East a distance of 162.44 feet along the meanderings of Yellow Creek; thence North 67 degrees 50 minutes 60 minutes 28 seconds East a distance of 244.36 feet along the meanderings of Yellow Creek to a point on the northeasterly right-of-way of Kentucky DOT right-of-way line; thence, South 25 degrees 24 minutes 13 seconds West (measured) and South 28 degrees 05 minutes 44 seconds West (record) a distance of 175.83 feet (measured); thence, South 25 degrees 40 minutes 55 seconds West (measured) and South 28 degrees 22 minutes 28 seconds East (record) along said Kentucky DOT right-of-way line a distance of 72.33 feet; thence, South 26 degrees 49 minutes 28 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 254.28 feet (measured) to the PLACE OF BEGINNING containing 54.33 acres more or less.

**TRAVELERS REST, SC**

PROPERTY DESCRIPTION
TRACT A

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a nail (found) being located approximately 179' from the intersection with Roe Ford Road, said nail also being located on the southernmost right of way of White Horse Road (a.k.a. U.S. Highway 25), thence along said right-of-way N 34 17 58 E for 992.60 feet to a 1/2" rebar (set), thence N 55 41 47 W for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 280.00 feet to a 1/2" rebar (set), thence S 55 41 47 E for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 264.37 feet to a 1/2" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Randolph R. Mathena S 09 56 41 E for 534.83 feet to a 1/2" rebar (set), thence N 81 33 19 E for 324.54 feet to a 2" open top iron pin (found), thence N 43 16 03 E for 218.80 feet to a 1/2" rebar (set), thence leaving said joint property line and continuing along a joint property line with Lyla Addie Haggard, Et Al S 52 39 07 E for 514.98 feet to a 2" open top iron pin (found), thence leaving said joint property line and continuing along a joint property line with Howard B. Addis, Et Al S 18 33 45 W for 357.98 feet to a 2" open top iron pin (found), thence S 48 29 23 E for 361.59 feet to a 3/4" crimp top iron pin (found) being located on the northernmost right-of-way of Roe Ford Road, thence along said right-of-way S 80 47 35 W for 906.81 feet to a 1/2" rebar (set), thence S 80 45 44 W for 789.10 feet to a 1/2" rebar (set), thence along a curve to the right having a length of 65.11 feet, a radius of 750.96 feet and a chord bearing and distance of S 81 57 02 W for 65.09 feet to a 1/2" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Furman University N 39 54 57 W for 71.18 feet to a concrete monument (found), thence N 51 34 35 W for 270.07 feet to a nail (found) being the point of beginning. Said tract contains 34.686 acres.

PROPERTY DESCRIPTION
TRACT B

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a 5/8" rebar (found) being located approximately 1278 feet from the intersection with White Horse Road (a.k.a. U.S. Highway 25) said rebar also being located on the southernmost right-of-way of Roe Ford Road, thence along said right-of-way N 80 47 35 E for 984.94 feet to a 5/8" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Furman University Foundation I S 66 22 15 E for 23.04 feet to a concrete monument (found), thence leaving said joint property line and continuing along a joint property line with Edgefield Subdivision S 43 13 58 W for 495.77 feet to a 5/8" rebar (set), thence S 36 03 35 W for 363.69 feet to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University S 84 00 00 W for 436.38 feet (passing through a 2" open top iron pin (found) at 414.13 feet) to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University Foundation I N 03 36 32 E for 171.24 feet to a 5/8" rebar (set), thence N 02 19 42 E for 100.27 feet to a 5/8" rebar (bent) (found), thence N 04 10 42 W for 282.14 feet to a 5/8" rebar (found) being the point of beginning. Said tract contains 9.050 acres.

WATERLOO, NY

*Issued By:*
**TICOR TITLE INSURANCE COMPANY**                    Schedule A    (cont'd)

No:    5507-25077

The land referred to in this Commitment is described as follows:

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Waterloo, County of Seneca, State of New York, being part of Lot 81 of the old Township of Junius, described as follows:

Beginning at a point in the apparent centerline of Brewer Road at the southwest corner of lands owned by Julius and Emilie Jahns and running thence South 82 degrees 51 minutes East along the fence line a distance of 631.3 feet to an iron pipe; thence North 6 degrees 33 minutes East a distance of 272.2 feet to an iron pipe; thence North 83 degrees 31 minutes 15 seconds West a distance of 759.2 feet to a point in the apparent centerline of Brewer Road; thence South 21 degrees 53 minutes 30 seconds West along the apparent centerline of Brewer Road a distance of 272.2 feet to the point of beginning and containing 4.888 acres of land.

**WOBURN, MA**

*Issued By:*
**CHICAGO TITLE INSURANCE COMPANY**                                           Schedule A   (cont'd)

**COMMITMENT FOR TITLE INSURANCE**
ALTA Standard Form (1966)                              No:    | 2751-25235 |

The land referred to in this Commitment is described as follows:

A certain parcel of land with the buildings and partially completed buildings thereon situated in Woburn, in said County of Middlesex, being shown on plan entitled "Plan of Land, Woburn, Mass." dated May 11, 1957, by Harry R. Feldman, Inc., engineers, recorded withtheh Middlesex South District Registry of Deeds, Book 8957, Page 65, and being further bounded and describing as shown on said planas follows:

| | |
|---|---|
| WESTERLY | by said Washington Street, by three bounds totaling five hun dred sixty-eight and 36/100 (568.36) feet; |
| NORTHERLY | by land now or formerly of Carlson, one thousand forty-six and 75/100 (1046.74) feet; |
| NORTHEASTERLY | by land of owners unknown, two hundred thirty-two (232) feet; |
| SOUTHEASTERLY | by land of owners unknown, two hundred eighty-six and 97/100 (286.97) feet; |
| NORTHEASTERLY | by land of owners unknown, one hundred two (102) feet, said line being through the center line of a brook; and |
| SOUTHERLY | by land now or formerly of Anderson, by two bounds totaling nine hundred and eighty-three and 10/100 (983.10) feet. |

