UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In the Matter of:          :     Bankruptcy Action # 01-1139
                           :
W.R. GRACE,                :     Wilmington, Delaware
                           :     April 21, 2008
          Debtors.         :     12:00 p.m.
----------------------------

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:               JANET S. BAER, ESQ.
                           Kirkland & Ellis
                           200 East Randolph Drive
                           Chicago, Illinois  60601

                           JAMES O'NEILL, ESQ.
                           Pachulski, Stang, Ziehl, Young & Jones
                           919 North Market Street, 16th Floor
                           Wilmington, Delaware  19801

For Montana:               FRANCIS MONACO, JR., ESQ.
                           Monzack and Monaco
                           1201 Orange Street
                           Wilmington, Delaware  19801

For Libby Plaintiffs:      CHRISTOPHER M. CANDON, ESQ.
                           Cohn, Whitesell & Goldberg
                           101 Arch Street, Suite 1605
                           Boston, Massachusetts  02110

For ACC:                   PETER VAN N. LOCKWOOD, ESQ.
                           Caplin & Drysdale
                           One Thomas Circle NW
                           Suite 1100
                           Washington, D.C.  20005

2

APPEARANCES:                (Continued)


For UniFirst:               DAVID FOURNIER, ESQ.
                            Pepper Hamilton
                            1313 North Market Street
                            Suite 5100
                            Wilmington, Delaware  19899

For PD Committee:           SCOTT BAENA, ESQ.
                            Bilzin, Sumberg, Baena, Price
                            & Axelrod
                            200 South Biscayne Boulevard
                            Miami, Florida  22131

For Unsecured Creditors:    KENNETH PASQUALE, ESQ.
                            Stroock & Stroock & Lavan
                            180 Maiden Lane
                            New York, New York  10038

For Asbestos Claimants:     JAMES J. RESTIVO, ESQ. (Via Telephone)
                            Reed, Smith, Shaw & McClay

For Creditors Committee:    DANIEL SPEIGHTS, ESQ. (Via Telephone)
                            Speights & Runyan

For Charleston:             KAREN BIFFERATO, ESQ. (Via Telephone)
                            Connolly, Bove, Lodge & Hutz

For U.S. Trustee:           DAVID KLAUDER, ESQ. (Via Telephone)
                            Office of the United States Trustee


Audio Operator:             Nicole Schaefer



Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-0129
                            (856) 435-7172
                            FAX:  (856)  435-7124
                            EMAIL:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Colloquy                                 3

1    THE COURT:  Pardon me for one minute.

2                    (Pause)

3    THE COURT:  Okay, this the matter of W.R. Grace, 01-

4    1139.  The participants by phone Martin Dies, Sander Esserman,

5    Christina Skubic, Guy Baron, Andrew Craig, Jerry white,

6    William Corcoan, Douglas Cameron, Lori Sinanyan, David

7    Bernick, James Restivo, Richard Levy, Dale Cockrell, Van

8    Hooker, Curtis Plaza, Matthew Russell, Jeanna Records, Peter

9    Lockwood, Walter Slocombe, Shayne Spencer, Douglas Mannal,

10   Bernard Bailor, Leslie Kelleher, Brian Kasprzak, Elihu

11   Inselbuch, Robert Guttmann, Michael Davis, James Rieger,

12   Tiffany, Cobb, Christina Kang, Matthew Daiker, Peter Shawn,

13   Rajeev Narang, David Parsons, Matthew Kramer, Alan Madian,

14   Terence Edwards, Robert Horkovich, Mark Shelnitz, Matt Doheny,

15   Jay Sakalo, Robert Scott, Leslie Davis, Michael Pappone,

16   Christopher Candon, Kim Christensen, David Beane, Tara Nauful,

17   Marion Fairey, Marti Murray, Janet Baer, Darrell Scott, Daniel

18   Speights, Theodore Freedman, Elizabeth Cabraser, Edward

19   Westbrook, Carl Pernicone, Roger Frankel, Richard Wyron, Lewis

20   Kruger, David Siegel, Mark Plevin, Arlene Krieger, Natalie

21   Ramsey, Elizabeth Devine, Scott Baena, Alex Mueller, Debra

22   Felder, Jonathan Brownstein, Jason Solganick, Ari Berman, John

23   Phillips, Kirk Hartley, and Leticia Chambers.

24       Okay, enter your appearances in Court.  Good

25   morning.

Colloquy                                          4

1        MS. BAER:  Good morning, Your Honor.  Janet Baer, on

2   behalf of the debtors.

3        MR. O'NEILL:  Good morning, Your Honor.  James

4   O'Neill on behalf of the debtors.

5        MR. BAENA:  May it please the Court, good morning,

6   Your Honor.  Scott Baena and Jay Sakalo on behalf of the

7   Property Damage Committee.

8        MR. LOCKWOOD:  Good morning, Your Honor.  Peter

9   Lockwood on behalf of the Asbestos Claimants Committee.

10       MR. PASQUALE:  Good afternoon, Your Honor.  Ken

11  Pasquale from Stroock for the Unsecured Creditors Committee.

12       MR. MONACO:  Good afternoon, Your Honor.  Frank

13  Monaco for the state of Montana.

14       THE COURT:  Excuse me one second.

15                       (Pause)

16       THE COURT:  Okay, thank you.

17       MR. CANDON:  Good afternoon, Chris Candon on behalf

18  of the Libby claimants.

19       THE COURT:  Ms. Baer?

20       MS. BAER:  Thank you, Your Honor.

21       Your Honor, with respect to agenda items numbers 1

22  and 2, those are claims related matters that are being

23  continued to the June 2nd hearing.

24       Agenda item number 3, Your Honor, is the debtor's

25  motion to approve a settlement with respect to its Libby

1   Montana environmental liability.  That matter is being

2   continued to June 2nd also.

3          Item number 4, Your Honor, is the motion of CSX

4   Transportation for payment of an administrative claim.  The

5   parties have finally come to an agreement on that matter.

6   They are working on a stipulation to resolve CSX's issues.  We

7   expect we will present one either before or at the next

8   hearing.  For control purposes, I would suggest we continue

9   this to the June 2nd hearing.  If we have the stipulation done

10  earlier, we'll submit it under certification of counsel.

11         THE COURT:  All right.

12         MS. BAER:  Your Honor, agenda item number 5 was the

13  debtor's motion for approval of an agreement with respect to

14  an environmental liability at its Curtis Bay facility.

15         Your Honor entered an order on this matter this

16  morning.  I just note for the record that the public comment

17  period passed just a couple of days ago.  And the USEPA asks

18  that in the event that a public comment filters in after the

19  fact, which sometimes they do because they come by regular

20  mail, if anything comes in that requires a change in the

21  order, we would ask then for an opportunity to file the

22  certification of counsel with a revised order.

23         We don't anticipate that will occur, but

24  occasionally things like that do happen.

25         THE COURT:  All right.

1          MS. BAER:   Your Honor, agenda item number 6 is the

2     debtor's motion to receive authority to pay certain pre-

3     petition real estate property tax claims.

4          Your Honor, this is one that's kind of a cleanup

5     matter.  In going back through all of the debtor's pending

6     claims, it was discovered that there are some outstanding pre-

7     petition real estate tax obligations that were sort of caught

8     in the mix and did not actually get covered by a first day

9     order, which would be typical in a case.  These are pre-

10    petition real estate tax obligations on owned or leased

11    property where there's actually interest running pursuant to

12    various state and local authorities' statutes, and they do

13    have in fact liens on that real property.

14         What we're asking, Your Honor, is for the authority

15    to pay up to 1.4 million dollars to resolve what would be a

16    priority and secured obligations to these taxing authorities.

17    Your Honor, once we have the authority from the Court, we will

18    go out and actually negotiate with the states the actual

19    allowed amount of their claim.  The interest statute has some

20    interpretations to it, and we will just have to get together

21    with them to figure out exactly how much we're owed, but we're

22    asking this Court for the authority to do that.

23         There were no objections to the order.  We do have a

24    slightly revised order to present to the Court.  The only

25    revision was to reflect the fact that it had said in here

Colloquy                                                    7

1   these were all owned properties.  They're owned and leased

2   properties where the debtor has the obligation.

3          So if Your Honor would like permit me, I'd like to

4   submit a slightly revised order and ask the Court for its

5   entry.

6          THE COURT:  All right.  Has the order been

7   circulated to the parties?

8          MS. BAER:  Your Honor, I apologize.  I did not have

9   a chance to circulate the order.  There was only one change

10  where it reflects that these were properties owned by the

11  debtor.  We added in the words "or leased".

12         THE COURT:  Anyone have an objection to that change

13  in item 6?

14         All right, hearing no objection, I will sign it.

15         MS. BAER:  Thank you, Your Honor.

16                         (Pause)

17         THE COURT:  That order is signed.

18         MS. BAER:  Thank you.  That takes us to agenda item

19  number 7.  This is the continued motion of the debtor to

20  resolve its multi-state environmental liabilities with the

21  EPA.

22         Your Honor, the United States has asked that we

23  continue this matter to June 2nd where they will be here for

24  the Libby matter, and counsel who represents the United States

25  on this matter is on trial this week, and so asked that we

1  simply put this over so that he can appear here once in June

2  and hopefully get both of these then resolved.

3          THE COURT:  Okay.

4          MS. BAER:  Your Honor, that takes us to the next

5  item on the agenda, agenda item number 8 which is the debtor's

6  motion to approve a liability transfer agreement with a

7  company called ELT, Environmental Liability Transfer, Inc.

8          Your Honor, we had a number of objections that were

9  raised to this order, and I am happy to say that I believe we

10  have resolved all of the objections.

11          I'd like to present to Your Honor a clean and a

12  black line that shows all the changes and then I will take you

13  through all the various changes.

14          THE COURT:  All right.

15          MS. BAER:  And Your Honor, just briefly a little

16  background.

17          This motion is to transfer to ELT ten former

18  industrial properties owned by the debtors.  These properties

19  are no longer in use.  These properties carry environmental

20  remediation obligations, oversight obligations and

21  liabilities.  The properties are located in Charleston South

22  Carolina, Owensboro Kentucky, Garantia Puerto Rico (phonetic),

23  and I probably pronounced that wrong, Woburn Massachusetts,

24  Waterloo New York, Atlanta Georgia, Memphis Tennessee, Fort

25  Pierce Florida, Joplin Missouri, and Travelers Rest South

Colloquy                                         9

1   Carolina.

2           Your Honor, our goal with this transaction is to

3   remove the liabilities from the estate to the extent possible,

4   to place in the line of who is responsible a financially

5   solvent company who can take on the responsibilities,

6   relieving the debtor of both the responsibilities as well as

7   the costs of monitoring, the costs of carrying the property,

8   and ultimately eliminate these liabilities from the portfolio

9   to the extent possible.

10          The search for a company to transfer these

11  properties to began in September of 19 -- 2006.  We identified

12  ten environmental transfer companies.  Extensive due diligence

13  was done, a search was done, a review and a bid process was

14  done, and ultimately after a great deal of time, the debtors

15  selected Environmental Liability Transfer, Inc. as the party

16  to whom they would transfer the liabilities and essentially

17  sell the property.

18          They entered into a non-binding letter of intent in

19  May of 2007.  Thereafter, the parties did extensive due

20  diligence with respect to the properties and the environmental

21  liabilities, as well as ELT's financial wherewithal.

22          In fact, Your Honor, in that process the debtor

23  hired Deloitte & Touche, who did a review of ELT's financial

24  status reported to the debtor.

25          Your Honor, ELT -- CDC, Commercial Developmental

1   Company is a privately owned company managed by two brothers

2   who participate both in the daily affairs of the company.

3          Since 1985, Commercial Development has acquired over

4   22 million square feet of commercial and industrial space.   In

5   the process they acquired distressed properties. In response

6   to increasing opportunities, CDC launched Environmental

7   Liability Transfer, Inc. to acquire and manage properties that

8   have environmental liabilities.

9          Over the last 20 years, CDS, ELT have assumed

10  liabilities estimated at 750 million dollars, distinguishing

11  approximately 99 percent of these liabilities under their

12  oversight.  They have an impressive resume of risk transfer

13  transaction experience, including deals with General Motors,

14  Caterpillar, Kaiser Aluminum, Millennium Chemicals and others.

15  In fact, Your Honor, they have been before this Court on two

16  different circumstances, one with Kaiser and one with another

17  debtor.

18         Your Honor, ELT is a private company, does not

19  publish its financial information.  We, however, did do

20  extensive due diligence on their financial information.  We

21  also did share that information in discussions with the

22  Creditors Committees, and if need be, there's a representative

23  of ELT in Court today who could address it privately if there

24  was any need for that.

25         Your Honor, the agreement essentially does the

1   following.  ELT assumes the debtor's liabilities and takes

2   transfer of the title of the properties.  ELT will take on

3   debtor's responsibility to perform the environmental

4   remediation, maintain the properties and pay all liabilities

5   that are related to the property.

