UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                        )  Case No. 01-01139(JKF)
                              )  (Jointly Administered)
W.R. GRACE & CO., et al.,     )
                              )  Multipurpose Room
                              )  824 Market Street
                   Debtors.   )  Wilmington, Delaware 19801
                              )
                              )
                              )  April 22, 2008
                              )  11:40 A.M.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:              Pachulski Stang Ziehl & Jones
                             By:  JAMES E. O'NEILL, ESQ.
                             919 North Market Street, 16th Floor
                             Post Office Box 8705
                             Wilmington, Delaware 19899-8705

                             Kirkland & Ellis,
                             By:  DAVID BERNICK, ESQ.
                                  THEODORE FREEDMAN, ESQ.
                                  JANET BAER, ESQ.
                             200 East Randolph Drive
                             Chicago, Illinois 60601


ECRO:                        NICOLE SCHAEFER

TRANSCRIPTION SERVICE:       TRANSCRIPTS PLUS
                             435 Riverview Circle
                             New Hope, Pennsylvania 18938
                             Telephone:  215-862-1115
                             Facsimile: 215-862-6639
                             e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Appearances:
(Continued)

For the PD Committee:        Ferry Joseph & Pearce, PA
                            By:  THEODORE TACCONELLI, ESQ.
                                 RICK S. MILLER, ESQ.
                                 JAY SAKALO, ESQ.
                            824 North Market Street, No. 904
                            Wilmington, Delaware 19899

                            Bilzin Sumberg Baena Price
                            & Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                            Wachovia Building
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, Florida 33131-5340

For Official Committee       Stroock & Stroock & Lavan LLP
                            By:  ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, New York 10038-4982

For the ZAI Claimants:       Sullivan Hazeltine Allinson LLC
                            By:  WILLIAM SULLIVAN, ESQ.
                            4 East 8 Street
                            Wilmington, Delaware

                            Richardson, Patrick, Westbrook
                            & Brickman, LLC
                            By:  EDWARD J. WESTBROOK, ESQ.
                            1037 Chuck Dawley Blvd., Building A
                            Mount Pleasant, SC 29464

For the Washington          The Scott Law Group, P.S.
Class:                      By:  DARRELL SCOTT, ESQ.

For the ACC:                Campbell & Levine
                            By:  MARK HURFORD, ESQ.
                            1201 Market Street, 15th Floor
                            Wilmington, Delaware 19801

                            Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                            One Thomas Circle, N.W.
                            Washington, District of Columbia 20005

Appearances:
(Continued)

For Future Claims            Orrick
Representative:              By:  ROGER FRANKEL, ESQ.
                            Columbia Center
                            1152 15th Street, N.W.
                            Washington, D.C. 20005-1706

For the Crown:              Womble Carlyle Sandridge & Rice, PLLC
                            By:  FRANK MONACO, ESQ.
                            222 Delaware Avenue, Suite 1501
                            Wilmington, DE 19801

                            Canadian Department of Justice
                            By:   JACQUELINE DAIS-VISCA, ESQ.

For the Canadian ZAI        The Hogan Firm
Claimants:                  By:  DANIEL K. HOGAN, ESQ.

                            MICHELLE BELENJAY, ESQ.

For Unsecured               Duane Morris, LLP
Creditors' Committee:       By:   RICHARD RILEY, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, Delaware 19801


TELEPHONIC APPEARANCES:

Robert Guttmann, Christina Kang, Christina Skubic, Daniel
Silver, Matthew Siaker, Terence Edwards, Debra Felder,
Elizabeth Carbraser, Mark Shelnitz, Marion Fairey, William
Corcoran, Arlene Krieger, Natalie Ramsey, James Rieger, Jeanna
Rickards, Walter Slocombe, Leslie Kelleher, Curtis Plaza, Lewis
Kruger, Michael Dierkes, Mark Plevin, Matt Doheny, Alex
Mueller, Douglas Cameron, David Bean, John Phillips, Shane
Spencer, Bernard Bailor, Matthew Russell, Elihu Inselbuch,
Jerry White, Kim Christensen, Rajeev Narang, David Parsons, Ari
Berman, Martin Dies, Matthew Kramer, Andrew Craig, Brian
Kasprzak, James Restivo, Robert Horkovich, Daniel Speights,
Peter Shawn, Mari Murray, Guy Baron, Richard Levy, Catherine
Chen, Elizabeth Devine, Jason Solganick, Kirk Harley, Elizabeth
Esayian, Lindsey Hoelzle, Christopher Candon, Leslie Davis,
Alan Madian and Beau Harbour.

1          THE COURT:  This is the matter of W.R. Grace,

2  Bankruptcy Number 01-11139.  Participants by phone:  Robert

3  Guttmann, Christina Kang, Christina Skubic, Daniel Silver,

4  Matthew Siaker, Terence Edwards, Debra Felder, Elizabeth

5  Carbraser, Mark Shelnitz, Marion Fairey, William Corcoran,

6  Arlene Krieger, Natalie Ramsey, James Rieger, Jeanna Rickards,

7  Walter Slocombe, Leslie Kelleher, Curtis Plaza, Lewis Kruger,

8  Michael Dierkes, Mark Plevin, Matt Doheny, Alex Mueller,

9  Douglas Cameron, David Bean, John Phillips, Shane Spencer,

10  Bernard Bailor, Matthew Russell, Elihu Inselbuch, Jerry White,

11  Kim Christensen, Rajeev Narang, David Parsons, Ari Berman,

12  Martin Dies, Matthew Kramer, Andrew Craig, Brian Kasprzak,

13  James Restivo, Robert Horkovich, Daniel Speights, Peter Shawn,

14  Mari Murray, Guy Baron, Richard Levy, Catherine Chen, Elizabeth

15  Devine, Jason Solganick, Kirk Harley, Elizabeth Esayian,

16  Lindsey Hoelzle, Christopher Candon, Leslie Davis, Alan Madian

17  and Beau Harbour.

18          I'll take entries in court, please.

19          MR. BERNICK:  Good afternoon, Your Honor.  David

20  Bernick for Grace.

21          THE COURT:  Anyone else for Grace entering an

22  appearance?

23          MR. O'NEILL:  Good afternoon, Your Honor.  James

24  O'Neill for Grace.

1              MR. FREEDMAN:  Theodore Freedman for Grace.

2              MS. BAER:  Janet Baer for Grace.

3              MR. BAENA:  May it please the Court.  Good morning,

4    Your Honor.  Scott Baena and Jay Sakalo for the PD Committee.

5              MS. KRIEGER:  Good morning, Your Honor.  Arlene

6    Krieger from Stroock on behalf of the Official Committee of

7    Unsecured Creditors.

8              MR. WESTBROOK:  Good morning, Your Honor.  Ed

9    Westbrook for the ZAI Claimants.

10             MR. SCOTT:  Good morning, Your Honor.  Darrell Scott

11   on behalf of the Washington Class.

12             MR. LOCKWOOD:  Good morning, again, Your Honor.

13   Peter Lockwood on behalf of the ACC.

14             MR. FRANKEL:  Good morning, Your Honor.  Roger

15   Frankel on behalf of David Austern (phonetic), the future

16   claims representative.

17             MR. MONACO:  Good morning, Your Honor.  Frank Monaco

18   for the Crown.  Your Honor, I also introduce my co-counsel,

19   Jacqueline Dais-Visca, she's from the Canadian Department of

20   Justice.

21             THE COURT:  Thank you.

22             MR. HOGAN:  Good morning, Your Honor.  Daniel Hogan

23   on behalf of the Canadian ZAI Claimants.  With me, Your Honor,

24   is Michelle Belenjay (phonetic) from the firm up in Canada.

25             THE COURT:  Thank you.  Mr. Bernick?

1        MR. BERNICK:  Your Honor, I think we have six items

2  on the agenda today, and all of them relate to the ZAI matter.

3  We've made -- we've had some informal contacts in anticipation

4  of the hearing because we know that Your Honor has a tight time

5  table today given the number of matters that have to be

6  considered.  And I think that -- I think that I would propose,

7  subject to -- I don't know we have a firm agreement, but what I

8  would propose is that the debtors start out -- I have a

9  relatively short statement to make that I don't think will take

10  very long.  And then I suppose people who have other ideas,

11  other motions should go, and then we'll probably -- I'll

12  probably then have a more extended response to the different

13  issues that had been -- have been raised.  And then if people

14  want to have further argument in response to my response, I

15  suppose that a certain amount of that's inevitable, albeit at

16  that point I think we'll probably be short on time.

17        But I -- I would -- I'd like to emphasize that my

18  initial remarks will be -- will be pretty short and that I  do

19  -- I'm not going to try to anticipate everything else that

20  might be out there.  I'm just going to try to give an overview

21  report.

22        THE COURT:  All right.

23  **(AUDIBILITY IS POOR - EXTREMELY DIFFICULT TO HEAR DURING MR.**

24  **BERNICK'S PRESENTATION -- AT TIMES INDISCERNIBLE)**

25        MR. BERNICK:  So, if that's satisfactory with the

1    Court, then I'll just -- I'll just go ahead and proceed.

2            Your Honor, I think that there -- we do have a bunch

3    of motions, but they're -- they all share some common features.

4    First, they're all directed to how this case -- how this issue

5    should be managed.  Essentially it's a case management series

6    of motions.

7            They all, in that respect, are directed to in varying

8    degrees and in varying context to the Court's discretion.

9    There are some hard and fast legal tests that are out there,

10   but an awful lot of the motions really call for the Court to

11   exercise discretion.

12           And the four most objective, therefore, I believe

13   really governs all these motions is the objective of how to

14   advance this case towards resolution.  And in that respect, I

15   think that the essential choice that the Court is presented

16   with is what I call almost a geometric choice.  By that, I mean

17   given where we are today, and given the confirmation that we

18   all hope to -- hope will occur, what's the path that's taken

19   between today and confirmation?  And essentially our option,

20   what we believe is the appropriate path, is the shortest

21   distance, it's a straight line.  Whereas I believe that the

22   proposals that you'll hear in the context of the other motions

23   call for a more complex arrangement, and in many cases, one

24   that doesn't actually lead back to confirmation, but assumes

25   that there's activity post confirmation, perhaps for a very

1  extended period of time.

2          So, what I want to do in my initial remarks is to

3  talk about that -- talk about that straight line, and then

4  contrast it with the other proposals --

5          THE COURT:  Mr. Bernick, excuse me.  Okay.  Thank

6  you.

7          MR. BERNICK:  And if I can ask the Court's indulgence

8  -- so, where are we today with respect to ZAI?  We're at a

9  point where we have essentially a small number of claims, I

10 believe it's less than ten claims, that are ZAI claims and are

11 before the Court.  And with respect to those ten claims, we

12 also have the determination of the very central issue, which is

13 the science issue.  And as the Court's well aware, we spent the

14 better part of really several years, taken all the way back to

15 a process that really began in '02 and several million dollars

16 worth of estate assets, (indiscernible) was developed.

17         The point that we want to get to is -- again, I

18 believe (indiscernible) -- at a certain point today, we'll want

19 to talk about that.  But I believe that what we're going to

20 (indiscernible) is that we aim for a confirmation hearing the

21 first part of January, we have specific dates to propose

22 (indiscernible).

23         THE COURT:  Right, I thought we provided dates.

24         MR. BERNICK:  You --

25         THE COURT:  Okay.

1          MR. BERNICK:  (Indiscernible) but we're subject to

2    our saying we want them.

3          THE COURT:  Oh.

4          MR. BERNICK:  We want them.

5          THE COURT:  All right.

6          MR. BERNICK:  Again, I think that in terms of a

7    disclosure statement hearing, as I indicated to Roger Frankel,

8    who's here for future representative, we know he has a conflict

9    that nobody (indiscernible).  So, it's not going to be in

10   September, maybe earlier than that, but more likely early

11   October for disclosure statement hearing.

12         THE COURT:  All right.

13         MR. BERNICK:  So, that's we're actually going with

14   the case.

15         Now, the only -- the best and highest prospect for

16   getting of to the end of the day with respect to confirmation

17   is to give fruition to the agreement in principle

18   (indiscernible) between the debtor and the Asbestos Claimants'

19   Committee, futures representative, and the Equity Committee.

20   And that agreement, as Your Honor is well aware, was very, very

21   actively negotiated, the economics of that agreement were gone

22   over so that Mr. Ostrick (phonetic) was satisfied -- I know

23   he'll be able to represent to the Court he got the last dollar

24   that was (indiscernible).

25         As a consequence of the (indiscernible), the company

1  (indiscernible), it's very important that other matters that

2  are still pending in this case be treated in a certain way

3  (indiscernible).  And one of those matters that's

4  (indiscernible) is through (indiscernible).  The plan -- the

5  (indiscernible) as a condition for confirmation that the ZAI

6  claims will be dealt with through an estimating or if the

7  parties can reach an agreement to treat it in some other

8  fashion that is consistent with and enables us to bring the

9  agreement and the principle in the plan home, there may be

10  another path.  But at the least, we (indiscernible) there has

11  to be some (indiscernible).

12          So, what's the straight path?  Well, the straight

13  path between today and getting to a confirmation where we

14  reserve and implement the agreement in principle that's been

15  reached, takes us down to relevantly (indiscernible).  We need

16  to have, first of all, a number of claimants, X claimants times

17  Y dollars in order to give us the estimate (indiscernible)

18  confirmation.  So, we really have two components.  Who are the

19  ZAI claimants, and what other claims (indiscernible).  Those

20  are two very simple components.

21          And in the past exist, under the Rules, they're

22  getting us to the point where we have that estimate, the ZAI

23  liability, are really threefold:

24          We can litigate through a judgment;

25          We can estimate for purposes of determining which of

1 those claims that are going forward, what are they worth for

2 distribution purposes;

3           Or we can settle.  And of course, I know that Your

4 Honor would always like -- everybody would like to see this

5 settle.

6           Those are the options, they're all available to us.

7 But each and every one of those options depends vitally on this

8 taking place in the bankruptcy process, utilizing the tools

9 that are uniquely available (indiscernible).  What do I mean by

10 that?  It is only in bankruptcy that we can find out who the

11 present claimants really are.  That's the only place it can be

12 done.  You could bar date by having people actually show up.

13 Yes, we can have estimates, we can extrapolate from the survey,

14 all kind of statics will be brought to bear, but they will all

15 be imperfect, they will have extremely ranges of confidence

16 (indiscernible).  But in bankruptcy, we don't have to worry

17 about doing that.  We can just say, people, show up.  And once

18 they show up, we then also have some things that are available

19 to us in bankruptcy that are uniquely available to us in

20 bankruptcy to enable us to figure out what's the best path to

21 get through an estimate, and what are they?

22           We can either litigate with respect to those

23 claimants.  We can say, okay, there's a determination with

24 respect to the science issue on these ten claims or whatever.

25 We're going to move for summary judgment with respect to all of

1  these other claimants, with respect to exactly the same issue.

2  And people object, or they want to come back and say the motion

3  can be denied, they can have that opportunity, and if, in fact,

4  they come back and do that, we can then get a very orderly and

5  simple process in getting to the point (indiscernible) a

6  litigated result.

7          We can take the same path through estimation.  Now,

8  in estimation and litigation (indiscernible) are very different

9  than bankruptcy because we have the ability to keep everybody

10  there and treat them according to the same protocol and the

11  same rules.  It's the only place in our jurisprudence -- our

12  judicial system where we get the ability for a unitary

13  consolidated proceeding, that's by both litigation and

14  estimation.  With estimation, we can do even more.  We can have

15  an estimation to follow the Federal Rules of Evidence and

16  Federal Rules and Civil Procedure that also permits the Court

17  to do things that couldn't be done in ordinary litigation,

18  including extrapolation.  And -- and we have settlement.  Why

19  is settlement enhanced by the bankruptcy process?  Because if

20  we have a bar date, and we have the claimants come forward, we

21  know exactly who they are and we can enter into settlement

22  discussions pertaining to those people specifically as a

23  defined number represented by counsel, or those claimants.  So,

24  that respect, this is a very tight channel, this is a very

25  tight bankruptcy specific channel and everything in it fits,

1  and each part of it depends on the prior part.  We depend on

2  getting identification of real claimants, not hypothesized

3  claimants, not claimants that need to do anything in order to

4  be, quote, "included."  We need those claimants, and then we

5  need a process for keeping them consolidated around this

6  constellation of (indiscernible).  And I believe that all of

7  these things are possible in a relatively simple term that

8  create a bar date, then to litigate or estimate, or settlement

9  all in time for that confirmation hearing, and we resolve yet

10 another issue and we keep this case going forward towards

11 confirmation (indiscernible).

12         Now, (indiscernible) that you're going to hear about

13 in a moment entail?  Well, they all entail deviating from this

14 very robust path, this path that is specifically called for and

15 enabled by the bankruptcy process, and nowhere else.  They're

16 all designed to take us away from that path.  So, we have

17 Proposal 1, which is let's take the claim as to which we

18 already have a determination, and have an entry of judgment so

19 that they can then be appealed.  Well, the first thing we know

20 is that that path is never going to get done by the time of any

21 kind of (indiscernible) confirmation.  That's a path that, you

22 know, see you later, maybe at some point in the future we'll

23 learn about what happened there, there's no certainty, there's

24 no definition of the liability, there's nothing.  And that

25 entry is now with respect to a handful of claims whereas if

1 (indiscernible) with respect to all personal injury -- all --

2 all claims that are being made to property damage associated

3 with the bar date.

4        It is also partial, not only with respect to number,

5 it is partial with respect to issue.  Because there are other

6 issues that I know that they -- the ZAI claimants say that they

7 want to raise.  Why not get them (indiscernible) so it's not

8 being taken up to appeal, and it is further an appeal that was

9 already sought earlier in this case, flatly rejected by Judge

10 Buckwalter when he said there is no reason why you need to

11 (indiscernible).

12        Then we have the idea that says that, no, we're not

13 going to have an entry of judgment, let's retain a bunch of

14 experts who are going to advise the Court on the question of

15 how many claims there are.  Well, that's a way of saying, you

16 know, gee, we can look in the microscope and count off the

17 little particles or we can not look in the microscope, but have

18 people do a survey in order to figure out how many particles

19 are under the microscope.  Why would you want to do that?  Why

20 would you want to avoid looking at the data, which only comes

21 out of this process here with the bar date, and serve as a

22 perpetuating in controversy that's never going to get resolved.

23 We already know that there's going to be a (indiscernible),

24 we'll all just do it amongst the experts, and any expert that

25 comes in to offer a, quote, "independent opinion" is going to

1  be subject to cross examination which will then show exactly

2  how broad (indiscernible) are.  So, this is a recipe that, yes,

3  produces a number.  But it produces a number that immediately

4  will say we got a huge question (indiscernible).  This is not

5  to enhance the cost of (indiscernible) lead to another --

6  another debate.

7           So, we then have the last (indiscernible).  We then

8  have the class proposal.  Now, the class proposal is a proposal

9  that says we're not going to replace everything that we've

10 talked about here.  We're not going to have X claimants, we're

11 going to have a class.  We're not going to know who the real

12 people are who are going to step forward.  But then, are we

13 going to be able to settle on the basis of knowing who -- how

14 many people are out there?  The answer to that is clearly no

15 because we'll be speculating who actually is somebody coming

16 forward, who will be able to litigate.  Well, of course, we

17 could litigate, but how is litigation going to advance the

18 cause.  And the reason that we know the litigation is not going

19 to advance the cause, and the destination are not going to

20 advance the cause is they're not going to get in the way of

21 those things.  Why?  Because the very first thing that's going

22 to happen if we have a class is that we're going to have an

23 appeal and was the class properly certified.

24           Federal Class Action Rules were specifically amended

25 to nip interlocutory appeals precisely to determine before you

1  go over and assume the class for purposes of everything in the

2  case that the class is properly certified to begin with.  The

3  fact that the Barbanti class doesn't change the picture, it

4  exacerbates the problem.  We're now going to have a Washington

5  Class, (indiscernible) Washington is going to tell us what the

6  rest of the world looks like?  And the Washington class, if it

7  were adopted or recognized here, would still be subject to the

8  same appeal.  So, the idea of a class proposal is a proposal

9  that was designed inevitably to produce delay.  And it's a

10 proposal that, Your Honor, frankly when we went back to this

11 before, I remember vividly, in March of 2002, there were

12 massive briefs, there were all kinds of people present here,

13 not here, but in Pittsburgh, for a very substantial argument on

14 this very issue.  And what Your Honor said then in March, and

15 then again in April, and then again in May, all the same

16 (indiscernible) if we're successful, this is Page 64 of the

17 March 18th transcript, or if you're successful on the

18 scientific side, (indiscernible) you were actually making this

19 proposal for the first time (indiscernible), it doesn't matter

20 how many potential people are out there, they're not going to

21 be a class, they're not going to have claim.  Then, again, in

22 April, I don't have to address it, it is the class

23 (indiscernible) shows me that the debtor is going to have

24 liability.  We can then go on later on to exactly the same

25 proposition came up every single month, and every single month

1  Your Honor was totally consistent with just that if we went

2  forward and did this science exercise that you have now done,

3  and it turns out that you didn't find that there was a basis

4  for having liability, there was no point in pursuing the idea

5  of (indiscernible) proposal.  And nothing has changed since

6  that time (indiscernible).  One is that we have that

7  determination.  And, two, is that we now have a plan that can

8  be -- we believe can be confirmed in a relatively short period

9  of time where the fact they're (indiscernible) a class does

10 exactly the opposite of what the term sheet contemplates and

11 introduces uncertainty and introduces delay and introduces a

12 factor that will create a cloud over this reorganization

13 because the condition in the term sheet is not met, and we now

14 have a stipulation where they're looking for a class and it's

15 just -- it's going to go nowhere.

16        That then brings us to the last proposal, which is

17 lift stay.  This is the one that I suppose is the -- it wasn't

18 the most amazing proposal.  List stay, of course, was not --

19 this is not a new proposal.  The lift stay was made by in '01,

20 back in '01.  The proposal was let's go back to

21 (indiscernible), let's go back (indiscernible) of class actions

22 that was pending, I think it was in Boston.  The lift stay

23 (indiscernible) while (indiscernible).  And that effort was

24 injected.  The lift stay motion was denied, and we were off to

25 have ZAI litigated in this case.

