# EXHIBIT 4

File No.  CI04-01-39818

## THE QUEEN'S BENCH
### Winnipeg Centre

BETWEEN:

### RAVEN THUNDERSKY and REBECCA BRUCE

plaintiffs

- and -

### THE ATTORNEY GENERAL OF CANADA (Her Majesty the Queen in Right of Canada), W.R. GRACE & CO, W.R. GRACE & CO.-CONN., CRYOVAC INC., SEALED AIR CORP., W.R. GRACE & CO. CANADA LTD., GRACE CONSTRUCTION MATERIALS LTD. CRYOVAC CANADA INC., 3079931 NOVA SCOTIA CO., SEALED AIR (CANADA) CO., GRANT INDUSTRIES LTD., ABC Cos and XYZ Cos.

defendants

---

### AFFIDAVIT OF
### RAVEN THUNDERSKY
### SWORN THE 30th DAY OF MARCH, 2005

---

### AIKINS, MacAULAY & THORVALDSON LLP
Barristers & Solicitors
30th Floor, 360 Main Street
Winnipeg, Manitoba
R3C 4G1

Keith J. Ferbers/Tyler J. Kochanski
Telephone No.:  957-4691/957-4633
Fax No.:  957-4269/957-4252

File No.: 0405627

(BOX 3)

THE QUEEN'S BENCH
WINNIPEG CENTRE

B E T W E E N:

RAVEN THUNDERSKY and REBECCA BRUCE

plaintiffs

- and -

THE ATTORNEY GENERAL OF CANADA (Her Majesty the Queen in Right of Canada),
W.R. GRACE & CO, W.R. GRACE & CO.-CONN., CRYOVAC INC., SEALED AIR
CORP., W.R. GRACE & CO. CANADA LTD., GRACE CONSTRUCTION MATERIALS
LTD. CRYOVAC CANADA INC., 3079931 NOVA SCOTIA CO., SEALED AIR
(CANADA) CO., GRANT INDUSTRIES LTD., ABC Cos and XYZ Cos.

defendants

AFFIDAVIT OF
RAVEN THUNDERSKY

I, Raven Thundersky, of the City of Winnipeg, in the Province of Manitoba,

MAKE OATH AND SAY THAT:

1.           I am one of the named plaintiffs in the legal action herein and, as such, have personal knowledge of the matters hereinafter deposed to by me, save where stated to be based upon information and belief and, where so stated, I do believe such statements to be true.

2.           I was born on May 21, 1965. Prior to 1964, my father, Victor Bruce, and my mother, Nora Bruce, resided in a log house located on Reserve Lands of the Poplar River First Nation in Manitoba.

3.           In or about 1964, the Department of Citizenship and Immigration - Indian Affairs Branch ("Indian Affairs") determined that it would construct a new 520 square foot home for my

- 2 -

family (the "Family Home").   I am advised by my father that the home was constructed by three Band Members according to a plan and using materials supplied by Indian Affairs.

4.            My family moved into the Family Home in about 1964 with the following family members residing there between about 1964 and 1975:

| | | |
|---|---|---|
| (a) | Victor Bruce (father), date of birth October 23, 1932; |
| (b) | Nora Bruce (mother), date of birth April 26, 1932; |
| (c) | Melvina Mitchell (sister), date of birth October 19, 1954 (now deceased); |
| (d) | Mardina Mitchell (sister), date of birth August 25, 1956 (now deceased); |
| (e) | Barbara Bruce (sister), date of birth September, 1960 (now deceased); |
| (f) | Rebecca Bruce (sister), date of birth February 9,1958; |
| (g) | Deborah Favell (sister), date of birth March 31, 1963; |
| (h) | Nancy Bruce (myself), date of birth May 21, 1965; |
| (i) | Delbert Bruce (brother), date of birth April 1, 1968; and |
| (j) | Dennis Bruce (brother) date of birth December 17, 1969. |

5.            When I was born, I was known as Nancy Bruce.  I have subsequently changed my name to Raven Cree Thundersky.  As indicated above, the other named plaintiff in the legal action herein, Rebecca Bruce, is my sister.

