IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: June 23, 2008** |
| | ) | **Objection Deadline: June 6, 2008** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO MAKE LEGALLY REQUIRED MINIMUM CONTRIBUTIONS TO DEFINED BENEFIT PENSION PLANS COVERING DEBTORS' EMPLOYEES**

The Debtors respectfully move this Court for the entry of an order authorizing the Debtors to make the minimum contributions to the defined benefit retirement plans covering the Debtors' employees in the United States (the "Grace Retirement Plans" or "Plans") required under federal law during the period July 15, 2008 to January 15, 2009 inclusive (the "08-09 Funding Period"). The contributions sought to be made are necessary to assure

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street,lzi.c., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch Nest Coal Company, H-G Coal Company.

compliance with the minimum funding requirements under federal law. The total of the legally required minimum contributions for the 08-09 Funding Period will be approximately $24 million. In support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is §§ 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

### Background

2.      The Debtors have requested and received Court permission to make their legally required minimum contributions to the Grace Retirement Plans pursuant to seven prior funding motions (collectively, the "Prior Funding Motions"). With respect to each such motion, prior to the applicable hearing date, the management of the Debtors has discussed the applicable motion with the Official Committee of Unsecured Creditors, the Official Committee of Property Damage Claimants, the Official Committee of Personal Injury Claimants and the Official Committee of Equity Security Holders  (collectively, the "Committees") and the Future Claimants' Representative (the "FCR").

3.      The Court entered orders approving the requests under each Prior Funding Motion (as modified). In accordance with those orders, the Debtors contributed approximately $48.5 million to the Grace Retirement Plans in 2003[2], approximately $20 million in 2004,

---

[2] This amount includes a contribution in 2003 of approximately $8.5 million for the Curtis Bay union pension plan, based on a separate motion and court order dated March 3, 2003 [Docket No. 3445].

approximately $24.1 million in 2005[3], approximately $101.4 million in 2006[4], approximately $76 million in 2007, and approximately $32.7 million to date in 2008.[5]

4.      In this Motion, the Debtors are seeking to continue funding the Grace Retirement Plans by timely making the legally required minimum contributions for those plans, which is consistent with the funding approach that was initially articulated in the Prior Funding Motion submitted on May 23, 2005 (Docket No. 8484) (the "2005 Funding Motion") and the Court's order dated June 22, 2005 (Docket No. 8667). The Debtors believe that this approach has had a beneficial impact on the Debtors' estate and its creditors, and that the continuation of this approach continues to be in the best interest of the Debtors' estate and its creditors.

5.      The Debtors have provided each of the Committees and the FCR with a prior draft of this Motion and have discussed the Motion with them and their representatives to the extent discussions were requested.

### Grace Retirement Plans

6.      The Prior Funding Motions included considerable background regarding the Grace Retirement Plans and the importance of maintaining those Plans and supporting their financial viability. That background continues to be valid. In summary, following is a review and update of some of the information noted originally in the Prior Funding Motions:

---

[3] This amount includes a contribution in 2005 of approximately $7.9 million to two union pension plans covering union employees at its Lake Charles, Louisiana and its Chattanooga, Tennessee plants, based on a separate motion and court order dated June 22, 2005 [Docket No. 8666].

[4] This amount includes a contribution in 2006 of approximately $1.1 million to one union pension plan covering union employees at Grace's Chicago Dewey & Almy Plant.

[5] This amount included the last quarterly contribution for the 2007 plan year, as well as the first quarterly contribution for the 2008 plan year. See Exhibit C for a list of the actual contributions to the Grace Retirement Plans for each calendar year from 2005 until 2007, as well as estimated annual contributions through 2009.

- The Grace Retirement Plans currently consist of ten funded, defined benefit pension plans, each of which is qualified under section 401(a) of the Internal Revenue Code (the "Code").

- The most significant Grace Retirement Plan is the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace Salaried Plan"), which comprises approximately 80% of the assets and 82% of the liability of the Grace Retirement Plans in the aggregate (depending on the measure of liability).

- The Debtors have a long history of providing employees with defined benefit pension plans.

- Many of the Grace Retirement Plans are maintained pursuant to collective bargaining agreements.

- The employers that are considered competitors or peers of the Debtors' businesses generally maintain defined benefit pension plans for their employees.

- The "plan year" of each Grace Retirement Plan is a calendar year.

### Funded Status of the Grace Retirement Plans

7.      Exhibit A to this motion updates several different calculations to measure the liabilities and assets of the Grace Retirement Plans, which were originally used in the Prior Funding Motions.  All amounts on Exhibit A have been calculated by the actuary of the Grace Retirement Plans.

