UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower – 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
            Debtors.  .
                              .    June 2, 2008
. . . . . . . . . . . . ..    1:07 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Reed Smith LLP
                          By:  JAMES RESTIVO, ESQ.
                               TRACI REA, ESQ.
                          435 Sixth Street
                          Pittsburgh, PA  15219


Audio Operator:           Janet Heller

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For the                     Stroock & Stroock & Lavan
Unsecured Creditors'        By:  ARLENE KRIEGER, ESQ.
Committee:                  180 Maiden Lane
                            New York, NY  10038-4982

For the EPA:                Department of Justice
                            By:  JAMES FREEMAN, ESQ.

For Committee of            Campbell & Levine
Asbestos Personal           By:  MARK T. HURFORD, ESQ.
Injury Claimants:           800 North King Street
                            Suite 300
                            Wilmington, DE  19701

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864

For the PD Committee:       Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For Baron & Budd,           Hogan Firm Attorneys at Law
et al.:                     By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801
For Everest
Reinsurance:                Crowell & Moring LLP
                            By:  LESLIE EPLEY DAVIS, ESQ.
                            1001 Pennsylvania Ave., N.W.
                            Washington, DC  20004-2595

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For the Crown:                  Womble Carlyle Sandridge & Rice
                                By:  FRANCIS MONACO, ESQ.
                                222 Delaware Avenue
                                Suite 1501
                                Wilmington, DE  19801

For the Asbestos
Creditors Committee:            Caplin & Drysdale, Chartered
                                By:  PETER LOCKWOOD, ESQ.
                                One Thomas Circle, NW
                                Washington, D.C.  20005

For the Future                  Orrick, Herrington & Sutcliffe LLP
Claimants                       By:  ROGER FRANKEL, ESQ.
Representatives:                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007

TELEPHONIC APPEARANCES:

For London Market               Mendes & Mount, LLP
Companies:                      By:  ALEXANDER MUELLER, ESQ.
                                750 Seventh Avenue
                                New York, NY  10019-6829

For Official Committee          Anderson Kill & Olick
of Asbestos Personal            By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:               1251 Avenue of the Americas
                                New York, NY  10020-1186

For Official Committee          Brandi Law Firm
of Asbestos Property            By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:               44 Montgomery St., Suite 1050
                                San Francisco, CA  94104

For the PD Committee:           Speights & Runyan
                                By:  MARION FAIREY, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924

For the Ad Hoc                  Dewey & LeBoeuf, LLP
Committee of Equity             By:  JENNIFER WHITENER, ESQ.
Sec. Holders:                   125 West 55th Street
                                New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Bloomberg, LLP:          Bloomberg, LLP
                             By:  STEVEN H. CHURCH
                             Chicago, IL


For Halcyon:                 Halcyon
                             By:  JOHN GREENE


For Royal Indemnity          Wilson, Elser, Moskowitz, Edelman
Company:                        & Dicker LLP
                             By:  CARL PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY  10017


For Federal Insurance        Cozen O'Connor
Company:                     By:  JEFFREY WAXMAN, ESQ.
                             Chase Manhattan Centre
                             1201 North Market Street
                             Wilmington, DE  19801


For the Official             Caplin & Drysdale Chartered
Committee of Asbestos        By:  WALTER SLOCOMBE, ESQ.
Personal Injury              One Thomas Circle, NW
Claimants:                   Washington, D.C.  20005


For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924


For Grace Certain            Montgomery, McCracken, Walker &
Cancer Claimants:               Rhoads LLP
                             By:  NATALIE D. RAMSEY, ESQ.
                             300 Delaware Avenue, Ste. 750
                             Wilmington, DE  19801


                             Caplin & Drysdale, Chartered
                             By:  ELIHU INSELBUCH, ESQ.
                             375 Park Avenue, #3505
                             New York, NY  10152


For Silver Point             Silver Point Capital
Capital:                     By:  JOHN KU


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Everest Reinsurance        Marks, O'Neill, O'Brien & Courtney
Company, et al.:               By:  JOHN D. MATTEY, ESQ.
                                    BRIAN L. KASPRZAK, ESQ.
                               913 North Market Street
                               Suite 800
                               Wilmington, DE  19801


For W.R. Grace:                Scarfone Hawkins LLP
                               By:  MATTHEW MOLOCI, ESQ.
                                    DAVID THOMPSON, ESQ.
                               One James Street South, 14th Floor
                               Hamilton, Ontario  Canada L84 3P9


For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103


For Murray Capital             Murray Capital Management, Inc.
Management                     By:  MARTI MURRAY


For State of California:       Hahn & Hessen
                               By:  CHRISTINA J. KANG, ESQ.
                               488 Madison Avenue, 14th Fl.
                               New York, NY  10022


For Various Claimant           Stutzman, Bromberg, Esserman & Plifka
Firms:                         By:  DAVID J. PARSONS, ESQ.
                                    VAN J. HOOKER, ESQ.
                                    SANDER L. ESSERMAN, ESQ.
                               2323 Bryan Street
                               Suite 2200
                               Dallas, TX  75201


For Everest Reinsurance        Crowell & Moring LLP
Company, et al:                By:  MARK PLEVIN, ESQ.
                                    LESLIE DAVIS, ESQ.
                               1001 Pennsylvania Avenue
                               Washington, DC  20004-2595


For W.R. Grace:                W.R. Grace & Co.
                               By:  MARK SHELNITZ, ESQ.
                                    WILLIAM SPARKS, ESQ.
                               750 Grace Drive
                               Columbia, MD  21044


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Tre Angeli LLC:          Tre Angeli LLC
                             By:  JOSEPH RADECKI


For Allstate Insurance:      Cuyler Burk, LLP
                             By:  ANDREW CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054

For Owens-Illinois:          McCarter & English
                             By:  DANIEL SILVER, ESQ.
                             Renaissance Centre, 405 N. King St.
                             Wilmington, DE  19801

For Fireman's Fund:          Stevens & Lee, P.C.
                             By:  DAVID R. BEANE, ESQ.
                             1105 North Market Street, 7th Fl.
                             Wilmington, DE  19801

For Travelers Casualty       Simpson Thacher & Bartlett
& Surety:                    By:  STERLING MARSHALL, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017


For the Property
Damage Committee:            Bilzin Sumberg Baena Price &
                               Axelrod LLP
                             By:  MATTHEW KRAMER, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For Dune Capital Mgmt:       Dune Capital Management
                             By:  GUY BARON


                    **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For W.R. Grace:             Cohn Whitesell & Goldberg, LLP
                           By:  CHRISTOPHER M. CANDON, ESQ.
                                DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For CNA:                   Goodwin Procter, LLP
                           By:  BRIAN MUKHERJEE, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For City of                Haynsworth Sinkler Boyd, P.A.
Charleston:                By:  TARA NAUFUL, ESQ.
                           1201 Main Street
                           Suite 2200
                           Columbia, SC  29211-1889

For Official Committee     Duane Morris LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

For Official Committee     LECG, LLC
of Asbestos Property       By:  ELIZABETH DEVINE, ESQ.
Claimants:                      ALAN MADIAN, ESQ.

For Vinson & Elkins:       Vinson & Elkins LLP
                           By:  ARI M. BERMAN, ESQ.
                           666 Fifth Avenue, 26th Floor
                           New York, NY  10103-0040

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  DAVID KLAUDER, ESQ.
                           844 King Street, Suite 2313
                           Lockbox 35
                           Wilmington, DE  19801

For the Canadian           Lauzon Belanger
Claimants:                 By:  MICHEL BELANGER, ESQ.
                                CAREEN HANNOUCHE, ESQ.
                           286 Saint-Paul West, Suite 100
                           Montreal (Quebec), H2Y 2A3

For David T. Austern:      Piper Jaffray & Co.
                           By:  JONATHAN BROWNSTEIN, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Citadel Investment    Citadel Investment Group
Group:                    By:  BEAU HARBOUR


For the Asbestos          Ferry Joseph & Pearce, P.A.
Creditors Committee:      By:  THEODORE TACCONELLI, ESQ.
                          824 Market Street, Suite 19899
                          Wilmington, DE  19899

For One Beacon            Drinker Biddle & Reath
America Insurance Co.:     By:  DAVID PRIMACK, ESQ.
                          1100 N. Market Street, Suite 1000
                          Wilmington, DE  19801

For the Debtors:          Kirkland & Ellis LLP
                          By:  BARBARA HARDING, ESQ.
                               SCOTT McMILLAN, ESQ.
                               SALVATORE BIANCA, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               DEANNA BOLL, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

For Official Committee    Dies & Hile LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701

For David T. Austern:     Piper Jaffray & Co.
                          By:  JASON SOLGANICK

For David T. Austern,     Phillips, Goldman & Spence, P.A.
the Future Claimants'     By:  JOHN C. PHILLIPS, ESQ.
Representative:           1200 North Broom Street
                          Wilmington, DE  19806

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For W.R. Grace:                 Pachulski, Stang, Ziehl & Jones LLP
                                By:  KATHLEEN P. MAKOWSKI, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE  19899-8705

For the                         Stroock & Stroock & Lavan
Unsecured Creditors'            By:  KENNETH PASQUALE, ESQ.
Committee:                      180 Maiden Lane
                                New York, NY  10038-4982

For the ZAI Claimants:          Sullivan Hazltine Allinson LLC
                                By:  WILLIAM SULLIVAN, ESQ.
                                4 East 8th Street, Suite 400
                                Wilmington, DE

For Asbestos Property           Pryor Cashman LLP
Damage Claimants:               By:  RICHARD LEVY, ESQ.
                                410 Park Avenue
                                New York, NY  10022

For Lehman Brothers:            Lehman Brothers
                                By:  ANDREW CHAN

For Official Committee          Richardson Patrick Westbrook &
of Asbestos Property              Brickman, P.C.
Claimants:                      By:  EDWARD J. WESTBROOK, ESQ.
                                174 East Bay Street
                                Charleston, SC  29401

For the Future                  Orrick, Herrington & Sutcliffe
Claimants                        LLP
Representatives:                By:  DEBRA FELDER, ESQ.
                                     RICHARD H. WYRON, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007

For Official Committee          Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property            By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:               Embarcadero Center West, 30th Fl.
                                275 Battery Street
                                San Francisco, CA  9411-3339

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.  This is the matte of

3  W.R. Grace, 01-1139.  Participants by phone, Alex Mueller,

4  Robert Horkovich, Terence Edwards, Jay Sakalo, Marion Fairey,

5  Darrell Scott, Jennifer Whitener, Steven Church, John Greene,

6  Carl Pernicone, Jeff Waxman, Walter Slocombe, Daniel Speights,

7  Scott Baena, Natalie Ramsey, John Ku, John Mattey, Matthew

8  Moloci, Brian Kasprzak, Jacob Cohn, Marti Murray, Christina

9  Kang, Van Hooker, Mark Plevin, Leslie Davis, Mark Shelnitz,

10  Joseph Radecki, Andrew Craig, Daniel Silver, David Parsons,

11  David Beane, Sterling Marshall, Tiffany Cobb, Sandy Esserman,

12  Guy Baron, Matthew Kramer, Tara Nauful, Michael Lastowski,

13  Elizabeth Devine, Jay Sakalo, Ari Berman, David Klauder,

14  Michael Belanger, William Sparks, Jonathan Brownstein, Brian

15  Mukherjee, Theodore Tacconelli, Beau Harbor, David Primack,

16  Barbara Harding, Scott McMillan, Martin Dies, Daniel Cohn,

17  Jason Solganick, Careen Hannouche, John Phillips, Kathleen

18  Makowski, David Thompson, David Bernick, Janet Baer, Theodore

19  Freedman, Ken Pasquale, Salvatore Bianca, Deanna Boll, Richard

20  Levy, Robert Horkovich, William Sullivan, Christopher Candon,

21  Alan Madian, Andrew Chan, Edward Westbrook, Debra Felder,

22  Richard Wyron, and Elizabeth Cabraser.  Are there parties in

23  Delaware who want to enter appearances in W.R. Grace?  Is there

24  anyone in the courtroom in W.R. Grace?  If not, we're going to

25  terminate the video conference.

1          UNIDENTIFIED ATTORNEY:  I saw Mr. Phillips on the

2 screen.

3          UNIDENTIFIED ATTORNEY:  He's hiding.

4          UNIDENTIFIED ATTORNEY:  He's sitting on that side of

5 the room, where you can't see.

6          THE COURT:  Okay.  Mr. Phillips.  Is anybody in

7 Delaware?

8          UNIDENTIFIED SPEAKER:  No, Your Honor.

9                    (Laughter)

10          THE COURT:  Other than you?

11                    (Laughter)

12          THE COURT:  Okay.  I guess we'll leave the video on

13 for a few minutes in case Mr. Phillips comes back.  But if no

14 on is there in about 15 minutes, then I'll just terminate the

15 video conference.  Were you expecting them in -- to stay in

16 Delaware? Anybody? No? Okay.  Although I had most of your

17 names on the phone list, I see most of you are here.  I'll take

18 entries in Court, please.

19          MR. BERNICK:  David Bernick for Grace.

20          MS. BAER:  Janet Baer for Grace.

21          MR. RESTIVO:  James Restivo and Tracy Rae for Grace.

22          MR. O'NEILL:  Good afternoon, Your Honor.  James

23 O'Neill for Grace.

24          MS. KRIEGER:  Good afternoon, Your Honor.  Arlene

25 Krieger from Strook and Strook and Lavan on behalf of the

1  unsecured creditors' committee.

2          MR. BAENA:  May it please the Court, good afternoon,

3  Your Honor, Scott Baena and Jay Sakalo on behalf of the

4  property damage committee.

5          MR. SCOTT:  Good afternoon, Your Honor.  Darrell

6  Scott on behalf of Zonolite Attic Insulation claimants.

7          MR. HURFORD:  Good afternoon, Your Honor.  Mark

8  Hurford, Campbell & Levine, on behalf of the ACC.

9          MR. LOCKWOOD:  Good afternoon, Your Honor.  Peter

10 Lockwood of Caplin & Drysdale for the ACC.

11         MR. FRANKEL:  Good afternoon, Your Honor.  Roger

12 Frankel with Orrick Herrington for the future claims

13 representative.

14         MR. FREEMAN:  Good afternoon, Your Honor.  Jim

15 Freeman with the Department of Justice for the Environmental

16 Protection Agency.

17         MR. HOGAN:  Good afternoon, Your Honor.  Daniel Hogan

18 on behalf of the Canadian Zonolite claimants.

19         MR. MONACO:  Good afternoon, Your Honor.  Frank

20 Monaco for the Crown.

21         THE COURT:  Ms. Baer?

22         MS. BAER:  Good afternoon, Your Honor.  Taking up the

23 agenda in the order in which it's set out, Agenda Items 1 and 2

24 are being continued.  We'll hand up orders at the end of the

25 hearing continuing those two matters.

1       Agenda Item Number 3, the motion of CSX

2   Transportation with respect to an administrative claim, that

3   matter has been resolved, and CSX has withdrawn its motion, and

4   that was done on an actual filing of a notice of withdrawal.

5       Agenda Item Number 4, Your Honor, is the motion of

6   the debtors for allowance of an OCP modification with respect

7   to Ernst & Young.  By agreement of the parties we are

8   continuing that matter to June 23rd.

9       Your Honor, that takes us to Agenda Item Number 5,

10  which is one of two very significant environmental settlements

11  on the agenda for today that we'd like to take up with your

12  Court.  The first matter, Your Honor, is the multi-site

13  settlement agreement, as we call it.  This resolves the United

14  States proofs of claim with respect to 35 sites around the

15  country.  This is not the Libby resolution.  It's a separate

16  item, Agenda Number 7.  This resolves cost recovery and various

17  related liabilities at owned and unowned sites around the

18  country.  The owned sites we continue to own.  Some of them are

19  open, some of them are closed.  The non-owned sites are

20  generally speaking superfund CERCLA sites.  There are multiple

21  parties involved and these resolve Grace's liabilities with

22  respect to those sites.

23      The settlement of the 35 sites is for the allowance

24  of a claim in the amount of $44.1 million total.  41.8 of that

25  is a general unsecured claim.  It will -- it is a pre-petition

1  claim, and it will be paid as an allowed claim upon

2  confirmation of the Chapter 11 plan.

3         $2.3 million of the settlement is an administrative

4  claim with the Department of Justice and the EPA for post-

5  petition environmental remediation and clean up costs at owned

6  sites.  Of that amount $672,574.52 will be paid within 30 days

7  of entry of an order approving the settlement.  This, again, is

8  an administrative claim.  The remaining amount of the

9  administrative claim is not called to be paid immediately.  The

10 EPA reserves its right to ask at some point in the future for

11 that payment, otherwise it will be paid as an administrative

12 claim under the Chapter 11 plan.

13        There are three significant sites that are covered in

14 the proofs of claim.  These are claims number 9634, 9635, which

15 are not resolved by this agreement.  The Fuzz Wrap site, which

16 was a site in Curtis Bay, Maryland, that was resolved last

17 month, and Your Honor entered an order resolving that claim.

18 The Libby asbestos clean up site, that is Agenda Item Number 7,

19 which I'll take up shortly, and Walpole, Massachusetts, which

20 is still being negotiated between the EPA and Grace.

21        Again, Your Honor, most of the money here will be

22 going to the EPA for the payment of general unsecured claims

23 for generally speaking past, present, and some future clean up

24 costs, all these general unsecured claims.  Some money will be

25 going to certain partially responsible parties.  That is called

**J&J COURT TRANSCRIBERS, INC.**

for in the settlement agreement and the EPA will be handling
those matters.   These are liquidated sites.   The sites have all
been subject to specific amounts that will be paid.   They will
be put behind us and Grace will be receiving both contribution
protection as well as a covenant not to sue from the United
States.

There is also a provision in this agreement for
additional sites in the event that other sites are some time in
the future discovered.   Pursuant to this agreement, the EPA
will be able to bring those to the attention of Grace, and
whatever claims ultimately come of those will be considered
general unsecured claims against the reorganized debtor.

Your Honor, there were four objections filed to this
order.   Pursuant to a certification of counsel which was filed
on May 23rd, 2008, we enclosed a black lined order and a black
lined agreement.   All of the objections have been resolved.
The objections of Tyco Healthcare, the City of Cambridge, and
the State of Montana were effectively objections saying we have
individual sites, what does is this doing with respect to our
individual sites, our individual proofs of claim?   And the
answer is it does not address their individual proofs of claim.
The order has been revised to reflect that.   Coneb (phonetic)
Pipeline and the '02 Steering Committee have claims with
respect to the Otis Pipeline site.   Those proofs of claim are
also, and individual claims are also not being resolved.   And

1  again, the settlement agreement has been amended to reflect the

2  fact that they are not being resolved.  And the order reflects

3  that.

4          In addition, Your Honor, the future claimants'

5  representative, the unsecured creditors' committee, and the ACC

6  all had certain questions with respect to the settlement.

7  We've worked with them and we've made some adjustments to the

8  settlement agreement and the order to reflect their concerns.

9  They were mostly clarification, as well as an issue with

10 respect to in the event that the EPA was given both stock as

11 well as cash, what could be done in terms of liquidating the

12 stock.

13         There were public comments from three entities,

14 Cambridge, which was resolved with respect to the language in

15 the amended order.  The Big Tex PRP Group, they have formally

16 --

17         THE COURT:  Could you push the microphone down?  I'm

18 getting a lot of feedback and so it's a little hard to hear.

19 Okay.  Thank you.

20         MS. BAER:  Sure.  The Big Tex PRP Group, they have

21 withdrawn their concerns with respect to a public comment that

22 they submitted.  And that leaves one public comment from an

23 individual named Barbara Sachow.  She was an individual who

24 simply filed a comment indicating she was rather unhappy with

25 everything -- unhappy with Grace, unhappy with the EPA, unhappy

1 with amounts paid.  Both Grace and the EPA would ask that Your

2 Honor enter the order despite that public comment.  She really

3 did not indicate any substantial -- or reason why it would not

4 be appropriate to enter this settlement agreement.

5         Your Honor, we have authority under Section 105 and

6 9019 for this settlement.  It is in the best interest of the

7 estates and its creditors.  It resolves 35 sites, puts finality

8 with respect to these sites.  We get the contribution

9 protection and the covenant not to sue.  We believe, in our

10 business judgment, that the amounts are fair and reasonable.

11 It eliminates potentially years of litigation over the allowed

12 amount of these claims, and also serves a public interest by

13 providing money for the clean up, reimbursement to the

14 government for clean up, and money available to finish whatever

15 clean up may be there in the future.  And, Your Honor, it

16 eliminates $700 million in proofs of claim filed against the

17 estate for $44.1 million.  As a result, Your Honor, we'd at

18 this time ask for entry of the amended order and the amended

19 settlement agreement be approved.

20         Your Honor, I know that James Freeman from the

21 Department of Justice is here, and I think he'd probably like

22 to step up and say a few words about this agreement.

23         THE COURT:  Mr. Freeman?

24         MR. FREEMAN:  Thank you, Your Honor.  I think our

25 request was well summarized by Ms. Baer.  I don't have anything

1  I think that needs to be added other than to say that we fully
2  support the agreement that we've entered into with Grace.  We
3  think it's in the public interest.  The money that we recover
4  from Grace will be used to offset EPA's costs at cleaning up
5  the sites that have been cleaned up, and so, that money will be
6  put to good use.  Unless the Court has any questions, I have
7  nothing further.
8         THE COURT:  Anyone wish to be heard on this
9  settlement matter?  All right.  No one wishes to be heard.  It
10 seems to me that this is a fair and very reasonable settlement
11 of the claims that have been filed against the estates by the
12 Department of -- the Environmental Protection Agency and the
13 Department of Justice, so I'm prepared to approve it.  Do you
14 have an order?
15        MS. BAER:  I do, Your Honor.  I have the final order,
16 and attached to it is the final revised settlement agreement.
17        THE COURT:  All right.  Thank you.
18                    (Pause)
19        THE COURT:  Okay.  That's entered.
20        MS. BAER:  Thank you, Your Honor.  That takes us to
21 Agenda Item Number 6, Your Honor, which was the motion of the
22 City of Charleston for relief from the automatic stay.  As you
23 may recall, at last month's hearing you approved a sale of I
24 think it was ten related properties to Environmental Litigation
25 Group, and the Charleston property was one of them.  This

1  motion was continued on your docket, awaiting closing of the

2  ELT agreement.  Unfortunately, the ELT agreement did not close

3  and is not going to close.  I suppose a lot people could try to

4  explain why it happened, but probably the best explanation is

5  with the real estate market the way it is things just did not

6  come together and the parties have decided to not go forward

7  with that transaction.

8          Where that leaves us, Your Honor, is Charleston wants

9  to buy this property.  Charleston would like to lift the stay

10  in order to take the property.  We are in negotiations with

11  Charleston.  We have negotiated and worked out an access

12  agreement so they can come onto the property and start to do

13  certain things they need to do to get ready to develop this

14  property.  We have obtained an appraisal of the property and

15  are in negotiations with Charleston over the price of the

16  property.

17          Your Honor, at this time we would ask that their

18  motion to lift stay be continued while the parties continue to

19  negotiate over the price in the hopes that there will never be

20  a need to lift the stay so that they can take the property by

21  eminent domain.  Even if the stay was lifted and they took it,

22  we would be back where we are in terms of litigating the issue

23  of price, so rather than waste the time and effort of Courts to

24  do that, we'd simply ask that the motion to lift stay be

25  continued, we continue to negotiate with Charleston, and

1 hopefully the parties will be able to come to an agreement on

2 the appropriate price and complete the sale to Charleston.  We

3 are not asking for time to try to sell the property to anybody

4 else.  We're simply asking for time to be able to work with

5 Charleston to come up with the right price.  I know that the

6 City of Charleston is on the phone, and they may want to be

7 heard on this.

8         THE COURT:  All right.  And who is representing the

9 City?

10         MS. NAUFUL:  Your Honor, Tara Nauful on behalf of the

11 City of Charleston.

12         THE COURT:  Yes.  Go ahead.

13         MS. NAUFUL:  Your Honor, the -- the City does not

14 object to a short continuance.  The City is concerned, however,

15 that this matter will be continued and continued for an

16 indefinite period of time, and as set forth in the pleadings

17 that were filed I believe in January, the City has an urgent

18 need for this property.  My client would like, or appreciate

19 some level of comfort, or a drop period, or a period of time

20 when we can know that if we don't reach an agreement that we

21 can come and have a hearing on the merits.  But Ms. Baer is

22 correct, we are negotiating.  We do have an access agreement.

23 But if we hit a wall in the next 30 to 60 days, the city needs

24 to go forward with its stay relief motion.

25         THE COURT:  Well, I can continue it every month for

1  status conferences so that at any point in time if you decide

2  that you've hit that wall you can tell me and we can schedule

3  an evidentiary hearing at that time.

4          MS. NAUFUL:  That would be fine, Your Honor.  The

5  City, again, is just concerned that we will stagnate and it

6  will be left without this property, which it desperately needs.

7          THE COURT:  Okay.  When is the next hearing date,

8  then?  June -- I'll continue it until June 23rd for a status

9  conference, and, you know, you can let me know then if you

10  think some further continuance is in order or whether you want

11  a hearing date.

12          MS. NAUFUL:  That would be fine.  Thank you, Your

13  Honor.

14          THE COURT:  All right.  It's continued until June

15  23rd for status.

16          MS. BAER:  Thank you, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          MS. BAER:  Your Honor, the next item on the agenda

19  is, in fact, the Libby environmental settlement.  Your Honor,

20  Grace considers this to be a significant achievement, and the

21  end of a very long and very expensive and trying chapter in the

22  history of Grace as well as in the history of Libby and the

23  EPA. This results past, present, and future costs at the Libby

24  superfund site other than the mine.  The vermiculite mine is

25  the subject of different discussions and is not nearly as far

1  along.  The investigation with respect to the mine and how to

2  handle it in the future is not as far along.  Your Honor, this

3  has been the source of litigation for many years.  In fact, the

4  District Court of Montana entered an order directing that Grace

5  will have to pay these past, present, and future costs.  That

6  was taken on appeal, and Grace did not prevail on appeal.  This

7  reimburses the United States for money it's already spent, and

8  it makes money available to the United States in the future to

9  complete the clean up of the Libby site.

10      It resolves the U.S. proof of claim for $250 million.

11  Again, it's for past, present, and future costs.  In exchange,

12  again, Grace gets contribution protection and a covenant not to

13  sue.  It will permit Grace to move on with its operations and

14  its regular business, while assuring that there's money

15  available for the completion of the Libby clean up.

16      The extraordinary thing about this motion, Your

17  Honor, is it calls for the payment of the entire amount within

18  30 days of the entry of the order.  This is a mixed site,

19  meaning there is some owned property and some unowned property.

20  It's a mixture of a general unsecured as well as administrative

21  claims.  And in that respect it's a little bit unusual.  But,

22  Your Honor, we believe under Section 105 and 363 you do, in

23  fact, have the authority to enter an order permitting Grace to

24  pay this mixed claim now and believe under these circumstances

25  it is tremendously in the best interest of the estate.

1          The compromise takes care of what the EPA is

2     currently estimating to be claims with a present value of $350

3     million, and it's resolving them for $250 million.  It gets

4     money into the CERCLA coffers to continue the clean up, as well

5     as to reimburse the EPA for their already spent costs.  But for

6     the settlement and payment now, there would be no compromise.

7     There would be future litigation that could go on for years.

8     And, of course, there's the risk to Grace of future costs as

9     time goes on.

10          Given this, and given the fact, Your Honor, that we

11    now do have an agreement in principle with the personal injury

12    committee, the future claimants' representative and the equity

13    committee, which will, in fact, pay general unsecured claims

14    100 cents on the dollar, the risk of payment now for fear that

15    in the future a Chapter 11 plan is confirmed that will have

16    significantly different treatment for unsecureds has gone down

17    considerably.  As a result, Your Honor, we believe that the

18    benefit to the public, the benefit to the estates, and the

19    benefit to the creditors is far outweighed by the risk of

20    permitting the payment of this contribution and of this

21    settlement at this time.

22          Your Honor, substantial time was spent with the

23    creditors' committees going through the details of this

24    settlement and the issues.   Ultimately nobody filed an

25    objection other than the Libby claimants and one insurer.   Your

1  Honor, I want to take up those objections first with respect to

2  the insurers.  Very -- I think it was last week some time, one

3  of the insurers filed a protective objection.  They did not

4  object to the settlement.  They simply wanted to for the record

5  make it clear that they were not consenting to or agreeing that

6  their insurance coverage would cover the Libby asbestos site.

7         Your Honor, based on concerns that were raised by the

8  personal injury committee and the future claimants'

9  representative, Grace did send out a notice of this settlement

10 to all of its insurers.  They did separately and in conjunction

11 with the committees also review whether or not they felt there

12 would be any insurance coverage.  Based on the current status

13 of Grace's insurance and the layers of insurance involved, the

14 analysis suggested insurance coverage was very doubtful.  In

15 any case, we did send out the notice.

16        By entering this order, Your Honor, we are not asking

17 for any findings with respect to insurance coverage.  We're not

18 asking for any findings that would in any way bind the insurers

19 to have consented to the settlement for purposes of insurance

20 coverage.  In fact, it is completely insurance neutral.  Again,

21 we sent out the notice out of an abundance of caution.  We're

22 not seeking to have anything entered that would bind or in any

23 way tie the insurance companies to some sort of coverage.

24        With respect to the Libby claimants, which was the

25 other filed objection, the Libby claimants filed a very short

1 objection, and their objection really said they -- given where

2 things are at, they are not objecting to the settlement.  They

3 are happy that we are, in fact, contributing funds for the

4 clean up of Libby.  They simply are unhappy that the EPA is

5 getting their money now, and the claimants are not.

6          Certainly, Your Honor, we sympathize with the

7 claimants in that respect, but things, of course, are not that

8 simple.  The reason Grace is in Chapter 11 is because of

9 tremendous challenges of personal injury liability, not just to

10 the Libby claimants but to tens of thousands of other

11 claimants.  Under these circumstances, Your Honor, there's

12 really nothing we can do at this point with respect to the

13 Libby claimants that would be appropriate.  On the other hand,

14 Your Honor, this settlement is tremendously in the best

15 interest of the estate.  It takes care of this significant

16 liability and takes, frankly, a significant question mark out

17 of the equation for this reorganized debtor going forward.

18 Under the circumstances, Your Honor, we would ask for entry of

19 the order permitting the settlement.

20          Your Honor, I'd also like t point out that there is

21 some precedent in this case for paying certain unsecured claims

22 prior to confirmation of a plan.  In the environmental clean up

23 site of Hatco, which was a New Jersey settlement a couple of

24 years ago, a very significant compromise was reached that did,

25 in fact, permit the debtor to pay that claim in advance, just

1 like we would be doing here, slightly in advance of confirming

2 a Chapter 11 plan.

3        Under these circumstances, Your Honor, we believe

4 it's in the best interest, there are no objections really

5 prohibiting the Court from entering this order.  I believe it's

6 fair to say that the committees are in support of going forward

7 and having this order entered.  And I know the United States,

8 again, is here and would probably like to step up an say

9 something about this.

10        THE COURT:  How much of this settlement is the debtor

11 supposed to pay in advance?

12        MS. BAER:  $250 million.

13        THE COURT:  All of it?

14        MS. BAER:  The entire settlement, Judge.

15        THE COURT:  And where is the debtor getting the

16 money?

17        MS. BAER:  The debtor has the money, Your Honor, from

18 various sources, including current cash on hand, cash that it

19 is bringing in from its non-debtor foreign subsidiaries.  It

20 also has availability on its debtor-in-possession financing.

21 The debtor has gone through with the committees the various

22 sources of payment for this settlement, and indicated to them

23 how that would be structured, and it's being structured in, as

24 you can imagine, a tax favorable way, so we are drawing from

25 the appropriate sources in order to make the payment, and we d,

1  in fact, have the money to make the payment.

2          THE COURT:  I recall a little bit about the Hatco

3  settlement, but not enough.  I don't recall that it was

4  anywhere in the vicinity of $250 million that was permitted to

5  be paid.

6          MS. BAER:  No, Your Honor.  It was $30 million, if I

7  recall.  Your Honor, we -- clearly it's a significant sum, but

8  it's a sum that has to be paid one way or the other.

