**Exhibit B**

Elyse Napoli Filon
Vice President
Tax, Risk Management & Strategic Finan

W. R. Grace & Co.
5400 Broken Sound Boulevard NW
Suite 300
Boca Raton, FL 33487

(561) 362-1302
Fax: (561) 362-1323
e-mail: elyse.napolifilon@grace.com

**GRACE**

September 3, 2002

<u>**BY HAND DELIVERY**</u>
Mr. Fritz Vilma
Case Manager
Internal Revenue Service
Mail Stop 4714
7850 SW 6th Court
Plantation, Florida 33324

*Received*
*James F. Fierli*
*IRS - LMSB 1714*
*9/3/2002*

<u>**PROTEST**</u>
In Re: Fresenius Medical Care Holdings, Inc. - EIN 13-3461988
<u>Taxable Years: 1993 through 1996</u>

Dear Mr. Vilma:

This letter constitutes a Protest to the various Forms 5701 – Notice of

Proposed Adjustments ("NOPAs"), identified in a Revenue Agent's Report ("RAR")

dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Fresenius

Medical Care Holdings, Inc. Affiliated Group ("Taxpayer") with respect to taxable years

ending December 31, 1993 through December 31, 1996. Fresenius Medical Care

Holdings, Inc. (f/k/a as W.R. Grace & Co.[1], and after that Fresenius National Medical

Care Holdings, Inc.), a New York corporation ("Fresenius" E.I.N. 13-3461988) is the

---

[1]     During the periods referred to in this Protest and the NOPAs a number of different
corporations were named W.R. Grace & Co. They subsequently changed their names. These
corporations during these periods were also the common parent corporations of consolidated
groups referred to by the same name. This explanation is provided to assist the Appeal Office in
understanding the various corporate changes and other issues, some of which arise from the
bankruptcy filing in April 2001 by Grace-Conn.

**GRACE**

Elyse Napoli Filon
Vice President
Tax, Risk Management & Strategic Finan

W. R. Grace & Co.
5400 Broken Sound Boulevard NW
Suite 300
Boca Raton, FL 33487

(561) 362-1302
Fax: (561) 362-1323
e-mail: elyse.napolifilon@grace.com

September 3, 2002

<u>**BY HAND DELIVERY**</u>
Mr. Fritz Vilma
Case Manager
Internal Revenue Service
Mail Stop 4714
7850 SW 6th Court
Plantation, Florida 33324

**PROTEST**
In Re: Fresenius Medical Care Holdings, Inc. - EIN 13-3461988
<u>Taxable Years: 1993 through 1996</u>

Dear Mr. Vilma:

This letter constitutes a Protest to the various Forms 5701 – Notice of Proposed Adjustments ("NOPAs"), identified in a Revenue Agent's Report ("RAR") dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Fresenius Medical Care Holdings, Inc. Affiliated Group ("Taxpayer") with respect to taxable years ending December 31, 1993 through December 31, 1996. Fresenius Medical Care Holdings, Inc. (f/k/a as W.R. Grace & Co.[1], and after that Fresenius National Medical Care Holdings, Inc.), a New York corporation ("Fresenius" E.I.N. 13-3461988) is the

---

[1]    During the periods referred to in this Protest and the NOPAs a number of different corporations were named W.R. Grace & Co. They subsequently changed their names. These corporations during these periods were also the common parent corporations of consolidated groups referred to by the same name. This explanation is provided to assist the Appeal Office in understanding the various corporate changes and other issues, some of which arise from the bankruptcy filing in April 2001 by Grace-Conn.

common parent of Taxpayer for the taxable years ended December 31, 1993 through December 31, 1996. This letter also constitutes a Protest to the various Forms 5701 – Notice of Proposed Adjustments designated as NOPA XXX-G identified in a Revenue Agent's Report ("RAR") dated August 2, 2002 and a corrected RAR dated August 30, 2002 issued to Sealed Air Corporation Affiliated Group (f/k/a W.R. Grace & Co. Affiliated Group) with respect to the taxable period September 29, 1996 through December 31, 1996 to the extent those correlative adjustments impact Taxpayer's tax liability. Sealed Air Corporation (f/k/a W.R. Grace & Co. and before that f/k/a Grace Holding, Inc.), a Delaware corporation ("Sealed Air" E.I.N. 65-0654331), is the common parent of the Sealed Air Corporation Affiliated Group (referred to herein as the Grace-Delaware consolidated group) for the taxable period September 29, 1996 through December 31, 1996.

On September 28, 1996, Sealed Air and certain directly and indirectly wholly-owned subsidiaries, including W.R. Grace & Co.—Conn., a Connecticut corporation ("Grace-Conn." E.I.N. 13-5114230) were spun out of the Taxpayer's consolidated group. Immediately following the spin-off, Grace Holding, Inc. changed its name to W.R. Grace & Co. ("Grace Delaware; n/k/a Sealed Air) and became the parent of a new consolidated group known as the W.R. Grace & Co. and Subsidiaries (E.I.N. 65-0654331) consolidated group which included Grace-Conn.

On March 31, 1998, Grace-Conn., which had become a subsidiary of Grace Specialty Chemicals, Inc., a Delaware Corporation (E.I.N. 65-0773649) (n/k/a W.R. Grace & Co.), and its new parent were spun out of the Grace-Delaware consolidated group. Immediately following the spin-off, Grace-Conn. became a member

of the W.R. Grace & Co. and Subsidiaries (E.I.N. 65-0773649) consolidated group. The Grace-Delaware consolidated group continued in existence and Grace-Delaware subsequently changed its name in 1998 to Sealed Air Corporation. Sealed Air today remains the common parent for the consolidated return filed for the period September 29, 1996 to December 31, 1996.

The Service made certain identical adjustments to both the Taxpayer for 1996 and to the Grace-Delaware consolidated group for the short period commencing September 29, 1996 and ending December 31, 1996. These Grace-Delaware consolidated group items are correlative to the proposed adjustments to Taxpayer and affect, in part, the amount of a net operating loss carryback to the 1994 year of Taxpayer. These NOPAs are designated in the RAR by the issue number followed by the letter "G" and are similarly subject to this Protest.

Taxpayer hereby protests the identified adjustments and requests that all of the matters addressed herein be referred for review by the Appeals Office. Taxpayer also respectfully requests a conference with said Appeals Office. Taxpayer reserves the right to supplement this Protest both before and during such conference.

A power of attorney authorizing the undersigned to represent the Taxpayer has previously been furnished to you.

