UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    824 North Market Street
                            .    Wilmington, Delaware  19801
              Debtors.  .
                            .    June 23, 2008
. . . . . . . . . . . . ..        1:04 p.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:        Pachulski, Stang, Ziehl & Jones
                        By:  JAMES O'NEILL, ESQ.
                        919 North Market Street
                        17th Floor
                        Wilmington, DE  19899-8705

For the Debtors:        Kirkland & Ellis, LLP
                        By:  DAVID BERNICK, ESQ.
                             BARBARA HARDING, ESQ.
                             JANET BAER, ESQ.
                             SCOTT A. McMILLIN, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601
                        (Telephonic Appearances by
                          Mr. McMillin and Ms. Harding)

For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022
                        (Telephonic Appearance)

Audio Operator:         Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtors:          Kirkland & Ellis, LLP
                          By:  AMANDA C. BASTA, ESQ.
                          655 15th Street, N.W.
                          Suite 1500
                          Washington, D.C.  20005
                          (Telephonic Appearance)


For the Debtors:          Reed Smith, LLP
                          By:  DOUGLAS E. CAMERON, ESQ.
                               JAMES J. RESTIVO, JR., ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA  15219
                          (Telephonic Appearances)


For Debtors:              Cohn Whitesell & Goldberg, LLP
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110
                          (Telephonic Appearance)


For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  DAVID M. KLAUDER, ESQ.
                          601 Walnut Street
                          Room 950W
                          Philadelphia, PA  19106


For W.R. Grace:           W.R. Grace
                          By:  MARK SHELNITZ, ESQ.
                               WILLIAM SPARKS
                               DAVID SIEGEL
                               PAUL J. NORRIS
                          7500 Grace Drive
                          Columbia, MD  21044
                          (Telephonic Appearance by Mr.
                           Shelnitz, Mr. Siegel, and
                           Mr. Norris)


For the Equity            Kramer Levin Naftalis & Frankel
Committee:                By:  DOUGLAS MANNAL, ESQ.
                          1177 Avenue of the Americas
                          New York, NY 10036
                          (Telephonic Appearance)


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Official Committee of Asbestos Property Damage Claimants: | Bilzin Sumberg Baena Price & Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>     SCOTT BAENA, ESQ.<br>     JAY M. SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131<br>(Telephonic Appearances) |
| For the Official Committee of Asbestos Property Damage Claimants: | Lieff Cabraser Heimann & Bernstein, LLP<br>By:  ELIZABETH J. CABRASER, ESQ.<br>Embarcadero Center West<br>275 Battery Street, Suite 3000<br>San Francisco, CA  94111<br>(Telephonic Appearance) |
| For the Official Committee of Asbestos Property Damage Claimants: | Richardson, Patrick, Westbrook & Brickman, LLC<br>By:  EDWARD J. WESTBROOK, ESQ.<br>1037 Chuck Dawley Boulevard<br>Building A<br>Mount Pleasant, SC  29464<br>(Telephonic Appearance) |
| For Certain Asbestos Claimants: | Simmons Cooper, LLC<br>By:  ROBERT W. PHILLIPS, ESQ.<br>707 Berkshire Boulevard<br>East Alton, IL  62024<br>(Telephonic Appearance) |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  ANNE MARIE AARONSON, ESQ.<br>3000 Two Logan Square<br>18th & Arch Streets<br>Philadelphia, PA  19103<br>(Telephonic Appearance) |
| For Longacre Master Fund: | Pepper Hamilton, LLP<br>By:  JAMES C. CARIGNAN, ESQ.<br>Suite 5100<br>1313 Market Street<br>Wilmington, DE 19899 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For the Ad Hoc               Dewey & LeBoeuf, LLP
Committee of Equity          By:  JENNIFER WHITENER, ESQ.
Security Holders:            125 West 55th Street
                             New York, NY  10019
                             (Telephonic Appearance)


For the Future Claimants Orrick, Herrington & Sutcliffe
Representative:               LLP
                             By:  ROGER FRANKEL, ESQ.
                                  RICHARD H. WYRON, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007
                             (Telephonic Appearance by Mr. Wyron)


For the Future Claimants Orrick, Herrington & Sutcliffe LLP
Representative:              By:  DEBRA FELDER, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007
                             (Telephonic Appearance)


For Committee of            Campbell & Levine
Asbestos Personal           By:  MARK T. HURFORD, ESQ.
Injury Claimants:           800 North King Street
                            Suite 300
                            Wilmington, DE  19701


For the Official            Stroock & Stroock & Lavan
Committee of Unsecured      By:  LEWIS KRUGER, ESQ.
Creditors:                       ARLENE G. KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY 10038
                            (Telephonic Appearance by Ms. Krieger)


For Official Committee      Duane Morris LLP
of Unsecured Creditors:     By:  RICHARD W. RILEY, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801


For Canadian ZAI:           Hogan Firm Attorneys at Law
                            By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the City of<br>Charleston: | Connolly Bove Lodge & Hutz LLP<br>By:  CHRISTINA M. THOMPSON, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 |
| For the City of<br>Charleston: | Haynsworth Sinkler Boyd, P.A.<br>By:  TARA E. NAUFUL, ESQ.<br>1201 Main Street<br>Suite 2200<br>P.O. Box 11889<br>Columbia, SC  29211<br>(Telephonic Appearance) |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701<br>(Telephonic Appearance) |
| For Asbestos Property<br>Damage Claimants<br>Represented by Dies &<br>Hile: | Pryor Cashman Sherman & Flynn LLP<br>By:  RICHARD LEVY, JR., ESQ.<br>410 Park Avenue<br>New York, NY  10022<br>(Telephonic Appearance) |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201<br>(Telephonic Appearance) |
| For Fireman's Fund: | Stevens & Lee<br>By:  CHRISTOPHER N. KELLY, ESQ.<br>111 North Sixth Street<br>P.O. Box 679<br>Reading, PA  19603<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For David T. Austern:          Piper Jaffray & Co.
                               By:  JASON SOLGANICK
                                    JONATHAN L. BROWNSTEIN
                               (Telephonic Appearances)

For Official Committee         Scott Law Group
of Asbestos Property           By:  DARRELL SCOTT, ESQ.
Damage Claimants:              1001 East Main Street, Suite 500
                               Sevierville, TN  37864
                               (Telephonic Appearance)

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022
                               (Telephonic Appearances)

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103
                               (Telephonic Appearance)

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054
                               (Telephonic Appearance)

For Canada, et al.:            Womble Carlyle Sandridge & Rice
                               By:  FRANCIS MONACO, ESQ.
                               222 Delaware Avenue
                               Suite 1501
                               Wilmington, DE  19801

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020
                               (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For CNA: | Goodwin Procter, LLP<br>By:  BRIAN H. MUKHERJEE, ESQ.<br>Exchange Place<br>Boston, MA  02109<br>(Telephonic Appearance) |
| For Grace Certain<br>Cancer Claimants: | Montgomery, McCracken, Walker &<br> Rhoads LLP<br>By:  NOEL C. BURNHAM, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern,<br>the Future Claimants'<br>Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806<br>(Telephonic Appearance) |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER VAN N. LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005<br>(Telephonic Appearance) |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  RITA C. TOBIN, ESQ.<br>375 Park Avenue<br>35th Floor<br>New York, NY  10152<br>(Telephonic Appearance) |
| For the Property<br>Damage Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

```
For Official Committee    Speights & Runyan
of Asbestos Property      By:  DANIEL SPEIGHTS, ESQ.
Damage Claimants:              MARION C. FAIREY, JR., ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924
                          (Telephonic Appearances)


For Royal Insurance:      Wilson Elser Moskowitz Edelman
                            & Dicker LLP
                          By:  CARL J. PERNICONE, ESQ.
                          150 East 42nd Street
                          New York, NY  10017
                          (Telephonic Appearance)


For The Scotts Company:   Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY STRELOW COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216


For London Market         Mendes & Mount, LLP
Companies:                By:  ALEXANDER MUELLER, ESQ.
                          750 Seventh Avenue
                          New York, NY  10019
                          (Telephonic Appearance)


For Bank Debtholders:     Paul, Weiss, Rifkind, Wharton
                           & Garrison LLP
                          By:  ANDREW N. ROSENBERG, ESQ.
                          1285 Avenue of the Americas
                          New York, NY 10019


For JPMorgan, Agent       Landis Rath & Cobb, LLP
and Bank Debtholders:     By:  RICHARD S. COBB, ESQ.
                               ADAM G. LANDIS, ESQ.
                          919 Market Street
                          Wilmington, DE  19801


For State of              Hahn & Hessen LLP
California, Department     By:  STEVEN J. MANDELSBERG, ESQ.
of General Services:      488 Madison Avenue
                          14th and 15th Floor
                          New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

```
APPEARANCES (Cont'd.):

For OneBeacon and         Drinker Biddle & Reath LLP
Seaton Insurance Cos.:    By:  WARREN T. PRATT, ESQ.
                          1100 N. Market Street
                          Suite 1000
                          Wilmington, DE 19801

For Vinson & Elkins:      Vinson & Elkins L.L.P.
                          By:  ARI M. BERMAN, ESQ.
                          666 Fifth Avenue
                          26th Floor
                          New York, NY  10103
                          (Telephonic Appearance)

For BNSF Railway:         Burns, White & Hickton
                          By: LINDSEY M. HOELZLE, ESQ.
                          100 Four Falls
                          Suite 515
                          1001 Conshohocken State Road
                          West Conshohocken, PA  19428
                          (Telephonic Appearance)

For Ernst & Young:        Latham & Watkins LLP
                          By:  STEPHEN R. TETRO, II, ESQ.
                          Sears Tower
                          Suite 5800
                          Chicago, IL  60606
                          (Telephonic Appearance)

For Everest Reinsurance:  Marks, O'Neill, O'Brien &
                           Courtney, P.C.
                          By:  BRIAN L. KASPRZAK, ESQ.
                               JOHN D. MATTEY, ESQ.
                          Suite 800
                          913 North Market Street
                          Wilmington, DE  19801
                          (Telephonic Appearances)

For Everest Reinsurance:  Crowell & Moring LLP
                          By:  LESLIE A. DAVIS, ESQ.
                               MARK D. PLEVIN, ESQ.
                          1001 Pennsylvania Avenue, N.W.
                          Washington, D.C.  20004
                          (Telephonic Appearances)
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Macerich Fresno            Pillsbury Winthrop Shaw
Limited Partners:               Pittman, LLP
                               By:  GERALD F. GEORGE, ESQ.
                               50 Fremont Street
                               San Francisco, CA  94105
                               (Telephonic Appearance)

For Hartford Financial         Wilmer Hale
Service Group:                 By:  MELANIE J. SCHMID, ESQ.
                               399 Park Avenue
                               New York, NY  10022
                               (Telephonic Appearance)

For the Fee Auditor:           Warren H. Smith & Associates,
                                P.C.
                               By:  WARREN H. SMITH, ESQ.
                               Republic Center
                               325 North St. Paul
                               Suite 4080
                               Dallas, TX  75201

For Her Majesty the            Office of the Attorney General
Queen in Right of              By:  JACQUELINE DAIS-VISCA
Canada:                        (Telephonic Appearance)

For Official Committee         LECG
of Asbestos Property           By:  ALAN MADIAN
Claimants:                          ELIZABETH DEVINE
                               (Telephonic Appearances)

For Future Claimants           Tre Angeli, LLC
Representative:                 By:  JOSEPH RADECKI
                               (Telephonic Appearance)

For Dow Jones News Wire:       Dow Jones News Wire
                               By:  PEG BRICKLEY
                               (Telephonic Appearance)

For Lehman Brothers:           Lehman Brothers
                               By:  ANDREW CHAN
                               (Telephonic Appearance)

1        THE COURT:  Good afternoon.  This is the matter of

2  W.R. Grace, Bankruptcy Number 01-1139.  The participants I have

3  listed by phone:  David Bernick, David Parsons, Matthew Kramer,

4  Amanda Basta, Christopher Candon, Scott McMillin, Barbara

5  Harding, Ari Berman, Lindsey Hoelzle, Ann Marie Aaronson,

6  Daniel Speights, Elizabeth Cabraser, Alan Madian, Terrence

7  Edwards, Jay Sakalo, Stephen Tetro, Martin Dies, John Mattey,

8  Brian Mukherjee, Peg Brickley, Jonathan Brownstein, Jason

9  Solganick, Andrew Chan, Mark Shelnitz, David Siegel, Theodore

10  Freedman, Robert Guttman, Douglas Mannal, Gerald George, John

11  Phillips, Leslie Davis, Robert Phillips, Jennifer Whitener,

12  Darrell Scott, Douglas Cameron, Rita Tobin, Debra Felder, Janet

13  Baer, James Restivo, Scott Baena, Andrew Craig, Warren Smith,

14  Tara Nauful, Mark Plevin, Melanie Schmid, Michael Davis, Robert

15  Horkovich, Steven Mandelsberg, Richard Levy, Alex Mueller,

16  Richard Wyron, Arlene Krieger, Jacob Cohn, Marion Fairey,

17  Jacqueline Dais-Visca, Peter Lockwood, Brian Kasprzak, Paul

18  Norris, Carl Pernicone, Joseph Redecki, Elizabeth Devine,

19  Edward Westbrook, Christopher Kelly.  That's all.  I'll take

20  entries in court, please.

