# Exhibit B



# INTERNATIONAL INSOLVENCY INSTITUTE

## Sixth Annual International Insolvency Conference

# Cooperation and Coordination in Cross-Border Insolvency Cases

*By*

*Mr. Justice J. M. Farley*
*Ontario Superior Court of Justice, Toronto*
*and*
*Bruce Leonard and John N. Birch*
*Cassels, Brock & Blackwell LLP*

*New York, New York, U.S.A.*

*June 12 - 13, 2006*

# Cooperation and Coordination in Cross-Border Insolvency Cases

Mr. Justice J.M. Farley
Ontario Superior Court of Justice
and
Bruce Leonard and John N. Birch
Cassels Brock & Blackwell LLP
Toronto, Canada

## CONTENTS

1. The Globalization of Reorganizations and Restructurings .................................................. 1

2. Preservation of Value Through Coordinating Cross-Border Administrations .............. 2

3. The Economic and Legal Background to Cross-Border Insolvencies and
   Reorganizations ............................................................................................................ 4

4. Protocols in Cross-Border Cases .................................................................................. 6

5. The Developing Practice of Court-to-Court Communications ......................................... 10

6. The UNCITRAL Model Law On Cross-Border Insolvency ............................................. 14

7. Canadian International Insolvency Developments and Trends ...................................... 22

   (a) Canadian Principles for Co-ordination of Administrations in Cross-Border Cases ........ 28

   (b) Foreign Representatives in Canadian International Insolvency Practice ...................... 34

   (c) U.S. Ancillary Injunctions Supporting Canadian Reorganizations ............................... 35

8 Guidelines for Court-to-Court Communications in Cross-Border Cases: The American
  Law Institute Transnational Insolvency Project ............................................................ 36

9. Conclusion ................................................................................................................... 43

APPENDICES

Page

Appendix 1    Recent cases under Chapter 15 of the U.S. Bankruptcy Code    47

Appendix 2    Canada-U.S. cases under s. 304 of the U.S. Bankruptcy Code    49

Appendix 3    Canada-U.S. cases under s. 18.6 of the *Companies' Creditors*    51
              *Arrangement Act*

Appendix 4    Recent Cross-Border Insolvency Protocols    53

Appendix 5    Ontario Superior Court of Justice notice of adoption of    57
              American Law Institute Transnational Insolvency Project:
              *Guidelines for Court-to-Court Communications in Cross-Border*
              *Cases*

Appendix 6    British Columbia Supreme Court notice of adoption of    59
              American Law Institute Transnational Insolvency Project:
              *Guidelines for Court-to-Court Communications in Cross-Border*
              *Cases*

Appendix 7    American Law Institute Transnational Insolvency Project:    60
              *Guidelines for Court-to-Court Communications in Cross-Border*
              *Cases* (English/French)

Appendix 8    International Bar Association Cross-Border Insolvency    84
              Concordat as adopted by the Council of the Section on
              Business Law of the International Bar Association (Paris:
              September 17, 1995) and by the Council of the International
              Bar Association (Madrid: May 31, 1996).

## Cooperation and Coordination in Cross-Border Insolvency Cases

### 1.    The Globalization of Reorganizations and Restructurings

The tremendous advances in information technology within the last two decades have made it possible for businesses to operate in a variety of different countries at the same time and to link all of these operations as if they were right next door. A multinational business can make decisions quickly that affect its global operations; it can allocate resources internationally in a manner which best suits its objectives and it can utilize its going-concern values to augment the value of its underlying operating assets on the basis that the whole is greater than the sum of the parts.

The onset of an insolvency case, however, stops all that and turns the otherwise cohesive business into a series of disconnected segments in several different countries. In a typical international insolvency, different sets of creditors assert different kinds of claims to different assets under different rules in different countries. The unified international business that was once carried on comes to an end and separate, unconnected remnants of the organization attempt to continue until they either starve or implode. It is almost as if a cross-border insolvency system had been set up deliberately to *promote* failures and liquidations.

The structural framework for dealing with multinational and cross-border businesses that encounter financial difficulties has not fully evolved from the state it was in several decades ago. When insolvency or financial failure affects a multinational business, it is still most commonly dealt with through a variety of independent, separate and often-unconnected administrations, most often for different, if not conflicting, purposes. However, recent experience and developments on the horizon hold the promise of significant improvements.   There have been initial and limited domestic legislative initiatives into the area of cooperation in international insolvencies and restructurings, but more profoundly it is the adoption of the UNCITRAL Model Law that will free the international legal regime for insolvencies from their detrimental compartmentalization.

Consider the contrast in domestic terms as if traditional international insolvency rules applied to a domestic business in financial difficulty. Suppose that the financially-troubled business had operations in Toronto, Montreal, Calgary and Vancouver instead of in England, France, China and the United States. After a filing, the portions of the business in Toronto, Montreal, Calgary and Vancouver would be run separately by different court-appointed officials. None of the courts involved would be obliged to recognize orders made by another court and there would be severe pressure from local

- 2 -

creditors for local courts to ignore the proceedings in the other courts entirely. Legislation would typically prefer local creditors over others. Transactions between the different portions of the business would grind to a halt. Receivables would be collected in the jurisdiction of the account debtor and would not be released to any of the other courts or creditors. It is only relatively recently that the insolvency profession and the courts have been able to work toward a system that pays more attention to the interests of the stakeholders than to issues of the national sovereignty of the jurisdictions involved.

The dual impact of globalization and technological innovation has changed international commerce forever. Transactions involving multinational businesses can be carried out in mere seconds, regardless of the geographical location of the parties to the transaction. Transactions among units of the same global enterprise have also moved firmly into the 21st century but, where unforeseen or unfortunate circumstances lead to the need for reorganizations or restructurings, the pace of communication among jurisdictions reverts to the 19th century. By and large, the stakeholders of the global business are the losers in this technological regression.

This paper is intended to explore means by which current and evolving protocols and judicial practices can be made to assist in the revival and rehabilitation of global businesses in financial difficulty. There are means by which this increased level of cooperation can be achieved without in any way compromising or infringing upon the local domestic practices and procedures that exist in the courts involved. The paper also suggests that, on the whole, significant stakeholder value can be preserved and maintained if communications between courts in multinational and cross-border cases are facilitated and enhanced.

## 2.    Preservation of Value Through Coordinating Cross-Border Administrations

The most logical and obvious solution to improving the current state of international cooperation in insolvencies and reorganizations would be a multinational treaty or convention to deal with insolvencies and reorganizations of multinational businesses. In practice, however, multinational treaties and conventions have proved exceptionally difficult to arrive at. There are very few functioning examples of international treaties on insolvency and reorganizations. The European efforts took almost 30 years to approach fruition, which illustrates the difficulty in negotiating an effective international insolvency convention. Clearly, multinational conventions cannot be expected to be the primary means of achieving significant improvement in the international insolvency area.

- 3 -

Bilateral treaties between countries are another option. These are easier to negotiate but there are still very few examples of functioning bilateral treaties in existence. The difficulty with bilateral or multinational treaties is that they become exercises in the negotiation of sovereign rights. What is needed more is an appreciation that treaties or conventions on international insolvency and reorganizations really primarily represent the regulation of commercial interests in the event of a financial failure. As long as the negotiation of treaties remains in the realm of sovereignty and national interest, the road toward a successful conclusion of a treaty or convention will be hard to find and successful efforts will be few and far between.

In the absence of effective treaty or convention arrangements, the choice in a multinational or cross-border insolvency or reorganization seems to be primarily between a primary/secondary jurisdiction structure and a concurrent/parallel proceedings structure. In concept, a primary/secondary jurisdiction model would involve a filing in the primary jurisdiction where the debtor's central operations are located and subsequent secondary filings in jurisdictions where other assets are located. In the concurrent/parallel jurisdiction model, the reorganizing business would file full proceedings in both the jurisdiction where its central operations are located and in other jurisdictions where key assets are located.

In a genuine primary/secondary model, the secondary jurisdiction would defer in major respects to the primary jurisdiction even, perhaps, to the point of turning over assets for administration in the primary jurisdiction. Conceptual difficulties will arise, of course, where the first case to be filed is in the "secondary" jurisdiction rather than the jurisdiction of the debtor's central operations. Moreover, recent experience has shown that some businesses opt to locate their offices in jurisdictions that are inconvenient for their creditors, thereby giving rise to an initial threshold issue in the proceedings as to which jurisdiction is the primary jurisdiction and which jurisdiction is the secondary jurisdiction. In addition, experience has shown that courts in all countries continue to be influenced by the interests of domestic creditors and that the courts of one jurisdiction are generally reluctant to yield authority or concede primacy to the courts of another. Consequently, administrations that appear to fall within the primary/secondary model may in fact actually be examples of the concurrent/parallel proceedings model.

The UNCITRAL Model Law provides a solution to the blockage encountered between the two primary legal systems which one generally comes across – the common law system on the one hand and Civil Code regimes on the other. Most simply put, the common law with its ingredient of inherent jurisdiction allows judges to do what justice and the law requires, but also what practicality dictates (See: *Canada (Minister of Indian*

- 4 -

*Affarirs and Northern Development)* v. *Curragh Inc.* (1994), 114 D.L.R. (4th) 176, 27 C.B.R. (3d) 148 (Ont. Gen. Div.) in general and particularly at para. 22.). Gaps in the legislation may be bridged where necessary. However, the tradition of the Civil Code is that the judiciary is only allowed to do what the Code specifically allows. The UNCITRAL Model Law, if adopted, provides that the courts of the adopting country are instructed to communicate and cooperate with the courts of other countries.

It is clear, however, that courts in different countries *are* capable of cooperating with each other and coordinating their administrations in the case of a cross-border or multinational reorganization or insolvency. The key to this increased willingness to cooperate and coordinate may well lie in the experience gained from cross-border insolvency protocols that have been negotiated in recent cases. Many of these protocols have been inspired by the International Bar Association's Cross-Border Insolvency Concordat or the American Law Institute's *Guidelines for Court-to-Court Communications in Cross-Border Cases* (discussed below).

Recent international experience with concurrent proceedings shows that orderly administrations of portions of business entities in different countries can be successfully carried out. The concurrent proceedings model recognizes the reality of a situation in which the courts of one jurisdiction are reluctant to yield their jurisdiction to the courts of another but wish to coordinate their administrations. By working concurrently but also in concert, administrations in more than one country can be carried out in a harmonized fashion which will be to the benefit of all of the stakeholders involved in the process.

3.     The Economic and Legal Background to Cross-Border Insolvencies and Reorganizations

In the insolvency field, Canadian courts have cooperated with U.S. courts with the result that enterprise values have been maximized and scarce resources have been preserved. Harmonization has been to the advantage of stakeholders in both countries. Canada and the U.S. are both common law jurisdictions. As such, their courts have not required the facilitation of the UNCITRAL Model Law dictating cooperation and communication. Just as parties enjoy the benefits of trade liberalization through the removal (or lessening) of tariffs and non-tariff barriers, so too in the legal sector, stakeholders on all sides of any border benefit from the elimination or lowering of legal barriers so that insolvencies and reorganizations can proceed in the most efficient, effective and timely fashion.

Insolvency is a condition which is inherently chaotic. With the effluxion of time and without the stabilization of distracting factors, values evaporate. Resources are not fully

- 5 -

utilized—indeed in some instances, scarce resources are completely lost. Often, these resources are intangibles, such as the goodwill which has been built up in a business, including an experienced work force, established ties to suppliers and customers as well as an organized distribution system. Time, experience and capital have been spent in building these assets. Although the organization has become insolvent, it would be a waste to have the business shut down and its tangible assets liquidated on a piecemeal basis. That result, with the likely evaporation of most of the intangible asset value, would not maximize value for the creditors of the company (nor for its shareholders).

There is now a general recognition that the reorganization or sale of an insolvent, but viable, business is the option which should be first explored so as to conserve the scarce resources. This may take the form of compromise of debt (restructuring the balance sheet) where creditors convert part of the debt owed them into equity, possibly with existing management continuing and possibly with the original shareholders maintaining a (reduced) equity participation. At the other end of the spectrum, the company may be taken over by a new equity investor with new management where the original creditors have sold their debt position to entrepreneurial "vulture funds" which may be counting on a reorganization plan leaving them with a return of more pennies on the dollar than they paid the original creditors, with or without an equity kicker. Existing management may survive if it is perceived that the troubles which beset the enterprise were unexpected by the industry generally. If, however, existing management was not performing well, it may not survive.

