IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al.,[1] | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| Debtors. | **Hearing Date: Sept. 15, 2008 at 10:30 a.m.**<br>**Related to Docket No. 18922** |

## RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

The Official Committee of Unsecured Creditors of W.R. Grace & Co., et al. (the

"Creditors' Committee"), by its undersigned counsel, submits this Response to the Debtors'

Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements dated as of

---

[1] The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., B&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

May 14, 1998 and May 5, 1999, dated June 13, 2008 (Docket No. 18922; the "Objection"),[2] and

respectfully states as follows:

## INTRODUCTION

1.      In their Objection, the Debtors adopt the extraordinary and unprecedented

position that the holders of approximately $500 million in bank debt may not be paid in full on

their claims, including receiving post-petition interest at the contract default rate, and in fact may

not receive any post-petition pendency interest at all because the Debtors' solvency has not been

judicially determined. The Debtors make this argument, straight-faced, even though the Debtors

currently have a market capitalization between <u>$1.6 billion and $2 billion</u>,[3] and have committed

to a Proposed Asbestos Settlement[4] (also referred to below as the "Settlement") which preserves

well over $1 billion of value for the Debtors' existing equity holders.

2.      The Debtors' "solvency" argument is therefore a straw man. It is true, of course,

that a dispute has existed since the first day of these bankruptcy cases between the Debtors,

equity holders and the commercial creditors, on the one hand, and the asbestos creditors on the

other, as to whether the Debtors are solvent after considering the estates' contingent asbestos

personal injury liabilities. But that dispute is now resolved, pending confirmation of the soon-to-

be proposed plan of reorganization, and that resolution provides for <u>well over a billion dollar</u>

<u>recovery to the equity holders</u>. The issue, therefore, is not whether the Debtors' solvency has

been judicially determined or whether the Proposed Asbestos Settlement "addresses" solvency,

---

[2]    On July 3, 2008, the Official Committee of Equity Holders (the "Equity Committee") filed a joinder to the Debtors' Objection (the "Joinder"). The Equity Committee's Joinder adds nothing new to the arguments asserted in the Objection, and will be referenced in this Response where appropriate.

[3]    Based on the low and high prices of W. R. Grace stock between April 7, 2008 (the date the Term Sheet documenting the Proposed Asbestos Settlement was publicly disclosed) and July 9, 2008, which were $21.88 (July 7, 2008) and $27.79 (June 16, 2008), and shares outstanding of 72.1 million.

[4]    Capitalized terms not defined herein are defined in the Objection.

but rather that the Settlement expressly provides the Debtors' equity holders with a recovery at the expense of the commercial creditors. In these circumstances, the law is beyond dispute: the absolute priority rule precludes <u>any</u> recovery for equity unless and until unsecured creditors are paid <u>in full</u> on their claims. <u>See</u> <u>In re Armstrong World Indus., Inc.</u>, 432 F.3d 507, 512-13 (3d Cir. 2005).

3.　　Not surprisingly, the Debtors also argue that even if the bank debt holders may receive post-petition interest, they should not receive the contract default rate of interest. The clear trend is to award default interest except where compelling equitable factors warrant a different result. <u>See</u> <u>In re Dow Corning Corp.</u>, 456 F.3d 668, 680 (6th Cir. 2006) ("Courts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed."). The United States Court of Appeals for the Sixth Circuit in <u>Dow Corning</u> and other courts have reasoned that this strong presumption in favor of allowing contract default interest exists because the equitable principles underlying the "fair and equitable" requirement of 11 U.S.C. § 1129(b) are not furthered by permitting solvent debtors to avoid their pre-petition contractual obligations to creditors. But even when the equities are considered in this case without applying this presumption, the Debtors' Objection is about a solvent debtor with a market capitalization between $1.6 billion and $2 billion imploring this Court, pursuant to its powers of equity, to run roughshod over the prepetition contractual rights of creditors in order to preserve a deal with equity holders that was negotiated and agreed upon without the involvement of the creditors. This perverse result violates the absolute priority rule and is the polar opposite of "equitable."

4.　　There are no equitable considerations that warrant depriving the bank debt holders of default interest where their pre-petition contracts provide for it. Despite the Debtors'

3

description of the default rate that the Debtors contracted to pay as "exorbitant" (Objection at p. 7, ¶ 17), the relevant credit agreements provide for only a 2% difference between the contract default rate and the base contract rate, which is not exorbitant.  Moreover, given the Debtors' market capitalization of between $1.6 billion and $2 billion, the roughly $100 million in additional post-petition interest payable to the bank debt creditors at the default rate (as opposed to the payment pursuant to the rate provided in the Proposed Asbestos Settlement) does not diminish the payout to any other creditor, and, under the absolute priority rule, the equity holders have no legal standing to claim prejudice.  Furthermore, by the time the plan of reorganization is confirmed, presumably in 2009, the Debtors will have enjoyed the use of the bank debt holders' money for nearly eight years and, correspondingly, the bank debt holders have been deprived of the use of that money during that lengthy period of time.  Under these circumstances, there is no equitable basis to deprive the bank debt holders of full payment on their claims.

5.      In the absence of valid equitable grounds supporting depriving the bank debt holders of contract default interest, the Debtors argue that the bank debt holders should nevertheless be bound to the interest rate contained in the Proposed Asbestos Settlement based on a "prior course of dealing" theory.  This back-door attempt to avoid paying contract default interest should also fail.  Unlike the asbestos personal injury claimants who negotiated a resolution of their claims, neither the bank debt holders nor the other commercial creditors represented by the Creditors' Committee ever agreed to accept less than payment in full as part of the Proposed Asbestos Settlement.  The Debtors' claim license under the Proposed Asbestos Settlement to treat commercial creditors inadequately based upon an outdated and entirely inapplicable agreement with the Creditors' Committee reached in January 2005 and modified in February 2006, concerning what even the Debtors must now acknowledge is an entirely different

4

proposed plan of reorganization than that which will be filed to encompass the Proposed Asbestos Settlement. Indeed, the Debtors, Creditors' Committee and Equity Committee locked arms in January 2005 to propose a plan of reorganization that was anything but consensual and that would as a matter of course require significant modification were the asbestos constituencies to ever come on board. As set forth in the sworn Declaration of Lewis Kruger, dated July 10, 2008 ("Kruger Dec.") that accompanies this Response, the Creditors' Committee's agreement with the Debtors made crystal clear that it would terminate in certain events (many of which occurred) and, more importantly, to remain a plan co-proponent, the Creditors' Committee would have to consent to modifications to the then-proposed plan of reorganization. See Kruger Dec. ¶ 4. Needless to say, the Creditors' Committee has not and will not support a plan of reorganization, such as that contemplated by the Proposed Asbestos Settlement, that fails to provide for payment of appropriate post-petition interest to the members of its constituency.

6.    Even if the 2005 co-proponency agreement, which was reached when circumstances were very different, somehow remains relevant today, the Creditors' Committee neither had the authority nor power to bind the individual bank debt holders to it. Indeed, throughout their Objection, the Debtors take extreme liberty in characterizing their prior agreement with the Creditors' Committee as an agreement with the "Lenders." This co-proponency agreement, however, was only with the Creditors Committee as an entity, and could not and did not purport to "lock-up" any specific bank debt holder or any other creditor represented by the Creditors' Committee. Any reliance placed upon this agreement by the Debtors when negotiating the Proposed Asbestos Settlement (without the involvement of the Creditors' Committee) was completely unreasonable, not only because the Creditors' Committee's agreement could never bind individual creditors as a matter of law, but also

because the Debtors were told directly on numerous occasions for about two years that the bank debt holders were expecting to receive payment of their claims in full, specifically including post-petition interest at the default rate.  See Kruger Dec. ¶ 5.

