## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | Hearing Date: September 15, 2008 at 10:30 a.m. |

## RESPONSE OF THE BANK LENDER GROUP IN OPPOSITION TO THE DEBTORS' OBJECTION TO CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

Dated: Wilmington, Delaware
     July 11, 2008

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Telecopier: (302) 467-4450

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Telecopier: (212) 757-3990

*Attorneys for The Bank Lender Group*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 2

COUNTER-STATEMENT OF FACTS ............................................................................... 9

ARGUMENT ........................................................................................................................ 14

I.     THE ISSUES RAISED IN THE OBJECTION ARE NOT RIPE ......................... 14

II.    THE PROPOSED ASBESTOS SETTLEMENT  VIOLATES THE
ABSOLUTE PRIORITY RULE ........................................................................... 19

     A.    The Debtors Cannot Circumvent the Absolute Priority Rule by
Agreement ..................................................................................................... 19

     B.    The Proposed Asbestos Settlement By Its Terms Concedes  That
the Debtors are Solvent ................................................................................ 23

III.   THE HOLDERS OF THE BANK LENDERS' CLAIMS SHOULD
RECEIVE POSTPETITION INTEREST AT THE CONTRACT
DEFAULT RATE ................................................................................................ 27

IV.   THE EQUITIES WARRANT PAYMENT OF POSTPETITION
INTEREST AT THE CONTRACTUAL DEFAULT INTEREST ..................... 34

     A.    The Default Contract Rate Is Reasonable and Not Inequitable or
Exorbitant .................................................................................................... 35

     B.    The Bank Lenders Have Enriched the Debtors and Have Not Done
Anything to Impede The Administration of these Bankruptcy
Cases ............................................................................................................ 35

     C.    The Bank Lenders Are Not And Were Never Bound by the Prior
Failed Agreements Between the Debtors and the Creditors'
Committee ..................................................................................................... 36

     D.    The Debtors' Arguments that Payment of Contract Default Interest
Jeopardizes the Proposed Asbestos Settlement is Not Tenable ................. 38

     E.    The Bankruptcy Codes' Anti-Ipso Facto Provisions are Not
Relevant ....................................................................................................... 40

V.    THE BANKRUPTCY COURT CANNOT REWRITE THE CREDIT
AGREEMENT TO AWARD THE DEBTORS A WINDFALL ......................... 43

VI.   THE "BEST INTERESTS OF CREDITORS"  TEST DOES NOT
PRECLUDE POSTPETITION  INTEREST AT THE CONTRACT
DEFAULT RATE ................................................................................................ 45

CONCLUSION .................................................................................................................... 48

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

AM-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.,
  33 F.Supp. 2d 235 (S.D.N.Y. 1998) ............................................................41

Anchor Resolution Corp. v. State Street Bank and Trust Co. of Conn. (In re
  Anchor Resolution Corp.),
  221 B.R. 330 (Bankr. D. Del. 1998) ...........................................................41

Butner v. United States,
  440 U.S. 48, 99 S.Ct. 914 (1979)................................................................44

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N.LaSalle St. P'ship,
  526 U.S. 434, 119 S.Ct. 1411 (1999)....................................................21, 33

Carrieri v. Jobs.com, Inc.,
  393 F.3d 508 (5th Cir. 2004) ......................................................................41

Consolidated Rock Products Co. v. Du Bois,
  312 U.S. 510, 61 S.Ct. 675 (1941).......................................................19, 24

Debentureholders Protective Comm. of Cont'l Invest. Corp. v. Cont'l Invest.
  Corp.,
  679 F.2d 264 (1st Cir. 1982).................................................................30, 36

FSLIC v. D&F Constr. Inc. (In re D&F Constr., Inc.),
  856 F.2d 673 (5th Cir. 1989) ......................................................................17

General Electric Capital Corp. v. Future Media Productions Inc.,
  Case No. 07-55694, 2008 WL 2610459 (9th Cir. July 3, 2008).....................31, 35, 47

In re A.H. Robins Co., Inc.,
  89 B.R. 555 (E.D. Va. 1988) ......................................................................40

In re Ace-Texas, Inc.,
  217 B.R. 719 (Bankr. D. Del. 1998)..............................................20, 30, 35

In re Adelphia Commc'ns,
  Case No. 02-41729, Bench Ruling (Bankr. S.D.N.Y. April 27, 2006) .................33, 46

In re Armstrong World Industries, Inc.,
  320 B.R. 523 (D.Del.2005)..........................................................................38

In re Armstrong World Industries, Inc.,
  432 F.3d 507 (3d. Cir. 2005) .....................................6, 9, 19, 20, 21, 22, 23, 24, 37, 39

*In re Calpine Corp.*,
   365 B.R. 392 (Bankr. S.D.N.Y. 2007)....................................................................4, 17

*In re Cardelucci*,
   285 F.3d 1231 (9th Cir. 2002) .................................................................................47

*In re Consol. Operating Partners L.P.*,
   91 B.R. 113 (Bankr. D. Colo. 1988)...................................................................31, 36

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D.Del. 2004)..............................................................32, 33, 46

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) ..........................................................7, 27, 28, 29, 33

*In re Dow Corning Corp.*,
   No. 01-CV-71843-DT, 2004 WL 764654 (E.D. Mich. Mar. 31, 2004) .....................28

*In re EBC I, Inc.*,
   356 B.R. 631 (Bankr. D. Del. 2006).........................................................................41

*In re Felicity Assoc's, Inc.*,
   197 B.R. 12, 14 (Bankr. D.R.I. 1996).......................................................................15

*In re Insilco Technologies, Inc.*,
   480 F.3d 212 (3d Cir. 2007) ....................................................................................24

*In re Kensington Int'l Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ....................................................................................37

*In re Liberty Warehouse Assocs. Ltd. P'ship*,
   220 B.R. 546 (Bankr. S.D.N.Y. 1998).....................................................................35

*In re Loral Space & Commc'ns Ltd.*,
   Bench Ruling, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005).....................33, 34, 47

*In re Manville Forest Prods. Corp.*,
   60 B.R. 403 (S.D.N.Y. 1986) ...................................................................................41

*In re Nextwave Personal Commc'ns, Inc.*,
   244 B.R. 253 (Bankr. S.D.N.Y. 2000).....................................................................42

*In re Phoenix Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ......................................................................15

*In re Resorts Int'l, Inc.*,
   145 B.R. 412 (D.N.J. 1990).....................................................................................24

*In re Skyler Ridge,*
    80 B.R. 500 (Bankr. C.D. Cal. 1987) .......................................................35

*In re Terry Ltd. P'ship,*
    27 F.3d 241 (7th Cir. 1994) .............................................................30, 35

*In re Trevarrow Lanes,*
    183 B.R. 475 (Bankr. E.D.Mich. 1995).....................................................17

*In re USG Corp.* (Bankr. D. Del. Case No. 01-02094) (JKF) ............................7

*In re Vanderveer Estate Holdings, Inc.,*
    283 B.R. 122 (Bankr. E.D. N.Y. 2002) ....................................................33

*In re Vest Assoc's,*
    217 B.R. 696 (Bankr. S.D.N.Y. 1998)..........................................17, 18, 35

*In re W.J. Smith,*
    No. 03-10666(1)11, 2008 WL 73318 (Bankr. W.D. Ky. Jan. 7, 2008).......31

*In re W.S. Sheppley & Co.,*
    62 B.R. 271 (Bankr. N.D. Iowa 1986)..........................................17, 18, 36

*In re WebSci Technologies, Inc.,*
    234 Fed. Appx. 26 (3d Cir. 2007).............................................................22

*In the Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,*
    791 F.2d 524 (7th Cir. 1986) ...................................................26, 32, 42, 43

*In the Matter of Southland Corp.,*
    160 F.3d 1054,1060 (5th Cir. 1998) ...............................................25, 30, 35

*Iridium v. Motorola, Inc. (In re Iridium Operating LLC),*
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)........................................................27

*Motorola, Inc. v. Official Committee of Unsecured Creditors
    (In re Iridium),* 478 F.3d 452 (2d. Cir. 2007) .....................19, 22, 23, 38, 39

*Public Affairs Assoc's, Inc.* v. *Rickover,*
    369 U.S. 111, 82 S.Ct. 582 (1962).............................................................15

*Ruskin v. Griffiths,*
    269 U.S. 827 (2d Cir. 1959) .......................................................25, 26, 37, 36

*United Merchants & Mgfs., Inc. v. Equitable Life Assurance Co. of
    the United States (In re United Merchants & Mfrs.),*
    674 F.2d 134 (2d Cir. 1982) .....................................................................42

iv

*United States v. AWECO, Inc. (In the Matter of AWECO, Inc.)*,
   725 F.2d 293 (5th Cir. 1984) ...................................................................19, 38, 39, 40

*UPS Capital Business v. Gencarelli (In re Gencarelli)*,
   501 F.3d 1 (1st Cir. 2007)............................................................................................31

*Vanston Bondholders Protective Committee v. Green*,
   329 U.S. 156, 67 S.Ct. 237 (1946).............................................................................31

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007) ......................................................................................26

## STATUTES

11 U.S.C. § 102(3).........................................................................................................16

11 U.S.C. § 541.............................................................................................................20

11 U.S.C. § 1124...........................................................................................................20

11 U.S.C. 1129(a)(7) ...............................................................................................43, 45

11 U.S.C. § 1129(a)(7)(A)(ii) ......................................................................................44

11 U.S.C. § 1129(b)(2)(B)............................................................................................22

11 U.S.C. § 1129(b)(2)(B)(i)-(ii) .................................................................................22

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................18, 19, 22

28 U.S.C. § 1961(a) ......................................................................................................45

28 U.S.C. § 5102...........................................................................................................45

28 U.S.C. § 5102(b) ................................................................................................34, 16

28 U.S.C. § 1129........................................................................................3, 4, 14, 15, 16

28 U.S.C. § 1129(a)(7) ...........................................................................................13, 45

Fed.R. Bankr. Proc. 9019..............................................................................................14

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 01-01139 (JKF) |
| W. R. GRACE & CO., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hearing Date: September 15, 2008 at 10:30 a.m. |
| | ) | |

## RESPONSE OF THE BANK LENDER GROUP IN OPPOSITION TO THE DEBTORS' OBJECTION TO CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

Lenders under the Prepetition Bank Credit Facilities[1] (the "Bank

Lenders"),[2] by and through their undersigned counsel, submit this response to the

Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit

Agreements Dated as of May 14, 1998 and May 5, 1999, dated June 13, 2008 [Docket

No. 18922] (the "Objection").

---

[1] The Pre-Petition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, the "1999 Credit Agreement," together with the 1998 Credit Agreement, the "Credit Agreements"). A copy of the 1998 Credit Agreement is attached hereto as Exhibit "A," and a copy of the 1999 Credit Agreement is attached hereto as Exhibit "B".

