```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE


IN RE:                       )  Case No. 01-01139(JKF)
                             )  (Jointly Administered)
W.R. GRACE & CO., et al.,    )
                             )  Multipurpose Room
                             )  824 Market Street
                 Debtors.    )  Wilmington, Delaware 19801
                             )
                             )
                             )  July 22, 2008
                             )  9:33 A.M.



                       TRANSCRIPT OF HEARING
           BEFORE HONORABLE JUDITH K. FITZGERALD
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:         Kirkland & Ellis,
                         By:  DAVID BERNICK, ESQ.
                              THEODORE FREEDMAN, ESQ.
                              JANET BAER, ESQ.
                         200 East Randolph Drive
                         Chicago, Illinois 60601

For Official Committee   Stroock & Stroock & Lavan LLP
                         By:  KEN PASQUALE, ESQ.
                         180 Maiden Lane
                         New York, New York 10038-4982

ECRO:                    NICOLE SCHAEFER

TRANSCRIPTION SERVICE:   TRANSCRIPTS PLUS
                         435 Riverview Circle
                         New Hope, Pennsylvania 18938
                         Telephone:  215-862-1115
                         Facsimile: 215-862-6639
                         e-mail CourtTranscripts@aol.com
```

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

Appearances:
(Continued)

For the PD Committee:          Ferry Joseph & Pearce, PA
                               By:  THEODORE TACCONELLI, ESQ.
                                    JAY SAKALO, ESQ.
                               824 North Market Street, No. 904
                               Wilmington, Delaware 19899

                               Bilzin Sumberg Baena Price
                               & Axelrod LLP
                               By:  SCOTT BAENA, ESQ.
                                    MATT KRAMER, ESQ.
                               Wachovia Building
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, Florida 33131-5340


For the ZAI Claimants:         Sullivan Hazeltine Allinson LLC
                               By:  ELIHU E. ALLINSON, III, ESQ.
                               4 East 8 Street
                               Wilmington, Delaware

                               Lieff Cabraser Heimann
                               & Bernstein, LLP
                               By:  ELIZABETH CABRASER, ESQ.
                               Embarcadero Center West
                               275 Battery Street, Suite 3000
                               San Francisco, CA 94111-3339

                               Richardson, Patrick, Westbrook
                               & Brickman, LLC
                               By:  EDWARD J. WESTBROOK, ESQ.
                               1037 Chuck Dawley Blvd., Building A
                               Mount Pleasant, SC 29464

For the Washington            The Scott Law Group, P.S.
Class:                        By:  DARRELL SCOTT, ESQ.

Appearances:
(Continued)

For the ACC:                    Campbell & Levine
                                By:  MARK HURFORD, ESQ.
                                1201 Market Street, 15th Floor
                                Wilmington, Delaware 19801

For Future Claims               Orrick Herrington & Sutcliffe
Representative:                 By:  RICHARD WYRON, ESQ.
                                Columbia Center
                                1152 15th Street, N.W.
                                Washington, D.C. 20005-1706

For the Canadian ZAI            The Hogan Firm
Claimants:                      By:  DANIEL K. HOGAN, ESQ.

For Unsecured                   Duane Morris, LLP
Creditors' Committee:           By:   RICHARD RILEY, ESQ.
                                1100 North Market Street, Suite 1200
                                Wilmington, Delaware 19801

For the Equity                  Kramer Levin Naftalis & Frankel LLP
Committee:                      By:  KEITH R. MARTORANA, ESQ.
                                1177 Avenue of the Americas
                                New York, New York 10036

For Maryland Casualty:          Connolly Bove Lodge & Hutz, LLP
                                By:  MARC PHILLIPS, ESQ.
                                The Nemours Building
                                1007 North Orange Street
                                P.O. Box 2207
                                Wilmington, Delaware 19899

TELEPHONIC APPEARANCES:

Marion Fairey, Gregory Boyer, Christina J. Kang, James Restivo,
Andrew K. Craig, Alan Runyan, Arlene Krieger, Debra Felder,
Robert Horkovich, Roger Frankel, Alex Mueller, Daniel Speights,
Walter Slocombe, Peter Lockwood, Marti Murray, Jennifer
Whitener, Lindsey Hoelzle, Samuel Rubin, David Beane, Scott
Baena, Douglas Cameron, Elizabeth Devine, Mark Shelnitz,
Terence Edwards, Richard Levy, David Bernick, Jaqueline Dais-
Visca, Matthew Kramer, Janet Baer, Martin Dies, Joseph
Schwartz, Robert Givone, Melanie Schmid, Lisa Esayian, and Erin
Van Valkenburg.

 1              THE COURT:  Okay.  That takes us back to W.R. Grace,

 2 Bankruptcy Number 01-11139.  The parties I have listed to

 3 appear by phone are Marion Fairey, Gregory Boyer, Christina J.

 4 Kang, James Restivo, Andrew K. Craig, Alan Runyan, Arlene

 5 Krieger, Debra Felder, Robert Horkovich, Edward J. Westbrook,

 6 Roger Frankel, Alex Mueller, Daniel Speights, Walter Slocombe,

 7 Peter Lockwood, Marti Murray, Elizabeth Cabraser, Jennifer

 8 Whitener, Lindsey Hoelzle, Samuel Rubin, David Beane, Scott

 9 Baena, Douglas Cameron, Elizabeth Devine, Jay Sakalo, Mark

10 Shelnitz, Terence Edwards, Richard Levy, David Bernick,

11 Jaqueline Dais-Visca, Matthew Kramer, Janet Baer, Martin Dies,

12 Joseph Schwartz, Robert Givone, Melanie Schmid, Lisa Esayian

13 and -- oh, that's all.

14              I'll take entries in court.  Good morning.

15              MR. BERNICK:  David Bernick for W.R. Grace.

16              MR. WESTBROOK:  Good morning, Your Honor.  Ed

17 Westbrook for the Barbanti ZAI certified class.

18              MR. SCOTT:  Good morning, Your Honor.  Darrell Scott

19 on behalf of the certified Barbanti class action.

20              MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo on

21 behalf of the Property Damage Committee.

22              MR. KRAMER:  Good morning, Your Honor.  Matt Kramer

23 also on behalf of the Property Damage Committee.

24              MR. HURFORD:  Mark Hurford for the ACC.

25              MR. WYRON:  Good morning, Your Honor.  Richard Wyron

1  for the FCR.

2         MS. CABRASER:  Good morning, Your Honor.  Elizabeth

3  Cabraser for the Barbanti Class.

4         MR. PASQUALE:  Good morning, Your Honor.  Ken

5  Pasquale for the Unsecured Creditors' Committee.

6         MR. HOGAN:  Good morning, Your Honor.  Daniel Hogan

7  for the Canadian ZAI claimants.

8         MR. TACCONELLI:  Good morning, Your Honor.  Theodore

9  Tacconelli for the Property Damage Committee.

10         MR. ALLINSON:  Good morning, Your Honor.  Elihu

11  Allinson for the ZAI claimants.

12         MR. O'NEILL:  Good morning, Your Honor.  James

13  O'Neill on behalf of Grace.

14         THE COURT:  Did I get everyone?

15                (No audible response heard)

16         THE COURT:  Mr. Westbrook, Mr. -- are you starting?

17  Okay.

18         MR. WESTBROOK:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MR. WESTBROOK:  Your Honor, Ed Westbrook appearing

21  this morning on behalf of the certified -- previously certified

22  Barbanti class action.

23         Your Honor, I have with me this morning Mr. Darrell

24  Scott, who is well known to the Court from his prior

25  appearances.  And Mr. Scott and I are pleased to have with us

1 this morning Ms. Elizabeth Cabraser from Lieff Cabraser firm in

2 San Francisco.   Ms. Cabraser is a well known advocate on class

3 action matters, has appeared in numerous state and federal

4 panels on class actions, and she is going to join us in

5 presenting this morning.

6        Your Honor, to use our time most efficiently, we've

7 divided our presentation into three parts.   I'm going to give a

8 brief historical perspective --

9        MR. BERNICK:   I'm sorry, Ed.   Can we know whether Mr.

10 Scott and Ms. Cabraser are -- are also appearing on behalf of

11 the -- what they call to be the certified Barbanti class?

12        MR. WESTBROOK:   Yes, they are.   Ms. -- Ms. Cabraser

13 was an original co-counsel with us in Barbanti.

14        MR. BERNICK:   Thank you.

15        MR. WESTBROOK:   Your Honor, I'm going to give a brief

16 historical perspective to put the Barbanti class into some

17 focus.   Mr. Scott will talk about the specific of the motion

18 today, and Ms. Cabraser will add some comments on how Barbanti

19 could perhaps fit into an overall resolution of ZAI, which is

20 near and dear to all of our hearts.

21        Your Honor, as to the background, in this bankruptcy,

22 over a time, I've heard some comments from Grace attempting to

23 cast class actions as perhaps an unfair device, a tool as

24 plaintiffs' lawyers use to put unfair leverage, we've heard

25 that term, on the debtor.   And whatever may be the case in

1  other circumstances, Your Honor, in my experience, class

2  actions in asbestos property damage have been very useful

3  tools.   We think they can be a useful tool in this bankruptcy

4  to resolve the ZAI situation.

5        Your Honor, I've prepared a few demonstratives to

6  help move us along.   First, Your Honor, is the role of class

7  actions in asbestos property damage, and resolving asbestos

8  property damage.   And, Your Honor, I think it tells us a few

9  things.   When Grace filed for bankruptcy, the Court may have

10  wondered why there weren't more asbestos property damage cases

11  pending against it.   And part of the reason is that Grace had

12  settled a large number of its claims prior to bankruptcy

13  through class actions.   We had the school asbestos litigation

14  which settled 36,000 school districts, about 14,000 of whom

15  were estimated to have asbestos, settled by Grace, never got to

16  this Court.

17        The Detroit Board of Education case was a Michigan

18  statewide class action settled for over 300 schools.

19  Kirbyville, down in Texas, Mr. Dies' cases, class action

20  included cities, counties, hospitals, and state buildings.

21  Over 800 claimants, never had to be individually addressed, and

22  the Prince George Center case, which was a group of private

23  office buildings leased to the federal government.

24        In addition, Your Honor, we have the Central

25  Wesleyan; Your Honor is familiar with the Central Wesleyan

1  case.  I'm counsel in that case.  We settled it with Grace just

2  before its bankruptcy, so it did not come to this Court or you

3  would have had 3,000 more claims of the college's.

4        But of particular relevance here, Your Honor, Central

5  Wesleyan was not settled with U.S. Gypsum before its

6  bankruptcy, and we brought that case into the U.S. Gypsum

7  bankruptcy.  Your Honor will recall U.S. Gypsum took the same

8  position Grace is taking today.  That is you shouldn't

9  recognized a previously certified class, that the class action

10 was a run around the bar date, that it wouldn't advance

11 matters, it would just complicate matters.  We filed briefs, we

12 got to the precipice, and then -- and from our perspective,

13 U.S. Gypsum got reasonable, from their perspective we got

14 reasonable.  And we were able to present to the Court a

15 settlement for the previously certified class that resolved all

16 those claims.  You lifted the stay, we were able to effectuate

17 that settlement through the class action.

18        My point, Your Honor, not to belabor it, is that

19 class actions are not some four-letter word in bankruptcy.

20 Class actions can help to achieve bankruptcy objectives.

21        Your Honor, there's an interesting case, In Re:

22 CommonPoint Mortgage out of the Western District of Michigan,

23 Chief Judge Gregg, in which he analyzes, in some detail, the

24 benefit that class actions can have in bankruptcy.  And I want

25 to just run through a few of those points as it relates to

1  what's coming up here in Barbanti.  Chief Judge Gregg said that

2  "Class actions are not inimicable to bankruptcy, they fit well

3  and harmonize with bankruptcy.  Class actions serve the goals

4  of efficiency, compensation, deterrence, and justice, which is

5  off the screen.   Efficiency, you get the common issues

6  litigated once and for all.  You have common counsel to speak

7  for all, you can streamline settlement discussions, and you can

8  resolve a large number of claims."

9          "As to compensation," and I think this is very

10  important here, Your Honor.  "Compensation" -- "The goal of

11  compensation is to have all creditors, large and small, treated

12  fairly."  Compensation doesn't give unfair leverage to a class

13  action.  But, in our view, Your Honor, it levels that playing

14  field.

15          With a class action, what you have for ZAI is a

16  $5,000 average claimant, homeowner in Pocatello, Idaho

17  confronting Mr. Bernick and Mr. Restivo, and their cast of

18  thousands.  In our view, that's not a level playing field.

19          Small claims represented through a class action can

20  get some compensation when we all know realistically in this

21  courtroom that without a class action, many, many ZAI claims

22  will not be pursued, homeowners will not go ahead.

23          Your Honor, deterrence, and Chief Judge Gregg said,

24  "Deterrence is a lesser goal, but it's still a goal in class

25  actions and in bankruptcy, especially in a reorganization case

1  because in a reorganization case, the debtor's going to go on

2  with its business.  You don't want a debtor to be able to know

3  that it can injure a lot of people in small ways, and just move

4  on and pay them nothing, reorganize."

5         We've heard, Your Honor, and God bless them, that

6  Grace's equity was $100 million when they went into bankruptcy,

7  it's now about a billion six.  That's wonderful, Your Honor.

8  But if they were to come out of bankruptcy with a billion six

9  and said, you know what, we didn't pay ZAI much of anything

10 because we were able to beat these folks down; that's not what

11 the bankruptcy system is all about.

12        And under justice, Your Honor, small claims can get

13 legal representation, and they have a meaningful opportunity to

14 participate.  To say that a ZAI homeowner has just as much

15 right as the banks to come in here and press its claim, well,

16 on paper that sounds right.  But in practicality, we all know

17 that that's not correct.

18        Your Honor, the ZAI class action, the Barbanti class

19 action, and the ZAI class actions in general, can form an

20 important part of the resolution of Grace's contaminated

21 vermiculate liability.  And they've made some strives already

22 recently in getting this partially put to bed.

23        Your Honor, this is a simplified scheme about the

24 distribution of vermiculate mined at the living mine.  It went

25 through Libby where some of it was taken home and put into

1  homes, some of it blew into the neighborhoods, it was taken to

2  expansion plants where it was expanded, and then in some

3  instances, Your Honor, a lot of instances it went to lumber

4  yards.  I left it out because that's not a claimant.

5        But also we've discovered in the ZAI science

6  discovery that some of the vermiculate was sold, in fact,

7  directly by Grace to homeowners.  So, this is the -- this is

8  the simplified distribution scheme.

9        Grace still has got to deal with the mine, I

10  understand.  They've just recently taken care of their

11  obligations in Libby, $250 million paid immediately to the EPA.

12  The vermiculate expansion plants contamination by vermiculate

13  liability was taken care of in another settlement, $44 million,

14  about half of which, as far as we can figure out just for the

15  vermiculate sites, there were some other environmental sites.

16  So, we have left Libby mine, and we have left the ZAI homes.

17        Your Honor, and this is the overall picture, this is

18  what we're --

19        THE COURT:  Excuse me one second.  What you're asking

20  me to certify, though, is a Washington State class, correct?

21        MR. WESTBROOK:  That's today's motion, Your Honor,

22  yes.

23        THE COURT:  Okay.  A Washington State class isn't

24  going to help me with Libby, Montana claims and ZAI homes.

25        MR. WESTBROOK:  No, Your Honor, that's finished.  My

1  point was --

2          THE COURT:  The homes aren't.  You just told me

3  they're not.

4          MR. WESTBROOK:  No, no.  I'm sorry, Your Honor.  The

5  Libby homes are finished.

6          THE COURT:  I thought you just said the ZAI Libby

7  homes are not finished.

8          MR. WESTBROOK:  No, no, I'm sorry, if I misspoke,

9  Your Honor.  The Libby homes and neighborhood, that has been

10 resolved.  That's part of the $250 million payment.  EPA was

11 remediating the homes in Libby --

12         THE COURT:  The homes and the neighborhood.

13         MR. WESTBROOK:  Yes.

14         THE COURT:  Okay.

15         MR. WESTBROOK:  In addition to other areas, but they

16 -- for about $30,000 a home, they were spending to clean up the

17 Libby homes.

18         THE COURT:  All right.

19         MR. WESTBROOK:  What we have left are non-Libby

20 homes, I should call them.

21         THE COURT:  All right.

22         MR. WESTBROOK:  Okay.  And then finally, Your Honor,

23 as part of the overall resolution of Grace's asbestos toxic

24 liability, what we have are a few blanks to be filled in.

25         First of all, on personal injury, Your Honor, they're

1    finished.  Before bankruptcy, they paid about $646 million.  In

2    bankruptcy, they've agreed to pay -- and this number, Your

3    Honor, is -- is as close as we can get an estimate from

4    somebody, two to two and a half billion dollars, for a total of

5    2.6 to 3.2.

6           Interesting, Your Honor, for traditional property

7    damage, before bankruptcy, Grace had actually paid more to the

8    property damage claimants than to the personal injury

9    claimants.  In this bankruptcy, the tail end of the traditional

10   property damage claimants, Grace has agreed to pay about 82

11   plus million.  The number goes up as they settle, so we'll --

12   so, that we have about three-quarters of a billion dollars they

13   paid for traditional asbestos property damage.

14          What we have left, Your Honor, the vermiculate

15   contamination situation.  Again, Libby mine, the homes and

16   neighborhood, environmental sites and the ZAI homes.  Before

17   bankruptcy, they paid nothing for any of those, denying

18   liability to all of those.  In bankruptcy, they've now paid for

19   the Libby homes, the neighborhood, they've paid for the

20   environmental sites, the vermiculate plants.

21          So, the question, Your Honor, is how do we get a

22   number in here for the ZAI homes?  This is what we're trying to

23   resolve.  Grace also has to resolve this, the Libby mine.  They

24   do that, they're done with their asbestos liability.

25          We believe, Your Honor, and Mr. Scott's going to

1 speak to that in a minute, that the Barbanti class action is

2 the first step in trying to put together a cohesive program to

3 resolve the claims of these small homeowners who otherwise

4 won't be on this chart.

5         Thank you, Your Honor.

6         THE COURT:  Well, maybe I'm asking the wrong person,

7 and if I am, Mr. Westbrook, you can defer the answer.  But how

8 is the Barbanti class going to solve all of the other ZAI home

9 issues?

10         MR. WESTBROOK:  Your Honor, I'm going to do exactly

11 what you said.  When Mr. Scott finishes, Ms. Cabraser's going

12 to speak about that in some detail.

13         THE COURT:  All right.

14         MR. SCOTT:  The question the Court just asked is

15 probably the most important question that will be asked today,

16 and I'm confident the Court will have an answer to that

17 question.

18         Elizabeth Cabraser, who has been class counsel on

19 this case since prior to the filing of this case, is the person

20 who can provide the Court with the most enlightening and,

21 indeed, the most enlightened view of that subject matter.  From

22 my part, let me say this, and then proceed to what I would like

23 to talk about.

24         The Barbanti class is a vehicle by which to give life

25 to a equitable claim which we view as a vision for global

1  resolution.  By demonstrating that the Washington class is

2  meritorious procedurally and substantively, it will become

3  apparent that that class should be expanded to a nationwide

4  class, or procedurally that a sister class proof of claim,

5  which covers all other classes, ought to be recognized because

6  of the merit.

7          We have steadfastly believed that when this Court

8  comes to understand the nature and the merit of these class

9  proofs of claim, they will prove themselves factually and as a

10 matter of law.  And we're willing to go through that fight in

11 order to establish it.  But in order to go through the fight,

12 you have to be able to bring a claim.  And that's what is

13 before the Court today.

14         I want to address just three things, and then turn

15 the lectern over to Elizabeth Cabraser who, I think, will be of

16 value to the Court in explaining how this motion is not an

17 impediment toward finality of Zonolite claims, it is a -- a

18 vehicle for resolution of those claims.  I want to do three

19 things:

20         Very briefly talk about the procedural history behind

21 the Barbanti class action;

22         Secondly, I want to talk about what the motion is,

23 and its merit;

24         And then very briefly, I want to talk about what the

25 benefits are of granting the motion and what the risks are of

1  not granting the motion.

2        The Barbanti class action was born in Spokane and in

3  my office.  It -- it was borne out of the very recent public

4  disclosure that Zonolite was contaminating with asbestos,

5  unlike traditional asbestos materials which contained asbestos

6  for some purpose, this was a contamination problem.  We

7  recognized that these are claimants who are unknown, and who

8  are almost certainly unknowing.

9        We also recognized that the number of homes involved

10  created such an intractable problem for the courts and for

11  Grace that a meaningful collective resolution needed to be

12  crafted.  We brought a class action asserting an equitable

13  claim, which sought prospective relief in order to avoid the

14  prospects of future injury.  We are trying to foreclose a third

15  wave of asbestos litigation, this time dealing with the new

16  subject of Zonolite.

17        We brought an equitable claim seeking unified

18  indivisible collective remedies which we thought would lower

19  the expense to what is now a debtor, create actual remedies for

20  actual people who have actual problems.  Rather than just

21  generate an exchange of monies with attorneys in between, and

22  would avoid the prospects of the Washington courts, and if our

23  MDL action were certified, all courts, from having to deal for

24  the next two or three decades with Zonolite claims.  We sought

25  programmatic remedies that provided notification.  Notification

1  to homeowners that the product was contaminated with asbestos,

2  but also notification to the real estate industry that the

3  product is contaminated with asbestos, including, for example,

4  home inspection industry.  Notification to trades persons who

5  would likely encounter the material, potentially disturb it and

6  contaminate living spaces, that it's contaminated with

7  asbestos.  In so doing, if we could prove to the court that

8  there was a legal basis for them assuming that responsibility,

9  it would avoid future liabilities.

10     Education:  We recognize that no matter how you count

11  the number of homes, if you multiply it by five or 10,000, the

12  figure becomes so astronomical that it is -- you have to search

13  for a different solution.  Our solution was to avoid, where

14  possible, the necessity of incurring the expense.  An

15  educational campaign that educated homeowners as to how to live

16  with Zonolite, how to manage Zonolite in place so they don't go

17  through the unnecessary expense of removing it when it needn't

18  be removed, and they don't, at midnight, try to remove it

19  themselves for fear of the value of their homes; a thing that,

20  in fact, happens.  Notification, education,

21  remediation/abatement.  We recognize that in -- in -- actually

22  many homes, Zonolite is not locked away in an attic, it

23  contaminates living spaces, and in ways that something needs to

24  be done now, and it requires an asbestos abatement team.  This

25  is a programmatic remedy that provides the resources, financial

1  and personnel, to accomplish abatement where necessary, and

2  remediation when necessary.  For example, when there's

3  remodeling of a home that -- that -- of necessity requires the

4  disturbance of Zonolite, which creates an expense.

5          We fought through cross certification with W.R.

6  Grace.  It wasn't a drive-by certification.  Mr. Restivo, Mr.

7  Flatey (phonetic), Mr. Cameron, Grace counsel from New York,

8  who was a class action specialist, all appeared, Grace's

9  experts testified.  The court put together a case management

10 order, discovery directed at the class certification issue, the

11 court had a large -- almost a full day hearing on the subject,

12 took it under advisement for, I believe two months it was two

13 months, and then issued a -- an order recognizing, certifying,

14 establishing a Washington class as an entity.  Not opt out

15 because the -- the claim sought and the remedy sought was an

16 indivisible thing.  It was either a thing that was meritorious

17 and owing to that community as a whole, or wasn't, and so it

18 was a non-opt out 23(b)(2) class action, and she appointed Mr.

19 Barbanti and ultimately Ralph Bush as the representatives for

20 that class.  She appointed me as lead class counsel, Elizabeth

21 Cabraser and Mr. Westbrook were additional counsel.  Mr.

22 Westbrook having endlessly more experience in the field of

23 asbestos and property damage claimants; Ms. Cabraser having

24 endlessly more experience in complex matters involving both

25 bankruptcy and class action, both of whom I invited because of

1  the importance of the litigation and its complexity.

2          We filed a federal action as a counterpart.  Mr.
3  Price, Mr. Prebble from Montana, who was in Missoula before the
4  judge who will now preside over the criminal trial against W.R.
5  Grace.  That case was MDL'd to Boston before Judge Saris, class
6  certification is briefed.  Within two weeks of the hearing on
7  class certification, bankruptcy occurred.  And so there never
8  was sort of the second shoe.

