UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Chapter 7
                              .
W.R. GRACE & CO.,             .    Case No. 01-01139(JKF)
*et al.*,                     .    (Jointly Administered)
                              .
          Debtors.            .    July 21, 2008 (1:06 p.m.)
                              .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1           THE COURT: The parties I have participating by

 2    phone are: Ken Pasquale, Marion Fairey, Elizabeth Cabraser,

 3    Janet Baer, Christopher Candon, Jennifer Whitener, Darrell

 4    Scott, Douglas Cameron, Van Hooker, Jacqueline Dais-Visca,

 5    Michel Belanger, Debra Felder, Theodore Freedman, Terence

 6    Edwards, Edward Westbrook, Melanie Schmid, John Phillips,

 7    Daniel Cohn, Amanda Basta, Lisa Esayian, Alex Mueller, Carl

 8    Pernicone, Warren Smith, Elizabeth Devine, Gregory Boyer,

 9    William Kirley, Richard Wyron, Joseph Radecki, Arlene

10    Krieger, Robert Horkovich, Tara Nauful, Scott McMillin, David

11    Bernick, Lindsey Hoelzle, Joseph Schwartz, Careen Hannouche,

12    Walter Slocombe, James Restivo, Gentry Klein, Beau Harbor,

13    Andrew Craig, Christina Kang, Martin Dies, David Parsons,

14    David Beane, Jay Sakalo, Matthew Kramer, David Thompson,

15    David Siegel, Douglas Mannal, Tiffany Cobb, Gerald George,

16    Mark Schlnitz, Jonathan Brownstein, Sander Esserman, Alan

17    Runyan, Jay Hughes, Robert Givone, Daniel Speights, Scott

18    Baena, Jason Solganick, Michael Davis, Robert Guttmann, Ari

19    Berman, Marti Murray, Richard Levy, and Elizabeth

20    DeCristofaro.  I'll take entries in court if you're ready.

21           MR. BERNICK: Yes, Your Honor.  David Bernick for

22    Grace.

23           MS. BAER: Janet Baer for Grace.

24           MR. O'NEILL: James O'Neill for Grace.

25           MR. KRUGER: Your Honor, Lewis Kruger for Unsecured
```

1    Creditors Committee.

2            MR. ACKEL: Chase Ackel on behalf of the Property

3    Damage Committee, Your Honor.

4            MR. COHN: Daniel Cohn on behalf of the Libby

5    claimants.

6            MR. FRANKEL: Roger Frankel on behalf of the Future

7    Claims Representative.

8            MR. LOCKWOOD: Peter Lockwood on behalf of the ACC,

9    Your Honor.

10           MR. HURFORD: Mark Hurford for the ACC.

11           MR. MANDELSSERG: Steven Mandelsserg of Hahn &

12   Hesson on behalf of the State of California, Department of

13   General Services.

14           MR. KRAMER: Good afternoon, Your Honor.  Matt

15   Kramer on behalf of the Property Damage Committee.

16           MR. TACCONELLI: Good afternoon, Your Honor.

17   Theodore Tacconelli for the Property Damage Committee.

18           MR. HOGAN: Good afternoon, Your Honor.  Daniel

19   Hogan on behalf of the Canadian ZAI claimants.

20           MR. PRATT: Warren Pratt for One Beacon America

21   Insurance Company and Seaton Insurance Company.

22           MS. AARONSON: Good afternoon, Your Honor.  Anne

23   Aaronson, Burlington Northern Sante Fe Railway.

24           MR. MONACO: Good afternoon, Your Honor.  Frank

25   Monaco for the Crown.

1           MR. ROSENBERG: Good afternoon, Your Honor.  Andrew

2    Rosenberg for the Bank Lenders.

3           MR. COBB: Good afternoon, Your Honor.  Richard Cobb

4    on behalf of the Bank Lenders.

5           THE COURT: Wait, I'm sorry, wait.  Okay, Mr. Cobb,

6    thank you.

7           MR. COBB: Sure.  Richard Cobb on behalf of the Bank

8    Lenders and JP Morgan Chase as agent.  Thank you.

9           THE COURT: Thank you.

10          MR. SCOTT: Good afternoon, Your Honor.  Darrell

11    Scott on behalf of Zanolite Attic Insulation Claimants.

12          MR. WESTBROOK: Hello, Your Honor.  Ed Westbrook for

13    the ZAI Claimants.

14          MR. ALLINSON: Elihu Allinson for the ZAI Claimants.

15          MR. KARWOWSKI: Good afternoon, Your Honor.  Henry

16    Karwowski here on behalf of Mian Realty LLC.

17          THE COURT: I'm sorry, Bean Realty?

18          MR. KARWOWSKI: Mian, M-I-a-n.

19          THE COURT: Oh, Mian, thank you.

20          MR. KARWOWSKI: Thank you, Your Honor.

21          MR. REILLY: Good afternoon, Your Honor.  Patrick

22    Reilly from Cole Schotz here on behalf of Mian Realty as

23    well.

24          MR. McDANIEL: Garvin McDaniel for Arrowood

25    Indemnity.

1          MR. WAXMAN: Good morning, Your Honor.  Jeff Waxman

2     of Cozen O'Connor on behalf of Federal Insurance Company.

3          THE COURT: Ms. Baer.

4          MS. BAER: Good afternoon, Your Honor.  Janet Baer

5     on behalf of W.R. Grace.  Your Honor, matter 1 on the agenda

6     is being continued, and we have an order we'll hand up that

7     continues that matter.  Number 2 on the agenda, Your Honor,

8     is the continued matter of the Bilzin Sumberg fees, and it

9     was really an expense issue that has been resolved, and we

10    have an order to hand up that resolves that.  Beyond that,

11    Your Honor, there was really the issue of Mr. Smith, our fee

12    examiner, looking into the expense issues, specifically hotel

13    charges and the like.  Mr. Smith, I know, filed a letter with

14    the Court where he is suggesting a new protocol.  It was

15    addressed to you, Your Honor -

16         THE COURT: I haven't seen it.

17         MS. BAER: I can certainly find a copy and hand it

18    up to you.  I believe Mr. Smith is on the phone and probably

19    wants to address the issue.

20         THE COURT: Okay.  Mr. Smith, I'm sorry, if you sent

21    a letter, I haven't seen it, so, perhaps you can just tell me

22    what I need to know.

23         MR. SMITH (TELEPHONIC): Certainly, Your Honor.  I

24    apologize, Your Honor, if it did not make it to you.  Your

25    Honor, basically, what we outlined was that since 2001 when

1    this case was filed, we had been relying on caps for hotel

2    charges in certain cities, and what we have found though is

3    that in the last year or two especially, hotels have

4    instituted what they call dynamic pricing which the result of

5    that is that the hotel charges very wildly based on demand,

6    and for example, in New York City a particular hotel room in

7    a particular hotel can vary up to $400 per day depending on

8    the demand, and that makes a cap system very unwieldy.

9    Again, Your Honor, when this case was filed in 2001, that

10   wasn't the case, but that's what we're dealing with now.  And

11   what we proposed in our letter, Your Honor, and I think it

12   was served on all counsel, even if it didn't make it to

13   chambers, is that we are going to start a system whereby we

14   will look to the rating of the hotel rather than the charge

15   on a hotel to determine whether or not it is a luxury hotel

16   because especially with the case law and the U.S. Trustee

17   guidelines, what we want to avoid is for parties to - we want

18   to avoid parties charging the estate for staying at luxury

19   hotels, and so, even though a hotel charge, you know, a

20   Holiday Inn or say a Marriott in Manhattan can - the room

21   rate can go up tremendously exponentially depending on the

22   time of year and various other demand factors.  As long as

23   it's not a luxury hotel, Your Honor, we would not find that

24   objectionable.  We want to use a designation of luxury hotels

25   that's accessible to all and very transparent, and so we

1   chose the Expedia star rating system on the website,

2   Expedia.com.  In talking to various people, everyone seems to

3   have access to Expedia.  Expedia uses a star system rating

4   and essentially five stars are for luxury hotels.  One star,

5   I guess, is for a flea bag, but basically what we did, in the

6   attachment to our letter, we examined and set forth in

7   exhibits a number of different hotels that are frequented by

8   professionals in this case.  We chose hotels that were, for

9   example, in Manhattan midtown east that were around the

10  offices of a lot of law firms there, and we chose other

11  hotels in other cities that are again close to law firms, and

12  what we found was that in our estimation those hotels that

13  are rated four stars and below are those hotels that we

14  consider to be reasonably priced based on counsel's need for

15  business centers and things like that.  Hotels that are rated

16  at four and a half stars and five stars, we generally would

17  find to be luxury hotels and thus objectionable unless the

18  applicant was able to obtain a very favorable rate.  The

19  rates, the methodology of this, Your Honor, is somewhat based

20  on the rate.  We have selected trigger rates for particular

21  cities.  For example in New York City, the trigger rate is

22  $450 now, in the sense that if there's a hotel charge above

23  $450, we will examine the particular hotel involved.  If that

24  particular hotel is not what is designated as a four and a

25  half star or five star hotel, we have no objections to that

1   charge because we realize that, though again, the hotel rates

2   can vary wildly.  We've laid out in our letter the various

3   trigger rates for other places.  New York City and London are

4   at $450, for example.  Washington, D.C. and Chicago are $350.

5   San Francisco and Atlanta at 350, and for example, Dallas,

6   the trigger rate is $250, and we came up with these trigger

7   rates, Your Honor, by essentially doing surveys of hotel

8   rates in various cities.  Does the Court have any questions?

9        THE COURT: No, but I haven't seen the letter yet.

10   I mean, I was handed up a copy but I haven't had a chance to

11   read to it yet, so -

12        MR. SMITH (TELEPHONIC): Again, Your Honor, I

13   apologize.

14        THE COURT: It may be sitting back in Pittsburgh and

15   just not have been brought to my attention, but I haven't

16   seen it, Mr. Smith.  So, okay, Ms. Baer?

17        MS. BAER: Your Honor, from the debtors'

18   perspective, I think Mr. Smith's approach is a logical

19   approach.  The situation we were having is exactly the one

20   he's identified, which is it's not that the hotel's that

21   expensive, it's that the rate can vary so tremendously

22   depending upon what day of the week, what's going on in town,

23   and when you're able to decide when you have to take a trip.

24   So, I think that the approach he's taking is a much better

25   approach and a one that will be much more workable for the

1    professionals.

2              THE COURT: Okay.  Has everyone seen this letter?

3    Everyone but me has seen it.  Okay. Anyone have any -

4              MR. SMITH (TELEPHONIC): Your Honor, I apologize, it

5    was mailed to you in Pittsburgh.  We did try to have it

6    electronically delivered.  I think we emailed the court

7    personnel, but obviously we emailed the wrong court

8    personnel.

9              THE COURT: Okay.  Anyone have any comments that you

10   want to spread on the record about this and then I'll take a

11   look at it and -

12             MR. SMITH (TELEPHONIC): Your Honor, there is one

13   blip in the system, and I wanted to bring this to the Court's

14   attention.  Again, Your Honor, there are - generally, we

15   would feel that hotels that are designated as four and a half

16   stars or five stars would be objectionable, and we would

17   recommend a reduction down to the trigger rate.  There is one

18   hotel that we have generally allowed without objection and

19   that's the DuPont Hotel in Wilmington.  The DuPont Hotel is

20   registered as a four and a half star hotel.  I think it

21   probably deserves that designation.  I mean, it does, I think

22   cross the line into luxury, and I was looking back as to why

23   we allow it, and, Your Honor, that I think goes back to when

24   Judge Newsom had a number of these bankruptcy cases, these

25   asbestos bankruptcy cases.  He used to stay there, and I

1    think the feeling was that if he stayed there, that attorneys

2    should be able to stay there.

3            THE COURT: Well, that explains why I never see any

4    of you at the Sheraton.

5            MR. SMITH (TELEPHONIC): But, Your Honor, what I

6    would propose is that the DuPont Hotel be the sole exception

7    to this star rating system.

8            THE COURT: What are the charges at the DuPont?

9            MR. SMITH (TELEPHONIC): Well, Your Honor, the - I

10   would ask any counsel to let me know because generally I

11   think they're able to get corporate rates that are somewhat

12   more favorable than the rates on the website.

13           MS. BAER: Your Honor, from the debtors'

14   perspective, debtors' Delaware counsel has a corporate rate.

15   It started in this case at 209, it's currently and just moved

16   to 269.  So it's $19 over, I believe, what Mr. Smith would

17   have had as his target rate in Delaware.

18           THE COURT: Okay, that's fine.

19           MR. SMITH (TELEPHONIC): So, Your Honor, we'll

20   continue to allow the DuPont Hotel?  I just wanted to make

21   that on the record, Your Honor, that we would continue to do

22   that so that -

23           THE COURT: All right, that's fine.

24           MR. SMITH (TELEPHONIC):  - but all counsel would be

25   aware of that.

1          THE COURT: All right, thank you.  I am quickly

2    looking at this and your explanation on pages 2, 3, and 4 of

3    how this proposal was put together.  It certainly seems like

4    a better system than the cap rate at this point in time, Mr.

5    Smith.  So, if nobody objects to it, I think this is a pretty

6    reasonable proposal, and I'm happy to implement it in both

7    Grace and whatever other cases are still pending, there

8    aren't too many, but that are still charging expenses and

9    hotels, but it seems to me that any case in which you're a

10   fee examiner, if you want to raise this with the parties, Mr.

11   Smith, it would be fine with me.

12         MR. SMITH (TELEPHONIC): Okay, very good, Your

13   Honor, we will do so.  We do have other cases in Delaware,

14   not before Your Honor, that we intend to institute this

15   system as well.  Your Honor, we had also done a survey

16   regarding our meal caps.

17         THE COURT: All right.

18         MR. SMITH (TELEPHONIC): And we were - I mean, I

19   know inflation is only supposed to be kicking along at 3 to 4

20   percent, Your Honor, but - of course, that's the court rate,

21   and it leaves out food and things like that, and we were

22   surprised -

23         THE COURT: It leaves out judges too, but I guess

24   that's another issue, go ahead, sorry.

25         MR. SMITH (TELEPHONIC): Your Honor, we are

1    proposing new meal caps, and we've again sent this around to

2    all parties.  Our proposed meals caps, again for New York and

3    London, they would be higher: $35 for breakfast, $45 for

4    lunch, $65 for dinner.  For all other locations: $25 for

5    breakfast, $35 for lunch, and $55 for dinner.

6              THE COURT: I'm sorry, all else were what?  Twenty-

7    five what?

8              MR. SMITH (TELEPHONIC): Yes, in all other

9    locations, other than New York City and London, it would be

10   $25 for breakfast, $35 for lunch, and $55 for dinner.

11             THE COURT: Okay, those are fine.

12             MR. SMITH (TELEPHONIC): Okay.  Thank you very much,

13   Your Honor.  If that's all, then I think I would like to be

14   excused, Your Honor.

15             THE COURT: All right.  Mr. Smith, I think these

16   rates, to the extent that they're still applicable in the

17   Pittsburgh cases too, you ought to contact those parties.  It

18   seems to me that they're facing the same issues.

19             MR. SMITH (TELEPHONIC): Yes, Your Honor.

20             THE COURT: Okay.  Thank you.

21             MR. SMITH (TELEPHONIC): Thank you, Your Honor.

22             THE COURT: You said you had arrived at a settlement

23   of the issue with or some order with respect to the Bilzin

24   fee?

25             MS. BAER: We do have that, Your Honor.  We can hand

1    that up.

2              THE COURT: All right.

3              MR. SMITH (TELEPHONIC): Yes, Your Honor, we have

4    examined that and that's what we do agree to.

5              THE COURT: All right, just a second.  Does this,

6    Mr. Sakalo, just simply allow what you were requesting?

7              MR. SAKALO: That's correct, Your Honor.

8              THE COURT: Okay.  All right, that order is entered,

9    and yes, Mr. Smith.  Does anybody have any questions or

10   comments for Mr. Smith before I excuse him?  Anybody have any

11   objection to this new proposal?  All right, no one's

12   objecting.  I think it's reasonable.  We'll implement it,

13   and, Mr. Smith, you're excused, thank you.

14             MR. SMITH (TELEPHONIC): Thank you very much, Your

15   Honor.

16             THE COURT: Okay, Ms. Baer.

17             MS. BAER: Your Honor, items 3 and 4 are with

18   respect to the future claimants' representative's

19   applications to modify the Piper Jaffray retention and to

20   allow the application to employ Tre Angeli, which is a

21   related situation.  Your Honor, you entered a lot of orders,

22   but we did not see orders entered on those two matters.

23             THE COURT: I'm denying orders on those two matters

24   because I did not have an opportunity to take a look at those

25   and understand what the relationship was between the two

1    firms.  As I understood it, some of the employees had

2    basically cross-pollinated, but I wasn't really sure what was

3    going on, and I wanted an explanation from the future claims

4    rep before I entered those, so, Mr. Frankel.

5            MR. FRANKEL: Your Honor, I'm afraid we confused the

6    matter by trying to work out a solution earlier on with the

7    U.S. Trustee, and we've concluded that the easiest way to do

8    this is two separate fee applications.  Essentially what

9    happened -

10           THE COURT: Retention.

11           MR. FRANKEL: Yes.

12           THE COURT: Okay.

13           MR. FRANKEL: What happened is that Mr. Rudecki

14   (phonetical), who is the principal at Piper Jaffray that

15   worked with us, left Piper Jaffray and formed his own firm.

16   The team that worked with him remained at Piper Jaffray and

17   so what we concluded was that we would just have two separate

18   retentions.  The aggregate is the exact same fee that it was

19   prior to his departure, and the same people will be working

20   for Mr. Austern that worked prior to his departure.  We just

21   did it as two separate retentions.  Originally, there was a

22   subcontract agreement which the U.S. Trustee was not

23   comfortable with.  So we now have this resolved with the U.S.

24   Trustee, and there have been no other objections.

25           THE COURT: All right, and how is the monitoring

1    going to go back and forth to make sure that there's not a

2    duplication of services?

3        MR. FRANKEL: Well, they will be required to file

4    what Piper Jaffray was filing prior to this, now both firms

5    will have to file with the normal fee process.  So, that

6    won't change.  Now it will just be two fee applications, two

7    processes for the monthly fees, and the same information will

8    be available.  There really is not going to be any difference

9    in the way this has worked in terms of duplication.  I mean,

10   it's the senior team which is basically Mr. Rudecki, and it's

11   the junior team that works with him that happens to be at

12   Piper Jaffray.

13       THE COURT: Okay, so, you're keeping the same caps

14   but it's just that two firms are going to be participating in

15   that cap.

16       MR. FRANKEL: Correct.

17       THE COURT: Okay.

18       MR. FRANKEL: And it's been split 50/50 as the caps

19   for each one.

20       THE COURT: All right, I'll have the orders entered

21   then on items 3 and 4.  I thought that's what was happening,

22   but I wasn't really clear because of the objection in the

23   contract before, and I thought I'd better just ask.

24       MR. FRANKEL: I think if we had just done this the

25   first time, then it would have been a lot easier, but, we

1  didn't.

2          THE COURT: All right, thank you.

3          MR. FRANKEL: Thank you, Your Honor.

4          THE COURT: Ms. Baer.

5          MS. BAER: Your Honor, agenda item number 5 was the

6  debtors' motion to approve the settlement it had reached with

7  the State of Montana over their pre-petition claim.  You

8  entered an order on that one this morning.  Item number 6,

9  Your Honor, was the debtors' motion to enter into an IRS

10  settlement that resolved research credit issues for the tax

11  years 1993 to 1996.  You entered an order on that this

12  morning.  Item number 7, Your Honor, was Reed Smith's

13  application to modify its retention to add additional

14  services, and that order was entered last week.  Item number

15  8, Your Honor, was the debtors' motion for permission to

16  borrow against its corporate owned life insurance policies.

17  That order was entered this morning.  That takes us, Your

18  Honor, to item number 9, which is the Scotts declaratory

19  judgment adversary proceeding.  Your Honor, since our last

20  hearing Scotts served on the debtor some informal discovery,

21  most specific of which is they were asking for all of the

22  debtors' insurance policies.  We provided to the Scotts

23  people a CD of all of the debtors' insurance policies.  We

24  also provided to them a document which outlines all of the

25  policies settled as well as not settled, and some financial

1  analysis of the remaining coverage.  I've spoken with Scotts'

2  counsel, who I believe is on the phone.  She's indicated that

3  they have received that informal discovery.  I talked to her

4  about some discovery that we believe the debtors need,

5  specifically, with respect to the status of the litigation

6  that Scotts may be facing around the country so that we can

7  assess where things are and where we need to go.  Under these

8  circumstances, Your Honor, I believe the parties are

9  proceeding to exchange information, and we believe it makes

10  sense to continue this matter to the September hearing so we

11  can continue to have these conversations and continue to

