IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors | ) | |
| | ) | **Re: Docket Nos. 18501 and 18735** |
| | ) | **Hearing Date: September 2, 2008 9:00 a.m.** |

**DEBTORS' SUPPLEMENTAL RESPONSE AND
OBJECTION TO MOTION OF MIAN REALTY
REGARDING THE APPLICABILITY OF THE AUTOMATIC STAY**

## TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................................1

    A.   Procedural Background.........................................................................................1

    B.   Factual Background ..............................................................................................2

          1.   Debtors' Ownership of 6 Kirby Avenue.....................................................2

          2.   Debtors' Sale of 6 Kirby Avenue to Mian ..................................................2

          3.   Contamination at Neighboring 40 Haynes Street ........................................3

          4.   Activities on the Mian Property...................................................................5

II.  ARGUMENT............................................................................................................6

    A.   The Automatic Stay Bars Mian's Claims .............................................................7

          1.   Contingent Claims Are "Claims" Subject to the Automatic Stay...............9

          2.   Mian's Contingent Claims Arose Prepetition ...........................................10

                i.    CERCLA and the Landfill Act Provide a Statutory Basis
                      For The Legal Relationship Between Mian and Debtors
                      Under the Third Circuit Standard ....................................10

                ii.   The 1987 Property Transaction Provided A Contractual
                      Basis For the Legal Relationship Between Mian and
                      Debtors under the Third Circuit's Standard......................12

                iii.  Other Jurisdictions Would Reach the Same Conclusion:
                      Mian Had Prepetition Contingent Claims..........................12

           3.   Mian's State Common Law Claims Do Not Arise Any Later Than the
              CERCLA Claims .......................................................................................15

           4.   Mian's Requests for Injunctive Relief Are Bankruptcy Claims ...............18

    B.   Mian Has Failed to Allege Grounds for Relief from the Stay .............................20

          1.   Mian Will Not Prevail on the Merits ........................................................21

                  i.    Debtors Are Not a Potentially Responsible Party Under
                      CERCLA.............................................................................21

                  ii.   Mian Cannot Obtain Contribution Under CERCLA or the
                      Spill Act .............................................................................22

                  iii.  Mian's Common Law Claims are Preempted by CERCLA24

|  | iv. | Mian's Landfill Act Claim Fails | 25 |
|  | v. | Mian's Claims Are Barred | 26 |
| **III.** | **CONCLUSION** | | **26** |

Mian Realty L.L.C. ("Mian") seeks to file a Third Party Complaint against Debtors in the District Court for the District of New Jersey in connection with environmental remediation of a piece of property (the "Mian property" or "6 Kirby Avenue") that Mian's predecessor purchased from Debtors *twenty-one years ago*. Mian is no different from the thousands of Debtors' other potential creditors and its attempt to pursue prepetition claims (both for monetary relief and for the Debtors to clean up the Mian Property) is precisely what the automatic stay was designed to prevent. Not only are Mian's claims subject to the automatic stay, Mian has failed to demonstrate any cause for lifting or modifying the automatic stay.

## I.    BACKGROUND

### A.    Procedural Background

On April 11, 2008, Mian filed a Motion requesting that this Court declare that (1) the automatic stay does not apply to the filing of Mian's proposed Third Party Complaint against Debtors; and (2) Debtors' alleged obligation under New Jersey law to clean up the Mian property does not constitute a "claim" under the Bankruptcy Code ("Mian's Motion"). Debtors initially responded by objecting to Mian's Motion on May 16, 2008, and requested a continuance in order to conduct discovery into Mian's assertions.[1] Simultaneously, Debtors served Mian with document requests and interrogatories. Mian responded to Debtors' discovery requests on June 10, 2008, and served Debtors with its own document requests and interrogatories, to which Debtors timely responded. On July 21, 2008, this Court set a date of August 14, 2008 for the

---

[1]    *See* Debtors May 16, 2008 Response (Docket No. 18735).

Debtors to file their supplemental response. Debtors now file this Supplemental Response pursuant to the Court's order.

**B.    Factual Background**

1.    Debtors' Ownership of 6 Kirby Avenue

In 1958, Baker & Taylor, Inc., a book distribution company that had been unrelated to Debtors, was purchased by Parents' Magazine Enterprises, Inc.  *See* Exhibit A.[2]  Parents' Magazine Enterprises, Inc. later purchased 6 Kirby Avenue on February 25, 1966.  *See* Exhibit B.  Debtors acquired Parents Magazine Enterprises, Inc. in 1970.  *See* Exhibit C.

In 1972 Baker & Taylor constructed a two-story office building with no basement at 6 Kirby Avenue.  *See* Exhibit C.  The building at 6 Kirby Avenue provided office space for Baker & Taylor's electronic data processing and marketing personnel.  *See* Exhibit D.  There is no indication that industrial activity took place at 6 Kirby Avenue during Baker & Taylor's occupancy.  On July 27, 1987, Baker & Taylor completed sale of 6 Kirby Avenue.  *See* Exhibits D, E, I.  On March 20, 1992, Debtors divested itself of Baker & Taylor.  *See* Exhibit E.

2.    Debtors' Sale of 6 Kirby Avenue to Mian

In late 1986, Baker & Taylor decided to sell 6 Kirby Avenue and consolidate its multiple offices at one location.  An internal recommendation was made that 6 Kirby Avenue should not be sold until Baker & Taylor was "satisfied that we either know that no [environmental] problem exists, or that we understand the extent of the problem, if there is one."  *See* Exhibit G.  Baker & Taylor completed an environmental due diligence investigation on December 22, 1986.  *See* Exhibit G.  One potential environmental concern for Baker & Taylor  was the handling of

---

[2]    In conjunction with this Supplemental Response, the Debtors have submitted an Exhibit Book of supporting material. All Exhibit references herein refer to documents in the Exhibit Book

hazardous substances at an adjacent property. Thus, the scope of Baker & Taylor's investigation included evaluating "what, if any, environmental problems may have been caused with our property by the 'dumping' that may have taken place on our neighbor's property." *Id.* Due diligence included consulting the New Jersey Department of Environmental Protection ("NJDEP"), a health officer for the Borough of Somerville, and conducting a documentary review. *See* Exhibit H. On January 7, 1987, Baker & Taylor concluded that the information discovered during their investigation "was sufficient to clear up the [environmental] issue." *Id.*

Bilal and Shakila Mian signed the Purchase and Sale Agreement with Debtors to purchase 6 Kirby Avenue for $900,000 "as is" on February 19, 1987. *See* Exhibit I. The purchase became final on July 29, 1987. *See* Mian's Motion ¶ 1; Exhibit F. Bilal and Shakila Mian transferred ownership of 6 Kirby Avenue to Mian Realty Partners, L.P. on December 29, 1988. *See* Mian's Motion ¶ 1; Exhibit J. Mian Realty Partners, L.P., transferred ownership of 6 Kirby Avenue to Mian Realty, L.L.C., on March 19, 1997. *See* Exhibit J.

