IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors | ) | |
| | ) | |

**EXHIBIT BOOK OF EXHIBITS IN SUPPORT OF DEBTORS' SUPPLEMENTAL
RESPONSE AND OBJECTION TO MOTION OF MIAN REALTY, LLC
<u>REGARDING THE APPLICABILITY OF THE AUTOMATIC STAY</u>**

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| A. | Baker & Taylor Website Information |
| B. | Initial Disclosures of Defendant, Mian Realty, L.L.C. in Civil Action 06-2891 |
| C. | Appraisal of Property at 6 Kirby Ave. as of September 25, 1985 |
| D. | Proposal to Consolidate Baker & Taylor Headquarters |
| E. | Deed, dated July 29, 1987 |
| F. | Index of Closing Documents re Sale of Baker & Taylor, dated March 20, 1992 |
| G. | Letter to Joseph DeMarco re Sale of 6 Kirby Avenue, dated December 22, 1986 |
| H. | Baker & Taylor Memo to N. Bloomgarden re Environmental Concerns/6 Kirby Property, dated January 7, 1987 |
| I. | Purchase and Sale Agreement, dated February 19, 1987 |
| J. | Deed, dated December 29, 1989 |
| K. | Litgo Submission to NJDEP, dated March 4, 2002 |
| L. | Letter to George Tyler from NJDEP re 40 Haynes Street, dated October 1, 1989 |
| M. | Letter to New Jersey Department of Environmental Protection re F. Sharp Screw Machine Products, JANR Transport, and Morgan Chemical Co., dated March 14, 1995 |
| N. | Groundwater Sampling Report, dated August 20, 1990 |

| Exhibit | Description |
|---|---|
| O. | Letter to Ms. Georgette Bunch re Remedial Investigation Report, dated April 8, 1993 |
| P. | Letter to Ms. Georgette Bunch re F. Sharp Screw Machine Products, JANR Transports and Morgan Chemicals, dated June 22, 1994 |
| Q. | Remedial Investigation Workplan for the Eastern Groundwater Plume at former F Sharp Screw Facility, dated November 14, 2002 |
| R. | Letter to Mr. William Friedman re F. Sharp Screw Machine Products, Janr Transport, and Morgan Chemical Co., dated September 13, 1996 |
| S. | Letter to Mr. Kenneth Kahora re Response to the Department's DRAFT Letter, dated December 1, 2000 |
| T. | Letter to Dr. Bilal Mian re Monitoring Well at 36 Kirby Ave., dated August 7, 1997 |
| U. | Remedial Investigation Addendum Report, dated February 25, 1998 |
| V. | Response of Mian Realty, LLC to Debtors' First Request for Production of Documents and First Set of Interrogatories, dated June 10, 2008 |
| W. | Letter to Mr. Murdo Morrison re Response to NJDEP letter of December 14, 2004, dated December 20, 2004 |
| X. | Letter to Dr. Bilal Mian re Access to Install Monitoring Wells, 6 Kirby Avenue, dated February 28, 2005 |
| Y. | Remedial Investigation Report, dated January 20, 2006 |
| Z. | NJDEP Water Monitoring & Standards Publication |

K&E 13227070.1

# EXHIBIT A



# Baker & Taylor, Inc.

Libraries ▾ | Retailers | International | Suppliers | About Us ▾ | Help ▾

Thursday May 01, 2008

login e-mail address   password (forget?)

Search the Site:

[Search]

Online Customer Support
service at your fingertips

register for BTOL today

General & Sales Information
btinfo@btol.com
800.775.1800

Customer
open an account

**Quick Links**

**Shop**
Title Source 3
B&T Link
Online
School
Selection

**Connect**
CD HotList
Book Awards
Fast Facts
Pubs Present

**Link**
Cust Support
B&T MARC
Compass

**Visit**
APG
BTMS
J.A. Majors
YBP

**Help**
Site Search
E-Guides
FAQ's
Info Request
Feedback
Contact Us
Careers
News

## History of Baker & Taylor

### Our Background

Baker & Taylor was founded in 1828 as a bindery and subscription book publisher. In 1912, the company discontinued publishing to focus on book distribution. In 1958, Baker & Taylor was purchased by Parents magazine and in 1970, W. R. Grace & Co. acquired the company. In 1991, the company was incorporated in Delaware as Baker & Taylor Holdings, Inc.

In 1992, The Carlyle Group officially acquired the company. In 1999, the company became known as Baker & Taylor Corporation, with business activities conducted by the wholly owned subsidiary, Baker & Taylor, Inc. In 2003, Baker & Taylor was acquired by Willis Stein & Partners. In mid-2006, Baker & Taylor was acquired by Castle Harlan, Inc., a New York-based private equity investment firm.

### Our Ownership



Baker & Taylor is owned by Castle Harlan Partners IV, L.P., a private equity limited partnership organized and managed by Castle Harlan, Inc., a leading New York-based private equity investment firm. Castle Harlan acquired Baker & Taylor in July 2006.

Castle Harlan invests in controlling interests in the buyout and development of middle-market companies in North America and Europe. The firm traces its roots to the start of the institutionalized private-equity business in the late 1960s.

Castle Harlan's currently owned companies include Ames True Temper, a highly regarded manufacturer of lawn and garden

### Baker & Taylor Is...

**Libraries**
Baker & Taylor has long-term relationships with libraries of all sizes and types across the country. We provide products and services to public libraries and school libraries. Our YBP Library Services division services all academic libraries, including universities, community colleges, and vocational institutions. In addition, we support corporate libraries, government libraries, association libraries, and many other special libraries.

**Retailers**
Baker & Taylor is a full-service distributor to retailers of all varieties. We support independent and chain bookstores, as well as video stores and music stores. In addition, we are a valuable partner to specialty stores, grocery stores, and other retail stores that carry entertainment products.

**The Internet**
Baker & Taylor offers drop-ship fulfillment services to a wide variety of internet vendors. With the unique ability to combine book, video, and music products in one box, shipped directly to a consumers location, we are a leader in direct fulfillment for large consumer products websites, as well as smaller specialty websites.

**International**
Baker & Taylor is the single source of supply of United States book needs for international customers, including libraries, retailers, wholesalers, and a variety of other international partners. With door-to-door

addition, sales representatives are
located throughout the United
States and around the world.

home  |  about us  |  help  |  copyright/privacy statement
public libraries  |  school libraries  |  academic libraries  |  retailers
suppliers  |  international

©2008 Baker & Taylor. All rights reserved.

# EXHIBIT B

GOLDSHORE, CASH & KALAC, P.C.
Crossroads Corporate Center
3150 Brunswick Pike, Suite 150
Lawrenceville, New Jersey 08648
Telephone: (609) 647-9840
Fax: (609) 637-9846
Attorneys for Defendant, Mian Realty, L.L.C.

## UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LITGO NEW JERSEY, INC., and SHELDON GOLDSTEIN,<br><br>            Plaintiffs,<br><br>                v.<br><br>LISA JACKSON, in her official capacity as the Commissioner of the New Jersey Department of Environmental Protection, STATE OF NEW JERSEY, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATE DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE NAVY, ALFRED SANZARI ENTERPRISES, MIAN REALTY, L.L.C., and KIRBY AVENUE REALTY HOLDINGS, L.L.C.,<br><br>            Defendants. | :<br>:<br>:<br>:    Civil Action No. 06-2891(AET)(TB)<br>:<br>:<br>:    **INITIAL DISCLOSURES OF**<br>:    **DEFENDANT, MIAN REALTY, L.L.C.**<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Pursuant to Rule 26(a) of the Federal Rules of Civil Procedure, set forth below are the Initial

Disclosures of Defendant, Mian Realty, L.L.C. ("Mian").

A.      Fed.R.Civ.P. 26(a)(1)(A):

Listed below are the names and, if known, addresses and phone numbers, of persons having

information that the disclosing party may use to support their claims or defenses (other than for impeachment purposes), together with a brief description of the matters as to which they may have knowledge:

> Dr. Bilal Mian
> 310 Main Street
> Somerville, New Jersey 08876
> (Knowledge as to the purchase of 6 Kirby Avenue, Somerville, NJ)

B. Fed. R. Civ. P. 26(a)(1)(B):

Listed below is a description by category and location of all documents, data compilations and tangible things that are in the possession, custody or control of this party that the disclosing party may use to support their claims or defenses (other than for impeachment purposes):

The following documents are in the possession of Mian's attorneys:

| Date: | Document: |
|---|---|
| No Date | Site Plan prepared by Donald H. Stires & Associates for Block 1, Lot 4.02 |
| January 30, 1920 | Deed from Gilbert A. Van Doren to Somerville Iron Works |
| November 13, 1924 | Borough of Somerville Ordinance to vacate Central Avenue between Loeser Avenue and Haynes Street (right to maintain sanitary/sewer sewers located in Central Ave reserved for Somerville Iron Works or Borough) |
| November 26, 1952 | Deed from Somerville Iron Works to Johnson Bronze Company |
| August 3, 1953 | Transfer of Interest from L.E. Wolfson, Saul Wolfson and Cecil Wolfson to Nathan Wolfson and Jack Surasky |
| August 3, 1953 | Deed from Johnson Bronze Company to L.E. Wolfson, Saul Wolfson and Cecil Wolfson |
| March 29, 1954 | Deed from L.E. Wolfson, Saul Wolfson, Cecil Wolfson, Nathan Wolfson and Jack Surasky to Edray Corporation |
| September 7, 1955 | Deed from Edray Corporation to Bonnie Realty Co. |

| 1961-1962 | Aerial Photograph from Somerset County Planning Board |
|---|---|
| January 4, 1966 | Deed from Edray Corporation to Bonnie Realty Co., to Somerville Industries, Inc. |
| February 25, 1966 | Deed from Somerville Industries, Inc., to Parents' Magazine Enterprises, Inc. (predecessor to W.R. Grace & Co.) |
| August 25, 1966 | Easement between Parents' Magazine Enterprises, Inc., and PSE&G |
| 1969-1970 | Aerial Photograph from Somerset County Planning Board |
| 1979 | Aerial Photograph from Somerset County Planning Board |
| February 19, 1987 | Purchase and Sale Agreement |
| June 29, 1987 | State of New Jersey Certificate for W.R. Grace & Co. |
| July 24, 1987 | IRS Certificate of Exemption |
| July 27, 1987 | State of Connecticut Good Standing Certificate for W.R. Grace & Co. |
| July 29, 1987 | Deed from W.R. Grace & Co. (successor by merger to the interests of Parents' Magazine Enterprises, Inc.) |
| July 29, 1987 | HUD-1 Settlement Statement |
| July 29, 1987 | Letter from Susan E. Backstrom, Esq., counsel for W.R. Grace & Co., re: title |
| July 29, 1987 | Letter from W.R. Grace & Co., to Coastal Title Agency and Lawyers Title Insurance Corp. |
| July 29, 1987 | Indemnification made by W.R. Grace & Co., re: title exception |
| July 29, 1987 | IRS 1099B Real Estate Purchase/Sale Form |
| August 5, 1987 | Lawyers Title Insurance Corporation Policy No. 85-01-216402 |
| December 29, 1988 | Deed to Mian Realty Partners, L.P. |
| March 19, 1997 | Deed to Mian Realty, L.L.C. |

# EXHIBIT C

## Professional Appraisal Associates

293 Morris Avenue
Summit, NJ 07901
(201) 273-2412

PO Box 390
Mendham, NJ 07945
(201) 543-7821

APPRAISAL OF PROPERTY

LOCATED AT:

BLOCK: #1    —    PART OF LOT: #4

6 KIRBY AVENUE, BOROUGH OF SOMERVILLE

SOMERSET COUNTY, NEW JERSEY

AS OF:

September 25, 1985

OWNED BY:

Baker & Taylor



GRACE00001



Professional Appraisal Associates

Commercial, Industrial, Residential Appraisals and Real Estate Consulting

October 17, 1985

Mr. J. Harry Baldeo
Manager, Industrial Engineering
Baker & Taylor
P.O. Box 6847
Bridgewater, NJ  08807

Re:  Appraisal of Property
     Block: #1 - Part of Lot: #4
     6 Kirby Avenue, Borough of Somerville
     Somerset County, New Jersey

Dear Mr. Beldeo:

In accordance with your request for an appraisal, we have
this date completed an inspection and analysis, as well as
having conducted an intensive survey of all pertinent
transactions within the subject property area.

