IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| W. R. GRACE & CO., *et al.*, | ) | Case No. 01-01139 (JKF) (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: September 15, 2008 |
| Debtors. | ) | Pittsburgh, PA |
| | ) | Relates to Docket Nos. 19072 and 18922 |
| | ) | |

**DECLARATION OF EDWIN N. ORDWAY, JR. IN SUPPORT OF THE RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999**

**EDWIN N. ORDWAY, JR.** states the following under penalties of perjury:

1. I am an Executive Director and the Managing Member of Capstone Advisory Group, LLC ("Capstone"), the financial advisor to the Official Committee of Unsecured Creditors (the "Creditors' Committee"). A copy of my curriculum vitae is attached as Exhibit 1 to this Declaration.

2. I make this Declaration in support of the Creditors' Committee's Response to Debtors' Objection to the Unsecured Claims Asserted Under The Debtors' Pre-Petition Credit Agreements, filed with the Court on or about July 11, 2008 [Docket No. 19072]. The information set forth in this Declaration is based upon my review and analysis of factual data accumulated as part of Capstone's ongoing services to the Creditors' Committee.

1

**The 2% Default Rate in the Pre-Petition Credit Agreements is Industry Standard**

3. The contractual interest rate under the Debtors' Pre-Petition Credit Agreements is, in sum, the ABR plus a 2% default rate. "ABR" refers to the Alternate Base Rate as defined in the Debtors' Pre-Petition Credit Agreements. The ABR, as applicable, is the U.S. Prime Rate adjusted from time to time, which, during the period of these bankruptcy cases, ranged from a low of 4.00% on June 27, 2003 to 8.25% on June 29, 2006 and was 5.9% on a weighted average basis during these bankruptcy cases. Consequently, the amounts sought by the Lenders under the Pre-Petition Credit Agreements are as low as 6% during some portion of these cases and as low as 8% on a weighted average basis throughout these cases.

4. In their objection to the bank debt holders' claims, the Debtors assert that the 2% default rate contained in the Debtors' Pre-Petition Credit Agreements[1] is "far from de minimus." To the contrary, the 2% default rate is industry standard. Capstone reviewed 55 credit agreements related to syndicated loan transactions executed between January 1, 1998 and December 31, 1999. Of the credit agreements we reviewed, the deal sizes of which were between $300 million and $700 million, **all** such credit agreements provided for a default interest rate of 2% or more. I believe that the agreements we reviewed are typical of credit agreements entered into during that time period. Attached as Exhibit 2 is a list of the syndicated loan transactions reviewed by Capstone in this regard as well as the search criteria used to generate this list.

**The Debtors' Market Capitalization has increased 1900% since the Petition Date**

5. From the Petition Date of April 2, 2001 to August 13, 2008, the Debtors' Market Capitalization[2] has grown by a multiple of almost 19 times, as illustrated in the chart below:

|  | Share Price[3] | Shares Outstanding[4] | Market Capitalization[2,5] |
|---|---|---|---|
| Petition Date | $ 1.52 | 65.3 | $ 99.3 |
| ↓ | ↓ |  | ↓ |
| August 13, 2008 | $ 26.56 | 72.1 | $ 1,915.0 |
| *% Increase in Value since Petition Date* | *1747%* |  | *1929%* |

---

[1] I refer in this Declaration to the holders of bank debt under the Debtors' Pre-Petition Credit Agreements as the "Lenders."
[2] "Market Capitalization" is defined as a company's outstanding shares multiplied by the closing share price as of the date of reference.
[3] Closing share price as of April 1, 2001 and August 13, 2008, respectively.
[4] Shares outstanding, in millions, as of March 31, 2001 and July 31, 2008, respectively. Shares outstanding is according to the Debtors' most recent publicly filed quarterly report.
[5] In millions of dollars.

2

Share price alone, excluding the impact of incremental shares issued since the Petition Date, has increased by over **1700%,** as shown above. Although share price is not necessarily directly correlated to company performance, such substantial growth is a clear indication that the public markets recognize the Debtors' strong ongoing earnings (and, therefore, value) generation notwithstanding the yoke of bankruptcy.

