IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**DECLARATION OF ROBERT M. TAROLA IN SUPPORT OF DEBTORS'
OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS'
CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999**

        I, Robert M. Tarola, hereby declare that the following is true to the best of my knowledge, information and belief:

        1.     I am the Senior Vice President – Corporate Strategy and former Chief Financial Officer (CFO) of W. R. Grace & Co. ("Grace"), which has its headquarters at 7500 Grace Drive, Columbia, Maryland 21044. I was CFO from May 1999 through March 2008. I am fully familiar with the facts set forth in this declaration (the "Declaration"), which I submit in support

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

of the Debtors' Objection To The Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999.

2. On November 13, 2004, Debtors filed their Plan of Reorganization (the "Plan"). Section 3.1.9 of the Plan provided that the holders of general unsecured claims would receive post-petition interest equal to the interest they would have received in a non-default situation. The Plan also provided that the equity holders would retain majority ownership in the reorganized Debtors. Shortly after the filing of that Plan, the Grace management team – specifically, myself, Paul Norris (Chairman and Chief Executive Officer ("CEO")) and David Siegel (Senior Vice President and Chief Legal Officer ("CLO")) – began negotiating with representatives for the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Official Committee of Equity Holders (the "Equity Committee") in an effort to enlist the Committees' support for the Debtors' Plan. It was important to us that the Debtors' Plan have the full support of both the general unsecured creditors and the equity holders, so as to focus the legal efforts on unresolved matters related to asbestos contingencies.

3. The point person for the Creditors' Committee during these negotiations was Mr. Thomas Maher of J.P. Morgan Chase & Co., Chairperson of the Creditors' Committee. Mr. Maher indicated that the Creditors' Committee would agree to be a proponent of the Debtors' Plan if the Debtors would agree to pay post-petition interest to the holders of the Debtors' two pre-petition bank credit facilities (the "Debt Holders"), and to other unsecured creditors, at rates acceptable to the Creditors' Committee. In response to that demand, we agreed to amend the Debtors' Plan to reflect revised interest rates on: (1) the Credit Agreement dated as of May 14, 1998, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party

Thereto, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Arranger; (2) the 364-Day Credit Agreement, dated as of May 9, 1999, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, Bank of America National Trust and Savings Association, as Documentation Agent, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Book Manager (collectively, the "Credit Agreements"); and (3) on all other general unsecured claims, as reflected in the Debtors' Amended Plan of Reorganization dated January 13, 2005 (the "Joint Plan"). It is my understanding that Mr. Maher was in discussions with certain of the Debt Holders during the time the agreement to amended interest rate terms was finalized.

4.  Under the Joint Plan, the Debt Holders under the Credit Agreements would receive post-petition interest at the rate of 6.09% per annum, compounded quarterly, and other unsecured creditors would receive a non-default contract rate or the Federal Judgment Rate of 4.19%, compounded annually. Significantly, at the time Mr. Maher agreed on the rates of post-petition interest under the Joint Plan it was expressly contemplated, as set forth in both the original Plan and the Joint Plan, that equity holders would retain a level of economic value in the reorganized Debtors as estimated by The Blackstone Group and disclosed in each of the Debtors' plans. This was a key factor in obtaining the support of the Equity Committee for the Joint Plan. Neither Mr. Maher nor any other representative from the Creditors' Committee ever suggested that the agreed-upon rates of post-petition interest would change if it turned out that the value of equity retained by current shareholders would be different from that estimated in the Joint Plan.

5. The agreement between the Debtors' and the Creditors' Committee concerning post-petition interest was memorialized in a letter dated January 12, 2005 (the "January 12, 2005 Letter Agreement") and in the Joint Plan. It was always my understanding that in entering into the January 12, 2005 Letter Agreement and becoming co-proponents of the Joint Plan, the Creditors' Committee was acting as a fiduciary on behalf of all unsecured creditors, including the Debt Holders, and that its actions could be relied upon for purposes of financial reporting to the Bankruptcy Court and to shareholders through the Securities and Exchange Commission.

