IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**AFFIDAVIT OF PAMELA D. ZILLY IN SUPPORT OF DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999**

I, Pamela D. Zilly, hereby swear that the following is true to the best of my knowledge, information and belief:

1. I am a Senior Managing Director in the Restructuring and Reorganization Advisory Group of The Blackstone Group, L.P. ("Blackstone"), an investment bank founded in 1985 and located at 345 Park Avenue, New York, New York. I am fully familiar with the facts set forth in this affidavit (the "Affidavit"), which I submit in support of the Debtors' Objection

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

To The Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 (the "Debtors' Objection").

2.      Blackstone is recognized for its expertise in providing financial advisory services in financially distressed situations and has served as financial advisor to debtors, creditors and other constituents in numerous chapter 11 proceedings and out-of-court restructurings. I personally have worked on many chapter 11 restructurings, advising both debtors and creditors in various cases and have vast experience working for companies in distressed situations. Selected current and previous advisory assignments include The Babcock & Wilcox Company, Combustion Engineering, Inc., ABB Lummus Global, Inc., Crane Co., Dow Corning Corporation, Safety-Kleen Corporation, APS Holding Corporation, America West Airlines, Inc., Best Products, The Caldor Corporation, Harvard Industries, Lone Star Industries, The Kendall Company, Inc., Phar-Mor, Inc., Spreckels Industries and Walter Industries.

3.      This Affidavit addresses the proposition advanced by both the Creditor's Committee and the Lenders that the Debtors' equity value, as reflected by Grace's stock price, somehow demonstrates that the Debtors are solvent.[2]  As discussed below, I strongly disagree with this proposition. The Debtors' market value is based on imperfect information and,

---

[2]  For purposes of this Affidavit, the term Creditor's Committee refers to the Official Committee of General Unsecured Creditors, and the term "Lenders" refers to the bank lenders under the Debtors' two pre-petition credit facilities: (1) the Credit Agreement dated as of May 14, 1998, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Arranger; (2) the 364-Day Credit Agreement, dated as of May 5, 1999, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, Bank of America National Trust and Savings Association, as Documentation Agent, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Book Manager.

accordingly, is a speculative view as to the outcome of the Debtors' unresolved asbestos liabilities. It is not a proxy of solvency.

4. In responding to the Debtors' Objection, both the Creditor's Committee and the Lenders take the position that the Debtors necessarily must be solvent because, given the trading prices of Grace's stock, the Debtors have a market value between $1.6 billion and $2 billion. (*See* Creditor's Committee Response at 2, 3, and 11 & n.9; Lenders' Response at 5) But the Debtors' market value does not equate to solvency. Solvency, by definition, is measured as the value of a company's assets in excess of the value of its liabilities. Here, it is impossible to measure the Debtors' liabilities because the most significant component of those liabilities, asbestos claims, has been disputed. The estimation proceeding, which was designed specifically to estimate the Debtors' potential asbestos liabilities, was not completed, meaning that the Debtors' liabilities are still unknown. Without a determination of the potential asbestos liabilities, there is no way to know if the value of the Debtors' assets exceeds the value of their liabilities and, therefore, if the Debtors are solvent.

5. The Owens Corning bankruptcy demonstrates that a company's market value is not a measure of solvency. In October 2000, Owens Corning filed for chapter 11 bankruptcy protection due primarily to material unresolved asbestos claims. Its joint plan of reorganization, filed on March 28, 2003, specified a total asbestos liability of $10.7 billion (on a net present value basis) and provided no recovery to existing common equity. In the ensuing years, while still in bankruptcy, Owens Corning's market value reached levels above $300 million. According to the Creditors' Committee and the Lenders, this market value would indicate that Owens Corning was solvent during its bankruptcy. But when Owens Corning emerged from

chapter 11 on October 31, 2006, after its liabilities had been settled, the company's existing equity holders received only out of the money warrants. Clearly, Owens Corning's market value was not a proxy for solvency, and the same holds true for the Debtors in this case.

6. The recent Calpine bankruptcy, one of the largest bankruptcies in U.S. history, also supports the lack of correlation between solvency and market value. In the year prior to emergence from bankruptcy, Calpine's market value reached approximately $1.9 billion. However, upon emergence from bankruptcy on January 31, 2008, Calpine cancelled existing equity interests, pursuant to the confirmed plan of reorganization, and issued existing common equity holders only warrants. This further demonstrates the speculative nature of market value in relation to solvency, particularly in a bankruptcy context.

7. Rather than demonstrating solvency, the Debtors' equity value, in the form of Grace's market value on the New York Stock Exchange, reflects speculative market views regarding the resolution of the Debtors' potential asbestos (and other) liabilities. This point is demonstrated at the times Grace's share price significantly deviates from the trend of market performance of other liquid chemical company stocks. I have compared Grace's relative stock price performance to a basket of chemical company stocks representing the chemical sector (the "Chemicals Index") as set forth in Exhibit A. Not surprisingly, there are instances where Grace's stock performance clearly deviates from the trend of the Chemicals Index, and these deviations are explainable by developments in the bankruptcy case that lead to speculative market views about the outcome of the Debtors' potential asbestos liabilities.

8. Grace's share price during the bankruptcy has been significantly more volatile than the Chemicals Index as a result of these changing market views about the ultimate asbestos

liability. In the second half of 2004, for instance, as the Debtors engaged in negotiations with representatives of asbestos claimants while developing a plan of reorganization capping the overall asbestos liability at $1.7 billion, Grace's stock increased from $6.04 per share on July 1, 2004 to $14.00 per share on November 15, 2004, the trading day following the filing of the Debtors' Joint Plan of Reorganization. This represents a 132% increase in Grace's market value, equating to approximately $530 million of value, while the Chemicals Index rose only 20% during that same time. As another example, shortly after July 24, 2006, when public reports that mediation had failed and that the Debtors had decided to cease discussions with the asbestos claimants, Grace's stock fell to new lows for 2006. Specific bankruptcy court events also led to changes in Grace's market value, further reinforcing that speculative market views of liability drove the share price. On March 15, 2006 and September 11, 2006, the Bankruptcy Court extended the Debtors' exclusivity period for filing a plan of reorganization. In both instances, the share price rose to higher levels in the ensuing weeks. Grace's stock continued to rise in late 2006 as the Bankruptcy Court heard the Debtors' Motions to Compel Response for the Personal Injury Questionnaires, established dates for the estimation proceedings and ordered mediation. After the Bankruptcy Court terminated the Debtors' exclusivity period on July 26, 2007, the stock price dropped approximately 12% as measured by the closing price on July 25, 2007 against the closing price on July 27, 2007.

9. Throughout the bankruptcy, the Debtors' asbestos liabilities have been disputed, meaning that Grace's market value could not be a measure of solvency. Instead, Grace's market value reflected speculative estimates made by market participants with imperfect publicly available information as to the outcome of the Debtors' potential asbestos liabilities.

10. The information contained in this Affidavit is true and correct to the best of my knowledge and belief.

August 14, 2008

_Pamela D. Zilly_
Pamela D. Zilly
Senior Managing Director

Subscribed and sworn to before me
this 14th day of August 2008

_Erin L. Arnold_
NOTARY PUBLIC, State of New York
My Commission Expires: 11/13/11

ERIN L ARNOLD
NOTARY PUBLIC-STATE OF NEW YORK
No. 01AR6177287
Qualified in Kings County
My Commission Expires November 13, 2011

7