# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

IN RE:                    Chapter 11

                          Case No. 01-01139(JFK)

W.R. GRACE & CO., ET AL.,

                          Debtors.

------------------------------------------------x


DEPOSITION OF FRANCO SEIF

New York, New York

Monday, March 26, 2007


Reported by:
AYDIL M. TORRES
JOB NO. 1-524

Page 2

```
1
2
3                   March 26, 2007
4                   11:15 a.m.
5
6          Deposition of FRANCO SEIF,
7     held at the offices of Hahn &
8     Hessen, LLP, 488 Madison Avenue,
9     New York, New York, pursuant to
10    Notice, before AYDIL M. TORRES, a
11    Notary Public of the State of
12    New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2            STIPULATIONS
3
4         IT IS HEREBY STIPULATED AND AGREED
5     by and between the attorneys for the
6     respective parties herein, that filing,
7     sealing and certification be and the
8     same are hereby waived.
9
10        IT IS FURTHER STIPULATED AND AGREED
11    that all objections, except as to the
12    form of the question shall be reserved
13    to the time of the trial.
14
15        IT IS FURTHER STIPULATED AND AGREED
16    that the within deposition may be signed
17    and sworn to before any officer
18    authorized to administer an oath, with
19    the same force and effect as if signed
20    and sworn to before the Court and that a
21    copy of this examination shall be
22    furnished without charge to the attorney
23    representing the witness testifying
24    herein.
25
```

Page 3

```
1
2     A P P E A R A N C E S:
3
4     HAHN & HESSEN, LLP
5     Attorneys for Franco Seif
6        488 Madison Avenue
7        New York, New York 10022
8     BY: STEVEN J. MANDELSBERG, ESQ.
9
10
11
12    REED SMITH, LLP
13    Attorneys for Debtor
14       435 Sixth Avenue
15       Pittsburgh, PA 15219
16    BY: TRACI S. REA, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 5

```
1
2     F R A N C O   S E I F,
3         called as a witness, having been
4         duly sworn by a Notary Public, was
5         examined and testified as follows:
6     EXAMINATION BY
7     MS. REA:
8         Q.  Good morning, Mr. Seif.  My name is
9     Traci Rea and I represent the debtors in this
10    bankruptcy proceeding.
11         Can you please state your full name
12    for the record?
13         A.  First name Franco.  F-R-A-N-C-O.
14    Last name is Seif.  "S" as in Sam, E-I-F as
15    in Frank.
16         Q.  Mr. Seif, have you been deposed
17    before?
18         A.  Yes.
19         Q.  On approximately how many
20    occasions?
21         A.  Probably over twenty times.
22         Q.  In connection with what types of
23    proceedings?
24         A.  Lawsuits, defendant, plaintiffs.
25    These types of proceedings.  I'm not sure
```

Page 6

1          Franco Seif
2    exactly what kind of --
3        Q.  What types of claims were at issue
4    in those lawsuits?
5          Do you recall?
6        A.  A couple of them were related to
7    asbestos.  Some of them were related to mold.
8        Q.  So you're fairly familiar with the
9    deposition process.  We have a court reporter
10   here who is going to be taking down
11   everything that we say.
12         So I would ask that you respond
13   verbally and that you keep your voice up so
14   that she can hear everything?
15         Also, I would ask that you wait
16   until I finish a question before you answer,
17   and I will try to do the same thing so the
18   record is nice and clear.  If you have any
19   questions about one of my questions, please
20   let me know and I'm happy to clarify it.
21         If you need to take a break at any
22   time, we're happy to do that as long as there
23   is not a question pending.
24         Okay?
25       A.  Yes.

Page 7

1          Franco Seif
2          (A Notice of Deposition was
3          marked as Exhibit 1, for
4          identification, as of this
5          date.)
6        Q.  I want to give you what has been
7    marked as Exhibit 1 (handing).
8          Have you seen that document before?
9        A.  (Witness examines Exhibit 1.)
10   No.
11       Q.  Mr. Seif, this is a Notice of
12   Deposition for your deposition here today,
13   and as you can see from this Notice it asks
14   that you bring with you the documents that
15   are attached as Exhibit A.
16         Did you bring any documents with
17   you today?
18       A.  Yes.
19       Q.  What documents did you bring?
20       A.  I brought the documents related to
21   this claim.
22       Q.  Did you bring a copy of a current
23   CV?
24       A.  Yes.
25       Q.  Okay.

Page 8

1          Franco Seif
2          MS. REA:  Do you have that,
3    Steve, that I can look at or...
4          MR. MANDELSBERG:  I believe
5    the CV and other documents you're
6    referring to are in the report of
7    Mr. Seif and his firm, dated
8    January 11, 2007 that have already
9    been produced.
10       Q.  The CV that you brought today is no
11   different than the one that was attached to
12   your report?
13       A.  It shouldn't be.
14       Q.  Okay.
15         Did you bring copies of the
16   material that you considered or relied upon
17   in drafting your expert report?
18       A.  Yes.
19         MS. REA:  Do we have copies
20   of those, Steven?
21         MR. MANDELSBERG:  I believe
22   the material is incorporated in the
23   expert report.  You can certainly
24   ask Mr. Seif those questions.
25       Q.  Mr. Seif, did you bring any

Page 9

1          Franco Seif
2    documents in addition to your expert report
3    with you today?
4        A.  Yes.
5        Q.  Could you tell me where those
6    documents are?
7        A.  In this office.  Here in this room.
8          MS. REA:  We can go off the
9    record for just a minute.
10         (Whereupon, a discussion was
11   held off the record.)
12         MR. MANDELSBERG:  In
13   response to the request for
14   documents in connection with the
15   Deposition Notice, which I think
16   was served on counsel for the State
17   of California, not on Mr. Seif
18   personally, Mr. Seif has brought
19   with him documents related to his
20   expert report, which may also
21   include documents that are in the
22   expert report, and it consists of
23   several folders relating to the
24   buildings identified in the expert
25   report, an invoice for professional

Page 10

Franco Seif

1  services, and a copy of the
2  hazardous materials survey that I
3  believe is identified in his report
4  as among the items he's reviewed or
5  relied upon.
6      MS. REA:  Thank you very
7  much.
8      MR. MANDELSBERG:  The record
9  should reflect that the documents I
10  just generally described have been
11  handed over to counsel for the
12  debtors.
13     MS. REA:  And I would just
14  like to mark this as a collective
15  exhibit, if that's okay, so we can
16  get a copy and have this on the
17  record as to what has been
18  produced.
19     Are there any objections to
20  that?
21     MR. MANDELSBERG:  No, I
22  don't believe -- the only caveat I
23  have is I -- we will do that, and
24  go through it.  I don't believe

(lines 1–25 renumbered below)

Page 10

1      Franco Seif
2  services, and a copy of the
3  hazardous materials survey that I
4  believe is identified in his report
5  as among the items he's reviewed or
6  relied upon.
7      MS. REA:  Thank you very
8  much.
9      MR. MANDELSBERG:  The record
10  should reflect that the documents I
11  just generally described have been
12  handed over to counsel for the
13  debtors.
14     MS. REA:  And I would just
15  like to mark this as a collective
16  exhibit, if that's okay, so we can
17  get a copy and have this on the
18  record as to what has been
19  produced.
20     Are there any objections to
21  that?
22     MR. MANDELSBERG:  No, I
23  don't believe -- the only caveat I
24  have is I -- we will do that, and
25  go through it.  I don't believe

Page 11

1      Franco Seif
2  that I have anything in here that
3  is attorney work product or
4  attorney/client privileged.  If it
5  is, it will be separated out and
6  identified in a log, but I don't
7  think there is any.
8      MS. REA:  Okay.
9      MR. MANDELSBERG:  So this
10  will be -- the prior one was
11  Exhibit 1?
12     MS. REA:  Right.
13     MR. MANDELSBERG:  Yes, so
14  this would be Exhibit 2.
15     MS. REA:  Yes.
16     (Documents were marked as
17  Exhibit 2, for
18  identification, as of this
19  date.)
20     MR. MANDELSBERG:  The
21  witness also presented, in response
22  to the question, materials --
23  brought with him and presented a
24  copy of the expert report, which
25  is, so that it's clear, the Exhibit

Page 12

1      Franco Seif
2  2 that we've just marked does not
3  include that copy of the expert
4  report.
5      MS. REA:  Okay.  Thank you.
6      Q.  And Mr. Seif, to avoid going
7  through these document by document, can you
8  tell me if there are any notes from you in
9  this stack of documents relating to your
10  expert report?
11     A.  There are -- there should be some
12  observations that I made while walking the
13  buildings that I took some notes, yes.
14     Q.  Would there be any correspondence
15  or other document reflecting communications
16  between yourself and any other experts that
17  have been retained in this litigation, to
18  your knowledge?
19     A.  No.
20     MR. MANDELSBERG:  Objection.
21     Q.  Mr. Seif, could you briefly outline
22  for me your educational background?
23     A.  I have a Bachelor's of Science
24  Degree in Civil Engineering.
25     Q.  Okay.

Page 13

1      Franco Seif
2      A.  And I have my Asbestos
3  Certifications from the EPA.
4      Q.  Your Civil Engineering Degree, was
5  from what university?
6      A.  Northeastern University.
7      Q.  What year did you obtain that?
8      A.  1987.
9      Q.  And your asbestos certifications,
10  what year were those obtained?
11     A.  Started 1987.
12     Q.  Did you obtain any asbestos
13  certifications in 1987?
14     A.  I started taking the classes in
15  1987, or it could be early 1988.
16     Q.  When did you actually obtain the
17  certification; do you recall?
18     A.  There was a series of classes that
19  you had to take.  It may have started at the
20  end of 1987 and continued up to 1988.
21     Q.  After you obtained your Bachelor's
22  of Science in Civil Engineering in 1987, what
23  was your first professional position after
24  that?
25     A.  In the environmental industrial

Page 14

