EXHIBIT A



### State of New Jersey
Department of Environmental Protection

Christine Todd Whitman
*Governor*

Robert C Shinn, Jr
*Commissioner*

NOV 0 8 1995

Mr. David Zervas
Environmental Waste Management Associates
1 Wall Street
Research Park
Princeton N.J. 08540-1513

RE: F. Sharp Screw Machine Products, Janr Transport, and Morgan
    Chemical Co. (F. Sharp)
    Somerville Boro., Somerset County
    ISRA Case #85647, 85648, 85649

Dear Mr. Zervas:

The New Jersey Department of Environmental Protection and Energy (NJDEP) has
reviewed the Remedial Investigation Report (RIR) and Remedial Action Workplan
(RAW) received on September 15, 1995. Based upon the review F. Sharp's
proposal for no further action in the area of the Loading Dock (AOC #13) is
acceptable.

However, F. Sharp's proposal for the placement of engineering controls without
the recording of a Declaration of Environmental Restriction is unacceptable.
F. Sharp has demonstrated through soil sampling activities that contamination
is above NJDEP's residential soil cleanup criteria in the area of the rail road
ditch. Therefore, F. Sharp shall either remediate to NJDEP's residential soil
cleanup criteria or submit a proposal for a Declaration of Environmental
Restriction. Pursuant to N.J.S.A. 58:10B-12 36.a.(2) the establishment of any
engineering or institutional controls require the consent of the owner of the
real property, the recording with the office of the county recording officer,
in the county in which the property is located. The purpose of a use
restriction is to put all interested parties on notice of the remaining
contamination and to identify those uses of the property inconsistent with that
contamination. Furthermore, N.J.S.A. 58:10B-12 requires the use restriction to
include the specific engineering or institutional controls at the property that
exist and that shall be maintained.

### Ground Water

F. Sharp's proposal for natural attenuation of ground water contamination is
unacceptable at this time. The two most critical tasks that must be completed
is delineation of the extent of ground water contamination and a receptor
evaluation. NJDEP's comments and recommendations for additional work regarding
F. Sharps proposal for natural attenuation proposal for ground water are
outlined below. Please be advised that additional work must be completed if F.
Sharp is interested in pursuing this type of remediation.

1. F. Sharp has not rehabilitated monitor well #3 (MW-3) as required by
NJDEP's letter dated April 21, 1995. An obstruction was reportedly present in
the well which prevented the well from being monitored. Furthermore, the RIR
indicates that MW-4 also has an obstruction. Therefore, F. Sharp shall repair

LITGO-RCRA0006395

MW-3 and MW-4 and submit an explanation as to why MW-3 was not rehabilitated. If these wells cannot be rehabilitated, they must be sealed and replacement wells must be installed. This is particularly important in the case of MW-4, this well is critical in understanding ground water flow conditions at the site. Replacement wells must be installed within 10 feet of the original locations and must monitor the same zone as the original wells monitored. Wells must be constructed and installed in accordance with NJDEP bedrock well specifications.

2. F. Sharp was required to replace the lock and cap for MW-3C. The RIR does not indicate whether or not this was done. This well is important for assessing the off-site trichloroethene (TCE) contamination and therefore it is important to insure that sample quality and integrity is not compromised. F. Sharp shall replace the lock and cap for MW-3C and submit an explanation as to why the lock and cap was not replaced.

3. The discussion of ground water sampling results in the RIR fails to mention that MW-5 and MW-6 contained 820 ug/L and 305 ug/L of cis-1,2-Dichloroethene. Therefore, F. Sharp shall submit an explanation as to why it was not addressed in the RIW. Please be advised that cis-1,2-Dichloroethene has a ground water quality standard of 10 ug/L.

