## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### FEE APPLICATION OF KIRKLAND & ELLIS LLP
### FOR THE TWENTY-EIGHTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Fee Application of Kirkland & Ellis LLP for the Twenty-Eighth Interim Period</u>.

### BACKGROUND

1.     Kirkland & Ellis LLP ("K&E") was retained as counsel to the Debtors.  In the Application, K&E seeks approval of fees totaling $7,263,172.00 and expenses totaling $4,742,857.17 for its services from January 1, 2008 through March 31, 2008 (the "Application Period").

2.     In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2008, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330,

Issued January 30, 1996 (the "U.S. Trustee Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served an initial report on K&E, and received a response from K&E, portions of which response are quoted herein.

**DISCUSSION**

3.      In our initial report, we noted that during the eight days of the estimation trial in January and March 2008, K&E had in attendance anywhere from six to 14 professionals and paraprofessionals.[1]  This does not include three K&E technical assistants who were present to lend technical support.  The total time spent at the trial, including non-working travel, was 748.20 hours for total fees of $360,568.00.   The time entries are listed on Exhibit "A."  Paragraph II.D.5. of the U.S. Trustee Guidelines provides: "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."  We understand the importance of this hearing and appreciate the need for multiple attendees.  However, not all of the attendees' roles were clear.  Thus, we asked K&E to explain why it was necessary for each

---

[1]The dates of the trial and the number of K&E professionals and paraprofessionals attending are as follows:

    January 14, 2008 – 14
    January 16, 2008 – 12
    January 22, 2008 – 12
    January 23, 2008 – 8
    March 24, 2008 – 6
    March 25, 2008 – 10
    March 26, 2008 – 15
    March 31, 2008 – 8

attorney and paralegal to attend the hearing, including their respective roles at the hearing.  K&E provided a response which we have included as Response Exhibit "A."  We appreciate K&E's response and accept K&E's response with respect to all those attending, with the exception of K&E partner, Deanna Boll.  It does not appear to us that the response establishes the necessity of Ms. Boll's attendance at the hearing.  We understand from the response that Ms. Boll, a restructuring partner, had conducted research and prepared trial materials.  Ms. Boll attended only a portion of the first day of the trial.  According to the response, her role at the trial "was to assist David Bernick and Ted Freedman with bankruptcy-related concepts and case law interpretation that was especially relevant to the opening portion of the trial."  However, attorneys Theodore Freedman and Janet Baer, both restructuring partners, were present and undoubtedly able to handle any such issues that arose. According to the response, Mr. Freedman was also in attendance on the first day of the hearing to assist Mr. Bernick with bankruptcy-related issues: "(Theodore Freedman) is a world-renowned expert in the field and the final word on the Grace case on Bankruptcy related issues... Ted was asked by David (Bernick) to attend the first day of the trial in order to counsel David on Bankruptcy issues for the opening statement..."   Thus, it does not appear that K&E has carried its burden of proving the necessity of Ms. Boll's attendance, and we recommend disallowance of Ms. Boll's time in traveling to and attending the hearing, for a reduction of $4,187.50 in fees.

4.    In our initial report, we noted the following time entries in which there was a discrepancy between the total time billed and the time recorded in parentheses:

a.    The time billed is 6.80 hours for total fees of $1,020.00.  However, the time recorded in parentheses totals 6.60 hours for total fees of $990.00.  Thus, it appears that there is an overcharge of $30.00.

2/18/2008    Bianca Portillo       6.80    Review and categorize correspondence re order

resolving City of Cambridge claim and motion to extend ART credit agreement (1.9); prepare file re matters to be heard at February 25 hearing (1.8); review and organize hearing transcripts (1.4); review, analyze and organize adversary proceeding pleadings (.9); prepare updates to order binders and index (.6).

b.      The time billed is 6.30 hours for total fees of $945.00.  However, the time recorded in parentheses totals 6.10 hours for total fees of $915.00.  Thus, it appears that there is an overcharge of $30.00.

| 2/22/2008 | Bianca Portillo | 6.30 | Review and categorize correspondence re environmental liability transfer agreement (.9); review and organize pleadings re same for central files (1.8); review and organize pleadings for adversary proceeding and Third Circuit appeal files (.7); update order binders and index (.4); update contact list (.8); review recent motions and orders and update motion status chart (1.5). |

Thus, we asked K&E whether or not it agreed that fee adjustments were warranted in these instances.

