IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Related Docket Nos. 18922, 19072, 19073, 19074**

**Hearing Date: September 29, 2008 at 10:00 a.m.**

## DEBTORS' TRIAL BRIEF IN SUPPORT OF OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
153 East 53rd Street
New York, New York 10022

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones
James E. O'Neill
Timothy P. Cairns
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

Co-Counsel for Debtors and Debtors in Possession

## INTRODUCTION

1.      More than three years ago, the fair and equitable rate of postpetition interest for the unsecured debt at issue was set using the method most hallowed by the bankruptcy process and most respected in the market – arms-length negotiation.  In 2005, the Debtors' proposed chapter 11 plan called for substantial value to remain with equity.  In 2005, the solvency of the Debtors was disputed and unresolved.  In 2005, at the behest of certain Lenders, the Creditors' Committee demanded postpetition default interest as a condition for supporting the Debtors' plan.  And in 2005, the Creditors' Committee and its counsel agreed on behalf of their constituency to a compromise which provided postpetition interest at an agreed rate in exchange for their support of the Debtors' plan.  The agreement was renegotiated and enhanced a year later.  In the intervening years, the Debtors regularly have used the agreed rate in their financial statements, all of which have been reviewed with the Committee.  The agreement has never been terminated.

2.      Today, the important facts are unchanged:  the Debtors' solvency is still disputed, the proposed plan (still in process) will preserve value for equity if it is confirmed, and the Debtors are still prepared to pay postpetition interest at the rate agreed upon in 2005 and 2006.  Only two things have changed:  (1) new Lenders have come into the picture with a higher cost basis; and (2) they have sought to wash their hands of history and insist that they get the maximum default rate that could be argued from the applicable Credit Agreements.  The overreach is of major financial consequence, as reflected by the following undisputed figures:

| | | | | | |
|---|---|---|---|---|---|
| Postpetition | Interest | (as | of | 12/31/08) | |
| using the Base Contract Rate: | | | $287 million | | |
| Postpetition Interest Using the Agreed Rate: | | | $323 million | | |
| Postpetition Interest Using the Default Rate: | | | $414 million | | |

3.      The Debtors and the plan proponents are still prepared today to pay the postpetition rates of interest contained in the long-standing agreements negotiated by the Creditors' Committee on behalf of all unsecured creditors, notwithstanding the Creditors' Committee's decision to litigate the matter with the Lenders.  As shown below, those rates are better than the Lenders could ever do through litigation.

4.      Indeed, today – on this record – the Lenders' insistence on more than the agreed-upon rates has shown them to be entitled to far less.  Today, there is no record of solvency and, absent solvency, the Lenders get no postpetition interest whatsoever.  And so the Lenders have paraded like so many paper tigers a series of contentions that have utterly no foundation in fact or law.  First, there was the haughty intonation of the oft-cited and totally inapposite "absolute priority rule."  That rule applies only to prepetition allowed claims, not postpetition interest.  Then, we were told by the Lenders of a legal doctrine that seemed odd – the presumption of solvency.  And it was odd.  It just does not exist, as this Court has noted:

> THE COURT:  I am not aware that there is a presumption of either solvency or insolvency anywhere in the Bankruptcy Code having to do with the issue that we're about to litigate.

(See Docket No. 19210 (Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge) 95:20-23 (July 21, 2008)).  The Creditors' Committee itself never really believed otherwise and so sought to establish the fact of solvency, but without any evidence of solvency.  In a brief submitted at the same time as the Lenders, the Committee argued that the Debtors' stock price proved solvency.  Of course, this approach, too, had no basis in the law, which defines solvency as the excess of assets over liabilities.  And the approach has been abandoned in fact by the Committee's own expert, who reviewed the market capitalization of the Debtors but offered no opinion regarding solvency.  Nor did he contest the affidavit of Pam Zilly, the Debtors' financial advisor, who opined that stock price is driven by many factors

2

and does not establish solvency. The final tiger was paraded into the arena by the Creditors'
Committee's expert who, giving up on solvency, was asked to and did give voice to his lawyers'
argument that the amount in dispute is *de minimis*. A brief deposition adduced the obvious: (1)
that there was no methodology behind this contention, just the teleprompting of counsel; (2) the
contention rested upon the comparison of two entirely different securities, unsecured debt and
equity; and (3) that looking at the issue in terms of the debt instruments themselves, the dispute
is far from *de minimis*.

5.      Never deterred, the Lenders now undoubtedly will go to "Plan B" and
press the Court to engage in a second round of estimation. This blunt proposal to set the chapter
11 cases back two years at the behest of those who just decided to come on the scene and rewrite
history still cannot get the Lenders more than what the anticipated plan will provide. Indeed, it
should earn them less. Even assuming now that they prevail in demonstrating solvency, their
quest for default interest only begins. Will the absolute priority rule work then? No. It is still
inapplicable and for the same reasons. The "best interests" test also will not do the trick. In the
end, the Lenders will have to seek support in the "fair and equitable" test of section 1129 of the
Bankruptcy Code. And so we will come full circle – the most probative evidence of fairness and
equity will remain the result of the arms-length negotiations of 2005 and 2006 and the adherence
of the Creditors' Committee and its counsel to the agreement for years. Can the Lenders even
identify any contribution they have made since? They have tried through their expert, Edwin N.
Ordway, arguing that the Debtors "used their money" and that they "supported" the Debtors.
But, it turns out that Ordway could not actually say as an expert that the Debtors used any money
beyond the original principal, for which the base contract rate, non-compounded, is the agreed
compensation. Critically, the difference between the rate agreed in 2005-2006 and the full

3

default rate the Lenders now seek is compounding – interest on interest – not interest on principal. The Lenders have no evidence that unpaid interest was ever "used" by the Debtors. As to the assertion that the Lenders "supported" the Debtors, it turns out that the Lenders' notion of support is their decision to forego unmerited opposition to the Debtors' pursuit of these cases. That brand of "support" cannot be in great demand.

6.     The picture of "fair and equitable," then, is never going to get better if an extended solvency proceeding is begun. The Lenders' insistence, then, upon such a proceeding will be a factor that should count against them rather than in their favor. It would be precisely the sort of self-serving dilatory conduct that the law says should not be rewarded. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 346-47 (Bankr. D. Del. 2004) (holding that a delay in the debtors' ultimate emergence resulting from a conflict of interest involving the debtors' unsecured noteholders and the fact that the "Noteholders have consistently acted as a group in this case in advancing their interests and opposing the Equity Committee" did not warrant payment of postpetition default interest under section 1129(b) of the Bankruptcy Code).

7.     The cynicism of Plan B is starkly revealed by the Lenders' own decision to keep the 2005-06 agreements in place while they litigate for more. They do not believe in their own position and, while they hope the Court will give them more, they want to insist that the Court cannot give them less.

8.     The Debtors therefore submit that the default interest rate issue can be decided now and with finality. As a matter of law, today the record supports no postpetition interest. Today, the record also establishes that even if the Debtors were solvent and the Lenders could clear the other legal hurdles, set out below, to default interest, the discretionary analysis of what is fair and equitable advocates only a result equal to or less than what the Creditors'

4

Committee and the Lenders agreed to long ago. The Debtors respectfully ask the Court to so decide their pending Objection to the Lenders' claims.

