1       IN THE UNITED STATES BANKRUPTCY COURT
2         FOR THE DISTRICT OF DELAWARE
3
4
   In re:                          ) Chapter 11
5                                  ) Case No.
   W.R. GRACE & CO., et al,        ) 01-1139(JFK)
6                                  )
              Debtors.             ) Jointly
7   ---------------------------)  Administered
8
9
10
11       DEPOSITION OF EDWIN N. ORDWAY, JR.
12              New York, New York
13            Friday, August 29, 2008
14
15
16
17
18
19
20
21
22
23   Reported by:
24   MAYLEEN CINTRON, RMR, CRR
25   JOB NO. 18494

Page 22

1  E. Ordway
2  compounding should take place quarterly?
3    A. There's a provision that addresses
4  default rate interest calculations.
5    Q. But does that make any reference to
6  "quarterly"?
7    A. It makes reference to the -- that
8  the calculation -- and I don't have the
9  document in front of me to be precise about
10 the language. That there would be
11 calculations of interest on payments that are
12 past due every time that there was an unpaid
13 balance, which would be quarterly.
14      If the interest wasn't paid, then
15 there was another calculation of the default
16 charge.
17    Q. Any other provisions that you can
18 recall?
19    A. No.
20    Q. So basically, the difference
21 between the default rate calculation and what
22 would be the base contract rate calculation
23 has two components; one is that the rate of
24 interest is different, and the other is that
25 there's interest on interest, correct?

Page 23

1  E. Ordway
2    A. Correct.
3    Q. Okay. Turning to the next page of
4  your declaration. It's actually, again, a
5  part of Paragraph 8. You go through the
6  calculation and find that, as you look at it,
7  the interest at issue is $90 million and you
8  say that the incremental amount being sought
9  by the lenders is 'di minimus'. Do you see
10 that?
11   A. Yes.
12   Q. Is that your word?
13   A. Yes.
14   Q. Did you choose that word?
15   A. Yes.
16   Q. Is that a term that is given
17 meaning in the accounting literature?
18   A. I'm not sure.
19   Q. Is that term a term that is given
20 meaning in the standards for valuation?
21   A. I'm not sure of that either.
22   Q. We know that it's a legal term,
23 correct?
24   A. Yes, we do.
25   Q. Is that, in fact, the source of

Page 24

1  E. Ordway
2  your decision to use the word; that is, a
3  legal context?
4    A. It's a legal term that is commonly
5  used in my business.
6    Q. But if we were to go to
7  professional standards and methodologies,
8  accounting standards and methodologies,
9  financial analyses standards and
10 methodologies, we would nowhere find an
11 objective standard stated on the basis of
12 which you can make a conclusion that something
13 is 'di minimus', correct?
14   A. Correct.
15   Q. Was it your idea or somebody else's
16 idea to offer an opinion as to whether the
17 interest rate at issue was 'di minimus'?
18   A. I was asked to provide my opinion.
19   Q. I know that. But was it your idea
20 or somebody else's idea to actually go ahead
21 and do that kind of analysis or determination;
22 that is, whether the interest at issue was
23 'di minimus'?
24      MR. PASQUALE: Objection to form.
25   A. I was asked to prepare this

Page 25

1  E. Ordway
2  affidavit.
3    Q. When you went down the road to say
4  is it 'di minimus' or not, was that something
5  that you thought of to do or something that
6  counsel thought to do?
7    A. It was our finding.
8    Q. I know it was your finding. But
9  I'm asking --
10      MR. PASQUALE: He's answering you.
11   Q. It wouldn't be your finding if it
12 wasn't in here.
13   A. I wouldn't have said it if it
14 wasn't a finding.
15   Q. I understand that. But whose idea
16 was it to even go down the path of doing that
17 analysis?
18      MR. PASQUALE: Objection. Let's be
19   specific. What analysis?
20      MR. BERNICK: Determine whether the
21   amount of interest at issue was
22   'di minimus'.
23   A. We were requested to prepare this
24 by counsel and to provide whether we believe
25 that this was 'di minimus' or not.

