## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W. R. GRACE & CO., et al., | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| Debtors. | **Hearing Date: September 29, 2008 at 10:00 a.m.** |

## PRE-TRIAL MEMORANDUM OF THE BANK LENDER GROUP IN OPPOSITION TO THE DEBTORS' OBJECTION TO CLAIMS ASSERTED  UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

Dated: September 5, 2008
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for The Bank Lender Group*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT....................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT ................................................................................................................ 12

I.     THE ISSUES RAISED BY GRACE IN THE OBJECTION ARE NOT RIPE ... 12

II.    THE PROPOSED ASBESTOS SETTLEMENT  VIOLATES THE
       ABSOLUTE PRIORITY RULE ............................................................................ 14

       A.     Grace Cannot Circumvent the Absolute Priority Rule through the
              Proposed Asbestos Settlement. .................................................................. 15

       B.     The Proposed Asbestos Settlement Concedes That Grace is Solvent....... 17

       C.     Grace's Market Capitalization Establishes Its Solvency. .......................... 20

III.   THE BANK LENDERS SHOULD RECEIVE POSTPETITION INTEREST
       AT THE CONTRACT DEFAULT RATE ............................................................ 23

IV.    THE EQUITIES WARRANT PAYMENT OF POSTPETITION INTEREST
       AT THE CONTRACTUAL DEFAULT INTEREST........................................... 28

       A.     The Bank Lenders Have Not Done Anything to Impede the
              Administration of these Chapter 11 Cases. ............................................... 28

       B.     The Contract Default Interest Rate is Reasonable. .................................... 30

       C.     All of Grace's Reliance Arguments Fail. ................................................... 30

              1.   The Bank Lenders were not a party to any
                   postpetition agreement among Grace or others, and
                   the Creditors' Committee could not bind the Bank Lenders............31

              2.   Grace did not reasonably rely on any conduct of the Bank Lenders...34

              3.   Third Circuit law prohibits invocation of
                   any reliance exception to the absolute priority rule........................34

              4.   Grace cannot satisfy any estoppel or other reliance based exception...35

              5.   The Administrative Agent lacked apparent authority to waive
                   or amend the Bank Lenders' rights under the Credit Agreements......37

|   | D. | The Passage of Time Has Not Deprived the Bank Lenders of Their Right to Receive Contract Default Interest ................................................ 39 |

|   | E. | Grace's Argument that Paying Contract Default Interest to the Bank Lenders Would Jeopardize the Proposed Asbestos Settlement is Not Tenable .................................................................................................... 42 |

|   | F. | The Bankruptcy Code's Anti-Ipso Facto Provisions are Not Relevant ..... 43 |

|   | G. | The Credit Agreements Cannot be Rewritten to Give Grace a Windfall .. 45 |

| V. | THE "BEST INTERESTS OF CREDITORS" TEST DOES NOT REQUIRE INTEREST AT THE FEDERAL JUDGMENT RATE ........................................ 45 |

| CONCLUSION ............................................................................................................. 47 |

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re A.H. Robins Co., Inc.,*
    89 B.R. 555 (E.D. Va. 1988) ..................................................................................... 43

*In re Ace-Texas, Inc.,*
    217 B.R. 719 (Bankr. D. Del. 1998) ............................................................... 15, 25, 30

*In re Adelphia Commc'ns,*
    No. 02-41729 (Bankr. S.D.N.Y. Apr. 27, 2006) .................................................. 27, 46

*Adelphia Recovery Trust* v. *Bank of America, N.A.,*
    390 B.R. 80 (S.D.N.Y. 2008) .................................................................................... 41

*Am. Nat'l Trust & Sav. Ass'n* v. *203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999) ............................................................................................ 16, 17

*Am-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.,*
    33 F. Supp. 2d 235 (S.D.N.Y. 1998) .......................................................................... 43

*Anchor Resolution Corp.* v. *State St. Bank & Trust Co. of Conn.*
    *(In re Anchor Resolution Corp.),* 221 B.R. 330 (Bankr. D. Del. 1998) ...................... 43

*Application of Lester,*
    386 N.Y.S.2d 509 (Sup. Ct. 1976) ............................................................................ 39

*In re Aquila Inc.,*
    805 A.2d 184 (Del. Ch. 2002) .................................................................................. 35

*In re Armstrong World Indus., Inc.,*
    320 B.R. 523 (D. Del. 2005) .................................................................................... 35

*In re Armstrong World Indus., Inc.,*
    432 F.3d 507 (3d Cir. 2005) ...............................................................................passim

*Atherton* v. *FDIC,*
    519 U.S. 213 (1997) ................................................................................................ 47

*In re AWECO, Inc.,*
    725 F.2d 293 (5th Cir. 1984)...............................................................................42

*Billops* v. *Magness Const. Co.,*
    391 A.2d 196 (Del. 1978)......................................................................................... 38

*Bruning* v. *United States*,
376 U.S. 358 (1964) ................................................................................................. 19

*Butner* v. *United States*,
440 U.S. 48 (1979) .................................................................................................... 45

*In re Calpine Corp.*,
365 B.R. 392 (Bankr. S.D.N.Y. 2007) ...................................................................... 13

*In re Cardelucci*,
285 F.3d 1231 (9th Cir. 2002) .................................................................................. 46

*In re Carter*,
220 B.R. 411 (Bankr. D.N.M. 1998) ......................................................................... 47

*In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*,
791 F.2d 524 (7th Cir. 1986) ......................................................................... 20, 25, 44

*In re Combustion Eng'g, Inc.*,
391 F.3d 195 (3d Cir. 2004) ..................................................................................... 42

*In re Congoleum*,
No. 05-06245, 2007 WL 4571086 (Bankr D.N.J. Dec. 28, 2007) .............................. 41

*In re Consol. Operating Partners L.P.*,
91 B.R. 113 (Bankr. D. Colo. 1988) ................................................................... 25, 29

*Consolidated Rock Prods.* v. *Du Bois*,
312 U.S. 510 (1941) .................................................................................................. 18

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ................................................................ 26-27, 46

*Coventry* v. *U.S. Steel Corp.*,
856 F.2d 514 (3d Cir. 1988) ..................................................................................... 39

*Covey* v. *Comm. Nat. Bank of Peoria*,
960 F.2d 657 (7th Cir. 1992) .................................................................................... 23

*Debentureholders Protective Comm. of Cont'l Invest. Corp.* v. *Cont'l Inv. Corp.*,
679 F.2d 264 (1st Cir. 1982) ..................................................................................... 29

*Del Sontro* v. *Cendant Corp., Inc.*,
223 F. Supp. 2d 563 (D.N.J. 2002) ........................................................................... 36

*Derry Finance N.V.* v. *Christiana Cos., Inc.*,
616 F. Supp. 544 (D. Del. 1985), *aff'd*, 797 F.2d 1210 (3d Cir. 1986) ...................... 36

*DFI Commc'ns* v. *Greenberg,*
    363 N.E.2d 314 (N.Y. 1977) .......................................................................34

*In re Dove-Nation,*
    318 B.R. 147 (8th Cir. B.A.P. 2004) ...........................................................13

*Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.,*
    No. 91-4027, 1992 WL 672289 (D.N.J. July 21, 1992) ..............................36

*In re Dow Corning Corp.,*
    456 F.3d 668 (6th Cir. 2006) ..............................................................passim

*In re Dow Corning Corp.,*
    244 B.R. 678 (Bankr. E.D. Mich. 1999) ......................................................46

*Equimark Comm. Fin. Co.* v. *C.I.T. Fin. Servs. Corp.,*
    812 F.2d 141 (3d Cir. 1987) ........................................................................40

*Ernst Iron Works* v. *Duralith Corp.,*
    200 N.E. 683 (N.Y. 1936) ...........................................................................38

*Ford* v. *Unity Hospital,*
    299 N.E.2d 659 (N.Y. 1973) ................................................................33, 38

*Gen. Elec. Co.* v. *Compagnie Euralair, S.A.,*
    945 F. Supp. 527 (S.D.N.Y. 1996) .............................................................36

*Gen. Elec. Capital Corp.* v. *Future Media Prods. Inc.,*
    No. 07-55694, 2008 WL 2610459 (9th Cir. July 3, 2008) ..............26, 30, 46

*In re Hanna,*
    872 F.2d 829 (8th Cir. 1989) ......................................................................19

*In re Hechinger Inv. Co. of Del.,*
    327 B.R. 537 (D. Del. 2005) .......................................................................23

*Heckler* v. *Cmty. Health Servs. of Crawford County, Inc.,*
    467 U.S. 51 (1984) ......................................................................................39

*In re Insilco Techs., Inc.,*
    480 F.3d 212 (3d Cir. 2007) ........................................................................17

*Int'l Boiler Works Co.* v. *Gen. Waterworks Corp.,*
    372 A.2d 176 (Del. 1977)........................................................................38, 39

*Iridium* v. *Motorola, Inc. (In re Iridium Operating LLC),*
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................................21

*Johnson* v. *Norris,*
  190 F. 459 (5th Cir. 1911) ...........................................................................47

*In re Kensington Int'l Ltd.,*
  368 F.3d 289 (3d Cir. 2004) .........................................................................31

*In re Kielisch,*
  258 F.3d 315 (4th Cir. 2001) ........................................................................19

*Kontrick* v. *Ryan,*
  540 U.S. 443 (2004) .....................................................................................40

*In re Liberty Warehouse Assocs. Ltd. P'ship,*
  220 B.R. 546 (Bankr. S.D.N.Y. 1998) ..........................................................30

*In re Loral Space & Commc'ns Ltd.,*
  Bench Ruling, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005) ................27-28

*In re Manville Forest Prods. Corp.,*
  60 B.R. 403 (S.D.N.Y. 1986) ........................................................................43

*Masuda* v. *Kawasaki Dockyard Co., Ltd.,*
  328 F.2d 662 (2d Cir. 1964) .........................................................................38

*Metlyn Realty Corp.* v. *Esmark, Inc.,*
  763 F.2d 826 (7th Cir. 1985) ........................................................................22

*In re Mobile Steel Co.,*
  563 F.2d 692 (5th Cir. 1977) ........................................................................41

*Moody* v. *Sec. Pac. Bus. Credit, Inc.,*
  971 F.2d 1056 (3d Cir. 1992) .......................................................................21

*Motorola, Inc.* v. *Off. Comm. of Unsecured Creditors
  (In re Iridium Operating LLC),* 478 F.3d 452 (2d. Cir. 2007) ................15, 17

*In re Murgillo,*
  176 B.R. 524 (9th Cir. B.A.P. 1995) .............................................................41

*In re Nextwave Personal Commc'ns, Inc.,*
  244 B.R. 253 (Bankr. S.D.N.Y. 2000) ..........................................................44

*Northrop Corp.* v. *Triad Int'l Mktg., S.A.,*
  842 F.2d 1154 (9th Cir. 1988) ......................................................................46

*In re Owens-Corning,*
  419 F.3d 195 (3d Cir. 2005) .........................................................................42

*In re Phillips Petroleum Sec. Litig.*,
   881 F.2d 1236 (3d Cir. 1989) ................................................................... 36

*In re PPI Enters. (U.S.), Inc.*,
   324 F.3d 197 (3d Cir. 2003) ..................................................................... 46

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ..................................................................... 21

*Ramone* v. *Lang*,
   No. Civ.A.1592-N, 2006 WL 905347 (Del. Ch. Apr. 3, 2006) ................................... 36

*Realty Assocs. Secs. Corp.*,
   163 F.2d 387 (2d Cir. 1947), *cert. denied*, 332 U.S. 835 (1947) ................................ 47

*In re Refco, Inc.*,
   336 B.R. 187 (Bankr. S.D.N.Y. 2006) ................................................................ 31, 37

*In re Resorts Int'l, Inc.*,
   145 B.R. 412 (D.N.J. 1990)......................................................................... 18

*Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*,
   452 N.Y.S.2d 447 (2d Dep't 1982) ................................................................ 35

*Ruskin* v. *Griffiths*,
   269 F.2d 827 (2d Cir. 1959) ........................................................................ 20, 25, 28

*In re Skyler Ridge*,
   80 B.R. 500 (Bankr. C.D. Cal. 1987) ............................................................ 30

*In re Smith*,
   No. 03-10666(1)11, 2008 WL 73318 (Bankr. W.D. Ky. Jan. 7, 2008)....................... 25

*In re Southland Corp.*,
   160 F.3d 1054 (5th Cir. 1998)..................................................................... 20, 25, 30

*In re Terry Ltd. P'ship*,
   27 F.3d 241 (7th Cir. 1994)........................................................................ 25, 30

*In re U.S. West, Inc. Sec. Litig.*,
   65 Fed. Appx. 856 (3d Cir. 2003) ................................................................ 35

*In re Unisys Corp. Retiree Medical Ben. ERISA Litigation*,
   58 F.3d 896 (3d Cir. 1995)......................................................................... 36

*United Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the U.S.*,
   *(In re United Merchants & Mfrs.)*, 674 F.2d 134 (2d Cir. 1982) ................................ 43

*United States* v. *AWECO, Inc. (In re AWECO, Inc.),*
   725 F.2d 293 (5th Cir. 1984) .......................................................................15, 42-43

*UPS Capital Bus. Credit* v. *Gencarelli (In re Gencarelli),*
   501 F.3d 1 (1st Cir. 2007) .......................................................................26

