**EXHIBIT 8**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

### DECLARATION OF MARK A. SHELNITZ IN SUPPORT OF DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

I, Mark A. Shelnitz, hereby declare that the following is true to the best of my

knowledge, information and belief:

1. I am the Vice President, General Counsel, and Secretary of W. R. Grace & Co., which

has offices located at 7500 Grace Drive, Columbia, Maryland 21044. I am fully familiar

with the facts set forth in this declaration (the "Declaration"), which I submit in support

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

of the Debtors' Objection To The Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999.

2. By letter agreement dated January 12, 2005, the Official Committee of Unsecured Creditors (the "Creditors' Committee") agreed to be a co-proponent of the Debtors' Amended Joint Plan of Reorganization, which was filed on January 13, 2005 (the "Joint Plan"). In return, the Debtors agreed that under the Joint Plan the Debtors would pay post-petition interest at the rate of 6.09% per annum, compounded quarterly, to the holders of the Debtors' two pre-petition bank credit facilities (the "Debt Holders"): (1) the Credit Agreement dated as of May 14, 1998, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Arranger, and (2) the 364-Day Credit Agreement, dated as of May 9, 1999, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, Bank of America National Trust and Savings Association, as Documentation Agent, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Book Manager (collectively, the "Credit Agreements").

3. In late 2005, the Creditors' Committee indicated that if the Debtors' wanted the Committee's continued support for the Joint Plan, the Debtors would have to agree to amend the prior agreement concerning post-petition interest. Accordingly, the Grace management team entered into negotiations with Tom Maher of J.P. Morgan Chase & Co. as to what the Creditors' Committee would accept as a fair and reasonable rate of post-petition interest in return for the Committee's continued support of the Debtors'

Joint Plan. Throughout these negotiations, it was my understanding that Mr. Maher was negotiating on behalf of the Debt Holders.

4. By letter dated February 27, 2006, the Debtors agreed to adjust the post-petition interest rate in the Joint Plan of Reorganization such that, commencing January 1, 2006, the previously agreed-upon 6.09% fixed interest rate would change to a floating adjusted interest rate tied to the "prime" rate of interest (the "February 27, 2006 Letter Agreement"). In return, the Creditors' Committee agreed to continue to be a co-proponent of the Debtors' Joint Plan. The February 27, 2006 Letter Agreement expressly provided that the floating adjusted base rate would accrue to the benefit of "the Holders of the Debtors' pre-petition bank credit facilities." Based on this language, as well as on the fact that Mr. Maher was negotiating on behalf of the Debt Holders, it was my understanding that the February 27, 2006 Letter Agreement had the support of the Debt Holders as well as the Creditor's Committee. There was no indication by anyone representing or acting in any capacity for the Debt Holders that the Agreement applied only to the Committee.

5. At the time the Debtors' and Creditors' Committee entered into the February 27, 2006 Letter Agreement, the Joint Plan, which was in the public record, contemplated that equity would retain significant value in the reorganized Debtors. Yet, to my knowledge, no one from the Creditors' Committee has ever suggested that the February 27, 2006 Letter Agreement would terminate or that the agreed-upon post-petition interest rate should be increased if it turned out that equity did in fact retain significant value in the Debtors. Moreover, following the February 27, 2006 Letter Agreement, the Creditors' Committee continued to endorse Debtors' Joint Plan of Reorganization and provided

support to the Debtors as they embarked on the estimation process to determine the amount of Debtors' asbestos personal injury liability.

6. As discussed more fully below, since February 27, 2006, I have had a host of communications with counsel for the Creditors' Committee, and at no time has counsel for the Creditors' Committee ever stated that it was terminating the agreement by which it became a co-proponent of Debtors' Plan of Reorganization.

