**EXHIBIT 23**



Slip Copy

Page 1

Slip Copy, 2007 WL 4571086 (Bkrtcy.D.N.J.)

**H**In re Congoleum Corp.
Bkrtcy.D.N.J.,2007.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States Bankruptcy Court,D. New Jersey.
In re CONGOLEUM CORPORATION, et al.,
Debtors and Debtors-in-Possession.
Congoleum Corporation, et al., Plaintiff,
v.
Arthur J. Pergament, as the collateral trustee of the
collateral trust, et al., Defendants.
**Bankruptcy No. 03-51524(KCF).**
**Adversary No. 05-06245.**

Dec. 28, 2007.

Richard Epling, Esq., Kerry Brennan, Esq., John
Pritchard, Esq., Pillsbury Winthrop, Shaw, Pittman,
New York, NY, for the Debtors.
Stephen V. Falanga, Esq., Connell, Foley, LLP,
Roseland, NJ, Katherine McLendon, Esq., Simpson,
Thacher & Bartlett, New York, NY, for Travelers
Insurance Co., The Travelers Indemnity Co., and
Travelers Casualty and Surety Co.
Barbara Alameda, Esq., O'Melveny & Myers, LLP,
New York, NY, for Century Indemnity, ACE
American Insurance.
Melissa Hager, Esq., Otterbourg, Steindler, Houston
& Rosen, PC, New York, NY, for Wachovia Bank.
Nancy Isaacson, Esq., Goldstein Isaacson,
Springfield, NJ, for Official Unsecured Asbestos
Claimant's Committee.
Laurie Binder, Esq., Seward & Kissel, LLP, New
York, NY, for Employers Insurance of Wausau.
Ronald E. Reinsel, Esq., Caplin & Drysdale,
Washington, D.C., for Asbestos Personal Injury
Claimants' Committee.
Jonathan P. Guy, Esq., Orrick, Herrington, &
Sutcliffe, Washington, D.C., for Future Claimants'
Representative.
Michael Zindler, Esq., Teich Groh, Trenton, NJ, for
Official Bondholders Committee.
Van Hooker, Esq., Stutzman, Bromberg, Esserman &
Plifka, Dallas, TX, for Certain Defendants.
Jeffrey S. Posta, Esq., Stark & Stark, Princeton, NJ,
for Campbell, Harrison, et al.
Michael Stamer, Esq., Michele Roberts, Esq., Akin,
Gump, Strauss, Hauer & Feld, New York, NY, James
Savin, Esq., Akin, Gump, Strauss, Hauer & Feld,
Washington, D.C., for Official Committee of
Unsecured Bondholders.

**OPINION**

KATHRYN C. FERGUSON, U.S.B.J.

**DISCUSSION:**

**\*1** This opinion resolves the Debtors' Motion for
Summary Judgment on Counts XVII, XVIII, XIX,
and XX of the Third Amended Complaint. The Court
took oral argument on this matter on November 5,
2007, and reserved decision.

**Factual Background**

Faced with pending asbestos personal injury claims,
Plaintiff, Congoleum Sales, Inc., and Congoleum
Fiscal, Inc. (collectively, the "Debtors"), sought to
obtain coverage from its primary insurance carriers
pre-petition. Through August 2002, substantially all
asbestos-related claims and defense costs were paid
through primary insurance coverage. However, in
March 2001 and then again in August 2002,
Congoleum received notice from its two lead primary
insurance carriers that its primary insurance coverage
was exhausted. During the period following August
2002, Congoleum faced a situation in which its
primary insurers claimed that their policies were
exhausted. At the same time, its excess carriers
claimed that the primary layers were not exhausted
and, therefore, excess coverage was not available.
This impasse left Congoleum with no carriers
defending claims and paying legal settlement costs.

Due to the coverage dispute with its insurers,
Congoleum sought to defer trial dates and to settle
cases for the promise of an assignment of insurance
proceeds whenever possible in order to conserve
cash. In those instances where asbestos claimants
refused to accept an assignment of insurance
proceeds and settlement was essential to avoid trial,
Congoleum paid cash. Pre-petition, Congoleum
settled approximately 61 claims through agreements
to assign, in the future, certain unidentified insurance

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

proceeds. Congoleum also entered two other settlement agreements involving 70 claims in which Congoleum agreed to pay an aggregate of approximately $90,000 in cash, but payments were not made on such agreements. These agreements are referred herein as the Pre-Petition Settlement Agreements.[FN1]

> FN1. In the New York Supreme Court, an asbestos personal injury liability trial returned a damages verdict of $33 million in the Cook and Arsenault cases. A settlement of $800,000 in cash for each case and an agreement to provide a security interest in insurance proceeds for the balance was reached. Additionally, a settlement of $3 million was reached with another pre-petition claimant, Dennis Matthews, which was to be funded by an assignment of certain insurance proceeds. Apart from the correspondence documenting the Cook, Arsenault and Matthews settlements, prior to the Petition Date, Plaintiff entered into letter agreements to assign in the future insurance proceeds with counsel for the Qualified Pre-Petition Settlement Claimants.

In November 2002, Congoleum commenced preliminary discussions with the Claimants' Representative, who represented the largest number of holders of Settled Asbestos Personal Injury Claims that would become Qualified Participating Claimants, regarding the concept of an inventory settlement and a potential Joint Prepackaged Plan of Reorganization in order to resolve claims of parties alleging asbestos-related bodily injuries. On April 10, 2003, a Claimant Agreement was executed, under which the payment of settlement amounts to each claimant that qualified under its terms were to be partially secured by a security interest in certain enumerated Congoleum insurance policy collateral. Under the terms of the Claimant Agreement, the amounts due to Qualified Participating Claimants were fixed by a compensable disease matrix attached to the Claimant Agreement. The aggregate amount of all settlements of the claims of the Qualified Participating Claimants is approximately $465,000,000.

On December 31, 2003 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11

Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Court"). The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

*2 On December 2, 2005, the Plaintiff filed the original complaint in this adversary proceeding. On February 7, 2006, the Court entered an order granting Plaintiff's motion for leave to file the First Amended Complaint nunc pro tunc to December 30, 2005. The Official Committee of Bondholder (the "Bondholders' Committee") and the Future Claimants' Representative (the "FCR") filed separate motions to intervene, which were granted by order of the Court on April 25, 2006 and May 9, 2006, respectively.

On March 16, 2006, the Debtors filed a motion for summary judgment with respect to the issues in Counts I and II of the First Amended Complaint. Such motion sought the avoidance of purported liens and security interests granted to the Secured Asbestos Claimants named as defendants and the allowance of liquidated settlement amounts with respect to these claims during the ninety days before the Petition Date as voidable preferential transfers. The motion also sought the avoidance of purported liens and security interests granted to the Secured Asbestos Claimants named as defendants and the allowance of liquidated settlement amounts with respect to these claims after the Petition Date, as voidable post-petition transfers.

On June 19, 2006, the Court issued an opinion ("Security Avoidance Opinion") denying the Debtors' summary judgment motion, and granting summary judgment on Counts I and II in favor of all of the defendants in this proceeding. The Bankruptcy Court held that when the claimants' documentation was approved, they did not receive a transfer of a security interest from the Debtors, but rather became beneficiaries of a security interest granted to the Collateral Trustee. An order denying the Debtors' summary judgment motion and granting summary judgment in favor of the defendants was entered by the Court on July 31, 2006.

On November 7, 2006, Plaintiff filed a Motion for Leave to File a Second Amended Complaint, which the Court granted by order on December 1, 2006. By the Second Amended Complaint, the Plaintiff added

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

as defendants all holders of Secured Asbestos Claims who signed tolling agreements with the Plaintiff prior to the filing of the Original Complaint, and who therefore had not previously been named as defendants in this proceeding. The Second Amended Complaint also includes amendments to Counts XI and XVI, wherein the Plaintiff has sought to disallow any claims of defendants Joseph F. Rice, the law firm of Motley Rice LLC, Perry Weitz, and the law firm of Weitz & Luxenberg, P.C. against Plaintiff with respect to the recovery of certain pre-petition transfers pursuant to 11 U.S.C. § 502(d).

On February 1, 2007, the Court issued an opinion ("Plan Opinion") denying confirmation of the Debtor's and the Official Committee of Unsecured Asbestos Claimants Second Modified Joint Plan Of Reorganization, as well as the Debtor's Tenth Modified Plan filed by Creditor Twin City Fire Insurance Company, Creditor First State Insurance Co.

*3 On May 18, 2007, the State Court issued its decision ("Coverage Action Opinion") with respect to Phase I insurance coverage, *Congoleum Corporation v. Ace American Ins. Co., et al.*, Docket No. MID-L-8908-01.On June 7, 2007, the Debtor filed an Omnibus Objection to Settled Asbestos Personal Injury Claims of All Qualified Pre-Petition Settlement Claimants and All Qualified Participating Claimants (the "Omnibus Objection"). The Omnibus Objection reflected the Plan Summary Judgment Opinion and the State Court Coverage Action Decision. However, on July 27, 2007, this Court issued the Omnibus Objection Opinion holding that the proper procedural framework was to file an adversary proceeding.

On August 14, 2007, the Debtor filed a motion to file a Third Amended Complaint, which the Court granted on September 5, 2007. That Complaint added Counts XVII, XVIII, XIV, and XX. On September 17, 2007, First Insurance Company and Creditor First State Insurance Company (as well as numerous other insurers) filed a motion to intervene as to Counts XVII, XVIII, XIV, and XX of the Third Amended Complaint. The Court denied that request on October 9, 2007.

On October 12, 2007, the Plaintiff/Debtors move for summary judgment with respect to Counts XVII,

XVIII, XIV, and XX of their Third Amended Complaint ("Complaint"). The Official Committee of Bondholders joins the Debtor's motion. The Unsecured Claimant's Asbestos Committee ("ACC") [FN2], as well as Certain Defendants [FN3] represented by the law firms of Levitt & Slafkes, P.C., and Stutzman, Bromberg, Esserman & Plifka, P.C., oppose the motion. Certain Asbestos Claimants represented by Cire & Pletcher, LLP, Paul L. Sadler, Esq., the law firm of Richardson, Patrick, Westbrook & Brickman, LLC, the law firm of Campbell, Harrison, Davis, Dove & Steakley, the law firm of Louis H. Watson, Jr., P.A., the Eaves Law Firm, and the law firm of Goldberg, Persky & White, P.C., join in the opposition.

> FN2. Subsequent to the filing of this motion, on December 11, 2007 the Court entered a stipulation between Debtors and the ACC to allow the ACC to appear and be heard in the Omnibus Adversary Action regarding any issue that the ACC may deem relevant to the rights of its general unsecured asbestos claimant constituency.

