UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .
                            .    824 North Market Street
                            .    Wilmington, DE  19801
            Debtors.   .
                            .    September 2, 2008
. . . . . . . . . . . . ..       9:12 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  JANET S. BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Beveridge & Diamond, P.C.
                          By:  PAMELA D. MARKS, ESQ.
                          Suite 2210
                          201 North Charles Street
                          Baltimore, MD  21201-4150


Audio Operator:           Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311    Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Debtors: | Pachulski, Stang, Ziehl, Young, Jones & Weintraub<br>By:  KATHLEEN P. MAKOWSKI, ESQ.<br>919 North Market Street, 17th Fl.<br>Wilmington, DE  19899-8705 |
| For Mian Realty: | Cole, Schotz, Meisel, Forman & Leonard, P.A.<br>By:  PATRICK J. REILLEY, ESQ.<br>1000 N. West Street, Suite 1200<br>Wilmington, DE  19801 |
| For Mian Realty: | Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C.<br>By:  HENRY M. KARWOWSKI, ESQ.<br>347 Mt. Pleasant Avenue<br>Suite 300<br>West Orange, NJ  07052 |
| For Committee of Asbestos Personal Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For the PD Committee: | Ferry, Joseph & Pearce, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For the Debtors: | W.R. Grace & Co.<br>By:  LYDIA B. DUFF, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044<br>(Telephonic appearance) |
| For State of Montana/ Canada: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS A. MONACO, JR., ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE  19801<br>(Telephonic appearance) |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806<br>(Telephonic appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Ad Hoc Committee<br>of Equity Security Holders: | Dewey & LeBoeuf LLP<br>By:  JENNIFER WHITENER, ESQ.<br>1301 Avenue of the Americas<br>New York, NY  10019-6092<br>(Telephonic appearance) |
| For Travelers: | Simpson Thacher & Bartlett LLP<br>By:  SAMUEL RUBIN, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017<br>(Telephonic appearance) |
| For Dune Capital Management: | Dune Capital Management<br>By:  LAURA HAMMOND<br>(Telephonic appearance) |
| For Official Committee of<br>Asbestos Personal Injury<br>Claimants: | Anderson Kill & Olick, P.C.<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1182<br>(Telephonic appearance) |
| For Scott's: | Vorys, Sater, Seymour and<br>  Pease LLP<br>By:  ROBERT J. SIDMAN, ESQ.<br>52 East Gay Street<br>Columbus, OH  42316<br>(Telephonic appearance) |
| For Davit T. Austern: | Orrick Herrington & Sutcliffe<br>By:  DEBRA L. FELDER, ESQ.<br>1152 15th Street, N.W.<br>Washington, D.C.  20005-1706<br>(Telephonic appearance) |
| For Ford Marrin: | Ford Marrin Esposito Witmeyer &<br>  Gleser, LLP<br>By:  SHAYNE W. SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005-1875<br>(Telephonic appearance) |

APPEARANCES (CONT'D):

For State of Montana:          Christensen, Moore, Cockrell,
                                  Cummings & Axelberg, P.C.
                               By:  DALE R. COCKRELL, ESQ.
                               Two Medicine Building
                               160 Heritage Way, Suite 104
                               Kalispell, MT  59904
                               (Telephonic appearance)

For Official Committee         Stroock & Stroock & Lavan LLP
of Unsecured Creditors:        By:  ARLENE G. KRIEGER, ESQ.
                               180 Maiden Lane
                               New York, NY  10038-4982
                               (Telephonic appearance)

For W.R. Grace:                Kirkland & Ellis LLP
                               By:  THEODORE FREEDMAN, ESQ.
                               Citigroup Center
                               153 East 53rd Street
                               New York, NY  10022-4675
                               (Telephonic appearance)

1          THE COURT:  All right.  This is the matter of W.R.

2 Grace, 01-1139.  There is a specially set hearing at nine

3 o'clock on the motion of Mian Realty for entry of an order

4 declaring that the automatic stay does not apply to a filing of

5 its proposed third party complaint against the debtor

6 concerning an environmental issue.  I think the list I have at

7 the moment is the accurate one for phone participation for this

8 hearing.  That would be John Phillips, Jennifer Whitener, Janet

9 Baer, Laura Hammond, Robert Horkovich, Robert Sidman, Debra

10 Felder, Shayne Spencer, Dale Cockrell, Arlene Krieger, Theodore

11 Freedman.  That's all.  And I'll take -- I can't type today.

12 I'm sorry.  I'll take entries in Court.  Thank you.

13          MS. BAER:  Good morning, Your Honor.  Janet Baer on

14 behalf of the debtor.

15          MS. MAKOWSKI:  Good morning, Your Honor.  Kathleen

16 Makowski from Pachulski, Stang, on behalf of the debtors.

17          MS. MARKS:  Good morning, Your Honor.  Pamela Marks

18 from the law firm of Beveridge & Diamond on behalf of the

19 debtors.

20          MR. REILLEY:  Good morning, Your Honor.  Patrick

21 Reilley from Cole Schotz on behalf of Mian Realty.

22          MR. KARWOWSKI:  Good morning, Your Honor.  Henry

23 Karwowski of Trenk DiPasquale, appearing on behalf of Mian

24 Realty.

25          THE COURT:  Sir, I'm sorry, but I can't hear you.

1         MR. KARWOWSKI:  I apologize.  Your Honor.  Henry

2   Karwowski, K-a-r-w-o-w-s-k-i, of Trenk DiPasquale, appearing on

3   behalf of Mian Realty, LLC.

4         THE COURT:  Thank you.

5         MR. KARWOWSKI:  Thank you.

6         MR. TACCONELLI:  Good morning, Your Honor.  Theodore

7   Tacconelli for the property damage committee.

8         MR. HURFORD:  Good morning.  Mark Hurford, Campbell &

9   Levine, for the ACC.

10         THE COURT:  Who is arguing on behalf of Mian Realty?

11   Mr. Karwowski?  Yes, sir.  Good morning.

12         MR. KARWOWSKI:  Good morning, Your Honor.  Just

13   reviewing procedurally, Mian Realty filed a motion back in

14   April.  The debtors filed opposition in May, and with their

15   opposition they filed a request to conduct supplementary

16   discovery.  The parties consensually agreed to exchange

17   discovery.  You may recall that the parties were back here on

18   July 21st, at which point the Court scheduled a briefing

19   schedule.  And subsequent to July 21, the parties filed --

20   well, the debtors filed a supplemental response and Mian Realty

21   filed a reply.  And it's my fault, I think there was some --

22   I'm not a regular practitioner in Delaware, Your Honor, so I

23   was not aware that replies are limited to five pages, so maybe

24   in my argument today going outside the scope of what's in our

25   papers because we just couldn't address all the points in five

1 pages.

2          THE COURT:  All right.  It's significantly longer

3 than five pages.  It's more like half a ream of paper with all

4 of the attachments.  But, okay.

5          MR. KARWOWSKI:  Okay.  Thank you, Your Honor.  The

6 motion is, as you mentioned, for an order declaring that the

7 automatic stay does not apply to this proposed third party

8 complaint.  Essentially the issue comes down to when did the

9 claims accrue?  When did Mian's claims accrue?  Mian is arguing

10 that _Frenville_ applies.  The debtors argue essentially that a

11 legal relationship test applies.  That's essentially what the

12 conflict comes down to.

13          There are a number of reasons as to why _Frenville_

14 should apply.  One is it was a case addressing a similar fact

15 situation, which was whether or not the automatic stay applied,

16 whether -- as opposed to the cases cited by the debtors.  Most

17 refer to whether claims were discharged.  So, factually which

18 is more apposite?  Is it _Frenville_ or the relationship cases?

19 It's _Frenville_.  And as we know, _Frenville_ mentions that -- or

20 holds that a claim does not accrue until there's a right to

21 payment.

22          The second reason why _Frenville_ should apply is it

23 addressed contractual contingent claims, meaning where the

24 parties are aware, upon entering their relationship, the

25 liability relies upon the occurrence or triggering of some

1   event.  It involves a bargained for contractual relationship,

2   such as a guarantee or surety, where liability again depends on

3   some identifiable future event.  Here we're not talking about

4   contractual liability, we're talking about environmental tort.

5   So, the concepts regarding contractual liability would not

6   apply here.  So, in looking in <u>Frenville</u>, is there any mention

7   of the expression legal relationship?  There is not.  There is

8   only right to payment.  That is a governed standard.  And in

9   fact, subsequent to <u>Frenville</u>, Courts applying <u>Frenville</u> have

10  required a right to payment.  Those cases, or examples of those

11  cases are the <u>Allegheny</u> case cited in our papers, also the

12  <u>Hillsborough</u> (phonetic) case.

13          The next question, why is the mere existence of a

14  legal relationship insufficient for determining whether or not

15  there's a claim?  One is, again, it's inconsistent with the

16  <u>Frenville</u> standard.  There must be a right to payment.  Second

17  is it would lead to absurd results.  In the <u>Schweitzer</u> case

18  cited by the debtors there's a reference to the need to avoid

19  absurd results.  I believe that case involved asbestos victims

20  who had not manifested injury yet as of the petition filings,

21  and the Court found that it would be absurd that these parties

22  could possibly know that they had a claim as of the petition

23  date.

