IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Re: Docket No. 19373**

## NOTICE OF AMENDED EXHIBIT A TO MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO ACQUIRE LIMITED LIABILITY COMPANY INTEREST IN GR 2008 LLC

1.       On August 25, 2008, the above-captioned debtors and debtors in possession filed the *Motion for an Order Authorizing the Debtors to Acquire Limited Liability Company Interest in GR 2008 LLC* (Docket No. 19373) (the "Motion") which seeks authority to invest in Newco on substantially the terms set forth in the Organization Agreement.

2.       Attached as Exhibit A was the Organization Agreement of GR 2008 (the "Original Agreement").

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

3.    Attached hereto as <u>Exhibit A</u> is the Amended Organization Agreement of GR 2008.

4.    Attached hereto as <u>Exhibit B</u> is a blacklined version reflecting the changes from the Original Agreement.

5.    Exhibit A hereto replaces Exhibit A attached to the Motion.

Dated: September 15, 2008

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

-and-

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

# EXHIBIT A

Amended Organization Agreement

**EXECUTION COPY**

**ORGANIZATION AGREEMENT**
**OF**
**GR 2008 LLC**


**September 12, 2008**

# ORGANIZATION AGREEMENT OF GR 2008 LLC

## TABLE OF CONTENTS

1.      DEFINITIONS ........................................................................................... 1

   1.01  General. ................................................................................... 1

   1.02  Definitions. .............................................................................. 1

   1.03  Additional Definitions................................................................. 4

2.      ORGANIZATION ..................................................................................... 4

   2.01  Organization............................................................................ 4

3.      CLOSINGS; TERMINATION; FURTHER ASSURANCE. ......................... 5

   3.01  First Closing. ........................................................................... 5

   3.02  Conditions to First Closing. ...................................................... 6

   3.03  Second Closing. ...................................................................... 6

   3.04  Conditions to Second Closing. ................................................. 6

   3.05  Termination. ............................................................................ 8

   3.06  Further Assurances................................................................... 8

4.      REPRESENTATIONS AND WARRANTIES OF RSS. ............................... 8

   4.01  Formation................................................................................ 8

   4.02  No Conflict; Authorization......................................................... 9

   4.03  Absence of Certain Changes. .................................................. 9

   4.04  Contracts............................................................................... 10

   4.05  Patents, Technology. ............................................................. 10

   4.06  Employee Secrecy and Noncompetition Agreements. ........... 11

   4.07  Compliance with Laws. .......................................................... 12

   4.08  Litigation and Claims.............................................................. 12

   4.09  Environmental Matters. .......................................................... 12

   4.10  Accuracy of Information. ........................................................ 12

   4.11  Investment Representations. .................................................. 13

   4.12  No Brokers. ............................................................................ 13

5.      REPRESENTATIONS AND WARRANTIES BY GRACE....................... 13

   5.01  Corporate Organization.......................................................... 13

   5.02  No Conflict. ............................................................................ 13

5.03    Authorization. ........................................................................ 14

5.04    Patents, Technology. ............................................................ 14

5.05    Employee Secrecy and Noncompetition Agreements. ......................... 15

5.06    Compliance with Laws. .......................................................... 15

5.07    Investment Representations. ................................................... 15

5.08    No Brokers. .......................................................................... 16

6.       COVENANTS. ....................................................................... 16

6.01    Filing with Bankruptcy Court.................................................. 16

6.02    Access and Inquiry. .............................................................. 16

6.03    Licenses and Permits. ........................................................... 16

6.04    Notices and Consents. .......................................................... 17

6.05    Public Announcements. ......................................................... 17

6.06    Notification. .......................................................................... 17

7.       SURVIVAL OF REPRESENTATIONS AND WARRANTIES ................. 17

7.01    Survival of RSS Representations and Warranties. .................... 17

7.02    Survival of Grace Representations and Warranties. ................. 17

8.       GENERAL. ............................................................................ 18

8.01    Notices. ............................................................................... 18

8.02    Limitation of Liability. ............................................................ 18

8.03    Force Majeure. ..................................................................... 19

8.04    Headings. ............................................................................ 19

8.05    Entire Agreement. ................................................................ 19

8.06    Counterparts. ....................................................................... 19

8.07    Relationship of Parties. ......................................................... 19

8.08    Governing Law; Dispute Resolution. ...................................... 20

8.09    Binding Effect. ...................................................................... 20

8.10    Assignment. ......................................................................... 20

8.11    Amendment; Waiver. ............................................................. 20

8.12    No Third Party Beneficiaries. ................................................ 21

8.13    Effectiveness. ....................................................................... 21

ii

## EXHIBITS

| | |
|---|---|
| Exhibit A | LLC Agreement |
| Exhibit B | Joint Development Agreement |
| Exhibit C | Note |
| Exhibit D-1 | Security Agreement |
| Exhibit D-2 | IP Security Agreement |
| Exhibit E | Services Agreement |
| Exhibit F | License Agreement |

## DISCLOSURE SCHEDULE

iii

**ORGANIZATION AGREEMENT** dated September ___, 2008 by and between RS Solutions, LLC, an Ohio limited liability company ("RSS"), and W. R. Grace & Co.-Conn., a Connecticut corporation ("Grace").

RSS and Grace wish to form, become the members of and capitalize and organize GR 2008 LLC (the "Company") for the purpose of developing certain products for use in the ready mix concrete industry.

In consideration of the mutual representations, warranties and agreements herein contained, RSS and Grace (the "Parties") agree as follows:

## 1. DEFINITIONS

### 1.01 General.

All Article and Section numbers, and Exhibit and schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated. Unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Section, paragraph or clause in which the word appears. Any of the terms defined in this Agreement may be used in the singular or the plural; words importing any gender include the other genders; and the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation."

### 1.02 Definitions.

For purposes of this Agreement the following defined terms have the following meanings.

"Affiliate" of any specified person or other entity means a person or other entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or other entity specified. As used in this definition, "control" of a specified entity means the direct or indirect possession of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities or other ownership interests, by contract, or otherwise.

"Ancillary Agreements" means the following agreements: (a) the LLC Agreement; (b) the Joint Development Agreement; (c) the Services Agreement; (d) the Note; and (e) the Security Agreements; and (f) the License Agreement..

"Authorization Date" shall mean the date on which the Bankruptcy Court shall enter an order authorizing the Organization.

"BACKGROUND INFORMATION" has the meaning given such term in the Joint Development Agreement.

- 1 -

"BACKGROUND PATENT RIGHTS" has the meaning given such term in the Joint Development Agreement.

"Bankruptcy Case" means *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Business Day" means a day on which banks are not permitted or required to close in New York, New York.

"Company" has the meaning given such term at the head of this Agreement.

"Contract" means any contract, agreement, commitment or other obligation, whether or not in writing, including any amendment, modification or supplement thereof.

"Disclosure Schedule" means the Disclosure Schedule being executed and delivered by the parties simultaneously with and forming part of this Agreement

"Dissolution Event" has the meaning given such term in the LLC Agreement.

"Encumbrance" means any charge, claim, community property interest, condition, equitable interest, lien, mortgage, option, pledge, security interest, right of first refusal, hypothecation or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, that relates to or otherwise imposes liability, obligations, or standards with respect to pollution, the protection of the environment, or the protection of human health or safety.

"First Closing" means the actions to be carried out as described in Section 3.01(b).

"First Closing Date" means the date on which the First Closing takes place.

"Governmental Authority" means the government of the United States, or of any other sovereign country; any political subdivision of any of the foregoing; or any court, agency, board, bureau, department or commission of any of the foregoing.

2

"Grace" has the meaning set forth at the head of this Agreement.

"Joint Development Agreement" means the Joint Development Agreement between Grace, RSS and the Company in the form attached hereto as **Exhibit B**.

"License Agreement" means the License Agreement between the Parties in the form attached hereto as **Exhibit F**.

"LLC Agreement" shall mean the Operating Agreement of the Company between the Parties  in the form attached hereto as **Exhibit A**.

"Note" means the Secured Promissory Note from the Company to the order of Grace evidencing certain obligations under the Joint Development Agreement and the Services Agreement in the form attached hereto as **Exhibit C**..

"Organization" means, collectively, the transactions contemplated by the Organization Documents.

"Organization Agreements" means this Agreement and the Ancillary Agreements.

"Organization Documents" means the Organization Agreements and all other agreements, instruments and documents delivered pursuant to this Agreement.

"Parties" has the meaning given such term at the head of this Agreement.

"Person" means any individual, partnership, firm, trust, association, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"RSS" has the meaning given such term at the head of this Agreement.

"RSS Change-in-Control" shall have the definition given it in the LLC Agreement; provided however, the term "Effective Date" as used in such definition shall refer to the date of this Agreement.

"RSS Executives" means Kenneth W. Feldmann, Joseph H. Sostaric and Joseph E. Stigler.

"RSS Liquidating Event" shall have the definition given such term in the LLC Agreement.

"RSS Operating Agreement" means the Third Amended and Restated Operating Agreement of RSS dated August 1, 2005, and any related subscription

3

agreements of the RSS Owners for outstanding limited liability company interests outstanding as of the date of this Agreement.

"Second Closing" shall mean the actions to be carried out as described in Section 3.03(b).

"Second Closing Date" means the date on which the Second Closing occurs.

"Security Agreements" means the Security Agreement and the IP Security Agreement between the Company and Grace securing the Company's obligations under the Note in the forms attached hereto as **Exhibit D-1** and **Exhibit D-2**, respectively.

"Services Agreement" means the Services Agreement between RSS, Grace and the Company in the form attached hereto as **Exhibit E**.

"Specified Business" shall have the definition given it in the LLC Agreement.

"Specified Patent Rights" means the patents described on Section 1.02 of the Disclosure Schedule.

1.03    Additional Definitions.

The following additional terms have the meanings ascribed thereto in the Section indicated below next to such term:

| Defined Term | Section |
|---|---|
| Certificate of Formation | 3.02(a) |
| Patent Rights | 4.05(a) |
| RSS Owners | 4.01 |
| Scheduled First Closing Date | 3.01(a) |
| Scheduled Second Closing Date | 3.03(a) |

## 2.    ORGANIZATION

2.01    Organization.

In reliance on the representations and warranties of the Parties set forth in this Agreement, and on the terms and subject to the conditions of this Agreement:

(a)    At the First Closing:

4

        (i)       the Company shall be formed under the Delaware Limited Liability Company Act,

        (ii)      Grace shall pay to the Company one million dollars ($1,000,000),

        (iii)     RSS shall pay to the Company ten thousand dollars ($10,000), and

        (iv)     the Ancillary Agreements shall be executed and delivered; and

(b)     At the Second Closing, Grace shall pay to the Company one million dollars ($1,000,000).

