IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. GRACE & CO., *et al.*, | : | Case No. 01-1139 (JKF) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re: D.I. No. 19581** |
| | : | |
| | : | |

**OBJECTION OF LONGACRE MASTER FUND, LTD. TO DEBTORS' DISCLOSURE
STATEMENT FOR THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE OF W.R. GRACE & CO., ET AL., THE OFFICIAL
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI
FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS DATED AS OF SEPTEMBER 19, 2008**

Longacre Master Fund, Ltd. ("Longacre"), by and through its undersigned

counsel, hereby objects (the "Objection") to the above-captioned debtors' (the "Debtors")

Disclosure Statement For The Joint Plan Of Reorganization Under Chapter 11 Of The

Bankruptcy Code Of W.R. Grace & Co., *et al.*, The Official Committee Of Asbestos Personal

Injury Claimants, The Asbestos PI Future Claimants' Representative, And The Official

Committee Of Equity Security Holders Dated As Of September 19, 2008 (D.I. 19581) (the

"Disclosure Statement"), and in support hereof, Longacre respectfully states as follows:

**Background**

1.      On April 2, 2001 (the "Petition Date") the Debtors each filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (as amended, the

"Bankruptcy Code").  The Debtors are presently operating their businesses and managing their

properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      Throughout these cases, Longacre acquired the claims of several

unsecured creditors, currently totaling in excess of $16.6 million in the aggregate, plus additional

interest, fees and charges (collectively, the "Longacre Claims").[1]  Longacre owns the Longacre

Claims and all rights and benefits under such claims belong to Longacre, as the successor-in-

interest to the respective entities that assigned the claims to Longacre.

3.  Certain of the Longacre Claims are based on agreements that, among other

things, required the contracting Debtor to pay an agreed-upon rate of interest in the event the

Debtor defaulted under the agreement, such as by failing to make payment or paying late.  For

example, certain of the Longacre Claims contemplate a yearly service charge for invoices paid

late, ranging from approximately 12% - 24% (per annum).

4.  Additionally, certain of the Longacre Claims are allowed pursuant to

Court-approved Stipulations between the Debtors and the original claimant that vary from silent

to clear to ambiguous on the subject of post-petition interest.  Certain of such Stipulations, for

example, set forth an allowed amount for the Claim, but are silent as to the payment of interest

(*see, e.g.,* D.I. No. 6598), others provide for the time at which interest will begin to accrue, but

do not specify the rate of interest to be paid (*see, e.g.,* D.I. 17632), and still others are ambiguous

regarding interest.

5.  On September 19, 2008, the Debtors filed the Joint Plan Of

Reorganization Under Chapter 11 Of The Bankruptcy Code Of W.R. Grace & Co., *et al.*, The

Official Committee Of Asbestos Personal Injury Claimants, The Asbestos PI Future Claimants'

Representative, And The Official Committee Of Equity Security Holders Dated As Of

September 19, 2008 (D.I. 19579) (the "Plan") and the accompanying Disclosure Statement.

---

[1]    Certain of the Longacre Claims include claims for interest, fees and/or other charges.  The aggregate amount of the Longacre Claims as stated herein is included solely for the purpose of providing the information requested in the Notice Of Hearing on the Disclosure Statement.  Longacre reserves all rights in connection with the Longacre Claims, including without limitation payment in full in accordance with the Bankruptcy Code and applicable law and including, without limitation, payment of interest in excess of the Federal Judgment Rate.

6.      The Disclosure Statement provides, among other things, that holders (the "Unsecured Creditors") of allowed general unsecured claims (the "Unsecured Claims"), such as Longacre, will receive a cash payment equal to the allowed amount of the respective claim plus ". . . post-petition interest [that] shall be calculated from the Petition Date at the rate of 4.19% compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate . . .".  (Disclosure Statement, § 1.2.1).  Thus, the Disclosure Statement contemplates that Unsecured Creditors will only receive interest at the 4.19% rate set forth in the Plan, even if the claimant had contracted for a higher interest rate in the event of default.  The Disclosure Statement erroneously states that Unsecured Claims are unimpaired, and therefore provides that Unsecured Creditors will not be entitled to vote on the Plan.  (Id. at § 4.3.1.9).

