## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    **Chapter 11** |
| | ) |
| **W. R. GRACE & CO.,** *et al.,* | )    **Case No. 01-01139 (JKF)** |
| | )    **(Jointly Administered)** |
| | ) |
| **Debtors.** | )    **Hearing Date: October 27, 2008** |
| |      **Re: Docket No. 19620** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR AN ORDER APPROVING DEBTORS' DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION DATED AS OF SEPTEMBER 19, 2008, SOLICITATION AND CONFIRMATION PROCEDURES, CONFIRMATION SCHEDULE AND RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of W.R.

Grace & Co., et al. (the "Debtors") by and through its undersigned counsel, hereby objects to the

Debtors' motion dated September 25, 2008 (the "Approval Motion") seeking the entry of an

order approving, among other things, the Debtors' Disclosure Statement for the Joint Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code dated as of September 19, 2008

[Docket ID. 19581] (the "Disclosure Statement") in respect of the Joint Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code of the Debtors, The Official Committee of Asbestos

Personal Injury Claimants (the "Asbestos PI Committee"), the Asbestos PI Future Claimants'

Representative (the "FCR") and The Official Committee of Equity Security Holders (the "Equity

Committee," and collectively with the Debtors, Asbestos PI Committee and FCR, the "Plan

Proponents") dated as of September 19, 2008 (the "Plan"), and respectfully states as follows:

## PRELIMINARY STATEMENT

The Disclosure Statement proffered by the Debtors should not be approved. The Plan described in the Disclosure Statement is not confirmable as a matter of law because the Plan improperly treats General Unsecured Creditors[1] in Class 9 as unimpaired, thereby depriving General Unsecured Creditors of the right to vote on the Plan. This is a significant flaw, premised on the failure of the Plan to provide for payment to general unsecured creditors of post-petition interest at the applicable default rates. This Court is already familiar with the post-petition interest dispute regarding the Bank Claims, having heard argument on the Debtors' objection to paying the 2% default rate due on those claims under the pertinent credit agreements. But, the Plan Proponents' refusal to pay the appropriate amounts of post-petition interest extends as well to "other" unsecured creditors in Class 9, by providing that those creditors will be paid interest only "at the non-default contract rate," even when those creditors have default rates specified in their respective agreements. Accordingly, neither creditors with Bank Claims nor "other" general unsecured creditors in Class 9 are being paid in full, because these creditors are not being paid the amount of post-petition default interest for which their agreements with the Debtors provide. And, because they are not being paid in full and are having their contractual rights to receive default interest altered, the Class of General Unsecured Claims in Class 9 is impaired as a matter of law.

The Debtors and their co-proponents are transparently attempting to disenfranchise general unsecured creditors by refusing to solicit their votes on the Plan. Under the improper construct of the Plan that Class 9 is not impaired, general unsecured creditors and the Unsecured

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms by the Plan.

2

Creditors' Committee would conceivably be prevented from objecting to confirmation on grounds that the Plan violates the absolute priority rule and is not "fair and equitable" under 11 U.S.C. § 1129(b)(2)(B), because those arguments are premised on the assumption that the objecting class is impaired. Of course, that the Plan Proponents say that Class 9 is not impaired doesn't make it so. That the Plan Proponents (and the Debtors in particular) contend that they can unilaterally choose what post-petition interest rates to pay on General Unsecured Claims doesn't make it legally permissible. And, that the Debtors believe they can propose a Plan that protects their equity holders and guarantees them a significant recovery, while denying general unsecured creditors the right to receive the benefits of their respective contractual bargains, can't trump the absolute priority rule and pertinent case law that holds to the contrary. As set forth below, the Plan's treatment of creditors in Class 9 renders them impaired and the votes of those creditors is required in order for the Plan to be considered for confirmation.

Even were the Plan somehow determined to be confirmable, notwithstanding that it violates the absolute priority rule and fair and equitable standard, and impermissibly concludes that Class 9 is unimpaired, this Court should still refuse to approve the Disclosure Statement because it contains omissions and inadequate disclosure with respect to fundamental and critical information required by Section 1125(b) of the Bankruptcy Code. Among other issues, the Disclosure Statement fails to adequately disclose – and hardly mentions at all – the pending litigation concerning payment of default interest on the Bank Claims and its relevance to the provisions of the Plan. It fails to adequately disclose the impact on creditors in Class 9 of the determination (albeit improper) that the class is not impaired. It fails to adequately disclose with respect to "other" unsecured creditors in Class 9 with default interest rates specified in their

3

contracts that they will not be paid that rate, and that there is no procedure provided in the Plan for a creditor to litigate the issue of the appropriate rate.

What is apparent from the Disclosure Statement and the Plan is that the Debtors are not interested in ensuring a fair process for determining disputes with creditors generally, and general unsecured creditors in Class 9 in particular. Rather, as detailed below, the Debtors prefer to impose procedural hurdles in order to hush any dissent to their distribution scheme. At bottom, the Plan attempts to shove through all dissenting parties-in-interest (and ultimately past this Court) the settlement reached among the Plan Proponents to resolve the personal injury asbestos liability issues and ensure a significant recovery to equity on the backs of general unsecured creditors. The provisions of the Bankruptcy Code governing confirmation of a plan of reorganization do not countenance that result and, accordingly, the Disclosure Statement describing the Debtors' unconfirmable Plan should not be approved.

## BACKGROUND

On April 2, 2001, each of the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and has continued in the management and operation of its businesses and properties pursuant to sections 1107 and 1108 of the Bankruptcy Code. Pursuant to an order of the Court, the Debtors' Chapter 11 cases have been procedurally consolidated and are being jointly administered.

On or about April 7, 2008, the Term Sheet dated April 6, 2008 documenting the Proposed Asbestos Settlement among the Plan Proponents was publicly disclosed. The Creditors' Committee was not invited to participate in any of the plan-related discussions occurring among the Plan Proponents that ultimately resulted in the Proposed Asbestos Settlement. The Proposed Asbestos Settlement inherently provided for the holders of Equity Interests to retain their

4

interests in the Debtors. But, the Proposed Asbestos Settlement does not provide for, among other matters, the payment of post-petition interest at the default rate for any unsecured creditors that have contracts or other agreements providing for default rates of interest.

The Plan, filed on September 19, 2008, embodies the Proposed Asbestos Settlement. The Disclosure Statement and a related Exhibit Book containing some, but not all, of the Exhibits referred to in the Plan and Disclosure Statement were also filed on that date. The Plan provides for a Class of General Unsecured Claims (Class 9) that includes accounts payable Claims, letters of credit Claims and the Lenders' Claims under the Pre-petition Credit Facilities. The Plan, as with the Proposed Asbestos Settlement, fails to provide for the Class of General Unsecured Claims to receive default rates of interest even when such parties' pre-petition agreements with the Debtors expressly provide for the Debtors to pay default interest.

On September 25, 2008, the Debtors filed the Approval Motion pursuant to which the Debtors seek entry of an order approving, among other matters, (i) the Disclosure Statement, (ii) solicitation and tabulation procedures and forms of Ballots and Master Ballots applicable to those Classes of Claims and Interests designated as impaired by the Plan (the "Voting Procedures"), (iii) the form of notice (the "Non-Voting Status Notice") to be served on those Classes of Claims the Plan designates as unimpaired, and (iv) various dates, deadlines and procedures relating to the Confirmation Hearing to be held on the Plan.

The Plan designates the Class of General Unsecured Claims as unimpaired. Consequently, with the exception of the purported applicability of the Non-Voting Status Notice, the Voting Procedures have not been made applicable to Class 9 Claims.

5

## ARGUMENT

### THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT RELATES TO A PLAN THAT IS NOT CONFIRMABLE AS A MATTER OF LAW AND DOES NOT CONTAIN ADEQUATE INFORMATION

Courts have held that it is appropriate to reject a debtor's disclosure statement "even if it properly summarizes and provides adequate information" when the disclosure statement describes a plan of reorganization that is so fatally flawed that confirmation is impossible. In re Monroe Well Serv., Inc., 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987); see also In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible . . . ."); In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("[T]he Court notes its agreement with the proposition that a disclosure statement should be disapproved where the plan it describes is patently unconfirmable."); In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("The Court believes that disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."); In re Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill.), aff'd, 80 B.R. 448 (N.D. Ill. 1987) ("Although the issue of whether a plan meets the requirements of § 1129(a) is usually reserved for the hearing on confirmation, in certain circumstances it is appropriate for the court to consider the issue at the hearing on the disclosure statement. One such instance is where it is readily apparent that the plan accompanying the disclosure statement could never legally be confirmed.").

Here, as explained in detail below, the Plan cannot be confirmed because (i) it fails to solicit creditors in Class 9 to vote on the Plan when such creditors are impaired, in violation of

6

11 U.S.C § 1124; (ii) it violates the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B)(ii), and fails to satisfy the "fair and equitable" standard under 11 U.S.C. § 1129(b). Accordingly, because the Plan is fatally flawed and, consequently, patently unconfirmable, it is appropriate for this Court to address issues ordinarily reserved for confirmation at the hearing on the approval of the proposed Disclosure Statement. See In re Phoenix Petroleum Co., 278 B.R. at 394; In re Unichem Corp., 72 B.R. at 98.

