## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| W. R. GRACE & CO., et al., | ) ) ) | Case No. 01-01139 (JKF) (Jointly Administered) |
| Debtors. | ) ) ) | Hearing Date: October 27, 2008 at 9:00 a.m. |

## OBJECTION OF BANK LENDER GROUP TO
## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
## DISCLOSURE STATEMENT, SOLICITATION AND CONFIRMATION
## PROCEDURES, CONFIRMATION SCHEDULE AND RELATED RELIEF

Certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank

Claimants"),[2] by their undersigned counsel, hereby object to the motion of the above-

captioned debtors ("Grace") for Entry of an Order approving Disclosure Statement,

Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief [Dkt

No. 19620] (the "Motion"),[3] and in support thereof, respectfully represent as follows:

---

[1]    The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements"). The Credit Agreements are attached as Exs. A and B to the Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., filed August 15, 2008 [Dkt No. 19332] which is attached as Ex. 1. (Please note that Exs. A and B to the Freedgood Aff. are not attached hereto).

[2]    The Bank Claimants include (i) Anchorage Advisors, LLC; (ii) Avenue Capital Group; (iii) Bass Companies; (iv) Caspian Capital Advisors, LLC; (v) Catalyst Investment Management Co., LLC; (vi) Intermarket Corp.; (vii) JD Capital Management, LLC; (viii) JP Morgan Chase, N.A. Credit Trading Group; (ix) Loeb Partners Corporation; (x) MSD Capital, L.P.; (xi) Murray Capital Management, Inc.; (xii) Normandy Hill Capital, L.P.; (xiii) Ore Hill Partners, LLC; (xiv) P. Schoenfeld Asset Management, LLC; and (xv) Restoration Capital Management, LLC. The Bank Claimants, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**I.**
**PRELIMINARY STATEMENT**

1.      It is elementary that a bankruptcy court should not approve a disclosure statement for an unconfirmable plan.  Grace has proposed just such a plan.  *See* Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co. et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders [Dkt No. 19579] (the "Plan").

2.      Under section 1124(1) of the Bankruptcy Code, a class of claims is impaired under a plan if the plan alters the legal, equitable or contractual rights to which such claim entitles the holder of such claim.  The legal, equitable and contractual rights of the Bank Lenders include the right to postpetition interest at the contract default rate.[4]

3.      In this reorganization-solvent debtor case, Grace proposes to pay the Bank Lenders, as members of Class 9, a lower rate of interest than the contract default rate, rendering the claims of the Bank Lenders impaired under section 1124(1).  As impaired creditors, the Bank Lenders have the right to vote on the Plan.  Grace seeks to deny the Bank Lenders their voting rights, in violation of section 1124(1), which renders the Plan unconfirmable.[5]  As a result, this Court should not approve the Disclosure Statement.

---

[4]     A finding that the Bank Lenders are impaired triggers the Bank Lenders' rights under section 1129(a)(7) and 1129(b) of the Bankruptcy Code.  These issues are beyond the scope of this Objection, which solely concerns the Plan's improper classification scheme.

[5]     The Bank Lenders believe that the Plan has a number of other fatal deficiencies that render the Plan unconfirmable, including but not limited to violations under sections 1129(a)(7) and 1129(b).  The Bank Lenders reserve all of their rights to make such objections in connection with confirmation.

## II.
## BACKGROUND

4.    Prepetition, Grace entered into the Credit Agreements.  Under them, Grace owes the Bank Lenders $500 million in aggregate principal amount.[6]  The Credit Agreements both matured several years ago.[7]  Both contracts have a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%.  (Credit Agreement §§ 5.1(c), 5.5).  In addition to specifying interest rates, the Credit Agreements provide for payment of facility fees, attorneys' fees, and a specified method for calculating interest which Grace owes the Bank Lenders.  (Credit Agreements §§ 1.1, 5.1, 5.2, 5.7, 5.13.).[8]

5.    After the Petition Date, Grace failed to comply with certain of its obligations under the Credit Agreements.  This includes its failure to comply with certain payment and reporting requirements, which triggered the default rate provisions under the Credit Agreements.  (*See* Freedgood Aff. at ¶ 13.)[9]

6.    On or about April 7, 2008, Grace publicly announced its proposed settlement (the "Proposed Settlement") which seeks to pay Bank Lenders postpetition interest at a rate that is *less* than that provided by the Credit Agreements.  In addition, the Plan fails to pay the Bank Lenders postpetition interest pursuant to the method of calculating such interest set forth

---

[6]    *See* 1998 Credit Agreement, Sch. 1; 1999 Credit Agreement, Sch. 1.

