## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Case No. 01-01139 (JKF)** |
| | : | |
| **W. R. GRACE & CO., et al.,**[1] | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | **Chapter 11** |
| | : | |
| | : | **Re: Docket No. 19581** |

### JOINT OBJECTION OF BANK OF AMERICA, N.A., MORGAN STANLEY SENIOR FUNDING, INC. AND TEMPO MASTER FUND LP TO APPROVAL OF DISCLOSURE STATEMENT REGARDING JOINT PLAN OF REORGANIZATION IN RESPECT OF THE DEBTORS, THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

Bank of America, N.A. ("BofA"), Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") and Tempo Master Fund LP ("Tempo"), by and through their respective undersigned counsel, respectfully submit this objection (the "Objection") to the *Disclosure Statement*

---

[1] The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G 11 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc. MRA holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

*Regarding Joint Plan of Reorganization in Respect of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders* [Docket No. 19581] (the "Disclosure Statement").    In support of this Objection, BofA, Morgan Stanley and Tempo respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Approval of the Disclosure Statement should not be granted because (i) it fails to provide "adequate information" within the meaning of section 1125 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code") and (ii) the Plan (as defined below) is fatally defective as proposed.  In particular, the Plan (1) fails to comply with section 1129(a)(1) of the Bankruptcy Code as it violates sections 1123(a)(1), 1123(a)(4) and 1122 of the Bankruptcy Code, and (2) violates section 1129(b)(1) of the Bankruptcy Code by imposing discriminatory treatment of BofA, Morgan Stanley and Tempo as compared to the treatment provided to other similarly situated unsecured creditors.  As such, given the infirmities of the Plan, this Court should not approve the Disclosure Statement or permit the unconfirmable Plan to be solicited.

## PROCEDURAL BACKGROUND

2.      On April 2, 2001 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (each, a "Debtor" and collectively, the "Debtors"), including W.R. Grace & Co. ("Grace") and W.R. Grace & Co. - Conn. ("Grace-Conn"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.      On September 19, 2008, the Debtors and the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official

Committee of Equity Security Holders (collectively, the "Plan Proponents") filed the (a) Disclosure Statement and (b) *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of September 19, 2008* (the "Plan" or "Plan of Reorganization") [Docket No. 19579].

## FACTUAL BACKGROUND

4.      On or about August 25, 2000, (i) Grace-Conn, a Connecticut corporation, on behalf of itself and W. R. Grace & Co., a New York corporation, and W. R. Grace & Co., a Delaware corporation (collectively, the "W. R. Grace Debtors"), and non-debtors Western Mineral Products Company and Southern Zonolite Company, and (ii) Reud, Morgan & Quinn, Inc. ("RMQ") and Environmental Litigation Group, P.C. ("ELG") and their respective clients (collectively, "Asbestos Personal Injury Claimants"), entered into two settlement agreements (each, an "Asbestos Settlement Agreement" and collectively, the "Asbestos Settlement Agreements") relating to bodily injury and wrongful death claims.  The Asbestos Settlement Agreements related only to bodily injury and wrongful death claims, and not to property damage claims.  The first Asbestos Settlement Agreement, the "Alabama Agreement," established procedures for qualifying Alabama Asbestos Personal Injury Claimants to settle their claims against the W. R. Grace Debtors and non-debtor parties to the Alabama Agreement.  The second agreement, the "Texas Agreement," likewise established procedures for qualifying Texas Asbestos Personal Injury Claimants to settle their claims against the W. R. Grace Debtors and the non-debtor parties to the Texas Agreement.

3

5.      Pursuant to the terms of the Asbestos Settlement Agreements, Grace-Conn was required to obtain guarantees of its prospective obligations under the Asbestos Settlement Agreements.    To satisfy this requirement, Grace-Conn caused National Union Fire Insurance Company of Pittsburgh, PA. and its affiliates[2] (collectively, "National Union") to issue two surety bonds (the "Surety Bonds") to Grace-Conn, as the principal, for the benefit of the asbestos personal injury claimants, as obligees.  Bond #ESD 7311060, dated October 23, 2000, secured payments under the Alabama Agreement; Bond #ESD 7311061, dated October 23, 2000, secured payments under the Texas Agreement.

