## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | **Related Docket Nos. 19581, 19620** |
| | **Hearing Date: October 27, 2008 at 9:00 a.m.** |
| | **Objection Deadline: October 17, 2008 at 4:00 p.m.** |

### LIBBY CLAIMANTS' OBJECTION TO DEBTORS' DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION AND APPROVAL MOTION

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby object to the Debtors' Disclosure Statement for the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of September 19, 2008 [D.I. No. 19581] (the "Disclosure Statement") and related Motion of the Debtors for an Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief (the "Approval Motion") [D.I. 19620].

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 18664], as it may be amended and restated from time to time.

**TABLE OF CONTENTS**

I.      INTRODUCTION............................................................................1
II.     EXECUTIVE SUMMARY..............................................................2
III.    FACTS......................................................................................4
        A. Poisoning a Town and its People.........................................4
            1.  Discovery of Disease; Grace Cover-Up..............................6
            2.  Dust Control at the Libby Mine and Mill was Feasible............7
            3.  Families and the Community..........................................8
        B. Libby Asbestos Disease.....................................................10
        C. Verdicts and Settlements Against Grace................................15
        D. Other Asbestos PI Claims.................................................18
        E. Grace Bankruptcy..........................................................19
        F. Plan Negotiations Between the PI Committee and Grace............22
        G. Treatment of Libby Claims Under the Plan............................23
            1.  Discriminatory TDP Provisions.....................................25
                (a) Medical Criteria..................................................26
                    (1) Blunting of the costophrenic angle is not a requirement in the
                        standard diagnosis of asbestos related disease.  There is no
                        basis in the medical literature for it.  It's use excludes over 72%
                        of Libby Claimants...........................................28
                    (2) The requirement of a minimum 3mm pleural thickening is not
                        a standard requirement in the diagnosis of asbestos related
                        disease.  There is no basis in the medical literature for it.  Its
                        use excludes over 38% of the Libby Claimants......... ............29
                    (3) The requirement of pleural thickening coverage of over 25%
                        is not a standard requirement in the diagnosis of asbestos related
                        disease.  There is no basis in the medical literature for it.  Its use
                        excludes over 29% of its Libby
                        Claimants...................................................29
                    (4) The omission of DLCO measurement is arbitrary.  Without
                        DLCO the severity of the Libby Claimants' asbestos disease
                        is not adequately observed................................30
                    (5) Summary: Effect of Exclusionary Medical Criteria.............32
                (b) Exposure Criteria.................................................33
                (c) Combined Effect of Exposure and Medical Criteria...............35
            2.  The Plan Deprives Libby Claims of the Benefit of Insurance Coverage
                for Which They Do Not Compete with Other Claims.................35
IV.     OBJECTIONS..............................................................................38
        A. Approval of the Disclosure Statement Would Violate the Requirements of
           Due Process of Law........................................................38
            1.  The Objection Period has been Inadequate.........................38
            2.  The Disclosure Statement is so Deficient that it is Unreasonable to
                Require Parties in Interest to Respond..............................38
            3.  The Disclosure Statement is Inadequate Because Plan Proponents Have
                Reserved the Right to Change Material Provisions of the Plan Without

Further Disclosure.....................................................................39

B. The Disclosure Statement Should Not be Approved in its Present Form
Because it Lacks Adequate Information................................................41

   1. Nature of Asbestos PI Claims.......................................................42

   2. How Asbestos PI Claims Will be Treated.........................................42

   3. Claims Allowance....................................................................44

   4. Insurance..............................................................................45

   5. Injunctions, Releases and Exculpations...........................................46

   6. Zonolite Attic Insulation Claims...................................................48

   7. Libby...................................................................................48

C. The Disclosure Statement Should Not be Approved Because the Plan is
Unconfirmable As a Matter of Law...................................................49

   1. The Plan is Unconfirmable Because the Treatment of Libby Claimants
Violates the Bankruptcy Code's Policy of Equal Distribution...................50

   2. The Plan is Unconfirmable Because it Places the Libby Claimants in a
Class with Claims that Are Not Substantially Similar.............................57

     (a) The Libby Claimants' Rights Against Grace Require Them to be
Separately Classified.............................................................59

     (b) The Libby Claimants' Rights Against Insurers Require the Libby
Claims to be Separately Classified.............................................60

     (c) Summary........................................................................64

   3. The Plan is Unconfirmable Because It Provides Different Treatment to
Claims of the Same Class.............................................................65

     (a) The Plan Violates Section 1123(a)(4) by Providing Different
Treatment of Claims in the Allowance/Liquidation Process................67

     (b) The Plan Violates Section 1123(a)(4) by Providing Different
Payment Terms for Claims Based on Jury Verdicts..........................71

     (c) The Plan Violates Section 1123(a)(4) by Providing Different
Payment Terms to Later-Allowed Claims.....................................71

     (d) The Plan Violates Section 1123(a)(4) by Providing Different
Treatment of Punitive Damages Claims.......................................74

     (e) The Plan Violates Section 1123(a)(4) by Providing Different
Treatment of Wrongful Death Claims.........................................74

     (f) The Plan Violates Section 1123(a)(4) by Taking Away the Libby
Claimants' Valuable Insurance Rights.........................................75

   4. The Plan is Unconfirmable Because It Denies the Libby Claimants
Their Right to Trial by Jury..........................................................76

   5. The Plan is Unconfirmable as a Matter of Law Because it Violates
the Libby Claimants' Right to Have Their Claims Allowed in
Accordance with Applicable Nonbankruptcy Law................................80

   6. The Plan is Unconfirmable Because It Provides for Injunctions,
Releases and Exculpations that are Impermissibly Broad........................80

     (a) Injunctions May Protect Third Parties Only from Claims within
the Four Categories Expressly Permitted by Section 524(g) and
Only if the Third Party Will Make a Substantial Financial
Contribution. ....................................................................81

(b) The Plan Injunctions, Releases and Exculpations Violate
     Section 524(g) by Protecting Third Parties from Claims
     Outside the Permissible Four Categories.............................82

(c) The Plan Injunctions, Releases and Exculpations Violate
     Section 524(g) by Protecting Third Parties Who Are Not
     Making a Substantial Financial Contribution................................86

(d) The Plan Impermissibly Provides that Claimants are Deemed
     to Have Given a Release Merely by Reason of Receiving a
     Distribution on Account of Their Claims....................................87

(e) The Plan Impermissibly Enjoins the Libby Claimants' Pursuit
     of Insurance Coverage as to Which They do not Compete with
     Each Other or any Other Claimant............................................87

(f) The Plan Impermissibly Enjoins the Libby Claimants Even
     Though the Plan is Not Fair and Equitable to the Libby Claimants........89

7. The Plan is Unconfirmable Because It Improperly Usurps the
   Courts' Function to Modify or Dissolve Preliminary Injunctions..............90

8. The Plan is Unconfirmable Because It Improperly Disallows Punitive
   Damages Claims..................................................................91

9. The Plan is Unconfirmable Because It Improperly Disallows
   Wrongful Death Claims..........................................................94

10. Other Grounds for Denial of Confirmation Will be Presented at the
    Confirmation Hearing............................................................97

V.    CONCLUSION.........................................................................97

## I.    **INTRODUCTION**

Nowhere have the effects of asbestos been so devastating as in Libby, Montana – a town of about 2,600 residents.   From 1963 to 1990, Grace owned and operated a mining and manufacturing facility in Libby, at which it produced vermiculite.   This ore was used to create zonolite, an insulating material.   But the vermiculite ore also contained dangerous levels of a rare form of amphibole asbestos consisting primarily of winchite asbestos.   Grace's operations blanketed the town with asbestos-laden dust.

Amphibole asbestos has been shown to be the most deadly form of asbestos, and must be distinguished from the more common chrysotile asbestos, which was the type used in 95 percent of commercial applications, including Grace's construction and insulation products.  Amphibole asbestos is at least four times as carcinogenic and fibrogenic as chrysotile asbestos, and is hundreds of times more productive of mesothelioma, the type of lung cancer specific to asbestos. Hundreds of Libby residents – workers at the Libby mine, their families, and townspeople who had the misfortune to breathe the dust-filled air – have been diagnosed with asbestos disease from exposure to Libby asbestos ("Libby Asbestos Disease").   A person so diagnosed has approximately a 76 percent likelihood of progressing to severe disease, which is about three times the progressivity rate for chrysotile asbestos disease.  Over 200 people have died of Libby Asbestos Disease and others are at or approaching the end stage of the disease.

In addition to the particular severity of Libby Asbestos Disease, the Libby Claimants carry an additional burden compared with other Asbestos PI Claimants.   Where most asbestos claimants seek recovery from multiple producers of asbestos products and many have already obtained substantial recoveries, the claims of the Libby Claimants (the "Libby Claims") arise from exposure only to Grace's asbestos.   As a result, the Libby Claimants' sources of recovery

are limited.  It would compound what is already a national tragedy if the Libby Claimants were left without adequate compensation for their injuries.

## II.    EXECUTIVE SUMMARY

Before the Petition Date, Libby Claimants obtained verdicts and settlements from Grace ranging from an average of $271,170 for unimpaired victims of nonmalignant pleural disease to $550,200 for impaired victims of nonmalignant disease, to $1,506,450 for mesothelioma.  These amounts are higher than for other Asbestos PI Claims, not only because of the greater severity of nonmalignant asbestos disease in Libby but also because the Libby Claimants' disease unquestionably resulted from Grace's asbestos.  Other Asbestos PI Claimants—for example, a construction worker who may have handled products of Grace and/or dozens of other manufacturers—raise major issues of causation and relative fault.

The Plan purports to pay Asbestos PI Claims on a *pro rata* basis based on their value in the tort system.  Yet as to the Libby Claims, the Plan will pay on the basis of a fraction of tort system value.  For example, most Libby Claimants with severe pleural disease—meaning that they are not just impaired (lung function of 80%) but severely impaired (lung function of 65%)—will be paid based on an allowed claim of from $2,500 to $20,000, compared with the established prepetition tort system value of $550,200 for impaired nonmalignant Libby Claims. Other Libby Claims are the subject of similar discrimination, as set forth in detail below.  And the Plan further discriminates against Libby Claimants by taking away their insurance rights, which are different from other Asbestos PI Claimants', and more valuable.

While continuing to object to the Disclosure Statement approval process on due process grounds, this Objection also objects to the Disclosure Statement itself.  The Disclosure Statement

fails to provide even the most basic information necessary for Asbestos PI Claimants to understand the Plan, for example:

- How many Asbestos PI Claims are projected and of what types and of what allowed amounts?

- How much money will the Asbestos PI Trust have to pay claims?

- How many cents on the dollar will the Asbestos PI Claimants be paid?

- When will Asbestos PI Claimants be paid?

- How will the allowed amounts of Asbestos PI Claims be determined?

- Which of Grace's insurers will be protected by the channeling injunction, and what consideration is being provided in exchange for such protection?

Only by addressing these issues and providing the other information requested by the Libby Claimants below in a full and accurate manner can the Disclosure Statement reach the point of providing adequate information to Asbestos PI Claimants, including the Libby Claimants.

The Libby Claimants also object to the Approval Motion on the basis that the Plan is unconfirmable as a matter of law. These objections include:

- The Plan violates the mandate of the <u>Combustion Engineering</u> decision to provide equality of treatment within the class of Asbestos PI Claims;

- The Plan places the Libby Claimants in a class with claims that are not substantially similar, in violation of Section 1122(a) of the Bankruptcy Code.

- The Plan provides different treatment of claims within the class of Asbestos PI Claims, in violation of Section 1123(a)(4) of the Bankruptcy Code.

- The Plan takes away the Libby Claimants' right to trial by jury. For example, even if a Libby Claimant resorts to the tort system to obtain a fair liquidated

amount for his claim, the Plan caps the claim at less than the amount of the judgment rendered by the jury.

- The Plan fails to determine Libby Claims in accordance with state law.

- The Plan includes injunctions, releases and exculpations that are impermissibly broad. The Plan protects parties beyond the scope permitted by Section 524(g). The Plan protects parties regardless of whether they supply substantial consideration. And the Plan provides that even a creditor who votes against the Plan is deemed to have released non-debtor parties.

- The Plan usurps the courts' function to modify or dissolve preliminary injunctions.

- The Plan categorically disallows claims for wrongful death and for punitive damages in violation of Supreme Court precedent.

While perhaps some of these provisions might be permissible if done with consent (or without objection), the Libby Claimants decline to assent and most vigorously object unless the Plan is amended to provide fair treatment of their claims.

