the claim were allowed at a 4x multiple, the liquidated amount would be $168,000—less than one-third of the tort system value of $532,350. If Extraordinary Claims treatment were denied, and again assuming that the claim would not be liquidated at less than the Scheduled Value, the liquidated value of the claim would be from $42,000 (the Scheduled Value) to $95,000 (the Maximum Value).[170] The $42,000 figure represents 8% of tort system value (a shortfall of $437,000 to $490,000 from the tort system value of $532,350). Thus, even more extremely than in the case of mesothelioma claims, the Asbestos PI Trust is not even permitted, let alone required, to liquidate Libby Claims for lung cancer at the tort system value of the claim.[171]

*Severe Disabling Pleural Disease.* Libby Claimants with impairment (lung capacity of less than 80%) have obtained verdicts and settlements averaging $550,200.[172] The TDP establishes a Scheduled Value of $50,000 for Disease Level IV-B, which is labeled Severe Disabling Pleural Disease.[173] As discussed earlier, even in the case of Libby Claimants with severe pleural disease (lung capacity of less than 65%), only about 17% will qualify under the improper medical criteria for Severe Disabling Pleural Disease contained in the TDP.[174] For these claimants, seeking a greater amount than the Scheduled Value requires, as for the other claims already discussed, that the claimant elect Individual Review with its attendant uncertainties and delays; and the result will be a liquidated claim value of from one to eight times the Scheduled Value, in the sole discretion of the Extraordinary Claims Panel.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $400,000. This is $150,000 less than the tort system value of the claim. If the claim were

---

[170]  TDP § 5.3(b)(3).

[171]  The analysis and figures for cancers other than mesothelioma or lung cancer are likely to be similar to lung cancer, but there is no verdict/settlement history for this type of Libby Claim.

[172]  See page 16 above.

[173]  TDP § 5.3(a)(3).

[174]  See pages 26-33 above.

allowed at a 4x multiple, the liquidated amount would be $200,000—well under half of the tort system value of $550,200. If Extraordinary Claims treatment were denied, and again assuming that the claim would not be liquidated at less than the Scheduled Value even though this is permitted under the TDP, the liquidated value of the claim would be from $50,000 (the Scheduled Value) to $100,000 (the Maximum Value)[175]—i.e., as little as 9% of tort system value, and a shortfall of between $450,000 and $500,000 compared to the tort system value of $550,200. Thus, as in the case of cancer claims, the Asbestos PI Trust is not even permitted, let alone required, to liquidate Libby Claims for severe pleural disease—even Libby Claimants who meet the inappropriate medical criteria for Severe Disabling Pleural Disease set forth in the TDP—at the tort system value of the claim.

The result will be even worse for the estimated 83% of Libby Claimants who have been diagnosed with severe pleural disease but who do not meet the TDP's improper medical standard for Severe Disabling Pleural Disease. Most will qualify only for Disease Level II, labeled Asbestosis/Pleural Disease,[176] with a Scheduled Value of $2,500.[177] Once again, to seek a greater amount than the Scheduled Value requires the claimant to elect Individual Review with its attendant uncertainties and delays. The result will be a liquidated claim value of from one to eight times the Scheduled Value, in the sole discretion of the Extraordinary Claims Panel.

Even if the claim were liquidated for the full 8x multiple, the liquidated amount would be $20,000—less than 4% of the tort system value of $550,200 and a shortfall in dollars of $530,000. If the claim were allowed at a 4x multiple, the liquidated amount would be $10,000—

---

[175] TDP § 5.3(b)(3).

[176] As discussed earlier, many cannot meet the improperly exclusionary requirement of FEV1/FVC ratio greater than or equal to 65%. Since this requirement is also part of the medical requirement for Disease Level III (TDP § 5.3(a)(3)), these Libby Claimants will fall to Disease Level II.

[177] TDP § 5.3(a)(3).

less than 2% of the tort system value. If Extraordinary Claims treatment were denied altogether, the liquidated value of the claim would be from $2,500 (the Scheduled Value) to $5,000 (the Maximum Value)[178]—*i.e.*, as little as 0.5% of tort system value. Thus, as with all other Libby Claims, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

*Pleural Disease (Impaired).* Libby Claimants with pleural disease who are impaired but not severe (lung capacity between 65% and 80%) are in the same boat as severe claimants who do not meet the TDP's medical criteria for Severe Disabling Pleural Disease. As described in the preceding paragraph, these claims have a tort system value of $550,200 based on verdict/settlement history but will be compensated based on liquidated claim values of from $2,500 to $20,000 under the terms of the TDP. Their liquidated claim values will range from 0.5% of tort system value, to a "high" of less than 4% of tort system value. Here again, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

*Pleural Disease (Unimpaired).* Unimpaired Libby Claimants with pleural disease have claims with a tort system value of $271,170 based on verdicts and settlements.[179] Under the TDP, these claims fall within Disease Level II, with a Schedule Value of $2,500.[180] Even if Extraordinary Claims Panel in its sole discretion liquidated for the maximum permitted 8x multiple, the liquidated amount of the claim would be $20,000. This is about 7% of the tort system value of $271,170 and a shortfall in dollars exceeding $250,000. If the claim were allowed at a 4x multiple, the liquidated amount would be $10,000—less than 4% of the tort

---

[178]  TDP § 5.3(b)(3).

[179]  See page 16 above.

[180]  TDP § 5.3(a)(3).

system value. If Extraordinary Claims treatment were denied altogether, the liquidated value of the claim would be from $2,500 (the Scheduled Value) to $5,000 (the Maximum Value)[181]—*i.e.*, as little as 1% of tort system value. Thus, as with all other Libby Claims, the Asbestos PI Trust is not even permitted, let alone required, to allow the claim at a figure anywhere close to its tort system value.

In sum, the Plan falls far short of meeting Combustion Engineering's requirement for equality of distribution. The TDP has been designed to liquidate Asbestos PI Claims other than Libby Claims at their value in the tort system. For Libby Claims, however, the TDP will result in liquidation at far less than tort system value. Because of the pervasive discrimination against the Libby Claimants, the Plan is unconfirmable as a matter of law.

2.    **The Plan is Unconfirmable Because it Places the Libby Claimants in a Class with Claims that Are Not Substantially Similar**

Section 1122(a) of the Bankruptcy Code provides that a "plan may place a claim or an interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). The Plan creates a single class of asbestos personal injury claims.[182]  In so doing, the Plan violates Section 1122(a) by placing the Libby Claims in the same class as claims that are not substantially similar to them. As a result, the Libby Claimants expect that their votes against the Plan will be overwhelmed by the hundreds of thousands of asbestos claimants who do not have life-threatening asbestos disease (if, indeed, they are sick at all), who may not be able to prove that Grace's asbestos caused their disease, and for whom Grace's insurance has either been exhausted or is capped at amounts capable of only paying pennies on the dollar. This is manifestly unfair to the Libby Claimants, each of whom

---

[181]  TDP § 5.3(b)(3).

[182]  This is *not* required by Section 524(g) of the Bankruptcy Code. To the contrary, Section 524(g) refers to a "class or classes of the claimants whose claims are to be addressed by a trust." 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

faces probability of death from asbestos disease that unquestionably resulted from Grace's asbestos rather than someone else's, and has rights to uncapped insurance.

Whether claims are "substantially similar" is determined with reference to the legal rights and priority inherent in the claim. E.g., In re Fairfield Executive Assoc., 161 B.R. 595, 600 (D. N.J. 1993) (citing In re Greystone III Joint Venture, 995 F.2d 1274, 1278 (5th Cir. 1991)). The statute flatly forbids placing dissimilar claims in the same class. In re Jersey City Medical Center, 817 F.2d 1055, 1060 (3d Cir. 1987). The purpose of this restriction is to assure the integrity of the voting process. See In re Holywell Corp., 913 F.2d 873, 880 (11th Cir.1990) (a plan cannot be confirmed if the classification is designed to manipulate class voting); In re Lumber Exchange, 134 B.R. 354, 357 (D. Mn. 1991) (classifications designed to manipulate voting should be closely scrutinized). On the critical issue of whether to waive the absolute priority rule and the other protections of Section 1129(b), it is only fair that creditors may only be outvoted by other creditors who start off with the same rights. See In re Combustion Engineering, Inc., 391 F.3d 190, 244 (3d Cir. 2004)("[Classification] manipulation is especially problematic in the asbestos context, where a voting majority can be made to consist of non-malignant claimants whose interests may be adverse to those of claimants with more severe injuries.").

In the most obvious example, suppose a secured creditor were placed in a class dominated by general unsecured creditors. If the plan proposed to pay, say, 50 cents on the dollar to all class members, that might seem just fine to general unsecured creditors. But to the secured creditor, who has superior legal rights by reason of his lien, 50 cents might seem like a rotten deal. While it would be fair for this creditor to be outvoted by other creditors holding liens of equal rank in the same collateral, if they were to reach a different conclusion about the

plan, it would not be fair at all for the secured creditor to be outvoted by general unsecured creditors, who have different legal rights.

      **(a)**      **The Libby Claimants' Rights Against Grace Require Them to be Separately Classified**

As discussed earlier, most asbestos personal injury claims against Grace result from alleged exposure to Grace's construction and insulation products.[183] From a legal standpoint, this means their rights against Grace differ from the Libby Claimants' in two important ways. First, the construction materials produced by Grace generally contain chrysotile asbestos—a different type of asbestos fiber than the amphibole asbestos from Libby. When exposure to Grace's products results in nonmalignant asbestos disease, there is about a 20% chance that it will progress. By contrast, for Libby Claimants there is a high probability that their disease will progress.[184] With a probability of death, the Libby Claimants may recover for future medical expenses. With no probability of death, other claimants may not so recover. No doubt the probability of death is an important reason why Libby Claimants obtain significantly larger verdicts and settlements from Grace than other Asbestos PI Claimants, even (indeed, especially) during the early stages of asbestos disease.[185]

Second, claimants who allege exposure to Grace's products face the legal issue of causation: was Grace's asbestos, or someone else's, responsible for the disease? A person exposed to Grace's products (typically, a construction worker) handled asbestos-containing products of many different manufacturers, and might not know or be able to prove that he handled Grace's products at all. The Libby Claimants, by contrast, were unquestionably exposed

---

[183] See page 18 above.

