IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | Objection Deadline: November 7, 2008 at 4:00 p.m. |
| | ) | Hearing Date: November 24, 2008 at 1:00 p.m. |

**MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING
THE SALE OF CERTAIN ASSETS TO ALCO IRON & METAL CO.**

The Debtors hereby request entry of an order (i) approving their execution of a Real Property Purchase and Sale Agreement and Escrow Instructions (the "Agreement") between W. R. Grace & Co. – Conn. (the "Debtor") and ALCO Iron & Metal Co. (the "Buyer") and (ii) authorizing the sale of certain assets of the Debtor to the Buyer in accordance with the terms and conditions set forth in the Agreement, pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.[2] In support of this Motion, the Debtors state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Agreement, and to the extent of any inconsistency, the Agreement shall govern.

**Jurisdiction**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for this Motion are sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

**Background**

3. The Debtor owns an operating facility located at 2140 Davis Street, San Leandro, CA 94577 (the "Property"). The Property is approximately 5.482 acres and includes buildings, structures, improvements and certain personal property which the Debtor has been using in the operations of a solvent based can sealant plant (the "Sealant Plant").

4. The Debtors have decided to consolidate two of their business units, Engineering Materials and Darex, to form the Materials and Packaging Technologies unit. The consolidation will allow the Debtors to better leverage their assets and consolidate certain manufacturing processes into their Chicago plant. As a result. the Debtors have determined that it would be in their best interest to shut down the Sealant Plant and sell the Property which they no longer need for any of their ongoing business activities.

5. While the Debtors only recently made the final decision to consolidate their business units, shut down the Sealant Plant and sell the Property, they have been discussing the possibility of this action for the past couple of years. In that regard, in approximately May, 2006 the Debtors began conversations with two local real estate brokers and received several unsolicited offers through them. At that time, no formal appraisal was conducted, but based on

2

the conversations with the two brokers and the unsolicited offers, Debtors believed the Property had a fair market value of approximately $5.7 million.

6. More recently, as the Debtors continued to discuss the potential shut down of the Sealant Plant and the sale of the Property, they did obtain a formal appraisal of the Property, dated April 30, 2008, indicating a fair market value of $6 million, and continued to speak with interested purchasers and the two real estate brokers.

7. During the course of the Debtors' discussions with real estate brokers and prospective purchasers, the Debtors were approached by and ultimately received an offer to purchase the Property by the Buyer, which operates a scrap metal business directly across the street from the Property. The Buyer, who seeks to expand its business, expressed an interest in the Property as early as May, 2006 when it made an offer to purchase the Property for $5,700,000.

8. The Buyer still seeks to expand its business and has now agreed to pay $6,500,000 for the Property. The Debtors consider the Buyer's offer to be a very favorable offer for the Property in light of the recently depressed real estate market generally, as well as the fact that there are several comparable properties in the neighborhood where the Property is located that have been on the market for sale for a substantial period of time.

9. The Debtors are also anxious to complete the sale of the Property as soon as possible in order to immediately eliminate any carrying costs that would otherwise be incurred if the Property were to remain idle after the Sealant Plant is shut down by years end. The Buyer has agreed, contingent upon completion of its due diligence, including exploration of financing

terms (which period expires on November 3, 2008), to close the purchase of the Property by the end of 2008 which is when the Sealant Plant is scheduled to be ready for transfer.

10. Due to (i) the Debtors desire to sell the Property as expeditiously as possible in order to avoid the carrying costs associated with the Property; (ii) the uncertainty in the real property marketplace; and (iii) the receipt of an offer to buy the Property for an amount in excess of the appraised value of the Property, the Debtors have determined, in their sound business judgment, to proceed with a private sale to the Buyers rather than continuing to market the Property and conducting a traditional Bankruptcy auction sale process. The Debtors believe that an auction sale process would subject the Debtors' estates to significant market risk with a low probability of identifying a higher and better offer. Furthermore, the Buyer has indicated to the Debtors, that it would not be willing to participate in an auction sale process. Given the fact that the Buyers offer is in excess of the appraised value of the Property, there is a substantial risk that the ultimate sales price via an auction sale could be lower than the price the Buyer is willing to pay under the Agreement.

11. As a result, on September 17, 2008, the Seller entered into the Agreement to sell the Property to the Buyer and seeks the Court's approval to consummate the sales transaction outlined in the Agreement.

### The Agreement

12. The significant terms of the Agreement are as follows:[3]

    a.     <u>Purchase Price</u>: $6,500,000.

---

[3] The summary of the terms of the Agreement set forth herein is provided solely for the convenience of the Court and parties in interest. Nothing in this Motion is intended to modify or otherwise alter the terms of the Agreement. To the extent there is any conflict between the summary set forth herein and the Agreement, the Agreement shall govern. A copy of the Agreement is also included as <u>Exhibit A</u> to the proposed form of order attached.

b.  <u>Due Diligence</u>: Buyer has a forty-five day due diligence period, expiring on November 3, 2008, to conduct investigations, inspections and studies of the Property. Buyer may at any time on or before November 3, 2008 terminate the Agreement by giving written notice to the Debtor if the results of the Buyer's investigations are unsatisfactory to the Buyer in its sole and absolute discretion.

c.  <u>Environmental Due Diligence and Response Actions</u>:

- The Debtor has engaged the services of a professional environmental consultant to prepare a Phase I site investigation for the Property and agreed to provide a copy of the report of that investigation to the Buyer. Additionally, the Debtor agreed to (i) provide the Buyer with a copy of the workplan for a Phase II environmental site assessment, (ii) initiate its implementation and (iii) provide a copy of the report of the assessment to the Buyer. The Debtor agreed to undertake legally required response actions post-closing if required to remediate environmental conditions determined by the Phase II environmental site assessment. The Buyer agreed not to conduct any other subsurface environmental site investigation.

