## EXHIBIT A

## PROPOSED ORDER

91100-001\DOCS_DE:141528.3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Objection Deadline: November 7, 2008 at 4:00 p.m.** |
| | ) | **Hearing Date: November 24, 2008 at 1:00 p.m.** |

**ORDER AUTHORIZING THE SALE**
**OF CERTAIN ASSETS TO ALCO IRON & METAL CO.**

This matter coming on to be heard on the Debtors' Motion[2] for entry of an order (a) approving the agreement by and between W.R. Grace & Co.-Conn. and ALCO Iron & Metal Co (the "Agreement") attached hereto as Exhibit A.; and (b) authorizing the sale of certain assets of W.R. Grace & Co. -Conn. (the "Property") to ALCO Iron & Metal Co.; all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and it appearing that the Court has jurisdiction over this matter; the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]  Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Agreement (as defined below) and the Motion, and to the extent of any inconsistency, the Agreement shall govern.

of counsel made, and the evidence proffered or adduced, at the hearing on the Motion; it appearing that the relief requested in the Motion and approval of the Agreement and the transactions contemplated thereby is in the best interests of the Debtors, their estates, creditors and other parties in interest; and based on the Motion, the statements of counsel, the record of the hearing on the Motion and the record in these cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby

ORDERED that the Motion is granted and the Debtors execution of the Agreement is hereby approved; and it is further

ORDERED that the Debtors are authorized to take whatever other actions may be necessary to consummate the transactions contemplated by the Agreement; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order; and it is further

ORDERED that this Order is effective immediately upon its entry.

Dated: November ___ , 2008

_____
Honorable Judith K. Fitzgerald
U. S. Bankruptcy Judge

11

# **EXHIBIT A**

# **AGREEMENT**

## REAL PROPERTY PURCHASE AND SALE AGREEMENT
## AND ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of this 11ᵗʰ day of September, 2008 by and between **W. R. Grace & Co. – Conn.**, a Connecticut corporation having an address at 7500 Grace Drive, Columbia, Maryland 21044 ("**Seller**"), and **ALCO Iron & Metal Co.**, a California corporation having an address at 1091 Doolittle Drive, San Leandro, California 94577 ("**Purchaser**").

## WITNESSETH:

In consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, Seller and Purchaser hereby covenant and agree as follows:

## ARTICLE I
## AGREEMENT TO PURCHASE AND SELL

1.01 **Real Property.** Seller hereby covenants and agrees to sell and Purchaser hereby covenants and agrees to purchase, upon the terms and subject to the conditions hereinafter set forth, the following (hereinafter referred to, collectively, as the "**Property**"):

(a) that certain parcel of land located at 2140 Davis Street, San Leandro, CA 94577, in Alameda County, California, containing approximately 5.482 acres, as more particularly described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b) the buildings (the "**Buildings**"), structures and improvements currently situated on the Land;

(c) all right, title and interest of Seller in and to any easements or rights of way appurtenant to the Land (which, along with the Land and Buildings are hereinafter the "**Real Property**");

(d) all right, title and interest of Seller in and to all warranties, guaranties, licenses and permits relating to the Land or the Buildings, to the extent to which the same are assignable as of right by Seller; and

(e) all right, title and interest of Seller in and to the items of personal property owned by Seller and currently located on the Property, except for those items set forth on Exhibit B attached hereto and made a part hereof (the "**Personal Property**").

## ARTICLE II
## DEFINITIONS

2.01 **Definitions.** In addition to all other words, terms and phrases defined in this Agreement, when used in this Agreement, the following words, terms and phrases shall have the respective meanings indicated below:

(a) "Additional Deposit": The sum of One Hundred Thousand Dollars ($100,000.00).

00222545.DOC /

(b)     "Assignment and Assumption Agreement": As defined in Section 8.02(a) below.

(c)     "Bankruptcy Court": As defined in Section 12.01 below.

(d)     "Business Day": Any day other than a Saturday, Sunday or official Federal or State of California holiday.

(e)     "Close of Escrow" or "Closing": As defined in Section 8.01 below.

(f)     "Closing Date": The later to occur of thirty (30) days after the Effective Date or twenty-one (21) days after the receipt of the Phase II ESA (if this Agreement has not been terminated pursuant to Section 4.04 hereof).

(g)     "Deed": A grant deed conveying title to the Real Property in accordance with Section 7.01 below.

(h)     "Deposit": Collectively, the Initial Deposit and the Additional Deposit.

(i)     "Due Diligence Period": The period commencing on the date of full execution hereof and ending at 5:00 p.m. pacific time forty-five (45) days thereafter.

(j)     "Effective Date": As defined in Section 12.01 below.

(k)     "Environmental Due Diligence Period": The period commencing on the date of full execution hereof and ending at 5:00 p.m. pacific time fourteen (14) days after Purchaser's receipt of the Phase II ESA.

(l)     "Environmental Laws": Collectively, all statutes, ordinances, by-laws, rules and regulations, executive orders and other administrative orders, judgments, decrees, injunctions and other judicial orders of or by any governmental authority, now or hereafter in effect, relating to pollution or protection of human health or the environment, including, without limitation, emissions, discharges, releases or threatened releases of Hazardous Substances, or the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

(m)     "Escrow": As defined in Section 8.01 below.

(n)     "Hazardous Substances": Collectively, any chemical, substance, waste, material, gas or emission which is deemed hazardous, toxic, a pollutant or a contaminant, including, but not limited to, petroleum and petroleum products, asbestos, chlorofluorocarbons, radon gas and PCB's.

(o)     "Initial Deposit": The sum of One Hundred Thousand Dollars ($100,000.00).

(p)     "Monetary Encumbrances": Collectively, all Unpermitted Exceptions that are a mortgage or similar encumbrance created voluntarily by Seller or Seller's predecessors in title which secure solely the payment of a stated indebtedness (but excluding any encumbrances arising out of the violation or alleged violation by Seller or any predecessor in title of Environmental Laws).

(q)     "Nonmonetary Encumbrances": Collectively, all Unpermitted Exceptions that are not a

Monetary Encumbrance.

(r)     "Owner's Title Policy":  A CLTA Standard Coverage Policy of title insurance in the face
        amount of the Purchase Price, which reflects that title to the Real Property is vested of
        record in the Purchaser, subject only to the Permitted Exceptions.

(s)     "Permitted Exceptions":  As defined in Section 7.01 below.

(t)     "Phase II ESA":  As defined in Section 4.02 below.

(u)     "Phase II Response Actions":  As defined in Section 5.03 below.

(v)     "Purchase Price": Six Million Five Hundred Thousand Dollars ($6,500,000.00).

(w)     "Purchaser's Default":  As defined in Section 9.01 below.

(x)     "Purchaser's Consultants":  As defined in Section 4.01 below.

(y)     "Purchaser's Investigations":  As defined in Section 4.01 below.

(z)     "Response Actions":  As defined in Section 5.03 below.

(aa)    "Seller Released Parties":   Collectively, Seller, its shareholders, officers, directors,
        employees and agents, and their respective successors and assigns.

(bb)    "Seller's Default":  As defined in Section 9.02 below.

(cc)    "Tank Farm Area":  As defined in Article XI below.

(cc)    "Toluene Release Response Actions":  As defined in Section 5.03 below.

(dd)    "Title Company":  Chicago Title Company, having an address of 2150 John Glenn Drive,
        Suite 300, Concord, CA  94520.

(ee)    "Title Defect Notice":  As defined in Section 7.02 below.

(ff)    "Unpermitted Exceptions":  As defined in Section 7.02 below.

(gg)    "Workplans for Tank Closure":  As defined in Section 5.03 below.

