UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO.,               .    Case No. 01-01139(JKF)
*et al.*,                       .
                                .    Sept. 29, 2008 (10:07 a.m.)
          Debtors.             .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: All Rise.

2            THE COURT: Good morning.

3            ALL: Good morning, Your Honor.

4            THE COURT: Please be seated.  This is the matter of

5    W.R. Grace, Bankruptcy No. 01-1139.  The participants I have

6    listed by phone are Jacob Cohn, Marti Murray, Scott Baena,

7    Darrell Scott, Edward Westbrook, Andrew Craig, Shayne

8    Spencer, Rita Tobin, Brian Mukherjee, Arlene Krieger, Peter

9    Shawn, Chelsea Clinton, Brian Kasprzak, Toby Daluz, Richard

10   Wyron, Gentry Klein, David Siegel, Carl Pernicone, Martin

11   Dies, Jennifer Whitener, Craig Bruens, Alex Mueller, Jason

12   Solganick, John D. Mattey, Leslie Davis, Steven Mandelsberg,

13   Dan Karmensky, Briana Cioni, Robert Horkovich, Douglas

14   Mannal, David Beane, Oliver Butt, Walter Slocombe, Douglas

15   Cameron, Jay Sakalo, Janet Baer, Sander Esserman, Christina

16   Kang, Warren Smith, Robert Guttmann, Michael Davis, Gerald

17   George, John O'Connell, Christopher Greco, David Bernick,

18   Elizabeth Devine, Catherine Chen, Matthew Kramer, Curtis

19   Plaza, Alan Runyan, Marion Fairey, Susette Smith, Terrence

20   Edwards, Mark Plevin, Jacqueline Dais-Visca, Debra Felder,

21   Ari Berman, Peg Brickley, Elihu Inselbuch, Melanie Dritz,

22   Christopher Candon, James Restivo, Anne Marie Aaronson,

23   Daniel Glosband, Jonathan Brownstein, Daniel Speights,

24   Barbara Harding, Theodore Freedman, William Sparks, Tiffany

25   Cobb, Ashok Vasvani, Mark Shelnitz, and Paul Norris.  If

1   there are any attorneys left in the United States, I'll take

2   entries in court.  Good morning.

3          MR. BERNICK: Good morning, Your Honor.  David

4   Bernick for Grace.

5          MR. LEON: Good morning, Your Honor.  Eric Leon also

6   for Grace.

7          THE COURT: I'm sorry, I can't hear you.  I

8   apologize.

9          MR. LEON: Eric Leon.

10         MR. BENTLEY: Phillip Bentley of Kramer Levin for

11  the Equity Committee.

12         MS. BAER: Janet Baer on behalf of Grace.

13         MR. O'NEILL: Good morning, Your Honor.  James

14  O'Neill on behalf of Grace.

15         MR. COBB: Good morning, Your Honor.  Richard Cobb

16  on behalf of the Bank Lender Group.

17         MR. ROSENBERG: Andrew Rosenberg on behalf of the

18  bank lenders.

19         THE COURT: Pardon me.  Court Call, is there _- I've

20  got music playing in the background and somebody -

21         COURT CALL: Right, I just located that line.  Out

22  of so many folks, it took a while to locate that line.

23         THE COURT: All right, thanks.  It also sounds like

24  somebody clacking kitchen pots.

25         COURT CALL: Oh.  I don't show any other noise

1    except for the courtroom line at this time, but as a gentle

2    reminder, ladies and gentlemen, for those of you who have

3    requested a live line today, please activate your mute

4    buttons at this time to not disrupt the courtroom, thank you.

5         THE COURT: Thank you.  One second, counsel, please.

6    Okay, thank you.

7         MR. KRUGER: Thank you, Your Honor.  Lewis Kruger,

8    Stroock, Stroock & Levin, for the Unsecured Official

9    Creditors Committee with my colleagues, Ken Pasquale and

10   Arlene Krieger.

11        THE COURT: Thank you.

12        MR. INSELBUCH: Good morning, Your Honor.  Elihu

13   Inselbuch for the Asbestos Creditors Committee.

14        MR. TACCONELLI: Good morning, Your Honor.  Theodore

15   Tacconelli for the Property Damage Committee.

16        MR. TURETSKY: Good morning, Your Honor.  David

17   Turetsky of Skadden Arps for Sealed Air Corporation.

18        MR. FRANKEL: Good morning, Your Honor.  Roger

19   Frankel for the Personal Injury Future Claims Representative.

20        THE COURT: Anyone else wish to enter an appearance?

21   Okay.

22        MS. BAER: Good morning again, Your Honor.  Janet

23   Baer on behalf of the debtors.  Your Honor, first we take up

24   the omnibus agenda schedule.  Matter number 1 on the agenda

25   is the continuing objection with respect to the Massachusetts

1    Department of Revenue.  That matter is tied up with an IRS

2    matter, and once again, we would like to continue that to the

3    next hearing which is on October 20th.

4              THE COURT: I'm sorry, Ms. Baer, just a second, I'm

5    behind here.  Okay, item 1 is continued, thank you.

6              MS. BAER: Thank you.  Your Honor, item number 2 is

7    the quarterly fee application matter.  I believe a

8    certification of counsel was filed with that.

9              THE COURT: I instructed staff to get those fees

10    approved and the orders entered.  I don't know whether that's

11    happened yet.  I just had an opportunity to talk to staff

12    this morning, so it's possible that they're not on the docket

13    yet, but the fees will be entered.

14              MS. BAER: Thank you, Your Honor.  Agenda item

15    number 3, Your Honor, is the motion of the debtors for

16    approval of a settlement agreement with the Town of Acton.

17    Certification of counsel was filed on that, Your Honor.  I

18    should say I received a communication from the Town of Acton

19    over the weekend.  They have now seen the debtors' draft plan

20    and disclosure statement that was just recently filed.

21    They've asked whether we could make a couple of adjustments

22    to the order.  I tried to talk to them this morning and

23    couldn't get ahold of them.  I'm not sure if the order will

24    ultimately be amended or not, but to the extent that the

25    Court's already entered it, what I would ask then is to be

1    able to submit a certification of counsel if we need to add

2    some language.

3            THE COURT: I already did instruct staff - that's

4    another one, I instructed staff to enter, I don't know

5    whether it's hit the docket, but if you need to amend it, you

6    can file a revised order if everybody agrees with it, but I

7    did instruct staff to enter that order as well.

8            MS. BAER: I suspect that that might happen since we

9    filed a certification of counsel, and I told counsel that,

10   that I thought that may happen in which case if we do need to

11   add some language, we'll go forward on the certification and

12   do it that way.

13           THE COURT: All right.

14           MR. SMITH (TELEPHONIC): Your Honor, sorry to

15   interrupt, but this is Warren Smith the fee auditor and if

16   all fee matters are concluded, if I could be excused, Your

17   Honor?

18           THE COURT: Yes.  Anybody who's interested in any

19   matters as to which I've instructed staff to enter orders,

20   even though they may not yet be on the docket and that would

21   be any matters as to which a CNO or COC has been filed, I

22   have instructed staff to enter all of those.  I was not able

23   to do that until this morning.  So, you're free to disconnect

24   or leave as you choose.  Thank you.  Thank you, Mr. Smith.

25           MR. SMITH (TELEPHONIC): Thank you, Your Honor.

1        MS. BAER: Your Honor, that takes us to agenda item

2    number 4, which is the debtors' motion to acquire a limited

3    liability company interest in a company identified as GR 2008

4    LLC.  A certificate of no objections was filed on that.

5        THE COURT: I have the same instruction to staff

6    with respect to that.

7        MS. BAER: Thank you, Your Honor.  That takes us to

8    agenda item number 5, which is the debtors' 25th omnibus

9    objection to claims.  On this, Your Honor, we have an order

10   to present to the Court with a number of exhibits.  The

11   claimants who did not respond, we are asking the Court enter

12   relief with respect to those claimants, and the exhibits

13   outline the various relief that is being asked for.  With

14   respect to those parties who either responded or did not

15   respond but contacted counsel requesting additional time to

16   address their issues, we are continuing that matter, and,

17   Your Honor, if I may, I'd like to just read into the record

18   the names of those parties for whom the matter's being

19   continued until the next hearing.

20       THE COURT: All right.

21       MS. BAER: Your Honor, they are: Adis Cohen Nobel

22   (phonetical), claim number 3344; Central Puget Sound

23   Recreational Regional Transport Authority, claim number 9123;

24   James and Anna Growl, claim number 9688; Harry Growl & Sons

25   claim number 9687; the Indiana Department of Revenue, claim

1    15355; a second one from the Indiana Department of Revenue,

2    claim 15369; Missouri Department of Revenue, claim 17719; Bro

3    and Moonos (phonetical), claim number 1959; New York State

4    Department of Tax and Finance, claim 2701; Old Castle APG,

5    claim 12943; Old Castle AG, claim 12944; the Pennsylvania

6    Department of Revenue, claim 318; Pennsylvania Department of

7    Revenue, claim 407; Richard Row, claim 14037; Richard Row,

8    claim 1641; Seaton Insurance Company, claim 15531; and June

9    Wright, claim 603.  Those matters, Your Honor, are all being

10   continued to the October 20th hearing.  In many of those

11   instances, counsel has contacted us for additional time to

12   respond, and we have agree with them to give them additional

13   time to respond.

14        THE COURT: All right.

15        MS. BAER: And, Your Honor, if I could, I would then

16   hand up an order with respect to all the exhibits.

17        THE COURT: I'll take it.  Thank you.  That order is

18   signed.

19        MS. BAER: Thank you, Your Honor.  Agenda item

20   number 6, Your Honor, is the debtors' 26th omnibus objection.

21   I believe a certificate of no objection was filed with

22   respect to that order.

23        THE COURT: All right, that order will have been

24   entered then.

25        MS. BAER: Thank you, Your Honor.  Agenda item

1    number 7 is the continued status of the Scotts Company.  As

2    Your Honor will recall this is an adversary proceeding filed

3    by the Scotts Company with respect to an issue as to whether

4    or not they are entitled to any shared insurance due to

5    certain asbestos claims that are being filed against Scotts.

6    Your Honor, I spoke with Scotts' counsel, who I believe is on

7    the phone, and we agreed that it makes sense to continue this

8    matter to the next hearing.  The debtors' plan, revised or

9    new plan of reorganization and disclosure statement was just

10   filed recently.  I think the parties are all studying that

11   and seeing what its implications would be on Scotts.  It's

12   clear that the Personal Injury Committee and personal injury

13   trusts that will be established will have quite an interest

14   in this as to the insurance, and under those circumstances, I

15   think it makes sense to continue this matter once again for

16   the parties to review the plan and then begin discussions

17   about how to handle this situation.

18            THE COURT: Continuing it until when?

19            MS. BAER: The next hearing, Your Honor, October

20   20th.

21            THE COURT: All right.  Anybody object to continuing

22   this to October 20?  All right, it's continued, thank you.

23            MS. BAER: Your Honor, agenda item number 8 is the

24   motion of the City of Charleston, South Carolina for relief

25   from stay.  This matter's been continued from time to time,

1    Your Honor.  The debtors and Charleston are still negotiating

2    over the sale of this property to Charleston.  There are

3    environmental challenges that make this a slow-going process,

4    but it is moving in a positive direction, and the parties

5    would ask that this matter also be continued to October 20th.

6            THE COURT: Anybody objecting?  All right, it's

7    continued.

8            MS. BAER: Your Honor, matter number 9 on the agenda

9    is a status report with respect to asbestos property damage

10   claims, and Mr. Restivo is on the line to address this

11   matter.

12           THE COURT: Mr. Restivo?

13           MR. RESTIVO (TELEPHONIC): Good morning, Your Honor.

14   James Restivo for the debtors.  Taking them in reverse order,

15   item number 10, Your Honor, is our motion to approve the

16   Jameson Hospital settlement.  A CNO was filed and that order

17   may be among the ones you talked to your staff today about.

18           THE COURT: That's correct.

19           MR. RESTIVO (TELEPHONIC): Item number 9 is a status

20   report on asbestos property damage claims.  Your Honor, on

21   September 2, we filed a motion for approval of the Bay Shore

22   Hospital settlement agreement, Docket No. 19428.  Objections,

23   if any, will be filed by October 3, and that will come on for

24   resolution at the October 20 omnibus.  On September 18, we

25   filed the Children's Hospital settlement agreement.  That

1    will come up for resolution at the November 24 omnibus

2    hearing.  Those two hospital settlements, along with the one

3    signed today on Jameson in effect will moot out motions

4    relating to a request to alter or amend the Court orders.

5    Those are still technically open at Docket Nos. 15421 and

6    16220.  As soon as the remaining two hospital settlements are

7    approved, we'll file a consent order mooting out those

8    motions that are still open.  On September 10, we filed a

9    motion to approve the settlement of 32 California State

10   University claims.  They will come on for resolution at the

11   October 20 omnibus hearing.  Also filed at that time approval

12   of Pacific Freeholds, that will come on for approval at the

13   October omnibus hearing.  On September 17, we filed a motion

14   for approval of the settlement of the 50 University of

15   California property damages claims.  They will come on for

16   approval at the November 24 omnibus hearing.  Lastly, Your

17   Honor, with respect to this category of claims, Mr. Speights

18   and I are in the process, getting settlement agreements

19   signed up on the 16 remaining Speights U.S. cases that were

20   settled, and hopefully, we'll be filing a motion to approve

21   those remaining 16 very shortly.  That leaves us, Your Honor,

22   with the rest of the property damage claims, by our count,

23   leaves Your Honor and the debtors with 74 unresolved property

24   damage claims.  Of those, Your Honor, 16 are claims of the

25   California Department of General Services.  Debtors believe

1    those are clearly barred by the statute of limitations.

2    Those have been briefed and argued, and we ask the Court to

3    rule on that motion.  On Thursday, Your Honor, the claimant

4    filed a certification of counsel reminding Your Honor that

5    argument on this motion was held on April 9, 2007.  I think

6    the Department of General Services is asking the Court to

7    rule on that motion.  If they are, debtors agree with that

8    request.  There is also a suggestion in that certification of

9    counsel that the Court ought to order the parties to conduct

10   discovery on our no hazard defense.  Obviously, the debtors

11   disagree with that.  If summary judgment is granted on the

12   statute of limitations, we will never get to a no hazard

13   trial, and if the Court decides there's some factual issue in

14   dispute precluding summary judgment, the next step would be a

15   hearing on that factual issue, and therefore, while we agree

16   with the Department of General Services that the Court should

17   proceed to rule on the summary judgment motion, obviously, we

18   don't think we ought to get involved in discovery on the no

19   hazard defense because the parties may not need to deal with

20   that.

21           THE COURT: Well, Mr. Restivo, let me tell you, that

22   one is actually my fault.  I thought my law clerk had that

23   back for final draft, and she thought that she had already

24   given that to me for final approval, and we just this morning

25   got resolved what the status of that opinion is, so that one

1  will be coming out shortly, very shortly, so, I think that we

2  can resolve that issue in the next day or two.  So, that one

3  really will be.  It's just one of those things, it was just a

4  glitch in my office that I don't have an explanation for.  It

5  was simply a glitch in my office.  It will be coming out

6  shortly.

7       MR. RESTIVO (TELEPHONIC): Thank you, Your Honor.

8  One of the other remaining 74 cases, Your Honor, is the

9  Maeserich (phonetical) claim which was also briefed and

10  argued at the same time, and again, I believe the parties

11  have asked the Court to also rule on that motion for summary

12  judgment.

13       THE COURT: Yes, and that one is not as - I had

14  thought that that one was ready, but when I got a draft back

15  - I had a student working on it, it's not ready.  So, that

16  one won't be coming out quite a quickly, but I am aware of

17  it, and someone is working it.

18       MR. RESTIVO (TELEPHONIC): The two remaining United

19  States cases, Your Honor, in the 74 cases, one is what is now

20  the individual claim of Anderson Memorial Hospital, a class

21  action having been denied, the other one is the Solo case,

22  Your Honor, where we asked the Court sometime ago to lift the

23  stay so the parties could have the appellate courts in New

24  York resolve the appeals.  We're now looking into the Solo

25  case, giving thought as to what might be done either in Your

1    Honor's Court or the New York Courts to move Solo along, and

2    we hope to file a suggestion with respect to Solo promptly.

3    That leaves, Your Honor, 55 remaining cases that are still

4    open and unresolved, and those are Canadian claims of

5    Speights & Runyan.  Of those 55 claims, Your Honor, 35 are

6    from provinces which have an ultimate statute of limitations.

7    You may recall at one point, I opined that the Canadian

8    ultimate statute of limitations is not unlike a United States

9    statute of repose.  In any event, Your Honor, it has become

10   apparent to Mr. Speights and to me, that we simply cannot

11   settle the 35 remaining Canadian claims that are subject to

12   an ultimate statute of limitations defense, and Mr. Speights

13   and I are in agreement that the Court should proceed to rule

14   on our motion for summary judgment with respect to the

15   ultimate statute of limitations.

16          THE COURT: All right, well -

17          MR. RESTIVO (TELEPHONIC): I believe Ms. Baer has in

18   the courtroom a listing of those 35 claims, and we will

19   provide that to the Court.  As the Court may recall, when we

20   filed our original motion, we were talking about 88 Canadian

21   claims.  We're talking about the ultimate statute of

22   limitations in some provinces and regular statutes of

23   limitations in some provinces.  Mr. Speights and I are

24   looking for a ruling only on these 35 cases in the ultimate

25   statute of limitations because Grace and Mr. Speights are

1    still in discussions on the remaining cases which are not

2    subject to an ultimate statute of limitations defense.  We

3    have not given up hope with respect to the possibility of

4    resolving them, and so the reason we want to give the Court a

5    list of the 35 claims is to make sure the Court only rules on

6    the ultimate statute of limitations because there is still

7    some hope we may be able to move the remainder of the

8    Canadian claims.

9         THE COURT: Well, I thought that -

10        MR. RESTIVO (TELEPHONIC): And that is where we

11    stand then with respect to the property damage claims.

12        THE COURT: I thought as to those that were subject

13    to, in the debtors' view, an ultimate statute of limitations,

14    that Mr. Speights had requested some opportunity to do

15    discovery or retain an expert in the event that we were

16    actually going to go forward with the summary judgment

17    argument on that point.

18        MR. RESTIVO (TELEPHONIC): Your Honor, I think the

19    arguments in the retentions have all been done.  It's my

20    recollection, but I don't have the file in front of me, that

21    with respect to the ultimate statute of limitations, Mr.

22    Speights did want to do, I think, some discovery of our

23    expert or have some information from our expert.  All of that

24    was done, and indeed, Mr. Speights filed after our argument

25    two supplemental pleadings which are part of the record at

1    Docket Nos. 17059 and 17171, and so, we believe that the case

2    is now ripe for resolution by the Court.

3        THE COURT: Okay, then we're going to set it up for

4    summary argument because it's been way too long, and I don't

5    even know that I've seen the supplemental pleadings because

6    it's just been simply way too long.  So, I want some

7    refresher before I take a look at this and some, I guess,

8    binder that's going to put all of the relevant pleadings

9    together for me.  I just simply don't have a - I have a

10   recollection, but not a good enough one to take this under

11   advisement in that format.  So, maybe I'll - I don't know,

12   Mr. Restivo, whether you and Mr. Speights want to work

13   something out or whether you want me to have Ms. Baer contact

14   my law clerk to set up some scheduling order and get this

15   done?  It doesn't have to be on an omnibus date if it's just

16   going to be you and Mr. Speights doing some argument.  We can

17   specially set it for an hour or two, however long it's going

18   to be, but I want to get it teed up in a fashion that's going

19   to make a little bit more sense than this.

20       MR. RESTIVO (TELEPHONIC): I'll be happy to talk to

21   Mr. Speights, and then we'll talk to Ms. Baer and then she

22   can talk to your scheduling clerk.  I'm hopeful of being out

23   of the country the last week in October, and so, if you let

24   Mr. Speights and I talk about the dates, then we'll talk to

25   Ms. Baer and maybe we could just set an argument for about an

1    hour to refresh ourselves and the Court as to what the

2    arguments are.

3            THE COURT: All right, that would be fine.

4            MS. BAER: And, Your Honor, I do have the listing of

5    the 35 claims if you'd like me to hand it up.

6            THE COURT: Sure, you can give that to Ms. Baker.

7    She'll take that.

8            MR. MANDELSBERG (TELEPHONIC): Your Honor, if Mr.

9    Restivo is finished speaking, this is Steven Mandelsberg from

10   Hahn & Hessen.  As you know, we represent the State of

11   California, Department of General Services.  Just a couple of

12   observations, Your Honor.  Mr. Restivo is correct.  We did

13   file a certification the other day that sought to inquire

14   about the status of the pending summary judgment motion of

15   W.R. Grace against our client's 16 claims, and I gather that

16   Your Honor's issuance of a decision this week might sort of

17   clarify matters, and for that, we appreciate the Court's

18   indication that a decision would be forthcoming, and we

19   obviously believe differently than Mr. Restivo that W.R.

20   Grace isn't clearly entitled to summary judgment as he

21   mentions.  We submitted extensive opposition papers as to

22   other claims.  I asked for a scheduling order and the factual

23   hearing, of course, will be influenced by the Court's

24   decision, but we don't think that there's any reason why the

25   parties can't move on a double-track basis pending the

1    decision.  There's only two witnesses involved on the hazard

2    issue.  Your Honor may recall that you recently granted our

3    order to submit the expert report of Mr. Wango (phonetical)

4    and there would be no reason why, pending your decision on

5    the summary judgment motion, some sort of scheduling order

6    couldn't be worked out, but we'll of course wait for that

7    decision.

8            THE COURT: Yeah, I think that's an issue that can

9    be addressed at the next omnibus if it's relevant, Mr.

10   Mandelsberg.

11           MR. MANDELSBERG (TELEPHONIC): Thank you, Your

12   Honor.

13           THE COURT: All right.

14           MS. BAER: We'll put the basic status of PD back on

15   for the next omnibus hearing then, Your Honor.

16           THE COURT: If it's relevant, I think it can go back

17   on at the next status hearing.

18           MS. BAER: Thanks.  Your Honor, that concludes the

19   omnibus portion of the hearing agenda today and takes us to

20   the contested matter.

21           THE COURT: Mr. Bernick, give me one second and let

22   me finish a note on - I just want to make sure that I make a

23   note about the fact that we have the list of the 35 and that

24   Ms. Baer's going to contact my office to arrange a schedule

25   for the argument on the Canadian claims.

1          Okay, so, yes, I think just to keep status reports

2     on the property damage issues will be helpful, so I think

3     another status report in October would be helpful.  Okay, so

4     we're up to item 11?  Mr. Bernick - Oh, sorry.

5          MR. BENTLEY: Your Honor, just a process

6     clarification before we proceed - Phillip Bentley for the

7     Equity Committee.  Your Honor issued an order saying you

8     would hear one hour from the debtor, one hour from the bank

9     lenders.  There are other parties on each side, the Equity

10    Committee here, the Commercial Committee on the other side,

11    that I think may need to be heard briefly.  So, I just wanted

12    to advise Your Honor of that before we get going.

13         THE COURT: Yes.  I understood that there would be

14    other parties who are all involved.  I think the positions of

15    the parties have sort of been consistent, I think.  The issue

16    is really a two - I'll say two-party dispute.  There's one

17    side basically on one position on the interest issue and

18    another set of parties on the other side on the interest

19    issue.  I'm not really seeing a wide variety of disputes in

20    the papers.  To the extent that there is a dispute and you

21    need some additional time, I'll certainly hear all of that.

22    I think the major arguments ought to be able to be

23    accomplished within the hour that I've allocated, but yes, I

24    certainly appreciate the fact that you have a client to

25    represent.  I'll be happy to hear everybody's positions, but

1   I don't think it should take four hours to argue these

2   matters.

3           MR. BENTLEY: We agree entirely.

4           THE COURT: All right, Mr. Bentley, thank you.

5           MR. BERNICK: Good morning, Your Honor.  This was

6   originally our motion, and we're prepared to go first.

7   There's been some colloquy between the sides with respect to

8   the status of exhibits and exhibits that apparently the bank

9   lenders and the Unsecured Creditors Committee would offer

10  into evidence.  I think probably the best idea procedurally

11  is to have the argument.  People can make reference to

12  whatever it is that they want, and if folks want to then

13  offer into evidence exhibits, that's fine, but my suggestion

14  is that we do that at the conclusion of the process rather

15  than right now at the beginning, and that way people can go

16  ahead and make the arguments they want and we can then have a

17  discussion about exhibits if that's necessary.

