THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| W. R. GRACE & CO., *et al.*,[1] ) | Case No. 01-1139 (JKF) |
| ) | Jointly Administered |
| ) | |
| Debtors. ) | Objection Deadline: November 26, 2008 |
| ) | Hearing Date: December 15, 2008 at 1:00 p.m. |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
THE SALE OF DEBTORS' LIMITED PARTNERSHIP INTERESTS IN
COLOWYO COAL COMPANY L.P.**

Debtors respectfully move this Court (the "Motion") for entry of an order authorizing them to sell their limited partnership interests (the "LP Interests") in Colowyo Coal Company L.P. ("Colowyo" or the "Partnership") for a purchase price of $8 million in a transaction that also provides for the relief of approximately $18 million of liability under a Letter of Credit (as defined below). In support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2. The statutory predicates for this Motion are section 105 and 363(b) of the Bankruptcy Code.

## BACKGROUND

3. On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

4. In 1994, Debtor Gracoal, Inc. ("Gracoal") was general partner and a limited partner, and Debtor Gracoal II, Inc. ("Gracoal II" and together with Gracoal, the "Gracoals" or the "Limited Partners") was the other limited partner of Colowyo, which operated a mining business in Colorado.

5. In December 1994, the Gracoals and certain of their affiliates entered into transactions which effectively divested control of and substantially all of their financial interest in Colowyo to Kennecott Colorado Coal Company ("KCCC" or the "General Partner"), a subsidiary of Rio Tinto America Inc. ("Rio Tinto"), for aggregate net proceeds of $219 million. Those transactions were as follows:

(a) Colowyo Coal Funding Corp. ("Colowyo Funding"), a subsidiary of Colowyo, issued bonds in the amount $192.8 million (the "Bonds") and Colowyo distributed the net proceeds of the Bonds to the Gracoals. These Bonds are nonrecourse with respect to Colowyo or any of its partners and are currently paid from the proceeds of two long term coal supply contracts (the "Bond Contracts"), and the rights to payments under the Bond Contracts are collateral for Colowyo Funding's obligations under the Bonds.

(b) The parent companies of the Gracoals have also provided additional collateral for the Bonds in the form of a $25 million standby letter of credit (the "Letter of Credit"), which can be drawn upon by the Bond trustee to pay interest and principal on the Bonds in the event that the cash flow from the Bond Contracts is insufficient. Currently, approximately $18.7 million remains undrawn under the Letter of Credit, and the Debtors remain liable for reimbursement of any additional drawings.

(c) As part of the 1994 transaction, KCCC purchased a general partnership interest in Colowyo for approximately $26.2 million, Gracoal withdrew as a general partner, and the Gracoals and KCCC executed the Amended and Restated Agreement of Limited Partnership of Colowyo Coal Company, L.P. (the "LP Agreement"). Under the terms of the LP Agreement, the Gracoals remained as limited partners of the Partnership; and received a Price Participation Right (a copy of which is attached hereto as Exhibit B) under which they are entitled, under certain terms and conditions, to receive annual payments from Colowyo.

6. Since 1994, the cumulative amount of proceeds the Limited Partners have received under the Price Participation Right is $1,162,706. As discussed more fully below, the Debtors are unable to predict with any confidence whether or not the Limited Partners will receive significant additional payments under those rights. The Debtors do not believe that they are likely to receive any other revenues from the LP Interests.

7. From the current date to the final principal payment on the Bonds (currently scheduled for the year 2016), the Debtors anticipate incurring cumulative fees associated with maintaining the Letter of Credit totaling approximately $1.9 million, and trustee fees and related administrative expenses totaling approximately $700,000.

8. Debtors reported the 1994 transaction as a divestiture and recorded a deferred tax liability of approximately $57 million (reflecting approximately $163 million in income). Under federal income tax law, no taxes were payable on the net Bond proceeds distributed to the Debtors, but such taxes become payable thereafter either as principal is paid on the Bonds, or upon the sale of the LP Interests.

9. As the result of negotiations with Rio Tinto, the Limited Partners and Debtor W. R. Grace & Co.-Conn. have entered into a Limited Partnership Interest Purchase & Sale Agreement (the "Sale Agreement") with Rio Tinto, the Partnership, the General Partner, and Rio Tinto White Horse Company (the "Purchaser") for the sale of the LP Interests to Purchaser. A copy of the Sale Agreement is attached hereto as Exhibit A.

