# EXHIBIT A

## LIMITED PARTNERSHIP INTEREST
## PURCHASE & SALE AGREEMENT

This LIMITED PARTNERSHIP INTEREST PURCHASE & SALE AGREEMENT (the *"Agreement"*) is entered into as of November 7, 2008 by and among Gracoal, Inc. and Gracoal II, Inc., each a Delaware corporation (each a *"Seller"* and together the *"Sellers"*), W. R. Grace & Co.-Conn., a Connecticut corporation and the indirect parent of each of the Sellers (*"Grace"* and together with the Sellers, the *"Grace Parties"*); Rio Tinto White Horse Company, a Delaware corporation (*"Purchaser"*), Kennecott Colorado Coal Company, a Delaware corporation (*"KCCC"*), Rio Tinto America Inc. a Delaware corporation and direct parent of KCCC and Purchaser and successor, by assignment, to RTZ America Inc. (*"RTA"*); and Colowyo Coal Company L.P., a Delaware limited partnership (the *"Partnership"* and together with Purchaser, KCCC, and RTA, the *"Rio Tinto Parties"*).

### BACKGROUND

A.  Pursuant to the terms and conditions of, and among other transactions contemplated by, that certain Acquisition Agreement, dated December 6, 1994, by and among the Sellers, W. R. Grace & Co., a New York corporation (*"WRG"*), KCCC, RTA and the Partnership (the *"Acquisition Agreement"*), Sellers, as Limited Partners, and KCCC, as General Partner, entered into that certain Amended and Restated Agreement of Limited Partnership of Colowyo Coal Company L.P., dated December 6, 1994 (the *"Partnership Agreement"*).  All capitalized terms used but not defined in this Agreement shall have the meanings given to them in the Partnership Agreement.

B.  Concurrently with entering into the Partnership Agreement: (i) the Partnership, its wholly-owned subsidiary Colowyo Coal Funding Corp. (*"CC Funding"*) and The Chase Manhattan Bank (National Association) (*"Trustee"*), entered into a Trust Indenture, dated December 6, 1994 (the *"Indenture"*) pursuant to which CC Funding issued certain Bonds (as defined in the Indenture), (ii) WRG and RTA entered into an Indemnification Agreement, dated December 6, 1994 (the *"Indemnification Agreement"*), (iii) WRG and KCCC entered into the CCS Contract Undertaking, dated December 6, 1994 (the *"CCS Contract Undertaking"*), (iv) WRG and the Trustee entered into the Grace Trustee Undertaking Agreement, dated December 6, 1994 (the *"Grace Trustee Undertaking Agreement"*), and (v) WRG delivered to the Trustee, in fulfillment of the Partnership's obligation to deliver a Debt Service Letter of Credit (as defined in the Indenture) pursuant to Section 4.5(b)(i) of the Indenture, an Irrevocable Letter of Credit No. A-94-305344 (the *"WRG Letter of Credit"*), with an original face amount of $25,000,000.

C.  In connection with the disaffiliation of WRG from the Grace Parties, (i) WRG's rights and obligations under, among other things, the Acquisition Agreement, the Indemnification Agreement, the CCS Contract Undertaking and the Grace Trustee Undertaking Agreement were fully assigned to and assumed by Grace (without, however, obtaining the consent of the relevant Rio Tinto Parties to such assignments) (the *"WRG Assignment Transaction"*) pursuant to the agreements and other documents identified on Schedule 1 attached hereto (collectively, the *"WRG Assignment Agreements"*); and (ii) Grace delivered to the Trustee, in substitution for the WRG Letter of Credit, Irrevocable Standby Letter of Credit No. LC870-091344 issued by Wachovia Bank, N.A. (the *"Grace Letter of Credit"*), with an original face amount of $25,000,000, of which $18,692,467.51 (the *"Current LOC Face Amount"*) remains undrawn as of the date of this Agreement.

D.  Sellers hold 100% of the Limited Partners' Partnership Interests in the Partnership, including certain rights under the Partnership Agreement to receive distributions of Cash Available for Distribution (*"Cash Distributions"*) and payment of amounts determined under the Terms of Price Participation (*"Price Participation Payments"*) set forth on Exhibit A of the Partnership Agreement (such rights and

interests, together with all other rights and interests of each Seller in the Partnership, whether arising prior to or after the date hereof, including Sellers' rights to participate in or benefit from the ownership, profits and/or losses of the Partnership and any and all interests or rights the Sellers may have in the properties or assets of the Partnership by virtue of being limited partners of the Partnership, are collectively referred to herein as the *"Limited Partnership Interests"*).

     **E.**    The Grace Parties and certain of their Affiliates, as debtors, have filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (*"Bankruptcy Code"*) with the United States Bankruptcy Court for the District of Delaware (*"Bankruptcy Court"*), Case Nos. 01–01139 et al., (JKF) (Jointly Administered) (collectively, the *"Bankruptcy Case"*).

     **F.** The Grace Parties and the Rio Tinto Parties (collectively, the *"Parties"*, and each a *"Party"*) wish to provide for the terms and conditions upon which Purchaser will purchase the Limited Partnership Interests.

     **G.** Certain capitalized terms used in this Agreement are defined in <u>Section 5.9</u>.

     NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

### PURCHASE AND SALE; CLOSING; TRANSACTIONS

     Section 1.1. Purchase and Sale of Limited Partnership Interests.   In consideration of the aggregate purchase price of eight million dollars ($8,000,000) (the *"Purchase Price"*), each Seller agrees to sell, transfer, convey and assign to Purchaser, free and clear of any Encumbrances, all of such Seller's Limited Partnership Interests which in the aggregate constitute 100% of the Limited Partnership Interests, and Purchaser agrees to purchase the Limited Partnership Interests and assume all of the Sellers' obligations and duties under the Partnership Agreement that first arise and become payable after the Closing. Each Seller shall be paid 50% of the Purchase Price.

