# EXHIBIT B

Exhibit A
to the AMENDED AND RESTATED AGREEMENT
OF LIMITED PARTNERSHIP
OF COLOWYO COAL COMPANY L.P.

### TERMS OF PRICE PARTICIPATION

1. <u>Amended and Restated Agreement</u>. The following provisions (the "Terms of Price Participation") are attached to and incorporated in that certain Amended and Restated Agreement of Limited Partnership of Colowyo Coal Company L.P., dated December 6, 1994, by and between Kennecott Colorado Coal Company, as General Partner and Gracoal, Inc. and Gracoal II, Inc., as Limited Partners (the "Agreement"). All terms used herein shall have the meaning attributed to them under the Agreement.

2. <u>Payment Obligation</u>. For each full calendar year during the Participation Term, as defined in Paragraph 3 below, there shall be allocated to the Limited Partners (in addition to all other allocations provided for under the Agreement), the following amounts, adjusted as described in Paragraph 5 below: $250,000 for every $1 per ton that the Annual Average Spot Price, as defined in Paragraph 4 below, exceeds $15 per ton, and an additional $100,000 for every $1 per ton that the Annual Average Spot Price exceeds $20 per ton (the "Price Participation Payment").

   a. The Price Participation Payment will be prorated for fractions of $1 per ton so that, for example, if the Annual Average Spot Price is $15.50 per ton, then the Price Participation Payment will be .5 x $250,000 = $125,000. For any partial calendar years during the Participation Term, the Price Participation Payment will be proportionately reduced in accordance with the number of days of that year that are included in the term relative to the 365 days in a full calendar year.

   b. The Price Participation Payment will also be proportionately reduced to the extent that an event of force majeure is experienced by the Partnership that either precludes the mining of coal from the Mine or reduces the daily production from the Mine below that necessary to fulfill the obligations of the Partnership under its non-spot sale contracts. In that event, the Price Participation Payment will be proportionately reduced in accordance with the number of days that such force majeure event occurred during the calendar year relative to 365 days. For

143733

purposes of these Terms of Price Participation, force majeure will have the meaning currently set forth in Paragraph 10.1 of the Coal Supply Agreement (Craig Station Unit No. 3), dated January 17, 1992, between Colowyo Coal Company and Western Fuels-Colorado, as such paragraph may be amended from time to time.

3: <u>Participation Term</u>. The Partnership's obligation to pay the Price Participation Payment will commence on the effective date of the Agreement and will continue until December 31, 2017 (the "Participation Term").

4. <u>Annual Average Spot Price</u>.

a. For purposes of these Terms of Price Participation, "Annual Average Spot Price" means either:

(1) the weighted average price per ton, FOB mine for Spot Sales, as defined in Subparagraph 4.b., made from the Mine during each calendar year; or

(2) if there are no Spot Sales from the Mine in a calendar year, the result of the following formula:

(i) the weighted average price per ton, FOB mine, reported by King Publishing Corporation in its COALBASE data base ("COALBASE"), for sales designated in COALBASE as spot sales, if any, of steam coal, made between unaffiliated buyers and sellers, during such calendar year from coal mines located in Moffatt, Rio Blanco, Routt, Mesa, Delta and Gunnison Counties, Colorado;

multiplied by

(ii) a fraction, the numerator of which is the actual weighted average BTUs per pound of all coal delivered from the Mine during such calendar year and the denominator of which is the weighted average BTUs per pound, as reported in COALBASE, for the coal sold pursuant to the spot sales identified in Subparagraph 4.a.(2)(i).

b. If the Annual Average Spot Price is calculated based on actual sales from the Mine under Subparagraph 4.a.(1):

(1) "Spot Sale" shall mean any sale of steam coal, which was mined by surface mining methods from the Mine, under a contract for a term of twelve months or less, including such sales made: (i) by the Partnership to unaffiliated, third parties or (ii) by an Affiliate of the General Partner ("the Kennecott Colorado Affiliate") to unaffiliated third parties, for coal that was first

143733                                    2

sold by the Partnership to the Kennecott Colorado Affiliate pursuant to the terms of any marketing or other similar type of agreement between the Partnership and the Kennecott Colorado Affiliate. In the latter case, the price received by the Kennecott Colorado Affiliate in the resale of such coal to unaffiliated, third parties will be used to calculate the Annual Average Spot Price. Steam coal means coal bought and sold for the purpose of generating electricity and does not include stoker coal, which is given special treatment to remove coal fines. "Spot Sales" do not include: a) spot sales made to buyers, or their Affiliates, that have a coal supply contract with Colowyo having a term of more than one year, during the term of such contracts or within one year after the termination of such contracts; b) any sales made pursuant to contracts executed prior to the execution date of the Agreement; or c) any sales made pursuant to the terms of Paragraph 3.1 of the Management Agreement.

(2) The Annual Average Spot Price shall not include any amounts paid by purchasers that reflect the added value associated with, or the costs of: a) the application of dust surfactants, oiling the coal, freeze proofing or the application of any other additive; or b) any coal beneficiation process that increases the heat value by 100 BTUs or more per pound.

(3) The Annual Average Spot Price will be calculated based upon the price paid for deliveries of spot coal that are made during the calendar year for which the Annual Average Spot Price is being calculated, regardless of whether payment is received during that year or a subsequent year.

c. With regard to calculations of the Annual Average Spot Price under Subparagraph 4.a.(2):

(1) Such calculation will be made on the basis of the most recent COALBASE reports covering the calendar year in question that are available thirty days in advance of the date on which the Price Participation Payment is due under Paragraph 6 below, and no adjustments will be made for subsequent updates that may be made to those reports.

