**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 01-01139 (JKF)<br>Jointly Administered<br><br>Related Docket Nos. 19581, 19620<br><br>Hearing Date: November 10, 2008 at 9:00 a.m. |

**ROYAL'S (i) OBJECTION TO DEBTORS' DISCLOSURE STATEMENT
FOR JOINT PLAN OF REORGANIZATION AND APPROVAL
MOTION; AND (ii) REQUEST FOR AN ADJOURNMENT**

O'MELVENY & MYERS LLP
Paul R. Koepff (*pro hac vice*)
Tancred V. Schiavoni (*pro hac vice*)
Gary Svirsky (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Carl J. Pernicone (*pro hac vice*)
150 East 42nd Street
New York, NY 10017-5639

BIFFERATO GENTILOTTI LLC
Ian Connor Bifferato (#3273)
Garvan F. McDaniel (#4167)
800 King Street, First Floor
P.O. Box 2165
Wilmington, DE 19899-2165
(302) 429-1900

*Attorneys for Arrowood Indemnity Company
f/k/a Royal Indemnity Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................4

    A.    Royal is a run-off entity that does not have any sources of new revenue ................................................................................................4

    B.    Grace and Royal fully settled all of Royal's asbestos coverage .................4

    C.    Grace repeatedly admitted that the 1995 Settlement Agreement precludes coverage for any asbestos-related claims ...................................7

        i.    Grace co-signed a letter with Royal in 2006 stating that there is no coverage under the Royal Policies .................................7

        ii.    Grace stated on the record in Montana state court that there is no coverage under the Royal Policies. .........................................8

        iii.    Grace made statements in this Court confirming that there is no coverage under the Royal Policies .........................................8

        iv.    Grace repeatedly stated in its SEC disclosures that there is no coverage under the Royal Policies ...........................................10

    D.    Grace abruptly changed its position about coverage under the settled Royal Policies ................................................................................11

ARGUMENT ...............................................................................................................................12

POINT I    THE DISCLOSURE STATEMENT DOES NOT COMPLY WITH BANKRUPTCY CODE SECTION 1125 BECAUSE IT IS MISLEADING AND INACCURATE AS TO ROYAL. .............................................................................................................12

    A.    The Disclosure Statement does not state that Grace released all rights and interests to coverage for asbestos-related claims .....................13

    B.    The Disclosure Statement does not reveal that Grace faces post-petition claims for violating the Settlement ...............................................15

    C.    The Disclosure Statement does not mention that Grace will face liability for violating federal securities laws ............................................20

POINT II    IN ANY EVENT, THERE IS NO MORE ASBESTOS-RELATED COVERAGE UNDER SETTLED THE ROYAL POLICIES AND THEREFORE NOTHING TO ASSIGN. ..................22

    A.    Grace failed to comply with the notice requirements in the Royal Policies ...................................................................................................22

    B.    The statute of limitations bars any breach of contract claims against Royal .................................................................................................24

    C.    The doctrines of estoppel and acquiescence bar any asbestos-related claims against Royal. ..................................................................25

# TABLE OF CONTENTS
### (continued)

**Page**

D.     Grace has waived all asbestos- related claims against Royal ...................27

E.     The doctrine of laches bars all  asbestos-related claims against
Royal .........................................................................................28

POINT III    THIS COURT SHOULD NOT APPROVE THE  DISCLOSURE STATEMENT BECAUSE
THE PLAN  IS UNCONFIRMABLE AS A MATTER OF LAW.............................................29

A.     The Plan is unconfirmable because it purports to upgrade  Grace's
bargained-for exchange in Settlement Agreement .....................................30

B.     The Plan is unconfirmable because it purports  to assign rights that
Grace does not have ...................................................................33

C.     The Plan is unconfirmable because it seeks to fund  the trust by
breaching the Settlement Agreement .........................................................34

D.     The Plan is unconfirmable because  Grace treats Royal's claims
differently  than other similarly situated claims ........................................35

POINT IV    GRACE IS JUDICIALLY ESTOPPED FROM CHANGING  ITS POSITION ABOUT THE
ROYAL POLICIES. ...................................................................................37

POINT V    PUBLIC POLICY BARS GRACE FROM RENEGING  ON A DULY EXECUTED
SETTLEMENT AGREEMENT. .......................................................................40

POINT VI    ROYAL REQUESTS A BRIEF ADJOURNMENT. ...........................................42

## TABLE OF AUTHORITIES

**Page**

**Cases**

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 746 N.Y.S.2d 131 (2002) ...................... 17

*ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3d Cir. 1985) ........................................ 32

*In re Adana Mortg. Bankers, Inc.*, 14 B.R. 29 (Bankr. N.D. Ga. 1981) ..................................... 12

*Argo Corp. v. Greater New York Mut. Ins. Co.*, 794 N.Y.S.2d 704 (N.Y. 2005) ........................ 23

*Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628 (S.D.N.Y. 2000) .................................. 28

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128
    (2d Dept. 1999) ................................................................................................................. 17

*AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.*, 891 F. Supp. 978 (S.D.N.Y.
    1995), *aff'd on other grds.*, 84 F.3d 622 (2d Cir. 1996) ......................................................... 24

*Butner v. United States*, 440 U.S. 48 (1979) ....................................................................... 31, 33

*Cal. Pub. Emples. Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427 (N.Y. 2000) ..................... 18

*Chase Sci. Research v. NIA Group*, 96 N.Y.2d 20 (N.Y. 2001) ........................................... 24, 25

*City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221 (6th Cir. 1995) .......... 31

*Columbia Cas. Co. v. Fed. Press Co. (In re Fed. Press Co.)*, 104 B.R. 56 (Bankr. N.D.
    Ind. 1989) ......................................................................................................................... 32

*Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267
    (2d Cir. 1987) .................................................................................................................... 22

*Crucible Materials Corp. v. Aetna Cas. & Sur. Co.*, 228 F. Supp. 2d 182 (N.D.N.Y.
    2001) ................................................................................................................................ 23

*Decarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497 (S.D.N.Y. 2001) .......................... 25

*Del Costello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983) .................................................. 40

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997) ............................................................ 37

*Elgie & Co. v. S.S. "S.A. Nederburg,"* 599 F.2d 1177 (2d Cir. 1979) ........................................ 25

*Felix v. Pinewood Builders, Inc.*, 818 N.Y.S.2d 119 (2d Dep't 2006) ....................................... 23

*Fidelity and Guar. Ins. Co. v. Star Equipment Corp.*, 541 F.3d 1 (1st Cir. 2008) ...................... 40

*First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993) .................................................. 33

*Fromer v. Yogel*, 50. F.Supp.2d 227 (S.D.N.Y. 1999) ............................................................. 16

*Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330 (N.Y. 1999) ..................................... 18

*Great Canal Realty Corp. v. Seneca Ins. Co., Inc.*, 800 N.Y.S.2d 521 (N.Y. 2005) ............. 22, 23

*Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282 (2d Cir. 2003) .................................... 22

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466 (N.Y. 1978) ................................................ 27

*IBA, Inc. v. Hoyt (In re Hoyt)*, 326 B.R. 13 (Bankr. W.D.N.Y. 2005) ........................................ 34

*In re Adelphia Communs. Corp.*, 352 B.R. 592 (Bankr. S.D.N.Y. 2006)..................................... 12

*In re Amatex Corp.*, 107 B.R. 856 (E.D. Pa. 1989) ........................................................................ 32

*In re Ark-La-Tex Timber Co, Inc.*, 482 F.3d 319 (5th Cir. 2007) ................................................. 37

*In re Atravasada Land & Cattle Inc.*, 388 B.R. 255 (Bankr. S.D. Tex. 2008) ............................ 37

*In re Bolin Oil Co.*, 51 B.R. 936 (Bankr. N.D. Ohio 1985) ......................................................... 31

*In re Braude Jewelry Corp.*, 333 B.R. 156 (Bankr. N.D. Ill. 2005) ............................................. 19

*In re Bush Indus., Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y. 2004).................................................... 30

*In re Captain Blythers, Inc.*, 311 B.R. 530 (B.A.P. 9th Cir. 2004)........................................ 37, 39

*In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981) ..................................................................... 15

*In re Crippin*, 877 F.2d 594 (7th Cir. 1989) ................................................................................. 31

*In re Crowder*, 374 B.R. 861 (Bankr. D.N.M. 2007).................................................................... 41

*In re Dapontes*, 364 B.R. 866 (Bankr. D. Conn. 2007) ................................................................ 34

*In re Ducane Gas Grills, Inc.*, 320 B.R. 324 (Bankr. D.S.C. 2004) ............................................. 19

*In re E. Maine Elec. Co-op.*, Inc., 125 B.R. 329 (Bankr. D. Me. 1991) ................................. 29, 30

*In re EES Lambert Assocs.*, 62 B.R. 328 (Bankr. N.D. Ill. 1986) ................................................ 31

*In re Egan*, 33 B.R. 672 (Bankr. N.D. Ill. 1983) ......................................................................... 14

*In re Fantastic Homes Enters., Inc.*, 44 B.R. 999 (M.D. Fla. 1984)............................................. 36

*In re Felicity Assoc.*, 197 B.R. 12 (Bankr. D. R.I. 1996).............................................................. 29

*In re Galerie Des Monnaies of Geneva, Ltd.*, 1986 WL 6230, at *2 (S.D.N.Y. May 27,
    1986) ........................................................................................................................................ 37

*In re Heaven Sent, Ltd.*, 50 B.R. 636 (Bankr. E.D. Pa. 1985) ...................................................... 31

*In re Hoffinger Indus.*, 321 B.R. 498 (Bankr. E.D. Ark. 2005) .................................................... 36

*In re Huff*, 118 B.R. 146 (Bankr. S.D. Fla. 1990)......................................................................... 41

*In re Ingleside Associates*, 136 B.R. 955 (Bankr. E.D. Pa. 1992) ......................................... 34, 35

*In re Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir.
    1997) ........................................................................................................................................ 33

*In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004) ................................... 33, 34

*In re Italian Cook Oil Corp.*, 190 F.2d 994 (3d Cir. 1951)  ........................................................ 31

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987).................................... 36

*In re Jones*, 179 B.R. 450 (Bankr. E.D. Pa. 1995)................................................. 32, 33

*In re Joshua Slocum Ltd.*, 922 F.2d 1081 (9th Cir. 1990) ......................................... 31

*In re Kelley*, 58 B.R. 927 (Bankr. D. Del. 1986) ........................................................ 34

*In re Koelbl*, 751 F.2d 137 (2d Cir. 1984) ................................................................. 30

*In re Linker*, 803 N.Y.S.2d 534 (1st Dep't 2005) ........................................................ 28

*In re Lunan Family Restaurants*, 194 B.R. 429 (Bankr. N.D. Ill. 1996) ....................... 19

*In re Manor Place Dev. Assocs., L.P.*, 144 B.R. 679 (Bankr. D.N.J. 1992)................... 30

*In re Mkt. Square Inn, Inc.*, 163 B.R. 64 (Bankr. W.D. Pa. 1994) ............................... 29

*In re O'Leary*, 183 B.R. 338 (Bankr. D. Mass. 1995) ................................................ 29

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ......................... 12

*In re Pitts*, 354 B.R. 58 (Bankr. E.D. Pa. 2006) ........................................................ 40

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir. 2001) .................. 40

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).............................................. 35

*In re Safety-Kleen Corp.*, 380 B.R. 716 (Bankr. D. Del. 2008)................................... 36

*In re Scottsdale Medical Pavilion*, 159 B.R. 295 (B.A.P. 9th Cir. Ariz. 1993)........................... 18

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) ............................................ 33, 34

*In re Triangle Foodservice Corp.*, 2003 Bankr. LEXIS 2284, at *8 (Bankr. N.D. Tex. Sept. 2, 2003) ......................................................................................... 13

*In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987) ......................................... 15

*In re United Trucking Serv.*, 851 F.2d 159 (6th Cir. 1988) ......................................... 18