EXCEPTING from the foregoing, the following parcel as conveyed to William S. Cummings by Deed recorded with said Registry of Deeds in Book 12113, Page 232:

Traingular parcel of land in Woburn, Middlesx County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| EASTERLY | by land of William S. Cummings and Joyce M. Cummings one hundred two (102.00) feet, N 23° 35' 33" W; |
| SOUTHWESTERLY | one hundred twenty-eight and 32/100 (128.32) feet, S 87° 37' 58" E; |
| SOUTHWESTERLY | eight and 24/100 (8.24) feet S 87° 59' 29" E; and |
| NORTHWESTERLY | one hundred twenty-nine and 88/100 (129.88) feet, by land of W. R. Grace & Co. |

the foregoing parcel is a portion of land of Grantor in Woburn, Middlesex south, Massachusetts shown on an

Page A - 2

WOBURN, MA

Issued By:

**CHICAGO TITLE INSURANCE COMPANY**                    Schedule A   (cont'd)

COMMITMENT FOR TITLE INSURANCE
ALTA Standard Form (1966)                        No:    2751-25235

The land referred to in this Commitment is described as follows:

unrecorded plan of land on Washington St. in Woburn, Mass., dated August 24, 1971, surveyed for William S. Cummings, Dana F. Perkins & Sons, Inc., Civil Engineers and Surveyors, Reading, Mass. and marked on said plan "parcel to be acquired from W. R. Grace & Co."

NOTE: As hereinafter used "recorded" shall mean "recorded with the Middlesex South District Registry of Deeds."

Page A - 3

Attachment B

Rate Schedule for de maximis



*de maximis, inc.*

## PROFESSIONAL SERVICES RATE SCHEDULE
## JANUARY 1, 2008

### FUND ADMINISTRATION

| | |
|---|---|
| Fund Administrator/Trustee | $ 150.00 |
| Fund Officer | $ 115.00 |
| Accountant | $ 100.00 |
| Account Support | $  60.00 |

### SUPPORT SERVICES

| | |
|---|---|
| Records Coordinator/Administrative Support | $ 50.00 - 65.00 |
| Word Processing Support | $ 45.00 - 52.00 |

### PERSONNEL CHARGES

- Management and technical personnel time charges will be invoiced according to the Rate Schedule above.

- Personnel time charges for direct project support activities such as report typing and reproduction are invoiced according to the Rate Schedule above. Charges include indirect support staff, text processing, equipment, computer connect charges, and nominal communication charges.

- All time is rounded to the nearest one-half hour.

### TRAVEL AND LIVING EXPENSES

- Travel and living expenses are charged at cost plus 10%.

### OTHER CHARGES AND REIMBURSABLE EXPENSES

- All project-related purchases will be invoiced at cost plus 10%, including materials, subcontractor costs, fees, equipment purchased, and other costs incurred specifically for the project.

- A miscellaneous charge equal to 5% of professional services billed will be added to cover routine project-related telephone usage, postage, and photocopying.

- Non-routine project-related charges such as overnight mailings, outside copying charges, and teleconferences will be invoiced at cost plus 3%.

- A nominal fee for document retention and preservation will be charged to each project on a yearly basis as necessary to cover the cost of such activity.

Fees are subject to change on an annual basis. Any change will be subject to written approval from the client.

Payment terms are 30 days from invoice date. de maximis reserves the right to charge a finance fee of 1% per month on the unpaid balance for payments beyond 30 days.

## **EXHIBIT D**

List of Claims Identified as Excluded Matters

1.    (Bankruptcy proofs of claim insofar as they do not cover Assumed Obligations)

2.    (Liability associated with corporate standing and back taxes for Guanica Caribe)

## EXHIBIT D - Excluded Matters

1) Waterloo, NY (Brewer Road Landfill) - Cost recovery lawsuit captioned W. R. Grace & Co. - Conn. v. Zotos International, Inc. Civil Action #98-CV-0838.

2) Woburn, MA - Lawsuit captioned W. R. Grace & Co. - Conn. v. Cummings Properties, LLC, Civil Action No. MISC 317002, regarding Cummings' claim that it has acquired a portion of Grace-owned property by adverse possession. Lawsuit dismissed without prejudice in October 2007. Tolling Agreement signed 10/17/07 provides that either Grace or Cummings may re-institute lawsuit in future.

3) Charleston, SC - Remedium is currently in settlement discussions with RMT, Inc. (environmental contractor) for cost recovery related to wetlands remediation work performed at the Charleston site in late 2006/early 2007.

4) Owensboro, KY - Grace's obligations under 9/14/05 Assignment, Assumption and Consent Agreement by and among W. R. Grace & Co. -- Conn.; Owensboro Specialty Polymers, LLC; and Daramic, LLC.