6          In exchange, ELT is providing the debtors 2.5

7   million dollars in cash at closing, and 40 percent of sales of

8   the property up to a total compensation paid to the debtors of

9   4.359 million dollars.

10         They also are to establish a trust agreement.  The

11  trust will be security for the performance of the

12  environmental obligations.  The trust will be funded initially

13  in the first 180 days with 2.5 million dollars in cash from

14  ALT, and then 75 percent of the sale of the properties going

15  forward will be put into the trust up to the amount of 11

16  million dollars.  So ultimately, the trust will have a total

17  of 11 million dollars in funding, plus the interest that is

18  earned on the 11 million dollars.

19         And Your Honor, the 11 million dollars actually

20  equals what ELT has indicated and estimates the cleanup costs

21  will be, and that is outlined in Exhibit E to the document.

22  That by the way, Your Honor, is actually more than what the

23  debtors had estimated the environmental remediation and

24  liabilities on the property would be.

25         There's also a separate mechanism set up for the

1   Charleston property, which is the subject of a motion to lift

2   stay.  Charleston has indicated they would like to acquire

3   that property for use in some Public Works projects.  The

4   debtors are in discussions with Charleston.  They have

5   recently provided Charleston with an appraisal and have had

6   discussions with respect to that.

7              If this agreement is approved and the transaction

8   closes, they will then continue those discussions with ELT,

9   the debtors will be out of the picture, and therefore we will

10  no longer need the lift stay, there will no longer be a stay

11  in effect.

12             That is ongoing.  I know the state of -- or the city

13  of Charleston is on the phone today and can address any issues

14  that are arising out of that.

15             But there's a separate mechanism in the agreement

16  with respect to the compensation.  The debtors and ELT have

17  agreed that in the event that the property sells for in excess

18  of three million dollars, there will actually be a sharing of

19  the proceeds.  So there's some upside, depending upon how

20  ultimately it comes out in terms of price.

21             Also security, Your Honor, for the performance of

22  ELT under this document and under this agreement.  ELT is

23  giving back to Grace mortgages on the properties which had a

24  positive value.  Many of these properties actually have a

25  negative value due to the environmental liability.  But those

1  properties with a positive value, the debtors will be provided

2  a mortgage.

3       ELT also provides an indemnity for the debtors to

4  indemnify the debtors for their performance under these

5  documents.

6       Your Honor, the debtors received six filed

7  objections to this motion and several informal inquiries. The

8  main thrust of almost all of the objections was the same,

9  which is what happens if ELT does not perform. Is the debtor

10 intending to transfer forever all of its liabilities to

11 governmental authorities with respect to environmental

12 cleanup?  And the answer to that, Your Honor, is no.  Under

13 the law, we do not believe that in certain of these

14 circumstances would be able to do that.  These are executory

15 contracts under 365 that are being assumed and assigned.

16       What, Your Honor, we are doing is we are

17 transferring the liability to ELT and they had a contractual

18 liability to the debtors to perform.  However, in the event

19 that there would not be performance, the debtors are still in

20 the line of title, and under the law would still have

21 remaining obligations.

22       The various state entities who are involved here,

23 and the United States Government and the EPA, asked for

24 clarifying language to be put into the order to make that

25 clear.  And Your Honor, if you look at the red line, the first

1  red line paragraph, which now becomes the fifth ordered

2  paragraph in the order, is the paragraph that was requested

3  and agreed to by all of the state entities and by the EPA.

4          This paragraph does two things.

5          Number one, it relates back to the multi-site

6  agreement which Your Honor has pending before her.  Because

7  there are a couple of properties that are being transferred

8  here that are addressed by the multi-site agreement, the most

9  significant of which is Woburn, Massachusetts.  What this

10  paragraph indicates is that this agreement with ELT does not

11  alter the debtor's obligations under the multi-site agreement.

12          The second thing it does, Your Honor, is it

13  addresses the State's and Government's concerns about its

14  effect on them.  And Your Honor, if I might read the ordered

15  paragraph into the record, because I know there are state

16  agencies on the phone.  We have shared this black line with

17  them.

18          It states as follows.

19          "Ordered that any contrary language or provisions in

20  the motion, the agreement or the trust agreement,

21  notwithstanding, this order, and the proposed transactions

22  approved by it, do not relieve the debtors of any liability or

23  other obligations.  One, under the settlement agreement

24  resolving the United States's proofs of claim regarding

25  certain environmental matters dated December 7th, 2007, and

1  filed with the Bankruptcy Court at docket number 17670.  Two,

2  under any existing settlements, stipulations, administrative

3  or judicial orders, consent decrees or judgments entered into

4  with the state of Florida, Georgia, Kentucky, Massachusetts,

5  Missouri, New York, Puerto Rico, South Carolina, and

6  Tennessee. Or three, under environmental laws, that the

7  debtors have to any federal, state or local environmental

8  entities with regard to the properties being transferred under

9  this order."

10        And Your Honor, I have spoken with all of the states

11 and they have indicated to me, and I can indicate to you, that

12 with the addition of this language into the order, they will

13 not pursue any of their other objections to the entry of the

14 ELT order.

15        THE COURT:  All right, let me just inquire.  Any

16 state representatives on the phone or Puerto Rico have any

17 objection to the entry of an order that has this change or any

18 concern about the fact that this language does not satisfy the

19 objection?

20        All right, hearing no comments, go ahead.  The

21 language change is fine.

22        MS. BAER:  Thank you, Your Honor.

23        Your Honor, the second objection that arose, and it

24 arose actually as a result of this paragraph, was by the

25 Unsecured Creditors Committee.

1    The Unsecured Creditors Committee was concerned that

2    by adding this language in, we might be giving a

3    misapprehension with respect to ELT's obligations.  And the

4    point was that despite the fact that Grace acknowledges under

5    state and local governmental laws, we still have an ongoing

6    obligation in the event ELT does not perform, that does not

7    change ELT's obligations under the agreement.

8    Therefore, the second ordered paragraph was added

9    into the agreement to resolve the Unsecured Creditors

10   Committee's concerns.

11   Your Honor, we circulated this on Friday, had heard

12   nothing other than from the state of New York.  The state of

13   New York -- and we had some conversations this morning, and

14   we're going to be striking out a little bit of this language,

15   and with the striking out a little of the language, we

16   understand that the state of New York is in agreement with it.

17   And perhaps before we inquire as to whether any of

18   the other states have any comments, I would read the current

19   language that we would intend to ask the Court to enter into

20   the record.

21   The paragraph, Your Honor, will read as follows:

22   "Ordered that notwithstanding any other language or

23   provision in this order, the obligations and responsibilities

24   of ELT and the other transferee parties under the agreement" -

25   - and then Your Honor, we would strike out the next language

1  which is there now which says "including but not limited to

2  those outlined in paragraphs 2.1 and 2.3 of the agreement".

3  So then it would go on to say that, "under the agreement are

4  not altered."

5        So it simply says that despite what it says in this

6  order, ELT's obligations are not altered.

7              THE COURT:  Okay.

8              MS. BAER:  Your Honor, it's -- again, my

9  understanding is that the state of New York is now comfortable

10  with that language.  We have not heard any other issues from

11  any other state agencies with respect to having any issues

12  with this provision.

13             THE COURT:  Does the Unsecured Creditors Committee

14  agree?

15             MR. PASQUALE:  Yes, Your Honor.

16             THE COURT:  Okay.  In case the record couldn't pick

17  it up, Mr. Pasquale indicated yes, that the Unsecured

18  Creditors agree.  That's fine.

19             MS. BAER:  Your Honor, UniFirst filed a separate

20  objection. They are a party involved in the Woburn,

21  Massachusetts site.  UniFirst had issues with respect to

22  certain cost-sharing agreements that had been entered into by

23  the PRP Group in Woburn, and asked for a provision in the

24  agreement to specify that essentially these cost-sharing

25  agreements are in fact being assumed by ELT, and they will

1  perform in lieu of the debtor with respect to the cost-sharing

2  agreements.

3          Your Honor, the language of the next black line

4  paragraph addresses those issues, and I will read that into

5  the record.

6          "Ordered that the written cost-sharing agreement

7  dated November 26th, 1990 among W.R. Grace and Cocahn

8  (phonetic), UniFirst Corporation and Beatrice Company, with

9  respect to the debtor's rights and obligations related to the

10  central area remediation investigation/feasibility study, is

11  deemed to be an assignable contract as defined by the

12  agreement. The cost-sharing agreement and the debtor's

13  underlying rights and obligations will be assigned and

14  transferred to ELT pursuant to the terms of the agreement. In

15  addition, ELT has agreed with UniFirst's approval to honor the

16  informal cost-sharing agreement" -- I'm sorry -- "arrangement

17  between Grace and UniFirst with respect to annual off-site

18  groundwater sampling conducted for each of them by a common

19  sampling contractor and testing laboratory."

20          Your Honor, it's my understanding that UniFirst and

21  ELT are in agreement with that language, and with that

22  language that resolves -- that language and the previous

23  language, that resolves all of UniFirst's objections.

24          THE COURT:  UniFirst or ELT wish to be heard on that

25  language change?

1          All right, hearing nothing, that's fine.

2          MS. BAER:   Your Honor, the next paragraph of the

3    black lined order addresses an issue raised by Owensboro

4    Specialty Polymers LLC.  They did not file an objection.  They

5    actually communicated with us much earlier than they needed to

6    with respect to the objection process, and we resolved their

7    issue without them having to file an objection.

8          They were concerned about a ground lease that is on

9    the property.  And Grace's post-petition obligations with

10   respect to that ground lease and post-petition promises to

11   effectively indemnify with respect to performance under the

12   ground lease.  Grace agreed, it does not believe it had the

13   opportunity nor was it seeking to be relieved of its post-

14   petition obligations to Owensboro.

15         As a result, Your Honor, we provided and added into

16   the black line the fourth new paragraph which provides as

17   follows:

18         "Ordered that notwithstanding the provisions of

19   paragraph 4.3B of the agreement, whereby among other things

20   the ground lease and environmental indemnity agreement dated

21   September 14th, 2005, between Grace's landlord and Owensboro

22   Specialty Polymers LLC as tenant, relating to the Owensboro

23   Kentucky property, shall be assigned as permitted by Section

24   13 of the ground lease.  Grace shall remain primarily liable

25   for the performance of all obligations of landlord under the

1   ground lease.  And such liabilities shall be unaffected by the

2   assignment."

3           Your Honor, it's my understanding that with that

4   provision added in, Owensboro has no objections to the entry

5   of this order.

6           THE COURT:  Owensboro wish to be heard?

7           Any party have an objection to that addition?

8           All right, hearing none, that's fine.

9           MS. BAER:  Thank you, Your Honor.

10          The fifth new paragraph added in the black line,

11  Your Honor, addresses some concerns of Hampshire Chemical

12  Company.  There's a separate settlement agreement with

13  Hampshire that is not affected by this agreement.  We have not

14  asked ELT to become responsible on that settlement agreement.

15          In addition, Hampshire has filed a proof of claim.

16  And it was not our intention to resolve or address their proof

17  of claim by this document.  Their proof of claim will be the

18  subject of the regular proof of claim review, adjudication and

19  objection process as appropriate.

20          As a result, Your Honor, we have added in the

21  following paragraph to the order:

22          "Ordered that notwithstanding any other provision in

23  this order, the agreement does not relieve the debtors of any

24  liability or other obligations pursuant to the settlement

25  agreement dated June 21, 1999 between the debtors and

1  Hampshire Chemical Corp.  With respect to proof of claim

2  number 13934 filed by Hampshire, such proof of claim is not

3  being adjudicated by this order and will be addressed

4  separately by the debtors.  The debtors and Hampshire preserve

5  all rights and defenses with respect to proof of claim number

6  13934."

7          Your Honor, it's my understanding with the addition

8  of that language, that Hampshire Chemical has no further

9  objections to the order.

10         THE COURT:  Does Hampshire Chemical wish to be heard

11  on this change?

12         Does anybody have an objection to this change?

13         All right, hearing none, it's fine.

14         MS. BAER:  Your Honor, the next added black line

15  paragraph, the sixth one added, is to resolve issues with

16  respect to ICI Americas.  ICI Americas has filed a proof of

17  claim. ICI Americas has alleged, among other things, some

18  liability of the debtors, not for the property that's being

19  sold, but with respect to its property which is next door as

20  well as with respect to certain property that it -- that the

21  debtors at one time leased from ICI Americas.

22         As a result, Your Honor, we have added in paragraph

23  six to the order to clarify that those issues are not being

24  addressed by this transfer to ELT.

25         The sixth paragraph adds as follows:

1           "Ordered that notwithstanding any other provision in

2    this order, with respect to any claims of ICI Americas, Inc.

3    filed in these bankruptcy cases, including without limitation

4    proof of claim number 13961, one, the alleged liability of the

5    debtors related to the ICI property formerly leased by the

6    debtors is not subject to the agreement, and two, proof of

7    claim number 13961 is not being adjudicated by this order and

8    will be addressed separately by the debtors, and the debtors

9    and ICI preserve all rights and defenses with respect to such

10   proof of claim."