1          Now, it would be one thing if something ever happened

2     to litigate.  It would be one thing if nothing happened in this

3     case and we simply went forward and we've now (indiscernible),

4     whatever it is.  Seven years, the same basic claims and nothing

5     had occurred.  That would be kind of (indiscernible).

6          But here, that's not what happened.  Here we actually

7     went forward.  Mr. Westbrook was appointed new counsel for the

8     plaintiffs.  With respect to the ZAI trial, Mr. Scott obviously

9     also has been (indiscernible).  There has been years of

10    litigation and millions of dollars spent, and we now have made

11    progress and we're pulling to make more progress.

12         So, what's the lift stay motion?  The lift stays, oh,

13    now that we're on the edge of gaining a closure, and we have a

14    bird in the hand that says we want certainty with respect to

15    ZAI, we're going to go all the way back seven years to wind the

16    clock back and have a lift stay so that everybody else in the

17    country can argue that the determination that you made with

18    respect to those kind of plans has nothing to do with them and

19    their litigation could be completely unimpaired because they

20    weren't party to that (indiscernible).  In a way of kind of

21    thumbing their nose in a process that they themselves have

22    participated in, participated actively, let's do it all over

23    again and pretend it never happened.

24         That's just -- that's just completely and utterly

25    responsible that they -- of the heavy duties and obligations

1  (indiscernible).  So, I know we're going to have a lot of

2  detailed discussion, we're going to talk about whether the

3  Barbanti class was really on appeal, not only appeal, whether

4  the notice went out, didn't go out, we're going to hear, I'm

5  sure, a reincarnation of the argument about whether estimation

6  is the right way to take care of the issue of what these claims

7  are really worth, (indiscernible) asking for disallowance under

8  502©, all kind of other things.  We can talk about all of that

9  (indiscernible).

10       But the fact that it's out there for Your Honor's

11  determination today is a basic fact about case management.  And

12  it said, do we want to find out and bring the Court, the people

13  who are out there as plaintiffs, yes or no?  Do we then want to

14  find out what the value of their claims is using whatever

15  vehicle is best suited and available for doing that?  And do we

16  want to do it on the basis that keeps us on track of keeping

17  this case on course?

18       So, there's only one answer to that question

19  (indiscernible) every single other proposal is a way of

20  diluting it, delaying it, distracting from it.  Why?  Because

21  it's a game of leverage.  And what it is the ZAI claimants want

22  is anything, anything of what it did, what it does or what is

23  necessary in order to bring us to the point where the agreement

24  that's been reached in principle becomes a reality.  Delay,

25  distraction, different alternative proposals of all ways of

1  producing leverage (indiscernible).

2        So, those -- that's our position, and I hope we can

3  do more (indiscernible).

4        THE COURT:  All right.  Mr. Westbrook?

5        MR. WESTBROOK:  Good afternoon, Your Honor.

6        THE COURT:  Good afternoon.

7        MR. WESTBROOK:  Mr. Bernick's short introduction used

8  exactly the 20 minutes that he said he'd take for his full

9  presentation.  So, I hope his long response doesn't take 40

10 minutes.

11       Your Honor, I was around at the birth of asbestos

12 property damage litigation in 1981, '82, '83, 25 years ago.  We

13 solved a lot of problems in those 25 years.  This is the last

14 major asbestos property damage problem that there is, I

15 believe, and is going to be.  And I'd like to be part of that

16 solution.  We have different views as to how that solution can

17 come about.

18       I was with Arthur Miller at Harvard the other week

19 and he was giving a presentation.  He said, we sometimes forget

20 what lawyers do is we solve problems, we don't just solve our

21 client's problem, we have to solve the other person's client's

22 problem.

23       How do we do that?  Mr. Bernick talked today about

24 the straight line.  Well, beauty's in the eyes of the beholder,

25 Your Honor.  The straight line that started out for ZAI through

1  the science trial -- and, Your Honor, you know we reserve our

2  positions about the science trial proceedings, et cetera.  But

3  the straight line that Your Honor set in the science trial

4  opinion was when you reached your conclusions, you said the

5  next thing we're going to do is see what claims are affected by

6  that, and the next thing we're going to do is see whether those

7  can be treated as a class action which will assist in this

8  bankruptcy.  That was the straight line.  We were all on the

9  straight line.  In fact, when Mr. Restivo was here for Grace

10  last year, he said, Your Honor, you said that, we should get a

11  briefing schedule.  We agreed we should do that.  And then

12  there was some discussion about that there was some settlement

13  floating around.  And, Your Honor, said, well, why don't you at

14  least look at that.

15        We looked at that.  And as I told you last time, Your

16  Honor, we have made great structural progress.  The problem is

17  in the dollars.  But we were all on the straight line of the

18  ZAI opinion until the last status conference when Mr. Bernick

19  jumped off the curb.  He said, well, there have been proposals

20  about that, and he was talking about your proposal, and he was

21  talking about our proposal, and he was talking about Mr.

22  Restivo's proposal for the further litigation, right along the

23  straight line of the ZAI science trial opinion.  But he said,

24  we don't think now that that's going to be productive.  We want

25  to now jump and zig-zag over the bar date.

1        We don't think, Your Honor, that that's the way it

2   should happen.  We're happy that they finally, after seven

3   years, reach an agreement with Mr. Lockwood's clients.  We're

4   happy to have that done.  We'd like to get an agreement with

5   Grace ourselves, but the exigency of getting a resolution

6   should not trump the rights of this group of claimants who,

7   since the very early days of this litigation, Your Honor, have

8   been seeking to have the class motion heard, who, since the

9   early days of this litigation, have done nothing but tried to

10  move this ahead.  And I think, you know, if there's any

11  implication that we have been trying to delay anything, it's

12  been our class motion that's been delayed, for good and valid

13  reasons, but we certainly are not coming in as Johnny Come

14  Lately's, after a bar date's been proposed, or on the eve of a

15  bar date and saying, wait a minute, let's have a science trial

16  opinion, let's look at the claims.  Your Honor said we have to

17  look at the claims.

18        Now, Mr. Bernick has written up there or talked about

19  less than ten claims.  He talked about, well, what we'll do now

20  is we'll go out with this notice and then the lawyers will come

21  in for these claimants, and they'll make their claims.  What

22  claims is he talking about?  We haven't determined that yet.

23        Mr. Bernick said that the Court has already

24  determined there's no liability.  I don't think so, Your Honor,

25  not in the ZAI opinion I read.

1          THE COURT:  No, I haven't determined there's no

2    liability.  What I did determine is that there is no

3    unreasonable risk of harm, and that's what the science trial

4    was all about.

5          MR. WESTBROOK:  Correct, Your Honor.

6          THE COURT:  But that --

7          MR. WESTBROOK:  Absolutely.

8          THE COURT:  -- does, I think, limit, to a large

9    extent, the type of -- the issue I was attempting to get to was

10   what's this pool of people going to be, and I did not want to

11   go out with some class notice that would frighten particularly

12   elderly people in the event that there was no unreasonable risk

13   of harm.  I am convinced that there is no unreasonable risk of

14   harm.  And I do not see the need to frighten a large pool of

15   people with respect to property damage issues, this was a

16   property damage issue that we were addressing.  So, we need to

17   figure out now how to find out who held -- who holds those

18   property damage claims.

19         MR. WESTBROOK:  Absolutely, Your Honor.  And to

20   determine that, and to determine if there are devices that we

21   can use that's going to assist in getting this whole thing

22   resolved.

23         Your Honor, I sent to Mr. Bernick last night -- and I

24   have for the Court, a notebook of some demonstrative aids, if I

25   can pass them to the Court.

1          (Attorneys conferring off the record)

2          THE COURT:  Okay.  Go ahead without them if you can,

3  Mr. Westbrook.

4          MR. WESTBROOK:  Okay, Your Honor.

5          (Attorneys conferring off the record)

6          THE COURT:  Okay.  It might just be a method of --

7  sometimes the way the tabs are created, but that's okay.

8          (Attorneys conferring off the record)

9          THE COURT:  Go ahead, Mr. Westbrook.

10         MR. WESTBROOK:  Your Honor --

11         (Attorneys conferring off the record/Pause)

12         MR. WESTBROOK:  Your Honor, no good deed goes

13  unpunished.  I sent them to Mr. Bernick last night.

14         MR. BERNICK:  You asked and I --

15         THE COURT:  All right.  Mr. Bernick -- Mr. Westbrook,

16  just go ahead without them, please.

17         MR. WESTBROOK:  Your Honor, it's helpful to review a

18  few facts.  The traditional asbestos property damage

19  litigation, which began 25 years ago, took over 20 years to

20  come to fruition.  The reason that happened was because the

21  claims, the asbestos property damage claims did not all accrue

22  at the same time.  They began in the early '80's.  But if the

23  claims were all ripe at one moment, they'd be barred by the

24  Statute of Limitations three or four, five years after the

25  first claims were filed.

1          We spent many years litigating with W.R. Grace, and

2     Appellate Courts deciding that property damage claims do not

3     accrue until there's been contamination of the building, and

4     until the building owner knows or reasonably should have known

5     about the contamination.  The Court said these claims don't all

6     come forward at one time.

7          We have to keep that in mind when we're talking about

8     the ZAI claims because Mr. Bernick has talked about claims.

9     What is he talking about?  Until we determine what these claims

10    are, what will the bar dates say?  Well, in their notice, they

11    say claimant, if you -- if you need to know whether you should

12    file a claim, go to your attorney.  Well, if the attorney gets

13    the court records, what's the attorney going to tell that

14    person, do you have a claim or not?  We need to determine that.

15    That's not a delay in tactic, that's the straight line.

16         We also, Your Honor, have got to address this issue

17    of whether class certification is appropriate.  Class

18    certification solves a lot of problems, due process and

19    otherwise.  I note -- in Grace's mind, class certification is a

20    big bugaboo.  But, Your Honor, class certifications were

21    commonplace in the traditional asbestos property damage cases.

22    They provided a vehicle to resolve great numbers of the claims,

23    the National Schools' Class Action, the College and University

24    Class Action, the Federal Lessors' Class Action, Michigan

25    Schools, Texas Schools, there weren't a -- that isn't something

1  alien.

2          Grace says, well, but class certifications are not

3  favored in the Bankruptcy Courts.  Your Honor, if you look at

4  the cases, and I've read an awful lot of them in the last few

5  months, you'll find that with the exception of those cases, and

6  I've read an awful lot of them in the last few months, you'll

7  find that with the exception of those cases where class

8  certifications are sprung at the last moment or sprung toward

9  the end of the bar date process, that the courts have been very

10  receptive to class certifications when you have small

11  claimants, unknown claimants and claimants who, more likely

12  than not, are not going to be able to pursue a claim by

13  themselves.

14          Mr. Bernick talks about, well, the lawyers will get

15  in here and Your Honor said yourself a number of years ago,

16  these claimants aren't going to be able to get lawyers to come

17  in here for a $7,000 claim.  You're going to have Joe Smith

18  from Pocatello, Idaho sending in his claim and then facing Mr.

19  Bernick who, on a good day, is a very, very, very formidable

20  opponent, on a bad day, he's a strong opponent.  But that's who

21  they want to come up against.  Without a class, without the

22  representation of a class, and Mr. Scott's going to talk some

23  more about the Barbanti situation, Your Honor.  Without that,

24  the playing field is not level in any -- any respect. It's not

25  off the straight line, Your Honor.  It's a logical issue the

1   Court said were going to determine.  We want to get back on the

2   track.  We'll move it along as fast as the Court wants to move

3   it along, but we think we need to get on the track.

4         Now, Your Honor is aware we have also asked that we

5   get -- get clarification, and this is somewhat in the

6   alternative.  Before this thing got too far down the railroad

7   with people saying things like Mr. Bernick has now said, which

8   is the Court has determined the liability.  In the -- in their

9   briefs, they say the core issue has now been resolved, there's

10  no need for Mr. Scott's Barbanti class because there are no

11  claims.  The Court hasn't determined that, in our view.  Before

12  we get too far down the road, or if that was going to be the

13  effect of the opinion -- Your Honor, we have the greatest

14  respect for the time the Court put into its opinion.  We also

15  pointed out, Your Honor, that the history of asbestos property

16  damage is that the first look at an issue sometimes needs

17  enlightment from the Appellate Courts.  If the ZAI opinion is

18  going to be used, as Mr. Bernick has already started to wield

19  it as that cudgel, the issue's been decided.  No need for this.

20  No need for a class.

21        We're willing, Your Honor, to stipulate that there

22  are claimants, and we'll bring a claimant forward, who has no

23  epidemiological evidence of it twice -- twice the risk, doesn't

24  have OSHA air levels, the things that the Court said showed

25  there was no unreasonable risk of harm, and test whether that

1 is, indeed, what makes a claim or doesn't make a claim.

2     We just don't think that it's fair to go all the way

3 down that road without that ever having been tested, and it to

4 be used by Grace as functionally final, but procedurally

5 interlocutory so we can never get an appeal.

6     THE COURT:  Well, on that issue, Mr. Westbrook,

7 frankly, I don't think this Court is in a position of being

8 able to create Appellate jurisdiction for that reason.  I just

9 don't think that's the function of the Court.  I've issued an

10 opinion.  I view that opinion as interlocutory.  I view it as

11 interlocutory for the reasons that I expressed in that opinion.

12 I set up status conferences to attempt to address the issues

13 that I specifically left undecided in that opinion.  That

14 happened, as I believe, back in 2006.  The parties advised me

15 that they were attempting to settle.  I thought that was a very

16 good thing.  I still think that's a very good thing.  I was

17 willing to hold off, attempting to address those other issues

18 which may be, you know, legally complex, I don't know.  I

19 haven't yet had the status conference, so I don't know how

20 technical that would be.

21     But I do not think that this Court, particularly

22 after District Court has denied Appellate relief on an

23 interlocutory basis of the rulings that I've made that this

24 Court is in the position of basically dismissing a claim that

25 somebody asks me to dismiss for the purpose of creating

1  Appellate jurisdiction.

2       If, in fact, there are claims out there that meet the

3  test that I have set out in that opinion, and those claims are

4  voluntarily dismissed, that's that.  They're voluntarily

5  dismissed.  But this Court is not going to create a situation

6  in which I dismiss a claim at the request of a movant and then

7  have that movant turn around and say, but that was error to

8  dismiss it.  I mean how do I do that?  If the claimant says

9  voluntarily dismiss my claim, then it's voluntarily dismissed.

10 But I'm -- that's not the Court making an error, that's the

11 claimant deciding that the case -- the claim's going to be

12 voluntarily dismissed.

13      So, your clients can't have it both ways.  Either

14 they agree that they have no right to a remedy and, therefore,

15 they dismiss their claim.  Or else they have to wait the

16 outcome now because they've taken their shot at the appeal, and

17 the Judge -- the District Court has said, no, it's not ripe.

18      So, I think your best bet, folks, since this is my

19 little effort to opine, is to get back to that settlement

20 table.  And I think you've got the basis for one.  Section

21 524(g) affords even the benefit of a 524(g) injunction for

22 property damage claims.  And this is a perfect situation for a

23 property damage type of claim.

24      I've looked at that Barbanti action.  And Mr.

25 Bernick's brief, with respect to what it asks for, is on point.

1  It does not ask, in many instances, for injunctive relief.

2  It's asking, in many ways, for a fund to be set up so that

3  certain types of injunctive relief can then be funded by the

4  debtor.  You know, it is a damages action.  It is not an action

5  asking for injunctive relief.  It's asking that the debtor fund

6  certain types of remedies.

7              If that's what the plaintiffs want, then negotiate

8  with the debtor.  Put these claims -- in which case, you don't

9  need a bar date, and you don't need a class action.  You can do

10 a class in the plan, which is the equivalent of a class action.

11 You can run it like a 524(g) trust, you can have people who

12 actually can substantiate that they have a damage issue into

13 the trust.  You can run it through CDP.  And you both have the

14 perfect solution to both of your problems:  Mr. Bernick gets

15 what he wants, which is the debtor to be relieved of this

16 responsibility.  And you folks get what you want, which is ZAI

17 claimants who actually have damages to be funded through

18 whatever type of trust you're able to negotiate.  Now -- and

19 the class action structure through the benefit of the 524(g)

20 injunction.  It works, folks.  So, I don't understand what the

21 hold up is here.

22             MR. WESTBROOK:  Your Honor, I think you've -- you've

23 put your finger on a very important point.  And what we had

24 suggested was that as part of that process, the Court has

25 suggested that we have the non-binding bar date; that didn't

1  fly with Grace.

2          But we had suggested that as part of that exact

3  process, that in addition to whatever claimants come forward,

4  that we use the same types of estimation that they've just used

5  to settle the personal injury situation.  Mr. Bernick says,

6  well, it would be statisticians.  I can guarantee the Court

7  that our statistics, which Grace has, are much more robust,

8  much more statistically accurate on the homes that exist, and

9  the homes that had been demolished, and the pace of

10 renovations, than how many people are going to come forward

11 with mesothelioma in the year 2018.  So, we are certainly

12 willing to do exactly what the Court has said, and we will take

13 -- certainly proceed on that basis, Your Honor.

14          Mr. Scott may want to speak a bit to Barbanti, and

15 also further on the estimation experts, Your Honor.  But I am

16 certainly happy to proceed in that way, Your Honor.  I think

17 that is the only type of solution that seems to work.  After 25

18 years, I think it addresses the ZAI unique circumstances, and

19 also takes account of the fact of their property damage

20 character.

21          So, from my standpoint, Your Honor, I think that's a

22 marvelous suggestion.

23          THE COURT:  Well, I do not want to be thought of as

24 having made a determination that it is homes that are

25 claimants.  But nonetheless, some statistics as to homes that

1 have ZAI may be helpful, but I'm not sure that's the means all

2 and end all, Mr. Westbrook.  I'm not making that kind of

3 finding.

4        But it does seem to me that Mr. Bernick is quite

5 correct about one thing:  The Bankruptcy Code is not

6 necessarily a thing of beauty in all respects.  But in this

7 particular regard, it works.  And, folks, you're here.  Your

8 motions for relief from stay are going nowhere.  You're not

9 getting relieved from the premises of this Court.  You are here

10 for a reason.  The automatic stay is for the benefit of this

11 estate.  You're going to stay here through this estate, you're

12 going to resolve these issues in this Court.  So, that's the

13 way it's going to be.

14        MR. WESTBROOK:  And we are looking for resolution.

15 Your Honor, I'll -- I'll reserve some time to come back after

16 Mr. Bernick come back, after my colleagues come back.  Mr.

17 Baena has some things he wanted to say, and Mr. Scott.

18        THE COURT:  Mr. Scott?

19        MR. SCOTT:  I will be genuinely brief, Your Honor.

20                    (Pause)

21        MR. SCOTT:  May it please the Court.  Darrell Scott,

22 I have been counsel for class of about 100,000 Washington

23 residents for the last seven years.  And I have been on a

24 mission to convince the Court, if not the debtors, that the

25 only genuine way that they can achieve closure is by

1 recognizing that there are a number of claims which have not

2 yet accrued, but which can be represented, accounted for, and

3 discharged through equitable class remedies.

4        Recognition of a class of homeowners, not that they

5 have claims, but that they are asserting a claim, and

6 representation of that class precisely where Mr. Bernick places

7 the battleground, would permit this Court to determine and to

8 resolve that the claims are of a -- of a large community of

9 unknowing individuals who, under the substantive laws of their

10 own states, have claims which have not yet accrued, but which

11 can be accounted for, and for which programmatic remedies can

12 be provided, and then discharged.  If that does not happen,

13 there will be an appeal.  Because unlike Mr. Bernick, I don't

14 see the law, as he calls it, a game of leverage.

15        If those claims are not represented here, they will

16 be represented elsewhere.  That is the duty I took on when I

17 was appointed as counsel to look out for the legal interests of

18 the Washington class.

19        I am not proposing a course that diverts from the

20 course that Mr. Bernick sets out.  I am only arguing that what

21 he calls the tight channel -- I call it a tight noose, does not

22 exclude my clients.

23        Mr. Bernick says on appeal -- he threatened today,

24 just like he did the very time I spoke to the Court, Court, you

25 recognize that class, you know, we're going to appeal.  It's

1  also true that when a Court does not recognize a class, there

2  is a right of appeal.

3           It is also the case that where that class claim is an

4  equitable claim for unified relief, and the Court does not

5  recognize that claim, it has denied that claim, and there is an

6  immediate right of appeal.  I want to make clear the Barbanti

7  motion that this Court merely recognized my clients' right to

8  assert the claim, which is all we're doing, the Court's denial

9  of that right to assert the claim is not a class certification

10 question.  It is a question as to whether or not that claim can

11 be brought.

12          So, if it is -- if the Court is of a mind that that

13 class should not be permitted to file its claim, then the

14 proper court -- course for this Court is to enter an order

15 disallowing that claim because it cannot be brought on an

16 individual basis.

17          THE COURT:  Oh, no, wait.  First of all, there's no

18 bar date.  So, you know, we went through this before.  Anybody

19 can file a proof of claim.  There is no bar date.  If your

20 client wants to file a proof of claim, the debtor will object

21 to it, we'll have litigation about it.

22          MR. SCOTT:  And that --

23          THE COURT:  I don't see --

24          MR. SCOTT:  That's right where we are.  We did file a

25 class proof of claim.

1            THE COURT:  Right.  And we have --

2            MR. SCOTT:  We have asked for recognition of it, and

3  they have contested it.

4            THE COURT:  And we -- we went through this several

5  years ago when we were attempting to determine the science

6  trial.  And the issue at that point was that you wanted to pick

7  out only certain claims within a class, not the whole class, to

8  look at the science issues.  And so that's what we did.  We

9  looked at the science issues, rather than determining whether

10 or not all of the class within -- all of the claims within that

11 class would be covered at that time.

12           So, you know, we've been picking and choosing, sort

13 of gerrymandering what's -- to use since today is Election Day

14 in Pennsylvania, I guess that's a good word to use --

15 gerrymandering these -- these issues to a certain extent

16 because it has hopefully been advancing the ball.  Then what

17 happened is a year and a half has gone by while parties

18 allegedly have been attempting to settle whether there has, in

19 fact, been productive negotiation or not, I obviously don't

20 know.  I hear from time to time that there is.  I've seen

21 nothing that shows me that, in fact, there has been real

22 movement.  But, nonetheless, I haven't yet also seen anybody

23 moving to get things back onto a litigation agenda.  So, I'm

24 assuming hopefully that there still is some movement toward

25 settlement.  I do not, in any way, want to jeopardize movement

1 towards settlement.  I think these issues, in order to get

2 everybody onto the same page, and get a consensual plan

3 through, probably are going to have to be settled.