6.            I am advised by my mother, father and other family members that in about 1976 the Bruce family moved into a new home also on the Poplar River Reserve.  My sister, Mardina, her husband, and their two children, moved into the Family Home built in 1964 and continued to reside there until about 1980 or 1981.

7.            The Family Home was extremely cramped in terms of living space.  There were times when we, as children, would go into the area of the attic.  Both myself and other family members recall it being "dusty" in the attic and the "dust" from the attic would be carried into the living space of the house.

- 3 -

8.        I am advised by my mother and father that they believe that the attic insulation may also have seeped through the ceiling due to the poor construction of the home such that the Zonolite insulation was exposed in living areas.  The ceiling was plywood with seams between the boards.  Sometimes the nails holding the boards would come loose.  I also recall this to be the case.  I am advised by my family members that no one ever advised our family to be careful about disturbing or inhaling the "dust" from the attic insulation.  I also recall workers in the house to install electricity in about 1969 which involved installing wiring in the ceiling and attic.

9.        In about 1996, Mardina became ill and was diagnosed with "lung cancer".  Mardina was a non-smoker and was 38 years old when she passed away in 1996.  She died within 3 months of her diagnosis not having received any treatment and there being no autopsy undertaken.

10.        My sister Melvina was initially diagnosed with lung cancer in 1997.  Melvina underwent treatment and testing which ultimately led to a diagnosis of mesothelioma.  Melvina died on April 6, 1999 after being in severe pain and undergoing radiation treatment.  Melvina's diagnosis of mesothelioma was confirmed at autopsy.  Melvina was 44 years old when she died.

11.        Mesothelioma is a rare form of cancer which is known to be caused by breathing in or ingesting asbestos fibers.  I have learned that the latency period between inhaling or ingesting the asbestos fibers and developing mesothelioma or other symptoms may vary depending upon a variety of factors including the duration and extent of exposure.

12.        Around the time that Melvina was diagnosed with mesothelioma, both myself and my husband, Allan Aitken, began asking questions and communicating with various departments and representatives of the federal government including the Department of Indian and Northern Affairs ("DIAND") and Health Canada (collectively referred to as the "Federal Government").  We were concerned that both Melvina and Mardina had died of lung related cancers.  We began attempting to determine whether there were any housing records available relating to the Family

- 4 -

Home and also wanted to know what would be done by the Federal Government to investigate the potential cause of my sisters' illnesses and to investigate and identify other aboriginal persons who may have been exposed to asbestos fibers on Reserve. We were suspicious at this point and in the following years that the common link was in residing in the Family Home.   We also wondered about a common link through school.

13.        In early to mid 2003, my sister Rebecca and my mother both began feeling ill. Both Rebecca and my mother were later diagnosed with mesothelioma which further increased our suspicions that the source of the asbestos fibers was the Family Home.

14.        We have continued to request that the Federal Government take steps to investigate the potential exposure of other aboriginal persons to asbestos fibers and set up a program to initiate appropriate monitoring and testing of those individuals potentially exposed to the Zonolite insulation In early 2004 and onward, we did what we could to draw this issue to the attention of the media and I have done numerous interviews with the Aboriginal People's Television Network ("APTN"), the Winnipeg Free Press, CBC Television and other media outlets.

15.        In 2004, we also continued our efforts to learn more about what information was available relating to the construction of the Family Home and other such homes on Reserve. It was not until about March 16, 2004 that we were provided with a copy of my father's application for housing assistance dated January 24, 1964, a copy of which, together with the covering letter from the Federal Government, is attached hereto and marked as Exhibit "A" to this my affidavit. This document indicates that the plan for construction of the house is to follow Canadian Indian Homes Plan Type "C". The materials for the house were as specified by Indian Affairs. At the bottom of page 2 of Exhibit "A" there is reference to the use of 46 bags of "Zonolite Insulation" in constructing the house.