8.      As indicated on Exhibit A, the funded status of the Grace Retirement Plans continues to improve.  The Plans, however, are still underfunded by most accepted measures (except for the "economic obligation" measure).  As of January 1, 2008, the amount by which the Plans were funded ranges from $+43 million to $-158 million, depending on the measure used.

9.      As specified on Exhibit A, the total market value of Grace Retirement Plan assets as of January 1, 2008 was approximately $774 million.  This is an increase of approximately $37 million from January 1, 2007 (when the market value was approximately

$737 million).[6]  The increase in the asset value during 2007 was the result of the Debtors'
contribution of approximately $76.0 million to the Grace Retirement Plans and asset returns of
approximately 6.3% during 2007, offset by approximately $82.8 million that was paid out of the
Plans during the year.[7]

### Employees Covered by the Grace Retirement Plans

10.    Virtually all of the Debtors' current employees are covered by one of the Grace
Retirement Plans.  The Grace Salaried Plan alone covers over 1,900 active, salaried employees
(of a total U.S. workforce of approximately 3,000 employees), or over 60% of the Debtors' U.S.
workforce.

11.    The Debtors' employees continue to consider ongoing benefit accruals under the
Grace Retirement Plans and the financial viability of those Plans as among the most important
aspects of their employment relationship with the Debtors.

12.    The Debtors' employees continue to closely monitor the financial viability of the
Grace Retirement Plans through the Debtors' ERISA and SEC disclosures, as well as other
research techniques.

13.    The Debtors' employees continue to emphasize to the Debtors' management the
importance of the Grace Retirement Plans.

14.    The Debtors' management and employees continue to be motivated to work
towards successfully creating value for the Debtors' estates by growing the revenues and profits

---

[6] As of March 31, 2008, the total market value of assets was $728.5 million, as a result of contributions, market
fluctuation and benefit payments.

[7] The Debtors project that in 2008 approximately $60 to $70 million will be paid out of the Grace Retirement Plans.
One factor that is expected to reduce the pay out from 2007, and prior years, is the cessation of elective lump
sum cash outs to participants, as of January 1, 2008, in accordance with the application of the PPA to the
Debtor's Chapter 11 status.

of the Debtors' businesses, with the expectation that at least a portion of the cash generated by those efforts would be used to provide the funding necessary to assure the long-term viability of the Grace Retirement Plans.

15.     The Debtors' management believes that continuing to make at least the legally required minimum contributions to each of the Grace Retirement Plans is essential to maintaining the morale of the Debtors' workforce and its confidence in management, and thereby the productivity and long-term profitability of the Debtors' businesses.  The employees are vital to maintaining and enhancing the value of the Debtors' estate and to the Debtors' successful reorganization.

### Prior Funding Motions

16.     Each of the Prior Funding Motions was tailored to recognize the concerns of the Debtors' employees regarding the financial viability of the Grace Retirement Plans, and the value of the employees to the Debtors' estates and their vital role in a successful reorganization of the Debtors.  In addition, the Debtors recognized, in developing those Motions, the concerns voiced by the Committees and their advisors – some of which expressed concern regarding the conservation of the Debtors' cash, while others expressed an interest in maintaining the morale of the Debtors' workforce.

17.     In the 2005 Funding Motion, the Debtors' proposed funding approach was simplified to satisfy the single most important goal of the multiple objectives previously considered in the 2003 and 2004 funding motions – i.e., making only the legally required minimum contributions for a 12-month period commencing July 2005.  As specified in that Motion, the Debtors' management believed that simplifying the funding approach in this manner recognized the concerns of the Committees regarding the continued conservation of the Debtors' cash, while addressing employee concerns regarding the continued viability of the Grace

Retirement Plans. The Court signed the order approving that funding approach of the 2005 funding motion on June 22, 2005. The 2006 and 2007 funding motions followed this same general approach.

### 08-09 Funding Approach

18.    Consistent with the funding approach initially established by the 2005 Funding Motion and the related Court Order, the funding approach for the 08-09 Funding Period (the "08-09 Funding Approach") is to make only those contributions to the Grace Retirement Plans that are necessary to satisfy the minimums that are legally required by applicable law.[8] Each such contribution shall be made no sooner than 1 month before the deadline imposed by federal law (unless a significant corporate income tax advantage may be achieved by making a contribution of the same amount earlier).