9          THE COURT:  Well, it does have to be paid at some

10 date, point or other.  But it's $250 million.  And some portion

11 of it, that's one thing, but $250 million in advance?  How do I

12 know this case isn't going to be administratively insolvent and

13 a plan will never be confirmed?

14         MS. BAER:  Your Honor, I think if you wanted to

15 obviously have evidence on that, we could do so.  We have

16 provided that information to our creditors' committees.  This

17 has been taken into account in pricing out and looking forward

18 to financing the debtor's exit from Chapter 11 under its plan.

19 This has been a line item for a very long time in the debtor's

20 plans and in the debtor's projections.  So, the amount of this

21 money has been budgeted for and taken into account in respect

22 to the settlement that we have negotiated.

23         THE COURT:  Okay.  I don't quite understand that,

24 because the only plan I have on the table was filed three or

25 four years ago.

1          MS. BAER:  Your Honor, I'm talking about the

2   agreement in principle we have entered into with the personal

3   injury committee, the FCR, and the equity committee.  In taking

4   into account that settlement and the amounts of money to be

5   paid under that settlement to confirm a plan, we have taken

6   into account the fact that we will be paying now $250 million

7   in cash to the Department of Justice in the U.S.

8          THE COURT:  I understand the need to pay some portion

9   of this type of a claim in advance.  I am not aware of how

10  there is authority for paying an entire unsecured claim as to

11  which the environmental agency at this point, as I understand

12  it, is not pursuing the environmental claim.  I mean, I don't

13  know -- I'm not sure of the structure of this.  I don't think

14  that what I have at the moment is -- or, maybe I do and it's

15  not here, an action against the debtor that would constitute

16  something that is not subject to the automatic stay.  I mean,

17  what's the theory under which this Court can authorize the

18  debtor to pay one unsecured creditor in advance of all other

19  unsecured creditors and essentially take it entirely out of the

20  case at this stage --

21         MS. BAER:  Your Honor --

22         THE COURT:  -- to the tune of $250 million?  20

23  million?  Okay.  $250 million?

24         MS. BAER:  It comes to you in a couple of ways.

25  There is a filed proof of claim.  This is a 9019 settlement of

1 the proof of claim.  We are using property of the estate under

2 363.  Granted, it's hard to find authority for a situation

3 where a debtor has actually asked for this because it's rare

4 that you have a debtor solvent to the extent that Grace is

5 solvent and able to pay these kinds of claims.

6        THE COURT:  It's rare because this is a Chapter 11

7 and there's a priority when you have a plan issue that talks

8 about how claims get paid.  And it's hard enough to allow

9 secured creditors to get paid absent a plan let alone unsecured

10 creditors, and that's what this is.  To the extent that there

11 is an administrative portion, okay.  What's the administrative

12 portion of this claim?

13        MS. BAER:  Your Honor, that's the problem with this

14 claim, and it's why this settlement makes sense.  This is such

15 a mixed bag.  To try to figure out which portion is

16 administrative, which portion is not --

17        THE COURT:  Wait.  When did the debtor stop operating

18 this mine?  In 1998?

19        MS. BAER:  1990.  1990.

20        THE COURT:  Okay.  Then it's not that hard.  I mean,

21 this is 2008.  Some portion of it has to be a pre-petition --

22        MS. BAER:  No question.  No question.

23        THE COURT:  And I understand this isn't the mine.  I

24 understand that.  But nonetheless, some portion of the -- I was

25 going to use the word fall out, it may be a bad word,

1  consequences of operation of this mine certainly had to have

2  occurred pre-petition.

3       MS. BAER:  Your Honor, there's no question about it.

4  A very significant amount of this claim is pre-petition, but we

5  also have the additional complication not only of pre-petition,

6  post-petition, but of owned and non-owned.  And the owned

7  portion of environmental claims, generally speaking, are

8  treated as administrative claims, and we can't get around that.

9  So, again, if we had to litigate this and figure out which was

10  pre-petition and which was post-petition, which was owned, and

11  which was non-owned, and then get into the issues with respect

12  to _Frenville_ and all the other theories that the EPA would put

13  on the table, we could be here a very long time litigating this

14  claim.  In the meantime, again, the EPA has indicated that they

15  believe right now the amount of this claim is in the

16  neighborhood, present value, of $350 million.  We also could be

17  here a very long time, pre-petition, post-petition, post-

18  confirmation litigating the allowed amount of this claim if we

19  were not able to do this compromise.  This compromise is

20  dependent upon the payment now.  If this is not paid now, this

21  compromise goes away.  The EPA has been very clear about this.

22  It needs to get its reimbursement.  It needs to get money into

23  its coffers so it can go forward and continue to do the clean

24  up.

25       And again, but for the payment now, this agreement

1 would not occur, and it would certainly not occur at this

2 number.  The EPA is here, and I certain they would like to take

3 this up themselves so they can tell you just how they feel

4 about that.  But that is the deal, Your Honor.  Absent the

5 payment now, this is not a deal.

6          THE COURT:  Well, that may be the deal, but it also

7 may not comport with the Bankruptcy Code, and if it doesn't,

8 then there's no deal.  So, what's the amount of the

9 reimbursement portion of this cost?  If you can't tell me how

10 much is pre and post, and you can't tell me what's unsecured

11 and administrative, what's the amount that's reimbursement as

12 opposed to future clean up costs?

13          MS. BAER:  That we can tell you.  I'd have to sit

14 back and pull out the numbers.  Your Honor, there's a judgment

15 from the Montana Courts for approximately $55 million.  That

16 was up to, if I recall correctly, the petition date.  Then

17 there was another very large amount of money that's been

18 expended between the petition date and today's date.  That is,

19 I'm going to say without pulling out my numbers, and Mr.

20 Freeman may know them better than I, somewhere in the

21 neighborhood of $100 million.  Then we've got the future

22 portion.

23          THE COURT:  Okay.

24          MS. BAER:  And again, I could get you more detail on

25 that if need be.

1            THE COURT:  All right.  Mr. Freeman?

2            MR. FREEMAN:  Thank you, Your Honor.  Ms. Baer's

3    figures, I believe, were approximately right.  We could pull it

4    out and get it to you more precisely, but in the ball park

5    sense --

6            THE COURT:  That's good enough.

7            MR. FREEMAN:  -- that's my recollection, as well.  I

8    just want to emphasize to the Court that the government is

9    taking a substantial compromise in the claim that we have been

10   asserting against Grace.  I understand your concerns, but you

11   just need to know that from our perspective the $250 million

12   agreement that we've reached is contingent on us getting the

13   money now so that we can -- we're going to put it in a special

14   account and it's going to be spent directly up in Libby doing

15   the future work at the site under -- EPA has procedures for

16   setting up special accounts, and this will be done according to

17   those procedures.  So, it will really help continue the clean

18   up in Libby without worrying about the budgeting difficulties

19   that are, you know, inherent in any big government project.

20           So, we both strongly support this settlement, and

21   it's important if it's going to be structured as it currently

22   is that we do receive the payment within 30 days, because as I

23   said, that was a -- that's a big component of our compromise,

24   to get the number to $250 million.

25           Just so you understand, we did -- also we did receive

some comments from the people up in Libby, the -- some of the

community groups commented on this settlement.  They were

generally favorable and supportive.  There was some concern

about the special account and what it meant, so we -- in our

papers we explained that the special account -- it's not a lock

box, per se, but the assumption and EPA special account rules

is that if it's in a special account for a specific site that

that money will be spent at that site until the clean up is

done on the future costs, and it's only if there's money left

over at the end that it would go back to the general superfund.

There are provisions if there's exigent circumstances, and

funding difficulties.  EPA, under the policy, is permitted to

get funds from a special account, but that, to my knowledge,

has never happened.

There were also some concerns about whether EPA had

enough money to -- from the settlement money that it was

getting from Grace to handle future O&M costs, and what we have

done there is committed to put $11 million of the payment from

Grace into a second special account that will be just dedicated

to future O&M, operations and maintenance, and that would be

spent at some point in the future after EPA has basically

finished its clean up, and then any -- any sort of continuing

operational -- continuous operational issues that would come up

would be paid with that $11 million fund, or whatever it's

grown to at the time EPA believes its clean up is finished.

1           There were some issues -- questions raised as to

2   whether that's enough, and our response to that is under our

3   estimates we believe it is enough.  We would reserve -- we

4   would reserve the right, after the clean up is done and we move

5   into the O&M phase, to talk with the state or any other entity

6   that might be assisting with the operations and maintenance, an

7   we could potentially fund it an extra amount if it looks like

8   it wouldn't be enough.  And as we pointed out in our papers

9   there's also a state claim that's -- a proof of claim that's

10  before the Court that could also, if there's a resolution of

11  that, some portion of that could go to the O&M, as well.  The

12  O&M issue was really the only issue that was raised in the

13  public comment.  The community and others who have been

14  following the Libby case seem to be satisfied with the

15  resolution from a monetary perspective.

16          THE COURT:  Okay.

17          MR. FREEMAN:  Thank you, Your Honor.

18          MR. BERNICK:  Your Honor, just to add a footnote.

19  This is David Bernick.  One other feature of this that has been

20  part of the company's consideration, and also has been vetted

21  with the other constituencies is the whole question of the

22  government's on-going enforcement powers with respect to future

23  expenditures.  That is this matter, this agreement would settle

24  out the future expenditures, which I believe that the

25  government would have the ability to recoup, notwithstanding

1  the fact the company has emerged from Chapter 11.  So, this

2  provides, as Ms. Baer indicated, we're paying what we're going

3  to have to pay.  And really the essence of this deal is to

4  provide certainty to the government, and also to the debtor and

5  all the other constituencies at a number that is very, very

6  significantly less from what the government itself is

7  projecting its ultimate cost to be, so that as we think about

8  going down the road to what we hope to be confirmation of a

9  plan structured along the lines of the agreement in principle,

10 what this does is to say the debtor and all the other

11 constituencies to the case get the benefit of certainty, a

12 lower sum of money to pay, and thereby the ability to go

13 forward and make real what the agreement in principle calls

14 for.  The agreement in principle is predicated upon a number of

15 other pieces coming into place.  This is one of those pieces.

16 So, it is particularly, in a sense, easy one to deal with,

17 because everybody wants it done, and because we have got the

18 on-going tale of costs and potential enforcement actions to

19 deal with in any event post-confirmation.  So, for all those

20 reasons, because it's an enforcement situation, we're going to

21 have the problem post-confirmation.  We're going to have to pay

22 the money.  It looks like it's really kind of a win-win

23 situation for all of the different constituencies in the case,

24 and that's why nobody is here, really, from any of the

25 committees saying that there is a big problem here.

1        It has also, and this is soft, but it's important,

2  significant, in a sense, political dimension to it in the sense

3  that it's part of bringing closure to the situation at Libby,

4  and that is a situation that is -- you know, is important to

5  bring closure to from a whole variety of different points of

6  view.  Libby is going to be with us for some time, and this is

7  really critical in terms of providing some closure to a certain

8  aspect of Libby.

9        One other thing, just to be clear, it is not our

10 position that because Grace has been determined to be solvent,

11 we are in a position, therefore, to pay hundred cent dollars to

12 everybody no matter what their claim is.  It is our position in

13 the context of the estimation that, yes, this company is, in

14 fact, solvent, but that's not been determined.  So, Ms. Baer

15 made reference to solvency, and solvency in the sense that the

16 cash is, in fact, available to make the payment.  If we have to

17 go back to estimation, we do believe we can establish our

18 solvency, but we're not here to argue that that solvency has,

19 in fact, already been determined, and therefore we can start to

20 afford to pay claims in full.  That's not the essence of the

21 argument we're making here.  We're saying that this is an

22 important part of an overall resolution and that we need it in

23 order to take the additional steps necessary to get to the

24 point of implementing that resolution.

25        THE COURT:  Anyone wish to speak who filed an

**J&J COURT TRANSCRIBERS, INC.**

1  objection?

2          MS. DAVIS:  Your Honor, this is Leslie Epley Davis on

3  behalf of Everest Reinsurance Company and Mt. McKinley

4  Insurance Company.  Ms. Baer correctly characterized what we

5  filed as more of a protective statement and insofar the debtor

6  has made its representations regarding as the, quote unquote

7  insurance neutrality intent of the order, we're fine to stand

8  by that.

9          THE COURT:  All right.  Do the Libby plaintiffs wish

10 to be heard?

11         MR. CANDON:  Your Honor, this is Chris Candon on

12 behalf of the Libby claimants, and we just stand on our written

13 objection.

14         THE COURT:  Well, Mr. Candon, I am a little confused

15 by the written objection, I guess, because it doesn't really

16 object to the settlement, but it does raise an issue about the

17 payment of the unsecured claim to the government before there's

18 a payment of a unsecured claim to the unsecured creditors who

19 may have suffered some injury as a result of asbestos exposure.

20 Now, in some instances those claimants may have a claim whose

21 amount is -- which amount has been determined, and in other

22 instances may not.  Nonetheless, I think that is the problem

23 for the debtor.  So, at the moment that, I think, is the hold

24 up to this settlement.  I think the Libby claimants really need

25 to make a decision at this point -- how much do you want the

1  property in Libby cleaned up?  Do you want it cleaned up enough

2  to withdraw this objection so that the debtor can make this

3  $250 million payment and the government can keep marching to

4  get this property cleaned up?  Because right now it's your

5  objection that's standing in the way of having the debtor, I

6  think, make a payment that is -- that every party knows will

7  not go up subject to appeal, and that will allow the government

8  to enter into this settlement agreement and go forward with the

9  clean up.

10        MR. CANDON:  Your Honor, I think -- you know, the

11  settlement is in the best interest for Libby.  I mean, we are

12  definitely in favor of getting that property cleaned up.  The

13  objection that we filed, limited objection, was intended just

14  to say that while the -- the fact that many of the claimant's

15  needs go unmet, the government should be paid.  So, to the

16  extent we don't want to hold up the settlement, I don't --

17  that's not our intent.  We want the property cleaned up.  It

18  has to be cleaned up in order to save other claims.

19        THE COURT:  Well, I think --

20        MR. CANDON:  That's written -- you know, that's

21  stated, actually, in the limited objection.  So, I mean --

22  nothing new

23        THE COURT:  Well, from what I'm hearing from the

24  government, the only way that it's going to go forward at the

25  moment unfettered because of budgetary and other issues is to

1  get this settlement done so that the debtor can pay this

2  settlement within 30 days.  It's at a discounted amount, but at

3  the moment that seems to benefit everyone.  The EPA has certain

4  procedures in place by statute and regulation that allow it to

5  basically put these funds into a special account, designated

6  account for the benefit of clean up at Libby, and therefore the

7  Libby claimants will know that, in fact, there is a dedicated

8  fund that will consist, at the moment, of about $100 million,

9  because 150 of it, in round numbers, has already been spent for

10 clean up, and another 100 will be there to be used for that

11 purpose.  So, if they want the clean up to go on, and march

12 forward, then the way to do it is to get the settlement

13 approved.  But I think your client has an objection that if it

14 wishes to pursue, will stop this settlement from going forward.

15 So, it's either one way or the other.  Do you want the

16 settlement to go forward, in which case, then, I think you need

17 to withdraw the objection that says that you don't object to

18 the debtor making this unsecured/administrative payment now, or

19 else you don't want it to go through, and things in Libby will

20 stay the way they are for some time to come.

21          MR. CANDON:  Then we will have to withdraw the

22 objection, Your Honor, because we definitely would like the

23 settlement to go forward and the clean up of the property to go

24 forward.

25          THE COURT:  All right.  With the objection withdrawn,

**J&J COURT TRANSCRIBERS, INC.**

40

1  both objections withdrawn, then, I think I will be in a

2  position to be able to approve the settlement.  Do you have an

3  order, Ms. Baer?

4         MS. BAER:  I do, Your Honor.  Your Honor, attached to

5  the order is a copy of the settlement agreement.

6         THE COURT:  All right.

7                    (Pause)

8         THE COURT:  It is an unusual thing for this Court to

9  approve a distribution to an unsecured creditor of this amount

10 at this stage in this case.  I am doing it because I believe

11 that the people in Libby have, from what's been put on evidence

12 or argument in this case, sustained some damage, and as a

13 result are entitled to get the properties there cleaned up.

14 And it appears that, based on rulings of other Courts and the

15 settlement agreement of the parties, that this is an

16 appropriate way to start that process, so it seems that for the

17 community interest and the individuals' interest, as well as

18 this estate's, that this is a good way to get that process

19 underway.  And since there is to be -- because there is to be a

20 dedicated fund that will be used specifically for the purpose

21 of clean up in Libby, I think that this is an appropriate means

22 of getting this payment made.  It's not something that I will

23 do on a regular basis.  I may never do it again.  But it seems

24 to me to be appropriate under these circumstances.  So, I will

25 do it based on the fact that there are now no objections to

1  that payment in advance.

2        MS. BAER:  Thank you, Your Honor.

3        THE COURT:  All right.  That order is entered.

4        MS. BAER:  Your Honor, that takes us to Agenda Item

5  Number 8, which is the motion of Meehan Realty to modify the

6  automatic stay.  By agreement of the parties we're asking that

7  matter be continued to June 23rd.

8        THE COURT:  All right.

9        MS. BAER:  Agenda Item Number 9, Your Honor, is the

10  application of the future claimants' representative with

11  respect to Piper Jaffray.  I understand by agreement between

12  the future claimants' representative and the U.S. Trustee that

13  matter is being continued to June 23rd.

14        THE COURT:  All right.

15        MS. BAER:  Your Honor, that takes us to Agenda Item

16  Number 10, which is a status report on the asbestos property

17  damage and ZAI mediations, and Mr. Restivo is going to address

18  those matters.

19        THE COURT:  Mr. Restivo?

20        MR. RESTIVO:  Good afternoon, Your Honor.  I'm going

21  to divide the status report, Your Honor, into events and

22  activities that occurred up until the date of the last omnibus

23  hearing, which was on April 21, and then what has occurred

24  since then as a result of some orders by this Court.  The Court

25  will recall that -- excuse me, Your Honor -- after a lot of

1  omnibus objections we began the individual property damage

2  claim objection process with 627 remaining property damage

3  claims, and the Court may recall that at least two of those

4  claims denominated Anderson were submitted as putative class

5  action claims.

6          Our first order of business, Your Honor, was to file

7  motions for summary judgment based upon either lack of product

8  identification and/or statute of limitations and/or statute of

9  repose, and those claims against which we filed motions were

10  present in various states, including but not limited to New

11  York, California, Louisiana, Libby, Canada, and other states.

12          Shortly thereafter, Your Honor, the claims

13  represented by Mr. Dies were settled, and that removed from the

14  list of open claims 121 out of Louisiana, and 138 out of

15  Arkansas, Oregon, Oklahoma, Arizona, and Texas, leaving the

16  Court and the parties with about 368 to deal with.  The 52

17  Libby claims were then expunged, Your Honor, bringing the

18  remaining claims down to approximately 316.

19          Thereafter, Your Honor, the 11 product identification

20  claims were expunged.  The six remaining Prudential claims were

21  settled, along with two claims that were on appeal from this

22  Court's ruling, and 18 or 19 Motley Rice claims were settled,

23  and that brought the remaining number of claims down, Your

24  Honor, to approximately 280.  I say approximately, Your Honor,

25  because there were a few instances in which there was both a

1 statute of limitations and a product i.d. objection, and while

2 this process was going on the Court was expunging some claims

3 for lack of authority for which we had filed motions.  And so,

4 the numbers were always a little bit of a moving target, but I

5 believe these numbers are, you know, 95 percent accurate.

6          As a result, Your Honor, of the Court's lack of

7 authority rulings, as a result of some individual settlements,

8 as a result of a ruling on Southern Wesleyan, the remaining

9 claims which had started out at about 30, end up being

10 basically two claims.  One is Solo, one is the claim of

11 Anderson Memorial Hospital itself, as opposed to the class

12 action.

13          During that process, the Canadian claims, either

14 through lack of authority rulings by this Court, or through

15 discussions which we had either with Mr. Speights, or in

16 California with Mr. Runyan, the number of claims remaining as

17 of the last omnibus was 55 in Canada and for California -- I

18 don't remember what it was -- 100 for California, Your Honor.

19 And so, as of the last status conference, the remaining statute

20 of repose cases and other statute of limitations cases and New

21 York statute of limitations cases were reduced from these

22 numbers but were still pending.

23          On April 21 we had our last omnibus hearing.  As a

24 result of an order issued by this Court, the parties were

25 ordered to mediation on April 24, 25, before the Honorable

1 Diane Welsh.  At that time, Your Honor, the parties settled 50

2 University of California claims, 32 California State University

3 claims, and the individual Pacific Freehold's claim, which the

4 Court may recall at one point we had scheduled for trial, and

5 then we decided to postpone it until the Court issued rulings

6 on the California summary judgment that was pending before the

7 Court.

8          So, at this time, Your Honor, with respect to

9 California, there are 17 claims left out of the original 125.

10 Those are sub-judiciary before the Court.  16 are the State of

11 California, and one is a separate pleading by Macerich, and our

12 response.  And so, those 17 claims are now ripe for

13 adjudication.  They have not settled, and we now need a ruling

14 on statute of limitations.

15          THE COURT:  Are they still in the process of

16 settling?  Because what's happening is every time I get about

17 to issue an opinion you call and tell me you've settled

18 something, and I'm wasting a lot of time working on opinions

19 because about the day I get it ready to go out the door, you

20 say you've settled, and then I don't have to issue it, and I

21 start working on something else and the same things happens.

22 And I'm really grateful that you're settling, but I would

23 really like to work on something that doesn't -- that needs my

24 attention, not something that you're settling.

25          MR. RESTIVO:  We understand that, Your Honor.  We

1  tell ourselves that the brownie points we score for settling is

2  better than the anger the Court has because she now has to put

3  a decision aside.

4        THE COURT:  I'm not angry -- no, I'm not angry about

5  settlements, but I -- it's just that it would be a better use

6  of my staff's time to be working on something that is truly not

7  in the settlement mode.

8        MR. RESTIVO:  Your Honor, I don't believe there's any

9  possibility of the Macerich claim being settled.  I have

10  similar pessimism with respect to the 16 State of California

11  claims.  I don't have a problem calling counsel for the State

12  of California to confirm whether my pessimism is legitimate,

13  but those are left because we don't think they can be resolved.

14        THE COURT:  All right.

15        MR. RESTIVO:  Your Honor, after the mediation before

16  Judge Welsh, Mr. Speights, and Mr. Runyan, and Grace were able

17  to resolve the remaining American cases Mr. Speights had,

18  except for Anderson Memorial class actions, which we have not

19  been able to resolve before Judge Welsh, taking off the board

20  other statute of limitations or statute of repose, and I

21  believe we've indicated to the Court staff that a ruling on New

22  York and a ruling on Arkansas was no longer necessary.

23        What that means, Your Honor, is that as of today we

24  are left with approximately 73 remaining -- 74 remaining cases.

25  Mr. Speights and I, Your Honor, are still in discussions over

1  the 55 remaining cases.  We were unable to make much progress

2  before Judge Welsh.  Mr. Speights and Grace were able to move

3  the remaining U.S. cases, but again, not much progress was made

4  on the 55 Canadian cases.  Mr. Speights and I have been

5  talking.  We don't know whether we will be able to resolve them

6  or not, but I believe Mr. Speights and I both believe we will

7  be able to report this Court one way or the other on June 22

8  whether we have resolved them or whether they are not

9  resolvable.  And so, to the extent our Canadian motions are

10  before the Court, we would ask the Court not to expend time on

11  a -- give us the next three weeks to see whether or not we can

12  move Canada.  Maybe we'll get lucky and we can take 55 off.  If

13  not, then the Court will have to rule.

14           THE COURT:  Okay.  Now, I did request and get

15  authority, in the event that you want to use them for that

16  purpose, to have Judge Agresti sit as a Settlement Judge in

17  this case on property damage issues.  So, he -- I don't know

18  what his availability between now and June 22nd -- but in the

19  event that that would be of assistance, he is available for

20  that purpose, not schedule-wise, but by -- by way of

21  designation.

22           MR. RESTIVO:  Yes.  We understand that, Your Honor.

23  I think that Mr. Speights and I will be able to resolve or not

24  resolve the Canadian cases.  If we need help, my guess is we

25  would go back to Judge Welsh, because we talked about the

1 Canadian cases before her, even though they weren't resolved,

2 and so my guess is we will not need the services of Judge

3 Agresti.  I hope we don't need the services of Judge Welsh, but

4 if we need a third party, my guess is she still has her notes,

5 and she knows we might come back.

6            THE COURT:  All right.

7            MR. RESTIVO:  And so, Your Honor, as of today 74

8 property damage cases are left.  As of the next omnibus hearing

9 on June 22, I think we'll be able to report to you as to where

10 we stand on Canada.  Maybe at that time we will be in a

11 position to renew or make a suggestion on Solo.  The Court may

12 recall we asked to lift the automatic stay, allow us to

13 prosecute the appeals in Solo.  At that time with 600 other

14 cases I think the Court said, you know, if you took care of

15 Solo what movement would it mean?  We may be getting to the

16 point in time where that case needs to be adjudicated on

17 appeal, because it may be one of the last remaining big ones

18 left.  And that's the property damage report, Your Honor.

19            THE COURT:  All right.  So, right now the only thing

20 that you are asking me to go forward with that I have as a

21 matter under advisement is California?

22            MR. RESTIVO:  That is correct, Your Honor.

23            THE COURT:  Okay.

24            MR. RESTIVO:  Let me turn, Your Honor, to ZAI and the

25 ZAI mediation.  And I apologize to Mr. Baena that I don't have

1  a magnetic board for ZAI, but maybe I'll do one next time.

2  Your Honor is aware that we went to mediation on May 12th with

3  Judge Gross.  Judge Gross worked the process all day long, and

4  was unable to reach a global resolution of the ZAI claims.  A

5  few days after that, Judge Gross, not being the sort of person

6  who can take no for an answer, attempted again to see whether

7  or not something could be done.  I believe he worked another

8  day or two, the telephones, as opposed to an in face meeting.

9  But again, the process did not allow him to be successful.

10          We are pleased to report, however, that following the

11  mediation before Judge Gross, the debtor, the Canadian ZAI

12  property damage claims, and the Crown continued to talk, and on

13  Friday, Your Honor, an agreement in principle was reached

14  between the Canadian ZAI counsel and Grace, resolving all of

15  the Canadian ZAI property damage claims.  That agreement in

16  principle, Your Honor, contemplates a contribution by the

17  Crown, but the Crown has not yet obtained instructions on that

18  point.  The parties' agreement also calls for a ZAI claim bar

19  date and notice program, basically in the form already proposed

20  to Your Honor.  However, that's going to require some

21  adjustments to reflect the parties' settlement, assuming the

22  settlement is finalized.  And so, in the coming weeks the

23  parties are going to be working to document the settlement, and

24  then to seek Crown approval and participation.  I understand

25  that there may also need to be Canadian Court approval as one

1  of the approval mechanisms.

2          Your Honor, because there are four or five agencies

3  of the Crown who are involved, Mr. Monaco and I are doubtful

4  that we will get all of this done by the next omnibus hearing,

5  which I believe is June 23.  I said 22, Your Honor.  We are

6  cautiously optimistic that we could get it all done by the July

7  omnibus hearing on July 21.  At least we would aim to do that,

8  but we are concerned about giving the Court too optimistic a

9  time table in light of the various government agencies that

10 have to get involved in Canada.

11         Under the settlement the claims bar process as it

12 relates to Canada will basically be adjourned so we can write

13 up the papers, hopefully get the Crown's involvement, get the

14 approvals, and then the claims bar notice will reference that

15 settlement and the claims bar process for Canada will proceed.

16 Obviously, the Canadian ZAI settlement will be part of a

17 revised plan of reorganization that's being worked on now by

18 the debtor in conjunction with various interested parties.

19         In light of all this, Your Honor, you will see on the

20 agenda as many as ten or 12 pleadings relating to Canadian ZAI.

21 Some are by the claimants, some are by the Crown, some are

22 responses by the debtor.  And the Canadian ZAI claimants, and

23 the Crown, and the debtor believe all of those should be

24 adjourned or continued for today, should not be a part of the

25 argument.  The Canadian notice is going to be carved out and

1 separate in any event from what's going on with American ZAI.

2 We believe -- I believe that all of those pleadings will be

3 mooted out if we can document the settlement with one minor

4 exception, and that is if the Court were to permit an

5 interlocutory appeal now of the Court's ZAI decision, I believe

6 the Crown, at least, wants to be heard on the point that that

7 decision affects all claims, not just claims emanating from

8 America.  I've indicated to the Crown that I'm not sure we will

9 get there today, but if we get there and if the Court indicates

10 that's the ruling, that may be an exception to no need to talk

11 about any of the motions relating to Canada today.

12          And so, I think we've made excellent progress in

13 terms of traditional property damage, outstanding progress in

14 terms of Canadian ZAI, and that's the status report on those

15 two items, Your Honor.

16          THE COURT:  What's the impact on Canadian personal

17 injury related to ZAI as a result of this settlement?

18          MR. RESTIVO:  The settlement will not impact or

19 relate to any personal injuries with respect to Canadian ZAI,

20 any discussions that have occurred on that.  I believe assume

21 that personal injuries will be handled as personal injuries,

22 and there hasn't been much more on that other than to recognize

23 that we're talking only about Canadian ZAI property damage

24 claims.

25          THE COURT:  All right.  Does anybody have anything

1  with respect to the status report?  Mr. Hogan?

2          MR. HOGAN:  Good afternoon again, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. HOGAN:  Daniel Hogan on behalf of the Canadian

5  ZAI property damage claimants.  I'm actually representing both

6  PI and PD in this capacity, but for purposes of today's

7  comments I'm going to limit them to the PD claims as you

8  understand them, Your Honor.  Mr. Restivo's recitation of the

9  gist of the resolution of those property damage claims for ZAI

10 in Canada is accurate with the one exception that as -- to the

11 extent that the Court does decide to make a determination with

12 regard to the Rule 54 motion for Appellate review, that we --

13 the Canadian ZAI claimants who have filed an objection in that

14 regard would want to be heard on that, as well, to the extent

15 that the Court decides to pursue that.  Aside from that, Your

16 Honor, we're happy to be involved in the process and to help

17 resolve it.

18         THE COURT:  All right.  Mr. Monaco?

19         MR. MONACO:  Good afternoon again, Your Honor.  Frank

20 Monaco for the Crown.  What Mr. Restivo reported to the Court

21 is essentially accurate, but I do want to emphasize to Your

22 Honor and to the parties in the courtroom that we may be -- I

23 think it's actually more than four or five agencies that make

24 up the Crown and who are interested in this settlement, so that

25 assuming even if we do get approval for this settlement it

1  could take much longer than the three weeks that could go by

2  until the next omnibus hearing, so I just want to let the Court

3  know that.  Secondly, Your Honor, we would also like to be

4  heard with respect to a Rule 54(b) motion if that does go

5  forward because I think we have some concerns with respect to

6  that motion because no settlement has actually been approved by

7  this Court.  Thank you.

8              THE COURT:  Mr. Baena?

9              MR. BAENA:  May it please the Court, Scott Baena on

10 behalf of the property damage committee.  I'm not ordinarily at

11 a loss of words, Judge.  I commend the parties for continuing

12 the negotiations.  But shame on them for not having so much as

13 reached out to us between Friday and today to tell us about

14 this outcome.  Mr. Hogan, to his credit, alluded to the fact

15 that we would be hearing something today, did not provide any

16 details, and so, I heard, with you, for the first time today

17 this settlement.  We believe that this has some very profound

18 consequences on a lot of different levels.  As you well know,

19 we have before the Court today a set of bar date program

20 motions, a motion and an amended motion.  It encompasses, as it

21 was originally designed, at least, it encompasses U.S. and

22 Canadian Zonolite claims.  Obviously, to the extent that it

23 implicates Canadian claims, it sounds like it's of academic

24 importance.

25              However, as it implicates U.S. claims, I continue to

53

1  ruminate out loud, as the Crown has up until now, repeatedly,

2  that it is beyond my comprehension that the same product,

3  installed the same way, in homes across the world, could result

4  in bankruptcy in the different treatment of the claimants.  I

5  don't understand the concept.