Exhibit 1 attached hereto identifies NOPAs which were included or referenced in the RAR to which the Taxpayer does not object and which should be treated by Appeals as tentatively agreed items that are not otherwise addressed in this Protest. Grace-Conn is severally liable for any assessment of taxes made with respect to both Taxpayer and the Sealed Air consolidated group. Both W.R. Grace & Co. and Grace-Conn are currently debtors in a bankruptcy action pending in Delaware (Docket No. 01-01140-PJW) and has been informed by its bankruptcy counsel that it will need court approval before it can agree to the NOPAs which are not being protested.

4

## Proposed Adjustments Protested

| NOPA | Year | | | | Affirmative Adjustment |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | |
| 112 | | | | | |
| 112-G | | | | $ 1,114,755 | (*) |
| 114 (R&E Credit) | $ 2,525,033 | $ 2,875,927 | $ 1,613,883 | $ 385,245 | (*) |
| 129 | $30,781,976 | $26,954,034 | $32,836,273 | | |
| 129-G | | | | $19,291,369 | (*) |
| 136 | | | | $ 6,666,870 | (*) |
| 142 [1] | | | $ 2,083,449 | | (*) |
| 144 [2] | | | | | $3,253,277 |
| 148 | | | | | $8,347,850 |
| 148-G | | | | $ 2,665,750 | (*) |
| 150 | | | | $ 921,252 | (*) |
| 150-G | | | | $ 1,352,568 | (*) |
| 152 | | | | $ 467,432 | (*) |
| 155 | ($ 7,371,173) | $ 203,209 | ($ 2,658,629) | ($ 351,437) | (*) |
| 155-G | ($10,497,910) | $ 324,486 | $20,114,463 | $ 1,418,914 | (*) |
| 156 | | | | $ 490,360 | (*) |
| 157 | $17,814,555 | $21,956,834 | | $ 1,481,261 | (*) |
| 158 (G.B. Credit) | | $ 2,630,402 | | | (*) |
| 159 (NOL Deduction | $11,214,676 | | | | (*) |
| 160 (Mini Tax Credit) | $22,376,476 | | | | (*) |
| 161 | | | | ($13,507,251) | (*) |
| 162 (FT Credit | ($ 2,161,697) | ($ 210,626) | $11,147,398 | $12,527,990 | (*) |
| 164 [3] | | ($1,373,647) | | | (*) |

(*)  To be furnished to Appeals Officer.

[1]  The NOPA disallowed a claim for an affirmative adjustment of the stated amount.  Taxpayer reserves the right to ask for an increase to its claim.

[2]  The NOPA disallowed a claim for an affirmative adjustment of the stated amount.  Taxpayer reserves the right to ask for an increase to its claim.

[3]  The NOPA disallowed part of a claim for an affirmative adjustment.  Taxpayer protests the disallowed amount.

Explanations of Adjustments and Reasons for Protest

<u>NOPA 112</u>

In NOPA 112, the Service proposed to disallow a deduction of $1,114,755 for Taxpayer for the year taxable ended December 31, 1996. The adjustment is labeled, "Schedule M-1, line 5, adjustment relating to the 1996 Restructuring Reserve, Account # 2868-19."

According to NOPA 112, this adjustment relates to the transfer of a credit balance of $1,500,000 from its 1995 Restructuring Reserve. In NOPA 112 and NOPA 112-G, the Service determined that Taxpayer should increase its income for 1996 as a result of the transfer of this credit balance. The Service also disallowed an "uninvestigated charge" of $19,970 on the grounds of lack of substantiation.

These adjustments relate to restructuring, divestment, environmental and special charges reserves. Taxpayer is reviewing these and other reserves and was not able to complete its analysis prior to the issuance of the RAR. Taxpayer anticipates that it will provide additional evidence supporting these Schedule M-1 items to Appeals.

<u>NOPA 112 – G</u>

In NOPA 112-G, the Service proposed to disallow deductions of $385,245 claimed by the Grace-Delaware consolidated group for the taxable year ended December 31, 1996. This adjustment appears to be the balance of the $1,500,000 adjustment that is discussed above with respect to NOPA 112.

This adjustment relates to restructuring, divestment, environmental and special charges reserves. Taxpayer is reviewing these and other reserves and was not

able to complete its analysis prior to the issuance of the RAR. Taxpayer anticipates that it will provide additional evidence supporting these Schedule M-1 items to Appeals.

## NOPA 114

Attached hereto and incorporated herein as Exhibit 2 is a memorandum dated August 24, 2002 setting forth Taxpayer's position disagreeing with the proposed adjustment and setting forth its position that the research and experimentation credits were understated and should be increased as is set forth in Exhibit 2.

## NOPAs 129 and 129-G

| NOPA | Year Ended | Amount |
|---|---|---|
| 129 | 12/31/93 | 30,781,976 |
| | 12/31/94 | 26,954,034 |
| | 12/31/95 | 32,836,273 |
| | 12/31/96 | 19,291,369 |
| 129-G | 12/31/96 | 6,666,870 |

These NOPAs all relate to the disallowance of interest deductions related to corporate owned life insurance ("COLI"). These issues were addressed in detail in a protest filed on August 14, 2001, and a supplemental protest filed on August 27, 2002 (the "COLI Protests") with Mr. Fritz Vilma, the Service's case manager. These COLI Protests have already been forwarded to the Appeals Office for consideration. Taxpayer hereby repeats its objections to these adjustments and the arguments set forth in the COLI Protests are incorporated herein by reference.

## NOPA 136

In NOPA 136, the Service proposed to disallow deductions of $2,083,449 for the taxable year ended December 31, 1995. Taxpayer claimed a deduction for an

Environmental and Adjusted Divestiture Reserve of $2,107,585, which the Service proposes to disallow to the extent in excess of $24,136.

Taxpayer maintained accounts for purposes of tracking its environmental and divestiture liability. During 1995, the balance in the relevant account with respect to environmental reserves increased by $2,398,411, whereas the balance with respect to divestiture liabilities decreased by $290,826. The difference of $2,107,585 is the amount of the deduction claimed by Taxpayer.

The Service's position appears to be that the Taxpayer did not, in fact, incur a deductible liability. NOPA 136 expressly acknowledges that this is a factual issue.