21        MR. BERNICK:  Good afternoon, Your Honor.  David

22  Bernick for Grace.

23        MS. BAER:  Good afternoon, Your Honor.  Janet Baer

24  for Grace.

25        MR. O'NEILL:  Good afternoon, Your Honor.  James

1 O'Neill for Grace.

2         MR. KRUGER:  Good afternoon, Your Honor.  Lewis

3 Kruger for the official unsecured creditors' committee.

4         MR. FRANKEL:  Good afternoon, Your Honor.  Roger

5 Frankel for the future claimants representative.

6         MR. HURFORD:  Good afternoon, Your Honor.  Mark

7 Hurford, Campbell & Levine, on behalf of the asbestos

8 committee.

9         MR. TACCONELLI:  Good afternoon, Your Honor.

10 Theodore Tacconelli for the property damage committee.

11         MR. LANDIS:  Good afternoon, Your Honor.  Adam Landis

12 here from Landis Rath & Cobb on behalf of JPMorgan Chase as

13 administrative agent and also on behalf of certain bank

14 debtholders, also here with my co-counsel in the matter, Andrew

15 Rosenberg from the Paul Weiss firm.

16         MR. ROSENBERG:  Good afternoon, Your Honor.

17         THE COURT:  Good afternoon.

18         MR. MANDELSBERG:  Good afternoon, Your Honor.  Steven

19 Mandelsberg from Hahn & Hessen for the State of California.  I

20 think you have me down as a phone participant, but I'm here in

21 person.

22         THE COURT:  Thank you.

23         MR. HOGAN:  Good afternoon, Your Honor.  Daniel Hogan

24 on behalf of the Canadian Zonolite claimants.

25         MS. COBB:  Good afternoon, Your Honor.  Tiffany

1  Strelow Cobb from the Vorys, Sater, Seymour & Pease law firm on

2  behalf of The Scotts Company, and I believe I, too, may be on

3  your phone attendance list as well.

4         MR. MONACO:  Good afternoon, Your Honor.  Frank

5  Monaco for the Crown.

6         THE COURT:  Excuse me one second.  Thank you.

7         MR. PRATT:  Warren Pratt for OneBeacon America

8  Insurance Company and Seaton Insurance Company.

9         THE COURT:  Ms. Baer?

10        MS. BAER:  Good afternoon, Your Honor.  Your Honor,

11 agenda item Number 1 is the debtors' eighteenth omnibus

12 objection to claims.  We've been continuing this for many, many

13 months, perhaps even years now, and I'm happy to say we finally

14 resolved the one remaining objection to NL Industries.  We have

15 a stipulation we're working on.  It's being looked at by the

16 other side right now, and we would expect to submit that under

17 certification of counsel shortly.

18        THE COURT:  All right.

19        MS. BAER:  So that should no longer be on the agenda.

20 Item Number 2, Your Honor, is being continued.  It's related to

21 an ongoing tax audit.  We have an order that we provided to

22 your clerk already.

23        THE COURT:  I signed that.

24        MS. BAER:  Thank you.  Your Honor, item Number 3 is

25 the quarterly fee applications.  We do have the draft orders

1 and the charts ready.  There is one objection that was filed by

2 the Bilzin law firm, and I believe Mr. Sakalo is on the phone,

3 or Mr. Baena.

4          THE COURT:  Mr. --

5          MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo

6 on behalf Bilzin Sumberg.

7          THE COURT:  Go ahead.

8          MR. SAKALO:  Your Honor, we filed an objection to the

9 fee auditor's final report with respect to our twenty-seventh

10 interim fee application primarily based on two grounds.  We

11 disagreed with recommended reductions with respect to hotel

12 charges and airline charges for the following reasons.  On the

13 hotel charges, the fee auditor has continued to impose caps of

14 $350 per night for New York City, $300 per night for

15 Washington, D.C. and $250 in most other locations.  In each of

16 the instances, our rates exceeded those locations where we

17 stayed at business-class hotels in connection attending

18 depositions for the PI estimation hearing.

19          The caps that the fee auditor has in place have been

20 there since January -- as early as January 2005, may have been

21 earlier than that.  We believe that those rates and caps are no

22 longer reasonable in light of the charges actually being

23 incurred in hotel rooms in New York, Chicago, Washington and

24 other locations involved in this case.

25          In addition, we've objected to the fee auditor's

1   recommendations with respect to airfare charges we incurred.

2   In each instance, we booked the airfare at the earliest

3   possible time and booked either a -- the lowest priced

4   refundable coach ticket or in some instances there was a

5   first-class ticket available for a lower price than the lowest

6   coach ticket, and in those cases we booked first-class tickets.

7   Again, those are actual charges we incurred for out-of-pocket

8   expenses.  We booked the travel at the time that we needed to

9   leave to attend the hearings or the depositions in question.

10          In the fee auditor's report, he recommended

11  reductions based on his current research on what it would cost

12  to fly today or a few days from today on the itinerary that we

13  flew from either Miami to New York, Miami to Washington and the

14  like, and we think his research is flawed for at least two

15  reasons.  One, he doesn't look at the cost to fly back at the

16  time when we actually flew, which was during peak travel season

17  to South Florida.  Many people like to fly to South Florida

18  during the winter and very few like to do so during the

19  summertime.  In addition, he did not look at the actual times

20  that we did fly.  Most of those were either early morning

21  flights or early -- or late evening flights, which in our

22  experience have been the most expensive tickets to procure,

23  but, due to the times that we needed to be at hearings or

24  depositions, were the flights that we needed to book in order

25  to be there on time.  For those reasons, Your Honor, we believe

1 | the fee auditor's report and recommendation should not be
2 | followed and our fee should be allowed as requested.
3 |     THE COURT: Mr. Smith? Anybody present for the fee
4 | auditor? Is this scheduled for today?
5 |     MS. BAER: It is, Your Honor.
6 |     MR. SAKALO: It is, Your Honor.
7 |     THE COURT: Mr. Smith aware of the fact that the
8 | objection is filed?
9 |     MR. SAKALO: I believe so, Your Honor. We did send a
10 | copy to him and we have been in discussions with him trying to
11 | resolve this consensually beforehand, but were unable to do so.
12 |     THE COURT: Is the objection -- Mr. Sakalo, I'm
13 | sorry, I just don't know. Is the objection timely so that
14 | we're sure this is on for today?
15 |     MR. SAKALO: I believe so, Your Honor. Mr. Smith had
16 | been on vacation all -- the week before last, and so last week
17 | we tried to resolve it. We were unable to do so and filed our
18 | objection the beginning of last week.
19 |     THE COURT: All right. Anybody else having the same
20 | problems with respect to hotel and airfare, because I'm not --
21 | everybody is staying in the same places at the same time, so
22 | I'm --
23 |     UNIDENTIFIED ATTORNEY: Your Honor, it's my --
24 |     MS. TOBIN: Your Honor, this is Rita Tobin on the
25 | phone, Caplin & Drysdale. Although we did not file an

1  objection to Mr. Smith's report, we are, in fact, having our

2  hotel costs cut for staying in New York and other major cities,

3  so certainly if this could be resolved and the cap could be

4  increased, we would like to reserve our right, assuming it was

5  resolved in the favor of the objector, to also have our

6  allowances recalculated based on the changed cap.

7            THE COURT:  Well --

8            MS. TOBIN:  But it is happening to us, too.

9            THE COURT:  All right.  It's not a matter of just

10 cutting because it depends on where you're staying.  It's a

11 question of whether where you're staying is reasonable.  I'm

12 not having any difficulties, for example, in Wilmington finding

13 places to stay at less than $250 a night.  Now, I'm not staying

14 at the Hotel du Pont, but I'm not always getting government

15 rates.  So if I can find these places and I'm booking them at

16 the same time that you're booking them -- I give you the same

17 year in advance time frames that you're aware of, so, you know,

18 if I'm not having trouble here, I don't know why you're having

19 trouble here.  Now, I'm not flying to New York for depositions

20 and those kinds of things, but with respect to the rates here,

21 if I can find them, I'm sure you can find them.  So, the

22 question is, where are you staying.  You don't need to stay at

23 the most luxurious places, but I -- but you're entitled to stay

24 in places that are, you know, equivalent and comparable for

25 what you need, and that's the issue.

1          MR. SAKALO:  Your Honor, this is Jay Sakalo again.

2    None of the hotel charges in question are in Wilmington.

3    They're all in New York, Washington, Chicago -- locations where

4    depositions were taken with respect to the PI estimation.  The

5    actual hotels that we stayed at that are at issue --

6          THE COURT:  Yes, I saw -- Mr. Sakalo, I saw yours.

7    With respect to somebody else who hasn't filed objections, I'm

8    not recalculating anybody's who haven't filed objections.  The

9    issue is whether or not you're having the same difficulties.

10   If you're having the same difficulties, then we need as a

11   programmatic basis to have this adjustment made.  I had

12   suggested to Mr. Smith on one of the hearings earlier that it

13   may be time to reassess this.  If you're having difficulties,

14   then I think it's time to take a look at this issue on a

15   system-wide, case-wide basis.  That's why I'm asking.  But

16   nobody is reserving any objections for anything.  You've all

17   got a case management order in place, and I'm not varying it.

18   If you didn't file an objection, it's too late.  I'm not

19   recalculating.  The question, though, is are you having

20   difficulty.  Caplin & Drysdale is saying it did.  Mr. Frankel,

21   you were about to speak, too.

22         MR. FRANKEL:  Your Honor, I think -- I don't

23   particularly care about the D.C. rates because we're there, but

24   in New York it really is unreasonable to have a cap like that.

25   I mean, it's not a question of staying at fine hotels.  It's

1 hard to find a room in New York for, you know, a reasonable

2 price, and so I think particularly in New York the cap is

3 unreasonable.

4          THE COURT:  Ms. Baer?

5          MS. BAER:  Your Honor, Your Honor, the debtor,

6 likewise, has had difficulty, frankly, for a couple of years in

7 New York and Washington, D.C.  We've taken it up with Mr. Smith

8 before.  In fact, he moved Washington from 250 to 300.  We're

9 still having the same problem in both D.C. and New York, and I

10 think it does make sense to take up this issue globally and

11 seek some adjustments.

12          MS. TOBIN:  Your Honor, this is Rita Tobin again.  I

13 was, in fact, referring to the hotel rates in New York and D.C.

14 and Chicago.  Those are the areas in which we feel that the cap

15 is too low given the current cost of a hotel room at ordinary

16 business rates.

17          THE COURT:  Okay.  I am informed by my clerk that

18 this response to the final fee auditor report was filed on June

19 18th.  In fact, it's past the deadline for today's hearing,

20 which may be why Mr. Smith is not on the phone.  So, I believe

21 that this issue has to be continued till the next omnibus,

22 which may be why Mr. Smith is not participating.  I think,

23 however, in the meantime that gives you all some leverage to

24 speak with Mr. Smith.  If you're having -- all of you are

25 having this difficulty in those three cities -- Washington, New

                    **J&J COURT TRANSCRIBERS, INC.**

1  York and Chicago -- it's apparently time to take a look at this

2  issue for everybody, but starting in the next fee application

3  process.  So I think that's how I will resolve this.  I will

4  expect Mr. Smith to do a new analysis to take a look at this

5  issue and raise the rates in those cities to something that's

6  reasonable for the next go-round in the next objection process.

7        Your objection, Mr. Sakalo, I'll have to continue to

8  the next omnibus because it's filed out of time.  Your response

9  is filed out of time to put it on today, and I'm not going to

10 do something without Mr. Smith having an opportunity to take a

11 look at your response.  So, your objection will be continued

12 till the next omnibus.  All of you, and Ms. Baer, I'll charge

13 you specifically with talking to Mr. Smith about those three

14 cities and having him do some investigation to find out what's

15 reasonable in those three cities.

16        MS. BAER:  I will do so, Your Honor.  In meantime, I

17 have an order awarding the interim fees, and on the bills and

18 fees it has the amount in here at the lower amount, taking into

19 account Mr. Smith's objections.  Perhaps, Your Honor, the thing

20 to do is to enter this order so that everybody can get these

21 fees, yet Bilzin reserves its right to request the additional

22 fees and have that objection continued to the next hearing.

23        THE COURT:  All right.  That's fine.  Mr. Sakalo, I'm

24 just -- I will put off the issue with respect to the airfare

25 for the same reason.  Since Mr. Sakalo -- I'm sorry -- since

**J&J COURT TRANSCRIBERS, INC.**

1  Mr. Smith is not here to address it, I'll simply continue that

2  till the next omnibus, as well.

3          MR. SAKALO:   Thank you, Your Honor.

4          THE COURT:   Thank you.

5          MS. BAER:   Thank you.

6                       (Pause)

7          THE COURT:   All right.   As to the uncontested portion

8  of the fees and expenses and those that have been resolved by

9  stipulation, I'm approving those portions today.

10          MS. BAER:   And, Your Honor, then we'll put the bills

11 and objection back on the agenda for the next omnibus hearing.