If productivity is a fundamental problem, then a balance sheet restructuring will only be a temporary solution that will be doomed to failure. Productivity issues require a complete rethinking of the organization and operation of the business so that the restructured enterprise can be made competitive. There must also be a recognition that the "successful restructuring" of an enterprise may only increase the pressure on its domestic competitors which may then find themselves next in line for insolvency proceedings if there is overcapacity in an industry sector which leads to a reduction rationalization.

Can every insolvent enterprise be successfully reorganized/rehabilitated? No. In some instances, technological innovation will have overcome an industry. Amalgamated Buggywhip Inc. may have been a darling of the stock markets in the 1880s but with the advent of the automobile its role as a survivor would be as a small niche player catering

- 6 -

to horse fanciers. Some businesses transition themselves – e.g. Studebaker from wagons to automobiles – only to succumb to competition from other vehicle manufacturers half a century later. Today, with many tariff barriers eliminated or reduced, foreign imports create increasing pressure on domestic industries.

Business on a worldwide basis is increasingly becoming more and more competitive. At the same time the world economy is becoming increasingly more interdependent. To enjoy the higher standard of living that results, we have to be flexible and adaptable to keep up with that competition. We really do not have a choice of standing still; for if we did, we would be opting out and so becoming poorer.

4.    **Protocols in Cross-Border Cases**

The insolvency profession around the world has fostered the development of practices and procedures to co-ordinate and harmonize international insolvency and restructuring proceedings. Because of the continuing absence of insolvency treaties and conventions, progress in the international insolvency area is highly dependent on the efforts of the insolvency community to develop structures and solutions to cross-border and multinational financial problems.

Cooperation among nations in cross-border insolvency cases has been steadily increasing. Since the early nineties, courts in different countries have entered into agreements and understandings with other courts in transnational cases and have, in several cases, made complementary orders. Increasingly, Courts have established "cross-border insolvency protocols" as arrangements to harmonize and co-ordinate cross-border reorganizations.

The basis for the increased use of cross-border insolvency protocols is, in large part, derived from the work of the Insolvency and Creditors' Rights Committee of the International Bar Association. Over a period of several years, this Committee, working through a multi-country subcommittee composed of representatives of over 25 countries and judges from eight countries, developed a Cross-Border Insolvency Concordat (the "Concordat"). The Concordat was formally adopted by the Council of the Section on Business Law of the International Bar Association as its Twelfth Biennial Meeting in Paris in September, 1995 and, subsequently, by the full Council of the International Bar Association itself at its meeting in Madrid in May, 1996. A copy of the Concordat is attached as Appendix 8 to this paper.

- 7 -

The Concordat provided guidelines for cross-border insolvencies and reorganizations which the parties or the courts could adopt as practical solutions to cross-border discord. The basis for the Concordat was that an insolvency regime that was predictable, fair, and convenient would promote international trade and commerce. The Concordat is remarkable because it reflects the concerted efforts of representatives not only from the United States and Canada, but also from Europe and other regions of the world. The Concordat project involved jurisdictions whose insolvency laws and procedures were based on both common law and civil law principles. While English was the working language of the project group, it was recognized the common principles had to be expressed in absolutely neutral language that was readily translatable into other tongues and legal concepts, thereby avoiding any actual or perceived bias towards the common law. The threat of an unintentional bias was real because common law jurisdictions, especially the U.S., England and Canada, had considerably more experience in international judicial cooperation than other nations and because the working philosophy in those jurisdictions was that if something was not forbidden and it made sense to do it, then it was judicially permitted. The key to the success of the project was the participation of judges along with practitioners from the outset. The international insolvency community has benefited significantly from the availability of the Concordat's principles.

As the insolvency profession has gained experience with cross-border insolvency cases, cross-border insolvency protocols, based on the example of the Concordat, have become more common and certain common themes and approaches in protocols have developed. The first major modern protocol was developed in *Maxwell Communication* which had administrations in both the United States and England. The U.S. and English judges, Brozman J. and Hoffmann J., respectively, sensed that the information they were receiving in their respective courts was askew. They independently raised with their respective counsel the concept that a protocol between the two administrations would be helpful, not only to resolve an impasse, but also to facilitate better and more timely exchanges of information. Interestingly, because the protocol provided for an intermediary, these two distinguished judges never spoke directly to each other until they met for the first time at an international insolvency conference shortly after the successful conclusion of the case. Not surprisingly, they have become fast personal friends.

Thereafter, courts in Canada and the United States developed a more modest protocol in *Re Olympia & York Developments Limited* which involved governance of O&Y's U.S. subsidiaries. The Protocol was established and accepted by Chief Judge Lifland of the U.S. Bankruptcy Court in New York and by Justice Blair of the Ontario Superior Court.

- 8 -

It involved the introduction of another intermediary, the distinguished U.S. diplomat Cyrus Vance, who was able to facilitate a *modus vivendi*.

The *Maxwell* and *O&Y* Protocols were what might be described as single-purpose arrangements between the courts, which had a limited scope. Once it became accepted that protocols could prevent the wasting of time, practitioners in several countries, including Canada, considered that it would be helpful to draft a list of principles to assist those involved in transborder insolvencies to finalize "general" protocols. The philosophy was that good fences make good neighbours.

Two months after the adoption of the Concordat a new proceeding, *Everfresh*, came along. Co-author Bruce Leonard, a member of the Canadian legal team, was involved in this case in which the operations of Everfresh were legally and functionally intertwined in both Canada and the U.S. By "coincidence", the case came before Judge Lifland in the U.S. and Justice Farley in Canada, both of whom had also been involved in developing the Concordat. It should be no surprise that the judges on both sides of the border enthusiastically supported the concept of developing a more general protocol based on the Concordat principles. While other functional work was progressing, a protocol was developed in a few weeks by the practitioners. Based upon a general consensus of those involved, each Court approved the protocol. As matters were proceeding more quickly in Canada than in the U.S., the protocol was then utilized to hold the first cross-border joint hearing so that the pace of proceedings on each side of the border could be coordinated.

The hearing was held by conference telephone, with counsel participating. Given the rather limited scope of the matters dealt with, a telephone conference was an effective form of communication for this case. However, the authors strongly recommend that generally a joint hearing be conducted through a videoconference facility which provides an ability to "see" and react to the other side of the proceedings. The technical limitations of the conference telephone without the video component led to some difficulties for Justice G.R. Forsyth of the Alberta Court and Judge Mark McFeeley of the U.S. Bankruptcy Court in New Mexico, in the *Solv-Ex* case in 1996; they were able to overcome these difficulties after considerable effort.

After the *Everfresh* case finished (in about six months), counsel on all sides were canvassed as to their satisfaction with the process. They estimated that as a result of the more timely and efficient dealing with matters, value was enhanced/preserved by a factor of some 40%. This was particularly significant when one appreciates that *Everfresh* was a fairly small insolvency involving some $50 million of value.

Other protocols followed in short order. These included ones outside the U.S. – Canadian ambit, including *Re Commodore Business Machines* (U.S. – Bahamas), *Re AIOC Corp.* (U.S. – Switzerland), and *Re Nakash* (U.S. – Israel), the latter two being of specific interest because they involved common law and civil code jurisdictions. *Nakash* is also interesting because a protocol was approved by the courts despite the objection of the most significant party. An extensive list of protocols and their texts can be found on the website of the International Insolvency Institute at www.iiiglobal.org. A listing of recent major cross-border insolvency protocols is attached as Appendix 4 to this paper.

Protocols have become more and more comprehensive, and procedures have become streamlined, improved and standardized. Counsel should have no difficulty in developing a readily acceptable protocol tailored to the specific needs of their case based upon these templates. Judges will be able to appreciate that the judiciary in other cases have been satisfied with the form, content and workability of these protocols. Indeed, in many instances, the very presence of a protocol has eliminated direct court involvement as the parties proceed smoothly according to the principles involved in the protocol (good fences indeed make good neighbours).

There is no prescribed format for a typical cross-border insolvency protocol. Protocols are intended to address the issues that are important to the actual case before the courts and these issues will vary from case to case. Since protocols are intended to reflect and facilitate solutions to particular problems and, as the dynamics in a multinational case change over the course of the case, additional issues may arise which may require amendments to the protocol. These amendments must be approved by both of the courts involved.

It must be remembered that protocols are intended to reflect the harmonization of procedural, rather than substantive, issues between jurisdictions. Protocols typically deal with co-ordination of

> (a)     court hearings in the two or more jurisdictions,
>
> (b)     procedures dealing with the financing or sale of assets,
>
> (c)     recoveries for the benefit or creditors generally and equality of treatment among the general body of unsecured creditors,
>
> (d)     claims filing processes, and,
>
> (e)     ultimately, plans in different jurisdictions.

- 10 -

In recent cases, cross-border insolvency protocols have been adopted in the early stages of a case; indeed many draft protocols are submitted to the courts upon the initiation of the insolvency proceedings. Protocols, however, are invariably expressed to be effective only upon their adoption and approval by each of the Courts involved in accordance with the local law and practice of each local jurisdiction.

The increased use of cross-border insolvency protocols and their acceptance by the courts is a positive development. Under traditional approaches, attempts at multinational reorganizations might have simply disintegrated as a result of creditors and courts in different countries attempting to seize the high ground and take jurisdiction over an entire case (or at least over all the assets) regardless of the creditors and the courts in other jurisdictions.

Cross-border insolvency filings these days have, however, been characterized by a high degree of respect by the courts of each country for the other. As businesses tend to become more international, there will be more opportunities and circumstances in which cross-border insolvency protocols can be implemented for the benefit of all of the stakeholders of the business involved. The solutions to cross-border issues that protocols deal with have the potential to develop into a set of rules and precedents which, in turn, may evolve into a form of "common law" of cross-border and multinational reorganizations. The use of cross-border insolvency protocols has been a major step forward in the progress toward ever-increasing levels of international cooperation in cross-border and multinational insolvencies and reorganizations.

5.     The Developing Practice of Court-to-Court Communications

As Justice Farley observed some time ago, (in "A Judicial Perspective on International Cooperation in Insolvency Cases" in the American Bankruptcy Institute *Journal*: March, 1998 at page 12), reorganization cases involve "real time litigation" where matters must often be dealt with urgently if there is to be anything left to save. This contrasts with "autopsy litigation" where it "doesn't matter much whether the case is dealt with this month or next year". To maximize the value of the overall enterprise for the benefit of all stakeholders, it is important for each court that administers different segments of the same overall insolvency to be aware of what the other courts are doing. There have been amazing advances in technology over the last half-dozen years and it is encouraging to see a trend developing where courts in insolvency cases are taking advantage of opportunities presented by these kinds of advances.

A leading example of technology assisting a joint country-to-country administration of a case took place in *Re Loewen Group Inc.* Loewen was the second largest funeral services

- 11 -

company in North America at the time of its financial difficulties and it filed under the CCAA in Toronto and in Chapter 11 in Delaware. The case was highly complex and the parties and the courts all recognized that it was essential that communication be maintained between the two courts. To that end, a joint hearing was held by videoconference between the Ontario Superior Court of Justice in Toronto (Justice Farley) and the United States Bankruptcy Court for the District of Delaware in Wilmington (Chief Judge Peter J. Walsh).

The hearing featured a complete report to both courts by counsel for the company and for the Creditors' Committee. Reports were made to both jurisdictions and the judges in both courts were able to converse with each other and ask questions of counsel in the other jurisdiction. Absent this kind of cooperation, comparable communications between the Courts in the two countries on the issues involved in the hearing might have taken several weeks and still not provided a general overview. But here, with some advance preparation, matters were dealt in less than two hours and with the benefit of an overall approach having been considered as a working blueprint. Similar cross-border videoconference hearings have been held in other Canada/United States cases, i.e. *Re Livent Inc.* (Toronto and New York) *Re PSI Net* (Toronto and New York), *Re Systech Systems* (Toronto and Raleigh, N.C.), *Re AgriBioTech Inc.* (Toronto and Nevada), and *Archibald Candy Corp.* (Toronto and Illinois).

The courts in the U.S. and U.K. involved in the reorganization of Federal-Mogul developed a cross-border insolvency protocol in 2001. In 2004, courts in the US and UK approved the first UK-US Court-to-Court communications protocol. Much of Federal-Mogul's financial problems were related to asbestos litigation, and much of this litigation related to claims against T&N plc, a UK corporation it acquired in 1997 with outstanding (and grossly underestimated) asbestos claims. This long and complicated trans-national insolvency was mired in US-UK negotiations related to these claims. In an effort to improve the efficiency of these international proceedings, in November 2004, Richards J. of the English Court and Judge Lyons of the US Bankruptcy Court approved the terms of the communication protocol. However, Justice Richards decided it was not prudent to participate in a conference call with the U.S. court regarding issues that may subsequently come before the British High Court.