7.    There is but one question for the Court to determine:  whether the Debtors, after nearly eight years in bankruptcy during which the bank debt holders did not receive a single penny on their claims and, during which the company's market capitalization increased from approximately $100 million[5] to between $1.6 billion and $2 billion, can propose and ultimately confirm a plan of reorganization that preserves over a billion dollars in value for its equity holders, but fails to pay the bank debt holders and other commercial creditors post-petition interest at the default interest rates the Debtors agreed to pay them.  In these cases on these facts, all unsecured commercial creditors, and the bank debt holders in particular as pertinent here, should receive post-petition interest at the contract default rate.

8.    Finally, although the Debtors' Objection is limited solely to the bank debt claims against these bankruptcy estates, the underlying issue — the legally proper determination of post-petition interest — resonates with respect to all unsecured commercial claims.  Not only does the Proposed Asbestos Settlement deprive the holders of bank debt of their right to payment of post-petition interest at the contract default rate, the Settlement is also inadequate in the manner in which post-petition interest is to be paid to the estates' trade creditors.[6]  The latter

---

[5]    On April 2, 2001, the price of W.R. Grace stock was $1.52 and shares outstanding at March 31, 2001 were 65.3 million, resulting in an equity value of approximately $99.3 million.

[6]    The Proposed Asbestos Settlement provides for the non-asbestos general unsecured creditors of the Debtors' estates, other than the bank debt holders, to receive "100% of [the] Allowed Amount [of their claims] plus post-petition interest . . . at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate."  Thus, to the extent other commercial creditors also have pre-petition agreements with the Debtors providing for the payment of interest when the Debtors have failed to make payment of amounts outstanding when due, those unsecured creditors are also not being provided with post-petition interest in accordance with the pre-petition

issue is one for another day,[7] but, as explained in more detail below, it is important for the Court to recognize now, even before a plan of reorganization is filed, that the Proposed Asbestos Settlement does not treat the commercial creditors in the manner required by law.

## COUNTER-STATEMENT OF FACTS

9.     The Debtors' Objection contains a section entitled "Statement of Facts" that is short on facts but long on argument and spin.  The Creditors' Committee therefore respectfully provides the following Counter-Statement of Facts, premised upon the accompanying Declaration of Lewis Kruger, so that the Court has a legally appropriate factual predicate upon which to determine the Objection.

10.     Contrary to the Debtors' argument, there has been no "prior course of dealing" between the Debtors and "the Lenders."  Objection at p. 7, ¶ 16.  The "prior course of dealing" is between the Debtors and Creditors' Committee, although it is irrelevant to the ultimate issue on the Objection.  By letter agreement dated January 12, 2005, the Creditors' Committee, for itself as the fiduciary for all non-asbestos unsecured creditors, agreed "to be a Plan Proponent with the Debtors and Equity Committee of the Amended Joint Plan of Reorganization to be filed with the Bankruptcy Court on or about January 13, 2005 as such plan may be amended from time to time with the consent of the Creditors' Committee ...."  Kruger Dec., Ex. A at 1.  Although the letter agreement did not so provide, the "Joint Plan" filed with the Court dated January 13, 2005 specified that the bank debt claims would be paid post-petition interest at a rate of 6.09% fixed, compounded quarterly.  This rate was negotiated between the Debtors and the Creditors'

---

contracts negotiated by the Debtors.  Further, there is no provision for unsecured creditors that may have rights to statutory rates of interest to receive those rates of interest.

[7]     Also for another day may be whether the Debtors' statement in page 5, footnote 3 regarding the contract rates of interest as of the Petition Date under the 1998 and 1999 Credit Agreements is correct.

Committee, in consultation with certain of the largest holders at that time of the bank debt claims.    Although the disclosure statement filed with the Joint Plan stated that "certain substantial Claimants" had agreed to support the Joint Plan (see disclosure statement, p. 59, n.18), the Creditors' Committee is not aware that any of the then largest holders of the bank debt had executed agreements with the Debtors concerning the payment rate.  Indeed, the Creditors' Committee does not believe that these entities hold much if any of the bank debt claims at the present time.  See Kruger Dec. ¶ 2.

11.    Under the 2005 co-proponency agreement, the Creditors' Committee could withdraw as a plan proponent in a variety of circumstances, including if the disclosure statement incorporating the Joint Plan was not approved by the Court by November 30, 2005, if there was a termination of the Debtors' exclusive period in which to file the Joint Plan, and if the Joint Plan failed to become effective on or before January 1, 2007.  Kruger Dec., Ex. A at 1-2.  The disclosure statement embodying the Joint Plan was not approved by November 30, 2005 (or ever), the Joint Plan never became effective, and the Debtors' exclusive period was terminated by this Court's order dated July 26, 2007.

12.    In February 2006, the Debtors and the Creditors' Committee (but none of the individual bank debt holders themselves) agreed to amend the Joint Plan to "modify the treatment of the Class of General Unsecured Creditors to provide that commencing January 1, 2006 the current 6.09% fixed, compounded quarterly, post-petition interest rate accruing for the Holders of the Debtors' pre-petition bank credit facilities shall change to a floating Adjusted Base Rate, compounded quarterly ...."  Kruger Dec., Ex. B at 1.  Like the agreement of a year earlier, the Creditors' Committee could withdraw as a plan proponent in a variety of circumstances, including if the disclosure statement incorporating the Joint Plan was not

8

approved by the Court by December 31, 2006, if there was a termination of the Debtors'
exclusive period in which to file the Joint Plan, and if the Joint Plan failed to become effective
on or before February 28, 2007. Kruger Dec., Ex. B at 1-2. The disclosure statement was not
approved by December 31, 2006 (or ever), the Joint Plan never became effective, and, as stated
above, the Debtors' exclusive period was terminated by this Court's order dated July 26, 2007.[8]

13.    The Debtors and the Creditors' Committee, including respective counsel, have
worked closely and cooperatively together since the beginning of these bankruptcy cases. See
Kruger Dec. ¶ 5. Shortly after Mark Shelnitz became the Debtors' General Counsel in April
2005, the Debtors' in-house legal staff and outside counsel at Kirkland & Ellis LLP, and the
Creditors' Committee's counsel at Stroock & Stroock & Lavan LLP ("Stroock"), began to have
regularly scheduled conference calls, approximately twice a month, to hear from the Debtors as
to the status of the cases, to discuss pending and upcoming motions and events and settlement
discussions with the asbestos personal injury claimants, if any. During many of these and other
discussions, Stroock advised the Debtors and their counsel that the bank debt was trading in the
market at a value reflecting recovery of the default rate and that the Creditors' Committee's
professionals were being told by holders of the bank debt that the holders expected to receive
post-petition interest at the default rate. Stroock advised the Debtors that, notwithstanding any
position the Creditors' Committee itself might determine to take, any consensual plan should
provide for post-petition interest payable at the default rate were the Debtors to hope for bank
debt holders to vote in favor of such a plan. Although the Debtors apprised Stroock that there
were plan-related discussions occurring that ultimately resulted in the Proposed Asbestos
Settlement, the Creditors' Committee was never invited to participate in those discussions,

---

[8]    Although counsel to the Creditors' Committee signed a letter agreement dated February 27, 2006,
neither the Debtors nor their counsel ever executed the February 27 letter agreement.

notwithstanding — and perhaps because of — Stroock's repeated warnings to the Debtors that post-petition interest payable at the default rate was expected by bank debt holders as part of any resolution.

14.    On or about April 7, 2008, the Term Sheet documenting the Proposed Asbestos Settlement was publicly disclosed.  <u>See</u> Objection, Ex. C.  The Proposed Asbestos Settlement does not pay bank debt holders post-petition interest at the default rate.  By letter dated April 21, 2008, an ad hoc group of bank debt holders, by their counsel Paul Weiss, Rifkind, Wharton & Garrison LLP, wrote to the Debtors' counsel and set forth their position that the failure of the Proposed Asbestos Settlement to provide for the payment of default interest on their claims, and other treatment issues, rendered any plan based on the Term Sheet unconfirmable.  <u>See</u> Kruger Dec. Ex. C.