[2] The Bank Lenders include (i) Anchorage Advisors, LLC; (ii) Avenue Capital Group; (iii) Bass Companies; (iv) Caspian Capital Advisors, LLC; (v) Catalyst Investment Management Co., LLC; (vi) Citigroup Special Situations; (vii) Intermarket Corp.; (viii) JD Capital Management, LLC; (ix) JP Morgan Chase, N.A. Credit Trading Group; (x) Lehman Brothers Inc.; (xi) Loeb Partners Corporation; (xii) MSD Capital, L.P.; (xiii) Murray Capital Management, Inc; (xiv) Normandy Hill Capital, L.P.; (xv) Ore Hill Partners, LLC; (xvi) P. Schoenfeld Asset Management, LLC; and (xvii) Restoration Capital Management, LLC.

## PRELIMINARY STATEMENT

1.      The Objection concerns the right of the Bank Lenders to postpetition interest at the contract default rate on their unsecured claims. Ordinarily, a solvency determination serves as the fulcrum for the right to postpetition interest; if solvency exists, then so does the right to postpetition interest. Further, if solvency exists, the majority of courts recognize an overwhelming presumption in favor of a contractual creditor's right to postpetition interest at the default rate.

2.      In these cases, at least for now, there will not be a solvency determination. Parties other than the Bank Lenders have reached a deal, the so-called Proposed Asbestos Settlement;[3] as part of their deal, they will forego an estimation of the Debtors' asbestos liability and by necessity, a determination of the Debtors' solvency. Instead, these parties propose to divide up the Debtors' reorganization value among all constituencies, including the equity, which will retain approximately $2 billion in value.[4] An additional feature of their deal limits the rate of postpetition interest on the Bank Lenders' $500 million of prepetition principal claims (together with interest, fees and expenses on those claims) to an amount less than the contractual default rate presumed in the circumstance of a solvent debtor.

3.      In attempting to limit the Bank Lenders' postpetition interest recovery, the Debtors are trying to have it both ways: they want to deprive the Bank Lenders of postpetition default interest by claiming that there's no solvency

---

[3]   Capitalized terms not defined herein are defined in the Objection.

[4]   The Debtors have a market capitalization between $1.6 billion and $2 billion based on prices of W.R. Grace stock between April 7, 2008 (the date the Term Sheet for the Proposed Asbestos Settlement was announced) and July 9, 2008, which were $21.88 (July 7, 2008) and $27.79 (June 16, 2008), on shares outstanding of 72.1 million.

determination to justify its award, but at the same time, they want to let equity keep $2 billion of value without any solvency determination.

4.      Can the Debtors really have it both ways?  The law says "No," and it says "No" emphatically.  For equity to retain any value, the Bank Lenders must receive postpetition interest at the contract default rate.  That conclusion follows because under section 1129(b), shareholders can only retain property under a non-discriminatory, fair and equitable chapter 11 plan in a single circumstance:  payment of the dissenting impaired unsecured creditor class in full – in short, in the circumstance of solvency. Inasmuch as the Bank Lenders have the ability to block confirmation of any plan in these cases that does not pay them in full, attention must turn to solvency.

5.      Around that issue, the Debtors make two solvency based arguments for not paying the Bank Lenders their contract default rate of interest:  first, they contend that under section 502(b)(2) of the Bankruptcy Code, the Bank Lenders have no right to postpetition interest because that right only exists "in cases where the Debtors' solvency has been established."  (Objection at ¶ 22).  The Debtors reason that because "the Debtors' actual solvency remains in dispute, has not yet been determined, and will never be determined unless the Proposed Asbestos Settlement falls through and the estimation litigation relating to the Asbestos PI Claims is revived and completed," the Bank Lenders may have no entitlement to postpetition interest whatsoever. *Id.*

6.      This false argument (which overlooks the Bank Lenders' independent and absolute due process right to establish solvency in response to a challenge to their right to postpetition, contract default interest, no matter whether they Debtors choose to or not) sets the stage for the Debtors' second argument – that the Bank

Lenders have no right to postpetition interest at the contract default rate under section 1129(b) of the Bankruptcy Code. (Objection at ¶¶ 23-43). Specifically, the Debtors maintain that the absence of a solvency determination (again, an absence portrayed by the Debtors as a perpetually unfillable void due to their "deal" with others ) deprives the Bank Lenders of the ability to argue that the "best interests" and "fair and equitable" standard even apply to their right to postpetition interest. (*Id.*)

       7.    At the outset, a few things seem self evident: first, whether the parties to the Objection litigate now or litigate later over postpetition default interest (and they should litigate later),[5] the parties should not waste their time and money or the energies of this Court on the argument that Bank Lenders have no right to postpetition interest in the absence of a solvency determination. If the Debtors insist that the Bank Lenders must establish solvency as a condition precedent to establishing their entitlement to postpetition interest, so be it; the Bank Lenders are prepared to do so. The apparently shared desire to avoid further trial of the solvency issue would suggest a different, and more sensible course – a presumption of the Debtors' solvency for purposes of determining the rate of postpetition interest on the Bank Lenders' claims.

---

[5]    Frankly, the Debtors have started down a procedural path which can only delay, not expedite, these cases. Though they characterize their attacks as "objections" to the Bank Lenders' claims, the "best interest test" and "fair and equitable" standards have nothing to do with section 502(b) claim allowance.

The "fair and equitable" test in particular looks at what is fair and equitable in connection with a particular chapter 11 plan. In this case, all that exists is an unapproved, five-page term sheet. Not surprisingly (and as established below), courts refuse to make a "fair and equitable" determination in a section 502(b) context. *See In re Calpine Corp.*, 365 B.R. 392, 401 (Bankr. S.D.N.Y. 2007) (Court refused to rule on default interest claims in context of claims objection – holding that in light of need to determine fair and equitable factors at confirmation, a "decision today on the default rate of interest may be premature.") The few courts that have considered the default interest issue pre-confirmation (in the context of section 506(b) determinations, rather than determinations under section 502(b)) have ruled that they would have to reconsider any ruling denying default interest under the fair and equitable standard in connection with plan confirmation.

8.      This presumption of solvency is one that is in fact self-evident where equity is to receive a recovery in the context of a non-consensual plan.  It is the most basic of propositions that a company is solvent if its equity will be retaining approximately $2 billion in value.  The Debtors' entire solvency argument is the novel one that unsecured creditors are only entitled to postpetition contractual interest in a "solvent" debtor case and not a case where equity retains approximately $2 billion in value.  A distinction without a difference if there ever was one; and one that has, not surprisingly, <u>never</u> been recognized by any court.  (The Debtors do not cite *any* case which has ever considered, much less adopted, their position).  A distinction which also flies in the face of almost one hundred years of Supreme Court jurisprudence on the relationship between creditors and shareholders in bankruptcy cases.[6]  A distinction which if upheld is upside down – by providing their equity holders with a billion dollar recovery, the Debtors are proposing a plan that presumes the estates' solvency for these purposes

9.      The presumption of solvency here is also the only conceivable outcome when considered in the context of the solvent debtor rule itself.  Solvency hearings are held to determine if equity can retain value – not to determine if a debtor whose equity will retain ownership is solvent.  The doctrine that unsecured creditors are only entitled to postpetition interest in a solvent case is not there to protect equity, but because Congress concluded that one creditor group should not receive postpetition interest at the expense of another creditor group – which would not happen in the case of a solvent debtor.  For purposes of the solvent debtor rule, once equity will receive a

---

[6]   Which jurisprudence holds that the absolute priority rule is not about solvency, it is about equity retaining value.

recovery there is no purpose in determining balance sheet "solvency" – there being no creditors to protect, it is a purely academic exercise at that point.

10. But there's the rub: the Debtors reject this approach because they know that solvency brings with it the overwhelming presumption in favor of postpetition default interest. Ever solicitous of their shareholders, the Debtors want them to retain $2 billion of value without paying their creditors in full. There is, however, no legal way to do this over creditor objection. If equity gets anything under a plan in the absence of solvency (whether presumed or established), it has to come from somewhere. This could only come from value "shifting" under the Proposed Asbestos Settlement and through the contemplated plan from the asbestos claimants "gifting" to equity of value that purportedly belongs to them. The Debtors concede as much in the Objection. (Objection ¶ 4). This "shifting through gifting" of value is exactly what the Third Circuit ruled in another mass asbestos case, *In re Armstrong World Industries, Inc.*, violates the absolute priority rule. 432 F.3d 507 (3d Cir. 2005). *Armstrong* – which held that existing equity could not through a settlement with the asbestos personal injury plaintiffs retain any equity over the objection of a dissenting class of commercial creditors – acts as an absolute bar to the shareholders' retention of approximately $2 billion in equity through a deal with the asbestos personal injury plaintiffs over the objection of the Bank Lenders.

11. In simple terms, if the Debtors want their shareholders to retain their interests through this shift and gift, value must shift a second time – approximately $100 million (the default interest at issue) must move to the Bank Lenders from equity's $2 billion of value. Otherwise, the now-unfiled plan that will implement the Proposed

Asbestos Settlement will violate the absolute priority rule because it will let equity keep $100 million that belongs to the Bank Lenders.

12.     A third point: even if this Court could somehow navigate the procedural minefield that the Debtors have created through the Objection and rule now on what's "fair and equitable," no equitable factor exists to overcome the presumption in favor of the payment of postpetition interest at the contract default rate. The rule, not the exception, is that courts apply the contract interest rate when the contest over value boils down to a dispute between creditors and shareholders. *In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006) ("Courts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed"). The Debtors' attempt to end run this principle, through "shifting and gifting" to evade the overwhelming presumption in favor of contractual default interest that accompanies solvency, will not work. If equity retains value, the principle applies. Any other outcome – like the one perversely urged by the Debtors on the basis of "doing equity" – would produce the polar opposite of equity. (Notably, in the other major asbestos case pending in this district in which equity reached a deal with the asbestos claimants to retain ownership of the company, *In re USG Corp.* (Bankr. D. Del. Case No. 01-02094) (JKF), the bank lenders received their full contract default interest.)

13.     Courts have repeatedly held that permitting a solvent debtor to avoid its prepetition contractual obligations to its creditors does not further the equitable principles underlying the "fair and equitable" requirement of section 1129(b). These chapter 11 cases present no exception to those holdings. Quite the contrary, the Bank Lenders through the Credit Agreements have been involuntarily funding the Debtors for

more than seven years through short term, prepetition credit facilities that featured low interest rates typically found in investment grade credits, not chapter 11 debtors. Virtually every court to consider the issue has deemed reasonable a 2% default interest for the added time and risk associated with an investment-grade-borrower-turned-chapter-11 debtor.