9          But our vision there gives this Court a vision as to
10  how this can proceed even in bankruptcy.  Our vision there was
11  a Washington class, which can -- can be promptly brought and
12  determined to be meritorious, can -- can be a vanguard
13  demonstrating the merit of both the procedure and the remedy,
14  and shedding light to the federal court on what it should do.
15  And if we were wrong, it would be fatal to our federal action.

16          Bankruptcy occurs.  First thing Mr. Barbanti and Mr.
17  Bush do is move for a property damage claimant -- committee.
18  Mr. Barbanti himself flew out to Wilmington, Delaware to appear
19  at the meeting of the first creditors, advocating for the
20  appointment of a committee and for himself as an appointee.
21  And he was appointed as class representative, the U.S. Trustee
22  appointed him.  He's one of the only individuals I can say who
23  actually, for the first couple of years, participated in the
24  committee meetings as an actual participant.  Mr. Barbanti and
25  Mr. Bush have perpetually met with me to discuss the progress

1  of this Washington class in these bankruptcy proceedings, and

2  they have been steadfast.  They, at the inception of this

3  bankruptcy, sought both recognition of their class and class

4  certification.  This Court deferred that issue to go through

5  the science trial.  And -- and -- and now, at the very first

6  opportunity to re-raise that issue, we have.  And they are now

7  here on the present motion.

8          What is the motion?  This motion does not ask the

9  Court to certify a class action.  That's reflected in the

10 pleadings, you might notice, which don't even address the

11 elements of class certification.  That's because this motion

12 isn't a motion for certification.  It is a motion for this

13 Court to recognize the agency relationship between Ralph Bush

14 and Marco Barbanti and the class they have an obligation to

15 represent.

16         It is a motion under Rule 303 that this Court merely

17 say, Mr. Bush and Mr. Barbanti are, in fact, by virtue of a --

18 an existing order, they are, in fact, agents of an existing in

19 fact class in a case which is in fact pending, albeit stayed,

20 in the State of Washington.  They have the authority to file a

21 claim, the exact claim they brought in that class action, in

22 these bankruptcy proceedings.  It is not a comment on the merit

23 of that claim.  It is not a comment on whether the class device

24 ultimately will prove itself to be a valuable device in

25 bringing finality to Zonolite claims.  It is only a recognition

1   that the -- they have the authority to file a claim as agents

2   of individuals they, in fact, represent.

3          And that if they are not permitted to file that

4   claim, then that -- then there is no voice for those claimants,

5   and that claim has no existence because it can only be brought

6   collectively.  And in this case, only through their

7   representatives.

8          What is the merit of the motion?  Why should a court,

9   and -- or -- I didn't say when must a court -- at least

10   recognize the authority of a existing representative to file a

11   claim on behalf of the agent or the principal they represent.

12   The opinion, In Re: Kraft, 2005 is -- is -- I think the most

13   informative valuable case.  It is a Bankruptcy Court decision

14   2005 out of the Northern District of Texas.  There's a variety

15   of cases that deal with the subject as to whether a Bankruptcy

16   Court can recognize a class and proceed on a class basis, and

17   what are the factors that determine whether it ought to allow

18   the class to proceed through bankruptcy.  And quite often,

19   those are cases where there was no pre-certified class.

20          There are a variety of other cases where there was a

21   pre-certified class, but they're very unique circumstances.

22   There was a judgment.  And so it's really enforcement of a

23   judgment, or some other anomaly isn't akin to this case.

24          In Re: Craft is -- is four-square this case.  In Re:

25   Craft, the court was presented with two motions:  One,

1  presented by a pre-certified class, the other presented by a

2  individual who sought to represent a class.  The one motion was

3  a motion for recognition of the class, and of the authority to

4  file the claim, and no more.  And the other was a motion for

5  class certification.

6          And the court, embracing the <u>In Re: American Reserve</u>

7  opinion, as most courts actually have, said, class device can

8  be perfectly appropriate, that's not to say it is in all cases,

9  but it can be.  And, therefore, as to the existing class, do

10  they have the authority to file a claim?  And the court

11  determined that under Rule 303, a -- a class certified by

12  another court, and representatives appointed by another court,

13  an existing order to that effect gives that representative the

14  authority to file that claim on behalf of that class.  The

15  affect is the class is before the court.  For better or worse

16  of that class, they're here, and their claim can be determined

17  not meritorious, meritorious, but they're at least before the

18  court, and that's what the court determined.  It's a certified

19  class, they have authority to bring the class before the court.

20          As to the other, the court said it's a different

21  analysis.  Here I have to engage in Rule 23, I have to weigh

22  the considerations as to whether it complicates the bankruptcy,

23  we have to look at the Rule 23 elements itself, and didn't

24  certify the other class.  I - if I recall, it was because it

25  was fairly late in the game, and it made things too complex.

1          We are only here asking that the Court recognize that

2  Mr. Barbanti and Mr. Bush undertook an oath in the State of

3  Washington, literally signed their names to a declaration that

4  they would be fiduciaries for owners and occupies of homes in

5  Washington.  The court not only empowered them, but burdened

6  them with the obligation of pursuing that claim, and me as

7  counsel, and the only thing we are asking is that the Court

8  open the courthouse door so that we can appear to do what we

9  say we can do.  Prove it's meritorious and prove it's best

10 managed on a class basis.

11         And if we lose either of those two, due process was

12 achieved because we have opportunity to be heard, which is all

13 we are asking.

14         What happens if the Court recognizes the class?

15 Well, counsel for Grace is perfectly skilled at contesting

16 claims.  And he has a proof of claim on behalf of a community

17 of Washington homeowners and we defend that claim against

18 whatever argument he wants to bring.  He can bring a motion for

19 decertification.  He can bring a motion to lift stay to have

20 the Washington Court of Appeals decertify.  He can bring a

21 motion saying the science trial wipes out the claim.  He can

22 bring a motion saying you're not entitled to this relief.  And

23 -- and we will defend that claim and prove not only

24 substantively it's meritorious, but that the class device is

25 the logical vehicle for providing a benefit to the debtors I'm

1  beginning to doubt they deserve, which is finality as to

2  Zonolite.

3         What happens if the Court doesn't recognize the

4  motion in front the Court?  Well, I don't have a client, Your

5  Honor.   You remember when -- I don't remember it was this

6  courtroom, I don't believe it was.  It was an omnibus hearing

7  where I appeared and Mr. Scott Baena wasn't present because it

8  was a non-event, omnibus hearing.  Mr. -- counsel for Grace

9  stood up and announced that they had filed proofs of claim on

10  behalf of my client, and we were going to have a science trial.

11  And I stood up and said they can have their science trial, but

12  my client cannot appear, and for that reason, will not appear,

13  because he is powerless if he is only an individual.  He cannot

14  -- he could not find counsel, he could not pay for counsel to

15  be here, and that's why we -- we went into -- as special

16  counsel.

17         Well, now as Elizabeth called us, we're -- we're non-

18  special counsel.  The science trial is in a hiatus, at the very

19  least.  And this -- this motion isn't a science trial motion.

20         We are in the exact same position.  If -- if the

21  authority of my client to file a unified claim on behalf of

22  that class is not recognized, then I don't have a client in

23  bankruptcy.

24         I am stayed in the Superior Court, prevented from

25  bringing it in Bankruptcy Court.  And then told by Grace

1  certainly post confirmation, I can't bring it then either
2  because it's either barred, or too late, or something or other.
3  It means the courthouse door was never, never opened.  I have
4  difficulty even imagining how -- and I can tell you this, too.
5  Mr. Barbanti, in assuming the -- the duties of a representative
6  has a duty to place the interests of that class above his own
7  financial interest.  That means if -- he isn't filing an
8  individual proof of claim to try to get some individual
9  monetary at law compensation for himself and abandon the class.
10  His obligation is to represent, for better or worse, for
11  victory or defeat, that class.  And his -- his only relief, if
12  this motion is denied, is before some other court.  And the
13  only court I know of that I can appear before would be some
14  other court.

15       So, this motion is a modest one, it only asks that
16  the courthouse door be opened and that an existing creditor,
17  the In Re: Trebled (phonetic) case, another bankruptcy case
18  said a pre-certified class is a single creditor, a single
19  existing creditor.

20       In only ask that the courthouse door be opened for
21  that creditor.  And -- and Grace can subject that creditor's
22  claim to whatever arguments it can imagine, and we have
23  confidence we can demonstrate to this Court it's meritorious.
24  And we will be able to demonstrate to the Court that the class
25  device, not only isn't a burden to this Court, it is -- it is

1 virtuous.

2         But those are not the issues before the Court, only

3 that the courthouse door not be closed.  And with that in mind,

4 I turn the lectern over to Elizabeth Cabraser, I still we have

5 another 15, 20 minutes of time.

6         Thank you.

7         THE COURT:  Ms. Cabraser?

8         MS. CABRASER:  Thank you, Your Honor.  Thank you,

9 Your Honor, and thank you for hearing us this morning and for

10 your patience throughout these proceedings.

11         The Barbanti Washington State class was a certified

12 class at the time of the Grace bankruptcy.  At the time of that

13 bankruptcy, there was a proposed nationwide class moving toward

14 certification in the District of Massachusetts under Federal

15 Judge Saris who was assigned the task as serving as MDL

16 transferee court for the litigation called  In Re: Zonolite

17 Attic Insulation, MDL 1376.

18         My role at that time was as a member of the court-

19 appointed executive committee charged with moving through the

20 briefing and hearing process on a nationwide class

21 certification.  We got through the briefing process.  Judge

22 Saris had set the class certification hearing for April 25th,

23 2001.  And the Grace bankruptcy was filed earlier that month.

24         Class proceedings have been in hiatus ever since.

25 You know, Your Honor, that the Zonolite claims are inherently

1  class claims.  You don't have individual claimants before you

2  at this time.  And as Mr. Westbrook and Mr. Scott have

3  explained and advocated at every opportunity  throughout these

4  proceedings, these are inherently collective claims for

5  equitable and injunctive relief.  And you have heard the mantra

6  of notification, education and remediation over and over and

7  over again without variance.  That is what these claims are.

8         You have before you today a creditor, a certified

9  class with a designated agent -- two designated agents; Mr.

10  Barbanti and Mr. Bush, who have, likewise, been present

11  throughout these proceedings.

12         So, you have agents, you have class representatives,

13  you have class counsel who have been designated, who have been

14  charged as fiduciaries by a court to represent this collective

15  claim, at least insofar as it has been certified for the

16  homeowners and residence of Washington State.

17         This existence of a fully and adequately represented

18  constituency solves the problem and provides what would

19  otherwise be a missing piece of the puzzle to enable Grace to

20  reorganize itself and to obtain that fresh start, which is the

21  purpose of these bankruptcy proceedings.

22         We're not here today seeking class certification of a

23  nationwide class.  And we're not asking Your Honor to revisit

24  at this time the previous class certification order in

25  Washington.

1          Your question is a fair one.  If that is the case,

2   and it is today, what is the ultimate purpose of allowing this

3   proof of claim as a class claim?  What good does it do to these

4   proceedings?  Does it provide a mechanism that is better, more

5   practical, more fair than any other mechanism that might exist

6   to enable this reorganization to proceed, either through a

7   consensual plan or through adjudication through further

8   litigation.

9          Last month Your Honor raised the suggestion of a

10  524(g) trustee.  Typically 524(g) has been utilized in asbestos

11  bankruptcies, as everyone in this courtroom knows far better

12  than I, to deal with personal injury claims as futures claims

13  become manifest.  And it provides a channel for those claims so

14  that the debtor can reorganize, can have that fresh start free

15  of fear of future litigation outside that predesignated

16  channel.  That enables shareholders to have confidence in the

17  new entity, it enables the public to have confidence in the new

18  entity, and it assures that multiple courts across the country

19  will not be involved for years and years and years with claims

20  that could have and should have been resolved in a proceeding

21  like this one.

22          That model has not been used, however, to address

23  claims like the ZAI claims; that's not a surprise.  These

24  claims are highly unusual, and perhaps they are unique.  We

25  have a confluence in this case, as Your Honor knows, of a

1 produce from one source, it was a branded product, it was

2 distributed nationwide.  It was used, not by businesses, or

3 sophisticated claimants, but in homes.  And most of those homes

4 harbor Zonolite insulation that is unknown to their owners.

5        As time progresses, the problem will become manifest

6 and homeowners will have to deal with it, regardless of the

7 level or degree of danger or risk of the product itself in

8 causing personal injury, the presence of that product in homes

9 when homeowners remodel, when they try to rent their homes,

10 when they try to sell their homes is going to impact the value

11 of those homes, is going to cost those homeowners money, and as

12 we all know today, it's homeowners who are bearing the brunt of

13 economic hard times.  These are small claims, they don't

14 attract lawyers on an individual basis.

15        When a personal injury claim for mesothelioma, for

16 example, becomes manifest at some point in the future, the

17 reason that a 524(g) trust mechanism works so well in

18 addressing that claim and assuring it can be resolved without

19 implicating the judicial process outside the Bankruptcy Courts

20 is that that claim has value.  It has value to a lawyer, it's a

21 known type of claim, the courts have experience and trustees

22 have experience in resolving that claim.  There isn't prior

23 experience in a 524(g) context --

24        THE COURT:  There wasn't -- there wasn't trier

25 experience in resolving asbestosis claims or, you know,

1  unimpaired claims in 524(g) trusts before they were set up

2  either.  I mean that's the same -- that's the same thing you

3  hear about cases being filed in the District of Delaware, "oh,

4  gee, the judges have experience."  Well, of course, they do

5  because cases are filed in the District in Delaware.  If they

6  were filed in the District of Iowa, Iowa judges would have

7  experience, too.  I mean that's a loop upon which, depending on

8  where you start, that's where you get off.

9          The fact that you don't have experience trying the

10  ZAI case in a 524(g) trust environment is an absolute

11  irrelevancy.  It hasn't been used in that context.  The

12  experience will come if the 524(g) process is used for that

13  purpose.  I mean you can't have the experience until the

14  circumstances warrant the experience being used.

15          MS. CABRASER:  We agree, Your Honor.

16          THE COURT:  Okay.

17          MS. CABRASER:  And it's -- every job applicant hears

18  you can't have the job until you've had experience with the

19  job.

20                    (Laughter)

21          THE COURT:  Exactly.

22          MS. CABRASER:   And -- and we sympathize.  And -- and

23  there's also the "there's always a first time," and there was a

24  first time for 524(g) trust, as well.

25          So, the real question is given that reality, is a

1 524(g) trust alone the best -- we -- we can predict, right,

2 what will be the best and most appropriate mechanism for a

3 given set of circumstances.  And 524(g) has proved itself

4 during the past 14 years in addressing future personal injury

5 claims.

6          Is it as effective in addressing these collective ZAI

7 claims?  And we would respectfully submit, Your Honor, that

8 authorizing and recognizing the Barbanti proof of claim today

9 enables us all to embark on an orderly systematic process of

10 determining just that question.  We believe, and we are

11 prepared to demonstrate in due course, that indeed a 524(g)

12 trust process is an appropriate process to use to address these

13 claims, but not alone; it needs a complement.  There is a

14 missing piece of the puzzle that dedicated specific loyal

15 representation of the ZAI constituency supply.  Because trusts

16 don't run themselves.  Trustees are fiduciaries.  Trusts are

17 given a source of funding, they're given a process, and they

18 implement that process and they depend on claims coming

19 forward.

20          In the case of a personal injury claim, that claim

21 will come forward.  Why?  It's a valuable claim.  Lawyers know

22 how to prosecute that claim.  They know the resolution values,

23 it's a known predictable entity.  It's become a systematic

24 process.  It's not just that this is as first time for ZAI.  It

25 is that the very nature of the claim is, number one, a claim

1 that sounds in programmatic collective relief.  How would a ZAI

2 claim come before a 524(g) trustee?  Through a class

3 representative, such as Mr. Barbanti.  So, the Barbanti class

4 is a part of that process.  It's not contradictory, it's not

5 inconsistent.

6        It enables the process to work as it was designed by

7 the Bankruptcy Code to work.  The trustee cannot go out and be

8 an advocate to bring those claims in.  That might even -- that

9 might even constitute a conflict of interest.  Certainly that's

10 a new role that no 524 trustee has ever had, to our knowledge.

11 And that would be new territory.

12        7023 of the Bankruptcy Rules is not new territory.

13 Class proofs of claim are not new territory.  Class

14 certification of equitable claims, programmatic claims, such as

15 this, are not new territory.  The courts have vast experience

16 with them.

17        The other aspect of these claims that you've heard

18 about this morning is that the monetary portion of these

19 claims, when a homeowner realizes that there's Zonolite in the

20 attic and has to disclose it, and has to deal with it, and

21 wants to remodel or sell or lease a piece of property, that

22 manifestation costs money.  It's real money to a homeowner.  In

23 the case of Mr. Bush, it was more money to remediate than his

24 equity in his property.  In the case of Mr. Barbanti, the need

25 to remediate one of his properties complicated and delayed and

1   diminished the sale value and the lease value of that property.

2   It's real impact on homeowners.  But it's not the level of

3   cost, it's not the magnitude of claim that most lawyers in this

4   country are equipped to deal with on an individual basis, it's

5   not feasible.  It costs more to bring, even in a Bankruptcy

6   Court with expedited proceedings, even through a trust

7   mechanism than it is worth.

8          All right.  Let's have -- let's ask lawyers to

9   aggregate those claims one after the other after the other.

10         THE COURT:  But where I'm losing this still is this,

11  I have a class proof of claim for the State of Washington, and

12  let's assume that I have a class proof of claim for homes in

13  the State of Washington, that still leaves me with 49 other

14  states.  Now, that may not be the case that ZAI was sold in all

15  49 other states, but let me just, for purposes of this

16  discussion, assume for the moment that it is.  I still have 49

17  other states, and several countries, without representation.

18  So, I have one class proof of claim that comes forward.  That

19  may solve, from your perspective as counsel for that class, the

20  problems for the homeowners in the State of Washington.

21         It doesn't, as I see it, solve the problems that

22  you're arguing would be solved for the debtor.  Because all it

23  does is solves the problems for the debtor with respect to the

24  homes in the State of Washington, but the debtor still has the

25  homes to address in the other 49 states, and wherever the other

1 countries are in which ZAI appears in homes.

2         MS. CABRASER:  Indeed, Your Honor.  Barbanti does not

3 complete the solution.  Barbanti enables the Court to embark on

4 the solution in an orderly way to see, for example, if the

5 Barbanti class, a discrete, previously certified Washington

6 State class, works in terms of addressing the merit of the

7 claims, the estimation of the claims.  It is, in effect, a

8 bellwether.  And one thing that the federal courts is use

9 bellwethers, they use exemplars to determine if, indeed, a

10 particular structure, a particular procedure, particular

11 counsel, particular claims work.

12         If the Court sees that the Barbanti class is a

13 constructive part of an overall plan, or an overall

14 adjudication of the bankruptcy, the next step, which is not

15 before Your Honor this morning, would be to consider the

16 expansion of the Barbanti class to include the states in which

17 Zonolite was distributed and in which it is in homes or to

18 certify a counterpart class for those remaining states.

19         You are way ahead of the game vis-a-vis other courts

20 who might similarly be considering the expansion of a state

21 right class into a nationwide class, or the addition of

22 additional states.  Because one thing you have, Your Honor, and

23 one thing that is quintessentially important to the bankruptcy

24 reorganization process is you have dedicated representation of

25 that constituency.  Mr. Scott and Mr. Westbrook have been here

1  from the beginning, they have pressed these claims from the

2  beginning.  The same claims asserted in Barbanti in Washington

3  State were asserted on a nationwide level in the cases that

4  were part of the Zonolite MDL, to which I referred.  Those

5  claims don't vary, it's the same claims, it's the same counsel,

6  it's the same type of homeowner experience.

7          So, you can extrapolate with confidence from the

8  Barbanti class as it works through its claims to the remaining

9  states.  But you have the problem in front of you today, and

10  you've had the problem in front of you since the inception of

11  the bankruptcy proceedings.  It's not just a Washington State

12  class, previously certified or not.  The nationwide class has

13  been waiting in the wings, the nationwide class is a -- is a

14  creditor or potential creditor.  And the claims by members of

15  those classes, now or in the future, complicate and prevent

16  Grace from achieving the comprehensive fresh start it wants and

17  would not allow this Court, with confidence, to say W.R. Grace

18  is reorganized, the claims are discharged, we have channels, we

19  have processes for every type of claim.  You'll have a channel

20  and a process for the P.I. claims, present and future.  You

21  have a channel and a process, an agreed sum for the traditional

22  property damage claims.  This proceeding needs a channel and a

23  process for the ZAI claims.  524(g) can be a vital part of that

24  process in terms of implementing and paying out claims and

25  funding programmatic relief.

1          But the creditors -- the creditor -- the creditor

2     class needs an advocate, it needs representation.  And this

3     Court is in the uniquely informed position to determine after

4     Mr. Scott and Mr. Westbrook, on behalf of Mr. Barbanti and

5     Bush, further demonstrate their dedication, their bona fides,

6     their experience, their adequacy in representing that class,

7     whether a larger class will be similarly represented, either by

8     them or by additional representatives.  You don't have to

9     decide that in a vacuum, it's not a matter of theory, it's been

10    a matter of practice before you for the past seven years.

11          THE COURT:  All right.  And why is it that the

12    Property Damage Committee itself is not appropriately

13    structured to represent the ZAI claims, without the need for a

14    -- for a class proof of claim or a -- or a class, whichever it

15    is?  I mean today you're only arguing a class proof of claim --

16          MS. CABRASER:  That's correct.

17          THE COURT:  -- but without that need.

18          MS. CABRASER:  And that's -- that's another very

19    excellent and profound question, and the answer is that a

20    committee of that type is necessary, it has been functioning,

21    it has been functioning well, but not necessarily sufficient to

22    represent that type of claim, given it's inherently collective

23    nature and given the very small values of the monetary claims

24    of its constituent members.

25          THE COURT:  But that's what committees do.  I mean

1  trade committees, for the most part, in most cases, represent

2  lots of very small claims, that's their whole purpose.  Most

3  trade creditors involved in cases have very small claims, given

4  the size of the claims pool altogether.  That's what trade

5  committees do.

6         I don't mean trade committees consisting of

7  bondholders and bank claims, I mean real trade committees.

8  Suppliers, you know, contractors, whatever you have, they're

9  very small claims, that's what committees are set up to do.

10 That's why we have committees.

11        So, why is it that a Property Damage Committee, which

12 is, by its very nature, a collective process, that's why you

13 have a committee, so that you can collectively aggregate the

14 small claims.  So, why is it that in this case when Mr.

15 Barbanti is already a member of that committee particularly,

16 and was appointed as a class representative, why is it that the

17 committee itself is not already set up to take cognizance of

18 the ZAI claims and do the bargaining with the debtor that needs

19 to be done to do exactly what you're suggesting?  And I'm not

20 making findings, I'm asking questions.

21        MS. CABRASER:  Um-hum.

22        THE COURT:  To -- to have a place at the table for

23 the ZAI claims.

24        MS. CABRASER:  The committee structure works well in

25 bankruptcy for small -- claims, large and small that are known

1  claims, such as trade claims.

2          You're right, Your Honor, most of those claims or

3  many of those claims, are small claims.  But they're existing

4  claims, for the most part, that are liquidated damages claim,

5  and because those claims are known, they can be added up.  A

6  committee structure does the job, and does the complete job.

7          Here, the committee structure for property damage

8  claims from the outset has been not quite an exact fit with

9  Zonolite.  It has certainly protected the interest, insofar as

10  it is able, of Zonolite claimants and those Zonolite claimants'

11  representatives on that committee.  But a committee alone is

12  not the best structure that is available under the Federal

13  Rules and under the Bankruptcy Rules to deal with claims that

14  have the unknown and unknowing aspect of these claims that are

15  both futures claims and small claims, and that require ongoing

16  programmatic advocacy and relief through repeated notification

17  and education over time so that people can learn of their

18  claims, learn what to do to mitigate their damages and harm,

19  and learn where to go to achieve the available relief, if

20  relief for this claim -- for this category of claim is

21  available through a plan of reorganization.