12  review this information.

13       THE COURT: Ms. Cobb?

14       MS. COBB (TELEPHONIC): Your Honor, this is Tiffany

15  Cobb of the law firm Vorys, Sater, Seymour & Pease on behalf

16  of the Scotts Company, good afternoon.

17       THE COURT: Good afternoon.

18       MS. COBB (TELEPHONIC): As of this moment, the

19  parties are indeed cooperating with informal discovery.  We

20  did receive the documents that Ms. Baer mentioned Wednesday,

21  July 16, and the debtors have made a similar request of the

22  Scotts Company that we are working on providing response to

23  the debtors.  We believe and assume that proceeding with

24  informal discovery is done without prejudice to anyone's

25  rights to do anything, and with that in mind, we have no

1    objection to continuing to proceed in this informal fashion

2    and to have this matter continued for another status hearing.

3              THE COURT: All right, thank you.  Mr. Pratt.

4              MR. PRATT: Thank you, Your Honor.  Warren Pratt

5    representing One Beacon American Insurance Company, successor

6    to Commercial Union and Seaton Insurance Company, successor

7    to Uniguard.  Your Honor, you may recall that most of these

8    insurance policies have been resolved by agreement between

9    the insurance companies and the debtor, and the carriers paid

10   a lot of money to resolve them.  However, Scotts, the

11   plaintiff in the adversary proceeding was not a party to the

12   settlement.  The settlement provided that in exchange for the

13   buyback or resolution of the policies that the debtor, Grace,

14   would indemnify the carriers if any claims were successfully

15   asserted against those policies.  So, these carriers are

16   actually creditors holding unliquidated contractual indemnity

17   claims against Grace.  We don't think that there's coverage.

18   We don't think that Scotts has coverage.  We think the

19   policies are exhausted for the most part, but if the Court

20   were to disagree and define that Scotts had coverage, then

21   those indemnity claims, contractual indemnity claims, would

22   be triggered, and Grace would have to reimburse the carriers

23   for whatever they ended up having to pay.  We filed proofs of

24   claim.  They're unliquidated, but it's not clear to us still

25   how these would be treated under a plan.  The prior plan,

1    Your Honor, has a lot of language and definitions in it that

2    are so convoluted that we couldn't tell whether these

3    contractual indemnity claims were intended to be channeled to

4    the asbestos trust or not.  We think channeling is

5    inappropriate because they're contractual indemnity claims.

6    However, Grace takes the position, confirmed to me again this

7    morning by Ms. Baer, that the debtors' intention is to

8    channel these claims.  So, if that's the case, then we're

9    going to have a dust up about that at the confirmation

10   hearing.  We don't object to the continuance of the adversary

11   in the sense that we would have preferred that this adversary

12   move along from the beginning to get this issues resolved,

13   but obviously, if it can be resolved informally, that's okay,

14   and Scotts is looking at the policies, and I hope they come

15   to the conclusion that they don't have a claim under them,

16   but if that turns out not to be the case, this will be a

17   confirmation issue if the plan purports to channel these

18   claims to the trust.  Mr. Lockwood said on the record last

19   time, and this is at page 42 of the transcript, "That claim

20   is not likely going to be channeled to an asbestos personal

21   injury trust."  Well, Ms. Baer thinks it is, so, I want the

22   Court to be aware of that conflict that the debtor is taking

23   one position about the plan language which may become more

24   clear or less clear when the plan's actually filed.  The ACC

25   is apparently taking a different view.  What I don't want to

1  be left with is a situation where at confirmation it's not

2  clear what the plan means and there's some kind of an effort

3  to hide the ball about that.

4           THE COURT: Okay, well, I think what you're going to

5  need to do, Mr. Pratt, is make sure at the disclosure

6  statement hearing that you raise the issue and we'll get the

7  plan fixed if not before the disclosure statement hearing so

8  that at least we're clear where that claim's going to be at

9  the disclosure statement hearing so that we know before plan

10 confirmation where it resides.

11          MR. PRATT: We will do that, Your Honor.

12          THE COURT: Okay.

13          MS. BAER: Your Honor, I don't think there's really

14 anything more to say on this for today.  We understand the

15 issue, and we understand it will come up.

16          THE COURT: All right.

17          MS. BAER: Your Honor, the next matter on the agenda

18 is a status on the City of Charleston lift stay.  As you'll

19 recall, Your Honor, the City of Charleston is seeking to

20 takeover a piece of Grace's property in Charleston for some

21 city works facilities.  We are in constant contact with

22 Charleston.  We're negotiating the sale of that property to

23 them.  There's a GO technical investigation that is now

24 proceeding.  We're discussing site work with the related

25 governmental entities in Charleston and also discussing a

1   Brownsfield agreement with the State of South Carolina.

2   Those matters are pending and proceeding, and under these

3   circumstances, we would suggest this motion just needs to be

4   continued again.

5          THE COURT: Anyone representing the City of

6   Charleston?  All right, until when?

7          MS. BAER: The September 2nd hearing, Your Honor.

8          THE COURT: Okay.  Excuse me one minute.  With

9   respect to the prior item, item 9, the declaratory judgment

10  action, you simply want that continued till September 2;

11  correct?

12         MS. BAER: Yes, Your Honor.

13         THE COURT: Okay, thank you.  Both items 9 and 10

14  are continued to September 2.  Court Call operator, are you

15  on, please.

16         OPERATOR: Yes, one moment till I isolate the noise.

17   Got it.

18         THE COURT: Thank you.  Okay, Ms. Baer.

19         MS. BAER: Your Honor, agenda item number 11 is Mian

20  Realty's motion for a declaration that the automatic stay

21  does not apply to a state court action in which they are

22  involved where the would like to name Grace as a third-party

23  defendant.  The state court action is a very large

24  environmental mess where they're seeking to collect various

25  damages from Grace.  This is a situation, Your Honor, where

1    Grace sold this property to Mian Realty in 1987, and since

2    1987 Grace has had no involvement with the property.  It was

3    a property that was operated by Baker & Taylor, which is a

4    book warehousing operation.  It was an entity that Grace had

5    an ownership interest in which shortly after selling the

6    property to Mian Realty, it then sold the business operation.

7    Your Honor, when we received this motion, it came out of the

8    blue such that, I mean we hadn't heard anything about this

9    property in many years.  We were not in a position to

10   actually respond on the merits as to whether or not the

11   automatic stay applied because we simply didn't know enough

12   about the situation, and although, Your Honor, on its face,

13   we know that if there's any environmental contamination on

14   the property, it would have happened years and years and

15   years before the petition date.  We know that Grace's

16   operation had nothing to do with environmental liability

17   whatsoever, but we didn't know anything more than that at the

18   time we filed our original response.  With our original

19   response, Your Honor, we filed a discovery request, and in

20   our response we indicated that until we received the

21   discovery, we weren't in a position to actually respond to

22   the merits of the actual motion.  Your Honor, we served our

23   discovery response in mid-May.  On June 16th we received

24   discovery responses from Mian Realty, 300 pages of documents

25   from Mian's records itself, CDs containing 25,000 pages of

1    materials from the New Jersey litigation that's been pending

2    for more than two years, and at the same time, Your Honor,

3    Mian Realty served on the debtors discovery.  Your Honor, in

4    the last 30 days we have gone through our records to the

5    extent we can.  We've made a tremendous search of everywhere

6    we could think of to find records that dated back to a sale

7    that took place in 1987.  Based on that, we were able to find

8    some documents.  We did recently serve those documents on

9    Mian Realty, and although the documents that were served on

10   us by Mian Realty would suggest that there are other

11   documents out there that have not been provided, and although

12   we really have not gotten through all the details of 25,000

13   pages of documents from the litigation, we do believe now

14   we're in a situation where we can now respond on the merits

15   of this motion.  Again, Your Honor, we do believe now, based

16   on the information we have, we have the facts necessary to

17   marry to the case law, to in fact provide and prove that this

18   is in fact a pre-petition matter that should be stayed by the

19   automatic stay, and that Mian should not be able to name

20   Grace as a third-party defendant bringing us into this rather

21   large environmental mess and go forward from there.  We

22   suggested to Mian Realty that we would ask Your Honor, as we

23   asked for in our original response, now for time to file a

24   detailed response where we can address the facts, address the

25   law based on those facts, and provide the Court with the

1    appropriate documentation to back up what we are saying and

2    have this matter set over after we're able to file that brief

3    for a hearing on the matter.  We do have it set over to

4    September 2nd or another date that Your Honor would determine

5    would be appropriate.  We do not anticipate calling

6    witnesses.  There is essentially no one around who has first-

7    hand knowledge, but we do have documents with respect to the

8    facts, and again, Your Honor, would ask for the opportunity

9    now to file a brief in detail on the response which will

10    address the facts as well as the law and have the matter set

11    over.

12        THE COURT: How much time do you want?

13        MS. BAER: Your Honor, from our prospective, we can

14    be ready for the September hearing if Your Honor wants to it

15    on that, and I would suggest something like an August 14th

16    response deadline.

17        THE COURT: Okay, let me hear from Mian.  Thank you.

18    Good afternoon.

19        MR. KARWOWSKI: Good afternoon, Your Honor.  Henry

20    Karwowski appearing on behalf of Mian Realty LLC.  Just a few

21    points, Your Honor.  First is that I think the

22    characterization of "out of the blue" is erroneous.  It turns

23    out that environmental counsel attempted to third party in

24    Grace, I think back in January.  So this is not a matter that

25    has come up only in the past few months.  In fact, I think

1    Grace has been on notice since January.  Upon realizing that

2    serving such a complaint would be a violation of the stay,

3    Mian Realty then retained bankruptcy counsel.  The motion was

4    filed in April, but we've agreed to adjournment requests to

5    allow discovery to go forward.  We served discovery on by

6    June 10th.  So, Grace has had about five weeks to go through

7    the documents.  So in terms of timing, I think we're ready to

8    address the merits.  I should also note that there are

9    certain time pressures in the District Court matter.  This

10   matter's pending in the district of New Jersey District

11   Court, and as Ms. Baer mentioned, the matter was originally

12   filed in 2006, and there's certain deadlines that have either

13   passed or are pending, and these time pressures require that

14   this matter be addressed as soon as possible to allow the

15   District Court to be able to determine whether or not Grace

16   can be a party.  So, we request either the matter be heard

17   today or at the very latest a hearing date in August because

18   I believe in his opposition papers Grace requested a hearing

19   in August not September.

20            THE COURT: I don't know if I can give you a hearing

21   date in August simply because of my own schedule.  I don't

22   have motions day scheduled in August.  The September 2 date

23   was my August omnibus agenda, and that may be the issue.

24   Erin, is it possible to get back into the LECAL from

25   Pittsburgh?  Are you still loaded for Pittsburgh.  Can you

1    run off - I know two weeks are totally out of the question.

2    Can you run off the fee app; okay.  If I can just proceed

3    with something else I'll see whether I can get something in.

4    I have a feeling it's probably not going to work, but I'll

5    see what I can do.  How much time are you looking at?

6             MS. BAER: Your Honor, again, we are getting through

7    complicated environmental documents that are 25,000 pages

8    long, so it's a challenge.

9             THE COURT: No, I mean, in terms of a hearing time.

10            MS. BAER: Oh, Your Honor, I believe, again, this is

11   going to be an argument on the legal issues.  The documents,

12   we would anticipate, would all be submitted with our response

13   brief.  So, I would say maybe an hour each side.

14            THE COURT: Do you agree?

15            MR. KARWOWSKI: That's fine, Your Honor, yes.

16            THE COURT: Okay, I'll see what my clerk comes back

17   with and get back to this as soon as I hear back from him in

18   a few minutes; okay?

19            MS. BAER: Thank you, Your Honor.

20            THE COURT: Okay.

21            MS. BAER: The next item on the agenda, Your Honor,

22   is Burlington Northern's motion to clarify the injunction

23   that Your Honor entered, and Mr. Bernick will be addressing

24   that for Grace.

25            THE COURT: All right, Mr. Bernick?

1          MR. BERNICK: Maybe if Burlington Northern goes

2     first, we'd be happy to respond at an appropriate time.

3          THE COURT: Burlington -

4          MR. BERNICK: Unless they'd like to have me argue it

5     for them.

6          THE COURT: Good afternoon.

7          MS. AARONSON: Good afternoon.  Again, Anne Anderson

8     from Pepper Hamilton on behalf of Burlington Northern.  Your

9     Honor, basically, we filed the motion just to clear up one

10    issue that the railroad had.  In August of 2007, you entered

11    an order that temporarily stayed the cases that were pending

12    against the railroad, but made a carve-out for the railroad

13    to continue to settle cases as long as a record wasn't made

14    against the debtor and to dismiss those cases.  Your April

15    11th order that expanded the preliminary injunction didn't say

16    whether that superceded the order or whether we were still

17    permitted to settle and dismiss cases as long as didn't make

18    a record against the debtor, and I did read through the

19    debtors' objection on that issue, and by our motion we

20    weren't seeking to go beyond what was entered earlier.  We

21    just wanted to know whether it's okay to continue to settle

22    on those same grounds, and basically, from our client's

23    perspective we view it as a benefit to the debtor and to the

24    insurance companies as well because at this point many of the

25    plaintiffs' injuries are not so severe that we're able to

1    settle these cases at a more reasonable level and then

2    through the passage of time, as these plaintiffs' injuries

3    become more severe, the settlement value of the cases is

4    going to rise and because the railroad believes it has

5    indemnity claims against the debtor and claims against the

6    insurance companies, we believe it's in the best interest of

7    everyone if we're allowed to continue to settle and try to

8    keep the amounts down lower.  As far as the depositions,

9    originally the railroad wanted to participate in depositions

10   that are scheduled by International Paper who is a co-

11   defendant and it's not stayed right now.  Just to deal with

12   the claims that are against the railroad for its own

13   liability and inquire of the deponents whether what their

14   relationship is with the railroad, what some of their

15   injuries are that they're asserting against the railroad, but

16   after reading the objections, we've decided we don't really

17   need those depositions for settlement purposes.  We can get

18   informal information from the plaintiffs so that there's no

19   possibility of creating a record against the debtors.

20           THE COURT: All right.

21           MR. BERNICK: Your Honor, there are some insurers

22   that at least filed objections that it would be all right.  I

23   guess actually the Libby claimants have a statement that's in

24   support, so maybe the Libby claimants ought to be heard

25   first?

1          THE COURT: Yeah, I understand the statement, Mr.

2     Cohn and I'm happy to hear whatever it is you want to put on

3     record.

4          MR. COHN: Your Honor, I have nothing to add right

5     now.  I may wish to respond to arguments they're making.

6          THE COURT: All right.  Okay.  I understand the

7     objection's from the insurance companies too but it seems to

8     me that with the debtor agreeing that the order that the

9     Court entered on the temporary stay and both Libby plaintiffs

10    and the railroad agreeing that the only thing they wish to do

11    at the moment is continue the settlements but making it very

12    clear that there would be no involvement of the debtor

13    whatsoever or any record made against the debtor that that

14    might take some of the sting out of what the insurance

15    companies were concerned with; does it?

16         MR. BERNICK: Yeah, just to be clear for the debtor,

17    Your Honor, we're trying to be - I won't say accommodating,

18    but cooperative here.  As a technical matter - not even a

19    technical matter, it's a basic procedural matter, this is not

20    really a motion for clarification.  The order is unambiguous.

21    They would like to read this order together with the first

22    order to suggest that there is ambiguity, but there's no

23    ambiguity on the face of the second order, and so what in

24    fact this is, is a motion for reconsideration, and it's out

25    of time, and it doesn't address the standard.  At the same

1   time, if Burlington Northern wants to settle these matters on

2   its own nickel and without affecting any of the debtors'

3   rights, we don't really believe that we are in a position to

4   object to them doing what they want to with their own money.

5   But if this is a predicate for now or later on asserting a

6   contractual indemnity claim, then we most certainly do have

7   an issue with their proceeding to settle these cases because

8   they're creating a loss as to which they are going to look

9   for relief from, from the debtor.  So, we're happy that there

10  is - that the record taint issue has now been addressed by

11  their undertaking not to participate in the depositions, but

12  the whole idea of the stay was that because they are

13  asserting a contractual indemnification, that they would be

14  creating a loss that would then be brought against the

15  estate, and the Court has addressed this many times before in

16  connection with other similar situations and the rule has

17  always been that the underlying liability should not be

18  resolved.  So, again, if Burlington Northern wants to settle

19  these cases for Burlington Northern for its own benefit, we

20  have no quarrel with that at all, but to the extent that this

21  is designed to supply a liability under the contractual

22  indemnity, we most certainly do have a problem with it.

23          THE COURT: Well, I think I heard from Ms. Aaronson

24  that they intend to use this as a basis for contractual

25  indemnity claims.

1          MR. BERNICK: That's what I heard, yeah.

2          THE COURT: So, Ms. Aaronson, maybe I'd better get a

3    specific statement.

4          MS. AARONSON: Yes.  That is true, Your Honor.

5    Basically, there are the 15 contracts between the debtor and

6    Burlington Northern where Burlington Northern is the

7    beneficiary of indemnity from the debtor whether or not Grace

8    is involved in any of the liabilities.  So, it's our position

9    that just the existence of these lawsuits provides us with a

10   claim under the indemnity provisions and whether they're

11   settled or not, we still have a claim for the indemnity.  I

12   think it's in the debtors' best interest if those claims are

13   settled now for a smaller amount than they would be over

14   time.  You know, if we wait until the injunction's lifted at

15   some point after the plan's confirmed, these injuries might

16   be more significant and the settlement amounts might be

17   higher.

18         MR. BERNICK: That's a judgment with which we do not

19   agree under the plain terms of the Code because there is an

20   assertion of an - this is no different from Seal Bear and

21   others.  It falls within 362(a) - either (a)(1) or (a)(3).

22   It is a claim against the estate, and as a consequence it

23   should be stayed, and the fact that Burlington Northern

24   believes that now is the right time because the entries are

25   going to get worse, is really irrelevant.  It's an action

1    that affects the estate, and it should be stayed.

2          THE COURT: These are - So, I understand, these are

3    personal injury claims that Burlington would be settling.  So

4    the indemnity claims, undoubtedly, would be channeled into

5    the personal injury trust?

6          MS. AARONSON: Right and they are claims - These are

7    cases where the debtor is not named as a defendant.  They're

8    actions that are brought by the plaintiffs against Burlington

9    Northern for injury allegedly caused by Burlington Northern,