      3.      Contamination at Neighboring 40 Haynes Street

Debtors understand from documents now produced that in 1983, more than 12,000 containers holding numerous hazardous substances, including toxic, flammable, and potentially explosive compounds, were moved to a warehouse on 40 Haynes Street, a property adjacent to the Mian property. *See* Exhibit K. On October 12, 1984, a report commissioned by NJDEP asserted that the environmental conditions at 40 Haynes Street constituted "an immediate danger to life, and public health." *Id.* In response to the report, NJDEP oversaw the removal and disposal of the hazardous substances stored at 40 Haynes Street. *Id.* However, many spills of hazardous substances apparently occurred during the handling of the containers at 40 Haynes Street, prompting a remedial investigation. *Id.* Although the initial focus of the environmental

investigation was confined to 40 Haynes Street, questions began to be raised in late 1989

concerning offsite contamination. *See* Exhibit L.

In the 1990s, years after Baker & Taylor sold 6 Kirby Avenue, the investigation

broadened to encompass the Mian property. *See* Exhibit M. Communications from

approximately 1990 indicate that NJDEP and Litgo (the owner of 40 Haynes Street) were

investigating the possibility that trichloroethane ("TCE") contamination found on the 40 Haynes

Street property possibly originated from adjacent properties, such as the Mian Property.[3]

---

[3]    Specifically, the communications showed the following:

- An August 20, 1990 Litgo Groundwater Sampling Report asserted that TCE contamination resulted from a regional source and represented an area-wide problem, and was not isolated to the Litgo site at 40 Haynes Street. *See* Exhibit N.
- On April 8, 1983 Litgo's consultant asserted in its Remedial Investigation Report that the 40 Haynes Street "is being impacted by an off-site source of TCE contamination which migrated to the site via the drainage conduits and/or groundwater." *See* Exhibit O.
- On June 22, 1994, Litgo's environmental consultant informed NJDEP that there may be an unidentified up gradient source causing contamination. *See* Exhibit P.
- On March 14, 1995, Litgo's environmental contractor proposed to NJDEP to install one deep well ("MW-9") on the Mian property: "[T]o document if contamination originating from an off-site source is impacting 40 Haynes Street." *See* Exhibit M.
- From 1995 onward, Mian allowed installation and repeated sampling of monitoring wells MW-9 and an additional monitoring well, MW-11, on the Mian Property. *See* Exhibit Q.
- A September 13, 1996 letter from NJDEP to Litgo directed Litgo to locate the source of contamination at 40 Haynes Street. *See* Exhibit R.
- On February 25, 1998, Litgo released a Remedial Investigation Addendum Report focused on determining the source of TCE contamination at 40 Haynes Street. *See* Exhibit U. Litgo conducted a historical aerial photograph review and noted large areas of disturbance on the Mian property in photographs dating back to 1930. *Id.*
- On December 1, 2000, a Litgo remediation contractor informed NJDEP in publicly available records of two issues involving the Mian property: (1) the Mian property had allegedly been used as a disposal and/or fill material site; and (2) an area of dark staining around MW-11 in a 1969 aerial photo suggested that MW-11 may be a potential source of TCE contamination. To further investigate the Mian property as a potential source of environmental contamination, Litgo's contractor proposed additional soil sampling on the Mian property and performed a title search of the Mian property. *See* Exhibit S.
- On November 14, 2002, Litgo's environmental consultant provided a 167 page Workplan to NJDEP which proposed to evaluate the TCE plume under the Mian property. *See* Exhibit Q. The Workplan included two maps that depict the plume on the Mian property and the existing and proposed monitoring sites on the Mian property. *Id.* One map dated May 9, 2001, clearly labeled the "Mian Property" and indicated a "stained area" on the Mian property that was the suspected source of the TCE contamination. *See id.*, Exhibit S.

4.    Activities on the Mian Property

On April 29, 1995, Mian allowed Litgo contractors to install the first of six monitoring

wells, MW-9, on the Mian property. *See* Exhibit Q. On August 7, 1997, Litgo confirmed

Mian's agreement to allow the installation of a second monitoring well on the Mian property.

*See* Exhibit T. This additional monitoring well, MW-11, was installed at the Mian property on

August 29, 1997. *See* Exhibit Q. On April 14, 2000, MW-13 was installed on the Mian property

which served as a third monitoring well. *Id.* Litgo's contractors repeatedly entered Mian's

property to collect samples from the multiple monitoring wells. *See* notes 4 and 5 herein.

The results of these investigations on Mian's Property were openly available and on file

at the NJDEP. Mian could also have obtained the results from Litgo. The publicly available

reports released by Mian's contractors and the NJDEP revealed the presence of a number of

contaminants, including TCE, well above NJDEP Ground Water Quality Standards[4] at Mian's

property (in monitoring wells 9, 11, and 13).[5]

By the time Grace filed their bankruptcy petitions on April 2, 2001, public allegations

had been made that there was a landfill formerly located on Mian's property, and extensive

environmental investigation had been completed on Mian's property to demonstrate that TCE

---

[4]    The NJDEP Ground Water Quality Standards, which indicate the Ground Water Quality Standard for TCE is 1
part per billion ("ppb"), were also publicly available. *See* Exhibit Z.

[5]    Specifically, the reports found the following:

- On September 5, 1997, TCE was detected in MW-11 at 253,000 ppb. *See* Exhibits Q, U,
- On November 24, 1997, TCE was detected in MW-9 at 48.2 ppb. *Id.*
- Also on November 24, 1997, TCE was detected in MW-11 at 229,000 ppb. *See* Exhibit Q. On the same
  date, a number of other contaminants were detected above their respective Ground Water Quality
  Standards, including vinyl chloride (10.5 ppb), 1, 1 dichloroethane (75.8 ppb), chloroform (86.4 ppb),
  carbon tetrachloride (70 ppb), and 1, 1, 2 - trichloroethane (302 ppb). *See* Exhibits Q, Z.
- On May 9, 2000, TCE was detected in MW-13 at 2,030 ppb. *Id.*
- On May 10, 2000, TCE was detected in MW-11 at 151,000 ppb. *Id.*
- On August 29, 2000, TCE was detected in MW-11 at 316,000 ppb. *Id.*
- On December 7, 2000, TCE was detected in MW-11 at 169,000 ppb. *Id.*

groundwater contamination had originated from that location. Grace's chapter 11 bankruptcy

filing generated significant media coverage and Bilal Mian concedes that he learned of Grace's

bankruptcy filing through the news media, though he does not indicate the exact date. *See*

Exhibit V. Thereafter, Mian continued to allow investigation of its property. On December 1,

2004, Mian allowed Litgo contractors to test in the vicinity of MW-11 and MW-13 to determine

the hydraulic conductivity of the bedrock aquifer at the Mian property. *See* Exhibit W. On

February 28, 2005, a Litgo contractor informed Mian that "additional investigation work [should

be performed] in the rear and east of existing monitoring well MW-11" on the Mian property.