Based upon the facts and opinions contained and attached to
the report, it is the appraiser's opinion that the market
value of the subject property, as of September 25, 1985 is:

     OFFICE BUILDING ON 1.62± ACRES  = $1,500,000.00
     2.38± ACRES EXCESS LAND         = $  190,000.00
     TOTAL MARKET VALUE              = $1,690,000.00

No responsibility has been assumed for matters which are
legal in nature, nor has any opinion on title been rendered
this appraisal, assuming marketable title. Liens and
encumbrances, if any, have been disregarded, and the
property appraised as though free of indebtedness.

I, the undersigned, hereby certify that to the best of my
knowledge and belief, the statements contained in this
appraisal and upon which the opinions herein are based, are
correct, subject to limiting conditions herein setforth.

---

293 Morris Avenue
Summit, NJ 07901
(201) 273-2412

PO Box 390
Mendham, NJ 07945
(201) 543-7821

41 Highway #34
Colts Neck, NJ 07722
(201) 780-8808

Please Reply to:  □ Summit    □ Mendham    □ Colts Neck

GRACE00002



Employment in and compensation for making this report are in
no way contingent upon the value reported, and I hereby
certify that I have no financial interest in the subject
property.

I sincerely appreciate the opportunity to be of service to
you.

Very truly yours,

PROFESSIONAL APPRAISAL ASSOCIATES


Robert F. Heffernan, S.R.A.
Appraiser-Consultant

RFH:cld

GRACE00003

ADDENDUM

Contingent and Limiting Conditions                    III
Qualifications of Robert F. Heffernan, S.R.A.         IV-V
Partial List of Clients                               VI-VII



GRACE00004

# I N T R O D U C T I O N



GRACE00005

1

## SUMMARY OF SALIENT FACTS

Date of Appraisal:                                    September 25, 1985

Property Identification:

    Block: #1 — Part of Lot: #4
    6 Kirby Avenue, Borough of Somerville
    Somerset County, New Jersey

Lot Size:

    4.00± acres (at westerly most portion of existing lot)
    1.62± acres to support existing office & adequate parking
    2.38± acres — excess land

Building Size:

    First Floor  = 8,836 sq. ft.
    Second Floor = 8,836 sq. ft.
    Total        = 17,672 sq. ft.

Zoning:

    I — Industrial District

Highest and Best Use:

    Office use, as presently utilized. Most likely a single owner
    user or an owner user utilizing nearly 50% of structure.

Final Value Estimate:

    Office Building on 1.62± Acres of Land = $1,500,000.00
    2,37± Acres of Excess Land            = $  190,000.00

    Total Market Value                    = $1,690,000.00



GRACE00006

PICTORIAL SUMMARY

View of Subject Office Building - Facing Southwest from Kirby Avenue



View of Subject Property Road Frontage on Kirby Avenue with Excess Land
Shown in Foreground - Facing Westerly





GRACE00007

3

PICTORIAL SUMMARY CONTINUED

Street Scene on Kirby Avenue - Facing Easterly



View of Adjacent Mill Type Industrial Building West of Subject Property





GRACE00008





GRACE00021

20

## HIGHEST AND BEST USE

The HIGHEST AND BEST USE is defined as "that reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.

Alternatively, that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest land value.

The definition immediately above applies specifically to the highest and best use of the land. It is to be recognized that in cases which a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use.

Implied within these definitions is recognition of the contribution of that specific use to community environment or to community development goals in addition to wealth maximization of individual property owners.

Also implied is that the determination of highest and best use results from the appraiser's judgement and analytical skill, i.e., that the use determined from analysis represents an opinion, not a fact to be found. In appraisal practice, the concept of highest and best use represents the premise upon which value is based. In the context of most probable selling price (market value) another appropriate term to reflect highest and best use would be most probable use. In the context of investment value an alternative term would be most profitable use.

The Highest and Best Use of the subject property in question, is for continued office utilization. The present office building can be supported by a land area of 70,288± sq. ft. and the parking indicated thereon, as shown on the site plan. At present, 35 parking spaces located on the easterly end of the parking area are not required to support the existing structure. This would leave an excess land area of approximately 2.38± acres.



GRACE00022

# EXHIBIT D

Proposal

        To consolidate Baker & Taylor's (B&T) headquarters (finance
and administration, marketing, and data processing) facilities B&T
proposes to:

>    1. Lease an office building totalling 50,820 square feet at
>       652 East Main Street, Bridgewater, New Jersey, effective
>       February 1, 1986 through February 29, 1996 (121 months)
>       for a total fixed net lease expense of $4,303,113.
>
>    2. Spend $300,000 for a telephone system and furniture and
>       fixtures.
>
>    3. Sell B&T's Marketing and Technical Center located at
>       6 Kirby Avenue in Somerville, New Jersey including the
>       building (17,800 sq. ft.) and related land (4 acres).
>       B&T expects to realize a gain of $672,000 pretax
>       ($450,000 after tax) on a estimated selling price of
>       $1,000,000.

        In addition to the above, certain one-time expenses (employee
relocation, write-off of existing leasehold improvements, severance
pay, and recruitment) totalling an estimated $500,000 pretax will be
incurred. (Provision for this expense is being made in 1985, with
spending to take place in 1986.)

        The proposed consolidation will accomplish the following
objectives:

>    1. House the entire headquarters staff in one facility;
>
>    2. Provide adequate space for the EDP people and facilities
>       upon expiration of the existing lease at Foothill Road,
>       (9,700 sq. ft.); and,
>
>    3. Provide space (approximately 2,000 sq. ft.) for a planned
>       IBM 3083 mainframe computer (to be the subject of a
>       separate RCA in early 1986 with installation planned by
>       mid-1986).

Background

        Baker & Taylor is the largest U.S. wholesaler of hardcover
and paperback books to public, school, and academic libraries and to

GRACE00070

# EXHIBIT E



104—DEED - BARGAIN AND SALE (Covenant as to Grantor's Acts)
CORP TO IND. OR CORP —Plain Language

Copyright 1982 By ALL-STATE LEGAL SUPPLY CO.
One Commerce Drive, Cranford, N.J. 0001

**39642 DEED**

This Deed is made on   July 29, 1987

Prepared by: (Print signer's name below signature)
Robert H. Folz, Esq.

BETWEEN   W. R. GRACE & CO.,

having its principal office at   a corporation of the state of   Connecticut
1114 Avenue of the Americas, New-York,
NY 10036-7794
referred to as the Grantor.

AND

BILAL A. MIAN and SHAKILA M. MIAN,
husband and wife,

whose post office address is 452 Steeplechase Lane, Bridgewater, New Jersey
08807,
The word "Grantee" shall mean all Grantees listed above.
referred to as the Grantee.

Transfer of Ownership. The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee. This transfer is made for the sum of NINE HUNDRED THOUSAND ($900,000.00) DOLLARS

The Grantor acknowledges receipt of this money.

Tax Map Reference. (N.J.S.A. 46:15-2.1) Municipality of Borough of Somerville
Block No.  1   Lot No.  4.02   Account No.
☐ No property tax identification number is available on the date of this Deed. (Check box if applicable.)

Property. The property consists of the land and all the buildings and structures on the land in the Borough of Somerville
County of Somerset   and State of New Jersey. The legal description is:

All that certain lot, tract or parcel of land and premises situate, lying and being in the Borough of Somerville, County of Somerset, State of New Jersey, being more particularly described as follows:

Beginning at a point in the southerly sideline of Kirby Avenue (50' Right of Way), said point being located S71°01'30"E a distance of sixty and zero hundredths (60.00') feet from the intersection of said southerly sideline of Kirby Avenue with the westerly sideline o Haynes Street and from said Point of Beginning running:

Thence 1) along the said southerly sideline of Kirby Avenue, S71°01'30"E a distance of three hundred eighteen and eighty-five hundredths (318.85') feet to a point;

Thence 2) departing said sideline and forming a new line, S18°58'30"W a distance of three hundred fifty-one and fifty-five hundredths (351.55') feet to a point in the northerly line of the Central Railroad of New Jersey;

Thence 3) along the said northerly sideline,N67°26'00"W a distance of three hundred nineteen and forty-seven hundredths (319.47') feet to a point;

Thence 4) N18°58'30"E a distance of three hundred thirty-one and fifty-five hundredths (331.55') to a point, said point being the Point and Place of Beginning.

Said proposed Lot 4.02 Block 1 containing 108,900 square feet or 2.500 acres more or less.

The above description is in accordance with a minor subdivision sketch plat prepared by Donald H. Stires Associates, Professional Engineer and Land Surveyor, N.J. Lic. No. 8881 approved as a minor subdivision on March 24, 1987.

RECORDED IN DEED BOOK 1646 PAGE 656

LITGO-RCRA0001238

# EXHIBIT F

GRACE DISTRIBUTION DIVESTMENT
BAKER & TAYLOR BOOKS
BAKER & TAYLOR VIDEO
SOFT-KAT

Date of Closing:          MARCH 20, 1992

Place of Closing:         Citibank
                          599 Lexington Avenue
                          New York, New York

INDEX OF CLOSING DOCUMENTS

| TAB | DOCUMENT |
|-----|----------|
| 1. | Asset Purchase Agreement |
| 2. | Schedules |
| 3. | Holdings 8.5% Subordinated Note Due March 20, 2002 with letter confirming interest rate |
| 4. | Holdings Common Stock Purchase Warrant |
| 5. | Bills of Sale |

    (a)   W.R. Grace & Co.-Conn.
    (b)   Baker & Taylor of Canada Limited
    (c)   Baker & Taylor International, Ltd.

6.    Assumption Agreements

    (a)   968689 Ontario Inc.
    (b)   Baker & Taylor, Inc.
    (c)   BTI, Ltd.

7.    Transitional Services Agreements:

    (a)   United Kingdom
    (b)   Japan
    (c)   Canada
    (d)   Australia
    (e)   Software
    (f)   State Tax Services
    (g)   Washington Office
    (h)   Ray Barratt

8.    Grace Leases of Owned Real Estate, including Lien Waivers

    (a)   50 Kirby Avenue, Somerville, NJ
    (b)   380 Edison Way, Reno, NV
    (c)   Mount Olive Road, Commerce, GA
    (d)   501 South Gladiolus Street, Momence, IL

# EXHIBIT G

**GRACE**

John Poggioli
Real Estate Counsel

W. R. Grace & Co.
Grace Plaza
1114 Avenue of the Americas
New York, NY 10036-7794
(212) 819-5593

December 22, 1986

FEDERAL EXPRESS

Mr. Joseph J. DeMarco
Vice President / Personnel
Baker & Taylor
652 E. Main Street
Bridgewater, New Jersey 08807-0920

        RE:   Sale of 6 Kirby Avenue
             Somerville, New Jersey

Dear Joe:

      I enclose herewith my cover letter to Purchaser's
attorney and the revised Purchase and Sale Agreement.

      As we discussed, the Agreement will not be in final form
until two (2) legal descriptions; one (1) for the property being
sold, and one (1) for the "Adjoining Property" have been completed.
It is my understanding that Harry Baldeo has directed his surveyor
to complete the legals as soon as possible.

      It is also my understanding that Harry is looking into
what, if any, environmental problems may have been caused with our
property by the "dumping" that may have taken place on our
neighbor's property.  It is my advice, as well as Nancy's, that we
do not finalize an Agreement until we are satisfied that we either,
know that no problem exists, or that we understand the extent of the
problem, if there is one.

      As we also discussed, because I am leaving Grace, I am
now turning this matter over to Nancy (212-819-5578).  Nancy will,
however, be out of the office on the two and one-half workdays,
December 29, 30 and 31.  Should you need any help during that period
please call Doug Crowley of this office (819-5574).

                Good Luck and Best Regards,

JP/mm
enc.

cc:  N. L. Bloomgarden
     H. Baldeo
     D. M. Crowley
     R. J. Gelmetti
     E. R. Gerard

# EXHIBIT H

R E C E I V E D

JAN 14 1987

NANCY L. BLOOMGARDEN

# BAKER & TAYLOR MEMO
### a GRACE company

DATE:       January 7, 1987

TO:         N. Bloomgarden

FROM:       H. Baldeo

RE:         Environmental Concerns/6 Kirby Property


Recently we discussed the possibility of environmental problems at the neighboring warehouse affecting the property at 6 Kirby. Since our conversation I have spoken to Ed Putnam of the New Jersey Department of Environmental Protection who was reluctant to give me information over the phone. He suggested that if we have specific questions requiring answers, we should write to:

> Mr. George King
> Chief Bureau Site Operator
> 65 Prospect Street
> Trenton, NJ   08625

He indicated that any request for information must include a copy of the tax map, referring to the Signo site at 40 Haynes Street, Somerville, NJ.