### The Debtors' Revenues and Earnings have improved Dramatically since the Petition Date

6. The Debtors' business performance also improved dramatically during this period. We compared Revenues and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") for the fiscal year 2000 to the Debtors' actual performance for the fiscal year 2007. EBITDA is a widely used measure of a company's profitability before considering cost of debt and taxes as well as non-cash costs such as depreciation and amortization. The increase in both Revenues and EBITDA indicate growth of 95% and 44.9%, respectively, suggesting a Compound Annual Growth Rate ("CAGR") of 10% and 5.4%, respectively. The following chart illustrates these and other points more clearly:

| (Dollars in millions) | FY 2007 | FY 2000 (a) | Increase ($) | Increase (%) | 7-Year CAGR |
|---|---|---|---|---|---|
| Revenues | $ 3,115.2 | $ 1,597.5 | $ 1,517.7 | 95.0% | 10.0% |
| EBITDA | $ 398.0 | $ 274.7 | $ 123.3 | 44.9% | 5.4% |
| Year-end Cash Balances | $ 536.3 | $ 191.9 | | | 15.8% |
| (a) Last full year before the Petition Date of April 2, 2001. | | | | | |

Again, the Debtors have been able to create significant enterprise value, bankruptcy notwithstanding and despite the difficult economic headwinds of the past 18 months. The value created by the Debtors during these bankruptcy cases was made possible, in some part, by the creditors' support of the Debtors' use of such cash to fund numerous strategic acquisitions and otherwise reinvest in their businesses. The total amount of cash used by the Debtors since the Petition Date related to acquisitions and capital expenditures is nearly $1 billion.

**Equity Value increased by over 1700% since the Petition Date, far exceeding the increase in Bank Debt Value**

7. The equity holders of the Debtors have benefitted substantially as compared to the Lenders, in part from the use of the Lenders' cash. Capstone also compared the growth of $1 worth of equity from the Petition Date to August 13, 2008 to the growth in $1 worth of the bank debt under the Debtors' Pre-Petition Credit Agreements, assuming the accrual of interest at ABR plus 2% default interest through December 31, 2008, as follows:

|  | Equity Value | Debt Value |
|---|---|---|
| As of Petition Date, April 2, 2001 | $ 1.00 | $ 1.00 |
| ↓ | ↓ | ↓ |
| As of August 13, 2009 | $ 17.47 | $ 1.83 |
| *% Increase in Value since Petition Date* | *1747%* | *183%* |

As the chart indicates, although the value of $1 of equity has grown over *seventeen-fold*, the value of the Lenders' claims, assuming the accrual of interest at ABR plus the 2% default rate, has grown less than *two* times through December 31, 2008.

**The Amount Of Default Interest due the Lenders is De Minimus in comparison to the Debtors' Value Under Various Metrics**

8. The default interest at issue is a relatively small amount in the context of these cases. Compared below is the total interest to be accrued through December 31, 2008 under both the amount proposed to be paid by the Debtors under the plan settlement Term Sheet publicly disclosed on or about April 7, 2008 (the "Proposed Plan") and that calculated using ABR plus a 2% default rate:

|  | Interest Amount |
|---|---|
| Interest per the Proposed Plan through December 31, 2008 | $ 323.4 |
| Interest calculated at ABR plus a 2% default rate through December 31, 2008 | $ 414.2 |
| **Amount of Interest at Issue** | $ (90.8) |

The differential between the amount of interest sought by the Lenders and that offered under the Proposed Plan is approximately $91 million through December 31, 2008. Given the amount of

4

value generated over the more than seven years the Debtors have been in bankruptcy and the resulting benefit now available to all stakeholders of the Debtors, the incremental amount being sought by the Lenders is de minimus.

9. To further illustrate the comparative significance of the value generated by the Debtors versus the value being sought by the Lenders (*i.e.*, post-petition interest accrued using ABR plus the 2% default rate), we compared a number of metrics specific to the Debtors to the incremental $91 million of interest:

|  | Cumulative Revenue[6] | Cumulative EBITDA[6] | Total Equity Value | Value per Share[7] |
|---|---|---|---|---|
| *($ in millions)* | $ 15,905.0 | $ 2,110.0 | $ 1,915.0 | 72.1 |
| $91 million of Interest at issue is % of: | 0.6% | 4.3% | 4.7% | $ 1.26 |

10. As illustrated above, the incremental $91 million of value represents a small percentage of all of the above metrics of the Debtors' performance. In particular, the value each shareholder would need to provide to the Lenders to ensure payment of post-petition interest at ABR plus the 2% default rate is an immaterial $1.26 per share (*i.e.*, approximately 5% of shareholder value).

11. Thus, the approximately $91 million at issue necessary to provide the Lenders with post-petition interest at the contractual ABR plus 2% default rate under the Pre-Petition Credit Agreements is but a minimal fraction of the Debtors' significantly increased value – a value, based on market capitalization, that has increased approximately **19 times** during the almost seven years of these bankruptcy cases.

Executed on August 14, 2008, at Saddle Brook, New Jersey.

Edwin N. Ordway, Jr.

---

[6] Cumulative Revenue and EBITDA include the 2nd, 3rd and 4th quarters of 2001 and annual amounts from 2002 through 2007.
[7] The amount of $1.26 per share is calculated by dividing the $90.8 million sought by the Lenders by the total number of shares outstanding.

5

...