6. Toward the end of 2005, which was the time under the January 12, 2005 Letter Agreement that the Creditors' Committee had the right to withdraw its support of the Joint Plan, Mr. Maher indicated that if the Debtors wanted the Committee's continued support for the Joint Plan, there would have to be an adjustment to the agreed-upon rate of post-petition interest under the Credit Agreements. He indicated no need to change the post-petition rates of interest for other unsecured claims. This led to another round of negotiations over roughly three-months time between the Creditors' Committee and the Grace management team (which now included myself as CFO, Fred Festa as CEO and Mark Shelnitz as CLO), although I held most of the direct discussions with Mr. Maher.

7. In February 2006, the Debtors and the Creditors' Committee agreed that, in exchange for the Creditors' Committee continued support of the Joint Plan, the Debtors would pay the Debt Holders post-petition interest at the rate in the Joint Plan through December 31, 2005 and, beginning January 1, 2006, at a floating adjusted interest rate tied to the "prime" rate of interest (the "floating Adjusted Base Rate"). This agreement was memorialized in a letter dated February 27, 2006 (the "February 27, 2006 Letter Agreement"). Based on my discussions

4

with Mr. Maher, it was my belief that the terms of the February 27, 2006 Letter Agreement had been discussed with certain Debt Holders and had the full support of the Creditor's Committee.

8. It was not until after Grace entered into the Asbestos Personal Injury Settlement in April 2008 that I learned that certain of the Debt Holders under the Credit Agreements were not supportive of the Joint Plan or the February 27, 2006 Letter Agreement.

9. The Debtors relied on the Joint Plan and the February 27, 2006 Letter Agreement for accounting purposes and for purposes of negotiating the agreement in principle to settle asbestos personal injury claims. I was personally involved in those negotiations. All of the Debtors' financials statements, settlement scenarios, valuation models and other information prepared from January 2005 through March 2008, both actual and projected, were based on the post-petition interest rates agreed to in the Joint Plan and the February 27, 2006 Letter Agreement.

10. The Debtors also relied upon the post-petition interest rates in the Joint Plan and February 27, 2006 Letter Agreement in all communications with the Creditors' Committee and its financial advisors, and all other official committees and representatives in Grace's bankruptcy proceedings. For example, within approximately 30 days following every calendar quarter since mid-2001, I hosted a call with the financial advisors of all official committees and the asbestos futures representative. The purpose of these calls was to update the financial advisors of the official committees about the financial condition of the Debtors. During those calls that took place after the February 27, 2006 Letter Agreement, I would almost always mention that the Debtors' financials were based upon the assumption that post-petition interest would be paid at rates reflected in the Joint Plan and February 27, 2006 Letter Agreement. The exact written

statement was: "Interest expense reflects the terms of the Plan, as amended, adjusted for floating prime on bank debt." Neither the Creditors' Committee's financial advisors nor any of the other financial advisors ever challenged or objected to the Debtor's use of this post-petition interest formula.

11. In addition to these quarterly conference calls, the Grace management team also attended annual conferences with representatives of the Creditors' Committee, its financial advisors and lawyers from Stroock & Stroock & Lavan LLP. The purpose of these meetings was to report on the Debtors' financial performance and expectations, and various bankruptcy court proceedings. During these meetings, the Grace management team used the post-petition interest rates from the Joint Plan and the February 27, 2006 Letter Agreement in compiling the Debtors' financial information. Again, none of the participants in these annual conferences ever challenged or objected to the Debtor's use of these post-petition interest rates.

12. Furthermore, on several of occasions between January 2005 and march 2008 I had discussed Grace's financial statements, business performance and bankruptcy proceedings with certain shareholders who were also Debt Holders. On no occasion did any such discussions give me the indication that the interest rates reflected in the Joint Plan and February 27, 2006 Letter Agreement were going to be the subject of a dispute.

13. To the best of my knowledge, the Creditors' Committee has never terminated the February 27, 2006 Letter Agreement or its co-proponency of the Debtors' Joint Plan.

14. The information contained in this Declaration is true and correct to the best of my knowledge and belief.

August 14, 2008

*Robert M. Tarola*
Robert M. Tarola
Senior Vice President
W. R. Grace & Co.

Subscribed and sworn to before me
this 14th day of August 2008

*Diane E. Armstrong*
NOTARY PUBLIC, State of MARYLAND
My Commission Expires: September 18, 2012

DIANE Z. ARMSTRONG
Notary Public, State of Maryland
County of Howard
My Commission Expires September 18, 2012