```
 1            Franco Seif
 2   hygiene industry related to start working
 3   with asbestos.
 4       Q.  What firm did you work with?
 5       A.  I worked with a company in
 6   Los Angeles called EPI Center.
 7       Q.  Did you start with them in
 8   approximately 1987?
 9       A.  Yes.
10       Q.  What was your position at that
11   company?
12       A.  I started as a Junior Civil, Junior
13   Civil Engineer.
14       Q.  What were your duties, generally,
15   as a Junior Civil Engineer?
16       A.  Conducting asbestos inspections in
17   buildings, schools, houses, writing
18   reports --
19       Q.  Okay.
20       A.  -- from these inspections, writing
21   management plans for schools, designing
22   asbestos abatement projects, and I also did
23   indoor air quality studies.
24       Q.  What does that entail, indoor air
25   quality studies?
```

Page 15

```
 1            Franco Seif
 2       A.  At that time, we did testing and
 3   sampling for radon, carbon dioxide --
 4       Q.  How about asbestos?
 5       A.  And asbestos, of course.
 6       Q.  So in the 1987 time period when you
 7   were a Junior Civil Engineer, one of the
 8   things you did was air sample testing for
 9   asbestos in buildings; is that right?
10       A.  I also did air testing, sure.
11       Q.  Okay.
12           How long did you stay with that
13   company, EPI Center?
14       A.  Until late '89 or early 1990,
15   around that time.
16       Q.  Where did you go from there?
17       A.  From there, I started my own
18   business.
19       Q.  Which is called?
20       A.  At that time, it was called
21   California Environmental Consultants.
22       Q.  Did you have any partners in that
23   business?
24       A.  No.
25       Q.  By yourself when you started?
```

Page 16

```
 1            Franco Seif
 2       A.  Yes.
 3       Q.  What did your business do?
 4       A.  Exactly what I used to do with EPI
 5   Center.
 6       Q.  Is that essentially the same
 7   business that you have today?
 8       A.  It has evolved into what it is
 9   today, sure.
10       Q.  Today the name of your business is?
11       A.  Clark Seif Clark, and the "Seif" is
12   me.
13       Q.  And you have partners?
14       A.  Yes.
15       Q.  Two Clarks?
16       A.  Yes.
17       Q.  Two partners?
18       A.  Yes.
19       Q.  And so today, what types of
20   consulting services do you provide?
21       A.  Of course, we still provide
22   asbestos consulting, lead-based paint
23   consulting, indoor air quality consulting,
24   general industrial hygiene consulting, health
25   and safety consulting, Phase 1, Phase 2
```

Page 17

```
 1            Franco Seif
 2   environmental site assessments.
 3       Q.  Okay?
 4       A.  Hazardous waste site
 5   characterization.
 6       Q.  The asbestos consulting that you're
 7   doing today, that's the same type of work
 8   that you did starting in 1987; is that right?
 9       A.  Yes.
10       Q.  I notice that behind your name
11   there are several different letters.
12           Could you tell me what those are?
13   P-E for one is?
14       A.  P-E. I'm a Registered Civil
15   Engineer within the State of California.
16       Q.  And I believe another set of
17   letters was C-A-C.
18       A.  C-A-C stands for CAL-OSHA Asbestos
19   Consultant.
20       Q.  What is that?
21       A.  In California on top of being
22   certified by the Environmental Protection
23   Agency, they have their own State
24   certification that you have to obtain before
25   you begin to act as a consultant. So we have
```

Page 18

Franco Seif

1
2 to take asbestos examination that are put
3 together by the California OSHA, and if you
4 pass, you become a consultant.
5    Q.  When did you obtain that
6 designation?
7    A.  I know I started in 1991.  Probably
8 a year or so after that, maybe.  I really do
9 not recall.
10    Q.  The last set of letters I noticed
11 was R-E-A.
12       Can you tell me what that is?
13    A.  R-E-A stands for Registered
14 Environmental Assessor.
15    Q.  What does that entail?
16    A.  Also, it is a California
17 registration that is provided or offered by
18 the California Environmental Protection
19 Agency, and you become registered to perform
20 environmental site assessments.
21       MR. MANDELSBERG: Off the
22    record.
23       (Whereupon, a discussion was
24    held off the record.)
25    Q.  When did you obtain that

Page 19

Franco Seif

1
2 designation?
3    A.  I do not recall.
4    Q.  Okay.
5    A.  In the early '90s, I know.
6    Q.  That's fine.
7       Mr. Seif, who hired you to prepare
8 your expert report in this proceeding?
9    A.  The State of California, Department
10 of General Services.
11    Q.  Who contacted you for the scope of
12 this work?
13    A.  A person by the name of Glenn
14 Connor.
15    Q.  What is Mr. Connor's position?
16    A.  Exact position, I do not know.  I
17 know he is some type of a project manager of
18 some sort.
19    Q.  Do you know if he is with the State
20 of California, Department of General
21 Services?
22    A.  Yes, I know.
23    Q.  He is with them?
24    A.  Yes.
25    Q.  When did you first speak with

Page 20

Franco Seif

1
2 Mr. Connor?
3       MR. MANDELSBERG: Objection.
4    About the engagement or
5    speak to him in any way?
6       MS. REA:  Yes, about the
7    engagement.
8    A.  It had to be the first or second
9 week of December of 2006.
10    Q.  What were you hired to do?
11    A.  I was hired to render an opinion to
12 the friability of the fireproofing material
13 that existed in the few State buildings.
14    Q.  Had you worked with Mr. Connor
15 before this engagement?
16    A.  Yes.
17    Q.  When did you first work with
18 Mr. Connor?
19    A.  Our company has been working for
20 the State as a consultant for three years,
21 and during these, you know, that three-year
22 period we've been engaged in one project with
23 Mr. Connor.  Specifically, the dates, I do
24 not know.
25    Q.  What was the nature of that

Page 21

Franco Seif

1
2 project?
3    A.  That project involved the
4 inspection and conducting assessments on
5 several State buildings for asbestos.
6    Q.  Was that also for litigation?
7    A.  No.
8    Q.  Do you know what the purpose of
9 that report was for?
10    A.  The State, apparently, they keep
11 records of the asbestos material in their
12 buildings as part of their management
13 planning, the condition of the asbestos
14 containing material in their buildings as
15 part of the management planning, something
16 that they have to do every three years.
17    Q.  If we can go back to this
18 engagement, you said that you were engaged to
19 determine the friability of asbestos in
20 various buildings; is that correct?
21    A.  Correct.
22    Q.  Did that include any sort of
23 assessments of the risks of exposure to that
24 asbestos?
25    A.  No.

---

**Page 22**