5. Additional delineation of the horizontal and vertical extent of ground water contamination is <u>deferred</u> pending resolution of the on-site vs. off-site contaminant source dispute. If F. Sharp had been successful in demonstrating an off-site source, no further ground water investigation would have been required. Since ground water contamination does not originate from off-site sources, the horizontal and vertical extent of contamination must be delineated pursuant to the Technical Requirements of Site Remediation (N.J.A.C. 7:26E). Furthermore, it appears that ground water contamination originating at the F. Sharp site may have migrated off-site. NJDEP recommends the installation of monitor wells at the following locations:

A.  A cluster well at the MW-11 location proposed by Environmental Waste Management Associates in their report dated April 21, 1995. (See Figure 1, MW-11/MW-11D)

B.  A deeper well to be paired with MW-5. (See Figure 1, MW-12)

C.  A deeper well to be paired with MW-6. (See Figure 1, MW-13)

D.  A well will be needed for delineation downgradient of MW-5 which should be located east to southeast approximately 150-200 feet from MW-5.(See Figure 1, MW-14)

E.  A well will be needed for delineation downgradient of MW-6 which should be located approximately 100 to 150 feet west of MW-6. (See Figure 1, MW-15)

6. F. Sharp shall sample all new monitor wells for volatile organic compounds with a forward library search (VO +10) by EPA method 624, dissolved oxygen (D.O.), specific conductance (S.C), temperature, pH, and parameters to be used for assessing biodegradation potential as discussed below. F. Sharp may propose sampling parameters for existing wells, but at a minimum existing MW's shall be sampled for D.O., S.C., temperature, pH and biodegradation parameters as discussed below. F. Sharp shall include at least one upgradient well for sampling which shall be either MW-1 or MW-7. Please be advised that VO +10 analyses may not be necessary for all existing wells. Upon deciding which MWs to sample, F. Sharp should keep in mind that the current available data is not adequate for establishing trends in ground water quality and data is needed to better evaluate the presence and distribution of TCE and its breakdown

LITGO-RCRA0006396

products. Furthermore, F. Sharp shall be advised that two rounds of water level elevation data must be collected from ALL monitor wells, two weeks apart to properly asses ground water flow direction.

7. F. Sharp believes natural attenuation for ground water is technically feasible based on documented degradability of the compounds of interest and aquifer characteristics at the site. While F. Sharp has shown some evidence of the breakdown of TCE, F. Sharp has not established whether or not this is actually occurring at the site or by what mechanisms. Please be advised that NJDEP's Guide for the Submission of Remedial Action Workplans states that it is unacceptable to rely solely on extrapolation from literature or studies from other sites.

A. F. Sharp discusses pH, Redox potential (Eh) and Iron (Fe) data and the role of these geochemical parameters in biodegradation for their assessment of site-specific degradability characteristics. Although pH data is available from on-site sampling, F. Sharp has relied on a minimal amount of data collected by another consultant who sampled MW-2B and MW-3C as part of another site investigation to assess Eh and Fe. These parameters have not been monitored at the F. Sharp site. F. Sharps review of Eh data suggest some probability (but no certainty) that conditions could be favorable for reductive dehalogenation (anaerobic biodegradation), but has not demonstrated conclusively that this process is taking place on-site and if or how it affects TCE and TCE breakdown products.

B. F. Sharp should evaluate parameters that are indicators of microbiological activity for both aerobic and anaerobic, such as nitrate, iron, manganese, carbonates, sulfate reduction, Eh, temperature, D.O., pH, methane and ethene. These parameters should be measured ON-SITE and compared from background sampling points, sampling points representing the highest contaminant levels and downgradient sampling points. It is important to assess changes in these parameters over time and changes in distribution across the site. It may be possible to develop a list of site specific biodegradation parameters once it is determined which process(es) are significant at this site.

C. Recent sampling data suggest that TCE may be breaking down to c-DCE, but data is limited and it is not possible to assess trends over time. Even if c-DCE is present as a degradation product of TCE, there is no data to suggest that c-DCE is or will continue to degrade. Contaminant distribution and changes in distribution over time need to be assessed; this task is complicated by the incomplete delineation and limited historical ground water quality data available. Data for c-DCE is not available for most of the analyses because it is a library search compound and several rounds of samples were analyzed using the GC rather than a GC/MS method, or, even when a library search may have been performed, it was not possible to locate in the NJDEP files.