K&E responded as follows:

You have raised an issue about two time entries of Bianca Portillo, a K&E professional who was a Restructuring Department project assistant assigned to the Cases during the time period covered by the Initial Report.  In each case, we do not dispute that a time recording error resulted in the total time set forth in parentheses being 0.2 hours greater than the sum of the individual time entries recorded.  K&E, therefore, does not dispute a fee reduction of $60.00 (0.4 x Bianca's hourly billing rate of $150.00).

We appreciate K&E's response and recommend a reduction of $60.00 in fees.

5.      In our initial report, we noted the following air fare charges for which more information was needed:

| 1/6/2008 | 1,452.00 | Travis Langenkamp, Airfare, Pittsburgh, PA, 01/06/08 to 01/25/08 (Trial) |
| 1/7/2008 | 1,446.00 | Amanda Basta, Airfare, Pittsburgh, PA, 01/08/08 to 01/25/08 (Trial) |

| 1/8/2008 | 1,457.00 | Raina Jones, Airfare, Pittsburgh, PA, 01/08/08 to 01/24/08 (Trial) |
| 1/20/08 | 1,214.93 | Deborah Scarcella, Airfare, Pittsburgh, PA, 01/20/08 to 01/24/08 (Trial) |
| 1/20/08 | 1,457.00 | Brian Stansbury, Airfare, Pittsburgh, PA, 01/20/08 to 01/23/08 (Trial) |
| 2/26/2008 | 1,476.99 | Brian Stansbury, Airfare, Pittsburgh, PA, 02/26/08 to 02/27/08 (Expert Witness Conference) |
| 3/7/2008 | 1,496.99 | Andrew Ross, Airfare, Pittsburgh, PA, 03/07/08 to 03/07/08 (Court Hearing) |
| 3/24/08 | 1,517.01 | Sandra Wilson, Airfare, Pittsburgh, PA, 03/24/08 to 03/29/08 (Trial) |
| 3/27/08 | 1,537.00 | Andrew Ross, Airfare, Pittsburgh, PA, 03/27/08 to 03/28/08 (Trial) |

In response to our inquiry, K&E provided additional information concerning these charges, which information we have included as Response Exhibit "B." We accept K&E's response and have no objection to these expenses.

6.      In our initial report, we noted the following ground transportation charge for which more information was needed

| 1/10/2008 | 364.10 | Theodore Freedman, Transportation to/from Columbia, MD, 01/10/08 (Client Conference) |

In response to our inquiry, K&E provided the following information concerning this charge:

This charge represents the expense of the taxicab and car service portions of Ted's January 10th trip from New York to Grace's Columbia, MD headquarters and back. The charges for the trip to Columbia break down as follows: first, $42.88 cab fare from Ted's home in New York City to Penn Station (then a train ride to BWI Airport Amtrak station, the cost of which is not part of the questioned expense), and second, $105.47 car service fare from BWI Airport Amtrak station to Columbia. The return trip expenses consisted of: first, $160.83 car service charge from Columbia

to BWI Airport Amtrack station (and then return train ride to Penn Station, New York), and, second, $54.92 cab fare from Penn Station to Ted's home.

Because these ground transportation charges are properly chargeable to the Debtors, K&E respectfully requests full reimbursement thereof.

We accept K&E's response, except with respect to the car service charges. The response does not establish the necessity of a car service from Baltimore-Washington International Airport to W.R. Grace headquarters. Our research indicates that the same 18-mile round trip, if taken by taxi, would have cost less than $110.00, including tip. Thus, we recommend a reduction of $156.30 in expenses.

7.    In our initial report, we noted the following meal charges for which more information was needed:

| 1/12/2008 | 529.56 | Travis Langenkamp, Travel Meal with Others, Pittsburgh, PA, 01/12/08 (Trial), Dinner for trial team |
| 3/26/08 | 250.00 | Alun Harris-John, Travel Meal, Pittsburgh, PA, 03/26/08 (Trial), Breakfast |

In response to our inquiry, K&E provided the following information concerning these charges:

The January 12th charge was actually two separate meals charged by Travis that were combined into one entry on the Fee Application. The first was for $31.75 for in-room breakfast. In accordance with the recently revised meal expenditure caps effective January 1, 2008, K&E agrees that this charge should be reduced by $6.75 in order to comply with the $25 breakfast meal expenditure cap. The remaining $497.81 was a charge for a restaurant dinner meal for seven members of the estimation trial team. K&E agrees to a reduction of $112.81 on this charge in order to comply with the recommended dinner expense cap. Therefore, K&E agrees to a total reduction of $119.56 on the January 12th meal charges.