## FACTUAL BACKGROUND

9.      The parties recently completed discovery into the facts bearing upon the Debtors' objection to contractual default interest. Based on that discovery, the Debtors believe that the following facts are undisputed.[1]

10.      The history of this dispute traces back to late 2004, when the Debtors were preparing to file their original plan of reorganization. In the Debtors' view, it was important that the Debtors' plan have the full support of both the general unsecured creditors and the equity holders, so that the Debtors could focus their legal efforts on unresolved matters related to asbestos contingencies.[2]   Accordingly, the Debtors' management team, led by then-Chief Financial Officer Robert Tarola, entered into negotiations with representatives for the Creditors' Committee and the Official Committee of Equity Holders in an effort to enlist their support for the Debtors' plan. The point person for the Creditors' Committee during these negotiations was Mr. Thomas Maher of J.P. Morgan Chase & Co., Chairperson of the Creditors' Committee. (Docket No. 19323 (Tarola Decl.) ¶ 3)

---

[1]   The evidence concerning the factual background to this dispute comes largely from the declarations of the Debtors' former Chief Financial Officer, Robert Tarola, and the Debtors' General Counsel, Mark Shelnitz, and there is no evidence to contradict these declarations. Tellingly, the Creditors' Committee and the Lenders did not submit a declaration or affidavit from anyone at J.P. Morgan Chase who was involved in negotiating the agreements on postpetition interest. Their only evidence concerning the history of the parties' negotiations is the declaration of Lewis Kruger, counsel for the Creditors' Committee, and on the key factual issues, Mr. Kruger's testimony does not contradict that of Messrs. Tarola and Shelnitz.

[2]   See Docket No. 19323 (Declaration of Robert M. Tarola In Support Of Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 and May 5, 1999 ("Tarola Decl.")) ¶ 2.

5

11.     Recent discovery in this matter demonstrates that, throughout these negotiations, Mr. Maher received input and recommendations from several of the Lenders under the Credit Agreements.  One such Lender, D.K. Acquisition Partners L.P., urged the Creditor's Committee "to insist that W. R. Grace commit to pay the contract default rate" as part of any plan of reorganization.  (See CC-JPM-0000009-12, attached hereto as Exhibit A)  However, another Lender, D.E. Shaw Laminar Portfolios, which at the time described itself as "likely the largest holder of W. R. Grace & Co. bank debt," encouraged the Creditors' Committee to compromise by accepting "postpetition interest in excess of floating-rate LIBOR (albeit less than fixed-rate LIBOR)."  (See CC-JPM-0000014-15, attached hereto as Exhibit B)  In its letter to counsel for the Creditors' Committee, D.E Shaw, rather presciently, wrote as follows: "In this context, we believe that every avenue to reach agreement among the Debtor, the Committee and the equity committee should be aggressively pursued.  Through our involvement in cases like Owens Corning, we have seen what can happen when one constituency is seen by the court to be the obstacle to resolution." (Id.)

12.     In the negotiations with the Debtors, Mr. Maher indicated that the Creditors' Committee would agree to be a proponent of the Debtors' plan if, and only if, the Debtors would agree to pay postpetition interest to the Lenders and other unsecured creditors at rates acceptable to the Creditors' Committee.  (Docket No. 19323 (Tarola Decl.) ¶ 3)  With respect to postpetition interest for the Lenders, Mr. Maher initially took the position that the Creditors' Committee would "not sign on to the Plan unless they get default interest compounded quarterly." (DR01448, attached hereto as Exhibit C)  In taking this hard-line stance, Mr. Maher pointed out that the Creditors' Committee accounted for only a "small tranch of the bank debt," and that "the non-committee holders [were] posturing for a full default rate." (DR00525,

6

attached hereto as Exhibit D)  The Debtors were unwilling to meet the demand of the "non-committee holders" for postpetition interest at the contract default rate.

13.     On November 13, 2004, as negotiations with the Creditors' Committee were continuing, the Debtors, with no co-proponents, filed their original Plan of Reorganization (the "Original Plan").  (Docket No. 6895)  Section 3.1.9 of the Original Plan provided that the holders of general unsecured claims would receive postpetition interest equal to the interest they would have received in a non-default situation.  (Id.)  Importantly, the Original Plan also provided that the equity holders would retain majority ownership in the reorganized Debtors. (Id., at § 3.1.10)

14.     Negotiations between the Debtors and the Creditors' Committee continued after the filing of the Debtors' Original Plan.  Eventually, Mr. Maher moved off his demand for postpetition interest at the contract rate of default and agreed that the Lenders under the Credit Agreements would accept postpetition interest at the rate of 6.09% per annum, compounded quarterly, and other unsecured creditors would accept a non-default contract rate or the federal judgment rate of 4.19%, compounded annually.  (Docket No. 19323 (Tarola Decl.) ¶ 4)  The 6.09% interest rate that Mr. Maher agreed to accept on behalf of the Lenders was higher than the contract rate of interest, but lower than the default rate of interest.

15.     As noted above, at the time Mr. Maher agreed on the rates of postpetition interest under what would become a joint plan, it was expressly contemplated, as set forth in both the Original Plan and later in the joint plan, that equity holders would retain a significant level of economic value in the reorganized Debtors.  (Docket No. 19323 (Tarola Decl.) ¶ 4)  This was a key factor in obtaining the support of the Equity Committee for the joint plan.  (Id.)  Neither Mr. Maher nor any other representative from the Creditors' Committee ever suggested that the

agreed-upon rates of postpetition interest would change if it turned out that the value of equity retained by current shareholders would be different from that estimated in the joint plan. (Id.)

16.    The agreement between the Debtors and the Creditors' Committee concerning postpetition interest was memorialized in a letter dated January 12, 2005 (the "January 12, 2005 Letter Agreement").[3]    The next day, January 13, 2005, the Debtors filed an Amended Joint Plan of Reorganization (the "2005 Joint Plan") that incorporated the agreed-upon postpetition interest rates to be paid on the Lenders' claims under the Credit Agreements and on all other general unsecured claims.  (See Docket No. 7560 at § 3.1.9(b))

17.    Toward the end of 2005, Mr. Maher indicated that if the Debtors wanted the Committee's continued support for the 2005 Joint Plan, there would have to be an adjustment to the agreed-upon rate of postpetition interest under the Credit Agreements.  (Docket No. 19323 (Tarola Decl.) ¶ 6)  He indicated no need to change the postpetition rates of interest for other unsecured claims.  (Id.)  This led to another round of negotiations over roughly three-months time between the Creditors' Committee and the Debtors' management team.  (Id.)

18.    In February 2006, the Debtors and the Creditors' Committee agreed that, in exchange for the Committee's continued support of the 2005 Joint Plan, the Debtors would pay the Lenders postpetition interest at the rate of 6.09% through December 31, 2005 and, beginning January 1, 2006, at a floating adjusted interest rate tied to the "prime" rate of interest (the "floating Adjusted Base Rate").  (Docket No. 19323 (Tarola Decl.) ¶ 7)  This agreement was

---

[3]    See Docket No. 19072 (Response Of The Official Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 (the "Committee's Response")) Exhibit A.

memorialized in a letter dated February 27, 2006 (the "February 27, 2006 Letter Agreement"). (See Docket No. 19072 (Committee's Response) Exhibit B).