Page 26

1       E. Ordway
2    Q.  Okay.  So to be fair, then, it was
3  counsel who came up with the idea of looking
4  at the amount of interest at issue, correct?
5    A.  Yes.
6    Q.  It was counsel that came up with
7  the idea of making that determination using
8  the comparison between the default rate and
9  the proposed plan rate, correct?
10        MR. PASQUALE:  Objection to form.
11     Misstates prior testimony.
12        MR. BERNICK:  I think it is exactly
13     what he said.
14        MR. PASQUALE:  I don't think it is.
15    Q.  It was counsel who decided, came up
16  with the idea of using those particular
17  elements -- that is, proposed plan versus
18  default rate -- to define the interest at
19  issue, correct?
20    A.  I'm not sure if it was our idea or
21  their idea--
22    Q.  And it is certainly --
23    A.  -- to frame it in any manner.
24    Q.  And it was certainly, Counsel, then
25  who asked you to determine whether that was

Page 27

1       E. Ordway
2  'di minimus', correct?
3    A.  Yes.
4    Q.  Now, because there is no standard
5  for what's 'di minimus', did counsel give you
6  any suggestions about what would be
7  'di minimus'?
8    A.  No.
9    Q.  Now, you ultimately end up saying
10  it's 'di minimus' by making a comparison to, I
11  think as you put it, "the benefit now
12  available to all stakeholders," right?
13    A.  Yes.
14    Q.  Whose idea was it to talk about
15  what was available to all stakeholders?  What
16  does stakeholders even mean?
17    A.  Stakeholders are all the -- in our
18  context, the way we wrote this, were all the
19  parties in interest associated with the
20  Debtor's cases.
21    Q.  Whose idea was it to determine
22  whether the amount at issue was 'di minimus'
23  by reference to the benefit available to all
24  stakeholders?
25        MR. PASQUALE:  Objection to form.

Page 28

1       E. Ordway
2    Q.  Whose idea was that?
3    A.  I believe that was our thought to
4  include that in the affidavit.
5    Q.  So, your point of reference, it was
6  you who decided that the point of reference
7  for making a comparison and determining
8  'di minimus', that the right point of
9  reference would be "benefit available to
10  stakeholders"?
11    A.  As well -- yes.
12    Q.  And it's true, is it not, that
13  there is no accounting standard, convention,
14  or methodology that tells you to make that
15  comparison?
16    A.  That's correct.
17    Q.  It's true that there is no
18  financial analysis, standard or methodology or
19  convention that tells you to make that
20  comparison, correct?
21    A.  Correct.
22    Q.  If somebody else were to make a
23  different comparison or to determine what was
24  'di minimus', you would have no basis using a
25  standard, or method or convention to say what

Page 29

1       E. Ordway
2  they are, correct?
3    A.  It would be their judgment versus
4  my judgment.
5    Q.  And to decide between your judgment
6  versus their judgment, there is no objective
7  standard or reliable method that you could
8  point to right now that would enable you to
9  make the decision, correct?
10    A.  That's correct.
11    Q.  Now, it's true, is it not, that
12  when you make the comparison between the
13  interest at issue and the benefit available to
14  the stakeholders, you're really talking about
15  a comparison of the interest at issue and the
16  value that's been generated at Grace, correct?
17    A.  Yes.
18    Q.  And it is true, is it not, that the
19  value that has been generated in Grace is
20  reflected, according to your work, in the
21  stock price, right?
22        MR. PASQUALE:  Objection to form.
23    A.  Yes.
24    Q.  And basically, the comparison that
25  you draw in determining the significance of