*In re USG Corp.,*
   No. 01-02094 (Bankr. D. Del. Mar. 27, 2007) .............................................2

*In re Vanderveer Estates Holdings, Inc.,*
   283 B.R. 122 (Bankr. E.D.N.Y. 2002) .......................................................30

*Vanston Bondholders Protective Comm.* v. *Green,*
   329 U.S. 156 (1946) .......................................................................27

*In re Vest Assocs.,*
   217 B.R. 696 (Bankr. S.D.N.Y. 1998) .......................................................13, 30

*VFB LLC* v. *Campbell Soup Co. (In re VFB LLC),*
   482 F.3d 624 (3d Cir. 2007) .......................................................21, 22, 23, 40

*Volvo Trucks of N. Am., Inc.* v. *United States,*
   367 F.3d 204 (4th Cir. 2004) .......................................................37

*In re W.S. Sheppley & Co.,*
   62 B.R. 271 (Bankr. N.D. Iowa 1986) .......................................................13

## FEDERAL STATUTES & RULES

11 U.S.C. § 502 .......................................................................4, 13, 14, 40, 41

11 U.S.C. § 506(b) .......................................................................4

11 U.S.C. § 726 .......................................................................46-47

11 U.S.C. § 1103 .......................................................................31, 37

11 U.S.C. § 1124 .......................................................................15

11 U.S.C. § 1126 .......................................................................31

11 U.S.C. § 1129(a) .......................................................................12, 13, 45, 46

11 U.S.C. § 1129(b) .......................................................................1, 12, 13, 15, 16, 17, 18, 25, 26, 46

28 U.S.C. § 1961 .......................................................................46, 47

Fed. R. Bankr. P. 3001 .......................................................................40

Fed. R. Bankr. P. 3007 ........................................................................................................40

## STATE STATUTES

Del. Code Ann. tit. 6, § 2301(a). ....................................................................................47

N.Y. C.P.L.R. §§ 5003, 5004 ...........................................................................................47

N.Y. Gen. Obl. Law § 15-301 ..........................................................................................34

## OTHER AUTHORITIES

S. Rep. 97-275 (1981) .......................................................................................................47

Certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Claimants")[2] submit this pre-trial memorandum in opposition to the objection filed by the above-captioned debtors ("Grace") dated June 13, 2008 to the Bank Lenders obtaining approximately $91 million of contract default interest [Dkt. No. 18922] (the "Objection").

## PRELIMINARY STATEMENT

Absent compelling equitable considerations, a plan must pay a class of dissenting creditors their contract default interest before shareholders get anything. Under Grace's plan its shareholders will get equity worth approximately $2 billion. At the same time, Grace refuses to pay approximately $91 million of contract default interest accrued at 2% over almost eight years on the Bank Lenders' more than $500 million of claims. Can Grace have it both ways?

It cannot. Outside a consensual plan, section 1129(b)'s absolute priority rule tolerates shareholders retaining property in only one circumstance: payment of the impaired unsecured creditor class in full—in short, in the circumstance of solvency. No other way exists. With or without a solvency trial, equity's retention of value means solvency if the

---

[1]  The Pre-Petition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements"). The Credit Agreements are attached as Exs. A and B to the Freedgood Affidavit, which is attached as Ex. 1.

[2]  The Bank Claimants include (i) Anchorage Advisors, LLC; (ii) Avenue Capital Group; (iii) Bass Companies; (iv) Caspian Capital Advisors, LLC; (v) Catalyst Investment Management Co., LLC; (vi) Citigroup Special Situations; (vii) Intermarket Corp.; (viii) JD Capital Management, LLC; (ix) JP Morgan Chase, N.A. Credit Trading Group; (x) Lehman Brothers Inc.; (xi) Loeb Partners Corporation; (xii) MSD Capital, L.P.; (xiii) Murray Capital Management, Inc.; (xiv) Normandy Hill Capital, L.P.; (xv) Ore Hill Partners, LLC; (xvi) P. Schoenfeld Asset Management, LLC; and (xvii) Restoration Capital Management, LLC. The Bank Claimants, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

proposed plan is lawful. Because Grace's shareholders will keep stock worth $2 billion, Grace's solvency must be presumed. If a solvency trial is necessary (which it should not be), then the Creditors' Committee and the Bank Claimants have a due process right to that trial, though its necessity is hard to see. In any event, because the Third Circuit treats market capitalization as the primary factor determining solvency, and Grace has a market capitalization of almost $2 billion, any such trial will result in a determination of solvency.

With solvency established (whether presumed or proven by Grace's market capitalization), the Bank Lenders must receive default interest unless there are compelling equitable considerations that overcome the strong presumption in favor of paying the Bank Lenders postpetition interest at the contract default rate. The rule, not the exception, is that courts apply the contract interest default rate, and no other rate, when a contest over value boils down to a fight between creditors and shareholders. If shareholders retain value, the rule applies. Any other outcome—like the one urged perversely by Grace on the basis of "doing equity" (that is, allowing equity to retain close to $2 billion in value without Grace satisfying its contractual obligations to the Bank Lenders)—would produce the polar opposite of equity. Notably, in the other major asbestos case in this district in which equity reached a deal with the asbestos claimants to retain ownership of the company, *In re USG Corp.* (Bankr. D. Del. No. 01-02094) (JKF), the bank lenders received their full contract default interest.[3]

No recognized equitable consideration—much less a compelling one— overcomes the presumption in favor of contract default interest here. The Bank Lenders have done nothing to impede these cases. In fact, they have involuntarily funded Grace for more than seven years through short term, prepetition credit facilities that featured the low interest

---

[3]    First Amended Joint Plan of Reorganization of USG Corporation and its Debtor Subsidiaries at 10, 19, *In re USG Corp.*, No. 01-02094 (Bankr. D. Del. Mar. 27, 2007) [USG Dkt. No. 11688], attached as Ex. 2.

rates typical for an investment grade credit, not a chapter 11 debtor. Every court to consider the issue has deemed reasonable the 2% default interest rate provided for under the Credit Agreements for the added time and risk associated with an investment-grade-borrower-turned-chapter-11 debtor.

Grace's attempt to overcome this presumption by concocting reliance-based arguments to defeat the Bank Lenders' claims collapses under its own weight. At most, Grace alleges that it had a "deal" with the Creditors' Committee over co-sponsorship of a long-dead plan. By Grace's own account, the Bank Lenders—the only entities that could agree to waive their right to contractual interest—never signed anything and were not parties to any deal. There is simply no act to which Grace can point on the part of the Bank Lenders, much less some inequitable act, which can serve as the basis for depriving them of contract default interest. That Grace avoided asking any of the Bank Lenders to sign the April 2008 Term Sheet for the Proposed Asbestos Settlement comes as no surprise: Grace already knew what the answer to its unasked question would be—a resounding "No." The Third Circuit has also clearly held that Grace's real complaint—that the Bank Lenders' refusal to accept a lower interest rate than is provided for in their Credit Agreements may cause the Equity Committee to walk away from its deal with the asbestos personal injury plaintiffs—cannot serve as a basis for disallowing the Bank Lenders' claims.

Finally, in attacking the Bank Lenders' right to contract default interest, Grace has started down a procedural path that can only delay, not expedite, these cases. Though Grace characterizes its attacks as "objections" to the Bank Lenders' claims, the "best interest test" and "fair and equitable" standards that Grace invokes have nothing to do with claim disallowance under section 502(b), and everything to do with plan confirmation under section

1129. The few courts that have considered the default interest issue before confirmation (all as part of section 506(b) determinations for oversecured creditors, rather than a claim objection under section 502(b)) have ruled that they would have to revisit any ruling denying contract default interest at confirmation if equity retained value. Grace's Objection is thus not ripe for judicial determination now, and inefficient, in any case.

None of Grace's arguments justify depriving the Bank Lenders of their contract default interest. The Objection should be overruled.

## STATEMENT OF FACTS

A review of the pleadings, affidavits and documents produced in discovery reveals that very few facts are in dispute.

### The Credit Agreements and Proofs of Claim

Before the Petition Date, Grace entered into the Credit Agreements. Under them, Grace owes the Bank Lenders $500 million in aggregate principal amount.[4] The scheduled maturity of the 1998 Credit Agreement was May 16, 2003. (1998 Credit Agreement §§ 1.1, 2.2.) It has a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%. (*Id.* §§ 5.1(c), 5.5; Ordway Decl. ¶ 3, attached as Ex. 3.) The scheduled maturity of the 1999 Credit Agreement was May 2, 2001. (Amendment to 1999 Credit Agreement, dated as of May 3, 2000, § 1.2 (amending definition of Termination Date); Freedgood Aff. ¶ 9].) It has a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%. (*Id.* §§ 5.1(c), 5.5; Ordway Decl. ¶ 3.)

JPMorgan Chase Bank, N.A. ("JPMorgan") serves as administrative agent (the "Administrative Agent") under the Credit Agreements. It timely submitted proofs of claim

---

[4]   *See* 1998 Credit Agreement, Sch. 1 ($250 million aggregate commitment); 1999 Credit Agreement, Sch. 1 ($250 million aggregate commitment).

nos. 9159 and 9168 dated March 27, 2003 (the "Proofs of Claim")[5] for amounts owed on account of, but not limited to, principal, interest, and fees and expenses on the loans and advances made under the Credit Agreements.[6] No party objected to the Proofs of Claim before Grace's June 13, 2008 Objection. (Debtor's Resp. & Obj. at 25; Freedgood Aff. ¶ 16.)

Grace's bankruptcy filing was an event of default under the Credit Agreements. (1998 Credit Agreement § 10(f)(i)(A); 1999 Credit Agreement § 10(f)(i)(A); Freedgood Aff. ¶ 13.) In addition, numerous other postpetition events of default under the Credit Agreements triggered Grace's obligation to pay interest at the default rate. (Freedgood Aff. ¶ 13.)

During the pendency of these cases, the Administrative Agent complied with the terms of the Credit Agreements and did not take any actions that impeded the cases' administration. (Freedgood Aff. ¶ 20; Debtors' Resp. & Obj. at 20 (Adm. No. 8); Off. Comm. of Equity Holders' Resp. & Obj. to the Off. Comm. of Unsecured Creditors of W.R. Grace & Co.'s and Bank Lender Group's First Set of Interrogatories at 3 (Interr. No. 8) ("Equity's Resp. & Obj."), attached as Ex. 5.)

**The Creditors' Committee's Agreements with Grace**

After almost four years in bankruptcy and with its asbestos liability still unresolved, Grace proposed filing a plan with its major non-asbestos constituents. By letter agreement dated January 12, 2005 (the "2005 Letter"), the Creditors' Committee agreed "to

---

[5]    *See* Proofs of Claim, attached as Exs. C & D to Freedgood Aff.; Freedgood Aff. ¶ 14; Objection at 1-2; Resp. & Obj. of Debtors to Off. Comm. of Unsecured Creditors of W.R. Grace & Co. and Bank Lender Group's First Request for Production of Documents, First Set of Interrogatories, and First Request for Admissions at 24 ("Debtors' Resp. & Obj."), attached as Ex. 4.

[6]    In addition to default interest rate, the Credit Agreements provide for payment of facility fees, attorneys' fees and specified method for calculating interest. (Credit Agreements §§ 1.1, 5.2, 5.7, 5.13.) The Objection only seeks to disallow the Bank Lenders' claims for postpetition interest calculated at the default rate (Objection ¶ 10), but Grace owes the Bank Lenders these other amounts as well.

be a Plan Proponent with the Debtors and Equity Committee of the Amended Joint Plan of

Reorganization to be filed with the Bankruptcy Court on or about January 13, 2005 as such

plan may be amended from time to time with the consent of the Creditors' Committee . . ."

(Kruger Decl. Ex. A, attached as Ex. 6.)  Although the 2005 Letter did not specify a

postpetition interest rate, Grace's "Joint Plan" filed January 13, 2005 included a postpetition

interest rate on the Bank Lenders' claims of 6.09% fixed, compounded quarterly. (*See* Joint

Plan [Dkt. No. 7560], attached as Ex. 7.)  Grace's Joint Plan also provided for the Bank

Lenders to receive a substantial equity stake in reorganized Grace. (*Id.*)

   The declaration submitted by Mark Shelnitz, Grace's general counsel, states as

his understanding that Grace's agreement with the Creditors' Committee in the 2005 Letter

somehow bound the Bank Lenders, and he suggests, by negative inference, that Grace relied

on that agreement to somehow "lock up" the Bank Lenders' support.  (Shelnitz Decl. ¶ 3,

attached as Ex. 8.)  Significantly, and contrary to Mr. Shelnitz's "understanding," there was

no agreement of any kind with the Bank Lenders.  In fact, Grace publicly acknowledged that

its agreement with the Creditors' Committee "did not commit any member of the Unsecured

Creditors' Committee or any creditor to vote for the Plan." (*See* Disclosure Statement,

Jan. 13, 2005, at 59 n.18 (the "Disclosure Statement") [Dkt. No. 7559], attached as Ex. 9.)