7. In late 2005, shortly after I became Grace's General Counsel, Grace's in-house counsel and Kirkland & Ellis began holding semi-monthly conference calls to update Stroock & Stroock & Lavan LLP ("Stroock"), counsel to the Creditors' Committee, on developments in the Debtors' bankruptcy proceeding. Those semi-monthly conference calls continued into the first quarter of 2008. In most instances, Lewis Kruger, Arlene Krieger and Ken Pasquale, all Stroock attorneys, participated in these conference calls. In addition to these scheduled calls, I also spoke directly with Mr. Kruger on various occasions to report on the status of the bankruptcy case. At no point during any of my conversations with Mr. Kruger prior to April 2008 did Mr. Kruger or anyone else at Stroock state that the Creditors' Committee demanded that Debtors pay interest under the Joint Plan at the default rates set forth in the Credit Agreements as a condition to continuing the Creditor's Committee's support.

8. Beginning in 2007, Mr. Kruger stated, in substance, that the market price of the unsecured debt under the Credit Agreements suggested that some of the Debt Holders were now expecting default interest. Significantly, Mr. Kruger never indicated that all, or even most, of the Debt Holders were expecting default interest; he only said that some of

the holders had this expectation. I responded, in substance, by noting that the Debtors and the Creditors' Committee had an agreement in place, memorialized in the February 27, 2006 letter, by which the Creditors' Committee pledged its support for the Debtors' Joint Plan. I indicated to Mr. Kruger that the Debtors were relying on the Creditors' Committee to honor that agreement. Mr. Kruger never said or did anything in response to suggest that the Committee, the Debt Holders or counsel for the Committee would withdraw support for the Debtors' Joint Plan of Reorganization. And Mr. Kruger certainly never said or did anything to suggest that the Creditors' Committee would vote against a plan of reorganization because it failed to provide for a default rate of interest for the Debt Holders. Also in 2007, Stroock did express the view that the Creditors' Committee had the right, if it so chose, to terminate the February 27, 2006 Letter Agreement because the disclosure statement had not been approved by December 31, 2006. Stroock, however, did not indicate that the Creditors' Committee was in fact terminating the February 27, 2006 Letter Agreement. Even following the announcement of the Proposed Asbestos Settlement, the Creditors' Committee has never formally terminated the February 27, 2006 Letter Agreement.

9. On April 6, 2008, the Debtors entered into a Proposed Asbestos Settlement with the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee. I was personally involved in negotiating the Proposed Asbestos Settlement. The Debtors relied on the February 27, 2006 Letter Agreement in negotiating the economic terms of such Settlement. In fact, the Debtors specifically incorporated into the Proposed Asbestos Settlement the post-petition interest rates from the February 27, 2006 Letter Agreement. In that regard, the Proposed Asbestos Settlement provides that the

Debt Holders shall receive "100% of allowed amount plus . . . postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly" -- exactly what was agreed to in the February 27, 2006 Letter Agreement. In Debtors' view, the fact that the Creditor's Committee, on behalf of the Debt Holders, agreed to these post-petition interest rates at a time when the Joint Plan contemplated significant value for equity demonstrated that these rates were fair and reasonable.

10. On April 21, the Debt Holders sent Debtors a letter rejecting the rate of post-petition interest reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate. The Debt Holders' position threatens the viability of the Proposed Asbestos Settlement and the plan of reorganization that Debtors and various co-proponents expect to file later this month to implement that Settlement. In response to the Debt Holders' position, the Debtors very well could take the position that the Debt Holders should not receive any post-petition interest under the Credit Agreements. The Debtors, however, are still prepared to abide by the commitments they made to the Creditors' Committee, including the Debt Holders, in the February 27, 2006 Letter Agreement.

11. The information contained in this Declaration is true and correct to the best of my knowledge and belief.

August 14, 2008

                                           Mark A. Shelnitz
                                           Vice President, General Counsel and Secretary

Subscribed and sworn to before me
this 14th day of August, 2008

Diane E. Armstrong
NOTARY PUBLIC, State of MARYLAND
My Commission Expires: September 18, 2012



DIANE Z. ARMSTRONG
Notary Public, State of Maryland
County of Howard
My Commission Expires September 18, 2012