> FN3. The Asbestos Claimants are the individuals represented by the following law firms (and listed on the referenced exhibits to the Complaint): (I) Belluck & Fox, LLP (Exhibit 3); (ii) Brayton Purcell, LLP (Exhibit 5); (iii) David M. Lipman, L.P. (Exhibit 10); (iv) Heard, Robins, Cloud & Lubel, LLP (Exhibit 12); (v) Hissey, Kientz, & Herron, PLLC (Exhibit 13); (vi) Motley Rice, LLC (Exhibit 19); (vii) SimmonsCooper, LLC (Exhibit 30); (viii) Weitz & Luxenberg, P.C. (Exhibit 32); (ix) Baron & Budd, P.C. (Exhibit 39); (x) Brent Coon & Associates (Exhibit 41); (xi) The David Law Firm (Exhibit 49); (xii) Early, Ludwick, Sweeny & Strauss (Exhibit 51); (xiii) Kazan, McClain, Abrams, Fernandez, Lyons, & Farrise, PC (Exhibit 61); (xiv) The Law Office of G. Patterson Keahey, P.C. (Exhibit 64); (xv) The Law Offices of Peter G. Angelos (Exhibit 69); (xvi) Morris, Sakalarios & Blackwell (Exhibit 76); (xvii) Norris & Phelps, PLLC (Exhibit 77); (xviii) Provost & Umphrey Law Firm, LLP (Exhibit 81); (xix) The Shein Law Center (Exhibit 83); (xx) Thornton & Naumes,

LLP, (Exhibit 86); (xxi) Waters & Kraus, LLP (Exhibit 88); and (xxii) Wilentz, Goldman & Spitzer, PC (Exhibit 90).

**Standard of Review**

Summary judgment should not be lightly granted. The Supreme Court has stated that "[i]t is appropriate only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law."*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. Pro. 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any "genuine issues of material fact." *Id.* Summary judgment should be denied if a reasonable jury, based on that evidence, could return a verdict for the nonmoving party. *In re CitX Corp., Inc.,* 448 F.3d 672, 2006 WL 1453117 (3d Cir. May 26, 2006); *Tran v. Metropolitan Life Ins. Co.,* 408 F.3d 130, 135 (3d Cir.2005). The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted."*Tomalewski v. State Farm Life Ins. Co.,* 494 F.2d 882, 884 (3d Cir.1984).

The moving party bears the burden of proving that there is no issue of material fact, though once shown, that burden switches to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the ultimate burden of persuasion on a dispositive issue at trial, the non-moving party must "go beyond the pleadings" and, by way of affidavits, depositions, answers to interrogatories, or admissions on file "designate specific facts showing that there is a genuine issue for trial."*Celotex* 477 U.S. at 323. The evidence that the non-moving party produces to show the existence of a genuine issue must be of sufficient quantum and quality to allow a rational and fair-minded fact finder to return a verdict in favor of the non-movant, bearing in mind the applicable standard of proof that would apply at trial on the merits. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact exists when a reasonable jury could find for the nonmoving party. *Id.* at 248-49.Facts that could alter the outcome are material and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is

correct. *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (Fed.Cir.1995).

### *Count XVII*

**\*4** Prior to the Debtor's filing Bankruptcy, many of the Pre-Petition Asbestos Claimants (the "Qualified Pre-Petition Settlement Claimants" or "Class 2" Claimants) [FN4] entered into individual settlement agreements with the Debtor to resolve their claims. *See generally* Brennan Dec. Ex. B. While each Class 2 settlement agreement was negotiated individually, a common element was that all or a portion of the settlement amount was to be paid through the receipt of an assignment of insurance proceeds from the Debtor. *Id.* In exchange, the Debtor was given a release of all claims alleged by the Pre-Petition Settlement Claimants, thus discharging Congoleum from any further monetary obligations with respect to such asbestos claims. *Id.* The Debtor now seeks to enforce the Class 2 releases in Count XVII of the Complaint by seeking "to disallow and expunge the claims settled under the pre-petition settlement agreements with prejudice because they are non-recourse to Congoleum and any property of the estate, including Congoleum's insurance policies."*See* Third Amended Complaint, Count XVII.

> **FN4.** This motion pertains to those Pre-petition Asbestos Claimants identified in the fact section.

In its motion for summary judgment, the Debtor argues that it has now, in good faith, fully performed its obligation "to pursue insurance proceeds" on behalf of the Class 2 Claimants by *attempting* to obtain insurance proceeds through litigation in the State Court Coverage Action ("Coverage Action").[FN5] In support of this position, the Debtor points to a March 26, 2003 letter agreement ("Letter Agreement") which, in the Debtor's estimation, speaks to assignment of proceeds rather than receipt of proceeds. *See* Brennan Dec. Ex. B. As an alternative theory, the Debtor contends that although the State Court did not address the issue of coverage for the Qualified Pre-Petition Settlement Claimants (Class 2), the State Court *will likely* determine that such claimants are not entitled to insurance coverage under the Pre-Petition Settlement Agreements. Essentially, the crux of the Debtor's argument is that it has upheld its end of the agreement with each Class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2 Claimant and, therefore, it should be permitted to enforce the releases it received in exchange.

> FN5. The Court notes that the Debtor has acknowledged the fact that it does not intend to pursue an appeal of the State Court Coverage Action.

In response to the Debtor's assertions, those opposing the motion argue that Congoleum has not upheld its end of the bargain. The opposition argues that the Class 2 Claimants gave releases in consideration for insurance *proceeds,* but instead received a *security interest* in insurance claims and proceeds. The opposition notes that in its July 27, 2007 Security Avoidance Opinion, this Court granted the Debtor's motion for summary judgment on Counts V and VI of the Debtor's Second Amended Complaint, holding that "the attempted grant of a security interest was ineffective because the transaction was outside the scope of Article 9 of the UCC and cannot be considered a common law pledge."Security Avoidance Opinion, at p. 12.Thus, because this Court has previously ruled that the security interest purportedly granted to the Class 2 Claimants was not valid, the opposition contends that there was no consideration provided by Congoleum for the releases given by the Class 2 Claimants.

*5 In response to the opposition, the Debtor argues that the consideration for the releases was the assignment of proceeds, or the security interest itself, which was invalidated by this Court's July 27, 2007 Opinion despite Congoleum's "best efforts" to uphold said interest. The Debtor further asserts that these security agreements were based on previous asbestos cases and that the Class 2 Claimants knew full well what they were getting. Lastly, the Debtor argues that it did not breach the security agreements, but rather acted pursuant to its power as debtor-in-possession under section 544 to avoid the security interests purportedly conveyed to the Collateral Trustee on behalf of, or directly to, Class 2 and Class 3 Claimants.

As the Third Circuit noted in *Enterprise Energy Corp. v. United States (In re Columbia Gas Systems):*

> Generally, application of the Bankruptcy Code does not change the attributes of a given legal relationship. *Butner v. United States,* 440 U.S. 48,

59, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, if the settlement agreement should be considered a contract under relevant nonbankruptcy law, it will be a contract in bankruptcy "unless some federal interest requires a different result...."*Id.* at 55.

Although settlement agreements may be judicially approved, they share many characteristics of voluntary contracts and are construed according to traditional precepts of contract construction. cf. *Fox v. United States Dep't of Housing & Urban Dev.,* 680 F.2d 315, 319 (3d Cir.1982) (observing this point for consent decrees). In a nonbankruptcy context, we have treated a settlement agreement as a contract. See *Halderman v. Pennhurst State Sch. & Hosp.,* 901 F.2d 311, 318 (3d Cir.), cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990).

50 F.3d 233, 238 (3d Cir.1995). As further explained in *Avatar Bus. Connection, Inc. v. Uni-Marts, Inc.:*

> [t]he interpretation or construction of a contract is usually a legal question for the court, 'suitable for a decision on a motion for summary judgment.'" *Driscoll Constr. Co. v. State Dep't of Transp.,* 371 N.J.Super. 304, 313, 853 A.2d 270 (App.Div.2004) quoting *Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Illinois,* 162 F.3d 789, 792 (3d Cir.1998). In these instances, the court's "primary objective in interpreting a contract is to derive the objective intent of the parties at the time of the making of the contract."*TIG Ins. Co. v. Combustion Eng'g, Inc. (In re Combustion Eng'g, Inc.),* 366 F.Supp.2d 224, 229 (D.N.J.2005); see also *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980) (in interpreting a contract, a court's paramount consideration is the intent of the parties.)

2005 U.S. Dist. LEXIS 37506, *24-25, 2005 WL 3588482 (D.N.J.2005). Thus, the Court must look to the terms of the settlement agreements, including the objective expectations of the parties, in order to determine whether the essential elements of the settlement agreements were fulfilled.

*6 It has been held that "[t]he pertinent principles of contractual construction are straightforward" and "[t]he court makes the determination whether a contractual term is clear or ambiguous."*Schor v. FMS Financial Corporation,* 357 N.J.Super. 185, 191, 814

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A.2d 1108 (App.Div.2002) (*citing Nester v. O'Donnell*, 301 N.J.Super. 198, 210, 693 A.2d 1214 (App.Div.1997) (*quoting Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F.Supp. 275, 282 (D.N.J.1992)). An ambiguity exists if the "terms of the contract are susceptible to at least two reasonable alternative interpretations."*Schor*, 357 N.J.Super. at 191, 814 A.2d 1108. As a general rule, the "terms of the contract must be given their plain and ordinary meaning."*Id.* (*quoting Kaufman*, 828 F.Supp. at 283) (internal quotations omitted). Accordingly, "where the terms of the contract are clear and unambiguous there is no room for interpretation and construction and the courts must enforce those terms as written."*Id.* (*quoting Karl's Sales and Service, Inc. v. Gimbel Bros., Inc.*, 249 N.J.Super. 487, 493, 592 A.2d 647 (App.Div.1991)) (internal citations omitted). The court will not rewrite a clearly written contract or "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other."*Id.* at 192, 592 A.2d 647. (*citing James v. Federal Ins. Co.*, 5 N.J. 21, 24, 73 A.2d 720 (1950)). However, "[w]here ... a contract is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in order to aid in interpreting the contract."*Avatar Bus. Connection, Inc. v. Uni-Marts, Inc.*, 2005 U.S. Dist. LEXIS 37506, at *36-37, 2005 WL 3588482.

In this case, it is undisputed that the Class 2 Claimants did not receive full payment from insurance proceeds in satisfaction of their claims. Whereas the Debtor maintains that the Class 2 Claimants did in fact receive the benefit of the settlement agreements-a security interest in insurance proceeds-this Court finds that in light of the language of the security agreements themselves, it is not reasonable that the Class 2 Claimants expected to be satisfied in full by the mere granting of a security interest. To the contrary, the evidence demonstrates that the Class 2 Claimants expected to be *fully paid* in consideration of granting Congoleum a release. For example, the March 26, 2003 Letter Agreement referenced by the Debtor states:

> This letter ("Letter Agreement") confirms an agreement between Congoleum Corporation ("Congoluem") and your firm as counsel for the attached list of claimants ("Claimants"). It is the intent of the parties in entering into this Letter Agreement to fully and finally settle all claims alleged by Claimants against Congoleum, for the individual demands set forth on the attached list [which lists a monetary settlement amount relative to a particular claimant], by grant of an assignment of certain insurance proceeds in the total amount of $XX.xx [depending on the individual claimant]. Congoleum shall undertake to prepare documents finalizing such an assignment. The parties further agree that this Letter Agreement is subject to the receipt of a signed release from each Claimant.