24          It also raises -- I'm sorry -- the third reason as to

25  why the legal relationship test should not apply is it raises

1  difficult issues of due process.  Again, <u>Schweitzer</u>, the Third

2  Circuit noted that the asbestos victims who had not had an

3  injury yet did not receive notice of the petition filings, and

4  here we should note, Your Honor, did Mian Realty receive notice

5  of the petition filings, actual notice from the debtors?  It

6  did not, signifying that there was not a relationship

7  sufficient for determining whether or not there was a claim.

8       THE COURT:  Well, why would Mian get notice of the

9  actual notice when Mian didn't have a relationship with the

10  debtor for I don't remember how many, but something like, if I

11  recall correctly, 17 years before the filing?  I mean, wasn't

12  the building sold to Mian, or the land sold to Mian back in the

13  1980s?

14       MR. KARWOWSKI:  That's correct, Your Honor.

15       THE COURT:  So, why would Mian -- why would the

16  debtor ever assume, if Mian hadn't raised an issue with the

17  debtor in 17 years that there was some actual notice

18  requirement for the debtor to give Mian actual notice of its

19  bankruptcy filing when Mian hadn't lodged any allegations

20  against the debtor in 17 years?  And I'm saying 17, correct me

21  if I'm wrong about the number, but it was a substantial period

22  of time.

23       MR. KARWOWSKI:  Well, that only supports the

24  proposition, Your Honor, that there was no legal relationship,

25  because if there was presumably there would have been notice.

1          THE COURT:  Well, there was a legal relationship at a

2   point in time, but there clearly -- at the point in time at

3   which the bankruptcy filing arose, the debtor couldn't possibly

4   have known that Mian was asserting that there was a legal

5   relationship.  It's sufficient to give actual notice, because

6   Mian hadn't lodged any claims against the debtor.  And in fact,

7   you're arguing even yet that Mian had only a contingent claim

8   which would have been unknown as to the debtor as of the date

9   of the filing of the bankruptcy.

10          MR. KARWOWSKI:  Yes, Your Honor.  As of the filing he

11  had no idea he had a claim.  That is correct.

12          THE COURT:  Okay.  So, if he didn't know, how would

13  the debtor know?

14          MR. KARWOWSKI:  Well --

15          THE COURT:  So, the debtor couldn't possibly give

16  actual notice of the bankruptcy.

17          MR. KARWOWSKI:  Well, it's just implicating that the

18  -- the importance of due process, and it's something that the

19  Schewitzer Court mentioned as a factor.

20          THE COURT:  But you can't give somebody due process

21  when they don't even know they have a claim.  I mean, the

22  purpose for the debtor advertising and publicizing the fact

23  that it is in bankruptcy and advertising notice of a bar date

24  is just that, to drive from the woodwork those entities that

25  think they have a claim or that suspect they have a claim that

1   the debtor doesn't know.  Mian falls into that exact category.

2   As of the date of the filing of the bankruptcy the debtor

3   couldn't possibly know that Mian doesn't know that it has a

4   claim.

5           MR. KARWOWSKI:  I think all of this supports our

6   position, Your Honor, because their position is -- for there to

7   be a contingent claim there must be awareness, and at that

8   point of time there was no awareness by anybody.  So, it --

9           THE COURT:  But there was awareness by Mian because

10  Mian had had all --

11          MR. KARWOWSKI:  That --

12          THE COURT:  -- this other stuff going on on the

13  property.  The debtor couldn't know because it didn't own the

14  property anymore.

15          MR. KARWOWSKI:  I --

16          THE COURT:  Mian clearly knew that there was

17  something going on on the property.

18          MR. KARWOWSKI:  Your Honor, I will explain in a few

19  minutes why there was no reason for him to suspect anything.

20          THE COURT:  Okay.  Well, I don't -- all right.  I

21  don't understand that.  If he had wells driven, and had

22  environmental studies going on, and other things going on on

23  the property, there was clearly reason for Mian Realty to

24  suspect something.

25          MR. KARWOWSKI:  Well --

1          THE COURT:  Otherwise why do all the things that he

2    was doing?

3          MR. KARWOWSKI:  Well, he wasn't doing anything, Your

4    Honor.  It was the neighbor who had contamination on his own

5    property, suspecting that perhaps it was coming from Mian's

6    property.  Mian himself never drilled a well, ever.

7          THE COURT:  Okay.

8          MR. KARWOWSKI:  And as far as he was told, there was

9    contamination on his neighbor's property, and pursuant to New

10   Jersey law they were merely investigating the full extent of

11   contamination.  And so, as far as he knew all there was was

12   contamination on the neighbor's property.  And no one ever came

13   to tell him, oh, by the way, there's contamination on your

14   property.  That never happened until '06, 2006.

15         THE COURT:  All right.

16         MR. KARWOWSKI:  Next, Your Honor, another reason why

17   the standard advocated by the debtor should not apply is

18   because it's actually more broad than the standard used by the

19   circuits.  And we're all aware of how much _Frenville_ has been

20   criticized in virtually every other circuit as being too narrow

21   of a standard.  So, how is it possible now that a mere

22   contractual relationship or the mere existence of a statute is

23   sufficient when under other circuits' law that would not be

24   sufficient?

25         THE COURT:  I'm sorry.  I didn't follow what -- I

1  just didn't follow what you said.  Would you restate?

2         MR. KARWOWSKI:  Of course, Your Honor.  Other

3  circuits, in determining whether or not there's a claim, appear

4  to require that the claimant have at least some notice or

5  knowledge, and according to the -- in order to have a claim, as

6  opposed to Frenville, which requires right to payment.  These

7  other circuits have a more liberal standard.  They say, well,

8  you know what?  To have a contingent claim all you need to have

9  is some notice or knowledge that you have a claim.  And what

10 I'm saying is the debtors are actually making that more broad

11 to say, you know what?  A mere contractual relationship, or the

12 mere existence of an applicable statute, such as CERCLA, is

13 enough, when under the other circuits that would not be enough,

14 you still need knowledge or awareness.  And the debtors are

15 saying, well, a mere contractual relationship is enough, a mere

16 statute is enough.  No, it's not, not even according to the

17 circuits.  So, what I'm saying is the debtor's standard is

18 actually more broad than any test ever applied by any other

19 Court.

20        THE COURT:  Okay.  So, you're looking at Frenville as

21 a restrictive standard because you not only need to know --

22 have notice of your claim, but you also have to have --

23 liquidated isn't quite the right word, but had it fixed to the

24 point where you have a right to payment?

25        MR. KARWOWSKI:  That's correct, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.

2          MR. KARWOWSKI:  That is what _Frenville_ says.  And

3 that is the way it has been applied.  You know, I would refer

4 to the -- I may be mispronouncing it, but the _Alle_ -- A-l-l-e-

5 g-h-e-n-y case.

6          THE COURT:  _Allegheny_.

7          MR. KARWOWSKI:  Exactly.  That's the District Court

8 matter that was actually affirmed by the Third Circuit, and

9 they applied the _Frenville_ test in the CERCLA context.  And

10 they required right to payment.

11          Next, let's get to the contractual relationship and

12 the statutory relationship, whether or not that's sufficient.

13 The debtors cite the _Paoli_ case, the _Paoli Yard_ case.  Even in

14 that case, Your Honor, if we look at the case, it requires that

15 the legal relationship be relevant to the claim, that the legal

16 relationship be relevant to the claim and that the claim flow

17 from that relationship, i.e., flow from the contract.  So, a

18 mere legal relationship is not sufficient.  That is what the

19 _Bessemer_ Court said.  _Bessemer_, that's the Third Circuit case,

20 '95, the _Penn Central_ case.  They said a mere legal

21 relationship is not enough.  There has to be some connection

22 between the claim and the relationship.  And here is Mian

23 asserting contractual claims, breach of contract?  No.  It's

24 asserting environmental tort claims.  So, even under their

25 test, even assuming a contractual relationship is sufficient,

1  it doesn't apply here because we're talking about environmental

2  claims, not contractual claims.

3       THE COURT:  But Mian's only method of having that

4  claim is based on the contract.  It purchased the property.  If

5  it hadn't purchased the property pursuant to the contract it

6  wouldn't be in the chain of title to give it any environmental

7  claim whatsoever.

8       MR. KARWOWSKI:  Yes, but what is the governing law,

9  Your Honor?  It's not contract law.  It's CERCLA.  It's

10 environmental law.  That's what's relevant here.  So, that's as

11 to the contractual issue.

12       As to the statutory relationship, a mere statutory

13 relationship is insufficient.  Why?  Because if we look at the

14 Schweitzer case, I believe it was a FELA matter, F-E-E -- I

15 apologize, F-E-L-A, some federal law.  And the Court still

16 assessed whether or not there was a manifestation of injury.