## 3.    CLOSINGS; TERMINATION; FURTHER ASSURANCE.

### 3.01  First Closing.

(a)     The Scheduled First Closing Date shall be a date chosen by the Parties that is not more than five Business Days after the Authorization Date, or such other date as the Parties may agree to in writing, at 10:00 a.m. local time at the offices of Grace, 7500 Grace Drive, Columbia, Maryland. The Parties shall meet at such time and place on the Scheduled First Closing Date to effect the First Closing, subject to the terms and conditions of this Agreement. All of the actions to be taken and documents to be executed or delivered at the First Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all such matters shall be completed.

(b)     At the First Closing:

        (i)       Grace shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an account designated by the Company, one million dollars ($1,000,000.00).

        (ii)      RSS shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an account designated by the Company, ten thousand dollars ($10,000.00).

        (iii)     The Parties and the Company shall execute and deliver the Ancillary Agreements.

3.02   Conditions to First Closing.

Each Party's obligations with respect to the transactions contemplated by Section 2.01(a) shall be subject to the fulfillment or waiver of the following conditions:

(a)     The certificate of formation of the Company in the form of Exhibit B to the LLC Agreement (the "Certificate of Formation") shall have been duly filed with the Secretary of State of Delaware, and shall be in full force and effect.

(b)     All the representations and warranties made by the other Party in this Agreement shall be true and correct in all material respects on the First Closing Date as though made on and as of such date, and such other Party shall have performed in all material respects all covenants and agreements of this Agreement that such other Party shall be required to perform on or before the First Closing Date; and such other Party shall have delivered to the first Party a certificate signed by one of its senior officers or members certifying to such effect.

(c)     No action, suit or proceeding by any third Person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the date of the First Closing) against such Party or any of its Affiliates or against the Company that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of any of the Organization Documents or the Organization, or seeks damages against such Party or any of its Affiliates or against the Company, or injunctive relief in connection therewith.

(d)     Since the date of this Agreement, there shall have occurred no RSS Change-in-Control and RSS shall have delivered a certificate to Grace, in form and substance satisfactory to Grace, to that effect.

3.03   Second Closing.

(a)     The Second Closing shall take place on the first anniversary of the First Closing Date (the "Scheduled Second Closing Date").

(b)     At the Second Closing, Grace shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an account designated by the Company, one million dollars ($1,000,000.00) (the "Grace Second Contribution").

3.04   Conditions to Second Closing.

Grace's obligations with respect to the transactions contemplated by Section 3.03(b) shall be subject to the fulfillment or waiver of the following conditions:

6

(a)      The Certificate of Formation and the LLC Agreement shall remain in full force and effect, no Dissolution Event shall have occurred, and the Company shall not have dissolved or been dissolved.

(b)      No action, suit or proceeding by any third Person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the Second Closing Date) against such Party or any of its Affiliates or against the Company that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of any of the Organization Documents or any part of the Organization, or seeks damages against such Party or any of its Affiliates or against the Company, or injunctive relief in connection therewith.

(c)      No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted and shall remain pending on the Second Closing Date, or shall have been threatened and such threat shall not have been withdrawn on or before Second Closing Date, and no claim shall have been made by any such third Person and shall not have been withdrawn on or before the Second Closing Date, which alleges that (i) infringement (whether by RSS or any of its Affiliates) of any United States or foreign patent rights or other Intellectual Property rights has occurred or is involved in connection with the operations of the business of RSS or the Specified Business, or (ii) RSS's manufacture of Mixing Systems (as defined in the Joint Development Agreement) in the United States, and RSS's sale of the same in any country of the world, does not infringe upon, or with respect to trade secrets otherwise violate, any third party Intellectual Property right in said countries.

(d)      Grace shall not have determined that there are intellectual property issues that (i) could have a material adverse effect on the business or prospects of the Company or (ii) relate to the Specified Patent Rights.

(e)      If Grace shall have determined in its sole discretion that a license or an option to obtain a license with respect to the Specified Patent Rights is advisable, the Company shall have obtained a license or an option to obtain a license with respect to the Specified Patent Rights in favor of the Company (and, upon the occurrence of a Dissolution Event, Grace) in such form as is acceptable to Grace in its sole discretion.

(f)      Since the date of this Agreement, none of the following shall have occurred: (1) an RSS Change-in-Control; or (2) an RSS Liquidating Event; or (3) a transferee, pledgee or RSS Pledgee (as such term is defined in the LLC Agreement) has become a Holder (as such term is defined in the LLC Agreement) of an LLC Interest (as such term is defined in the LLC Agreement) as a result of or in connection with an Encumbrance of all or a portion of RSS' LLC Interest, through foreclosure or otherwise, and RSS shall have delivered a certificate to Grace, in form and substance satisfactory to Grace, that none of the events set forth in clauses (1), (2) and (3) of this Section 3.04(f) has occurred.

7

3.05    Termination.

(a)    If the First Closing shall not have taken place within 120 days after the date of this Agreement, either Party may give notice to the other Party that it wishes to terminate this Agreement; provided, however, that if the failure of the First Closing to occur by such date is the result of breach by either Party of the terms and conditions of this Agreement or failure to deliver the certificate described in Section 3.02(b), then such Party shall have no right to give such notice or otherwise terminate this Agreement.  In the event and upon receipt of such notice, this Agreement and the other Organization Agreements shall terminate and be of no further force or effect.

(b)    If any of the conditions set forth in Section 3.04 shall not have been met or on before the Scheduled Second Closing Date, then Grace shall have the right by notice to RSS to terminate this Agreement.  Otherwise, if the Second Closing shall not have taken place within thirty days after the Scheduled Second Closing Date, then either Party may give notice to the other Party that it wishes to terminate this Agreement; provided, however, that if the failure of the Second Closing to occur by such date is the result of breach by Grace of its obligation to pay the Grace Second Contribution, then Grace shall have no right to give such notice or otherwise terminate this Agreement.

3.06    Further Assurances.

At any time and from time to time at and after the First Closing, each Party, at the request of the other Party, shall execute and deliver or cause to be executed and delivered all such documents and instruments and take or cause to be taken all such other action as the requesting Party may reasonably deem necessary or desirable in order to carry out the intents and purposes of this Agreement and the other Organization Documents.

## 4.    REPRESENTATIONS AND WARRANTIES OF RSS.

Except as otherwise set forth in the **Disclosure Schedule** with explicit reference to the Section and any subsection in question, RSS represents and warrants to Grace as follows:

4.01    Formation.

RSS is a limited liability company duly formed and validly existing and in good standing under the laws of Ohio, with full limited liability company power and authority to carry on its business as presently conducted, and to own and operate its assets and business, and the execute, deliver and perform its obligations under the Organization Documents to which it is or will be a party. The copies of the formation and any other organizational documents (including the articles of formation of RSS and the RSS Operating Agreement) of RSS which heretofore have been delivered to Grace are true and complete, and there

8

is no agreement other than the RSS Operating Agreement that is an "operating agreement" (as defined in the Ohio Limited Liability Company Act) of RSS. RSS has no bylaws. No RSS Liquidating Event has occurred. The schedule to this Section lists all the members and all the direct or indirect legal and beneficial owners ("beneficial owner" is defined as set forth in Rule 13d-3 under the Securities Exchange Act of 1934, as amended, or any successor provision thereto) of membership interests of RSS (collectively, the "RSS Owners"), and indicates whether such ownership is direct or indirect and legal and/or beneficial, and the nature and amount of each RSS Owner's membership interest and disposition, voting and/or managerial power. Except as set forth on the schedule to this Section, RSS Owners are and will be on the First Closing Date the record and beneficial owners and holders of the membership interests owned by each of them, free and clear of all Encumbrances.

4.02   No Conflict; Authorization.

(a)   The execution and delivery by RSS of the Organization Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder, and/or the occurrence of the Organization, will not (i) result in the breach of any of the terms of, or constitute a default under, its organizational documents, or any Contract to which it or any of the RSS Executives is a party or by which RSS or any of its assets may be bound, (ii) violate any order, writ, injunction or decree of any Governmental Authority, or (iii) constitute or give rise to an RSS Liquidating Event.

(b)   No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority, or the consent of any other Person, is required as a prerequisite to the execution and delivery by RSS of the Organization Documents to which it is or will be a party, or its performance of its obligations hereunder and thereunder.

(c)   The execution and delivery by RSS of the Organization Documents to which it is or will be a party, and the performance of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary limited liability company action, including any necessary action of the RSS Owners. RSS has duly executed and delivered or will duly execute and deliver the Organization Documents to which it is or will be a party, and such documents are or will be RSS's legal, valid, and binding obligations, enforceable against RSS in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

4.03   Absence of Certain Changes.

(a)   Since January 1, 2008, there has not been: (i) any change in the condition (financial or other), assets, liabilities, business or prospects of RSS,

9

except normal changes in the ordinary course of business which have not in the aggregate been materially adverse; or (ii) any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the assets, business or prospects of RSS.

(b) There has not been any change in the relationship or course of dealing between RSS and any of its suppliers or customers that has had or could have a material adverse effect on RSS or its prospects.

(c) As far as RSS is aware, there exists no occurrence, event or condition that materially adversely affects or may reasonably be expected to materially adversely affect the assets, business or prospects of RSS, or that could reasonably be expected to interfere in any material respect with its ability to execute, deliver or perform its obligations under the Organization Documents to which it is or will be a party.

4.04 Contracts.

Other than the RSS Operating Agreement and any other Contracts listed on the schedule to this Section, there are no Contracts to which RSS is a party relating to the issuance, sale or transfer of any RSS membership or limited liability company interests or equity or other securities of RSS.

4.05 Patents, Technology.

(a) The schedule to this Section sets forth in Part I a list of all patents and patent applications (collectively or individually "Patent Rights") under development for use by, or otherwise applicable to, RSS or the business of RSS or the Specified Business, including those items that are owned or controlled (in the sense of having the right to license others) by each of RSS and its Affiliates. At the First Closing Date, RSS will have sole and exclusive ownership rights to its Patent Rights filed or issued on or prior to the First Closing Date whose grant to the Company is provided for in the Joint Development Agreement, free and clear of any Encumbrance that is inconsistent with or would preclude or prevent such grant in whole or part.

(b) Part II of the schedule to this Section sets forth a list of all licenses and other Contracts with respect to any intellectual property or intellectual property rights, used by, under development for use by, or otherwise applicable to, RSS or the Specified Business.

(c) As far as each of RSS and the RSS Executives is aware, for the conduct of the Specified Business, no right, license, consent or other agreement (other than by or between RSS, Grace and/or the Company) is or will be required with respect to any of RSS' intellectual property, other than those listed or described in the schedules to this Section or in the schedules to Section 5.04.

10

(d)     As far as each of RSS or the RSS Executives is aware, (i) no infringement (whether by RSS or its Affiliates) of any US or foreign patent rights or other intellectual property rights has occurred or is involved in connection with the operations of the business of RSS or the Specified Business, and no claim of any such infringement has been made or implied; (ii) RSS's manufacture of Mixing Systems (as defined in the Joint Development Agreement) in the United States, and RSS's sale of the same in any country of the world, does not infringe upon, or with respect to trade secrets otherwise violate, any third party Intellectual Property right in said countries; (iii) all of the licenses and other Contracts listed or described in the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder; and (iv) there are no patents that would impede the Company's use of the intellectual property disclosed in the schedules to this Section.