7.      Notwithstanding that the Plan would reduce the interest rate to which some Unsecured Creditors are contractually entitled, the Disclosure Statement provides that holders of equity in the Debtors will retain their interests under the Plan.  (Id. at §§ 4.3.1.10, 4.3.1.11).  The equity that interest holders will retain under the Plan approximates $1.2 billion.[2]

**Unsecured Creditors must be afforded the right to vote on the Plan.**

8.      The Disclosure Statement states that Debtors will not be soliciting votes for acceptance or rejection of the Plan from Unsecured Creditors because they are deemed to accept the Plan.  (Disclosure Statement, § 4.3.1.9).  However, Unsecured Creditors are clearly entitled to vote on the Plan pursuant to section 1126(a) of the Bankruptcy Code, which states, in relevant part "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."  11 U.S.C. § 1126(a).  The presumption that a particular class accepts a plan (which presumption obviates the need to solicit acceptances from such class) only attaches if the treatment afforded by the Plan to such class would render it "unimpaired."  11 U.S.C. §

---

[2]      As of September 24, 2008, Debtors had a market capitalization of $1.2 billion based on $16.19 per share stock price on shares outstanding of 72.2 million.

1126(f).  Clearly, the treatment proposed for Unsecured Creditors in the Plan impairs their claims.

9.    A class is "impaired" if its legal, equitable or contractual rights are altered under the reorganization plan. In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005) (citing 11 U.S.C. § 1124).  Impairment ". . . can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement.  When the agreement requires a higher post-default rate of interest, this means the higher rate must be paid.  Any other treatment would alter the creditor's rights." In re Ace-Texas, Inc., 217 B.R. 719, 727 (Bankr. D. Del. 1998).  As noted, supra, the Plan proposes a set rate of interest regardless of the rate that may otherwise accrue on Unsecured Claims under the contracts governing such claims.  Indeed, the fixed 4.19% rate set forth in the Plan is lower than the interest claimed under certain of the Longacre Claims.  The Plan, then, would alter the rights of those Unsecured Creditors contractually entitled to default rate interest exceeding the Federal Judgment Rate and/or the 4.19% rate proposed in the Plan.  Thus rendered "impaired," Unsecured Creditors must be afforded the right to vote on the Plan.

### Summary of Objections

10.    The Disclosure Statement cannot be approved because it does not contain "adequate information" as required by section 1125 of the Bankruptcy Code.  As an initial matter, the Disclosure Statement and proposed solicitation procedures purport to deprive Unsecured Creditors of the right to vote to accept or reject the Plan, even though the treatment proposed for Unsecured Creditors would clearly render their class impaired.  Further, the Disclosure Statement relates to a Plan that, on its face, cannot be confirmed.  In its present form, the Plan cannot satisfy section 1129 of the Bankruptcy Code because it plainly violates the "absolute priority" rule in contravention of binding Third Circuit precedent.  If, under the Plan, owners of equity in the Debtor retain their interests and section 1129(b) applies, the Plan cannot

-4-

be confirmed unless the Unsecured Creditors class is made unimpaired.  Thus, if in connection

with allowance of a claim the Court determines that an Unsecured Creditor is entitled to be paid

interest under its contract at a certain 'default' rate, the Plan must honor that contractual right,

even if that rate is greater than the arbitrary 4.19% set forth in the Plan.  Finally, the Plan cannot

be confirmed because it could be interpreted to permit disparate treatment to different creditors

in the same class.  The treatment proposed for holders of general unsecured claims, as described

in the Plan and Disclosure Statement, is ambiguous regarding the different levels of interest to be

paid on various categories of Class 9 unsecured claims.   To resolve this ambiguity, the

Disclosure Statement should attach a spreadsheet setting forth this information for each

Unsecured Claim so that the holders of such claims are aware of what they will receive if the

Plan is confirmed before casting their votes upon it.

**The Disclosure Statement does not contain adequate information because it describes a Plan that cannot be confirmed.**

11.    The purpose of a disclosure statement is to provide enough information to

creditors to permit them to determine whether to vote for or against a plan.  In re Phoenix

Petroleum Co., 278 B.R. 385, 392-93 (Bankr. E.D. Pa. 2001).  The determination of whether a

disclosure statement has adequate information is within the discretion of the bankruptcy court.