Moreover, even were this Court to find that the proposed Disclosure Statement satisfies the information requirements of section 1125 of the Bankruptcy Code, the Court is nevertheless empowered to deny approval of the proposed Disclosure Statement because the Debtors' Plan cannot be confirmed. See, e.g., In re Mahoney Hawkes, LLP, 289 B.R. 285, 294 (Bankr. D. Mass. 2002) (denying motion to approve disclosure statement even though it met the information requirements of section 1125 of the Bankruptcy Code because the debtor's underlying plan was not confirmable).

## A. Class 9 (General Unsecured) Claims Are Impaired And Their Votes On The Plan Must Be Solicited

The Plan cannot be confirmed because it incorrectly and illegally designates the Class of creditors holding General Unsecured Claims (Class 9) as not impaired. Under this construct, the Class is presumed to have accepted the Plan under 11 U.S.C. § 1126(f), and, as a result, general unsecured creditors will not be solicited to vote on the Plan. That the Plan is so structured is not much of a surprise: the Debtors' telegraphed their approach in their pleadings objecting to payment of default interest on the Bank Claims. By deeming Class 9 unimpaired, the Debtors hope to preclude general unsecured creditors from objecting to confirmation on the grounds that the Plan violates the absolute priority rule and the fair and equitable standard of 11 U.S.C. §

7

1129(b), which arguments presume that the impacted Class of creditors be impaired. The Debtors' cynical attempt to disenfranchise general unsecured creditors should be rejected.

"The Bankruptcy Code creates a presumption of impairment 'so as to enable a creditor to vote on acceptance of the plan.'" In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 203 (3d Cir. 2003) (hereafter, "PPI"). The burden of overcoming this presumption rests on the debtor to demonstrate that the plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights." Id. If the plan does not leave the creditor's rights "entirely 'unaltered'," the creditor's claim will be labeled as impaired under 11 U.S.C. § 1124(1). Id. at 202 (citations omitted); see also In re L & J Anaheim Assocs., 995 F.2d 940, 943 (9th Cir. 1993); In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909, at *14 (N.D. Tex. May 24, 2005) ("no impairment is too small to escape the necessity of a vote by the class so affected."); In re Coram Healthcare Corp., 315 B.R. 321, 351 (Bankr. D. Del. 2004) ("if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired.").

**(i)     The Claims of Creditors in Class 9 Are Not Being Paid In Full**

Claims are "unimpaired" pursuant to § 1124(1) of the Bankruptcy Code only if the plan provides for the payment of the claims in full, in cash, on the effective date of the plan. PPI, 324 F.3d at 206; In re Monclova Care Ctr., Inc., 59 F.App'x 660, 664 (6th Cir. 2003) (claim was "impaired" because debtor's plan failed to include interest payments); In re New Midland Plaza Assocs., 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000). Here, under the proposed Plan, General Unsecured Claims in Class 9 are not being paid in full because they are not receiving the contractual interest to which they are entitled in the circumstances of these bankruptcy cases.

The Plan provides that a general unsecured creditor in Class 9 will be paid

8

the Allowed Amount of its Allowed General Unsecured Claim
with post-petition interest either (i) in Cash in full on the later of
(A) the Effective Date or as soon as practicable thereafter or (B)
the date such General Unsecured Claim becomes an Allowed
General Unsecured Claim or as soon as practical thereafter, or
(ii) on such other less favorable terms as may be agreed upon by
the Holder of an Allowed General Unsecured Claim. Post-petition
interest on Allowed General Unsecured Claims shall be determined
as follows: either (i)(A) for holders of Pre-petition Credit
Facilities, post-petition interest shall be calculated at the rate of
6.09% from the Petition Date through December 31, 2005 and
thereafter at floating prime, in each case compounded quarterly;
and (B) for all other General Unsecured Claims, post-petition
interest shall be calculated at the rate of 4.19%, from the Petition
Date compounded annually, or if pursuant to an existing contract,
interest at the non-default contract rate, unless the General
Unsecured Claim includes an allowed and liquidated amount for
post-petition and/or future liability, in which case the interest to be
paid on the Claim shall begin to run from the date of the stipulation
or order allowing the claim in such liquidated amount, or (ii) on
such other less favorable terms as those that  may be agreed upon
by the Holder of an Allowed General Unsecured Claim, including
an agreement whereby no interest is paid on the Claim or interest
begins to accrue on the Claim on a date other than the Petition
Date.

Plan at 45, § 3.1.9(b).  Under the Plan, neither creditors holding Bank Claims nor those with "all

other General Unsecured Claims" are paid contractual default interest on their Claims.

Accordingly, the Plan does not "leave [] unaltered the [creditor's] legal, equitable, and

contractual rights."  PPI, 324 F.2d at 203.  Class 9 is therefore impaired.

The Bank Claims, as the Plan and Disclosure Statement acknowledge, derive from the

Debtors' Pre-petition Credit Facilities.  Those contracts provide that, in the event of the Debtors'

default, interest shall be paid equal to the Prime Rate plus 2% (the "Default Rate").  See

Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., filed August 15, 2008,

9

Docket No. 19322, at Exs. A, B, at §§ 5.1(c), 5.5.[2]  The Debtors' bankruptcy filing was an event

of default under the Pre-petition Credit Facilities, and there were numerous other post-petition

defaults under the Credit Facilities that triggered the Debtors' obligation to pay interest on the

Bank Claims at the Default Rate.  See id. at 3, ¶13 and Exs. A, B at § 10(f)(i)(A).

 The Plan does not propose to pay the Bank Claims at the Default Rate.  Rather, the Plan

proposes to pay post-petition interest on the Bank Claims at a specific rate selected by the Plan

Proponents that indisputably has no foundation in the Pre-petition Credit Facilities themselves.

As this Court is well aware,[3] the interest rate selected by the Debtors is that taken from their

now-defunct, superseded and replaced joint plan of reorganization filed in January 2005.  The

rate was negotiated with and agreed to by the Creditors' Committee then but, as recently argued

to the Court, that agreement was rendered moot by significant subsequent events (not the least of

which was the Debtors' failure to ever have that joint plan approved by the Court), and the

---

[2]   The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases.  See
Fed. R. Evid. 201(b) (a court may take notice of judicially noticed facts "not subject to reasonable
dispute"); Waltz v. County of Lycoming, 974 F.2d 387, 389 (3d Cir. 1992) (pleadings, motions, and
briefs which were part of the record were "subject to judicial notice" without further proof).

[3]   See, e.g., the Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit
Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No. 18922), the Response of the
Official Committee of Unsecured Creditors to Debtors' Objection to the Unsecured Claims Asserted
Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.
19072), the Response of the Bank Lender Group in Opposition to the Debtors' Objection to the
Unsecured Claims Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and
May 5, 1999 (Docket No. 19073) and the Joinder of JPMorgan Chase Bank, N.A. in the Response of
the Bank Lender Group in Opposition to the Debtors' Objection to the Unsecured Claims Asserted
Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.
19074), the Debtors' Trial Brief in Support of Objection to the Unsecured Claims Asserted Under the
Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No. 19476), the Pre-
Trial Memorandum of the Bank Lender Group in Opposition to the Debtors' Objection to Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket
No. 19478), and the Joinder of the Official Committee of Unsecured Creditors in the Pre-Trial
Memorandum of the Bank Lender Group in Opposition to the Debtors' Objection to Claims Asserted
Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.
19477).

Debtors' ultimate abandonment of the joint plan in favor of the current Plan. It is of no moment that the rate designated in the Plan was once agreed to by the Creditors' Committee. In determining whether creditors holding Bank Claims in Class 9 are impaired, all that matters is that the Plan alters these creditors' contractual rights. The Plan does not provide for payment of the Default Rate on the Bank Claims – a default rate expressly set forth in the Pre-petition Credit Facilities – and thus these creditors' contractual rights are being impermissibly altered, without providing them with the right to vote on the Plan.

Creditors holding "other" General Unsecured Claims under a contract are also having their contractual rights altered by the Plan. The Plan expressly provides that such creditors are to be paid interest "at the non-default contract rate." Plan at 45, § 3.1.9(b); Disclosure Statement at 17-18, § 4.3.1.9. Those creditors who have contracts providing for a default rate will be paid some amount different than the rate contained in their contracts. In addition, there may be certain other General Unsecured Claims that are impaired because they are entitled to state law statutory rates that exceed 4.19%, which the Plan is not recognizing for purposes of providing appropriate Distributions. This alteration in these "other" creditors' contractual and statutory rights renders their Claims impaired.

The impairment of Class 9 is impermissible because it results solely from the treatment provided the Class in the Plan; it is not the result of the application of any provision of the Bankruptcy Code. The Third Circuit, in PPI, held that a claim is impaired under 11 U.S.C. § 1124 only if the plan of reorganization itself, as opposed to some provision of the Bankruptcy Code, alters the creditor's rights. 324 F.2d at 205. The Debtors previously argued in connection with its objection to paying the Default Rate on the Bank Claims that the Bank Claims were unimpaired because 11 U.S.C. § 502(b) itself precludes the payment of unmatured (post-petition)

11

interest. <u>See</u> Debtors' Trial Brief in Support of Objection to the Unsecured Claims Asserted

Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.