[7]    The 1998 Credit Agreement matured on May 16, 2003, and the 1999 Credit Agreement matured on May 2, 2001. (1998 Credit Agreement §§ 1.1, 2.2. and Amendment to 1999 Credit Agreement, dated May 3, 2000, § 1.2).

[8]    The administrative agent of the Credit Agreements submitted proofs of claim nos. 9159 and 9168 dated March 27, 2003 (the "Proofs of Claim") for amounts owed on account of the Credit Agreements. In addition to postpetition interest, the Proofs of Claim requested payment of facility fees and attorneys' fees.

[9]    The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases. *See* Fed. R. Evid. 201 (a court may take notice of judicially noticed facts "not subject to reasonable dispute"); *Waltz v. County of Lycoming*, 974 F.2d 387, 389 (3d Cir. 1992) (pleadings, motions, and briefs that were part of the record were "subject to judicial notice" without further proof).

in the Credit Agreements, and appears to fail to pay the facility fees and attorneys' fees due under such contracts.

7.      On June 13, 2008, Grace objected to the Proofs of Claim to the extent such claims sought to include postpetition interest at the contract default rate as part of the "allowed" amount of the Bank Lenders' claims [Dkt No. 18922] (the "Objection").

8.      On September 19, 2008, Grace filed the Plan incorporating the Proposed Settlement. The Plan classifies the Bank Lenders' claims as "unimpaired," and thus, the Bank Lenders are deemed to have voted to accept the Plan. (*See* Plan at §3.1.9(c).)

9.      The Plan, however, does not pay the Bank Lenders in accordance with their legal and contractual rights set forth in the Credit Agreements. Instead, it provides for payment in accordance with the unapproved Proposed Settlement.

10.     The Plan provides that each holder of an allowed general unsecured claim shall be paid "*the Allowed Amount of its Allowed General Unsecured Claim*" with "*post-petition interest.*" It further provides that postpetition interest on the Bank Lenders' allowed claims is "*calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly.*" (Plan at §3.1.9(b).) Thus, there is no dispute that despite the Credit Agreements specifying the legal, equitable and contractual rights of the Bank Lenders to receive payment of "X," the Plan pays Bank Lenders "Y" on account of their claims. The Bank Lenders are thereby impaired.

### III.
### OBJECTION

11.     A court should not approve a disclosure statement for an unconfirmable plan. *In re Curtis Ctr. Ltd., P'Ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) (disapproving of disclosure statement where the plan it described was patently unconfirmable on account of an

4

improper classification scheme); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (E.D. Pa. 1987).[10]

12.     Section 1129(a)(1) of the Bankruptcy Code requires that, in order for a plan to be confirmed, the plan must "comply with applicable provisions of this title." The Plan does not satisfy section 1129(a)(1) because it classifies the Bank Lenders' claims as "unimpaired," although under the black letter law of this Circuit, such claims are "impaired."

13.     The Third Circuit is crystal clear on the law on "impairment." If the chapter 11 plan does not leave the creditor's legal, equitable, and contractual rights "*entirely 'unaltered,'* the creditor's claim will be labeled as impaired under section 1124 of the Bankruptcy Code." *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) (emphasis supplied). Payment at an interest rate *other* than the contract default rate does not satisfy the legal requirements of section 1124 of the Bankruptcy Code for classifying a claim as "unimpaired" and thereby, disenfranchising a creditor. There is no legal distinction *for impairment purposes* between non-payment of the base contract or default contract rate, and no court has ever recognized such a distinction. What's more, the Third Circuit presumes impairment under a plan. A debtor only overcomes the presumption if it demonstrates that the plan leaves the creditor's rights unaltered. *Id.* at 203. Grace has made no effort to satisfy its burden to overcome the legal presumption that the Bank Lenders are "impaired" and entitled to vote.

14.     Grace argued that a creditor is not "impaired" for purposes of voting on a plan if the plan pays a creditor the allowed prepetition amount of its claim in full, but excluding

---

[10]     *See also, e.g., In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990); *In re O'Leary*, 183 B.R. 338, 339 (Bankr. D. Mass. 1995); *In re Moorpark Adventure*, 161 B.R. 254, 258 (Bankr. C.D. Cal. 1993).

any postpetition interest.[11]  Grace's position is that a claim is unimpaired for purposes of

section 1124 if its plan proposes to pay the Bank Lenders *any* amount of postpetition interest,

even if the chosen rate is lower than the one under the Credit Agreements.  In sum, Grace sees

itself as generous for paying interest as an "extra" to a creditor already unimpaired by virtue

of receipt of its "allowed" section 502 prepetition claim.