6.      Prior to the Petition Date, BofA issued three standby letters of credit for the account of Grace-Conn (collectively, the "Letters of Credit") as collateral for certain insurance transactions and the Surety Bonds issued by National Union that secured Grace-Conn's obligations under the Asbestos Settlement Agreement.    The Letters of Credit provided as follows:

| Letter of Credit Number | Face Amount | Issuance Date | Expiry Date[3] |
|---|---|---|---|
| 7404289 | $10,439,830 | 10/17/00 | 10/17/05 |
| 7403968 | $ 2,190,000 | 07/30/00 | 07/31/05 |
| 7404163 | $ 6,000,000 | 09/15/00 | 09/15/05 |

In particular, Letters of Credit Nos. 7404289 and 7404163, in the amounts of $10,439,830 and $6,000,000, respectively, were issued as collateral for the Surety Bonds, and Letter of Credit No.

---

[2]  The affiliates include: AIU Insurance Company, American Home Assurance Company, Granite State Insurance Company, Illinois National Insurance Company, the Insurance Company of the State of Pennsylvania, New Hampshire Insurance Company, Commerce and Industry Insurance Company and Commerce and Industry Insurance Company of Canada.

[3]  Each Letter of Credit has a provision concerning the automatic extension of its expiry date and each extends automatically in accordance with such provision unless a timely and appropriate notice is given by BofA.

4

7403968, in the amount of $2,190,000, was issued as collateral for Grace-Conn's payment of general insurance premiums *not* associated with asbestos claims.

7.    As noted above, the Debtors filed for chapter 11 bankruptcy protection in this Court on the Petition Date. As of the Petition Date, two of four installment payments required under the Asbestos Settlement Agreements had been paid by the Debtors. The third installment payment was paid by agreement of the parties during the above-captioned chapter 11 cases. The Debtors never made the fourth installment payment as required by the Asbestos Settlement Agreements.

8.    Due to the fact that the Debtors were unable to make all four installment payments under the Asbestos Settlement Agreements, National Union became obliged to pay the remaining amounts under such agreements and its right to draw down on the three Letters of Credit was triggered. Accordingly, on or about June 6, 2002, National Union, as beneficiary under Letter of Credit number 7404289 (the "First LOC"), drew down the First LOC in the amount of $9,729,720. On or about February 10, 2003, National Union, as beneficiary under Letter of Credit number 7403968 (the "Second LOC"), drew down the Second LOC in the amount of $250,000.

9.    On October 4, 2002, the Court entered the *Order Granting Bank of America Limited Relief From the Automatic Stay to Setoff Certain De Minimis Deposit Account* [Docket No. 2865] (the "Setoff Order"). Pursuant to the Setoff Order, BofA was authorized to, and did, setoff $200,000 (the "Setoff Amount") held by BofA in a depository account against the amounts due to BofA as a result of National Union's draw upon the First LOC.

10.    By Stipulation dated November 11, 2005 (the "November 11, 2005 Stipulation"), which was approved by order of this Court dated November 14, 2005 [Docket No. 11081], BofA and the Debtors agreed to the following:

(a)    BofA would have an allowed, unsecured, nonpriority claim against Grace-Conn in the amount of $9,779,720, representing the Drawn Amounts under the First LOC and the Second LOC, less the Setoff Amount (the "BofA Allowed Claim").

(b)    BofA would also have a contingent, unsecured, nonpriority claim against Grace-Conn in the amount of $8,650,110 (the "BofA Contingent Claim"), representing the undrawn amounts under the Outstanding Letters of Credit (as such term is defined in the November 11, 2005 Stipulation). In the event that BofA was required to satisfy the claim of any beneficiary under any of the Outstanding Letters of Credit subsequent to the date of the Stipulation, (i) that portion of the BofA Contingent Claim representing the total amount drawn under the Outstanding Letters of Credit would become an allowed, unsecured, nonpriority claim against Grace-Conn without further action by any party (the "BofA Further Allowed Claim") and (ii) the outstanding amount of the BofA Contingent Claim would be reduced in an amount equal to the BofA Further Allowed Claim.[4]

(c)    If, subsequent to the date of the Stipulation, one or more of the Outstanding Letters of Credit (i) expires without being renewed or (ii) is terminated, the BofA Contingent Claim shall be reduced in an amount equal to the amount of each such Outstanding Letter of Credit that is undrawn at the time of its expiration or termination.