## III.    FACTS

### A.    Poisoning a Town and its People

Libby is set in the scenic northwestern corner of Montana, framed by the peaks of the northern Rocky Mountains and the winding Kootenai River. Once known as an outdoor paradise, Libby is inextricably linked to what the Environmental Protection Agency (the "EPA") has called "the worst case of community wide exposure to a toxic substance in U.S. history."[2]

---

[2] www.highplainsfilm.org/rev_libby_ifp.html

From 1963-1990, Grace operated a vermiculite mine and mill seven miles northeast of Libby. Before 1963, the mine was operated by The Zonolite Company.[3]

Grace's Vermiculite Mountain near Libby was the largest source of vermiculite in the world, supplying two-thirds of the vermiculite used in the United States. The vermiculite itself was harmless. It was an excellent product for insulation, ceiling plaster, building materials and potting soil. However, the Libby vermiculite ore was contaminated with a naturally-occurring amphibole asbestos. The vermiculite ore contained up to 26 percent asbestos,[4] leading to airborne dust in the workplace consisting of 40 percent or more asbestos.[5]

The mining operation was open cut, reducing the top of Vermiculite Mountain to benches.[6] Blasting loosened the ore, which was then loaded into trucks.[7] Half or more of the loads were asbestos or other waste materials, which were dumped down the side of the mountain. The vermiculite ore was dumped to a conveyor belt, leading to the dry mill. The dry mill was a seven-level refining process, with the raw ore introduced at the top level. It then passed through shakers, crushers, hammermills and down chutes to screens for sorting out asbestos and other impurities.[8] The final product was vermiculite concentrate, which traveled on a railroad car down the mountain to storage, then by truck to storage by the river, then by conveyor across the river to be loaded onto railroad cars, which were pushed to Libby.[9] Every time the vermiculite

---

[3] The Zonolite Company name was acquired by Grace, and a successor shell company, Montana Vermiculite Company survived until it was dissolved in 1964.

[4] Whitehouse et al. (2008), "Environmental Exposure to Libby Asbestos and Mesotheliomas," p.1.

[5] The facts come from the transcript and exhibits in Finstad v. W.R. Grace & Co., 8 P.3d 778 (Mont. 2000). The proof met Montana's high standard for punitive damages, and Grace was found guilty by a jury of intentional, reckless and/or malicious conduct. Mont. Code Ann. § 27-1-221 (1997).

[6] Affidavit of Dr. Terry Spear, ¶5 [Adversary Proc. D.I. 363, Exh. S] ("Spear Aff.").

[7] Spear Aff. ¶6.

[8] Spear Aff. ¶5.

[9] Spear Aff. ¶5.

was moved it produced clouds of dust, containing a high percentage of asbestos fiber.[10]   The

blasting produced clouds of dust.   The railroad cars hauling concentrate produced clouds of dust.

Workers have testified that inside the dry mill, they could not see a light bulb at 15 feet.[11]   A

1967 study by Grace on the dust from the large stack on the dry mill showed 24,000 pounds of

dust *per day*.[12]   At 40 percent asbestos, that meant 10,000 pounds of asbestos rained down on the

workers in the service area near the mill each and every day.[13]

### 1.   Discovery of Disease; Grace Cover-Up

The operators of the Libby mine knew of the asbestos in the ore from the 1920s forward.

In 1956 the State of Montana, Division of Disease Control, performed an industrial hygiene

inspection.   The State did a thorough report finding asbestos levels far in excess of the standard,

and citing medical literature on the hazards of asbestos.   The Zonolite Company recognized in

1956 that the asbestos was toxic and fatal—a "serious hazard."   The State reports also listed

many recommendations on dust control.   These were not followed.   The State continued

inspections, and repeatedly objected to poor progress on dust control.   But the workers were

never told of the inspection reports, or the asbestos hazard.

Management did, however, begin monitoring the health of the workers.   In 1959, then in

1964 and every year thereafter, chest x-rays were taken.   Each year 25-30 percent of the workers

had abnormal chest x-rays.   In 1961, three workers died of asbestosis.   The Zonolite Company

did not tell the workers, nor did Grace after it acquired the mine in 1963 and employed the same

management personnel.   In 1964, Grace was informed of the greatly elevated risk of lung cancer

with asbestos exposure.   A 1965 study of chest x-rays and lung function tests showed that 20

---

[10] Spear Aff. ¶¶ 9-11.

[11] Spear Aff. ¶5.

[12] Spear Aff. ¶10.

[13] Spear Aff. ¶10.

percent of the workforce had asbestosis. By 1973, 16 were dead. Yet Grace told the workers the dust was no more harmful than farm dust. The Chief Engineer was famous for saying "you can breathe a ton of it, it won't hurt you." He knew otherwise. Grace intentionally exposed the workers to asbestos fibers, knowing workers were dead and dying. As to the period through 1974, Grace has publicly acknowledged that "[t]here is no question, and Grace does not deny, that workplace conditions at the Libby mill . . . were dangerous, and tragically caused or contributed to disease and/or death as a result of asbestos exposure."[14]

By 1979, when Grace finally told the workers of the hazard of asbestos exposure, 30 were already dead of asbestos disease. By 1999, deaths from asbestos disease had risen to at least 97. Others have certainly died of asbestos disease as well, but exact numbers will never be known because not all workers have been tracked, and because the family doctors were not informed and generally were not equipped to diagnose asbestos disease.

### 2.    Dust Control at the Libby Mine and Mill was Feasible

Vacuum trucks and baghouses were available in the 1950s and before. The owners of the Libby mine, including Grace after 1963, chose not to use them. The State reports give long lists of maintenance measures not undertaken. Change houses and showers were standard at other Montana mines since the 1950s. Grace never had a change house or showers for workers all the way to end in 1990. As a result, Grace workers went home dusty. The asbestos dust permeated their houses and cars, resulting in a 24-hour exposure for the workers, and extending the asbestos exposure to the workers' families and neighbors.

Grace executives visited other similar plants and reported "the lack of dust laden air [and] excellent housekeeping." Eventually Grace made some improvements. In 1974, Grace replaced

---

[14] U.S. v. W.R. Grace & Co., No. 03-35924 (9th Cir.), Appellant's Brief dated April 26, 2004, at 8.

the old dry mill with a new wet mill. In the 1970s and 1980s, Grace added other dust control measures. However, at no point did Grace meet industrial hygiene standards. The operation remained dusty to the end. Workers often worked in visible dust, which at the Grace mine and mill meant a violation at over 100 times the asbestos standard. In the final demolition of most of the facilities from 1991-1993, workers were exposed to extreme asbestos dust.

Others besides Grace are responsible for failing to protect workers and the community from Grace's asbestos. As one example, Maryland Casualty Company ("Maryland Casualty"), Grace's workers' compensation carrier from 1962 through 1973,[15] had an engineering division and a medical division which undertook in 1964 to design an industrial hygiene program for the Libby mine. Maryland Casualty was fully aware of the magnitude of the problem. Indeed, the 1965 study showing 20 percent incidence of asbestosis was conducted by Maryland Casualty's own consulting pulmonologist. Nevertheless, the industrial hygiene program designed by Maryland Casualty did not provide for adequate dust control measures, did not provide for proper medical monitoring, did not provide for workers to be told of their exposure to asbestos, and did not provide for workers or their families to be educated about how to protect themselves.

### 3.    Families and the Community

Asbestos fibers are so small that they go right through a vacuum cleaner. They are reported to remain in houses over ten years after entry. The Libby community became contaminated with vermiculite and its associated asbestos fibers. Vermiculite provided superb insulation for houses. Members of the community could obtain pickup loads free from Grace's piles along the railroad tracks on the edge of downtown Libby. Asbestos-contaminated vermiculite was also used in gardens as a soil enhancer. The piles of slippery shale-like

---

[15]   CNA, which became Grace's insurer in 1973, may have taken on a similar role at that time.

vermiculite concentrate were great for kids to slide on. Grace even donated the contaminated ore to the town to use on the little league baseball fields and high school track. Grace did not prevent children from using the piles on the Grace property along the railroad. More Grace piles and storage areas were across from the swimming pool and public parks.

Libby is in a small bowl-like valley in the Rocky Mountains. Dust entering this bowl can be re-circulated for years. On a typical day, 12 to 16 railroad cars per day full of dusty vermiculite were shipped out of Libby. In addition, another 15-20 trains of 100 cars went through Libby each day at 50 mph, recycling Grace's dust into the community. Libby was a dusty place. The dust was permeated with asbestos.

As a result, there are now more cases of community asbestos disease than there are cases for workers or family members of workers. The Libby Claimants consist of:

295 ex-workers

223 family members of workers

419 other members of the Libby community

937 total cases

According to the CARD Clinic, more than 1,500 people from the Libby community have been diagnosed with asbestos disease—a terrible concentration of misery in one small community.

This American tragedy has drawn national media attention, including a major documentary "Dust to Dust," by Michael Brown, shown on PBS. The Libby story has been the subject of NBC Dateline, ABC 20/20, CBS 48 Hours, CNN Time, and other investigative news reporting. Libby has also been the subject of three books:

An Air that Kills - How the Asbestos Poisoning of Libby, Montana, Uncovered a National Scandal, by A. Schneider and D. McCumber, (Putnam, 2004).

Libby, Montana - Asbestos and the Deadly Silence of an American Corporation,

9

by A. Peacock (Johnson, 2003).

Fatal Deception, by M. Bowker (Rodale, 2003).

For decades Libby has suffered from an unprecedented 24-hour-per-day contamination of the community's homes, playgrounds, gardens and air, such that the entire community has been designated a Superfund site and is listed on the EPA's National Priorities List.  Through the Superfund program, the EPA projects to spend as much as $350 million on cleaning up property in and around the Libby area.[16]  This Court has approved a settlement allowing the United States to collect past and future costs incurred by the EPA at the Libby Superfund site for a total of $250 million.[17]  Payment was due within 30 days of this Court's approval.  Meanwhile, the vast majority of the injury *to people* remains uncompensated.  Victims of advanced asbestos disease in Libby die of strangulation as their lungs become unable to take in enough oxygen to support life.  While these victims have struggled for every breath, Grace's Chapter 11 case has moved at a snail's pace for more than seven years.

**B.    Libby Asbestos Disease**

Despite the overwhelming evidence of the severity of asbestos disease in Libby and Grace's admitted wrongdoing, Grace's medical response has been woefully inadequate.  Not until the year 2000, when the widespread community disease was confirmed through asbestos health screening conducted by the federal Agency for Toxic Substances and Disease Registry (the "ATSDR"), did Grace feel compelled by the ensuing national media attention to establish a medical plan to care for the people it had poisoned.  This was nearly 40 years after Grace first recognized the disease and 10 years after it closed operations.  Predictably, the Grace medical plan has serious shortcomings.  The Grace medical plan can be terminated at Grace's discretion,

---

[16] D.I. 18271.

[17] D.I. 18848.

yet the Plan presents no assurance that Grace will maintain the medical plan to care for those afflicted with the asbestos disease it caused. More alarmingly, the medical plan is available only to those whom Grace itself deems qualified.[18] Even for people admitted to the plan, it fails to cover essential services. Among other medical expenses the Grace medical plan refuses to cover are end stage 24-hour care and home assistance.[19] For Libby Claimants with impaired lung capacity, especially those on oxygen, these services are critical as they are unable to care for themselves. Exhausted family members bear the burden, with no help from Grace.

Around the same time the ATSDR screening was conducted, the Center for Asbestos Related Disease (the "CARD Clinic") was established in Libby to diagnose and treat asbestos disease. Through the CARD Clinic, Dr. Alan C. Whitehouse, Dr. C. Brad Black, and Dr. Mark Heppe have diagnosed at least 1,500 patients with asbestos related disease due to exposure to Libby asbestos in Lincoln County.[20] The CARD Clinic regularly treats about 1,200 of these patients.[21] Since the CARD Clinic opened in 2000, more than 65 patients have died of cancer or respiratory failure related to asbestos disease.[22] Most of those deaths have occurred since Grace filed its Chapter 11 case on April 2, 2001.[23] Currently the CARD Clinic has over 80 patients on oxygen, and over 100 patients are severely limited, with short life expectancy.[24] Most of these require 24-hour care.[25]

---

[18] Affidavit of Dr. C. Brad Black, ¶14 [D.I. 363, Exh. C] ("Black Aff.").

[19] Black Aff. ¶6

[20] Black Aff. ¶2.

[21] Black Aff. ¶2.

[22] Black Aff. ¶7.

[23] Since the Chapter 11 filing, at least 41 clients of the firm McGarvey, Heberling, Sullivan & McGarvey in Kalispell, Montana have died of asbestos related disease. [Black Aff. Ex. D, ¶4.]

[24] Black Aff. ¶7.

[25] Black Aff. ¶7.

While the CARD Clinic is relatively new, Dr. Whitehouse has evaluated and treated Libby patients for more than 25 years.[26] During that time, Dr. Whitehouse has also treated and evaluated over 500 non-Libby patients with asbestos disease from predominantly chrysotile exposure.[27] Based on his practice, Dr. Whitehouse observed marked differences between Libby Asbestos Disease and asbestos related disease caused by chrysotile exposure.

Over 95 percent of the asbestos used in construction materials was chrysotile asbestos. As a result, the overwhelming majority of the asbestos disease is due to chrysotile exposure. Similarly, the vast majority of medical research is on chrysotile asbestos disease. Chrysotile is the type of asbestos that Grace used in the construction and insulation products that have resulted in assertion of the overwhelming majority of Asbestos PI Claims.