[184] See pages 10-14 above.

[185] See pages 15-16 above.

to Grace's asbestos and have no meaningful exposure to asbestos generated by anyone else. As a result, in the tort system Grace has no causation defense to liability to the Libby Claimants, and Grace has no right to diminish its liability by proving that other asbestos producers bear part of the responsibility for the claimant's injuries.

These differences in the Libby Claimants' legal rights go to the heart of why the Plan is a rotten deal for the Libby Claimants, while the other members of the Asbestos PI Committee have concluded that it is a favorable deal for their clients. The Libby Claimants have much stronger claims against Grace than most Asbestos PI Claimants, resulting in a history of higher average verdicts and settlements. The Libby Claimants have stronger insurance rights than other Asbestos PI Claimants, because coverage for their claims is not subject to aggregate limits. Because of their very different legal rights, the Libby Claims must be separately classified from other Asbestos PI Claims.

> **(b)    The Libby Claimants' Rights Against Insurers Require the Libby Claims to be Separately Classified**

In cases where only the debtor is being discharged or otherwise protected from liability, the issue whether claims are "substantially similar" focuses on the legal character of the claim *as it relates to the debtor*. E.g., In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 670 (Bankr. D. D.C. 1992). Thus, if two creditors have equal rights against the debtor, their claims are substantially similar even if one of the creditors also has rights against a third party such as a guarantor. Of course, this rule makes perfect sense if the creditor's rights against the third party are unaffected by the plan.

Where a creditor's rights against a third party are affected by the plan, the rule must be different.

[C]reditors that have recourse against non-debtors are not similarly situated with creditors that have no such rights; therefore, permitting creditors to pursue non-debtors in no way violates the policy of equal treatment for similarly situated creditors.   In fact, a plan of reorganization that classifies together, for equal treatment, creditors both with and without non-debtor recourse, while eliminating the rights of those with non-debtor recourse, actually undermines the Bankruptcy Code's classification and treatment scheme.   It is an attempt to impose equal treatment amongst creditors whose rights are not "substantially similar," within the meaning of section 1122(a).

\* \* \* \* \*

The creditor rights that are relevant to assessing substantial similarity for purposes of classification are those rights being affected by the plan, which includes non-debtor rights when the plan extinguishes such rights through non-debtor releases. Although it is true that Congress' intended reach for both section 1122(a) and section 1123(a)(4) likely was limited to creditors' claims against the debtor, it is also true that Congress clearly intended that creditors' rights against non-debtors, as a norm, would remain untouched by the debtor's plan of reorganization by virtue of section 524(e).   Assuming arguendo that section 524(e) does not prohibit the plan from altering creditors' non-debtor claims, if the plan does release non-debtor claims, this expanded treatment of claims must lead to a more expansive role for the Bankruptcy Code's treatment and classification provisions.   To put it another way, if the plan departs from the debtor-only default mode with respect to section 524(e), the debtor-only default rules of sections 1122(a) and 1123(a)(4) are no longer appropriate.

Brubaker, "Bankruptcy Injunctions And Complex Litigation: A Critical Reappraisal of Non-Debtor Releases In Chapter 11 Reorganizations", 1997 U. Ill. L. Rev. 959, 982-83 (1997).

In this case, the Plan affects the Libby Claimants' rights not only against Grace, but also Grace's insurers.   The Asbestos PI Channeling Injunction includes within its scope the Settled Asbestos Insurance Companies.[186]   Some or all of Grace's three primary insurers[187] may turn out to be included.[188]   In addition, the Asbestos Insurance Entity Injunction enjoins all claimants

---

[186]  Plan § 8.2.1.  The injunction includes "any other Asbestos Protected Party," which Section 1.1(42)(d) of the Plan defines to include the Settled Asbestos Insurance Companies.

[187]  See pages 36-37 above for a discussion of the three primary insurers.

[188]  The Plan defines Settled Asbestos Insurance Company to mean any Asbestos Insurance Entity that is listed in Exhibit 5.  Plan § 1.1(183)(i).  At the moment, Exhibit 5 simply says "to follow."  The Plan purports to permit the Exhibit Book to be "amended, supplemented, or modified from time to time" (id., § 1.1(98)), and any reference to Exhibit 5 would then mean Exhibit 5 as so amended, modified or supplemented (id., § 1.2(c)).

from pursuing rights against any of Grace's insurers, except as permitted by the Asbestos PI Trust.[189] The apparent purpose of this injunction is to centralize in the Asbestos PI Trust control over and receipt of proceeds from Grace's insurance. Thus, this Court must apply the rule articulated by Professor Brubaker: when a plan affects creditors' rights against third parties, the issue of whether creditors' claims are "substantially similar" for purposes of classification must be measured with reference to the creditors' rights against the third parties as well as their rights against the debtor.

The Libby Claimants must be separately classified because their rights against third parties—specifically, Grace's insurers—are not substantially similar to the rights of the remaining personal injury claimants. The Libby Claims were generated as a result of Grace's operations, as distinct from exposure to Grace's finished products. As described above,[190] Grace's insurance policies contain separate and distinct provisions concerning premises claims (*i.e.*, the Libby Claims) and products claims (*i.e.*, the other Asbestos PI Claims, which result from exposure to Grace's products).

The most important distinction is that Grace's insurance policies contain an aggregate cap on products claims but not premises claims,[191] with two important effects. First, since products claims vastly exceed the caps under Grace's products coverage, this coverage will pay only a small portion of the products claims against Grace.[192] Second, the aggregate caps create the need for pursuit of products coverage to be controlled by the Asbestos PI Trust in order to avoid a race

---

[189] Plan § 8.4.1.

[190] See pages 35-37 above.

[191] See page 37 above.

[192] See Disclosure Statement §§ 2.10.2.3 and 2.10.2.4 describing Grace's non-settled products coverage. While the Plan Proponents have not supplied an estimated value for the coverage (despite the hearing "Estimated Insurance Recoveries"), it is clear that even if the insurers actually stepped up to the plate and paid the face amount of the coverage ($917 million), it would be far less than the Asbestos PI Claims that will be allowed by the Asbestos PI Trust.

to the courthouse whereby the first claimants to obtain judgment against the insurers would obtain a recovery, but there would be nothing left for later claimants once the aggregate caps were exhausted. Indeed, Section 524(g) arguably requires that when insurance proceeds are subject to an aggregate cap, they be administered by an asbestos trust and divided between present and future claims on a non-discriminatory basis.[193]

The Libby Claimants bear an entirely different relationship to Grace's insurance coverage. The lack of any aggregate cap on insurers' liability for Libby Claims means that there is no barrier to a very high percentage recovery by the Libby Claimants from the insurers.[194] Moreover, there is no need for centralized pursuit of the insurers, because there is no aggregate cap that will be exhausted by the first claimants to achieve recovery. These distinct legal rights require separate classification.

The rights of the Libby Claimants in relation to Grace's insurance go right to the heart of the Bankruptcy Code's scheme for classification and voting. As a result of their distinct rights, the Libby Claimants have starkly different considerations from other personal injury claimants in voting whether to accept or reject the Plan. For other claimants, the insurance provisions of the Plan are an unalloyed benefit. By sharing in insurance proceeds attributable to the Libby Claims, the non-Libby claimants will receive more insurance money per claim than they are entitled to on their own. In addition, centralization of collection and distribution of insurance money will avoid the injustice of earlier claimants' receipt of a disproportionate share of the insurance and ensure compliance with the mandate of Section 524(g) requiring non-discrimination against future claims. For Libby Claimants, by contrast, sharing their insurance money with the other

---

[193]  11 U.S.C. § 524(g)(2)(B)(V).

[194]  Recovery of 100% is unlikely because of deductibles, potential issues of allocation among insurers for different years of coverage, and other defenses that insurers can be counted on to attempt.

claimants is dilutive of their recovery, and centralized collection/distribution of insurance money is not required either to assure fairness among existing Libby Claimants or non-discrimination against future claims. The integrity of process of voting on the Plan requires that the Libby Claims be separately classified.

Divergent insurance rights formed the basis for separate classification of certain unsecured claims in In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002). Mahoney Hawkes involved liquidation of a law firm. Unsecured claims entitled to recovery under the debtor's malpractice insurance were placed in a separate class. Id. at 289. Over objection, the court determined that this classification was permissible (which, in the First Circuit, is the same as a determination that separate classification was required[195]) because, while the rights of all general unsecured creditors were the same in relation to the debtor, one class also had rights against the insurer. Id. at 295. This Court, too, has upheld separate classification of creditors with otherwise identical rights on the basis of insurance. In re United States Mineral Prods. Co., 2005 WL 5898300, *23 (Bankr. D. Del. 2005) (Fitzgerald, J.) (claims covered by products liability insurance classified separately from uninsured claims).

    (c)    **Summary**

The Plan Proponents' inclusion of the Libby Claimants in the same class as other asbestos claimants robs the Libby Claimants—probably by design—of the very rights that the Bankruptcy Code's classification and voting scheme was designed to uphold. As Professor Brubaker expresses it: "The danger of inappropriate classification, by combining creditors with substantially different rights, is that classes can be manipulated to produce class assent by diluting the voice of dissenters, placed in classes filled with agreeable creditors." Brubaker,

---

[195] Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984).