- Either of the Buyer or the Debtor has the right to terminate the Agreement at any time prior to fourteen days following the Buyer's receipt of the Phase II environmental site assessment described below if, in the case of the Buyer, the Phase II environmental site assessment identifies conditions that legally require remedial action that would unreasonably adversely affect the Buyer's ability to conduct its currently contemplated business operations on the Property or, in the case of the Debtor, the Phase II environmental site assessment identifies conditions that that the Debtor concludes would be impractical for the Debtor to address cost-effectively or without unreasonable disturbance of the Buyer's contemplate business operations.

- The Debtor has requested approval from the appropriate local agency of a workplan for Underground Storage Tank closure and a workplan for Hazardous Material Business Plan amendment or closure, subject to retention of permission to operate in the lease-back area (as described below). The Debtors request proposes to clean, inert and remove certain tanks and appurtenances before closing. The cost to comply with these agency requirements is estimated to be $1.3 million. Any other required response actions are to be completed by the Debtors after closing.

d.  <u>Lease Back</u>. Buyer shall enter into a lease back to the Debtor at a rate of $0.10 per square foot per month of the portion of the Property in which the Debtors'

construction products tanks currently sit for an initial term of one year from closing with two one-year renewal options.[4]

e.    Buyer agrees to grant the Debtor, and its agents, consultants and contractors, permission to enter the Property post-closing in order to conduct the response actions agreed to as outlined in c above.

f.    Debtor shall be responsible for the payment of Buyer's broker Lawrence C. Jones, Jr. of Cushman & Wakefield ("Broker") of the commission due to the Broker in the amount of 4.5% of the Purchase Price when the closing occurs.

## Relief Requested

13.    By this Motion, the Debtors respectfully seek the entry of an order, pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Debtors' execution of the Agreement; and (ii) granting the Debtors' authority to consummate the transactions contemplated in the Agreement.

## Basis for Relief

### Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004

14.    This Court has the statutory authority to authorize and approve the Agreement, pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 9019.

15.    Section 105(a) of the Bankruptcy Code provides in pertinent part that "[the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

---

[4] The Debtors operations at the Property for the Sealant Plant will be terminated by the end of 2008; a distribution business in Specialty Concrete will remain on site during the lease period. Production operations in the Sealant Plant have already been transferred to another site and the Debtors are currently only shipping inventory from the Property.

16.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1). This Court may authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by some "articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

17.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction.

### Application of Standards for Approval of a Sale to the Facts of This Case

18.    The Debtors have determined that the disposition of the Property by private sale to the Buyer will produce the highest and best offer for the Property, thereby maximizing the value to the estates, and is in the best interests of the Debtors, their estates and creditors, and the public interest. The Agreement was the product of a rigorous negotiation process and represents a fair and reasonable exchange for the highest and best consideration available.

91100-001\DOCS_DE:141528.3

19. The Debtors believe that, in their business judgment, the Agreement will provide a larger recovery for the Debtors' estates than would be provided by any other viable alternative. The Debtors believe that the amount of the consideration received for the Property is fair and reasonable based upon their investigation and knowledge of the marketplace.

20. Finally, approval of the Agreement benefits the public. As part of the sales process and pursuant to the Agreement, the Debtors will be performing certain environmental remediation. Completion of this remediation is in the public interest as it eliminates the risks associated with the current environmental contamination which may be on the Property.

21. For the above reasons, the Debtors believe that the Agreement represents a fair and reasonable price for the sale of a piece of Property that the Debtors no longer need in their operations and provides the assurance that certain environmental liabilities associated with the Property are remediated.

## Conclusion

22. The Agreement is fair and equitable and in the best interests of the Debtors, their estates, and their creditors, and also in the public interest. Accordingly, the Debtors have demonstrated a sound business justification for the execution and consummation of the Agreement.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, (i) approving the Debtors' execution of the Agreement attached as Exhibit A to the proposed form of order and (ii) authorizing the Debtors to consummate the transaction contemplated thereby.

91100-001\DOCS_DE:141528.3

Dated: October 20, 2008

        KIRKLAND & ELLIS LLP
        David M. Bernick, P.C.
        Janet S. Baer
        200 East Randolph Drive
        Chicago, Illinois 60601
        (312) 861-2000

        and

        PACHULSKI STANG ZIEHL & JONES LLP

        */s/ James E. O'Neill*
        James E. O'Neill (Bar No. 4042)
        Timothy P. Cairns (Bar No. 4228)
        91 9 North Market Street, 17th Floor
        P.O. Box 8705
        Wilmington, Delaware 1 9899-8705
        (302) 652-4 100

        Co-Counsel for the Debtors and Debtors in Possession