## ARTICLE III
## PURCHASE PRICE AND DEPOSIT

3.01    **Purchase Price and Payment of Purchase Price.**  On the terms and subject to the conditions set
        forth in this Agreement, Purchaser hereby covenants and agrees to pay the Purchase Price in
        lawful money of the United States by federal wire transfer of immediately available funds to the
        Title Company at least two (2) days prior to the Close of Escrow.

3.02    **Deposit.**

        (a)     <u>Making of Initial Deposit</u>.  Purchaser shall deliver the Initial Deposit in immediately

available United States funds within two (2) Business Days of the date hereof into the Escrow provided for in Section 8.01 below.

(b) <u>Making of Additional Deposit</u>.   Unless Purchaser has previously terminated this Agreement in accordance with the provisions of Section 4.04 below, Purchaser shall deliver the Additional Deposit in immediately available United States funds into the Escrow provided for in Section 8.01 below not later than 5:00 p.m. pacific time on the last day of the Due Diligence Period.

(c) <u>Holding and Disposition of Deposit</u>.  The Initial Deposit and the Additional Deposit shall be held by the Title Company and disbursed as follows:

(i) If Purchaser terminates this Agreement in accordance with the terms of this Agreement, Purchaser shall comply with its obligations under Section 4.03(d) below and pay all cancellation charges imposed by the Title Company (except as otherwise expressly provided in this Agreement), and upon such compliance and such payment, the Title Company shall deliver the Deposit together with all interest accrued thereon to Purchaser.

(ii) If the Close of Escrow occurs, Purchaser shall receive a credit at the Close of Escrow against the Purchase Price and any other amounts then payable by Purchaser hereunder in an amount equal to the Deposit, and all interest accrued thereon, and the Title Company shall pay over to Seller at the Closing the Deposit, together with all interest accrued thereon.

(iii) If a Purchaser's Default or Seller's Default occurs, Seller and Purchaser's respective rights concerning the Deposit shall be governed by the terms and provisions of Article IX below.

### ARTICLE IV
### PURCHASER'S INVESTIGATIONS; ENVIRONMENTAL DUE DILIGENCE CONFIDENTIALITY; RIGHT TO TERMINATE

**4.01** **Purchaser's Investigations.**

(a) Subject to the provisions of this Agreement and except for Environmental Due Diligence which shall be governed by Section 4.02 below, during the Due Diligence Period, Purchaser shall have the right, at its sole cost and expense, to conduct or cause to be conducted such investigations, inspections and studies of and with respect to the Property and its intended purchase and use thereof as Purchaser deems necessary or desirable, including, without limitation, (a) reviews of plans, specifications, warranties, contracts and other pertinent documents, (b) exploration of the feasibility of obtaining a financing commitment on terms satisfactory to Purchaser, and (c) exploration of the feasibility of obtaining from the City of San Leandro any necessary conditional use permits or other required licenses and permits (collectively, **"Purchaser's Investigations"**).

(b) Within two (2) Business Days after full execution hereof, Seller shall furnish to Purchaser a copy of each of the following, to the extent available to it:  plans and specifications of the Buildings; engineering reports and certifications (including, but not limited to, structural, roof, sprinkler, plumbing, electrical, mechanical, and civil) relating to the Buildings; copies of warranties, maintenance and service contracts (if any) which are in effect on the date of

4

this Agreement; copies of real estate tax bills for the current fiscal year and the prior fiscal year; copies of utility bills for the past calendar year; copies of governmental approvals, licenses and permits relating to the Real Property; as-built plans; certificates of occupancy; and rail track agreements. Purchaser acknowledges that Seller makes no representation or warranty as to the accuracy or completeness of any materials so provided.

(c)     Any on-site Purchaser's Investigations which are permitted under this Agreement shall be done after twenty-four hours' prior notice to Seller. Unless otherwise approved by Seller in writing in advance, any entry upon the Real Property or performance by Purchaser, its employees, agents, contractors, subcontractors, invitees, consultants and other representatives (collectively, **"Purchaser's Consultants"**) of any of Purchaser's Investigations shall occur only with an authorized designee of Seller present. Purchaser and Purchaser's Consultants shall take all reasonable precautions to minimize the impact of all Purchaser's Investigations on the Property and the activities of Seller. Purchaser shall, immediately after the conclusion of each portion of Purchaser's Investigations, restore the Property to its pre-existing condition.

(d)     Purchaser further assumes all risks associated with the performance of Purchaser's Investigations and agrees to indemnify, defend, and hold harmless Seller, and all of Seller's officers, directors, employees, agents, consultants, invitees, contractors and subcontractors of, from and against any and all costs, losses, claims, defenses, demands, damages, liabilities, and expenses (including, without limitation, reasonable attorneys' fees) arising from, out of, or in connection with, the entry onto the Property by, and the performance of Purchaser's Investigations by, Purchaser or any of Purchaser's Consultants.

(e)     The foregoing restoration and indemnity obligations of Purchaser contained in this Section 4.01 shall survive the Closing or sooner termination of this Agreement.

**4.02    Environmental Due Diligence.**

(a)     Within two (2) Business Days after full execution hereof, Seller shall provide Purchaser with access to the environmental site assessments and other documents listed on Attachment 4.02. These documents describe *inter alia* (i) the presence of contamination associated with releases of toluene in 1985 and 1987 (the **"Toluene Releases"**), which are currently being remediated by Seller in accordance with requirements of the Regional Water Quality Board, and (ii) the existence of permitted underground and aboveground tanks.

(b)     Seller has engaged the services of a professional environmental consultant to prepare a Phase I site investigation for the Property and will at its sole cost provide a copy of the report of this investigation to Purchaser within two (2) Business Days after full execution hereof.

(c)     Within two (2) Business Days after full execution of this Agreement, Seller shall provide Purchaser with a copy of the workplan for Phase II environmental site assessment (the **"Phase II ESA"**) and shall initiate implementation of the Phase II ESA.

(d)     Promptly upon receipt of the report of the Phase II ESA, Seller, at its sole cost, shall provide a copy to Purchaser. Receipt of the Phase II ESA is anticipated to occur by November 15, 2008. Purchaser shall not conduct any other subsurface environmental site

00222545.DOC /

5

investigation.

(e)    Purchaser acknowledges that Seller makes no representation or warranty as to the accuracy or completeness of any materials provided hereunder.

**4.03    Confidentiality and Return of Due Diligence Information.**

(a)    Purchaser agrees that all written materials and information provided by Seller with respect to the Property, and all materials and information obtained by Purchaser from sources other than Seller, that is not already public information or that is obtained pursuant to any agreement of confidentiality shall be held in strict confidence and shall not be disclosed to any third party, including without limitation any governmental agency, except (i) in connection only with the transaction contemplated by this Agreement, to Purchaser's employees, agents, contractors, subcontractors, consultants, attorneys, appraisers and other representatives, in which event Purchaser shall direct each such recipient of such information to maintain the confidentiality of such information, or (ii) as required by law or court order. Notwithstanding the foregoing, Purchaser shall have the right to discuss the Property with representatives of the City of San Leandro; provided, however, that no such discussions involving environmental matters shall be conducted without a representative of Seller being present.

(b)    If for any reason the Closing does not occur, Purchaser shall promptly (i) return to Seller all written and other tangible or electronic materials regarding the Property that Seller has provided to Purchaser and all copies thereof, and (ii) deliver to Seller copies of all written studies, analyses, reports and assessments relating to any of Purchaser's Investigations or to Environmental Due Diligence.

(c)    The provisions of this Section shall survive the termination of this Agreement but shall not survive the Closing.

**4.04    Right to Terminate.**

(a)    Purchaser may, as its sole and exclusive remedy, terminate this Agreement by giving written notice to Seller at any time on or before the expiration of the Due Diligence Period, if the results of Purchaser's Investigations are unsatisfactory to Purchaser in its sole and absolute discretion.