18          THE COURT: Anybody object?

19          MR. COBB: No, Your Honor.  Richard Cobb on behalf

20  of the bank lender group.

21          THE COURT: Mr. Bentley, any objection?

22          MR. BENTLEY: No objection, Your Honor.

23          THE COURT: Anybody object?  All right, that's the

24  process we'll use, thank you.

25          MR. BERNICK: Okay.  Your Honor, if I could step up

1    to the board here.  What I would like to do is begin by

2    laying out what I'll call a legal roadmap that I think is

3    necessary in order to focus the issues that are essentially,

4    at the end of the day, our point of view, factual issues and

5    factual determinations that have to be made by the Court, but

6    in order to perhaps speed the process of getting to that

7    point, I want to talk first of all about the legal framework,

8    and fundamentally, one of the major problems that we have

9    with this case, is that there's a very different view between

10   the two sides - Can Your Honor see this?

11          THE COURT: Yes, I can.

12          MR. BERNICK: But with respect to, in a sense, what

13   is the governing body of law when it comes to the questions

14   not only the substantive questions of what rate of interest

15   should be paid to the unsecured creditors and the bank

16   lenders, but also the process that applies in the

17   determination of that issue, and what I've drawn here, very

18   simply, is a simple time line, and it's not designed to be

19   precise chronologically, but it is designed to be precise in

20   terms of the sequence of what particular kinds of facts and

21   what kinds of law apply, particularly given the distinction

22   between what happens pre-bankruptcy and what happens post-

23   bankruptcy.  Pre-bankruptcy, this is a focus of a lot of what

24   bank lenders have to say and there's no question but that the

25   credit agreements are dispositive documents pre-bankruptcy.

1    The difficulty with their position is that they appear to

2    suggest and argue, indeed strenuously so, that the entirety

3    of the matter now before the Court can simply be resolved by

4    taking a look at the credit agreements, and that is just not

5    so.  It ignores a fundamental fact, which is that we are in

6    bankruptcy, and bankruptcy has an impact both on the

7    substantive rights that are involved as well as the process

8    that needs to be followed.  In order to make it more concrete

9    about that, clearly the credit agreements are part of the

10   bankruptcy with payment of principal and interest.  The

11   credit agreements also set out a process whereby the terms of

12   the credit agreements to be modified, that process requiring

13   various kinds of written consent and authorization and indeed

14   the law that deals with contracts, supplies an awful lot of

15   other requirements and vehicles and rules and procedures that

16   give bite to that process, and we've heard in their briefs

17   it's kind of a profusion of some of these doctrines.  Well,

18   was there actual authority, was there apparent authority, is

19   there estoppel - all of these doctrines are very interesting

20   in a pre-bankruptcy context.  The question is, what relevance

21   do they have now that we're in bankruptcy?  Bankruptcy gets

22   filed and immediately the case now has - the bankruptcy law

23   now affects both substantive entitlement and process.  And

24   the key provisions that we focus on is sanctioned by those

25   two.  You can't write § 502 out of the Code.  You can't

1   decide § 502 out of the Code, and 502 has an impact on

2   substantive rights.  It says what is allowable and what is

3   not allowable, and no amount of explanation or parsing of

4   cases can change the plain language of § 502.  It says, that

5   with respect to principal and interest - pre-petition's

6   interest, that is allowable.  With respect to post-petition

7   interest, no.  It just says, no, pure and simple, no ifs,

8   ands, or buts about it, it says, no.  What that means is that

9   there is no legal entitlement under the Code to post-petition

10  pendency interest.  There's just not.  Now, the process also

11  is affected.  We can talk for a long time about working

12  consents and clear authorization, et cetera, et cetera, under

13  the credit agreements, but the fact of the matter is that

14  credit agreements can't revise or countermand what 502 says.

15  502 trumps the credit agreements.  So, for the bank lenders

16  to participate directly in the process as if they're now

17  coming in, they're all sitting down here in court everyday,

18  negotiating and figuring out how to amend the agreement,

19  that's just not how it works.  We have a Committee appointed,

20  the Unsecured Creditors Committee, and the Unsecured

21  Creditors Committee is designed to represent the interests of

22  the group as a whole including the bank lenders.  The bank

23  lenders, there's no question about it, don't in a sense

24  directly participate until the time comes for there to be a

25  vote and confirmation.  What happens in between?  Well, what

1    happens in between is absolutely of the essence.  It is the

2    plan development negotiation process.  And why is that the

3    job of the Unsecured Creditors Committee, which it clearly

4    is, is that where you have not simply the preexisting

5    contracts, but you have the overlay of bankruptcy including

6    provisions that affect the substantive rights of the

7    participants.  It's totally appropriate that the creditors

8    work through a Committee whose job it is to deal with the

9    bankruptcy context, and how is it that you get to the

10   hallmark and the ultimate goal that a bankruptcy, if you have

11   a plan that's developed and negotiated and agreed to.  You

12   don't wait till the end and the noses are counted before you

13   reach a vision and a way of getting to the finish line here

14   and a resolution.  This whole entire bankruptcy process

15   depends vitally on the functions that the Unsecured Creditors

16   Committee plays, the ability of the Unsecured Creditors

17   Committee to take on the critical process of plan development

18   negotiation and produce the ability to get the closure in the

19   case.  That is what the process is about.  That's the process

20   under the Code.  So, we now talk about this whole stage

21   that's being set in terms of not simply that the

22   documentation that predated the bankruptcy but the very basic

23   dimensions of what the bankruptcy processes are about and the

24   very basic provisions about what substantive rights are

25   retained and which ones are not.  And so, what is the job

1   then of the Unsecured Creditors Committee in trying to get a

2   plan that's developed and negotiated?  Well, you have to look

3   down the road.  In the Indico (phonetical) case, actually the

4   Fifth Circuit puts it best, it says, Once the bankruptcy is

5   filed, equitable considerations really affect everything that

6   happens in the case, because at the end of the day, there

7   goes - equitable considerations play a huge role in the

8   confirmation process.  So, the job of the Unsecured Creditors

9   Committee is not only to focus on pre-bankruptcy agreements,

10  but to focus on equity.  Equity is doing - Equity is the job

11  of the Unsecured Creditors Committee to do equity, and what

12  is equity, the manifestation relief, the verbalization of

13  that requirement, we have 1124(1) which deals with

14  impairment, and that's a necessary predicate for 1129, which

15  we're going to get to, and as we had indicated under 1124(1)

16  it is the Code that says that there's no post-petition

17  interest, there's no impairment, but this deals with the

18  impairment issue.  The basic provision dealing with equity,

19  obviously, is 1129(b).  1129(b) says, Equity that was fair

20  and equitable is going to carry throughout the case.  So the

21  Unsecured Creditors Committee has the obligation to do equity

22  and to obtain equity.  The impact, though, of 1129(b) on 502

23  is an interesting and critical one.  1129(b) says, Yes, we're

24  going to do what is fair and equitable, but the specific

25  impact that it has on 502 with respect to pre- and post-

1    petition interest is to create an element of potential change

2    to 502 and uncertainty in the following way: 502 says that

3    principal and pre-petition interest are allowable, but

4    whether they become allowed is subject to the requirement of

5    fairness and equity in the absolute priority rule.  So with

6    respect to the absolute priority rule, if you have a

7    situation where there is insolvency and there's not the

8    ability to pay principal and interest in full, the absolute

9    priority rule says, you may get less than full principal and

10   pre-petition interest.  Likewise, 1129(b) says with respect

11   to post-petition interest or it's been applied with respect

12   to post-petition interest, saying, You may actually get post-

13   petition interest notwithstanding 502 if it is - if you have

14   a solvent debtor and the solvent debtor is able to pay all of

15   its claims in full.  So, what that then indicates is that

16   502, which says no post-petition interest is subject to the

17   overlay of the fair and equitable requirement with the

18   possibility that there may be a plus, you may get post-

19   petition interest, depending upon solvency.  Now, this

20   becomes then the stage that is set for the whole question of

21   who is doing equity here in this case because this is the

22   stage that says with respect to a case where solvency itself

23   is an issue, there is tremendous risk and uncertainty with

24   folks like the bank lenders.  They are at risk if the

25   solvency determination or if the estimation of personal

1    injury claims turns out to be a bad result, they're at risk

2    of getting not only no interest, no pre-petition interest,

3    they're at risk of getting less than all the principal back.

4    They may do worse as a result of the fair and equitable

5    requirement as set forth in the absolute priority rule, but

6    alternatively, if the solvency analysis works out well, the

7    estimation works out well, they may be able to do better than

8    what 502 would ultimately enable them to get.  So the stage

9    is now set that in a case, such as the present case, where

10   solvency is a central issue, we now know that the Unsecured

11   Creditors Committee, trying to do equity or under the

12   obligation to do equity, faces enormous uncertainty and risk,

13   and that now brings us to the factual story that we believe

14   is so critical here, because ultimately this case turns on

15   that factual story.  The time is the end of 2004 and early

16   2005.  At that point in time, the parties in the case, under

17   the direction of the Court, had been directed to go ahead -

18   the debtors had been directed to file a claim.  Your Honor

19   will recall the debtor wanted to do an estimation, and Your

20   Honor said, Look, before we do anything, we're going to get a

21   plan filed, and then we'll think about the estimation

22   process.  So estimation is very much at the forefront as well

23   as the requirement to file a plan.  The debtor and the bodily

24   injury claimants, the Asbestos Claimants Committee, as well

25   as the PD Committee, are poles apart, and they're poles apart

1   in precisely the way that magnifies the risks and

2   uncertainties that are created by the Code in the context of

3   a case where solvency is an issue.  The debtor obviously

4   believes that it's solvent because it believes the asbestos

5   liabilities are much lower than the PD indicates and UCC

6   Committee do who believe the debtor is insolvent because the

7   liabilities are much greater, but what this means now is that

8   the bank lenders are sitting there saying, Well, which way is

9   it going to turn out?  Maybe we'll have pennies on the

10  dollar.  Maybe we'll be able to get some of that post-

11  petition interest that 502 would otherwise preclude.  They

12  could have sought to go either way, and indeed there are

13  cases where the unsecured creditors that negotiated first

14  with the bodily injury claimants, that's what happened in <u>Dow</u>

15  <u>Corning</u> when the banks tried to do a deal with the tort

16  claimants.  That's where they first cast their lines, and the

17  tort claimants were prepared to pay them pretty much in full.

18  So, if they had a choice, they could have gone to the

19  asbestos claimants and done a deal, but history told them

20  that that deal was not likely to pay them even the full

21  amount of their principal and pre-petition interest, that

22  basically in these kinds of cases, the bank lenders had been

23  under huge pressure, indeed and as a result of that pressure,

24  had agreed when they had to do a deal with the claimants,

25  they agreed to numbers that were far lower than even the

1    amount that 502 would allow.  So, they decided - the bank

2    lenders decided to go, it chose us, it decided to do a deal

3    with us, but what then unfolded was an arm's length

4    negotiation.  We know now from the record in this case, and I

5    would direct Your Honor's attention to Exhibit A to our trial

6    brief, which is a piece of correspondence from one of the

7    bank lenders at the time.  It's dated November of 2004 where

8    that particular lender said, We should be asking for default

9    interest.  So they had lenders that were out there that were

10   saying default interest is where we should go, but they

11   obviously had other people in the group and they ultimately

12   negotiated the deal, and the deal gets interesting because

13   far from the kind of hear no evil, see no evil that they now

14   say characterizes the relationship between the bank lenders

15   and the Committee that is that the bank lenders were out

16   there blind to what the Committee was doing, we now know from

17   the briefs themselves that the rate was negotiated - and this

18   is a quotation, if we can - We now know from the brief that

19   was filed by the Unsecured Creditors Committee before the

20   Court in connection with this matter, this rate was

21   negotiated between the debtors and the Creditors Committee in

22   consultation with certain of the largest holders at that time

23   of the bank debt claims.  Now they go on to say, Oh, well,

24   but you didn't have them signed in ink.  And of course, as

25   they were talking about a limit, you couldn't have them sign

1   in ink, but the fact of the matter was that this was a deal

2   that was not only negotiated at arm's length, it was

3   negotiated with the direct participation, arm in arm, the

4   significant largest holders of the bank debt stood with the

5   Unsecured Creditors Committee behind them, knew what they

6   were doing, and obviously were comfortable with it.  The

7   result of all that is that as the process contemplated and

8   facing these kinds of risks, these folks decided to do a deal

9   in the early part of 2005.  Now, today, that deal is much

10  maligned.  It's kind of, Show me anything, but don't show me

11  that deal.  They say, It wasn't binding.  It's like the thing

12  never happened, that we were just talking to ourselves in the

13  process.  We were negotiating against ourselves.  We agreed

14  that if our plan went through, we would pay them principal,

15  pre-petition interest, post-petition interest including a

16  certain level of default but it had no binding affect on

17  them.  They can just walk away because after all they're not

18  the Committee.  That position is cynical, it's wrong, and

19  it's inequitable under 1129(b).  What specifically did they

20  say?  They say, We did not seek to have them nor did they

21  modify their credit agreement.  They say they didn't follow

22  the process that the credit agreement required in order to do

23  some change to the interest rate.  The answer to that is

24  pretty simple.  It's the 502 - it's 502 that's the issue.

25  It's the economy - It's 502.  It's not the credit agreement

 1    that's their problem, it's 502.  What's the point of

 2    modifying the credit agreement?  It's not going to change the

 3    terms of 502, and 502 is the problem, and then how would you

 4    actually modify the credit agreement?  This is a case that

 5    turns on the ultimate question of what the asbestos

 6    liabilities were.  No matter what they agreed in the credit

 7    agreement, the asbestos liabilities didn't turn out right,

 8    they were underwater.  So what are you going to do?  They

 9    have a modification that all the majority holders explicitly

10    and with authority agreed to, that says in the credit

11    agreement, Well, depending upon, you know, this level of

12    solvency and this level of insolvency, this level of asbestos

13    liabilities, whether it's this plan, the other plan, or it's

14    three years from now, four years from now, it's trying to tie

15    a knot on a whistle that you make.  You can't possibly in the

16    context of that kind of document, a credit agreement, give

17    rise to an elaborate contingent plan that anticipates all the

18    potential developments in a Chapter 11.  No one would even

19    dream of trying to deal with the myriad different

20    developments that could take place that would cause the

21    agreement to have to read out differently.  They say, second,

22    Hey, guys, the bank lenders remain free to vote against the

23    plan.  You didn't believe that you had a deal because

24    otherwise you would have assured that they had to vote for

25    the plan.  And the answer is that, Well, they know that we

1  couldn't do that.  There are very significant issues with

2  trying to, quote, "lock up a vote".  So the vote could not be

3  locked up no matter what we did, and we knew that.  So, what

4  is it that we did, what is it that we did with this deal, and

5  in what way is it binding?  We did precisely what the

6  bankruptcy process, about looking for fairness and equity and

7  recognizing the uncertainty of the issue of solvency, we did

8  exactly what the bankruptcy process contemplates.  We did a

9  deal with the Unsecured Creditors Committee on the basis of

10  which they then agreed to support our plan.  That's the most

11  that could be done.  That was the right thing to be done.

12  That is the functionality that is sought through the

13  operation of the Unsecured Creditors Committee, and when they

14  did that deal - the Unsecured Creditors Committee did that

15  deal to support the plan, they were operating with the

16  authority of their constituency, witness this very statement

17  in the brief.  This is not a situation where they were a

18  rogue committee.  This is a situation where they were an

19  authorized committee, an informed committee, and not only was

20  that true on the basis of what's said in the brief, it could

21  not but be true because we know that they had correspondence

22  with their own people.  So we had a deal, a deal that under

23  the bankruptcy process has all the hallmarks of exactly what

24  is respected in the bankruptcy process and expected, and in

25  doing so, the Unsecured Creditors Committee did follow their

1    obligation to keep their mind and their eye focused on

2    1129(b), on the risks and uncertainties associated with the

3    process, and on 502, which by no means gave them an assurance

4    much less an entitlement to be able to get post-petition

5    interest.  Now, they've got a lot of things - a lot of legal

6    doctrines and cases that they want so say, Oh, well, that

7    doesn't really mean anything, and it goes on and on and on,

8    and I'm sure that I'll hear about this, and I'll have to

9    respond to it as I'm looking forward to in connection with

10   the reply process, which then reminds me I've got to get

11   done, but enough said that, first of all, most of the cases,

12   a lot of doctrines, to get back to their brief, deal with all

13   kinds of doctrines that pertain to contract modifications.

14   This is not a contract modification issue.  This is a plan

15   negotiation issue.  Those documents like estoppel, like, you

16   know, apparent authority, actual authority.  It reads like a

17   nice textbook but it doesn't read out of the right text

18   because it deals with contract instead of with bankruptcy.

19   Then they deal with the Armstrong cases if Armstrong helps

20   them out.  Armstrong was an issue of judicial estoppel and

21   waiver, and the Third Circuit looked it as an issue of

22   judicial estoppel and waiver, and the question on the table

23   was whether there was estoppel to make an objection to the

24   plan, and the Court said that there was not estoppel to make

25   objection to the plan.  We're not arguing estoppel.  We're

1   not arguing that they can't object.  They have objected to

2   what we're doing.  The question is whether their objection is

3   well-taken or not, and <u>Kensington</u> and <u>Armstrong</u> doesn't

4   answer that question at all because <u>Armstrong</u> is a completely

5   different case.  It's ultimately a case of a clearly

6   insolvent debtor and the question has been an absolute

7   priority rule question, which it is not in this particular

8   case.  So, their citation to <u>Armstrong</u> for the proposition

9   that we can't somehow prevent them from making their

10  arguments, is completely inapposite.  They're making their

11  arguments, they can go ahead and make them, they're wrong,

12  and <u>Armstrong</u> doesn't address the issue of whether they're

13  right.  <u>Kensington</u>, that was an issue that pertained to the

14  recusal of Judge Woolen in connection with this case and

15  other cases.  The issue there was the timeliness of the

16  recusal motion, and the Court then found, on the basis of

17  very specific facts, that the people who made the motion for

18  recusal did not have - it was too hard to connect the dots

19  saying that they should have imputed knowledge with regard to

20  what one of the law firms that represented some of them knew

21  at a given point in time.  Not only is it factually

22  distinguishable, this is not a timeliness question.  Again,

23  they're here making the objections.  This is not a question

24  of whether it can be considered.  This is a question of

25  whether it's meritorious.  But we're not done because not

1   only did they do a deal at the time that was every bit as

2   hallowed and important and weighty in the context of doing

3   equity as any deal could be, but the facts actually got even

4   more powerful.  Subsequent to that deal being done in early

5   2004, there are more effects.  The deal was re-upped in 2006,

6   same deal.  Maybe some new lenders had come into the picture,

7   but the idea that somehow lenders couldn't know about the old

8   deal when it's re-upped.  You now have two separate deals,

9   included they would have to have known about it.  Why?

10  Because these deals were reflected in Grace's financial

11  statements, and the exhibits - and this process, Your Honor,

12  actually include - I think they even listed Grace's financial

13  statements that were made public during this process.  They

14  clearly call out exactly how interest is being calculated,

15  and it's not simply the default rate.  It's a different rate.

16  It's the agreed rate.  So, now I'm supposed to imagine that

17  lenders who are now trading into these debt securities are

18  somehow still not knowledgeable to the fact that they're not

19  getting under Grace's view of what the obligations are, that

20  they're not getting their credit agreements?  When the

21  financial statements themselves call out in black and white

22  that they're not getting that rate.  They're getting a

23  different rate.  Throughout this whole period of time,

24  moreover, the UCC, the Unsecured Creditors Committee never

25  says it's backing out.  No bank lender comes forward and says

1    that they're asking for more.  Things remain status quo, and

2    it gets better yet.  On the basis of having done this deal

3    with the Unsecured Creditors Committee, the debtor went

4    forward and did its job.  We litigated.  We litigated very,

5    very extensively, and we ultimately negotiated very

6    extensively with the claimants, both on the PD side and also

7    with respect to personal injury.  Nobody said during that

8    entire process, We're backing out.  We're backing out.  That

9    letter is no longer good.  Nobody said that the letter was

10   terminated.  Nobody said that the letter was not good and to

11   forget about it.  And so the debtor went ahead and did a term

12   sheet, and it incorporated as one element of that term sheet

13   as a precondition for the plan that was the subject of that

14   term sheet, it incorporated the terms of the 2006 agreement,

15   and we then get the statement, that's an outrageous statement

16   in the briefs that have been filed by the bank lenders that,

17   Oh, they kind of learned about it way after the fact, and

18   geeze, they just never knew, and well, if they had been

19   consulted, they certainly would have objected.  Well, we know

20   that's not true either because a term sheet was essentially

21   given to the counsel to the Unsecured Creditors Committee,

22   and this is one of the exhibits that we have in the case,

23   that's the memo from Ms. Krieger to Mr. Shelnitz with a copy

24   to Mr. Kruger, basically reiterating that they're looking at

25   this in the same term, the same language, the same rate, and

1   all the rest of that, and they're not saying that they're

2   backing off of that.  They're not saying that the letter is

3   terminated.  The most that is said is that there's a proviso,

4   Any such holder may seek to obtain a higher interest rate and

5   shall be entitled to if the Court determines such rate is

6   appropriate.  What's so magnificent about that and so

7   stunning is that now in the face of the actual term sheet

8   there's no statement that the letter agreement is terminated.

9   Not one single statement.  Indeed, the Committee through its

10  counsel is not saying that the Committee through its counsel

11  believes that this is inequitable, believes that the letter

12  agreement is no longer good.  To the contrary, it says, Okay,

13  now somebody may - Well, of course, somebody may seek to

14  obtain a higher rate, and if the Court says they get a higher

15  rate, they get it.  That's always true.  Anybody can

16  ultimately at the end of the day, if they want to, vote

17  against and object.  That's a restatement of what the law

18  says is true.  What is not there, and therefore, really in

19  critical respect, is upon the very question, is the deal with

20  the Unsecured Creditors Committee still good?  This email

21  says it is still good.  It says, We're still there.  We're

22  still not walking away.  Today, as we sit here in court, the

23  letter agreement has not been terminated, has not been

24  terminated.  Indeed today, while they asked to get a higher

25  rate of interest, they say that the letter - they're still

1   not saying that the letter agreement is terminated.  I don't

2   mean to interrupt Your Honor's looking at it.  This is the

3   same -

4           THE COURT: Well, it says, One, for holders of pre-

5   petition bank credit facilities, post-petition at the rate of

6   6.09 percent from the filing date and thereafter at the

7   floating rate compounded quarterly in the manner provided for

8   under the credit facility for all other unsecured claims -

9           MR. BERNICK: Yes.

10          THE COURT:  - which isn't relevant now.

11          MR. BERNICK: Right.

12          THE COURT: And then, provided, however, any such

13  holder may seek to obtain a higher rate, but that's for the

14  all other unsecured claims.  That's under the second

15  paragraph under for all other unsecured claims not under the

16  pre-petition bank credit facility which is fixed at 6.09

17  percent.

18          MR. BERNICK: Fair enough.

19          THE COURT: So, they're not asking for more than

20  6.09 percent.

21          MR. BERNICK: That's fair enough.  Yeah, well, so,

22  we have here, you know, a stunning statement that they then

23  had the opportunity right there and then, knowing the term

24  sheet, to say, no, wait a minute, the Committee's not onboard

25  and the counsel are not onboard, and they never said that.

1   Indeed, today, they still have never said that, so they're

2   coming before this Court with what is basically a hedge.

3   They're saying, Oh, Your Honor, please find that we're

4   entitled to the full contractual default rate, but by the

5   way, there really is a floor here because we're still signing

6   on, we've still got this letter agreement with the debtor.