10. The Sale Agreement provides for sale of the LP Interests to the Purchaser for a purchase price of $8 million in cash, payable at the closing. It is a condition to the closing of the Sale Agreement that the Letter of Credit be replaced by a letter of credit obtained by Rio Tinto or one of its affiliates.

11. The Debtors and the Purchaser contemplate that, pursuant to section 363(f) of the Bankruptcy Code, completion of the sale will vest the LP Interests in the Purchaser free and clear of any liens on the LP Interests. The liens on the LP Interests will attach to the proceeds of the sale.

12. Upon sale of the LP Interests, the Debtors will recognize approximately $99 million in taxable income for U.S. federal income tax purposes, which the Debtors expect to offset entirely with net operating losses.

**RELIEF REQUESTED**

13. By this Motion, the Debtors seek entry of an order by this Court approving the Sale Agreement and authorizing the Debtors to enter into the Transaction Documents (as defined therein) for the sale of the LP Interests substantially upon the terms and conditions set forth in the Sale Agreement, and to perform any and all acts that are necessary or useful to implement the Sale Agreement.

**BASIS FOR RELIEF**

14. The Debtors bring this Motion under sections 105(a) and 363(b)(1) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

15. This court has the statutory authority to authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use or sale is an exercise of the Debtors' sound business judgment and when such use or sale is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Circ. 1986); In re Lionel Corp., 772 F. 2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justifications"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b); In re Montgomery Ward

5

Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W. D. Wash. 1997).

16.  Under Section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71. Once a debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The business judgment rule has significance in Chapter 11 cases as it shields a debtor's management from second guessing. See Committee of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D. N.Y. 1986) ("The Code favors the continued operations of a business by a debtor and a presumption of reasonableness attaches to debtor's management decisions."). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

17.  Courts have applied four factors in determine whether a sound business justification exists: 1) whether a sound business reason exists for the proposed transactions; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; (iv) whether adequate and reasonable notice is provided. See Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abbotts Dairies, 788 F.2d 145-47 (implicitly adopting the articulated business justification test of the Lionel standard and adding the "good faith" requirement); Delaware & Hudson, 124 B.R. at 176 (adopting Lionel in this district).

**Application of the Standards for Approval of a Sale to the Facts of This Case**

18. Because Rio Tinto is the only available buyer for the Partnership Interests, and the Debtors believe that it will not pay a higher price, the Debtors believe that $8 million is a fair and reasonable purchase price under the circumstances and that the Sale Agreement is in the best interests of the Debtors and their estates. In 1994, the Debtors terminated all control of and involvement in the operations of the Partnership, retaining the LP Interests. Under the terms of the LP Agreement, the assignment of the LP Interests to a third party, or of an economic interest in the LP Interests that would cause a termination of Colowyo for tax purposes, require the prior written consent of the General Partner, which may be given or withheld in the General Partner's absolute discretion. In addition, neither the LP Interests nor such economic interests may be assigned to a third party engaged in the operation, management or mining of coal or coal mining business without the prior written consent of the General Partner. Rio Tinto has advised the Debtors that it is not willing to provide any such required consent. The Limited Partners' alternatives regarding the LP Interests therefore are to continue to hold the LP Interests, or to sell them to Rio Tinto.

19. The rights of the LP Interests are more limited than conventional limited partnership interests. The LP Interests are not denominated as percentages of the total partnership interests in Colowyo. Under the LP Agreement, except for the Price Participation Rights described below, the only Partnership revenues in which the Limited Partner has any interest are the proceeds of the Bond Contracts, but only after payment of management fees and other expenses, and the allocation of reserves for the payment of interest and principal on the Bonds. Because the general trend of coal prices since 1994 has been lower than projected in establishing the terms of the LP Interests, and there is no evidence that this pattern will change in

the future except for temporary "spikes," the Debtors have concluded that the chances are remote that the Limited Partners will receive any proceeds from the Bond Contracts either during the term of the Partnership or in the event of its dissolution. In addition, after the repayment of the Bonds, the General Partner has the right to purchase the LP Interests for $100.