     Section 1.2.  Closing and Closing Date.  The sale of the Limited Partnership Interests and the consummation of the other Transactions (the *"Closing"*) shall take place at 10:00 a.m. (Eastern time), at such place as the Parties may mutually agree, on the date agreed upon by the Parties that is no later than five (5) business days following the satisfaction (or waiver where applicable) of the conditions set forth in Section 4.1 and Section 4.2 below. All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete. The date on which the Closing is effective is referred to in this Agreement as the *"Closing Date"*. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers in and to the Limited Partnership Interests shall be considered to have passed to Purchaser as of 12:01 a.m. (eastern time) on the Closing Date.

     Section 1.3.  Closing Deliveries. At the Closing:

          (a)     (i)  Purchaser shall pay the Purchase Price to the Sellers by wire transfer in immediately available federal funds to the account(s) designated on <u>Exhibit A</u> attached hereto, and (ii) RTA or an Affiliate of RTA shall pay to Grace the amount of any Additional Draw-Downs (as defined in Section 1.5(b) below) pursuant to and in accordance with Section 1.5(b);

(b)      Sellers shall deliver a certificate executed by an authorized officer of each of the Grace Parties, dated the Closing Date, certifying the due authorization of this Agreement and the Transactions by such Grace Party, and certifying the incumbency and genuineness of the signatures of those individuals executing this Agreement and the other Transaction Documents on behalf of such Grace Party;

(c)      Purchaser shall deliver a certificate executed by an authorized officer of each of the Rio Tinto Parties (except that the Partnership's certificate shall be executed by an authorized officer of KCCC on behalf of the Partnership), dated the Closing Date, certifying the due authorization of this Agreement and the Transactions by such Rio Tinto Party, and certifying the incumbency and genuineness of the signatures of those individuals executing this Agreement and the other Transaction Documents on behalf of such Rio Tinto Party;

(d)      Sellers shall deliver a certificate executed by an authorized officer of each of the Grace Parties, dated the Closing Date, certifying that (i) the representations and warranties of the Grace Parties in Section 2.1 are true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date; and (ii) the Grace Parties have performed and complied in all material respects with all their respective covenants and agreements contained in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(e)      Purchaser shall deliver a certificate executed by an authorized officer of each of the Rio Tinto Parties (except that the Partnership's certificate shall be executed by an authorized officer of KCCC on behalf of the Partnership), dated the Closing Date, certifying that (i) the representations and warranties of the Rio Tinto Parties in Section 2.2 are true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date; and (ii) the Rio Tinto Parties have performed and complied in all material respects with all their respective covenants and agreements contained in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(f)      Purchaser and each of the Sellers shall execute and deliver a Bill of Sale & Assignment Agreement in the form attached as Exhibit B hereto;

(g)      Purchaser shall deliver to the Trustee, in substitution and cancellation of the Grace Letter of Credit, a replacement letter of credit in favor of the Trustee and satisfying the terms of Section 4.5(b) of the Indenture (the *"Substitute LOC"*), which Substitute LOC shall be (i) by order and for the account of a Rio Tinto Party (or an Affiliate thereof) and no Grace Party shall have any liability thereunder, and (ii) for an aggregate amount equal to the Face Amount of the Grace Letter of Credit (as determined in accordance with the paragraphs 1 and 4 thereof) as of the Closing Date (which Face Amount shall be equal to the Current LOC Face Amount *minus* the aggregate amount of Additional Draw-Downs (as defined in Section 1.5(b)));

(h)      The Trustee and Grace shall execute and deliver an agreement terminating any obligations of Grace under Section 3(b) (the *"Grace Insurance Undertaking"*) of the Grace Trustee Undertaking Agreement (the *"Insurance Undertaking Termination Agreement"*); and if the Trustee requires, as a condition to executing and delivering the Insurance Undertaking Termination Agreement, that the Trustee and a Rio Tinto Party (or an Affiliate thereof) enter into a substitute insurance undertaking, which undertaking shall be reasonably acceptable to the Rio Tinto Parties, on terms substantially similar to the Grace Insurance Undertaking (the *"Substitute Insurance Undertaking"*), then such Substitute Insurance Undertaking shall be executed and delivered by the Trustee and a Rio Tinto Party (or an Affiliate thereof);

3

(i)        each of the Parties shall deliver a certificate issued by its jurisdiction of incorporation or formation certifying as to its existence and, if good standing information is provided in the certificates of such jurisdiction, its good standing; and

(j)        the Grace Parties on the one hand, and the Rio Tinto Parties on the other hand, shall deliver such other certificates and documents as may be requested by the Rio Tinto Parties on the one hand, and the Grace Parties on the other hand, and that are reasonably necessary to carry out and accomplish the transactions contemplated by this Agreement.