(2) In the event that COALBASE ceases to report the spot prices described in Subparagraph 4.a.(2), or if COALBASE materially changes the components of those prices or the manner in which they are derived, the parties will promptly meet and negotiate in good faith for the substitution of another suitable spot price

indicator with substantially the same economic characteristics and performance as the spot price mechanism used in COALBASE before its discontinuance or material alteration. If the parties are unable to agree on a suitable replacement spot price indicator within ninety (90) days after the discontinuance or material alteration of COALBASE, either party may demand that the matter be submitted to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association as then in effect. Within two weeks of such demand for arbitration, each party will appoint an arbitrator and give the other party notice thereof. Thereafter, the American Arbitration Association will appoint a third arbitrator from a panel of arbitrators having expertise in the coal industry. Each arbitrator will agree to hear the dispute promptly and to render a decision as soon as practicable thereafter. The decision of the arbitrators will be final and binding upon the parties hereto. Fees and expenses of the arbitrators will be shared equally by the parties.

  d. In the event that for any calendar year, there are no Spot Sales from the Mine and COALBASE reports that no spot sale satisfying the criteria set forth in Subparagraph 4.a.(2) occurred during the calendar year, the parties will promptly meet and negotiate in good faith to agree upon a figure that is a reasonable substitute for the Annual Average Spot Price, which will be used to calculate the Price Participation Payment for such calendar year. It is agreed that a reasonable substitute would be a figure that would likely have been the Annual Average Spot Price had there been Spot Sales from the Mine during the relevant calendar year. If the parties are unable to agree on a reasonable substitute figure within 90 days after the end of such calendar year, either party may demand that the matter be submitted to binding arbitration in accordance with the procedures set forth in Subparagraph 4.c.(2) for a determination of a reasonable substitute figure.

  e. For purposes of these Terms of Price Participation, an "Affiliate" of a buyer means (i) any Person directly or indirectly owning, controlling or holding with power to vote ten percent (10%) of the outstanding voting securities of such buyer, (ii) any Person ten percent 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by such buyer, (iii) any Person directly or indirectly controlling, controlled by or under common control with such buyer, (iv) any officer, director or partner of such buyer, and (v) principals and agents of such buyers.

  5. <u>Price Adjustments</u>. The parties agree that in order to enjoy the benefit of their bargain, the $15 and $20 prices and

143733            4

the $250,000 and $100,000 figures referenced in Paragraph 2 above will be adjusted annually (either upward or downward) as follows:

    a. The $15 and $20 prices will be increased or decreased to account for any new government imposed cost or any change to existing government imposed cost when such cost results in increased or decreased cost to the Partnership. Such adjustments would include, but are not limited to, changes in the federal abandoned mine lands fee, federal black lung excise tax, State of Colorado severance tax, property taxes, federal and state surface and underground royalty rates, and any other third party cost incurred or changed after execution of the Agreement. The prices, as adjusted in this Subparagraph 5.a., will be used in calculating the Price Participation Payment due for the calendar year in which the new or changed costs are incurred.

    b. The $15 and $20 prices and the $250,000 and $100,000 figures will be adjusted each calendar year by the percentage change in the first published value of the Gross Domestic Product Implicit Price Deflator Index, published by the Department of Commerce (the "GDP-IPD Index"), for the last quarter of such calendar year from the first published value of that index for the quarter ending October 31, 1993. The prices and figures, as adjusted in this Subparagraph 5.b. will be used in calculating the Price Participation Payment due for such calendar year. The base year for the GDP-IPD Index is 1987 and the value of the index for that year was 100. If the GDP-IPD Index is discontinued or the basis for its calculation is substantially modified, a substitute index which can reasonably be expected to produce substantially the same results shall be substituted by mutual agreement of the parties. In the event the base year for the index changes, the adjustment provided for in this Subparagraph 5.b. will be modified so that the change in base year does not alter the economic effect of the adjustment. To the extent the parties cannot agree on a substitute index or the appropriate modifications to the adjustment, the matter will be resolved by arbitration in accordance with the procedures set forth in Subparagraph 4.c.(2).

    6. <u>Payment Dates</u>. The Price Participation Payment will be paid on or before April 1 following each calendar year during the Participation Term. Provided, however, if any information necessary to calculate that payment is not available by March 1 following such calendar year, the Price Participation Payment will be paid within thirty days after the date on which the information becomes available.

7. <u>Audit Rights</u>. The Limited Partners will have access to and the right upon reasonable notice to inspect and audit, at their own expense, such books and records of the Partnership as are necessary to verify the correctness of the Price Participation Payments. The Limited Partners shall notify the General Partner of the date of the completion of such audit. If, thereafter, there is a dispute as to the correctness of such payments, any Partner may require that the matter be submitted to arbitration pursuant to the procedures of Subparagraph 4.c.(2), upon notice to the other Partners given within 90 days after the completion of the audit. All amounts that are finally determined to be owing to the Limited Partners under this Paragraph 7 will be paid within 30 days of such determination and will bear interest thereon, calculated at the then current prime rate as published in the Money Rates section of the Wall Street Journal. If there is a final determination under this Paragraph 7 that the Limited Partners have been overpaid, they will pay the amount of such overpayment to the Partnership within 30 days of such determination and such payments shall not bear interest.

8. <u>Reductions in Price Participation Payments</u>. The General Partner may cause the Partnership to set off against the Price Participation Payments provided hereunder, or reduce such payments by, any amount the Limited Partners or their Affiliates owe to the Partnership, the General Partner or any of its Affiliates.