*Kane v. Johns-Manville Corp.*, 843 F. 2d 636 (2d Cir. 1988) ................................ 35, 36

*Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218 (3d Cir. 2000)..................... 41

*M. & C. Creditors Corp. v. Pratt*, 17 N.Y.S.2d 240 (N.Y. Sup. Ct. 1938) ................ 28

*Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co.*, 372 F.2d 18 (3d Cir. 1966) ......................................................................................... 35, 40

*Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44 (3d Cir. 2001).......... 31

*Miller v. Almquist*, 671 N.Y.S.2d 746 (1st Dep't 1998) ............................................ 17

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175 (N.Y. 1982) .............. 25, 27

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........................................................ 37

**TABLE OF AUTHORITIES**
(continued)

Page

*NLRB v. Bildisco and Bildisco*, 465 U.S. 513 (1984) ................................................................ 31

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) ...................................................................................................................... 16

*Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718 (2d Cir. 1992) ............................ 24

*Pollitz v. Wabash R.R. Co.,* 100 N.E. 721 (N.Y. 1912) ................................................................ 25

*Reading Co. v. Brown*, 391 U.S. 471 (1968) .............................................................................. 18

*Romano v. Metropolitan Life Ins. Co.*, 2 N.E.2d 661 (N.Y. 1936) .............................................. 25

*Rothschild v. Title Guar. & Trust Co.*, 97 N.E. 879 (N.Y. 1912) ................................................ 25

*Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) ............... 12

*Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801 (N.Y. 2003) ............ 28

*Schulz v. State*, 615 N.E.2d 953 (N.Y. 1993) ............................................................................. 28

*Stone*, 873 F.2d at 625 ................................................................................................................ 28

*Trustees of Columbia University in the City of New York v. Mitchell/Giurgola Assos.*, 451 N.Y.S.2d 371 (1st Dep't 1985) ................................................................................................ 16

*Werking v. Amity Estates, Inc.*, 2 N.Y.2d 43 (N.Y. 1956) .......................................................... 27

*Wilcher v. City of Wilmington*, 139 F.3d 366 (3d Cir. 1998) ..................................................... 40

*Winstead v. Uniondale Free Sch. Dist.*, 608 N.Y.S.2d 487 (2d Dep't 1994) .............................. 23

*Zartman v. First Nat'l Bank of Waterloo, N.Y.*, 216 U.S. 1324, 1325 (1910) ...................... 30, 31

**Statutes**

11 U.S.C. §1125(a)(1) ................................................................................................................. 12

11 U.S.C. §1125(a)(3) .................................................................................................. 30, 33, 34, 35

11 U.S.C. §1122(a) ..................................................................................................................... 36

15 U.S.C. §78j(b) - 20 ................................................................................................................ 20

17 CFR 240.10b-5 ...................................................................................................................... 20

18 U.S.C. §1350(c) ............................................................................................................... 20, 21

N.Y. C.P.L.R. §213(2) .......................................................................................................... 24, 25

**Federal Rules**

Fᴇᴅ. R. Bᴀɴᴋ. Pʀᴏᴄ. 3017 ........................................................................................................ 42

**Other Authorities**

Cᴏʟʟɪᴇʀ ᴏɴ Bᴀɴᴋʀᴜᴘᴛᴄʏ (15ᵗʰ ed. rev.) ........................................................................ 18, 33, 34

Arrowood Indemnity Company, f/k/a Royal Indemnity Company ("Royal") hereby objects to the Debtors' Disclosure Statement for the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., *et al.*, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated September 19, 2008 (the "Disclosure Statement") and related Motion of the Debtors for an Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief.

## PRELIMINARY STATEMENT

Grace & Co. ("Grace") and Royal entered into a Settlement Agreement that fully resolved the parties' coverage dispute about certain primary policies (the "Policies") that Royal issued to the Zonolite Company in Libby, Montana, Grace's predecessor.  Under the Settlement Agreement, Royal paid an astounding $100 million, in return for which Grace gave a broad, unconditional, and all-encompassing release as to any and all past, present and future asbestos-related claims.  Grace also obligated itself to cooperate with Royal in defending and enforcing the Settlement Agreement and agreed not to tender or present any more asbestos-related claims to Royal.

For thirteen years in signed documents, countless statements in *this* and other courts, and multiple SEC filings Grace has (correctly) maintained that the Royal Policies no longer offer coverage for asbestos-related claims—as is clear from the Settlement Agreement's plain language.  And during the seven years that Grace has spent in bankruptcy trying to reorganize its business and establish a Section 524(g) trust, it has not once asserted that it has any remaining asbestos-related coverage under the Royal Policies—that is until it filed its Disclosure Statement on September 19, 2008, which coyly fails to make clear that Royal no longer has *any* obligations

under the Policies.  What is worse, Grace has deleted as an exhibit to the Plan of Reorganization

(the "Plan") a schedule listing the Royal policies as "fully resolved" and replaced it with a

schedule that misleadingly suggests the Settlement Agreement resolved only the "products"

claims—rather than all asbestos-related claims.  But Grace and its officers, directors, risk

managers, and attorneys well know that the Settlement Agreement precludes any additional

asbestos-related claims.  Moreover, any rights that Grace had in Royal's coverage have long

since expired because (i) Grace did not comply with the Policies' notice requirements; (ii) the

statute of limitations has run; (iii) and various equitable doctrines, such as estoppel, waiver, and

laches bar coverage.

Why the sudden about-face?  In an effort to top off the deal with the claimants, Grace's

new strategy apparently is to walk away from an unambiguous and long-honored settlement

agreement—after enjoying the $100 million Royal paid in 1995.  This Court should not

countenance such shameless disregard for contractual obligations and abuse of bankruptcy

process, which would discourage other insurers from resolving their disputes out of court.

Grace's repudiation of the Settlement Agreement will invariably lead Royal to prosecute

claims against Grace (or the Section 524(g) trust) for post-petition breach of contract and various

tort claims for violating the Settlement Agreement.  Royal will seek damages or other

compensatory payments for restitution, the amount of any financial harm caused to Royal, legal

fees and indemnification, among other things.

Grace's failure to explain in the Disclosure Statement that it has no claim, right or interest

in the Royal Policies to assign to the 524(g) trust violates Section 1125 by misleading claimants

about the Royal Policies.  Likewise, Grace's failure to explain *any* of the above risks in the

Disclosure Statement violates Section 1125 by misleading claimants about their likely recovery


under the Plan.  The law does not allow such a misleading disclosure statement, especially when it involves repudiating a settlement agreement.

The Disclosure Statement has other serious problems because the underlying Plan is unconfirmable as a matter of law.  Among other things, the Plan runs afoul of Sections 1129 by (i) seeking to "upgrade" the Settlement Agreement by giving Grace the bargain's benefits ($100 million over thirteen years) while allowing it to shirk all obligations; (ii) attempting to assign to the trust Grace's so-called rights in the Royal Policies, though Grace has *no asbestos-related rights* left; (iii) trying to fund the Plan trust by breaching the Settlement Agreement, despite the Third Circuit's "deep-seated preference for settlement rather than litigation," *Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 22-23 (3d Cir. 1966); and (iv) treating Royal's claims differently than other similarly situated claims.

Grace's ill-founded reversal about its Settlement Agreement obligations at this late date has thrust Royal into this bankruptcy case in an effort to preserve its contractual rights.  This is not a problem that will go away if Grace remains vague and equivocal about its Settlement Agreement obligations.  Indeed, at the October 27, 2008 Disclosure Statement hearing, the Court explicitly warned that, at confirmation, Grace will be unable to "duck" the issue concerning the Royal Policies and, stating that "[w]e are going to take this up at plan confirmation if it is not resolved.  So, a word to the wise, get it fixed, one way or another, get it fixed because *this one will not be ducked for confirmation, it will not be ducked*.  So, get it fixed, one way or another."[1]

To try and address this issue immediately, Royal contacted Grace, whose counsel has as yet declined an invitation to meet.  Royal believes that after Grace familiarizes itself with the facts and arguments in this brief, Grace may reconsider its new position and reaffirm that Royal

---

[1] October 27, 2008 Hr'g Tr. at 50:3-7 (emphasis added) (attached as Ex. A to November 10, 2008 Declaration of Brad Elias ("Elias Decl."), submitted in support of this brief).

has no more asbestos-related obligations under the Policies.[2]  If Grace does not reconsider, this

Court should require Grace to amend the Disclosure Statement to re-confirm that the Settlement

Agreement remains binding.  To assist the Court, Royal attaches hereto some specific

amendments to the Disclosure Statement.[3]

## STATEMENT OF FACTS

**A.    Royal is a run-off entity that does
        not have any sources of new revenue.**

Royal is in run-off and is actively regulated by the Delaware Insurance Department.

Royal no longer underwrites policies and has no source of new insurance revenues.  Royal has

finite (and limited) resources to meet its policyholder obligations and its primary purpose is to

achieve a solvent run-off.  Moody's, A.M. Best, and Fitch withdrew Royal's ratings in 2005

when the company announced its intention to enter into run-off.  These ratings were below

investment grade before they were withdrawn.

**B.    Grace and Royal fully settled
        all of Royal's asbestos coverage.**

In the action entitled *Maryland Casualty Co. v. W. R. Grace & Co.*, *et al.*, Royal (together

with other insurers) asserted claims and/or cross-claims against Grace, seeking a declaration of

the parties' rights and obligations concerning coverage for Grace's asbestos-related suits under

the Royal Policies ("New York Coverage Action").[4]  Grace countersued in 1985, seeking broad

coverage not just for products claims, but for all suits "in which claimants have alleged bodily

injury . . . *arising out of alleged exposure to asbestos or asbestos containing products* allegedly

---

[2] Royal notes that it does not yet have the facts and documents that Grace claims support its new position.

[3] *See* Royal's proposed amendments (Elias Decl., Ex. B).

[4] The following policies were at issue in the suit and the ones that the Settlement Agreement resolved: RLG027635 (03/31/53-03/31/54); RLG031840 (03/31/54-04/01/55); RLG035805; (04/01/55-04/01/56); RLG045762 (04/01/56-04/01/57); RLG045836 (04/01/57-04/01/58); RLG053959 (04/01/58-04/01/59); RLG021629 (04/01/59-04/01/60); RLG021620 (04/01/60-04/01/61); RLG021621 (04/01/61 -04/01/62); RLG021622 (04/01/62-04/01/63).  The Settlement Agreement did not cover two high level late-year excess policies issued as part of a separate program.

sold by Grace . . . (the 'asbestos-related bodily injury cases')."[5]  Grace further claimed that the

Royal Policies "provide insurance coverage against loss and liability arising from bodily injury

cases, *including asbestos-related bodily injury cases against Grace*."[6]

In 1995, Grace and Royal reached an agreement-in-principle to settle coverage for any

and all past, present and future Asbestos-Related Claims and Products Claims under the Royal

Policies (the "Settlement Agreement").  The basic terms were that Royal would pay

$100 million, and that Grace would in turn agree there was no more coverage for products claims

(since the $6.0 million aggregate limits for such claims had been exhausted) and that it would

give a broad, unconditional and all-encompassing release as to any and all past, present and

future asbestos-related claims.  That agreement was intended to settle all allegations and claims

raised in that coverage case, and, specifically, Grace's claims to coverage for asbestos-related

bodily injuries allegedly arising from exposure to asbestos or asbestos-containing materials.