5) Bankruptcy Proofs of Claim:

| Proof of Claim # | Claimant | Site |
|---|---|---|
| 372 | Pumping Systems Inc. | Atlanta, GA |
| 1641 | Richard C. and Donna M. Rowe | Memphis, TN |
| 2450 | McMaster-Carr Supply | Atlanta, GA |
| 4242 | Cummings Properties LLC | Woburn, MA |
| 9634 | United States of America | Woburn, MA |
| 12791 | Tennessee Department of Environment and Conservation | Memphis, TN |
| 12849 | Massachusetts Department of Environmental Protection | Woburn, MA |
| 13934 | Hampshire Chemical Corp. | Owensboro, KY |
| 14037 | Richard C. and Donna M. Rowe | Memphis, TN |
| 14736 | South Carolina Department of Health & Environmental Control | Charleston, SC |
| 15180 | Missouri Department of Natural Resources | Joplin, MO |
| 15181 | Missouri Department of Natural Resources | Joplin, MO |
| 15182 | Missouri Department of Natural Resources | Joplin, MO |
| 73850 | Peterson Lumber Co. Inc. | Travelers Rest, SC |
| 73942 | Martha Stokes | Travelers Rest, SC |
| 113024 | Forrest Oil Co. | Travelers Rest, SC |

## EXHIBIT E

### ELT Proposal

See attachment



# ENVIRONMENTAL
## LIABILITY TRANSFER
### C O O C O
Incorporated

**VIA ELECTRONIC COPY**                                   January 15, 2007

Mr. M. Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Ave., Suite 301
Memphis, TN 38119-4840

**RE: W.R. Grace & Co. – Property and Liability Transfer Project**

Dear Mr. Obradovic:

Environmental Liability Transfer, Inc. ("ELT") is pleased to present its offer in response to your November 10, 2006 Request for Proposal concerning the W.R. Grace ("WRG") Property and Liability Transfer Project. ELT is offering to acquire the base portfolio consisting of nine sites and to assume all associated remedial obligations concerning the Sites. The sites in the base portfolio are located in Atlanta, GA; Charleston, SC; Fort Pierce, FL; Guanica, PR; Joplin, MO; Memphis, TN; Owensboro, KY; Travelers Rest, SC; and Waterloo, NY ("Sites"). ELT may be interested in the two additional sites, Acton & Woburn, Massachusetts, at a later date but is not currently submitting a bid for those sites. The assumption of WRG's environmental remedial liabilities will exhaustively include all remedial issues that are known, unknown, above grade, at grade, below grade, onsite, offsite (but originating onsite and migrating offsite) whether the issues occurred or were caused to occur in the past, present or future. In addition, collectively ELT along with its sister company Commercial Development Company, Inc. ("CDC"), will broadly and indefinitely indemnify WRG from any future environmental remedial liability associated with the Sites. ELT will assist WRG in designing a comprehensive insurance package for the Sites (optional, not a requisite of ELT), insurance premium expenditures, if any, shall be borne by WRG. Any and all insurance policies should name WRG as the named insured and ELT as an additional insured. If requested, ELT will seek quotes from multiple "A" Rated or better AM Best Rated environmental insurance companies such as, AIG Environmental, XL Environmental, ACE and Zurich North America. This current proposal from ELT does not include the assumption of any potential Natural Resource Damages ("NRD") or third party property or bodily injury claims, which currently exist or arise prior to closing, due to past or present operations.

---

1650 Des Peres Road ⁞ Suite 306 ⁞ St. Louis, MO 63131 ⁞ Phone (314) 775-0500 ⁞ Fax (314) 775-0503
www.ELTransfer.com

ELT has taken into consideration the positive fair market value of the real estate identified in the base portfolio and the liabilities of these sites to determine its bid. ELT feels it has addressed all WRG's instructions to bidders as laid out in the November 10, 2006 request for proposals and is pleased to submit a positive value offer to WRG to acquire the Sites and assume all associated remedial obligations associated with the Sites.

1. **ELT's Offer:** ELT is pleased to tender the following offer to WRG as it concerns the Sites designated within the bid package. This letter of intent ("LOI") constitutes the response of ELT to the November 10, 2006 request for proposal in this matter. This confirms ELT's intent to negotiate a definitive Environmental Liability Transfer & Assumption - Real Estate Sale and Purchase Agreement relating to all environmental remedial obligations and real estate concerning the Sites. The following terms and conditions are intended to be a guide in drafting a definitive agreement and should not be construed to preclude other provisions that are consistent with the terms specified below. This LOI in and of itself is not a binding agreement.

2. **Basic Transaction:** ELT or its assign will enter into a transaction with WRG whereby ELT will assume all environmental remedial liabilities associated with the Sites (excluding NRD and Third Party Claims as specified above). Further, ELT, its assign and CDC will collectively indemnify WRG from any and all environmental remediation liabilities whether known or unknown, at grade, below grade, above grade, onsite or offsite (but which originated onsite and migrated offsite) - whether the remedial liabilities were caused to occur in the past, present or future. ELT will not, however, assume responsibility for any environmental liabilities that are known to WRG but not disclosed to ELT. In addition, ELT will assist WRG in designing an acceptable comprehensive environmental insurance package. Finally, ELT will take title to the Sites at closing. The total consideration called for in this LOI reflects a combination of ELT's positive valuation of the real estate combined with the negative value of the liabilities to be indefinitely assumed.

3. **Insurance Coverage:** If required, ELT will assist WRG in designing a comprehensive environmental insurance package which may include Pollution and Legal Liabilty ("PLL") and Cost Cap Cleanup ("CCC") components. Any and all insurance policies shall name WRG as the named insured and ELT as an additional insured. Any and all insurance premium expenditures shall be borne by WRG. ELT has not approached the insurance market concerning this potential transaction and would not do so until such time that WRG affirms in writing its intentions to accept ELT's offer. ELT's staff has successfully negotiated numerous policies similar in scope to what is anticipated herein.