11          Your Honor, it's my understanding with the insertion

12   of that paragraph into the order, ICI Americas's objections

13   have been resolved.

14          THE COURT:  ICI Americas have any comments with

15   respect to this change?

16          Does any party have any objection to the change?

17          Hearing none, it's approved.

18          MS. BAER:  Thank you, Your Honor.

19          The last black lined added paragraph was added at

20   the request of the Unsecured Creditors Committee. They were

21   concerned that the 11 million dollar obligation of ELT into

22   the trust be 11 million dollars and clarify that any interest

23   earned on the money in the trust was not to be included in the

24   11 million dollar obligation.

25          The seventh black line paragraph added addresses

1   this issue as follows:

2           "Order that notwithstanding any contrary language or

3   provision in the motion, the agreement or the trust agreement,

4   ELT shall be obligated to deposit the principal amount of 11

5   million dollars into the trust established to secure

6   performance of ELT's and other transferee parties' obligations

7   under the agreement, and the amounts deposited shall consist

8   of one, the initial payment made by ELT after closing and

9   within 180 days of the effective date in the amount of 2.5

10  million dollars, and two, that portion of sales proceeds

11  pursuant to Article 3 of the agreement that ELT is obligated

12  to deposit into the trust upon the sale of properties.  But,

13  the 11 million dollars required to be deposited by ELT shall

14  not include earnings on the funds in the trust, and

15  notwithstanding those earnings, ELT is still obligated to

16  deposit the principal amount of 11 million dollars into the

17  trust pursuant to the agreement.  The earnings on the funds in

18  the trust shall remain in the trust and shall also secure the

19  performance of ELT's and other transferee parties' obligations

20  under the agreement."

21          Your Honor, it's my understanding that with the

22  addition of that paragraph, that resolves the Unsecured

23  Creditors Committee's other issues with respect to this

24  transaction.

25          THE COURT:  Mr. Pasquale, is that acceptable to the

Colloquy                                    24

1  Creditors Committee?

2          MR. PASQUALE:  It is, Your Honor, thank you.

3          THE COURT:  All right.

4          MS. BAER:  Your Honor, with all of those additions

5  to the order, that resolves all of the objections that were

6  raised.

7          There were other objections raised with respect to

8  ELT's financial wherewithal, with respect to the amounts of

9  cleanup costs and the like.  However, all the parties have

10 indicated that they have been satisfied with the additions to

11 this order, and do not pursue any further obligations.

12         Under those circumstances, Your Honor, we believe

13 that this transaction is in the best interest of the debtors.

14 It's a cost effective way to eliminate liability and

15 responsibility.  It minimizes any future risks that Grace may

16 have.  It eliminates the cost of carrying these properties

17 including taxes, operation and maintenance of the properties.

18 It benefits the public because it gets the property cleaned

19 up, and brings into the mix a financially solvent and

20 experienced company to do that cleanup and maintain these

21 properties.  It generates cash flow for the debtors in the

22 amount of 4.4 million dollars.

23         Under these circumstances, Your Honor, we believe

24 that this is a transaction in the best interest of the estate

25 and its creditors and we would ask Your Honor for its

Colloquy                                    25

1    approval.

2              THE COURT:  Does anyone at this point wish to be

3    heard in objection to the motion of the debtors?

4              THE COURT:  All right, there are no further

5    objections pending.  I think it is in the best interest of the

6    debtors for reasons -- and the estates -- for the reasons you

7    have articulated and I will sign the order.  Do you need to

8    resubmit it with the one modification or can I simply sign the

9    one you have now?

10             MS. BAER:  Your Honor, we have underlined that

11   provision, and I am very content with you just signing it with

12   that crossed out.

13             THE COURT:  All right.

14                            (Pause)

15             MS. BAER:  And Your Honor, I do want to point out

16   one thing.  There was a little delineation in the attachment

17   to the order, which is the ELT agreement.  The Unsecured

18   Creditors Committee pointed out to us there were a couple of

19   typos on page 9.  And we have interlineated the agreement to

20   fix those typos.  In paragraphs B, C, and -- 3.4B and C, and

21   3.5B, there was a reference to Section 3.5, that should have

22   been a reference to Section 3.4.

23             THE COURT:  Yes, I see that they've been corrected

24   and that's fine.

25             MS. BAER:  Thank you, Your Honor.

1              (Pause)

2              THE COURT:  I have a note by my staff that some of

3    the filings are coming in not in PDF searchable format, and

4    while I -- not from the debtor, from some others -- and I just

5    want to make a note, please, to get the filings in PDF

6    searchable format.  It's very difficult to attempt to move

7    back and forth on the -- we're trying to be considered

8    literate although my staff is much better at it than I am, but

9    nonetheless, please, if you could re-advise the parties to

10   file things in PDF searchable format, that would be very

11   helpful.  Okay, thank you.

12             MS. BAER:  Thank you, Your Honor.

13             Your Honor, agenda item number 9 was the motion of

14   the city of Charleston, South Carolina for relief from the

15   automatic stay.

16             Your Honor, with entry of the motion approving the

17   ELT agreement, the debtor will be selling the Charleston

18   property to ElT.  As a result, Your Honor, I believe upon

19   closing of that sale, the city of Charleston's motion will be

20   moot.

21             I know that counsel for the city of Charleston is on

22   the phone today.  And I would seek guidance from you, Your

23   Honor, as to how you would like to handle procedurally getting

24   this off the agenda.

25             THE COURT:  When do you expect that this transaction

1    will occur?

2            MS. BAER:  Your Honor, they're going to try to do it

3    in two weeks.  I believe the agreement gives us 30 days.

4            THE COURT:  Maybe the best thing to do is just in

5    case it does take 30 days -- well, is to put the relief from

6    stay back on the June 2nd agenda, unless it's been withdrawn

7    by that time.

8            MS. BAER:  That's fine, Your Honor.  And we can

9    certainly work with the city of Charleston once the

10   transaction closes, perhaps submit an agreed order.

11           THE COURT:  I'm sorry, I was just going to ask

12   whether that was acceptable.  Go ahead.

13           MS. BIFFERATO: I'm sorry, Your Honor.  Your Honor,

14   Karen Bifferato on behalf of the city of Charleston.  That

15   would be acceptable to us.

16           THE COURT:  All right.  Item 9 is continued to June

17   2nd unless withdrawn earlier, and I'm sure you folks can work

18   something out if that's the case.  Okay.

19           MS. BAER:  Thank you, Your Honor.

20           Your Honor, agenda items 10 and 11 relate to three

21   claims filed by the Speights & Runyan firm that have been the

22   subject of many, many hearings.  And you know, occasionally

23   things actually can be resolved, as we're proving in this

24   case, and these three claims have been resolved.  They have

25   been settled.  And the Reed, Smith firm, our co-counsel and

Colloquy                                    28

1   Mr. Speights are working on some sort of a settlement

2   agreement to resolve these three claims.

3              THE COURT:  All three?

4              MS. BAER:  All three have been settled.

5              THE COURT:  Okay.

6              MS. BAER:  So, Your Honor, I think you can mark

7   these as having been resolved and we will follow with a

8   settlement agreement.

9              THE COURT:  I think what I will do is continue them

10  to a hearing date to make sure that in fact I get something.

11  So pick a hearing date that's reasonable.

12             MS. BAER:  I know Mr. Restivo is on the phone, and

13  perhaps he'd like to address that since he's been working with

14  Mr. Speights to put the agreement together.

15             THE COURT:  All right, Mr. Restivo.

16             MR. RESTIVO:  Good afternoon, Your Honor.  How about

17  the June omnibus?

18             THE COURT:  That's fine, if that gives you enough

19  time?

20             MR. RESTIVO:  I think Mr. Speights may be on the

21  phone.  That would be my suggestion.  We ought to be able to

22  do it by then unless he has some problem with that.

23             THE COURT:  Mr. Speights?

24             MR. SPEIGHTS:  I think that will be fine.  We should

25  be able to do it by then.  If we have some problem, I'm sure

1   we can discuss it and work it out, but I believe we can do it

2   by then.

3           THE COURT:  Okay, that's fine.  If you've got them

4   resolved, then you know, I have CNO's or TSE's (phonetic),

5   however you're going to do it in advance, and I'm sure they'll

6   be taken off in any event.  So I'll continue them to June 2nd

7   simply so I don't lose track of them.  Thank you, gentlemen.

8           MS. BAER:  Your Honor, that takes us to agenda item

9   number 12, which is the debtor's motion for entry of an order

10  appointing former Judge Magistrate Diane M. Welsh of the

11  Eastern District of Pennsylvania as a mediator for the

12  Speights & Runyan property damage claims.

13          Your Honor, the U.S. Trustee filed a limited

14  objection to entry of this order.  He had two issues.  Number

15  one had to do with his request that a mechanism be built in so

16  that prior to the parties paying the mediator's fees, the

17  creditors in the case would have an opportunity to review

18  those fees and object.

19          We had no objection to that.  The mediator had no

20  objection to that.  And we have in fact built into a revised

21  agreed order which I will hand up to Your Honor, a revised

22  order the mechanism which is identical to the mechanism that

23  had been entered in this case before when we had a plan

24  mediator involved.

25          Your Honor, the second objection that the U.S.

1   Trustee raised had to do with the fact that the indemnity

2   provision of the order does except out willful misconduct and

3   gross negligence.

4           Your Honor, I spoke with counsel for Judge Welsh who

5   indicated that obviously Judge Welsh has no intention of

6   behaving that way and causing willful misconduct and gross

7   negligence, but she had not been familiar with and had never

8   been asked to have an order entered that excepted out that

9   language.  They were somewhat comfortable and thought their

10  insurance carrier would be uncomfortable agreeing to that

11  language, and indicated if the Court insists the language be

12  in there, they will accept that and they will continue -- you

13  know, they will perform the duties and obligations of the

14  mediator, but would prefer the language not be in there unless

15  it's a requirement of the Court.

16          THE COURT:  I have never permitted an indemnity

17  cover gross negligence and willful misconduct, and I don't

18  know what the insurance carriers would feel, but I'm not sure

19  that an insurance carrier would cover gross negligence and

20  willful misconduct in any event, and I am not going to sign an

21  order that provides an indemnity for that type of conduct.

22          I know Judge Welsh.  I'm certain that she is not

23  going to engage in that type of conduct.  I have absolutely

24  every confidence that it's not going to be an issue that will

25  come up.  Nonetheless, I am not going to sign an order that

1  provides an indemnity for that type of conduct.  So I do

2  insist that it has to come out.

3           MS. BAER:  And actually, Your Honor, it's not there,

4  it's the opposite, which is that basically we have a broad

5  indemnity and we do not except out --

6           THE COURT:  Fine.  Either way --

7           MS. BAER:  Would you like us then to put it in,

8  excepting it out?

9           THE COURT:  Yes, that's fine.

10          MS. BAER:  Okay.  We would do that, Your Honor,

11  that's not a problem. And we can either interlineate it or we

12  can go back and type it and bring it back.

13          THE COURT:  If you can interlineate it, that's fine.

14          MS. BAER:  I'll do it right now, Your Honor.

15          THE COURT:  All right.

16          MS. BAER:  Your Honor, that takes us to the last

17  item on the agenda which is the --

18          THE COURT:  Let me hear from the U.S. Trustee.

19          MS. BAER:  Okay.

20          THE COURT:  With those changes --

21          MR. KLAUDER:  Yes, that's fine.  I've seen the new

22  order, that's fine.

23          THE COURT:  All right.  With those changes then when

24  you hand it up, I'll sign that order.

25          MS. BAER:  Thank you, Your Honor.

1          That takes us to agenda item number 13 which is the

2     state of Montana's motion for stay pending appeal with respect

3     to this Court's denial of the state and the debtor's request

4     to expand its preliminary injunction to include actions

5     against the state of Montana.

6          As this is the state's motion, I will yield the

7     podium to the state.

8               THE COURT:  Mr. Monaco.

9               MR. MONACO:  Good afternoon, Your Honor.

10              THE COURT:  Good afternoon.

11              MR. MONACO:  For the record, Frank Monaco for the

12    state of Montana.

13         Your Honor, again, I wanted to express my

14    appreciation for scheduling this on a prompt basis.

15         With respect to the background of this, Your Honor,

16    I'm not going to burden the record with any type of extensive

17    discourse on the background of this case.  Your Honor's

18    intimately familiar with it.  It's contained in your original

19    opinion issued almost a year ago, and in the more recent order

20    denying our motions for reconsideration, and of course it's --

21    the background's contained in the various pleadings associated

22    with those opinions.

23         But so Your Honor does know, both the debtor and the

24    state of Montana filed notices of appeal with respect to Your

25    Honor's decisions on April 10th.  And the state of Montana is

1  seeking a stay of this Court's decision; that is a stay of the

2  State Court actions filed by the Libby claimants against the

3  state pending the disposition of this appeal.