4       If we need to start to marching down a litigation

5 path, then, you know, let's march.  Now that the personal

6 injury things are off my calendar, I actually have days free.

7 So, if we need them for ZAI, then fine.  Let's put them on for

8 ZAI and we'll march to that tune instead of the personal injury

9 tune, if that's what we need to do.

10      But I think at this point, this discussion as to

11 whether a class proof of claim should be filed really is not

12 the focus that we should be having.

13      The focus that we should be having is whether or not,

14 rather than looking at a specific class proof of claim for

15 Washington residents, all ZAI claimants, whoever they are,

16 wherever they are, should not be treated in a similar fashion

17 by the debtors' estates.  And probably the way to do that is

18 through a 524(g) mechanism which resolves the debtors' issues

19 and resolves all ZAI claimants' issues in a fashion that is the

20 equivalent of what both of you are asking for.

21      Now, does it require a bar date?  I don't think so.

22 Maybe Mr. Bernick wants to argue that it does, I really don't

23 believe it does.  I think the 524 issues can be adjudicated

24 without that need.  I'm amenable to either way, it can be done

25 either way.  And maybe that's an issue for, you know,

1 estimation purposes if it's an estimation issue that will have

2 to be undertaken.

3        If it's going to be an issue where the debtor, for

4 example, says, look, our pot has to be X dollars, and that's

5 all we can afford, and you folks can do what you want with it,

6 but this is what we do.  And then ZAI goes and develops the

7 TBP's and that's how it works, okay.  You've got lots of

8 flexibility in a 524(g) context.  Why don't you go start

9 talking to each other and use it?

10        MR. SCOTT:  I agree wholeheartedly with the Court's

11 view that this is resolved through 524(g).  The question is who

12 are you attempting to exclude?

13        And the past point I was only trying to make was the

14 motion before this Court is a motion to recognize an existing

15 equitable class proof of claim, and we look forward to what the

16 Court's order is with respect to that pending --

17        THE COURT:  Well, I don't --

18        MR. SCOTT:  -- claim.

19        THE COURT:  I have looked at that complaint, Mr.

20 Scott, and I don't really see equitable relief in that

21 complaint.

22        MR. SCOTT:  And I --

23        THE COURT:  That's the difficulty that I have.

24        MR. SCOTT:  And I understand why the Court might

25 think that, having not had the benefit of the briefing as to

1 what the nature of these claims are and the law governing the

2 claim.  That was an issue that was looked into over the course

3 of three-quarters of a year by Judge Cathleen O'Connor --

4          THE COURT:  All right.

5          MR. SCOTT:  -- who understands Washington's equitable

6 law.  And if -- if it's the Court's ruling that it is not

7 equitable, I would -- that's -- that's fine, so long as the

8 Court enters an order so that we know what we're dealing with.

9          THE COURT:  I am not entering an order.  What I'm

10 doing is ordering you folks to a real settlement.  And we're

11 going to discuss how, when and where that's going to take

12 place.  Whether it needs to be supervised or whether it's going

13 to be something that you folks are going to undertake on your

14 own.  And if, in fact, it results in -- it does not result in a

15 settlement, let me say it that way, then, Mr. Scott, we are

16 going to tee up this issue for reargument.  Because, frankly,

17 it was argued way too long ago for me to have enough of a

18 recollection to undertake that issue again.

19          MR. SCOTT:  And I agree with those sentiments

20 wholeheartedly.

21          THE COURT:  Okay.  And then we will address the class

22 proof of claim.

23          MR. SCOTT:  I apologize for taking so much time.

24          THE COURT:  No, it's no time, thank you, I appreciate

25 the issue.  Okay.  Who's -- Mr. Baena?

1           MR. BAENA:  May it please the Court, Scott Baena on

2    behalf of the Property Damage Committee.

3           Your Honor, with that, I'm not sure that we want to

4    sit here now and debate the wisdom of a bar date and a notice

5    program line-by-line as we intended to object to.  We had a

6    very limited position in all of this.  We commented on the

7    usefulness of the bar date.  We commented upon the ability to

8    effectuate a bar date through the notice program that has been

9    proposed by the debtor.

10          But it sounds like the Court would like to put that

11   to the side for a moment.  And we're fine with that, Judge,

12   because we -- we likewise think that there's been an

13   intermission here.  The Court did very clearly in your

14   published opinion say we were going to pause now and reflect on

15   where to go from here.  And we -- we haven't had that

16   convocation amongst ourselves.  It just has not occurred.

17          And bringing it before the Court by way of a motion

18   to establish a bar date, if anything, takes us further away

19   from whatever it is you are hoping to accomplish through that

20   process than bringing us closer.

21          I will say this, Judge, I want to disabuse the Court

22   of any misapprehensions.  This is the first time we've appeared

23   before you on a matter since the announcement of the settlement

24   with personal injury.  Let me make sure the Court is aware, we

25   -- we welcome that result on -- on many levels.

1          First, without it, we couldn't get through the rest

2    of this case, that's clear.

3          And secondly, this has been a collaborative process

4    throughout between the Committees, the Asbestos Committees.

5    We're happy that our brethren have reached that result, just as

6    I'm sure they're pleased that we resolved, in large part,

7    traditional property damage.

8          Our concern here, though, is that Zonolite was among

9    the triumvirate of asbestos claims at the outset of this case.

10   It was needing the same sort of attention and resolution as the

11   other sort of asbestos claims.  We put it to the end of the

12   cue.  And we just wish to assure that the question as posed by

13   Mr. Bernick isn't the question that we're really trying to

14   resolve here, which is how do we do all that to get to a

15   confirmation hearing in January?  That's not the calculus here.

16         Zonolite shouldn't end up like a spectator at a

17   soccer game in South America where it gets crushed at the gate

18   where everybody is trying to get to the exit.  They have the

19   same vital interests in the outcome of this case, they have

20   been abiding by everybody's direction to hold their horses.

21   But they -- they're not -- they shouldn't be abbreviated in the

22   resolution of their claims, and that's what we're concerned

23   about, the process.  And we didn't see that those interests

24   were advanced by a bar date.

25         So, I'll save the argument -- the specifics about why

1  a bar date doesn't work because it sounds like we're not going

2  there today.

3          Thank you, Judge.

4          THE COURT:  Mr. Hogan?

5          MR. HOGAN:  Good afternoon, Your Honor.  Daniel Hogan

6  on behalf of the Canadian ZAI claimants.

7          I've obviously listened to your comments over the

8  last hour, Your Honor, and it definitely changes the game, as

9  it were, in terms of my client's perspective on how to proceed.

10          I will tell you, however, Your Honor, that the

11 Canadian ZAI claimants are postured quite differently from

12 these American ZAI claimants in that there's been an ongoing

13 Canadian insolvency proceeding that has paralleled this

14 proceeding before the CCAA, I think you saw that in the orders

15 that I had attached.  That proceeding, as part of its mandate,

16 includes certain injunctive relief against proceeding against

17 having class actions proceed in Canada.  And that was really

18 one of the mandates for us to file our motion for relief.

19          We've got overlapping injunctive relief, some of

20 which relates to Grace Canada, some of which relates to the

21 U.S. debtors here.  But that court has taken a keen and active

22 interest in these proceedings and has monitored those -- these

23 proceedings through reports that have been filed by

24 representative counsel, who are, in fact, my clients.

25          Your Honor, we're -- we're fairly late to this game

1 relative to the various other ZAI claimants in that at least

2 with regard to these motions, we weren't really even brought on

3 -- brought into this issue until April 9th when the Crown filed

4 an objection, and then April 10th when the debtor filed their

5 amendment to the -- to the bar date motion to include Canadian

6 ZAI claimants.

7        And so I just want to make the Court aware, to the

8 extent it's not aware, that we are late to this party, but we

9 have active claims.

10        Another distinction that I want the Court to be aware

11 of is that representative counsel in Canada, as appointed by

12 the CCAA, is counsel that is representative of both PD claims

13 and PI claims.

14        THE COURT:  Yes, I know that.

15        MR. HOGAN:  And that distinction's important.  I -- I

16 just want to draw the Court's attention to it because there's

17 been dialogue in this case over the years with the PD

18 Committee, they've been approached, the PI Committee.  But

19 because of how representative counsel in Canada is

20 characterized as representing both those interests, they could

21 never really get any traction with either the PD Committee or

22 the PI Committee.  We were essentially that round peg trying to

23 be put into that square hole, and it hasn't really worked.  So,

24 we've been on the outside to a certain extent.

25        And in part, that's what precipitated our motion for

1  relief.  There is a -- there is a program in Canada.  There is

2  the CCAA.  And the plan that was last put forth by the debtor

3  articulated that there would be a Canadian litigation protocol

4  or procedure where a Canadian court would oversee the

5  determination of the Canadian Zonolite claims.  And that's

6  what, in part, precipitated our motion for relief from the

7  automatic stay.

8          The Crown is inherently involved in this process

9  because of the claims that are being asserted in Canada aren't

10  just against W.R. Grace or Grace Canada, but also are against

11  the Crown.  And as you know, there's been objections filed by

12  the Crown.  Those -- those claims against the Crown are

13  intertwined with the claims against Grace.  They're essentially

14  indemnification claims, claims that the Crown didn't -- didn't

15  foresee the risk, it didn't prevent the risk, it didn't abate

16  the risk.  In effect, promoted the risk.

17          And -- and then in addition to that, Your Honor,

18  there are some individually situated groups or class of people

19  that are distinctly different from the American Zonolite

20  claimants.  Inuit-speaking individuals, the French-speaking

21  individuals, which make of a large minority of the population

22  in Canada.  And so these are some of the considerations and

23  concerns that Canadian Zonolite claims have, and that we wanted

24  to get before your Court -- the Court today because it appeared

25  that what was going to happen today is, in fact, what has

1  happened, which is that the Court's looking to determine some

2  sort of universal approach to deal with the Zonolite claims.

3  And I wanted to make sure that the Court was aware that we're

4  not postured quite the same as the various other ZAI entities.

5           THE COURT:  I realize the Canadian claims are not

6  quite in exactly the same position, but at least as to the

7  property damage claims, I think the bargaining positions of the

8  parties can take one of -- you know, probably many approaches,

9  but two simple ones:  Either that for property damage -- and

10  I'm speaking only to property damage right now.  For property

11  damage purposes, you're going to be folded into the same type

12  of approach that the American ZAI claims will have.  Or that

13  you're going to have a whole separate bargaining structure with

14  the debtor and/or litigation structure through the plan,

15  however the plan proponents and you agree.  That will encompass

16  either PD and/or PI claims in Canada, or just PD claims.

17           And, you know, again, I hate to keep going back to

18  Federal-Mogul because it seems that that's all I've been doing

19  today, and I'm not trying to use that as the model for be all

20  and end all, but that case did, of course, have a foreign

21  component in which there had to be a separate type of plan

22  structure because of the foreign component claims.  Now that

23  was much different from what you're talking about with just

24  this one small segment of the claims, but nonetheless, there

25  was the capability of taking a look at that one particular line

1  of claims from a foreign court, and then incorporating into the

2  American plan a structure based on that foreign claim.

3        So, you know, you folks have lots of bargaining room

4  if you'd just start talking to each other.  And now that the PI

5  resolution is hopefully resolved, and the PD non-ZAI claims

6  seem to be more on track, I think it's time to do that.

7        MR. HOGAN:  Your Honor, you mentioned Federal-Mogul.

8  It's interesting because my clients and I, we've discussed in

9  part potentially filing a motion to create a protocol for the

10  intercore communication between the CCAA and this Court.  Is

11  that something the Court would entertain?

12        THE COURT:  Oh, sure.  I mean I entertain all

13  motions, but whether we need it or not, you know, I don't know.

14  I think -- I think what you really need is to talk to the plan

15  components.  But, yes, I mean I'm always happy to talk to my

16  brethren on other courts, I always learn a whole lot from that.

17  So, yes, there's no -- no reason I wouldn't entertain such a

18  motion.  But nonetheless, I really think the issue at this

19  point is that you probably can -- can encompass what all of you

20  need in the structure of the Canadian and the American cases.

21  And exactly how you choose to do that is going to have to be a

22  matter of some bargaining, notwithstanding the slight

23  difference -- well, maybe major difference in the comport of

24  the law that applies in Canadian cases as opposed to the

25  American cases.

1        The claims treatment issues are something you can

2    bargain.  How we work out the confirmation process, I don't

3    think, will be a problem.  Can't -- the Canadian Court and

4    American Courts have had very friendly relations in terms of

5    confirming plans, unlike some issues that happened in Federal-

6    Mogul, that has not been the case with Justice Barliant

7    (phonetic) in other cases before.

8        MR. HOGAN:  Your Honor, two other points I'd care to

9    make.  They relate primarily to the notice program.  One is

10   this, as we understand it, the Canadian Government, the Crown

11   has a significant database -- or database, which includes the -

12   - the -- I guess the property locations, for lack of a better

13   term, that are, in fact, -- that contain Zonolite.

14   **(AUDIBILITY IS POOR - MR. BERNICK'S IS NOT AT A FUNCTIONING**

15   **MICROPHONE -- AT TIMES INDISCERNIBLE)**

16       MR. BERNICK:  Your Honor, if he wants to get into

17   that, I think that's actual (indiscernible).  And -- but I

18   (indiscernible).  I wonder why we're having that -- they were

19   happy, as we have said, to have changes to our notice of

20   program to accommodate facts and circumstance that are

21   (indiscernible).  I don't know why it is important to have --

22   to take before the Court on something that's not even really an

23   issue that's ripe.

24       THE COURT:  Yeah, I don't think the issue about

25   notice is going to be ripe for today because I don't think

1  we're going to get that far, Mr. Hogan.  So, maybe --

2         MR. HOGAN:  Well, I caveated it.  That's -- I just

3  wanted to bring that -- and the last point, Your Honor, relates

4  to a report that I understand that the Canadian Government is

5  getting ready to issue.  It's a Health Canada Report.  And as I

6  understand that report, it's going to attempt to address, not

7  unlike the science trial decision addressed, the nature and

8  extent of the potential harm caused by Zonolite in individuals'

9  homes in Canada.  And I just wanted the Court to be aware of

10 that because it may impact not only the negotiations, but to

11 the extent that there is a notice program, how that would play

12 out.

13 **(AUDIBILITY IS POOR - MR. BERNICK'S IS NOT AT A FUNCTIONING**

14 **MICROPHONE -- AT TIMES INDISCERNIBLE)**

15        MR. BERNICK:  (indiscernible) as we understand it,

16 we've been told the fall, can't wait for the report.  We

17 understand that they have addressed the same issues and were --

18 been apprized of that.  We can't wait for the report to decide

19 what we're doing.

20        MR. HOGAN:  Well, I was told it was June, Your Honor.

21 But June, the fall, whichever.

22        MR. BERNICK:  The -- a lot of different times and I

23 think that they're being wise and deliberate about it, being

24 careful in their process.  Again the fact remains, we can't --

25 we can't (indiscernible).

1          THE COURT:  Okay.  Well, I think at this point in

2  time, what -- I'm going to go back to what I said earlier.  I

3  believe that what would be the best course of events at the

4  moment is to have you folks start talking to each other and see

5  what can happen.  Whether or not you can't accommodate some

6  settlement.  You know, if, in fact, you can accommodate some

7  settlement, then notice of the settlement can certainly be

8  incorporated into a disclosure statement type of notice.  It

9  won't take the separate notice, and the debtor can certainly

10  save millions of dollars in the notice program because it won't

11  have to do it twice.  It won't have to do it separately through

12  ZAI notices, and separately through disclosure statement

13  notice.  There will be some savings that will accrue because we

14  will be able to figure out a way to do -- to do what's in that

15  notice, some notice that will, I'm sure, satisfy the ZAI

16  claimants.

17          So, you know, to the extent that the debtor is short

18  on funds, several million dollars may be able to go into a ZAI

19  pot that would otherwise go into an advertising pot.  So, why

20  don't you folks talk?

21          MR. HOGAN:  Your Honor, I -- I'm prepared to address

22  and be responsive to that (indiscernible) remarks, but that --

23  if that's what Your Honor wants to talk about, that's -- we'll

24  talk about it.  But there some things that Your Honor ought to

25  be aware of because that is not my writing on a clean slate,

1 Your Honor.

2          THE COURT:  All right.

3          MR. HOGAN:  Your Honor, the Crown, I think has --

4          THE COURT:  Mr. Monaco?

5          MR. MONACO:  Good afternoon, Your Honor.  Frank

6 Monaco for the Crown.

7          Your Honor, we filed objections to the various

8 motions because of our concerns about fair and equal treatment

9 for all ZAI claims, regardless of whether they're north or

10 south of the border.

11          I don't disagree with Your Honor's observation that

12 at least as to the PD claims, certainly there's no reason to

13 distinguish them -- Canadian claims from American claims.

14          I'd like to pick up on one thing that Mr. Bernick

15 alluded to in addressing Mr. Hogan's comments.  I think it's

16 more accurate to say that the Canadian solvency proceeding is

17 not really parallel.  It has ancillary jurisdiction --

18          THE COURT:  Okay.

19          MR. MONACO:  -- and primary jurisdiction over Grace

20 Canada.

21          THE COURT:  All right.

22          MR. MONACO:  And it's important, Your Honor -- I'm

23 going to stress to the Court that it's important that the

24 parties and the Court get this right because pursuant to 18.6

25 of the CCAA, which is the Insolvency Act in Canada, that the

1  decisions made here be fair and equitable so that that Court

2  can give comity, and we don't have problems down the road.

3         So, we are concerned that the treatment of all

4  claims, including the Canadian claims, be fair and equitable.

5         THE COURT:  Mr. Monaco, I hope to be fair and

6  equitable --

7         MR. MONACO:  I'm not --

8         THE COURT:  -- with respect to the treatment of all

9  claims.

10         MR. MONACO:  Your Honor, I'm not insinuating

11  otherwise.

12         And Mr. Hogan did -- he did inform the Court that

13  there are existing orders appointing the class representative,

14  as well as orders staying any actions until October 1st of

15  2008.

16         Your Honor, we are both a direct claimant and have

17  claims for contribution indemnification.  The direct claims

18  result from our purchase of ZAI, which we installed -- the

19  Government installed in reserve housing and military base

20  housing, and we have incurred expenses in remediating by having

21  to seal attics.

22         We also have contribution and indemnification claims

23  as a result of being a co-defendant with Grace in the various

24  class actions that have been currently stayed.

25         Your Honor, I'd just like to sum up.  What we are

1 seeking is the Court's guidance to have the Canadian treated in

2 this proceeding.  I think today's hearing is a positive

3 development from the Crown's perspective, and hopefully the

4 arguments and the positions developed here will assist the

5 Court in doing so.

6       THE COURT:  Well, Mr. Monaco, is the Canadian

7 proceeding look to treat the Canadian claims through the Grace

8 Canada proceeding?  Or does the Grace -- does the Canadian

9 proceeding -- I guess is that mandated?  Or if there is a fair

10 and equitable treatment in this proceeding here, will the

11 Canadian claims process permit the Canadian claims to be

12 treated through a agglomeration of cases --

13       MR. MONACO:  Well --

14       THE COURT:  -- including through the U.S. proceeding?

15       MR. MONACO:  I think -- and my co-counsel can correct

16 me if I'm wrong, but I think the Canadian Court is looking to

17 this Court in the first instance to deal with these issues.

18       THE COURT:  Okay.

19       MR. MONACO:  I think that's -- that's the position of

20 the Canadian Court.

21       THE COURT:  All right.

22       MR. MONACO:  Because it's an ancillary court.

23       MR. BERNICK:  And we believe that's -- that's

24 absolutely correct.

25       THE COURT:  Okay.

1          MR. MONACO:  And, Your Honor, one other thing I

2    wanted to confirm what Mr. Bernick said about the risk

3    assessment.  It's our understanding it will be issued in the

4    fall, not June.

5          THE COURT:  All right.

6          MR. BAENA:  Just one comment.  Scott Baena on behalf

7    of PD.

8          Just -- just for the record, Judge, I'm not sure that

9    it's ancillary or a parallel proceeding, and nothing I heard

10   today forecloses that debate.  Remember, Judge, Grace Canada

11   was formed days before this case was filed.  And it was formed

12   for purposes of commencing a proceeding in Canada.

13         FEMALE SPEAKERS:  That's absolutely incorrect.

14         MR. BERNICK:  Your Honor, I -- I -- why do we have to

15   get into this today?  Mr. Baena is in a very difficult position

16   with respect to the different plaintiffs that now constitute

17   the PD claimants.  Is this a statement that's being made on

18   behalf of Mr Spites (phonetic), who's got Canadian claims that

19   haven't been settled?

20         MR. BAENA:  Excuse me, Judge.  I was in the middle of

21   a presentation.

22         MR. BERNICK:  But I have a concern that I want to

23   raise about what it is, what --

24         MR. BAENA:  Raise it.

25         MR. BERNICK:  -- capacity Mr. Baena is speaking.

1          MR. BAENA:  Your Honor --

2          THE COURT:  Do you represent the Property Damage

3   Committee.

4          MR. BAENA:  I represent the Committee, Your Honor.

5          THE COURT:  All right.

6          MR. BAENA:  And I am not able to answer any of those

7   questions here today.  And my whole point is that it's not so

8   clear what the state of that proceeding is.  And I don't think

9   any discussion here today forecloses what it was.

10         THE COURT:  All right.  Did -- I -- Mr. Baena, I'm

11  sorry.  Is that because you have some disagreement that the

12  Canadian Court is looking to this Court in the first instance

13  to resolve the claims?  I just am not clear what the --

14         MR. BAENA:  I'm not -- you know, we're hearing all

15  sorts of versions about the interaction between the two

16  proceedings, and it's just not clear.  It's not been

17  demonstrated what the interactive nature of those proceedings

18  are.