16.        It was only upon receipt of Exhibit "A" that my husband and I were able to confirm that the attic insulation used in the Family Home was Zonolite insulation.

- 5 -

17.        Allan and I have subsequently conducted extensive research on Zonolite attic insulation ("Zonolite") in conjunction with various investigations undertaken by our legal counsel, Keith Ferbers, and others working in conjunction with him.  We have learned that Zonolite is the trade name for attic insulation made from vermiculite which was mined by the W. R. Grace Co. in Libby, Montana.  It is known that this vermiculite contained tremolite fibers which, if ingested or inhaled, poses a serious safety and health hazzard.

18.        The following is a summary of the current medical status of each of my immediate family members:

(a)    Myself - I have undergone testing and monitoring in the past year including a PET Scan which was undertaken in Edmonton in June, 2004.  This investigation was negative.   CAT Scans in 2004 have detected asbestosis although there is no present indication of mesothelioma.  Asbestosis is scarring of the lungs.  The symptoms often begin with shortness of breath. Asbestosis is known to be progressive as more and more lung tissue is affected;

(b)    Rebecca Bruce (sister) - As indicated above, Rebecca was diagnosed with mesothelioma in 2003.  Rebecca has undergone extensive surgery under the care of a specialist in Detroit, Dr. Harvey Pass.  Dr. Pass is associated with the Barbara Anne Karmanos Cancer Clinic in Detroit. The surgery was undertaken in December, 2004 and involved removal of her left lung, replacement of the lining around her heart and, the removal of several cancerous lymph nodes and the reconstruction of her diaphragm. Rebecca has since returned to Detroit for radiation therapy in February, 2005 and only returned on March 15, 2005;

(c)    Nora Bruce (mother) - My mother was diagnosed with peritoneal mesothelioma in late 2003.  She has undergone chemotherapy treatment and

- 6 -

has ongoing symptoms including fatigue, shortness of breath and pain. Notwithstanding, my mother's doctors are relatively pleased with the fact that her treatment has seemed to have slowed down the progression of the disease in that mesothelioma is normally fatal within one year of the diagnosis;

(d)     Victor Bruce (father) - Testing on CT Scan in 2004 has indicated asbestosis;

(e)     Deborah Favell (sister) - Deborah has undergone x-rays in 2004 but no other specific testing to this point;

(f)     Dennis Bruce (brother) - Dennis has also undergone x-rays in 2004 but no further specific testing to this point; and

(g)     Delbert Bruce (brother) - Delbert has undergone testing in the past few months and has been diagnosed with asbestosis.  Asbestosis may be the precursor to developing mesothelioma.  Testing of Delbert including a PET Scan in 2004 has ultimately determined that, in addition to asbestosis in the lungs, there is one operable cancer site suspected to be mesothelioma.

19.     In addition, one of Mardina's children, who lived in the house for about 3 years, has shown abnormalities on a CAT Scan in 2004 with the diagnosis being asbestosis.

20.     In total, eight members of the Bruce family have either died from or have been diagnosed with diseases known to be caused by exposure to asbestos fibers.   All of my family members, including myself, live in constant fear of developing or worsening of the disease.

21.     I have learned and also been advised by various doctors that early monitoring and detection of the disease process is crucial to initiating timely treatment.

22.     Due to our ongoing communications with and requests for information from the Federal Government, we have learned that its analysis suggests that 593 aboriginal homes were insulated with Zonolite between 1960 and 1990.  I believe that this number underestimates the number of aboriginal homes constructed with Zonolite.

- 7 -

23.          As Allan and I have become known in the community for our efforts to have additional action taken by the Federal Government and others, numerous individuals have approached us to advise that either they or other family members believe that they have been exposed to asbestos fibers on Reserves. We have been making note of the names of such individuals and advising them to seek proper treatment.