19.    The legally required minimum contributions to the Grace Retirement Plans for the 08-09 Funding Period are specified in the following schedule (the "Schedule"):

| Payment Due Date[9] | Contributions[10] | Plan Year |
|---|---|---|
| **2008** | | |
| July 15 | $20,284 | 2008 |
| September 15 | $10,528,926 | 2007 |
| October 15 | $5,820,937 | 2008 |
| **2009** | | |
| January 15 | $7,604,629 | 2008 |
| **Total** | **$23,974.776** | |

---

[8]Consistent with the most recent Prior Funding Motions, the 08-09 Funding Approach does not include the objective of eliminating the requirement of the Grace Retirement Plans to pay PBGC variable rate premiums. It is estimated that the Grace Retirement Plans will be required to pay approximately $0.8 million in PBGC variable rate premiums for 2008. In order to avoid the requirement to pay all such premiums for 2008, the Debtors would be required to contribute approximately $92.6 million to the Plans by September 15, 2008, in addition to the legally required minimums.

[9] Debtors may slightly accelerate the timing of the legally required minimum contributions during the 08-09 Funding Period to maximize tax benefits

[10] All contributions specified in this motion and the exhibits hereto have been calculated by the actuary of the Grace Retirement Plans.

20.    The contributions listed on the Schedule for the 2007 and 2008 plan years have been finalized, and are not subject to change as a result of future market performance of the assets of the Grace Retirement Plans or any anticipated changes in applicable law.

21.    It is necessary to secure Court approval for the payment of legally required minimum contributions for the 08-09 Funding Period at this time because the first due date with respect to such contributions is July 15, 2008, less than 1 month after the hearing date for this Motion.

## Addressing Employees' and Creditors' Concerns

22.    The Debtors believe that the legitimate concerns of their employees will be addressed if management can report to the employees both the recent improvement in the Plans' funded status, and with the Court's approval for the Debtors to make all of the legally required minimum contributions to the Grace Retirement Plans for the 08-09 Funding Period.

23.    The Debtors also believe that the legitimate concerns regarding the Debtors' conservation of cash will continue to be addressed by the 08-09 Funding Approach because cash will only be used to satisfy the minimum contribution requirements imposed by applicable law, and not to make any additional contributions to satisfy any other objective.

24.    In addition, the Debtors' annual funding obligations to the Grace Retirement Plans are continuing to decrease to a level that is more sustainable, as indicated in Exhibit C, which lists all contributions made (and estimates of contributions to be made) during each calendar year from 2005 to 2009.

## Relief Requested

25.     By this Motion, the Debtors seek authority to make the minimum contributions required by applicable federal law to one or more of the Grace Retirement Plans for the period July 15, 2008 to January 15, 2009 (inclusive).

## Basis for Relief

26.     Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business property of the estate." 11 U.S.C. § 363(b).

27.     A court has the statutory authority to authorize a debtor to use property of the estate pursuant to § 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Abbots Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071(2d Cir. 1983), see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); Fulton State Bank v. Schipper, 993 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClun, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b); In re Ernst Rome Ctr Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

28.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid

business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Res., Inc., 147 B.R. 654, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

### The Proposed Transactions Are Supported by Sound Business Judgment

29.    The Debtors respectfully submit that implementing the 08-09 Funding Approach is the least costly approach to funding the Grace Retirement Plans in accordance with the requirements imposed by applicable federal law.  Such implementation will also allow for the funding of the Grace Retirement Plans in a manner that helps to maintain the morale and productivity of the Debtors' employees throughout the United States, and that maintains competitive employee benefits vis-à-vis the Debtors' competitors and peers, which is key to continuing to maintain a dedicated, motivated and loyal work force.  Such a work force is a vital component of the Debtors' estates and restructuring efforts.

30.    For the reasons set forth in detail above, the Debtors have determined in their business judgment that implementing the 08-09 Funding Approach is in the best interests of the Debtors' estates and creditors.  As specified above, clear business reasons exist to justify, under section 363(b) of the Bankruptcy Code, such implementation.

### Notice

31.    Notice of this Motion has been given to (i) of the Office of the United States Trustee, (ii) counsel to the Debtor-In-Possession lenders, (iii) counsel to each Official Committee appointed by the United States Trustee, (iv) counsel to the FCR, and (v) those parties that requested papers under Fed.R.Bankr.P.2002.  In light of the nature of the relief requested, the

Debtors submit that no further notice is required.

### No Prior Request

32.    No prior Application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order substantially in the form attached hereto (i) authorizing the Debtors to make the minimum contributions to the Grace Retirement Plans for the 08-09 Funding Period required by federal law, and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  May 19, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors-In-Possession

## Exhibit A

## Funded Status of the Grace Retirement Plans

As of January 1, 2007 and January 1, 2008, depending on the measure of liability, the

funded status of the Grace Retirement Plans is specified in the following chart.[1]

### January 1, 2007

### (all amounts in millions)

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO | ERISA/ "Current Liability"[2] |
|---|---|---|---|---|
| | $ 752 | $ 926 | $ 962 | $934 |
| Asset Value[3] | 769 | 737 | 737 | 704 |
| Funded Status | $ +17 | $ −189 | $ −225 | $ -230 |

### January 1, 2008

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO | ERISA/ "Current or Target Liability" |
|---|---|---|---|---|
| | $ 756 | $ 904 | $ 932 | $ 919 |
| Asset Value | 799 | 774 | 774 | 799 |
| Funded Status | $ +43 | $ -130 | $ -158 | $ -120 |

---

[1] Please note that the methodology for calculating the Economic Obligation (FAS 35), ABO and PBO for January 1, 2008 is consistent with that methodology for prior years. See the Prior Funding Motions for a more detailed explanation of these funded status measurements.