6          I don't understand the concept either, therefore, how

7  we proceed today to design a program of notice in respect of

8  the U.S. Zonolite claims when I don't even understand what the

9  settlement is in respect of Canadian claims, whether there

10  should be parity between the two, and whether we're not just

11  going down a rabbit hole spending $4 million in cash on a

12  notice program which apparently, at least it sounds like

13  apparently, the program for the United States is entirely

14  different both in terms -- not just of the notice, but in terms

15  of how the debtor substantively intends to deal with the

16  claims.  You design a notice program with a result in mind, and

17  we don't understand the result at this point.  We have the

18  right to understand this settlement.  We have the right to

19  determine whether this settlement should implicate the United

20  States program and the United States claims --

21          THE COURT:  Mr. Baena, would you push the microphone

22  down?  Just -- yes, Thank you.

23          MR. BAENA:  You're welcome.  I'm sorry.  Is that

24  better, Judge?

25          THE COURT:  Yes.  Thank you.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BAENA:  And all I can say, Judge, is this is a

2     great surprise that shouldn't have occurred this way.  You

3     know, I've labored for 35 years under the impression that

4     bankruptcy only works best when it's consensual, and so, kudos

5     for reaching an agreement.  But there's a larger group of

6     people here, and this isn't all together a litigation exercise.

7     It's a reorganization exercise.  And why we were kept out in

8     the cold, knowing that we filed objections to the notice

9     program today, knowing that we've been involved in the

10    mediation program, knowing that there is this issue about the

11    nexus between Canada and the United States, why would we be

12    left out to hear this today?  It makes no sense.  And I must

13    tell Your Honor I'm not prepared to go forward as a result.

14    Thank you.

15          MR. BERNICK:  I suppose that's Mr. Baena'a

16    prerogative.  He's not the only party that's interested in the

17    ZAI notice program for the United States.  The ZAI claimants

18    themselves are interested in that program.  The ZAI claimants

19    have filed their own objections and their own briefs with

20    respect to that program.  I frankly -- I think we've even

21    raised in our papers we don't see why it really is necessary,

22    or indeed appropriate for Mr. Baena, on behalf of the property

23    damage committee, which now has a huge, an enormous invested --

24    vested interest in bringing this case to conclusion so that the

25    settlements that have been reached can be implemented, why it

1 is that the property damage committee, having that interest on

2 the one hand, on the other continues to participate in the

3 litigation process, and basically argue as has been argued here

4 just now that there should be further delay, that matters

5 should be put over, file motions for further delay, when the

6 ZAI claimants, speaking for themselves, and it's their specific

7 interest that's at issue here, have said -- have set out their

8 position, been able to file claims, have been able to litigate

9 claims, indeed have been litigating on their own for lo these

10 many years.

11          So, I'm happy to address the status of the property

12 damage committee in connection with the pending matters. I

13 obviously can't advise Mr. -- or, even speak to the question of

14 whether Mr. Baena wants to proceed.  But we are here today to

15 proceed.  We don't believe there's been any inappropriate

16 conduct whatsoever in connection with the mediation process.

17 It started out as being a separate mediation.  It then became

18 -- that was before the last status conference, and then became

19 a joint mediation.  The Canadians participated in that process.

20 It became clear that there wasn't going to be resolution with

21 the U.S. claimants, and at that point rather than give up on

22 the notion of mediation and settlement all together, the

23 discussions continued to see whether there might be a

24 settlement that included the Canadians.  And that is no

25 different than in any other situation where you have claimants

1 that are differently situated, and the Canadian claimants are

2 differently situated than the U.S. claimants where we have

3 groups of claimants.

4          Take a look at the situation right here.  We have all

5 kinds of different traditional property damage claimants, all

6 of whom are negotiating for their particular claimants in

7 reaching their particular deals.  So, at the time when we have

8 a settlement, and if we do have a settlement, and we're very

9 hopeful that we do, that we have a final settlement with

10 respect to the Canadian ZAI claimants that requires notice to

11 the Court, and at some point approval of the Court, it will be

12 made available to everybody.  It will be made available to Mr.

13 Baena and to others.  But I don't know of any rule, or

14 principle that says that you have to have all of the same

15 people involved in the negotiation process at the same time.

16 We started out that way.  It didn't work out.  And both the

17 Canadians and the debtors decided it was better to try to see

18 if we could do a deal with the Canadians, and it turned out

19 that that was so.

20          So, we will apprize Mr. Baena -- I'm sorry that he

21 feels that he has not been -- that he has been abused in this

22 process.  That was not the intent.  The intent was to simply

23 get this thing done.  And from the point of view of today,

24 there is -- again, there's the insistence that somehow these

25 two things are inextricably linked.  That's not so.  We started

1  out with the idea of doing a U.S. based notice program way back

2  years, and years, and years ago.  We then included the

3  Canadians, and we then made special provision for the Canadians

4  because they said that they needed a separate kind of notice

5  program.  Whatever kind of notice program that's going to be,

6  it's the Canadians who are going to have to sign on to whether

7  they are satisfied or they're not.  It's their claims.  It's

8  their claimants.  And that will be a subject that Mr. Restivo

9  will take up with the Crown and with Mr. Hogan's clients, and

10 will determine at that time, and we'll see what that notice

11 program looks like.  It will have to be different.  But there's

12 no reason why we can't go forward and get this said today.

13         The U.S. program, the U.S. program doesn't have to be

14 the same as the Canadian program in the same fashion that the

15 U.S. settlement doesn't have to be the same as the Canadian

16 settlement.  And if Mr. Baena believes that somehow that leads

17 to a problem with plan confirmation, he's always free, on

18 behalf of I don't know which constituency he's going to

19 represent in that capacity, objecting to the plan of

20 reorganization on the grounds that it treats different people

21 differently.  I mean, frankly, his committee, or his standing

22 up here today and arguing this thing just underscores how

23 multiply conflicted he is.  But one thing that shouldn't happen

24 is that his sense of being ill at ease, and he should be,

25 should somehow interfere with the process of moving this thing

1  forward.  We had an emergency motion last week, looking for a

2  continuance.  We now have an instanter motion here today to

3  say, well, I'm just going to pick up my marbles and go home,

4  and we can't go forward here.  That's just not right.  So, we

5  ought to have the argument.  We ought to lay before the Court

6  what the objections are, what's been said, what's not been

7  objected to.  And if Mr. Baena wants to take the position that

8  he should be given the opportunity to re-raise these issues

9  down the road, Your Honor can take that up at that time, and we

10  believe that that's not appropriate, but Your Honor can take

11  that up.  But he cannot unilaterally bring to a stop this

12  hearing just because he wasn't included in the last round of

13  negotiations with a constituency that he does not specifically

14  represent in the sense of being counsel for those claimants,

15  and that's exactly what he's doing here.  And I think it's very

16  inappropriate.

17        We're prepared to proceed, and I'm prepared to lay

18  out what I think is the lay of the land with respect to the

19  notice and bar date program.  It is actually very, very

20  streamlined now in terms of what even is objected to at all.  I

21  can review, Your Honor, these matters very, very briefly here.

22  Basically because the Canadian situation has been taken off the

23  table for purposes of this discussion per the Canadian

24  claimants themselves today, we're talking about a U.S. program.

25  The U.S. program, in terms of the content of the notice, the

1  claim form and the notice communication or publication program

2  --

3          THE COURT:  Just one second, Mr. Bernick.  Mr. Baena?

4          MR. BAENA:  Your Honor, I would appreciate it if the

5  Court would rule.  I -- counsel is just going to filibuster now

6  and go into his argument --

7          THE COURT:  You need to be either at the table or --

8          MR. BERNICK:  I don't that that there's even a motion

9  that's pending.

10         MR. BAENA:  Can I use the microphone?

11         MR. BERNICK:  Your Honor, I don't think he's even --

12  there's not even a motion that's pending.  He says I'm not

13  prepared to proceed.  That's not a motion.  Is he asking for a

14  motion for a continuance instanter?

15         THE COURT:  I don't know.  Let me find out.

16         MR. BAENA:  Thank you, Judge.  First, Judge, just to

17  make it clear, again, it's not the fact that we were not

18  involved in the negotiation that is troublesome, but what is on

19  a personal and professional level troublesome is that we didn't

20  even get apprized of it before today.  And if counsel does not

21  see a connection between the resolution of a whole group of

22  Zonolite claims to the matters before the Court today, I

23  certainly can't help him in his confusion.  It's absolutely

24  clear to me that they are connected.

25         Indeed, Judge, the settlement, I presume, and again,

1  I'm just speculating, but I presume it is a class type

2  settlement, so it's not this one off settlement like the

3  matters that were referred to by Mr. Restivo.  This was a class

4  like settlement of all claims originating from Canada.  It may

5  be a perfectly great settlement.  It may be the best way for us

6  to proceed in respect of those claims, and maybe others.  I

7  don't know.  I doubt that the Court does, because you heard the

8  same thing I did.  And it certainly may have an impact on what

9  we're giving people in the United States notice of.  We're here

10  to talk about a $4 million notice program that has lots of

11  floors, but we can talk about that.  But at bottom, now, we

12  find out that it leads to a very different process than in

13  respect of the same kind of claims that emanate in some other

14  part of the world.  The same product, same sort of harm, same

15  sort of issues, and yet we're supposed to believe that that's

16  irrelevant to the resolution of Zonolite claims?  It can't be

17  irrelevant.  And the notice program there can't be irrelevant

18  to the notice program here.  They both inform one another.  I

19  think it's entirely appropriate for us to know what the

20  settlement is, to understand the program they intend to employ

21  in respect of it, and see if we can close the gap here between

22  the United States and Canada.  Otherwise, Judge, you're going

23  to -- if we just proceed now on the United States, we're going

24  to come to a conclusion that there should or shouldn't be a

25  program at all, and we have no idea how that even implicates

1 the Canadian resolution.  It doesn't make sense.  It just

2 doesn't make sense.  And so, I do move, ore tenus, Judge, for

3 us to put off until the 22nd any further discussion, and during

4 that period of time I would appreciate it if the Court would

5 instruct the parties to the settlement to share that

6 information with the Zonolite claimants from the United States

7 and with the committee.

8            THE COURT:  Well, on the latter point, the problem

9 with sharing that information until Mr. Monaco at least has

10 marching orders from his constituencies, as I understand it,

11 and let me make sure I do have this correct, there is a

12 settlement that the attorneys have agreed to in principle.  Mr.

13 Monaco has agreed to take it back to his client, but he does

14 not yet have authority from his client to put pen to paper.

15 Have I got that right?

16            MR. RESTIVO:  I'm going to answer it this way, Your

17 Honor.  Our goal was to reach a resolution of Canadian and U.S.

18 ZAI.  We ultimately reached an agreement in principle, but the

19 Crown has not yet been instructed yet, and so the Crown has to

20 get authority to do what we hope the Crown will do.  If, in

21 reaching that goal, we have concluded that the property damage

22 committee would have been helpful, we would have involved them.

23            THE COURT:  No.  That's not my question.  My question

24 is how far along this settlement is.  Is there a settlement, or

25 is there not?  When you say the Crown hasn't given the

1   instructions, does that mean that the Crown at some point

2   hasn't yet said okay, we're in?   Because I don't -- I -- Mr.

3   Monaco, let me hear from you.

4           MR. MONACO:   Your Honor, let me clear this up.   Your

5   Honor, on Thursday there were settlement discussions between

6   the three parties.   No settlement was reached.   On Friday an

7   agreement in principle was reached between the plaintiffs and

8   Grace.   That settlement in principle was communicated to my

9   client and to me.   We have not yet signed off on it, and we

10  need to take it back to our client, and get authority and a

11  consensus from the various agencies that I represent.   So,

12  that's where we are.

13          THE COURT:   So, as I understand it, you, as a lawyer,

14  are prepared to make a recommendation to your client?   Your

15  client has not yet said, fine, we're in?

16          MR. MONACO:   We're in the process of discussing it

17  with my client.   We are not in.   That is correct.

18          THE COURT:   All right.   So, at this point you're not

19  prepared to disclose what the settlement is because you don't

20  feel you have a settlement?

21          MR. MONACO:   No, Your Honor.   I don't know that it's

22  appropriate to disclose what the settlement is.

23          THE COURT:   All right.   So, I'm back to what I was

24  going to say, Mr. Baena.   I don't think it's close enough to

25  actually having a settlement until I know for sure that the

J&J COURT TRANSCRIBERS, INC.

1 parties are in agreement that they have a settlement.  It seems

2 to me that the -- Mr. Hogan's clients and the debtor have

3 reached a settlement that involves the Crown, but I don't think

4 the Crown has agreed to the settlement yet.  So, I don't feel

5 that there is a settlement yet.  What I'm hearing is, gee, this

6 is good, we like the construct, we're going to take it back to

7 our clients, but until the crown says yes, we agree that this

8 -- that we can do this piece, I don't think there is a

9 settlement.  So, I don't think I can instruct the parties to

10 advise anybody else of what the settlement is.  I don't think

11 it's finalized to that level at this point.  So, although the

12 parties are asking that we not consider whatever the notice

13 program is supposed to be with respect to Canada because they

14 may wish to design something around a settlement, I don't think

15 there's a settlement yet.  So, although I understand not being

16 advised about it, I don't think you weren't appropriately not

17 advised, because I don't think there's a settlement to be

18 advised about yet.

19         MR. SCOTT:  Good afternoon, Your Honor.  Darrell

20 Scott.  Mr. Westbrook apologizes for being unable to attend.

21 He's literally at sea.  I just want to make a couple remarks.

22 I'm delighted to hear that there is a potential settlement

23 involving Canada.  In whatever its state is, it's good news

24 that there are conversations taking place, and it's an occasion

25 to note that this progress is achieved because there are

1  counsel in Canada who are appointed to represent Canada that

2  facilitated discussions about resolution of Canadian claims,

3  whatever that resolution might be.  Whether the Court proceeds

4  with regard to the bar date or not, Zonolite Attic Insulation

5  claimants' primary concern is for many years we've been

6  attempting to put ourselves in that same stature by having,

7  because we genuinely believe that the only real resolution to

8  Zonolite claims, whatever country they might be in, is

9  collective and through designated representatives, and so we

10 would just encourage the Court to keep on track the Court's

11 consideration of both recognition of a class that's already

12 certified, and entertaining a notion of a class with regard to

13 the remainder of the states.  That, I think, is imperative.

14         The second thing I would say is the Court remarked at

15 the last omnibus that the Court did not view a bar date process

16 as irreconcilable with consideration of and potentially

17 treatment of Zonolite in some class form.  I think that's

18 exactly true.  Were we in the happy situation of having a class

19 settlement we'd probably be proposing, as well, a claim form

20 bar date notice that accommodated that class proceeding.  So, I

21 don't see them as irreconcilable, and the Canadian analog here

22 seems to sort of illustrate that point, as well.

23         I do, however, appreciate Mr. Baena's concern.  As

24 this Court knows, Zonolite Attic Insulation claimants'

25 principle concern with a bar date process has to do with its

1  effectiveness, has to do with its ability to bring claims

2  before the Court, not with the form of the notice, or its

3  dissemination.  It has to do with whether it can, as a matter

4  of due process, accomplish what they hope to accomplish.  And I

5  have plenty of arguments about that, but I do want to say, as

6  my last point, that this -- this is a surprise, and I can

7  appreciate how Mr. Baena, who takes great responsibility with

8  regard to -- I will call more traditional concerns about the

9  appropriate use of a proof of claim and bar date, how this

10  revelation would be of concern to him in being in a position to

11  really argue today on.

12       THE COURT:  Well, I promised in another hearing today

13  that I was going to keep my mouth shut about certain issues

14  because it seems that I get myself in more trouble rather than

15  less every time I do raise something, but having raised the

16  concept of trying to get you folks to settle, and having raised

17  the concept of trying to get something done through maybe a

18  524(g) issue, and having had both of those fail, and still

19  trying to figure out some resolution between classes for ZAI

20  claimants, class proofs of claim for ZAI claimants, and a bar

21  date notice in the format that the debtor wants it, that might

22  still get the notice out that everybody agrees needs to go out.

23  We need a notice that somehow or other going to get the

24  universe of ZAI claimants into the bankruptcy process

25  somewhere, somehow, although beyond those pretty broad

1  parameters I don't think anybody agrees about anything, I'm

2  going to throw out yet one more concept and see -- and then I'm

3  taking a recess, and letting you all fight about it for a few

4  minutes.

5           MR. BERNICK:  Your Honor --

6           THE COURT:  Mr. Bernick.

7           MR. BERNICK:  I understand, Your Honor --

8           THE COURT:  Mr. Bernick, this is my talking.

9           MR. BERNICK:  Yes --

10          THE COURT:  You will please be quiet until I'm

11  finished.

12          MR. BERNICK:  Okay.  Fine.

13          THE COURT:  And then you may argue to counsel, not to

14  me, while I take a recess.

15          MR. BERNICK:  Okay.

16          THE COURT:  I think the big problem with the ZAI, and

17  this is what I was wrestling with very early on in this case

18  because for a while it was the 800 pound gorilla analogy that

19  was being used.  I think the problem still is we really do not

20  know how many claims are out there, and I don't think in that

21  sense of it's buildings, so let's put that concept to rest.

22  It's not necessarily buildings.  It's claims that are going to

23  be filed that will have to be reconciled.  Regardless of

24  whether you want to call them buildings, claimants, claims,

25  there is an issue as to what will be filed that the debtor will

1  have to reconcile, and how to treat that massive data is going

2  to be an issue.  That's what official committees do well.  What

3  about the concept of an official committee for ZAI claims?

4  That might have the effect of eliminating the class proof of

5  claim.  It may have the issue that you have a counsel to deal

6  with that can represent ZAI claimants.  It may eliminate the

7  concern that the property damage committee has had -- has

8  raised from time to time about not being able to represent

9  individual claimants.  And it may eliminate, to the extent --

10  I'm not sure there is one, but to the extent if there is an

11  alleged conflict because of ZAI claims still going forward with

12  other property damage claims not going forward and being

13  settled, that type of construct, I think it would not probably

14  add any more to the expense of this estate to have to do that

15  than it will to continue the litigation that has already been

16  very costly in this estate anyway.  Having said that, you may

17  all hate the idea.  I can see many frowns.  I don't know.

18  We're taking a ten or 15 -- we'll take ten minutes.  See what

19  you think.

20                    (Recess)

21          MR. BERNICK:  We have conversed, Your Honor, in

22  cooperative and brotherly tones, and I say that just because it

23  happens that that's the composition of our little group.  I'm

24  not sure how far the agreement goes, and I know that everybody

25  will have an opportunity to speak to it, but basically what

1  we've proposed was that we extend the arrangement that we had

2  in connection with the Science (sic) trial going forward, so

3  that effectively, as I understand, it was Mr. Scott and Mr.

4  Westbrook who were designated -- were the two who were

5  designated, and I guess also local counsel, to deal with the

6  Science trial issues, and did so, and they were paid -- my

7  further understanding is they have not submitted any invoices

8  since that matter was resolved.  And what we've expressed as

9  our willingness, and Mr. Scott indicated his agreement to

10 moving forward with that arrangement so that they would

11 continue to serve in a representative capacity.

12         That would be completely without prejudice to -- Your

13 Honor had suggested that that might obviate the need to have

14 class proofs of claim, and as anticipated they -- they are not

15 suggesting that their agreement to serve in this capacity in

16 any affects their request to have the class proof of claim be

17 used.  And we have not solicited that agreement.  So, this

18 would be without prejudice to or without relationship to that.

19 Your Honor would then presumably take up their request for a

20 class proof of claim in the course of the proceedings as we

21 have contemplated.  That is, that we would schedule that to

22 take place some time fairly soon.

23         Of course, it's our view, as you know, that we

24 believe, as Your Honor does, that 524(g) does provide the

25 appropriate vehicle, that you don't need the class proof of

1   claim.   The bar date is the first step of proceeding down the

2   road, etcetera.   But that would all be reserved for another

3   day.   So, the merit of this would be that if it's acceptable to

4   Your Honor, that we could proceed with Mr. Scott and Mr.

5   Westbrook acting as counsel to ZAI claimants for purposes of

6   the proceedings going forward relating to ZAI.   And then,

7   whatever Your Honor decides is the appropriate disposition of

8   the request for class certification would not have the effect

9   of -- if Your Honor were to decide against that it wouldn't

10  have the effect of removing them as counsel to the ZAI

11  claimants.   So, that's the essence of what we've talked about.

12          We're very anxious to proceed with the notice of bar

13  date hearing today.   We don't believe that the motion for

14  continuance is well taken.   We even struggle with how it is

15  that Mr. Baena can make that motion, but we don't believe the

16  grounds for the motion have been demonstrated, we therefore

17  believe that the motion for continuance should be denied, and

18  that we simply go forward on the basis of the record that we

19  have, which, Your Honor, goes back now for six years.   There

20  must have been -- I can't figure out how many different briefs

21  have been filed on the notice and bar date program, and we're

22  all here ready today, and the debtor and the proponents for the

23  plan, the agreement in principle, that is to say, are very

24  anxious to get this process underway now.   Every week that

25  passes, you know, gets us down the road where people are going

1  to get jammed because we have now got confirmation dates that

2  we've reserved for the Court in January, and it's very

3  important to get this notice out for the bar date to take

4  place.  We're then prepared, although we differ with the

5  position on the merits, we're prepared to take up the issue of

6  a class proof of claim and determine whether that's necessary,

7  and I know that Mr. Scott feels very passionately about that,

8  as do others.  We could take that up in due course.  But

9  today's business is the notice and bar date, and we would like

10 very much to proceed with that, and suggest that Your Honor

11 deny the motion for continuance.

12         THE COURT:  Okay.  I'm a little confused as to point

13 one, which is how I have counsel representing a group of

14 claimants in a representational capacity who don't know that

15 they have counsel representing them in that representational

16 capacity.

17         MR. BERNICK:  Well, in connection with the notice and

18 bar date you have already -- Mr. Scott represents people who

19 are, in fact, already claimants.  There are ZAI claimants --

20         THE COURT:  Oh, sure.

21         MR. BERNICK:  -- in connection with this case.  So,

22 there's no question but that he would have the ability to speak

23 to the notice and bar date issue.  Mr. Baena, I think, has a

24 very difficult situation that way insofar as there is a request

25 not to have the matter proceed.  If he wants to argue on the

1  merits of the notice and bar date, I don't -- you know, in

2  terms of the content of the notice program, etcetera, I'm not

3  sure why that's necessary, because there are people who do

4  represent ZAI claimants and the matter is specific to ZAI

5  claimants.  It's not a matter of any general interest to other

6  members of the property damage committee.  All the other

7  members of the property damage committee, save Mr. Speights,

8  and even Mr. Speights, are focused on matters other than the

9  ZAI.  So, the matter is specific to ZAI.  ZAI folks are

10  represented.  But if Mr. Baena wants to speak to the issue on

11  the merits, we don't have any quarrel with that, either.

12      What we do have a quarrel is a position being taken

13  by counsel for the property damage committee to the effect that

14  this matter should be put over, continued, delayed, because

15  that runs directly contrary to the interests of all

16  constituencies who have settled and want to get to the

17  confirmation hearing.  We also believe that that's

18  inappropriate on the merits, but we don't know how Mr. Baena

19  speaks to the issue of delay.  But for purposes of arguing the

20  merits of the note -- the content of the notice, and the notice

21  publication program, most of which Your Honor have not even

22  been objected to -- as we sit here today have not been objected

23  to by the ZAI claimants, have only been objected to in a

24  footnote by Mr. Baena on behalf of the PD committee, we should

25  be able to resolve those today and get that process set in

1 motion.  And then, if we are going to come back and argue about

2 class, at that point Mr. Scott, Mr. Westbrook will pay -- the

3 estate will pay their fees to speak to those issues.

4 Presumably both of them, as purported class counsel -- they're

5 going to want to be class counsel.  So, they will have standing

6 and an appropriate basis for speaking to those issues in any

7 event.  If the class claim is denied, then the only remaining

8 question is in what capacity could they continue to be paid by

9 the estate?  And it seems to me that at that point they are

10 effectively special counsel acting on behalf of claimants who

11 are ZAI claimants until such time as the claimants actually

12 file their proofs of claim.  At that time, if those claimants

13 who filed their proofs of claim want other counsel other than

14 special counsel, they're obviously free to have that happen.

15 So, if you kind of space this over time today, everybody who

16 needs to argue is here prepared to argue.

17             If we go forward and go to the issue of class proof

18 of claim, the people who want to be class counsel and they're

19 named representatives of the class, will be the ones to argue,

20 and if that is denied, we're still prepared to fund the payment

21 of fees for Mssrs. Scott and Westbrook acting as counsel to ZAI

22 claimants until the bar date passes, at which time they can act

23 in that capacity, or if the individual claimants want somebody

24 else, they can pick somebody else.  But it doesn't seem to me

25 that at any point we really need anybody more than counsel who

1  are already fully up to speed.

2          The concern, frankly, about going and asking for a

3  special new committee with its own counsel, is time.  That's

4  going to take some significant period of time, and we just

5  don't think that -- we just don't see how it's really necessary

6  in this given case.

7          THE COURT:  Well, okay.  The timing issue may be a

8  factor.  Perhaps more appropriate is something like a

9  subcommittee of the property damage committee with its own

10  special counsel.  My concern is simply that if -- to the extent

11  that the issue is that you don't know who the universe of

12  claimants is --

13          MR. BERNICK:  Right.

14          THE COURT:  -- we have to figure out who that

15  universe of --

16          MR. BERNICK:  Yes.

17          THE COURT:  -- claimants is.  So, some notice has to

18  be created.

19          MR. BERNICK:  Yes.

20          THE COURT:  Everybody seems to be in agreement about

21  that.  Whether it's through a bar date, or a class proof of

22  claim, I'm not really -- I haven't ever really known that it's

23  going to make much difference, frankly, but you need to get

24  some notice out.  So, a notice goes out in whatever format.

25  Once that notice goes out you've got this universe of claimants

1  that have to be addressed.  If it's through a subcommittee of

2  the property damage committee, okay, but it's still -- it seems

3  to me that even for the debtor to have somebody to bargain with

4  and for those -- that entity to have a representative so that

5  you can, in fact, deal appropriately with all of the issues in

6  one format, it would make more sense to have everybody focused

7  in one channel.  And --

8          MR. BERNICK:  I don't -- we don't have a problem with

9  that mechanism either, Your Honor.  We don't.  We agree with

10  Your Honor.  We have to have a way of finding out who the

11  claimants are.  We believe that the only way to do that

12  appropriately is the bar date, because it's only through the

13  bar date that people who don't show up don't have claims.  And

14  if you have a class proof of claim, then you don't really know

15  who the real claimants are going to be because the class proof

16  of claim stands in service of all absent class members.

17          THE COURT:  Well, and the -- look, the problem I'm

18  having, and since I'm just speaking in general to see whether

19  we can get through the structural issues, at this point --

20  somewhere in the past, and I don't remember, it's been long ago

21  in the past, there were estimates of the number of houses in

22  the United States that might have ZAI in them somewhere, and I

23  don't remember the numbers, but it was some huge number --

24          MR. BERNICK:  Right.

25          THE COURT:   -- five to 15 million homes --

1          MR. BERNICK:  Whatever.

2          THE COURT:  If that's accurate, and if it's also

3    accurate that houses may turn over since the time that ZAI has

4    been used in these homes, three times on average, then you're

5    looking at somewhere between 45 and 150 million potential

6    homeowners who might be potential claimants in the case.  There

7    is no way to certify a class of 45 to 150 million potential

8    claimants.  I mean, it's -- it's not manageable.  It's going to

9    be very difficult.  There has to be a better structure, folks.

10   There just has to be.  Now, you folks need to talk about this.

11   You've got to talk about it.

12         MR. BERNICK:  Your Honor, I -- this is why I was

13   cringing a little bit at the outset.  The -- it seems to me

14   that Your Honor has indicated to us what the structure is, and

15   the structure is that you can deal with claims in the aggregate

16   in the context of a plan of reorganization, and 524(g), you've

17   got the channeling injunction.  And therefore, no matter

18   whether you're talking about a plan, or you're talking about a

19   class in terms of notice, there's going to have to be notice

20   that goes out.  If there's a bar date there's going to have to

21   be notice that goes out.  And the notice has to satisfy all the

22   same requirements which are the requirements of due process

23   under <u>Mullane</u>.  So, that's all totally a common feature.

24         But there are enormous consequences, I mean,

25   unbelievable consequences as to whether you proceed by way of

1  saying that unless people opt out, they're in.  That's the

2  whole difference.  Under the class rule everybody who doesn't

3  act is in.  They're in by default.  And as a result you never

4  find out who it is that is an actual claimant until if you

5  certify the class you then have the litigation, and then you

6  figure out, well, you know, who actually is going to make a

7  claim, and show that the claim is meritorious.  And there are

8  enormous problems with even that.

9          But be that as it may, under the bar date procedure,

10  and I'm saying all this now knowing that we're going to spend

11  the next hour talking about what we -- I thought we were going

12  to talk about next time, which is class certification.  But

13  it's obviously a matter that's central to the Court's thinking.

14  Under the bar date process you find out who the current

15  claimants are, and if -- if the notice is adequate, which we

16  believe that this clearly is.  It's not even contested -- what

17  people are contesting is the footnote objection by Mr. Baena's

18  firm.  But if the notice is sufficient under Mullane, you will

19  then know who all the current claimants are, and maybe that if

20  you can contact all the current claimants, there's no such

21  thing as claimants down the road because at that point this is

22  very, very different from other cases.  You are dealing with

23  the current holder of the property.  So, it's not -- future

24  turnover doesn't matter anymore because you are dealing with

25  the holder of the claim at the time that resolution is reached.

1  You don't have to worry about the future.  So you've got the

2  current, you've got the currents, you've got everybody who is,

3  by virtue of the notice, in a position to resolve the claim.

4  You then need a representative of that group.  And I -- you

5  know, I don't know that we have a better idea than Your Honor's

6  idea in terms of working with some subcommittee and counsel to

7  the subcommittee of the property damage committee.  We don't

8  have a quarrel with that.

9       But the key thing from our point of view is to stop

10 talking about let's figure out how many homes might be out

11 there.  That's total rank speculation.  We'll know how many

12 people there are when the number of claim forms come in.  And

13 it's vital.  This issue, make no mistake about it, this issue,

14 and you can see it happening already today, when it drifts, we

15 lose time every week that passes.  We wanted to take this up

16 last time.  Your Honor had a whole series of motions, and

17 recently decided, okay, let's take this one up first next time,

18 and then we'll do class thereafter.  And that's what we all

19 came here to --

20      THE COURT:  And I think that's the way to go about

21 it.  The reason I raised these things out of order is I asked

22 you folks to talk to see if you couldn't put a process

23 together.  You did go to mediation.  It wasn't successful.

24 Mediation is still on my mind, and that's the reason I am still

25 pushing along these lines.

1          MR. BERNICK:  There is no question about -- no one --

2   I mean, Mr. Restivo has done a fabulous job, and Mr. Finke

3   working with him, obviously on property, and his area in

4   particular.  And frankly, the Canadian situation -- everyone

5   was going to go, wow, that's great, because we're making some

6   progress.  And no one has given up on that.  But the fact of

7   the matter is, and it's, you know, reflected in Your Honor's

8   observation about every time you write an opinion then things

9   get resolved -- that is the way things get resolved.  It's the

10  way they've gotten resolved in every single instance in this

11  case.  Unfortunately on Your Honor's back is that they get

12  resolved when people see where the litigation is going, and the

13  day -- you know, there is an end of the day.  There is a, to

14  quote McGovern (phonetic), there are three walls of the canyon,

15  whatever it is.  That's when things get resolved.

16         So, Your Honor told us, even before the Science

17  opinion, you had a telephone call, and you said, I want to

18  resolve this.  And nobody paid attention to it, and then the

19  Science opinion came out.  So, the Science opinion is there,

20  and now we have to take the next step.  The next step should be

21  the bar date, find out who is there.  Just keep on marching

22  down the road.  But if we don't keep on marching down the road,

23  we're not going to get to the mediated solution because the

24  pressure is not there.  The pressure -- and it's on us, too.

25  We don't know exactly what's going to happen.  So, by no means

1 are we of the mind that says let's litigate this thing forever.