This adjustment relates to restructuring, divestment, environmental and special charges reserves that were deducted in 1995. Taxpayer believes that this is an accounting issue relating to the computation of environmental and divestiture reserves. Taxpayer objects to the disallowance and will provide additional evidence supporting these deductions to Appeals. Taxpayer is further reviewing these reserves and anticipates that it will submit additional evidence to Appeals supporting a claim for an affirmative adjustment.

**NOPA 142**

In NOPA 142, the Service proposed to disallow additional deductions claimed with respect to the Cryovac division and the Construction Products division for the taxable year ended December 31, 1995. The adjustment is labeled, "Reconciling Schedule M - Restructuring Reserve, Claim for Refund." The adjustment set forth in

NOPA 142 is $0, as the Service proposes to disallow the additional deductions claimed during the audit.

According to NOPA 142, this adjustment relates to the Taxpayer's claimed restructuring reserves for 1995. With respect to the 1995 restructuring reserves, Taxpayer has previously presented information to the Service concerning the claimed deductions.

The Taxpayer determined that, on a consolidated basis, it had over-deducted $13,909,663, whereas the Service determined that the Taxpayer had over-deducted $17,162,940. The proposed adjustment reflects that differential. (NOPA 142 refers to NOPAs 110 and 137 as to the aggregate components of the amount at issue NOPA 142. After the issuance of NOPA 142, NOPA 137 was revised. Taxpayer believes that the amount of the disallowed claim was not affected by this revision.)

In this regard, the $13,909,663 adjustment proposed by the Taxpayer related to four entities. The Service proposed to accept the adjustments for two entities that resulted in an increase in taxable income (which totaled $17,162,940) but disallowed the adjustments for the other two entities, which resulted in a decrease in taxable income of $3,253,277. This adjustment relates to expenditures by the Cryovac and Construction Products divisions of Grace-Conn.

Turning first to the Cryovac division, the Taxpayer's claimed adjustment of $3,253,277 included $2,228,277, which was derived from a comparison of the 1994 and 1995 ending balances of the reserve accounts maintained by Taxpayer for Grace-Conn's Cryovac division. The Service determined, however, that there were no

expenditures in connection with this aspect of the restructuring in 1995. Instead, according to the Service, the Taxpayer made a charge to a liability account but did not make payment in 1995; payment was made in 1996. According to the Service, the Taxpayer was allowed a deduction for this amount in 1996.

With respect to the Construction Products division, the Service made a similar adjustment of $1,025,000. The Taxpayer claimed restructuring expenditures of $5,131,000 in 1995, but the Service determined that actual expenditures by the Taxpayer in 1995 for restructuring with respect to the construction products division should be limited to $4,374,000. The proposed disallowance is equal to the difference between these two amounts.

Taxpayer objects to the disallowance of the claimed deductions, which the Service acknowledged in NOPA 142 are factual in nature. Taxpayer will provide additional evidence supporting this NOPA to Appeals.

## NOPA 144

In NOPA 144, the Service proposed to disallow an additional deduction of $8,347,850 claimed by Taxpayer for the year taxable ended December 31, 1995. This adjustment is labeled, "Reconciling Schedule M – Environmental Reserve, Claim for Refund."

According to NOPA 144, this adjustment relates to environmental expenditures that were recorded by the Remediation Unit, also known as the Ag Chem division. Taxpayer claimed environmental expenditures of $21,222,150 on its return for

1995, but the Remediation Unit's records indicated that such expenditures totaled $29,570,000, with the difference being the amount of the claimed refund ($8,347,850).

Taxpayer maintained accounts for this division in the general ledger and miscellaneous schedules of the Remediation Unit, which information has previously been provided to the Service. The various environmental costs incurred by the different divisions within Taxpayer were consolidated through intercompany liability accounts. Taxpayer traditionally determined the amount of its expenditures by comparing the opening and closing balances in the various accounts that it maintained.

In this situation, Taxpayer determined the difference between the accumulated expenditures reflected on internal company reports for 11 units, divisions or subsidiaries for the fourth calendar quarter of 1994 and 1995. Taxpayer has provided the Service with a detailed explanation of how these reserves were calculated. The foregoing notwithstanding, the Service contends that no records were provided that would enable the tracking of intercompany accounts or to show that these expenditures were not deducted twice.

This is a factual issue. Taxpayer claimed during the audit that it was entitled to these additional deductions. The Service has essentially proposed to disallow these deductions on grounds of lack of substantiation, but in reality the Service is asking Taxpayer to not only substantiate these deductions but also prove a negative, i.e., that no other entity, affiliate or subsidiary claimed these deductions. Taxpayer believes that it has already fully substantiated these deductions through its accounting processes and has met its burden of proving its entitlement to the deductions. The Service cannot challenge this substantiation except with contrary evidence. If necessary, Taxpayer will provide

additional evidence supporting these deductions to Appeals to the extent necessary to rebut specific factual assertions raised by the examining agents, although Taxpayer does not believe that the Service can fairly request it prove a negative in order to be entitled to these deductions.

## NOPA 148

In NOPA 148, the Service proposed to disallow restructuring expenses of $2,665,750 for the taxable year ended December 31, 1996. The Service claimed that this amount was part of expenses totaling $3,587,002, that allegedly were deducted twice. The deduction was also disallowed for lack of substantiation. (The balance of the $3,587,002 is addressed in NOPA 148-G, below.)

Taxpayer believes that there was no "double deduction" of this restructuring expense. Taxpayer is entitled to the deduction as reported on these respective returns for 1996. Taxpayer is further reviewing its restructuring expenses and reserves and anticipates that it will provide additional evidence supporting this deduction to Appeals.

## NOPA 148-G

In NOPA 148-G, the Service proposed to disallow restructuring expenses of $921,252. The Service claimed that this amount was part of expenses totaling $3,587,002, that allegedly was deducted twice on the return for the taxable period ended December 31, 1996. The deduction was also disallowed for lack of substantiation. This proposed adjustment is erroneous for the same reasons set forth in the response to NOPA 148.

## NOPA 150

In NOPA 150, the Service proposed an adjustment to increase Taxpayer's taxable income by $1,352,568 for the taxable year ended December 31, 1996. Taxpayer had claimed a deduction of $1,179,192 for compensation; the Service disallowed this claimed deduction and proposed an additional increase in income of $173,376. Apparently the Service contends that Taxpayer claimed a favorable adjustment on Schedule M-1 of $1,586,707, relating to deductions for "reserve fluctuations" that took into account the timing of compensation deductions, on the grounds that Taxpayer used an incorrect amount in the reversal of the current year's payments that were deducted in a prior year. The Service disallowed this adjustment and also determined an increase. (The Service makes a corresponding adjustment of $467,432 in NOPA 150-G, apparently on the grounds that a total adjustment of $1,820,000 is appropriate, a portion of which is allocable to the Grace-Delaware consolidated group.)