12          THE COURT:   All right.   Thank you.   Okay, Ms. Baer,

13 thank you.

14          MS. BAER:   Your Honor, that takes us to agenda item

15 Number 4, which was the debtors' motion for an order allowing

16 Ernst & Young to retain its fees as an ordinary course

17 professional.   Your Honor, the U.S. Trustee raised some issues

18 about this, and as a result we have revised the order to

19 reflect the U.S. Trustee's concerns.   Pursuant to the order,

20 and I've handed your clerk both a clean and a black line, Ernst

21 & Young is requesting that it remain as an OCP, that its fees

22 which it has incurred above the cap, which is $1.2 million,

23 Your Honor, they will submit fee applications for those fees.

24 The fee applications will not be the traditional fee

25 applications that the attorneys file, but somewhat of a hybrid.

1  They've worked with the U.S. Trustee to come up with a form

2  that works for an accounting firm doing the kind of work

3  they're doing.

4       They're doing essentially offshore expat-type tax

5  consulting, which is really much more of an OCP type than it

6  would be a regular professional.  We're not seeking to retain

7  them as a 327(a) professional.  We're seeking to keep them as

8  an OCP, but because they're the cap -- above the cap, going

9  forward they will file the monthly and the quarterly fee

10 applications and request final fee authorization, just like all

11 of the professionals who are retained under 327.

12      THE COURT:  Wait, I'm sorry.  I thought the order

13 said that they were not going to be filing.  Did I -- I looked

14 at this pretty quickly.

15      MS. BAER:  They will be, Your Honor.  If you look at

16 Paragraph 5 what it indicates is they're going to be filing --

17 you can go back to the red line.  First of all, Your Honor, by

18 August 14th as per Paragraph 3, they will be filing interim fee

19 applications for all the fees and expenses incurred --

20      THE COURT:  Right.

21      MS. BAER:  -- in excess of 1.2 million, and then if

22 you look at Paragraph 5, it explains that although they're

23 going to be filing interim fee applications they will not be in

24 the form that is normally used for the -- especially the

25 attorneys who are filing fee applications.  It will be a format

1  that's slightly different, as approved by the U.S. Trustee.

2          THE COURT:  Well, I don't know what that is, and

3  that's nice of the U.S. Trustee, but I have no clue what this

4  means.  So until I see it, I'm not in a position to approve

5  this.  I have no clue what this means.

6          MS. BAER:  I understand, Your Honor.  The U.S.

7  Trustee and counsel for E&Y worked this out.  What I would

8  suggest is, why don't we continue this to July 21st, which is

9  our next omnibus hearing and we will have counsel for E&Y or

10  the debtors submit something which indicates to Your Honor what

11  exactly that's going to look like.

12          MR. TETRO:  Your Honor, this is Stephen Tetro of

13  Latham & Watkins on behalf of Ernst & Young.  Just to add some

14  clarity to that -- and I'm happy to proceed, of course, however

15  Your Honor would wish with respect to giving you an example of

16  what we might present.  But just to try to add a little clarity

17  to that, what's been contemplated is that E&Y has throughout

18  this case been issuing invoices as an OCP.  Those invoices

19  provide a general description of the services that are being

20  rendered, along with the attendant fees.  They do not include

21  traditional daily time detail that you would expect in a 327(a)

22  type retention.  But that is the same form -- the same invoice

23  form that we've been using so far as an OCP is what we propose

24  to use going forward with, of course, the difference being that

25  they would be submitted to the Court as parties in interest for

1 review and objection pursuant to the fee application process.

2 I think the U.S. Trustee is of the view, and I presume the U.S.

3 Trustee is in the courtroom, but the U.S. Trustee has expressed

4 to us that, having been given examples of what these invoices

5 and what this form looks like, that they present sufficient

6 detail for the U.S. Trustee, at least, to evaluate the

7 appropriateness of these fees, given the types of ordinary

8 course services that we're talking about here.

9        THE COURT:  Well, the fee application order that's in

10 place requires essentially line item objections in order to

11 have the Court consider them.  I don't know how you get line

12 item objections if, in fact, there aren't line item details.

13 So, I don't understand this hybrid form to mean that there is

14 going to be some kind of compliance.  With that type of detail,

15 I don't know how it can work, so I don't -- either you're an

16 OCP, I think, or you're not.  I don't understand how this

17 process will work itself out unless somebody is going to give

18 me some examples to see.  Mr. Klauder?

19        MR. KLAUDER:  Your Honor, David Klauder for the

20 United States Trustee.  I think everyone's in agreement that

21 the work they are doing has nothing to do with the bankruptcy

22 restructuring type work that 327(a) professional, and that's

23 what gave us the comfort to go ahead with this format this way

24 and keep them as an ordinary course professional.  I know it's

25 difficult because you haven't seen the invoices and really

1  you're just hearing us talk about them.  Perhaps what Ms. Baer

2  said might be the best way to do it so that you can see the

3  type of detail that they would provide.  I guess in essence

4  Ernst & Young is requesting something of a waiver of the

5  typical fee application format that is presented by 327(a)

6  professionals.  We've looked at the invoices they've provided

7  and they're pretty detailed, and they give a good indication of

8  what they are doing, the time they are working on it and the

9  fees they are incurring.  So, for that reason we were

10 comfortable with it, but understanding that Your Honor hasn't

11 seen that or the fee auditor hasn't seen that, and I'm sure the

12 fee auditor may want to at least have some way to comment on

13 that, but from our perspective we thought it was sufficient.

14         MS. BAER:  Your Honor --

15         THE COURT:  Well, I guess the other -- the question

16 is, how far above the cap are they getting.

17         MS. BAER:  Well, Your Honor, I was just going to

18 raise that as -- maybe it's a possibility that with respect to

19 E&Y we lift the cap just for E&Y and give them a different cap.

20 They are actually at about $1.8 million now, Your Honor, and I

21 believe the cap is 1.2.  E&Y does a combination of work for

22 debtors and non-debtor affiliates, and originally non-debtor

23 affiliates were paying E&Y, which is why it didn't get on the

24 OCP reports.  It's a combination now.  Sometimes there's

25 reimbursement, sometimes there's not, and there was no way to

1  really break it down in very firm lines.  So, again, although

2  they're in excess of $1.8 million now, it hasn't all been for

3  the debtors in this case.  It has also been for non-debtor

4  affiliates.  You know, the alternative of lifting the cap in

5  general would then just leave them as an OCP.

6          THE COURT:  Well, I don't think it's appropriate to

7  lift the cap in general as to all professionals, but it may be

8  appropriate to lift it for this --

9          MS. BAER:  That's what --

10         THE COURT:  -- and get a final fee true-up or

11 something at the end of the case.  I'm not sure what this

12 hybrid process is going to do.  I'm not sure why -- to put Mr.

13 Smith in the position of reviewing a fee application that has

14 nothing to do with the bankruptcy process, I don't know what he

15 would be reviewing it for, so maybe the best thing is simply to

16 take them outside the fee cap and simply have a review at the

17 end of the case, which is saying something because you know how

18 much I despise reviews at the end of the case, because you

19 can't -- it's difficult five and six and seven years at the end

20 of the case to know what happened six years earlier.  It's just

21 very difficult to remember, so --

22         MS. BAER:  Well, Your Honor, I suppose the

23 alternative is the OCPs will not be required to file anything

24 at the end of the case --

25         THE COURT:  No, they won't.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  -- and perhaps as they're going to be

2 remaining an OCP here, the only exception would be their cap

3 will be lifted.

4          THE COURT:  Mr. Klauder, that may be the solution in

5 this instance.  If the U.S. Trustee's Office is satisfied that

6 they're really not doing bankruptcy-related services, and the

7 order perhaps may just say that to the extent that something

8 changes and they do do bankruptcy-related services, at that

9 point, they've got to come back to the Court for reevaluation.

10          MR. KLAUDER:  Understood.  That's fine.

11          THE COURT:  All right.  How about giving me that form

12 of order instead.

13          MS. BAER:  We'll do that, Your Honor.  We'll revise

14 the order and submit it under certification of counsel.

15          THE COURT:  All right.

16          MR. TETRO:  Thank you, Your Honor.

17          THE COURT:  All right, thank you.

18          THE OPERATOR:  Your Honor, this is the operator, and

19 I do have Mr. Warren Smith on the line now.

20          THE COURT:  Oh.  All right, just a minute.  This was

21 Item 4.  Mr. Smith, we were dealing a few minutes ago with Item

22 3, which was -- Mr. Sakalo was arguing the one objection that

23 came in with respect to your fee report, and I thought that

24 perhaps you may not have seen it since it was not filed until

25 June 18th.  If you're prepared to address it today, I can go

1 back to it.  If you're not, I was going to put it over till the

2 next omnibus.  It had to do with hotel charges in essentially

3 Washington, Chicago and New York and had to do also with a

4 couple of airfare charges just for his firm.

5          MR. WARREN:  Yes, Your Honor, I'm prepared to deal

6 with it.  We can talk about that now if you'd like.

7          THE COURT:  All right.  All -- I did canvass the

8 other professionals, and they've all indicated that they're all

9 having difficulty in those three cities living within the cap

10 for those -- for hotels in those cities.  So, I had asked Ms.

11 Baer to contact you, but I'll just ask on my own since you're

12 now on the phone, that you reassess, please, in those three

13 cities what an appropriate monthly -- or, I'm sorry -- what an

14 appropriate nightly charge for hotels in those cities may be.

15 It may be that it's simply too low.  If they're all -- if all

16 of the professionals in those cities are having their hotel

17 charges cut -- I'm not expecting them to stay in luxury hotels,

18 but if they're all having trouble living within that cap it's

19 apparently time to take a look at that issue.  So, if you

20 wouldn't mind, I would like a report back from you at the next

21 omnibus as to what's appropriate for nightly hotel charges in

22 those three cities, and, if it's appropriate to get it raised,

23 I'd like it raised effective for the next go-round of monthly

24 and quarterly fee applications.

25          With respect to Mr. Sakolo's concern about just his

1 firm's for the objection that he's raised, if you could address

2 those, Mr. Smith, I'm ready to hear from you about those.

3         MR. SMITH:  Well, yes.  Yes, I can do that, Your

4 Honor, and as a matter of fact, Mr. Sakalo and I talked about

5 this issue last week.  I'm surprised he didn't mention it to

6 the Court.

7         THE COURT:  He did.

8         MR. SMITH:  I had told Mr. Sakalo that I would be

9 reevaluating our caps on those cities.  Actually, I had talked,

10 I recall, about New York City and Washington, D.C., but we can

11 certainly include Chicago in that was well.

12         THE COURT:  All right.  Thank you.

13         MR. SMITH:  Now, one thing, Your Honor, though, I

14 mean as far as -- I would disagree to the extent that there was

15 an implication that all firms are having problems.  That does

16 not -- that is not our experience.

17         THE COURT:  All right.

18         MR. SMITH:  And I would point out also that one of

19 the hotel items at issue here was for the Four Seasons in

20 Westlake Village, California, and so I'm wondering if -- I

21 would acknowledge, Your Honor, that part of the problem may be

22 that we need to raise our caps, but if people are going to

23 start staying at the Four Seasons, we're going to have to

24 substantially increase our caps across the country.

25         MR. SAKALO:  Your Honor, if I may address that, the

1 -- there was one stay at the Four Seasons, and ironically it's

2 the lowest priced hotel on -- of the ones in dispute that Mr.

3 Smith has an issue with.  That was for $325 per night, and that

4 was the location for the deposition of Mark Peterson, who, as

5 the Court knows, was the personal injury committee's primary

6 valuation expert on the extent of the PI liabilities.  That was

7 the location of the deposition, and we thought it made eminent

8 sense considering that that's where the deposition was being

9 taken and every other hotel within reasonable distance of that

10 was about the same price, a little bit higher or a little bit

11 lower.  We chose to stay at the Four Seasons at that negotiated

12 rate that I believe Mr. Peterson's company was able to obtain.

13 I'm not sure exactly how we were able to obtain that rate at a

14 Four Seasons in California.  And, in addition, I believe

15 everybody else involved in that deposition who had to travel to

16 California stayed at that hotel as well.

17         THE COURT:  Okay.  Well, the one thing -- if those

18 are essentially the same rates that everybody else is charging

19 at that hotel and it's eliminating, I guess, travel expenses

20 back and forth to get to the hotel, it probably saves some

21 transportation expense.  Is that what happened?

22         MR. SAKALO:  That's correct, Your Honor.  For each of

23 these depositions in question, particularly with respect to the

24 one at the Westlake Village Four Seasons, we stayed as close as

25 possible to the location of the deposition.  Mr. Kramer, one of

1   my partners who attended virtually all of these depositions at

2   issue, stayed where he was able to walk to the location of the

3   deposition.  There were no taxicab charges.  There were no

4   additional travel charges in.  Of course, we could stay further

5   away and have to take a cab in.  To us that doesn't make a lot

6   of sense.  Particularly given the scheduling of these

7   depositions, it was useful for us to have a location close to

8   that that we could back to, if need be, during breaks and the

9   like.  And I believe, as I indicated in our initial response to

10  the fee auditor and I did in our report back to the Court, that

11  we stayed in locations where most of the other professionals

12  who had to travel for these depositions stayed.  Unfortunately,

13  for us, we were the -- in the one city that nobody chose to

14  take the deposition in and had to travel for each of these

15  depositions.