There has been authoritative United States appellate level recognition of the importance communication between courts hearing international insolvency proceedings in order to aid coordination and efficiency of the process. In a decision by the United States Court of Appeals for the Third Circuit in *Stonington Partners v. Lernout & Hauspie Speech Products N.V.*, 310 F. 3d 118 (3rd. Cir 2002), the Court referred to the earlier *Maxwell*

- 12 -

decision and made several pointed observations about the need for international cooperation. In this case, a problem was created by related plenary insolvency proceedings in the US and Belgium wherein the application of each jurisdiction's law led to different results.   Seeing a need for direct court-to-court communication to overcome this obstacle, the Third Circuit Court, in a judgment on one of the many issues, virtually ordered that the parties and courts below have direct communication with the Belgian court:

> We *strongly recommend*, in a situation such as this, that an *actual dialog occur* or be attempted *between the courts* of the different jurisdictions in an effort to reach an agreement as to how to proceed or, at the very least, an understanding as to the policy considerations underpinning salient aspects of the foreign laws. *Maxwell* provides a good example. There, the Court of Appeals for the Second Circuit attributed the "high level of international cooperation and a significant degree of harmonization of the laws of the two countries" in large part to "the cooperation between the two courts overseeing the dual proceedings." *Maxwell*, 93 F.3d at 1053. While we do not know whether the cooperation there was initiated by the court or the parties, there is no reason that a court cannot do so, especially if the parties (whose incentives for doing so may not necessarily be as great) have not been able to make progress on their own....In *Maxwell*, the court suggested that "bankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a case-by-case basis." Id.  Even if cooperation could not be achieved, it would be valuable to communicate regarding the policies animating a certain law so as to be better able to perform a choice-of-law analysis. While not required by our case precedent or any principle of law, we urge that, in a situation such as this, communication from one court to the other regarding cooperation or the drafting of a protocol could be advantageous to the orderly administration of justice. [Emphasis added.]

Communication between courts can forge a path out of a disorganized, even confrontational insolvency process.   This was illustrated in *Cenargo*.   Cenargo International is a UK company which operates deep sea cargo vessels, ship brokering and ship operating as well as passenger ferry services.  Despite being based in the UK with only minimal ties to the United States, Cenargo filed for Chapter 11 protection in

- 13 -

January 2003 in New York.[1]  This did not sit well with one of the major creditors of Cenargo, and despite having a presence at the Chapter 11 hearings, and in breach of the automatic US stay, this creditor filed in the UK two weeks later for Cenargo to be placed into administration.  The UK court gave the administrator power to set aside the US stay and ordered an injunction to keep the Cenargo directors and their agents from pursuing the Chapter 11 proceedings.

In response to this UK ruling, the US Bankruptcy Court in New York ordered an injunction against the creditors pursuing their English remedies.  As one can imagine, this led to a situation where each jurisdiction put in place injunctions that pretty well prevented anyone from doing anything without being in contempt of the other jurisdiction's orders.   Many aspects of the insolvency, including contempt and professionals' fees were debated at several sessions in courts on both sides of the ocean, but this only partially relieved the deadlock.

Then, the break-through occurred: a transatlantic conference call between the judges.  What otherwise would have been a banal telephone call was actually the *first* such call between judges in the US and UK.  And the results were bountiful: this call led to an agreed-upon administration scheme, a firm was assigned as administrator in the UK,

---

[1] Chapter 11 has been scrutinized for accepting jurisdiction over companies with only minor assets in the U.S.  Examples are:. *In re Globo Communicacoes e Participacoes S.A.*, 317 B.R. 235 (SDNY 2004)(*Globo*) and *In re Aerovias Nacionales de Colombia S.A. Avianca*, 303 B.R. 1 (SDNY 2003)(*Avianca*).

In *Avianca* the Colombian debtor filed for Chapter 11 protection and US creditors moved to dismiss the cases on the basis that its place of business and employees were principally in Colombia, and that the debtor had not filed a proceeding there. This was denied as the court found that the debtor had property in the US, creditors in the US, and there was no obligation or requirement for the debtor to file in its native jurisdiction.

In *Globo*, the US Bankruptcy Court for the Southern District of New York dismissed a proceeding brought by some large US creditors for an involuntary Chapter 11 petition against the debtor, Globo.  The debtor had its headquarters in Brazil and was formulated under Brazilian law, and all of its employees and most of its property was in Brazil.  The debtor's connection to the US was that it had $32,000 in a US bank account, a line of credit with a US bank, and considerable bond debt in the US.   On appeal, the District Court did not agree with the Bankruptcy Court's reasons for dismissing the petition and remanded it to the Bankruptcy Court with further directions.

- 14 -

and the Chapter 11 proceedings were suspended.[2]  No sanctions for contempt, it was agreed, would be pursued.

These spectacular results from a single conference call illustrate the need to make this more commonplace.

For international insolvencies to be efficiently managed on a global basis, this new concept of court-to-court communication will have to be practiced and learned.  From the above examples, it looks as if we're on our way.

## 6.    The UNCITRAL Model Law On Cross-Border Insolvency

The United Nations Commission on International Trade Law (UNCITRAL) is a major United Nations organization headquartered in Vienna, Austria, which has undertaken exhaustive studies and reviews in many significant areas of international commercial law.  Its efforts have led to a number of international conventions and model laws which have been widely adopted in Canada and around the world and, most recently, produced the Model Law on Cross-Border Insolvency (the "Model Law").

UNCITRAL began a study of the feasibility of achieving higher levels of cooperation in the international insolvency area in April 1994, as a result of an international insolvency colloquium in Vienna sponsored with INSOL International.  The objective in developing the Model Law was to establish a set of uniform principles that would deal with the requirements which a foreign insolvency representative would need to meet in order to have access to the courts of other countries in cross-border cases.  The Model Law project, however, evolved into a much broader work and ultimately became an agreed-upon international model for domestic legislation dealing with cross-border insolvencies that could be adopted anywhere in the world with or without variations that would reflect local domestic practices and procedures.  The official text of the Model Law has now been published and widely disseminated and is available on UNCITRAL's web site at *http://www.UNCITRAL.org* and on the International Insolvency

---

[2] The European process won out in the end because it had obvious advantages, one of which is that an administrative order from the UK is presumptively recognized throughout the EU, and the US orders are not.  This was relevant when, shortly after the UK administration order, a Cenargo vessel was seized in France.

Institute web site at *www.iiigobal.org* (follow the "International Organization Projects" link).

The primary goal of the Model Law is to facilitate domestic recognition of foreign insolvency proceedings and to increase international cooperation in multinational cases. Foreign insolvency proceedings are divided into two categories in the Model Law, i.e., "main" proceedings and "non-main" proceedings. A main proceeding is one which takes place in the country where the debtor has its centre of main interests. If the foreign proceeding is recognized as a *main* proceeding, the Model Law provides for an automatic stay of proceedings by creditors against the debtor's assets and the suspension of the right to transfer, encumber or otherwise dispose of the debtor's assets. The scope and terms of the stay of proceedings are subject to the normal requirements of domestic law.

The Model Law contemplates a high level of cooperation between courts in cross-border cases. Domestic courts are directed to cooperate "to the maximum extent possible" with foreign courts and foreign insolvency representatives in the Model Law: Article 26. The courts may communicate directly with each other and may request information or assistance directly from the foreign court or from the foreign insolvency representative: Article 25. Cooperation can, for example, consist of appointing someone to act on the direction of the court, communicating information by any means considered appropriate by the court and co-ordinating the administration of the debtor's assets and affairs in both jurisdictions: Article 27. The courts may also approve or implement agreements concerning the co-ordination of concurrent proceedings involving the same debtor: Article 30.

The UNCITRAL Model Law was being formulated at the time of Canada's 1997 amendments to the *Companies' Creditors Arrangement Act (CCAA)* and *Bankruptcy and Insolvency Act (BIA)*. Many of the significant concepts of the Model Law were introduced into these statutes at that time, although not expressed in the language of the Model Law. It is ironic, therefore, that having incorporated Model Law concepts eight years ago, we are now, unfortunately, departing from it with recent legislative amendments. This is discussed further in section 7. While Canadian courts prior to 1997 relied on their inherent jurisdiction and on principles of comity, specific authorization for court-to-court communications is now found in section 18.6(2) of the CCAA and section 268(3) of the BIA.

- 16 -

Allaying Concerns with the Model Law

Inevitably, some concerns have been expressed that the Model Law is likely to prejudice the rights of individual domestic creditors. These concerns, however, are addressed in the Model Law itself.

The Model Law is intended to put in place a system that will aid and assist trade and commerce between nations and enhance and facilitate investment and credit availability to less-developed countries. Greater certainty in matters of trade and investment will inevitably increase cross-border trade and investment and improve international commerce for the benefit of everyone who participates in it. However, if parties to international agreements and treaties each insisted that preference be given to their own investors or creditors over others or that their investors and creditors should not be prejudiced while those in other countries could be, there would be no international progress in the economic and commercial spheres and the international economy would go back to the "beggar thy neighbour" regimes of the 1930s.

The Model Law is an attempt to improve the world-wide regime for trade and commerce and investment for the benefit of everyone involved in the global economy. Concerns relating to issues that are particularly local or domestic were addressed in the development of the Model Law. Consequently:

1.     The Model Law contemplates that a domestic court may decline to act where doing so would be contrary to domestic public policy: Article 6.

2.     The Model Law provides that it is to be interpreted having regard to its international origin and the need to promote uniformity in its application and the observance of good faith: Article 8.

3.     The Model Law does not affect the ranking of claims in a proceeding under domestic law except that the claims of foreign creditors must not be ranked lower than the claims of general domestic creditors: Article 13(2).

4.     Subsequent to a foreign insolvency representative's application for recognition, it must inform the domestic court promptly of any change in the status of the foreign proceeding or in its appointment: Article 18(8).

5.     The recognition of a foreign proceeding does not affect the rights of domestic creditors to commence proceedings under domestic insolvency law or the right to file claims in such a proceeding: Article 20(4).

- 17 -

6.    In granting, denying, or modifying relief under the Model Law, the domestic court "must be satisfied that the interests of creditors and other interested persons including the debtor are adequately protected": Article 22(1).

7.    The domestic court is entitled to communicate with or request information or assistance directly from foreign courts or foreign representatives: Article 25(2).

8.    Where a domestic proceeding and a foreign proceeding are both taking place, the domestic and foreign court are obliged to cooperate with each other. If the domestic insolvency proceeding began before an application for recognition of the foreign proceeding was filed, the relief granted to the foreign representative must be consistent with the domestic proceeding: Article 29(a)(i).

9.    Where a domestic proceeding is commenced after an application for recognition for a foreign proceeding is filed, the relief in effect in favour of the foreign representative must be reviewed by the domestic court and must be modified or terminated if it is inconsistent with the domestic insolvency proceeding: Article 29(b).

10.    In determining whether relief should be granted to a foreign insolvency representative from a non-main proceeding, the domestic court must be satisfied that the relief relates to assets that, under domestic law, should be administered in that foreign proceeding: Article 29(c).

The recognition of a foreign proceeding under the Model Law therefore does not bar domestic creditors from commencing a domestic insolvency proceeding under domestic law: Article 20(4). If a domestic proceeding is commenced after an application for recognition of the foreign proceeding, the domestic court must review the relief sought by the foreign representative and must modify that relief if it is inconsistent with the domestic proceedings: Article 29(b)(i). As a consequence, the Model Law permits domestic insolvency proceedings to be commenced and continued and directs that relief granted to a foreign insolvency representative or a foreign insolvency administration be modified if it is inconsistent with domestic insolvency law. These measures ensure that domestic creditors will not be unfairly treated by the recognition of foreign proceedings under the Model Law because the domestic insolvency proceedings would take precedence over the recognition accorded to the foreign insolvency proceedings by the domestic court.

Structurally and logically, if the procedures provided in the Model Law for the recognition and access of foreign insolvency administrations and foreign insolvency representatives would be unfair to Canadian creditors if Canada adopted the Model

- 18 -

Law, they must also be unfair to the domestic creditors of the other countries that adopt the Model Law. This cannot be. It is impossible to visualize a situation in which the domestic creditors of every country that adopts the Model Law are all prejudiced as a result. The international consensus on which the Model Law was developed was that domestic creditors would not be prejudiced by the Model Law and the structure of the Model Law itself bears this out.