10

## ARGUMENT

### THE BANK DEBT HOLDERS SHOULD RECEIVE
### POST-PETITION INTEREST AT THE CONTRACT DEFAULT RATE

15.     The Debtors' argument that the bank debt holders should not receive any post-petition pendency interest because the Debtors' solvency has not been judicially determined is simply not credible, given their market capitalization of between $1.6 billion and $2 billion and that the Debtors' equity holders stand to recover over a billion dollars under the proposed plan embodying the Proposed Asbestos Settlement, in violation of the absolute priority rule.  In this case, the equities support awarding the commercial creditors payment in full, which for the bank debt holders includes post-petition interest at the contract default rate.

**A.     The Bank Debt Holders May**
**Receive Post-Petition Interest**

16.     The Debtors argue initially that it is "black letter law" that the bank debt holders may not receive any post-petition interest because the Debtors' solvency has "not yet been determined."  Objection at pp. 9-10, ¶ 24.  The Debtors fail to provide any legal support for this supposed "black letter" proposition, yet are quite obviously compelled to assert such disingenuous arguments in light of (1) the over a billion dollar recovery provided to Debtors' equity holders in the Proposed Asbestos Settlement without paying the claims of the bank debt holders in full; and (2) Debtors' market capitalization of between $1.6 billion and $2 billion,[9] a fact that the Debtors completely ignore in their Objection.   Under these circumstances, the Debtors' "solvency" argument is nothing more than an impermissible end run around the absolute priority rule.

---

[9]     According to the official website of the New York Stock Exchange (www.nyse.com), as of July 9, 2008, the Debtors' market capitalization is $1.65 billion.  The Court may take judicial notice of this and the other financial data concerning the Debtors under Federal Rule of Evidence 201.  See, e.g., Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000).

17.    As the United States Court of Appeals for the Third Circuit explained in Armstrong, "[i]n its initial form, the absolute priority rule required that 'creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever.'" Armstrong, 432 F.3d at 512 (quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444 (1999)) (ellipsis in original). The Third Circuit further held that:

> The absolute priority rule was later codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129(b). Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *LaSalle*, 526 U.S. at 441-42, 119 S.Ct. 1411.

Id. Thus, in simple terms, the absolute priority rule "requires that senior classes receive full compensation for their claims before other [junior] classes can participate." In re Websci Techs., Inc., 234 Fed. Appx. 26, 30 (3d Cir. 2007) (holding that under 11 U.S.C. § 1129(b)(2)(B)(ii), because a shareholder "would have been junior to all other claimants, he could not have retained the stock or any rights arising from its ownership."); In re Insilco Techs., Inc., 480 F.3d 212, 218 n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full."). Moreover, "a settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule." In re Iridium Operating LLC, 478 F.3d 452, 463 (2d Cir. 2007) (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

18.    In Armstrong, an asbestos bankruptcy case with which this Court is, of course, well familiar, the Third Circuit held that under the plain language of 11 U.S.C. §

DM3\767488.1

1129(b)(2)(B)(ii), a plan provision distributing warrants to purchase new common stock to equity holders over the objection of unsecured creditors violated the absolute priority rule. See Armstrong, 432 F.3d at 513-14. Similarly, here, the Proposed Asbestos Settlement preserves over a billion dollars in value for the Debtors' equity holders over the bank debt holders' objection that the absolute priority rule is being violated. Yet despite the over a billion dollar recovery provided to the Debtors' equity holders in the Proposed Asbestos Settlement, the Debtors still argue that the commercial creditors may not receive any post-petition interest because solvency has not been "determined." The Debtors have it completely backwards: "Implicit in this [absolute priority] rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent." In re Resorts Int'l, Inc., 145 B.R. 412, 483 (Bankr. D.N.J. 1990) (citing In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984)). Thus, by providing their equity holders with a significant recovery, the Debtors are proposing a plan that concedes the estates' solvency for these purposes.

19.     The Debtors' argument that solvency has not been "determined" is also flatly belied by the Debtors' market capitalization of between $1.6 billion and $2 billion. For example, in VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007), the Third Circuit held that a company's market capitalization is a reliable measure of its value, since "it reflects all the information that is publicly available about a company at the relevant time of valuation." Id. at 631 (citing Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988)). The Third Circuit concluded that the market's valuation of the company at issue as solvent was "strong evidence" of its solvency. Id. at 633. Thus, "[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" Id. (quoting In re Prince, 85 F.3d 314, 320 (7th Cir. 1996)); see also In re Iridium Operating LLC,

373 B.R. 283, 346-47 (Bankr. S.D.N.Y. 2007). In short, under the Third Circuit's holding in VFB LLC, the market has already spoken as to the Debtors' solvency.

20.     Finally, the Debtors' argument that the "Lenders" are "cherry-picking" among the terms of the Proposed Asbestos Settlement demonstrates why the Debtors' argument lacks merit. Objection at p. 10, ¶ 25. It is disingenuous for the Debtors to argue that the "Lenders" have "embrace[d] the Proposed Asbestos Settlement to the extent they believe it helps them establish the Debtors' solvency" (id.) when the Proposed Asbestos Settlement establishes the Debtors' solvency by providing over a billion dollars of value for the Debtors' existing equity holders. Similarly, the Equity Committee's argument in its Joinder that absent the Settlement, "it is unclear whether the Debtors would be deemed solvent" (Joinder at p. 4, ¶ 13), also misses the point. An ultimate finding that the Debtors are insolvent would not only bar post-petition interest for the bank debt holders but also eliminate any recovery for the Debtors' equity holders. Therefore, it is the Debtors' equity holders who want to "have their cake and eat it too" by depriving the bank debt holders of payment in full on their claims while reaping over a billion dollars in recovery as a result of the Proposed Asbestos Settlement.

21.     In sum, the Debtors cannot hide behind the lack of a judicial determination of solvency while providing their equity holders with a recovery in violation of the absolute priority rule. The Debtors' argument that the bank debt holders may not receive any post-petition interest because the Debtors' solvency has not been determined should be flatly rejected.

**B.    The Bank Debt Holders Should Receive**
**Post-Petition Default Interest at the Contract Default Rate**

22.    The Debtors argue that the bank debt holders may not receive post-petition interest at the default rate required by the terms of the 1998 and 1999 Credit Agreements under (1) the "best interests of creditors" test under 11 U.S.C. 1129(a)(7); and (2) the "fair and equitable" test of 11 U.S.C. § 1129(b).  See Objection at pp. 9-17.  Neither argument is correct. Under the "best interests of creditors" test, the federal judgment rate is not the maximum rate of interest which creditors may receive, and under the "fair and equitable" test, the contract default interest rate should be enforced absent compelling equitable considerations warranting a different outcome.  Here, equitable principles support payment of the bargained-for interest at the contract default rate.

**1.    The "Best Interests of Creditors" Test Does Not**
**Preclude Post-Petition Interest at the Contract Default Rate**

23.    In their Objection, the Debtors purport to apply the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7), and not surprisingly, conclude that the federal judgment rate is the only interest rate available to the bank debt holders.  See Objection at pp. 11-12, ¶¶ 28-30. This argument completely misses the mark.  In chapter 7 cases, 11 U.S.C. §  726(a)(5) recognizes that creditors should receive interest before return of any excess liquidation proceeds to the debtor, and provides for the payment of interest "at the legal rate from the date of the filing of the petition."  11 U.S.C. § 726(a)(5).  Although courts have recognized that under section 726(a)(5), the creditors of a solvent chapter 7 estate may receive not less than post-petition interest at the federal judgment rate in accordance with 28 U.S.C. § 1961(a), the federal judgment rate is by no means the maximum rate that may be applied in a chapter 11 solvent debtor case.