14.    Moreover, the Debtors have not alleged, until now, that the Bank Lenders have done anything to impede these cases. Their new allegations amount to nothing more than foot-stomping over the Bank Lenders' unwillingness to "just go along" with a deal that will cost them $100 million. But the $100 million in default interest accumulated over the past seven years does not take away anything from any other creditor's recovery. After the asbestos claimants' "gifting," default interest will come out of equity's pocket. Despite the Debtors' claim that this issue could unwind the entire settlement (Objection at ¶¶ 18, 39, 44), *the amount involved represents less than 5% of the Debtors' reorganization value* (estimated at approximately $1.6 billion to $2 billion)– a recovery to which equity has no right in the absence of solvency.

15.    The Debtors reliance argument is equally uncompelling. If the Debtors were so confident that creditors had agreed to the settlement curious why they did not ask them to become party to the Term Sheet before it was executed? While the Debtors seek to obscure this issue in their papers, even they at most allege that any "deal" was between them and the Creditors' Committee. The Bank Lenders – the only entities that could agree to waive their own contractual interest – were even by the Debtors' account not parties to any agreement. In any event, whatever understanding there may have ever been with the Creditors' Committee was with respect to a different plan (which

plan provided for the Bank Lenders to receive equity), which by its very terms long since expired.

16.    There is simply no equitable doctrine that holds that the Bank Lenders must forgo their right to contractual default interest, in a case where equity will receive a substantial recovery, on the grounds that it is necessary to achieve a consensual resolution of these cases.[7] This equitable back door around the absolute priority rule has been definitively closed by the Third Circuit and cannot be reopened. *Armstrong*, 432 F.3d at 518. The fact of a consensual deal to resolve a prolonged chapter 11 – even one entered into with the most noble of intentions – cannot be used as a sword to take away unsecured creditors' rights to the protections of the absolute priority rule. *Id.*

17.    For all of these reasons, the Bank Lenders respectfully submit this Objection should be overruled.

## COUNTER-STATEMENT OF FACTS

18.    The Debtors' bankruptcy filings constituted an event of default under the Credit Agreements. (1998 Credit Agreement § 10(f)(i)(A); 1999 Credit Agreement § 10(f)(i)(A)). JPMorgan Chase Bank, in its capacity as agent for the lenders under the Credit Agreements, timely submitted proof of claim nos. 9159 and 9168 ("Proofs of Claim") for amounts owed on account of, but not limited to, principal, interest, and fees and expenses on the loans and advances made under the Credit Agreements.

---

[7]    In the absence of an asbestos estimation hearing, we will of course never know if equity is making a "concession" in not seeking an estimation hearing on the asbestos claims amount or is receiving a windfall to which they would not otherwise be entitled.

19.    The aggregate principal amount owed under the Credit Agreements is $500 million (1998 Credit Agreement − $250 million and 1999 Credit Agreement − $250 million).[8] The 1998 Credit Agreement was scheduled to mature as of May 16, 2003 (*see* 1998 Credit Agreement, definition of Termination Date and §2.2) and has a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%. (*see* 1998 Credit Agreement §§ 5.1(c), 5.5). The 1999 Credit Agreement was scheduled to mature as of May 2, 2001 (*see* 1999 Credit Agreement, definition of Termination Date), and also has a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%. (*see* 1999 Credit Agreement §§5.1(c), 5.5).

20.    On or about April 7, 2008, the Debtors publicly announced the Term Sheet outlining the Proposed Asbestos Settlement. (Objection, Ex. C.) The Proposed Asbestos Settlement would impute a value to the asbestos claims, and pay all creditors, with the exception of the holders of Bank Lender claims, "in full." It also provides that existing equity will retain ownership of the Company. (Objection ¶ 13). The Debtors have not sought approval of the Proposed Asbestos Settlement, nor have they filed a plan incorporating its terms.

21.    The Debtors have identified as an important component of the Proposed Asbestos Settlement the postpetition rate of interest that the parties to such agreement decided to pay to the Bank Lenders on their claims under the Credit Agreements. (Objection, p. 6, ¶ 15.)

---

[8]    *See* Credit Agreements.

**_Creditors' Committee's Failed Agreements with Debtors_**

22.    Contrary to the Debtors' assertions, there was no "prior course of

dealing" or "agreement" between the Debtors and the Bank Lenders in which the Bank

Lenders agreed to the interest rate set forth in the Term Sheet for the Proposed Asbestos

Settlement. (Objection, p. 7, ¶ 16.) We also understand, as set forth in the Creditors'

Committee's response, dated July 11, 2008 (the "Creditors Committee Response"), that

some "prior course of dealing" existed regarding the interest rate for the Bank Lenders'

claims between the Debtors and the Creditors' Committee. We understand, based on

exhibits filed with the Creditors Committee Response, that by letter agreement dated

January 12, 2005 (the "Failed 2005 Agreement"), the Creditors' Committee, for itself as

the fiduciary for all non-asbestos unsecured creditors, agreed "to be a Plan Proponent

with the Debtors and Equity Committee of the Amended Joint Plan of Reorganization to

be filed with the Bankruptcy Court on or about January 13, 2005 as such plan may be

amended from time to time with the consent of the Creditors' Committee . . .." [9]

Although the letter agreement did not so provide, the "Joint Plan" filed with this Court

and dated January 13, 2005 [Docket No. 7560] specified that the Bank Lenders' claims

would receive postpetition interest at a rate of 6.09% fixed, compounded quarterly.

23.    We further understand that the negotiation of this rate involved the

Debtors and Creditors' Committee, in consultation with certain of the holders at that time

of the Bank Lenders' claims. Although the disclosure statement filed with the Joint Plan

stated that "certain substantial Claimants" had agreed to support the Joint Plan,[10] we

---

[9]    _See_ Creditors Committee Response.

[10]    _See_ Disclosure Statement [Docket No. 7559], p. 59, n. 18.

further understand that none of the prior Bank Lenders executed agreements with the
Debtors concerning the interest rate.  We do not believe that any of these holders remain
Bank Lenders today.

24.    Under the terms of the Failed 2005 Agreement, the Creditors'
Committee could withdraw as a plan proponent for a host of reasons and circumstances,
including (a) if the disclosure statement incorporating the Joint Plan was not approved by
this Court by November 30, 2005, (b) if there was a termination of the Debtors' exclusive
period in which to file the Joint Plan, and (c) if the Joint Plan failed to become effective
on or before January 1, 2007.[11]  To date, this Court has not approved the disclosure
statement incorporating the Joint Plan.  Accordingly, the Joint Plan did not become
effective on or before January 1, 2007.  This Court terminated the Debtors' exclusive
period by order dated July 26, 2007. [Docket No. 16396].

25.    We also understand from the Creditors Committee Response that
in February 2006, the Debtors and the Creditors' Committee (but again, none of the Bank
Lenders) agreed to amend the Joint Plan (the "Failed 2006 Agreement") to "modify the
treatment of the Class of General Unsecured Creditors to provide that commencing
January 1, 2006 the current 6.09% fixed, compounded quarterly, postpetition interest rate
accruing for the Holders of the Debtors' prepetition bank credit facilities shall change to a
floating Adjusted Base Rate, compounded quarterly . . .."[12]  As with the Failed 2005
Agreement, the Creditors' Committee could withdraw as a plan proponent in a variety of
circumstances, including (a) if the disclosure statement incorporating the amended Joint

---

[11]    *Id.*

[12]    *See* Creditors Committee Response.

Plan was not approved by the Court by December 31, 2006, (b) if there was a termination of the Debtors' exclusive period in which to file the amended Joint Plan, and (c) if the amended Joint Plan failed to become effective on or before February 28, 2007. Again, like the circumstance with the 2005 Failed Agreement, this Court never approved the disclosure statement, much less by the agreed deadline, in this instance, December 31, 2006. The amended Joint Plan never became effective, and, as noted above, the Court terminated the Debtors' exclusive period by order dated July 26, 2007 [Docket No. 16396].

26.     Accordingly, these conditional agreements between the Debtors and the Creditors' Committee have long since expired by their own terms. Any understanding regarding these failed plans that may have existed with some unnamed holders of Bank Lenders' claims (parties that have long since exited these cases) have expired with them.

27.     Circumstances have also changed dramatically since these conditional agreements were first entered into. It was uncertain at that time whether equity would retain any interest; hence the conditional support for a plan where the Bank Lenders would in fact receive equity themselves. Today, the Debtors' equity trades for over $22 per share; its EBITDA has improved by roughly $100 million. The Company's financial condition has in short dramatically improved and existing equity's recovery has been a primary beneficiary of this development.

### The Creditors' Committee Advised the Debtors of Market Expectations for Default Rate Interest

28.     We also understand that since the outset of these cases, the respective counsel for the Debtors and the Creditors' Committee have regularly

scheduled conference calls, to discuss among other things, settlement discussions, if any, with the asbestos personal injury claimants. We understand that on these calls, the Creditors' Committee's counsel continually advised the Debtors and their counsel that holders of the bank debt expected to receive postpetition interest at the default rate.

29.    We further understand that the Creditors' Committee's counsel advised the Debtors that, notwithstanding any position that the Creditors' Committee itself might determine to take, any consensual plan should provide for postpetition interest payable at the default rate if the Debtors expected the Bank Lenders to vote in favor of such a plan. Although we have been informed that the Debtors apprised the Creditors' Committee's counsel of plan-related discussions that ultimately resulted in the Proposed Asbestos Settlement, the Creditors' Committee never received an invitation to participate in those discussions, notwithstanding its counsel's repeated warnings to the Debtors that the Bank Lenders expected the payment of postpetition interest at the default rate as part of any resolution.

30.    As stated above, on or about April 7, 2008, the Debtors publicly disclosed the Proposed Asbestos Settlement, which does not pay holders of the bank debt postpetition interest at the default rate.

## ARGUMENT

### I.
### THE ISSUES RAISED IN THE OBJECTION ARE NOT RIPE

31.    The relief sought by the Debtors requires this Court, before approval of the Proposed Asbestos Settlement or the filing of a chapter 11 plan, prematurely to (a) opine as to the reasonableness of the Proposed Asbestos Settlement which is not before the Court, (c) hold that the "best interests" test of section 1129(a)(7)

of the Bankruptcy Code does not compel the award of default interest for the Bank
Lenders' claims, and (c) hold that the treatment accorded the Bank Lenders' claims under
a non-existent, hypothetical plan of reorganization based on the un-filed Proposed
Asbestos Settlement complies with section 1129(b) of the Bankruptcy Code.