22          Trade creditors don't need most of those steps.  What

23  they need is a committee to achieve economies of scale for them

24  once they've put in their proofs of claim to get those claims

25  resolved and paid out.  The members of the ZAI class need more

1 than traditional large value, sophisticated property claimants,

2 and they need more than personal injury claimants, past and

3 future, which is why the class component of an overall

4 structure works best under these circumstances.  It's not a

5 novel structure, it has been utilized before.  There is a rich

6 body of jurisprudence that governs it in both the Federal and

7 Bankruptcy Court and State Courts.  And the United States

8 Supreme Court, which has mentioned 524(g) trusts only in

9 passing in one case, has had occasion to visit and revisit the

10 due process aspects of class actions and has set forth

11 controlling rules that govern us all, court, class

12 representatives and class counsel.  And the promise that the

13 Supreme Court gives all of us is that if due process is

14 achieved through adequate representation of class members in

15 the context of a class action, the determinations of the court

16 regarding that class are final for all time, and for all people

17 within the defined class, the debtor is relieved of all future

18 responsibility to the claims of that defined group for all

19 time.  One court, not many, is charged with any of the ongoing

20 jurisdictional and implementational aspects of the class

21 decree, or the plan of reorganization, and judicial economy and

22 fairness both to the debtor and an inchoate at this point, but

23 yet impacted and to be impacted, class of creditor.

24        Committees work well in bankruptcy for most of the

25 routine claims that come into bankruptcy.  But every so often,

1 Your Honor, there is a claim that is so inherently collective

2 in nature, that is equitable in nature, that compromises the

3 perfect storm of small damages, unknown and unknowing

4 claimants, the missing and remedial recovery that the class

5 structure is the best structure under the circumstances.

6        We advocate this as has been done for the past seven

7 years because we believe it is the most practical, most

8 workable, best established complement to the committee

9 structure and to the utilization of other known devices, such

10 as 524(g).  And we would like the opportunity, not just to

11 argue this, but to demonstrate this to Your Honor in an orderly

12 and expedited way, to hasten the complete and successful

13 reorganization of the bankruptcy and a structure of meaningful

14 relief for the class.

15        Thank you.

16        THE COURT:  All right.  Thank you.

17        MR. SCOTT:  If I might also add, Your Honor, a

18 committee cannot file proof of claim.  A committee cannot

19 defend the proof of claim.  And the Court will remember that

20 this Committee quickly backed away from any representation of

21 Zonolite when the science trial was teed up, disavowed because

22 of inherent conflicts, engagement.  And it required different

23 counsel.

24        MR. BERNICK:  Give me just a moment, Your Honor.

25        THE COURT:  Actually, Mr. Bernick, while you're

1 getting ready, I think my staff, who's -- which has been here

2 since 8:30, probably could use a five-minute --

3          MR. BERNICK:  Oh.

4          THE COURT:  -- break anyway.  So, why don't we just

5 take a --

6          MR. BERNICK:  Thank you.

7          THE COURT:  -- five-minute stretch break for

8 everyone.

9          MR. BERNICK:  Thank you.

10          THE COURT:  Okay.

11          (Recess 10:34 A.M./Reconvene 10:48 A.M.)

12          THE COURT:  Please be seated.  Mr. Bernick?

13          MR. BERNICK:  Thank you, Your Honor.  Your Honor, I'd

14 like to begin and talk about the rules that are applicable to

15 the matters that are before the Court this morning.  We're here

16 on a matter that is governed exclusively by federal law,

17 federal procedural law as set forth in the Code, federal

18 bankruptcy practice as set forth in the Code.  There is no

19 issue of state law for the Court to resolve.  There's no issue

20 of state law that's properly before this Court.

21          And I want to talk about the rules and how they work

22 with respect to the matters that are before the Court in how

23 novel it is -- how novel the approach is that's being advocated

24 by the ZAI claimants' counsel for just a moment here.

25          (MR. BERNICK IS NOT SPEAKING AT A MICROPHONE)

1        MR. BERNICK:   And with the Court's indulgence, I'm

2    going to come up to the easel here and talk about the structure

3    of Rule 9014.  9014 is the operative rule.  And 9014 of the

4    Bankruptcy Code spells out what is to take place with respect

5    to applications Part 7 rules, as Your Honor is well familiar.

6    Part 7 rules deal with various procedural matters, including

7    Rule 23.

8        Part 7 does not specifically call out the application

9    of Rule 23, except with respect to adversary proceedings.  This

10   is not an adversary proceeding.  The adversary complaint was

11   originally filed in '01 or '02, it was withdrawn and I think

12   ultimately dismissed.  This is a contested matter that's

13   brought under Rule 9014.

14       With respect the Part 7 rules, the Part 7 rules spell

15   out -- and I don't -- or sits -- sets out certain particular

16   rules that shall apply, and then says with respect to the other

17   rules that are part of Part 7, they may be applied.  So, the

18   operative rule here or the operative language is a "may"

19   language, says "the court may apply the rule."  And the rule

20   that's at issue here is Rule 7023, which, by its current terms

21   under Rule -- under Part 7 is confined to adversary

22   proceedings.  But this 9014 creates a plenary power, a

23   discretionary power to go ahead and apply that rule under

24   circumstances as dictated by the court's discretion.

25       So, we have a pretty simple equation here.  It's an

1  equation that says 9014 -- under 9014, the court may apply

2  7023, which is a class action rule as a federal rule of civil

3  procedure 23.

4        We also know from the decisions which have

5  interpreted the language of 9014, that the "may" decision, that

6  made as whether 7023 shall be applied, or may be applied,

7  focuses on the unique characteristics of bankruptcy, that's in

8  the context for which a class action rule is invoked.

9        So, we have a decision -- a question of should it be

10 applicable, does it apply, with a question mark?  And if it

11 does apply, compliance?  Is there compliance with Rule 23?  And

12 both decisions have to be taken.  The decision about whether to

13 apply is different from the decision about is there compliance

14 with the rule.  And that's significant because may apply under

15 9014 is simply a question of the rule that is class action rule

16 should be brought to bear in the case.  There's a separate

17 decision that has to be made with respect to compliance.

18       9014 doesn't say the court may in its discretion

19 certify a class; that's not what it says.  It says the court

20 may, at any stage, direct that a -- other part of Part 7 shall

21 apply, that's the discretion decision.

22       There's nothing about this rule that simply displaces

23 the substantive requirements of Rule 23.  That is a separate

24 analysis.  So, this is not a case where somehow there's

25 different class action procedure in bankruptcy because of the

1 "may" language in 9014.  There is a threshold consideration in

2 bankruptcy under 9014 as to whether Rule 23 applies, and then

3 you got to follow Rule 23.  So, it is a two-prong test.

4          Now, the reason I do all this, the reason I put the

5 box around it is that there are some things that are not in

6 this picture, that are not in Rule 9014, and are not in Rule

7 7023.  One thing that is not in this picture is state class

8 action law.

9          Another thing that's not in this picture are the

10 state courts.  Another thing that's not in this picture is Rule

11 3001, which deals with the filing of the claim, that's not in

12 this picture.  And it is certainly nowhere in this picture,

13 because 3001 is not here, because somehow 3001 can be used to

14 trump any part of this process, that's nowhere to be found.

15 That's, indeed, contrary to the language that's set forth in

16 Rule 9014.

17          So, the argument that says somehow the court should

18 be looking to state procedural law is a false argument.  The

19 argument that somehow there's such a thing as a motion for

20 recognition under Rule 3001 that Mr. Scott says we want the

21 Court to recognize a agency, there is -- there is no such

22 motion.  And there's certainly no such motion that displaces

23 what 9014 says, which is the court needs to exercise its

24 discretion and in applying Part 7, which has substantive

25 requirements.

1          The whole idea for a motion brought pursuant to 3001

2    is simply false, and an abrogation of the Code.

3          The notion that somehow this Court can simply defer

4    to, and not pass on the merits of Rule 7023 because that matter

5    has been determined by a state court under state law is nowhere

6    to be found in contrary to the Code.  That would be the Court

7    basically relinquished -- not relinquishing but failing to

8    exercise its power to actually do what 9014 says, which is

9    decide whether to apply, apply Rule 23.  Rule 23 requires an

10   affirmative decision.

11         Now, in a service of the idea that all of this

12   landscaping was playing under the rule, and in every single

13   circuit this has addressed this, which is it's a two-prong

14   test, every Circuit Court that's adopted the idea of class

15   actions in bankruptcy have recognized this two-part

16   requirement, including originally American Reserve out of the

17   7th Circuit.  And in service of saying that all of that is

18   wrong, there are two cases that are cited, and only two cases

19   that are cited.

20         One case that's decided is the Trebled (phonetic)

21   case.  I'm going to put the Trebled case in black because it

22   does fall within this group, it doesn't stand for the

23   proposition for which it is urged.  In Trebled, there was a

24   prior class certification by a federal court under federal

25   procedural rules, resulting in a final judgment.  And under

1  those circumstances, the <u>Trebled</u> court properly found, or

2  certainly exercised its discretion under Rule 9014, and said,

3  you know what, it's a federal -- a prior federal certification,

4  and a final judgment, it's collateral estoppel.  It's not that

5  you are failing to apply the requirements of Rule 23, it's that

6  they have already been finally determined by a court of

7  competent jurisdiction, a federal court applying the right law,

8  that's entirely consistent with the picture that I think that

9  9014 sets out, entirely inconsistent with what it is that we

10 have here.

11        The other decision that I'll put in red is the <u>Kraft</u>

12 decision.  Because <u>Kraft</u> lies outside of this rubric.  <u>Kraft</u> is

13 a District Court case.  And <u>Kraft</u> is three things, none of

14 which are consistent with the Rule, and none of which have been

15 adopted by any court elsewhere.

16        First of all, <u>Kraft</u> conflated the 9014 analysis about

17 whether to apply Rule 23 with the substantive Rule 23 analysis,

18 and it specifically says, "I've asked what we're doing."  It

19 says, "Basically we think that this is all discretionary."  And

20 in doing so, the <u>Kraft</u> court disregarded the express

21 instruction of 9014, which deals with the application of rules.

22 The court basically said, I'm not going to apply the rules, I'm

23 going to exercise my discretion and simply decide that the

24 prior certification was good enough.

25        Number two, as set forth in Footnote 14, the

1  _Kraft_ recognized that it was out of step with other courts,

2  which is a mild statement.

3          And the third thing that _Kraft_ is significant for is

4  that at least in the _Kraft_ case, the prior certification was

5  made by a federal court under federal law, applying the Federal

6  Rules of Civil Procedure.  Here, what the plaintiffs argue for

7  is not _Kraft_, it's not _Trebled_, it is something completely

8  different, completely novel and completely wrong, which is that

9  somehow you can apply -- have a federal court arrogate its

10  decision-making power and responsibility under the Federal

11  Rules of Bankruptcy Rules to a state court, applying state law

12  and then say, well, it's all okay because we're simply finding

13  -- asking Your Honor to find that there is recognition of the

14  agency relationship between the class representatives and the

15  class, go to Rule 3001.  And, therefore, they're so careful to

16  say, oh, we're not asking you to revisit -- we're not asking

17  you to revisit the Rule 23 requirements and certifications,

18  we're not asking you to do that.  We're not asking you, indeed,

19  to exercise your discretion.  What they're saying is, you know

20  what, this is really good, this is a good way of solving this

21  bankruptcy case and all you got to do is recognize that agency

22  relationship.  That's not _Kraft_, that's not _Trebled_, and that's

23  certainly not the law of every single Circuit that's recognized

24  class actions, and that's not Rule 9014.  It's just plain

25  wrong.  Very clever, but wrong.

1        Now, the significance that that has with respect to

2   the impact of their approach on actual rights that are

3   important rights is palpable.  And I want to go through the

4   analysis -- what is the two-prong analysis, and I'll try to be

5   quick about it under each of these prongs, and get to, I think,

6   the same questions that Your Honor posed and other counsel for

7   the ZAI folks addressed here this morning.

8        It's tempting in this context because it's logically

9   coherent, it made sense.  And to begin with the "may" question

10  is should the court, may the court apply, should the court

11  apply Rule 7023?  Do that first before you get to the actual

12  application of the Rule.

13       And I'm going to violate the -- that logical order

14  because the fact of the matter is that we're dealing with what

15  can only be fairly described as the dead cat in the room.  And

16  the dead cat in the room is that what they're asking the Court

17  to do with a (b)(2) certification is squarely contrary to

18  settled 3rd Circuit law.

19       They're asking the Court to certify a (b)(2) non-opt

20  out class.  And to do so would directly contravene the 3rd

21  Circuit's decision in the <u>Asbestos School</u> litigation in 1986.

22  It would also contravene the law of all the other circuits that

23  have decided this matter, which is you can't simply invoke

24  (b)(2) and eliminate people's opt-out rights by reframing as

25  equitable relief under (b)(2) what is actually compensatory or

1  damages relief.

2        And in the Asbestos Schools case, there was -- that

3  was a remediation case.  Mr. Westbrook was present in this

4  case, and I know that it was not as ably argued by Arthur

5  Miller because Ed didn't have a chance to take his feet.

6        MR. WESTBROOK:  But we won.

7                    (Laughter)

8        MR. BERNICK:  That's right.  He won, we'll get to the

9  (b)(3) thing here in a minute.

10       But what happened in Asbestos Schools is, again, is

11 asbestos property damage remediation case, and the 3rd Circuit

12 had this to say, says, "District Court concluded that despite

13 the plaintiffs' ingenuity, the claims in this suit were

14 essentially for damages and an action -- money for -- action

15 for money damage may not be maintained as a Rule 23(b)(2) class

16 action."  That's what the 3rd Circuit said.

17       Now, this case is no different.  Indeed, in this

18 case, the particular brand of equity that -- on which the ZAI

19 claimants' counsel seek to visit upon their clients, the

20 particular brand of ingenuity is particularly -- is

21 particularly problematic.  And I'm going to play, you know,

22 kind of Wheel of Fortune here.  What if you had an ordinary

23 claimant?  I'm sorry not -- I -- I can just move it over here.

24       THE COURT:  Unfortunately I think -- I can't move the

25 monitor, so I'm going to --

1          MR. BERNICK:  That's okay.  I'll move -- I'll move

2 this.

3          THE COURT:  All right.  Thank you.

4          MR. BERNICK:  Is that okay?

5          THE COURT:  That's fine.

6          MR. BERNICK:  An ordinary claimant who is being

7 accorded due process rights will get a neutral notice, must be

8 neutral under Supreme Court law, will then have the opportunity

9 to make a decision whether to file, what to do, if that person

10 decides to file a claim, they'll file a claim.  They'll then

11 have the opportunity to prove liability.  And if they're

12 successful in proving liability, they can collect damages.

13 That's not a function of the class action rules, that's a

14 function of due process of law.  And those are requirements

15 that can't be abrogated consistent with due process.

16          If we take a look at what it is that will be

17 accomplished under the circumstances that are being advocated

18 here, what happens?  Well, the neutral notice is out.  Under

19 (b)(2), there is no neutral notice.  Indeed, that counsel

20 insisted neutral notice is not a requirement.

21          Instead, it is replaced with warnings and education,

22 that's one huge prong of what they want.  They want to warn and

23 educate.  They don't want to give neutral notice.

24          What happens to the opportunity to make a decision?

25 That's out.  There's no decision to be made because there's no

1  opt out.   That's gone under (b)(2), it's a mandatory class.

2          What happens with respect to the ability to recover

3  dollars?   That's gone, too.   There's no independent or separate

4  ability claim for damages.   You have to claim out of a fund,

5  that's where your recourse is.   Because they want to make --

6  they want to transform compensation on an individual basis with

7  taking from a fund that's administered in its own fashion.

8          But it doesn't stop here.   I mean right now, you can

9  see immediately that far from preserving the substantive rights

10  and procedural due process rights of individual claimants in

11  their effort to get into (b)(2), they're essentially

12  constraining their own clients.   But it gets worse.

13          In this particular case, if we go to the particular

14  context that as we now take a look at what happens in the

15  context of the bankruptcy environment, and this is now germane,

16  we're now into the "may" world, how does the bankruptcy context

17  affect these folks?   Because all of what I've said to be true

18  would be reason that you follow <u>Asbestos Schools</u>, and you do

19  not apply (b)(2).   These facts alone establish that it's not

20  (b)(2) and, indeed, it's a very -- would be a hugely

21  compromising application of (b)(2).

22          But if we now go to 9014 and "may," there are a whole

23  series of additional factors.   And the reason that's very

24  important, I want to underscore here for a moment before I go

25  on why it's so important to deal with the "may."   There's been

1   a not so veiled indication that we're only at Step 1 in their

2   ongoing quest.  And the reason I say that is that they've been

3   very careful to say, oh, well, we're not really asking the

4   Court to address certification; we want recognition of the

5   Washington class.  And by the way, that national class, it's

6   still out there.  And we received a call indicating that no one

7   was supposed to talk about anything else other than the

8   Washington class here today.  But they, themselves, have now

9   made a reference to there being some kind of national class

10  that's going to be brought.

11        And so while today I want to address 7023 with

12  respect to (b)(2), and I think that the answer to that is

13  Asbestos School -- that Asbestos Schools case and the

14  particular way that their claim for equitable relief actually

15  is a derogation of rights, and is a classic ingenious

16  manipulation of pleadings to get into (b)(2), directly contrary

17  to 3rd Circuit.  I also want to get into 9014 in the "may"

18  because I think that this Court needs to resolve the issue now

19  about whether there should be any class here because I think

20  that on the concern that if Washington doesn't work, then we'll

21  be back again at another date even later in this process.  And

22  our essentially -- essential position is the class action

23  doesn't sense no matter what the class is.

24        So, let's talk a little bit about 9014.  In the

25  context of this particular case, what does application of the

1  class rules and certification mean?  Well, what about those

2  people who actually are now compelled to participate in this

3  class?  Well, in the context of this case, they're being asked

4  to participate in a class that already has -- where the

5  representative has already had a very nature determination made

6  in the science trial that there's a major defect, if not a

7  dispositive defect, in their claim.  Mr. Barbanti was one of

8  the individuals whose claims was litigated in the context of

9  the science trial.

10       So, now all these good folks that are going to be

11  represented by Mr. Barbanti are now burdened by Mr. Barbanti's

12  loss in connection with the science trial.

13       Now, of course, the Court will point out, well, Mr.

14  Bernick, aren't you now going to argue -- aren't you, in fact,

15  going to argue the science trial outcome should be binding on

16  all those people who are claimants?  The answer is, yes, we

17  will, but this motion basically accomplishes the litigation of

18  that issue in one stroke.  In one stroke, they are now making

19  every single one of the ZAI claimants on a non-opt out basis

20  subject to Your Honor's determination from the science trial

21  adverse to them.

22       So, far from having the ability to litigate liability

23  without a new or at least subject to some kind of motion

24  practice, these folks, on behalf of their clients, are

25  compromising their clients' rights.  Now, it may be that they

1  have some broader strategy, which is to try to overturn the

2  science trial determination.  But certainly people who aren't

3  Mr. Barbanti ought to have at least the right to think about

4  and maybe decide whether they would like to be with Mr.

5  Barbanti now that Mr. Barbanti has lost in the science issue.

6  Then what about the people who actually respond to

7  the bar date by saying, I want to file a claim?  They've gotten

8  the notice and they say, I want to have a claim.  Well, the

9  answer to those people is that they have no claim.  They do not

10  have the right on an non-opt out situation to actually have the

11  claims they decide to file in response to the bar date

12  litigated.

13  So, you see, this is just a wild, wild proposition.

14  It gets worse.  What about with respect -- and this is

15  perfectly appropriate in the context of working with 9014, how

16  does -- how does their effort affect the prospects for

17  resolution?  Well, actually let me reverse this a little bit

18  and do it this way.  There are some other factors before I get

19  to resolution; resolution is down here.

20  There are plus factors that are unique to this case.

21  What about futures?  These people want to control them.  You

22  heard it.  They have got their magical solution, their magical

23  solution for how to prevent there ever being a futures problem

24  in this case.  They're going to put it all in the package and

25  resolve them.  Well, how do they represent those people?  How

1  do they have the right to do that?

2      They claim that it's a benefit; it's an enormous

3  problem for them.  They're now not only saying that the people

4  who are out there who they want to represent will be bound to

5  their particular brand of justice, they're reaching out into

6  the future so that everybody on a mandatory non-opt out basis

7  is subject to that same determination, all under Rule 23(b)(2).

8      What about fairness?  Fairness doesn't play much of a

9  role in this process.  The Washington people, they're burdened

10 by the science trial outcome, they're non-opt out, they have to

11 be satisfied with whatever they're told in the education or

12 whatever comes out of the fund.  Whereas everybody else will

13 not be so constrained, they'll be able to exercise rights.

14 How's that fair?  That's not fair.

15     Why is it that these folks here -- this is under the

16 aegis of "we know how to educate these people" kind of the

17 brand of paternalism.  You get kind of totalitarianism.  Which

18 is we are going to do everything for you, you've got to play by

19 our rules, our rules.  That's not class action practice.

20     And then when it comes to resolution, and this is of

21 the essence because, again, as they're waiting in the wings for

22 something else to happen in this case, and they're going to

23 have now a new class action, let's (indiscernible).  They apply

24 also to Washington, but they would apply to any class.  The key

25 fact equals who is a claimant?  We can -- we can have all kinds

1  of speculation about how many people can -- will come forward.

2  There will be surveys that they referred to, extrapolations,

3  statistical stuff, we've been through that ad nauseam in the

4  case, and it -- well, let me tell you, we go down this road,

5  we're going to go through it until the cows come home.  It will

6  all be completely and utterly speculative because none of it

7  addresses the key fact that must be determined which is who

8  actually comes before the Court after getting due process

9  notice and says, I've got a claim and I want to litigate it.

10  There are many people who may decide that they either don't

11  have claims, or they don't care about their claims.  So, who

12  actually shows up?   (Indiscernible) bankruptcy process says,

13  we count.

14          Well, we're going to get those with respect to people

15  around the country.  But this -- what this does with respect to

16  that key fact is to say: doesn't matter, got to include

17  everybody, everybody.  How does that affect resolution when you

18  now have injected into the process a certification always

19  subject to interlocutory appeal because all class action

20  certifications are now subject under the rules of interlocutory

21  appeal.  Or they say, oh, well, all we do is run the

22  calculator, and we own the company.  That's not a benefit to

23  resolution.

24          What about the _Amchem_ (phonetic) problem?  Don't they

25  now have an enormous conflict of interest with respect to

1  futures?  With respect to non-D.C. people?  They're purporting

2  to represent the interest of the futures.  _Amchem_ says you

3  can't do that.  They're purporting to create a template for

4  non-Washington people.  Well, but non-Washington people are in

5  a different situation than that Barbanti people.  Don't you

6  have conflicts?  How do these people -- they all said this

7  morning that they are representing the Barbanti class.  Don't

8  they have a conflict with respect to representing here or

9  talking to the interest of anybody who's a futures?  Of anybody

10  who is outside of D.C. -- of Washington?  Don't we have an

11  enormous _Amchem_ problem?  Wasn't even talking about the future,

12  wasn't even talking about folks outside of Washington.

13          And then finally when it comes to resolution, the

14  elephant in the room is the deal.  There's a -- there is a bird

15  in hand kind out there that's been put together at great pains.

16  And we now have folks that are prepared to say that -- as we

17  know, it's delicately balanced, indeed, it recites that all of

18  the -- there's -- one of the preconditions or conditions or

19  parameters of the agreement in principle is that all ZAI claims

20  will be subject to an estimation and they will be paid in full.

21          When are we going to know who the real claimants are?

22  We are only going to know who they are, and we're only going to

23  know what that estimate is if we actually have them come

24  forward in response to the bar date, file their claims, and

25  have a determination of whether their claims have value.

1          To the extent that we have any kind of class that's

2    out there which purports to bring into this case an unknown

3    number of people because they don't have to do anything in

4    order to participate in the class, particularly if it's (b)(2).

5    But to the extent that we have an unknown number of people who

6    are out there and never expressed themselves, how in the world

7    can you do an estimation of a value of their claims unless

8    they're all zero?  How can you do any kind of estimates as to

9    this deal?  There's huge uncertainty that will sweep over this

10   deal.