10   and it doesn't involve the debtor.

11         MR. LOCKWOOD: It is not -

12         THE COURT: You need to use a microphone.

13         MR. LOCKWOOD: Your question was whether these

14   claims by the plaintiffs were going to be channeled into the

15   trust.

16         THE COURT: Right.

17         MR. LOCKWOOD: And the answer to that is that the

18   plan is still being negotiated, and I'm not going to get into

19   the issue of drafting but suffice it to say that it is by no

20   means clear, to put it as vaguely as I can, that that will in

21   fact be true.

22         THE COURT: Okay, well, I think Mr. Bernick is quite

23   correct about the rulings that I've made consistently in this

24   case, which essentially are that if the claims are going to

25   increase the liabilities of this estate, they're stayed, and

1    if your client wishes to settle on its own behalf with

2    respect to direct liability and does not intend to file

3    claims against the estate because it's settling claims on its

4    own, then the estate has no interest in it, and your client's

5    free to do what it chooses.  So, I think because at this

6    point in time I have entered the preliminary injunction which

7    I had not done at the time that I entered the temporary stay,

8    and I was permitting the settlements to go forward, I wasn't

9    even clear at that point whether the stay would be made into

10   an injunction in favor of Burlington.  I think to be

11   consistent with that ruling, I need to do just what Mr.

12   Bernick said, which is to say that the answer is no.  You

13   can't settle to the extent that the settlement would then

14   turn into a contractual indemnity claim against the debtor.

15   If your client wishes to settle and at the same time say

16   that, that settlement is not going to be a claim against the

17   debtor, you're free to do what you choose to do, but to the

18   extent that you then intend to rely on the contractual

19   indemnity claims, I think that's stayed by the preliminary

20   injunction and has to wait the outcome of the plan.

21          MR. COHN: Your Honor, I think I may be able to help

22   with this part of the issue.

23          THE COURT: All right.

24          MR. COHN: And, you know, it's an odd posture that

25   we find ourselves in aligning ourselves with our adversary

1    litigation, which is BNSF, but we do want to make sure that

2    the order that emerges from today's proceedings does indeed

3    permit settlements to go forward and thus, you know, can't

4    prejudice the railroad.  There's a distinction, Your Honor,

5    between whether the estate will be bound by this settlement

6    and I think you're absolutely right that the estate can't be

7    bound by any proceeding to which it is not a party.  But, I

8    don't believe that there's any warrant to simply saying that

9    BNSF cannot assert its claims against the estate based on the

10   settlement, and if Grace - or Grace, however, is free to

11   object to the claim on any basis, either having to do with

12   whether the indemnity identification agreements are valid or

13   whether it was approved in settlement or any basis whatsoever

14   because Grace writes on a clean slate by reason of being

15   protected by the automatic stay and by reason of your

16   injunction orders.  And so, I think it's really a middle

17   ground, Your Honor, which is that Grace is not bound by

18   anything that happens between BNSF and the Libby claimants,

19   but BNSF is free to assert a claim - assert, not have allowed

20   necessarily.

21            THE COURT: But that imposes a burden on the debtor

22   that the debtor doesn't otherwise have, and that is to

23   litigate an objection to claim that otherwise can't be raised

24   because there is no claim to assert because the injunction

25   prohibits the claim from being settled and therefore, the

1   claim is not liquidated, and so, I think it still causes a

2   burden to the debtor that the automatic stay protects.

3         MR. COHN: But remember, Your Honor, that was the

4   whole thrust of Paycore and those cases was that the debtor

5   was going to have to litigate a claim.  A claim would be

6   asserted against the estate down the road, but that that

7   wasn't - and the debtors' rights would be fully preserved as

8   to that claim.

9         THE COURT: No, the issue in Paycore was that there

10  was no contractual indemnity clause, that was the problem. It

11  took an absolutely separate litigation in Paycore.  There was

12  no contractual indemnity.  That's what the Court faced.  Here

13  there is an alleged, there are 15 alleged contractual

14  indemnity -

15        MR. COHN: Right, and I guess - I'm sorry, Your

16  Honor, and I guess what I'm getting at, Your Honor, is that

17  if you put BNSF in the same position as a common line

18  editorial, which is to say that there no automatic right of

19  identification, but they would actually have to prove it up,

20  then you're putting them in the exact same position that the

21  Third Circuit had said it was okay in Paycore and you're

22  permitting us to go forward with settlements because BNSF

23  could settle on the basis that they have enough faith in

24  their own reasonableness of settling that they do think they

25  could eventually prove it up against the debtor even though

1    it's not automatic.

2            THE COURT: But that's not that's not their claim.

3    Their claim is that they have contractual indemnities with

4    the debtor which makes it an automatic claim against the

5    estate, and what I'm saying is that as I - I didn't look at

6    my opinion again, and I apologize for this, but as I recall

7    the circumstances, correct me if I'm wrong, the allegations

8    are that BNSF has two forms of liability: direct liability

9    and liability that's essentially derivative of what it did

10   for the debtor that would at some point in time come back

11   against the debtor on a contractual indemnity issue.

12           MR. COHN: No.

13           THE COURT: No, just the contractual issue.

14           MR. COHN: It's that BNSF has direct liability, but

15   BNSF asserts -

16           THE COURT: The contractual indemnity.

17           MR. COHN:  - that it is that Grace has

18   indemnification obligations -

19           THE COURT: Under the claim.

20           MR. COHN: - even as to BNSF's own direct liability.

21           THE COURT: Okay, well then, I think if that's the

22   case, because of the contractual indemnity issue, that the

23   automatic stay does protect the debtor from that claim, and

24   so to the extent that BNSF wants to waive that indemnity

25   issue, it's free to settle.  To the extent that it does not

1    want to waive that indemnity issue, I think the injunction

2    protects the debtor.  That's the whole purpose for the

3    injunction not to increase either the claims against or the

4    litigation costs of the estate.

5         MR. COHN: But you just placed BNSF in a worst

6    position as a contractual indemnitor then it would be if it

7    had a common law right of indemnification.  And again, I say,

8    from the Libby's claimants' perspective you're making it more

9    difficult for them to actually settle because of the fact

10   that you're actually going to bargain from having any claim

11   rather than letting them as a contractual - I'm sorry, as a

12   common law indemnitor would have the right to prove up a

13   claim if they can in the future.

14        THE COURT: Well, I mean, I only take the facts the

15   way I find them.  What Paycore tells me is that if you have

16   to bring a separate suite, which you do if there's a common

17   law indemnity claim, then the law simply says that at that

18   point in time because there are two separate actions that

19   have to be brought, that the Court's ability to enter the

20   injunction is somewhat restricted, but to the extent that

21   there's a contractual indemnity which is a direct claim

22   against the estate by virtue of the contract that the

23   injunction can be entered.  It's a core jurisdiction matter

24   and that the injunction should be - not should, but can and

25   in this case I did, enter it and that will protect the

1    estate.  So, I think it's on all fours with Third Circuit

2    jurisprudence, and I think it's going to have to wait the

3    outcome of the plan.  So, but it's between your clients and

4    BNSF.  If they choose not to raise the indemnity issue

5    because there are 15 contracts, there may be claims that

6    don't fall within those contracts.  If there are and they

7    choose to settle with your clients without presenting that

8    claim against the estate, they're free to do it.  What

9    they're not free to do is to settle and then bring a claim

10   against the estate.

11              MR. COHN: And since the connection with the

12   bankruptcy estate was the existence of those indemnification

13   agreements -

14              THE COURT: Right.

15              MR. COHN:  - then -

16              THE COURT: They're stayed.

17              MR. COHN: Yeah.

18              THE COURT: On that basis, they're stayed.

19              MR. COHN: Yeah.  Thank you.

20              THE COURT: Okay.  So, I need an order, I guess,

21   that I'm not sure what kind of clarification order that -

22              MR. BERNICK: I think it's probably just a - it's

23   just denial on the motion for clarification.  That was the -

24              MR. COHN: On the -

25              MR. BERNICK: I'm sorry, it's not even his motion.

1          MR. COHN: On the chance, no, on the chance that

2     BNSF will settle despite the need for a waiver to accompany

3     that, it does seem that a clarification would be in order to

4     make it clear that BNSF can settle.  It really would be the

5     same language that you included in the temporary stay order,

6     which was negotiated language.

7          THE COURT: Well, no, the temporary stay order was

8     entered for different purposes.  At that time I did not know

9     whether BNSF was a party that was entitled to be included

10    within the temporary injunction at all.  I had no evidence of

11    the contractual indemnities.  Then when I got the evidence of

12    the contractual indemnities, that's when I decided that, yes,

13    I did have jurisdiction, and yes, it was appropriate to

14    include them.  So, at this point I don't think I'm faced with

15    the same landscape.  The reason I did not include the same

16    paragraph in the preliminary injunction order that I included

17    in the temporary stay order is because I didn't think it was

18    appropriate any longer because of the contractual

19    indemnities.  It was not oversight.  It was intentional on my

20    part.  I did not think it was appropriate.  However, I'm not

21    attempting to stop the parties from settling claims that will

22    have no impact on this estate, and that will be the case.

23    There will be no impact on this estate if BNSF wants to

24    settle a claim and not bring an indemnity claim against the

25    estate, and I'm not in any way trying to prohibit that, so -

1    that's all, but to the extent that they're alleging a

2    contractual indemnity, that is stayed.

3            MR. COHN: Right.  So that an order may be submitted

4    then to that effect -

5            MR. BERNICK: Come on this is -

6            THE COURT: I don't think you need it.  Let me do it

7    this way instead: If you want to have settlements, I think it

8    would be better if we do it this way - If you want to have

9    settlements that will show that BNSF is settling with the

10   Libby claimants and not going to file a claim against this

11   estate, it would be better, I think to have something filed

12   with this Court that simply show that.  Then I think it will

13   be clear that it's not in violation of the preliminary

14   injunction and all parties will be protected.

15           MR. KRUGER: All right then, then we are free to go

16   through the negotiating process -

17           THE COURT: Yeah, sure.

18           MR. KRUGER: - to get to that point.

19           THE COURT: You can talk to BNSF.  What you can't do

20   is implicate the debtor.  You can't have any findings that in

21   any way will implicate the debtor in any way.  You simply

22   can't do it.

23           MR. BERNICK: But the motion for clarification that

24   was with respect to an order that did one thing; it

25   preliminarily enjoined the prosecution of claims.

1          THE COURT: That's right.

2          MR. BERNICK: That is unchanged.

3          THE COURT: That is unchanged.

4          MR. BERNICK: It doesn't purport by its terms to

5    govern whatever kind of settlement negotiations might take

6    place that don't implicate the prosecution of any claim

7    against the estate.  So, there is no clarification that's

8    necessary.  I believe the motion for clarification should

9    simply be -

10          THE COURT: Denied.

11          MR. BERNICK: - denied.

12          THE COURT: Yes, I think that's true and what I've

13    suggested is that if you're somehow or other in a workaround

14    present an order and I'll be happy to consider that order,

15    but this order on this motion I think will simply say that

16    the motion for clarification is denied.  You've got this

17    record.  I'm happy to facilitate settlements to the extent

18    that they don't impact this estate.

19          MR. KRUGER: That's fine, Your Honor, I agree.  This

20    record does in fact clarify even though as a technical matter

21    the clarification will be denied.  So, thank you.

22          THE COURT: All right, so, Mr. Bernick if the debtor

23    wants to submit that order that will deny the motion or - Ms.

24    Aaronson, I don't know.  Do you want to submit it or do you

25    want me to have the debtors submit it.

1          MS. AARONSON: We're actually fine on the record,

2    but if you want an order to circulate then -

3          MR. BERNICK: Well, I think -

4          THE COURT: Oh, no, I need an -

5          MR. BERNICK:  - just for purposes of closing up

6    this motion, we should have an order.

7          MS. AARONSON: Okay, then I can draft an order and

8    send it to you.

9          THE COURT: All right, so you're going to file it

10   then?

11         MS. AARONSON: Yes.

12         THE COURT: All right, I will enter an order then

13   when it's submitted by Ms. Aaronson.

14         MS. AARONSON: Okay, thank you, Your Honor.

15         THE COURT: Okay, Ms. Baer?

16         MS. BAER: Your Honor, that takes to matter number

17   13 which is a status report on the property damage

18   settlements and mediation, and I believe Mr. Cameron from

19   Reed Smith is on the telephone to address that and the next

20   two matters.

21         THE COURT: All right, just a minute.  Before we get

22   there, let me go back to the item -

23         MS. BAER: Item 11, Mian Realty?

24         THE COURT: Yeah, just a minute.  Isn't it 10?  I'm

25   sorry, maybe I made a mistake.

1          MS. BAER: Item 11 is Mian Realty.

2          THE COURT: Eleven, okay, thank you.  Actually - I

3     actually, literally cannot schedule a hearing in August and

4     the reason is because I have a whole week trial schedule that

5     I know is not going to settle, and I simply can't get even an

6     argument for two hours scheduled into this schedule.  So I

7     think the first time that I can put it on the calendar

8     literally is September 2nd.

9          MS. BAER: Your Honor, given that it's going to be

10    heard on September 2nd, then, could we have at least until

11    August 14th to respond?  And it's really -

12         THE COURT: How long is your agenda.  I think what

13    I'd like to do is put this argument in the morning since it's

14    going to take a couple of hours, and I've generally been

15    getting some time freed up in the morning, so - The debtors'

16    response is due by August; 14 you say?

17         MS. BAER: Yes, Your Honor.

18         THE COURT: And when's the reply date?

19         MR. KARWOWSKI: How about August 24th, Judge?

20         MS. BAER: Is that a Friday - I'm looking at your

21    actual last date for replies -

22         UNIDENTIFIED SPEAKER: August 22nd.

23         MS. BAER: August 22nd is the Friday.

24         THE COURT: All right.  Then argument will be here

25    in Delaware on September 2 at - one second, please.  Let's

1   say 9 o'clock.

2          MR. KARWOWSKI: I'm sorry, Your Honor, that was 9

3   a.m.

4          THE COURT: Nine a.m., yes, sir.

5          MS. BAER: Thank you, Your Honor.

6          THE COURT: And I'll reserve until 11.

7          MR. KARWOWSKI: So, just to confirm, Your Honor, the

8   debtors' opposition or actually reply is due August 14th and

9   Mian Realty's, I guess, sur-reply would be due August 22nd.

10         MS. BAER: I guess what I'd call is a supplemental

11  response and then a reply.

12         THE COURT: Wait, whose motion is that?

13         MS. BAER: It's Mian Realty's motion.  We responded.

14  We're asking to file a supplemental response, so our

15  supplemental response would be due on the 14th of August.

16  Mian Realty's reply would be due on the 22nd of August.

17         THE COURT: All right, yes, now the briefs are

18  coming in with these documents too?

19         MS. BAER: Yes, Your Honor, it would be - We will

20  file a response, and we will probably file documents that

21  will be backed up by an affidavit as to their authenticity or

22  something like that.

23         THE COURT: All right, the same with Mian, and if

24  you've got additional documents or affidavits or briefs that

25  you want to submit, do that with the reply, please.

1          MR. KARWOWSKI: Your Honor, if I may, is it possible

2    that the Court can determine that the September 2nd hearing

3    date would be considered peremptory, meaning it cannot be

4    adjourned again.

5          THE COURT: Sure, but you're scheduling it for

6    argument not for an evidentiary hearing.

7          MR. KARWOWSKI: That's correct, yes.

8          THE COURT: Right.  So, I mean, if I determine I

9    need an evidentiary hearing then it will have to be adjourned

10   because you won't have witnesses here.

11         MR. KARWOWSKI: Also, Your Honor, I take it that

12   following up to August 22nd there cannot be any further

13   pleadings submitted.

14         THE COURT: That's - Well, I don't know about that.

15   I guess it will depend on what you do in your reply, but I'm

16   not expecting that the debtor's going to have anything else

17   after that date.  Normally, the pleadings are going to be

18   closed, but I don't know until you get here and I determine

19   whether I need an evidentiary hearing whether I'm going to

20   allow anybody else to submit anything.  I'm assuming that

21   since you're agreeing this can be done by argument that it

22   can be, but until I hear it I don't know for sure.  So, I

23   suggest that you do your best to get everything filed with

24   the supplemental response and with the reply because it seems

25   pretty much like a legal argument, but I don't know the

1    factual underpinnings with all these documents that are out

2    there.  It seems like an awful lot of documents.

3        MS. BAER: Your Honor, we hope at the end of the day

4    the documents will be - the key documents not terribly

5    voluminous, but it's a lot to go through to find those key

6    documents.

7        THE COURT: Okay.

8        MR. KARWOWSKI: All I'm asking, Your Honor, Ms. Baer

9    indicated before that it's her belief that based on her

10   earlier record that these things are pre-petition.  I'd just

11   like to know for the record that, for the reasons set forth

12   in the motion that we vehemently disagree, and that these

13   claims accrued post-petition, just for the record.

14       THE COURT: Okay. I'm sure that's something you're

15   going to be telling me about in a brief.

16       MR. KAROWOWSKI: Yes, Your Honor.

17       THE COURT: Okay.

18       MS. BAER: That would be the issue.

19       MR. KARWOWSKI: Thank you, Your Honor.

20       THE COURT: Okay, thank you.  Okay, now up to item

21   13 then, the status conference on the property damage and

22   mediation.  Mr. Cameron?

23       MR. CAMERON (TELEPHONIC): Good afternoon, Your

24   Honor.  Doug Cameron on behalf of the debtor.  With respect

25   to agenda item 13, there are settlements that we previously

1    reached on a number of Mr. Speight's claims, some of those

2    claims also involved Mr. Brandy as lead counsel and Mr.

3    Restivo and Mr. Speights have been working to finalize the

4    settlement agreement template for the Jamison Hospital claim,

5    which was the first of those claims that we settled so that

6    essentially the same form of agreement could be utilized for

7    all of the settlements that we've reached with Mr. Speights

8    and Mr. Brandy.  I believe Mr. Restivo and Mr. Speights have

9    reached agreement on the settlement agreement template for

10   the Jamison Hospital claim, and we contemplate filing a

11   motion to approve that settlement agreement shortly and then

12   hope to then follow up with the prompt filing of motions to

13   approve the settlement agreements for the other claims that

14   we've settled with Mr. Speights and Mr. Brandy.  There are

15   claims that Mr. Speights still has pending that we've not

16   settled and those are the 55 Canadian claims that are the

17   subject of the debtors' motion for summary judgment that's

18   currently pending before Your Honor and the Anderson Memorial

19   Hospital claim.  As Your Honor may recall from last month's

20   status report, Mr. Restivo and Mr. Speights had been

21   discussing the Canadian claims to see is those claims could

22   be settled.  We requested certain supporting information so

23   that we can further assess those claims and determine whether

24   we can settle them, and it's my understanding that Mr.

25   Speights has now compiled that information but both Mr.

1   Restivo and Mr. Speights were out on vacation last week, so