*See* Exhibit V. Soon afterward, Mian allowed three additional monitoring wells and four vapor

point monitoring wells, a total of seven new wells, to be installed on the Mian property in March

2005. *See* Exhibit Y. NJDEP monitoring wells records list the owner of these wells as "Mian

Realty."

## II.    ARGUMENT

This Court should deny Mian's Motion and declare its potential claims subject to the

automatic stay. Mian's potential claims clearly arose prepetition and are thus subject to section

362 of the Bankruptcy Code which operates as an automatic stay of any attempt "to recover *a*

*claim* against debtor that arose *before the commencement* of the case. . ." 11 U.S.C. § 362(a)(1)

(emphasis added).

Mian seeks to avoid the stay by contending that (i) the stay does not apply to its claims,

and (ii) it can avoid the stay simply by asserting a claim for injunctive relief. As demonstrated

below, Mian's claims were clearly contingent claims that arose prior to the Debtors' bankruptcy

petitions. Further, Mian's claims for injunctive relief are simply just a rephrasing of its monetary

claims and do not provide a basis for avoidance of the stay. While the stay may not apply to a

governmental authority exercising its police powers to stop an ongoing contamination, Mian is a

private entity and not exempt from the stay. The automatic stay clearly applies to Mian's attempt to file a Third Party Complaint against Debtors.

Furthermore, Main has failed to allege, much less, demonstrate sufficient cause to modify the automatic stay. Protecting the Debtors from the distraction and drain of resources that would be necessary to address prepetition claims is particularly appropriate here. Mian seeks to unnecessarily draw Debtors into expensive and lengthy multi-party litigation and Mian cannot meet its burden of demonstrating that it would be likely to prevail on the merits. Mian's claims do not have a sound basis in fact or law.

A.    **The Automatic Stay Bars Mian's Claims**

The automatic stay applies to Mian's potential claims and Mian may not be permitted to pursue those claims against the Debtors outside of these bankruptcy cases. It is well-established that "[t]he automatic stay provision of the Bankruptcy Code [is] one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (quoting S. Rep. No. 95-989, 95 Cong. 2d Sess. 54-55, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5840-41 (1978)). The automatic stay is designed "to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor." *Gilman v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 177 B.R. 475, 479 (D. Del. 1993) (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986), *cert. denied*, 479 U.S. 876 (1986)). *See also Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995) (holding that the scope of section 362 is intended to be very broad and is a fundamental debtor protection).

The automatic stay applies to all prepetition claims. *In re Continental Airlines*, 134 F.3d 536, 539 n.5 (3d Cir. 1998). A creditor who has a "claim" must file a proof of the claim with the bankruptcy court prior to a date fixed by the court to avoid the claim being discharged upon judicial confirmation of the reorganization plan. 11 U.S.C. §§ 501, 502. When in doubt, courts should find the claim to arise prepetition. *See, e.g., In re Zerodec Mega Corp.* 59 B.R 272, 275 (Bankr. E.D. Pa. 1986) ("[A]ll doubt as to the time that a claim arose should clearly be resolved in favor of finding it a prepetition claim.").

Mian has asserted a variety of claims, all but one of which essentially seek the same relief: payment of clean-up costs in the New Jersey environmental clean-up litigation. The other claim is to void under the Sanitary Landfill Closure and Contingency Fund Act ("Landfill Act") a 21 year-old property transaction. N.J.S.A. 13:1E-100 et seq. In asserting that the automatic stay does not apply to these claims, Mian fails to correctly apply Third Circuit jurisprudence and erroneously focuses solely on whether a fully mature claim accrued prior to Debtors' bankruptcy filing. Mian had *contingent* claims prior to Debtors' bankruptcy, and the automatic stay applies to contingent claims. 11 U.C.S. § 101(5)(a); *In re Reading Co.,* 115 F.3d 1111, 1123 (3d Cir. 1997) (holding that prepetition bankruptcy claims arise if a "claimant possessed an interest rising to the level of a contingent claim").[6]

In the Third Circuit, a contingent claim arises when there is a "legal relationship" between parties. Although Mian asserts that the Third Circuit's decision in *Frenville* shows that state law alone guides the inquiry as to when a claim arises, this argument would require state

---

[6]    Debtors recognize that the *Reading* analysis is set in the context of a dischargeable claim, as opposed to whether the automatic stay applies. However, this is a distinction without a difference for the purpose of evaluating the accrual of a claim. *See, e.g., In the Matter of Chicago Railroad Company*, 974 F.2d 775, 782 (7th Cir. 1992) (treating the issue of a prepetition claim the same under the discharge and stay provisions of the Bankruptcy Code).

law to trump federal environmental policy, which is inconsistent with the *Frenville* Court's analysis. *See, In re Frenville,* 744 F.2d 332 (3d Cir. 1984). Under *Frenville,* CERCLA would constitute "overriding federal law" that governs the accrual date of Mian's cost recovery, contribution, and all state common law claims associated with environmental clean-up costs (which encompass all of Mian's claims). *Id.* at 337.

Mian's claims for clean-up costs are contingent claims. The date that the claims arose is governed by CERCLA and federal policy. As explained below, Mian's contingent claims arose prior to the Debtors' bankruptcy petition date and are subject to the automatic stay.

      1.     Contingent Claims Are "Claims" Subject to the Automatic Stay

Mian's claims are subject to the automatic stay because they are contingent claims that arose prior to the petition date. "A contingent claim has been described as one in which 'the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created.'" *In re Chateaugay Corp.,* 112 B.R. 513, 520 (S.D.N.Y. 1990), citing *In re All Media Properties, Inc.,* 5 Bankr. 126, 133 (Bankr. S.D. Tex. 1980); *In re Remington-Rand Corp.,* 836 F.2d 825, 826 (3d Cir. 1988) (finding that contingent claims arise even before a person has a present cause of action against the debtor). Under the Bankruptcy Code, "claim" includes "contingent" claims, and these terms are to be construed broadly. The Bankruptcy Code defines "claim" as, *inter alia,* a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added). "There can be little question that the definition of 'claim' in the Bankruptcy Code is very broad,[] and that Congress intended that all legal

obligations of the debtor, no matter how remote or contingent, [would] be able to be dealt with in the bankruptcy case." *In re Chateaugay Corp.*, 112 B.R. at 520.