I have also spoken to Bruce Wolf, Health Officer for the Borough of Somerville. Please see attached documentation which addresses our concerns. I believe this information is sufficient to clear up the issue. Specifically, please note paragraph 4 of B. Wolf's May 13 letter to M. Richardson in which he states that there is no evidence of adverse effect on surrounding properties due to chemical leakage, runoff, or airborne emissions. Also please note Items 1 and 5 of the December 8 memo to the mayor stating that a large majority of the materials have been removed but completion date is difficult to estimate. During our phone conversation he indicated that a March/April time frame is realistic.

GRACE00076

- 2 -

Also attached are service contracts for the 6 Kirby site which
I received from Jean Diamond, Facilities Administration.
Please address any questions you may have to her attention.

If you have any further questions, please feel free to contact
me.


JHB/saj
3894D


cc:     J. Diamond
        J. DeMarco
        J. McLoone
        D. Williamson

GRACE00077



STATE OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION

UPDATE ON
REMOVAL ACTION
AT
SIGNO TRADING INTERNATIONAL/JANR WAREHOUSE
40 HAYNES STREET
SOMERVILLE, NJ

This is to bring you up to date on the cleanup operations being conducted at the Signo Trading International/JANR Warehouse.

You may know from our previous flyers, that the New Jersey Department of Environmental Protection (NJDEP) has hired a contractor, Clean Venture Inc., to conduct the removal action at this site. The project is being funded by the New Jersey Spill Fund. A public meeting was held by NJDEP in Somerville in August 1985 to discuss the cleanup.

The various drums, boxes, cartons and other containers of hazardous waste found at the site were originally stored in an unsafe manner posing a risk of fire and explosion. In October and November of 1984, NJDEP reduced this threat significantly through a site stabilization project. Among other activities, NJDEP has also sampled over 5,000 containers, many of which were mislabeled, and prepared materials for bulk transport and disposal. As part of the site Health and Safety Plan, regular air monitoring is conducted to ensure that there are no off-site public impacts. A 24-hour guard and patrol has been in place at the site for the past one and one-half years. In addition, substantial evidence has been gathered for the potential civil and/or criminal prosecution of responsible parties.

Due to a number of factors beyond the control of NJDEP, the cleanup process has been hampered and attempts to complete this project quickly have been frustrating. Hazardous waste site cleanups have been affected nationwide by a number of serious issues including the current insurance and bonding crisis. Our contractors are required by hazardous waste regulations to have proper insurance and bonding before initiating on-site work and many contractors, including Clean Venture, have experienced considerable difficulty in this regard. Consequently, Clean Venture was not able to begin work at the Signo/JANR site as originally scheduled.

Another issue which has affected the cleanup at this and other sites in New Jersey is the lack of hazardous materials treatment and disposal facilities approved for use by NJDEP. The Department relies on a number of disposal firms for the actual transport, disposal or treatment of hazardous materials. However, the disposal process is highly complex and NJDEP must work within the limitations set by these firms and the receiving treatment/disposal facilities, especially with respect to availability and scheduling. Furthermore, recent hazardous waste regulations in many states have increased the time necessary to carry out the treatment or disposal process. This too, has resulted in cleanup delays.

You are probably aware, that in December 1985 a fire completely destroyed the complex adjacent to the Signo/JANR Warehouse which included the Dande Plastics, Inc. facility. However, the fire was confined to the Dande Plastics complex and did not affect or delay the Signo/JANR warehouse cleanup. Furthermore, there

*New Jersey Is An Equal Opportunity Employer*                    over...

GRACE00078

-2-

was no evidence of off-site contamination in the vicinity of the warehouse or the Dande Plastics facility.

In April of this year, there was a spill at the Signo/JANR Warehouse site after a leak developed in a disposal tanker containing acids scheduled for removal. Clean Venture and NJDEP personnel acted quickly to neutralize and contain the spill on site. Air monitoring did not indicate any public health threat.

In spite of these complications, to date NJDEP has succeeded in removing and disposing of approximately 70 percent of the hazardous material stored at the Signo/JANR site. We are making every effort to complete the removal action by the end of this summer. After the removal action has been completed, the Signo/JANR Warehouse and work area will be decontaminated and sampling will be conducted in and around the building.

If you have any questions on this matter, please call Jeffrey Folmer of NJDEP at (609) 984-3081 or Bruce Wolf of the Somerville Health Department at (201) 725-2300.

6/86

GRACE00079

HEALTH OFFICER
& SECRETARY
BRUCE D. WOLF R.S., M.A.

**BOARD OF HEALTH**

Borough Of SOMERVILLE

PROVIDING HEALTH SERVICES TO:
SOMERVILLE
MANVILLE
RARITAN



MUNICIPAL BUILDING, 25 WEST END AVENUE
SOMERVILLE, NEW JERSEY 08876
(201) 725-2300

August 20, 1986

TO: Board of Health/Mayor and Council

FROM: Bruce D. Wolf, Health Officer

SUBJ: 40 Haynes Street Update

I conducted a site visit of the above and note the following progress:

1) Approximately 80-85% of materials have been removed

2) Over 90% of liquid wastes have been processed; thus the potential for spills, leaks and odors is minimal.

3) All solids have been bulk piled and are awaiting analysis and disposal. Pile is securely stored.

4) Completion is not expected before October. NJDEP does not want to project actual dates due to possible unforseen delays.

I toured the entire site. It appears to be stable and organized. Twenty-four hour guards are still on duty and all doors are secured.

There has been some change in personnel at the NJDEP. That is why the enclosed letter was sent. It is critical that environmental testing be done on the entire site prior to completion.

If you have any questions, please feel free to contact me.

BDW

cc: Ralph Sternadori, Clerk-Administrator

"PROTECTING YOUR FAMILY'S HEALTH & ENVIRONMENT"

GRACE00080

HEALTH OFFICER
& SECRETARY
BRUCE D. WOLF R.S., M.A.

**BOARD OF HEALTH**

Borough Of SOMERVILLE

PROVIDING HEALTH SERVICES TO:
SOMERVILLE
MANVILLE
RARITAN



MUNICIPAL BUILDING, 25 WEST END AVENUE
SOMERVILLE, NEW JERSEY 08876
(201) 725-2300

May 13, 1986

Mrs. Marlene Richardson
146 Fairview Ave.
Somerville N.J. 08876

Dear Mrs. Richardson:

This is in followup to our meeting of May 9, 1986 at which your concerns about the 40 Haynes St. warehouse were discussed at length. Those also present were; Dr. Kathleen Cunningham of the N.J. State Dept. of Health, Grace Singer of the N.J. Dept. of Environmental Protection,  Sue Ann Bennett and Leslie Gray.

As requested, you have already received a copy of two inventories of materials stored at the JANR Warehouse, 40 Haynes St.  Inventory (A) was provided by the warehouse operators as part of our original local investigation.  Inventory (B) was provided by the NJDEP and its cleanup contractor-Clean Venture Inc..

We of course share your concerns for the safety and health of our residents and our actions clearly bear this out.  While this case has been a long and frustrating one for all involved, we feel confident that the precautions taken by local and State officials have greatly minimized the potential hazards to area residents.

The greatest concern at this site has always been the potential for fire or explosion.  These concerns have been largely mitigated through stabilization of the chemicals, 24 hour guards, emergency contingency planning and an ongoing reduction in the number of containers stored.  There is currently no evidence of significant chemical leakage, runoff or airborne emissions to surrounding properties as a direct result of the chemicals being stored in the warehouse.  Despite these initial indications, the need for environmental study of the warehouse property has long been recognized as essential.  I have been in contact with Dr.  Jorge Berkowitz, Director of the N.J. DEP's Hazardous Site Mitigation Unit.  He has agreed to authorize necessary environmental tests as part of the total cleanup process.  The exact nature and extent of these tests will be determined cooperatively between NJDEP and this Dept. and will depend on the results of the preliminary tests done in the highest risk areas at the warehouse site.

"PROTECTING YOUR FAMILY'S HEALTH & ENVIRONMENT"

GRACE00081

Attached you will find copies of the air monitoring sheets kept by the NJDEP and Clean Venture. The air tests are conducted whenever an activity involving open liquids is done on site. The results do not indicate the presence of any air pollutants of concern on any off-site properties. In fact, some of the low level readings detected at the perimeter of the property may be linked to other unidentified sources.

In addition, below is a summary of the air tests conducted by this Department during the December 20, 1985 fire at Dande Plastics (which did not affect the JANR warehouse).

| LOCATION | TIME | TEST | RESULT |
|----------|------|------|--------|
| 169 Fairview Ave | 5:30 am | H2S | <5 ppm |
| " | " | HCN | 0 ppm |
| " | " | SO2 | 0 ppm |
| " | 6:30 am | ( all tests 0 ppm) | |
| NoEast corner of Dande Bldng | 8:15 am | H2S | 0 ppm |
| " | " | HCN | 1 ppm |
| " | 8:20 am | SO2 | 0 ppm |

Based on these and other test results obtained by the NJDEP, it was decided that the area was safe for residents. It should also be noted that during the fire the wind direction was towards the southeast (away from residential areas) about 98% of the time.

Based on all the information currently available including what we gained through conversations with your veterinarian and family doctor, we see no direct evidence that the presence of the chemicals in the 40 Haynes St warehouse has resulted in any adverse health affects to area residents. However, we are still committed to insuring that all appropriate environmental tests are done to confirm these findings.

In response to your statements about night-time activity on the site, a thorough local and state investigation was conducted. It revealed no "authorized" work after normal working hours. The security

GRACE00082

guard also reported no unusual activity. Despite this, I have
requested the Somerville Police to assist the 24 hour security guards
in keeping a close watch on the property.

The most recent NJDEP "projections" on the complete removal of the
chemicals is 2-3 months. This Department plans regular site visits and
conversations with key state people to insure continued progress.

If there are any further questions, please feel free to call.

Very truly yours,

Bruce D. Wolf
Health Officer

cc Dr. Jorge Berkowitz-NJDEP
   Mrs. Grace Singer-NJDEP
   Dr. Terry Shehata-NJDOH
   Dr. Kathleen Cunningham-NJDOH
   Sen. John H. Ewing
   Hon. Mayor and Council
   Board of Health
   Tom Ross
   Sen. John H.Ewing

GRACE00083

DECEMBER 8, 1986

TO: HONORABLE MAYOR AND COUNCIL

FROM: BRUCE WOLF, HEALTH OFFICER

SUBJECT: 40 HAYNES ST. UPDATE

On the above date, I met with the NJDEP site manager to discuss cleanup progress. He informs me of the following;

1) "Large majority" of materials have been removed.

2) Completion is waiting for final disposal clearance from the various disposal sites.

3) All mass "bulking" (or mixing) of hazardous liquids is completed, all remaining items are either solids or in repacked metal drums.

4) 24 hour security is still on site.

5) Completion date is still hard to estimate due to complexity of final disposal clearances.

The need for a comprehensive final site evaluation was reasserted by me and will be monitored over the next few months. It appears that they are making all possible efforts to expedite completion.

If there are any further questions, please call.

Bruce

GRACE00084

# CONTRACT PROPOSAL

From
## Phil's Landscaping
320 Plainfield Ave.
Piscataway N.J.
08854

**Phil's Landscaping** will perform ground maintenance services to the attached specifications for:

_Baker + Taylor_
company

_6 Kirby Ave_
address

_Somerville N.J 08876_
state

The work to be performed at the following location(s)

Cost for the above service $ _# 140.00 per month + Tax_

## ACCEPTANCE OF PROPOSAL
The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work specified. Billing shall be on a monthly basis.

_Philip Armstrong_
PHIL'S Landscaping

_Jean Diamond_
Authroized signature

_3/13/86_
Date

_3/7/86_
Date

(201) 885-1037
320 Plainfield Ave.
Piscataway N.J.
08854

# Phil's LANDSCAPING

## COMMERCIAL GROUNDS MAINTENANCE SERVICES

### Contract Specifications

**1. PERIOD OF CONTRACT:**
The contract shall be in effect for one year, and shall be performed over a period of (8) months, from March 15 __86__, to November 15 __86__.

**2. TURF MOWING REQUIREMENT:**
All primary lawn areas shall be mowed once a week or as needed to maintain an "attractive and neat" appearance. No grass clippings shall be visible on lawn.

**3. EDGING AND TRIMMING REQUIREMENTS:**
Lawn areas by building, walkways, structures, trees and planting beds shall be edged or trimmed regularly to provide for a neat appearance.

**4. PRUNING SHRUBS:**
All "prunable" shrubs shall be professionally trimmed and pruned once a year or as necessary to provide a neat appearance.

**5. PLANT AND SHRUB BEDS:**
All plant and shrub beds shall be kept free of weeds and debris. If additional mulch is required, such action is an "extra", which must be authorized by the client.