```
 1              Franco Seif
 2      Q.  So you were just to determine
 3  whether or not asbestos containing material
 4  in these buildings was friable; is that
 5  correct?
 6      A.  Correct.
 7      Q.  You were retained, you said, in
 8  December of 2006.
 9          What did you do during that time
10  period, from 2006, early part of 2007?
11      A.  I don't understand.
12          What do you mean, what did I do?
13      Q.  Well, you said you were first
14  contacted in 2006, the end of 2006.
15          I'm just trying to get a sense of
16  after you were contacted, did you start work
17  immediately, what did you do?
18      A.  Initially, we tried to get in touch
19  with the property manager to get access to
20  some of these buildings.
21      Q.  Okay.
22      A.  That was the first order of work.
23      Q.  And the reason I ask, it seems from
24  your report that the actual inspections that
25  you did were in January of 2007; is that
```

---

**Page 23**

```
 1              Franco Seif
 2  correct?
 3      A.  Yes.
 4      Q.  What did you do in between January
 5  of -- well, you were hired, you said, in
 6  December of 2006; is that correct?
 7      A.  Yes.
 8      Q.  After you were hired to when you
 9  first inspected the buildings, what sort of
10  lead work, if any, did you do?
11          MR. MANDELSBERG:  Objection.
12          Other than to get access to
13      the buildings?
14          MS. REA:  Right.
15          MR. MANDELSBERG:  Objection.
16      A.  I reviewed the MVA reports that
17  were sent to me.
18      Q.  So those reports were generated
19  before you inspected the buildings?
20      A.  I recall they were.
21      Q.  Other than reviewing those reports,
22  did you have any other role in the
23  preparation of those reports?
24      A.  I'm sorry.
25          Could you repeat?
```

---

**Page 24**

```
 1              Franco Seif
 2      Q.  Other than reviewing those reports,
 3  did you have any other role in the
 4  preparation of the MVA reports?
 5      A.  I did not have any.
 6      Q.  How much was your bill for your
 7  work on this project?
 8      A.  I brought the bill with me.
 9      Q.  Okay.
10      A.  A little over $23,000.
11      Q.  Okay.
12          MR. MANDELSBERG:  The record
13      should reflect the witness was
14      referring to a portion of Exhibit
15      2.
16      Q.  Mr. Seif, can you tell me, what did
17  you do today to prepare for this deposition?
18      A.  I met with my Mr. Steve.
19          THE WITNESS:  I'm sorry,
20      Steve.  I forget your last name.
21          MR. MANDELSBERG: Mandelsberg.
22      Q.  Did you meet with him this morning?
23      A.  Yes.
24      Q.  Did you meet with anyone else this
25  morning with Mr. Mandelsberg?
```

---

**Page 25**

```
 1              Franco Seif
 2      A.  Yes.
 3      Q.  Who is that?
 4      A.  Christina Kang (phonetic).
 5      Q.  How long did you meet with
 6  Mr. Mandelsberg and Ms. Kang?
 7      A.  From 9:00 to 11:00.
 8      Q.  What did you discuss in this
 9  meeting this morning?
10          MR. MANDELSBERG:  Objection.
11          Don't answer.
12          MS. REA:  Sorry?
13          MR. MANDELSBERG:  Objection.
14          Don't answer.  It's
15      privileged.
16          MS. REA:  Are you
17      representing Mr. Seif?
18          MR. MANDELSBERG:  We are
19      representing the State and he has
20      been engaged on behalf of the State
21      and on behalf of counsel as an
22      expert.  So you're asking him what
23      was discussed between counsel as
24      for privileged information.
25          MS. REA:  And the
```

Page 26

```
 1            Franco Seif
 2    attorney/client privilege would
 3    apply with respect to a client and
 4    an attorney.
 5         Is Mr. Seif your client?
 6         MR. MANDELSBERG: The
 7    attorney/client privilege would
 8    apply to an expert retained by or
 9    at the request of counsel to assist
10    in rendering an expert report.
11         MS. REA: I disagree,
12    Mr. Mandelsberg, but we will
13    reserve the right to reask that
14    question, if we need to, when the
15    time comes.
16    Q.  Mr. Seif, did you review any
17  documents this morning?
18    A.  No.
19         MS. REA: Mark this as
20    Exhibit 3.
21         And Mr. Mandelsberg, this is
22    the report of Mr. Seif.  I did not
23    bring another copy, but I would
24    like to mark this one.
25         (A report was marked as
```

Page 27

```
 1            Franco Seif
 2    Exhibit 3, for
 3    identification, as of this
 4    date.)
 5    Q.  Mr. Seif, can you please identify
 6  what has been marked as Exhibit 3?
 7    A.  The cover page appears to be the
 8  expert report that I prepared.
 9    Q.  Okay.
10         You can flip through it briefly,
11  but I will represent to you that that is your
12  expert report.  If you see anything in there
13  that's not, please let me know.
14    A.  Just let me review and make sure
15  that all the pages are here of the body of
16  the report.
17    Q.  Absolutely.  Take your time.
18    A.  It appears that most -- all the
19  exhibit are here.
20    Q.  Can you keep that in front you?
21         MR. MANDELSBERG: The record
22    should reflect that what was
23    actually produced to counsel for
24    the debtors is Mr. Seif's expert
25    report was actually an original
```

Page 28

```
 1            Franco Seif
 2    report with exhibit tabs and which
 3    included cover photographs and what
 4    has been marked as Exhibit 3
 5    appears to be a copy of that.
 6         MS. REA: That's correct.
 7         Would you rather we mark an
 8    original?
 9         MR. MANDELSBERG: No, it
10    doesn't matter.  I'm just noting
11    that that's not what was actually
12    produced.  We do have a copy of an
13    original with the color photos,
14    with the tabs.  It may be easier
15    for Mr. Seif to look at that and
16    find documents if you're going
17    identify specific pages.
18         MS. REA: Okay.
19         MR. MANDELSBERG: Which I
20    don't see are Bates numbered.
21         MS. REA: If we run into a
22    problem, we can switch problems.  I
23    think we will because I think the
24    questions will be straightforward
25    based on that copy.  But you're
```

Page 29

```
 1            Franco Seif
 2    right, it's a black and white copy
 3    of the original.
 4    Q.  Mr. Seif, can you please tell me
 5  what you did to prepare this report?
 6    A.  I reviewed the documents I
 7  mentioned earlier, and the documents I
 8  reviewed are listed in my report, by the way,
 9  and then I visited the buildings that I
10  referenced in my report and did a visual
11  inspection on visiting these buildings.
12    Q.  If you can turn to Page 9 of your
13  report, it should state there "documents
14  reviewed."
15         Do you see that?
16    A.  Yes.
17    Q.  Are those the documents that you
18  reviewed in order to prepare this report?
19    A.  Not to prepare the report, but just
20  to see the work that had already been
21  prepared for this case.  So it kind of gave
22  me an idea to what other work related to
23  these buildings relating to asbestos others
24  have done that could help me or give me an
25  idea to what is going on in these buildings.
```

Page 30