D. Several degradation pathways are known to exist for TCE. With one possible exception, all of these pathways involve formation of vinyl chloride. Vinyl chloride has been found to be very persistent in the environment under anaerobic conditions, but it has been observed to degrade rapidly under aerobic conditions. Better information is needed concerning on-site geochemical processes and contaminant distribution is needed to fully assess viable degradation pathways, whether or not complete degradation will occur and the fate of any breakdown products that may be forming.

E. F. Sharp should evaluate enhanced bioremediation options or other "active" remedial options. The long time frame that may be required for natural remediation to attain cleanup goals may add significantly to the cost of this approach, such as, monitoring. NJDEP believes it to be highly unlikely that a

LITGO-RCRA0006397

trend of decreasing contaminant concentrations will be observed during the proposed two years of quarterly ground water monitoring. Monitoring data collected over the past six years have not shown a decreasing trend.

8.  F. Sharp explanation that delineation is complete is unacceptable. NJDEP believes delineation is not complete as discussed above. Furthermore, F. Sharp states the plume has not migrated in five years. This statement is not substantiated. Without complete delineation and a well designed and a periodic ground water monitoring program, it is not possible to determine whether or not the plume is migrating.

9.  F. Sharp states that contaminant levels in off-site MWs have decreased. NJDEP's review of monitoring data indicate that TCE levels in MW-1A and MW-2B, which have been in the low ppb range for each sample event, have remained relatively constant. The sampling events of April 1990, July 1991, and May 1995 reported TCE levels at 880 ug/l, 28 ug/l, and 15.5 ug/l respectively for MW-3C. While this appears to indicate a decreasing trend, it should be noted that a significant drop in ground water elevation of eight to nine feet occurred between the first round of sampling and subsequent rounds. Furthermore, MW-3C has been missing its cap and lock for some time. NJDEP believes that both factors suggest that data from this well should not be used to draw major conclusions about ground water quality trends.

10.  F. Sharp states that contaminant levels in MW-5 show a decreasing trend. The sampling events of April 1989, May 1989, April 1990, July 1991, March 1994, and May 1995 reported TCE levels at 500 ug/l, 550 ug/l, 630 ug/l, 1,190 ug/l, 502 ug/l, and 728 ug/l respectively for MW-5. NJDEP does not believe this represents a decreasing trend.

11.  F. Sharp estimates ground water flow velocity utilizing a model that considers only primary porosity, an approach that may not be valid in a fractured bedrock aquifer where secondary porosity must be considered when evaluating ground water flow and contaminant migration. It may be appropriate to conduct aquifer test(s) at this site, once additional wells have been installed in order to better define site-specific aquifer characteristics. Additional techniques for characterization of bedrock aquifers are described by Michalski, Fall 1990 Ground Water Monitoring Review. A combination of video logging, in-well tracer tests, borehole geophysics, and in some instances, packer sampling have been found to yield useful data. Again, it must be emphasized that additional monitor wells, particularly deeper wells to be paired with existing wells, should be installed prior to implementing these investigative techniques.

12.  F. Sharp's attempt to use their estimate of ground water flow velocity to establish a sentinel well location is premature. A better assessment of the extent and distribution of contamination is required. Aquifer characteristics must be defined and a receptor analysis should be completed before a sentinel well location is established.

13.  F. Sharp shall conduct a well search to identify all irrigation, monitoring and domestic wells located within a one-half mile radius of the site (including any such wells located on-site) and all industrial, public supply wells and wells with water allocation permits located within a one mile radius of the site. The sources used to identify these wells shall include, but not necessarily be limited to, the NJDEP Water Supply Element - Bureau of Water Allocation's paper, microfiche and computer records, as well as the records of the local and county health departments. All wells identified as potable wells (domestic and public supply wells) are assumed to be active unless F. Sharp provides documentation to the contrary. Once all wells have been identified, F. Sharp shall verify the actual location of all potable wells, and F. Sharp

LITGO-RCRA0006398

shall report the method of verification (i.e. field verified, lot and block numbers compared to local tax map, owner contacted, etc.).