The March 26th meal charge of $250.00 represents a typographical error on K&E's part. The correct original charge was for $30.05 for a breakfast meal for Alun Harris-John. Again in accordance with the recommended meal caps, K&E agrees to a reduction of $225.00 on this charge.

We appreciate K&E's response and recommend a reduction of $344.56 in expenses.

8.      In our initial report, we noted a total of $4,364.10 for "Scanned Images." It appeared that K&E had billed these scanned images at $0.15 per page. Thus, we asked K&E to explain why these scanned pages should be charged at a higher rate than the $0.10 per page allowed for photocopies in this District. K&E responded as follows:

> The Initial Report requests an explanation for the $0.15 a page charge for scanned images. A scanned image is a picture of a document which allows one to transmit or store the document electronically. In establishing the cost of scanned images, K&E considers the firm's underlying cost basis as well as pricing at other law firms and other third-party service providers. A recent third party survey indicates that K&E's $0.15 per page scan charge is consistent with the current market price. For these reasons, K&E respectfully requests approval of the $4,364.10 in scanned images charges included in the Fee Application.

> We understand K&E's response and note that the Local Rules do not address the issue of scanned pages, only photocopies. However, there is sufficient similarity between the two that we do not feel comfortable recommending that scanned pages be reimbursed at a rate exceeding 10 cents per page. Unlike a photocopy, a scanned page requires no paper or toner, and thus it appears to us that if scanned pages are reimbursed at all, it should be at a rate not exceeding the 10 cents per page charged for photocopies. K&E billed for 29,094 scanned pages, which if charged at a rate of 10 cents per page, would cost $2,909.40. Thus, we recommend a reduction of $1,454.70 in expenses.

9.      In our initial report, we noted that those copies billed in the Application as "Standard Prints NY" appear to have been billed at a rate of $0.15 per page. The current per page limit for photocopies is $0.10 per page in this District. Thus, we asked K&E whether it would agree to reduce

these copies to $0.10 per page in order to comply with the Local Rule.  K&E responded as follows:

> The Initial Reports notes that K&E billed $0.15 a page for copies made in its New York office.  Given that the applicable Local Rule limits photocopy charges to $0.10 per page, K&E has no objection to an expense reduction of $655.35.  (In the time period covered by the Initial Report, K&E billed $0.15 a page for 13,107 pages of copies, for a total charge of $1,966.05.  Reducing the per-page charge to $0.10 lowers the total charge to $1,310.70).  Going forward, K&E will ensure that all copies are charged at the $0.10 per page rate.

We appreciate K&E's response and recommend a reduction of $655.35 in expenses.

10.    In our initial report, we noted the following charges for books:

| 12/15/2007 | 645.84 | AMAZON - Information Broker Doc/Svcs, Books, A Erskine |
|---|---|---|
| 1/15/2008 | 168.70 | AMAZON - Information Broker Doc/Svcs, Books, A Erskine |

Pursuant to Paragraph II.E.7. of the U.S. Trustee Guidelines, library and publication charges are

considered nonreimbursable overhead.  Thus, we asked K&E to explain why the estate should

reimburse these expenses.  K&E responded as follows:

> The December 15th charge actually represented two separate charges:  $76.00 for an interlibrary loan of a publication, and $569.84 for two treatises ordered from the vendor Amazon.com.  The January 15th charge was for two publications ordered from Amazon.com.  All of these materials were ordered in conjunction with K&E's estimation trial preparation; as part of K&E's estimation trial preparation, K&E built a database of all publications cited by all expert witnesses due to testify in the estimation proceedings.  This database was used extensively by K&E estimation trial team members in their respective preparations for conducting direct and cross examinations of the testifying expert witnesses.  But for the estimation trial, K&E would have had no need to ever obtain these publications.  Thus, we believe the charges are appropriately reimbursable by the Grace estates.

We accept K&E's response and have no objection to these expenses.

## CONCLUSION

11.    Thus, we recommend approval of $7,258,924.50 in fees ($7,263,172.00 minus

$4,247.50) and $4,740,246.26 in expenses ($4,742,857.17 minus $2,610.91) for K&E's services for

the Application Period.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul, Suite 1250
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document has been served by
First Class United States mail to the attached service list on this 29th  day of August, 2008.