19.    The Creditors' Committee has recently taken the self-defeating position that it was only the Creditors' Committee, and not its lawyers or the Lenders, that supported the February 27, 2006 Letter Agreement.  (See Docket No. 19072 (Committee's Response) ¶ 12) This false assertion is self-defeating because, while that may be what the Creditors' Committee says now, it is not what the Committee said then and therefore would only serve to show sharp practice.  Neither the Creditors' Committee nor the Lenders submitted an affidavit or declaration from Mr. Maher or anyone else suggesting that the Creditors' Committee gave any indication in 2006 that it was only the Creditors' Committee, and not its lawyers or the Lenders, that supported the February 27, 2006 Letter Agreement.  The only evidence on this point comes from the undisputed declaration of Mr. Shelnitz who testified that, in fact, "[t]here was no indication by anyone representing or acting in any capacity for the [Lenders] that the Agreement applied only to the Committee."[4]    Moreover, the plain language of the February 27, 2006 Letter Agreement makes clear that Mr. Maher negotiated that Agreement specifically on behalf of, and for the benefit of, the Lenders.  Indeed, the very first paragraph of the Letter Agreement expressly states that the floating Adjusted Base Rate would accrue to the benefit of "the Holders of the Debtors' pre-petition bank credit facilities" – that is, the Lenders.  (See Docket No 19072 (Committee's Response) Exhibit B)

---

[4]    See Docket No. 19324 (Declaration Of Mark A. Shelnitz In Support Of Debtors' Objection To The Unsecured Claims Asserted Under The Debtors Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Shelnitz Decl.")) ¶ 4.

20.     At the time the Debtors and the Creditors' Committee entered into the February 27, 2006 Letter Agreement, the 2005 Joint Plan, which was in the public record, contemplated that equity would retain significant value in the reorganized Debtors. (Docket No. 19324 (Shelnitz Decl.) ¶ 5)  No one from the Creditors' Committee ever suggested that the February 27, 2006 Letter Agreement would terminate or that the agreed-upon postpetition interest rate should be increased if it turned out that equity did in fact retain significant value in the Debtors. (Id.)

21.     The Debtors relied on the 2005 Joint Plan and the February 27, 2006 Letter Agreement for accounting purposes and, eventually, for purposes of negotiating the agreement in principle to settle the asbestos personal injury claims (the "Asbestos PI Claims"). (Docket No. 19323 (Tarola Decl.) ¶ 9)  In addition, all of the Debtors' financials statements, settlement scenarios, valuation models and other information prepared from January 2005 through March 2008, both actual and projected, were based on the postpetition interest rates agreed to in the 2005 Joint Plan and the February 27, 2006 Letter Agreement. (Id.) The Debtors also relied upon these postpetition interest rates in all communications with the Creditors' Committee and its financial advisors and all other official committees and representatives in the Debtors' chapter 11 cases. (Id. ¶ 10)  For example, within approximately 30 days following every calendar quarter since mid-2001, the Debtors hosted a call with the financial advisors of all official committees and the asbestos personal injury futures representative. (Id.) The purpose of these calls was to update the financial advisors of the official committees about the financial condition of the Debtors. (Id.) During those calls that took place after the February 27, 2006 Letter Agreement, the Debtors would almost always mention that their financials were based

10

upon the assumption that postpetition interest would be paid at rates reflected in the 2005 Joint Plan and the February 27, 2006 Letter Agreement. (Id.) No one ever objected.

22.    Beginning in 2007, Lewis Kruger of Stroock Stroock & Lavan LLP ("Stroock"), counsel for the Creditors' Committee, contacted Mark Shelnitz, the Debtors' General Counsel, to say that the market price of the unsecured debt under the Credit Agreements suggested that some of the Lenders were now expecting default interest.[5]  (Docket No. 19324 (Shelnitz Decl.) ¶ 8) Mr. Kruger never indicated that all, or even most, of the Lenders were expecting default interest; he said only that some of the Lenders had this expectation. (Id.) Mr. Shelnitz responded by noting that the Debtors and the Creditors' Committee had an agreement in place, memorialized in the February 27, 2006 Letter Agreement, by which the Creditors' Committee pledged its support for the 2005 Joint Plan. (Id.) Mr. Shelnitz indicated to Mr. Kruger that the Debtors were relying on the Creditors' Committee to honor that Agreement. (Id.) Mr. Kruger never said or did anything in response to suggest that the Creditors' Committee, counsel for the Creditors' Committee or the Lenders would withdraw support for the 2005 Joint Plan. (Id.) And Mr. Kruger certainly never said or did anything to suggest that the Creditors' Committee would vote against a plan of reorganization if it failed to provide for a default rate of interest for the Lenders. (Id.)

23.    Toward the end of the first quarter of 2008, the Debtors entered into negotiations with the Asbestos Claimants' Committee, the Future Claims Representative and the Equity Committee in an effort to resolve all of the Asbestos PI Claims and to gather additional

---

[5]    Mr. Kruger's testimony concerning this conversation is generally consistent with that of Mr. Shelnitz, although Mr. Kruger does not identify when the conversation took place. Accordingly, Mr. Shelnitz's testimony that this conversation did not occur until early 2007 is undisputed.

support for a consensual plan of reorganization. Throughout those negotiations, the February 27, 2006 Letter Agreement remained in place. These negotiations ultimately resulted in the Term Sheet For Resolution Of Asbestos Personal Injury Claims, dated April 6, 2008 (the "Proposed Asbestos Settlement"), which the Debtors will implement in the context of a chapter 11 plan. (See Docket No. 18922, Exhibit C)

24.    Before the Debtors executed the Proposed Asbestos Settlement, they sent a draft Term Sheet to counsel for the Creditors' Committee. In response, on April 4, 2008, Ms. Krieger at Stroock sent an email to Mr. Shelnitz setting forth "our initial thoughts on changes to the Allowed General Unsecured Claims treatment description in the Term Sheet." (See CC-SSL-0000158, attached as Exhibit E) Ms. Krieger did not express any Committee opposition to the rates of postpetition interest set forth in the draft Term Sheet; she only sought to preserve (for the first time) an option for a "holder" to apply for a higher rate of postpetition interest. Specifically, Ms. Krieger proposed that the Debtors pay

> 100% of allowed amount plus postpetition interest as follows: (i) for holders of pre-petition bank credit facilities, postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly in the manner provided for under such bank credit facilities; and (ii) for all other unsecured claims, interest at 4.19% compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate; provided, however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate.

Ms. Krieger's proposal reflects the same economic treatment for postpetition interest as that set forth in the February 26, 2007 Letter Agreement. While Ms. Kreiger suggested that individual Lenders should have the right to "seek to obtain a higher interest rate," she tellingly did not make a demand for contractual default interest. Nor did she say anything about the absolute priority rule requiring such interest. To the contrary, her email demonstrates that, as of April 4, 2008, the

12

Creditors' Committee was still supportive of the February 26, 2006 Letter Agreement and, obviously, still of the view that the postpetition interest rates reflected in that Agreement were fair and equitable.

25.    As noted above, the Debtors entered into the Proposed Asbestos Settlement on April 6, 2008.  In that settlement, the Debtors specifically incorporated the economic treatment for postpetition interest set forth in Ms. Krieger's email: "100% of allowed amount plus post-petition interest as follows:  (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate." (See Docket No. 18922, Exhibit C ¶ 7)

26.    On April 21, 2008, counsel for the Lenders sent the Debtors a letter rejecting the rate of postpetition interest reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate. (See Docket No. 19072, Exhibit C)  Nowhere in that letter, or in the briefs that followed, do the Lenders or the Creditors' Committee even purport today to terminate the February 27, 2006 Letter Agreement.