Page 30

1         E. Ordway
2  the interest at issue, are comparisons between
3  the interest that has accrued to the debt on
4  which you're opining by comparison to the
5  value that's accreted to equity, correct?
6       MR. PASQUALE: I'm going to object
7     to form. The affidavit goes into more
8     than just that, David, as you well
9     know.
10   A. It's one of the examples that we
11 use.
12   Q. Right, you got comparisons to
13 EBITDA, you got comparisons to revenues. At
14 the end of the day, EBITDA and revenue are
15 also reflected in equity value, correct, or
16 not?
17   A. One would assume that the market
18 value contemplates operating performance, so
19 the answer would be yes.
20   Q. So fundamentally, at the heart of
21 your determination that the interest at issue
22 is 'di minimus', is a comparison between the
23 interest at issue on the one hand and the
24 value of Grace equity on the other, correct?
25   A. Not only the value of Grace, but

Page 31

1         E. Ordway
2  also the total value of the Company and the
3  operating performance of the Company.
4    Q. Operating performance, generally
5  speaking, is reflected in equity; or not?
6    A. Generally speaking.
7    Q. But, is it true that equity value,
8  that is stock price, can reflect many, many
9  things other than company performance; true?
10   A. Correct.
11   Q. And in fact you provide no
12 methodology in your declaration here that
13 enables us to relate stock price to actual
14 company performance, correct?
15   A. Correct.
16   Q. Now, it's true, is it not, that the
17 debt that you're talking about here and the
18 equity securities that you're talking about
19 here, are two totally different kinds of
20 securities?
21   A. Correct.
22   Q. Debt accretes value based upon
23 interest, correct?
24   A. Correct.
25   Q. Equity accretes value based upon

Page 32

1         E. Ordway
2  performance, not interest, correct?
3    A. Can I change an answer?
4    Q. Depends on which one you want to
5  change.
6       MR. PASQUALE: Yes, you could --
7    Q. I tell you what, if you want to ask
8  me whether you could change an answer, I
9  appreciate that. But you probably have the
10 prerogative at some point in this process to
11 change it on your own.
12      So what answer do you want to
13 change?
14   A. The one from -- the prior question
15 you asked me about the debt instrument, that
16 it accretes value according to its contract
17 rate of interest.
18      In this instance, too, the debt is
19 traded, there's a market for trading the debt,
20 and the debt improved in value since the
21 filing of the bankruptcy, albeit there were
22 some ups and down, based on the performance of
23 the Company as well.
24   Q. Sure. As a matter of the debt
25 contract, the security agreement or the

Page 33

1         E. Ordway
2  agreement that underpins the debt security,
3  the value of that debt security, in the sense
4  of the obligation to repay that security, is
5  driven solely by the interest rate and
6  principal amount, correct?
7    A. And other fees that are contained
8  in the terms of the agreement.
9    Q. The value of the debt security, in
10 the sense of what is owed to the creditor is
11 not contingent upon how the Company performs,
12 correct?
13   A. The obligation is not contingent
14 upon the Company's performance, that's
15 correct.
16   Q. Where in the case of equity, equity
17 does not accrete interest under contract,
18 correct?
19   A. Correct.
20   Q. Or under law, correct?
21   A. Correct.
22   Q. And equity, by contrast to debt,
23 accretes value based upon the performance of
24 the Company and how that performance then is
25 reflected in the stock price, correct?

Page 34

E. Ordway
A. Among other factors, yes.
Q. In fact, independently of market price, you could add private equity that accretes value simply based upon the performance of the Company, correct?
A. Correct.
Q. If you wanted to make a different comparison using your own work here -- put it differently.
   If we look at the work that you've done here, you choose to determine whether the interest at issue is 'di minimus' by comparing it to the value that has accreted to Grace's operations, among other things, correct?
   MR. PASQUALE: Thank you, David.
A. Yes, among other things.
Q. But if we just wanted to talk about what was owed under the debt instruments, would you say that the amount at issue here is 'di minimus' in relationship to the amounts that may or may not be owed under the debt agreements themselves?
   In other words, you compare the debt to the equity. I'm asking you: If you