The Disclosure Statement filed with Grace's Joint Plan and filed as an exhibit to Grace's 10-K

dated March 7, 2005 merely stated—without any corroboration or reference to any

agreement—that "certain [unnamed] substantial Claimants" had agreed to support Grace's

Joint Plan.[7]  Furthermore, footnote 18 of such Disclosure Statement provided that the

Creditors' Committee and Grace "intend to memorialize their agreement in a plan support

---

[7] Disclosure Statement at 59 n.18; Debtors' Form 10-K & Ex. 99-1, Mar. 7, 2005, attached as Ex. 10.

agreement." (Disclosure Statement at 59 n.18.) Though the Creditors' Committee and Grace

never executed a Plan Support Agreement, the Creditors' Committee drafted and proposed

one, and Grace's counsel commented on it.[8] Consistent with the parties' negotiations, Grace

left unchanged language stating that the Creditors' Committee's agreement to support Grace's

Joint Plan did not bind individual members of the Creditors' Committee or individual

creditors.[9]

  As noted, JPMorgan was a member of the Creditors' Committee.[10] There is no

evidence that JPMorgan ever made any agreement with Grace in any capacity other than as a

member of the Creditors' Committee. Moreover, even if JPMorgan had done so, Grace, as a

party to the Credit Agreements, knew that under those instruments JPMorgan served merely

as the Administrative Agent and had no authority to bind the Bank Lenders to any

modification of the interest rate of the Credit Agreements, or to agree to a non-contract rate of

interest. (Freedgood Aff. ¶ 18; Credit Agreements §§ 11.1, 13.1.)

  In sum, there is no evidence that establishes that the Bank Lenders—including

the "Substantial Claimants"—entered into any agreement with Grace, the Creditors'

Committee or the Administrative Agent to accept a non-contract interest rate on the Bank

Lenders' claims or to support Grace's Joint Plan.

  Further, under the terms of the 2005 Letter, the Creditors' Committee could

withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve

the Disclosure Statement incorporating Grace's Joint Plan by November 30, 2005, (b) if

---

[8] *See* E-mail from Arlene Krieger to Janet Baer (with draft Plan Support Agreement attached) (Feb. 18, 2005), attached as Ex. 11; E-mail from Janet Baer to Arlene Krieger (with K&E comments to draft Plan Support Agreement attached) (Mar. 16, 2005), attached as Ex. 12.

[9] *Id.*

[10] Notices of Appointment of Official Comm. of Unsecured Creditors, Dec. 3, 2003 [Dkt. No. 352]; July 10, 2006 [Dkt. No. 12767], attached as Ex. 13 .

Grace's exclusive period to file its Joint Plan terminated, and (c) if its Joint Plan failed to become effective on or before January 1, 2007.[11] This Court never approved the Disclosure Statement incorporating Grace's Joint Plan and the Joint Plan did not become effective on or before January 1, 2007. This Court terminated Grace's exclusive period by order dated July 26, 2007. [Dkt. No. 16396.]

In 2006, e-mails between representatives of Grace and the Creditors' Committee further confirmed Grace's understanding that it was negotiating with the Creditors' Committee alone, and that it was seeking the Creditors' Committee's continued support and views in connection with its Joint Plan, and the documentation for any amended plan—not the support or views of the Administrative Agent, or any of the Bank Lenders. (*See* E-mail from R.Tarola, CFO of Grace, to T. Maher, Chairman of Creditors' Committee (Feb. 14, 2005), attached as Ex. 14.)

In February 2006, Grace and the Creditors' Committee (but again, none of the individual Bank Lenders) agreed to amend Grace's Joint Plan (the "2006 Letter") to "modify the treatment of the Class of General Unsecured Creditors to provide that commencing January 1, 2006 the current 6.09% fixed, compounded quarterly, postpetition interest rate accruing for the Holders of the Debtors' prepetition bank credit facilities shall change to a floating Adjusted Base Rate, compounded quarterly ..." (Kruger Decl. Ex. B.) The 2006 Letter's adjusted rate came as a result of negotiations between representatives of Grace and the Creditors' Committee through its counsel and Chairman, whereby Grace sought the Creditors' Committee's continued support as a co-proponent of Grace's Joint Plan. (*See*

---

[11]   2005 Letter, Kruger Decl. Ex. A .

Ex.14, Feb. 14, 2005 E-mail from R. Tarola to T. Maher; E-mail from J. Baer to R. Tarola, M. Shelnitz, et al. (Feb. 27, 2006), attached as Ex. 15.)

Unlike the 2005 Letter that Grace described in footnote 18 of the Disclosure Statement, the parties to the 2006 Letter did not publicly disclose the existence of the agreement embodied in the 2006 Letter. The first public disclosure of the 2006 Letter itself occurred when Mr. Kruger included it as an Exhibit to his Declaration. (*See* 2006 Letter, Kruger Decl. Ex. B; E-mail from K. Pasquale to A. Rosenberg (Apr. 15, 2008), attached as Ex. 16.)[12]

As with the 2005 Letter, the Creditors' Committee under the 2006 Letter could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve a disclosure statement incorporating Grace's amended Joint Plan by December 31, 2006, (b) if Grace's exclusive period to file its amended Joint Plan terminated, and (c) if its amended Joint Plan failed to become effective on or before February 28, 2007. As with the conditions set forth in the 2005 Letter, this Court never approved any disclosure statement, Grace's amended Joint Plan never became effective, and, as noted, this Court terminated Grace's exclusive period by order dated July 26, 2007 [Dkt. No. 16396].

The circumstances that existed at the time of the 2005 Letter and the 2006 Letter have undisputedly changed dramatically. (*See generally* Ordway Decl.) Then, it was uncertain whether equity would retain *any* interest under a plan—hence the Creditors' Committee's conditional support for a plan in which unsecured creditors would receive equity themselves. (*See* Joint Plan § 3.1.9(b).) That equity (which Grace's shareholders will retain under the proposed plan) would be extremely valuable today. As of August 14, 2008, it

---

[12] The interest rate set forth in the 2006 Letter, although not the existence of the 2006 Letter itself, was referred to in Grace's public filings. (*See generally* excerpts from Debtors' Form 10-K's filed 2007-2008, attached as Ex. 10.)

traded for over $26 per share, reflecting an increase in value of more than 1700% from the Petition Date. (Ordway Decl. ¶ 5.)  In addition, since the Petition Date, Grace's market capitalization has grown by a multiple of almost 1900%.  (*Id.*)  In sum, Grace proposes to bind the Creditors' Committee to aspects of the 2005 Letter which are to Grace's advantage (*i.e.*, non-contract interest rate) while changing other aspects which no longer suit its equity constituency (*i.e.*, the equity distribution to unsecured creditors proposed under the Joint Plan.)

**The Creditors' Committee Advised Grace**
**of Market Expectations for Default Rate Interest**

Since approximately April 2005, counsel for each of Grace (and sometimes Grace personnel) and counsel for the Creditors' Committee have participated in regularly scheduled conference calls, typically twice a month. (Kruger Decl. ¶ 5.)  In them, the participants discussed, among other topics, the state of any settlement discussions with the asbestos personal injury claimants.  (*Id.*)  As early as 2007, counsel for the Creditors' Committee advised Grace that the bank debt was trading in the market at a value reflecting recovery of contract default interest, and that holders of the bank debt had advised the Creditors' Committee's professionals that the holders expected to receive postpetition interest at the contract default rate. (*Id.*; Shelnitz Decl. ¶ 8; E-mail from A. Krieger to K. Pasquale (May 9, 2007), attached as Ex. 17.)

Well before commencement of the negotiations that resulted in the Term Sheet dated April 6, 2008, the Creditors' Committee's counsel advised Grace that, notwithstanding any position that the Creditors' Committee itself might take, any consensual plan should provide for postpetition interest payable at the contract default rate if Grace expected the Bank Lenders to vote in favor of Grace's plan. (Kruger Decl. ¶ 5.)  Grace never invited the

10

Creditors' Committee or any of the Bank Lenders to participate in the plan related discussions that culminated in the Proposed Asbestos Settlement, notwithstanding the Creditors' Committee's counsel's repeated warnings to Grace that the Bank Lenders expected to receive postpetition interest at the contract default rate as part of any global resolution. (*Id.*)

## The April 2008 Term Sheet

On or about April 7, 2008, Grace publicly announced the April 2008 Term Sheet outlining the Proposed Asbestos Settlement. (Objection Ex. C; Tr. of Grace's Conf. Call, Apr. 7, 2008, attached as Ex. 18.)

The Proposed Asbestos Settlement provides for an imputed value to the asbestos claims and the payment of all creditors "in full," with the exception of the Bank Lenders.[13]  Rather than paying them the contract default rate, the Proposed Asbestos Settlement seeks to impose the 6.09% interest rate and subsequent floating Prime Rate set forth in the 2006 Letter. (Objection Ex. C.)  As Grace concedes, the Proposed Asbestos Settlement also provides that shareholders will retain their equity interests in the Company (*Id.* ¶ 13), and that such equity interests have "value." (*See* Debtors' Resp. & Obj. at 18 (Adm. No. 2).)

The parties to the April 2008 Term Sheet include Grace, the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee. (*See* Objection Ex. C; Shelnitz Decl. ¶ 9.)  In addition to not inviting the Creditors' Committee, the Administrative Agent, or any of the Bank Lenders to participate in the negotiations that ultimately resulted in the April 2008 Term Sheet, Grace did not ask any of them to sign that document as a party. (*See* Kruger Decl. ¶ 5; Freedgood Aff. ¶ 19.)

---

[13]    It also does not provide for full payment of other general unsecured creditors.

With respect to the April 2008 Term Sheet, Grace argues that the Bank Claimants' unwillingness to accept the lower postpetition rate threatens the Proposed Asbestos Settlement because various stakeholders will withdraw their support if the Bank Lenders receive contract default interest. (Objection ¶ 26.) A review of the docket for Grace's bankruptcy cases, though, shows that only the Equity Committee has joined in Grace's Objection.

Promptly upon learning of the April 2008 Term Sheet, the Bank Claimants by letter dated April 21, 2008, wrote to Grace's counsel and set forth their position that the failure to provide for the payment of contract default interest on the Bank Lenders' claims rendered any plan based on the April 2008 Term Sheet unconfirmable. (Kruger Decl. Ex. C.)

To date, Grace has not sought approval of the Proposed Asbestos Settlement, nor has Grace filed a plan incorporating its terms.

### ARGUMENT

## I.   THE ISSUES RAISED BY GRACE IN THE OBJECTION ARE NOT RIPE

In its Objection, Grace asks this Court to (a) consider the reasonableness of the Proposed Asbestos Settlement, which Grace has not even submitted for approval, (b) rule that the "best interests" test of section 1129(a)(7) of the Bankruptcy Code does not compel the award of contract default interest on the Bank Lenders' claims, and (c) rule that the treatment accorded the Bank Lenders' claims under a non-existent, hypothetical plan based on the un-filed Proposed Asbestos Settlement complies with the absolute priority rule of section 1129(b) of the Bankruptcy Code. None of these issues provides a recognized basis for a claim objection under section 502(b) of the Bankruptcy Code. Section 502(b) sets out the exclusive grounds for disallowance, and it does not include the section 1129(a)(7) and 1129(b)(2)

grounds argued by Grace. *In re Dove-Nation*, 318 B.R. 147, 150 (8th Cir. B.A.P. 2004) (refusing to disallow a claim because "[s]ection 502(b) sets forth the sole grounds for objecting to a claim and directs the court to allow the claim unless one of the exceptions applies."); 11 U.S.C. § 502(b). By the Objection, Grace is improperly attempting to resolve plan confirmation issues through a section 502(b) claims disallowance objection.

The Bank Claimants' delivery of a letter stating that the value allocation outlined in the Proposed Asbestos Settlement would violate the absolute priority rule does not legitimatize accelerating the confirmation issue of contract default interest. The cases cited by Grace for ripeness of the section 1129(b) issue are inapplicable. Both of those cases concern the confirmability of a filed plan at the disclosure settlement stage, not claim objections.[14] The limited case law in this area uniformly prohibits disallowance of the Bank Lenders' claims for purposes of a chapter 11 plan at this juncture. *See In re Calpine Corp.*, 365 B.R. 392, 401 (Bankr. S.D.N.Y. 2007) (holding that it is premature to rule on the issue of whether creditors are entitled to postpetition default interest outside of the context of confirmation).[15] For these reasons, Grace's Objection is not ripe for adjudication, and on this basis alone, this Court should overrule the Objection.

---

[14]    Objection ¶ 46 (citing *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996)).

[15]    The handful of cases deciding a creditor's entitlement to default interest at the contract rate outside of confirmation (all in the context of a section 506(b) determination involving oversecured creditors) uniformly involve rulings made without consideration of the section 1129(b) "fair and equitable" standards at issue here—which are properly heard at confirmation as part of the consideration of the entire plan. *See In re Vest Assocs.*, 217 B.R. 696, 703-05 (Bankr. S.D.N.Y. 1998) (disallowing default interest, subject to reconsideration if equity received a recovery at confirmation); *In re W.S. Sheppley & Co.*, 62 B.R. 271, 278-79 (Bankr. N.D. Iowa 1986) (observing that "[q]uestions as to whether the plan treatment of the secured creditor is 'fair and equitable' and whether it is receiving the 'indubitable equivalent' of its claim—should the secured creditor object to the plan—are issues left under § 1129 of the Code for the confirmation hearing").