> *7 Please countersign in the space provided if this letter accurately reflects the agreement Congoluem and Claimants.

Brennan Dec. Ex. B, Part 1 of 21. While the Debtor is correct in noting that this Letter Agreement discusses assignment of "proceeds," the Court is satisfied that the term "proceeds" means the funds themselves, not some inchoate right to collect the funds. Even the Letter Agreement advanced by the Debtor suggests that these Claimants intended to settle their claims and give a release in exchange for receipt of actual funds.

Moreover, a sample of the Pre-petition Settlement Agreements themselves contains language throughout the document demonstrating similar expectations:

> WHEREAS, in order to avoid further time, expense and uncertainties of litigation, CONGOLEUM CORPORATION and the undersigned PLAINTIFFS desire to enter into a final compromise and settlement....

> THAT the undersigned PLAINTIFFS, **for an in consideration of FORTY-FIVE THOUSAND DOLLARS AND NO/100 ($45,000.00),** pursuant to the assignment of insurance, as set forth in Congoleum's Prepack Settlement Agreement ...

> This agreement is conditioned upon the issuance of the above-described consideration and shall be void **if the consideration is not paid in full ...**

Brennan Dec. Ex. B, Part 1 of 21. In light of the above language, the Court finds that the Class 2

settlement agreements are clear on their face and should not be rewritten to favor one party over the other. Contrary to the Debtor's assertion, the Court finds that the Class 2 Claimants clearly expected to receive payment, in a determined monetary amount, in exchange for providing Congoleum with a release of claims. It would be unreasonable to hold that the Class 2 Claimants expected to be fully compensated by being solely provided with a security interest in those proceeds. At best, the security agreement was a vehicle in which Congoleum attempted to pay a predetermined monetary amount to each Class 2 Claimant and to defer any obligation to pay actual proceeds until the conclusion of the coverage litigation. Moreover, even if the Court had validated the security interest in its July 27, 2007 Opinion, the Class 2 Claimants still have not been paid and would have claims for their alleged injuries. The Court's avoidance of the security agreement is not tantamount to avoiding the Class 2 Claimants' claims altogether.

The Court also notes that the Debtor's argument that the Class 2 Claimants' claims should be expunged because those claims merged into the Claimant Agreement is not persuasive. The Class 2 Claimants were not parties to the Claimant Agreement and did not sign additional releases binding them to that agreement. Rather, the Debtor unilaterally extended the Claimant Agreement to the Class 2 Claimants. Nor are the Class 2 Claimants bound by the decision in the State Court Coverage Action, as they were not parties to that litigation. That decision dealt solely with the Debtor's insurers' obligation to provide coverage related to the Class 3 Claimants, holding that "[t]he defendant insurers ... reasonably declined to provide coverage to Congoleum for the Claimant Agreement [Class 3 Claimants] on multiple grounds...." State Court Coverage Action, Brennan Dec. Ex. M, at pp. 11-12.Clearly, such a holding does not preclude the Class 2 Claimants from asserting claims against Congoleum. In fact, the State Court has yet to address the issue of insurer coverage with respect to the Class 2 Claims.

*8 Lastly, it is important to note that the Debtor has acknowledged the fact that it does not intend to pursue an appeal of the State Court Coverage Action. In the same breath, however, the Debtor argues that it has put forth its "best efforts" by litigating said action. This argument is disingenuous. The Debtor

has decided on its own that pursuing an appeal is futile and that resting on the State Court ruling is somehow equivalent, in and of itself, to "best efforts." *See* Debtor's Corrected Memorandum of Law, at p. 34.Such an interpretation essentially allows the Debtor to unilaterally decide when "enough is enough" and should not be permitted.

In light of the foregoing, the Court finds that the Class 2 settlement agreements must fail for lack of consideration on the part of Congoleum. Thus, the Debtor's motion for summary judgment with respect to Count XVII is denied as to the Debtor and granted in favor of the Defendants.

### *Count XVIII*

It is also undisputed that the Class 3 Claimants did not receive full payment in satisfaction of their claims. Rather, they received a secured interest in insurance proceeds for 75% of their claim, plus an unsecured claim of 25%. *See* Brennan Dec. Ex. I, Claimant Agreement; Exhibit K, Superceding Security Agreement. As with the Class 2 settlement agreements, the Class 3 settlement agreement ("Claimant Agreement") includes language clearly demonstrating that the Class 3 Claimants expected to receive an actual payment amount. Support for this can be found throughout the Claimant Agreement:

> WHEREAS, Congoleum entered into settlement agreements prior to this Claimant Agreement **to resolve certain Asbestos Claims,** under which some or all of the consideration **has yet to be paid** (the "Pre-Existing Settlement Agreements")....

> WHEREAS, Congoleum and Claimants' Counsel, on behalf of Participating Asbestos Claimant (as defined below), wish to resolve and settle, **in the amounts set forth in the compensable disease matrix** attached hereto as Appendix A ("Compensable Disease Matrix"), all of the Asbestos Claims asserted by Asbestos Claimants who qualify as Participating Asbestos Claimants (as defined below) and to secure, in part, payment of the amounts for which such Asbestos Claims are settled by the grant of a security interest in the Collateral (as defined in the Security Agreement); and

> WHEREAS, Congoleum wishes to settle the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Asbestos Claims asserted by Asbestos Claimants **in order to attain certainty as to its asbestos-related liability** to Participating Asbestos Claimants so that it may concentrate its attention on the operation of its business;

WHEREAS, Congoleum **anticipates** that it will commence a reorganization case under chapter 11 of the U.S. Bankruptcy Code ...

Brennan Dec. Ex. I, Claimant Agreement, at p. 2. The Amended Claimant Agreement lends further support, stating in part:

A. The Security Interest contemplated by the Superceding Security Agreement shall secure an amount equal to seventy-five (75%) of the aggregate of all Participating Asbestos Claimants' Settlement Amounts (the "Secured Amount") as provided in the Collateral Trust Agreement and the Superceding Security Agreement. Congoleum's obligation **to pay each Participating Asbestos Claimant its pro rata share of the Secured Amount** shall be referred to herein as the "Secured Asbestos Claims."

**\*9** B. Until all of the Secured Asbestos Claims for all Participating Asbestos Claimants **are paid in full,** Congoleum shall evaluate, bring, prosecute, litigate, defend and settle any claim against its insurers to obtain Insurance Proceeds ...

Brennan Dec. Ex. I, First Amended Claimant Agreement, at p. 4. As with the Class 2 Claimants, the Court finds that the language contained in the Claimant Agreement and the Amended Claimant Agreement clearly shows that the Class 3 Claimants expected to receive payment, in a predetermined monetary amount, in exchange for providing Congoleum with a release of their claims, as well as a 150-day moratorium on litigation. Holding otherwise would allow the Debtor to retain the benefit of its bargain to the detriment of the Class 3 Claimants. Accordingly, the Debtor's motion for summary judgment with respect to Count XVIII is denied as to the Debtor and granted in favor of the Defendants.

### Count XIX

As an alternative theory, the Debtor has also plead in Count XIX "to expunge without prejudice claims settled under the Pre-Petition Settlement Agreements

and the Claimant Agreement because the purpose of those agreements has been frustrated by intervening events."*See* Third Amended Complaint, Count XIX. The Debtor argues that both Congoleum, as well as both the Class 2 and Class 3 Claimants, "entered into the Claimant Agreement, the Security Agreement and the Collateral Trust Agreement ... to move towards a consensual Bankruptcy Code § 524(g) plan of reorganization that would provide for an orderly and efficient means of allowing and paying tens of thousands of asbestos-related claims and provide the business with the substantial benefit of a channeling injunction against future claims."[FN6]*See* Debtor's Corrected Memorandum of Law, at p. 38.The Debtor now argues, however, that subsequent intervening judicial decisions have frustrated the purpose of these agreements, including this Court's application of *In re Combustion Engineering, Inc.,* 391 F.3d 190 (3d Cir.2005) to its Plan Summary Judgment Opinion denying confirmation.

> FN6. As discussed, infra, the Court does not buy into Debtor's argument that the Class 2 Claimants merged into the Claimant Agreement.

It should be noted that many, but not all, Class 3 Claimants do not oppose the relief sought in Count XIX. With respect to the Class 2 Claimants, however, counsel for those parties argue that the primary purpose of the Pre-Petition Settlement Agreements was to avoid the risk, time and expense of a trial and avoid the possibility of a much larger judgment. Accordingly, because the Debtors have managed to avoid trial on said claims, these defendants argue that the primary purpose has not been frustrated.

The Third Circuit recognizes the principle of frustration of purpose. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 102 (3d Cir.1986); *Chase Manhattan Bank v. Iridium Afr. Corp.,* 474 F.Supp.2d 613, 620 (D.De.2007). The Restatement 2d of Contracts, § 265-Discharge by Supervening Frustration-states the following:

**\*10** Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4571086 (Bkrtcy.D.N.J.)

language or the circumstances indicate the contrary.

Restatement (Second) of Contracts, § 265. Comments A and B to § 265 further explain the rationale behind the rule, stating in part:

a. Rationale. This Section deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract....The rule stated in this Section sets out the requirements for the discharge of that party's duty. First, the purpose that is frustrated must have been a **principal purpose** of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, **as both parties understand,** without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made ...

b. Limitations on scope. The rule stated in this Section is subject to limitations similar to those stated in § 261 with respect to impracticability. **It applies only when the frustration is without the fault of the party who seeks to take advantage of the rule, and it does not apply if the language or circumstances indicate the contrary ...**

Accordingly, this Court must again look to the objective intent of the parties to determine the principal purpose of both the Class 2 and Class 3 agreements.

In its submission, it is apparent to the Court that the Debtor is attempting to ascribe its own motives-orderly resolution of asbestos claims and reorganization of the Debtor pursuant to a 524(g) plan-to the Class 2 and Class 3 Claimants. However, as the Court noted in its analysis of Counts XVII and XVIII, the intent of the Class 2 and Class 3 Claimants was to receive payment for their claims in exchange

for granting a release to the Debtor. Nowhere in the documents submitted is it suggested that the Claimants' primary purpose was for Congoleum to reorganize successfully.

With respect to the Class 2 Claimants, the Debtor's argument that this Court's interpretation of *In re Combustion Engineering, Inc.,* 391 F.3d 190 (3d Cir.2005) "frustrates" the principal purpose of the parties is also not persuasive. Nothing in the Court's Plan Opinion held that pre-petition settlements can never be recognized in bankruptcy. Moreover, any argument that the Court should wait until the pending appeal of that opinion is finalized before deciding the Debtor's frustration count is without merit. The Court's Plan Opinion is the law of the case and, therefore, is relevant to the instant motion, despite the fact that it is currently on appeal.