17 It still looked to whether or not there was a claim under FELA.

18 It wasn't enough that the FELA existed.  There had to be

19 something more.  So therefore, the mere existence of a

20 statutory relationship is not enough.  There has to be some

21 claim, continued claim under the statute.

22       THE COURT:  Well, that's a personal injury claim.

23 So, yes, you do have to have some manifestation.  You have to

24 know you were injured.

25       MR. KARWOWSKI:  Yes.

1          THE COURT:  That's a bit different from an

2  environmental injury, isn't it?

3          MR. KARWOWSKI:  But it's the same because the debtors

4  are saying the mere existence of the statute was enough.  The

5  fact that CERCLA existed in '86 was enough to create a

6  statutory relationship, and I'm saying that's not enough.

7  There's got to be something more.  Otherwise, think about it,

8  think about how broad --

9          THE COURT:  Well, I don't think the fact that the

10  statute exists gives you a claim.

11          MR. KARWOWSKI:  That is what they're saying, Your

12  Honor.

13          THE COURT:  Well --

14          MR. KARWOWSKI:  And Mian is saying that we disagree.

15          THE COURT:  Okay.

16          MR. KARWOWSKI:  Next is policy.  Why should the Court

17  apply Frenville and not the legal relationship test?  There are

18  a number of reasons, Your Honor.  What are CERCLA's goals?

19  Number one, facilitate expeditious clean up and protect the

20  public health.  Number two, produce a large group of

21  potentially responsible persons who can pay for the

22  environmental damage, produce settlements among the parties.

23          THE COURT:  Yes, but who has that right to do all

24  that?  The issue, I think, is not what CERCLA is intended to

25  do.  The issue is, I think, who has the right to enforce the

1  CERCLA provisions?  And I think what the debtor is saying is

2  that the governmental entities have the right to enforce those

3  claims, and in fact do enforce those claims, and in this

4  instance have enforced those claims.  So, where is the private

5  right of action?

6       MR. KARWOWSKI:  Well, under New Jersey law, Your

7  Honor, a private actor has standing.  And I believe we cite law

8  in our brief for that proposition.  And not only that, but that

9  point the debtor has made is limited to the injunction point.

10 They don't make that point as to the other claims.

11      THE COURT:  But that's the point.  As to the

12 injunction claim that, to a certain extent, assuming that you

13 can't convert the injunction into a damage claim, assuming that

14 you can't, then maybe there is some basis to say that the

15 provisions of the discharge injunction that protect the debtor

16 because of -- and the automatic stay if the plan hasn't yet

17 been confirmed, which of course in this case it hasn't,

18 shouldn't apply.  But to the extent that the claim, including

19 the injunction, can be turned into a monetary damage claim,

20 then why isn't Mian in the same position as every other

21 claimant in the case, i.e., subject to the automatic stay to

22 the extent that the debtor, at some point, has to deal with

23 these claims.  The debtor will have to deal with them through

24 the plan, which hasn't yet been confirmed.  Why does Mian get a

25 free pass beyond the automatic stay when no other creditor has?

1            MR. KARWOWSKI:  Well, because, Your Honor, those

2  other parties had claims as of the petition date.

3            THE COURT:  So did Mian.  If Mian has the right to

4  payment, i.e., a damage claim, against the debtor, then so does

5  Mian.  It should be filing a claim.

6            MR. KARWOWSKI:   Yes, Your Honor --

7            THE COURT:  And if it didn't, then it's too late.

8            MR. KARWOWSKI:  You are correct, Your Honor, except

9  the key word is assuming.  And Mian is saying there was not a

10 continued claim as of -- not only do you not need a contingent

11 claim, number one, number two, even if there was it didn't

12 exist in this case.

13           THE COURT:  But the definition of claim in the

14 Bankruptcy Code includes contingent claim.  There's no way

15 around that.

16           MR. KARWOWSKI:   But that's not the way the Third

17 Circuit interprets it.

18           THE COURT:  But it is the way the Third Circuit

19 interprets it.  What the Third Circuit has interpreted

20 differently is in the automatic stay context when the -- when a

21 person may be able to get around the provision of the automatic

22 stay in a breach of contact suit for an instance that came up

23 in _Frenville_, which, don't forget, was an accounting matter,

24 not an environmental claim at all.  So, the issue in _Frenville_

25 was very narrow, not the broad type of relief that we're

1  looking at now, and is much different from talking about a plan

2  that hasn't yet been confirmed, and whether or not a debtor

3  ought to be dealing with what may be a pre-petition claim

4  through the course of its Chapter 11.  Mian is essentially

5  saying we ought to be taken out of this case and allowed to go

6  into State Court and sue the debtor, unlike any other creditor

7  in the case.  Now, why?  Why should Mian get that opportunity

8  when no other creditor in the case has?  I can assure you there

9  have been innumerable creditors who have attempted this type of

10  action in this case, and I know, because I've been here for

11  almost all of them, probably not all but almost all of them,

12  and so far they haven't succeeded.  Why should Mian?

13          MR. KARWOWSKI:  Because, Your Honor, those -- I think

14  I looked at the docket, and I -- I did look at the docket, and

15  if I'm not mistaken those parties were seeking relief from the

16  stay, as opposed to arguing that the automatic stay does not

17  apply.

18          THE COURT:  It doesn't matter.

19          MR. KARWOWSKI:  I don't think I've seen a single

20  motion like this in this case.

21          THE COURT:  Well, I'm not sure whether one particular

22  creditor wasn't actually seeking a declaration that the

23  automatic stay didn't apply, but my recollection may be in

24  error, because it's been a long case, so I'm not sure about

25  that.  But regardless, it doesn't matter whether you get it

1  through the front door or the back door.  What you're basically
2  doing is trying to get out of the provision of the automatic
3  stay and into State Court.  Now, why should Mian get that
4  opportunity when this debtor hasn't yet confirmed the plan?
5  It's in the process of dealing with its liabilities.  And to
6  the extent that Mian has a claim, why shouldn't Mian be in the
7  same position as every other creditor.  If, in fact, your
8  client had a contingent claim, if it did, then it should be
9  here.  If it had no claim pre-petition, then we ought to be
10  talking about when the claim arose because I'm not quite sure
11  how, if it -- if the relationship between your client and the
12  debtor arose back in the '80's and the debtor's responsibility
13  for the environmental problem had to have accrued when the
14  debtor owned the property, which was back in the '80s, then the
15  debtor's responsibility for that environmental damage had to
16  have accrued back in the '80s because it hasn't owned the
17  property since.  So, any way you look at it, no matter how I
18  slice it the debtor, to the extent the debtor is liable at all,
19  its liability is back in the '80s.

20          Now, your client's relationship with the debtor began
21  and ended back in the '80s.  It hasn't had any contact with the
22  debtor since then.  So, to the extent that the debtor is
23  responsible for some damage that your client has suffered, its
24  liability was fixed back in the '80s.  So, how does your client
25  not have a claim against the debtors that arose back in the

1  '80s?

2        MR. KARWOWSKI:  Because we don't look -- Your Honor,

3  because we don't look at whether a claim arose when the act

4  occurred.  We look at it in -- in the Third Circuit as to when

5  right to a payment arose.  And even if we apply the --

6        THE COURT:  On a breach of contract, but this isn't,

7  as you've just said, a breach of contract claim.

8        MR. KARWOWSKI:  But there's nothing in _Frenville_ that

9  limits it to breach of contract.

10        THE COURT:  Well, there's a footnote in _Frenville_

11  that says in mass tort context it may not apply, so if it may

12  not apply in mass tort context why may not it apply in

13  environmental context either?

14        MR. KARWOWSKI:  Well, I'm not sure that it says the,

15  when you say it, I'm not that that is the --

16        THE COURT:  Well, look at the footnote.  I don't have

17  the case here.

18        MR. KARWOWSKI:  But, Your Honor, even assuming we

19  apply the debtor's tests, again, those tests require some

20  awareness or knowledge.  Mian had no idea, back in 2001, that

21  he had a claim.

22        THE COURT:  Neither do asbestos creditors at the time

23  that they've suffered their injury.  That's probably why the

24  footnote in _Frenville_ says that it may not apply in mass tort

25  cases.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KARWOWSKI:  But <u>Schweitzer</u> is an asbestos case,

2    and the Court said you know what, if you didn't know, then you

3    didn't have a claim, if there was no manifestation of injury.

4    And that's the same thing that we have here, Your Honor.  And

5    I'll get to the reasons why he didn't know.  But I also -- I

6    wanted to briefly mention why CERCLA -- there are certain

7    policies, and why, if we apply the debtor's test, it would

8    create bad incentives.  For example, assuming the debtor's test

9    applies, what would stop a debtor, like Grace, from selling

10   property, a month later saying, oh, by the way, there's an

11   environmental hazard on your property --

12          THE COURT:  Well, you're assuming --

13          MR. KARWOWSKI:  -- and then filing?

14          THE COURT:  But you're assuming that Grace knew that

15   there was some environmental liability, too.  And what you're

16   just telling me is --

17          MR. KARWOWSKI:  There's an exhibit -- Your Honor,

18   there was an exhibit that shows they knew.