### 4.06    Employee Secrecy and Noncompetition Agreements.

(a)     Each RSS Executive, officer, manager, director, employee, independent contractor, consultant and agent of RSS who has access to any proprietary technology owned or used by RSS has executed and is bound by a written Contract obligating such Person to keep such material confidential, and each RSS Executive, officer, manager, director, employee, independent contractor, consultant and agent of RSS whose duties include the development of proprietary technology or proprietary computer software has executed and is bound by a written Contract assigning to RSS all rights thereto.    All of such Contracts are in full force and effect, and as far as RSS and the RSS Executives are aware, there are no defaults thereunder.

(b)     Except as specifically set forth in the schedule to this Section, as far as RSS and the RSS Executives are aware, no: (i) employee, independent contractor, consultant or agent of RSS who has access to any of RSS' BACKGROUND INFORMATION or BACKGROUND PATENT RIGHTS; or (ii) RSS Executive, officer, manager or director, is a party to, or is otherwise bound by, any Contract:   (A) requiring such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets or containing any prohibition or restriction on competition or solicitation of customers; (B) that limits or purports to limit the ability of such Person to engage in or continue or perform any conduct, activity, duties or practice relating to the business of RSS or the Specified Business; or (C) that limits or purports to limit the ability of such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets.

(c)     Except as specifically set forth in the schedule to this Section, as far as RSS and the RSS Executives are aware, no RSS Executive, officer, manager, director, employee, independent contractor, consultant or agent of RSS is a party to, or is otherwise bound by, any Contract that in any way adversely affects, or will adversely affect, the ability of RSS to meet its obligations under the Organization Documents and to provide Services to the

11

Company pursuant to the Joint Development Agreement, the Services Agreement or otherwise.

### 4.07   Compliance with Laws.

RSS has complied in a timely manner in all material respects with all laws and governmental regulations and orders relating to RSS or any of the property owned, leased or used by it, including, but not limited to, labor, occupational safety and health, environmental and antitrust laws.

### 4.08   Litigation and Claims.

There is (a) no suit, action or claim, (b) no investigation or inquiry by any Governmental Authority, and (c) no legal, administrative or arbitration proceeding (each an "Action") pending or (so far as RSS is aware) threatened against RSS or any of its assets, or to which RSS is a party, and (so far as each of RSS and the RSS Executives is aware) there is no basis for any such Action, except as specifically set forth in the schedule to this Section, which schedule also specifies each Action pending at any time since RSS's formation.  Except as specifically set forth in the schedule to this Section, there is no outstanding order, writ, injunction or decree of any Governmental Authority or arbitration tribunal against or binding on RSS or any of its assets.

### 4.09   Environmental Matters.

Neither RSS nor any of the RSS Executives (i) has received any notice of any violation of, or liability incurred pursuant to, any Environmental Law affecting RSS or any of its employees or owned or leased property, nor is RSS or any of the RSS Executives aware of any such violation or liability for which notice has not been received, nor (ii) has received any notice of existing or potential injuries to current or former employees of RSS caused by exposure to hazardous or chemical substances.

### 4.10   Accuracy of Information.

As far as each of RSS and the RSS Executives is aware, the information provided by RSS and any of the RSS Executives in this Agreement or the Exhibits or the Disclosure Schedule to this Agreement, or otherwise provided to Grace in connection with this Agreement, taken as a whole, does not contain any materially misleading statement, or omit any information the failure to disclose which makes any information disclosed materially misleading.  For purposes of this Section, "materially misleading" means materially misleading with respect to the business, condition (financial or otherwise), assets or prospects of RSS or the Company taken as a whole, or that could reasonably be expected to materially interfere with RSS's ability to perform its obligations under any of the Organization Documents to which it is a party.

12

### 4.11   Investment Representations.

RSS (a) is acquiring its interest in the Company for its own account as an investment and without an intent to distribute the interest; (b) acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws and may not be resold or transferred by RSS without appropriate registration or the availability of an exemption from such requirements; (c) acknowledges that it and its legal and business advisors have had sufficient opportunity to perform due diligence and obtain all requested pertinent information from the Company and Grace with respect to the terms of this Agreement, the other Organization Documents and the Organization; (d) has evaluated the risks involved in investing in the Company and agreeing to certain terms of this Agreement and has determined that this is a suitable investment and business arrangement for RSS after taking into consideration such risks.

### 4.12   No Brokers.

Neither RSS nor any of its Affiliates has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the execution, delivery or performance of the Organization Documents, or any of them, or the Organization.

## 5.   REPRESENTATIONS AND WARRANTIES BY GRACE.

Except as set forth in the **Disclosure Schedule** with explicit reference to the Section and any subsection in question, and as subject to, and except for actions and approvals required by, the U.S. Bankruptcy Code with respect to the Bankruptcy Case, Grace represents and warrants to RSS as follows:

### 5.01   Corporate Organization.

Grace is a corporation duly organized and validly existing and in good standing under the laws of Connecticut, with full corporate power and authority to carry on its business as presently conducted and to own and operate its assets and business, and to execute, deliver and perform its obligations under the Organization Documents to which it is or will be a party.

### 5.02   No Conflict.

The execution and delivery by Grace of the Organization Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, its certificate of incorporation and by-laws, or any Contract to which it is a party or by which it or any of its assets are bound, or (ii) violate any order, writ, injunction or decree of any court or Governmental Authority.

5.03   Authorization.

(a)   The execution and delivery by Grace of the Organization Documents to which it is or will a party, and its performance of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary corporate action on its part.  Grace has executed or will execute the Organization Documents to which it is a party, and such documents and such documents are or will be Grace's legal, valid, and binding obligations, enforceable against Grace in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

(b)   Except for approval of the Bankruptcy Court, no consent, approval, order or authorization of, or registration, declaration or filing with, any court or Governmental Authority is required as a prerequisite to the execution and delivery by Grace of the Organization Documents to which it is or will be a party, or its performance of its obligations hereunder and thereunder.

5.04   Patents, Technology.

(a)   The schedule to this Section sets forth in Part I a list of Grace's BACKGROUND PATENT RIGHTS, including those items that are owned or controlled (in the sense of having the right to license others) by each of Grace and its Affiliates.  On the First Closing Date, Grace will have sole and exclusive ownership rights to its BACKGROUND PATENT RIGHTS filed or issued prior to the First Closing Date whose grant to the Company is provided for in the Joint Development Agreement, free and clear of any Encumbrance that is inconsistent with or would preclude or prevent such grant in whole or part.

(b)   Part II of the schedule to this Section sets forth a list of all licenses and other Contracts with respect to Grace's BACKGROUND PATENT RIGHTS.

(c)   As far as Grace is aware, for the conduct of the Specified Business, no right, license, consent or other agreement (other than by or between Grace, RSS and/or the Company) is or will be required with respect to any of Grace's BACKGROUND PATENT RIGHTS.

(d)   As far as Grace is aware, no infringement (whether by Grace or its Affiliates) of any US or foreign patent rights or other intellectual property rights has occurred or is involved in connection with their use of Grace's BACKGROUND PATENT RIGHTS, and no claim of any such infringement has been made or implied. As far as Grace is aware, all of the licenses and other Contracts listed or described in the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder.  As far as Grace is aware, there are no patents that would impede the Company's use of the BACKGROUND PATENT RIGHTS.

14

5.05    Employee Secrecy and Noncompetition Agreements.

(a)    Each employee, independent contractor, consultant and agent of Grace's concrete admixture business who has access to any of Grace's BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS has executed and is bound by a written Contract obligating such Person to keep such material confidential, and each employee, independent contractor, consultant and agent of Grace's admixture business whose duties include the development of BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS has executed and (except in the case of employees of longer standing) is bound by a written Contract assigning to Grace all rights thereto. All of such Contracts are in full force and effect, and as far as Grace is aware, there are no defaults thereunder.

(b)    Except as specifically set forth in the schedule to this Section, as far as Grace is aware, no employee, independent contractor, consultant or agent of Grace's admixture business who has access to any of Grace's BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS is a party to, or is otherwise bound by, any Contract: (i) requiring such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets or containing any prohibition or restriction on competition or solicitation of customers; (ii) that limits or purports to limit the ability of such Person to engage in or continue or perform any conduct, activity, duties or practice relating to the Specified Business; or (iii) that limits or purports to limit the ability of such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets.

(c)    Except as specifically set forth in the schedule to this Section, as far as Grace is aware, no employee, independent contractor, consultant or agent of Grace's admixture business is a party to, or is otherwise bound by, any Contract that in any way adversely affects, or will adversely affect, the ability of Grace to meet its obligations under the Organization Documents and to provide Services to the Company pursuant to the Joint Development Agreement, the Services Agreement or otherwise.

5.06    Compliance with Laws.

Grace's business has complied in a timely manner with all laws and governmental regulations and orders, including, but not limited to, labor, occupational safety and health, environmental and antitrust laws, which are material to its execution, delivery or performance of the Organization Documents to which it is a party.

5.07    Investment Representations.

Grace (a) is acquiring its interest in the Company for its own account as an investment and without an intent to distribute the interest; (b) acknowledges

that the interests have not been registered under the Securities Act of 1933 or any state securities laws and may not be resold or transferred by RSS without appropriate registration or the availability of an exemption from such requirements; (c) acknowledges that it and its legal and business advisors have had sufficient opportunity to perform due diligence and obtain all requested pertinent information from the Company and RSS with respect to the terms of this Agreement, the other Organization Documents and the Organization; (d) has evaluated the risks involved in investing in the Company and agreeing to certain terms of this Agreement and has determined that this is a suitable investment and business arrangement for Grace after taking into consideration such risks.

### 5.08   No Brokers.

Neither Grace nor any of its Affiliates has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the execution, delivery or performance of the Organization Documents, or any of them, or the Organization.

## 6.   COVENANTS.

### 6.01   Filing with Bankruptcy Court.

As soon as practicable after the execution of this Agreement, Grace shall file a motion with the Bankruptcy Court seeking approval of the Organization. RSS shall have the right to review and provide comments on the motion and any amendments to the motion.

### 6.02   Access and Inquiry.

Between the date of this Agreement and the First Closing, Grace shall have all reasonable access to the facilities of RSS. Each Party, upon request, will permitted to contact and make reasonable inquiry of employees of the other Party with respect to the Specified Business and the Organization. RSS shall make available to Grace all books, records, and other financial data and files of RSS relating to the Specified Business and the Organization, to the extent reasonably requested by Grace. Each of the Parties acknowledges that the terms of the Confidentiality Agreement shall apply to information gained by them pursuant to the foregoing.

### 6.03   Licenses and Permits.

The Parties shall co-operate with respect to the preparation and filing with the appropriate Governmental Authorities of applications for the issuance to the Company of all governmental licenses and permits required to operate the Company after the First Closing.