In re Listani Foods, Inc., 329 B.R. 491, 496 (D. N.J. 2005).  To meet the 'adequate information'

standard under the Bankruptcy Code, a disclosure statement must contain information that is

material, important and necessary for creditors and shareholders to properly evaluate the

proposed plan and thus enable them to make a reasonably informed decision on the plan.  In re

William F. Cable Co., 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981).

12.    When deciding whether to approve a disclosure statement, the Bankruptcy

Court should determine whether the plan to which such statement relates can be confirmed.  In re

Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (holding that if Court can determine from a

reading of the plan that it does not comply with section 1129, then it is incumbent upon the Court to decline approval of the disclosure statement); In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (holding that disapproval of disclosure statement is appropriate where it describes a reorganization plan that is not confirmable); In re Monroe Well Service, Inc., 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (holding that it is appropriate to disapprove disclosure statement, even if adequate information is provided, where plan cannot be confirmed); see also In re Atlanta West VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); In re Kehn Ranch, Inc., 41 B.R. 832, 833 (Bankr. D. S.D. 1984); In re Curtis Center Ltd. P'ship., 195 B.R. 631, 637 (Bankr. E.D. Pa. 1996).

13.    The Plan to which the Disclosure Statement relates is facially not confirmable because it does not meet the 'fair and equitable' requirement of section 1129(b) of the Bankruptcy Code, to the extent that section applies based on the vote of Class 9.  To be 'fair and equitable,' and thus confirmable, the Plan must satisfy the 'absolute priority' rule.  The absolute priority rule requires a plan to provide for payment in full of a dissenting class's claims, or absent payment in full, to provide that holders of claims or interests junior in priority to those of the dissenting class will not receive nor retain any property under the plan.  In re Armstrong World Indus., Inc., 432 F.3d 507, 512-13 (3d Cir. 2005).  Said another way, the absolute priority rule ". . . requires that senior classes receive full compensation for their claims before other [junior] classes can participate." In re Websci Techs., Inc., 234 Fed. Appx. 26, 30 (3d Cir. 1997) (holding that under § 1129(b), because a shareholder "would have been junior to all other claimants, he could not have retained the stock or any rights arising from its ownership."); In re Insilco Techs., Inc., 480 F.3d 212, 218 (3d Cir. 2007) (holding that "[e]ven in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full.").

14.     Under the Bankruptcy Code, the Unsecured Creditors are in a class superior to that of equity interest holders.  11 U.S.C. §§ 726, 1129(b)(2)(B)(ii).  As such, to comply with the absolute priority rule, the Debtor's Plan may provide for the retention of ownership by holders of equity interests *only* if it provides that the Unsecured Creditors, such as Longacre, will be paid in full.

15.     'Payment in full,' for purposes of the absolute priority rule, means paying default rate interest to those creditors that had contracted for it.  Anything less compromises the rights of unsecured creditors, a senior class, for the benefit of equity interest holders, a junior class.  In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006), the United States Court of Appeals for the Sixth Circuit stated:

> [I]n solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor . . . When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interests is significantly reduced.
>
> Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract.  To do otherwise (i.e., to interpret the amended plan as not requiring the payment of default interest), they argue, would violate § 1129(b)'s fair and equitable standard.  We agree.  Default interest rates are intended to transfer some of the risk of default from creditors to the debtor.  By interpreting the plan as allowing interest only at the non-default rate, the bankruptcy court effectively transferred that risk back to the Class 4 creditors.  Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness."  Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.

Dow Corning, 456 F.3d at 679.

16.     Where, as here, a Plan proposes that equity retain value, the "fair and equitable" confirmation requirement of § 1129(b) means that full protection must be given to

#10101707 v7

creditors' contractual rights, including post-petition interest at the default rate. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004) (rejecting proposition that § 1129(b) limits post-petition interest to federal judgment rate and holding "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11"); In re W.J. Smith, No. 03-10666(1)11, 2008 WL 73318, at *1 (Bankr. W.D. Ky. Jan. 7, 2008) (awarding unsecured creditor post-petition interest at 7% contract interest rate and holding "[s]olvent debtors should not receive a windfall because they sought bankruptcy protection."); In re Southland Corp., 160 F.3d 1054, 1059-60 (holding that creditors must receive the "bargained-for default interest," which "compensates them for the unforeseeable costs of default"); In re Terry Ltd. P'ship., 27 F.3d 241, 243 (7th Cir. 1994) (holding that "[c]reditors have a right to bargained-for post-petition interest").