19476) at 24-25.  Not only is the Debtors' position wrong as a matter of law, it was exactly the

reason Congress revised § 1124 in 1994 to <u>repeal</u> what was then § 1124(3).  As the Third Circuit

explained in <u>PPI</u>:

> Before 1994, § 1124(3) specified that a creditor receiving full
> payment of an "allowed claim" was not impaired . . . . Interpreting
> this statute in 1994, one bankruptcy court held that § 1124(3)
> allowed a solvent debtor to pay the "allowed" claims of unsecured
> creditors in full, excluding postpetition interest, without risking
> impairment. <u>In re New Valley Corp.</u>, 168 B.R. 73, 77-80 (Bankr.
> D.N.J. 1994) . . . . After the <u>New Valley</u> decision, Congress
> repealed § 1124(3).

324 F.2d at 205-06.  The Court of Appeals quoted the legislative history: "[a]s a result of this

change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the

claims, the class would be impaired, entitling creditors to vote for or against the plan of

reorganization." <u>Id</u>. at 206, citing H.R. Rep. No. 103-385, at 47-48 (1994), reprinted in 1994

U.S.C.A.N. 3340, 3356-57.  The <u>PPI</u> court agreed with the bankruptcy court below that

> Section 1124(3) created nonimpairment status by a cash payment
> equal to the allowed amount of the claim but without postpetition
> interest.  <u>Such treatment could not qualify for nonimpairment
> under § 1124(1) because the failure to pay postpetition interest
> does not leave unaltered the contractual or legal rights of the claim.</u>

324 F.3d at 207 (citing <u>In re PPI Enters.</u>, 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis

added).

Accordingly, the Debtors are wrong in contending that § 502(b) permits them to propose

a plan that does not pay Class 9 post-petition default interest and still deem that class

unimpaired.  It is as a result of the Plan's provisions – and <u>not</u> as the result of the application of

12

any provision of the Bankruptcy Code – that neither the Bank Claims nor the "other" General

Unsecured Claims in Class 9 are proposed to be paid post-petition interest at the default rate

contained in their respective contracts.  No provision of the Code enables the Debtors to propose

a specific interest rate not found in the creditors' respective contracts.  Although creditors

holding Bank Claims and "other" general unsecured creditors are to be paid post-petition interest

under the Plan, the rate applied to both groups here is of the Debtors' making.  Debtors' choice

of an interest rate, (regardless of whether the rate is reasonable, equitable or fair, issues to be

resolved at confirmation), significantly alters the contractual rights of creditors in Class 9.  Class

9 is therefore impaired and must be permitted to vote on the Plan.

**(ii)      Class 9 Is Not Assured of Payment On the Effective Date**

The Plan also alters the Class 9 creditors' legal and equitable rights by failing to ensure

that their Claims will be paid on or near the Plan's Effective Date.  Rather, Distributions to Class

9 are proposed to be made on "the Effective Date <u>or as soon as practicable thereafter</u> . . . ."  Plan

at § 3.1.9(b) (emphasis added).  There is no time limitation upon the "or as soon as practicable

thereafter" provision anywhere in the Plan (or explained in the Disclosure Statement).  No

legitimate reason exists for the Debtors to have unbridled discretion to determine what may be

"practicable" in any given circumstance.

A deferred or delayed payment of the claim renders the class of such creditors' claims

impaired.  <u>See</u> <u>In re Valley View Shopping Ctr., L.P.</u>, 260 B.R. 10, 33 (Bankr. D. Kan. 2001)

(class was impaired when payment was to be paid within 90 days of effective date); <u>In re</u>

<u>Grandfather Mountain Ltd. P'ship</u>, 207 B.R. 475, 485 (Bankr. M.D.N.C. 1996) (class was

impaired when payment was deferred); <u>In re Hotel Assocs. of Tuscon</u>, 165 B.R. 470, 475 (B.A.P.

9th Cir. 1994) (class was impaired when payment to unsecured creditors was delayed for 30

13

days).  Here, Distributions to Class 9 can occur at any time, solely in the Debtors' discretion of what might be "practicable."  Such a delay in payment to creditors in Class 9 is inappropriate and impairs the Class, requiring that Class 9 vote on the Plan.

**(iii)**    **Class 9 Should Be Permitted To Vote On The Plan To Preserve Resources of the Estates**

As set forth above, Class 9 is impaired and must therefore be permitted to vote.  The Disclosure Statement should therefore not be approved in its present form.  Should this Court, however, approve the Disclosure Statement and defer ruling until the Confirmation Hearing on the issue of whether Class 9 is impaired, then the votes of creditors in Class 9 should nevertheless be solicited now and tallied, conditionally, in order to preserve resources of the estates and to ensure that the Court has the information available at the Confirmation Hearing to consider the impact of the Plan on Class 9 in the context of, inter alia, 11 U.S.C § 1129 (a)(7).

The Bankruptcy Code does not preclude soliciting creditors when a class is deemed unimpaired by the plan's proponent.  Section 1126(f) provides that solicitation of an unimpaired class "is not required," but it does not prohibit soliciting the class.  Indeed, purportedly unimpaired classes are often solicited in circumstances like this, when a dispute exists with respect to the plan's treatment of the class that could jeopardize confirmation and require subsequent solicitation were votes from the class not obtained.  See, e.g., PPI, 324 F.3d at 202 (although unsecured creditor classes in the plan were designated as unimpaired, debtor nonetheless solicited votes from each class); In re Am. Family Enters., 256 B.R. 377, 404 (D. N.J. 2000) (creditors in Class 6 were arguably unimpaired but were solicited to vote because "if the necessary majorities vote to accept the Plan, the issue of impairment will be moot.").

14

The Debtors here run the significant risk of having to solicit the votes of creditors in Class 9 after having previously solicited votes from other Classes and, thereby, significantly delay consideration of confirmation of their Plan, in the event that this Court finds that Class 9 is impaired. The issue of whether unsecured creditors in Class 9 should receive default interest on their Claims has yet to be determined (and, as to the Bank Claims only, is <u>sub judice</u>). By soliciting the votes of Class 9, now, with all other impaired Classes, the Debtors will preserve resources and ensure that a second round of solicitations will not be required even were the Court to hold at the Confirmation Hearing that Class 9 is impaired. In the face of the Debtors' continued pleas that this Plan and its associated disputes must be heard at the earliest opportunity – even, in the case of the Debtors' objection to paying default interest on the Bank Claims, prior to the filing of the Plan – no logical reason exists for not now soliciting the votes of Class 9 in these circumstances.

## B.  The Plan Cannot Be Confirmed Because It Fails To Provide For The Payment of Default Interest To Creditors in Class 9

The Plan violates the absolute priority rule and cannot be confirmed. As the United States Court of Appeals for the Third Circuit explained in <u>In re Armstrong World Indus., Inc.</u>, "[i]n its initial form, the absolute priority rule required that 'creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever.'" 432 F.3d 507, 512 (3d Cir. 2005) (quoting <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 444 (1999)) (ellipsis in original). The Third Circuit further held that:

> The absolute priority rule was later codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129(b). Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such

15

> claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *LaSalle*, 526
> U.S. at 441-42, 119 S. Ct. 1411.

Id. Thus, in simple terms, the absolute priority rule "requires that senior classes receive full

compensation for their claims before other [junior] classes can participate." In re Websci Techs.,

Inc., 234 F.App'x 26, 30 (3d Cir. 2007) (holding that under 11 U.S.C. § 1129(b)(2)(B)(ii),

because a shareholder "would have been junior to all other claimants, he could not have retained

the stock or any rights arising from its ownership."); In re Insilco Techs., Inc., 480 F.3d 212, 218

n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute

priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all

creditors are paid in full.").

Moreover, "a settlement presented for approval as part of a plan of reorganization,

because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in

the sense of conforming to the absolute priority rule." In re Iridium Operating LLC, 478 F.3d

452, 463 (2d Cir. 2007) (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,

Inc. v. Anderson, 390 U.S. 414, 424 (1968)). Indeed, in Iridium, the Second Circuit held that

creditor groups may not through a pre-plan settlement provide recoveries to junior classes unless

senior creditors are paid in full. Id.

As set forth in significant detail in the pleadings filed by the Creditors' Committee and

the Bank Lenders in response to the Debtors' objection to the Lenders' request for payment of

default interest on their Claims,[4] the Plan provides for the Debtors' equity holders to retain

---

[4]   In the interests of brevity, we do not reiterate these arguments here but incorporate by reference as if
      fully set forth herein the Creditors' Committee's and Bank Lenders' prior pleadings in the contested
      matter commenced by the Debtors' objection to the Bank Claims. See Response of the Official
      Committee of Unsecured Creditors to Debtors' Objection to the Unsecured Claims Asserted Under
      the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No. 19072);

16

substantial value as a result of a settlement among the Plan Proponents, but fails to provide

payment to unsecured creditors of the full post-petition default interest due under their respective

contracts.  The Plan not only fails to provide for payment of default interest to the Lenders, but

also precludes payment of default interest to "other" unsecured creditors who may have

provisions in their respective contracts for payment of interest at a default rate.  By providing a

substantial recovery to equity holders at the expense of unsecured creditors who are not receiving

default interest and thus not being paid in full, the Plan violates the absolute priority rule and

cannot be confirmed.