15.    Grace's approach to impairment resurrects the discredited analysis of *In re

New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), a decision that Congress repudiated in

its 1994 repeal of section 1124(3).  The repealed provision specified that a creditor receiving

full payment of an "allowed claim" was not impaired.[12]  In *New Valley*, before filing its

chapter 11 plan, the debtor objected to certain lenders' claims and sought declaratory

judgment rulings that (a) payment under the plan of the full amount of the lenders' allowed

prepetition claims rendered such claims unimpaired, and (b) the debtor had no obligation to

pay postpetition interest on unimpaired claims.  168 B.R. at 74.  The relief sought in *New

Valley* depended on the interplay of sections 502(b)(2), 1129(a)(7)(A), and the now-repealed

section 1124(3).  While acknowledging the reorganization-solvent debtor exception to non-

payment of postpetition interest, the bankruptcy court in *New Valley* held that "section

1124(3) allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full,

excluding postpetition interest, without risking impairment." *PPIE*, 324 F.3d at 205 (*citing

New Valley*, 168 B.R. at 77-80).

---

[11]    Grace's Trial Brief, at ¶ 48 [Dkt No. 19476].

[12]    The language of repealed section 1124(3) provided as follows: "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to -(A) with respect to a claim, the allowed amount of such claim . . . ." 11 U.S.C. § 1124(3) (repealed).

16.    To eliminate this anomalous result under the *New Valley* decision, Congress repealed section 1124(3) and made clear that in a reorganization-solvent debtor case, unimpairment required paying a creditor a separate entitlement of postpetition interest *in addition* to the "allowed" prepetition amount of a creditor's claim. *See PPIE*, 324 F.3d at 206. Congress' motivation in deleting section 1124(3) was to overturn the *New Valley* decision which denied unsecured creditors the right to receive postpetition interest and "preclude this unfair result in the future." *Id.* at 206 (citing H.R.Rep. No. 103-835, at 47-48 (1994)).

17.    Subsequently, the Third Circuit dispelled any doubt as to Congress' intent in eliminating section 1124(3) in *PPIE* by upholding the lower bankruptcy court's conclusion that in repealing section 1124(3):

> Congress ... *intended that to be unimpaired, the claim must receive postpetition interest.*

*PPIE*, 324 F.3d at 206 (quoting *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis supplied). The Third Circuit held that it was also understood that a cash payment equal to the allowed prepetition amount of the claim, but without postpetition interest, "could not qualify for nonimpairment under section 1124(1) because the failure to pay postpetition interest does not leave unaltered the contractual or legal rights of the claim." *Id.* at 207 (quoting *PPIE*, 228 B.R. at 352). Thus, as made clear in the Third Circuit's decision in *PPIE* and the legislative history of section 1124, a plan must pay postpetition interest in accordance with the creditor's contract to be "*un*impaired" for purposes of section 1124.

A.    **Section 502(b)(2) Concerns The Allowed Amount of a Claim; It Does Not Limit or Determine The Legal, Equitable and Contractual Entitlement to Postpetition Interest**

18.    *PPIE* dealt with whether a plan improperly classified a landlord's allowed claim as "unimpaired" where the plan proposed to pay the full amount of the "allowed" claim as reduced by section 502(b)(6) *plus* postpetition interest on his allowed claim. The creditor contended that his claim was impaired by operation of section 502(b)(6). *PPIE*, 324 F.3d at 203-04. The Third Circuit rejected the creditor's "impairment by statue argument," but at the same time held that a claim must receive postpetition interest on the allowed prepetition claim, as capped under section 502(b)(6), to be *un*impaired.

19.    By analogy, Grace argues that section 502(b)(2), and not the Plan, is the source of impairment of the Bank Lenders' legal and contractual rights, and therefore, that its classification scheme complies with *PPIE*.[13]    However, Grace's section 502(b)(2) argument fails because section 502(b)(2), like section 502(b)(6), only determines the "allowed amount" of a creditor's prepetition claim. It has nothing to do with a creditor's separate legal and contractual entitlement to postpetition interest on the allowed amount of such creditor's claim in the circumstances specified in the Bankruptcy Code, as discussed below. By this distinction, the Third Circuit on the one hand concluded that full payment of the allowed prepetition claim as limited by section 502(b)(6) would initially render the claim unimpaired, but held, on the other hand, that a creditor must receive postpetition interest on the allowed amount of the claim for such claim to be unimpaired. Again, that is why the *PPIE* plan