---

[4] For example, if BofA was required to pay $5,500,000 to the beneficiary of Outstanding Letter of Credit number 7404163, the BofA Further Allowed Claim would be $5,500,000 and the BofA Contingent Claim would be reduced to $3,150,110 (representing $8,650,110 less $5,500,000). If BofA thereafter was required to pay an additional $1,000,000 to National Union under the Second LOC, the BofA Further Allowed Claim would be increased to $6,500,000 (representing the collective amounts drawn under both Outstanding Letters of Credit) and the BofA Contingent Claim would be further reduced to $2,150,110 (representing $3,150,110 less $1,000,000).

11.     By way of a Transfer of Claim Agreement, dated April 24, 2006, BofA transferred to Morgan Stanley all BofA's right, title, and interest in its allowed, unsecured, nonpriority claim against Grace-Conn in the aggregate amount of $9,779,720, as described in the November 11, 2005 Stipulation.

12.     On or about November 13, 2007, (i) the Debtors, (ii) National Union, and (iii) the asbestos personal injury claimants entered into that certain *Settlement Agreement and Mutual Release* providing, *inter alia*, as follows:

(a)  National Union would pay the asbestos personal injury claimants the sum of $15,350,000 in full satisfaction and settlement of National Union's obligations under the Bonds (the "Payment Amount").

(b)  Upon payment of the Payment Amount, the Bonds would be cancelled and the originals returned to National Union and all obligations of National Union under the Bonds would be deemed fully satisfied and the related Adversary Proceeding would be dismissed.[5]

(c)  In order to partially fund the Payment Amount, National Union would draw down (i) the remainder of the First LOC in the remaining amount of $710,110 and (ii) Letter of Credit No. 7404163 (the "Third LOC") in the aggregate amount of $6,000,000, and both the First LOC and Third LOC would be cancelled.

13.     By way of a Transfer of Claim Agreement dated February 22, 2008, BofA sold to Morgan Stanley all BofA's right, title, and interest in its allowed, unsecured, nonpriority claim against the Debtors in the aggregate amount of $6,710,110.  Such claim was described in the November 11, 2005 Stipulation as a contingent claim which thereafter became an allowed claim

---

[5] Grace-Conn commenced an Adversary Proceeding (Case No. 02-01657) on January 18, 2002, seeking to enjoin National Union from making certain prospective payments pursuant to the Bonds.

7

based on draws made by National Union on the remaining amounts in the First and Third LOCs pursuant to the November 13, 2007 Settlement Agreement. By way of a separate Transfer of Claim Agreement, also dated February 22, 2008, Morgan Stanley transferred one-half of that $6,710,110 claim (i.e., $3,355,055) to Tempo.

14.    Accordingly, as of February 22, 2008, Morgan Stanley and Tempo (as transferees of BofA's claims) had allowed, unsecured, nonpriority claims for reimbursement on drawn amounts under the three LOCs in the aggregate amount of $16,489,830.[6] See Disclosure Statement at pp. 69-70 (describing allowance of BofA's claims).

15.    On September 19, 2008, the Plan Proponents filed the relevant (a) Disclosure Statement and (b) Plan of Reorganization.

16.    Article 3 of the Plan is entitled "Classification and Treatment of Claims and Equity Interest," and purports to classify claims and equity interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. Relevant here, Article 3 provides as follows:

### 3.1.6    Class 6.        Asbestos PI [Personal Injury] Claims

(a)    Classification

Class 6 consists of all Asbestos PI Claims against the Debtors.

(b)    Treatment

(i)    All Asbestos PI Claims shall be resolved in accordance with the terms, provisions, and procedures of the Asbestos PI Trust Agreement and the TDP [Trust Distribution Procedures].

---

[6] As discussed above, the Debtors, pursuant to the November 11, 2005 Stipulation, agreed to allow BofA an unsecured claim in the amount of $9,779,720, representing drawn amounts (1) on the First LOC (less the $200,000 setoff, $9,529,720) and (2) on the Second LOC ($250,000). Also pursuant to the November 11, 2005 Stipulation, BofA was allowed an additional unsecured claim in the amount of $6,710,110, representing amounts drawn on the remaining portion of (1) the First LOC ($710,110) and (2) the Third LOC ($6,000,000). Accordingly, the aggregate allowed, unsecured, nonpriority claim purchased from BofA by Morgan Stanley and Tempo is $16,489,830.

(ii)    All Asbestos PI Claims shall be paid by the Asbestos PI Trust solely out of the Asbestos PI Trust Assets as and to the extent provided in the TDP.  Asbestos PI Claims shall not be deemed Allowed or Disallowed, but rather shall be resolved by the Asbestos PI Trust pursuant to the terms of the TDP.