Chrysotile is a serpentine asbestos, meaning that its fibers have a curly or club-like shape.[28] By contrast, the Libby asbestos—comprised of a combination of 84% winchite, 11% richterite, and 6% tremolite[29]—is amphibole asbestos. The amphiboles are long, sharp spear-like fibers.[30] When breathed in, the fibers lodge in the structure around the alveoli (tiny air sacs in the lungs), and are too small to be expelled.[31] Asbestos fibers irritate and inflame the lung tissue structure around the air sacs (the interstitia).[32] Scarring in the interstitia is interstitial disease.[33] When the interstitia are significantly scarred, they can no long expand or contract fully, and

---

[26] Expert Report by Dr. Alan C. Whitehouse dated July 23, 2007 ("Whitehouse Report"), ¶ 5.

[27] Whitehouse Report ¶5. From 1984-2004, Dr. Whitehouse's practice was located in Spokane, Washington, where he practiced occupational medicine. Whitehouse Report ¶6.

[28] Whitehouse Report ¶ 10.

[29] Generally referred to and originally believed to be substantially comprised of tremolite, Libby asbestos has been more recently analyzed to be a combination of winchite, richterite, and tremolite. Whitehouse Report ¶ 10 (citing Meeker (2003), "The Composition and Morphology of Amphiboles from the Rainy Creek Complex, Near Libby, Montana," American Mineralogist 88:1955-69).

[30] Whitehouse Report ¶ 10.

[31] Whitehouse Report ¶ 11.

[32] Whitehouse Report ¶ 11.

[33] Whitehouse Report ¶ 11.

breathing is restricted.[34]  As compared to chrysotile asbestos, amphiboles migrate more readily through the structure of the lung to the pleura (the lung lining), and cause pleural disease.[35] Pleural disease is particularly pronounced with Libby asbestos fibers.[36]

Amphibole asbestos, including Libby asbestos, is far more toxic than chrysotile asbestos.[37]  Studies have indicated that amphiboles are about four to ten times as carcinogenic as chrysotile fibers, that amphibole asbestos is roughly four to ten times as fibrogenic (asbestosis causing) as chrysotile asbestos, and that asbestos disease (including asbestos pleural disease) from exposure to amphiboles is much more highly progressive—meaning that that the victim has a far greater chance of progressing from mild to moderate to severe disease.[38]

Libby already has the highest mesothelioma rate in the country.[39]  A recent publication, Whitehouse et al. (2008), "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am. J. Ind. Med., reviews an unprecedented 12 cases of mesothelioma due to environmental exposure in the 11 years leading up to 2007.  The article predicts that an epidemic of mesothelioma can likely be expected from the Libby asbestos contamination over the next 20 years.

> Exposure to Libby asbestos of unknown magnitude continued past 1990. The latency period for mesotheliomas attributable to environmental exposures in Libby has therefore not nearly been completed and the extent of the epidemic of environmental mesothelioma due to exposures based at Libby will probably not peak for another 10-20 years.[40]

---

[34] Whitehouse Report ¶ 11.

[35] Whitehouse Report ¶ 12.

[36] Whitehouse Report ¶ 12.

[37] Whitehouse Report ¶ 48.

[38] Whitehouse Report ¶¶ 50-54, citing numerous studies.

[39] Whitehouse Report ¶ 39.

[40] Whitehouse (2008), p. 4.

Most prevalent, however, is a form of nonmalignant asbestos disease far more severe than reported elsewhere in the United States. A person diagnosed with nonmalignant Libby Asbestos Disease has approximately a 76 percent likelihood of progressing to severe disease— about three times the progressivity rate for chrysotile asbestos disease.[41] Even more disturbing is that nonmalignant Libby Asbestos Disease has a much higher probability of death than asbestos disease from predominantly chrysotile exposure. Dr. Whitehouse and the CARD Clinic have observed at least seven cases of pleural disease progression leading to death.[42] None of the seven deceased patients had significant interstitial disease.[43] To put the severity of disease in perspective, in 2004, the American Thoracic Society reported only five total cases of death by pleural disease outside of Libby.[44]

Another troubling aspect of Libby Asbestos Disease is that there are numerous examples of those afflicted with Libby Asbestos Disease from surprisingly minimal exposures:

> Tom Murray, a former federal magistrate judge, worked at the mine during the summers of 1948 and 1949. He died of asbestos lung cancer.

> Betty Maxwell, for about ten summers, visited Libby for 1-2 week periods and cleaned cabins. She now has severe asbestos disease and is on oxygen.

> Victoria Skidmore visited Libby for errands, averaging about two trips per month for 14 years. She now has pleural mesothelioma.[45]

Fortunately, the cohort of people who have lived in or visited Libby is relatively small. Within that cohort, however, is an immense concentration of suffering from a form of asbestos disease far more severe than the vast majority of Asbestos PI Claimants.

---

[41] Whitehouse Report ¶ 33.

[42] Whitehouse Report ¶ 36.

[43] Whitehouse Report ¶ 36.

[44] Whitehouse Report ¶ 36. (citing ATS (2004,) "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," Am. J. Respir. Crit. Care Med, vol. 170: 691-715 (2004)).

[45] Whitehouse Report ¶ 32.

## C.    Verdicts and Settlements Against Grace

Many of the Libby victims of asbestos disease brought suit against Grace. To do so, they engaged Montana lawyers[46] rather than the personal injury law firms that have gathered hundreds of thousands of asbestos claims to assert in litigation and bankruptcy cases nationwide, and who regularly serve on Chapter 11 creditors' committees such as the Asbestos PI Committee. Prior to Grace's Chapter 11 filing, Libby Claimants obtained a series of verdicts and settlements against Grace. Libby Claimants also sued others who they assert share legal responsibility.[47]

Not surprisingly, the highly progressive and deadly nature of pleural disease in Libby resulted in a record of verdicts and settlements that are far greater than for pleural disease in other asbestos cases elsewhere. Libby average settlements for pleural disease have ranged from $212,000 (unimpaired claimant) to $343,000 (impaired claimant) compared with, for example, $2,500 (unimpaired) and $7,500 (impaired) fixed as the pleural disease claim levels under the TDP proposed by Grace and the Asbestos PI Committee.[48] Across the board, similar disparities exist between historic Libby claim values and those proposed by the TDP based, according to the Plan Proponents, on historic claim values for Asbestos PI Claims as a whole:

---

[46] McGarvey, Heberling, Sullivan & McGarvey of Kalispell, Montana, and Lewis, Slovak & Kovacich, P.C. of Great Falls, Montana.

[47] Other actions include: (1) Libby Claimants who worked at the Libby mine before it was purchased by Grace in 1963 have brought suit against the mine's former owner, Montana Vermiculite Company (then named The Zonolite Company); while MVC is not believed to have assets of its own, the Libby Claimants believe that insurance through Royal Indemnity Company is available to be applied toward any recovery. (2) Libby Claimants commenced actions in Montana state courts against the State of Montana for breaching its duty to warn. See Orr v. State of Montana, 106 P.3d 100 (Mont. 2004) (permitting these lawsuits to proceed). (3) Libby Claimants brought actions in Montana state courts against BNSF Railway Company and its predecessors, premised on common negligence and strict liability relating to the railroad's transportation of asbestos and asbestos contamination on the railroad's property. (4) Libby Claimants have sued Maryland Casualty Company, asserting that by undertaking to implement an industrial hygiene program at the Libby mill and then failing to develop a program that met then-prevailing standards for such programs, Maryland Casualty breached a duty to the Libby Claimants. Libby Claimants may have similar claims against CNA but have been unable to pursue them to date.

[48] A Severe Disabling Pleural Disease category is also included in the TDP grid ($50,000), but, as discussed below, is so exclusionary in medical criteria that only about 17% of Libby severe pleural cases would qualify.

| Historic Libby Claim Values vs. TDP Values | | | | |
|---|---|---|---|---|
| Disease | Settlement/ Verdict Amts. | Adjustment Factor[49] | Adjusted Libby Settlements/Verdicts | TDP Values |
| Mesothelioma | $605,000 | 2.49 | $1,506,450 | $180,000 |
| Lung Cancer | 315,000 | 1.69 | 532,350 | 42,000 |
| Other Cancer | N/A[50] | 1.73 | 544,950 | 20,000 |
| Libby Impaired | 420,000 | 1.31 | 550,200 | 7,500 |
| Libby Unimpaired | 207,000 | 1.31 | 271,170 | 2,500 |
| Libby Wrongful Death[51] | 250,000 | 1.31 | 327,500 | 0 |

This is a shocking but not unexpected result. The Disclosure Statement indicates that before the Petition Date, Grace's asbestos personal injury claims were disposed of (settlements and verdicts) for an average of approximately $4,000 per claimant.[52] The prepetition Libby average settlement and verdict amount was $387,000—nearly 100 times the amount received by other successful Grace claimants. Clearly, the severity of Libby Asbestos Disease in the form of high progressivity and probability of death, coupled with the fact that the Libby Claimants were exposed only to Grace's asbestos while other claimants had multiple sources of asbestos exposure, required compensation from Grace on a much greater scale.

The cases of Les Skramstad and Jerry Finstad tell only part of the suffering experienced in Libby:

Les Skramstad came to Libby when he was 17 years old. Shortly after his arrival, he met his future wife, Norita. They raised five children together. Les had several jobs at the mine from 1959-1961, first working as a sweeper and then in the experimental lab. During those years he

---

[49] The Libby Claim figures have been brought current using the same adjustment developed by Asbestos PI Committee's estimation expert, Dr. Mark Peterson, to bring Grace's pre-bankruptcy verdict/settlement figures into line with current values for purposes of the TDP.

[50] The Libby Claimants did not obtain any prepetition verdicts or settlements for Other Cancer claims. The adjusted figure assumes that the Libby Claimants would obtain the same verdict/settlement for Other Cancer as they in fact obtained for Lung Cancer.

[51] Dr. Peterson did not develop an adjustment for wrongful death claims. Accordingly, the lowest adjustment that he developed for other types of claims was utilized.

[52] Disclosure Statement § 2.7.1.

16

was exposed to high levels of asbestos dust on a daily basis. As a sweeper, he would often be required to wade through up to 10 inches of the contaminated dust. His nose would become so packed with it, he could hardly breathe. There was no washhouse, no shower at the mine on the hill for the workers to clean up before they went home to their families. So at the end of the day, Les went home to his wife and young children covered with dust. He didn't know and the company never told him of the dangers of asbestos. In 1995, at the age of 57, Les was diagnosed with asbestosis. He required oxygen for the simplest of activities. He struggled with the disease and the hardship it brought upon his family. The most difficult part was that his wife and two of his children were also diagnosed with asbestosis. Les filed suit against Grace and received a jury verdict of $660,000. He had hoped to live to see the outcome of the criminal trial, but in January 2007 at the age of 70, he died of mesothelioma, having lived his final years in terrible pain.

Jerry Finstad started working for Grace in Libby in 1965. Like Les Skramstad, Jerry started out as a sweeper in the dry mill. He too suffered the horribly dusty conditions. Supervisors at the mine told Jerry and other workers that the dust was not harmful. After his time as a sweeper, Jerry worked in and around other parts of the mine. Conditions were dusty wherever he went. Jerry was unaware of the harm of asbestos and was never told about it. He continued to work for Grace for about two years. Three decades later, in 1998, Jerry was diagnosed with asbestosis. At the time, Jerry was only in his middle 50s. His conditioned deteriorated and soon found it difficult getting up and down stairs. He required oxygen for periods of the day. In 1998, Jerry filed suit against Grace and received a verdict of $483,000, including $83,000 of punitive damages.

## D.    Other Asbestos PI Claims

The vermiculite mine in Libby was only a part of Grace's global business.  Grace is best known for its construction and insulating products, many of which contained asbestos.  As a result, like other asbestos companies, Grace increasingly became a defendant in suits alleging personal injury claims from asbestos exposure as well as asbestos-related property damage claims.  By the Petition Date, nearly 130,000 personal injury claims were pending against Grace.[53]  Only 171 of these lawsuits were brought by Libby Claimants.[54]

While Libby Asbestos Disease is a result of the Libby amphibole asbestos, Grace's overwhelming asbestos liability is due to chrysotile asbestos that was incorporated into its construction and insulation products.  Grace was one of many companies in the construction industry that sold products containing chrysotile asbestos.  Because construction and insulation workers were exposed to asbestos-containing products sold by different companies, the typical asbestos personal injury claimant, a construction or insulation worker, often files claims against many, even dozens of defendants.  Throughout this case, Grace has complained that it is the victim of (a) phony claims from mass screenings; (b) claimants with pulmonary function tests that do not conform to American Thoracic Society (the "ATS") standards; (c) use of peripatetic, hired gun doctors for diagnoses; (d) claims based on minimal or no proof of exposure to Grace's products; (e) claimants who shifted their attention to Grace as a new target defendant; and (f) claimants whose lung function will never actually be impaired.[55]  It is important for this Court to understand that none of these complaints apply to the Libby Claimants:

---

[53] Disclosure Statement § 2.7.1.

[54] Libby Claimants now number over 935 and more Libby Claims can be expected in the future.

[55] Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire dated May 10, 2005 [D.I. 8395], Tab 2.

- **Phony claims from mass screenings**. There has never been a mass screening in Libby paid for by a law firm. The two screenings done in Libby were conducted by the federal ATSDR and the State of Montana. As a result of these government screenings, the number of diagnosed cases increased dramatically. In the case of the Libby Claimants, virtually all saw their doctor before ever contacting an attorney about a claim.