"Bankruptcy Injunctions And Complex Litigation: A Critical Reappraisal of Non-Debtor Releases In Chapter 11 Reorganizations", 1997 U. Ill. L. Rev. 959, 987 (1997). This case presents the very situation that concerned the Third Circuit in Combustion Engineering whereby asbestos personal injury claimants with weaker legal rights will swamp other class members with stronger legal rights when all are placed in the same class. In re Combustion Engineering, Inc., 391 F.3d 190, 244 (3d Cir. 2004). The Plan is unconfirmable because it permits the Libby Claimants to be outvoted by Asbestos PI Claimants whose legal rights are not substantially similar.

### 3. The Plan is Unconfirmable Because It Provides Different Treatment to Claims of the Same Class.

Section 1123(a)(4) requires that, for confirmation to be granted, a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Favoring one group of class members is unacceptable because, among other things, such treatment skews the class voting. In re Richard Buick, Inc., 126 B.R. 840, 854 (Bankr. E.D. Pa. 1991). "Although one purpose of section[] …1123(a)(4) is to insure equality of distribution, an equally, if not more, important purpose is to protect the integrity of the voting process in a Chapter 11 case. Voting on a plan is by class. Section 1123(a)(4) prevents a plan proponent from rigging the vote of a particular class by providing for more favorable treatment to a claim that by virtue of its amount controls whether or not the class accepts the plan." In re Rhodes, Inc., 382 B.R. 550, 556 (Bankr. N.D. Ga. 2008). The requirement of "equal treatment" is separate and apart from the "substantially similar" standard of Section 1122, such that a violation of Section 1123(a)(4) prohibits confirmation regardless of whether the requirements of

Section 1122(a) have been satisfied. In re Jersey City Medical Center, 817 F.2d 1055, 1061 (3d Cir. 1987).

A typical Chapter 11 plan will provide equal treatment to claims within a class by paying each claim, on uniform terms, either a specified percentage of its allowed amount or providing each claim a *pro rata* share of a specified pool of assets, again based on the allowed amount of the claim. The typical Chapter 11 plan does not govern allowance of claims (which is handled by the bankruptcy court through the statutory claims allowance process[196]) or disposition of rights against third parties (which are left to each individual claimant to pursue[197]). Thus, in a non-asbestos case, equal treatment of class members is achieved simply by paying all of them the same percentage of their allowed claim.

In asbestos cases where a Section 524(g) trust is established, the practice has arisen for the function of allowing claims to be assumed by the trust. Thus, the Plan provides that Asbestos PI Claims will not be allowed or disallowed, but instead "shall be resolved by the Asbestos PI Trust pursuant to the TDP."[198]  For the most part, the TDP refers to "liquidation" rather than "allowance" of claims, but it amounts to the same thing: the process whereby the trust will determine the amount of the claim which, when multiplied by the Payment Percentage, will constitute the claimant's distribution from the trust.

In asbestos cases where a Section 524(g) trust is established, the practice has arisen for disparities among claimants' rights against third parties (or against different debtors in a multi-debtor case) either to be ignored or addressed through establishment of sub-trusts. The Plan elects the former approach, ignoring rights against third parties. The Plan provides that all

---

[196]  See 11 U.S.C. § 502; Fed. R. Bankr. P. 3007, 3008.

[197]  See 11 U.S.C. § 524(e).

[198]  Id.

claims will be paid from a single trust with a single pool of assets, regardless of the claimants' divergent rights against third parties, the pursuit of which is being enjoined by the Plan.

Because asbestos plans depart from the Chapter 11 norm by including provisions governing allowance of claims and rights against third parties, disparities of treatment regarding claims allowance and third-party rights may form the basis for violation of Section 1123(a)(4). Compliance with Section 1123(a)(4) cannot be assessed, as in a non-asbestos case, simply by determining whether all class members will receive the same percentage and on the same terms.

The Plan lumps all Asbestos PI Claims in a single class[199] but treats them differently, not only concerning claims allowance and rights versus third parties but also the classic subject matter of Section 1123(a)(4): terms on which claims are paid. Specifically, and as more fully explained below, the TDP violates Section 1123(a)(4) by providing differential treatment of Asbestos PI Claims based on (a) the type of asbestos disease, (b) whether the claim is based on a jury verdict, (c) when the claim is liquidated by the PI Trust, (d) whether the claim is for wrongful death, (e) whether the claim is for compensatory or punitive damages. For purposes of Section 1124(a)(4), the issue is not whether different treatment is legally permissible. Even where different treatment is permitted, different treatment of claims *within the same class* is not.

> (a)     **The Plan Violates Section 1123(a)(4) by Providing Different <u>Treatment of Claims in the Allowance/Liquidation Process.</u>**

Concerning allowance of claims, the TDP provides for each claimant to initially elect to be treated in accordance with Expedited Review[200] or Individual Review.[201] Under Expedited Review, the claim is valued in accordance with a grid specifying a different Scheduled Value for different claims based on medical/exposure criteria. If the claimant provides evidence that meets

---

[199] Plan § 3.1.6(a).

[200] TDP § 5.3(a).

[201] TDP § 5.3(b)(1).

the criteria for a particular Disease Level, the claim is valued at the Scheduled Value for the Disease Level.[202]    Under Individual Review, the PI Trust makes a largely discretionary determination of the value of the claim in the tort system based on consideration of factors specified in the TDP.[203]    However, the claim may not be valued at more than the Maximum Value for the particular Disease Level specified in the TDP.[204]    If dissatisfied with the valuation resulting from individual review, the claimant may proceed to mediation,[205] then to binding or non-binding arbitration[206] and then (if non-binding arbitration was elected) to obtain a verdict through the tort system[207]—again capped at the Maximum Value for the particular Disease Level.[208]

The above-described provisions concerning allowance of claims violate Section 1123(a)(4).    Although it has become standard practice in asbestos cases to specify different treatment for different claims within the same class, it is questionable that this practice (which has never been addressed in a reported decision) passes muster under Section 1123(a)(4).    The nine Disease Levels range from Mesothelioma, with a Scheduled Value of $180,000, to Other Asbestos Disease, with a Scheduled Value of $300.    Even if this disparate treatment is permissible, it surely is *different*.    Section 1123(a)(4) requires that all class members be treated the same.

The payment of claims based upon vastly different Scheduled Values might be defended as the "same treatment" on the basis that the Scheduled Values reflect a uniform standard,

---

[202] TDP § 5.3(a)(1)-(3).

[203] TDP § 5.3(b)(2).

[204] TDP § 5.3(b)(1)(B).

[205] TDP § 5.10(b).

[206] TDP § 5.10(a).

[207] TDP §§ 5.11 and 7.6.

[208] TDP §§ 5.10(c) (as to arbitration awards) and 7.7 (as to litigation verdicts).

namely, the value of the claim in the tort system.  Indeed, the TDP sets as the goal of the Asbestos PI Trust "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."[209] However, for the Libby Claimants, this goal is not met (indeed, was not even attempted) by the terms of the TDP.  As explained above, Libby Claims are entitled to receive only a fraction of their tort system value.

The failure to provide Libby Claims with the *right* to be liquidated at tort-system value might be defended on the basis that the Asbestos PI Trust has the *discretion* to liquidate Libby Claims at tort-system value.  This defense must fail for two reasons.  First, since the TDP does not contain medical criteria reflective of reality for Libby Claims, many Libby Claimants will not qualify for a Disease Level where even the Maximum Value, increased for Extraordinary Claims treatment, would reach the level of tort-system value.[210]  Second, relegating virtually all of the Libby Claimants to the discretion of the Asbestos PI Trust, even if it could be defended as reasonable, does *not* constitute the same treatment as the TDP provides other claimants.  Others are provided the right to fair (if not overly generous) treatment *on a non-discretionary basis*. The Plan may not include the Libby Claimants in the same class as other claimants without providing them the same treatment as other claimants, namely, the *right* to have their claims liquidated at tort-system value.

The TDP's failure to provide or even permit fair treatment of the Libby Claimants might be defended on the basis that the TDP provides every claimant with the option to obtain a verdict in the tort system if dissatisfied by the liquidated claim value offered by the trust.  This defense must fail for three reasons.  First, the TDP compels virtually all Libby Claimants to pursue jury

---

[209] TDP § 2.1.

[210] See thorough discussion of this issue at pages 28-33 above.

verdicts in order to obtain tort-system value while almost none of the hundreds of thousands of other claimants will be forced to utilize this option.[211]  For this reason, the TDP most certainly does not provide the same treatment to both groups of claimants.  Second, when a Chapter 11 plan provides all creditors with the option to settle or litigate, the fact that any creditor may elect to litigate does not save the plan from violating Section 1123(a)(4) when the settlement option provides different treatment to members of the same class.  In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986).[212]

Third, while the TDP does confer on every claimant the right to obtain a verdict in the tort system, the TDP *does not require the claim to be allowed in the amount of the verdict*. Rather, the trust's payment of the claim will be based on the *lesser* of the verdict amount or the Maximum Value for the claimant's Disease Level.[213]  For purposes of Section 1123(a)(4), it does not matter whether the treatment is permissible, only whether it is uniform throughout the class. While the TDP assures other claimants that they will receive the tort-system value of their claims, claimants who actually resort to the tort system certainly will not.  B the medical criteria used to establish Maximum Values do not reflect the reality of Libby Claims, the cap on jury verdicts will fall disproportionately—perhaps solely—on Libby Claimants.  This is not the uniform treatment that Section 1123(a)(4) requires.

In sum, the terms of the TDP relating to liquidation of claims do not provide the same treatment to Libby Claimants as to other class members.  Therefore, the Plan is unconfirmable under Section 1123(a)(4).

---

[211]  The Libby Claimants understand that under other asbestos trusts, it is unheard of for claimants to seek judgment through the tort system. This is one of the issues that should be discussed in the Disclosure Statement.  See Point IV, B, 3 above.