(b)    Either Purchaser or Seller may, as its sole and exclusive remedy, terminate this Agreement by giving written notice to the other at any time on or before expiration of the Environmental Due Diligence Period if (i) in the case of Purchaser, the Phase II ESA identifies conditions that legally require remedial action that would unreasonably adversely affect the Purchaser's ability to conduct its currently contemplated business operations on the Property or (ii) in the case of Seller, the Phase II ESA identifies conditions that Seller concludes would be impractical for Seller to address cost effectively or without unreasonable disturbance of Purchaser's contemplated business activities.

(c)    If this Agreement is terminated pursuant to either paragraphs (a) or (b) of this Section 4.04, (i) Purchaser shall (a) comply with its obligations under Section 4.03(b) above, and (b) pay all cancellation charges imposed by the Title Company, and (ii) promptly thereafter the Title Company shall return to the Purchaser the Deposit together with all

interest accrued thereon. In such event, except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder. If Purchaser does not terminate this Agreement pursuant to this Section 4.04 by giving written notice to Seller by the end of the Due Diligence Period, or the Environmental Due Diligence Period, as the case may be, Purchaser shall be conclusively presumed to have waived its right to terminate pursuant to the provisions hereof.

## ARTICLE V
### "AS IS" SALE; LIMITED REPRESENTATIONS AND WARRANTIES OF SELLER; ENVIRONMENTAL UNDERTAKINGS

5.01    **No Representations or Warranties by Seller.** Except as expressly otherwise provided in Sections 5.02 and 5.03 below, Purchaser specifically acknowledges and agrees that Seller is selling and Purchaser is purchasing the Property on an **"AS IS WITH ALL FAULTS"** basis and that, except with respect to the representations and warranties set forth in Section 5.02 below, Purchaser is not relying on any oral or written representations or warranties of any kind whatsoever, express or implied, from Seller, its employees, directors, officers, agents, consultants, contractors, subcontractors or brokers as to any matters concerning the Property including, without limitation, any information contained in any report, plan, specification, study, analysis, document, or other written material given by or on behalf of Seller to Purchaser with respect to the Property.

Purchaser acknowledges that it has had (or will have pursuant to the provisions of this Agreement) access to and sufficient time to review all information, documents, agreements, studies and tests relating to the Property which it deems necessary or desirable, including the Phase I Report for the Property prepared in accordance with ASTM Standards and the Phase II ESA.

**WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING PARAGRAPHS, IN ENTERING INTO THIS AGREEMENT AND PURCHASING THE PROPERTY, PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS SET FORTH IN SECTION 5.02 HEREOF, SELLER, ITS EMPLOYEES, OFFICERS, AGENTS, CONSULTANTS, CONTRACTORS, AND BROKERS HAS NOT MADE, DOES NOT HEREBY MAKE AND WILL NOT HEREAFTER BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR OTHERWISE, WITH RESPECT TO THE PROPERTY OR THE PHYSICAL CONDITION THEREOF, INCLUDING, WITHOUT LIMITATION, (I) THE INFRASTRUCTURE SERVICING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE AVAILABILITY OR ADEQUACY OF UTILITY SERVICES; (II) THE DEVELOPMENT POTENTIAL OF THE PROPERTY; (III) THE PROPERTY'S USE, HABITABILITY, MERCHANTABILITY, FITNESS, SUITABILITY, VALUE OR ADEQUACY FOR ANY PARTICULAR PURPOSE; (IV) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSURFACE CONDITIONS, WATER TABLE CONDITIONS, (V) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, (VI) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY; (VII) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY APPLICABLE LAWS, CODES, ORDINANCES, RULES, REGULATIONS OR ORDERS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY; (VIII) THE PRESENCE OF HAZARDOUS SUBSTANCES ON, UNDER, IN, OR ABOUT THE PROPERTY OR THE ADJOINING OR NEIGHBORING PROPERTY OR THE EXISTENCE OF ANY UNDERGROUND TANKS OR CONTAINERS ON OR ABOUT THE PROPERTY; (IX) THE CONDITION OR QUALITY OF CONSTRUCTION OF THE BUILDINGS OR ANY OTHER IMPROVEMENTS ON THE PROPERTY; AND (X) THE QUALITY OF SELLER'S TITLE TO THE PROPERTY, AND THE EXISTENCE OF ANY LIENS, ENCUMBRANCES, CHARGES, ASSESSMENTS, RESTRICTIONS OR CLAIMS RELATING THERETO.**

00222545.DOC /

The provisions of this Section 5.01 shall survive the Closing or the earlier termination of this Agreement.

5.02    **Limited Representations and Warranties of Seller.**    Notwithstanding    the    provisions    of Section 5.01 hereof, Seller hereby makes as of the date of this Agreement the following representations and warranties to Purchaser:

(a)    Seller is a corporation duly organized, validly existing and in good standing under the laws of Connecticut, and is duly qualified to conduct business in the State of California. Seller has full right, power and authority to execute and deliver this Agreement and to perform its covenants and obligations under this Agreement, subject to the provisions of Section 12.01 hereinbelow;

(b)    this Agreement has been duly and validly authorized, executed and delivered by Seller;

(c)    Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(d)    the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder on the part of Seller does not and will not conflict with or result in the breach of any material terms or provisions of, or constitute a material default under, any mortgage, indenture or judgment to which Seller is a party;

(e)    Seller has not received any written notice of any pending or threatened condemnation, eminent domain or similar proceeding with respect to all or any portion of the Real Property;

(f)    Seller has not entered into any leases or occupancy agreements which are presently in effect affecting the Real Property, and Seller has not granted to any person or entity any option to acquire, lease or occupy all or any portion of the Property, except pursuant to matters which are of record; and

(g)    Seller has terminated, or prior to the Closing will terminate (to the extent terminable), all service and maintenance agreements relating to the Property.

5.03    **Environmental Undertakings of Seller.**

(a)    Tank Closure.    Seller shall promptly request approval by the appropriate local agency of (i) a workplan for Underground Storage Tank closure and (ii) a workplan for Hazardous Material Business Plan amendment or closure, subject to retention of permission to operate in the lease-back area referenced in Section 11.01 (collectively "**Workplans for Tank Closure**"). The Seller's request for approval of the Workplans for Tank Closure shall propose the removal of those tanks and appurtenances specified on Attachment 5.03(a) hereto.    Prior to Closing, in accordance with and to the extent required by the approved Workplans for Tank Closure, Seller shall clean, inert and remove tanks and appurtenances.    It is understood and agreed, however (as discussed in Paragraph (b) immediately below), that any other required Tank Closure Response Actions shall be completed by Seller after Closing.

(b)    Response Actions.    If the Phase II ESA determines that environmental conditions subject

9

to legal requirements for remedial action are present in soil or groundwater as a result of Seller's operations, Seller shall undertake, at Seller's cost, response actions to correct such conditions (the **"Phase II Response Actions"**). Seller further agrees to complete all legally required response actions to address the Toluene Releases described in Section 5.03(c) hereof (the **"Toluene Release Response Actions"**) and any releases from tanks and appurtenances identified during implementation of the Workplans for Tank Closure described in Section 5.03(a) hereof or amendments thereto (the **"Tank Closure Response Actions"**). Collectively the Phase II Response Actions, the Toluene Release Response Actions, and the Tank Closure Response Actions shall be referred to herein as the **"Response Actions,"** all of which shall be completed by Seller after Closing. Seller undertakes no other actions or responsibility in connection with environmental conditions at the Property.