7   They shouldn't be able to do that hedge.  It is not fair.

8   It's not equitable.  It's not candid with the Court.  This

9   then brings to the issue that we believe - the issues that we

10  believe should be decided here, and I'll go through this, I

11  think in fairly short order so that my colleagues on the

12  other side can address these issues.  First of all, there's

13  an initial contention that our request to have this matter

14  determined is procedurally premature because we're not in the

15  throws of a final confirmation hearing, and we think that

16  that argument doesn't really have any basis for it.  There's

17  nothing in the plan, there's nothing in the Code that says

18  that somehow you can't tee up confirmation issues, that is,

19  discrete confirmation issues after a plan has been filed,

20  after a disclosure statement has been filed but before the

21  final confirmation hearing.  <u>Calcine</u> (phonetical) did not

22  involve that circumstance.  The case that is actually most

23  instructive on this is a case called - it's a Delaware case,

24  <u>In Re: Stone & Webster</u>.  It's decided by Judge Walsh and the

25  citation is 286 Bankruptcy 532, and at that time and in the

1    course of that case, this issue really is crossed.  The Court

2    says - this dealt with substantive consolidation, I view the

3    Creditor Committee's consolidation motion as a request for

4    the Court to make a determination that as an element of the

5    plan, the substantive consolidation provision is authorized

6    and on the facts of these Chapter 11 cases is appropriately

7    warranted.  While not a routine procedure, it is not at all

8    unusual for a plan proponent or a plan opponent to seek a

9    determination prior to the plan confirmation hearing as to

10   the legitimacy of a particular provision of the proposed

11   plan.  I view the Creditor Committee's consolidation motion

12   as such a request.  And that's exactly the request that we've

13   teed up and we've teed it up on a very timely basis.  We then

14   come to the merits and we would propose, Your Honor, that the

15   Court address the merits by focusing on three basic

16   questions, and the three questions are these: We ask the

17   Court to determine first whether the Unsecured Creditors

18   Committee's agreement is dispositive of fair and equitable no

19   matter what the outcome of any solvency procedure would be,

20   and this essentially is the question that's posed about

21   whether they are held to their actions, that having basically

22   made a bet and made a deal where the picture was uncertain

23   and they were at risk of loss, whether they are now held to

24   that deal as a matter of equity.  That is that looking at

25   this through the lens of what's fair and equitable, what's

1  fair and equitable is that the bankruptcy process as it

2  unfolded and as it was fully complied with should be

3  respected, and the Court specifically doesn't need to look at

4  solvency because after the fact, a determination of solvency

5  is exactly what they bargained away.  They bargained away,

6  under this arrangement, they bargained away that

7  determination because they got an exchange, a floor that

8  protected them, therefore, the very first issue is whether as

9  a matter of equity, fairness and equity, whether this deal

10  should be respected.  A deal that still remains in place in

11  this Court.  The second issue says, If the agreement is not

12  dispositive because it is not binding, which is really their

13  nomenclature, and we would suggest, it's not the appropriate

14  test but is a question of whether it is equitably dispositive

15  but let's assume that Your Honor says, Gee, you know, because

16  it's not binding, I want to take a look at the other fair and

17  equitable factors that should be controlling on this issue.

18  Your Honor says, Fine, let's go ahead and do that but then

19  fair is fair and equitable is equitable.  That is a question

20  where the result could either be above what our agreement is,

21  that is that they get more default interest, or below what

22  that agreement is, that is that if they want to say this

23  agreement is not binding, well, it's not binding.  Then we'll

24  go and do the fair and equitable analysis, but then their

25  fortunes rest or fall on the analysis, and they have no

1  guarantee of any kind of floor.  Now, again, we would say

2  that that's not really fair and equitable because what that

3  does is basically they move in to replace their bet.  The

4  fact that they made four - So, they now have relief because

5  they're making an objection, but that's the second issue.

6  And the third issue is, they have now basically said, Oh,

7  well, you can't really do anything to us.  We got a letter

8  that says that we got a floor, that at the worst that we

9  don't win now because solvency hasn't been demonstrated, so

10  then our third alternative, say they, is to have this case

11  held hostage including the plan.  They want the plan

12  presumably to stay in place.  The plan that we filed based

13  upon the agreement that we reached with the proponents.  They

14  want to say, Well, let's just put that on hold, then at our

15  convenience now go ahead and litigate the estimation process

16  so that we can show solvency.  And the question that supposes

17  is, Well holding the case hostage, even if they could do it,

18  changed the analysis.  Will it change the analysis?  Now the

19  first and the third issues are fairly straightforward.  We

20  believe that the whole - every fiber of the bankruptcy

21  process says, A deal's a deal.  You do a deal with the

22  Committee, they stand by that deal, and that should be where

23  the case goes unless they exercise their rights and they

24  terminate the deal, and if they exercise their rights and

25  terminate the deal then all bets are off.  But here they did

1    a deal, they never terminated it, and therefore, we believe

2    that it's a matter of the facts of this case that that

3    agreement should be dispositive.  It should be respected no

4    matter what the outcome of an ultimate solvency determination

5    might be because that was the very purpose of the deal was to

6    basically say, We're going to give up our rights to go ahead

7    and do a long-term solvency analysis, but we're also going to

8    get some protection in that process.  The third also is a

9    fairly easy question that is, we're holding the case hostage

10   to change the analysis, because, first of all, it's not at

11   all clear that they can even do that.  I mean, we're now

12   going to have an estimation proceeding.  After all of this

13   time has passed and they're going to spend now another 12 -

14   18 months developing an estimation proceeding and try to

15   unwind all that while keeping the deal in place.  I'm not

16   aware of anything that says that deal has to stay in place if

17   the estimation proceeding then is resumed over the long term,

18   but whether or not it's feasible there's no question but that

19   under those circumstances they are putting their interests

20   over the interests of all of the players in the case on the

21   basis of what is essentially a speculative outcome, and under

22   those circumstances, we believe that Quorum Healthcare is

23   absolutely right on point.  They are doing something that has

24   no semblance of fairness and equity.  They're basically using

25   a threat of holding up this proceeding and jeopardizing the

1   ultimate outcome of the case in order to bet on a litigation

2   outcome that they basically decided not to bet on when they

3   made the deal with us.  So, if they want to go ahead and do

4   it and Your Honor goes ahead and does it, the fact of the

5   matter is, it shouldn't change the equitable analysis, and we

6   believe that that's the answer to point three.  With respect

7   to the second question, which is what happens if you take a

8   step back, what happens if you take a step back and only add

9   that how you reconcile that position, that is that they're

10  going to hold every up as the only way to go, with the brief

11  that was filed by the Creditors Committee in this case, that

12  isn't possible.  The Creditors Committee in response to our

13  objection, said this about timing: The latter - which is the

14  determination of post-petition interest - The latter issue is

15  one more - with respect to trade debt - is an issue for

16  another day, but as explained in more detail below, it's

17  important for the Court to recognize now even before a plan

18  of reorganization is filed that the proposed asbestos

19  settlement does not treat the commercial creditors in a

20  manner required by the law.  The Unsecured Creditors

21  Committee in this case in response to our objection said,

22  This issue is a today issue.  This issue must be a resolved

23  issue.  They didn't say, Oh, well, geeze, you know, we need

24  to have a full-fledged estimation to reserve our due process

25  rights.  They say, We should determine this issue now.  Why?

1    Because they recognized as they did when they did the deal,

2    when the Unsecured Creditors Committee did the deal in this

3    case, they were trying to look out for what's fair and

4    equitable.  Even here they're saying, Well, we have to

5    recognize that a part of this process is getting the plan

6    done, and because we need to get the plan done, we can't hold

7    that off forever.  We need to get a plan done, and therefore,

8    we need to get the Court's advice with respect to this issue.

9    So with that I come to the second category, Your Honor, which

10   is, Well, if we're not going to look at the agreement as

11   being dispositive and we're going to revisit all of the

12   different equitable factors - How do those factors cut?

13   What's the right price?  Either below the agreed rate or

14   above the agreed rate.  You essentially then get into, I

15   think what are five basic points.  Number one, there has been

16   no demonstration of solvency by the unsecured creditors or

17   bank lenders in this case, and because there has been no

18   demonstration of solvency and it's their burden to

19   demonstrate solvency in order to prove that they're entitled

20   to have that amount, to get default interest under 1129(b),

21   because they have not demonstrated solvency 502 still

22   controls.  So, why haven't they demonstrated solvency?  Their

23   whole argument is based upon market cap as a measure of what

24   value is.  That's the only evidence that's now in the record

25   is market cap, but there's no case that says that market cap

1   is a measure of liabilities, and what we're talking about

2   here is not what Grace's worth is as a company.  What we're

3   talking about is the uncertainty over liabilities.  And the

4   cases that rely upon market cap that they've cited, cases

5   like Uranium (phonetical), as an example, those are cases

6   where the market cap that was being examined was of an entity

7   prior to its being in bankruptcy.  Market cap is not a

8   prediction and market price is not a prediction of the

9   outcome of a bankruptcy estimation process with respect to

10  asbestos liabilities.  Cases don't sell whole.  So is there

11  any record - There's no law that says you've got to do that.

12  Indeed, the law would suggest exactly the opposite, but what

13  about in the record of this case?  Well, in the record of

14  this case Ms. Zilly has an affidavit that they didn't bother

15  to take her deposition.  We offered her for deposition, they

16  didn't take it.  And she said, Take a look at the cases,

17  cases like Owens Corning, as a good example, market price is

18  not necessarily a predictor of anything, and that's because

19  there are many, many other factors that affect price other

20  than what the actual ongoing value of the company is where

21  the company's in Chapter 11.  Was there any rebuttal, any

22  expert rebuttal or factual rebuttal to Ms. Zilly?  No.  They

23  produced an expert, Mr. Ordway.  Mr. Ordway had no solvency

24  opinion, and indeed, his own report basically says that a lot

25  of different things affect market price.  So, as we sit here

1   today, there's no demonstration of solvency.  We don't know

2   what the outcome is of a whole variety of different factors,

3   including the asbestos liability because right now what we

4   have is a plan, a condition, and that condition includes the

5   agreement with respect to post-judgment interest.  What about

6   contribution to the case?  They have struggled.  They know

7   that as a critical factor had they contributed in a positive

8   fashion to this case and therefore they had an expert, Mr.

9   Ordway, and Mr. Ordway came and we've given and we will give

10  Your Honor excerpts from his deposition.  It was kind of a

11  stunning thing, because Mr. Ordway basically had a lot of

12  things told to him about what he should do in his analysis.

13  I want you to take a look at the contribution.  I want you to

14  take a look at this.  I want you to take a look at that, and

15  he couldn't make them stick.  All he came up with by way of

16  saying, There's a contribution that's been made by these

17  folks in this case is that they (a) supported the plan or

18  they supported the debtor in connection with efforts to

19  acquire a business or other matters that dealt with the

20  ordinary course of its business, and that was all that he

21  could point to by way of support.  Well, the difficulty was

22  that there was no basis for not supporting those things, and

23  ultimately in his deposition he admitted in black and white

24  that when he talks about support, it was the failure to make

25  objections that wouldn't have been good objections to begin

1    with.  That's their notion of support is that they didn't

2    make non-meritorious objections.  And the second thing that

3    he says is that, Well, the company was able to use our cash.

4    Well, that's a very loose term.  There's the use of

5    principal.  There's the use of pre-petition interest and then

6    there's the use of interest on interest.  We're talking here

7    about compensation or an award of post-judgment interest as

8    interest on interest, that is, interest on interest as it

9    would otherwise mature, although we don't say that it does

10   mature after the filing of the -

11          THE COURT: Wait.  I lost that, I'm sorry.

12          MR. BERNICK: Default interest - the default

13   interest -

14          THE COURT: But the proposition is that the debtor

15   had a loan and made use of the funds.

16          MR. BERNICK: It had a loan to make use of the

17   funds.

18          THE COURT: The funds -

19          MR. BERNICK: That's correct.

20          THE COURT: Right.  Okay?

21          MR. BERNICK: That's not really the issue that

22   divides us on default interest.

23          THE COURT: No, I know that, but you're saying Mr.

24   Ordway's saying that their contribution is that they made the

25   debtor a loan, and the debtor made use of the funds.

1          MR. BERNICK: But they're being compensated for

2     that.

3          THE COURT: Exactly.

4          MR. BERNICK: Yeah, so, in other words, the

5     principal and pre-petition interest -

6          THE COURT: Yes.

7          MR. BERNICK: - is not - it's not interest on that

8     that's at issue.

9          THE COURT: Right.

10         MR. BERNICK: It's interest on interest.

11         THE COURT: Well, I understand - I understand the

12    theory.  I was not - I missed what you were saying as to why

13    that was Mr. Ordway's theory.

14         MR. BERNICK: Mr. Ordway didn't make a distinction.

15    That's his basic problem.

16         THE COURT: Okay, all right.

17         MR. BERNICK: He said, Oh, we had use of the money,

18    but he never analyzed the question of whether we actually

19    used the interest on interest.

20         THE COURT: Okay.

21         MR. BERNICK: Or that we actually used the un-

22    matured interest and therefore should pay interest on

23    interest.

24         THE COURT: All right.

25         MR. BERNICK: And so, and that again, it's black and

1    white in his deposition.  That didn't pan out either.  So the

2    whole idea of they made a contribution was completely

3    factually undercut by Mr. Ordway.  The fact of the matter is,

4    they made no contribution that is germane to the issue here

5    which is interest on interest.  The third question is, well,

6    somehow are they entitled to get this?  Is it equitable?

7    Because this is *de minimis*, and that $100 million among

8    friends, big deal.  And so they had Mr. Ordway again go like

9    this, and Mr. Ordway says, Oh, well, it's not that big in the

10   scheme of things.  Look how much money equity made in this

11   process, and he has basically an analysis that again we've

12   got Daubert questions.  We don't believe the deposition.  The

13   report should come in and we'll deal with that issue later

14   on, but the fact of the matter is that Mr. Ordway also walked

15   away from that.  He wasn't aware of any standard or

16   methodology that would call for that comparison between

17   equity returns and debt returns.  It was something that was

18   given to him by the lawyers to do this whole *de minimis*

19   argument.  There's not even nomenclature that fits within the

20   parlance of financial analysts.  It's all legally driven, and

21   he recognized that the enemy admit it, and if the comparison

22   is apples and apples, that is, how did the - what would be

23   the impact on the debt securities?  Is it *de minimis*?  And

24   the answer's, No, $100 million of additional interest is not

25   *de minimis* at all in debt security terms.  Nor could he even

1    say that it was immaterial, and that's another thing that he

2    said, Oh, well, it's immaterial.  Well, geeze, is $100

3    million immaterial to anybody in this case, including the

4    shareholders, people who bought into the Grace doctrine in

5    the course of the case couldn't say that.  So the whole idea

6    of their case about whether they made a contribution, their

7    case about whether there's *de minimis,* immaterial, all went

8    totally down the tubes as a matter of fact through a simple

9    cross-examination questions from Mr. Ordway.  And finally we

10   come to two of the last points that we just can't ignore.

11   Even if the letter is not dispositive on its face,

12   dispositive under these circumstances on the issue of

13   fairness and equity, the letter still comes back, the

14   agreement still comes back as being the best and most

15   probative evidence of what is fair and equitable because it's

16   a marketplace event.  It was negotiated at arm's length.  It

17   is the best indication of how those pluses and minuses of

18   uncertainty with respect to the ultimate ability to recover

19   post-petition interest shake out in this case.  And then

20   finally, is the impact on this case.  Basically what the

21   unsecured creditors and bank lenders are saying in this case

22   is, Let's go roll the dice.  We don't really believe that

23   anybody's going to walk away from this deal.  Earlier they

24   said, they'd be out of this.  Oh, maybe this is an

25   evidentiary red matter.  Mr. Rosenberg, I believe, said,

1    maybe this is an evidentiary matter.  Maybe we'll be able to

2    show that when Mr. Bernick says that this really will

3    jeopardize the case, that's not really true factually.  Never

4    happened.  There's not a single piece of inquiry, there's not

5    a single fact that is adduced on the basis of which they can

6    now say, Oh, well, they don't really mean it.  Let's just

7    take another 12 months, go plotting through this.  It's not

8    that big a deal.  They'll make do.  There's no evidence of

9    that.  So, what they're doing basically is to say, Well, we

10   did our deal back then.  Don't pay attention to it.  This is

11   a different day.  Oh, by the way, we're still not willing to

12   leave it, really, up to Your Honor about whether that deal

13   should - up to Your Honor about what the right rate should

14   be, and even if Your Honor were to decide it, that's probably

15   the right rate, that's okay.  We'll bet again from the Court.

16   We'll wait for another 12 months and see if everybody sits

17   there and hangs on by their shoestrings while we go through a

18   full estimation process.  For all those reasons, Your Honor,

19   we would ask the Court to rule today on the three issues that

20   we put out on the board.

21          THE COURT: All right, you've ten minutes for

22   rebuttal, Mr. Bernick.

23          MR. BERNICK: Thank you.

24          THE COURT:  Mr. Bentley?

25          MR. BENTLEY: Good morning, Your Honor.  Phillip

1    Bentley for the Equity Committee.  Your Honor, there is no

2    disagreement to return to your comment at the outset between

3    us and the debtors.  We agree wholeheartedly with all of the

4    arguments that Mr. Bernick just made quite eloquently, and I

5    don't intend to repeat any of them.  What I'd like to do is

6    add three points, and I think I can do it quite briefly.

7    Three points that are of particular importance to the Equity

8    Committee and our perspective here is not identical to the

9    debtors.  The three points relate to, one, fairness.  The

10   equitable considerations that Your Honor will balance if Your

11   Honor concludes that certainly the arguments that Mr. Bernick

12   made are not dispositive, that is, we agree with Mr. Bernick

13   that the first point here is that there's an agreement that

14   was reached between the debtors and the Creditors Committee

15   and that that agreement is binding and that that should end

16   the story or largely end the story.  We agree with that.  We

17   also agree with Mr. Bernick's point that in that solvency has

18   not been established and absent solvency being established,

19   you don't get to an entitlement to post-petition interest.

20   We agree with both those points but the point I'm going to

21   add is a point that's germane in the event Your Honor

22   believes that those two arguments don't end the discussion.

23   In the event Your Honor gets past those arguments and

24   concludes - and applies the reasoning that the courts have

25   applied in a solvent context -

1          THE COURT: But this isn't an issue of no post-

2     petition interest.  The debtor and the plan provide for post-

3     petition interest.  This is only, as I understand it, the

4     difference between what the plan already provides, which is

5     higher than the interest that would have been attributed

6     under the contract right, but not as high as the default

7     rate.

8          MR. BENTLEY: No, that's absolutely right, Your

9     Honor.

10          THE COURT: Okay.

11          MR. BENTLEY: And that it's really a matter of

12     consent.  The consent of the debtors, the consent of the

13     Equity Committee to pay them that amount of interest even

14     though they might not be entitled to any were Your Honor to

15     determine the legal issues without considering our consent.

16          THE COURT: All right.

17          MR. BENTLEY: Let me turn to the additional fairness

18     point that from the standpoint of our Committee is extremely

19     important, and that is, Mr. Bernick has focused principally

20     on the agreement with the Creditors Committee.  There's, of

21     course, another agreement that's critical here, and that's

22     central to why we're all here today arguing about post-

23     petition interest, and that's the agreement that was reached

24     back in April among the debtors, the Equity Committee, and

25     the representatives of the personal injury claimants.  Now,

1   that settlement, the lenders are one of the principal

2   beneficiaries of that settlement because as Mr. Bernick has

3   mentioned, absent that settlement there would be genuine

4   uncertainty as to the debtors' ultimate aggregate liability

5   to the asbestos claimants, and there would also be an

6   argument that the asbestos claimants have pressed throughout

7   this case as to whether this Court would have the power to

8   cap the aggregate claims of the asbestos claimants.  The

9   settlement that was reached in April, eliminates those

10  uncertainties, and there's great benefit, of course, to all

11  parties, including the lenders because it eliminates a huge

12  hurdle to proving insolvency and having them be paid in full

13  plus post-petition interest.  The equitable point, Your

14  Honor, that's germane today is this: In order to get that

15  settlement, the debtors made substantial concessions to

16  equity, made very substantial concessions.  Essentially,

17  we're getting substantially less under that settlement than

18  we would if we litigated all the way with the asbestos

19  claimants and won.  As in the nature of any settlement, we're

20  accepting a substantial reduction from the recovery we'd get

21  in that circumstance.

22          THE COURT: Well, that's assuming that the debtor's

23  solvent.  If the debtor isn't solvent, you're getting

24  substantially less, but then so would the banks.

25          MR. BENTLEY: True, Your Honor, but my point is

1    this, Your Honor -

2         THE COURT: So, the banks ought to be aligned with

3    equity in that position.  I mean, the lay of the land here is

4    really very strange, but -

5         MR. BENTLEY: Well, the point, Your Honor, is we

6    made a substantial concession to eliminate that uncertainty.

7    The essence of the lender's position is they should be able

8    to reap the benefit of eliminating the uncertainty of the

9    magnitude of the asbestos claimants but they should not give

10   up anything.  They should recover exactly what they would

11   recover in the event we litigated to the end of the road with

12   the asbestos claimants and won.  In other words, they should

13   get a hundred percent of the post-petition interest measured

14   under the highest possible measure, and we think, Your Honor,

15   that's the opposite of equity.  They would like to reap the

16   benefits of the asbestos settlement without bearing any of

17   the costs.  So that's point one, Your Honor.  The second

18   point relates to practical consequences of the lender's

19   position in the event it were to be adopted by Your Honor.

20   And as Your Honor is undoubtedly aware, the deal that was

21   reached in April was a very difficult deal to negotiate.  It

22   was a very big accomplishment, and the equity gave up as much

23   as it was prepared to give.  It was right at the upper bounds

24   of what they were prepared to give to the claimants.  One of

25   the central elements of that deal, Your Honor, was that this

1   agreed amount of post-petition interest would be paid to the

2   lenders, nothing more.  We are obviously prepared to stick by

3   that deal.  We're prepared to pay that amount of interest.

4   We're not prepared to pay more, and if Your Honor were to

5   rule that they're entitled to a greater rate of default

6   interest, that condition of the deal would not be satisfied,

7   we would not have a deal.  Now, does that mean we couldn't go

8   back and renegotiate it?  It certainly may, Your Honor.  Our

9   goal is to get this case resolved consensually, but the last

10  thing we want, Your Honor, is to have to go back and reopen

11  that deal and renegotiate the deal, and that's the position

12  that we and everyone in this courtroom would be forced into

13  in the event the agreed amount -

14       THE COURT: The Court's not going to be held hostage

15  to a legal determination by virtue of the fact that it's

16  either going to cause more negotiation or not, Mr. Bentley,

17  I'm sorry, but that's inappropriate.  If I come to the legal

18  determination that the bank's entitled to it, then the

19  consequences are going to be whatever they are.  I think it

20  would be highly unfortunate, but nonetheless, if that's

21  what's required, that will be required.

22       MR. BENTLEY: We understand that, Your Honor.  We

23  understand Your Honor's going to do what's legally

24  appropriate, what's legally required.  That was a key part of

25  this deal though because we, like the debtors, understood

1    that there was a deal with the Creditors Committee on which

2    we could rely and on which we did rely, and we would hate to

3    see that achievement upset.  One final point, Your Honor, and

4    this is a legal point.  The central case on which the lenders

5    rely is the Sixth Circuit <u>Dow Corning</u> decision.  That's the

6    case on which they rely for the proposition that in balancing

7    the equities, Your Honor should put a heavy thumb on the

8    scales in favor of the contractual default amount, and my

9    point, Your Honor, is simply that the facts of <u>Dow Corning</u>

10   were fundamentally unlike the facts of this case, and

11   therefore, the <u>Dow Corning</u> holding on which they rely really

12   does not apply here for one simple reason.  In <u>Dow Corning</u>,

13   Your Honor, the debtors and the breast implant claimants

14   reached a settlement that was not contingent on any specified

15   resolution of the post-petition interest issue.  The

16   settlement left that issue to be resolved through post-

17   confirmation litigation.  The debtors and the breast implant

18   claimants went ahead, confirmed the plan, were prepared to

19   consummate the plan.  So the Court in <u>Dow Corning</u> was not

20   faced with this additional element that the whole successful

21   resolution of the bankruptcy hinged on a particular

22   resolution of the post-petition interest issue.

23           THE COURT: Do you know whether in <u>Dow Corning</u> there

24   was a financial default pre-petition?

25           MR. BERNICK: There was no financial default pre-

1       petition in the <u>Dow Corning</u> case.

2                THE COURT: All right.

3                MR. BENTLEY: So, my point to wrap up on <u>Dow</u>

4       <u>Corning</u>, Your Honor, is simply had the facts in that case

5       been the same as they are in this case in that key respect,

6       we don't know what the holding of the Sixth Circuit would

7       have been, and we think it may well have been quite

8       different.