20. The only potential for future revenue from the LP Interests is therefore their Price Participation Right. The following description of the Price Participation Right is qualified in its entirety by the provisions of the Price Participation Right set forth in Exhibit B hereto. Subject to certain other terms and conditions, the Price Participation Right provides for an annual payment (the "Price Participation Payment") to the Limited Partners as follows: $250,000 for every $1 per ton that the Annual Average Spot Price exceeds $15 per ton and an additional $100,000 for every $1 per ton that the Annual Average Spot Price exceeds $20 per ton (as such $15 and $20 prices and the $100,000 and $250,000 figures have been adjusted in accordance with the terms of the Price Participation Right). The Annual Average Spot Price is the weighted average price per ton FOB mine for Spot Sales made from the Colowyo mine during each calendar year. Spot Sales are limited to sales under contracts with a term of twelve months or less.

21. As noted above, the Price Participation Right has provided very little revenue to the Debtors. Since 1995, it has yielded total payments to the Limited Partners of approximately $1.2 million. One factor here is the unfavorable price trends described above. In addition, because of the particular dynamics of spot sale prices under the Price Participation Right, there has been no general correlation between improvements in coal pricing and Price Participation Payments; and so it is uncertain as to whether, when and in what amount the Limited Partners may receive additional revenue from their investment.

22. Against this background, the Debtors entered into discussions with Rio Tinto to determine whether there was an opportunity to monetize the Price Participation Right. An integral part of those discussions was the Debtors' need for relief from their continuing potential obligations of approximately $18.7 million under the Letter of Credit. Because of the trend of coal prices below the 1994 projections as described above, the Partnership has not been able to build up reserves to protect against temporary downward fluctuations in the revenues from the Bond Contracts. Besides the general fluctuations in coal prices, the Bond Contract cash flow is subject to contractual penalties because the energy value of the coal currently being mined has tended to be lower than the requirements of the contracts, and to events causing downtime at the generating plants covered by the Bond Contracts, during which the purchaser is not required to purchase coal. The result is ongoing substantial risk that a temporary decrease in cash flow will leave the Partnership unable to supply all the funds to make a scheduled payment on the Bonds, and that the Letter of Credit will have to be drawn upon to make payment in full. The Debtor's estimate of the aggregate risk ranges between $7 million and the entire $18.7 million still undrawn.

23. The Sale Agreement contemplates the necessary relief from the Letter of Credit exposure. In the Sale Agreement, Rio Tinto has agreed to use its reasonable best efforts to obtain such relief, and that obtaining such relief is a condition precedent to the Transaction.

24. Because of Rio Tinto's control over the transfer of the LP Interests, and because of its confirmation that it will not consent to their transfer to a third party, the Debtors have concluded that any attempt to seek higher and better offers for the LP Interests would be futile.

25. In the negotiation of the purchase price for the LP Interests, the Debtors used as their valuation benchmark the value of potential future payments under the Price Participation

Right, less potential future liability for Letter of Credit draws and other expenses, including taxes, and the agreed purchase price of $8 million is consistent with that benchmark. Since Rio Tinto is the only available buyer for the Partnership Interests, and the Debtors believe that it will not pay a higher price, the Debtors believe that $8 million is a fair and reasonable purchase price under the circumstances.

26. Although the sale of the LP Interests will result in the recognition of income of approximately $99 million in the year of sale, the Debtors have sufficient net operating losses to offset such income. Furthermore, if the Partners continued to hold the LP Interests, the Debtors would eventually recognize much of this income over time as the principal on the Bonds was paid.

27. Thus the sale of the LP Interests results in:

- $8 million of additional cash to the Debtors for use either in the Debtors' business operations or the emergence from chapter 11;

- the elimination of $18.7 million of future liability under the Letter of Credit and of the estimated approximately $1.9 million of future expenses for maintenance of the Letter of Credit; and

- the elimination of approximately $700,000 of future trustee fees and related administrative expenses.

28. The Debtors therefore have concluded that the sale of the LP Interests pursuant to the Sale Agreement provides an attractive opportunity to monetize the Debtors Price Participation Right and also relieve the Debtors of continuing exposure under the Letter of Credit.

29.    Accordingly, the sale of the LP Interests is in the best interests of the Debtors, their estates and creditors. Thus, the Bankruptcy Court should approve the Sale Agreement.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit C, approving the Sale Agreement and granting such further relief requested herein and such other and further relief as is just and proper..

Dated: November 10, 2008

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100
Co-Counsel for the Debtors and Debtors in Possession