Section 1.4.  Closing Transactions.  Upon consummation of the Closing and as of the effective time of the Closing contemplated by Section 1.2:

(a)        the transfer of the Limited Partnership Interests from Sellers to Purchaser shall be effective;

(b)        the Sellers shall cease to be Partners of the Partnership, and all payments and distributions relating to the Limited Partnership Interests, including any Cash Distributions and Price Participation Payments, whether arising or payable prior to or after the Closing, shall be paid to the Purchaser;

(c)        Grace (as assignee of all of WRG's rights and the entity assuming all of WRG's obligations under the Indemnification Agreement) and RTA agree that, without any further action by any Party or any other person or entity, the Indemnification Agreement shall be terminated and shall be of no further force or effect, and no Party shall have any further liability or obligation under the Indemnification Agreement;

(d)        Grace (as assignee of all of WRG's rights and the entity assuming all of WRG's obligations under the CCS Contract Undertaking) and KCCC agree that, without any further action by any Party or any other person or entity, the CCS Contract Undertaking shall be terminated and shall be of no further force or effect, and no Party shall have any further liability or obligation under the CCS Contract Undertaking;

(e)        except as set forth in this Agreement, all other agreements and arrangements between the Grace Parties on the one hand, and the Rio Tinto Parties on the other hand, shall be terminated and shall be of no further force or effect; and

(f)        KCCC, as General Partner, hereby consents to the admission of Purchaser as a Limited Partner in the Partnership, shall take all actions necessary and/or desirable to evidence the transfer of the Limited Partnership Interests on the books and records of the Partnership as of the Closing and thereafter the Partnership shall continue, with KCCC as the General Partner and Purchaser as the Limited Partner, in accordance with the terms and conditions of the Partnership Agreement, which shall remain in full force and effect.

Section 1.5.  Substitution for Grace Letter of Credit.

(a)        The Rio Tinto Parties shall use their reasonable best efforts to obtain, and all of the Parties shall use their reasonable best efforts to cause the Trustee to accept, in substitution and cancellation of the Grace Letter of Credit, the Substitute LOC.

(b)        If after its May 2008 draw-down (at which time the amount available under the Grace Letter of Credit was equal to the Current LOC Face Amount), the Trustee has drawn

4

down or hereafter draws down any amounts under the Grace Letter of Credit (*"Additional Draw-Downs"*), then, at the Closing, RTA shall, or shall cause an Affiliate of RTA to, reimburse Grace for the aggregate amount of the Additional Draw-Downs. The amount of any Additional Draw-Downs shall be certified in writing (the *"Additional Draw-Down Certificate"*) by Grace to the Rio Tinto Parties (which certification shall be made at least one (1) business day prior to the Closing Date for Additional Draw Downs made two or more business days prior to the Closing Date), and payment of any Additional Draw-Downs shall be made at Closing by wire transfer to the account specified by Grace in the Additional Draw-Down Certificate.

Section 1.6.  Substitution for Grace Insurance Undertaking.  The Parties shall use their reasonable best efforts to cause the Trustee to enter into an agreement terminating all of Grace's obligations under the Grace Trustee Undertaking Agreement, including all obligations of Grace under Section 3(a) and Section 3(b) thereunder, and if required by the Trustee in connection with entering into the Insurance Undertaking Termination Agreement, the Substitute Insurance Undertaking.

Section 1.7.  Reasonable Best Efforts.  Notwithstanding the reasonable best efforts required of the Parties pursuant to Sections 1.5 and 1.6 or any other provision of this Agreement, it is expressly understood, acknowledged and agreed that none of the Parties shall be required to make any payment to, or otherwise incur any obligation in favor of, the Trustee (other than the Substitute LOC, the Substitute Insurance Undertaking and any customary fees and expenses of the Trustee, as applicable), or seek to obtain the consent of the holders of the Bonds, in connection with any of the transactions contemplated by this Agreement or obtaining the Trustee's (a) acceptance of a Substitute LOC pursuant to Section 1.5 or (b) delivery of the Insurance Undertaking Termination Agreement or a Substitute Insurance Undertaking pursuant to Section 1.6.

Section 1.8. Consent to WRG Assignment.  The Rio Tinto Parties hereby consent to the assignment to and assumption by Grace of WRG's rights and obligations under the Acquisition Agreement, the Indemnification Agreement, the Grace Trustee Undertaking Agreement and the CCS Contract Undertaking on the terms and conditions of such assignment and assumption as are set forth in and contemplated by the WRG Assignment Agreements.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1.  Representations and Warranties of the Grace Parties.  Each of the Grace Parties hereby represents and warrants to each of the Rio Tinto Parties as follows:

(a)     Authority; Enforceability.  Each of the Grace Parties is duly organized and validly existing in good standing in the jurisdiction of incorporation specified at the head of this Agreement.  Subject to the approval of the Bankruptcy Court, each of the Grace Parties has full corporate power and authority to execute and deliver this Agreement and any other Transaction Documents to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the Transactions.  This Agreement has been duly authorized, executed and delivered by or on behalf of each of the Grace Parties and, subject to approval of the Bankruptcy Court, is the legal, valid and binding obligation of the Grace Parties enforceable against the Grace Parties in accordance with its terms, except as the enforcement hereof or thereof may be limited by (i) judicial principles limiting the availability of specific performance, injunctive relief, and other equitable remedies; and (ii) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect generally relating to or affecting creditors' rights.  Each of the other Transaction Documents to which any of the Grace Parties will be a party has been duly authorized by and upon its due execution and delivery, subject to approval

of the Bankruptcy Court, will be the legal, valid and binding obligation of such Grace Party, enforceable against such Grace Party in accordance with its terms, except as the enforcement hereof or thereof may be limited by judicial principles limiting the availability of specific performance, injunctive relief, and other equitable remedies.

(b)     No Conflict.   Subject to the approval of the Bankruptcy Court, the execution and delivery by the Grace Parties of this Agreement and the consummation by the Grace Parties of the Transactions and the compliance by the Grace Parties with the provisions hereof and thereof will not (i) violate any provision of law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, administrative agency or other governmental body applicable to the Grace Parties, (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under, (A) any organizational documents of the Grace Parties or (B) any contract, agreement, indenture, mortgage, guaranty, lease, license or understanding, written or oral, to which any of the Grace Parties is a party, which breach, conflict, default or right shall adversely affect the ability of any of the Grace Parties, to execute, deliver or perform their obligations under this Agreement or the other Transaction Documents, or (iii) result in the creation of any Encumbrance on the Limited Partnership Interests.