In the final, signed Settlement Agreement, the term "Asbestos-Related Claims" was

defined as follows:

> [A]sbestos-related claims or lawsuits asserted by or on behalf of persons alleging
> (1) bodily injury, sickness, disease and/or death as a result of an exposure to
> asbestos or asbestos-containing materials, and (2) damages for injury or damage
> to buildings and property allegedly caused by asbestos or asbestos-containing
> materials.[7]

The term "Asbestos-Related Claims" was not limited to claims coming within the Products

Hazard.  Rather, the Settlement Agreement had a separate definition of "Products Claim:"

> "Product Claims" shall mean any Asbestos-Related Claim and any other claim,
> demand, or lawsuit for bodily injury or property damage falling within the
> "Products Hazard" definition of the Primary Policies, regardless of the cause of
> action or theory of recovery or coverage employed by the person asserting such

---

[5] Grace's Answer, Cross-Claim and Counterclaim at p.12  ¶24 (emphasis added) (Elias Decl., Ex. C).
[6] *Id*. at p.21 ¶56 (emphasis added).
[7] Settlement Agreement at Second Whereas Clause (Elias Decl., Ex. D).

claims (including claims based on failure to warn) or the cause of action or theory of coverage employed by Grace or any other Person with respect to such claims.[8]

To effectuate the settlement, Grace agreed that the products coverage for the Royal Policies was cancelled, since the total of all aggregate limits for the Products Hazard had been exhausted:

> Grace hereby agrees to the cancellation of all insurance coverage for Product Claims under the Primary Policies, effective as of the Effective Date, in exchange for a payment of $100,000,000 as provided in Section 2.0. The cancellation of insurance coverage for Product Claims under the Primary Policies shall not affect the rights and obligations of Grace and Royal under the Primary Policies with respect to insurance coverage for claims that are not Product Claims.[9]

Grace likewise gave Royal the following release not just as to products claims but as to all asbestos-related claims:

> Except for the obligations set forth in this Agreement, Grace hereby releases and forever discharges Royal of and from any and all actions, causes of action in law or in equity, suits, debts, liens, contracts, indemnity and defense obligations, agreements, promises, liabilities, claims, demands, losses, costs or expenses of any kind or nature, known or unknown, fixed or contingent, direct or indirect, which Grace now has or may have against Royal in any way relating to the New York Primary Action and/or payment or handling of Asbestos-Related Claims and other Product Claims under the Primary Policies, including, but not limited to, any alleged potential claim for breach of the covenant of good faith and fair dealing, unfair claims practices or punitive damages.[10]

Importantly, the final, executed Settlement Agreement was substantially different than the original draft Grace sent to Royal, which purported to limit the settlement's scope to products claims without releasing other kinds of asbestos-related claims. When Royal explained that the agreement should be far broader and include all asbestos-related claims, even those not falling within the definition of "Products Hazard," Grace revised the final version accordingly. As a result, the final signed Settlement Agreement included a broad, unconditional and all-

---

[8] *Id*. at §1.2 .
[9] *Id*. at §3.0.
[10] *Id.* at §4.0.

encompassing release of any and all asbestos-related claims, even those not within the definition of "Products Hazard." The documents created contemporaneously with the Settlement Agreement's drafting and negotiation also confirm that the parties intended and agreed to a broader settlement than just products claims.

On January 18, 1995, the Court signed a Stipulated Order of Dismissal that stated "[a]ll claims brought by Grace and Royal against each other in this action are dismissed with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure."[11]

C.    **Grace repeatedly admitted that the
      1995 Settlement Agreement precludes
      coverage for any asbestos-related claims.**

   i.    *Grace co-signed a letter with Royal in 2006 stating
         that there is no coverage under the Royal Policies.*

Grace is the target of lawsuits in Montana state court alleging bodily injury from Grace's mining operation in Libby, Montana. One of Grace's co-defendants in those cases is Burlington Northern and Santa Fe Railroad ("BNSF"). After receiving BNSF's April 12, 2006, request for coverage under the Royal Policies in connection with the Libby Claims, Grace together with Royal agreed that there was no coverage for BNSF because the 1995 Settlement Agreement had a release that barred any further claims for coverage for any and all asbestos-related claims. It was further agreed that Grace and Royal would send a "joint" letter so advising BNSF.

Accordingly, Royal's outside counsel and Grace's Senior Litigation Counsel Jay Hughes *cosigned* a May 5, 2006 letter sent to BNSF stating that based on "the 1995 Settlement Agreement between Grace and Royal[,] . . . *Royal has fully discharged and satisfied any*

---

[11] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ.7451 (SWK), Stipulated Order of Dismissal (S.D.N.Y. Jan. 18, 1995) (Elias Decl., Ex. E).

*obligations it may have owed Grace for asbestos related claims under the Zonolite policies*."[12]
In this joint letter, both Royal and Grace stated unequivocally that the "[a]greement reflects that, in consideration of paying Grace the sum of *$100 Million, Grace fully and finally released Royal from any further liability for asbestos related claims under the Zonolite policies.*"[13]

ii.    *Grace stated on the record in Montana state court that there is no coverage under the Royal Policies.*

In March 2002, asbestos personal injury claimants in Libby, Montana—the so-called Libby Claimants—made a motion in Montana state court to have Royal appointed "trustee" for Montana Vermiculite Corporation.  During argument on that motion, Grace's outside counsel Janet Baer stated in open court that the claim for coverage under the Royal Policies "was all settled in 1994 and 1995. *Royal received a release and an indemnity from Grace.  To the extent that the Plaintiffs have causes of action, unfortunately, those causes of action are against Grace.*"[14]  Ms. Baer then submitted to the court a proposed order jointly with Royal's counsel that provided in part that "any coverage obligation for asbestos claims that Royal may have owed under that coverage *was fully satisfied and released pursuant to the 1995 Settlement Agreement between Royal and W. R. Grace & Co.*"[15]

iii.    Grace made statements in this Court confirming that there is no coverage under the Royal Policies.

Grace has spent the last seven years in this Court attempting to set up a Section 524(g) trust to resolve its asbestos-related liabilities.  Not once during that time has Grace contended that it has any remaining asbestos-related coverage under the Royal Policies.  In fact, Grace has stated just the opposite.  In 2003, in a brief supporting its motion to expand the preliminary

---

[12] May 5, 2006 letter from Wilson Elser to Hedger Moyers, at 2 (emphasis supplied) (Elias Decl., Ex. F).  The Royal Policies and the "Zonolite policies" are synonymous because the Royal Policies were issued to Grace's predecessor-in-interest, the Zonolite Company.
[13] *Id.* (emphasis supplied).
[14] March 22, 2002 Hr'g Tr. at 7-8 (emphasis added) (Elias Decl., Ex. G).
[15] Grace's proposed order to the Montana state court (emphasis added) (Elias Decl., Ex. H).

injunction to include Montana Vermiculite Corporation, Grace stated that "*in full and final settlement of Royal's obligations* under the Pre-Sale Policies.  In the Royal Settlement, the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims made against the Pre-Sale Policies."[16]  Grace further stated that under the Settlement Agreement the "Royal Policies *were cancelled*.  Royal *settled its obligations under the Royal Policies* with Grace.  Grace indemnified Royal for future claims that may arise under such policies."[17]

Grace added that in "In the Royal Settlement, the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims made against the Royal Policies issued by Royal to Zonolite."[18]  So "[a]ny attempt by Plaintiffs to pursue Royal and collect from Royal under the Royal Policies will immediately and directly affect Grace."[19]  And "[t]o the extent that a judgment for damages is entered against Montana Vermiculite, which could trigger coverage under the Pre-Sale Policies, Grace may have indemnity obligations to Royal."[20]  Grace did not make these assertions in a vacuum but rather in response to the Libby Claimants' assertions to the contrary.[21]

Grace ultimately persuaded the Bankruptcy Court, at least as to the Settlement Agreement's implication.  Accordingly, on October 7, 2004, this Court granted Grace's motion to expand the bankruptcy injunction to include Montana Vermiculite, stating that "[t]he settlement [between Grace and Royal] resolved Royal's obligation under the Pre-Sale

---

[16] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶3 (emphasis added) (Elias Decl., Ex. I).

[17] Grace's Reply Brief in Support of Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶8 (emphasis added) (Elias Decl., Ex. J).

[18] *Id.* at 10.

[19] *Id.* at 8.

[20] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶15 (Elias Decl., Ex. I).

[21] Libby Claimants' Opposition to Debtors' Motion to Expand The Preliminary Injunction to Include Actions Against Montana Vermiculite Corporation Elias Decl., Ex. K).

[Zonolite] Policies and provided that Debtors would indemnify and hold Royal harmless against any asbestos-related claims made against those policies."[22]

In November 2004, Grace filed its first Disclosure Statement, where it stated in §2.7.2.2 that "[w]ith one exception, *coverage disputes regarding the Grace and Zonolite primary policies that have been settled, and the settlement amounts paid in full.  The only unsettled primary coverage is that of CNA . . . .*  Grace asserts that this [CNA] coverage is available to pay asbestos-related Claims that are not based on product liability, such as Claims made by certain Libby residents."[23]  Grace filed an Amended Disclosure Statement in January 2005.  The amended statement's description of the Royal Policies mirrored the text in the 2004 Disclosure Statement.[24]  In addition, Exhibit 10 to the Amended 2005 Disclosure Statement, entitled "Primary & Excess Insurance Policies That Were or Are Applicable to Asbestos-Related Claims," categorized the Royal Policies as "Resolved."[25]

Absolutely nothing has happened between November 2004 and October 2008 that in any way affects the settlement between Grace and Royal or anything that Grace has said and done confirming that the Settlement Agreement extinguished any possible claim for coverage for any and all asbestos-related claims.

    iv.    *Grace repeatedly stated in its SEC disclosures*
            *that there is no coverage under the Royal Policies.*

As recently as August 8, 2008, Grace filed a Form 10Q statement with the United States Securities and Exchange Commission that tracks Grace's representation to the bankruptcy court about primary coverage in connection with the claims by the Libby Claimants.  That 10Q

---

[22] Oct. 7, 2004 Memorandum Opinion (Elias Decl., Ex. L).

[23] 2004 Disclosure Statement at §2.7.2.2 (emphasis added) (Elias Decl., Ex. M).

[24] 2005 Amended Disclosure Statement at §2.7.2.2 (Elias Decl., Ex. N).

[25] Exhibit 10 to 2005 Amended Disclosure Statement, at 16 (exhibit entitled "Primary & Excess Insurance Policies That Were or Are Applicable to Asbestos-Related Claims" categorized the Royal Policies as "Resolved") (Elias Decl., Ex. O).

states—under the heading "Insurance Rights"—that with "one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts have been paid in full."  That representation to the SEC and shareholders is essentially the same as Grace's statement in its 2004 Disclosure Statement.  And based on Grace's 2004 Disclosure Statement, the "exception" is clearly a reference to CNA's policies.  Indeed, Grace has repeated essentially that description of the Settlement Agreement—or has indicated that "Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and  personal injury cases and claims"—in *every* SEC Form 10K that it has filed since entering into that agreement in 1995.[26]

**D.    Grace abruptly changed its position about coverage under the settled Royal Policies.**

On October 23, 2008, Grace filed Exhibit 5 to its Disclosure Statement with the Bankruptcy Court.  Notwithstanding the 1995 Settlement Agreement and all that Grace has said and done since 1995, Exhibit 5 purports to state that only the "products" coverage of the Royal Policies has been settled.   Moreover, Grace has included in the Disclosure Statement text suggesting that it will transfer rights under the Royal Policies to the trust when those Policies are fully settled—even thought there are no asbestos-related rights to transfer.  On November 6, 2008, Grace suggested a proposed amendment to Exhibit 5, which did not reaffirm that Royal has no more asbestos-related obligations under the Policies and, thus, state that none were being assigned to the 524(g) trust.

---

[26] *See* Grace, Annual Reports (Form 10-Ks) for February 29, 2008 at F-25; March 2, 2007 at F-23; March 13, 2006 at 24; March 7, 2005 at F-19-20; March 5, 2004 at 11; March 13, 2003 at 10-11; March 28, 2002 at 10; April 16, 2001 at 11; December 4, 2000 Amendment to Previous 10-K at F-10; March 28, 2000 at 10; March 29, 1999 at 10; March 30, 1998 at 10; March 28, 1997 at 15; March 29, 1996 Amendment to Previous 10-K at 25 (Elias Decl., Ex. P).