4. <u>Total Consideration:</u>  The total consideration to be paid by ELT to WRG upon closing is:  **$109,000.**

5. <u>Bid Form:</u>

### W.R. Grace & Co.
### Property and Liability Transfer Project

| Property Locations | Bid Price ($) |
|---|---|
| 9 Sites<br>(Atlanta, GA; Charleston, SC; Fort Pierce, FL; Guanica, PR; Joplin, MO; Memphis, TN; Owensboro, KY; Travelers Rest, SC; and Waterloo, NY) | $109,000 |
| Acton, MA | ELT has chosen not to bid on the Acton, MA site at this time. |
| Woburn, MA | ELT has chosen not to bid on the Woburn, MA site at this time. |
| Total | $109,000 |

6. <u>Environmental Due Diligence</u>:  Upon being selected as the successful bidder ELT is prepared to move directly to the development of a definitive Liability Transfer & Assumption – Real Estate Sale and Purchase Agreement.  In addition, ELT is prepared to approach the insurance markets to aid WRG in designing an acceptable insurance package concerning the Sites.  Simultaneously, ELT will be conducting its final environmental due diligence.  Anticipated due diligence will include a more detailed review of documentation, reports and studies, site inspections, interaction with WRG's current consultants and discussions with the various regulatory agencies.  ELT estimates a time requirement for additional environmental due diligence of 60-90 days.

7. <u>Real Estate Due Diligence</u>:  ELT has nearly completed its real estate due diligence, although ELT would like to verify the information provided was true and accurate.  Any additional real estate due diligence would take place concurrently with any additional environmental due diligence.

8. <u>Consent Orders</u>:  ELT is willing to enter into consent orders with state and/or federal regulatory agencies on any or all of the Sites, if required.

1650 Des Peres Road    Suite 306    St. Louis, MO 63131    Phone (314) 775-0500    Fax (314) 775-0503
www.ELTransfer.com

9. **Legal Entity:** ELT will form a Limited Liability Corporation ("LLC") for each of the Sites in the base portfolio. The LLCs will be take title to the Sites and assume their associated liabilities. The individual LLCs will be owned by ELT. Each LLC will be backed by corporate guarantees from both ELT and CDC.

### Assets and Liabilities
Environmental Liability Transfer, Inc. is a privately held corporation and therefore safeguards its financial information, but ELT will share its financial information upon being selected as the successful bidder for the project. At such time all appropriate information will be supplied.

ELT can share with you a thumbnail view of its financial status as of year end 2005. At year end 2005, ELT and its affiliated companies held assets valued in excess of $300,000,000, with liabilities of approximately $115,000,000 and revenues in excess of $35,000,000.

Over the past 20 years, ELT and its sister company, Commercial Development Company, (CDC) have assumed nearly $750,000,000 in perceived environmental liabilities from Corporate America. To date, ELT and CDC have been able to bring closure to over 99% of the liabilities they have assumed.

10. **Closing Costs:** Any and all closing costs including but not limited to title fee/costs, transfer taxes, mortgage taxes and survey costs, shall be paid by WRG.

11. **Financial Assurance:** ELT will provide WRG with corporate guarantees and full indemnification from any and all environmental remedial liabilities associated with the Sites. Any and all environmental remedial obligations are being transferred to ELT in perpetuity.

### Corporate Guarantee
Collectively, ELT and CDC will provide Corporate Guarantees to the LLCs holding the properties and the assumed liabilities.

### Indemnification
ELT, CDC and the LLCs will broadly and indefinitely indemnify WRG against any future environmental remediation liabilities whether known or unknown, including at grade, below grade or above grade, onsite or offsite. This indemnification extends beyond the term of any insurance policy (if any).

### Environmental Insurance
Any environmental insurance policies acquired by WRG for this transaction will further enhance any indemnification provided by ELT, CDC and the LLCs.

The assumption of WRG's environmental remedial liabilities will exhaustively include all remedial issues that are known, unknown, above grade, at grade, below grade, onsite, offsite (but originating onsite and migrating offsite) whether the issues occurred or were caused to occur in the past, present or future. As indicated earlier this proposal does not include the assumption of any potential Natural Resource Damages ("NRD") or third party property or bodily injury claims, which currently exist or arise prior to closing, due to past or present operations.

12. **Funding of Remedial Obligations:** ELT's bid for the Sites is one that is considered a Positive Value Transaction. Positive Value Transactions are transactions in which the value of the real estate is greater than that of the environmental liabilities. Positive Value Transactions typically do not call for upfront funding for the remedial obligations. ELT will utilize its own funds to address the remedial obligations for the sites. The value of the real estate may be collateralized to aid in the funding of the remedial obligations.

13. **Alternative Proposals:** ELT has discussed with members of WRG's team the concept of Sale/Leasebacks of other real estate assets where WRG has ongoing operations. The addition of any such properties could increase the amount of ELT's offer substantially.

14. **Confidentiality:** Each party agrees to keep confidential this LOI and the underlying documents shared between the parties in pursuing this transaction.

ELT has successfully completed dozens of complex projects similar in scope to the one proposed herein. We also understand that a proposal may not completely convey our intentions in a clear and concise manner. Consequently, we would welcome the opportunity to visit you and to fully answer any questions that you may have regarding this proposal.

Very truly yours,

ENVIRONMENTAL LIABILITY TRANSFER, INC.

*Mark A. Hinds*

Vice President - New Business Development

Agreed and Accepted this ____ day of January, 2007

Name:_____

Title:_____

1650 Des Peres Road    Suite 306    St. Louis, MO 63131    Phone (314) 775-0500    Fax (314) 775-0503
www.ELTransfer.com



## Risk Transfer Project Experience

Below is a partial combined list of Risk Transfer Experience for Environmental Liability Transfer, Inc. Members of our project team were directly involved in the successful completion of these projects and will be bringing that experience to W.R. Grace & Company for this transaction.