4           And under Bankruptcy Rule 8005, we are required to

5  make this request to Your Honor in the first instance, and we

6  are discharging that responsibility.

7           And in my argument, Your Honor, I will seek to

8  address various of the arguments made by the Libby claimants

9  to our various arguments.

10          THE COURT:  Well, Mr. Monaco, a stay of the State

11 Court action makes some sense while this still goes forward

12 because -- I think the problem is this. The Third Circuit and

13 the law in this case has set up a construct that is very

14 difficult for a Trial Judge to get around.  In fact, it's

15 impossible for a Trial Judge to get around because my duty is

16 to follow the Third Circuit law.

17          And the Third Circuit law, as I view it, tells me

18 that unless there is a contractual indemnity essentially in

19 the concepts of this case -- I'm not going outside the

20 concepts of this particular decision -- and there is a direct

21 liability statute, that where the problem exists that the

22 state may be found liable on a direct liability statute, and

23 then have to prove in a separate action against the debtor

24 that the debtor's conduct was somehow or other the cause of

25 the state's direct action -- and oh, by the way, I don't even

1  know whether the states filed a proof of claim in this case,

2  so that's another issue that may have to be addressed, then

3  there is not the type of 105 injunction relief that this Court

4  can do.

5       So faced with that line of reasoning, even though I

6  understand the difficulty that this type of analysis provides

7  to the debtor and the state, I don't think this Court can do

8  anything but say the Court cannot issue a 105 injunction.  I

9  just don't think I can do it.

10      If there is some grounds for having a District

11  Court, an Appellate Court look at the difficulty that that

12  causes for this kind of a case, because obviously what

13  happened is, I think in this circumstance, that the debtor,

14  who has successfully argued in every other concept, that the

15  automatic stay or the 105 injunction essentially has been able

16  to protect it and its assets and its creditors, in this one

17  concept can't do it, and yet this underlying theory -- not

18  theory, but factual circumstance is no different from any of

19  the others that the debtor would state, but the theory is much

20  different.  And that's the problem.  This Court has no grounds

21  around it as I see it under the law of the Third Circuit.

22      So it seems to me that if there's an argument that

23  can be made to the Appellate Court that says that this

24  argument that the construct of that law makes no sense in this

25  kind of case, then I think that the parties should not be put

1   to trying that case until that argument can be made.  Whether

2   it's successful or not, I don't know, I don't know that the

3   Circuit has had an opportunity necessarily to address it in

4   this specific type of action.  Although, when you take a look

5   at Pacor, Pacor does not particularly differ on -- well, no,

6   it does differ significantly on the facts, but it does not

7   differ on the underlying effect on the estate.

8           So, I don't know what will happen on appeal, but it

9   seems to me that unless the State Court action is stayed while

10  the appeal goes forward, lots of parties' rights could be

11  jeopardized, particularly while the debtor is marching now

12  rapidly, I hope, towards confirmation of a plan that may be

13  able to address even this liability issue.

14          MR. MONACO:  Well, Your Honor, I certainly agree

15  with your ultimate conclusion --

16          THE COURT:  I thought you might.

17          MR. MONACO:  -- that's what I'm asking for.  But

18  just so the record is clear, and it's evident that Your Honor

19  is struggling with some of these concepts in terms of -- I

20  mean, it's very easy to state the proposition that it can

21  conceivably affect the administration of the estate.  That's

22  something that Gerard, Combustion Engineering, Pacor and

23  Federal-Mogul all pay service to, but the application is very

24  difficult.

25          And Your Honor, just so you understand where the

1    state of Montana is coming from in this legal analysis because

2    it's very difficult and it's a very significant issue.  And I

3    agree with Your Honor, I'm not sure that the District Court or

4    the Third Circuit have faced this exact kind of situation.

5          And as far as I'm concerned, there's very, very,

6    significant differences from the situation the state of

7    Montana and the debtor are facing in this particular case than

8    there are in Pacor, Federal-Mogul, Combustion Engineering.

9          But before we get too far afield of that -- and I'll

10   say this for the record and with all due respect to Your

11   Honor, we -- both the debtor, and that's why they're

12   appealing, and Montana come from the position that Gerard

13   controls this situation.  And the reason it is, is because in

14   Gerard, just like in this case, both the state of Montana and

15   the Libby claimants not only are parties to this underlying

16   adversary proceeding, but they've filed proofs of claim.

17         And I wanted to answer Your Honor's question.  The

18   state of Montana has filed proof of claims.  It's my

19   understanding the Libby claimants have done so as well.

20         In these other situations you're dealing, Pacor,

21   Federal Mogul and Combustion Engineering, you are dealing with

22   parties that weren't submitted to the jurisdiction of the

23   Court.

24         Again, another significant factor is the fact that

25   those cases dealt with removal of actions involving thousands

1  of non-bankruptcy actions to the Bankruptcy Court.  Here we're

2  talking about something materially different.  And both

3  <u>Federal-Mogul</u> and <u>Pacor</u> found that the proof of claim issue

4  and the removal versus the injunction issue were significant

5  factors.

6          And just so Your Honor -- Your Honor did address in

7  both opinions the contractual contribution/indemnification

8  issue versus the common law contribution/indemnification.

9  Well, I struggle with that because conceptually, from a legal

10  and practical standpoint, I really don't see what the

11  difference is.

12          But putting that --

13          THE COURT:  Circuit says there's a difference.

14          MR. MONACO:  All right, well, let me address that,

15  Your Honor.  And I would point Your Honor's attention to page

16  43 of the <u>Combustion Engineering</u>.  That issue is one of many

17  factors that the Third Circuit looks at in dealing with this.

18          We also have derivative liability and identity of

19  interest.  The debtor has stated in numerous pleadings and on

20  the record that they feel there is derivative liability and

21  also identity of interest.

22          THE COURT:  Well, what the debtor has stated is that

23  they're concerned that if the state loses, that you will be

24  pursuing the debtor on that theory.  I don't think the debtor

25  has admitted that the debtor is liable for having misled

Colloquy                                    38

1    the --

2                MR. MONACO:  No --

3                THE COURT:  -- state on its direct cause of action.

4                MR. MONACO:  No, Your Honor, we're not saying -- I

5    never -- I don't think I said that they were admitting

6    liability.  But they do say to the extent there is

7    liability --

8                THE COURT:  They know you're coming after them.

9                MR. MONACO:  -- it's derivative -- and something

10   else that Your Honor should understand.  There's 120 pending

11   actions.  Fifty-two of those actions state claims for aiding

12   and abetting.  So, that isn't just a matter of independent

13   action against the state of Montana.  It also involves Montana

14   and Grace as co-conspirators.  How could we possibly defend

15   ourselves in a state action with those types of -- it's a

16   rhetorical question; we can't.

17               THE COURT:  Those actions can't go forward.  Aiding

18   and abetting actions clearly cannot go forward.  The only

19   thing that can go forward is the direct action causes of

20   action.  Anything that's going forward against the debtors

21   clearly -- I though the first opinion clarifies that process.

22               The problem is the direct action statute.  Because

23   the direct action statute in Montana specifies that no party

24   who is -- let me state it affirmatively.  That a party who is

25   not before the Court is not subject to collateral estoppel

1   findings.  That's the difficulty.

2          So the debtor, who is not a party to that cause of

3   action, therefore is not subject to any record taint,

4   collateral estoppel, although the record taint issue, you

5   know, to the extent witnesses testify, they testify about the

6   problem, but nonetheless --

7          MR. MONACO:  Well, Your Honor, let me address that

8   as well.

9          And one thing I think Your Honor assumed in your

10  opinion was that the state of Montana could not ultimately

11  join Grace as a third-party defendant and --

12         THE COURT:  Not without relief from the stay.

13         MR. MONACO:  Right.  Well, Your Honor, we are -- if

14  Your Honor would deny this motion, we would have recourse to

15  the District Court for the same type of motion.  And we're

16  also going to file a motion for relief from the automatic stay

17  for a determination, under _Frenville_, we don't even need

18  relief under the circumstance.  Number two, under the _Rexine_

19  (phonetic) factors, we're entitled to motion for relief.

20         THE COURT:  Well, maybe.  I've addressed that once

21  already.

22         MR. MONACO:  Well, Your Honor, we're a materially --

23  we're much further along than we were before --

24         THE COURT:  Yes.

25         MR. MONACO:  -- in this case than we were when we

1   filed that motion, I believe it was about two years ago.

2            THE COURT:  Yes, you are.  Paces, yes.

3            MR. MONACO:  Well, we now have a personal injury

4   estimation settlement and also we are -- Grace has stated they

5   think they can get out of bankruptcy by the end of this year.

6   And that also should influence Your Honor in extending the

7   stay because if we -- if our claims aren't resolved, we're

8   going to take the position that they're either administrative

9   claims or they're claims not capable of being discharged and

10  therefore we have the right to go against the reorganized

11  debtor.  And these claims could be hundreds of millions of

12  dollars.

13           THE COURT:  Wait.  These are direct action claims

14  against the state.  I mean in the first place, I don't even

15  know if the state's found liable you have an action back

16  against Grace, because these are direct actions that --

17  statute claims that say that regardless of how the state found

18  out about whatever bad things Grace is doing, however that

19  happened, the problem is that if the state's found liable

20  under that Montana statute, it's because it violated its

21  parens patriae duty to its citizens.  That has nothing to do

22  with Grace.

23           The fact that Grace misled it, the fact that Grace

24  was the initial bad actor, that it was Grace's products that

25  were involved, that's not what Montana's duty is.  That's the

1    problem with the statute the way it's written.

2              MR. MONACO:  Well, Your Honor, a couple of

3    responses.

4              THE COURT:  In this context.

5              MR. MONACO:  A couple of responses.

6              Well, first of all, the Libby claimants, as a

7    predicate to obtain relief, have to show that the debtor's

8    mining activities were the cause of this.  So that necessarily

9    implicates them from a factual standpoint.

10             THE COURT:  No, they have to show that there was

11   some hazardous product that the state knew was a danger to its

12   citizens and it didn't disclose. That's what they -- I mean,

13   ultimately --

14             MR. MONACO:  Well --

15             THE COURT:  -- that's what they've got to show.

16   That the state knew of the danger, had a duty to disclose and

17   didn't.

18             MR. MONACO:  Well, Your Honor, but that still

19   entails discovery from Grace.  We need to know what Grace knew

20   or didn't know, what they may have withheld.

21             I don't see how we can have an effective defense

22   strategy if we are forced to go forward without Grace.

23   Particularly with the aiding and abetting situation.  The

24   other --

25             THE COURT:  The aiding and abetting will not go

1    forward. That is stayed.  That is not a direct action cause of

2    action.

3              MR. MONACO:  Well, you know, the other part of our

4    defense strategy would be to show Grace is a superseding

5    intervening cause. And again --

6              THE COURT:  On a direct action statute?

7              MR. MONACO:  Yes, Your Honor.  That's, you know --

8              THE COURT:  That's not a tort statute.

9              MR. MONACO:  Pardon?

10             THE COURT:  The direct action statute isn't a tort

11   statute.  It's an absolute liability statute.

12             MR. MONACO:  Well, Your Honor, we still have that

13   right to do that, and I think we would have the right to show

14   Grace is a third-party defendant for contribution -- Your

15   Honor, the point --

16             THE COURT:  Contribution on a direct action statute,

17   that Grace somehow or other made the state, directly

18   intervened with the state not coming forward with advising its

19   citizens of the hazard, that Grace somehow interfered with the

20   state's obligation to advise its citizens of a hazard?

21             MR. MONACO:  Well, Your Honor, it's for the Libby

22   claimants' burden to prove that, and that's a part of our

23   defense, is that Grace did not inform us of everything that

24   was going on.

25             THE COURT:  Oh, how and what the state knew, that's

Colloquy                                        43

1    a different issue.

2            MR. MONACO:  Right.

3            THE COURT:  But and how the Libby claimants are

4    going to prove it without Grace there, I'm not sure, because

5    right now Grace isn't going to be there.

6            MR. MONACO:  But Your Honor, from a bankruptcy level

7    -- and I think I've -- well, stepping back.  My job is not to

8    change Your Honor's mind.

9            THE COURT:  No, I'm pretty much convinced that the

10   State Court action should be stayed, because of all the issues

11   that you've just addressed and the ones that I -- that were

12   not before me in the opinion and I haven't addressed, but --

13           MR. MONACO:  And Your Honor, let me just state one

14   other thing for the record.  And as we stated in our papers,

15   we do believe that a stay would promote a consensual

16   resolution.

17           As Your Honor is aware, Grace just announced a

18   settlement of the PI estimation hearing.  It goes to the

19   amount and funding of a 524(g) trust.  We have no idea how

20   that is going to affect our contribution indemnification

21   claims.  We haven't had an opportunity to talk to Grace about

22   it.  They're still apparently trying to parse through some of

23   these details of the settlement.