19         THE COURT:  Oh, okay.

20         MR. BAENA:  That's all.

21         THE COURT:  All right.

22         MR. BAENA:  Remember, this was all under the Rules

23  that existed prior to the amendments -- the BAPCPA amendments,

24  and it was different then to -- you know, to commence an

25  ancillary proceeding.

1                    THE COURT:  Yes.

2                    MR. BAENA:  You had to commence one here.  They

3    didn't commence one here.  That -- that's the problem.

4                    THE COURT:  All right.  Mr. Bernick?

5                    MR. BERNICK:  Yes.  I -- I want to deal with the --

6    we used to say that the -- well, I want to deal with the kind

7    of -- it's not a gorilla, but it's an animal of some not

8    insignificant dimension that's in the room.  And it's been put

9    in the room by suggestions that have been made repeatedly by

10   Mr. Westbrook and by others, and indeed, for that matter, by

11   Your Honor's response to it, which is that it's settlement.  It

12   is, you know, how to resolve this thing.  And the suggestion

13   that's been made by Mr. Westbrook is that things were kind of

14   going along and they were all honky-dory and Mr. Restivo is in

15   there say, amen, amen, amen, and then all of a sudden, it got

16   off track.

17                   THE COURT:  I don't think I said any of that.

18                   MR. BERNICK:  No, Your Honor didn't say any of that.

19   But that's what was suggested to Your Honor.  And I -- Your

20   Honor has raised the question, well, and properly so, what was

21   happening during this whole period of time when Your Honor was

22   prepared to go forward and you ask for the status conference to

23   say what's going to happen here, and there was no real status

24   conference because the report back to Your Honor is that we're

25   having discussions.  And will now assure Your Honor of a few

1  things.  I suppose you'll have to take them with a grain of

2  salt in the same fashion that I'm kind of asking that Your

3  Honor take with a grain some of the other observations that

4  have been about the same process.  And maybe the very fact that

5  we have differing views is exactly what one of the problems was

6  with the process.

7       But all of the things that I think Your Honor

8  expected that would be done during this interim period or

9  thought that would be done were done.  That is there were

10 active settlement discussions involving Mr. Westbrook,

11 involving Grace, all kinds of different things explored.  Those

12 active discussions continued all the way up and through the

13 process that led us to have a term sheet with respect to the

14 prospective plan components.

15      Number two, that process was driven by W.R. Grace,

16 the debtor sin this case.  It was not driven by me.  It was not

17 driven by Mr. Restivo.  It was driven by the folks who are

18 sitting here for Grace today, and it was the client that

19 decided what to do and what not to do.  This is not a question

20 of lawyers and who's a lawyer here, and this and that and the

21 other.  And that kind of observation, frankly, doesn't give

22 credit to the client for being the decision maker.  And

23 obviously it doesn't give credit to us either.

24      But in any event, that's not going to get us

25 anywhere.  The -- it was Grace, it was and is Grace that's in

1  control and that remains so.

2          Those discussions, to Your Honor's point, have

3  included various kinds of vehicles, including potential

4  inclusion in the plan that has been outlined.  We tried very

5  hard to get ZAI into that plan.  We tried to get everybody into

6  that plan.  And as a consequence, all the different ideas for

7  how to do that, 524(g), claims facilities, criteria, you name

8  it, all the people who were involved in that -- I know that Mr.

9  Lockwood would agree, and I think probably Mr. Westbrook, as

10  well, very versed in different ways at trying to get to a

11  resolution.  So, all of that was put on the table, it was all

12  very clear -- carefully gone through.

13          It didn't work.  It didn't come to fruition.  And I

14  venture to say that one of the major reasons it didn't come to

15  fruition is money.  It's financial.  A, what money is there?

16  And, B, what money really should be allocated to this given the

17  very substantial problems that do pertain to these claims.

18  These are claims that had no track record of success at all.

19  Not one dollar paid.  And, in fact, the Barbanti litigation, to

20  the extent there was a preliminary injunction, came out against

21  the claimant.  So, the idea that we should just pay, well, what

22  are we paying for?

23          So, it's a financial issue, and it's a merits issue,

24  and it's a number of people issue, number of claimants issue.

25  That's what the hang-up is.  It's not 524(g) and can there be a

1  facility.  It is what are the economic dimensions of that

2  facility so that we can go on and deal with all the other

3  matters that are before the Court in this case, and all the

4  other constituencies that have to be taken care of, which then

5  brings me to the following point.

6       Your Honor can order that there be a mediation.  And

7  we can get a mediator, and we can all meet.  And I know that

8  Your Honor is doing that with respect to the traditional PD

9  claims.  And if Your Honor does that, we will be sure to go

10 ahead and have that mediation.

11      It will be my prediction that that mediation will be

12 -- will have a tremendous handicap at the outset.  And the

13 handicap will be that all of the different vehicles that are

14 out there have already been considered.  And the other -- the

15 other handicap that will be out there is that, again, the

16 predicates for the disagreement before will not have changed,

17 which are financial and are numbers of claimants.  That's what

18 the -- that's what the drivers were of the failure to reach

19 agreement before.  Why should we expect that they're going to

20 change now that we've got a mediator.

21      And that's what then brings us to the need that we

22 really have.  We need -- we have a need for two basic things,

23 and I think that there's a reaction to the fact that we've

24 asked for a bar date.  But the bar date, as I can see it, is

25 the only way that we're going to get what we need.  What we

1  need is data, reliable data.  How many claimants are there?

2  Not extrapolations, not predictions, hard data.

3        In fact, when we went down the road with the

4  estimation of personal injury claims, you'll remember, I know

5  you could never forget, that what drove the greatest amount of

6  time in that case was not the statistical models, although they

7  were very labor intensive.  It was getting the data, including

8  through a bar date, including through the submission of a lot

9  of information, that's what then ultimately enabled us to get

10 to the point where we could see what the other side of the coin

11 was.

12       Now, we're not asking that that be done again.  We're

13 not asking to have a whole bunch of fancy submissions.  And,

14 indeed, you know from the bar date proposal that we made, the

15 claim form is utter simplicity.  What we want to get is who are

16 they?  Who are the claimants?  That is a huge piece of missing

17 data.  And when Your Honor suggested that maybe -- and you

18 suggested before, why is there really a difference in view as

19 between both sides?  Why can't everybody agree that that's

20 important data to have?  The difficulty is that we -- we then

21 said, well, gee,  maybe there's a way to think about doing

22 that.  What came back on the other side was experts and kind of

23 doing a survey, a survey, or, you know, let's take a telephone

24 pole, we could do a survey in the -- surveys are fraught with

25 problems.  They're not hard data, they're not reliable data

1 because what you get depends upon what you ask for.  We've

2 litigated surveys in many, many different cases.  That's a

3 recipe for more disagreement and for more posturing.

4          What we want is hard underlying data, and the only

5 way to find out who's a claimant is to ask who's a claimant.

6          The second thing that we need -- and we don't think

7 that that's actually going to be very expensive to accomplish,

8 and will give us data that is not only good for purposes of

9 estimation, but you can actually then use to process these

10 claims if the claims ultimately are presented for payment.

11 We'll know who it is that's a claimant, so it's not wasted

12 money.

13          The second thing that we need is a parallel path.

14 The lesson of this case generally, indeed, in each and every

15 phase of this case, that the only way to get to resolutions is

16 to have a parallel path for litigation or estimating or

17 whatever it's going to be.  Because it's only when you've got

18 that path that people really can make the hard choices about

19 what it is that they want to do.  And that parallel path is

20 critical, not only for purposes of producing resolution of ZAI,

21 that parallel path is important for keeping us on track for the

22 estimation, for the -- for the confirmation process generally.

23          And what I'm very concerned about is that no matter

24 how short of time we get involved in some kind of ordered

25 process of mediation, even if it's 30 days, 45, 60 days, it's

1  30, 45, 60 days off a period of time to confirmation.  And,

2  therefore, when we come back and say, well, if we want to

3  settle, which we do, I put it right up there on the board, we

4  want to settle this case, we've always wanted to settle this

5  case, we want to settle, we want to settle.  I'll say it a

6  zillion times, we don't need a mediator to tell us that we want

7  to settle the case.  We understand that.  We want to settle the

8  case.

9        But if we want to get the case resolved or estimated

10 so that we can get to a confirmation that keeps this package

11 together, and keeps this case on track to get resolved,

12 something's got to happen.  And by doing the mediation, we

13 aren't going to change the levers from making that happen.  So,

14 we do think we need the bar date, and we do -- we think we need

15 a process that says following the bar date, we're going to be

16 back here in court if we can't reach agreement to actually do

17 think that may not all be, you know, pleasant and ducky, but

18 they've got to get done because there's way too much to lose in

19 this case.  We can't bank on a cooperative settlement of

20 process alone to get us to where we want to be.

21        I think that the bar date has been out there.  We

22 moved for a bar date before.  We put together a whole notice

23 program that essentially wasn't contested in terms of process

24 and reach before.  The notice itself was -- there was a debate

25 about the notice.  The notice that we got here is pretty much

1   the same as the notice we had before.

2           Remember the notice issue before was not the

3   description or anything, just did you -- do you include some

4   kind of statement about the risks, et cetera, et cetera?  Well,

5   we're over that one now.  So, the content of the notice

6   shouldn't be a problem.  So, that's why we're here.

7           And what I would propose to the Court is let's get

8   the bar date set.  Let's get the notice out.  If Your Honor

9   wants to -- we have greater satisfaction that all steps to

10  resolve the case are being taken, we are completely happy to

11  have some kind of mediated process.  I say that not knowing

12  whether my client's going to agree with it, but I think that

13  they will.  That's not an issue.  But we've got to have data

14  and we've got to have a parallel track.

15          When it comes to the Canadians, I -- you know, I'm

16  not sure what the issue really is.  We are happy to have the

17  Canadians included in the process, indeed, there were very

18  active, advanced settlement discussions with Canadian ZAI

19  claimants that broke down.  But we actually expected that there

20  was going to be a deal with ZAI claimants in Canada.  There's

21  no reluctance to proceed with that, we'd be happy to have that

22  process take place.

23          In Canada, we believe that it really is parallel.

24  That they -- we can set up a process in Canada that is parallel

25  to what we have here. So, we have a Canadian bar date, people

62

1 come in in response to the Canadian bar date.  We don't have to

2 is there and scratch through a bunch of records to figure out

3 whether the stuff is still there.  We'll know whether we have

4 claimants or not.  Totally on board with doing that in Canada.

5 That may have to lag a little because the other one is a little

6 bit further advanced.

7          But would really, really strongly urge Your Honor,

8 now that we're here, let's not let go of the schedule here.

9 Let's keep on track, let's get the bar date done, let's get it

10 done.  We'd ask the Court issue the order so that we can have

11 the notice issue within whatever it is, 30 days, and get the

12 process going.  And we can have all the discussions that

13 anybody would want.

14          The only thing that gets lost in that process is the

15 estate spends the money to get the bar date notice out.  And

16 given where we are in this case, that's not insignificant

17 money, but it's money that's been proven three different times

18 to have yielded results when it comes to litigation in this

19 case.  That is money that is extremely well spent.

20          So, Your Honor, I don't know if you -- I know that

21 we're tied up for time, but we would be very, very reluctant to

22 have this bar date issue deferred.  We believe -- and if Your

23 Honor needs to set a special time for a further proceeding, the

24 debtor very, very strenuously and vigorously, in service of

25 getting to confirmation in January, consistent with the terms

1  sheet, wants there to be a bar date.

2           Your Honor then can decide what it is that we're

3  going to do with the information.  But we've got to have a bar

4  date.

5           THE COURT:  Okay.  Go ahead, Mr. Westbrook -- just a

6  second.

7        (The Court conferring off the record with staff)

8           MR. WESTBROOK:  No, Your Honor, and we're not --

9  we're not intruding on that.  I have two minutes, Your Honor,

10 that's all.  And I would not stand except Mr. Bernick --

11          THE COURT:  Well, Mr. Westbrook, excuse me.  What

12 else are we going to be doing after this issue?

13          MR. WESTBROOK:  Going home.

14          THE COURT:  Going home?

15          MR. WESTBROOK:  I wouldn't -- I wouldn't cancel a

16 cab, Your Honor, I have two minutes.

17          THE COURT:  Anybody else speaking after this?

18          UNIDENTIFIED ATTORNEY:  Just one comment after that,

19 Your Honor.

20          THE COURT:  Cancel the cab.

21          UNIDENTIFIED ATTORNEY:  Don't say that, then there

22 will be more.

23                         (Laughter

24          MR. WESTBROOK:  Your Honor --

25          THE COURT:  Go ahead, Mr. Westbrook.

1        MR. WESTBROOK:  I only -- I only rise because Mr.

2 Bernick felt it necessary to put his toe into the stream of

3 settlement negotiations and a little bit behind the scene.  I

4 will say only one thing about that, Your Honor, that is that we

5 were not involved -- we were not invited to the last round of

6 settlement negotiations.

7        In fact, as -- as those on Grace's side know, perhaps

8 not Mr. Bernick, that a certain PI lawyer who was at those

9 negotiations new ZAI's positions and parameters on which we

10 could resolve it and his report was that he was not able to

11 engage Grace in any discussions.  That's all I'll say on that

12 point, Your Honor.  I didn't want to leave any impression that

13 we haven't been trying to get this resolved.

14        Your Honor --

15        MR. BERNICK:  Maybe he's at fault because that's not

16 what (indiscernible).

17        MR. WESTBROOK:  I don't want to get into that, Your

18 Honor.

19        THE COURT:  All right.  Well, in any event, it's

20 water over the dam at this point.  At this point in time, the

21 PI issues are resolved.  So, the debtor has a pretty good

22 handle with respect to the environmental liabilities it's been

23 settling and what context the environmental liabilities are

24 left to settle.  It knows pursuant to the PI settlement what

25 property damage issues are out there.  I don't know

1  specifically what its estimate for how much it's going to have

2  to reserve to take care of those property damage issues are,

3  but obviously it's got some amounts in mind.

4        So, the reality is that in order to keep the debtor

5  functioning and contributing to the trust and operating a

6  business and making money, there are always limitations on

7  resources.  You know, there has to be limitations on resources

8  and people have to take haircuts.  It just has to happen.

9  People don't get paid lots of dollars in bankruptcy dollar

10 terms.

11       So, to be realistic about this, people have to

12 realize it's not going to be a huge pot of money that is going

13 to pay a lot of claims when the Court's already determined

14 there isn't an unreasonable risk of harm, but obviously if

15 you've got, at some point in time, to remediate a home, there

16 is going to be a cost involved.  And to the extent that

17 somebody can show that it's ZAI in a home and there will be a

18 charge, there is going to be a cost.

19       So, if you want to do a notice program as the

20 Barbanti class action talks about, there will be a cost.  If

21 you want to do a remediation type program, there will be a

22 cost.  If you want to try to do a combination program, there

23 will be a cost.  But it's finite dollars, that's the problem,

24 it's finite dollars.

25       Now, you know, you've got -- there are only so many

1  dollars that can go around.  If you want to get this settled,

2  you'll get it settled.  If the case ends up in liquidation,

3  there isn't going to be anything for anybody.  So, you know,

4  where are you going, folks?  Why are you not sitting down at

5  the table and having some meaningful settlement discussions?  I

6  don't get it.

7       MR. WESTBROOK:  We certainly understand, Your Honor,

8  and we're certainly willing to do that.  And I will only say

9  that as to the bar date issue, if we get back on track -- if

10 things should break down, that we do think that the Court

11 should stay on track with the ZAI opinion, claims next, the

12 class certification issue, and we can get those litigated.  But

13 we're willing to also engage the Canadian folks in some

14 discussions, Your Honor, and see if we can put something

15 jointly together.  We think Your Honor's (indiscernible) idea

16 is maybe the way that we can finally cracked.

17       THE COURT:  All right.  With respect to -- let me

18 address one thing, Mr. Westbrook, with respect to the

19 possibility of a bar date.  Because it seems to me that the

20 debtors' construct of the bar date does not foreclose the

21 concept of class action proof of claims, class -- pardon me.

22 Class proofs of claim either.  And so if I provide some very

23 brief period of time without issuing a bar date notice to try

24 to get this settled, and it will be brief, then I am inclined

25 to think that a bar date probably needs to be set.  And I think

1 it probably has to be set before some class notice goes out.  I

2 am still of a mind that perhaps some class notice of 524(g)

3 cannot be utilized, may be appropriate, but I think it's going

4 to have to be in conjunction with or after some bar date

5 notice.  Because I think the notice program that the debtor is

6 contemplating -- and I'm not making findings about it, but in

7 construct, should work.

8           Now, for Canada, it may need some tweaks.  The debtor

9 can work with the Canadians in terms of the language issues and

10 so forth.  But in the United States, for the most part, it's a

11 pretty extensive bar date program.

12           So, it should be sufficient to advise people that if

13 they want to take a look or have somebody do it for them at

14 what's in their attic, and find out whether they've got this

15 particular type of insulation there, that they've got to file a

16 claim.  And depending on what happens with respect to those

17 claims, then it may still be appropriate to have a class or

18 classes, I'm not sure at this point in time how all that would

19 work to address the issues.

20           So -- but I still think that it may be worth first,

21 starting with the bar date.  So, while you're out talking, I

22 think you folks had better perhaps include that in your

23 discussions.

24           MR. WESTBROOK:  We will, Your Honor.  And we

25 understand that before the Court would do that, we'd have an

1  opportunity to come talk about all the things Mr. Baena wants

2  to talk about --

3           THE COURT:  Yes, sir.

4           MR. WESTBROOK:  -- and all the other issues we have

5  about a bar date.

6           THE COURT:  Yes, sir.

7           MR. WESTBROOK:  Thank you, Your Honor.

8           THE COURT:  Mr. Hogan?

9           MR. HOGAN:  Briefly, Your Honor.  It just relates to

10  the notice component of the bar date.  And that is the debtors

11  indicated that they vigorously want a bar date set.  They also,

12  in their application for that bar date, indicated that they

13  preferred actual notice.  And they also requested that as to

14  individual plaintiffs' attorneys that had information regarding

15  the location of those individuals, that they be mandated to

16  bring that information forward.  And I just wanted to ask that

17  that -- that that applied to the Canadian Government, as well,

18  insofar as we understand that they have a significant database

19  that represents exactly which properties have Zonolite in it

20  and that would be very useful from the Canadian Zonolite

21  claimants' perspectives.

22           THE COURT:  Mr. Monaco?

23           MR. MONACO:  Your Honor, I had not intended to get

24  into this kind of detail, but I feel compelled to respond.

25  First of all, Your Honor, it's going to have to be a best

1  efforts type of -- we don't want to be the subject of -- of an

2  order that compels us to file things.  We need to use best

3  efforts to the extent that we are going to provide these

4  documents.

5          The other -- the other aspect of this Your Honor

6  should be aware of is that we do have information and it is

7  voluminous and it is located in a number of different areas,

8  and it would take us a very long time to get it together.  So,

9  the parties need to understand that, and that's something we'll

10 have to deal with in terms of the detail of any kind of bar

11 date order.

12 **(AUDIBILITY IS POOR - MR. BERNICK'S IS NOT AT A FUNCTIONING**

13 **MICROPHONE -- AT TIMES INDISCERNIBLE)**

14         MR. BERNICK:  Your Honor, if I could add as a

15 facilitator of the process (indiscernible).

16                         (Laughter)

17         THE COURT:  That was sweet, Mr. Westbrook.

18         MR. BERNICK:  When we tried the police case many

19 years ago, you said the same thing.

20                         (Laughter)

21         MR. BERNICK:  If we could, I think, just advocate in

22 favor of having the discussion about what's the real world, I

23 think to the extent that we've got information so that we can

24 provide better notice then that's fine.  But I also agree that

25 we're operating within a time frame here that doesn't enable us

1  to uncover every single (indiscernible) out there and due

2  process doesn't require it.  It requires (indiscernible).

3          So, what I would suggest is that we have a three-way

4  conversation, if that's okay with you guys, and see what we can

5  work out.  I think everybody's aiming in the right direction.

6          MR. MONACO:  That's fine, Your Honor.

7          THE COURT:  That I agree with.  You know, I think --

8  I'm not -- I do not want to hold up a notice program of any

9  type, including for disclosure statement and plan purposes

10 because you're going to have the same issue in terms of getting

11 notice out to everyone at that time, even if it's not for ZAI

12 special notices anyway.  So, I think at this point, we're going

13 to have to have this discussion anyhow.

14         So, I think a reasonable notice process is all that

15 is required for actual -- for a search to find actual claimant,

16 perhaps, Mr. Monaco, your client might be able to get started

17 on putting together what types of processes would be

18 appropriate to identify claimants, to the extent that it can.

19 And that may be a good thing for, Mr. Westbrook, you and Mr.

20 Scott, to the extent that you know available ZAI claimants and

21 known claimants, too.  Because one thing I am not going to do

22 is back off any order that I make this time that says that

23 claimants have to provide information to the debtor.  That

24 caused way too many problems the last time with respect to the

25 personal injury issues.  So, if there is an order that goes out

1 that says that to the extent that a package goes out and

2 someone provides it a client, that information has to be

3 provided to the debtor or the debtor doesn't have to give

4 actual notice, we're going to have that discussion at the next

5 hearing, and that order is not going to be modified.  So, if

6 anybody's going to have an objection to telling the debtor who

7 the actual clients are so that the debtor provides actual

8 notice, tell me about it at the next hearing.  Because right

9 now, that seems like a darn good idea based on my view

10 originally and the District Court opinion, looking at the

11 actual notice issues last time.

12          MR. BERNICK:  Can we talk maybe about the timing

13 here?  I think --

14          THE COURT:  Yes.

15          MR. BERNICK:  -- (indiscernible).

16          THE COURT:  Yes, that's what I wanted to get to, too.

17 Do you folks really need a mediator?  Or can you sit down

18 together and have a discussion with the business folks involved

19 and say, look, this is our data, this is what we think the

20 universe of houses, claims, whatever it is that you're going to

21 provide is, and why we think we have a -- I'm just going to

22 pick a wild number -- you know, a database of 500,000 homes

23 that have ZAI, which means a potential claimant base of, you

24 know, a million people that may, at some point over the next 50

25 years, provide claims against Grace, and Grace will provide us

1  -- say, you know, this is it, X dollars is all we have.  You

2  can do what you want with it, but this is what we provide.