**The Government/CMHC**

24.          As is evident from Exhibit "A", my father's application for housing dated January 24, 1964, it has always been known to the Federal Government and the Canada Mortgage and Housing Corporation ("CMHC") that Zonolite was used in the construction of the Family Home and other aboriginal homes. The danger of exposure to asbestos has been known for many years yet it is my belief that the Federal Government has failed to act on this knowledge and continues to take inadequate steps to investigate and monitor aboriginal persons who have been exposed to Zonolite insulation on Reserves. We have retained an expert on the scientific knowledge relating to the harmful effects of asbestos over the years, Barry Casteleman, who will be swearing a separate affidavit. Attached hereto and marked as Exhibit "B" to this my affidavit are excerpts from "Asbestos-Medical and Legal Aspects", fifth edition, (the "Casteleman Book") relating to various positions advanced by the Federal Government on the use and safety of asbestos. In addition to its inaction, the Federal Government has taken an active role in opposing measures that were taken by the Environmental Protection Agency ("EPA") in the United States to limit the dangers of exposure to asbestos. The Federal Government has also promoted the use and alleged safety of asbestos containing products.

25.          Attached hereto and marked as Exhibit "C" to this my affidavit is a letter from DIAND dated May 11, 2004 indicating that it was only then undertaking a review of its internal records to identify the extent of the use of vermiculite insulation on Reserves. Also attached hereto and marked as Exhibits "D" to "F" to this my affidavit are printouts of various documents contained on the websites referred to in Exhibit "C" including the following:

- 8 -

(a)     Exhibit "D" - Health Canada Information Sheet on vermiculite insulation which outlines the review efforts of DIAND and confirms its knowledge that, if ingested or inhaled these fibers, posed a health risk. This document confirms the Federal Government's knowledge that the vermiculite ore produced by the mine in Libby, Montana was dangerous. This sheet also contains a list of various precautionary steps including not allowing children to play in an attic, not using an attic for storage, and ensuring that all cracks and holes in ceilings are sealed to prevent insulation from sifting through;

(b)     Exhibit "E" - Health Canada Information Circular dated April, 2004 further confirming the Federal Government's knowledge of the potential health risk if vermiculite insulation that contains asbestos is exposed to one's living space and also containing a list of precautionary steps; and

(c)     Exhibit "F" - CMHC Information Sheet relating to asbestos including a statement that the concern for the health of asbestos workers was expressed as long ago as the late 1800's with the risks becoming more evident in the late 1960's. There are again recommendations as to how to minimize asbestos risks in the home.

26.          In addition, attached hereto and marked as Exhibit "G" to this my affidavit is a copy of a letter that we received from DIAND on or about July 27 or 28, 2004 together with the spreadsheet referred to in the letter. The letter, which is addressed to the Chief and Council of the Poplar River First Nation, indicates that DIAND's record search revealed Zonolite insulation may have been used in the construction of 5 homes on the Poplar River First Nation including the Bruce Family Home. This letter urges precautionary steps as outlined in the information package sent on May 11, 2004 (Exhibits " C" to "F"). Exhibit "G" is further confirmation that the Federal Government has had and continues to have in its possession documentation confirming its knowledge that aboriginal homes were built with the use of Zonolite insulation. We have been advised by the Federal Government that the review undertaken by DIAND has identified at least 565

- 9 -

homes built on Reserves likely containing Zonolite insulation including 28 in Quebec, 234 in Manitoba, 276 in Saskatchewan, 25 in Alberta, 28 in British Columbia and 2 in the Yukon.

27.          Attached hereto and marked as Exhibit "H" to this my affidavit is a copy of an article from the Seattle Post Intelligencer website dated February 11, 2000. The article makes reference to the fact that Canada continues to fight a worldwide ban on asbestos in order to protect the Canadian Asbestos Industry even though many European countries have determined that asbestos should be banned on the basis that there is no safe exposure level to the cancer causing fiber. The article indicates that Canada continues to maintain this position notwithstanding the report of a scientific committee which found that there is sufficient evidence that all forms of asbestos, including chrysotile, are carcinogenic.