[2] As a result of the Pension Protection Act of 2006, the "ERISA" liability measure changed to "Target Liability", effective for 2008, from "Current Liability" in prior years. The principle differences between these measures are: (1) the interest rate is calculated using a simplified corporate bond yield curve for Target Liability (versus a single corporate bond rate for Current Liability); and (2) Target Liability requires the incorporation of a revised mortality table recognizing longer life spans.

[3] Explanation of "Asset Value." Under FAS 35, the appropriate "asset value" for each plan year is the market value plus receivables as of the last date of the preceding plan year. The "asset value" for the ABO and PBO (under FAS 87) is the "market value" but does not include such receivables. The "asset value" for the January 1, 2007 "ERISA / Current Liability" measure is the three-year average "actuarial" asset value, not market value. (2007 was the last year that this "actuarial" asset value measure could be used to calculate the "current liability.") The "asset value" for the January 1, 2008 "ERISA / Target Liability" measure is the market value plus receivables as of that date.

## Change From 1/2007 to 1/2008

| Measures of Liability | Economic Obligation (FAS 35) | ABO | PBO | ERISA/ "Current or Target Liability" |
|---|---|---|---|---|
| Change in Funded Status | $ +26 | $ +59 | $ +67 | $ +110 |

**Exhibit B**

**Schedule of Projected Minimum Required Contributions
to the Grace Retirement Plans from 2007 to 2009**

| Payment Due Date | Contributions Per Plan Year | | |
|---|---|---|---|
| | **2007** | **2008** | **2009** |
| **2007** | | | |
| | | | |
| July 15 | $8,982,359 | | |
| September 15 | | | |
| October 15 | $14,830,385 | | |
| **2008** | | | |
| January 15 | $14,830,385 | | |
| April 15 | | $17,823,645 | |
| July 15 | | $20,284[1] | |
| September 15 | $10,528,926 | | |
| October 15 | | $5,820,937 | |
| **2009** | | | |
| January 15 | | $7,604,629 | |
| April 15 | | | $9,132,023 |
| July 15 | | | $9,330,283 |
| September 15 | | $4,806,841 | |
| October 15 | | | $9,488,040 |
| **Totals** | **$49,172,055** | **$36,076,336[2]** | **$27,950,346** |

(a)

---

[1] The amount of the contributions for July 15 and October 15, 2008, take into account an offset for the "excess" contributed on April 15. Without the offset, each of the quarterly contributions would have been approximately $7.6 million.

[2] In the Prior Funding Motion, filed in May 2007, the estimated total contributions for the 2008 plan year were approximately $44.9 million.

14

## Exhibit C

### Total Contributions By Calendar Year[1]

| Due Date | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| | | | | | |
| January 15 | 0 | $8,713,625 | $16,279,562 | $14,830,385 | **$7,604,629** |
| April 15 | 0 | $20,331,037 | $20,567,271 | $17,823,645 | $9,132,023[3] |
| July 15 | $15,429,390 | $21,343,849 | $8,982,359 | **$20,284**[2] | $9,330,283 |
| September 15 | 0 | $44,893,500 | $15,343,157 | **$10,528,926** | $4,806,841 |
| October 15 | $8,710,981 | $6,145,562 | $14,830,385 | **$5,820,937** | $9,488,040 |
| | | | | | |
| Totals | $24,140,371 | $101,427,573 | $76,002,734 | **$49,024,177**[4] | 40,361,816 |

---

[1] Amounts include all contributions made to the Grace Retirement Plans, including past contributions to union plans to effectuate benefits increases.

[2] Bolded blocks indicate minimum required contributions for the 08-09 Funding Period: July 2008 to January 2009. The contributions noted for July 15 and October 15, 2008, and January 15, 2009, are the remaining quarterly contributions for the 2008 plan year. The contribution noted for September 15, 2009 is the last contribution for the 2008 plan year.

[3] The contributions noted for April 15, July 15 and October 15, 2009, are estimates for quarterly contributions for the 2009 plan year.

[4] In the Prior Funding Motion, filed May 2007, the estimated total contributions for the 2008 calendar year were approximately $54.2 million.