2 As you saw in PI that's not where we were there, either.  So,

3 we're not there here, either.  So, we want to go forward and

4 see if we can resolve it.  But the only way that that can

5 happen is if the case proceeds, because otherwise then we've

6 got, you know, the 800 pound gorilla is over here, and they now

7 successfully wear that hat --

8          THE COURT:  I know it's only 400, Mr. Lockwood.

9          MR. BERNICK:  Well, we know that it's --

10          MR. LOCKWOOD:  I beg your pardon, Your Honor.

11                    (Laughter)

12          MR. BERNICK:  We know that it's ten time the

13 agreement that's stuck in everybody's throat here this

14 afternoon, which was very important and very large.  So, we

15 don't want to jeopardize that, so our urgent request to the

16 Court is to take 45 minutes and go through it, because, you

17 know, in five minutes, I mean, I can tell you that there's no

18 one who has come forward and said the communication program is

19 flawed, the only issue that Mr. Baena has raised in the

20 footnote is that maybe it will cost more than we say that it

21 will cost.

22          On the content of the notice there are objections to

23 the content of the notice.  There are about four of them after

24 you kind of parse through the footnote.  We can take the up in

25 very short order.  They're not very hard.  And we can get this

1 thing done.  There are no objections to the claim form.  This

2 time the claim form isn't 25 pages long, it's one page long.

3 It's just a modified Form 10.  So, all we really have to do is

4 for Your Honor to hear, if Mr. Baena wants to talk, or Mr.

5 Scott wants to talk about the problems they have with the

6 content of the notice.  We can get that resolved in short order

7 and be off to the races, and then we can talk with --

8            THE COURT:  All right.

9            MR. BERNICK:  -- with Mr. Scott about the class

10 argument, because we're happy to proceed with that promptly.

11           THE COURT:  Okay.  I do not see a basis for

12 continuing today's argument with respect to the proof of claim

13 notice form based on the resolution of the Canadian claims.  I

14 haven't heard enough that convinces me that there is actually a

15 resolution yet.  I understand that there is a resolution in

16 principle.  I certainly hope that by the next hearing or the

17 hearing after I'm told that there is a resolution.  And when

18 there is a resolution, then I am ordering the parties to convey

19 that resolution both to the ZAI American claims and to the

20 appropriate committees so that to the extent that it is

21 relevant to whatever we're doing, that information can be

22 shared.  And if it's a resolution that can be piggybacked, that

23 that effort can be made.  So, that is the order.  As soon as it

24 is a final settlement, then I a -- a final settlement in

25 principle, i.e., when the Crown has signed onto it, then I want

1  that information communicated.

2          For today, however, I don't think that is far enough

3  along.  The Crown is apparently a necessary party, and to the

4  extent the Crown has not agreed that it is yet participating, I

5  don't see a basis for continuing today's hearing, so we're

6  going forward.  With respect to Mr. Scott being able to

7  represent the ZAI claimants in the capacity in which you've

8  articulated, Mr. Bernick, I agreed to that construct in the

9  scope of the Science trial because of the basis on which the

10  proofs of claim were being filed and then objected to, and I

11  thought that was appropriate.  I think if it's going to go

12  forward through the rest of this case on a formal basis, it

13  should be formalized somehow.  To the extent that the asbestos

14  property damage committee is willing to set up some

15  subcommittee, even if it requires special counsel, if that's an

16  appropriate mechanism, that may be a way to do it.  But I do

17  think that there should be some formalized mechanism so that

18  notice -- whatever notice is appropriate can be made of that --

19  so that as ZAI claimants do find out about this case and file

20  claims and whatever, they do know that there is a body that

21  will be representing their interests, which at this point they

22  may not even know fully about the case, so I don't know how

23  else to make that more formal.  Mr. Baena, I'm certain you've

24  been through these kinds of issues before.  We can address that

25  at an appropriate time.  I'm not sure today is the appropriate

1    time.    But for the next status conference in June, I would

2    like something from all of you articulating how that's going to

3    go forward.    If the property damage committee feels it can do

4    it on its own, that's fine.    But I want to know how the ZAI

5    claimants, whoever they are, are going to be represented as a

6    group in this case going forward.    Okay, Mr. Bernick.    This is

7    Item 14, I think.

8            MR. BERNICK:    Right.    And I'm going to try to move

9    through this fairly quickly.    With respect to -- if you just

10   break down the -- if you break down the components of the

11   notice and bar date program into parts, we have the -- there

12   was an objection that was filed by the -- by the ZAI claimants,

13   an objection that was filed by -- and I want to make clear that

14   when I'm standing up here to address these matters today I'm

15   focused solely on the claim form, the content of the notice,

16   and the publication program.    I'm not addressing, and I

17   understand that all the different matters that Mr. Scott, and

18   Mr. Baena, and Mr. Westbrook had talked about before regarding

19   how effective this process is going to be versus a class proof

20   of claim, or class notice.    I understand that those are all set

21   for another day.    I'm talking about whether this notice program

22   meets the requirements of due process and whether the content

23   of the notice is appropriate from that point of view.    That is

24   all that I'm going to be addressing here today because I

25   believe that that's all that Your Honor has to decide.    So,

1   what are the components.  We have notice by publication.  The

2   Kinsella proposed plan is part -- is an attachment to our

3   motion.  It's the bar date notice plan for Zonolite Attic

4   Insulation claims.  I'm talking about the U.S. plan.  It is

5   substantially the same.  It's very similar to the program as it

6   was originally proposed back in 2002, although it's been

7   modified somewhat since, and most importantly is it's targeted

8   only to the ZAI claimants, which was a major issue before.  The

9   target audience is homeowners 35 years and old.  It's a broad

10  national published notice.  It also has notice by mail to third

11  party do-it-yourself publications.  National paid media include

12  television, print publications, and the internet, multiple

13  notices in eight national consumer magazines, three newspapers,

14  and the like.  Reach is estimated by -- Ms. Kinsella to reach -

15  -

16          MR. BAENA:  Objection, Your Honor.  Hearsay.

17          MR. BERNICK:  It's not --

18          MR. BAENA:  He cannot testify to anything that Ms.

19  Kinsella has said in her report.  I asked to cross examine her.

20  I can't.  He can't testify.

21          MR. BERNICK:  I'm not offering sworn testimony,

22  therefore it can't be hearsay.

23          MR. BAENA:  He's offering it for the truth of the

24  matter asserted.

25          MR. BERNICK:  Mr. Baena's objection is not well

1  taken.  I'm not offering any evidence.  The paper is submitted.

2  And Mr. Baena's expostulations in the background there are

3  neither professional nor appropriate.  I am not offering -- I'm

4  discussing what's already been tendered into the record as an

5  attachment to the motion.  There was no objection that it's

6  improper evidence, or that it's hearsay.  They asked for a

7  continuance so that they could retain an expert.  That

8  emergency continuance motion was denied by order of this Court,

9  and it's improper for Mr. Baena now to be treating this as an

10 evidentiary hearing, which it's not, and Your Honor has already

11 said that it's not an evidentiary hearing.

12      MR. BAENA:  Your Honor, I objected on a number of

13 grounds, and requested the continuance on a number of grounds.

14 Counsel omitted the most important one of this conference --

15      MR. BERNICK:  That motion has been denied.

16      MR. BAENA:  Is this his courtroom?  Does he own it?

17      MR. BERNICK:  That is completely inappropriate --

18      THE COURT:  Gentlemen.  All right.  Mr. Baena, state

19 your objection, please.

20      MR. BAENA:  Your Honor, I asked to cross examine Ms.

21 Kinsella.  That's why I asked for a continuance, because the

22 Court's rules that we've abided by since the beginning was that

23 no testimony at an omnibus hearing.  If you had told me I had

24 to do it tomorrow, that would have been fine.  I didn't seek

25 any delay.  I sought the very, very fundamental right to

1  examine a witness.  And he is now offering up and trying to

2  demonstrate to you through this offer the wisdom and -- and the

3  -- the effectiveness of this program based upon the report of

4  an expert who designed this whole program.  And he's telling me

5  it's irrelevant?  It's just an attachment?  It's hearsay.  It's

6  pure hearsay.

7            MR. BERNICK:  Your Honor, Mr. Baena is not only

8  mistaken about the content and posture of this hearing, he is

9  completely mistaken about the Federal Rules of Evidence which

10 govern in this Court.  Anything that I say is not proffered as

11 evidence.  The matter that I refer to is a matter in the

12 record.  It was appropriately submitted.  In fact, it's been

13 submitted in this Court for the better part of six years in

14 some form or another.  And under the federal rules this is a

15 preliminary matter.  This is not the trial on the merits of the

16 claim.  It's a preliminary matter.  Preliminary matters, under

17 Rule 104, can be decided on the basis either of evidence or of

18 other matters that are not evidence.  Matters can be considered

19 by the Court under Rule 104 that are not evidence at all.

20            So, to the extent that he is suggesting, Your Honor,

21 that in order to issue a notice program, or a proven notice

22 program, or, for that matter, take any other step that Your

23 Honor does take in this case based upon an assessment of the

24 facts, that you have to have sworn testimony subject to cross

25 examination with the witness on the stand or in another fashion

1  admissible under the Federal Rules is just plain wrong.  It is

2  a frivolous objection, and with due respect to Mr. Baena, I'd

3  like the opportunity so that we can make our argument today.

4  Mr. Baena wants to make all the arguments he wants, he can do

5  it on his own time, but I'd like to get through a very short

6  presentation so that it can be before Your Honor.

7        THE COURT:  All right.  Mr. Baena, I'm not aware that

8  I have to have evidence with respect to what this notice

9  program is purported to be, which is what Mr. Bernick is

10 telling me now, that what the -- what the debtor is proposing

11 to do is set out in the affidavit of Ms. Kinsella, and I think

12 that is where it's set out, it's not that the conclusions that

13 she draws about how it's going to -- who it's going to reach

14 may be hearsay, but what the debtor is proposing to do is

15 identified in her affidavit.  And I don't think that's

16 inappropriate for the Court to consider.  It's what the debtor

17 says it's going to be.

18      MR. BAENA:  Your Honor, I did not object about where

19 they intended to publish it.  I objected the moment he said

20 what Ms. Kinsella said the reach would be.  That's absolute

21 hearsay.  And to the extent he has to demonstrate to you who is

22 going to have an opportunity to see this article, and it's

23 based upon her testimony, bring her in.  He cannot do that.

24 That's hearsay.

25      MR. BERNICK:  Your Honor, moreover, as we had

1  indicated in our response to his motion, they are completely

2  and utterly out of time, totally out of time.  This is a delay

3  tactic.  They have been working with their Hillsoft (phonetic)

4  organization for years.  They've continued to work with their

5  Hillsoft organization; indeed, submit bills from it even after

6  Mr. Hillsey (phonetic) left.  So, the idea that somehow they've

7  been disabled from objecting in exactly the fashion that he has

8  done in making the request to cross examine Mr. -- Ms.

9  Kinsella, or to produce an expert of their own, they have been

10 sitting there on that issue not only for years in connection

11 with essentially the same notice program, but actually during

12 the pendency of our motion, which was filed on March the 18th,

13 and they did nothing.

14        THE COURT:  When was the response date for this

15 motion?

16        MR. BERNICK:  The response date for the motion was

17 April the 10th.

18        THE COURT:  And when was the affidavit filed?

19        MR. BERNICK:  The affidavit was filed on March the

20 18th.  It was filed in connection with our original motion, and

21 they then responded on the 10th of April with an objection.

22 And the objection, Your Honor, to the extent -- and I'll

23 display it now, the objection they made at that time -- this is

24 the official committee of property damage claimants, I

25 apologize for marking it up, but you have here in Footnote 4 --

1          THE COURT:  You need to wait until I get the system

2    on.

3                    (Pause)

4          MR. BERNICK:  You have there -- oh, I'm sorry.

5                    (Pause)

6          THE COURT:  It's on.

7          MR. BERNICK:  Okay.  You have there in Footnote 4,

8    just this, like, part here, the entirety of the objection that

9    actually relates to the content and publication aspect -- it

10   just disappeared again.

11         THE COURT:  Well, we had it --

12                   (Pause)

13         THE COURT:  There it is.  Okay.

14         MR. BERNICK:  I won't touch it.  The content -- the

15   notice content in the publication program, that's the entirety

16   of their objection.  In their expedited motion they blew it up

17   and put it in text, but it's effectively the same thing.  And

18   actually, if you take a look at this, there's not a single

19   objection to the publication process itself other than the

20   conclusory statement that there are (indiscernible)

21   deficiencies, including without limitation that it has likely

22   underestimated the actual cost to implement the program.

23   That's the only one.  Everything else really relates to the

24   content of the notice as opposed to the publication program.

25   So, they filed this on April the 10th, and that's it.  There

1  was no objection or even, indeed, a joinder in this statement

2  by the ZAI claimants.  So, as we sat there on April the 10th,

3  the only issue that had even really been raised at all wasn't

4  raised by the ZAI claimants.  It was raised by Mr. Baena.  It

5  was raised by Mr. Baena in a footnote.  And the footnote had

6  nothing to do with the publication process.  It had to do with

7  the notice content.  And indeed, the notice content issues that

8  are raised here, as I'll go through them very briefly, are none

9  of them even really factual issues.  They are mostly issues of

10 law.  They pose issues of law.  They don't require factual or

11 expert testimony.

12         So, this was the 10th of April, and we then actually

13 addressed the Canadian issues, which turns out now, God bless,

14 to be perhaps issues that are moot.  But the first indication

15 that we had that they were taking the position that they were

16 not prepared to proceed.  They wanted to cross examine Ms.

17 Kinsella was literally, whenever it was, last week when they

18 took the position that they needed more time and they needed to

19 cross examine Ms. Kinsella, and they asked for emergency

20 relief.  Prior to that time they had done zip, nothing.

21         THE COURT:  Mr. Baena?

22         MR. BAENA:  Yes.  Counsel, of course, conveniently

23 omits one --

24         THE CLERK:  You have to stand near a microphone.

25         MR. BAENA:  Counsel, of course, conveniently omits

1  one very, very, very important fact, one -- an occurrence that

2  has materially changed everything that they previously

3  proposed.  On May 23, the Friday night before the three-day

4  weekend, they filed an amended bar date program, an amended

5  program that materially changes what was on the table for, as

6  counsel says, the last six years.  And, yes, we filed a motion

7  immediately after getting that, seeking a continuance so that

8  they would be required to bring Kinsella to Court so that we

9  could cross examine her, and so that we could have an

10 opportunity to talk to a new testifying expert ourselves.

11         A material change on May 23rd.  And I'm happy to

12 discuss that change when it's my turn to address the merits.

13         MR. BERNICK:  Well, that --

14         THE COURT:  Okay.  What I believe I did was this.  I

15 think I said, number one, this amended motion filed May 23rd

16 was late for today anyway.  Number two, I wasn't taking any

17 additional documents because the amended motion was late

18 anyway, and so I don't know how we're going to discuss it today

19 because it was late anyhow.  Number two, if we need an

20 evidentiary hearing, then I was going to set it at today's

21 hearing.  So, if we can't get through the issues and we need an

22 evidentiary hearing, I thought in my order that denied your

23 request that I said we would discuss that today, and if you

24 need discovery, I'll give it to you.

25         MR. BAENA:  I don't need discovery.

1          THE COURT:  So, I'll see what happens.

2          MR. BERNICK:  Did the --

3          MR. BAENA:  I don't need discovery, Judge.  I never

4    asked for discovery in my motion to continue, in my

5    conversations with --

6          THE COURT:  All right.  Or, for an evidentiary

7    hearing.

8          MR. BAENA:  I never asked for discovery.

9          THE COURT:  Okay.  Then for an evidentiary hearing if

10   we need to get there.

11         MR. BERNICK:  Okay.  Well, the only thing that we

12   modified on May 23 is in terms of the reach of the notice of

13   the publication was to include the Aboriginal tribes in Canada.

14   So, it had nothing to do with the reach of the program at all,

15   and --

16         MR. BAENA:  Judge --

17         MR. BERNICK:  Your Honor, I -- Mr. Baena has just got

18   to tune it down a little bit here.  I mean, this is -- I can't

19   say anything -- there's all this emotion back here --

20         THE COURT:  At the moment we're only dealing with

21   American claims, so is there a change in May 23rd notice with

22   respect --

23         MR. BERNICK:  Yes.  There's a change in the content

24   of the notice that I'm going to get to in connection with May

25   23.  And we don't even have to take it up today.  I think it's

1 very simple and appropriate -- or, we can take it up today.

2 But it's nothing that relates to Ms. Kinsella in the -- she's

3 talking about the publication program and its reach.  She is

4 not -- she is not expressing opinions regarding the content of

5 the notice.  She didn't craft the content of the notice.

6         THE COURT:  All right.  Mr. Bernick, finish your

7 presentation.  I'm going to hear from Mr. Baena.  If he needs

8 time to cross examine Ms. Kinsella, if I think that that's

9 appropriate after I hear from you and hear his objection, then

10 I'm going to give it to him.  But nonetheless, let me find out

11 whether the issues are even related to what she would testify

12 about if she were a witness.

13         MR. BERNICK:  Yes.  Well, I'd like to speak,

14 obviously, to that, because that then -- we're now going down

15 his slope.  The issues that are raised, again, Your Honor sees

16 the only objection that was made.  This is it.  There's nothing

17 else.  And if you take a look at the rest of the objection, it

18 raises the following issues.  And I'm going to try to do my

19 best to read off of it.  And it gets into the specifics.  It

20 says it's fraught with deficiencies, including, without

21 limitation -- okay -- let's now see what all this fuss is about

22 -- likely underestimates the actual cost to implement the

23 program.  Again, they've had years in which to talk about that.

24 The notice itself carries the ZAI Science trial opinion to the

25 extreme by depicting ZAI as harmless.  That is completely

1   unexplained.  In point of fact, ZAI is not -- is not depicted

2   in any way, at all.  It is shown in photographic form, and the

3   notice that actually talks about the ZAI goes so far as to say,

4   and this is the notice that would be in the magazines, that

5   some of which maybe have contained naturally occurred asbestos.

6   And, of course, everybody in the world knows that asbestos is a

7   potentially harmful material.  So, where the idea that it

8   portrays it as being harmless came from is completely

9   unexplained and that there's no support for it.  And that's --

10  well, that is what it is.

11          The notice is largely written in legalese and not

12  likely to clearly inform or motivate ZAI claims.  So, that's

13  the legalese issue.  Now, it is true that there are some legal

14  terms that occur here, and obviously in the filed notice there

15  are more.  They are standard legal terms that all of these

16  notices contain.  In fact, very importantly, Your Honor, the

17  notice that has gone out already, this is the PD notice that

18  went out earlier that excluded ZAI, this is the original

19  property damage notice for the bar date, and I believe the time

20  this was issued this no longer, in terms of its content, was

21  even objected to anymore.  The format that we've used here for

22  Zonolite is pretty much exactly the same as the format that we

23  used previously for the notice that Your Honor approved for the

24  prior bar date.  And the language in describing the product

25  that they now say is harmless -- says is harmless, it is

1  identical to the language that was used in talking about what

2  -- Grace vermiculite products back in the old notice.  The

3  notice that went out for the bar date on traditional PD also

4  included other kinds of claims involving vermiculite that were

5  not ZAI.  For example, masonry fill and the like. So, here we

6  have other vermiculite products, some of which may contain

7  naturally occurring asbestos used in construction.  This is the

8  totality.  What you see here is the totality of the description

9  that was used in that Court approved notice that went out

10  without objection.  And they're now taking the position that

11  somehow, gee, this says it's harmless, or it's too laden with

12  legalese.  It's exactly the same approach as approved by the

13  Court without their objection previously.

14          So -- and they say, well, it doesn't clearly inform

15  or motivate ZAI claimants.  That, too, is not an issue of fact.

16  That presents an issue of law, which is whether it's the

17  purpose of a notice to motivate anybody.  Third Circuit law,

18  Penn Central case, Penn Central, indeed, is the case that's

19  cited all over the country, says that the purpose of filing a

20  notice is not to motivate anybody to do anything.  It's to

21  provide them notice, that is that they are informed that

22  something is to take place, i.e., a hearing.  And the language

23  out of Penn Central is totally clear.  The purpose of a notice

24  requirement is to advise individuals who will be affected by

25  the outcome of any proceeding of the impending hearing,

1  italics, so that they can take steps to safeguard their

2  interests.  The notice requirement is not necessarily intended

3  to advise them of the nature of those interests.  So, you're

4  not required, indeed, you're not supposed to be motivating

5  people or telling them the basis of their claims.  In fact, the

6  notice, under Supreme Court law, in the words of the Supreme

7  Court, must be scrupulously neutral, because it's a Court-

8  ordered notice, and therefore has to be completely neutral.

9  So, the idea of motivation is not an issue for expert

10 testimony.  It is irrelevant as a matter of law.

11         And in talking about the reach of the Kinsella

12 program, that is not a statement about motivation.  That's not

13 a statement about efficacy.  That's a statement about who

14 reads.  The whole issue of how impactful of a notice is is not

15 an issue that's appropriate under the due process requirements.

16 You get the information out there in a clear fashion to an

17 audience.  They are then on notice.  It is not the job of a

18 notice to motivate anything, to say -- motivate that they'll

19 file a claim as opposed to not file a claim.  So, that is a

20 mistake as a matter of law.

21         The notice fails even to allude to the fact that an

22 estimation process is intended by the debtors to precede the

23 determination of objections filed to any proof of claim.  And

24 the ZAI claimants' recoveries will be limited by the outcome of

25 the estimation.  That says that, well, you have to have a

1  notice that describes the legal proceedings that will then be

2  entailed after the claim is filed or not filed.  That, again,

3  is defective.  That's a contention that is defective as a

4  matter of law.  That is not the purpose of the notice.  The

5  purpose of the notice is to say you have to file a claim,

6  there's going to be a hearing, if you don't file the claim

7  you're not going to have a claim.  That's it pure and simple.

8  The question of what's going to happen afer the notice goes out

9  and the bar date occurs is a matter for legal proceedings.

10 It's not contemplated by the notice.  It doesn't have to be

11 contemplated by the notice.  And, in fact, once again the

12 traditional PD notice that was approved by this Court without

13 objection for the bar date doesn't have anything to do with

14 estimations, or, you know, what might happen in the future, or

15 any of the rest of that.  That is not the purpose of the

16 notice.

17        So, we now have come to the end of all of the

18 different things that have been said.  It is to educate the

19 unwary, and unknowing, and to motivate the holders.  That is

20 all defective as a matter of law.  We don't need evidence on it

21 because it's not even relevant.  The only question is what the

22 Third Circuit has said -- are you giving notice of the hearing

23 so that they can take steps to safeguard their interests?

24 You're not necessarily intended to advise them of the nature of

25 those interests.

1          What I would add here, Your Honor, is that this

2  particular notice actually is broader than the notice that we

3  had for traditional PD.  Literally the whole page is

4  specifically devoted to ZAI and nothing else.  You therefore

5  have the opportunities for photographs.  You have descriptions

6  of what the appearance is like.  And not only do you have the

7  statement that it may contain naturally occurring asbestos, but

8  you actually do have an explanation of what some of the claims

9  are.  Zonolite Attic Insulation claims could include, among

10 others, the cost of removal, the diminution of property value

11 or economic loss, or other property related claims caused by

12 Zonolite Attic Insulation manufactured by Grace.  So, this is a

13 notice that actually goes way beyond the notice that was

14 provided even with respect to PD in this case that they never

15 objected to when it was approved by the Court.

16          The last thing I'll say, Your Honor, is that this

17 case not only involves this notice, and in this kind of detail,

18 but the very fact of there being a proof of claim form that it

19 calls out for detail to be provided tells these folks that

20 here's how you can get involved in understanding what your

21 claim is about.  That is, if you take the claim form, because

22 of the detail that it has, it asks for documentation, whether

23 it's been removed, etcetera, etcetera.  If you take that claim

24 form together with this notice, it says here's what's going to

25 happen is you've got to -- you've got to be on notice or you're

1    going to lose your claim.  It says here's the material that may

2    be harmful.  It says, here are the kind of claims that you may

3    have, and that invites the claimant to get involved in the

4    process of looking into it by here's a claim form that you had

5    to fill out.  So, this is -- this is much more robust,

6    actually, than the PD notice that somehow escaped the

7    challenges that Mr. Baena is now mounting.

8          The last thing I'll say is that the ZAI claimants,

9    Mr. Scott sitting here, filed their own brief.  Their own brief

10   never said we're relying upon the property damage committee to

11   set out our objections to the content of the notice or the

12   notice publication program.  They never filed a single piece of

13   paper that said that.  They never filed anything that suggested

14   to the Court that somehow they had any kind of problem with

15   this.  Indeed -- in fact, Your Honor, because they don't.

16   Their position is that they believe that a class proof of claim

17   will be more effective than a bar date.  We believe that that's

18   the wrong measure.  Efficacy is not a measure -- it's not a

19   question of getting people to come forward.  This is due

20   process notice.  But that's the essence of their position.

21   They didn't take a position on the content of the notice or

22   publication because that wasn't their gig.  They weren't going

23   down that road.  So, when they stand up here today and want to

24   talk about this thing all over again, where was their

25   objection?  Where was it?

1          THE COURT:  Mr. Baena?

2                      (Pause)

3          THE COURT:  Mr. Baena, that tray pulls out, if that

4    helps you at all.

5          MR. BAENA:  I've got a lot of stuff on it, Judge.

6          THE COURT:  Oh, does it?

7          MR. BAENA:  But I'll use it.  Thank you, Judge.

8    Thank you, Your Honor.  May it If it please the Court, Scott

9    Baena on behalf of the property damage committee.  Am I using

10   this mike correctly now, Judge?

11         THE COURT:  That's fine.

12         MR. BAENA:  Judge, I'd like to start by reminding the

13   Court that we actually are here on a bar date motion that asks

14   the Court to do several things.  First and foremost, it asks

15   the Court to establish a bar date.  and then, if the Court does

16   that, it asks that the Court approve form.  Mr. Bernick's

17   presentation assume that we already have a bar date.  And while

18   I hear the Court is inclined towards the establishment of the

19   bar date, the devil is in the detail, and the detail in this

20   instance is, well, what are we creating a bar date for?  And I

21   alluded earlier to the fact that about ten days ago the debtor

22   amended its bar date program.  And we think that's significant

23   for at least two reasons.  First, something did happen in the

24   last six years to amend the program that Mr. Bernick said we

25   should have been complaining about all along, even when this

1 part of the case was on ice.

2        But more importantly, the amendment made very

3 substantive changes to the bar date program, and especially in

4 respect of what they're seeking a bar date in respect of.

5 Indeed, what they intend now by this new and improved bar date

6 program exceeds, we think, all conceivably permissible bounds

7 of bar dates, and notices, and forms of notice.

8        And frankly, what they are trying to achieve by their

9 bar date program actually makes the point that we've been

10 making all along, which is that a bar date that we're

11 accustomed to in the practice of bankruptcy, in the context of

12 Zonolite really doesn't do the job.

13        Now, more specifically, if I can direct the Court's

14 attention to the revised, the new and improved notice regarding

15 amended ZAI bar date exhibits which was filed on May 23rd, and

16 it has all the same bar date notices in it except they've

17 changed them in some very material respects.  And they've made

18 the changes in all of them, so I can show you illustratively

19 from one of them what they did.  And here's the mischief right

20 there, Judge.  They're seeking, by this bar date program --

21        MR. BERNICK:  It's impossible to read it.  Can he

22 blow it up a little bit?

23        MR. BAENA:  I don't know how to do that.

24              (Pause)

25        MR. BAENA:  They are seeking, by this program, to

1  bar, forever, as they say in each of these notices, any future

2  Zonolite Attic Insulation claim that somebody doesn't come

3  forward and file a proof of claim for.  We, of course, know you

4  can't do that.  That violates everything we know about notice

5  and bar dates.  It violated 1141.  It exceeds the permissible

6  bounds of this Court's jurisdiction.  It certainly is

7  inconsistent with _Frenville_.  So, we start right away with an

8  infirm bar date program.  It cannot be approved.

9          And we think that they understood that.  Of course

10  they understood that.  And the reason that they went that way

11  is the same reason that the Court was ruminating at the last

12  hearing about 524(g).  The same reason why they're trying to

13  posture Mr. Westbrook and Mr. Scott as some sort of ombudsman

14  counsel to Zonolite claimants, because they understand that

15  just knowing today's claims is but part of the Zonolite story.

16  We need to know all the claims.  And Zonolite claims really

17  find an analog in personal injury claims to the extent that as

18  long as somebody who is exposed to their product is walking

19  around, they carry the propensity for getting sick.  And that's

20  why we have future claims, and why we have future claims

21  representatives.  And it's no different with respect to this

22  product.  So long as a house stands that has Zonolite in it,

23  there is the prospect of damage.  And if we don't identify the

24  extent of that damage, we may not be able to overcome issues

25  including the fundamental confirmation issue of feasibility.

1 We need to size those claims.  And that's been the challenge

2 from the beginning.  And our position has been the same

3 throughout.

4         And let me pause for a second and let me just assure

5 the Court --

6         THE COURT:  But -- but, excuse me -- but -- I'm sorry

7 for interrupting, but that just led me down a path that maybe I

8 hadn't gone down before.  That's always the case with respect

9 to class action litigation.  I mean, you have a class set up.

10 People file claims.  And if you miss that date and you're

11 within the class, assuming you haven't opted out, and you're

12 within the class, that's sort of the end of the matter.  Once

13 the class terminates, if you haven't filed your claim and the

14 class distribution is made, you're done.  So, what's any

15 different here?

16         MR. BAENA:  This isn't a class claim that we're

17 talking about.  We're talking -- Judge --

18         THE COURT:  But what would the difference be under

19 524?  I mean, these are no --

20         MR. BAENA:  Oh.  524, it's pretty simple.  524 tells

21 you that there is -- you don't bar, you channel --

22         THE COURT:  Right.  Okay.

23         MR. BAENA:  -- those claims.  And you have somebody

24 there objecting to that objection -- to that injunction.  You

25 have a legal rep representing those interests.  You have -- you

1 are being asked to require people who, A, probably don't know

2 that they have Zonolite in their home to file a proof of claim

3 in respect of a claim that has not even arisen.  How is that

4 possible?  It's --

5           THE COURT:  But the claim has arisen because the

6 substance is in place in a home.

7           MR. BAENA:  Excuse me, Judge.  <u>Frenville</u> tells us  --

8           THE COURT:  Somebody may not know about it --

9           MR. BAENA:  <u>Frenville</u> tells us that that claim does

10 not accrue unless state law says it accrued.

11          THE COURT:  Well, <u>Frenville</u> also has a footnote that

12 says that it may not apply in mass tort situations.

13          MR. BAENA:  And nobody has, in the many years since

14 <u>Frenville</u> was issued by the Third Circuit, filled in the blank

15 in that regard.

16          THE COURT:  Well, someone has, but someone hasn't

17 found out yet whether it's going to be upheld on appeal.  But

18 --

19          MR. BAENA:  Okay.

20          THE COURT:  Okay.

21          MR. BAENA:  But we have not provided that in this

22 case, Judge.  <u>Frenville</u> says you look to state law for when a

23 cause of action accrues.  As we well know in many, many, many

24 jurisdictions, indeed, the majority of them, it doesn't accrue

25 until there's contamination.

1          THE COURT:  Okay.

2          MR. BAENA:  So, in those jurisdictions there's no

3 claim.  And what we're saying is, irrelevant, you need to come

4 forward.  And what you're really saying is we want to know how

5 many homes have this in it.  That's what you're really saying.

6 Even though earlier you said let's not go that way, that's

7 exactly what this is attempting to do, in recognition of the

8 fact that we really do have to size the Zonolite claims and the

9 process begins with the universe of homes that have Zonolite in

10 it.  And that's what they're trying to get to by this new

11 inclusion, which is impermissible.  And that's why we've said

12 all along, yes, we think you need to estimate, but we don't

13 think a bar date advances the process because you can't get to

14 those future claims.  What you really need to start with as a

15 data point is how many homes?  How many homes?  And it's been

16 told to this Court in many different ways, on many different

17 occasions, in many different contexts.  That analysis can be

18 done without a bar date.  And so, we start with the

19 proposition, Judge, this is dead on arrival.