Taxpayer believes that it properly deducted payments for compensation. Taxpayer anticipates that it will provide additional evidence supporting this deduction to Appeals.

**NOPA 150-G**

In NOPA 150-G, the Service proposed to increase the Grace-Delaware consolidated group's taxable income by $467,432 for the taxable period ended December 31, 1996. This adjustment is related to NOPA 150.

Taxpayer believes that compensation was appropriately deducted on Grace-Delaware's 1996 returns. Taxpayer anticipates that it will provide additional evidence supporting this deduction to Appeals.

**NOPA 152**

The Service proposes additional adjustments to foreign taxes paid as follows:

| Years | Amount | Account or Return Line |
|---|---|---|
| 1993 | ($7,371,173) | Foreign Taxes Paid – (TP Favor) |
| 1994 | 203,209 | "      "      " |
| 1995 | ($2,658,629) | "      "      " |
| 1996 | ($ 351,437) | "      "      " |

This issue is both factual and computational. Taxpayer reserves the right to submit evidence to Appeals to contest this adjustment. To the extent that adjustments are made to foreign source income or that adjustments are made to taxable income, both the amount of the credit and the utilization of the credit may change. Taxpayer reserves the right to contest the amount and utilization of the credits.

**NOPA 155 and NOPA 155-G**

In NOPA 155, the Service proposed the following adjustments to Taxpayer's adjusted current earnings (ACE) for purposes of applying the alternative minimum tax (AMT) during the Years in Issue:

| Year | ACE Adjustment |
|------|----------------|
| 1993 | (10,497,910) |
| 1994 | 324,486 |
| 1995 | 20,114,463 |
| 1996 | 1,418,914 |

These adjustments were based on the Service's allegations concerning the "buildup in life insurance contracts" that were determined by the Service.

The assertion in NOPA 155 and NOPA 155-G that the Taxpayer is expected to agree with these adjustments is erroneous. Taxpayer will provide additional evidence supporting Taxpayer's computation of its ACE adjustments to Appeals.

## NOPA 156

In NOPA 156, the Service proposed to decrease the credit for prior year minimum tax in the following amounts:

| Year | Decreased Credit |
|------|------------------|
| 1993 | 17,814,555 |
| 1994 | 21,956,834 |
| 1995 | 1,481,261 |

According to NOPA 156, Taxpayer claimed credits for prior year minimum taxes of $26,436,593, $21,956,834 and $1,481,261 for 1993, 1994 and 1996, respectively. NOPA 156 alleges that as a result of the IRS examination of the tax returns for years through 1992, the corrected amount of credits for prior year minimum taxes available to Taxpayer for 1993 was limited to $7,269,609, reducing the allowable credit by $19,166, 984. (The disallowance was reduced to $17,814,555 as a result of adjustments made in NOPA 103.)

Taxpayer disputes this computation.  Taxpayer had additional minimum tax credit carryovers from 1991 and 1992 that were not taken into account.  The minimum tax credit carryover from 1991 and 1992 is also expected to change as a consequence of any adjustments to those returns which result from IRS consideration of claims for refund for 1991 and 1992 relating to COLI which were disallowed and which have been referred to Appeals for consideration.

The utilization of credits is computational and requires correlative adjustments to other tax years at issue.  Taxpayer reserves the right to contest these computations and to submit additional evidence to Appeals.

## NOPA 157

In NOPA 157, the Service proposed to recharacterize as ordinary income $2,630,402 of capital gains reported by the Taxpayer for the year ending December 31, 1994.  This determination relates to the application of Section 1231.

Under Section 1231(a), if the section 1231 gains for any taxable year exceed the section 1231 losses for such taxable year, such gains and looses are treated as long-term capital gains or long-term capital losses, as the case may be.  Under Section 1231(c), the net section 1231 gain for any taxable year is treated as ordinary income to the extent such gain does not exceed the non-recaptured net section 1231 losses.  The non-recaptured net section 1231 losses means the aggregate amount of the net section 1231 losses for the 5 most recent preceding taxable years over the portion of such losses taken into account in determining non-recaptured net section 1231 losses in prior years.

According to NOPA 157, Taxpayer reported net section 1231 losses of $2,630,402 for 1993, and reported net section 1231 gains of $12,343,153 for 1994. NOPA 157 contends that Taxpayer failed to treat as ordinary income the amount of its net section 1231 gains recognized in 1994 that were equal to its non-recaptured net section 1231 losses from 1993.

Taxpayer is evaluating the Service's position and will submit additional information as to this adjustment to Appeals.

## NOPA 158

In NOPA 158, the Service proposed a decrease of general business credit carryforward of $11,214,676. According to NOPA 158, Taxpayer claimed a carryforward of general business credits in such amount, which was utilized in its entirety as a credit against its 1993 tax liability. According to NOPA 158, as a result of examinations for prior periods, Taxpayer has no unused general business credit carryover to 1993. Accordingly, the Service disallowed the claimed general business credit carryover in its entirety.

Taxpayer disputes this determination. Taxpayer had unused general business credits at least to the extent of the amounts claimed that carried forward to 1993. Taxpayer will provide a schedule of unused business credits to Appeals.

## NOPA 159

In 1996, Grace-Conn and Taxpayer engaged in a spin-off transaction in which Grace-Conn was separated from the group for which Fresenius is now the common parent. On the return for the period September 29, 1996 through December 31, 1996, the

Grace-Delaware consolidated group reported a net operating loss of $73,714,433. This net operating loss was carried back to 1994.

In NOPA 159, the Service determined that the appropriate amount of the loss that could be carried back was $50,030,638 based upon adjustments reflected in other NOPAs to the return filed by Grace-Delaware for the period September 29, 1996 through December 31, 1996.

This adjustment is computational as it depends in part on other adjustments included in the final computations of tax liability and will involve adjustments from the loss year to 1994 and possibly other years.

## NOPA 160

On its 1997 return, the Grace-Delaware consolidated group reported a net operating loss of $145,789,694. This net operating loss was carried back to Taxpayer's 1988 return and was deducted in full. The carryback to 1988 affected the amounts and applications of prior year minimum tax and other credits that had previously been utilized. Taxpayer determined that, after giving effect to these changes, the prior year minimum tax credit that was available and utilized in the year ended December 28, 1996, was $13,507,251. Accordingly, NOPA 158 tentatively allowed a minimum tax credit for 1996 in such amount. This adjustment is computational and may require correlative adjustments to the extent that any adjustments made in a subsequent audit of 1997 impact the loss that is available to carryback to reduce Taxpayer's 1988 income tax liability.