16          THE COURT:  Okay.  Well, Mr. Smith, if everybody else

17  stayed there, if that's the case, then, you know I -- if that

18  is the case, then I suppose there's no reason to object to

19  this.  I'm a little surprised that there aren't Sheratons and

20  Fairfields and Marriotts and things that have rates in the $250

21  range as opposed to the $350 range in these hotels, folks, and,

22  quite frankly, I'm really not sure -- they also have business

23  centers and they have fax machines and they have similar

24  charges, so there -- you may need to go outside those

25  properties for some food services, but they also have

1  transportation available, so I'm afraid your standard of

2  nightly stays may have to change a bit.  So, Mr. Smith, when

3  you're doing your analysis, I expect all the hotel properties

4  in the area to be included in the analysis, not just the Four

5  Seasons and whatever other hotels there are.  But nonetheless,

6  for this one, that one seems to be appropriate if everyone else

7  stayed there, if that's the case.  I don't --

8          MR. SAKALO:  Your --

9          THE COURT:  Yes.

10          MR. SAKALO:  Your Honor, I'm sorry to interrupt.

11  With respect to the other stays you mentioned, three of those

12  were at a Marriott property, one was a Hyatt and one was a

13  Westin.  Those were -- those were corporate hotels.

14          THE COURT:  Yes, I didn't -- with respect to the ones

15  in the New York and Chicago area that were contested, one of

16  the rates -- one of the rates at one of the nights the property

17  seemed to be pretty high.  I don't have it front of me, but it

18  was in the nature of like $549 a night.  That seemed pretty

19  high.  The rest of them, frankly, didn't seem to be out of line

20  for what some of the other rates were.

21          In this instance, Mr. Sakalo, I'm going to approve

22  them because I'm having Mr. Smith take a look at this issue.

23  So, I'll have him take a look.  I'll approve them in this one

24  charge.  I don't know if I'm going to do it again.  I'll do it

25  for this.

1           Now, what's the issue with respect to the airfare?

2  Because whether you got a cheaper first class airfare or not,

3  that's -- frankly, I've just never seen a cheaper first class

4  airfare than coach fare, but maybe that's happened and I just

5  missed it.

6           MR. SMITH:  Your Honor, if I could address that, I

7  have to say that I'm more sympathetic with Bilzin's position

8  regarding the hotels than some of these airfares.  The airfare,

9  again, we went out and looked at comparable economy refundable

10 airfares, Your Honor, to compare with the ones that we had

11 highlighted here, and we know that the four -- four of these

12 airfares were for what were called special first class

13 airfares, which are supposedly free upgrades to first class.

14 Your Honor, after examining airfares for some time now, we've

15 come to the conclusion that just as there is no free lunch,

16 there's no really -- no such thing as a free upgrade to first

17 class, that's really free.

18          What appears to have happened here is that airlines

19 listened to their customers, many of whom are businessmen who

20 basically want to fly in first class but their companies will

21 only pay for coach, and so virtually every airline has created

22 a special fare, which is designated as a coach fare with a free

23 upgrade to first class.  It's been our experience, Your Honor,

24 that universally these fares are much higher than an economy

25 fare, which, again, is not upgradeable to first class and yet

1  may be fully refundable.  And we would point out that four of

2  these airfares here fall into the category of free upgrade to

3  first class, but, again, just as there is no free lunch, it's

4  been our experience there is no free upgrade.

5           THE COURT:  Okay.  Mr. Sakalo?

6           MR. SAKALO:  Your Honor, with respect to the flights

7  that were booked as first class A fares, those are all on

8  American Airlines, Your Honor, and those are not economy or

9  coach tickets that include an automatic upgrade.  On American

10 Airlines, they actually have a fare class that is available to

11 gold and platinum members, and myself and my partners, flying

12 as frequently as we do, are gold or platinum members, and we

13 are able to obtain those flights at that first class -- for

14 first class fares that are lower priced and fully refundable

15 economy tickets.  I'm not sure which airlines Mr. Smith looked

16 at, but our travel agency who obtains our tickets for us

17 provides us for each of the flights in question the refundable

18 coach ticket price and the first class ticket price, if there

19 is one available on that flight, and as you'll see, as Mr.

20 Smith pointed out, only four of the flights at issue were

21 actually the first class fare because on those -- on the ones

22 that weren't the first class fare, those were instances where

23 there was no available first class fare lower than the lowest

24 available coach ticket.  In those instances, we booked the

25 coach ticket, and Mr. Smith takes issue with those charges as

1 well.  I'm not sure what to do about that other than to say we

2 booked the tickets that were available at the time at the

3 earliest possible moment, and those were the flights that we

4 took.  I understand his research today shows that one might be

5 available for a lower price.  Again, as I said earlier, when he

6 wasn't on the phone and for his benefit, we don't believe that

7 he compared apples to apples.  I'm not sure what flight times

8 he looked at, what time of the day, what days of the week he

9 looked at for those itineraries.

10       MR. SMITH:  Your Honor, with all due respect, the

11 greatest discrepancies that we found with the airfares that

12 were charged here and the airfares that we researched were the

13 airfares in which Bilzin Sumberg took first class and we asked

14 about an economy class.  Whether or not their travel agent was

15 unable to find an economy class airfare that was cheaper than

16 the first class airfare, unless that travel agent is here and I

17 can cross examine that travel agent to the extent of their

18 research, I really can't address how diligent their travel

19 agent was in researching the alternative to first class, but,

20 again, those were the greatest discrepancies here, Your Honor.

21       THE COURT:  All right.  The practice has been that

22 I'm only authorizing fares for coach class.  That's what I'm

23 going to continue do.  So I'm disallowing anything other than

24 the coach class fares.  I will allow the hotel charges for the

25 reason that I've stated, but not the upgrades -- anything above

1  the coach class fares.  So, I guess, Mr. Smith, can you give me

2  an order that will simply add in, I guess, whatever the excess

3  charges are for the hotel, or, Ms. Baer, can you work with Mr.

4  Smith for those additional numbers?

5          MS. BAER:  We'll do so, Your Honor.  We've already

6  given you and you've already signed the order that disallows --

7  or that does not take into account these additional charges,

8  and what I would suggest is we'll work out a separate order to

9  take into account the hotels and the coach fares that you have

10 permitted.

11         THE COURT:  All right.  Okay, thank you.  All right,

12 Mr. Smith, if you could, I would appreciate just an update next

13 month at the next omnibus as to what you've been able to

14 ascertain as to hotel charges in those three cities then so we

15 can see what might be reasonable charges going forward.

16         MR. SMITH:  Yes, Your Honor.  We have already started

17 that process --

18         THE COURT:  Okay.

19         MR. SMITH:  -- as I had mentioned to Mr. Sakalo.

20         THE COURT:  All right.  Thank you, sir.

21         MR. SMITH:  Thank you.  May I be excused?

22         THE COURT:  Yes, sir.  Thanks.

23         MR. SMITH:  Thank you.

24         THE COURT:  Okay.  I think we're up to Number 5 then.

25         MS. BAER:  We are, Your Honor, and you've already

1  signed the order on Number 5.  That was Grace's pension --

2  minimum pension obligations.

3       THE COURT:  Okay.  One second till I get back up

4  here, please.

5            (Pause)

6       THE COURT:  Okay.  Thank you.

7       MS. BAER:  Your Honor, agenda item Number 6 is the

8  motion of Scotts Company.  This is an adversary proceeding, the

9  declaratory judgment.  As you might recall, Your Honor, The

10 Scotts Company has been the defendant in some asbestos personal

11 injury cases around the country having to do with the product

12 that they sold which contained Grace vermiculite.  The Scotts

13 Company filed this motion for declaratory relief asking that it

14 be declared that they were entitled to share in Grace's

15 liability insurance for these actions.  The matter has been

16 stayed and continued from time-to-time.

17       Your Honor, we're just up for status today, and from

18 the debtors' perspective, now that we have an agreement in

19 principle with the futures rep and the personal injury

20 committee that indicates that the insurance that Grace does own

21 will be going to the trust, or the proceeds will be going to

22 the trust, under a plan, it seems to me that we need to have a

23 new discussion that involves the personal injury committee and

24 the futures rep, who clearly has an interest in this insurance,

25 to see where Scotts is going.

1          I have spoken briefly with Scotts counsel about the

2    matter.  I think what makes sense here is to continue this for

3    one or two omnibus hearings so the parties can now talk given

4    sort of the change in circumstances from what's been going on

5    for the last couple of years.

6              THE COURT:  Good afternoon.

7              MR. PRATT:  Warren Pratt, Your Honor, for OneBeacon

8    America Insurance Company, which is the successor to Commercial

9    Union, and Seaton Insurance Company, successor to Uniguard.

10   Your Honor, these carriers' predecessors resolved virtually all

11   of their asbestos-related coverage with Grace back in the '90s.

12   They are named as defendants in this adversary proceeding, but

13   I'm here today essentially representing these companies as

14   creditors because as part of the settlement back in the '90s

15   the carriers and Grace signed a settlement agreement that

16   included an extremely large payment, I mean in the aggregate in

17   nine figures.  There was a payment by the carriers to Grace,

18   and in exchange for that virtually all of the asbestos-related

19   insurance coverage was resolved.  In other words, there is no

20   more coverage under those policies, virtually all of them.

21         To implement that, Grace agreed to indemnify

22   Commercial Union and Uniguard, now OneBeacon and Seaton, for

23   any claims that would be asserted against the carriers, and

24   that's exactly what's being done in this adversary proceeding.

25   Scotts is claiming coverage on my client's policies under a so

1 called vendor endorsement.  Well, if -- we dispute that there's

2 any liability there at all.  We also claim that the policies

3 for the most part have been exhausted.  But if it were to be

4 the case that a Court were to find that there was coverage

5 under those policies available to Scotts, which was not a party

6 to the settlement, then we have indemnity agreements from Grace

7 for the dollar amounts involved.

8         So, we are creditors.  We filed proofs of claim.

9 They're unliquidated at this point.  But the interesting thing

10 is that under the plan the prior -- you know, the former plan

11 that's to be superseded now, but we can't tell what's supposed

12 to happen to those claims.  We think they are general unsecured

13 claims, but there has been some indication from Ms. Baer in the

14 past that they are to be channeled to the trust.  We don't

15 think they're properly channeled, but we can't tell how the

16 plan has really intended to treat those claims.  So that is

17 going to be a big issue at the confirmation hearing if it's not

18 resolved.

19         It could be resolved in the context of this adversary

20 proceeding, but, as Ms. Baer indicated, this proceeding has

21 just continued to be stayed, and I just wanted the Court to

22 know that we've been here the whole time and we're going to be

23 asserting this issue at the confirmation hearing if it's not

24 sooner resolved.  You know, alternatively this adversary

25 proceeding could heat up now and maybe it could be resolved in

1  the adversary, but so far that hasn't happened.

2        THE COURT:  All right.  Good afternoon.

3        MS. COBB:  Your Honor, good afternoon.  Tiffany Cobb

4  on behalf of The Scotts Company.  The Scotts Company filed the

5  complaint for declaratory relief back in 2004, hard to believe,

6  and that matter has been continued.  It hasn't just been from

7  time-to-time.  It's been continued for three and a half years

8  and then some under the premise that the insurance policies

9  were going to be retained by the reorganized debtor.  Time and

10  time again we've heard that.  It's not at issue in the plan.

11  We don't need to get to this now.  It's a distraction.

12        Well, the reported settlement clearly changes that,

13  and Your Honor may recall back at the October status on this

14  matter Your Honor -- and I think I have a quote here.  "If

15  there is some change with respect to the insurance then the

16  debtors should definitely put this on to an earlier agenda and

17  should update both the insurance companies that are involved,

18  the committees and The Scotts Company, and otherwise if there

19  is no change let's put it off until June."  Well, there's

20  clearly been a change, a material one.  Ms. Baer is correct.

21  She did speak with me before the hearing, and we are -- The

22  Scotts Company is certainly amenable to a dialogue, and in that

23  regard if it makes sense to schedule another status conference,

24  that's fine.  But on the other hand, to OneBeacon's point, you

25  know, this is going to be an issue at confirmation, and the

1  premise that kept this matter stayed for over three and a half

2  years is gone, and there seems to be some logic to proceeding.

3             THE COURT:  Okay.  Committees, anybody wish to be

4  heard on this?