We would note one other criticism of the Model Law; namely the Model Law deals with single corporate enterprises and not with a group of corporate enterprises which may be generally considered to be a common functional enterprise. That issue was of concern and was considered at the UNCITRAL meetings; however, there was no consensus as to how specifically to deal with this as a general rule to apply to all conceivable circumstances. We expect that this is a "work in progress" which will benefit from analysis of future insolvency proceedings regarding groups of corporate enterprises and the judicial interpretation given to the law in these cases.

The European Union's approach in its Insolvency Regulations of the E.U. dealing with groups of corporate enterprises and the concept of "centre of main interests" ("COMI") has had some teething problems; witness the Parmalat situation (See: http://www.parmalat.com/en/intro.html for information regarding this large multi-national insolvency and the problems that plagued the proceedings).

In *Parmalat*, the parent company was granted bankruptcy protection in 2003 in Italy, home of the parent company. Eurofood IFSC Ltd. was an Irish subsidiary of Parmalat. Irish creditors filed a petition in January, 2004, for the winding up of the Eurofood company. However, two weeks later in Italy, Eurofood was admitted to the Italian bankruptcy proceedings and the civil court there declared that Eurofood's centre of main interest was in Italy. The dilemma this created was considered by the Irish High Court and Irish Supreme Court, which held that the COMI of a subsidiary is where its registered office is located and where it carries on its administration. The fact that a parent company can control the subsidiary is not determinative of the COMI being located with the controlling parent company. In a preliminary opinion to the European Court of Justice in September, 2005, the Advocate General agreed with the Irish courts

Thus it appears that, although the Model Law does not address the issue of the centre of main interest in corporate groups, the precedent set by the European Union in this case indicates that European courts will consider each company's COMI separately and not place the COMI with the group of companies as a whole.

Further the solutions in the area of corporate groups or enterprises will be of an evolutionary nature. This type of situation will likely be more difficult for evolution in

the countries which have civil code legislation. However, with respect to common law jurisdictions and specifically Canadian – U.S. cross border cases involving a common functional enterprise group, we would expect that practicality would prevail and solutions would be found which would closely match previous experience even with both jurisdictions operating under Model Law enactments. Likely this would take the form of stays as to the individual corporate enterprises issuing from the court of that corporation's jurisdiction and being recognized in the other jurisdiction's court on an "interim" basis while an overall protocol to encompass the group is resolved and adopted by both courts. Conceivably this protocol would allow the appreciation of where the functional power lies in the group with the court of that jurisdiction dealing with the group on a main proceeding basis and the court in the other jurisdiction dealing with that jurisdiction's corporations within the group on an ancillary proceeding basis with the stays becoming on that basis being recognized as "permanent".

Over 80 countries and international organizations participated in the development of the Model Law and, at each stage of the way, there was a consensus on each of the provisions of the Model Law. Consequently, the Model Law is a much broader expression of international cooperation in an important commercial area than is currently reflected by the number of countries that have passed the Model Law. A number of countries seem to have been waiting for the United States to pass the Model Law and the expectation is that, now that this has occurred, a number of other countries will almost certainly pass the Model Law themselves. It is also worth remembering Canada's important participation in and contribution to the development of the Model Law. Consequently, all of the indications based on international cooperation and the development of international trade and commerce favour the adoption of the Model Law.

Adoption of the Model Law

In May, 2000, Mexico became the first major country to officially adopt the Model Law as part of its domestic insolvency legislation. An unofficial translation of Part XII of the New Mexican Insolvency Act (incorporating the provisions of the UNCITRAL Model Law) is available on the International Insolvency Institute web site (*iiiglobal.org*) at Country Pages/Mexico/Legislation.

In November 2000, the Parliament of South Africa passed legislation to enact the UNCITRAL Model Law. (Bill No. 4B-2000, passed November 2, 2000). The most significant point of departure between the South African legislation and the Model Law is a provision that makes the South African legislation applicable to "officially designated" countries. This designation is accomplished by notice from the appropriate

- 20 -

government ministry and the ministry may, by a comparable notice, withdraw the designation of any country. The process is not as routine as it appears because both types of notices must be approved by the South African Parliament before they become official. More information about the South African legislation can be found on the International Insolvency Institute website: www.iiiglobal.org and then follow the Country Pages/South Africa links.

In November, 2000, Japan passed legislation which came into effect on April 1, 2001 which adopted the principles of the Model Law. Prior to the adoption of Japan's Law on Recognition of and Assistance in Foreign Insolvency Proceedings, the Japanese system for insolvencies had been highly territorial and Japan neither recognized foreign insolvency proceedings nor sought to extend the effect of its own domestic insolvency proceedings to property of a Japanese debtor abroad. Consequently, the adoption of the new legislation represents a very significant and very important change in Japanese insolvency legislation brought about by the adoption of the principles of the Model Law. More information about the Japanese legislation, including an unofficial translation thereof, can be found on the International Insolvency Institute website: www.iiiglobal.org and then follow the Country Pages/Japan links.

In the UK, section 14 of the *Insolvency Act* 2000 gives the Secretary of State the power to enact the Model Law. Britain's Insolvency Service plans to implement the Model Law by March 31, 2006.

The United States implemented the Model Law in Chapter 15 of the US Bankruptcy Code in October 2005, as discussed below.

Canada, it was hoped, was on the brink of passing legislation incorporating the Model Law into its insolvency statutes. Unfortunately, the legislation that did pass does not match the Model Law structure and wording to the extent, in the authors' opinions, it should have. This is discussed in the next section.

The status of the adoption Model Law is as follows:

| Country | Status |
| --- | --- |
| Mexico | Adopted and enacted. |
| Montenegro (part of the former Yugoslavia) | Adopted and enacted. |

- 21 -

| | |
|---|---|
| Japan | Adopted and enacted with variations. |
| Poland | Adopted and enacted. |
| Romania | Adopted and enacted. |
| South Africa | Adopted and enacted but not yet proclaimed in force. |
| Spain | Legislation passed in 2004 and in force with international insolvency provisions that parallel (and may be more extensive than those in) the Model Law and also reflect the European Union *Regulation on Insolvency Proceedings*. |
| United Kingdom | Enabling legislation for adoption passed and enacted. Adoption scheduled by March 31st, 2006. |
| British Virgin Islands | Adopted and enacted. |
| Argentina | Bill submitted to Congress with slight variations. |
| Pakistan | Considering draft legislation. |
| United States | Adopted and enacted. |
| Australia | Studied and adoption recommended. |
| New Zealand | Studied and adoption recommended. |
| Canada | See observations below regarding Bill C-55. |

The introduction of the Model Law by those countries that have enacted it and those that have recommended its adoption will provide an impetus to other countries to adopt it. If the Model Law is widely adopted in domestic insolvency legislation around the world it will move international insolvency cooperation to an entirely new and higher plane.

*New Legislation – Comparison of s. 304 and the new Chapter 15*

Chapter 15 became effective in October 2005 and replaces s. 304 of the Bankruptcy Code, which was the previous section under which ancillary proceedings were brought. Chapter 15 is the US adoption of the Model Law, and it very closely resembles the

- 22 -

wording and structure of the Model Law, as well as its principles and intent. Thus, it is broader than s. 304 in terms of relief and jurisdiction. Whereas s. 304 had a number of criteria that could be used to decline recognition, Chapter 15 creates an obligation on U.S. courts to recognize orders from a court of competent jurisdiction in the COMI, unless there is an overriding public policy reason not to.[3]

Chapter 15 clearly expresses the Model Law's policy of foreign recognition and international co-operation. It is by this guidance that predictability and confidence in the treatment of international insolvencies will be improved.

The first US case to make use of Chapter 15 occurred in November 2005. The US Bankruptcy Court for the Western District of Washington recognized a proceeding in bankruptcy in Canada under the Canadian *Bankruptcy and Insolvency Act* already under way in British Columbia. The case was *In re Ian Gregory Thow*. Case No. 05-30432 (W. Dist. of Washington at Seattle Nov 10, 2005)  Several other new Chapter 15 cases followed. See Appendix 1.

7.    **Canadian International Insolvency Developments and Trends: -**

Whereas reorganization of businesses in the US proceeds under the US Bankruptcy Code's Chapter 11, in Canada, large corporations usually restructure under the *Companies' Creditors Arrangement Act (CCAA)*. When things go awry in a business that

---

[3] The six factors listed in s. 304(c) were: 1. the just treatment of all holders of claims against or interests in such estate; 2. the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; 3. the prevention of preferential or fraudulent dispositions of property of such estate; 4. the distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; 5. comity; and 6. if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns. These factors were meant to help guide the court when balancing the policies of international cooperation with protection of US creditor interests. The courts had very broad discretion in the application of these factors. There was no guidance in the statute as to whether to bestow greater weight on any one of the factors when weighing them. Section 304(c)(5), comity, was interpreted to be of considerable importance by many courts, but this preference for comity was not routinely followed.

- 23 -

operates and/or has assets on both sides of the US/Canada border, there will usually be a proceeding on both sides of the border.

If the main centre of action is in the US, the Canadian proceedings will likely occur under Section 18.6 of the CCAA, "International Insolvencies" (see also Part XXIII of the *Bankruptcy and Insolvency Act (BIA)*). The purpose of Section 18.6 is to recognize and co-ordinate foreign and domestic proceedings under the *CCAA* and to ensure creditors are treated fairly.

The Canadian Parliament recently passed new legislation (Bill C-55, entitled *An Act to Create the Wage Earner Protection Program Act and to Amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*). This Bill modified a number of aspects of Canada's insolvency/reorganization statutes including provisions regarding international insolvency. It was hoped that, like the US, Canada would adopt the Model Law into its legislation with this Bill; unfortunately, this was not to be the case.

Canada participated in every stage of the development of the Model Law. All 80 countries (including Canada) that participated in its development reached a consensus on all aspects of the Model Law legislation. When it came time for Canada to put the Model Law into its own legislation with Bill C-55, however, the version of the Model Law that the drafters of the legislation invented didn't resemble any other adaptation of the Model Law anywhere in the world. Despite the commitment that Canada and other countries made in the development of the Model Law to adopt it substantially in its agreed form, the current legislation eliminates virtually half of the provisions of the Model Law that are being universally adopted elsewhere. That is, it isn't just a matter of Canada's current version of the Model Law having different wording and a different layout, there are important provisions of the Model Law that are left out of Bill C-55 and there are provisions of Bill C-55 that are inconsistent with the Model Law.

With regard to provisions of the Model Law that have been entirely left out of Bill C-55, the following is a short, but representative list:

1.    Article 7: The ability of the Court and trustees to provide additional assistance to a foreign representative;

2.    Article 8: The stipulation that the Model Law should be interpreted with regard to its international origins and the need to promote uniformity in its application and the observance of good faith;

- 24 -

3.      Article 13(1):  The right of foreign creditors to participate in proceedings under Canadian insolvency law on the same basis as Canadian creditors;

4.      Article 13(2):  The requirement that the claims of foreign creditors must not be ranked lower than general unsecured creditors;

5.      Article 14:  The requirement of notification to foreign creditors of domestic proceedings and the requirement to directions as to the procedures for filing claims;

6.      Article 17(3):  The requirement that an application for recognition of a foreign proceeding should be decided "at the earliest possible time";

7.      Article 19:  Provision for urgent interim relief that may be granted on the filing of an application for recognition of a foreign proceeding;

8.      Article 22(1):  The requirement that the Court must be satisfied in granting or denying relief that the interests of creditors and other interested persons including the debtor are adequately protected;

9.      Article 23(1):  The power of a foreign representative to initiate avoidance proceedings or proceedings to challenge invalid or improper pre-bankruptcy transactions;

10.     Article 25(2):  The express ability of the Court to communicate directly with and to request information or assistance from foreign courts and foreign representatives;

11.     Article 26(2):  The explicit authority of a trustee to communicate directly with foreign courts and foreign representatives;

12.     Article 27:  The explicit enumeration of the means by which Courts and trustees may cooperate with foreign courts and foreign trustees, including, in particular, the communication of information by any appropriate means, the coordination of the administration and supervision of a debtor's assets and affairs and the approval or implementation by Courts of agreements concerning the coordination of proceedings (i.e., protocols).

It is baffling as to why Parliament felt the need to delete Article 8 of the Model Law which specifically indicates its paramount purpose is to promote uniformity in the application of the Model Law and the observance of good faith.  One can only imagine

- 25 -

that when the Model Law was eviscerated to fit into Bill C-55, it would have been immensely ironic to retain a provision that spoke to the need to promote its uniformity.