24.    The "best interests of creditors" test of section 1129(a)(7) "requires that an impaired claim-holder who does not accept the proposed plan must 'receive . . . under the plan . . . property of a value . . . that is not less than the amount that such holder would . . . receive . . . if the debtor were liquidated under chapter 7.'" In re Dow Corning Corp., 244 B.R. 678, 686 (Bankr. E.D. Mich. 1999) (quoting 11 U.S.C. § 1129(a)(7)(A)(ii)) (ellipses in original).  As the bankruptcy court held in Dow Corning, the federal judgment rate is not the limit of what a claimant in a chapter 11 solvent debtor case may receive:

> But what must be remembered is that by its own terms, the best-interests test simply establishes a *minimum* payment requirement.  *See* 11 U.S.C. 1129(a)(7)(A)(ii) (The creditor must receive property of a value "*not less than* the amount" which would be received under chapter 7. (emphasis added)) . . . . Thus the upshot of the best-interests test is that the creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is *at least* equal to the federal statutory rate.  We are unwilling to infer from this that Congress intended to preclude creditors from being paid at a higher rate.

Id. (emphasis in original).  Importantly, the bankruptcy court in Dow Corning held that limiting creditors to post-petition interest at the federal judgment rate in solvent debtor cases could not be "reconciled with the central role of contract rights in a pending reorganization."  Id. at 685 (emphasis added).  As explained in the next section of this response, the Debtors' disregard for the bank debt holders' pre-petition contract rights violates settled principles of bankruptcy law.

25.    The Debtors provide no legal support for their argument that the "best interests of creditors" test precludes the payment of contract default interest.  The Debtors argue instead that courts have "consistently interpreted the 'legal rate' of interest to be the federal judgment rate," (Objection at pp. 11-12, ¶ 29), but none of the cases cited by the Debtors support the proposition that the federal judgment rate is the ceiling for recovery.  See In re Coram Healthcare Corp., 315 B.R. 321, 346 (Bankr. D.Del. 2004) (the court held that "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11"

16

and rejected the proposition that the section 1129(b) requires post-petition interest at the federal judgment rate); In re Adelphia Commc'ns, No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) (Objection, Ex. D) (the court held that under the "fair and equitable test" of section 1129(b), it had the discretion to determine the equitable rate of pendency interest, and held that an adjusted contract rate was appropriate); In re Cardelucci, 285 F.3d 1231 (9th Cir. 2002) (the issue was whether the state statutory judgment rate or the federal judgment rate should apply to the payment of post-petition interest on a state court judgment obtained by a judgment creditor prior to the bankruptcy case. Although the Ninth Circuit reasoned that the single federal judgment rate was appropriate to promote uniformity, because there was no contract rate to apply, the court did not have to determine whether the federal judgment rate applied versus a contract rate (or contract default rate)).[10]

26.    In sum, the Debtors' argument that the bank debt holders are limited to the federal judgment rate of interest under the "best interests of creditors" test of 11 U.S.C. 1129(a)(7) is simply incorrect.

### 2.    Post-Petition Interest at the Contract Default Rate is Permitted Under the "Fair and Equitable" Test

27.    The Debtors also argue that the bank debt holders may not receive contract default rate of interest under the "fair and equitable test" of 11 U.S.C. § 1129(b). See Objection at pp. 12-17, ¶¶ 31-43. This argument ignores the importance of creditors' contractual rights where the debtor is solvent, and the strong presumption, as recognized by the majority of courts, including most recently by the Sixth Circuit in Dow Corning, that the contract default interest

---

[10]    The Debtors also cite In re Loral Space & Commc'ns Ltd., Bench Ruling, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005) (Objection, Ex. E), but this case is completely inapposite. In Loral, the court found that the debtor was insolvent, but held in dicta that if the issue of post-petition interest was relevant, it would have rejected the federal judgment rate in favor of the non-default contract rate. (Id. at 41). The contract default rate was not even at issue.

rate should be paid to creditors in solvent debtor cases, subject only to compelling equitable considerations that render an award of default interest inappropriate.

28.     The "fair and equitable" standard of section 1129(b)(2)(B) requires that in order to cram down a chapter 11 plan on dissenting unsecured creditors, the plan must comply with the "absolute priority rule," such that a rejecting senior class of impaired creditors is paid in full before any class of junior creditors or equity holders can receive or retain any distribution under the plan. See Dow Corning, 456 F.3d at 672.  In Dow Corning, a class of unsecured commercial debt holders holding approximately $1 billion in debt objected to a plan proposed by the solvent debtor and the tort claimants' committee that proposed paying the principal amount of all of the unsecured debt along with post-petition interest at the federal judgment rate rather than the contract default rate.  The unsecured creditors argued that:

> the bankruptcy court's imposition of the federal judgment interest rate, as opposed to the rates required by the debt contracts, means that <u>Class 4 was not being paid the full interest it was owed, while Dow Corning's two shareholders, both in a class undisputedly junior to Class 4, were retaining millions of dollars in equity</u>.

Id. at 672 (emphasis added).  The bankruptcy court had previously held that the plan was not "fair and equitable" under section 1129(b) because it provided equity holders with a recovery of millions of dollars while the claims of the class of unsecured creditors were not paid in full under the absolute priority rule, which meant post-petition interest at the contract default rate.  See Dow Corning, 244 B.R. at 695-96.  In plain and simple terms, the bankruptcy court held that "[i]n this context, the rationale for use of the contract rate of interest is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so."  Id. at 695.

29.     Although the bankruptcy court in Dow Corning ultimately excused the debtor from having to pay the default rate based on its view that "no effect is to be given to contractual

18

provisions which purport to define as a default the filing of a voluntary petition for bankruptcy relief," Dow Corning, 244 B.R. at 696,[11] on further appeal, the Sixth Circuit reversed and remanded. See Dow Corning, 456 F.3d at 671-72. The Sixth Circuit held that:

> [I]n solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor. . . . When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced.
>
> Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract. To do otherwise (i.e., to interpret the amended plan as not requiring the payment of default interest), they argue, would violate § 1129(b)'s fair and equitable standard. We agree. Default interest rates are intended to transfer some of the risk of default from creditors to the debtor. By interpreting the plan as allowing interest only at the non-default rate, the bankruptcy court effectively transferred that risk back to the Class 4 creditors. Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.

Id. at 679 (emphasis added) (citations omitted). Thus, in solvent debtor cases, the "fair and equitable" requirement of section 1129(b) means full protection for creditors' contractual rights, including post-petition interest at the default rate.[12]

---

[11] The district court in Dow Corning affirmed on this basis as well, holding that the non-default interest rate would apply "unless the individual claimant can show that the Debtor defaulted prepetition." In re Dow Corning Corp., No. 01-CV-71843-DT, 2004 WL 764654, at *10 (E.D. Mich. Mar. 31, 2004). The Debtors (represented by the same counsel as were the debtors in Dow Corning) resurrect this same argument herein, which was implicitly rejected by the Sixth Circuit in Dow Corning, and is otherwise erroneous. See infra at pp. 34-35, ¶¶ 53-55.