32.    The mere fact that the Bank Lenders have taken the unsurprising
position that a plan based on the Proposed Asbestos Settlement would violate the
absolute priority rule does not accelerate the proper review of the issue of their right to
contract default interest by this Court. The cases cited by the Debtors to establish the
ripeness of the section 1129(b) issue are irrelevant and thus, inapplicable. (Objection at
¶ 46 (*citing In re Phoenix Petroleum Co.,* 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001); *In
re Felicity Assoc's, Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996)). In those cases, unlike the
situation here, courts had actual filed plans to evaluate. They considered the
confirmability of those plans in connection with approving disclosure statements for
those plans. In short, the courts addressed section 1129 issues as part of the confirmation
process. The procedural context here involves a claim objection – a procedure separate
and apart from the plan and disclosure statement process that arose in *Phoenix* and
*Felicity.*

33.    There is not now, nor could there ever be in the context of a
section 502(b) claims objection hearing, an adequate record concerning what is fair and
equitable in the context of an unsubmitted settlement agreement, an unfiled plan, and
unfiled disclosure statement. A decision that "is bound to have far-reaching import"
cannot be made in the absence of such an adequate record. *Public Affairs Assoc's, Inc.* v.
*Rickover*, 369 U.S. 111, 113, 82 S.Ct. 582 (1962). The Debtors entire argument – that in

the context of the Proposed Asbestos Settlement it is inequitable to permit the Bank

Lenders to receive contract default interest—must rest on a consideration of the

settlement and the implementing plan. This Court has never approved the Proposed

Asbestos Settlement, nor considered its ramifications under the "fair and equitable" and

"best interest" tests in the context of a plan. No basis exists to disallow the Bank

Lenders' interest claims on these principles without first concluding that the plan itself

satisfies them – something only achievable in connection with plan confirmation or

perhaps, at a bare minimum, a settlement filed and noticed in accordance with

Bankruptcy Rule 9019. A claims objection hearing certainly does not provide the forum

for those determinations.

        34.     The Debtors' extraordinary position that a hearing on a

section 502(b) objection permits the application of the "fair and equitable" and "best

interests" tests run afoul of the Bankruptcy Code and the case law. [13] Section 1129 of the

---

[13]   Section 502(b) claim allowance is unrelated to section 1129(b)'s fair and equitable test. The "fair and equitable" test in section 1129(b)(1) is not limited by the reference to "allowed amount" in section 1129 (b)(2). The starting point must be the words of the statute itself. The words "fair and equitable" in section 1129(b)(1) are not unqualified in any way.

There is, however, a list of specific requirements set forth in section 1129(b)(2). Section 1129(b)(2) states in relevant part: For the purpose of this subsection, the condition that a plan be "fair and equitable . . . includes the following requirements:" During the final Congressional compromise that restored the words "fair and equitable" in section 1129(b)(1), the word "includes" was added to the preamble of the list of specific requirements now contained in section 1129(b)(2). The word "includes" has a defined meaning in the Bankruptcy Code that is explicitly set forth in section 102 (the "Rules of Construction"). The Rules of Construction, applicable to all of Title 11, state that the words "includes' and 'including' *are not limiting.*" 11 U.S.C. § 102(3) (emphasis added). This means that the "condition that a plan be fair and equitable" in section 1129(b)(1) is "not limited" by the list of "requirements" enumerated in section 1129(b)(2). Because the words "fair and equitable" are "not limited" by section 1129(b)(2), they remain controlling.

Ultimately, to be confirmed under section 1129(b), the Debtors' yet-to-be filed plan must be found to be "fair and equitable" with respect to each rejecting class, and the "requirements" set forth in section 1129(b)(2) are merely the *minimum* requirements necessary for the fair and equitable test to be met. Commentators and the court are fully in accord with the statutory mandate that section 1129(b)(2) is not exclusive of the requirements for finding that a plan is "fair and equitable."

Bankruptcy Code expressly provides for the application of these tests in connection with actual confirmation of a particular plan, not a hypothetical plan.

35.     The limited case law in this area universally prohibits disallowance of the Bank Lenders' claims for purposes of a chapter 11 plan at this juncture. *See In re Calpine Corp.*, 365 B.R. at 401 (holding that it is premature to rule on the issue of whether creditors are entitled to postpetition default interest outside of the context of confirmation).[14]

36.     In the handful of instances in which courts have decided a creditor's entitlement to default interest at the contract rate outside of confirmation (all in the context of a section 506(b) determination involving liquidating debtors with oversecured creditors), they have uniformly made either conditional rulings or reserved the rights of parties to reopen the matter at the time of confirmation. *See In re Vest Assoc's*, 217 B.R. 696, 703-704 (Bankr. S.D.N.Y. 1998); *In re W.S. Sheppley & Co.*, 62 B.R. 271, 278-79 (Bankr. N.D. Iowa 1986).

37.     *Sheppley*, for example, involved determining whether the "allowed secured claim" of the first mortgage lienholder must include a contract default rate of interest. 62 B.R. at 272. Although a liquidating chapter 11 plan was pending, the court

---

*See* 7 Collier on Bankruptcy, ¶1129.05[1] (15th ed. rev. 1998) ("That this preamble [to section 1129(b)(2)] is non-exclusive is demonstrated by both the legislative history and by Congress' use of 'includes,' a term that is expressly non-exclusive under the Code's internal definitions." (footnotes omitted)); *FSLIC* v. *D&F Constr. Inc. (In re D&F Constr., Inc.)*, 856 F.2d 673, 675 (5th Cir. 1989) ("Section 1129(b)(2) sets minimal standards plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'"); *In re Trevarrow Lanes*, 183 B.R. 475, 492 (Bankr. E.D.Mich. 1995) ("The list of requirements set forth in § 1129(b)(2) which are essential for a finding that the plan is 'fair and equitable' is not exhaustive.")

[14]    The Bank Lenders could find no case considering the fair and equitable standard in connection with a pre-confirmation section 502(b) claims objection.

had not confirmed the Plan. *Id.* The *Sheppley* court stressed that its ruling only determined the "*pre-confirmation* amount of the claim,"[15] and observed that "[q]uestions as to whether the plan treatment of the secured creditor is 'fair and equitable' and whether it is receiving the "indubitable equivalent" of its claim should the secured creditor object to the plan – are issues left under Section 1129 of the Code for the confirmation hearing." *Id.* at 278.

38.    Similarly, in *Vest Assoc's*, the debtor objected to a creditor's proof of claim that sought default interest rate in the context of a case that was liquidating. 217 B.R. at 699. The debtor objected to the claim before confirmation, but after the filing of the debtor's first amended plan. *Id.* at 703. The court concluded that although it was disallowing the claim, if equity received a recovery at confirmation, the creditor could reopen its default interest argument. *Id.* at 707 & n.7.

39.    The logic of the ripeness concern is overwhelming when considered in the context of the Debtors' cases. Imagine if the Court were to disallow default interest on fair and equitable grounds based on the equities of the "current" plan and the final plan were to deviate in some meaningful way from the Term Sheet  How are deviations to be measured as a five-page term sheet turns into hundreds of pages of a chapter 11 plan and disclosure statement? Worse still, what if the plan is never confirmed, an estimation hearing was eventually held and the Debtors even by their own definition were found to be "solvent" and the equity recovery were to increase by billions more?

---

[15]    *Id.* (emphasis in original).

40.    In sum, the Objection is not ripe for adjudication, and on that basis alone, this Court should overrule the Objection.

## II.
### THE PROPOSED ASBESTOS SETTLEMENT
### VIOLATES THE ABSOLUTE PRIORITY RULE

41.    The rule in the Third Circuit is unequivocal: in accordance with the absolute priority rule, equity cannot retain any interest until senior creditors receive full payment, including postpetition interest. *Armstrong,* 432 F.3d at 513; 140 Cong. Rec. H 10,768 (daily ed. Oct 4, 1994) ("[I]n order for a plan to be fair and equitable, <u>unsecured and undersecured</u> creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery." (*citing Consolidated Rock Products v. DuBois,* 312 U.S. 510, 527, 61 S.Ct. 675, 687 (1941).) If the Debtors here do not have surplus value after all creditors have been paid in full (*i.e.*, they are neither presumed nor determined to be solvent), but equity nonetheless retains value, that value retention can only result from an impermissible value transfer from a creditor class of the type that the Third Circuit expressly forbids. If the Debtors are "not solvent," that is just what is going on here.

A.    **The Debtors Cannot Circumvent the Absolute Priority Rule by Agreement**

42.    A plan that transfers value to an equity class over the objection of an impaired senior creditor class, even in the context of a purported "settlement" of the case, cannot be confirmed. *Armstrong*, 432 F.3d at 513; *Motorola, Inc. v. Official Committee of Unsecured Creditors, (In re Iridium)*, 478 F.3d 452, 464 (2d. Cir. 2007); *United States v. AWECO, Inc., (In the Matter of AWECO, Inc.)*, 725 F.2d 293, 398 (5th

Cir. 1984).  After *Armstrong*, it is beyond dispute that the absolute priority rule bars equity from receiving anything where an impaired creditor class objects.

43.    "The plain language of [Section 1129(b)(2)(B)(ii)] makes it clear that a plan *cannot give property* to junior claimants over the objection of a more senior class that is impaired . . .."  *Armstrong*, 432 F.3d at 513.  A class is impaired if its legal, equitable or contractual rights are altered under the reorganization plan.  *Id.* at 512, fn.2. *citing* 11 U.S.C. § 1124.

44.    "'[I]mpairment can be avoided only if the plan proposes *cash payment in the full amount of the claim in accordance with the parties' agreement.  When the agreement requires a higher postdefault rate of interest, this means the higher rate must be paid.  Any other treatment would alter the creditor's rights.'"  In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) *quoting* James F. Queenan, Jr., Chapter 11 Theory & Practice § 30.15, at 30:49 (1994) (emphasis added).  Accordingly, pursuant to the law of the Third Circuit, because the Bank Lenders, parties undoubtedly holding impaired claims, will object to any plan based on the Proposed Asbestos Settlement, equity cannot retain any interest.

45.    In *Armstrong*, the company, like the Debtors in these cases, filed a chapter 11 case to deal with its significant contingent asbestos-related liability.  The plan proposed in *Armstrong* included, among others, three relevant classes:  Class 6 claimants – comprised of the claims of unsecured bank lenders, who were to receive a 59% recovery; Class 7 claimants -- whose claims were *pari passu* to Class 6 comprised of present and future asbestos-related claimants, who agreed to receive a 20% recovery, and Class 12, consisting of equity interest holders, which were to be wiped out.  Id. at 509.

Under the *Armstrong* plan, if Class 6 voted against the plan, Class 7 would receive

warrants, which Class 7 would then automatically "waive" in favor of the equity class.

*Id.*

46.     The Third Circuit reversed the lower court's confirmation of the

*Armstrong* plan on the basis that it violated the absolute priority rule:

> The absolute priority rule, as codified, ensures that "the
> holder of any claim or interest that is junior to the claims of
> [an impaired dissenting] class will not receive or retain
> under the plan on account of such junior claim or interest
> any property. The plain language of the statute makes it
> clear that a plan cannot give property to junior claimants
> over the objection of a more senior class if that class is
> impaired."

*Armstrong*, 432 F.3d at 513 (*quoting* 11 U.S.C. 1129(b)(2)(B)(ii)).