11          Now, that, unfortunately, I think, is what they want.

12   You have heard before when it came to -- the arguments about

13   ZAI that counsel for the ZAI claimants stood up and said,

14   indeed, they told Judge Buckwalter this, as well, when they

15   asked for an interlocutory appeal of Your Honor's science

16   determination.  They said, a deal is going to be done in this

17   case, it's going to be done soon.  We want to be part of that

18   deal.  And what we need from you, Judge Buckwalter, is to

19   review this thing because right now, our leverage is not so

20   great, we want to improve our leverage.

21          So, sure, certification of the Washington Barbanti

22   class is designed to create uncertainty.  It's designed to

23   create leverage.  That is not designed to bring us forward to a

24   deal, much as there are all kinds of, I'm sure, earnestly

25   professed desires to get this case done and brought to a

1  conclusion.  The best way of getting that is to find out who

2  the ZAI claimants really are, do they have a claim so we can

3  pay them.  That is the shortest way to connect the dots.

4        In preserving under some (b)(2) construct the claims

5  of people who do not come before the Court in connection with

6  the bar date, and will never learn until they make a claim

7  against the fund is the best way to ensure that there is no

8  deal.  And the law does not require that we create novel

9  classes and recognize novel motions like recognition, and

10  service of people who do not come forward by the bar date.  The

11  fact of the matter is that under the Bankruptcy Code, you give

12  due process notice, people have got to file their claims.  If

13  they don't file their claims, they are not allowed, they don't

14  get paid, they don't have to be estimated, they don't have to

15  be part of the plan.  That is the fact of the matter under the

16  bankruptcy procedures.

17        So, for all those reason, Your Honor, we are at a

18  very critical juncture.  There was a lot of focus paid to class

19  action, and class action is an option for a long time.  Your

20  Honor set the bar date, and counsel was very anxious to come

21  forward and have the class issue determined.  So, we set it all

22  up, we got everybody here, the class issue is before the Court.

23  Now is the time to decide really is it going to play a role

24  that's productive, and is it even allowed under the rules?  Not

25  doing it piecemeal in steps, Washington versus national, it's

1 just let's get it done now and get on with business so we can

2 get to the end of the road.

3          One last thing I'll say is just to offer just a

4 couple of comments with respect to these charts Mr. Westbrook

5 showed you.  He showed this chart here.  This is the one with

6 all of the lawsuits that have been class actions.  What's very

7 notable is that all of them were before <u>Amchem</u> and <u>Ortiz</u>

8 (phonetic).  Because -- there's a whole big trend where

9 everything was trying to use class actions as the tool to

10 produce resolution and settlement.   And then <u>Amchem</u> and <u>Ortiz</u>

11 came out and said there's such a thing called predominance, and

12 there's such a thing of -- of what is representing too many

13 people.  And this was after a series of decisions that I know

14 Your Honor is familiar with, swept the country in the mid-

15 1990's.  In the early 1990's and late 1980's, class action

16 procedure was felt to be the best way of kind of managing

17 disparate litigation.  It turned out to be a way of creating

18 disparate litigation.  And by the mid-1990's virtually every

19 single Circuit in the country had decided that you shouldn't be

20 certifying classes that -- where there were truly individual

21 issues and differences of law that were involved.  That did go

22 up to the Supreme Court, and so we've got a bunch of cases that

23 were decided before, and these are all cases, including <u>In Re:</u>

24 <u>Asbestos Litigation</u>, which was certified as a (b)(3) class,

25 quote, "notwithstanding the Court's concern over

1  manageability." And that's what the 3rd Circuit said. And it

2  was manageability that ultimately was the Achilles' heel of

3  this whole use of class actions and the reason why you don't

4  see any other class actions that are certified and affirmed on

5  appeal in the late 1990's and since that time.

6         Indeed, even where you have commercial class actions

7  where there are damage -- economic damage claims, they are not

8  certified as nationwide classes because of variations in the

9  law between the different states. So, these are all old cases.

10        Number two, they all involve a mature tort. These

11 are cases where lots and lots of people have already come

12 forward and presented claims for individual litigation and been

13 successful. There had not been a single lawsuit in the entire

14 country with respect to ZAI that's been successful, including

15 the Barbanti case, which Your Honor is well familiar, resulted

16 initially in a preliminary injunction hearing where the court

17 said, you know what, I don't think this thing is so easy, I'm

18 not sure that there really is risk.

19        So, we're sitting here today contemplating massive

20 theoretical liability where there is no track record of there

21 having been established liability in any case.

22        And finally, none of these cases are (b)(2) cases,

23 which is what the Washington case is. There was a reference,

24 Your Honor, to this chart here as a way of saying, well, the

25 time has come finally to get to the people in their homes.

1 Everything else has been resolved, and Mr. Westbrook talked

2 about all the money that's been spent.  And with due respect to

3 Mr. Westbrook, I don't think that the picture is really

4 complete because a major player ain't there, which is the EPA.

5 It is the EPA, that with respect to the Libby area, the homes

6 and neighborhoods of Libby, spent the $250 million -- or will

7 be spending, they say, $250 million, it was the EPA that said

8 they had to be cleaned up.  That was litigated, it was

9 litigated as a cleanup matter under the EPA's special powers,

10 that's why that occurred.

11          With respect to the vermiculate expansion plants --

12 with respect to the mine, the EPA hasn't actually decided what

13 to do, that's not an issue that's been resolved, but it's an

14 issue that will -- will, in fact, be addressed in connection

15 with a government directed remediation.

16          With respect to the vermiculate expansion plants, Mr.

17 Westbrook tossed out a figure of $44 million and said that that

18 includes the vermiculate expansion plants.  Well, it does, but

19 it also includes a whole bunch of other environmental sites

20 that got nothing to do with vermiculate or expansion plants at

21 all.  And in this instance, Grace agreed to remediate those

22 sites, together with non -- non-vermiculate sites.  So, it's

23 not like somehow $44 million got spent on the expansion plants,

24 or that, indeed, the expansion plants are even that major a

25 problem.

1          What about the homes, the homes outside of Libby?

2    Because the homes in Libby itself, there are many circumstances

3    surrounding those homes, including what's in them.  Because the

4    homes in Libby, some of them have expanded product.  But a lot

5    of them have vermiculate concentrate, which is a very closely

6    related, but different material.  So, these are not commercial

7    attic-filled insulation properties.  They're part of the

8    broader issue that the EPA felt affected Libby as a whole and,

9    therefore, was included in the EPA's cleanup.

10          But with respect to homes outside of Libby where

11    commercial attic fill insulation has been used, the EPA

12    specifically addressed whether there was some pressing need to

13    take all that stuff out and said, no.  No.  So, when we get to

14    the homes, not only do we have not a single claim that's ever

15    been filed and found to be meritorious, you have the EPA itself

16    who drove the costs of recovery elsewhere saying, we don't see

17    a need to go into everybody's attic and take it out.  That's

18    what that chart says.

19          Then we've got all these supposed benefits:

20    efficiency, compensation, deterrence and justice.

21          Well, efficiency.  There's been a lot of discussion

22    about efficiency.  The Bankruptcy Code, after all, is designed

23    to produced efficiency.  It's got something called a bar date.

24    And you can get all the common issues litigated, you can get

25    common counsel, you can have streamline settlement discussions

1  and resolve a large number of claims, all completely without

2  regard to class actions because of the unique properties of the

3  Bankruptcy Code, which include having a bar date, that brings

4  everybody into court, and rule -- having Rule 42, which does

5  apply under the Code and says you can have a consolidated

6  litigation even where the predominance requirements of Rule 23

7  are not met.  And this is a speech, I know -- I know that Your

8  Honor has heard and, respectfully, counsel has heard from me

9  far too often, but it still remains true today.  You don't need

10  a class to get those efficiencies.

11         Compensation.  We agreed, we agreed to compensate Mr.

12  Westbrook and Mr. Scott.  Your Honor heard it last time, to act

13  on behalf of this group of people.  Well, it turns out that,

14  for various reasons that I can't completely appreciate because

15  they were announced to me, not by Mr. Westbrook, but by Mr.

16  Baena somehow in an e-mail, that arrangement is not

17  satisfactory, and they are not prepared to act as special

18  counsel with respect to the ZAI claimants.  I guess their

19  decision is to act for counsel for the purported class.

20         So, we tried to make that arrangement; it didn't

21  work.  Maybe there's some other way that it can happen.  We

22  thought that that was the fasted way to go.  And I guess today,

23  the people who are going to be representing the common

24  interests of those folks are people on the P.D. Committee.  And

25  I don't think that that's terribly attractive, not because of

1 efficacy considerations at all, but because of -- of the -- the

2 smooth working of the process of dealing with and negotiation

3 with the committee in this area, but that is where it stands.

4 And until people file their claims, I suppose that they're

5 going to have to be represented by the P.D. Committee.

6          Deterrence.  Well, we've got teach a lesson to the

7 debtor and set an example to others, that's very interesting

8 with respect to a product that's never even been found to have

9 liability associated with it.  Indeed, Your Honor's

10 determination suggests that there will be no liability with

11 respect to it.  So, somehow there's a lesson to the debtor that

12 we need to be chastised for conduct that's not been found to be

13 wrongful at this point?

14          And then justice.  That justice is the only way --

15 class action is the only way to get the justice.  I thought

16 that that's what the bankruptcy law did, as well.  Indeed,

17 given the problems with resolving mass torts, that it may well

18 be that the better brand of justice is to be found in the

19 Bankruptcy Courts.

20          So, for all those reasons, we think that the time has

21 come for the Court to issue a decisive pronouncement with

22 respect to this continuing effort.  You saw that in the case of

23 Anderson Memorial, it was like the issue that never died until

24 finally we argued it all and we had another round of briefs and

25 Your Honor issued an opinion.  We think that the same thing is

1  necessary here and that we ought to really decide one way or

2  another, is there going to be a class action given the

3  constraints -- or given -- not the constraints, but given the

4  guidance of Rule 9014 and the decisions that have been rendered

5  in this area.

6          Thank you, Your Honor.

7          THE COURT:  Mr. Westbrook?

8          MR. WESTBROOK:  Your Honor, I'm -- respond to just

9  one point on the special counsel situation, just so there is no

10 misapprehension.  The problem arose, Your Honor, because Grace

11 insisted that if we were going to be special counsel for ZAI,

12 the Property Damage Committee could have no further role, even

13 on bankruptcy specific issues which are very technical and

14 which we do not have expertise.  And we said we could not agree

15 to those constraints, that we would be speaking for ZAI on

16 matters of complex bankruptcy matters.  That's why it didn't go

17 ahead.

18         MR. BERNICK:  But, Your Honor, with due respect to

19 Mr. Westbrook, the only statement, at least that I received, or

20 anyone, I think, from my firm received as to why this was done

21 was a one-line e-mail from Mr. Baena that basically said that

22 given the terms of our proposed order, he didn't believe it was

23 appropriate that there be this kind of role.

24         We never really found out exactly what it was.  I

25 personally had a conversation with Mr. Westbrook at the very

1  beginning, which was very cordial, very cooperative and I -- I

2  believe I'm not accusing Mr. Westbrook of any kind of bad faith

3  at all, I just don't know what the ultimate problem was.  But

4  certainly if the issue is whether the P.D. Committee or Mr.

5  Baena can provide bankruptcy advice to the folks who are

6  representing the ZAI claimants, I don't think we have a problem

7  with that.  The whole idea was that somebody should be standing

8  up for them who didn't have the other dynamics of the committee

9  to deal with because they're a special situation.  Mr. Dies has

10  settled all of his claims.

11         So, if the only issue is whether bankruptcy advice

12  can be offered to Mr. Scott and Mr. Westbrook, I don't think

13  there's any issue from us that that's okay.

14         MR. WESTBROOK:  Your Honor, that was the provision

15  that came back from Grace, and then Mr. Baena said it wasn't

16  acceptable.  Our position was if there's some complex

17  bankruptcy issue that came up, Mr. Baena should be allowed to

18  come up here and educate the Court on it if the Court could be

19  helped, and we are not the people to take time from Mr. Baena

20  to educate us and then we try to ventriloquist to the -- to the

21  Court.  We want Mr. Baena not to be disabled, and I think the

22  e-mail from Grace said that the Property Damage Committee would

23  have no further role, and we couldn't accept that.

24         MR. BERNICK:  We -- we could --

25         THE COURT:  Okay.  Well, I don't -- I don't -- my

1  concept when this issue came up very quickly at a status

2  conference was not that the Property Damage Committee was being

3  disenfranchised, it was that the ZAI claimants were being

4  enfranchised.

5          So, I think maybe there's just a little bit of

6  miscommunication going on that you folks ought to -- if you

7  were talking, rather than e-mailing, maybe you'd be able to

8  work it out.

9          So, the order is you talk.  It seems to me that maybe

10  there's just some written problem.  You know, sometimes things

11  get put in writing that don't have quite the same inflection.

12  And as a result, there's --

13              MR. WESTBROOK:  That --

14              THE COURT:  -- a misunderstanding.

15              MR. BERNICK:  That's fine.  Although to be clear, we

16  do have concerns with Mr. Baena arguing the substantive

17  positions as he has in the past on many of these things because

18  we think that, frankly, he's conflicted.  He's got a whole

19  group of people who have settled their cases.

20          But be that as it may, if the issue is whether they

21  can get bankruptcy advice from Mr. Baena, there's no -- that's

22  not a -- that's not a problem.

23              THE COURT:  Well, I think --

24              MR. BERNICK:  So, we'll talk --

25              THE COURT:  I think --

1              MR. BERNICK:  We'll talk some more.

2              THE COURT:  All right.  I think the better way to

3    handle that is if the debtor thinks there's a conflict, the

4    debtor ought to raise the conflict issue.  If there's a

5    bankruptcy issue that's relevant to the Property Damage

6    Committee, that's why there's a Property Damage Committee.

7    They ought to be raising the issue, the bankruptcy issue.  If

8    it's also relevant to the ZAI claimants, then they can raise or

9    log onto or do whatever they choose with respect to that same

10   issue.

11             But I think the construct was that as to the unique

12   ZAI negotiations, and issues, the problem that you faced

13   earlier was that the committee has, as Mr. Scott indicated

14   earlier, not felt comfortable making the representation of the

15   whole ZAI community, and you folks did, so that's why you were

16   special counsel for the objection to claim process that went

17   forward.  I thought the same essential role was what you were

18   talking about carrying out, and what the debtor had essentially

19   proposed to carry forth at its expense.

20             So, I -- folks, talk.  I think maybe you were on the

21   same page and not realizing it.

22             Mr. Sakalo?

23             MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo on

24   behalf of the Property Damage Committee.

25             I think Your Honor's comments just now, we --

1  clarifies the issues as to what you were viewing the role as

2  special counsel to be for ZAI claimants.  There were some

3  additional issues with regard to the proposed order that the

4  debtors circulated to us.  I don't think Mr. Bernick's

5  characterization of Mr. Baena's response is accurate.

6         There was a colloquy back and forth between the

7  committee and the debtors in response to the proposed order, it

8  was in response to the debtors' answers that Mr. Baena advised

9  that it was no longer -- the order wasn't acceptable to Mr.

10  Scott, Mr. Westbrook or to the Property Damage Committee.  We

11  hear you, we will continue those conversations.

12         But I'll note, Mr. Bernick appeared to be very

13  careful in saying that if Mr. Westbrook or Mr. Scott need

14  bankruptcy advice, they can consult with Mr. Baena and with me.

15  But if they were going to come to court and argue issues, he

16  wasn't so clear as to whether the debtors believed we still

17  have that authority.

18         In their response to our inquiry about that, they

19  said they didn't think we should have any role whatsoever with

20  respect to ZAI interests.  And so I just want the Court to be

21  aware that that's the rub that will need to be worked out if

22  we're going to be able to proceed going forward.

23         THE COURT:  Well, the committee, so far, has, for the

24  most part, wiped its hands of the ZAI claimant interest.  I

25  mean --

1          MR. SAKALO:  Well --

2          THE COURT:  -- that's what the committee's position

3 has been.  So, I --

4          MR. SAKALO:  It has been with respect to the

5 litigation issues, but not with respect to the pure bankruptcy

6 issues.

7          THE COURT:  That's right.

8          MR. SAKALO:  So, the debtors' response was "all ZAI

9 interests."  So, I just wanted the Court to be aware of that

10 issue.

11          THE COURT:  Okay.  Well, you know, the committee -- I

12 don't think the debtor is in the position of disenfranchising

13 the committee.  That's not the debtors' role.

14          MR. SAKALO:  Thank you, Your Honor.

15          THE COURT:  Okay.  Mr. Scott?

16          MR. SCOTT:  Thank you, Your Honor.  I'll be very

17 brief.

18          Counsel for Grace, I think, just proved my point and

19 simultaneously evaded the genuine issue that's before this

20 Court.  We just heard a whole flurry of reasons why the Court

21 may not wish to maintain a class action during the course of

22 these bankruptcy proceedings, skipping over the issue as to

23 whether there is authority to file the proof of claim and

24 attempt to defend it.

25          There was a concern that there would be no notice in

1 23(b)(2).  There's a little bit of hypocrisy here.  As counsel

2 for the Washington class, which required no notice, we fought

3 for a year to have a notice issued over Grace's objection.  I

4 remember being before the Court on -- I think the fifty hearing

5 trying to have a notice issued to inform homeowners.  And --

6 and, again, quarreling about the picture and raising to the

7 Court the prospect that this was all an effort to delay because

8 of the prospects of a bankruptcy.  The Court asked counsel, is

9 there a prospect of bankruptcy?  And the answer was, I don't

10 know anything about that.  And within 14 days, they filed

11 bankruptcy.

12          If this Court thinks that notice ought to be issued,

13 I would say, thank God, and we would happily issue notice.

14          He says 23(b)(3), it's -- it's 3rd Circuit Rule that

15 you can't certify 23(b)(2) where you're seeking damages.

16          Well, first of all, that was the very subject that

17 was addressed by the Washington court, whether this action is

18 an equitable action or is a damages action.

19          If this Court believed the argument that Mr. Bernick

20 just made, the only consequence would be the Court would say,

21 your class action cannot obtain compensatory relief for these

22 individuals, that must be done individually.  Had -- had the

23 Washington court ruled that we could not seek compensatory

24 relief, one of two things would have happened.  We either would

25 have jettisoned it as a remedy, or changed it into a 23(b)(3)

1   where you could.

2          So, it's a legitimate question, but it is not a

3   reason to close the courthouse doors so that we can't even

4   argue about it.  He says, the time is now.  Well, I agree, but

5   I need to be here with my client representing my client to

6   argue about it.

7          He says, opt out.  He's -- suddenly there's this

8   strong desire to represent the Zonolite claimants so the poor

9   people cannot opt out.  If the Court believed that there should

10  be a right of opt out, the Court can provide a right of opt

11  out.

12         It may be that a court in this context will say, some

13  individuals filed individual proofs of claim, at law claims,

14  they should have a right to pursue those on an individual

15  basis, and I will deem those individuals as not part of the

16  class, that might be a remedy.  But we don't get to argue about

17  that until we have the claimant here attempting to defend the

18  claim that they have brought.

19         There is this dead cat argument which had to do with

20  -- which -- I think we just talked about which had to do with

21  you can't deal with damages within 23(b)(2), that isn't

22  correct.  Were it correct, it -- it would simply be corrected

23  by making it 23(b)(3) or by eliminating that as a remedy that

24  we could seek as class counsel.

25         There is the argument that -- I listened with -- with

1   great interest to Mr. Bernick's discussion of the civil rules.

2   Because if there's anyone who ought to be accused of being

3   imaginative, and in a positive fashion, it's -- it's -- it's

4   Mr. Bernick.  And I listened to his discussion of Rule 9014,

5   and its relationship with 7023, and I kept waiting for the

6   punch line, and there wasn't one.

7           That's correct.  The -- the procedure is Rule 9014

8   provides that the court may apply other rules, including 7023,

9   to any stage of the proceedings.  And the stage of the

10  proceedings that we are now is just the filing of a proof of

11  claim.

12          And the _Kraft_ opinion squarely addressed that issue

13  and concluded that a pre-certified class, and their

14  representative, is a fiduciary, therefore, an agent and,

15  therefore, has a right to file that proof of claim.

16          The court is functionally using Rule 9014 at this

17  stage of the proceeding to acknowledge Rule 23, which provides

18  for an agency relationship between a designated representative

19  and a class, and that's all.  And no more than that.  That's

20  all that we are seeking.

21          And then, having recognized their right to file their

22  class, we have to -- we will deal with all the issues that

23  arise by virtue -- by virtue of the -- of the class.

24          The _Kraft_ opinion, Footnote 14.  The only thing

25  Footnote 14 said is some courts have argued -- and we recognize

1  that even though it was pre-certified, the Court won't

2  recognize it because counsel filed the motion too late.  Well,

3  doubtlessly, but that's not at issue here.  That -- Footnote 14

4  is -- is smoke and mirrors.

5          The only question, the only issue before this Court

6  is whether my clients can file a claim for a community of

7  people they have responsibility for; they either can or they

8  can't.

9          If the Court permits that to be filed, we would be

10 happy, we would invite very prompt argument on all the panoply

11 of issues they might want to raise where they try to convince

12 the Court that this class, while it is -- the proof of claim

13 was recognized, it ought not to proceed as a class action.

14         THE COURT:  I'm sorry, say that again?

15         MR. SCOTT:  Let me say it this way.  Rule 23, which

16 we are incorporating, has two provisions:  One is 23(a), the

17 other's 23(b).  And there's a difference between the two that's

18 not often acknowledged.  Rule 23(a) has to do with the

19 circumstances under which a class can be filed.  And (b) has to

20 do with the circumstances under which it can be maintained.

21         Right now, we are only at the -- the question of can

22 it be filed.  And we are saying because we have already

23 established all of the elements for certification, and we have

24 an order, it can be filed.  This Court is empowered to make a

25 determination that it cannot be maintained at any point in the

1 proceeding, just as the Superior Court in Spokane, Washington

2 could have.  Judge Kathleen O'Connor, in certifying that class,

3 is not -- is not hamstringing herself from making a different

4 determination at any stage in those proceedings, and we're not

5 asking the Court to handcuff itself either.

6        What we -- we're -- we're -- I'm only asking for the

7 opportunity to be heard, which is the second element of due

8 process.  Not just notice, but a meaningful opportunity to be

9 heard.

10       And the last thing I'll say is the -- the <u>In Re:</u>

11 <u>American Reserve</u> case, which is the most cited case having to

12 do with the circumstances under which a court -- a Bankruptcy

13 Court should embrace class actions, said there's -- when there

14 is a perfect storm of three elements, it's the classic case

15 where  class can't be of value.  Where the claimants are

16 unknown, which is true here, where they are unknowing and,

17 therefore, may not recognize their right to file a claim, which

18 we believe the factual record before this Court demonstrates.

19 And thirdly, where their claims are of such value that as a

20 practical matter, they cannot bring and defend a claim.  And

21 all three of those things are true here.

22       And for that reason, we ask that the Court merely

23 recognize Marco Barbanti and Ralph Bush are agents, they are

24 fiduciaries.  They, therefore, have the authority to file a

25 claim.  And we will see whether they can do they say they can

1  do.  Demonstrate that this claim withstands all of the

2  challenges to the claim that the -- that a debtor brings,

3  proven meritorious, and, in fact, proven a bellwether as to how

4  all Zonolite claims can be resolved, and that's all that we're

5  asking at this time.

6            Thank you, Your Honor.

7            THE COURT:  Ms. Cabraser?

8            MS. CABRASER:  I can't resist taking a swing at that

9  dead cat, Your Honor.

10                         (Laughter)

11            MR. BERNICK:  Breathe some life into that poor thing.

12            MS. CABRASER:  I think it's -- I think the cat is

13 very much alive.  They actually have nine lives, and this cat

14 is on life number one.

15            Your Honor --

16            UNIDENTIFIED ATTORNEY:  That's -- that's exactly our

17 concern.

18            MS. CABRASER:  Well, and Your Honor -- and Your Honor

19 holds the key to addressing that concern.  Because under Rule

20 7023, you will be the one making further orders with respect to

21 the maintenance, the conduct, the alteration, the expansion,

22 the typography of the ZAI class claim.  You were told that the

23 dead cat was the non-opt out provision of Rule 23(b)(2).  And

24 there can be no -- no due process because there's no opt out,

25 there's no notice, there's no this, there's no that.