2   the information has not yet been exchanged.  We will review

3   that information as soon as we receive it and work over the

4   next couple of weeks to see if we can settle the Canadian

5   claims, and we think we'll know before the August omnibus

6   hearing whether those claims can be settled.  If they cannot

7   be settled, we will so advise Your Honor either before or at

8   the August omnibus hearing.  At that time, we'll ask Your

9   Honor to issue your ruling on the outstanding motion for

10  summary judgment relating to the 55 Canadian claims.

11  Finally, Your Honor, as you're aware, I think from the July

12  2, 2008 email that the mediator, Jeff Welch, sent to you, the

13  parties participated in a mediation earlier this month in an

14  attempt to resolve the remaining 17 California claims that

15  are the subject of the outstanding motions for summary

16  judgment.  Those claims are the 16 claims of the State of

17  California Department of General Services.  They're the

18  subject of the debtors' motion for summary judgment and the

19  single claim by Masserich Fresno (phonetical) which is the

20  subject of Masserich's motion and the debtors' cross-motion

21  for summary judgment.  Unfortunately, as mediator Welch

22  reported, the parties could not reach a resolution of those

23  claims, and as a result, the debtor would request that Your

24  Honor issue your rulings on those pending motions for summary

25  judgment relating to the 17 California claims.

1          THE COURT: Good afternoon.

2          MR. MANDELSSERG: Good afternoon, Your Honor, Steven

3   Mandelsserg from Hahn & Hessen.  We represent the State of

4   California, Department of General Services.  Mr. Cameron's

5   report is basically correct about the State of California's

6   participation in mediation.  You may recall from the June

7   omnibus hearing, Your Honor, that we had suggested that the

8   parties might consider mediation given the suggestion by the

9   Court back in April of last year and at several other times,

10  and you may recall that Mr. Restivo, on behalf of the

11  debtors, indicated that the debtors didn't really believe

12  that a mediation would be successful given the pending

13  decision - given the pending motions for summary judgment,

14  and I guess that prophesy was self-fulfilled without getting

15  into details of the mediation.  I think it accurate to say

16  that both parties, at least speaking for the State of

17  California, would appreciate a decision on those motions

18  since a decision might prompt further settlement.  Judge

19  Welch did indicate, I believe, in her July 2 email report to

20  Your Honor that she is available for further discussions if

21  and when a decision is rendered.  So, on behalf of the State

22  of California, we'd appreciate that decision as quickly as

23  possible.

24          THE COURT: Okay, well, I have actually given drafts

25  of both of those issues back to one of my clerks who is

1   working on it, so hopefully, it should be not too long from

2   now.

3           MR. MANDELSSERG: Thank you, Your Honor.

4           THE COURT: Okay.  Anything else on item 13?

5           MR. SPEIGHTS (TELEPHONIC): May it please the Court.

6   This is Dan Speights, Your Honor.

7           THE COURT: Yes, sir.

8           MR. SPEIGHTS (TELEPHONIC): I think Mr. Cameron

9   correctly set forth where we are with one small comment about

10   the Jamison release, which we all want to be a template for

11   all of our settled cases, was negotiated by Mr. Restivo and

12   me and finally after several drafts, we were able to at least

13   preliminarily agree on a draft, which I've sent out to all

14   the clients and I want to get the okay on all of them but I

15   had not gotten the okay on all of them yet, and that's were

16   we are on the Jamison.  The good news is I've received no

17   objections to the template yet from the clients I've heard

18   from.

19           THE COURT: Okay, so, I guess you'll just - when you

20   know what you're going to do with that you're going to file

21   something; is that - that's what you're telling me.

22           MR. SPEIGHTS (TELEPHONIC): Yes, and I think Mr.

23   Restivo would like to go ahead and file the Jamison as soon

24   as we can do that and hopefully that will be fairly quickly.

25   I hope to be able to talk to Mr. Restivo in the next day or

1   two about that.

2          THE COURT: Are you filing the Jamison whether all

3   your clients agree with it or not?  I'm not quite sure -

4          MR. SPEIGHTS (TELEPHONIC): Well, what I didn't want

5   was for Jamison to file and then somebody else pointed out

6   something that Grace would agree could be amended.  So I

7   think Jamison is fine.  We just want to get that feedback,

8   but I think I'll have the feedback from everybody else this

9   week, and we'll be able to go forward, and I think Mr.

10  Restivo would like file Jamison by itself first.  I don't

11  care whether he files it all at once or Jamison by itself.

12         THE COURT: Okay.  I'll just ask for status reports

13  until I get something from you on those claims, Mr. Speights

14  and Mr. Cameron, and when I do, you know, they'll be

15  scheduled, you'll just put them on the agenda, and we'll take

16  them as they come.

17         MR. SPEIGHTS (TELEPHONIC): Thank you, Your Honor.

18         MR. CAMERON: Thank you, Your Honor.

19         MS. BAER: Your Honor, those claims are the subject

20  of matters 14 and 15 on the agenda that we continue to carry.

21  So would you like us to take them off the agenda now and just

22  wait for the submission of the settlement agreements or keep

23  them on?

24         THE COURT: I think they should just stay on even if

25  what you do is just say that they're continued just so we

1   don't lose track of them.

2           MS. BAER: Okay.

3           THE COURT: Give me one second though.  Yeah,

4   because I'll definitely need to know what's happening with

5   the Canadian claims in any event because I have those that

6   I'm not working on until I find out what the status is.  So,

7   I'm going to need some updates with respect to those anyway.

8           MS. BAER: Then we'll keep matters 13, 14, and 15 on

9   the agenda.

10          THE COURT: I think it would be better just to keep

11  getting status reports so I don't lose track of them,

12  otherwise they're just going to slip off my radar.

13          MS. BAER: Okay.

14          THE COURT: Okay.

15          MS. BAER: That takes us to agenda item number 16.

16  Number 16 is a status on the Canadian ZAI PD claims

17  settlement.  Your Honor, we announced, I believe at the last

18  hearing, that we had reached an agreement in principal with

19  the Canadian ZAI claimants on a settlement which will resolve

20  their treatment under our Chapter 11 plan as well as resolve

21  pending litigation in Canada.  Your Honor, we have come to a

22  final agreement with the Canadian ZAI PD claimants with

23  respect to the settlement, and we have a final agreement on

24  the documentation, however the Crown is a party to that

25  agreement.  The Crown has yet to be able to give us a final

1   answer as to whether or not they can go forward.  We expect

2   that maybe as soon as tomorrow, we will have a final answer

3   from the Crown.  They have given us some comments on the

4   documentation that we'd agreed on, and we're looking at that

5   documentation now.  So, we're very close to either getting

6   closure or knowing we have to proceed without the Crown being

7   involved, and I would expect to know that very, very soon,

8   and once we have that agreement signed, we would then get it

9   filed and to get the approvals both in Canada and here in the

10  United States.  I would suggest, Your Honor, we simply

11  continue this to the next agenda on September 2nd, by then,

12  hopefully, we will have the agreement done and perhaps the

13  motion on file already.

14          THE COURT: All right, Mr. Hogan?

15          MR. HOGAN: Good afternoon, Your Honor, thank you.

16  Daniel Hogan on behalf of the Canadian ZAI claimants.  Your

17  Honor, Ms. Baer's statements are essentially accurate with

18  regard to the status of the negotiations.  We are waiting for

19  some indication from the Crown as to whether or not the terms

20  are agreeable and whether they're going to participate in the

21  resolution, and we await those comments and the final

22  determination as well, Your Honor.

23          THE COURT: Okay.

24          MR. HOGAN: With regard to the motion which is

25  recited in 16 which was our motion for relief from stay, that

1  matter has been passed a number of times, and I would ask

2  that it continue to be passed until we get that resolution,

3  Your Honor.

4         THE COURT: That's fine.

5         MR. HOGAN: Thank you.

6         THE COURT: Mr. Monaco?

7         MR. MONACO: Good afternoon, Your Honor.  Frank

8  Monaco for Her Majesty, Queen and Right of Canada.  Your

9  Honor, essentially what Ms. Baer and Mr. Hogan said is

10  correct.  We are dealing with a number of different

11  government agencies who would have to sign off on this and

12  also vacation schedules associated with these various

13  government agencies.  So, we could have an answer as soon as

14  tomorrow, but it could be beyond tomorrow.  I did want to let

15  the Court know that.  Thank you.

16         THE COURT: Mr. Monaco, is there an issue yet still

17  about the protocol or is this settlement going to resolve the

18  protocol?

19         MR. MONACO: Unfortunately not, Your Honor.  I did

20  speak with Mr. Hogan before the hearing started to see if we

21  could resolve it, but I think he wants to go forward with his

22  motion, and we'll have to respond in kind.

23         THE COURT: All right.  All right, this will be

24  continued until September 2, and we'll just keep finding out

25  what's going on so it also doesn't fall off.

1          MS. BAER: Thank you, Your Honor.  Your Honor, the

2     next matter on the agenda is the motion of the Canadian ZAI

3     PD claimants with respect to a protocol.  Both the debtor and

4     the Crown have responded.  We, frankly, don't think there's

5     an issue here.  We think that the system is working, but I

6     know that counsel wants to be heard.

7          THE COURT: Mr. Hogan.

8          MR. HOGAN: Thank you, again, Your Honor.  Daniel

9     Hogan on behalf of - and this is an important clarification,

10    Your Honor.  I'm here on behalf of the Canadian CAI claimants

11    and the characterization that I'm here on behalf of the

12    Canadian ZAI PD claimants is not entirely accurate insofar as

13    representative counsel before the CCAA who are essentially my

14    clients, have been appointed to represent both PD and PI

15    claimants, and so I want the record to evidence that, Your

16    Honor, and be clear.  Your Honor, we did file this motion, as

17    you're well aware, for the creation or establishment of a

18    protocol.  However, the protocol itself isn't necessarily the

19    end game.  It is merely a mechanism that we sought in order

20    to make the Court aware of the issues relative to the

21    assertion of Canadian privacy laws that have been asserted by

22    the Crown.  We, being again Canadian representative counsel,

23    within the context of the CCAA proceeding have made certain

24    discovery requests of the Crown for the disclosure of

25    pertinent data bases and other documentation that relate to

1     addresses and names of individuals in Canada who live in

2     homes that were insulated with the ZAI.  We, based on those

3     request and discovery requests, have been met with a defense

4     brought to you by the Crown indicating that there are privacy

5     laws in Canada that prevent the consensual disclosure of that

6     documentation in data bases, and so, as a result of that, we

7     were essentially backed into a corner of having to make an

8     assertion that we're entitled to that documentation, however,

9     the CCAA Court apparently retains jurisdiction for the

10    purpose of making a determination about whether those privacy

11    laws have an impact on the disclosure of the information,

12    and, of course, we're well aware that this Court accedes the

13    jurisdiction relating to practically everything with regard

14    Grace, and so it seemed from our perspective that the most

15    prudent thing to do was to come to this Court and ask the

16    Court either for a protocol for the dialogue between the two

17    courts or for a ruling from this Court that a protocol isn't

18    necessary and that the CCAA has it well within their rights

19    to make a ruling as to the determination about whether these

20    privacy laws prevent the disclosure of the data bases and

21    documentation.  Now, we made our application, we've received

22    responses from both the Crown and from the debtor.  Both are

23    fashioned in the nature of a response, not an objection,

24    which I find interesting.  Also if you read the responses to

25    each of the two parties, they don't really seem to object to

1   the notion that the CCAA can undertake the determination

2   about the privacy law and whether or not it will bar us from

3   getting that information.  It seems that they appear to have

4   a problem with the creation of a protocol, and I think I can

5   understand why.  It's a rather involved lengthy process that

6   would involve a large amount of negotiations at a very late

7   stage in this proceeding, I understand that, but I don't know

8   that it necessarily - those determinations are necessarily

9   such that it prevents us from needing a protocol.  With

10  regard to the Crown, they seem to argue and I'm not entirely

11  sure I understand the argument, but they seem to argue that

12  we can't have a protocol and we can't have a determination

13  from the CCAA until this Court makes a determination that

14  it's willing to give up some jurisdiction to the CCAA, and I

15  don't know that I agree with that characterization and that

16  argument, and I look forward to hearing the arguments from

17  Mr. Monaco as to how that argument unfolds, but from our

18  perspective, Your Honor, there's a need for the disclosure of

19  this information, that need will be required - or it's going

20  to be there regardless of whether we settle or whether our

21  agreement in principal falls apart and Grace determines that

22  they need to force a bar dates.  So, in either event, we're

23  going to need this information.  The debtors also indicated

24  that they're in agreement that to the extent actual notice

25  can be made, that it should be made, and this just further

1    promotes that outcome.  So -

2         THE COURT: Your clients represent the personal

3    injury claimants.  Do the personal injury claimants know that

4    your clients represent them?  I mean, I'm not sure I

5    understand the structure of how they're appointed to

6    represent - Obviously, the personal injury and property

7    damage claimants - well let's say personal injury claimants,

8    who live in houses for which you want this information

9    obviously don't know that you don't about them because if

10   they did you'd already have that information, but yet, you

11   represent their representatives who need to know who they

12   represent.  So, isn't that the issue that we're all trying to

13   find out who the pool of claimants really is and where they

14   are?

15        MR. HOGAN: Well, certainly.

16        THE COURT: Okay.

17        MR. HOGAN:  We are trying to figure out who we

18   represent.

19        THE COURT: Right.

20        MR. HOGAN: We've been appointed by the CCAA to

21   represent those class of individuals who may have personal

22   injury claims or do have personal injury claims or may in the

23   future have personal injury claims.

24        THE COURT: Oh, so, it's an appointment by the CCAA.

25        MR. HOGAN: That's correct.

1          THE COURT: Okay, that's what I was not clear about,

2     and I didn't ask my question very artfully, I'm sorry.  I

3     wasn't sure how the representatives were appointed, and it's

4     by the CCAA.

5          MR. HOGAN: That's correct, Your Honor.

6          THE COURT: Okay.  Okay, that was the piece that I

7     was missing.

8          MR. HOGAN: My apologies, Your Honor.

9          THE COURT: All right, thank you.

10         MS. BAER: Your Honor, just very briefly.  We agree

11    that the information, if it's to be provided, we need to get

12    over the Canadian privacy issue.  The debtor agrees that it's

13    the CCAA Court that is the one who should determine and enter

14    the order with respect to the privacy issue, and if that

15    order is entered and the information's provided, we will use

16    that either under our settlement or if we don't have a

17    settlement in order to give actual notice of these, either

18    way we anticipate there will be a bar date and there will be

19    claims.  So, we don't think at this point we need to

20    negotiate a protocol.  Again, we're happy for you to

21    communicate with the Canadian Court as appropriate, but with

22    respect to the concerns that are presently before the Court

23    and presently among the parties, we believe that the Canadian

24    Court is the right court to enter this order and can in fact

25    do it, and I don't think it impinges on your jurisdiction at

1   all.  So, we don't think there's an issue here that needs to

2   be decided by you right now.

3        THE COURT: Well, I mean, I'm happy if we have to go

4   the protocol route, but if some letter, order, something on

5   my behalf simply says, Look, we have an issue, we need to get

6   notice out, you know, you're the expert in adjudicating

7   Canadian privacy claims or if in your discretion you think

8   it's appropriate to do, would you kindly, if that does it, we

9   all need to get the notice somehow.  We need to know who the

10  claimants are.  Mr. Monaco, I don't know what the Crown's

11  position is.  I mean if it's going to be opposed it will be

12  opposed.  If it isn't then -

13       MR. MONACO: Your Honor, just to pick up with what

14  Ms. Baer said, because I agree with everything she said.  The

15  problem here is what Mr. Hogan's clients are asking for

16  really doesn't fit what they actually need.  What they

17  actually need is information.  The best way to get that

18  information is through an order by the Canadian Court that

19  protects the Crown in terms of giving confidential

20  information about individuals.  So, let me just back up a

21  minute and give the Court some background.  I think Your

22  Honor will recall at a hearing, this was probably several

23  years ago, and it was in the context, I believe, the 15th

24  omnibus objection, the debtor was requesting that you set up

25  a separate Canadian claims objection.  Your Honor declined.

1    You said you were perfectly suited to handle these claims,

2    and it's clear that this Court - the Canadian Court is

3    ancillary to this Court.  The other thing that Your Honor

4    should be aware of is that there has been a monitoring point

5    in that Court that provides the Canadian Court with up-to-

6    date monthly reports, detailed reports, because I've seen

7    them, on what happens in this Court.  And because the

8    information, there's thousands - there's no dispute - we do

9    have information that is relevant to the information that Mr.

10   Hogan seeks, but again, the problem is to try to get the

11   consent of each of these individuals would be impractical.

12   So we realize there has to be a court order under the privacy

13   act in Canada, and we do not disagree that the Canadian Court

14   is best suited to do that, and of course, they're going to

15   have to file some kind of motion, as long as the request was

16   reasonable, there is no reason for us to oppose it, and I

17   think that accomplishes everything he wants, and just to make

18   another point, if you read the article that was attached to

19   our response, which deals with coordination and cooperation

20   in cross-border insolvencies, you can see that it's a

21   developing area of the law.  There's no firm guidelines, and

22   we would spend an inordinate amount of time and energy trying

23   to develop something that really doesn't accomplish what they

24   need, and so, for that reason alone, which will only cause

25   more delay, I think the Court can take judicial notice that

1      nothing is easy in this case.  We could take each of these

2      issues as they develop on a case-by-case basis, and by that I

3      mean the issue respecting the privacy act.  There's no reason

4      to develop a protocol on this singular issue.  So, Your

5      Honor, I think it's premature, it's unnecessary, and will

6      just cause more mischief and not really get to the heart of

7      the matter.

8              THE COURT: Well, I guess the question is, what is

9      it that I either need or should do that will assist in

10     getting this done because I think that the concern simply is

11     that regardless of whether there's a settlement, a bar date,

12     however notice is going to out, actual notice would certainly

13     be preferable, and to the extent that particularly a

14     governmental entity has the information that parties, plural,

15     need to get the appropriate notice out, it ought to be a

16     relatively simple matter to get it, once the appropriate

17     protections are in place for that disclosure.  So, what do I

18     do to assist?

19             MR. MONACO: Well, Your Honor, I'm not sure you have

20     to do anything, quite honestly.  The Canadian Court can just

21     issue this order regarding the privacy act.  I'm not sure

22     there's any dispute that they have jurisdiction, and it's

23     something for that Court to handle as opposed to this Court.

24     I don't think anyone in the courtroom disputes that.  As far

25     as the notice program, my understanding is, it's either going

1   to be set up in the context of this settlement or if for some

2   reason the settlement doesn't happen, the debtor will