2.    Mian's Contingent Claims Arose Prepetition

In the Third Circuit, before one can have an "interest" which is cognizable as a contingent claim under the Bankruptcy Code, "one must have a legal relationship relevant to the purported interest from which that interest may flow." *Schweitzer*, 758 F.2d at 943. Mian and Debtors have the requisite legal relationship upon which a contingent claim is based for two independent reasons. First, a statutory-based legal relationship flows from CERCLA as well as the Landfill Act. Second, the contractual history between Mian and Debtors gives rise to a legal relationship. Under either the statutory or the contractual foundation, a legal relationship between Mian and Debtors exists that is sufficient to give rise to a contingent claim.

i.    *CERCLA and the Landfill Act Provide a Statutory Basis For The Legal Relationship Between Mian and Debtors Under the Third Circuit Standard*

A "legal relationship" sufficient to form the basis of a contingent claim may arise by operation of a statute. *E.g., In re Gullone*, 301 B.R. 683, 687 (Bankr. D. N.J. 2003) (holding that legal relationship between debtor and claimant arose by operation of a New Jersey statute). Consistent with this approach, the federal CERCLA statute creates the requisite legal relationship between property owners and potentially liable parties from which a contingent claim may flow.[7] *In re Penn Central Transportation Co.* ("Paoli Yard"), 944 F.2d 164, 167 (3d

---

[7]    Mian has asserted cost recovery claims under Section 107 and contribution claims under Section 113 of CERCLA against Debtors. In addition, Mian has asserted claims under the New Jersey Spill Act, which provides for a contribution action similar to CERCLA section 113. New Jersey courts have uniformly held that the Spill Act must be "read in a manner substantially similar to CERCLA." *SC Holdings, Inc. v. A.A.A. Realty Co.*, 1996 U.S. Dist LEXIS 12428, at * 28, 32 (D.N.J. Aug. 19, 1996) (Brown, J.). As such, and as no authority exists for the proposition that a Spill Act claim accrues in a manner different from a CERCLA claim, Mian's Spill Act claim will be addressed in Debtors' discussion of Mian's CERCLA section 113 claim.

Cir. 1991), cert. denied 503 U.S. 906 (1992) (referring to CERCLA as a statutory basis for a legal relationship); *Reading*, 115 F.3d at 1123. Although both the *Paoli Yard* and *Reading* Courts determined that in the facts before them, there was no legal relationship, the reasoning was specific to the timing of the passage of the relevant CERCLA provisions from which the relationship would have arisen. Obviously a statute that is not yet passed cannot create a legal relationship. Yet, in these cases the Third Circuit established a clear foundation for CERCLA serving as the basis for the legal relationship requisite to a contingent claim. The Third Circuit explained that "it was not until the passage of CERCLA that a legal relationship was created" between the claimants and debtors.[8] *Reading*, 115 F.3d at 1122 (emphasis added) (quoting *Paoli Yard*, 944 F.2d at 168). Unlike the facts in *Paoli Yard* and *Reading*, in the instant case all of the significant events occurred after the enactment of CERCLA and its amendments. Thus, CERCLA operates as a valid statutory basis from which a legal relationship flows and Mian's contingent claim arose.

    An additional statutory basis for a legal relationship between Mian and Debtors is Mian's claim under the Landfill Act which is an asserted state law basis for recovery of damages voiding the 1987 property transaction. The Landfill Act requires a seller to disclose to the buyer the presence of a "sanitary landfill" at the time of the property sale, thereby creating a statutory legal relationship between a buyer and a seller. N.J.S.A. 13:1E-100 et seq. For Debtors and Mian, the legal relationship would have to have arisen upon conclusion of the 1987 property transaction, or at latest when Mian knew or should have known that its property may have been a sanitary

---

[8]    Mian cites dicta without any analysis from *Al Tech Specialty Steel Corp. v. Allegheny Int'l, Inc.,* 126 B.R. 919 (W.D. Pa. 1991) as to when a fully mature CERCLA claim arises. Again, Mian fails to apply the difference between a mature and contingent claim. As discussed more fully herein, the current legal relationship doctrine under the subsequent *Paoli Yard* and *Reading* cases, and the facts under those cases, are more on point and instructive here.

landfill, or otherwise may have had a condition that Mian contends that Debtors should have

disclosed. This information was publicly available to Mian no later than 1998. *See* Exhibits U,

Q. Thus, a legal relationship between Mian and Debtors arose either at the time of the 1987

property transaction, or in any event no later than 2000.

> ii.    *The 1987 Property Transaction Provided A Contractual Basis For the Legal Relationship Between Mian and Debtors under the Third Circuit's Standard*

In addition to the statutory bases for a requisite legal relationship, the 1987 property

transaction created a legal relationship. *See* Exhibits I, E. Bilal and Shakila Mian contracted to

purchase the property "as is" from Debtors in 1987. Bilal Mian is the managing member of the

current ownership of the Mian property and is the individual who responded to interrogatories on

behalf of Mian Realty L.L.C. *See* Exhibit V. "One who contracts with a debtor prior to the

reorganization bargains for a legal relationship with that debtor." *Schweitzer*, 758 F.2d at 943

(asserting that legal relationship giving rise to contingent claim flows more easily from a

contractual relationship than a tortfeasor-victim relationship); *In re Remington-Rand Corp.*, 836

F.2d at 832 (holding that contingent claim arose from contractual claim between parties);

*Reading v. City of Philadelphia*, 155 B.R. 890, 902 (E.D. Pa. 1993) (finding legal relationship

between debtor and claimant based on contractual indemnification agreement where claimant

asserted indemnification claims in response to Debtor's CERCLA contribution claims)  Clearly,

the contractual relationship created by the purchase agreement gave rise to a legal relationship

from which a contingent claim could flow.