**6. SPRING AND FALL CLEAN-UPS:**
The location shall be cleaned early spring and it will be given a thorough cleaning-up during the last visit in mid-November.

**7. LAWN APPLICATIONS:**
Lime . . . Weed Controls . . . Crabgrass Controls . . . Fertilizer
Lime: granular lime shall be applied on all lawn areas in early spring at the rate of 50 lbs. per sq. ft. or as needed to maintain a PH of 6.2 to 6.5.

Weed Control: 2-4D, with Dicamba shall be used to kill some 43 broad leaf weeds. This shall be done in mid-May, and August.

Crab Grass Control: Granular or water soluble crabgrass control shall be applied to all turf areas in early spring.

Fertilizers: All lawn areas shall receive an application of 10-6-4 fertilizer in early spring, early summer and early fall.

**8.** All work service and materials will be guaranteed. Verification of all insurance requirements are available.

■ Landscape/Design
■ Railroad Tie Construction/Dry Laid Brickwork
■ Industrial and Commercial Lawn Maintenance

GRACE00086

*[handwritten:] signal ADT Contract not available
Cost $2469 annually  J. Diamond*

## RIDER
### For Additional Service

THIS RIDER made this _____ day of _____, is part

of and is to be attached to Agreement made the _____ day of _____, by and between

_____ *ADT* _____

hereinafter called "ADT", and _____ *Odin - Taylor* _____

hereinafter called the "Customer", for _____

service in the premises of the Customer at _____

in the City of _____ *Bon Cryanton* _____, State of _____ *NY* _____

The Customer hereby requests, and ADT agrees, to install the following additional protection:

*THREE   INFRA RED   DETECTORS*

*[handwritten illegible]*

*Installation by 10/20 - 10/21*

*PER JIM SUTTON 10/20/86, I SHOULD CALL AND I WILL PROBABLY HAVE BETTER LUCK
WITH "SKIP SHRINER" THAN WOULD JIM SUTTON*

The Customer hereby agrees to pay ADT, its Agents or Assigns, the sum of _____ ($ *927* )

payable twenty-five percent upon signing of this Agreement and the balance, seventy-five percent, payable upon completion of the installation, and to pay in

addition the additional sum of _____ ($ *350* )

per annum payable in advance.

The parties hereto mutually agree that the aforesaid agreement, of which this rider is made a part, is and shall be and remain in full force

and effect in accordance with all of the terms and conditions thereof, modified only as in this rider specifically provided.

This rider is not binding unless approved in writing by an authorized representative of the Company described above as ADT.

*Baker Taylor
6 10/21 Ave*                                          Customer

By _____ *[signature]* _____                    ADT

                          Agent        By _____ *Dave Williamson* _____

APPROVED _____                                        *Ass. Sales Mktg.*

     Authorized Representative of ADT                                        Title

GRACE00087

# *Air King Service*

*Automatically Renewed*

HEATING & AIR CONDITIONING

51 BRETT ST. - PISCATAWAY, N. J. 08854 - (201) 469-9222

## PREVENTIVE MAINTENANCE AGREEMENT FOR
## HEATING AND AIR CONDITIONING SYSTEMS

This agreement is between  AIR KING SERVICE  hereinafter called the Seller and _____
BAKER & TAYLOR COMPANY  hereinafter called the Purchaser, provides for the Maintenance of the following equipment located at  6 Kirby Avenue, Somerville, N.J. 08876

### EQUIPMENT

1   Mammoth HVAC Roof Top Unit

3   Exhaust Fans

### THE SELLER FURTHER AGREES TO:

1. Provide regular scheduled maintenance calls ___4___ times per year, year round.
   (2) Summer visits and (2) Winter visits.

2. Give purchaser preferential service over non-contract customers.

3. Performance of this contract and any service, maintenance, repair, and/or replacement of equipment or any component parts thereof shall be performed only during normal working hours, 8:00  to  5:00 , Monday through Friday, unless otherwise stated herein. Premium time will be charged for labor performed other than during regular working hours or on Saturday, Sunday or Holidays. Purchaser agreed to compensate AKS the prevailing hourly rate of ___$41.00___ per hour, per man, $60.00 for overtime.

4. Furnish purchaser with a complete copy of the service engineer's report indicating what repairs, if any, were necessary resulting from each inspection.

5. Use only qualified mechanics.

6. Take all reasonable precautions to avoid damage to property or injury to persons.

7. Furnish supervisory help when needed.

8. Instruct purchaser in the operation of equipment to provide for greatest operating efficiency.

| OPTIONAL SERVICES: | YES | NO |
|---|---|---|
| 1. Include replacement miscellaneous small parts. | | X |
| 2. Filters to be cleaned or replaced when necessary. | X | |
| 3. All other work performed outside of maintenance will be done on a time and material basis. | X | |
| 4. Include ___0___ hours emergency service. | | |

GRACE00088

**THE PURCHASER AGREES:**

1. To provide free access to all equipment during normal working hours so that inspection may be completed as called for under this contract.

2. To accept the judgement of Seller as to the best means and methods to be employed for any corrective or repair work necessary.

3. To have repairs made promptly.

4. That any alterations, additions, adjustments or repairs made by others, unless authorizes by the Seller, will release and terminate all obligations of Seller.

5. That the Seller's work under this contract will not include cabinets, duct work, valves, insulation, and recording instruments.

6. The purchaser will assume responsibility and pay extra for all service and material required due to electrical power failure, low voltage, burnt out main or branch fuses, low water pressure or contamination.

7. That the Seller shall not be liable for any damage due to labor disturbances, freeze-up, fire, commercial delays, spoilage, loss of business, war conditions, and/or Acts of God or circumstances beyond his control, and it is expressly agreed that the seller assumes no liability for negligence or failure whatsoever, that to perform the services herein set forth, and in no event is the Seller's liability for any reason whatsoever, to exceed the amount of the service charge for one monthly period.

8. That either party hereto shall, at least thirty days prior to the anniversary date hereof, notify the other in writing of its desire to terminate this agreement on such date. This agreement shall continue on for a further period of one year and thereafter from year to year unless terminated as herein provided.

9. That as part of this service agreement, the Seller shall not be required to furnish any items of equipment which may be recommended or required by insurance companies, Government, State, Municipal or other authorities.

10. That the Seller shall not be required to remove or replace or alter any part of the building structure in the performance of this agreement.

11. That the Seller shall not be bound to make any correction in design or equipment.

12. The Seller shall not be responsible for any major repairs, overhaul or replacement of any major components such as compressors, shafts, bearings, motors, coils, blowers. This work to be performed on a quoted time and material basis only.

Net sum of ____$928.00____ per year to be paid as follows:
To be paid quarterly with payments of $232.00 each quarter.

| Your Acceptance | Our Approval |
|---|---|
| | AIR KING SERVICE |
| (Company) | (Company) |
| By_____ | By _Earl O Mix_ |
| Title_____ | Title _President_ |
| Date_____ | Date _March 26, 1985_ |

# Central Jersey Building Maintenance

*Complete Janitorial Service*

61 Main Street
So. Bound Brook, N.J. 08880
201-356-8540

November 6, 1986

Sound Video Inc.
6 Kirby Ave.
Bridgwater, N.J.

We are pleased to submit our contract for cleaning services to be performed for your company at said property as follows:

Frequency of service
· Our employees will report to work (2) times per week, after 5:30 p.m.

Schedule for cleaning
    1.)  Empty all waste baskets and replace soiled liners.
    2.)  Vacuum all carpeted areas.
    3.)  Clean and disinfect all fixtures in the rest rooms.
    4.)  Mop all tile Floors.
    5.)  Dust and wash all office furniture,shelves and window sills.
    6.)  Clean entrance glass doors.
    7.)  Provide a shop-vac type vacuum for day use by Sound Video employees

We will perform the above mentioned services for the sum of ($295.00) per month
All our personel are covered by workman's compensation and public liability insurance in the amounts of $100/500,000.00 and finished operations insurance.

Central Jersey Building Maintenance          Sound Video Inc.

GRACE00090

# Proposal

# ROUND VALLEY LANDSCAPING

Page No. __1__
of ____1____ Pages

~~Lebanon, New Jersey~~
~~(201) 236-6773~~
~~(201) 236-2885~~  215-252-7906

**Lawn Service**                                          **Light Excavating**

| PROPOSAL SUBMITTED TO: | DATE: 11/14/86 |
|---|---|
| NAME: | JOB NAME: Snow Plowing Bid |
| STREET: 6 Kirby Ave. | STREET: 2401 Laurhurst Ave. |
| CITY: Somerville | CITY: Easton   STATE: PA. 18042 |
| STATE: N.J. 08876 | ARCHITECT:   DATE OF PLANS: |

We hereby submit specifications and estimates for:

O  Plow Parking Lot + rear steps -        $ 165.00

$60.00 pr. hr. for a vehicle with spreader
mounted for salting.
(Salt not included in price)

* Subject to cancellation at any time.

O  Please sign and return original

We hereby propose to furnish labor and materials — complete in accordance with the above specifications, for the sum of:

_____ dollars ($ _____ ) with payment to be made as follows:

All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents or delays beyond our control. Owner to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workmen's Compensation Insurance.

Authorized Signature _Andrew V. Kouthack_

NOTE: This proposal may be withdrawn by us if not accepted within _____ days.

## Acceptance of Proposal

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.

Accepted:
Date 12/4/86

Signature _Patricia Szyplak_

Signature _____

GRACE00091

# EXHIBIT I



## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT is made this _19th_ day of _Feb_, 1987 by and

between W. R. GRACE & CO., a Connecticut corporation having an office at

1114 Avenue of the Americas, New York, New York 10036-7794 ("Seller") and,

DR. BILAL MIAN, having an address at 452 Steeplechase Lane, Bridgewater,

New Jersey 08807 ("Purchaser").

### W I T N E S S E T H :

WHEREAS, Seller is the owner in fee of that certain parcel of

land situate in Somerset County, New Jersey, more particularly described

in Exhibit "A" attached hereto; and

WHEREAS, Seller desires to sell said parcel of land to Purchaser

and Purchaser desires to purchase the same from Seller.

NOW, THEREFORE, in consideration of the foregoing, the mutual

agreements herein contained, and other good and valuable consideration,

the receipt and sufficiency of which are hereby acknowledged, it is hereby

mutually agreed as follows:

1.  Property to be conveyed

    Seller agrees to sell and Purchaser agrees to purchase the aforesaid

parcel of land together with any improvements thereon and all rights and

appurtenances thereto, and any right, title, and interest of Seller in and

to adjacent streets, alleys or rights of way (said parcel of land,

improvements, and rights and appurtenances being hereinafter collectively

referred to as the "Property"), said Property to be conveyed subject to

the Permitted Exceptions described in Section 3 hereof.

2.  Purchase Price; Deposit

    (a)  The purchase price for the Property shall be Nine Hundred
         Thousand Dollars ($900,000.00) (the "Purchase Price") and shall
         be payable in cash or unendorsed bank cashiers check or
         unendorsed certified check, payable in immediately available
         federal funds, or Purchaser's attorney's trust check, payable to
         the order of Seller, drawn on a bank which is a member of the
         New York Clearing House Association or the Federal Reserve
         System.

    (b)  Contemporaneously with the execution hereof, Purchaser shall
         deposit with Seller the sum of Ninety Thousand Dollars
         ($90,000.00) as an earnest money deposit (together with interest
         accrued thereon, if any, the "Deposit") payable by unendorsed
         certified check. The Deposit shall be held in an

000030

M000046

7.   Property "AS IS"

   Purchaser acknowledges that the Property, the condition thereof, the improvements thereon, the roads adjoining the Property, if any, and the uses and non-uses thereof have been examined by Purchaser and/or Purchaser's agents and that Purchaser accepts the same "AS IS" as of the date of this Agreement, but subject to normal use, wear and tear between the date of this Agreement and the Closing.

   It shall be a condition to Purchaser's obligation to close the transaction described herein that, at the time of Closing, the Property complies with and does not violate rules and regulations of the governmental entities having jurisdiction over the Property. The condition described in the preceding sentence shall not apply to a state(s), of non-compliance or/and violation(s) which in the aggregate would cost no more than ten thousand dollars ($10,000) to remedy according to the estimate of an engineer acceptable to both Seller and Purchaser. Seller and Purchaser shall each pay one-half (1/2) of the costs and fees of the engineer retained pursuant to this Section 7.

   Purchaser acknowledges that Seller has made no representations or warranties with respect to the Premises except as set forth in this agreement. Purchaser agrees, further, that Seller shall not be responsible for any statements or representations of any kind furnished to Purchaser by any real estate broker or any other person.