```
 1          Franco Seif
 2     Q.  Did you review any documents
 3  relating to these buildings that are not
 4  listed on Page 9 of your report?
 5     A.  No.
 6     Q.  Did you review the material that
 7  these claimants have submitted in the
 8  bankruptcy proceeding to support their claim?
 9          MR. MANDELSBERG:  Objection.
10      You mean other than the MVA
11      reports?
12          MS. REA:  Yes.
13     A.  I'm not really clear to what
14  documents you're relating to.  That means I
15  did not.
16     Q.  Have you seen claim forms submitted
17  by California Department of General Services
18  in the bankruptcy?
19     A.  You want to show me an example?
20     Q.  Sure.  This is an example.  I'm not
21  going to mark it, but this is an example of a
22  claim form (handing).
23          Have you seen documents like that?
24     A.  (Witness examines document.)
25          No.
```

Page 31

```
 1          Franco Seif
 2     Q.  I can have it back.
 3          Other than the MVA testing that you
 4  have already referenced, did you see any
 5  other asbestos survey or asbestos testing
 6  with respect to the buildings that are the
 7  subject of the report?
 8     A.  As I stated on Page 9 of my expert
 9  report document, I reviewed a survey that was
10  performed by a company called Kleinfelder,
11  and that was for building 714 "P" Street,
12  another supplemental report for that same
13  building, prepared by the same consulting
14  firm, and an updated asbestos survey again by
15  same firm for another address that I visited,
16  which is the 744 "P" Street --
17     Q.  Okay.
18     A.  -- Tower.
19     Q.  Do you know if there were any
20  earlier asbestos surveys done for these
21  buildings?
22     A.  I do not know.
23     Q.  So you didn't see any surveys on
24  these buildings in the 1980s time frame?
25     A.  I did not see.
```

Page 32

```
 1          Franco Seif
 2     Q.  Mr. Seif, who wrote the report?
 3     A.  I did.
 4     Q.  Did you have any drafts of this
 5  report?
 6     A.  I don't have any drafts.
 7     Q.  Did you discuss this report with
 8  counsel before it was finalized?
 9          MR. MANDELSBERG:  You can
10      answer that yes or no.
11     A.  Yes, yes.
12     Q.  Did you make any changes to the
13  report as a result of any discussion with
14  counsel?
15     A.  I may have changed some grammatical
16  mistakes.
17     Q.  Okay.
18          You say in your report that you
19  relied upon the Asbestos Hazard Emergency Act
20  of 1986; is that correct?
21     A.  Yes.
22     Q.  6.4 in your documents relied on.
23          What, generally, does that act
24  provide?
25     A.  That act provides for the rules and
```

Page 33