F. Sharp shall plot the results of the well search on a scaled map (scale shall be less than or equal to 1:24,000) in relation to the facility, and F. Sharp shall accurately depict all wells on this map. F. Sharp shall submit a listing of all wells identified cross referenced to the scaled map, and F. Sharp shall submit the list, the map, and any specific information available on the wells to the NJDEP. F. Sharp shall submit the following information with the results of the well search: the type of well, the status of the well (active, inactive, properly abandoned pursuant to N.J.A.C. 7:9-9 et. seq.), total depth, casing length, open bore hole or screened interval, copies of well records and or well logs on file with the NJDEP's Bureau of Water Allocation, and any additional records available in county or municipal records. F. Sharp shall submit a listing of all sources referenced in performing the well search. If a referenced agency is unable to provide the information requested, F. Sharp shall provide written documentation that the source was contacted and that the request for information was either denied or that the information was unavailable.

A. It is recommended that efforts be made to determine the status of each well identified in the well search. By identifying which wells are inactive, it may be possible to avoid unnecessary sampling that might be required based on the assumption that potable wells could be impacted by off-site contamination, and unnecessary delays which could develop if an accurate status determination becomes necessary for decision making at a later point in the case. A status determination can be made by contacting the well owner directly or by contacting the local water purveyor to determine whether or not the particular property in question is serviced by the purveyor.

B. NJDEP files contain several references to an on-site production well that was reportedly 300 ft. deep. F. Sharp shall submit an explanation as to what actions, if any, were taken to address the production well. Specifically, has this well ever been sampled and/or has it been sealed. If the well was sealed, F. Sharp shall submit a copy of the well abandonment form. If the production well has not been sealed then F. Sharp shall submit a proposal to seal the well.

14. F. Sharp must conduct a receptor evaluation to determine locations of ecological and human receptors; such as, surface water bodies, wetlands associated with the Raritan River, and ground water users. The Somerville and Bridgewater Department of Health may have information on file. Furthermore, the Bureau of Water Allocation may also have pertinent information.

15. F. Sharp proposes to sample ground water quarterly for two years. This timeframe is not likely to be long enough for site contaminants to demonstrate a trend of decreasing contaminant concentrations or for contamination to decrease below the Ground Water Quality Standards.

A. The ground water monitoring program should include biodegradation parameters.

B. F. Sharp states that upgradient monitor wells will not be sampled because it will not yield useful information. NJDEP believes at least one of the upgradient monitor well should be sampled periodically. It may not be necessary to sample for VO + 10 every quarter, but annual sampling for VO + 10 should be included as well as other parameters sampled quarterly.

C. The specific details of the ground water monitoring program can be finalized once site characterization work is complete. Upon additional MWs

LITGO-RCRA0006399

installation, it may be useful to initiate a quarterly monitoring program. NJDEP believes this would provide information that would assist in determining an appropriate remedial strategy.

D.  Pursuant to N.J.A.C 7:9-6.6 of the Ground Water Quality Standards, the NJDEP requires that a Classification Exemption Area (CEA) be established as part of the approved remedy whenever constituent standards applicable to a ground water classification area are not or will not be met for the term of the remediation.  A guidance document has recently been issued by the Site Remediation Program dated April 1995 that should be used to assist F. Sharp in incorporating this requirement into their RAW.  If F. Sharp does not already have a copy of this guidance document, they may contact the case manager, Kenneth Kahora to obtain a copy.

Therefore, F. Sharp shall submit a revised Remedial Action Schedule, pursuant to N.J.A.C. 7:26E-6.5, which includes all tasks associated with the remediation of the site. within thirty calender days of the receipt of this letter.  If you have any questions, please contact the Case Manager, Kenneth J. Kahora, at (609) 292-2697.

Sincerely,

Stephen Maybury, Acting Bureau Chief
Bureau of Environmental Evaluation
and Cleanup Responsibility Assessment

enclosure

c:  Sheldon Goldstein, Property Owner
    Sara Kinsel, BGWPA
    Chris Lacy, BEERA
    Steve Krajewski, Health Department

LITGO-RCRA0006400