_____
        Warren H. Smith

# SERVICE LIST
### Notice Parties

**The Applicant**
Janet S. Baer
David M. Bernick, P.C.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

jbaer@kirkland.com
dbernick@kirkland.com

**The Debtor**
David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

william.sparks@grace.com

**Counsel for the Debtors**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
James R. O'Neill
Pachulski, Stang, Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

**Official Committee of Equity Holders**
Gary M. Becker
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

**United States Trustee**
David Klauder
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

**RESPONSE EXHIBIT "A"**

The time period covered by the Fee Application was the first quarter of 2008 which was the period in which Grace commenced its trial on Asbestos Personal Injury estimation.  As a result, it was essentially the most time intensive and costly period, to date, in Grace's seven year chapter 11 history.  During that time period, K& E attorneys and legal assistants were working around the clock either preparing for or conducting the trial on these matters.  The work that the K& E estimation team has been doing since essentially January 2005, finally culminated in the trial and demanded the support of every member of the estimation team as well as support from the Restructuring team.

With that background, K&E hereby responds to the Initial Report.  Each of K&E's responses in this letter corresponds to the paragraph in the Initial Report raising particular concerns regarding the Fee Application.

1.      Attendance at PI Estimation Trial (¶ 3 and Exhibit A)

The Initial Report requests greater explanation concerning multiple professionals' attendance at, and preparation for, the personal injury ("PI") estimation trial dates occurring in January and March of 2008.

The PI estimation trial commenced January 14, 2008 and continued, on scheduled dates, until the parties reached settlement in early April, 2008.  The work performed by K&E during the period covered by the Initial Report represents the great majority of the trial time.  As has been explained in prior responses, it is not K&E's routine practice to have multiple K&E professionals attend hearings or meetings.  However, a trial of this magnitude required participation by numerous members of the trial team who all had very distinct and vital roles at the trial.  In addition, it required the participation of many more attorneys and paraprofessionals on site in Pittsburgh to support the trial team.

The specific roles and responsibilities of the members of the PI litigation team, which we have expounded upon at length in prior responses, continued throughout the trial.  Specifically, we refer you to our two most recent responses (replying to your initial report regarding the Twenty-Fifth Interim Period, your initial report regarding the Twenty-Sixth Interim Period and your initial report regarding the Twenty-Seventh Interim Period, respectively (collectively, the "Prior Reports")), for detailed discussions of the roles and responsibilities of the PI team members whose trial time is at issue here.

The following lettered paragraphs list, in the order listed in Exhibit A to the Initial Report, each of the professionals whose time is listed in Exhibit A, together with such professional's specific trial role and responsibilities.

(a)    Amanda Basta

Amanda, the senior-most associate on the D.C. estimation litigation team, played a large role in the estimation proceedings.  She was primarily responsible for all materials regarding the PI Proofs of Claim and Questionnaires which formed the basis for much of the Expert work for the trial.  She was also the associate responsible for third party fact discovery. On January 14th, her role was to support David Bernick in his opening statement and *Daubert* presentations.  She was available to conduct research and answer questions on issues on which she had worked.  Her role on January 16th was much the same.  Amanda's presence in Court was required on most days because of her extensive work on the PI Questionnaires which touched almost all of the evidence presented by Grace's witnesses at the trial in one way or the other.  Amanda attended trial on January 23rd because she was responsible for preparing the doctors and screeners whose video depositions were being presented that day, and in that capacity, she assisted presenting attorney Barbara Harding.  In particular, Amanda was tasked with handling evidentiary issues that arose in connection with the video presentations.  Amanda's March 25th and 26th trial date work was similar.  Again, she attended the trial in order to address PI Questionnaire and third party discovery issues and to provide support to the presenting attorneys.  On March 26th, she attended in order to support David Bernick in his presentation with regard to evidentiary issues relating to the admissibility of certain Rule 1006 summaries.

(b)    Raina Jones

D.C. PI litigation team associate Raina Jones attended portions of three trial days.  On January 14th, she spent 3.3 hours reviewing expert testimony to assist with the creation of trial outlines, and 7.3 hours attending the trial.  Her courtroom duties included responding to any factual issues that arose during the course of the witness examinations, and researching legal issues as they arose.  On January 22nd and March 26th, Raina again attended the trial, and performed the same tasks with regard to the witnesses testifying on that day.