## ARGUMENT

27.    As a general rule, the Bankruptcy Code prohibits the payment of postpetition interest on account of unsecured claims.  While courts have recognized exceptions to this general prohibition, these exceptions only apply in cases where the debtors' solvency has been established.  This is not such a case.  Here, the Debtors' solvency has not been established, and unless the plan of reorganization contemplated by the Proposed Asbestos Settlement is not confirmed and the estimation litigation relating to the Asbestos PI Claims is revived and completed, solvency will never be established.  Thus, as a matter of law, the Lenders today are

13

not entitled to any postpetition interest, much less interest accruing at the default rate under the

Credit Agreements.  And any proposal now to allow the Lenders to embark upon an expensive

and time-consuming solvency proceeding would only produce disruption and delay; even if the

Lenders could ultimately establish solvency, they still would not be entitled to postpetition

interest at a rate higher than that already provided for in the Proposed Asbestos Settlement.

## I.    ON THE RECORD AS IT EXISTS TODAY, THE LENDERS ARE NOT ENTITLED TO ANY POSTPETITION INTEREST BECAUSE THERE HAS BEEN NO SHOWING OF SOLVENCY.

28.    Section 502(b)(2) of the Bankruptcy Code governs the allowance of

claims and interests in chapter 11 cases.  That section prohibits allowance of a claim for

"unmatured interest."  See 11 U.S.C. § 502(b)(2); In re Chateaugay Corp., 156 B.R. 391, 403

(S.D.N.Y. 1993) ("502(b)(2) bars postpetition interest on a pre-petition unsecured claim").  As

discussed below, courts have recognized two exceptions to the general prohibition against

postpetition interest for unsecured claims, one based on the "best interests" test of section

1129(a)(7), and the other based on the "fair and equitable" requirement of section 1129(b).  But

these exceptions apply if, and only if, "the debtor ultimately proves solvent."  In re Colortex

Indus., Inc., 19 F.3d 1371, 1376 (11th Cir. 1994).

29.    Neither the Creditors' Committee nor the Lenders have offered any proof

of the Debtors' solvency, and it would be impossible for them to do so.  Solvency, by definition,

is measured as the value of a company's assets in excess of the value of its liabilities.  See In re

Bus. Fin. Corp., 451 F.2d 829, 835 (3d Cir. 1971).  Here, it is impossible to measure the Debtors'

liabilities because the most significant component of those liabilities, the Asbestos PI Claims, is

14

still in dispute.[6]  The estimation proceeding, which was designed specifically to estimate the

Asbestos PI Claims, was not completed, meaning that the Debtors' total liabilities are still

unknown.  (Docket No. 19325 (Zilly Aff.) ¶ 4)  Without a determination of the Asbestos PI

Claims, there is no way to know if the value of the Debtors' assets exceeds the value of their

liabilities and, therefore, if the Debtors are solvent.  (Id.)

30.     The fact that there has been no showing of the Debtors' solvency is what

makes this case so different from In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006).  In

Dow, the Debtors' solvency was a matter of undisputed fact:  "Unlike most debtors in

bankruptcy, Dow Corning was fully solvent at the time it filed its bankruptcy case; it has

remained so throughout and has never disputed its ability to pay all of its creditors." Id. at 670.

This case could not be more different.  Here, solvency has been disputed from day one, and

whether the Debtors have the ability to pay all of their creditors in full has never been decided.

31.     Recognizing that they cannot offer any proof of the Debtors' solvency, the

Creditors' Committee and the Lenders instead have offered up a series of throw-away

contentions in order to justify their belated demand for postpetition interest at contractual default

rates.  These include the absolute priority rule, the unprecedented "presumption of solvency," the

fact that the Debtors' anticipated plan of reorganization will provide value for equity, and the

Debtors' current market capitalization.  But none of these contentions can survive any scrutiny.

---

6    See Docket No. 19325 (Affidavit Of Pamela D. Zilly In Support Of Debtors' Objection To The Unsecured
     Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Zilly
     Aff.")) ¶ 4.

**A.    The Absolute Priority Rule Is Inapplicable Because The Allowed Amount Of The Lenders' Claims Will Be Paid In Full.**

32.    Under the absolute priority rule, codified in section 1129(b)(2) of the Bankruptcy Code, confirmation of a plan over the dissent of an impaired class of unsecured claims requires that (i) "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the <u>allowed amount</u> of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." § 1129(b)(2) (emphasis added). The Creditors' Committee and the Lenders erroneously assert that the absolute priority rule requires that the Lenders receive postpetition interest at the contract rate of default before equity can retain any value in the reorganized Debtors. This assertion is wrong as a matter of law.

33.    The absolute priority rule has nothing to do with the payment of postpetition interest to unsecured creditors. As made clear by the plain language of section 1129(b)(2), the absolute priority rule requires only the payment in full of the "<u>allowed amount</u>" of an unsecured creditor's claim. 11 U.S.C. § 1129(b)(2)(B) (emphasis added); <u>see also</u> <u>In re Gosman</u>, 282 B.R. 45, 48 (Bankr. S.D. Fla. 2002) (the absolute priority rule provides that "if unsecured creditors do not receive payment in full on their <u>allowed claims</u>, then no holder of a claim or interest junior to those of the unsecured creditors may retain any property under the plan") (emphasis added).

34.    It is well settled that an "allowed claim" does <u>not</u> include postpetition interest. See <u>In re Coram Healthcare</u>, 315 B.R. at 343 ("an allowed claim does not include interest <u>unmatured</u> as of the petition date") (emphasis added); <u>In re Country Manor of Kenton, Inc.</u>, 254 B.R. 179 (Bankr. N.D. Ohio 2000) ("As a result [of section 502(b) of the Bankruptcy

16

Code], upon a party objecting to a proof of claim such as occurred in the instant case, unmatured interest (i.e., postpetition interest) does not, under any circumstance, become a part of that creditor's allowed claim.") (emphasis added); In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1399-1400 (5th Cir. 1986) ("an allowed claim may not include 'unmatured interest'") (emphasis in original) (citing § 502(b)(2)).

35.    The Lenders' "allowed claims" consist of the principal and interest that was due and owing under the Credit Agreements as of the petition date. See 11 U.S.C. §§ 101(5), 501 and 502. It is undisputed that these allowed claims will be paid in full under the Proposed Asbestos Settlement and, ultimately, under the plan of reorganization. That is all that is required under the absolute priority rule.

36.    The Third Circuit's decision in In re Armstrong World Industries, Inc., 432 F.3d 507 (3d Cir. 2005), does not in any way compel a different conclusion. In Armstrong, unsecured creditors, who were to be paid only 59.5% of their allowed claims under a proposed chapter 11 plan, challenged that plan on the basis that it provided for distributions of warrants to equity without paying unsecured creditors the full amount of their claims. The plan was particularly problematic because it ensured that the warrants would be distributed to equity even though the allowed amount of unsecured creditors' claims would not be paid in full. Given that the creditors stood to recover only 59.5% of their allowed claims, the Third Circuit affirmed the District Court's holding that the issuance of warrants to the equity interest holders violated the absolute priority rule. Id. at 509, 512-513. Any reliance that the Creditors' Committee and the Lenders place on Armstrong is, at best, misplaced. In sharp contrast with the creditors in Armstrong, the Lenders in this case will be paid 100% of the allowed amount of their claims. Therefore, in contrast with Armstrong, the absolute priority rule is not implicated in this case.

17

37.    The Creditors' Committee's own conduct during these bankruptcy cases demonstrates that the Committee itself does not believe that the absolute priority rule entitles the Lenders to postpetition interest at the contract default rate.  From the time that the Debtors filed their first plan of reorganization in November 2004, that plan has always expressly provided that equity would receive significant value in the reorganized Debtors.  And yet, after the filing of that plan, the Creditors' Committee twice entered into agreements whereby the Lenders would receive postpetition interest at less than the contract rate of default.  If the Committee truly believed that it was black-letter law that the absolute priority rule required the Debtors to pay postpetition interest at the contractual default rate before equity can receive any value, as it now asserts, there would have been no logical reason for the Committee to enter into those agreements.  Instead, the Committee would have simply cited to the absolute priority rule and demanded that the Lenders receive contractual default interest.  The fact that the Committee did not do so, but instead negotiated and agreed to a lower rate of postpetition interest, belies their position today.