Page 35

E. Ordway
just focused on the debt, the amount of interest at issue here is not 'di minimus' compared to what is owed on the debt, correct?
A. Correct.
Q. In fact, is it true that if we compare the highest number, which is the default interest calculation that you've done, to the base interest rate, even assuming that that base interest rate extends beyond the event of Grace filing for bankruptcy, you're talking about as much as a 40 percent difference in the amount of interest it's owing, correct?
A. I think that calculation is right.
Q. And that certainly would not be 'di minimus', correct?
A. The statement of being 'di minimus' was in the context of other financial information. But in the context of the debt itself and the interest itself, I would not call that 'di minimus', if that were the comparison.
Q. Excuse me, what?
A. If that were the comparison we were

Page 36

E. Ordway
making.
Q. Have you ever done an opinion on solvency?
A. Yes.
Q. Is that something that's ordinarily done by people within your field of expertise?
   MR. PASQUALE: David, I'm going to raise an objection. We had an agreement that questioning would be limited to the declaration.
   MR. BERNICK: I'm not going to stray from that agreement. You'll see.
   MR. PASQUALE: But solvency is not in here.
   MR. BERNICK: That's what I wanted to get you to say, really.
Q. You know about solvency opinions, correct?
A. Yes, I do.
Q. You do not express here an opinion -- in your declaration, you do not express an opinion about solvency, nor do you do a solvency calculation, correct?
A. Correct.

Page 37

E. Ordway
   MR. BERNICK: Did I abide by my agreement?
   MR. PASQUALE: Well, you did. But you asked about solvency questions, and now I feel compelled to say for the record that the judge has deferred any issues of solvency until after the hearing. So we will reserve the right to deal with that issue later if we need to.
   MR. BERNICK: I don't want to argue about it. I'm making such progress here.
   MR. COBB: On the record for bank lenders, the judge has deferred certain questions with regard to solvency, calculations thereof, until a later date.
   MR. PASQUALE: That's more accurate.
   MR. BERNICK: I'm glad we are in agreement with respect to that.
BY MR. BERNICK:
Q. Now, you have looked also in your

Page 46

1       E. Ordway
2       Q.  Have you determined what other, if
3   any, contribution the general Unsecured
4   Creditors at issue here, what other
5   contribution, if any, those creditors made to
6   the bankruptcy case?
7           MR. COBB:  Objection to form again.
8       A.  Am I aware of other ones?
9       Q.  Yes.
10      A.  Yes.
11          MR. PASQUALE:  Let's be clear.
12      Your objection is well taken.
13          MR. COBB:  Objection as to form.
14      I'll be precise.  The "general
15      Unsecured Creditors at issue here."
16      You can answer if you can.
17          MR. PASQUALE:  Do you mean the
18      Committee, David or do you mean the
19      creditor body?  I think that's the
20      issue.
21          MR. BERNICK:  I make no such
22      distinction.  If you want to object to
23      form on the grounds that the Committee
24      is different from the lenders, feel
25      free.

Page 47

1       E. Ordway
2       Q.  My question is whether you have
3   looked to see whether the unsecured lenders in
4   this case made any other contribution to the
5   bankruptcy case itself other than being
6   co-proponents of Grace's Plan of
7   Reorganization?
8       A.  Is the question the unsecured
9   lenders or the Creditors Committee?  I guess
10  you said --
11      Q.  Either or both.
12      A.  The Committee, I believe, has
13  provided substantial contribution to the case
14  in terms of, as the case has progressed, since
15  its onset with being cooperative with the
16  Debtor.
17      Q.  Is there anywhere in the
18  declaration where you state that those
19  activities in any way, shape, or form
20  contributed to Grace's stock price?
21      A.  No.
22      Q.  Let's talk a little bit about
23  creditors' support.  Creditor's support for
24  Grace acquisitions and reinvestments is one of
25  the two contributions which you say that the