## II.     THE PROPOSED ASBESTOS SETTLEMENT
## VIOLATES THE ABSOLUTE PRIORITY RULE

Grace tries to overcome its ripeness problem by invoking section 502(b)(2)'s restriction on unmatured interest as a statutory basis for denying the Bank Lenders' contract default interest claim.  (Objection ¶¶ 19-22.)  It makes the bizarre argument that as a result of the Proposed Asbestos Settlement, Grace's solvency *at this moment* remains unproven and unprovable, and that in the absence of a solvency determination, section 502(b)(2) forbids contract default interest.  With Grace determined to let its shareholders keep $2 billion of value under its plan, such an argument is pure sophistry.  It also ignores the due process rights of the Creditors' Committee and the Bank Lenders to establish, if need be, that Grace's assets exceed its liabilities and it disregards Grace's nearly $2 billion market capitalization— conclusive evidence of solvency in the Third Circuit.

If this Court decides to consider now, rather than at confirmation, whether Grace can allow its shareholders to retain $2 billion of value while it refuses to pay the Bank Lenders their contract default interest, the law in the Third Circuit is unequivocal:  under the absolute priority rule, equity cannot retain *any* interest if an impaired dissenting class of senior creditors does not receive full payment, including postpetition interest.  *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005); 140 Cong. Rec. H 10,768 (daily ed. Oct 4, 1994) ("[I]n order for a plan to be fair and equitable, *unsecured and undersecured* creditors' claims must be *paid in full, including postpetition interest*, before equity holders may participate in any recovery.") (emphasis added), *cited in In re Dow Corning Corp.*, 456 F.3d 668, 678 (6th Cir. 2006).  If Grace has no surplus value after paying all its creditors in full (that is, if Grace is neither presumed nor determined to be solvent), but its shareholders nonetheless will retain value, then that value retention can only result from

14

"gifting" from the asbestos claimants—an impermissible value transfer forbidden by

*Armstrong.* Said another way, solvency provides the only lawful basis for shareholders to

retain value under section 1129(b), and solvency requires paying postpetition interest at the

contract default rate.

## A. Grace Cannot Circumvent the Absolute Priority Rule through the Proposed Asbestos Settlement.

While Grace sees in the Proposed Asbestos Settlement a substantive

justification for overlooking the absolute priority rule, a bankruptcy court cannot confirm a

plan that transfers value to an equity class over the objection of an impaired senior creditor

class, even in the context of a purported "settlement" of the case. *Armstrong*, 432 F.3d at 513;

*Motorola, Inc.* v. *Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 452, 464 (2d Cir. 2007); *United States* v. *AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d

293, 298 (5th Cir. 1984). After *Armstrong*, it is beyond dispute in the Third Circuit that the

absolute priority rule bars equity from receiving anything, including under a settlement, if an

impaired creditor class objects.[16]

In *Armstrong*, the company, like Grace, filed a chapter 11 case to deal with its

significant contingent asbestos-related liability. Three classes were at the core of the

*Armstrong* plan: Class 6 claimants—consisting of unsecured creditors, including bank

lenders, that would receive a 59% recovery; Class 7 claimants—consisting of present and

future asbestos-related claimants, *pari passu* with Class 6, who agreed to receive a 20%

---

[16]  "The plain language of [section 1129(b)(2)(B)(ii)] makes it clear that a plan *cannot give property* to junior claimants over the objection of a more senior class that is impaired . . . ." *Armstrong*, 432 F.3d at 513. A class is impaired if its legal, equitable or contractual rights are altered under the reorganization plan. *Id.* at 512 n.2 (citing 11 U.S.C. § 1124). "[I]mpairment can be avoided only if the plan proposes *cash payment in the full amount of the claim in accordance with the parties' agreement. When the agreement requires a higher postdefault rate of interest, this means the higher rate must be paid. Any other treatment would alter the creditor's rights.*" *In re Ace-Texas, Inc.*, 217 B.R. 719, 727 (Bankr. D. Del. 1998) (internal quotation omitted) (emphasis added).

15

recovery, and Class 12—consisting of shareholders, whose equity interest would be wiped
out. *Id.* at 509. If Class 6 voted against the plan, then Class 7 asbestos claimants would
receive warrants, which they would automatically "waive" in favor of Class 12, the equity
class. *Id.* The Third Circuit reversed the lower court's confirmation of the *Armstrong* plan on
the basis that this scheme violated the absolute priority rule:

> The absolute priority rule, as codified, ensures that "the holder
> of any claim or interest that is junior to the claims of [an
> impaired dissenting] class will not receive or retain under the
> plan on account of such junior claim or interest any property.
> The plain language of the statute makes it clear that a plan
> cannot give property to junior claimants over the objection of a
> more senior class if that class is impaired."

*Armstrong*, 432 F.3d at 513 (quoting 11 U.S.C. 1129(b)(2)(B)(ii)).

The Court of Appeals rejected the argument that the asbestos claimants could
do whatever they wanted with their plan distributions, observing that the absolute priority rule
"arose from the concern that because a debtor proposed its own reorganization plan, the plan
could be 'too good a deal' for that debtor's owners, *id.* at 512 (citing *Bank of Am. Nat'l Trust
& Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999)), "encourag[ing] parties
to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and
…undermin[ing] Congress's intention to give unsecured creditors bargaining power in this
context." *Id.* at 514-15.

As did the company in *Armstrong*, Grace maintains that existing equity will
retain its ownership interests through "a concession by the personal injury claimants" and that
the value to be retained by equity exists solely on account of the "delicately balanced"
settlement between the asbestos claimants and current equity, under which the asbestos
claimants have agreed to give up a certain amount of claimed value and "equity holders have

16

agreed to accept a certain value." (Objection ¶¶ 3-4, 14.)  This arrangement is precisely what *Armstrong* forbids.  If anything, this case is more egregious than *Armstrong* in its violation of the absolute priority rule:  instead of giving its shareholders out-of-the money warrants, Grace proposes to allow them to retain their primary equity interests worth nearly $2 billion.[17]

**B.**    **The Proposed Asbestos Settlement Concedes That Grace is Solvent.**

So if Grace is acting lawfully in giving its shareholders $2 billion of value, Grace has to be solvent (*i.e.*, there must be surplus value after all creditors are paid in full). (Objection ¶¶ 3, 14; Debtors' Resp. & Obj. at 18 (Adm. No. 2).)  As the Third Circuit explained in *Armstrong*, "[i]n its initial form, the absolute priority rule required that 'creditors …be paid before the stockholders could retain [equity interests] for any purpose whatsoever.'"  *Armstrong*, 432 F.3d at 512 (quoting *LaSalle*, 526 U.S. at 444) (ellipsis and brackets in original).  The Third Circuit further held that a plan is "fair and equitable" if: (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests.  *Id.* (quoting 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *and LaSalle*, 526 U.S. at 441-42); *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full.").

---

[17]    The Court of Appeals for the Second Circuit held that the absolute priority rule applies to distribution schemes under pre-plan settlements, as well; that is, creditor groups cannot through settlement give junior classes recoveries unless senior creditors are paid in full. *Iridium*, 478 F.3d at 463 & n.18 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson (TMT Trailer Ferry)*, 390 U.S. 414, 424 (1968)). In *Iridium*, Motorola, which held administrative claims, objected to the pre-plan settlement because it distributed assets to more junior creditors (the litigation trust and the creditors committee) before Motorola received payments on its more senior claims. *Id.* at 456, 462. The Second Circuit vacated approval of the settlement and remanded the decision after concluding that the distribution of the residual litigation recoveries to the unsecured creditors violated the absolute priority rule. *Id.* at 466.

Critically, "[i]mplicit in this [absolute priority] rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent." *In re Resorts Int'l, Inc.*, 145 B.R. 412, 483 (D.N.J. 1990) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984)). The absolute priority rule's prohibition on equity retaining value until creditors receive full payment of all amounts due under their contracts applies regardless of any balance sheet solvency determination; that is, regardless of "[w]hether a company is solvent or insolvent in either the equity or the bankruptcy sense," because "'any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights' of creditors 'comes with judicial denunciation.'" *Consolidated Rock Prods.* v. *Du Bois*, 312 U.S. 510, 527 (1941) (quoting *Louisville Trust Co.* v. *Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674, 684 (1899)).

With a solvent debtor, "full payment" includes postpetition interest at the contract rate. This comports with the purpose of the solvent debtor requirement for postpetition interest: the requirement protects one creditor group from receiving postpetition interest at the expense of another creditor group; the requirement never "protects" equity from creditors receiving postpetition interest. Once equity receives a recovery, the inquiry into solvency simply becomes an academic exercise—which of course shows the absurdity of Grace's argument that unsecured creditors are only entitled to postpetition contractual interest in a "solvent" debtor case and not a case where equity retains approximately $2 billion in value without a solvency determination.

The cases drive home this point. *See Bruning* v. *United States*, 376 U.S. 358,

363 n.4 (1964) (quoting *Am. Iron & Steel Mfg. Co.* v. *Seaboard Air Line Ry.*, 233 U.S. 261,

266 (1911)):

> [I]n case funds are not sufficient to pay claims of equal dignity,
> the distribution is made only on the basis of the principal of the
> debt. But that rule did not prevent the running of interest during
> the receivership; and if, as a result of good fortune or good
> management, the estate proved sufficient to discharge the
> claims in full, interest as well as principal should be paid.

Modern cases have reaffirmed this basic principle under the current

Bankruptcy Code:

> The general rule 'disallowing' the payment of unmatured
> interest out of the assets of the bankruptcy estate is a rule of
> administrative convenience and fairness to all creditors. The
> rule makes it possible to calculate the amount of claims easily
> and assures that creditors at the bottom rungs of the priority
> ladder are not prejudiced by the delays inherent in liquidation
> and distribution of the estate. But when concerns for
> administrative convenience and fairness are not present,
> postpetition interest will be 'allowed.'… Postpetition interest is
> also payable out of the assets of the bankruptcy estate—if the
> debtor ultimately proves to be solvent—before any sums are
> returned to the debtor.

*In re Hanna*, 872 F.2d 829, 830-31 (8th Cir. 1989); *see also In re Kielisch*, 258 F.3d 315, 322

(4th Cir. 2001) (same).

Circuit courts have also reinforced this concept for decades:

> The only good reason for refusing to give a creditor in
> reorganization all that he bargained for when he extended credit
> is to help other creditors, the debtor's assets being insufficient
> to pay all creditors in full. All of [the debtor's] creditors will be
> paid in full, even if the debenture holders are paid out at the
> highest valuation of their claim. *The only competing equities
> are those of [the debtor's] stockholders, and are weak . . . .*

\* \* \*

19

> The fact that a proceeding is equitable does not give the judge a
> free-floating discretion to redistribute rights in accordance with
> his personal views of justice and fairness, however enlightened
> those views may be. The function of equitable considerations in
> a bankruptcy proceeding is to guide the division of a pie that is
> too small to allow each creditor to get the slice for which he
> originally contracted. *Hence if the bankrupt is solvent the task
> for the bankruptcy court is simply to enforce creditors' rights
> according to the tenor of the contracts that created those rights.*

*In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 791 F.2d 524, 527-28 (7th Cir. 1986)

(emphasis added); *see also Ruskin* v. *Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("No benefit

will be given to the debenture holders at the expense of any other class of creditors. The

burden of this payment will fall entirely on the interest of the stockholders. They cannot

complain that they are treated inequitably when their interest is cut down by the payment of a

sum to which the debenture holders are clearly entitled by the express provisions of the trust

indenture.") (citation omitted).

A review of the April 2008 Term Sheet makes clear that paying postpetition

interest at the contract default rate to the Bank Lenders will not reduce the payout to other

creditors. Rather, the value needed to pay the Bank Lenders will come from equity, as it

should, in compliance with the absolute priority rule. *See In re Southland Corp.*, 160 F.3d

1054, 1060 (5th Cir. 1998) (holding that it was "especially significant" that no junior creditors

would be harmed by the award of default interest).

## C.   Grace's Market Capitalization Establishes Its Solvency.

As described above, equity's retention of value completely answers the

solvency question for purposes of determining an entitlement to postpetition interest. This

Court need look no further as to solvency. Moreover, even if it did look further, the result

20

would be the same. The law in this Circuit is that Grace's substantial market capitalization conclusively puts to rest Grace's specious argument that it might not be solvent.