**\*11** In sum, the Court finds that it was neither the Class 2 nor the Class 3 Claimants' primary purpose in entering into their respective settlement agreements to reorganize the operations of the Debtor. As such, the Debtor's motion for summary judgment with respect to Count XIX is denied as to the Debtor and granted in favor of the Defendants.

### Count XX

The Debtor also seeks in Count XX "to equitably disallow claims settled under the pre-petition settlement agreements and the claimant agreement pursuant to 11 U.S.C. § 510(C)."*See* Third Amended Complaint, Count XX. Section 510(c) of the Bankruptcy Code states:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interests to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(C).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Debtor argues that 11 U.S.C. § 510(c) allows for "equitable disallowance" of claims under principles of "equitable subordination." However, the Court notes that these are two distinct concepts and that § 510(c) deals solely with equitable subordination. While equitable disallowance is a means by which a claim may be invalidated, equitable subordination focuses on altering the order of payment of a claim, which in turn presupposes that a valid claim already exists. To allow equitable disallowance under the guise of equitable subordination would be contradictory. Furthermore, the Third Circuit noted the following in *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims, et. al.*:

> In the course of reaching its holding, the district court concluded that § 510(c) is the exclusive remedy available to a bankruptcy court in circumstances like these and that the bankruptcy court was accordingly without authority to fashion a "disallowance" remedy. We do not endorse that conclusion. *In re Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court held that the bankruptcy court exercised its statutory responsibilities as a court of equity and indicated that a purchase of claims against a debtor in bankruptcy by a fiduciary, when consistent with principles of equity, may properly lead either to the "disallowance" of the fiduciary's claim or to the subordination thereof. The rationale of Pepper would suggest that under pre-Code law a bankruptcy court was authorized to disallow a portion of the fiduciary's claim when that would produce an equitable result. **We find it unnecessary here to resolve the issue as to whether equitable "disallowance" remains an available remedy.**The Committee sought subordination under § 510(c), the district court has appropriately remanded this matter to the bankruptcy court for application of § 510(c), and neither side maintains that the authority granted by that section cannot be utilized to fashion a just remedy.

*12 160 F.3d 982, 991 n. 7 (3d Cir.1998). Thus, the Court finds that it is unclear as to whether "equitable disallowance" may be plead under § 510(c). While the Court makes no determination whether equitable disallowance may be plead under § 510(c), it is clear that equitable subordination is a valid cause of action under that section.

In addition to arguing that equitable disallowance may be plead under § 510(c), the Debtor maintains that the elements of a claim for equitable disallowance are the same as a claim for equitable subordination. The Third Circuit has articulated the required elements to sustain a claim for equitable subordination, holding that:

> "[b]efore ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. *U.S. v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (describing existing case law as consistent with the three part test identified in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977)).

*Citicorp Venture Capital*, 160 F.3d at 986-987. With respect to the first prong, the Debtor is correct in that it has been held that creditor misconduct is not a prerequisite for equitable subordination. *See Burden v. United States*, 917 F.2d 115, 120 (3d Cir.1990) ("[I]n determining whether to subordinate, courts must balance the equities of the various claims; and creditor misconduct is not a prerequisite for equitable subordination"). However, the Third Circuit subsequently observed the following:

> This court, in *In re Burden*, 917 F.2d 115, 120 (3d Cir.1990), concluded that "creditor misconduct is not [always] a prerequisite for equitable subordination."*Burden* involved subordination of a tax penalty in the absence of government misconduct. The Supreme Court, in two recent cases regarding the standards for tax penalty subordination, has refused to decide whether misconduct is required under § 510(c), resolving each case on the principle that "categorical" subordination is not permissible. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 229, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996); *Noland*, 517 U.S. at 543. **We need not here resolve the issue of whether misconduct is always a prerequisite to equitable subordination**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

because the bankruptcy court properly found misconduct.

*Citicorp Venture Capital,* 160 F.3d at 987 n. 2.

While it appears that the issue of whether creditor misconduct is always a prerequisite to equitable subordination is unresolved, the Court is satisfied that the focus of a § 510(c) claim is one of equity. In that regard, the Court is persuaded by the analysis in *Waslow v. MNC Commercial Corp. (In re Paolella),* noting that "in applying equitable subordination principles, the courts differentiate between insider and non-insider claimants." 161 B.R. 107, 118 (E.D.Pa.1990), aff 'd without opinion, 37 F.3d 1487 (3d Cir.Pa.1994). The *Waslow* court observed that:

> *13 [e]quitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries. As Judge Easterbrook pointed out in *Kham & Nate's Shoes No. 2, Inc. v. First Bank,* 908 F.2d 1351, 1356 (7th Cir.1990), "cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between."

*Waslow,* 161 B.R. at 119. The court went on to note that "[t]he primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. *Id.* (citing *In re Teltronics Servs., Inc.,* 29 Bankr.139, 169 (Bankr.E.D.N.Y.1983)).

In this case, there is no disputing that the Class 2 and Class 3 Claimants are neither insiders nor fiduciaries of the Debtor. Rather, they are creditors with personal injury claims who entered into substantial arm's length negotiations with the Debtor in an effort to recover monies for their alleged injuries. As such, allowing the Debtor to present a § 510(c) claim under these set of facts would be inconsistent with the equitable principles inherent in the Bankruptcy Code. Therefore, the Debtor's motion for summary judgment with respect to Count XX is denied and summary judgment on that count is granted in favor of the Defendants. Counsel for Debtor should submit a form of order in accordance with this opinion.

Bkrtcy.D.N.J.,2007.
In re Congoleum Corp.
Slip Copy, 2007 WL 4571086 (Bkrtcy.D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Page 1

**C**Dow Chemical Co. v. Schaefer Salt & Chemical
Co.
D.N.J.,1992.
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
The DOW CHEMICAL COMPANY, Plaintiff,
v.
SCHAEFER SALT & CHEMICAL COMPANY
a/k/a Charles Schaefer & Sons, Inc.; Charles F.
Boeddinghaus; Judy L. Boeddinghaus; J.F. Barbour;
and Carole Barbour, Defendants.
Civ. A. No. 91-4027.

July 21, 1992.

Riker, Danzig, Scherer, Hyland & Perretti by Alan E.
Kraus, David P. Arciszewski, Morristown, NJ, for
plaintiff.
Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime
by Anthony J. Pasquariello, Roseland, NJ for
defendant Schaefer Salt & Chemical Co.
Fein Such Kahn & Shepard by James E. Shepard,
Parsippany, NJ for defendants Charles F.
Boeddinghaus, Judy L. Boeddinghaus, J.F. Barbour
and Carole Barbour.

*OPINION*

BISSELL, District Judge.
*1 This matter arises before this Court pursuant to
several motions. First, plaintiff Dow Chemical
Company ("Dow") has moved for summary
judgment against defendant Schaefer Salt &
Chemical Company, a/k/a Charles Schaefer & Sons
("Schaefer"). Defendants Charles F. Boeddinghaus,
Judy Boeddinghaus, J.F. Barbour and Carole Barbour
("the individual defendants") have moved for
summary judgment against the plaintiff Dow, and
Dow has cross-moved against these defendants for
summary judgment.

*I. FACTS AND BACKGROUND*

The facts and background of this matter were
recently considered by this Court in an Opinion dated
July 7, 1992, affirming an order of Magistrate Judge
Haneke. However, this Court will reassert these facts

herein as supplemented by the parties in the various
summary judgment motions.

Plaintiff Dow Chemical Company is a Delaware
corporation with its principal place of business in
Michigan. (Compl., ¶ 1). Defendants Charles F.
Boeddinghaus and Judy Boeddinghaus are husband
and wife and are residents of New Jersey. (*Id.*, ¶¶ 3,
4; First Amended Answer (hereinafter "Answer"), ¶¶
3, 4). Defendants J.F. Barbour and Carole Barbour
are husband and wife and are residents of New
Jersey. (Compl., ¶¶ 5, 6; Answer, ¶¶ 5, 6). Finally,
defendant Schaefer is a New Jersey corporation with
its principal place of business in Elizabeth, New
Jersey. (Compl., ¶ 2; Answer, ¶ 2). This Court's
jurisdiction is premised upon diversity of citizenship
of the parties and an amount in controversy in excess
of $50,000.

Many of the facts underlying this litigation are
undisputed. Dow manufactures a variety of products,
including several calcium chloride products which
are used to melt ice and snow at temperatures below
freezing. (Dow's Br. in Support of Motion for
Summary Judgment against Schaefer (hereinafter
"Dow's Br."), at 4). Dow sells calcium chloride
products to "repackers" and distributors nationwide.
(*Id.*) The repackers purchase the product in bulk
form, and then repack it into bags for sale to its end-
users. (*Id.*) The distributors purchase already
packaged calcium chloride, thus avoiding the cost
and expense in packaging the product. (*Id.*) Not all
repackers are distributors and not all distributors are
repackers. (*Id.*)

Schaefer was both an authorized distributor and a
repacker. (Barbour Dep. at 84:3-7, attached as Exh. A
to Arciszewski Aff. of June 5, 1992 (hereinafter
"Barbour Dep.")). Agreements as to each role were
strictly separate. (*Id.* at 84:8-16). Schaefer's
relationship with Dow as a repacker and distributor
had lasted for more than 15 years. (*Id.* at 29:9-25;
31:12-20).

Dow and Schaefer entered into a sales agreement on
May 14, 1990 in which Schaefer promised to
purchase calcium chloride pellets. (Compl., ¶ 9;
Answer, ¶ 9; *see also* Kenneth Schultz Aff. (Dow's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Account Manager) and Exh. A thereto). The agreement provided for a 500 ton minimum purchase, but the estimated quantity of goods Schaefer intended to purchase was 5,000 tons. (Compl., ¶ 9; Answer, ¶ 9).

*2 The price per unit for the pellets was set forth in a three-phase program, called the Pellet Repacker Program. (Compl., ¶ 10; Answer, ¶ 10). Phase I was "pre-season," covering the period from March 1, 1990 to June 30, 1990, and provided that pellets were $180 per ton with payment due January 1, 1991. (Compl., ¶ 11; Answer, ¶ 11). The pellets were shipped F.O.B. Ludington, Michigan, and Schaefer was required to purchase 35%, or 175 tons, of its minimum during Phase I. (Compl., ¶ 11; Answer, ¶ 11). Phase II, the "early season," was for purchases made between July 1, 1990 and October 31, 1990 at a price of $195 per ton with payment due March 15, 1991. (Compl., ¶ 12; Answer, ¶ 12). Phase III was "in season," and covered purchases between November 1, 1990 and February 28, 1991. (Compl., ¶ 13; Answer, ¶ 13). The price during Phase III was $205 per ton with payment due in 60 days. (Compl., ¶ 13; Answer, ¶ 13).