19          THE COURT:  Well, okay.  Then, if that's the case,

20   then your client apparently didn't do the due diligence that it

21   should have done when it purchased the property, so no matter

22   how you look at it, its claim should have accrued back in the

23   '80's when it purchased the property, and it may, in fact, have

24   some breach of contract type claim against the debtor, but if

25   your client didn't know about it until 2006 because it hadn't

1  manifested until that time, how would Grace have known about it

2  until 2006 when it manifested?

3          MR. KARWOWSKI:  Two things, Your Honor.  One, it did

4  know, and number two, the obligation is not on the buyer to

5  look -- to search out for hazards.  Under New Jersey law the

6  obligation is on the buyer to disclose to the seller.

7          THE COURT:  The seller is --

8          MR. KARWOWSKI:  I'm sorry.  From the seller to

9  disclose to the buyer.  Yes.  The second reason why this test,

10 the debtor's test would create bad incentives is it would limit

11 the pool of potentially responsible parties, leaving some

12 parties to shoulder the burden, and it would create a situation

13 where the DEP claimants will spend more time trying to find out

14 who is a potential party rather than cleaning up the property,

15 which is what CERCLA is designed to do.  It's first to clean up

16 the property and then deal with liability later.  That's what

17 CERCLA says.  You don't have a claim until response costs are

18 incurred.

19         THE COURT:  But that gets us back into the public

20 versus private right of action issue again.

21         MR. KARWOWSKI:  But, Your Honor, I don't think --

22 even the debtors don't argue that Mian has standing to assert

23 these claims.  They assert standing only as to the injunction

24 claim, not as to the remaining nine claims, so I don't think

25 there's an issue as to standing.  And again, policy would be

1 furthered here especially because why?  Because here this is a

2 case where, I think it's Exhibit G in the debtor's exhibit

3 book, it showed as a memo or letter in which the debtor is

4 expressly saying or referring to an environmental damage.

5 That's Exhibit G.  This is the December 22nd, 1986 letter, Your

6 Honor.  And if I may quote from it?  This is pre-sale, Your

7 Honor.  "It is also my understanding that Harry is looking into

8 what, if any, environmental problems may have been caused with

9 our property by the dumping that may have taken place on our

10 neighbor's property."  This is pre-sale, Your Honor.

11          THE COURT:  Yes.  And then it says, "It's my advice,

12 as well as Nancy's, that we do not finalize an agreement until

13 we're satisfied that we either know that no problems exist, or

14 understand the extent of the problem if there is one."

15          MR. KARWOWSKI:  Okay.  Then --

16          THE COURT:  So, obviously they didn't know at that

17 point in time.

18          MR. KARWOWSKI:  Okay.  Then let's look to see what

19 kind of research they did to find out.  That's in Exhibit H.

20 This is a January 7th, 1987 memo.  And if we look at the first

21 page, near the bottom, this is a few months -- this is a month

22 before the sale.  They say the completion date is difficult to

23 estimate.  That's completion, they were referring to cleaning

24 up the environmental damage.

25          THE COURT:  Well, it says at the beginning, "Recently

1  we discussed the possibility."  I don't know to whom these

2  memos are going.  I don't know who these entities are, so --

3          MR. KARWOWSKI:  Well, Baker & Taylor, Your Honor, is

4  -- was owned by W.R. Grace.

5          THE COURT:  "Recently we discussed the possibility of

6  environmental problems at the neighboring warehouse affecting

7  the property at 6 Kirby.  Since our conversation I have spoken

8  to Ed Putnam of the New Jersey Department of Environmental

9  Protection, who was reluctant to give me information over the

10  phone.  He said that if we have specific questions requiring

11  answers we should write to this person who is the chief bureau

12  site operator," and so forth.  Then, "I've also spoken to Bruce

13  Wolf, the health officer for the Borough of Somerville, please

14  see attached documentation which addresses our concerns.  I

15  believe this information is sufficient to clear up the issue."

16          MR. KARWOWSKI:  Okay.  Let's look at that memo, then,

17  that he's referring to.  That's the next -- that's two pages

18  later, Your Honor.

19          THE COURT:  Okay.  "This is to bring you up to date

20  on the clean up operations being conducted at the site."

21          MR. KARWOWSKI:  And if we look in the third paragraph

22  we see a reference to the need for regular air monitoring, a

23  24-hour guard and patrol.  This is how extensive the damage is

24  at this property.

25          THE COURT:  But this is the neighboring property.

1                MR. KARWOWSKI:  Yes.

2                THE COURT:  Okay.  So, you mean your client purchased

3   this property with air control monitoring equipment set up

4   there and didn't know that it was going on in the neighboring

5   property?

6                MR. KARWOWSKI:  I don't know, Your Honor.

7                THE COURT:  Okay.  So -- but he wasn't purchasing the

8   neighboring property anyway, and Grace didn't own it?

9                MR. KARWOWSKI:  But how was it -- why is it that

10  Grace is so concerned that in their own memo they say, wow,

11  this might implicate our own property?

12               THE COURT:  Because --

13               MR. KARWOWSKI:  There must have been some connection

14  there.

15               THE COURT:  Well, because they want to make sure that

16  they've done due diligence, which they did.

17               MR. KARWOWSKI:  Okay.  but if we see later on -- we

18  see the clean up -- in the next paragraph, "The clean up

19  process has been hampered, and attempts to complete this

20  project quickly have been frustrating."

21               THE COURT:  Well --

22               MR. KARWOWSKI:  The next paragraph, "Another issue

23  which has affected the clean up at this and other sites is the

24  lack of hazardous materials treatment and disposal facilities

25  approved for use by NJ DEP."

1           THE COURT:  Okay.

2           MR. KARWOWSKI:  In the next paragraph, a reference to

3 a fire, completely destroyed the complex adjacent to the

4 warehouse.  The next paragraph, in April of this year there was

5 a spill.  And then, in the next paragraph we see, well, you

6 know what, 70 percent has been cleaned up.

7           THE COURT:  Okay.

8           MR. KARWOWSKI:  30 percent had yet to be cleaned up.

9           THE COURT:  And then it says --

10          MR. KARWOWSKI:  And yet despite --

11          THE COURT:  -- "We're making every effort to complete

12 the removal action by the end of the summer.  After the removal

13 action has been completed the warehouse and work area will be

14 decontaminated, and sampling will be conducted in and around

15 the building."

16          MR. KARWOWSKI:  End of summer meaning months after

17 the sale occurs.

18          THE COURT:  Well, I don't know --

19          MR. KARWOWSKI:  So, despite these --

20          THE COURT:  -- when the sale occurs.

21          MR. KARWOWSKI:  It was in February of '87, Your

22 Honor.

23          THE COURT:  All right.  Then in August of -- August

24 20 of '86 there is a site visit note that says that 80 to 85

25 percent of the materials were removed, 90 percent of the liquid

1 waste were processed.  The potential for anything else is

2 minimal.  All the solids have been bulk piled and are awaiting

3 disposal, and completion is expected before October.  So, it's

4 clear that the New Jersey DEP did the clean up.  So, at that

5 point what damage is there to your client?  And this is all in

6 the neighboring property.  So far we don't have anything that

7 ties the neighboring property clean up or damage into your

8 client's property.

9      MR. KARWOWSKI:  Well, I would note, number one, Your

10 Honor, as to number four, completion is not expected before

11 October.

12      THE COURT:  Right.

13      MR. KARWOWSKI:  -- but it also says, the NJ DEP does

14 not want to project actual dates due to possible unforeseen

15 delays.  We don't actually know when it actually completed the

16 clean up.

17      THE COURT:  Okay.  But before October.  This is dated

18 August 20, so that's not a long time in the future.

19      MR. KARWOWSKI:  Which is post sale.  But it brings to

20 mind an interesting paradox in that why is it that Mian was

21 duty bound to look for things in the '90s, and look for a

22 claim, when it had no -- when he had no idea that he had one?

23 Or as here, this is sufficient?  W.R. Grace knows that 30

24 percent of the clean up hasn't even occurred yet, and they --

25      THE COURT:  But it's not on its property.

1          MR. KARWOWSKI:  That's a reasonable response, Your

2 Honor, but apparently it was enough to have in their own memo a

3 concern about it.

4          THE COURT:  Okay.

5          MR. KARWOWSKI:  That there might have been some

6 connection between the two properties.

7          THE COURT:  And it did due diligence, and it's been

8 told that the clean up is progressing apace, and that by

9 October everything is going to be done, and that the property

10 is going to be decontaminated.  So --

11          MR. KARWOWSKI:  But to disclose none of that in -- to

12 the potential purchaser?

13          THE COURT:  Well, I don't know what it disclosed and

14 what it didn't disclose.

15          MR. KARWOWSKI:  This was nothing, Your Honor, so --

16          THE COURT:  Well, I don't know what it disclosed and

17 what it didn't disclose.

18          MR. KARWOWSKI:  There's nothing in the purchase

19 agreement about that.