16

6.04   Notices and Consents.

The Parties shall cooperate (a) to give notice to all third parties and to make all other filings with Governmental Authorities that may reasonably be required to consummate the Organization and (b) to obtain all consents of third parties required for the assignment of the Assigned Contracts or otherwise to consummate the Organization.

6.05   Public Announcements.

Except as otherwise may be required by law, neither Party shall make or cause to be made any public statement (including, without limitation, any press release) with respect to this Agreement and the Organization, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

6.06   Notification; Amendment of RSS Operating Agreement.

Each Party shall give the other Party prompt notification of any information that comes to its attention that comes to its attention (a) indicating that any representation, warranty, covenant or agreement contained in this Agreement has been breached, or any condition contained in this Agreement will not be fulfilled, or (b) otherwise material to the Organization. RSS shall not permit the provisions of Section 13.1 of the RSS Operating Agreement to be amended without the prior written consent of Grace.

## 7.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES

7.01   Survival of RSS Representations and Warranties.

All representations and warranties of RSS under this Agreement shall survive the First Closing and the Second Closing and the delivery of instruments of conveyance and assignment hereunder, shall survive any liquidation and dissolution of RSS, and shall remain effective (subject to any applicable statute of limitations). The representations and warranties set forth in Section 4.03 and subsequent Sections of Article 4 (other than Sections 4.05(a), 4.11 and 4.12) shall expire and be of no further force and effect on the third anniversary of the First Closing Date, except in each case with respect to any Claim that Grace has asserted in writing prior to such expiration, setting forth with reasonable specificity the basis and nature of such Claim.

7.02   Survival of Grace Representations and Warranties.

All representations and warranties of Grace set forth in this Agreement shall survive the First Closing and the Second Closing and shall remain effective (subject to any applicable statute of limitations). The representations and warranties set forth in Section 5.03 and subsequent Sections of Article 5 (other than Sections 5.04(a), 5.07 and 5.08) shall expire and be of no further force and

17

effect on the third anniversary of the First Closing Date, except in each case with respect to any Claim that RSS has asserted in writing prior to such expiration, setting forth with reasonable specificity the basis and nature of such Claim.

## 8.  GENERAL.

### 8.01  Notices.

All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be deemed to have been duly given if in writing and delivered personally or by private delivery service, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

| If to RSS: | If to Grace: |
|---|---|
| RS Solutions, LLC<br>4992 Rialto Road<br>West Chester, Ohio 45069<br>Attention: President<br>Fax: (513) 874-3222<br>Confirmation: (513) 874-4075 | W. R. Grace & Co.—Conn.<br>62 Whittemore Avenue<br>Cambridge, Massachusetts 02140<br>Attention: Andrew Bonham<br>Fax: (617) 491-2029<br>Confirmation: (617) 876-1400 |
| with a copy to: | with a copy to: |
| Keating, Muething & Klekamp<br>Suite 1400, One E. Fourth St.<br>Cincinnati, OH 45202<br>Attention: Paul V. Muething<br>Fax: (513) 579-6986<br>Confirmation: (513) 579-6517 | W. R. Grace & Co.—Conn.<br>7500 Grace Drive<br>Columbia, Maryland 21044<br>Attention: Corporate Secretary<br>Fax: (410) 531-4545<br>Confirmation: (410) 531-4000 |

Any Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

### 8.02  Limitation of Liability.

Notwithstanding any provision of this Agreement, the other Organization Documents or the Prior CDAs (as defined in the LLC Agreement), each Party acknowledges and agrees that no Party shall seek or be entitled to incidental, punitive, indirect or consequential damages, damages for lost profits, business interruptions, claims of customers or litigation expenses pursuant to this Agreement, the other Organization Documents, the Prior CDAs or the transactions set forth herein and therein and the sole and exclusive remedy of any Party following the date of this Agreement with respect to any and all claims

18

relating to this Agreement, the other Organization Documents, the Prior CDAs and the transactions set forth herein and therein, shall be pursuant to the remedies provisions set forth in this Agreement and the other Organization Documents. The remedies of the Parties hereunder are cumulative and shall not exclude any other remedies to which a Party may be entitled under this Agreement, the other Organization Documents or the Prior CDAs. Each Party further agrees and acknowledges that (i) each Party's maximum aggregate liability for money damages pursuant to this Agreement, the other Transaction Documents (as defined in the LLC Agreement), the Prior CDAs, and the transactions set forth herein and therein, shall be limited as set forth in Section 11.4 of the LLC Agreement; and (ii) each Party's maximum aggregate liability for money damages pursuant to the License Agreement shall be limited as set forth in Section 12.09 of the License Agreement..

### 8.03  Force Majeure.

If the performance of any obligation under this Agreement is prevented or impaired for any cause beyond the reasonable control of a defaulting Party, such as by acts of war, riot, acts of defaults of common carriers, or governmental laws, acts or regulations, such Party shall be excused from performance as long as such cause continues to prevent or impair performance; provided, however, the Party claiming such excuse shall hereto promptly notify the other Parties of the existence of such cause and shall at all times use diligent efforts to resume and to complete performance.

### 8.04  Headings.

The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

### 8.05  Entire Agreement.

This Agreement, the other Organization Documents and the Prior CDAs represent the entire agreement among all the Parties with respect to their subject matter and supersede any and all previous oral or written agreements or understandings among the Parties or between any of them.

### 8.06  Counterparts.

This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by any one or all of the Parties. Each such counterpart shall be an original, but all such counterparts shall constitute but one agreement.

### 8.07  Relationship of Parties.

The Parties are independent contractors, and, except as set forth in this Agreement or the other Organization Documents, no Party nor its employees or

agents will be deemed to be employees or agents of another Party for any purpose or under any circumstances. No partnership, joint venture, alliance, fiduciary or any relationship other than that of independent contractors is created hereby, expressly or by implication.

### 8.08   Governing Law; Dispute Resolution.

This Agreement is made in and shall be construed in accordance with the laws of the State of Delaware without regard to conflicts-of-laws principles that would require the application of any other law. Each Party hereby irrevocably submits in any proceeding arising out of or relating to this Agreement or any of its rights or obligations hereunder to the exclusive jurisdiction of the federal or state courts sitting in Wilmington, Delaware, and the appellate courts having jurisdiction thereover, agrees to accept service of process sent in accordance with Section 8.01, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

### 8.09   Binding Effect.

The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted assigns.

### 8.10   Assignment.

Except as otherwise provided in this Article, this Agreement may not be assigned in whole or part by any Party without the prior written consent of the other Parties; provided however, that RSS and Grace may assign their respective rights under this Agreement to any Person that becomes a Substitute Member (as defined in the LLC Agreement).

### 8.11   Amendment; Waiver.

While this Agreement is in effect, the Parties may amend the terms and conditions of this Agreement through a mutual written agreement signed by duly authorized officers of the Parties and referring to this Agreement. No Party shall have any vested rights in this Agreement that may not be modified through an amendment to this Agreement. The invalidity or unenforceability of any Article, Section, or other portion of this Agreement in any jurisdiction shall not cause or support the invalidity of the entire Agreement as to such jurisdiction, and shall not affect the validity or enforceability of such Article, Section, or portion thereof in any other jurisdiction. The Members will replace any Article, Section, or portion thereof found invalid or unenforceable with alternative language that will be as similar as possible in its conditions with regard to its financial effects. The failure of any Party to exercise any right or insist upon strict performance of a covenant or condition hereunder shall not be waiver of its right to exercise such right or demand strict compliance therewith in the future. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted

20

jointly by all Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any Articles or Sections of this Agreement.

8.12   No Third Party Beneficiaries.

This Agreement is entered into among the Parties for the exclusive benefit of the Parties and their permitted assignees. This Agreement is expressly not intended for the benefit of the Company, or for the Parties as members of or holders of any interest in the Company, or of any creditor of the Parties or of the Company or any of them.

8.13   Effectiveness.

This Agreement shall become effective on the Authorization Date. If this Agreement is terminated in accordance with its terms before the Authorization Date occurs, it shall be deemed void *ab initio.*

**IN WITNESS WHEREOF,** the Parties have duly executed this instrument on the date first above written.

RS SOLUTIONS, LLC

By: _Kenneth W. Feldmann_
    Kenneth Feldmann
    Secretary and Treasurer

W. R. GRACE & CO.-CONN.

By: _Lawrence S. Shapiro_
    Lawrence S. Shapiro
    Authorized Signatory

# **EXHIBIT B**

Blacklined Organization Agreement

8/22/08EXECUTION COPY

ORGANIZATION AGREEMENT
OF
GR 2008 LLC

[              ], 2008September 12, 2008

THIS AGREEMENT AND THE OTHER AGREEMENTS AS DEFINED OR
REFERRED TO HEREIN ARE DRAFT AGREEMENTS ONLY AND DELIVERY
OR DISCUSSION OF THESE DRAFT AGREEMENTS SHOULD NOT BE
CONSTRUED AS AN OFFER OR COMMITMENT WITH RESPECT TO THE
PROPOSED TRANSACTION TO WHICH THESE DRAFT AGREEMENTS
PERTAIN.   NOTWITHSTANDING THE DELIVERY OF THESE DRAFT
AGREEMENTS OR ANY PAST, PRESENT OR FUTURE APPROVALS BY
THE MANAGEMENTS, BOARDS OF DIRECTORS, OR STOCKHOLDERS OF
ANY PARTY TO THE PROPOSED TRANSACTION (OR ANY RELATED
PERSON) OR ANY OTHER PAST, PRESENT OR FUTURE WRITTEN OR
ORAL INDICATION OF ASSENT, OR INDICATION OF RESULTS OF
NEGOTIATIONS OR AGREEMENT, NO PARTY TO THE PROPOSED
TRANSACTION (AND NO PERSON RELATED TO ANY SUCH PARTY) WILL
BE UNDER ANY LEGAL OBLIGATION WITH RESPECT TO THE PROPOSED
TRANSACTION OR ANY SIMILAR TRANSACTION, AND NO OFFER,
COMMITMENT, UNDERTAKING, ESTOPPEL OR OBLIGATION OF ANY
NATURE WHATSOEVER SHALL BE IMPLIED IN FACT, LAW OR EQUITY,
UNLESS AND UNTIL THE FORMAL AGREEMENTS PROVIDING FOR THE
TRANSACTION HAVE BEEN EXECUTED AND DELIVERED BY ALL
PARTIES THERETO.