17.    Because the Debtors' Plan will enable owners of equity to retain their interests, the Plan cannot be confirmed absent payment in full of Unsecured Creditors' claims or the affirmative vote of Class 9, neither of which is possible under the Plan as proposed. 'Payment in full' requires honoring such creditors' contract rights. Where an unsecured creditor has contracted with the Debtors for payment of default interest at a certain rate, the post-petition interest paid to such creditor should accord with such bargained-for rate. To permit the Plan to modify such rights would deprive creditors of the benefit of their bargain and would impair their creditor class in violation of the absolute priority rule. In such a scenario, the Plan could not pass scrutiny under the "fair and equitable" standard of Bankruptcy Code section 1129(b).

18.    Related to the foregoing, the Plan and Disclosure Statement also are objectionable because they seek to compromise the amounts of claims that have not yet been adjudicated by this Court. In proposing to limit the post-petition interest to which Unsecured Creditors will be entitled, the Debtors are attempting to cap the amount of Unsecured Claims without the holders of such claims being given the opportunity to prosecute their claims in

connection with the claims resolution process.   Unsecured Creditors must be given adequate opportunity for a hearing in connection with their claims.  This would include factual and legal demonstrations regarding not only the allowable principal amounts of the claims, but also the interest that must be paid to make such claimants whole.  Through the Disclosure Statement and Plan, however, the Debtors seek to cap post-petition interest at an arbitrary amount and to deprive Unsecured Creditors of not only a hearing on the proper claim amounts, but even of a right to vote on the Plan.  The Disclosure Statement and Plan should preserve the right of Unsecured Creditors to demonstrate the amounts of their claims, including any post-petition interest in excess of 4.19% per annum, in connection with an evidentiary hearing via the claims reconciliation process.

19.     Further, the Disclosure Statement is unclear and ambiguous with respect to post-petition interest to be paid on Class 9 Claims.  One reasonable interpretation is that the interest claims of some Unsecured Creditors will be artificially limited while other claims, held by other Unsecured Creditors in the same class, will not be so limited.

20.     Under such an interpretation, the Debtors' Plan and Disclosure Statement would run afoul of section 1123 of the Bankruptcy Code, which requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."   11 U.S.C. § 1123(a)(4).   This requirement restates the "cardinal principal" of bankruptcy reorganization that all claims within a class should be treated equally.   In re Huckabee Auto. Co., 33 B.R. 141, 148 (Bankr. Ga. 1983); In re Granada Wines, Inc., 26 B.R. 131, 134 (Bankr. D. Mass. 1983). The Disclosure Statement provides:

> Post-petition interest on Allowed General Unsecured Claims shall be determined as follows . . . for all other General Unsecured Claims, post-petition interest shall be calculated from the Petition Date at the rate of 4.19%, compounded annually, or if pursuant to an existing contract, at the non-default contract rate, unless the General Unsecured Claim includes an

allowed and liquidated amount for post-petition and/or future liability, in which case the interest to be paid on the Claim shall begin to run from the date of the stipulation or order allowing the claim in such liquidated amount, or (ii) on such other less favorable terms as those that may be agreed upon by the Holder of an Allowed General Unsecured Claim, including an agreement whereby no interest is paid on the Claim or interest begins to accrue on the Claim on a date other than the Petition Date.

(Disclosure Statement, § 1.2.1).

21.    Though unclear, the Plan appears to contemplate that some Unsecured Creditors will receive interest accruing as of the Petition Date.  Other Unsecured Creditors in the same class, however, if holding an Unsecured Claim that "includes an allowed and liquidated amount for post-petition and/or future liability," do not fare as well.  These Unsecured Creditors have their interest calculated from a date subsequent to the Petition Date; i.e., " . . . the date of the stipulation or order allowing the claim in such liquidated amount . . .".  Id.  The Plan would not require, as a requisite for such disparate treatment, that the Unsecured Creditor stipulate to calculate interest as of a certain date.   The only apparent requirement, as set forth in the Disclosure Statement, is that the Unsecured Claim include "an allowed and liquidated amount for post-petition and/or future liability . . .".  Id.  Accordingly, either the Disclosure Statement fails to adequately describe whatever non-disparate treatment was intended by the Plan, or the Plan purports to treat similarly situated Unsecured Creditors differently even though they are in the same class, and without the consent of those Unsecured Creditors that are to receive lesser treatment.  If the latter is true, the proposed treatment would fly in the face of section 1123(a)(4) of the Bankruptcy Code and the Plan would be facially unconfirmable.