 The Plan as structured fails to satisfy the fair and equitable standard of 11 U.S.C. §

1129(b).  In In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006), a class of unsecured

commercial debt holders holding approximately $1 billion in debt objected to a plan proposed by

the solvent debtor and the tort claimants' committee that proposed paying the principal amount

of all of the unsecured debt along with post-petition interest at the federal judgment rate rather

than the contract default rate.  The unsecured creditors argued that:

> the bankruptcy court's imposition of the federal judgment interest
> rate, as opposed to the rates required by the debt contracts, means
> that Class 4 was not being paid the full interest it was owed, while
> Dow Corning's two shareholders, both in a class undisputedly
> junior to Class 4, were retaining millions of dollars in equity.

---

Response of the Bank Lender Group in Opposition to the Debtors' Objection to the Unsecured Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket
No. 19073); Pre-Trial Memorandum of the Bank Lender Group in Opposition to the Debtors'
Objection to Claims Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and
May 5, 1999 (Docket No. 19478); Joinder of the Official Committee of Unsecured Creditors in the
Pre-Trial Memorandum of the Bank Lender Group in Opposition to the Debtors' Objection to Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket
No. 19477).

17

Id. at 672 (emphasis added).  The bankruptcy court had previously held that the plan was not

"fair and equitable" under section 1129(b) because it provided equity holders with a recovery of

millions of dollars while the claims of the class of unsecured creditors were not paid in full under

the absolute priority rule, which meant post-petition interest at the contract default rate.  See In re

Dow Corning Corp., 244 B.R. 678, 695-96 (Bankr. E.D. Mich. 1999).  In plain and simple terms,

the bankruptcy court held that "[i]n this context, the rationale for use of the contract rate of

interest is straightforward: A debtor with the financial wherewithal to honor its contractual

commitments should be required to do so."  Id. at 695.

Although the bankruptcy court in Dow Corning ultimately excused the debtor from

having to pay the default rate based on its view that "no effect is to be given to contractual

provisions which purport to define as a default the filing of a voluntary petition for bankruptcy

relief," id. at 696, on further appeal, the Sixth Circuit reversed and remanded.  The Sixth Circuit

held that:

> [I]n solvent debtor cases, rather than considering equitable
> principles, courts have generally confined themselves to
> determining and enforcing whatever pre-petition rights a given
> creditor has against the debtor. . . . When a debtor is solvent, then,
> the presumption is that a bankruptcy court's role is merely to
> enforce the contractual rights of the parties, and the role that
> equitable principles play in the allocation of competing interests is
> significantly reduced.
>
> Based on this application of the absolute priority rule in solvent
> debtor cases, Class 4 argues that we should enforce their rights
> under the contract, including their right to interest awarded at the
> default rate as set forth in the terms of their contract.  To do
> otherwise (i.e., to interpret the amended plan as not requiring the
> payment of default interest), they argue, would violate § 1129(b)'s
> fair and equitable standard.  We agree.  Default interest rates are
> intended to transfer some of the risk of default from creditors to the
> debtor.  By interpreting the plan as allowing interest only at the
> non-default rate, the bankruptcy court effectively transferred that

18

risk back to the Class 4 creditors. <u>Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.</u>

<u>Dow Corning</u>, 456 F.3d at 679 (emphasis added) (citations omitted). Thus, in solvent debtor cases, the "fair and equitable" requirement of section 1129(b) means full protection for creditors' contractual rights, including post-petition interest at the default rate.

Here, the Plan concedes that the Debtors are solvent by providing substantial value to equity holders. But, more precisely, the Disclosure Statement informs creditors that the "Reorganized Enterprise Value at the Effective Date is approximately $3.20 billion to $3.70 billion, with $3.45 billion as the midpoint estimate" and that the "estimated Reorganized Equity Value of the Reorganized Debtors and Non-Debtor Affiliates ranges from approximately $1.3 billion to $1.8 billion." Disclosure Statement at 47, § 2.11.1; <u>id</u>. at 50, § 2.11.6. The Debtors cannot in good faith argue that there is a question concerning their solvency when they have disclosed that they are solvent with very valuable equity interests post-emergence.

As previously argued to this Court in connection with the Debtors' objection to the Bank Claims, in these circumstances there are no "compelling equitable factors" that would justify ignoring creditors' contractual rights to receive post-petition default interest on their allowed claims. Accordingly, the Plan's failure to provide for payment of default interest to general unsecured creditors in Class 9 in the face of the Debtors' solvency dooms the Plan. The Plan therefore cannot be confirmed and the Disclosure Statement should be not approved.

19

## C. The Disclosure Statement Does Not Contain
## Adequate Information In Its Current Form

Even if the Plan is amended to properly provide that Class 9 Claims are impaired so that

the votes of the holders of General Unsecured Claims are solicited now (or such creditors are

provisionally given the right to vote pending the Court's consideration in connection with the

confirmation proceedings of whether Class 9 Claims are impaired), the Disclosure Statement

cannot be approved in its current form because it fails to contain "adequate information" as

required by Section 1125(b) of the Bankruptcy Code. Section 1125(b) of the Bankruptcy Code

prohibits the solicitation of votes to accept or reject a plan from creditors or equity holders

"unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure

statement approved . . . by the court as containing adequate information." 11 U.S.C. § 1125(b).

In turn, the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records, that
> would enable a hypothetical reasonable investor typical of the
> holders of claims or interests of the relevant class to make an
> informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

"The importance of full disclosure is underlaid by the *reliance* placed upon the disclosure

statement by the creditors and the court. Given this reliance [the court] cannot overemphasize

the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate

information.'" Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.), 183 B.R.

812, 821 (Bankr. N.D. Ill. 1995) (quoting Oneida Motor Freight Inc. v. United Jersey Bank, 848

F 2d. 414, 417 (3d Cir. 1988)) (emphasis in original). See also In re E. Redley Corp., 16 B.R.

429, 430 (Bankr. E.D. Pa. 1982) ("[t]he requirement that a disclosure statement contain adequate

20

information serves to present the parties entitled to vote on the plan with an opportunity to independently evaluate the merits of the proposed plan . . . . Without information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment, the disclosure statement cannot be approved."). Because the Disclosure Statement does not contain adequate information at this time, the Creditors' Committee submits that the Court should not and cannot approve it.

1. **The Disclosure Statement Contains No Information On The Creditors' Committee's Positions On The Plan's Treatment of Class 9 Claims or The Bank Claims Default Interest Litigation**

The Disclosure Statement is woefully inadequate as it contains no information on the Creditors' Committee's positions on the Plan, on the treatment of Class 9 Claims, or on the Bank Claims Default Interest Litigation commenced by the Debtors and pending before the Court. These deficiencies are described seriatim below:

1.      The last paragraph of the Preliminary Statement section of the Disclosure Statement (page 12) sets forth the position of each of the PI Committee, the FCR and the Equity Committee on the Plan, but not that of the Creditors' Committee and, accordingly, the information in this paragraph is inadequate. The paragraph should be revised to include the following:

> "The Unsecured Creditors' Committee is not a co-proponent of the Plan. For a more detailed discussion of the Unsecured Creditors' Committee's objections to the treatment of Class 9 Claims, see the discussion in Section 4.3.1.9 herein."[5]

---

[5] These references assume that the additional disclosures proposed by the Creditors' Committee in this Objection would be accepted and incorporated into the designated section of the Disclosure Statement.

2.      It is disclosed in a chart on page 17 of the Disclosure Statement that the Plan treats Class

9 (General Unsecured) Claims as not impaired.  As set forth supra, the Creditors'

Committee disputes this treatment as being contrary to law and contends that it renders

the Plan unconfirmable.  Accordingly, in the column of the chart labeled "Impaired," the

chart should be revised to state as follows:

> "The Unsecured Creditors' Committee believes that General
> Unsecured Claims are impaired and the "NO" should be replaced
> with a "Yes".  For a more detailed discussion of the Creditors'
> Committee's objections to the treatment of Class 9 Claims, see the
> discussion in Section 4.3.1.9 herein."

3.      Section 1.2.6 of the Disclosure Statement is inadequate.  Among other matters, this

section fails to disclose that the Creditors' Committee and certain holders of Bank Claims

are engaged in litigation with the Debtors over whether the holders of Bank Claims

should receive post-petition interest at the contractual default rate provided for in the Pre-

petition Credit Facilities.  It should also disclose that the Creditors' Committee

previously informed the Debtors that it disagrees with the treatment provided for "other"

Class 9 Claims.  Accordingly, the end of the first paragraph in Section 1.2.6 should be

supplemented with the following text:

> "There is a dispute between the Debtors and the Unsecured
> Creditors' Committee regarding whether General Unsecured
> Claims are receiving under the Plan Cash in the full amount of
> their respective Claims with post-petition interest and whether the
> Plan leaves General Unsecured Claims impaired.  The Debtors
> have already commenced litigation concerning the Bank Claims,
> which the Creditors' Committee has joined, seeking to disallow
> their Claims for post-petition interest at the contractual default rate
> under the Pre-petition Credit Facilities.  The Creditors' Committee
> previously informed the Debtors that it also disputes the Plan
> treatment for other Class 9 Claims to the extent they have contracts

22

        providing for default rates of interest.  See the more detailed
        discussion in Section 4.3.1.9. herein."