---

[13]    Debtors' Corrected Motion to Strike the Bank Lender Group's Sur-Reply or, In The Alternative, Motion for Leave to File a Sur-Reply [Dkt No. 19622].

provided for interest on the allowed prepetition claim of the landlord as limited by section 502(b)(6) to render such claim unimpaired.[14]

20.    Section 502(b)(6), as *PPIE* explained, deals with determining the "allowed amount" of a landlord's prepetition claim. *PPIE*, 324 F.3d at 205. That provision, though, *did not affect* the landlord's ability to receive postpetition interest on the "allowed amount" of the landlord's prepetition claim because the entitlement to postpetition interest is *separate* and *in addition* to the allowed amount of its prepetition claim. *Id.* at 206. Questions regarding whether an impaired creditor is entitled to postpetition interest and at what rate are answered by the applicable contracts, which in this case are the Credit Agreements, other sections of the Bankruptcy Code, and applicable caselaw. A creditor not receiving *all* that the creditor's contract provides is undeniably impaired.[15]

21.    Therefore, while postpetition interest may be disallowed under section 502(b)(2) as part of the "allowed" prepetition amount of such creditor's claim, section 502(b)(2) does not eliminate, and has nothing to do with, a creditor's entitlement to postpetition interest. The availability of the entitlement to postpetition interest arises under section 1129(a)(7)[16], 726(a)(5)[17] and section 1129(b)'s "fair and equitable" test.[18]

---

[14]    The *PPIE* plan paid the complaining creditor postpetition interest in addition to the allowed amount of such creditor's claim as reduced by section 502(b)(6). *See PPIE*, 228 B.R. at 342-43.

[15]    Grace's own Plan makes it clear that a creditor's entitlement to postpetition interest is in addition to the allowed amount of a creditor's claim. "Each Holder of an Allowed General Unsecured Claims shall be paid the Allowed Amount of its Allowed General Unsecured claim *with post-petition interest* . . . *Post-petition interest on Allowed General Unsecured Claims shall be determined as follows:* . . ." *See* Plan at §3.1.9(b). (emphasis supplied).

[16]    Section 1129(a)(7)(A)(ii) of the Bankruptcy Code governs confirmation of a plan and provides that each holder of a claim of such class "will *receive* . . . on account of such claim . . *a value*, as of the effective date of the plan, *that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7* of [the Bankruptcy Code]." (emphasis supplied).

[17]    Section 726(a)(5) of the Bankruptcy Code governs distribution of property of the estate and provides that "in *payment of interest* at the *legal rate* from the date of the filing of the petition, *on any claim* paid under paragraph (1), (2), (3) of (4) of this subsection. . ." (emphasis supplied). Those sections refer to "allowed claims."

Disallowance of postpetition interest as part of a creditor's allowed claim under section 502(b)(2) begins, not ends, the inquiry as to the ultimate entitlement to postpetition interest under a plan.

**B.    Grace's Failure to Comply With Its Contractual Obligations Postpetition Triggered the Default Interest Rate Under the Credit Agreements**

22.    Once Grace's *PPIE* argument is dispensed with, its position boils down to one never accepted by any court: that the Bank Lenders are not impaired because the contract right to default interest, as a result of some type of "ipso facto" protection, somehow does not exist at all in bankruptcy, and thus, taking such contract right to default interest away does not constitute impairment. This is simply wrong as a matter of law.

23.    Under the Credit Agreements, Grace's failure to satisfy its contractual obligations postpetition when due constituted events of default triggering the default interest rate. (*See* Freedgood Aff. at ¶13). Grace has never contested that it has failed to satisfy such postpetition contractual payment obligations.

24.    The Bankruptcy Code does not shield a debtor from default on its obligations. Indeed, debtors can and do default on their obligations postpetition.[19] No provision of the Bankruptcy Code provides that defaults somehow disappear or that their consequences may be ignored in bankruptcy. To the contrary, there are numerous provisions which recognize that defaults survive and must be dealt with whether they occurred pre or postpetition. *See* 11 U.S.C. §§365(b), 1124(2)(A).

---

[18]    Section 1129(b) provides in relevant part that "the court . . .shall confirm the plan notwithstanding the requirements of [section 1129(a)] if the plan does not discriminate unfairly, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

[19]    *See AM-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F.Supp. 2d 235, 241-43 (S.D.N.Y. 1998) (finding that debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of such surety's obligations); *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986) (addressing situation in which debtor defaulted on payments of principal and interest while in Chapter 11).