(c)    Asbestos PI Channeling Injunction

The sole recourse of the Holder of an Asbestos PI Claim on account of such Asbestos PI Claim shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction, the Asbestos PI Trust Agreement, and the TDP.

(d)    Impairment and Voting

Class 6 is impaired.  The Debtors are soliciting the votes of Holders of the Asbestos PI Claims in Class 6 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

...

### 3.1.9    Class 9.        General Unsecured Claims

(a)    Classification

Class 9 consists of all General Unsecured Claims against the Debtors.

(b)    Treatment

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its Allowed General Unsecured Claim with post-petition interest either (i) in Cash in full on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim or as soon as practicable thereafter, or (ii) on such other less favorable terms as may be agreed upon by the Holder of an Allowed General Unsecured Claim.  Post-petition interest on Allowed General Unsecured Claims shall be determined as follows: either (i)(A) for holders of Pre-petition Credit Facilities, post-petition interest shall be calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (B) for all other General Unsecured Claims, post-petition interest shall be calculated at the rate of 4.19% from the Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate, unless the General Unsecured Claim includes an allowed and liquidated amount for post-petition and/or future liability, in which case the interest to be paid on the Claim shall begin to run from the date of the stipulation or order allowing the claim in such liquidated amount, or (ii) on such other less favorable terms as those that may be agreed upon by the Holder of an Allowed General Unsecured Claim, including an agreement whereby no interest is paid on the Claim or interest begins to accrue on the Claim on a date other than the Petition Date.

(c)    Impairment and Voting

Class 9 is unimpaired.  The Holders of General Unsecured Claims in Class 9 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

(Plan at pgs. 42, 45).

17.    Article 1 of the Plan is entitled "Definitions, Construction of Terms, Exhibits and Ancillary Documents."  Article 1.1.123 defines the phrase "Indirect PI Trust Claim" as including

any Claim… that is [] held by any Entity that is a *claim seeking reimbursement*, indemnification, subrogation, or contribution *from the Debtors with respect to* any surety bond, *letter of credit* or other financial assurance issued by any Entity on account of, or with respect to, Asbestos PI Claims; provided, however, for the avoidance of doubt, the term "Indirect PI Trust Claim" shall not include or pertain to any Asbestos PD [Property Damage] Claim, CDN ZAI PD Claim, Environmental Claim or Workers' Compensation claim.

(Plan at p. 25) (emphasis added).  Under Article 1.1.32 of the Plan, an "Asbestos PI Claim" *includes* any "Indirect PI Trust Claim." (Plan at p. 10).

18.    Accordingly, under the Debtors' proposed Plan, the portion of the aggregate allowed unsecured claim - as purchased by Morgan Stanley, a portion of which was then transferred to Tempo - representing amounts drawn, less any setoff by BofA, on the *First* LOC ($10,239,830) and *Third* LOC ($6,000,000) would be improperly and unfairly treated as claims for reimbursement under Class 6 (Asbestos PI Claims), an impaired class, rather than the correct Class 9 (General Unsecured Claims), an unimpaired class.  Moreover, the portion of the aggregate allowed unsecured claim representing the $250,000 drawn on the *Second* LOC would likewise be treated as a claim for reimbursement under Class 6, as that amount was also drawn to pay the remaining amounts due under the Asbestos Settlement Agreements.

## DISCUSSION

I.   **The Disclosure Statement for a Plan of Reorganization Which is Patently Unconfirmable Cannot Be Approved**

19.   "If, on the face of the plan, the plan could not be confirmed, then the Court [should] not subject the estate to the expense of soliciting votes and seeking confirmation.  Not only would allowing an unconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate."  In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("approval should be withheld if … it is apparent that the plan will not comply with Code § 1129(a)"); In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("Allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation."); see also In re Beyond.com Corporation, 289 B.R. 138, 138 (Bankr. N.D. Cal. 2003) ("Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved.").