- **Pulmonary function tests which do not conform to American Thoracic Society standards**. The Center for Asbestos Related Disease in Libby and the Klock and Whitehouse Clinic in Spokane, Washington have consistently and rigorously applied ATS standards. In fact, Dr. Whitehouse's technician Mary Kay Collins won U.S. respiratory therapist of the year for her excellence.

- **Use of peripatetic, hired gun doctors**. Long before there was any litigation, a large number of the Libby Claimants sought treatment from Dr. Whitehouse. As noted above, he has treated victims of Libby Asbestos Disease since 1980. The Center for Asbestos Related Disease has been treating patients since 2000. In virtually all cases, a Libby patient's medical records come from the treating physician, with a standard chart consisting of medical reports, physical exam, chest x-ray and/or CT scan, and full pulmonary function tests. In Libby it is Grace that has brought in peripatetic, hired gun doctors to counter the testimony of the patient's own physician. Not surprisingly, no judge or jury has relied upon Grace's doctors in any of the trials on medical issues.

- **Minimal or no proof of exposure to Grace's products.** In Libby, Grace was unquestionably the source of the asbestos that has caused the Libby Claimants' asbestos disease. Grace does not contest this. There is no issue of inadequate exposure histories. It is well documented that Grace's asbestos dust pervaded the community, and only a few of the Libby Claimants have any significant asbestos exposure outside of Libby, Montana.

- **A shift to new target defendant.** In Libby, Grace is not a victim of a shift in defendants. Grace was always named defendant in cases brought by Libby Claimants before the Petition Date.

- **Payments to litigants who will never be impaired.** Asbestos disease can be diagnosed radiographically before impairment sets in. In Libby, as elsewhere, the current status is that most patients are unimpaired (no lung function under 80% of normal). However, with Libby Asbestos Disease, there is at least a 76% probability of progression. Thus, unlike other Asbestos PI Claimants who are unimpaired, even a currently unimpaired Libby Claimant is very likely to become impaired and eventually die of asbestos disease.

### E.    Grace Bankruptcy

On April 2, 2001, Grace filed a petition for relief under Chapter 11 of the Bankruptcy Code. Shortly thereafter, the Official Committee of Asbestos Personal Injury Claimants was

formed (the "Asbestos PI Committee").[56]  Except for the inclusion of a sole Libby representative, membership of the Asbestos PI Committee was a reunion of the same lawyers who serve together on personal injury committees in most of the significant asbestos bankruptcy cases in this country.  The members include: Frederick M. Baron, Esq., John D. Cooney, Esq., Mark C. Meyer, Esq., Robert Jacobs, Esq., Steven L. Kazan, Esq., Michael V. Kelley, Esq., Thomas M. Wilson, Esq., Joseph F. Rice, Esq., Nancy W. Davis, Esq., Ian P. Cloud, Esq., Steven T. Baron, Esq., and Perry Weitz, Esq.  Most of these members belong to the largest of the mass filer law firms.

On May 24, 2004, the Bankruptcy Court approved the appointment of David T. Austern as the legal representative for the future asbestos personal injury claimants.[57]  As Asbestos PI FCR, Mr. Austern has nominal responsibility for future Libby Claimants, but has taken no steps whatsoever to protect their interests.[58]  The FCR has refused to even review the medical evidence concerning the differences between Libby and usual nonmalignant disease.

As this Chapter 11 case began to develop, it became apparent that members of the Asbestos PI Committee were concerned only to maximize their own revenues and would not provide a fair deal for the Libby Claimants.  By acting exclusively in their own interests, the members of the Asbestos PI Committee have chosen to ignore the Libby-related issues that—as has been recognized even by Grace[59]—separate this case from the numerous other cases in which the members of Asbestos PI Committee similarly serve.  This could not have been more evident

---

[56] D.I. 95.

[57] D.I. 5645.

[58] Libby Claimants that have retained Montana counsel postpetition have "claims" under the Bankruptcy Code and are represented by those firms, not the FCR.  However, it is estimated that there will be hundreds more who will be diagnosed with Libby Asbestos Disease in the future.

[59] Grace itself, in a Status Report on the Progress of the Case [D.I. 11756], recognized the separate interests of the Libby Claimants by listing them as a separate agenda item ("Provisions regarding Libby claimants to be negotiated") in their checklist for the negotiation of a consensual plan.  Exhibit C, Item III.A.2.

than at the outset of the personal injury estimation proceeding. Although Grace had designated a number of Libby-specific expert witnesses, the Asbestos PI Committee informed the Libby Claimants' counsel that the committee would not designate witnesses to respond to Libby-specific issues. The Asbestos PI Committee instead advised the Libby Claimants' lawyers that, if they concluded such experts might be necessary, they must designate their own. More broadly, the Asbestos PI Committee told the Libby Claimants that the committee did not plan to defend against Libby-specific evidence or positions that Grace may assert. Thus, in a stunning breach of fiduciary duty, the Asbestos PI Committee was prepared to let Grace's evidence concerning Libby Claims go unanswered in the estimation proceeding, even if the result were to be this Court's determination of a lower overall estimate of Grace's asbestos liability.

The Libby Claimants determined that they needed to defend against Grace's attack and present evidence on Libby-specific medical issues. Accordingly, the Libby Claimants filed a motion seeking to be treated analogously to a subcommittee whereby they could be represented separately from the Asbestos PI Committee on issues where their interests diverge from the rest of the committee, with the expense of such representation borne by the bankruptcy estate.[60] This Court denied the Libby Claimants' motion without prejudice, reserving the right to consider a later request for compensation from the Libby Claimants.[61] As the estimation proceeding developed, it became apparent that Grace's statistical experts had not separately broken out Grace's liability for Libby Claims.[62] The Libby Claimants were able to negotiate with Grace to be removed from the estimation proceeding, with all parties agreeing that the estimation trial

---

[60] Libby Claimants' Motion for Payment of Certain Expenses In Connection with Claims Estimation and Plan Process dated February 20, 2006 [D.I. 11865].

[61] D.I. 12450.

[62] Neither had the Asbestos PI Committee's. The Asbestos PI FCR's experts did have an exhibit containing data, largely inaccurate, about Libby Claims.

would be Libby-neutral.[63]    The estimation trial was called off when Grace, the Asbestos PI Committee and certain other parties reached agreement on a term sheet that ultimately led to the Plan.

### F.    **Plan Negotiations Between the PI Committee and Grace**

From the outset, Grace vowed that this case would be different from other asbestos bankruptcy cases.  Grace claimed to be solvent if asbestos claims were reduced to their true value.  To determine the true value of its asbestos liability, Grace declared war on unimpaired claims.  In November 2004, Grace filed a plan and plan-related motions intended to disallow invalid and overstated claims of mass filers, with all valid Asbestos PI Claims to be paid in full. This aspect of Grace's plan had promise for the Libby Claimants.  Even though Grace could be anticipated to object even to legitimate Asbestos PI Claims, the Libby Claimants could have expected resulting settlement payments approaching the full value of the Libby Claims.

The Asbestos PI Committee opposed Grace's initial plan, claiming that Grace was insolvent by reason of an aggregate asbestos personal injury liability that the committee's expert estimated would most likely be between $5.0 and $5.8 billion.[64]    Then, in the course of the estimation trial, Grace and the Asbestos PI Committee struck the deal that led to the Plan.  Grace gave up its position that invalid and overstated Asbestos PI Claims would be disallowed, instead agreeing to be cleansed of asbestos liability upon turning over to an asbestos trust assets with an announced value of $2.9 billion. The Asbestos PI Committee gave up its position that Grace was insolvent, agreeing that Grace would emerge from Chapter 11 with existing shareholders not

---

[63] Agreed Order Granting Libby Claimants' Motion In Limine Concerning Estimation Proceeding Evidence [D.I. 17431].  This order reserved the rights of all parties to later address the medical criteria for Libby Asbestos Disease, the extent to which Libby Asbestos Disease has separate characteristics from other asbestos disease, and whether and in what amount any particular claim based on Libby Asbestos Disease should be allowed.

[64] Peterson Supplemental/Corrected Estimation Report.

only owning the company but having equity worth up to $1.8 billion.[65]  Non-asbestos creditors, too, would receive treatment reflecting Grace's solvency.[66]  Indeed, one of the issues this Court has been called upon to resolve is the rate of interest that unsecured bondholders will be paid on their prepetition claims.  Asbestos PI Claimants, however, will not be paid 100% plus interest.  Instead they are limited to a fixed pool of assets, to be divided as the Asbestos PI Committee sees fit.  The TDP devised by the Asbestos PI Committee will pay only a fraction of the proposed value of asbestos claims.  Not surprisingly, the Plan Proponents have chosen to conceal the Payment Percentage from public disclosure.  Indications are that it will be as little as 30 cents on the dollar.

There are only two possible explanations for this otherwise unfathomable turn of events: either the Asbestos PI Committee breached its duty to its constituents by accepting a plan that severely discriminates against Asbestos PI Claims in comparison to other general unsecured claims, or the personal injury constituency is in fact receiving much more than 30 percent of the aggregate amount of *valid* Asbestos PI Claims, but have rigged the TDP to overpay claims that are invalid or weak.  Whichever explanation is true (maybe both are), the outcome is severely detrimental to the Libby Claimants, who have serious asbestos disease unquestionably caused by Grace's asbestos, and who cannot file a raft of claims against other asbestos producers.

### G.    Treatment of Libby Claims Under the Plan

While negotiations proceeded in fits and starts between Grace and the Asbestos PI Committee, there were internal negotiations between representatives for the Libby Claimants and the rest of the members of the Asbestos PI Committee concerning the treatment of Libby Claims.  The pace of these negotiations accelerated when Grace and the Asbestos PI Committee reached

---

[65] Disclosure Statement § 2.11.2.6.

[66] Disclosure Statement § 4.3.

an agreement.[67]  The other members of the Asbestos PI Committee had all the resources of the Asbestos PI Committee, including counsel, who instead of acting in a neutral role served as advisor and spokesperson for the majority group.  The Asbestos PI FCR and counsel also aligned themselves with the Asbestos PI Committee majority.

Without commenting on the specific substance of the negotiations,[68] the Libby Claimants presented two alternative approaches for the fair and equitable treatment of their claims: (1) adjustment of the TDP to provide liquidated values for Libby Claims consonant with the prepetition history of settlements and verdicts versus Grace, or (2) establishment of a separate trust or sub-trust to be funded by the estimated total amount that would be paid to Libby Claims under the first approach.[69]  The Asbestos PI Committee and the Asbestos PI FCR declined to adopt either approach.  Instead, they have proposed the Plan under which most Libby Claims are not even permitted, never mind entitled to, a liquidated value reflecting verdict and settlement history.  Thus, even if the Libby Claimants were to accept the injustice of a low Payment Percentage resulting from dilution of their claims by hundreds of thousands of Asbestos PI Claims that Grace has condemned as invalid, the Libby Claimants still face (1) terms of the TDP that have been crafted so as to deprive the Libby Claimants of their fair *pro rata* share of the funds of the Asbestos PI Trust and (2) prejudicial treatment of the insurance coverage for Libby Claims.

---

[67] When the agreement was introduced and brought before the Asbestos PI Committee for approval, the Libby Claimants voted against it as failing to provide adequate treatment for the Libby Claims.

[68] The Libby Claimants reserve the right to require disclosure of otherwise confidential communications within the Asbestos PI Committee and between committee members and committee counsel, in connection with the Libby Claimants' claims against the committee and counsel for, *inter alia*, breach of fiduciary duty.

[69] Under either approach, Libby Claimants were to have the benefit of insurance available on an uncapped basis to pay premises/non-completed operations claims, and were to be free to pursue their independent claims against third parties.

1.    **Discriminatory TDP Provisions**

The TDP declares as its goal "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[70]   The TDP sets a Payment Percentage applicable to all claims.   To determine the amount paid to each claimant, the Payment Percentage is applied to the liquidated value of each Asbestos PI Claim as determined pursuant to the TDP.[71]   Most of the TDP is devoted to the criteria and process for liquidating claims.

Under the TDP, each claimant initially elects to be treated in accordance with Expedited Review[72] or Individual Review.[73]   Under Expedited Review, the claim is valued in accordance with a grid specifying a different Scheduled Value for different types of claims based on medical and exposure criteria.   If the claimant provides evidence that he was exposed to Grace's asbestos and meets the criteria for a particular Disease Level, the claim is valued at the Scheduled Value for the Disease Level without the delay or uncertainty of Individual Review.[74]

Under Individual Review, the Asbestos PI Trust makes a largely discretionary determination of the value of the claim in the tort system based on consideration of factors specified in the TDP.[75]   However, the claim may not be valued at more than the Maximum Value for the particular Disease Level specified in the TDP unless it is an Extraordinary Claim.[76]   The Asbestos PI Trust may designate an Extraordinary Claim where the claimant's exposure was largely to Grace's asbestos and the claimant has little likelihood of substantial recovery other

---

[70]  TDP § 2.1.