[212]  The <u>AOV</u> decision is discussed in greater detail at Point IV, C, 3, (f) below.

[213]  TDP § 7.7.

**(b)    The Plan Violates Section 1123(a)(4) by Providing Different
Payment Terms for Claims Based on Jury Verdicts**

The TDP provides for claims liquidated through obtaining a judgment in the tort system

to be paid differently from other claims.  Other claims are generally paid in a lump sum, based

(with some exceptions) on order of allowance.[214]  Claims based on judgments, however, are

bifurcated, with an initial payment (capped at the greater of the PI Trust's last offer to the

claimant or the award declined by the claimant in non-binding arbitration) based on order of

allowance and the balance *paid in years six through ten following the initial payment.*[215]

Whatever may be said of this discriminatory provision as a substantive matter, claims based on

future judgments are most assuredly being treated differently from other claims.  By failing to

provide the same payment provisions to all claims of the class, the Plan is unconfirmable under

Section 1123(a)(4).

**(c)    The Plan Violates Section 1123(a)(4) by Providing Different
Payment Terms to Later-Allowed Claims**

Where the economic deal is that funds to pay a particular class will be made available

over time rather than paid in full on the effective date, the typical Chapter 11 plan will provide

the same treatment to all class members by paying them in accordance with the same schedule of

installments.  See, e.g., In re Northwestern Corp., 362 B.R. 131, 133 (D. Del. 2007) (describing

plan providing for subsequent *pro rata* distributions).  If a creditor's claim has not yet been

allowed or disallowed when the first installment is due, the creditor's installment is set aside in

reserve, to be paid if and when the claim is allowed.  See, e.g., id. at 134 (describing plan

providing for distribution of surplus funds when claim is allowed for less than reserved amount).

---

[214]  TDP §§ 5.1(c), 5.4(a), 5.4(b).

[215]  TDP § 7.7.

The TDP takes a radically different approach. The TDP provides for the first funds received by the Asbestos PI Trust to be used to pay the earliest-allowed claims.[216] If the Asbestos PI Trust does not have sufficient funds on hand to pay a claim when it is allowed, the claim is placed in a queue for payment in order of allowance.[217] These provisions subject later-allowed claims to later payment and greater risk of non-payment than earlier-allowed claims. This hazard especially awaits claims based on judgments in the tort system, where the TDP stretches out payment over a period of more than ten years.[218] Thus, the Plan does not treat later-allowed claims the same as earlier-allowed claims. This is a self-evident violation of Section 1123(a)(4).

Section 524(g) does not excuse compliance with Section 1123(a)(4). In fact, the two provisions are consistent. Section 1123(a)(4), which requires "the same treatment for each claim," applies by its terms only to present claims, not future demands. Recognizing that future demands cannot possibly receive the exact same treatment as claims because demands do not yet exist when the plan is confirmed, Section 524(g) sets a different standard for demands, namely, that the asbestos trust be set up in a way that provides "reasonable assurance" that future demands will be treated "in substantially the same manner" as present claims.[219] The full text of Section 524(g)(2)(B)(ii)(V) states that

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to

---

[216] TDP § 5.1.

[217] Id. See also TDP § 2.4 concerning establishment of the maximum annual amount to be distributed by the Asbestos PI Trust regardless of greater amount of claims that may have been allowed.

[218] TDP § 7.7.

[219] 11 U.S.C. § 524(g)(2)(B)(ii)(V).

pay, present claims and future demands that involve similar claims in substantially the same manner.[220]

This language does not apply the "reasonable assurance" standard to present claims, only to future demands. Indeed, the Third Circuit has described this provision as "specifically tailored to protect the due process rights of *future claimants*." In re Combustion Engineering, Inc., 391 F.3d 190, 234, n.45 (3d Cir. 2004) (emphasis added). If the language is at all ambiguous in this regard, then it must be construed to apply only to future demands so as to harmonize with Section 1123(a)(4), which would otherwise be given no effect.[221]

Moreover, the provisions of Grace's proposed TDP imposing discriminatory risks and delays on later-allowed claims are contrary to the spirit, as well as the letter, of Section 524(g). That section's reference to "structured, periodic, or supplemental payments" and to "pro rata distributions" strongly suggests that the TDP should not simply pay the earliest claims in a lump sum at what is expected to be the full and final percentage for all claims. Rather, the trust should hold back sufficient reserves so that later-allowed claims get paid, immediately upon allowance, the same percentage that earlier-allowed claims have received, and with no greater risk.

The terms of the deal struck between Grace and the Asbestos PI Committee generate particular risk for claims that are not allowed promptly after the effective date of the Plan. Section 524(g) contemplates that "a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an 'evergreen' source of funding to pay future claims." In re Combustion Engineering, Inc., 391 F.3d 190, 234 (3d Cir. 2004). The Plan, however, does not provide an "evergreen source of funding" from Grace—far from it. After receiving substantial assets on the Effective Date

---

[220] Id.

[221] FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (statutes should be interpreted so as to fit all parts into an harmonious whole).

(largely from sources other than Grace), the Asbestos PI Trust will receive no new assets whatsoever for the next ten years. The payments to be received by the trust in 2019 and thereafter will depend entirely on Grace's financial position at the time.[222] These provisions mean that later-allowed claims are subject to significantly greater risk of delay or failure of payment than are earlier-allowed claims. This risk falls heavily on the Libby Claimants since, as explained above, the TDP has been structured to relegate the Libby Claimants to the most drawn-out course of claims liquidation. Even if this discrimination against later-allowed claims could somehow be defended on the merits, it violates Section 1123(a)(4) by failing to provide the same treatment of present claims without regard to date of allowance.

### (d)    The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Punitive Damages Claims

The TDP provides for disallowance of punitive damages claims, "notwithstanding their availability in the tort system."[223] This definitely constitutes different treatment from other Asbestos PI Claims. For this reason, Section 1123(a)(4) requires that the Plan either place punitive damages claims in a separate class or treat them the same as other claims. See In re Genesis Health Ventures, Inc., 266 B.R. 591, 600 (Bankr. D. Del. 2001) (example of punitive damages claims placed in a separate class, where treated differently).

### (e)    The Plan Violates Section 1123(a)(4) by Providing Different Treatment of Wrongful Death Claims

The TDP provides for wrongful death claims to be included in the same class as other

---

[222] See Plan §§ 1.1(81) (defining Deferred Payment Agreement as obligation of Reorganized Grace-Conn.), 1.1(40) defining Asbestos PI Trust Assets, which include the Deferred Payment Agreement), and 7.2.2. (providing for Asbestos PI Trust to be funded with the Asbestos PI Trust Assets).

[223] TDP § 7.4. Punitive damage claims are included within the definition of Asbestos PI Claims (Plan § 32(i)) and are therefore part of Class 6 (Plan § 3.1.6).

Asbestos PI Claims[224] and automatically disallowed. This treatment is not apparent on the face of the TDP, but the Libby Claimants have been informed by the Asbestos PI Committee that the TDP is intended to accomplish this result.[225]

Categorically disallowing wrongful death claims most assuredly represents different treatment from other Asbestos PI Claims. For this reason, inclusion of wrongful death claims in the same class as other Asbestos PI Claims violates Section 1123(a)(4).

### (f)    The Plan Violates Section 1123(a)(4) by Taking Away the Libby Claimants' Valuable Insurance Rights

As explained earlier,[226] Libby Claims are covered by a different type of insurance than other Asbestos PI Claims. Unlike the products liability insurance covering other claims, the premises insurance for Libby Claims is not subject to an aggregate cap. Yet the Plan provides for insurance proceeds resulting from Libby Claims to be put in the same pool as other insurance proceeds. Because Libby Claimants are being deprived of more valuable rights in order to receive the same benefit (a *pro rata* share of the entire insurance pool), the Libby Claims are being treated differently.

Assessing equality of treatment under a plan requires analysis of not only what the creditor will receive but also what the creditor must give up. In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986). Requiring similarly-situated creditors to give up unequal consideration for the same treatment under a plan necessarily results in unfair treatment. Id. In AOV Industries, all unsecured creditors were placed in one class and each member of that class

---

[224] Wrongful death claims are included within the definition of Asbestos PI Claims (Plan § 32(i)(a)) and are therefore part of Class 6 (Plan § 3.1.6).

[225] In order to be paid by the Asbestos PI Trust, a claimant is required by the TDP to have a Disease Level. In Montana, at least, the wrongful death claim does not belong to the asbestos victim or his estate. Matter of Estate of Pegg, 209 Mont. 71, 81, 680 P.2d 316 (1984). This may be the basis on which the Asbestos PI Committee intends that the Asbestos PI Trust will deny wrongful death claims.

[226] See pages 35-37 above.

was given an "option": (i) tender a release to the third parties funding the plan in exchange for a 13% dividend; or (ii) retain its claim and seek a more substantial recovery by pursuing litigation against the plan funders. Id. at 1150. The creditors within the class, however, had different types of claims against the third parties funding the plan. Some creditors held direct (although unliquidated and disputed) contract claims against the plan funders, while the remaining creditors possessed only derivative claims against the third parties. The D.C. Circuit held that the proposed treatment of unsecured creditors under the plan was inherently unequal, even though unsecured creditors had the option to forego distributions from the plan funders and prosecute their claims against those third parties:

> The most conspicuous [type of] inequality . . . is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some cognizable chose in action — in exchange for the same percentage of recovery.

Id. at 1152.

So it is with the Libby Claimants. Because they are giving up more valuable insurance rights than other members of the same class, the Libby Claimants are not receiving the same treatment as other class members. This is a violation of Section 1123(a)(4).