(c)     <u>Response Action Procedures</u>.  The following procedures apply to any Response Actions:

(1)     Seller shall select one or more environmental engineer or consultant subject to the reasonable approval of Purchaser to plan, conduct, coordinate, and supervise the Response Actions. Purchaser acknowledges that GeoTrans, Inc. and NRC Environmental Services and their subcontractors, if any, are approved for these purposes.

(2)     Seller shall arrange for the approved environmental engineer or consultant to prepare, in compliance with any applicable Environmental Law, a response action plan that will (a) achieve compliance with applicable Environmental Laws, (b) minimize the disruption of operations at the Property and be cost effective.

(3)     Seller shall provide a reasonable opportunity for Purchaser to review and comment in advance on each material filing with an applicable governmental authority; Seller shall reasonably address any timely received comments of Purchaser.

(4)     Seller shall coordinate with appropriate governmental authorities and shall arrange for the implementation of all legally required Response Actions in a timely and professional manner.

(5)     Seller shall be responsible for all costs to plan, conduct, supervise, complete, or otherwise implement the Response Actions, except for Purchaser's costs, if any, for review, comment or other activity in connection with the Response Actions.

(d)     <u>Right of Access to Perform Response Actions.</u>

(1)     Purchaser grants Seller and its agents, consultants and contractors permission to enter the Property after Closing in order to conduct the Response Actions. Purchaser shall cooperate with Seller during implementation of Response Actions and will take such actions as reasonably requested to achieve legally compliant, environmentally protective, and cost effective remedies, including recording of a deed restriction or other notice prohibiting use of groundwater or limiting use of land to industrial purposes.

(2)     Seller shall require its agents, consultants and contractors to perform all activities

in a workmanlike manner, to use their best efforts not to interfere with Purchaser's business operations when implementing Response Actions, and to provide advance notice prior to taking any on-site action.

(3)  Upon completion of the Response Actions, in whole or in part, Seller shall provide Purchaser with a copy of such closure letter, no-further-action letter, or other documentation received from a governmental authority evidencing the authority's agreement that the Response Action is complete, and this Right of Access shall then terminate insofar as it relates to the Response Action completed.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

6.01   **Representations and Warranties of Purchaser.**  Purchaser hereby represents and warrants to Seller, as of the date of this Agreement, with the understanding that said representations and warranties constitute a material inducement to and are being relied upon by Seller, as follows:

(a)  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of California and duly qualified to do business in the State of California, and has full right, power and authority to execute and deliver this Agreement and to perform its covenants and obligations under this Agreement;

(b)  This Agreement has been duly and validly authorized, executed and delivered on behalf of Purchaser; and

(c)  Purchaser is, and after giving effect to the transaction contemplated by this Agreement, will be, solvent and is not subject to any voluntary or involuntary proceedings in bankruptcy, reorganization, dissolution or liquidation or to any assignment for the benefit of creditors, and no trustee, receiver or liquidator has been appointed for Purchaser.

## ARTICLE VII
## TITLE EXAMINATION AND SURVEY MATTERS

7.01   **Title to be Conveyed.**  Seller shall transfer good and marketable title to the Real Property by the Deed on the Closing Date, running to Purchaser or to a nominee of Purchaser that is owned or controlled by the named Purchaser, subject to the following (collectively, the "**Permitted Exceptions**"):

(a)  Zoning regulations, and municipal building restrictions, and all other laws, ordinances, regulations and restrictions of any duly constituted public authority enacted prior to the Closing Date;

(b)  Real estate taxes and betterment assessments levied or assessed on the Real Property not yet due and payable;

(c)  The lien of supplemental taxes assessed pursuant to Chapter 3.5, commencing with Section 75, of the California Revenue and Taxation Code with respect to matters occurring on or after the Closing Date;

(d)  The printed exceptions which appear in the Owner's Title Policy issued by the Title

11

Company;

(e)  All matters of title or affecting title which constitute "Permitted Exceptions" in accordance with Sections 7.02 or 7.04 below, including, without limitation, any such matters which are not made the subject of a "Title Defect Notice" (as hereinafter defined); and

(f)  Right of Access in Section 5.03(d) for performance of the Response Actions by Seller or its agents, consultants or contractors.

7.02  **Title Examination Prior to Closing; Survey; Waiver by Purchaser.**  Purchaser acknowledges receipt prior to the date hereof of (i) a preliminary title report issued by the Title Company and dated May 21, 2008, together with copies of all instruments referred to therein as exceptions to title, and (ii) an ALTA survey of the Property dated July 24, 2008, prepared by Kier & Wright, which materials Purchaser shall review during the Due Diligence Period.  Purchaser shall give written notice to Seller (a **"Title Defect Notice"**) on or before the expiration of the Due Diligence Period, if such preliminary title report or survey discloses any title defect or objectionable encroachment upon the Land (collectively called the **"Unpermitted Exceptions"**), which notice shall contain a description of each Unpermitted Exception.  Any matter of record title as of the effective date of such preliminary title report, or matter in existence which appeared on the survey, which is not the subject of a Title Defect Notice shall be conclusively deemed to constitute a Permitted Exception.

7.03  **Curing and Removal of Title Objections.**  If Purchaser gives a Title Defect Notice to Seller in accordance with the provisions of the preceding Section 7.02, then:

(a)  With respect to any Unpermitted Exception that is a Monetary Encumbrance, Seller shall, on or prior to the Close of Escrow, (A) pay the amount necessary to remove the same from the record title to the Property and (B) obtain recordable instruments or other documentation sufficient to cause the Title Company to delete such matters from its title insurance policy to be issued to Purchaser; and

(b)  With respect to any Unpermitted Exception that is a Nonmonetary Encumbrance, Seller shall have the option, in its sole discretion, either:

(i)  to use reasonable efforts to remove or cure the same, in which event Seller may extend the Closing Date by written notice to Purchaser for up to sixty (60) days to enable it to make such efforts to remove or cure the Nonmonetary Exceptions.  If Seller makes such election but is unable to complete such removal or cure by such extended Closing Date, Seller shall so notify Purchaser and Purchaser shall, as its sole and exclusive remedy, on or before the tenth (10th) day after Purchaser's receipt of Seller's notice, give notice to Seller, that Purchaser either:

(x)  elects to proceed with the Closing, in which event all Nonmonetary Encumbrances identified in the Title Defect Notice which Seller has not cured or removed shall be conclusively presumed thereafter to constitute Permitted Exceptions and the Closing shall occur on the tenth (10th) day after Purchaser gives such notice to Seller; or

(y)  elects to terminate this Agreement, in which event (1) Purchaser shall comply with its obligations under Section 4.04 above, and pay all cancellation charges imposed by the Title Company, and (2) promptly

thereafter the Title Company shall return to the Purchaser the Deposit together with all interest accrued thereon, and, except as expressly provided otherwise in this Agreement, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder.

Unless Purchaser gives notice to Seller within such 10-day period that Purchaser has elected to terminate the Agreement pursuant to the foregoing clause (y), Purchaser shall be conclusively presumed to have elected to proceed to Closing pursuant to the foregoing clause (x); or

(ii)     to take no action in connection with the existence of such Unpermitted Exceptions, in which event all of the Unpermitted Exceptions will be deemed waived by Purchaser unless Purchaser terminates this Agreement as provided in the next succeeding paragraph.

Seller shall give written notice to Purchaser not later than five (5) Business Days after Seller's receipt of the Title Defect Notice as to which of the foregoing options under clause (ii) Seller elects. Unless Seller states in such notice that it has elected to proceed pursuant to the preceding clause (ii)(A) to attempt to remove or cure the Unpermitted Exceptions, Purchaser shall have the right to terminate this Agreement by giving written notice of termination to Seller within three (3) Business Days after its receipt of such notice from Seller, in which event (1) Purchaser shall comply with its obligations under Section 4.04(b) above, and pay all cancellation charges imposed by the Title Company, and (2) promptly thereafter the Title Company shall return to the Purchaser the Deposit together with all interest accrued thereon, and, except as expressly provided otherwise in this Agreement, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder. The Closing Date shall be extended for such period of time as necessary to give Seller and Purchaser the benefit of the time periods stated in this clause (ii).