9                THE COURT: All right, thank you.

10               MR. BENTLEY: Thank you, Your Honor.

11               MR. ROSENBERG: Good morning, Your Honor.

12               THE COURT: Good morning.

13               MR. ROSENBERG: Andrew Rosenberg, Paul, Weiss,

14      Rifkind, Wharton & Garrison for the bank lenders.  I feel - I

15      have no demonstratives and nothing to put up on the board.  I

16      feel a little bit like a - I guess a kid who shows up for

17      show-and-tell without a toy, so it's just going to be me and

18      nothing else to look at.  As Your Honor knows, we've fully

19      briefed these issues, and what I'm going to do is try to just

20      hit the high points here.  It is the most basic proposition

21      of corporate law that creditors must be paid all amounts owed

22      to them under their contracts before equity can retain value.

23               THE COURT: Why are the banks entitled to a default

24      rate of interest.

25               MR. ROSENBERG: As a matter of statute?

1           THE COURT: As a matter of anything.  Why are the

2    banks in this case entitled to a default rate of interest?

3    What is the pre-petition default that lets the banks claim a

4    default rate of interest in this case?

5           MR. ROSENBERG: Your Honor, I don't believe the law

6    is such that there needs to be a pre-petition default.  I

7    believe we cited that Chicago case in our brief.

8           THE COURT: But I'm not in Chicago.

9           MR. ROSENBERG: Correct, Your Honor.

10           THE COURT: Okay.

11           MR. ROSENBERG: We're not in the Seventh Circuit.

12           THE COURT: And I don't, as a matter of corporate

13    law, there was no default pre-petition.

14           MR. ROSENBERG: Correct.

15           THE COURT: You're relying largely on the corporate

16    documents.  So, we agree that there's no pre-petition default

17    that would have led to a default rate of interest.  So, why,

18    post-petition, because as I understand it, the debtors aren't

19    in any financial default post-petition either, and the

20    debtors have made all the payments when due.  The only issue

21    appears to be the fact that the debtors filed bankruptcy.

22    That's clearly not an event of default that's going to get

23    you a default rate of interest.  The debtors are already

24    proposing to pay interest at higher than the contract rate.

25    So, what as a matter of corporate law in the facts of this

1    case entitles the banks to a default rate of interest, as a

2    matter of corporate law?

3        MR. ROSENBERG: Two things, Your Honor.  First, the

4    debtors had their numerous defaults post-bankruptcy.  There

5    were financial covenants that had been breached.  There are

6    interest payments that have not been made, so whether - the

7    debtors may not have been in default.

8        THE COURT: Interest payments?

9        MR. ROSENBERG: Correct.

10       THE COURT: Okay, such as?

11       MR. ROSENBERG: The debtors were supposed to pay

12   interest on a quarterly basis according to the contracts.

13   They did not.  The debtors breached various financial

14   covenants, reporting requirements post-petition.  I don't

15   there's any dispute that there are numerous post-petition

16   defaults in accordance with the documents.  So, putting aside

17   whether the bankruptcy itself can be an event of default

18   triggering other fee requirement to pay post-petition

19   interest, there have been - I would have to guess, dozens of

20   defaults, and Mr. Freedgood's affidavit, I believe, is

21   evidence of the numerous defaults that occurred post-

22   petition.  Second, as a matter of -

23       THE COURT: Covenant defaults and you're saying

24   post-petition interest rate defaults.

25       MR. ROSENBERG: Covenant and payment defaults,

1    correct.

2           THE COURT: Okay.

3           MR. ROSENBERG: Virtually, I think every default

4    that there could be in there has occurred at this point.

5           THE COURT: And the interest rate defaults are based

6    on -

7           MR. ROSENBERG: The failure to pay the interest when

8    due on a quarterly basis.

9           THE COURT: Okay.  From what theory?  How were the -

10   I'm sorry, what was the security that generated a post-

11   petition payment obligation on behalf of the debtors?

12          MR. ROSENBERG: The credit agreement itself provides

13   that interest is supposed to be paid on a quarterly basis.

14   It obviously doesn't say post-bankruptcy.  It says it's

15   supposed to be paid.  When it's not paid, that's a default

16   that occurred post-bankruptcy.  Financial reports are

17   supposed to be provided post-bankrupt under the contract.

18   They were not provided.  That's a default.  Bankruptcy

19   doesn't relieve the debtor of all consequences of a default.

20   It simply relieves the debtor to the automatic stay of the

21   enforcement of the default, and I don't believe there's been

22   any case cited for ending up in an *ipso facto* clause taking

23   away a right from the debtor that says, Debtors are relieved

24   of all consequences of their default, and I believe that we

25   have cited several cases in our brief to the contrary.

1          THE COURT: Okay, go ahead.

2          MR. ROSENBERG: Thank you, Your Honor.  What Grace's

3   equity wants to do here is the polar opposite of the basic

4   proposition of corporate law that I just addressed.  They

5   essentially want to keep the equity in their house without

6   having to pay off the mortgage in full in accordance with the

7   terms.  This case is really that simple.  Grace has made an

8   eloquent 50-minute presentation in an effort to dance around

9   this basic truism.  I suspect we'll hear 10 more minutes in

10  rebuttal.

11         THE COURT: But you don't have a secured claim.

12         MR. ROSENBERG: Correct.

13         THE COURT: Okay.  So, that's the whole problem.

14  Why does the debtor have to pay interest on an unsecured

15  claim?

16         MR. ROSENBERG: The debtor has to pay -

17         THE COURT: I mean, this is a bankruptcy.  Section

18  502 talks about when the debtor has an obligation to pay

19  interest.

20         MR. ROSENBERG: Correct.

21         THE COURT: You don't have a mortgage.  You don't

22  have a security interest.  You don't have an entitlement to

23  interest, period, end of story from what I can tell.

24         MR. ROSENBERG: I think the debtor has made out a -

25  there's a fundament confusion between § 502 and the legal

1    entitlement to post-petition interest.  Section 502, Your

2    Honor, says that a claim that essentially under 502(a) when

3    you file a proof of claim it's deemed allowed.  No

4    disagreement there and including any claims in there.

5    Section 502(b) -

6          THE COURT: It says it's *prima facie* evidence of the

7    allowance, I believe.

8          MR. ROSENBERG: Correct, no dispute, Your Honor,

9    under § 502(b) that a claim for a un-matured interest can be

10    disallowed.  No dispute there.  However, the entitlement to

11    post-petition interest is in addition to the allowed claim.

12    Even the debtors - and I'm going to through this, even the

13    debtors' plan which was filed last week talks about interest

14    on the allowed claim, not as part of the allowed claim,

15    interest on the allowed claim.  And if we turn, for instance,

16    to section - the distinction is, among other places, § 726 of

17    the Code shows this.

18          THE COURT: But we're not in § 726.

19          MR. ROSENBERG: Correct.  I'm trying to demonstrate

20    for the Court, however, the distinction between an allowed

21    claim and interest on an allowed claim -

22          THE COURT: Well, I understand the distinction, but

23    we're not in Title - in a Chapter 7, nor are we talking about

24    the priority scheme of distribution that a Chapter 7 Trustee

25    would make.

1          MR. ROSENBERG: Right.

2          THE COURT: We're in a Chapter 11 plan whereby

3   people can negotiate for different treatment, unless you're

4   telling me that you want to go back to an absolute priority

5   distribution.

6          MR. ROSENBERG: What I'm saying - Well, under § 1129

7   -

8          THE COURT: Yes.

9          MR. ROSENBERG: And I want to turn to section -

10         THE COURT: Well, I want to go back to the interest

11  issue first because you told me that the debtors were in

12  default because they hadn't paid the quarterly interest.

13         MR. ROSENBERG: Correct.

14         THE COURT: But it's an unsecured claim.

15         MR. ROSENBERG: Correct.

16         THE COURT: And so un-matured interest allowed.  So

17  the debtors don't have to make those payments, so they're not

18  in default.  So, you're not entitled to a post-petition

19  default rate of interest.  So we go back to the fundamental

20  question that I asked.  Where are you entitled as a matter of

21  corporate law to the default rate of interest?

22         MR. ROSENBERG: There's a contract, Your Honor.

23         THE COURT: Yes.

24         MR. ROSENBERG: And we're going to get to the legal

25  entitlement - I think this is all under 1129, which is the

1   legal entitlement to be paid interest due under your contract

2   before equity retains any value.  That's where this comes

3   from, Your Honor.  It's not a 502 issue.  It's an 1129 issue.

4          THE COURT: Well, I guess this is the cart before

5   the horse.  I think the two of you are trying to determine

6   which applies first, 1129 or 502, and that may be the

7   question.

8          MR. ROSENBERG: Well, I think that is actually

9   critical and essential, and perhaps, I think, Your Honor, the

10   confusion over this will fall away a little bit if I get into

11   the procedural context we're in and we cut the issue of

12   impairment, because I think the PPIE case, New Value, all

13   recognize the distinction between the legal entitlement to

14   post-petition interest and allowance of claims, and I think

15   that actually causes the odd procedural setting of this and

16   also I think will make this distinction clear, and it

17   probably will makes sense, Your Honor, I will turn to those

18   and skip the rest of my introduction.

19          THE COURT: Well, actually, I think I'm just going

20   to let you recite your argument the way you want to because

21   what I was not picking up in the brief is the question that

22   I've asked, and I'm still not picking it up from your answer,

23   and so I think if you just say your argument the way you wish

24   to state it, maybe I'll pick it up from that.  So, I'll just

25   go back, try to keep my mouth shut, and -

1        MR. ROSENBERG: Your Honor, it's your Court, if you

2    have questions, I encourage you to ask them.

3        THE COURT: Well, that was my question.  So, I've

4    asked it, and I'll try and pick it up from the argument.  So,

5    go ahead.

6        MR. ROSENBERG: Okay.  If I have not convinced Your

7    Honor at the end of the argument as to be the legal - or

8    have a basis for the legal entitlement to what post-petition

9    interest is, please ask again, because I don't want to leave

10   the podium without convincing you of that basic point.

11       THE COURT: All right.

12       MR. ROSENBERG: And I'm sure Mr. Bernick would not

13   like that either, because it would give him nothing to rebut

14   in his final 10 minutes.

15       THE COURT: All right, Mr. Rosenberg, go ahead.

16       MR. ROSENBERG: Okay.  Let's begin at the beginning

17   with the procedural context of this hearing, which I think it

18   goes right to the point about 502 and its interrelationship

19   with 1129, fortunately, it's about the next 6 or 7 minutes of

20   my presentation.

21       THE COURT: All right.

22       MR. ROSENBERG: This is a claims objection.  The

23   proofs of claim filed by the bank agent indeed sought post-

24   petition interest.  The five exclusive claims were upon

25   filing deemed *prima facie* evidence of an allowed claim as of

1    the petition date.  Hence, prior to the objection under

2    § 502(b), the claims for post-petition interest were deemed

3    allowed.  The debtors have now objected to the proofs of

4    claim.  They're pleading is styled, Objection to Unsecured

5    Claims.  The relief they seek is disallowance of the proofs

6    of claim to the extent that they seek allowance of post-

7    petition interest at the default rate, and the debtors, quite

8    frankly, could have made its objection at any time after the

9    proof of claim was filed four years ago and without reference

10   to any Chapter 11 plan whatsoever.  The only valid basis for

11   disallowing an allowed pre-petition claim under § 502(a) are

12   the grounds set forth in § 502(b).  I don't think there's any

13   disagreement yet on anything.  And the objection would be

14   procedurally proper if the debtors had only made an objection

15   on the basis that the bank lenders' claims are for un-matured

16   interest under § 502(b) as of the petition date.  Instead,

17   Grace goes far beyond § 502(b) and makes numerous other

18   objections under § 1129 and § 1124 that have everything to do

19   with plan confirmation and nothing to do with § 502(a) and

20   (b) claims allowance.  Specifically, the debtors seek to

21   disallow the bank lenders' claims to the extent that the bank

22   lenders will seek post-petition interest in connection with

23   the Chapter 11 plan under § 1129(a)(7), 726(a)(5), and

24   1129(b), and as now set forth in their trial brief and in the

25   plan that was just filed, Grace now apparently also seeks a

1    ruling that the bank lenders will be unimpaired under § 1124

2    as well.  This additional relief is not permissible in the

3    context of a claims objection.  While post-petition interest

4    is allowable under § 502(8)(a), absent objection and

5    disallowance under 502(b), it is separately payable under

6    1129(a)(7), 726(a)(5), and 1129(b) on an allowed pre-petition

7    claim.  That's how they're in their plan, as I mentioned,

8    Your Honor, as the allowed claim and interest on the allowed

9    claim.

10           THE COURT: Well, they could volunteer to pay

11   interest on an allowed claim.

12           MR. ROSENBERG: Correct.

13           THE COURT: Okay.

14           MR. ROSENBERG: Your Honor, I will get to the

15   requirement to pay this and where it comes from.

16   Disallowance of post-petition interest as part of an allowed

17   claim under § 502(b) is merely the beginning of the inquiry

18   on post-petition interest, not the end.  Post-petition

19   interest under 726(a)(5) and 1129(b) represents an

20   entitlement to interest on allowed pre-petition claims, not

21   necessarily part of the allowed claim itself.  It's this

22   entitlement that presents a problem for the debtor.  It's

23   this entitlement that creates that board, because what the

24   debtor is really asking for here is something that is not

25   available in the claims objection process.  It will defeat

1   the bank lenders' entitlement to post-petition interest on

2   their allowed pre-petition claims in the context of the plan

3   the debtors have filed.  It's the context of the plan that

4   the debtors filed that this right arises.  It's not some in

5   the midst type right that it rises to.  That is what 502(b)

6   deals with.  Where this entitlement comes from is in

7   connection with this plan, that's why it's embodied in

8   1129(b) and all the case law that I'm going to discuss, and

9   it's not limited to 502(a) and (b).  It's in the plan

10  context.

11          THE COURT: So, your contention is that a creditors

12  committee can negotiate with the lender's consent to a

13  particular rate of interest so that the plan can get filed

14  and then the lenders, after they've agreed to that rate of

15  interest for purposes of the plan negotiation, can turn

16  around and disagree with that rate of interest simply because

17  once the plan is actually filed and then returns a

18  distribution to equity as a part of that plan, the lenders

19  then feel that they're entitled to more interest than the

20  plan provides despite what they've agreed to.

21          MR. ROSENBERG: No, Your Honor.

22          THE COURT: Because clearly, they wouldn't be

23  allowed to the - Had the debtor just filed an objection, as I

24  understand your argument, to the un-matured portion of the

25  interest on an unsecured claim, that amount of interest would

1    clearly be disallowed.  So there would be no entitlement to

2    the un-matured interest.

3         MR. ROSENBERG: Correct.  In a vacuum having nothing

4    to do with the plan -

5         THE COURT: In a vacuum.

6         MR. ROSENBERG:  - un-matured interest is disallow-

7    able under 502(b).

8         THE COURT: Okay.  So, we now have the principal

9    allowed, no un-matured interest.

10        MR. ROSENBERG: Uh-huh.

11        THE COURT: Now going forward for post-petition

12    interest, unless the debtors are solvent, I think we can all

13    agree to, that there would be no post-petition interest on an

14    unsecured claim, not for anybody.  Not for the banks, not for

15    the trade, not for the assets, not for anybody.

16        MR. ROSENBERG: Correct, and I'll get into in a few

17    moments, Your Honor, what solvency means in this context, but

18    agreed it must be reorganization solvent.

19        THE COURT: Okay.  And in that context, typically,

20    would be in some form of no distribution to equity, I think

21    we can all agree with that too.

22        MR. ROSENBERG: Correct, if equity was getting no

23    distribution, agreed.

24        THE COURT: No interest is being paid to anybody.

25        MR. ROSENBERG: Uh-huh.

1           THE COURT: Well, equity may not even have to get a

2     distribution necessarily, but for purposes of this

3     discussion, let's just assume that equity wouldn't be getting

4     a distribution.  So, no interest is being paid, equity's not

5     getting anything.  Now, the creditors decide that they really

6     do want to reorganize, and so they get together and everyone

7     bargains, and so, entities give up something so that equity

8     can give something, and in the context everybody says, Fine,

9     I'll give up A, you'll give up B, and in that context we'll

10    pay a little bit of interest, even though we wouldn't have to

11    to unsecured creditors, and so while we do that, we'll pay a

12    little bit to the equity and that way everybody will be

13    happy, and we'll get a plan together, and it will be a

14    consensual plan, and life will go on, and everybody says,

15    fine.  So even though, as a matter of pure law, no one would

16    be, in quotes, "entitled" to that interest rate or that

17    distribution to equity, the parties agree to it.  That's what

18    the plan process, the negotiation process does.  So, the

19    debtor's allowed to pay claims, if it chooses to, and the

20    debtor files a plan that says, I'm going to pay these claims.

21    The parties all vote for it.  That's the end.  They've agreed

22    to it, that's the end of the matter.  Isn't that what the

23    plan negotiation process is supposed to do to get a

24    consensual plan together?

25           MR. ROSENBERG: Your Honor, two points: One, as to

1   the entitlement, the answer is that once a plan is filed, and

2   let's put the so-called agreement to the side for a moment,

3   as a legal matter, if equity is to retain value, then the

4   creditors are entitled to be paid in full in accordance with

5   their contracts unless there's compelling equitable

6   circumstances to find that they shouldn't.

7        THE COURT: As a legal premise, correct.

8        MR. ROSENBERG: Once the debtor filed this plan,

9   retaining equity, putting aside any agreement as a matter of

10  law absent some -

11       THE COURT: You can't put aside the agreement, the

12  debtor wouldn't be filing a plan.

13       MR. ROSENBERG: I'm going to get to the agreement in

14  a second, Your Honor.  I just want to establish because we

15  were talking about where the entitlement came from, and I

16  think it's important to establish that, that this is not -

17  giving interest is not a gift back to the bank lenders.  It's

18  an entitlement they have to be paid in amounts due under

19  their contracts before equity gets anything - basic

20  proposition of bankruptcy law.  We're entitled, if equity is

21  getting value, to be paid in full.  Now, let's get to the

22  agreement, Your Honor.

23       THE COURT: As an unsecured creditor, I think we've

24  got an issue with respect to entitlement.  As an unsecured

25  creditor, you're entitled to be paid your principal, not un-

1    matured interest.  I'm not sure -

2          MR. ROSENBERG: Unless the debtor is solvent.

3          THE COURT:  - unless the debtor is solvent, but

4    that doesn't mean that returning something to equity in the

5    context of a negotiated plan makes the debtor solvent.  I

6    have a fundamental disagreement with you with respect to the

7    fact that because equity gets a distribution in a negotiated

8    plan that that makes the debtor solvent.  I cannot see how in

9    the context of a case in which there has not been an

10   estimation of the ZAI liabilities, the property damage

11   liabilities, the asbestos personal injury liabilities, the

12   Canadian liabilities, the U.S. liabilities, you can state as

13   a matter of fact that this debtor is solvent.  I have no

14   evidence of that.  I don't know that the debtor's solvent or

15   not solvent.

16         MR. ROSENBERG: Well, to turn to the solvency

17   question, one would just go right to there.  I agree that

18   solvency is a critical issue, and let's skip some of the

19   earlier parts of this and address that, and then I want -

20   please, Your Honor, don't let me forget to go back to the

21   agreement.

22         THE COURT: All right.

23         MR. ROSENBERG: Okay.  We're really talking at the

24   end of the day about the fair and equitable standard;

25   correct?  Correct.  One circumstance where it's deemed fair

1    and equitable to not pay - this is not paid post-petition

2    interest is where a debtor is not reorganization solvent.

3    There's no disagreement here.  As set forth in page 17

4    through 20 in our brief, and I think we've cited a lot of

5    law, the reason that it is fair and equitable to not pay

6    dissenting creditors post-petition interest where all

7    creditors are not being paid all amounts due to them,

8    insolvency again.  In other words, the solvency requirement

9    is to protect creditors of companies that can't pay their

10   debts in full when being harmed to the passes of time in

11   bankruptcy by the growth in claims with higher post-petition

12   interest rates as compared to those with lower interest

13   rates.  If the debtor's equity is retaining value under a

14   plan, this concern is alleviated and creditors are entitled

15   to post-petition interest because such payment will be at the

16   expense of equity.  That's all that the case law says.

17   There's simply no general fair and equitable principle that

18   stands for the proposition that equity should retain value

19   before its creditors are paid in full.  Now, what the - and

20   this has caused a lot of confusion here.  What the debtors

21   are seeking to do is to look at solvency as divorced from the

22   fair and equitable standard of 1129(b) on some type of

23   balance sheet insolvency.  This makes no sense in this

24   circumstance.  Solvency is part of the fair and equitable

25   determination itself, Your Honor, we believe at confirmation,

1    is not solvency in a vacuum, but whether the fair and

2    equitable standard has been satisfied by the debtor if it

3    seeks to cram down the bank lenders.

4              THE COURT: But the debtor isn't going to try to

5    cram you down.  The debtor's already paying you interest.

6    This is not a case where the debtor is saying, I'm not going

7    to pay the bank's interest.  The debtors' plan already

8    proposes to pay more than the contract rate of interest.

9              MR. ROSENBERG: What is the debtors' plan proposed -

10   this is odd since we don't obviously have, the debtors' plan

11   is not before it, but what is the debtors' plan doing then if

12   it's not cramming us down if we're voting no against the

13   plan?

14             THE COURT: Well, the debtors' plan proposes to pay

15   principal plus a rate of interest that is higher than the

16   contract rate and less than the default rate.  So the only

17   issue is whether or not the rate ought to be something higher

18   than the contract rate and less than the default rate.

19   That's what we're fighting about at the moment.

20             MR. ROSENBERG: Correct.

21             THE COURT: Okay, the parties are fighting about at

22   the moment whether the bank is entitled to a default rate of

23   interest.

24             MR. ROSENBERG: Uh-huh.

25             THE COURT: Outside bankruptcy, just period, outside

1    bankruptcy, bankruptcy had never happened and the debtors

2    were, I guess, liquidating the company.  As a matter of

3    contract law, period, just matter of contract law, that's

4    what I went to in the first place, how would the banks be

5    entitled to claim a default rate of interest?  And you're

6    telling me that it would be because the debtors missed

7    quarterly interest payments.  Well, as a matter of contract

8    law, that may have been the case, but 502 stops the debtor, I

9    believe, in this circumstance from having to pay that

10   quarterly rate because the debtors have objected to the un-

11   matured interest claim, and I think based on the fact that

12   this is an unsecured claim, there is no entitlement to un-

13   matured interest, so the debtors didn't have to make that

14   payment, so there is no financial default.  Now, I don't know

15   about the reports issue, the reporting requirement that

16   you're speaking about and how that impacts.  I know the

17   debtors file monthly operating reports.  While that may not

18   be sufficient and the AKs and the other financial filings, I

19   don't know.  I'll assume for purposes of this discussion just

20   because otherwise I can't get through it, that that would

21   take the place for bankruptcy purposes of the reporting

22   requirements.  As I said, I'm not making a finding.  I'm just

23   making an assumption, that that would take place because

24   otherwise I can't get through the point that I want to make.

25   So, the debtors have satisfied financial reporting

1    requirements that the credit agreement requires, assuming

2    that the credit agreement still is somehow operative in that

3    respect post-petition.  So, there is no default that would

4    entitle the lenders in a comparable circumstance outside

5    bankruptcy to a default rate.  So, I don't see where you get

6    a default rate.  I mean, I don't see the comparability pre-

7    and post-petition under the circumstances here.  The big

8    thing is the financial issue, I think.  It's not so much the

9    reporting issue.  The debtor's pretty much subject to a

10   scrutiny in the bankruptcy context.  Had the lenders, I

11   think, deemed themselves worried about what the debtor was

12   doing from a financial reporting circumstance, I think I

13   would have heard from you a whole number of years ago, and I

14   haven't.  The lenders have been very silent in that respect

15   and in addition, they've dealt with the debtor in DIP

16   financing post-petition.  So, I don't think they would have

17   been doing that either, if they had been too uncomfortable

18   with what the debtor was doing from a reporting circumstance.

19   So I find it a little hard to believe that they're really

20   relying on that premise.  Now, not paying the post-petition

21   interest if 502 wasn't out there, that might be an issue, but

22   502 is out there, and so the debtors don't owe post-petition

23   interest on the un-matured portion of the interest rate.  So

24   there's no financial default.  I can't see an entitlement,

25   and that's the word I'm looking for, the entitlement to the

1    post-petition interest.  There's no financial default.