(c)     Ownership of Limited Partnership Interests.

(i)     The Sellers own in the aggregate beneficially and of record all of the Limited Partnership Interests as described in the Partnership Agreement and, upon consummation of the Transactions at the Closing, Sellers will have transferred to Purchaser all right, title and interest in the Limited Partnership Interests, free and clear of any and all Encumbrances (other than failures of effective transfer or Encumbrances resulting from the actions of omissions of Purchaser or any of its Affiliates or any person or entity acting by, through or under any of them).

(ii)     Except pursuant to the Partnership Agreement, none of the Sellers or any of their Affiliates, or any person acting in concert with any of them, has (A) except for this Agreement, entered into or agreed to enter into with any person any agreement, option, call, warrant, commitment or any other right or interest of any character whatsoever to acquire the Limited Partnership Interests or any interest therein, including any Economic Interest (as defined in the Partnership Agreement), or (B) sold, transferred, conveyed or assigned or agreed to sell, transfer, convey or assign to any person any, right or interest of any character whatsoever in or to any of the Claims to be released as of the Closing Date by the Grace Group pursuant to Section 3.2 below.

(d)     No Encumbrances on Collateral.   None of the Grace Parties nor any of their respective Affiliates has taken, or failed to take, any action which has resulted, or will result, in the existence of an Encumbrance, and no Encumbrance has been placed by any creditor of any Grace Party or any of their Affiliates, in respect of its capacity as such creditor, on any Collateral (as defined in the Indenture).

(e)     No Interest in Bonds.   None of the Grace Parties is a record or "beneficial owner" (as such term is defined under Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of any Bonds or any interest in any Bonds, including any right, swap, derivative or other such arrangement in relation to the Bonds.

(f)     WRG Assignment Transaction.   Effective as of July 24, 1996, pursuant to the WRG Assignment Agreements, WRG assigned to Grace all of WRG's rights and interests, and Grace assumed all of WRG's obligations, of any character whatsoever with respect to the Partnership

6

Arrangements, including all of WRG's rights and interests under the Acquisition Agreement, the CCS Contract Undertaking, the Indemnification Agreement and the Grace Trustee Undertaking Agreement, to the extent that such rights, interests and obligations were in existence as of July 24, 1996. Grace has delivered to RTA a correct and complete copy of each WRG Assignment Agreement. WRG did not retain and has no further rights or interests in the Partnership under any Partnership Arrangements (as defined in Section 3.2) or in any Partnership Arrangement Claims (as defined in Section 3.4), to the extent that such rights and interests were based upon or related to any Partnership Arrangements in existence as of July 24, 1996.

Section 2.2. Representations and Warranties of the Rio Tinto Parties. Each of the Rio Tinto Parties hereby represents and warrants to each of the Grace Parties as follows:

(a)    Authority; Enforceability. Each of the Rio Tinto Parties is duly organized and validly existing in good standing in the jurisdiction of incorporation or formation specified at the head of this Agreement. The Partnership has not been dissolved, and no amendments have been made in the Partnership Agreement since the date thereof. KCCC is the sole general partner of the Partnership, and has not assigned its Partnership Interest (as defined in the Partnership Agreement) in whole or part to any other person or entity. Each of the Rio Tinto Parties has full corporate or partnership power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder and to consummate the Transactions. This Agreement has been duly authorized, executed and delivered by or on behalf of each of the Rio Tinto Parties, is the legal, valid and binding obligation of the Rio Tinto Parties and is enforceable against the Rio Tinto Parties in accordance with its terms, except as the enforcement hereof or thereof may be limited by (i) judicial principles limiting the availability of specific performance, injunctive relief, and other equitable remedies; and (ii) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect generally relating to or affecting creditors' rights. Each of the other Transaction Documents to which any of the Rio Tinto Parties will be a party has been duly authorized by and upon its due execution and delivery will be the legal, valid and binding obligation of such Rio Tinto Party, enforceable against such Rio Tinto Party in accordance with its terms, except as the enforcement thereof may be limited by (i) judicial principles limiting the availability of specific performance, injunctive relief, and other equitable remedies; and (ii) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect generally relating to or affecting creditors' rights.

(b)    No Conflict. Subject to the terms of the Indenture and the agreements related thereto, the execution and delivery by the Rio Tinto Parties of this Agreement and the consummation by the Rio Tinto Parties of the Transactions and the compliance by the Rio Tinto Parties with the provisions hereof will not (i) violate any provision of law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, administrative agency or other governmental body applicable to the Rio Tinto Parties, (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under, (A) any organizational documents of any Rio Tinto Party or (B) any contract, agreement, indenture, mortgage, guaranty, lease, license or understanding, written or oral to which any of the Rio Tinto Parties is a party, which breach, conflict, default or right shall adversely affect the ability of any of the Rio Tinto Parties to execute, deliver or perform their obligations under this Agreement or the other Transaction Documents.

(c)    No Transfer of Claims. None of the Rio Tinto Parties or any of their Affiliates, or any person or entity acting in concert with them, has sold, transferred, conveyed or assigned or agreed to sell, transfer, convey or assign to any person any, right or interest of any character whatsoever in or to any of the Claims to be released as of the Closing Date by the Rio Tinto Group pursuant to Section 3.3 below.

7

## ARTICLE III

### COVENANTS AND OTHER AGREEMENTS

Section 3.1. Bankruptcy Court Approval; Consents.

(a)    As soon as reasonably practicable (and in any event within ten business days) following execution and delivery of this Agreement, after permitting the Rio Tinto Parties a reasonable opportunity to review and comment, the Grace Parties shall file a motion with the Bankruptcy Court (the *"Sale Motion"*) for an order in form and substance reasonably satisfactory to Purchaser approving this Agreement and the Transactions and the transfer of the Limited Partnership Interests free and clear of all Encumbrances pursuant to Section 363 of the Bankruptcy Code (the *"Sale Order"*).