**ARGUMENT**

**POINT I**

**THE DISCLOSURE STATEMENT DOES NOT COMPLY
WITH BANKRUPTCY CODE SECTION 1125 BECAUSE
IT IS MISLEADING AND INACCURATE AS TO ROYAL.**

Section 1125 of the Bankruptcy Code requires that the Disclosure Statement provide

"adequate information," which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, *that
> would enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan.*

11 U.S.C. §1125(a)(1) (emphasis added).  Providing adequate information in a disclosure

statement is an axiomatic Bankruptcy Code principle.  *See Ryan Operations G.P. v. Santiam-

Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("The Code imposes on debtors an

affirmative duty of full disclosure").

A disclosure statement must contain all information relating to the risks posed to

creditors and equity holders under the proposed plan of reorganization.  *See In re Phoenix

Petroleum Co.*, 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001) ("Relevant factors for evaluating

the adequacy of a disclosure statement may include . . . information relevant to the risks posed to

creditors under the plan").[27]  This means that the disclosure statement must be accurate and not

misleading.  *See Id.* (sustaining objection that the "debtor has asserted erroneous information" in

its disclosure statement"); *In re Adelphia Communs. Corp.*, 352 B.R. 592, 596-97 (Bankr.

S.D.N.Y. 2006) (finding that information can only be included in a disclosure statement if it is

---

[27] *See also In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure
statement is to provide all material information which creditors and equity security holders affected by the plan need
in order to make an intelligent decision whether to vote for or against the plan."); *In re Adana Mortg. Bankers, Inc.*,
14 B.R. 29, 31 (Bankr. N.D. Ga. 1981) (rejecting "Disclosure Statement [that] does not provide any information
relevant to the risks of the Creditors under the terms and provisions of Debtor's Plan.").

"accurate and its inclusion is not misleading); *cf. In re Triangle Foodservice Corp.*, 2003 Bankr.

LEXIS 2284, at *8 (Bankr. N.D. Tex. Sept. 2, 2003) ("The Debtor filed its Disclosure Statement

in good faith with reasonable care and diligence and has not knowingly or negligently included

therein any materially misleading or erroneous statement or representation.").

      Grace's Disclosure Statement falls far short of providing sufficient information for

claimants to "make an informed judgment about the plan," as Section 1125 requires.  The

Disclosure Statement (a) inaccurately states that Grace has remaining asbestos-related coverage

under the Royal Policies; (b) does not state that Grace faces breach of contract and a host of

other claims for violating the Settlement Agreement; and (c) does not mention the risk that Grace

will face liability for violating federal securities laws.

**A.**      **The Disclosure Statement does not state that Grace released**
          **all rights and interests to coverage for asbestos-related claims**
          **under the Royal Policies.**

      The Settlement Agreement resolved in full all of Royal's obligations under the pre-sale

Zonolite policies, for which Royal paid $100 million.  No insurance rights, interests, or proceeds

remained after the settlement, so none can be assigned under the settled Royal Policies.  As a

result, the Plan's purported assignment of any proceeds or other rights related to the Royal

Policies will be a nullity and unenforceable under both bankruptcy and non-bankruptcy law.  Yet

nowhere in the Disclosure Statement does Grace spell this out.  As if that were not bad enough,

Grace has deleted the schedule listing Royal's policies as "resolved" and replaced it with

Schedule 5 that suggests misleadingly that only products claims were released by the Royal

Settlement, which is simply untrue.[28]  And Grace well knows that it is untrue.

      The Settlement Agreement leaves no doubt that Royal's asbestos-related coverage is fully

resolved, as it defines the term "Asbestos-Related Claims" as "claims or lawsuits asserted by or

---

[28] *See* Exhibit 5 to Grace's 2008 Disclosure Statement (Elias Decl., Ex. V).

on behalf of persons alleging . . . *bodily injury, sickness, disease and/or death as a result of an exposure to asbestos or asbestos-containing materials*."[29]   Nothing in this definition suggests that the Settlement Agreement encompasses anything less that *all claims alleging bodily injury as a result of exposure to asbestos*—regardless of whether they are products claims.

Moreover, the term "Asbestos-Related Claims" was not limited to claims coming within the "Products Hazard."   The Settlement Agreement provided a separate definition for "Products Claims:"

> "Product Claims" shall mean any Asbestos-Related Claim and any other claim, demand, or lawsuit for bodily injury or property damage falling within the "Products Hazard" definition of the Primary Policies, regardless of the cause of action or theory of recovery or coverage employed by the person asserting such claims (including claims based on failure to warn) or the cause of action or theory of coverage employed by Grace or any other Person with respect to such claims.[30]

And the release provision's plain language makes clear that Grace released Royal from both "Asbestos-Related Claims" *and* "Product Claim:"

> Grace hereby releases and forever discharges Royal of and from any and all actions, causes of action in law or in equity, suits, debts, liens, contracts, indemnity and defense obligations, agreements, promises, liabilities, claims, demands, losses, costs or expenses of any kind or nature, known or unknown, fixed or contingent, direct or indirect, which Grace now has or may have against Royal in any way relating to the New York Primary Action and/or payment or handling of *Asbestos-Related Claims* and other *Product Claims* under the Primary Policies.[31]

Consistent with this language, Grace represented for more than thirteen years, in court statements and multiple SEC filings that the Royal Policies no longer offered coverage for asbestos-related claims.   During that time Grace never once distinguished between products, non-products, or premises claims—and rightly so, considering the Settlement Agreement's plain language.

---

[29] Settlement Agreement at Second Whereas Clause (emphasis added) (Elias Decl., Ex. D).
[30] *Id.* at §1.2.
[31] *Id.* at §4.0.

Because the Settlement Agreement released all asbestos-related claims under the Royal

Policies, the claimant-creditors will be denied what Grace alleges to be a source of funds for the

Section 524(g) trust.  The Disclosure Statement does not address this misrepresentation, but

instead creates the misimpression that that "non-products" coverage remains available under the

Royal Policies.  That omission is contrary to settled law, requiring that a disclosure statement

must contain all information relating to the risks posed to creditors and equity holders under the

proposed plan of reorganization.  *See In re Unichem*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("the

disclosure statement does not adequately inform the creditors how conditional that payment is or

of the strings . . . attached to it.").  And any opinions or factual allegations must be supported by

factual information.  *See In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981) ("The Court

finds that mere allegations or opinions, unsupported by factual information, do not meet the

required [adequate information] standard."); *In re Egan*, 33 B.R. 672, 675 (Bankr. N.D. Ill.

1983) ("without factual support, statements of opinion or belief are entirely inappropriate in

Disclosure Statements.").

**B.      The Disclosure Statement does not reveal that Grace
faces post-petition claims for violating the Settlement
Agreement.**

Grace's proposed Disclosure Statement fails to explain the risk that Grace faces from

breaching the Settlement Agreement.  Grace's new position violates, among other things, the

Settlement Agreement's cooperation clause and prohibition against presenting or tendering any

additional asbestos-related claims to Royal.  This leads to separate post-petition breach of

contract claims.

*First*, under Section 16.1 of the Settlement Agreement, Grace has a duty to cooperate

with Royal.  Specifically, Grace agreed that "it will not take a position in . . . any other litigation

involving Asbestos-Related Claims under the Primary Policies, with respect to . . . whether Royal had an obligation to defend or indemnify Grace, Zonolite or Other Insured for Asbestos-Related Claims."[32]  The representation in Grace's Disclosure Statement that Royal has any remaining asbestos-related claims obligations under its primary policies violates the Section 16.1's express language.  As a result of this breach, Royal will be entitled to recover damages or other compensatory payments, among other things, for indemnification, restitution, the amount of any recovery that any claimants may obtain, and legal fees, and other costs and expenses incurred by Royal as a result of Grace's failure to cooperate.[33]  The Disclosure Statement does not mention that Grace could be liable to Royal for breaching Section 16.1.

 *Second*, under Section 19.0 of the Settlement Agreement, Grace "agree[d] that no further Asbestos-Related Claims or Products Claims will be presented or tendered by Grace to Royal under the Primary Policies for any reason or purpose regardless of the theory of coverage."[34]  But Grace's Disclosure Statement contemplates tendering additional asbestos-related claims for payment to Royal.  Moreover, if this Court approves the Disclosure Statement, then Grace will have *an affirmative duty* to facilitate tendering asbestos-related premises claims to Royal, in direct violation of Section 19.0.  This duty arises from Grace's fiduciary relationship with its creditors and its representation that the Settlement Agreement only covered "Products Claims."  *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (finding that a debtor-in-possession has a fiduciary relationship with its

---

[32] Settlement Agreement §16.1 (Elias Decl., Ex. D).

[33] Royal's indemnity-related damages could include those specifically set out in the Settlement Agreement as well as for implied indemnity.  *See Fromer v. Yogel*, 50 F.Supp.2d 227, 240 (S.D.N.Y. 1999) ("[u]nder New York Law, implied indemnity is a restitution concept which permits shifting the loss because to forbid it would result in the unjust enrichment of one party at the expense of the other"). *Trustees of Columbia University in the City of New York v. Mitchell/Giurgola Assos.*, 492 N.Y.S.2d 371, 451-52 (1st Dep't 1985) (implied indemnity permits one who is held vicariously liable solely on account of the negligence of another to shift the entire burden of the loss to the actual wrongdoer.).

[34] Settlement Agreement §19.0 (Elias Decl., Ex. D).

creditors and a duty "to maximize the value of the bankruptcy estate").  Grace's breach will

entitle Royal to damages or other compensatory payments, among other things, for restitution,

the amount of any claimants may obtain, legal fees, indemnification and other costs and expenses

incurred by Royal as a result of Grace's breach.  The Disclosure Statement is silent about

Grace's potential liability for breaching Section 19.0.

Third, Grace breached the covenant of good faith and fair dealing, which under

New York law is contained in every contract.  *See Aventine Inv. Mgmt., Inc. v. Canadian*

*Imperial Bank of Commerce*, 697 N.Y.S.2d 128 (2d Dept. 1999).  The covenant "embraces a

pledge that neither party shall do anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp.*

*v. Jennifer Realty Co.*, 746 N.Y.S.2d 131, 135 (2002).  The implied covenant "is breached when

a party to a contract acts in a manner that, although not expressly forbidden by any contractual

provision, would deprive the other party of the right to receive the benefits under their

agreement." *Aventine Inv. Mgmt., Inc.*, 697 N.Y.S.2d at 130.  In furtherance of the covenant of

good faith, each party must eschew actions that would deprive the other of the benefits of the

contract. *See Miller v. Almquist*, 671 N.Y.S.2d 746, 749 (1st Dep't 1998).  Grace's public (and

inaccurate) assertion that the Settlement Agreement only covers "Products Claims" would

destroy the "fruits of contract" for Royal.  *511 West 232nd Owners Corp.*, 746 N.Y.S.2d at 135.

Namely, Royal would lose the security and finality for which it paid $100 million under the

Settlement Agreement.  Rather than "eschewing" actions that would deprive Royal of the

Settlement Agreement's benefits, Grace's new position takes direct aim at destroying those

benefits.  Grace's failure to ratify or affirm the agreement—taken together with its actions in

aiding claimants to obtain additional money from Royal—breaches the covenant of good faith and fair dealing.

Grace's conduct also leads to fraudulent inducement, *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 348 (N.Y. 1999) ("To state a claim for fraudulent inducement in an insurance context, plaintiffs must allege a 'misrepresentation or material omission' by defendants"), misrepresentation, *Cal. Pub. Emples. Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434 (N.Y. 2000) ("before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity") (internal citations omitted), or other claims.  Further, funds that Grace is holding from the Royal settlement need to be immediately sequestered and separated from the proposed trust, pending resolution of the issue—namely confirmation that Royal owes no more money for asbestos-related claims.  *In re Scottsdale Medical Pavilion*, 159 B.R. 295, 303 (B.A.P. 9th Cir. Ariz. 1993) ("The bankruptcy judge did not err in denying the debtor the use of those funds, and requiring their sequestration.").