### 2.7 Million Square Foot Manufacturing Facility – York, PA



### Caterpillar Corporation – York, Pennsylvania

This 2.7 million square foot facility was acquired under a combination Sale – Leaseback – Environmental Liability Transfer transaction. Caterpillar Corporation received in excess of $30,000,000 and entered into a long-term leaseback of a portion of the facility. In addition to the economic considerations received, Caterpillar effectively transferred all environmental liability at the site both known and unknown. After considerable remedial activities the site has been brought to Pennsylvania Act II closure. While the details of the environmental contamination onsite remain confidential, the assessed value of the liability transfer itself exceeded $10,000,000.

1650 Des Peres Road   Suite 306   St. Louis, MO 63131   Phone (314) 775-0500   Fax (314) 775-0503
www.ELTransfer.com

### 15 Acre Truck Terminal, Greensboro, NC



**S&W Motorline – Greensboro, North Carolina**
The acquisition of this 15 acre truck terminal was a positive cash transaction for the seller as well as a complete environmental liability transfer. After acquisition the site was leased to a third party while remedial activity was performed. Removal of 250 underground drums was performed along with hydrocarbon remediation of the surrounding soil saturated with a multitude of contaminants. After remedial closure was obtained the site was sold to a private investment group. The environmental liability transfer was valued at $4,000,000.

### 202,000 Square Foot Manufacturing Facility – Branford, CT



**Sanvick Millford Corporation – Branford, CT**
Located upon 9 acres, this 202,000 square foot facility possessed 97 monitoring wells onsite. The environmental liability transfer transaction covered all conditions both known and unknown – above and below grade. The environmental issues included chlorinated solvents along with soil and groundwater impacted by heavy metals released from a plating process. The environmental liability transfer value was in excess of $8,000,000.

### 1.1 Million Square Foot Manufacturing Facility – Euclid, OH



### General Motors Corporation – Euclid, Ohio

Acquired from General Motors, this Fisher Body facility consists of 64 acres of ground and 1,100,000 square feet of building structure. A significant environmental liability transfer plan was introduced into the acquisition economics resulting in a net positive cash transaction for General Motors. The environmental liability transfer value was in excess of $4,500,000.

### 1.8 Million Square Foot Aluminum Smelter – Mead, WA



### Kaiser Aluminum – Mead, Washington

Acquired out of bankruptcy, this 1.8 million square foot aluminum smelter located on 450 acres in Mead Washington possesses a superfund site on its grounds. The Kaiser Bankruptcy Trust received in excess of $7,000,000 for the facility, its equipment and land while effectively transferring all environmental liabilities. Currently the site is undergoing remedial activity commensurate with a smelter decommissioning. Future plans for the site include demolition of all structures followed by commercial, retail and residential redevelopment. This project will be nominated for a Phoenix award as it fully demonstrates ELT's ability to turn environmental blight into a vibrant reuse. The environmental liability transfer value was in excess of $40,000,000.

### 740,000 Square Foot Manufacturing Facility, Muncie, IN



### ABB / Westinghouse - Muncie, IN

Acquired from ABB, this facility manufactured large capacity transformers for both Westinghouse and ABB. The environmental liability transfer included an onsite landfill, PCB's in the soil and groundwater as well as, free-floating petroleum impaction. The remedial work is ongoing. The environmental liability transfer value was in excess of $10,000,000.

### 13 Site Chemical Manufacturing Portfolio
#### (Hammond, IN Site Pictured Below)



### Millennium Chemicals – 13 Site North American Portfolio

A combination of sites throughout North America that total over 1,000,000 square feet under roof and approximately 130 acres of land. Environmental issues range from below grade heavy metal impaction of soil and groundwater to asbestos and underground tank removal. Working in concert with regulators from multiple States, -11 of the 13 sites have reached closure. The environmental liability transfer value was in excess of $150,000,000.

**619,000 Square Foot Manufacturing Facility – Euclid, OH**



### PMX Corporation – Euclid, OH

A 619,000 square foot facility located on 78 acres was formerly utilized for the production of copper. The liability transfer covered all impaction including an onsite landfill, heavy metals in the groundwater and soil, fugitive dust and asbestos-impregnated building materials. The environmental liability transfer value was in excess of $10,000,000.

**400,000 Square Foot Manufacturing Facility – Evansville, IN**



### Kraft General Foods – Evansville, IN

As part of the sites' risk management program and remedial plan approximately 142,000 square feet of structure was razed. Substantial asbestos and PCP remediation was implemented as well as the removal of nine underground storage tanks and the associated contaminated soil. The environmental liability transfer value was in excess of $8,500,000

**240,000 Square Foot Manufacturing Facility – Port Clinton, OH**



### Uniroyal Corporation – Port Clinton, OH

Working with Uniroyal Corporation, the "Debtor In Possession," this facility was purchased through the Bankruptcy Courts. Included in the acquisition was a complete environmental liability transfer covering all issues onsite and offsite. The property possessed an onsite landfill, unexploded ordnance, chlorinated impacted soil and groundwater and considerable above ground storage tanks. The environmental liability transfer value of this transaction was in excess of $6,500,000.

**550,000 Square Foot Manufacturing Facility – Cheshire, CT**



### Textron Corporation – Cheshire, CT

Inserting the environmental liability transfer program allowed this 550,000 square foot facility to be sold to a "risk averse" major retailer. The site possessed PCB contamination, asbestos contamination, required PCB transformer removal, PCB wood block removal, and significant below grade contamination abatement. The environmental liability transfer value contained in this transaction exceeded $6,500,000.

**700,000 Square Foot Manufacturing Facility – Danville, IL**



### General Motors Corporation – Danville, IL

This 700,000 square foot General Motors foundry located upon 101 acres and complete with all production equipment was acquired in concert with an environmental liability transfer. After abatement, the facility was sold to a local manufacturing concern which in turn received complete indemnification against environmental liability. The environmental liability transfer value contained within the original transaction with General Motors Corporation exceeded $2,000,000.