24           And I think a stay would promote a consensual

25   resolution because otherwise it puts us in the position of

Colloquy                                    44

1    having to get relief from the stay, object to the settlement,

2    object to the plan and continue to take an adversarial posture

3    in this case.

4           And one other thing for the record, Your Honor.  I

5    think Your Honor, pursuant to the <u>BNSF</u> opinion has already

6    addressed two of the four standards against the Libby

7    claimants in connection with the harm to the Libby claimants

8    as well as the public interest.

9           Your Honor stated in that opinion, and it would

10   apply to the Montana situation as well, that there's already a

11   procedure in place to protect some of the Libby claimants

12   while this -- while the bankruptcy reorganization is

13   proceeding and while they are stayed, and that's at page 30 of

14   Your Honor's opinion.

15          And then Your Honor also addressed the public

16   interest which is what I've just stated, how this will promote

17   a resolution and avoid needless litigation.

18          And just so again the record is clear, Your Honor,

19   in terms of the public interest.  Montana -- from our

20   standpoint, the citizens of Montana are being asked to fund

21   damages we believe were caused, to the extent they were

22   caused, were caused by Grace, and this addresses issues of the

23   public interest.

24          So, unless Your Honor has any other questions, I

25   just wanted the record to be clear what our position was, and

Colloquy                                    45

1   why Your Honor should issue the stay pending appeal.

2            THE COURT:  Well, I am -- I am concerned about the

3   possibility of records taint issue.  I just don't think that

4   that is an issue that the Circuit seemed to provide this Court

5   with a way around in the context of the direct action statute

6   and the Pacor analysis which I felt I was constrained to

7   apply.  It seems to me that the jurisdictional standard under

8   those circumstances are pretty clear, and that is the problem.

9            I disagree with the Libby claimants when they make

10   an argument that I don't have jurisdiction under these

11   circumstances to consider a stay pending appeal.  I clearly

12   have jurisdiction to decide the issue.  What I don't have

13   jurisdiction to do, I think, is enter the injunction that the

14   debtor -- or I shouldn't -- I apologize, it's not a

15   jurisdictional issue in that sense.

16            The issue is whether or not the reach of a 105

17   injunction should cover this kind of circumstance.  And I

18   think the issue is that it does not cover this kind of

19   circumstance because of the fact that the Circuit has

20   identified the fact that unless there can be an automatic --

21   and that's my word -- automatic transfer of the liability from

22   the entity who suffers the judgment into the debtor's estate

23   without requiring a separate lawsuit to be brought, that in

24   that instance the injunction essentially should not enter.

25            And I can't see under the Montana statute how that

1   does not happen.  And as a result, the factors that I would

2   have looked at, did look at, in the <u>BNSF</u> and <u>Gerard</u> and all

3   the other cases where I imposed the 105 injunction, I think

4   are not the crucial test.

5         I think there's an issue, a big issue.  I think

6   Circuit has to decide whether I appropriately applied those

7   standards and perhaps in a concept like this, where the

8   purpose of the bankruptcy is essentially to stop all of the

9   claims against the debtor, impose this breathing spell and let

10  the debtor address its claims in the concept of a plan.

11  Perhaps I'm wrong.  And I think the Circuit should take a look

12  to see, or the District Court and the Circuit to take a look

13  and see, and that's really where this issue should go and has

14  to go.  And I think there is a reasonable possibility,

15  otherwise I wouldn't be writing an opinion, that reasonable

16  minds can differ on that issue.

17        And so I think that a stay of the State Court

18  litigation is warranted under the circumstances, and I'm going

19  to hear from the Libby claimants because I understand they've

20  been trying to get back to this Montana many, many times and

21  I've always said no, until now.  This one I think they've got

22  a right to get there, whether that right should be immediately

23  granted or stayed pending appeal is right now the issue.

24        MR. MONACO:  Thank you, Your Honor.

25        MR. CANDON:  Good afternoon, Your Honor.

Colloquy                                    47

1          THE COURT:  Good afternoon.

2          MR. CANDON:  Chris Candon on behalf of Libby

3   claimants.

4          Well, I heard the direction that you're leaning, and

5   I heard the jurisdictional issue.

6          But first, I just want to point out one aspect of

7   this, is that Grace is not even moving for a stay here.  So

8   we're talking about just the state of Montana is --

9          THE COURT:  Well, that's because Grace isn't going

10  to be involved at the moment.  I mean Grace isn't the one who

11  suffers the injunction, who suffers from not having an

12  injunction.  Grace has the automatic stay.  So unless Grace

13  chooses to participate in the State Court suit, right now

14  nobody can drag Grace there, including Libby.  And Libby's

15  aiding and abetting claims are not going to get Grace there.

16         MR. CANDON:  Right.

17         THE COURT:  In fact, Libby's aiding and abetting

18  claims are  not going to be tried.

19         MR. CANDON:  The -- does the state have standing in

20  this issue to claim like harm to the bankruptcy estate?

21  That's what they're claiming.  I mean they are sitting here --

22  Grace could be the one that -- the argument that there's going

23  to be a harm to the bankruptcy estate.  But it's the state of

24  Montana that's sitting here saying --

25         THE COURT:  I think it does.  Because in fact, I

1 think there could be harm to the bankruptcy estate, but

2 regardless of that fact, it has the right to claim to itself.

3 Doesn't it?

4          MR. CANDON:  It can claim harm to itself but that's

5 not the standard.  Pacor is very clear on the Third Circuit.

6 The standard is harm to the bankruptcy estate, not to the

7 defendant litigant.  So for them to be coming up here with a

8 harm to them, that has nothing to with the bankruptcy case.

9 It has nothing to do under the Third Circuit. And that part

10 actually is clear under Third Circuit jurisdiction.  It's

11 conceivable effect on the bankruptcy estate, that's been cited

12 throughout and that's just -- that's crystal clear.

13          THE COURT:  But Montana is a creditor here.  And so

14 Montana has the right, I think at least to argue as

15 potentially a very large creditor, that as part of this estate

16 it could be harmed in its capacity as a creditor. Not -- even

17 if I move aside the concept that it could be harmed by being

18 forced to litigate in State Court, forget that piece of it,

19 but if it sustains a judgment and then has to come back and

20 litigate here, what will happen to the claim against this

21 state as a result of that judgment could adversely affect all

22 creditors in the estate.  And it is clearly a creditor.

23          MR. CANDON:  That's the -- I mean in your -- in the

24 Gerard -- I mean in your most recent decision here in Montana,

25 he just claimed that there is no jurisdiction and that the

1   only impact here is that there might be conceivably another,

2   has to be another matter, and then that would bring it back to

3   the Bankruptcy Court.

4           Well, that's what we're talking about now. That

5   other matter all of a sudden gives them jurisdiction here in

6   the bankruptcy case for a stay pending appeal?

7           THE COURT: No, no. the jurisdictional issue was

8   not this Court saying that I don't have jurisdiction to decide

9   the issue. The issue in my -- in the opinion is whether or

10  not the jurisdiction was there to extend extent the stay under

11  105 to include Montana as a, in quotes, "related party" as

12  that term was used in the adversary proceeding for the debtor.

13          And the answer is I think under the _Pacor_ line of

14  cases, no. Because of the problems that Montana faces under

15  the Montana direct action statute which says that if Montana

16  is found liable, then Montana has to bring a separate cause of

17  action against the debtor somehow to prove that the debtor was

18  responsible for Montana being liable.

19          And it's not the type of circumstance where if there

20  were a contractual indemnity there is a governing document

21  that automatically -- again, that's my word -- automatically

22  would show a claim against the state.

23          It's not a jurisdictional issue under Section 1334,

24  where this Court doesn't have the power to adjudicate the

25  claim. I clearly have the power to take a look at the

Colloquy                                              50

1    circumstance.  The issue is does that power give you 105

2    injunctive relief.  And I think under Pacor the answer is no.

3          But that doesn't mean that I can't adjudicate the

4    issue.  I clearly can adjudicate the issue.

5          MR. CANDON:  First of all, I think we're getting

6    away from the matter a little bit because I don't think we're

7    here actually to argue -- reargue the state of Montana like --

8          THE COURT:  No, but it goes to your question if I

9    have jurisdiction to adjudicate the issue, can I then go to

10   the next step to look at whether or not I can adjudicate the

11   question, the next question which is can I stay the State

12   Court action pending an appeal.  And I think the answer is

13   yes, because I have jurisdiction to adjudicate the issue.

14   So --

15         MR. CANDON:  I don't -- I guess I'm losing a little

16   bit on the issue.  When you say -- you had looked over the

17   jurisdictional issue and you found that the jurisdiction did

18   not exist to enter the injunction.

19         THE COURT:  Right.

20         MR. CANDON:  And now for over -- this action's been

21   stayed for 30 months now,  and twice we've heard the Court

22   does not have jurisdiction to stay matters between these third

23   parties.

24         THE COURT:  Right.  To issue a 105 injunction.

25         MR. CANDON:  But what we're saying is the Court

Colloquy                                      51

1    doesn't have power to issue an injunction but it does have

2    power to stay the matter between -- pending appeal?

3              THE COURT:  Well, I think --

4              MR. CANDON:  The Court has ruled that it doesn't

5    have jurisdiction over the matter.

6              THE COURT:  The reality of this though, it has been

7    stayed while the Court has looked at this issue.  And I think

8    what I'm suggesting is that it's not as though this litigation

9    has been ongoing for the past 30 months, it hasn't.  It's been

10   stopped while this issue has been litigated.

11             So I guess what I'm -- maybe I'm approaching it

12   incorrectly but my approach was, while this issue is now

13   pending appeal, the question is should the litigation in

14   Montana go forward or should it be continued in the condition

15   that it's currently in pending that appeal.  And my view is it

16   ought to stay in the current posture pending that appeal,

17   because I don't see any harm to anyone in having that stay

18   further extended.

19             The Libby claimants, who have had potentially no

20   relief for the past seven years which I am very sympathetic

21   with, are really not going to be further harmed by not having

22   this additional relief for this additional period of time.

23             MR. CANDON:  Why --

24             THE COURT:  That is the reality.

25             MR. CANDON:  This is a stay -- a request for

1   preliminary injunction that's been pending for 30 months.

2          THE COURT:  Yes --

3          MR. CANDON:  You can't say the Libby claimants

4   haven't been harmed.  Every day, week, month, year matters.

5          THE COURT:  Every --

6          MR. CANDON:  And so when you see like in these

7   papers that oh, don't worry, we have another week or another

8   month or -- it's not that long, but that's adding up.  It's

9   been going on since August of 2005 when the motion was filed.

10         THE COURT:  Every aspect of this claim has taken

11  that some position.  This group is no different.

12         MR. CANDON:  It's not necessarily true.  Not every

13  other asbestos plaintiff has these rights against third

14  parties that --

15         THE COURT:  I don't know --

16         MR. CANDON:  -- that this Court doesn't have

17  jurisdiction in.

18         THE COURT:  I don't know if every other asbestos

19  plaintiff has those rights or not.  What I do know is that

20  this group is the only group who has tried five times now to

21  get around the automatic stay, and apparently finally hit the

22  bulls-eye on one.  This group did it. The other groups

23  haven't, haven't tried.

24         MR. CANDON:  So without jurisdiction over the matter

25  under 105, how can the Court have jurisdiction under Rule 8005

1   or 7062, whatever, removing under -- I mean the Court's

2   determined it doesn't have jurisdiction.  And the whole matter

3   has been under 1334, but you're saying it's not 1334, it's

4   just a matter of jurisdiction under 105?

5              THE COURT:  No.  Section 105 is not a jurisdictional

6   --

7              MR. CANDON:  I understand.  To have jurisdiction you

8   have to find under 1334.

9              THE COURT:  Right.

10             MR. CANDON:  And you did not have jurisdiction under

11  1334.  So how do you have jurisdiction under Rule 8005 or 7062

12  for a stay?

13             THE COURT:  I think the issue is that <u>Pacor</u> says

14  that in order to expand the reach of Section 105 to a third-

15  party action, that that's what you're looking at.  Whether in

16  a 105 context, Section 1334 will allow a Court to expand the

17  reach of Section 105 to third parties.  And the answer is yes

18  sometimes, and no sometimes.

19             In this instance, the answer is no.  And the reason

20  it was no is because under the <u>Pacor</u> analysis, if the state

21  were found to be liable, it would not have an automatic claim

22  against the debtor.  It would have to bring a separate suit

23  against the debtor.  But for that separate suit requirement,

24  the answer would have been yes, there was jurisdiction.  But

25  that separate suit requirement under the <u>Pacor</u> line of

1    reasoning makes all the difference.  That's the only reason.

2    It's a separate suit requirement.

3          So --

4          MR. CANDON:  So in this --

5          THE COURT:  -- it's the 105 issue for expanding the

6    injunction in that context.

7          MR. CANDON:  So to have power to act, to have

8    jurisdiction, jurisdiction wasn't there, so the stay couldn't

9    -- the injunction couldn't issue.

10         THE COURT:  The injunction under 105 would not

11   extend the automatic stay as the debtor requested to make the

12   state of Montana a related party in that adversary.