3  However it's going to work.  Can you sit down and do that

4  together, or do you need a mediator?

5  **(AUDIBILITY IS POOR - MR. WESTBROOK IS NOT AT A FUNCTIONING**

6  **MICROPHONE -- AT TIMES INDISCERNIBLE)**

7          MR. WESTBROOK:  Your Honor, I've settled many, many

8  cases for Grace for a lot of dollars over the years, and --

9              **(MR. WESTBROOK APPROACHES MICROPHONE)**

10         MR. WESTBROOK:  -- up to this point, we've always

11  been able to get this done.  In this particular circumstance,

12  Your Honor, I think there might be some benefit of having a

13  respected mediator there who can either tell us we're crazy

14  about something, or perhaps tell Grace that it's off base on

15  something.  If they'll listen.  I mean if they're not going to

16  pay any attention anyway, don't waste the money on a mediator.

17  But we're certainly willing to do it either way. But I would --

18  if I were asked to choose, I'd say I'm tipping slightly for

19  getting a distinguished mediator who can talk some sense into

20  both sides.

21         THE COURT:  Okay.  Well, that's the key.  Is the

22  other side willing to listen, too?

23  **(AUDIBILITY IS POOR - MR. BERNICK'S IS NOT AT A FUNCTIONING**

24  **MICROPHONE -- AT TIMES INDISCERNIBLE)**

25         MR. BERNICK:  I'm prepared, and Grace is prepared to

1  accept the idea.

2         UNIDENTIFIED ATTORNEY:  We're prepared.

3         MR. BERNICK:  They're all -- they're prepared,

4  they're ready to go, laws a little different in Canada.  But

5  the -- I think everybody's -- I don't get any sense that people

6  are not proceeding here in good faith, Your Honor.  I think

7  there's a difference of opinion.  If they -- if they would feel

8  more comfortable having a mediator, we don't have a problem

9  with that as long as we can get it done.  If it doesn't alter

10 the time table -- we don't think we need a mediator, but we're

11 happy to accommodate them --

12        THE COURT:  All right.

13        MR. BERNICK:  -- (indiscernible).

14        THE COURT:  Are you folks going to be able to agree

15 on a mediator who can get up to speed rapidly?

16        MR. WESTBROOK:  I don't think that would be a point

17 of disagreement, Your Honor.  We could probably agree on

18 somebody.

19        THE COURT:  Mr. Hogan, do you think so?

20        MR. HOGAN:  I think we could, Your Honor.

21        THE COURT:  Okay.  Mr. Bernick?

22        MR. BERNICK:  I would hope, yes.

23        THE COURT:  All right.  Then how much time, three

24 weeks?

25        UNIDENTIFIED ATTORNEY:  That sounds fine.

1      UNIDENTIFIED ATTORNEY:  Fine, Your Honor.

2      THE COURT:  I mean you've been talking for, you know,

3 nearly two years.  So, it seems to me -- I know you haven't,

4 Mr. Hogan, but --

5      MR. HOGAN:  Well, not ZAI, Your Honor, but is it

6 three weeks to have the mediation or three weeks --

7      THE COURT:  Yes.

8      MR. HOGAN:  Okay, I just wanted to be clear on that.

9      THE COURT:  Three weeks to have the mediation.

10      MR. HOGAN:  So, the agreement as to the mediator's

11 going to have to happen within the next week, I would say.

12      THE COURT:  Oh, I would say by tomorrow.

13      MR. HOGAN:  Yeah.

14                    (Laughter)

15      THE COURT:  Yes.

16      MR. BERNICK:  That's -- that's fine.

17      THE COURT:  Mr. Monaco?

18      MR. MONACO:  Your Honor, I just want to make the

19 record clear that we -- we will participate also to get this

20 done.

21      THE COURT:  All right.  Okay.  Do you -- are you

22 going to need an appointment order for a mediator if you agree

23 on who the mediator is, whether I get an appointment order

24 signed tomorrow or not.  To my -- my way of thinking is

25 irrelevant, you can present one later, that's fine.  I'll sign

1  one later.

2          MR. BERNICK:  That's fine with us, Your Honor.

3          THE COURT:  All right.  The terms and conditions will
4  be the normal --

5          MR. BERNICK:  Yes.

6          THE COURT:  -- terms and conditions for appointment,
7  but the mediator will have to substantiate that he or she is
8  disinterested within the meaning as you all will understand
9  that to be.  Okay?  That provides three weeks.  The next
10 omnibus is June 2nd in Pittsburgh.

11         MR. BERNICK:  Right, yes.

12         THE COURT:  Okay.  Is that a fair time table?  We
13 address this issue again June 2nd.  If there is no settlement,
14 then we will argue the bar date objections specifically because
15 I will, at that point in time, be prepared to make rulings with
16 respect to a bar date.  So, Mr. Baena, I'll hear your line item
17 objections, whatever it is that you wish to bring, and anybody
18 else's, as well.

19         Mr. Scott, I will probably not address the class
20 claim issue at that time because I think I'm going to want to
21 get it either re-briefed, if you need to update the briefs, but
22 definitely I'm going to want full briefs and take a look at it
23 and have it reargued.  But I prefer to get through the bar date
24 issue first.  I don't see the two as inconsistent with each
25 other, I think they can be juxtaposed.

1          MR. BERNICK:  That's fine with us.

2          THE COURT:  All right.

3          MR. BERNICK:  So, we'll simply continue the matters

4   that we talked about today until the next omnibus.

5          THE COURT:  On June 2nd.

6          MR. BERNICK:  Except -- except the class where -- I

7   guess we're going to hear from the Court --

8          THE COURT:  The schedules.

9          MR. BERNICK:  The schedules.

10         THE COURT:  Yes.  We will discuss the schedule for

11  adjudicating your issue, Mr. Scott, on June 2nd.  So, perhaps

12  you can discuss that with the debtor in the meantime.

13         Okay.  All right.  As to the relief from stay

14  request, I haven't heard argument from anybody.  That is not

15  likely to be granted on behalf of any ZAI claimant.  I will

16  hear any argument you choose to make on June 2nd, but you'd

17  better come up with something more than what you've got in your

18  brief so far.  So, that is not too likely to be granted.

19         Okay.  Anything more?  Mr. Hogan?

20         MR. HOGAN:  Your Honor, just an -- just an

21  administrative matter.  Because we were brought into this so

22  late as to these various controversies, and I filed my motions,

23  I believe I filed my response to the bar date and the 54(b)

24  motion.  I filed a motion for leave, and those orders haven't

25  been signed.

1          THE COURT:  They will be.

2          MR. HOGAN:  Thank you, Your Honor.

3          THE COURT:  Okay.  I'll make a note.

4          MR. BERNICK:  And we'll be in immediate contact

5  (indiscernible) represent the Canadians (indiscernible).

6          THE COURT:  Yes, Mr. Monaco, Mr. Hogan, and Mr.

7  Baena.

8          MR. BERNICK:  Thank you.

9          THE COURT:  Anyone else need to be involved in that

10  mediation discussion?

11                  (No audible response heard)

12          THE COURT:  Okay, folks.

13          MULTIPLE SPEAKERS:  Thank you.

14          THE COURT:  All right.  We're adjourned.  Thank you.

15              (Proceedings Adjourn at 1:23 P.M.)

16                  C E R T I F I C A T I O N

17

18          I, Karen Hartmann, certify that the foregoing is a

19  correct transcript to the best of my ability, from the

20  electronic sound recording of the proceedings in the above-

21  entitled matter.

22

23   /s/  *Karen Hartmann*                   Date:  April 26, 2008

24  TRANSCRIPTS PLUS

25

**$**

$7,000- 26:17

**'**

'01- 17:19,20
'02- 8:15
'80'S- 24:22
'82- 20:12
'83- 20:12

**/**

/S/- 77:23

**0**

0111139- 4:3

**1**

1- 13:17
100,000- 32:12
10TH- 42:4
18.6- 49:24
18TH- 16:17
1981- 20:12
1:23- 77:11
1ST- 50:14

**2**

20- 20:8 24:19
2002- 16:11
2006- 28:14
2008- 50:15 77:23
2018- 31:11
25- 20:12,13
24:19 31:17
26- 77:23
2ND- 75:10,13
76:5,11,16

**3**

30- 59:25 60:1
62:11

**4**

40- 20:9
45- 59:25 60:1

**5**

50- 71:24
500,000- 71:22
502- 19:8
524- 36:23
524(g)- 29:21
30:11,19 36:18
37:8,11 56:7,25
67:2
54B- 76:23

**6**

60- 59:25 60:1
64- 16:16

**9**

9TH- 42:3

**A**

ABATE- 43:15
ABBREVIATED-
40:21

ABIDING- 40:20
ABILITY- 12:9,12
39:7 77:19
ABLE- 9:23
15:13,16 26:12,16
28:8 30:18
48:14,18 53:6
64:10 70:16 72:11
73:14
ABOVE- 77:20
ACC- 5:13
ACCEPT- 73:1
ACCOMMODATE-
46:20 48:5,6
73:11
ACCOMPLISH- 39:19
59:7
ACCORDING- 12:10
ACCOUNT- 31:19
ACCOUNTED-
33:2,11
ACCRUE- 24:21
25:3 48:13
ACCRUED- 33:2,10
ACCURATE- 31:8
49:16
ACHIEVE- 32:25
ACT- 49:25
ACTION- 15:24
21:7 25:23,24
29:24
30:4,9,10,19
65:20 66:21
ACTIONS- 17:21
41:17 50:14,24
ACTIVE- 41:21
42:9 55:10,12
61:18
ACTIVELY- 9:21
18:22
ACTIVITY- 7:25
ACTUAL- 46:17
68:13 70:15
71:4,7,11
ADD- 69:14
ADDITION- 31:3
43:17
ADDRESS- 16:22
25:16 28:12,17
38:21 47:6 48:21
66:18 67:19
75:13,19
ADDRESSED-
47:7,17
ADDRESSES- 31:18
ADDRESSING- 23:16
49:15
ADJOURN- 77:15
ADJOURNED- 77:14
ADJUDICATED-
36:23
ADJUDICATING-
76:11
ADMINISTRATIVE-
76:21
ADOPTED- 16:7
ADVANCE- 7:14
15:17,19,20
ADVANCED- 40:24

61:18 62:6
ADVANCING- 35:16
ADVERTISING-
48:19
ADVISE- 14:14
67:12
ADVISED- 28:14
ADVOCATE- 69:21
AFFECTED- 21:5
AFFORD- 37:5
AFFORDS- 29:21
AFTERNOON-
4:20,24 20:5,6
41:5 49:5
AGAINST- 26:21
41:16 43:10,12,13
56:20 71:25
AGENDA- 6:2 35:23
AGGLOMERATION-
51:12
AGREE- 29:14
37:10 38:19 44:15
56:9 58:19 61:12
69:24 70:7
73:14,17 74:22
AGREED- 21:11
AGREEMENT- 6:7
9:17,20,21
10:7,9,14 19:23
22:3,4 57:19
60:16 74:10
AHEAD- 7:1 22:10
24:2,9,16 57:10
63:5,25
AIDS- 23:24
AIM- 8:20
AIMING- 70:5
AIR- 27:24
ALAN- 4:17
ALBEIT- 6:15
ALEX- 4:9
ALIEN- 26:1
ALLEGEDLY- 35:18
ALLOCATED- 56:16
ALLUDED- 49:15
ALONE- 60:20
ALTER- 73:9
ALTERNATIVE-
19:25 27:6
AMAZING- 17:18
AMEN- 54:15
AMENABLE- 36:24
AMENDED- 15:24
AMENDMENT- 42:5
AMENDMENTS- 53:23
AMERICA- 40:17
AMERICAN- 41:12
43:19 44:12
45:2,20,25 46:4
49:13
AMONG- 40:8
AMONGST- 14:24
39:16
AMOUNT- 6:15 58:5
AMOUNTS- 65:3
ANCILLARY- 49:17
51:22 52:9 53:25
AND/OR- 44:14,16
ANDREW- 4:13

ANIMAL- 54:7
ANNOUNCEMENT-
39:23
ANTICIPATE- 6:19
ANTICIPATION- 6:3
ANYBODY'S- 71:6
ANYHOW- 70:13
ANYWAY- 70:12
72:16
ANYWHERE- 55:25
APOLOGIZE- 38:23
APPEAL- 14:8
15:23 16:8 19:3
28:5 29:16
33:13,23,25
34:2,6
APPEALED- 13:19
APPEALS- 15:25
APPEARANCE- 4:23
APPEARED- 39:22
43:24
APPELLATE- 25:2
27:17 28:8,22
29:1
APPLICATION-
68:12
APPLIED- 68:17
APPLIES- 45:24
APPOINTED- 18:7
33:17 42:11
APPOINTING- 50:13
APPOINTMENT-
74:22,23 75:6
APPRECIATE- 38:24
APPRIZED- 47:18
APPROACH- 44:2,12
APPROACHED- 42:18
APPROACHES- 44:8
72:9
APPROPRIATE- 7:20
25:17 67:3,17
70:18
APRIL- 16:15,22
42:3,4 77:23
AREAS- 69:7
AREN'T- 26:16
43:9 60:13
ARGUE- 18:17
36:22 75:14
ARGUED- 38:17
ARGUING- 33:20
ARGUMENT- 6:14
16:13 19:5 40:25
76:14,16
ARGUMENTS- 51:4
ARI- 4:12
ARLENE- 4:7 5:5
ARRANGEMENT- 7:23
ARTHUR- 20:18
ARTICULATED- 43:3
ASBESTOS- 9:18
20:11,14 24:18,21
25:21 27:15
40:4,9,11
ASPECT- 69:5
ASSERT- 34:8,9
ASSERTED- 43:9
ASSERTING- 33:5
ASSESSMENT- 52:3

ASSETS- 8:16
ASSIST- 21:7
23:21 51:4
ASSOCIATED- 14:2
ASSURE- 40:12
54:25
ATTACHED- 41:15
ATTEMPT- 28:12
47:6
ATTEMPTING- 23:9
28:15,17 35:5,18
37:12
ATTENTION- 40:10
42:16 72:16
ATTIC- 67:14
ATTICS- 50:21
ATTORNEY-
25:12,13 63:18,21
73:2,25 74:1
ATTORNEYS-
24:1,5,8,11 68:14
AUDIBILITY- 6:23
46:14 47:13 69:12
72:5,23
AUSTERN- 5:15
AUTOMATIC- 32:10
43:7
AVAILABLE-
11:6,9,18,19
19:15 70:20
AVOID- 14:20
AWARE- 8:13 9:20
27:4 39:24
42:7,8,10 44:3
47:9 48:25 69:6
AWFUL- 7:10
26:4,6

**B**

BACK- 7:24 8:14
12:2,4 16:10
17:20,21 18:15,16
27:1 28:14 29:19
32:15,16 35:23
44:17 48:2 54:24
58:22 60:2,16
66:9 70:22
BAENA- 5:3,4
32:17 38:25 39:1
53:1,4,6,10,14,20
,22
52:6,15,20,24,25
54:2 68:1 75:16
77:7
BAER- 5:2
BAILOR- 4:11
BALL- 35:16
BANK- 60:19
BANKRUPTCY- 4:3
11:8,10,16,19,20
12:9,19,25 13:15
21:8 26:3 32:5
65:9
BAPCPA- 53:23
BAR- 11:12 12:20
13:8 14:3,21
21:25 22:14,15
25:10 26:9
30:9,25 34:18,19

36:21 39:4,7,8,18
40:24 41:1 42:5
57:24 58:8,14
60:14,15,21,22
61:8,25
62:1,9,15,22
63:1,3
66:9,19,20,23,25
67:4,11,21
68:5,10,11,12
BARBANTI- 16:3
19:3 26:23 27:10
29:24 31:14 34:6
56:19 65:20
BARGAIN- 46:2
BARGAINING-
44:7,13 45:3,22
BARLIANT- 46:6
BARON- 4:15
BARRED- 24:23
BASE- 50:19 71:23
72:14
BASED- 45:2 71:9
BASIC- 18:4 19:11
57:22
BASIS- 15:13 17:3
19:16 28:23 29:20
31:13 34:16
BATTLEGROUND-
33:7
BEAN- 4:10
BEAR- 11:14
BEAU- 4:18
BEAUTY- 32:6
BEAUTY'S- 20:24
BECOMES- 19:24
BEGAN- 8:15
24:19,22
BEHIND- 64:3
BEHOLDER- 20:24
BELENJAY- 5:24
BENEFIT- 29:21
30:19 32:10 37:25
72:12
BERMAN- 4:12
BERNARD- 4:11
BERNICK- 4:20,21
5:25 6:1,25
8:5,7,24
9:1,4,6,13 20:23
21:18 22:18,23
23:23 24:13,14,15
25:8 26:14,19
27:7,18 30:14
31:5 32:4,16
33:6,13,20,23
36:22 40:13 46:16
47:15,22 49:14
51:23
52:2,14,22,25
54:4,5,18 63:
BERNICK'S- 6:24
20:7 29:25 46:14
47:13 69:12 72:23
BET- 29:18
BIG- 25:20
BIRD- 18:14
BIRTH- 20:11
BIT- 31:14 62:6

64:3
BOARD- 60:3 62:4
BORDER- 49:10
BOSTON- 17:22
BOTH- 12:13 29:13
30:13,14 36:20
42:12,20 50:16
58:19 72:20
BREAK- 66:10
BRETHREN- 40:5
45:16
BRIAN- 4:13
BRIEF- 29:25
32:19 66:23,24
76:18
BRIEFING- 21:11
37:25
BRIEFS- 16:12
27:9 75:21,22
57:5,21
BROAD- 15:2
BROKE- 61:19
BROUGHT- 11:14
34:11,15 42:2,3
76:21
BUCKWALTER- 14:10
BUGABOO- 25:20
BUILDING- 25:3,4
BUNCH- 7:2 14:13
58:13 62:2
BUSINESS- 65:6
71:18

C
CAB- 63:16,20
CALCULUS- 40:15
CALENDAR- 36:6
CALL- 7:10,16,23
33:21
CALLED- 13:14
CALLS- 33:14,21
CAMERON- 4:10
CAN- 8:7
11:3,10,11,13,17,
22,23
10:7,24,25
12:3,4,7,14,21
13:19 14:16,17
16:24 17:7,8
18:17 19:8
20:2,16 21:7
23:21,25 24:2
28:5
30:3,9,11,12,13
31:6 32:25
33:2,11 34:10,19
36:23,24 37:5
44:8 45:19 46:1
48
CAN'T- 29:13 46:3
47:16,18,24,25
48:5 58:19
60:16,19
CANADA- 5:24
41:17,20 42:11,19
43:1,9,10,22
44:16 47:5,9
49:20,25 51:8

52:10,12
61:20,23,24 62:4
67:8 73:4
CANADIAN- 5:19,23
41:6,11,13 42:5
43:3,4,5,23 44:5
45:20,24 46:3,10
47:4 49:13,16
51:1,6,7,8,11,16,
20
50:4 52:18 53:12
61:18,25 62:1
66:13 68:17,20
CANADIANS-
61:15,17 67:9
77:5
CANCEL- 63:15,20
CANDON- 4:17
CAPABILITY- 44:25
CAPACITY- 52:25
CARBRASER- 4:6
CARE- 19:6 46:8
57:4 65:2
CAREFUL- 47:24
CAREFULLY- 56:12
CASE- 7:4,5,14
9:14 10:2 13:10
14:9 16:2 17:25
18:3 19:11,17
29:11 30:8 34:3
40:2,9,19 42:17
44:20 46:6 52:11
55:16 57:3 58:6
60:4,5,7,8,9,11,1
9
59:14,15 61:10
62:16,19 66:2
69:18
CASES- 7:23 25:21
26:4,5,7
45:20,24,25 46:7
51:12 59:2 72:8
CATHERINE- 4:15
CATHLEEN- 38:3
CAUSE-
15:18,19,20
CAUSED- 47:8
70:24
CAVEATED- 47:2
CCAA- 41:14 42:12
43:2 45:10 49:25
CDP- 30:13
CENTRAL- 8:12
CERTAIN- 6:15
8:18 10:2 30:3,6
35:7,15 41:16
42:24 64:8
CERTAINLY- 22:13
31:11,13,16
48:7,9 49:12
66:7,8 72:17
CERTAINTY- 13:23
18:14
CERTIFICATION-
25:17,18,19 34:9
66:12
CERTIFICATIONS-
25:20 26:2,8,10
CERTIFIED- 15:23

16:2
CERTIFY- 77:18
CETERA- 21:2 61:4
CHANGE- 16:3
57:20 60:13
CHANGED- 17:5
57:16
CHANGES- 41:8
46:19
CHANNEL- 12:24,25
33:21
CHARACTER- 31:20
CHARACTERIZED-
42:20
CHARGE- 65:18
CHEN- 4:15
CHOICE- 7:15,16
CHOICES- 59:18
CHOOSE- 45:21
72:18 76:16
CHOOSING- 35:12
CHRISTENSEN- 4:12
CHRISTINA- 4:4
CHRISTOPHER- 4:17
CIRCUMSTANCE-
46:20 72:11
CIRCUMSTANCES-
31:18
CIVIL- 12:16
CLAIM- 13:17
16:21 25:12,14
26:12,17,18
28:1,24
34:3,4,5,8,9,10,1
3,15,19,20,25
29:6,9,15,23 33:5
36:11,14 37:15,18
38:2,22 45:2
58:15 66:22 67:16
75:20
CLAIM'S- 29:11
CLAIMANT- 25:11
27:22 29:8,11
50:16 56:21
59:5,11 70:15
71:23 76:15
CLAIMANTS- 5:9,23
10:16,19 11:11,23
12:1,20,23
13:2,3,4 14:6
15:10 19:21
22:6,21 26:11,16
27:22 30:17
31:3,25 36:15
41:6,11,12 42:1,6
43:20 48:16 52:17
56:24 57:17
58:1,16 61:19,20
62:4
70:18,20,21,23
CLAIMANTS'- 9:18
36:19 68:21
CLAIMS- 5:16
8:9,10,11 10:6,19
11:1,24 13:25
14:2,15 18:4
19:6,14 21:5
22:16,17,19,21,22
23:18 24:21,23,25