**W.R. Grace & Company**

28.          Documents that I have reviewed indicate that the W.R. Grace & Company is incorporated in the State of Delaware and which, in 1963, purchased the Zonolite Company which operated the world's largest vermiculite mine in Libby, Montana. Attached hereto and marked as Exhibit "I" to this my Affidavit are pages 574 to 581 of the Castleman Book. These pages set out some of the corporate history of W.R. Grace & Co. Reference is also made to various documentation that has been produced in legal actions in the United States demonstrating the knowledge that W.R. Grace & Co. had of the dangers and health hazards associated with its products which, to its knowledge, contained tremolite asbestos.

29.          Our legal counsel has set out in a separate affidavit the various corporate searches undertaken relating to our efforts to properly identify the various U.S. and Canadian companies operating over the course of time in conjunction with W.R. Grace & Co. All of the corporate defendants presently named in the legal action, with the exception of Grant Industries Ltd., are believed to, at one time or another, have operated in enterprise with W.R. Grace & Co. (referred to collected hereafter as the "Grace Defendants").

- 10 -

30.        Subsequent to the commencement of legal proceedings on October 25 and 26, 2004, we learned through our legal counsel that another corporate entity, which was not named as a defendant, Grace Canada Inc., had filed for protection pursuant to section 18.6 of *The Company's Creditors Arrangement Act*, R.S.C. 1985, C.c-36, (the "CCAA"). Neither in any of our own research nor in the corporate searches undertaken by our legal counsel, did we identify the corporate entity known as Grace Canada Inc. We were also unaware of its Application or the Order that it obtained pursuant to the CCAA on April 4, 2001. Attached hereto and marked as Exhibits are the following documents:

    (a)    Exhibit "J" - Notice of Application filed by Grace Canada Inc. in the Ontario Superior Court of Justice on April 4, 2001;

    (b)    Exhibit "K" - Body of the affidavit of Pierre Le Bourdais (i.e. without exhibits) sworn on April 3, 2001 with Mr. Le Bourdais identifying himself as treasurer of Grace Canada Inc.; and

    (c)    Exhibit "L" - Initial Order of Mr. Justice Farley dated April 4, 2001 (this copy of the Initial Order is unsigned but our legal counsel has been advised by counsel for the Grace Defendants that the Order was granted and entered); and

    (d)    Exhibit "M" - a cover page from a document filed in the United States Bankruptcy Court for the District of Delaware which sets out the names of the 62 entities related to W.R. Grace & Co. and on whose behalf the Chapter 11 proceedings were commenced.

31.        I am advised by our legal counsel that counsel for the Grace Defendants has also provided him with copies of various reports filed in the CCAA proceedings by Mr. Le Bourdais who is referred to as the "Information Officer" in the Initial Order. These reports and other material indicate that W.R. Grace & Co. voluntarily filed for reorganization on April 2, 2001 pursuant to a special provision of Chapter 11 of the United States Bankruptcy Code with the filing taking place in the U.S. Bankruptcy Court in Delaware. I am advised by my legal counsel that he has been advised by legal counsel in the United States that these special provisions of Chapter 11 permit a

- 11 -

company facing asbestos claims to file for protection from legal actions even if the company is not insolvent or bankrupt. I am advised by my legal counsel that the reports filed by Mr. Le Bourdais in the CCAA proceedings indicate that, in the almost 4 years since the filing under Chapter 11, essentially nothing has happened to allow for timely resolution of personal injury claims arising from exposure to Zonolite attic insulation. Based upon the report provided to our legal counsel dated October 29, 2004, it is indicated that the Ontario Court has granted an Order extending the stay of proceeding against Grace Canada Inc. to April 1, 2005 and that the U.S. Court continues to defer a hearing on proposals for case management of the personal injury claims and that numerous case management motions remain unresolved. I am advised by Mr. Ferbers that, by way of letter dated March 17, 2005, counsel for the Grace Defendants provided Mr. Ferbers with the fourteenth report of Mr. Le Bourdais dated February 28, 2005. This report attaches an "Amended Joint Plan of Reorganization" which is not yet approved. Mr. Ferbers advises that he has not yet had an opportunity to fully consider the proposed plan.