20          Just because need that information doesn't mean that

21 we can disregard Frenville, that we can disregard 1141, and we

22 can disregard about 200 years of jurisprudence and say, okay,

23 now we're going to require people who don't know they have the

24 product to also tell us about the claim they don't know about

25 having because it hasn't yet arisen.  We cannot do that.  So,

1  we start with the preliminary view that the program is not

2  legally viable.

3          The second issue --

4          THE COURT:  Well, as to those folks, then it would

5  seem that the solution would be to appoint a future claims rep,

6  and that takes care of that, because those folks can't possibly

7  file a proof of claim if they don't know that they either have

8  the product or don't have a claim that has arisen.

9          MR. BAENA:  Judge, how we address that omission is

10  not before the Court today.

11         THE COURT:  But it is, because it's a notice issue,

12  and I can't -- there is no way to give notice to people who

13  will never know that they have a proof of claim no matter what

14  kind of notice you give them.

15         MR. BAENA:  I agree with that.

16         THE COURT:  You and I could have a conversion, Mr.

17  Baena, and I could say to you, you know, today is the day

18  you've got to file a proof of claim for ZAI, and you could say,

19  yes, you know, I was really aware of that, but not know that

20  you have a claim and not file.  Well, no matter what kind of

21  actual notice you have, if you don't know you have a claim, you

22  can't file a claim.

23         MR. BAENA:  That's correct.

24         THE COURT:  Okay, so --

25         MR. BAENA:  We're in agreement.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- no notice program.

2          MR. BAENA:  So this is dead.

3          THE COURT:  No.  No.  It's not dead, because there

4   will be people who will know that they have claims and know

5   that they have ZAI, and, as to them, a notice program will

6   solve that problem and set a bar date.

7          MR. BAENA:  Okay, but it's dead as to the futures.

8          THE COURT:  Okay, but there's no way to solve that

9   problem.

10          MR. BAENA:  But then it makes no point.  That's my

11  point.  You see, if we're just trying to capture the present

12  claims, it doesn't facilitate the real analysis, which is

13  what's the total value of the liabilities.  That's my only

14  point, Judge.  And we're about to spend $4 million on a program

15  to find out just a little piece of the equation.  That's why

16  we've been saying let's design the estimation model before we

17  design the notice model, because we should understand what we

18  need to estimate, where we could get that information from, and

19  what we could as a matter of due process, bankruptcy law, and

20  otherwise, reasonably expect to accomplish through a notice

21  program.

22          So if you go forward with this program, we will talk

23  about the other idiosyncracies of it and the problems we find

24  with it, but it's a lot of money to come up with nothing.  In

25  our humble opinion, it's the tip of the iceberg, and so in 140

1  days, 160 days, whenever this is over, and Mr. Bernick is

2  licking his chops and telling you we're ready to go, and I

3  stand up and say but we don't have all the data, I'm sure he's

4  going to get up and say here we go.  He's trying to delay us

5  again.

6        But the fact is we will not have the data, and that

7  is a systemic problem with this whole program.  And instead of

8  ready, fire, aim, we were saying maybe we ought to design the

9  program now.  The -- particularly when the expense of this

10 program is so high and the duration is so long.

11       THE COURT:  All right, so what is it specifically,

12 without the globals -- but specifically, what is it that the

13 committee thinks ought to be done?

14       MR. BAENA:  Well, in terms of the estimation program?

15       THE COURT:  Yes, how is it that you envision this

16 case getting from here to the end?

17       MR. BAENA:  Well, we've said that before.  It's in

18 our papers again.  What we've said, Judge, is we believe that

19 you can estimate the number of homes that have Zonolite in it

20 to this day through expert testimony.  We believe you can do

21 that.

22       There is a way to model this, and, you know, the

23 Zonolite claimants I believe even said let it be your expert

24 not their expert that does this modeling.  But there is a way

25 to model it, and we think that's a better way to get that data

1  point.

2           The next issue is the multiplier.  You know, what is

3  the cost of the damages?  And that's something else we can

4  argue about and try to ascertain in between.  But I think, you

5  know, the range of differences of opinion on a -- how much

6  would it be if, you know, sort of analysis, I don't think

7  there's a wide difference of opinion amongst the parties.  The

8  wide difference of opinion is how pervasive is the problem.

9  That's where the -- and we've heard Mr. Bernick talk to that

10  point.  That's the point that has created the impasse.  When he

11  talks about -- we don't know how big this problem is.  That's

12  the point.

13           So, you know -- and so where we are.  This program

14  has to be vetted of future claim references.  You can't bar

15  those forever this way or any way, and once we vet these

16  notices of that, we question whether there's any real value to

17  spending $4 million on this program wasting another 100 and

18  some odd days to publish and circulate and air on T.V. all

19  these notices and then just begin at that point in time to

20  architect what we're going to do with it.

21           Indeed, as I just tried to imagine, what it was the

22  debtor would have you do when somebody said I do believe I'm

23  going to have a claim in the future.  Imagine if that happened.

24  What would you do with that?  I going to have a claim in the

25  future.  But you don't have a claim?  No, I don't, but I'm

1  going to get one.  I mean what would we do?

2          And I think the devil again in this is in the detail.

3  Remember the deal that debtor reached with the ACC.  That deal

4  specifically says that there will be an estimation of the ZAI

5  claims, and that will be a cap on what everybody's entitled to

6  even if the individual allowances of ZAI claims results in a

7  higher number.  So ain't it beautiful?  We'll just herd these

8  guys into the same car, value them at zero, create this

9  artificially low ceiling.  Who cares what their actual damages

10 is at the end of the day?  And that, of course, is likewise

11 unacceptable.

12          So that's our vision, Judge.  It's elegantly simple.

13 It's been consistent for six years.

14          THE COURT:  Okay.  What happens in the committee's

15 view once you have the two data points, the number of claims,

16 and the multiplier?  Then what?  I mean let's assume that you

17 know those numbers, and that for some reason miracles do

18 occasionally happen, and everybody even agrees as to what they

19 are.

20          MR. BAENA:  From our perspective, it's always been an

21 issue of feasibility.  It's never been an issue about

22 allowance.  The debtor has turned this really on its head and

23 said the estimation that they're going to do is for allowance

24 purposes.  Allowance purposes.  An aggregate allowance -- an

25 aggregate estimation for allowance purposes.  From our

1    standpoint, the whole issue is okay they've got to deal now

2    with equity -- with the ACC and, therefore, equity.  Let's see

3    what equity is really entitled to, because that's what we're

4    talking about.  How big are these claims?  And that's just a

5    feasibility issue.  It's -- and once we determine the amount

6    and whether they're capable of responding if and when those

7    claims are allowed, we're gone.

8            THE COURT:  Now, how are the claims going to be paid?

9    I mean the issues in terms of knowing what the answers to the

10   questions you posed are done, but what's the end result of

11   confirmation?

12           MR. BAENA:  Well, Judge, there are other options on

13   the table.  Now, the Zonolite claimants would want to talk to

14   you about class certification and the processes that would be

15   applicable in a class resolution of claims including proofs of

16   claims or notices in respect of proofs of claims, proofs of

17   claims, some allowance process, and I'm sure that Mr. Scott

18   will talk to you how that all works.  I mean that is one model.

19           Another model you've addressed is 524(g), and another

20   model is a _Manville_ result, which is a non-524(g) kind of trust

21   in respect of Zonolite.  But they're -- getting the money out

22   isn't going to be the problem.  The problem is going to be

23   identifying how much money needs to be available, and that's

24   the process we think that the Court would be better advised to

25   focus on.

1          THE COURT:  Well, I think getting the money out may

2   be a problem if you've got a significant issue as you're

3   positing between presents and futures.

4          MR. BAENA:  You have that same problem in the

5   personal injury side, Judge.

6          THE COURT:  Well, did.

7          MR. BAENA:  You did.  Yes, you did, but once the

8   amount was resolved, you didn't.  If you had decided the

9   estimation hearing, the same result.  The same result.  So, you

10  know, I don't see that part as nearly as arduous in terms of

11  the -- you know, the intellectual capital you have to throw at

12  it as designing an estimation model.  And a notice program, if

13  one is necessary, that facilitates that estimation model,

14  again, we don't think so.

15         And in terms of the notice itself, you know, it was

16  almost out of slapstick when Mr. Bernick was saying I don't

17  know what they're talking about.  You know, we've carried this

18  science opinion too far.  This is a neutral notice.  Judge,

19  this picture that I have up here now is the picture of somebody

20  holding Zonolite.  That's what it is, holding -- I don't think

21  it's Mr. Bernick's hands either.  Somebody is holding Zonolite.

22         I can't conceive of a bigger testimonial from this

23  court about the harmlessness of this product than suggesting

24  through advertising that somebody can pick it up and hold it.

25  And we think that this is a very big deal, because as we've

1 said in our papers and before the Court before, as the -- the

2 Court is not in shock that some might not agree with the

3 Court's science opinion.  I know you're not in shock.  I heard

4 you chastize somebody about the Montana decision and how

5 reasonable people may disagree.  That's why we have appellate

6 courts.

7         The problem we have with the science opinion is it's

8 an interlocutory order, and this where --

9         MR. BERNICK:  Your Honor, these are matters that

10 aren't even up for today, and if we can have an estimate from

11 counsel -- I think I went all of about 12 minutes, and Mr.

12 Baena, you know, he's very articulate, and he gets very

13 involved.  He's gone through about every single issue that had

14 been raised on all the different motions.  Mr. Scott hasn't

15 spoken, and I want to make sure that I have the time to address

16 these, so that we perhaps can get a decision today.  So if we

17 can gt an estimate from Mr. Baena about how much longer he's

18 going to go?

19         THE COURT:  Mr. Baena.

20         MR. BAENA:  Thirty minutes.

21         THE COURT:  Thirty more minutes?

22         MR. BAENA:  Well, you want me to go through the form

23 line by line, Judge, or not?  It's up to you.

24         THE COURT:  I guess if you have objections line by

25 line.

1          MR. BAENA:  If this is dead, I don't need to do it,

2   you know, but he raised the science issue.  Am I limited to the

3   time he raised it incorrectly in my response?  I'm telling you

4   that's where it's implicated.  And I'm telling you as well that

5   that is an overhang on this whole process as well, because as

6   long as your order is interlocutory, we haven't really resolved

7   the threshold issue that you wanted to resolve before we

8   started a notice program at all.  And that is the harmfulness

9   of the product.

10          And I do believe that pleadings filed in the context

11  of this motion have made the issue even one that demands

12  further consideration by the Court, despite the fact of the

13  Canadian settlement.  I mean our friends from Canada tell us

14  there's a study in Canada that's under way to -- they indicated

15  would soon become available --

16          MR. BERNICK:  But I would --

17          MR. BAENA:  -- about the harmfulness of this product.

18          MR. BERNICK:  I would object.  This is not before the

19  Court in connection with any of these matters.  Mr. Baena says

20  he's got 30 minutes.  I don't know what the Court's time is

21  like.  We'd like to know how much Mr. Scott has.  This again is

22  the most amazing performance coming from the Property Damage

23  Committee, which is comprised of people who want to get this

24  case done, and Mr. Baena is now making out the proposition that

25  all of the settlements that his client -- that his constituency

1  has now entered into are idleness, because he's here to foster

2  the idea that ZAI is going to swallow the world.  That is what

3  Mr. Baena is doing right now, and it's been swallowed short

4  term, because nobody else can talk here today, and, number two,

5  because this whole ZAI matter is going to take the rest of

6  time, and we'll never get to confirmation.

7          Whose interest does Mr. Baena actually represent

8  here, and how much time is Mr. Scott going to spend covering

9  this or other matters today, so that we can get to the point of

10 having a decision by the Court instead of hearing about Mr.

11 Baena's musings in matters that are not even set forth in the

12 objections that he made?  Remember, his objection was ten lines

13 of space in a footnote.

14         THE COURT:  All right.  With respect to the issue of

15 the interlocutory aspect of the science trial, I don't think I

16 was trying to get to the harmfulness of the product.  I've

17 determined that issue to my own satisfaction.  What I thought

18 that the issue left was whether or not there were claims that

19 could still be left against this estate not based on the issues

20 that I had addressed in the case.  There were issues that were

21 not tried.  That was the problem.  They were not based on the

22 harmfulness of the product.

23         The harmfulness of the product, as far as I'm

24 concerned, left in place, which is essentially what was

25 adjudicated and/or by virtue of the sonication process, that I

1 did not find to be credible for the reasons articulated in that

2 case, showed, for example, that you had as little risk of dying

3 from that type of asbestos exposure as you did -- and I've

4 forgotten the specifics, but, for example, by being hit by a

5 car or crossing the street.  So there was not in that issue

6 -- in that instance, in my view, anything left with respect to

7 the harmfulness of the product.  That's not what was left, but

8 there were other types of claims that were not addressed in

9 that opinion.  That's where I thought we needed to go.

10         With respect to taking a look at whether or not there

11 ought to be an appeal on an interlocutory basis, that issue has

12 already been addressed by a District Court.  I don't set aside

13 the District Court findings.

14         With respect to the parties' request that I pick a

15 representative claim to somehow dismiss for the purpose of

16 artificially creating an appeal, that's not the business of

17 this Court, and if somebody wants to voluntarily dismiss a

18 claim, that's up to those folks.  That's not going to create an

19 appeal.  That will be a voluntary dismissal.  So, folks, I'm

20 sorry, but you're stuck with what you've got.

21         MR. BAENA:  Okay.

22         THE COURT:  So --

23         MR. BAENA:  But, Judge, does that mean you're okay

24 with people holding this product in their hands in this notice?

25         THE COURT:  I'm not okay with people holding the

1  product in their hands in this notice, because I don't think

2  it's necessary in this type of a notice to have to go to that

3  level.  To the extent that the purpose is to articulate the

4  scope or the size or the type of product, you can do it without

5  that particular type of notice.  And to the extent that that

6  may for some reason cause somebody to think it's a good idea to

7  play with this type of product, I don't think it's a good idea

8  to play with this type of product.  So those types of notices

9  or pictures I think can be addressed, Mr. Baena, and you're

10  quite right, we should address those types of issues.

11         MR. BERNICK:  If you want to move it -- could you

12  move it to the other one?  Because we're happy, Your Honor, to

13  go with fewer photos.  We did that by way of helping people.

14  This is now a photo of one granule next to a paper clip.

15         THE COURT:  Well, you can put a photograph in of a

16  pile of it in place somewhere if you want, but it doesn't have

17  to be being held in somebody's hands, if that's the case.

18         MR. BERNICK:  In fact, this one was already

19  published.  So we thought we were being helpful?  Well, fine,

20  we'll take the other photo out.

21         MR. BAENA:  So they have a picture of a bag?

22         MR. BERNICK:  Well, so you a bag -- a bag is not --

23         MR. BAENA:  I'm asking.

24         MR. BERNICK:  A bag is now different, because --

25         MR. BAENA:  No.

1          MR. BERNICK:  -- it's not being held -- like you

2  don't open the bag, and once you open the bag, you don't take

3  what's in it out of it.

4          THE COURT:  No, the issue with the bag may be that if

5  somebody's seen the bag but not the product inside, they may

6  recognize what the bag looked like.  You know, they may

7  remember it 30 years ago or whatever --

8          MR. BAENA:  Thank you,  Judge.

9          THE COURT:  -- from having picked it up in a store.

10         MR. BERNICK:  Yeah, the bag changed many, many

11 different times.

12         THE COURT:  If there were picture or, you know, logos

13 or something, people do have recollections of that kind of

14 thing, for product identification it may be helpful.

15         MR. BAENA:  Your Honor, do we have a determination

16 about including future claims in the bar date?

17         MR. BERNICK:  Your Honor, that's interesting Mr.

18 Baena asks, because he has had the argument on that.  I waited

19 to see what his argument was.  I've not been heard, and now Mr.

20 Baena wants you to rule on the basis of his argument.

21         MR. BAENA:  I'm prepared to sit down to let you

22 respond to that argument if you'd like.

23         MR. BERNICK:  I have to do that, but I'm wondering

24 about Mr. Scott, and whether Mr. Scott needs to be heard.

25         MR. BAENA:  Judge, we ought to add an estimate for

1  his time and interrupting everybody, too.

2           MR. BERNICK:  I would suggest that Mr. Baena finish

3  any arguments that he has on all aspects of this.  That Mr. --

4           THE COURT:  Would --

5           MR. BAENA:  I would suggest --

6           THE COURT:  If we don't mind, I believe I'm sitting

7  at the bench.

8           MR. BERNICK:  Yes, I know that, Your Honor.

9           THE COURT:   Could we just let me control the process

10  and stop --

11           MR. BERNICK:  I'm sorry, Your Honor.

12           THE COURT:  -- everybody else from doing it, and we

13  might get through this in probably 15 or 20 minutes quicker

14  than normal?

15           MR. BERNICK:  Great.

16           THE COURT:  Mr. Baena, if you don't mind, would you

17  just finish whatever argument you have to make, please?  I

18  don't think it's necessary, however, to go into the arguments

19  with respect to the harmfulness of the product or the

20  interlocutory nature of the ZAI science trial opinion.  I don't

21  really consider that before me today for the reasons that I've

22  already -- in this motion for the reasons I've articulated.

23           MR. BAENA:  Okay.  If I may turn then to comments

24  about the forms of notice?

25           THE COURT:  All right.


                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. BAENA:  Judge, we actually did take discovery

2   back in 2002 on the Zonolite notices.  I deposed Ms. Kinsella.

3   They deposed Mr. Hillsey.  And the process was back then

4   informed somewhat by all that.

5        One of the issues that we've constantly raised,

6   particularly amongst the experts, is how do you get peoples'

7   attention.  You know, Mr. Bernick alluded to the notion of

8   reach.  You understand reach is just how many opportunities

9   people get to see the ads.  It doesn't mean who read it.  It

10  doesn't mean whether they got it, if you know what I mean.

11       And the first thing that we've heard all these

12  experts talk about in the their depositions, which are part of

13  the record, is the headline of the ad, and the dichotomy

14  amongst the experts is having a headline that assumes too much

15  knowledge on the part of the people seeing it.  And if you look

16  at the headlines that are used in these ads, it assumes too

17  much.  It assumes that these people know that they had

18  Zonolite, and as you have heard over and over and over again,

19  these people don't know anything.  They are unknowing.  This

20  isn't trying to get notice to some bank that you better file a

21  proof of claim to that note we signed.  They know they have the

22  note.  This is going to people who don't know they have

23  Zonolite, don't know the implications of having Zonolite, and

24  they start off by addressing this to those people as though

25  they know.

1          And so our first and a central objection we have is

2     the headlines assume too much.  By way of contrast, if they

3     talked -- if you have a home with loose fill attic insulation,

4     your rights may be affected.  You know, it's, as Ms. Kinsella

5     wrote in one of her articles, you start from the broad, and you

6     work your way down.  You funnel that information.  And so

7     through the context of the notice itself, it becomes apparent

8     that it's a Grace product that we're talking about.  That that

9     product is Zonolite as opposed to starting the conversation, if

10    you will, with the reader, by assuming they know that they have

11    the product, and that's a systemic problem.  As I said, it's in

12    their notices, and that needs to be changed.

13         You'll notice as well in the -- it's the same one.

14    If you have a home with Zonolite, you'll notice that there's a

15    section entitled Zonolite Loose Fill Attic Insulation Claims.

16    There I just merely point out that the content is not

17    consistent with the Court's order on the Zonolite case where it

18    says that it may contain naturally occurring asbestos.  Your

19    Honor found that it does.

20         Now, you'll notice that what these people are

21    supposed to do, according to this notice, is file a proof of

22    claim, and in order to do that they're instructed to contact

23    the claims agent -- I think that's Rust Consulting -- for

24    instructions.  The instructions are another set of papers that

25    are prepared, and the problem with these instructions are, we

1 maintain, that they violate virtually every rule of good

2 notice.  They violate every rule that Catherine Kinsella wrote

3 about in one of her treatises, because it is turgid.  It is

4 dense.  It's internally inconsistent.  It's virtually

5 impossible to understand, and it needs to be fixed.  I'm not

6 prepared to sit here and fix it.  This is what notice experts

7 do.  That's why I wanted the notice experts before Your Honor.

8 That's why we've suggested that the notice experts meet and

9 talk about these things, all of which was rejected.

10        But these clearly are in violation of their own

11 notice expert's view of what these notices ought to have.  In

12 October 25th, 2002 Ms. Kinsella wrote the Plain Language Tool

13 Kit For Class Action Notice, and that was published in the

14 class action litigation report, and she explained in her

15 deposition in 2002 that the construct of these notices aren't

16 terribly different than the construct of class action notices.

17 These principles pertain.  And when you go through it, the very

18 first thing she says --

19        MR. BERNICK:  Now we have a citation to Ms.

20 Kinsella's article in this -- this doesn't follow the same

21 hearsay objection?

22        MR. BAENA:  It's a secondary authority.  It's a

23 published authority.

24        MR. BERNICK:  Well, so now we're going to establish

25 that now it has to be an authoritative publication?

1          MR. BAENA:  She is not commenting on this case.

2          THE COURT:  I overruled the objection with respect

3     to --

4          MR. BERNICK:  I understand that.  I haven't said

5     anything in the effort to get all of the things that are out

6     there, although we're now eating up the half hour that was

7     predicted.  But every single one of the points that have been

8     made so far are not in the objection that was filed, even --

9          THE COURT:  They're not.

10         MR. BERNICK:  -- even belatedly --

11         MR. BAENA:  Oh, they are, Judge.

12         MR. BERNICK:  -- and -- and they cite record that was

13    not put before the Court in connection with any of these

14    motions.  We're now going back to 2002.  I'll be happy to take

15    it up, but this is now -- this is now a massive effort and Mr.

16    Baena shoveling a record with respect to the pending motion

17    that he never did.

18         THE COURT:  Mr. Bernick, I live here.  We're going to

19    be here all night if it takes that long to get through.

20         MR. BERNICK:  Okay.

21         THE COURT:  Go ahead, Mr. Baena.

22         MR. BAENA:  The instructions -- and we do complain

23    even in our footnote that the instructions are dense.  They're

24    turgid.  They're impossible to understand.  I must tell you,

25    Judge, that it will be a challenge for the Court to get through

1  these instructions.  And, of course, Judge, even by these

2  objections from counsel, what -- you know, what's clear here is

3  I'm focused on a bankruptcy process.  I'm not so sure everybody

4  else is.  It sounds more like a litigation process, and this

5  isn't a litigation process.  This is the most basic principle

6  of bankruptcy law.  The way we get the people, you know,

7  enfranchised in the bankruptcy process, and now we have special

8  challenges.

9          When I deposed Ms. Kinsella -- and that is part of

10  the record -- she agreed that there was a challenge here,

11  because these people are unknowing.  And so the principle of

12  plain language is certainly entirely applicable, and we would

13  submit that that principle has been wholly disregarded.  And

14  while they say Ms. Kinsella didn't draft anything, I would

15  challenge that.  On cross examination I would challenge that,

16  and I suspect I would prove that she did.  She prepared the

17  publication notices, and they prepared the information notices,

18  but they're hand in glove.  And the information notices are

19  just impossible for somebody to follow, and they need to be

20  fixed.

21                        (Pause)

22          MR. BAENA:  One of the great omissions I think from

23  the notice is how far down in the notice it is before you even

24  get to a bar date.  Your Honor, I was looking at notices that

25  are used in other cases, and that's usually in the headline, so

1  people have it.  This one, it gets buried at the bottom of the

2  text.  The text gets complicated, and we think that that could

3  be problematic.

4        THE COURT:  Is that in the instruction?  That's -- or

5  is that in the notice itself?

6        MR. BAENA:  I have up here a notice.

7        THE COURT:  That's the notice.  Okay.

8        MR. BAENA:  The instruction --

9        MR. BERNICK:  The instruction was --

10       MR. BAENA:  -- has the bar date as a defined term not

11  in the heading but in one of the defined terms.  One -- the

12  first defined term admittedly.  But, you know, there's a

13  process that they're expecting people to perform.

14       THE COURT:  Yes, it should be early on.  That

15  shouldn't be a difficult change to make.

16       MR. BERNICK:  Well, actually, in the --

17       THE COURT:  It's up at the top.  It says, "You must

18  file your claim on or before blank."

19       MR. BERNICK:  Right, and then in the one pager it's

20  right below the photos in a larger type, bolder type.  It's

21  right here.  We can move it though.  It don't make any

22  difference.

23       THE COURT:  But can't it go in the heading?

24       MR. BERNICK:  We could put it in the heading.  We'll

25  follow the format here from the traditional property one.

1          THE COURT:  Yes, I think that would help.

2                      (Pause)

3          MR. BAENA:  You know, Judge, instead of going through

4    all the problems with the instructions, I would commend to the

5    Court that that whole thing needs to be redone.  It should be

6    done by the notice experts.  If we're going to use it, it

7    should be done by them, so that it is in understandable

8    language.  It could be reviewed by counsel to make sure it's

9    correct, but to sit here and start picking out sentences when

10   the whole thing is just this massive cluster of information in

11   legalese -- it's all legalese.

12         You know, Kinsella says don't use defined terms.  The

13   whole thing is defined terms.  She says don't use italics or

14   bold letters.  It's bold letters and italics.  It just -- one

15   rule after another seems to be transgressed by that -- by those

16   instructions, and they seem to be the heart of this whole

17   program.

18                      (Pause)

19         MR. BAENA:  On the television notice we would observe

20   that it's not all together clear, but it's not -- you know,

21   they show the date -- the bar date, then they show the product,

22   then they show the phone number, and the bar date is a -- is

23   mentioned again in a voice over I believe.  As opposed to

24   having that bar date on the screen, as we did like Kinsella

25   text, the bar date was on the screen, so that you were

1  constantly aware of the urgency and the deadline.

2            MR. BERNICK:  Well, wait a minute.  Wait a minute.

3  That -- if you want -- it's on the screen at the top.

4            MR. BAENA:  It's only on once.

5            MR. BERNICK:  It's on twice.  Take the last one.

6            MR. BAENA:  The last one, right.

7            MR. BERNICK:  Yes, so --

8            MR. BAENA:  The way they did it in the other one is

9  they --

10           MR. BERNICK:  Well, just --

11           MR. BAENA:  -- had the bar date on every one of them.

12           MR. BERNICK:  Could you just -- fine, we'll put the

13 bar date under every one of them.

14           MR. BAENA:  And, oh, I misspoke.  It's not in the

15 voice over.  It's not even alluded to in the voice --

16           MR. BERNICK:  We'll put it in the voice over.

17           MR. BAENA:  Okay.  One of the things that the reader

18 of this has no idea of is the point of filing this claim.  What

19 is the point of filing this claim?  It sounds pretty basic to

20 us, but do they know that they're going to be next implicated

21 in a process?  And, you know, in getting people to do things, I

22 think they wish to know what it is that's expected of them.

23 This tells just a piece of the story.

24           THE COURT:  What do you want it to say?

25           MR. BAENA:  Well, there should be a description of

1  what we're going to do.  I mean do you wish to tell them,

2  Judge, that you've already decided that if their claim is based

3  upon presence in their house, they don't have a claim?  Do you

4  want to tell them that their claim is subject to objection

5  and/or it's going to be subject of an estimation proceeding?

6  That they may have to hire counsel?  What are we telling these

7  people about how they participate in this process?

8        THE COURT:  Well, I guess we can give them the

9  information that's on the back of the 341 notice with respect

10  to the effect of filing a proof of claim.

11        MR. BERNICK:  I suppose -- I don't mean to be

12  sarcastic -- we could tell them that the debtor will seek to

13  disallow all their claims, because the Court already has ruled

14  that the product's not dangerous.  I mean it could go on

15  forever.

16        THE COURT:  But the Court said is that it doesn't

17  pose an unreasonable risk of harm.  I never said that the

18  product was not dangerous, as I recall.

19        MR. BERNICK:  I'm sorry, Your Honor.  Then we'll --

20  we will quote that.  I mean where does it end?

21        THE COURT:  Well, I don't know what the debtor

22  intends to do.  In terms of the effect of filing a proof of

23  claim, there are legal consequences.  The proof of claim in a

24  -- to the extent that there is standard language that the

25  administrative office let's you use them on the back of a proof

**J&J COURT TRANSCRIBERS, INC.**

1  of claim form, I suppose we can do that.  That's what this

2  would be.  It's a proof of claim form, and there will be legal

3  consequences.

4          MR. BAENA:  Now, Judge, one last point, and that is

5  -- you alluded to it already.  Your science opinion refers to

6  the fact that while product liability claims may be adversely

7  affected by your opinion -- it doesn't quite say that, but it

8  -- there are other claims that may not be, and you indicated we

9  have to get into that.

10         The proof of claim form -- and I think I'm grateful

11 for this -- does not require a claimant to identify the basis

12 of its claim, but it shouldn't be the case that by the debtor's

13 omission of that the claimant doesn't have the benefit of any

14 basis for raising it's claim.

15         THE COURT:  That's true.  That was the reason why two

16 years ago I wanted you folks to try to get together to

17 articulate what ought to happen next, so -- okay.

18         MR. BAENA:  I'll defer to Mr. Scott.

19         MR. BERNICK:  Can we now get at least an estimate

20 from Mr. Scott?

21         MR. SCOTT:  I always consider it a privilege to

22 address the Court at all, and so I ask the Court how much time

23 the Court would allow me.

24         THE COURT:  Mr. Scott, we are going to be here all

25 night, if necessary.

1          MR. SCOTT:  I'm hoping not anymore than a half hour.

2     I may be 15 minutes.  I'll be compact.

3          It occurred to me during this discussion -- and I'm

4     not going to repeat a number of arguments that were made --

5     that the -- it would aid the Court, which is my primary concern

6     -- it would aid the Court in understanding the process that

7     Zonolite counsel went through in trying to determine how to

8     manage Zonolite claims before they even arose in -- arrived in

9     bankruptcy, because the problems that are being presented by

10    this Court now are the exact problems that we had before there

11    was a bankruptcy.  And at the heart of it, that's the reason

12    why we think an important component of ultimate resolution is

13    class based.  I'm not arguing classes.  I'm trying to give the

14    Court a prospective that sheds light on what we view as serious

15    problems with this proof of claim process.

16         When Grace added to its latest proof of claim form

17    the addition if you believe you may some time in the future

18    have a claim, you have to file a proof of claim, that was

19    glorious.  It is the Achilles Heel of this proof of claim

20    process.  That is the problem that we have been citing from the

21    day this bankruptcy began, which they acknowledge at the

22    eleventh hour by adding that in.  And so that raises the

23    question how do you deal with people who cannot respond to the

24    proof of claim.

25         That's the same problem we had when we filed this as

1  a class action.  There were four distinguishing characteristics

2  of Zonolite claims that distinguish it outside bankruptcy,

3  distinguish it inside bankruptcy.  One was recency.  This was a

4  product which was not sold as containing asbestos, and it only

5  recently been discovered to contain asbestos.  That meant

6  you're dealing with a large community of people who are

7  oblivious to whether they have a claim or not.  That was a

8  problem before we arrived in bankruptcy.

9       The second was these were an unknowing community of

10  claimants.  That's a problem for class counsel.  How do you

11  give notice to people who are not only unknown but unknowing?

12  That was a problem.

13       The third problem was the size of the claims if they

14  were viewed as at law claims.  We're not very large, 5,000,

15  maybe 10,000, dollars as a damage claim.

16       And then the last problem was this.  It's manifested

17  in this Court as an accrual question.  All right.  Zonolite

18  contains asbestos.  It has the capacity to contaminate property

19  if it's disturbed.  And you can unknowingly expose yourself to

20  asbestos if you disturb it.  Most people probably have not

21  disturbed this material.  They may or may not have claims at

22  this moment in time.

23       What in the world can you do about it?  That created

24  the important distinction between an at law claim for damage

25  and a class remedy that was injunctive and that sought

1  prospectively to avoid claims from arising.  So the Barbanti

2  and the class filed in <u>MBL</u> importantly were not cases that

3  tried to aggregate individual claims and then pay damage

4  awards.  Although that's what this proof of claim process is

5  about, and that is an appropriate process but only part of the

6  process.

7          All of the class actions that were filed were

8  equitable actions prospective efforts to avoid what in

9  bankruptcy you would call a future claim.  Notification,

10  education so that you know how not to disturb it, and

11  remediation if and when it were ever necessary would, in our

12  view, treat a community -- a class of unknown, unknowing people

13  who may not even have a claim at this moment in time.  That

14  would serve a benefit.  That same -- that is exactly the

15  problem we have now.