## NOPA 161

NOPA 161 addressed the foreign tax credits allowable for the below years. NOPA 161 decreased (increased) the foreign tax credits allowable to Taxpayer as follows:

| Year | Foreign Tax Credits |
|------|---------------------|
| 1993 | (2,161,697) |
| 1994 | (210,626) |
| 1995 | 11,147,398 |
| 1996 | 12,527,990 |

In addition, NOPA 161 states that the amounts of foreign tax credits allowed for 1995 and 1996 do not include any carrybacks of excess credits from subsequent separate return years of members included in Taxpayer's returns for the years at issue. However, in subsequent discussions with IRS, the Service has stated that carrybacks of excess credits from subsequent separate return years may be included subject to a review of the computations. The Service is further reviewing this computation and has indicated that it will provide a revised computation of Foreign Tax Credits.

This issue is almost totally computational and may require correlative adjustments depending on the outcome of other issues, subsequent audits and the availability of credits for carryback to Taxpayer's return for the years 1993 through and including 1996.

## NOPA 162

NOPA 162 states in its entirety:

Per this examination, there are no alternative minimum taxes (AMT) for the 1993-1996 years. Data regarding the available foreign tax credits for AMT purposes will be provided at a later time.

The determination of an AMT liability is expected to be only computational. Taxpayer reserves the right to protest any proposed adjustment to the extent it disagrees with any AMT computations prepared by the Service.

## NOPA 164

In a prior audit of Taxpayer's 1990-1992 returns, Taxpayer disclosed an issue that related to demolition of a plant in Libby Montana. Based on this disclosure, the IRS disallowed demolition expenses of $337,633 in 1990 and $1,373,647 in 1991.

The disallowed Libby plant demolition expenses increase the tax basis of the land on which the demolished structure was located (IRC Section 280B(a)(2)). Taxpayer sold the Libby property in an asset sale during 1994. The capitalized demolition costs should have been deducted in 1994, when the Libby property was sold.

Subsequent review of the tax returns and supporting workpapers revealed that the Taxpayer's disclosure with respect to this issue was erroneous. Taxpayer did not deduct the demolition costs of $1,373,647 in computing its taxable income for 1991. In addition, Taxpayer failed to deduct any of the capitalized demolition costs upon disposition of the Libby property.

On August 9, 2002, Taxpayer filed a claim asserting that the following amounts were not deducted in computing its taxable income for 1994:  (1) $337,633 and $1,373,647 disallowed by the IRS for 1990 and 1991, respectively and (2) $1,373,647 capitalized by the taxpayer in 1991. NOPA 164 allowed a deduction for the demolition costs ($337,633 in 1990 and $1,373,647 in 1991) capitalized by the IRS pursuant to the Rev. Proc. 94-69 disclosure, but the claim for the additional deduction of $1,373,647 was

denied. This denial was based upon the Taxpayer's inability (due to insufficient time) to
substantiate its failure to include this amount as a deduction in its 1994 tax return.

Taxpayer will provide Appeals with substantiation that it did not deduct
the demolition costs of $1,373,647 in 1994 and that Taxpayer is entitled to an additional
deduction of this amount.

## 2. Adjustment to Inventory Relating to 9/28/96

On September 28, 1996, Sealed Air and certain directly and indirectly
wholly-owned subsidiaries, including W.R. Grace & Co.-Conn were spun out of
Taxpayer's consolidated group.  Cost of Goods Sold (CGS) were allocated between the
two short period returns of Grace-Conn.  Taxpayer is reviewing the inventory allocations
relating to this transaction and reserves the right to submit additional information to
Appeals.

## Request for Affirmative Adjustments

### 1. Interest Reported in Both 1995 and 1996

In the corrected RAR, the examining agent at p. 4D, ¶ 16 refers to a claim
submitted by Taxpayer on August 29, 2002.  The Service did not have sufficient time to
consider this claim prior to the issuance of the corrected RAR.  The corrected RAR
acknowledges that the "parties orally agreed to address this issue at a later date."  The
discussion below summarizes the claim and related documents provided to the agent.

Taxpayer's taxable income was overstated in the 1996 short period tax
returns, as filed, by $28,649,577.  This overstatement consists of the following
components: (1) $17,265,623 of interest received from the IRS that was also reported in

Taxpayer's 1995 taxable income and (2) $11,384,000 of taxable income arising from an incorrect analysis of the book/tax difference relating to "accrued interest - prior year taxes."

a) IRS Interest income included in both 1995 and 1996

During 1996, Taxpayer received $17,265,623 of interest income from the IRS. This interest income was reported in the 1995 income tax return as a component of the book/tax difference calculated for "accrued interest – prior year taxes."  Although this taxable income was properly reported in 1995, it was also included as taxable income in 1996.

Book Treatment of IRS Interest

For book purposes, $9,788,000 of the interest was recorded in 1995 and the remaining amount, $7,477,663, was recorded as income in 1996. The income recorded on the books for 1995 was accrued as an account receivable. This receivable balance was reversed in 1996 when the receipt of cash was recorded.

Tax return reporting of interest income in 1995

The interest was reported in the 1995 tax return as follows:  (1) $9,788,000 was included in income for both book and tax purposes and (2) $7,477,663 was included in taxable income as a book/tax difference.

Tax return for 1996 short tax periods

The interest income reported for book purposes in 1995 was recorded as an account receivable.  In computing 1996 taxable income in the short period tax returns,

reversal of this account receivable was erroneously determined to create an unfavorable book/tax difference of $9,788,000. This book/tax difference of $9,788,000 was included as taxable income in the 1996 tax returns as a book/tax difference for "IRS refund receivable".

The IRS interest income included in book income for 1996 should have been excluded from taxable income as a book/tax difference. However, due to confusion surrounding the way in which this income was recorded for book purposes, it was not properly excluded from taxable income in 1996.

b) Book/tax difference in 1996 for Accrued Interest - Prior Year Taxes

An unfavorable book/tax difference of $11,061,153 was included in the computation of taxable income for 1996 relating to "accrued interest – prior year taxes. The computation of this book/tax difference erroneously included the effect of a transfer of $11,384,000 from the "accrued interest – prior year taxes" account to a federal income taxes payable account. Since the end of year balance in "accrued interest - prior year taxes" changed primarily due to a transfer and not as a result of cash flows or book income/expense, the methodology employed to compute this book/tax difference had the effect of overstating Taxpayer's 1996 taxable income by $11,384,000.