5             MR. FRANKEL:  Your Honor, this is interesting.  I

6  would just say -- I'd ask that it be continued so that we can

7  look into it.  This is -- we're just not familiar with the

8  Scotts matter.

9             THE COURT:  Mr. --

10            UNIDENTIFIED ATTORNEY:  Your Honor, I'm not sure if

11 Mr. Lockwood is on the phone.

12            MR. LOCKWOOD:  Your Honor, I am.  Peter Lockwood.  I

13 agree with Mr. Frankel.  This is sort of the first time this

14 topic has come up in the form that it's just been presented,

15 and the committee has its own insurance counsel, among other

16 things, and is also in the middle of plan discussions with

17 Grace, and I think rather than trying to sort out something at

18 this hearing that is sort of -- we haven't had a chance to

19 think about or talk about is a bit premature, and so I think at

20 a minimum we request a continuance so that we can familiarize

21 ourselves with, you know, what the possible issues here are and

22 how this issue is related to the plan.  I mean, for example,

23 the notion that something -- if, in fact, Mr. Pratt's clients

24 paid out all their asbestos coverage to Grace before it filed

25 for bankruptcy and what it's looking at is a claim against

1 Grace arising out of some possible liability to Scotts Company

2 on the same policies, with all due respect that claim is not

3 likely going to be channeled to an asbestos personal injury

4 trust.  But in any event, rather than getting into a sort of ad

5 hoc and unprepared debate on that topic, I mention it simply by

6 way of illustration of some of the issues that we need to sort

7 of address based on what's been said here so far.

8          MR. BERNICK:  I --

9          THE COURT:  All right.  Well, how much -- Mr.

10 Bernick?

11          MR. BERNICK:  Yes, I just -- it just sounds to me

12 like there's actually a mat agreement that people ought to have

13 a further discussion on this score.  It does seem, however,

14 that if the insurance companies believe that the policies have

15 been paid out that ought to be something that's relatively easy

16 to come forward and establish.  If all the policies have been

17 paid out, I'm not sure what Scotts is even doing with this

18 thing.  They've -- I think it was their position that the

19 insurance was somehow a reason why they should be participants

20 in this process, but it does seem to me that our discussions

21 could be expedited if the Scotts folks and the -- particularly

22 the insurance company, if they believe that this policy really

23 doesn't have any value anymore, that probably is the first item

24 of discussion.

25          MS. COBB:  Your Honor, with all due respect, we have

1 been precluded from any form of discovery.  We don't know the

2 nature and extent of the policies.  I know that Ms. Baer had

3 mentioned that Grace themselves had just undertaken some due

4 diligence in that regard.  We have not seen the policies.  We

5 have been stayed from any -- from anything beyond essentially

6 filing the complaint.  We would be happy to have a dialogue

7 with OneBeacon, but that certainly does not resolve the issue

8 of the extent and the nature of the coverage and the property

9 interest that The Scotts Company asserts.

10        Your Honor, one thing that I had neglected to mention

11 before, you may recall, and I'm sorry, I just don't remember if

12 it was two years ago, three years ago, but there was a point in

13 time when Your Honor did include The Scotts Company in the

14 intended parties to participate in mediation sometime ago, and

15 the mediation efforts fell through before Scotts was ever

16 included in that process.  We have and remain receptive to

17 having a dialogue, but I think given the timing here it needs

18 to be a bit structured.  You know, I think there needs to be

19 some decision as to whether we proceed with a hearing on the

20 motion to relief, the injunction, given that the underlying

21 premise is no longer there to proceed with litigation or, in

22 lieu of that, if there is some alternative -- essentially

23 alternative dispute resolution that would make sense here,

24 that's fine as well.  But I think to just continue it to

25 another status hearing, you know, several months away really

1  isn't going to accomplish that.

2          THE COURT:  Well, I don't know about several months

3  away, because if the process is still on track to hit

4  confirmation in January, if it is, then I don't know that

5  several months is realistic.  It's going to have to be sooner

6  than that.  But I am still a little concerned about Scotts'

7  overall premise as to where there is entitlement under the

8  policies, assuming they exist and are not paid out anyway.  I

9  mean, that's where we left this two and a half years ago, that

10 there has to be I think some showing that Scotts' premise gives

11 it a right to entitlement to coverage under these policies at

12 the outset, and that's where I thought the track might go

13 toward some settlement discussions and mediation, and maybe

14 that is where you need to focus some effort.  I don't know.

15         MR. BERNICK:  We're -- I'm sorry, Your Honor.

16         THE COURT:  Go ahead.

17         MR. BERNICK:  We're happy to proceed with this

18 promptly.  I think that the agenda here, with all due respect

19 to Scotts, has evolved in a certain way.  I think that their

20 principal concern was getting protection from the ongoing

21 underlying litigation, and it sounds like kind of not so hard

22 to read between the lines is the desire to participate in this

23 plan.  I know that Mr. Lockwood and Mr. Frankel would also be

24 happy to talk with Scotts about participating in the plan, if

25 that's an option, but I don't see -- it doesn't seem to me that

1  that requires the Court's intervention.  I think what really

2  has to happen here is that we have to get the information

3  that's relevant and have a discussion promptly, and we'll go

4  ahead and do that and be able to report to the Court, if the

5  Court wants to hear about this, maybe not at the next omnibus,

6  but at the one after that exactly what the status is.  But it

7  doesn't seem to me that this is really an overly complex matter

8  and that we just ought to sit down and find out what the story

9  is.

10      THE COURT:  Well, I think you need to find out what

11  the story.  I agree with that.  Whether there is or isn't going

12  to be participation in the plan depends on a whole lot of

13  things, and so, yes, you first need to find out what the story

14  is, so --

15      MS. COBB:  Well, in that regard, just to clarify,

16  Your Honor, in the past we have been stayed from any

17  opportunity to conduct any discovery.  Is there a limited

18  relief here to permit us to engage in some limited discovery on

19  the insurance front?  It sounds like the debtor has that

20  information now and may even be willing to produce that

21  informally, but I think with the stay in place, the -- again,

22  the premise has been that the injunction order and the stay

23  have precluded our ability to proceed, so it still seems to me

24  we need to do one of two things.  It either needs to be some

25  alternative resolution, or we need to proceed with a hearing

1  substantively on the issue of whether that stay and the

2  injunction are lifted to pursue the litigation and formal

3  discovery in that setting.

4          MR. BERNICK:  You know, that's all -- I mean, it's a

5  nice statement to say let's reinitiate discovery, I suppose.

6  If we want to talk about reinitiating discovery, we can talk

7  about a long road that -- it doesn't seem to me anybody really

8  has any concrete information that suggests it's going to yield

9  anything.  We have, again, no desire to impair the process of

10 coming to closure with Scotts and with the carriers to the

11 extent that they're present here in court on what the

12 underlying facts are.  It sounds to me like Scotts doesn't

13 really know what the insurance policies are on the basis of

14 which they say that they're entitled to coverage to begin with,

15 so --

16         MS. COBB:  Well, that's not a fair statement, David.

17 There have been public records filed by Grace that have the

18 language that has -- in reference to policies, but by the same

19 token we do not know the universe of the insurance because --

20 precisely because they are Grace policies, and I am simply

21 trying to seek clarification as to whether you're willing to

22 informally produce that and, if not, if we should have a

23 hearing to assess whether we are entitled to proceed now that,

24 again, that underlying premise is gone.

25         MR. BERNICK:  Yes, I think the last -- in fact, I

1 believe that the policies that were discussed before in briefs

2 did not tend to establish that Scotts had any access to these

3 policies, but be that as it may, again, it seems to me that for

4 us to have a discussion now doesn't really advance the cause.

5 It's been raised.  I think that it has to be addressed.  The

6 plan does purport to deal -- or the agreement in principle will

7 implicate Grace's insurance policies, so we'll focus on the

8 information and to the extent that counsel for the insurance

9 companies has information we're more than open to it.  I --

10         THE COURT:  Why don't we do this.  Why don't I send

11 you to informal discovery until the next status conference, so

12 nothing formal, but order you all to talk, because to the

13 extent that there are policies out there on which Scotts thinks

14 it's entitled to coverage but the debtor is still doing due

15 diligence, I don't know that the debtor has actually identified

16 what the universe of policies is either, but nonetheless it

17 appears that somewhere in this mix and moving forward toward

18 the confirmation process the debtor is in that -- is in the

19 process of getting policies together that it's obviously going

20 to have to give information about to both the committee, the

21 future claims rep committees, for all future claims rep and so

22 forth, and to that extent Scotts probably is going to have to

23 participate in that discussion to the extent that it's claiming

24 some entitlement to these policies or proceeds of policies

25 somewhere, the committee and the future claims rep need to talk

1  to Scotts to find out what your position is.  So why don't I

2  just send you to informal discovery until the next omnibus.

3  If, in fact, you can't get what you need, then we'll consider

4  setting a date by which we have to have some formal proceeding

5  to determine whether it's appropriate to lift this injunction

6  or not.  I think in the next month you ought to be able to come

7  to some resolution on an informal basis of what Scotts at least

8  is entitled to see, not to see and so on without the need for a

9  formal resolution of this process.  The parties have been

10 talking, and I think at the moment that may be a better way to

11 do this, and if it doesn't work then you can tell me next month

12 it hasn't worked and why and we'll go to the mats at that

13 point.

14          MS. COBB:  Okay.  Thank you, Your Honor.

15          MR. BERNICK:  That's fine.

16          MR. LOCKWOOD:  Your Honor, just for clarification, we

17 would request that the committee's representative in these

18 discussions be Mr. Horkovich from the Anderson Kill firm, who

19 is the committee's insurance counsel.

20          THE COURT:  All right.

21          MS. COBB:  That's fine, Your Honor.  We're constantly

22 in contact with Mr. Horkovich these days.

23          THE COURT:  Okay.  That's fine.  Thank you.  All

24 right, Item 6 is continued to the next omnibus I guess for a

25 status report and to determine whether to set a formal hearing

1  schedule on the matter of lifting the stay imposed.  Okay.

2          MS. BAER:  Your Honor, agenda item Number 7 is the

3  motion of the City of Charleston for relief from the automatic

4  stay.  Your Honor, this matter has been continued from

5  time-to-time.  As you'll recall, last hearing I reported that

6  our sale of this property to ELT did not go forward.  We are in

7  negotiations with Charleston over a couple of matters.  We've

8  shared appraisals with each other in terms of value of the

9  property.  Charleston is working on an access agreement with

10 Grace to go on to the property with their expert and do a

11 geotechnical study of the property.  The parties have

12 determined that prior to further negotiations on a price for

13 the sale, the geotechnical work needs to be done so that they

14 can adequately assess the situation.

15          The City of Charleston is also working with the state

16 agencies to get the appropriate agreement going forward with

17 respect to the environmental concerns there.  Bottom line is

18 the parties are continuing to work toward a potential sale to

19 Charleston, and under these circumstances, Your Honor, we would

20 ask that the matter simply be continued for another hearing.

21 We don't want the stay lifted and any kind of other litigation

22 to commence.  We do believe that the parties are working in the

23 direction of doing an agreed upon sale so that no stay will

24 need to be lifted and no litigation will need to be ensued.

25          THE COURT:  Someone representing the City?  Good

J&J COURT TRANSCRIBERS, INC.

1   afternoon.

2          MS. THOMPSON:  Good afternoon, Your Honor.  Christina

3   Thompson on behalf of the City of Charleston.  The City is in

4   favor of continuing this to the next omnibus hearing while the

5   parties continue to negotiate.

6          THE COURT:  Okay.  Item 7 is continued to the July

7   omnibus then.  Thank you.

8          MS. BAER:  Your Honor, agenda item Number 8 is

9   another motion to lift stay.  This is by Mian Realty.  Mian

10  Realty is the purchaser of some property from Grace back in the

11  late '90s.  Apparently there are some environmental issues on

12  the property.  Grace was kind of taken by surprise given how

13  long ago they sold this property.  Grace did not operate any

14  chemical plants and the like there.  They operated a book

15  publishing business there.

16         They are in the midst of discovery with Mian Realty.

17  We've just received a very large amount of discovery from Mian,

18  as well as discovery requests by Mian of Grace.  Your Honor,

19  Grace asked Mian whether they'd agree to continue this till the

20  September 2nd hearing so that all the discovery could be

21  completed and the matters reviewed.  Mian was unwilling to do

22  that but did agree that this matter should be continued to July

23  21.  By July 21, Your Honor, Grace should have reviewed all the

24  discovery that it received.  It will just be at the point where

25  it will have given Mian discovery, providing we can find the

**J&J COURT TRANSCRIBERS, INC.**

1  information given how long ago this property was sold.

2          Under these circumstances, Your Honor, we'd like to

3  continue the matter to July 21, but reserve our right on July

4  21 to come in and ask for a further continuance depending upon

5  where the discovery is at and how -- what kind of a tough time

6  we have or not trying to locate the information that Mian is

7  looking for from us.

8          THE COURT:  Anyone representing Mian?

9                      (Pause)

10         MS. BAER:  Your Honor, I should say for the record

11 Mian did send me a letter on Friday confirming that they were

12 in agreement to the continuance to July but opposed any

13 continuance beyond then.

14         THE COURT:  Okay.  The hearing is continued -- on

15 Item 8 is continued till the July omnibus, and we'll address

16 any further continuances at that time.

17         MS. BAER:  Thank you, Your Honor.

18         THE COURT:  All right, nine.

19         MS. BAER:  Agenda item Number 9 is the application of

20 the futures rep to modify the employment of Piper Jaffray.  By

21 agreement of the parties, that matter has been continued to

22 July 21st.  They also have filed now a separate application

23 that is up at the same time.

24         THE COURT:  All right.  It's continued.

25         MS. BAER:  Your Honor, that takes us to matters

1 related to asbestos property damage claims, and I believe Mr.