Moreover, the deletion of provisions allowing Courts to communicate with each other and with foreign representatives verges on being incomprehensible. Likewise, the omission of statutory provisions to deal with forms of cooperation available to the Courts, specifically including court-to-court communications, coordination of administrations and the implementation of protocols which are areas in which Canadian practice has been prominent, shows a legislative disconnect with the need for progress and improvement in international cooperation in insolvencies and reorganizations. We can only assume, keeping a positive view of matters, that the drafters of Bill C-55 thought that these provisions were mere surplusage given the approach previously taken by the various Canadian judges involved in cross-border insolvencies.

Then there are, unfortunately, instances in which Bill C-55 is in conflict with the provisions of the Model Law. These instances, again, are unfortunate and are largely inexplicable. A few examples will suffice to illustrate the point.

1.      The types of foreign proceedings for which the cooperation of a Canadian Court can be provided are restricted.

> Where the Model Law applies to assist foreign courts and foreign representatives in *any* insolvency proceeding, the CCAA provisions do not provide for co-operation with cases that involve liquidations: Section 45 (1). The BIA Provisions do apply to liquidations so that the BIA Provisions are inconsistent with the CCAA Provisions: Section 268 (1).

2.      The CCAA Provisions depart from the internationally-accepted model in which the Model Law permits foreign main proceedings in the jurisdiction where the debtor has its centre of main interests and secondary proceedings everywhere else. Under the Model Law, a secondary proceeding can only take place in a jurisdiction where the debtor has an establishment, i.e., where it carries on business, and can apply only to assets in the secondary jurisdiction.

> The qualification that there must be a place of business for a foreign non-main proceeding to be recognized has been deleted from the CCAA Provisions: Section 45 (1) and from the BIA Provisions: Section 268 (1). Consequently, Canadian legislation would appear to claim worldwide jurisdiction for secondary proceedings in Canada. By contrast, countries that have adopted the Model Law are satisfied that secondary proceedings should apply only to assets in the secondary jurisdiction, thereby avoiding unnecessary conflicts of jurisdiction.

- 26 -

3.    Both the CCAA Provisions and the BIA Provisions appear to prevent the recognition of a foreign main proceeding if BIA or CCAA proceedings have been commenced against the debtor and appear to nullify any recognition order made by a Canadian court in those circumstances.

The BIA and CCAA provisions allow the Court to recognize a foreign main proceeding which it does by making an order staying proceedings and restricting the debtor's ability to sell assets outside the ordinary course of business. (Under the Model Law, this results from the provisions of the statute which is a more predictable formulation.) Strangely, the provisions go on to say that the sections under which the Court is allowed to make that order and, under which, presumably it *has made* the order, do not apply if other BIA or CCAA proceedings have been commenced at the time the order recognizing the foreign proceedings is made.

This may be intended to mean that a foreign main proceeding cannot be recognized if a local proceeding is taking place under the BIA or the CCAA. That would mean the Canadian proceedings would be secondary proceedings and the scheme of the Model Law is to permit secondary proceedings but to restrict them to local assets. The Canadian formulation seems not to have this restriction so Canada appears to claim worldwide jurisdiction for its secondary proceedings which is directly inconsistent with and destructive of the objects and intentions of the Model Law. (In fairness, the language used in doing so is so obscure that other interpretations may also be possible.)

4.    The CCAA Provisions dealing with interim relief prevent protection of a debtor's assets where there is jeopardy to them.

In the CCAA Provisions, the Court, if it is satisfied that it is necessary for the protection of the debtor's property or the interests of the creditors, can only allow the foreign representative to "monitor" the debtor's business: Section 49(1)(c). The Model Law uses the more reasonable term of "administering" the debtor's assets so that they can be kept away from the danger of disappearance. The BIA provisions are similar to that. In an urgent case under the CCAA, however, the CCAA Provisions provide only the power to "monitor" the debtor's assets which is probably a formulation that occurs nowhere else in the world, either presently or under the Model Law.

5.    Bill C-55 deliberately fails to promote the interests of uniformity in international insolvency legislation.

- 27 -

Canada had agreed to the provision of the Model Law (Article 8) that expressly confirms the Model Law's international origins and the need for international uniformity in its provisions but this provision was not included in Bill C-55.

The concept of the Model Law, to which Canada agreed, was that a series of domestic enactments by major countries around the world would in effect create a form of international bankruptcy treaty because all countries would adopt substantially the same legislation. This, Canada has not done.

There are some downsides to failing to adopt the Model Law when most of Canada's major trading partners have done so. Foreign courts that want to know whether Canada would recognize and assist their insolvency proceedings will be highly perplexed. Bill C-55 has no resemblance at all to the Model Law or to the domestic adaptations of the Model Law in Canada's major trading partners. Courts in other countries will not be easily persuaded that Canada has in fact enacted the Model Law.

Canadian problems with the Model Law will, naturally, be exacerbated by the completely different approaches taken by the United States, Mexico and the U.K. Failing to adopt the Model Law in its agreed-upon form may give Canadian cases difficulty in the United States system. It could be easy for courts in the United States to conclude that the recognition called for under Chapter 15 of the United States Bankruptcy Code does not need to be accorded to cases from Canada since Canada has apparently decided not to provide the same quality of access and recognition to U.S. cases. It is ironic and unfortunate that Bill C-55 takes such a completely different approach to international co-operation but we are none the wiser as to the policy reasons for Canada failing to adopt the Model Law. It is easy to be struck by the irony of the pronouncements in Canadian government press releases that have been made to the effect that Canada *has* adopted the Model Law when it is quite clear that it has not.

Instead of showing leadership in an important area of international commercial law, Canada has decided to chart a separate course that diverges from the Model Law, which Canadian representatives helped to developed. One can only hope that, in the time before Bill C-55 is scheduled to be proclaimed, amendments can be made to properly enact the Model Law. This chance will come in the summer of 2006 when legislative hearings will be held. In this regard we note that Bill C-55 was extremely hastily introduced and then passed without the benefit of the customary intense scrutiny by committees of the House of Commons and of the Senate.

Despite the incorporation of the Model Law in the US Chapter 15, and despite Canada's shortcomings in its adoption of the Model Law, we hope that there will not be any

- 28 -

material changes to the essence of 'joint proceedings' as it relates to cross-border protocols or court-to-court communication. Fortunately, even without the legislative support, the common law of Canada supports the spirit of international cooperation.

    *(a)*    *Background of Canadian Principles for Co-ordination of Administrations in Cross-Border Cases:-*

Prior to Bill C-55, Canada has had a long history of cooperation in cross border cases. This cooperation has a firm foundation in the general law of Canada. Justice Farley observed in *ATL Industries Inc. v. Han Eol Ind. Co.* (1995), 36 C.P.C. (3d) 288 (Ont. Gen. Div.) at pp. 302-3:

> Allow me to start off by stating that I agree with the analysis of MacPherson J. in *Arrowmaster Inc. v. Unique Forming Ltd.* (1993), 17 O.R. (3d) 407 (Gen. Div.) when in discussing *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, 76 D.L.R. (4th) 256, 52 B.C.L.R. (2d) 160, 122 N.R. 81, [1991] 2 W.W.R. 217, 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, he states at p. 411:
>
>> The leading case dealing with the enforcement of "foreign" judgments is the decision of the Supreme Court of Canada in *Morguard Investments, supra*. The question in that case was whether, and the circumstances in which, the judgment of an Alberta court could be enforced in British Columbia. A unanimous court, speaking through La Forest J., held in favour of enforceability and, in so doing, discussed in some detail the doctrinal principles governing inter-jurisdictional enforcement of orders. I think it fair to say that the overarching theme of La Forest J.'s reasons is the necessity and desirability, in a mobile global society, for governments and courts to respect the orders made by courts in foreign jurisdictions with comparable legal systems, including substantive laws and rules of procedure. He expressed this theme in these words, at p. 1095:

- 29 -

Modern states, however, cannot live in splendid isolation and do give effect to judgments given in other countries in certain circumstances. Thus a judgment *in rem,* such as a decree of divorce granted by the courts of one state to persons domiciled there, will be recognized by the courts of other states. In certain circumstances, as well, our courts will enforce personal judgments given in other states. Thus, we saw, our courts will enforce an action for breach of contract given by the courts of another country if the defendant was present there at the time of the action or has agreed to the foreign court's exercise of jurisdiction. *This, it was thought, was in conformity with the requirements of comity, the informing principle of private international law, which has been stated to be the deference and respect due by other states to the actions of a state legitimately taken within its territory. Since the state where the judgment was given has power over the litigants, the judgments of its courts should be respected."* (Emphasis added)

*Morguard Investments* was, as stated earlier, a case dealing with the enforcement of a court order across provincial boundaries. However, the historical analysis in La Forest J.'s judgment, of both the United Kingdom and Canadian jurisprudence, and the doctrinal principles enunciated by the court are equally applicable, in my view, in a situation where the judgment has been rendered by a court in a foreign jurisdiction. This should not be an absolute rule – there will be some foreign court orders that should not be enforced in Ontario, perhaps because the substantive law in the foreign country is so different from Ontario's or perhaps because the legal process that generates the foreign order diverges radically from Ontario's process.

- 30 -

Later, in *Re Babcock & Wilcox Canada Ltd.* (2000), 18 C.B.R. (4th) 157, the Ontario Superior Court of Justice (Justice Farley) set out a succinct statement of the principles applicable to cooperation between courts in different countries in multinational cases and, at the same time, established new ground in protecting non-debtor parties to an international reorganization.

The case involved Babcock & Wilcox, which filed for bankruptcy protection in Louisiana largely as a result of the weight of asbestos litigation. Babcock & Wilcox had an operating subsidiary in Canada ("B&W Canada") which was neither part of the Chapter 11 case nor apparently insolvent. Because claims against the parent (but not B&W Canada) were stayed, there was a risk that the parent's creditors might advance claims against B&W Canada based on *alter ego* or similar theories. Further, Canadian creditors and, perhaps, even some Canadian courts might not have recognized a stay of proceedings under Chapter 11 if B&W Canada had been included in that filing (assuming there had been jurisdiction to do so).

The amendments to the BIA and the CCAA in 1997 added new provisions to allow cooperation with bankruptcy courts in other countries to allow enterprise value to be maintained in multinational cases while a reorganizational solution to the financial difficulties of a multinational debtor was negotiated.

Section 18.6(2) of the CCAA allowed a Canadian court to "make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of [Canadian] proceedings... with any foreign proceeding." The threshold issue for the Canadian court in *Re Babcock & Wilcox Canada Ltd.* was whether this relief could be made available to a solvent entity which, after all, was itself not otherwise eligible to seek insolvency protection under the CCAA.

Mr. Justice Farley indicated that it was appropriate to grant relief based on a number of factors (many of which are relevant to any form of litigation) which he described (at pp. 167-8) as follows:

> ...Relying upon the existing law on the recognition of foreign insolvency orders and proceedings, the principles and practicalities discussed and illustrated in the Cross-Border Insolvency Concordat and the UNCITRAL Model Law on Cross-Border Insolvencies and inherent jurisdiction, all as discussed above, I would think that the following may be of assistance in advancing guidelines as to how s. 18.6 should be applied. I do not intend the factors listed below to be exclusive or exhaustive but merely an initial attempt to provide guidance:

- 31 -

(a) The recognition of comity and cooperation between the courts of various jurisdictions are to be encouraged.

(b) Respect should be accorded to the overall thrust of foreign bankruptcy and insolvency legislation in any analysis, unless in substance generally it is so different from the bankruptcy and insolvency law of Canada or perhaps because the legal process that generates the foreign order diverges radically from the process here in Canada.

(c) All stakeholders are to be treated equitably, and to the extent reasonably possible, common or like stakeholders are to be treated equally, regardless of the jurisdiction in which they reside.

(d) The enterprise is to be permitted to implement a plan so as to reorganize as a global unit, especially where there is an established interdependence on a transnational basis of the enterprise and to the extent reasonably practicable, one jurisdiction should take charge of the principal administration of the enterprise's reorganization, where such principal type approach will facilitate a potential reorganization and which respects the claims of the stakeholders and does not inappropriately detract from the net benefits which may be available from alternative approaches.

(e) The role of the court and the extent of the jurisdiction it exercises will vary on a case by case basis and depend to a significant degree upon the court's nexus to that enterprise; in considering the appropriate level of its involvement, the court would consider:

    (i) the location of the debtor's principal operations, undertaking and assets;

    (ii) the location of the debtor's stakeholders;

    (iii) the development of the law in each jurisdiction to address the specific problems of the debtor and the enterprise;

    (iv) the substantive and procedural law which may be applied so that the aspect of undue prejudice may be analyzed;

    (v) such other factors as may be appropriate in the instant circumstances.