[12] The Equity Committee attempts to distinguish Dow Corning on the grounds that there, "the Debtor and its shareholders were prepared to, and did, consummate their settlement with the tort claimants without regard to the rate at which post-petition interest was awarded." Joinder at p. 6, ¶ 18. This purported "distinction" is solely of the Equity Committee's own making, and reflects only that in Dow Corning, the parties to the settlement were prepared to have the court determine the appropriate rate of interest rather than hold the settlement agreement hostage, as the Equity Committee tries to do

19

30.    The Sixth Circuit in <u>Dow Corning</u> also recognized that "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a <u>presumption</u> that the default interest rate should be allowed." <u>Id.</u> at 680 (emphasis added).    Although many of these cases address whether to pay default interest to secured creditors, they present the same basic policy concerns that guided the Sixth Circuit's decision awarding default interest to unsecured creditors in <u>Dow Corning</u>: a solvent debtor should be held to its contractual obligations to creditors, especially where equity holders stand to gain while creditors' claims are not paid in full.    This basic principle is not new.    For example, in <u>Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv.. Corp.</u>, 679 F.2d 264 (1st Cir. 1982), the First Circuit held that:

> Where the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid instalments [sic] of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments due before and instalments due after the petition was filed.    This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to his advantage.    Moreover, the rule does not in any way affect any creditor other than the claimant of interest on interest.    Finally, the rule is in harmony with the settled English and American law that when an alleged bankruptcy is proved solvent, the creditors are entitled to receive post-petition interest before any surplus reverts to the debtor.

<u>Id.</u> at 269.    Under these circumstances, the interests of a solvent debtor's equity holders cannot overcome the requirement that the debtor's creditors be paid in full pursuant to their contractual rights.[13]

---

here.    Simply stated, the Equity Committee should not be permitted to dictate the recovery by commercial creditors in this bankruptcy case.

[13]    Numerous other courts have held that in solvent debtor cases, there is a presumption in favor of applying the contract default rate of interest, including most recently the Ninth Circuit. <u>See Gen. Elec. Capital Corp. v. Future Media Productions Inc.</u>, No. 07-55694, 2008 WL 2610459, at *4 (9th Cir. July 3, 2008) (holding that "[t]he bankruptcy court should apply a presumption of allowability for the contracted for default rate, 'provided that the rate is not unenforceable under applicable

20

31.     The Sixth Circuit's recognition in <u>Dow Corning</u> of the importance of creditor contract rights in solvent debtor cases has been explicitly followed in recent decisions, including a decision of the First Circuit. <u>See</u> <u>In re Gencarelli</u>, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor contractual prepayment penalties, the court held that "[l]et us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law.") (citing <u>Dow Corning</u>, 456 F.3d at 679); <u>In re W.J. Smith</u>, No. 03-10666(1)11, 2008 WL 73318, at *1 (Bankr. W.D.Ky. Jan. 7, 2008) (awarding unsecured creditor post-petition interest at 7% contract interest rate where "[t]he Sixth Circuit acknowledged in [<u>Dow Corning</u>] that in most cases where a debtor is solvent, courts generally confine themselves to determining and enforcing whatever pre-petition rights a creditor has against the debtor. Solvent debtors should not receive a windfall because they sought bankruptcy protection.") (citing <u>Dow Corning</u>, 456 F.3d at 679).[14]

32.     In their Objection, the Debtors try to obscure the Sixth Circuit's ruling in <u>Dow Corning</u> that there is a strong presumption in favor of the contract default rate of interest, and,

---

nonbankruptcy law.'") (quoting 4 <u>Collier on Bankruptcy</u>, ¶ 506.04[2][b][ii] (15th Ed. 1996) ("Most courts have allowed, or at least recognized a presumption of allowability for, default rates of interest, provided that the rate is not unenforceable under applicable nonbankruptcy law.")); <u>In re Southland Corp.</u>, 160 F.3d 1054, 1059-60 (5th Cir. 1998) (holding that the "default interest rate is generally allowed" subject to equitable considerations, and ultimately ruling that creditors must receive the "bargained-for default interest," which "compensates them for the unforeseeable costs of default."); <u>In re Terry Ltd. P'ship</u>, 27 F.3d 241, 243 (7th Cir. 1994) (holding that there is a "presumption in favor of the contract rate subject to rebuttal based on equitable considerations," and "[c]reditors have a right to bargained-for post-petition interest and 'bankruptcy judges are not empowered to dissolve rights in the name of equity.'") (citation omitted); <u>In re Ace-Texas, Inc.</u>, 217 B.R. 719, 723-24 (Bankr. D.Del. 1998) (awarding contract default rate of interest after debtor failed to satisfy its burden to overcome the presumption in favor of the contractual rate).

[14]     Contrary to the Equity Committee's assertion that the Sixth Circuit's holding in <u>Dow Corning</u> is "not shared by other courts that have addressed the issue" (Joinder at p. 5, ¶ 16), no court has rejected the Sixth Circuit's holding that there is a presumption in favor of awarding the default interest rate.

21

consequently, that it is the Debtors' burden to overcome that presumption.  For example, the
Debtors mischaracterize the court's holding in <u>Coram</u> as supporting a "'bottom-up' approach that
starts with the premise that the federal judgment rate represents the minimum rate of interest
necessary to satisfy the 'fair and equitable' standard of section 1129(b)" and that "the specific
equities of a given case can compel the application of a higher rate of postpetition interest."
Objection at pp. 13-14, ¶ 33.  While it is certainly true that the federal judgment rate is merely
the <u>minimum</u> interest rate that creditors may receive (<u>see</u> <u>supra</u> at pp. 11-14, ¶¶ 16-21), the
Debtors' implication that the court in <u>Coram</u> held that there is a presumption that the federal
judgment rate applies subject to equitable considerations is wrong.  The court in <u>Coram</u> simply
held that "the specific facts of each case will determine what rate of interest is 'fair and
equitable,'" <u>Coram</u>, 315 B.R. at 346, and its ultimate holding demonstrates that compelling
countervailing facts are required to preclude allowance of the contract default interest rate.
Indeed, although the Debtors argue that "[o]f course, in [<u>Coram</u>], the federal judgment rate also
turned out to be the maximum" (Objection at p. 14, ¶ 33), the Debtors conveniently fail to
mention that in <u>Coram</u>, the court applied the federal judgment rate because the debtors' CEO was
also employed as a consultant by the largest noteholder, creating an "actual conflict of interest
that tainted the Debtors' restructuring of its debt, the Debtors' negotiation of a plan, and the
Debtors' ultimate emergence from bankruptcy." <u>Coram</u>, 315 B.R. at 346. The <u>Coram</u> court held
that "[a]s a result of these <u>peculiar facts</u>," allowing post-petition interest at the contract default
rate would not be "fair and equitable." <u>Id.</u> at 347 (emphasis added).  Thus, <u>Coram</u>, which was
decided before <u>Dow Corning</u>, is fully consistent with the Sixth Circuit's holding that only
"compelling equitable considerations" will overcome the presumption that the contract default
rate of interest applies. <u>Dow Corning</u>, 456 F.3d at 679.[15]

---

[15]    The Debtors also erroneously rely on <u>Vanston Bondholders Protective Comm. v. Green</u>, 329 U.S. 156

33.    In sum, <u>Dow Corning</u> and its progeny stand for the proposition that where, as here, the debtor is solvent, a chapter 11 plan that fails to pay the contract default rate of interest to creditors is not "fair and equitable" and cannot be confirmed.    These cases apply a presumption in favor of enforcing the creditors' contractual rights that may only be overcome by compelling equitable considerations.[16]  However, as explained below, even when the equities are considered without such a presumption, the bank debt holders still should receive post-petition interest at the contract default rate.

---

(1946).  In <u>Vanston</u>, the Supreme Court rejected a claim of oversecured mortgage bondholders to post-petition interest, finding that the interest on interest was in the nature of a penalty for nonpayment and that subordinate creditors would have borne a greater loss if interest on interest were paid.  <u>Id.</u> at 166.  The Court, however, observed that in other cases, "where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." <u>Id.</u> at 164-65.