47.     Notably, the Third Circuit *rejected* the argument that the asbestos

claimants could do whatever they wanted with the recoveries received under the plan,

observing that the absolute priority rule "arose from the concern that because a debtor

proposed its own reorganization plan, the plan could be "too good a deal" for that

debtor's owners. *Armstrong*, 432 F.3d at 512 (*citing Bank of Am. Nat'l Trust & Sav.*

*Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 119 S.Ct. 1411 (1999)). The Third

Circuit reasoned that allowing the asbestos claimants to agree to provide value to existing

equity "would encourage parties to impermissibly sidestep the carefully crafted strictures

of the Bankruptcy Code and would undermine Congress's intention to give unsecured

creditors bargaining power in this context." *Id.* at 514-15.

48.     As in *Armstrong*, the Debtors assert that the retention by existing

equity of their ownership interests in the Company is "a concession by the personal injury

claimants" and that the value to be retained by equity exists solely on account of the

"delicately balanced" settlement between the asbestos claimants and current equity, under which the asbestos claimants have agreed to give up a certain amount of claimed value and "equity holders have agreed to accept a certain value." (Objection at ¶¶ 3-4, 14.) The plan outlined in the Term Sheet is analytically indistinguishable from the plan in *Armstrong*. (If anything, this case is clearer than *Armstrong*, in that the violation of the absolute priority rule is more egregious. Instead of giving equity holders out-of-the money warrants, the Debtors propose to allow equity holders in these cases to retain their interests in the Company valued at approximately $2 billion.)

49.    As the Third Circuit in *Armstrong* made clear, any concessions by the asbestos claimants to equity interest holders are legally irrelevant when it comes to application of the absolute priority rule, any value that the asbestos claimants "leave on the table" remains an asset of the estates. 11 U.S.C. § 541 (defining "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case"); *Iridium*, 478 F.3d at 461. It is the priority scheme of the Bankruptcy Code, not the asbestos claimants and old equity, that ultimately determines the distribution of reorganization value.

50.    Similarly, in *Iridium*, the Court of Appeals for the Second Circuit held that the absolute priority rule applies to distribution schemes under pre-plan settlements. That is, creditor groups cannot through settlement give junior classes recoveries unless senior creditors are paid in full. Id. at 463 & n. 18 *citing Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer Ferry)*, 390 U.S. 414, 88 S.Ct. 1157 (1968). In *Iridium*, a group of secured lenders and the creditors' committee reached a settlement which resolved a dispute over the validity

of the lenders' liens, funded a litigation trust to pursue litigation against Motorola, Inc.,

the debtor's former parent, and proposed a distribution scheme for the debtor's assets. *Id.*

at 456, 459.

51.     Motorola, which held administrative claims, objected to the pre-

plan settlement because it distributed assets to more junior creditors (the litigation trust

and the creditors committee) before payments were made to Motorola for its more senior

claims. *Id.* at 456, 462. The settlement contemplated the division of any cash recoveries

from the litigation against Motorola such that the lenders would receive 37.5% and the

estates would receive the remaining 62.5% to be distributed according to a "future, as-

yet-confirmed reorganization plan." *Id.* The Second Circuit vacated and remanded the

decision after concluding that the distribution of the residual litigation recoveries to the

unsecured creditors violated the absolute priority rule. *Id.* at 466.

**B.     The Proposed Asbestos Settlement By Its Terms Concedes
That the Debtors are Solvent**

52.     In any event, as used by the Debtors, the Debtors must be

presumed solvent. Equity can only receive a recovery if the Debtors are solvent or if in

determining the Bank Lenders' claims, this Court presumes or determines their solvency.

Absent the Bank Lenders acceptance of the proposed plan, there is no other way.

53.     As the Third Circuit explained in *Armstrong*, "[i]n its initial form,

the absolute priority rule required that 'creditors . . . be paid before the stockholders could

retain [equity interests] for any purpose whatsoever.'" *Armstrong*, 432 F.3d at 512

(*quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434,

444 (1999)) (ellipsis and italics in original). The Third Circuit further held that:

> The absolute priority rule was later codified as part of the
> "fair and equitable" requirement of 11 U.S.C. § 1129(b).

> Under the statute, a plan is fair and equitable with respect
> to an impaired, dissenting class of unsecured claims if (1) it
> pays the class's claims in full, or if (2) it does not allow
> holders of any junior claims or interests to receive or retain
> any property under the plan "on account of" such claims or
> interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *LaSalle*, 526
> U.S. at 441-42, 119 S. Ct. 1411.

*Id.*

54.     Thus, in simple terms, the absolute priority rule "requires that

senior classes receive full compensation for their claims before other [junior] classes can

participate." *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 30 (3d Cir. 2007)

(holding that under 11 U.S.C. § 1129(b)(2)(B)(ii), because the shareholder "would have

been junior to all other claimants, he could not have retained the stock or any rights

arising from its ownership."); *In re Insilco Technologies, Inc.*, 480 F.3d 212, 218 n.10 (3d

Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute

priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing

unless all creditors are paid in full.").

55.     Critically, "implicit in this [absolute priority] rule is that

*stockholders cannot participate in a reorganization plan unless it is established that the*

*debtor is solvent.*" *In re Resorts Int'l, Inc.*, 145 B.R. 412, 483 (D.N.J. 1990) (*quoting*

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984))

(emphasis added). The absolute priority rule applies "[w]hether a company is solvent or

insolvent in either the equity or the bankruptcy sense" because "'any arrangement of the

parties by the subordinate rights and interests of the stockholders are attempted to be

secured at the expense of the prior rights' of creditors 'comes with judicial

denunciation.'" *Consolidated Rock*, 312 U.S. at 527, 61 S.Ct. at 687 *quoting Louisville*

*Trust Co. v. Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674, 684, 19 S.Ct. 827, 830 (1899).

56.    The presumption of solvency in this instance is in complete accord with the absolute priority rule. The solvent debtor requirement for postpetition interest is based on not permitting one creditor group to recover postpetition interest at the expense of another creditor group; it is not to "protect" equity against creditors receiving postpetition interest. A review of the Term Sheet makes clear that allowance of interest at the contract default rate to the Bank Lenders will not reduce the payout to other creditors. Every creditor, with the exception of the Bank Lenders, will receive full payment. Rather, the value to pay the Bank Lenders' their contract default interest will come from equity—as it should—in compliance with the absolute priority rule. *See In the Matter of Southland Corp.*, 160 F.3d 1054,1060 (5th Cir. 1998) (holding that it was "especially significant" that no junior creditors would be harmed by the award of default interest); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (debtors with the "financial wherewithal to honor its contractual commitments should be required to do so."). A debtor simply cannot invoke solvency or a defense to a claim for contractual postpetition interest when equity is receiving a recovery.

57.    This concept has been echoed by Circuit courts for decades:

> The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full. All of [the debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. *The only competing equities are those of [the debtor's] stockholders, and are weak . . ..*

*    *    *

> The fact that a proceeding is equitable does not give the
> judge a free-floating discretion to redistribute rights in
> accordance with his personal views of justice and fairness,
> however enlightened those views may be. The function of
> equitable considerations in a bankruptcy proceeding is to
> guide the division of a pie that is too small to allow each
> creditor to get the slice for which he originally contracted.
> *Hence if the bankrupt is solvent the task for the bankruptcy
> court is simply to enforce creditors' rights according to the
> tenor of the contracts that created those rights; . . .*

*In the Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 791 F.2d 524, 527-28

(7th Cir. 1986) (emphasis added); *see also Ruskin*, 269 F.2d at 832 ("No benefit will be

given to the debenture holders at the expense of any other class of creditors. The burden

of this payment will fall entirely on the interest of the stockholders. They cannot

complain that they are treated inequitably when their interest is cut down by the payment

of a sum to which the debenture holders are clearly entitled by the express provisions of

the trust indenture.") (citation omitted).

      58.    Finally, the Debtors' substantial market capitalization belies the

specious argument that solvency has not been "determined." In *VFB LLC v. Campbell

Soup Co.*, 482 F.3d 624 (3d Cir. 2007), the Third Circuit held that a company's market

capitalization is a reliable measure of its value, since "it reflects all the information that is

publicly available about a company at the relevant time of its valuation." *Id.* at 631

(*citing Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989 (1988)). The Third

Circuit concluded that the market's valuation of the company at issue <u>as solvent</u> was

"strong evidence of its solvency." *Id.* at 633. Thus, "[a]bsent some reason to distrust it,

the market price is 'a more reliable measure of the stock's value than the subjective

estimates of one or two expert witnesses.'" *Id.* (*quoting In the Matter of Prince*, 85 F.3d

314, 320 (7th Cir. 1996)); *see also Iridium v. Motorola, Inc. (In re Iridium Operating*

*LLC)*, 373 B.R. 283, 346-47 (Bankr. S.D.N.Y. 2007).  In short, under the Third Circuit's

holding in *VFB LLC*, the market has already spoken as to the Debtors' solvency.

**III.**
**THE HOLDERS OF THE BANK LENDERS' CLAIMS SHOULD RECEIVE**
**POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE**

59.     With the solvency "issue" put in its proper place, the only issue

that remains involves whether some overwhelming equitable factor here mandates

modifying the Bank Lenders' right to their contract default interest.  The equities here

overwhelmingly support awarding the commercial creditors payment in full, which for

the holders of the Bank Lenders' claims includes postpetition interest calculated at the

contract default rate.

60.     As recognized by the majority of courts ( most comprehensively by

the Sixth Circuit in *Dow Corning*), under the "fair and equitable" test, the contract default

interest rate must be enforced absent compelling equitable considerations warranting a

different outcome.  With a solvent debtor (in these cases, either proven or presumed), a

bankruptcy court enforces the contractual rights of the parties, and the role that equitable

principles play in the allocation of competing interest is *significantly reduced.  Dow*

*Corning*, 456  F.3d at 679 (emphasis added).

61.     In *Dow Corning*, a class of unsecured commercial debt holders

holding approximately $2 billion in debt objected to a plan proposed by the solvent

debtor and the tort claimants committee.  The plan jointly contemplated paying the

principal amount of all of the unsecured debt, along with postpetition interest at the

federal judgment rate rather than the contract default rate.[16] The unsecured creditors

argued that:

> [T]he bankruptcy court's imposition of the federal
> judgment rate, as opposed to the rates required by the debt
> contracts, means that *Class 4 was not being paid the full*
> *interest it was owed, while Dow Corning's two*
> *shareholders, both in a class undisputedly junior to Class*
> *4, were retaining millions of dollars in equity.*

*Dow Corning*, 456 F.3d at 672 (emphasis added).

62.    The *Dow Corning* bankruptcy court had found that the plan did not

meet the "fair and equitable" standard of section 1129(b) because it provided equity

holders with a recovery of millions of dollars, while it failed to pay the claims of the class

of unsecured creditors in full under the absolute priority rule – meaning, postpetition

interest at the contract default rate. The bankruptcy court further held that "[i]n this

context, the rationale for use of the contract rate of interest is straightforward: A debtor

with the financial wherewithal to honor its contractual commitments should be required

to do so." *Dow Corning*, 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999).