1          In fact, Federal Rule 23, which you would be

2   operating under as 7023, provides in any class certified under

3   Rule 23(b)(1), which is the limited fund class, the equivalent

4   of bankruptcy, by the way, or (b)(2), the Court may direct

5   appropriate notice to the class, that's Rule 23(c)(2)(A).  And

6   Rule 23(c)(1)(C) says, "An order that grants or denies class

7   certification may be altered or amended before final judgment."

8          So, if the Barbanti class, as certified by the

9   Washington court under the precise same provisions of

10  Washington Rule 23 is Federal Rule 23, was wrong or

11  insufficiently omniscient with respect to what would happen in

12  these proceedings, this Court will be the Court to correct and

13  improve the situation through notice, through amendment,

14  through expansion, by appointing additional representatives or

15  counsel.  And, by the way, by allowing an opt out right, the

16  Federal jurisprudence of Rule 23(b)(2) says, "Courts can, in

17  the exercise of their equity jurisdiction," and this is an

18  equity court, "decide if it's appropriate or necessary for due

19  process in a particular case to certify under (b)(1) or (b)(2)

20  and allow opt outs."

21         Now, one might ask the practical question to where

22  would one opt out?  We are in bankruptcy.  The point of

23  bankruptcy is that you can't escape.  And because you can't

24  escape, your due process rights to assert your claims and to

25  have them addressed in a fair, as well as efficient way, is all

1  important.

2          So, if the point is that there may be someone who has

3  larger than average damages, who really wants to assert their

4  own claim and take Mr. Bernick to trial, and doesn't want to

5  rely on class counsel, the remedy is not the nuclear option, or

6  using an atomic bomb to kill a fly.  The option is to

7  accommodate, since we're in a zoological mode, the fly.  And

8  the Court accommodates that person under Rule 23(d)(2) which

9  enables the Court to allow intervention, to allow appearance

10 through individual counsel, to allow individual trials of

11 individual issues within the construct of the class action.  If

12 the class action is the best solution for the most claimants,

13 you needn't abandon it or deny it or decertify it because for

14 some individuals within the class, something else works better

15 for them.  Within your overall ongoing jurisdiction, all of

16 those interests can be accommodated.

17         Mr. Bernick's Amchem argument was really a catch 22

18 argument because the ZAI claimants are all about Amchem.  What

19 we want to do in this process is exactly what the Supreme Court

20 commanded in Amchem, which is "to provide structural

21 assurances," that's the quote from Amchem, of adequate

22 representation at every stage of the proceeding.  And you have

23 seen at every stage of the proceeding completely dedicated,

24 loyal representation of ZAI interest.

25         Mr. Bernick argues that because we don't already have

1  a nationwide class certified, there must be some conflict

2  between the certified class and the yet to be certified class.

3  Or because we represent Washington residents, we cannot

4  represent other.

5          The solution is embodied in <u>Amchem</u>.  If you need

6  additional classes or subclasses to provide structural

7  assurances, they can and should be certified.  The problem with

8  <u>Amchem</u> that could not be resolved within the class mechanism,

9  as the majority saw it, was that in <u>Amchem</u>, a pre-bankruptcy

10 settlement, there hadn't been representation of future

11 claimants at any stage of the negotiations that led to the

12 settlement.  Here the ZAI class, the ZAI claim has been an

13 inherently future claim, and it has been represented throughout

14 these proceedings by the counsel you see before you.

15         The Washington State certification does not

16 predestine or govern everything this Court does under Rule

17 7023.  But I think it's wrong to argue that because that was

18 done in the State Court under state law, it should be utterly

19 ignored.  Bankruptcy Courts honor and implement and enforce

20 State Court concepts, State Court laws, State Court judgments.

21 Breach of contract is a state law claim.  Most creditors come

22 into Bankruptcy Court with state law claims.  Corporations are

23 creditors in Bankruptcy Court, and corporations are creatures

24 of state, not federal, law.

25         So, this Court may appropriately grant the specific

1 motion before it today without differentiating or

2 discriminating against the fact that the Barbanti class was

3 certified under Washington Rule 33 by a State Court.

4          The courts which honor class proofs of claim and

5 enable representatives of certified classes to file such proofs

6 of claim, subject to ongoing Rule 7023 proceedings, the <u>Zenith</u>

7 case, and the <u>Kaiser International</u> case from this District

8 don't make such distinctions.

9          This proceeding is the proceeding that the Supreme

10 Court in <u>Ortiz</u>, the other case Mr. Bernick mentioned from the

11 Supreme Court, thought might be superior from the standpoint of

12 due process, to a class settlement in which the defendant

13 claiming a limited fund nonetheless made only token payment to

14 a mandatory class; not all or nearly all of its assets.

15          These proceedings exist because Grace has declared

16 that its claims exceed -- the claims against it, its

17 liabilities exceeds it assets and there isn't enough to go

18 around.  It's the quintessential limited fund situation from

19 which any federal or state court would conclude that opt outs

20 could not be allowed, and that allowing opt outs would violate,

21 not accommodate due process.

22          THE COURT:  Wait, I'm sorry, can you back up because

23 what I just heard for most of yesterday was how the debtor is

24 returning 1.6 to $2 billion in equity.  So, I don't -- I mean

25 it's disputed, I think, whether the debtor is or isn't solvent,

1  but I -- as long as the debtor is returning 1.6 to $2 billion

2  in equity, I'm having some difficulty saying that there aren't

3  sufficient funds to, in quotes, "go around" assuming that the

4  settlement works.  If I have to get into an estimation hearing,

5  then I don't know what the outcome of that would be.  I'm not

6  called on to determine that right now.

7       MS. CABRASER:  Understood, Your Honor.  And that's a

8  fair point, and we're not asserting that Grace is or must be a

9  limited fund.  The only point I was making is that whether or

10 not this Court should accommodate individuals within the ZAI

11 class who might wish to, quote/unquote, "opt out" to present

12 their claims before this proceeding in some format other than a

13 class action, is discretionary.  You can do it, whether the

14 class is certified under Rule 23(b)(1), (b)(2) or (b)(3), and

15 to determine whether opt outs should or should not be allowed

16 is simply a matter of weighing the equities.  The Rule 23

17 procedures are sufficiently flexible to enable the Court to do

18 that.  Rule 23 isn't the gotcha rule, it isn't a rule that says

19 because plaintiffs came in and didn't ask for the precisely

20 correct class under the precisely correct subsection of the

21 rule, they're not entitled to class relief.

22      It is for the Court to determine the scope of the

23 class, the definition of the class, the claims that are

24 included in the class, whether and to what extent there will be

25 notice, and whether and to what extent there will be opt outs,

1 and who the representative plaintiffs and class counsel will

2 be.

3         We are suggesting to Your Honor this morning that you

4 have a tremendous head start in that process, which can be

5 completed expeditiously through follow-on motions because of

6 the preexistence of the Barbanti class and the dedicated and

7 adequate representation of Barbanti class representatives and

8 counsel on behalf of ZAI claimants as a whole throughout those

9 proceedings.  It is a valuable foundation upon which to build

10 the remaining components of an overall solution of this matter.

11         MR. BERNICK:  I just have a couple very quick

12 comments, Your Honor, if that's permissible.

13         THE COURT:  All right.

14         MR. BERNICK:  I know this won't be going back with

15 you to Pittsburgh, so is that okay if I (indiscernible - not at

16 microphone).

17                 (Pause)

18         (MR. BERNICK IS NOT SPEAKING AT A MICROPHONE)

19         MR. BERNICK:  In their brief and in their motion, the

20 ZAI claimants asked for two things:  They asked for recognition

21 of the certified Washington class action and the proof of claim

22 form filed on behalf of that class, that's what they asked for.

23         And -- so, there were two things that were on the

24 table:  One was the claim -- the claim form, class form.  And

25 the other was the class -- the Washington class (b)(2).

1          We know that in connection with the Washington class

2   (indiscernible) here,  to get permission to do this, they have

3   to deal with the 9014 "may" issue.  And we know that with

4   respect to getting the class, somebody had to apply what was a

5   version of Rule 23, and, in this case (d)(2).  And this is all

6   of what they asked for.  And even in citing the _Kraft_ decision,

7   they were careful to say this, "In determining whether Marco

8   Barbanti and Ralph Bush are designated of a certified

9   class, who mile file a proof of claim on behalf of the class

10  they represent, the Bankruptcy Court is not called upon to re-

11  litigate," not litigate, "re-litigate the class certification

12  determinations previously made by the certifying court.  As the

13  Court reasons _In Re: Kraft_," and there's some language and then

14  the footnote which they cite, it says, "Absent extraordinary

15  circumstances, this Court will accept a prior judicial

16  determination of Rule 23."

17          And, in fact, in the _Craft_ case, that is exactly what

18  the court did.  The court did conflate 9014 analysis with Rule

19  23 application and concluded that the -- the Kraft class is

20  already certified.  That is this was not simply approval to

21  file the claim form.  This was adoption of the Kraft previously

22  certified decision issued by a federal court.

23          So, coming in here today, there were, therefore, two

24  things that were on the table for the Court to address:

25          One was 9014 (indiscernible) and (d)(3) -- (d)(2),

1 both of these were before the court.

2        We now have the suggestion that all of this is wrong,

3 and that, in fact, the only thing that the Court is really

4 being asked to do is this.  That is all we're doing is asking

5 Your Honor to give us permission to file the form.  And that

6 some other day, there will be an assessment about whether the

7 case really should be a (b)(2) case.  And that if it turns out

8 that down the road it doesn't have to be -- it shouldn't be a

9 (b)(2) case, because I think we can all predict has to be the

10 outcome, then we're going to go through, by virtue of

11 amendment, to (b)(3).  That is the amendment (indiscernible).

12 And, of course, that's not right.  You have to get a

13 certification under a provision of the rule.  So, in order --

14 you can't simply amend and say, well, I wish it wasn't (b)(2)

15 after all, we're going to decertify that and, by amendment,

16 make it (b)(3) because we have to have a hearing under (b)(3).

17 We have to give notice of a hearing under (b)(3) because we

18 have to provide an opt out right.

19        So, in fact, what you would have is a motion under

20 (b)(3).  And if that motion is then granted, and then somewhere

21 down the road in this case have opt outs, then the question is,

22 well, are they bound by the bar date?  So, now we have people

23 who filed by the bar date and they're out there, and we're now

24 God knows how close to or, indeed, now pushing, pushing back

25 confirmation, which they're -- is going to be the next thing

1  they're going to be asking about.  That's all designed to do is

2  push back and push back and delay.  We're going to then have to

3  ask the question of how to reconcile the opt out right with the

4  people who filed by the bar date.  Which is exactly -- exactly

5  the problem that has led many courts to say that where there is

6  a bar date, there shouldn't be a class.

7       So, we have not nine lives of the cat, but that poor

8  kitchen at least is going to go through three or four different

9  iterations all before we have a confirmation hearing?  I don't

10  think so.  I don't think that they should be permitted to

11  string us along like this.  I don't think that they should be

12  permitted, the debtor doesn't believe they should be permitted

13  to place before the Court today two requests:  One is to

14  recognize a certified class under (d)(2).  And the second is to

15  have the claim form recognized.  I don't think they should be

16  permitted to put both those matters before the Court and then

17  say, oh, well, we were really only asking for permission to

18  file the form, and whatever that class might be down the road,

19  (b)(2), (b)(3), who knows, Your Honor, you're so good and you

20  have so much under the rules, you'll determine that.

21       In fact, they've put more before the Court.  They've

22  put the class form and they've put the recognition of the

23  class.  And what that then implicates are two things:  One is

24  (b)(2).  And (b)(2) is squarely before the Court today.  And

25  then critically, 9014, the discretionary analysis, and that's

1  why I urge that the Court not only focus on the dead cat in the

2  room, which is (b)(2), and the <u>Asbestos Schools</u> case, but focus

3  on all of those different factors that we outlined about why,

4  given the context -- particularly context of this case, the

5  Court should say, no, I am not going to exercise my discretion

6  to apply 7023, that this is not the right case for it.

7           Because if Your Honor doesn't do that, then sure as

8  we're sitting here, there's now going to be a motion, there

9  will be class proof of claim filed, it will be a (b)(3) proof

10  of claim, and then it will move.  Then they will move to

11  certify based upon that class claim a (b)(3) class.   We know

12  they're going to do it.

13           So, I think it's particularly important that the

14  matter is before the Court under 9014.  The Court is seized of

15  the issues under Rule 9014, let's get those issues resolved so

16  that we can get on with the rest of the case.

17           THE COURT:  Any parting comments, gentlemen or Ms.

18  Cabraser?

19           MR. SCOTT:  We appreciate your patience and your

20  time.

21           MS. CABRASER:  Thank you, Your Honor.

22           MR. SCOTT:  Thank you.

23           THE COURT:  All right.  We're adjourned.  Thank you.

24           MULTIPLE SPEAKERS:  Thank you.

25                 (Proceedings Adjourn at 12:04)

1

2                          C E R T I F I C A T I O N

3

4           I, Karen Hartmann, certify that the foregoing is a

5   correct transcript to the best of my ability, from the

6   electronic sound recording of the proceedings in the above-

7   entitled matter.

8

9    /s/  Karen Hartmann                 Date:   July 26, 2008

10  TRANSCRIPTS PLUS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**$**

**$100–** 10:6
**$2–** 81:24 82:1
**$250–** 11:11 12:10
62:6,7
**$30,000–** 12:16
**$44–** 11:13
62:17,23
**$5,000–** 9:16
**$646–** 13:1

---

**'**

**'01–** 42:11
**'02–** 42:11

---

**/**

**/S/–** 88:10

---

**0**

**0111139–** 4:2

---

**1**

**1–** 52:1
**1.6–** 81:24 82:1
**10,000–** 17:11
**10:34–** 41:11
**10:48–** 41:11
**12:04–** 87:25
**1376–** 26:17
**14–** 31:4 46:25
72:10 74:24,25
75:3
**14,000–** 7:14
**15–** 26:5
**1980'S–** 60:15
**1986–** 48:21
**1990'S–** 60:15
61:5

---

**2**

**2.6–** 13:5
**20–** 26:5
**2001–** 26:23
**2005–** 21:12,14
**2008–** 88:10
**22–** 79:17
**23A–** 75:16,18
**23B–** 75:17
**23B1–** 78:3 82:14
**23B2–** 18:18 49:15
55:7 72:1,15
73:21 77:23 78:16
**23B3–** 72:14,25
73:23
**23C1C–** 78:6
**23C2A–** 78:5
**23D2–** 79:8
**25TH–** 26:22
**26–** 88:10

---

**3**

**3,000–** 8:3
**3.2–** 13:5
**300–** 7:18
**3001–** 44:11,13,20
45:1 47:15
**303–** 20:16 22:11
**33–** 81:3

---

**36,000–** 7:14
**3RD–** 48:18,20
49:11,16 52:17
61:1 72:14

---

**4**

**42–** 64:4
**49–**
33:13,15,16,25

---

**5**

**524–** 32:10
**524G–** 28:10
29:17,23
30:1,10,12,24
31:1,3,11 32:2
35:23 39:8 40:10

---

**7**

**7–**
42:5,6,8,14,17,21
43:20 44:24
**7023–** 32:12 42:20
43:2,6 44:7 45:4
48:11 52:11
74:5,8 77:20 78:2
80:17 81:6 87:6
**7TH–** 45:17

---

**8**

**800–** 7:21
**82–** 13:10
**8:30–** 41:2

---

**A**

**ABANDON–** 25:9
79:13
**ABATEMENT–** 17:24
18:1
**ABILITY–** 51:2,4
53:22 88:6
**ABLE–** 8:14,16
10:2,10 15:12
25:24 38:10 55:13
68:7 70:22
**ABLY–** 49:4
**ABOVE–** 25:6 88:7
**ABROGATED–** 50:15
**ABROGATION–** 45:2
**ABSENT–** 84:14
**ABSOLUTE–** 30:10
**ACC–** 4:24
**ACCEPT–** 67:23
84:15
**ACCEPTABLE–** 67:16
70:9
**ACCOMMODATE–** 79:7
81:21 82:10
**ACCOMMODATED–**
79:16
**ACCOMMODATES–**
79:8
**ACCOMPLISH–** 18:1
**ACCOMPLISHED–**
50:17
**ACCOMPLISHES–**
53:17
**ACCORDED–** 50:7
**ACCURATE–** 70:5

---

**ACCUSED–** 74:2
**ACCUSING–** 67:2
**ACHIEVE–** 8:20
38:19,23
**ACHIEVED–** 23:12
39:14
**ACHIEVING–** 35:16
**ACHILLES'–** 61:2
**ACKNOWLEDGE–**
74:17
**ACKNOWLEDGED–**
75:18
**ACROSS–** 28:18
**ACT–** 64:12,17,19
**ACTIONS–** 6:4,23
7:2,7,13
8:19,20,24
9:2,3,25 10:19
39:10 45:15 47:24
60:6,9 61:3,4,6
64:2 76:13
**ACTUAL–** 16:19,20
19:24 48:2,11
**AD–** 56:3
**ADD–** 6:18 40:17
**ADDED–** 38:5
**ADDITION–** 7:24
12:15 34:21
**ADDRESS–** 15:14
20:10 28:22 31:12
33:25 52:4,11
84:24
**ADDRESSED–** 7:21
45:13 48:7 62:14
63:12 72:17 74:12
78:25
**ADDRESSES–** 56:7
**ADDRESSING–** 29:18
31:4,6 34:6 77:19
**ADEQUACY–** 36:6
**ADEQUATE–** 39:14
79:21 83:7
**ADEQUATELY–** 27:17
**ADJOURN–** 87:25
**ADJOURNED–** 87:23
**ADJUDICATION–**
28:7 34:14
**ADMINISTERED–**
51:7
**ADOPTED–** 45:14
46:15
**ADOPTION–** 84:21
**ADVANCE–** 8:10
**ADVERSARY–**
42:9,10,21
**ADVERSE–** 53:21
**ADVICE–** 67:5,11
68:21 70:14
**ADVISED–** 70:8
**ADVISEMENT–** 18:12
**ADVOCACY–** 38:16
**ADVOCATE–** 6:2
32:8 36:2 40:6
**ADVOCATED–** 27:3
41:23 50:17
**ADVOCATING–** 19:19
**AEGIS–** 55:16
**AFFECT–** 22:15
51:17 54:16 56:17

---

**AFFECTED–** 63:8
**AFFIRMED–** 61:4
**AGAINST–** 7:11
19:4 23:17 59:7
81:2,16
**AGENCY–** 20:13
44:21 47:14,21
74:18
**AGENT–** 21:11 27:9
74:14
**AGENTS–** 20:18
21:1 27:9,12
76:23
**AGGREGATE–** 33:9
37:13
**AGREE–** 30:15
66:14 73:4
**AGREED–** 13:2,10
35:21 62:21 64:11
**AGREEMENT–** 77:19
**AHEAD–** 9:22 34:19
42:23 66:17
**AIN'T–** 62:4
**AKIN–** 21:23
**ALAN–** 4:4
**ALBEIT–** 20:19
**ALEX–** 4:6
**ALIVE–** 77:13
**ALLINSON–** 5:10,11
**ALLOW–** 21:17
35:17 78:20
79:9,10
**ALLOWED–** 59:13,24
67:17 81:20 82:15
**ALLOWING–** 28:2
78:15 81:20
**ALONE–** 31:1,13
38:11 51:19
**ALTERATION–** 77:21
**ALTERED–** 78:7
**ALTOGETHER–** 37:4
**AM/RECONVENE–**
41:11
**AMCHEM–** 56:24
57:2,11 60:7,10
79:17,18,20,21
80:5,8,9
**AMEND–** 85:14
**AMENDED–** 78:7
**AMENDMENT–** 78:13
85:11,15
**AMERICAN–** 22:6
45:16 76:11
**ANALYSIS–** 22:21
43:24 46:16,17
48:4 84:18 86:25
**ANALYZES–** 8:23
**ANDERSON–** 65:23
**ANDREW–** 4:4
**ANNOUNCED–** 24:9
64:15
**ANOMALY–** 21:23
**ANXIOUS–** 59:20
**ANYWAY–** 41:4
**APPARENT–** 15:3
**APPEAL–** 56:19,21
58:15 61:5
**APPEALS–** 23:20
**APPEAR–** 4:3 19:18

---

23:8 24:12 25:13
**APPEARANCE–** 79:9
**APPEARANCES–** 5:25
**APPEARED–** 6:3
18:8 24:7 70:12
**APPEARING–** 5:20
6:10
**APPEARS–** 34:1
**APPLICABLE–** 41:14
43:10
**APPLICANT–** 30:17
**APPLICATION–** 42:8
46:21 48:12 51:21
52:25 84:19
**APPLICATIONS–**
42:5
**APPLIED–** 42:17
43:6
**APPLIES–** 44:2
**APPLY–**
43:1,10,11,13,14,
21
42:16,19,23 45:9
46:5,17,22 47:9
48:10,11 51:19
55:23,24 64:5
74:8 84:4 87:6
**APPLYING–** 44:24
46:7 47:5,11
**APPOINTED–**
18:18,20 19:21,22
22:12 26:19 37:16
**APPOINTEE–** 19:20
**APPOINTING–** 78:14
**APPOINTMENT–**
19:20
**APPRECIATE–** 64:14
87:19
**APPROACH–** 41:23
48:2
**APPROPRIATE–** 22:8
31:2,12 54:15
66:23 78:5,18
**APPROPRIATELY–**
36:12 80:25
**APPROVAL–** 84:20
**APRIL–** 26:22
**AREA–** 62:5 65:3
66:5
**AREAS–** 12:15
**AREN'T–** 12:2
53:14 54:2 82:2
**ARGUE–** 40:11 47:6
53:14,15 70:15
73:4,6,16 80:17
**ARGUED–** 49:4
65:24 74:25
**ARGUES–** 79:25
**ARGUING–** 33:22
36:15 68:16
**ARGUMENT–** 23:18
44:17,18,19 72:19
73:19,25 75:10
79:17,18
**ARGUMENTS–** 25:22
58:12
**ARISE–** 74:23
**ARLENE–** 4:4
**AROSE–** 66:10

ARRANGEMENT- 64:16,20
ARROGATE- 47:9
ARTHUR- 49:4
ASBESTOSIS- 29:25
ASPECT- 32:17 38:14
ASPECTS- 39:10,20 63:23 64:3
ASSERT- 78:24 79:3
ASSERTED- 35:2,3
ASSERTING- 16:12 82:8
ASSESSMENT- 85:6
ASSETS- 81:14,17
ASSIGNED- 26:15
ASSOCIATED- 65:9
ASSUME- 33:12,16
ASSUMING- 17:8 25:5 82:3
ASSURANCES- 79:21 80:7
ASSURES- 28:18
ASSURING- 29:18
ASTRONOMICAL- 17:12
ATOMIC- 79:6
ATTEMPT- 71:24
ATTEMPTING- 6:22 73:17
ATTIC- 17:22 26:17 32:20 63:11,17
ATTIC-FILLED-63:7
ATTORNEY- 77:16
ATTORNEYS- 16:21
ATTRACT- 29:14
ATTRACTIVE- 64:25
AUTHORITY- 20:20 21:1,10 22:3,10,14,19 24:21 70:17 71:23 76:24
AUTHORIZING- 31:8
AVAILABLE- 38:12,19,21
AVERAGE- 9:16 79:3
AVOID- 16:13,22 17:9,13
AWARE- 70:21 71:9

B

B1- 78:19
B3- 49:9 60:24 82:14 85:11,16,17,20 86:19 87:9,11
BACK- 4:1 52:21 67:15 70:6 81:22 83:14 85:24 86:2
BACKED- 40:20
BACKGROUND- 6:21
BAENA- 4:9 24:7 64:16 66:21 67:5,15,17,19,21 68:16,21 70:8,14
BAENA'S- 70:5
BAER- 4:11