3   continue on with their program.  We're still going to have to

4   get this order no matter what.

5        THE COURT: Right, that's what I mean.  I think the

6   order is necessary regardless of how the case comes down.

7   The notice has to be given, and you can't give the notice

8   until you have the information.  You can't get the

9   information until you get the court order, so -

10        MR. MONACO: Right.  Your Honor, my co-counsel,

11  Jacqueline Dais-Visca's on the phone.  She has more insight

12  into the mechanics of how such an order would be obtained.

13  I'll defer to her.  She might be able clear this up.

14        THE COURT: All right, can you assist, ma'am?

15        MS. DAIS-VISCA (TELEPHONIC): Hi.  This is

16  Jacqueline Dais-Visca.  Yes, I think subject to what Grace

17  has to say on this point, I think it's sufficient that this

18  Court just order that that issue be determined by the

19  Superior Court in Ontario that it seized with the CCAA

20  proceedings, and then we can just show up in front of that

21  Court and seek that order in relation to disclosure in

22  accordance with the privacy act, and I think that can be done

23  in a fairly quick turnaround.

24        THE COURT: Mr. Hogan?

25        MR. HOGAN: Your Honor, just so that the Court is

1   fully advised as to this matter.  I find it interesting that

2   we're having this part of the discussion insofar as the

3   reason that this whole thing came about was we were told by

4   Canadian counsel effectively for the government, for the

5   Crown, that this Court was seized with the issue, and that as

6   a result that we would have to bring a motion of this nature,

7   maybe not quite to the characterization of a protocol, but we

8   didn't just dream this up out of whole cloth, Your Honor, it

9   was either we deal with this issue before this Court or the

10  CCAA isn't seized with the issue, and so -

11          THE COURT: Well, frankly, I think you're safer,

12  based on the fact that I'm been pretty adamant about the fact

13  that jurisdiction is primarily here, so, I think this simply

14  takes care of an issue, but I think that the Canadian Court

15  is best suited to enter the order, particularly when the

16  Crown's involved in making the disclosure of this particular

17  information.  So, why don't you folks work out an

18  appropriately phrased order that will simply request, advise,

19  whatever it is, that I need to do, give up jurisdiction if

20  it's a jurisdictional issue, to have the Canadian Court

21  address the request and/or permit you to file the request

22  there, Mr. Hogan, whatever it is that it takes so that I can

23  do an order, you can get your information, and then simply

24  make sure, however, that the order is clear, that that

25  information is going to be used for appropriate purposes in

1   this case in the United States, because what I don't want to

2   face later is some issue that while we disclosed it in Canada

3   but you can't use it for purposes of notice in the United

4   States.

5          MR. HOGAN: I understand.  Your Honor, a related

6   matter to this is the fact that, as we hope, we reach a

7   resolution with both the Crown and the debtor or maybe just

8   with the debtor, but in either event, if either of those

9   eventualities occur, there's going to be a need to go back to

10  the CCAA and to have that Court approve the resolution.

11         THE COURT: Yeah, maybe.

12         MR. HOGAN: And so, would you rather that I parcel

13  that out of this and we just deal with these as they come up

14  and we'll come back before you for that purpose in that order

15  as well?

16         THE COURT: I'm not - How are you planning to

17  proceed or are you far enough along?  Are you coming here

18  first or going there first?

19         MR. HOGAN: I'll let the debtor speak to that, Your

20  Honor.

21         MS. BAER: Your Honor, we're going to need Canadian

22  counsel to make sure.  In the past, we've done this a number

23  of times, Your Honor has entered orders here -

24         THE COURT: First.

25         MS. BAER:  - and then we've gone up there and had

1   them approved.

2          THE COURT: Yes, so I think it's probably not

3   necessary to deal with that now because if you're going to

4   have to get the approval here then I think what will happen

5   is that the approval will go here and then you'll take the

6   process back to Canada.  I don't think you need a protocol

7   for that, at least there hasn't been one before.

8          MR. HOGAN: Okay.

9          MS. BAER: Your Honor, and if we determine for some

10  reason the procedure needs to be flipped, I think we can work

11  out something to submit to you because clearly we all want to

12  do the same thing and get it done.

13         THE COURT: All right, okay.  All right, Mr. Hogan,

14  do you want - I'm not sure.  Why don't I just order all of

15  you to work out an order and submit it, and I'll continue

16  this till the September 2nd hearing in the event that I don't

17  have an order from you, and I'll look, since it's your

18  motion, Mr. Hogan, for you to actually electronically file

19  it, but I will assume that you're working with Mr. Monaco and

20  the debtor to get it done.

21         MR. HOGAN: Certainly, Your Honor, be glad to.

22         THE COURT: All right, thank you.

23         MR. HOGAN: Thank you.

24         MR. BERNICK: Your Honor, it's my privilege to turn

25  to the last item with which we are seized today, and that is

1    the default interest matter is up for a status conference

2    before the Court, and I think I can brief, perhaps others

3    will want to take up other issues.  The last time that we

4    were here on this matter, we basically took up the question

5    of the scheduling, and Your Honor set September the 15th as

6    the date for the hearing and a briefing schedule.  There was

7    also some discussion about pinning down any discovery that

8    would be required in connection with that hearing because we

9    were concerned that any such discovery might yet be effective

10   deferring the hearing.  Obviously, you know from the debtor

11   that we're very, very anxious to get this matter resolved.

12   Since last time, three things have been done, and I think

13   that we're on track for a hearing on the 15th of September.

14   First, briefs have now been filed in response to our

15   objection by certain holders of the debit issue by the

16   Committee for the Unsecured Creditors and also, I believe, by

17   JP Morgan Chase as the agent.  So those briefs have now been

18   filed.  There's also been a discussion about discovery, and I

19   think that the only discovery that's been discussed is

20   relatively modest.  There was some interest expressed by the

21   Committee in taking the deposition of Mr. Sheldon, who's the

22   general counsel for W.R. Grace.  There's been a discussion

23   about that from Grace's point of view.  We have an interest

24   in deposing Mr. Kruger who submitted an affidavit in

25   connection with briefs.  But whatever happens in that area,

1   we're assuming that discovery can be accomplished in

2   relatively short order, and therefore, will not pose an

3   obstacle to proceeding on the 15th of September.  Also,

4   pursuant to Your Honor's unmistakable message to the parties,

5   there has been at least a preliminary discussion about

6   whether there might be room to resolve this matter, and

7   there's been no substantive meeting since the hearing in

8   connection with that, but the matter has been discussed, and

9   I'm assuming that there will be some effort going forward to

10  get this matter resolved.  So I think that we're on track for

11  a hearing on the 15th of September, which, as again, Your

12  Honor knows is very important to us.  Your Honor raised the

13  question last time as to whether there would have to be an

14  evidentiary hearing.  We don't really see the necessity for

15  that.  I think there are likely to be or at least could be

16  one affidavit that's already a matter of record in the case,

17  that's Mr. Kruger's affidavit.  If there are depositions,

18  they can be used and referred to in the course of the

19  briefing, and otherwise discussed before the Court, but we

20  don't see that there is some evidentiary matter as to which

21  it would be necessary to actually call live testimony.  So,

22  from our point of view, it's a very urgent threshold matter,

23  it is now on track to be heard on the 15th of September.

24          THE COURT: All right.  Good afternoon.

25          MR. KRUGER: Good afternoon, Your Honor.  Lewis

1   Kruger for the Official Unsecured Creditors Committee and

2   perspective witness.  I do want to suggest that perhaps we're

3   not really on target the way Mr. Bernick would suggest that

4   we are.  First, Mr. Bernick, as I understand his papers,

5   having now looked at them again and really thought about

6   where we are in this case, suggests that, number one, the

7   impression of solvency has not been addressed by this Court.

8   Secondly, he will not concede that the debtor is indeed

9   solvent.  Third, that the absolute priority rule which

10  appears to apply generally in Chapter 11 may not apply in

11  this case.  Fourth, that there was a course of conduct and

12  dealing which may give rise to equitable reasons for why

13  default interest contractually agreed to should not be

14  present in this case.  All of that, it seems to me, Your

15  Honor, is too soon for this conversation at the moment.

16  There is no reorganization plan on file in this case.  We're

17  acting and having a discussion as though we know its content

18  because we looked at a term sheet more than three months ago,

19  but as we heard today, and I assume it must be true, since

20  there's been this long delay between the term sheet and the

21  filing, there must be issues that are complex for both the

22  debtor and the co-proponents, the asbestos claimants in

23  dealing with the reorganization plan.  It's very hard to have

24  a meaningful discussion today or September 15th about the

25  absolute priority rule, solvency of the debtor, all of those

1    issues until one has seen the reorganization plan and the

2    disclosure statement.  It seems to me that those issues and

3    the issue of the interest rate appropriate for, quote,

4    "payment in full" with respect to unsecured debt which is

5    protected by a default interest provision in its documents is

6    an issue that ought to be addressed at confirmation.  At the

7    very least, it seems to me, it's an issue that needs to be

8    addressed only after one can see a reorganization plan and a

9    disclosure statement.  It's very hard and when you look at

10   the briefing both at the debtor's proposal as well as the

11   responsive briefs, absent classification, absent knowing

12   what's in the disclosure statement, this seems to me to be

13   asking the Court for a declaratory judgment based on a

14   document and a set of circumstances that is really not yet

15   present, and to the extent that there needs to be a valuation

16   question, that may well be an evidentiary hearing, and the

17   valuation question is one that nobody really would like to

18   get into but since the debtor won't concede it, if you

19   believe, Your Honor, that valuation is a prerequisite for

20   discussion of the absolute priority rule, then there will

21   need to be a valuation discussion and a valuation hearing.

22   That would be helped enormously, it seems to me if it's going

23   to take place, to take place post-having seen the disclosure

24   statement and see what it says about that issue, if it says

25   anything about it at all.  It may well be that the debtor

1    will try to obfuscate the question of whether or not it's

2    solvent or insolvent along the way, even I note in passing

3    that the debtor relies or says it relied upon the long-term

4    agreement with the Unsecured Official Committee with respect

5    to the interest rate, but of course that plan presumed

6    solvency by the debtor, but of course, Mr. Bernick who's been

7    saying it's solvent for the last seven years now says, Oh, no

8    court has yet determined that's true yet, that certainly may

9    be true.  But there will be a very, very different view of

10   this case when we do indeed see a plan and do indeed see a

11   disclosure statement.  If there is a desire to have discovery

12   during this period between now and September 15th, and if we

13   are not to have discovery with respect to valuation until we

14   see the disclosure statement as well as the plan, then it

15   seems to me that there could be discovery about all the other

16   issues that are present in the responses and in Mr. Bernick's

17   motion seeking to say that there is no default interest

18   present for these claims for various reasons.  That can go

19   forward.  We can put on hold the question of valuation unless

20   and until we see what there is in the plan and in the

21   disclosure statement.  A last comment about those subjects.

22   When I think about the question of interest for unsecured

23   creditors, and by the way, this has been only teed up, if you

24   will, with respect to bank creditors, but there are other

25   unsecured creditors who will also be claiming default

1    interest, ordinary trade vendors who supplied trade credit to

2    Grace pre-Chapter often have on their invoices statements

3    that say, If you don't pay us within 30 days or 60 days, the

4    interest clock runs at 1 percent a month or 2 percent a month

5    or whatever, now for seven years.  So, no doubt there will be

6    those issues also present.  It will be interesting to see how

7    those are going to be addressed by Grace in its plan and in

8    its disclosure statement.  So for all of those reasons, I

9    don't want to suggest that this should not be an issue that

10   we consider, but it does seem to me that we are considering

11   it at the wrong moment, and that it may well be that the

12   September 15th hearing needs to be an adjourned status

13   conference after they have seen, if we have indeed seen by

14   September 15th the plan and the disclosure statement.  Thank

15   you.

16          THE COURT: Good afternoon.

17          MR. ROSENBERG: Good afternoon.  It's always nice to

18   be the last speaker at the end of a long day.  Andrew

19   Rosenberg of Paul Weiss Rifkind Wharton & Garrison for the

20   bank lenders.  I have actually some more remarks, but

21   initially I join in with Mr. Kruger's position, and I think

22   before I add more it probably makes more sense to get some

23   guidance from the Court as to whether Mr. Kruger's position

24   is going to be adopted because if that's the case and we

25   support and think that does make the most sense in this

1    particular context, then I will have nothing more to add.

2           MR. BERNICK: Well, I'm certainly going to want to

3    respond to Mr. Kruger and in the order of logic it seems here

4    that I should have the opportunity to respond also to what

5    counsel for the holders has to say, so, perhaps at the risk

6    of -

7           MR. ROSENBERG: Unnecessary words?

8           MR. BERNICK:  - of unnecessary words, I would

9    suggest that we just go in the fashion and hear what Mr.

10   Rosenberg has to say, which I'm sure will be very

11   informative.

12          MR. ROSENBERG: Exactly.  We agree.  Actually, we do

13   agree on most of your preliminary remarks too that the briefs

14   have filed, and I think absent the, quote, "solvency issue",

15   that the discovery may be a little bit more extensive than

16   you described, but not a lot, and I think it can certainly be

17   wrapped up in a day in September, whatever the date I think

18   we have is September 15th, and we have had at least

19   preliminary discussions, myself and Mr. Bernick, and I think

20   we've both agreed that those should continue.  Turning to the

21   solvency issue, and this is why we're trying to get some

22   guidance as to what we're doing on the 15th.  As a legal

23   matter, and I don't want to get too much into oral argument

24   here.  I'm not sure Your Honor has even had a chance to read

25   our lengthy brief.

1          THE COURT: I haven't.

2          MR. ROSENBERG: But in summary what the brief says

3  is that equity can only retain value be it through a solvency

4  trial, settlement, gifting by another class, if the debtors

5  are solvent, and since we assume that the plan when and if

6  proposed would be a legal plan, that the debtor has to be

7  presumed solvent and that the plan on its face would hence

8  solve, you know, without essentially, satisfy any burden that

9  we have to prove solvency.  Thus, we need to try on the facts

10 of this case the only stuff that needs to still be tried, and

11 September 15th will be the issues that - the reliance issues,

12 whether there was a deal with the Creditors Committee, et

13 cetera.  Our brief also notes that as far as we can find, no

14 case has ever discussed, much less ruled that for purposes of

15 post-petition interest determination you could do anything

16 other than presume solvency or equity retaining value.

17 There's nothing to prove and the history of the whole issue

18 of post-petition interest and solvent debtors was that the

19 prohibitions are limitations on post-petition interest were

20 put in to protect creditors who had higher rats of interest

21 from benefitting at the expense of creditors with lesser

22 rates of interest.  None of this matters where equity is

23 retaining value which we believe is about $1.6 to $2 billion.

24 That's not the purpose of the prohibition.  At that point,

25 solvency is presumed, and you simply get into the Dow Corning

1    type factors as to whether the debtor could overcome the

2    rebuttable presumption in favor of default interest.  I also

3    note that -

4         THE COURT: Wait, so, if I understand the position

5    that you just articulated -

6         MR. ROSENBERG: Uh-huh.

7         THE COURT:  - the debtor's between a rock and a

8    hard spot.  If the debtor proves that it is not solvent, then

9    it can't push anything back to equity.  If it proves that

10   it's solvent then the issue is whether default interest has

11   to apply.  I think the case law will support the proposition

12   that it does not have to apply -

13        MR. ROSENBERG: Correct.

14        THE COURT:  - that that's an equitable

15   consideration for the Court, which is one reason why I

16   suggested that maybe you ought to try to settle it in the

17   first place because it may end up costing you less money than

18   having to try the various issues it may have to try.  But is

19   that the position that you're taking?

20        MR. ROSENBERG: That's exactly our position, Your

21   Honor, that ultimately you have to be solvent - or insolvent,

22   and, you know, equity we actually find here saying that

23   they're in a better position viz-a-viz the bank lenders

24   because they settled the asbestos claims compared to if they

25   had actually finished the trial, proved balance sheet

1    solvency, and perhaps retained at the same $1.6 to $2 billion

2    in value, but if they're solvent, that's exactly it, Your

3    Honor.  Where this has to end up is ultimately with a hearing

4    on rebuttable presumption in favor of default interest and

5    that is not an automatic entitlement to default interest,

6    that is simply a rebuttable presumption in our favor governed

7    by the fair and equitable standards.  That's the hearing that

8    we expected to have, that's the hearing that's always had in

9    the context of default interest, and what we're trying to do

10   today is make sure that when we get to the Court on September

11   15th we're not expected to have a wholly different trial where

12   we have to - I'm not even sure how we do it, quote, "prove

13   solvency" in the connection of some claims objection hearing.

14   I don't even know who our adversary would be.  I guess the

15   debtor, they say they are solvent, so - that's exactly where

16   we are, Your Honor.

17          THE COURT: So on September 15th, what you want to do

18   is have a hearing on the presumption on the rebuttable

19   presumption of the default interest rate and that's it.

20   That's what you're aiming for.

21          MR. ROSENBERG: Well, yes, Your Honor.  The caveat

22   to that I think that it's odd to do, as Mr. Kruger said, to

23   try to do a fair and equitable hearing about a plan that

24   hasn't been filed so we don't know what it's going to look

25   like in the context of a claims objection hearing, and we do

1    brief this extensively, but whatever date we actually have

2    that hearing, that's what we think should be tried.

3        THE COURT: Well, that's frankly a little bit of

4    what concerns me.  How I'm going to judge whether default

5    interest or any interest or what rate of interest is

6    appropriate when I don't know what the claims are that are

7    being paid because I haven't seen the disclosure statement

8    and plan to know what the debtor proposes to pay by

9    classification.

10        MR. ROSENBERG: Your Honor, when you have an

11    opportunity to read our brief, you will see that we could not

12    find a single case where a final ruling was made in the

13    context of a claims objection for that very reason.  The

14    courts always say, it's a fair and equitable standard and

15    let's decide this at confirmation.  The only cases where it

16    was even partially addressed were 506(b) cases involving

17    liquidations and mortgagees where they said they could rule

18    partly and then finish the rest if there's a confirmation

19    hearing, but we actually couldn't find any cases doing this

20    because how can you decide what is fair and equitable in

21    connection with a particular plan that doesn't exist and that

22    who knows what its final terms are going to be like in a

23    502(b) claims objection.  That's why it's never been done.

24        THE COURT: Okay.

25        MR. BERNICK: This is exactly what we were concerned