> iii.   *Other Jurisdictions Would Reach the Same Conclusion:  Mian Had Prepetition Contingent Claims*

Finding that Mian had contingent claims against the Debtors is also consistent with well

recognized precedent in other jurisdictions dealing with CERCLA claims.  The Fifth, Seventh,

and Ninth Circuits include as "contingent claims" any potential claim based on prepetition conduct that could have been "fairly contemplated" by the parties at the time the debtor filed its bankruptcy cases, based upon examination of a creditor's knowledge and surrounding circumstances. *In re Crystal Oil Co.*, 158 F.3d 291, 296 (5th Cir. 1998) ("a regulatory environmental claim will be held to arise when 'a potential ... claimant can tie the bankruptcy debtor to a known release of a hazardous substance."); *In re Jensen,* 995 F.2d 925 (9th Cir. 1993) (same); *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775, 786 (7th Cir. 1992) (same); *In re Nat'l Gypsum Co.*, 139 B.R. 397, 408 (N.D. Tex. 1992) (determining whether a claim is contingent includes consideration of the "knowledge by the parties of a site in which a PRP may be liable, commencement of investigation and cleanup activities, and incurrence of response costs.") (emphasis added); *NCL Corp. v. Lone Star Bldg. Ctrs., Inc.*, 144 B.R. 170, 177 (Bankr. S.D. Fla. 1992); *Sylvester Bros. Dev. Co. v. Burlington Northern R.R.*, 133 B.R. 648, 653 (Bankr. D. Minn. 1991).

Applying the "fair contemplation" approach to the facts of this case, it is evident that Mian was on notice that its neighbor was expending funds to address environmental contamination at Mian's own property, and indeed that the neighbor gathering the data was building its case against Mian even as the investigation proceeded. Mian allowed Litgo contractors to install and sample monitoring wells on the Mian property in 1995 and 1997 and continued to allow Litgo contractors to monitor the Mian property in various ways for a decade. *See* Exhibits Q, T, W, X, Y. During that time frame, these monitoring wells repeatedly and consistently detected elevated concentrations of TCE. *Id.* This information, as well as Litgo's allegations that the source of contamination was Mian's property, was a matter of public record

at NJDEP. *See* Exhibits M, Q, U, S. All of the physical events giving rise to Mian's right of action occurred prior to Debtors' bankruptcy petitions.

Thus, when Mian let its neighbors install multiple monitoring wells and return on many separate occasions to sample and re-sample, over time escalating the investigation, Mian was on notice of a potential or "contingent" liability and its contingent claims. *In re Nat'l Gypsum Co.*, 139 B.R. at 408 (asserting that commencement of investigation is indicia of fair contemplation). Due to the investigatory activities and detection data that was publicly available to Mian, Mian should have "fairly contemplated" that it might have a potential CERCLA claim against Debtors.

Likewise, Mian would clearly be found to have a prepetition contingent claim under the somewhat different analysis applied by the Second and Fourth Circuits. In those courts, "[s]o long as there is a prepetition triggering event, i.e., the release or threatened release of hazardous waste, the [contingent] claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication." *In re Chateaugay*, 112 B.R. at 513, 522 (holding that before a contingent claim can be discharged, it must result from prepetition conduct fairly giving rise to the contingent claim); *In re Chateaugay*, 944 F.2d at 997, 1003 (2d Cir. 1997) (holding that though claimant was unaware of all of the sites at which debtor was a potentially responsible debtor following petition, claimant was able to ascertain the information; the fact that claimant had not gathered this information rendered its claim "contingent"); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 203 (4th Cir. 1988) (holding that plaintiff's contingent claim based on medical problems arising from implanted contraceptive device arose prepetition because the acts constituting the tort occurred prepetition).

The prepetition triggering event in this case, when Mian knew or should have known that contamination potentially existed on his property, was no later than when Litgo sampled a

monitoring well on the Mian property. *See* Exhibits Q, U. Shortly after the monitoring of that first well, Mian was able to ascertain that elevated concentrations of TCE were detected in the monitoring wells at the Mian property.

       3.     <u>Mian's State Common Law Claims Do Not Arise Any Later Than the CERCLA Claims</u>

As noted above, all of Mian's CERCLA claims, as well as Mian's Spill Act claims, were contingent claims that arose prepetition. Mian's common law contribution and indemnification claims seek the same relief as Mian's CERCLA and Spill Act claims: all response costs incurred or to be incurred by Mian in connection with the clean-up of the Mian property. Despite this, Mian argues that (1) its state common law contribution and indemnification claims did not accrue until a complaint was filed against Mian, and so (2) the automatic stay should not apply. In essence, Mian is asking the Court to conclude that the alleged later accrual date of specific state common law contribution and indemnification claims trumps federal statutory law (CERCLA) for the same relief. Under Mian's reasoning, even if it is barred under bankruptcy from pursuing its CERCLA claims, it can bypass the bankruptcy process by simply pleading state law claims.

In *Reading*, the Third Circuit held that state common law claims are preempted by CERCLA 113(f) where those claims obstruct the intent of Congress. *Reading,* 115 F.3d at 1117. Other courts have adopted *Reading's* reasoning and found that, to the extent a plaintiff's state common law claims are, in fact, claims for common law contribution based on potential or actual CERCLA liability, those claims would be preempted. *E.g., Rhodia, Inc. v. Bayer Cropscience, Inc.,* 2007 U.S. Dist. LEXIS 82582, at \*37 (D. N.J. 2007) (holding that common law negligence and indemnification claims will be preempted to the extent such claims are for contribution or restitution based on CERCLA liability); *Bedford Affiliates v. Sills,* 156 F. 3d 416, 425-27 (2d Cir.

1998) (holding that section 113 preempts state law restitution and indemnification actions). Mian's claims are, in fact, claims for common law contribution based on potential or actual CERCLA liability related to the Litgo lawsuit, and are therefore preempted by CERCLA section 113.

In light of this preemption by CERCLA, the Court should not focus on evaluating common law indemnification and contribution claims' independent accrual date. But even if those claims could be pursued, the *contingent* claims arose when the legal relationship arose as under CERCLA. *See Reading*, 115 F.3d at 1122. Relying solely on *Frenville,* Mian mistakenly asserts that a claim for common law contribution or indemnification does not accrue until entry of judgment in favor of plaintiff. Main's Motion ¶ 24-25. However, *Frenville* concerned solely state law claims, and did not address federal environmental claims. In *Frenville*, an accounting firm that provided prepetition services to a debtor was sued post-petition by banks alleging that the accounting firm had negligently and recklessly prepared the debtor's financial statements. *Frenville*, 744 F.2d at 333-34. The accounting firm applied to the bankruptcy court for relief from the automatic stay to implead the debtor for common law contribution and indemnity. The *Frenville* Court applied state law to determine when the accounting firms' solely state law claims arose. However, the *Frenville* Court limited its holding by pointing out that the approach is different when there is an overriding federal law:

> while federal law controls which claims are cognizable under the
> Code, the threshold question of when a right to payment arises,
> *absent overriding federal law*, 'is to be determined by reference to
> state law.'

*Id.* (emphasis added).