8.   INTENTIONALLY DELETED

9.   Casualty and Condemnation

   (a)   Subject to (c)(ii) below, Purchaser or Seller may terminate this Agreement by notice (the "Termination Notice") given within twenty-one (21) days after the occurrence of an "Event of Termination").

   (b)   As used herein, "Event of Termination" shall mean either:

      (i)   a fire or other casualty causing damage or destruction to the Property as a result of which the estimated cost of repair and restoration exceeds fifty thousand dollars ($50,000); or

      (ii)   the giving of official notice by the proper governmental authority of a condemnation or taking under the power of eminent domain of a material part of the Property (the area so affected, the "Condemned Area").

   (c)   If Purchaser or Seller elects to terminate this Agreement after an Event of Termination, Seller shall:

      (i)   notify the Title Company that it is authorized to repay the Deposit to Purchaser;

**000034**

M000050



subdivision approval that may be required for such transaction. Seller agrees to promptly apply for such approval at its own expense. At the Closing, however, Purchaser shall reimburse Seller for the costs of the survey of the Property.

EXCEPT WHERE SPECIFICALLY PROVIDED TO THE CONTRARY, NOTHING CONTAINED IN THIS AGREEMENT SHALL BE DEEMED TO OBLIGATE SELLER TO BRING ANY ACTION OR PROCEEDING OR OTHERWISE TO INCUR ANY EXPENSE WHATSOEVER TO RENDER TITLE TO THE PROPERTY MARKETABLE OR INSURABLE, OR TO RENDER OR THE PHYSICAL LEGAL OR OTHER CONDITION OF THE PROPERTY ACCEPTABLE TO PURCHASER.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

W. R. GRACE & CO.

By _____
Vice President

DR. BILAL MIAN

_____
BILAL MIAN

000042

M000068

# EXHIBIT J

102—DEED - BARGAIN AND SALE (Covenant as to Grantor's Acts)
IND. TO IND. OR CORP — Plain Language      -D  RV

Copyright 1983 by ALL-STATE LEGAL SUPPLY CO.
One Commerce Drive, Cranford, N.J. 07016

Prepared by: (print signer's name below signature)
*[signature]*
Barry B. Freedman, Esq.

5765   **DEED**

This Deed is made on December 29    , 19 89 .

BETWEEN   Bilal A. Mian and Shakila M. Mian, husband and wife

whose address is       452 Steeplechase Lane, Bridgewater, New Jersey
referred to as the Grantor.

AND    Mian Realty Partners, L.P., a New Jersey limited
partnership,

RECORDED/FILED
SOMERSET COUNTY

91 MAR 19 PM 1:45

whose post office address is   452 Steeplechase Lane, Bridgewater, New Jersey
*[illegible CLERK]* referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership. The Grantor grants and conveys (transfers ownership of) the property
described below to the Grantee. This transfer is made for the sum of
Ten ($10.00) DOLLARS
The Grantor acknowledges receipt of this money.

Tax Map Reference. (N.J.S.A. 46:15-2.1) Municipality of Somerville
Block No. 1         Lot No. 4.02         Account No.
☐ No property tax identification number is available on the date of this deed. (Check box if applicable.)

Property. The property consists of the land and all the buildings and structures on the land in
the Borough          of          Somerville
County of Somerset          and State of New Jersey. The legal description is:

All that certain lot, tract or parcel of land and premises situate,
lying and being in the Borough of Somerville, County of Somerset,
State of New Jersey, being more particularly described as follows:

Beginning at a point in the southerly sideline of Kirby Avenue (50'
Right of Way), said point being located S71°01'30"E a distance of sixty
and zero hundredths (60.00') feet from the intersection of said
southerly sideline of Kirby Avenue with the westerly sideline of Haynes
Street and from said Point of Beginning running:

Thence 1) along the said southerly sideline of Kirby Avenue,
S71°01'30"E a distance of three hundred eighteen and
eighty-five hundredths (318.85') feet to a point;

Thence 2) departing said sideline and forming a new line,
S18°58'30"W a distance of three hundred fifty-one and
fifty-five hundredths (351.55') feet to a point in the
northerly line of the Central Railroad of New Jersey;

Thence 3) along the said northerly sideline, N67°26'00"W a
distance of three hundred nineteen and forty-seven
hundredths (319.47') feet to a point;

Thence 4) N18°58'30"E a distance of three hundred thirty-one and
fifty-five hundredths (331.55') to a point, said
point being the Point and Place of Beginning.

Said proposed Lot 4.02 Block 1 containing 108,900 square feet or 2.500
acres more or less.

The above description is in accordance with a minor subdivision sketch
plat prepared by Donald H. Stires Associates, Professional Engineer
and Land Surveyor, N.J. Lic. No. 8881 approved as a minor subdivision
on March 24, 1987.

RECORDED IN DEED          BK1809P6446

M000070

E I C : : : 5 9

WARRANTY BY GRANTOR:

Grantor herein will warrant, secure and forever defend the title to the subject property.

Promise by Grantor. The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

Signatures. The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

_____    _____ (Seal)
                                     BILAL A. MIAN

_____    _____ (Seal)
BARRY R. FREEDMAN, ESQ.              SHAKILA M. MIAN

STATE OF NEW JERSEY, COUNTY OF  Somerset        SS.:

I CERTIFY that on  March 13        , 19 91 .

Bilal A. Mian and Shakila M. Mian, his wife,   personally came before me
and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):
   (a)  is named in and personally signed this Deed;
   (b)  signed, sealed and delivered this Deed as his or her act and deed; and
   (c)  made this Deed for $ 10.00          as the full and actual consideration paid or to be
        paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
Barry R. Freedman
An Attorney at Law of New Jersey

BK1809PG449

000065

M000081



104-DEED-BARGAIN AND SALE (Covenant as to Grantor's Acts)    Prepared by: *Kiran Sachdeva*
CORP. TO IND. OR CORP. - Plain Language                                    KIRAN SACHDEVA

# DEED

This Deed is made on ___March 19th___ 19 **97**

BETWEEN        Mias Realty Partners, L.P., a New Jersey Limited Partnership

a partnership of the state of        New Jersey
having its principal office at   452 Steeplechase Lane, Bridgewater, NJ
                                                                referred to as the Grantor,

AND        ` Mias Realty, L.L.C.

whose post office address is  452 Steeplechase Lane, Bridgewater, NJ
                                                                referred to as the Grantee.

The word "Grantee" shall mean all Grantees listed above.

Transfer of Ownership.    The Grantor grants and conveys (transfers ownership of)
the property described below to the Grantee. This transfer is made for the sum of Ten Dollars
and 00 Cents (10.00).
                                        The Grantor acknowledges receipt of this money.

Tax Map Reference. (N.J.S.A. 46:15-2.1) Municipality of  Somerville
Block No.     1     Lot No.     4.02    as to Account No.
☐ No property tax identification number is available on the date of this Deed (check box
if applicable)

Property.    The property consists of the land and all the buildings and structures on the
land in BOROUGH  of        Somerville
County of      Somerset              and State of New Jersey. The legal description is:

All that certain lot, tract or parcel of land and premises situate, lying and being in the Borough
of Somerville, County of Somerset, State of New Jersey, being more particularly described as
follows:

Beginning at a point in the southerly sideline of Kirby Avenue (50' Right of Way), said point being
located S71° 01' 30"E a distance of sixty and zero hundredths (60.00') feet from the intersection of
said southerly sideline of Kirby Avenue with the westerly sideline of Haynes Street and from said
Point of Beginning running:

Thence 1)    along the said southerly sideline of Kirby Avenue, S71° 01' 30"E a distance
                 of three hundred eighteen and eighty-five hundredths (318.85') feet to a point;

Thence 2)    departing said sideline and forming a new line, S18° 58' 30"W a distance of three
                 hundred fifty-one and fifty-five hundredths (351.55') feet to a point in the northerly
                 line of the Central Railroad of New Jersey;

Thence 3)    along the said northerly sideline, N67° 26' 00"W a distance of three hundred
                 nineteen and forty-seven hundredths (319.47') feet to a point;

Thence 4)    N18° 58' 30"E a distance of three hundred thirty-one and fifty-five
                 hundredths (331.55') to a point, said point being the Point and Place of beginning.

Said proposed Lot 4.02 Block 1 containing 168,900 square feet or 2,500 acres more or less.

The above description is in accordance with a minor subdivision sketch plat prepared by Donald H.
Stires Association, Professional Engineer and Land Surveyor, N.J. Lic. No. 8881 approved as a
minor subdivision on March 14, 1987.

Being the same premises conveyed to Bilal A. Mian and Shakia M. Mian, husband and Wife, by
Deed from W.R. Grace & Co., dated July 29, 1987, and recorded August 5, 1987 in County of
Somerset Deed Book 1646 Page 656.

                                BK 2 1 0 4 PG 4 2 9

1997103708

000066

M000082

Being the same premises conveyed to Grantor above from Bilal A. Mian and Shakila M. Mian, husband and Wife, dated December 29, 1988 and recorded March 19, 1991 in the County of Somerset Deed Book 1809, Page 446.

Subject to covenants, easements and restrictions of record, if any.
Subject to State Statutes and Municipal Ordinances affecting the use of said premises.
Subject to utility easements and grants, if any.
Subject to such state of facts as an accurate survey would disclose.

Promises by Grantor.    The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

Signatures.    The Grantor signs this Deed of the date at the top of the first page.

MIAN REALTY PARTNERS, A NJ LIMITED PARTNERSHIP

BY _____    BY _____
Shakila M. Mian    (Partner)        Bilal A. Mian        (Partner)

STATE OF NEW JERSEY, COUNTY OF        Somerset

I CERTIFY    that on _March 19th_ , 19 97 , Bilal A. Mian &
Shakila M. Mian

personally came before me and these persons acknowledged under oath, to my satisfaction that:
(a) they are the        General Partners of MIAN REALTY PARTNERS, A NEW
        JERSEY LIMITED PARTNERSHIP  the company named in this Deed;
(b) they executed this Deed as their own act and deed; and
( c) the full and actual consideration paid or to be paid for the transfer of title is $10.00
        (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
SARFRAZ TARIQ, NOTARY PUBLIC
STATE OF NEW JERSEY
Muhammad Tahir

BK 2 1 0 4 PG 4 3 1

000067

M000083

# EXHIBIT K

Submitted by:   Litgo New Jersey, Inc.
                (F Sharp Screw Site ECRA/ISRA
                Case Nos. 85647, 85648, 85649)

Submitted to:   New Jersey Department of
                Environmental Protection

Dated:  March 4, 2002


### SIGNO II
### 40 Haynes Avenue
### Somerville, New Jersey

## SIGNO TRADING INTERNATIONAL, INC.
## SCI EQUIPMENT & TECHNOLOGY, INC
## JANR TRANSPORT, INC.

### Table of Contents

1.  Purpose of this Submission . . . . . 1

2.  Signo I. . . . . . . . . . . . . . . 2

3.  Signo II . . . . . . . . . . . . . . 3

4.  NJDEP's Removal Action at Signo II . 4

5.  Dande Plastics Fire. . . . . . . . . 5

6.  Post-Removal Action Sampling
    and Remediation. . . . . . . . . . . 6

7.  Summary. . . . . . . . . . . . . . . 8

### 1.  Purpose of this Submission.

This submission is made on behalf of Litgo New Jersey, Inc. ("Litgo"). The purpose of this submission is to provide the New Jersey Department of Environmental Protection (the "NJDEP") with a brief, but descriptive history of the property located at 40 Haynes Avenue in Somerville, New Jersey, now known as the "F Sharp Screw" site (ECRA/ISRA Case Nos. 85647, 85648, 856490, and formerly known as "Signo II," the name used herein This history includes the NJDEP's efforts to remove hazardous materials stored at Signo II. Unfortunately, those efforts resulted in

LITGO-RCRA0013765

discharges of hazardous substances to the environment at Signo II.

Litgo has reviewed the files of the NJDEP pertaining to both Signo II and the property at 140 Thomas Street, Newark, New Jersey, known as "Signo I." It is clear from those files, pertinent portions of which are attached, that hazardous substances originally stored at Signo I were transported and stored at Signo II, together with hazardous substances from other locations. It is also clear that this movement of hazardous substances was completed during the NJDEP's supervision of the cleanup of Signo I.