```
 1          Franco Seif
 2  regulations under which -- actually, it was
 3  drafted to ensure that school buildings are
 4  surveyed for asbestos and that management
 5  plannings are submitted to the government of
 6  each state as they relate to the asbestos
 7  hazard in each building.
 8     Q.  When did you become aware of that
 9  act?
10     A.  Soon as I became involved in the
11  asbestos industry back in '87.
12     Q.  So around 1987?
13     A.  Yes.
14     Q.  So, Mr. Seif, you have almost
15  twenty years experience in this asbestos
16  area.
17          Can you tell me what you mean by
18  the term "fireproofing"?
19     A.  Fireproofing is a material that is
20  applied to steel structures in buildings to
21  allow lead time from the time a fire starts
22  to the building begins to melt.
23     Q.  Is that something different from
24  acoustical plaster?
25     A.  Acoustical plaster is the
```

Page 34

Franco Seif

1    terminology that's used to allow for the
2    transfer of the noise from one area to the
3    other. That's the word acoustical.
4
5        Q. Are the two materials different?
6        A. It depends on where they are
7    applied and how they are applied, but they
8    should be different.
9        Q. Where is acoustical plaster
10   normally applied?
11       A. Acoustical plaster mostly is
12   applied inside of an apartment building, that
13   I have seen, or in office buildings.
14       Q. Do you understand that fireproofing
15   is normally applied directly to steel beams
16   of the structure?
17           MR. MANDELSBERG: Objection.
18           You can answer, if you
19       understand.
20       A. In most cases it is applied to
21   steel beams, yes.
22       Q. Have you ever seen fireproofing
23   painted?
24       A. No.
25       Q. Have you ever seen acoustical

Page 35

Franco Seif

1    plaster painted?
2
3        A. Yes.
4        Q. Have you ever heard of acoustical
5    plaster being called fireproofing?
6        A. No.
7        Q. You said before that you started
8    doing this around 1987; is that correct?
9        A. Yes.
10       Q. Have you inspected buildings with
11   fireproofing applied to steel beams and steel
12   decking in the course of that, approximately,
13   twenty years?
14       A. Yes.
15       Q. Here you inspected some buildings
16   with that fireproofing; is that right?
17       A. Yes.
18       Q. Is what you observed in these
19   buildings any different than what you've seen
20   in other buildings in the twenty years of
21   your experience?
22           MR. MANDELSBERG: Objection.
23       A. Just break it down. Let me know
24   exactly what you mean.
25       Q. For example, you talked about

Page 36

Franco Seif

1    fireproofing applied to steel, and you
2    noticed in some of these inspections that
3    there are some overspray, for example.
4
5        Have you seen that sort of
6    overspray in other buildings that you've
7    inspected?
8        A. Yes.
9           MR. MANDELSBERG: Objection.
10       Q. You saw that over the course of
11   your career for twenty-some years?
12       A. Yes.
13       Q. You also talk about fireproofing
14   material that's dislodged from the
15   fireproofing.
16       Have you seen that as well in your
17   twenty years experience?
18       A. Yes.
19       Q. Is that fairly common to see that
20   sort of dislodged material?
21       A. Yes.
22       Q. How long would that debris and that
23   dust have been in the building?
24           MR. MANDELSBERG: Objection.
25       A. I do not really understand what you

Page 37

Franco Seif

1    mean by how long has it been in the building.
2
3        Q. You noted, for example, that there
4    was debris and dust that had settled on tiles
5    in the space in between the ceiling and the
6    fireproofing.
7        Do you recall that?
8        A. Yes.
9        Q. How long would that debris and dust
10   have been located where it had settled?
11           MR. MANDELSBERG: Objection.
12       A. I don't know.
13       Q. Could it be as long as shortly
14   after the fireproofing was applied?
15           MR. MANDELSBERG: Objection.
16       A. I don't think so. Based on my
17   experience, you don't apply fireproofing
18   while -- after you install your dropped
19   ceiling or your acoustical tile ceiling.
20       Q. Okay.
21       Could it be there shortly after
22   application, a year after application?
23           MR. MANDELSBERG: Objection.
24       A. It could be.
25       Q. Now, you say in your report, you

Page 38

1          Franco Seif
2   claim that vibration in the building caused
3   fiber release.
4          How long have you had that opinion?
5      A.  How long have I --
6          MR. MANDELSBERG:  Objection.
7          You can answer if you
8      understand.
9      A.  How long have I had this opinion?
10     Q.  Uh-huh.
11     A.  The first class that I took about
12  asbestos.
13     Q.  Okay.
14         So that was around 1987/'88?
15     A.  Yes.
16     Q.  Have you told building owners that
17  vibration can cause fiber release?
18     A.  Yes.
19     Q.  Would you say that's fairly common
20  knowledge?
21     A.  To whom?  I'm sorry.  I mean, it's
22  not common knowledge.  I mean, you have to be
23  -- you have to tell somebody.  If you're not
24  in the asbestos industry, you wouldn't know.
25  You have to be told.

Page 39

1          Franco Seif
2      Q.  In the asbestos industry, would you
3   say that's fairly common knowledge since
4   1987?
5      A.  Since the rule was written, yes.
6      Q.  You've told building owners in
7   buildings that you've inspected that that's
8   the case; is that correct?
9      A.  If we are conducting assessments,
10  yes.
11     Q.  You said you tested for asbestos in
12  other buildings over the past twenty years;
13  is that right?
14     A.  Yes.
15     Q.  What different types of testing did
16  you conduct in that time period?
17     A.  What do you mean by "different
18  types of testing"?
19     Q.  I think we talked about air
20  testing.
21         Do you recall air testing?
22     A.  Yes.
23     Q.  You have conducted air testing in
24  buildings since the mid 1980s; is that right?
25     A.  Yes.

Page 40

1          Franco Seif
2      Q.  And have you done bulk sample
3   analysis?
4      A.  Yes.
5      Q.  How long have you been doing that?
6      A.  Same period.
7      Q.  Are there other types of testing
8   relating to asbestos that you can think of?
9      A.  Yes.
10     Q.  What other testing?
11     A.  We've done surface dust sampling.
12     Q.  Okay.
13         When did you start doing that?
14     A.  In the early '90s it became more
15  prevalent to do dust sampling.
16     Q.  What does that entail?
17     A.  It entails vacuuming, in a simple
18  term, dust from a surface into a filter, into
19  a cassette that contains a filter, and then
20  into a cassette -- I'm sorry.  Vacuuming a
21  known surface area into a cassette that has a
22  filter, and then taking that cassette to the
23  lab for analysis to find the concentrations
24  of asbestos fibers.
25     Q.  Any other testing that you can

Page 41

1          Franco Seif
2   think of?
3      A.  Not at this time.
4      Q.  Okay.
5          Mr. Seif, I'm going to refer you to
6   Page 3 of your report.  You can take the clip
7   off, if it helps.
8          And on Page 3, the second sentence,
9   I believe, says, "The case involves claims
10  for damages filed by DGS against W.R. Grace
11  as the manufacturer of known asbestos-
12  containing construction products that are
13  present in sixteen DGS building sites."
14         Do you understand that there are
15  sixteen DGS building sites that are at issue
16  in this case?
17     A.  Yes.
18     Q.  It later states that you inspected
19  six building sites.
20         Why only six of the sixteen?
21     A.  Due to the lack of time between the
22  date of the assignment and the date that the
23  report was due, we had to select these sites
24  so I would have the time to visit them and be
25  able to produce report.

Page 42

Franco Seif

1
2     Q.  How did you select the six sites
3  that you visited?
4     A.  I did not select them.
5     Q.  Who selected them?
6     A.  I assume the State.  They were sent
7  to me, you know...
8     Q.  Do you know why those six buildings
9  were chosen over the other ten?
10     A.  Yes.
11     Q.  Why?
12     A.  Due to the value of the claim of
13  these buildings.
14     Q.  Do you have any information
15  regarding the other ten buildings that
16  weren't inspected?
17          MR. MANDELSBERG:  Objection.
18     A.  What do you mean by information?
19     Q.  Did you inspect those buildings
20  subsequent to this report?
21     A.  No.
22     Q.  Did you come to any conclusion on
23  those buildings at any time?
24     A.  Other than if they contain the same
25  type of material than from just an expert

Page 43

Franco Seif

1
2  opinion, but they may have the same
3  conditions, the same type of material as
4  those other buildings.
5     Q.  But you don't know, sitting here
6  today, what type of material are contained in
7  those buildings, do you?
8     A.  I presume I reviewed the MVA
9  reports which has the same type of analysis
10  as the other ones.  That clarifies that point
11  for me.
12     Q.  Other than the information
13  contained in the MVA reports for those
14  buildings, do you have any other information
15  regarding any alleged asbestos in those
16  buildings?
17     A.  No.
18     Q.  You did not prepare those MVA
19  reports; is that correct?
20     A.  Correct.
21     Q.  In the second paragraph, in the
22  introduction, you state that, "The purpose of
23  my retention was to inspect areas of the DGS
24  buildings where these WR Grace materials are
25  present."

Page 44

Franco Seif

1
2         What is the basis for the
3  statement there that it is WR Grace materials
4  that are present in these buildings?
5     A.  Based on the MVA report.
6     Q.  And solely on the MVA report?
7     A.  Yes.
8     Q.  You didn't do any independent
9  analysis to determine that?
10     A.  No.
11     Q.  And then another purpose that you
12  list here, purpose "C," which is, "Assess the
13  condition and the potential exposure hazard
14  to asbestos of the building occupants and
15  maintenance personnel at the sites."
16         What did you do to that?
17     A.  Assessing the condition is
18  practically based on visual observations.
19     Q.  What about assessing the potential
20  asbestos exposure hazard, how would you do
21  that?
22     A.  The potential, that's why I have
23  the word potential there.  Once I determined,
24  or I observed the condition of the material
25  and its friability, since I did not do an

Page 45

Franco Seif

1
2  exposure assessment, the potential for
3  exposure hazard becomes, if the material is
4  friable and it is not in good damage and the
5  situation that I saw in some of these
6  buildings gave me the inclination that there
7  could be a potential for exposure in these
8  buildings.
9     Q.  So you attempted to assess the
10  presence of asbestos and the condition of
11  asbestos; is that correct?
12     A.  Correct.
13     Q.  Mr. Seif, why is asbestos
14  hazardous?
15     A.  Although this is probably more to a
16  toxicologist but, you know, health hazard is
17  one of the first items that we study once you
18  get into this industry, and based on
19  toxicology reports that asbestos causes
20  asbestosis, it cause us mesothelioma, it
21  causes lung cancer, and other organs also can
22  be effected by the exposure to the asbestos
23  fibers.
24     Q.  Do you understand that exposure to
25  be through inhalation of asbestos fibers?

Page 46

1          Franco Seif
2     A.  Yes.
3     Q.  But you didn't assess inhalation
4  risks with respect this report, did you?
5     A.  No.
6     Q.  How would you do that?
7     A.  We would have conducted an exposure
8  assessment, which is through the collection
9  of air samples over certain period of time in
10  each building.
11     Q.  How long has the asbestos been in
12  these buildings?
13          MR. MANDELSBERG:  Objection.
14     A.  I'm not aware.
15     Q.  Would it surprise you to know that
16  it has been in some of these buildings as
17  early as 1956?
18          MR. MANDELSBERG:  Objection.
19     A.  No.
20     Q.  You don't have any information one
21  way or the other?
22     A.  I do not have any information.
23     Q.  Okay.
24          In Paragraph 3.1, in connection
25  with the Fairview Development Center, the

Page 47

1          Franco Seif
2  second paragraph there describes material
3  that were you looking at.
4          In the second sentence is says, "In
5  general, the ceiling system is comprised of
6  gypsum button-board supporting layers of
7  steel wire lath, spray-applied fireproofing,
8  and paint.  The fireproofing is exposed to
9  the occupied space of the building."
10          Do you see that reference?
11     A.  Yes.
12     Q.  Now, in that building you're
13  talking really about acoustical plaster, not
14  fireproofing; is that correct?
15     A.  That's why I initially when I
16  looked it, that's what I thought.  It looked
17  like acoustical plaster, and to my surprise
18  it was not acoustical plaster, but it
19  appeared that after painting the surface for
20  such a long time, it had -- it gave the