(c)    Elli Leibenstein

Elli is the litigation partner on the trial team responsible for working with Grace's ultimate estimate expert witnesses, Thomas Florence, Elizabeth Anderson and others.  Elli has been doing this very specialized expert work for the past several years and is uniquely qualified to provide such expertise. Since the trial was focused on the estimated value of Grace's asbestos liability, Elli's role was key to the ultimate presentation and outcome of the trial. During the trial, Elli's role was to prepare the witnesses for their testimony, assist with the preparation of the witness' demonstratives and counsel David Bernick at trial in questioning such witness. Elli attended Court on January 14th in order to support David Bernick in his opening presentation with respect to the ultimate estimation conclusions and the expert reports relied upon to reach such conclusions. Elli's subsequent appearances at the trial on January 16, January 22, March 25, March 26 and March 31 were all necessary in order for him to assist with the witnesses that were testifying on estimation issues.

(d)    Brian Stansbury

Brian is the D.C. litigation associate on the estimation team most directly responsible for medical issues relevant to the estimation case.  As such, his attendance and assistance at the estimation trial was critical.  Specifically, during the January 14th proceedings, Brian assisted during David Bernick's presentation of the Debtors' opening statement, by advising David on the medical criteria and medical graphics used therein.  On January 16th, Brian sat second chair for expert witness Dr. Howard Ory's testimony.  In that capacity, he assisted Barbara Harding with her direct and redirect examinations of Dr. Ory, ensuring that Barbara addressed all relevant issues and preparing redirect questions and exhibits.  On January 16th, Brian sat second chair for both David Bernick's direct and redirect examinations of Dr. David Weill, and for Scott McMillin's direct and redirect examinations of Dr. Daniel Henry.  His roles with regard to both these witnesses was the same as that on January 14th.  On March 25th, Brian again sat second chair, and assisted Barbara Harding with her examination of Dr. Suresh Moolgavkar.  On March 26th, he attended in order to advise the presenting attorneys on any medical criteria issues arising during the course of Dr. Elizabeth Anderson's testimony.

(e)    David Mendelson

David Mendelson was the D.C. litigation partner responsible for all discovery responses provided by Grace related to the PI Estimation case. He also was responsible for issues at trial relating to the Debtors' corporate conduct, historical settlement practices, and insurance coverage issues.  He worked in the trial site in Pittsburgh during the trial in order to be continually available to assist on these issues.  He attended portions of the trial only when his attendance was necessary on the dates in question (January 14th, 16th, 22nd, and 23rd) in such capacity.

(f)    Deanna Boll

New York restructuring partner Deanna Boll was not a full-time member of the estimation team, and attended the trial only for a portion of the first day.  Her role was to assist David Bernick and Ted Freedman with bankruptcy-related concepts and case law interpretation that was especially relevant to the opening portion of the trial.  She analyzed issues and conducted research regarding PI claims estimation for the purposes of claims allowance under the Bankruptcy Code.  In addition, Deanna prepared related trial materials, and conferred with David prior to and during his opening statement presentation.

(g)    Janet S. Baer

I was the only restructuring attorney who was generally present for most of the trial.  As you will recall, I have been the restructuring partner in charge of the Grace case on a daily basis for the last number of years.  I am also the only member of the Grace team, other than David Bernick, who has essentially worked on the case from the date of the Chapter 11 filing on April 2, 2001 to date.  As a result, my presence was required at the trial both to provide historical

continuity for the case but to also assist with Bankruptcy related issues that arose during the trial. I worked out of our Pittsburgh trial site for the majority of the trial and attended portions of the Jan. 14th, Jan. 16, Jan. 22, March 24, March 26 and March 31 hearing when my presence was needed to provide historical information or Bankruptcy expertise.