## B.    There Is No Such Thing As A "Presumption Of Solvency."

38.    The Lenders and the Creditors' Committee next urge this Court to adopt a "presumption of solvency."[7]    (Docket No. 19072 (Committee's Response) ¶ 18)  Tellingly, neither the Creditors' Committee nor the Lenders cite any legal authority for this type of presumption, and none exists.  Simply put, there is no such thing as a presumption of solvency. While the Bankruptcy Code clearly recognizes a presumption of insolvency "on and during the

---

[7]    See Docket No. 19073 (Response Of The Bank Lender Group In Opposition To The Debtors' Objection To Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Lenders' Response")) ¶¶ 52-56.

90 days immediately preceding the date of the filing of the petition" for purposes of pursuing preferential payments, 11 U.S.C. § 547, it just as clearly does <u>not</u> recognize any type of presumption of solvency. And, contrary to the assertions of the Creditors' Committee and the Lenders, there is absolutely no basis for adopting such a novel presumption in these chapter 11 cases.

**C.  The Plan Of Reorganization Contemplated By The Proposed Asbestos Settlement Does Not Establish Solvency.**

39. The Creditors' Committee and the Lenders then argue that solvency is established by the fact that equity stands to retain value under a plan of reorganization based upon the Proposed Asbestos Settlement. This argument makes no sense. Solvency, as noted above, is measured as the value of a company's assets in excess of the value of its liabilities. <u>See</u> <u>In re Bus. Fin. Corp.</u>, 451 F.2d at 835. The Proposed Asbestos Settlement, however, does not even purport to determine the Debtors' liabilities. Instead, the Proposed Asbestos Settlement represents a compromise in which each of the constituencies reached an artificial agreement concerning how to allocate the Debtors' assets specifically to avoid the need to litigate solvency. Because the various constituencies have never reached agreement on the Debtors' total liabilities, the Proposed Asbestos Settlement has no bearing on the issue of solvency. Indeed, if a plan incorporating the Proposed Asbestos Settlement is not consummated, the various constituencies will be right back where they were before that Settlement – embroiled in a dispute over the Debtors' total liabilities and, more generally, the Debtors' solvency. And should that happen, the Asbestos PI claimants almost certainly will seek to have the Debtors' liabilities resolved for a higher number than that set forth in the Proposed Asbestos Settlement.

40. The Creditor's Committee and the Lenders need look no further than the history of these cases to recognize that the Proposed Asbestos Settlement and the pending plan of

19

reorganization cannot possibly be considered a proxy of solvency. The Debtors filed their 2005

Joint Plan, which called for equity to receive significant value, in January 2005. At that time, the

Debtors had not even started the estimation litigation, the very purpose of which was to

determine the Debtors' liabilities. Clearly, then, the fact that Debtors have filed, or will file, a

plan of reorganization calling for equity to receive value cannot possibly be viewed as a proxy of

solvency.

**D.      The Debtors' Market Capitalization Does Not Establish Solvency.**

41.     Equally unavailing is the Creditors' Committee's and Lenders' contention

that the Debtors' current equity value, as measured by the trading price of W. R. Grace stock on

the New York Stock Exchange, somehow demonstrates the Debtors' solvency. Absent a

determination of the Debtors' total liabilities, the Debtors' equity value cannot possibly speak to

the operative legal test of whether or not the Debtors are solvent. At most, the market

capitalization, which has fluctuated wildly over the past few years, merely reflects traders'

speculation as to the most likely outcome of the Debtors' total liabilities, most notably its

Asbestos PI Claims.

42.     The Creditor's Committee's own expert, Edwin Ordway of Capstone

Advisory Group, LLC, implicitly concedes that the Debtors' equity value does not establish

solvency.[8] In his Declaration, Mr. Ordway specifically refers to the increase in the Debtors'

market capitalization since the Petition Date. (Docket No. 19321 (Ordway Decl.) ¶ 5) And

during his deposition, Mr. Ordway testified that he has rendered opinions on solvency.

---

[8]   See Docket No. 19321 (Declaration of Edwin N. Ordway, Jr. In Support Of The Response Of The Official
Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The
Debtors' Credit Agreements Dated As Of May 14, 1998 And May 15, 1999 ("Ordway Decl.")).

20

(Deposition excerpts of Edwin N. Ordway, Jr. ("Ordway Dep.") 59:4-8 (Aug. 29, 2008), attached as Exhibit F)   Tellingly, however, Mr. Ordway did not opine that the Debtors' market capitalization provided a basis to conclude that Debtors are solvent.   (Exhibit F (Ordway Dep.) 36:3-25)

43.     The fact that Mr. Ordway refused to draw any connection between market capitalization and solvency is explained by the Affidavit of Pam Zilly and the exhibit thereto. (Docket No. 19325)   As Ms. Zilly testifies, far from establishing solvency, the Debtors' equity value at most reflects speculative market views regarding the most likely resolution of the Debtors' potential asbestos (and other) liabilities.   In her Affidavit, Ms. Zilly compared W. R. Grace's relative stock price performance to a basket of chemical company stocks representing the chemical sector (the "Chemicals Index").   (Id. ¶ 7)   This comparison shows that, while Grace's stock price is directionally consistent with the Chemicals Index, Grace's stock price historically has demonstrated greater volatility.   (Id., Exhibit A)   She found that this volatility in Grace's stock price, and thus its equity value, is readily explainable by developments in the bankruptcy case that impact the market's speculation about the outcome of the Debtors' potential asbestos liabilities.   (Id. ¶ 7)

44.     For example, in the second half of 2004, as the Debtors engaged in negotiations with representatives of asbestos claimants while developing a plan of reorganization capping the overall asbestos liability at $1.7 billion, Grace's stock increased from $6.04 per share on July 1, 2004 to $14.00 per share on November 15, 2004, the trading day following the filing of the Original Plan.   (Id. ¶ 8)   This represents a 132% increase in Grace's market value, equating to approximately $530 million of value, while the Chemicals Index rose only 20% during that same time.   (Id.)   As another example, shortly after July 24, 2006, when public

21

reports that mediation had failed and that the Debtors had decided to cease discussions with the asbestos personal injury claimants, Grace's stock fell to new lows for 2006. (Id.)  And after the Bankruptcy Court terminated the Debtors' exclusivity period on July 26, 2007, the stock price dropped approximately 12% as measured by the closing price on July 25, 2007, against the closing price on July 27, 2007. (Id.)

45.     As Ms. Zilly's analysis demonstrates, Grace's equity value reflects, at most, speculative estimates made by market participants with imperfect publicly available information as to the outcome of the Debtors' potential asbestos liabilities.  It does not reflect any type of determination as to Debtors' solvency.

46.     The recent Owens Corning bankruptcy amply demonstrates that a company's market value is not a measure of solvency. (Docket No. 19325 (Zilly Aff.) ¶ 5)  In October 2000, Owens Corning filed for chapter 11 bankruptcy protection due primarily to material unresolved asbestos claims. (Id.)  Its joint plan of reorganization, filed on March 28, 2003, specified a total asbestos liability of $10.7 billion (on a net present value basis) and provided no recovery to existing common equity. (Id.)  In the ensuing years, while still in bankruptcy, Owens Corning's market value reached levels above $300 million. (Id.)  According to the Creditors' Committee and the Lenders, this market value would indicate that Owens Corning was solvent during its bankruptcy. (Id.)  But when Owens Corning emerged from chapter 11 on October 31, 2006, after its liabilities had been settled, the company's existing equity holders received only out of the money warrants. (Id.)  Clearly, Owens Corning's market value was not a proxy for solvency, and the same holds true for the Debtors in these cases.