Page 48

1       E. Ordway
2   Unsecured Creditors made to Grace's stock
3   price, correct?
4       A.  Correct.
5       Q.  I don't see anywhere in your
6   declaration where you cite any evidence to
7   support the proposition that the creditors
8   support for acquisition and reinvestment had
9   any effect on stock price.  Would you agree
10  with me that there is nothing in the
11  declaration that provides that evidence?
12      A.  I agree.
13      Q.  Isn't it true that Grace had to
14  bring proposed acquisitions before the
15  Bankruptcy Court for approval?
16      A.  Correct.
17      Q.  Isn't it true that none of those
18  acquisitions were contested by anybody?
19      A.  They weren't contested by us as a
20  result of our review and analysis, and belief
21  that it was the appropriate course of action.
22      Q.  But they weren't contested by any
23  of the other stakeholders in the case, were
24  they?
25      A.  Not that I recall.

Page 49

1       E. Ordway
2       Q.  In fact, all of Grace's
3   acquisitions, everybody agreed, were prudent
4   and appropriate acquisitions to make, correct?
5       A.  I'm not sure what the other party's
6   conclusions were, but they didn't object.
7       Q.  So, is what you're saying that the
8   contribution of general Unsecured Creditors
9   when it comes to creditors' support, is that
10  they decided not to object?
11      A.  They decided to not object.
12      Q.  What about reinvestment?  Are you
13  aware of any reinvestment that Grace made?
14  All Grace's financial, including CapEx, were
15  made available to the Committee and different
16  stakeholders, correct?
17      A.  Correct.
18      Q.  Are you aware of any issue that was
19  ever raised with respect to the reinvestment
20  of Grace earnings into the Grace business?
21      A.  There were issues raised, but I
22  think concluded to our satisfaction over time.
23      Q.  But did anyone at any point in the
24  bankruptcy ever object to any of Grace's
25  reinvestments?

Page 50

**E. Ordway**

A. Not that I recall.

Q. So they were essentially noncontroversial, weren't they?

A. I think it was controversial in the sense of the Company making acquisitions during a bankruptcy, but we accepted that they were appropriate in the circumstances.

Q. So again, the contributions that the creditors made, insofar as reinvestment was concerned, was simply a decision not to object, correct?

A. Correct.

Q. So when we're sitting here today, you say that the creditors' support with respect to acquisitions and reinvestment created a positive contribution to stock value, all you're really referring to is that you might have had an impact on Grace's stock value if you had decided to object to the acquisitions or the reinvestments, correct?

MR. PASQUALE: Objection to form.

A. It would have been detrimental to the value of the Company, highly likely, if we objected to some of these acquisitions.

Page 51

E. Ordway

Q. And you regard that as being a favorable contribution to the case, that you simply failed to get in the way?

MR. PASQUALE: Objection to form.

A. Yes, I do.

Q. Let's talk about money, the use of cash, which appears on, I think, the next page.

It says, "The equity holders of the Debtors have benefited substantially as compared to the lenders, in part from the use of lender's cash." Do you see that?

A. Yes.

Q. Now, that has got two components, one is that there was a benefit to the equity holders, and the second, that the benefit was substantial, right?

A. Yes.

Q. Incidentally, whose idea was it to take a look at whether the general Unsecured Creditors had created a positive contribution to Grace's stock performance? Was that your idea or counsel's idea?

A. I think it may have been counsel's

Page 52

**E. Ordway**

idea.

Q. Who decided how that analysis should be done; you or counsel?

A. I believe it was our idea as to how this calculation and presentation should be -- should be made to illustrate that point.

Q. Well, but when it came to creditors' support, what we just got done talking about, was it your idea to identify creditors support as a potential contributor to stock price or counsel's idea?

A. The creditors' support as it relates to the reinvestments and acquisitions?

Q. Yes.

A. That was my idea.

Q. And the use of lender's cash, was that your idea or counsel's idea?

A. That may have been counsel's idea. I don't recall.

Q. Now, in neither instance, that is neither in respect to creditors' support nor in respect to use of lender's cash, in neither case do we see any quantification of the contribution, correct?