In this Circuit, courts rely on a "going concern" or "market price" valuation to establish the value of a company with continuing day-to-day operations. *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000); *Moody* v. *Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1057 (3d Cir. 1992) (citing cases). In *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007), the Third Circuit held that a company's market capitalization provides a reliable measure of its value, since "it reflects all the information that is publicly available about a company at the relevant time of valuation." *Id.* at 631 (citing *Basic Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988) (plurality)). It concluded that the market's valuation of the company at issue *as solvent* was "strong evidence of its solvency." *Id.* at 633. Thus, "[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" *Id.* (quoting *In the Matter of Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *see also Iridium* v. *Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 346-47 (Bankr. S.D.N.Y. 2007). At the August 14, 2008 market price of more than $26/share, Grace has a market capitalization of approximately $2 billion (Ordway Decl. ¶ 5), meaning that the public market valued Grace's equity at $2 billion. According to Grace's co-plan proponent, supporting objector, the Equity Committee, this $2 billion market capitalization ends the solvency debate:

> Grace stock is publicly traded and highly liquid . . . At the current market price of about $26 . . . the market capitalization of Grace's equity is more than $1.8 billion. If there is any truth to market efficiency and the 'wisdom of the crowd'—and there

21

assuredly is—there can be no question about Grace's solvency.[18]

Remarkably, in the face of its $2 billion market capitalization and these Third Circuit precedents, Grace and its financial advisor challenge the reliability of Grace's own stock price as a basis for establishing its solvency. Ms. Zilly contends that Grace's market value reflects imperfect information concerning Grace's unresolved asbestos liabilities. (*See* Zilly Aff. ¶ 3, attached as Ex. 20). Courts do not, of course, assume that "market value" gives a perfect indication of a company's value. They just accept that market capitalization is better than any other measure because one rarely, if ever, has perfect information. Because the "price of an actively traded stock reflects the value placed on it by the professional investors who follow a firm closely" and not just "any one analyst," it is "an *unusually reliable* source of information when the essential conditions (liquid markets, public information, and a following by professional investors) are met." *Metlyn Realty Corp.* v. *Esmark, Inc.*, 763 F.2d 826, 834 (7th Cir. 1985) (emphasis added). Nothing about these chapter 11 cases suggests any basis for ignoring market value. Grace's stock is publicly traded and highly liquid. Grace is presumably in compliance with its reporting requirements. The investing public has had nearly five months to digest the Term Sheet that Grace publicized in April 2008 describing the Proposed Asbestos Settlement, and the substance of Grace's Objection to the Bank Lenders' claims and the Bank Claimants' response thereto, has been a matter of public record for nearly three months.

To get around these facts, Ms. Zilly insists that only an estimation hearing can really determine solvency—the proverbial battle of experts that courts decry as a poor

---

[18]    Off. Comm. of Equity Security Holders' Mem. in Support of Debtors' Mot. to Exclude Certain Expert Opinions Relating to Current Future Asbestos Personal Injury Liability, dated Dec. 7, 2007, at 2 [Dkt. No. 17577] (citing *VFB LLC*, 482 F.3d at 633), attached as Ex. 19.

substitute for market value. She offers two reasons for her insistence: first, because the market has been "wrong" in two instances as to the ultimate equity value of other chapter 11 debtors, Ms. Zilly finds market capitalization an unreliable indicator of value here. (Zilly Aff. ¶¶ 6-7.)[19] Of course, the Third Circuit presumably understood that equity values vary from day-to-day when it ruled that market value provides the best measure of solvency.[20]

Second, Ms. Zilly reasons that because the market lacks all of the facts necessary to divine the outcome of a contested estimation hearing, market value cannot establish solvency. This too is simply wrong. Again, Grace's current market capitalization reflects market knowledge of the range of Grace's asbestos liability, market reaction to the April 2008 Term Sheet, market appreciation of the grounds for the Bank Claimants' opposition to their proposed treatment, and market awareness of the approximately $91 million in dispute. Although imperfect, the market value reflects the material and relevant public information available with respect to the parties' past disputes and thus, for purposes of any plan based on the Term Sheet, market value remains the best indicator of Grace's enterprise value.

## III. THE BANK LENDERS SHOULD RECEIVE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE

With the solvency "issue" now in its proper place, and with the right to postpetition interest established, attention turns to whether the Bank Lenders must receive

---

[19]    Ms. Zilly makes no attempt to explain how these cases have any relevance to Grace; only one of which even had substantial asbestos-related liabilities.

[20]    *VFB LLC*, 482 F.3d at 633; *see also, e.g., Covey* v. *Comm. Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) ("To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i) [that is to say, at a particular point in time], a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent."); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) ("[B]ecause valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to 'prevailing marketplace values' ... rather than to values created with the benefit of hindsight for the purpose of litigation.").

contract default interest on their claims. As recognized by the majority of courts (most

comprehensively by the Sixth Circuit in *Dow Corning*), under the "fair and equitable" test, a

court must enforce the contract default interest rate absent compelling equitable

considerations warranting a different outcome. With a solvent debtor (here, either proven or

presumed), a bankruptcy court enforces the contractual rights of the parties, and the role of

equitable principles in the allocation of competing interests is "significantly reduced." *Dow

Corning*, 456 F.3d at 679.

In *Dow Corning*, a class of unsecured commercial debt holders holding

approximately $2 billion of claims objected to a plan proposed by the solvent debtor and the

tort claimants' committee. The plan proposed paying the principal amount of all of the

unsecured debt, along with postpetition interest at the federal judgment rate rather than the

contract default rate. The unsecured creditors argued that:

> [T]he bankruptcy court's imposition of the federal judgment
> interest rate, as opposed to the rates required by the debt
> contracts, meant that *Class 4 was not being paid the full interest
> it was owed, while Dow Corning's two shareholders, both in a
> class undisputedly junior to Class 4, were retaining millions of
> dollars in equity.*

*Dow Corning*, 456 F.3d at 672 (emphasis added).

On appeal, the Sixth Circuit held that:

> [I]n solvent debtor cases, rather than considering equitable
> principles, courts have generally confined themselves to
> determining and enforcing whatever pre-petition rights a given
> creditor has against the debtor. . . . When a debtor is solvent,
> then, the *presumption is that a bankruptcy court's role is merely
> to enforce the contractual rights of the parties, and the role that
> equitable principles play in the allocation of competing interest
> is significantly reduced.*
>
> Based on this application of the absolute priority rule in solvent
> debtor cases, Class 4 argues that we should enforce their rights

24

under the contract, including their right to interest awarded at
the default rate as set forth in the terms of their contract. To do
otherwise (i.e., to interpret the amended plan as not requiring
the payment of default interest), they argue, *would violate
§ 1129(b)'s fair and equitable standard.* We agree. Default
interest rates are intended to transfer some of the risk of default
from creditors to the debtor. By interpreting the plan as
allowing interest only at the non-default rate, the bankruptcy
court effectively transferred that risk back to the Class 4
creditors. *Despite the equitable nature of bankruptcy
proceedings, the bankruptcy judge does not have "free-floating
discretion to redistribute rights in accordance with his personal
views of justice and fairness." Rather, absent compelling
equitable considerations, when a debtor is solvent, it is the role
of the bankruptcy court to enforce the creditors' contractual
rights.*

*Id.* at 679 (emphasis added) (citations omitted). *Dow Corning* recognized that "[c]ourts in

solvent debtor cases have overwhelmingly concluded that there is a presumption that the

default interest rate should be allowed." *Id.* at 680. Numerous other courts have upheld the

strong presumption in favor of the contract rate of interest in solvent debtor cases. *See In re

Smith*, No. 03-10666(1)11, 2008 WL 73318, at *1 (Bankr. W.D. Ky. Jan. 7, 2008) (awarding

creditors the contract interest rate because "in most cases where a debtor is solvent, courts

generally confine themselves to determining and enforcing whatever pre-petition rights a

creditor has against the debtor. Solvent debtors should not receive a windfall simply because

they sought bankruptcy protection.") (citing *Dow Corning*, 456 F.3d at 679)).[21]

---

[21]    Indeed, courts have even held that "[w]hen the Debtor is solvent, the equities <u>dictate</u> that additional interest
be paid to the … creditor rather than to the debtor." *In re Consol. Operating Partners L.P.*, 91 B.R. 113,
116 (Bankr. D. Colo. 1988) (emphasis added); *see also Ruskin*, 269 F.2d at 831 (holding that it is "the
opposite of equity to allow the [solvent] debtor to escape the expressly-bargained-for result of its act"); *cf.
Southland*, 160 F.3d at 1059-60 (holding that the "default interest rate is generally allowed" subject to
equitable considerations, and ultimately ruling that creditors must receive the "bargained-for default
interest," which "compensates them for the unforeseeable costs of default"); *In re Terry Ltd. P'ship*, 27 F.3d
241, 243 (7th Cir. 1994) (recognizing a "presumption in favor of the contract rate subject to rebuttal based
upon equitable considerations," but that "[c]reditors have a right to bargained-for postpetition interest and
bankruptcy judges are not empowered to dissolve rights in the name of equity") (citation omitted); *In re
Ace-Texas*, 217 B.R. 723-24 (awarding contract default rate of interest after debtor failed to overcome the
presumption in favor of the contract rate); *Chicago, Milwaukee*, 791 F.2d at 528.

Recent circuit level decisions have expressly endorsed *Dow Corning*'s recognition of the importance of creditor contract rights as well. *See UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor's claims for prepayment penalties, the court held: "Let us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law." (citing *Dow Corning*, 456 F.3d at 679)); *see also Gen. Elec. Capital Corp. v. Future Media Prods. Inc.*, No. 07-55694, ---F.3d---, 2008 WL 3091471, at *4 (9th Cir. Aug. 7, 2008) (as amended).

Grace tries to muddle the presumption in favor of the contract default rate—and their overwhelming burden to overcome that presumption—by mischaracterizing the court's holding in *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004). They read that decision as supporting a "'bottom-up' approach that starts with the premise that the federal judgment rate represents the minimum rate of interest necessary to satisfy the 'fair and equitable' standard of section 1129(b)" and that "the specific equities of a given case can compel the application of a higher rate of postpetition interest." (Objection ¶ 33.) While the federal judgment rate certainly sets the *minimum* interest rate that creditors may receive, Grace erroneously implies that the court in *Coram* recognized a presumption that the federal judgment rate applies, subject to equitable considerations that might justify a higher rate.

The *Coram* court though, merely stated the unremarkable proposition that "the specific facts of each case will determine what rate of interest is 'fair and equitable.'" *Coram*, 315 B.R. at 346. In fact, while Grace argues that "[o]f course, in [*Coram*], the federal judgment rate also turned out to be the maximum" (Objection ¶ 33), it fails to mention that the

*Coram* court applied the federal judgment rate solely because the largest noteholder employed the debtors' CEO as a consultant, creating an "actual conflict of interest that tainted the Debtors' restructuring of its debt, the Debtors' negotiation of a plan, and the Debtors' ultimate emergence from bankruptcy." *Coram*, 315 B.R. at 346. The *Coram* court held that "[a]s a result of these *peculiar facts*," allowing postpetition interest at the contract default rate would not be "fair and equitable." *Id.* at 347 (emphasis added). Thus, *Coram* remains fully consistent with the Sixth Circuit's holding in *Dow Corning* that only "compelling equitable considerations" will overcome the presumption that the contract default rate of interest applies. *Dow Corning*, 456 F.3d at 679.[22]

The other decisions that Grace cites, *Adelphia*[23] and *Loral*,[24] have no bearing here. *Adelphia* involved a contest between *creditors*, not creditors versus equity.[25] In weighing the interests of "parent" creditors versus "subsidiary" creditors, the court observed that "under the facts of this case, awarding interest at a lower rate won't reward insiders, or for that matter, even innocent public equity; as a practical matter, it will merely shift value from one creditor constituency to another." *See* Transcript at 14:16-23; *Adelphia*. That concern does not arise here, because shareholder interests remain subordinate to creditor claims; equitable rules governing contests between creditors simply do not apply. *Loral* is

---

[22]  Grace erroneously relies on *Vanston Bondholders Protective Committee* v. *Green*, 329 U.S. 156 (1946), where the debtor was insolvent, as well. In *Vanston*, the Supreme Court rejected a claim of oversecured mortgage bondholders to postpetition interest, finding that the interest on interest was in the nature of a penalty for nonpayment and that subordinate creditors would have borne a greater loss if interest on interest were paid. *Id.* at 166. The Court, however, observed that in other cases, "where an estate is ample to pay all creditors and to pay interest even after the petition is filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." *Id.* at 164-65.

[23]  Transcript, *In re Adelphia Commc'ns*, No. 02-41729 (Bankr. S.D.N.Y. Apr. 27, 2006), attached to Objection as Ex. D.

[24]  Transcript, *In re Loral Space & Commc'ns Ltd.*, No. 03-41710 (Bankr. S.D.N.Y. July 25, 2005), attached to Objection as Ex. E.

[25]  Objection ¶¶ 29, 35.

27

also inapposite. There, the court found that the debtor was *insolvent* and that equity would

not receive any recovery, regardless of whether the contract rate of interest or the federal

judgment rate of interest applied. *See* Transcript at 21:20, 37:7-10; *Loral*.

In sum, *Dow Corning* and its progeny stand for the proposition that where, as

here, a debtor is solvent, a chapter 11 plan that fails to pay contract default interest to creditors

is not "fair and equitable" and cannot be confirmed. They apply a presumption in favor of

enforcing the creditors' contractual rights, a presumption only overcome by compelling

equitable considerations. Let us turn, then, to a consideration of the equities here.

## IV.    THE EQUITIES WARRANT PAYMENT OF POSTPETITION INTEREST AT THE CONTRACTUAL DEFAULT INTEREST

Though Grace's Objection nowhere particularizes the substantive bases for its

equitable arguments, all are meritless.

### A.    The Bank Lenders Have Not Done Anything to Impede the Administration of these Chapter 11 Cases.

At the outset, the undisputed evidence shows that the Administrative Agent

and the Bank Lenders, including the Bank Claimants, have done nothing to impede the

administration of these chapter 11 cases.[26] Rather than impede progress, the Bank Lenders

have made the administration of these cases possible because Grace has had the use of the

Bank Lenders' low-interest loans (the contract rate was as low as 6% at one point and the

average rate of contract interest was less than 8%) over the course of the last seven years to

fund numerous strategic acquisitions and otherwise reinvest in Grace's business. (*See*

---

[26]    *See Ruskin*, 269 F.2d at 832 ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.").