This sales agreement also contains a provision for "Temporary Voluntary Allowances" on prices:

Temporary voluntary allowances from the then current contract price may be instituted, changed or withdrawn at any time by [Dow] and shall not be deemed a change in price. [Dow] is not required to give Buyer any prior notice of the institution, change or withdrawal of any temporary voluntary allowances.

(Sales Agreement, ¶ 3 of "General Terms and Conditions," Exh. A to Schultz Aff. (hereinafter "Sales Agreement")). This provision "recogniz[es] that Dow from time to time wants to offer discounts or competitive credits to its repackers in order to assist them in meeting particular competitive situations." (Schultz Aff., ¶ 4).

There are several other provisions which are relevant to the motions presently before this Court. Paragraph 2 of the "General Terms and Conditions" is entitled "Change of Price and Terms" and states as follows:

Seller may increase the price, change the

transportation terms, terms of payment or minimum requirement per shipment at any time providing Seller gives Buyer thirty days prior written notice. Buyer's failure to object to the increase or change by written objection received by Seller prior to the effective date of the increase or change shall be considered acceptance. Seller shall advise Buyer within fifteen days from the receipt of timely written objection from Buyer whether Seller will (a) continue to supply on terms and conditions in effect prior to the announced increase or change, (b) enter into negotiations with Buyer or (c) cancel this contract if Seller elects to enter into negotiations under (b) and if within thirty days from the date of Seller's increase or change, agreement has not been reached and Seller has not agreed to continue to supply on the terms and conditions in effect prior to the announced increase or change, then either party may by written notice terminate the negotiations and cancel this contract. Unless otherwise agreed as part of the negotiations, price and other terms applicable during the negotiating period shall be those which Seller implemented by the notice.

*3 (Sales Agreement, "General Terms and Conditions," ¶ 2).

The Sales Agreement provided Dow with various options in the event that Schaefer failed to pay. Dow could defer shipments, alter payment terms or even cancel the contract. (Sales Agreement, "General Terms and Conditions," ¶ 16). If Schaefer's "financial responsibility" was unsatisfactory, Dow could accelerate due dates and demand immediate payment for any outstanding invoices. (Id.) Further, Schaefer agreed "to pay all costs and expenses including reasonable attorney's fees incurred by Seller in the collection of any sum payable." (Id.)

The contract also provided that it was the final complete and exclusive written expression of the contract between the parties. (Id., ¶ 18(F)). Finally, any modification had to be in writing and signed by both parties to be effective. (Id.)

In addition to the Sales Agreement, Dow and Schaefer entered into a distributor agreement on January 1, 1990. A very small portion of Schaefer's debt to Dow arose under the distributorship agreement. This agreement contained all of the provisions described above, except for the Pellet

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Repacker Program. (Schultz Aff., ¶ 5).

Dow alleges that it shipped goods pursuant to the Sales Agreement and distributorship agreement such that by July 1, 1991, Schaefer had unpaid balances in the amount of $690,527.78. (Compl., ¶ 14; see also Max Muller Cert. (Manager of Collections for Dow) and Andre N. Balfour Cert. (Financial Manager for Dow)). Schaefer has admitted this unpaid balance, but denies that such amount is presently due and owing. (Answer, ¶¶ 14, 16). As will be more fully described below, Dow demanded payment on several occasions to no avail.

Defendant Charles F. Boeddinghaus is Executive Vice-President of Schaefer. (C. Boeddinghaus Aff. of June 29, 1992, ¶ 1). Defendant J.K. Barbour is President of Schaefer. (J.K. Barbour Aff. of June 5, 1992, ¶ 1). They are each 50% shareholders in Schaefer. (Id., ¶ 3). On December 27, 1989, these two individuals and their wives signed personal guarantees of the obligations of Schaefer to Dow. (Compl., ¶¶ 25, 31, 37, 43). These guarantees will be more fully described in connection with the individual defendants' motion for summary judgment and Dow's cross-motion.

Dow filed its complaint on September 18, 1991, asserting eight counts. The First through Fourth Counts are directed at Schaefer, asserting breach of contract, wrongful failure to pay upon a book account, wrongful failure to pay the reasonable value of the goods, and account stated, respectively. The Fifth through Eighth Counts seek payment of the personal guarantees executed by each of the four individual defendants, respectively.

Schaefer has asserted affirmative defenses and a counterclaim against Dow based upon the following disputed allegations. In the Sales Agreement, Dow agreed to extend protections to Northeast repackers (of which Schaefer is one) who purchased bulk quantities of chemical from Dow and repacked it for resale in the retail and wholesale markets, by "protecting" up to 35% of the gross volume minimum purchase requirements pursuant to a so-called Phase I/Option A under the 1990-1991 repacking program. (Answer, ¶ 49). Specifically, the Sales Agreement provides, within the Repacker Program, for an "Inventory Protection Program" as follows:

*4 In order to promote adequate inventories for the winter season at repacker facilities, Dow Chemical U.S.A. agrees to the following for those repackers who meet Phase I/Option A purchase requirements [i.e. 175 tons]:

-Calcium chloride pellet inventory remaining at repackers' facility or warehouses as of March 1, 1991, will be "protected" up to the 35% gross volume minimum required under Phase I/Option A in the 1990-1991 repacker program.

-Dow agrees to rebill "protected" volume under Phase I of the 1991-1992 repacker program at 1991-1992 Phase I price, and to reduce minimum purchase requirements by "protected" volume.

-Physical audit of material may be necessary and must be agreed to by the repacker prior to participation in the program.

(Sales Agreement, Repacker Program at 2). Schaefer asserts that, "[e]ssentially, this protection for repackers such as Schaefer required Dow to re-bill Schaefer the following year for product unsold during the prior year and required Dow to reduce the next year's required volume by the amount of unsold inventory during the previous season up to a thirty-five (35%) percent gross volume minimum (the 'Repacker Program')." (Answer, ¶ 49).

Schaefer alleges that the Repacker Program was designed by Dow to alleviate the concern of Northeast repackers that Midwest repackers and foreign importers were flooding the Northeast market at prices with which the Northeast repackers could not compete. (Id., ¶ 50). The foreign importers had lower production, labor and other costs than the Northeast repackers, creating the "Importer Problem." (Id.) The Midwest repackers were geographically closer to Dow's central manufacturing location and therefore engendered lower freight costs, creating the "Midwest Repacker Problem." (Id.) Thus, both foreign and Midwest repackers could sell calcium chloride to a customer or potential customer of Schaefer at prices which were too low for Schaefer and the other Northeast repackers to meet. (Id., ¶ 52). Schaefer asserts that the Repacker Program did not adequately address either the Importer Problem or the Midwest Repacker Problem. (Id., ¶ 51).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Barbour [FN1] attended a repacker meeting convened by Dow in Scottsdale, Arizona in January 1991. (*Id.,* ¶ 53). Barbour informed Dow that the Midwest Repacker Problem and the Importer Problem were continuing, and that he was going to formally raise the issues at the meeting. (*Id.*) Dow's Products/Marketing Manager Doug Brownfield, Sales Representative Ken Schultz, [FN2] and District Manager Peter Cera pleaded with Barbour not to raise the problems, asserting that Dow would "take care of" Schaefer so that Schaefer "would not get hurt by either" problem. (*Id.,* ¶ 54).

Specifically, Dow representatives promised to guarantee Schaefer a minimum 15% return on Schaefer's investment, to be determined on a "cost basis." (*Id.,* ¶ 55). In order to qualify for the 15% minimum guarantee, Schaefer was required to provide a quotation letter from a competent Midwest repacker or an importer, showing substantially lower prices, addressed to Schaefer's customers or potential customers. (*Id.,* ¶ 56). However, Dow did not respond to Schaefer's request for minimum guarantees quickly enough in order to meet such reduced prices, so that Schaefer lost the customers anyway. (*Id.,* ¶ 57). "In addition, Dow would set the reduced prices based on other than Schaefer's actual costs basis, thereby rendering the minimum price guarantee worthless to Schaefer." (*Id.*) The effect, according to Schaefer, "was to induce Schaefer to purchase more chemical product from Dow than Schaefer would have done" absent such a guarantee. (*Id.,* ¶ 58).

*5 Based on these allegations, Schaefer has asserted two affirmative defenses: first, that Dow intentionally or negligently misrepresented that the Repacker Program and/or the minimum guarantee would alleviate any harm to Schaefer resulting from the Midwest Repacker Problem or the Importer Problem, and second, that Dow knew or reasonably should have known that it was not going to abide by the letter and spirit of either the Repacker Program or the minimum guarantee. (*Id.,* ¶¶ 62, 65).[FN3] Furthermore, Schaefer has asserted a counterclaim for damages. Specifically, Schaefer alleges that as a result of Dow's inequitable conduct, it has suffered actual damages in the amount of approximately $700,000, the amount of calcium chloride it ordered from Dow. (*Id.,* ¶ 69). Schaefer has also lost profits

in the approximate amount of $250,000 as a result of Dow's failure to keep its promise of a 15% minimum profit, and $450,000 as a result of a lost business opportunity with AKZO, a Northeast chemical manufacturer. (*Id.,* ¶¶ 70, 71).

There are presently four applications before this Court. First, Dow has moved for summary judgment against Schaefer for the amount due under the contract plus interest, costs, and so forth. Dow also seeks summary judgment dismissing Schaefer's affirmative defenses and counterclaim. In response, Schaefer has opposed the motion on the merits and has submitted a <u>Fed.R.Civ.P. 56(f)</u> application for continued discovery. This application was based in part upon Schaefer's appeal from an order of Magistrate Judge Haneke which had denied Schaefer's motion to compel production of certain documents and its motion for an extension of the discovery deadline. By Opinion and Order dated July 7, 1992, this Court affirmed the decision of the Magistrate Judge, concluding that the present motions should proceed.

Also before this Court are cross-motions for summary judgment on the guarantees signed by the individual defendants.

## II. DISCUSSION

### A. Standards Governing Motions for Summary Judgment

Under <u>Federal Rule of Civil Procedure 56(c)</u>, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also* <u>Chipollini v. Spencer Gifts, Inc.,</u> 814 F.2d 893, 896 (3d Cir.) (*en banc* ), *cert. dismissed,*<u>483 U.S. 1052 (1987).</u> In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. <u>Continental Insurance Co. v. Bodie,</u> 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. *See* <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317 (1986). The Supreme

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Court has stated that in applying the criteria for granting summary judgment,

*6 the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*Id.*)

### B. Analysis of Dow's Motion Against Schaefer

As indicated above, many of the facts are not disputed. Schaefer has not contested the existence of the Sales Agreement or distributorship agreement or their terms, or the fact that it received considerable shipments under these agreements. Rather, Schaefer claims that Dow made an additional promise to the effect that Schaefer would recognize a 15% guaranteed profit on all of the calcium chloride it purchased under these agreements.