20          THE COURT:  What does it have to disclose about a

21 neighboring property?  What obligation does Grace have to

22 disclose something that's happening on a neighboring property?

23          MR. KARWOWSKI:  In a usual situation, nothing.  But

24 apparently in this case, given the memo, there was something

25 leading them to believe that --

1          THE COURT:  That's an assumption.  You've just

2     criticized me for making an assumption about your client's

3     claim, and quite frankly that's an assumption that because

4     there's something happening on a neighboring property there's

5     something happening on the property being sold.

6          MR. KARWOWSKI:  But does that happen to properties

7     being sold every day, that the buyer stands back and thinks,

8     you know what, maybe I should check to see if there's

9     environmental damage --

10          THE COURT:  Frankly, in this day and age, I think

11     yes, it does.  Just about every day.  Even neighboring

12     properties in residential areas have blacktop driveways and

13     people are looking to see whether that's causing environmental

14     damage.  Yes, it does happen, on a regular basis.

15          MR. KARWOWSKI:  Okay.  But I guess I make the point,

16     Your Honor, that it just seems like W.R. Grace is making two

17     different -- making inconsistent arguments.  It's saying no,

18     you should have known about your claim, and oh, by the way,

19     back in '86, we didn't have an obligation to disclose.

20          THE COURT:  There wasn't -- from what I can see in

21     the documents on the property that the debtors sold, so far

22     there isn't a connection to a hazard on the property that the

23     debtor sold.  So, if your client didn't know about a claim, and

24     the debtor didn't know about a claim, so far I'm not seeing

25     that perhaps there really was a claim.  But if there was a

1  claim, then it arose back in the '80's.  That's the point, I

2  think.  To the extent there was a claim, it was unknown --

3  that's not the right word -- to the extent that it was -- to

4  the extent the claim existed but had not manifested back in the

5  '80s, it arose nonetheless in the '80s.  It gave rise to a

6  claim for liability back in the '80s, even though the liability

7  itself was not fixed and liquidated back at that time.

8          MR. KARWOWSKI:  But, Your Honor, even the debtors are

9  not arguing that.  They're not arguing that the claim was

10 contingent in '86.  They're saying it -- the contingent claim

11 accrued when Mian knew about it.  Awareness, knowledge.  It's

12 not when the act occurs.  It's when there's awareness,

13 knowledge.

14         THE COURT:  Okay.

15         MR. KARWOWSKI:  Even the debtors don't make that

16 argument about --

17         THE COURT:  Well --

18         MR. KARWOWSKI:  -- going back to '86.

19         THE COURT:  Just because the debtors don't make the

20 argument either doesn't mean I have to buy the debtor's theory,

21 either.  I mean, I'm trying to look at the documents and figure

22 out what it is that I have here, and whether or not the

23 automatic stay does or doesn't apply to this case.  It seems to

24 me that to the extent that these documents indicate that

25 something happened back in the '80s that may have given rise to

1 a liability, there's a pre-petition claim to which the

2 automatic stay applies.  That's the only issue I have before

3 me, whether the automatic stay applies such that if there is a

4 liability the debtor ought to be dealing with it in its plan if

5 the debtor is liable.  That's what I'm looking at today.  I'm

6 not trying to figure out whether there is a claim, isn't a

7 claim, who is right and wrong.  I'm only trying to look at this

8 from the perspective of the automatic stay.  I'm not making any

9 findings.  I don't have any evidence before me to make

10 findings.  I've got these letters that say the debtor is

11 looking at something, you're telling me they didn't disclose

12 it.  I'm trying to figure out whether back in the '80s is there

13 enough that there could have been a claim, and if so, does the

14 automatic stay cover it?  That's all.

15      MR. KARWOWSKI:  I understand, Your Honor, and I'm

16 saying that even under their own test I'm saying it could --

17 not even they're saying it accrued in '86.  They're saying it

18 accrued much later.

19      Moving on, Your Honor.  I've been referring to the

20 cases cited by the debtors.  Let's look very briefly at some of

21 these cases and see if they're factually relevant to our

22 matter.  And the way the debtors describe their test is the

23 fair contemplation test, whereas when you look at some of these

24 cases, or actually all of them, there's more than just this

25 could have been fairly contemplated.  There's actual notice or

1  knowledge.  For example, <u>Crystal Oil</u>, the claimant actually

2  observed the waste and the claimant actually had information

3  tying the debtor to the contaminated site.  The <u>Jensen</u>

4  (phonetic) case.  There was a letter from the California

5  Department of Health Services informing the claimant of, quote,

6  serious environmental hazard at the site.  The <u>Chicago</u>

7  <u>Milwaukee</u> case.  Claimant had clear knowledge of release of a

8  hazardous substance.  And finally, the <u>National Gypsum</u> case.

9  That case actually supports Mian.  Why?  Because it says in

10 determining whether there's claim accrual what do you look at?

11 The knowledge of the claimant, the commencement of clean up,

12 and the occurrence of response costs.  This actually supports

13 Mian, Your Honor.

14          So, if we look at some of these cases we notice that

15 these cases require actual notice or knowledge.  Do the debtors

16 cite anything factually similar to this case where there's some

17 documents indicating, well, you know what, Mian, we want to

18 drill on your property, see if our contamination on our

19 property has spread to your property?  Is there anything like

20 that?  No, Your Honor.  Those cases don't exist.  So, we get to

21 the question of could Mian have fairly contemplated that he had

22 a claim?  Even assuming this test applies, because again, I'm

23 saying, Your Honor, <u>Frenville</u> applies, and it requires a right

24 to payment.  But even assuming we apply their test, Mian still

25 wins.

34

1        Let's look at some of their exhibits.  And these are

2   the debtors' own exhibits, Your Honor.  Som of them refer only

3   to mere testing that will occur.  These are Exhibits M, R, S

4   and Q.  They don't say Mian, there's contamination on your

5   property.  They say only we're going to conduct testing.

6   Others fail to even refer to Mian's property.  They refer to

7   the outer area.  So, it's impossible to determine whether or

8   not it was referring to Mian's property.  Those are Exhibits N,

9   O and P.

10         THE COURT:  I'm sorry.  M, O and P?

11         MR. KARWOWSKI:  N, as in Nancy.

12         THE COURT:  N.

13         MR. KARWOWSKI:  O and P.

14         THE COURT:  Okay.  Thank you.

15         MR. KARWOWSKI:  In fact, Exhibit P says there may be

16   contamination.  It doesn't even say there is contamination,

17   number one.  Number two, if you look for the word Mian in that

18   document it's nowhere.  Next, most importantly, Your Honor,

19   some of these exhibits cited by the debtors, they actually show

20   that Mian's property was not a source of contamination.  These

21   are Exhibits N, as in Nancy, O, Q and R.  Let's look at some of

22   these exhibits.  And before we begin, Your Honor, I would note

23   there's a map in Exhibit Q.  This will help us understand what

24   some of these documents say.  In Exhibit Q we're looking at

25   Document 4724.  And looking at this map, Your Honor, we see

1  that Mian's property is all the way to the right, to the east.

2  And where are the wells that were put on Mian property?  MW9,

3  MW11.  Knowing that Mian's property is to the east, let's look

4  at Exhibit N, as in Nancy, Page 8.

5          THE COURT:  I'm sorry.  Page what?

6          MR. KARWOWSKI:  Page 8, on top, also it says on the

7  bottom, 17643.  This is an environmental report from 1990.

8  What does it say near the bottom?  Conclusions and

9  recommendations.  This is in debtors' own exhibit, Your Honor.

10 It says prevailing groundwater flow direction is toward the

11 southeast.  Not coming from the east, which is Mian's property.

12 It's going to Mian's property.  So, if Mian were actually

13 looking at a document like this, this is what he would have

14 found.  Next, Exhibit O, Page 4, on the bottom it says 18612.

15         THE COURT:  Okay.

16         MR. KARWOWSKI:  The first full paragraph, the second

17 sentence.  TCE concentrations detected in these four monitoring

18 wells indicate a suspected off-site source of TCE contamination

19 exists to the northwest, not to the east, which is, again,

20 Mian's property.  Exists to the northwest.  Next, Exhibit Q.

21 Looking at Page 5, also on the bottom designated by the number

22 4685.  First full sentence.

23         THE COURT:  Go ahead.

24         MR. KARWOWSKI:  The plume appears to originate in the

25 vicinity of the MW4 monitoring well, and extends offsite to the

1 east on the neighboring property near MW11.  So, again, it's

2 saying where?  The contamination originates on Litco's

3 (phonetic) property, extends to the east, spreading to the

4 east, Mian's property.  These are actually the documents, Your

5 Honor, that the debtors are saying should have told Mian, well,

6 you have a claim.  In fact, these documents say Mian, you don't

7 have a claim.  And finally, Your Honor, Exhibit R.  This is

8 designated by the number 4786.  In the first paragraph we see

9 the sentence beginning, "Available groundwater."  "Available

10 groundwater data suggests that a source may be present in the

11 area between Monitor Well 4, 5 and 3C."  Those are on Litco's

12 property.  Again, what are the wells on Mian's?  Nine and 11.