/

# ORGANIZATION AGREEMENT OF GR 2008 LLC

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | **DEFINITIONS** | 21 |
| 1.01 | General. | 21 |
| 1.02 | Definitions. | 21 |
| 1.03 | Additional Definitions. | 24 |
| 2. | **ORGANIZATION** | 24 |
| 2.01 | Organization. | 24 |
| 3. | **CLOSINGS; TERMINATION; FURTHER ASSURANCE.** | 25 |
| 3.01 | First Closing. | 25 |
| 3.02 | Conditions to First Closing. | 25 |
| 3.03 | Second Closing. | 26 |
| 3.04 | Conditions to Second Closing. | 26 |
| 3.05 | Termination. | 27 |
| 3.06 | Further Assurances. | 28 |
| 4. | **REPRESENTATIONS AND WARRANTIES OF XYZRSS.** | 28 |
| 4.01 | Formation. | 28 |
| 4.02 | No Conflict; Authorization. | 29 |
| 4.03 | Absence of Certain Changes. | 29 |
| 4.04 | Contracts. | 210 |
| 4.05 | Patents, Technology. | 210 |
| 4.06 | Employee Secrecy and Noncompetition Agreements. | 211 |
| 4.07 | Compliance with Laws. | 212 |
| 4.08 | Litigation and Claims. | 212 |
| 4.09 | Environmental Matters. | 212 |
| 4.10 | Accuracy of Information. | 212 |
| 4.11 | Investment Representations. | 212 |
| 4.12 | No Brokers. | 213 |
| 5. | **REPRESENTATIONS AND WARRANTIES BY GRACE.** | 213 |
| 5.01 | Corporate Organization. | 213 |
| 5.02 | No Conflict. | 213 |

5.03    Authorization. ........................................................213

5.04    Patents, Technology. ..............................................214

5.05    Employee Secrecy and Noncompetition Agreements. ........................215

5.06    Compliance with Laws. ...........................................215

5.07    Investment Representations. ....................................215

5.08    No Brokers. ...........................................................216

6.    COVENANTS. ............................................................216

6.01    Filing with Bankruptcy Court. .................................216

6.02    Access and Inquiry. ................................................216

6.03    Licenses and Permits. ............................................216

6.04    Notices and Consents. ...........................................217

6.05    Public Announcements. ..........................................217

6.06    Notification. ..........................................................217

7.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES ................217

7.01    Survival of XYZRSS Representations and Warranties. .......................217

7.02    Survival of Grace Representations and Warranties. ............................217

8.    GENERAL. ..................................................................218

8.01    Notices. ................................................................218

8.02    Limitation of Liability. .............................................218

8.03    Force Majeure. ......................................................219

8.04    Headings. .............................................................219

8.05    Entire Agreement. .................................................219

8.06    Counterparts. ........................................................219

8.07    Relationship of Parties. ..........................................219

8.08    Governing Law; Dispute Resolution. ..........................220

8.09    Binding Effect. ......................................................220

8.10    Assignment. ..........................................................220

8.11    Amendment; Waiver. ..............................................220

8.12    No Third Party Beneficiaries. ..................................221

8.13    Effectiveness. ........................................................221

## EXHIBITS

Exhibit A          LLC Agreement
Exhibit B          Joint Development Agreement
Exhibit C          Note
Exhibit D -1          Security Agreement
Exhibit D-2          IP Security Agreement
Exhibit E          Services Agreement
Exhibit F          License Agreement

## DISCLOSURE SCHEDULE

**ORGANIZATION AGREEMENT** dated [————————]September ___, 2008 by and between XYZ, a ————————————————— ("XYZRS Solutions, LLC, an Ohio limited liability company ("RSS"), and W. R. Grace & Co.-Conn., a Connecticut corporation ("Grace").

XYZRSS and Grace wish to form, become the members of and capitalize and organize GR 2008 LLC (the "Company") for the purpose of developing certain products for use in the ready mix concrete industry.

In consideration of the mutual representations, warranties and agreements herein contained, XYZRSS and Grace (the "Parties") agree as follows:

1.     **DEFINITIONS**

       1.01   General.

       All Article and Section numbers, and Exhibit and schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.   Unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Section, paragraph or clause in which the word appears.  Any of the terms defined in this Agreement may be used in the singular or the plural; words importing any gender include the other genders; and the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation."

       1.02   Definitions.

       For purposes of this Agreement the following defined terms have the following meanings.

       "Affiliate" of any specified person or other entity means a person or other entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or other entity specified.   As used in this definition, "control" of a specified entity means the direct or indirect possession of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities or other ownership interests, by contract, or otherwise.

       "Ancillary Agreements" means the following agreements:   (a) the LLC Agreement; (b) the Joint Development Agreement; (c) the Services Agreement; (d) the Note; and (e) the Security Agreements; and (f) the License Agreement.

       "Authorization Date" shall mean the date on which the Bankruptcy Court shall enter an order authorizing the Organization.

- 1 -

"BACKGROUND INFORMATION" has the meaning given such term in the Joint Development Agreement.

"BACKGROUND PATENT RIGHTS" has the meaning given such term in the Joint Development Agreement.

"Bankruptcy Case" means *In re*: *W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Business Day" means a day on which banks are not permitted or required to close in New York, New York.

"Company" has the meaning given such term at the head of this Agreement.

"Contract" means any contract, agreement, commitment or other obligation, whether or not in writing, including any amendment, modification or supplement thereof.

"Disclosure Schedule" means the Disclosure Schedule being executed and delivered by the parties simultaneously with and forming part of this Agreement

"Dissolution Event" has the meaning given such term in the LLC Agreement.

"Encumbrance" means any charge, claim, community property interest, condition, equitable interest, lien, mortgage, option, pledge, security interest, right of first refusal, hypothecation or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, that relates to or otherwise imposes liability, obligations, or standards with respect to pollution, the protection of the environment, or the protection of human health or safety.

"First Closing" means the actions to be carried out as described in Section 3.01(b).

"First Closing Date" means the date on which the First Closing takes place.

2

"Governmental Authority" means the government of the United States, or of any other sovereign country; any political subdivision of any of the foregoing; or any court, agency, board, bureau, department or commission of any of the foregoing.

"Grace" has the meaning set forth at the head of this Agreement.

"Joint Development Agreement" means the Joint Development Agreement between Grace, ~~XYZ~~RSS and the Company in the form attached hereto as **Exhibit B**.

"License Agreement" means the License Agreement between the Parties in the form attached hereto as **Exhibit F.**

"LLC Agreement" shall mean the Operating Agreement of the Company between the Parties  in the form attached hereto as **Exhibit A**.

"Note" means the Secured Promissory Note from the Company to the order of Grace evidencing certain obligations under the Joint Development Agreement and the Services Agreement in the form attached hereto as **Exhibit C**..

"Organization" means, collectively, the transactions contemplated by the Organization Documents.

"Organization Agreements" means this Agreement and the Ancillary Agreements.

"Organization Documents" means the Organization Agreements and all other agreements, instruments and documents delivered pursuant to this Agreement.

"Parties" has the meaning given such term at the head of this Agreement.

"Person" means any individual, partnership, firm, trust, association, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"~~XYZ~~RSS" has the meaning given such term at the head of this Agreement.

"~~XYZ~~RSS Change-in-Control" shall have the definition given it in the LLC Agreement; provided however, the term "Effective Date" as used in such definition shall refer to the date of this Agreement.

"~~XYZ~~RSS Executives" means Kenneth W. Feldmann, Joseph H. Sostaric and Joseph E. Stigler.

3

"~~XYZ~~RSS Liquidating Event" shall have the definition given such term in the LLC Agreement.

"~~XYZ~~RSS Operating Agreement" means the Third Amended and Restated Operating Agreement of ~~XYZ~~RSS dated August 1, 2005, and any related subscription agreements of the ~~XYZ~~RSS Owners for ~~currently~~ outstanding limited liability company interests_ outstanding as of the date ~~of this Agreement~~.

"Second Closing" shall mean the actions to be carried out as described in Section 3.03(b).

"Second Closing Date" means the date on which the Second Closing occurs.

"Security ~~Agreement~~Agreements" means the_ Security Agreement and the IP Security Agreement between the Company and Grace securing the Company's obligations under the Note in the ~~form~~forms attached hereto as **Exhibit D-1 and Exhibit D-2**, respectively.

"Services Agreement" means the Services Agreement between ~~XYZ~~RSS, Grace and the Company in the form attached hereto as **Exhibit E**.

"Specified Business" shall have the definition given it in the LLC Agreement.

"Specified Patent Rights" means the patents described on Section 1.02 of the Disclosure Schedule.

1.03   Additional Definitions.

The following additional terms have the meanings ascribed thereto in the Section indicated below next to such term:

| Defined Term | Section |
|---|---|
| Certificate of Formation | 3.02(a) |
| ~~Intellectual~~Patent ~~Property~~Rights | 4.05(a) |
| ~~XYZ~~RSS Owners | 4.01 |
| Scheduled First Closing Date | 3.01(a) |
| Scheduled Second Closing Date | 3.03(a) |

4

## 2. ORGANIZATION

2.01  Organization.

In reliance on the representations and warranties of the Parties set forth in this Agreement, and on the terms and subject to the conditions of this Agreement:

(a)  At the First Closing:

(i)  the Company shall be formed under the Delaware Limited Liability Company Act,

(ii)  Grace shall pay to the Company one million dollars ($1,000,000),

(iii)  XYZRSS shall pay to the Company ten thousand dollars ($10,000), and

(iv)  the Ancillary Agreements shall be executed and delivered; and

(b)  At the Second Closing, Grace shall pay to the Company one million dollars ($1,000,000).

## 3. CLOSINGS; TERMINATION; FURTHER ASSURANCE.

3.01  First Closing.

(a)  The Scheduled First Closing Date shall be a date chosen by the Parties that is not more than five Business Days after the Authorization Date, or such other date as the Parties may agree to in writing, at 10:00 a.m. local time at the offices of Grace, 7500 Grace Drive, Columbia, Maryland. The Parties shall meet at such time and place on the Scheduled First Closing Date to effect the First Closing, subject to the terms and conditions of this Agreement. All of the actions to be taken and documents to be executed or delivered at the First Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all such matters shall be completed.

(b)  At the First Closing:

(i)  Grace shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an account designated by the Company, one million dollars ($1,000,000.00).

5

(ii)    ~~XYZ~~RSS shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an account designated by the Company, ten thousand dollars ($10,000.00).

(iii)    The Parties and the Company shall execute and deliver the Ancillary Agreements.

3.02   Conditions to First Closing.

Each Party's obligations with respect to the transactions contemplated by Section 2.01(a) shall be subject to the fulfillment or waiver of the following conditions:

(a)    The certificate of formation of the Company in the form of Exhibit B to the LLC Agreement (the "Certificate of Formation") shall have been duly filed with the Secretary of State of Delaware, and shall be in full force and effect.

(b)    All the representations and warranties made by the other Party in this Agreement shall be true and correct in all material respects on the First Closing Date as though made on and as of such date, and such other Party shall have performed in all material respects all covenants and agreements of this Agreement that such other Party shall be required to perform on or before the First Closing Date; and such other Party shall have delivered to the first Party a certificate signed by one of its senior officers or members certifying to such effect.

(c)    No action, suit or proceeding by any third Person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the date of the First Closing) against such Party or any of its Affiliates or against the Company that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of any of the Organization Documents or the Organization, or seeks damages against such Party or any of its Affiliates or against the Company, or injunctive relief in connection therewith.