**The Disclosure Statement needs greater specificity as to the interest payments to be made to various Unsecured Creditors that have reached different settlements with Debtors.**

22.    The Disclosure Statement lacks adequate information because it is ambiguous as to the interest payments that are to be made to Unsecured Creditors that have already reached settlement with the Debtors providing for interest inconsistent with the regime

that is proposed by the Plan.  With respect to Unsecured Claims other than claims of the pre-petition lenders, the Disclosure Statement sets forth no less than five (5) options for payment of post-petition interest, and the options it does provide are, themselves, unclear.

23.    The Disclosure Statement purports that, if a particular Unsecured Claim "includes an allowed and liquidated amount for post-petition and/or future liability . . .[then] . . . the interest to be paid on the Claim shall begin to run from the date of the stipulation or order allowing the claim in such liquidated amount . . .".  (Disclosure Statement, § 1.2.1).  It is impossible to discern which Unsecured Claims 'include[] an amount for post-petition and/or future liability,' given that allowed Unsecured Claims presumably would represent amounts due as of the Petition Date.  11 U.S.C. § 502(b).  To the extent Debtors are referring to Unsecured Claims that have been settled to provide for post-petition interest, the Disclosure Statement contemplates payment of 'interest' that 'shall begin to run from the date of the stipulation or order,' but does not specify the rate at which interest will be paid.  As presently drafted, such 'interest' could be any of standard contract-rate interest, contract default-rate interest, the 4.19% set forth in the Disclosure Statement, Federal Judgment Rate interest, or a particular rate that Debtors and the particular claimant may have agreed to (if any) in their Stipulation.  This provision of the Disclosure Statement is subject to so many different interpretations that it is impossible for an unsecured creditor to know what interest it will receive under the Plan.

24.    The Disclosure Statement adds to, rather than clarifies, the ambiguity respecting interest payments to be made to Unsecured Creditors that have reached settlements with the Debtors.  As noted, supra, only considering the Stipulations involving the Longacre Claims, such agreements vary widely on the issue of post-petition interest.    Given the ambiguous Plan language governing treatment of Class 9 claims, Unsecured Creditors cannot possibly be expected to understand, from a deliberate reading of section 1.2.1 of the Disclosure Statement, the amount they will receive from post-petition interest accruing on account of their

-11-

claims.  This is particularly true where the Plan treatment could deviate from, or even conflict

with, the terms of any stipulation allowing the claim.  Without this information, the Unsecured

Creditors cannot make an informed decision regarding how to vote on the Plan, and the

Disclosure Statement therefore fails the "adequate information" standard.

    25. To resolve this ambiguity, the Court should require the Debtors to attach

to the Disclosure Statement a spreadsheet that sets forth, for each Unsecured Claim, the Debtors'

position with respect to:  (i) the allowed principal amount of each Unsecured Claim; (ii) the rate

of post-petition interest that the Debtors believe will accrue on each such Unsecured Claim under

the treatment proposed in the Plan; and (iii) the specific date on which post-petition interest starts

to accrue on such claim under the treatment proposed in the Plan.  This way, the Unsecured

Creditors will have the information respecting what they will be paid under the Plan so they can

make an intelligent, informed vote.

    WHEREFORE, Longacre respectfully requests that the Court deny approval of

the Disclosure Statement absent modification to address the deficiencies noted herein.

Dated:  October 16, 2008       PEPPER HAMILTON LLP
Wilmington, DE

              /s/ James C. Carignan
              David M. Fournier (No. 2812)
              James C. Carignan (No. 4230)
              Hercules Plaza, Suite 5100
              1313 N. Market Street
              P.O. Box 1709
              Wilmington, DE   19899-1709
              (302) 777-6500

              - and –

              PEPPER HAMILTON LLP
              Robert S. Hertzberg, Esq.
              100 Renaissance Center, Suite 3600
              Detroit, MI 48243-1157
              (313) 259-7110

              *Counsel to Longacre Master Fund, Ltd.*