4.      Sections 2.9.3.1 (first paragraph) and 2.9.3.5 of the Disclosure Statement are inadequate

as they fail to disclose the Creditors' Committee's position that the Plan's treatment of

Class 9 Claims should be modified to provide the holders of Class 9 Claims (other than

Bank Claims), including letters of credit claims and accounts payable claims, with the

opportunity to prove that they are entitled to post-petition interest at rates other than the

4.19% or contractual non-default rate provided currently by the Plan.  The Creditors'

Committee has, on more than one occasion, provided to the Debtors relevant excerpts

from the confirmed plan of reorganization in In re USG Corp., Case No. 01-2094 (JKF),

(Bankr. D. Del. Mar. 27, 2006) that sets forth a procedure by which general unsecured

creditors can assert their arguments in favor of a higher post-petition interest rate than

that provided for in the plan.  (Copies of the relevant pages from the USG plan of

reorganization are annexed to this Objection as Exhibit A).  The Debtors have to date

determined not to provide for such a procedure in the Plan.  Accordingly, these

paragraphs should be revised to include the following text:

        "The Unsecured Creditors' Committee has also informed the
        Debtors of its position that the Debtors should modify the
        treatment provided to Class 9 Claims, other than Bank Claims, but
        including letters of credit claims and accounts payable claims, so
        as to provide each of those claim holders with the opportunity to
        dispute the payment of post-petition interest at the rate the Debtors
        ascribe to such holders pursuant to section 3.1.9. (b)(ii) of the Plan.
        The Unsecured Creditors' Committee has suggested the Debtors
        modify the Plan to include procedures similar to those post-petition
        interest rate dispute resolution procedures established in the
        confirmed plan of reorganization for the USG Corporation chapter
        11 cases, and has forwarded to the Debtors the pertinent sections of
        USG's confirmed plan for their consideration."

5.    The second paragraph of section 2.9.3.1 of the Disclosure Statement is incomplete,

inaccurate and requires revision.  Among other things, the paragraph incorrectly states

that "[i]n June 2008, as part of its negotiations leading up to the Plan, JP Morgan Chase

Bank, N.A. ("JP Morgan"), in its capacity as agent for the pre-petition lenders (the

"Lenders") demanded a payment of post-petition interest at 100% of the contract default

rate, compounded quarterly, on the obligations outstanding under the Debtors' Pre-

petition Credit Facilities (the "Bank Claims")."  To the contrary, JPMorgan never

negotiated any aspect of this Plan, nor did it ever demand in June 2008 the payment of

default interest.  Accordingly, the paragraph should be revised as follows:

> "By letter dated April 21, 2008, certain holders (the "Objecting
> Lenders") of claims outstanding under the Debtors' Pre-petition
> Credit Facilities (the "Bank Claims") demanded payment on the
> Bank Claims to include post-petition interest at 100% of the
> contractual default rate, compounded quarterly, plus facility fees
> and other fees due and attorneys' fees and costs.  On June 13,
> 2008, the Debtors filed an objection to the Bank Claims seeking an
> order from the Bankruptcy Court that post-petition interest at the
> contract default rate need not be paid in connection with the Bank
> Claims.  (Docket No. 18922).  The Objecting Lenders and the
> Unsecured Creditors' Committee, joined by JPMorgan Chase Bank
> N.A. ("JPMorgan"), in its capacity as agent for all pre-petition
> lenders (the "Lenders"), responded to and opposed the Debtors'
> claim objection.  (Docket Nos. 19073, 19072, 19074).  The matter
> was heard by the Court on September 29, 2008 and the Court's
> ruling is pending.  For a more detailed discussion of this litigation,
> *see infra* section 3.2.8.4 (Certain Post-Petition Litigation Matters;
> Bank Claims Default Interest Litigation)."

## 2.    The Disclosure Statement Contains Inadequate Information on the Creditors' Committee

Section 3.2.3.1 of the Disclosure Statement fails to provide any information regarding the

composition of the Creditors' Committee and fails to disclose that the Creditors' Committee had

24

employed an asbestos claims consultant and the identity of that consultant. This section should

be supplemented to include the following text after the first sentence:

> "As originally appointed, the Unsecured Creditors' Committee was comprised of nine members: (i) J.P. Morgan Chase & Co., (ii) Wachovia Bank NA, (iii) Bank of America, (iv) First Union National Bank, (v) ABN Amro Bank N.V., (vi) The Bank of New York, as indenture trustee, (vii) Bankers Trust Co., as indenture trustee, (viii) Sealed Air Corp. and (ix) Zhagrus Environmental Inc.
>
> During the course of the chapter 11 case, certain members of the Unsecured Creditors' Committee resigned, one new entity was appointed and then resigned and certain members merged. The Committee currently has three members (i) J.P. Morgan Chase, (ii) Wachovia Bank, f/k/a First Union National Bank, and (iii) Sealed Air Corp."

In addition, this section of the Disclosure Statement should be supplemented to include

the following sentence at the end of the section:

> "Navigant Consulting, Inc. f/k/a Chambers Associates was employed as the asbestos issues expert for the Unsecured Creditors' Committee."

### 3. The Post-Petition Litigation Section of The Disclosure Statement Fails to Contain Any Discussion of the Bank Claims Default Interest Litigation

Section 3.2.8 of the Disclosure Statement contains descriptions of a number of post-

petition litigation matters, but is totally devoid of any discussion of the Debtors' litigation with

certain of the Lenders and the Creditors' Committee over whether post-petition interest should

be paid to the Lenders at the Default Rate, compounded quarterly, as provided for in the Pre-

petition Credit Facilities. Accordingly, Section 3.2.8 of the Disclosure Statement is currently

incomplete and should be revised to include the following insert as new Section 3.2.8.4:

> 3.2.8.4 Bank Claims Default Interest Litigation

25

In response to the Debtors' proposed term sheet for Chapter 11 plan of reorganization publicly disclosed on April 7, 2008, certain Lenders, by their counsel, sought payment on the Bank Claims to include post-petition interest at 100% of the contractual default rate, compounded quarterly, plus facility fees and other fees due, and attorney fees and costs, in accordance with the terms set forth in the Pre-petition Bank Credit Facilities. On June 13, 2008, the Debtors filed an objection to the Bank Claims seeking an order from the Bankruptcy Court that post-petition interest at the contract default rate need not be paid in connection with the Bank Claims. (Docket No. 18922). The Objecting Lenders (Docket No. 19073) and the Unsecured Creditors' Committee (Docket No. 19072), joined by JPMorgan (Docket No. 19074), in its capacity as agent for all Lenders, responded to and opposed the Debtors' claim objection. Those parties argued, <u>inter alia</u>, that the Lenders are entitled to post-petition interest at the default rate because the Debtors' equity holders will retain significant value under the Plan and, accordingly, payment in full, including post-petition default interest, must be paid to the Lenders to comply with the absolute priority rule under 11 U.S.C. §1129(b)(2)(B)(ii). Those parties also argued that the Debtors are solvent as demonstrated by the retention of value by the existing equity holders and because no compelling equitable considerations exist, the Lenders' contractual rights should be enforced and payment made of post-petition interest at the default rate.

On or about September 5, 2008, the Debtors filed their Trial Brief (Docket No. 19476), responding to the arguments raised by the Objecting Lenders and Unsecured Creditors' Committee. The Objecting Lenders also filed a Pre-Trial Memorandum on or about September 5, 2008 (Docket No. 19478), joined by the Unsecured Creditors' Committee (Docket No. 19477), reiterating the arguments previously asserted and marshalling the evidence with respect to those arguments. The Debtors, in their Trial Brief, argued, *inter alia,* that the Lenders are not entitled to post-petition interest at the default rate because there has not been any determination of the Debtors' solvency and that, accordingly, neither the absolute priority rule nor the "fair and equitable" test of 11 U.S.C. § 1129(b)(2) are applicable. The Debtors also argued that, in any event, post-petition interest at the default rate need not be paid because the equities weigh in the Debtors' favor and the Lenders should be bound to a prior agreement between the Debtors and Unsecured Creditors' Committee by which a post-petition interest rate was established with respect to the Debtors' January 2005 plan of reorganization, an agreement modified by those

26

parties in February 2006.  The Court held a hearing on the
Debtors' objection on September 29, 2008 and the Court's ruling is
pending.