25.    Instead, section 362 of the Bankruptcy Code merely prevents creditors from immediately enforcing the consequences of a pre or postpetition default; it does not insulate Grace from the occurrence of a default in the first instance. Indeed, as noted above, bankruptcy courts enforce bankruptcy and other default provisions all the time.[20]

26.    Courts also do not regard Grace's payment-related default provisions as "ipso facto" clauses (which under section 365 only concern the termination or modification of contractual rights, in any case), in fact recognize that postpetition defaults are to be enforced, and do enforce such rights in accordance with a creditor's contract. *See In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524 (7th Cir. 1986). *Chicago* involved the exact question at issue here: whether certain debenture holders should receive principal *plus* interest on their bonds where the indenture trustee declared a default *after* the debtor filed its petition. *Id.* at 525-26. The debtor objected to the debenture holders' claims for principal *plus* interest on principal during the default years, arguing that "repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed." *Id.* at 526. The Seventh Circuit upheld the lower court's decision to permit acceleration of the principal and interest in accordance with the terms of the indentures, based on the occurrence of the default declaration *after* commencement of the bankruptcy case. *Id.* The Court found that if the bankrupt is solvent, the task for the bankruptcy court is simply to enforce creditors' rights

---

[20]    *See, e.g., Anchor Resolution Corp. v. State Street Bank & Trust Co. of Conn. (In re Anchor Resolution Corp.)*, 221 B.R. 330, 337 (Bankr. D. Del. 1998) (enforcing a make-whole provision triggered by an event of default, even where the "default" was the filing of a bankruptcy petition); *United Merchants & Mgfs., Inc. v. Equitable Life Assurance Co. of the United States (In re United Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages provision triggered by the filing of a Chapter XI petition rather than by some other event of default).

(including defaults) according to the contracts that created those rights; anything else constituted a windfall for the debtors. *Id.* at 527-28.

27.     Significantly, the Seventh Circuit flatly rejected arguments identical to those previously advanced here; the Court summarily dismissed the debtor's argument that it should be excused from the consequences of its default because it could not make payments in bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared, a default under clause (a) [a payment default] was impossible because the debtor could not have repaid the principal immediately even if it had wanted to do so. Defaults are often involuntary.

*Id.* at 529. The Third Circuit agrees with *Chicago* that the mere fact that "'a bankruptcy proceeding is equitable does not grant a court a free-floating discretion to redistribute rights ...'" *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quoting *Chicago*, 791 F.2d at 528).

28.     Courts enforce creditors' rights in accordance with their contracts because the Supreme Court mandates that they do. *See Butner v. United States*, 440 U.S. 48, 55 (1979). The Supreme Court held that:

> Property interests are created and defined by state law. *Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.* Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving *"a windfall merely by reason of the happenstance of bankruptcy."*

*Id.* (quoting *Lewis v. Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)) (emphasis supplied).[21]

---

[21]    *See also Chicago*, 791 F.2d at 527 ("It is not the objective of the bankruptcy laws to confer windfalls on debtors."); *In re Cybridge Corp.*, 312 B.R. 262, 273 (D.N.J. 2004) (accord).

29.     Grace does not challenge the Bank Lenders' right to default interest under applicable state law, and there is simply no federal interest and certainly no Bankruptcy Code provision or caselaw permitting a court to eliminate from a contract valid state law rights to default interest, nor is there any authority which holds that as a matter of federal bankruptcy law such rights simply *vanish* in bankruptcy such that a creditor is *un*impaired under section 1124 if such rights are taken away.  If this court were to rule so otherwise, it would permit Grace to alter unilaterally its creditors' state property rights in plain violation of the *Butner* mandate.

## CONCLUSION

30.     By failing to pay the Bank Lenders postpetition interest on the amount of their allowed claims in accordance with the interest rates set forth in the Credit Agreements and pursuant to the method of calculating such interest contained therein, and by failing to pay the facility fees and attorneys' fees due under the contracts, the Plan does not leave the Bank Lenders' legal, equitable *and* contractual rights "unaltered" as required under section 1124. Grace cannot disenfranchise the Bank Lenders.  Because the Plan's classification scheme does not comply with the Bankruptcy Code and the governing law in this Circuit, the Plan is unconfirmable, and this Court should not approve a Disclosure Statement for this unconfirmable Plan.

Dated:  October 17, 2008
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for The Bank Lender Group*