20.   Fundamentally, a plan of reorganization may be confirmed only if all of the requirements of section 1129(a) of the Bankruptcy Code are satisfied.  Copy Crafters, 92 B.R. at 979.  Section 1129(a)(1) provides for the confirmation of a plan "only if . . . [] [t]he plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  Thus, if the Court determines as a preliminary matter that the Plan simply cannot satisfy the requirements of section 1129(a) of the Bankruptcy Code, the Court must decline to approve the Disclosure Statement.  See, e.g., Dakota Rail, 104 B.R. at 145 (the existence of the fact that vital funding for the continued operations of the debtor will not be available if the plan is confirmed precludes approval of the underlying disclosure statement); Pecht, 57 B.R. at 141 (patent violation of absolute priority rule will preclude approval of disclosure statement); In re Unichem Corp., 72

B.R. 95 (Bankr. N.D. Ill. 1987) (absence of good faith precludes approval of disclosure statement).

21.    As demonstrated below, the requirements of sections 1129(a)(1) and (b)(1) of the Bankruptcy Code cannot be satisfied.  Accordingly, the Plan is not confirmable as a matter of law and the Court should not approve the Disclosure Statement.

**II.    The Disclosure Statement Should Not be Approved Because the Plan Does Not Satisfy All of the Requirements of Section 1129 of the Bankruptcy Code**

      **A.    Section 1129(a)(1) - The Requirement of a Plan's Compliance With the Provisions of the Bankruptcy Code**

22.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  As discussed below, the Plan does not comply with all applicable provisions of the Bankruptcy Code and, thus, cannot be confirmed.

          **1.    The Plan Provides for Improper Discriminatory Treatment for Morgan Stanley's and Tempo's Unsecured Claims**

23.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan of reorganization shall "provide the same treatment for each claim or interest of a particular class, unless the holder of such particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  This provision requires that all creditors who are similarly situated receive equal treatment.  Corestates Bank, N.A. v. United Chem. Tech., Inc., 202 B.R. 33, 47 (E.D. Pa. 1996) ("A plan that does discriminate unfairly gives unequal treatment to creditors who are similarly situated regarding legal rights and priority.") (citations omitted)); In re B&W Enters., 19 B.R. 421, 425 (Bankr. D. Idaho 1992) (equal treatment of class members basic premise of bankruptcy law); see also In re Barney & Carey Co., 170 B.R. 17, 35 (Bankr. D.

Mass. 1994) ("Although the statute might permit some fair and reasonable differences in treatment... the discrimination must be fair and supported by a rational basis").

24.     In the instant matter, the Plan improperly discriminates against Morgan Stanley and Tempo, the purchasers of BofA's claims, as entities in Class 6 (Asbestos PI Claims). BofA issued the Letters of Credit, the draws under which simply happened to be used by the beneficiaries to pay asbestos-related claims. Like other unsecured creditors (with Class 9 claims under the Plan), BofA lent money under the Letters of Credit for the account of Grace-Conn and yet, Morgan Stanley and Tempo find themselves improperly in a class with individuals who have been injured due to asbestos exposure. BofA, Morgan Stanley and Tempo have never alleged an injury due to asbestos exposure like other members of Class 6 have. They have not filed state court actions seeking damages incurred in connection with such exposure like Class 6 claimants have. Rather, BofA was a lender. Morgan Stanley's and Tempo's claims should be treated with the claims of other lenders.

25.     Moreover, the Plan unfairly discriminates against Morgan Stanley's and Tempo's unsecured claim for reimbursement for drawn amounts under the Letters of Credit when compared to other general creditors holding the same legal rights. See, e.g., In re Fairfield Executive Assoc., 161 Bankr. 595, 600 n.6 (D.N.J. 1993) ("Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor, because they are claimants of equal legal rank entitled to share pro rata.") (citations omitted). Morgan Stanley's and Tempo's claims do not arise in tort like Class 6 Claimants claims, rather they arise from money loaned, similar to many of the creditors holding Class 9 claims. The other creditors with unsecured claims for reimbursement for drawn amounts under letters of credit have Class 9 (General Unsecured Claims) rather than Class 6 (Asbestos PI

Claims).  However, because of the *attenuated and irrelevant* connection between (1) the BofA Letters of Credit - issued *merely as collateral for the Surety Bonds* that *happen to* secure the Debtors' obligations - and (2) the payment of asbestos personal injury claims *by the beneficiary*, National Union, of the Letters of Credit, Morgan Stanley's and Tempo's unsecured claims for reimbursement have been unfairly disadvantaged and treated instead as an Asbestos PI Claim under Class 6, rather than as a General Unsecured Claim under Class 9.  Therefore, the Plan's attempt to *isolate* Morgan Stanley's and Tempo's general unsecured claims for reimbursement for drawn amounts under the BofA-issued Letters of Credit constitutes an unreasonable Class distinction based on the identity of the individuals or entities, i.e., asbestos personal injury claimants, to *whom* the letter of credit beneficiary ultimately pays funds.  Such treatment, under Class 6, of Morgan Stanley's and Tempo's claims constitutes unfairly discriminatory treatment when compared to other general unsecured creditors holding the same legal rights.