[71]  TDP §§ 2.3, 4.2 and 4.3.

[72]  TDP § 5.3(a).

[73]  TDP § 5.3(b)(1).

[74]  TDP § 5.3(a)(1)-(3).

[75]  TDP § 5.3(b)(2).

[76]  TDP § 5.3(b)(1)(B).

than from the Asbestos PI Trust.[77]    The Asbestos PI Trust may in its discretion value an Extraordinary Claim at up to five times the Scheduled Value (in the case of 75% exposure to Grace's asbestos) or eight times the Scheduled Value (in the case of 95% exposure to Grace's asbestos), with the determination of the trust's Extraordinary Claims Panel being final.[78]    In any other instance where the claimant is dissatisfied with the valuation resulting from Individual Review, the claimant may proceed to mediation,[79] then to binding or non-binding arbitration[80] and then (if non-binding arbitration was elected) to obtain a verdict through the tort system.[81] The TDP specifies and even a verdict obtained through the tort system will be capped at the Maximum Value for the particular Disease Level.[82]

Under this regime, the Scheduled Value and Maximum Value applicable to each claim are critical. These are determined by the Disease Level for which the claim satisfies medical and exposure criteria. The TDP treats Libby Claims unfairly in both respects.

### (a) Medical Criteria

In its present form, the TDP excludes legitimate Libby Claims by creating disease criteria that are not consistent with standard medical practice. Criteria for diagnosing asbestos disease have been adopted by the American Thoracic Society. See "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," Am. J. Respir. Crit. Care Med., Vol. 170:691-715 (2004)("ATS (2004)").[83]    The diagnosis of asbestos disease generally requires at a

---

[77] TDP § 5.4(a).

[78] TDP § 5.4(a).

[79] TDP § 5.10(b).

[80] TDP § 5.10(a).

[81] TDP §§ 5.11 and 7.6.

[82] TDP §§ 5.10(c) (as to arbitration awards) and 7.7 (as to litigation verdicts).

[83] Whitehouse Report ¶¶ 14, 70.

minimum, a history of exposure to asbestos and a 15-year latency period.[84]    The ATS (2004)

Official Statement sets the diagnostic criteria as follows:

- Evidence of structural pathology consistent with asbestos-related disease as documented by imaging or histology.

- Evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies, or other means.

- Exclusion of alternative plausible causes for the findings.[85]

It is standard medical practice to use the ATS (2004) definition.[86]    The Libby Claimants who are

under the treatment of Dr. Whitehouse and the other doctors at the CARD Clinic have been

diagnosed in accordance with ATS (2004).  However, the TDP adds to the ATS (2004) standard

diagnosis for pleural disease several additional requirements that discriminate against Libby

Claimants.

It is not discriminatory to categorize claimants by severity for compensation purposes.  It

is discriminatory to add certain elements to the diagnosis for groups of claimants and not add

them for other groups.  For the cancer claims (mesothelioma, lung cancer and other cancers) a

diagnosis is all that is required for compensation.  But for Severe Disabling Pleural Disease—a

category for which many Libby Claimants *should* qualify—additional requirements of blunting,

3mm thickness, and extent greater than 25% are added to the diagnostic requirements.  These

additions operate to exclude many Libby Claimants with severe disease.  They are

discriminatory.

---

[84] Whitehouse Report ¶ 15.

[85] Whitehouse Report ¶ 70 (citing ATS (2004) at p. 691).

[86] Whitehouse Report ¶ 70.

**(1) Blunting of the costophrenic angle is not a requirement in the standard diagnosis of asbestos related disease.  There is no basis in the medical literature for it.  Its use excludes over 72% of Libby Claimants.**

The TDP defines "Severe Disabling Pleural Disease" to include "diffuse pleural thickening" of at least extent "2" and at least width "a" as defined in the ILO's *Guidelines for the Use of the ILO International Classification of Radiographs and Pneumoconioses* (2000).[87]  As noted in the TDP,[88] the ILO Guidelines (2000) for "diffuse pleural thickening" require "associated blunting of the costophrenic angle."[89]  The requirement of blunting is contrary to the ATS (2004) Official Statement of standard practice in diagnosis of asbestos related disease.[90] The requirement of blunting is also contrary to standard practice in chest medicine.[91]  Diffuse pleural thickening and blunting are two separate findings on chest films.  They may or may not appear on the same patient.  Libby pleural disease generally does not cause blunting of the costophrenic angle.[92]  A study by Dr. Whitehouse,[93] measuring 79 sets of chest x-rays, found that 72% of the Libby Claimants did not have blunting of the costophrenic angle.[94]  *Of seven Libby Claimants dead of asbestos disease, only four had blunting.*[95]  The blunting requirement will exclude many legitimately severe Libby Claims.

---

[87] TDP § 5.3(a)(3).

[88] TDP § 5.3(a)(3) n.7.

[89] Costophrenic angles are the angles formed between the inner surface of the ribs and the dome of the diaphragm.

[90] Whitehouse Report ¶ 70.

[91] Whitehouse Report ¶ 70.

[92] Whitehouse Report ¶ 74.

[93] Dr. Whitehouse performed the measurements of 79 sets of chest x-rays at the request of counsel, in response to a "blunting" requirement in early drafts of the 2005 asbestos bailout bill.  The blunting provision was subsequently removed from the Libby provisions in the 2005 asbestos bailout bill.

[94] Whitehouse Report ¶ 74.

[95] Whitehouse Report ¶ 74.

**(2) The requirement of a minimum 3mm pleural thickening is not a standard requirement in the diagnosis of asbestos related disease. There is no basis in the medical literature for it. Its use excludes over 38% of the Libby Claimants.**

The TDP's definition of "diffuse pleural thickening" for Severe Disabling Pleural Disease requires "at least width 'a'."[96] Per ILO (2000) Guidelines, this is pleural thickening of a 3mm minimum width. Like the blunting requirement, the 3mm requirement in pleural thickening is contrary to the ATS (2004) diagnostic standards.[97] There is no scientific basis for a requirement of 3mm thickness to diagnose "diffuse pleural thickening."[98] As stated by the President of the American Thoracic Society, "diffuse pleural scarring can be associated with greatly diminished FVC (Forced Vital Capacity) regardless of the extent or thickness of the scarring or its bilaterality."[99]

Dr. Whitehouse's measurements for the study of 79 sets of chest x-rays show that about 38% of Libby patients are excluded by a requirement of a minimum 3mm thickness.[100] Also, of the Libby patients with severe disease, *seven of 18 (39%) would be excluded by the 3mm requirement*.[101] The 3mm requirement is improperly exclusionary upon the Libby Claimants.

**(3) The requirement of pleural thickening coverage of over 25% is not a standard requirement in the diagnosis of asbestos related disease. There is no basis in the medical literature for it. Its use excludes over 29% of Libby Claimants.**

---

[96] TDP § 5.3(a)(3).

[97] Whitehouse Report ¶ 75.

[98] Whitehouse Report ¶ 75.

[99] Whitehouse Report Exhibit 3.

[100] Whitehouse Report ¶ 75.

[101] Whitehouse Report ¶ 75.

The TDP's definition of "diffuse pleural disease" for Severe Disabling Pleural Disease requires "at least extent '2'."[102] Per the ILO (2000) Guidelines, extent "2" is pleural thickening of 26-50% "of the extension of the lateral chest wall." This requirement is contrary to the ATS (2004) diagnostic standards. There is no scientific basis for it.

Dr. Whitehouse's measurements for the study of 79 sets of chest x-rays show that about 37% of Libby patients are excluded by a requirement of extent greater than 25%. The extent greater than 25% requirement is improperly exclusionary upon the Libby Claimants.

### (4) The omission of DLCO measurement is arbitrary. Without DLCO the severity of the Libby Claimants' asbestos disease is not adequately observed.

It is proper to categorize claims by severity. However, all three standard measures of severity of asbestos must be available. The TDP's definitions of "Severe Disabling Pleural Disease" and moderate "Asbestosis/Pleural Disease" employ forced vital capacity (FVC) and total lung capacity (TLC), but omit diffusion capacity (DLCO). DLCO is one of the three standard measures for severity of asbestos disease.[103] There are a number of Libby Claimants with severe disease and impairment whose only number under 65 is DLCO. DLCO needs to be included as an option to prove severity of disease along with FVC and TLC.

DLCO measures the lungs' efficiency in transferring oxygen into the blood stream.[104] The DLCO measurement is a key indicator of severity and impairment in asbestos disease,[105]

---

[102] TDP § 5.3(a)(3).

[103] Whitehouse Report ¶ 77.

[104] Whitehouse Report ¶ 77.

[105] The importance of DLCO as an indicator of severity in asbestos pleural disease is long established. Whitehouse Report ¶ 17 (citing Cookson (1983) "Pleural Thickening and Gas Transfer in Asbestosis," Thorax 1983; 38:657-661.) In the Cookson study (a study of a cohort exposed to amphibole asbestos) it was determined that "the ratio of transfer factor [the British term for diffusion capacity] to effective alveolar volume correlated directly with the degree of pleural thickening as alveolar volume fell with increasing severity of pleural disease." Whitehouse Report ¶ 17.

especially with the Libby Claimants.[106]  The ATS (2004), p.697, states:

> Evaluation of subjects with suspected asbestos-related disease should include spirometry . . . all lung volumes and the carbon monoxide diffusing capacity.  In addition to diminished lung volumes, the carbon monoxide diffusing capacity is commonly reduced due to diminished alveolar - capillary gas diffusion, as well as ventilation - profusion mismatching.

Fishman's Pulmonary Diseases and Disorders (3rd Ed. 1998), p.883, states:

> The characteristic pulmonary function changes of asbestosis are a restrictive impairment with a reduction in lung volumes (especially FVC and total lung capacity), decreased diffusion capacity, and arterial hypoxemia.

Similarly, the AMA Guides to Permanent Impairment (5th Ed.) uses diffusion capacity as a basis for assessment of permanent impairment due to respiratory disorders.[107]  Diffusing capacity is available at any lung center, and is standardized.[108]  The Center for Asbestos Related Disease in Libby applies this standard technique.[109]

DLCO is a particularly important indicator of the severity of restrictive disease in the Libby Claimants.[110]  The Whitehouse (2004) study found that:

> In a group of 123 patients, including those with improved FVC, the average yearly loss was 2.2% for FVC, 2.3% for TLC, and 3.0% for DLCO as calculated over an average of 35 months.[111]

Of the 123 patients in the Whitehouse study, 76% had progressive loss of lung function.[112]  In the Libby cohort, DLCO shows progressive decline along with FVC and TLC.[113]  In many individual cases, there is significant asbestos disease on the chest x-ray, and only the DLCO is

---

[106] Whitehouse Report ¶¶ 78-82.

[107] Whitehouse Report ¶ 77.

[108] Whitehouse Report ¶ 77 (citing American Thoracic Society, "Single Breath Carbon Monoxide Diffusing Capacity (Transfer Factor).  Recommendations for a Standard Technique."  Am. Rev. Resp. Dis. 1987; 136:1299).

[109] Whitehouse Report ¶ 77.

[110] Whitehouse Report ¶ 78.

[111] Whitehouse Report ¶ 78(citing Whitehouse (2004) at p. 221).

[112] Whitehouse Report ¶ 79.

[113] Whitehouse Report ¶ 79.

reduced, not the FVC or TLC.[114]  Some patients with severe shortness of breath are severe only in the DLCO defect.[115]  DLCO defect is often the leading indicator of severity in the Libby cohort, and has the greatest correlation with shortness of breath and the timing of the patients' entry to oxygen treatment.[116]  Failure to provide DLCO as a measure of severity excludes many Libby Claimants.

### (5)  Summary:  Effect of Exclusionary Medical Criteria

The cumulative effect of applying these exclusionary criteria to the Libby Claimants is dramatic.[117]  It is estimated that perhaps about 75% of Libby patients with severe disease will be excluded by the requirements for blunting, extent greater than 25%, and the 3 mm thickness from meeting the TDP criteria for Severe Disabling Pleural Disease.

In theory, the process of Individual Review may allow a claimant to obtain a liquidated value for an appropriate Disease Level despite failing to meet the medical criteria.[118]  However, the Individual Review process is discretionary.  It does not justify discrimination in the medical criteria.  Individual Review is supposed to be for exceptional claims, which need to be handled on a discretionary basis outside the set of rules applicable to other claims in order to provide compensation to the claimant at a level reflecting what he could recover in the tort system. Claimants electing Individual Review pay a penalty by reason of the delay and uncertain outcome inherent in Individual Review.  Although the Disclosure Statement does not disclose the percentage of claimants expected to utilize Individual Review based on experience with similar

---

[114] Whitehouse Report ¶ 79.

[115] Whitehouse Report ¶ 79.

[116] Whitehouse Report ¶ 79.

[117] It is assumed that the blunting, extent greater than 25%, and 3mm thickness requirements are met if present in either the right or left lung.  The TDP is not clear on this point.  It all requirements must be met in both lungs, the exclusions are far more dramatic.