### 4. The Plan is Unconfirmable Because It Denies the Libby Claimants Their Right to Trial by Jury

The Seventh Amendment to the United States Constitution guarantees the right to trial by jury in civil cases. The constitutional right to trial by jury extends to asbestos personal injury claims in Chapter 11 cases. In re G-I Holdings, Inc., 323 B.R. 583, 607 (Bankr. D.N.J. 2005). In addition, the right to trial by jury of personal injury claims in bankruptcy cases is protected by

statute. 28 U.S.C. § 1411(a)[227] provides: "This chapter [Chapter 87 of Title 28] and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim."[228]

In the case of the Libby Claimants, their jury trial rights for their claims against Grace arise not only under the U.S. Constitution, but also under the Montana constitution. The right to trial by jury under Article II, Section 26, of the Montana constitution is "the same as that guaranteed by the Seventh Amendment." Linder v. Smith, 193 Mont. 20, 23, 629 P.2d 1187, 1189 (1981).

The Supreme Court has recognized that Section 1411(a) guarantees personal injury and wrongful-death claimants the right to jury trials against a debtor notwithstanding its bankruptcy. Granfinanciera v. Nordberg, 492 U.S. 33, 64 n.17 (1989) ("Congress itself, in enacting 28 U.S.C. § 1411, explicitly provided for jury trials of personal injury and wrongful-death claims.") The courts of appeals have also emphasized this right. See In re Clay, 35 F.3d 190, 197 (5th Cir. 1994)(recognizing that Section 1411 singles out personal injury and wrongful death cases for jury trials); Matter of Grabill Corp., 967 F.2d 1152, 1153 (7th Cir. 1992)("[the] only provision related to jury trials, 28 U.S.C. § 1411, preserves this right for personal injury and wrongful death actions"); In re United Missouri Bank, 901 F.2d 1449, 1453 (8th Cir. 1990) (same); American Universal Ins. Co. v. Pugh, 821 F.2d 1352, 1354-55 (9th Cir. 1987)(same).

These judicial statements faithfully follow the legislative history of Section 1411. During floor debate, Senator Heflin stated that "Congress never intended that the filing of a bankruptcy petition by a debtor act as an escape hatch from jury trials." 130 Cong. Rec. S7619 (daily ed.

---

[227] The only exception to this rule, concerning involuntary cases (see 11 U.S.C. § 1411(b)), is irrelevant here.

[228] The reference to "this chapter" means Chapter 87 of Title 28, United States Code, concerning jurisdiction and venue in bankruptcy cases.

June 19, 1984).    Representative Kastenmeier, a ranking majority member of the conference committee, stated unequivocally during House debate on the conference report that "the parties do not lose any right any right to a jury trial that they may have had if the claim had been cognizable outside the bankruptcy context." 130 Cong. Rec. 20,228 (June 29,1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 579, 580.    Although it may be possible, without use of a jury, to estimate personal injury claims for purposes other than liquidation,[229] there is no doubt that for purposes of liquidation the Libby Claimants' right to trial by jury is sacrosanct.

    The Plan is unconfirmable as a matter of law because the TDP overrides the right of the Libby Claimants, and for that matter all other Asbestos PI Claimants, to have the amount of their claims determined by a jury.    The TDP limits any jury verdict to the lesser of the amount determined by the jury or the Maximum Value imposed by the TDP.[230]    To say "in case of conflict between the jury verdict and the TDP, the TDP controls" renders meaningless the opportunity to have the amount of a tort claim determined by a jury.    The TDP also blatantly discriminates against Asbestos PI Claimants who seek to exercise their right to a jury trial by providing that if the jury verdict exceeds the last offer from the Asbestos PI Trust, the increment will not be paid for five years, and even then payment will be stretched out over years six through ten.[231]    This delay in payment is on top of the delay imposed by the TDP in getting to court.    Even though the Libby Claimants are barred by the very terms of the TDP from obtaining a liquidated claim value corresponding to tort-system value,[232] they must go through the time-consuming process of Individual Review, followed by mediation, followed by non-binding

---

[229]    <u>Cf.</u> <u>G-I Holdings</u>, 323 B.R. at 607-617 (extensive discussion of jury right in context of estimation proceeding).

[230]    TDP § 7.7.

[231]    <u>Id</u>.

[232]    See discussion above at Point IV, C, 1.

arbitration before they may proceed in the tort system.[233]  Courts have held that a reasonable

delay for the purpose of mandatory mediation does not violate the right to trial by jury.  But the

terms of the TDP, whereby the lapse of time from claim filing to final payment will approach 15

years for those who elect trial by jury compared with a few months for those who obtain

Expedited Review, place an undue burden on the exercise of a Constitutional right and are

clearly meant for that purpose.  The injury is compounded because payment of interest is barred,

even during the period of artificial delay caused by the discriminatory terms of the TDP.[234]

Those who obtain jury verdicts are also denied "sequencing adjustments"[235] (the TDP equivalent

of interest[236]) even when available to claimants who are otherwise similarly situated.

The Supreme Court has repeatedly emphasized that courts must zealously guard against

impingement of the right to trial by jury.  E.g., Beacon Theatres v. Westover, 359 U.S. 500, 501

(1959) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so

firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury

trial should be scrutinized with the utmost care."); Jacob v. New York City, 315 U.S. 752, 753

(1942) ("The right of jury trial in civil cases at common law is a basic and fundamental feature of

our system of federal jurisprudence which is protected by the Seventh Amendment.  A right so

fundamental and sacred to the citizen . . . should be jealously guarded by the courts.").  The

Supreme Court's mandate that this Court jealously guard the Libby Claimants' right to trial by

jury requires that this Court deny confirmation of the Plan.

---

[233]  See discussion above at Point III, G, 1.

[234]  TDP § 7.7.

[235]  Id.

[236]  See TDP § 7.5.  The term "sequencing adjustment" is used instead of "interest" in order to avoid unfavorable tax treatment.

79

5.    **The Plan is Unconfirmable as a Matter of Law Because it Violates the Libby Claimants' Right to Have Their Claims Allowed in Accordance with Applicable Nonbankruptcy Law**

Under state law, the valid amount of a personal injury claim is the amount provided by a final judgment obtained through the tort system. Claims in bankruptcy cases must be allowed or disallowed under state law except where the Bankruptcy Code otherwise provides. Butner v. United States, 440 U.S. 48 (1979). The TDP violates this rule in two respects. First, as explained above, for most Libby Claims the TDP does not permit the Asbestos PI Trust to voluntarily allow the claim in the amount that could be obtained in the tort system. Second, once the Libby Claimant obtains a judgment through the tort system, the TDP caps the liquidated value of the claim at less than the judgment. If a bankruptcy court (other than by reason of a specific provision of the Bankruptcy Code) were to allow a claim for less than the amount required by applicable nonbankruptcy law, its judgment would be summarily reversed. The Bankruptcy Code, if indeed it permits at all the delegation to the Asbestos PI Trust of the bankruptcy and district courts' claims-allowance function, provides no authority for claims to be allowed in a different amount than would be required of the courts themselves.

6.    **The Plan is Unconfirmable Because It Provides for Injunctions, Releases and Exculpations that are Impermissibly Broad**

The Plan is unconfirmable because it contains injunctions, releases and exculpations that are impermissibly broad. As will be explained below,

- The Asbestos PI Channeling Injunction,[237] the Asbestos Insurance Entity Injunction,[238] the release provision contained in Section 8.8.7 of the Plan (the "Creditor Release") and the exculpation provision contained in Section 11.8 of the Plan (the "Exculpation Provision") impermissibly bar the Libby Claimants and holders of future Libby Claims from pursuing their independent claims;

---

[237] Plan § 8.2.

[238] Plan § 8.4.

- The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction and the Creditor Release impermissibly bar the Libby Claimants and holders of future Libby Claims from pursuing insurers for payment under premises/non-completed operations coverage containing no aggregate cap on insurers' liability; and

- The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction, the Creditor Release and the Exculpation Provision may not be imposed on the Libby Claimants and on future Libby Claimants because the Plan is not fair and equitable as to them.

Because these provisions overstep the bounds of the Bankruptcy Code, the Plan is unconfirmable as a matter of law.

> **(a)    Injunctions May Protect Third Parties Only from Claims within the Four Categories Expressly Permitted by Section 524(g) and Only if the Third Party Will Make a Substantial Financial Contribution**

In conjunction with a Chapter 11 plan governed by Section 524(g), courts may not enter injunctions inconsistent with the limitations of Section 524(g).  In re Combustion Engineering, 391 F.3d 190, 235-38 (3d Cir. 2004).  Section 524(g) permits injunctions to protect claims arising out of the four specific relationships with the debtor set forth in Section 524(g)(4)(A)(ii) (the "Four Categories").  In a plan based on Section 524(g), an injunction may not bar claims based other than on the Four Categories.

Even if a claim against a third party falls within the Four Categories, the third party may be protected by an injunction only if "fair and equitable . . . in light of the benefits provided, or to be provided, to [the asbestos] trust on behalf of such . . . third party."  11 U.S.C. § 524(g)(4)(B)(ii).  Largely this has been construed to mean that in order to be protected by an injunction, a third party must make a substantial financial contribution to the plan.  In re Congoleum Corp., 362 B.R. 167, 179-80 (Bankr. D.N.J. 2007), and authorities cited therein.

(b)    **The Plan Injunctions, Releases and Exculpations Violate Section 524(g) by Protecting Third Parties from Claims Outside the Permissible Four Categories**

The Asbestos PI Channeling Injunction, by its terms, goes far beyond enjoining third-party claims that fall within the Four Categories.  The Asbestos PI Channeling Injunction provides that "all present and future Holders of Asbestos PI Claims . . . permanently and forever shall be stayed, restrained and enjoined from taking any and all legal or other actions . . . for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on or with respect to any Asbestos PI Claims . . . other than from the Asbestos PI Trust . . . ."[239]  This language does not limit the injunction to the Four Categories but, rather, prohibits collection of Asbestos PI Claims from any party based on any legal theory regardless of whether the claim may be enjoined under Section 524(g)(4)(A)(ii).  For example, the quoted language would prohibit the Libby Claimants from continuing to prosecute their legal actions against the State of Montana, Maryland Casualty Company or BNSF based on their own tortious conduct with respect to the Asbestos PI Claims of the Libby Claimants.  The Plan is unconfirmable unless an express limitation is added to the Asbestos PI Channeling Injunction limiting its effect to the Four Categories permitted by Section 524(g)(4)(A)(ii).