7.04    **Change of Conditions.**  If between the expiration of the Due Diligence Period and the Close of Escrow, an updated title report shows any new Unpermitted Exceptions which did not appear on the record title to the Land as of the date of the preliminary title report, or an updated survey shows any new encroachments or other survey matters not in existence as of the date of the survey referenced above, in either case which has a material adverse effect on the marketability, operation, value or use of the Real Property, then Purchaser shall have the right to give Seller written notice of any such new Unpermitted Exception and in such instance the parties shall have the same rights and obligations as to such new Unpermitted Exceptions as stated in Section 7.03 above.

## ARTICLE VIII
## ESCROW AND CLOSING

8.01    **Escrow.**  An escrow ("**Escrow**") shall be opened with the Title Company by delivery of a fully executed copy of this Agreement and the standard form of escrow instructions of the Title Company (to the extent not inconsistent with the provisions hereof) to the Title Company within two (2) Business Days after the execution of this Agreement by Seller and Purchaser ("**Opening of Escrow**").  Escrow shall close ("**Close of Escrow**") and the Deed shall be recorded by the Title Company in the Official Records of Alameda County on or before the Closing Date.

8.02    **Delivery to Escrow.**  At least two (2) days prior to the Closing Date, the parties shall deliver the

following to the Title Company:

(a)     Seller shall deliver or cause to be delivered to the Title Company:

    (i)     the duly executed and acknowledged Deed;

    (ii)     a bill of sale, pursuant to which Seller conveys title to the Personal Property to Purchaser;

    (iii)     a closing and settlement statement;

    (iv)     an assignment and assumption of all guaranties, warranties, licenses and permits relating to the Property (the "**Assignment and Assumption Agreement**") (i) assigning to Purchaser without recourse to or warranty by Seller, (A) all of Seller's right, title and interest in and to all guaranties and warranties relating to the Property, and (B) all of Seller's right, title and interest in and to all licenses, permits, special permits, consents and approvals issued by any governmental authority in connection with the ownership, development or operation of the Property, in each case to the extent assignable as of right by Seller at no cost to Seller, and (ii) containing an assumption thereof by Purchaser effective from and after the Closing Date;

    (v)     an affidavit of Seller stating Seller's U.S. taxpayer identification number and that Seller is not a "foreign person" within the meaning of Section 1445 (f)(3) of the Internal Revenue Code of 1986, as amended (the "**FIRPTA Certificate**");

    (vi)     a certificate as to the authority and incumbency of the officer(s) of Seller executing the documents and instruments delivered at the Close of Escrow;

    (vii)     a certification by Seller that all representations and warranties made by Seller in Section 5.01 of this Agreement are true and correct in all material respects as of the Closing Date, except as may be set forth in such certificate;

    (viii)     such customary documents and certificates as the Title Company shall require to consummate the transaction contemplated by this Agreement and to issue the Owner's Title Policy (provided that the foregoing shall not commit Seller to pay any amount, give any indemnity or other agreement or to undertake any other obligation which Seller shall not have specifically agreed to perform);

    (ix)     a duly executed lease of the Tank Farm Area; and

    (x)     a copy of the Bankruptcy Court order, as described in Section 12.01.

(b)     Purchaser shall deliver or cause to be delivered to the Title Company:

    (i)     the Purchase Price, plus or minus prorations and adjustments as provided in Section 8.06 below;

    (ii)     a duly executed and acknowledged counterpart of the bill of sale;

    (iii)     a duly executed preliminary change of ownership report (a "**PCOR**") in the form

required by the Title Company;

(iv)     a duly executed counterpart of the closing and settlement statement;

(v)      a duly executed and acknowledged counterpart of the Assignment and Assumption Agreement;

(vi)     a certification by Purchaser that all representations and warranties made by Purchaser in Section 6.01 of this Agreement are true and correct in all material respects as of the Closing Date, except as may be set forth in such certificate;

(vii)    such customary documents and certificates as the Title Company shall require to consummate the transaction contemplated by this Agreement and to issue the Owner's Title Policy; and

(viii)   a duly executed lease of the Tank Farm Area.

**8.03**    **Close of Escrow.**  At the Close of Escrow:

(a)      Possession of Property.  Possession of the Property shall be delivered to Purchaser.

(b)      Funds.  The Title Company shall disburse all funds deposited with them by Purchaser in payment of the Purchase Price as follows (after the recordation of the Deed and such other matters as the parties mutually direct, pursuant to the provisions of Section 8.03(b)): (a) deduct all items chargeable to the account of Seller pursuant to the provisions of Section 8.07(a); (b) if, as the result of the prorations and credits pursuant to Section 8.06, amounts are to be charged to the account of Seller, deduct the total amount of such charges; (c) if, as the result of the prorations and credits pursuant to Section 8.06, amounts are to be charged to the account of Purchaser, add the total amount of such charges; (d) disburse the Purchase Price, as adjusted above, to Seller promptly upon the Close of Escrow; and (e) disburse the remaining balance of the funds, if any, to Purchaser promptly upon the Close of Escrow.

(c)      Recording.  The Title Company shall deliver the completed PCOR to the Alameda County Recorder and cause the Deed (with documentary transfer tax information to be affixed after recording), and any other documents which the parties hereto may mutually direct, to be recorded in the Official Records of Alameda County, and obtain conformed copies thereof for distribution to Purchaser and Seller.

(d)      Owner's Title Policy.  The Title Company shall issue the Owner's Title Policy to Purchaser.

(e)      Delivery of Documents to Purchaser.  The Title Company shall deliver to Purchaser at or promptly following the Close of Escrow: (i) a conformed copy of the recorded Deed; (ii) the original FIRPTA Certificate; (iii) the original certificate as to Seller's authority and incumbency; (iv) duly executed counterparts of the bill of sale, the closing and settlement statement, the lease of the Tank Farm Area and the Assignment and Assumption Agreement; and (v) the original duly executed certification by Seller described in Section 8.02(a)(vii).

(f)     Delivery of Documents To Seller.  The Title Company shall deliver to Seller at or promptly following the Close of Escrow:  (i) duly executed counterparts of the bill of sale, the closing and settlement statement, the lease of the Tank Farm Area and the Assignment and Assumption Agreement; (ii) the original duly executed certification by Purchaser described in Section 8.02(b)(vi); and (iii) a conformed copy of the recorded Deed.

8.04    **Conditions Precedent to Purchaser's Obligations.**  The Purchaser's obligations to consummate the transactions contemplated by this Agreement shall be subject to satisfaction, on or prior to the Closing Date (or such shorter period of time as stated in this Agreement), of each of the following conditions precedent, any one or more of which may be waived by Purchaser:

(a)     all of the representations of Seller contained in Section 5.02 of this Agreement shall be true and correct in all material respects on and as of the Closing Date, as though remade as of the Closing Date;

(b)     Seller shall have performed, observed and complied in all material respects with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on its part on or before the Closing Date; and

(c)     The Real Property shall be free of all tenants and other occupants and shall then be in substantially the same condition as it is on the last day of the Due Diligence Period (reasonable wear and tear, and damage by casualty or taking excepted).