2    There's no entitlement to the post-petition - I'm sorry, I

3    didn't mean that.  There's no entitlement to a default rate

4    of interest under the documents pre-petition.  So you don't

5    get a default rate of interest pre-petition, why would you be

6    entitled to it post-petition?

7           MR. ROSENBERG: Is Your Honor saying that there's no

8    right to post-petition interest at all in bankruptcy

9    essentially giving it -

10          THE COURT: No.

11          MR. ROSENBERG: Okay.

12          THE COURT: No, I'm not saying that.  I'm looking at

13   this case, the facts of this case.  I don't think you could

14   make a blanket statement, Mr. Rosenberg.  I would in no way

15   be trying to generalize beyond the facts of this specific

16   case.

17          MR. ROSENBERG: But, isn't Congress's repeal - I

18   mean, I think this goes back to New Value, Your Honor, which

19   is where Congress said, essentially, if you aren't being paid

20   post-petition interest, and it has to be post-petition

21   interest in accordance with the contract, it's not just any

22   post-petition interest, you were impaired, and if you're

23   impaired an -

24          THE COURT: But you're getting more than the

25   contract rate.

1          MR. ROSENBERG: But I'm still impaired, Your Honor.

2     I'm not getting what the contract rate.  Your Honor, we

3     should discuss what is the appropriate rate here.

4          THE COURT: Well, if you want the contract rate,

5     that's easy.  I'll sign an order that says you get the

6     contract rate.

7          MR. ROSENBERG: The contract rate is the rate Your

8     Honor set forth in the contract, which is the default rate at

9     this point.

10         THE COURT: It is not.  I wholly disagree.  I do not

11    see an entitlement to the default rate of interest.  I don't

12    see a legal basis on the facts of this case for the debtors

13    to be even offering let alone this Court confirming a plan

14    that would provide for that default rate absent the consent

15    of the parties.

16         MR. ROSENBERG: And this, Your Honor, is not because

17    - it's not, Your Honor, because you believed that we are - or

18    the Court believes that we're not impaired.  It's simply - it

19    comes down to the legal point in Your Honor's view that the

20    default itself as a matter of corporate law has not occurred?

21         THE COURT: No, I think it's that you're entitled to

22    some post-petition interest as a matter of impairment.

23         MR. ROSENBERG: Okay.

24         THE COURT: You're entitled maybe to the contract

25    rate, but the contract rate is not the default rate.  The

1    default rate stands to protect creditors for particular

2    reasons.  Those particular reasons are not met in this case.

3    Therefore, there is no entitlement in this case to the

4    default rate of interest.  Now, parties can bargain for it,

5    and I have no problem with parties bargaining for it, but

6    that's not what happened here.  The parties bargained for a

7    rate that was - maybe not quite midway, but somewhat midway

8    between the contract rate and the default rate.  So, that's

9    what they bargained for, and it worked.  You know, you got a

10   plan together.  That's what the parties bargained for, and

11   people relied on it.  Now, why should the rug be pulled out

12   when there was a bargained-for agreement with the banks

13   participation in the part of the Creditors Committee.  Well,

14   you laugh, but there are letters that say, "With the banks

15   participation".  There's a brief that asserts that.  Is that

16   false?  Have I been mislead?  If so, I'd like to know that

17   because I would hold counsel accountable.  So, if that's the

18   case, I demand an affidavit, I demand it.  I order it.  If

19   I've been given a false statement in a brief by counsel, I

20   order the parties who prepared that false statement knowingly

21   and intelligently to retract it, and I will enforce remedies

22   against counsel who have deliberately mislead parties in this

23   Court.  I will do that.

24          MR. ROSENBERG: Let's, Your Honor, turn to the crux

25   of this thing which really seems to be the Creditors

1    Committee's agreement.

2           THE COURT: And I want it within 10 days.

3           MR. PASQUALE: Your Honor, I - Ken Pasquale from the

4    Unsecured Creditors Committee.  I'm not certain what the

5    Court's asking for.  There's been no misrepresentation made

6    in any pleadings we filed.

7           THE COURT: Well, I've got counsel sitting here

8    laughing when I just asked that question.

9           MR. COBB: I was not laughing.

10          THE COURT:  It was you.

11          MR. COBB: Your Honor, Richard Cobb on behalf of the

12   bank lender group.  I was not laughing.  I was appreciating

13   the Court has identified the crux of the issue, and, Your

14   Honor, there has been no misstatement by either the bank

15   lender group or by the Unsecured Creditors Committee in any

16   part of our papers.

17          THE COURT: All right, if that's the case, then I

18   have a brief on file that indicates that the Creditors

19   Committee acted with the knowledge and consent of the bank

20   lenders who were the principal lenders at the time.  If

21   that's the case, then the interest rate was negotiated with

22   the bank lenders' participation and consent.  So, if I don't

23   have a misrepresentation of record, then everybody

24   participated and this was a knowing involvement and agreement

25   by everyone, why should the Court in some how or other be

1    involved in something that unwinds a deal.

2              UNIDENTIFIED SPEAKER: (Microphone not recording.)

3              THE COURT: I'm sorry, sir?

4              UNIDENTIFIED SPEAKER: There are reasons and we'll

5    get to them.

6              MR. ROSENBERG: Your Honor -

7              THE COURT: Particularly from the Creditors

8    Committee.

9              UNIDENTIFIED SPEAKER: Particularly -

10             MR. BERNICK: I think this is the part that you have

11   -

12             THE COURT: Yes.

13             MR. ROSENBERG: Your Honor, sorry, I was just

14   checking on the time that I have.

15             THE COURT: I have been interfering with your time.

16   I said I would keep my mouth shut, and I didn't.  So, I will

17   give you more time, sir.

18             MR. ROSENBERG: Thank you, Your Honor.

19             THE COURT: But I'm still looking for the same

20   answer.

21             MR. ROSENBERG: Yes.

22             THE COURT: Okay.

23             MR. ROSENBERG: But let me get back to it because I

24   think this is boiling down to something relatively -

25             THE COURT: Solvency?  You were talking about

1    solvency.  I still don't have any indication of where the

2    debtor is solvent on this record.

3          MR. ROSENBERG: I don't think Your Honor - Well, let

4    me - I want to finish the point on the agreement since that

5    seems to be -

6          THE COURT: All right.

7          MR. ROSENBERG: I don't think while there's a lot of

8    legal principles going around, Your Honor doesn't seem to

9    dispute the fact that post-petition interest should be paid,

10   it's just a question of whether that's post-petition default

11   interest or not.

12         THE COURT: Exactly.  That's exactly correct.

13         MR. ROSENBERG: So, I think at that point, quite

14   frankly, Your Honor, you go past the solvency point because

15   solvency is only necessary to establish a right to post-

16   petition interest at all.  If we're past an impairment, it's

17   the same issues.  If we're past that, we're really now into

18   the crux of the fair and equitable considerations.

19         THE COURT: All right then, if that's the case, I'm

20   not sure I necessarily agree that we have to get that far,

21   but if we're there, why is this rate of interest not fair and

22   equitable?  It's what the parties bargained for.

23         MR. ROSENBERG: Your Honor keeps referring to the

24   parties -

25         THE COURT: Yes.

1          MR. ROSENBERG:  - and talking about the Creditors

2     Committee.  The Creditors Committee is not the bank lenders.

3     There's no evidence of any agreement by the bank lenders -

4          THE COURT: But there is.

5          MR. ROSENBERG: Where?

6          THE COURT: Could you - Mr. Bernick, I'm sorry, but

7     that's not really too legible at the moment because of the

8     highlighting.

9          MR. ROSENBERG: I can see that, Your Honor, even

10    under the highlighting.

11         MR. BERNICK: It says, In consultation with certain

12    of the largest holders at the time of the bank debt.  And the

13    full sentence reads - that would be page 7 - thank you, it

14    says, This rate was negotiated between the debtors and the

15    Creditors Committee in consultation with certain of the

16    largest holders at the time of the bank debt claims.  I'll

17    note also, that I believe that the bank lenders also had a

18    joinder in this brief in addition to filing their own, which

19    may be a misstatement about that, but I think that's true.

20         THE COURT: Okay, so -

21         MR. ROSENBERG: We're certainly given that there's

22    no, quote, "agreement".  The question is whether the bank

23    lenders were consulted, and I assume they were consulted by

24    the Creditors Committee, but it's not - this is not an

25    agreement by all of the bank lenders.  At most what we have

1    established here is that certain bank lenders were consulted

2    at the time, bank lenders who are no longer here, who aren't

3    all the bank lenders.  Let's just imagine Bank XYZ.  Bank

4    XYZ, there's no - wasn't consulted.  There's no evidence that

5    there was any type of bank vote.  There's no evidence that

6    the bank agent went back and reported to the bank.  There's

7    no evidence that Bank XYZ had any involvement in this case

8    whatsoever.  What is the compelling equitable circumstance to

9    take away Bank XYZ's contractual default interest and give it

10   over to the equity holders?  The answer, Your Honor, is none.

11   The bank lenders as a group, the bank agent, none of them are

12   party to any type of agreement.  All that we have in this

13   record, the entire record that we have in terms of bank

14   lender involvement in this entire process - We've heard a lot

15   about the Creditors Committee and its deals.  All we've heard

16   about the bank lenders, as I say, two letters talking about

17   post-petition interest in 2004 from two individual letters

18   and that statement.  There's no agreement by the bank

19   lenders, no vote by the bank lenders, no plan support

20   agreement by the bank lenders, nothing by the bank lenders.

21   What we have is the Creditors Committee.  The Creditors

22   Committee is not the agent of the bank lenders.  It is simply

23   a fiduciary, but that's it.  It can't bind the bank lenders.

24   It's not everybody.  It's not the bank lenders, and how we

25   can take away the rights an individual bank lender has on the

1    contract because the Creditors Committee four years ago

2    talked to a couple of the larger holders, and I don't know

3    what was said or done.  All we have is this statement.  We

4    have no idea of anything more than that.  That cannot be the

5    compelling equitable considerations necessary in order to

6    take away the right to default interest.  Why don't I turn

7    now just as a general matter to those equitable

8    considerations, and, you know, the Third Circuit has not

9    ruled on the issue, but the clear trend of the decisional law

10   is that creditors should receive all that the contracts

11   provide for before equity retains value.  Consequently, I

12   submit that the Third Circuit would adopt and this Court

13   should follow the Sixth Circuit's decision in <u>Dow Corning</u>, I

14   think, you know, the First Circuit in the <u>Jen Correlli</u>

15   (phonetical) case, the Ninth Circuit in the <u>Future Media</u>.

16   The trend is to enforce what the contract says.  I think one

17   was a prepayment penalty case, one was an attorney's fees

18   case, but the trend is clearly, as a matter of equity,

19   enforce the contracts in the case where equity is retaining

20   value.  Let's go into the <u>Dow Corning</u> standard for a second

21   because I think it really bears the <u>Dow Corning</u> standard on

22   whether this is sufficient or not.  That standard is as

23   follows: When the debtor is solvent, and to me solvency, Your

24   Honor, every case that's looked at, look at pages 17 to 20 of

25   our brief, solvency for these purposes is for purposes of the

1    fair and equitable rule, is equity retaining value, and if

2    equity is retaining value for these purposes it's considered

3    solvent because it's not - it's fair and equitable because

4    it's coming out of equity who agreed to these contracts not

5    out of other creditors who didn't sign onto the contracts

6    that had these rates of interest.  Where the debtor is

7    solvent, and I urge the Court to go back and look at pages 17

8    through 20 of our brief again.

9         THE COURT: Well, I've looked at it and most of the

10    cases that you cited.

11         MR. ROSENBERG: Thank you, Your Honor.  The

12    presumption is that the Bankruptcy Court's rule is merely to

13    enforce contractual rights of the parties and the role that

14    equitable principals play in the allocation of competing

15    interest is significantly reduced.  Despite the equitable

16    nature of bankruptcy, the bankruptcy judge - and this is

17    right out of the case - does not have, quote, "free floating

18    discretion to redistribute rights in accordance with his

19    personal views of fairness and justice".  Rather, absent

20    compelling equitable considerations when a debtor is solvent

21    it is the role of the Bankruptcy Court to enforce creditors'

22    rights - and those are contract rights.  And as is said,

23    While the debtors would have the Court look at this, the

24    payment of post-petition interest due under a contract to be

25    a gift to which a lender needs to show it is equitably

1   entitled, that a contribution has to be made or something

2   else, <u>Dow Corning</u> says the opposite.  It correctly holds that

3   it is a right which can only be taken away after the debtor

4   has demonstrated compelling equitable considerations for

5   doing so.  And what is the compelling equitable

6   considerations here to support taking away the contractual

7   rights?  None of the traditional equitable factors courts

8   have considered for denying or taking away post-petition

9   interest could I find here.  Credit agreements governed by

10  New York law, there's no claim that default interest not

11  allowable under New York law.  The testimony of Mr. Ordway,

12  uncontested on this point, is that the 2 percent default rate

13  is within the industry standards, and in our brief at page 30

14  and footnote 31, recite a host of cases.  There's no evidence

15  that the bank lenders have delayed or impeded these cases.

16  No evidence that they've done anything at all other than ask

17  now to be paid the rate set forth in their contract.  This is

18  very different than the <u>Coram</u> case where among other things

19  there were terrible conflicts of interest between the lead

20  lender and the restructuring officer running the company.  As

21  of August 28, 2008, when the affidavits were filed, equity

22  was retaining approximately 1.8 billion of value.  No other

23  creditors are harmed by the bank lenders receiving post-

24  petition default interest distinguishing this from the

25  <u>Adelphia</u> case where, even aware as creditors of the holding

1    company were being harmed, they found it would be inequitable

2    because even though they weren't creditors of the same

3    company they were still creditors.  As we discussed, the bank

4    lenders didn't sign any agreement to any particular interest

5    rate.  No evidence they were ever asked to sign something.

6    All we had, as I said, is two letters in 2004 complaining

7    about interest rates, and the statement from the Creditors

8    Committee that some lenders, whoever they may be, some

9    unnamed lenders were consulted back when no idea who they

10    were, how much they represented, or why as a matter of law

11    other bank lenders should not get their interest rate because

12    these people happened to be consulted.

13            THE COURT: Are the banks not on the Creditors

14    Committee?  Banks held most seats on the Creditors Committee?

15            MR. ROSENBERG: The bank agent has a seat on the

16    Creditors Committee and there's no evidence whatsoever that

17    Mr. Mayer of JP Morgan was acting as anything other - nor

18    could he, as chairman of the Creditors Committee as fiduciary

19    for the Creditors Committee when dealing with the debtors.  I

20    think all the correspondence in exhibits filed indicate that

21    everything addressed to Mr. Mayer was in the capacity as

22    Creditors Committee, support his role as chairman of the

23    Creditors Committee.  He's not representing the banks nor

24    could he has a legal matter when he's on a Creditors

25    Committee he is the fiduciary for all and Your Honor it's

1    simply irrelevant that he happened to be a member of the

2    Creditors Committee.  And I think in terms of the conduct of

3    the banks in terms of, quote, "breaching the agreement that

4    they're not even party to", I've heard Mr. Bernick mention a

5    lot of things that the banks were doing, what they were

6    thinking, what they were doing.  They were betting.  They

7    were hedging.  They were directing.  There's absolutely no

8    record of any of that in evidence today.  What's in record is

9    two old letters and an in consultation.  There's no evidence

10   of a bank vote.  There's no evidence this was presented to

11   the banks.  There's no evidence that the banks directed

12   anyone to do anything.  All we know is the Creditors

13   Committee cut a bargain, and they'll discuss the bargain, and

14   that they may have consulted - or, Your Honor, excuse me, did

15   consult with some holders at the time who could not possibly

16   bind all of the other holders and are, I believe, Your Honor,

17   long since gone from this case.  The debtor also mentioned

18   that the bank lenders had some obligation in connection with

19   the debtors' financials to say something or to make a

20   contribution to this case.  I'm unclear, Your Honor, what the

21   bank lender is supposed to do.  You vote on a plan.  There's

22   a disclosure statement.  There's a plan.  You should raise

23   your hand at the time of the disclosure statement hearing, I

24   think, you know, prior to plan confirmation, but what is the

25   bank lender supposed to do?  It's my friend XYZ bank in

1    Washington again.  A, is he charged with reading the debtors'

2    financial, and B - what is he supposed to do?  Send a letter

3    to the SEC?  Raise - send a letter to - file something with

4    the Court saying, I disagree with the interest rate that the

5    debtors are utilizing for purposes of their financial

6    statements.  The answer is, the first time that anything

7    happened, when the term sheet came out that actually the

8    debtor indicated was planning to go forward with on the plan.

9    The bank lenders raised their hands, wrote a letter, said, I

10   object, and here we are.  And in terms of the contribution

11   that the bank lenders are supposed to make, I don't think -

12   the standard is not that you contributed, you know, putting

13   us on Mr. Ordway's declaration which I believe does show how

14   the bank lenders enhanced the case, it's irrelevant.  There's

15   no obligation in order to get what's due your contract where

16   equity is retaining a value that you make a contribution to

17   the case, some positive act of good.  I think the question

18   really comes down and this is where Your Honor has been

19   heading, because I think once we're past the point you're

20   entitled to at least post-petition interest as a matter of

21   law, whatever that rate may be, it all comes down, Your

22   Honor, to Dow Corning.  The final question is whether, absent

23   some actual inequitable conduct on the part of individual

24   bank lenders, the Court can take away the individual bank

25   lender's right to post-petition interest because of what

1   someone else may have done?   Some agreement by the Creditors

2   Committee?  Because of what someone else is threatening to

3   do, and the Equity Committee walking from the deal they cut

4   with others, but certainly not with us?  Or because the bank

5   lenders have merely asked to be paid amounts due to them

6   under their contracts.  Again, the Dow Corning standard is

7   that while the Court has discretion here, it's not free-

8   floating discretion.  The bank lenders submit that an

9   equitable consideration cited by the debtors which don't

10  point to actual conduct on the part of any or maybe at most

11  the one or two substantial holders, individual bank lenders

12  apart from enforcing the contract's rights and which don't

13  fall within any recognized state law equitable doctrine that

14  accepted by the Court would be just this type of disfavored

15  free-floating equitable discretion.  And let's turn again to

16  the equitable consideration decided by the debtors, and

17  again, Your Honor, it comes back to the, quote, "deal", and

18  I'm going to leave it to the Creditors Committee to discuss

19  the deal itself and why the debtors could not rely on it as

20  that they say that they did, but there's no dispute in

21  Kensington and other cases, § 1103 of the Bankruptcy Code,

22  the Creditors Committee cannot, does not, impossible to bind

23  the bank lenders.  There is no deal that's being breached,

24  reneged on, or anything else but a bank lender, because

25  there's no evidence of anything other than two old letters

1    and this in consultation statement in the Creditors

2    Committee's statements.  And I will also point out, Mr.

3    Bernick says the contracts of are sort of who cares

4    contracts.  It's who cares what they say?  Those contracts do

5    say the debtors signed them, that you can't change a

6    Creditors Committee - a bank lender's interest rate without

7    their consent.  Now, once you get to a plan, they obviously

8    can be outvoted, but there's no deal that anyone can cut

9    outside of the bankruptcy plan process which would trump the

10   credit agreement that takes away that creditor's right to

11   say, This is my interest rate, and I want my interest rate as

12   I'm entitled to my interest rate.  We also, and again, Your

13   Honor mentioned Mr. Mayer being on the Creditors Committee,

14   there's no evidence that anyone can point to in the record

15   that he agreed to anything on behalf of the bank lenders.  No

16   statements saying, On behalf of the bank lenders, I hereby

17   agree.  As opposed to his role as a Creditors Committee

18   member, which was the role he was when he was dealing with

19   the debtors, it's the role, and I'm sure Stroock ably

20   represented him, so the role he had to have when he's on the

21   Creditors Committee.  He's not everybody on a Creditors

22   Committee, hopefully, as a creditor you're required to be,

23   but at that point you put aside your individual creditor hat.

24   You're representing everyone.  You're not cutting deals for

25   others, and there's no evidence that he cut this deal for the

1    bank lenders as bank agent.  And again, he couldn't.  The

2    credit agreement, Section 13(1) says quite clearly what the

3    agent's responsibilities and roles are.  He would go beyond

4    the contract if he did that.  The debtors know that.  They're

5    parties to the contract.  All that you really have is Mr.

6    Shelnitz' declaration that the debtor supplied that Mr. Mayer

7    did, quote, "not do anything to confirm that he was not

8    impermissibly making agreements on behalf of the individual

9    bank lenders".  He was not - that's not the evidence that he

10   did not go out of his way to state, I am only acting on

11   behalf of the Creditors Committee, not the bank lenders, and

12   I hereby confirm that to you.  He's on the Creditors

13   Committee.  That's the role you're dealing with him until

14   someone - unless he - unless there's evidence that the bank

15   group as a whole directed him to act as their agent and that

16   he was assigning stuff on behalf of the bank group and that

17   they've modified the credit agreement to allow him to do so.

18   And finally, I come down to the last point, and it's the

19   point Your Honor mentioned when dealing with the Equity

20   Committee that, Can the bank lenders as a matter of equity

21   forfeit their contract right to post-petition interest

22   because the successful assertion of that right will cause the

23   Equity Committee to walk from the asbestos settlement?

24   That's what we heard.  That's the result that has been

25   predicted.  It may have been, it may not.  I will not, unlike

1   Mr. Bernick, speculate as to what is in other people's heads

2   whether they're betting, hedging, or anything else.  But,

3   this type of claim that a right must be forfeited in order to

4   prevent a complex settlement from unraveling has been

5   rejected by the Third Circuit in <u>AEWI</u>, Second Circuit <u>Irivium</u>

6   (phonetical), Fifth Circuit <u>Aweiko</u> (phonetical) -

7         THE COURT: You don't need to argue that point.  I

8   already indicated that I am not going to pay attention to

9   that.  The Court will not be held hostage to somebody saying

10  they're going to walk away from the deal if I determine as a

11  legal proposition that that's what I have to do, that's what

12  I'll do.

13        MR. ROSENBERG: Okay.  In sum, there's nothing in

14  the record that justifies that as a matter of law the

15  extraordinary result that depriving the bank lenders of their

16  contractual rights, trenching the value of such rights to

17  equity holders or you're retaining billions under the plan.

18  Now, Your Honor, I just wanted to go back to my brief for a

19  moment and page 43, and I think this is the point Your Honor

20  mentioned which is the right to default interest because I

21  don't think there's any dispute that there is an entitlement

22  to some post-petition interest under the Bankruptcy Code.

23  Your Honor's question is whether that's a right to

24  entitlement to default interest, and to me there is no

25  distinction.  <u>New Valley</u> said that your entitlement - that

1   once you're changing anybody's rights under a contract, and

2   they have a right to post-petition interest in accordance

3   with the rates set forth in the contract, that's in the

4   contract, default or otherwise, that's a contract right.

5   When you're changing that you're impairing somebody.  So

6   there is clearly an entitlement because otherwise what would

7   you be taking away?  The question then is, does the fact of

8   bankruptcy somehow blunt the entitlement to default interest

9   as opposed to pre-default contract interest?  And the answer

10  there is, yes, Your Honor, there has to be.  There's no law

11  at all that states that bankruptcy waives the consequences of

12  default.  All that bankruptcy does, the only section - and we

13  can point to their, I guess, two sections - Automatic stay.