(b)    Subject to Section 1.7, the Parties will use their reasonable best efforts to timely obtain any and all approvals and consents required for the consummation of the Transactions.

Section 3.2. Grace Release and Discharge of Claims. As a material inducement to the Rio Tinto Parties to enter into this Agreement, from and after the Closing Date, the Grace Parties, their parents and their Affiliates, and each of their subsidiaries, divisions, related entities, predecessors, successors, assigns, agents, partners, associates, officers, directors, employees, representatives, and attorneys, both past and present, and all persons acting by, through, under or in concert with any of them (collectively, the *"Grace Group"*) hereby forever release and discharge, each of the Rio Tinto Parties and each of their parents, Affiliates, subsidiaries, divisions, related entities, predecessors, successors, assigns, agents, partners, associates, officers, directors, employees, representatives, and attorneys, both past and present, and all persons acting by, through, under or in concert with any of them (collectively, the *"Rio Tinto Group"*) from any and all claims, obligations, demands, actions, causes of action, complaints, costs, charges, Taxes, judgments, attorneys' fees, damages and liabilities of any kind whatsoever, known or unknown, direct or indirect, asserted or unasserted, liquidated or unliquidated, in tort, contract, or any other legal theory, statutory or otherwise, upon or by reason of any cause or thing whatsoever from the beginning of the world (collectively, *"Claims"*) that any of the Grace Group ever had, now have or could have, or shall or may hereafter have against the Rio Tinto Group arising out of or relating to the Partnership, the Partnership Agreement (including rights to receive Cash Distributions and Price Participation Payments whether arising or payable prior to, on or after the Closing Date), the ownership or transfer of the Limited Partnership Interests (including any Tax and other liabilities or consequences directly or indirectly incurred by reason of or related to the ownership or transfer of the Limited Partnership Interests, in each case, whether arising or payable prior to, on or after the Closing Date), the Acquisition Agreement (including any of the Ancillary Agreements (as defined therein) contemplated thereby), the CCS Undertaking Agreement and the Indemnification Agreement (including matters caused by, incurred as a result of or otherwise related to the termination of the CCS Undertaking and the Indemnification Agreement at the Closing as contemplated by this Agreement), any act, omission or failure to act of KCCC as the Manager or as the General Partner of the Partnership, any act , omission or failure to act of either Seller as a Limited Partner of the Partnership, any other agreements or arrangements relating to any of the foregoing, or the operation of the business of the Partnership (collectively, the *"Partnership Arrangements"*); except for and excluding (a) Claims arising from a breach by any of the Rio Tinto Parties of any representation, warranty, covenant or agreement set forth in this Agreement or any other Transaction Document and (b) Claims for which a Grace Group member is entitled to indemnification under Article XI of the Acquisition Agreement, but only to the extent the time period during which such indemnification may be sought under the Acquisition Agreement has not expired and, if not so expired, subject to the terms, conditions and limitations applicable to any such indemnification expressly set forth in the Acquisition Agreement (all Claims described in sub-clauses (a) and (b) collectively, *"Reserved Grace Claims"*).

8

Section 3.3. Rio Tinto Release and Discharge of Claims. As a material inducement to the Grace Parties to enter into this Agreement, from and after the Closing Date, the Rio Tinto Group hereby forever releases and discharges the Grace Group and WRG from any and all Claims that any of the Rio Tinto Group ever had, now have or could have, or shall or may hereafter have against the Grace Group arising out of or relating to the Partnership Arrangements; except for and excluding (a) Claims arising from a breach by any of the Grace Parties of any representation, warranty, covenant or agreement set forth in this Agreement or any other Transaction Document and (b) Claims for which a Rio Tinto Group member is entitled to indemnification under Article XI of the Acquisition Agreement, but only to the extent the time period during which such indemnification may be sought under the Acquisition Agreement has not expired and, if not so expired, subject to the terms, conditions and limitations applicable to any such indemnification expressly set forth in the Acquisition Agreement (all Claims described in sub-clauses (a) and (b) collectively, *"Reserved Rio Tinto Claims"* and together with the Reserved Grace Claims, the *"Reserved Claims"*).

Section 3.4. Full and Complete Releases. Each of Grace Parties on the one hand, and each of the Rio Tinto Parties on the other hand, understands and agrees that, effective as of the Closing Date, it is releasing and discharging Claims arising out of or relating to Partnership Arrangements (collectively, *"Partnership Arrangement Claims"*) that such Party and other members of the Grace Group on the one hand, and of the Rio Tinto Group on the other hand, do not know exist or may exist in the their favor at this time which, if known by them, would materially affect their decision to enter into this Agreement and to grant the releases contemplated hereby. Nonetheless, for the purpose of implementing a full and complete release and discharge of all Partnership Arrangement Claims other than Reserved Claims, the Grace Parties on the one hand, and the Rio Tinto Parties on the other hand, each expressly acknowledges that the releases set forth in this Agreement are intended to include in their effect, without limitation, all Partnership Arrangement Claims other than Reserved Claims, which the Grace Parties and the other Grace Group members on the one hand, and the Rio Tinto Parties and the other Rio Tinto Group members on the other hand, do not know or suspect to exist in their favor or to their benefit at the time of execution hereof and that the releases set forth herein contemplate the extinguishment of any and all such Claims other than Reserved Claims.