Disclosure of these risks is essential because Royal's damages claim for breach of contract would be entitled to administrative priority, and could significantly reduce the assets of the estate available to general creditors.  *See Reading Co. v. Brown*, 391 U.S. 471, 485 (1968) (holding that tort claims based on post-petition actions of debtor-in-possession have first priority); *In re United Trucking Serv.*, 851 F.2d 159, 162 (6th Cir. 1988) ("the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under §503 to TRC."); 1 Collier on Bankruptcy §10.01 (15th ed. rev.) ("As a general proposition, a nondebtor party is not required

to obtain leave of the bankruptcy court before filing suit against an operating trustee or a debtor in possession, provided that the lawsuit is based on an act or conduct by the trustee or the debtor in possession in carrying out business in connection with the debtor's property.").[35]  Because Grace's breach occurred post-petition and sought to benefit the estate by securing additional coverage, Royal would be entitled to payment before all other general creditors.

The risk that Grace (or the Section 524(g) trust) may be exposed to the above liabilities and payments must be disclosed to creditors voting on the Plan because such expenses would reduce the funds available to pay creditors' claims.  And Royal would seek to recover from individual officers and directors, and to the extent they have indemnification agreements with Grace.  These risk disclosures are particularly important here because Grace has stated in pleadings filed before this Court that in the Royal Settlement "the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims made against the Royal Policies issued by Royal to Zonolite."[36]  And after Grace made those statements, this Court held that "[t]he settlement [between Grace and Royal] resolved Royal's obligation under the Pre-Sale [Zonolite] Policies and provided that Debtors would indemnify and hold Royal harmless against any asbestos-related claims made against those policies."[37]

---

[35] *See also In re Braude Jewelry Corp.*, 333 B.R. 156, 161 (Bankr. N.D. Ill. 2005) ("Section 365(g)(2) has been interpreted to mean that a creditor whose executory contract or lease has been assumed has an administrative priority if the debtor thereafter breaches the contract."); *In re Ducane Gas Grills, Inc.*, 320 B.R. 324, 338 (Bankr. D.S.C. 2004) ("Plaintiffs' claim for breach of contract arising from Ducane's rejection of the Newman Agreements is entitled to administrative priority status."); *In re Lunan Family Restaurants*, 194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) ("Where a contract is assumed by a debtor-in-possession, damages which arise from a post-petition breach of that contract are actual, necessary costs and expenses of preserving the estate.").

[36] Grace's Reply Brief in Support of Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶10; *see also* Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶3 (emphasis added) (Elias Decl., Exs. J and I).

[37] Oct. 7, 2004 Memorandum Opinion (Elias Decl., Ex. L).

C.    **The Disclosure Statement does not
mention that Grace will face liability
for violating federal securities laws.**

Grace's new position on the Royal Policies directly contradicts the representations it has

made to the SEC over a thirteen-year period.  As a result, Grace, and its officer and directors,

could now faces potential liability for violations of the federal securities laws, including the

Securities Exchange Act of 1934 and the Sarbanes-Oxley Act.  *See* 17 CFR 240.10b-5;[38] 15

U.S.C. §78j(b); 18 U.S.C. §1350.  The risk that Grace—as well as its current and former

officers—may be exposed to fines, penalties, and legal fees must be disclosed to creditors voting

on the plan because such expenses would reduce the funds available to pay creditors' claims.

As recently as August 8, 2008, Grace filed a Form 10Q that stated under the heading

"Insurance Rights" that with "one exception, coverage disputes regarding Grace's primary

insurance policies have been settled, and the settlement amounts have been paid in full."  That

representation is essentially the same as Grace's statement in its 2004 Disclosure Statement.

And based on Grace's 2004 Disclosure Statement, the "exception" is a reference to the CNA

policies.  Indeed, Grace has repeated that description of the Settlement Agreement—or has

indicated that "Grace has settled with and been paid by its primary insurance carriers with

respect to both property damage and  personal injury cases and claims"—in *every* SEC Form

10K that it has filed since entering into that agreement in 1995.[39]  Nothing has occurred that

would justify or explain Grace's recent change in position.

---

[38] 17 CFR 240.10b-5 provides that "[i]t shall be unlawful for any person, directly or indirectly . . . (a) To employ any
device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light of the circumstances under which they
were made, not misleading, or  (c) To engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.")
[39] *See* Grace, Annual Reports (Form 10- Ks) for February 29, 2008 at F-25; March 2, 2007 at F-23; March 13, 2006
at 24; March 7, 2005 at F-19-20; March 5, 2004 at 11; March 13, 2003 at 10-11; March 28, 2002 at 10; April 16,
2001 at 11; December 4, 2000 Amendment to Previous 10-K at F-10; March 28, 2000 at 10; March 29, 1999 at 10;
March 30, 1998 at 10; March 28, 1997 at 15; March 29, 1996 Amendment to Previous 10-K at 25.  (Elias Decl., Ex.
P).

There is no way to reconcile Grace's repeated public representations to investors with its current representation in Exhibit 5. Either the Settlement Agreement settled all asbestos-related litigation between Grace and Royal or it did not. Assuming *arguendo* that Grace's current position is accurate and the coverage dispute has not been settled, then Grace has been misrepresenting its available coverage to investors and creditors for more than a decade. Grace was either acting in bad faith in issuing misleading disclosures then or it is acting in bad faith in issuing a misleading disclosure statement now.

Grace—as well as its current and former officers—face the further the risk of substantial fines and penalties under Section 906 of the Sarbanes-Oxley Act, which imposes harsh penalties on any violator who:

> (1) certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $ 1,000,000 or imprisoned not more than 10 years, or both; or

> (2) willfully certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $ 5,000,000, or imprisoned not more than 20 years, or both.

18 U.S.C. §1350(c).

Since 2002, Grace's officers and directors have personally certified the accuracy of its financial disclosures, including its annual SEC Form 10K filings. But Grace's Disclosure Statement now suggests that that those statements are inaccurate. This is a risk that must be disclosed to the estate's creditors because, in addition to fines, indemnity obligations to the officers and directors, the cost of restating its financial statements for the last thirteen years, Grace may have to pay money damages to defrauded investors, which could ultimately reduce the creditors' recovery. Those are risks about which Grace's creditors would want to know.

## POINT II

**I**N ANY EVENT, **THERE IS NO MORE ASBESTOS-RELATED COVERAGE UNDER**
**SETTLED THE R**OYAL **P**OLICIES **AND THEREFORE NOTHING TO ASSIGN.**

Even assuming that the Settlement Agreement did not unconditionally release Royal from

coverage obligations for asbestos-related claims under the Policies—which is clearly not the

case—any right or interest that Grace had in Royal's coverage has long since expired because

(a) Grace did not comply with the Policies' notice requirements; (b) the applicable statute of

limitations has run; (c) the doctrines of judicial estoppel, equitable estoppel, waiver and

acquiescence bar any asbestos-related claims; (d) Grace has waived all asbestos-related claims;

and (e) the doctrine of laches bars all asbestos-related claims against Royal.

**A.      Grace failed to comply with the notice**
**         requirements in the Royal Policies.**

No coverage is available under the Policies for any asbestos-related claims because Grace

did not comply with the condition precedent to coverage requiring it to give immediate written

notice of claims (including the Libby Claims) to Royal.  *See*, *e.g.*, *Commercial Union Ins. Co. v.*

*International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir. 1987) ("Under New York

law, compliance with a notice-of-occurrence provision in an insurance policy is a condition

precedent to an insurer's liability under the policy.").  Failure to comply with a policy's notice

conditions constitutes a breach of the insurance contract, and is a complete defense to the

insured's claims for defense or indemnity.  *See*, *e.g.*, *Green Door Realty Corp. v. TIG Ins. Co.*,

329 F.3d 282, 287 (2d Cir. 2003) ("an insured's failure to provide timely notice of a claim to its

excess insurer is a complete defense to coverage"); *Great Canal Realty Corp. v. Seneca Ins. Co.,*

*Inc.*, 800 N.Y.S.2d 521, 522 (N.Y. 2005) ("The insured's failure to satisfy the notice requirement

constitutes 'a failure to comply with a condition precedent which, as a matter of law, vitiates the

contract'") (citing *Argo Corp. v. Greater New York Mut. Ins. Co.*, 794 N.Y.S.2d 704, 706 (N.Y. 2005)).

Under New York law, the insurer's right to prompt notice of a claim is considered so fundamental that the insurer is not required to show prejudice to be relieved from its obligations under the contract because of the insured's failure to comply with the notice requirement.  *See Great Canal Realty*, 800 N.Y.S.2d at 522 ("[T]he carrier need not show prejudice before disclaiming based on the insured's failure to [give timely notice]. . ."); *Argo Corp.*, 794 N.Y.S.2d at 706 (holding that "[n]o showing of prejudice is required").  Time periods as short as several months can constitute a breach of the notice requirement as a matter of law.  *See*, *e.g.*, *Crucible Materials Corp. v. Aetna Cas. & Sur. Co.*, 228 F. Supp. 2d 182, 195 (N.D.N.Y. 2001) ("New York courts routinely find delays of less than ten months to be unreasonable."); *Great Canal Realty*, 800 N.Y.S.2d at 522 (holding that four-month delay in giving notice was unreasonable as a matter of law); *Felix v. Pinewood Builders, Inc.*, 818 N.Y.S.2d 119, 120 (2d Dep't 2006) (holding that delay of more than seven months was unreasonable as a matter of law); *Winstead v. Uniondale Free Sch. Dist.*, 608 N.Y.S.2d 487, 489 (2d Dep't 1994) ("unexplained delay of approximately one month is unreasonable in and of itself").

Additionally, New York law requires the insured to timely notify its insurer of *each* individual claim or lawsuit, regardless of whether the various lawsuits arise from the same or a different accident or occurrence.  For example, in *AXA Marine* the court held that an insured's timely notice of an alleged occurrence (a robbery) and two lawsuits relating thereto did *not* excuse its failure to notify the insurer of a *third* lawsuit that was later filed.  *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.*, 891 F. Supp. 978, 983 (S.D.N.Y. 1995), *aff'd on*

*other grds.*, 84 F.3d 622 (2d Cir. 1996); *accord, Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718, 724 (2d Cir. 1992).

Grace not only failed to provide immediate notice of the Libby and other pre-bankruptcy claims—*it failed to provide any notice whatsoever*.[40]  In fact, eight years after the first Libby complaint was filed, Grace has still not tendered any of the Libby complaints to Royal.  Royal did not even learn of the Libby claimants' other suits until BNSF sought coverage under the Royal Policies in connection with the Libby Claims.  Grace's failure to satisfy the condition precedent for notice is a complete defense to any current or future claim against Royal.

**B.    The statute of limitations bars any
      breach of contract claims against Royal.**

Based on the Settlement Agreement, Royal expressly denied Grace coverage for any and all asbestos-related claims more than eight years ago.  Thus, any claim by Grace (or the trust) that Royal breached its insurance contracts by denying coverage for the Libby or other asbestos-related claims is barred by the six-year statute of limitations applicable to New York contract claims.  *See* N.Y. C.P.L.R. §213(2); *Chase Sci. Research v. NIA Group*, 96 N.Y.2d 20, 30 (N.Y. 2001) (finding that six year statute of limitations under CPLR §213 applies to breach of contract action against insurance broker).

Here, in December 1999, Grace's insurance broker purported to give notice to certain insurers of a "potential loss involving W.R. Grace and its vermiculite mine in Libby, Montana."[41]  In a January 12, 2000, letter Royal denied coverage for such asbestos-related claims on the grounds that the claims were released under the Settlement Agreement.[42]  Now, *more than eight and a half years later*, Grace suggests that there is coverage under Royal's

---

[40] Elias Decl. at ¶2.
[41] December 9, 1999 letter from Marsh USA, Inc. to Royal (Elias Decl., Ex. Q).
[42] January 12, 2000 letter from Royal to Jeffrey Posner (Elias Decl., Ex. R).