**207,000 Square Foot Manufacturing Facility – Sioux City, IA**



### General Motors Corporation – Sioux City, IA

Located upon 27 acres, this 207,000 square foot facility was acquired from General Motors Corporation in concert with an environmental liability transfer program. Various environmental issues were abated and currently the facility is being leased to a national distribution company. The environmental liability transfer value encapsulated within this transaction was in excess of $2,500,000.

**2 Brick Plants Totaling 1,177 Acres and 650,000 Square Feet**



### ANH Refractories – Mexico & Farber, Missouri

Working with the "Debtor in Possession" through the bankruptcy court, these facilities were purchased from ANH Refractories in January 2006. Totaling over 650,000 square feet of buildings on nearly 1,200 acres, these two industrial plants were utilized for manufacturing bricks. ANH was able to divest of these underutilized facilities as well as transfer their environmental liabilities associated with the sites. The environmental liability transfer value of this transaction was in excess of $2,500,000.

**2,000,000 Square Foot Manufacturing Facility – Minneapolis, MN**



### BAE Systems – Minneapolis, Minnesota

ELT acquired this 2,000,000 square foot office and industrial complex on 113 acres in Minneapolis, Minnesota from BAE Systems. This was a great solution for BAE who was not utilizing the entire facility. It was an opportunity for them to sell the property and leaseback only the portions that they needed for their operations as well as transferring certain environmental liabilities associated with the site. Terms and conditions of this transaction are confidential.

**1.1 Million Square Foot Manufacturing Facility – Lafayette, LA**



### Fruit Of The Loom – Lafayette, LA

A 1,000,000 square foot facility located upon 61 acres was acquired from Fruit Of The Loom through the Federal Bankruptcy Courts. Working in concert with the Trustees, an environmental liability transfer program was instituted covering all known and unknown, - above and below grade issues. The final transaction brought positive value to the trustee and associated creditors. The environmental liability transfer value was in excess of $800,000.

**500,000 Square Foot Brewery – Frankenmuth, MI**



### G. Heileman Brewery – Frankenmuth, MI

This facility was acquired through the Federal Bankruptcy courts. Working closely with City planners, a remedial plan was implemented that included 75% demolition of the Historical site. Asbestos impregnated building materials, PCB in the ground soil and water and other caustics were abated. The environmental liability transfer value was in excess of $4,500,000.

**450,000 Square Foot Brewery – Belleville, IL (Before)**



### G. Heileman Brewery – Bellville, IL

The 27 acre facility was capable of producing 800,000 barrels of beer annually and was also utilized for wine production. As part of the remedial plan, 68% of the buildings were demolished while performing asbestos and PCB remediation as well as, below grade hydrocarbon cleanup due to underground storage tank removal. Fifteen acres were sold to an adjacent nursing home and approximately 180,000 square feet of structure was retained for future warehouse and distribution use. The site was a winner of a Phoenix award. The environmental liability transfer value contained in this transaction was in excess of $6,500,000.



**450,000 Square Foot Brewery – Belleville, IL (After)**



1650 Des Peres Road    Suite 306    St. Louis, MO 63131    Phone (314) 775-0500    Fax (314) 775-0503
www.ELTransfer.com

**16.5 Acre Redevelopment Site – Atlanta, GA**



### Viacom / Westinghouse – Atlanta, GA

ELT acquired this 100,000 square foot facility on 16.5 acres located at 1600 Ellsworth Industrial Boulevard in Atlanta, Georgia from Viacom / Westinghouse. ELT will remove asbestos and demolish the building and remediate soil and groundwater contamination. The site will then be rezoned for a mixed-use redevelopment project. Terms and conditions of this transaction are confidential.

### No Photo Available

### EPS, LLC - Marietta, Ohio

This closed industrial landfill was acquired in a liability buyout with EPS, LLC. EPS effectively transferred the title to the real estate and all environmental liabilities at the site - both known and unknown to ELT. EPS was pleased to remove this liability from their balance sheet which gave them the freedom to focus on their core business activities. The site has received closure from the State of Ohio Environmental Protection Agency (OH EPA). ELT purchased an environmental insurance policy and will continue to be responsible for the care and maintenance of the landfill. The environmental liability transfer value was in excess of $500,000.

1650 Des Peres Road :: Suite 306 :: St. Louis, MO 63131 :: Phone (314) 775-0500 :: Fax (314) 775-0503
www.ELTransfer.com

**62,500 Square Foot Foundry – St. Louis, MO (Before)**



**Carondelet Foundry – St. Louis, MO**
This foundry with structure covering 7 acres of land was acquired through an environmental liability transfer program which required 100% demolition in order to institute the agreed upon remedial program. The environmental liability transfer value was in excess of $3,000,000. See the "after" photo.

**62,500 Square Foot Foundry – St. Louis, MO (After)**



1650 Des Peres Road ⬜ Suite 306 ⬜ St. Louis, MO 63131 ⬜ Phone (314) 775-0500 ⬜ Fax (314) 775-0503
www.ELTransfer.com

145 Acre – 680,000 Square Foot Cement Factory – St. Louis, MO (before)



### Alpha Portland Cement – St. Louis, MO

In order to implement the remedial strategy, 680,000 square feet of concrete and steel manufacturing buildings were demolished on this 145 acre site. Asbestos, PCB transformers and heavy metals received remediation. After completion of the remedial plan the site was redeveloped into an industrial complex housing several nationally recognized concerns. The environmental liability transfer value pertaining to this project was in excess of $5,000,000. See the following "after" photos.