13         MR. CANDON:  Okay, so then if you back up, and now

14   we're -- still it's a jurisdictional issue.  You have to have

15   jurisdiction to act in this instance over this stay pending

16   appeal, you're still acting over two non-debtor parties.

17   You've said that these two parties don't fall within this

18   Court's jurisdiction under this state litigation --

19         THE COURT:  They clearly do fall within my

20   jurisdiction as creditors within the estate.  It's not an in

21   personam --

22         MR. CANDON:  That I understand.  They can't have

23   jurisdiction over each other individual parties but --

24         THE COURT:  What can't I -- fine.  So then I can

25   enjoin the Libby plaintiffs from pursuing this private action

Colloquy                    55

1  against, as creditors, against the state of Montana as a

2  creditor, while this still goes on, to see whether or not I

3  appropriately construed the 1335 jurisdiction as it applies to

4  Section 105 pending appeal.  So it's not either, in that

5  context, a subject matter jurisdiction or an in personam

6  jurisdiction issue for Rule 8005.

7            It isn't a jurisdictional issue in this context.

8            MR. CANDON:  This context, I mean we're talking

9  about the Libby claimants versus the state of Montana.  It's

10 still -- that is what we're talking about.  We're staying that

11 matter.

12           THE COURT:  You're staying a lawsuit --

13           MR. CANDON:  Between --

14           THE COURT:  -- that will affect --

15           MR. CANDON:  Between third-party non-debtors --

16           THE COURT:  Between creditors of the estate, yes.

17           MR. CANDON:  I think they are creditors of the

18 estate, but they are third-party non-debtors.  I mean the

19 analysis is exactly the same.

20           THE COURT:  The Court's jurisdiction to adjudicate

21 matters in Federal Court depends upon a whole host of factors.

22 And you have some kinds and you don't have others.  And I

23 think in this context, I have jurisdiction to take a look at

24 this issue and adjudicate this limited narrow issue, even

25 though I don't have jurisdiction to expand under Section 105

Colloquy                          56

1   the automatic stay in that adversary to include the state of

2   Montana.

3          MR. CANDON:  But by granting the stay, you're doing

4   -- it's ultimately the same thing.  We're talking about a stay

5   that's just going to go on --

6          THE COURT:  No, I'm not doing the same thing.  I'm

7   not including -- I am not expanding Section 105.  If the

8   District Court tells me that I improperly denied the 105

9   injunction for the benefit of the state of Montana, then that

10  will be the District Court making that decision or the Circuit

11  Court, it's not me.  I've already decided I couldn't do it and

12  they'll tell me that I'm wrong and that I should have done it

13  and remand it and then I'll do it -- or they'll do it, however

14  they decide to do it.

15         MR. CANDON:  But that's the -- I mean, we're talking

16  -- it's the same matter.  You've already decided you can't

17  stay the litigation.  I guess it's a very circular argument, I

18  understand that, it seems kind of strange, but the reality is

19  it's the same people on the top of the circle as it is at the

20  bottom of the circle.  It's the same litigation.  We're

21  talking about the same thing.  You can't stay it at the top

22  but you can at the bottom?

23         THE COURT:  Yes, I can because I can impose

24  different circumstances.  I can impose different rules for

25  different individual issues to take care of different problems

1  under different circumstances.  I am not imposing an

2  injunction for the benefit of the state of Montana as a

3  related party in that adversary.  I found under, as I

4  construed Pacor in this context, that Montana cannot be a

5  related party. That's what I've decided.  I can be wrong.

6         If I am wrong, and that litigation proceeds in the

7  meantime, there has been a lot of prejudice to everybody.  The

8  only entity who is not going to be prejudiced as a result of

9  keeping everything in status quo are the Libby claimants,

10  because they have a remedy right here in the Bankruptcy Court

11  where they are right now.  They have a remedy.  No one else

12  has.

13         So the Libby parties are the only parties who won't

14  be prejudiced if I keep a level playing field and impose this

15  temporary stay.  Everybody else will be prejudiced if it turns

16  out that I am wrong, and that the District or the Circuit

17  Court say that I'm wrong, everyone else will be prejudiced,

18  not the Libby parties.  They're the only parties who won't be

19  prejudiced by keeping this stay in place for now.

20         MR. CANDON:  That's not necessarily the case either.

21  I mean, 524(g) is not going to stop the litigation from

22  happening as a -- it's going to happen eventually.

23         THE COURT:  It may very well --

24         MR. CANDON:  And without the debtors, so there's no

25  harm or no effect on the estate --

1          THE COURT:  No, but that's not necessarily the case

2    because the debtors could propose a plan in agreement with the

3    state that will pick up, not necessarily under 524, but by

4    agreement with the state, the debtors can propose some sort of

5    plan that takes a look at this issue and include the Libby

6    plaintiffs and say fine, you've brought a cause of action here

7    and --

8          MR. CANDON:  I think we learned in <u>Combustion</u>

9    <u>Engineering</u> or -- I think it's <u>Combustion Engineering</u> that

10   plan provisions can't create jurisdiction.

11         THE COURT:  This has -- it is not a jurisdictional

12   issue.  You're now talking about using Section 105 as -- to --

13   as was used in the <u>Combustion Engineering</u> case, to get -- in

14   that case, an affiliate of the debtor to do certain things

15   that the Court said could not be done under the context of

16   that case.

17         That doesn't prohibit a debtor and another party,

18   like the Libby plaintiffs, and a creditor in the estate, i.e.

19   Montana, and the Libby claimants with another creditor from

20   coming to a resolution --

21         MR. CANDON:  And that may happen down the road.

22         THE COURT:  Right.

23         MR. CANDON:  That's not -- their litigation is non-

24   debtor third party litigants.  That --

25         THE COURT:  The litigation in the State Court is

Colloquy                                          59

1    between, at the moment is a direct action statute.  But you

2    can't say it doesn't involve the debtors because the very

3    causes of action involve the state of Montana going in and

4    inspecting the debtor's mine and the debtor's product, and

5    taking advantage of the debtor's healthcare officials and the

6    debtor's mining inspection reports and the debtor's asbestos

7    claims, and from that knowledge not reporting to the citizens

8    of the state the hazard that it allegedly learned because of

9    the debtor's operation.  The Libby plaintiffs can't have it

10   both ways.

11          You can't on the one hand say it doesn't involve the

12   debtors and on the other hand say it's totally independent of

13   the debtors.  Of course from the Libby's point of view, it

14   involves the debtors.  Otherwise, you wouldn't be raising this

15   issue in this case.  Of course it involves the debtors.  The

16   problem isn't that it didn't involve the debtors.  It involves

17   the fact that the bankruptcy stay prohibits you from suing the

18   debtors in the state of Montana along with the state of

19   Montana in that direct action suit right now.  And it's going

20   to continue to prohibit you from doing that, given the current

21   circumstances of the case.

22          And the question for everybody is, how do you manage

23   that litigation while it's going on?  And that is a very

24   difficult ball to be juggling.  In fact, it's an impossible

25   ball to juggle.

1          So, the answer that I could come up with, the only

2    one that I can see, given <u>Pacor</u> is that the action against the

3    state by the Libby plaintiff can be permitted to go forward

4    because of one reason and one reason only, and that is because

5    there is no direct liability channel directly from the state

6    of Montana, if Libby can ever prove a direct cause of action -

7    - and I note the footnote in the <u>Johns-Manville</u> opinion that

8    indicates that so far it's never happened, despite these

9    causes of action and despite the fact that I wrote the

10   operation this way, it's never happened  that there has been a

11   direct liability judgment issued against them under these

12   statutes.  But nonetheless, there's a right to do it.  So

13   fine, you have that right.

14          But that doesn't mean that at some point in time the

15   debtor doesn't have to be involved in this process, of course

16   it does.  You need the debtor's records, you need the debtor's

17   witnesses --

18          MR. CANDON:  The discovery is done in this case.

19   This has case --

20          THE COURT:  Okay.

21          MR. CANDON:  Well, one thing we did get somewhat

22   sidetracked was Mr. Monaco came up here and there was a

23   discussion, like a rearguing of the reconsideration motion.  I

24   don't know if the any actual prerequisites for the issuance of

25   a stay pending appeal have even been argued or addressed or

1  even talked about.

2              THE COURT:  Well, go ahead and make whatever

3  argument -- I cut Mr. Monaco off, and if you want a different

4  record made then, I'll listen to the argument.  But I thought

5  the briefs articulated them.  If you need some oral argument

6  on that point, then go right ahead.

7              MR. CANDON:  We obviously would like to highlight

8  the various elements of --

9              THE COURT:  Go ahead.

10             MR. CANDON:  Likelihood of success on appeal.  This

11 Court now has had this under advisement for over 30 months --

12             THE COURT:  No, that's not correct.  I have to stop

13 that statement.  That has been on my docket that long but it

14 has been on appeal to the District Court for quite some time,

15 and this Court thought that I could not adjudicate anything

16 while it was on appeal. That was number one.

17             And number two, and I apologize to the parties for

18 this, I simply lost track of this case.  I thought I was

19 waiting for something from BNSF about this and so I was

20 waiting for something to come in that apparently I was

21 actually in fact not waiting for.  So, part of that period of

22 time was that.

23             MR. CANDON:  Okay, doing without that then, it was

24 December '05 is when the initial temporary stay went into

25 effect.

1          THE COURT:  That's right.

2          MR. CANDON:  So I mean, maybe it's been periods of

3    time during that 30 months that it wasn't actually being

4    considered by the Court, but it still has been stayed for over

5    30 months.  And anyway, the likelihood of success, you've

6    actually -- we want to reiterate your ruling in the state of

7    Montana, you're right on point with all the Third Circuit case

8    law.  You have reiterated everything today, likelihood of

9    success.  This is the way the Third Circuit is going to rule

10   on this matter.  <u>Pacor</u>, <u>Federal-Mogul</u>, <u>Combustion Engineering</u>.

11          It couldn't be a clearer set of cases on the point

12   in which you in your own opinion said these claims look

13   identical, or very substantially similar, I don't remember

14   exactly.  So likelihood of success I think, the state of

15   Montana has a very high burden to prove to you that they're

16   going to be successful on appeal, given the Third Circuit

17   cases that you have cited and followed.

18          THE COURT:  The reason, and I think perhaps the

19   reason that I am concerned about the likelihood of success on

20   appeal in this case is because of the record taint problem.

21   Because I don't see how anybody is going to be proving this

22   case without witnesses from the debtor, and I don't think

23   that's a factor that I was able to consider, but I'm not sure

24   that that's not a grounds for someone to argue in this case.

25   And that's really frankly why I am concerned about the

1   likelihood of success.

2           MR. CANDON:  Record taint argument, Your Honor,

3   you've cited the Montana statute, you've cited direct action.

4   There is no record taint.  It's an illusory like argument.

5   We've been talking about it for two years.

6           THE COURT:  No.  There's no collateral estoppel, but

7   that doesn't mean that there's not a record taint. When a

8   witness testified, the witness testified -- you don't back off

9   the testimony, you know, it can be used for purposes of

10  later --

11          MR. CANDON:  Well, much of the record taint that we

12  talked about, and this has been in all the different various

13  pleadings, is you know the most damning of the reports are

14  from people that are dead.  I mean record taint, record taint,

15  but that's as tainted as far as it's going to be.

16          THE COURT:  Well, that information obviously I'm not

17  privy to.  I don't know who witnesses will be.

18          MR. CANDON:  Well, I understand that, but we put it

19  in our papers that one of our major -- the big testifying

20  witness for the Grace company and from the state of Montana

21  that worked out of the Libby mine is dead.  I think he's been

22  dead for several years.  So I mean the record can't get any

23  more tainted in Libby than it already is.  It's beyond -- it's

24  a tainted record and I don't think there's anything that's

25  going to be done to change it.

1          THE COURT:  Well, I don't know what records

2    specifically you're talking about.  I'm not talking about

3    those poor individuals who've died.  I'm talking about how

4    you're going to prove the case against the state.

5          MR. CANDON:  I'll switch on to other factors then.

6          We've talked about likelihood of success. The other

7    factors are harm to the state, harm to the Libby claimants and

8    the public interest.

9          And harm to the state, as I said, initially Grace is

10   not moving per se in the appeal.  I don't see the state having

11   standing to address the harms to the bankruptcy estate.  And

12   so the only harm there is that this litigation will ultimately

13   have to go forward sooner rather than later.

14         With respect to the harm to the Libby claimants, the

15   appeal has been pending for a long time.  It's been over a

16   year since you actually initially said that jurisdiction did

17   not exist. And as I said, the pain and suffering out there is

18   severe and real.  And while you've mentioned that they're the

19   only ones that may not be harmed, I beg to differ.  I think

20   it's a very different story than just one side arguing another

21   in a Bankruptcy Court.  It's real harm.

22         And as for public interest, that I think weighs in

23   there as well, but I also believe the state of Montana has no

24   right to hide behind the protections of the Bankruptcy Court

25   for a stay that they're just not entitled to and the debtors

1    themselves haven't moved for.