25:2,5,8,9,22
27:11 29:2,3,22
30:8
33:1,5,8,10,15
35:7,10 38:1
40:9,11,22
42:9,12,13
43:5,9,12,13,14,
CLARIFICATION-
27:5
CLASS- 5:11
16:1,2,3,5,6,8,21
,22
15:8,11,22,23,24
17:9,14,21 19:3
21:7 22:8,12
23:11
25:17,19,20,23,24
26:2,7,10,21,22
27:10,20
30:9,10,19 32:22
33:3,4,6,18,25
34:1,3,9,13,25
35:7,10,11
36:11,14 37:15
38:21
CLASSES- 67:18
CLEAN- 48:25
CLIENT'S- 20:21
41:9 61:12
CLIENTS- 22:3
29:13 33:22 41:24
45:8 71:7
CLIENTS'- 34:7
CLOCK- 18:16
CLOSER- 39:20
CLOSURE- 18:13
32:25
CLOUD- 17:12
COCOUNSEL- 5:18
51:15
CODE- 32:5
CODEFENDANT-
50:23
COIN- 58:10
COLLABORATIVE-
40:3
COLLEAGUES- 32:16
COLLEGE- 25:23
COMBINATION-
65:22
COME- 12:2,4,20
20:17 22:13,20
24:20 25:6
26:16,21 31:3,10
32:15,16 56:13,14
60:2 62:1 68:1
76:17
COMES- 14:20,25
61:15 62:18
COMFORTABLE- 73:8
COMING- 15:15
22:13
COMITY- 50:2
COMMENCE- 53:24
54:2,3
COMMENCING- 52:12
COMMENT- 52:6
63:18

COMMENTED- 39:6,7
COMMENTS- 41:7
49:15
COMMITTEE- 5:4,6
9:19 39:2
42:18,21,22
53:3,4
COMMITTEES- 40:4
COMMON- 7:3
COMMONPLACE-
25:21
COMMUNICATION-
45:10
COMMUNITY- 33:8
COMPANY- 9:25
COMPELLED- 68:24
COMPELS- 69:2
COMPLAINT-
37:19,21
COMPLETELY-
18:19,24 61:10
COMPLEX- 7:23
28:18
COMPONENT-
44:21,22 68:10
COMPONENTS-
10:18,20 45:15
55:14
COMPORT- 45:23
CONCEPT- 66:21
CONCERN- 40:8
52:22
CONCERNED- 40:22
50:3 59:23
CONCERNS- 43:23
49:8
CONCLUSIONS- 21:4
CONDITION- 10:5
17:13
CONDITIONS-
75:3,6
CONFERENCE- 21:18
28:19 54:22,24
CONFERENCES-
28:12
CONFERRING-
24:1,5,8,11 63:7
CONFIDENCE- 11:15
CONFIRM- 52:2
CONFIRMATION-
7:17,19,24,25
8:20 9:16
10:5,13,18
13:9,11,21 40:15
46:2 59:22
60:1,10 62:25
CONFIRMED- 17:8
CONFIRMING- 46:5
CONFLICT- 9:8
CONJUNCTION- 67:4
CONSENSUAL- 36:2
CONSEQUENCE- 9:25
56:6
CONSIDERATIONS-
43:22
CONSIDERED- 6:6
57:14
CONSISTENT- 10:8
17:1 62:25

CONSOLIDATED-
12:13 13:5
CONSTELLATION-
13:6
CONSTITUENCIES-
57:4
CONSTITUTE- 52:16
CONSTRUCT- 66:20
67:7
CONTACT- 77:4
CONTACTS- 6:3
CONTAIN- 46:13
CONTAMINATION-
25:3,5
CONTEMPLATES-
17:10
CONTEMPLATING-
67:6
CONTENT- 61:5
CONTESTED- 35:3
60:23
CONTEXT- 7:8,22
37:8 64:23
CONTINUE- 76:3
CONTINUED- 55:12
CONTRAST- 8:4
CONTRIBUTING-
65:5
CONTRIBUTION-
50:17,22
CONTROL- 56:1
CONTROVERSIES-
76:22
CONTROVERSY-
14:22
CONVERSATION-
70:4
CONVINCE- 32:24
CONVINCED- 23:13
CONVOCATION-
39:16
COOPERATIVE-
60:19
CORCORAN- 4:6
CORE- 27:9
COST- 15:5
65:16,18,20,22,23
COULDN'T- 12:17
40:1
COUNSEL- 12:23
18:7 32:22 33:17
41:24 42:11,12,19
COUNT- 14:16
COUNTRY- 18:17
COURSE- 11:3
15:16 17:18 19:17
33:19,20 34:14
38:2 44:20 48:3
COURT- 4:2,19,22
5:3,21,25 6:22
7:1,10,15
8:5,11,23,25
9:3,5,12,23 12:16
14:14 19:12
20:4,6 22:23
23:1,6,8,24,25
24:2,6,9,15
25:5,13
27:1,2,8,11,14,24

28:6,7,9,21,22,24
29:5,10,17 30:24
31:6,12,23
32:9,12,18
COURT'S- 7:8
8:7,13 34:8
37:10,16 38:6
42:16 44:1 51:1
65:13
COURTS- 25:2
26:3,9 27:17
45:16 46:4
COVERED- 35:11
CRACKED- 66:16
CRAIG- 4:13
CRAZY- 72:13
CREATE- 13:8
17:12 28:8 29:5
45:9
CREATED- 24:7
CREATING- 28:25
CREDIT- 55:22,23
CREDITORS- 5:7
CRITERIA- 56:7
CRITICAL- 59:20
CROSS- 15:1
CROWN- 5:18 42:3
43:8,11,12,14
46:10 49:3,6
CROWN'S- 51:3
CRUSHED- 40:17
CUDGEL- 27:19
CUE- 40:12
CURB- 21:19
CURRENTLY- 50:24
CURTIS- 4:8

D

DAISVISCA- 5:19
DAM- 64:20
DAMAGE- 14:2
20:12,14
23:15,16,18
24:18,21 25:2,21
27:16 29:22,23
30:12 31:19 39:2
40:7 44:7,9,10,11
53:2 64:25 65:2
DAMAGES- 30:4,17
DANIEL- 4:4,14
5:22 41:5
DARN- 71:9
DARRELL- 5:10
32:21
DATA- 14:20
58:1,2,7,17,20,25
59:4,8 61:13
71:19
DATABASE- 46:11
68:18 71:22
DATE- 11:12 12:20
13:8 14:3,21
21:25 22:15 26:9
30:9,25 34:18,19
36:21 39:4,7,8,18
40:24 41:1 42:5
57:24 58:8,14
60:14,15,21,22
61:8,25

62:1,9,15,22
63:1,4
66:9,19,20,23,25
67:4,11,21
68:5,10,11,12
69:11 75
DATE'S- 22:14
DATES- 8:21,23
25:10
DAVID- 4:10,12,20
5:15
DAVIS- 4:17
DAY- 9:16
26:19,20 35:13
DAYS- 22:7,9 36:6
52:11 59:25 60:1
62:11
DEAL- 44:2 51:17
54:5,6 57:2 61:20
69:10
DEALING- 38:8
DEALT- 10:6
DEBATE- 15:6 39:4
52:10 60:24
DEBRA- 4:5
DEBTOR- 9:18
16:23 30:4,5,8,15
34:20 37:3 39:9
42:4 43:2 44:14
48:9,17 55:16
62:24 64:21 65:4
67:5,8 70:23
71:3,6,7 76:12
DEBTORS- 6:8
32:24 41:21 68:10
DEBTORS'-
36:17,18 66:20
DECIDE- 47:18
63:2
DECIDED- 27:19
55:19
DECIDING- 25:2
29:11
DECISION- 47:7
55:22
DECISIONS- 50:1
DEED- 24:12
DEFERRED- 62:22
DEFINED- 12:23
DEFINITELY- 41:8
75:22
DEFINITION- 13:24
DEGREES- 7:8
DELAY- 16:9 17:11
19:24 22:11 25:15
DELAYED- 22:12
DELAYING- 19:20
DELIBERATE- 47:23
DEMOLISHED- 31:9
DEMONSTRATED-
53:17
DEMONSTRATIVE-
23:24
DENIAL- 34:8
DENIED- 12:3
17:24 28:22 34:5
DEPARTMENT- 5:19
DESCRIPTION- 61:3
DESIGNED- 13:16

16:9
DESTINATION-
15:19
DETAILED- 19:2
DETERMINATION-
8:12 11:23 13:18
17:7 18:17 19:11
31:24 43:5
DETERMINE- 15:25
23:2,20 25:9,14
27:1 33:7 35:5
44:1
DETERMINED-
22:22,24 23:1
27:8,11 65:13
DETERMINING-
10:25 35:9
DEVELOPED- 8:16
51:4
DEVELOPMENT- 51:3
DEVELOPS- 37:6
DEVIATING- 13:13
DEVICES- 23:20
DEVINE- 4:16
DIALOGUE- 42:17
DIDN'T- 17:3 19:4
30:25 40:23
43:14,15 54:3,18
56:13,14 64:12
DIERKES- 4:9
DIES- 4:13
DIFFERENCE- 45:23
58:18 73:7
DIFFERENT- 6:12
12:8 19:25 20:16
43:19 44:23 47:22
52:16 53:24 55:11
56:6,10 57:13
59:2 62:17 69:7
73:4
DIFFERENTLY-
41:11
DIFFERING- 55:5
DIFFICULT- 6:23
52:15
DIFFICULTY- 37:23
58:20
DILUTING- 19:20
DIMENSION- 54:8
DIMENSIONS- 57:1
DIRECTED- 7:4,7
DIRECTION- 40:20
70:5
DISABUSE- 39:21
DISAGREE- 49:11
DISAGREEMENT-
53:11 57:16 59:3
73:17
DISALLOWANCE-
19:7
DISALLOWING-
34:15
DISCHARGED-
33:3,12
DISCLOSURE-
9:7,11 48:8,12
70:9
DISCRETION-
7:8,11

DISCUSSIONS- 12:22 54:25 55:10,12 56:2 61:18 62:12 64:11 66:5,14 67:23
DISINTERESTED- 75:8
DISMISS- 28:25 29:6,8,9,15
DISMISSED- 29:4,5,9,12
DISMISSING- 28:24
DISTANCE- 7:21
DISTINCTION- 42:10
DISTINCTION'S- 42:15
DISTINCTLY- 43:19
DISTINGUISH- 49:13
DISTINGUISHED- 72:19
DISTRACTING- 19:20
DISTRACTION- 19:25
DISTRIBUTION- 11:2
DISTRICT- 28:22 29:17 71:10
DIVERTS- 33:19
DOCUMENTS- 69:4
DOESN'T- 7:24 16:3,19 20:9 27:23 28:1 41:1 55:21,23 69:25 70:2 71:3 73:9
DOHENY- 4:9
DOLLAR- 9:23 56:19 65:9
DOLLARS- 8:15 10:17 18:10 21:17 37:4 48:10,18 65:9,23,24 66:1 72:1,8
DON'T- 6:7,9 11:16 16:22 20:20 21:13,24 22:1,24 25:5 28:2,7,9,18,19 30:8,9,20 33:13 34:23 35:19 36:21,22 37:8,17,20 45:13 46:2,21,24,25 48:20 49:11 50:2 53:8 54:17 59:6 60:6 62:1,20 63:21 64:17,25 65:9 66:6
DOUGLAS- 4:10
DRAW- 42:16
DRIVEN- 55:15,16,17
DRIVERS- 57:18
DROVE- 58:5
DUCKY- 60:17
DUE- 25:18 70:1
DUTIES- 18:25

DUTY- 33:16

E

EACH- 11:7 13:1 37:9 45:4 48:4 59:14 75:24
EARLIER- 9:10 14:9 48:2
EARLY- 9:10 22:7,9 24:22
ECONOMIC- 57:1
ECONOMICS- 9:21
ED- 5:8
EDGE- 18:13
EDWARDS- 4:5
EFFECT- 27:13 43:16
EFFECTUATE- 39:8
EFFORT- 17:23 29:19
EFFORTS- 69:1,3
ELDERLY- 23:12
ELECTION- 35:13
ELECTRONIC- 77:20
ELIHU- 4:11
ELIZABETH- 4:5,15,16
ELSE'S- 75:18
ELSEWHERE- 33:16
EMPHASIZE- 6:17 69:25
ENABLE- 11:20 69:25
ENABLED- 13:15 58:9
ENABLES- 10:8
ENCOMPASS- 44:15 45:19
ENDS- 66:2
ENGAGE- 64:11 66:13
ENHANCE- 15:5
ENHANCED- 12:19
ENLIGHTMENT- 27:17
ENTAIL- 13:13
ENTER- 12:21 34:14
ENTERING- 4:22 38:9
ENTERS- 38:8
ENTERTAIN- 45:11,12,17
ENTITIES- 44:4
ENTITLED- 77:21
ENTRIES- 4:19
ENTRY- 13:18,25 14:13
ENVIRONMENTAL- 64:22,23
EPIDEMIOLOGICAL- 27:23
EQUAL- 49:8
EQUITABLE- 33:3 34:4 37:15,20 38:5,7 50:1,4,6 51:10
EQUITY- 9:19
EQUIVALENT- 30:10 36:20

ERROR- 29:7,10
ESAYIAN- 4:16
ESSENTIAL- 7:15
ESSENTIALLY- 7:5,19 8:9 42:22 43:13 60:23
ESTABLISH- 39:18
ESTATE- 8:16 32:11 62:15
ESTATES- 36:17
ESTIMATE- 10:17,22,25 11:21 13:8 65:1
ESTIMATED- 60:9
ESTIMATES- 11:13
ESTIMATING- 10:6 59:16
ESTIMATION- 12:7,8,14,15 19:5 31:4,15 37:1 58:4 59:9,22
ET- 21:2 61:4
EVE- 22:14
EVENTS- 48:3
EVERYBODY- 11:4 12:9 18:16 36:2 40:18 56:5 58:19
EVERYBODY'S- 40:20 70:5 73:5
EVERYONE- 70:11
EVERYTHING- 6:19 12:25 15:9 16:1
EVIDENCE- 12:15 27:23
EXACERBATES- 16:4
EXAMINATION- 15:1
EXAMPLE- 37:4 76:6
EXCEPT- 63:10
EXCEPTION- 26:5,7 37:12
EXCLUDE- 33:22
EXERCISE- 7:11 17:2
EXIGENCY- 22:5
EXISTED- 53:23
EXIT- 40:18
EXPECT- 57:19
EXPECTED- 55:8 61:19
EXPENSES- 50:20
EXPENSIVE- 59:7
EXPERT- 14:24
EXPERTS- 14:14,24 31:15 58:22
EXPLORED- 55:11
EXPRESSED- 28:11
EXTENDED- 6:12 8:1
EXTENSIVE- 67:11
EXTENT- 23:9 35:15 42:8,24 47:8,11 48:17 56:20 65:16 69:3,23 70:18,20 71:1
EXTRAPOLATE- 11:13
EXTRAPOLATION-

12:18
EXTRAPOLATIONS- 58:2
EYES- 20:24

F

FACILITATOR- 69:15
FACILITIES- 56:7
FACILITY- 57:1,2
FACING- 26:18
FAILURE- 57:18
FAIR- 28:2 49:8 50:1,4,5 51:9 75:12
FAIREY- 4:6
FAIRLY- 41:25
FAITH- 73:6
FALL- 47:16,21 52:4
FANCY- 58:13
FAR- 27:6,12 47:1 76:18
FASHION- 10:8 36:16,19 55:2
FAST- 7:9 27:2
FAULT- 64:15
FAVOR- 69:22
FAVORED- 26:3
FEATURES- 7:3
FEDERAL- 12:15,16 15:24 25:24 46:5
FEDERALMOGUL- 44:18 45:7
FEEL- 68:24 73:7
FELDER- 4:5
FELT- 64:2
FEMALE- 52:13
FIELD- 26:24
FIGURE- 11:20 14:18 23:17 48:14 62:2
FILE- 25:12 34:13,19,20,24 41:18 67:15 69:2
FILED- 24:25 36:11 41:23 42:3,4 43:11 49:7 52:11 76:22,23,24
FILING- 45:9
FINAL- 28:4
FINALLY- 22:2 66:16
FINANCIAL- 56:15,23 57:17
FIND- 11:10 17:3 19:12,14 23:17 26:5,7 59:5 67:14 70:15
FINDING- 32:3
FINDINGS- 67:6
FINE- 36:7 38:7 39:11 69:24 70:6 73:25 74:1,16,25 75:2 76:1
FINGER- 30:23
FINITE- 65:23,24
FIRM- 5:24 6:7
FIRST- 7:4 8:21

10:16 13:19 15:21 16:19 24:25 27:16 34:17 39:22 40:1 51:17 53:12 67:20 68:25 75:24
FIVE- 24:24
FLATLY- 14:9
FLEXIBILITY- 37:8
FLOATING- 21:13
FLY- 31:1
FOCUS- 36:12,13
FOLDED- 44:11
FOLKS- 29:18 30:16,20 32:7 37:5 38:10,13 45:3 48:4,20 55:17 66:4,13 67:22 71:17,18 73:14 77:12
FOLLOW- 12:15
FOLLOWING- 57:5 60:15
FORECLOSE- 66:20
FORECLOSES- 52:10 53:9
FOREGOING- 77:18
FOREIGN- 44:20,22 45:1,2
FORESEE- 43:15
FORGET- 20:19 58:5
FORM- 58:15
FORMED- 52:11
FORMIDABLE- 26:19
FORTH- 43:2 67:10
FORWARD- 11:1 12:20 13:10 15:12,16 17:2 18:3,7 25:6 27:22 31:3,10 37:15 54:22 68:16
FOUR- 7:12 24:24
FRAME- 69:25
FRANK- 5:17 49:5
FRANKEL- 5:14,15 9:7
FRANKLY- 16:10 28:7 38:16 55:21
FRAUGHT- 58:24
FREE- 36:6
FREEDMAN- 5:1
FRENCHSPEAKING- 43:20
FRIENDLY- 46:4
FRIGHTEN- 23:11,14
FRUITION- 9:17 24:20 56:13,15
FULL- 20:8 75:22
FUNCTION- 28:9
FUNCTIONALLY- 28:4
FUNCTIONING- 46:14 47:13 65:5 69:12 72:5,23
FUND- 30:2,5
FUNDED- 30:3,17
FUNDS- 48:18
FURTHER- 6:14

14:8 21:22 31:15
39:18 62:6,23
**FUTURE-** 5:15 9:8
13:22
**FUTURES-** 9:19

## G

**GAINING-** 18:13
**GAME-** 19:21 33:14
40:17 41:8,25
**GATE-** 40:17
**GENERALLY-**
59:14,22
**GENUINE-** 32:25
**GENUINELY-** 32:19
**GEOMETRIC-** 7:16
**GERRYMANDERING-**
35:13,15
**GET-** 8:17 11:21
12:4,12 13:20
14:7,22 15:20
21:10 22:4 23:9
26:14,16
27:1,3,5,12 28:5
29:19 30:16 35:23
36:1,2 40:1,14,18
42:21 43:24 46:16
47:1 49:24 52:15
55:24 56:5,10
57:7,25 58:9,15
59:1,15,24
60:9,10
**GETS-** 25:12 30:14
40:17 62:14
**GIVE-** 6:20 9:17
10:17 50:2
55:21,23 59:8
71:3
**GIVEN-** 6:5 7:17
56:16 62:16
**GO-** 6:11 7:1
16:1,24
17:15,20,21 18:15
19:4 22:20 23:11
24:2,9,16 25:12
28:2 37:8 39:15
48:2,18,19 54:22
57:2,9 62:8
63:5,25 66:1 73:4
**GOING-** 6:19,20
8:19 9:9,13
11:1,25
13:10,12,20
15:9,10,11,12,13,
17,18,19,20,21,22
14:13,14,22,23,25
16:4,5,20,21,23
17:15 18:15
19:1,2,4 20:15
21:5,6,24
23:10,21 25:13
26:12,16,17,22
27:1,12,18
29:5,11 31:10
**GONE-** 9:21 35:17
56:12
5:3,5,8,10,12,14,
17,22
**GOOD-** 4:20,24

20:5,6 22:12
24:12 26:19 28:16
35:14 41:5 49:5
59:8 64:21 70:19
71:9 73:6
**GORILLA-** 54:7
**GOT-** 9:23 15:4
25:16 27:6 29:20
37:7 41:19 52:18
54:15 57:20 59:17
60:12,18,25
61:13,14 63:3
65:3,15,25
67:14,15 69:23
76:17
**GOVERNING-** 38:1
**GOVERNMENT-** 46:10
47:4 50:19 68:17
**GOVERNS-** 7:13
**GRACE-**
4:2,21,22,25
5:1,2 21:9 22:5
25:1 26:2 28:4
31:1,7 41:20
43:10,13 49:19
50:23 51:7,8
52:10
55:11,15,18,25
64:11 71:25
72:8,14,25
**GRACE'S-** 25:19
64:7
**GRAIN-** 55:1,3
**GRANTED-** 76:15,18
**GREATER-** 61:9
**GREATEST-** 27:13
58:5
**GROUP-** 22:6
**GROUPS-** 43:18
**GUARANTEE-** 31:6
**GUESS-** 35:14
46:12 51:9 76:7
**GUIDANCE-** 51:1
**GUTTMANN-** 4:4
**GUYS-** 70:4

## H

**HAIRCUTS-** 65:8
**HALF-** 35:17
**HAND-** 18:14
**HANDFUL-** 13:25
**HANDICAP-**
57:12,13,15
**HANDLE-** 64:22
**HANGUP-** 56:25
**HAPPENING-** 54:21
**HAPPY-** 22:2,4
31:16 40:5 45:15
46:19 61:10,16,21
73:11
**HARBOUR-** 4:18
**HARD-** 7:9 56:5
58:2,25 59:4,18
**HARLEY-** 4:16
**HARM-** 23:3,13,14
27:25 47:8 65:14
**HARTMANN-**
77:18,23
**HARVARD-** 20:18