32.        The Olgivy Renault law firm, as legal counsel to the Grace Defendants and Grace Canada Inc., alleges that our legal counsel, Mr. Ferbers, is in a conflict of interest. I am advised by Mr. Ferbers that counsel for the Grace Defendants has also advised that it is the intention of the Grace Defendants to apply in the CCAA proceedings to seek similar protection for the Grace Defendants as has been ordered for Grace Canada Inc. Upon resolution of the allegations of conflict of interest, if it is determined that we may continue to be represented by Mr. Ferbers, we intend to immediately proceed with the motion to have Rebecca and I named representative plaintiffs and obtaining an Order approving certification of the legal proceedings as class proceeding.

33.        I have read the affidavit sworn by Mr. Le Bourdais on April 3, 2001, including paragraphs 23 and 24 where Mr. Le Bourdais claims that the company's processing eliminates "virtually all of the tremolite" and that the company believes that Zonolite attic insulation poses no significant health risks. I was shocked to read this. I believe that Mr. Le Bourdais' affidavit is misleading and does not provide full and frank disclosure to the Ontario Court of the knowledge, past conduct and culpability of Grace Canada Inc. and the Grace Defendants.

Case 01-01139-AMC   Doc 18728-4   Filed 05/16/08   Page 14 of 19

- 12 -

34.        Mr. Le Bourdais ignores the scientific evidence that has been generated worldwide and which confirms the danger of the products of the Grace Defendants.

35.        Subsequent to the commencement of the legal proceedings in Manitoba, I have learned that, on or about February 7, 2005, the W.R. Grace Company and seven of its current or former executives have been charged pursuant to a Federal Grand Jury indictment for conspiring to endanger the residents of Libby, Montana and concealing the health risks from asbestos contaminated vermiculite.  Attached hereto and marked as Exhibits "N" and "O" are copies of articles from the Associated Press and Reuters news services dated February 7 and 8, 2005.  These articles indicate that the Indictment suggests that the conspiracy began in 1976 and continued until 2002.  In view of this new information, we will be seeking to amend the claim against the Grace Defendants (and ultimately Grace Canada Inc.) to include allegations of fraudulent concealment, fraudulent misrepresentation and other such deliberate conduct.

36.        In addition, I have learned that legal actions have been commenced in the United States alleging that W. R. Grace & Co. and a number of the Grace Defendants have engaged in fraudulent transactions to spinoff and shield key assets from lawsuits by asbestos victims.  Attached hereto and marked as Exhibit "P" to this my affidavit is a copy of a newspaper article which I believe appeared in either 2000 or 2001 relating to the accusations of fraudulent dealings by some of the Grace Defendants.  The legal actions are described as challenging the validity of various asset sales involving subsidiaries of W.R. Grace & Co. and the Speciality Packing Division dating back at least to 1996 in order to evade asbestos liabilities.  I am advised by my legal counsel that Mr. Le Bourdais states in his Reports filed in the CCAA proceedings that the fraudulent transfer and conveyance claims have been resolved by way of a settlement agreement that still needs approval and that does not involve W.R. Grace & Co. or its 61 subsidiaries.

37.        Attached hereto and marked as Exhibit "Q" to this my affidavit is a copy of an article from the Seattle Post Intelligencer dated December 22, 1999. The article refers to the fact that W.R.

- 13 -

Grace & Co. ignored for many years the signs of asbestos contamination that doctors and health officials were saying would be killing people. There is reference to a coverup perpetrated by the company and the fact that there are hundreds of company documents showing it knew that workers were at risk but that the company continued to represent, as does Mr. Le Bourdais, that there is no danger. There is also reference to evidence advanced in U.S. legal actions indicating that the company decided not to warn the public about a potential health hazzard because it would be bad for business. There is also reference in this article to the correspondence attached as Exhibit "V" to this my affidavit.