16          If we filed -- we sent out a proof of claim, there

17  will be individuals who recognize they have a claim, who for

18  one reason or another, although their claim is small, will file

19  a proof of claim, and the Court could even estimate that

20  community of individuals who arrive in Bankruptcy Court.  The

21  argument ZAI counsel are making is that notice program did not

22  accomplish what needs to be accomplished.  It will -- it would

23  have as a matter of due process.  Mr. Bernick is exactly right.

24  This is a due process question.

25          It would not as a matter of due process have brought

1 within the scope of the bankruptcy the vast majority of

2 Zonolite claimants who are unknowing and probably don't have a

3 -- may not have an existing claim under the accrual laws of the

4 particular state where their house has to be.

5         Now, that's not to say you can't do anything about

6 that community.  You provide them representation.  You provide

7 them unified and indivisible programmatic remedies that

8 extinguish the prospect of a future claim against Grace ad

9 infinitum.  It is a community of people who, if they showed up

10 five years from now and said I contaminated they home, they

11 would say why in the world did you do that.  There's been five

12 years of education about how you did that, and you would cause

13 problems for yourself?  Here is what you could've done to not

14 disturb it, and there was even material -- even funds available

15 to remove it responsibly, if it were necessary.  As a practical

16 matter, it extinguished what would be called in bankruptcy

17 future claims.

18         So now we have this proof of claim process.  This

19 proof of claim process in a backward kind of way will be

20 valuable, because I think -- and I sense that the Court wants

21 to issue one.  It will be valuable in its failure, because I am

22 confident in the aftermath of this proof of claim, if it goes

23 forward without representation of the unknowing and without

24 efforts to remedy that unknowing -- if it just moves forward,

25 it will by its failure prove something else needs to be done

1  with Zonolite claimants.  It may be a 524(g) futures rep, and

2  you try to transform it all into a damages claim, but there are

3  better ways, we believe, and they are class based.

4      So our objection to this process isn't to the form.

5  It isn't to its dissemination.  It's to a fundamental problem

6  of due process which says this notice cannot capture and bring

7  before the Court roughly nine out of ten Zonolite claimants.

8  That's what we believe is the case, and it is that component of

9  Zonolite claimants that we believe need representation, and

10  they need a remedy within bankruptcy, and the proof of claim

11  does not do that.

12      THE COURT:  How did you get to the nine out of ten?

13  You know, see, that's the problem.  Everybody talks numbers,

14  but where are they coming from?

15      MR. SCOTT:  Let me give you some numbers.  We

16  submitted to the Court two surveys that we did early on in this

17  -- in the Zonolite --

18      THE COURT:  Yes.

19      MR. SCOTT:  -- litigation in an effort to determine

20  whether or not Zonolite claimants could on their own accord

21  come forward.  The purpose was to educate the Court in Spokane

22  as to why an equitable remedy made sense rather than an at law

23  remedy, and it's because the people could not come forward, and

24  they couldn't opt out.  And those -- that data roughly speaking

25  -- it's just my memory -- was to the effect that something like

1  60/65 percent of the homeowners do not know what kind of

2  insulation they have in their homes at all, and nine out of ten

3  or something like that wouldn't recognize Zonolite if they ran

4  into it.  It gave you pause that -- if you did traditional

5  class action, you send out a notice, it would be about as

6  futile as this proof of claim notice.  But an equitable class

7  doesn't involve notice at all.  It involves representation and

8  no notice, because it's not possible to provide notice.

9         Another figure, number of homes.  We did an analysis

10 backtracking through Grace's records to determine how many

11 homes are currently in existence, how many are taken out of the

12 housing market year by year by year.  My figures could be

13 completely wrong, but they were done by an expert in that

14 field, and I believe they're actually correct.

15        I looked at those this morning before I came over,

16 because he laid it out year by year by year.  And our analysis

17 then was by the year 2008 there would be 1,067,000 homes in the

18 United States left containing Zonolite assuming certain

19 assumptions that Grace could quarrel with.  But that estimation

20 was doable.  We had to do that in the class action in order to

21 say to the Court this program, as a matter of due process, will

22 satisfy the needs of this community moving forward.  So we were

23 doing estimations outside of bankruptcy.

24        But the important thing was we weren't saying, as

25 Grace says here, let's aggregate individual claims, send out a

1  notice, have them show up, put them altogether, add up that

2  amount of money, and then demand a settlement, because that, in

3  fact, is the tip of a very large iceberg, and it only causes

4  money to change hands, which doesn't interest me.  It didn't

5  accomplish anything, and that's why this notice program I

6  think, as a matter of due process, will fail, because a -- some

7  large portion of the Zonolite claimants will be unrepresented.

8  They'll be unknowing, and they will have claims that may or may

9  not be future claims, but they won't be bound by this proof of

10  claim process.  That --

11          THE COURT:  All right.  And how do you want to do it?

12          MR. SCOTT:  If we had a proof of claim process that

13  required individuals who had actual at law damage claims to

14  appear in bankruptcy, that would cleanse from Grace's creditor

15  base what I'd call at law claims.  People wanted money, because

16  they had damages in the past, and they'd have to prove they had

17  some kind of a damage in the past.

18          An additional component would be a class, a unified

19  23(b)(2), non-opt out class with appointed representatives

20  having fiduciary duties toward the unknowing and the deceived

21  that puts together a program of remedies that moving forward

22  assures that that community of individuals is provided benefits

23  commensurate with their situation.  And by that I mean moving

24  forward after Grace's emerged from bankruptcy.

25          There is a fund that is insuring that people are

1  advised there's not a need to -- there's not a reason to

2  disturb this, unless you have to, and you shouldn't disturb it,

3  and here are the things you can do to not disturb it, and those

4  are all wise things.

5        THE COURT:  But you can do that now.  I mean that's

6  the whole purpose for the negotiations that I've attempted to

7  have you folks mediate to put into a 524(g) now.  That's

8  exactly the point.  You don't need a class proof of claim to do

9  that.  You can do it through a 524(g) trust.

10       MR. SCOTT:  A 524(g) trust is a potential damages

11  approach toward --

12       THE COURT:  It doesn't have to be damages.  You can

13  do all sorts of things through a trust.  You can write the

14  trust procedures to do whatever you want.

15       MR. SCOTT:  That could -- that may well be, but if a

16  debtor has come to believe, as I believe this debtor has come

17  to believe, that this Court will permit it to constrict its ZAI

18  credit base to people who file a proof of claim, what I

19  characterize as one out of ten people at best, then they would

20  have no reason to discuss anything other than a bar date that

21  will isolate a tiny community.  We will pretend like that's the

22  -- those are the only claimants there are, and we'll pay them.

23       THE COURT:  Look, here's the problem.  It seems to me

24  that the debtor's major interest in this whole problem is

25  trying to figure out what it can afford to put into a mechanism

1  which I'm going to call a 524(g) trust, because, frankly, I

2  think the debtor needs the certainty that it will be able to

3  deal with both present and future claims.  And since these are

4  asbestos related, it can do that through a 524(g) trust.

5          But in saying that, it obviously has to reconcile

6  that with the settlement that it's arrived at with the other

7  committees.  But for the moment I'm just going to put that

8  little technicality aside.

9          MR. SCOTT:  And that's the other reason why it ought

10  to be programmatic remedies, because it -- because in truth the

11  numbers are so large.  There isn't a way to meaningfully

12  provide monetary compensation as a remedy.

13          THE COURT:  Well, that's also the reason that you

14  can't meaningfully set up a class.  That's the problem.  How do

15  you manage a class with -- if I assume that you're number is

16  correct that there are 1,067,000 homes, if that was the

17  number --

18          MR. SCOTT:  Seventy-six, yes.

19          THE COURT:  I'm sorry?

20          MR. SCOTT:  I thought it was a million 76 thousand.

21          THE COURT:  Okay.  Whatever, a million 76 thousand

22  homes.  I'm sorry if I got it backwards.  A million and 76

23  thousand homes still involved with ZAI in 2008, and assuming

24  that that will turn over even three times pursuant to ownership

25  before the incidents of ZAI is somehow gone, I'm still dealing

1  at that time with just owners of the homes in the neighborhood

2  three million claimants -- four million -- five -- almost five

3  million -- 5,025,000 -- 250,000 claimants.  How can you have a

4  class that has, you know, more people in it than three states

5  combined?

6          MR. SCOTT:  Oh, that is actually the value of a

7  class, but it -- in this case these are potential future claims

8  that run, we believe, with the land not with individuals.

9          THE COURT:  Okay, but --

10          MR. SCOTT:  And so it is -- it is -- it is --

11          THE COURT:  The land doesn't have a claim.  I mean

12  there's no way in a bankruptcy context that you can -- even for

13  a class proof of claim, you can't file it for the land.  You

14  have to have a claimant involved.

15          MR. SCOTT:  But the claim runs with the land.

16          THE COURT:  It may run with the land.  That makes it

17  even worse if that's the case --

18          MR. SCOTT:  No, it --

19          THE COURT:  -- because at some point in time you've

20  got -- you have to have -- at some point if it runs with the

21  land and it shows up, it becomes a real live claim.  Somebody

22  at some point wants to approach someone to say, okay, I'm

23  damaged.  Fix me.

24          MR. SCOTT:  That's exactly right.

25          THE COURT:  Okay.

1          MR. SCOTT:  And so it doesn't multiple over time,

2 unless you try to turn it into a damage claim.  There are a

3 community of homes which have the potential for generating any

4 number of damages claims in the future.  When a homeowner in

5 the future discovers they have vermiculite or Zonolite in their

6 home, just as they do to this day, they go on to the web site.

7 They discover that it's harmless if they don't disturb it.

8 They learn if it is leaking into their basement through cracks

9 in the ceiling, here are the individuals who can remedy that

10 inexpensively, and they also learn if it's not possible to

11 leave it undisturbed through --

12          THE COURT:  Where to go.  All of which can be done

13 through a trust.

14          MR. SCOTT:  I haven't disputed that.

15          THE COURT:  Okay.

16          MR. SCOTT:  I -- what --

17          THE COURT:  So my -- my issue or the point I wanted

18 to make was the debtor's interest in all of this is trying to

19 figure out what it can afford in order to get something set up

20 that will meet the needs of the constituents who are going to

21 have to at some point in time file a claim with this trust.

22          MR. SCOTT:  That's correct.

23          THE COURT:  How does it do that without knowing what

24 the universe of claims is likely to be?  Now, the problem may

25 be that this proof of claim is now crafted.  It says that if

1  you think you're ever going to have a claim, you have to file

2  one now, because I don't know how you do that.  What the debtor

3  will do is object to it saying you don't have a claim now, and

4  we have to estimate it.  Well, if you don't know that you have

5  Zonolite in your attic now and you file a claim saying, well, I

6  do or I don't, but I may in the future, I don't know how we

7  estimate that.  So that may be a problem.  Maybe that's the

8  problem.

9      If you estimate based on current claims that are

10  filed, people do that all the time.  That's just a process we

11  go through.  How valid that is, I don't know.  I suppose that

12  will be a battle of experts just like it usually is in an

13  estimation hearing.

14      The debtor will say, well, based on these numbers --

15  I'm obviously hypothesizing -- you know, there will be three

16  times as many people filing claims in the future, and you'll

17  say no, there will be nine or ten times as many people in the

18  future.  And the Court will say, okay, I believe that there

19  will be six or seven, and that will be the number, and that's

20  what will have to be funded.  You know, so --

21      MR. SCOTT:  We esti --

22      THE COURT:  -- so there's a methodology by which it

23  can be done.

24      MR. SCOTT:  That's right, but it's an estimation

25  proceeding --

1          THE COURT:  Right.

2          MR. SCOTT:  -- and not an estimation proceeding with

3 regard to the limited numbers of individuals who filed a proof

4 of claim, although they may be -- they may be -- you know,

5 there may be information there that's relevant.

6          THE COURT:  Right, that set the base.  That set the

7 base --

8          MR. SCOTT:  That's correct.

9          THE COURT:  -- for the estimation hearing.

10          MR. SCOTT:  Our process has been identifying the

11 number of existing homes that remain and then further an

12 analysis using available Department of Commerce information as

13 to the number of homes that go through substantially -- through

14 substantial renovations in any given year that would likely

15 involve remodeling disturbance of attic insulation and then

16 prorating that out over time -- over a 20/30-year period.

17          THE COURT:  Okay, so, in any event, whether you do it

18 the way you're choosing, which is the -- a non-traditional way,

19 that will flip the coin as we did for the personal injury.  The

20 debtor will be using traditional estimation models.  You won't

21 be, and we'll be back to the races doing two different types of

22 estimation in the same proceeding.

23          But what difference in the long run does it make?  I

24 guess the question is this.  If the proof of claim form is

25 useful to set current claims, that's the issue.  Is it useful

1  to set current claims?  Because everybody at some point, it

2  seems to me, needs a handle on what the numbers are.  It --

3  every -- all of you seem to agree on that.  You disagree, I

4  think, on what the number is that you need to know.

5         The debtor wants to look at claimants, both present

6  and future.  You and the committee seem to think that that's

7  not a possible thing to do because of the knowledge base of the

8  people who currently own homes.  You don't seem to think that

9  the people who own their own homes right now know whether they

10 are in a position to be able to file a claim in all instances,

11 and so this proof of claim form is going to miss --

12         MR. SCOTT:  It will fall on deaf --

13         THE COURT:  -- a substantial --

14         MR. SCOTT:  -- deaf ears.  It --

15         THE COURT:  -- base.

16         MR. SCOTT:  People, even if they saw it, would not

17 recognize that it applies to them.

18         THE COURT:  Okay.

19         MR. SCOTT:  And so that's the problem that we're

20 facing.  So everybody agrees we need to get an arm around the

21 claims base.  The question is how best to do it.

22         MR. SCOTT:  Which is why we made the proposal that we

23 invited the Court to obtain an expert that would estimate the

24 number of existing homes, the likelihood of disturbance, and

25 what the consequences would be if there was disturbance

1 financially.

2          THE COURT:  Well, okay, I -- frankly, I am more

3 comfortable in that circumstance, making a decision between

4 expert opinions.  If you folks can't agree on an expert, then I

5 am appointing a court expert, because all that does is adds

6 another body to the base.  Everybody can challenge a court

7 expert anyway.  So if we have to march down that road, I prefer

8 the parties just find experts of their own.  We'll have a

9 hearing, and I'll decide whatever I'm going to decide rather

10 than have yet another expert added to the mix.

11          MR. SCOTT:  We recommended that the Court appoint one

12 to illustrate we weren't afraid of what the facts would end up

13 being on this case, which is why I say this proof of claim

14 process will be valuable in its failure.  We're not afraid of

15 the law or the facts of the case.  We're only trying to make it

16 clear to the Court that this proof of claim process will have a

17 very sparse response because of the nature of the ZAI

18 claimants, and that will not provide the closure that Grace

19 needs.

20          THE COURT:  Well, I think where I am coming down

21 without hearing all of this argument yet is on a combination of

22 things.  Number one, I'm not totally convinced that a proof of

23 claim process of some form wouldn't be useful, but I don't

24 think it can be quite as broad as the debtor wants.  I don't

25 think it can reach future claims.  I don't know how it can.  I

1  don't see how you can say to someone if you think you're ever

2  going to have a claim, file a claim.  I mean --

3          MR. SCOTT:  You can certain --

4          THE COURT:  -- okay, so the whole world files a

5  claim.  That doesn't do you any good.  But I also am not

6  convinced that a class action proof of claim is necessarily the

7  way to go.  I'm not totally sure about that, but I think a

8  better resolution would be to look at the construct of a trust

9  mechanism as opposed to a class proof of claim.  It seems to me

10  in concept getting the current and the futures into the same

11  mechanism through a 524(g) would actually work in this case,

12  and it seems to me in construct that may be better.

13          Now, I don't direct the plan, so I don't -- I'm not

14  the plan supporter.  I'm not a plan proposer, but it seems to

15  me in construct that it would work in this concept.  So having

16  said all that, Mr. Bernick, I'm sorry -- Mr. Scott --

17          MR. SCOTT:  No, I've taken enough time I'm sure.

18          THE COURT:  All right.  I understand your argument.

19  I think I'm somewhat sympathetic with respect to the futures

20  issue.  I don't see how it's going to work in a proof of claim

21  form.

22          MR. SCOTT:  Thank you, Your Honor.

23          MR. BERNICK:  The hard part is figuring out where to

24  begin and then also end promptly and try to maintain some focus

25  here.  This reminds me of many of the discussions that we

1  actually had with respect to parallel issues on personal

2  injury, and I would think that there is some learning that we

3  can derive from that process.  That process ultimately did

4  result in a bar date.  Indeed, the bar date was felt to be

5  indispensable to developing some control over the flow of

6  information, and the bar date was set with a notice.  It didn't

7  require that we have a complete structure for the estimation

8  process.  The estimation process and the structure was very

9  much in flux at the time of the bar date, heavily disputed.

10 The various theories of estimation had not been fully

11 articulated, but the -- having a bar date was unnecessary

12 prerequisite to get control --

13        THE COURT:  But you were looking for claims as of the

14 date of the filing of the bankruptcy petition.

15        MR. BERNICK:  Well, but, Your Honor, I'm going to get

16 -- I'm going to get to the futures question in just a moment,

17 because I think that Your Honor has been -- has heard a lot

18 from the other side with respect to that, has not heard from us

19 at all, and I'm here to say that the futures issue is a totally

20 and completely different issue, and indeed it's one that we

21 have had experience with in cases like Dalkon Shields and cases

22 like DalCorning where the identity of the claimant, at least

23 the current claimant, is known, can enter into an arrangement

24 as represented by counsel to dispose of their claims, including

25 claims that have not yet arisen.  All of the -- the DalCorning

1  trust, the Dalkon Shield's trust, all contemplate -- most of

2  the asbestos trusts all contemplate the resolution of claims as

3  they arise in the future, but because in contrast to the

4  personal injury claims, here you can at any given time identify

5  a person with the ability to dispose of a claim now and forever

6  precisely because any deal that you do with that person runs

7  with the property.  You can completely dispose of claims now,

8  because you have --

9       THE COURT:  Only if that person can figure out that

10  they have a claim though.

11       MR. BERNICK:  Well, but that is a separate question.

12  The point is is it determinable.  With respect to a future

13  personal injury claimant, it's not even determinable who they

14  are much less what they're going to have, much less do they

15  have the ability to actually dispose of their claims.

16       THE COURT:  Why is this any different, unless you

17  know the houses in which ZAI is actually been placed?

18       MR. BERNICK:  Because that's what you actually have,

19  is you have a home -- the whole purpose of the proof of claim

20  form is to make people say whether they do have proof that ZAI

21  is in their home.  And if they do have proof that the ZAI is in

22  their home, then they do have the ability today to dispose of

23  all claims they may have now or in the future, and that makes

24  this fundamentally, completely different.  You can have a car

25  owner who receives a notice from the manufacturer and enters

1  into a resolution with the manufacturer with respect to, you

2  know, fixing a gizmo in the car.

3          THE COURT:  Well, you know, I guess where I'm losing

4  this is what difference does it make to the debtor if the

5  present and future claimants want to address their claims by

6  way of an education and notice program with the possibility of

7  remediation only if someone finds it necessary to disturb this

8  rather than --

9          MR. BERNICK:  I -- there's no issue.

10         THE COURT:  -- settling this by damage claims?

11         MR. BERNICK:  There's no issue.  Your Honor, again,

12  you -- what they're saying about us has nothing to do with

13  reality.  They're pursuing --

14         THE COURT:  It does, because it makes a big

15  difference as to how this whole notice program and how the

16  dollars are spent.

17         MR. BERNICK:  Well, no, but with due respect, Your

18  Honor, again, I think that this has gotten way, way ahead, and

19  I'm happy to address it.  And, as we went through in connection

20  with property damage many years ago and with personal injury,

21  I'll draw a picture of how it works.  I'll do it right now.

22  But the issue for today is a narrow issue.  The issue for today

23  is how to set up a bar date program that meets with due

24  process.  So what I --

25         THE COURT:  I don't think this one does with respect

1  to the futures.

2          MR. BERNICK:  Well, if Your Honor would just give me

3  a chance to --

4          THE COURT:  Go ahead.

5          MR. BERNICK:  -- utter the words, with due respect to

6  the Court, I'm going to go through that, so let me just take it

7  step by step, and we'll just take them one stage at a time.

8  The issues that have been raised -- and I'm going to set aside

9  the question of the may have a claim and deal with that

10  specifically after I talk about the other issues that have been

11  raised with respect to the notice and the program.  I will get

12  to that, and I will then also get to the whole question of what

13  are the alternatives.  Where is this whole thing going?  I'm

14  going to get to that.  I'm going to get to estimation.  I'm

15  going to get to litigation.  I'm going to get to the 524(g)

16  plan.  I'm going to get to the idea of education.  I'm going to

17  talk about all those things and address all the issues that

18  have been raised, and I'm going to try to do it very, very

19  succinctly.

20          But the first step is what we actually came to talk

21  about here today, which is the notice and bar date program.

22  Again setting aside the amendment that says may, which was an

23  important amendment to make, and I'll indicate why.

24          The standard is due process.  Due process means

25  notification.  It does not mean persuasion.  And that is a

1  fundamental issue of law, and they're just dead wrong about it.

2  In the cases that we cited going all the way back when, but

3  they all go back to <u>Penn Central</u>, the Third Circuit's decision.

4  The purpose of the notice is not to tell people that they

5  should or should not file a claim.  It's not.

6      The purpose of the notice is to, quote, not get their

7  attention and make them do something.  The purpose of the

8  notice is completely otherwise.  It's to provide them with a

9  piece of information. Otherwise, all notices would have to be

10 crafted using experts who are going to do psychology on how a

11 particular notice will sell with a particular population so as

12 to be effective.

13      That's not the law.  The law doesn't require that.

14 Indeed the law says completely the opposite.  The law says

15 utter neutrality.  You're simply supposed to get the

16 information out there, and then people have got to make

17 decisions about whether they're going to look into it, not look

18 into it, and make a claim, not make a claim.

19      It is not the business of this Court to make a

20 decision about what notice is going to be, quote, effective.

21 The whole predicate of every single one of their arguments when

22 they say you got to get their attention, or it  can't be too

23 legalese, or it's not going to work, it's not going to get them

24 out of the woodwork, those are all arguments that are flat out

25 contrary to establish law.  There's not a single case -- not a

1 single case that says --

2         THE COURT:  I interpret the argument to say that if a

3 notice is not intelligible, it does not comport with due

4 process.

5         MR. BERNICK:  That is fine.  That's --

6         THE COURT:  That's what I'm interpreting the argument

7 to mean.

8         MR. BERNICK:  That is the only thing that comes out

9 of it.  All the arguments are -- and I'll go through them that

10 Mr. Baena talked about very specifically.  These were the

11 specifics that we talked about today.  You got to get the

12 attention of the claimants, Mr. Baena says, and that gets you

13 to the headlines.  You got to have the right headline.  You

14 can't assume that your audience knows more than they know.

15         So, yeah, well, we had a headline.  In fact, we took

16 that as one of the initial suggestions way back when, and we

17 took all of the headlines to make them talk to specific people,

18 and that's exactly what we did with respect to the traditional

19 PD claim.  It's what we did with respect to PI, and it's what

20 we're doing here, is we have a simple headline.

21         Beyond that, to get into psychology about how does

22 the headline grip you.  We made a mistake maybe by saying we'll

23 go down that road.  Due process doesn't say you have to have a

24 headline.  It doesn't say you have to have -- you can't presume

25 that your audience knows a certain amount of this, that, or the

1  other.  It simply says it has to be a clear notice, has to pass

2  on information.  We satisfy that standard very clearly.

3          Indeed, with respect to our particular notice, we, as

4  the Court has seen, go on at length in headlines to set out

5  everything that -- in words of one syllable Zonolite defines.

6  What is Zonolite?  And we can say -- we can say see below for

7  definition or see below for description.  We give them the

8  photo.  This is totally common sense, and that's all that's

9  required is common sense providing information.  This is not

10  confusing.  This is not unintelligible.  This is not, gee, I

11  can't possibly understand it.

12          Your Honor picks up -- we pick up the newspapers

13  every day, in The Wall Street Journal, Financial Times,

14  whatever it is, and U.S.A. Today, and you've got notice of

15  class action settlement.  There's a whole column like that.

16  It's full of legalese.  There's no kind of friendly kind of,

17  oh, are you one of these people and kind of a little icon and

18  something going like this.  You don't have a psychologist go

19  over all the notices that are provided for securities class

20  action settlements, so the people who may not know that the

21  real securities holders are really put on notice and motivated

22  more and more.  That's just garbage.  That's just not the law.

23  This is not the way that the law works.

24          That's the headline point.  We went down their road.

25  We did the headline.  Headline is not required.  The standard

1 of you got to get their attention is not required.  It's not

2 the law.  Otherwise, I guess Mr. Hillsey would be doing a land

3 office business, and everybody else as well, because without an

4 expert opinion you wouldn't be able to issue a notice, and

5 that's not the law.  The law doesn't say that.

6        The second point that was made is that this was

7 inaccurate.  Some of the -- some of which may have contained

8 naturally occurring asbestos.  Well, Your Honor's determined

9 that's wrong.  They all do it.  That's not true.  There are

10 forms of attic insulation that came from a different mine that

11 didn't have the Tremolite contamination.  So it's not true to

12 say they all had the asbestos in it.  That's just a mistake

13 that was made here.

14        The point was made -- third point by Mr. Baena, there

15 was the headlines that may have -- then the instructions.  Oh,

16 it's just these instructions are garbage.  It's just legalese.

17 And Mr. Baena was here to say it violates every rule of good

18 notice, and it's the experts who should craft the instructions.

19 It's not the experts who craft the instructions.  It's the

20 lawyers who craft the instructions.  All of the instructions

21 with respect to claim forms that have been issued by this Court

22 in this case have been crafted by the Court with input from the

23 lawyers.  We haven't had an expert come in and do a survey and

24 conduct a poll and say, well, how do you feel about this set of

25 instructions, or how do you feel about that set of

1 instructions.  We don't have a psychologist who acts as a

2 gatekeeper for the issuance of instructions.  Again, that's not

3 the law.

4        And you can see where this is all going in terms of,

5 you know, Ms. Kinsella or Mr. Hillsey.  We don't have to sit

6 there and depend upon an expert to tell us how to structure a

7 legal document.  Notice does not require psychologists who run

8 polls and then come in and try to interpret the results to tell

9 us whether or not the Court an issue a notice.

10        Fourth point that Mr. Baena made is the bar date.  We

11 should have the bar date more prominently featured.  We will

12 move the bar date up, so it's more prominently featured in the

13 magazines.  We will have the bar date in the constant voice

14 over, March 31, 2008, March 31 -- we'll do whatever they want.

15 They have -- you know, the prominence of the date, that doesn't

16 make that much difference.  And so that was the fourth point

17 that Mr. Baena made.

18        Then the fifth point that he made is, well, what's

19 the point.  What's going to happen?  Shouldn't they know

20 something about the proceedings?  Again, the law doesn't even

21 -- the law under Penn Central says you don't even have to say

22 in the ordinary case -- "It's not necessarily intended to

23 advise them of the nature of those interests."  You don't even

24 have to tell them what their interests are, much less what the

25 proceedings are going to be.  The proceedings could be any

1  number of different things.

2          If you have a class action settlement, you have to

3  tell them about the settlement process and the claim process,

4  but we don't have a settlement.  So what is it that you have to

5  tell them?  You have to -- that they may have a claim, and then

6  we go beyond that and indicate the kinds of claims that they

7  have, but we don't have to tell them the nature of the

8  proceeding.

9          In terms of the consequences of the proceeding, we do

10 have in the claim form what Your Honor indicated, which is that

11 there's standard language.  In the claim form we have that,

12 "The effect of failing properly -- failing to properly file a

13 ZAI proof of claim," and that's the standard language, and we'd

14 be happy to move that up and make it more prominent in the

15 notice.  It's more legal language, but we'll do the legal

16 language.  We'll move it up and make it more prominent, but

17 that's all that they have to know, is that they have to take

18 steps if they want to preserve their rights.

19         There's a whole world of, you know, retaining

20 counsel, not retaining counsel, looking into it, not looking

21 into it.  Is it perfect?  No, it's not perfect, but due process

22 is not a doctrine of perfection.  It's a doctrine of

23 reasonableness.

24         THE COURT:  May I see the top of that document?

25         MR. BERNICK:  Which one, the --

1          THE COURT:  The one you have up on the screen.

2          MR. BERNICK:  This is the -- these are -- this is the

3  -- these are the instructions for the proof of claim form.

4  Let's see.  This is the proof --

5          THE COURT:  Can you just zone it -- make it so that I

6  can see the page?

7          MR. BERNICK:  Yeah.  This is the whole proof of claim

8  form.

9          THE COURT:  Okay.

10          MR. BERNICK:  And we would be happy, if it's

11  appropriate, to say, you know, failure to file a proof of claim

12  could lead to whatever.  We can move it up if that's

13  appropriate.

14          THE COURT:  Well, I think it's -- you're just using

15  the proof of claim form with some modification --

16          MR. BERNICK:  That's right.

17          THE COURT:  -- to make this applicable.  I didn't

18  really see any objections that I recall raised to the proof of

19  claim form.  It's pretty standard language.  I just wanted to

20  verify that that's what I was looking at.

21          MR. BERNICK:  Yes, we haven't changed that at all,

22  and you're right, there were no objections to the proof of

23  claim form whatsoever.

24          THE COURT:  And I think the language you've got at

25  the back seems to be the standard -- essentially the standard

**J&J COURT TRANSCRIBERS, INC.**

1  language with respect to the consequences of not failing --

2            MR. BERNICK:  Okay.

3            THE COURT:  -- of failing to file.

4            MR. BERNICK:  So then those are the specific

5  objections that were made.  I think we've made undertakings

6  with respect to the -- indicating the consequences of failure.

7  We can move that up in the claim form.  We can move -- put that

8  more prominently in the notice.  The bar date, to reference the

9  bar date in a voice over on the T.V. program or the T.V. ad is

10 fine.  The headlines, I think we've done the headlines.  The

11 may have asbestos, we explained why that is true.  And then the

12 instructions being legalese, yeah, they're always legalese,

13 because they're drafted by lawyers.  That's not a shocker.

14           So then the question really is -- the only other

15 question -- points that were made by -- they were made by Mr.

16 Scott with respect to the due process.  He argued due process.

17 And, in fact, I think Mr. Scott himself said candidly, and we

18 appreciate that.  I know that the Court appreciates that.  He

19 says their problem is not with the form or not with the content

20 of the program.  And I think that that's where their papers

21 were, and that's where we thought this whole thing was until we

22 heard from -- he heard the footnote objections from Mr. Baena.

23           But Mr. Scott also argues that the problem is due

24 process.  That if you do this, it'll be important.  It'll be

25 unfortunately a cautionary tale, because he says if we do this,

1 the net result is that nine out of ten people won't come

2 forward, and that's not due process.  And that again is a

3 mistake in law.  Due process is not efficacy.  Due process is

4 notice.  It is not how many people you get to come forward.

5 All kinds of people don't come forward for a whole variety of

6 reasons.

7         If the purpose of due process were to get people to

8 come forward, then we'd be into the business of motivating

9 them.  Why would people want to come forward if they didn't

10 really think that they wanted to pursue the claim?  Well, you

11 can make them come -- a lot of people are like that.  If you

12 then incentivize them to come forward by saying you must or let

13 me tell you this or let me tell you that, you really ought to

14 do it, then we're into a never, never land.  That they'll want

15 to say this goes back to two thousand --

16         THE COURT:  No, I think the issue is not that.  The

17 issue is with respect to people coming forward.  If you've got

18 a claim that existed as of the filing date of this bankruptcy,

19 then -- and the debtor wants a bar date, and there is a reason

20 to have a bar date set, then as of the filing date, if there

21 was a claim, people got to file a claim.

22         MR. BERNICK:  Yes.

23         THE COURT:  But as to a future claim that somebody

24 doesn't know they have, I am very concerned.

25         MR. BERNICK:   Yes.

1          THE COURT:  I don't see how this Court can or ought

2  to compel somebody who doesn't yet know that they have a claim

3  to come forward saying, oh, but I might.