## Conclusion

Taxpayer believes that the proposed adjustments are erroneous, either factually, legally, or both. Taxpayer further believes that it can support the positions taken in its returns as filed and that Taxpayer is entitled to adjustments in its favor as set forth herein and in further requests for affirmative adjustments that will be submitted to

the Appeals Office. For these reasons, Taxpayer hereby protests the adjustments set forth in the NOPAs and seeks review thereof by Appeals.

* * *

The undersigned assisted in the preparation of the protest but does not know personally that the statements of facts contained in the protest are true and complete.

A power of attorney (Form 2848) authorizing the undersigned to represent Taxpayer in this matter was previously submitted and is attached hereto as Exhibit 3.

Respectfully submitted,

*Elyse Napoli Filon*

Elyse Napoli Filon
Vice President – Tax
W. R. Grace & Co. Affiliated Group
As Agent For Fresenius Medical Care
Holdings, Inc.

August 24, 2002

Response To From 5701-114, Research Credits

Re:     Taxpayer name:         Fresenius National Medical Care Holdings, Inc.
        Years:                 December 31, 1993 through December 31, 1996

Dear Sir/Madam:

This letter is a response to the Internal Revenue Services' ("IRS") Revenue Agent's Report ("RAR") as it relates to Form 5701-114, research credits, for Fresenius National Medical Care Holdings, Inc. The taxpayer disagrees with the assessments contained in the RAR to the extent they relate to the issues outlined in this protest. Accordingly, the taxpayer wishes to protest the action of the IRS.

Specifically, the taxpayer *agrees* with the following assessments:

- As it relates to the base year research expenses, the taxpayer agrees with the adjustments made by the IRS for disallowed research expenses in the 1984 -1986 audit cycle and the 1987-1989 audit cycle (see page 10 of the Form 5701-114).

- As it relates to the base year gross receipts, the taxpayer agrees with adjustments made by the IRS for the 1988 acquisition of National Medical Care & Subsidiaries (see page 16 of Form 5701-114).

- With respect to the "Davison increase" adjustment (see page 9 of Form 5701-114), the taxpayer agrees to a 10% increase in base period expenses.

Specifically, the taxpayer *disagrees* with the following conclusions reached by the IRS in making its assessments:

- The adjustment of 40% as it relates to the "Davison increase" (see page 9 of Form 5701-114).

- The adjustments related to base period and historical research expenses and gross receipts for "dispositions occurring before or during the current credit year " (see pages 13-17 of Form 5701-114).

- The adjustments relating to differences that existed between the tax return amounts and the PwC workpapers with respect to AgChem, E&C Polyfibon, Polyfibron and Hamphire Chemicals, and American Breeders and Chomerics (see page 17 of Form 5701-114).

- The use of "rounded" numbers in the IRS' calculated version of the credit for 1993-1996.

Exhibit 2

·The IRS adjustments are based on a number of factors outlined in the Form 5701. As part of this protest, the taxpayer will comment on the validity of each factor, as well as include some critical factors not considered by the IRS. The results of the above mentioned acceptances and rejections by the taxpayer will be summarized at the conclusion of this protest, supported by exhibits in support of this protest.

## Davison Increase (Page 8-9 of Form 5701)

Facts:

During the taxpayer's audit cycle of 1990-1992, additional qualified research expenses were introduced to the IRS, supplementing filed amounts. The additional costs had been omitted from the originally filed research credit calculations. These costs were identified as part of a review performed by Coopers & Lybrand during this audit cycle. The supplemental costs related to the Cryovac, Washington Research Center, and Davison divisions only. The IRS proposed an arbitrary increase to the base period research expenses (defined as years 1984-1988) of 40% based on the additional costs claimed for Davison in the '90-'92 cycle. This extrapolation was not supported by any facts.

The IRS adopted a similar position in support of its adjustments for the current cycle, 1993-1996. In reviewing the current cycle's research credit amounts, the IRS received no additional costs from the taxpayer to supplement the filed research credits.

Discussion of law:

The consistency rules as defined by the Internal Revenue Code ("IRC") require that you must apply similar treatment to the base period in terms of qualifying research costs, as are applied to the current determination year. IRC §41(c)(5)(A) states the following:

> " In general, notwithstanding whether the period for filing a claim for credit or refund has expired for any taxable year taken into account in determining the fixed base percentage, the qualified research expenses taken into account in computing such percentage shall be determined on a basis consistent with the determination of qualified research expenses for the credit year."

Thus, it is correct, given the introduction of newly qualified research expenses in a current year, to revisit the base period and incorporate similar costs, to the extent such activities and costs existed. First, without the introduction of newly qualified research expenses, the IRC would not call for an adjustment to the base period. Second, there is no support or inference in the IRC or Treasury Regulations for an arbitrary extrapolation to the base period based on the level of costs incurred in a current year.

Conclusion:

Given that the taxpayer intends to introduce additional qualifying costs to the originally filed research credit claims for 1993-1996, as part of this protest, the consistency rules as outlined above would apply to the taxpayer. The arbitrary adjustment made by the IRS is not appropriate or reasonable given the method applied (i.e., using the current year as the benchmark for spending in 1984-1988). The IRS used another argument for incorporating this arbitrary "40%", which went on to note that these costs were "accepted" during the previous audit cycle, and would ongoing expenses in the current cycle. The IRS in their report, however, did not take the ongoing costs, into account. Also, the accepted portion of the previous audit cycle related to a negotiated settlement, not a matter of tax law.

The taxpayer submits that an adjustment to the base period is warranted. However, the taxpayer believes the adjustment is much closer to 0% than 40%. The taxpayer, for purposes of this protest and the related computations, has used 10%.

## Adjustments for Acquisitions/Dispositions (page 13-16 of Form 5701)

Facts:

The taxpayer disposed of a number of companies and/or divisions during the years 1986-1993, and acquired one business, National Medical Care ("NMC"), in 1988. Schedules exist showing the timing of these dispositions and acquisition, as referred to in the engineer's report, Form 5701-114, page 12.