2 Restivo is on the phone is going to address the next couple of

3 matters.  Mr. Restivo?

4          MR. RESTIVO:  Good afternoon, Your Honor.  Jim

5 Restivo for the debtor.  Item Number 10, Your Honor, is a

6 status report on asbestos property damage claims.  At the June

7 omnibus I reported that Mr. Speights and I were talking about

8 his Canadian cases.  There are 55 of those left.  I think I

9 indicated that we would know by today whether or not we had

10 settled those cases or whether or not we would be unable to

11 settle those cases.  In fact, we've had a lot of discussions.

12 I have asked for some further information which Mr. Speights

13 has promised to get me, and so we will be in a position at the

14 July omnibus, Your Honor, to tell you that we have either moved

15 these cases or that we are unable to move them.  We are moving

16 with all deliberate speed, but some of the information requests

17 have to be answered in Canada and so it's gone a little bit

18 slower than I had anticipated.  And so that's where we stand on

19 the Canadian cases and we'll give you a full report next month.

20          THE COURT:  All right.

21          MR. RESTIVO:  Item Number 11, Your Honor, and item

22 Number 12 relate to a motion to alter or amend the Court's

23 order.  Those cases have been settled.  Mr. Speights and I are

24 working through a settlement agreement because these settlement

25 agreement for the first case settled, namely Jamison Hospital,

1 will be used for the model of all of the settlements we have

2 reached.  It's taken us some time and we're answering some

3 questions to nail down the settlement form, but we have been in

4 a lot of discussions on that and, again, I believe we will be

5 in a position to have that done by the July omnibus.

6          THE COURT:  That's all of 11 and 12?

7          MR. RESTIVO:  That is correct, Your Honor.  Those --

8 three cases are involved in Items 11 or 12.  Those cases have

9 been settled, and so 11 and 12 are really no longer active, but

10 we need to present to the Court a settlement agreement and

11 because these are going to be the sample for all of the

12 settlements with the Speights law firm, it's a little harder

13 come up with the form, and we're working on that.

14          THE COURT:  All right.  Good afternoon.

15          MR. MANDELSBERG:  Good afternoon, Your Honor.  I'd

16 just like to go back briefly to Item 10.  Steven Mandelsberg,

17 Hahn & Hessen.  We represent the State of California,

18 Department of General Services, which has filed 16 property

19 damage claims totaling over $130 million.

20          I just would like to point out that we've not --

21 although since last April when -- Your Honor may recall after

22 the trial of the product ID hearing matters and Your Honor had

23 suggested that the parties might want to consider mediation at

24 that time, I'd just like to give an update as to the efforts in

25 that regard.

1          There has been no mediation with the State of

2     California as to its claims since last April.  Your Honor may

3     recall that Mr. Restivo at the end of the trial indicated that

4     he would prefer to wait until the Court had decided the pending

5     summary judgment motions, one of which was directed to our

6     client's claims on the sole ground of the pendency of the

7     Alabama v. W.R. Grace Supreme Court complaint.

8          We did, in October or November, attempt to pursue

9     some dialogue with W.R. Grace's in-house counsel, Mr. Fink.

10    That was unsuccessful, and we were advised that W.R. Grace

11    would prefer to wait until the Court decided the motions.  In

12    December of 2007, Your Honor may recall hearing suggested that

13    mediation might very well be a good idea to pursue and that

14    parties -- PD claimants should not necessarily wait for the

15    Court to decide those motions.  And in January of this year,

16    Your Honor, you may recall that you repeated that indicated and

17    actually even said that you'd be prepared to direct the parties

18    to mediation, they shouldn't wait for a decision.

19         So, here we are now in June.  No one has approached

20    our -- me or our client about mediation.  We know that

21    mediation has been directed and had as to other PD claims, some

22    with success, some with not success, and we would just suggest

23    that given the status of the matter and the delays involved,

24    that mediation with a third-party neutral might be beneficial

25    at this time or within a short schedule.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Okay.  Mr. Restivo.

2              MR. RESTIVO:  Your Honor, we do not think that

3    mediation would be successful.  As we reported to the Court at

4    the last omnibus, those cases have been fully briefed and

5    argued, and we think the Court ought to rule on those cases.

6    Obviously, if Mr. Mandelsberg or someone from his client wants

7    to talk to me they can pick up the phone.  If they have a

8    proposal, I'm happy to listen to that, but clearly the past

9    discussions make it crystal clear that their view of these

10   cases is very much different than our view of the cases, and I

11   think we're at a stage where really both parties need the

12   guidance of the Court by way of a ruling on the motions for

13   summary judgment.

14             MR. MANDELSBERG:  Well, Your Honor, that's basically

15   the same thing Mr. Restivo said on April 24th of last year, and

16   I just note that as recently as January Your Honor at the

17   hearing then remarked at Page 40, Line 4, "If you're going to

18   go to mediation, I would think the time to do it is before you

19   get a definitive ruling from the Court rather than after."  So,

20   we're sort of in a holding pattern here.  I don't -- I

21   understand -- I don't want to get into the details of our

22   communications, I understand that W.R. Grace disagrees with us

23   about our claims.  They disagreed with us as to the product ID

24   issues.  That's why we had to have a trial, but that trial is

25   over and if the statute of limitations issue is going to be the

1  single thing that's going to prevent a mediation when the

2  issues really relate to damages, it seems, then I think a

3  mediation schedule, submissions before a disinterested neutral,

4  would be beneficial.

5          MR. RESTIVO:  Your Honor, Jim Restivo again.  With

6  all due respect to Mr. Mandelsberg, it is true there was a

7  request for mediation.  That request was made by the Speights &

8  Runyan firm.  Now, we responded and reacted to that request and

9  eventually it was determined that there would be a mediation

10 before Judge Welsh, which we did.  This is the first time Grace

11 has heard since that time that the State of California wanted

12 to be a part of a mediation.  They never contacted us.  They

13 never contacted Judge Welsh.  To the best of my knowledge, they

14 never contacted the property damage committee or Mr. Speights.

15 You know, we went to the mediation and we mediated with whoever

16 wanted to mediate.  Now that they think that perhaps there's

17 going to be some ruling on the motion, you know, at the

18 eleventh hour, they say now we want to mediate.  If they were

19 present when the Court said mediation makes sense, they should

20 have said they wanted to go to mediation.  We don't want to go

21 back to a mediation.  We've had it.  They didn't participate.

22 they didn't indicate to anyone they wanted to participate.

23         Again, if someone picks up the phone and wants to

24 talk to me, I'd be more than happy to talk to them, but the

25 time for mediation has come and gone.  It was partially

1 successful.  It was also successful without mediation.  And so

2 my suggestion then is if they have some proposal that's

3 different from what they proposed before, I will be all ears,

4 but I don't believe mediation will work at this late date as to

5 their 16 or 17 claims.

6         MR. MANDELSBERG:  Your Honor, Mr. Restivo has got his

7 facts a little bit askew.  First of all, we don't -- we don't

8 represent the same clients that Mr. Speights represents.  We

9 never have.  We represent different claimants with different

10 issues and different concerns.  That's why the product trial ID

11 hearing referred to just us -- our claims.  Second, as Mr.

12 Restivo will remember, we did express an interest in mediation

13 right after Your Honor ruled on April 24th, 2007.  They weren't

14 interested then for the same reason.  Third, the invitation to

15 mediation and the proposed order that Mr. Restivo is referring

16 to referred only to specific claims and claimants.  It didn't

17 invite any mediation for any claimants other than the ones that

18 Speights represented.

19         So, we're representing different claims with

20 different matters.  To the extent that they involved property

21 damage claims and they're filed in this proceeding, I suppose

22 they have some connection, but they don't have any connection

23 in the context that we're grouped together with Mr. Speights'

24 claims.  I don't think Mr. Speights ever represented otherwise.

25 I don't think the asbestos property damage claimants' committee

ever represented otherwise, and we have indicated at prior hearings that we're interested in exploring settlement through mediation. So I don't know why he continues to lump us in with a host of other claimants who are not represented -- who are represented by different counsel and have different claims.

THE COURT: Well, I'm not sure either. I'm not exactly sure what the debtor -- why the debtor is so adamant about not going to mediation with respect to settlement in this one. I guess the debtor is pretty confident about his legal position. Other than that, I don't -- I mean, I don't know what else there is, and my view still is the same. If you're going to mediate, normally the reason that you want to try to settle is because there are risks involved in litigation. Apparently, the debtor thinks in this instance that its risk in litigation isn't very high. I go back to --

MR. RESTIVO: Your Honor, there's two parts to that. One, we do feel very confident on our motion, but, secondly, there were a number of hearings at which the subject of mediation of property damage claims was discussed. It is true that the subject was raised by the Speights & Runyon firm. It's also true, however, that Your Honor expressed a preference for mediation. And so the second reason is if the State of California wanted the mediation to include their claims when we were picking a mediator and we were -- went to Philadelphia and we were spending a couple of days in Philadelphia, they should

1  have indicated to Your Honor or to us that they, too, wanted to

2  mediate their claims.  They didn't mention anything.  We've had

3  the mediation.  He says that back in April of 2007 they

4  mentioned mediation.  I don't remember whether they did or they

5  didn't, but clearly when the Court was talking to the parties

6  and promoting mediation, which we went to, I didn't hear one

7  word from the State of California that they wanted to be

8  involved in mediation.

9       And the second reason we don't want to do it now is,

10  you know, they had their opportunity.  We went.  We went to

11  Judge Welsh.  It's over, and if they really wanted to mediate

12  before they thought a ruling was coming, they should have said

13  it when the Court was talking to the parties about mediation.

14           THE COURT:  Well, okay.

15           MR. MANDELSBERG:  Your Honor, I don't want to belabor

16  this, but Mr. Restivo either forgets or isn't aware of the

17  numerous times we have communicated our intention to mediate,

18  not the least of which was at the end of the -- in November of

19  2007 of my communications with Mr. Fink and in-house counsel

20  when after they voiced the same statement Mr. Restivo was

21  saying now, we want to wait until the Judge rules, we said we'd

22  like to explore mediation beforehand.  We waited for the

23  Court's ruling.  We feel very confident in our position as

24  well.  These motions were specifically litigated.  There was

25  never any global mediation directive that included the State of

1 California.  The order didn't do so.  The motion seeking the

2 appointment of Judge Welsh didn't do so.  There was never any

3 reference to include us, nor would we have expected that we

4 would be lumped together with other claimants involving

5 different issues and different proof.

6       So, I appreciate what Mr. Restivo is saying now, but

7 we've already gone through the step of some direct dialogue.

8 It was several weeks, between October and November of 2007.  I

9 don't want to get into the details of it, but to suggest to the

10 Court that we haven't made some effort privately to resolve

11 this matter is just not being accurate.

12       THE COURT:  Okay.  Well, all I can suggest is this.

13 I have summer clerks.  I am getting caught up.  If you folks

14 are going to mediate, you need to do it soon because what is

15 holding me up is the fact that these property damage claims

16 have a way of changing on a pretty regular basis, and I get

17 opinions done and before I get them out I get a notice that

18 says that you've settled.  And so I am always behind the eight

19 ball because as soon as I get something finished it's worthless

20 because you've got something settled, and so I'm, frankly, to

21 the point where I don't know what I'm supposed to work on

22 because by the time I get something done it's settled and it's

23 wasting a lot of my staff and my time.  But this issue, because

24 it hasn't been settled, is something that I do have somebody

25 working on, and, in fact, I've got drafts circulating through

1  the office.  So, an opinion is going to be coming in pretty

2  short order.

3          Mr. Restivo, I had the Circuit appoint Judge Agresti

4  in Pittsburgh, where you are, for the purpose of assisting this

5  Court in getting mediations done to the extent that it's

6  necessary to help between now and whenever this case is no

7  longer pending in the District of Delaware solely for the

8  purpose of assisting with mediation.  It seems to me that at

9  least to the extent that you are in Pittsburgh we can get

10 something done in Pittsburgh, or, if you want to go to

11 mediation in front of Judge Welsh and she's got the time, then

12 there is Judge Welsh who's available and who is familiar at

13 least with the aspect of the Speights & Runyan portion of this,

14 although, frankly, I'm not sure that that means much because

15 these claims are not Speights & Runyan claims.

16         So, if -- I think if -- that's not inappropriate,

17 since the debtor has attempted to settle with all the other

18 constituent groups, to try to make one effort to get this thing

19 settled in some fashion with a neutral who will try to guide

20 you through.  If it works, fine.  If it doesn't work, then it's

21 going to be pretty short order till I get an opinion done.  So,

22 I think you should take one effort to try to get this settled

23 because the debtor has been trying to settle the property

24 damage claims and, frankly, you've been doing a very good job

25 at it.  So, why not take one chance to try to get this done?

1  If it works, as I said, that's wonderful, and if it doesn't

2  then an opinion will be coming down the pike in not too

3  terribly long a time period after I'm told that it's not

4  successful.

5        MR. MANDELSBERG:  Your Honor, we'll be available to

6  participate in a mediation session of that type at any

7  reasonable schedule.

8        MR. RESTIVO:  Your Honor, Jim Restivo again.  We

9  will, at the Court's urging, be happy to take one shot in --

10  immediately.  We would want to do it again before Judge Welsh.