(f) Where one jurisdiction has an ancillary role,

    (i) the court in the ancillary jurisdiction should be provided with information on an ongoing basis and be kept apprised of developments in respect of that debtor's reorganizational efforts in the foreign jurisdiction;

    (ii) stakeholders in the ancillary jurisdiction should be afforded appropriate access to the proceedings in the principal jurisdiction.

- 32 -

    (g) As effective notice as is reasonably practicable in the circumstances should be given to all affected stakeholders, with an opportunity for such stakeholders to come back into the court to review the granted order with a view, if thought desirable, to rescind or vary the granted order or to obtain any other appropriate relief in the circumstances.

The stay in *Babcock & Wilcox* was in place for several years while the main U.S. proceeding moved toward resolution. Interestingly, no affected Canadian creditor challenged, objected to or questioned the Canadian order in the interim. It would seem that this lack of creditor involvement may be taken as a form of practical approval by those concerned for a common sense solution to a cross-border problem which maximized the potential for value and minimized the difficulties and costs. The decision in *Re Babcock & Wilcox (Canada) Inc.* is perhaps the clearest and most unambiguous statement to date of the extent to which Canadian courts will cooperate with the courts of other countries in cross-border and multinational reorganizations.

It is worth noting that in an earlier Canadian case arising out of the Dow Corning reorganization, *Roberts v. Picture Butte Municipal Hospital* (1998), 23 C.P.C. (4th) 300, Justice G.R. Forsyth of the Alberta Court of Queen's Bench was faced with arguments from local Canadian creditors that their actions against Dow Corning should not be stayed by its Chapter 11 proceedings. Even prior to the 1997 amendments of the BIA and the CCAA, the Court nonetheless stayed the proceedings against Dow Corning pending its reorganization under Chapter 11. The court relied upon the principles of comity and declared (at paragraph 31) that

        ...I find that common sense dictates that these matters would be best dealt with by one Court, and in the interest of promoting international comity it seems the forum for the case is in the U.S. Bankruptcy Court....I reach this conclusion based on all the circumstances, including the clear wording of the *U.S. Bankruptcy Code* provision, the similar philosophies and procedures in Canada and the U.S....and the incredible number of claims outstanding.

Canadian cooperation with foreign insolvency proceedings is increasing. The Ontario Superior Court of Justice has granted orders under section 18.6 of the CCAA to stay claims in Canada against a company reorganizing under Chapter 11 in several recent cases: *Canlau International (Barbados) Corp. v. Atlas Securities Inc. (Liquidator of)* (Nordheimer J., unreported, August 31, 2001); *Owens Corning Inc.* (March 12, 2002), *Re Matlack Inc.* (2001), 26 C.B.R. (4th) 45; *Re Babcock & Wilcox, supra; Slater Steel Corp., Re,* (2003) Court File No. 03-CL-5028 (Ont. S.C.J. [Commercial] June 2, 2003); *United Airlines*

(2003) Court File No. 03-CL-5003 and 03-CL-4932 (Ont. S.C.J. [Commercial]May 16, 2003); *Recoton Canada Ltd* (2003) Court File No. 03-CL-5005 (Ont. S.C.J. [Commercial]); *Delano Technology Corporation (2003)* Court File No. 03-CL-4962 (Ont. S.C.J. [Commercial]); *Noma Co., Re* (2004) Court File No. 02-CL-4804 (Ont. S.C.J. [Commercial] Nov.30, 2004); *Flintkote Mines Ltd., Re,* (2005) 500-11-024361-046 (Cour superieure du Quebec June 23, 2005); *Atkins Nutritionals Inc., Re,* (2005) Court File No. 05-CL-6011, (Ont. S.C.J. [Commercial] Aug 4, 2005); *Pliant Corporation of Canada Ltd., Re,* (2006) Court File No. 06-CL-6225 (Ont. S.C.J. [Commercial] Jan.03, 2006).

Although courts throughout Canada routinely recognize and assist foreign bankruptcy proceedings, one decision of the Supreme Court appears to have gone the other way. In *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, the Supreme Court of Canada faced a situation where competing claims were made to a ship from (a) its bankruptcy trustee appointed in a Belgian proceeding; and (b) American creditors asserting an *in rem* maritime lien for stevedoring services. A Quebec court had recognized the Belgian bankruptcy order. The Federal Court, which was dealing with the maritime lien claim, refused to give effect to the Quebec court's orders and refused to stay the lien proceedings.

The Supreme Court ruled that even though the Federal Court did not have jurisdiction to deal with bankruptcy issues, the Belgian bankruptcy order could not prevent it from dealing with the maritime lien because the Federal Court had jurisdiction over admiralty issues. While the Court ruled that the Belgian bankruptcy was "certainly not irrelevant" to the Federal Court proceedings, it was apparently not sufficiently important to the Court to justify interfering with the Federal Court's maritime proceedings. This rather technical reasoning downplays the international aspects of the case and overlooks the fact that a secured claim against a bankrupt debtor is usually a bankruptcy issue.

Interestingly, the Supreme Court noted that Canadian law would not recognize a maritime lien for the kind of stevedoring services that had been provided by the maritime lien creditor in New Jersey. But the court held that Canadian law would recognize and enforce a maritime lien that was valid where it arose and that the maritime lien was valid under U.S. law. In yet another proceeding in the saga, however, the United States Bankruptcy Court for the Southern District of New York had granted a temporary restraining order prohibiting creditors from prosecuting claims against the debtor's property in the U.S. The Supreme Court did not seem to take this into account.

The case had several factors that supported recognizing the Belgian bankruptcy proceedings. The Supreme Court realized this and took a pre-emptive strike at a couple of them. It denied that the American creditor was "forum-shopping," because in an

- 34 -

admiralty law case, "every port is automatically an admiralty emporium." The Court also deflected the argument that there was a very weak link between Canada and the Belgian ship by reasoning that in international maritime commerce, ships are not connected to any particular jurisdiction.

The issue that the Supreme Court did not tackle head on is why the Belgian court's order was not entitled to respect and recognition. The debtor was incorporated in Belgium, had its head office in Belgium and carried on business there. The Belgian Court therefore had clear jurisdiction to deal with its bankruptcy. Nor could it be said that Belgian bankruptcy law is so misguided and oppressive that it would be against Canadian public policy to recognize Belgian bankruptcy proceedings in Canada. If the tables were turned, a Canadian court would fully expect a foreign court to recognize a Canadian bankruptcy order issued with respect to a Canadian debtor incorporated and carrying on business in Canada. Counsel for the trustees reported being unable to locate any Canadian case in the past 20 years where a Canadian court had refused to recognize a foreign bankruptcy proceeding in comparable circumstances.

The end result was that despite (a) a valid bankruptcy order made by a Belgian court with respect to a Belgian debtor, (b) a U.S. order halting all proceedings against the property of the debtor, (c) neither the debtor nor the creditor nor the ship having any substantial connection to Canada, and (d) principles of international comity and cooperation, the Supreme Court still ruled in favour of one creditor from a foreign jurisdiction over the trustees representing the estate in bankruptcy and the creditors generally.

There is hope that this decision will be taken as an oddity, based on highly specific and unusual facts and that it will not reverse the constructive cooperation that Canadian courts have consistently shown to foreign courts in cross-border insolvencies for many years.

### (b)    Foreign Representatives in Canadian International Insolvency Practice:-

When the BIA and CCAA were amended in 1997 to add provisions dealing with the recognition of foreign insolvency proceedings and foreign insolvency representatives, Parliament maintained a healthy skepticism about the *bona fides* of debtors-in-possession. Foreign courts occasionally have some difficulty in accepting that an entity that appears to be the same organization that it was prior to the filing of a bankruptcy case can thereafter owe fiduciary responsibilities to creditors to whom it has failed to honour its commitments. In that vein, the 1997 Canadian provisions required, essentially, that a foreign representative be a court-appointed officer operating under the authority of the foreign court. The intention seemed to have been to exclude the

- 35 -

debtor-in-possession from being its own foreign representative in a Canadian proceeding.

There are some signs that the legislative rigidity of this position is being softened by judicial consideration. In recent case involving a Chapter 11 filing in Nevada and a companion CCAA filing in Toronto, the Ontario Superior Court (Justice Farley) determined that an independent "responsible officer" appointed in the Chapter 11 case was appropriate to act as a foreign representative under the CCAA: *Re Agri Bio Tech Inc.* (Unreported: Ontario Superior Court, May 2000).

(c)    *U.S. Ancillary Injunctions Supporting Canadian Reorganizations:-*

There is also a long history of U.S. courts supporting Canadian reorganizations. The U.S. Bankruptcy Courts have assisted in Canadian reorganizations involving debtors with operations and assets in the United States where a Canadian-based debtor with substantial operations (and creditors) in the United States has commenced reorganizational proceedings under the CCAA. As indicated above, we do not expect that the different procedures laid out in Chapter 15 will result in any relevant change from that previously obtained through the employment of s. 304. U.S. Bankruptcy Courts have granted relief in aid of the Canadian reorganization proceedings to restrain creditors in the United States from taking proceedings against the debtors' U.S. assets. The U.S. courts in these cases have usually considered these applications to be non-controversial and injunctions have been routinely granted to restrain U.S.-based creditors from pursuing their remedies against the debtors' U.S.-based assets. Ancillary orders have been granted by U.S. bankruptcy courts in recent years in aid of several important Canadian reorganizations; see Appendix 2. Mr. Justice Farley commented on this practice in his January 2004 paper delivered to the Third East African Magistrates and Judges Association Judicial Conference in Dar es Salaam, Tanzania:

> As a side note, historically and now, the U.S. is used to having a Chapter 11 stay respected essentially on a worldwide basis because so many foreign enterprises have U.S. investments or their principals travel to the U.S. In contrast many foreign enterprises may be willing to run the risk of ignoring a stay order emanating from a Canadian or other non-U.S. court on the basis of having no tangible connection with the country whose court has issued the stay. An example of this would be the seizure of *Canada 3000 Inc.* planes in Europe by creditors notwithstanding Ground J.'s CCAA order. In those types of circumstances, Canadian CCAA applicants would have to obtain foreign recognition of the Canadian order usually on a comity basis so as to allow for practical enforcement. That process may

- 36 -

take some time – in which case as illustrated by *Canada 3000* - the horse will have been taken from the barn. However, at present, it is not unusual for foreign-retained counsel to be waiting by the fax machine for a copy of the CCAA order so that they may obtain a recognition order within a few hours from the U.S. or other major trading partner court, with that recognition order having effect for the whole of the day of issue. Allow me to observe that the Courts of Canada and the U.S. are very cognizant of the doctrine of comity and further that the increased volume of proceedings traffic across the 49th parallel has resulted in that familiarity allowing for significant streamlining of applications.

8.    *Guidelines for Court-to-Court Communications in Cross-Border Cases:* **The American Law Institute Transnational Insolvency Project**

The American Law Institute ("ALI") is a prestigious organization comprising senior and respected judges, lawyers and academics (with a strong international component) from over 20 countries. The ALI was organized in 1923 following a study by the "Committee on the Establishment of a Permanent Organization for the Improvement of the Law". The ALI was formed to "promote the clarification and simplification of the law and better its adaptation to social needs [and] to secure the better administration of justice ...".

The ALI has developed authoritative *Restatements* of the law of agency, conflict of laws, contracts, judgments, and foreign relations. Other ALI projects have resulted in the development of model statutory formulations in the areas of evidence, securities law and land development. With representatives of the governments of U.S. states, the ALI participated in developing the Uniform Commercial Code which many authorities regard as one of the most important developments in United States commercial law. Part of the current work on revisions to the Uniform Commercial Code includes the development of international annotations to the Code.

The Transnational Insolvency Project began in 1994 and was the ALI's first private international law project. It was intended to develop cooperative procedures for use in business insolvency cases involving companies with assets or creditors in more than one of the United States, Canada, and Mexico. The ALI assumed that harmonization of the formal legislation of the three countries would be achieved in the foreseeable future and that prospects of a comprehensive insolvency treaty were slim. The primary thrust of the project was, therefore, on approaches that could be implemented by the insolvency community and the courts without the need for actual formal legislation.

The project proceeded in two phases. The first phase produced authoritative summaries of the insolvency law and practice in each of the United States, Canada and Mexico. These survey statements are intended to be comprehensive but readily understandable by an international audience. They contain a useful and succinct description and summary of the domestic and international bankruptcy law and practice in each NAFTA country.