[16]    The Debtors mischaracterize the April 21, 2008 letter by the ad hoc group of bank debt holders (Kruger Dec., Ex. C) as advocating that "once solvency is established, unsecured creditors are automatically entitled to postpetition interest at the full contract default rate of interest – period, full stop."  Objection at p. 14, ¶ 34.  This argument is a straw man.  The letter clearly states that "[n]o equitable factors or considerations exist in these chapter 11 cases to warrant a denial of payment to the Bank Facility Claimants in accordance with their contracts.  In fact, the equities strongly favor payment of the full amounts due under the Pre-Petition Bank Credit Facilities." Kruger Dec., Ex. C at 2.

DM3\767488.1

C.    **The Equities In This Case Warrant Payment of**
      **Post-Petition Interest at the Contract Default Rate**

34.    Although the Sixth Circuit in <u>Dow Corning</u> did not identify the equitable factors

that should be considered in deciding whether to award default interest, several cases provide

pointed guidance.  Under the facts of this case, even if this Court undertakes a straight balancing

approach without adopting the strong presumption in favor of contract default interest applied by

the Sixth Circuit in <u>Dow Corning</u>, these equitable factors warrant the payment of default interest

to the bank debt holders.

1.    **A 2% Differential Between the Contract Default**
      **Rate and the Base Contract Rate is Not "Exorbitant"**

35.    As the Debtors' acknowledge (Objection at p. 5, ¶ 12), the relevant credit

agreements provide for only a 2% difference between the contract default rate and the base

contract rate, a difference that courts have found to be reasonable on its face.  <u>See, e.g.</u>,

<u>Southland Corp.</u>, 160 F.3d at 1060 (finding no inequity where "[t]he 2% spread between default

and pre-default interest rates is relatively small."); <u>Ace-Texas</u>, 217 B.R. at 723-24 (finding that a

2% difference between the default rate and the pre-default rate was "reasonable and appropriate,"

and "well within the range of interest rates which the court has seen in other cases in recent years

and is not significantly higher than the non-default rate.").

36.    The Debtors argue in a footnote that the 2% difference between the contract

default rate and the base contract rate "could result in an increased payment to the Lenders of

over $100 million due to the large principal outstanding and the duration of these chapter 11

cases."  Objection at p. 5 n.2.  The Debtors, however, studiously hide the fact that they have a

market capitalization of between $1.6 billion and $2 billion.  Considering that the difference

between paying the bank debt holders the default contract rate and the payment set forth in the

24

Proposed Asbestos Settlement is approximately $100 million (or only between 5% and 6.25% of the Debtors' market capitalization),[17] the application of the default rate is not inequitable.

### 2.   The Payment of Default Interest Will Not Harm Other Creditors

37.   Given the magnitude of the value preserved for equity under a plan encompassing the Proposed Asbestos Settlement, allowance of interest at the contract default rate to bank debt holders will leave sufficient value to enable other unsecured creditors to receive post-petition interest at the rates appropriate for each of those creditors. Thus, awarding default interest will not diminish the payout to other creditors. See Southland Corp., 160 F.3d at 1060 (holding that it was "especially significant" that no junior creditors would be harmed by the award of default interest).

38.   The equitable reasons for protecting other creditors do not apply to protecting equity holders because creditors' rights and claims take priority over equity interests. See 11 U.S.C. §§ 1129(a)(7) and 1129(b)(2)(B)(ii). Thus, in In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 791 F.2d 524 (7th Cir. 1986), the Seventh Circuit held that:

> The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full. All of [the debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. The only competing equities are those of [the debtor's] stockholders, and are weak . . . .
>
> *        *        *
>
> The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted.

---

[17]   This difference is calculated through December 31, 2008 and assumes the prime rate remains at 5% through year end.

> Hence if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights; and one of those rights in this case was the right to accelerate the repayment of principal.

Id. at 527-28 (citations omitted) (emphasis added); see also Ruskin v. Griffiths, 269 F.2d 827, 832 (2d Cir. 1959) ("No benefit will be given to the debenture holders at the expense of any other class of creditors.  The burden of this payment will fall entirely on the interest of the stockholders.  They cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture.") (citation omitted).

39.     Similarly, in In re Adelphia Commc'ns (Objection, Ex. D), cited by the Debtors (and the Equity Committee), the issue was not a priority contest between creditors and equity holders, but rather one affecting the relative rankings of different classes of creditors.   In rejecting both the federal judgment rate and default rate in favor of an adjusted contract rate payable to unsecured creditors, the court held that "where entitlements of creditors affect entitlement of structurally junior creditors, of debtors that are the equity holders of lower-level subs, there is much more than sufficient authority to make adjustments in certain creditor groups' non-bankruptcy entitlements to achieve greater overall fairness." Id. at 21 (emphasis added); see also Vanston, 329 U.S. at 166 (rejecting creditors' claim for interest on interest because subordinate creditors would have suffered a greater loss).   In contrast, enforcing the bank debt holders' pre-petition contractual right to default interest is not at the expense of any other creditor, and therefore should not warrant an "adjustment" to those rights under the guise of equity.

40.     Finally, although the interests of equity holders are not relevant when compared to the contractual rights of creditors to receive their bargained-for interest rates, the payment of

DM3\767488.1

interest to the bank debt holders at the default rate still leaves the Debtors' equity holders with <u>over a billion dollars</u> in value, hardly an "inequitable" result.    The Equity Committee's characterization of this recovery as "uneconomic and contrary to the interests of equity holders" (Joinder at p. 2, ¶ 3), is simply not a credible reason for this Court to refuse to protect and enforce the contractual rights of the bank debt holders.

### 3.    The Debtors Have Been Enriched by the Use of the Bank Debt Holders' Money for Nearly Eight Years

41.    The Debtors filed for bankruptcy in April 2001, and will have had the use of the bank debt holders' funds <u>for nearly eight years</u> by the time the plan is confirmed, presumably in 2009.  From day one of these cases, the bank debt holders have had liquidated, undisputed claims for at least the $500 million principal amount of the debt.  During the long pendency of these cases, the bank debt holders have lost the use of their money and have received no payment.  In contrast, on day one of these cases, the Debtors' shareholders had an aggregate equity value of approximately $100 million.  See <u>supra</u> at p. 6 n.5.  Even with the payment of default interest to the bank debt holders, equity looks to benefit from an increase in value of <u>over ten times</u> the value it started with when these chapter 11 cases began.  In stark contrast to this windfall, the bank debt holders are merely asking that their contractual rights to default interest be enforced.  Under these circumstances, equity favors the payment of default interest.  See <u>Debentureholders Protective Comm. of Cont'l Invest. Corp.</u>, 679 F.2d at 269 (enforcing contract provision is "fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to *his* advantage.") (italics in original); <u>In re Consol. Operating Partners L.P.</u>, 91 B.R. 113, 117 (Bankr. D.Colo. 1988) ("The equities of this case do not favor any deviation from the imposition of the

27

Late Payment Rate.  The benefit derived from any reduction in the contract rate would not inure

to the creditors but instead would be a windfall to the debtor.  Such a result would mean that any

solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11.  No

such result was intended by Congress.").

4. **The Debtors' Reliance on the 2005 Co-Proponency Agreement As Having Bound the "Lenders" to a Position Was and Is Unreasonable**

42.    The Debtors argue that the "Lenders" should be locked into the post-petition

interest rate set forth in the prior 2005 co-proponency agreement (as modified in February 2006)

between the Creditors' Committee and the Debtors.  See Objection at p. 15, ¶¶ 37-38.  This

"course of conduct" argument is without merit.