63.    Although the bankruptcy court in *Dow Corning* ultimately excused

the debtor from having to pay the default rate based on its erroneous view that the

Bankruptcy Code contains a general policy against *ipso facto* provisions, on further

appeal, the Sixth Circuit reversed and remanded.[17] *See Dow Corning*, 456 F.2d at 671-

72. The Sixth Circuit held that:

---

[16]    The obvious parallels between *Dow Corning* and *W.R. Grace* do not require further elaboration.

[17]    The district court in *Dow Corning* affirmed on this basis as well, holding that the non-default interest
rate would apply "unless the individual claimant can show that the Debtor defaulted pre-petition."
*In re Dow Corning Corp.*, No. 01-CV-71843-DT, 2004 WL 764654, at *10 (E.D. Mich. Mar. 31,
2004). The Debtors (represented by the same counsel as were the debtors in *Dow Corning*) resurrect

[I]n solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever prepetition rights a given creditor has against the debtor. . . . When a debtor is solvent, then, the *presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced.*

Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract. To do otherwise (i.e., to interpret the amended plan as not requiring the payment of default interest), they argue, *would violate § 1129(b)'s fair and equitable standard.* We agree. Default interest rates are intended to transfer some of the risk of default from creditors to the debtor. By interpreting the plan as allowing interest only at the non-default rate, the bankruptcy court effectively transferred that risk back to the Class 4 creditors. *Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.*

*Id.* at 679 (emphasis added) (citations omitted).

64.    The Sixth Circuit in *Dow Corning* recognized that "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a <u>presumption</u> that the default interest rate should be allowed." *Id.* at 680 (emphasis added). These courts have reasoned that in solvent debtor cases, the "fair and equitable" requirement of section 1129(b) requires the full protection of creditors' contractual rights to postpetition interest at the default rate. Although many of these cases involve the issue of whether

this same argument herein, which was implicitly rejected by the Sixth Circuit in *Dow Corning*, and is otherwise erroneous. *See Dow Corning, 456 F.3d at 677.*

secured creditors should receive default interest, they present the same basic policy

concerns that guided the Sixth Circuit's decision in *Dow Corning*: holding that a solvent

debtor should honor its contractual obligations to creditors, where equity holders would

get the benefit of not paying in full.

        65.    For example, in *Debentureholders Protective Comm. of Cont'l*

*Invest. Corp. v. Cont'l Invest. Corp.*, 679 F.2d 264 (1st Cir. 1982), the First Circuit held

that:

> Where the debtor is solvent, the bankruptcy rule is that
> where there is a contractual provision, valid under state
> law, providing for interest on unpaid installments [sic] of
> interest, the bankruptcy court will enforce the contractual
> provision with respect to both installments due before and
> installments due after the petition was filed. This rule is
> fair and equitable inasmuch as the solvent debtor's estate
> will have been enriched by the bankruptcy trustee's use of
> money which the debtor had promised to pay promptly to
> the creditor, and, correspondingly, the creditor will have
> been deprived of the opportunity to use the money to his
> advantage. Moreover, the rule does not in any way affect
> any creditor other than the claimant of interest on interest.
> Finally, the rule is in harmony with the settled English and
> American law that when an alleged bankruptcy is proved
> solvent, the creditors are entitled to receive postpetition
> interest before any surplus reverts to the debtor.

*Id.* at 269. Under these circumstances, the interests of the solvent debtor's equity holders

cannot overcome the requirement of full payment of the debtor's creditors in accordance

with their contractual rights.[18]

---

[18] Numerous other courts have held that in solvent debtor cases, there is a presumption in favor of
applying the contract default rate of interest. *See Southland*, 160 F.3d at 1059-60 (holding that the
"default interest rate is generally allowed" subject to equitable considerations, and ultimately ruling
that creditors must receive the "bargained-for default interest," which "compensates them for the
unforeseeable costs of default."); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (holding
that there is a "presumption in favor of the contract rate subject to rebuttal based on equitable
considerations," but "[c]reditors have a right to bargained-for postpetition interest and bankruptcy
judges are not empowered to dissolve rights in the name of equity.") (citation omitted); *In re Ace-*

66.    Recent decisions have endorsed the Sixth Circuit's recognition in *Dow Corning* of the importance of creditor contract rights, including that of the First Circuit. *See UPS Capital Business v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor's claims for prepayment penalties, the court held that "[l]et us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law.") (*citing Dow Corning*, 456 F.3d at 679); *In re W.J. Smith*, No. 03-10666(1)11, 2008 WL 73318, at *1 (Bankr. W.D. Ky. Jan. 7, 2008) (awarding creditor the contract interest rate because "in most cases where a debtor is solvent, courts generally confine themselves to determining and enforcing whatever prepetition rights a creditor has against the debtor. Solvent debtors should not receive a windfall because they sought bankruptcy protection.") (*citing Dow Corning*, 456 F.3d at 679).

67.    Just last week, the Court of Appeals for the Ninth Circuit joined the majority of its sister circuits and adopted the position that courts should presume payment of default interest at the contract rate unless the "default interest" provisions were unenforceable under applicable nonbankruptcy law. *See General Electric Capital Corp. v. Future Media Productions Inc.*, Case No. 07-55694, 2008 WL 2610459 at *4 (9th Cir. July 3, 2008), a copy is attached hereto as Exhibit "C."

68.    Indeed, courts have even held that "[w]hen the Debtor is solvent, the equities <u>dictate</u> that additional interest be paid to the . . . creditor rather than to the debtor." *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 116 (Bankr. D. Colo. 1988)

---

*Texas*, 217 B.R. at 723-24 (awarding contract default rate of interest after debtor failed to satisfy its burden to overcome the presumption in favor of the contract rate).

(emphasis added); *see also Ruskin*, 269 F.2d at 831 (holding that it is "the opposite of equity to allow the [solvent] debtor to escape the expressly-bargained-for result of its act"); *cf. Chicago*, 791 F.2d at 528 (enforcing a compound interest provision and noting that "[t]he only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full").

69.    In their Objection, the Debtors try to muddle the presumption in favor of the contract default rate – and their overwhelming burden to overcome that presumption – by mischaracterizing the court's holding in *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D.Del. 2004). They read that decision as supporting a "'bottom-up' approach that starts with the premise that the federal judgment rate represents the minimum rate of interest necessary to satisfy the 'fair and equitable' standard of Section 1129(b)" and that "the specific equities of a given case can compel the application of a higher rate of postpetition interest." (Objection at pp. 13-14, ¶ 33.) While the federal judgment rate certainly sets the <u>minimum</u> interest rate that creditors may receive, the Debtors erroneously imply that the court in *Coram* recognized a presumption that the federal judgment rate applies, subject to equitable considerations. The *Coram* court merely stated the unremarkable proposition that "the specific facts of each case will determine what rate of interest is 'fair and equitable.'" *Coram*, 315 B.R. at 346.

70.    In fact, although the Debtors argue that "[o]f course, in [*Coram*], the federal judgment rate also turned out to be the maximum" (Objection at p. 14, ¶ 33), the Debtors fail to mention that in *Coram*, the court applied the federal judgment rate

because the largest noteholder employed the debtors' CEO as a consultant, creating an

"actual conflict of interest that tainted the Debtors' restructuring of its debt, the Debtors'

negotiation of a plan, and the Debtors' ultimate emergence from bankruptcy." *Id.* at 346.

The *Coram* court held that "[a]s a result of these peculiar facts," allowing postpetition

interest at the contract default rate would not be "fair and equitable." *Id.* at 347

(emphasis added).[19]  Thus, *Coram* is fully consistent with the Sixth Circuit's holding in

*Dow Corning* that only "compelling equitable considerations" will overcome the

presumption that the contract default rate of interest applies. *Dow Corning*, 456 F.3d at

679.

71.    The other decisions cited by the Debtors, *In re Adelphia*

*Commc'ns*[20] and *In re Loral Space & Commc'ns Ltd.*[21], have no bearing here. *Adelphia*

involved a contest between *creditors*, not creditors versus equity.[22]  In weighing the

interests of "parent" debtor creditors versus "subsidiary" debtor creditors, the court

observed that "under the facts of this case, awarding interest at a lower rate won't reward

insiders, or for that matter, even innocent public equity; as a practical matter, it will

merely shift value from one creditor constituency to another." (*See Adelphia* Tr. at

---

[19]    The Debtors also erroneously rely on *Vanston Bondholders Protective Committee* v. *Green*, 329 U.S. 156, 67 S.Ct. 237 (1946), where the debtor was insolvent.  In *Vanston*, the Supreme Court rejected a claim of oversecured mortgage bondholders to postpetition interest, finding that the interest on interest was in the nature of a penalty for nonpayment and that subordinate creditors would have borne a greater loss if interest on interest were paid. *Id.* at 166.  The Court, however, observed that in other cases, "where an estate is ample to pay all creditors and to pay interest even after the petition is filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." *Id.* at 164-65.

[20]    *In re Adelphia Commc'ns*, Case No. 02-41729, Bench Ruling (Bankr. S.D.N.Y. April 27, 2006) (Ex. D. to the Objection).

[21]    *In re Loral Space & Commc'ns Ltd.*, Bench Ruling, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005) (Ex. E. to the Objection.).

[22]    *See* Objection at p. 11, ¶ 29, and p. 14, ¶35.

---

p. 14:16-23, attached to Objection as Exhibit D). Thus, in rendering its decision, the *Adelphia* court was concerned with protecting the recoveries of different creditor groups[23] – a concern that does not arise here. *See Ruskin*, 269 F.2d at 831. Because the interest of the shareholders remain subordinate to creditors' claims, the equitable rules governing contests between creditors simply do not apply.

72.      *Loral* is also inapposite. There, the court found that the debtor was *insolvent* and concluded that equity would not receive any recovery, regardless of whether the contract rate of interest or the federal judgment rate of interest applied. (*See Loral* Tr. at pp. 21:20, 37:7-10, attached to Objection as Exhibit E).

73.      In sum, *Dow Corning* and its progeny stand for the proposition that where, as here, the debtor is or is effectively solvent, a chapter 11 plan that fails to pay the contract default rate of interest to creditors is not "fair and equitable" and cannot be confirmed. These cases apply a presumption in favor of enforcing the creditors' contractual rights, a presumption only overcome by compelling equitable considerations. Let us turn, then, to a consideration of the equities.

## IV.
## THE EQUITIES WARRANT PAYMENT OF
## POSTPETITION INTEREST AT THE CONTRACTUAL DEFAULT INTEREST

74.      Each of the Debtors' equity-based arguments is meritless and falls far short of showing that any of the Bank Lenders' conduct defeats the overwhelming "presumption" of an entitlement to contract default interest.

---

[23]      *See* Adelphia Tr. at pp. 15-17.