BALANCED- 57:17
BANK- 37:7
BANKRUPTCIES- 28:11
BANKS- 10:15
BAR- 8:10 54:7,11 57:24 59:6,10,20 63:23 64:3 85:22,23 86:4,6
BARBANTI'S- 53:11
BARGAINING- 37:18
BARRED- 25:2
BASED- 87:11
BASIS- 17:8 21:16 23:10 29:14 33:4 51:6 53:19 55:6 73:15
BEANE- 4:8
BEAR- 43:16
BEARING- 29:12
BEAT- 10:10
BECOME- 15:2 28:13 29:5 31:23
BECOMES- 17:12 29:16
BED- 10:22
BEHIND- 15:20
BELABOR- 8:18
BELIEVED- 15:7 70:16 72:19 73:9
BELLWETHER- 34:8 77:3
BELLWETHERS- 34:9
BENEFIT- 8:24 23:25 55:2 56:22
BENEFITS- 15:25 63:19
BERNICK'S- 70:4 74:1 79:17
BIG- 60:8
BILLION- 10:7,8 13:4,12 81:24 82:1
BINDING- 53:15
BIRD- 57:14
BIT- 52:24 54:17 68:5 72:1
BLACK- 45:21
BLANKS- 12:24
BLESS- 10:5
BLEW- 11:1
BOARD- 7:17
BODY- 39:6
BOMB- 79:6
BONA- 36:5
BONDHOLDERS- 37:7
BORN- 16:2
BORNE- 16:3
BOSTON- 19:5
BOTH- 18:24,25 19:13 20:3 38:15 39:6,22 43:12 85:1 86:16
BOUND- 55:4 85:22
BOX- 44:5
BOYER- 4:3
BRAND- 49:18,20 55:5,17 65:18
BRANDED- 29:1

BREACH- 80:21
BREAK- 41:4,7
BREATHE- 77:11
BRIEF- 6:8,15 71:17 83:19
BRIEFED- 19:6
BRIEFING- 26:20,21
BRIEFS- 8:11 65:24
BRINGS- 64:3 77:2
BROADER- 54:1 63:8
BROUGHT- 8:6 16:12,17 19:11 20:21 21:5 42:13 43:16 45:1 52:10 58:25 73:18
BRUNT- 29:12
BUCKWALTER- 58:14,18
BUILD- 83:9
BUILDINGS- 7:20,23
BUNCH- 60:22 62:19
BURDEN- 25:25
BURDENED- 23:5 53:11 55:9
BUSH- 18:19 19:17,25 20:13,17 23:2 27:10 32:23 36:5 76:23 84:8
BUSINESS- 10:2 60:1
BUSINESSES- 29:2

C

CABRASER'S- 14:11
CALCULATOR- 56:22
CALL- 6:11 12:20 42:8 52:6
CALLED- 24:17 26:16 60:11 63:23 82:6 84:10
CAMERON- 4:9 18:7
CAMPAIGN- 17:15
CAN'T- 25:1 30:13,18 48:23 49:24 50:15 57:3 64:14 72:15 73:3,21 75:8 76:15 77:8 78:23 85:14
CANADIAN- 5:7
CARE- 11:10,13 56:11
CAREFUL- 47:15 52:3 70:13 84:7
CARRY- 69:19
CARRYING- 69:18
CASES- 7:10,19 21:15,19,20 22:8 30:3,5 35:3 37:1,3 45:18 60:22,23 61:9,11,22 68:19 CAST- 6:23 9:17
CAT- 48:15,16

73:19 77:9,12,13,23 86:7 87:1
CATCH- 79:17
CATEGORY- 38:20
CAUSING- 29:8
CENTER- 7:22
CENTRAL- 7:24,25 8:4
CERTAIN- 42:15
CERTAINLY- 16:8 25:1 32:9 38:9 44:12,22 46:2 47:23 54:2 67:4
CERTIFICATIONS- 47:17 56:20
CERTIFY- 11:20 20:9 22:24 34:18 43:19 48:19 72:15 78:19 87:11 88:5
CERTIFYING- 18:13 60:20 76:2 84:12
CHALLENGES- 77:2
CHANCE- 49:5
CHANGED- 72:25
CHANNEL- 28:13,16 35:19,21,22
CHANNELS- 35:18
CHARACTERISTICS- 43:7
CHARACTERIZATION- 70:5
CHARGED- 26:19 27:14 39:19
CHART- 14:4 60:5 61:24 63:18
CHARTS- 60:4
CHASTISED- 65:12
CHIEF- 8:23 9:1,23
CHOOSE- 69:9
CHRISTINA- 4:3
CIRCUIT- 45:13,14,17 47:23 48:18 49:11,16 52:17 60:19 61:1 72:14
CIRCUIT'S- 48:21
CIRCUITS- 48:22
CIRCULATED- 70:4
CIRCUMSTANCES- 7:1 21:21 30:14 31:3 39:4 40:5 42:24 46:1 50:17 63:2 75:19,20 76:12 84:15
CITE- 84:14
CITED- 45:18,19 76:11
CITIES- 7:20
CITING- 84:6
CIVIL- 43:2 47:6 74:1
CLAIMANT- 9:16 11:4 19:17 49:23 50:6 55:25 70:24 73:17
CLAIMANTS'- 38:10 41:24 49:19

CLAIMING- 81:13
CLARIFIES- 70:1
CLASSES- 15:5 35:15 59:9 60:20 61:8 80:6 81:5
CLASSIC- 52:15 76:14
CLEAN- 12:16
CLEANED- 62:8
CLEANUP- 62:9 63:9
CLEVER- 47:25
CLIENTS- 49:19 51:12 53:24 75:6
CLIENTS'- 53:25
CLOSE- 13:3 73:3 85:24
CLOSED- 26:3
CLOSELY- 63:5
CO-COUNSEL- 6:13
CODE- 32:7 41:17,18 42:4 45:2,6 59:11 63:22 64:3,5
COGNIZANCE- 37:17
COHERENT- 48:9
COHESIVE- 14:2
COLLATERAL- 46:4
COLLECT- 50:12
COLLECTIVE- 16:11,18 27:4,14 31:6 32:1 36:22 37:12 40:1
COLLECTIVELY- 21:6 37:13
COLLEGE'S- 8:3
COLLOQUY- 70:6
COME- 8:2 10:8,15 30:12 31:21 32:2 39:25 42:2 56:1,5 57:23 59:5,10,20 61:11,25 65:21 67:18 70:15 80:21
COMES- 15:8 33:18 55:12,20 56:8 57:13
COMFORTABLE- 69:14
COMING- 9:1 31:18 84:23
COMMANDED- 79:20
COMMENT- 20:22,23
COMMENTS- 6:18,22 60:4 69:25 83:12 87:17
COMMERCIAL- 61:6 63:6,11
COMMITTEE'S- 71:2
COMMITTEES- 36:25 37:1,5,6,7,9,10 39:24
COMMON- 9:5,6 63:24,25 64:23
COMMONPOINT- 8:22
COMMUNITY- 18:17 23:16 69:15 75:6
COMPANY- 56:22
COMPELLED- 53:2
COMPENSATE- 64:11

**COMPENSATION-** 9:4,9,10,11,12,20 25:9 51:6 63:20 64:11
**COMPENSATORY-** 48:25 72:21,23
**COMPETENT-** 46:7
**COMPLAINT-** 42:10
**COMPLEMENT-** 31:13 40:8
**COMPLETE-** 34:3 38:6 40:12 62:4
**COMPLETED-** 83:5
**COMPLETELY-** 47:7,8 56:6 64:1,14 79:23
**COMPLEX-** 18:24 22:25 66:16 67:16
**COMPLEXITY-** 19:1
**COMPLIANCE-** 43:11,13,17
**COMPLICATE-** 8:11 35:15
**COMPLICATED-** 32:25
**COMPLICATES-** 22:22
**COMPONENT-** 39:3
**COMPONENTS-** 83:10
**COMPREHENSIVE-** 35:16
**COMPROMISES-** 40:2
**COMPROMISING-** 51:21 53:25
**CONCENTRATE-** 63:5
**CONCEPT-** 68:1
**CONCEPTS-** 80:20
**CONCERN-** 52:20 60:25 71:25 77:17,19
**CONCERNS-** 68:16
**CONCLUDE-** 81:19
**CONCLUDED-** 49:12 74:13 84:19
**CONCLUSION-** 59:1
**CONDITIONS-** 57:18
**CONDUCT-** 65:12 77:21
**CONFERENCE-** 68:2
**CONFIDENCE-** 25:23 28:16,17 35:7,17
**CONFIDENT-** 14:16
**CONFINED-** 42:21
**CONFIRMATION-** 25:1 85:25 86:9
**CONFLATE-** 84:18
**CONFLATED-** 46:16
**CONFLICT-** 32:9 56:25 57:8 69:3,4 80:1
**CONFLICTED-** 68:18
**CONFLICTS-** 40:22 57:6
**CONFLUENCE-** 28:25
**CONFRONTING-** 9:17
**CONNECT-** 59:3
**CONNECTION-** 53:12 59:5 62:14 84:1
**CONSENSUAL-** 28:7
**CONSEQUENCE-** 72:20
**CONSIDER-** 34:15
**CONSIDERATION-** 44:1
**CONSIDERATIONS-** 22:22 65:1
**CONSIDERING-** 34:20
**CONSISTENT-** 46:8,14 50:15
**CONSISTING-** 37:6
**CONSOLIDATED-** 64:5
**CONSTITUENCY-** 27:18 31:15 34:25
**CONSTITUENT-** 36:24
**CONSTITUTE-** 32:9
**CONSTRAINED-** 55:13
**CONSTRAINING-** 51:12
**CONSTRAINTS-** 66:3,15
**CONSTRUCT-** 59:4 69:11 79:11
**CONSTRUCTIVE-** 34:13
**CONSULT-** 70:14
**CONTAINED-** 16:5
**CONTAMINATE-** 17:6
**CONTAMINATED-** 10:20 17:1,3,6
**CONTAMINATES-** 17:23
**CONTAMINATING-** 16:4
**CONTAMINATION-** 11:12 13:15 16:6
**CONTEMPLATING-** 61:19
**CONTESTED-** 42:12
**CONTESTING-** 23:15
**CONTEXT-** 29:23 30:11 39:15 43:8 48:8 51:14,15,16 52:25 53:3,8 54:15 73:12 87:4
**CONTINUE-** 70:11
**CONTINUING-** 65:22
**CONTRACT-** 80:21
**CONTRACTORS-** 37:8
**CONTRADICTORY-** 32:4
**CONTRARY-** 44:15 45:6 48:17 52:16
**CONTRAVENE-** 48:20,22
**CONTROL-** 54:21
**CONTROLLING-** 39:11
**CONVERSATION-** 66:25
**CONVERSATIONS-** 70:11
**CONVINCE-** 75:11
**COOPERATIVE-** 67:1
**CORDIAL-** 67:1
**CORPORATIONS-** 80:22,23
**CORRECTED-** 73:22
**COST-** 29:11 33:3
**COSTS-** 32:22 33:5 63:16
**COULDN'T-** 67:23
**COUNT-** 17:10 56:13
**COUNTERPART-** 19:2 34:18
**COUNTIES-** 7:20
**COUNTRIES-** 33:17 34:1
**COUNTRY-** 28:18 33:4 56:15 60:14,19 61:14
**COUPLE-** 19:23 60:4 83:11
**COURSE-** 30:4 31:11 53:13 71:21 85:12
**COURT'S-** 42:1,24 60:25
**COURTHOUSE-** 23:8 25:3,16,20 26:3 73:3
**COURTROOM-** 9:21 24:6 28:11
**COURTS-** 16:10,22,23 22:7 28:18 29:19,21 32:15 34:8,19 39:7 44:10 47:1 65:19 74:25 78:16 80:19 81:4 86:5
**COVERS-** 15:5
**COWS-** 56:5
**CRAFT-** 21:24,25 84:17
**CRAFTED-** 16:12
**CRAIG-** 4:4
**CREATE-** 16:19 57:3 58:22,23 59:8
**CREATED-** 16:10
**CREATES-** 18:4 42:22
**CREATING-** 60:17
**CREATURES-** 80:23
**CREDITOR-** 25:16,18,19,21 27:8 35:14 36:1 39:23
**CREDITOR'S-** 25:21
**CREDITORS-** 9:11 19:19 36:1 37:3 38:22 80:21,23
**CREDITORS'-** 5:5
**CRIMINAL-** 19:4
**CRITICAL-** 59:18
**CRITICALLY-** 86:25
**CROSS-** 18:5
**CURRENT-** 42:20

D

**D2-** 84:5,25 86:14
**D3-** 84:25
**DAIS-VISCA-** 4:11
**DAMAGES-** 38:4,18 40:3 49:1,14 50:12 51:4 72:15,18 73:21 79:3
**DANGER-** 29:7
**DANIEL-** 4:6 5:6
**DARRELL-** 4:18 5:23
**DATE-** 8:10 52:21 54:7,11 57:24 59:6,10,20 63:23 64:3 85:22,23 86:4,6 88:10
**DAVID-** 4:8,10,15
**DAY-** 18:11 85:6
**DAYS-** 72:10
**DC-** 57:10
**DEAD-** 48:15,16 73:19 77:9,23 87:1
**DEAL-** 11:9 16:23 21:15 28:12 29:6 32:20 33:4 38:13 42:6 51:25 57:14 58:9,10,16,18,24 59:8 67:9 73:21 74:22 84:3
**DEALING-** 16:15 48:14 65:2
**DEALS-** 44:11 46:21
**DEAR-** 6:20
**DEBRA-** 4:5
**DEBTOR-** 6:25 10:2 16:19 28:14 33:22,23,24 37:18 39:17,22 65:7,11 69:3,4,18 71:12 77:2 81:23,25 82:1 86:12
**DEBTOR'S-** 10:1
**DEBTORS-** 23:25 70:4,7,16
**DEBTORS'-** 70:8 71:8,13
**DECADES-** 16:24
**DECERTIFICATION-** 23:19
**DECERTIFY-** 23:20 79:13 85:15
**DECIDE-** 36:9 45:9 46:23 54:4,11 56:10 59:23 66:1 78:18
**DECIDED-** 45:20 48:23 60:19,23 62:12
**DECIDES-** 50:10 43:5,9,12,13,17,21
**DECISION-** 21:13 45:10 46:11,12 48:21 50:9,24,25 64:19 84:6,22
**DECISION-MAKING-** 47:10
**DECISIONS-** 43:4,12 60:13 66:4
**DECISIVE-** 65:21
**DECLARATION-** 23:3
**DECLARED-** 81:15
**DECREE-** 39:21
**DEDICATED-** 31:14 34:24 79:23 83:6
**DEDICATION-** 36:5
**DEEM-** 73:15
**DEFEAT-** 25:11
**DEFECT-** 53:6,7
**DEFEND-** 23:17,23 40:19 71:24 73:17 76:20
**DEFENDANT-** 81:12
**DEFER-** 14:7 45:3
**DEFERRED-** 20:4
**DEFINED-** 39:17,18
**DEFINITION-** 82:23
**DEGREE-** 29:7
**DELAWARE-** 19:18 30:3,5
**DELAY-** 72:7 86:2
**DELAYED-** 32:25
**DELICATELY-** 57:17
**DEMONSTRATE-** 25:23,24 31:11 36:5 40:11 77:1
**DEMONSTRATES-** 76:18
**DEMONSTRATING-** 15:1 19:13
**DEMONSTRATIVES-** 7:5
**DENIED-** 25:12
**DENIES-** 78:6
**DENY-** 79:13
**DENYING-** 13:17
**DEROGATION-** 52:15
**DESCRIBED-** 48:15
**DESERVE-** 24:1
**DESIGNATED-** 27:9,13 74:18 84:8
**DESIGNED-** 32:6 58:22,23 63:22 86:1
**DESPITE-** 49:12
**DETERMINATION-** 53:5,20 54:2 55:7 57:25 58:16 65:10 75:25 76:4 84:16
**DETERMINATIONS-** 39:15 84:12
**DETERMINE-** 21:17 34:9 36:3 82:6,15,22 86:20
**DETERMINED-** 19:12 22:11,16,18 45:5 46:6 56:7 59:21
**DETERMINING-** 31:10 84:7
**DETERRENCE-** 9:4,23,24 63:20 65:6
**DETROIT-** 7:17
**DEVICE-** 6:23 20:23,24 22:7 23:24 25:25

DEVICES- 40:9
DEVINE- 4:9
DICTATED- 42:24
DIDN'T- 10:9 21:9
22:23 49:5 64:20
66:16,22 67:8
70:19 82:19
DIED- 65:23
DIES- 4:11 67:9
DIES'- 7:19
DIFFERENCE- 75:17
DIFFERENCES-
60:21
DIFFERENT- 17:13
22:20 40:22
43:13,25 47:8
49:17 57:5 61:9
63:6 76:3 86:8
87:3
DIFFERENTIATING-
81:1
DIFFICULTY- 25:4
82:2
DIMINISHED- 33:1
DIRECTED- 18:10
62:15
DIRECTLY- 11:7
48:20 52:16
DISABLED- 67:21
DISAVOWED- 40:21
DISCHARGED- 35:18
DISCLOSE- 32:20
DISCLOSURE- 16:4
DISCOVERED- 11:5
DISCOVERY- 11:6
18:10
DISCRETE- 34:5
DISCRETION- 42:24
43:18,21 44:24
46:2,23 47:19
87:5
DISCRETIONARY-
42:23 46:19 82:13
86:25
DISCRIMINATING-
81:2
DISCUSSIONS- 9:7
63:25
DISENFRANCHISED-
68:3
DISENFRANCHISING-
71:12
DISMISSED- 42:12
DISPARATE-
60:17,18
DISPLACES- 43:22
44:22
DISPOSITIVE- 53:7
DISPUTED- 81:25
DISREGARDED-
46:20
DISTINCTIONS-
81:8
DISTRIBUTED- 29:2
34:17
DISTRIBUTION-
10:24 11:8
DISTRICT- 8:22
21:14 26:14

30:3,5,6 46:13
49:12 81:7
DISTRICTS- 7:14
DISTURB- 17:5
DISTURBANCE- 18:4
DIVIDED- 6:7
DOESN'T- 9:12
24:3 33:21 43:18
45:22 51:8
52:20,23 55:8
56:16 79:4 85:8
86:12 87:7
DOLLARS- 13:4,12
51:3
DOOR- 23:8
25:3,16,20 26:3
DOORS- 73:3
DOTS- 59:3
DOUBT- 24:1
DOUBTLESSLY- 75:3
DOUGLAS- 4:9
DRIVE-BY- 18:6
DROVE- 63:16
DUE- 23:11 31:11
39:10,13
50:7,14,15 51:10
56:8 59:12 62:2
66:18 76:7 77:24
78:18,24 81:12,21
DUTIES- 25:5
DUTY- 25:6
DYNAMICS- 67:8

E
EACH- 48:5
EARLIER- 26:23
69:13,14
EARLY- 60:15
EARNESTLY- 58:24
EASEL- 42:2
EASY- 61:17
ECONOMIC- 29:13
61:7
ECONOMIES- 38:23
ECONOMY- 39:21
ED- 4:16 5:20 6:9
49:5
EDUCATE- 50:23
55:16 67:18,20
EDUCATED- 17:15
EDUCATION- 7:17
17:10,20 27:6
38:17 50:21 55:11
EDUCATIONAL-
17:15
EDWARD- 4:5
EDWARDS- 4:10
EFFECT- 22:13
34:7
EFFECTIVE- 31:6
EFFECTUATE- 8:16
EFFICACY- 65:1
EFFICIENCIES-
64:10
EFFICIENCY- 9:4,5
63:20,21,22,23
EFFICIENT- 78:25
EFFICIENTLY- 6:6
EFFORT- 51:11

54:16 65:22 72:7
ELECTRONIC- 9:7
ELEMENT- 76:7
ELEMENTS- 20:11
22:23 75:23 76:14
ELEPHANT- 57:14
ELIHU- 5:10
ELIMINATE- 48:24
ELIMINATING-
73:23
ELIZABETH- 4:7,9
5:2 6:1 14:18
15:15 18:20 24:17
26:4
ELSEWHERE- 46:15
63:16
EMAIL- 64:16
66:21 67:22
EMAILING- 68:7
EMBARK- 31:9 34:3
EMBODIED- 80:5
EMBRACE- 76:13
EMBRACING- 22:6
EMPOWERED- 23:5
75:24
ENABLE- 27:19
28:6 81:5 82:17
ENABLES- 28:16,17
31:9 32:6 34:3
79:9
ENCOUNTER- 17:5
ENDLESSLY-
18:22,24
ENFORCE- 80:19
ENFORCEMENT-
21:22
ENFRANCHISED-
68:4
ENGAGE- 22:21
ENGAGEMENT- 40:22
ENLIGHTENED-
14:21
ENLIGHTENING-
14:20
ENORMOUS- 55:2
56:25 57:11
ENSURE- 59:7
ENTIRE- 61:13
ENTIRELY- 46:8,9
ENTITLED- 23:22
82:21 88:8
ENTITY- 18:14
28:17,18 31:23
ENTRIES- 4:14
ENVIRONMENT-
30:10 51:15
ENVIRONMENTAL-
11:15 13:16,20
62:19
EPA- 11:11 12:10
62:4,5,7,12
63:8,11,15
EPA'S- 62:9 63:9
EQUALS- 55:25
EQUATION- 42:25
43:1
EQUIPPED- 33:4
EQUITABLE- 14:25
16:12,17 27:5

32:14 40:2 48:25
52:14 72:18
EQUITIES- 82:16
EQUITY- 10:6
32:24 49:18
78:17,18 81:24
82:2
EQUIVALENT- 78:3
ESAYIAN- 4:12
ESCAPE- 78:23,24
ESSENCE- 55:21
ESSENTIAL- 52:22
69:17
ESSENTIALLY-
49:14 51:11 52:22
69:18
ESTABLISH- 15:11
51:19
ESTABLISHED- 40:8
61:21 75:23
ESTABLISHING-
18:14
ESTATE- 17:2
ESTIMATE- 13:3
57:23
ESTIMATED- 7:15
59:14
ESTIMATES- 58:8
ESTIMATION- 34:7
57:20 58:7 82:4
ESTOPPEL- 46:4
EVADED- 71:19
EVERYBODY-
55:6,12 56:17
59:22 64:4
EVERYBODY'S-
63:17
EVERYONE- 5:14
28:11 41:8
EVERYTHING- 55:18
60:9 62:1 80:16
EXAMPLE- 17:3
18:2 29:16 34:4
65:7
EXCEED- 81:16
EXCEEDS- 81:17
EXCELLENT- 36:19
EXCEPT- 42:9
EXCHANGE- 16:21
EXCLUSIVELY-
41:16
EXECUTIVE- 26:19
EXEMPLARS- 34:9
EXERCISE- 44:23
45:8 46:23 47:19
55:13 78:17 87:5
EXERCISED- 46:2
EXISTENCE- 21:5
27:17
EXPANDED- 11:2
15:3 63:4
EXPANSION-
62:11,16,18,20,23
,24
11:2,12 34:16,20
77:21 78:14
EXPEDITED- 33:6
40:12
EXPEDITIOUSLY-

83:5
EXPENSE- 16:19
17:14,17 18:4
69:19
EXPERIENCE- 7:1
18:22,24
30:4,7,9,12,13,14
,18
29:21,22,23,25
32:15 35:6 36:6
EXPERTISE- 66:14
EXPERTS- 18:9
EXPLAINED- 27:3
EXPLAINING- 15:16
EXPRESS- 46:20
EXPRESSED- 58:6
EXTENT- 58:1,5
82:24,25
EXTRAORDINARY-
84:14
EXTRAPOLATE- 35:7
EXTRAPOLATIONS-
56:2

F
FACED- 69:12
FACTORS- 21:17
51:23 54:18,20
87:3
FACTUALLY- 15:9
FAILING- 45:7
46:5
FAIR- 28:1,5
55:14 78:25 82:8
FAIREY- 4:3
FAIRLY- 9:12
22:25 48:15
FAIRNESS- 39:22
55:8
FAITH- 67:2
FALL- 45:17
FALSE- 44:18 45:2
FAR- 11:14 28:11
51:9 53:22 64:9
70:23
FASHION- 51:7
74:3
FASTED- 64:22
FATAL- 19:15
FCR- 5:1
FEAR- 17:19 28:15
FEASIBLE- 33:5
FEET- 49:5
FELDER- 4:5
FELT- 60:16 63:8
69:14
FIDES- 36:5
FIDUCIARIES- 23:4
27:14 31:16 76:24
FIDUCIARY- 74:14
FIELD- 9:14,18
18:22
FIFTY- 72:4
FIGHT- 15:10,11
FIGURE- 11:14
17:12 62:17
FILED- 7:9 8:11
19:2 24:9 26:23
30:3,5,6 42:11