1   about last time when we talked about the schedule and we had

2   the very active discussion that I know Your Honor will recall

3   concerning the schedule is that this matter starts to slide

4   and it can't slide and it's not necessary that it slide and

5   all of these proposals that you've now heard, both from Mr.

6   Kruger and from Mr. Rosenberg, all stand to service the

7   proposition that perhaps their perceived leverage will be

8   enhanced if they're standing on the doorstep of a

9   confirmation hearing, and we're on the doorstep of a

10  confirmation hearing and everything is done riding upon Your

11  Honor's determination, and they are the people who are coming

12  forward saying, Oil our squeaky wheel to the tune of X-tens

13  of millions of dollars.  That is exactly why we pushed this

14  issue in the fashion which we did and, Your Honor, I believe

15  that we are - there's no reason why this matter needs to be

16  deferred.  In fact -

17        THE COURT: Well, how can I determine that until I

18  at least the plan and the disclosure statement and know what

19  the claims are?

20        MR. BERNICK: Well, that's relatively easily

21  answered because the plan in fact will be filed, by the

22  latest, on August the 15th so that by the time that our brief,

23  our reply brief is filed, there will in fact be a plan on

24  file.  That plan is going to call for a payment scheme that

25  will come as a surprise to nobody because it's reflected

1    already in the agreement in principal.  The claims, the

2    claims of asbestos claimants that have been settled will be

3    paid in full.  Indeed, all of the asbestos claims will be -

4    the property damage claims will be paid in full.  All the PI

5    claims will be channeled to a trust.  They will be paid

6    according to the terms of that trust and will be paid in

7    full.  We will then have to deal with the question of what to

8    do with respect to the unsecured claims, and the key issue

9    with respect to the unsecured claims is what does payment in

10   full mean?  We will pay those claims in full.  There's not an

11   issue about whether they'll be paid in full.  There's not an

12   absolute priority rule issue because they will be paid in

13   full.  The question is, What does paid in full mean?  We take

14   the position, we believe properly so, that they're not

15   entitled to receive default interest.  Indeed, they're not

16   entitled to receive dependency interest.  They're entitled to

17   receive the interest that is allowed to them under the

18   contracts absent default, and the 502, as our brief lays out,

19   § 502 of the Code basically says that they're not entitled to

20   get default interest.  The only way that they can mount a

21   claim for default interest and a claim that they are making,

22   they're saying that, Our claim is not paid in full unless you

23   pay it to the extent of default interest.  The only way they

24   can make out that proposition is by saying, if they fall

25   within a principle that's been articulated under 1129 that

1    says that fairness and equitable considerations demand that

2    the claim be paid including default interest in the event

3    that the debtor is solvent.  So we have a relatively clear

4    situation.  We say that their claim is in fact being paid in

5    full.  Indeed, with respect to our term sheet, we're actually

6    paying them probably what we believe is above payment in

7    full, and because it's being paid in full, they have no basis

8    for objection they have no basis for objection on any kind of

9    basis.  If they want to come back and say that's not payment

10   in full because they're entitled to default interest, they

11   have to establish their entitlement to default interest.  To

12   do so they bring themselves under, again, this principle that

13   says with respect to solvent debtors, default interest may be

14   owing.  So we have a relatively simple issue that's presented

15   before the Court.  It's not something that's going to change

16   in connection with our plan at all.  It is: Are they right

17   that this debtor is solvent and because it's solvent under

18   the cases decided under 1129, they are entitled as part of

19   their claim to be paid default interest.  Or are we right,

20   that they're not entitled to that because they haven't

21   established solvency.  This is a very unique case.  This is a

22   case in which solvency not only has been disputed during the

23   course of the case, it remains disputed today.  There was no

24   agreement in connection with the agreement in principal that

25   the debtor agreed to, that the equity folks agreed to, or

1    that the personal injury claimants agreed to that said that

2    this debtor is solvent.  There is no agreement as to any

3    level of liability, not agreement as to any level of

4    solvency.  The essence of this agreement is that solvency -

5    that the amount of the solvency remains disputed, but because

6    the parties are prepared to agree to an allocation with

7    respect to the available value that lies in the debtor, the

8    issue of solvency need not actually be addressed either by

9    the parties or by the Court, but for the issue that they've

10   raised, which is making their claim for default interest, the

11   Court in the course of confirming the proposed plan will not

12   have to engage in an estimation of the value of the tort

13   claims, it will not have to make -

14        THE COURT: But if you don't settle it, I do have to

15   address it because if they raise it and somebody has a burden

16   of proving solvency and they don't prove it, then they're

17   clearly not entitled to default interest but then equity's

18   not entitled to retain anything.

19        MR. BERNICK: Well, that's not actually - I don't

20   believe that's actually the case.  If Your Honor will indulge

21   me for half a moment.

22        THE COURT: But the big issue, before we even get

23   there, the problem I'm still, I think, having is that

24   although there may be a plan filed and although there may be

25   a trust that will have certain dollars and that that will set

1   the amounts that will be paid out, so regardless of what the

2   claims are that would share against that trust, I would know

3   what the value of those claims would turn out to be because

4   the trust would set the value by way of a cap.  I still don't

5   know, I don't think, unless the plan's going to tell me, what

6   either the U.S. or the Canadian ZAI claims are.

7          MR. BERNICK: Well, that is also true, but again,

8   would be immaterial.  If they're trying -

9          MR. KRUGER: Your Honor, if I may interrupt for a

10  moment.  This is a status conference hearing -

11         THE COURT: Yes.

12         MR. KRUGER: - and not a hearing on the substance,

13  but the reality really is -

14         MR. BERNICK: Excuse me, excuse me -

15         MR. KRUGER:  - that if equity is retaining equity

16  regardless of who gets there, the plan that does not provide

17  the equity with the equity recovery that they're getting is

18  the only plan that you can have that says if the debtor is

19  solvent and equity retains something, then if debtor is

20  insolvent, equity retains nothing.  That's just a baseline

21  fact and the reality of it is that Mr. Bernick can dance all

22  day, but he cannot dance away from the fact that either he's

23  going to file a plan that is unlawful on its face because it

24  provides a recovery for equity when a debtor is insolvent or

25  it provides a recovery for equity when a debtor is solvent.

1    They can't have it both ways.

2          THE COURT: Well, lots of cases bargain away that

3    particular problem, and, you know -

4          MR. KRUGER: Not in this Circuit, Your Honor.  We

5    tried that in Armstrong and the Third Circuit said, Go

6    recovery for the equity unless they are solvent.

7          THE COURT: No, that's not what was tried in

8    Armstrong.  What was tried in Armstrong was an agreement by

9    one class of unsecured creditors to divest a portion of the

10   claim to another class of unsecured creditors bypassing yet a

11   third class.  That was the problem in Armstrong.

12         MR. KRUGER: What's happening here is it's happening

13   just the same way.  The asbestos guys would say to you, We've

14   given up something for the benefit of the deal the result to

15   which is that equity gets to retain something.

16         THE COURT: No, the issue - the debtor can certainly

17   propose a plan that will get around the absolute priority

18   rule and will establish issues that would come up from it in

19   various ways.  I mean that can happen.  It happens all the

20   time in less complicated cases than this.  It can happen in

21   this case if the debtor chooses to do it.  The problem is, I

22   don't know what the debtor is going to choose to do.  I

23   haven't seen it.

24         MR. KRUGER: And we were perfectly happy to deal

25   with the solvency question.  We're happy to go ahead with the

1    S&H hearing if that's the only way to determine solvency.

2    We're happy to do it by expert testimony or alternatively,

3    Your Honor, we'll file our own plan that has a different

4    outcome and deals with this issue.

5         MR. BERNICK: Your Honor, I - with all due respect

6    to my more senior and learned bankruptcy colleague, these

7    matters all will be addressed in due course, and I will make

8    a prediction which is that after I'm done speaking,

9    notwithstanding the fact that Mr. Kruger had the opportunity

10   to stand up and speak, he'll stand up again, and that's fine,

11   but I was just getting to the question that Your Honor has

12   raised, and I think Your Honor well appreciates that the

13   issue is not really the absolute priority rule.  The real

14   issue is what - are the claims being paid in full, and with

15   respect to personal injury, they're being paid in full; with

16   respect to property damages, they're being paid in full; and

17   with respect to the -

18        THE COURT: Wait, personal injury claims aren't

19   being paid in full.  They're being paid in full according to

20   the trust distribution schedule, that's not payment in full.

21        MR. BERNICK: But that is a payment - No, I didn't

22   say payment in full.  That is, there is an agreement to

23   settle the issue such that the personal injury claimants

24   would be saying that their claims had been fully resolved.

25   That's what a settlement is all about.  A settlement says

1   that the claims are being paid according to the terms that

2   have been agreed.  They are prepared to agree - is what this

3   deal contemplates.  They're prepared to agree that their

4   claims, while they could ask for more, are in fact being

5   settled at X-dollars, and at X-dollars, they are being paid

6   in full.  Same thing with respect to the property damage

7   claims.  So now we come to the unsecured bank claims, and if

8   in fact the unsecured bank claims are not being paid in full

9   and equity still has value, then there is an issue of the

10  absolute priority rule.  But if in fact it turns out that

11  after we're done going through these matters the unsecured

12  claims are being paid in full because they're not entitled to

13  default interest and therefore our plan actually is more

14  generous than what we're actually required to do, then there

15  is no issue for the absolute priority rule because this

16  debtor in fact does have the ability to pay all those claims

17  in full and have money left over for equity.  So the issue

18  then becomes as of . . . (microphone not recording) very

19  straightforward issue to be faced . . . burden of proof is

20  that we believe that under 502 they are not entitled to the

21  interest.  They have asserted a line of cases under 1129 that

22  says that in fact, once the debtor is solvent, they do get

23  the interest provided the other equitable factors are

24  present.  Now, on the issue of solvency, we stated with

25  respect to solvency there is a dispute.  There has never been

1    an adjudication with respect to solvency.  They in order to

2    put themselves . . . under 1129 -

3              MR. KRUGER: Your Honor, I'm sorry.  This is meant

4    to be a status conference, and I've watched Mr. Bernick's

5    technique over the years of avoiding the subject.  This is a

6    status conference.  The issue for today is discovery and the

7    September 15th hearing.  It isn't to review the cases.  It

8    isn't the history of the cases.  It isn't anything other than

9    a status conference.

10             MR. BERNICK: Your Honor, I -

11             MR. KRUGER: If you want to change it to a

12   substantive discussion, let's have that.

13             MR. BERNICK: (Microphone not recording) . . .

14   raised these issues.

15             THE COURT: Mr. Kruger, I'll be happy to let you

16   have an opportunity to discuss this too.  My question trying

17   to get to what we're trying to do on September 15th is, What

18   are we trying to do on September 15th?  I'm trying to find our

19   from Mr. Bernick where the dispute is, and I'm not quite

20   understanding at this point what the dispute is, and that's

21   what I am interpreting this to be.

22             MR. BERNICK: Yes.

23             THE COURT: I'm trying to figure out what the debtor

24   is telling me the dispute is going to be.

25             MR. BERNICK: Yes.

1           THE COURT: That's all I am using this for.  So -

2           MR. BERNICK: That is the only purpose, and I would

3    not have gone down this road.

4           THE COURT: Okay, well, keep it short, Mr. Bernick.

5           MR. BERNICK: All right, I was -

6           THE COURT: But tell me what the dispute is because

7    I'm still not getting it.  Okay.

8           MR. BERNICK:  I think, in the last ten minutes,

9    I'm not sure how much time I let him talk about that.  I will

10   keep it short.

11          THE COURT: All right.

12          MR. BERNICK: So, our position is that today

13   solvency is disputed and on September the 15th this solvency

14   is going to be disputed because it has been unresolved, the

15   estimation proceeding has been suspended.  If they want to

16   put on a case that says that their solvency for purposes of

17   demonstrating that they're entitled to default interest,

18   they're certainly - I say "they" because I want to talk about

19   who is in a position to be able to do that.  They are

20   certainly free to argue that matter under the law on

21   September the 15th.  That is that this is a solvent debtor.

22   So we then get to the question of, Well, what will that

23   actually involve, and we now know what it will actually

24   involve because their papers have been filed and they made

25   commitments to what it will actually involve.  With respect

1    to the Unsecured Creditors Committee, the Unsecured Creditors

2    Committee has staked out a very clear position in their

3    brief.  The Unsecured Creditors Committee did not say in

4    their brief that, Oh, we can't deal with any of this stuff.

5    It's way down the road, very complex stuff.  It's going to be

6    a confirmation issue.  That is not what they said in their

7    brief.  The Committee said exactly the opposite.  The

8    Committee said in their brief, that it is important for the

9    Court to recognize now even before a plan of reorganization

10   is filed, that the proposed asbestos settlement does not

11   treat the commercial creditors in a manner required by law.

12   They didn't propose that the matter be deferred at all.  They

13   said, Right now, this plan is illegal and the matter can be

14   determined now, and then it went on to explain why.  Did they

15   say, Oh, well, this is going to be very complex and my

16   goodness, we really need all this time.  We need to look at

17   the plan.  They said nothing of the kind.  What they said was

18   that this is really - they said this like three different

19   times.  The debtors' solvency argument is, therefore, a

20   strawman, not that they wanted to prove it but that they said

21   it's a strawman.  It is true, of course, that the dispute has

22   existed since the first day of these bankruptcy cases between

23   the debtors, equity holders, and the commercial creditors on

24   the one hand and the asbestos creditors on the other as to

25   whether the debtors are solvent after considering the

1    estate's contention to asbestos personal liabilities.  But

2    that dispute is now resolved.  It's all done.  It's over

3    with.  It's gone, and in fact, that's correct, it has been

4    settled.  The dispute is still there, but the matter has been

5    settled by virtue of the agreement that's entered into.  But

6    that dispute is now resolved pending confirmation of the soon

7    to be proposed plan of reorganization and that resolution

8    provides for well over a billion dollars of recovery for the

9    equity holders.  The issue, therefore, is not whether the

10   debtors' solvency has been judicially determined or whether

11   the proposed settlement addresses solvency but rather that

12   the settlement expressly provides the debtors' equity holders

13   with a recovery at the expense of the commercial creditors.

14   In these circumstances the law is beyond the dispute.  So,

15   what is it that they're actually focused on.  They're no

16   longer focused on the matter as to which the parties were

17   spending enormous time and effort, that is, What are the

18   liabilities in fact?   What they're saying is, that the plan

19   establishes solvency, that the burden of solvency is

20   necessary to trigger - treatment under the 1129 cases is

21   established by the fact of their being an agreement and the

22   market capitalization that is associated with the perception

23   that that agreement will come to fruition.  That's the

24   position that Mr. Kruger's committee has taken, and as to

25   that, the papers are just - you know, they're just, How can

1    there be an issue?

2         MR. KRUGER: (Microphone not recording) . . . not

3    yet read the briefs.  If we're going to go into excerpts,

4    I'll also take experts from his.

5         THE COURT: Yeah, I haven't read the briefs.

6         MR. KRUGER: I mean, I don't understand, that would

7    be totally inappropriate.

8         MR. BERNICK: It's not inappropriate at all.  It's

9    their position is not -

10        THE COURT: I'm not asking for their position

11   though.  I'm asking for your position.  I'm trying to figure

12   out what the dispute is.

13        MR. BERNICK: Our position is that on September the

14   15th, we will say - the burden will not be ours.  We will say

15   that the record in this case and it's an exhaustive record,

16   establishes precisely that the scope of liabilities is

17   disputed, and therefore, solvency has not been established in

18   this case.  There has been agreement that has obviated the

19   need to establish solvency.  That will be our position, and

20   we'll be happy to argue that position on the law, that is,

21   wether under those circumstances they can even begin to talk

22   about default interest.  As to the so-called presumption of

23   solvency that Mr. Rosenberg argued, we will be happy to argue

24   whether the law presumes solvency.  We think that there's no

25   such thing as a presumption of solvency.  That is a misnomer.

1   The law in the case of <u>Dow Corning</u>, which I personally was

2   involved in, the law says where there is solvency, under

3   those circumstances there's a presumption that the award of

4   default interest or the allowance of a default interest is

5   equitable and therefore it should take place.  There's no

6   case, no case that says there should be a presumption of

7   solvency.  So, if Mr. Rosenberg and Mr. Kruger want to stand

8   up on September the 15th and argue to Your Honor that they

9   come under the scope of 1129(a) because solvency is presumed

10  and the debtor has not rebutted that presumption, that's an

11  issue of law we're more than happy to argue that issue of

12  law, but I think that what they're now suggesting is, what

13  they would like to do on September the 15th is to say, you

14  know what, we now have the plan.  Yes.  The plan provides for

15  the payment of these claims in full.  Yes.  We believe we're

16  right on the presumption that there is solvency, but if we're

17  wrong, we believe we want to now make a record on the fact

18  that there is solvency in fact, solvency in fact.  And from

19  our point of view, if Mr. - We had the discussion about the

20  discovery.  If Mr. Kruger and the Committee want to make a

21  record of Grace's solvency by arguing that the agreement, the

22  proposed agreement and the market's reaction to that

23  agreement established solvency, we'll be happy to entrust

24  that issue as well.  We believe that that contention is

25  absolutely defective as a matter of law.  So they can on

1    September the 15th make that argument too, that even if

2    there's not a presumption of solvency, solvency is

3    established by the fact of what the agreement does, what the

4    plan proposes, and the marketplace's reaction to it.  We'll

5    take that matter up also on the 15th of September.  What is

6    not appropriate, what is not appropriate is for them to be

7    saying, for the Committee to be saying that somehow nothing

8    can really happen on the 15th because it's too early and it's

9    really a subject for confirmation because their papers

10   describe nothing that would require waiting to confirmation.

11   Indeed, their papers say, Decide this matter now, and we also

12   believe it's inappropriate for the holders who are

13   represented by Mr. Rosenberg to take that position, because

14   frankly, Mr. Rosenberg's comments never have done anything in

15   connection with the estimation proceeding.  They've elected

16   to stand by and watch that whole proceeding evolve.  They

17   have no rights to participate in the ongoing estimation

18   proceeding because they never preserved their rights to