Here, the interface between CERCLA and bankruptcy serves as "overriding federal law" which *Frenville* requires this Court to apply. As discussed above, federal law provides for

contingent claims under a legal relationship analysis. Under *Frenville's* reasoning, when

overriding federal law exists, the court looks to federal law, not state law, to determine when a

right to payment arises. Significantly, the *Frenville* Court also suggests that "if there were some

overriding federal policy, we might have the power to develop federal law." (citations omitted).

The *Frenville* Court then goes on to state that "[a] bankruptcy proceeding stemming from a mass

tort - such as exposure to asbestos - may be a case in which the application of federal law is

indicated." *Id.* at n.8.

Because *Frenville* seems to unduly narrow the construction of a contingent claim in spite

of well accepted principles that they are to be broadly construed, *Frenville* is widely criticized

for its approach to defining a claim. *E.g., In re Andrews*, 239 F.3d 708, 710 n.7 (5th Cir. 2001)

(noting that *Frenville's* approach has been "universally rejected.").[9] However, despite

*Frenville's* analytical weaknesses, *Frenville* does provide support for Debtors' position that

federal policy governs, rather than subservient state law claims. Therefore, the very case on

which Mian relies actually supports Debtors' position that federal law governs the accrual date

under the facts of this case.

---

[9]    *See also, e.g., Grady.*, 839 F.2d at 201-02. ("We have found no court outside the Third Circuit which has
followed the reasoning and holding of *Frenville*. All of the cases coming to our attention which have
considered the issue have declined to follow *Frenville's* limiting definition of claim. We likewise decline to
follow *Frenville*.") (citations omitted) *In re Designer Doors, Inc.*, 2008 Bankr. LEXIS 1836, *10 (D. Ariz.
2008) ("The accrual of a cause of action under state law does not determine when a claim arises under the
Bankruptcy Code. This is because the Code defines "claim" to include contingent and unmatured claims,
which may not yet constitute a cause of action under state law. The failure to understand this important
distinction between a claim and a cause of action is what gave rise to the famous misunderstanding in
*Frenville*.").

4.    Mian's Requests for Injunctive Relief Are Bankruptcy Claims

Mian is incorrect in its assertion that its request for the Debtors to conduct an environmental clean-up is not a "claim."[10]  *See* Mian's Motion ¶ 28.  To the extent that Mian's request for clean-up can be reduced to a claim for monetary payment, there is no question that such a monetary claim is a dischargeable bankruptcy claim.  *E.g., In re W.R. Grace & Co.,* 384 B.R. 678, 682 n.4 (D. Del. 2008) (distinguishing when a state seeks to enforce its regulatory and police powers from when a state "seeks to do nothing but liquidate a monetary fine.").  To support the proposition that Debtors' obligation to clean up waste does not constitute a claim dischargeable in bankruptcy, Mian relies on and misapplies a single case, *In re Torwico Elecs., Inc. v. State of New Jersey, Dep't of Envt'l Protection,* 8 F.3d 146, 150-51 (3d Cir. 1993).

In *Torwico,* Torwico Electronics, a manufacturing business, filed for Chapter 11 protection, and thereafter NJDEP issued a notice of violation to Torwico for having generated hazardous waste and violated the law.  *Torwico,* 8 F.3d at 147.  NJDEP, seeking to enforce Torwico's obligation under state and federal environmental laws, issued an Order requiring Torwico to submit a written plan for the hazardous site and assessing a monetary penalty for failure to take action under the earlier notice of violation.  *Id.* at 148.  Torwico argued that the obligation to clean up constituted a "claim" under the Bankruptcy Code, while the state argued that the claims involved did not seek monetary judgment, but rather sought to remedy ongoing pollution by forcing Torwico to clean up the site.  *Id.* at 149.  The Third Circuit concluded that "Torwico's obligations under [NJDEP's] administrative order do not constitute a claim,"

---

[10]    Mian seems to concede that his alleged causes of actions seeking monetary relief constitute "claims" under bankruptcy law.

reasoning that Torwico should not be allowed to use its bankrupt status to avoid complying with a state order to ameliorate its own continued and ongoing environmental hazard. *Id.* at 150-51.

First, *Torwico* is inapplicable because Mian's claims are made by a private party, not a regulatory entity. *Torwico* has been construed narrowly as a decision that applies only to a state's ability to enforce its environmental laws. *See Krafczek v. Exide Corporation*, 2007 WL 1199530 at * 3 (E.D. Pa. 2007) (explaining that *Torwico* created only a "narrow exclusion for state environmental law enforcement actions" that was grounded on the "state's inherent regulatory and police powers"). The *Torwico* "decision as a whole was based on the debtor's status as a generator of hazardous waste who, under New Jersey law, had an ongoing responsibility for the waste which was posing a continuing environmental hazard." *In re IT Group,* 339 B.R. 338, 343 (D. Del. 2006) (finding *Torwico* inapplicable because "the relief sought by NJDEP is compensatory in nature and not the type of preventive or ongoing hazardous clean-up relief that amounts to an affirmative injunction."). Unlike the *Torwico* debtor, Mian is not a regulatory agency and cannot avail itself of police power authorities. Moreover, Debtors are not alleged to be out of compliance with any ongoing regulatory obligation. Thus, Mian's *Torwico* reliance is not on point.

Second, *Torwico* is inapposite to this case because Mian's injunction is essentially an alternate way to seek monetary relief. *E.g. In re W.R. Grace & Co.*, 384 B.R. at 682 n.4 (finding Torwico inapplicable where claimant "seeks to do nothing but liquidate a monetary fine."). To the extent that Mian seeks monetary relief, such claims are subject to the automatic stay. The Second Circuit's reasoning in *Chateaugay*, 944 F.2d at 1008, explicitly adopted by the Third Circuit in *Torwico*, 8 F.3d at 149, is instructive. In *Chateaugay*, the Second Circuit considered what constituted a claim in the context of bankruptcy and discussed clean-up orders as follows:

> an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to *do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation.*

944 F.2d at 1008 (emphasis added).

Quite clearly, Mian's injunctive relief claim essentially duplicates monetary claims, and can be converted into a simple monetary obligation. As a result, the automatic stay prevents Mian from pursuing its request that Debtors clean up the Mian property.

**B.    Mian Has Failed to Allege Grounds for Relief from the Stay**

Mian only seeks a declaration that the stay does not apply, and has not asked the Court to modify the stay. Should Mian belatedly ask the Court to consider modification, that relief should be denied. Mian cannot demonstrated sufficient "cause" to warrant this relief as required by section 362(d) of the Code.