The NJDEP files further establish that multiple spills of hazardous substances occurred during the NJDEP's removal action at Signo II. While the NJDEP was aware of these spills during the course of its removal action and initially committed to address them properly, it ultimately concluded that an investigation and remediation of the Signo II property was not necessary because there was an ongoing remediation of the property under what was then known as the Environmental Cleanup Responsibility Act ("ECRA"). In short, the NJDEP improperly and irresponsibly transferred its obligation to remediate the Signo II property to the property owners.

For the past ten years, Litgo has been pursuing the completion of the ECRA remediation of the Signo II property under what is now the Industrial Site Recovery Act. In the course of Litgo's environmental investigation, it has discovered contamination consistent with the discharges of hazardous substances that occurred during the NJDEP's removal action at Signo II. Litgo hopes that this submission may provide the basis for the commencement of meaningful discussions with the NJDEP leading to the NJDEP's participation in the completion of the remediation of the property and the reimbursement of Litgo's costs associated with the contamination caused during the NJDEP's removal action.

2. **Signo I.**

On April 11, 1983, the NJDEP responded to a chemical fire at the warehouse located at the Signo I property at 140 Thomas Street in Newark. (Attachment 1) In the warehouse, the NJDEP found some 20,000 containers and 6,500 drums of illegally-stored hazardous substances "tightly packed within five floors" and "cover[ing] the gamut of hazard classes, i.e. – flammable, corrosive, oxidizer, poisonous, explosive, radioactive, poison

LITGO-RCRA0013766

gas, dangerous when wet, irritant, compressed gas, etc."
(Attachment 1)

The NJDEP applied to the Superior Court of New Jersey for
an order directing the responsible parties, namely, Signo
Trading International, Inc. ("Signo") and its principals, to
remove all hazardous substances from Signo I under the
supervision of the NJDEP. (Attachment 1)   The order was signed
by Judge Stanton on July 15, 1983.   As explained by one Deputy
Attorney General:   "The original court order, referred to above
placed the burden of the cleanup on Signo.   However, supervisory
authority was placed on DEP to insure that the chemicals when
transferred by Signo were transferred to licensed warehouses
capable of storing hazardous materials."   (Attachment 2)

A "substantial quantity" of the containers were moved out
of the Signo I warehouse pursuant to the Court's order -- and
right into Signo II.   (Attachment 2)

### 3.   Signo II.

The Signo II property formerly consisted of several
warehouse buildings, some of which, including what became known
as the "JANR warehouse," were occupied by Signo and its
affiliates, SCI Equipment & Technology, Inc. and JANR Transport,
Inc.   Signo II was not properly licensed or permitted for the
storage of hazardous substances.   (Attachment 2)   The NJDEP's
first visit to Signo II appears to have been on January 31,
1984, at which time spills from the materials stored there were
noticed.   (Attachment 3)[1]   It is important to note that the
buildings at Signo II used for the storage of hazardous
substances were serviced by floor drains.   (Attachment 4)   This
inspection determined that the first delivery of hazardous
substances from Signo I to Signo II occurred on October 13,
1983.   (Attachment 3)   More than 12,000 containers of varying
size were ultimately brought to Signo II.   (Attachment 6)

In or about October 1984, one year since materials were
first brought to Signo II and nine months after the NJDEP's
first visit to the property, the NJDEP retained the services of
Thomas F. Dalton, Ph.D. to inspect Signo II and report on the
conditions found there.   (Attachment 7)   Dr. Dalton concluded in

---

[1]   The spillage within the building was confirmed during a NJDEP inspection on
October 11, 1984 (Attachment 6), and was later described as "significant" by
the New Jersey Department of Health after an inspection on June 13, 1985.
(Attachment 5)

LITGO-RCRA0013767

his report that the conditions at Signo II were "just as dangerous as SIGNO Trading I" and "constitute[d] an immediate danger to life and public health, and should be acted on with all due haste by N.J. DEP." (Attachment 7)[2] Among other things, Dr. Dalton identified "drums from other locations with N.J. DEP-BFO labels on them," which Dr. Dalton found "difficult to understand." (Attachment 7)

### 4.  NJDEP's Removal Action at Signo II.

In or about March 1985, the State of New Jersey published a "Request for Proposal for Staging, Samplng, and Removal of Hazardous Material, JANR Warehouse (Signo Trading)" seeking proposals for the removal and disposal of the hazardous substances from Signo II.[3] The State ultimately awarded a contract for this work to Clean Ventures, Inc. ("Clean Ventures") on October 31, 1985.

Immediately, difficulties were encountered in performing the removal action. Most notably, there was a lack of adequate documentation regarding the contents of the containers at Signo II such that each container had to be treated as containing an unknown substance. (Attachment 8) The NJDEP acknowledged the inability to be sure what types of hazardous substances were present at Signo II by requiring all visitors to the property to sign a release, which indicates that the NJDEP "is without complete knowledge as to the content and nature of the hazardous substances on the site" or "the nature or degree of the hazards which might arise therefrom" and that "[a]ny person or persons who enter upon the site, examine the site, or conduct any activity on or in the vicinity of the site do so at their own risk." (Attachment 9)

Many spills of hazardous substances occurred during the handling of containers at Signo II, both inside and outside the buildings. In addition, in the course of performing its work, Clean Ventures formed two unpermitted "bulk solid piles," complete with leachate collection trenches, where bulked hazardous substances were dumped on the ground awaiting disposal. Clean Ventures also constructed an unpermitted bulk liquid pool on the ground for the bulking of hazardous

---

[2]  This is quite different from the NJDEP's earlier evaluation of Signo II, conducted just two weeks prior to Dr. Dalton's report, which concluded that "the conditions in Somerville do not pose an imminent threat to health and welfare." (Emphasis in original.) (Attachment 2)

[3]  The Request for Proposal is not attached because it is voluminous.

LITGO-RCRA0013768

# EXHIBIT L



CN 028
Trenton, N.J.  08625-0028

(609)633-7141

## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION
DIVISION OF HAZARDOUS WASTE MANAGEMENT

Michele M. Putnam
Deputy Director
*Hazardous Waste Operations*

John J. Trela, Ph.D., Director

Lance R. Miller
Deputy Director
*Responsible Party Remedial Action*

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
George Tyler, Esq.
Giordan, Halleran & Ciesla
270 State Highway 35,
P.O. Box 190
Middletown, NJ 07748

**OCT** 31 1989

Dear Mr. Tyler:

RE:  Industrial Establishment:  F Sharp Screw Machine Products,
       Morgan Chemicals, Inc. and JANR Transport
     Location:  40 Haynes Street, Somerville Boro., Somerset County
     Block:  50     Lot:  3
     Transaction:  Sale of Property
     Addendum to Sampling Plan Dated:  June, 1989
     ECRA Case #85647,85649,85648

Sanzari Enterprises owns the property that F sharp Screw Machines Products,
Morgan Chemicals, Inc. and JANR Transport occupy.  Sanzari Enterprises has
received a Partial Cleanup Plan Approval on January 27, 1989 which is
currently being implemented.  The above referenced Sampling Plan has been
amended to a Cleanup Plan.

Pursuant to the authority vested in the Commissioner of the New Jersey
Department of Environmental Protection ("NJDEP") by the Environmental
Cleanup Responsibility Act, N.J.S.A. 13:1K-6 et seq. (ECRA), and duly
delegated to the Assistant Director of the Industrial Site Evaluation
Element pursuant to N.J.S.A. 13:1B-4, the above referenced Cleanup Plan
submitted on behalf of Sanzari Enterprises is hereby approved by NJDEP with
post-approval conditions set forth below:

<u>Soils</u>

1.  Verification sampling is required at the three transformers on the west
    wall of Grist Moving and Storage.  Sanzari Enterprises shall undertake
    the following:

    a.  Take two soil samples at the edge of the base of the transformer
        pad in the 0-6 inch increment with analysis for polychlorinated
        biphenyls (PCBs) and petroleum hydrocarbons (PHCs).  These samples
        shall be biased towards surface runoff and stained soils.

**LITGO 18213**

000163

b. If these samples exceed the ECRA action levels, the soils shall be excavated with post-excavation samples taken. The area will be considered remediated when all post-excavation samples are below current ECRA action levels.

2. Sanzari Enterprises shall remove all containated sediment and soil in the 8" diameter circular hole in the floor of Quality Tube. Remediation of this area shall be deemed complete when post-excavation samples are below ECRA action levels.

Hydrogeology

3. The groundwater data indicates that operations on Sanzari Enterprises property may have contributed to offsite contamination. The Department has concluded that remediation for this contamination is not warranted at this time due to the concentrations of the contaminants found in the ground water and the expected extent of the problem. However, before final Department sign-off on this issue and the issuance of a letter of full compliance, Sanzari Enterprises shall undertake the additional investigative requirements outlined below, as a condition of this Cleanup Plan approval in order to resolve any questions regarding the impact of Sanzari Enterprises' activities on ground water. In the event that remediation is necessary Sanzari Enterprises financial assurance and cost estimate shall be adjusted and maintained to meet that contingency. The NJDEP will accept any required instrument(s) of financial assurance, in proper form from Sheldon Goldstein, contract purchaser of the site.

4. Three additional monitoring wells (MWs) shall be installed 50-100 feet downgradient (southwest, south, southeast) of the southern property boundary. This will require off-site access.

5. These MWs shall be constructed to monitor the same interval as the existing MWs, on the Sanzari Enterprises property.

6. All wells shall be sampled for VO+15.

7. A contour map shall be provided for each sampling episode incorporating measurements from all new and existing MWs.

8. All potable wells downgradient of Sanzari Enterprises, within a 1/2 mile, shall be identified and accurately located on a site map. Sanzari Enterprises shall utilize the results of sampling by Bridgewater Township of potable wells in this area.

9. Due to the presence of VO contamination in the on-site MWs, Sanzari Enterprises shall seal the production well according to N.J.A.C. 7:9-9.1 during installation of proposed MWs. This requires that all obstructions be cleared prior to sealing.

10. Sanzari Enterprises shall conduct the above requested sampling and submit the results along with the additional requirements within 120 days of receipt of this document.

11. Sanzari Enterprises shall notify the Department in writing two weeks prior to drilling.

# EXHIBIT M





ENVIRONMENTAL WASTE
MANAGEMENT ASSOCIATES, INC.

**MIDATLANTIC
REGION:**
I Wall Street
Research Park
Princeton, NJ 08540

Phone: 609/683-7600
Fax: 609/683-1556

<u>Via Hand Delivery</u>

March 14, 1995

New Jersey Department of Environmental Protection
Division of Responsible Party Site Remediation/ISRA
CN 028
Trenton, New Jersey 08625-0028
Attn: Mr. Ken Kahora, Case Manager

Re:    F. Sharp Screw Machine Products, Janr Transport, and Morgan Chemical Co.
       (F Sharp)
       Somerville Boro, Somerset County
       ISRA Case #85647, 85648, 85649

       EWMA Project #88106

Dear Mr. Kahora:

As agreed at our March 10, 1995, joint meeting, Environmental Waste Management
Associates, Inc. (EWMA) is providing this proposed Remedial Investigation Workplan
which details the actions to be taken in order to successfully close this case. It is EWMA's
understanding that the only two remaining issues to be resolved are 1) ground water
contamination and 2) off-site soils contained within the drainage ditch (Area #5). All
issues concerning on-site soils have been completed to the satisfaction of the New Jersey
Department of Environmental Protection (NJDEP) and have been closed.

**I. Ground Water Issues**

During the meeting, two different interpretations of ground water flow, specifically
involving differing positions on the potential for mounding at the site, were presented by
EWMA and the NJDEP. In order to resolve these differences, both sides agreed that
additional investigation would be conducted to obtain more conclusive data. The
following outlines EWMA's proposal for the two areas of ground water contamination.
EWMA will implement this scope of work upon written agreement by NJDEP that if the
findings are consistent with the hypothesis contained herein, no additional activities will be
required. The two separate areas of contamination, in the area of MW-6 and near MW-4
and MW-5, are discussed below. EWMA has attached a map to this letter denoting
proposed well locations.

**CORPORATE
HEADQUARTERS:**
Wayne, NJ
Phone: 201/633-7900
Fax: 201/633-7482

**WESTERN REGION:**
Englewood, CO
Phone: 303/843-9700
Fax: 303/843-9094

**Environmental Waste Management Associates, Inc.**
Comprehensive Environmental Services

Page 1


RECYCLED

LITGO-RCRA0006347



## MW-6 Ground Water

EWMA proposes to install one deep well (MW-8) approximately 100' north of MW-6. MW-8 will be located in James Street or immediately adjacent to it. In order to be consistent with MW-6, MW-8 will be cased with 35' of 6" steel casing and will have an open hole from 35' to 60' below ground surface (bgs), pending Bureau of Water Allocation (BWA) approval. The well will be sampled for Volatile Organics plus 10 associated peaks (VO+10) two weeks after installation.