21  impression that it was acoustical plaster.
22     Q.  It was fireproofing on the ceiling?
23     A.  Yes.
24     Q.  How you could tell it was
25  fireproofing rather than acoustical plaster?

Page 48

1          Franco Seif
2     A.  Because I taken the sample, I
3  realize that I'm touching fireproofing
4  directly.
5     Q.  Just by taking the samples --
6     A.  Yes.
7     Q.  How can you differentiate between
8  the two?
9     A.  There was a very thin layer of
10  paint on the fireproofing, and then it was
11  the -- it was the fireproofing, which was
12  very surprising to me because I have never
13  seen this application before.
14     Q.  I guess, how would you determine
15  just by touching it that's it fireproofing as
16  opposed to acoustical plaster?
17     A.  It was not just by touching it.
18     Q.  Okay.
19     A.  I was taking a sample and I
20  realized that directly above the thin layer
21  of paint I am touching fireproofing directly,
22  which was very loose, very -- fell directly
23  into the container that I was taking the
24  sample from, and when I took the sample to
25  the lab, I asked the lab analyst, you know,

Page 49

1          Franco Seif
2  to see if that first layer that's, you know,
3  if there is asbestos in that first layer,
4  what is that first layer, and we realized
5  that it was just paint.  There was no plaster
6  application there.
7     Q.  Right, but underneath paint you're
8  telling me that there was fireproofing rather
9  than acoustical plaster; is that correct?
10     A.  Correct.
11     Q.  Your conclusion in that regard is
12  based on your visual observations and in
13  touching the material?
14          MR. MANDELSBERG:  Objection.
15     A.  Visual observation, the color of
16  the material.  From my experience, gypsum
17  plaster applied on ceiling surfaces, normally
18  it's all consistent, it's white because
19  gypsum is white, or dark tan or -- I'm sorry.
20  White or offwhite color, and this one was
21  not.  This one was consistent with what I've
22  seen in buildings, what looks like
23  fireproofing.  It is that dark tan color, as
24  I recall.
25     Q.  Other than the dark tan color, was

Page 50

Franco Seif

1 there anything else that would indicate to
2 you that this was fireproofing rather than
3 acoustical plaster?
4     A.  Yes.
5     Q.  What?
6     A.  The consistency and the texture of
7 the material.  Again, from my experience
8 taking acoustic plaster samples you see a lot
9 of round dusty type particles, and this one
10 was not.
11     Q.  Okay.
12         You said here that this material
13 was painted; is that correct?
14     A.  Yes.
15     Q.  Do you understand in your
16 experience that painting affectively
17 encapsulates the material?
18         MR. MANDELSBERG:  Objection.
19     A.  It provides some type of
20 encapsulation, yes.  But it's not the proper
21 way to encapsulate asbestos material.
22     Q.  But it does provide some type of
23 encapsulation?
24         MR. MANDELSBERG:  Objection.

Page 51

Franco Seif

1     A.  It should.
2     Q.  You state then on the next page
3 "that this particular material had been
4 painted with several layers of paint." It's
5 the second paragraph.  And then you say that
6 "this was confirmed by maintenance personnel
7 in the building who stated that the ceiling
8 surface is painted on a regular basis."
9         Do you know how often this ceiling
10 was painted?
11     A.  No.
12     Q.  Did the maintenance personnel tell
13 you how long that material had been on the
14 ceiling?
15     A.  No.
16     Q.  Did they tell you that they knew
17 that there was asbestos in that material?
18     A.  I do not recall if they told me.
19     Q.  And down towards the end of that
20 page, in Section 3.2, the very last
21 paragraph, second sentence, you state that,
22 "The air movement will most likely cause
23 erosion of the applied fireproofing material
24 and thus carry asbestos fibers into the

Page 52

Franco Seif

1 occupied space of the building."
2         When in the life of the building
3 would that occur?
4     A.  Is this for the next building?
5     Q.  Yes, for the Ventura County, and
6 the language, as you know, is in several of
7 the different buildings, but just as a
8 general matter, this idea, this concept of
9 air movement causing erosion, in your view,
10 when would that happen in the life of a
11 building?
12     A.  Any time and every time the HVA
13 system is running there is that likelihood
14 that there is air erosion.
15     Q.  Would you expect HVA system to
16 start running around the time that the
17 building construction has been completed?
18     A.  Definitely before it is occupied.
19     Q.  Which normally would be within the
20 first year after construction, would you say?
21     A.  Maybe.
22     Q.  Okay.
23         When did you first understand this
24 to be the case?

Page 53

Franco Seif

1         MR. MANDELSBERG:  Objection.
2     Q.  I apologize.  That is a poorly
3 worded question.
4         When did you develop the opinion
5 that air movement could cause erosion to the
6 applied fireproofing material?
7     A.  From the time I developed some
8 logic about air erosion.  It doesn't have to
9 -- the speed of air causes erosion on any
10 material.
11     Q.  Would you say that's an opinion
12 that you've held for the past almost 20
13 years?
14     A.  Yes.
15     Q.  Have you advised building owners
16 over the past twenty years of this opinion?
17     A.  Yes.
18     Q.  And if you wanted to know whether
19 that air movement had actually eroded
20 materials, would you take air samples?
21     A.  Well, taking air samples have to be
22 a part of taking air samples. I'm not sure
23 if I'm being clear or not because if I take
24 an air sample today in this room, as part of

Page 54

Franco Seif

1
2   determining — assuming there is fireproofing
3   up in this decking here, and we've taken air
4   samples yesterday, the air sample really
5   constitutes the volume of air that I collect
6   in the period of time that I collected the
7   samples.  If I take it for one hour, it is
8   for this one hour.  If in this one hour there
9   are no fibers that are being dislodged or
10  released into this office space, then the air
11  sample will show that there are no fibers
12  released into this office space, but it
13  doesn't mean that is the case at all times.
14  That's why we say, you know, it is a
15  potential.  There is a potential for fiber
16  release, there is a potential for hazard, and
17  then at that time it would depend on the
18  occupants of this office to say, well, we
19  know there is asbestos there, but we're not
20  going to worry about it because we hired
21  somebody who took an air sample for one hour
22  and didn't find any asbestos, but once they
23  know the importance of having asbestos in the
24  office space, and that fibers could be
25  released any time, any movement, and that any

Page 55

Franco Seif

1
2   time, any moment could be when nobody has
3   taken air samples, you know, then it becomes
4   an issue.
5       Q.  Okay, and my question was a little
6   bit different.
7           I just want to know, if you wanted
8   to test the theory that air movement from the
9   HVAC was causing erosion to the fireproofing,
10  would one of the ways to test that be through
11  air sampling, generally?
12      A.  Not necessarily.
13      Q.  How would you test that theory?
14      A.  The theory is tested -- the theory
15  exists based on physics, not based on air
16  tests.  If there is air moving around
17  material, especially if the material is
18  friable, then that air will begin to erode
19  that material and carries with it whatever
20  that material contains, whether it's silica
21  or whether it's asbestos fibers, or whether
22  it's any other cellulose-based fibers, the
23  air erodes at the material.  It is based on
24  physics.
25      Q.  Okay.

Page 56

Franco Seif

1
2       And you said before, you used the
3   words in your report potential of hazard.
4           How would you determine whether
5   that potential became an actuality?
6       A.  If somebody becomes sick maybe or,
7   you know...
8       Q.  Did you do any air sample testing
9   in any of these buildings?
10      A.  No.
11      Q.  Are you aware of any air sample
12  testing that has been done on these
13  buildings?
14      A.  I'm not aware.
15      Q.  You don't know of any air sample
16  testing then that would exceed ETA levels in
17  these buildings?
18      A.  I'm not aware.
19      Q.  You don't know of any air sample
20  testing that would exceed OSHA levels in
21  these building?
22      A.  I don't know.
23      Q.  Do you know of any scientific
24  studies that have shown that air movement in
25  the air space between the suspended ceiling

Page 57

Franco Seif

1
2   and the fireproofing actually causes erosion
3   of the applied fireproofing material and
4   carries asbestos fiber into the occupied
5   space?
6       A.  Any studies?
7       Q.  Uh-huh.
8       A.  I'm not aware of any studies.
9       Q.  If we can move to the next page,
10  it's 3.3.  We're now on Office Building
11  Number 8 on Page 5 of your report.
12          It says in the very first paragraph
13  that this was an 18-story structural steel
14  building that was vacant.
15          Do you know why the building was
16  vacant?
17      A.  Yes.
18      Q.  Why?
19      A.  Because they were removing all the
20  fireproofing from the building.
21      Q.  How long had the building been
22  vacant?
23      A.  I'm not aware.
24      Q.  In the fourth paragraph there you
25  talk again about the HVAC system, and then

Page 58

Franco Seif

1
2  the fourth sentence down you say, "Vibration
3  could be caused by several factors, such as
4  moving furniture or heavy office equipment
5  and that this may exacerbate the exposure to
6  asbestos in the occupied space."
7      A.  Yes.
8      Q.  When in the life of the building
9  would vibrations start to occur?
10     A.  At the time people begin to walk on
11  the floor above that -- above where the
12  surface is applied.
13     Q.  So that would be as soon as the
14  building is occupied?
15     A.  Yes.
16     Q.  This opinion that vibration can
17  exacerbate exposure, have you held that
18  opinion over the course of the last twenty
19  years?
20     A.  Yes, both of these, the vibration
21  and the air erosion are also taken from the
22  EPA standards.
23     Q.  Have you advised building owners
24  about this vibration issue over the past
25  twenty years?

Page 59

Franco Seif

1
2      A.  Yes.
3      Q.  Have you seen any scientific
4  studies that establish that vibrations causes
5  exacerbation of exposure to the occupied
6  areas of asbestos fibers?
7      A.  I haven't seen scientific studies.
8  I have seen evidence.
9      Q.  You have seen no formal studies,
10  though, that would establish it?
11     A.  No, I have not.
12     Q.  In the next paragraph, the very
13  first sentence says, "The presence of friable
14  fireproofing material and the evidence of
15  fireproofing debris that settled on the
16  ceiling tile indicates that the potential of
17  exposure to asbestos is high for maintenance
18  personnel when conducting activities above
19  the suspended ceiling."
20         My first question for you is, is
21  the debris that you're talking about there,
22  did you test the asbestos content of that
23  debris?
24     A.  I'm sorry.  Could you -- I didn't
25  see where --

Page 60

Franco Seif

1
2      Q.  The very last paragraph on the same
3  page, it's on Page 5, starting with
4  "Furthermore."
5         MR. MANDELSBERG:  The first
6  sentence of the last paragraph.
7      A.  Okay.
8         "Furthermore, the --
9      Q.  "-- presence of friable
10  fireproofing material and the evidence of
11  fireproofing debris that settle on a ceiling
12  tile indicates that the potential of exposure
13  to asbestos is high for maintenance personnel
14  when conducting activities above the
15  suspended ceiling."
16         Do you see that?
17     A.  Yes, now I see.
18     Q.  Now, that debris there, did you
19  test the asbestos content of that debris?
20     A.  In some instances, we tested
21  debris, and just for verification purposes,
22  but in most of the time, you could see that
23  the debris settled on the ceiling material is
24  consistent in texture and appearance to the
25  fireproofing that's on the decking.

Page 61

Franco Seif

1
2      Q.  Did you find respirable fibers in
3  the debris of asbestos?
4      A.  I'm sorry?  Could you repeat that?
5      Q.  Did you find respirable asbestos
6  fibers in that debris.
7      A.  We didn't test for respirable
8  fibers.
9      Q.  So you were just confirming, again,
10  the presence of potentially asbestos
11  containing materials?
12     A.  Yes.
13     Q.  And you talk about this exposure to
14  asbestos when personnel are conducting
15  activities above the suspended ceiling.
16         Do you know how often maintenance
17  workers would conduct activities above the
18  suspended ceiling in this building?
19     A.  No.
20     Q.  Did you look at any building logs
21  or anything along that line to determine when
22  maintenance was going on there?
23     A.  No.
24     Q.  Do you know what the exposure level
25  would be when the material was accessed?

Page 62