      (h)     Salvatore Bianca

Sal Bianca is a senior Chicago litigation associate who was formerly a restructuring associate. Sal has worked on the Grace case for several years and plays a key support role in the Bankruptcy case in general, the Estimation proceedings and the Criminal case. He did not have a specific assigned role in the trial but instead was asked to support the trail team in Pittsburgh to perform various tasks as they came up. Sal attended the first day of trial, January 14 (approx. 6.5 hrs) and spent about 1.5 hrs in preparation. Prior to the hearing, he helped prepare materials re Grace's opening statement, potential responses to the claimants' opening and *Daubert* arguments. He attended the hearing because he has been involved in various aspects of the estimation since 2004 (including the drafting of portions of the *Daubert* briefs addressed at the hearing) and has a familiarity with the case that required his presence in court so that he could address any issues that arose at a moment's notice. Sal attended portions of the January 15 hearing specifically related to the direct and cross examinations of Howard William Ory and Joseph Rodricks. Sal attended these portions of the hearing because he was familiar with both experts' work in the case and assisted in the preparation of Dr. Ory for his testimony. On January 22, Sal attended the full examination of David Weil and portions of the examination of Daniel Henry. He attended the hearing because he worked in preparing Dr. Weil for the trial. He is also familiar with the studies addressed by Dr. Weil as well as studies the asbestos claimants would potentially raise on cross-examination. On January 23, he attended the portion of the hearing regarding the deposition designations of doctors and screening companies. Sal conducted one of the depositions addressed at the hearing and wrote portions of the estimation briefs regarding claims being manufactured through the screening process. On March 26, Sal attended portions of the Elizabeth Anderson examination because he was familiar with her risk assessment work in both the civil and the criminal case. He is one of the attorneys on the criminal case in charge of addressing risk assessment issues and his presence was necessary at the trial to assure continuity as well as to lend factual support.

      (i)     Scott McMillin

Scott McMillin is a litigation partner in the Chicago office who is on both the Estimation trial team and the Criminal team. His role in the trial was to prepare and try the scientific aspects of the estimation trial. He worked extensively with the physicians, industrial hygienists, risk assessors and epidemiologists who testified at trial. On January 22, Scott put on the testimony of physician Dr. Daniel Henry. On March 24, Scott put on the testimony of industrial hygienist, Dr. Peter Lees. Scott was also integrally involved in preparing the other physicians, risk assessor and epidemiologists who both prepared reports and testified at trial. In this regard, Scott supported David Bernick in preparing and putting those witnesses on the stand.

(j)    Daniel Rooney

Chicago-based senior legal assistant Dan Rooney headed up the split Washington, D.C./Chicago trial support team. He and his team were charged with preparing and organizing all exhibits and graphics for trial each day. This task included not just the preparation of documents that were in fact used, but also procuring topic-based documents and information used for analyses by the Debtors' entire trial team of attorneys and experts. Dan's exhibit and graphics role was detail-oriented and document-intensive; he and his team were literally in charge of locating, organizing and keeping running track of millions of records. In addition, he was in charge of trial logistics. He coordinated the logistics of the remote trial site and served as the liaison between the trial team and the trial site building owners. On January 14th, Dan assisted in the setup of the presentation system in court. He also prepared opening statement and *Daubert* argument exhibits and graphics for David Bernick's use. He remained in court in order to respond to trial team document and information requests that were made during the course of the day. Dan's work on January 16th and January 22nd was much the same. On January 23rd, he prepared transcripts and video for presentation in connection with the Debtors' tendering of numerous witnesses via deposition designation.

(k)    Ellen Ahern

Ellen is a litigation partner and member of the Chicago PI litigation team who has worked with Barbara Harding and Scott McMillin on the development of expert testimony. On January 14th, Ellen prepared and revised graphics used by David Bernick in his opening statement. In addition, she worked on doctor and screener investigative matters and other non-party discovery related themes. On January 16th, she attended the trial to assist with the examination of Dr. Rodricks and to coordinate testimony amongst science experts, including the March 26th testimony of Dr. Elizabeth Anderson on risk assessment. On January 22nd and 23rd, she attended portions of the witness examinations in order to provide support on specific science experts testifying and again to coordinate amongst the experts. On March 26th, Ellen prepared for and attended the trial in order to work up the substantive materials for the examination of Dr. Anderson. Finally, on March 31st, Ellen attended the oral argument on the Rule 408 motion, providing legal analysis and case law discussion on the same, and also attended the direct examination of Dr. Thomas Florence in order to coordinate doctor and screener testimony issues as they related to estimation analysis and testimony.

(l)    David Bernick

As you are well aware, David Bernick is lead counsel for Grace. David is a litigation equity partner who has led the Grace team and litigation strategy since the petition date. He was the lead trial lawyer at the Estimation trial, the lead architect of the Estimation strategy and the final word on all witness testimony at trial and all materials presented at the Trial. David's participation at every trial day was absolutely required by the client and necessary to the process. On those occasions when Scott McMillin or Barbara Harding put on witnesses rather than David,

David was at Scott or Barbara's side counseling with them and directing and approving final questions and exhibits.