47.     Despite the creative efforts of the Creditors' Committee and the Lenders, the fact remains that the Debtors' solvency has not been established and will never be established

22

unless the plan of reorganization incorporating the Proposed Asbestos Settlement is rejected. This is not a case, then, where the Debtors will "ultimately prove[] solvent." In re Colortex Indus., Inc., 19 F.3d at 1376. Therefore, the Lenders have no entitlement to any postpetition interest, and they certainly have no entitlement to postpetition interest at the contract rate of default.

## II.    AN EXTENDED SOLVENCY PROCEEDING WOULD AT MOST CONFIRM THE APPROPRIATENESS OF THE AGREED-UPON RATES OF POSTPETITION INTEREST.

48.    Embarking on a new estimation proceeding is pointless.  Even if that proceeding were to establish the Debtors' solvency, the Creditors' Committee and the Lenders still would be left with no legal basis for demanding postpetition interest.  In solvent debtor cases, courts have recognized two exceptions to section 502(b)'s bar against postpetition interest, one grounded in the "best interests" test of section 1129(a)(7) and the second grounded in the "fair and equitable" requirement of section 1129(b) of the Bankruptcy Code.  But these exceptions are not only limited to solvent debtor cases, they also are limited to those creditors whose claims are "impaired."  Indeed, the best interests test of section 1129(a)(7) expressly applies only to "each impaired class of claims or interests."  11 U.S.C. § 1129(a)(7).  And the same restriction applies to the fair and equitable test of section 1129(b): "An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2).  'Unimpaired' creditors have no such rights."  Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 205 n.14 (3d Cir. 2003).  Here, the Lenders are not impaired as a matter of law, and thus the exceptions found in section 1129 do not apply.  And even if those exceptions do apply, the Lenders still have no entitlement to contractual default interest.  Payment of contractual default interest is not required under the "best interests" test, and it certainly would not be "fair and equitable" to award such interest where, as here, the

23

Creditors' Committee and the Lenders are attempting to reap a windfall by reneging on their prior agreements.

**A.      The Exceptions in Section 1129 of the Bankruptcy Code Will Never Apply Because the Lenders' Claims Are Not Impaired.**

49.      The question of whether a claim is impaired is governed by section 1124 of the Bankruptcy Code, which states in pertinent part: "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124 (emphasis added). Consistent with this statutory language, the Third Circuit has made clear that a claim is only impaired under section 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. In re PPI Enterprises (U.S.), Inc., 324 F.3d at 204-05.

50.      With respect to a creditor's claims, plan impairment occurs "when the debtor alters the 'legal, equitable, and contractual rights to which [their] claim entitles the holder of such claim," whereas statutory impairment occurs when "the operation of a provision of the [Bankruptcy] Code alters the amount that the creditor is entitled to under nonbankruptcy law." In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 353 (Bankr. D. Del. 1998). The distinction between plan impairment and statutory impairment is critical in these cases. "A creditor's claim outside of bankruptcy is not the relevant barometer for impairment; [the court] must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights." In re PPI Enters. (U.S.), Inc., 324 F.3d at 204. As long as a plan does not itself alter a creditor's rights but leaves such creditor subject to the other provisions of the Bankruptcy Code, the creditor's claim is unimpaired. Id. ("[W]e hold that where § 502(b)(6) alters a creditor's

24

nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1).").

51.    Here, as made clear in the Proposed Asbestos Settlement, the Debtors' plan of reorganization will do nothing to impair the claims of the Lenders. To the contrary, the plan will pay the full amount of the Lenders' allowed claims. As such, this clearly is not a case of plan impairment. At most, this is a case of statutory impairment. To the extent that the Lenders contend that their claims are "impaired" because they will not receive postpetition interest at the contract default rate, this alleged "impairment" results, if at all, by operation of the Bankruptcy Code and, more specifically, section 502(b). As the Third Circuit has held, this is not the type of impairment that will trigger a claimant's rights under section 1129.

52.    The Lenders, relying upon In re Ace-Texas, Inc., 217 B.R. 719, 727 (Bankr. D. Del. 1998), claim that "impairment can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement." (Lenders' Response at ¶ 44). The Lenders, however, overlook the fact that Ace-Texas predates the Third Circuit's decision in PPI Enterprises, which is now the governing standard for determining whether a claim is impaired under section 1124 of the Bankruptcy Code. The language from Ace-Texas on which the Lenders purport to rely is fundamentally inconsistent with the Third Circuit's pronouncement in PPI Enterprises that "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment" and that the focus must be on "whether the plan itself is a source of limitation" on the creditor's rights. In re PPI Enter. (U.S.), Inc., 324 F.3d at 204. Under this standard, it is clear that the Lenders' claims are not impaired; the Lenders' contention to the contrary is premised upon outdated and inapposite case law.

25

**B.    The Best Interests Test Would Not Entitle The Lenders To A Default Rate Of Interest.**

53.    Even if the Creditors' Committee and the Lenders could establish that the Debtors are solvent – which they cannot – and even if they could establish that the Lenders' claims are impaired – which they cannot – the Lenders still would not be entitled to postpetition interest at the contract rate of default.   Neither the "best interests" test nor, as discussed in Section C below, the "fair and equitable" test would entitle the Lenders to an award of postpetition interest at the contract default rate.

54.    The "best interests" test of section 1129(a)(7) requires a plan of reorganization to provide each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7.  See Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) (holding that the presentation of liquidation analysis showing lesser probable recovery in chapter 7 satisfies section 1129(a)(7)).  In essence, the best interests test contemplates a comparison of distributions under a proposed chapter 11 plan of reorganization with those that would be realized in a hypothetical chapter 7 liquidation.  See In re Jartran, Inc., 44 B.R. 331, 390 (Bankr. N.D. Ill. 1984).  A chapter 7 liquidation, in turn, is governed by the priority scheme set forth in section 726 of the Bankruptcy Code.  Under section 726(a)(5), in a chapter 7 liquidation, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition" before distributions may be made back to the debtor. 11 U.S.C. § 726(a)(5).

55.    The Bankruptcy Code does not define the "legal rate" of interest.  Courts, however, have consistently interpreted the "legal rate" of interest to be the federal judgment rate. See, e.g., In re Cardelucci, 285 F.3d 1231, 1234-35 (9th Cir. 2002); In re Coram Healthcare

26

Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("Most courts, however, conclude that [the legal rate] means the federal judgment rate.") (citations omitted); see also In re Adelphia Commc'ns, Case No. 02-41729, Bench Ruling, tr. at 7 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) ("It is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate.").

56.    As of the Petition Date, the federal judgment rate was 4.19%, which was below the contract rate and default rate under either of the Credit Agreements at that time. Clearly, then, the Lenders cannot argue that the best interests test warrants the payment of pendency interest at the contract default rate.  And, given that the best interests test requires a comparison of a chapter 11 plan treatment to the liquidation of a debtor, the Lenders may not even be entitled to any postpetition interest absent evidence that the Debtors would be solvent using a chapter 7 liquidation valuation. See, e.g., In re Lisanti Foods, Inc., 329 B.R. 491, 500 (Bankr. D. N.J. 2005) ("In making [a section 1129(a)(7)] showing, the liquidation value of the debtor's assets is controlling."); but see In re Coram Healthcare, 315 B.R. at 345 ("In this case, though, it is relevant to compare the amount of debt to the confirmation value ($317 million) because the Debtors are reorganizing instead of liquidating."). There is simply no record that would support a presumption of the Debtors' solvency in a liquidation.