Page 53

**E. Ordway**

A. I don't have it calculated in here in this paragraph, but it's a half a million dollars worth of lending, plus 400 and change of interest that hasn't been paid.

Q. I just asked you whether we see anywhere in here a methodology that you used in determining what contribution, if any, that cash had?

A. No.

Q. Now, if we wanted to determine -- with respect to creditors' support, if we wanted to determine the impact that that had on stock price, can you point to any accounting or financial analysis, methodology or standard that you used in determining the creditors' support did have a positive impact on stock price?

A. I don't have a calculation to demonstrate that.

Q. Do you have any kind of standard, methodology, or stated methodology to demonstrate it, on creditors' support?

A. There isn't a standard methodology for determining a precise quantification of

14

Page 54

E. Ordway

1 the benefit of the stock price from the
2 lender's cash.
3    Q.  I'm talking about creditors'
4 support.
5         MR. PASQUALE: More generally.
6    Q.  Creditors' support for acquisitions
7 and reinvestments.
8    A.  There isn't a precise methodology
9 for determining that.
10    Q.  There isn't any methodology for
11 determining that, correct, this is a question
12 of your judgment?
13    A.  It would be a question of judgment.
14    Q.  When it comes to lender's cash. I
15 want to go through lender cash a little bit.
16        First of all, we don't see here the
17 deployment of any standard, methodology or
18 objective test in saying the use of lender's
19 cash benefited the equity holders or the
20 Debtor, correct?
21    A.  Correct.
22    Q.  Same thing with regard to the word
23 "substantially," it says that the equity
24 holders benefited substantially. Was that

Page 55

E. Ordway

1 your word or counsel's word?
2    A.  My word.
3    Q.  Is that a word that was derived
4 from the accounting literature or the
5 financial analysis literature, or that's just
6 a general word in your vocabulary?
7    A.  It's a general word in my -- it is
8 my judgment to use that word.
9    Q.  That there is no objective measure
10 or test that you used to determining
11 substantial or insubstantial, correct?
12    A.  No.
13    Q.  Is my statement correct, that there
14 was no objective test that you used?
15    A.  Sorry. Yes.
16    Q.  Now, when we talk about the money,
17 the cash that the lenders provided to Grace
18 that Grace used, we have the principal of $503
19 million, principal plus accrued interest as of
20 the date of filing, correct?
21    A.  Correct.
22    Q.  Now, the loan documents call for
23 compensation for the use of that principal
24 with simple interest, correct?

Page 56

E. Ordway

1    A.  Correct.
2    Q.  And we know that the compensation
3 for the use of that principal with simple
4 interest, would be about the $287 million
5 number, right?
6    A.  That sounds correct. That sounds
7 about right.
8    Q.  Now, if we deal with default,
9 default has got two components to it, one is a
10 different rate, and the other is compounded,
11 correct?
12    A.  Correct.
13    Q.  If we just talk about the default
14 rate applying before we get to interest on
15 interest, just apply the higher default rate,
16 am I right that that would take the interest
17 up approximately $15 to $18 million to about
18 $304 million?
19    A.  I don't know that calculation, if
20 that's right or wrong.
21    Q.  So, if we have principal of
22 $500 million, and the unpaid interest on the
23 principal, not interest on interest, but
24 interest on the principal, that would be

Page 57

E. Ordway

1 something in the area of between $280 and
2 $300 million approximately?
3        MR. PASQUALE: Object to form.
4    A.  I'm not sure of your calculation.
5 But it sounds order of magnitude, like it
6 might be good for this discussion.
7    Q.  What I'm getting at is: When we
8 talk about use of lender's cash, we have
9 principal, we have interest on the principal
10 and we have interest on interest. Those are
11 three different things, correct?
12    A.  Correct.
13    Q.  And all I'm trying to do is get a
14 rough idea of the three tranches: The
15 principal plus accrued interest as of the date
16 of the filing is roughly $500 million, the
17 unpaid interest on principal -- simple
18 interest, not interest on interest, interest
19 on principal -- is another 300-odd-million
20 dollars, and then we have the interest on
21 interest component which takes you as high up
22 as the $414 million, right?
23        MR. PASQUALE: Objection. Asked
24        and answered.