Ordway Decl. ¶¶ 3, 6.) The total amount of cash used by Grace since the Petition Date related to acquisitions and capital expenditures totals nearly $1 billion. (*Id.* ¶ 6.)

Grace, with the Bank Lenders' support, used this invested capital to improve dramatically its business, and in particular, its equity value. While in bankruptcy, Grace's market capitalization has grown by an outstanding multiple of almost 19 times ($99.3 million to $1.915 billion), and the share price has increased from $1.52/share to $26.56—an increase of more than 1700%. (*Id.* ¶¶ 5, 7.) Its business performance has also improved spectacularly during these bankruptcy cases. Specifically, a comparison of Grace's revenues ($1,597.5 million in 2000 to $3,115.2 million in 2007) and EBITDA ($274.7 million in 2000 to $398.0 million in 2007) indicate growth of 95% and 44.9%, respectively. (*Id.* ¶ 6.)

Shareholders have also benefited substantially when compared to the Bank Lenders. [27] A comparison of the growth of $1 worth of equity versus $1 face amount of bank debt (assuming accrual at the default rate) demonstrates that the equity increased by 1747% (to $17.47 per share) while the bank debt only increased by 183% (to $1.83). (*Id.* ¶ 6.)[28] Nevertheless, Grace argues that equity permits further exaggerating this disparity by taking away the contract default interest due to the Bank Lenders and transferring it to Grace's shareholders. (It also bears noting that the amount of value that shareholders would have to "give up" to ensure full payment of the postpetition interest at the rate set forth in the Credit

---

[27]  *See Debentureholders Protective Comm. of Cont'l Invest. Corp.* v. *Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) (enforcing contract provision is "fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to *his* advantage") (emphasis added); *Consol. Operating Partners*, 91 B.R. at 117 ("The equities of this case do not favor any deviations from the imposition of the Late Payment Rate. The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11. No such result was intended by Congress.").

[28]  This does not take into account fees owed to the Bank Lenders.

Agreements is only $1.26 per share, which at most reduces Grace's market capitalization from $2 billion to $1.9 billion.) (*Id.* ¶ 10.)) Under these circumstances, equity overwhelmingly weighs in favor of payment of contract default interest, not against it.

**B.    The Contract Default Interest Rate is Reasonable.**

Grace attacks the contract default rate as exorbitant and thus inequitable,[29] but the default rate represents only a 2% increase from the Credit Agreements' base interest rate.[30] Mr. Ordway establishes, based on his review of 55 credit agreements related to syndicated loan transactions executed during the same period as the Credit Agreements, that the Credit Agreements' default rate is not "exorbitant," but rather conforms to the "industry standard" (*Id.* ¶ 4, Ex. 2.); the 2% default rate also falls well within the range regularly accepted by courts.[31] Grace has put forward no facts or law to the contrary.

**C.    All of Grace's Reliance Arguments Fail.**

Grace's ultimate equitable argument boils down to the contention that the Bank Lenders have "reneged" on failed agreements to which *none* of the Bank Lenders were *ever* parties, and that Grace reasonably relied on the Bank Lenders' commitment to a lower interest rate. Whether viewed through the prism of bankruptcy law, contract law or traditional

---

[29]    *See* Objection ¶ 17.

[30]    *See* Credit Agreements §§ 5.1(c); Ordway Decl. ¶ 3; Freedgood Aff. ¶¶ 8, 11.

[31]    *See, e.g., Future Media*, 2008 WL 3091471, at *1 (2% spread between default and pre-default rate); *Southland*, 160 F.3d at 1059-60 (2% spread between default and pre-default interest rates was considered small); *Terry*, 27 F.3d at 244 (3% spread not unreasonable); *Ace-Texas*, 217 B.R. at 723-4 (2% spread reasonable and appropriate in the light of other cases allowing 3% and 4.3%); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002) (5% difference between default and non-default rate reasonable); *Vest*, 217 B.R. at 703 (same); *In re Skyler Ridge*, 80 B.R. 500, 510-511 (Bankr. C.D. Cal. 1987) (4% difference between default and non-default rate was enforceable); *see also Ace-Texas*, 217 B.R. at 724 (suggesting that rate of 26% and 36% would be exorbitant); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 551-52 (Bankr. S.D.N.Y. 1998) (22.8% rate is *not* exorbitant when the debtor is solvent).

doctrines of apparent authority or estoppel, on these facts nothing could be further from the truth.

1. **The Bank Lenders were not a party to any postpetition agreement among Grace or others, and the Creditors' Committee could not bind the Bank Lenders.**

It is incontrovertible that no Bank Lender was a party to any postpetition agreement among Grace and others, and specifically, that neither the 2005 Letter nor the 2006 Letter purport by their express terms to bind any Bank Lender. (2005 Letter, Kruger Decl. Ex. B; 2006 Letter, Kruger Decl. Ex. C.) Grace's *only* "evidence" of an "agreement" with the Bank Lenders consists of the bare assertions in the Tarola and Shelnitz Declarations that they "belie[ved] that the terms of the February 27, 2006 Letter Agreement [with the Creditors' Committee] had been discussed with certain Debt Holders. . ." (Tarola Decl. ¶ 7, attached as Ex. 21; Shelnitz Decl. ¶ 3.) Regardless of any belief Grace may have had, it is black letter law that the Creditors' Committee had neither the authority nor the power to bind the Bank Lenders to either the 2005 Letter or the 2006 Letter.[32] Nor can a Creditors' Committee "lock up" the votes of its constituents or vote on their behalf. *See* 11 U.S.C. §§ 1103, 1126(a). Section 1103 of the Bankruptcy Code sets forth the scope of a committee's powers and duties and it nowhere says that an official creditors' committee has the right to vote for or against a plan on behalf of its constituents. 11 U.S.C. § 1103. The Bankruptcy Code instead expressly grants the holder of a claim or interest the power to accept or reject a plan. 11 U.S.C. § 1126(a); *Armstrong*, 432 F.3d at 518.

---

[32] *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) (holding that an official creditors' committee does not have the authority to bind each individual creditor); *In re Refco, Inc.*, 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006) (noting that "a committee's assent to a plan or a transaction does not bind its members, let alone its constituents").

Grace also appears to claim that the Chairman of the Creditors' Committee, Mr. Maher (a designee of JPMorgan), was acting in his capacity as the Administrative Agent and on behalf of all of the Bank Lenders when he negotiated with Grace over the 2005 and 2006 Letters executed by the Creditors' Committee and that this again somehow bound the Bank Lenders to some deal. (*See* Shelnitz Decl. ¶ 3 (claiming to have an "understanding that Mr. Maher was negotiating on behalf of the Debt Holders").) However, there is not a single document signed by the Bank Lenders nor a single specific statement ascribed to Mr. Maher and cited by Grace that supports this "understanding." In fact, every statement ascribed to Mr. Maher by Grace indicates that the only support that he could promise to Grace was that of the Creditors' Committee. (Shelnitz Decl. ¶ 3; Tarola Decl. ¶¶ 6-7.)

Other evidence reinforces the certainty that Grace was dealing with Mr. Maher in his capacity as Chairman of the Creditors' Committee, alone. (*See* Ex. 15, Feb. 14, 2005 E-mail from R. Tarola to T. Maher). In recounting his discussion with Mr. Maher, Mr. Tarola expressly and repeatedly confirms that "the *committee* of general unsecured creditors will continue to be co-proponents of Grace's current plan of reorganization until an event or events (to be defined by you after consultation with the committee) occur." (*Id.*) (emphasis added). In the same e-mail, Mr. Tarola also asks Mr. Maher "how best to describe the *committee's* continued support for [Grace's] plan of reorganization" along with the "*committee's* view of required documentation and bankruptcy court disclosure." (*Id.*) (emphasis added). Mr. Tarola never refers to the Bank Lenders, any agreement with the Bank Lenders' or any effort to obtain the Bank Lenders' continuing support.

Moreover, even assuming that Mr. Maher was somehow acting in a dual capacity as Chairman of the Creditors' Committee and as the Administrative Agent in his

32

discussions with Grace, Mr. Maher's actions or statements, as a matter of contract, could not

bind the individual Bank Lenders. An agent's power to bind his principal is coextensive with

the principal's grant of authority. *Ford* v. *Unity Hospital*, 299 N.E.2d 659, 666 (N.Y. 1973).

The Credit Agreements clearly delineate the limited scope of the Administrative Agent's

authority, and Grace is a party to the Credit Agreements.[33]  The Credit Agreements expressly

prohibit the Administrative Agent (or anyone, for that matter) from obtaining any

modification or waiver of the interest rate without the express written consent of the Majority

Banks (as defined by the Credit Agreement), the consent of each Bank (as defined by the

Credit Agreements) affected thereby, *and Grace*.[34]  In addition, the Credit Agreements

contained a "no oral modifications" clause, and thus, the scope of authority granted to the

Administrative Agent under the Credit Agreements could not be expanded, altered, or

supplemented by any contract other than a writing signed by the requisite parties, including

the Majority Banks, the Administrative Agent, *and Grace*.[35]  There is no evidence of any such

writings, because none exists.

---

[33]  Credit Agreements § 11.1 ("[E]ach such Bank irrevocably authorizes Chase, as the Administrative Agent for such Bank, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are *expressly delegated to the Administrative Agent by the terms of this Agreement* and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Bank, and *no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement* or any other Loan Document or otherwise exist against the Administrative Agent.") (emphasis added).

[34]  Credit Agreements § 13.1(a) ("*With the written consent of the Majority Banks*, the Administrative Agent, the Parent and the Company may, from time to time, enter into written amendments, supplements or modifications hereto ... *provided, however*, that no such waiver and no such amendment, supplement or modification shall (i) reduce the amount or extend the maturity of any Loan or Note or any installment thereof, or *reduce the rate or extend the time of payment of interest thereon*, or *reduce any fee payable to any Bank hereunder*, or change the amount of any Bank's Commitment, in each case *without the consent of the Bank affected thereby*.") (emphasis added).

[35]  Credit Agreements § 13.1(a) ("Neither this Agreement, any Note, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this subsection. *With the written consent of the Majority Banks*, the Administrative Agent, the Parent and the Company may, from time to time, enter into written amendments, supplements or modifications hereto

2. **Grace did not reasonably rely on any conduct of the Bank Lenders.**

Unable to point either to any actual agreement with the Bank Lenders, or any authority for any other party to bind the Bank Lenders to any agreement, Grace now appears to fall back on reliance-based arguments based on the doctrines of apparent authority or estoppel to defeat the Bank Lenders' claims. Grace says that it relied on the "deal" with the Bank Lenders and that Grace's reliance should prevent the Bank Lenders from receiving contract default interest. Grace's eleventh hour invocation of these doctrines fails utterly.

3. **Third Circuit law prohibits invocation of any reliance exception to the absolute priority rule.**

The Third Circuit has ruled that there is no reliance based exception to the absolute priority rule. In *Armstrong*, the Third Circuit flatly rejected the argument that creditor participation in the plan process, even where that participation includes an agreement on recovery and the allocation of reorganization value, justifies departing from, or even flexibly applying, the absolute priority rule. *Armstrong*, 432 F.3d at 518. In *Armstrong*, the debtors based their plan on an *actual* agreement with the creditors committee and the asbestos personal injury plaintiffs on the split of reorganization value, an agreement recited in the disclosure statement that went out to all creditors. Just as here, the creditors' committee changed its position as circumstances changed. And circumstances have changed dramatically here; the terms of the currently contemplated plan differ substantially from the Joint Plan in that it no longer provides for an equity recovery for the Bank Lenders, equity

---

... *provided, however,* that no such waiver and no such amendment, supplement or modification shall ...(ii) amend, modify or waive any provision of this subsection [13.1(a)] ... without the *written consent of all the Banks,* or (iii) amend, modify or waive any provision of Section 11 without the *written consent of the then Administrative Agent.*") (emphasis added); N.Y. GEN. OBL. LAW § 15-301 ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."); *DFI Commc'ns v. Greenberg*, 363 N.E.2d 314, 314-16 (N.Y. 1977).

value has soared since 2005, reorganized companies in other asbestos cases have paid their

creditors in full when their shareholders have retained value, numerous termination events

have occurred and, of course, over three years have passed since Grace and the Creditors'

Committee executed the 2005 Letter.

In upholding the right of the creditors' committee to change its mind, the

District Court in *Armstrong* observed:

> in the absence of bad faith, which was not alleged here, and
> particularly in light of the changed circumstances, until a party
> consents and the consent is final, that party may walk away
> from the table for a good or bad reason or no reason at all.

*In re Armstrong World Industries, Inc.*, 320 B.R. 523, 534 n.24 (D. Del. 2005) (citing *In re*

*Huckabee Auto. Co.*, 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981)).