In support of its motion, Dow argues that it is entitled to summary judgment under various theories. First, Dow asserts that Schaefer has admitted that it owes the full amount sought. (Dow's Br. at 17-21). Further, Dow argues that it is undisputed that Schaefer has breached its contracts. (*Id.* at 21-22). Dow also argues that the parol evidence rule, the integration clause in the contracts, and the Statute of Frauds bar Schaefer's claim that there is a 15% minimum guarantee. (*Id.* at 22-29). In addition, Dow argues that Schaefer's claims are implausible and too ambiguous to be enforceable. (*Id.* at 29-31). Finally, Dow argues that to the extent Schaefer's counterclaim asserts that Dow tortiously interfered with Schaefer's business relations, the claim fails as a result of a lack of evidence. (*Id.* at 31-33).

Before addressing the merits of the parties' positions, this Court must address Schaefer's application for denial of this motion and an extension of discovery made pursuant to *Fed.R.Civ.P. 56(f)*. In addition, this Court must address the question of the applicable law.

### 1. Schaefer's *Rule 56(f)* Application

Schaefer argues that this Court must deny Dow's motion for summary judgment and reverse Magistrate Judge Haneke's Order of June 16, 1992 in which he denied Schaefer's motion to compel the production of documents and its application for an extension of the discovery deadline in order to continue with depositions. This request is now moot in light of this Court's Opinion and Order of July 7, 1992, affirming the Order of Magistrate Judge Haneke in its entirety.

### 2. Choice of Law

*7 The parties' Sales Agreement provides that it will be governed by Michigan law, including that State's version of the Uniform Commercial Code. The distributorship agreement provides that it will be governed by New Jersey law and that State's version of the Uniform Commercial Code. Dow asserts that there is no conflict between these States on any relevant issue, and Schaefer does not disagree. This Court's research suggests that the parties are correct that there is no conflict, and accordingly, this Court will primarily utilize references to New Jersey's Uniform Commercial Code for simplicity.

### 3. Analysis of Dow's Motion

Dow asserts that it is entitled to summary judgment as to its claim, contained in the First Count of its complaint, that Schaefer has breached the Sales Agreement and the distributorship agreement by virtue of its failure to pay. Attached to the complaint are copies of all of the invoices and a demand letter. (Compl., Exhs. A, B. C). Dow also relies upon Schaefer's pre-litigation and pre-answer negotiating letters, in which Schaefer admitted its obligation. For example, in June 1991, Charles Boeddinghaus wrote to Andre Balfour, Dow's Financial Manager, proposing a future business plan between the parties. (Balfour Cert., ¶ 4 and Exh. B). This proposal specifically recognized "our obligation to eliminate

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

our outstanding balance to you." (Balfour Cert., Exh. B at 4). Dow refused to review the proposal until the debt was paid in full. (Balfour Cert., ¶ 5 and Exh. C). On July 10, 1991, Mr. Boeddinghaus submitted another proposal to Dow which, *inter alia*, addressed paying the outstanding balances. (Balfour Cert., ¶ 6, Exh. D). Dow again rejected the proposal. (Balfour Cert., ¶ 6 and Exh. E). During this process, Balfour spoke with Mr. Boeddinghaus and Mr. Barbour by telephone several times. (Balfour Cert., ¶ 7). Neither ever stated that Schaefer did not owe Dow the money or that Dow owed Schaefer more credits or that Dow breached a promise that Schaefer would recognize a 15% minimum profit. (*Id.*)

Schaefer engaged in further discussions with Max Muller, Dow's Manager of Collections. On August 8, 1991, Mr. Boeddinghaus wrote to Mr. Muller offering to transfer title and return its entire inventory of calcium chloride product, valued at $300,000, in order to reduce its outstanding balance with Dow. (Muller Cert., ¶ 4 and Exh. B). This did not occur, for reasons which are not disclosed. (Muller Cert., ¶ 4). On September 12, 1991, Mr. Boeddinghaus again wrote to Muller, proposing another payment schedule pursuant to a proposed promissory note for the full amount. (*Id.*, ¶ 5 and Exh. C). Dow responded on September 17, 1991 with several changes which it would require, including an irrevocable letter of credit securing the amount owed. (Muller Cert., ¶ 6 and Exh. D). Schaefer never responded in writing to the letter. (Muller Cert., ¶ 6). Throughout this period, Muller spoke with Schaefer representatives by telephone on several occasions. (*Id.*, ¶ 7). Schaefer never disputed the amount due, but rather recognized its obligation. (*Id.*) There was never any mention of a 15% guarantee on all products sold in competition with the Midwest repackers or foreign importers. (*Id.*)

**8** Ken Schultz states that he "never promised Schaefer, orally or in writing, that Dow would guarantee Schaefer a minimum 15 percent gross profit on sales made in competition with Dow's Midwest repackers." (Schultz Aff., ¶ 6). Indeed, "Dow would never make any such guarantee because it does not make good economic sense to guarantee a buyer's resale profit margin at the ultimate expense of Dow's own profit margin." (*Id.*) Peter Cerra, District Sales Manager, similarly asserts that he never promised that Dow would guarantee a 15% profit to

Schaefer. (Cerra Aff., ¶ 3).

As indicated above, Dow filed its complaint on September 18, 1991. On November 7, 1991, Boeddinghaus and Barbour wrote to Dow's President, Frank Popov, seeking his assistance in resolving its difficulties in satisfying its indebtedness to Dow. (Muller Cert., Exh. E). At this point in time, Schaefer had not yet answered the complaint. Its answer with affirmative defenses and a counterclaim based upon the alleged 15% minimum guarantee was not filed until December 17, 1991, at which time Dow first became aware of such claims. (*Id.*, ¶ 7). The amended answer was filed on April 3, 1992.

It is clear from Schaefer's pre-litigation admissions and its answer to the complaint that unless Schaefer can prove that Dow breached the alleged 15% minimum guarantee (thus entitling Schaefer to avoid its debt to Dow), Dow is entitled to summary judgment on its claim for breach of contract.[FN4] Schaefer's answer admits the contracts, the shipments and that it has not paid on the invoices. Accordingly, the question of whether Dow is entitled to summary judgment depends on whether Schaefer's counterclaim and defenses survive summary judgment.

Dow asserts that the principals of Schaefer do not agree on when the alleged 15% minimum guarantee was made. Mr. Boeddinghaus testified that the promise of a 15% gross profit was made in 1988 or 1989, before the Sales Agreement and distributorship agreement were signed (May 14, 1990 and January 1, 1990 respectively). (C. Boeddinghaus Dep. at 60:6-11, attached as Exh. B to Arciszewski Aff. of June 5, 1992 (hereinafter "Boeddinghaus Dep.")). Mr. Barbour, on the other hand, asserts that the promise was made during the winter of 1990-1991, after the agreements were signed. (J.F. Barbour Dep. at 159:4-24).

The obvious place to begin this analysis is with the parol evidence rule, as the Sales Agreement and the distributorship agreement both purport to constitute the entire agreement between the parties. Related to the parol evidence rule is the question of whether this Court will enforce the parties' agreements to the extent such agreements prohibit oral modifications.

The parol evidence rule of the Uniform Commercial

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Code provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

**\*9** (a) by course of dealing or usage of trade (12A:1-205) or by course of performance (12A:2-208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

(Uniform Commercial Code ("UCC") § 2-202, N.J.S.A 12A:2-202). This provision prohibits the use, as a matter of law rather than as an evidentiary matter, of evidence of contradictory terms created prior to or contemporaneous with a written agreement where that agreement is the final expression of the parties. Such a written agreement may, however, be explained or supplemented by course of dealing or course of performance. It may also be supplemented by proof of consistent additional terms, but only where the writing was not intended to be a complete and exclusive statement of the terms of the agreement. *See generally Flavorland Ind., Inc. v. Schnoll Packing Corp., 167 N.J.Super. 376 (Essex County Ct.1979); NAG Enterprises v. All State Industries, 285 N.W.2d 770, 771-72 (Mich.1979).*

The Sales Agreement and distributorship agreements both specifically provide that they are the "final, complete and exclusive written expression of the contract between the parties." (Sales Agreement, "General Terms and Conditions," ¶ 21(G)). Both documents are signed by the parties, and their validity is not challenged herein. Furthermore, such provisions are generally given conclusive effect in determining whether the contract is integrated. *See, e.g., United States v. Clementon Sewerage Authority, 365 F.2d 609, n. 1 (3d Cir.1966).* Therefore, this Court finds that, as a matter of law, these contracts constitute a final expression of the parties' agreement with respect to the repacker relationship and distributorship relationship, respectively.

The next question is whether a 15% minimum guarantee allegedly made prior to these agreements, as asserted by Mr. Boeddinghaus, contradicts the terms of those agreements. Under the terms of this alleged promise, Schaefer would, as a result of credits granted by Dow on the price of calcium chloride, recognize a 15% return on Schaefer's investment in the calcium chloride. (Answer, ¶ 55). In order to get these credits Schaefer would have to show that a competitor was selling to Schaefer's customers and/or potential customers at substantially lower prices than Schaefer could meet. (*Id.*, ¶ 56).

In contrast, the Sales Agreement provides for a particular purchase price depending on the date of purchase under the Pellet Repacker Program. (Sales Agreement, Schedule P-1). It further provides that Dow may increase the price or make any other changes so long as it provides notice and Schaefer does not object. (*Id.* at "General Terms and Conditions," ¶ 2). The Sales Agreement also provides that Dow may, in its sole discretion, provide temporary allowances as to price. (*Id.*, ¶ 3). Finally, it provides for "protection" of a certain amount of inventory as detailed in the "Repacker Inventory Protection Program." (*Id.* at "Pellet Repacker Program"). The distributorship agreement is identical to the Sales Agreement with respect to these provisions, except that it does not contain a Pellet Repacker Program; prices are "those then in effect to Dow distributors" pursuant to Product Riders. (Distributorship Agreement, ¶ 3).

**\*10** This comparison of the alleged 15% minimum guarantee with the provisions in the agreements shows that the alleged guarantee is inconsistent with those provisions. Therefore, to the extent that Schaefer is asserting that there is a pre-agreement promise of a 15% minimum profit, Dow is entitled to summary judgment. Such an inconsistent term is barred by the parol evidence rule. *See, e.g., Fr. Winkler KG v. Stoller, 839 F.2d 1002, 1005-1006 (3d Cir.1988)* (guarantor's allegation of an oral promise not to enforce was an inconsistent term barred by the parol evidence rule).

Schaefer argues that proof of the alleged 15% minimum guarantee is not barred by the parol evidence rule because it was a promise upon which it relied to its detriment, citing *Restatement (Second)*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Page 8

*Contracts, § 139.* By making this argument, Schaefer fails to distinguish the two possible scenarios created by the deposition testimony of its principals: (a) the alleged promise was made *before* the agreements were signed; and (b) the alleged promise was made *after* the agreements were signed. Only the latter situation could, under certain circumstances, be ameliorated by the concept of promissory estoppel relied upon by Schaefer. (*See§ 139,* specifically referring to avoiding the Statute of Frauds).