13        So, what is the result of this, Your Honor?  Debtors'

14 own exhibits show that in the '90's if Mian had researched this

15 -- he had no reason to, because no one had ever told him that

16 he had a claim.  But even if he did, he would have noticed that

17 these documents say, well, you know what, there's no

18 contamination on my property, therefore I have no claim against

19 the buyer -- I'm sorry -- the seller.  Additional documents

20 that were omitted from debtors' papers support this.  I'll

21 hurry up, Your Honor.  That's Exhibits A and B to the reply.

22 If we look very quickly at Exhibit A to the reply, the second

23 page, this is a DEP report from 1995.  We're looking at

24 Paragraph 5, the fifth sentence, referring to the expression,

25 or the part of the sentence, "groundwater contamination does

1   not originate from offsite sources," offsite sources meaning

2   potentially Mian's property.

3           Next, Your Honor, Exhibit B, if we look at Document

4   3784.

5           THE COURT:  3784?

6           MR. KARWOWSKI:  3784.

7           THE COURT:  All right.

8           MR. KARWOWSKI:  Mian's property is the property where

9   it says grass, existing building.  Those are wells.  You'll

10  notice the absence of any numbers underneath those circles,

11  whereas if we look to the left of that the Litco property, see

12  under the circles?

13          THE COURT:  I don't have these exhibits.  I haven't

14  seen your reply yet except for the portion of it that is

15  actually the reply itself.  I haven't printed all those

16  documents yet.

17          MR. KARWOWSKI:  I merely point this out just for the

18  record, Your Honor, that on the Litco property we see

19  references to numbers.  Those signify detections of TCE.  Do we

20  see those on the Mian property?  There's nothing.

21          THE COURT:  All right.

22          MR. KARWOWSKI:  Moving on, Your Honor.  Debtors refer

23  to Exhibit U.  It has a reference to large areas of

24  disturbance.  What does that mean?  It can mean anything?

25  Number one, it could have been road construction, number one.

Number two, it doesn't even specify Mian's property. It just says generally in the area. And as I'll show in a second, any allegation of contamination was disproven anyway. Also, Exhibit S, more general allegations of, quote, staining; therefore, there was a recommendation of testing, that testing occur. But if we look at Exhibits C, D and E, that were attached to the reply, subsequent to tests that were conducted pursuant to their recommendations show that there was no contamination.

Again, Your Honor, that's Exhibits C, D and E. C is a February 16th, '01 letter conducted two months after -- I'm sorry -- sent two months after Exhibit S was sent. We see on Page 4, quote, "based on the soil sampling results these areas are not considered to be potential sources for the contamination identified in Wells 5 and 11." Exhibit D, a November 9, 2001 report, if we see on Page 5, designated by the number 16992, Paragraph 2, second sentence, the plume appears to have originated in the vicinity of the MW5 monitoring well cluster, and extends offsite to the east on the neighboring property. So, it originates on Litco's property, extends to Mian's property.

And we see Exhibit E, this is a January 20, 2006 report. And I'll note, Your Honor, that this was Exhibit Y in the debtors' exhibit book, and this page was actually omitted. And we see again, on the bottom of Page 6, Paragraph 2, the

1  plume appears to originate in the vicinity of the MW4

2  monitoring well cluster, extends offsite to the east on the

3  neighboring property.  So, insofar as there were allegations

4  that, Mian, there's contamination on your property, testing is

5  then done, and they show that there's no contamination.  So,

6  again, Your Honor, cutting through all of this was there any

7  reason for me to be concerned?  No, because all he's being told

8  is there's contamination on the site -- on the other property.

9  But even assuming he looks at these documents, Your Honor, they

10  indicate there's no contamination on his property.  So, was he

11  aware, in the '90s, that he had a claim?  The answer is no.

12       As to contamination on Mian's own property, and I'll

13  be done in a few minutes, Your Honor.

14       THE COURT:  Please.  I think you need to wrap it up.

15  It's gone on a long time.

16       MR. KARWOWSKI:  I will, Your Honor.  As to

17  contamination on his own property, the debtors appear to rely

18  upon Exhibits U and Q.  I've already dealt with U.  I've

19  already dealt with Q, as well.  And I would note that Q was

20  actually issued post-petition, so he would not have known as of

21  the filing date even if you looked at that thing, Exhibit Q.

22  But as we went over before, Exhibit Q actually says that Mian

23  is not liable.

24       And then, finally, Your Honor, in terms of the

25  remaining exhibits, W, X, Y, those are also post-petition.  And

1  in fact, if we look at Exhibit X, it refers to resolving

2  environmental matters on the adjacent property.  Again, no

3  reference to contamination on his own property.  This is as

4  late as 2005, where someone is expressing a concern about

5  contamination on Litco's property, but nothing about

6  contamination in Mian's property.

7         The remaining arguments, Your Honor, there's the

8  preemption argument.  We deal with that in our papers.  I would

9  also note, Your Honor, that it's not even relevant to what

10 we're doing here because I would submit that that's a matter

11 for the District Court.  That's a substantive allegation

12 regarding a claim.  We're dealing with the automatic stay.

13 Assuming there's a preemption let the District Court handle it.

14 The same with the injunctive relief, Your Honor.  If, in fact,

15 Judge Thompson finds that there is an ongoing hazard that needs

16 to be dealt with, then we can always defer until later on

17 whether or not there's a hazard to be corrected today.

18        A few more points, Your Honor.  Arguments regarding

19 relief from stay, they argue they did not arrange for disposal.

20 In fact, we cite -- we offer the proposition that all you need

21 to do is move some dirt around.  That qualifies as disposal.

22 And we say, you know what, you built a 17,000 square foot

23 building.  Presumably in doing that you had to check if the

24 ground would support this building.  So, we would submit that

25 that constitutes disposal of a hazardous substance under

1  CERCLA.  But again, Your Honor, it's a factual issue for the

2  District Court anyway.  Let them deal with whether or not

3  there's -- whether Mian actually asserts a CERCLA claim that

4  survives 12(b)(6).  All Your Honor is dealing with is automatic

5  stay.

6          The same with the innocent or interim owner defense.

7  We argue that that defense doesn't apply.  But again, even

8  assuming it does, let the District Court deal with it.  It's a

9  substantive matter dealing with CERCLA.  Let the District Court

10  deal with it.

11          And finally, they make the allegation regarding the

12  inapplicability of the Landfill Act, but I think we deal with

13  that in our papers, so -- that's all for now.  Thank you, Your

14  Honor.

15          THE COURT:  Ms. Baer?

16          MS. BAER:  Your Honor, I'll try to be brief, as

17  frankly you made a lot of the arguments I would have made in

18  terms of issues.  So, let's go back to the beginning again,

19  Your Honor.  What Mian wants to do here is pursue a third party

20  complaint against Grace to collect a pre-petition debt, and

21  that's simply what they're doing here, Your Honor, and when you

22  boil it all down, we sold the property in 1987.  We had nothing

23  more to do with the property.  If there are environmental

24  issues on the property, Mian, starting in at least 1987 when

25  they purchased the property, had a legal relationship with

1  Grace.  That legal relationship arises under CERCLA, and that

2  legal relationship arises under the contract between the

3  parties.  In at least 1985, when the first well was put on

4  Mian's property, Mian was on notice that there could be issues.

5  Mian was on notice that the neighbor was looking for source of

6  environmental contamination.  And over the next number of years

7  --

8       THE COURT:  Wait.  I'm sorry.  1985 the first well

9  put on Mian's property?

10      MS. BAER:  1995.

11      THE COURT:  Oh.

12      MS. BAER:  I'm sorry, Your Honor.  I may have

13  misspoke.

14      THE COURT:  Okay.

15      MS. BAER:  In 1995 the first well was put on Mian's

16  property.  A subsequent well was put on in 1997.  Wells were

17  put on later, after that.  We don't know what Mian knew or

18  didn't know.  What we know is that Mian owned the property,

19  that a number of wells were put on the property, that the

20  neighbor was doing clean up, was doing subsequent

21  investigation.  We know that.  The New Jersey Department of

22  Environmental Protection had the reports results.  Mian could

23  have asked for them at any time the wells were being put on its

24  property, and Mian could have known, and we know from some of

25  the documents that we have looked at, is that there were issues

1   being investigated.  They were looking not just for the source,

2   Your Honor, but they were also looking for whether or not there

3   was the presence of environmental contamination.  Just because

4   the environmental reports were showing that the source may have

5   been Litco's property doesn't mean that they weren't looking

6   for and ultimately finding presence of TCE on Mian's property.

7   In fact, Your Honor, if you look at Exhibit U, that's exactly

8   what it does.  There is a listing now and it looks at

9   Monitoring Wells 9 and 11, and sees -- in fact is seeing in the

10  groundwater, deep in the groundwater some potential TCE

11  presence -- not necessarily the source, but the presence, and

12  that's one of the things that we're looking for.