(d)    Since the date of this Agreement, there shall have occurred no ~~XYZ~~RSS Change-in-Control and ~~XYZ~~RSS shall have delivered a certificate to Grace, in form and substance satisfactory to Grace, to that effect.

3.03   Second Closing.

(a)    The Second Closing shall take place on the first anniversary of the First Closing Date (the "Scheduled Second Closing Date").

(b)    At the Second Closing, Grace shall deliver to the Company as contribution to its capital, by wire transfer in immediately available funds to an

6

account designated by the Company, one million dollars ($1,000,000.00) (the "Grace Second Contribution").

3.04   Conditions to Second Closing.

Grace's obligations with respect to the transactions contemplated by Section 3.03(b) shall be subject to the fulfillment or waiver of the following conditions:

(a)   The Certificate of Formation and the LLC Agreement shall remain in full force and effect, no Dissolution Event shall have occurred, and the Company shall not have dissolved or been dissolved.

(b)   No action, suit or proceeding by any third Person (including but not limited to any Governmental Authority) shall have been instituted (and remain pending on the Second Closing Date) against such Party or any of its Affiliates or against the Company that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of any of the Organization Documents or any part of the Organization, or seeks damages against such Party or any of its Affiliates or against the Company, or injunctive relief in connection therewith.

(c)   No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted and shall remain pending on the Second Closing Date, or shall have been threatened and such threat shall not have been withdrawn on or before Second Closing Date, and no claim shall have been made by any such third Person and shall not have been withdrawn on or before the Second Closing Date, which alleges that (i) infringement (whether by ~~XYZ~~RSS or any of its Affiliates) of any United States or foreign patent rights or other Intellectual Property rights has occurred or is involved in connection with the operations of the business of ~~XYZ~~RSS or the Specified Business, or (ii) ~~XYZ~~RSS's manufacture of Mixing Systems (as defined in the Joint Development Agreement) in the United States, and ~~XYZ~~RSS's sale of the same in any country of the world, does not infringe upon, or with respect to trade secrets otherwise violate, any third party Intellectual Property right in said countries.

(d)   Grace shall not have determined that there are intellectual property issues that (i) could have a material adverse effect on the business or prospects of the Company or (ii) relate to the Specified Patent Rights.

(e)   If Grace shall have determined in its sole discretion that a license or an option to obtain a license with respect to the Specified Patent Rights is advisable, the Company shall have obtained a license or an option to obtain a license with respect to the Specified Patent Rights in favor of the Company (and, upon the occurrence of a Dissolution Event, Grace) in such form as is acceptable to Grace in its sole discretion.

7

(f)    Since the date of this Agreement, none of the following shall have occurred: (1) an ~~XYZ~~RSS Change-in-Control; (2) an ~~XYZ~~RSS Liquidating Event; or (3) a transferee, pledgee or ~~XYZ~~RSS Pledgee (as such term is defined in the LLC Agreement) has become a Holder (as such term is defined in the LLC Agreement) of an LLC Interest (as such term is defined in the LLC Agreement) as a result of or in connection with an Encumbrance of all or a portion of ~~XYZ~~RSS' LLC Interest, through foreclosure or otherwise, and ~~XYZ~~RSS shall have delivered a certificate to Grace, in form and substance satisfactory to Grace, that none of the events set forth in clauses (1), (2) and (3) of this Section 3.04(f) has occurred.

3.05   Termination.

(a)    If the First Closing shall not have taken place within 120 days after the date of this Agreement, either Party may give notice to the other Party that it wishes to terminate this Agreement; provided, however, that if the failure of the First Closing to occur by such date is the result of breach by either Party of the terms and conditions of this Agreement or failure to deliver the certificate described in Section 3.02(b), then such Party shall have no right to give such notice or otherwise terminate this Agreement.  In the event and upon receipt of such notice, this Agreement and the other Organization Agreements shall terminate and be of no further force or effect.

(b)    If any of the conditions set forth in Section 3.04 shall not have been met or on before the Scheduled Second Closing Date, then Grace shall have the right by notice to ~~XYZ~~RSS to terminate this Agreement.  Otherwise, if the Second Closing shall not have taken place within thirty days after the Scheduled Second Closing Date, then either Party may give notice to the other Party that it wishes to terminate this Agreement; provided, however, that if the failure of the Second Closing to occur by such date is the result of breach by Grace of its obligation to pay the Grace Second Contribution, then Grace shall have no right to give such notice or otherwise terminate this Agreement.

3.06   Further Assurances.

At any time and from time to time at and after the First Closing, each Party, at the request of the other Party, shall execute and deliver or cause to be executed and delivered all such documents and instruments and take or cause to be taken all such other action as the requesting Party may reasonably deem necessary or desirable in order to carry out the intents and purposes of this Agreement and the other Organization Documents.

## 4.    REPRESENTATIONS AND WARRANTIES OF ~~XYZ~~RSS.

Except as otherwise set forth in the **Disclosure Schedule** with explicit reference to the Section and any subsection in question, ~~XYZ~~RSS represents and warrants to Grace as follows:

8

4.01    Formation.

~~XYZ~~RSS is a _____limited liability company duly formed and validly existing and in good standing under the laws of _____Ohio, with full limited liability company power and authority to carry on its business as presently conducted, and to own and operate its assets and business, and the execute, deliver and perform its obligations under the Organization Documents to which it is or will be a party. The copies of the formation and any other organizational documents (including the articles of formation of ~~XYZ~~RSS and the ~~XYZ~~RSS Operating Agreement) of ~~XYZ~~RSS which heretofore have been delivered to Grace are true and complete, and there is no agreement other than the ~~XYZ~~RSS Operating Agreement that is an "operating agreement" (as defined in the Ohio Limited Liability Company Act) of ~~XYZ~~RSS. ~~XYZ~~RSS has no bylaws. No ~~XYZ~~RSS Liquidating Event has occurred. The schedule to this Section lists all the members and all the direct or indirect legal and beneficial owners ("beneficial owner" is defined as set forth in Rule 13d-3 under the Securities Exchange Act of 1934, as amended, or any successor provision thereto) of membership interests of ~~XYZ~~RSS (collectively, the "~~XYZ~~RSS Owners"), and indicates whether such ownership is direct or indirect and legal and/or beneficial, and the nature and amount of each ~~XYZ~~RSS Owner's membership interest and disposition, voting and/or managerial power. Except as set forth on the schedule to this Section, ~~XYZ~~RSS Owners are and will be on the First Closing Date the record and beneficial owners and holders of the membership interests owned by each of them, free and clear of all Encumbrances.

4.02    No Conflict; Authorization.

(a)    The execution and delivery by ~~XYZ~~RSS of the Organization Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder, and/or the occurrence of the Organization, will not (i) result in the breach of any of the terms of, or constitute a default under, its organizational documents, or any Contract to which it or any of the ~~XYZ~~RSS Executives is a party or by which ~~XYZ~~RSS or any of its assets may be bound, (ii) violate any order, writ, injunction or decree of any Governmental Authority, or (iii) constitute or give rise to an ~~XYZ~~RSS Liquidating Event.

(b)    No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority, or the consent of any other Person, is required as a prerequisite to the execution and delivery by ~~XYZ~~RSS of the Organization Documents to which it is or will be a party, or its performance of its obligations hereunder and thereunder.

(c)    The execution and delivery by ~~XYZ~~RSS of the Organization Documents to which it is or will be a party, and the performance of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary limited liability company action, including any necessary action of the

9

~~XYZ~~RSS Owners. ~~XYZ~~RSS has duly executed and delivered or will duly execute and deliver the Organization Documents to which it is or will be a party, and such documents are or will be ~~XYZ~~RSS's legal, valid, and binding obligations, enforceable against ~~XYZ~~RSS in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

4.03    Absence of Certain Changes.

(a)    Since January 1, 2008, there has not been: (i) any change in the condition (financial or other), assets, liabilities, business or prospects of ~~XYZ~~RSS, except normal changes in the ordinary course of business which have not in the aggregate been materially adverse; or         (ii)     any     damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the assets, business or prospects of ~~XYZ~~RSS.

(b)    There has not been any change in the relationship or course of dealing between ~~XYZ~~RSS and any of its suppliers or customers that has had or could have a material adverse effect on ~~XYZ~~RSS or its prospects.

(c)    As far as ~~XYZ~~RSS is aware, there exists no occurrence, event or condition that materially adversely affects or may reasonably be expected to materially adversely affect the assets, business or prospects of ~~XYZ~~RSS, or that could reasonably be expected to interfere in any material respect with its ability to execute, deliver or perform its obligations under the Organization Documents to which it is or will be a party.

4.04    Contracts.

Other than the ~~XYZ~~RSS Operating Agreement and any other Contracts listed on the schedule to this Section, there are no Contracts to which ~~XYZ~~RSS is a party relating to the issuance, sale or transfer of any ~~XYZ~~RSS membership or limited liability company interests or equity or other securities of ~~XYZ~~RSS.

4.05    Patents, Technology.

(a)    The schedule to this Section sets forth in Part I~~, (i)~~ a list of all patents~~,~~ and patent applications~~, inventions, technology, trade secrets, software, and know-how used by~~ (collectively or individually "~~Intellectual Property~~Patent Rights") under development for use by, or otherwise applicable to, ~~XYZ~~RSS or the business of ~~XYZ~~RSS or the Specified Business, including those items that are owned or controlled (in the sense of having the right to license others) by each of ~~XYZ and its Affiliates, and (ii) a brief description of any Intellectual Property that is not readily or conveniently reduced to a list but which is used by, under development for use by, or otherwise applicable to, XYZ or the business of XYZ or the Specified Business, together with identification of the Person that~~

10

owns or controls such item.   XYZ hasRSS and its Affiliates.  At the First Closing Date, RSS will have sole and exclusive ownership rights to its Intellectual Property rightsPatent Rights filed or issued on or prior to the First Closing Date whose grant to the Company is provided for in the Joint Development Agreement, free and clear of any Encumbrance that is inconsistent with or would preclude or prevent such grant in whole or part.

(b)     Part II of the schedule to this Section sets forth a list of all licenses and other Contracts with respect to any Intellectual Property or Intellectual Propertyintellectual property or intellectual property rights, used by, under development for use by, or otherwise applicable to, XYZRSS or the Specified Business.

(c)     As far as each of XYZRSS and the XYZRSS Executives is aware, for the conduct of the Specified Business, no right, license, consent or other agreement (other than by or between RSS, Grace and/or the Company) is or will be required with respect to any Intellectual Propertyof RSS' intellectual property, other than those listed or described in the schedules to this Section or in the schedules to Section 5.04.

(d)     As far as each of XYZRSS or the XYZRSS Executives is aware, (i) no infringement (whether by XYZRSS or its Affiliates) of any US or foreign patent rights or other Intellectual Propertyintellectual property rights has occurred or is involved in connection with the operations of the business of XYZRSS or the Specified Business, and no claim of any such infringement has been made or implied; (ii) XYZRSS's manufacture of Mixing Systems (as defined in the Joint Development Agreement) in the United States, and XYZRSS's sale of the same in any country of the world, does not infringe upon, or with respect to trade secrets otherwise violate, any third party Intellectual Property right in said countries; (iii) all of the licenses and other Contracts listed or described in the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder; and (iv) there are no patents that would impede the Company's use of the Intellectual Propertyintellectual property disclosed in the schedules to this Section.