## 4. Section 4.3.1.9 of the Disclosure Statement Describing the Plan's Treatment of Class 9 Claims Should Reflect A Summary of the Creditors' Committee's Disclosure Statement Objections to Such Treatment

Section 4.3.1.9 of the Disclosure Statement, which reflects the treatment of General

Unsecured Claims in Section 3.1.9 of the Plan, should reflect the positions that the Creditors'

Committee has raised in this Objection.  Accordingly, Section 4.3.1.9 of the Disclosure

Statement should be supplemented with the following additional disclosure:

> "The Unsecured Creditors' Committee has filed an objection
> [Docket ID.___] to the Court's approval of the Disclosure Statement
> contending, among other arguments, that it describes a Plan that is
> unconfirmable on its face as a matter of law, as it improperly treats
> Class 9 Claims as unimpaired within the meaning of § 1124(1) of
> the Code and thereby disenfranchises the Class of the right to vote.
> Case law supports denying approval of a debtor's disclosure
> statement where it is apparent at the disclosure statement approval
> stage that the related plan is fatally flawed and not confirmable.
>
> The Unsecured Creditors' Committee believes that the Debtors'
> Plan impairs the rights of the Class 9 Creditors, as it "does not
> leave the creditor's rights entirely unaltered." In re Coram
> Healthcare Corp., 315 B.R. 321, 351 (Bankr. D. Del. 2004).  The
> Debtors' Pre-petition Credit Facilities that govern the rights of
> certain holders of Class 9 Claims call for a payment equal to the
> Prime Rate plus 2% in the event of default, compounded quarterly.
> The current Plan calls for Class 9 creditors to receive rates selected
> by the Plan Proponents that have no foundation in the Pre-petition
> Credit Facilities (6.09% interest through December 31, 2005 and
> thereafter at the floating Prime Rate compounded quarterly, with
> no default interest).  Therefore, under the Plan, Class 9 creditors
> have their legal and contractual rights altered and should be
> classified as impaired.  "Other" General Unsecured Creditors with
> contracts providing for a default rate are similarly impaired
> because under the Plan they are only to be paid interest at the
> "non-default contract rate."  In addition, there may be certain other
> General Unsecured Claims that are impaired because they are

27

entitled to state law statutory rates that exceed 4.19% that the Plan is not recognizing for purposes of providing appropriate Distributions. The impairment is impermissible because it results solely from the treatment of the Class in the Plan.

In addition, the Unsecured Creditors Committee believes that the Debtors' Plan alters the Class 9 creditors' legal and equitable rights by failing to ensure that their Claims will be paid on or about the Effective Date. Currently, the Plan calls for Cash payment "on the Effective Date or as soon as practical thereafter." (Emphasis added). Such delay leaves the timing of Distributions at the discretion of the Debtors and impairs the Class by deferring payment.

The Unsecured Creditors' Committee's Objection proposed that the Court either refrain from considering approval of the Disclosure Statement until after the Court hears argument and rules on the merits of the impairment issue, or provide Class 9 Claims with the provisional right to vote with the Court to take up the merits of the impairment issue in connection with the Plan's confirmation proceedings. See, e.g., In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 202 (3d Cir. 2003). The Court heard preliminary argument on the impairment issue at the Disclosure Statement hearing and [insert the Court's ruling]."

## 5. Failure to Provide A Process For The Determination of Post-Petition Interest Rates for Certain Class 9 Claims

Section 4.3.1.9 of the Disclosure Statement repeats the treatment in § 3.1.9 of the Plan

that "Post-petition interest on Allowed General Unsecured Claims shall be determined as

follows: -- either (i)(A) for holders of Pre-petition Credit Facilities . . . and (B) for all other

General Unsecured Claims, post-petition interest shall be calculated at the rate of 4.19% from the

Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-

default contract rate, . . . ." Disclosure Statement at 82, § 4.3.1.9; Plan at 45, § 3.1.9(b).

However, neither Section 4.3.1.9 of the Disclosure Statement, Section 3.1.9 of the Plan,

nor any other section of the Disclosure Statement and Plan sets forth the process by which a

NY 71785311v3
10/17/08

holder of a Class 9 Claim with an existing contract providing for the payment of interest at a contractual non-default interest rate is to provide documentation to the Debtors or Reorganized Debtors supporting its contractual interest rate. The Plan should be amended to establish such a process and the Disclosure Statement should be revised to describe that process.

### 6. Failure To Disclose That The Debtors Seek Unlimited and Unnoticed Extensions of Their Time to Object to Claims

Section 4.5.1 of the Disclosure Statement fails to disclose that Section 5.1 of the Plan provides the Reorganized Debtors with the right to file objections to Plan Claims (other than Asbestos PI Claims) for another 180 days after the Effective Date and further grants the Reorganized Debtors the right to obtain additional extensions of their time to file objections to non-Asbestos Claims without providing notice to creditors of that relief and holding a hearing thereon. After almost eight years in Chapter 11, the Debtors have had a significant period of time to review Claims and determine to which of those the Debtors should object. Any post-Effective Date extensions should be extremely limited and on notice to all Class 9 Claims that have not yet become Allowed Claims, or are not at the time the subject of a pending objection. This section of the Disclosure Statement should therefore be revised to disclose as follows:

> "The Unsecured Creditors' Committee objects to the unlimited and unnoticed extensions of the Reorganized Debtors' right to file objections to Claims provided in section 5.1 of the Plan. The Reorganized Debtors should receive one 60-day post-Effective Date period within which to file objections to Claims, or such later date as may be specifically fixed by the Bankruptcy Rules, or in a final order of the Court with respect to such Claim. No further or other extensions of the Reorganized Debtors' time to file objections to proofs of claim should be permitted. Claims that are not already Allowed Claims, Disallowed Claims, or the subject of objections as of the expiration of such 60-day post-Effective Date period should automatically be Allowed Claims."

29

### 7. The Plan Provision Regarding Post-Effective Date Modification or Withdrawal of the Plan Is Contrary to Law

Section 4.4 of the Disclosure Statement inadequately describes Section 4.1.2 of the Plan, which concerns post-Effective Date modifications to the Plan and other Plan Documents. Although Section 4.4 of the Disclosure Statement is totally devoid of any detail as to which Plan Documents the Plan Proponents are obtaining authority to modify, a review of Section 4.1.2 of the Plan itself reflects that it provides the Plan Proponents with authority "to amend, modify, or supplement the Plan Documents" from and after the Effective Date, as provided in the Plan Documents, except to the extent any such change to the Plan conflicts with the Sealed Air Settlement Agreement or the Fresenius Settlement Agreement and is not expressly consented to in writing. Plan at 47, § 4.1.2.

Section 1127(b) of the Bankruptcy Code permits a debtor to make modifications to its plan at any time after confirmation and *prior to substantial consummation*, as long as such plan continues to meet the requirements of §§ 1122 and 1123. Once a plan has been substantially consummated, the debtor is precluded from making amendments or modifications under § 1127(b). See In re Antiquities of Nev., Inc., 173 B.R. 926, 928 (B.A.P. 9th Cir. 1994) ("If this were not the case, a proponent of a plan could file an endless series of motions to modify the plan, at every bump in the road, seriously jeopardizing the incentive for creditors to vote in favor of a plan.").

To the extent Section 4.1.2 would enable the Plan to be amended, modified or supplemented after the Plan has been substantially consummated, whether as a result of a direct modification to the Plan, or indirectly as a result of a modification to other Plan Documents, Section 4.1.2 is contrary to law. The provision should be deleted.

30

Correspondingly, that portion of Section 4.4 of the Disclosure Statement that relates to Plan Section 4.1.1, which addresses plan modifications prior to the Effective Date, must be revised to delete the reference to Section 4.1.2 and limit the Plan Proponents' ability to amend the Plan Documents solely to the extent consistent with Section 1127(b) of the Bankruptcy Code. The second sentence of Section 4.1.1 of the Plan should be revised to read as follows:

> "After the Confirmation Date, the Plan Proponents acting together, may alter, amend or modify this Plan in accordance with and subject to the limitations of Bankruptcy Code § 1127(b)."

## 8. The Procedure Described In Section 4.5.1 for Objecting to Claims filed by Employees is Contrary to Law

The procedures described in Section 4.5.1 of the Disclosure Statement and at Section 5.1 of the Plan for providing notice that "the Plan constitutes an objection to all Claims asserted by current or former employees of the Debtors" other than Employee Benefit Claims asserted by such claimants is contrary to law. Disclosure Statement at 83, § 4.5.1.; Plan at 47-48, § 5.1. The Debtors propose to provide notice of their objection to these claimants by including the objection in the Non-Voting Status Notice sent to unimpaired Classes not entitled to vote. But, Bankruptcy Rule 3007 provides that "[a] copy of the [written] objection with notice of the hearing thereon shall be . . . delivered to the claimant . . . ." Fed. R. Bankr. P. 3007(a).

A review of the form of the Non-Voting Status Notice annexed to the Approval Motion at Exhibit E, for which the Debtors seek approval, reflects a number of infirmities relating to the proposed notice to current and former employees. The heading on the Non-Voting Status Notice fails to prominently display that this pleading is also noticing the Debtors' objections to all Claims asserted by current and former employees other than Employee Benefit Claims. In addition, the Non-Voting Status Notice contains no specificity as to the nature of the Debtors'

31

specific objection to any of the claimants affected. Further, to the extent the objection

constitutes "an omnibus objection (i.e., an objection to claims asserted by more than one

claimant)" to certain of the claims of current and former employees under Delaware Local

Bankruptcy Rule 3007-1, the Local Rule requires, among other things, that the objection include

an exhibit identifying at a minimum (i) the name of each claimant, (ii) the claim number for each

claimant, (iii) the claim amount for each claimant and (iv) the reason in sufficient detail as to

why the claim should be disallowed. Del. Bankr. L.R. 3007-1(e)(iii)(A). Rule 3007-1(f)(iii) also

requires that an objection based on substantive grounds shall include all substantive objections to

such claim. Del. Bankr. L.R. 3007-1(f)(iii). Assuming that the unsecured creditors' claims are

substantive in nature, which they appear to be, the Delaware Local Rules require that the Debtors

include "substantive objections" which are presumptively more than a general objection as the

Debtors have proposed in section 5.1 of the Plan. The Debtors' proposed form and manner of

objecting to their current and former employees' claims is not adequate and does not comply

with law.