26.    Accordingly, by placing these allowed unsecured claims in Class 6 - an impaired class,  rather than in Class 9 (General Unsecured Claims) - an unimpaired class, the Plan unfairly provides unequal treatment of claims by unsecured creditors who provide money under a letter of credit for the account of a Debtor.  Therefore, the Plan cannot be confirmed for failure to comply with section 1129(a)(1) of the Bankruptcy Code, as it violates section 1123(a)(4) of the Bankruptcy Code.

## 2.    The Plan Improperly Classifies Dissimilar Claims in the Same Class

27.    Bankruptcy Code section 1123(a)(1) requires that a plan of reorganization designate, subject to section 1122, classes of claims, other than claims of the kind specified in sections 507(a)(2) (administrative expenses), 507(a)(3) (involuntary case gap claims), or 507(a)(7) (certain unsecured tax claims) and classes of interests.    11 U.S.C. § 1123(a)(1).

14

Section 1122 contains two rules applicable to classification of claims and a single rule concerning classification of interests. 11 U.S.C. § 1122. Under section 1122(a), a claim or interest may be placed in a particular class under a plan only if such claim or interest is substantially similar to the other claims or interests of such class. 11 U.S.C. § 1122(a). Section 1122(b) provides that a plan may designate a separate class of claims consisting of unsecured claims that are less than or reduced to such an amount that the Court approves as reasonable and necessary for administrative convenience. 11 U.S.C. § 1122(b).

28.    The Third Circuit, in In re Jersey City Medical Center, adopted "the general view which permits the grouping of similar claims in different classes." 817 F.2d 1055, 1061 (3d Cir. N.J. 1987). However, it recognized that "the classification of the claims or interests must be *reasonable*" and "a plan should not '*arbitrarily*' designate classes." Id. (citing In re U.S. Truck Co., Inc., 800 F.2d 581, 586 (6th Cir. 1986) and Matter of LeBlanc, 622 F.2d 872, 879, reh'g denied, 627 F.2d 239 (5th Cir. 1980)) (emphasis added).

29.    Here, the Plan unreasonably and arbitrarily classifies dissimilar unsecured claims in the same class. Specifically, the Plan defines Morgan Stanley's and Tempo's claims for reimbursement as an Indirect PI Trust Claim which claim, in turn, is included in the definition of an Asbestos PI Claim, even though BofA provided financing to the Debtors and was never exposed to asbestos. Especially in today's economic environment, banks and financial institutions should be provided with incentives to provide financing to companies in need, not penalized for doing so. If the Debtor prevails in its efforts to classify the Morgan Stanley's and Tempo's claims arising under these letters of credit, banks will have new reasons to withhold credit.

RLF1-3330410-6

30.     Moreover, the Plan unreasonably and arbitrarily classifies *similar* unsecured claims in *different* classes. See In re Jersey City Medical Center, 817 F.2d at 1061. The Plan Proponents offer no business or economic justification for the separate placement of Morgan Stanley's and Tempo's unsecured claims in Class 6 as opposed to similar claims, treated in Class 9, made by other general unsecured creditors. See Oxford Life Ins. Co. v. Tucson Self-Storage (In re Tucson Self-Storage), 166 B.R. 892, 897 (B.A.P. 9th Cir. Ariz. 1994). Specifically, there is *no legal distinction* between such claims justifying separate classification of reimbursement claims for amounts drawn under letters of credit. See id. at 898. The sole distinction between Indirect PI Trust Claims (for purposes of Class 6) and General Unsecured Claims is not the *purpose* for which the funds are drawn by the beneficiary under a letter of credit, i.e., to serve as collateral for a surety bond, but *who* is the *end-recipient* of such funds, i.e., the asbestos personal injury claimant.

31.     Based on the foregoing, the inclusion of Morgan Stanley's and Tempo's unsecured claims in Class 6 constitutes an impermissible classification of dissimilar claims. Therefore, the Plan cannot be confirmed for failure to comply with section 1129(a)(1) of the Bankruptcy Code, as it violates sections 1122 and 1123(a)(1).