[118] TDP § 5.3(b)(1)(A).

trusts in other cases, it is not likely to be a large percentage. The TDP written by the Asbestos PI Committee unfairly discriminates against the Libby Claimants by requiring that most Libby Claimants (about 83% of severe Libby Claimants) must resort to Individual Review, while virtually all non-Libby Claims will be compensated at Scheduled Value levels without the need for Individual Review.

### (b)    Exposure Criteria

The TDP establishes three levels of exposure criteria. For a claim to be paid at all, an Asbestos PI Claimant must demonstrate Grace Exposure.[119] Libby Claimants will have no problem meeting this criterion. Claims meeting the second and third levels of exposure criteria are categorized as Extraordinary Claims. At the second level of exposure, requiring that at least 75% of the claimant's exposure be to Grace's asbestos, a claimant may at the PI Trust's discretion receive up to five times the Scheduled Value for his Disease Level.[120] At the third level of exposure, requiring that at least 95% of the claimant's exposure be to Grace's asbestos, a claimant may at the PI Trust's discretion receive up to eight times the Scheduled Value for his Disease Level.[121] Properly designed, the Extraordinary Claims provisions can serve to assure appropriate compensation of claimants who have much stronger claims against Grace in the tort system, because their exposure is largely or solely to Grace's asbestos—thus eliminating defenses of causation, comparative fault, etc.

Under the Plan, however, treatment as an Extraordinary Claim is subject to a further requirement: "there is little likelihood of a substantial recovery elsewhere."[122] Although the language is opaque, presumably "elsewhere" means from a party other than Grace. Libby

---

[119]  TDP § 5.7(b)(3).

[120]  TDP § 5.4(a).

[121]  TDP § 5.4(a).

[122]  TDP § 5.4(a).

Claimants have asserted claims against various other parties. However, as this Court has pointed out on numerous occasions in enjoining the pursuit of those claims, Grace is the party with primary liability to the Libby Claimants, because it was Grace's asbestos that made them sick. The likelihood of Libby Claimants obtaining a substantial recovery from any other party is unknown and unknowable at this time. Yet the Extraordinary Claims Panel established under the TDP will have unfettered discretion ("All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review"[123]) to determine whether any particular Libby Claim will be limited to the minimal Scheduled Value—same as a construction worker who can recover from 20 other asbestos producers, and probably has—or receive a more appropriate liquidated value. This renders the Extraordinary Claims multiplier illusory.

The Disclosure Statement does not disclose the nature and amount of Asbestos PI Claims that are expected to seek or obtain designation as Extraordinary Claims.[124] The Libby Claimants, who live in a small town blanketed by Grace's asbestos, are obviously the most qualified to receive this designation. Few others can meet the 95% Grace exposure requirement. However, complete discretion is conferred on the Extraordinary Claims Panel. The Panel is chosen by the trustees of the Asbestos PI Trust, who are chosen by the Asbestos PI Committee, which is controlled by a majority hostile to the Libby Claimants. This situation renders illusory any expectation that Libby Claims will receive the multiple of Scheduled Values that they deserve by reason of their strength on the exposure issue.

---

[123] TDP § 5.4(a).

[124] Elsewhere (see Point IV, B, 3), the Libby Claimants object to this lack of disclosure.

(c)    **Combined Effect of Exposure and Medical Criteria**

Even if a Libby Claim were designated an Extraordinary Claim and provided with the maximum multiple of eight times Scheduled Value, the claim would still not be liquidated at an amount consistent with its value in the tort system.[125]  In other words, Libby Claims could not be allowed for their tort system value even if the trustees were inclined to do so.  The TDP contains no escape valve.  While the TDP permits an Asbestos PI Claimant dissatisfied with the liquidated value offered by the Asbestos PI Trust to obtain a judgment in the tort system, the liquidated value of the claim for purposes of the TDP will be the *lesser* of the judgment amount or the maximum amount that the Asbestos PI Trust was permitted to offer.[126]  And any increment by which the judgment exceeds the Asbestos PI Trust's last offer will be paid on a discriminatory basis: payment does not even start until at least five years after the judgment, and is then paid in five equal installments.[127]  Thus, claimants who exercise their constitutional right to trial by jury first incur the delay of going through Individual Review, mediation and arbitration.[128]  Then they must bring suit and obtain a judgment in the tort system.  Then they must wait an additional ten years to be paid.

2.    **The Plan Deprives Libby Claims of the Benefit of Insurance Coverage for Which They Do Not Compete with Other Claims**

Like other comprehensive general liability policies of the same era, Grace's insurance distinguishes between "premises" claims and "products" claims.  Products (a/k/a completed operations) coverage addresses liability from products that have been placed in the stream of

---

[125]  The figures are presented in detail at Point IV, C, 1 below.

[126]  TDP § 7.7.

[127]  TDP § 7.7.

[128]  These are required prerequisites to seeking judgment in the tort system.  TDP § 5.10, 5.11.

commerce either through sale/transfer of a product or completion of an operation or service.[129] In addition to being subject to per-claim and per-occurrence limits, products coverage is subject to an aggregate cap on claims. By contrast, premises (a/k/a non-completed operations) coverage addresses liability that arises from operations (including harmful materials that have not yet been placed in the stream of commerce). While subject to per-claim and per-occurrence limits, premises coverage is *not* subject to any aggregate limit. This means that even in a mass tort case, injured people do not compete with each other for premises/operations coverage. The only issue is whether an injury is covered by the policy, not whether the coverage has been exhausted.[130]

Unlike the vast majority of Asbestos PI Claims which are products claims because they result from exposure to Grace's products, Libby Claims are premises claims because the Libby Claimants were injured by harmful materials generated in the course of Grace's operations. Comprehensive general liability insurance, including coverage of premises and products claims, was supplied by Royal Indemnity Company[131] for the period from 1954-1963,[132] Maryland Casualty Company for the period from 1962-1973, and Continental Casualty Company ("CNA") from 1973-1985. According to Grace, all primary policies have been settled except for "assertions of coverage for premises personal injury claims" by CNA.[133] The Libby Claimants assert that premises coverage against Royal Indemnity Company is also unresolved because Grace's prepetition settlement with Royal is limited solely to products claims, leaving premises

---

[129] For example, a construction worker exposed to the Grace's asbestos-containing products would have a products/completed operations claim because the harmful material had left Grace's possession at the time the injury occurred.

[130] Assuming the insurer is solvent. In the case of Grace's three insurers described below, there has been no suggestion of insolvency.

[131] N/k/a Arrowood Indemnity Company.

[132] The insurance was purchased by The Zonolite Company, n/k/a Montana Vermiculite Company. As part of the purchase of Zonolite's assets, Grace "obtained all rights under the insurance policies purchased by Zonolite." Disclosure Statement § 2.10.2.1 (page 42).

[133] Disclosure Statement § 2.10.2.2 (page 42).

coverage intact.[134]    Finally, with respect to Maryland Casualty Company, the Libby Claimants assert that they are not bound to Grace's settlement because their rights against Maryland Casualty had already vested at the time of the settlement and (again, because there is no aggregate cap on premises coverage) the insurance was not exhausted either before or by reason of the settlement.[135]    The same rationale would apply to the settlement with Royal if somehow premises coverage were in fact settled.

Policies providing coverage for premises/operations claims are an important potential source of recovery for the Libby Claimants.    Pursuit of this coverage by the Libby Claimants would harm no other Asbestos PI Claimant because, as noted, premises claims do not compete with each other because there is no aggregate cap on coverage.    Yet under the Plan, this special coverage for Libby Claims is thrown into the pool of other Asbestos Insurance Rights,[136] to be administered by the Asbestos PI Trust and used to pay Asbestos PI Claims, including the vast majority of claims that have no right to premises/operations coverage.[137]

---

[134] The Grace/Royal Settlement Agreement provides, Section 2.0, Royal agrees to pay Grace the sum of [REDACTED] in full satisfaction of Royal's alleged obligation to indemnify Grace, Zonolite, and any Other Insureds for Loss arising out of **Products Claims** under the Primary Policies and in full satisfaction of Royal's alleged obligation to defend Grace, Zonolite or any Other Insureds or to pay Defense Expenses arising out of **Products Claims** under the Primary Policies.  Elsewhere (see Point III, II, E below) the Libby Claimants object to Grace's incorrect or incomplete disclosure concerning the status of Royal Indemnity Company coverage.

[135] An injured party's rights vest at the time their injuries occur, and cannot thereafter be defeated by actions of the insurer and insured. See Allied Products Corp. v. ITT Industries, Inc. (In re Allied Products Corp.), 2004 WL 635212 (N.D. Ill.), affirming 288 B.R. 533 (Bankr. N.D. Ill. 2003); McLane v. Farmers Insurance Exchange, 150 Mont. 116 (1967); 43 Am. Jur. 2d Insurance § 416.  In McLane, the Montana Supreme Court held that the injured party's rights "vested either at the time of the accident or at the time of the [insurance company's] implied waiver of the right to rescind. . . .  In either case, [the insured] and [the insurance company] cannot do anything either in concert or through the failure of [the insured] to defend to affect the rights of [the injured party] after they vested." McLane, 150 Mont. at 119.

[136] Plan § 1.1(12).

[137] Plan § 7.2.2(d).

## IV.    OBJECTIONS

### A.    Approval of the Disclosure Statement Would Violate the Requirements of Due Process of Law

Approval of the Disclosure Statement would violate due process of law because (a) the Libby Claimants and other parties have not been provided adequate time to object to the Disclosure Statement, (b) the proposed Disclosure Statement lacks even the most basic information that would allow parties in interest to provide a meaningful response, and (c) the self-amendatory provisions of the Plan will, if utilized to make material changes in the terms of the Plan, render the Disclosure Statement inadequate.

### 1.    The Objection Period has been Inadequate

The Disclosure Statement, Plan and Exhibits constitute over 630 pages. In a large and complex case such as this one, even the standard 25-day notice period provided by Rule 2002(b) of the Federal Rules of Bankruptcy Procedure is an inadequate objection period. It is not reasonable to expect that even the most dedicated counsel will be able to review, understand, analyze and respond to such a massive amount of material in so brief a time. The Libby Claimants sought and were denied an extension of time within which to object to the Disclosure Statement.[138] They continue to object that they have not had adequate time to respond.

### 2.    The Disclosure Statement is so Deficient that it is Unreasonable to Require Parties in Interest to Respond

Asbestos Claimants are the only creditors who will not be paid in full under the Plan. Yet

---

[138] On October 2, 2008, the Libby Claimants filed their Motion (A) For Reconsideration of Order Granting Debtors Leave From Scheduling Order and Shortening Notice of Motion to Approve Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief and (B) To Set a Reasonable Deadline For Objections to and Date For Hearing on Approval of Disclosure Statement [D.I. 19683]. This Court dismissed that motion for failure to comply with the Case Management Order, Local Rules of Procedure and/or Chambers Procedures. Although the Libby Claimants did not believe that the motion was of the type that is typically noticed out for a hearing date and objection deadline, the Libby Claimants resubmitted the motion [D.I. 19709], together with a motion for leave of the Case Management Order and to shorten notice [D.I. 19710] per the Court's instruction. Those motions were denied on October 8, 2008 [D.I. 19715, 19716].

the Disclosure Statement fails to provide even the most basic information relevant to Asbestos PI

Claimants.  How many Asbestos PI Claims are projected and of what types and of what allowed

amounts?  How much money will the Asbestos PI Trust have to pay claims?  *How many cents on*

*the dollar will the Asbestos PI Claimants be paid?*  When will they be paid?  How will the

allowed amount of their claims be determined?  Which insurers will be protected by the

channeling injunction, and what consideration is being provided in exchange for such protection?

One can search in vain through the entire 145 pages of the Disclosure Statement without finding

an answer to these most basic questions.  This massive document is a filibuster, not a disclosure

document.  The Plan Proponents have not even attempted to provide adequate information to

their largest and most key constituency.  For this reason, the Libby Claimants object to

Disclosure Statement in its entirety and request that it be summarily disapproved and the Plan

Proponents instructed to go back to the drawing board and produce a document that is worthy of

this Court's and parties' review.

> **3.     The Disclosure Statement is Inadequate Because Plan Proponents
> Have Reserved the Right to Change Material Provisions of the Plan
> Without Further Disclosure**

The Plan provides that it may be modified prior to the Confirmation Date.[139]  The

accompanying Exhibit Book may be amended, supplemented, or modified "from time to

time."[140]  Further documents will be filed in connection with the Plan even as late as the

Effective Date.[141]  And, Plan Documents may be amended even after the Effective Date.[142]  Any

reference in the Plan to a document that has been amended, modified or supplemented

---

[139] Plan § 4.1.1.

[140] Plan § 1.1(98).

[141] Plan § 11.14.

[142] Plan § 4.1.2.

automatically refers to the revised document.[143]   Obviously, these provisions are prudent and reasonable as they relate to non-material changes.

The Plan Proponents appear to have in mind something more draconian.  For example, one of the most important terms of the TDP is the Initial Payment Percentage, *i.e.*, the percentage of the liquidated value of each Asbestos PI Claim that will be paid by the Asbestos PI Trust, at least to those claimants lucky enough to have their claims paid in the early months of the trust. That amount has been left blank in the version of the TDP contained in the Exhibit Book.[144] Unless that figure—along with the basis therefor, the risk that it might change in years after the Effective Date, and other important information—are disclosed in the Disclosure Statement[145] *and not changed thereafter*, the Disclosure Statement cannot comply with the requirements of the Bankruptcy Code but, even more fundamentally, Asbestos PI Claimants will be denied due process of by law reason of having inadequate notice of and opportunity to object to a material element of the Plan.