Other clauses of the Asbestos PI Channeling Injunction appear to bar the Libby Claimants from pursuing claims against Maryland Casualty Company (and other Grace insurers) based on the insurers' independent torts in relation to the Libby Claimants.  The Asbestos PI Channeling Injunction contains multiple provisions protecting "Asbestos Protected Parties."  For example, the Asbestos PI Channeling Injunction provides that any holder of an Asbestos PI Claim "shall have no right at any time to assert its Asbestos PI Claim . . . against . . . any . . .

---

[239]  Plan § 8.2.1.

Asbestos Protected Party . . . ."[240]  And the Asbestos PI Channeling Injunction bars anyone from

suing an Asbestos Protected Party in any way related to an Asbestos PI Claim,[241] or enforcing a

judgment,[242] creating a lien,[243] and so on.  Asbestos Protected Parties include Settled Asbestos

Insurance Companies.[244]   A Settled Asbestos Insurance Company is "an Asbestos Insurance

Entity that has entered into an Asbestos Insurance Settlement Agreement; *but only* with respect

to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified . .

. in Exhibit 5 in the Exhibit Book."[245]  The "*but only*" clause, which was obviously intended to

preserve claims under non-settled insurance policies, might also be construed to preserve claims

not based on any insurance policy at all, *i.e.*, independent claims.  But the Libby Claimants

should not be required to litigate this issue in the future when they pursue their independent

claims against, for example, Maryland Casualty Company.[246]  Instead, the Plan should expressly

provide that independent claims are reserved from the Asbestos PI Channeling Injunction.[247]

The Asbestos Insurance Entity Injunction also, by its terms, would enjoin the Libby

Claimants from pursuing independent claims against entities that happen to be insurers of Grace.

The Asbestos Insurance Entity Injunction bars assertion of "any claim, demand or cause of

action against any Asbestos Insurance Entity, based upon, arising out of, or in any way

---

[240]  Plan § 8.2.1.

[241]  Plan § 8.2.1(a).

[242]  Plan § 8.2.1(b).

[243]  Plan § 8.2.1(c).

[244]  Plan § 1.1(42)(d).

[245]  Plan § 1.1(183).

[246]  The Libby Claimants have brought suit against Maryland Casualty Company, which served as Grace's workers compensation insurer and is thus an Asbestos Insurance Entity that may become a Settled Asbestos Insurance Company, because Maryland Casualty (through its engineering and medical divisions) undertook to design an adequate industrial hygiene program for the Libby mine, but negligently failed to do so.

[247]  Plan § 8.2.2 already contains a series of reservations from the Asbestos PI Channeling Injunction.

connected with any Asbestos PI Claim or Demand . . . ."[248]  An Asbestos Insurance Entity may

properly be protected against claims based on its "provision of insurance to the debtor or a

related party" since that is one of the Four Categories of claims as to which an injunction is

permitted.[249]  But since the Asbestos Entity Injunction contains no such limitation, it will by its

terms bar the assertion even of independent claims against entities that happen to be Asbestos

Insurance Entities.  As in the case of the Asbestos PI Channeling Injunction, the problem can

(and must) be solved by expressly reserving independent claims from the effect of the Asbestos

Insurance Entity Injunction.

The Creditor Release also goes beyond the permissible Four Categories.  The Creditor

Release provides:

> [E]ach Holder of a Claim . . . who votes in favor of the Plan *or receives or retains*
> *any property under this Plan* shall be deemed to unconditionally have released the
> Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured
> Creditors' Committee, the Asbestos PI Committee, the Equity Committee, the
> Asbestos PI FCR, and the Asbestos PD FCR, and each party's Representatives, as
> of the Effective Date, from any and all Claims . . . based in whole or in part upon
> any act or omission, transaction, agreement, event, or other occurrence taking
> place on or before the Effective Date in any way relating or pertaining to, the
> Debtors or the Reorganized Debtors, their operations on or before the Effective
> Date, their respective property, the Chapter 11 Cases, or the negotiation,
> formulation and preparation of this Plan . . . .[250]

This provision has the same effect as an injunction, in that it will bar present and future Libby

Claimants from asserting causes of action belonging to them (not the bankruptcy estate) that they

would otherwise have the right to assert.  This provision is coercive in the sense that it applies

even to those who vote against the Plan and do not consent to the release, but who are unwilling

or unable to turn down whatever paltry distribution the Plan has to offer.  If proper at all, which

---

[248]  Plan § 8.4.1.1(a).

[249]  11 U.S.C. 524(g)(4)(A)(ii)(III).

[250]  Plan § 8.8.7 (emphasis added).

it is not (see Point IV, C, 6, (d) below), the Creditor Release must be limited to the Four

Categories of claims that Section 524(g) permits to be enjoined.

The Exculpation Provision, too, goes beyond the permissible Four Categories.    The

Exculpation Provision states:

> None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the
> Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Asbestos PI
> Trustees of the Asbestos PI Trust, the Trust Advisory Committee, the Asbestos
> PD Trustees of the Asbestos PD Trust, the Asbestos PI Committee, the Asbestos
> PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the
> Asbestos PI FCR, the Asbestos PD FCR, or any of their respective
> Representatives are to have or incur any liability to any Entity for any act or
> omission in connection with or arising out of the Chapter 11 Cases . . . so long as,
> in each case such action, or failure to act, did not constitute gross negligence or
> willful misconduct.[251]

The Libby Claimants object to this provision as it relates to the Asbestos PI Committee, the

Asbestos PI FCR, the trustees of the Asbestos PI Trust, the Trust Advisory Committee, and their

respective Representatives.  The Exculpation Provision has the same effect on present and future

Libby Claimants as an injunction, in that the Exculpation Provision bars assertion of claims—in

this case, claims for other than gross negligence or willful misconduct against those owing a

fiduciary duty to present and/or future Libby Claimants—that present and/or future Libby

Claimants would otherwise be free to assert.  Claims for breach of fiduciary duty, self-dealing

and the like against official committees, future claims representatives and the like do not fall

within the Four Categories, and so may not be enjoined under a Chapter 11 plan governed by

Section 524(g).  It is bad enough that fiduciaries for the Libby Claimants have used their

positions to betray the legitimate interests of the Libby Claimants.  It is positively appalling that

they are now also trying to insulate themselves from liability for their misdeeds.

---

[251] Plan § 11.8.

(c)  **The Plan Injunctions, Releases and Exculpations Violate Section 524(g) by Protecting Third Parties Who Are Not Making a Substantial Financial Contribution**

The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction, the Creditor Release and the Exculpation Clause are all impermissible as they apply to any protected party that does not make a substantial financial contribution under the Plan. In order to comply with Section 524(g), these provisions must all be limited to named individuals and entities determined by this Court, after notice and an opportunity for the Libby Claimants and all other interested parties to be heard, to be making a substantial financial contribution to the Plan. So far as has been disclosed, the Asbestos PI Committee, the Asbestos PI FCR and their Representatives are not making a financial contribution; they are being, and will continue to be, paid by the bankruptcy estate for their efforts. The Asbestos PI Trust and the Trust Advisory Committee do not even exist; they are certainly not making a financial contribution under the Plan. So far as has been disclosed, Montana Vermiculite Company, Grace's predecessor in Libby, is not making a financial contribution to the Plan. The company is inactive, and all of its assets (including insurance) were taken over by Grace many years ago. The Plan does not even require that a Settled Asbestos Insurance Company make a substantial financial contribution to the Plan, only that the insurer be party to an Asbestos Insurance Settlement Agreement and be listed by the Plan Proponents in Exhibit 5 to the Exhibit Book, which as of the moment has not been disclosed.

As requested above,[252] the Plan Proponents should be required to disclose in the Disclosure Statement which persons are providing consideration under the Plan, and describe the consideration they are providing. This Court should require Grace to prove, at the Confirmation

---

[252] See Point IV, B, 5.

Hearing, that the consideration provided by each such person is sufficiently substantial so that an injunction, release and/or exculpation in that person's favor is fair and equitable as required by Section 524(g). Since the Asbestos PI Channeling Injunction, the Asbestos Insurance Entities Injunction, the Creditor Release and the Exculpation Clause appear to protect persons regardless of whether they are supplying consideration, these provisions render the Plan unconfirmable as a matter of law.

> **(d)  The Plan Impermissibly Provides that Claimants are Deemed to Have Given a Release Merely by Reason of Receiving a Distribution on Account of Their Claims**

The Creditor Release provides that "each Holder of a Claim . . . who votes in favor of the Plan *or receives or retains any property under this Plan* shall be deemed to unconditionally have released" various parties.[253]  A provision deeming a creditor to give a release by reason of receiving a distribution under a plan is impermissible.  In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (Walrath, J.) ("[A] release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected."), and authorities cited therein.  The Plan will be unconfirmable as a matter of law unless the words "or receives or retains any property under this Plan" are stricken from the Creditor Release.

> **(e)  The Plan Impermissibly Enjoins the Libby Claimants' Pursuit of Insurance Coverage as to Which They do not Compete with Each Other or any Other Claimant**

The Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction and the Creditor Release by their terms would preclude Asbestos PI Claimants from pursuing various of Grace's insurers to collect under Grace's insurance policies, without regard to whether or not the coverage being pursued by such claimants is subject to an aggregate cap.  These provisions are

---

[253]  Plan § 8.8.7 (emphasis added).

overbroad, and render the Plan unconfirmable unless an exception is carved out for Grace's insurance that is not subject to an aggregate cap on the insurer's liability.