8.05    **Conditions Precedent to Seller's Obligations.**  The Seller's obligations to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or prior to the Closing Date (or such shorter period of time as stated in this Agreement), of each of the following conditions precedent, any one or more of which may be waived by Seller:

(a)     all of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, as though remade as of the Closing Date;

(b)     Purchaser shall have performed, observed and complied in all material respects with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on its part on or before the Closing Date; and

(c)     Seller and Purchaser shall have agreed on the form of the lease for the Tank Farm Area.

8.06    **Prorations and Adjustments.**

(a)     All real estate taxes and assessments, including supplemental taxes and assessments, shall be prorated and adjusted between the parties as of the Closing Date, regardless of when the bill for such supplemental taxes or assessments is received by Purchaser or Seller.

(b)     Seller shall make reasonable efforts to cause the water, electricity, gas and other utility meters at the Buildings to be read on the day prior to the Closing Date, and shall pay outside of the closing directly to the appropriate utility providers all final bills rendered pursuant to such meter readings.  If Seller is unable to obtain a final reading of any utility meter on that date, then the costs of such utility service shall be adjusted as of the Closing Date based on the last bill received by Seller from the supplier of such utility.

(c)     The parties are not currently aware of any other costs or expenses that must be adjusted between them as of the Closing Date, and if any such costs or expenses arise or become known to them on or before the Closing Date, they shall be equitably adjusted between the parties in accordance with customary practice in the State of California.

(d)     The provisions of this Section 8.06 shall survive the Closing.

**8.07    <u>Fees and Closing Costs.</u>**

(a)     Seller shall pay one-half (1/2) of the cost of transfer taxes imposed by the City of San Leandro.

(b)     Purchaser shall pay (a) the cost of recording the Deed and any other documents that Purchaser may choose to record; (b) one-half (1/2) of the cost of transfer taxes imposed by the City of San Leandro; (c) the premium costs for the issuance of the Owner's (and Lender's, if applicable) Title Policy; and (d) the escrow fees or similar charges of the Title Company.

(c)     All other costs which must be incurred with respect to the Close of Escrow shall be allocated per the custom of Alameda County, except to the extent otherwise specifically provided herein.

**ARTICLE IX**
**DEFAULTS AND REMEDIES**

**9.01    <u>Purchaser's Defaults and Seller's Remedies.</u>**

(a)     <u>Purchaser's Default</u>.   It shall be a default by Purchaser under this Agreement (a **"Purchaser's Default"**) if any one or more of the following shall occur:

(i)     Purchaser shall fail to pay any sum of money under this Agreement when due and payable or shall fail to perform any of its other covenants and agreements contained in this Agreement when required, and such failure shall continue for three (3) Business Days after Seller gives Purchaser notice of such failure (but in no event later than the Closing Date), <u>except</u> that if such failure relates to any payment, covenant or agreement to be made or performed at Closing, there shall be no notice, grace or cure period required); and

(ii)     any representation or warranty of Purchaser contained in this Agreement shall prove to have been materially false or incorrect when made.

(b)     <u>Seller's Remedies for Purchaser's Default</u>.   If a Purchaser's Default occurs, then Seller shall have the right to terminate this Agreement immediately by giving notice to Purchaser, in which event the Title Company shall deliver to Seller the entire Deposit together with all interest accrued thereon in full and complete satisfaction of all claims and damages, without further instructions from Purchaser and notwithstanding conflicting instructions from Purchaser. The remedy set forth in the preceding provisions of this Section 9.01(b) shall be Seller's sole and exclusive remedy hereunder, at law or in equity, for a Purchaser's Default, and are in the nature of liquidated damages (and not as a

17

penalty). The parties have made this provision for liquidated damages because it would be difficult to calculate actual damages for such breach, and these sums represent reasonable compensation to Seller for such breach. In the event that Seller terminates this Agreement, then except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and neither Purchaser nor Seller shall have any further rights, obligations or liabilities hereunder.

**9.02    Seller's Default and Purchaser's Remedies.**

(a)    Seller's Default.  It shall be a default by Seller under this Agreement (a "**Seller's Default**") if either or both of the following shall occur:

    (i)    Seller shall fail to perform any of its covenants and agreements under this Agreement when required to be performed hereunder and such failure shall continue for three (3) Business Days after Purchaser gives Seller notice of such failure (but in no event later than the Closing Date), except that if such failure relates to any covenant or agreement to be performed at Closing, there shall be no notice, grace or cure period required; and

    (ii)    any representation or warranty of Seller contained in Section 5.02 of the Agreement shall prove to have been materially false or incorrect when made.

(b)    Purchaser's Remedies for Seller's Default.  If a Seller's Default occurs, then Purchaser shall have the right either (i) to terminate this Agreement immediately by giving notice to Seller, in which event Purchaser shall comply with its obligations under Section 4.04(b) above, and upon such compliance the Title Company shall return to the Purchaser the Deposit together with all interest accrued thereon, or (ii) to pursue an action for specific performance of this Agreement as its sole and exclusive remedy hereunder. In the event that Purchaser terminates this Agreement, then except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and neither Purchaser nor Seller shall have any further rights, obligations or liabilities hereunder. In no event shall Seller be liable to Purchaser for any actual, punitive, speculative, consequential or other damages.

**ARTICLE X**
**CONDEMNATION/DAMAGE AND DESTRUCTION**

**10.01    Eminent Domain and Condemnation.**  If, at any time prior to Closing, action is initiated or threatened to take any portion of the Real Property by eminent domain or condemnation proceedings, Purchaser shall have ten (10) Business Days from receipt of written notice of such event from Seller to advise Seller that it intends either (i) to terminate this Agreement, or (ii) to accept the Real Property subject to said condemnation proceeding or in the condition in which it is left following such condemnation or taking, and receive either the full amount of the condemnation award that Seller received for the Real Property (less the reasonable costs, including without limitation attorneys' fees, incurred by Seller in obtaining such award) or, if Seller has not received said award on or before the Closing Date, accept an assignment from Seller of Seller's rights in and to said award and the Closing shall occur without an adjustment to the Purchase Price. If Purchaser does not give a notice pursuant to subsection (i) above on or before ten (10) Business Days after the giving of Seller's notice of the eminent domain or condemnation proceeding, Purchaser shall be conclusively presumed to have elected to proceed in accordance with subsection (ii) above. The Closing Date shall be extended for the period of

time necessary to allow Purchaser to make the election stated in this Section 10.01(a).

**10.02  Damage and Destruction.**

If at any time before the Closing Date, the Buildings are wholly or partially damaged or destroyed as a result of fire or other casualty not caused by Purchaser, its agents, contractors, representatives or employees, the Closing shall be postponed while Seller procures an estimate of the cost to repair the Buildings, which Seller shall obtain within thirty (30) days of the occurrence of such fire or other casualty. Based upon the estimate, the parties shall have the following sole and exclusive rights:

(a)    If the cost of such repair is not more than five hundred thousand dollars ($500,000.00), then the Closing shall proceed and Seller shall pay to the Purchaser at the Closing (by means of a credit against the Purchase Price) the cost of such repair as set forth in the Estimate, but Seller shall not be required to repair such damage or destruction;

(b)    If the cost of such repair exceeds five hundred thousand dollars ($500,000.00), then Purchaser may give notice to Seller terminating this Agreement within ten (10) Business Days of receipt of the Estimate. In the event that Purchaser does not so elect to terminate, Purchaser shall accept the Property in the condition in which it is left following such fire or other casualty, in which event the Closing shall occur and Seller shall assign to Purchaser all of its rights in and to insurance proceeds receivable by Seller in connection with such fire or other casualty, and there shall be no adjustment to the Purchase Price on account of such damage other than a credit given to Purchaser at the Closing in an amount equal to the deductible (if any) on Seller's all risk property insurance; and

(c)    Notwithstanding the foregoing clauses (a) and (b), in the event that such damage or destruction resulted from a fire or other casualty caused by Purchaser, its agents, contractors, representatives or employees, Purchaser shall accept the Property in the condition in which it is left following such fire or other casualty, in which event the Closing shall occur without adjustment to the Purchase Price and Seller shall assign to Purchaser all of its rights in and to insurance proceeds receivable by Seller in connection with such fire or other casualty by an assignment in form reasonably acceptable to Seller and Purchaser, but Seller shall not be required to make any payment to Purchaser, or give to Purchaser any credit at the Closing, on account of the deductible (if any) on Seller's all risk property insurance.