14  You're obviously, you are prevented from enforcing the

15  consequences of a default against the debtor.  We can't go

16  ahead and say, Give me my default interest or I'm seizing

17  your assets.  That doesn't mean you don't have a right to

18  them.  That doesn't mean the consequences are waived.  It

19  simply means you can't collect on it today, but there's no

20  law that I'm aware of, Your Honor, that says simply because

21  it's a bankruptcy you're excused of the consequences of a

22  default.  Quite frankly at that point, Your Honor, I'm not

23  sure why any court has ever paid - allowed to be paid and why

24  any debtor has ever paid default interest because I'm sure

25  there are many, many cases where all the defaults occurred

1   post-bankruptcy, and if that's the law, then the right to

2   default interest, quite frankly in most cases is non-existent

3   even though it has been allowed and paid and as Your Honor

4   pointed out in <u>Dow Corning</u> which both myself and Mr. Bernick

5   were involved in, there were no pre-petition defaults in

6   those cases either, and the Sixth Circuit ultimately found

7   that the presumption was in favor of default interest, and I

8   believe that this very same argument was raised in that case

9   and rejected by the Sixth Circuit.  It looked eerily familiar

10  when I saw it in this case because I had seen it some eight

11  years before.  It was considered.  It was rejected.  It was

12  rejected because there is nothing in the Code that relieves

13  you of the consequences of default.  The only other provision

14  in the Code is the *ipso facto* clause that says to the extent

15  you're going to take away a right from the debtor, the

16  debtor's going to lose something, that is unenforceable, and

17  that has a history, Your Honor, because prior to the

18  enactment of the Code in '78, there were provisions in

19  contracts.  They were enforceable.  It essentially says,

20  Whatever rights the debtor has, it loses upon bankruptcy.

21  We're not taking away any right from this debtor.  We are

22  enforcing the rights we have against the debtor.  We are not

23  able to collect on them today, but under a Chapter 11 plan

24  that ultimately deals with our rights, that's when we're

25  entitled to receive the benefit of rights, including the

1    rights we have as a consequence of the default, who we may

2    not be able to enforce immediately, but ultimately, the

3    debtor has to satisfy its obligations as result of that

4    default.  It has to do so under a Chapter 11 plan, and if it

5    doesn't do so under that Chapter 11 plan, the equity holders

6    can't get value.

7            THE COURT: All right, so the answer to the solvency

8    question from your point of view is all the cases simply say

9    that in this context for fair and equitable, if equity gets a

10   return, then the debtor is solvent.  Whether or not - It's

11   not a mathematical test of any type.  It doesn't matter

12   whether the debt - It's not a balance sheet test -

13           MR. ROSENBERG: No.

14           THE COURT: It's nothing.  It's just a return to

15   equity, period.

16           MR. ROSENBERG: Well, it's not a nothing.  It is

17   part of the fair and equitable.  If you look as many times

18   what an equitable factor that the courts that have parsed

19   through this understand, it's that equity receiving value is

20   one of the factors.  That's where a lot of this confusion, as

21   I said, Your Honor, arises is that there's the belief that

22   somehow it's a separate determination.  The determination

23   was, all creditors should be paid.  That's what's fair - It

24   makes a lot of sense, Your Honor, that why should the debtor

25   do better equity in bankruptcy than outside of bankruptcy.

 1    It should satisfy it's obligations.  The fair and equitable

 2    part comes in when other creditors are harming each other,

 3    not when they're enforcing their rights against the debtor.

 4    The debtor's the one that signed the contract.  They

 5    shouldn't do better simply because.  And, Your Honor, I have

 6    three pages of cases discussing this issue.  I couldn't find

 7    a single case in the context of a solvent debtor that much

 8    less ruled the way the debtor wants.  I couldn't even find

 9    one that discussed it because, Your Honor, it is so far

10    fetched a concept that the debtor can retain billions of

11    dollars of value, yet for purposes of the solvency

12    consideration as part of the fair and equitable standard as

13    to who should get what, they should be considered neither

14    solvent nor insolvent.  It's not only too cute by half, Your

15    Honor, it's just too cute, and I think if you look at the

16    Armstrong case, one of the things that is quite apparent from

17    that case is that any scheme whereby equity retains value

18    before creditors are satisfied in full and Armstrong actually

19    referred not satisfaction in full with allowed claims but

20    satisfaction in full of claims.  That that is disfavored and

21    disallowed in the Third Circuit and if the scheme in that

22    case to get the warrants to equity traveling through the

23    asbestos creditors was $10 million worth of warrants was

24    something the Third Circuit disfavored, I cannot imagine what

25    the Circuit's view would be of the case where equity gets $2

1   billion of value through some scheme where solvency is made

2   not part of the plan but something outside of the plan that

3   first you say I'm not solvent, but then you have a plan that

4   has the greatest indicia of solvency of all time - equity

5   value at the bottom.  That's solvency and it's the whole

6   purpose of the solvent debtor exception, it's not to protect

7   equity.  It's not something they could hang their hat on with

8   some scheme that says, I'm going to look at it in a vacuum.

9   I'm going to look at in a balance sheet.  It's part of the

10  fair and equitable standard.  It's only arising in connection

11  with this plan.  It doesn't arise outside of this plan, and

12  in the context of this plan, equity is retaining value,

13  that's all you need to know for purposes of solvency, and I

14  think that that is well-ingrained in 1129 when Congress

15  amended the Code and the incorporation of the absolute

16  priority rule.

17            THE COURT: Okay.

18            MR. ROSENBERG: Thank you, Your Honor.

19            THE COURT: Thank you.  Mr. Kruger?

20            MR. KRUGER: Your Honor, Lewis Kruger, Stroock,

21  Stroock & Levin for the Unsecured Creditors Committee.  I

22  guess, good afternoon.  I thought I was going to say good

23  morning, but I guess not.

24            THE COURT: I think it's afternoon.

25            MR. KRUGER: Your Honor, I realize that as cases go

1   on, various things happen.  Deal fatigue sets in.  People

2   become impatient to see the end, and eight years is a long

3   time, and I listened to Mr. Bernick very, very carefully this

4   morning.  He always speaks articulately and with great

5   passion, and I can hear him saying to himself, it's hard for

6   me to imagine why after eight years and we worked so hard at

7   the estimation process to beat down the asbestos claimants to

8   get them to accept a deal, why all of you creditor types are

9   ungrateful for that effort and not willing to accept the

10  interest rate that we have provided to you, and didn't you,

11  after all, agree to that interest rate at one time?  And the

12  answer to that question is, Your Honor, yes we did.  We did

13  agree to a 6.09 percentage rate in January 2005, and we did

14  that in connection with a plan in which we were a co-

15  proponent.  That plan, Your Honor will recall, only too well,

16  I'm sure, provided for a full-scale estimation process, the

17  conclusion of which would be a determination by the Court as

18  to the estimated value of the claims of the asbestos

19  claimants, and the debtor would provide the funds in that

20  amount and the asbestos claimants would not be impaired and

21  would not have the right to vote, and I remember being in

22  court and having Your Honor say, very hard for you to believe

23  that the asbestos claimants would not have a right to vote.

24  That plan went nowhere.  Part of the provisions of the

25  agreement that was reached in January 2005 was that there

1    would be approval of a disclosure statement supporting that

2    jointly proposed plan by November of 2005.  That never

3    happened.  So in 2006, yes, there was another agreement with

4    respect to the interest rate, but that plan, also, never

5    happened.  The plan that has now been filed is the result of

6    an agreement between the debtor, the equity, and the asbestos

7    plaintiffs and the property damage claimants and perhaps the

8    future claims representatives.  Well, the one party not

9    proponent of that plan is the Official Unsecured Creditors

10   Committee.  We were not a participant in those negotiations.

11   We were not asked to participate in those negotiations, and I

12   always thought we were not asked to participate in those

13   negotiations because no one wanted us standing there saying

14   how a 6.09 percent deal is really dead because that plan has

15   gone away.  The modification to the floating prime rate has

16   also gone away.  Those plans never saw the light of days.

17   Your Honor terminated exclusivity in 2007, which was also a

18   precondition for the continuation of that agreement.  All of

19   that came to pass.  There was no agreement.  Those interest

20   rates no longer obtained with respect to those plans, and

21   yes, we did indeed ask people in January of 2005 and before

22   that whether they would support the 6.09 percent interest,

23   and yes, some of the large holders said they would with

24   respect to that plan because we were looking for the

25   conclusion of this case in a reasonably short time frame, not

1    three and a half years later when we still are not at the

2    conclusion of this case, and at best, we're looking at a 2009

3    event.  So, the lenders themselves have been sitting with

4    this debt on their books now for nine years.  The debt itself

5    has matured during the process of these years, all on its own

6    terms.  Now, Mr. Bernick says, Nobody ever told us how the

7    world had changed, but Your Honor, in 2006, the world did

8    indeed begin to change after the 2006 agreement.  First of

9    all, the PI estimation hearing, and yes, Mr. Bernick did a

10   fine job and proceeded in earnest.  The questionnaires were

11   ordered and filed.  There was enormous progress being made in

12   that direction.  The ZAI decision by this Court -

13          THE COURT: Mr. Kruger, excuse me, I'm sorry.  My

14   computer is doing something very strange.  It's not typing so

15   just a minute till I see what's - Okay, I think I've picked

16   up but I don't want to lose what you're saying, so -

17          MR. KRUGER: What I was saying, Your Honor, after

18   the January 2006 agreement, lots of things changed.  The PI

19   estimation process went forward in earnest.  You ordered

20   questionnaires from the asbestos claimants.  All of that

21   made, obviously, a significant difference.  You issued a ZAI

22   decision.  Many of the PD claims were settled, and then in

23   August 2006, the Sixth Circuit decided the Dow Corning case,

24   and for those reasons, including the fact that Grace did so

25   well in operating its business, and we're very, very pleased

1    about that, the world changed and the bank debt began trading

2    in the marketplace at the default rate.  So, in early 2007,

3    in conversation with Mr. Shelnitz, lawyers from Kirkland &

4    Ellis, and others, we began to say to them that the bank debt

5    holders were assuming that they were going to be paid the

6    full default interest rate, and that it was not sensible to

7    rely on anything other than that if they indeed were going to

8    seek the approval of any reorganization plan that would be

9    approved by the bank debt holders.  So there was no question

10   that the debtor did not rely on that, and a point of fact Mr.

11   Shelnitz recalled from time to time during his negotiations

12   with the various other parties to which we were not invited,

13   to say that they were still fighting for the 6.09 percent

14   interest rate to which I would always say, Thank you very

15   much, but I remind you again that the bank debt holders are

16   looking for a full default interest rate.  There is no

17   question that the debtor did not rely, could not have relied,

18   should not have relied on anything that had been negotiated

19   previously as though there was some agreement - you know,

20   what they really would like to do is take an agreement with

21   respect to a plan in January of 2005, everything else

22   disappears.  The only part that should remain still constant

23   is the interest rate for their purposes, and therefore, that

24   should now become an equitable basis for a determination that

25   the 6.09 is a fair and equitable rate.  There is really no

1    basis for that, Your Honor.  That's not what occurred.  It

2    was a negotiated deal.  All aspects of the deal were part of

3    the same transaction.  When you take away all the other parts

4    of the transaction query why does that one part stand out?

5    It stands out because it's comfortable and helpful for the

6    debtor because it also enables them to retain for the equity

7    the billion plus dollars of equity that their reorganization

8    plan acknowledges a reorganization value being retained for

9    the equity.  Now, the Committee itself, of course, Your

10    Honor, never gets to vote on a plan.  Committee members may

11    vote on a plan and creditors may vote on a plan, but the

12    Committee itself never votes on a plan.  It doesn't approve

13    or disapprove.  They may say something in a disclosure

14    statement with respect to a plan, but that's as far as it

15    gets to go, and I always thought, Your Honor, that the issues

16    that we're confronting today really were 1129 issues, and I

17    suggested when we were here at the status conference, that it

18    would be a far better time to hear these arguments at the

19    conclusion of hearings on the plan and disclosure statement

20    not as an objection to claim allowance.  In any event, Your

21    Honor, I just want to point out again that, you know, Mr.

22    Bernick's charts, one of the charts to your left, I don't

23    know how we can describe it in the record but the chart to

24    your left which shows the January 2005, 6.09 percent.  It

25    doesn't show it in those terms, but that's the agreement that

1    Mr. Bernick has referenced to.  Yes, there was that

2    agreement, as I said, but of course, the underlying premise

3    of that agreement went away.  There was another modification

4    in January of 2006.  That agreement also went away in the

5    sense that the plan that was filed was not a plan in which we

6    were a co-proponent and point of fact, we were never asked if

7    we wanted to become a co-proponent of that plan.  So this was

8    really well outside of the Unsecured Creditors Committee and

9    their role in this case, and their role in this case maybe

10   would have been different had indeed we had been consulted in

11   part of the negotiation process and the like, which we were

12   not.  A final comment, Your Honor.  Mr Bernick referred to

13   the fact that we say that the Court ought to be aware now of

14   the fact that there were other creditors who may be claiming

15   default interest rate as well.  That's not to say that that

16   makes this hearing one about that or that now relates to

17   this.  What we're saying is that there are others who will

18   have similar kinds of claims including ordinary trade

19   creditors who have on their invoices statements that say, For

20   every month you don't pay us, interest runs at the rate of X

21   percent a month.  Those will also be presented, I assume, by

22   others in due course, but those are claims that are out there

23   as well, and our only purpose was to make sure that the Court

24   was aware of those claims as well as part of this entire

25   process.  Lastly, Your Honor, I think the Armstrong case

1    makes one thing clear and that is that people are entitled to

2    change their minds.  Mr. Bernick has given perhaps the

3    greatest demonstration of the ability to change one's mind.

4    He was the person who suggested that we ought to have the

5    Committee and the debtor as co-proponents of a plan and look

6    where we are today.  Now, Mr. Bernick's in love with the

7    asbestos claimants and they are co-proponents of a plan just

8    the reverse of where he was before.  The Committee is also

9    entitled to change its mind and it's view but did not have to

10   do so in this instance because it all went away without the

11   Committee having done anything.  The plan that is filed is

12   not one that the Committee approved.  It's not one that was

13   the premise from the negotiation of the interest rates that

14   the Committee agreed to.  With respect to the other issues,

15   Your Honor, I think we all would like to see these cases

16   conclude.  We would like to see them conclude promptly, but

17   they should not conclude promptly by looking away from

18   parties' entitlements under the law, and in this particular

19   case, the bank creditor's entitlement to default interest.

20   Thank you.

21        THE COURT: Anyone else before Mr. Bernick has some

22   rebuttal?  All right, Mr. Bernick.

23        MR. BERNICK: I just would note as a footnote, not

24   only do we have the brief that was filed by the Creditors

25   Committee, we actually have Mr. Kruger's own affidavit in the

1    case that says, This rate was negotiated between the debtors

2    and the Creditors Committee in consultation with certain of

3    the largest owners at the time of the bank debt claims.  So,

4    that kind of leads me to - I'll come back to that in just a

5    moment, if I can just gather my notes here for just a second.

6    I'll want to begin with that solvency and just touch on it

7    for a couple of minutes.  There's a fundamentally different

8    notion than solvency that's been advanced here that finds no

9    support in the absolute priority rule which is what it is

10   that really is at the centerpiece - at least their

11   construction of the absolute priority rule, at the

12   centerpiece of the insistence throughout that it is a

13   hallowed principle of corporate law that what we're trying

14   here can't be done.  Mr. Rosenberg said that solvency is only

15   a factor to be considered, only a factor to be considered as

16   part of the equitable analysis, and that solvency is

17   established when equity gets something under a plan.  The

18   fact that equity may get something under the plan, does not

19   even trigger the absolute priority rule when it comes to

20   post-judgment interest.  With respect to post-judgment

21   interest, 1129, working with 502, says that if the claims of

22   - in this case the bank lenders, are being paid in the

23   allowed amount, they're being paid in the allowed amount that

24   is another way in which 1129(b) is satisfied.  It's only if

25   the claims are not being paid in the allowed amount, even

1   given to the absolute priority rule.  So the formulation

2   that's been given with respect to what solvency means here,

3   which is that equity gets something, doesn't even find

4   support of the absolute priority rule.  Dow Corning doesn't

5   stand for a different proposition.  Dow Corning has been much

6   cited and misunderstood.  I don't recall actually Mr.

7   Rosenberg being there at the time.  I was there at the time.

8   I litigated that case at the trial court level and on appeal,

9   and what's significant about the Dow Corning case is that

10  first of all it doesn't address the issue of what the test

11  for solvency is at all.  Dow Corning was a case in which

12  solvency really had never been disputed by the company, never

13  really was at issue actually in the case itself.  That is to

14  say, there were competing estimates of solvency because we

15  never got to the point of having an estimation at all.  Dow

16  Corning was clearly solvent at the time that these issues

17  were litigated because they were litigated pretty much after

18  the fact, but the really key thing for understanding the

19  appeal, and this is nowhere to be found in all their

20  citations of Dow Corning is that the issue actually framed

21  for decision in the Dow Corning case had nothing whatever to

22  do with either a determination of solvency or a determination

23  of what 1129(b) would require by way of an equitable

24  analysis, and the reason for that is that the essence of Dow

25  Corning's position at trial and at the Court of Appeals was

1   not based upon any of that.  Dow Corning's position was based

2   upon the fact that the interest rate that was adopted in that

3   case had been incorporated into the plan of reorganization.

4   It had not been appealed by the unsecured creditors or the

5   Unsecured Creditors Committee, and therefore, that feature of

6   the plan became final, and because it became final it was not

7   subject to any kind of revision under the application of the

8   fair and equitable standard under 1129(b).  So, the issue of

9   what it takes to find solvency and if there is solvency, what

10  the equitable analysis actually looks like, there was no

11  record whatsoever.  Indeed, we asked at the trial court level

12  to have a record made about what the equitable analysis would

13  look like, and that request was denied.  So the issue really

14  went before the Court of Appeals solely on the question of

15  whether this issue could be opened up or whether there had

16  been a final judgment, final order not subject to appeal.  It

17  already defined what the applicable rate of interest was.

18  The Court of Appeals said, We don't believe that the terms of

19  that final rule are sufficiently clear, and therefore, we're

20  going to construe it in light of what things we believe

21  1129(b) might call for, but there was no record.  It was

22  basically the Court of Appeals was reaching out saying, Well,

23  here's what the 1129(b) analysis might look like, and because

24  they didn't have a record, they remanded the case for the

25  determination of what would be fair and equitable in the

1   principles that they applied.  So the idea that <u>Dow Corning</u>

2   provides instruction on the issue of what is solvency and

3   then how solvency would bear upon the fair and equitable

4   determination of the facts on this case is as completely and

5   utterly without foundation in that decision.  <u>Dow Corning</u> had

6   nothing to do with that proposition.  It's a far reaching

7   decision, but it doesn't deal with the facts that are

8   uniquely presented here.  The statement is made that <u>Dow</u>

9   <u>Corning</u> is a trend.  If it is a trend, it's a trend of first

10  impression in this Circuit.  In this Circuit we don't have

11  any such trend, and you can point to the District Court and

12  the Bankruptcy Court opinions, which we have in our brief,

13  that are completely different from the <u>Dow Corning</u> kind of

14  analysis, that are very much an even-handed balancing of the

15  equitable factors, and that's what we believe is appropriate

16  here.  Solvency though remains a threshold issue.  If there

17  is not solvency and it is their burden to demonstrate

18  solvency under 1129(b), if there's not solvency, they're out

19  of luck.  So, it's not a factor.  It is a *sine qua non,* and

20  it is their burden in order for them to escape the reach of

21  502.  It is their burden in order to escape the reach of 502,

22  and they haven't been able to meet that burden, not by any

23  stretch of the word.  Well, we still at the end of the day

24  come back to the factors that ultimately are the ones that

25  have most bite and are most persuasive here, and that's why

1    we have framed the issues in the way in which we have done.

2    The issue that really has bite is, assuming that they could

3    get themselves into the zone of solvency, which they have not

4    done, what is fair and equitable.  What is fair and

5    equitable?  And thus the most prominent fact that stands

6    between them and even a straight-faced test of being able to

7    say it's equitable for them to get 100 cents of everything

8    that they believe that they're ultimately entitled to - not

9    even entitled, but that they can ask for, the biggest problem

10   with that is their entire conduct during the course of this

11   case and continuing on to today.  The statement was made by

12   Mr. Kruger that, Gee, you know, I actually felt there was a

13   certain amount of brotherly love there.  Mr. Bernick has not

14   been through as many battles as I have.  I know what battle

15   fatigue is all about.  I know what case fatigue is all about,

16   and that's really what's going on here is there's an

17   expression by the debtor of "fatigue".  Whey do we have to

18   keep on with this, and this is not a fatigue case.  This is a

19   case, God knows, we've shown that we have stamina.  We will

20   continue to have stamina.  This is a problem not with our

21   being concerned about fatigue.  This is a problem with our

22   being concerned about the rewriting of history, that

23   basically taking what has happened in this case for years and

24   pretending that it is not so.  So, Mr. Kruger says, Well, he

25   did agree.  We now know the affidavit, it says, he agreed,

1   the Committee agreed, and they agreed with authority.  So,

2   there's no issue in this case any more about how, Oh, no, I

3   didn't know, you know.  The lenders were onboard.  Everybody

4   was onboard, and they made a deal -

5            THE COURT: But what they're saying is, they made a

6   deal for a plan that went nowhere, and so, the deal that they

7   made wasn't for this plan.  That's what they're saying.

8            MR. BERNICK: That is a fair point.  They could at

9   any point under the terms of those letters walked away and

10  said, We're not standing by that deal because that deal was

11  for a plan.  So this is why the subsequent history becomes so

12  key.  They never did it.  So, the new plan comes onboard.

13  Did they walk away?  No, they stood by their letters.  They

14  stood by the agreement.  He says that we're happy to stay

15  put, in January of 2006, there are more developments in the

16  case.  There's estimation.  They didn't walk away.  They

17  stayed put with respect to that agreement.

18            THE COURT: But that's also for a different plan.  I

19  think what we need to do is get to this plan, the one that

20  was just filed and as to which the negotiations for the 6.09

21  percent are now on the table.

22            MR. BERNICK: Yes, but I think in connection with

23  this plan, it's the same story.  They're still sitting here

24  today with those letters in place.  They're not abrogating

25  those letters.  They're not saying that they're not relying

1   upon those letters, and in connection with the negotiation of

2   this plan, Your Honor, as we know, they got the term sheet,

3   and when they got the term sheet, the didn't say the deal is

4   off.  Indeed, as we saw from Ms. Krieger's email, there was

5   no statement to that effect at all.  The essence of what

6   they're saying - that's this one here.

7        THE COURT: But that email went from Ms. Krieger to

8   the Committee; correct?

9        MR. BERNICK: No, it went from Ms. Krieger to Mark

10  Shelnitz as the general counsel in W.R. Grace.

11       THE COURT: I'm sorry, from Grace though to the

12  Committee.

13       MR. BERNICK: No, no, it's from the Committee to

14  Grace.

15       THE COURT: Oh, I'm sorry.  Okay, this came from the

16  Committee to Grace.

17       MR. BERNICK: Right.  So the deal was a draft term

18  sheet, and it went out, and this was the only comment that

19  came back.  So, we actually went ahead.  We did use the rate.

20  We incorporated them to the term sheet.  They knew that the

21  negotiations were taking place.  At any point they could have

22  revoked the letter agreement they had.  They could have told

23  us, we're not onboard.  They never ever did that.  Those

24  letters remained in place.  We sent the term sheet.  This is

25  the only answer coming back.  It doesn't say, Deal's off.  We

1    don't like this plan, and then say that, Oh, our deal only

2    relates to the prior plan, and in this case, as we sit here

3    today, Your Honor, there's nothing that revokes that deal.

4    They want to argue to have Your Honor give them more but

5    they're still not revoking that deal.  So, we can't have

6    really a clearer case in which the conduct of the Unsecured

7    Creditors Committee, obviously, with the knowledge of the

8    bank lenders has been, in the context of this case, to insist

9    that they're basically asking the Court to have it both ways.

10    That they want the letter to remain in place, but they want

11    to ask the Court for more.  Now, Your Honor, in fairness, we

12    have incorporated into the plan the letter rate and we're

13    prepared to stand by that, but this is why I come to points

14    one and two that wrote up on the board that we believe that

15    this agreement should be dispositive.  They can't have it

16    both ways.  They can't say, Gee, Judge, we really want you to

17    determine this matter and it might be more or it might be

18    less.  They don't say that.  They say, We just want not just

19    the letter, we want more than the letter, but they don't want

20    to expose themselves to the downside that they're actually

21    entitled to less than the letter.  So, they come in with the

22    letter in hand.  They say, It's over here behind here, but

23    gee, by the way, would you please give me more, and this is

24    really the essence of - in the conduct of this courtroom is

25    also frankly somewhat surprising.  The conduct in this

1    courtroom when confronted by this whole problem of what the

2    Committee has done and the Committee even today has not

3    revoked that letter.  The statements that are now being made

4    by counsel are as follows: First, there was no evidence that

5    the bank lenders were involved.  Well, that's just not true.