Section 3.5. Further Assurances. At any time and from time to time after the date hereof, at the request of any of the Parties, and without further consideration, the other Parties shall execute and deliver such other instruments of sale, transfer, conveyance, assignment, assumption and confirmation and take such other action as such Party may reasonably request as necessary or desirable in order to more effectively sell, transfer, convey and assign the Limited Partnership Interests from the Sellers to the Purchaser, more effectively effect the assumption of liabilities of the Sellers by the Purchaser, or otherwise effect, confirm or evidence the purposes of this Agreement or any of the other Transaction Documents.

Section 3.6. Confidentiality. Until the second anniversary of the Closing Date, other than as reasonably necessary or advisable in connection with the Sale Motion and the obtaining of the Sale Order, the Grace Parties shall keep confidential and shall not disclose any information and materials regarding the business and operations of the Partnership provided to Sellers as Limited Partners of the Partnership (whether or not such information or materials have been expressly designated as confidential), except (i) to the creditors' and equity holders' committees and future claims representatives in the Bankruptcy Case, and their respective counsel and advisors, (ii) for the purpose of enforcing any provision of this Agreement or the other Transaction Documents, (iii) to the extent, and only to the extent, that in the reasonable opinion of counsel to the disclosing party, such disclosure is required by law or any court or regulatory body, or (iv) if the information or materials are already publicly known or available, or become publicly known or available other than through the actions of any of the Grace Parties.

9

Section 3.7. Partnership Distributions. Until the earlier of (a) the Closing or (b) the termination of this Agreement in accordance with Section 5.1, and notwithstanding any provision in the Partnership Agreement or the terms of any other Partnership Arrangements, the Parties acknowledge and agree that the Partnership shall not, and KCCC as the General Partner shall cause the Partnership not to, make any distributions or payments in respect of the Limited Partnership Interests, including any Cash Distributions and Price Participation Payments, whether arising or payable prior to or after the date of this Agreement.

### ARTICLE IV

### CONDITIONS TO CLOSING

Section 4.1. <u>Rio Tinto Conditions</u>. The obligation of the Rio Tinto Parties to consummate the Transactions shall be subject to the fulfillment, on or before the Closing Date, of the following conditions (any or all of which may be waived by the Rio Tinto Parties to the extent permitted by applicable law):

(a)     the representations and warranties of the Grace Parties in <u>Section 2.1</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date;

(b)     the Grace Parties shall have performed and complied in all material respects with all their respective covenants and agreements contained in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     the Grace Parties have made such deliveries at the Closing as are required of them under <u>Section 1.3</u>;

(d)     a Rio Tinto Party (or an Affiliate thereof) shall have obtained, and the Trustee shall have accepted, the Substitute LOC;

(e)     all consents, if any, under the Indenture and any agreements related thereto shall have been obtained; and

(f)     the Sale Order shall have been entered and shall have become a Final Order. The Sale Order shall have become a *"Final Order"* when (i) the time to appeal, petition for *certiorari*, or move for reargument or rehearing of the Sale Order shall have expired and no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing of the Sale Order shall then be pending, or (ii) any right to appeal, petition for *certiorari*, reargument, or rehearing of the Sale Order shall have been waived in writing or (iii) in the event that an appeal, writ of *certiorari*, or reargument or rehearing of the Sale Order has been sought, the Sale Order shall have been affirmed by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or proceedings for reargument or rehearing shall have expired and no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing of the Sale Order shall then be pending.

Section 4.2. <u>Grace Conditions</u>. The obligation of the Grace Parties to consummate the Transactions shall be subject to the fulfillment, on or before the Closing Date, of the following conditions (any or all of which may be waived by the Grace Parties to the extent permitted by applicable law):

(a)     the representations and warranties of the Rio Tinto Parties in <u>Section 2.2</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date;

(b)      the Rio Tinto Parties shall have performed and complied in all material respects with all their respective covenants and agreements contained in this Agreement to be performed or complied with by them on or prior to the Closing Date; and

(c)      the Rio Tinto Parties have made such deliveries at the Closing as are required of them under Section 1.3;

(d)      a Rio Tinto Party (or an Affiliate thereof) shall have obtained, and the Trustee shall have accepted, the Substitute LOC;

(e)      the Trustee shall have entered into the Insurance Undertaking Termination Agreement;

(f)      all consents, if any, under the Indenture and any agreements related thereto shall have been obtained; and

(g)      the Sale Order shall have been entered and shall have become a Final Order.

## ARTICLE V

### MISCELLANEOUS

Section 5.1.  Termination. This Agreement may be terminated prior to the Closing as follows:

(a)      by Purchaser, if (i) the Sale Motion has not been filed within ten (10) business days after the date of this Agreement; or (ii) the Sale Order has not been entered by the Bankruptcy Court and become a Final Order by March 31, 2009, provided that Purchaser may not exercise the right to terminate this Agreement under this Section 5.1(a) if the Rio Tinto Parties have breached in any material respect their obligations under this Agreement;

(b)      by Sellers, if the Sale Order has not been entered by the Bankruptcy Court and become a Final Order by March 31, 2009, provided that Sellers may not exercise the right to terminate this Agreement under this Section 5.1(b) if the Grace Parties have breached in any material respect their obligations under this Agreement;

(c)      by mutual written consent of Purchaser and Sellers;

(d)      by Purchaser if there shall have been a breach of any representation, warranty, covenant or agreement in this Agreement by the Grace Parties which would result in the failure of a condition set forth in Section 4.1, and which breach is incapable of cure or is not cured within ten (10) business days after the Grace Parties' receipt of notice thereof; and

(e)      by Sellers if there shall have been a breach of any representation, warranty, covenant or agreement in this Agreement by the Rio Tinto Parties which would result in the failure of a condition set forth in Section 4.2, and which breach is incapable of cure or is not cured within ten (10) business days after the Rio Tinto Parties' receipt of notice thereof.