Policies. The statutory period for filing any breach of contract claim against Royal—if one

existed at all—has long since expired.[43]

**C.    The doctrines of estoppel and acquiescence
bar any asbestos-related claims against Royal.**

Any claims against Royal for its refusal to provide coverage for asbestos-related claims

are barred under the estoppel and acquiescence doctrines because Grace adopted and ratified

Royal's position that the Settlement Agreement released any and all asbestos-related claims.

Under New York law, "estoppel rests upon the word or deed of one party upon which another

rightfully relies and so relying changes his position to his injury." *Nassau Trust Co. v. Montrose

Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (N.Y. 1982). Estoppel does not require fraud or

intentional deception. Rather, "a party may not, even innocently, mislead an opponent and then

claim the benefit of his deception." *Romano v. Metropolitan Life Ins. Co.*, 2 N.E.2d 661, 663

(N.Y. 1936).[44] Similarly, the doctrine of acquiescence "may, upon the one hand, rest upon the

principle of ratification, and may be denominated implied ratification, or it may, upon the other

hand, rest upon the principle of estoppel, and may be denominated equitable estoppel." *Pollitz v.

Wabash R.R. Co.,* 100 N.E. 721, 725 (N.Y. 1912) (reversing dismissal of directors' ratification

defense to breach of fiduciary duty claim).

While neither estoppel nor acquiescence requires a plaintiff's express approval of the

defendant's position, Grace provided such approval on numerous occasions. *See Rothschild v.

Title Guar. & Trust Co.*, 97 N.E. 879, 880 (N.Y. 1912). Grace repeated time and again that the

Settlement Agreement barred coverage for all asbestos-related claims. Grace did so in its joint

---

[43] In New York, breach of contract claims must be filed within six years of the breach. N.Y. CPLR §213(2); *see also Chase Sci. Research v. NIA Group*, 96 N.Y.2d 20, 30 (N.Y. 2001) (finding that 6 year statute of limitations under CPLR §213 applies to breach of contract action against insurance broker).
[44] *See also Elgie & Co. v. S.S. "S.A. Nederburg,"* 599 F.2d 1177, 1180 n.6 (2d Cir. 1979) ("[E]quitable estoppel can come into being without intentional misrepresentation."); *Decarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 510 (S.D.N.Y. 2001) ("[I]t is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead.").

letter to BNSF, countless pleadings in this Court, statements in at least one other court, and multiple SEC filings.  In none of these many statements did Grace even hint that the Settlement Agreement may have not covered some asbestos-related claims or that it did not apply to "products" claims.  Until last month, Grace consistently supported Royal's position—and it did so unwaveringly for thirteen years.

Moreover, Grace is estopped from changing its position because it acquiesced to Royal's assertion that no coverage was available for asbestos-related claims.  As discussed above, Grace's insurance broker purported to give notice to certain insurers in December 1999 of a potential loss involving Grace's vermiculite mine in Libby, Montana.[45]  Royal expressly denied coverage for any asbestos-related claims on the grounds that the claims were released under the Settlement Agreement.[46]  In the eight years that followed, Grace never contested or otherwise disputed this denial of coverage, and Royal relied on Grace's acquiescence on this issue.

Royal relied on Grace's actions to its detriment in at least two ways.  *First*, Royal consented to dismiss with prejudice claims against Grace in the New York Coverage Action in reliance on Grace's representation that, in return, Grace would release all asbestos-related claims against Royal.  Had Royal known that any asbestos-related claims would survive—and that it would have to pay more money in addition to the $100 million it had already paid—it would never have consented to the Settlement Agreement or to dismiss its claims.  And *second*, in reliance on Grace's repeated assertions that all asbestos-related claims against Royal had indeed been released, Royal never took steps to further protect its interests in the thirteen years since entering into the Settlement Agreement.  These steps may have included seeking a declaration

---

[45] December 9, 1999 letter from Marsh USA, Inc. to Royal (Elias Decl., Ex. Q).
[46] January 12, 2000 letter from Royal to Jeffrey Posner (Elias Decl., Ex. R).

from a court about the Settlement Agreement's terms or playing a more active role in the

bankruptcy proceeding.

Under these circumstances, even if the Settlement Agreement arguably had a different

meaning when signed, Grace consistently adopted and acquiesced in Royal's interpretation and

is equitably estopped from impeaching it.

**D.      Grace has waived all asbestos-
         related claims against Royal.**

Through its actions, Grace has also waived all asbestos-related claims against Royal.

Waiver is the "intentional relinquishment of a known right[, and] may be accomplished by

express agreement or by such conduct or failure to act as to evince an intent not to claim the

purported advantage." *Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 469 (N.Y. 1978).

Grace (i) was aware of certain facts, and (ii) elected to not take advantage of them. *Werking v.

Amity Estates, Inc.*, 2 N.Y.2d 43, 52 (N.Y. 1956). Waiver does not require any showing of

reliance, and once a waiver "has been executed, [it] cannot be expunged or recalled." *Nassau

Trust Co.*, 56 N.Y.2d at 184.

Grace's actions since 1995 easily establish waiver. *First*, having been represented by

experienced counsel, Grace was obviously aware that when it entered into the Settlement

Agreement it released asbestos-related claims against Royal. *Second*, armed with that

knowledge, Grace never sought additional coverage. It did not submit a single claim or sought

any payment whatsoever from Royal for asbestos-related claims, even after it was the target of a

major class action suit. On the contrary, Grace elected to deny—again and again that coverage

was available, which evinced its intent to relinquish all asbestos-related coverage. And *third*,

Grace received notice of Royal's position in January 2000.[47]  Grace remained silent and did not respond or object to that letter.

**E.     The doctrine of laches bars all
         asbestos-related claims against Royal.**

Laches bars coverage in connection with the Libby Claims because while Grace has been aware of those claims for at least eight years, it has never submitted a notice of claim or even supplied Royal with the Libby complaints.  Under New York law, the two laches elements are present here: (i) unreasonable delay and (ii) resulting prejudice.  *See Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 816 (N.Y. 2003); *In re Linker*, 803 N.Y.S.2d 534, 537 (1st Dep't 2005) ("Prejudice may be demonstrated by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay.").

Although Grace has delayed submitting the Libby Claims for years, a multi-year delay is not required for laches to apply.  "[I]n some cases the diligence required [for laches to apply] is measured by months rather than by years[, and] in others a delay of two, three or four years has been held fatal." *M. & C. Creditors Corp. v. Pratt*, 17 N.Y.S.2d 240, 266 (N.Y. Sup. Ct. 1938) (finding claim brought 33 months after plaintiff knew of facts barred by laches); *see also Schulz v. State*, 615 N.E.2d 953, 957 (N.Y. 1993) (finding claim barred by laches where plaintiff brought suit within one year of the challenged conduct).  Where, as here, a plaintiff has no excuse for its delay, defendants need to show "little prejudice." *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir. 1989); *see also Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 643 (S.D.N.Y. 2000) ("The extent of prejudice demanded to be shown varies inversely with the reasonableness and excuse for delay.").  The facts here demonstrate ample prejudice because Grace's failure to timely submit the Libby Claims has severely prejudiced Royal.  Royal has

---

[47] January 12, 2000 letter from Royal to Jeffrey Posner (Elias Decl., Ex. R).

been deprived of the opportunity to investigate the claims for more than eight years, assert its

rights in this or any other Court, or account for the internal business risk that it may have to pay

additional money to Grace.  During this time, countless changes have undoubtedly occurred in

the condition of the allegedly contaminated sites and the claimants' physical conditions.  Key

evidence may no longer be available, memories may have faded, and key witnesses may have

disappeared or died.  Under these circumstances, Royal cannot adequately assess or defend the

Libby Claims.

## POINT III

### THIS COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS UNCONFIRMABLE AS A MATTER OF LAW.

Grace's Plan is unconfirmable on its face given how it treats the $100-million Royal

Settlement Agreement.  While objections to the details of a proposed plan of reorganization are

typically not considered at the disclosure statement stage, when the objectionable provisions go

to the very essence of the proposed plan, and where they render the plan unconfirmable as a

matter of law, such objections may appropriately be proffered as objections to the disclosure

statement.  *In re Felicity Assoc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996) ("It has become standard

Chapter 11 practice that when an objection raises substantive plan issues that are normally

addressed at confirmation, it is proper to consider and rule upon such issues prior to

confirmation, where the proposed plan is arguably unconfirmable on its face."); *In re O'Leary*,

183 B.R. 338, 338-39 (Bankr. D. Mass. 1995) ("Courts may refuse to approve disclosure

statements that describe plans that cannot confirmed."); *In re Mkt. Square Inn, Inc.*, 163 B.R. 64,

68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of

confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re E.

Maine Elec. Co-op.*, Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure statement

describes a plan that is so fatally flawed that confirmation is impossible, the court should

exercise its discretion to refuse to consider the adequacy of disclosures.").[48]  The Plan here is

unconfirmable because it (a) purports to upgrade Grace's bargained-for exchange in the

Settlement Agreement; (b) purports to assign rights in Royal's Policies that Grace does not have;

(c) seeks to fund the trust by breaching the Settlement Agreement; and (d) treats Royal's claims

differently than other similarly situated claims.

A.    **The Plan is unconfirmable because it purports to upgrade
       Grace's bargained-for exchange in Settlement Agreement.**

The Plan cannot be confirmed because it violates Sections 1129(a)(1) and (a)(3) by

purporting to strip Royal of its bargained-for right to Grace's cooperation in fighting any

challenge to the Settlement Agreement—and thus attempts to rewrite the Settlement Agreement

to reap the benefits but not abide by the obligations.  The Bankruptcy Code requires that a

reorganization plan be "proposed in good faith and not by any means forbidden by law."

11 U.S.C. §1129(a)(3).  "[M]eans forbidden by law" refers to state as well as federal law.  *See
In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984); *In re Bush Indus., Inc.*, 315 B.R. 292, 308

(Bankr. W.D.N.Y. 2004) (mandate under Section 1129(a)(3) includes laws of corporate

governance).  Courts will deny confirmation under Section 1129(a)(3) where, as here, the debtor

proposes a plan to effect improper objectives, including to avoid applicable law or to gain a

tactical advantage.  *See In re Bush Indus., Inc.*, 315 B.R. at 304-08; *In re Manor Place Dev.
Assocs., L.P.*, 144 B.R. 679, 686 (Bankr. D.N.J. 1992).[49]

The Supreme Court ruled nearly a century ago that it was "well settled" that a debtor's

rights under a contract are "subject to all valid claims, liens and equities."  *Zartman v. First Nat'l*

---

[48] The Plan also attempts to preclude Royal from asserting defenses to any challenge to the Settlement Agreement.
Using the Plan to achieve a tactical litigation advantage is improper and violates Section 1129(a)(3).

[49] The Court should also deny confirmation based on Section 1129(a)(1), which prohibits confirmation of a plan
that, by its terms or in its proposed implementation, conflicts with or contravenes applicable bankruptcy law.  *See In
re Manor Place Dev. Assocs., L.P.*, 144 B.R. 679 (Bankr. D.N.J. 1992).

*Bank of Waterloo, N.Y.*, 216 U.S. 134, 138 (1910).  "While bankruptcy courts have the power to

allow debtors to *escape* burdensome contracts by rejecting them, bankruptcy courts do not have

the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."

*In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) (vacating confirmed plan on grounds that it

allowed debtors to unilaterally modify contract); *see also Butner v. United States*, 440 U.S. 48,

55 (1979) (rule that property rights should not receive different treatment because an interested

party enters bankruptcy is necessary "to reduce uncertainty . . . and to prevent a party from

receiving a windfall merely by reason of the happenstance of bankruptcy") (internal quotation

omitted).  It is well-established that a debtor must assume a contract's burdens as well as its

benefits, *see NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984), citing *In re Italian

Cook Oil Corp.*, 190 F.2d 994, 996 (3d Cir. 1951), even in the case of assigned contracts,

*Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).[50]

Therefore, a debtor may not use the bankruptcy process to upgrade a contract that is the basis

for its claim against a non-debtor.  *See In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D.