145 Acre – 680,000 Square Feet Cement Factory – St. Louis, MO (Current)



1650 Des Peres Road ⌐ Suite 306 ⌐ St. Louis, MO 63131 ⌐ Phone (314) 775-0500 ⌐ Fax (314) 775-0503
www.ELTransfer.com

### 170 Acre Quarry – San Antonio, TX



### Hanson America Quarry – San Antonio, TX

This idle, 170 acre quarry was acquired from Hanson America. Indiscriminate dumping of trash, machinery and industrial waste which included storage tanks up to 10,000 gallons in size, drums and asbestos containing machinery along with unauthorized dumping of byproduct from brick manufacture, tar plume and other hazards were present. The environmental liability transfer value was in excess of $2,500,000.

### 2 Former Coal Mine Sites Totaling More Than 4,000 Acres
### West Virginia & Illinois



### Peabody Energy – West Virginia & Illinois

ELT acquired the liabilities of two former coal-mining operations from Peabody Energy, the largest coal company in the United States. The sites are located in West Virginia and Illinois. The mining activities include nearly 4,000 surface acres and the mineral rights to over 25,000 subsurface acres. ELT acquired the real estate as well as the liabilities associated with the sites, including the acid mine drainage water treatment facility. Operation of the water treatment facility will continue in perpetuity. Terms and conditions of these transactions are confidential.

## Corporate Qualifications

Environmental Liability Transfer, Inc., (ELT) is a comprehensive environmental liability acquisition company providing its clients complete and final environmental liability transference. Combining superlative expertise within the practices of environmental law, environmental insurance, environmental engineering, corporate indemnification and commercial redevelopment, ELT offers unparalleled economic solutions for absolute environmental liability transfer and removal.

ELT is a member of the Commercial Development Company, Inc. (CDC) family of businesses. CDC is a leading North American real estate development firm specializing in the development, acquisition and redevelopment of major commercial and industrial sites. Since 1985 CDC has acquired over twenty two million square feet under roof. As a byproduct of its pursuits, CDC has also acquired, indemnified and alleviated over three quarters of a billion dollars of environmental liabilities. In response to the increasing corporate demand for environmental liability transference, CDC has launched its affiliate, Environmental Liability Transfer, Inc. In full concert with the expertise and financial backing of CDC, Environmental Liability Transfer, Inc., stands ready to acquire and provide complete removal of environmental liability.

### Liability Acquisition Strategy
ELT possesses the unique ability to acquire both contractual and statutory liability while providing insured finite capital solutions for highly variable environmental concerns. In addition to fee based environmental liability transference, ELT actively purchases commercial and/or industrial facilities, portfolios and land sites throughout North America. In doing so ELT's clients often discover that their environmental liabilities can be transferred while receiving a positive net payment in return.

### Liability & Asset Evaluation
ELT's liability and asset evaluation process addresses all aspects of the proposed transaction including the qualification and quantification of known and unknown environmental conditions both onsite and offsite, real estate attributes, suitable risk management strategies, real estate development and/or redevelopment potential and future exit strategies, if applicable. ELT has continually refined its proprietary evaluation process and is positioned intellectually and financially to pursue multiple transactions quickly and cost effectively.

### Risk Management
As it pertains to Brownfield and Superfund sites, effective management of environmental and financial risk is essential. ELT evaluates the property condition, the potential transaction structure and the liability concerns of both itself and its client. Risk management factors include the selection of remedy, assumption of regulatory requirements, legal structure, insurance and indemnification.

This innovative and proven approach to risk management has effectively limited risk to highly risk-averse corporate land owners and provides a highly efficient, cost effective, vehicle for environmental liability transfer.



March 8, 2007

Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119

**RE: W.R. Grace & Co. -- Property and Liability Transfer Project**

Mitch:

Thank you for the opportunity to visit and submit ELT's proposal last week. A post meeting action item for ELT was to provide a breakdown of ELT's estimated environmental costs per site. They are as follows:

| Site | ELT Liability | WRG Liability |
|---|---|---|
| Fort Pierce, FL | $ 1,690,000.00 | $ 1,590,000.00 |
| Memphis, TN | $    758,000.00 | $    740,000.00 |
| Atlanta, GA | $    211,000.00 | $      95,000.00 |
| Guanica, PR | $    580,000.00 | $    206,580.00 |
| Owensboro, KY | $    474,000.00 | $    459,000.00 |
| Travelers Rest, SC | $    537,000.00 | $      22,000.00 |
| Waterloo, NY | $ 1,580,000.00 | $ 1,200,000.00 |
| Joplin, MO | $    462,000.00 | $    342,000.00 |
| Charleston, SC | $ 1,525,000.00 | $ 1,824,000.00 |
| Subtotal: | $ 7,817,000.00 | |
| **Contingency** | **15%** | |
| **Group 1 Total** | **$ 9,200,000.00** | **$ 6,478,580.00** |
| | | |
| Woburn, MA | $ 1,539,000.00 | $ 1,489,000.00 |
| **Contingency** | **15%** | |
| **Group 2 Total** | **$1,800,000** | **$1,489,000** |
| | | |
| Acton, MA | $23 -- $28 million | $19,546,000.00 |
| **Contingency** | **15%** | |
| **Group 3 Total** | **$26.5 -- $32 million** | **$19,546,000.00** |
| | | |
| **Grand Total** | **$37.5 -- $43.0 million** | **$27,513,580.00** |

1650 Des Peres Road  ♦  Suite 306  ♦  St. Louis, MO 63131  ♦  Phone (314) 775-0500  ♦  Fax (314) 775-0503 ♦ www.ELTransfer.com

It has also been requested of ELT to provide details concerning the structure of its corporate guarantee. To that end, we have instructed our counsel to provide ELT's standard contract language in such matters for your review. It will follow via a separate e-mail.

Finally, at the request of WR Grace, ELT is prepared to amend its previously submitted proposal to include both the Woburn MA, and Acton MA, properties. To do so, we are prepared to provide three separate concepts for your consideration.