2              Thank you, Your Honor.

3              THE COURT:  Okay.

4              MR. LOCKWOOD:  Your Honor, I haven't planned on

5    saying anything on this issue today, but in light of what Mr.

6    Monaco has said and what, a number of the things that the

7    Court has said, I think it's important because the so-called

8    record that Mr. Monaco confesses to be establishing here has

9    the potential for going well beyond what could be regarded as

10   the more limited issues in front of the Court here today.

11             Basically what Montana is urging, and what the Court

12   seems to be accepting for purposes of the limited continuance

13   of this stay, which regardless of whose responsibility it is,

14   has been in existence for two and one-half years --

15             THE COURT:  Yes, it has.

16             MR. LOCKWOOD:  -- and it was never in existence as a

17   105 injunction.  It's been in existence as a quote "stay" for

18   two and --

19             THE COURT:  That's correct.

20             MR. LOCKWOOD:  -- one-half years.  And there is no

21   assurance that it will not continue in existence for some

22   significant additional period of time, because while it is

23   true that we have reached an agreement in principal with the

24   debtor on personal injury settlement, as the Court will hear

25   tomorrow, there's ZAI, there's Mr. Speights has a number of

1    other claims that are not yet resolved, and there are various

2    other matters that are going to have to get resolved here.

3         And so, -- and we have our friends the insurance

4    companies who haven't yet been heard from, but since there's

5    part of the deal with PI's and assignment of the insurance,

6    Your Honor is more than familiar with what that tends to

7    precipitate by way of, shall we say -- I don't want to use the

8    word delay exactly, but it tends to sometimes draw things out

9    a bit.

10        So I don't think we can discuss this from the

11   perspective of oh, it's only going to be a couple of months or

12   something like that.  We're talking about a significant

13   potential.

14        THE COURT:  Well, but this has been stayed pending

15   appeal.  This is a stay pending plan conference.

16        MR. LOCKWOOD:  Well, I understand, Your Honor, but I

17   mean the appeal is to the District Court, and then the appeal

18   is to the Third Circuit and the appeal is to the -- to the

19   United States Supreme Court.  And Montana has made it

20   absolutely clear through a variety of threats that Mr. Monaco

21   has articulated here about what it's going to do if it doesn't

22   get its way, that it's going to adopt a fairly scorched earth

23   approach to this matter from its own perspective.

24        The fact of the matter is this.  Every argument that

25   Montana has made here could have been made in the Pacor case.

1    Montana -- and the Court has seemed to be influence by this.

2    The Pacor case was the one that set the contractual indemnity

3    as the Court has recognized.

4         But the reason, however, which the Court also

5    articulated as to why Pacor, Federal-Mogul and Combustion

6    Engineering have -- and for that matter Gerard itself have

7    focused on distinguishing contractual indemnification from

8    non-contractual indemnification, is precisely the critical

9    matter here which is that there's no dispute when there's a

10   contract.

11        The Court's own opinion in this matter in discussing

12   the prior injunction issue in Gerard pointed out that Grace

13   itself acknowledged the existence of its obligation under the

14   contractual indemnity.

15            THE COURT:  That's right.

16            MR. LOCKWOOD:  Grace has denied and will continue to

17   deny, as will the personal injury creditors as a group, and

18   the trust when it comes if to that, that Montana has any

19   indemnification claim here.

20        Mr. Monaco has cited no case for Montana suggesting

21   that there is some sort of automatic indemnity.  In his papers

22   he's tried to say oh well, there will be a necessity for

23   adjudication in the case of a contractual indemnity versus a

24   non-contractual indemnity.  Well --

25            THE COURT:  Well, there are clearly no automatic

1   indemnity or I would have issued the 105 injunction.

2           MR. LOCKWOOD:  Right.  And -- but if you go back to

3   Pacor and you think about how that Pacor fits the Montana

4   situation, Pacor was a Johns-Manville distributor.

5           THE COURT:  Yes.

6           MR. LOCKWOOD:  Its liability was in effect

7   derivative of Johns-Manville.  It could have made all the

8   arguments -- it could have said with respect to the Johns-

9   Manville bankruptcy, that Johns-Manville would be subject to

10  record taint because Pacor would be litigating whether Johns-

11  Manville asbestos was dangerous or not.  It could have been

12  talking about how its liability was quote "derivative" only --

13  a term by the way, which has meaning as the Court is well

14  aware, only in the context of a 524(g) injunction and has

15  nothing whatsoever to do with whether the Court has

16  jurisdiction over a 105 fight between two creditors.

17          The Court seems to be motivated by the fact that the

18  Libby claimants are creditors, and Montana is creditors.

19  Well, that's also true of any co-defendant in the tort system.

20  We could have every asbestos manufacturer in the United States

21  show up in a case, whether in Grace or something else, and say

22  I have contribution claims.  Owens-Illinois for example, who

23  we've seen pop up in a couple of the recent cases before Your

24  Honor, is a co-defendant.  They can make the same arguments

25  about they -- Grace's product gave -- was a cause of the

1    asbestos related disease of a particular plaintiff, and that

2    that would create record taint because they would have to show

3    that vermiculite was in order to apportion liability.  They

4    would have claims against the debtor estate if the claim

5    against Owens-Illinois or some other third -- co-defendant was

6    permitted to go forward in the tort system, gives rise to a

7    judgment, gives rise to a claim over.

8           All of these arguments could be made by a plethora

9    of co-defendants in a tort system. The only thing that's

10   unique about this situation -- and I'm focused on something

11   Your Honor said when you said none of the other asbestos

12   claimants have come in here, only Libby has come in here.  The

13   other asbestos claimants haven't needed to come in here

14   because they could sue Owens-Illinois, they could sue Georgia-

15   Pacific, they could sue dozens of companies in the Court

16   system, and convert those companies into contribution

17   claimants against Grace, if their lawsuits are successful.

18   The reason the Libby claimants can't do that is because Libby

19   is uniquely -- the only exposure that these people had is

20   because they lived in Libby, Montana, as far as we're aware.

21          THE COURT:  Well, that will be very interesting to

22   see when the TDP analysis starts to come, whether that's the

23   case, that we have a unique body of claimants who actually

24   filed only claims against Grace.  I will actually look forward

25   to --

1          MR. LOCKWOOD:  There are provisions in every TDP,

2     including several that Your Honor has approved, that say if --

3     that have what are called extraordinary claims provisions,

4     that says if a claimant can show that their exposure is more

5     than 75 percent of the product of a particular -- of the

6     bankrupt defendant whose trust they are claiming against, they

7     can get up to five times.

8          I mean this is not -- the possibility that this sort

9     of limited exposure exists has not been uncovered or thought

10    about for the first time in this case.

11         THE COURT:  Of course not.

12         MR. LOCKWOOD:  It just happens that the Libby

13    claimants, as a self-identified group, because of a variety of

14    phenomenon, particularly a lot of bystander exposure that goes

15    beyond the normal occupational exposure that we see in these

16    cases, they happen to have been more visible -- and also you

17    have a criminal case which by the way, I might add, if you're

18    talking about record taint, the notion that we should be

19    enjoining Libby claimants from suing Montana because of record

20    taint, while the Federal Government goes forward with a

21    criminal case, and you have appeals, grand jury and testimony

22    and this, that and the other thing, seems to me to be an

23    awfully far reach here.

24         And at the end of the day, Your Honor, while Your

25    Honor clearly has jurisdiction over Libby's claims against the

1   debtor, and Montana's claims against the debtor, that doesn't

2   mean that you have, that Your Honor has jurisdiction over

3   Libby's claims against Montana. And that's what <u>Pacor</u>

4   basically said, and that's what Mr. Candon said, and he was

5   right.

6         And while -- it's easy to sort of say well, gee,

7   it's just a limited injunction, we're giving the people a

8   breathing space, but every time we go through one of these

9   things, it's sort of like what in the military they call

10  mission creep.  We kind of expand a little bit farther, the

11  circle of people who can piggyback on the Grace bankruptcy

12  case.

13        THE COURT:  Gee, that would be the first time in an

14  asbestos bankruptcy that we would have had 524(g) injunction

15  creep come up.

16        MR. LOCKWOOD:  Well, I will say one other thing,

17  that --

18        THE COURT:  You get tagged with that one.  I get

19  insurance neutrality and Mr. Boflack (phonetic) gets -- what

20  was it, I've forgotten now, he had a term of art that he get -

21  - you get the creep.

22        MR. LOCKWOOD:  Well, one thing that Mr. Monaco did

23  say both in his papers and I averted here today, the Court

24  sort of suggested a little bit when you started talking at the

25  end of your colloquy with Mr. Candon, was the notion that

Colloquy                                    72

1   somehow or another Montana is going to get wrapped up in this

2   plan.

3           I mean Montana is facially ineligible for 524(g)

4   protection.  It has none of the relationships to the debtor

5   that Your Honor is familiar with --

6           THE COURT:  I don't think in any way there's a

7   524 --

8           MR. LOCKWOOD:  So, as Mr. Candon suggested, there's

9   -- unless there's a voluntary settlement --

10          THE COURT:  Right, that's --

11          MR. LOCKWOOD:  -- between the Libby claimants and

12  Montana --

13          THE COURT:  Right.

14          MR. LOCKWOOD:  -- as part of this thing, there's no

15  way --

16          THE COURT:  That's exactly right --

17          MR. LOCKWOOD:  -- that the rest of us are going to

18  be able to craft a plan that would prevent the Libby claimants

19  from pursuing Montana --

20          THE COURT:  Right.

21          MR. LOCKWOOD:  -- once this case is over.

22          THE COURT:  What I think I said -- because the

23  problem is this.  That even after the Libby plaintiffs and

24  Montana figure out what they're going to do with each other,

25  which hopefully they will start talking about, then we still

1   have Montana talking with and about the debtor, and Libby

2   talking with and about the debtor, and the Libby plaintiffs

3   after all are part of the personal injury process.

4          So, you know, it's -- at the moment, it's -- I know

5   that there is -- there has been through this case a kind of

6   self identification of the Libby asbestos plaintiffs as though

7   they are a whole group under themselves, but the reality is

8   that they're part of the asbestos personal injury plaintiff

9   group.  So --

10         MR. LOCKWOOD:  That's true. And just like the

11  members of that group will retain their claims against Owens-

12  Illinois, and all the other non-bankrupt co-defendants in the

13  tort system notwithstanding whatever 524(g) plan we craft with

14  the debtor, so too will Libby claimants retain their rights

15  against non-debtor affiliates, --

16         THE COURT:  yes, they will --

17         MR. LOCKWOOD:  -- that are not affiliates of Grace,

18  et cetera.  And that's why I use the expression mission creep

19  here, because I mean everybody else, there's been, or at least

20  -- I shouldn't say -- at least a number of the insurers, et

21  cetera, there's been some arguable possibility that there will

22  be protection for them in a 524(g) environment.  Now that

23  we've gotten to Montana, we've really sort of gotten beyond

24  anything that anybody's tried, and certain under Combustion

25  Engineering we couldn't possibly -- your comment about 524(g)

Colloquy                                    74

1   creep does have a certain ring to me but I believe -- believe

2   me, Your Honor, we haven't yet pushed anywhere near the edge

3   of that envelope as would be required to address Montana here.

4         So the bottom line is that --

5         THE COURT:  You don't think I have jurisdiction --

6         MR. LOCKWOOD:  I think Mr. Candon's absolutely

7   right.  There's a circularity problem.  You have jurisdiction

8   to determine whether you have jurisdiction.  That was the

9   point you made.  That's clearly true.

10        But once you've determined that you don't have

11  jurisdiction, then you don't have jurisdiction to stay your

12  determination that you don't have jurisdiction when the effect

13  of the stay is to enjoin people from suing third parties.

14  Because that's really what's going on here.

15        We keep using these words like stay as though -- as

16  though as some sort of, you know, it's not an injunction, but

17  a stay is an injunction.  And while I personally think that

18  Your Honor is unduly dubious about your opinion standing up, I

19  think that the District Court and the Third Circuit are going

20  to conclude that you're right on the money.  And whatever

21  policy reasons somebody like Montana might want to adduce

22  about why somehow or another they should be able to piggyback

23  on this bankruptcy are going to have to be addressed to the

24  legislature at the end of the day.

25        But, even if your own concern that well, maybe

1    you're wrong and maybe the conundrum that you see between what

2    qualifies under <u>Pacor</u> and what does not, is felt and

3    ultimately recognized, isn't it more appropriate to let the

4    District Court decide whether the issue to stay here?  Because

5    the District Court is going to be the one who's going to have

6    to decide whether it thinks you're clearly right, in which

7    event it probably wouldn't issue the stay, or, your concern

8    that maybe you're not getting it right is sufficiently

9    material that it should issue this.  I mean, you're not the

10   only person that has to pass on this.

11            THE COURT:  I have to yes, I agree, I'm not the only

12   person that has to pass on it, but I should clarify my

13   position on the record.