**HASN'T-** 27:11
42:23
**HATE-** 44:17
**HAVEN'T-** 22:22
23:1 28:19 35:22
39:15 52:19 64:13
74:3 76:14,24
**HE'D-** 20:8
**HE'LL-** 9:23
**HE'S-** 26:20 64:15
**HEALTH-** 47:5
**HEAR-** 6:23 7:22
13:12 19:4 35:20
75:16 76:7,16
**HEARD-** 22:8 52:9
76:14 77:11
**HEARING-** 6:4 8:20
9:7,11 13:9 40:15
51:2 53:14 71:5,8
**HEAVY-** 18:25
**HELD-** 23:17
**HELPFUL-** 24:17
32:1
**HIGHEST-** 9:15
**HISTORY-** 27:15
**HOELZLE-** 4:17
**HOGAN-** 5:22
41:4,5 42:15 45:7
46:8 47:1,2,20
48:21 49:3 50:12
68:8,9 73:19,20
74:4,5,8,10,13
76:19,20 77:2,6
**HOGAN'S-** 49:15
**HOLD-** 28:17 30:21
40:20 70:8
**HOLDS-** 23:17
**HOLE-** 42:23
**HOME-** 10:9
63:13,14 65:15,17
**HOMEOWNERS-** 33:4
**HOMES-**
31:8,9,24,25 47:9
71:22
**HONKYDORY-** 54:1
5:4,5,8,10,12,14,
17,18,22,23
**HONOR-** 4:20,24
6:1,4 7:2 9:20
11:4 16:10,14
17:1 20:5,11,25
21:1,3,10,13,16
22:1,7,16,24
23:5,19,23
24:4,10,12,17
25:16,20
26:3,15,23,25
27:4,13,15,21
30:22
31:13,15,16,21
32:15,
**HONOR'S-** 19:10
49:11 54:11 56:2
66:15
**HOPE-** 7:18 20:2,9
50:5 73:22
**HOPEFULLY-**
35:16,24 45:5
51:3

**HOPING-** 39:19
**HORKOVICH-** 4:14
**HORSES-** 40:20
**HOUR-** 41:8
**HOUSES-** 71:20
**HOUSING-** 50:19,20
**HUGE-** 15:4 58:16
65:12
**HYPOTHESIZED-**
13:2

## I

**I'D-** 6:17 20:15
46:8 49:14 50:25
72:18
**I'LL-** 4:19 6:11
7:1 32:15 40:25
60:5 64:11 74:25
75:16 77:3
**I'M-** 6:19,20 19:4
29:10 32:1,2
35:23 36:24 38:9
39:3 40:6
44:10,19 45:15
48:2,15,21 49:22
50:7,10 51:16
52:8 53:10,14
55:2 59:23 61:15
67:6,18 70:8
71:21 72:18,25
75:20,22
**I'VE-** 26:4,6
28:9,23 29:24
35:20 41:7 44:18
72:7
**IDAHO-** 26:18
**IDEAS-** 6:10 56:6
**IDENTIFICATION-**
13:2
**IMMEDIATE-** 34:6
77:4
**IMMEDIATELY-** 15:3
**IMPACT-** 47:10
**IMPERFECT-** 11:15
**IMPLEMENT-** 10:14
**IMPLICATION-**
22:11
**IMPORTANT-** 10:1
30:23 42:15 46:21
49:22,23 58:20
59:21
**IMPRESSION-** 64:12
**INCLINED-** 66:24
**INCLUSION-** 56:4
**INCONSISTENT-**
75:24
**INCORPORATED-**
48:8
**INCORPORATING-**
45:1
**INCORRECT-** 52:13
**INCURRED-** 50:20
**INDEED-** 28:1
54:10 58:14 59:14
61:17
**INDEMNIFICATION-**
43:14 50:17,22
**INDICATED-** 9:7
68:11,12

**INDISCERNIBLE-**
6:24
8:16,18,20,22
10:1,3,4,5,10,11,
15,17,19
9:1,9,18,24,25
11:9,16 12:5,8
13:6,11,12,21
14:1,7,11,23
15:2,4,5,7
16:5,16,18,19,23
17:5,6,9,21,23
18:3,5,9,20
19:1,7,9,19
20:1,3
46:15,17,18,21
47:14,15,
**INDIVIDUALLY-**
43:18
**INDIVIDUALS'-**
47:8
**INDULGENCE-** 8:7
**INEVITABLE-** 6:15
**INEVITABLY-** 16:9
**INFORMAL-** 6:3
**INHERENTLY-** 43:8
**INITIAL-** 6:18 8:2
**INJECTED-** 17:24
**INJUNCTION-** 29:21
30:20 56:20
**INJUNCTIVE-**
30:1,3,5 41:16,19
**INJURY-** 14:1 31:5
36:6,8 39:24 58:4
70:25
**INSELBUCH-** 4:11
**INSIGNIFICANT-**
54:8 62:16
**INSINUATING-**
50:10
**INSOFAR-** 68:18
**INSOLVENCY-** 41:13
49:25
**INSTALLED-**
50:18,19
**INSULATION-** 67:15
**INTENDED-** 39:5
68:23
**INTENSIVE-** 58:7
**INTERACTION-**
53:15
**INTERACTIVE-**
53:17
**INTERCORE-** 45:10
**INTEREST-** 41:22
**INTERESTING-** 45:8
**INTERESTS-** 33:17
40:19,23 42:20
**INTERIM-** 55:8
**INTERLOCUTORY-**
15:25
28:5,10,11,23
**INTERMISSION-**
39:13
**INTERTWINED-**
43:13
**INTRODUCE-** 5:18
**INTRODUCES-** 17:11
**INTRODUCTION-**

20:7
INTRUDING- 63:9
INUITSPEAKING-
43:20
INVITED- 64:5
IRRELEVANT- 74:25
ISN'T- 25:25
40:13 65:14 66:3
ISSUE- 7:4
8:12,13 11:24
12:1 13:10 14:5
16:14 19:6
23:9,16 25:16
26:25 27:9,16
28:6 30:12 35:6
36:25 37:1,3
38:2,16,18,25
42:3 45:18
46:23,24 47:5
56:23,24
61:2,13,16
62:10,11,22 63:12
66:9,12 70:10
75:13,2
ISSUE'S- 27:19
ISSUED- 28:9 52:3
ISSUES- 6:13 14:6
23:15 28:12,17
32:12 35:8,9,15
36:1,18,19,23
46:1,5 47:17
51:17 64:21,25
65:2 67:9,19 68:4
70:25 71:11
ISSUING- 66:23
IT'S- 7:5,21 8:10
9:9 10:1 12:11
14:7 16:9
17:14,15 19:10,21
22:11 24:17
26:24,25 28:2
29:9,17 30:2,5
32:13 33:25
37:1,3 38:6,12,24
42:8 45:6,8
47:5,6
49:15,22,23 51:22
52:3,9 53:7,16
54:7,8,11
56:15,23,24,
ITEM- 75:16
ITEMS- 6:1

J

JACQUELINE- 5:19
JAMES- 4:7,14,24
JANET- 5:2
JANUARY- 8:21
40:15 62:25
JASON- 4:16
JAY- 5:4
JEANNA- 4:7
JEOPARDIZE- 35:25
JERRY- 4:11
JOE- 26:17
JOHN- 4:10
JOHNNY- 22:13
JOINTLY- 66:15
JUDGE- 14:9 29:17

38:3 39:11,21
41:3 52:8,10,20
JUDGMENT- 10:24
11:25 13:18 14:13
JUDICIAL- 12:12
JUMP- 21:25
JUMPED- 21:19
JUNE- 47:20,21
52:4 75:10,13
76:5,11,16
JURISDICTION-
28:8 29:1
49:17,19
JURISPRUDENCE-
12:11
JUSTICE- 5:20
46:6
JUXTAPOSED- 75:25

K

KANG- 4:4
KAREN- 77:18,23
KASPRZAK- 4:13
KEEN- 41:21
KEEPS- 19:16
60:10,11
KELLEHER- 4:8
KEY- 72:21
KIM- 4:12
KINDS- 16:12
55:11 56:3
KIRK- 4:16
KNOWING- 15:13
61:11
KNOWN- 25:4 70:21
KNOWS- 25:4 64:24
KRAMER- 4:13
KRIEGER- 4:7
5:5,6
KRUGER- 4:8

L

LABOR- 58:7
LACK- 46:12
LAG- 62:5
LANGUAGE- 67:9
LARGE- 23:8,14
33:8 40:6 43:21
LATE- 41:25 42:8
76:22
LATELY'S- 22:14
LATER- 13:22
16:24 74:25 75:1
LAUGHTER- 63:23
69:16,20 74:14
LAWYER- 55:20
64:8
LAWYERS- 20:20
22:20 26:14,16
55:20
LEAD- 7:24 15:5
LEARN- 13:23
45:16
LEAVE- 64:12
76:24
LED- 55:13
LEFT- 28:13 64:24
71:19 75:22
LEGAL- 7:9 33:17
LEGALLY- 28:18

LESLIE- 4:8,17
LESSON- 59:14
LESSORS'- 25:24
LET'S- 13:17
14:13 17:20,21
18:22 22:15,16
36:5,7 58:23
61:7,8 62:8,9
LEVEL- 26:24
LEVELS- 27:24
39:25
LEVERAGE- 19:21
20:1 33:14
LEVERS- 60:13
LEVY- 4:15
LEWIS- 4:8
LIABILITIES-
64:22,23
LIABILITY- 10:23
13:24 16:24 17:4
22:24 23:2 27:8
LIFT-
17:17,19,22,24
18:12,16
LIKEWISE- 39:12
LIMIT- 23:8
LIMITATIONS-
24:24 65:6,7
LIMITED- 39:6
LINDSEY- 4:17
LINE- 7:21 8:3
20:24,25
21:3,8,9,17,23
25:15 26:25 44:25
57:16
LINEBYLINE- 39:5
LIQUIDATION- 66:2
LIST- 17:18
LISTENED- 41:7
LITIGATE- 10:24
11:22 13:8
15:16,17 18:2
LITIGATED- 12:6
17:25 59:2 66:12
LITIGATING- 25:1
LITIGATION-
12:8,13,17
15:17,18 18:10,19
20:12 21:22
22:7,9 24:19
34:21 35:23 36:4
43:3 44:14 56:19
59:16 62:18
LOCATED- 69:7
LOCATION- 68:15
LOCATIONS- 46:12
LOCKWOOD- 5:12,13
56:9
LOCKWOOD'S- 22:3
LOGICAL- 26:25
LONG- 6:10 20:9
38:7,17 69:8 73:9
LOOK- 14:16,17
21:14 22:16,17
26:3 27:16 33:17
35:8 37:4,15
44:25 51:7 67:13
71:19 75:22
LOOKED- 21:15

29:24 35:9 37:19
38:2
LOOKING- 14:20
17:14 32:14 36:14
44:1 51:16 53:12
71:10
LOSE- 60:18
LOST- 62:14
LOT- 7:10 19:1
20:13 25:18
26:4,6 45:16
47:22 58:8 65:13
72:8
LOTS- 37:7 45:3
65:9

M

MADIAN- 4:17
MAJOR- 20:14
45:23 56:14
MAKE- 6:9 18:11
22:21 28:1 34:6
37:13 39:24 42:7
43:21 44:3 46:9
59:18 70:22 74:18
75:15 76:16 77:3
MAKER- 55:22
MAKING- 16:18
29:10 32:2 60:13
65:6 67:6
MANAGED- 7:5
MANAGEMENT- 7:5
19:11
MANDATE- 41:15
MANDATED- 51:9
68:15
MANDATES- 41:18
MANY- 7:23
14:15,18 15:14
16:20 25:1 30:1,2
31:10 39:25 44:8
58:1 59:2 65:25
69:18 70:24 72:7
MARCH-
16:11,14,17
36:5,8
MARCHING- 36:4
MARI- 4:15
MARION- 4:6
MARK- 4:6,9
MARTIN- 4:13
MARVELOUS- 31:22
MASSIVE- 16:12
MATT- 4:9
MATTERS- 6:5
10:1,3 57:3 76:3
MATTHEW-
4:5,11,13
MEANINGFUL- 66:5
MEANS- 32:1 71:23
MEANTIME- 76:12
MECHANISM- 36:18
MEDIATED- 61:11
MEDIATION-
57:6,10,11 59:25
60:12 74:6,9
77:10
MEDIATOR- 57:7,20
60:6 71:17

72:4,13,16,19
73:8,10,15
74:22,23 75:7
MEDIATOR'S- 74:10
MEET- 29:2 57:7
MERELY- 34:7
MERITS- 56:23
MESOTHELIOMA-
31:11
MET- 17:13
METHOD- 24:6
MICHAEL- 4:9
MICHELLE- 5:24
MICHIGAN- 25:24
MICROPHONE- 46:15
47:14 69:13
72:6,9,24
MICROSCOPE-
14:16,17,19
MILITARY- 50:19
MILLER- 20:18
MILLION- 8:15
48:18 71:24
MILLIONS- 18:10
48:10
MINORITY- 43:21
MISAPPREHENSIONS-
39:22
MISSING- 58:16
MISSION- 32:24
MODEL- 44:19
MODELS- 58:6
MODIFIED- 71:5
MOGUL- 46:6
MONACO- 5:17
49:4,5,6,19,22
50:5,7,10
51:6,13,15,19,22
52:1 68:22,23
70:6,16 74:17,18
77:6
MONEY- 56:15,16
59:12 62:15,17,19
65:6,12 72:16
MONITORED- 41:22
MONTH- 16:25
MONTHS- 26:5,6
5:3,5,8,10,12,14,
17,22
MOTION- 12:2
17:24 18:12
22:8,12 34:7
37:14 39:17 41:18
42:5,25 43:6
45:9,18 76:24
MOTIONS- 6:11
7:3,6,10,13,22
32:8 42:2 45:13
49:8 76:22
MOVANT- 29:6,7
MOVE- 11:25 22:10
27:2
MOVED- 60:22
MOVEMENT-
35:22,24,25
MOVING- 35:23
MUCH- 31:7,8
38:23 44:23
60:18,25 65:1

73:23
MUELLER- 4:9
MULTIPLE- 77:13
MURRAY- 4:15

N

NARANG- 4:12
NATALIE- 4:7
NATIONAL- 25:23
NECESSARY- 19:23
64:2
NEEDING- 40:10
NEGOTIATE-
30:7,18
NEGOTIATED- 9:21
NEGOTIATION-
35:19
NEGOTIATIONS-
47:10 64:3,6,9
NEW- 17:19 18:17
64:9
NIGHT- 23:23
24:13
NIP- 15:25
NOBODY- 9:9
NONBINDING- 30:25
NONETHELESS-
31:25 35:22 44:24
45:18
NONZAI- 45:5
NOOSE- 33:21
NORMAL- 75:4
NORTH- 49:9
NOSE- 18:21
NOTE- 25:19 77:3
NOTEBOOK- 23:24
NOTICE- 19:4
22:20 23:11 25:10
39:4,8 46:9,19,25
47:11
48:7,8,9,10,13,15
60:22,24,25
61:1,2,5,8
62:11,15 65:19
66:23 67:1,2,5
68:10,13 69:24
70:8,11,14
71:4,8,11
NOTICES- 48:12
70:12
NOTWITHSTANDING-
45:22
NUMBERS- 25:22
57:17

O

O'CONNOR- 38:3
O'NEILL- 4:24,25
OBJECT- 12:2
34:20 39:5
OBJECTION- 42:4
71:6
OBJECTIONS- 43:11
49:7 75:14,17
OBJECTIVE-
7:12,13
OBLIGATIONS-
18:25
OBSERVATION-

49:11 55:21
OBSERVATIONS-
55:3
OCCUR- 7:18
OCCURRED- 18:5
39:16
OCTOBER- 9:11
50:14
OFFER- 14:25
OFFICIAL- 5:6
OMNIBUS- 75:10
76:4
ONE- 7:23 10:3
11:7 17:6,17
18:1,2 19:18
24:23 25:6 29:20
32:5 41:18
44:8,24,25 46:9
49:14 52:1,6
54:2,3 55:5
56:14,19 61:5
62:5 63:18 64:4
66:18 70:21 74:25
75:1
ONES- 44:9
ONGOING- 41:12
OPERATING- 65:5
69:25
OPINE- 29:19
OPINION- 14:25
21:4,18,23
22:16,25
27:13,14,17
28:10,11,13 29:3
39:14 66:11 71:10
73:7
OPPONENT- 26:20
OPPOSED- 45:24
OPPOSITE- 17:10
OPTION- 7:19
OPTIONS- 11:6,7
ORDER- 10:17 13:3
14:18 19:23 34:14
36:1 37:16 38:8,9
57:6 62:10 65:4
69:2,11 70:22,25
71:5 74:22,23
ORDERED- 59:24
ORDERING- 38:10
ORDERLY- 12:4
ORDERS- 41:14
50:13,14 76:24
ORIGINALLY- 71:10
OSHA- 27:24
OSTRICK- 9:22
OTHERWISE- 25:19
48:19 50:11
OURSELVES- 22:5
39:16
OUTCOME- 29:16
40:19
OUTLINED- 56:4
OUTSET- 40:9
57:12
OVERLAPPING-
41:19
OVERSEE- 43:4
OVERVIEW- 6:20
OWN- 33:10 38:14

OWNER- 25:4

P

PACE- 31:9
PACKAGE- 60:10
71:1
PAID- 56:19 65:9
PARALLEL- 49:17
52:9
59:13,16,19,21
61:14,23,24
PARALLELED- 41:13
PARAMETERS- 64:9
PARSONS- 4:12
PARTIAL- 14:4,5
PARTICIPANTS- 4:3
PARTICIPATE-
74:19
PARTICIPATED-
18:22
PARTICLES-
14:17,18
PARTICULARLY-
23:11 28:21
PARTIES- 10:7
28:14 35:17 44:8
49:24 69:9
PARTY- 18:20 42:8
PASS- 23:25
PAST- 10:21 37:13
PATH- 7:18,20
10:10,12,13 11:20
12:7
13:14,16,20,21
36:5
59:13,16,18,19,21
PAUSE- 32:20
39:14
PAY- 56:21 65:13
72:16
PAYING- 56:22
PAYMENT- 59:10
PD- 5:4
42:12,17,21 44:16
45:5 49:12
52:7,17 57:8
PEG- 42:22
PENDING- 10:2
17:22 37:16
PENNSYLVANIA-
35:14
PEOPLE- 6:10,13
11:12,17 12:2,22
14:18 15:12,14
16:12,20 19:12
23:10,12,15 27:7
30:11 31:10 43:18
56:8,24 59:18
61:25 65:8,9,11
67:12 71:24 73:5
PERFECT- 29:22
30:14
PERHAPS- 7:25
64:7 67:1,22
70:16 72:14 76:11
PERIOD- 8:1 17:8
54:21 55:8 60:1
66:23
PERMIT- 33:7

51:11
PERMITS- 12:16
PERMITTED- 34:13
PERPETUATING-
14:22
PERSON- 25:14
PERSON'S- 20:21
PERSONAL- 14:1
31:5 36:5,8 39:24
58:4 70:25
PERSPECTIVE- 41:9
51:3
PERSPECTIVES-
68:21
PETER- 4:14 5:13
PHASE- 59:15
PHILLIPS- 4:10
PHONE- 4:3
PI- 42:13,18,22
44:16 45:4
64:8,21,24
PICK- 35:6 49:14
71:22
PICKING- 35:12
PICTURE- 16:3
PIECE- 58:16
PITTSBURGH- 16:13
75:10
PLACE- 11:8,11
12:11 18:12 61:22
PLACES- 33:6
PLAINTIFFS- 18:8
19:13 30:7 52:16
PLAINTIFFS'-
68:14
PLAN- 10:4,9 17:7
30:10 36:2 43:2
44:14,15,21
45:2,14 55:14
56:4,5,6 70:9
PLANS- 18:18 46:5
PLAY- 47:11
PLAYING- 26:24
PLAZA- 4:8
PLEASANT- 60:17
PLEASED- 40:6
PLEVIN- 4:9
PM- 77:15
POCATELLO- 26:18
POINTED- 27:15
POINTS- 46:8
POLE- 58:24
POLICE- 69:18
POOL- 23:10,14
POOR- 6:23 46:14
47:13 69:12
72:5,23
POPULATION- 43:21
POSED- 40:12
POSITION- 20:2
28:7,24 39:6 44:6
51:19 52:15
POSITIONS- 21:2
44:7 51:4 64:9
POSITIVE- 51:2
POSSIBILITY-
66:19
POST- 7:25
POSTURED- 41:11

44:4
POSTURING- 59:3
POT- 37:4 48:19
65:12
POTENTIAL- 16:20
47:8 56:3 71:23
POTENTIALLY- 45:9
PRECIPITATED-
42:25 43:6
PRECISELY- 15:25
33:6
PREDICATES- 57:16
PREDICTION- 57:11
PREDICTIONS- 58:2
PREFER- 75:23
PREFERRED- 68:13
PRELIMINARY-
56:20
PREMISES- 32:9
PREPARED- 48:21
54:22 72:25
73:2,3 75:15
PRESENT- 11:11
16:12 74:25
PRESENTATION-
6:24 20:9,19
52:21
PRESENTED- 7:15
59:10
PRETEND- 18:23
PREVENT- 43:15
PRINCIPLE- 9:17
10:9,14 19:24
PRIOR- 13:1 53:23
PROBLEM- 16:4
20:14,21,22 21:16
46:3 54:3 61:6
65:23 73:8
PROBLEMS-
20:13,20 25:18
30:14 50:2 55:5
56:17 58:25 70:24
PROCEDURALLY-
28:4
PROCEDURE- 12:16
43:4
PROCEED- 7:1
31:13,16 41:9,17
61:21
PROCEEDINGS- 21:2
41:22,23 53:16,17
77:15,20
PROCESSES- 70:17
PRODUCE- 16:9
PRODUCES- 15:3
PRODUCING- 20:1
59:20
PRODUCTIVE- 21:24
35:19
PROGRAM- 39:5,8
43:1 46:9,20
47:11 48:10 60:23
65:19,21,22
67:5,11 70:8
PROGRAMMATIC-
33:11
PROGRESS- 18:11
21:16
PROMOTED- 43:16