38.        I am advised by our legal counsel, Mr. Ferbers, that attached hereto and marked as Exhibits " R" to "T" are examples of judicial decisions which refute any contention by Mr. Le Bourdais in his affidavit that judicial decisions have generally been rendered in favor of W.R. Grace & Co.:

(a)    Exhibit "R" - an excerpt from a U.S. publication known as Mealey's Litigation Reports dated November 17, 1989 which references a case in Illinois wherein W.R. Grace & Co. acknowledged being aware of a report referred to as Zonolite Vermiculite Ore Review dated July 24, 1969 which report is attached hereto and marked as Exhibit "S" to this my affidavit. The report concluded that the vermiculate from W.R. Grace's mines in Libby, Montana contained tremolite asbestos dust which was difficult to separate in the mill and which was a definite health hazzard;

(b)    Exhibit "T" - a two page decision of the South Central Judicial District Court of the State of North Dakota wherein the court concluded that the evidence raised a reasonable inference that both the raw material of W.R. Grace & Co. and its finished products may contain sufficient tremolite asbestos to be harmful; and

(c)    Exhibit "U" - a decision from the Missouri Court of Appeals, Eastern District, Division Three dated February 2, 1993 finding that there was

- 14 -

sufficient evidence to establish causation between W.R. Grace & Company's asbestos containing tremolite and the development of a tumor in the plaintiff.

**Grant Industries/Eddy Match Company Limited**

39.        During the course of investigating the distribution chain of Zonolite in Canada, particularly Western Canada, searches undertaken both by ourselves and by our legal counsel suggested that a company, or a group of companies, known as Grant Industries Ltd. was involved in the importing, processing, distribution and sale of Zonolite in Canada.  Our legal counsel undertook various Corporations Branch searches of Grant Industries and identified a number of companies seemingly operating in enterprise with Grant Industries Ltd.

40.        Based upon documents that I have reviewed, it is my belief that Grant Industries Ltd. was the primary processor and distributor of Zonolite in Western Canada.  In that the corporate searches undertaken by our legal counsel suggested that there were no active companies associated with the Grant Industries Ltd. involved in the distribution of Zonolite, we do not have any specific address to serve the Notice of Application or Statement of Claim on Grant Industries Ltd.

41.        Attached hereto and marked collectively as Exhibit "V" to this my affidavit are copies of various memos and letters dated between September 16, 1964 and February 9, 1965 relating to Grant Industries Ltd. operating in Western Canada. These letters refer to concerns about the danger of the asbestos being supplied by the W.R. Grace Company.  This documentation includes the following comments:

(a)        In reference to the use of vermiculite from W.R. Grace & Co. - "Asbestos is well known as the cause of lung fibrosis";

(b)        In reference to testing of workers at the Zonolite plant of Grant Industries Ltd. in Calgary - "this number of men with breathing abnormalities in a group of 9 is most unusual and puzzling ... since vermiculite is a micaceous material

- 15 -

this leaves us somewhat uneasy.  We are of the opinion that a more detailed study of these men by a chest specialist would be desirable ...."; and

(c)    In reference to dealing with the Alberta Department of Public Health - "I am attaching a few articles that presents the picture in the U.S. very clearly. There are very tight laws in the some States like New York and California where some States have none.  Each area should be investigated for City, County and State laws.  The U.S. federal government is now getting into the act.  I am sure that it will not be long until there will be very strict laws in almost all areas.  It is much better to stay ahead of them and act before they do.  Frankly, we will have no other choice before long.  It is my opinion that trying to save a few dollars on installation of the initial dust collection equipment will be a poor investment."

42.         Further, attached hereto and marked collectively as Exhibit "W" to this my affidavit is a letter dated December 10, 1968 and an Attending Physician's Statement dated December 4, 1968 referencing an employee at the Winnipeg plant of Grant Industries Ltd. by the name of Paul Annen. The letter from Grant Industries Ltd. to W.R. Grace & Co. dated December 10, 1968 points out that Mr. Annen was suffering from asbestosis and makes reference to an article on the effects of asbestos which was not being circulated to employees within the company.  This letter also references knowledge that the exposure of employees to asbestos is an unnecessary health hazzard which in turn may lead to large claims.  Also attached hereto and marked as Exhibit "X" to this my affidavit is a Memorandum dated June 1, 1970 which again speaks about asbestos and staying unscrupulous, unethical and mean in selling its asbestos containing product, Mono-Kote.