4          MR. BERNICK:  Okay, but --

5          THE COURT:  I mean --

6          MR. BERNICK:  But you're --

7          THE COURT:  -- on top of the fact that this notice is

8  going to go out across the country, and you may have 50 million

9  claims filed by people who say I'm not going up to my attic to

10  see what kind of attic insulation I have, but I may file -- I

11  may have a claim in the future.  It doesn't make any sense to

12  do that.

13          MR. BERNICK:  Well, Your Honor, let me address that.

14  But if we had taken that out of the -- if we had taken out --

15  that out of the notice -- the due process argument that Mr.

16  Scott has made is an argument that he makes more generally with

17  respect to the notice, as I have taken it.  And it's wrong,

18  because it's predicated upon efficacy.  That is getting people

19  to come forward.  That's not the right test.  That's erroneous

20  as a matter of law.  It's not the law of this circuit.  The law

21  of this circuit is reasonable notice.  It's neutrality.  It is

22  information that says there is a hearing.  If you want to

23  participate, you've got to file the claim, period.  The

24  issue --

25          THE COURT:  No, it's also that to have a claim you

1  have to be a creditor, and to be a creditor, but for a few odd

2  sections of the Bankruptcy Code, you have to have had a claim

3  on the bar date --

4          MR. BERNICK:  But that is a --

5          THE COURT:  -- on the petition date.

6          MR. BERNICK:  I'm sorry.  I don't mean to talk over

7  Your Honor.  That is not actually -- I think that's an issue

8  about whether their claim can be barred.  That is whether it is

9  a claim that exists as of the time of the bar date and could be

10  barred.  That's not really a due process issue.  You can give

11  notice to anybody that you want, but I don't -- what I'm

12  suggesting, Your Honor, is that their test of due process is

13  the wrong test.

14          THE COURT:  But this claim says if you don't file

15  this claim now, and you have it, which includes if you think

16  you may have one in the future, you're forever barred.

17          MR. BERNICK:  That's correct.  That's not a due

18  process issue.

19          THE COURT:  I think it is.

20          MR. BERNICK:  I don't know how in the world it would

21  be.  You can tell -- if you owned a ZAI home or -- I don't want

22  to bring the Court -- Ms. Krieger here owns a ZAI home, and she

23  had no idea that she had a ZAI home, but she's now been sitting

24  here in court, and they say they seem to be pretty excited

25  about something.  Now, maybe she has no claim.  For whatever

1 reason they say she has no claim.  If I tell her that if you

2 want to preserve whatever rights you have now or in the future,

3 you've got to show up, she's got due process even though she

4 does not have a claim and may never have a claim.  She's got

5 due process.  She's been notified.

6          The issue about whether you're a future or not is a

7 bankruptcy issue.  It's not a due process issue.  You have all

8 kinds of notices that go out with respect to people who have no

9 claims.  They can be -- people who have no claims under the

10 Bankruptcy Code can be the subject of a due process

11 consideration.  So what I'm suggesting is that the test that

12 they're applying is a test that's the wrong test.  It's a test

13 of efficacy.  It's not a test of information.

14          And the issue about currents versus futures could

15 become a due process issue but need not be a due process issue.

16 It is first and foremost a bankruptcy issue, and I think it's

17 an important one.  I just told Your Honor what our thinking

18 was, and then Your Honor can determine -- obviously will

19 determine whether it's appropriate to go down this road.  But

20 there was -- there was a method to this, and it was very

21 carefully thought through.

22          With respect to currents, we know we can style the

23 language of the notice, so that it says if you have a claim,

24 then we'll -- and that's the way it read originally, if you

25 have a claim.  The problem with have a claim is that have a

1  claim is have a something which is in sense kind of says that's

2  easy, have as opposed to may in the future have.  But what you

3  have under the Bankruptcy Code, if you have a claim is you have

4  something that's every amorphous.  It could be contingent.  It

5  may not have arisen.  It could be all kind of different things,

6  because have in the sense of having a claim has all kinds of --

7  has a very, very broad scope, and we could've rested with that.

8           We then chose to use the word may, and why did we

9  choose to use the word may?  For two reasons.  One is we wanted

10 to make sure that we picked up as many people as possible in

11 our population of people who would respond to the bar date, and

12 we thought that if you may have a claim, it basically takes

13 people who may not be terribly certain, and it says you should

14 still file.  The effect of their failing to file is not

15 determined here.  You're saying if you don't file, you may lose

16 your claims.  But we're not here deciding in connection with

17 the claim -- with the notice and bar date.  We're not deciding

18 the status of any individual, so we would prefer to say if you

19 have claims or may in the future have claims.

20          For example, what about people with contingent

21 claims?  You would say from a technical bankruptcy point of

22 view they have a claim for bankruptcy purposes, but for a

23 layperson they may not think about a contingent claim as a

24 claim that they currently have, because they may think, well,

25 it hasn't really happened yet.  It hasn't happened.  I may have

1  it or I may not have it in the future.

2        So by using the word may we sought to expand the
3  population of people that we were bringing into the process
4  without crossing the issue of what effect it actually would
5  have, because we realized that that's an issue under the
6  Frenville case.  We understand that.  So that was point one, is
7  that this does not read out as a legal determination that all
8  people, whether their claims are contingent or haven't even a
9  clue are barred.  It is a notice that they may be barred, and,
10 therefore, people should file.

11       Now, we're not asking the Court to resolve today
12 whether, you know, what -- and what -- where do you draw the
13 line with respect to ZAI.  Is it current and -- is it current
14 albeit contingent, or is it future unaccrued?  We're not asking
15 the Court to make that final decision today at all.  What we're
16 asking the Court to do is to maximize the sweep of people who
17 are brought in, so that that issue then can be framed with the
18 benefit of further argument and further information.  And I
19 would suggest to the Court that the answer to that question is
20 not the answer that they've given you here today.

21       In order to have a claim, you have to have two
22 things.  It's not just the home.  They say, well, Mr. Bernick
23 did us a great favor.  He said, oh, the real issue here is how
24 many people may come forward.  The only way to figure that out
25 is to count up all the homes.  That's just not true.  You have

1  to have the home plus you have to come forward.  Those are the

2  things that you have to have.

3          And if you have the home, and you do come forward,

4  you then get to the question of, well, what is your status if

5  you have ZAI in the attic.  You've got -- ZAI is in the attic.

6  Yes, you've got the home, and, yes, you came forward.  Are you

7  a future or are you a current claimant?  Well, this all goes

8  down the road -- the reason this is felt to be significant is

9  that there are some states in which the claim does not accrue

10  until there's, quote, contamination.  Some states were that so.

11          But let's see how critical that really is to the

12  process.  (A) These people are identified.  That is you can

13  tell who they are.  You know who owns the home that's got the

14  product in it and has come forward, because that's what the

15  claim form asks for.  They can be represented by counsel or not

16  represented by counsel.  And, very critically, they -- their

17  claim may already have accrued, simply because the ZAI is in

18  the attic, and that's going to pose an issue of state law, and

19  we can argue long and hard about what's the -- whether state

20  law really says what they indicate.

21          Typically in property damage cases -- and we can

22  explain one -- another day how all this doctrine arose about

23  contamination.  It basically had to do with the Economic Loss

24  Doctrine.  You couldn't sue in tort for economic loss.  You

25  can't do it.  So -- but there's an exception to economic loss

1 where the product has caused injury not to itself but to

2 something else.  So the idea of contamination is release that

3 the -- that the material has been released, therefore, it's

4 outside of the product, therefore, it's caused some other

5 injury, and it means that the Economic Loss Doctrine is not a

6 bar.

7       So you can see that if you had fireproofing around a

8 column, and the asbestos is in the matrix, traditional PD, an

9 argument might be made under, for example, California law that

10 the claim does not accrue until there's evidence that the fiber

11 has been released to the air.  Why?  Because at that point

12 you've got some cognizable or potential injury outside the

13 product.  It's not product failure, i.e., economic loss.  It is

14 injury to the property, thereby it's a tort that's recoverable

15 in tort.

16       Well, what's significant here is that in this

17 particular case with ZAI, the asbestos fibers were never

18 confined to any kind of matrix whatsoever.  Day one you would

19 say was there contamination of the structure, i.e., the attic.

20 Day one there was contamination of the attic.  Why?  Because

21 those fibers are not contained in any matrix.  There was fibers

22 released to the air when the product was originally installed.

23 You know it has to be as soon as the person takes the bag and

24 goes like this, there's fiber in the air.  You've got

25 contamination.

1          So the whole idea that there's some significant issue

2 about accrual in a contamination state is ludicrous when it

3 comes to ZAI, specifically because how ZAI is put together and

4 how it's installed.  Fibers day one in the air.

5 Inconsequential in terms of their effect, but day one in the

6 air at least with respect to the attic.

7          But however you come out on accrual, there is also

8 another very important fact, and that is resolution.  Ms.

9 Krieger, who is, of all things, reasonable.  If she heard that

10 she -- she came into court and said, oh, yeah, I've got the ZAI

11 in my home.  Do I want to file a claim?  She might say, well,

12 you know, it hasn't really caused contamination yet, therefore,

13 I don't really know that I have a claim, but she then looks at

14 it and says, well, but, you know, if there -- I now know what

15 the story is.  I've been educated about it.  Maybe I would go

16 ahead and resolve that claim, maybe not resolve that claim.

17 Maybe I would learn that the good Judge has decided in the ZAI

18 science trial that there's not an unreasonable risk that's

19 associated with this material and, therefore, why do I want to

20 waste my time filing a claim?

21          The point is that in contrast to a -- an unidentified

22 unrepresented personal injury claimant who is not manifested,

23 the owner of a home with ZAI in it today has the ability to

24 resolve that claim in a way that is forever binding.  So when

25 Your Honor hypothesizes that there may be claimant after

1  claimant after claimant after claimant, that's not really true.

2  The claim -- the issue passes from owner to owner to owner as

3  the home passes from owner to owner to owner, and you can't

4  recover for it three different times.  You recover for it once.

5          The key thing though is that if you send out the

6  notice, and it goes to a broad enough number of people, you

7  then -- what we would hope is you have a consensual resolution

8  pursuant to a plan that means that all of these people, because

9  they have come forward regardless of whether there's a

10 contamination issue or not, they're prepared to sign on to a

11 resolution.  And what that really means is that the futures

12 problem, where you can't even have somebody who can participate

13 in the process like what you have in personal injury, they

14 can't -- they don't even know who they are.  They don't even

15 know where they go.  They don't know what to do about anything.

16 You don't have a futures problem here that way.

17         You have a difference, because these people are

18 identifiable.  They can participate in the process.  They can

19 get due process, because they can receive the notice like Ms.

20 Krieger receives the notice.  So for all those reasons, we

21 don't think that there is a futures issue here at all.

22         At the same time we're not asking the Court to

23 resolve it.  We're asking the Court to preserve the opportunity

24 to decide that in a way that's sensible and to do so to make

25 the notice be expansive.  That's why we're going down that

1  road.

2           Now, that plays into one last thing, Your Honor,

3  which is important, and that is where does this whole thing go.

4  It can go different places.  First with respect to the question

5  of what to do with the currents, well, is -- you know, is class

6  -- does class -- if there's a futures problem here, does class

7  solve it?  No.  Class can only bind people who can participate

8  and can opt in or opt out.  You can never get resolution of a

9  true futures issue through a class.  So that's just a non-

10  starter.

11           Can you say, well, gee, we have to do the estimation

12  process with respect to futures, and when it comes to

13  estimation we just look at the homes.  That's just not true

14  either, because you don't have a claim just by having a home.

15  You have to have a claim and a person who is asserting a home

16  and a person who's asserting a claim with respect to that.

17           Do you have to decide how you might do that estimate

18  now?  No, you don't have to, but more importantly, the -- what

19  you do need to do in order for this process to begin is you got

20  to get the currents involved.  That's a first step no matter

21  which way you're going.  If you're estimating, if you're

22  litigating, if you're planning, you got to get the currents,

23  and people who don't come forward shouldn't be able to

24  prosecute their claims.  That's the whole idea of a bar date.

25           So the narrow issue today is can we bring the

1 currents on board through a bar date, and does this bar date

2 satisfy due process?  The bar date clearly is there.  It is the

3 only way of bringing the currents forward that's contemplated

4 by the Code.  It doesn't then entail wrapping in all kinds of

5 other people who are not going to be prosecuting their claims,

6 and it satisfied -- do we satisfy due process?  Yes, for all

7 the reasons that we've indicated.  So we think that for today

8 the bar date's there.  We should do the bar date and then go

9 forward.

10        Where are we headed?  Well, you got a lot of

11 different ways to go.  The simplest way is litigation, which is

12 to say we get those claims in there, and it's pretty simple,

13 which is okay, we're now going to move for summary judgment

14 with respect to all these claims on the grounds that because

15 there's not a unreasonable risk of harm with respect to the

16 product, their claims are not sustainable.  Very, very simple.

17 And that litigation would be binding with respect to all people

18 who came forward as current claims pursuant to the bar date.

19        What we do with respect to the futures, that also is

20 fairly simple.  With respect to future claimants, we would

21 channel them to a post-confirmation litigation and settlement.

22 It's been done in <u>Dow Corning</u>.  It's been done in many other

23 cases.  And if future claimants wnat to raise the same issue

24 and prove to the Court that no -- that all is wrong, and that

25 there really is risk, they would be free to do that.  Their

1  rights would not be compromised, and we would go forward and

2  pay nothing for these people, because their claims do not have

3  value, which would -- is exactly what we believe to be the

4  truth.

5       We could do something else.  We can estimate.  And

6  the brief that Mr. Baena has filed suggests that it's just

7  perplexing.  I -- the words are -- I really -- I'm envious of

8  some of the language.  I don't know if Mr. Baena can take

9  credit for that or his able partner, but surreal hodgepodge

10  aggregate proceedings and the like.  He said how can you

11  estimate for allowance purposes, and the answer is, is you can

12  estimate for allowance purposes, because that's what 502(c)

13  says.  You can estimate for allowance purposes.

14       So we can do an estimate.  In the course of doing an

15  estimate, we would say that the claims should be estimated at

16  zero because of this.  They might say the claims should be

17  estimated at much, much more money, because while they disagree

18  with the science opinion, and they'll say each claim has got X

19  dollars worth of value, and there are Y number of claims, and,

20  therefore, they can do an estimate.  So you would then have

21  competing estimates for allowance purposes, again all

22  completely contemplated by the Code, but again beginning with

23  the information and participants that you have through current

24  claimants.

25       Or you can go down the road of plan, which would be

1 our preferred course.  And in connection with the plan road,

2 the idea of having an educational process is not only not out

3 of the question, that's probably how the thing may end up being

4 resolved.  There's absolutely no reason why we can't have

5 current claimants come forward, see if we can have a consensual

6 plan.  If we don't, we litigate.  If we do, we have a

7 consensual plan, and then we can say we can litigate -- or I

8 should say we can also say I'll tell you what, we're willing to

9 pay -- we're willing for plan confirmation purposes not to pay

10 zero.  We're willing for play confirmation purposes to pay X

11 dollars but no more, in which case we would then not litigate.

12 We would estimate for allowance purposes but with a default or

13 where the crossover point is not zero but some number of

14 dollars that's set forth in the plan.  Those dollars can be

15 used for whatever purpose is appropriate.  That would be

16 another way to go.

17          Or we can have a plan that says it's an agreed plan,

18 and we have education that's built into it.  That's not out of

19 the question.  That's definitely in the question.  So all these

20 things are options that if we want to -- if we want to go

21 forward to predicate for them all is having an actual

22 constituency, the population current claimants, and being able

23 to move forward with that sense of how many people have come

24 forward, see if we can do a deal, but if we can't do a deal, we

25 know who to litigate against, and we know how to do the

1   estimation, and we go down exactly the same road.

2          This is exactly the same road that we have followed

3   for PD and for PI, exactly the same road.  We hope it's much

4   more -- we have more flexibility, because we don't have to deal

5   with jury trial rights here, because it's property damage.  You

6   don't have the jury trial right that applied to PI.  So when

7   all these statements are made, that, you know, we're not

8   willing to do this or consider that, that's just false.

9          One last thing, due process.  Does due process

10  require all these different things?  Mr. Scott has got this --

11  again this notion that due process -- when you do to say it's

12  efficacy as opposed to notice, what does that say with respect

13  to classes?  That says you can only have a class if you have an

14  education program to educate the class, so that they can make

15  decisions, because, otherwise, it's not effected.  If efficacy

16  is it, then you need education before you can have a class,

17  which then would mean in all cases you need -- he wants a

18  (b)(2) non-opt out educational program, so that means that

19  before a class can pass due process, there has to be a (b)(2)

20  educational component, so that then people can make decisions

21  about what it is that they want to do.  That's false.  That's

22  not due process, otherwise, we would have (b)(2) classes as a

23  first step for class certification all over the country.

24  That's not the way that it works.

25          So this is not a matter of due process.  All of these

1  considerations that we've talked about is a litigation

2  estimation plan.  They're not due process issues.  The due

3  process issue is does this plan for notice and publication,

4  does it, in fact, provide information about the fact of there

5  being a due date that you may have a claim and that you're

6  required, if you want, to preserve your rights to that claim to

7  come forward by that due date.  And it clearly does.

8          THE COURT:  Mr. Baena, literally, five minutes.  I'm

9  cutting you off at the end of five minutes.

10          MR. BAENA:  Okay.  Do you want to take this down?

11          MR. BERNICK:  No.  If you can read it, you're welcome

12  to it.

13          MR. BAENA:  All right.  Let me start with may, and I

14  hope it doesn't sound like another Abbott and Costello routine

15  like we just heard before.  The may is superseded by the

16  instructions, the proof of claim form, and the notices where

17  they all say if you don't, your claim shall be barred forever.

18  Every one of the forms say it shall be barred forever.  So that

19  whole routine was just unrealistic.  It had nothing to do with

20  the program that was on the table.

21          Let me start in the order next that he went.  The

22  headline.  Kinsella.  Kinsella says the headline is, in fact,

23  the critical -- a critical component, if not one of the most

24  critical components, of the notice.  And she says everything

25  about the headline they've done is wrong.  It's wrong.  That's

J&J COURT TRANSCRIBERS, INC.

1 why she agreed when we jettisoned Zonolite last time in 2002

2 and went to property damage.  That's why she conceded to change

3 the headline and in respect to traditional property damage.

4        I was reading the paper today, saw one of these

5 notices.  It's the same point.  They don't say if you purchased

6 one of these 18 different kinds of products, then read the rest

7 of this thing.  They say if you bought a replacement power

8 adapter.  I mean you work like in a farm.

9        THE COURT:  So you want the notice to say if you have

10 insulation in your attic.

11        MR. BAENA:  Yes, if you have loose fill insulation in

12 your attic.

13        MR. BERNICK:  Absolutely not.  All kinds of

14 insulation in the attic.  It has to be a descriptor, otherwise,

15 it is equally misleading.  And again --

16        MR. BAENA:  And you get to those descriptors, Your

17 Honor, after you capture the attention of the audience to make

18 people read more.

19        THE COURT:  Okay.  Put the notice form up, please.

20        MR. BAENA:  The one that I read this morning?

21        THE COURT:  Yes.  No.  No.  The -- yes, the notice

22 form for ZAI.

23        MR. BAENA:  Okay.  It assumes they know they have

24 Zonolite loose fill attic --

25        THE COURT:  All right, so you --

1          MR. BAENA:  -- insulation.

2          THE COURT:  If you have a home with loose fill attic

3    insulation --

4          MR. BERNICK:  Well, that's just not -- it's just not

5    true.  This is not -- loose fill attic insulation, there are

6    all kinds of loose fill attic insulation.

7          MR. BAENA:  Correct.

8          MR. BERNICK:  No.  No.  Because these people -- these

9    people are only even in the zone if it's Zonolite.  That's

10   totally accurate.  Totally accurate.

11         MR. BAENA:  It is --

12         MR. BERNICK:  Now, we could put in Zonolite

13   parentheses vermiculite loose fill attic insulation, but to say

14   we're going to give notice to these people who just have loose

15   fill attic insulation, this is -- I really -- this is so wrong.

16   The idea of citing a transcript, we can't even read it, and

17   then saying, oh, this is necessarily required when our witness

18   didn't even say that.  And how he's saying, oh, well, let's

19   just start with the funnel -- this is all pop psychology.  This

20   is a fully and completely accurate statement.  It's not

21   designed to invite people in --

22         MR. BAENA:  Is this coming out of my time?  Is this

23   coming out of my time?

24                         (Laughter)

25         MR. BAENA:  Can we turn him off?

1          THE COURT:  Mr. Scott?

2          MR. SCOTT:  Yes.

3          MR. SCOTT:  As somebody who represents Zonolite

4   plaintiffs, I will rely on your analysis for this purpose.  If

5   your clients were reading a notice like this, what would be

6   best suited to get their attention?  If you have a home with

7   loose fill attic insulation or if you have a home with Zonolite

8   or vermiculite, whichever and/or both you choose, loose fill

9   attic insulation?

10          MR. SCOTT:  My concern was even that if it's

11  Zonolite, because, in fact, there are a variety of brands that

12  Grace is responsible for, but if they want to limit this to

13  Zonolite, Zonolite is I think preferable, but it's fatally

14  flawed.

15          THE COURT:  Fatally flawed because of the Zonolite?

16  Because it's not inclusive of Zonolite?

17          MR. SCOTT:  Mr. Barbanti, who's the class

18  representative in the certified class, the labeling on one of

19  his two homes isn't Zonolite attic insulation, because the

20  product that Grace is responsible was branded in a variety of

21  different brands, one of which was Zonolite, primarily

22  Zonolite.  But that's just one illustration of the reason why

23  this proof  of claim process will fail in time.

24          THE COURT:  Are you trying to limit it to Zonolite?

25          MR. BERNICK:  Yeah, well, that's what it says.

1  That's what our intent -- I don't -- I don't know enough about

2  the detail of what Mr. Scott just referred to, but I do know

3  how he answered the question, which is preferred to have

4  Zonolite there.

5          THE COURT:  He said if you're limiting it to

6  Zonolite, because --

7          MR. BERNICK:  I don't -- I --

8          THE COURT:  -- the Barbanti class --

9          MR. BERNICK:  I am content with the thing as it reads

10  there and as described in the definition tells us what it is

11  that we're doing.  It defines what is Zonolite.  It is sold --

12  made -- they have glittery, dah, dah, dah, granules, dah, dah,

13  dah, may be found, and it gives a -- it gives this -- that's

14  actually the virtue of not having the bag with Zonolite, which

15  is what they wanted, it basically says this.  If it's this,

16  it's in.  And I think that if Mr. -- Mr. Scott is saying there

17  may have been other names --

18          THE COURT:  I think if there --

19          MR. BERNICK:  -- this is the descriptor.

20          THE COURT:  -- if there are other names, it would --

21  the debtor would be advised to put in all other names and to

22  take the word Zonolite out of the caption, because, otherwise,

23  what you're going to get is just Zonolite, and that may not be

24  a bar date for all other products that were sold --

25          MR. BERNICK:  Well, then it should be --

1          THE COURT:  -- under that label.

2          MR. BERNICK:  Well, then it should be vermiculite.

3          THE COURT:  Then it should just be loose fill attic

4  insulation --

5          MR. BERNICK:  No.

6          THE COURT:  -- and you can change the description

7  below to say --

8          MR. BERNICK:  Your Honor --

9          MR. BAENA:  Judge, you know, we're having a debate.

10          THE COURT:  Wait, Mr. Baena.

11          MR. BERNICK:  That loose fill could pick up any

12  number -- people can think of fiberglass as being loose fill.

13          THE COURT:  Well --

14          MR. BERNICK:  Well, but they could.

15          THE COURT:  Okay.  All right.  Vermiculite -- loose

16  fill vermiculite then.

17          MR. BERNICK:  That's fine.

18          MR. BAENA:  Grace didn't even -- Judge, I -- who --

19          MR. BERNICK:  That's right.  We didn't --

20          MR. BAENA:  Who knows vermiculite?  Oh, I don't have

21  that.

22          THE COURT:  Well, that's true, too.

23          MR. BAENA:  Well, what is vermiculite?

24          MR. BERNICK:  Well, that's what --

25          MR. BAENA:  I never heard of vermiculite until --

1          THE COURT:  You know what?  Then just --

2          MR. BAENA:  -- I went into this case.

3          MR. BERNICK:  Vermiculite is what it is that we're

4     showing here.  See, this is -- I mean, Your Honor, with due

5     respect, this --

6          THE COURT:  If you only want it with Zonolite -- I

7     mean that's the problem.

8          MR. BERNICK:  No.  No.  No.  The vermiculite is

9     what's --

10         THE COURT:  Are you only going to get Zonolite?

11         MR. BERNICK:  Vermiculite is shown here.  I'm content

12    to take out Zonolite here and turn it into vermiculite.  And

13    vermiculite is exactly what's portrayed here.  Mr. Scott's

14    concerned about the name.  That's fine.  We'll say vermiculite,

15    and this will be shown here.  This is what it looks like no

16    matter what its name is.

17         MR. BAENA:  Your Honor --

18         MR. BERNICK:  But, see, you know, it --

19         MR. BAENA:  If his assumption is by his comment that

20    nobody gets past the headline --

21         THE COURT:  Mr. Baena, you didn't even raise this

22    objection.

23         MR. BAENA:  I did, too, Judge.

24         THE COURT:  Where?

25         MR. BAENA:  This was my objection.

1              THE COURT:  When?  Where?

2              MR. BERNICK:  Where?

3              MR. BAENA:  Excuse me?

4              THE COURT:  Where in the papers --

5              MR. BERNICK:  There's not a word in the -- any one of

6  his papers that said this.  Not a word.  And, in fact --

7              MR. BAENA:  This was the objection we raised in 2002

8  to this notice program.

9              MR. BERNICK:  No, actually, you didn't.

10             MR. BAENA:  Okay.

11             MR. BERNICK:  No, you didn't.  You didn't raise that.

12             MR. BAENA:  Okay.  We filed a report from Mr.

13 Hillsey, and it was in his report.

14             MR. BERNICK:  Here's what I would propose as being --

15 think is consistent with what we've just said.  This is the

16 notice that was actually issued for traditional PD and other

17 non-ZAI.  Grace vermiculite products, that's what it --

18             MR. BAENA:  In the body of the notice.

19             THE COURT:  What does the notice caption say?

20             MR. BERNICK:  That's -- this is -- "If you own or

21 operate --" this is going to work completely against what he's

22 saying.  "If you own or operate a commercial, residential, or

23 public building constructed with asbestos-containing products

24 or have other claims against Grace --"

25             THE COURT:  All right.  That won't work.

1          MR. BERNICK:  Well, but that's -- but that's -- and

2    that's because it covered a variety of different products, and

3    somehow that was still okay as a headline.

4          MR. BAENA:  No.

5          THE COURT:  Could -- put it back down.

6          MR. BAENA:  But the only thing that referred to --

7          MR. BERNICK:  Excuse me.

8          THE COURT:  Push it back down.

9          MR. BAENA:  The only thing that --

10          MR. BERNICK:  Yes, here it is.

11          MR. BAENA:  Judge, this is impossible.  This is --

12          THE COURT:  Gentlemen --

13          MR. BAENA:  -- impossible.

14          THE COURT:  -- please put it, so that I can see the

15    caption.

16          MR. BERNICK:  Yes, I am.

17          MR. BAENA:  Down.  Down.  The headline.

18          THE COURT:  Thank you.

19          MR. BAENA:  And there are -- this notice, Your Honor,

20    was for medical monitoring, and it was for general unsecured

21    claims and traditional property damage.

22          MR. BERNICK:  That's also false.

23          MR. BAENA:  Excuse me.

24          MR. BERNICK:  Also false.

25          MR. BAENA:  Okay.

1                MR. BERNICK:  It was for Grace vermiculite products,

2   too.

3                MR. BAENA:  Your Honor --

4                THE COURT:  I am going back to what I said.  Mr.

5   Scott said he would prefer to have Zonolite in if you're

6   limiting it to Zonolite.  If limiting it to Zonolite, leave

7   Zonolite in the caption.  If it's going to be other products,

8   then you need to change the description, so that it is clear.

9   Either that, or you've got to define Zonolite somewhere to

10  include the product names --

11               MR. BERNICK:  That's --

12               THE COURT:  -- otherwise, Grace is not going to get

13  out all of the products that it intends to get out.

14               MR. BERNICK:  I'm happy with that, Your Honor, and

15  what we would propose is to use as the descriptor exactly what

16  we use with respect to other vermiculite products in the -- in

17  the notice that did go out.  So we will say if you have a home

18  with Vermiculate loose fill attic insulation, and where it

19  comes down to here, what is vermiculate loose fill attic

20  insulation, we'll have this descriptor.  It will include

21  reference to Zonolite, and if we want to include other brands,

22  we will list those brand names.  So this would say vermiculite.

23  This would say vermiculite just like it did in the one that

24  went out, and then here when we have the brand names, it's up

25  to us to decide how broad it is that we want it to be.  We will

1  list Zonolite, or we'll list Zonolite and others.

2          THE COURT:  All right.  Vermiculite's broader than

3  Zonolite.

4          MR. BAENA:  Judge, just to observe for the record,

5  their objective is to get as few claims as possible.  Our

6  objective is to give as good notice as possible.

7          THE COURT:  No, I think their objective is to get as

8  many claims as possible, whether they're current or futures,

9  and the Court's objective is to get out whatever kind of notice

10 is going to make sense to as many people as possible.  So I

11 don't want somebody to get a notice they don't understand.

12         MR. BAENA:  Okay, Judge.  Mr. Bernick talked about

13 the effect of not complying.  I said there ought to be

14 something in there about what you got to do.  And the Court and

15 Mr. Bernick refer to the proof of claim form and the

16 instructions which said, oh, they tell you what happens.

17 Remember, Judge, the reader doesn't see that until they request

18 it.  Remember, the notice just says you can request the proof

19 of claim form.  You can request the instructions, but you've

20 got to call a number.  You got to do this.  You got to do that

21 to get it.  It's not in the notice.  That's my only point.

22 That was the point then.

23         MR. BERNICK:  We agreed it -- we agreed.  We said --

24 I don't think Mr. Baena was listening.  The thing that goes out

25 says, "To preserve your claim now and the future, you must file

1  the appropriate claim," and we said we would include, if he --

2  it'll make everybody happy, "or your claim shall be barred --

3  forever barred, estopped, and enjoined."

4          MR. BAENA:  Okay.

5          MR. BERNICK:  We're not having -- we're not -- we

6  don't have a problem with that.

7          MR. BAENA:  And are you leaving in the "or may have a

8  claim in the future?"

9          MR. BERNICK:  That -- we most definitely --

10         MR. BAENA:  I asked the Judge.  I'm sorry, Your

11 Honor.  I am trying to have a --

12         MR. BERNICK:  Well, I have a -- I apologize.

13         MR. BAENA:  -- colloquy with the Court right now not

14 him.

15         THE COURT:  I am having some difficulty with the may

16 have a claim in the future, however, here's the issue, Mr.

17 Baena.  And I think Mr. Bernick articulated this correctly.

18 The may have a claim in the future for people reading this who

19 are not lawyers may indeed get out the contingent claims that

20 are going to be covered anyway by virtue of the statute and may

21 actually have them file claims --

22         MR. BAENA:  Let's stop, Judge.

23         THE COURT:  -- they may not otherwise have.

24         MR. BAENA:  Let's stop then talk -- what is a

25 contingent claim in the context of a Zonolite home?  What is

1  the contingent claim?

2         THE COURT:  Well, here's --

3         MR. BAENA:  We think about guarantees as being a

4  contingent claim?  No.  Some of us do.  Some of us do like

5  courts of law say that those are contingent claims.

6         THE COURT:  Here's the problem.  I -- this is what I

7  think may be the problem.  Let's assume that I have the home

8  with the Zonolite in it, and I get the notice, and it says if I

9  may have a claim, but I don't choose to file a claim now, and I

10  sell my home -- and I'll just use you, Mr. Baena, since we're

11  having the colloquy.  I sell my home to you, and I don't tell

12  you anything about either the notice or the claim form.  I'm

13  not sure what happens to you and your claim in the future.