With respect to the acquisition, the taxpayer did not add any gross receipts or expenses of the acquired company into its base period calculation for the 1993 determination year, but did add in gross receipts for the 1994-1996 determination years. As it turns out, NMC did not have any research expenses to transfer, only gross receipts. As it relates to dispositions, the taxpayer did not remove any gross receipts or research expenses from its base period for divested companies in the 1993 and 1994 determination years. In 1995, the taxpayer made some downward adjustments to the base period expenses and gross receipts, but the IRS has not been able to verify the validity of these adjustments.

The taxpayer has represented to the IRS that it has made no attempt to furnish any information about the base period for the divested companies to the acquiring companies. The taxpayer has also represented to the IRS that no contact has been made by the acquiring companies to obtain that information from the taxpayer.

Discussion of Law:

IRC §41(f)(3) defines special rules relating to adjustments for certain acquisitions, etc. Specifically, this section reads as follows:

(A) Acquisitions. If after December 31, 1983, a taxpayer acquires the major portion of a trade or business of another person (hereinafter in this paragraph referred to as the "predecessor") or the major portion of a separate unit of a trade or business of the predecessor, then for purposes of applying this section for any taxable year ending after such acquisition, the amount of the qualified research expenses paid or incurred by the taxpayer during periods before such acquisition shall be increased by so much of such expenses paid or incurred by the predecessor, with respect to the acquired trade or business as is attributable to the portion of such trade or business or separate unit acquired by the taxpayer, and the gross receipts of the taxpayer for such periods shall be increased, by so much of the gross receipts of such predecessor with respect to the acquired trade or business as is attributable to such portion.

(B) Dispositions. If after December 31, 1983-

(i) a taxpayer disposes of the major portion of any trade or business or the major portion of a separate unit of a trade or business in a transaction to which subparagraph (A) applies, and,

(ii) the taxpayer furnished the acquiring person such information as is necessary for the application of subparagraph (A),
then, for purposes of applying this section for any taxable year ending after such disposition, the amount of the qualified research expenses paid or incurred by the taxpayer during periods before such disposition shall be decreased by so much of such expenses as is

attributable to the portion of such trade or business or separate unit disposed of by the taxpayer, and the gross receipts of the taxpayer for such periods shall be decreased by so much of the gross receipts as is attributable to such portion.

The IRS, through IRC §41(f)(3), provides clear guidance on how base period gross receipts and research expenses should be adjusted for acquisitions and dispositions. With respect to dispositions, the taxpayer must <u>furnish</u> the acquiring company with such information as would be necessary to apply the rules of IRC §41(f)(3)(A), otherwise, the taxpayer <u>would not</u> be required to decrease their base period expenses or gross receipts for such dispositions.

The taxpayer submits that the intent of IRC §41(f)(3), as it relates to dispositions, is to effectively prevent "double dipping." Double dipping in this case occurs when the taxpayer and the acquirer have included the same base period information for the taxpayer's divested company in their respective credit calculations. The "furnishing" step in the rules under IRC §41(f)(3)(B)(ii) force the issue by creating this proactive step the taxpayer must take in order to apply the general rules in IRC §41(f)(3). When this step is not taken, the government cannot logically expect IRC §41(f)(3)(A) to be followed as it relates to the divested companies.

Conclusion:

IRC §41(f)(3) provides clear direction on the application of base period adjustments relating to acquired and divested trade or businesses, or separate units. The IRS examining engineer, in her report (page 12, paragraph 4, of Form 5701-114,) acquiesced to the rule asserting that the taxpayer must <u>furnish</u> the acquiring person information relating to the base period for the divested company in order to appropriately apply the rules of IRC §41(f)(3)(A).

The IRS engineer, in her report, suggested that IRC §41(f)(3)(A) be followed, without the "furnishing" requirement being fulfilled, because in her words "there is no information to suggest that [the taxpayer] withheld this information…" The IRS has no basis for making such a claim when, in fact, that claim is in direct contradiction to the statute. The taxpayer has made representations to the IRS asserting that <u>no data has been furnished</u> to any acquiring companies, in any instance. The IRS, without taking the necessary steps to determine if any acquiring company obtained such data from the taxpayer (which the taxpayer has represented has not happened), can simply not support their assertion.

The taxpayer believes, therefore, it is appropriate to protest, in full, the effect of the divestiture adjustments as they relate to the base years and the historical gross receipts years (please see page 13 and 16 of Form 5701-114 for a listing of these adjustments).

## AgChem/Other Company Adjustments (page 14 & 17 of Form 5701)

Facts:

The IRS examining engineer, as part of her discussion of the acquisition and disposition issues above, made some adjustments with respect to gross receipt amounts for AgChem Division and other companies, including E& C Polyfibron, Polyfibron & Hampshire Chemicals, Walnut Grove, and American Breeders and Chomerics (herein referred to as "other companies"). In computing gross receipts to be used for the IRS divestiture adjustment, of which these companies were a part, the IRS determined that amounts reported for gross receipts by the taxpayer, pursuant to workpapers provided by the tax preparer, PricewaterhouseCoopers LLP ("PwC"), were different from tax return statements.

The IRS arbitrarily decided to use tax return amounts for these gross receipts rather than amounts provided on tax return support workpapers. The IRS gave no explanation for denying the use of the amounts provided by PwC. The effect of this arbitrary adjustment was to increase the fixed base percentage, which in turn increased the base amount and ultimately reduced the research credits claimed by the taxpayer.

Conclusion:

The IRS adjustments are not a matter or law. Rather, these adjustments are a result of blatant disregard for tax return supporting documents. The IRS cannot make this kind of arbitrary adjustment without providing explanation for why the supporting documents were not allowed. The taxpayer provided credit calculation support as requested by the examining agent. That support was reasonable in form and understanding.

The taxpayer contends the IRS simply did not like the result they were getting by using these supporting workpapers. Thus, they decided to use some other amounts to improve their position. There is no logic to support these adjustments. The taxpayer hereby protests these adjustments in full.

These adjustments relate solely to the disposition issue (each of these companies were divested by the taxpayer prior to the 1993-1996 return filings). Based on the taxpayer's argument above, that supports removing the IRS' adjustments for dispositions, these particular adjustments become null and void.

## Additional Qualifying Research Expenses for 1993-1995

Facts:

During the 1990-1992 audit cycle, the taxpayer introduced, as part of its defense to adjustments proposed by the IRS in connection with the research credits, new qualifying research costs identified through a study conducted by Coopers & Lybrand ("C&L"). As a result of the C&L study, the taxpayer undertook a similar review for purposes of identifying additional tax credit opportunities for other years up to and including 1995. The taxpayer used the tools and procedures obtained through C&L to qualify and quantify additional research expenditures for 1993, 1994, and 1995. The additional costs are made up of Davison Division in-house wages, supplies, and contract research expenses. Documentation of this review by the taxpayer is currently available.