11  In fact, Your Honor, while all of the claims were represented

12  by Speights & Runyan, the California claims were primarily

13  represented by Tom Brandi's law firm, and so, in fact, Judge

14  Welsh mediated different claims involving different law firms

15  all involving property damage, and so I will contact Mr.

16  Mandelsberg  and then together he and I can contact Judge

17  Welsh.  We'll look at the calendars, we'll set up a time and

18  we'll go mediate and we'll take a shot at it and we'll do it

19  ASAP, if not earlier.

20        THE COURT:  All right.

21        MR. GEORGE:  Your Honor?  Your Honor, this is Gerald

22  George representing Macerich, which is also a property damage

23  claimant in California whose claim has not been resolved.

24  We're in a similar situation with the State of California, and

25  I would just like to request that we be included in the

1  mediation effort as well.

2          MR. RESTIVO:  We will include Macerich as well.  If

3  you could send me an e-mail, sir, so I know how to get back in

4  touch with you, when we call Judge Welsh we will include you in

5  the call.

6          MR. GEORGE:  Thank you very much.

7          THE COURT:  Okay.  I want all of these continued till

8  the July omnibus because Macerich, I do have an opinion just

9  about ready to go.  It's even closer than the State of

10  California claims.  So, this is getting a little frustrating.

11          MR. GEORGE:  Thank you, Your Honor.

12          THE COURT:  Mr. Restivo, what other ones are out

13  there?  Because I want them all to go to mediation before I

14  take on any more opinions because, you know, even my clerks --

15  at some point my students would like to have something that

16  they can actually use as writing samples so that some of you at

17  some point might know that they've actually done something for

18  me.  So -- and at this point they're never going to have any

19  writing samples that they can actually admit that they've had

20  -- that they've written because you're never going to get to

21  see them.  So, what else is out there?

22          MR. RESTIVO:  Your Honor, I believe that's -- other

23  than Canada, which I've reported on, I believe that is all that

24  is out there --

25          THE COURT:  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

64

1        MR. RESTIVO:  -- and I hope the clerks understand my

2   own personal preference is to wait for the opinions, but I am

3   willing at the Court's urging to, you know, take a quick shot

4   at mediation.

5        THE COURT:  All right.  All -- Item 10, the State of

6   California and Macerich -- I'm not sure what all is included in

7   Item 10 other than the Canadian claims, but we're talking about

8   these in Item 10, so to the extent they're not in Item 10, they

9   now are.  They're all continued to the July omnibus.  I will

10  not issue opinions before then, but I will shortly after that

11  if they're not settled.  So, they're continued to the July

12  omnibus.

13       MR. RESTIVO:  Your Honor, with respect to that -- Jim

14  Restivo again -- assuming we can get the mediation done

15  promptly, if we settle, we would advise the Court.  If we don't

16  settle, would it be permissible to advise the Court in advance

17  of July 21 that we have been unsuccessful?

18       THE COURT:  Yes, after your mediation is concluded, I

19  mean, you can, you know, let --

20       MR. RESTIVO:  Rather than waiting to tell you on July

21  21, because maybe when we show up, you know, the opinion will

22  be done if we're not successful.

23       THE COURT:  Well, I should get a report from the

24  mediator that tells me that you weren't successful.

25       MR. RESTIVO:  That's correct.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  So, yes, it can be filed, and, yes, Mr.

2   Restivo, you can call my Pittsburgh staff and let them know

3   that that report's been filed.

4          MR. RESTIVO:  Thank you, Your Honor.

5          THE COURT:  Okay, thanks.

6          MR. RESTIVO:  Your Honor, the next item is Item 13,

7   the status on --

8          THE COURT:  Now, wait a minute, Mr. Restivo.  I just

9   want to make sure -- I'm not sure I was done with 11 and 12, so

10  let me get caught up.  Eleven and 12 were the motion to alter

11  or amend the Court's order.  They were the three claims.

12  You're working on the settlement because you're going to use

13  the Jamison Hospital one as the model, and these are all

14  continued to the July omnibus.  Is that correct?

15         MR. RESTIVO:  That is correct, Your Honor.

16         THE COURT:  All right.  Just one minute.

17                        (Pause)

18         THE COURT:  Okay.  Thank you.

19         MR. RESTIVO:  Item Number 13, Your Honor, is a status

20  report on the Canadian ZAI BD claim settlement.  Your Honor, in

21  furtherance of Grace's agreement in principle with the Canadian

22  ZAI claimants, after the June omnibus hearing Grace and the

23  Canadian ZAI claimants exchanged term sheets and have been in

24  discussion with respect to those term sheets.  Certain

25  proposals have been made to the Crown, but the Crown does not

1  yet have authority to make any counterproposals.  Once the

2  Crown responds, Grace and the Canadian ZAI claimants will

3  discuss finalizing the term sheets.  The debtor, Your Honor,

4  believes that all three parties are moving forward in good

5  faith and with all deliberate speed given the number of

6  government agencies involved in Canada and the complexities of

7  some of the issues.  Accordingly, Your Honor, we hope to be in

8  a position to report more substantively at the July 21 omnibus,

9  and we suggest that the motion to lift the automatic stay under

10  agenda Item 13 simply be carried on that agenda until the July

11  omnibus so we can try to formalize the agreement in principle

12  and we can see whether or not that agreement can also include

13  the Crown.

14          THE COURT:  Anybody -- Mr. Hogan?  Good afternoon.

15          MR. HOGAN:  Good afternoon, Your Honor.  Daniel Hogan

16  on behalf of the Canadian Zonolite claimants.  Your Honor, Mr.

17  Restivo's recitation of the circumstances relating to this

18  agreement in principle are essentially accurate, and so I would

19  ask as well that this matter be continued until July 21st so

20  that we can explore and hopefully resolve the issues that we

21  have between us.

22          THE COURT:  All right.  Thank you.  Mr. Monaco,

23  anything you need to put on record?  No?

24          MR. MONACO:  Nothing further, Your Honor.

25          THE COURT:  All right.  Okay, Item 13 is continued

1  till the July omnibus as well.

2         MR. RESTIVO:  That concludes my report, Your Honor.

3         THE COURT:  Thank you.  Mr. Bernick?

4         MR. BERNICK:  Yes.  With regard to Item 14, Your

5  Honor, may or may not recall that there was some discussion at

6  the time that we reported that an agreement in principle had

7  been reached between the debtor and the personal injury --

8  different personal injury constituencies, that not all other

9  constituencies were signed on to the agreement in principle,

10  and in particular that the general unsecured creditors were

11  still studying the matter.  As you again may or may not recall,

12  one of the conditions precedent to the agreement in principle

13  is the agreement to a pendency interest rate that's specified

14  in that agreement.

15         There have been -- there's been an exchange of

16  correspondence.  There have been face-to-face meetings, both

17  with counsel for the unsecured creditors' committee, as well as

18  certain actual debtholders, that has not produced agreement at

19  this point in time.  We're obviously hopeful that at some point

20  we will get to agreement, but as has been the approach that we

21  followed in other aspects of the case where we don't have

22  initial agreement, we thought it was really very, very

23  important to initiate a formal process before the Court to get

24  the matter decided by the Court on a timely basis, and, as a

25  consequence, the debtor has filed an objection to claims that

1  are embedded in the general unsecured debt claims for default

2  interest.  The position that's been taken by the general

3  unsecured creditors is that they're entitled to whatever the

4  full amount of the default interest would be under the various

5  instruments that govern the debt.  The debtor --

6          THE COURT:  General unsecured creditors?

7          MR. BERNICK:  General unsecured creditors' default

8  interest to the full extent required -- or not required -- to

9  the full extent spelled out in their contracts.  So --

10          THE COURT:  I saw the objections to claims to the

11  bank debt.  I didn't realize that the debtor had filed

12  objections to the claims of trade creditors as well.

13          MS. BAER:  No.

14          UNIDENTIFIED ATTORNEY:  It hasn't.

15          MS. BAER:  The bank debt is unsecured.

16          THE COURT:  I understand, but I thought Mr. Bernick

17  just mentioned general unsecured --

18          MR. BERNICK:  No, it's -- then it's my problem.  This

19  is with respect to the general unsecured debt that is bank

20  debt.

21          THE COURT:  Bank debt, oh, okay.

22          MR. BERNICK:  Yes.

23          THE COURT:  All right.  We're back -- sorry.  I'm

24  back on the same page.  I thought you were talking about an

25  objection to claim of all general unsecured --

1            MR. BERNICK:  I don't believe that --

2            THE COURT:  -- all general unsecured debt.

3            MR. BERNICK:  I don't believe that we've picked up

4    the trade debt at this point.

5            THE COURT:  Okay.

6            MR. BERNICK:  So, the discussions have been with the

7    bank debtholders.

8            THE COURT:  All right.

9            MR. BERNICK:  So, again, as in other aspects of the

10   other parts of the case, we thought that it was important to

11   initiate the litigation process to get the matter resolved in

12   the event that it can't be resolved otherwise.  In consequence,

13   we filed an objection.  The objection is listed in the agenda.

14   And Mr. Rosenberg, who represents the bank debtholders, or

15   certain of the bank debtholders, was good enough to reach out

16   to me this morning to try to find out what the debtor wanted,

17   and what the debtor would like and what I think that we have at

18   least general agreement on is to seek a fairly prompt hearing,

19   indeed as prompt as can be scheduled, with respect to this

20   matter.  There's an indication from the debtholders that they

21   may want some discovery.  The debtor is cooperative, obviously,

22   with respect to any reasonable request for discovery.  So, what

23   we would like, that is the debtor would like, is to find time

24   in Your Honor's calendar we would hope in September to have a

25   special setting to take this matter up, that is the objection

1  to the default interest request, and if we can schedule that

2  date then I think we'll be able to submit to the Court a

3  proposed scheduled or at least acquaint the Court with our idea

4  for a proposed scheduled for the briefing and the completion of

5  any discovery that's required.

6         THE COURT:  All right.  What are you contemplating by

7  way of a hearing?

8         MR. BERNICK:  I think it's going to -- I sincerely

9  doubt that there'll be any need for any kind of evidentiary

10 presentation.  We're very familiar with Your Honor's practices

11 and preferences in that regard.  So I think what we're really

12 talking about is an exchange of briefs following -- or a

13 completion of briefing following any discovery that takes place

14 and then basically argument, and I don't think that the

15 argument should last too terribly long.  I think if Your Honor

16 set two hours at a maximum we'd certainly be able to fit the

17 argument into that time frame.

18        THE COURT:  All right.  Good afternoon.

19        MR. ROSENBERG:  Good afternoon.  Andrew Rosenberg,

20 Paul, Weiss, Rifkind, Wharton & Garrison for the bank

21 debtholders.  Mr. Bernick's recitation is accurate, with one --

22 I guess one caveat.  Your Honor, it's somewhat odd procedurally

23 obviously to have a status conference several weeks before our

24 initial responses are even due.  Therefore, we haven't framed

25 out exactly what our case would necessarily be completely.  It

1  may be that we want to put on evidence, so I would not want to

2  preclude that now, and obviously this is going to be a process.

3  We're going to have to decide that when we fully flesh our case

4  in the next two weeks, but a September date does make sense to

5  us also.  I just can't -- you know, I anticipate that we could

6  be putting on evidence.  I just don't know for sure because

7  we're so early in the process in having the status conference

8  before our response is due.

9         THE COURT:  Well, that poses the problem in that

10  until I know what you intend to do I'm a little hard pressed to

11  reserve time.  But assuming that you might want to put on

12  evidence, in what nature?  Because if you're going into a

13  solvency hearing, then I don't think two hours is probably

14  going to do it.

15         MR. ROSENBERG:  Perhaps what makes sense, Your Honor,

16  is our responses aren't even due to the -- to July 3rd, that we

17  talk to Mr. Bernick after they're -- after they're filed and

18  see if we can work backwards on some schedule and present a

19  scheduling order that both parties agree to to Your Honor.  I

20  think rather than trying to do this here in the absence of, as

21  I say, an initial response from our side I think that would,

22  you know, make a lot more sense for all concerned.

23         MR. KRUGER:  Your Honor, Lewis Kruger for the

24  unsecured creditors' committee.  Just to confirm, there are

25  three parties to this process, not just two.  The committee

1 itself will want to be heard because in the objection there are

2 various things said about the committee's position which we

3 will need to clarify on the record, and I believe we will need

4 an evidentiary hearing and there will be discovery.

5          UNIDENTIFIED ATTORNEY:  Say something again?

6          MR. ROSENBERG:  Yes.  Perhaps what would make some

7 sense is if we could reset the response date, maybe have

8 another status conference on July 21st, although I would hope

9 that we could enter into a scheduling order before that to

10 present to the Court.

11          MR. BERNICK:  This is exactly the reason why we

12 wanted to have this teed up.  We've now seen the position kind

13 of evolve a little bit as we're standing here today.  I think

14 that September will be adequate time to complete anything

15 that's necessary.  There is an overriding need to schedule this

16 matter, have it heard, have it resolved, if it can't be

17 resolved on a consensual basis because this is, in fact, a

18 condition and a predicate for the plan.  That plan is extremely

19 delicately balanced.  We wouldn't be here if there were some

20 easy solution.  We wouldn't be here if the issue was an issue

21 that somehow could be swallowed up in the noise that's

22 associated with the plan.  This is a real live issue.