The second and more challenging phase of the project was to develop principles and procedures that would be acceptable to all three NAFTA countries which would lead to harmonization and coordination of insolvency proceedings in cases that involved more than one of the NAFTA jurisdictions. This phase was completed at the ALI's Annual Meeting in Washington in May 2000. As with the first phase of the project, the second phase proceeded under the guidance of country teams that had been assembled by the ALI in the United States, Canada and Mexico consisting of leading insolvency practitioners, judges and academics. The preparation of the ALI *Statement*, consequently, was a rigorous process for the reporters on the project, particularly for the Main Reporter, Professor Jay L. Westbrook of the University of Texas at Austin.

One of the most important elements in the second phase of the project was the preparation of guidelines dealing with cross-border communications in multinational insolvency cases. The *Guidelines Applicable to Court Communications in Cross-Border Cases* (the "*Guidelines*") were reviewed by the reporters and advisors in each of the three NAFTA countries and approved by the membership of the American Law Institute at its Annual Meeting. The *Guidelines* are, in fact, largely based on examples from actual cross-border cases involving cross-border insolvency protocols.

The *Guidelines* recognize that one of the essential elements of cooperation in cross-border cases is communication among the administrating authorities of the countries involved. Because of the importance of the courts in insolvency and reorganizational proceedings, it is essential that the supervising courts be able to coordinate their activities to assure the maximum available benefit for the stakeholders of financially troubled enterprises.

Is communication between courts a radical step? Are there fundamental issues of procedural fairness involved? The answer is "no" to the first question and "yes" to the second, but procedural fairness questions have been well addressed over the past decade. There has always been communication between courts – in the past this has usually been through one court issuing an order accompanied by reasons and the other court responding in kind with communications being through counsel in each jurisdiction. However, this process is time consuming and it does not lend itself to developing solutions in real time.

Many jurisdictions, including most common law jurisdictions, have prohibitions against communications by one party to the court in the absence of the other party. In some jurisdictions, by contrast, the prohibition may be milder and may not even exist at all. Arrangements for court-to-court communications in cross-border cases must not promote or condone any contravention of domestic rules, procedures or ethics. The *Guidelines*, in fact, specifically mandate that local domestic rules, practices and ethics must be fully observed at all times.

The *Guidelines* are intended to enhance coordination and harmonization of insolvency proceedings that involve more than one country through communications among the jurisdictions involved. Communication among courts in cross-border cases is both more important and more sensitive than in domestic cases. The *Guidelines* are intended to encourage such communications and to permit rapid cooperation in a developing insolvency case, while ensuring due process to all concerned. The concept of court-to-court communications is best seen as a linking of two concurrent court hearings, all conducted in accordance with proper systems and procedures. The only change from a purely domestic hearing is the technological link to the other court.

The intent behind the *Guidelines* was that a court intending to employ the *Guidelines*—with or without modifications—should adopt them formally before applying them. A court might make its adoption of the *Guidelines* contingent upon, or temporary until, the corresponding adoption of them by other courts concerned in the matter, in order to ensure that judges, counsel, and parties are not subject to different standards of conduct.

The *Guidelines* are intended to be adopted following the appropriate notice to the parties and counsel as would be given under local procedures with regard to any important procedural decision under similar circumstances. If communication with other courts is urgently needed, the local procedures, including notice requirements, that are used in urgent or emergency situations would be employed, including, if appropriate, an initial period of effectiveness, followed by further consideration of the *Guidelines* at a later time. Questions about the parties entitled to such notice (for example, all parties or representative parties or representative counsel) and the nature of the court's consideration of any objections (for example, with or without a hearing) are governed by local rules of procedure and are not addressed in the *Guidelines*.

One of the issues that may arise is whether a party's participation in arguments or submissions being made in a hearing in the other country constitutes an attornment to the jurisdiction of the other court. The *Guidelines* attempt to anticipate that difficulty by indicating that such participation will not constitute an attornment to the jurisdiction of the other court unless the party who participates in the hearing in the other court is actually seeking relief from that court. This is consistent with Article 10 of the Model

- 39 -

Law, which indicates that an application by a foreign representative does not subject the foreign representative or the foreign assets or the affairs of the debtor to the jurisdiction of the domestic court for any purpose other than the actual application.

In actual practice, court orders made in cross-border cases usually indicate that any informal participation in the proceedings in the foreign court does not constitute an attornment. It is also the case, moreover, that a party in one jurisdiction would have to be represented by counsel admitted to the bar of the other jurisdiction in order to even receive an audience from that court. In practice, therefore, a properly prepared joint court hearing need not unnecessarily or unexpectedly expose a party in one country to the risk of attornment to the jurisdiction of the other court.

The *Guidelines* are not meant to be static, but are meant to be adapted and modified to fit the circumstances of individual cases and to change and evolve as the international insolvency community gains experience from working with them. They are intended to apply only in a manner that is consistent with local procedures and local ethical requirements. They do not address the details of notice and procedure that depend upon the law and practice in each jurisdiction. However, the *Guidelines* set out approaches that are likely to be useful in achieving efficient and just resolutions of cross-border insolvency issues. Their use, with such modifications and under such circumstances as may be appropriate in a particular case, is likely to be advantageous to all stakeholders.

As a side note, we would observe that the *Guidelines* are not intrinsically restricted for use in insolvency matters. Considerable interest has been generated for their use in non-insolvency cross border litigation generally. In this regard please note the establishment of a committee under the auspices of the International Bar Association following its annual meeting in Auckland, New Zealand in 2004 and the paper of Justice David Baragwanath of New Zealand found at *www.iiiglobal.org*.

Application of the *Guidelines* in Cross-Border Cases

The *Guidelines* have been applied by Canadian courts in numerous cases, including the following:

Re Matlack (Court File No. 01-CL-4109)

In an early precedent-setting ruling, the *Guidelines* were adopted and approved in a cross-border case between Canada and the United States. The case, *Re Matlack Systems Inc.*, (2001), 26 C.B.R. (4th) 45 (Ont. S.C.J), involved a former NYSE-listed transportation

- 40 -

company that had filed under Chapter 11 in Delaware. The company had Canadian operations which it carried on directly, rather than through Canadian subsidiaries.

Local Canadian creditors (i.e., those not having a presence in the United States) were not subject to the automatic stay of proceedings created by the Chapter 11 case. There was considerable potential for Canadian creditors in this category to take action and to effect attachments that would have had a highly negative effect on the company's attempts to carry on its business in the normal course and a creditor seizure of corporate assets.

The company consequently brought an application under section 18.6 of the CCAA. The Ontario Superior Court of Justice (Justice Farley) granted a stay of proceedings against Canadian creditors in aid of the Chapter 11 proceedings in Delaware. Justice Farley also approved, from the Canadian side, a cross-border insolvency protocol to co-ordinate the insolvency administrations in the two countries. The precedent-setting feature about the protocol in *Matlack* is that it specifically incorporated the *Guidelines* and Justice Farley took the opportunity to provide his approval for the *Guidelines* from the Canadian side.

In accordance with the procedural suggestions contained in the *ALI Transnational Insolvency Statement*, the *Guidelines* were approved by the Canadian court on the basis that they would not be effective until they were approved from the U.S. Bankruptcy Court in Delaware. The Delaware court subsequently approved the protocol and the *Guidelines* and, consequently, the *Guidelines* were set formally in place for the first time in a cross-border case. (See *Re Matlack Inc., supra* and *Re Matlack Systems Inc.* (United States Bankruptcy Court for the District of Delaware (Hon. Mary F. Walrath), Case No. 01-01114 (MFW)), May 24, 2001.)

*Re PSINet* (Court File No. 01-CL-4155)

In a subsequent cross-border reorganization proceeding between the United States and Canada, the *Guidelines* were also approved and adopted by the U.S. Bankruptcy Court for the Southern District of New York, (Hon. Robert E. Gerber) and the Ontario Superior Court of Justice in Toronto (Justice Farley). In the New York bankruptcy case, PSINet and twenty-five of its subsidiaries filed for Chapter 11 protection while in Canada, PSINet Limited and four of its major subsidiaries sought protection under the CCAA. The business of the Canadian companies was fully integrated with the business of the Chapter 11 debtors and there was a significant degree of interrelatedness and interconnectedness between the business operations in each country.

Both courts approved a cross-border insolvency protocol to co-ordinate the administrations in the two countries which provided that particular matters arising in

- 41 -

the case would be dealt with in joint hearings between the Bankruptcy Court in New York and the Ontario Superior Court in Canada. The protocol contemplated that matters relating to the sale of the assets of the business, the allocation of proceeds between the companies in the Chapter 11 proceedings and the companies in the CCAA case and matters relating to issues arising from "indefeasible rights of use", a concept of increasing significance in telecom reorganizations, would be dealt with in joint cross-border court hearings. To provide a framework for the joint hearings, the protocol included, verbatim, the text of the *Guidelines*. *(See Re PSINet Ltd.* (2001), 28 C.B.R. (4th) 95).

*Mosaic Group Inc.* (Court File No. 02-CL-4816)

The *Guidelines* were also very successful at facilitating effective communication on a number of cross-border issues in *Mosaic* between Justice Farley of the Ontario Superior Court and the Hon. Harlin DeWayne Hale of the United States Bankruptcy Court for the Northern District of Texas. This proceeding also involved a successful stalking horse bidding process.

*Systech Retail Systems Corp.* (Court File No. 03-CL-4836)

On January 20, 2003, Justice Ground of the Ontario Superior Court granted an initial order and also approved a cross-border protocol which was subsequently approved by the United States Bankruptcy Court for the Eastern District to North Carolina, Raleigh Division (Hon. A. Thomas Small)(Case No. 03-00142-5-ATS) The protocol attached and incorporated the *Guidelines*.

*Archibald Candy Corporation* (Court File No. 04-CL-5308 and 04-CL-5461)

On January 28, 2004, Archibald Candy Corporation commenced bankruptcy proceedings pursuant to Chapter 11. Archibald Canada, which carries on business as Laura Secord, was profitable and was well positioned for continuing success. On February 2, 2004, the US proceedings were recognized as "foreign proceedings" under s. 18.6 of the CCAA. On June 22, 2004, the Ontario Superior Court of Justice [Commercial List] appointed an interim receiver of Laura Secord to facilitate its sale as part of the insolvency process of its parent company. The sale was by way of an American style "stalking horse" bidding process. It was complicated by the fact that the U.S. parent company owned critical assets (such as intellectual property and lease rights), thus it was necessary for courts on both sides of the border to get involved. An insolvency protocol was approved by both courts, and a few days later a joint hearing by video conference occurred on June 29, 2004. Bidding procedures were approved and an auction took place under the supervision of the interim receivers. The sale was approved by US and Canadian Courts in a joint hearing held by video conference on

- 42 -

July 27, 2004. This example shows so well many of the positive aspects of cooperation and coordination in cross-border insolvency, such as the expeditious and efficient sale and distribution of a major asset, the survival of a successful subsidiary to carry on business, and the gesture of comity shown by Canadian courts in participating in a US style bidding process.

The application of the *Guidelines* in the *Matlack, PSINet, Mosaic, Systech, and Archibald* cases represents a significant step forward in international cooperation in cross-border cases and it would seem that the courts that are involved in cross-border cases are becoming confident of the utility and constructiveness of using the *Guidelines* as a means of facilitating communications between courts in different countries that are dealing with the same business enterprise.

Formal Adoption of the *Guidelines* by Canadian Courts

The use of the *Guidelines* in *Matlack, PSINet, Mosaic, Systech, and Archibald* made a compelling case for their formal adoption in Canada. The Ontario Superior Court of Justice officially approved the adoption of the *Guidelines* for matters on the Commercial List in Toronto and issued a formal notice to the profession. The Court intends to apply the *Guidelines* not only to court-to-court communications between courts of Canada and other countries but also to communications between courts in different provinces. The *Guidelines* will only be adopted in specific cases, following adequate notice to the parties. The Commercial List has also taken steps to ensure that local norms of judicial procedure are observed, such as by requiring that Canadian principles of confidentiality (such as the deemed undertaking rule) be considered before materials are transmitted to the cooperating court.

Recently, in November 2004, the Supreme Court of British Columbia adopted the *Guidelines* as well.

A notice describing the approval of the *Guidelines* by the Ontario Superior Court of Justice is attached as Appendix 5, and for the Supreme Court of British Columbia as Appendix 6. The text of the *Guidelines*, in English and French, is attached at Appendix 7. The *Guidelines* are available in many other languages on International Insolvency Institute website at *www.iiiglobal.org*. (Follow the link to "International Insolvency Resources".)