43.    As previously explained, the 2005 co-proponency agreement and February 2006

modification concerned a different proposed plan of reorganization than that which will be filed

encompassing the Proposed Asbestos Settlement, and made crystal clear that the Creditors'

Committee could withdraw as a plan proponent upon the occurrence of certain events.  See

Kruger Dec., Exs. A, B.  Many of the events set forth in the agreement, which formed the basis

for a withdrawal, occurred.  See supra at pp. 8-9, ¶¶ 11-12.  Given these circumstances, the

Debtors could have no reasonable expectation that the Creditors' Committee would support a

proposed plan under the terms set forth in the agreements.

44.    The Creditors' Committee also repeatedly advised the Debtors and their counsel

for about two years that the bank debt was trading in the market at a value reflecting recovery of

the default rate, and that notwithstanding any position that the Creditors' Committee itself might

adopt, any consensual plan would have to provide for post-petition interest at the default rate in

28

order for the bank debt holders to vote in favor of it.[18]  See supra at p. 9, ¶ 13.  Yet now, when it

is convenient for them to do so, the Debtors act as if they were never given this information and

conclude that it is "equitable" to bind the bank debt holders to terms to which they never agreed.

45.     The Debtors' attempt to bind the individual bank debt holders to the terms of the

2005 co-proponency agreement also fails as a matter of law.  Indeed, by repeatedly using the

generalized term "Lenders" in their Objection, the Debtors intentionally conflate the individual

bank debt holders with the Creditors' Committee to create the false impression that the

individual bank debt holders are bound by the Creditors' Committee's participation in the 2005

co-proponency agreement.  See, e.g., Objection at p. 15, ¶ 37 ("[T]he Lenders' rejection of the

Negotiated Bank Debt Interest Rate and their demand for the contract default rate represent a

clear departure from their prior agreements and course of conduct in these chapter 11 cases.")

(emphasis added).  Contrary to the Debtors' argument, it is black letter law that the Creditors'

Committee had neither the authority nor the power to bind the individual bank debt holders to the

2005 co-proponency agreement.  The Third Circuit has held that:

> While it is true that the Unsecured Creditors Committee in Owens Corning
> represented Kensington's interests in the Owens Corning bankruptcy, it is

---

[18]    Circumstances had changed from the time the 2005 co-proponency agreement (as modified in
February 2006) had been agreed to that supported the position that the Debtors had taken from the
first day of these chapter 11 cases that they were solvent and that supported the legal position that in a
solvent debtor situation unsecured creditors should receive interest at the default contract rate.  Those
circumstances included (i) the Court's numerous orders during 2006 and 2007 continuing to require
asbestos personal injury questionnaires to be filled out and filed notwithstanding the multiple
attempts by asbestos counsel to derail that process, (ii) the Court's August 2006 order, as amended,
establishing a bar date for certain pre-petition asbestos personal injury claims, (iii) the Court's
issuance of numerous orders in 2006 and 2007 disallowing and expunging numerous asbestos
property damage claims and approving various settlements in 2007 such that the number of such
claims remaining had dropped by September 2006 from the over 4000 claims filed to approximately
660 claims and currently to under a hundred claims, (iv) the Court's December 2006 decision finding,
among other matters, that there was no unreasonable risk of harm from ZAI, and (v) the Sixth
Circuit's August 2006 Dow Corning decision.  By 2007 these circumstances were reflected in the
market such that the bank debt was trading with the expectation that holders of the debt would receive
the default rate of interest.

established that a Creditors Committee owes a fiduciary duty to the unsecured
creditors as a whole, not to the individual members. . . . So while the Committee
had a duty to represent the collective interests of the unsecured creditors, it did
not have the authority to bind each individual creditor.

In re Kensington Int'l Ltd., 368 F.3d 289, 315 (3d Cir. 2004) (citations omitted) (emphasis

added); see also In re Quality Beverage Co., 181 B.R. 887, 894 (Bankr. S.D.Tex. 1995) (holding

that although a creditors' committee "bears a strong duty to the interests of the unsecured

creditors it represents, it has neither the power nor the authority to bind each individual

creditor."). The Debtors could not have had a reasonable expectation that any individual

unsecured creditor would be bound by the terms contained in the 2005 co-proponency

agreement, especially given their knowledge that the bank debt holders required post-petition

interest at the contract default rate.

46.     The Debtors' reliance on the 2005 co-proponency agreement is also especially

unreasonable because the Creditors' Committee was not a party to the Proposed Asbestos

Settlement and was never invited to participate in the negotiations concerning its terms.

Incredibly, despite excluding the Creditors' Committee from the negotiations, the Debtors assert

that the "Lenders want to accept all of the benefits of" an agreement to which neither the

Creditors' Committee nor the bank debt holders was a party, but "none of what they perceive to

be the burdens, such as the payment of postpetition interest at the rate of 6.09%," even though

the "Lenders" never agreed to such terms. Objection at p. 15, ¶ 38. To borrow the Debtors'

phrasing, that is the opposite of equity.

47.     Moreover, it is beyond peradventure that the Creditors' Committee itself cannot

be "estopped" from changing its position and object to a proposed plan (especially one

contemplating the violation of the absolute priority rule). See Armstrong, 432 F.3d at 517-18

(creditors' committee did not waive its right to object to plan despite initially endorsing the plan

and recommending its acceptance to its constituents, since "[t]he confirmation process . . . entitled [the creditors committee] to lodge an objection against the Plan before the objection deadline.").

### 5. The Debtors' Argument that Payment of Contract Default Interest "Jeopardizes" the Proposed Asbestos Settlement is Unavailing

48.     The Debtors also argue that awarding contract default interest to the bank debt holders "jeopardizes the Proposed Asbestos Settlement" because the "equity holders would be well within their rights to resume the estimation litigation over the estimated Asbestos PI Claims." Objection at pp. 15-16, ¶ 39. This argument does not promote equity; instead, it unjustifiably seeks to excuse the Debtors' failure to satisfy the equitable principles underlying the "fair and equitable" requirement of section 1129(b).

49.     Essentially, the Debtors argue that although they have provided their equity holders with over a billion dollar recovery before satisfying the claims of unsecured creditors in full, it is nevertheless "inequitable" for the bank debt holders to challenge that arrangement. The Debtors cannot legally justify depriving the bank debt holders of their full pre-petition contractual rights based on their equity holders' claims of prejudice or their equity holders' threat to continue the estimation process. This position erroneously equates the interests of the Debtors' equity holders with unsecured creditors, since "the two groups are very different, and the equitable reasons for protecting other creditors do not apply to protecting equity holders. Creditors's [sic] right and claims take priority over equity interests." In re Brokers, Inc., No. 04-53451, 2007 WL 4963164, at *3 (Bankr. M.D.N.C. Dec. 3, 2007) (citing Dow Corning, 456 F.2d at 679).[19] Thus, the Debtors' argument that the payment of contract default interest "frustrates a

---

[19]    Debtors' reliance on In re A.H. Robins Co., Inc., 89 B.R. 555 (E.D.Va. 1988) does not support the Debtors' position and is clearly distinguishable because that case has nothing to do with what the bank debt holders are legally entitled to receive under the "fair and equitable" test of section 1129(b).

31

fundamental purpose of the Bankruptcy Code" impermissibly ignores the Code's protection of

the rights of creditors. As one court has explained:

> When credit is extended pursuant to an agreement, all parties reasonably expect
> that the agreement will be carried out. Nevertheless, honest but unfortunate,
> debtors sometimes find themselves in intractable financial situations from which
> they have no means of escape and they take refuge in the Bankruptcy Code. The
> Code makes it possible for them to start anew, free of the obligations that they
> improvidently undertook. But the Code also serves to protect creditors by
> requiring fairness and equity in the distribution of a debtor's property. If solvent
> debtors are to be allowed to receive the Code's benefits, then they must pay *all* of
> their obligations before retaining any property.

In re Gaines, 178 B.R. 101, 104 (Bankr. W.D.Va. 1995) (emphasis added) (italics in original).