A.      **The Default Contract Rate Is Reasonable and Not Inequitable or Exorbitant**

75.      All of the equitable factors traditionally considered by courts

mandate payment of default interest.  The default rate represents only a 2% increase from

the Credit Agreements' base interest rate; such a default rate is consistent with

commercial loans of a similar character, and falls well within the range accepted by other

courts.  *See, e.g., Future Media*, 2008 WL 2610459 at *1 (2% increase between default

and pre-default rate), *Southland*, 160 F.3d at 1060 (2% spread between default and pre-

default interest rates was considered small); *In re Terry Ltd. P'ship*, 27 F.3d at 244 (3%

spread not unreasonable); *In re Ace-Texas, Inc.*, 217 B.R. at 724 (2% spread reasonable

and appropriate in the light of other cases allowing 3% and 4.3%); *In re Vanderveer*

*Estate Holdings, Inc.*, 283 B.R. 122, 131 (Bankr. E.D. N.Y. 2002) (5% difference

between default and non-default rate is reasonable); *In re Vest Assoc's*, 217 B.R. at 703

(5% difference between default and non-default rate reasonable); *In re Skyler Ridge*, 80

B.R. 500, 510-511 (Bankr. C.D. Cal. 1987) (4% difference between default and non-

default rate is reasonable and enforceable); *see also In re Ace-Texas, Inc.*, 217 B.R. at

724 (suggesting that rate of 26% and 36% would be exorbitant); *In re Liberty Warehouse*

*Assocs. Ltd. P'ship*, 220 B.R. 546, 551-552 (Bankr. S.D.N.Y. 1998) (22.8% rate is not

exorbitant when the debtor is solvent).

B.      **The Bank Lenders Have Enriched the Debtors and Have Not Done**
        **Anything to Impede The Administration of these Bankruptcy Cases**

76.      Rather than impede progress in these cases, the Bank Lenders have

made the administration of these cases possible because the Debtors have had the use of

the Bank Lenders' low-interest loans (the base rate was as low as 4% at one point) over

the course of the last seven years.  Under these circumstances, equity weighs in favor of

payment of default interest. *See Cont'l Invest. Corp.*, 679 F.2d at 269 (enforcing contract

provision is "fair and equitable inasmuch as the solvent debtor's estate will have been

enriched by the bankruptcy trustee's use of money which the debtor had promised to pay

promptly to creditor, and correspondingly, the creditor will have been deprived of the

opportunity to use the money to *his* advantage) (emphasis in original); *In re Consol.*

*Operating Partners L.P.*, 91 B.R. at 117 ("The equities of this case do not favor any

deviations from the imposition of the Late Payment Rate. The benefit derived from any

reduction in the contract rate would not inure to the creditors but instead would be a

windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid

the cost of default rate interest could file for Chapter 11. No such result was intended by

Congress."); *see also Ruskin*, 269 F.2d at 832 ("where there is no showing that the

creditor entitled to the increased interest caused any unjust delay in the proceedings, it

seems the opposite of equity to allow the debtor to escape the expressly-bargained-for

result of its act."); *Sheppley*, 62 B.R. at 277 (*citing Ruskin*, 269 F.2d at 832).

C.    **The Bank Lenders Are Not And Were Never Bound by the Prior**
      **Failed Agreements Between the Debtors and the Creditors' Committee**

        77.    The Debtors cry foul and disingenuously complain that the Bank

Lenders have somehow reneged on failed agreements to which the Bank Lenders were

never parties. There is nothing inequitable about the Bank Lenders refusing to accept

prior agreements in which they were never joined, reached under different circumstances

involving wholly different plans, and which in any event, have long since expired by their

own terms.

        78.    The Bank Lenders were not party to any agreement among the

Debtors and others, and the Creditors' Committee – a separate entity from the individual

Bank Lenders and other creditors with fiduciary duties to all unsecured creditors – had

neither the authority nor the power to bind the Bank Lenders, to either the Failed 2005

Agreement or the Failed 2006 Agreement. *See In re Kensington Int'l Ltd.*, 368 F.3d 289,

315 (3d Cir. 2004) (creditors' committee does not have the authority to bind each

individual creditor.) Nor did either Failed Agreement purport to bind the Bank Lenders;

to the contrary, the Creditors' Committee repeatedly communicated to the Debtors that

the Bank Lenders expected default interest and that the Debtors should not enter into any

settlement which did not provide for payment of such interest – precisely what the

Debtors went ahead and did anyway.  Remarkably, they now seek to impose the terms of

the Proposed Asbestos Settlement on the Bank Lenders under the guise of equity.

79.     Even assuming that some subset of the Bank Lenders (the

members of which have long since sold their claims) took part in earlier negotiations or

agreements, the Third Circuit in *Armstrong* flatly rejected arguments that creditor

participation in drafting the plan justifies a departure from, or even a flexible application

of, the absolute priority rule.  To the contrary, the *Armstrong* court expressly held that a

court cannot silence a creditor's objection merely because the creditor was "an active

participant in the reorganization process." *Id.* at 518.

80.     There is also nothing inequitable about a group of creditors

changing its position as circumstances change, even if the Debtors relied on the position.

In *Armstrong*, the Debtors based their plan on an actual agreement with the creditors

committee and the asbestos personal injury plaintiffs; the creditors committee later

changed its position as circumstances changed.  In upholding the right of the Creditors

Committee to change its mind, the District Court in *Armstrong* observed:

> in the absence of bad faith, which was not alleged here, and
> particularly in light of the changed circumstances, until a
> party consents and the consent is final, that party may walk
> away from the table for a good or bad reason or no reason
> at all.

*In re Armstrong World Industries, Inc.*, 320 B.R. 523, 534, n. 24 (D.Del.2005) *citing In the Matter of Huckabee Auto. Co.*, 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981). Equity is surely not served by a ruling that punishes individual creditors for the actions of the Creditors' Committee.

81.    In any event, as discussed above, the Debtors never implemented the Failed 2005 Agreement or the Failed 2006 Agreement and a number of the conditions for termination of those Agreements have undeniably occurred.

**D.    The Debtors' Arguments that Payment of Contract Default Interest Jeopardizes the Proposed Asbestos Settlement is Not Tenable**

82.    According to the Debtors, granting the Bank Lenders default interest would "seriously compromise" any hope of achieving a consensual resolution and jeopardize these cases. (Objection at pp. 15-16, ¶39). Courts have repeatedly rejected this argument as a justification for circumventing the absolute priority rule. It is black letter law that the protections of section 1129(b) cannot be ignored, no matter how protracted, no matter how complex the case. *See, e.g., Iridium*, 478 F.3d at 465; *AWECO*, 725 F.2d at 299 (*citing Protective Committee v. Anderson*, 390 U.S. 414, 450, 88 S.Ct. 1157, 1176 (1968)) (need for expedition is not a justification for abandoning proper standards.)

83.    The Third Circuit considered the very clash between the chapter 11 goals of debtor rehabilitation and the absolute priority rule in the context of a settlement between asbestos claimants and existing equity, and its decision was unequivocal:

benefits associated with a settlement cannot overcome the absolute priority rule.

*Armstrong*, 432 F.2d at 518 ("We recognize that the longer that the reorganization

process takes, the less likely that the purposes of Chapter 11 (preserving the business as a

going concern and maximizing the amount that can be paid to creditors) will be fulfilled.

Nevertheless, we conclude that the absolute priority rule applies [and] we . . . deny

confirmation of [Armstrong's] plan").

84.     Similarly, in *Iridium*, although the Second Circuit found that the

case-resolving settlement had substantial benefits, including avoiding expensive and

protracted litigation, it nonetheless vacated approval of the pre-plan confirmation

settlement for failing to conform to the absolute priority rule. *Iridium*, 478 F.3d at 465-

466.

85.     In *AWECO*, the Fifth Circuit ruled that a court could not approve a

pre-plan confirmation settlement unless it complied with the absolute priority rule. 752

F.2d at 298. While observing that testimony at the lower court indicated that a settlement

of the litigation would give the debtor its only chance at reorganization,[24] and expressing

sympathy for the bankruptcy judge "who has suffered the travails of months filled with

the problems of the debtor and its creditors" . . . and acknowledging that "preserving a

settlement potentially advantageous to the debtor and its creditors is a worthy goal,"[25] the

Fifth Circuit vacated the lower court's decision. *Id.* at 299. It could not conclude that the

settlement complied with the absolute priority rule. *Id.* at 299. Indeed, the Fifth Circuit

found that a "bankruptcy court abuses its discretion in approving a settlement with a

---

[24]    *Id.* at 297.

[25]    *Id.* at 299-300.

junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors." *Id.* at 298.

86.     The decision on which the Debtors rely, *A.H. Robins*, does not hold otherwise. There, the District Court only disallowed creditors' claims for punitive damages because the size of the potential liability was so "staggering" that it jeopardized other creditor recoveries. *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988). The *A.H. Robins* court concluded that it "would not be fulfilling its duties in the oversight of this bankruptcy if it were to allow a windfall claim to certain creditors that could jeopardize the full compensation of claims to all others." *Id.* at 563-64. To allow the Bank Lenders' claims in full at the default interest rate would not impact other creditors' recoveries; it would merely reduce equity's recovery to its proper amount.

87.     Under any account, the Debtors have failed to allege any inequitable conduct on the part of the Bank Lenders that would support a reduction of the contractual default interest rate set forth in the Credit Agreements. In the end, the Debtors' real complaint is that the Bank Lenders' won't "go along" and voluntarily give up approximately $100 million of value to equity interest holders. If insisting on contractual rights amounts to "inequitable conduct," then the solvent debtor exception that has to apply here serves no purpose.

E.     **The Bankruptcy Codes' Anti-Ipso Facto Provisions are Not Relevant**

88.     The Debtors offer a hodge-podge as their final equitable argument. They say that (i) it is inequitable to pay default interest because the Debtors could not pay interest during the chapter 11 cases; and (ii) because there can never be a postpetition default, there can never be default interest. As a logical matter, at a minimum, the

Debtors' assertion means that no creditor *could ever* obtain pendency interest at the contract default rate *unless* a default occurred prepetition. That is simply not the law.

89.    The Bankruptcy Code does not shield a debtor from default on its obligations. Indeed, debtors can and do default on their obligations postpetition. *See AM-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F.Supp. 2d 235, 241-43 (S.D.N.Y. 1998) (finding that debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of such surety's obligations); *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986) (addressing situation in which debtor defaulted on payments of principal and interest while in Chapter 11).[26] The Bankruptcy Code merely prevents creditors from immediately enforcing the consequences of a pre or postpetition default. It does not insulate the Debtors from the occurrence of a default in the first instance.