63:15 72:10 73:13
75:2,9,19,22,24
83:22 85:23 86:4
87:9
**FILING-** 14:19
25:7 44:11 74:10
**FILL-** 63:11
**FILLED-** 12:24
**FINAL-** 39:16
45:25 46:4 78:7
**FINALITY-** 15:17
20:25 24:1
**FINALLY-** 12:22
46:6 57:13
61:22,25 65:24
**FINANCIAL-** 17:25
25:7
**FIND-** 24:14 47:13
59:1
**FINDING-** 47:12
**FINDINGS-** 37:20
**FINE-** 50:5 68:15
**FINISHES-** 14:11
**FIRM-** 6:1 66:20
**FIRST-** 7:6 12:25
14:2 19:16,19,23
20:5 30:23,24
31:24 46:16 48:11
72:16
**FIVE-** 17:11
**FIVE-MINUTE-**
41:2,7
**FLATEY-** 18:7
**FLEW-** 19:18
**FLEXIBLE-** 82:17
**FLURRY-** 71:20
**FLY-** 79:6,7
**FOCUS-** 6:17 59:18
87:1,2
**FOCUSES-** 43:7
**FOLKS-** 10:10 48:7
51:17 53:10,24
55:15 57:12,16
64:24 67:5 68:6
69:15,20
**FOLLOW-** 44:3
51:18
**FOLLOW-ON-** 83:5
**FOOTNOTE-** 46:25
74:24,25 75:3
84:14
**FORECLOSE-** 16:14
**FOREGOING-** 88:5
**FORM-** 10:19
83:22,24 84:21
85:5 86:15,18,22
**FORMAT-** 82:12
**FORTH-** 39:10
41:17,18 44:15
46:25 69:19 70:6
**FORTUNE-** 49:22
**FORWARD-** 31:19,21
33:18 56:1 57:24
58:23 59:10,21
61:12 69:17 70:22
**FOUGHT-** 18:5 72:2
**FOUND-** 44:14 45:6
46:1 63:15
65:8,12,18 66:24

**FOUNDATION-** 83:9
**FOUR-** 86:8
**FOUR-LETTER-** 8:19
**FOURSQUARE-** 21:24
**FRANCISCO-** 6:2
**FRANKEL-** 4:6
**FRANKLY-** 68:18
**FREE-** 28:14
**FRESH-** 27:20
28:14 35:16
**FRONT-** 24:4
35:9,10
**FULL-** 18:11 57:20
**FULLY-** 77:17
**FUNCTION-**
50:13,14
**FUNCTIONALLY-**
74:16
**FUNCTIONING-**
36:20,21
**FUND-** 51:4,7
55:12 59:7 78:3
81:13,18 82:9
**FUNDING-** 31:17
35:25
**FUNDS-** 82:3
**FURTHER-** 28:7
36:5 66:12 67:23
77:20
**FUTURE-** 16:14
17:9 28:15 29:16
31:4 35:15,20
39:3,17 55:6
57:11 80:10,13
**FUTURES-** 28:12
38:15 54:21,23
57:1,2,9

---

**G**

**GAME-** 22:25 34:19
**GENERAL-** 10:19
**GENERATE-** 16:21
**GENTLEMEN-** 87:17
**GENUINE-** 71:19
**GEORGE-** 7:22
**GERMANE-** 51:15
**GETS-** 51:12 54:14
**GIVE-** 6:7,15 9:12
14:24 40:24 50:23
59:11 85:5,17
**GIVEN-** 30:25
31:3,17 36:22,23
37:3 65:17
66:2,3,22 87:4
**GIVES-** 19:9 22:13
39:13
**GIVONE-** 4:12
**GLOBAL-** 14:25
**GO-** 9:22 10:1
15:10,11 17:16
20:4 32:7 38:19
42:23 47:15 48:3
51:13,22,24
56:4,5 60:21
63:17 64:22 66:16
81:17 82:3 85:10
86:8
**GOAL-** 9:10,24
**GOALS-** 9:3

**GONE-** 51:1,3
4:14,16,18,20,22,
25
5:2,4,6,8,10,12,1
8,19
**GOOD-** 28:3 46:24
47:20 53:10 69:23
86:19
**GOT-** 7:15 8:12,13
11:9 26:21 44:3
47:21 54:22 55:18
56:9,16 59:12,22
60:22 62:20,23
63:19,23 65:6
68:18
**GOTCHA-** 82:18
**GOVERN-** 39:11
80:16
**GOVERNED-** 41:16
**GOVERNMENT-** 7:23
62:15
**GOVERNS-** 39:6
**GRACE'S-** 10:6,20
12:23 18:8 72:3
**GRANT-** 80:25
**GRANTED-** 85:20
**GRANTING-** 15:25
16:1
**GRANTS-** 78:6
**GREGG-** 8:23
9:1,23
**GREGORY-** 4:3
**GROUP-** 7:22 39:18
45:22 64:13 68:19
**GUESS-** 64:18,22
**GUIDANCE-** 66:4
**GYPSUM-**
8:5,6,7,13

---

**H**

**HADN'T-** 80:10
**HALF-** 11:14 13:4
**HAMSTRINGING-**
76:3
**HAND-** 57:15
**HANDCUFF-** 76:5
**HANDLE-** 69:3
**HANDS-** 70:24
**HAPPILY-** 72:13
**HAPPY-** 75:10
**HARBOR-** 29:4
**HARD-** 29:13
**HARM-** 38:18
**HARMONIZE-** 9:3
**HASN'T-** 30:11
62:12
**HASTEN-** 40:12
**HE'S-** 19:22 68:18
73:7
**HEAD-** 83:4
**HEAR-** 30:3 70:11
**HEARD-** 5:15
6:22,24 10:5
23:12 27:5 32:17
54:22 58:12
64:8,12 71:20
76:7,9 81:23
**HEARING-** 18:11
19:6 24:6,8

26:9,20,22 61:16
72:4 82:4
85:16,17 86:9
**HEARS-** 30:17
**HEARTS-** 6:20
**HEEL-** 61:2
**HELP-** 7:6 8:20
11:24
**HELPED-** 67:19
**HIATUS-** 24:18
26:24
**HIGHLY-** 88:24
**HISTORICAL-**
6:8,16
**HISTORY-** 15:20
**HOELZLE-** 4:8
**HOGAN-** 5:6
**HOLDS-** 77:19
**HOME-** 10:25 12:16
14:8 17:4 18:3
56:5
**HOMEOWNER-** 9:16
10:14 32:19,22
35:6
**HOMEOWNERS-** 9:22
11:7 14:3 17:1,15
23:17 27:16
29:6,9,11,12
33:2,20 72:5
**HONOR'S-** 53:20
58:15 65:9 69:25
**HORKOVICH-** 4:5
**HOSPITALS-** 7:20
**HOW'S-** 55:14
**HUGE-** 50:22 58:9
**HUGELY-** 51:20
**HURFORD-** 4:24
**HYPOCRISY-** 72:1

---

**I**

**I'D-** 41:13
**I'LL-** 4:14 46:11
48:4 50:1 60:3
70:12 71:16 76:10
**I'VE-** 6:22 7:5
46:18 51:17 56:9
**IDAHO-** 9:16
**IGNORED-** 80:19
**IMAGINATIVE-** 74:3
**IMAGINE-** 25:22
**IMAGINING-** 25:4
**IMMEDIATELY-**
11:11 51:9
**IMPACT-** 29:10
33:2 48:2
**IMPACTED-** 39:23
**IMPEDIMENT-** 15:17
**IMPLEMENT-** 31:18
80:19
**IMPLEMENTATIONAL-**
39:20
**IMPLEMENTING-**
35:24
**IMPLICATES-** 86:23
**IMPLICATING-**
29:19
**IMPORTANCE-** 19:1
**IMPORTANT-** 9:10
10:20 14:15 34:23

48:3 51:24,25
79:1 87:13
**IMPROVE-** 58:20
78:13
**INCEPTION-** 20:2
35:10
**INCHOATE-** 39:22
**INCONSISTENT-**
32:5 46:9
**INCORPORATING-**
75:16
**INCURRING-** 17:14
**INDEED-** 14:21
31:11 34:2,9
44:15 47:18 49:17
50:19 51:20 57:17
58:14 61:6 62:24
65:9,16 85:24
**INDICATED-** 69:13
**INDICATING-** 52:6
**INDICATION-** 52:1
**INDISCERNIBLE-**
55:23 56:12 83:15
84:2,25 85:11
**INDIVIDUALLY-**
7:21 72:22
**INDIVISIBLE-**
16:18 18:16
**INDULGENCE-** 42:1
**INDUSTRY-** 17:2,4
**INFLECTION-** 68:11
**INFORMATIVE-**
21:13
**INFORMED-** 36:3
**INGENIOUS-** 52:15
**INGENUITY-**
49:13,20
**INHERENT-** 40:22
**INHERENTLY-** 26:25
27:4 36:22 40:1
80:13
**INIMICABLE-** 9:2
**INITIALLY-** 61:16
**INJECTED-** 56:18
**INJUNCTION-** 61:16
**INJUNCTIVE-** 27:5
**INJURE-** 10:3
**INJURY-** 12:25
13:8 14:2 28:12
29:8,15 31:4,20
39:2
**INQUIRY-** 70:18
**INSISTED-** 50:20
66:11
**INSOFAR-** 27:15
38:9
**INSPECTION-** 17:4
**INSTRUCTION-**
46:21
**INSUFFICIENTLY-**
78:11
**INSULATION-** 26:17
29:4 63:7,11
**INTEREST-** 25:7
32:9 38:9 56:25
57:2,9 70:24 74:1
79:24
**INTERESTING-** 8:21
13:6 65:7

INTERESTS- 25:6
64:24 70:20 71:9
79:16
INTERLOCUTORY-
56:19,20 58:15
INTERNATIONAL-
81:7
INTERPRETED- 43:5
INTERVENTION-
79:9
INTRACTABLE-
16:10
INVITE- 75:10
INVITED- 18:25
INVOKE- 48:23
INVOKED- 43:8
INVOLVE- 61:10
IOWA- 30:6
IRRELEVANCY-
30:11
ISN'T- 11:23
20:12 21:23 24:19
25:7,25 29:22
73:21 81:17,25
82:18
ISSUED- 18:13
65:25 72:3,5,12
84:22
ISSUES- 9:5 14:9
26:2 60:21 63:24
66:13 69:12
70:1,3,15 71:5,6
74:22 75:11 79:11
87:15
ITERATIONS- 86:9

J
JAMES- 4:4 5:12
JANET- 4:11
JAQUELINE- 4:11
JAY- 4:9,20 69:23
JENNIFER- 4:7
JETTISONED- 72:25
JOB- 30:17,18,19
38:6
JOIN- 6:4
JOSEPH- 4:12
JUDGE- 8:23
9:1,23 19:4,5
26:15,21 58:14,18
76:2
JUDGES- 30:4,6
JUDGMENT-
21:22,23 45:25
46:4 78:7
JUDGMENTS- 80:20
JUDICIAL- 29:19
39:21 84:15
JULY- 88:10
JUNCTURE- 59:18
JURISDICTION-
46:7 78:17 79:15
JURISDICTIONAL-
39:20
JURISPRUDENCE-
39:6 78:16
JUSTICE- 9:4
10:12 55:5 63:20
65:14,15,18

K
KAISER- 81:7
KANG- 4:4
KAREN- 88:5,10
KATHLEEN- 76:2
KEN- 5:4
KEY- 55:24
56:7,16 77:19
KILL- 79:6
KINDS- 55:25
58:24
KIRBYVILLE- 7:19
KITCHEN- 86:8
KNOWLEDGE- 32:10
KNOWN- 5:24 6:2
29:21 31:23 37:25
38:5 40:9
KNOWS- 28:11,25
85:24 86:19
KRAFT- 21:12
46:11,12,13,16,20
47:1,3,4,7,22
74:12,24
84:6,13,19,21
KRAMER- 4:11,22
KRIEGER- 4:5

L
LANDSCAPING-
45:12
LANGUAGE-
42:18,19 43:5
44:1,15 84:13
LARGE- 7:12
9:8,11 18:11
37:25 39:1 64:1
LARGER- 36:7 79:3
LATE- 22:25 25:2
60:15 61:5 75:2
LATER- 52:21
LAUGHTER- 30:20
49:7 77:10
LAWSUIT- 61:13
LAWSUITS- 60:6
LAWYER- 29:20
LAWYERS- 6:24
29:14 31:21
33:3,8
LEAD- 18:20
LEARN-
38:17,18,19 59:6
LEASE- 32:21 33:1
LEASED- 7:23
LEAVES- 33:13
LECTERN- 15:15
26:4
LED- 80:11 86:5
LEFT- 11:4,16
12:19 13:14
LEGAL- 10:13 17:8
LEGITIMATE- 73:2
LESSER- 9:24
LESSON- 65:6,11
LET'S- 33:8,12
52:24 55:23 60:1
87:15
LEVEL- 9:18 29:7
33:2 35:3

LEVELS- 9:13
LEVERAGE- 6:24
9:12 58:19,20,23
LEVY- 4:10
LIABILITIES- 17:9
81:17
LIABILITY- 10:21
11:13 12:24
13:18,24 50:11,12
53:22 61:20,21
65:9,10
LIBBY- 10:25
11:11,16,24
12:5,6,9,11,17
13:15,19,23
62:5,6
63:1,2,4,8,10
LIEFF- 6:1
LIES- 46:12
LIFT- 23:19
LIFTED- 8:16
LIGHT- 19:14
LIKEWISE- 27:10
LIMITED- 78:3
81:13,18 82:9
LINDSEY- 4:8
LINE- 74:6
LIQUIDATION- 38:4
LISA- 4:12
LISTED- 4:2
LISTENED- 73:25
74:4
LITERALLY- 23:3
LITIGATE- 53:22
56:9 84:11
LITIGATED- 9:6
53:8 54:12 62:8,9
63:24
LITIGATION- 7:13
16:15 19:1 26:16
28:8,15 48:21
53:17 60:17,18,24
61:12 64:6 71:5
LIVES- 77:13 86:7
LOCKED- 17:22
LOCKWOOD- 4:7
LOG- 69:9
LOGICAL- 23:25
48:13
LOGICALLY- 48:8
LONG- 59:19 82:1
LONGER- 70:9
LOOK- 22:23 50:16
51:14
LOOKING- 44:18
LOOP- 30:7
LOSE- 23:11
LOSING- 33:10
LOSS- 53:12
LOST- 54:5
LOT- 10:3 11:3
59:18 63:4,21
LOTS- 37:2 61:11
LOWER- 16:18
LOYAL- 31:14
79:24
LUMBER- 11:3

M
MAGICAL- 54:22
MAGNITUDE- 33:3
MAINTAIN- 71:21
MAINTAINED- 49:15
75:20,25
MAINTENANCE-
77:21
MAJOR- 53:6
62:4,24
MAJORITY- 80:9
MAKE- 50:9,24
51:5 59:6 64:20
75:24 81:8 85:16
MAKING- 37:20
53:18 69:14 73:23
76:3 77:20 82:9
MANAGE- 17:16
MANAGEABILITY-
61:1,2
MANAGED- 23:10
MANAGEMENT- 18:9
MANAGING- 60:16
MANDATORY- 51:1
55:6 81:14
MANIFEST- 28:13
29:5,16
MANIFESTATION-
32:22
MANIPULATION-
52:16
MANTRA- 27:5
MANY- 9:21 17:22
38:3 39:19
56:1,10 60:12
63:2 68:17 86:5
MARCO- 20:14
76:23 84:7
MARION- 4:3
MARK- 4:9,24
43:10
MARTI- 4:7
MARTIN- 4:11
MASS- 65:17
MASSACHUSETTS-
26:14
MASSIVE- 61:19
MATERIAL- 17:5
63:6
MATERIALS- 16:5
MATT- 4:22
MATTERS- 6:3 8:11
18:24 41:15,22
42:6 66:16 86:16
MATTHEW- 4:11
MATURE- 61:10
MDL- 16:23
26:15,17 35:4
MDL'D- 19:5
MEANINGFUL- 10:13
16:11 40:13 76:8
MEANS- 25:3,7
MECHANISM- 28:4,5
29:17 31:2 33:7
80:8
MEETING- 19:18
MEETINGS- 19:24
MELANIE- 4:12

MEMBER- 26:18
37:15
MEMBERS- 35:14
36:24 38:25 39:14
MEMORIAL- 65:23
MERELY- 20:16
76:22
MERIT- 15:6,8,23
19:13 20:22 21:8
34:6
MERITORIOUS- 15:2
18:16 19:12 22:17
23:9,24 25:23
63:15 77:3
MERITS- 45:4
MESOTHELIOMA-
29:15
MET- 19:25 64:7
MICHIGAN- 7:17
8:22
MICROPHONE- 41:25
83:16,18
MID1990'S- 60:18
MIDNIGHT- 17:18
MILD- 47:2
MILE- 84:9
MILLER- 49:5
MILLION- 10:6
11:11,13 12:10
13:1,11
62:6,7,17,23
MINE- 10:24
11:9,16 13:15,23
62:12
MINED- 10:24
MIRRORS- 75:4
MISAPPREHENSION-
66:10
MISCOMMUNICATION-
68:6
MISSING- 27:19
31:14 40:4
MISSOULA- 19:3
MISSPOKE- 12:8
MISUNDERSTANDING-
68:14
MITIGATE- 38:18
MODE- 79:7
MODEL- 28:22
MODEST- 25:15
MONETARY- 25:9
32:18 36:23
MONEY- 29:11
32:22,23 49:14,15
62:2
MONIES- 16:21
MONITOR- 49:25
MONTANA- 11:24
19:3
MONTH- 26:23 28:9
MONTHS- 18:12,13
MORTGAGE- 8:22
MOTIONS- 21:25
59:9 83:5
MOVE- 7:6 10:3
19:17 49:23,24
50:1 87:10
MOVING- 26:13,19
MUCH- 10:9,14

55:8 58:24 77:13
86:20
MUELLER- 4:6
MULTIPLE- 28:18
87:24
MULTIPLY- 17:11
MURRAY- 4:7

**N**

NAMES- 23:3
NATIONAL- 52:5,9
59:25
NATIONWIDE- 15:3
26:13,20 27:23
29:2 34:21
35:3,12,13 61:8
80:1
NAUSEAM- 56:3
NEAR- 6:20
NECESSARY- 18:1,2
36:20 66:1 78:18
NECESSITY- 17:14
18:3
NEEDED- 16:11
NEEDN'T- 17:17
79:13
NEGOTIATION- 65:2
NEGOTIATIONS-
69:12 80:11
NEIGHBORHOOD-
12:9,12 13:16,19
NEIGHBORHOODS-
11:1 62:6
50:7,8,18,19,20,2
3
NEW- 16:15 18:7
28:17
32:10,11,12,13,15
53:23 55:23
NINE- 77:13 86:7
NON- 24:17 62:22
NONDC- 57:1
NONETHELESS-
81:13
NONEVENT- 24:8
NON-LIBBY- 12:19
NON-OPT- 18:18
48:19 53:19 54:10
55:6,10 77:23
NON-VERMICULATE-
62:22
NON-WASHINGTON-
57:4
NORTHERN- 21:14
NOTABLE- 60:7
NOTE- 70:12
NOTICE- 20:10
50:7,18,19,20,23
54:8 56:9 59:12
71:25
72:2,3,5,12,13
76:8 77:25
78:5,13 82:25
85:17
NOTIFICATION-
16:25 17:2,4,20
27:6 38:16
NOTION- 45:3
NOTWITHSTANDING-

60:25
NOVEL- 39:5 41:23
47:8 59:8,9
NUCLEAR- 79:5

**O**

O'CONNOR- 76:2
O'NEILL- 5:12,13
OBJECTION- 69:16
72:3
OBJECTIVES- 8:20
OBLIGATION- 20:14
23:6 25:10
OBLIGATIONS-
11:11
OBTAIN- 27:20
72:21
OCCASION- 39:9
OCCUPIES- 23:4
OCCURRED- 19:7
62:10
OCCURS- 19:16
OFFER- 60:3
OFFERED- 67:12
OFFICE- 7:23 16:3
OFTEN- 21:18
39:25 64:9 75:18
OLD- 61:9
OMNIBUS- 24:6,8
OMNISCIENT- 78:11
ONE-LINE- 66:21
ONGOING- 38:15
39:19 52:2 79:15
81:6
OPEN- 23:8
OPENED-
25:3,16,20
OPERATING- 78:2
OPERATIVE-
42:3,18
OPINION- 21:12
22:7 65:25
74:12,24
OPT- 18:14 51:1
73:7,9,10 77:24
78:15,20,22
81:19,20
82:11,15,25
85:18,21 86:3
OPTION- 59:19
79:5,6
OPT-OUT- 48:24
ORDER- 15:11
16:13 18:10,13
20:18 22:13 27:24
48:13 58:4 66:22
68:9 70:3,7,9
75:24 78:6 85:13
ORDERLY- 31:9
34:4 40:11
ORDERS- 77:20
ORIGINAL- 6:13
ORIGINALLY- 42:11
45:16
ORTIZ- 60:7,10
81:10
OTHER'S- 75:17
OTHERWISE- 14:3
27:19

OUTCOME- 53:15
55:10 82:5 85:10
OUTLINED- 87:3
OUTS- 78:20
81:19,20 82:15,25
85:21
OUTSET- 38:8
OVERTURN- 54:1
OWING- 18:17
OWN- 25:6 51:7,12
56:22 79:4
OWNERS- 24:4 29:4

**P**

PACKAGE- 54:24
13:1,7,13,17,18,1
9
PAID- 11:11 38:25
57:20 59:14,18
PAINS- 57:15
PALPABLE- 48:3
PANELS- 6:4
PANOPLY- 75:10
PARAMETERS- 57:19
PARTIALLY- 10:22
PARTICIPANT-
19:24
PARTICIPATE-
10:14 53:2,4 58:4
PARTICIPATED-
19:23
PARTICULARLY-
37:15 49:20,21
58:4 87:4,13
PARTIES- 4:2
PARTING- 87:17
PARTS- 6:7
PASQUALE- 5:4,5
PASS- 45:4
PASSING- 39:9
PAST- 31:4 36:10
39:2 40:6 68:17
PATERNALISM-
55:17
PATIENCE- 26:10
87:19
PAUSE- 83:17
PAY- 10:4,9
13:2,10 24:14
59:3
PAYING- 35:24
PAYMENT- 12:10
81:13
PD- 64:24 65:5
67:4
PENDING- 7:11
20:19
PEOPLE'S- 48:24
PERFECT- 40:3
76:14
PERFECTLY- 22:8
23:15 54:15
PERHAPS- 6:19,23
28:24
PERMISSIBLE-
83:12
PERMISSION- 84:2
85:5 86:17
PERMITS- 75:9

PERMITTED- 21:3
86:10,12,16
PERPETUALLY-
19:25
PERSON- 14:6,19
50:9 79:8
PERSONAL- 12:25
13:8 28:12
29:8,15 31:4,20
39:2
PERSONALLY- 66:25
PERSONNEL- 18:1
PERSONS- 17:4
PERSPECTIVE-
6:8,16 8:12,13
33:19
PETER- 4:7
PHONE- 4:3
PI- 35:20
PICTURE- 11:17
44:6,7,9,10,12
46:8 62:3 72:6
PIECE- 27:19
31:14 32:21
PIECEMEAL- 59:25
PITTSBURGH- 83:15
PLACE- 17:16 25:6
37:22 42:4 86:13
PLAIN- 47:24
PLAINTIFFS- 47:6
82:19 83:1
PLAINTIFFS'- 24:6
49:13
PLAN- 28:7 34:13
38:21 39:21 59:15
PLANTS- 11:2,12
62:11,16,18,20,23
,24
PLAY- 49:21
55:8,18 59:23
PLAYER- 62:4
PLAYING- 9:13,18
45:12
PLEADINGS- 20:10
52:16
PLEASED- 5:25
PLENARY- 42:22
POCATELLO- 9:16
POINTS- 8:25
POOL- 37:4
POOR- 73:8 77:11
86:7
PORTION- 32:18
POSED- 48:6
POSITION- 8:8
24:20 36:3 52:22
67:16 71:2,12
POSITIONS- 68:17
POSITIVE- 74:3
POST- 25:1
POTENTIAL- 35:14
POTENTIALLY- 17:5
POWER- 42:22,23
45:8 47:10
POWERLESS- 24:13
POWERS- 62:9
PRACTICAL- 28:5
40:7 76:20 78:21
PRACTICALITY-