19   participate in that proceeding.  So the only folks who have

20   been along for the ride and actually preserved their right

21   through the whole case management process to put in actual

22   evidence of tort liability is the Committee.  Nobody else has

23   preserved their rights.  The Committee has announced their

24   vision for how to establish solvency.  It does not require

25   that we go back to the estimation process.  So, when Your

1    Honor says, Isn't the debtor between kind of a rock and a

2    hard place, the answer's, Absolutely not.  The deal that the

3    debtor entered into specifically did not address solvency.

4    It's preserved as a disputed issue.  The only actual

5    participants in the process were the Unsecured Creditors

6    Committee.  They have not come forward with any vision of

7    solvency proofs other than the plan and the marketplace

8    perception of the plan and then they argue about the

9    presumption of solvency.  So there's no reason at all, based

10   upon the management of this case, to somehow go back and

11   reactivate the estimation process.  And if that were to be

12   attempted, that would be the most assured way of undercutting

13   the agreement that's in place and the most assured way of

14   taking this case back to the beginning, and under those

15   circumstances, for the holders or for Mr. Kruger's Committee

16   to come back and say, We want to establish that we are on the

17   good side of equity, which they have to do to get default

18   interest.  They have to be good guys.  They've got to be

19   equitable players, and the way that we're going to do it is

20   to compel the re-invocation or the restarting of the

21   estimation process, which will have the effect of tanking the

22   deal that will resolve this case.  All they'll do is

23   establish that they are not playing by the rules, that they

24   are engaging in inequitable conduct, and they ought to lose

25   on that basis alone.  So, I think that the vision for what

1   ought to happen on the 15th is very, very clear.  We've a deal

2   that preserves the dispute, does not resolve the dispute

3   about solvency.  If they want to come in and say that there's

4   a presumption, such that as a matter of law the burden is on

5   us to establish insolvency, we'll respond to that.  To the

6   extent that they want to put in evidence of the deal, what

7   the deal does and the market cap and the marketplace and

8   argue that that is sufficient to sustain their burden on

9   solvency, we will address that as well.  All of those things

10  can be done on September the 15th without delaying anything in

11  this case, and this is exactly why, Your Honor, I stood up

12  here last time and I was so focused on timing and Your Honor

13  agreed and everybody - there wasn't a person in this room

14  last time that said we couldn't do it by September the 15th.

15  Now with the benefit of a few weeks, all of a sudden it's,

16  Well, let's kind of see where things are going.  That's

17  backsliding, Your Honor, and we don't have time for it in

18  this case.

19          MR. KRUGER: Your Honor, I think I've heard from Mr.

20  Bernick.  He would like us to reopen the estimation hearing

21  because what he says is, that if we're wrong on the

22  presumption of solvency, that it's too late for us to do

23  anything else beyond that, and he points out that we have

24  reserved our rights with respect to the estimation hearing.

25  So I want to say to the Court right now, if on September 15th

1    Your Honor were to decide that we are wrong on the

2    presumption of solvency, which we come to because we

3    recognize that the equity is retained, a hundred percent of

4    the equity in this case, if we're wrong about that, then we

5    would - and, therefore, the only other way we can establish

6    solvency is a result of the estimation hearing, we want to go

7    forward with the estimation hearing.

8              THE COURT: Well, I -

9              MR. KRUGER: Mr. Bernick gave us no choice.  What he

10   really says, if Your Honor listened to him carefully, what he

11   says is, If you're wrong in the presumption, there's no

12   choice for you except to accept that you're wrong about this

13   issue of solvency.

14             THE COURT: Well, I -

15             MR. KRUGER: That can't be right.

16             THE COURT: I'm not -

17             MR. KRUGER: And I also, one more -

18             THE COURT: Wait, wait, wait.

19             MR. KRUGER: Okay.

20             THE COURT: I am not aware that there is a

21   presumption of either solvency or insolvency anywhere in the

22   Bankruptcy Code having to do with the issue that we're about

23   to litigate.  This isn't a preference issue.  There isn't a

24   90-day issue.  There's not an insider transaction.  I'm not

25   aware of that presumption.

1         MR. KRUGER: Mr. Bernick has raised it -

2         THE COURT: I am aware of the cases that Mr. Bernick

3    cited.  I read those cases in connection with these asbestos

4    litigations and other contexts, I do not think that they

5    establish a presumption that the debtor was solvent.  I think

6    what they do is establish with respect to an interest rate

7    that if the debtor is solvent, then certain things flow from

8    that consequence, but there has not been an assumption, a

9    presumption - pardon me - a presumption of solvency.  In some

10   of the cases I don't think solvency was contested, but that

11   doesn't mean that there was a presumption of solvency.  If

12   the committees are going to raise an issue with respect to

13   solvency.  It may have nothing to do with the estimation

14   hearing.  I mean, there may be other reasons why this debtor

15   is or isn't solvent.

16        MR. KRUGER: But that certainly is a very big one,

17   Your Honor, and I want to say that if that is the issue and

18   Mr. Bernick takes the position that the only way to establish

19   solvency was to have completed the estimation hearing, if

20   that's his view, we will undertake to complete the estimation

21   hearing and demonstrate solvency.

22        THE COURT: I don't know why -

23        MR. KRUGER: What he says is that it's too late.

24        THE COURT: No, I don't -

25        MR. KRUGER: I should remind him, Your Honor, that

1    the proof of claim - you listened to him not interrupting him

2    for a half hour, Your Honor, in spite of all of his -

3         THE COURT: Maybe you'd like to know what's of

4    concern to me.

5         MR. KRUGER: Well, I - okay.

6         THE COURT: Because I'm the one who is going to be

7    trying the case.  So I would think that maybe you'd want to

8    know, Mr. Kruger, but okay, I'm happy to listen.  I didn't

9    mean to cut you off, I was willing to hear what you have to

10   say.

11        MR. KRUGER: That's okay, I'll be happy to listen to

12   your view.

13        THE COURT: No, sir, I'm listening to you.

14        MR. KRUGER: I'm listening.

15        MR. ROSENBERG: Can I hear what the Court has to

16   say?

17        THE COURT: No, it was for Mr. Kruger.  I was

18   concerned about something for his Committee, but - So, Mr.

19   Kruger, I don't want to cut you off.  I had every intention

20   of listening to what you had to say, so, please, continue.

21        MR. KRUGER: Okay.  Your Honor, it does seem to me

22   that the proof of claim of the bank group was filed five

23   years ago.  Mr. Bernick now comes along and says, Why are we

24   rushing?  Look at what your brief said.  Look at what

25   everything else said, and what we're going to have again is

 1    the exact same thing the second time.  He's going to file a

 2    plan, which I suspect will be more than five or ten pages,

 3    and a disclosure statement that I'm even prepared to believe

 4    is going to run at some length, and he's going to file that

 5    on August 15th, he says.  I've heard other dates up till now,

 6    but maybe that one will be true, and the reality of it is,

 7    that the same way the hearing we held on June 21st was

 8    preceded by putting this issue on the calendar very shortly

 9    before that hearing took place.  So everybody looked at that

10    in a very, very short time frame.  All that I suggest is that

11    at least as my understanding from what he has said today is

12    that the presumption of solvency where the equity retains

13    equity is not present because there was a dispute as to

14    solvency.  Therefore, the only way to determine solvency is

15    to value the asbestos claims.  The only way I know of to

16    value the asbestos claims is the estimation hearing.  He

17    suggests that maybe it's too late in the day to resume the

18    estimation hearing, therefore, what he really says is, Sorry.

19     Wrong in the presumption, and no remedy, you're not

20    entitled.  That's all well and good but we did reserve our

21    rights to go forward with estimation.  If indeed we are wrong

22    that the equity can retain equity where there is no

23    demonstration of solvency, which by the way, I've been at

24    this a very long time and it would have been the first time

25    I've ever heard that equity retains equity when there's no

1   belief that there is solvency, but if that were indeed to be

2   the case, and I just want say that we're prepared to move

3   forward with the estimation process.

4          MR. ROSENBERG: I'll be brief, Your Honor, because I

5   think we - There is a resolution that makes some sense here

6   with two points.  One, in terms of the going forward, it's

7   interesting, if you listen to Mr. Bernick, about 50 percent

8   of the discussion was on 502, the other 50 percent was on

9   1129, fair and equitable, what's a confirmable plan, the

10  absolute priority, the Armstrong decision, et cetera, which

11  again points I think back to where Your Honor started which

12  is, How do I do this in the absence of considering at least

13  to have a disclosure statement to consider, and I just - All

14  the arguments we've been talking about here now for almost a

15  half hour and at least 50 percent or maybe more seem to be

16  going to all those points.  I don't know how you argue the

17  whole plan and the whole fair and equitable which is the

18  context of everything in a 502(b) situation.  So I think at a

19  minimum, we should finish the discovery between now and

20  September 15th on the non-solvency issues, so to speak.  In

21  terms of the solvency itself, I think when Your Honor does

22  have an opportunity to read our brief you will see that we

23  cite extensive precedent, Supreme Court, otherwise, that

24  basically stands that there's an assumption of whether you

25  call it presumption/assumption of solvency anytime equity is

1    retaining value.  Not for other purposes.  For purposes of

2    post-petition interest alone that the presumption at that

3    point is in favor of post-petition interest.  You are

4    presumed solvent for those purposes when equity regains value

5    and then as the Court pointed out rightly at the beginning of

6    this is it has held the rebuttable presumption based on a

7    fair and equitable standard.  So, we think it makes sense to

8    try to at least get the discovery done on those issue.  Now,

9    in terms of the solvency issue again, I think Mr. Kruger's

10   suggestion makes a lot of sense, whenever we do join issue on

11   this and here's why: The debtor has taken great pains to

12   point out that there was no determination of solvency in

13   connection with the quote, "settlement".  Nor quite frankly

14   was there any reason for it, it's just a settlement.   Now

15   take two situations, but our problem is that they're now

16   trying to use something good as a sword against us in terms

17   of the solvency issue.  If the solvency trial had finished,

18   and let us imagine it was concluded and Your Honor ruled, and

19   it resulted in a claim that ultimately paid value such that

20   it left the debtor with say $1.6 to $2 billion.  The debtor

21   would have been established as solvent on a balance sheet

22   basis.  Do the exact same thing through a settlement, and,

23   you know, presto/change o, there's no determination of

24   solvency.  Equity gets the exact same thing, but now they're

25   much better off, viz-a-viz us.  That is not the intention of

1    the solvent debtor rule in any way, shape, or form, and it's

2    too cute by half.  What I think makes sense, because I think

3    we will prove to Your Honor when as I said, when you've had

4    an opportunity to read our briefs, and at the appropriate

5    time after oral argument that we're right and that this

6    solvency issue is a presumption/assumption whatever you want

7    to call it, and that there's really no point in reopening at

8    this time the estimation trial, which I guarantee that Mr.

9    Kruger doesn't want to do, Mr. Bernick doesn't want to do,

10   Mr. Lockwood, I'm sure doesn't want to do, and I know the

11   Court doesn't want to do, but the Committee's reserved their

12   rights, if it needs to be reopened at the time, if the Court

13   finds that we're wrong that there is no assumption, there is

14   no presumption in this context, that's the time to do it.

15   That way we don't have to go through discovery and everything

16   else now and reopen the trial, quite frankly, which we hope

17   there's no reason at all.  We just can't be precluded from

18   doing that if it turns out Your Honor disagrees with our

19   legal argument that we are - that you find that we have to

20   prove solvency but yet we're given - or the Committee's given

21   no opportunity to do it.  That seems to be the way through

22   this quagmire.

23           THE COURT: So, your position isn't that there is a

24   simple presumption of solvency.  It's that because this plan

25   is going to retain whatever the equity value is going to be,

1   that the debtor has to be presumed to be solvent because

2   under whatever the cases are that you're going to cite, the

3   debtor can't commit a return to equity without violating the

4   absolute priority rule if a creditor objects, and your view

5   is that in order to satisfy the absolute priority rule,

6   you've got to be given a default rate of interest.

7          MR. ROSENBERG: In order that - I have to be paid in

8   full and I'm entitled to a presumption then I'm entitled to

9   my contract rate of interest and that presumption, I agree

10  with the Court, can be overcome based on the equities that

11  the Court determines that under fair and equitable that it is

12  inequitable at that time, but I agree with you one hundred

13  percent on the absolute priority rule, all we're trying to

14  get to is the case where every other case has gotten to,

15  which is where equity's retaining value you consider the fair

16  and equitable standards, the conduct, you know, in the entire

17  case as to whether we're entitled to default interest or not.

18  No one has ever, to my knowledge, ever raised the issue of

19  where equity is retaining value that you have to litigate

20  balance-sheet insolvency.

21         THE COURT: But here's the issue that I still don't

22  know and it may be because I haven't seen the plan.  I still

23  don't know what's happening with the ZAI claims.

24         MR. ROSENBERG: Well that, Your Honor, that's one of

25  the reasons that we've suggested it's - we don't know how -

1        THE COURT: I mean I don't know if equity is going

2   to keep anything.

3        MR. ROSENBERG: We have no idea either.  That was

4   what - Well, you'll see in our brief, we put pages on to that

5   and there are all sorts of hypotheticals you could actually

6   rule on our claim based on one plan, the plan could change.

7   What happens if our claim is disallowed at that point?  Does

8   it come back to life under the new plan?  It goes on and on,

9   and that was our - it's fair and equitable in the context of

10  a plan which doesn't exist and even if it's filed, it could

11  change.

12       THE COURT: All right.  Mr. Lockwood?

13       MR. LOCKWOOD: Your Honor, this has been a

14  fascinating preview of the arguments of September the 15th.

15       THE COURT: Not really.

16       MR. LOCKWOOD: But that's what it is.  That's what

17  it's been.  I mean, a couple of basic points.  First, under

18  the plan that is being drafted, equity is retaining equity

19  interests, it's not being cancelled.  That means that

20  whatever the value of equity will be as a result of ZAI

21  claims, PD claims, any other kind of claims, it will be -

22  maybe it will be a billion two to a billion six.  Maybe it

23  will only be a hundred million or five hundred million or

24  whatever, but as long as the plan contains a retention by

25  equity of ownership of the reorganized debtor, then all these

1   absolute priority arguments that the UCC and the bank debt

2   holders want to make, they can make.  The dispute, however,

3   as I hear it, is not whether they're going to get post-

4   petition interest.  The debtors' plan contemplates giving

5   them post-petition interest at an agreed rate.  So, all of

6   this absolute priority and what's the plan going to say, et

7   cetera, is kind of irrelevant.  The issue which the debtors

8   are attempting to tee up and which Your Honor will hear

9   argued, hopefully, on September the 15th as opposed to today,

10  is whether or not that post-petition interest rate has to be

11  the default rate in the contract or can be the lower rate

12  that the debtor is putting in the plan.  It's no secret.

13  It's the one they agreed to before.  It's in the term sheet

14  that's been published to everybody.  It's no amount of

15  negotiations with the ZAI claimants or plan drafting from the

16  SCR and the ACC is going to change that.  We've already

17  agreed in the term sheet that that would be the rate of

18  interest they propose.  So, it going to come down to a legal

19  issue, which is, first, which side is right as a matter of

20  law about whether or not you can pay something lower than the

21  default rate under the circumstances that will exist on

22  September the 15th, with or without a plan, but at least

23  accepting as a predicate that the plan will retain equity of

24  whatever value.  That would be a legal argument.  Depending

25  on how that argument goes and Your Honor's response to it, it

1    may well be that there will be a second argument about

2    whether or not there's additional proceedings that need to

3    occur to resolve some factual issue that Your Honor has

4    determined arises out of the first set of arguments.  But

5    we're not there yet.  The debtors think this could be

6    resolved as a matter of law.  They're asking for an

7    opportunity to convince Your Honor of that and initially at

8    least, the Unsecured Creditors Committee and the bank debt

9    holders agreed that they would take issue join the issue and

10   present their arguments on this, kind of like summary

11   judgment really.  I mean that's what's going to get argued,

12   and if Your Honor decides no summary judgment because there's

13   facts in dispute or whatever, then people will be able to

14   make all their arguments about, you know, we need to have a

15   full-blown estimation hearing, which would drag the Committee

16   and the SCR back in and we would then not be agreeing to our

17   number, but we'd be trying to prove a higher number and the

18   debtors would be back, I guess, if they're forced to have to

19   re-litigate this trying to prove a lower number, and on the

20   other hand the question for Your Honor will be, Is the

21   settlement number the right number?  And what conclusions, as

22   a matter of law do you draw from that?  So, I would just

23   suggest that we move right along, do the limited discovery,

24   not redo the estimation case.  Do it under the discovery

25   that's been proposed, have everyone show up on September the

1    15th, have the argument once Your Honor has had a chance to

2    read the briefs that Your Honor had not yet had, and see

3    where we come out at it.  Maybe the debtor will win.  Maybe

4    they won't win, but that's the way you resolve these things.

5        MR. BERNICK: Yeah, I actually agree with Dr.

6    Lockwood here.  Almost as surprising as when he reached a

7    deal.  The reason that we went down this road and this has

8    become so problematic is that the position being taken by the

9    Unsecured Creditors is that where there is by some measure

10   either they say the law requires it or they say the agreement

11   establishes it or their solvency, somehow the burden then

12   shifts to us to prove insolvency and if we fail to do it,

13   they get hundred cent dollars on the default interest, and

14   that's not the reality of the law, and it's not the reality

15   of this case.  We're not shoving to one side the fact that

16   there is value going to equity.  We're not shutting to one

17   side that the debtor and the plan proponents originally had a

18   case to be made that the liability, the tort liability was

19   very low.  We're not shoving that to one side at all.  All

20   that we're saying is that because the issue of the

21   liabilities has been so actively litigated and disputed and

22   it's still not resolved today that they don't get the same

23   treatment as they would.  They're not entitled to the same

24   rate of interest as they would be if this debtor were

25   indisputably solvent and had always been so.  If this debtor

1    were indisputably solvent, had always been so, there was

2    never really any other question about it, they'd have a much

3    more powerful case to get paid not only default interest, not

4    only interest and default interest, but hundred cent dollars

5    on default interest.  That's not this case.  This case is one

6    where solvency, liability, they've been disputed throughout

7    where the unsecured creditors contributed nothing by way of

8    the litigation position, and we ended up in a situation where

9    there's still a dispute about liability and still a dispute

10   about solvency.  That's why we even came up with the term,