Although the Bankruptcy Code does not define what constitutes cause, "courts generally consider the policies underlying the automatic stay [and] ... the competing interests of the debtor and movant." *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993). In particular, Delaware courts consider the following three factors in balancing the competing interests of the parties: (1) whether any great prejudice to either bankrupt estate or the debtors will result from continuation of the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits. *Id.* All of the elements in this three-factor test weigh in Debtors' favor. Debtors already explained how the first two factors demonstrate that the automatic stay should not be lifted. *See* Debtors' May 16, 2008 Response (Docket No. 18735).

That explanation is incorporated herein by reference. As discussed below, the third factor also weighs in Debtors' favor.

    1.    <u>Mian Will Not Prevail on the Merits</u>

Mian fails to demonstrate any likelihood of success on the merits. Mian merely attaches its Third Party Complaint alleging various causes of action. But a mere assertion or restatement of causes of action does not demonstrate a likelihood of success on the merits. *Cf. In re Daly & Sinnott Law Center PLLC*, 292 B.R. 796, 801-02 (Bankr. D. Vt. 2003) (sufficient evidence, as opposed to allegations, required to show likelihood of success on merits). Furthermore, for the reasons discussed below, Mian's claims would fail as a matter of law.

    *i.*    *Debtors Are Not a Potentially Responsible Party Under CERCLA*

Mian provides no basis for the assertion that Debtors are a potentially responsible party ("PRP") subject to CERCLA liability.[11] CERCLA sets out the following four categories of persons potentially liable under the statute: (1) current owners/operators of a facility; (2) persons who owned/operated a facility at the time a hazardous substance was disposed; (3) persons who arranged for the disposal, treatment, or transport of hazardous substances; and (4) any person who accepts hazardous substances for transport. *See* 42 U.S.C. § 9607(a)(1) - (4). Based upon Mian's own allegations, none of the foregoing categories apply to Debtors. Debtors are neither the current owner/operator of the facility at issue nor were they the owner/operator of the facility at the time a hazardous substance was allegedly disposed. *See* Exhibits C, D. Further, Debtors neither arranged for the transport of hazardous substances nor accepted such substances for transport. *Id.*

---

[11]    The elements of CERCLA Sections 107 and 113 claims are the same. *United States v. Consolidation Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003); *Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir. 1999).

Rather, assuming *arguendo* that there had been historic filling of the Mian property, the Debtors would have owned the property between the time of the dumping and Mian's current ownership. Such interim owners of a facility are not liable under CERCLA unless a they actually caused a separate, active release. *See, e.g., United States v. 150 Acres of Land*, 204 F.3d 698, 705-06 (6th Cir. 2000) (concurring in the judgment of the Second and Third Circuits that interim owners can be liable only if their actions led to disposal of hazardous substances (citing *United States v. CDMG Realty Co.*, 96 F.3d 706, 713-18 (3d Cir. 1996) (holding that, based on CERCLA's structure, language and purpose, passive migration does not constitute "disposal" under CERCLA, and therefore interim owners were not liable for passive migration of hazardous substances)) and *ABB Indus. Sys., Inc. v. Prime Tech, Inc.*, 120 F.3d 351, 358 (2d Cir. 1997) (adopting reasoning of *CDMG Realty* and finding interim owner not liable under CERCLA for disposal of hazardous substances.)).

Debtors' former subsidiary, Baker & Taylor, was merely a book distributor and interim owner of the Mian property. Mian has not alleged that Baker & Taylor generated hazardous substances and there is no evidence that Baker & Taylor ever knew of the existence of the alleged contaminant on the Mian property. Accordingly, there is no evidence of a release by the Debtors and Debtors are not liable under CERCLA. *Gallagher v. T.V. Spano Bldg. Corp.*, 805 F. Supp. 1120, 1125 (D. Del. 1992) (stating that one element of a prima facie Section 107 claim is that "[Defendants] ... fall within one of the four categories of 'covered persons.'") (citing *Artesian Water Co. v. New Castle County*, 659 F. Supp. 1269, 1278-79 (D. Del.), aff'd 851 F.2d 643 (3d Cir. 1988)).

ii.    <em>Mian Cannot Obtain Contribution Under CERCLA or the Spill Act</em>

Mian seeks contribution from Debtors under section 113(f) of CERCLA and the Spill Act. Like any traditional contribution claim, Mian's contribution claims are dependent on Mian

and Debtors both being liable to a third party, which in this case would be Litgo. In *Reading*, the Third Circuit examined the traditional concepts of contribution as well as the statutory text of section 113(f) to determine whether a section 113(f) contribution claim against defendant Reading was discharged by Reading's bankruptcy. The *Reading* court concluded that, "[i]n permitting a party to seek contribution from 'any other person who is liable or potentially liable' under section 107(a), it is inherent in the concept of contribution that the person commonly liable be liable to the same entity. Otherwise, contribution could become an endless circle of attempts to seek reimbursement from unrelated parties." *Reading,* 115 F.3d at 1124 (emphasis added). Other courts have adopted *Reading's* reasoning that § 113(f) ""does not permit contribution among liable parties who do not have a common derivation of liability." *See Signature Combs, Inc. v. United States,* 253 F. Supp. 2d 1028, 1032 (W.D. Tenn. 2003) (expressly adopting *Reading's* holding that "a plaintiff may only bring a CERCLA § 113(f) contribution claim against a defendant when both the plaintiff and the defendant share a common derivation of liability."); *E.I. Du Pont De Nemours & Co. v. United States,* 297 F. Supp. 2d 740, 746-54 (D. N.J. 2003) (holding that a third party plaintiff cannot bring a section 113(f) claim unless the contribution defendant is liable to the primary plaintiff under § 107); *United States v. Pesses,* 1998 U.S. Dist. LEXIS 7902, at *11 (E.D. Pa. 1998) (holding that to prevail on a § 113 contribution claim, the claimant must demonstrate that the Debtor is liable to a third party). Thus, Mian's contribution claim depends on both Mian and Debtors both being liable to Litgo with Litgo's claims serving as the common claim from which Mian's claim is derived.

Applying this *Reading* common derivation requirement to the case at bar, the question becomes whether *Litgo's* theoretical claim under CERCLA Section 107 against Debtors arose prior to Debtors filing their Bankruptcy petitions. The answer is that it did. Assuming *arguendo*

that CERCLA liability elements one, two, and three could be met, at issue in a discussion of

timing is whether the fourth element -- that Litgo incurred response costs -- occurred prepetition.