If the water level elevation of MW-8 is higher than that of MW-6 and there are similar contaminants present, the NJDEP will agree that contamination is from an off-site source and will close this area of concern with no further work required.

## MW-4 and MW-5 Ground Water

MW-4 and MW-5 are the only shallow bedrock wells on-site and these wells also exhibit the highest water level elevations. EWMA believes the water level difference is due to the deep wells being installed in another zone in the Brunswick Formation, while the NJDEP maintains the water level difference is due to mounding. Since agreement could not be reached at the meeting, EWMA proposed, and the NJDEP tentatively agreed, that MW-4 and MW-5 should both be drilled 20' deeper so that "apples to apples" comparison could be made between MW-4 and MW-5 and the remaining deep wells. Thus, MW-4 and MW-5 will each have 18' of casing and approximately 41'-43' of open hole. The water levels of MW-4 and MW-5 will be measured prior to drilling and 2 weeks following drilling. If the water levels decrease significantly so that they are consistent with the other deep wells (within +/- 4 feet of the mean water level of the other deep wells), the NJDEP will conclude that no mounding has been present in this area.

If the water levels remain at their present levels, thereby indicating a ground water mound, EWMA will install two additional deep wells (MW-10 and MW-11), cased from 20' to 60' bgs, to further delineate the extent of the mound. In addition, EWMA will locate the pipe which formerly drained into the brick junction box (previously removed) and will seal it so that water can no longer discharge to this area. EWMA will measure water level elevations after 2 weeks to evaluate whether the mounding was caused by the pipe drainage.

To document if contamination originating from an off-site source is impacting MW-4 and MW-5, EWMA proposes to install one deep well (MW-9) approximately 150' northeast of MW-5. To eliminate time consuming delays associated with obtaining off-site access agreements, MW-9 will be installed on the property line. The NJDEP tentatively agreed that this well location, although not technically an off-site well, would be adequate to assess ground water contamination entering the property. In order to be consistent with the newly overdrilled MW-4 and MW-5, MW-9 will be cased with 20' of 6" steel casing and will have an open hole from 20' to 60' bgs, also pending BWA approval. MW-9 will be sampled for VO+10 2 weeks following installation. If there is no appreciable

LITGO-RCRA0006348

mounding, the water level elevation of MW-9 is higher than that of MW-5 and there are contaminants present in MW-9 similar to those found in MW-5, the NJDEP will agree the contamination is from an off-site source and will close this area with no further work required.

Upon NJDEP's acceptance of the above, the following implementation timetable can be expected:

| Task | Completion |
|------|------------|
| BEERA Approval | 3 days |
| Approval from BWA | 1 week |
| Receive Well Permits | 3 weeks |
| Drill Wells | 4 weeks |
| Well Sampling | 6 weeks |
| Lab Results | 9 weeks |
| Report | 10-12 weeks |

## II. Off Site Soil Issues-Area #5

EWMA proposes to obtain soil samples from within the drainage ditch at discrete sample locations which have exhibited concentrations of contaminants above the residential standards as follows:

| Former Sample Location | Parameter |
|------------------------|-----------|
| FS-33 | Lead |
| FS-34 | Lead |
| FS-42 | Lead, Copper |
| FS-44 | Lead |
| FS-47 | Lead |
| FS-49 | Lead, Copper, Zinc |
| FS-50 | Lead, Zinc |
| 5A | Lead, Targeted BN's |
| 5B | Cadmium, Copper, Lead, Zinc Targeted BN's |

Should this sampling reveal levels below the current residential cleanup criteria, NJDEP will agree that no further action is necessary for the area. If the sampling reveals levels above the current residential cleanup criteria but below the non-residential cleanup criteria, EWMA will propose a deed restriction for this area. If the sampling reveals levels above the current non-residential cleanup criteria, a deed restriction and the appropriate institutional control will be proposed. Please be advised that if an institutional control is necessary, the selection of said control will be based upon monetary as well as health and safety concerns. Ultimately, the control selected may be influenced by the current use of

**Environmental Waste Management Associates, Inc.**                    Page 3

LITGO-RCRA0006349

 

this area: this property is currently owned by NJ Transit and is adjacent to an active railway bed. Access to this area for the implementation of the selected control may be restricted.

In summary, EWMA on behalf of the property owner, believes the above-referenced investigatory scenario is both prudent and fair. It is our belief the implementation of this scenario will determine the source of the two areas of ground water contamination as well as determining the final status of the soils in the drainage ditch.

As we agreed at the March 10, 1995 meeting, the issue of necessary additional sampling is to be resolved between the parties this week. Please feel free to contact this office at (609) 683-7600 to discuss this letter in detail or to arrange a conference call. Your attention to these issues is very much appreciated.

Sincerely,

a. Wright for

David S. Zervas, Associate
Environmental Waste Management Associates, Inc.

cc:     S. Goldstein, Property Owner
        W. Friedman, Esq.
        R. Greenberg, Ph.D., President, EWMA
        A. Waring, EWMA
        L. Davis, EWMA
        W. Howitz, Assistant Director, DRPSR
        K. Fell, Section Chief, GWPA

p:Zervas/Misc/DEPFSP.DOC

**Environmental Waste Management Associates, Inc.**                    **Page 4**

LITGO-RCRA0006350



LITGO-RCRA0006351

# EXHIBIT N



EXHIBIT
D - 11

# GROUNDWATER SAMPLING REPORT

**F-Sharp Screw Machine Company**
**40 Haynes Street**
**Somerville, New Jersey**

## ECRA CASE #85647

August 20, 1990

SUBMITTED BY:
ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES.
200 MALTESE DRIVE
TOTOWA, NJ  07512

COPY

LITGO 09734

LITGO-RCRA0017634

# TABLE OF CONTENTS

INTRODUCTION                                          PAGE 1

SCOPE OF REPORT                                       PAGE 1

GEOLOGY                                               PAGE 2

HYDROGEOLOGY                                          PAGES 3 - 5

MONITORING WELL INSTALLATION                          PAGES 5 - 6

MONITORING WELL CONSTRUCTION                          PAGES 6 - 7

GROUNDWATER SAMPLING AND ANALYSIS                     PAGE 7 - 8

RESULTS                                               PAGE 8

CONCLUSIONS AND RECOMMENDATIONS                       PAGES 8 - 10

TABLES:

GROUNDWATER ANALYTICAL RESULTS, 4/13 & 16/90          TABLE 1

GROUNDWATER ANALYTICAL RESULTS, 4/7/89                TABLE 2

GROUNDWATER ANALYTICAL RESULTS, 5/9/89                TABLE 3

COMPARATIVE TABLE OF ANALYTICAL RESULTS               TABLE 4

WELL SEARCH SUMMARY                                   TABLE 5

APPENDICES:

SITE PLAN/WELL LOCATION MAP                           APPENDIX 1

GROUNDWATER CONTOUR MAP                               APPENDIX 2

WELL RECORD SEARCH                                    APPENDIX 3

WELL CONSTRUCTION LOGS                                APPENDIX 4

BORING LOGS                                           APPENDIX 5

WELL CERTIFICATIONS                                   APPENDIX 6

QA/QC METHODOLOGY                                     APPENDIX 7

HEALTH AND SAFETY PLAN                                APPENDIX 8

LABORATORY ANALYTICAL PACKAGES                        APPENDIX 9

LITGO 09735

LITGO-RCRA0017635

**Groundwater Sampling Report**                           **PAGE 1**
F-Sharp Screw
40 Haynes Street
Somerville, NJ
ECRA CASE #85647

## INTRODUCTION:

Environmental Waste Management Associates ("EWMA") was retained
by Sheldon S. Goldstein to install three groundwater monitoring
wells at Block 5112, Lot 1 Watson Street and Nimitz Street in
Bridgewater, New Jersey. These wells were installed to monitor the
subsurface condition as required in the Cleanup Plan approval letter
issued by the NJDEP on October 13, 1989.

## SCOPE OF REPORT:

This report details observations made, and the results of samples
taken upon the installation of three monitoring wells at the above-
referenced property on March 19, 1990 and March 21, 1990. Results
of groundwater monitoring are enclosed within this report. Wells
were surveyed in June 30, 1990 by Volosin Associates (NJ P. L. S.
License No. 34022 and P. P. License No. 4221).

LITGO 09736

# ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES

LITGO-RCRA0017636

**Groundwater Sampling Report**
F-Sharp Screw
40 Haynes Street
Somerville, NJ
ECRA CASE #85647

PAGE 8

## RESULTS:

Samples were obtained on April 13 & 16, 1990 from the newly installed monitoring wells and from four of the five existing well on the F-Sharp property. As was the case during previous rounds of sampling, MW-3 did not contain enough water for sampling. These well samples were analyzed for volatile organics ("VO + 15") plus a library search. The results are summarized in Table 1; the complete laboratory analytical package is contained within Appendix #7. Results of previous groundwater sampling are summarized in Tables 2 & 3.

## CONCLUSIONS AND RECOMMENDATIONS:

To date three monitoring wells have been installed in addition to the five wells at the site; monitoring wells were installed approximately 150 feet downgradient (southwest, south, southeast) of the southern property boundary. Although variation in water level measurements exist, prevailing groundwater flow direction is toward the southeast; groundwater flow is believed to be anisotropic due to highly fractured nature of the bedrock.

## ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES

LITGO 09743

LITGO-RCRA0017643

## Groundwater Sampling Report
F-Sharp Screw
40 Haynes Street
Somerville, NJ
ECRA CASE #85647

The well search performed previously indicates that there are no shallow bedrock water supply wells in the vicinity of the site or adjacent area.

One round of groundwater sampling has been performed. Volatile organic concentrations in the wells ranged from 7.7 to 888 ppb with only MW-1 exhibiting non detected concentrations; the major contaminant in the wells is trichloroethylene ("TCE"). MW-2, the upgradient well, has consistently exhibited elevated TCE concentrations (430 ppb, 290 ppb, and 155.8 ppb, respectively) over three rounds of sampling (Summary Table, Table 4). This coupled with the fact that there is no pattern to the concentrations or occurrence of TCE at the site indicates that the contamination is unrelated to a point source and is a result of regional TCE contamination. TCE has been widely used in the Somerville area and the area-wide problem with TCE has been documented by the Department.

Based on the Comparative Table of Analytical Results (Table 4), the total VOC for MW-2, MW-4 and MW-5 has been decreasing for the period between April 1989 to April, 1990.

Therefore, since no potential groundwater receptors were identified in the area of the site and the groundwater investigation indicates that the TCE contamination is an area-wide problem, EWMA proposes

## ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES

LITGO 09744

**Groundwater Sampling Report**
F-Sharp Screw
40 Haynes Street
Somerville, NJ
ECRA CASE #85647

no further action. Additionally, EWMA proposes to seal all wells at the site (in accordance with all Local, State and Federal regulations) and requests that formal closure of the case be granted by NJDEP/ECRA.

# ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES

LITGO 09745

# EXHIBIT O



*file Goldstein*

ENVIRONMENTAL WASTE
MANAGEMENT ASSOCIATES

**MIDATLANTIC
REGION:**
18 Business Park Dr.,
Skillman, NJ 08558
Phone: 609/683-7600
Fax: 609/683-4556

Certified Mail    P 340 913 554
Return Receipt Requested

**FILE COPY**

April 8, 1993

Ms. Georgette Bunch
New Jersey Department of Environmental Protection & Energy
Division of Responsible Party Site Remediation
CN 028
Trenton, New Jersey  08625-0028

> Re:    Remedial Investigation Report
>        F. Sharp Screw Machine Products, JANR Transports
>            and Morgan Chemicals
>        40 Haynes Street, Somerville, New Jersey
>        ECRA Cases #85647, 85648, and 85649

EWMA Project #88106

Dear Ms. Bunch:

Enclosed please find the original and two copies of the Remedial Investigation
Report for the above referenced site.  This report addresses those concerns
outlined in the Department's July 20, 1992 and September 25, 1992 letters.

Please contact me if you have any questions or comments regarding this report.  I
can be reached at our Princeton, New Jersey office (609-683-7600).

Sincerely,

*Elizabeth A. Davis*

Elizabeth A. Davis, Project Manager
Environmental Waste Management Associates, Inc.