```
 1            Franco Seif
 2     A.  No.
 3     Q.  When you talk about normal routine
 4  activities in maintenance activities, when,
 5  again, in the life of the building would
 6  those types of activities first start to take
 7  place?
 8     A.  As soon as maintenance is needed on
 9  any level inside of the building.
10     Q.  In your experience, would that be
11  early on in the life of the building?
12            MR. MANDELSBERG:  Objection.
13     A.  It would be speculative, so I
14  probably should not comment on it.
15     Q.  Okay.
16        The last sentence of that paragraph
17  says that these areas should be cleaned on a
18  regular basis because of the potential for
19  asbestos exposure.
20        Would you recommend dry rag dusting
21  as part of that cleaning?
22     A.  No.
23     Q.  Why not?
24     A.  That would be an activity that will
25  cause elevated levels of fibers to become
```

Page 63

```
 1            Franco Seif
 2  airborne.
 3     Q.  Have you recommended not doing that
 4  to building owners?
 5     A.  Sure.
 6     Q.  How long have you been making those
 7  sorts of recommendations?
 8     A.  Since I've learned that you do not
 9  dry sweep asbestos containing material.
10     Q.  Was that roughly in 1987?
11     A.  Yes.
12     Q.  How about dry brushing the
13  material?
14     A.  No.
15     Q.  Same response, wouldn't recommend
16  it?
17     A.  Yes.
18     Q.  Haven't recommended it in the last
19  twenty years?
20     A.  Yes.
21     Q.  How about blowing the material off
22  surfaces with an aerosol can of air spray?
23     A.  It's not recommended.
24     Q.  Why not?
25     A.  Again, for the same reason, just
```

Page 64

```
 1            Franco Seif
 2  the tender of the fibers airborne.
 3     Q.  You've been telling folks that for
 4  the last twenty years?
 5     A.  Yes.
 6     Q.  Okay.
 7        If we can turn to Page 6 of your
 8  report, 3.4, in the discussion of Office
 9  Building Number 9, are you with me there?
10     A.  Yes.
11     Q.  The very last sentence of that
12  first paragraph says, "The ceiling tiles in
13  the building also contains asbestos product."
14        Do you see that?
15     A.  The last paragraph -- I'm sorry.
16     Q.  The first paragraph, the last
17  sentence, Section 3.4 --
18     A.  Yes, yes.
19     Q.  Okay.
20        -- are the ceiling tiles in this
21  building releasing asbestos fibers?
22     A.  If you try to lift them up, there
23  is that potential, yes.
24     Q.  Other than fireproofing, acoustical
25  plasters, and ceiling tile, did you look for
```

Page 65