(m)    Theodore Freedman

Ted Freedman is the senior restructuring partner on the Grace team. I refer to Ted as "the professor." Ted has experience with the representation of companies with Asbestos issues that spans over at least the last 25 years. Ted is a world renowned expert in the field and the final word on the Grace case on Bankruptcy related issues. Ted has worked with David Bernick on all of the Asbestos chapter 11 cases that Kirkland & Ellis has been involved in. Ted was vital to the preparation of the legal memorandum and briefs that supported Grace's estimation request and counseled the Grace trial team on ultimate Bankruptcy issues. Ted worked directly with David Bernick on the Bankruptcy legal aspects of his opening statement and was asked by David to attend the first day of the trial in order to counsel David on Bankruptcy issues for the opening statement and to help David address and counter the statements made by the PI Committee and FCR in their opening statements. Ted was on site in Pittsburgh for preparation for the opening statement and attended only the first day of trial.

(n)    Travis Langenkamp

Travis is a senior legal assistant and the senior-most member of the D.C. PI litigation support team. At trial, he was charged with supporting the needs of trial attorneys Barbara Harding, David Mendelson, Amanda Basta, Brian Stansbury and Raina Jones. On January 14th, Travis procured backup materials to support the presenting attorneys' *Daubert* argument. On this day as well as January 16th and 22nd, he prepared materials to support K&E's slide presentations, put together binders for attorneys' courtroom reference, pulled case law upon request, prepared exhibits, researched deposition testimony issues, and worked with the trial technology group to prepare demonstratives. In addition, Travis assisted the trial attorneys with any in-court requests.

(o)    Barbara Harding

D.C.-based litigation partner Barbara Harding was the second most senior litigation partner on the estimation litigation team. Barbara second chaired the entire trial along side David Bernick. As discussed in prior responses, Barbara is the litigation partner who was in charge of the day to day PI estimation case and has functioned as David Bernick's quarterback on the expert side of the case. In addition, Barbara is an integral part of the Criminal team and as such was responsible for providing a bridge between the two teams and making sure that information from the Criminal proceedings was shared with and integrated into the estimation side of the case, as appropriate. Barbara's trial responsibilities were many, and included overall responsibility for preparing and conducting the examinations of many of the Debtors' expert witnesses. Specifically, on January 16th, Barbara conducted the direct and redirect examinations of Dr. Howard Ory and, on March 25th, she conducted the direct and redirect examinations of

Dr. Suresh Moolgavkar. When Barbara was not introducing testimony, she acted as David Bernick's right hand in presenting evidence and witnesses for the entire case.

(p)      Timothy Fitzsimmons

Tim, who holds a doctorate in biomedical sciences, is a legal assistant analyst member of the D.C. estimation team. His role in the trial, as has been the case throughout the estimation process, has been to review and analyze many of the underlying documents related to the expert witnesses - in the case of the trial, the testifying expert witnesses. He was heavily involved in the preparation of those testifying witnesses. On each of the dates in question (January 16th, March 25th, and March 26th), he attended only those portions of the trial in which expert witnesses testified. On these trial dates, he recommended issues and citations for use on redirect examinations of the Debtors' witnesses. He helped the trial team understand the biomedical aspects of the cross-examination themes then being developed, and assisted the trial attorneys with the medical and scientific aspects of the witnesses testimony.

(q)      Andrew Erskine

Project assistant Andrew Erskine was a member of Dan Rooney's Chicago estimation trial support team. His questioned time entries (March 24th, 25th, 26th, and 31st) are all trial dates, and Andrew was present in the courtroom for the entirety of the proceedings on those days. He sat at the counsel table and traced the exhibits and demonstratives used by the presenting attorneys (by recording which were used in court, by whom, and whether each was offered, admitted or rejected). In conjunction, he continually updated the trial team's exhibits list database. Andrew was tasked with tracking and making immediately available all physical copies of documents in the courtroom. In addition, he acted as liaison between the courtroom and K&E's remote trial site, communicating with the team at the remote site and ensuring that all requests made to team members at the remote site were carried through. Finally, he came to the courtroom early each day in order to set up the trial team's materials and supplies before the start of the trial day.