C.    **The Fair And Equitable Test Would Not Entitle The Lenders To A Default Rate Of Interest.**

57.    As with the "best interests test," the "fair and equitable" test would not even support, much less mandate, an award to the Lenders of postpetition interest at the contract default rate.  The starting point for the "fair and equitable" test is the statutory language of section 1129(b)(2), which, as noted above, codifies the absolute priority rule.  As previously discussed, the absolute priority rule is inapplicable here because, under the Proposed Asbestos

27

Settlement, the allowed amount of the Lenders' claims will be paid in full.  But the statutory language of section 1129(b)(2) is not the end of the inquiry.  Even where these statutory requirements are met, courts have held that general equitable considerations in a "cram down" situation may justify an award of postpetition interest.  In view of the relevant equitable considerations here, the Lenders cannot credibly argue that they are entitled to postpetition interest at the contract default rate.

58.    The equitable basis for postpetition interest reaches back to at least the United States Supreme Court decision in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1946), where the Court stated:  "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."  Id. at 165.  The Lenders take the position that, once solvency is established (or in this case, presumed), unsecured creditors are automatically entitled to postpetition interest at the full contract default rate of interest.  No court has ever adopted such a rigid, formulaic approach.  Instead, courts that have analyzed the appropriate rate of postpetition interest payable to unsecured creditors in solvent estates over the years agree that, consistent with Vanston, the analysis ultimately hinges upon "a balance of equities."  See In re Coram Healthcare Corp., 315 B.R. at 346 ("[T]he specific facts of each case will determine what rate of [postpetition] interest is 'fair and equitable.'"); In re Dow Corning Corp., 456 F.3d at 680 (remanding the issue of the appropriate rate of postpetition interest for "consideration of any equitable factors affecting the interest rate"); In re Loral Space & Commc'ns Ltd., Bench Ruling, No. 03-41710, tr. at 39-40 (Bankr. S.D.N.Y. July 25, 2005) (Drain, J.) ("In my view . . . the court has a large amount of discretion in deciding what the appropriate rate of interest should be under a Chapter 11 plan for a solvent

28

debtor."). Depending on the balancing of these equitable factors, courts have held that the appropriate rate of postpetition interest can be tied to the legal rate, the contract rate or the contract default rate.

59. The Lenders plainly do not want the Court to engage in a true balancing of the equities. That is clear from the fact that the Lenders and the Creditors' Committee have never terminated the agreement on postpetition interest. The Lenders and the Creditors' Committee want to use the agreement to establish a minimum amount of postpetition interest, and hope that they can achieve a greater amount through litigation. But they cannot have it both ways. If the Lenders and the Creditors' Committee are unwilling to abide by their prior agreement, the Court must engage in a true balancing test with no predetermined minimum amount of postpetition interest. And in these chapter 11 cases, where the Lenders have only created burdens without providing any corresponding benefits, a true balance of the equities shows that they are plainly not entitled to contractual default interest, and arguably are not entitled to any postpetition interest at all.

60. <u>Burden: Demanding a Solvency Proceeding.</u> As noted above, the Lenders' claim to postpetition interest of any type first requires a determination of solvency, and it would be wholly inequitable for the Lenders to demand a solvency hearing at this late date. Since early 2005, the Creditors' Committee has promised that in return for the Lenders receiving postpetition interest as set forth in the January 12, 2005 Letter Agreement, and later in the February 27, 2006 Letter Agreement, the Committee would support the Debtors' plan of reorganization. As late as April 4, 2008, the Creditors' Committee still expressed support for the previously agreed-upon rates of postpetition interest for the Lenders as being fair and reasonable. (<u>See</u> Exhibit E) The Debtors' entire exit strategy from chapter 11 has been based

29

upon the Creditors' Committee's promise of continued support, from terminating the estimation litigation to entering into the Proposed Asbestos Settlement. Should the Creditors' Committee or the Lenders demand a solvency hearing at this late date, it would put on hold indefinitely the entire reorganization of the Debtors and jeopardize the anticipated recoveries of all of the other constituencies, including the asbestos personal injury claimants. For the Creditors' Committee or the Lenders to take such drastic action, after years of agreeing to be co-proponents of a plan that treated postpetition interest in exactly the same way as the Proposed Asbestos Settlement, would destroy any equitable claim to postpetition interest at the higher default rate.

61.   Burden:  Endangering the Proposed Asbestos Settlement.  The Lenders' demand for the contract default rate represents an improper attempt by the Lenders to "have it both ways" by accepting all of the benefits of the Proposed Asbestos Settlement without accepting what they perceive to be the burdens. The only reason that the Lenders stand to receive their principal and any postpetition interest whatsoever is because all of the parties to the Proposed Asbestos Settlement made meaningful concessions that, if implemented, will enable the Debtors to emerge from bankruptcy. While the Lenders are all too willing to accept the concessions of the other constituencies, they are unwilling to make any concessions of their own. What makes the Lenders' stance particularly unfair is that the only so-called "concession" required of the Lenders under the Proposed Asbestos Settlement is that they accept postpetition interest at a rate that is higher than both the federal judgment rate and the contract rate.

62.   Burden:  Reneging on Prior Agreements.  The Lenders' attempt to renege on their prior agreement as to the appropriate postpetition interest rate inevitably jeopardizes the Proposed Asbestos Settlement. As stated above, the Proposed Asbestos Settlement that equity holders have bought into assumes a postpetition interest rate starting at 6.09% until December

30

31, 2005 and then at floating prime thereafter.  If that rate were to change as a result of the Lenders' demand, the equity holders would be well within their rights to resume the estimation litigation over the Asbestos PI Claims.  Should that occur, any hope the Debtors currently have of achieving a consensual resolution would be seriously compromised.  This potentially disastrous impact of an award of postpetition interest at the contract default rate is reason enough to reject the Lenders' demand.  Cf. In re A.H. Robins Co., Inc., 89 B.R. 555, 562 (E.D. Va. 1988) (disallowing claim for punitive damages in a chapter 11 case because of the potential impact on the debtor's plan of reorganization).

63.    Burden:  Demanding Payments Prohibited by Law.  The Lenders' demand for postpetition interest at the contract default rate is inequitable in light of the fact that any so-called default – or failure to make timely payment – exists solely because the Debtors have been legally precluded from making such payments during these cases.  Under such circumstances, it would be wholly inequitable to treat the Debtors' failure to make timely payments under the Credit Agreements as triggering a claim for interest at the contract default rate.  See In re Nextwave Personal Commc'ns, Inc., 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval.").

64.    In their brief, the Lenders argue that the Debtors' position would mean that "no creditor could ever obtain pendency interest at the contract default rate unless a default occurred prepetition."    (Docket No. 19073 (Lenders' Response) ¶ 88)    That is a mischaracterization of the Debtors' position. The Debtors' position is not that the absence of a prepetition default means that a creditor never has the right to postpetition interest at the contract default rate.  Instead, the Debtors' position is simply that where, as here, the Debtors' only

31

alleged "default" resulted from the fact that Debtors did not make payments that they were legally prohibited from making, it would be inequitable to treat such non-payment as triggering an award of default interest.[9]

65.    Burden: Behaving Opportunistically.    The Lenders' rejection of the agreed-upon rate of postpetition interest, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for the Debtors' litigation and reorganization efforts throughout these cases, which have resulted in the Proposed Asbestos Settlement following the recent claims estimation proceedings, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate.