Page 58

1      E. Ordway
2      A. I can't confirm precisely your
3   number other than the 414 and the
4   500-and-three-and-a-half, which is the
5   principal plus pre-petition interest.
6      Q. So when you say that really it is
7   the equity holders and the Debtors used the
8   lender's cash, how do you know that they used
9   unpaid interest on principal?
10     A. I don't understand the question.
11     Q. Well, unpaid interest on principal,
12  you have the principal of $500 million, you
13  then have monies above that all the way up to
14  another $400 million, what portion of that
15  $400 million that you say would be owing to
16  the Unsecured Creditors as interest, either
17  interest on principal or interest on interest,
18  how much of that do you know that the Debtor
19  actually used in its operations?
20     A. It would be -- I suppose we can
21  calculate it by looking at change in cash
22  balances from the beginning of the case
23  through now, for example. The difference --
24  first of all, cash is fungible, but presumably
25  the balance -- the difference between that

Page 59

1      E. Ordway
2   would have been used in operations, to support
3   operations.
4      Q. But that's what I'm asking: Do you
5   know how much of the lender's interest, unpaid
6   interest, actually got used in operations?
7   Does that anywhere appear in the affidavit?
8      A. No.
9      Q. It's true, is it not, that Grace
10  has had substantial cash balances, correct?
11     A. Yes.
12     Q. That cash balance as of the end of
13  June of this year is about $400 million and
14  that's after some very substantial payments,
15  correct?
16     A. Yes.
17     Q. Do you know that Grace's cash
18  balance ever was lower than the unpaid
19  interest on interest?
20     A. I don't know.
21     Q. Well, if you don't know, how do you
22  know that Grace actually used the lender's --
23  not the principal, but actually used unpaid
24  interest in order to fund its growth?
25     A. I know that taken over time, this

Page 60

1      E. Ordway
2   is a significant amount of money and that it
3   exceeds the change in the cash on-hand from
4   the beginning of the case till now. So it is
5   implicit that that difference, a portion was
6   used to fund operations. And certainly during
7   the case it was used to fund operations.
8      Q. I'm not talking about just the
9   interest on principal or interest on interest.
10  Not the original $500 million.
11        MR. PASQUALE: So he is going
12     outside the declaration to ask you that
13     question.
14        MR. BERNICK: To the contrary.
15        MR. PASQUALE: That's what he
16     wrote.
17        MR. BERNICK: It is all embedded.
18     That's what I'm trying to find out.
19     Q. You said that the equity holders
20  used the lender's cash. I'm construing
21  lender's cash to be the broadest it could
22  possibly be, which is principal, interest on
23  principal and interest on interest.
24        I'm simply asking whether you know
25  that statement to be true with respect to

Page 61

1      E. Ordway
2   interest on principal or interest on interest,
3   based on what is in your declaration?
4      A. I don't have a calculation to
5   precisely demonstrate how much of the unpaid
6   interest, whether it's interest on interest,
7   was, in effect, used for operations other than
8   generally it had to have been.
9      Q. No quantification at all appears in
10  the declaration, correct?
11     A. No.
12     Q. You can't tell whether it was
13  substantial or 'di minimus', correct, as an
14  expert?
15     A. The reason that we're used the word
16  "substantial" is because the sum is $414
17  million, that's a substantial number.
18     Q. Fair enough. But you cannot, as an
19  expert, say "substantial" when it comes to the
20  actual cash that was actually used in
21  operations because you don't know how much
22  that was, correct?
23     A. I don't know how much that was at
24  this point in time, although that's
25  determinable, certainly.