### 4.    **Grace cannot satisfy any estoppel or other reliance based exception.**

Even if the Third Circuit permitted such a reliance based "exception," Grace

cannot satisfy the elements of any known reliance doctrine.  Promissory estoppel certainly

does not apply here.  Under that doctrine, a party must prove not by a preponderance, but by

clear and convincing evidence, that (i) a definite and certain promise was made; which was

(ii) reasonably expected to induce reliance by promisee; (iii) the alleged promisee acted in

reliance on the promise (i.e. action was unequivocally referable to the alleged promise and

inconsistent with any other explanation); and (iv) the alleged promisee sustained an

unconscionable injury such that enforcement of the promise is necessary to avoid injustice.[36]

A review of elements (i) and (ii) alone defeat Grace's ability to invoke

promissory estoppel.  Grace has no evidence of any express written or oral representation that

---

[36]  *See generally, e.g., In re Aquila Inc.*, 805 A.2d 184, 193 (Del. Ch. 2002) (quoting *Lord* v. *Souder*, 748 A.2d
393, 399 (Del. 2000)), *cited in In re U.S. West, Inc. Sec. Litig.*, 65 Fed. Appx. 856, 863-64 (3d Cir. 2003);
*Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*, 452 N.Y.S.2d 447, 449 (2d Dep't 1982).

the Creditors' Committee's offer to accept the 6.09% interest rate would remain irrevocable, once the conditions expired.[37]  To the contrary, the January 2005 Disclosure Statement indicated that Grace and Creditors' Committee "intend[ed] to memorialize their [2005 Letter, and, as amended, the 2006 Letter] in a plan support agreement," but they never did so. (Disclosure Statement at 59 n.18.)[38]  Nor can Grace show by clear and convincing evidence that its purported continued reliance on the Creditors' Committee's agreements to suspend temporarily its right to object to certain treatment of its constituents was foreseeable or reasonable.  By Grace's admission, once the conditions failed to materialize by a date certain, the "Debtors and the Creditors' Committee agree[d] that the Creditors' Committee had the right to withdraw as Plan Proponent…" (2006 Letter, Kruger Decl. Ex. B.)  Mr. Shelnitz in fact acknowledges that in 2007 "Stroock did express the view that the Creditors' Committee had the right, if it so chose, to terminate the February 27, 2006 Letter Agreement because the disclosure statement had not been approved by December 31, 2006." (Shelnitz Decl. ¶ 8.)[39]  Furthermore, there is no evidence that Grace could justifiably rely on the "old deal" since the April 2008 Term Sheet differs from the Joint Plan previously supported by the Creditors'

---

[37] "A promise is an expression of commitment to act in a specified way, or to bring about a specified result in the future, or to take responsibility that the result … will occur, communicated in such a way that the addressee of the expression may justly expect performance…." *Ramone* v. *Lang*, No. Civ.A.1592-N, 2006 WL 905347, at *15 (Del. Ch. Apr. 3, 2006) (ellipses in original) (citation omitted).

[38] "A truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built. The intention is subject to change." *Derry Finance N.V.* v. *Christiana Cos., Inc.*, 616 F. Supp. 544, 550 (D. Del. 1985), *aff'd*, 797 F.2d 1210 (3d Cir. 1986) (quoting *Metro. Life Ins. Co.* v. *Childs Co.*, 130 N.E. 295, 298 (N.Y. 1921)). In other words, an "agreement[] to agree" does not constitute a sufficiently definite to form a basis of a promissory estoppel claim against the Creditors' Committee. *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989).

[39] An "indefinite proposal, subject to modification or withdrawal at [defendant's] sole discretion, cannot form the basis of a promissory estoppel claim." *Del Sontro* v. *Cendant Corp., Inc.*, 223 F. Supp. 2d 563, 575 (D.N.J. 2002); *Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.*, No. 91-4027, 1992 WL 672289, at *12 (D.N.J. July 21, 1992) (same); *see also, e.g., Gen. Elec. Co.* v. *Compagnie Euralair, S.A.*, 945 F. Supp. 527, 536 (S.D.N.Y. 1996) (reliance for promissory estoppel claim destroyed by contract language vesting sole discretion in defendant); *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 907-08 (3d Cir. 1995) (reliance on employer representations regarding benefits "may never be 'reasonable' where the participant is in possession of a written document notifying him of the conditional nature of such benefits").

Committee, in that it no longer provides for an equity recovery for unsecured creditors.

Finally, because the legal inability of a creditors' committee to bind an individual creditor is

well-established, Grace could never have reasonably relied on the Creditors' Committee's

alleged promises as binding on the Bank Lenders.[40]

In any event, it is undisputed that before Grace's entry into the Proposed

Asbestos Settlement (and after January 2007, when the Creditors' Committee's right to

withdraw vested) the Creditors' Committee repeatedly communicated to Grace that the Bank

Lenders expected contract default interest and that Grace should not enter into any settlement

that did not provide for payment of such interest (precisely what Grace went ahead and did

anyway). (*See id.*; Kruger Decl. ¶ 5; Ex. 17, May 9, 2007 E-mail from A. Krieger to K.

Pasquale.) If Grace was so certain that the Creditors' Committee still supported the interest

rate under the 2006 Letter, then why didn't Grace just ask it to agree to the Proposed Asbestos

Term Sheet? The answer is both self-evident and demonstrated by Grace's public statements

at the time.[41]

### 5. The Administrative Agent lacked apparent authority to waive or amend the Bank Lenders' rights under the Credit Agreements.

Unable to point to justifiable reliance on the outdated 2005 and 2006 Letters

with the Creditors' Committee, Grace appears to insinuate that the Administrative Agent had

the apparent authority to bind the Bank Lenders and that it relied on that apparent authority.

Under the doctrine of apparent authority, if a third party changes position in reliance on the

---

[40] *Refco*, 336 B.R. at 197 (noting that "a committee's assent to a plan or a transaction does not bind its members, let alone its constituents" (citing 7 Collier on Bankruptcy ¶ 1103.05[1][d][i] at 1103-26; and *Armstrong*, 432 F.3d at 518)). "It is well-settled that reliance upon statement or actions *contrary to law* is not reasonable." *Volvo Trucks of N. Am., Inc.* v. *United States*, 367 F.3d 204, 212 (4th Cir. 2004) (citing, e.g., *Fredericks* v. *Comm'r*, 126 F.3d 433, 443 (3d. Cir. 1997)).

[41] *See* Ex. 18, Tr. of Grace's Conf. Call, Apr. 7, 2008 at 7-8, where Grace's management publicly stated in connection with the announcement of the April 2008 Term Sheet that it was unsure of the Creditors' Committee's support for the old 2006 Letter interest rates included therein.

reasonable belief that an agent is acting within the scope of his authority, "the principal is estopped to deny that the agent's act was not authorized."[42] However, "[t]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the *part of the principal*—not the agent." *Ford*, 299 N.E.2d at 664 (emphasis added). Accordingly, the misrepresentations of the agent are "an insufficient basis for reliance upon 'apparent authority.'" *Id.*[43] And Grace has not cited any evidence that the Bank Lenders (as opposed to the Administrative Agent) engaged in any conduct, misleading or otherwise, that would lead them to believe that the Administrative Agent had the authority to waive rights under, or amend or modify, the Credit Agreements.

Moreover, a third party on notice of an express "limitation of an agent's authority ... cannot subject the principal to liability upon a transaction with the agent in violation of such limitation."[44] Here, Grace ignores numerous provisions in the Credit Agreements *to which Grace and the Bank Lenders were parties* expressly disclaiming the authority of the Administrative Agent or any other person to effect any waiver or amendment that would operate to reduce the interest rate obligation without the express written consent of the Majority Banks, the Administrative Agent, *and Grace*, along with the consent of each affected Bank.[45] If such a departure from the apparent scope of the authority of the Administrative Agent had occurred, Grace would also have had a duty to investigate such a

---

[42]  *Masuda* v. *Kawasaki Dockyard Co., Ltd.*, 328 F.2d 662, 665 (2d Cir. 1964).

[43]  To the extent it could apply, Delaware law on apparent authority is the same. *See Billops* v. *Magness Const. Co.*, 391 A.2d 196, 198 (Del. 1978).

[44]  *Ernst Iron Works* v. *Duralith Corp.*, 200 N.E. 683, 684 (N.Y. 1936); *see also Int'l Boiler Works Co.* v. *Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977) (third party is not permitted to claim protection if he ignores facts illustrating the agent's lack of authority).

[45]  *See* discussion *supra* notes 33-35 and accompanying text.

departure. The primary obligation to ascertain the true authority of one purporting to act as agent rests upon the individual dealing with the purported agent, not upon the principal.[46] By Grace's own account, it did nothing to confirm the Administrative Agent's supposed apparent authority.

## D.    The Passage of Time Has Not Deprived the Bank Lenders of Their Right to Receive Contract Default Interest.

Grace has also tried to cobble together some low order equitable arguments. It implies that the Bank Lenders have forfeited or waived their right to contract default interest by somehow "laying in wait" to object to Grace's proposal to re-write the Credit Agreements, so as to maximize their leverage in negotiating more than they deserve. (Objection ¶¶ 3, 17.) Grace has also suggested that the Bank Lenders somehow "slept on their rights," and thus forfeited their right to contract default interest, including by proving solvency at trial, if necessary. (July 21, 2008 Transcript at 87:18-19, [Dkt. No. 19210], attached as Ex. 22.) These arguments are baseless.

The Bank Lenders did not forfeit or waive any right; rather, they have done everything that they needed to do to assert prima facie valid and allowable proofs of claims establishing their entitlement to postpetition interest at the contract default rate.[47] Under

---

[46]  *Application of Lester*, 386 N.Y.S.2d 509, 514 (Sup. Ct. 1976); *Int'l Boiler Works*, 372 A.2d at 177 (same, under Delaware law). The doctrine of equitable estoppel is relative to that of apparent authority. The doctrine of equitable estoppel only applies when the truth concerning material facts is unknown to the party claiming the benefit of the estoppel, "not only at the time of the conduct which amounts to a representation or concealment, *but also at the time when that conduct is acted upon by him.*" *Heckler* v. *Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984) (emphasis added). "If, at the time when he acted, *such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means*, he cannot claim to have been misled by relying upon the representation or concealment." *Id.* (emphasis added). For the same reason that Grace cannot make out a defense to the proof of claim based on apparent authority, any equitable estoppel claim must also fail.

[47]  Forfeiture is the failure to timely assert a right. *Kontrick* v. *Ryan*, 540 U.S. 443, 458 n.13 (2004). In contrast to forfeiture, waiver involves the intentional relinquishment of a known right or privilege. *Id.* To assess whether a person intentionally relinquished a known right or privilege, courts generally examine the particular facts and circumstances of the case. *Coventry* v. *U.S. Steel Corp.*, 856 F.2d 514, 522-23 (3d Cir.

section 502(a), "[a] claim or interest, proof of which is filed under section 501 of [Title 11] is deemed allowed, unless a party in interest ... objects." *See also* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute prima facie evidence of the validity and amount of the claim."). The Administrative Agent on behalf of all of the Bank Lenders timely filed the Proofs of Claim, thereby asserting and preserving their right to postpetition interest. The Proofs of Claim ask for amounts owed on account of, but not limited to, principal, interest and fees and expenses on the loans and advances made under the Credit Agreements, which includes claims for interest at the default rate. (Proofs of Claim).

No party objected to the Proofs of Claim in writing until June 13, 2008, when Grace filed the Objection. *See* Fed. R. Bankr. P. 3007(a) ("An objection to the allowance of a claim shall be in writing ..."). Accordingly, the Proofs of Claim, including the demand for contract default interest, were *deemed* allowed until June 13, 2008. "Once [a prima facie valid] claim is alleged, the burden shifts to the debtor to produce evidence sufficient to negate the prima facie valid claim, that is, evidence equal in force to the prima facie case." *VFB LLC*, 482 F.3d at 636 (internal citation omitted). Until Grace objected in writing to the Proofs of Claim, the Administrative Agent and the Bank Lenders, as a matter of law, did not have to do anything to prove the validity of their claims. Grace, on the other hand, waited more than five years to object to the Bank Lenders' Proofs of Claim. Now that Grace has objected, the Bank Lenders have every right to prove their right to contract default interest, including by establishing Grace's solvency at trial (which, as noted above, should not be necessary here).

---

1988)). The burden of proof is on the party asserting the waiver. *Equimark Comm. Fin. Co.* v. *C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 145 (3d Cir. 1987).

Grace, however, complains that the Administrative Agent or the Bank Lenders for some reason had to do more than file the Proofs of Claim to preserve their claims for contract default interest—despite the plain language of section 502(a). What were the Bank Lenders supposed to do? The substance of the 2005 Letter ended up in the Disclosure Statement. The Disclosure Statement expressly provided that individual creditors were not bound or committed to vote in favor of Grace's Joint Plan and that the parties intended to memorialize this agreement in a plan support agreement. (Disclosure Statement at 59 n.18.) The Disclosure Statement was never subject to a hearing, and the Plan Support Agreement was never executed. As for the various interest rate assumptions that Grace incorporated into its public filings, they were just that, assumptions. Grace's public filings imposed no obligation on the Bank Lenders to do anything. Grace has never sought approval of the Proposed Asbestos Settlement, so no objection was possible, and once Grace publicly announced its terms, the Bank Claimants responded promptly by writing the April 21, 2008 letter to Grace's counsel and expressing their position on contract default interest.