To the extent that Schaefer is asserting that Dow made the promise after the Sales and distributorship agreements were signed, the issue is whether an alleged oral modification (*i.e.* the 15% guarantee) is effective. Both agreements specifically require any modifications to be in writing. Section 2-209(2) of the U.C.C. addresses such provisions:

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(U.C.C. § 2-209(2); N.J.S.A. 12A:2-209(a)). The comment to the Code provides that "[s]ubsection (2) permits the parties in effect to make their own Statute of Frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing." (Comment 3).

In the present matter, both Dow and Schaefer are "merchants" within the definition of that term. Section 2-104 provides that a merchant "means a person who deals in goods of the kind ... involved in the transaction." (U.C.C. § 2-104(l); N.J.S.A. 12A:2-104(1)). Therefore, it is not necessary that the provision requiring written modifications be separately signed to be enforceable.

It is undisputed that the alleged 15% minimum guarantee was never put into writing. As a matter of law, then, the alleged attempt at modification of the parties' agreements to provide for a 15% minimum guarantee is not valid. *See, e.g., Green Construction Co. v. First Indemnity of America Insurance,* 735 F.Supp. 1254, 1261 (D.N.J.1990), aff'd,935 F.2d 1281 (3d Cir.1991). This is particularly true in light

of the provision in § 2-209(3) that the requirements of the Statute of Frauds, § 2-201, must also be met if the agreement as modified would be within it. The Statute of Frauds would clearly apply to the agreements herein as modified by virtue of the fact that they are for the sale of goods in excess of $500. (U.C.C. § 2-201(1); N.J.S.A. 12A:2-201(1)).[FN5]

**\*11** Schaefer further argues that Dow should be estopped from denying the validity of the alleged 15% minimum guarantee because of Schaefer's reliance on such a promise. *Section 139* of the *Restatement (Second) Contracts* provides:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

Schaefer argues that it relied upon Dow's promise of a 15% minimum profit, and that its reliance was reasonable especially given its importance to Dow in the Northeast region. (Schaefer's Br. in Opp. at 12). This Court disagrees. Defendant J.K. Barbour described the alleged 15% minimum guarantee and his reliance thereon. In contrast, however, he admitted that under the contracts, Dow had complete

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

discretion whether or not to give Schaefer credits:

Q: As I understand your testimony and your contention, sometime early in the winter of 1990, Mr. Schultz [of Dow] initiated discussions with you that in situations where Dow decided to give you a competitive allowance that the price that they would consider for such competitive allowance would be one that would get you a 15 per cent return over what they regarded as appropriate costs?

A: Yes.

Q: Is that a fair summary?

A: That's a fair summary of what this initial proposal was to us.

Q: And as those discussions went on in the winter of 1990, it got a little further refined and you and Dow disagreed about what were an appropriate level of costs to measure against, right?

A: Yes. In effect I was setting the stage for a postseason negotiation for additional credits, yes.

Q: So the net result of these discussions is that Dow has, as you claim, promised that in situations where it decided to give credits, they will be of a certain minimum level?

A: Yes.

Q: But Dow has not changed the underlying principle that Dow has the discretion to decide whether it's going to give credits at all. Isn't that right?

A: The problem with your question is Dow prior to me making substantial additional purchases for that season made it clear to me that, despite them being able to come up with a uniform across the nation type of an answer to the Midwest repacker problem, would in fact make sure that I didn't lose business and/or profit to the Midwest repackers this particular season. Based on that, I made substantial purchases which I told them I would not make if I wasn't given basically their assurances as they had in the past that I would be protected. In the past, the solution always would be I would make demands at the end of the season and pretty much get what I had wanted.

*12 Q: But nobody committed to you that they would change the underlying principle of competitive credits that Dow had the election as to whether or not to give, did they?

A: I'm not sure I understand that question.

Q: We've established, haven't we, that the written agreements, the written repacker sales contract and the written distributorship agreement, reserve to Dow the discretion to decide whether to give a credit and how much to give, right?

A: That's correct.

Q: You agree with that?

A: Yes.

(Barbour Dep. at 159:4-24; 161:7-162:20, attached as Exh. A to Pasquariello [FN6] Aff. of June 29, 1992 (hereinafter "Barbour Dep. II)).

This deposition testimony makes it clear that any alleged reliance upon Dow's assertion that Schaefer would be "protected" by a 15% minimum guarantee was unreasonable. Barbour specifically acknowledges that whether to give Schaefer credits was within Dow's discretion, and that its assurances were not meant to eliminate that discretion. Reliance upon an alleged promise of protection at the same time that the promisor admittedly has discretion on the issue is unreasonable as a matter of law.

Another factor to consider is "the definite and substantial character of the action or forbearance in relation to the remedy sought." Schaefer seeks to avoid its obligation to Dow and collect damages for its alleged injuries. The alleged action taken in reliance was the purchase of calcium chloride pursuant to the terms of the Sales Agreement and the distributorship agreement. However, Schaefer has not provided any "substantial" or "definite" evidence concerning this alleged reliance other than the conclusory allegations of its principals. For example, Schaefer could have shown that, compared to prior years, it purchased significantly more calcium chloride due to the alleged promise. Since no such evidence was presented, however, it is evident that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Page 10

avoidance of the alleged promise is not necessary to avoid injustice.

Another factor which weighs against enforcement of the alleged 15% minimum profit guarantee is "the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence." The alleged action taken in reliance upon the alleged 15% profit guarantee is the purchase of calcium chloride, which is also consistent with the parties' practice over more than 15 years and is consistent with fulfilling the obligations under the Sales and distributorship agreements. Thus, it is inconclusive as to the making and terms of the alleged promise. Furthermore, the making and terms of the 15% minimum profit guarantee are not supported by "clear and convincing evidence" elsewhere in the record. Of course, a party does not need to meet that standard at the summary judgment stage; in the face of categorical denials of such a promise, however, it is incumbent upon the party asserting the promise to come forward with more than conclusory allegations. This Court determines that it is not necessary to enforce the alleged 15% minimum guarantee in order to avoid injustice, and therefore Schaefer's claim for promissory estoppel fails.

*13 Dow's motion for summary judgment as to its claim of breach of contract is therefore granted. In light of this determination, it is unnecessary to consider at length the Second through Fourth Counts of Dow's complaint as they simply assert alternative theories supporting the same relief. Summary judgment is granted as to the Second Count (book account) and the Fourth Count (account stated) for the reasons set forth above. Plaintiff's *quantum meruit* claim (Third Count) is dismissed as moot. Summary judgment is also granted as to Schaefer's defenses and counterclaims. Those defenses and counterclaims are predicated upon allegations of "inequitable conduct" and "unclean hands." (*See, e.g.,* Second Affirmative Defense, ¶¶ 66, 67). These equitable defenses are inapplicable in the case at bar, an action at law for the collection of a debt. Pursuant to the terms of the contracts, Dow is entitled to costs and expenses including attorneys' fees. Accordingly, Dow shall submit a detailed application for such costs and expenses within 15 days of the date of this Opinion and accompanying Order. Schaefer shall

have 15 days from the date of such application in which to challenge the reasonableness of those fees and expenses. Upon receipt of Schaefer's opposition, this Court will consider the application without oral argument and without any further reply papers.

*C. The Motions as to the Guarantees*

The basic contours of the facts concerning the personal guarantees executed by the individual defendants are essentially undisputed, with some notable exceptions. Prior to December 1989, Schaefer had a $1,000,000 line of credit with Dow. As of November 1989, Schaefer owed Dow approximately $637,000 under a roll-over invoice due for payment on January 1, 1990. This invoice meant that there was only approximately $363,000 remaining in its credit, an amount insufficient to meet Schaefer's orders for the 1989-1990 season.

Since the available credit was insufficient, Dow offered to increase Schaefer's credit but only if the principals would personally guarantee Schaefer's obligations. On December 22, 1989, Andre Balfour wrote to Barbour and to Boeddinghaus (separately, but with identical terms) enclosing the guarantee forms, one for each married couple. (Individual Defs'. Br., Exhs. A, B). Balfour stated that "[t]he guarantee is in consideration of a $1,500,000 line of credit." (*Id.*) Further, when completing the form, Barbour and Boeddinghaus should note that the dollar amount being guaranteed should be $500,000, that their spouses "should" sign the guarantee form, and that it should be dated and notarized. (*Id.*) Barbour and Boeddinghaus agreed, and on December 27, 1989 they each signed a personal guarantee. (Individual Defs' Br., Exhs. C, D). They each also had their wives sign the guarantee.

The individual defendants make the following allegations in support of their motion for summary judgment. Schaefer had a $1,000,000 credit limit with Dow prior to November 1989, which was not secured by any personal guarantees. (J. Barbour Aff. of June 5, 1992, ¶ 9).[FN2] Given Schaefer's outstanding debt to Dow at that time, there was only $362,860 in available credit. (*Id.*, ¶ 9). Barbour negotiated with Dow, and acquired a foreign competition price protection credit of $67,821.60 against the amount due under the invoices. (*Id.*, ¶ 11). Barbour personally guaranteed this amount,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

Page 11

which expired upon payment of the balance. (*Id.*) The invoice in question is not a part of this litigation. (*Id.*)

**\*14** Because of the limited available credit, Schaefer had not made any substantial orders for the 1989-1990 season. (*Id.*, ¶ 12). Ken Schultz approached Barbour, and as an inducement to purchase, advised that he would be able to get pricing support from Dow in connection with price concessions on the initial order and competition it was experiencing. (*Id.*) Barbour also discussed the credit limit situation with Schultz, and after discussions with Dow's credit department, Schultz informed Barbour that it could be increased with personal guarantees. (*Id.*, ¶ 13).

Barbour's understanding of the content of the guarantee was that doing so would increase Schaefer's credit limit from $1,000,000 to $1,500,000. (*Id.*, ¶ 14). The personal guarantees would only be for $500,000, "and only to the extent and for the period of time that the credit actually extended by Dow to Schaefer exceeded $1,000,000." (*Id.*, ¶ 15). Barbour further states that Schaefer did not need to purchase any calcium chloride from Dow because it had a left-over inventory from the previous season, and it could obtain calcium chloride from other sources. (*Id.*)

Barbour describes the guarantee as follows:

It was further understood and agreed that any time Schaefer's balance due and owing to Dow fell below $1,000,000.00 the requested personal guaranties would not be in effect. However, if Schaefer again placed an order with Dow which put the amount outstanding over $1,000,000.00 the guaranties would again become effective as to that amount up to an additional $500,000.00 over the original $1,000,000.00 line of credit.