13          Your Honor, this is a contingent claim.  This is a

14  classic contingent claim.  That's what the Bankruptcy Code

15  says.  If we leave out the word contingent claim, that makes no

16  sense.  And on thing that Mian did not do here today is they

17  never mentioned the <u>Reading</u> case.  The <u>Reading</u> case is a lead

18  case in the Third Circuit.  The <u>Reading</u> case is subsequent to

19  <u>Frenville</u>, and the <u>Reading</u> case says when you have a CERCLA

20  claim you look at the legal relationship, the legal

21  relationship test that started with <u>Schweitzer</u>.  <u>Schweitzer</u> and

22  <u>Reading</u> were pre-CERCLA cases, therefore they couldn't, in

23  those cases, find that in fact CERCLA was the legal

24  relationship that would then create this contingent claim.  But

25  here, Your Honor, we have two legal relationships.  We have

1 CERCLA, and under CERCLA Grace is, in fact, a former owner, and

2 therefore Grace is involved in CERCLA to the extent that they

3 could be a potentially responsible party.  That's one legal

4 relationship.  The second legal relationship, Your Honor, is

5 the contractual one.  Grace, Baker & Taylor, contracted with a

6 Mian entity.  The entities have changed, but they are

7 essentially Mian entities.  And that created another legal

8 relationship.  And since at least 1995, if not sooner, Mian

9 knew that it may have a claim against Grace.  That, Your Honor,

10 under the Reading analysis, and under the Schweitzer analysis,

11 constitutes a contingent claim.  Your Honor, in talking about

12 Frenville, a couple of things were not mentioned.  There's the

13 footnote, which Your Honor pointed out.  But even before you

14 get to the footnote, there's a very significant discussion

15 where it talks about the legal relationship, and it talks about

16 when a cause of action accrues, and it said that a right to

17 payment arises absent overriding federal law by reference to

18 state law.  Here, Your Honor, we have overriding federal law.

19 We have CERCLA.  And that's where we get to the contingent

20 claim we have.

21          I'd like to read from Judge Randy Haines, who is a

22 well regarded Bankruptcy Judge, and I think does one of the

23 nicest jobs of talking about Frenville and trying to make this

24 distinction.  He says, I quote, "The accrual of a cause of

25 action under state law does not determine when a claim arises

**J&J COURT TRANSCRIBERS, INC.**

1  under the Bankruptcy Code.  That is because the Code defines

2  claim to include contingent and unmatured claims which may not

3  yet constitute a cause of action under state law.  The failure

4  to understand this important distinction between a claim and a

5  cause of action is what gives rise to the famous

6  misunderstanding in _Frenville_."  Your Honor, if we did not read

7  it this way, if we read _Frenville_ the other way, we would weed

8  out the possibility of contingent claims.  Here, Your Honor, we

9  have a contingent claim.  We have a contingent claim, and it's

10  one that Mian has possessed pre-petition.  There's no doubt

11  whatsoever, no doubt whatsoever, Your Honor, here that we have

12  a pre-petition claim and the automatic stay applies.  That's

13  all you're being asked to decide today, and I think it's very

14  simple to decide.

15          Your Honor, I want to clear up a couple of other

16  things that were said by Mian's counsel.  Number one, the issue

17  of Grace's knowledge.  In 1986, when Baker & Taylor decided to

18  sell this property it did what a prudent landowner does.  It

19  investigated to see whether or not there were problems, any

20  environmental issues, because it saw that its next door

21  neighbor was, in fact, doing some clean up.

22          Your Honor, what its next door neighbor was doing,

23  and this was well published in the New Jersey newspapers at the

24  time, is they were cleaning up a spill of some environmental

25  contamination in drums that had been mishandled on the

1  property.  That was a mishandling that took place in the '80s.

2  Grace investigated.  Grace looked at what was happening.  It

3  talked to the New Jersey Department of Environmental

4  Protection.  And as you can see from the documents which were

5  discussed today, it concluded that that clean up of those drums

6  was underway, in fact, was close to completion, and it had not

7  implicated its own property.  It looked at its own landscaping

8  records, which are attached as part of the same exhibit that

9  was pointed out by Mian's counsel.  It looked at the various

10 records and concluded that its own property was okay.

11         Your Honor, things changed, but not because really of

12 that contamination.  What's going on now, Your Honor, as we

13 understand it from reviewing these documents, is there is

14 another contamination issue, not the spillage of the drums, but

15 the clean up of the spillage of the drums apparently prompted

16 Litco to look further.

17         There is apparently another source, or another

18 contamination problem which is a groundwater contamination

19 problem, and that's this investigation that's been going on.

20 That's what these groundwater -- these monitoring wells have

21 been doing.  They've been investigating to check and see

22 whether or not there is other contamination deep within the

23 groundwater.

24         Your Honor, when Baker & Taylor built a two-story

25 building with no basement in the early '80's, and constructed

1  that building, it could not have known and could not have

2  discovered from that building, and could not have moved around

3  anything that was contaminated.  The contamination we're

4  talking about here is deep in the groundwater.  In fact, Your

5  Honor, and as Mian has pointed this out, if you look at the

6  soil, you look at the soil samples that they attach today, the

7  soil was not the problem.  The soil was clean.  When Baker &

8  Taylor built this building it was moving around clean soil.

9  That's not the environmental issue for which Litco is seeking

10  to collect from Mian.

11        Your Honor, one other point we need to make, and that

12  has to do with the way in which contribution protection works

13  under CERCLA.  Here what Mian is doing is it's trying to assert

14  a CERCLA 113 action.  Your Honor, if Mian was arguing that the

15  stay should be lifted, we would have of course argued that they

16  don't have any justification to do so, and one of the things is

17  because we don't believe they ultimately have a CERCLA claim

18  against Grace.  CERCLA 113 actions are derivative.

19        Litco is not pursuing Grace.  Litco is the one that

20  has the contamination.  Litco is the one who is looking to see

21  whether or not some of this contamination seeped onto Mian's

22  property or was the source of the problem on Litco's property.

23  Litco hasn't filed a claim against Grace, therefore Mian

24  actually would not be able to succeed here with respect to this

25  claim being asserted by Litco.

1     But again, Your Honor, you're not being asked today

2 to decide whether or not the stay should be lifted.  If you

3 were, Your Honor, we believe that you would conclude the stay

4 should not be lifted.  Mian is trying to involve Grace in

5 complicated, convoluted environmental litigation, and

6 litigation under CERCLA where Grace is not the owner, Grace did

7 not create the disposal, Grace did not arrange for the

8 disposal, Grace had nothing to do with it and no knowledge of

9 it.  That will ultimately fail, Your Honor.  That CERCLA claim

10 will fail.

11     But right now, today, you're being asked to decide is

12 this a pre-petition claim that should be stayed, and, Your

13 Honor, based on what Mian knew, based on the timing with

14 respect to what's happening here, there can be no doubt that a

15 legal relationship under the <u>Reading</u> and the <u>Schweitzer</u> test

16 existed.  This was a legal relationship created, number one, by

17 federal statute, which is outside of the <u>Frenville</u> analysis,

18 the CERCLA statute, and number two, by the contractual

19 relationship between the parties.  Under this legal

20 relationship they have a contingent claim under Section 101.

21 They are seeking to collect this contingent claim.  They are

22 seeking to collect a pre-petition claim, which, of course, is

23 stayed by the automatic stay.  And there's no exception, Your

24 Honor.  They are not a governmental entity.  They are not

25 seeking to enforce a police power right.  This is not a <u>Tourico</u>

1   (phonetic) situation.  Even if they were seeking to enjoin us

2   and order us to do clean up, this does not give them a police

3   power right, therefore they're still not exempt from the

4   automatic stay, Your Honor.

5           Under these circumstances we think it's quite clear

6   this is a pre-petition claim, the automatic stay applies, and

7   Mian's motion must be denied.

8           THE COURT:  Two minutes.

9           MR. KARWOWSKI:  All right.  Just a couple things,

10  Your Honor.  One is with respect to the allegation of Mian

11  being on notice of the issues, he may have a claim -- that's

12  not the standard.  The issue is was he aware?  Even assuming we

13  applied their test, was there awareness of knowledge that you

14  possessed a claim?  Based on the documents I went through,

15  there's nothing in there that would suggest, oh, I now have an

16  environmental claim.

17          THE COURT:  Well, the question is are you on

18  reasonable inquiry notice?  And when someone is drilling wells

19  on your property because they are trying to ascertain whether

20  there is groundwater contamination, you're on inquiry notice,

21  and if that happened in 1995, six years before this case was

22  filed, it's a pre-petition claim.

23          MR. KARWOWSKI:  But, Your Honor --

24          THE COURT:  There's just no way around it.

25          MR. KARWOWSKI:  But -- Your Honor, you said yourself

1  that this happens all the time now.

2              THE COURT:  It does.

3              MR. KARWOWSKI:  So, does that mean all those people

4  have --

5              THE COURT:  What I said happens all the time --

6              MR. KARWOWSKI:  Does that mean --

7              THE COURT:  -- what I said happens all the time is

8  that people are concerned about environmental issues to the

9  point where if there is an obvious issue they will inquire.