4.06   Employee Secrecy and Noncompetition Agreements.

(a)     Each XYZRSS Executive, officer, manager, director, employee, independent contractor, consultant and agent of XYZRSS who has access to any proprietary technology owned or used by XYZRSS has executed and is bound by a written Contract obligating such Person to keep such material confidential, and each XYZRSS Executive, officer, manager, director, employee, independent contractor, consultant and agent of XYZRSS whose duties include the development of proprietary technology or proprietary computer software has executed and is bound by a written Contract assigning to XYZRSS all rights

11

thereto.   All of such Contracts are in full force and effect, and as far as ~~XYZ~~RSS and the ~~XYZ~~RSS Executives are aware, there are no defaults thereunder.

(b)   Except as specifically set forth in the schedule to this Section, as far as ~~XYZ~~RSS and the ~~XYZ~~RSS Executives are aware, no:  (i) employee, independent contractor, consultant or agent of ~~XYZ~~RSS who has access to any of ~~XYZ~~RSS' BACKGROUND INFORMATION or BACKGROUND PATENT RIGHTS; or (ii) ~~XYZ~~RSS Executive, officer, manager or director, is a party to, or is otherwise bound by, any Contract:  (A) requiring such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets or containing any prohibition or restriction on competition or solicitation of customers; (B) that limits or purports to limit the ability of such Person to engage in or continue or perform any conduct, activity, duties or practice relating to the business of ~~XYZ~~RSS or the Specified Business; or (C) that limits or purports to limit the ability of such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets.

(c)   Except as specifically set forth in the schedule to this Section, as far as ~~XYZ~~RSS and the ~~XYZ~~RSS Executives are aware, no ~~XYZ~~RSS Executive, officer, manager, director, employee, independent contractor, consultant or agent of ~~XYZ~~RSS is a party to, or is otherwise bound by, any Contract that in any way adversely affects, or will adversely affect, the ability of ~~XYZ~~RSS to meet its obligations under the Organization Documents and to provide Services to the Company pursuant to the Joint Development Agreement, the Services Agreement or otherwise.

4.07   Compliance with Laws.

~~XYZ~~RSS has complied in a timely manner in all material respects with all laws and governmental regulations and orders relating to ~~XYZ~~RSS or any of the property owned, leased or used by it, including, but not limited to, labor, occupational safety and health, environmental and antitrust laws.

4.08   Litigation and Claims.

There is (a) no suit, action or claim, (b) no investigation or inquiry by any Governmental Authority, and (c) no legal, administrative or arbitration proceeding (each an "Action") pending or (so far as ~~XYZ~~RSS is aware) threatened against ~~XYZ~~RSS or any of its assets, or to which ~~XYZ~~RSS is a party, and (so far as each of ~~XYZ~~RSS and the ~~XYZ~~RSS Executives is aware) there is no basis for any such Action, except as specifically set forth in the schedule to this Section, which schedule also specifies each Action pending at any time since ~~XYZ~~RSS's formation.  Except as specifically set forth in the schedule to this Section, there is no outstanding order, writ, injunction or decree of any Governmental Authority or arbitration tribunal against or binding on ~~XYZ~~RSS or any of its assets.

12

4.09    Environmental Matters.

Neither ~~XYZ~~RSS nor any of the ~~XYZ~~RSS Executives (i) has received any notice of any violation of, or liability incurred pursuant to, any Environmental Law affecting ~~XYZ~~RSS or any of its employees or owned or leased property, nor is ~~XYZ~~RSS or any of the ~~XYZ~~RSS Executives aware of any such violation or liability for which notice has not been received, nor (ii) has received any notice of existing or potential injuries to current or former employees of ~~XYZ~~RSS caused by exposure to hazardous or chemical substances.

4.10    Accuracy of Information.

As far as each of ~~XYZ~~RSS and the ~~XYZ~~RSS Executives is aware, the information provided by ~~XYZ~~RSS and any of the ~~XYZ~~RSS Executives in this Agreement or the Exhibits or the Disclosure Schedule to this Agreement, or otherwise provided to Grace in connection with this Agreement, taken as a whole, does not contain any materially misleading statement, or omit any information the failure to disclose which makes any information disclosed materially misleading.    For purposes of this Section, "materially misleading" means materially misleading with respect to the business, condition (financial or otherwise), assets or prospects of ~~XYZ~~RSS or the Company taken as a whole, or that could reasonably be expected to materially interfere with ~~XYZ~~RSS's ability to perform its obligations under any of the Organization Documents to which it is a party.

4.11    Investment Representations.

~~XYZ~~RSS (a) is acquiring its interest in the Company for its own account as an investment and without an intent to distribute the interest; (b) acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws and may not be resold or transferred by ~~XYZ~~RSS without appropriate registration or the availability of an exemption from such requirements; (c) acknowledges that it and its legal and business advisors have had sufficient opportunity to perform due diligence and obtain all requested pertinent information from the Company and Grace with respect to the terms of this Agreement, the other Organization Documents and the Organization; (d) has evaluated the risks involved in investing in the Company and agreeing to certain terms of this Agreement and has determined that this is a suitable investment and business arrangement for ~~XYZ~~RSS after taking into consideration such risks.

4.12    No Brokers.

Neither ~~XYZ~~RSS nor any of its Affiliates has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the execution, delivery or performance of the Organization Documents, or any of them, or the Organization.

13

## 5.    REPRESENTATIONS AND WARRANTIES BY GRACE.

Except as set forth in the **Disclosure Schedule** with explicit reference to the Section and any subsection in question, and as subject to, and except for actions and approvals required by, the U.S. Bankruptcy Code with respect to the Bankruptcy Case, Grace represents and warrants to ~~XYZ~~RSS as follows:

### 5.01    Corporate Organization.

Grace is a corporation duly organized and validly existing and in good standing under the laws of Connecticut, with full corporate power and authority to carry on its business as presently conducted and to own and operate its assets and business, and to execute, deliver and perform its obligations under the Organization Documents to which it is or will be a party.

### 5.02    No Conflict.

The execution and delivery by Grace of the Organization Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, its certificate of incorporation and by-laws, or any Contract to which it is a party or by which it or any of its assets are bound, or (ii) violate any order, writ, injunction or decree of any court or Governmental Authority.

### 5.03    Authorization.

(a)    The execution and delivery by Grace of the Organization Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary corporate action on its part.  Grace has executed or will execute the Organization Documents to which it is a party, and such documents and such documents are or will be Grace's legal, valid, and binding obligations, enforceable against Grace in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

(b)    Except for approval of the Bankruptcy Court, no consent, approval, order or authorization of, or registration, declaration or filing with, any court or Governmental Authority is required as a prerequisite to the execution and delivery by Grace of the Organization Documents to which it is or will be a party, or its performance of its obligations hereunder and thereunder.

14

5.04    Patents, Technology.

(a)    The schedule to this Section sets forth in Part I, (i) a list of all Intellectual PropertyGrace's BACKGROUND PATENT RIGHTS, including those items that are owned or controlled (in the sense of having the right to license others) by each of Grace and its Affiliates, and (ii) a brief description of any Intellectual Property that is not readily or conveniently reduced to a list but which is included in Grace's BACKGROUND INFORMATION and BACKGROUND PATENT RIGHTS, together with identification of the Person that owns or controls such item.   Grace has. On the First Closing Date, Grace will have sole and exclusive ownership rights to its Intellectual Property rightsBACKGROUND PATENT RIGHTS filed or issued prior to the First Closing Date whose grant to the Company is provided for in the Joint Development Agreement, free and clear of any Encumbrance that is inconsistent with or would preclude or prevent such grant in whole or part.

(b)    Part II of the schedule to this Section sets forth a list of all licenses and other Contracts with respect to any of Grace's BACKGROUND INFORMATION and BACKGROUND PATENT RIGHTS.

(c)    As far as Grace is aware, for the conduct of the Specified Business, no right, license, consent or other agreement (other than by or between Grace, RSS and/or the Company) is or will be required with respect to any Intellectual Property, other than those listed or described in the schedules to this Section or in the schedules to Section 4.05.of Grace's BACKGROUND PATENT RIGHTS.

(d)    As far as Grace is aware, no infringement (whether by Grace or its Affiliates) of any US or foreign patent rights or other Intellectual Propertyintellectual property rights has occurred or is involved in connection with their use of Grace's BACKGROUND INFORMATION and BACKGROUND PATENT RIGHTS, and no claim of any such infringement has been made or implied. As far as Grace is aware, all of the licenses and other Contracts listed or described in the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder.  As far as Grace is aware, there are no patents that would impede the Company's use of the Intellectual Property disclosed in the Disclosure Schedule to this SectionBACKGROUND PATENT RIGHTS.

5.05    Employee Secrecy and Noncompetition Agreements.

(a)    Each employee, independent contractor, consultant and agent of Grace's concrete admixture business who has access to any of Grace's BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS has executed and is bound by a written Contract obligating such Person to keep such material confidential, and each employee, independent contractor, consultant and agent of Grace's admixture business whose duties include the development

15

of BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS has executed and (except in the case of employees of longer standing) is bound by a written Contract assigning to Grace all rights thereto. All of such Contracts are in full force and effect, and as far as Grace is aware, there are no defaults thereunder.

(b)    Except as specifically set forth in the schedule to this Section, as far as Grace is aware, no employee, independent contractor, consultant or agent of Grace's admixture business who has access to any of Grace's BACKGROUND INFORMATION OR BACKGROUND PATENT RIGHTS is a party to, or is otherwise bound by, any Contract: (i) requiring such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets or containing any prohibition or restriction on competition or solicitation of customers; (ii) that limits or purports to limit the ability of such Person to engage in or continue or perform any conduct, activity, duties or practice relating to the Specified Business; or (iii) that limits or purports to limit the ability of such Person to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets.

(c)    Except as specifically set forth in the schedule to this Section, as far as Grace is aware, no employee, independent contractor, consultant or agent of Grace's admixture business is a party to, or is otherwise bound by, any Contract that in any way adversely affects, or will adversely affect, the ability of Grace to meet its obligations under the Organization Documents and to provide Services to the Company pursuant to the Joint Development Agreement, the Services Agreement or otherwise.

     5.06   <u>Compliance with Laws.</u>

Grace's business has complied in a timely manner with all laws and governmental regulations and orders, including, but not limited to, labor, occupational safety and health, environmental and antitrust laws, which are material to its execution, delivery or performance of the Organization Documents to which it is a party.