9. **Section 4.5.2 Inadequately Discloses
   Information Regarding The Impact of the Plan's
   Disputed Claim Provisions on Class 9 Claims**

Section 4.5.2 of the Disclosure Statement fails to disclose that Section 5.2 of the Plan (in

conjunction with other Plan provisions, notably Section 5.1 and the definition of Allowed Claims

in Plan Section 1.1.4.(b)), could result in a further substantial delay in the Reorganized Debtors

making Distributions to Class 9 Claims that are not the subject of stipulations or court orders

fixing the allowance of their Claims. Section 5.2 of the Plan provides that "[n]o Distribution

shall be made with respect to all or any portion of any Disputed Claim pending the entire

resolution" of such claim. Plan at 48, § 5.2. A Disputed Claim is defined by the Plan as neither

32

an Allowed Claim nor a Disallowed Claim. With respect to creditors holding Class 9 Claims

that filed timely proofs of claim, Class 9 Claims are Allowed Claims when no objection has been

"interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code,

the Bankruptcy Rules, or a Final Order of the Bankruptcy Court." Id. at 3, § 1.1.4 (b). As

reflected above, currently Section 5.1 of the Plan effectively provides the Reorganized Debtors

with the ability to object to Claims for a seemingly infinite period of time after the Effective

Date.

Subject to clarification from the Plan Proponents, Section 5.2 of the Plan in conjunction

with the other provisions referred to above, appears to provide a mechanism whereby the

Reorganized Debtors can delay making a Distribution on a Class 9 Claim on or about the

Effective Date simply by refusing to acknowledge prior to the Effective Date that they have no

objection to the allowance of a Class 9 Claim. Withholding Distributions on Claims to which the

Debtors have no objection raises serious questions as to whether the Plan has been proposed in

good faith in compliance with Section 1129(a)(3) of the Code, and consequently, whether it is

confirmable as a matter of law. See In re Coram Healthcare Corp., 271 B.R 228, 234 (Bankr. D.

Del. 2001) (plan must be "proposed with honesty, good intentions and a basis for expecting that

a reorganization can be effected with results consistent with the objectives and purposes of the

Bankruptcy Code."); In re Hoosier Hi-Reach, Inc., 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986) (two

objectives of the Code are "the expeditious resolution of disputes and speedy payment to

creditors."). The Plan Proponents should clarify their intention in the Disclosure Statement and

the Plan should be amended to require the Debtors to add as an exhibit to the Disclosure

Statement a schedule identifying those Class 9 Claims to which the Debtors will not object. The

Allowed Claim Schedule should identify the Class 9 Claim and the proposed Allowed Amount

of each such Claim.  The Allowed Claim definition in the Plan should also be modified as necessary to reflect that Class 9 Claims on the Allowed Claim Schedule constitute Allowed Claims.

Further disclosure and clarification is needed in Section 4.5.2 of the Disclosure Statement in respect of those instances where the Debtors have no objection to the pre-petition portion of a Class 9 Claim, but there is not yet an agreement with the Debtors or a determination over the post-petition interest to be provided on that Claim.  The Creditors' Committee believes that in the absence of an agreement between the holder of a Class 9 Claim and the Debtors on the amount of post-petition interest to be provided on that Class 9 Claim, the pre-petition undisputed portion of the Claim should be deemed an Allowed Claim under the Plan, such that Distributions on such Allowed Claim may be made without further delay on or about the Effective Date.  No legitimate reason exists for delaying payment on the undisputed amounts of such General Unsecured Claims.  Given the almost eight years that Class 9 Claims have waited for Distributions in this case, any further delay in making Distributions in this situation smacks of the Debtors attempting to use inappropriate leverage to seek agreements on the amount of post-petition interest to be paid.  Further, since post-petition interest will accrue until Allowed Class 9 Claims are paid, payment of the pre-petition portions of Class 9 Claims, even in the absence of resolutions on the post-petition interest portion, will be beneficial to the estates as it will reduce the amount of interest needing to be ultimately paid.

34

**10. The Disputed Claims Distribution Section
Fails to Disclose that the Plan Does Not
Provide for the Establishment of A Cash
Reserve for Class 9 Claims**

Section 4.5.2 of the Disclosure Statement is inadequate as it is totally silent on the fact

that the Plan does not establish Cash reserves on the Effective Date for the benefit of Class 9

Claims.  Consequently, there is no assurance that when Disputed Class 9 Claims become

Allowed Claims, Cash will be available to make Distributions in accordance with the treatment

provided for Allowed Class 9 Claims under the Plan.  This is a critical piece of information the

Disclosure Statement should prominently disclose.

Cash reserves in an amount, equal, at all times, to the Claim amount, including post-

petition interest, of any Disputed Class 9 Claim must be established and fully maintained to

ensure that each claimant's rights to Distributions under the Plan will not be adversely impaired.

If the history of other Chapter 11 cases is a guide, it may take a considerable period of time for a

consensual or litigated resolution of claim disputes, including those relating to post-petition

interest to occur.  In Sections 9.4.1 and 9.4.2 of the Disclosure Statement, the Debtors identify

two risks that are specifically relevant to this point: the Reorganized Debtors' potential inability

to achieve their financial results and to satisfy their post-reorganization debt obligations.

Accordingly, Section 4.5.2 of the Disclosure Statement should be revised and the

following text added:

> "The Plan currently contains no provisions for the establishment
> and maintenance of a reserve, fully funded with Cash, from which
> Class 9 Claims may be payable, including Claims for post-petition
> interest that become Allowed Claims after the Effective Date.  The
> Unsecured Creditors' Committee believes that the Plan should be
> amended to provide for the establishment and maintenance of a

35

Cash reserve for the benefit of each holder of a Class 9 Claim in an amount equal, at all times to the lesser of (i) the amount of the Claim, with post-petition default interest, (ii) the amount determined by the Court, or (iii) such other amount as may be agreed upon by the holder of a particular Class 9 Claim and the Debtors."

## 11. Section 4.6 Fails To Reflect There Is A Dispute Over The Treatment of Class 9 Claims As Unimpaired

Section 4.6 of the Disclosure Statement is inadequate as it fails to disclose that the

Creditors' Committee disagrees with the Plan's treatment of Class 9 as an unimpaired Class.

Accordingly, Section 4.6 should be revised and the following text added to the end of the second

paragraph in the section:

"The Unsecured Creditors' Committee disputes the Plan's treatment of Class 9 as an unimpaired Class not entitled to vote and believes that the Plan as currently constructed is not confirmable on its face as a matter of law. For a more detailed discussion on the Unsecured Creditors' Committee's position see section 4.3.1.9."

## 12. The Disclosure Statement Describes Section 8.1.5 of the Plan that is Contrary to Law

The second sentence of Section 8.1.5 of the Plan, set forth in Section 4.8.1.5 of the

Disclosure Statement, is contrary to law. The second sentence provides in relevant part that

"[t]he Confirmation Order … shall constitute an order disallowing all Plan Claims (other than

Asbestos PI Claims and Asbestos PD Claims) to the extent such Plan Claims are not allowable

under any provision of Bankruptcy Code § 502." Plan at 77-78, § 8.1.5. Section 502(a) of the

Bankruptcy Code provides that proofs of claim filed under section 501 of the Code are "deemed

allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). The Bankruptcy Rules

further provide that the filing of a proof of claim executed and filed in accordance with the

Bankruptcy Rules constitutes "prima facie evidence of the validity and amount of the claim."

36

Fed. R. Bankr. P. 3001(f). Accordingly, the Debtors, the Reorganized Debtors or other parties in interest must affirmatively file an objection to the proof of claim to negate the *prima facie* valid claim that has been asserted. VFB LLC v. Campbell Soup Co., 482 F.3d 624, 636 (3d Cir. 2007).

Unless the Plan is amended to delete the second sentence of Section 8.1.5 (prior to the date the Disclosure Statement is approved), the Disclosure Statement should be revised to state in its Section 4.8.1.5 the following:

> "The Unsecured Creditors' Committee has filed an objection to the Disclosure Statement contending that the provision in Plan § 8.1.5 providing for the Confirmation Order to constitute an order disallowing all Plan Claims to the extent they are not allowable under Section 502(b) of the Code is contrary to law and renders the Plan unconfirmable."

### 13. The Release By The Debtors and Estate Parties Needs To Be Clarified

Section 4.8.8.8 of the Disclosure Statement sets forth the "Release by Debtors and Estate Parties" provision set forth in Section 8.8.8 of the Plan. This Release appears to be one intended to be given by the Debtors and the Reorganized Debtors on their own behalf and on behalf of their respective estates and Affiliates "and any and all Entities who may purport to claim by, through, for or because of them...." Disclosure Statement at 108, § 4.8.8.8. Although the Creditors' Committee has no objection *per se* to those provisions of this Release, the Release goes on to provide that "any third parties" are also providing conclusive and unconditional releases "to the Debtors and their Non-Debtor Affiliates' Representatives and their respective properties...." Id. With the inclusion of the words "any third parties," the Release appears to be overly broad as it would enjoin parties even if they are not Holders of Claims or Equity Interests from bringing suits or causes of action they may have against non-debtor parties. Either the Plan

37

should be amended to delete prior to the date the Disclosure Statement is approved the reference to "any third parties," as parties granting releases, or Section 4.8.8.8 of the Disclosure Statement should be revised to explain why the Release needs to be so broad and the authority that exists for the Court to grant such a release.