**B.      Section 1129(b) - The Requirement that a Plan Not Discriminate Unfairly and is Fair and Equitable**

32.     A plan can be confirmed under 11 U.S.C. § 1129(b) only if it does not discriminate unfairly. The Bankruptcy Appellate Panel of the Ninth Circuit addressed this issue, stating:

> In order to be confirmed under § 1129(b), the Code requires that a plan not discriminate unfairly ... The plan discriminates unfairly if it singles out the holder of some claim or interest for a particular treatment ... Courts have denied confirmation of Chapter 11 plans that propose widely disparate treatment of similarly situated creditors as unfairly discriminatory ... we ...

16

hold that the Chapter 11 plan cannot be confirmed where the plan proposes to pay unsecured deficiency claims only 10 percent, but proposes to pay other unsecured claims in full ... Such a plan "discriminates unfairly" in violation of § 1129(b)(1) and cannot be confirmed.

In re Tucson Self-Storage, Inc., 166 B.R. at 898 (citations omitted).

33.    The Debtors' Plan imposes unfairly discriminatory treatment on Morgan Stanley's and Tempo's unsecured claims for reimbursement for amounts drawn under the Letters of Credit as compared to the treatment provided to other unsecured creditors with the same legal rights.  For this reason alone, the Plan cannot be confirmed.  Therefore, this is yet another reason why the Disclosure Statement should not be approved.

34.    As described above, the Plan improperly discriminates against Morgan Stanley and Tempo by unfairly grouping these entities in Class 6 (Asbestos PI Claims) regardless of the fact that BofA was merely a lender to the Debtor.  This relationship is identical to that of the banks and financial institutions with claims in Class 9.

35.    BofA issued the Letters of Credit, the draw under which simply happened to be used by the beneficiaries to pay asbestos-related claims.  Like other unsecured creditors, BofA merely provided money under the Letters of Credit for the account of Debtor Grace-Conn.  Because money is fungible, Morgan Stanley, Tempo and BofA submit that these allowed unsecured claim be treated like the claims of other general unsecured creditors.

36.    The inherent unfairness and inequity of the Plan's treatment of Morgan Stanley's and Tempo's claims under Class 6 is made all the more obvious when one takes into consideration the language in the Court-approved, November 11, 2005, Stipulation between BofA and the Debtors.  The Stipulation *expressly* provides that "BofA shall have an allowed, unsecured, nonpriority claim against Grace-Conn in the amount of $9,779,720, representing the Drawn Amounts under the First LOC and Second LOC, less the Setoff Amount" and a

17

"contingent, unsecured, nonpriority claim against Grace-Conn in the amount of $8,650,110, representing undrawn amounts under the Outstanding Letters of Credit." See November 11, 2005, Stipulation and Court Order dated November 14, 2005 [Docket No. 11081]. The Stipulation further provides that once the undrawn amounts are drawn by the beneficiary, National Union, for purposes of satisfying the claim of any asbestos personal injury claimant, those amounts "shall become an allowed, unsecured, nonpriority claim against Grace-Conn without further action by any party." [7] See id. Therefore, rather than treating Morgan Stanley's and Tempo's claims as allowed, noncontingent unsecured claims, the Plan proposes to treat their claims in *direct contravention* of the Court-approved, November 11, 2005, Stipulation.

37.    Moreover, BofA provided money, a fungible item, upfront to the Debtor Grace-Conn under a financial contract made at that Debtor's request, and on the Debtor's behalf, and the draws under the Letters of Credit *happened* to be applied to pay the Surety Bonds - i.e., personal injury litigation bonds. The money provided under such financial contract equates to the Debtor Grace-Conn's *unsecured debt* and *not* an asbestos personal injury claimant's claim against the Debtor. Therefore, in order for the Plan to meet the fair and equitable requirement under 11 U.S.C. § 1129(b), Morgan Stanley, Tempo and BofA submit that Morgan Stanley's and Tempo's unsecured claims for reimbursement must be treated like the claims of other similarly situated general unsecured creditors, and in particular, the claims in Class 9 which, according to the Disclosure Statement, includes "approximately $27.6 million of amounts drawn under drawn letters of credit ..." See Disclosure Statement at p 82.