To take another example, the proposed Asbestos PI Channeling Injunction[146]—obviously, a fundamental aspect of the Plan—by its terms will protect each Asbestos Protected Party.  This is defined to include the Settled Asbestos Insurance Companies,[147] who are in turn defined to consist of any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement and that is listed in Exhibit 5 to the Plan.[148]  At the moment, Exhibit 5 simply says "to follow."  The names of the Settled Asbestos Insurance Companies and the terms on which

---

[143]  Plan § 1.2(c).

[144]  Exhibit 4.

[145]  As noted in the previous point, the Libby Claimants and other parties in interest are entitled to adequate time to respond to the proposed language of disclosure, and to understand the underlying facts.

[146]  Plan § 8.2.

[147]  Plan § 1.1(42)(d).

[148]  Plan § 1.1(183)(i).

their insurance coverage has been settled are a material aspect of the treatment of Asbestos PI Claims.[149] Unless the names of the Settled Asbestos Insurance Companies and the terms on which their insurance coverage has been settled are disclosed in the Disclosure Statement[150] *and not changed thereafter*, the Disclosure Statement cannot comply with the requirements of the Bankruptcy Code. And, even more fundamentally, Asbestos PI Claimants will be denied due process of by law reason of having inadequate notice of and opportunity to object to a material element of the Plan.

### B.   The Disclosure Statement Should Not be Approved in its Present Form Because it Lacks Adequate Information

The Bankruptcy Code requires that a disclosure statement contain "adequate information," defined to mean:

> information of a kind, and in sufficient detail . . . , including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed decision about the plan . . . .

11 U.S.C. § 1125(a)(1), (b). Under the Plan, all creditors are being paid in full except for Asbestos PI Claimants. Thus the Asbestos PI Claimants are the creditors whom the Disclosure Statement should focus on assisting to make an "informed decision" about the Plan. As noted above, the Disclosure Statement is so lacking in basic information material to the Asbestos PI Claimants that a point-by-point response to the Disclosure Statement should not be required. However, in the event that this Court wishes to consider specific objections to the Disclosure Statement in its present form, the Libby Claimants' objections are as follows.

---

[149] Asbestos Insurance Rights will be pursued for the benefit of the Asbestos PI Trust. Plan § 7.2.2(d).

[150] As noted in the previous point, the Libby Claimants and other parties in interest are entitled to adequate time to respond to the proposed language of disclosure, and to understand the underlying facts.

1.      **Nature of Asbestos PI Claims**

The sole description of the Asbestos PI Claims consists of the two paragraphs constituting Section 2.7.1 of the Disclosure Statement.[151]  The following additional information should be provided:

•       *How many Asbestos PI Claims are expected to be asserted, and in what amounts and disease categories?*  This information is relevant because the Asbestos PI Trust will process and liquidate claims by disease category.

•       *How many prepetition judgments are outstanding and unpaid, and in what amounts?*  This information is relevant because the Asbestos PI Trust will pay these claims in accordance with the judgment amount rather than according to the standards applicable to other claimants.

•       *How many prepetition settlements are outstanding and unpaid, and in what amounts?*  This information is relevant because the Asbestos PI Trust will pay these claims in accordance with the terms of settlement rather than according to the standards applicable to other claimants.

•       *How many Asbestos PI Claims consist of (and over the life of the Asbestos PI Trust, are projected to consist of) claims for wrongful death, and in what amounts?*  This information is relevant because the Asbestos PI Trust will categorically disallow all claims for wrongful death.

•       *How many Asbestos PI Claims consist of (and over the life of the Asbestos PI Trust, are projected to consist of) claims for punitive damages, and in what amounts?*  This information is relevant because the Asbestos PI Trust will categorically disallow all claims for punitive damages.

2.      **How Asbestos PI Claims Will be Treated**

The chart that appears early in the Disclosure Statement to summarize the treatment of various classes of claims indicates for Asbestos PI Claimants, in the column labeled Estimated Percentage Recovery, "Unknown."[152]  The brief summary of the treatment of Asbestos PI Claims in the chart indicates simply that the claims will be paid through the Asbestos PI Trust.  Nor does

---

[151]  Disclosure Statement § 2.7.1 (page 26).  Some additional historical data on asbestos personal injury litigation can be gleaned from the previous section 2.7 (pages 25-26).

[152]  Disclosure Statement, page 16.

the discussion concerning treatment of Asbestos PI Claims[153] or the Asbestos PI Trust[154] provide

such basic information as the percentage payment to Asbestos PI Claims, the value of the assets

that the Asbestos PI Trust will receive, and what its financial position is projected to be over its

lifetime.  Therefore, the following additional information should be provided:

> • ***Which Asbestos PI Claims will be eligible for payment from the Asbestos PI Trust?*** This information is relevant because the terms of the TDP provide for the Asbestos PI Trust to pay "PI Trust Claims." This term appears not to have been defined in the Plan, Asbestos PI Trust Agreement or TDP.

> • ***What are the values of the assets that will fund the Asbestos PI Trust on the Effective Date?*** This information is relevant because it is a basic financial term concerning treatment of Asbestos PI Claims.

> • ***What percentage of the liquidated amount of each Asbestos PI Claim will be paid?*** This information is relevant because for creditors in a bankruptcy case, the number of cents on the dollar that will be paid on their claims is perhaps the single most fundamental piece of information that a disclosure statement should contain. Yet the Disclosure Statement says nothing about it. The provision of the TDP specifying the initial Payment Percentage has been left blank.

> • ***Will the Payment Percentage remain the same throughout the life of the Asbestos PI Trust?*** This information is relevant because Asbestos PI Claimants need to understand whether the Asbestos PI Trust is skewed in favor of claimants who, under the terms of the TDP, will be favored with the ability to get their claims allowed at a relatively early date.

> • ***What are the projected sources and uses of cash for the Asbestos PI Trust over its lifetime?*** This information is relevant because, in order to assess whether the Plan is a good deal for Asbestos PI Claimants, it is crucial for them to understand the projected financial position of the Asbestos PI Trust.

> • ***How great is the risk that the Asbestos PI Trust will become insolvent, or will significantly delay payment of claims by reason of insufficient funds?*** This information is relevant because, while this risk is present in any asbestos case under which a Section 524(g) trust is established, it is particularly acute in this case because it appears that there will be no transfers of assets to the trust between the Effective Date and the year 2019, when Grace's installment payments are scheduled to begin.

---

[153] Disclosure Statement § 4.3.1.6 (page 80).

[154] Disclosure Statement § 4.7.2 (pages 87-89).

3.    **Claims Allowance**

The Disclosure Statement provides no information whatsoever on how the Asbestos PI Trust will liquidate claims.[155]  Therefore, the following information should be provided:

•    ***In plain English, what is the process for allowance of claims under the TDP?*** This information is relevant because, unlike the typical bankruptcy claims-allowance process where the bankruptcy court determines the amount of any disputed claims pursuant to defined legal standards, in this case the Asbestos PI Committee has written its own standards for allowance of claims in the form of the TDP—a complex legal document whose workings need to be explained to the average Asbestos PI Claimant.

•    ***With respect to Libby Claims, how does the TDP implement its professed goal of liquidating claims in accordance with their value in the tort system?***  This information is relevant because it will assist the Libby Claimants in understanding whether they will be treated fairly, and in accordance with their legal rights, under the Plan.

•    ***How many claimants, and in what disease categories and amounts, are projected to use Expedited Review and how many are projected to use Individual Review?*** This information is relevant because it will assist Asbestos PI Claimants in understanding how the TDP's claims allowance process is expected to work.

•    ***How many claimants, and in what disease categories and amounts, are projected to use mediation and/or arbitration?***  This information is relevant because it will assist Asbestos PI Claimants in understanding how the TDP's claims allowance process is expected to work.

•    ***How many claimants, and in what disease categories and amounts, are projected to seek to liquidate their claims by seeking a judgment in the tort system?***  This information is relevant because it will assist Asbestos PI Claimants in understanding how the TDP's claims allowance process is expected to work.

•    ***How many claimants, and in what disease categories and amounts, are projected to qualify for treatment as Extraordinary Claims?***  This information is relevant because it will assist Asbestos PI Claimants in understanding how the TDP's claims allowance process is expected to work.

•    ***What is the relationship between the values established by the TDP (Scheduled Values and Maximum Values), and Grace's history of verdicts and settlements?***  This information is relevant because it is necessary for Asbestos PI Claimants to be able to compare the liquidated claim value they are being offered under the Plan with the liquidated claim value to which they are entitled by law, namely, the value of their claim in the tort system.

---

[155]  See Disclosure Statement §§ 4.3.1.6 (page 80) and 4.7.2 (pages 87-89), which purport to describe treatment of Asbestos PI Claims and the Asbestos PI Trust.

• *For Libby Claimants specifically, what is the relationship between the Scheduled Values and Maximum Values for which they will be eligible under the TDP, and Grace's history of verdicts and settlements?* This information is relevant because it is necessary for the Libby Claimants to be able to compare the liquidated claim value they are being offered under the Plan with the liquidated claim value to which they are entitled by law, namely, the value of their claim in the tort system, and to compare the proposed treatment of Libby Claims with the proposed treatment of other Asbestos PI Claims.

• *In the case of a claim that is ineligible under the terms of the TDP to be liquidated in an amount corresponding to its value in the tort system, what is the rationale for the TDP to require the claimant to waste his own and the Asbestos PI Trust's time and resources by proceeding with Individual Review, mediation and arbitration before being permitted to seek a judgment in the tort system?* This information is relevant because it will assist the Libby Claimants—most of whom are ineligible under the terms of the TDP from obtaining the tort-system value of their claims—to understand the basis on which the TDP has been structured.

• *What is the rationale for the TDP to pay claims liquidated in the future by judgment in the tort system on a delayed basis compared with other claims?* This information is relevant because (especially considering the oddity of a group of tort lawyers drafting a Plan provision that discriminates against jury verdicts) it will assist Asbestos PI Claimants to understand why payment of claims based on jury verdicts will be stretched out over a ten-year period while other claims will be paid right away.

• *Will wrongful death claims be categorically disallowed under the TDP and, if so, why?* This information is relevant because holders of wrongful death claims have the right to know how they will be treated under the Plan, and why.

• *Will punitive damages claims be categorically disallowed under the TDP and, if so, why?* This information is relevant because holders of punitive damages claims have the right to know how they will be treated under the Plan, and why.

• *Why does the Asbestos PI Committee advocate acceptance of the Plan when the Payment Percentage for Asbestos PI Claims will be far less than 100%, while other creditors are being paid 100% plus interest and Grace's stockholders will retain value that the Disclosure Statement estimates at more than $1.3 billion?* This information is relevant because, in order for Asbestos PI Claimants to determine whether to accept the Plan, they need to understand why the apparently discriminatory treatment of their claims can actually be viewed as a good deal, for example, if Asbestos PI Claims of dubious validity are being liquidated on favorable terms at the expense of the holders of legitimate claims such as the Libby Claimants.

### 4.   Insurance

The Disclosure Statement fails to accurately and completely describe Asbestos Insurance

Rights, especially those related to premises/non-completed operations coverage.[156]    The

discussion of primary insurance coverage should be corrected so as to include a reference to

insurance from Royal Indemnity Company for the period 1954-1963.  Products coverage was

settled, but the Libby Claimants assert that premises coverage (the type available to cover Libby

Claims) remains outstanding.  The Disclosure Statement should also disclose that the Libby

Claimants assert that Grace's settlement with Maryland Casualty Company does not preclude

them from premises coverage under the settled policies.  Finally, the following additional

information should be provided:

> •    *What is the projected value of the Asbestos Insurance Rights constituting products/completed operations coverage, and what is the projected aggregate liquidated amount of the Asbestos PI Claims covered by such insurance?*  This information is relevant because, while the Plan provides for Asbestos Insurance Rights to be pursued for the *pro rata* benefit of all Asbestos PI Claimants, the two types of Asbestos PI Claims (products/completed operations claims versus premises/non-completed operations claims) are contributing Asbestos Insurance Rights of differing value.

> •    *What is the projected value of the Asbestos Insurance Rights constituting premises/non-completed operations coverage, and what is the projected aggregate liquidated amount of the Asbestos PI Claims covered by such insurance?*  This information is relevant because, while the Plan provides for Asbestos Insurance Rights to be pursued for the *pro rata* benefit of all Asbestos PI Claimants, the two types of Asbestos PI Claims (products/completed operations claims versus premises/non-completed operations claims) are contributing Asbestos Insurance Rights of differing value.

> •    *Is any of the primary premises/non-completed operations coverage ("Primary Premises Coverage") subject to an aggregate cap such that there is the need to avoid a race to the courthouse whereby earlier claimants would be covered and later claimants would not?*  This information is relevant because the rationale for and benefit from centralizing pursuit of insurance in an asbestos trust is to avoid a race to the courthouse whereby earlier claimants would be paid and, once the aggregate cap is exhausted, later claimants would not.