It is routine in bankruptcy cases for creditors to be freed from any bankruptcy impediment to collecting from the debtor's insurers. In mass tort cases, however, it is common for collection of product liability insurance to be centralized in the bankruptcy estate or a trust for the benefit of creditors whose claims are covered by the insurance. This is necessary because, as previously discussed, the standard products liability insurance policy is subject to an aggregate cap on the insurance.[254]   If claimants were left free to pursue the insurers on their own, the first to collect would get paid and then, once the aggregate limit of coverage was exhausted, later claimants would collect nothing. This would be unfair under any circumstances, and in an asbestos case would most likely violate the statutory mandate to provide reasonable assurance that future claims will be treated the same as present claims.[255]

The Collier treatise explains as follows:

> When the court is reasonably confident that the policy proceeds will be sufficient to satisfy all creditors with claims that may be paid under the policy, the court should grant relief from the stay to permit an action either against the debtor, if necessary, or directly against the insurer. Because the policy proceeds will be available only to creditors with the type of claims covered by the policy, there is no depletion of assets that would otherwise be available to satisfy general, unsecured claims, and there is therefore no reason to delay the creditor seeking to recover under the policy.

3 Collier on Bankruptcy ¶ 362.07[3][a] at 362-85. In In re 15375 Memorial Corp., 382 B.R. 652, 689-90 (Bankr. D. Del. 2008) (Gross, J.), the court found that the availability of insurance on an uncapped basis was a reason for granting a claimant relief from the automatic stay. The court observed that "there can be no legitimate complaint that the estates will be dissipated by

---

[254]  See Point III, G, 2 above (pages 35-37).

[255]  11 U.S.C. § 524(g)(2)(B)(ii)(V).

allowing the litigation to go forward" because, *inter alia*, the subject polices "contain no aggregate coverage limits for a given policy period." Id. On that basis, the court granted relief from the automatic stay.

For the same reason, the Libby Claimants may not be barred from pursuing insurance that is not subject to aggregate coverage limits. As discussed earlier,[256] the Libby Claims are covered by premises rather than products insurance, and unlike Grace's products insurance, Grace's premises insurance is not subject to an aggregate cap. Since the rationale for centralizing collection of insurance proceeds does not exist in the case of Grace's premises insurance, there is no basis for enjoining the direct pursuit of Grace's premises insurers by present and future Libby Claimants. For this reason, the injunctions proposed in the Plan must be rejected as not being fair and equitable. 11 U.S.C. § 524(g)(4)(B)(ii) (court may not enter an injunction protecting insurers unless the court determines that the injunction is fair and equitable).

In sum, the Plan will be unconfirmable unless an exception is carved out from the Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction and the Creditor Release[257] so as to permit the Libby Claimants to pursue Grace's insurers directly for premises coverage.

(f)    **The Plan Impermissibly Enjoins the Libby Claimants Even Though the Plan is Not Fair and Equitable to the Libby Claimants**

The Plan pays other Asbestos PI Claimants based on the tort system value of their claims while the Libby Claimants will receive as little as one-half of one percent of the tort system

---

[256] See Point III, G, 2 above (pages 35-37).

[257] No carve-out from the Creditor Release would be necessary if the phrase "or receives or retains any property under this Plan" is stricken as requested in the previous Point.

value of their claims.[258]  For this reason and because of the other provisions of the Plan cited in

this brief that treat present and future Libby Claimants on an unfair and discriminatory basis, the

Plan is not fair and equitable as to them.  Accordingly, the Libby Claimants may not be the

subject of an injunction under Section 524(g). 11 U.S.C. § 524(g)(4)(B)(ii) (court may not enter

an injunction protecting insurers unless the court determines that the injunction is fair and

equitable).  The Plan is unconfirmable because it enjoins present and future Libby Claimants

through the Asbestos PI Channeling Injunction, the Asbestos Insurance Entity Injunction, the

Creditor Release and the Exculpation Provision.

### 7.    The Plan is Unconfirmable Because It Improperly Usurps the Courts' Function to Modify or Dissolve Preliminary Injunctions

Section 8.7.1 of the Plan provides:

> All of the injunctions and/or automatic stays provided for in or in connection with
> the Chapter 11 Cases . . . in existence immediately prior to the Confirmation Date
> shall remain in full force and effect until the injunctions set forth in this Plan
> become effective, and thereafter if so provided by this Plan, the Confirmation
> Order, or by their own terms.

This provision is improper insofar as it purports to freeze in place an injunction—such as the

preliminary injunction in the Chakarian Case that now prevents the Libby Claimants from

pursuing claims against BNSF—even though (a) there is cause for this Court to dissolve the

injunction, or (b) the injunction is reversed on appeal.  Confirmation of the Plan will provide no

authority for this provision since, as explained above, the permissible scope of the injunctions

that may be granted under a plan is narrower than the preliminary injunctions that this Court has

imposed during the Chapter 11 case.  Most notably, it is clear that the Plan may not enjoin the

Libby Claimants from pursuing claims against third parties whose relationship to the debtor is

outside the ambit of Section 524(g)(4)(A)(ii) of the Bankruptcy Code.  Therefore, during the

---

[258] See Point IV, C, 1 above.

period from the Confirmation Date to the Effective Date, existing injunctions in the Chakarian Case must stand or fall in accordance with this Court's pre-Effective Date jurisdiction.

Section 8.7.1 is also improper insofar as it could be construed to carry forward past the Effective Date any of the preliminary injunctions granted in the Chakarian Case. Section 8.7.1 carries forward existing injunctions until the Effective Date "and thereafter if so provided . . . by their own terms." Elsewhere (see Point IV, B, 5 above) the Libby Claimants have called for disclosure of whether these words are intended to include injunctions, such as those entered in the Chakarian Case, that do not by their own terms specify an expiration date. If the language just quoted is intended to include such injunctions, then the provision is improper; if the language is not intended to include such injunctions, then it should be clarified.

### 8.    The Plan is Unconfirmable Because It Improperly Disallows Punitive Damages Claims

The Plan, through the TDP, categorically disallows punitive damages even while acknowledging that they are available in the tort system.[259] Punitive damages are available to the Libby Claimants under Montana law. Mont. Code Ann. § 27-1-221. Indeed, two of the Libby Claimants obtained an award of punitive damages in the amount of $83,000, but the Montana Supreme Court set aside the award at the Libby Claimants' request and remanded for a new trial on punitive damages because of an improper and prejudicial ruling by the trial judge. Finstad v. W.R. Grace & Co., 301 Mont. 240, 8 P.3d 778, 787 (2000). The new hearing on punitive damages had not commenced when Grace entered Chapter 11 in April 2001.

---

[259] Punitive damage claims are included within the definition of Asbestos PI Claims (Plan § 32(i)) and are therefore part of Class 6 (Plan § 3.1.6(a)), which provides for Class 6 claims to be treated in accordance with the TDP (Plan § 3.1.6(b)(1)). Section 7.4 of the TDP states: "[I]n determining the value of any liquidated or unliquidated PI Trust Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system."

Claims in bankruptcy cases are allowed or disallowed under state law except where the Bankruptcy Code otherwise provides. <u>Butner v. United States</u>, 440 U.S. 48 (1979). Disallowance of punitive damages claims is not required or permitted by Section 502(b) of the Bankruptcy Code. Indeed, the sole provision of the Bankruptcy Code addressing punitive damages applies only to Chapter 7 cases. <u>See</u> 11 U.S.C. § 726(a)(4).

The Supreme Court has held that categorical disallowance of claims is not permitted under the Bankruptcy Code. <u>United States v. Noland</u>, 517 U.S. 535 (1996). <u>Noland</u> concerned post-petition tax penalty claims asserted by the Internal Revenue Service. <u>Id</u>. at 537. The bankruptcy court had subordinated the claims based on what the judge described as the Bankruptcy Code's "preference for compensating actual loss claims." <u>Id</u>. The Supreme Court determined that the bankruptcy court had exceeded its powers under the Bankruptcy Code by subordinating penalty claims on a categorical basis. <u>Id</u>. at 543. Although <u>Noland</u> was a Chapter 7 case, its holding has been extended to Chapter 11. <u>United States v. Reorganized CF & I Fabricators of Utah, Inc.</u>, 518 U.S. 213 (1996).

Based on <u>Noland</u> and <u>CF&I</u>, courts do not have the power to categorically disallow punitive damage claims in Chapter 11 cases. <u>In re A. G. Financial Service Center, Inc.</u>, 395 F.3d 410, 413-14 (7th Cir. 2005). <u>Accord</u>, <u>In re Roman Catholic Archbishop of Portland in Or.</u>, 339 B.R. 215, 227 (Bankr. D. Or. 2006);[260] <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 600-01 (Bankr. D. Del. 2001); <u>In re Infiltrator Systems, Inc.</u>, 248 B.R. 707, 711-12 (Bankr. D. Conn. 2000). <u>See</u> <u>also</u> Grant, <u>How United States v. Noland Prohibits the Disallowance of Punitive</u>

---

[260] Curiously, even after holding that <u>Noland</u> and <u>CF&I</u> prohibited disallowance of punitive damages claims, the bankruptcy court in the Portland Archdiocese case indicated that it would be permissible to place punitive damages claims in a separate class and provide for them to recover only after compensatory claims were paid in full. 339 B.R. at 227-28. Of course, subordination was precisely what <u>Noland</u> and <u>CF&I</u> forbade. In any event, the Plan provides for punitive damages claims against Grace to be entirely disallowed rather than subordinated.