The Closing Date shall be extended for the period of time necessary to allow the parties to proceed under this Section 10.02.

**ARTICLE XI**
**LEASE BACK OF TANK FARM**

**11.01  Lease Back of Tank Farm.** Purchaser agrees to enter into a lease back to Seller of that portion of the Land on which Seller's Construction Products tanks currently sit (the "**Tank Farm Area**"), upon the following terms and conditions: (a) the area to be leased is outlined in red on <u>Exhibit C</u> attached hereto and hereby made a part hereof; (b) full rental for the leased area shall be $0.10 per square foot per month; (c) the term of the lease shall be one (1) year from the Closing Date, with two (2) renewal options for one (1) year each; and (d) the parties shall use their diligent good faith efforts to negotiate the form of lease during the Due Diligence Period.

**ARTICLE XII**
**GENERAL PROVISIONS**

12.01  **Seller's Bankruptcy.**  Seller filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq., in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on April 2, 2001, and operates its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code). This Agreement shall not become effective unless approved by the Bankruptcy Court, and the Effective Date shall be the date on which the Bankruptcy Court enters an order approving this Agreement. If this Agreement is not approved by the Bankruptcy Court on or before December 31, 2008, it shall be null and void.

12.02  **Broker.**  Seller and Purchaser each hereby represents and warrants to the other that it has not dealt with any broker, finder or other intermediary in connection with the transactions contemplated hereby other than Lawrence C. Jones, Jr., of Cushman & Wakefield (the "**Broker**"), and that no fees or commissions are due or payable to any third party other than Broker by reason of any of the said transactions. Seller and Purchaser each agrees to indemnify, defend and hold the other harmless of, from and against any and all costs, losses, claims, and expenses arising out of a breach of their respective representations and warranties contained in this Section 12.01 or any claim by any broker or other third party other than Broker claiming to have been employed by or at the direction of the indemnifying party. Seller shall be responsible for the payment of the commission due to the Broker in the amount of 4.5% of the Purchase Price pursuant to a separate agreement, if and when the closing occurs. The provisions of this Section 12.02 shall survive the Close of Escrow.

12.03  **Notices.**  All notices, demands, requests, consents, waivers, approvals and other communications shall be in writing and shall be deemed given (i) upon the hand delivery thereof during business hours provided a receipt is obtained, or (ii) upon the earlier of delivery or tender for delivery if sent by certified mail, return receipt requested, postage charges prepaid, or (iii) on the next Business Day following delivery to a recognized overnight delivery service such as Federal Express or Express Mail, freight charges prepaid, in each case addressed or delivered to the respective parties at their respective addresses set forth below (or at such other addresses designated by any party by notice to the other parties in the manner set forth herein):

SELLER:    W. R. GRACE & CO. – CONN.
7500 Grace Drive
Columbia, Maryland 21044
Attention: Vicki B. Finkelstein, Esq.

with a copy at the same address to the Attention of Chris Schult;

PURCHASER: ALCO IRON & METAL CO.
1091 Doolittle Drive
San Leandro, CA 94577
Attention: _____

12.04  **Limitations on Liability.**  In no event shall any officer, director, shareholder, employee, agent or affiliate of Seller or Purchaser have any personal liability hereunder, nor shall any of them be named personally in any suit, action or proceeding concerning any matter hereunder, nor shall any of their assets be attached, liened or levied upon or in any other way held liable for any of the

00222545.DOC /

20

obligations of Seller or Purchaser, respectively. Notwithstanding anything to the contrary contained in this Agreement, in no event shall either party be entitled to recover from the other party in connection with any claim arising out of or relating to this Agreement or any representation made herein, any lost profits or any direct, compensatory, punitive, indirect, consequential or other damages.

12.05    **Amendments.**  This Agreement may not be amended, modified or extended, nor may any party hereto be relieved of any of its liabilities or obligations hereunder, except by a written instrument duly executed by Purchaser and Seller.

12.06    **Governing Law.**  This Agreement is made pursuant to and shall be governed by and construed in accordance with the internal laws of the State of California without reference to conflicts of laws principles.

12.07    **Headings.**  The article, section and other headings used in this Agreement have been inserted for convenience of reference only, and shall not be deemed in any manner to modify, expand, explain or restrict any of the provisions of this Agreement and are not intended to have any legal effect.

12.08    **Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors in interest, legal representatives, and any permitted assigns; provided, however, that Purchaser shall not assign its interest in this Agreement without the prior written consent of Seller, which consent Seller shall not unreasonably withhold; provided, however, Seller consents to Purchaser assigning this Agreement to a Limited Liability Company (LLC) in which the principals or officers of Purchaser comprise the majority ownership and control. Purchaser shall not be released or relieved of any of its obligations under this Agreement in the event of any assignment by Purchaser of this Agreement or any of Purchaser's rights and/or obligations under this Agreement.  Any permitted assignee of Purchaser's rights under this Agreement shall be obligated to expressly assume in writing, as a condition to the effectiveness of such assignment, all of Purchaser's obligations under this Agreement and agree in writing to be bound by the terms of this Agreement as if such permitted assignee were the original Purchaser signing this Agreement.  In addition, Purchaser shall have the right to designate a nominee to take title to the Real Property in accordance with the provisions of Section 7.01, but no such designation of a nominee shall release the named Purchaser from any of its obligations or liabilities hereunder.

12.09    **Integration.**  This Agreement, including the exhibits attached to this Agreement and references contained in this Agreement, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, proposals, offers, counteroffers, agreements and understandings of the parties regarding said subject matter, whether written or oral, all of which are hereby merged into and superseded by this Agreement.

12.10    **Interpretation and Construction.**  All words used herein in singular number shall extend to and include the plural number, where the context so requires.  All words used herein in the plural number shall extend to and include the singular number, where the context so requires.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that both Seller and Purchaser have contributed with the advice of counsel to the preparation of this Agreement.

12.11    **Waiver.**  Except as expressly provided herein, no waiver by any party of any failure or refusal of the other party to comply with its obligations under this Agreement shall be deemed a waiver of

any subsequent failure or other refusal to so comply by such other party. No waiver shall be valid unless in writing signed by the party to be charged and then only to the extent therein set forth.

12.12 <u>Severability.</u> If any term or provision of this Agreement or application thereof to any person or circumstance shall, to any extent, be found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each other term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

12.13 <u>No Third Party Beneficiaries.</u> This Agreement and the representations, warranties, covenants and agreements contained herein are made and entered into for the sole protection and benefit of the parties hereto, their successors in interest and their permitted assigns, if any, and no other person, persons, entity or entities shall have any right of action hereon or right to claim any right or benefit from the terms contained herein or be deemed a third party beneficiary hereunder.

12.14 <u>Time.</u> Time is of the essence in the performance of each of the parties' respective obligations contained herein.

12.15 <u>Survival.</u> All terms and provisions of this Agreement regarding the disposition of the Deposit shall survive the termination hereof until such disposition has been accomplished in accordance with this Agreement. All terms and provisions of this Agreement set forth in Section 5.03 shall survive the Close of Escrow until completion of all Response Actions. The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every agreement, representation, warranty and obligation of Seller and Purchaser herein contained or expressed, except as otherwise expressly provided in this Agreement.