6    Then it was those two old letters.  Well, that's just not

7    true.  The statements that were made in court just this

8    morning, just those two old letters and oh, by the way, this

9    brief, and that's not our brief.  Well, we now know that

10   there were the two letters.  We also know that were actually

11   emails like this, the statement with respect to Mr. Mayer,

12   this is an email that was sent from Bob Tarola, who was the

13   CFO of Grace on November 8, 2004, and it was produced in this

14   case, and he's talking to basically the CEO, the financial

15   advisor, other people at the company, and he says, Mar - Mar

16   was the guy who worked for JP Morgan who was the agent and

17   sat on the Commercial Creditors Committee.  It says, I spoke

18   with Tom this morning.  He said he is willing to compromise,

19   but the Committee reps only hold a small tranche of the bank

20   debt, and the non-committee holders are pushing for a full

21   default rate.  I asked them to work with us on a rate of

22   about 4 percent.  He will get back to me tomorrow.  The idea

23   that this is all just a couple of old letters, this was a

24   robust negotiation.  There's co-tempering it's evidence of a

25   negotiation.  The constituencies for the unsecured creditors

1   were in there pitching.  Some for default rate, some that

2   were prepared to do less, and they all did a deal, and to sit

3   there and say, Oh, well, there's a couple of old letters.

4   That's just false.  Not only is it false, but we now know

5   also that the same deal was in the company's public

6   statements, and, Your Honor, as to whether the public

7   statements or financial statements were made, this company -

8   and it's in Mr. Shelnitz's affidavit made regular, specific

9   reports to the Unsecured Creditors Committee, and the bank

10  lenders often showed up, and these were detailed reports and

11  in those presentations the same deal that was struck off in

12  2005 and in 2006 was explicitly born into and wed into the

13  documents.  So, the idea that somehow they can distance

14  themselves by saying, Oh, this was an old couple of letters,

15  absolutely gives lie to their explicit conduct, the conduct

16  of the Unsecured Creditors Committee and the bank lenders in

17  this case, again, and again, and again throughout this case,

18  that's inequitable.  It is inequitable to say, Oh, we'll do

19  these letters.  We'll stand by these letters, we'll show up

20  with you, we know that you - we know that you have them in

21  your financial statements.  We know that you're working with

22  them in connection with the ongoing negotiations, and then at

23  the end of the day, what do they say?  Well, they say, Here,

24  oh, we're not sure we signed onto the brief until Mr.

25  Kruger's affidavit says they are signing on to the brief.  We

1    say, Two old letters.  We know that it's much more than two

2    old letters.  Ultimately, their proposition comes right down

3    to what it is that Mr. Rosenberg really did argue, because at

4    the end of the day, they don't want to talk about equity.

5    They just want to talk about who was actually legally bound

6    by the deal.  That's the essence of what they're saying is

7    that the bank lenders were not actually, legally,

8    contractually bound by this deal with authority, et cetera,

9    et cetera, et cetera, that deal is irrelevant and they can

10   walk away from it.  And, Your Honor, they can do that as much

11   as they want as a matter of law.  They can't do it as a

12   matter of equity.  What we're asking the Court to determine

13   is that equity means something here.  It means a bankruptcy

14   process where you can rely upon and trust counsel for the

15   Unsecured Creditors Committee, people who are on the

16   Unsecured Creditors Committee for their word and for the

17   results of their negotiations, and not at the end of the day,

18   have people stand up in court and were no where a part of

19   this process and kind of pooh-pooh it because it's just a

20   couple of old letters, and to have the very, kind of almost

21   unseemly tabloid we had this morning where we have an issue

22   raised about the integrity of Mr. Kruger and his firm for the

23   briefs that they filed -

24           THE COURT: Well, that was apparently a

25   misunderstanding on my part for which if I have not

1  apologized, I do apologize.

2       MR. BERNICK: That's very fair and honorable of Your

3  Honor, but I think that Mr. Rosenberg then just turned around

4  and made the same argument all over again, which even after

5  Your Honor said that, you say, Couple of old letters.  No, it

6  is the gentleman here and the Committee today who are

7  standing behind and saying, That was in fact an agreement

8  that was reached, and nowhere -

9       THE COURT: Well, it does appear to be an agreement

10  that was reached, but whether it's an agreement that was

11  reached with respect to this plan, although, you know, the

12  April letter does seem to suggest that that same agreement is

13  the agreement that the parties have still continued to go

14  forward with with respect of the plan that's now on the

15  table.

16       MR. BERNICK: And today.  The letter agreements, you

17  can terminate them.  They have never sent a letter

18  terminating them, even today.  I don't know how much, how

19  clear it can possibly be that they want to have it both ways,

20  and really the argument therefore, I really think Your Honor

21  - and I'm going to put this up on the board because it

22  absolutely goes to the heart of the matter.

23       MR. KRUGER: Your Honor, we've gone over the one

24  hour limit so that we now -

25       THE COURT: I think we did, Mr. Kruger, I'll allow

1    everybody to do it, but I've let Mr. Bernick - he had 10

2    minutes, he now had 25, so I'll give him 5 more and I'll

3    allow everyone else 20 minutes, because - everyone else but

4    Mr. Bernick used up their time.  So, I'll allow everyone else

5    20 minutes and then we'll be finished.  Mr. Bernick, I'll

6    give you 5 more minutes.

7         MR. BERNICK: At the end of the day, Your Honor, the

8    essential argument that they're making here is not doing

9    equity.  It is not how the case has been run.  It is not how

10   the plan was developed.  The essential argument that they're

11   making today is that this is just a question of contract law.

12   Unless somebody was actually bound by that contract, that

13   contract can be passed aside.  It doesn't factor into

14   applicable analysis.  That is the essence of what they're

15   saying here, is the contract doesn't matter because we didn't

16   sign it.  They said it again, and again, and again, and

17   again, and therefore, the real issue here is whether equity

18   means something in this case.  Equity is not simply a

19   question particularly because of 502, which says that prior

20   contracts don't govern the question of post-petition

21   interest, and therefore, they've got to come in under 1129,

22   first show solvency, then show equity.  They can't show

23   solvency, and they won't be able to show equity, but they

24   don't even really want to show equity.  Mr. Rosenberg said

25   this morning, he walked away from all the factors that they

1   recited.  Contribution to the case, use of cash, he says, We

2   don't have to do any of that.  The issue of law for Your

3   Honor is whether absent a contract that changes the credit

4   agreements whether - that kind of change whether that means

5   that there is no choice that the Court has but to give them

6   the extra interest.

7           THE COURT: That seems to be the issue.

8           MR. BERNICK: Yes.

9           THE COURT:  That seems to be what he's arguing.  I

10  don't understand that the Court is faced with a fair and

11  equitable determination that says it's a matter of contract

12  law.  Contract law generally isn't based solely on a fair and

13  equitable analysis.

14          MR. BERNICK: That's exactly right.  So their

15  position was essentially the position of contract law that

16  they say displaces the equitable analysis because the

17  equitable analysis is just unremittingly one way.  This whole

18  thing stands for the process of doing equity.  Their own

19  experts concede that all of their efforts to show that they

20  made some contribution to the case, they failed and the

21  deposition could not be clearer.  Not a single one of them

22  work out.  So, ultimately what they want to come and the -

23          THE COURT: One minute.

24          MR. BERNICK: Yeah - the only issue of bankruptcy

25  law that they can then try to invoke in order to make this

1    work is to say, Well, I have a new lender.  The new lender

2    wasn't there, didn't agree, and therefore, the new lender -

3    you know, we can't find those guys.  If they're new lenders,

4    if the come in and buy the securities, they can't be found -

5    We've got to look at this from the point of view of the

6    lightest guy on the block.  Now, I'm not going to make an

7    argument about the basis on which they bought in and all the

8    rest.  I'm making a different point.  We're not saying the

9    new lender can't come in and make the objection.  We're not

10   saying that they have no ability to get around the agreement

11   that was reached.  This can come in and object.  They've got

12   very able counsel, et cetera, et cetera, but what they can't

13   do is to use the fact that they're now objecting to say, We

14   control the issue of fair and equitable.  Fair and equitable

15   is controlled not just by the new lender on the block.  Fair

16   and equitable is defined by the whole conduct of the bank

17   lenders in this case, and that conduct is very much bound up

18   in the agreement that was reached.

19              THE COURT: I need to take a recess because I'm

20   losing battery power in my computer, and I need to get new

21   batteries.  So, can somebody tell me - I'm not sure.  How do

22   I contact someone to get batteries, because I'm losing type.

23   So, I need a 5-minute recess to get batteries.  We'll take a

24   5-minute recess.

25              (Whereupon at 1 p.m., a recess was taken in the

1    hearing in this matter.)

2            (Whereupon at 1:12 p.m., the hearing in this matter

3    reconvened and the following proceedings were had:)

4            THE CLERK: All rise.

5            THE COURT: Thank you.  Please be seated.  Mr.

6    Bentley, do you have any comments?

7            MR. BENTLEY: Briefly, Your Honor.

8            THE COURT: All right.

9            MR. BENTLEY: Two brief points, Your Honor, both

10   from the perspective of the - to add the perspective of the

11   Equity Committee to what Mr. Bernick has argued.  First, you

12   heard Mr. Bernick's argument and you saw the evidence to the

13   effect that the Creditors Committee never terminated the

14   agreement they had reached as to post-petition interest, and

15   to the contrary, Ms. Krieger sent an email to Grace's general

16   counsel commenting on the draft term sheet with the asbestos

17   plaintiffs indicating quite the opposite of them having

18   walked away, that they were still supportive of that.  The

19   point I'd like to add, Your Honor, is the fact that they

20   didn't walk away, the fact that they did quite the opposite,

21   had very significant consequences to the Equity Committee and

22   to the deal that was reached with the asbestos claimants.

23   You've heard that - from Mr. Kruger that the Creditors

24   Committee was not invited into the room in the negotiations

25   with the asbestos claimants.  There was a reason for that,

1    and that is, in any negotiation, bringing an additional party

2    into the room makes it more complicated, more difficult to

3    get agreement, and the reason it was considered not necessary

4    to bring them in was because we believed, as the debtor

5    believed, that we had a deal with them and that that deal was

6    still on the table.  A very, very important belief, we relied

7    it, it had very important consequences.  Second point, Your

8    Honor, there's a second equitable point in addition to this

9    absolute essential equitable point.  You'll recall the first

10   argument I made when I stood up previously was that there's a

11   second equitable point, namely that what the banks are trying

12   to do here is to get the benefit of the deal that we and the

13   debtors negotiated with the asbestos claimants for which we

14   made major concessions for which we accepted lesser treatment

15   than we would have gotten had we litigated to the end of the

16   road and won.  They're trying to get those benefits of

17   eliminating and threat to solvency without giving up a

18   penny's worth of concession, getting exactly the same

19   treatment that they would get if we went all the way to the

20   end of the road and won, and that, Your Honor, as I said

21   before, is the opposite of equity.  The one point I want to

22   make as rebuttal is that you heard many, many arguments from

23   Mr. Rosenberg and Mr. Kruger.  They didn't say a word in

24   response to that point.  They have no argument to the

25   contrary, Your Honor, and we hope that Your Honor will take

1    that into consideration.

2         THE COURT: All right.  Mr. Rosenberg.

3         MR. ROSENBERG: It is good afternoon now, Your

4    Honor, and good news for everyone.  I will not be using the

5    full 20 minutes.  A couple of very brief points.  Starting

6    with the equitable standard and Mr. Bernick's statement that

7    the, you know, I start and end with the contract.  Well, of

8    course, I start with the contract.  I think the Supreme Court

9    says you start with your state law, you know, state law

10   rights.  That has to be the starting point.  It isn't the

11   end, but it's certainly the starting point, and equitable

12   considerations do play a factor thereafter.  However, where

13   equity retains value a bar on those equitable considerations

14   and their ability to take away state law rights is much

15   higher, because there's no equitable principle that says that

16   equity should do better inside a bankruptcy rather than

17   outside, and that is a key point, Your Honor.  It is, the

18   company that signed the credit agreement, there's no reason,

19   other creditors aren't being harmed, that the company and its

20   equity holders should benefit by paying less than is due

21   under that contract, absent compelling equitable

22   circumstances that take away such rights.  So if there are

23   compelling equitable circumstances because, obviously, let us

24   imagine that you have state law rights, but you have done

25   something heinous to harm the estate.  You've done something

1    that really damages the estate, damages equity.  Obviously,

2    that's a compelling equitable circumstance at that point.

3    Equity could say that you could lost you contract because

4    you've hurt equity.  What is the conduct during the case.  I

5    keep hearing about the conduct during the case, and I keep

6    hearing there's no conduct ever pointed to as to the

7    individual bank lenders.  I saw a third letter, I guess, now

8    from 2004 that Mr. Mayer - it was addressed to him as a

9    chairman of the Creditors Committee.  It actually stated

10   quite clearly that he said that, I only have a little bit of

11   - I can't really speak for the bank debt.  I only have a

12   little bit on here, and they're saying I want default

13   interest.  So it doesn't look like Mr. Mayer was listening to

14   the banks.  He did what he did as fiduciary for everybody on

15   behalf of the Creditors Committee.  You need to show

16   something, compelling equitable considerations of each of

17   these bank lenders who are going to lose their state law

18   claims that there's some compelling equitable conduct on

19   their part to take it away from them, not that the Creditors

20   Committee didn't honor the deal, and I think Mr. Kruger has

21   addressed, and if he wants to address some more the deal and

22   how things have changed and everything else, but what I've

23   hard for the last several hours has been the Creditors

24   Committee did this, the Creditors Committee did that.  That's

25   not a compelling equitable circumstance that somebody else

1    did something and now you won't abide by it, and in

2    considering the conduct, I guess, you know, we did see that

3    some lenders were consulted back in 2004, whether their views

4    were taken into account, whether they were accepted or

5    anything else, I have no idea.  There's nothing in the record

6    before us on that point.  We just know they were consulted,

7    but what we did hear is that this is a different plan right

8    now and there is zero, point zero evidence that any lender

9    consulted, supported, agreed to, did anything at all to make

10   any type of agreement in connection with this plan.  None.  I

11   didn't see anything.  I didn't see anything past 2004.  So,

12   once you've established it's a different plan, whatever

13   consultation support there was back with somebody back in

14   2004, how can you possibly at that point conclude that it's

15   compelling equitable consideration to take away their rights

16   because somebody was consulted by the Creditors Committee

17   four years ago with respect to a non-existent plan.  That

18   cannot possibly be the standard that allows equity to do

19   better in bankruptcy than it would do outside bankruptcy and

20   to do better than their contract allows them.  Finally

21   turning to Dow.  Unfortunately, I was there, Mr. Bernick, but

22   - and I guess we're still there because the case continues in

23   some form.  We're not citing Dow for its facts.  We're citing

24   Dow for its standard, and I think the trend in this Circuit,

25   the trend in other circuits is more and more towards

1    upholding creditors' rights in bankruptcy.  As I said the

2    First Circuit case on pre-payment penalties, a good example,

3    the Court says flat out that we're going to enforce

4    creditors' rights under the contract absent some compelling

5    equitable circumstances.  So the trend is to enforce those

6    rights.  As to solvency, solvency was not mentioned in <u>Dow</u>,

7    and I think, quite frankly, hasn't ever been mentioned in any

8    case, and as I said, Your Honor, the reason it didn't come up

9    in <u>Dow</u>, the reason that it's, quite frankly, never come up

10   before, is I don't think anybody, until this case, has ever

11   considered solvency as some type of a separate basis that one

12   can be not solvent for purpose of consideration of fair and

13   equitable and creditor's entailment to post-petition

14   interests while a debtor walks away with billions of dollars

15   of value.  There's no case that supports it.  There's no case

16   that discusses it, and the reason is, because it is so far-

17   fetched that nobody has ever quite frankly bought it up to

18   date, and that's why it's not addressed in <u>Dow</u> and not

19   addressed in any other case.  Finally, as to 1129.  I think

20   there was some question as to the absolute priority rule, as

21   to whether you only need to pay the allowed amount to trigger

22   it.  I believe that 1129(b)(2) specifically states that the

23   fair and equitable standard includes the following and it

24   includes paying the allowed amount of the claim, includes,

25   under § 102, it specifically states without limitation and

1    the law is and the case law establishes that the allowed

2    amount is certainly sufficient in the case of a insolvent

3    debtor that's we all we need to prove once the solvent debtor

4    has come in.  That's with the solvent debtor exception, the

5    absolute priority rule comes in.  It comes in through the

6    statement that this only includes, not including without

7    limitation, and that's the hook by which all of the law cited

8    in page 17 through 20 of our brief comes in to establish that

9    you can't cram down a lender where equity is retaining value

10   without paying them post-petition interest.  Thank you, Your

11   Honor.

12          THE COURT: Okay, but the issue still is that this

13   plan already provides for post-petition interest.  We're not

14   into a circumstance where we're talking no post-petition

15   interest.  We're talking simply the difference between a

16   bargained for post-petition interest rate and a default post-

17   petition rate.  That's what this issue is.

18          MR. ROSENBERG: Your Honor, we don't disagree.

19   Quite frankly, you know, I thought all of this was a bit of a

20   sideshow, the issues that were just raised and the debtors

21   about us not being impaired, the issues about solvency.

22   Quite frankly, once we agreed that we're entitled to post-

23   petition interest, you don't need to establish any of those

24   anymore.  The difference is that the debtor is saying I can

25   give you whatever interest I want.  It's a gift, and what

1    we're saying is we have a right, but once you cross the

2    bridge that we're entitled to post-petition interest, then

3    that post-petition interest has to start with our state law

4    contract and then it goes, as Your Honor stated, onto the

5    fair and equitable considerations.  Is there a compelling

6    equitable consideration for not paying the rate in accordance

7    with the contract?  It is that simple.  Quite frankly, Your

8    Honor said it at the initial status conference, and nothing

9    has changed and all of that is a sideshow, and the question

10   is whether this Court has found where there is no conducted

11   pointed to on behalf of the banks and none of the traditional

12   equitable considerations have been triggered, is there

13   compelling equitable consideration to take away contract

14   rights in the banks?  It's that simple.  There are none, and

15   the banks should be paid the full default interest due under

16   their contracts.

17           THE COURT: Okay.  So, really what this comes down

18   it is, you're arguing a difference in application

19   essentially.  If I get to looking at the fair and equitable

20   standard, what you're really telling is, the banks are saying

21   that the standard is that the Court has to apply fair and

22   equitable standard if there is no reason not to pay the

23   default rate.  The debtor's saying, No, that's not the

24   premise.  You only pay the default rate if the banks, in

25   quotes, "deserve it", and to deserve it you have to have done

1   something that - I'll use these words, "enhanced the

2   bankruptcy process somehow in the context of this case", and

3   the banks haven't shown that they did that in this case, that

4   their conduct hasn't risen to the level of deserving the full

5   default rate.  So, that's really what you're arguing.  Is it

6   that it's automatically paid unless or that it's not paid as

7   a matter of right unless?  So, it's the question of, you

8   know, who has the burden of going forward with the evidence

9   to determine whether the default rate ought to be paid.  Is

10  it the debtor who has to pay it unless there's a reason not

11  to or is it the creditor who has to show me why you deserve

12  it.  That's really what this is coming down to.

13          MR. ROSENBERG: That is basically it, Your Honor, I

14  guess we do believe we have made some contributions as set

15  forth in Mr. Ordway's declaration, but that is basically it,

16  and we do start with the premise that where equity is

17  retaining value, that that's how you - there's no further

18  contribution or there's a presumption no further contribution

19  is required by the lenders.  They don't have to have done

20  something super good to have earned the right to get paid

21  post-petition interest.  If equity is retaining value, they

22  should be paid amounts due under their contract.  It's as

23  simple as that, and there's no equitable reason why it should

24  be any different.

25          THE COURT: Okay, but you keep talking about post-

1    petition interest -

2          MR. ROSENBERG: Uh-huh.

3          THE COURT:  - and the bank lenders are to get post-

4    petition interest, a hefty rate of post-petition interest in

5    today's economy, a very hefty rate of post-petition interest

6    in today's economy where three or four days ago people were

7    paying the Treasury to lend them money, I mean -

8          MR. ROSENBERG: But I might add, Your Honor, people

9    also are paying to - I'm not sure if it would be hefty in

10   today's economy when General Electric, I believe, it cost

11   them 10 percent which is to borrow money the other day, which

12   is about 4 percent more than the rate set for us.

13         THE COURT: Well, yeah.

14         MR. ROSENBERG: So, the world's a bit -

15         THE COURT: Strange world.

16         MR. ROSENBERG: - Topsy-turvy, but, you know, the

17   question is whether we have to be paid the rate due under our

18   contract, absent a compelling equitable circumstance against

19   us that takes it away or whether the debtor giving us any

20   post-petition interest is sufficient, absent us having made a

21   positive contribution to the case.  I think we've made a

22   positive contribution, but I don't think that's the standard

23   here.  That is the entire issue, Your Honor.

24         THE COURT: All right.

25         MR. ROSENBERG: Thank you.

1          THE COURT: Mr. Kruger.

2          MR. KRUGER: Your Honor, I'll be brief.  I think Mr.

3    Bernick got carried away when he suggested that perhaps the

4    Committee was not fulfilling its fiduciary obligation or

5    acting fair and equitably towards the debtor.  We've done

6    nothing except be fair and equitable towards the debtor.

7    Nothing more demonstrates that than our willingness to become

8    a co-proponent of a plan, and I heard Your Honor actually say

9    a moment ago, What about the agreement?  Let me say again so

10   it's very, very clear.  We never thought that it was sensible

11   for us to send a letter terminating the agreement because, if

12   you'll recall, the debtor was in the midst of its estimation

13   trials with the asbestos plaintiffs.  We thought it helped in

14   terms of the dynamics of that litigation and the dynamics of

15   the relationship for us to continue to look like a supporter

16   of the debtors' program, and we were a supporter of the

17   debtors' estimation program, but the 6.09 percent interest

18   rate agreement is gone.  Let there be no misunderstanding

19   about that.  It is terminated.  It is gone.  The debtors

20   terminated if no one else did.  They terminated it by filing

21   the plan that they have filed.  Second, Your Honor, and I -

22          THE COURT: Well, I haven't seen the plan yet.  I

23   understand it's been filed, but I literally have not seen it.

24   I haven't been in the office yet, so I don't know how the

25   current plan terminated it.

1        MR. KRUGER: Well, one thing I do know about it is

2   that we're not a co-proponent.

3        THE COURT: Well, that's so.

4        MR. KRUGER: And when Mr. Bentley says that he was

5   not aware - he relied upon the 6.09 percent agreement, if he

6   did so it was because the debtor never told him that we had

7   been saying for a year to the debtor that the 6.09 percent

8   agreement doesn't work.  Let me just read a moment, if I may

9   -

10       MR. BERNICK: Your Honor, I'm sorry.  At this point

11  I really have - Mr. Kruger has now made a representation on

12  the record that is not consistent with his own affidavit.

13       MR. KRUGER: I'm going to read from my affidavit.

14       MR. BERNICK: His affidavit is very, very clear -

15       MR. KRUGER: It says - I'm sorry, I didn't interrupt

16  you, David, and you're not interrupting me now either.

17       THE COURT: Pardon me, gentlemen.  You will speak to

18  me, not to each other.

19       MR. KRUGER: I would like to speak to you and not to

20  him.

21       THE COURT: Then do so, please.

22       MR. KRUGER: Your Honor, in my declaration I said

23  Stroock advised the debtors and their counsel that the bank

24  debt was trading in the market at a value reflecting recovery

25  of the default rate and that the Creditors Committee

1   professionals were being told by holders of the bank debt

2   that the holders expected to receive post-petition interest

3   at the default rate.  Stroock advised the debtors that

4   notwithstanding any position the Creditors Committee itself

5   might determine to take, any consensual plan should provide

6   for post-petition interest payable at the default rate, for

7   the debtors to hope for the bank debtor holders to vote in

8   favor of such a plan.  They knew full well.  They knew it

9   for more than a year.  For them to then come along and say,

10  number one, we didn't invite you to the negotiation.  Number

11  two, we relied upon an agreement with respect to a failed

12  plan, but somehow or other we acted inequitably?  If there's

13  any inequitable behavior, the debtor has demonstrated it

14  totally.  The last piece of my comment, Your Honor -

15          THE CLERK: You need to stay at the microphone.

16          MR. KRUGER: I'll stay at the mike then.  Your

17  Honor, the memorandum that's been much of from Ms. Krieger to

18  Mark Shelnitz, April 4th, I think, 2008.  I think that was two

19  days after we saw for the first time published the term sheet

20  of the agreement between the debtor and the asbestos

21  plaintiffs.  That memorandum, I noticed two things about it.