Section 5.2.  Amendments and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of all of the Parties.  No waivers of or

11

exceptions to any term, condition or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

Section 5.3. Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.   If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

Section 5.4. Survival of Representations and Warranties.  The representations and warranties of the Parties set forth in Article II shall survive the Closing, and each Party (the *"Representing Party"*) shall be responsible to the other Parties for all claims, losses, liabilities, costs and expenses of the other Party resulting from or relating to any breach by the Representing Party.   In addition, the Grace Parties shall jointly and severally indemnify and hold harmless each Rio Tinto Group member from and against any and all claims, losses, liabilities, costs and expenses (including attorneys' fees) and other damages arising from or incurred as a result of, and including all costs and expenses (including attorneys' fees) of defending any third party claim involving or alleging facts or circumstances that, if true, would constitute a breach of the representations or warranties set forth in Section 2.1(f).

Section 5.5.  Entire Agreement.  This Agreement constitutes the entire agreement between the Parties relative to the specific subject matter hereof.  Any previous agreement between the Parties relative to the specific subject matter hereof is superseded by this Agreement.

Section 5.6.  Expenses.  Each Party hereto agrees to pay its own expenses with respect to the negotiation and execution of this Agreement and the other Transaction Documents and the Transactions. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, including any action arising from breach of any representation or warranty contained herein, the prevailing Party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such Party may be entitled.

Section 5.7.  Notices.  All notices and other communications required or permitted hereunder shall be in writing and will be effectively delivered when delivered (a) by hand, (b) by facsimile providing confirmation of transmission, (c) by registered or certified mail, postage prepaid, return receipt requested or (d) by a nationally recognized overnight courier providing proof of delivery.   All communications shall be addressed to the Parties to be notified as set forth below or at such other address as such Party may designate by ten (10) days' advanced written notice to the other Parties.

| If to any of the Grace Parties: | If to any of the Rio Tinto Parties: |
|---|---|
| c/o W. R. Grace & Co.-Conn.<br>7500 Grace Drive<br>Columbia, Maryland 21044<br>Attention: Corporate Secretary<br>Fax:     (410) 531-4545<br>Confirmation: (410) 531-4362 | c/o Rio Tinto<br>4700 Daybreak Parkway<br>South Jordan, Utah 84095<br>Attention: Legal Department<br>Fax:     (801) 204-2892<br>Confirmation: |

12

Section 5.8. Assignment; Binding Effect. This Agreement may not be assigned by any Party without the prior written consent of the other Parties, which consent shall not unreasonably be withheld or delayed, and any assignment without such consent shall be void *ab initio* and of no force or effect. This Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

Section 5.9. Construction; Certain Definitions. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa. As used in this Agreement, (i) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation"; (ii) *"Tax"* means any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, net proceeds, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts; (iii) *"Affiliate"* when used with respect to any person, means any other person directly or indirectly controlling, controlled by, or under common control with such person; (iv) as used in the definition of Affiliate, the term *"control"* means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise; (v) *"Encumbrances"* means any and all liens, charges, security interests, mortgages, pledges, options, preemptive rights, rights of first refusal or first offer, proxies, levies, voting trusts or agreements, or other adverse claims or restrictions on title or transfer of any nature whatsoever other than any of the foregoing arising pursuant to the terms of the Partnership Agreement or from act performed by or on behalf of any of the Rio Tinto Parties or their Affiliates; (vi) *"Transactions"* means the transactions contemplated by this Agreement; and (vii) *"Transaction Documents"* means this Agreement and any other agreements, instruments and documents executed pursuant hereto or in connection herewith.. The headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

Section 5.10.    Governing Law.    Except to the extent the Bankruptcy Code applies, this Agreement and the other Transaction Documents will be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any applicable principles of conflict of laws that would cause the laws of another state to otherwise govern this Agreement.

Section 5.11.    Submission to Jurisdiction.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and the other Transaction Documents and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement or the other Transaction Documents, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 5.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware, and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which

13

they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding contemplated by Section 5.11(a) by delivery of a copy thereof in accordance with the provisions of Section 5.7.

Section 5.12.    Waiver of Right to Trial by Jury. EACH PARTY TO THIS AGREEMENT WAIVES, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR THE TRANSACTION DOCUMENTS OR ANY PROVISION HEREOF OF THEREOF.

Section 5.13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

| GRACOAL, INC. | RIO TINTO WHITE HORSE COMPANY |
|---|---|
| By: _W B McGowan_ _(signature)_<br>Name: _W. Brian McGowan_<br>Title: _President_ | By:<br>Name:<br>Title: |
| GRACOAL II, INC. | KENNECOTT COLORADO COAL COMPANY |
| By: _W B McGowan_ _(signature)_<br>Name: _W. Brian McGowan_<br>Title: _President_ | By:_____<br>Name:<br>Title: |
| W. R. GRACE & CO.-CONN. | RIO TINTO AMERICA INC. |
| By: _W B McGowan_ _(signature)_<br>Name: _W. Brian McGowan_<br>Title: _Senior Vice President_ | By:_____<br>Name:<br>Title: |
| | COLOWYO COAL COMPANY L.P.<br><br>By: Kennecott Colorado Coal Company,<br>Its General Partner<br><br>By:<br>Name:<br>Title: |