Ill. 1986) ("However expansive the bankruptcy court's power may be to protect the property

interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a

contract or rewriting its terms."); *In re Heaven Sent, Ltd.*, 50 B.R. 636, 638 (Bankr. E.D. Pa. 1985)

("the Code does not augment the rights of a debtor under a contract"); *In re Bolin Oil Co.*, 51 B.R.

936, 938 (Bankr. N.D. Ohio 1985) (with respect to an insurance policy issued to the debtor, "[t]he

Bankruptcy Code does not enlarge the rights of the debtor under a contract").

---

[50] *See also In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (9th Cir. 1990) (bankruptcy court "must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain"); *City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party").

Courts have consistently applied these principles in asbestos bankruptcies.  Indeed, in a
bankruptcy case similar to this one, a district court in the Third Circuit held that the filing of
bankruptcy did not alter the rights of parties to insurance contracts.  *See In re Amatex Corp.*, 107
B.R. 856, 865-66 (E.D. Pa. 1989) ("It is therefore clear, under Pennsylvania law, that the rights and
obligations of the Debtor and [insurer] under the [insurance] policy are not altered because of the
Debtor's Chapter 11 filing.").  The *Amatex* court acknowledged that it had no power to alter the
terms of the policy.  "[T]his court does not have the power to require that [the insurer] cash out the
coverage under its policy contrary to the terms of that policy.  [The insurer] must only indemnify the
Debtor in accordance with the terms of its policy."  *Id.* at 871; *see also ACandS, Inc. v.  Aetna Cas.
& Sur. Co.*, 764 F.2d 968, 975 (3d Cir. 1985) ("It is undisputed that . . . the policy language
explicitly gave the insurer the right to defend ACandS in any suit in which the insurer had the duty
to defend.  The district court was without power to abrogate this contract right."); *In re Jones*, 179
B.R. 450, 455 (Bankr. E.D. Pa. 1995) (holding that the debtor did not have any right to immediate
possession of the insurance proceeds); *see also Columbia Cas. Co. v. Fed. Press Co. (In re Fed.
Press Co.)*, 104 B.R. 56, 64 (Bankr. N.D. Ind. 1989) (debtor "not automatically relieved of its
obligations under the . . . policies simply because it has filed its Chapter 11 petition").

Here, Grace seeks to avoid its contractual obligation to assist and cooperate with Royal
and to ensure that the Royal Settlement Agreement is fully implemented and that no further
asbestos-related or products claims are tendered to Royal.  Grace wants freedom to assign rights
but does not want to fulfill its contractual obligations that are conditions to Royal's paying $100
million.  Grace effectively wants to upgrade its contract (which is a complex bundle of mutual-
flowing rights and obligations) into a one-way stream of income.  Grace is brazen enough to try
this because it expects this Bankruptcy Court to protect it from its contractual obligations.  Had

an insurance company attempted something like this, Grace would have rightfully complained of bad faith.

**B.      The Plan is unconfirmable because it purports
        to assign rights that Grace does not have.**

The proposed Plan cannot be confirmed because the purported assignment of Grace's insurance rights to the trust violates the Royal Settlement Agreement and is invalid under state law and, thus, Section 1129(a)(3).

The Third Circuit has recognized that "the estate's legal and equitable interests in property rise no higher than those of the debtor," *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993), and thus are "subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law," *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997); *see also In re Jones*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("Under the reasoning of *McAteer*, the owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition."). Uniform treatment of the property rights of the debtor and its successors is necessary "to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55 (1979).[51]

---

[51] Grace's attempt to use its reorganization to obtain a tactical advantage over Royal is also a bad faith use of the Bankruptcy Code, and thus contrary to Section 1129(a)(3). The Third Circuit has held that the good faith "focuses on two inquiries," one of which is "whether the petition is filed merely to obtain a tactical litigation advantage." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120 (3d Cir. 2004) (citing *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999)). The court then noted that "because filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws, courts have typically dismissed Chapter 11 petitions under these circumstances." *Integrated Telecom*, 384 F.3d at 119-20 (holding that bankruptcy petition was not filed in good faith and dismissing petition); *accord SGL Carbon*, 384 F.3d at 165 (same). Though the good faith standards applying to bankruptcy petitions and bankruptcy plans are distinct, the reasoning of *Integrated Telecom* and *SGL Carbon* applies to Section 1129(a)(3) as well as Section 1112(b). The Third Circuit reasoned (i) the good faith requirement of Section 1112(b) bars debtors from using bankruptcy to achieve objectives outside the legitimate scope of the Code; (ii) obtaining a tactical litigation advantage is such an impermissible objective; and (iii) therefore, a bankruptcy petition filed to obtain a litigation advantage does not satisfy the good faith requirement. *See SGL Carbon*, 200 F.3d at 165-66; *Integrated Telecom*, 200 F.3d at 120. Point one is also true with respect to Section 1129(a)(3). *See* 7 COLLIER ON BANKRUPTCY §1129.03[3][a][iii] (15th ed. rev.) (noting that purpose of Section 1129(a)(3) is to ensure that the proposed "plan will achieve a result consistent with the objectives

Grace's attempt to assign Royal's Policies fails because pursuant to the Settlement Agreement, Grace no longer has *any* rights to asbestos-related coverage under the Royal Policies. Grace may not transfer to the trust assets to which it has no right, such as asbestos-related coverage under the Royal Policies. *See In re Kelley*, 58 B.R. 927, 930 (Bankr. D. Del. 1986)) ("Misrepresentation of their assets and of the amount of income available after expenses for distribution to creditors makes any attempt to determine whether the proposed plan meets the requirements of § 1325(a)(4) and (b)(1) meaningless."); *IBA, Inc. v. Hoyt (In re Hoyt)*, 326 B.R. 13, 15 (Bankr. W.D.N.Y. 2005) ("the Debtors' various Plans were not proposed in good faith, because among other things, the Debtors' Schedules and Statements, as originally filed and amended, were materially inaccurate relative to their assets and income").

**C.      The Plan is unconfirmable because it seeks to fund
         the trust by breaching the Settlement Agreement.**

Section 1129(a)(3) prohibits confirming any plan that was proposed by any means forbidden by law. 7 COLLIER ON BANKRUPTCY §1129.03 (15th ed. rev.). The section 1129(a)(3) prohibition is expansive, and includes all applicable law, not merely bankruptcy law. *Id.*; *In re Dapontes*, 364 B.R. 866, 867 (Bankr. D. Conn. 2007) ("The 1129(a)(3) prohibition is expansive, *i.e.*, it includes both federal and any other applicable law."). Courts in the Third Circuit have held that confirmation can be denied pursuant to Section 1129(a)(3) when a contract has been violated. *See In re Ingleside Associates*, 136 B.R. 955, 962 (Bankr. E.D. Pa. 1992) ("[P]roposed amendments and modifications to [] partnership agreement[s], as those to any other contract, may be so substantial as to justify denial of confirmation under [Section 1129(a)(3)].").

Royal and Grace entered into a pre-petition Settlement Agreement, pursuant to which, in exchange for $100 million, Grace gave Royal full releases as to all asbestos-related claims.

---

and purposes of the Bankruptcy Code"). And point two is also relevant to Section 1129(a)(3) because it speaks to the purpose of the Bankruptcy Code as a whole. *See SGL Carbon*, 200 F.3d at 165-66; *Integrated Telecom*, 200 F.3d at 120.

Shortly after the parties executed the Settlement Agreement, the court presiding over the New York Coverage Action entered a Stipulated Order dismissing Grace's and Royal's claims against each other with prejudice.[52]  The court confirmed its intention to accept the Settlement Agreement between Royal and Grace in its 1998 Final Judgment when it stated "IT IS HEREBY FURTHER ORDERED AND ADJUDGED that the claims of Grace and Royal against each other are dismissed pursuant to the Court's order of January 18, 1995."[53]

The Disclosure Statement and Plan contemplate that Royal's Policies will be among the assets transferred to the trust to pay asbestos-related personal injury claims.[54]  That transfer would violate the Settlement Agreement.  That is contrary to Section 1129(a)(3) not only because Grace proposes to fund the trust in breach of a contract but also because that contract is a settlement agreement, to which courts in this circuit attach special importance.  *See Mack Trucks*, 372 F.2d at 22-23; *Ingleside Assocs*, 136 B.R. at 962.  Moreover, by seeking more money from Royal, Grace violates not only a binding settlement agreement, but also the court orders approving that agreement.  The Third Circuit has made clear that those are grounds to deny confirmation under Section 1129(a)(3).

**D.     The Plan is unconfirmable because
Grace treats Royal's claims differently
than other similarly situated claims.**

Section 1129(a)(1) requires that a proposed plan comply with the "applicable provisions of this title." 11 U.S.C. § 1129(a)(1).  In evaluating that provision's requirement, courts review whether a plan complies with the Bankruptcy Code.  *See In re PWS Holding Corp.*, 228 F.3d 224, 243 (3d Cir. 2000); *Kane v. Johns-Manville Corp.*, 843 F. 2d 636, 648 (2d Cir. 1988)

---

[52] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ.7451, Stipulated Order of Dismissal (S.D.N.Y. Jan. 18, 1995) (Elias Decl., Ex. E).

[53] *Maryland Casualty Co. v. W.R. Grace & Co.*, 83 Civ. 7451 (JSM), Final Judgment (S.D.N.Y. Mar. 4, 1998) (Elias Decl., Ex. S).

[54] Plan at §7.2.2(d)(ii) (Elias Decl., Ex. [T]; 2008 Disclosure Statement §1.2.8 (Elias Decl., Ex. U).

("applicable provisions" means Bankruptcy Code provisions that concern form and content of reorganization plans). Under Section 1129(a)(1), courts have reviewed and considered, among other provisions, a plan's compliance with Section 1122 (classification of claims and interests). *See, e.g., In re Fantastic Homes Enters., Inc.*, 44 B.R. 999, 1001 (M.D. Fla. 1984) (reversing order confirming plan which violated Section 1129(a)(1) because of non-compliance with Section 1122(b)).

Section 1122(a) permits claims to be placed in the same class only if they are "substantially similar." 11 U.S.C. §1122(a). In determining the propriety of a plan's classification, the Bankruptcy Code requires that "classification of the claims or interests must be reasonable." *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[t]he authorities recognize that the classification of claims or interests must be reasonable."). But Grace's classification of Royal's claims cannot qualify as "reasonable" because *Grace fails to classify them at all.*[55]

Royal has both insurance-related claims and contract-related claims against Grace. The contractual claims must be treated like other contract claims. *See In re Hoffinger Indus.*, 321 B.R. 498, 505 (Bankr. E.D. Ark. 2005) ("A plan discriminates unfairly only if similar claims are treated differently without a reasonable basis for the disparate treatment.") (internal quotation marks omitted). And Royal must receive treatment at least equal to that of unsecured creditors. *In re Safety-Kleen Corp.*, 380 B.R. 716, 733 (Bankr. D. Del. 2008) ("if it's a contract claim, you'll be treated like any other unsecured creditor). But under the current Plan, it remains a mystery how Grace will treat Royal's claims. Until this omission is corrected, the Plan will remain unconfirmable.

---

[55] *See* 2008 Disclosure Statement §4.3.1 (failing to classify Royal's claims) (Elias Decl., Ex. U).