Base Concept (Previously Submitted 1/15/07)

ELT acquires real estate and environmental liabilities associates with the: Fort Pierce, FL – Memphis, TN – Atlanta, GA – Guanica, PR – Owensboro, KY – Travelers Rest, SC – Waterloo, NY – Joplin, MO – Charleston, SC sites. ELT will pay W.R. Grace a sum of $109,000. All other provisions of the previously submitted proposal would remain the same.

Concept Number Two:

In addition to the sites specified in its January 15, 2007 proposal ELT also accepts the Woburn and Acton, MA properties. W.R. Grace pays ELT a sum of $14,850,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. ELT will agree to split all proceeds over the amount of $2,400,000 received from the eventual sale of the Woburn site with W.R. Grace on a 50% / 50% basis. All other provisions of the previously submitted proposal would remain the same.

Concept Number Three:

In addition to the sites specified in its January 15, 2007 proposal ELT also accepts the Woburn and Acton, MA properties. W.R. Grace pays ELT a sum of $12,050,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. ELT would not share revenues from the eventual sale of the Woburn site. All other provisions of the previously submitted proposal would remain the same.

Please accept the new concepts as options available to W.R. Grace. We look forward to more discussion in which we can further clarify our offering.

Very truly yours,

Environmental Liability Transfer, Inc.

Mark A. Hinds

Mark Hinds
Vice President – New Business Development



March 12, 2007

Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119

**RE: W.R. Grace & Co. – Property and Liability Transfer Project**

Mitch:

Per your request, Environmental Liability Transfer, Inc. (ELT) is willing to share with W.R. Grace a breakdown of ELT's estimated environmental costs per site along with its approximate real estate valuations. The values are shown in the table below.

| Site | ELT Liability | Real Estate Values |
|------|---------------|--------------------|
| Fort Pierce, FL | $ 1,690,000 | $5,000,000 |
| Memphis, TN | $ 758,000 | $500,000 |
| Atlanta, GA | $ 211,000 | $1,000,000 |
| Guanica, PR | $ 580,000 | $500,000 |
| Owensboro, KY | $ 474,000 | $625,000 |
| Travelers Rest, SC | $ 537,000 | $800,000 |
| Waterloo, NY | $ 1,580,000 | $0.00 |
| Joplin, MO | $ 462,000 | $200,000 |
| Charleston, SC | $ 1,525,000 | $3,000,000 |
| Subtotal: | $ 7,817,000 | |
| Contingency | 15% | |
| **Group 1 Total** | **$ 9,200,000** | **$11,625,000** |
| | | |
| Woburn, MA | $ 1,539,000 | $7,100,000 |
| Contingency | 15% | |
| **Group 2 Total** | **$1,800,000** | **$7,100,000** |
| | | |
| Acton, MA | $23 – $28 million | $15,000,000 |
| Contingency | 15% | |
| **Group 3 Total** | **$26.5 – $32 million** | **$15,000,000** |

ELT's steering committee has reviewed W.R. Grace's request to remove the Woburn, MA real estate from the portfolio while continuing to include the assumption of its associated environmental liabilities. ELT has determined that it is not feasible to assume responsibility for the environmental liability at Woburn without having control of the associated real estate. ELT understands that W.R. Grace has an interest in disposing of all sites together. To accommodate W.R. Grace, ELT will increase its offer for the Woburn, MA site from $2,400,000 to $4,000,000. Combined with the assumption of an estimated $1,800,000 in environmental liabilities ELT's total offer for the Woburn site is just under $6,000,000.

ELT's bid for Group 1 is based upon the mitigation of risk over the nine site portfolio. Conversely, the removal of any site(s) from Group 1 may lead to a reduction in purchase price greater than what is reflected within the individual site evaluations provided above.

ELT is providing W.R. Grace three distinct offerings; an offer for Group 1, an offer for Group 2 and an offer for Group 3. W.R. Grace may elect to choose one, all, or any combination of the offerings to follow:

### Group 1 Bid (Previously Submitted 1/15/07)

ELT acquires real estate and environmental liabilities associated with the sites ELT refers to as Group 1: Fort Pierce, FL – Memphis, TN – Atlanta, GA – Guanica, PR – Owensboro, KY – Travelers Rest, SC – Waterloo, NY – Joplin, MO – Charleston, SC sites. ELT will pay W.R. Grace a sum of $109,000. All other provisions of the previously submitted proposal would remain the same.

### Group 2 Bid:  Woburn, MA

ELT acquires real estate and environmental liabilities associated with the Woburn site. ELT will pay W.R. Grace a sum of $4,000,000. All other provisions of the previously submitted proposal would remain the same.

### Group 3 Bid:  Acton, MA

ELT acquires the Acton, MA property including its associated environmental liabilities, W.R. Grace pays ELT a sum of $12,000,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. All other provisions of the previously submitted proposal would remain the same.

Once again, we appreciate the opportunity to bid on this important project. Please do not hesitate to call me with any questions that you may have regarding this submission.

Very truly yours,

Environmental Liability Transfer, Inc.

Mark Hinds
Vice President – New Business Development

**W.R. Grace & Co.**                          6                          May 7, 2007

**Exhibit B**

**List of Properties for Potential Sale/Transfer**

Acton, MA
Charleston, SC
Owensboro, KY
Guanica, Puerto Rico
Waterloo, NY
Atlanta, GA
Memphis, TN
Fort Pierce, FL
Joplin, MO
Travelers Rest, SC
Woburn, MA

GRACE

Schedule 8.9

The City of Charleston, South Carolina, has filed a motion with the Bankruptcy Court requesting relief from the court's automatic stay in order to allow the City to acquire the Transferor Parties' property located in Charleston. This action may affect Transferor Parties' title to this property.

34