14            I think my opinion correctly follows the law.

15   Otherwise, I would not have issued my opinion the way I did.

16   So I don't want to make it seem on the record as though I

17   think I did not follow the law.  I believe I did correctly

18   follow the law and apply it to the facts of this case.  So, in

19   that sense, I think the opinion is correct.

20            Whether that opinion is going to withstand the test

21   of time, and some Court that has the ability to change the law

22   is going to think that it ought to be the law is the issue.

23            MR. LOCKWOOD:  And the question under the standards

24   applicable for stays pending appeal is likelihood of success.

25   And that means is it likely that the District Court or the

1    Third Circuit is going to decide you got it wrong, or is it

2    likely that they're going to decide that you got it right.

3          And I suggest to you, Your Honor, that it is likely,

4    more likely that they are going to decide that you got it

5    right. And I therefore suggest that the basic premise is that

6    -- that Montana's motion is based on is wrong, i.e. they do

7    not have a likelihood of success on appeal, and that if -- and

8    that after all, if some higher Court disagrees with that, it

9    can always issue the stay because they're going to be in a

10   better position than you are to figure out whether they think

11   you're right or wrong.

12         So, on that basis, Your Honor, I respectfully urge

13   you not to extend the stay.

14         THE COURT:  Okay.

15         MR. MONACO:  Your Honor, I'll be fairly brief.

16         Your Honor, we've heard lots of eloquent argument

17   about whether Section 105 injunction should issue, and whether

18   524(g) applies, but what we're here for today is a stay

19   pending appeal under Rule 8005 which gives Your Honor all

20   discretion to fashion relief to protect all the parties in

21   this case.

22         I think I've made a record based on -- both on my

23   papers and my argument today that we've met the four prongs of

24   Rule 62, likelihood of success on the merits, harm to Montana,

25   and to the debtors for that matter, the relative harm to Libby

1   claimants and public interest.

2            Your Honor has I think already made her ruling

3   regarding the stay, and I have a form of order attached to my

4   motion.

5            THE COURT:  Well, Mr. Monaco, I think I better back

6   up and just give you five minutes to restate whatever it is on

7   the record that you want to state with respect to anything

8   that you want to restate from your brief or anything that you

9   want to expand, because I really did not give you an

10  opportunity to make that argument so perhaps I'd better let

11  you do that if you want to state anything other than what is

12  in your brief.  In case I hadn't made it clear, I did read

13  your brief, in the event that that's not clear, so I thought

14  that perhaps your briefs were the basic arguments, but if

15  there is something that --

16           MR. MONACO:  Well, Your Honor, I think I've made --

17  just to sort of sum up what I stated to Your Honor previously.

18  We think the standard is very broad in this situation.  It's

19  not the same as whether 524(g) applies or whether 105 or

20  whether -- reasonable minds can differ on whether Your Honor's

21  opinion will stand up, but I think given the Gerard case,

22  given the fact that Pacor, Federal-Mogul and Combustion

23  Engineering could all be distinguished on the facts of this

24  case, not the least of which is that the Libby claimants and

25  Montana not only are parties to this particular adversary

1    proceeding, but they also filed proofs of claim in this case.

2            THE COURT:  How do I have -- I think the problem is,

3    Mr. Monaco, and this really is the issue I guess, how do I

4    have jurisdiction to issue a stay if I don't have jurisdiction

5    to issue the injunction?  Because am I doing through the back

6    door what I can't --

7            MR. MONACO:  No, Your Honor, it's a different issue

8    -- it's a different standard altogether.  That's just

9    bootstrapping to say that you don't have subject matter

10   jurisdiction over this particular issue.  Bankruptcy Rule 8005

11   is very clear.  I think Your Honor has the discretion to

12   fashion broad relief.  We've given you all the reasons why you

13   should.  Your Honor has stated at the inception in the

14   colloquy with Mr. Candon about why you should.

15           And because there's going to be a lot of mischief if

16   this is allowed to proceed.  And I think Your Honor has

17   independent jurisdictional basis to stay pending appeal.  And

18   I do not think that simply saying well you don't have --

19   that's the ultimate issue for the District Court.  That's only

20   one part of the analysis under whether it's likely to -- more

21   likely to be successful on appeal.  That's one factor that you

22   can look at.  And I think I've articulated, and I think Your

23   Honor has articulated why we think a District Court could look

24   at this differently.  I --

25           THE COURT:  I thought you had to meet all four

Colloquy                                     79

1    standards?

2              MR. MONACO:   And Your Honor, I think we have.   If

3    you look at the relative harm to Montana, that's at two

4    different levels.   You've got the level of a defense strategy,

5    which I mentioned previously, of having to proceed ahead with

6    aiding -- in the face of aiding and abetting claims, and the

7    fact that it's a predicate to the Libby claimants proving

8    their claim, that they have to show there was wrong on the

9    part of Montana.   We have to get witnesses and documents from

10   Grace.   They're going to be involved in this trial, whether

11   they like it or not. And it's going to prejudice our defense

12   strategy if we have to proceed ahead.

13             On the other hand, from a bankruptcy level, we're

14   going to have to proceed with a motion for relief, if we don't

15   prevail, we're going to have to go to the District Court for a

16   stay, we're going to have to deal with these issues at

17   confirmation, and so Montana is going to be prejudiced at the

18   bankruptcy level as well, and it's going to cause the debtor

19   to have to respond to these matters as well.

20             In terms of the relative harm to the Libby

21   claimants, again, Your Honor has spoken to that issue directly

22   in the BNSF decision.   At page 30, it's very clear as to why

23   there is no significant harm to Libby claimants, who are going

24   to have to wait anyway to prove their claims under the

25   524(g) --

1        THE COURT:  Well, but that's against the debtors.

2        MR. MONACO:  That's true, Your Honor, but the issues

3   overlap and are very much the same.  And they're going to have

4   to wait anyway.

5        And finally, Your Honor, as far as the public

6   interest, Your Honor has again addressed that in your <u>BNSF</u>.

7   So I think we've met all four factors.

8        I would be surprised if Your Honor didn't believe in

9   the correctness of your decision but that's really not the

10  standard.  What I'm asking Your Honor is to see that we have

11  made a case, that <u>Gerard</u> controls, that <u>Pacor</u>, <u>Combustion</u>

12  <u>Engineering</u> and <u>Federal-Mogul</u> are all distinguishable for

13  various reasons.  And that we can -- and Your Honor has also

14  mentioned the record taint. And for all those reasons, we

15  believe that we will prevail on appeal.

16       And again, I think it will have a beneficial result

17  for all parties involved in this case, if it is stayed pending

18  -- the stay -- the appeal is going to be running parallel to

19  the confirmation and this could lead to a consensual

20  reorganization.  And if the stay isn't, it certainly is not

21  going to promote that goal.

22       So for all those reasons, Your Honor, I think that

23  we have -- to get back to your initial reaction, I think we

24  have met our burden in showing why a stay makes sense in this

25  situation.

Colloquy                                81

1            THE COURT:  All right.  Thank you.

2            MR. CANDON:  Your Honor, can I have just one second?

3            THE COURT:  Yes.

4            MR. CANDON:  All this --

5            THE COURT:  You need to use the microphone.

6            MR. CANDON:  With all this Mr. Montana talking about

7    the BNSF opinion, that's just not the opinion that you're

8    focused on here.  You're focused on the one you just ruled in

9    the state of Montana.

10           And then the other issue is for discovery and all

11   those other matters that's going to rely on Grace and they're

12   going to have to go seek information from Grace, don't forget

13   that these matters were going forward against the state of

14   Montana up until 2005, and the case got started in April 2001,

15   Grace filed, state of Montana filed a motion for relief from

16   stay, that's what got to this August 2005 motion for expansion

17   of the preliminary injunction.  For four years beforehand

18   where apparently things were going in Montana that didn't

19   bother the debtor.

20           THE COURT:  Okay, thank you.

21           MS. BAER:  Your Honor, just very briefly, since

22   people have suggested that the debtor is standing by silently

23   and therefore doesn't support the motion, which is not true.

24   Obviously the debtors agree that the appropriate thing to do

25   here is to issue the stay pending appeal.

1      The debtors have moved for leave to file Your

2  Honor's decision, relief to appeal is an interlocutory order

3  before Judge Buckwalter.  We believe it's key to preserve the

4  status quo while the District Court and perhaps the Third

5  Circuit look at your opinion.

6      You have respectfully cut a fine line between this

7  and all the others. The debtor does not believe that that fine

8  line is correct.  We believe that <u>Pacor</u>, <u>Federal-Mogul</u> are

9  distinguishable and the Court for the same reasons it entered

10  the orders on <u>BNSF</u>.  <u>Montana Vermiculite</u>, <u>Maryland Casualty</u>

11  and the Third Circuit affirmed in <u>Gerard</u> that the Court did in

12  fact have jurisdiction to enter with respect to the state of

13  Montana.

14      Your Honor, under those circumstances, the stay

15  pending appeal again makes perfect sense, ad you do have the

16  jurisdiction to enter it under the Bankruptcy Rules.  You're

17  not looking at the rationale for the underlying injunction or

18  no injunction; you're looking at whether a stay pending appeal

19  should issue.

20      We do believe there is likelihood of success on the

21  merits.  Again, Your Honor, respectfully, we do believe that

22  if this is looked at, the District Court or the Third Circuit

23  may very well come out on the other side and agree that this

24  is just like the situations with the others.

25      Secondly, Your Honor, with respect to harm.  Again,

1   given where this case is at and given the status quo that has

2   been maintained all this time, Your Honor, we submit that the

3   harm to the estate, the harm to the bankruptcy estate here is

4   much more significant in terms of what will happen and what

5   can happen quickly than maintaining the status quo for a

6   little longer while we put together our Chapter 11 plan.

7          Certainly, Your Honor, the Libby claimants' claims

8   against Grace will be dealt with in the Chapter 11 plan.  And

9   certainly, Your Honor, it is our intention that Montana's

10   claims against Grace will be dealt with in the Chapter 11

11   plan.  Let us set up that mechanism.  Let us deal with that

12   and preserve the status quo.  And then to the extent that

13   there are independent, truly independent things that are going

14   on, let us get in the position where those do not affect and

15   hurt the debtor like they would if they went forward now.

16          Your Honor, we believe that preserving the status

17   quo, maintaining and completing this bankruptcy case in the

18   posture it's in is very much in the public interest.  And for

19   those reasons, we believe that the stay pending appeal should

20   be issued.

21          THE COURT:  I am going to -- I will be issuing an

22   order on this, if not today then tomorrow.  I'm going to go

23   back and take a look again at the rule and the jurisdictional

24   issue after Court is over today.  So I will issue an order

25   either today or tomorrow on this matter on the stay pending

1  appeal.  But I'm not going to do it right now because I do

2  want to go back and take a look at the jurisdictional issue

3  and the Rule 8005 issue again, but it will come out either --

4  well, I should say by Thursday when I get back from

5  Pittsburgh. I'm not sure I can do it here, so by Wednesday for

6  sure.  If you don't get an order Wednesday, then Ms. Baer,

7  contact my chambers and ask my staff why, because I want it

8  out by Wednesday so that there is not a holdup with respect to

9  anybody's appeal process.  So by Wednesday there will be an

10  order on this issued.

11          Is there anything else on Grace's agenda?

12          MS. BAER:  There's not, Your Honor, and I just have

13  three orders to hand up.  I have orders on matters 1 and 2,

14  which are just continuances.

15          And Your Honor, on agenda item 12, which was the

16  application to approve the PD mediator --

17          THE COURT:  Yes.

18          MS. BAER:  -- I just wanted to read into the record

19  what I've added to the order.

20          THE COURT:  All right.

21          MS. BAER:  With respect to the order, the paragraph

22  that begins on the bottom of page 3 under Section B,

23  "liability and indemnity of the mediator".  The second

24  sentence begins, "The mediator shall not be liable to any

25  person as a result of any action or omission taken or made by

1    the mediator in good faith. The debtors and S&R are equally

2    indemnified, defend, and shall be jointly and severally liable

3    for any such indemnification entered defense and hold the

4    mediator harmless from any claims by any party against the

5    mediator arising out of or related to the performance of her

6    duties as mediator, provided however, that the mediator shall

7    not have such indemnification rights if a Court of competent

8    jurisdiction determines pursuant to a final and non-appealable

9    order that the mediator is liable upon such claim as a result

10   of such willful conduct, misconduct or gross negligence."

11             THE COURT:  That's fine.

12             MS. BAER:  Your Honor, with those interlineations,

13   I'd like to submit the order for entry.

14             THE COURT:  Fine.

15             Anyone else have any housekeeping matters to

16   address?  Okay.

17             (Matter adjourned at 1:50 p.m.)

18                         * * * *

86

# **C E R T I F I C A T I O N**

I, Sandra Carbonaro, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

SANDRA CARBONARO

<u>Doman Transcribing & Recording Svcs.</u>    _____

AGENCY                                    DATE