PROOF- 34:19,20,25 36:11,14 37:15 38:22 66:21
PROOFS- 66:22
PROPER- 34:14
PROPERLY- 15:23 16:2 54:20
PROPERTIES- 68:19
PROPERTY- 14:2 20:12,14 23:15,16,18 24:18,21 25:2,21 27:15 29:22,23 31:19 39:2 40:7 44:7,9,10 46:12 53:2 64:25 65:2
PROPONENTS- 44:15
PROPOSAL- 13:17 15:8 16:8,10,19 17:5,16,18,19,20 19:19 21:20,21,22 58:14
PROPOSALS- 7:22 8:4 19:25 21:19
PROPOSE- 6:6,8 8:21 61:7
PROPOSED- 22:14 39:9
PROPOSING- 33:19
PROPOSITION- 16:25
PROSPECT- 9:15
PROSPECTIVE- 55:14
PROTOCOL- 12:10 43:3 45:9
PROVEN- 62:17
PROVIDE- 66:22 69:3,24 70:23 71:21,25 72:2
PROVIDED- 8:23 25:22 33:12 71:3
PROVIDES- 71:2,7 75:9
PUBLISHED- 39:14
PULLING- 18:11
PURCHASE- 50:18
PURSUANT- 49:24 64:24
PURSUE- 26:12
PURSUING- 17:4
PUTTING- 70:17

Q
QUOTE- 13:4 14:25

R
RAILROAD- 27:6
RAISE- 14:7 52:23,24
RAISED- 6:13 54:20
RAJEEV- 4:12
RAMSEY- 4:7
RANGES- 11:15
RAPIDLY- 73:15
RATHER- 35:9 36:14

REACH- 10:7 22:3 57:18 60:16,24
REACHED- 10:15 19:24 21:4 40:5
REACTION- 57:23
READY- 47:5 73:4
REALISTIC- 65:11
REALITY- 19:24 65:4
REALIZE- 44:5 65:12
REARGUED- 75:23
REARGUMENT- 38:16
REASON- 14:10 15:18 24:20 28:8 32:10 45:17 49:12
REASONABLE- 70:14
REASONABLY- 25:4
REASONS- 22:13 28:11 56:14
REBRIEFED- 75:21
RECEPTIVE- 26:10
RECIPE- 15:2 59:3
RECOGNITION- 33:4 35:2
RECOGNIZE- 33:25 34:1,5 37:14
RECOGNIZED- 16:7 34:7
RECOGNIZING- 33:1
RECORD/PAUSE- 24:11
RECORDING- 77:20
RECORDS- 25:13 62:2
REFLECT- 39:14
REINCARNATION- 19:5
REJECTED- 14:9
RELATE- 6:2 46:9
RELATIONS- 46:4
RELATIVE- 42:1
RELATIVELY- 6:9 13:7 17:8
RELEVANTLY- 10:15
RELIABLE- 58:1,25
RELIEF- 28:22 30:1,3,5 32:8 34:4 37:20 41:16,18,19 43:1,6 76:13
RELIEVED- 30:15 32:9
RELUCTANCE- 61:21
RELUCTANT- 62:21
REMAINS- 47:24 56:1
REMARKS- 6:18 8:2 48:22
REMEDIATE- 65:15
REMEDIATING- 50:20
REMEDIATION- 65:21
REMEDIES- 30:6 33:3,11
REMEDY- 29:14
RENOVATIONS- 31:10

REORGANIZATION- 17:12
REPEATEDLY- 54:9
REPLACE- 15:9
REPORT- 6:21 47:4,5,6,16,18 54:24 64:10
REPORTS- 41:23
REPRESENTATION- 26:22 33:6
REPRESENTATIVE- 5:16 9:8,19 41:24 42:11,12,19 50:13
REPRESENTED- 12:23 33:2,15,16
REQUEST- 29:6 76:14
REQUESTED- 68:13
REQUIRE- 36:21 70:2
REQUIRED- 70:15
REQUIRES- 70:2
RESERVE- 10:14 21:1 32:15 50:19 65:2
RESIDENTS- 32:23 36:15
RESOLUTION- 7:14 22:5 32:14 40:10,22 45:5 56:11 59:20
RESOLUTIONS- 59:15
RESOLVE- 13:9 25:22 32:12 33:8 40:14 53:13 54:12 61:10 64:10
RESOLVED- 14:22 23:22 27:9 37:11 40:6 45:5 60:9,11 64:13,21
RESOLVES- 36:18,19
RESOURCES- 65:7
RESPECT- 7:7,14 8:8,11 9:16 11:22,24,25 12:1,24 13:25 14:1,4,5 18:8,14,18 23:15 26:24 27:14 29:25 37:16 50:8 52:16 55:13 57:8 64:22 66:17,18 67:16 70:24 75:16
RESPECTED- 72:13
RESPECTS- 32:6
RESPOND- 68:24
RESPONSE- 6:12,14 20:9 54:11 62:1 76:23 77:11
RESPONSIBILITY- 30:16
RESPONSIBLE- 18:25
RESPONSIVE- 48:22
RESTIVO- 4:14 21:9 54:14 55:17
RESTIVO'S- 21:22

RESULT- 12:6 38:14 39:25 40:5 50:18,23
RESULTS- 38:14 62:18
RETAIN- 14:13
RICHARD- 4:15
RICKARDS- 4:7
RIEGER- 4:7
RIGHTS- 22:6
RIPE- 24:23 29:17 46:23,25
RISE- 64:1
RISK- 23:3,12,13 27:23,25 43:15,16 52:2 65:14
RISKS- 61:4
ROAD- 27:12 28:3 50:2 58:3
ROBERT- 4:3,14
ROBUST- 13:14 31:7
ROGER- 5:14 9:7
ROOM- 45:3 54:8,9
ROUND- 42:22 64:5
RULES- 10:21 12:11,15,16 15:24 53:22
RULING- 38:6
RULINGS- 28:23 75:15
RUN- 30:11,13
RUSSELL- 4:11

S
SAKALO- 5:4
SALT- 55:2
SATISFACTION- 61:9
SATISFACTORY- 6:25
SATISFIED- 9:22
SATISFY- 48:15
SAVE- 40:25 48:10
SAVINGS- 48:13
SAW- 41:14
SCENE- 64:3
SCHEDULE- 21:11 62:8 76:10
SCHEDULES- 76:8,9
SCHOOLS- 25:25
SCHOOLS'- 25:23
SCIENCE- 8:13 11:24 17:2 21:1,2,3,23 22:15 23:3 35:5,8,9 47:7
SCIENTIFIC- 16:18
SCOTT- 5:4,10 18:8 31:14 32:17,18,19,21 34:22,24 35:2 37:10,18,20,22,24 38:5,15,19,23 39:1 52:6 70:20 75:19 76:11
SCOTT'S- 26:22 27:10
SCRATCH- 62:2

SEAL- 50:21
SEARCH- 70:15
SECOND- 59:6,13 63:6
SECONDLY- 40:3
SEE- 11:4 13:22 21:5,6 23:14 33:14 34:23 37:20 40:23 48:4 57:24 58:10 66:14 70:4 75:24
SEEKING- 22:8 51:1
SEEN- 35:20,22
SEGMENT- 44:24
SENDING- 26:18
SENT- 23:23 24:13
SENTIMENTS- 38:19
SEPARATE- 44:13,21 48:9
SEPARATELY- 48:11,12
SEPTEMBER- 9:10
SERIES- 7:5
SERVE- 14:21
SERVICE- 62:24
SET- 21:3 28:12 29:3 30:2 61:8,24 62:23 66:25 67:1 68:11
SETS- 33:20
SETTLE- 11:3,5 15:13 28:15 31:5 35:18 60:3,4,5,7 64:24
SETTLED- 36:3 52:19 66:1,2,24 72:7
SETTLEMENT- 12:18,19,21 13:8 21:12 29:19 35:25 36:1 38:10,15 39:23 48:6,7 54:11 55:10 60:19 61:18 64:3,6,24 66:5 75:13
SETTLING- 64:23
SEVEN- 18:4,15 22:2 32:23
SEVERAL- 8:14,15 35:4 48:18
SHANE- 4:10
SHARE- 7:3
SHAWN- 4:14
SHE'S- 5:19
SHEET- 17:10,13 55:13 63:1
SHELNITZ- 4:6
SHORTEST- 7:20
SHOT- 29:16
SHOULDN'T- 40:16,21 61:6
SHOW- 11:12,17,18 15:1 65:17
SHOWED- 27:24
SHOWS- 16:23 35:21
SIAKER- 4:5
SIDE- 16:18 39:11

58:10,22 64:7 72:22
SIDES- 58:19 72:20
SIGN- 74:25
SIGNED- 74:24 76:25
SIGNIFICANT- 46:11 68:18
SILVER- 4:4
SIMILAR- 36:16
SIMPLE- 10:20 12:5 13:7 44:9
SIMPLICITY- 58:15
SIMPLY- 18:3 76:3
SIN- 55:16
SINGLE- 16:25 19:19 70:1
SIT- 39:4 71:17 72:3
SITTING- 55:18 66:4
SITUATED- 43:18
SITUATION- 26:23 29:5,22 31:5
SIX- 6:1
SKUBIC- 4:4
SLATE- 48:25
SLIGHT- 45:22
SLIGHTLY- 72:18
SLOCOMBE- 4:8
SMALL- 8:9 26:10 44:24
SMITH- 26:17
SOCCER- 40:17
SOLGANICK- 4:16
SOLUTION- 20:16 30:14 31:17
SOLVE- 20:20,21
SOLVED- 20:13
SOLVENCY- 49:16
SOLVES- 25:18
SOMETHING'S- 60:12
SOMEWHAT- 27:5
SORTS- 53:15
SOUGHT- 14:9
SOUND- 77:20
SOUNDS- 39:10 41:1 73:25
SOUTH- 40:17 49:10
SPEAKERS- 52:13 77:13
SPECIAL- 62:23 70:12
SPECIFIC- 8:21 12:25 36:14
SPECIFICS- 40:25
SPECTATOR- 40:16
SPECULATING- 15:15
SPEED- 73:15
SPEIGHTS- 4:14
SPENCER- 4:10
SPENDS- 62:15
SPENT- 8:13 18:10 25:1 62:19
SPITES- 52:18

SPRUNG- 26:8
SQUARE- 42:23
STAFF- 63:7
STAND- 63:10
STANDPOINT- 31:21
START- 5:8 36:4 37:8 45:4 48:4
STARTED- 20:25 27:18 70:16
STARTING- 67:21
STATE- 53:8
STATEMENT- 6:9 9:7,11 48:8,12 52:17 61:4 70:9
STATICS- 11:14
STATISTICAL- 58:6
STATISTICALLY- 31:8
STATISTICIANS- 31:6
STATISTICS- 31:7,25
STATUS- 21:18 28:12,19 54:22,23
STATUTE- 24:24
STAY- 17:17,18,19,22,24 18:12,16 32:8,10,11 43:7 66:11 76:13
STAYED- 50:24
STAYING- 50:14
STAYS- 18:12
STEP- 15:12
STEPS- 61:9
STIPULATE- 27:21
STIPULATION- 17:14
STRAIGHT- 7:21 8:3 10:12 20:24,25 21:3,8,9,17,23 25:15 26:25
STREAM- 64:2
STRENUOUSLY- 62:24
STRESS- 49:23
STRONG- 26:20
STRONGLY- 62:7
STROOCK- 5:6
STRUCTURAL- 21:16
STRUCTURE- 30:19 44:13,14,22 45:2,20
SUBMISSION- 58:8
SUBMISSIONS- 58:13
SUBSTANTIAL- 16:13 56:17
SUBSTANTIATE- 30:12 75:7
SUBSTANTIVE- 33:9
SUCCESS- 56:18
SUCCESSFUL- 16:16,17
SUDDEN- 54:15
SUFFICIENT- 67:12
SUGGESTED- 30:24,25 31:2

54:19 58:17,18
SUGGESTION- 31:22 54:12
SUGGESTIONS- 54:9
SUITED- 19:15
SUM- 50:25
SUMMARY- 11:25
SUPERVISED- 38:12
SUPPOSE- 6:10,15 17:17 55:1
SURVEY- 11:13 14:18 58:23,24
SURVEYS- 58:24 59:2
SWEET- 69:17
SYSTEM- 12:12

---
T
---
TABLE- 6:5 29:20 56:11 66:5 73:10 75:12
TABS- 24:7
TACTIC- 25:15
TAKING- 11:8 38:23 44:25
TBP'S- 37:7
TECHNICAL- 28:20
TEE- 38:16
TELEPHONE- 58:23
TELLING- 71:6
TEN- 8:10,11 11:24 22:19
TERENCE- 4:5
TERM- 13:7 17:10,13 46:13 55:13
TERMS- 9:6 41:9 46:4 60:23 62:25 65:10 67:9 69:10 70:10 75:3,6
TEST- 27:25 29:3
TESTED- 28:3
TESTS- 7:9
TEXAS- 25:25
THAT'S- 6:15,25 7:18 9:13 10:3,14 11:11 12:13 13:21 14:15,22 15:21 18:6,24 19:24 20:2 21:24 22:1,12 23:3,21 24:7 25:15 26:20 28:9,16 29:4,10 30:7 31:21 32:1,12 34:24 35:8,14 36:9,25 37:4,7,23 38:7,11 40:2,15,
THEODORE- 5:1
THERE'S- 7:25 11:23 13:23,24 14:23 19:18 22:10,24 23:1 25:3 27:9 34:17 39:12 41:12 42:16 43:11 45:17 49:12 57:23 58:21 60:18 61:20 73:7
THEREFORE- 7:12

29:14 60:2
THESE- 7:13 11:24 12:1 13:7 19:6 22:21 25:5,9 26:16 30:8 32:12 35:15 36:1 38:1 41:12,22 42:2 43:22 51:17 56:17,18 59:9 69:3 76:22
THEY'D- 24:23
THEY'LL- 22:21 72:15
THEY'RE- 7:3,4 10:21 11:6 13:15 15:20 16:20,21 17:9,14 29:4 40:6,21 43:13 47:23 49:9 57:19 58:25 72:15 73:3,4
THEY'VE- 29:16 31:4 42:18 60:18 67:14,15
THREATENED- 33:23
THREE- 24:24 62:17 73:23 74:6,9 75:9
THREEFOLD- 10:23
THREEQUARTERS- 38:3
THREEWAY- 70:3
THUMBING- 18:21
TIED- 62:21
TIGHT- 6:4 12:24,25 33:21
TIME- 6:4,16 8:1 13:9,20 16:19 17:6,9 21:15 24:22 25:6 27:14 32:15 33:24 35:11,20 38:23,24 39:22 45:6 48:2 54:21 58:6 59:24 60:1 62:21,23 64:20 65:15 66:23 67:18 69:8,25 70:11,22,24 71:11 73:10,23 75:12,15,
TIMES- 6:24 10:16 46:15 47:14,22 60:6 62:17 69:13 72:6,24
TIMING- 71:12
TIPPING- 72:18
TODAY- 6:2,5 7:17,19 8:8,18 10:13 19:11 20:23 33:23 35:13 41:2 43:24,25 44:19 46:25 52:10,15 53:7,9 55:18 76:4
TODAY'S- 51:2
TOE- 64:2
TOMORROW- 74:12,24
TOOK- 24:19 33:16
TOOLS- 11:8

TOWARD- 26:8 35:24
TOWARDS- 7:14 13:10 36:1
TRACK- 19:16 27:2,3 45:6 54:16 56:18 59:21 60:11 61:14 62:9 66:9,11
TRACTION- 42:21
TRADITIONAL- 24:18 25:21 40:7 57:8
TRANSCRIPT- 16:17 77:19
TRANSCRIPTS- 77:24
TREAT- 10:7 12:10 51:7
TREATED- 10:2 21:7 36:16 51:1,12
TREATMENT- 46:1 49:8 50:3,8 51:10
TREMENDOUS- 57:12
TRIAL- 18:8 21:1,2,3,23 22:15 23:3 35:6 47:7
TRIUMVIRATE- 40:9
TRUMP- 22:6
TRUST- 30:11,13,18 65:5
TUNE- 36:8,9
TURN- 29:7
TURNS- 17:3
TWEAKS- 67:8
TWICE- 27:23 48:11
TWO- 10:18,20 17:7 44:9 46:8 53:15 55:15 57:22 63:9,16 74:3 75:24
TYPES- 30:3,6 31:4 70:17

---
U
---
UNCERTAINTY- 17:11
UNCOVER- 70:1
UNDECIDED- 28:13
UNDERLYING- 59:4
UNDERSTANDS- 38:5
UNDERTAKE- 38:13,18
UNDERTAKEN- 37:2
UNIDENTIFIED- 63:18,21 73:2,25 74:1
UNIFIED- 34:4
UNIMPAIRED- 18:19
UNIQUE- 31:18
UNIQUELY- 11:9,19
UNITARY- 12:12
UNITED- 67:10
UNIVERSAL- 44:2
UNIVERSE- 71:20
UNIVERSITY- 25:23
UNKNOWING- 33:9

UNKNOWN- 26:11
UNLIKE- 33:13
46:5 47:7
UNPUNISHED- 24:13
UNREASONABLE-
23:3,12,13 27:25
65:14
UNSECURED- 5:7
UPDATE- 75:21
URGE- 62:7
USED- 20:7 27:18
28:4 31:4 54:6
USEFULNESS- 39:7
USING- 19:14
UTILIZED- 67:3
UTILIZING- 11:8
UTTER- 58:15
UTTERLY- 18:24

V

VALID- 22:12
VALUE- 19:14
VARYING- 7:7,8
VEHICLE- 19:15
25:22
VEHICLES- 56:3
57:13
VENTURE- 56:14
VERSED- 56:10
VERSIONS- 53:15
VIEW- 27:11 28:10
37:11 58:18 71:9
VIEWS- 20:16 55:5
VIGOROUSLY- 62:24
68:11
VITAL- 40:19
VITALLY- 11:7
VIVIDLY- 16:11
VOLUMINOUS- 69:7
VOLUNTARILY-
29:4,9,12

W

WAIT- 22:15 29:15
34:17 47:16,18
WALTER- 4:8
WANTS- 27:2 30:15
34:20 36:22 46:16
48:23 61:9 63:1
68:1
WASHINGTON- 5:11
16:4,5,6 32:22
33:18 36:15
WASHINGTON'S-
38:5
WASN'T- 17:17
60:23
WASTE- 72:16
WASTED- 59:11
WATER- 64:20
WAYS- 19:25 29:13
30:2 56:10
WE'D- 22:4 61:21
62:10 67:25
WE'LL- 6:11,16
8:18 13:22 14:24
15:15 22:19,20
27:2,22 34:21
36:8 48:23 59:11

62:3 69:9 76:3
77:4
WE'RE- 8:8,19
9:1,13 11:25
14:12
15:9,10,11,22
16:4,16
18:11,13,15
19:1,2,4 21:5,6
22:2,3 25:7 27:21
33:25 34:8
38:8,10 39:11
40:5,13,22
41:1,25 44:3
46:18 47:1,19
53:14 54:24 57:25
58:12 60:15
61:5,6 62:8,2
WE'VE- 6:3 15:9
18:3 35:12 39:22
41:19 42:24 45:8
47:16 57:20,23
59:1 60:4
61:13,14 63:3
69:23 72:10
WEEK- 20:18 74:11
WEEKS- 73:24
74:6,9 75:9
WELCOME- 39:25
WEREN'T- 18:20
25:25 42:2
WESTBROOK- 5:8,9
18:7 20:4,5,7
24:3,4,9,10,12,15
,17
23:5,7,19 28:6
30:22 32:2,14
54:10,13 55:10
63:5,8,11,13,15,2
4,25
56:9 64:1,17
66:7,18 67:24
68:4,7 69:17
70:19 72:5,7,9,10
73:16
WHAT'S- 7:18
10:12 11:20 18:12
23:10 25:13 35:13
48:14 54:23 67:14
69:22
WHEREAS- 7:21
13:25
WHICHEVER- 47:21
WHITE- 4:11
WHO'S- 9:8 38:25
52:18 55:20 59:5
WHOLE- 23:21 35:7
44:13 45:16 53:7
54:21 58:13 60:22
WHOLEHEARTEDLY-
37:10 38:20
WIELD- 27:18
WILD- 71:22
WILL- 6:9,18 7:18
10:6 11:14,15
15:1,4,16 17:12
21:7 22:20 25:10
26:14 31:12 32:19
33:13,15 34:20

37:1 38:21 39:21
41:10 44:12,15
46:3 48:13,14,15
51:4,10 52:3
57:9,11,12,13,15,
16
54:25 59:8 61:13
63:22 64:
WILLIAM- 4:6
WILLING- 27:21
28:17 31:12
66:8,13 72:17,22
WIND- 18:15
WISDOM- 39:4
WISE- 47:23
WISH- 40:12 75:17
WON'T- 48:9,10,11
WORD- 35:14
WORK- 31:17 41:1
46:2 56:13
67:7,9,19 70:5
72:3
WORKED- 42:23
WORKS- 30:20 32:7
37:7
WORLD- 16:6 69:22
WORRY- 11:16
WORTH- 8:16 11:1
19:7 67:20
WOULDN'T- 45:17
63:15
WR- 4:2 25:1
43:10 55:15
WRITING- 48:25
WRITTEN- 22:18

X

X- 10:16 15:10
37:4 72:1

Y

Y- 10:17
YEAR- 21:10 31:11
35:17 38:3
YEARS- 8:14
18:4,9,15
20:12,13 22:3
24:19,24 25:1
26:15 31:18 32:23
35:5 42:17 69:19
71:25 72:8 74:3
YIELDED- 62:18
YOU'D- 45:4 76:16
YOU'LL- 7:22
26:5,6 55:1 58:4
66:2
YOU'RE- 13:12
16:17 26:17 30:18
32:7,8,11
44:11,13,23 67:21
70:10 71:20
YOU'VE- 29:20
30:22 37:7 59:17
65:15,25 74:2
76:17

Z

ZAI- 5:9,23 6:2
8:8,10 10:5,19,22

14:6 17:25
18:8,15 19:21
20:25 21:18,23
22:25 25:8 27:17
30:16 31:18 32:1
36:7,8,15,19 37:6
41:6,11,12 42:1,6
44:4,12
48:12,15,18 49:9
50:18 56:5 59:20
61:18,20 65:17
66:1
ZAI'S- 64:9
ZIGZAG- 21:25
ZILLION- 60:6