43.         The documentation referred to in paragraphs 41 and 42 above was obtained on or about October 27, 2004.  It is around this time that we (Allan and I) learned that Grant Industries Ltd. operated as a division of the Eddy Match Company Limited.  We have also only recently learned (on about March 8, 2005) that there were 9 plants exfoliating asbestos in Canada with there being five plants in Western Canada including one each in Winnipeg, Regina, Edmonton, Calgary and

- 16 -

Vancouver with all of the Western Plants operating under the name of Grant Industries Ltd.. While Grant Industries Ltd. listed its head office as Vancouver and seems to have been out of operation for many years, it is my understanding that the Eddy Match Company continues to operate with its head office located at 100 Crandall Street in Pembrooke, Ontario. It is for this reason that we wish to add the Eddy Match Company as a respondent/defendant to the legal proceedings. We are also requesting an extension of time for service of the legal proceedings on Grant Industries Ltd. and that service may be effected by serving the documents on the Eddy Match Company.

44.         I am advised by our legal counsel, Mr. Ferbers that attached hereto and marked as Exhibit " Y " to this my affidavit is a printout from a data base that he obtained through inquiries that were made of the U.S. Environmental Protection Agency ("EPA") relating to facilities that received crude ore from the W.R. Grace & Co. vermiculate mine in Libby, Montana. The two page printout attached as Exhibit " Y" relates to search criteria limited to Manitoba, Canada. I am advised by Mr. Ferbers that he received the database on about October 22, 2004. This printout also refers to Grant Industries Ltd. as a division of the Eddy Match Company. I am also advised by Mr. Ferbers that he was cautioned by the representative from the EPA that the database is not a complete listing of shipments made by the W.R. Grace Co.

**Representative Plaintiffs**

45.         I believe that both Rebecca and I would be appropriate representative plaintiffs if our legal proceedings are permitted to proceed as class proceedings. It is our present intention to proceed only with certification of the class set out at paragraph 4(c) of the statement of claim, that is, limiting the class of persons proceeding at this time to individuals exposed on Reserves (or designated lands) including those eligible as a result of their relationship to any deceased persons pursuant to *The Fatal Accidents Act.* Our proposed class would include those persons who have been exposed in Manitoba or elsewhere in Canada to asbestos or asbestos containing products, particularly Zonolite attic insulation, while living on Reserves or designated lands, and who have or may suffer in the future personal injury as a result of the action or inaction of one or more of the defendants.

- 17 -

46.          Rebecca is still recovering from her therapy and so has not yet sworn an affidavit.

47.          Attached hereto and marked collectively as Exhibit "Z" are numerous newspaper articles, transcripts of interviews and other such documentation relating to my efforts to publicize the dangers of exposure to Zonolite and other asbestos containing products, and to seek action from the Federal Government.  Both Allan and I also recently attended before a Senate Committee to do a presentation on these issues.

48.          With respect to the possibility of Mr. Ferbers being removed as our legal counsel, my family and I request that the court not do so.  We have been working with Mr. Ferbers for many months and want him to continue to be our lawyer.  I am aware that Mr. Ferbers' law firm was the registered agent for service for one or more of the Grace Defendants.  I am also aware that his law firm may have done other work for more than one of the Grace Defendants.  In our eyes, this does not create a conflict of interest and we ask the court to honour our choice of legal counsel.

49.          I make this affidavit *bona fide*.

SWORN before me at the City of          )
Winnipeg, in the Province of             )
Manitoba, the ___ day of                 )          RAVEN THUNDERSKY
March, 2005                              )

_____
A Barrister-at-Law in and for the
Province of Manitoba