14         Conversely, let's say that I do see the notice, and I

15  think I do have Zonolite, so I do file the claim, and I accept

16  whatever the remedy is, and I use it for whatever purpose I

17  choose, but I don't remediate the Zonolite in my home, and then

18  I sell my home to you.  I've now taken whatever the debtor has

19  given me as the remediation capability.  I've satisfied that

20  claim forever.  I do know that I've barred you from doing

21  anything that you can do in the future because of that notice.

22  And I don't know that that's appropriate when we're dealing

23  with a potentially hazardous product.

24         I agree with Mr. Bernick that the problem in many

25  other contexts has been that if you have a current claim and

1 you don't file a proof of claim, even though you don't know

2 about the consequence that you may be barred in the future from

3 doing something about it, and you may bar your successors in

4 interest, but I don't know in the context of a potentially

5 hazardous situation if that's appropriate.  And it may mean

6 that a case like this calls out for a different remedy, and so

7 it may not be appropriate to put that future claim holder into

8 this notice program.  It may be appropriate to treat them like

9 a demand holder because of the circumstance in this case.  And,

10 Mr. Bernick, that's what I'm wrestling with.

11          MR. BAENA:  I would like to brief that, Judge.  I

12 would like to brief that --

13          MR. BERNICK:  I'm sorry.

14          MR. BAENA:  -- because I don't think --

15          MR. BERNICK:  I --

16          MR. BAENA:  -- that we've just discussed anything to

17 do with a contingent claim.  I don't think --

18          THE COURT:  I don't think it's contingent.

19          MR. BAENA:  -- it has anything to do with a

20 contingent claim, nor --

21          THE COURT:  I don't think --

22          MR. BAENA:  -- do I think it's a future claim.

23          THE COURT:  I don't think it's contingent.

24          MR. BAENA:  It's a present claim that you're dealing

25 with in the first instance, and what happens with the successor

1  homeowner is a different issue.  They would bar the successor

2  homeowner --

3            THE COURT:  Yes, it would.

4            MR. BAENA:  -- for not filing a claim.

5            THE COURT:  It would bar the claim, because the

6  present homeowner filed the claim, accepted the remedy, and

7  that's that.

8            MR. BAENA:  Okay.

9            MR. BERNICK:  That's right.

10           MR. BAENA:  Okay.

11           THE COURT:  That's what would happen if you did a

12  class proof of claim.

13           MR. BAENA:  And if that -- and if there was

14  contamination in that home, that's probably the right result.

15           THE COURT:  That's what would happen if you --

16           MR. BAENA:  And if there was no contamination in that

17  home, you would say --

18           THE COURT:  They wouldn't be paid.

19           MR. BAENA:  -- it's a future claim.  It's not a

20  current claim.

21           THE COURT:  No, if there was no contamination, there

22  wouldn't be a claim.

23           MR. BAENA:  But that's my point.

24           THE COURT:  Oh, you mean if it's hasn't shown up yet.

25           MR. BAENA:  The best it could be is a future claim or

1  else there's no claim at all.  And, Judge, we are really going

2  out on a limb here in the sense of inviting criticism of a

3  notice program.  We are -- I mean, clearly, the way the notice

4  is written isn't descriptive of the problem that you're

5  describing.  Certainly, we've got to concede that a reader --

6  after two hours of legal argument about this, a reader isn't

7  going to come to the same conclusions that we've come to or --

8         THE COURT:  Oh, Mr. Baena, frankly, this notice is so

9  simple.  In all the things in this case, this is the most

10 simple notice.  People reading this notice have to understand

11 what it's about.  What they may not know is that they have

12 Zonolite in their attic.  But reading this notice tells them

13 clearly that if they know they have Zonolite in their attic,

14 they know what to do with it.  This notice is, if anything, in

15 pretty legible, pretty clear English, and I have no problem

16 saying that anybody seeing this notice can go to take a look at

17 legal counsel and say what do I need to do if they don't

18 understand it on their own.  I have no problem with this

19 notice.  I don't see any problem with it whatsoever, including

20 the caption, except I asked Mr. Scott, because he represents

21 the claimants, if there should be a change.

22        MR. BAENA:  Including the point that it directs

23 people who don't have claims to file a claim anyway.

24        THE COURT:  That --

25        MR. BERNICK:  We don't know that they don't have

1 claims.  That's the point.

2         THE COURT:  The problem that I am attempting to

3 address with respect to the -- to that issue, I think is one

4 that maybe other courts with similar circumstances have looked

5 at.  I'm not aware of the cases if they have, because this kind

6 of an issue has not come up in the breast implant cases and the

7 other cases that you cited earlier, because those are known

8 claimants.  You know --

9         MR. BAENA:  Right.

10         THE COURT:  -- the breast implants are being

11 transferred from one woman to the next.  They're in a known --

12                         (Laughter)

13         MR. BERNICK:  That's true.

14         THE COURT:  Hopefully, they're not.

15         MR. BERNICK:  But at the time that the notice speaks,

16 they are -- you know, you have the same thing here.  You have a

17 home with the product in it and an identifiable person who's in

18 a position to dispose of the claim whether or not it is -- you

19 know, there's contamination or not.

20         THE COURT:  I understand that, but the problem is

21 that you're dealing with a product -- with -- in the case of a

22 home --

23         MR. BERNICK:  Yes.

24         THE COURT:  -- you're dealing with an asset that is

25 transferable -- readily transferable, and you're dealing with

1  potentially a program that may provide, you know, money to

2  somebody who may choose to remediate the home and may not.

3           MR. BERNICK:  But that --

4           THE COURT:  And the difficulty with that is that if

5  they don't use it for that purpose, you're still left with the

6  hazard, and the whole purpose of attempting the remediation and

7  paying somebody to do it has been lost.  And I don't think that

8  that's the purpose of having somebody file a claim under this

9  notice program as saying if you think you may have a claim in

10 the future, file it now, to bar someone who may actually find

11 themselves in the --

12          MR. BERNICK:  But the problem, Your Honor, is that --

13          THE COURT:  -- in that circumstance in the future.

14          MR. BERNICK:  The problem, Your Honor, is that I

15 believe that exactly the opposite is true.  That is that the

16 person who owns the home today can, in fact, give up any and

17 all claims that run with the property.

18          THE COURT:  I agree.

19          MR. BERNICK:  And so it may be that the person who

20 gets the home later on is not well informed and left holding

21 the bag.  And that's true.  That's also a reason why you can

22 try to craft the relief here in a way that would minimize that

23 risk, but that is -- that is the -- that's not just unique to

24 this case.

25          THE COURT:  What interest does the debtor have if the

1  claim holders have a different --

2          MR. BERNICK:  Because we want to be able -- we want

3  to be able to deal with this problem up front now with --

4          THE COURT:  You can't.

5          MR. BERNICK:  -- with certainty --

6          THE COURT:  You can't.  You can't.

7          MR. BERNICK:  -- and not be at risk of an argument

8  that somebody has that says their claim didn't arise until the

9  future.

10          THE COURT:  You can deal with that perfectly through

11  a 524(g) mechanism.  That's exactly what 524(g) lets you do.

12          MR. BERNICK:  That is true that it -- that 524(g) can

13  provide that channeling relief.  There's no question about it,

14  but you're then going to get into the question of all this

15  speculation about, well, what might the future bring.  And we

16  don't have to engage in that speculation, because we have --

17          THE COURT:  The debtor won't be involved in that, so

18  what does the debtor care?

19          MR. BERNICK:  Well, no, but they're going to want to

20  say -- because this is where they're going.  This is the whole

21  place that they're going.  They're then going to want the Court

22  to engage in -- in a sense they're going to force the

23  estimation back to this, which we want to avoid.

24          THE COURT:  Why do we need an estimation?

25          MR. BERNICK:  They'll force the estimation back to --

1  because they'll then say you got to estimate and provide for

2  the futures in the sum of money that you've put into the trust.

3  And they'll then want to engage in all kinds of speculation

4  about how many other homes that are out there will come into th

5  process.  We in turn will have a very simple answer.  You know

6  what I'm saying?  Is that they'll say beyond the currents there

7  are then going to be -- you heard it today -- you know, 100

8  million futures, and, we, therefore, have to set aside enough

9  money to provide for 100 million futures.  Something like that.

10  If they -- they will take that position.

11          We in turn would take the position -- well, we have a

12  simple answer to that.  We want to bar the currents and then

13  set up a 524(g) process that says that if you win in the

14  future, you get paid, but we're going to litigate every single

15  one of those claims on the trust.

16          THE COURT:  But if you're doing that --

17          MR. BERNICK:  And then you'll --

18          THE COURT:  But you already have that position.  I

19  mean you don't need a bar date for that.

20          MR. BERNICK:  But see, Your Honor, no -- no, Your

21  Honor -- Your Honor, (a) we do, because we want to get the

22  current claims in to then (b) the subject of that ruling.  We

23  want to apply the science opinion not to ten claimants but to

24  all current claimants.  But, Your Honor, hear me out,

25  because --

1          THE COURT:  That's not the purpose of the bar date.

2  I'm sorry.

3          MR. BERNICK:  Well --

4          THE COURT:  That is not the purpose.

5          MR. BERNICK:  Well, it --

6          THE COURT:  If you want to expand that ruling in that

7  fashion, it seems to me you need a summary judgment argument of

8  some sort, or you need a 5 --

9          MR. BERNICK:  We will.  We will, but it has to be

10  binding with respect to -- we have to be binding with respect

11  to currents.  But, Your Honor, hear me out again, because --

12          THE COURT:  I'm sorry.  We're leaving in ten minutes.

13  I retract what I said about staying all night.  I've just --

14  I've had it.

15          MR. BERNICK:  Okay.

16          THE COURT:  So ten minutes, and we're quitting, and

17  if we --

18          MR. BERNICK:  Okay.  Well, I'll --

19          THE COURT:  -- if I get to a ruling, I do, and if I

20  don't, I don't.

21          MR. BERNICK:  Okay.  Well, I -- then I -- Your Honor,

22  again, we're trying to do something that's good here.  What

23  we're saying is that rather than put ourselves into a position

24  where we've got poles apart, we say zero, they say 100 million,

25  that we create the predicate for having a plan that actually

1  brings people in, and instead of leaving the tail there

2  resolves the claim now in the same fashion that I can resolve

3  the claim with Ms. Krieger.  That is to say you don't have to

4  wait until some artificial date down the road to resolve the

5  claim.  Any homeowner, any car owner, any owner can release a

6  party with respect to a claim that applies to a piece of

7  property that they have.  That is one of the benefits of the

8  particular situation we have here.

9          So what we're trying to do, we're trying real hard to

10  -- in using the bar date to get a broad population of claimants

11  in in order to provide as much as closure as possible through

12  the plan, and if we don't do that -- you know, I -- look --

13  Your Honor, if you would feel more comfortable if we take may

14  out, we'll take may out, but it was our effort to try to

15  advance the caus further down the road for daeling with the

16  plan.  That's why we did it.  If it makes Your Honor feel

17  uncomfortable, take the may out.  We'll -- we -- we'll revoke

18  our proposal.  We think that it was a good idea.  We think that

19  may includes a lot of things.  You know, how many people

20  understand contingent claims?  But if it's too much out of the

21  edge, then we'll do it.  So if Your Honor would be -- we'll

22  withdraw the suggestion.  We'll withdraw the revision, because

23  Your Honor has just said the most important thing today, which

24  is the notice is clear.  People will understand it.  They'll be

25  able to go forward.  We'll take that last issue out, and if

1 Your Honor will today enter our order without that language, we

2 have nothing more to say.

3      THE COURT:  Well, I understand why the debtor wants

4 to put it in with respect to the may.  It seems to me that

5 you're correct.  That more people will understand may than they

6 will the concept of contingent claims.  Nonetheless, I think

7 there is an issue with respect to attempting to get the future

8 claims in the context that that notice does it.  And to the

9 extent that there's an objection, I'm afraid it may go too far

10 and be misinterpreted.

11      MR. BERNICK:  Okay.  Fine.  So we'll revise our

12 proffer and eliminate the -- I think we can pretty much take

13 out or not pursue the May 23 amendments, because I think that

14 they just related to that and to the notice to the aboriginal

15 tribes in Canada, which is not before the Court.  So we would

16 withdraw -- agree to withdraw our May 23 revisions.

17      THE COURT:  All right, Mr. Scott.

18      MR. SCOTT:  Just one additional point, Your Honor.

19 It is pointed out to me that the order -- the proposed order

20 also includes a provision that parties cannot file class proofs

21 of claim, so long as that -- I'm not sure that's appropriate in

22 that order, and we haven't had a discussion about the timing of

23 how the Court wants to entertain class proofs of claim or that

24 we should file the class proof, seek a motion ahead of time to

25 file the class proof of claim, but I certainly didn't want to

1  foreclose --

2           MR. BERNICK:  No.

3           MR. SCOTT:  -- obviously, the prospect.  And I'm

4  certain that wasn't their intention.

5           MR. BERNICK:  That's not our intent, and I'm happy --

6  will be very happy if Your Honor enters the order on this, and

7  I'd be happy -- although, obviously, it's Your Honor's time and

8  the Court personnel time to talk about a date for arguing the

9  class, although I think we probably argued it today a lot.  I'm

10  happy to set a date, because that's what Your Honor indicated

11  last time, where we can come, and Mr. Scott can be heard on

12  that issue.

13           THE COURT:  Yes, I think at this point the issue

14  should -- the information about the class proof of claim, not

15  filing one, probably should be taken out.  We're --

16           MR. BERNICK:  We'll take it out.

17           THE COURT:  I think we'll just adjudicate them in the

18  normal course.  I am concerned, Mr. Scott, about the nature of

19  the class proof of claim in this context.  I wonder what -- and

20  I'm not trying to push off this issue, because I think it is --

21  it may be one vehicle to resolve this, but I really wonder if a

22  524(g) trust can be implemented, whether that isn't going to be

23  a better resolution.  And so --

24           MR. SCOTT:  That's a good question.  That's a --

25           THE COURT:  And so I wonder whether you want to

1 pursue class proof of claim arguments.  If you do, then I need

2 to give you a date.  If you're content to see what happens with

3 respect to this bar date issue and what comes in and whether it

4 will lead to a 524(g) trust solution --

5 　　　　　MR. SCOTT:  We would definitely like to argue the

6 class certification issues if we think it's appropriate.  Worst

7 case, it could shed light on the value of 524(g), and so I do

8 think it's imperative that that be addressed, because I -- it

9 will sharpen the Court's understanding of the actual situation

10 of the Zonolite claimants, and the more Court understands that,

11 I think the better off the claimants will be.

12 　　　　　THE COURT:  All right.  First of all, then with

13 respect to this proof of claim bar date issue, I will take an

14 order from the debtor that makes the changes that we've

15 discussed --

16 　　　　　MR. BERNICK:  Okay.

17 　　　　　THE COURT:  -- and enter it -- are you going to be

18 filing that tomorrow or circulating it with counsel?

19 　　　　　MR. BERNICK:  We'll circulate it with counsel I hope

20 by tomorrow and then I hope we can file it immediately

21 thereafter, so that we can get going.

22 　　　　　MR. BAENA:  Judge, could we have a date -- the bar

23 date?  I don't think --

24 　　　　　THE COURT:  Oh, yes.

25 　　　　　MR. BAENA:  We haven't set a date.

1          THE COURT:  We've never discussed the bar date.  Has

2  -- is anyone objecting to what the debtor had proposed, which

3  was 140 days.  Is that correct?

4          MR. BERNICK:  One hundred forty days.  And that's

5  very important for us in terms of marching --

6          THE COURT:  What date is that?

7          MR. BERNICK:  One hundred and forty would be three

8  months and 20 days, so three months and 20 days from today

9  would be roughly, June, July, August, some time after Mr.

10 Frankel gets back from his famous vacation at the end of

11 September.

12         THE COURT:  Why don't we say September 30?

13         MR. BERNICK:  That's fine.

14         MR. BAENA:  Judge, according to the notice flow chart

15 that accompanies the program, they anticipated a May 1 approval

16 date.  We're obviously 30 days --

17         THE COURT:  Yes.

18         MR. BAENA:  -- behind.  With the May 1 approval date,

19 they presumed that they would not complete their notice program

20 until August 7th, and so --

21         THE COURT:  Oh.

22         MR. BAENA:  -- if we roll it forward, then they won't

23 complete it until September 7, and parenthetically, I will tell

24 you it might be wise to make sure that they can get all these

25 publications in now given that we're rolling 30 days forward.

1          Secondly, so I -- all you would be giving is like

2    three weeks for people to comply.

3          THE COURT:  That's -- and that's not enough.

4          MR. BAENA:  And we requested last time in respect of

5    property damage that there be at least 90 days from the

6    conclusion of the notice sent.  Again, people have to request

7    things.  People have to complete things.  We've alluded to the

8    prospect of people having to hire lawyers now, and I would

9    think that you want to roll this out to the end of the year.

10         MR. BERNICK:  No, this is -- it's the same old stuff.

11   First of all, you have a rolling process.  It's not that --

12   nobody gets the notice until the last person gets the notice.

13         Secondly, with respect to property damage, we were

14   agreeable to a very extended period of time because of the very

15   detailed claim form that was adopted in connection with that.

16   We don't have a claim form here.  We don't have a complex of

17   the products.  We don't have a complex set of different uses

18   for products, and that date is totally appropriate.

19         Your Honor, this is an issue.  Where they're going is

20   to jam us on the confirmation hearing.

21         THE COURT:  Well, I don't want jammed on the

22   confirmation hearing either, but I am concerned that if the

23   notice program won't be finished until the beginning of

24   September, that those people who don't hear about it until that

25   time won't have enough time.

1          MR. BERNICK:  Well, typically, you get --

2          MR. BAENA:  Judge, the way it works is you don't

3 achieve your --

4          THE COURT:  I'm sorry.  Just a second.  Ms. Baer.

5          MS. BAER:  Our notice expert indicated if you look at

6 it, most of the publications are done within 60 days of the

7 rolling, but when you get to the end, you've got the people who

8 have now gotten four or five different notices from different

9 sources.

10         THE COURT:  So when is it going to start.

11         MS. BAER:  It's keyed off of when you enter the

12 order, and then it immediately starts.  We get the publications

13 in as soon as we can based on when they --

14         MR. BERNICK:  But when is the first publication?  Mr.

15 Baena, if you could help us?  When is the first publication?

16         MR. BAENA:  Yes, according to your program, the first

17 publication would be in July.

18         MR. BERNICK:  Okay, so then the first T.V.?

19         MR. BAENA:  T.V. is yes, July.

20         MR. BERNICK:  Okay, so --

21         MR. BAENA:  July 14th.  Roll it forward to August

22 14th.

23         MR. BERNICK:  I now understand and remember this.

24         MR. BAENA:  Yes, the way --

25         MR. BERNICK:  It's iterative, so yes, hypothetically,

1  you might have a person at the very end, but that -- who kind

2  of saw it for the first time, but the whole idea is that it's a

3  series of overlapping --

4          THE COURT:  Okay.

5          MR. BERNICK:  -- notices.

6          MR. BAENA:  Judge --

7          THE COURT:  Well, if --

8          MR. BAENA:  -- if I may?  Judge --

9          THE COURT:  If the first one's going out in July,

10 then it seems to me that this 100 -- that 120 days from July

11 14th is still 30, 60 -- is October 14th.  So why don't we say

12 if you make the bar date October 31, that still gives you two

13 months -- two and a half months until the plan confirmation.

14 That should be sufficient, and that should get the --

15         MR. BAENA:  July is August now, Judge.  It starts

16 July with a May 1 approval.  We're at June, so --

17         THE COURT:  Well, you ought to be able to get it

18 started --

19         MR. BERNICK:  Yes.

20         MR. BAENA:  So, Judge -- Judge, if I may?  The way

21 you -- you know, they talk about reach.  The way you get the

22 reach is by completing the program.

23         THE COURT:  Yes.

24         MR. BAENA:  And so if you don't go through the entire

25 program, and you got to wait for that last publication, and

1  then give that person enough time to do all these things that

2  you were talking about --

3           THE COURT:  Yes.

4           MR. BAENA:  -- and --

5           MR. BERNICK:  What?

6           MR. BAENA:  -- so as I hear you, you're giving 30

7  days?

8           THE COURT:  No, I'm giving 60 basically for the very

9  last person, because under the original program, it should've

10  been done in August.  I'm now assuming it's going to be done in

11  September, and I'm giving until October 31st for the bar date,

12  which is actually six weeks beyond the last publication.

13           MR. BERNICK:  Right.  In other words, you've moved it

14  out.

15           THE COURT:  Until October 31st.

16           MR. BERNICK:  Yes, we were saying at the end of

17  September, Scott, and she's made it the end of October.

18           MR. BAENA:  Okay, Judge, I do urge you to require the

19  debtor to speak to their media placement expert, because we're

20  in an election period.  There is going to be a problem with

21  placing these ads.  We've been alerted to that.

22           THE COURT:  Okay.  If there is a problem placing the

23  ads, then I want the debtor to notify me of that fact, and I

24  reserve the right to extend this bar date.  So you can --

25           MR. BERNICK:  All right.  And --

1            THE COURT:  -- you can all discuss it, but for now

2   I'm going to set it at October 31st.  Mr. Baena, if you have

3   some indication, you know, as this date approaches that that's

4   an improper -- too short for whatever reason, I'll hear that as

5   this date marches, but we need a deadline for now, and I'm

6   going to make it October 31st.

7            MR. BAENA:  That's fine, but, Judge, I don't want to

8   come back.  I don't want to be forced to come back and complain

9   after you spent all this money.  All I'm asking is have them

10  ask their expert now --

11           THE COURT:  I will have them ask it now.

12           MR. BAENA:  -- whether they can make all this media

13  placements and have them just give us a notice.

14           MR. BERNICK:  You can't -- the way that we'll find

15  out is (a) if we get the order entered, i.e., when we send it

16  out tomorrow or the next day, that we get a prompt response, so

17  that we don't have to ask for another hearing before the Court,

18  which has happdned frequently in the past, and (b) then people

19  go -- start to make the calls to make the placements.  You

20  don't find out whether the space is there by kind of saying,

21  well, gee, might there be space there.  You find out by bidding

22  for it.

23           MR. BAENA:  You reserve that space.

24           MR. BERNICK:  What?

25           MR. BAENA:  It's my understanding you can reserve the

1  space.

2         MR. BERNICK:  The way we're going to reserve space is

3  get an order from the Court that authorizes us to go --

4         THE COURT:  You've got an order.  You're authorized

5  to go get the space.

6         MR. BERNICK:  Great.

7         THE COURT:  So go find the space.

8         MR. BERNICK:  Okay.

9         THE COURT:  Let the committee and the other parties

10  know by the end of the week whether the ads can be completed by

11  the end -- by the middle of September.  I'm assuming that they

12  can be completed by the middle of September in setting an

13  October 31st bar date.

14         MR. BERNICK:  Okay.

15         THE COURT:  If they can't, then I want to know that

16  fact, so that we -- then we can have a phone conference.  I

17  will be in the office all day tomorrow, all day Thursday, all

18  day Friday.  Well, part of the day Friday.  I have a conference

19  I have to go to at lunch time.  So I'll be in most of the day

20  Friday.  Get through to me by Thursday if there is an issue

21  with respect to this before these notices actually have to be

22  printed.  But I'm assuming that October 31st will be an

23  adequate tmie frame for people to file proofs of claim.

24         MR. BAENA:  And if, Judge, you could just require the

25  media placement person to file a certificate at the end of the

1 media program describing all of the placements that were made

2 and completed?

3           THE COURT:  Yes.

4           MR. BAENA:  We would appreciate that --

5           THE COURT:  Yes, that -- I --

6           MR. BAENA:  -- at the end of the program.

7           THE COURT:  At the end of the program, yes, I believe

8 that's required under the Court order that was submitted

9 earlier, I think.  If it isn't, add it, Ms. Baer, please.

10          Mr. Scott, what I propose to do is this.  My staff is

11 gone, so I'm not going to be able to find a date for the

12 argument right now.  If no one objects, I will have Ms. Baer

13 contact my staff in the morning and work out a date for the

14 argument.  I think we will be able to do it in July.  The

15 omnibus hearing is July 21st.  Correct?

16          MS. BAER:  Yes.

17          THE COURT:  I think we might be able to do this

18 argument on the 22nd of July, the next day, but I have to

19 verify that with staff in Delaware, because I know I've got

20 something scheduled that morning, and I don't know if it's

21 going to carry into the afternoon.  So I'm not positive of that

22 fact.  If so, that may be the best time.  If not, then I'm

23 going to have to look for another date.  But if Ms. Baer can

24 contact staff, they can work out a date with her, and then she

25 can send an e-mail around for the date for the argument.  I'm

1  assuming that two hours is going to be sufficient?

2       MR. SCOTT:  Perhaps.  The Court ought to allow three.

3  In view of the Court's comments today, I think the hearing on

4  class certification will not be just limited to the present

5  motion which concerns recognition of a class proof of claim

6  with regard to the certified class, but will be the blotter

7  question as to whether class treatment of Zonolite claims has

8  utility here or not, otherwise, it would be piecemeal.  So it's

9  a longer --

10       MR. BERNICK:  I don't understand what the difference

11  is.  I mean I have never -- I've urged shorter hearings in the

12  past, and I have long ago learned that the Court is most

13  interested in hearing all the issues to completion, and,

14  therefore, if Mr. Scott believes that we ought to set aside

15  three hours, I'm not going to argue with him on that.  It would

16  be helpful if we then had an allocation of time and we knew who

17  was going to be arguing.

18       THE COURT:  I will allocate -- I will allow three

19  hours.  It's allocated half and half by each side.  So you

20  folks within the sides can determine who's arguing, but it's

21  half for the class certification and half against the class

22  certification.  You folks divide it up as you choose, but I am

23  limiting it to three hours.  Mr. Monaco.

24       MR. MONACO:  Your Honor, for the record, Frank Monaco

25  for the Crown.  I did not intend to fall on the agony.  I

1  promise to be brief.  While we're on the form of order, you

2  heard earlier today that the Crown and the Canadian claimants

3  were not going to be part of this process, however, I am

4  concerned about the form of order.  At Page 4, the very first

5  decretal paragraph has a provision that basically requires that

6  counsel that participates in this hearing have to produce lists

7  of ZAI addresses.

8          My concern -- and I raised this in an earlier hearing

9  -- within 30 days is -- first of all, there  should be some

10 qualifying language regarding best efforts.  Second of all,

11 that it was -- could burdensome and expensive.  And also

12 there's another concern that has come up recently that this

13 could violate Canadian privacy acts.

14         What I would suggest doing, since we're circulating a

15 form of order, is that we specifically except out counsel to

16 the Crown in this provision.

17         MR. BERNICK:  We're happy to do that.  It's nothing

18 to do with Canada.

19         MR. MONACO:  Well, I -- well, the way it's written

20 now, it says anyone who's participating in these hearings.

21         MR. BERNICK:  Well, then -- you're right.

22         MR. MONACO:  So I want it to be -- the record to be

23 clear on this point.

24         MR. BERNICK:  That's fine.  You should --

25         THE COURT:  All right.  The order that's going to be

1    issued with respect to these notices will only affect the

2    United States claims.

3            MS. BAER:  Right.

4            THE COURT:  Now, if you happen to have the United

5    States claimant, Mr. Monaco, it will apply to you in your

6    capacity as representing that United States claimant.

7            MR. MONACO:  I do not know if one, Your Honor.

8            THE COURT:  Okay, so but not to Canadian claims.

9            MR. MONACO:  Thank you.

10           THE COURT:  Okay.

11           MR. BAER:  Your Honor, I have the two orders from

12   Items 1 and 2.

13           THE COURT:  All right.  I'll take those.  Did we go

14   through everything?

15           MR. BERNICK:  What?  We really appreciate Your

16   Honor's spending the time late here.

17           MS. BAER:  Your Honor, it's Items 13 through the end

18   are all ZAI related.  I should note that if you go back on

19   property damage, Mr. Speights still has two matters that we've

20   resolved, but we still haven't submitted the settlement

21   agreements, so we can carry them on the agenda again.

22           THE COURT:  Are those on -- no, those are not 18.

23   Those are --

24           MS. BAER:  No.

25           MR. O'NEILL:  Those are 11 and 12, Your Honor.

1           THE COURT:  All right.  Those are just carried until

2     June, so that you can submit a settlement order?

3           MR. O'NEILL:  Yes.

4           THE COURT:  Anything else?  Those are continued to

5     June --

6           MS. BAER:  23rd.

7           THE COURT:  -- 23rd, unless a settlement order is

8     submitted earlier.  Did I miss anything else?

9                     (No verbal response)

10          THE COURT:  Okay.  With respect to 15, I need an

11    order from the debtor that denies the request for me to dismiss

12    an individual claim.  If the individual claimants choose to

13    dismiss their claims, they may do so, but I'm not picking a

14    claim to dismiss simply for the purpose of dismissing a claim.

15    I don't think that's appropriate.

16          Okay.  With respect to Item 16, with respect to the

17    request that the Court use a Court-appointed expert, I think

18    I've indicated that if an expert is necessary in this context,

19    and I think this may be something that we will be addressing

20    again in another proceeding perhaps later, whether an expert is

21    necessary, I really think it would be more appropriate for the

22    parties to get their own experts and for the Court simply to

23    adjudicate the matter rather than using a Court expert.  It

24    will just add expense to this proceeding, because everybody

25    would have the right to contest the Court's expert in any

1  event.  I don't think that it would add any benefit, so I will

2  deny that motion, too, but for that reason.  Not to deny the

3  process but simply to say that the parties should get their own

4  experts, if that is necessary.  So, Ms. Baer, if you will, I'll

5  take that order, too.

6        With respect to Item 17, which was the ZAI claimants'

7  request to lift the stay and return to the tort system, I

8  carried that from the last hearing, because I wanted you folks

9  to try to mediate a resolution, and I simply wanted to keep the

10 status quo.  I indicated at the last hearing, and I -- nothing

11 I've heard today has changed my mind, that, in fact, I think

12 you folks are here -- I believe this is the appropriate place

13 to resolve the issues related to ZAI, and I don't see a benefit

14 at this point to returning ZAI to the tort system.  I think

15 that the estimation needs to be done here.  I don't see how the

16 debtor is going to confirm a plan, frankly, without it, so for

17 those reasons, I'm going to deny that motion.  I'll deny it

18 without prejudice.  I want you folks to continue to try to

19 resolve these matters informally.  That motion is to be denied

20 without prejudice, and, Ms. Baer, I'll take an order from you

21 to that effect as well.

22        MS. BAER:  Okay.

23        THE COURT:  And with respect Item 18, this was the

24 expedited motion of the Canadian ZAI claimants for relief from

25 stay.  I don't remember this one.  I'm sorry.

1          MS. BAER:  Your Honor, it's identical to the one for

2  the U.S. claimants, but it's been filed by the ZAI claimants of

3  Canada.

4          THE COURT:  Oh.

5          MR. HOGAN:  And pursuant to I think the arrangement

6  that we have in place, Your Honor, all the --

7          THE CLERK:  State your appearance.

8          MR. HOGAN:  I'm sorry.  Daniel Hogan on behalf of the

9  Canadian ZAI claimants, or ZED AI, as the Canadians like to

10  pronounce it, Your Honor.  I think we were adjourning all

11  matters relative to us in light of our agreement in principle.

12          THE COURT:  Oh, including --

13          MR. HOGAN:  And so I just ask that this be adjourned.

14  It can be dismissed at some point down the road, but for

15  purposes of our settlement or agreement in principle --

16          THE COURT:  All right.

17          MR. HOGAN:  -- I think that's probably the more

18  appropriate thing to do.

19          THE COURT:  It's continued until July then.

20          MR. HOGAN:  Thank you, Your Honor.

21          THE COURT:  July 21.  Okay.  Now, is that everything?

22          MS. BAER:  That's the agenda.

23          THE COURT:  All right, folks.  We're adjourned.

24  Thank you.

25          MR. BERNICK:  Thank you very much, Your Honor.

211

1          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

2          MR. BAENA:  Appreciate the Court's time.

3                    * * * * *

## C E R T I F I C A T I O N

We, TAMMY DeRISI and PATRICIA C. REPKO, court

approved transcribers, certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter, and to the best of

our ability.


/s/ Tammy DeRisi
TAMMY DeRISI


/s/ Patricia C. Repko
PATRICIA C. REPKO                    DATE:  June 10, 2008

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**