The IRS has not considered any additional qualifying research expenses of the taxpayer in the proposed adjustment included in the RAR.

Discussion of Law:

The taxpayer has identified qualified research expenses for each of the years 1993, 1994, and 1995, for use in the credit calculation. The taxpayer believes these additional costs qualify for tax credit under IRC §41 and IRC §174, and the respective related treasury regulations.

In-house research expenses are defined under IRC §41(b)(2). Supplies are defined under IRC §41(b)(2)(C). Contract research is defined under IRC §41(b)(3).

Conclusion:

The taxpayer submits that it is entitled to supplement the originally filed research credit calculations of 1993-1996 with new information obtained about additional qualified research expenses. The taxpayer is making the following adjustments with respect to 1993-1995:

| Davison Division | 1993 | 1994 | 1995 |
|---|---|---|---|
| Qualified costs per filed returns | $ 8,455,915 | $ 9,102,175 | $ 4,727,584 |
| Revised qualified costs | $12,824,466 | $14,114,492 | $ 7,555,626[1] |
| Additional costs recommended by taxpayer | $ 4,368,551 | $ 5,012,317 | $ 2,828,042[2] |

Documentation related to the qualified costs per filed returns and revised qualified research costs is located in Exhibits A, B, and C, as attached to this protest.

## Extrapolation of C&L Study

As stated previously in this protest, C&L performed a study of the research credit for the taxpayer during the '90-'92 audit cycle for purposes of maximizing the tax credit claimed for those cycle years. The study focused on only three divisions within the taxpayer's business, Davison, Washington Research, and Cryovac. An additional benefit of this study was to provide a turnkey approach for the taxpayer to follow in maximizing future year credit calculations.

Given the benefits derived by applying the appropriate methodologies afforded under IRC §41 and §174, the taxpayer could have evaluated all other companies within the group, but did not due to timing, personnel, and cost constraints. To date, neither the IRS nor the taxpayer has attempted to perform a reasonable extrapolation for these potential qualifying costs. The taxpayer contends that it is more than reasonable to expect that additional costs, company wide, would be appropriate based on the '90-'92 results of the analysis completed for Davison, Cryovac, and Washington Research, and the results of the additional costs provided for Davison in the '90-'93 cycle.

Performing an in depth study across so many other companies is not practical or reasonable for obvious reasons such as time, people, and cost. As the taxpayer only evaluated Davison for purposes of supplying additional research costs to the '90-'93 research credits, it would be reasonable to perform a company-wide extrapolation based on the Davison results as a percentage of the total qualified research expenses before the additional claims. The first step is to compute the percentage of non-Davison costs to the total research costs claimed pursuant to the original tax returns.

### Calculation of Non-Davison Qualified Research Amounts

| | 1993 | 1994 | 1995 |
|---|---|---|---|
| Davison qualified research costs before additional costs | $ 8,455,915 | $ 9,102,175 | $ 4,727,584 |
| Total qualified research costs per returns | $74,677,973 | $66,301,389 | $43,499,641 |
| Non-Davison research costs | $66,222,058 | $57,199,214 | $38,772,057 |
| Non-Davison research costs % | 88.7% | 86.3% | 89.1% |

---

[1] Qualified costs of $15,111,252 have been limited to 50% due to credit expiration
[2] The 1995 additional costs have been extrapolated based on the increase from 1993-1994, $643,766 ($5,012,317 -$4,368,551). This increase represents slightly less than 12%. This calculation has been performed due to the absence of supporting workpapers for the originally filed amounts for Davison. The revised 1995 numbers are available (see Exhibit C).

·Given the large percentage of non-Davison research costs to the total, the taxpayer believes it would be conservative to expect a 10-20% increase in those expenses if a formal study were conducted. For purposes of this protest, the taxpayer will use the lower end of this range and extrapolate a 10% increase for research expenses of non-Davison companies. The taxpayer, therefore, proposes the following adjustments to the determination year qualified research expenses for non-Davison companies.

Calculation of Extrapolated Research Amounts for Non-Davison Divisions

| | 1993 | 1994 | 1995 |
|---|---|---|---|
| Non-Davison research costs | $66,222,058 | $57,199,214 | $38,772,057 |
| Extrapolated increase | x      10% | 10% | 10% |
| Additional qualified research costs for non-Davison companies | $ 6,622,205 | $ 5,719,921 | $ 3,877,205 |

The results of these adjustments can be found in Exhibit E, "1993-1996 Research Credits As Recalculated By Taxpayer."

## Conclusion ·

Pursuant to the taxpayer's protest included herein, the taxpayer has recalculated the research credit for the tax years 1993-1996 (see Exhibit E), and submits the following adjustments to the RAR proposals:

| | 1993 | 1994 | 1995 | 1996 | Totals |
|---|---|---|---|---|---|
| Research credits per IRS | $1,954,797 | $ 612,941 | $1,213,594 | $ -0- | $ 3,781,332 |
| Recommended credits | $5,568,467 | $5,084,219 | $3,263,318 | $ -0- | $13,916,004 |
| Taxpayer recommended Increase (decrease) | $3,613,670 | $4,471,278 | $2,049,724 | $ -0- | $10,134,672 |

The total research tax credits originally filed by the taxpayer were $10,796,175. Based on the taxpayer's recommendations, Fresenius National Medical Care Holdings will be entitled to a refund of $3,119,830($13,916,004-$10,796,175). Attached to this protest are the following exhibits in support of the taxpayer's protest:

> EXHIBIT A: 1993 Davison Research Expenditures (Original and Adjusted)
> EXHIBIT B: 1994 Davison Research Expenditures (Original and Adjusted)
> EXHIBIT C: 1995 Davison Research Expenditures (Adjusted)
> EXHIBIT D: 1993-1996 Research Credits As Calculated By IRS
> EXHIBIT E: 1993-1996 Research Credits As Recalculated By Taxpayer

On a clerical note, the IRS' calculated research credits differ from the version attached as Exhibit D by $57,743, due to the fact the IRS used some rounded numbers in the adjustments included in the RAR. This difference, which is favorable to the taxpayer, has been taken into account in the taxpayer's recalculated research credit.

* * * * * * * *