23          I think that maybe what would make sense, rather than

24 having this remain kind of a loose end with a tail that's not

25 tied down is to try to set a date, pick a date in September

1 where we have a couple of hours, and it'll be a tentative date,

2 and if at sometime they want to make an application or they

3 want to acquaint the Court in connection with an omnibus or

4 otherwise that somehow that's not enough time for them to put

5 all their evidence in, then we can certainly take that off

6 calendar.  But I'm very cognizant of the fact that the Court

7 has a very, very tight docket and I would like to, if at all

8 possible, get a date in that docket so that we can aim at that,

9 and I think that we have to take very seriously the notion that

10 we're going to have all this discovery and we're going to have

11 evidentiary issues.  Mr. Kruger's position with respect to the

12 positions that the unsecured creditors' committee took I think

13 are largely going to be -- are largely going to be immaterial

14 to the outcome of this issue.  Our position doesn't turn on

15 that.  I can understand how he would want to make a matter of

16 record of what it is that he did or didn't do, but I don't

17 think that our position at the end of the day is going to turn

18 on that.  It's going to turn on equity.

19          And so, again, we would like not to have this remain

20 a floating matter from a scheduling point of view.  We'd like

21 to get time in September and then we would resist the idea that

22 they can postpone now their time to respond to our brief.  This

23 is a matter that has been very, very extensively discussed.

24 Their position seems to be one where they say this is very,

25 very well established law.  It shouldn't take long to litigate

1  and put that in writing.  So, we would object to the idea of

2  their getting more time on their brief --

3        THE COURT:  Oh, I don't see any reason to have more

4  time for the brief.  I think the law is pretty well

5  established, and I think the issue is, are you going to consent

6  or are we going to a solvency hearing.  That's what it seems to

7  me they're narrow -- to be narrowing down to, and if we're

8  going back into a full-blown solvency hearing, I don't think

9  two hours is going to do it.  It certainly wasn't going to do

10  it when we were going to be estimating the PI issues, and even

11  if we don't have to estimate the PI issues, if you're going to

12  be estimating other aspects of this case, like the ZAI aspects

13  of it alone, I don't think you're going to do it two hours.  So

14  -- and, if, in fact, you've got to estimate all that, folks,

15  your concept of interest, from where I've been sitting and

16  watching this case, settlement might be a very good thing for

17  you folks to be talking about.

18        MR. ROSENBERG:  Well, Your Honor, I'm not as -- you

19  know, obviously I've not as familiar with the issues that may

20  have gone with solvency in the past here.  I don't think I've

21  raised the issue necessarily of having a solvency hearing.  All

22  I said, Your Honor, was that our response isn't even due for

23  two weeks --

24        THE COURT:  Yes.

25        MR. ROSENBERG:   -- and it was difficult for me to sit

**J&J COURT TRANSCRIBERS, INC.**

1  here and frame at this very moment the exact evidentiary

2  hearing that I would want to put before Your Honor.  We have no

3  objection to setting a date in September, and to the extent

4  that we -- when we get a better sense in the next few weeks as

5  to what type of evidence we're likely to present after

6  discovery, if we need to apprise that Court that we think that

7  time is insufficient, we will do so promptly.

8            THE COURT:  All right.  Well, I think the idea of

9  setting a date in September is fine.  The idea that that date

10  may not be sufficient and therefore continued is not fine.  If

11  it's insufficient, we're going to start on whatever day I give

12  you, and then I'll give you continuation days because Mr.

13  Bernick's correct, I do have some limited numbers of days.  So,

14  I'll lock in a date we'll begin.  But the problem I'm having is

15  this.  I've looked at the motion.  I think the issue is pretty

16  clear.  The unsecured creditors, unless the debtor is solvent,

17  aren't entitled to any interest.  It doesn't matter -- default

18  interest, not default interest.  It's no interest.  So, unless

19  we're going into a solvency hearing, then I think the issue

20  that you face is it's not any interest, folks, it's no

21  interest.  So, there's a settlement out there that indicates at

22  the moment that the debtor is willing not just to pay you

23  interest, but more interest than the contract rate, but not up

24  to the default rate.  So, I'm not sure what on earth it is that

25  we're going to be going into a hearing, an evidentiary hearing,

1  about unless it's solvency.

2          MR. ROSENBERG:  Your Honor, I think there will be an

3  -- well, I think there -- Your Honor, we haven't had an

4  opportunity to respond, and I do think at a status conference

5  it's difficult for me to respond on an ad hoc basis.  I don't

6  think as an initial matter the issue is solvency under the law.

7  I think the Third Circuit has made clear that the absolute

8  priority rule is the issue and that's -- if equity is going to

9  retain 100 percent ownership of the company, that is a -- there

10 is a very basic issue.  At that point, creditors need to be

11 paid in full in accordance with their contracts, and we're not

12 asking for anything more than is due under that contract.  So I

13 think when we frame the issue, and we're going to show you

14 obviously the law to that effect, that the issue is the

15 retention of 100 percent equity, which I think is going to be

16 worth --

17         THE COURT:  All --

18         MR. ROSENBERG:  -- hundreds of millions, if not

19 billions, of dollars.

20         THE COURT:  I have no --

21         MR. ROSENBERG:  That is the issue.

22         THE COURT:  I have no problem with the absolute

23 priority rule.  What you're just saying is that the settlement

24 blows up and there is no settlement agreement that will lead to

25 consensual plan.  So if that's the case, then there's no

1  settlement.  We go back to the boards.  We'll just start the

2  trial over again, and rather than solvency, we'll just go back

3  to the estimation hearing.  So, folks, one way or another, I'm

4  not sure exactly what it is that you intend to do, but if we're

5  going back into an estimation hearing on personal injury, then

6  probably not just interest, but the whole amount of your debt

7  in terms of principal is at issue.  You folks should be talking

8  and not to me.

9          MR. ROSENBERG:  Your Honor, we're happy to talk.  I

10 think one of the issues obviously is we don't view this as

11 something that -- you've heard from Bernick that this blows up

12 the whole settlement.  That may also be an evidentiary issue as

13 to the truth of that or not.  We view this as simply a transfer

14 of value from one creditor group to equity that's retaining

15 ownership of the company.  That involves at most a few percent

16 of the value of a company worth billions of dollars.  We don't

17 see this as a blow up the plan type of issue as much as has

18 been portrayed, and that's something that Your Honor will hear

19 in September.

20         THE COURT:  Okay.  All right.  My clerk tells me --

21 just a minute.  I want to double-check on the calendar, so give

22 me one second here.  Oh, Mr. Kruger, I'm sorry.  Did I cut you

23 off?

24         MR. KRUGER:  No, that's all right.  Mr. Rosenberg --

25         THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1                       (Pause)

2              THE COURT:  Mona, I'm not sure where -- I'm not

3  reading the same dates that you're reading.  You've got -- you

4  have September 5th.  I have it listed as Chapter 13 day.  So,

5  I'm not --

6                       (Pause)

7              THE COURT:  Okay.  I believe I have two days, but

8  unfortunately they're not back to back.  I -- it looks as

9  though right now I have September 15th available in Pittsburgh,

10 and I believe I have September 30th available here.

11             MR. BERNICK:  I see by my calendar that that's Rosh

12 Hashanah.

13             THE COURT:  Which one, Mr. Bernick?

14             MR. BERNICK:  The 30th.

15             THE COURT:  The 30th.  Does that affect the 29th,

16 too?

17             MR. BERNICK:  It begins at sundown, so I suppose for

18 people's travel plans we might --

19             THE COURT:  Because that's the Delaware omnibus for

20 this case, the 29th.

21             MR. BERNICK:  Is that right?

22             UNIDENTIFIED ATTORNEY:  Yes --

23             MR. BERNICK:  Okay.  Well, what -- if it were to be

24 -- I would guess you probably have other -- you have all your

25 debtor cases that day in the morning, or some in the morning

                    **J&J COURT TRANSCRIBERS, INC.**

1  anyhow.  Or do you?

2          THE COURT:  I do, but the morning -- I might be able

3  to juggle something.  I will try next month and see whether or

4  not I can juggle dates because this morning really kind of fell

5  apart, and Federal-Mogul is -- has pretty much been coming off,

6  so I might be able to flip those times so that I can do this

7  case in the morning, at least start it earlier.

8          MR. BERNICK:  By the way, what I was getting at is

9  that if you -- if we had the special setting take place in the

10  morning --

11          THE COURT:  Oh --

12          MR. BERNICK:  -- then we wouldn't have to worry -- or

13  we would have to worry less about people getting back in the

14  evening.

15          THE COURT:  Oh.

16          MR. BERNICK:  You know, the debtor's overwhelming

17  preference is to do it on the 15th anyhow because for us every

18  -- really every week counts.  The disclosure statement hearing

19  in this case I believe is scheduled for the early part of

20  October, and so even the 29th of September really is right on

21  the edge there.  If we can do it on the 15th of September, that

22  really does give -- gives plenty of time to get this thing

23  done.  It gives -- good Lord, it gives 75 days, which is eons

24  in time.

25          THE COURT:  Well, I've got the 15th.  Anybody have a

1  problem with September 15th?

2          MR. ROSENBERG:  None here, Your Honor.

3          UNIDENTIFIED ATTORNEY:  None here either.

4          THE COURT:  You want to say ten o'clock so you can

5  come in that day, or is that -- does that get you in and out

6  that same day at 10:00?

7          MR. BERNICK:  Yes.  If you make it like 10:30 --

8          THE COURT:  10:30?

9          MR. BERNICK:  -- I know that that's --

10          THE COURT:  All right, September 15th at 10:30.

11          MR. BERNICK:  Great.

12          MR. ROSENBERG:  Thank you.

13          THE COURT:  All right, one second.  I need to get

14  back there to my proceeding memo, so one minute please.  Okay,

15  September 15th at 10:30 in Pittsburgh will be -- I guess I'll

16  just say Item 14 either argument or evidentiary hearing, and I

17  guess we will decide that next month at the omnibus.

18          MR. BERNICK:  That's fine with us.

19          MR. ROSENBERG:  Fine with us.

20          THE COURT:  Mr. Kruger?

21          MR. KRUGER:  That's fine.

22          MR. FRANKEL:  Your Honor, do you have all day on that

23  --

24          THE COURT:  I will have -- I'll reserve the rest of

25  the day.

1          MR. FRANKEL:  Thank you.

2          MR. BERNICK:  Are you -- you counting on spending a

3 good portion of that on her?

4          UNIDENTIFIED ATTORNEY:  He's going to cross examine

5 her.

6          THE COURT:  All right.  Tell me what the rest of the

7 day means, so those of you who have planes out can get planes

8 out so that I can tell my staff.

9          MR. BERNICK:  Yes, I really -- I would really be

10 surprised if this took -- even if it's an evidentiary hearing

11 -- I don't know what they're expecting to put on, but I -- you

12 know, if we're here after two o'clock in the afternoon it'll be

13 amazing.

14          THE COURT:  Well, for now, why don't we discuss that

15 in July.

16          MR. ROSENBERG:  That --

17          THE COURT:  That may be more appropriate, when we

18 know --

19          MR. ROSENBERG:  That's what I was going to suggest,

20 Your Honor.

21          THE COURT:  All right.  For now I'll just reserve the

22 rest of the day, and we can decide in July what that will

23 constitute.

24          MR. ROSENBERG:  Thank you, Your Honor.

25          THE COURT:  Okay.  Thank you.  Ms. Baer?

Case 01-01139-AMC   Doc 19036   Filed 07/02/08   Page 82 of 83

1          MS. BAER:  Your Honor, I have one brief scheduling
2  matter to take up with the Court.  A couple of months ago you
3  entered an order permitting the debtor to return back and cash
4  in its corporate-owned life insurance policies, and the debtor
5  is in the process of analyzing those policies and discovered
6  that it may be tremendously to the debtor's advantage, rather
7  than turning them back in and cashing them in, to borrow
8  against them, that the interest rates involved are actually
9  lower than the interest rates on its debtor-in-possession
10  financing.  What the debtor would like to do, Your Honor, is
11  get a motion on file quickly to be heard at the next hearing,
12  which is the July 21st hearing, and we'd ask orally if we could
13  shorten the time to file the motion by this Friday and then
14  have the response deadline be two weeks later, which would be
15  July 11th, and then the hearing would be on July 21st.
16          THE COURT:  That's fine.
17          MS. BAER:  Thank you, Your Honor.  That's all we have
18  on the agenda.
19          THE COURT:  That can't be.  It's --
20          MR. BERNICK:  Don't give anybody the opportunity to
21  reconsider.
22          THE COURT:  All right.  Anybody have any housekeeping
23  matters?  Okay, we're adjourned.  Thank you.
24          MS. BAER:  Thank you, Your Honor.
25          MR. BERNICK:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

83

* * * * *

**C E R T I F I C A T I O N**

I, DENISE M. O'DONNELL, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Denise M. O'Donnell              DATE:   July 1, 2008

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**