The full texts of the ALI's Summary Reports on United States, Mexican and Canadian insolvency law and practice together with the *Principles of Cooperation in Transnational Insolvency Cases* can be ordered from the American Law Institute. Ordering information can be found on the ALI's website at *www.ali.org*. (Bruce Leonard was the Chair for

- 43 -

Canada on the American Law Institute Transnational Insolvency Project and was the Project Reporter for Domestic Aspects of Canadian Insolvency Law and Justice Farley was the Senior Canadian Judicial Representative on the ALI Project.)

9.    **Conclusion**

In looking back a dozen years, it is truly amazing the strides that have been made in improving co-ordination and cooperation in cross-border insolvency cases.  Waiting for the negotiation and adoption of international treaties was simply not feasible; likely another century would have passed. Justice Farley gave the following report on behalf of the 1997 UNCITRAL/INSOL Judicial Colloquium:

> … INSOL and UNCITRAL will continue to hold a Judicial Colloquium, and INSOL will initiate a separate section for the judiciary to deal with these matters on a continuing basis between Colloquia.

How do the bar and insolvency practitioners fit into this equation?

1.    The judiciary rely upon you as professionals – skilled practitioners in the field – to implement these proposals and generally to assist in these matters.

2.    As a result of this initiative you will know what is expected of you and how to implement it through building on the Concordat and the UNCITRAL model law and other valuable initiatives from time to time. There will be the desirability of your taking the opportunity during the immediate stabilization period provided by stays to see whether using the Concordat and the draft UNCITRAL model there can be harmonization between the various concurrent proceedings – both as to procedures and timing. This hopefully will lead to the timely and cost-effective development of a protocol to be entered into amongst affected parties and thereafter submitted for consideration and approval by the respective courts. Once you review the Concordat and the UNCITRAL draft you will see that there is a fertile field of possible steps to consider and adopt with suitable changes into a protocol. It is expected that you will be significantly advanced on the learning curve through the use of Concordat and UNCITRAL so that you will be able to "shortcut" the negotiating time required to table a protocol. It will be helpful to the parties concerned and the legal system generally to make every effort to effect this protocol harmonization.

- 44 -

3.     The courts will rely on you to carry their message of cooperation and communication as expressed in formal orders and accompanying reasons to the other courts – reliably and faithfully.

4.     In this regard we in the judiciary may need your assistance to ensure that where transcripts are not a regular feature of the domestic court a transcript to the extent desired by the judge can be made available forthwith. We will also need your assistance with respect to excellence of translation (not mere words but concepts – the opposite to legal research by computer which is based upon word identification and not concept analysis).

5.     You will be expected to advise the local court of what procedures are taking place in other jurisdictions, and to maintain an update of that situation.

6.     The courts will recognize the need for you to return to them to obtain appropriate relief from time to time, including adjustment of any initial order or orders which may have been deployed in the immediate emergency circumstances.

We, as judges, will rely upon counsel and insolvency practitioners to take the lead in providing the conduit for judicial cooperation and communication. We are confident that we can rely upon you as professionals to ensure that justice is done.

The key in this Colloquium is that the participating judges have reached consensus about being outward-looking – rather than inward-looking. International insolvencies are truly international; they are not local, with merely local solutions. We have progressed beyond national interests; we are now clearly looking at international concerns. As we approach the next millennium, we must not be looking backwards toward the nineteenth and early twentieth centuries; rather, we must be forward looking to solve our problems.

Cross-border insolvency matters between the U.S. and Canada have been and are being dealt with smoothly and expeditiously. Parties and their counsel have ably assisted in the process. The end result is that both countries have benefited.

Although it is always unwise to generalize, it would seem that the courts in the major trading countries, taken as a whole, are demonstrating an increased willingness to cooperate with each other and to co-ordinate activities to secure commercially-oriented results in international restructurings and insolvencies.   The protocols that were approved in the *PSINet, Matlack, Philip Services, Loewen, Livent, Everfresh, Maxwell Communication, Olympia & York* and *Nakash* insolvencies are fine examples of

- 45 -

international cooperation between courts, and they are examples that will, almost certainly, be built upon by the courts in future multinational insolvencies.

The courts seem more and more prepared to work toward a framework that encourages co-ordination and cooperation between jurisdictions in multinational cases. They simply need the active and innovative participation of the insolvency community to create structures that are conducive to increasing cross-border co-ordination in multinational cases. Nonetheless, there are still cases where particular courts overlook trends in international co-ordination. As such, the trend toward greater international cooperation should not be taken for granted.

Recent experience with international workouts and insolvencies shows, however, that the courts and the insolvency community can achieve considerable progress without the need for legislative action. The examples of cooperation in recent international cases show that, even in the absence of treaty arrangements among countries, a kind of international insolvency custom of cooperation may be developing. With the continuing support of the insolvency community and the judiciary in insolvency cases, the insolvency community can quite confidently expect significant continuing progress in the area for the benefit and advantage of international commence and everyone affected by it.

J.M. Farley, E. Bruce Leonard, and John N. Birch
Toronto, Ontario
February 2006

## Cooperation and Co-ordination in Cross-Border Insolvency Cases

### APPENDICES

| | | Page |
|---|---|---|
| Appendix 1 | Recent cases under Chapter 15 of the U.S. Bankruptcy Code | 47 |
| Appendix 2 | Canada-U.S. cases under s. 304 of the U.S. Bankruptcy Code | 49 |
| Appendix 3 | Canada-U.S. cases under s. 18.6 of the *Companies' Creditors Arrangement Act* | 51 |
| Appendix 4 | Recent Cross-Border Insolvency Protocols | 53 |
| Appendix 5 | Ontario Superior Court of Justice  notice of adoption of American Law Institute Transnational Insolvency Project: *Guidelines for Court-to-Court Communications in Cross-Border Cases* | 57 |
| Appendix 6 | British Columbia Supreme Court notice of adoption of American Law Institute Transnational Insolvency Project: *Guidelines for Court-to-Court Communications in Cross-Border Cases* | 59 |
| Appendix 7 | American Law Institute Transnational Insolvency Project: *Guidelines for Court-to-Court Communications in Cross-Border Cases* (English/French) | 60 |
| Appendix 8 | International Bar Association Cross-Border Insolvency Concordat as adopted by the Council of the Section on Business Law of the International Bar Association (Paris: September 17, 1995) and by the Council of the International Bar Association (Madrid: May 31, 1996). | 84 |

- 4 / -

## Appendix 1

## Recent cases under Chapter 15 of the U.S. Bankruptcy Code

*In re Ian Gregory Thow*, United States Bankruptcy Court for the Western District of Washington at Seattle, Case No. 05-30432 (November 10, 2005) (Judge Philip H. Brandt).

*In re TriGem Computer Inc.*, United States Bankruptcy Court for the Central District of California at Los Angeles, Case No. LA 05-50052-TD (December 7, 2005) (Judge Thomas B. Donovan).

*In re La Mutuelles du Mans Assurances IARD UK Branch MMA et al.* United States Bankruptcy Court for the Southern District of New York, Case No. 05-60100 (BRL) (December 7, 2005) (Judge Burton R. Lifland).

*In re MuscleTech Research and Development Inc.*, United States Bankruptcy Court for the Southern District of New York, Case No. 06-10092 (JMP) (January 19, 2006) (Judge James M. Peck).

*In re Gestion-Privee Location L.L.C.*, United States Bankruptcy Court for the Middle District of North Carolina, Case No. 06-80071 (February 23 2006) – pending.

*In re Moulin Global Eyecare Holdings, Ltd.*, United States Bankruptcy Court for the Northern District of California at San Francisco, Case No. 06-30018 (February 10, 2006) (Judge Thomas E. Carlson) – pending.

*In re Trade and Commerce Bank*, United States Bankruptcy Court for the Southern District of New York at Manhattan, Case No. 05-60279 (SMB) (February 7, 2006) (Chief Judge Stuart M. Bernstein) – pending.

*In re Young Chang Co. Ltd.*, United States Bankruptcy Court for the Western District of New York, Case No. 06-40043 (Judge Paul B. Snyder) – pending.

Related Cases:

In *United States v. J.A. Jones Construction Group*, Case No. CV-2003-1383-SJF-MDG (E. Dist. of N.Y. at Brooklyn Nov 29, 2005) (Judge Marilyn D. Go) the court ruled that relief to a foreign representative could only be granted under Chapter 15. The applicant had mistakenly filed under s. 304, but the court granted a temporary stay in order to allow the defendant time to properly file under Chapter 15.

- 48-

For a section 304 case that discusses Chapter 15 in its analysis, see *In re Artimm, S.r.l.*, Case No. 01-42911 SB (Cen. Dist. of California at Los Angeles Dec 1 2005)(Judge Samuel L. Bufford).

- 49-

## Appendix 2

## Canada-U.S. cases under s. 304 of the U.S. Bankruptcy Code

*Stelco Inc.*, Ontario Superior Court of Justice, Court File No. 04-CL-5306 and United States Bankruptcy Court for the  Eastern District of Michigan, Case No. 04-42401 (MBM).

*Ivaco Inc.*, Ontario Superior Court of Justice, Court File No. 03-CL-5145 and United States Bankruptcy Court of the Eastern District of Michigan, Case No. 03-65608 (R).

*Air Canada*, Ontario Superior Court of Justice, Court File No. 03-CL-4932 and United States Bankruptcy Court for the  Southern District of New York, Case No. 03-11971 (PCB).

*Slater Steel Inc.*, Ontario Superior Court of Justice, Court File No. 03-CL-5028 and United States Bankruptcy Court for the District of Delaware, Case No. 03-11652 (MFW).

*GT Group Telecom Inc.*, Ontario Superior Court of Justice, Court File No. 02-CL-4580 and United States Bankruptcy Court for the  Southern District of New York, Case No. 02-B-13193 (RDD).

*AT&T Canada*, Ontario Superior Court of Justice, Court File No. 02-CL-004715 and United States Bankruptcy Court for the  Southern District of New York, Case No. 01-42536 (SMB).

*Teleglobe Inc.*, Ontario Superior Court of Justice, Court File No. 02-CL-4528 and United States Bankruptcy Court for the District of Delaware, Case No. 02-11404

*Fantom Technologies*, Ontario Superior Court of Justice, Court File No. 01-CL-4303, and United States Bankruptcy Court for the Western District of New York, Case No. 01-16783-K

*Canada 3000 Inc.*, Ontario Superior Court of Justice, Court File No. 01-CL-4314 and United States Bankruptcy Court of the Central District of California, Case No. 01-43656 (KM)

- 50-

*Canadian Airlines International Ltd.,* Alberta Court of the Queen's Bench, Docket Calgary 0001-05071 and United States Bankruptcy Court for Hawaii, Case No. 00-01089.

*Euro United Corp.,* Ontario Superior Court of Justice, Court File No. 99-CL-3592 and United States Bankruptcy Court for the Western District of New York, Case No.1-99-17139 (MJK).


Also, related to the *Mosaic Group, Inc.* and its Affiliates (Ont. S.C.J. Court File No. 02-CL-4816), are the United States Bankruptcy Court Cases of *Mosaic Infoforce GP Holdco, Inc.,* No. 05-32558 (N. D. of Texas, Dallas) and *Mosaic Infoforce LP Holdco, Inc.,* Case No. 05-32559 (N. D. of Texas, Dallas).

- 51-

Appendix 3

**Canada-U.S cases under s. 18.6 of the *Companies' Creditors Arrangement Act***

*Pliant Corporation of Canada Ltd., Re,* (2006), Ontario Superior Court of Justice, Court File No. 06-CL-6225 (Jan 3, 2006).

*Atkins Nutritionals Inc., Re,* (2005), Ontario Superior Court of Justice, Court File No. 05-CL-6011 (Aug 4, 2005).

*Flintkote Mines Ltd., Re,* (2005), Quebec Superior Court, Docket, 500-11-024361-046 (June 23, 2005).

*Androscoggin Energy LLC, Re,* (2004), Ontario Superior Court of Justice Court File No. 04-CL-5643 (Nov. 26, 2004).

*Archibald Candy Corp* (2004), Ontario Superior Court of Justice, Court File No. 04-CL-5308 and 04-CL-5461.

*Slater Steel Corp., Re,* (2003), Ontario Superior Court of Justice, Court File No. 03-CL-5028 (June 2, 2003).

*Delano Technology Corporation* (2003), Ontario Superior Court of Justice, Court File No. 03-CL-4962.

*Recoton Canada Ltd* (2003), Ontario Superior Court of Justice, Court File No. 03-CL-5005.

*United Airlines* (2003), Ontario Superior Court of Justice, Court File No. 03-CL-5003 and 03-CL-4932 (May 16, 2003).