50.     The Equity Committee similarly argues that if the Proposed Asbestos Settlement

is "modified" to pay the bank debt holders contract default interest, it will "have no choice but to

withdraw its support for the Settlement; causing the Settlement to fail." Joinder at p. 4, ¶ 11. It

bears repeating that the Equity Committee carved out this significant recovery for its constituents

in the absence of the Creditors' Committee, which was not invited to sit at the negotiating table

despite having advised the Debtors for about two years that the bank debt holders would not vote

in favor of any plan that did not provide payment of post-petition interest at the contract default

rate. As such, there can be no argument that either the Creditors' Committee or the individual

commercial creditors have jeopardized the Proposed Asbestos Settlement through any

---

In A.H. Robins, the court relied on its powers of equity to disallow punitive damages because such
damages could not be estimated, which is not the case here, and thus, "[t]his unknown liability would
destroy the ability of Robins to reorganize because the impossibility of estimating a liability of the
Company renders compliance with numerous provisions of the Bankruptcy Code virtually
impossible." Id. at 562. In fact, the court held that the inability to quantify punitive damages would
make it difficult to "determine whether the 'best interest of the creditors' test of Section 1129(a)(7)
had been met or, in the event any class had rejected the plan, whether the elements of cramdown
under Section 1129(b)(2)(B) could have been satisfied." Id. That is plainly not the case here, since
the amount of post-petition interest at the default contract rate is a readily determinable fixed amount,
the amount is not so large as to preclude reorganization, and the payment of post-petition interest at
the contract default rate will satisfy the absolute priority rule and the "fair and equitable" test of
section 1129(b).

32

inequitable conduct.  The Equity Committee cannot dictate the bank debt holders' recovery by threatening to abandon the Settlement in the face of what would be its constituents' recovery of over a billion dollars in value even were contract default interest paid to the unsecured creditors.[20]

51.    Finally, the Debtors argue that payment of default interest is inequitable because "but for the Debtors' litigation and reorganization efforts throughout the case . . . the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate."  Objection at p. 17, ¶ 43.  This argument turns the world on its head.  The Debtors' solvency is no basis to deprive the bank debt holders, and the commercial creditors generally, of their contractual rights.  It is the very reason why those rights, including the contractual right to the payment of default interest, should be enforced.  See Dow Corning, 456 F.3d at 679 ("[A]bsent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.").

52.    In sum, an award of default interest is "fair and equitable" under the facts of this case when the equities are considered, even without applying the strong presumption in favor of the allowance of post-petition interest at the contract default rate applied by the Sixth Circuit in Dow Corning.  Id. at 679-80.

---

[20]    The contention by both the Debtors and the Equity Committee that the equity holders have made certain "concessions" to reach the Proposed Asbestos Settlement, including the alleged "dilution" of the equity holders' proposed recovery, is therefore irrelevant, since the absolute priority rule does not countenance any recovery by equity until creditors are paid in full.  See Objection at p. 6, ¶ 14; Joinder at p. 3, ¶ 9.

DM3\767488.1

D.    **The Bankruptcy Code's Anti-Ipso Facto Provisions Are Not Relevant**

53.    The Debtors argue that contract default interest should be disallowed pursuant to an alleged general policy against ipso facto provisions in the Bankruptcy Code.  See Objection at pp. 16-17, ¶¶ 41-42.  Simply stated, the bank debt holders are not enforcing an ipso facto provision.  Under the Debtors' theory, no creditor, secured or unsecured, could ever obtain pendency interest at the contract default rate in a chapter 11 bankruptcy case unless there was a default prior to the petition date.  That is not the law.

54.    Thus, the Debtors' assertion that "a creditor's rights are fixed as of the petition rate" (Id. at p. 16, ¶ 41) misses the point because "a creditor's contractual right to interest retains validity during the pendency of chapter 11 reorganization."  Dow Corning, 244 B.R. at 686 (emphasis added); see also Coram, 315 B.R. at 344 (citing Dow Corning, 244 B.R. at 686).[21]  In addition, the Debtors' argument that "[t]here was no prepetition default or failure to make timely payment" (Objection at p. 16, ¶ 41) also fails because the payment of default interest is not triggered by the filing of a bankruptcy petition, but rather by unpaid debt.  As the Seventh Circuit has held, "[i]t is not a good answer that, once bankruptcy was declared a default . . . was impossible because the debtor could not have repaid the principal even if it had wanted to do so."  Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 791 F.2d at 529.

55.    The Debtors' "ipso facto clause" argument was at least implicitly rejected by the Sixth Circuit in Dow Corning, which, in reversing the rulings of the bankruptcy court and district court (which were based on the erroneous view that pendency interest at the base contract rate would apply unless the debtor defaulted pre-petition), instead focused on the bedrock equitable

---

[21]    Carrieri v. Jobs.com Inc., 393 F.3d 508 (5th Cir. 2004), cited by the Debtors, merely held that shareholders' redemption rights were fixed as of the date of the bankruptcy petition, and is not relevant to the issues presented in the Objection.

34

principle that creditors must be paid in full before equity holders may receive any recovery under the "fair and equitable" test of section 1129(b).   See Dow Corning, 456 F.3d at 678-79. Moreover, as the Sixth Circuit held in Dow Corning, the purpose of the contract default rate of interest is in part to "transfer some of the risk of default from creditors to the debtor," Id. at 679 (emphasis added), and thus, depriving creditors of the bargained-for interest in a solvent debtor case would effectively alter the parties' agreement by transferring that risk back to creditors: "The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor.   Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11.   No such result was intended by Congress." Consol. Operating Partners L.P., 91 B.R. at 117 (emphasis added).[22]

## RESERVATION OF RIGHTS

56.     The Creditors' Committee reserves its rights to amend or supplement this Response in any manner and on any ground that is appropriate and to respond to additional objections the Debtors assert to the Proofs of Claim to the extent any additional objections are permitted.[23]

---

[22]   The cases cited by the Debtors are factually inapposite because they involve the application of ipso facto contractual terms to property of the estate. See In re EBC I, Inc., 356 B.R. 631, 639-40 (Bankr. D.Del. 2006) (nondebtor's termination of contract with debtor was insufficient to deprive debtor of its contractual property rights under 11 U.S.C. § 541(c)(1)); In re NextWAVE Personal Communications, 244 B.R. 253 (Bankr. S.D.N.Y. 2000) (debtors' failure to make post-petition payments on notes was not a default triggering forfeiture of debtors' licenses to provide telecommunications services).

[23]   The Debtors' "reservation of rights" to assert additional substantive grounds for objections should be rejected because it is barred by the plain terms of Local Rule 3007-1(f)(iii), which provides that "[a]n Objection based on substantive grounds shall include all objections on substantive grounds." Local Rule 3007-1(f)(iii) (emphasis added).

DM3\767488.1

## CONCLUSION

57.     For the reasons set forth above, it is respectfully submitted that this Court deny

the Debtors' Objection in its entirety.

Dated: Wilmington, Delaware
      July 11, 2008

                        Respectfully submitted:

                        **STROOCK & STROOCK & LAVAN LLP**

                        Lewis Kruger
                        Kenneth Pasquale
                        (Members of the Firm)
                        180 Maiden Lane
                        New York, New York  10038-4982
                        Tel: (212) 806-5400
                        Fax: (212) 806-6006

                        and

                        **DUANE MORRIS LLP**

                        /s/ Michael R. Lastowski
                        Michael R. Lastowski (DE I.D. 3892)
                        Richard W. Riley (DE I.D. 4052)
                        William S. Katchen
                        1100 North Market Street, Suite 1200
                        Wilmington, Delaware 19801-1246
                        Tel: (302) 657-4942
                        Fax: (302) 657-4901

                        Counsel for the Official Committee
                          of Unsecured Creditors

DM3\767488.1