90.    Bankruptcy courts also enforce bankruptcy default provisions all the time. *See, e.g., Anchor Resolution Corp. v. State Street Bank and Trust Co. of Conn. (In re Anchor Resolution Corp.)*, 221 B.R. 330, 337 (Bankr. D. Del. 1998) (enforcing a make-whole provision triggered by an event of default, even where the "default" was the filing of a bankruptcy petition); *United Merchants & Mgfs., Inc. v. Equitable Life*

---

[26]    The authorities that the Debtors cite lend no support to their position. In *Carrieri* v. *Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004), the Fifth Circuit held that a subordination agreement *would* be enforceable in bankruptcy and that an equityholder whose redemption right had not vested prior to the bankruptcy could not exercise the right during bankruptcy. The issue here, of course, is not whether the Bank Lenders' "right" to default interest matured before bankruptcy, but whether the Debtors can escape their contractual obligations to pay interest at the default rate solely because they filed for bankruptcy. In *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006), the court held that ipso facto clauses "by which a contract is *terminated* as a result solely of the debtor's insolvency or bankruptcy" are generally disfavored under the Bankruptcy Code. *Id.* at 640 (emphasis added). The Bank Lenders, of course, do not want to terminate the Credit Agreements – they want to enforce them.

*Assurance Co. of the United States (In re United Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages provision triggered by the filing of a Chapter XI petition rather than by some other event of default).[27]

91.    The Debtors' focus on the bankruptcy itself as a default, however, is both factually incorrect and legally irrelevant. The Bank Lenders do not rely merely on the bankruptcy default; the Debtors have in fact defaulted on numerous payment and non-payment provisions of the Credit Agreements. While the Debtors' theory appears to be that any and every postpetition default is somehow attributable to an "ipso facto" clause, enforcement of the consequences of payment defaults do not require the enforcement of "ipso facto" clauses. Courts do not regard payment-related default provisions as "ipso facto" clauses, and in fact recognize that postpetition defaults are to be enforced and do enforce such rights in accordance with a creditor's contracts. *See In the Matter of Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524 (7th Cir. 1986).

92.    *Chicago, Milwaukee* involved the exact question at issue here: whether certain debenture holders should receive principal <u>plus</u> interest on their bonds where the indenture trustee declared a default *after* the debtor filed its petition. *Id.* at 525-26. The debtor objected to the debenture holders' claims for principal <u>plus</u> interest on principal during the default years, arguing that "repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed." *Id.* The Seventh Circuit

---

[27]    The single case cited by Debtors to the contrary, *In re Nextwave Personal Commc'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000), cites no authority for its conclusion that a postpetition payment default does not constitute a "default," nor has it been followed for this point. *Nextwave* also involved the termination of an estate agreement as a result of the default – which is the consequence that "ipso facto" clauses are intended to prevent; the Bank Lenders are not seeking termination of a contract or of an agreement. Moreover, in light of *United Merchants & Mgfs., Inc.* v. *Equitable Life*, 674 F.2d 134, *Nextwave* clearly is erroneous under Second Circuit law.

upheld the lower court's decision to permit acceleration of the principal and interest in accordance with the terms of the indentures, based on the occurrence of the default declaration *after* commencement of the bankruptcy case. *Id.* The Court found that if the bankrupt is solvent, the task for the bankruptcy court is simply to enforce creditors' rights (including defaults) according to the contracts that created those rights; anything else constituted a windfall for the Debtors – and one of those rights in that case was the right to accelerate the repayment of principal. *Id.* at 527-28.

93.    Significantly, the Seventh Circuit flatly rejected arguments identical to those advanced here; the Court summarily dismissed the debtor's argument that it should be excused from the consequences of its default because it could not make payments in bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared,
> a default under clause (a) [a payment default] was
> impossible because the debtor could not have repaid the
> principal immediately if it wanted to. Defaults are often
> involuntary.

*Id.* at 529.

<h2 style="text-align:center">V.</h2>

## THE BANKRUPTCY COURT CANNOT REWRITE THE CREDIT AGREEMENTS TO AWARD THE DEBTORS A WINDFALL

94.    The Debtors' final "equitable" argument illustrates the inequitable conduct of the Debtors, not the Bank Lenders. The Debtors – who did not even invite the Bank Lenders to participate in the settlement negotiations – effectively ask this Court to implement this settlement over their Objection so as to: (a) rewrite the Credit Agreements with a lower interest rate, (b) rewrite the Credit Agreements as if bankruptcy and failure to pay amounts when due were not events of default, and (c) read numerous other

covenants that the Debtors have violated over the last seven years out of the Credit

Agreements altogether.[28]

95.    Courts cannot rewrite contracts to provide debtors with a windfall.

As the Supreme Court recognized:

> Property interests are created and defined by state law.
> Unless some federal interest requires a different result,
> there is no reason why such interests should be analyzed
> differently simply because an interested party is involved in
> a bankruptcy proceeding.  Uniform treatment of property
> interests by both state and federal courts within a State
> serves to reduce uncertainty, to discourage forum shopping,
> and to prevent a party from receiving "a windfall merely by
> reason of the happenstance of bankruptcy."

*Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918 (1979) (*quoting Lewis v.*

*Manufacturers National Bank*, 364 U.S. 603, 609 (1961)).

96.    The Debtors are looking for precisely such a windfall here.  They

do not challenge the validity of the Bank Lenders' claim for postpetition interest under

applicable state law.  Nor, when all other creditors receive full payment and equity retains

an interest currently valued by the market at approximately $2 billion, can they

reasonably contest their ability to pay.

97.    On these facts, permitting the Debtors to escape their state-law

contract obligations triggers the three concerns articulated in *Butner*:  (i) it renders the

enforceability of state rights uncertain; (ii) it encourages forum-shopping; and (iii) it

gives the Debtors a windfall by permitting them to satisfy their debt obligations at a

---

[28]    *See, e.g.,* Credit Agreements §§ 10(a) (failure to pay principal or interest when due); 9.1(a) (certain
financial covenants); 9.3 (prohibition on fundamental changes); 9.5 (acquisition of additional debt).

reduced rate of interest, while at the same time using the monies provided under the

Credit Agreements to fund these bankruptcy cases for the past seven years.

## VI.
## THE "BEST INTERESTS OF CREDITORS" TEST DOES NOT PRECLUDE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE

98.     Finally, the Debtors purport to apply the "best interests of

creditors" test under 11 U.S.C. 1129(a)(7), and not surprisingly, conclude that the federal

judgment rate constitutes the only interest rate available to the bank debt holders.

(Objection at pp. 11-12, ¶¶ 28-30).  This argument completely misses the mark.  In

chapter 7 cases, section 726(a)(5) recognizes that creditors should receive interest before

the return of any excess liquidation proceeds to the debtor, and it provides for the

payment of interest "at the legal rate from the date of the filing of the petition."  Although

courts have recognized that under section 726(a)(5), creditors of a solvent chapter 7 estate

may receive not less than postpetition interest at the federal judgment rate in accordance

with 28 U.S.C. § 1961(a), the federal judgment rate by no means amounts to the

maximum rate applicable in a chapter 11 solvent debtor case.

99.     The "best interests of creditors" test of Section 1129(a)(7)

"requires that an impaired claim-holder who does not accept the proposed plan must

'receive . . . under the plan . . . property of a value . . . that is not less than the amount that

such holder would . . . receive . . . if the debtor were liquidated under chapter 7.'"  *In re*

*Dow Corning Corp.*, 244 B.R. 678, 686 (Bankr.E.D.Mich.1999) (*quoting* 11 U.S.C.

§ 1129(a)(7)(A)(ii)) (ellipses in original).  As the bankruptcy court held in *Dow Corning*,

the federal judgment rate does not limit what a claimant in a chapter 11 solvent debtor

case may receive:

> But what must be remembered is that by its own terms, the best-interests test simply establishes a *minimum* payment requirement. *See* 11 U.S.C. 1129(a)(7)(A)(ii) (The creditor must receive property of a value "not less than the amount" which would be received under chapter 7 (emphasis added)) . . .. Thus the upshot of the best-interests test is that the creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is *at least* equal to the federal statutory rate. We are unwilling to infer from this that Congress intended to preclude creditors from being paid at a higher rate.

*Id.* (emphasis in original).

100.    Importantly, the bankruptcy court held that restricting creditors to postpetition interest at the federal judgment rate in solvent debtor cases could not be "reconciled with the <u>central role of contract rights</u> in a pending reorganization." *Id.* at 685 (emphasis added).

101.    The Debtors have also failed to provide any legal support for their argument that the "best interests of creditors" test limits the Bank Lenders to the federal judgment rate. Although the Debtors cite three cases for the proposition that courts have "consistently interpreted the 'legal rate' of interest to be the federal judgment rate," (Objection at pp. 11-12, ¶ 29), those cases do not support the Debtors' position that interest at the federal judgment rate imposes a ceiling on recovery. *See In re Coram Healthcare Corp.*, 315 B.R. at 346 (the court held that "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11" and <u>rejected</u> the proposition that the Section 1129(b) requires postpetition interest at the federal judgment rate); *In re Adelphia Commc'ns* Bench Ruling, Case No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) (Objection, Ex. D) (the court held that under the "fair and equitable test" of Section 1129(b), it had

the discretion to determine the equitable rate of pendency interest, and held that an adjusted contract rate was appropriate under the facts of that case); *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) (the issue was whether the state statutory judgment rate or the federal judgment rate should apply to the payment of postpetition interest on a state court judgment. While the Ninth Circuit reasoned that the single federal judgment rate was appropriate to promote uniformity, largely because there was no contract rate to apply, the court did not have to determine whether the federal judgment rate applied versus a contract rate (or contract default rate)).[29] Moreover, as for *Cardelucci*, the recent Ninth Circuit ruling in *Future Media* confirms that *Cardelucci* stands for nothing more than what is the legal rate in the Ninth Circuit for purposes of section 726(a)(5) and has no applicability to section 1129(b)'s fair and equitable test.

102.    In sum, the Debtors' argument that Bank Lenders can only receive the federal judgment rate of interest under the "best interests of creditors" test of 11 U.S.C. 1129(a)(7) is simply wrong.

---

[29]    The Debtors also cite *In re Loral Space & Commc'ns Ltd.*, Bench Ruling, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005) (Ex. E to Objection), but this case is completely inapposite. In *Loral*, the court found that the debtor was insolvent, but held in dicta that if the issue of postpetition interest was relevant, it would have <u>rejected</u> the federal judgment rate in favor of the non-default contract rate. (Tr. at 41). The contract default rate was not even at issue.

## CONCLUSION

For all of the foregoing reasons, the Bank Lenders respectfully request that this Court overrule the Objection as procedurally improper or, if it considers the Objection, overrule it on the merits, and grant the Bank Lenders such other and further relief as this Court deems just and proper.

Dated: Wilmington, Delaware
July 11, 2008

LANDIS RATH & COBB LLP

Adam Landis (No. 3407)
Richard Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Telecopier:  (302) 467-4450

- and -

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Telecopier:  (212) 757-3990

*Attorneys for The Bank Lender Group*