10:16
PRACTICE- 36:10
41:18 53:24 55:19
PREBANKRUPTCY-
80:9
PREBBLE- 19:3
PRECERTIFIED-
21:19,21 22:1
25:18 74:13 75:1
PRECIPICE- 8:12
PRECISE- 78:9
PRECISELY-
82:19,20
PRECONDITIONS-
57:18
PREDESIGNATED-
28:15
PREDESTINE- 80:16
PREDICT- 31:1
85:9
PREDICTABLE-
31:23
PREDOMINANCE-
60:11 64:6
PREEXISTENCE-
83:6
PRELIMINARY-
61:16
PREPARED- 7:5
31:11 57:16 64:17
PRESENCE- 29:8
PRESENT- 8:14
20:7 24:7 27:10
35:20 49:3 82:11
PRESENTATION- 6:7
PRESENTED- 21:25
22:1 61:12
PRESENTING- 6:5
PRESERVING- 51:9
59:4
PRESIDE- 19:4
PRESS- 10:15
PRESSED- 35:1
PRESSING- 63:12
PREVENT- 35:15
54:23
PREVENTED- 24:24
PREVIOUS- 27:24
PREVIOUSLY- 5:21
8:9,15 34:5 35:12
84:12,21
PRICE- 19:3
PRINCE- 7:22
PRINCIPAL- 21:11
PRINCIPLE- 57:19
PRIOR- 5:24 7:12
14:19 29:22 45:24
46:3,24 47:4
84:15
PRIVATE- 7:22
PROBLEM- 16:6,10
27:18 29:5
35:9,10 54:23
55:3 56:24 57:11
62:25 66:10
67:3,6 68:10,22
69:12 80:7 86:5
PROBLEMATIC-
49:21

PROBLEMS- 16:20 33:20,21,23 65:17
PROCEDURAL- 15:20 41:17 42:6 44:18 45:25 51:10
PROCEDURALLY- 15:2,4
PROCEDURE- 19:13 34:10 43:3,25 47:6 60:16 74:7
PROCEDURES- 59:16 82:17
PROCEED- 14:22 19:10 21:16,18 28:6 70:22 75:13
PROCEEDINGS- 20:1,22 26:10,24 27:4,11,21 28:4 33:6 35:11 42:9,22 71:22 74:9,10 76:4 78:12 80:14 81:6,15 83:9 87:25 88:7
PROCESSES- 35:19
PRODUCE- 29:1 60:10
PRODUCED- 63:23
PRODUCT- 17:1,3 29:1,7,8 63:4 65:8
PRODUCTIVE- 59:24
PROFESSED- 58:25
PROFOUND- 36:19
PROGRAM- 14:2
PROGRAMMATIC- 16:25 17:25 32:1,14 35:25 38:16
PROGRESS- 19:25
PROGRESSES- 29:5
PROMISE- 39:12
PROMPT- 75:10
PROMPTLY- 19:11
PRONG- 50:22
PRONGS- 48:5
PRONOUNCEMENT- 65:21
PROOF- 15:4 23:16 25:8 28:3 31:8 33:11,12,18 36:14,15 40:18,19 71:23 74:10,15 75:12 83:21 84:9 87:9
PROOFS- 15:9 24:9 32:13 38:24 73:13 81:4,5
PROPERLY- 41:20 46:1
PROPERTIES- 32:25 63:7 64:2
PROPOSED- 26:13 66:22 69:19 70:3,7
PROPOSITION- 45:23 54:13
PROSECUTE- 31:22
PROSPECT- 72:7,9

PROSPECTIVE- 16:13
PROSPECTS- 16:14,22 54:16 72:8
PROTECTED- 38:9 71:18
PROVED- 31:3
PROVEN- 77:3
PROVIDE- 14:20 28:4 67:5 73:10 79:20 80:6 85:18
PROVIDED- 16:25
PROVIDES- 17:25 27:18 28:13 74:8,17 78:2
PROVIDING- 23:25 77:23 85:13
PROVISION- 67:14 78:9
PROVISIONS- 75:16 78:9
PUBLIC- 16:3 28:17
PUNCH- 74:6
PURE- 71:5
PURPORTED- 64:19
PURPORTING- 57:1,3
PURSUANT- 45:1
PURSUE- 73:14
PURSUED- 9:22
PURSUING- 23:6
PUSH- 86:2
PUSHING- 85:24
PUZZLE- 27:19 31:14

Q

QUARRELING- 72:6
QUEST- 52:2
QUICK- 48:5 83:11
QUICKLY- 40:20 68:1
QUINTESSENTIAL- 81:18
QUINTESSENTIALLY- 34:23
QUOTE- 60:25 79:21
QUOTE/UNQUOTE- 82:11
QUOTES- 82:3

R

RAISE- 69:4,8 75:11
RAISED- 28:9
RAISING- 69:7 72:6
RALPH- 18:19 20:13 76:23 84:8
RATHER- 16:20 68:7
RE- 8:21 21:12,24 22:6 25:17 26:16 60:23 76:10 84:10,13
REACHING- 55:5

READY- 41:1
REALISTICALLY- 9:20
REALITY- 30:25
REALIZES- 32:19
REALIZING- 69:21
REASON- 7:11 24:12 29:17 44:4 51:18,23 52:2 59:17 61:3 73:3 76:22
REASONABLE- 8:13,14
REASONS- 64:14 65:20 71:20 84:13
RECEIVED- 52:6 66:19,20
RECENT- 16:3
RECENTLY- 10:22 11:10
RECITES- 57:17
RECOGNITION- 20:3,25 22:3 44:20 47:13 52:4 59:9 83:20 86:22
RECOGNIZE- 17:10,21 20:13 21:10,16 23:1 24:3 44:21 47:21 59:9 74:25 75:2 76:17,23 86:14
RECOGNIZED- 8:9 15:5 16:7,9 24:22 45:15 47:1,23 74:21 75:13 86:15
RECOGNIZES- 23:14
RECOGNIZING- 18:13 31:8
RECONCILE- 86:3
RECORDING- 88:7
RECOURSE- 51:5
RECOVER- 51:2
RECOVERY- 40:4 36:19
RED- 46:11
REFERRED- 35:4 56:2
REFLECTED- 20:9
REFRAMING- 48:24
RELATIONSHIP- 20:13 47:14,22 74:5,18
RELEVANCE- 8:4
RELIEF- 16:13 23:22 25:11 27:5 32:1 35:25 38:16,19,20 40:14 48:25 49:1 52:14 72:21,24 82:21
RELIEVED- 39:17
RELINQUISHED- 45:7
RELINQUISHING- 45:7
RELITIGATE- 84:11
RELY- 79:5
REMAINING- 34:18 35:8 83:10
REMAINS- 64:9

REMEDIAL- 40:4
REMEDIATE- 32:23,25 62:21
REMEDIATING- 12:11
REMEDIATION- 18:2 27:6 49:3,11 62:15
REMEDIATION/ABATE MENT- 17:21
REMEDIES- 16:18,19,25
REMEDY- 17:25 18:15 19:13 72:25 73:16,23 79:5
REMODEL- 29:9 32:21
REMODELING- 18:3
REMOVE- 17:18
REMOVED- 17:18
REMOVING- 17:17
RENDERED- 66:4
RENT- 29:9
REORGANIZATION- 9:25 10:1 28:6 34:24 38:21 39:21 40:13
REORGANIZE- 10:4 27:20 28:14
REORGANIZED- 35:18
REPEATED- 38:16
REPLACED- 50:21
REPRESENTATION- 10:13 31:15 33:17 34:24 36:2 39:14 40:20 69:14 79:22,24 80:10 83:7
REPRESENTATIVE- 19:21 21:10 22:13 25:5 32:3 37:16 53:5 74:14,18 83:1
REPRESENTATIVES- 18:19 21:7 22:12 27:12 36:8 38:11 39:12 47:14 78:14 81:5 83:7
REPRESENTED- 9:19 27:17 36:7 53:11 65:5 80:13
REQUESTS- 86:13
REQUIRE- 38:15 59:8
REQUIRED- 40:22 72:2
REQUIREMENT- 45:16 50:20
REQUIREMENTS- 43:23 44:25 46:5 47:17 50:14 64:6
REQUIRES- 17:24 18:3 45:9

RERAISE- 20:6
RESERVE- 22:6 45:16 76:11
RESIDENCE- 27:16
RESIDENTS- 80:3
RESIST- 77:8
RESOLUTION- 6:19 10:20 12:23 15:1,18 16:11 31:22 54:17,19 55:20 56:17,23 57:13 60:10
RESOLVE- 7:4 9:8 13:23 14:3 41:19 52:18 54:25 64:1
RESOLVED- 8:15 12:10 28:20 29:18 38:25 62:1,13 77:4 80:8 87:15
RESOLVING- 7:7 29:22,25 65:17
RESOURCES- 17:25
RESPECTFULLY- 31:7 64:8
RESPOND- 54:6 66:8
RESPONSE- 5:15 54:11 57:24 70:5,7,8,18 71:8
RESPONSIBILITY- 17:8 39:18 47:10 75:7
RESTIVO- 4:4 9:17 18:6
RESULT- 68:12
RESULTED- 61:15
RESULTING- 45:25
RETURNING- 81:24 82:1
REVERSE- 54:17
REVISIT- 27:23 39:9 47:16,17
RICH- 39:5
RICHARD- 4:10,25
RIGHTS- 48:2,3,24 50:7 51:9,10 52:15 53:25 55:13 78:24
RISK- 29:7 61:18
RISKS- 15:25
ROAD- 56:4 60:2 85:8,21 86:18
ROBERT- 4:5,12
ROGER- 4:6
ROLE- 7:6 26:18 32:10 55:9 59:23 66:12,23 67:23 69:17 70:1,19 71:13
ROOM- 48:15,16 57:14 87:2
ROUND- 65:24
ROUTINE- 39:25
RUB- 70:21
RUBIN- 4:8
RUBRIC- 46:12
RULED- 72:23
RUN- 8:10,25 31:16 56:21

RUNYAN- 4:4

S

SAKALO- 4:9,20 69:22,23 71:1,4,8,14
SALE- 33:1
SAMUEL- 4:8
SAN- 6:2
SARIS- 19:5 26:15,22
SATISFACTORY- 64:17
SATISFIED- 55:11
SAW- 65:22 80:9
SCALE- 38:23
SCHEME- 10:23 11:8
SCHMID- 4:12
SCHOOL- 7:13,14 48:21 52:13
SCHOOLS- 7:18 49:2,10 51:18 52:13 87:2
SCHWARTZ- 4:12
SCIENCE- 11:5 20:5 23:21 24:10,11,18,19 40:21 53:6,9,12,15,20 54:2,5 55:10 58:15
SCOPE- 82:22
SCOTT'S- 13:25
SCREEN- 9:5
SEARCH- 17:12
SEATED- 41:12
SECOND- 11:19 19:8 76:7 86:14
SECONDLY- 15:22
SEE- 33:21 34:4 51:9 54:13 61:4 63:16 76:25 80:14
SEEK- 49:19 72:23 73:24
SEEKING- 16:1 27:22 72:15 74:20
SEEN- 79:23
SEES- 34:12
SEIZED- 87:14
SELL- 29:10 32:21
SEPARATE- 43:16,23 51:3 60:13
SERIES- 51:23 60:13
SERVE- 9:3
SERVICE- 45:11,17 59:10
SERVING- 26:15
SET- 26:22 30:1 31:3 37:9,17 39:10 41:17,18 44:15 46:25 59:20,21 65:7
SETS- 42:15 46:9
SETTLE- 13:11
SETTLED- 7:12,14,15,18 8:1,5 48:18 67:10

68:19
SETTLEMENT- 8:15,17 9:7 11:13 60:10 63:25 80:10,12 81:12 82:4
SEVEN- 36:10 40:6
SEVERAL- 33:17
SHALL- 42:16 43:6,20
SHAREHOLDERS- 28:16
SHEDDING- 19:14
SHELNITZ- 4:10
SHOE- 19:8
SHORTEST- 59:3
SHOULDN'T- 8:8 60:19 85:8 86:6
SHOWED- 60:5
SHOWS- 56:12
SIGNED- 23:3
SIGNIFICANCE- 48:1
SIGNIFICANT- 43:14 47:3
SIMILARLY- 34:20 36:7
SIMPLE- 42:25
SIMPLIFIED- 10:23 11:8
SIMPLY- 43:15,22 45:2,3 46:23 47:12 48:23 73:22 82:16 84:20 85:14
SIMULTANEOUSLY- 71:19
SINGLE- 25:18 45:12 47:23 53:19 60:19 61:13 63:14
SISTER- 15:4
SITES- 11:15 13:16,20 62:19,22
SITS- 42:15
SITTING- 61:19 87:8
SITUATION- 7:4 13:15 54:10 57:5 66:9 67:9 78:13 81:18
SIX- 10:7,8
SIZE- 37:4
SKILLED- 23:15
SKIPPING- 71:22
SLOCOMBE- 4:6
SMALL- 9:11,19 10:3,12 14:3 29:13 36:23 37:2,3,9,14,25 38:3,15 40:3
SMOKE- 75:4
SMOOTH- 65:2
SOLD- 11:6 33:14
SOLUTION- 17:13 34:3,4 54:22,23 79:12 80:5 83:10
SOLVE- 14:8 33:19,21
SOLVED- 33:22
SOLVENT- 81:25

SOLVES- 27:18 33:23
SOLVING- 47:20
SOPHISTICATED- 29:3 39:1
SOUGHT- 16:13,24 18:15 20:3 22:2
SOUND- 88:7
SOUNDS- 10:16 32:1
SOURCE- 29:1 31:17
SPACES- 17:6,23
SPEAKERS- 87:24
SPECIAL- 24:15,18 62:9 64:17 66:9,11 67:9 69:16 70:2
SPECIALIST- 18:8
SPECIFIC- 6:17 31:14 66:13 80:25
SPECULATION- 56:1
SPECULATIVE- 56:6
SPEECH- 64:7
SPEIGHTS- 4:6
SPELL- 42:14
SPELLS- 42:4
SPENDING- 12:16 62:7
SPENT- 62:2,6,23
SPOKANE- 16:2 76:1
SQUARELY- 48:17 74:12 86:24
STAFF- 41:1
STAGE- 43:20 74:9,17 76:4 79:22,23 80:11
STAND- 45:22
STANDING- 67:7
STANDPOINT- 81:11
STANDS- 65:3
START- 27:20 28:14 30:8 35:16 83:4
STARTING- 5:16
STATEMENT- 47:2 66:19
STATEWIDE- 7:18
STATISTICAL- 56:3
STATUS- 68:1
STAY- 8:16 23:19
STAYED- 20:19 24:24
STEADFAST- 20:2
STEADFASTLY- 15:7
STEP- 14:2 34:14 47:1 52:1
STEPS- 38:22 59:25
STOOD- 24:9,11 58:13
STOP- 51:8
STORM- 40:3 76:14
STRATEGY- 54:1
STREAMLINE- 9:7 63:25
STRETCH- 41:7
STRING- 86:11

STRIVES- 10:21
STROKE- 53:18
STRONG- 73:8
STRUCTURAL- 79:20 80:6
STRUCTURE- 34:10 37:24 38:6,7,12 39:4,5 40:5,9,13 42:2
STRUCTURED- 36:13
SUBCLASSES- 80:6
SUBSECTION- 82:20
SUBSTANTIVE- 43:23 44:24 46:17 51:9 68:16
SUBSTANTIVELY- 15:2 23:24
SUCCESSFUL- 40:12 50:12 61:13,14
SUDDENLY- 73:7
SUFFICIENT- 36:21 82:3
SUFFICIENTLY- 82:17
SUGGESTION- 28:9 85:2
SUGGESTS- 65:10
SUIT- 49:13
SUM- 35:21
SUPERIOR- 24:24 76:1 81:11
SUPPLIERS- 37:8
SUPPLY- 31:15
SUPPOSE- 65:4
SUPPOSED- 52:7 63:19
SUPREME- 39:8,13 50:8 60:22 79:19 81:9,11
SURPRISE- 28:23
SURROUNDING- 63:3
SURVEYS- 56:2
SWEEP- 58:9
SWEPT- 60:14
SWING- 77:8
SYMPATHIZE- 30:22
SYSTEM- 10:11
SYSTEMATIC- 31:9,23

T

TABLE- 37:22 83:24 84:24
TACCONELLI- 5:8,9
TAIL- 13:9
TAKING- 8:8 51:7 77:8
TASK- 26:15
TEACH- 65:6
TEAM- 17:24
TECHNICAL- 66:13
TEED- 40:21
TELLS- 7:8
TEMPLATE- 57:3
TEMPTING- 48:8
TERENCE- 4:10
TERM- 6:25
TERMS- 34:6 35:24 42:20 66:22

TERRIBLY- 64:25
TERRITORY- 32:11,12,13,15
TEST- 44:3 45:14
TEXAS- 7:19 21:14
THEODORE- 5:8
THEORETICAL- 61:20
THEORY- 36:9
THEREFORE- 22:9 47:15 63:9 74:14,15 76:17,24 84:23
THEY'LL- 50:10 55:13
THEY'VE- 10:21 11:10 13:2,18,19 38:24 52:2 54:7 86:21,22
THIRD- 16:14 47:3
THIRDLY- 76:19
THOUSANDS- 9:18
THREE- 6:7 15:14,18 16:24 46:13 76:14,21 86:8
THREE-QUARTERS- 13:12
THRESHOLD- 44:1
TIMES- 29:13
TODAY- 6:18 8:8 14:15 15:13 27:8,22 28:2 29:12 31:8 35:9 36:15 52:8,11 61:19 64:9,22 81:1 84:23 86:13,24
TODAY'S- 11:21
TOKEN- 81:13
TOOK- 8:7 18:12
TOOL- 6:23 7:3 60:9
TOOLS- 7:3
TORT- 61:10
TORTS- 65:17
TOSSED- 62:17
TOTAL- 13:4
TOTALITARIANISM- 55:17
TOWARD- 15:17 26:13
TOXIC- 12:23
TRACK- 61:20
TRADE- 37:1,3,4,6,7 38:1,22
TRADES- 17:4
TRADITIONAL- 13:6,9,13 16:5 35:21 39:1
TRANSCRIPT- 88:6
TRANSCRIPTS- 88:11
TRANSFEREE- 26:16
TRANSFORM- 51:6
TREATED- 9:11
TREBLED- 25:17 45:20,21,23 46:1

47:7,22
TREMENDOUS- 83:4
TREND- 60:8
TRIAL- 19:4 20:5
23:21
24:10,11,18,19
40:21
53:6,9,12,15,20
54:2 55:10 79:4
TRIALS- 79:10
TRIER- 29:24
TRULY- 60:20
TRUMP- 44:14
TRUST- 29:17
30:10,24 31:1,12
33:6
TRUSTEE- 19:21
28:10 32:2,7,10
TRUSTEES- 29:21
31:16
TRUSTS- 30:1
31:15,16 39:8
TURN- 15:14 26:4
TURNED- 60:17
TURNS- 64:13 85:7
TWO- 13:4 16:24
18:12 19:6 21:25
23:11 27:9 45:18
46:25 61:10 72:24
75:16,17 83:20,23
84:23 86:13,23
TWO-PART- 45:15
TWO-PRONG- 44:3
45:13 48:4
TYPICALLY- 28:10
TYPOGRAPHY- 77:22

U
ULTIMATE- 28:2
67:3
UM-HUM- 37:21
UNCERTAINTY-
58:9,22
UNDERSCORE- 51:24
UNDERSTOOD- 82:7
UNDERTOOK- 23:2
UNFAIR- 6:23,24
9:12
UNFORTUNATELY-
49:24 58:11
UNIDENTIFIED-
77:16
UNIFIED- 16:17
24:21
UNIMPAIRED- 30:1
UNIQUE- 21:21
28:24 43:7 54:20
64:2 69:11
UNIQUELY- 36:3
UNITED- 39:7
UNKNOWING- 16:8
38:14 40:3 76:16
UNKNOWN- 16:7
29:4 38:14 40:3
58:2,5 76:16
UNLESS- 58:7
UNLIKE- 16:5
UNNECESSARY-
17:17

UNSECURED- 5:5
UNUSUAL- 28:24
URGE- 87:1
URGED- 45:23
USED- 28:22 29:2
30:11,12,14 44:13
63:11
USING- 74:16 79:6
UTILIZATION- 40:9
UTILIZED- 28:10
39:5
UTTERLY- 56:6
80:18

V
VACUUM- 36:9
VALUABLE- 20:24
21:13 31:21 83:9
VALUE- 15:16
17:19 29:10,20
33:1 39:1 57:25
58:7 76:15,19
VALUES- 31:22
36:23
VANGUARD- 19:12
VARIANCE- 27:7
VARIATIONS- 61:8
VARIETY- 21:14,20
VARY- 35:5
VAST- 32:15
VEHICLE- 14:24
15:18 23:25
VEILED- 52:1
VENTRILOQUIST-
67:20
VERMICULATE-
10:21,24
11:6,12,15
13:14,20
62:11,16,18,20
63:5
VERSION- 84:5
VERSUS- 59:25
VICTORY- 25:11
VIEW- 9:13,18
14:21,25
VIEWING- 70:1
VIOLATE- 48:13
81:20
VIRTUE- 20:17
74:23 85:10
VIRTUOUS- 26:1
VIS-A-VIS- 34:19
VISION- 14:25
19:9,10
VISIT- 39:9 49:19
VITAL- 35:23
VOICE- 21:4

W
WAIT- 81:22
WAITING- 35:13
55:21 74:5
WALTER- 4:6
WANTS- 23:18
32:21 35:16 79:3
WARN- 50:22
WARNINGS- 50:21
WARRANT- 30:14

WASN'T- 18:6,17
24:7 29:24
57:11,12 67:15
70:9,16 74:6
85:14
WAVE- 16:15
WAYS- 10:3 17:23
WE'LL- 13:11 49:8
52:20 68:24 69:1
WE'VE- 6:6,24
10:5 11:5 56:3
60:22 63:19 65:6
WEEKS- 19:6
WEIGH- 22:21
WEIGHING- 82:16
WEREN'T- 7:10
WESLEYAN- 7:25
8:5
WESTERN- 8:22
WHAT'S- 9:1 60:6
63:3
WHATSOEVER- 70:19
WHEEL- 49:22
WHEREAS- 55:12
WHICHEVER- 36:14
WHITENER- 4:8
WHO'S- 41:1 57:9
WHOLE- 18:17 37:2
45:1 51:22 60:8
61:3 62:19 63:8
67:7 68:18 69:15
71:20 83:8
WILD- 54:13
WILLING- 15:10
WILMINGTON- 19:18
WINGS- 35:13
55:21
WIPED- 70:24
WIPES- 23:21
WISH- 71:21 82:11
85:14
WITHDRAWN- 42:11
WITHSTANDS- 77:1
WON- 49:6,8
WON'T- 14:4 75:1
83:14
WONDERFUL- 10:7
WORD- 8:19
WORK- 32:6,7
34:11 39:24 41:21
52:20 64:21 68:8
WORKABLE- 40:8
WORKED- 70:21
WORKING- 54:15
65:2
WORKS- 29:17 34:6
35:8 37:24 39:4
79:14 82:4
WORLD- 51:16 58:6
WORSE- 22:15
25:10 51:12 54:14
WORTH- 33:7
WOULDN'T- 8:10
WR- 4:1,15 18:5
19:4 35:17
WRITING- 68:11
WRITTEN- 68:10
WRONGFUL- 65:13
WYRON- 4:25

Y
YARDS- 11:4
YEAR- 72:3
YEARS- 19:23
28:19 31:4 36:10
40:7
YESTERDAY- 81:23
YORK- 18:7
YOU'D- 68:7
YOU'LL- 35:19
86:20
YOU'RE- 11:19
23:22 33:22 36:15
37:19 38:2 40:25
72:15 86:19
YOU'VE- 30:18
32:17 35:10 55:18

Z
ZENITH- 81:6
ZERO- 58:8
ZONOLITE- 15:17
16:4,16,24
17:16,22 18:4
20:25 24:2
26:16,25 29:4
32:19 34:17 35:4
38:9,10 40:21
73:8 77:4