11   the interest rate that's actually in the term sheet and will

12   be in the plan, is an interest that gives them the base

13   contract rate of interest plus some premium or element of

14   default interest, and what we're saying at this point is that

15   Your Honor should take a look at that, applying the equitable

16   factors that 1129 requires and in so doing considers the

17   history, considers the course of conduct and the like, and

18   also considers the fact that even today, liability that is

19   the ultimate question of what the liability is, is still

20   disputed and that the only way that we can get to the finish

21   line with these folks over here is by having an agreement

22   that doesn't finally resolve that issue.  That agreement

23   though pegged a number for the unsecured creditors. The

24   unsecured creditors now want to say, Well, we want the answer

25   as if solvency had always been clear, and it's always been

1    the sword, but we want to build off and change the agreement.

2    Basically, rewrite the agreement to give them more money or

3    trash the agreement, which is crazy.  So the facts are, not

4    that solvency should be presumed, that basically shifts the

5    tables.  The facts are that solvency is still disputed and

6    Your Honor can consider that fact together with all of the

7    other facts that are in the briefs in saying, What's the

8    right - what's the equitable answer?  We believe that the

9    equitable answer should be the number that we've put into the

10   plan.  If they disagree, they can say, that's not fair and

11   that's not equitable, but they can't insist in that process

12   that solvency must be presumed, that we have the burden of

13   demonstrating insolvency, and they cannot say that, Oh, well,

14   all of a sudden they're now going to reinvoke and step back

15   and particularly these folks who were content to wait on the

16   sidelines, step back into the estimation process and push it

17   all the way to the end because that will actually destroy the

18   plan that we have.  So what I would say is that you don't

19   presume solvency.  You recognize the fact that the

20   liabilities are disputed, and now I've committed the same sin

21   that everybody else had which I'm not addressing Your Honor's

22   concern.

23        THE COURT: No, that's all right.  I guess we'll get

24   to it and raise it later.

25        MR. BERNICK: Well, what's Your Honor's concern.

1          THE COURT: No, it's okay.  I'll figure it out on my

2    own later.

3          MR. BERNICK: Okay, well -

4          MR. ROSENBERG: Your Honor, this may be a first, and

5    Mr. Lockwood - I think I agree with Mr. Lockwood in general,

6    and I actually thought Mr. Bernick was agreeing with him also

7    and then I guess we've gone back into all the merits of the

8    case, but I think we were saying the same thing.  There is a

9    legal disagreement between the Creditors Committee, the bank

10   lenders, and the debtor as to presumptions, assumptions of

11   solvency, burden of proof which essentially do cry out for

12   some type of a summary judgment type ruling at some point,

13   and all that Mr. Kruger and Mr. Lockwood, who I also think

14   were saying the same thing, was to the extent that this Court

15   finds, denies, as I'll use Mr. Lockwood's - our summary

16   judgment that this can be resolved purely as a legal matter

17   and says, No, banks, creditors, Committee, you need to prove

18   this as a balance sheet matter by looking at these ZAI claims

19   and the asbestos personal injury claims that we have the

20   right or the Creditors Committee has the right to reopen the

21   estimation at that time and meet that burden of proof.  So I

22   think the three of us are at least saying the same thing.

23   Again, I -

24          THE COURT: Well, I guess from my point of view, the

25   question still for me is if the agreement fixes the

1    liabilities, I still don't know what the assets are.  I mean,

2    who is going to give me the asset side of this equation so I

3    know whether from a balance sheet perspective the debtor is

4    solvent in that sense.  I mean, I have to judge it as of a

5    snapshot date; don't I?

6         MR. ROSENBERG: Well, I think it's -

7         THE COURT: So, I mean, are you gong to give me the

8    market cap.  I mean the Circuit at this point in time tells

9    me that, you know, I don't know how because if I looked at

10   Bear Stearns on day one, I would have come up with a whole

11   different analysis as to market value than I would have if I

12   worked on it on day 45 perhaps, but nonetheless, the Circuit

13   tells me that I need to do that.  So on September 15th, are

14   you going to tell me what the debtor's worth on a fair market

15   value assessment and is that what I use to determine what the

16   assets are and then I compare it to the liabilities in this

17   plan, and I say, Okay, A minus, you know, and net worth and

18   that gives me the answer and the debtor's either solvent or

19   not and that determines if, because if so, and it's in that

20   formula, it's not going to take very long.

21        MR. ROSENBERG: Unfortunately, I don't think it's

22   going to be possible to do.  I think you pointed out two

23   issues, Your Honor, one, we're right back into the plan.  How

24   you possibly are going to determine in the context of the

25   September 15th claim objection the assets - the disclosure

1   statement hasn't been approved.  The plan hasn't been

2   confirmed.  How are you going to do all this stuff -

3           THE COURT: Well, it's only ever going to be an

4   estimation.

5           MR. ROSENBERG: Right, it would be an estimation

6   under a plan.

7           THE COURT: But I'm being told that the plan is

8   going to be filed.

9           MR. ROSENBERG: Right.

10          THE COURT: We have the settlement agreement.  You

11  know what the liabilities are as determined so far by the

12  settlement.  I don't know that you know all the liabilities,

13  but that's the major one.  So, you know what the liabilities

14  are to the banks.  You know what the liabilities are to the

15  general unsecured creditors.  You know the asbestos

16  liabilities.  In general terms you know the property damage

17  liabilities and as the settlement agreements are being filed

18  with those, you can fix those more and more, and to the

19  extent they haven't been filed, you can at least get a

20  ballpark figure that's pretty close as to what they'll be.

21  Probably the ZAI is really still the big issue that you don't

22  know the answer to.  So, you know, for purposes of this

23  issue, you'll figure out some plug number, that's what

24  everybody always does, so you'll figure out a plug number and

25  that will be what ZAI is for purposes of this issue, but

1  where do I get the assets side?

2      MR. ROSENBERG: Well, I think the answer is

3  threefold: One, I think the Circuit would say, what is it,

4  VHF, DBF, something like that - DBH, I believe, that if you

5  just look at the market gap which I think that today is $1.6

6  to $2 billion.  What we would say -

7      THE COURT: All right, well wait, just stop right

8  there.  1.6 to 2 billion is the market cap.

9      MR. ROSENBERG: Correct.

10      THE COURT: That's what you're telling me the

11  retention of equity is going to be.

12      MR. ROSENBERG: Correct.

13      THE COURT: That's without taking against any of

14  that market cap any of the liabilities the debtor has to pay.

15      MR. ROSENBERG: That's after - That is what the

16  equity is worth which is the market's determination and

17  market's view, not the market's view of the assets over the

18  liabilities.  That's what the market cap is, $1.6 to $2

19  billion.

20      MR. BERNICK: If the deal goes through.

21      MR. ROSENBERG: Now, we're going back to argue the

22  plan again.

23      MR. BERNICK: That's the whole problem.  This is why

24  I think - again, I would agree what - everybody wants to

25  agree with Mr. Lockwood for some odd reason today - I would

1    also agree with Mr. Rosenberg.  I think we can go forward on

2    the 15th because I think all the matters really can be

3    actually presented to the Court.  The theory that says that

4    if you look to the market cap and the agreement to establish

5    solvency, is the theory that the Committee has actually put

6    before the Court in the brief, we are more than happy to

7    address that theory on the 15th of September, and if that

8    theory is accurate, obviously their position is significantly

9    enhanced.  It's not over, but it's significantly advanced.

10   So the answer to Your Honor's question, if you assume that

11   the -

12          MR. ROSENBERG: Wait, can I answer - it was asked of

13   me.

14          MR. BERNICK: Fine, but I -

15          MR. ROSENBERG: You'll answer it anyway.

16          THE COURT: Mr. Rosenberg, I was asking you.  Let's

17   do it that way, go ahead, please.

18          MR. ROSENBERG: Thank you.  I think the second

19   point, Your Honor, is that we would say that for purposes of

20   the solvent debtor rule and post-petition interest that we

21   will show you that the law is that where equity is retaining

22   value you don't need to go assets over liabilities market

23   cap.  Simply the debtors' retention of value alone -

24          UNIDENTIFIED SPEAKER: (Microphone not recording.)

25          MR. ROSENBERG: The Court is asking what we're

1    trying to do on the 15th.  Please stop interrupting me.  We

2    will demonstrate it's a matter of law that that's what the

3    Court needs to look at.  Now, here's where the Lockwood

4    principle comes in, so to speak.  Let us imagine that the

5    Court determines that we're not right.  The right way to look

6    at this is not just whether equity is retaining value or not

7    right that it's simply a market cap, that we need to get into

8    other issues, assets over liabilities, an old-fashioned

9    balance sheet test which we don't think is the right test

10   here.  If you do that, then you need to do liabilities.  If

11   you do liabilities, you're getting back into the asbestos

12   estimation.  All that we're saying is, and we still don't

13   think September 15th is the right date because, as I said,

14   we're all discussing plan issues, but whatever date it is

15   that we resolve the legal issues first as to what is the

16   right standard is what you look at it, and then and only then

17   if you determine that we actually have to do assets and

18   liabilities and figure out liabilities, do we potentially

19   reopen the asbestos estimation to figure out the liabilities.

20   That seems to be a way out of this conundrum.  Because it

21   doesn't -

22            THE COURT: I guess I'm still confused as to why we

23   have to reopen the liability issue if all parties are

24   agreeing to what the liabilities are, and the only issue, I

25   guess, is whether or not there is value to the equity that's

1    being retained.  On a market cap basis, there clearly is.

2    Whether there will be on a going-forward basis, I don't know.

3            MR. ROSENBERG: I don't think we - I think probably

4    we will agree that there's no agreement as to what the

5    asbestos liabilities are.  There's simply an agreement, as I

6    understand the settlement, as to what their recoveries are,

7    but not their liabilities.

8            THE COURT: Right.

9            MR. ROSENBERG: That's the open question.  We hope

10   never to resolve this.  Only if the Court determines that

11   it's not market cap, it's not the presumption that we have

12   described, will you actually have to look at assets versus

13   liabilities.  It is only in that circumstance that we have to

14   reopen the liability side and determine what they are.

15           THE COURT: Well, I don't know if I -

16           MR. ROSENBERG: Which we hope not to do.

17           THE COURT:  - can do that anyway.

18           MR. BERNICK: I can agree with now Mr. Rosenberg for

19   just a moment, because I think we're maybe one step a little

20   bit closer and that is, as Mr. Rosenberg just said, it is

21   true that there's not an agreement about what the liabilities

22   are.  There is a settlement of what the liabilities are, and

23   under that settlement for settlement purposes rather than for

24   litigation or adjudication purposes, there is harmony and

25   peace and those are the claims that will be paid and they'll

1    be paid in full.  That's an agreement, however, that is

2    executory.  It doesn't come into existence, it doesn't come

3    into fruition until the plan is confirmed and goes effective,

4    and that is the source of exactly the snapshot that will

5    exist on September the 15th and that we will be arguing is the

6    relevant snapshot, that is to say, on September the 15th,

7    there will be an executory agreement that provides for the

8    payment of all those claims in full and as to which the

9    unsecured creditors are now arguing that they're entitled to

10   default interest.  We will say that the facts as of September

11   the 15th establish only the agreement, the dispute, the

12   agreement to settle, and then the marketplace's valuation of

13   equity, assuming that that settlement goes forward, because

14   that's what's driving the market the cap.  What's driving the

15   market cap is an expectation that the agreement will actually

16   be consummated, but as of September the 15th, based upon the

17   adjudicated record, there will not be agreement on what the

18   liabilities are.  There will not be agreement on what the

19   assets are.  There will be a dispute, and it is in light of

20   that dispute that Your Honor is then going to have to engage,

21   how does equity cut, because the reality of this plan is,

22   that it's a plan that resolves the case while not resolving

23   that dispute.  That is - will then have to be tested under

24   the equitable principles of 1129 to determine what is the

25   appropriate rate of interest to apply to the unsecured debt

1    in light of that package.  This is not a case where solvency

2    is undisputed or has always been undisputed.  This is a case

3    where at a certain point in time, the controversy was

4    resolved, and that will be our position.  They'll take, I'm

5    sure, a different position.  Your Honor will then have the

6    ability to resolve it.  I believe that part of that argument

7    will encompass, Your Honor's then also looking down the road

8    and saying, Well, if in fact I agree, let's say you agree

9    with the debtors' position, the plan proponent's position,

10   that the right of interest is appropriate under those facts,

11   what if Mr. Rosenberg is then given the opportunity or Mr.

12   Kruger is then given the opportunity to continue the

13   estimation in order to establish solvency in fact,

14   adjudicated solvency in the legal sense of what is required,

15   not settlement, settlement versus adjudication, just like

16   tort, there's another settlement versus adjudication, that

17   the liability to determine solvency you must have liabilities

18   and assets.  Your Honor will then say, What if they go

19   forward and establish solvency then -

20        THE COURT: All right, I've got it.

21        MR. BERNICK:  - what's equitable then?

22        THE COURT: All right, well, let me ask the question

23   in this fashion.  The interest rate that the debtor's

24   proposing to pay on the plan obviously is going to return

25   something to the creditors.  I don't know what the value of

1   that return is, but it's going to be something.  The default

2   interest rate is going to be obviously a higher something,

3   but I don't know what that something is either.  What's the

4   delta between the two.

5        MR. BERNICK: A hundred million dollars.

6        THE COURT: Okay.

7        MR. ROSENBERG: We agree.

8        THE COURT: All right, then, you know what your

9   marching orders are.  Why are you here arguing about this

10  instead of going to try to settle this issue?  Because you're

11  going to end up spending, if you have to go back into

12  estimation, not a hundred million dollars but multi-millions.

13  It will cost multi-millions for this estate to have to

14  litigate those claims and that is money that can go to

15  somebody, either the banks or the unsecured creditors or

16  someone, rather than you, and not, folks, that I'm unhappy

17  paying professionals, but nonetheless, in this case, it's

18  really time to get something out to the creditors.

19       MR. BERNICK: This has never been an either/or, Your

20  Honor.  We have tried and we have tried both before the

21  objection was filed and since the objection was filed, but

22  certainly before the objection was filed to be able to

23  resolve this on an agreed basis, and all I will say without

24  getting into the back and forth, I guess it's in the papers,

25  is that the demand was for a hundred cent dollars.  We're

1    still more than happy to go down the road, and see if this

2    thing can be resolved.  But bear in mind, we did hear

3    something that we think is very important.  We did not put

4    into the plan or take the position in our papers that because

5    this is disputed, they don't get any default interest.  We

6    have not said that.  We established as our floor what had

7    previously been agreed in connection with prior plans and

8    left value for equity.  We're not saying here that they are

9    absolutely bound by those prior agreements because even

10   though they haven't withdrawn from them, we recognize the

11   circumstances have changed.  We're not saying, Well, you're

12   bound by it, too bad.  But we're saying that that was a

13   benchmark we chose because we thought it was fair and they

14   thought it was fair before.  To put us back, I said the delta

15   now is a hundred million dollars, is a hundred million above

16   what we already put on the table and therefore have not

17   walked away from.  So when Your Honor thinks that, Well,

18   there's a spread and it's time to kind of whack up that

19   spread, when we came in before the Court with our brief, we

20   already essentially gave them default interest and the

21   question is, how much.  The number that's on the table -

22            THE COURT: Yes, not the contract rate, I understand

23   that.

24            MR. BERNICK: It's in the briefs, it is not only the

25   contract rate is it default as well.  It's just not hundred

1    cents on the dollar default.

2         THE COURT: I understand it's not the default rate

3    under the contract, but it's more than the interest rate

4    without the default under the contract.  I understand where

5    it's coming from.  It still seems to me that in the long run

6    you're going to be better off settling this issue.

7         MR. BERNICK: No questions.  That's what we have

8    said, and I'm assuming that Mr. Rosenberg, as he's indicated,

9    believes the same thing.

10         MR. ROSENBERG: Without the ten-minute roundabout,

11    yes, Your Honor, we are happy to talk.  It makes sense to

12    talk.

13         THE COURT: Then, this is an order.  I want you

14    folks to have a face-to-face meeting, and I do mean face-to-

15    face with the appropriate business people to get this

16    resolved, and I understand that it means that equity may get

17    a little less than it's expecting if that's the case.  I

18    appreciate that fact.  That's the way it is.  This is a

19    Chapter 11.  That's just simply the way it is.

20         MR. BERNICK: Then they can - they were agreeable to

21    what's been put out.

22         MR. ROSENBERG: Mr. Bernick, please, come on.

23         MR. BERNICK: I'm sorry -

24         MR. ROSENBERG:  The Court has given us an order.

25    We're not now debating again the merits of this.

1          THE COURT: All right, it's an order, just go see

2    what you can do.  Otherwise, if it's not resolved, I'll see

3    you September 15th.  I understand what the issue is, and I

4    think it can be argued on September 15th.  I don't think we

5    need an evidentiary hearing.  I think we can do it as a

6    matter of law.  If I'm wrong, then we'll reopen whatever we

7    need to and we'll undertake an evidentiary hearing after

8    that, but it appears to me from what I've heard at this point

9    that we ought to be able to get the arguments done.  If we

10   have to look at solvency, then we'll have to open up a

11   record.

12          MR. ROSENBERG: Your Honor, "by not evidentiary" I

13   assume you mean except as any evidentiary it's confined to be

14   the other factors that we were talking about in terms of -

15          THE COURT: Then submit whatever documents -

16          MR. ROSENBERG: Whatever affidavits or proffers as

17   well.

18          THE COURT: Exactly, but I -

19          MR. ROSENBERG: Thank you, Your Honor.

20          THE COURT:  - didn't expect that you were going to

21   have live witnesses that day.

22          MR. ROSENBERG: Okay, thank you.

23          MR. BERNICK: Your Honor, just, I'm not sure what

24   Mr. Rosenberg's thinking is, at least - it's evidentiary in

25   the traditional sense of just like this morning in connection

1   with the 363 deal or whatever -

2          THE COURT: Yes, I was not expecting live witnesses

3   that day, that's - let me just back off that statement.  I

4   was not expecting live witnesses.

5          MR. ROSENBERG: Paper evidence, not human evidence.

6          THE COURT: Correct.

7          MR. ROSENBERG: Okay, thank you, Your Honor.

8          THE COURT: All right, Mr. Kruger, is there anything

9   else you want to put on -

10          MR. KRUGER: Not a thing, Your Honor.

11          THE COURT: All right, Mr. Lockwood?

12          MR. LOCKWOOD: No, ma'am.

13          THE COURT: Anybody?  Okay, I think we're adjourned.

14   Thank you.

15          ALL: Thank you.

16          (Whereupon at 5:06 a.m., the hearing in this matter

17   was concluded for this date.)

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                    July 28, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221