Litgo incurred response costs to clean up 40 Haynes Street two decades before Debtors filed

their chapter 11 petitions. *See* Exhibit K. Litgo persistently investigated and sought to establish

throughout the 1990's that an off-site source existed as a potential source for contamination,

including installing and sampling monitoring wells on the Mian property. *See* Exhibits K, O, P,

Q, U. Moreover, Litgo asserted as early as 1998 that the Mian property had been disturbed and

filled historically and was a potential source of the contamination. *See* Exhibits S, U. Litgo also

conducted a title search and historical review of the Mian property thereby determining that

Debtors were a previous owner of the Mian property. *Id.* In short, Litgo's theoretical section

107 claim against Debtors would have accrued prepetition and would be subject to the automatic

stay and ultimately dischargable.

Litgo has filed no claim against the Debtors in these chapter 11 cases, nor could it, given

the passage of the bar date over 5 years ago. As such, Debtor is not liable to Litgo, and Debtors

and Mian cannot be commonly liable to Litgo. Thus, Mian's CERCLA contribution claim

against Debtors would necessarily fail. *Reading*, 115 F.3d at 1124-26.

Likewise, because "rights of contribution ... are analogous under CERCLA and the Spill

Act," Mian's contribution claims under CERCLA and the Spill Act should be construed in a

similar manner. *Reichhold, Inc. v. United States Metals Refining Co.*, 2004 U.S. Dist. LEXIS

27634, at * 7 (D. N.J. Oct. 27, 2004). Thus, Mian's Spill Act claims would similarly fail as a

matter of law.

### iii.    *Mian's Common Law Claims are Preempted by CERCLA*

State common law claims are preempted by CERCLA section 113 where those claims

obstruct the intent of Congress. *Reading*, 115 F.3d at 1117 (preempting claimant's contribution

and restitution claims because claims conflict with the remedies expressly provided in

CERCLA). Like *Reading*, other courts have found that, to the extent a plaintiff's state common

law claims are, in fact, claims for common law contribution based on potential or actual

CERCLA liability, those claims would be preempted. *See supra* section A.4; *Rhodia*, 2007 U.S.

Dist. LEXIS 82582 at *37 (holding that common law negligence and indemnification claims will

be preempted to the extent such claims are for contribution or restitution based on CERCLA

liability); *Bedford Affiliates*, 156 F. 3d at 425-27 (holding that § 113 preempts state law

restitution and indemnification actions). Therefore, Mian cannot succeed in its common law

contribution and indemnification claims.

### iv.    *Mian's Landfill Act Claim Fails*

Mian seeks recovery of damages, or voiding of the 1987 sale of the Mian property based

on Debtors' alleged non-disclosure of the presence of a "sanitary landfill"[12] on the Property

pursuant to the Landfill Act, N.J.S.A. 13:1E-100 *et seq*. Mian's Motion, ¶ 26. Even if Mian

could overcome the bankruptcy claims bar date, Mian's claims are untenable. A New Jersey

court has never permitted a party to void a contract for sale of property for failing to disclose

information pursuant to the Landfill Act literally *decades* after entering into the contract, and

where the seller had *no knowledge* of a possible former "sanitary landfill" on the property.

Moreover, Mian is not even the proper party to seek rescission under the Landfill Act because

there were a number of intervening transfers of the Mian property since the 1987 property

transaction was completed. *See* Exhibit J.

---

[12]    Debtors never operated a landfill on the Mian property and Mian makes no allegations that such activities occurred during the period of Debtors' ownership. Nor did Debtors benefit from the past use of the Mian property as a "government approved" "sanitary landfill," which could only have occurred years before Debtors' ownership of the Property. *See* Processing of Damage Claims Pursuant to the Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.A.C. 7:1I-1.5.

###### v.    *Mian's Claims Are Barred*

The record is clear that Mian did not file a proof of claim by Debtors' March 31, 2003

Bar Date and Mian was aware of Debtors' chapter 11 status. Even when Mian was sued in 2007,

it failed to seek to file a late proof of claim. Instead, now in 2008, it is attempting to bring

Debtors directly into the Litgo litigation, still without filing a proof of claim, by seeking a

determination that it is somehow exempt from the automatic stay. Mian is clearly attempting to

circumvent the bankruptcy system, and this should not be allowed. Parties with a legal

relationship to debtors in bankruptcy prior to the bankruptcy case "should not be entitled to stand

aloof and avoid the consequences of the bankruptcy proceedings." *Schweitzer*, 758 F.2d at 943;

*see also In re Penn. Central Transp. Co.*, 71 F.3d 1113, 1116 (3d Cir. 1995) (criticizing

claimants who seek to "obtain a continuance of the guaranties unaffected by reorganization, the

equivalent of a preference for them over unsecured creditors with accrued or determinable

claims."). Public policy requires claimants like Mian to follow the rules of the bankruptcy

forum, and file timely proofs of claim. Consistent with the policy that: "all doubt as to the time

that a claim arose should clearly be resolved in favor of finding it a prepetition claim," it is clear

that this Court should find that Mian had a prepetition contingent claim and failed to file that

claim by the bar date.

There is no likelihood that Mian will have any success on the merits of its claims against

the Debtors and Mian's claims will fail as a matter of law. *In re Zerodec Mega Corp.*, 59 B.R. at

275. As a result, should Mian seek relief from the stay to pursue its claims against the Debtors,

that relief must be denied.

### III.    CONCLUSION

Mian's potential claims against the Debtors are clearly prepetition claims. And, Mian has

failed to show sufficient cause why it should be afforded relief from the automatic stay.

Moreover, even if Mian were afforded such relief, it will not succeed on the merits of its claims. Accordingly, upholding the stay is not a harsh result, but rather, is an equitable result that ensures that a party that needs the protection of the automatic stay will in fact have that protection.

Wherefore, for all of the foregoing reasons, the Debtors respectfully request that the Court enter an Order (1) denying Mian's motion; (2) declaring that the automatic stay applies to Mian's filing of its proposed Third Party Complaint; and (3) declaring that any claims Mian may seek to assert against the Debtors regarding cleanup of the Mian property are prepetition claims subject to the stay and bar date.

Dated: August 14, 2008

                                    KIRKLAND & ELLIS
                                    David M. Bernick, P.C.
                                    Janet S. Baer
                                    200 East Randolph Drive
                                    Chicago, Il 60601
                                    (312) 861-2000

                                    and

                                    PACHULSKI, STANG, ZIEHL, & JONES LLP

                                    Laura Davis Jones (Bar No. 2436)
                                    James E. O'Neill (Bar No. 4042)
                                    Kathleen P. Makowski (Bar No. 3648)
                                    Timothy P. Cairns (Bar No. 4228)
                                    919 North Market Street, 17th Floor
                                    P. O. Box 8705
                                    Wilmington, DE 19899-8705 (Courier 19801)
                                    (302) 652-4100

                                    Co-Counsel for Debtors and Debtors in Possession