**CORPORATE
HEADQUARTERS:**
Wayne, NJ
Phone: 201/633-7900
Fax: 201/633-7482

**WESTERN REGION:**
Englewood, CO
Phone: 303/843-9700
Fax: 303/843-9094

**LITGO 10081**

*Comprehensive Environmental Services*


RECYCLED

cc:    Richard S. Greenberg, Ph.D., President, EWMA
       David Zervas, Associate, EWMA
       Sheldon Goldstein, property owner

LITGO 10082

**Environmental Waste Management Associates, Inc.**                    **Page 2**

Remedial Investigation Report

F. Sharp Screw Machine Products, JANR Transports
and Morgan Chemicals
40 Haynes Street
Somerville, New Jersey

ECRA Cases #85647, 85648,
& 85649

April 8, 1993

Prepared By:
Environmental Waste Management Associates, Inc.
1 Wall Street
Research Park
Princeton, New Jersey  08540

LITGO 10083

LITGO-RCRA0018606

# Table of Contents

| | |
|---|---|
| Introduction | Page 1 |
| Remediation Summary | Page 1 |
| Areas of Concern | |
|   July 20, 1992 NJDEPE Letter | |
|     Area 12 (I.B:1-2) | Page 1 |
|     Item I.B:3 | Page 2 |
|     Item I.B:4-9 | Page 3 |
|     Item I.B:10 | Page 4 |
|     Item II:A | Page 6 |
|     Item II: B & D | Page 6 |
|     Item II:C | Page 7 |
|     Item II:E | Page 7 |
|     Item II:F | Page 7 |
|     Item II:G | Page 7 |
|   September 25, 1992 NJDEPE Letter | |
|     Area 4 | Page 8 |
|     Area 5 | Page 9 |
|     Area 6 | Page 12 |
|     Area 9 | Page 13 |
|     Area 10 | Page 14 |
|     Area 11 | Page 14 |
|     Area 13 | Page 15 |
|     Areas 1, 2, 3, 7, 8 and 12 | Page 17 |
| Summary of Recommendations | Page 17 |

# List of Tables

| | |
|---|---|
| Table 1 | Analytical Results Summary - Area 4 |
| Table 2 | Analytical Results Summary - Area 6 |
| Table 3 | Analytical Results Summary - Area 9 |
| Table 4 | Analytical Results Summary - Area 10 |
| Table 5 | Analytical Results Summary - Area 13 |

Remedial Investigation Report                                              Page 3
F Sharp Screw Machine Products, JANR Transport
    and Morgan Chemicals
40 Haynes Street, Somerville, New Jersey
ECRA Case #'s: 85647, 85648, & 84649

part of the site's storm water drainage system which was installed during original site
construction activities which date back to at least 1910. The 24" steel influent pipe
which entered this structure was not removed.

A review of historical Sanborn maps (which date back to 1910) has revealed the original
site property boundaries encompassed the adjacent property to the east of the current F-
Sharp Screw site property boundaries. Consequently, it is expected that the drainage
systems extends beyond the current site property boundary to other currently operating
facilities. This is further supported by EWMA's field records which note that water was
observed to be flowing through the storm water drainage pipes and out the 24" terra
cotta pipe which discharges into the off-site drainage ditch even at times of low flow
(non storm water events).

Consequently, these new findings support EWMA's contention that the mounding in
this area is caused by breaches in the integrity of the storm water drainage system
which runs through the site.

> ### Item I.B:4-9

Due to the presence of a site wide storm water drainage system which appears to have
been installed during original site construction activities which date back to at least
1910, EWMA believes the site is being impacted by an off-site source of TCE
contamination which migrated to the site via the drainage conduits and/or ground
water. Additionally, low levels of TCE were detected in sample #6 (collected by Fred C.
Hart Associates, Inc.) which was collected from the drainage ditch beneath the 24" terra
cotta pipe. This sample exhibited a TCE concentration of .14 ppm. The presence of TCE
in this sample location further supports EWMA's contention that the TCE has impacted
the ground water quality of the site via migration along the drainage conduits.

If mounding was not occurring in the vicinity of MW-4 and MW-5, the general site
ground water flow direction would be towards the southeast, thus placing MW-1, MW-
2, MW-6, and MW-7 as upgradient site wells. The only site structure which might have
impacted the water quality in these four wells is the small building near the James Street

**Environmental Waste Management Associates, Inc.**

**LITGO 10088**

Remedial Investigation Report                                        Page 4
F Sharp Screw Machine Products, JANR Transport
   and Morgan Chemicals
40 Haynes Street, Somerville, New Jersey
ECRA Case #'s:  85647, 85648, & 84649

site entrance.  Based upon a review of historic Sanborn maps, this structure is a
gatehouse, as evidenced on the 1948 Sanborn map.  Consequently, this area is not
suspected to have released TCE to the subsurface environment.

Additionally, a total of four ground water sampling events have been conducted at the
site to date.  TCE concentrations detected in these four monitoring wells indicate the
suspected off-site source of TCE contamination exists to the northwest of the subject
facility.  Furthermore, the decreasing TCE concentration trend observed in MW-2 (from
430 ppb to 124 ppb) and MW-4 (from 30 ppb to 15.8 ppb) and the increasing TCE
concentration trend observed in MW-5 (from 500 ppb to 1,190 ppb) indicates the
contamination is moving beneath the site.  During the time the increase in TCE
concentration in MW-5 was observed (from April 7, 1989 to April 13/16, 1990), the site
was vacant, thus eliminating an on-going site discharge source.

Finally, eighteen of the soil samples collected by Fred C. Hart Associates, Inc. during the
April 27, 1988 and May 2, 1988 sampling event were analyzed for volatile organics.  One
of these samples (#37) was collected from the 5.5' soil increment beneath the base of the
junction box (Area 12).  TCE was not detected in this sample.  If this junction box were
the source of the TCE contamination in MW-4 and MW-5, one would suspect the
surrounding soils to have also been impacted.

Consequently, no further monitoring wells should be required to further delineate on-
site ground water quality in the area of this junction box .  Alternately, EWMA is
currently investigating local and NJDEPE records for possible off-site, upgradient
sources of the TCE contamination. The results of this investigation will be forthcoming
under separate cover.

    Item I.B:10

A review of the historical ground water data generated at this site indicates priority
pollutant metals (PPM) analysis was performed on MW-1 - MW-5 by Fred C. Hart
Associates, Inc. on April 7, 1989 and May 9, 1989.  The results were as follows:

**Environmental Waste Management Associates, Inc.**

LITGO 10089

# EXHIBIT P





ENVIRONMENTAL WASTE
MANAGEMENT ASSOCIATES, INC.

**MIDATLANTIC REGION:**
1 Wall Street
Research Park
Princeton, NJ 08540

Phone: 609/683-7600
Fax: 609/683-1556

**Certified Mail**   P 864 830 583

**Return Receipt Requested**

June 22, 1994

Ms. Georgette Bunch
New Jersey Department of Environmental Protection & Energy
Division of Responsible Party Site Remediation/ISRA
CN 028
Trenton, New Jersey  08625-0028

      Re:   F. Sharp Screw Machine Products, JANR Transports
              and Morgan Chemicals
              40 Haynes Street, Somerville, New Jersey
              ISRA Cases #85647, 85648, and 85649

      EWMA Project #88106

Dear Ms. Bunch:

This letter outlines those actions which have recently been implemented at the above referenced site. Three general areas of Departmental concern are associated with the site; (1) on-site soils, (2) the off-site railroad tracks that are adjacent to the property (designated as Area 5), and (3) ground water in the vicinity of the site. This report particularly addresses on-site soils issues because of our effort to resolve these issues as a first priority. However, EWMA again will reiterate arguments which prohibit the performance of additional remedial activities in Area 5. Additionally, EWMA is preparing a ground water report based on the latest round of ground water monitoring data. This report will be submitted under separate cover upon completion.

**CORPORATE
HEADQUARTERS:**
Wayne, NJ
Phone: 201/633-7900
Fax: 201/633-7482

**WESTERN REGION:**
Englewood, CO
Phone: 303/843-9700
Fax: 303/843-9094

*Comprehensive Environmental Services*

RECYCLED

1.      The discharge pipes terminate on property owned by New Jersey Transit Rail Operations ("NJ Transit"). This property maintains operations associated with the active Raritan Valley Line of NJ Transit. Trains utilize these lines on a regular and frequent basis.

2.      Due to the close proximity of the railroad tracks and the slope which exists between the fence on the subject site and the NJ Transit property, insufficient area exists to facilitate remedial activities. Additionally, the area in question has been disturbed, and possibly impacted, by regrading and maintenance activities conducted by NJ Transit to keep the tracks in working order.

3.      As referenced in EWMA's March 14, 1990 "Sampling and Remediation Report" EWMA attempted to obtain off-site access from NJ Transit. NJ Transit approved our request for access with specific contingencies in a letter dated January 29, 1990. In order to complete the requested remedial action in this area, EWMA would violate sections 9.a, 9.b, and 9.f of the access agreement. Consequently, access to this area for future remedial actions will not be granted by NJ Transit.

4.      Analytical data obtained from the soils beneath the discharge pipes (EWMA's March 14, 1990 report) as well as upgradient and downgradient soil samples (EWMA's September 10, 1991 report) reveal elevated metals. A review of the analytical data reveals soil contamination in both the upgradient and downgradient samples. Analytical data submitted in EWMA's September 10, 1991 report reveals elevated levels of arsenic, copper and lead in the upgradient sample and elevated levels of copper, lead and zinc in the downgradient sample. This analytical data shows that contamination is present upgradient of the discharge locations suggesting an upgradient source of contamination.

Since elevated metal concentrations are being found along the entire ditch which borders the railroad tracks (upgradient and downgradient), EWMA believes at a minimum, railroad operations are a major contributor to the contamination being found in this area in addition to an unidentified upgradient source. Remediation of soils in this area is unwarranted as railroad

**Environmental Waste Management Associates, Inc.**                    **Page 5**

# EXHIBIT Q

# REMEDIAL INVESTIGATION WORKPLAN
# FOR THE EASTERN GROUNDWATER PLUME
# FORMER F SHARP SCREW FACILITY
# SOMERVILLE, NEW JERSEY
# ISRA CASE Nos. E85647, E85648, E85649

*Prepared For:*

*Litgo of New Jersey, Inc.*
*Two Executive Boulevard*
*Suffern, New York 10901*

*Prepared By:*

*JM Sorge, Inc.*
*50 County Line Road*
*Somerville, New Jersey 08876*

JMS Project # 2000.100

**November 14, 2002**

LITGO-RCRA0004678

anomolously high water levels and poor condition of this former well.

The abandonment of monitoring well MW-4 and installation of replacement monitoring well MW-4R has confirmed that the elevated water levels historically observed in MW-4 were due to the lack of a grout seal. Since the installation of the replacement well the general water level elevation has dropped from approximately 70 feet above sea level to 40 feet. The abandonment and installation activities are discussed in detail in the Section 6.0 of the Remedial Investigation Report - Western and Central Groundwater, dated July 13, 2001.

Based on the Bound Brook, NJ USGS Topographic Quadrangle map, regional groundwater is expected to follow the local topographic gradient which is generally southeast toward the Raritan River. Groundwater flow is variable across the Site. On the western portion of the Site groundwater flow appears to be generally to the southwest while flow on the eastern portion of the Site is to the southeast. The Site is located on a local topographic high and may be located on a groundwater divide. An small, unnamed stream is located approximately 1000 feet to the southeast of the Site and Peters Brook is located approximately 1,800 feet to the west. Both streams flow southward and discharge to the Raritan River.

### 2.3.3 Soils

The soils encountered in this area consist of low permeability silts and silty clays overlying shallow weathered shale, formed from material weathered from shale, siltstone, and fine-grained sandstone. Shale bedrock is at a depth of approximately 4 to 6 feet, as described in the 1976 US Department of Agriculture Soil Survey of Somerset County, New Jersey.

### 2.4 Areas of Concern

Two (2) Areas of Concern (AOCs) remain at the Site. There have been many AOCs at the Site historically, however, through investigation and remediation the only remaining issues are related to groundwater. At this point in the investigation there are no more soil issues remaining at the Site as confirmed by the Department's September 4, 2001 correspondence. The following presents a brief description of the two areas:

1.  The Western Groundwater Plume comprises the western portion of the site and probably extends to upgradient areas to the west. The source of the western plume is believed to be the current Truckform Property. According to historic Sanborn fire insurance maps the Truckform Property was operated as the machine shop for the former Somerville Iron Works. Concentrations of chlorinated volatile organic compounds (TCE and cis 1,2-DCE) have been detected in this area since the initial monitoring wells were installed in 1989. While the downgradient extent of the plume has been largely determined by the installation of monitoring wells in the central portion of the site, the upgradient extent of the plume has not been determined.

2.  The Eastern Groundwater Plume is located in the southeastern portion of the former F

LITGO-RCRA0004684