```
 1            Franco Seif
 2  any other asbestos containing materials in
 3  these buildings?
 4     A.  I did not attempt to, no.
 5     Q.  Turn to Page 8 of your report, in
 6  Section 4, the expert opinion section, in
 7  4.2, it says, "It is common for friable
 8  applied or sprayed-on fireproofing material
 9  to dislodge and settle on surfaces below it,
10  such as suspended ceiling material or utility
11  component."
12        You've seen that sort of settling
13  in the buildings that you've looked at in the
14  last twenty years or so; haven't you?
15            MR. MANDELSBERG:  Objection.
16     A.  Yes.
17     Q.  Is this sort of thing in virtually
18  any building that has fireproofing?
19     A.  Not necessarily, but it's not
20  uncommon.
21     Q.  Have you seen buildings where there
22  was no debris, but there was fireproofing?
23     A.  I really cannot recollect, but in
24  most cases I could tell, or I remember in
25  most cases that I've been involved with that
```

Page 66

Franco Seif

1  there has been some fireproofing at one point
2  or the other got dislodged.
3  Q. In Section 4.4, the very last
4  sentence says, "Accidental contact is a
5  concern for exposure to asbestos," what do
6  you mean by accidental contact?
7  A. Walking, working in spaces that
8  contain -- that has materials that contains
9  asbestos, where you are not attempting to
10 work in the material that contains asbestos
11 but you are working next to it where
12 accidentally you brush against that material,
13 especially if it is friable, as it is in this
14 case, or you slip and touch that material by
15 mistake, that type, or carrying a ladder such
16 as in that first building that we discussed,
17 the one down in Costa Mesa, if you're
18 carrying a ladder and accidentally you hit
19 the ceiling, that's right there you can cause
20 that material to become dislodged.
21 Q. You're not suggesting, though, that
22 touching the material is physically
23 dangerous, the touching, the contact in and
24 of itself, are you?

Page 67

Franco Seif

1  A. Touching means like laying your
2  hand softly and just removing it?
3  Q. Sure.
4  A. I don't know if that could be a
5  potential for exposure.
6  Q. I just want to make sure that I
7  understand what you're saying here.
8  Is what you're saying that contact
9  is a concern because it may disturb the
10 material and therefore cause release of
11 respirable fibers into the air?
12 A. Contact, yes.
13 Q. But you're not saying that if I
14 touch asbestos, I might get sick from the
15 contact between of my finger and the
16 asbestos?
17 A. If you touch friable material and
18 there are -- that happens to be some fibers
19 sticking out and you just touch it and it
20 gets dislodged, then there's the potential of
21 you being exposed to that fiber that got
22 dislodged.
23 Q. In terms of respiration of the
24 fiber?

Page 68

Franco Seif

1  A. In terms of having a fiber released
2  into the air that you could be exposed to.
3  Q. But the concern is that you're
4  going to inhale it; is that correct?
5  A. The concern is that there's a fiber
6  and you're inhaling, of course.
7  Q. Right.
8  It's not a concern that if I touch
9  a fiber I would get sick. It's a concern if
10 I inhale a fiber, I might get sick?
11 A. If it gets dislodged after you
12 touch it.
13 Q. Right, I understand. I just want
14 to make sure that I'm clear on it.
15 On 4.8 it says, "The ceiling tile
16 in office buildings 8, 9, Subsection 4.3 and
17 4.4 is also friable." And that's the ceiling
18 tile we talked about before.
19 And it's your opinion that when
20 that tile is moved, it is releasing asbestos
21 fiber; is that correct?
22 A. Yes.
23 Q. Do you believe that maintenance
24 workers may be moving those tiles on a

Page 69

Franco Seif

1  routine basis?
2  A. If they have to do maintenance
3  above the ceiling, they have to remove those
4  ceiling tiles.
5  Q. Are you aware that W.R. Grace did
6  not manufacture ceiling tiles?
7  A. I'm not aware.
8  Q. Paragraph 4.11 on the next page,
9  Page 9, it says that your expert opinion is
10 that friable fireproofing material should be
11 abated, and when you talk about removal,
12 encapsulation and enclosure, and you seem to
13 indicate that in your expert opinion that
14 material should be removed; is that correct?
15 A. Yes.
16 Q. Why do you conclude that the
17 material should be removed?
18 A. When it comes to friable material,
19 for the last twenty years, the recommendation
20 of removal, enclosure and encapsulation has
21 always been there because that's what the EPA
22 recommends, but when material is friable,
23 removal is the only solution that in the long
24 term provides owners with the security that

Page 70

1          Franco Seif
2    there is no potential exposure to asbestos
3    anymore in the building, while the other
4    solutions will always give that -- the
5    indication that there could be potential
6    exposure to the fibers, whether you
7    encapsulate it or you enclose it, there's
8    always that risk that you could exposure to
9    asbestos fibers.
10       Q.  So is it your opinion that any
11   friable asbestos containing material should
12   be removed from a building?
13       A.  Yes.
14       Q.  And that opinion wouldn't change
15   one way or the other whether you had air
16   sample testing that fell below EPA or OSHA
17   guidelines?
18       A.  Yes.
19       Q.  It would change or it would not
20   change?
21       A.  My opinion would not change.
22       Q.  Are you familiar with the EPA's
23   green book message?
24       A.  Yes.
25       Q.  Is that message that asbestos

Page 71

1          Franco Seif
2    should be maintained in place?
3          MR. MANDELSBERG:  Objection.
4       A.  There are -- it's one of the
5    recommendations.  Operations and maintenance
6    -- in the green book, in the purple book, and
7    even with the EPA, operations and maintenance
8    is an alternative, but it is also a temporary
9    alternative.
10       Q.  Mr. Seif, we've talked a lot about
11   your report today, and I just want to make
12   sure that I'm clear what it was designed to
13   do and what I believe you're saying that
14   you're doing here.
15          Would you agree with me that what
16   your report purports to do is to confirm the
17   presence of asbestos in the building and the
18   condition of that asbestos?
19          MR. MANDELSBERG:  Objection.
20       A.  And the friability situation.
21       Q.  It does not purport to do a hazard
22   assessment?
23       A.  No.
24          MR. MANDELSBERG:  Objection.
25          Asked and answered.

Page 72

1          Franco Seif
2       Q.  Mr. Seif, can you tell me, do you
3    know of anyone who has gotten sick as a
4    result of exposure to asbestos in any of
5    these buildings?
6       A.  In these buildings, no.
7          MS. REA:  Can we take a
8       brief break.
9          (Whereupon, a recess was
10      taken at this time.)
11          MS. REA:  Mr. Seif, thank
12      you very much.
13          I have no more questions
14      today.  I don't know if your
15      counsel has any that he would like
16      to follow-up on.
17          MR. MANDELSBERG:  We don't
18      have any questions.
19          Thank you.
20          MS. REA:  Would you like to
21      read and sign?
22          MR. MANDELSBERG:  Yes, we
23      want an original of the transcript
24      which we ask you send to us
25      directly and we will arrange to

Page 73

1          Franco Seif
2    have Mr. Seif read it, sign it
3    before a notary and return it to
4    counsel.
5          -o0o-
6          (Whereupon, the examination
7    of FRANCO SEIF was concluded at
8    12:30 p.m.)
9
10
11      _____
12          FRANCO SEIF
13
14
15   Subscribed and sworn to
16   before me this ___ day
17   of_____ , 2007.
18
19   _____
20   NOTARY PUBLIC
21
22
23
24
25

Page 74

1
2        --------------- I N D E X ---------------
3
4   WITNESS      EXAMINATION BY      PAGE
5   FRANCO SEIF   MS. REA        5
6
7
8        ---------------- EXHIBITS --------------------
9
10  EXHIBIT                  FOR ID.
11    1      Document            7
12    2      Documents          11
13    3      Report             27
14
15      (Exhibits 1 and 3 retained by reporter.)
16  ---------------------------------------------------
17
18
19
20
21
22
23
24
25

Page 75

1
2        C E R T I F I C A T E
3
4   STATE OF NEW YORK   )
5             : ss.
6   COUNTY OF QUEENS    )
7        I, AYDIL M. TORRES, a Notary Public
8   within and for the State of New York, do
9   hereby certify:
10       That FRANCO SEIF, the witness whose
11  deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by the
14  witness.
15       I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 5th day of April, 2007.
21
22
23     _____
24
25        AYDIL M. TORRES