(r)      Laura Durity

Associate Laura Durity, a junior associate on the D.C. estimation litigation team, aided in the preparation of direct examinations of the Debtors' expert witnesses, conducting requested research and reviewing and editing graphics. In addition, Laura researched evidentiary issues that arose during the trial relating to admissions and motion responses. She also reviewed reliance materials of claimants' witnesses in order to assist the Debtors' attorneys with their cross-examinations of such witnesses. On the weekend dates in question, Laura was tasked with managing the support team to ensure that the proper documents for each Debtors' witness direct or cross examination were ready in advance of the scheduled examinations. On trial days, Laura was not physically present in court, but instead worked at K&E's remote trial office, monitoring the live feed of the testimony and continuously responding to messages from courtroom

participants about needed documents and conducting legal research.

        (s)      Ritu Kelotra

       D.C. estimation litigation team associate Ritu Kelotra was also tasked with assisting presenting attorneys with direct and redirect examinations of the Debtors' expert witnesses. On March 25th, she assisted David Bernick, Barbara Harding and Brian Stansbury in court during the examination of Dr. Moolgavkar, by procuring appropriate exhibits and expert witness reliance materials. She also prepared exhibits for Dr. Moolgavkar's redirect during his cross examination. On March 26th, she performed the same tasks in regard to Dr. Anderson's testimony.

        (t)      Andrew Ross

       D.C. case assistant Andrew Ross prepared the trial exhibits for both of the Debtors' witnesses (Dr. Moolgavkar and Dr. Anderson) who testified on March 25th - 26th. He attended court each of those days in order to assist with the presentation of those exhibits and provided both process and substantive expertise with respect to those exhibits as they were used by the presenting attorneys. Andrew also prepared demonstratives in connection with these two witnesses that were likewise used by the trial team.

**RESPONSE EXHIBIT "B"**

Airfare Charges (¶ 5)

In the Initial Report, you identify nine airfare charges with respect to which you request additional information.  The chart below sets forth, in the 3 left-most columns, the original expense entries, while the last column indicates the departure city.  In each case, the charge was for a roundtrip economy class flight, departing and returning on the respective dates identified in the third column.

|     | Date | Charge | Original Expense Entry | Departure City |
|-----|------|--------|------------------------|----------------|
| (a) | 1/6/2008 | 1,452.00 | Travis Langenkamp, Airfare, Pittsburgh, PA, 01/06/08 to 01/25/08 (Trial) | Washington, D.C. |
| (b) | 1/7/2008 | 1,446.00 | Amanda Basta, Airfare, Pittsburgh, PA, 1/08/08 to 1/25/08 (Trial) | Washington, D.C. |
| (c) | 1/8/2008 | 1,457.00 | Raina Jones, Airfare, Pittsburgh, PA, 1/08/08 to 01/24/08 (Trial) | Washington, D.C. |
| (d) | 1/20/2008 | 1,214.93 | Deborah Scarcella, Airfare, Pittsburgh, PA , 01/20/08 to 01/24/08 (Trial) | Washington, D.C. |
| (e) | 1/20/2008 | 1,457.00 | Brian Stansbury, Airfare, Pittsburgh, PA, 01.20/08 to 01/24/08 (Trial) | Washington, D.C. |
| (f) | 2/26/2008 | 1,476.99 | Brian Stansbury, Airfare, Pittsburgh, PA, 02/26/08 to 02/27/08 (Amanda Basta, Airfare, Pittsburgh, PA, 1/08/08 to 1/25/08 (Trial) | Washington, D.C. |
| (g) | 3/7/2008 | 1,496.99 | Andrew Ross, Airfare, Pittsburgh, PA, 03/07/08 to 03/07/08 (Court Hearing) | Washington, D.C. |
| (h) | 3/24/2008 | 1,517.01 | Sandra Wilson, Airfare, Pittsburgh, PA, 03/24/08 to 03/29/08 (Trial) | Washington, D.C. |
| (i) | 3272008 | 1,537.00 | Andrew Ross, Airfare, Pittsburgh, PA, 03/27/08 to 03/28/08 (Trial) | Washington, D.C. |

Each of these airfares was incurred for purposes of attending the estimation trial, and was booked

at the economy coach rate.  Unfortunately, in many instances it was unclear until very shortly before the date of the flight that the individual would need to travel on the date and time booked. As a result, many times only limited or no discounts were available on the airfare and this was the best refundable rate available.  K&E respectfully requests full reimbursements of these airfare charges.