66.    While the Lenders have created a host of burdens in these chapter 11 cases, they have not accounted for a single corresponding benefit.    The Lenders and the Creditors' Committee vainly attempt to prove otherwise by relying on the Declaration of Mr. Ordway, the financial advisor retained by the Committee.[10]    But Mr. Ordway's declaration does

---

[9]    The Lenders cite In re Chicago, Milwaukee, St. Paul & Pacific R.R., 791 F.2d 524 (7th Cir. 1986), for the proposition that "Courts do not regard payment-related default provisions as 'ipso facto' clauses, and in fact recognize that postpetition defaults are to be enforced and to enforce such rights in accordance with a creditor's contracts." (Docket No. 19073 (Lenders' Response) ¶ 91)  The Lenders' reliance on Chicago, Milwaukee is misplaced.  As a threshold matter, Chicago, Milwaukee was decided under the Bankruptcy Act, not the Bankruptcy Code.  Id. at 525 (noting that the Bankruptcy Act "has since been repealed but remains applicable to this proceeding").  It is well-settled that the Bankruptcy Code offers debtors far greater protections with respect to creditors enforcing contractual defaults as a result of bankruptcy-related events.  See, e.g., In re C.A.F. Bindery, Inc., 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) ("Recognized under the former Bankruptcy Act, [ipso facto] clauses are unenforceable under the Bankruptcy Code").  Moreover, Chicago, Milwaukee did not involve a demand for contractual default interest under section 1129(b), and thus does not even address the question of whether it would inequitable to impose such interest where, as here, the only alleged "default" resulted solely from the operation of the Bankruptcy Code after the Petition Date.

[10]    See Docket No. 19321 (Declaration of Edwin N. Ordway, Jr. In Support Of The Response Of The Official Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The (Continued...)

32

not provide any equitable support for the Lenders' claim for postpetition interest at the contract rate of default.

67.    <u>No Benefit from the Purported Use of the Lenders' Cash.</u>    In his Declaration, Mr. Ordway adopts the contention, first raised in the Lenders' brief, that the equities favor an award of postpetition interest at the contract default rate because the Debtors have had the use of the Lenders' money for over seven years.  (Docket No. 19321 (Ordway Decl.) ¶ 7) But both Mr. Ordway and the Lenders overlook one very salient point – it was not <u>these</u> Lenders' money.  Indeed, throughout their brief, the Lenders struggle to distance themselves from the January 2005 and February 2006 agreements on postpetition interest by trumpeting the fact that these agreements were reached by a different set of Lenders. As the Lenders proclaim: "We do not believe that any of these holders remain Bank Lenders today."  (Docket No. 19073 (Lenders' Response) ¶ 23)  If that is true, it strains credulity for Mr. Ordway and these Lenders to simultaneously argue for postpetition interest at the contract default rate on the ground that the Debtors had the use of these Lenders' money for over seven years.

68.    Moreover, as Mr. Ordway admitted during his deposition, he had no idea how much, if any, of the unpaid interest under the Credit Agreements was actually used in the Debtors' operations. (Exhibit F (Ordway Dep.) 59:4-8)  Mr. Ordway acknowledged that Debtors had substantial cash balances, and thus he could not say that Debtors in fact used any of the unpaid interest in operations. (Exhibit F (Ordway Dep.) 59:9-11; 60:24-61:25) Thus, even if the Debtors did in fact have the use of the money of these Lenders for over seven years, which is not

---

Debtors' Credit Agreements Dated As Of May 14, 1998 And May 15, 1999 ("Ordway Decl.")); <u>see also</u> Lenders' Br. ¶ 13.

33

the case, the Creditors' Committee has no basis to say that any of the unpaid interest on these funds was actually used in the Debtors' operations.

69.     <u>No Benefit from the Creditors' Committee's So-Called "Support."</u>  Mr. Ordway also attempts to bolster the Creditors' Committee's and the Lender's claim for contract default interest by asserting that "[t]he value created by the Debtors during these bankruptcy cases was made possible, in some part, by the creditors' support of the Debtors' use of such cash to fund numerous strategic acquisitions and otherwise reinvest in their business." (Docket No. 19321 (Ordway Decl.) ¶ 6)  But when pressed about this assertion during his deposition, Mr. Ordway was forced to concede that the "creditors' support" consisted of nothing more than the fact that the Creditors' Committee did not object to the strategic acquisitions and reinvestments that were approved by this Court without objection by any of the constituencies.  (Exhibit F (Ordway Dep.) 49:7-11; 50:9-13).  As Mr. Ordway testified, this is the extent of the Creditors' Committee's support that supposedly created value for the Debtors during this bankruptcy proceeding:

> Q:    And you regard that as being a favorable contribution to the case, that [the creditors] simply failed to get in the way?
>
> MR. PASQUALE:  Objection to form.
>
> A:    Yes, I do.

(<u>Id</u>. 51:2-6)  Despite Mr. Ordway's opinion, this is hardly the type of support that would justify an award of postpetition interest at the contract rate of default.

70.     Unable to articulate any real benefit created by the Lenders or the Creditors' Committee, Mr. Ordway resorts to the argument that the differential between the amount of interest sought by the Lenders and that offered under the Proposed Asbestos Settlement – $91 million – is "de minimus."  (Docket No. 19321 (Ordway Decl.) ¶ 8).  Mr.

34

Ordway's opinion is flawed for at least three reasons. First, Mr. Ordway admitted that there are no professional standards, accounting standards, or financial analyses that define whether an amount is "de minimus." (Exhibit F (Ordway Dep.) 24:6-14) Instead, the only reason that Mr. Ordway offered an opinion that the $91 million was "de minimus" was because he was asked to do so by his counsel. (Id. 24:19-25:25) Second, Mr. Ordway's "de minimus" opinion rests upon a comparison between two incomparable securities – W. R. Grace stock and the unsecured debt. (Id. 29:11-23) By Mr. Ordway's own admission, these are "two totally different kinds of securities." (Id. 31:16-21) Third, as Mr. Ordway testified, when viewed in relation to the debt, $500 million, the amount of interest at issue, $91 million, could hardly be deemed "de minimus." (Id. 34:18-35:5)

71.    In the end, Mr. Ordway's Declaration does nothing to bolster the Lenders' demand for contractual default interest. Try as they might, the Lenders cannot change the fact that, because the Debtors' solvency has not been determined, and will not be determined unless the anticipated plan of reorganization is rejected, the Lenders are not entitled to any postpetition interest, let alone postpetition interest at the contract default rate. Their belated demand for such interest is nothing more than an improper attempt to reap a windfall by reneging on an agreement that was negotiated specifically on their behalf and for their benefit. It would be the height of inequity to reward such tactics.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Debtors' Objection, the Debtors respectfully submit that their Objection should be sustained and the Proofs of Claim should be disallowed to the extent they seek postpetition interest at the default rate of interest under the Credit Agreements.

35

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order disallowing the Lenders' Proofs of Claim to the extent they seek postpetition interest at the default rate of interest under the Credit Agreements and (b) grant any further and related relief as it may deem appropriate.

Dated:  September 5, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
153 East 53rd Street
New York, New York 10022
(212) 446-4800

and

PACHULSKI STANG ZIEHL & JONES LLP


_/s/ James E. O'Neill_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

K&E 13163123.6