Finally, "laying in wait" is not an enumerated basis for disallowance under Bankruptcy Code section 502(b), nor can it be inferred. "[W]here the bankrupt is the victim it has an adequate remedy at law. It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief." *In re Mobile Steel Co.*, 563 F.2d 692, 699 n.10 (5th Cir. 1977).[48] Even if the remedy were available, it is a "draconian" remedy that can only be used in "extreme instances." *Adelphia Recovery Trust* v.

---

[48] *See also In re Murgillo*, 176 B.R. 524, 533 (9th Cir. B.A.P. 1995) (explaining that "the proper exercise of the bankruptcy court's equitable powers under § 502 is through investigation into the existence, validity and enforceability of claims leading to their allowance or disallowance" and "disagree[ing] with [the debtor's] attempt to convert this review into an unlimited license to invalidate otherwise valid state-based claims"); *In re Congoleum Corp.*, No. 05-06245, 2007 WL 4571086, at *11 (Bankr D.N.J. Dec. 28, 2007) (noting that the Third Circuit has not held that "equitable disallowance" remains a cognizable basis for disallowance following the 1978 enactment of the Bankruptcy Code).

*Bank of America, N.A.*, 390 B.R. 80, 99 (S.D.N.Y. 2008). Given the allocation of the burdens of proof and its own inaction, Grace cannot make that showing.

E.    **Grace's Argument that Paying Contract Default Interest to the Bank Lenders Would Jeopardize the Proposed Asbestos Settlement is Not Tenable.**

According to Grace, paying the Bank Lenders contract default interest would "seriously compromise" any hope of achieving a consensual resolution and jeopardize these cases. (Objection ¶ 39.) The Third Circuit in *Armstrong* rejected this very argument in the context of a settlement between asbestos claimants and existing equity as a justification for circumventing the absolute priority rule:

> We recognize that the longer that the reorganization process takes, the less likely that the purposes of Chapter 11 (preserving the business as a going concern and maximizing the amount that can be paid to creditors) will be fulfilled. Nevertheless, we conclude that the absolute priority rule applies [and] we...deny confirmation of [Armstrong's] plan.

*Armstrong*, 432 F.3d at 518. Indeed, on three separate occasions in three different asbestos cases, the Third Circuit has rejected the need to resolve complex protracted cases as a justification for overriding the substantive demands of bankruptcy law. *Id.* at 518-519; *In re Owens-Corning*, 419 F.3d 195, 211 (3d Cir. 2005); *In re Combustion Eng'g, Inc.*, 391 F.3d 195, 209, 211 (3d Cir. 2004).[49]

---

[49]    The Third Circuit's view is consistent with that of other circuits. In *In re AWECO, Inc.*, the Fifth Circuit ruled that a court could not approve a pre-plan confirmation settlement unless it complies with the absolute priority rule. 725 F.2d 293, 298 (5th Cir. 1984). While observing that testimony at the lower court indicated that a settlement of the litigation would give the debtor its only chance at reorganization, and expressing sympathy for the bankruptcy judge "who has suffered the travails of months filled with the problems of the debtor and its creditors" . . . and acknowledging that "preserving a settlement potentially advantageous to the debtor and its creditors is a worthy goal," the Fifth Circuit vacated the lower court's decision because it could not conclude that the settlement complied with the absolute priority rule. *Id.* at 297-300. Indeed the Fifth Circuit found that a "bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors." *Id.* at 298.

The decision to which Grace points, *A.H. Robins*, does not hold otherwise. There, the District Court only disallowed creditors' claims for punitive damages because the size of the potential liability was so "staggering" that it jeopardized other creditor recoveries. *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988). The District Court concluded that it "would not be fulfilling its duties in the oversight of this bankruptcy if it were to allow a windfall claim to certain creditors that could jeopardize the full compensation of claims to all others." *Id.* at 563-64. Here, allowing the Bank Lenders' claims in full, including interest at the contract default rate, would not impact other creditors' recoveries; it would merely reduce equity's recovery.

## F.    The Bankruptcy Code's Anti-Ipso Facto Provisions are Not Relevant.

Grace submits that it is inequitable to pay default interest (a) because Grace could not pay interest during these chapter 11 cases; and (b) because there can never be a postpetition default other than the bankruptcy filing itself, there should be no right to contract default interest. (Objection ¶ 41.)

Contrary to Grace's position, the Bankruptcy Code does not erase defaults, though it sometimes blunts their impact; debtors default on their obligations pre- and postpetition and the petition date does not diminish the defaults in either circumstance.[50]

---

[50]    *See Am-Haul Carting, Inc.* v. *Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 241-43 (S.D.N.Y. 1998) (finding that debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of such surety's obligations); *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986) (addressing situation in which debtor defaulted on payments of principal and interest while in Chapter 11); *see also, e.g., Anchor Resolution Corp.* v. *State St. Bank & Trust Co. of Conn. (In re Anchor Resolution Corp)*, 221 B.R. 330, 337 (Bankr. D. Del. 1998) (enforcing a make-whole provision triggered by an event of default, even where the "default" was the filing of a bankruptcy petition); *United Merchants & Mfrs., Inc.* v. *Equitable Life Assurance Co. of the United States (In re United Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages provision triggered by the filing of a Chapter XI petition rather than by some other event of default).

43

The single case cited by Grace to the contrary, *In re Nextwave Personal Communications, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000), identifies no authority for its conclusion that a postpetition payment default does not constitute a "default," nor has it been followed for this point. *Nextwave* also involved the termination of an estate agreement as a result of the default—the consequence that Congress intended to prevent in striking "ipso facto" clauses. Nor do the Bank Claimants rely merely on Grace's bankruptcy default arising upon the filing. Grace has defaulted on numerous payment and non-payment provisions of the Credit Agreements. (Freedgood Aff. ¶ 13.)

Absent express prohibition by Congress, bankruptcy courts enforce creditors' rights in accordance with creditors' contracts. *See In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524 (7th Cir. 1986), a case involving the exact question at issue here. In *Chicago, Milwaukee*, debenture holders sought principal *plus* interest on their bonds where the indenture trustee declared a default *after* the debtor filed its petition. *Id.* at 525-26. The debtor argued against interest during the default years, contending that "repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed." *Id.* at 526. The Seventh Circuit flatly rejected arguments identical to those advanced here; it summarily dismissed the debtor's argument that it should be excused from the consequences of its default because it could not make payments in bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared, [a payment default] was impossible because the debtor could not have repaid the principal immediately if it wanted to. Defaults are often involuntary.

*Id.* at 529.

44

### G.    The Credit Agreements Cannot be Rewritten to Give Grace a Windfall

Grace's final "equitable" argument illustrates the reach of its own inequitable conduct, not that of the Bank Lenders. Grace effectively urges this Court to implement the April 2008 Term Sheet over the Bank Claimants' objections. It asks this Court to: (a) tear up the Credit Agreements and to write new ones with a lower interest rate, (b) rewrite the Credit Agreements as if bankruptcy and failure to pay amounts when due were not events of default, and (c) read numerous other covenants that Grace has violated over the last seven years out of the Credit Agreements altogether.[51]

Courts cannot rewrite contracts to provide a debtor with a windfall "merely by reason of the happenstance of bankruptcy." *Butner* v. *United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)). Grace wants just such a windfall for its shareholders here—the ability to satisfy its debt obligations at a reduced rate of interest, while at the same time enjoying the benefit of the financing provided under the Credit Agreements to fund these bankruptcy cases for the past seven years.

### V.    THE "BEST INTERESTS OF CREDITORS" TEST DOES NOT REQUIRE INTEREST AT THE FEDERAL JUDGMENT RATE

Grace maintains that under the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code, the federal judgment rate constitutes the *only* interest rate available to the Bank Lenders.[52] (Objection ¶¶ 28-30.) This argument completely misses the mark.

The "best interests of creditors" test of section 1129(a)(7):

---

[51]    *See* Freedgood Aff. ¶13.

[52]    It is unclear why Grace is even raising this issue since it has stated in its Objection that it only seeks to disallow default interest, not the non-default contract rate.

45

> requires that an impaired claim-holder who does not accept the proposed plan must "receive … under the plan … property of a value … that is not less than the amount that such holder would … receive … if the debtor were liquidated under chapter 7."

*In re Dow Corning Corp.*, 244 B.R. 678, 686 (Bankr. E.D. Mich. 1999).

In chapter 7 cases, section 726(a)(5) entitles creditors to interest calculated "at the legal rate from the date of the filing of the petition" before the debtor can receive any excess liquidation proceeds. Some courts have recognized that while creditors of a solvent chapter 7 estate may not receive *less* than postpetition interest based on the federal judgment rate under 28 U.S.C. §1961(a), that rate is by no means the *maximum* rate in a chapter 11 solvent debtor case. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 206 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2).").[53]

In any event, it is simply incorrect to read, even in the context of a chapter 7 case, section 726(a)(5) as some courts recently have (*see, e.g.*, *Cardelucci*, 285 F.3d at 1234-35) as evidence of Congressional intent to override state law with a uniform federal postpetition interest rate. When Congress enacted the Bankruptcy Code in 1978, no uniform "federal" judgment rate existed;[54] the "legal rate" under section 762(a)(5) meant either a state

---

[53]    While Grace cites three cases for the proposition that courts have "consistently interpreted the 'legal rate' of interest to be the federal judgment rate," (Objection ¶ 29) none of these cases impose a ceiling on recovery. *See Coram*, 315 B.R. at 346 (stating that "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11" and *rejecting* the proposition that the section 1129(b) requires postpetition interest at the federal judgment rate); Bench Ruling, *Adelphia*, No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006) (Objection Ex. D) (holding that under the "fair and equitable test" of section 1129(b), the court had the discretion to determine the equitable rate of pendency interest and that under the facts of that case, an adjusted contract rate was permitted); *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) (reasoning that the federal judgment rate was an appropriate rate for postpetition interest on a state court judgment, where there was *no* otherwise applicable contract rate). As for *Cardelucci*, the recent Ninth Circuit ruling in *Future Media* confirms that *Cardelucci* only establishes the legal rate in the Ninth Circuit under section 726(a)(5) and has no applicability to section 1129(b)'s fair and equitable test.

[54]    *Northrop Corp.* v. *Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).

statutory rate or the applicable contractual default rate.[55] Consistent with caselaw under the Bankruptcy Act, during at least the first twenty plus years of practice under the Bankruptcy Code (including when the Credit Agreements were executed) "the majority of cases follow[ed] a state law approach by providing that when a creditor seeks interest on a claim, the bankruptcy courts apply the [credit] agreement's interest rate." *In re Carter*, 220 B.R. 411, 415 (Bankr. D.N.M. 1998).

The 1982 amendment to 28 U.S.C. § 1961 (imposing a uniform postjudgment interest rate on *money judgments* obtained in federal courts) does not alter this conclusion. 28 U.S.C. § 1961(c)(4 ) expressly states that it "shall not be construed to affect the interest on any judgment of any court not specified in this section." The existence of a prima facie valid proof of claim is *not* a money judgment obtained in a district court; nor does the filing of a bankruptcy petition constitute in any sense a money judgment.[56] Absent evidence that Congress sought to impose a uniform rate of postpetition interest, and absent the furtherance of a legitimate federal policy, this Court should respect, not displace, state law.[57]

## CONCLUSION

Every case has its story. What is the story of this case? More than seven years of the Bank Lenders' patience in Grace's unrelenting effort to establish its solvency, and

---

[55] *Compare Realty Assocs. Secs. Corp.*, 163 F.2d 387, 391 (2d Cir. 1947), *cert. denied*, 332 U.S. 835 (1947) (enforcing the 5% contractual default rate instead of the 6% New York judgment rate where there were "no equities to override the bargain which the parties made for themselves"). Application of a higher state statutory rate could be justified if the debtor was solvent, *id.* at 392 (Clark, J., dissenting), and application of a lower statutory rate if the contract rate was usurious. *Johnson* v. *Norris*, 190 F. 459, 463-64 (5th Cir. 1911). Both New York's postjudgment rate of 9% and Delaware's postjudgment rate of 5% above the federal rate well exceed the default rate under the Credit Agreements. *See* N.Y. C.P.L.R. §§ 5003, 5004; DEL. CODE ANN. tit. 6, § 2301(a).

[56] Nor are the policies of the amendment implicated in these cases: the uniform federal rate was enacted in response to delay tactics of *defendant* judgment debtors who profited from state statutory rates set *lower* than the cost of money, S. REP. 97-275, at 11-12, 30 (1981), not to grant defendants a reprieve from their contractual obligations or applicable state law.

[57] "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts." *Atherton* v. *FDIC*, 519 U.S. 213, 218 (1997).

now with solvency, the Bank Lenders' right to contract default interest. Solvent now by any

measure, how does Grace reward that patience? By asking this Court to inflict a $91 million

reduction on the Bank Claimants, so that Grace's shareholders can keep equity worth

$2 billion instead of $1.9 billion, based on a stale agreement with the Creditors' Committee

on a dead plan that was never binding on the Bank Lenders in the first place. There is no

basis in the facts, there is no basis in the law, and there is no basis in equity for Grace's

Objection. It should be overruled.

Dated: Wilmington, Delaware     **LANDIS RATH & COBB LLP**
       September 5, 2008

Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Telecopier: (302) 467-4450

-and-

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Telecopier: (212) 757-3990

*Attorneys for The Bank Lender Group*