(*Id.*, ¶ 16). When Barbour received the guarantee forms, he "had certain questions concerning whether or not it correctly embodied the agreement I had reached with Dow through Ken Schultz in our oral discussions." (*Id.*, ¶ 19). He therefore called Andre Balfour, at which time Mr. Balfour confirmed the content of the personal guarantee. (*Id.*, ¶ 20). As a result of this conversation, Barbour and Boeddinghaus were satisfied that the guarantees complied with their understanding, and accordingly, they signed them. (*Id.*, ¶ 21).

Charles Boeddinghaus has substantially agreed with Barbour's testimony, asserting that the guarantee was meant to "guaranty only an amount up to a total of $500,000.00 and only to the extent and for the period of time that the credit actually extended by Dow to Schaefer exceeded $1,000,000.00." (C. Boeddinghaus Aff. of June 5, 1992, ¶ 8). Boeddinghaus also spoke with Balfour concerning the guarantees, in which Balfour confirmed Boeddinghaus' understanding of the guarantees. (*Id.*, ¶ 10).

Judy Boeddinghaus and Carole Barbour do not own an interest in Schaefer in any capacity. (C. Boeddinghaus Aff., ¶ 14; J. Barbour Aff., ¶ 22; J. Boeddinghaus Aff., ¶ 6; C. Barbour Aff., ¶ 6). They each signed the personal guarantees at the request of their husbands, without knowing what it was. (C. Barbour Aff., ¶ 7; J. Boeddinghaus Aff., ¶ 7).

**\*15** These individual defendants seek summary judgment on various grounds. First, Carole Barbour and Judy Boeddinghaus assert that the guarantees fail because there is a lack of consideration and the guarantees constitute mere offers of guarantee. (Individual Defs.' Br. at 8-16). Next, Carole Barbour and Judy Boeddinghaus argue that Dow's requirement that they sign the guarantees constitutes a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691*et seq.*(*Id.* at 17-22). Finally, all four defendants argue that the personal guarantees are not valid in the present action because Dow is seeking repayment of an amount less than Schaefer's original $1,000,000 line of credit. (*Id.* at 23-27).

Dow has opposed the motion and has cross-moved for summary judgment, asserting that the personal guarantees are valid as written and that any alleged oral understandings to the contrary are barred by the parol evidence rule.

Before reaching the merits of these motions, this Court recognizes the individual defendants' position that Dow's cross-motion is untimely because of Magistrate Judge Haneke's scheduling order asserting that all dispositive motions must be filed by June 7, 1992. (*See* Individual Defs'. Reply Br. at 2). The cross-motion was filed on June 29, 1992. In this Court's view, the cross-motion is not improper

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

despite Magistrate Judge Haneke's order. First, there was no reason for Dow to seek summary judgment on the guarantees unless and until it succeeded on its claims against Schaefer, since the guarantees do not take effect until Schaefer is liable. Second, the cross-motion was timely filed in response to the individual defendants' motion for summary judgment. Third, this Court's view is that wherever possible, the merits of an action should be reached. Even if Dow could have filed this motion pursuant to Magistrate Judge Haneke's order rather than as a cross-motion, it cannot be said that the individual defendants have in any way been prejudiced by the cross-motion. They have had an opportunity to submit papers in opposition and an opportunity for oral argument. This Court will consider the cross-motion.

The first issue raised by the individual defendants is an asserted lack of consideration, based on Carole Barbour's and Judy Boeddinghaus' statements that they never received any benefit or inducement to execute the guarantees. (C. Barbour Aff., ¶ 5; J. Boeddinghaus Aff., ¶ 5). This argument is without merit. The question of consideration is not whether the guarantors have received any, but whether the debtor whose liability is being guaranteed has received consideration. *See, e.g., Public Loan Co. v. Federal Deposit Insurance Co., 803 F.2d 82, 85-86 (3d Cir.1986)* (review of whether the debtor actually received the loan which was guaranteed); *Conoco Inc. v. Inman Oil Co., Inc., 774 F.2d 895, 909 (8th Cir.1985)* (in response to the guarantor's allegation that he received no consideration for his guarantee, the Court asserted that the contention was without merit by virtue of the fact that the debtor received a line of credit; *Kelly-Springfield Tire Co. v. Action Automotive, 648 F.Supp. 731, 734 (N.D.Ill.1986)* ("It is hornbook law that '[a] guaranty of the payment of past and future indebtedness is supported [by consideration] by an agreement to extend future credit or by the making of a loan to the debtor in addition to an existing obligation'") (citing 38 Am.Jur.2d Guaranty, § 43 (1968)); *cf. Continental Bank of Pa. v. Barclay Riding Academy, 93 N.J. 153, 171 (1983)*, *cert. denied sub. nom.*, *Barclay Equestrian Center, Inc. v. Continental Bank of Pa., 464 U.S. 994 (1983)* (holding that a third party can issue an enforceable mortgage to secure the obligation of another, derived from the principle that one may enter into a binding contract for the benefit of another; so long as the contract is bargained for by the promisee, it is immaterial that the consideration

runs to a designated third-party beneficiary) (other citations omitted). There is no dispute, in the present matter, that Dow made additional substantial sales to Schaefer after the guarantees were signed. Accordingly, there is no failure of consideration for the guarantees.

**\*16** Carole Barbour and Judy Boeddinghaus next argue that the guarantees constitute mere unaccepted offers, not guarantees, relying on *Union National Bank in Minot v. Schimke, 210 N.W.2d 176 (N.D.1973)*. In *Schimke*, Norbert Schimke signed two promissory notes in favor of the plaintiff on September 18, 1970 and on March 10, 1971. (*Id.* at 177). On May 28, 1971, the bank prepared a guaranty contract and gave it to Norbert Schimke for his signature and that of his wife, Fern. (*Id.*) The custom in the Schimke household was that Norbert handled business matters and Fern handled household matters; in accordance therewith, Fern signed the guaranty without reading it or discussing it. (*Id.*) No one with the plaintiff bank ever spoke with Fern regarding the guaranty or why her signature was necessary. (*Id.*)

Norbert Schimke died, and the bank filed a claim against his estate. (*Id.* at 178). When it was not paid, the bank brought suit against Fern Schimke on the guarantee. (*Id.*) The Supreme Court of North Dakota considered the trial court's dismissal for lack of consideration on the guarantee, and particularly noted that North Dakota has a statutory provision to the effect that an offer to guarantee is not binding until notice of its acceptance is communicated. (*Id.*) In the matter before the Court, the bank never communicated with Fern Schimke and therefore the guaranty agreement was never consummated, but rather only an unaccepted offer of guaranty was made. (*Id.* at 179).

The defendants' reliance upon the decision in *Schimke* is misplaced for several reasons. First, that decision interpreted North Dakota law, including a particular statutory provision, which is not relevant to this action. Second, the guarantee in that action did not have adequate consideration as the underlying loans were made prior to the execution of the guarantee. In the present matter, there is consideration for the guarantees.

Finally, the guarantee contract in the *Schimke* action

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 672289 (D.N.J.)

is different in at least one significant respect from the guarantees executed herein. The guarantees in the present matter specifically provide that "[t]he Guarantor waives all notices, including but not limited to notice of acceptance." (Barbour Guarantee, Exh. C to J. Barbour Aff.; Boeddinghaus Guarantee, Exh. B to C. Boeddinghaus Aff. (collectively referred to herein as "guarantee")). This waiver of notice is unambiguous as a matter of law. *See* Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J.Super. 11, 27 (App.Div.1985) (construction of a written agreement is a matter of law for the court unless it is uncertain or ambiguous).

Thus, both Carole Barbour and Judy Boeddinghaus waived any requirement of notice of acceptance of the guarantee. The fact that neither read the documents or questioned the content thereof is simply not a defense.

The next question is whether Dow's requirement that Carole Barbour and Judy Boeddinghaus sign the guarantees constitutes a violation of the Equal Credit Opportunity Act ("ECOA"). The defendants argue that it is unlawful under the ECOA for any creditor to discriminate against an applicant on the basis of, *inter alia,* marital status. (Individual Defs'. Br. at 17). They argue that Dow is subject to this statute, and that it discriminated by virtue of the requirement that the spouses sign the guarantees. (*Id.* at 17-22). They therefore assert that the guarantees are void and unenforceable.

**\*17** This argument is without merit. ECOA provides specific remedies to civil litigants asserting ECOA violations. Section 1691e(a) provides that any creditor who fails to comply with ECOA is liable to the aggrieved applicant for actual damages, and (b) provides that such creditor may be liable for punitive damages under certain circumstances and as limited by that section. (15 U.S.C. § 1691e(a), (b)). Subsection (c) further provides that the aggrieved applicant may seek equitable and declaratory relief "as is necessary to enforce the requirements imposed under this title." (15 U.S.C. § 1691e(c)). Finally, Subsection (d) provides that the aggrieved applicant who is successful is entitled to costs and attorney's fees. (15 U.S.C. § 1691e(d)). The statute does not, however, provide that transactions completed in violation of the ECOA are void or unenforceable.

At least one court faced with the issue concluded that there is no authority for the contention that ECOA provides a defense to non-payment of a promissory note. *United States v. Joseph Hirsch Sportswear Co., Inc.,* 1989 WL 20604 (E.D.N.Y.1989), aff'd,923 F.2d 842 (2d Cir.1990). Since ECOA provides on its face only for a civil action for actual damages, it may only be employed as a counterclaim, not a defense. (*Id.*) This Court agrees with this assessment of ECOA. Since the statute provides a detailed description of relief which is available, this Court will not impute an additional form of relief by holding that ECOA avoids the liability created in violation thereof, assuming such a violation exists.[FN8]

There is an additional reason why ECOA does not provide relief to Carole Barbour and Judy Boeddinghaus. The civil action provisions of the statute provide that "an aggrieved applicant" may seek damages. 15 U.S.C. § 1691e(a). Section 1691e(b) defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). The regulations provide that for purposes of Reg. § 202.7(d) (quoted above at n. 8), the term "applicant" includes "guarantors, sureties, endorsers and similar parties." 12 C.F.R. § 202.2(e). Under these principles, both Charles Boeddinghaus and James Barbour are "applicants" within the statute who may seek relief for violations thereof. However, their wives are not "aggrieved applicants," only spouses of applicants. Therefore, they do not have standing to assert an ECOA claim. *See, e.g., Morse v. Mutual Federal S. & L. Ass'n of Whitman,* 536 F.Supp. 1271, 1278 (D.Mass.1982) (determining that the guarantor's wife is not an "aggrieved applicant" with standing to bring an action under ECOA; "[i]f requiring Cynthia's signature was improper ... the affront was not to her, but to Allen, who was unable to secure 'credit' without the signature of his wife.") Since they do not have standing to bring a claim under ECOA, Carole Barbour and Judy Boeddinghaus are also prohibited from asserting it as a defense.

**\*18** The next issue concerns the scope of the guarantee. As indicated above, the individual defendants argue that the guarantee was meant only to cover the extent to which Schaefer's liability

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.