10 That's what you were asking about, and I want to make sure that

11 my comment is taken in that regard, not that people are

12 drilling wells looking for groundwater contamination.  You've

13 presented this in the perspective of soil contamination, not

14 groundwater contamination.  This is groundwater contamination.

15 People don't know about groundwater contamination, typically

16 speaking, but when somebody drills a well on your property

17 looking for groundwater contamination, you're on notice if

18 there is groundwater on your property and somebody is drilling

19 a well trying to figure out whether the water is contaminated,

20 you're on notice to try to figure out whether your water is

21 contaminated.

22             MR. KARWOWSKI:  Okay.  But what does a person do,

23 then?  Do they just file a complaint the next day?  Or do they

24 wait for the results?

25             THE COURT:  Well --

1          MR. KARWOWSKI:  He waited for the results.  The

2     results come back, they say --

3          THE COURT:  What a person does is inquire.  And the

4     New Jersey Department of Environmental Protection has reports.

5     And to the extent that your client is on inquiry notice, you

6     have a duty to inquire when Grace files a bankruptcy case in

7     2001, and then sends out a bar date notice, you have a duty to

8     file, if nothing else, a notice that your client may have a

9     claim.  It's then up to the debtor to decide whether or not the

10    debtor is going to object to it.  But all of that happened here

11    except for the fact that your client didn't file the claim.  So

12    --

13         MR. KARWOWSKI:  But, Your Honor, all the documents --

14    if you were to look at the documents, they would have told you,

15    as we went through them, they said the contamination is on

16    Litco's property, not on Mian's.

17         THE COURT:  That's actually not what the documents

18    said that you pointed out.

19         MR. KARWOWSKI:  They do say that.  Many of the

20    documents say originates on Litco's, extends to the east.

21         THE COURT:  Well, that's the point.  Extends to the

22    east means that one --

23         MR. KARWOWSKI:  I mean, going -- going towards.

24         THE COURT:  -- it doesn't mean it's starting on your

25    property, but it's extending to that property.

1          MR. KARWOWSKI:  Your Honor, that is what it says.

2  And that --

3          THE COURT:  Pardon me.  We can't talk over each

4  other.  The court reporter can't get it.  So, you go first, and

5  then I'll try to get from you the information I'm trying to get

6  from you.

7          MR. KARWOWSKI:  I apologize, Your Honor.  But some of

8  those documents say that, yes, but some of the documents we

9  went through said, yes, there's no contamination offsite.

10          THE COURT:  Exactly.  There's no contamination on

11  site.  Some of the documents also say that there's no

12  contamination, period, so there's no claim, period.

13          MR. KARWOWSKI:  So, wouldn't that support Mian, then,

14  if he's being told I don't have a claim?

15          THE COURT:  Of course.  It also supports Grace.

16  There's no claim.  If there's no contamination, there's no

17  claim.  There's no CERCLA issue at all --

18          MR. KARWOWSKI:  But he's being sued now.  And we're

19  --

20          THE COURT:  Then he'll have a defense.  If there's no

21  claim, if there's no contamination --

22          MR. KARWOWSKI:  Exactly.

23          THE COURT:  -- he'll have a defense.

24          MR. KARWOWSKI:  You're exactly right, Your Honor.

25          THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. KARWOWSKI:  And that happens in the District

2  Court.

3          THE COURT:  Fine.  But you're not going to drag Grace

4  into it.  This is clearly a pre-petition claim.  I wholly agree

5  with Ms. Baer's argument, every word of it, and I adopt it as

6  my analysis.  This is a pre-petition claim.  The automatic stay

7  applies.  Your request for a declaration that the automatic

8  stay does not apply has to be denied.  It is simply the wrong

9  analysis in this context.  Frenville does not stand for the

10  proposition that you're asking me to extend Frenville in this

11  particular context, it just does not stand for that

12  proposition.

13          MR. KARWOWSKI:  Your Honor, even assuming we don't

14  apply Frenville, we apply their tests, there has to be

15  awareness, knowledge.

16          THE COURT:  No, there does not.  There has to be an

17  obligation on behalf of your client to inquire.  There's got to

18  be some basis for ascertaining that a claim may exist.  In this

19  instance there were wells drilled on the property back in 1995,

20  1997, and other times pre-petition, before the bankruptcy was

21  filed.  To that extent there is reasonable inquiry notice that

22  should satisfy that test that puts your client on notice that

23  there may be a basis for contamination.  Your client is now

24  asserting at this point in time that Grace may have somehow or

25  other caused that contamination.  If Grace did cause that

1  contamination you have a claim against Grace that should be

2  reconcilable in this bankruptcy case.  To the extent that the

3  clean up has already occurred, then that's a monetary damage

4  issue.  To the extent that the clean up has not yet occurred

5  and you're seeking somehow injunctive relief, I -- at this

6  point that is an issue that can abide whatever the District

7  Court determines is appropriate relief if the District Court

8  determines that there is appropriate relief.  That claim surely

9  can then be converted into a money damage claim, because

10  somebody will have to do the work, you'll know what the cost

11  is, and as to the debtor, which hasn't been involved in that

12  property since 1987, that can be a money damage claim.  The

13  problem your client is going to have to face is no claim has

14  been filed.  But that's a different issue for a different day.

15       MR. KARWOWSKI:  Your Honor, you mentioned inquiry

16  notice.  No one came back to him and said, oh, by the way,

17  those are results, produce something.  And if he had gone to

18  look at the documents they would have indicated nothing.

19       THE COURT:  I've already addressed -- I've addressed

20  that.  I don't know how else more to say it.  There are wells

21  being drilled on the property for groundwater contamination.

22  That is a pretty big inquiry notice that somebody is concerned

23  about contamination on the property.  Groundwater isn't static.

24  It flows.

25       MR. KARWOWSKI:  So, even though the wells are coming

**J&J COURT TRANSCRIBERS, INC.**

1  back saying negative he should still file a claim?

2          THE COURT:  Your client should do whatever your

3  client deems appropriate.  The fact that your client didn't

4  file a claim may mean that your client didn't think he -- may

5  mean your client thought he didn't have a claim.  I don't know

6  what's in your client's mind.

7          MR. KARWOWSKI:  Your Honor, he had no idea about this

8  until '06, so -- that's when he was sued.  So, actually '07.

9  So -- and everything -- all the facts that we have all

10  indicated that he did not have a problem, he did not have a

11  claim.

12          THE COURT:  If he had no claim then he doesn't file a

13  claim.  In this context he's on inquiry notice to ascertain in

14  1995 whether there was a claim.  If there was a claim then at

15  that point in time when Grace files its bankruptcy, he's got an

16  obligation when the bar date notice goes out to take action to

17  file a claim.  If it's a contingent claim, or an unliquidated

18  claim, or an unfixed claim for whatever reason, then he files

19  it in that capacity, and when the claim becomes known, becomes

20  fixed, becomes liquidated, then those elements become known and

21  the claim gets amended.

22          MR. KARWOWSKI:  But, Your Honor, nothing --

23          THE COURT:  That's how the bankruptcy system works.

24          MR. KARWOWSKI:  I understand, Your Honor.  But

25  nothing would tell him that he had even a contingent claim.

**J&J COURT TRANSCRIBERS, INC.**

1  Everything was saying there's no contamination.  So, Your

2  Honor, I would ask that --

3          THE COURT:  Your own -- the documents that you've

4  just given me from your point of view, you're arguing at odds

5  with your own analysis.  You know, you can't have your cake and

6  eat it, too.  Either the documents do support that there's

7  contamination that started offsite and moved to the east, or

8  they don't.  If they don't, then there is no claim.

9          MR. KARWOWSKI:  But, Your Honor, that's for the

10  District Court.

11          THE COURT:  If they do --

12          MR. KARWOWSKI:  That's for the District Court.  And,

13  in fact -- I guess we don't know today because --

14          THE COURT:  No.

15          MR. KARWOWSKI:  -- there's a complaint.

16          THE COURT:  The issue for me is whether or not there

17  was sufficient notice, pre-petition, that this claim arose so

18  that it is pre-petition, then the automatic stay applies.  For

19  the reasons I've already articulated, and I'm not debating this

20  with you, I've already made my ruling, I find that it is a pre-

21  petition claim.  The automatic stay does apply.  And your

22  motion to have a declaration that the automatic stay does not

23  apply is denied.  That's the end of this story.

24          I'll take an order, Ms. Baer, from you after you

25  circulate it to counsel, that will deny the motion.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Thank you, Your Honor.  I'll do so.

2          MR. KARWOWSKI:  Thank you, Your Honor.

3                    * * * * *

4              **C E R T I F I C A T I O N**

5          I, TAMMY DeRISI, court approved transcriber, certify

6 that the foregoing is a correct transcript from the official

7 electronic sound recording of the proceedings in the above-

8 entitled matter.

9

<u>/s/ Tammy DeRisi</u>              Date:  September 9, 2008

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.

JL