     5.07   <u>Investment Representations.</u>

Grace (a) is acquiring its interest in the Company for its own account as an investment and without an intent to distribute the interest; (b) acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws and may not be resold or transferred by ~~XYZ~~RSS without appropriate registration or the availability of an exemption from such requirements; (c) acknowledges that it and its legal and business advisors have had sufficient opportunity to perform due diligence and obtain all requested pertinent information from the Company and ~~XYZ~~RSS with respect to the terms of this Agreement, the other Organization Documents and the Organization; (d)

16

has evaluated the risks involved in investing in the Company and agreeing to certain terms of this Agreement and has determined that this is a suitable investment and business arrangement for Grace after taking into consideration such risks.

    5.08   No Brokers.

Neither Grace nor any of its Affiliates has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the execution, delivery or performance of the Organization Documents, or any of them, or the Organization.

## 6.    COVENANTS.

    6.01   Filing with Bankruptcy Court.

As soon as practicable after the execution of this Agreement, Grace shall file a motion with the Bankruptcy Court seeking approval of the Organization. ~~XYZ~~RSS shall have the right to review and provide comments on the motion and any amendments to the motion.

    6.02   Access and Inquiry.

Between the date of this Agreement and the First Closing, Grace shall have all reasonable access to the facilities of ~~XYZ~~RSS.  Each Party, upon request, will permitted to contact and make reasonable inquiry of employees of the other Party with respect to the Specified Business and the Organization. ~~XYZ~~RSS shall make available to Grace all books, records, and other financial data and files of ~~XYZ~~RSS relating to the Specified Business and the Organization, to the extent reasonably requested by Grace.  Each of the Parties acknowledges that the terms of the Confidentiality Agreement shall apply to information gained by them pursuant to the foregoing.

    6.03   Licenses and Permits.

The Parties shall co-operate with respect to the preparation and filing with the appropriate Governmental Authorities of applications for the issuance to the Company of all governmental licenses and permits required to operate the Company after the First Closing.

    6.04   Notices and Consents.

The Parties shall cooperate (a) to give notice to all third parties and to make all other filings with Governmental Authorities that may reasonably be required to consummate the Organization and (b) to obtain all consents of third

17

parties required for the assignment of the Assigned Contracts or otherwise to consummate the Organization.

6.05   Public Announcements.

Except as otherwise may be required by law, neither Party shall make or cause to be made any public statement (including, without limitation, any press release) with respect to this Agreement and the Organization, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

6.06   Notification; Amendment of RSS Operating Agreement.

Each Party shall give the other Party prompt notification of any information that comes to its attention that comes to its attention (a) indicating that any representation, warranty, covenant or agreement contained in this Agreement has been breached, or any condition contained in this Agreement will not be fulfilled, or (b) otherwise material to the Organization.  RSS shall not permit the provisions of Section 13.1 of the RSS Operating Agreement to be amended without the prior written consent of Grace.

## 7.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES

7.01   Survival of XYZRSS Representations and Warranties.

All representations and warranties of XYZRSS under this Agreement shall survive the First Closing and the Second Closing and the delivery of instruments of conveyance and assignment hereunder, shall survive any liquidation and dissolution of XYZRSS, and shall remain effective (subject to any applicable statute of limitations).  The representations and warranties set forth in Section 4.03 and subsequent Sections of Article 4 (other than Sections 4.05(a), 4.11 and 4.12) shall expire and be of no further force and effect on the third anniversary of the First Closing Date, except in each case with respect to any Claim that Grace has asserted in writing prior to such expiration, setting forth with reasonable specificity the basis and nature of such Claim.

7.02   Survival of Grace Representations and Warranties.

All representations and warranties of Grace set forth in this Agreement shall survive the First Closing and the Second Closing and shall remain effective (subject to any applicable statute of limitations).  The representations and warranties set forth in Section 5.03 and subsequent Sections of Article 5 (other than Sections 5.04(a), 5.07 and 5.08) shall expire and be of no further force and effect on the third anniversary of the First Closing Date, except in each case with respect to any Claim that XYZRSS has asserted in writing prior to such expiration, setting forth with reasonable specificity the basis and nature of such Claim.

18

8.    **GENERAL.**

8.01    Notices.

All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be deemed to have been duly given if in writing and delivered personally or by private delivery service, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

| If to ~~XYZ~~RSS: | If to Grace: |
|---|---|
| RS Solutions, LLC<br>4992 Rialto Road<br>West Chester, Ohio 45069<br>Attention:  President<br>Fax: (513) 874-3222<br>Confirmation:  (513) 874-4075<br><br>with a copy to:<br><br><br><br><br><br>Keating, Muething & Klekamp<br>Suite 1400, One E. Fourth St.<br>Cincinnati, OH 45202<br>Attention: Paul V. Muething<br>Fax: (513) 579-6986<br>Confirmation:  (513) 579-6517 | W. R. Grace & Co.—Conn.<br>62 Whittemore Avenue<br>Cambridge, Massachusetts 02140<br>Attention:  Andrew Bonham<br>Fax: (617) 491-2029<br>Confirmation:  (617) 876-1400<br><br>with a copy to:<br><br>W. R. Grace & Co.—Conn.<br>7500 Grace Drive<br>Columbia, Maryland 21044<br>Attention:  Corporate Secretary<br>Fax: (410) 531-4545<br>Confirmation:  (410) 531-4000 |

Any Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

8.02    Limitation of Liability.

Notwithstanding any provision of this Agreement, the other ~~Transaction~~Organization Documents ~~(as defined in the LLC Agreement)~~ or the Prior CDAs (as defined in the LLC Agreement), each Party acknowledges and agrees that no Party shall seek or be entitled to incidental, punitive, indirect or consequential damages, damages for lost profits, business interruptions, claims

19

of customers or litigation expenses pursuant to this Agreement, the other ~~Transaction~~Organization Documents, the Prior CDAs or the transactions set forth herein and therein and the sole and exclusive remedy of any Party following the date of this Agreement with respect to any and all claims relating to this Agreement, the other ~~Transaction~~Organization Documents, the Prior CDAs and the transactions set forth herein and therein, shall be pursuant to the remedies provisions set forth in this Agreement and the other ~~Transaction~~Organization Documents. The remedies of the Parties hereunder are cumulative and shall not exclude any other remedies to which a Party may be entitled under this Agreement, the other ~~Transaction~~Organization Documents or the Prior CDAs. Each Party further agrees and acknowledges that (i) each Party's maximum aggregate liability for money damages pursuant to this Agreement, the other Transaction Documents (as defined in the LLC Agreement), the Prior CDAs, and the transactions set forth herein and therein, shall be limited as set forth in Section 11.4 of the LLC Agreement; and (ii) each Party's maximum aggregate liability for money damages pursuant to the License Agreement shall be limited as set forth in Section 12.09 of the License Agreement..

8.03    Force Majeure.

If the performance of any obligation under this Agreement is prevented or impaired for any cause beyond the reasonable control of a defaulting Party, such as by acts of war, riot, acts of defaults of common carriers, or governmental laws, acts or regulations, such Party shall be excused from performance as long as such cause continues to prevent or impair performance; provided, however, the Party claiming such excuse shall hereto promptly notify the other Parties of the existence of such cause and shall at all times use diligent efforts to resume and to complete performance.

8.04    Headings.

The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

8.05    Entire Agreement.

This Agreement, the other Organization Documents and the Prior CDAs represent the entire agreement among all the Parties with respect to ~~its~~their subject matter and supersede any and all previous oral or written agreements or understandings among the Parties or between any of them.

8.06    Counterparts.

This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by any one or all of the Parties. Each such counterpart shall be an original, but all such counterparts shall constitute but one agreement.

20

8.07    Relationship of Parties.

The Parties are independent contractors, and, except as set forth in this Agreement or the other Organization Documents, no Party nor its employees or agents will be deemed to be employees or agents of another Party for any purpose or under any circumstances.  No partnership, joint venture, alliance, fiduciary or any relationship other than that of independent contractors is created hereby, expressly or by implication.

8.08    Governing Law; Dispute Resolution.

This Agreement is made in and shall be construed in accordance with the laws of the State of Delaware without regard to conflicts-of-laws principles that would require the application of any other law.  Each Party hereby irrevocably submits in any proceeding arising out of or relating to this Agreement or any of its rights or obligations hereunder to the exclusive jurisdiction of the federal or state courts sitting in Wilmington, Delaware, and the appellate courts having jurisdiction thereover, agrees to accept service of process sent in accordance with Section 8.01, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

8.09    Binding Effect.

The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted assigns.

8.10    Assignment.

Except as otherwise provided in this Article, this Agreement may not be assigned in whole or part by any Party without the prior written consent of the other Parties; provided however, that ~~XYZ~~RSS and Grace may assign their respective rights under this Agreement to any Person that becomes a Substitute Member (as defined in the LLC Agreement).

8.11    Amendment; Waiver.

While this Agreement is in effect, the Parties may amend the terms and conditions of this Agreement through a mutual written agreement signed by duly authorized officers of the Parties and referring to this Agreement.  No Party shall have any vested rights in this Agreement that may not be modified through an amendment to this Agreement.  The invalidity or unenforceability of any Article, Section, or other portion of this Agreement in any jurisdiction shall not cause or support the invalidity of the entire Agreement as to such jurisdiction, and shall not affect the validity or enforceability of such Article, Section, or portion thereof in any other jurisdiction.  The Members will replace any Article, Section, or portion thereof found invalid or unenforceable with alternative language that will be as similar as possible in its conditions with regard to its financial effects.  The failure

21

of any Party to exercise any right or insist upon strict performance of a covenant or condition hereunder shall not be waiver of its right to exercise such right or demand strict compliance therewith in the future.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any Articles or Sections of this Agreement.

      8.12   No Third Party Beneficiaries.

This Agreement is entered into among the Parties for the exclusive benefit of the Parties and their permitted assignees.  This Agreement is expressly not intended for the benefit of the Company, or for the Parties as members of or holders of any interest in the Company, or of any creditor of the Parties or of the Company or any of them.

      8.13   Effectiveness.

This Agreement shall become effective on the Authorization Date.  If this Agreement is terminated in accordance with its terms before the Authorization Date occurs, it shall be deemed void *ab initio*.

**IN WITNESS WHEREOF**, the Parties have duly executed this instrument on the date first above written.

| ~~XYZ~~RS SOLUTIONS, LLC | W. R. GRACE & CO.-CONN. |
|---|---|
| By:_____ | By:_____ |
| ~~Name:~~ | ~~Name:~~ |
|    Kenneth Feldmann |    Lawrence S. Shapiro |
| ~~Title:~~   Secretary and Treasurer |    Authorized Signatory |
| | ~~Title:~~ |

22

Document comparison done by Workshare DeltaView on Friday, September 12, 2008 4:47:12 PM

| Input: | |
|---|---|
| Document 1 | file://Y:/Legal2/JMCFARLA/WORD/Deals/Red Sox/Red Sox Org Agreement v7r (2) as filed 082508.doc |
| Document 2 | file://Y:/Legal2/JMCFARLA/WORD/Deals/Red Sox/Red Sox Org Agreement FINAL(no Exs).doc |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 255 |
| Deletions | 233 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 490 |