### 14. The Disclosure Statement Inadequately Describes the Plan Provisions Addressing <u>Executory Contracts and Unexpired Leases</u>

Section 4.9 of the Disclosure Statement is inadequate as it fails to provide any detail regarding the procedures set forth in Section 9.1 of the Plan relating to the Debtors' assumption and rejection of executory contracts and unexpired leases. A review of the Plan's provisions reveals, among other matters, that as of the Effective Date, the Debtors will assume all executory contracts and unexpired leases that have not previously been assumed or rejected or designated to be rejected by the tenth day prior to the Effective Date.

The Plan's provisions also reveal that with respect to those executory contracts and unexpired leases being assumed, the Debtors do not intend to cure any default that exists as of the Effective Date with respect to such contracts or leases at the time of and in connection with the assumption. Rather, any such default "shall be cured in the ordinary course of the Reorganized Debtors' business promptly after such default becomes known to the Reorganized Debtors and, if the cure amount is disputed, such cure amount shall be established pursuant to applicable law...." Plan at 91-92, § 9.1 The Plan described in the Disclosure Statement contains no process for the Debtors to provide notice to the non-debtor parties to the executory contracts and unexpired leases that the Debtors intend to assume such agreements and stating the cure amount, if any, the Debtors believe they are obligated to pay in connection with such assumption. The Plan described in the Disclosure Statement also provides no opportunity for the

38

non-debtor parties to these agreements to object to the proposed assumption of their agreements by the Reorganized Debtors as of the Effective Date and/or the cure amount identified by the Debtors. The Disclosure Statement therefore fails to disclose that Section 9.1 of the Plan is contrary to law, because Section 365 of the Code precludes the Debtors from assuming any executory contract or unexpired lease when there has been a default in such agreement unless the Debtors, among other requirements, cures or provides adequate assurance that they will promptly cure such default.

### 15. Failure To Describe and Explain The Plan Provision Providing For Dissolution of The Unsecured Creditors' Committee

Section 4.11 of the Disclosure Statement is inadequate as it contains no information regarding Section 11.7 of the Plan addressing when each of the official committees appointed in these cases and the FCR are released from their duties, and with respect to the official committees, dissolve. A review of Section 11.7 of the Plan reveals that the treatment for the Creditors' Committee is significantly different than that for the other official committees and the FCR. Although the other official committees and the FCR continue in existence and retain standing and capacity for a number of post-Effective Date activities, including (i) to "object to any proposed modification of the Plan" and (ii) to "participate in any appeals of the Confirmation Order (if applicable)," the Creditors' Committee's existence, standing and capacity are not extended for those activities. Plan at 98, § 11.7. The Creditors' Committee submits that there is no basis to treat it differently on these critical and fundamental matters. All Class 9 Claims may not have been Allowed or Disallowed as of the Effective Date, and as already discussed in this Objection, the Plan as currently constructed does not ensure that Allowed Class

NY 71785311v3
10/17/08

9 Claims will receive Distributions on the Effective Date. If there is a rationale for the disparity in treatment, the Disclosure Statement should state what it is.

In addition, the Creditors' Committee should also remain in existence and have standing and capacity to act post-Effective Date with respect to the Bank Claims Default Interest Litigation to which it is a party and any appeals from orders ruling on such litigation, and with respect to any other litigation that may occur concerning the payment of default interest to other Class 9 Claims with contractual default interest rate provisions.

Accordingly, Section 4.11 of the Disclosure Statement should be revised to provide the following:

> "In its Disclosure Statement Objection [Docket No.    ], the Unsecured Creditors' Committee states that section 11.7 of the Plan should also provide for it to remain in existence and have standing and capacity to act post-Effective Date (i) to object to any proposed modification of the Plan and (ii) to participate in any appeals of the Confirmation Order (if applicable). In addition, the Unsecured Creditors' Committee states that it should remain in existence and have standing and capacity to act post-Effective Date with respect to the Bank Claims Default Interest Litigation to which it is a party and any appeals from rulings thereon and any other litigation that is commenced addressing the payment of default interest to other Class 9 Claims with contractual default interest rate provisions."

## 16. The Discussion In Section 9.2.4 Should Be Expanded

In Section 9.2.4 of the Disclosure Statement, the Debtors describe the risk to the Plan if the Court finds that the Debtors must pay the Lenders under the Pre-petition Credit Facilities default interest in accordance with those agreements, rather than the treatment described for the Lenders in Section 2.9.3.1 of the Disclosure Statement. The discussion of this risk factor would be more informed if it were supplemented by a discussion of the parties' respective positions on

40

the default interest issue.  Accordingly, Section 2.9.3.1 of the Disclosure Statement should be

supplemented by providing a reference to the new proposed Section 3.2.8.4 as follows:

> "For a more detailed discussion of the Bank Claims Default
> Interest Litigation *see supra* section 3.2.8.4 (Certain Post-Petition
> Litigation Matters; Bank Claims Default Interest Litigation)."

## 17. The Disclosure of Certain Financial Information Related To Estimated Claims in the Disclosure Statement is Inadequate and Irreconcilable

The Table in Section 1.2.1 (the "Claims Table") of the Disclosure Statement summarizes

in chart form the treatment, classification, as impaired or unimpaired, and the estimated

aggregate amount of the Allowed Claims for each Class of Claims and Interests (the "Estimated

Amount of Allowed Claims") addressed by the Plan.  With respect to the Class of General

Unsecured Claims, Class 9, the Claims Table reflects the Estimated Amount of Allowed Claims

as being $826.3 million, excluding post-petition interest (the "Class 9 Estimated Claims

Amount").  The Disclosure Statement also contains narrative sections specifically describing

amounts on the Debtors' books and records relating to different types of liabilities.  Section

2.9.3.1 describes and quantifies the Debtors' debt and accrued liabilities.  Section 2.9.3.5

describes and quantifies the Debtors' accounts payable liabilities and Section 2.9.3.6 describes

and quantifies the Debtors' other accrued liabilities.  In addition, Section 4.3.1.9 of the

Disclosure Statement describes the treatment of Class 9 Claims under the Plan, states the

classification of the Class as unimpaired and provides some additional financial information,

including stating that the estimate of the total of all Allowed General Unsecured Claims, as of

June 30, 2008, including post-petition interest, is $1,155.8 million (the "Class 9 Total Allowed

Claim Amount").

41

The Disclosure Statement does not contain adequate information within the sections identified above to be able to determine the principal and interest components by category of each type of Class 9 liability, with the exception of the Debtors' liability under the Pre-petition Credit Facilities. The Claims Table should be revised to provide additional information so that the Class 9 Estimated Claims Amount from the Claims Table can be reconciled to the Total Class 9 Allowed Claim Amount set forth in Section 4.3.1.9 of the Disclosure Statement.

In addition, Section 4.3.1.9 states that Class 9 Claims includes "approximately $127.9 million of other liabilities (including interest)." Disclosure Statement at 82-83, § 4.3.1.9. It is impossible to determine from the other information in the Disclosure Statement what liabilities are included in the "other liabilities" component of Class 9 Claims. The Disclosure Statement should be revised to provide that information, including the principal and interest components of those liabilities.

Footnote 9 to the Claims Table provides the portion of the $826.3 million Class 9 Estimated Claims Amount to be paid on the Effective Date and the amount to be paid thereafter. The information in the Disclosure Statement is inadequate to determine how much of each type of liability within Class 9 the Debtors intend to pay under the Plan on the Effective Date. The Disclosure Statement should be revised to provide this information.

## RESERVATION OF RIGHTS

The Creditors' Committee expressly reserves all of its rights to further object on any and all grounds the Creditors' Committee believes appropriate to the Disclosure Statement and related exhibits, as the same may be amended, modified or supplemented and to object to confirmation of the Plan and its related exhibits, as the same may be amended, modified or

42

supplemented.  In addition, in the event Class 9 Claims are determined to be impaired and their votes solicited on the Plan, or Class 9 Claims are provisionally allowed to vote on the Plan pending a determination on whether Class 9 is impaired under the Plan, the Creditors' Committee expressly reserves all of its rights to review and object to the voting and solicitation procedures and forms of ballots and master ballots the Debtors propose to be applicable to Class 9 Claims.

NY 71785311v3
10/17/08

**WHEREFORE,** the Creditors' Committee respectfully requests that this Court deny approval of the Disclosure Statement unless and until (1) the Court determines whether Class 9 Claims are impaired or provisionally allows Class 9 Claims to vote on the Plan, and (2) the Disclosure Statement is amended, modified or supplemented as necessary to cure the numerous defects identified above, and grants the Creditors' Committee such other and further relief as may be just and proper.

Dated:  October 17, 2008
       Wilmington, Delaware

Respectfully submitted:

**STROOCK & STROOCK & LAVAN LLP**

Lewis Kruger
Kenneth Pasquale
(Members of the Firm)
180 Maiden Lane
New York, New York  10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

and

**DUANE MORRIS LLP**

/s/ Michael R. Lastowski
Michael R. Lastowski (DE I.D. 3892)
Richard W. Riley (DE I.D. 4052)
William S. Katchen
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel: (302) 657-4942
Fax: (302) 657-4901

Counsel for the Official Committee
  of Unsecured Creditors

NY 71785311v3
10/17/08