38.    Accordingly, by placing Morgan Stanley's and Tempo's unsecured claim in Class 6 - an impaired class, rather than in Class 9 (General Unsecured Claims) - an unimpaired class,

---

[7] Once the remainder of the First and Third LOCs were drawn, that additional draw of $6,710,110 was added to the original allowed, unsecured, nonpriority claim of $9,779,720 to reach an aggregate, allowed, unsecured, nonpriority claims against the Debtors in the amount of $16,489,830.

the Plan unfairly provides unequal treatment of unsecured creditors who provide money, a

fungible item, under a letter of credit for the account of a Debtor.  Therefore, the Plan may not be

confirmed pursuant to section 1129(b) of the Bankruptcy Code.

**III.      The Disclosure Statement Should Not Be Approved, under 11 U.S.C. § 1125,
because it Lacks Adequate or Sufficient Information with Regard to the Treatment
of Morgan Stanley's and Tempo's Claims Under Class 6**

39.      Section 1125 of the Bankruptcy Code requires that the Disclosure Statement

provide "adequate information," defined as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, that would enable a
> hypothetical reasonable investor typical of holders of claims or interests
> of the relevant class to make an informed judgment about the plan, but
> adequate information need not include such information about any other
> possible or proposed plan.

11 U.S.C. § 1125(a)(1).

40.      Here, the Disclosure Statement fails to provide sufficiently detailed information

regarding the handling and treatment of Class 6 claims which would enable Class 6 claimants to

effectively vote on the Plan.  While the Disclosure Statement states that "Class 6 is impaired[,]"

a Class 6 claimant is given no indication as to the *extent* of the impairment.  Without this type of

information, a Class 6 claimant does not have sufficient information to determine whether or not

to vote to approve the Plan.

41.      Specifically with regard to Morgan Stanley's and Tempo's status as Class 6

claimants with fixed allowed claims, the Disclosure Statement fails to provide any description of

the Plan, or provide any other pertinent information, that would allow them to evaluate their

position and quantify their expected potential loss.   Therefore, the Disclosure Statement

precludes Morgan Stanley and Tempo from identifying a basis on which to form their decisions to vote for or against the Plan.

42. Because the Disclosure Statement lacks adequate or sufficient information for Morgan Stanley and Tempo to make an informed judgment about the Plan, the Disclosure Statement violates 11 U.S.C. § 1125. Therefore, the Disclosure Statement should not be approved.

## RESERVATION OF RIGHTS

43. Morgan Stanley, Tempo and BofA expressly reserve, and do not waive, their right to object to any proposed modifications to the Disclosure Statement, whether proposed by the Plan Proponents or any other party, and expressly reserves any and all objections it may have to confirmation of the Plan. Furthermore, nothing contained in this Objection constitutes a waiver of any of Morgan Stanley's, Tempo's and BofA's rights including, but not limited to, those relating to their respective rights under the Letters of Credit, any of their rights to have any non-core matter relating to the interpretation of their contractual rights and the Debtors' or Reorganized Debtors' contractual obligations adjudicated by the United States District Court.[8] Morgan Stanley, Tempo and BofA reserve their right to amend, modify, or supplement the objections made in this Objection in response to, or as a result of, any discovery being conducted in connection with confirmation of the Plan and/or any submission in connection with the Plan or this case filed by any party-in-interest. Finally, Morgan Stanley, Tempo and BofA also reserve the right to adopt any other objections to approval of the Disclosure Statement filed by any other party.

---

[8] To the extent of any undrawn amount under the Second LOC - which constitutes a contingent claim retained by BofA and transferred to Morgan Stanley and Tempo - Morgan Stanley, Tempo and BofA do not waive their right to argue that such contingent claim(s) must be placed in Class 9 (General Unsecured Claims), as the Second LOC was issued as collateral supporting Grace-Conn's payment of general insurance premiums not associated with asbestos clams.

## CONCLUSION

WHEREFORE, Morgan Stanley, Tempo and BofA respectfully request that this Court enter an order: (a) denying approval of the Disclosure Statement under section 1125 of the Bankruptcy Code and (b) granting such other and further relief as is just and proper.

Dated: October 17 , 2008

Noah Heller, Esq.
Merritt A. Pardini, Esq.
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-6539
Facsimile: (212) 894-5671

*Attorneys for Morgan Stanley
Senior Funding, Inc. and
Tempo Master Fund LP*

Dated: October 17 , 2008

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
Dana L. Reynolds (No. 4930)
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Bank of America, N.A.*