### 5.    Injunctions, Releases and Exculpations

In any asbestos Chapter 11 case, injunctions are a critical component of the plan.  The

Disclosure Statement simply sets forth the terms of the injunctions, releases and exculpations

---

[156] Insurance rights are addressed at Section 2.10 of the Disclosure Statement (pages 42-44).

contained in the Plan with no accompanying explanation and in some instances without even identifying the beneficiaries of the injunctions.[157]  As a matter of fair disclosure (not to mention due process), those who will be affected by injunctions, releases and exculpations—primarily the Asbestos PI Claimants—are entitled to a clear explanation of their scope and effect.  This requires including at least the following information:

•   *What is the effect of the proposed injunctions under the Plan on any independent claims that Asbestos PI Claimants may have against parties, such as insurers, that are to be protected by such injunctions?*  This information is relevant because the effect of the Plan on claims against third parties is an important consideration for Asbestos PI Claimants who have such claims in determining how to vote on the Plan.

•   *Specifically as to the Libby Claimants, what is the effect of the proposed injunctions under the Plan on their claims against Maryland Casualty Company, Montana Vermiculite Company and its insurer Royal Indemnity Company and successors, Burlington Northern Santa Fe Railroad and affiliates and the State of Montana?*  This information is relevant because the effect of the Plan on claims against third parties is an important consideration for Asbestos PI Claimants who have such claims in determining how to vote on the Plan.

•   *What effect will the Plan have on the existing preliminary injunction in the adversary proceeding entitled W.R. Grace & Co., et al. v. Margaret Chakarian, et al. and John Does 1-1000 (Adv. Proc. No. 01-771) (the "Chakarian Case"), and, specifically, will such injunction terminate when the Plan-imposed injunctions take effect on the Effective Date?*  This information is relevant because the effect of the Plan on claims against third parties is an important consideration for Asbestos PI Claimants who have such claims in determining how to vote on the Plan.

•   *Who are the Settled Asbestos Insurance Companies, and what are the terms of settlement?*  This information is relevant because in order to give proper disclosure (not to mention notice and opportunity to be heard) concerning an injunction, the parties to be protected by the injunction need to be named.  Although the Plan proposes to protect Settled Asbestos Insurance Companies through an injunction, they are not identified in the Disclosure Statement or any other document, and there is no explanation of the terms of settlement.

•   *What is the effect of the proposed injunctions under the Plan on Primary Premises Coverage?*  This information is relevant to the Libby Claimants as beneficiaries of Primary Premises Coverage, because their ability to recover such coverage is an important consideration concerning whether to accept the Plan.

---

[157]  Disclosure Statement pages 97-108 and 112.

- *In the case of each of the persons protected by any injunction, release or exculpation under the Plan, what specific consideration has been supplied by the beneficiary in exchange for such protection?* This information is relevant because, in addition to consideration being a legal requirement, the consideration being supplied by the beneficiaries of injunctions, releases and exculpations is a factor that Asbestos PI Claimants may wish to consider in deciding whether to vote in favor of the Plan.

- *What causes of action exist against the beneficiaries of the exculpation clause under the Plan?* This information is relevant because in order to understand the effect of the exculpation clause under Section 11.8 of the Plan, Asbestos PI Claimants need to know what claims are being exculpated.

- *Is there any temporal limitation on the exculpation clause under the Plan?* This information is relevant because, if the exculpation clause will excuse not just past misconduct but misconduct that has not even yet taken place, Asbestos PI Claimants are entitled to know that this is the intended effect of the clause.

- *What consideration is each of the parties protected by an injunction, release or exculpation under the Plan supplying in exchange for the protection of such injunction, release or exculpation?* This information is relevant because Asbestos PI Claimants need to be able to evaluate whether the parties protected by injunctions, releases and exculpations have complied with the requirements for such protection, including the "fair and equitable" requirement of Section 524(g).

### 6.    Zonolite Attic Insulation Claims

The Plan does not specify and the Disclosure Statement does not disclose how ZAI claims will be treated. This is a serious omission. Other creditors should be informed in the Disclosure Statement of the outcome of any discussions concerning treatment of ZAI claims.

### 7.    Libby

Finally, the Disclosure Statement contains inaccurate or insufficient information concerning Libby, Montana. Attached hereto as Exhibit A, the Libby Claimants respectfully submit a revised Section 2.6.2 (Libby Vermiculite) and a new Section 2.6.2.1 (Personal Injury Claims from Libby Operations), together with black-lines showing changes from the proposed Disclosure Statement.

48

C.    **The Disclosure Statement Should Not be Approved Because the Plan is Unconfirmable As a Matter of Law**

This Court should deny approval of the Disclosure Statement because the Plan is unconfirmable for the reasons set forth below.[158]  As a general rule, objections to the details of a proposed plan of reorganization are not considered at the disclosure statement stage.  However, when the objectionable provisions of a proposed plan go to its very essence, and where they render the plan uncomfirmable as a matter of law, such objections may appropriately be proffered as objections to the disclosure statement.   In re Felicity Assocs., 197 B.R. 12, 14 (Bankr. D. R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably uncomfirmable on its face.") (internal quotations omitted); In re O'Leary, 183 B.R. 338, 338-39 (Bankr. D. Mass. 1995) ("Courts may refuse to approve disclosure statements that describe plans that cannot be confirmed."); In re Mkt. Square Inn, Inc., 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); In re E. Maine Elec. Co-op., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures.") (internal quotations omitted); In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("[T]his court will not approve a disclosure statement for an admittedly unconfirmable plan."); In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("[A]llowing a facially nonconfirmable plan to accompany a disclosure statement is both

---

[158]  The Libby Claimants intend to object to confirmation of the Plan on other bases as well, and reserve their right to do so.  See Point IV, C, 10 below.

inadequate disclosure and a misrepresentation."); In re Copy Crafters Quickprint, Inc., 92 B.R.

973, 980 (Bankr. N.D.N.Y. 1988) (disclosure statement "approval should be withheld if . . . it is

apparent that the plan will not comply with Code § 1129(a) . . . ."); In re Atlanta W. VI, 91 B.R.

620, 622 (Bankr. N.D. Ga. 1988) ("A court may refuse to approve a disclosure statement when it

is apparent that the plan which accompanies the disclosure statement is not confirmable."); In re

Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) ("[W]here it is readily apparent that the

plan accompanying the disclosure statement could never be legally confirmed[,]" a court should

deny a disclosure statement at the disclosure statement hearing.); In re Pecht, 53 B.R. 768, 772

(Bankr. E.D. Va. 1985) ("[B]ecause the disclosure describes a plan which cannot be confirmed,

the disclosure statement should not be approved."); LAWRENCE P. KING, 7 *COLLIER ON*

*BANKRUPTCY* ¶ 11.25.03[5] (15th ed. Rev. 2004) ("[M]ost courts will not approve a disclosure

statement if the underlying plan is clearly uncomfirmable on its face.").

**1.    The Plan is Unconfirmable Because the Treatment of Libby Claimants Violates the Bankruptcy Code's Policy of Equal Distribution**

In the context of another major asbestos case, the United States Court of Appeals for the

Third Circuit has emphasized: "Equality of distribution among creditors is a central policy of the

Bankruptcy Code." In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004), quoting

Begier v. IRS, 496 U.S. 53, 58 (1990).  Even though it "complies with the literal terms of the

Bankruptcy Code . . . , [a] Plan may impermissibly discriminate against certain asbestos personal

injury claimants." Id.  Thus, courts must "consider the bankruptcy scheme as an integrated

whole in order to evaluate whether Plan confirmation is warranted." Id. at 241.  Noting that the

various groups of asbestos personal injury claimants in Combustion Engineering "appear to

receive a demonstrably unequal share of the limited Combustion Engineering fund," and that no

findings had been made by the bankruptcy court or the district court concerning "whether the most seriously injured asbestos claimants received fair treatment under the Plan," the Third Circuit remanded the case. Id. at 242.

Although the discriminatory scheme hatched by the asbestos claimants' committee in Combustion Engineering was different from the Plan's blatant discrimination against the Libby Claimants, the pattern of behavior is characteristic. The asbestos claimants' committee was controlled by the same majority and represented by the same counsel as in this case. Members of the committee in Combustion Engineering and in this case include the same personal injury lawyers who have filed hundreds of thousands of claims, and been found to have exercised "undue influence"[159] and pocketed inappropriate payments[160] in other asbestos bankruptcies. The Libby Claimants have not appeared in other bankruptcies. For them, Grace is the only debtor from whom they have a right to recover, their claims indisputably result from exposure to Grace's asbestos, and their medical condition is in all instances serious or highly likely to become so. Despite (or perhaps because of) their compelling circumstances, the Libby Claimants have been frozen out of the Plan—an easy target because they are outsiders.

The ruin of Libby is Grace's foremost shame. With no other asbestos producer to look to, Grace's victims in Libby have the greatest need for recovery in this case. On occasions when the Libby Claimants appeared in this Court seeking to pursue claims against third parties who contributed to their distress, this Court viewed those claims as an indirect way to get at Grace, which this Court viewed as the proper source of recovery for the Libby Claimants. Now the Libby Claimants need this Court's help in obtaining a proper recovery from Grace.

---

[159] In re ACandS, 311 B.R. 36, 43 (Bankr. D. Del. 2004).

[160] In re Combustion Engineering, 295 B.R. 459 (Bankr. D. Del. 2003), vacated on other grounds, 391 F.3d 190 (3d Cir. 2004) (Joseph Rice's $20 million fee was disallowed because of a conflict of interest).

The pitifully inadequate compensation that the Libby Claimants are slated to receive under the Plan results from discrimination against the Libby Claimants in the medical criteria and other terms of the TDP, and the inflation of the amounts siphoned to other claimants and their lawyers. The announced goal of the TDP is to pay all claimants "as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[161] Presumably this goal has been achieved—perhaps more than achieved—for Asbestos PI Claimants other than the Libby Claimants. For the Libby Claimants, however, the TDP does not even attempt to meet this goal.

*Mesothelioma.*   Libby Claimants with mesothelioma have obtained verdicts and settlements of $1,506,450.[162] The TDP establishes a Scheduled Value of $180,000 for Disease Level VIII, which is Mesothelioma.[163] In order to obtain a greater amount, a Libby Claimant with mesothelioma must elect Individual Review with its attendant uncertainties and delays. Upon Individual Review, in the sole discretion of the Extraordinary Claims Panel, a Libby Claim may be liquidated for up to eight times the Scheduled Value, but there is no assurance that this will be done, and the Panel's decision is apparently non-appealable, even to an arbitrator.[164] Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $1,440,000—or $66,000 less than the tort system value of the claim. If the claim were allowed

---

[161] TDP § 2.1.

[162] See page 16 above. This and all figures for historic verdicts and settlements have been adjusted to bring forward prepetition figures to current value. This is a necessary step to provide an apples-to-apples comparison between the Libby Claimants' verdict/settlement record and the Scheduled Values used in the TDP. The adjustment factor, which was developed by the Asbestos PI Committee's experts, is the same factor the Asbestos PI Committee used to establish the Scheduled Values under the TDP. The Asbestos PI Committee claims that the Scheduled Values reflect Grace's prepetition verdict/settlement history of Asbestos PI Claims converted to current values through use of the adjustment factor.

[163] TDP § 5.3(a)(3).

[164] See extensive discussion at pages 33-34 above.

at a 4x multiple, the liquidated amount would be $720,000—less than half of the tort system value of $1,506,450.

By electing Individual Review, a claimant forfeits the right to obtain even the Scheduled Value.[165] Assuming, however, that the claimant would receive not less than the Scheduled Value even if Extraordinary Claims treatment were denied, the liquidated value of the claim would be from $180,000 (the Scheduled Value) to $450,000 (the Maximum Value).[166] Maximum Value is the most that can be allowed to a claim other than an Extraordinary Claim under the TDP, whether the claim is determined by Individual Review, mediation, arbitration, or obtaining a judgment in the tort system.[167] Maximum Value is a shortfall of $1,056,000 to $1,326,000 from tort system value. In sum, the Asbestos PI Trust is not even permitted, let alone required, to liquidate Libby Claims for mesothelioma at the tort system value of the claim.

*Lung Cancer.* Libby Claimants with lung cancer have a verdict and settlement history of $532,350.[168] The TDP establishes a Scheduled Value of $42,000 for Disease Level VII, which is Lung Cancer 1.[169] As was just described in the case of mesothelioma, a Libby Claimant with lung cancer may seek a greater amount than the Scheduled Value only by electing Individual Review with its attendant uncertainties and delays. The result will be a liquidated claim value of from one to eight times the Scheduled Value, in the sole discretion of the Extraordinary Claims Panel.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $336,000. This is $196,000 less than the tort system value of a Libby Claim for lung cancer. If

---

[165] "[T]he liquidated value of any PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review." TDP § 5.3(b)(1)(B).

[166] TDP § 5.3(b)(3).

[167] See discussion at pages 25-26 above.

[168] See page 16 above.

[169] TDP § 5.3(a)(3).