92

_Damage Claims in Chapter 11_, 14 Bankr. Dev. J. 199 (1997).  As Judge Easterbrook of the

Seventh Circuit explained:

> Both the bankruptcy judge and the district judge said that punitive
> damages are unavailable in bankruptcy, because their award would be
> unfair to other creditors, but neither judge attempted to locate this rule in
> the text of the Bankruptcy Code.   Bankruptcy law enforces non-
> bankruptcy entitlements, unless they are modified according to the Code.
> See, e.g., Butner v. United States, 440 U.S. 48 (1979). . . .  [T]he Supreme
> Court has rejected the contention that tax penalties may be disfavored
> categorically, see United States v. Noland, 517 U.S. 535 (1996), strongly
> implying that case-by-case administration of the Code's authority for
> equitable subordination is the right way to deal with all punitive financial
> claims. Thus if state law deems punitive damages unavailable against an
> insolvent defendant, federal bankruptcy courts would follow suit on the
> Butner principle; but if state law allows punitive awards against insolvent
> parties, there is no federal bar . . . .

A.G. Financial, 395 F.3d at 413-14.  Cases predating Noland and CF&I that permit categorical

disallowance of punitive damages claims[261] are no longer valid.[262]

In sum, the Plan is unconfirmable as a matter of law by reason of providing for the

categorical disallowance of punitive damages claims.  Moreover, as a matter of equity, it is truly

stunning that Grace proposes with the connivance of the Asbestos PI Committee to escape all

financial penalty for its history of reprehensible conduct that would fully justify the imposition of

massive punitive damages, while at the same time preserving what the Disclosure Statement

estimates to be more than $1.3 billion of value for its shareholders.[263]

---

[261] E.g., Novak v. Callahan (In re GAC Corp.), 681 F.2d 1295, 1301 (11th Cir. 1982); In re A.H. Robins Co., Inc., 89 B.R. 555 (E.D. Va. 1988); In re Celotex Corp., 204 B.R. 586, 613, 632 (Bankr. M.D. Fla. 1996); Jim Walter Homes, Inc. v. Adams (In re Hillsborough Holdings Corp.), 146 B.R. 1015, 1021-22 (Bankr. M.D. Fla. 1992); In re Johns-Manville Corp., 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part, 78 BR 407 (S.D.N.Y. 1987), aff'd 843 F.2d 636 (2nd Cir. 1988).

[262] The same can be said of a post-Noland decision that fails to cite Noland or CF&I.  In re Dow Corning Corp., 244 B.R. 721, 728-29 (Bankr. E.D. Mich. 1999), rev'd on other grounds, 255 B.R. 445 (E.D. Mich. 2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002)

[263] Disclosure Statement § 2.11.2.6.

9.    The Plan is Unconfirmable Because It Improperly Disallows Wrongful Death Claims.

The Plan, through the TDP, provides for automatic disallowance of wrongful death claims[264]—a violation of Supreme Court precedent barring categorical disallowance of legally valid claims.

Claims in bankruptcy cases are allowed or disallowed under state law except where the Bankruptcy Code otherwise provides. Butner v. United States, 440 U.S. 48 (1979). Disallowance of wrongful death claims is not required or permitted by Section 502(b) of the Bankruptcy. As already demonstrated (see Point E immediately above), the Supreme Court has held that the Bankruptcy Code does not permit categorical disallowance of claims. United States v. Noland, 517 U.S. 535 (1996); United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213 (1996). Although these cases dealt with penalty rather than wrongful death claims, the Supreme Court's rationale—that categorical disallowance of claims is the province of Congress rather than the courts[265]—equally applies to both types of claims. Indeed, Section 524(g) of the Bankruptcy Code expressly requires an asbestos trust established thereunder to "assume the liabilities of a debtor which . . . has been named as a defendant in . . . wrongful death . . . actions seeking recovery for damages allegedly caused by [asbestos]." 11 U.S.C. § 524(g)(2)(B)(i)(I). It hardly seems plausible that Section 524(g) would expressly require wrongful death claims to be assumed by asbestos trusts only to have them be categorically disallowed.

Wrongful death claims are established by statute in Montana. Mont. Code Ann. § 27-1-513. It is clear under Montana law that this right of action extends to at least the spouse and the

---

[264] See Point IV, C, 3, (e) above.

[265] Noland, 517 U.S. at 543

surviving heirs,[266] including children of the deceased, whether they be minors or adults.[267] It may also extend to a grandchild or sibling of the deceased, who can establish a special relationship or dependency on the decedent for support and care.

In a wrongful death action, "damages may be given as under all the circumstances of the case may be just."[268] Generally the damages under this cause of action will include loss of consortium by a spouse,[269] the loss of comfort and society of the decedent suffered by the surviving heirs, and the reasonable value of the contributions in money that the decedent would reasonably have made for the support, education, training and care of the heirs during the respective life expectancies of the decedent and the survivors.[270] No specific pecuniary loss need be shown.[271] Montana is somewhat unique in providing for damages for the sorrow, mental distress or grief recoverable in a wrongful death action:

> Montana, unlike many jurisdictions, allows recovery in a wrongful death action for loss of care, comfort, society and companionship, holding that the speculative nature of such awards is no objection.
>
> * * *
>
> Although Montana has consistently adhered to the requirement [206 Mont. 330] that the loss of society and companionship be susceptible of "pecuniary loss" translation, this Court has refused to require a yardstick for measurement. If a jury can evaluate the intangible loss suffered from not having the decedent's care, comfort and companionship, surely that same jury can be trusted to ascribe damages to grief.[272]

---

[266] Hearn v. Safeco Ins. Co. of Illinois, 329 Mont. 347, 125 P.3d 597, 605-06 (2005), citing Swanson v.Champion International Corp., 39 State Rptr. 639, 646 P.2d 1166 (Mont. 1982).

[267] Bear Medicine v. U.S., 192 F. Supp. 2d 1053, 1067 (D. Mont. 2002).

[268] Mont. Code Ann. § 27-1-323.

[269] Mize v. Rocky Mountain Bell Telephone Co., 38 Mont. 521, 535, 100 P. 971, 974 (1909).

[270] Hennessey v. Burlington Transp. Co., 103 F.Supp. 660, 665 (D. Mont. 1950).

[271] Waltee v. Petrolane, Inc., 162 Mont. 317, 321, 511 P.2d 975, 978 (1973).

[272] Dawson v Hill & Hill Truck Lines, 206 Mont. 325, 329-30, 671 P.2d 589, 591-92 (1983), citing Burns v. Eminger, 84 Mont. 397, 276 P. 437 (1929).

The Montana wrongful death action is separate and distinct from a survival action, which arises under a different statute[273] and allows personal causes of action, including tort actions existing during the lifetime of a person, to survive his death. A survival action belongs to the decedent's estate and may only be pursued by the decedent's personal representative.[274] Damages recoverable in a survival action for the death of the decedent through tort include his lost earnings from the time of his injury to his death, the present value of his reasonable earnings during his life expectancy,[275] the medical and funeral expenses incurred by him as a result of the tort, reasonable compensation for his pain and suffering, and other special damages.[276] The damages recoverable in the survival action are personal to the decedent; they do not include any damages suffered by the decedent's widow, children or other heirs.[277]

Given that the survival action and the wrongful death action are separate and distinct under Montana law, are for the benefit of different people and involve different and non-duplicative damages, the TDP's disallowance of wrongful death claims cannot—as to a Montana wrongful death claim, at least—be justified on the basis that the wrongful death claim will somehow be satisfied through the Asbestos PI Trust's allowance and payment of the claim of the asbestos victim or his estate. Indeed, the wrongful death claim will not even have arisen if the asbestos victim's claim is paid during his lifetime. There is no basis in law for the Plan to make no provision for the allowance and payment of wrongful death claims (at least those arising under Montana law). Such treatment is tantamount to disallowance and forbidden by <u>Noland</u>

---

[273] Mont. Code Ann. 27-1-501.

[274] <u>See</u> Mont. Code Ann. § 72-3-604; <u>Swanson v. Champion International Corp.</u>, 39 State Rptr. 639, 642, 646 P.2d 1166, 1169 (Mont. 1982).

[275] <u>Krohmer v. Dahl</u>, 145 Mont. 491, 496-97, 402 P.2d 979, 982 (1965).

[276] <u>Beeler v. Butte and London Copper Development Co.</u>, 41 Mont. 465, 478, 110 P. 528, 532 (1910).

[277] <u>Swanson v.Champion International Corp.</u>, 39 State Rptr. 639, 646 P.2d 1166, 1169 (Mont. 1982), citing <u>Marinkovich v. Tierney</u>, 93 Mont. 72, 86, 17 P.2d 93, 96 (Mont. 1932).

and <u>CF&I</u>.  In sum, the Plan is unconfirmable as a matter of law by reason of providing for the categorical disallowance of wrongful death claims.

> **10.**    **Other Grounds for Denial of Confirmation Will be Presented at the Confirmation Hearing**

While the Libby Claimants have chosen to present, in the context of consideration of the Disclosure Statement, certain of the grounds requiring denial of Plan confirmation, this memorandum should not be construed as presenting a complete list of the Libby Claimants' objections to confirmation.  The Libby Claimants completely reserve their right to further amplify the grounds for denial of confirmation set forth herein, and to present other and additional grounds, in connection with the confirmation process.

## V.    CONCLUSION

Based on the foregoing, the Approval Motion must be denied.

Dated: October 17, 2008

**LANDIS RATH & COBB LLP**

_(signature)_

Adam G. Landis (No. 3407)
Rebecca L. Butcher (No. 3816)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 600
Wilmington, DE  19801
Telephone:    (302) 467-4400
Facsimile:    (302) 467-4450

- and -

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA 02110
Telephone:    (617) 951-2505
Facsimile:    (617) 951-0679

_Counsel for the Libby Claimants_