12.16 <u>IRS Real Estate Sales Reporting.</u> Purchaser and Seller hereby agree that Purchaser's attorneys shall act as "the person responsible for closing" the transaction which is the subject of this Agreement pursuant to Section 6045(e) of the Internal Revenue Code of 1986, as amended, and that Purchaser's attorneys shall prepare and file the informational return (IRS Form 1099-B) required by said Section 6045(e).

12.17 <u>No Recording.</u> Purchaser shall not record this Agreement or any copy, notice or memorandum thereof.

12.18 <u>Counterparts.</u> This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement.

    **IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed on their behalf under seal as of the day and year first above written.

SELLER:                          W. R. GRACE & CO. – CONN.,
                                 a Connecticut corporation

                                 By: _____

                                 Its: _____

00222545.DOC /

PURCHASER:                ALCO IRON & METAL CO.,
                          a California corporation

                          By:   _____

                          Its:  _____


We acknowledge receipt of a fully-executed copy of the foregoing Real Property Purchase and Sale Agreement and Escrow Instructions executed by Seller and Purchaser, and we agree to follow all instructions contained therein.

TITLE COMPANY:            CHICAGO TITLE COMPANY
                          a _____

                          By:   _____

                          Its:  _____

# EXHIBIT A
## DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN LEANDRO, COUNTY OF ALAMEDA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

BEGINNING at a point on the Northeastern line of Bay Shore Boulevard or County Road No. 1434, distant thereon North 45° 04' West 165 feet from the Northwestern line of Davis Street or County Road No. 1434; running thence along said line of Bay Shore Boulevard North 45° 04' West 322 feet; thence North 44° 56' East 365.86 feet to the Southwestern line of the right of way, 60 feet wide, of the Southern Pacific Railroad Company, formerly Bay and Coast Railroad Company; thence along the last named line South 55° 31' East 243.25 feet; thence continuing along the last named line tangent with the last named course Southerly on a curve to the right with a radius of 2835 feet, a distance of 397.13 feet to the Western line of the tract of land described in the Deed by Dennis Sullivan to John Mathews, dated March 9, 1875, recorded in Book 105 of Deeds, Page 415, Alameda County Records, thence along the last named line South 13° 02' East 56.16 feet to said line of Davis Street; thence along the last named line South 69° 30' West 301.95 feet to a point distant thereon North 69° 30' East 165 feet from said line of Bay Shore Boulevard; thence North 45° 04' West 165 feet to a line drawn North 69° 30' East from the point of beginning; thence South 69° 30' West 165 feet to the point of beginning.

Except that portion conveyed to the State of California by Grant Deed recorded April 20, 1978, Reel 5354, Image 757.

Also excepting therefrom that portion conveyed to the State of California by Grant Deed recorded December 9, 2004, Instrument No. 2004-544815.

Assessor's Parcel No. 077A-0649-002-04

PARCEL TWO:

BEGINNING at a point on the Northeastern line of Bayshore Boulevard, distant thereon North 45° 04' West 165 feet from the Northwestern line of Davis Street, as said Boulevard and Street existed prior to November 3, 1952; and running thence along said line of Bayshore Boulevard South 45° 04' East 62.21 feet to a point distant thereon North 45° 04' West 102.79 feet from said line of Davis Street; thence from a tangent that bears South 45° 04' Easterly on a curve to the left with a radius of 160 feet, a distance of 162.73 feet to said line of Davis Street; thence along the last named line North 69° 30' East 62.21 feet to a point distant thereon North 69° 30' East 165 feet from said line of Bayshore Boulevard; thence North 45° 04' West 165 feet to a line drawn North 69° 30' East from the point of beginning; and thence South 69° 30' West 165 feet to the point of beginning.

Except that portion conveyed to the State of California by Grant Deed recorded December 20, 1952, Book 6910, Page 457, Alameda County Records.

Also excepting that portion conveyed to the State of California by Grant Deed recorded April 20, 1978, Reel 5354 Image 757.

Also excepting therefrom, that portion conveyed to the City of San Leandro by Deed recorded December 9, 2004 Instrument No. 2004-544815.

Assessor's Parcel No. 077A-0649-017-04

2

CLTA Preliminary Report Form - Modified (11/17/06)

00222545.DOC /

## EXHIBIT B
## EXCLUDED PERSONAL PROPERTY

The following items of personal property shall be removed by Seller from the Property prior to Closing:

1. Seller's books, records, and computer equipment
2. Banbury Dust Collection System
3. Horiba Particle Size Analyzer
4. Banbury Chopper
5. Gas Chromatograph and Computer
6. Drum Emulsion 6K Homogenizer
7. Tank Trucks (2)
8. Calendar Mill and Banbury Mixer

The following items of personal property shall remain the property of Seller, but shall remain on the Tank Farm Area, or be moved by Seller to the Tank Farm Area prior to Closing:

1. Brookfield Viscometer (2)
2. Blue M Lab Oven
3. Ingersoll Rand Air Dryer
4. Toyota Forklift (2)
5. Load Out Piping
6. Load Arms
7. Polarset Tank and Meter Line
8. Mobile Platform
9. Load–out Equipment
10. Pre-mix Tank and Load Arms
11. Load-out Piping
12. Load-out Arms
13. Lignin Heater
14. Safety Cage
15. All tanks and other items currently located on the Tank Farm Area

00222545.DOC /

**EXHIBIT C**
**LOCATION OF LEASE BACK AREA**



PLOT PLAN
SAN LEANDRO, CA

**ATTACHMENT 4.02**
**List of Environmental Documents**

- **Supplemental Site Investigation Report**
  Geotrans, Inc. – June 16, 2008

- **Summary of Site Conditions, Site Investigations & Corrective Actions**
  Geotrans, Inc. – November 20, 2007

- **Site Investigation Report**
  Geotrans, Inc. – October 4, 2007

- **Initial Site Evaluation**
  W. R. Grace Facility – San Leandro, CA
  Geotrans, Inc. – November 2, 2005

- **Quarterly Monitoring Results Reporting**
  HLA – February 2, 1987; December 5, 1986; April 10, 1989; January 10, 1997; May 5, 2000

- **Letter Report Entitled Well Installation and Groundwater Monitoring, former Underground Tank Farm**
  HLA – December 29, 1994

- **Letter Report Entitled Shallow Soil and Groundwater Investigations**
  HLA – January 21, 1993 (Text 1-4; Table 2,3; Figure 2)

- **Soil Sampling and Laboratory Analysis**
  Environmental Geotechnical Consultants, Inc. – December 5, 1990

- **Underground Line Testing – San Leandro**
  West Coast Locators, September 1990

- **Report of Tank Farm Construction and Monitoring Activities**
  HLA – March 20, 1990 (Test 1-12; Figure2)

- **Phase V Toluene Leach Investigation**
  W. R. Grace Facility – San Leandro, CA
  Harding Lawson Associates (HLA) – November 6, 1987

- **Phase IV Toluene Leach Investigation**
  W. R. Grace Facility – San Leandro, CA
  HLA – April 9, 1987

- **Letter to WQCB – describes 1987 toluene release**
  W. R. Grace – January 10, 1987

- **Underground Tank Monitoring Letter Report to San Leandro Fire Dept.**
  HLA – 9/15/86

- **Groundwater Contamination Investigation**

W. R. Grace & Co. Plant
HLA – 8/16/85 (Test. Page 1-5; Figures 1-8)

**ATTACHMENT 5.03(a)**
**List of Items Proposed for Removal**

1.  Underground Storage Tanks, including appurtenances (subject to agency approval of Workplans for Tank Closure).

2.  Wastewater collection tanks.

3.  Broken asphalt and concrete pile in northeast corner of property.