22  One is that it says, Set forth below are our initial

23  thoughts.  We had not yet reviewed anything with the

24  Committee, and secondarily, if you read the last line of it

25  again, Your Honor read it as pertaining to non-bank

1  creditors.  Nothing in that paragraph replies only to non-

2  bank creditors.  What it really did was seek to preserve the

3  rights of all the parties so that we may have the hearing

4  that we are in fact having today.  That's what that

5  memorandum did.

6       THE COURT: Well, it certainly doesn't look like

7  that.  It says, And two, for all other unsecured claims

8  interest at - whatever that percentage is, compounded

9  annually or if pursuant to an existing contract, interest at

10  the non-default contract rate provided however any such

11  holder may seek to obtain a higher interest rate and shall be

12  entitled to such higher interest rate if the Court determines

13  such rate is appropriate.  That's all within subsection two.

14       MR. KRUGER: That's right and that applies to the

15  bank debt that just as well as the -

16       THE COURT: No, subsection one applies to the

17  holders of the pre-petition credit facility.

18       MR. KRUGER: Not it doesn't -

19       THE COURT: It says, one, For holders of pre-

20  petition bank credit facilities.  And then, two, For all

21  other unsecured claims.  It's clearly written that way.

22       MR. KRUGER: But the last section of it -

23       THE COURT: There's no three.

24       MR. KRUGER: This -

25       THE CLERK: You have to use the microphone.  It

1    won't be on the record.

2         MR. KRUGER: Sorry.  It's hard for me to read it.

3    But the purpose of it was to preserve the rights of all

4    creditors to have the argument that we're having today.  That

5    was the purpose of it, but in any event, it was before the

6    Committee had an opportunity to look at it and to comment on

7    it.

8         THE COURT: All right.

9         MR. KRUGER: One last thing, Your Honor.  I don't

10   know whether Your Honor believes that the solvency issue has

11   been determined or not for the purposes of considering

12   whether or not the bank debt holders are entitled to receive

13   default interest.  But if Your Honor believes that you need a

14   balance sheet solvency test to determine that, I remind the

15   Court again that the Unsecured Creditors Committee has

16   reserved its right to continued the estimation process to

17   seek that out, if it's necessary.  I know nobody wants that,

18   and we don't want it either, but so long as the debtor

19   continues to pretend that they are insolvent and so long as

20   the Court may believe that that issue is not one of 1129's

21   inclusion, that equity retains something, that's sufficient

22   solvency for determining whether or not a lender is entitled

23   to default interest, but if Your Honor believes that you need

24   to know with a balance sheet certainty and a valuation

25   question, solvency, we're prepared to continue with the

1    estimation process.

2         THE COURT: Well, here's - I guess here's the

3    problem, and I'm not making findings.  I'm trying to

4    articulate a problem.  At this stage, I have no understanding

5    yet as to what the value of either - I don't mean the

6    negotiated value, I mean if we have to get into an

7    evidentiary hearing.  I don't know what the value of the

8    asbestos personal injury claims, either American or Canadian,

9    would turn out to be.  I don't know what the value of the ZAI

10   claims, whether property damage or at least as Canada would

11   turn out to be, personal injury would be.  So, there's a

12   whole unknown property damage component that hasn't yet been

13   evaluated, nor has the personal injury component been

14   evaluated anywhere.  There are still, according to Mr.

15   Restivo's analysis this morning, some - I don't remember the

16   exact number, 74 property damage claims that are still out

17   there that haven't yet been litigated for a number of

18   reasons, some of which have been settled, some not.  I don't

19   know the settlement values.  There are other claims that will

20   have to be addressed in the plan, the value of which I don't

21   yet know.  So, even if the asset side of the equation can be

22   determined and let's just to make it easy, not by way of

23   ruling, just to make it easy, let's assume that some market

24   capitalization value could fix the asset value.  Let's just

25   make that assumption for this discussion purposes to make it

1    easy, and I'm not making findings along those lines, let's

2    just say it did, then so let's say that the debtor,

3    therefore, its asset side could be determined easily, I still

4    have no idea how the liability side would come out.  So, do I

5    know whether the debtor is solvent for a contested plan

6    confirmation purpose if there is no negotiated agreement by

7    which a return to equity could be made?  No.  I don't have a

8    clue.  Do I care if it's a consensual plan so that unsecured

9    creditors can get some rate of interest and equity can get a

10   return?  No, I don't care.  But do I care in the event that

11   there's a contested plan and I'm going to have to determine

12   whether unsecured creditors get a penny of interest, let

13   alone a default rate of interest, let alone any type of

14   interest, and equity gets anything?  Yes, I care a great

15   deal.  So, are we going to have to do some type of estimation

16   if in fact this doesn't get worked out and I have to make a

17   determination that I'm called upon to make here and for other

18   unsecured creditors if they ask for more money by way of

19   interest than the plan provides because it's contested and

20   I've get to get into a cram down?  Yeah, I guess at some

21   point we're going to be into a full-blown estimation hearing

22   for that purpose.  So, the cost and expense will undoubtedly

23   mean that the debtor won't have the dollars to devote to

24   paying the interest and/or the equity or maybe both because

25   it will be very expensive.  You folks know it, you've been

1   there before, so have I.  So who's benefitting?  You

2   professionals will be taking home a lot of money, but your

3   clients won't.  Now, that's the bottom line.

4         MR. KRUGER: But, Your Honor, as I said, if it's

5   necessary to have the estimation trial because of the

6   solvency issue, we're prepared to go forward with that.

7         THE COURT: Well, I appreciate that fact.  I hope

8   your clients do to because by making this battle, I think you

9   folks will be maybe taking home substantial bonuses, but I'm

10  not so sure your clients are going to be benefitting.

11        MR. KRUGER: Your Honor, it's not our battle.  The

12  debtor and the Asbestos Committee have offered a plan.  It's

13  their battle.

14        THE COURT: Mr. Kruger, it's everybody's battle.

15  The debtor has finite -

16        MR. KRUGER: But they haven't consulted us about it.

17  They knew.

18        THE COURT: Mr. Kruger, the debtor has finite

19  dollars.  You folks can talk to each other.  There is nothing

20  that prohibits you, all of you, from talking to each other.

21  You don't need to battle everything in the courtroom.  You

22  can talk to each other and see if you can't resolve these

23  issues outside the litigation context.

24        MR. KRUGER: Your Honor, it's important to remember

25  that any recovery by the bank debt holders of a full default

1    interest hurts the equity.

2         THE COURT: I understand that.

3         MR. KRUGER: It hurts no one else.

4         THE COURT: I understand that, and so the equity in

5    the event that equity chooses to take something out of their

6    billion two so that they can provide something more to the

7    bank and the bank chooses maybe not to take the default rate

8    but something more than the 6.09 so that you can get past

9    this issue, it may be advisable to everybody because

10   otherwise everybody's probably going to get hurt.  That's

11   what negotiation is all about.  But, I'm not in a position to

12   be able to do that.  I've got a legal issue, and it's going

13   to come down either yes or no.  That's what happens with a

14   legal issue, and if that means that you go back to litigation

15   mode, that's what happens.  You'll be going back to

16   litigation mode, and everybody will not benefit from it.

17   That's the reality.  No one will benefit.

18        MR. KRUGER: Your Honor, there's always hope for a

19   deal, Your Honor.  Thank you.  Thank you very much, Your

20   Honor.

21        MR. BERNICK: If I could just - I understand where

22   Your Honor's going.  That's frankly where we have always

23   been.  That's why the plan reads out the way that it did.  We

24   didn't take it back off the table when they contested it.  We

25   left it on the table and they had to - I understand that Your

1    Honor is then facing a legal issue that, I think your message

2    is, both sides could get hurt, and we fully appreciate that,

3    and we'd be very anxious to be able to move forward, and

4    beyond that I really can't say.  I think that Mr. Bentley has

5    talked about the equity folks.  I know that these folks over

6    here will have a different view.  The debtors' viewpoint has

7    been the same thing throughout, which is to get this deal put

8    together, and if there's one thing that this case stands for,

9    is the debtor has shown a track record of taking the pieces

10   of the puzzle that are each one of them very, very difficult

11   to fashion and through a variety of means, getting them put

12   into place, and I think that that's true.  You've seen it on

13   PD.  We've seen it with the cooperation of the FCR and the PI

14   on the personal injury side.  There are other parts that we

15   think are going to come into place, but we can't have a

16   situation, we can't put together the full puzzle when there's

17   one piece that says, Well, we get it all, and if we don't get

18   it all, we're just going to hold up the case for a long time.

19   That's a very hard proposition for us to deal with, and we

20   may have to deal with it, and God knows we've had to deal

21   with problems before, we'll deal with it.  I'm going to focus

22   though -

23            MR. KRUGER: Your Honor, is this another sur-

24   rebuttal?  Are we going to go through this yet again?

25            THE COURT: No, but he's the moving party.  He gets

1   the last word, so - Mr. Bernick, you've got exactly 10

2   minutes, and I'm counting.

3          MR. BERNICK: I'm going to take less, although my

4   colleague Mr. Rosenberg also thought he was going to take

5   less and couldn't manage it, but I understand that, I've been

6   there myself.  Just a couple of things.  I really believe

7   that it's too late in the day.  Mr. Kruger made a very

8   important announcement.  He said the letter's gone.  The

9   letter is no longer, and presumably the reason that he said

10  that is that we've been at pains to show that the fact that

11  the letters are still there is the most tangible evidence of

12  the fact that they don't really want to let go of it, they

13  want to have their cake and eat it too, and that's not right.

14  And that it's not just the last plan or the plan before it,

15  it's this plan, and this plan, the fact of concurrence with

16  this plan by the Committee is expressed in black and white by

17  Ms. Krieger.  She got the term sheet because remember, we

18  made the public announcement but we then circulated the term

19  sheet.  So this was not just some out of nowhere.  This was a

20  very, very important statement, and at best, even if you

21  adopt Mr. Kruger's interpretation, all that it says, it

22  doesn't say anything about the Committee walking away or its

23  counsel walking away.  It just preserved an option for a

24  holder, and we can deal with a holder.  A holder doesn't

25  change history.  A holder can speak, no one can foreclose him

1   from speaking but they can't change history.  This email

2   confirmed the history.  The history was further confirmed in

3   all the briefing that took place today, and there actually is

4   no more powerful evidence of the fact that the equities here

5   in the case are in our favor.  Because of that agreement,

6   there is no more powerful fact than the very fact that Mr.

7   Kruger had to take to his feet today and at the very last

8   minutes of the last argument somehow make it all different by

9   announcing that they're walking away from the letter.  It's

10  the most powerful evidence of how much in place these

11  agreements have been.  Two, second point, counsel make no

12  bones about the fact, and Your Honor actually has said, Well,

13  gee, aren't we just talking about the stuff, that is, the

14  difference between the plan and what's involved in the plan,

15  and the answer to that is, yes, if the plan still holds.  And

16  what we've said is that if the - our plan, we put it on the

17  table.  That was a given.  We could have walked away from it,

18  and said, Now you're contesting, we're going to take it off

19  too.  We left it on the table, and you say, well, if it's on

20  the table and we're keeping it on the table, it has to be

21  because you're keeping it on the table too.  There's no point

22  for us to litigate this issue where all we face is downside

23  and all they face is upside.  So that's why I differentiated

24  between the first issue and the second issue.  If that

25  agreement is important, then it should be stayed in our plan,

1    it should stay before the Court, but then it really should be

2    dispositive.  If that agreement is not important, that it is

3    not dispositive, and they're saying, Oh, well, we walk away

4    from it.  Then, well, why should it stay in the plan?  Why

5    shouldn't they face the downside of getting nothing?  Why

6    should they face the upside and not the downside?  And yet,

7    even in that context, they still can't walk away from the

8    agreement.  The agreement's still there.  Even if he says,

9    No, it's not, it's still there.  It's been born into the

10   history of what we're dealing with.  So the difference

11   between one is, one is our plan.  Take it or leave it.  Two

12   says, Well if it's not the plan, then you don't get the

13   letter, then you also face the downside of not getting any

14   interest or getting less, and even then the plan's important

15   - the agreement is important because it bears upon the

16   equities of the situation.  It's part of the history that

17   can't - Mr. Kruger today can't wipe away that history.  So

18   that's the reason we distinguish those, but when you get to

19   two, and this is the other thing, when you get to two, the

20   history is relevant, but there are other relevant factors

21   too.  Those factors are not the contract.  The equitable

22   factors are not the contract.  The equitable factors are the

23   factors on the basis of which they may get what's in the

24   contract, but the source of "they may get" is 1129(b).

25   1129(b) is not the contract, it's the equitable analysis.

1    Now, what did they have under issue two now to put into the

2    equitable analysis?  They just basically have just given up.

3    They no longer say, really that there's a contribution.  They

4    no longer say that it's *de minimis*.  They say nothing to say

5    that they have done equity here, and in fact, you can make a

6    strong argument to base upon the history of how they've acted

7    here in the case.  The equities actually cut against them,

8    and that's why we say it's important to have the lower amount

9    there.  Last point is that they say that the equities are our

10   problem.  That is, the burden is on us to show something

11   extraordinary to get back from what they're entitled.  502

12   says they're not entitled to anything.  So the word

13   "entitled" is wrong.  It's all equitable, and the idea that

14   somehow we bear the burden or a greater burden than they do

15   under 1129(b) is just not how the cases work.  At most you

16   get - you know, Dow Corning which is the Sixth Circuit's

17   decision that says there's a presumption, but there still has

18   to be an analysis on both sides of the equation.  If you take

19   a look at all the equitable factors, not just the old

20   contract, which is a legal factor, not an equitable factor,

21   there's not one, not one equitable factor that cuts in their

22   favor, and their conduct in the case cuts against them.

23   Thank you.

24           THE COURT: All right.  I am going to take this

25   under advisement.  This is not an issue that needs an

1   immediate adjudication.  I am ordering you folks to talk and

2   that is an order, and I want you to speak between now and the

3   October 20th omnibus hearing to see whether or not you can

4   come up with a consensual resolution of this before I have to

5   make a ruling.  So, I am not going to look at it between now

6   and October 20th to see whether or not you can come up with a

7   consensual resolution.  Mr. Rosenberg, Mr. Kruger, I am

8   ordering the Committee and the bank lenders to meet with the

9   debtor and the Equity Committee to see whether or not some

10  consensual resolution of this issue can be arrived at between

11  - I'm ordering the debtor as a proponent of the plan to the

12  extent that the Creditors Committee is a proponent, I don't

13  really think any resolution will affect the Creditors

14  Committee or frankly even the debtor at this point.  I think

15  it will affect equity, but nonetheless, as co-plan

16  proponents, I think they need to be involved in the

17  discussion.  It's really, I believe, an issue that is going

18  to affect the Equity Committee and the bank lenders and the

19  Creditors Committee.  I would like to see whether or not you

20  can consensually resolve the interest issue.  Mr. Kruger, I

21  would also like to see whether or not the Creditors Committee

22  can't somehow or other become a co-proponent of this plan,

23  somehow, some way.  That's why I want the Creditors Committee

24  to be meeting with the debtor and the Asbestos Creditors

25  Committee, particularly.  So, I want all of you back to the

1   bargaining table, and I'm ordering you to do it between now

2   and October 20th for the omnibus hearing, but particularly

3   about the interest issue, whether or not you can become co-

4   proponents of the plan.  All right.  I will not look at this

5   until at least October 20 when you can give me a report about

6   your meeting.  Mr. O'Neill, anything else on the agenda for

7   today?

8           MR. O'NEILL: Your Honor, we do have one continuance

9   order I can hand up to your clerk.

10          THE COURT: All right.

11          MR. O'NEILL: And I don't know whether counsel wants

12  the exhibits that were also submitted.

13          THE COURT: Oh, yes, I'm sorry.

14          MR. COBB: Your Honor, Richard Cobb on behalf of the

15  bank lenders.  Your Honor, this - I frankly it's a bit of a

16  silly issue, but it does involve the evidence that the

17  Court's going to consider in connection with this

18  presentation.  Your Honor had ruled some time ago that there

19  would be no witnesses that could testify at the hearing on

20  any topic, whether it be an evidentiary or it be fact-based

21  or expert.  So, Your Honor, the parties on both sides

22  attached exhibits to the papers that were filed in support of

23  their respective positions.  It's the bank lenders and the

24  Committee's position that those exhibits should become part

25  of the record and that the Court should consider them as

1    evidence.  Your Honor, late Friday, hearing nothing from the

2    debtors with regard to anything with regard to exhibits being

3    yes, it's their motion, I sent an email suggesting that we

4    don't need to hand exhibit books up to burden Your Honor on

5    another long trip back to Pittsburgh with heavy luggage, but

6    we should simply tell the Court that that's the evidence that

7    will be submitted in support of the parties' respective

8    positions.  Your Honor, at 7:30 last evening and then

9    completing the circle at 11:30 last evening, I received

10   objections from the debtors to our exhibits, and they run the

11   gambit - I haven't heard what they are yet, but they run the

12   gambit it appears directed towards expert testimony, perhaps

13   to hearsay.  Your Honor, it is simply - we think that it is a

14   little ridiculous, frankly, Your Honor, to even have this

15   discussion.  Your Honor can give the evidence the weight that

16   it believes is appropriate.  They can consider the documents

17   as part of the record.  But the idea that we are now - I

18   don't know, over the next hour or two, have some sort of

19   discussion or argument over Daubert standards and what

20   evidence constitutes hearsay when we can't bring a witness

21   in, in order to provide the authenticity and take the hearsay

22   rule out of play is just - it's silliness.  That's our

23   position, Your Honor.  I'll allow the debtors to state where

24   they stand on this at this point.

25             MR. BERNICK: That was a somewhat selective

1    recitation of what actually occurred, Your Honor.  The

2    pretrial order, we have a pretrial order that was an agreed

3    order about how we were going to proceed today, it simply

4    didn't make provisions for what folks were going to offer

5    into evidence.  So at some point last week, I don't know if

6    it was Thursday, Friday, whatever, the issue got raised by

7    the other side about, well, what do you intend to offer into

8    evidence so that we can get this thing resolved.  I said,

9    Frankly, we'll see, but why don't you tell me - and they then

10   said that they wanted to put everything that they had in all

11   of their briefs into evidence.  You know it was at that point

12   that I said, No, that really is silliness.  What do you

13   really need for purposes of the case?  There are all kinds of

14   stuff in the briefs, and essentially between then and now

15   they have refused to say which particular things they want to

16   offer into evidence.  Now, where I come from, offering

17   something into evidence means some thing, and where they've

18   made no bones about the fact that depending upon what

19   happens, they may take an appeal, and they regard this as a

20   trial, somebody says, Well, what comes into evidence?  I say,

21   Well, I'll take that just as it is.  I say, Give me the

22   lists.  They won't even give me the lists.  So last night I

23   was sitting there with the cat over on one side and the dog

24   on the other side in my apartment, and I went through on my

25   own, and I typed out a little email because I figured out

1    from the briefs what all the different exhibits were, and I

2    told them which ones I would object to if they offered it

3    into evidence, and I set that up.  I also said, Here are the

4    ones that we're going to offer.  I've received no response to

5    that whatsoever except a statement that, well, they still

6    want to kind of shovel everything in.  And what I would

7    suggest is as follows: I'm prepared to say now exactly what

8    we're offering into evidence and which of their exhibits we

9    object to, and what I would think is that between now and

10   perhaps the omnibus, we can see if we can work this out, and

11   if we can't work it out, then we will let the Court determine

12   that along with everything else.  We'll provide a list to the

13   Court of what it is that's objected to and what is not

14   objected to rather than trying to resolve those issue today,

15   but I do -

16        THE COURT: Well, I think that makes sense, but in

17   terms of a binder, frankly, if you're going to make an

18   evidentiary submission, I would like it in a binder, pre-

19   marked - I don't want it today.  You can mail it to me.  I'm

20   not going to carry it home on a plan.

21        MR. BERNICK: Okay, that's fine.

22        THE COURT: You can send it to me in Pittsburgh

23   rather than having it attached to a brief because if it's

24   actually a trial submission, I don't know that anybody, if

25   there is some appeal to this, will ever find it attached to a

1    brief.  It really should be, I think, marked with however

2    it's going to be used so that if you need to do something

3    with it later you actually have it marked as an exhibit

4    somewhere.

5         MR. BERNICK: Okay.  So, that's fine.  We'll go

6    ahead and do - we'll see if we can reach agreement.  If not -

7    But, Your Honor, I will say that today we have said exactly

8    what it is that we want to offer and exactly what it is that

9    we're objecting to, and there are - reference has been made

10   to Daubert, we're wanting - We're going to want to submit Mr.

11   Ordway's deposition, which is short, but the guy admitted out

12   of his own mouth that there was no standard or methodology

13   that he used for anything.  So, we don't mean to minimize

14   these things.  We tried to focus on the issues and focus on

15   the exhibits, and we're still prepared to do that.  So, I can

16   go through it now but it sounds to me like it might be more

17   productive to simply have a discussion with the other side,

18   and if we can't reach agreement then we'll notify the Court

19   which ones are at issue.

20        THE COURT: I think that would make more sense.  To

21   the extent that there's an authenticity issue -

22        MR. BERNICK: There's no authenticity issue.

23        THE COURT: All right, because if you need a witness

24   for authenticity purposes, that's a different issue, but I

25   had understood from the last conference months ago that the

1   documents were not really at issue, that that was not the -

2   authenticity was not the issue.

3           MR. BERNICK: No, no, their exhibit list includes,

4   for example, a transcript of a hearing before Your Honor.

5   Cases - they have cases that are exhibits.  They've got -

6           MR. ROSENBERG: I thought we were postponing this

7   for another day.

8           MR. BERNICK: Well, but -

9           MR. ROSENBERG: Come on.

10          MR. BERNICK: In fairness, Mr. Cobb made a statement

11  that basically said, We're engaging in silliness here, and

12  it's exactly the opposite.  I've tried many, many, many

13  cases, all we're trying to do is focus on what they really

14  need and to do us the courtesy of telling us what it is.

15          THE COURT: All right, well, reported cases are

16  obviously not going to be an evidence matter, but I don't

17  care if you attach copies -

18          MR. COBB: No question, Your Honor, and Your Honor,

19  it's disappointing to have to even have this discussion with

20  the Court at this stage.  The email was sent late Friday, and

21  it was addressed by Mr. Bernick on sometime Saturday. And

22  there was never a suggestion.  I pointed him right to our

23  compendium of all of 23 exhibits, Your Honor -

24          THE COURT: Okay.

25          MR. COBB:  - and then, you know, twelve hours

1    before the hearing we find out in summary fashion, in an

2    email, Well, we have objections to these points.  This is

3    just not appropriate.  We'll talk with debtors.  We'll try to

4    work this out, Your Honor, in good faith.  We reserve all

5    rights with respect to any of their exhibits that they

6    apparently intend to submit in support of their arguments.

7    Thank you, Your Honor.

8         THE COURT: All right, I really don't see why having

9    done the argument that the exhibits are going to be - and

10   having seen most of the exhibits attached to the briefs

11   anyway, I'm not really sure what the nature of too many

12   objections is going to be.  If you've got a Daubert issue,

13   okay, I mean, that's a legal argument that you can probably

14   make with respect to experts, but other than that, the

15   documents are the documents.  I think to the extent that

16   you've got an objection, raise it.  In all probability what

17   I'm going to do, I'll tell you now, is admit it.  I've seen

18   them anyway, and in all probability take whatever the

19   objection is with respect to the weight of the exhibit.  If

20   there is some legal issue that I have missed in the context

21   of looking at the exhibits then I certainly will consider

22   that, but if it's an authenticity issue and you need a

23   witness to authenticate the document, I will certainly permit

24   the opportunity to authenticate a document that you think is

25   appropriate.  I just didn't understand that that was going to

1   be an issue and I'm not really sure why it will be, so -

2   Okay.  Submit them in binders, pre-marked for identification.

3   If you've got any issues about them, you can let me know in

4   some fashion that I'm sure you two can agree on, a letter

5   submission, but make sure it's docketed, otherwise it will

6   not be brought to my attention and we'll be fine, and if

7   there are issues we'll address them at the next hearing.

8           ALL: Thank you, Your Honor.

9           THE COURT: Okay.  Is that it?

10          MR. BERNICK: Yup.

11          THE COURT: All right, we're adjourned.  Thank you.

12          (Whereupon at 1:54 p.m., the hearing in this matter

13   was concluded for this date.)

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan_____October 3, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221