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

| GRACOAL, INC. | RIO TINTO WHITE HORSE COMPANY |
|---|---|
| By: _W B McGowan Jr_ <br> Name: _W. Brian McGowan_ <br> Title: _President_ | By: _McBarrett_ <br> Name: _M BARRETT_ <br> Title: _CFO_ |
| GRACOAL II, INC. | KENNECOTT COLORADO COAL COMPANY |
| By: _W B McGowan Jr_ <br> Name: _W. Brian McGowan_ <br> Title: _President_ | By: _____ <br> Name: <br> Title: |
| W. R. GRACE & CO.-CONN. | RIO TINTO AMERICA INC. |
| By: _W B McGowan Jr_ <br> Name: _W. Brian McGowan_ <br> Title: _Senior Vice President_ | By: _McBarrett_ <br> Name: _M BARRETT_ <br> Title: _CFO_ |
| | COLOWYO COAL COMPANY L.P. |
| | By: Kennecott Colorado Coal Company, <br>    Its General Partner |
| | By: _____ <br> Name: <br> Title: |

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

| GRACOAL, INC. | RIO TINTO WHITE HORSE COMPANY |
|---|---|
| By: W.B. McGowan _(signature)_ <br> Name: W. Brian McGowan <br> Title: President | By: _____ <br> Name: <br> Title: |
| GRACOAL II, INC. | KENNECOTT COLORADO COAL COMPANY |
| By: W.B. McGowan _(signature)_ <br> Name: W. Brian McGowan <br> Title: President | By: _(signature)_ <br> Name: J.P. Beasn <br> Title: CHIEF OPERATING OFFICER |
| W. R. GRACE & CO.-CONN. | RIO TINTO AMERICA INC. |
| By: W.B. McGowan _(signature)_ <br> Name: W. Brian McGowan <br> Title: Senior Vice President | By: _____ <br> Name: <br> Title: |
|  | COLOWYO COAL COMPANY L.P. |
|  | By: Kennecott Colorado Coal Company, <br> Its General Partner <br><br> By: _(signature)_ <br> Name: J.P. Beasn <br> Title: CHIEF OPERATING OFFICER |

## SCHEDULE 1

### WRG Assignment Agreements

1. Grace Chemical Restructuring Agreement, dated as of July 24, 1996, by and among W.R. Grace & Co., a New York corporation, Grace Holding, Inc., a Delaware corporation, and W.R. Grace & Co.-Conn., a Connecticut corporation.

2. Bill of Sale and Assignment and Assumption Agreement, dated as of July 24, 1996, by and among W.R. Grace & Co., a New York corporation, Grace Holding, Inc., a Delaware corporation, and W.R. Grace & Co.-Conn., a Connecticut corporation.

**EXHIBIT A**

| Seller | Wire Instructions |
|---|---|
| Gracoal, Inc. | JPMorgan Chase Bank, NA<br>New York, NY USA<br>SWIFT code: CHASUS33<br>ABA: 021000021<br>Account name: W. R. Grace & Co.-Conn.<br>Account number: 016001257<br>Memo: Payment to Gracoal, Inc. for Limited Partnership Interest |
| Gracoal II, Inc. | JPMorgan Chase Bank, NA<br>New York, NY USA<br>SWIFT code: CHASUS33<br>ABA: 021000021<br>Account name: W. R. Grace & Co.-Conn.<br>Account number: 016001257<br>Memo: Payment to Gracoal II, Inc. for Limited Partnership Interest |

**EXHIBIT B**

**FORM OF**
**BILL OF SALE & ASSIGNMENT AGREEMENT**

THIS BILL OF SALE & ASSIGNMENT AGREEMENT (this *"Agreement"*) is entered into as of [●], 2008 by and among Gracoal, Inc. and Gracoal II, Inc. (each *"Seller"* and together, the *"Sellers"*) and Rio Tinto White Horse Company (*"Purchaser"*).

**BACKGROUND**

**A.**  Reference is made to that certain Limited Partnership Interest Purchase and Sale Agreement, dated as of November 7, 2008 (the *"Purchase Agreement"*). All capitalized terms used but not defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

**B.**  This Agreement is being executed and delivered by the Sellers and Purchaser pursuant to Section 1.3(d) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the agreements of the parties in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Purchaser agree as follows:

1.        Subject to the terms and conditions of the Purchaser Agreement, each of the Sellers hereby sells, transfers, conveys and assigns to Purchaser, as of the Closing Date and free and clear of all Encumbrances, such Seller's entire right, title and interest in and to the Limited Partnership Interests, and Purchaser hereby accepts the sale, transfer, conveyance and assignment of the Limited Partnership Interests, and hereby assumes and agrees to be bound by all of the obligations and duties of each of the Sellers as Limited Partners under the Partnership Agreement, first arising or payable after the Closing.

2.        This Agreement constitutes an absolute unconditional and irrevocable conveyance of the Limited Partnership Interests to Purchaser by which Sellers completely divest themselves of any and all rights, title and interest in and to the Limited Partnership Interests as of the date hereof, including without limitation, all rights to receive Cash Distributions and Price Participation Payments, whether arising prior to or after the Closing Date.

3.        Nothing set forth in this Agreement shall be deemed to enlarge, alter or amend the rights and obligations of the parties expressly set forth in the Purchase Agreement.  In the event of any conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the terms of the Purchase Agreement shall control.

4.        This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns.  Nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto and their respective successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

5.        This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one instrument.

6.        Except to the extent that the Bankruptcy Code applies, this Agreement shall be governed by, construed in accordance with, the laws of the State of Delaware without giving effect to any

applicable principles of conflict of laws that would cause the laws of another state to otherwise govern this Agreement.

IN WITNESS WHEREOF, this Assignment has been duly executed and delivered by the duly authorized officers of each of the Sellers and the Purchaser as of the date first above written.

| SELLERS: | PURCHASER: |
|---|---|
| GRACOAL, INC.<br><br>By: _____<br>Name:<br>Title: | RIO TINTO WHITE HORSE COMPANY<br><br>By: _____<br>Name:<br>Title |
| GRACOAL II, INC.<br><br>By: _____<br>Name:<br>Title: | |