## POINT IV

### GRACE IS JUDICIALLY ESTOPPED FROM CHANGING ITS POSITION ABOUT THE ROYAL POLICIES.

Grace's repeated assertions in pleadings and other formal submissions before this Court estop it from now changing its position to Royal's detriment. *See Donaldson v. Bernstein*, 104 F.3d 547, 556 (3d Cir. 1997). The judicial estoppel doctrine is premised on preserving the integrity of the judicial process. *In re Atravasada Land & Cattle Inc.*, 388 B.R. 255, 273 (Bankr. S.D. Tex. 2008). Its classic application is the preclusion of inconsistent positions by a party to gain an advantage from the court. *See*, *e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase") (internal quotation marks omitted). The application of judicial estoppel is typically informed by whether there are "clearly inconsistent" positions, whether the first position was accepted by a court so that acceptance of a second position would create the impression that one of the courts was misled, and whether an unfair advantage or detriment would result in the absence of an estoppel. *Id.* at 750-51; *see also In re Ark-La-Tex Timber Co, Inc.*, 482 F.3d 319, 332 (5th Cir. 2007) (same); *New Hampshire*, 532 U.S. at 750-51. All three of these factors are satisfied here.

Judicial estoppel is especially relevant in bankruptcies, where the court often relies on parties' representations in the furtherance of a case's "speedy and efficient" administration. *In re Atravasada Land & Cattle Inc.*, 388 B.R. at 273; *see also In re Captain Blythers, Inc.*, 311 B.R. 530, 538 (B.A.P. 9th Cir. 2004) ("We conclude that debtor is judicially estopped from taking a position which is inconsistent with prior statements made to secure plan confirmation"). Accordingly, the accuracy of parties' stated or pled positions is particularly important. *Id.*; *see also In re Galerie Des Monnaies of Geneva, Ltd.*, 1986 WL 6230, at *2 (S.D.N.Y. May 27, 1986) ("Judicial estoppel is invoked . . . to prevent the party from playing fast and loose with the

courts, and to protect the essential integrity of the judicial process") (citations and quotations omitted).

Grace has recently taken the position that it may have Royal Policy rights to assign, whereas in this bankruptcy proceeding for the past seven years it has steadfastly claimed that no asbestos-related coverage was available under those policies.  For example, in a 2003 brief supporting its motion to expand the preliminary injunction to include Montana Vermiculite Corporation, Grace stated that "in full and final settlement of Royal's obligations under the Pre-Sale Policies[, i]*n the Royal Settlement, the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims* made against the Pre-Sale Policies."[56]  Grace further represented to this Court that under the Settlement Agreement the "*Royal Policies were cancelled.*  Royal settled its obligations under the Royal Policies with Grace.  Grace indemnified Royal for future claims that may arise under such policies."[57]

Grace added that in "in the Royal Settlement, *the Debtors agreed to indemnify and hold harmless Royal against any asbestos-related claims* made against the Royal Policies issued by Royal to Zonolite.[58]  Grace later stated that "[a]ny attempt by Plaintiffs to pursue Royal and collect from Royal under the Royal Policies will immediately and directly affect Grace."[59]  And "[t]o the extent that a judgment for damages is entered against Montana Vermiculite, which could trigger coverage under the Pre-Sale Policies, Grace may have indemnity obligations to Royal."[60]

---

[56] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶3 (emphasis added) (Elias Decl., Ex. I).
[57] Grace's Reply Brief in Support of Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶8 (emphasis added) (Elias Decl., Ex. J).
[58] *Id.* at 10.
[59] *Id.* at 8.
[60] Grace's Motion to Expand Preliminary Injunction to Include Montana Vermiculite Corporation at ¶15 (Elias Decl., Ex. I).

At the end of 2004, in its first Disclosure Statement, Grace made the following

unambiguous representation:

> [w]ith one exception, *coverage disputes regarding the Grace and Zonolite*
> *primary policies that have been settled*, and the settlement amounts paid in full.
> The only unsettled primary coverage is that of CNA . . . .  Grace asserts that
> this [CNA] coverage is available to pay asbestos-related Claims that are not based
> on product liability, such as Claims made by certain Libby residents.[61]

In its Amended January 2005 Disclosure Statement, Grace's description of the Royal Policies in

§2.7.2.2 mirrored the text in the 2004 Disclosure Statement.  In addition, Exhibit 10 to the

Amended 2005 Disclosure Statement, entitled "Primary & Excess Insurance Policies That Were

or Are Applicable to Asbestos-Related Claims," categorized the Royal Policies as "Resolved."[62]

Even standing alone, Grace's repeated assertions in its disclosure statements would be

sufficient in these circumstances to estop it from now changing its position to Royal's detriment.

*See Donaldson*, 104 F.3d at 556 ("With respect to the situation here, even if we assume that a

bankruptcy disclosure statement is not enforceable as a contract, it is at least a representation

which in appropriate circumstances can serve as the basis for judicial estoppel."); *In re Captain*

*Blythers, Inc.*, 311 B.R. at 538 ("We conclude that debtor is judicially estopped from taking a

position which is inconsistent with prior statements made to secure plan confirmation, such as its

Plan and Amended Disclosure Statement.").

Grace actually persuaded the Court to endorse its position about the Settlement

Agreement, as on October 7, 2004, the Court granted Grace's motion to expand the bankruptcy

injunction to include Montana Vermiculite and stated that:

---

[61] 2004 Disclosure Statement at §2.7.2.2.(emphasis added) (Elias Decl., Ex. M).
[62] Exhibit 10 to 2005 Amended Disclosure Statement, at 16 (exhibit entitled "Primary & Excess Insurance Policies
That Were or Are Applicable to Asbestos-Related Claims" categorized the Royal Policies as "Resolved") (Elias
Decl., Ex. O).

> The settlement [between Grace and Royal] resolved Royal's obligation under the
> Pre-Sale [Zonolite] Policies and provided that Debtors would indemnify and hold
> Royal harmless against *any asbestos-related claims* made against those policies.[63]

The Court ultimately agreed with Grace and expanded the bankruptcy injunction to include

Montana Vermiculite.  If approved, Grace's Disclosure Statement would give Grace the

advantage of decreasing the amount of its contribution to the trust and transferring that burden

to Royal.  All three judicial estoppel elements are easily satisfied here.

## POINT V

### PUBLIC POLICY BARS GRACE FROM RENEGING
### ON A DULY EXECUTED SETTLEMENT AGREEMENT.

The Third Circuit has observed that the law has a "deep-seated preference for settlement

rather than litigation."  *Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co.*,

372 F.2d 18, 22-23 (3d Cir. 1966); *accord In re Pitts*, 354 B.R. 58, 65 (Bankr. E.D. Pa. 2006)

(*citing Wilcher v. City of Wilmington*, 139 F.3d 366 (3d Cir. 1998)) (public policy strongly

favors the settlement of disputes and the enforcement of settlement agreements); *Fidelity and*

*Guar. Ins. Co. v. Star Equipment Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) ("Settlement agreements

enjoy great favor with the courts as a preferred alternative to costly, time-consuming litigation.").

Protecting the finality of settlement agreements is an integral part of the public policy of

promoting settlement.  *See Del Costello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 171 (1983)

(observing the "national interests in stable bargaining relationships and finality of private

settlements"); *see In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 363 (3d

Cir. 2001) ("permitting litigation of [Excluded Policies] claims through the use of evidence of

those sales practices and patterns that were the subject of the class action would impair the

finality of the class settlement to an unacceptable degree. In effect, this would permit the re-

litigation of the released claims.").  The sanctity of settlements is particularly important in the

---

[63] Oct. 7, 2004 Memorandum Opinion (Elias Decl., Ex. L).

bankruptcy context. *See In re Huff*, 118 B.R. 146, 148 (Bankr. S.D. Fla. 1990) ("Because

settlements are favored in federal law and the prompt resolution of claims and disputes makes

the compromise of claims of particular importance in a bankruptcy reorganization, settlement of

bankruptcy claims should be liberally construed and a stricter standard is applied to a Rule 60

motion in this context.") (citations and quotations omitted).

Grace's efforts in this Court, if permitted to stand, would discourage parties from

entering into settlement agreements, especially with financially troubled companies that might

then seek bankruptcy protection and try to unwind those settlements.  That applies with equal

force to asbestos bankruptcies, where insurers would have no incentive to settle with financially

troubled policyholders.  Insurers would rightly fear that notwithstanding settlement agreements,

claimants could pursue coverage later—with the full blessing of the insured, just as the Libby

Claimants are seeking to do here.  *See In re Crowder*, 374 B.R. 861, 874 (Bankr. D.N.M. 2007)

("As a matter of public policy, courts presume that when parties have settled a dispute they

intended a complete accord and satisfaction of their respective claims against each other arising

out of the facts underlying the explicitly settled dispute.) (citations and quotations omitted); *cf.*

*Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 223 (3d Cir. 2000) ("a party should not

be left guessing about the finality and hence efficacy of the settlement.").  Absent the knowledge

that a settlement buys lasting peace, insurers would rightly conclude that they would be better

served to avoid settlements and then contest coverage.  This would place a tremendous strain on

judicial resources and ultimately increase the costs for all involved.

Here, Royal spent $100 million dollars to ensure that it would not be forced to litigate

coverage for thousands of asbestos-related claims at a potentially enormous cost.  But now it

faces that very prospect.  Public policy requires that Grace be prevented from impairing the finality of the Settlement Agreement.

<div align="center">

**POINT VI**

**ROYAL REQUESTS A BRIEF ADJOURNMENT.**

</div>

Grace filed its Disclosure Statement on September 19, 2008.  On October 23, 2008, less than two days before the Disclosure Statement hearing, notwithstanding the Settlement Agreement and all that Grace has said and done since 1995, Grace filed Exhibit 5 to the Plan that states that only the "products" coverage of the Royal Policies has been settled.  At the October 27, 2008 Disclosure Statement hearing, the Court explicitly warned that, at confirmation, Grace will be unable to "duck" the concerning the Royal Policies and, stated that "[w]e are going to take this up at plan confirmation if it is not resolved.  So, a word to the wise, get it fixed, one way or another, get it fixed because *this one will not be ducked for confirmation, it will not be ducked.*  So, get it fixed, one way or another."  On November 6, 2008, Grace suggested a proposed amendment to Exhibit 5, which did not reaffirm that Royal has no more asbestos-related obligations under the Policies.

Immediately after the October 27, 2008 Disclosure Statement hearing, Royal's counsel wrote and called Grace's counsel about the changed position with regard to the Settlement Agreement and requested a meeting.  As yet, Grace's counsel has declined the invitation for an in-person meeting.  Royal believes that after Grace familiarizes itself with the Settlement Agreement and related facts, Grace may reconsider its new position and reaffirm that Royal has no more asbestos-related obligations under the Policies.  Grace has not shared any documents yet with Royal, which could help resolve this matter.

Additionally, Royal has not had the benefit of the 25-day notice period under Federal Rule of Bankruptcy Procedure 3017.  In light of the foregoing, to facilitate a resolution of the

dispute concerning the Royal Policies, Royal requests a brief adjournment of the Disclosure

Statement hearing with regard to the matters raised by Royal.

## CONCLUSION

Based on the forgoing, Royal requests that the Court deny approval to the proposed

Disclosure Statement.


Dated: November 10, 2008
      New York, New York

                                      BIFFERATO GENTILOTTI LLC
                                      /s/ Garvan F. McDaniel
                                      Ian Connor Bifferato (#3273)
                                      Garvan F. McDaniel (#4167)
                                      800 King Street, First Floor
                                      P.O. Box 2165
                                      Wilmington, DE 19899-2165
                                      (302) 429-1900

                                      O'MELVENY & MYERS LLP
                                      By: /s/ Paul R. Koepff
                                      Paul R. Koepff (*pro hac vice*)
                                      Tancred V. Schiavoni (*pro hac vice*)
                                      Gary Svirsky (*pro hac vice*)
                                      Times Square Tower
                                      7 Times Square
                                      New York, New York 10036
                                      Telephone:    (212) 326-2000
                                      Facsimile:    (212) 326-2061

                                      WILSON ELSER MOSKOWITZ
                                      EDELMAN & DICKER LLP
                                      Carl J. Pernicone  (*pro hac vice*)
                                      150 East 42nd Street
                                      New York, NY 10017-5639
                                      Telephone:    (212) 490-3000
                                      Facsimile:    (212) 490-3038


                                    *Attorneys for Arrowood Indemnity Company*
                                    *f/k/a Royal Indemnity Company*