10-K 1 a08-2884_110k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2007**              **Commission file number 1-13953**

# W. R. GRACE & CO.

Incorporated under the Laws of the                    I.R.S. Employer Identification No.
**State of Delaware**                                              **65-0773649**

**7500 Grace Drive, Columbia, Maryland 21044-4098**
**410/531-4000**
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐          No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                              Accelerated filer ☐
Non-accelerated filer ☐                              Smaller Reporting Company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☒

fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

***Insurance Rights***—Grace holds insurance policies that provide coverage for 1962 to 1984 with respect to asbestos-related lawsuits and claims.  For the most part, coverage for years 1962 through 1972 has been exhausted, leaving coverage for years 1973 through 1985 available for pending and future asbestos claims.  Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

For each insurance year, Grace's coverage consists of both primary and excess coverage.  Primary coverage for an insurance year generally reimburses Grace for the portion of paid claims allocated to that year starting at the first dollar paid (after any deductible) through the coverage limit.  With one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts have been paid in full. Excess insurance generally reimburses Grace for claims paid above a specified policy threshold through the coverage limit.  For each insurance year, Grace's insurance program includes multiple layers of excess coverage.  A layer of excess coverage, which may include multiple insurers, is triggered once claim payments that can be assigned to that insurance year are paid up to the threshold of that layer.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount available under these settlement agreements is approximately $487 million.  With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $430 million of excess coverage.  Such policies are at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Debtors Plan were approved at the recorded asbestos-related liability of $1,700 million. In estimating its ultimate insurance recovery, Grace has assumed that its unsettled excess coverage will be available on terms that are substantially similar to the existing settlement agreements described above.  Grace believes that any allowed ZAI claims also would be covered under the policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

In addition, Grace has approximately $253 million of excess coverage with insolvent or non-paying insurance carriers.  Non-paying carriers are those that, although technically solvent, are not currently meeting their obligations to pay claims.  Grace has filed and continues to file claims in the insolvency proceedings of these carriers.  Grace periodically receives distributions from some of these insolvent carriers and expects to receive distributions in the future.  Settlement amounts are recorded as income when received.

In November 2006, Grace entered into a settlement agreement with an underwriter of a portion of its excess insurance coverage. The insurer paid a settlement amount of $90 million directly to an escrow account for the benefit of the holders of claims for which Grace was provided coverage under the affected policies.  The escrow account balance at December 31, 2007 and 2006 approximated $94.8 million and $90.3 million, respectively, including interest earned on the account. Funds will be distributed from this account directly to claimants at the direction of the escrow agent pursuant to the terms of a confirmed plan of reorganization or as otherwise ordered by the Bankruptcy Court.  The settlement agreement provides that unless Grace confirms a plan of reorganization by December 31, 2008, at the option of the insurer, exercisable at any time prior to April 30, 2009, the escrow amount with interest must be returned to the insurer.  Grace will record the amount in the escrow account as an asset and reduce its asbestos insurance receivable balance if and when all contingencies for the release of such amount are satisfied.

As of December 31, 2007, including the settlement discussed above and after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $917 million of excess coverage from 54 presently solvent insurers.  Grace estimates that eligible claims would have to exceed $4 billion to access total coverage.  Grace further estimates that, assuming the resolution value of asbestos-related claims is equal to the recorded liability of $1,700 million (which should fund claim payments in

F-25

excess of $2 billion), it should be entitled to approximately $500 million of insurance recovery, including the escrow described above. This amount was determined by estimating the aggregate and per year payout for claims over time and applying the expected insurance recovery factor to such claims. However, the ultimate amount of insurance recovered on such claims will depend on a number of factors that will only be determined at the time claims are paid including: the nature of the claim (PI, PD or ZAI), the relevant exposure years, the timing of payment, the solvency of insurers and the legal status of policy rights. Accordingly, Grace's recorded estimate of insurance recovery may differ materially from actual amounts received.

### 4. Income Taxes

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2007, 2006, and 2005 are as follows:

**Income Taxes—Consolidated Operations**

| (In millions) | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Income (loss) before income taxes:** | | | |
| Domestic | **$ 355.2** | $ (96.6) | $ 10.5 |
| Foreign | **185.9** | 150.1 | 142.3 |
| Intercompany eliminations | **(466.6)** | (27.1) | (64.2) |
| | **$ 74.5** | $ 26.4 | $ 88.6 |
| **Benefit from (provision for) income taxes:** | | | |
| Federal—current | **$ 29.0** | $ (8.5) | $ 5.1 |
| Federal—deferred | **34.5** | 41.8 | 13.8 |
| State and local—current | **(1.3)** | (1.4) | (1.0) |
| Foreign—current | **(66.2)** | (43.0) | (47.5) |
| Foreign—deferred | **9.8** | 3.0 | 8.3 |
| | **$ 5.8** | $ (8.1) | $ (21.3) |

The above table reflects the elimination in 2007 of approximately $440 million of domestic income resulting from repatriated earnings.

At December 31, 2007 and 2006, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

**Deferred Tax Analysis**

| (In millions) | 2007 | 2006 |
|---|---|---|
| **Deferred tax assets:** | | |
| Liability for asbestos-related litigation | **$ 595.0** | $ 595.0 |
| Net operating loss/credit carryforwards | **71.1** | 133.8 |
| Deferred state taxes | **121.0** | 146.9 |
| Liability for environmental remediation | **129.0** | 126.4 |
| Other postretirement benefits | **27.8** | 29.7 |
| Reserves and allowances | **40.8** | 38.6 |
| Research and development | **35.2** | 33.3 |
| Pension liabilities | **99.3** | 152.5 |
| Foreign loss/credit carryforwards | **36.6** | 24.8 |
| Accrued interest on pre-petition debt | **70.7** | 56.8 |
| Other | **9.2** | 5.4 |
| Total deferred tax assets | **$1,235.7** | $1,343.2 |
| **Deferred tax liabilities:** | | |
| Asbestos-related insurance receivable | **$ (180.5)** | $ (180.5) |
| Deferred foreign and other income | **(10.0)** | (111.6) |
| Pension assets | **(11.4)** | (41.0) |
| Properties and equipment | **(47.2)** | (60.5) |
| Other | **(80.0)** | (63.7) |
| Total deferred tax liabilities | **$ (329.1)** | $ (457.3) |

**Valuation allowance:**

10-K 1 a07-6889_110k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2006**

**Commission file number 1-13953**

# W. R. GRACE & CO.

| Incorporated under the Laws of the | I.R.S. Employer Identification No. |
|---|---|
| **State of Delaware** | **65-0773649** |

**7500 Grace Drive, Columbia, Maryland 21044-4098**
**410/531-4000**
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐        No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐        No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒        No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Grace is cataloguing, analyzing and reconciling the information furnished with the proofs of claim and questionnaires. Grace expects that the estimation process for personal injury claims will include the compilation of data from the questionnaires, review and analysis of such data by experts, the preparation of expert reports, including estimates of the number of personal injury claims expected to be filed in the future, and depositions of witnesses and other pretrial discovery proceedings. Grace expects the process to conclude with the estimation hearing that is currently scheduled to begin in September 2007. Grace expects to adjust its recorded asbestos-related liability as necessary to reflect rulings made by the Bankruptcy Court following the estimation trial after consideration of all evidence presented by Grace, the official committees and the representative of future asbestos claimants; such adjustments may be material.

For property damage claims, the case management order provides that estimation will be preceded by litigation on certain common threshold issues affecting a substantial majority of claims. Such litigation will consist of determining, among other things, (1) whether asbestos-containing products formerly manufactured by Grace are hazardous in place, and (2) compliance with the applicable statute of limitations. Grace will also ask the Bankruptcy Court to rule on Grace's specific objections to individual claims and groups of claims.

The Funding Amount will primarily be a function of the number of property damage and personal injury claims entitled to be paid under the Plan, and the amount payable per claim. Through the estimation process, Grace will seek to demonstrate that most claims have no value because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

Conversely, the asbestos claimants committees and the representative of future asbestos claimants continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of the payment from Cryovac directly to the asbestos trust under the settlement agreement described in Note 2), during the fourth quarter of 2004, Grace accrued a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2006 and 2005 to $1,700 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

***Insurance Rights***—Grace previously purchased insurance policies that provided coverage for years 1962 to 1985 with respect to asbestos-related lawsuits and claims. For the most part, coverage for years 1962 through 1972 has been exhausted, leaving coverage for years 1973 through 1985 available for pending and future asbestos claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

With one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts paid in full. Grace's excess coverage is for loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount for settled insurers available under these settlement

F-23

agreements is approximately $487 million.  With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $430 million of excess coverage, which is at layers of coverage that have not yet been triggered, but certain layers may be triggered if the Plan were approved at the recorded asbestos-related liability of $1,700 million. Grace believes that any allowed ZAI claims also would be covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

In addition, Grace has approximately $253 million of excess coverage with insolvent or non-paying insurance carriers. Non-paying carriers are those that, although technically solvent, are not currently meeting their obligations to pay claims. Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

In November 2006, Grace entered into a settlement agreement with an underwriter of a portion of its excess insurance coverage. The insurer paid a settlement amount of $90 million directly to an escrow account for the benefit of the holders of claims for which Grace was provided coverage under the affected policies.  Funds will be distributed from this account directly to claimants at the direction of the escrow agent pursuant to the terms of a confirmed plan of reorganization or as otherwise ordered by the Bankruptcy Court.  Grace will record the amount in the escrow account as an asset and reduce its asbestos insurance receivable balance when all contingencies for the release of such amount are satisfied.

As of December 31, 2006, including the settlement discussed above and after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $917 million of excess coverage from 55 presently solvent insurers. Grace estimates that, assuming the resolution value of asbestos-related claims equal to the recorded liability of $1,700 million (which should fund claim payments in excess of $2 billion), it should be entitled to approximately $500 million of insurance recovery.  This amount was determined by estimating the aggregate and per year payout for claims over time and applying the expected insurance recovery factor to such claims. However, the ultimate amount of insurance recovered on such claims will depend on a number of factors that can only be determined at the time claims are paid including: the nature of the claim (PI, PD or ZAI), the relevant exposure years, the timing of payment, the solvency of insurers and the legal status of policy rights. Accordingly, Grace's recorded estimate of insurance recovery may differ from actual amounts received.

### 4. Income Taxes

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2006, 2005, and 2004 are as follows:

**Income Taxes—Consolidated Operations**
*(In millions)*

| | 2006 | 2005 | 2004 |
|---|---:|---:|---:|
| Income (loss) before income taxes: | | | |
| Domestic | $ (96.6) | $ 10.5 | $(549.3) |
| Foreign | 150.1 | 142.3 | 148.1 |
| Intercompany eliminations | (27.1) | (64.2) | (2.6) |
| | $ 26.4 | $ 88.6 | $(403.8) |
| Benefit from (provision for) income taxes: | | | |
| Federal—current | $ (8.5) | $ 5.1 | $ 32.1 |
| Federal—deferred | 41.8 | 13.8 | 14.8 |
| State and local—current | (1.4) | (1.0) | (0.3) |
| Foreign—current | (43.0) | (47.5) | (25.1) |
| Foreign—deferred | 3.0 | 8.3 | (20.0) |
| | $ (8.1) | $ (21.3) | $ 1.5 |

At December 31, 2006 and 2005, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

F-24

10-K 1 file001.htm ANNUAL REPORT

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2005                Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the            I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

**7500 Grace Drive, Columbia, Maryland 21044-4098**
**410/531-4000**
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐            No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐            No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒            No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of ''accelerated filer and large accelerated filer'' in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐            Accelerated filer ☒            Non-accelerated filer ☐

The Funding Amount will be primarily a function of the estimated number of allowed property damage and personal injury cl[...] and the amount payable per claim. Through the estimation process, Grace will seek to demonstrate that most claims should no[...] allowed because they fail to establish any material property damage, health impairment or significant occupational exposure t[...] asbestos from Grace's operations or products. If the Bankruptcy Court agrees with Grace's position on the number of, and the [...] to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount c[...] less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings [...] favorable to Grace's position.

Conversely, the asbestos claimants committees and the future claimants representative continue to assert that Grace's asbestos [...] liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Bankruptcy C[...] accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all [...] substantially all equity value by current Grace shareholders. Therefore, due to the significant uncertainties of this process and [...] litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Cour[...]

However, as Grace is willing to proceed with confirmation of the plan of reorganization with a Funding Amount of up to $1,6[...] million (assuming that other conditions precedent to confirmation of the plan of reorganization are satisfied, including the ava[...] of the payment from Cryovac directly to the asbestos trust under the settlement agreement described below), during the fourth [...] of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the ma[...] amount allowed as a condition precedent under the plan of reorganization. This amount, plus $87.0 million for pre-Chapter 11 [...] contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2005 to $1,700.0[...] Any differences between the plan of reorganization as filed and as approved for confirmation could fundamentally change the [...] accounting measurement of Grace's asbestos-related liability and that change could be material.

23

*Insurance Rights*

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims [...] has settled with and has been paid by all but one of its primary insurance carriers with respect to both property damage and pe[...] injury claims. Grace has also settled with its excess insurance carriers that wrote policies available for property dam[...] cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may co[...] claims as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist [...] excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote poli[...] available for personal injury claims in layers of insurance that Grace believes may be reached based on its current estimates. I[...] coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, [...] be entitled to approximately $500.0 million, on a net present value basis, of insurance recovery. Such recovery, however, wou[...] only as claims are paid by the asbestos trust, absent an alternative payment arrangement with Grace's insurers.

See Item 1 of this Report and Notes 2 and 3 to the Consolidated Financial Statements and ''Management's Discussion and An[...] Results of Operations and Financial Condition'' in the Financial Supplement for additional information.

## ENVIRONMENTAL CIVIL PROCEEDINGS

*Libby, Montana and Vermiculite-Related Proceedings.*

From 1963 until 1992, Grace conducted vermiculite mining and related activities near Libby, Montana. Previous owners had [...] conducted similar activities at the Libby site since the 1920s. The mined vermiculite ore contained varying amounts of asbesto[...] impurity, almost all of which was removed during processing. Expanded vermiculite was used in products such as fireproofing[...] insulation and potting soil.

*EPA Lawsuit*

In November 1999, Region 8 of the Environmental Protection Agency began an investigation into alleged excessive levels of [...]

asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to un
additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a la
U.S. District Court for the District of Montana, Missoula Division (*United States v. W. R. Grace & Company et al.*) under the
Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) for the recovery of costs allegedly incu
the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such forme
activities. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated
health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA
sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues t
limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issue
primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 3
On August 28, 2003, the District Court issued a ruling in favor of the United States that requires us to reimburse the governme
$54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the cle
The Ninth Circuit Court of Appeals upheld the District Court's rulings. Grace intends to appeal this case to the U.S. Supreme

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (*Tennis
al. v. W. R. Grace & Co., et al.*) against Grace on behalf of all owners of improved private real property situated within 12 mil
Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination an
property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation
property damages, and punitive damages. This case has been stayed as a result of the Chapter 11 filing. However, as describe
the EPA has been conducting remediation activities in and around Libby, which include the remediation of private real proper

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for the District of Minnesota, 4th Divisio
*v. W. R. Grace & Co.-Conn.*) alleging loss of property values in the vicinity of the former Grace plant in Minneapolis,

24

which processed vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 filing. The EPA has
commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and drive
houses near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 pro
the EPA has taken action at 252, and has not obtained access to the remaining 17. As of December 31, 2005, the EPA had spe
approximately $7.6 million on these residential cleanup actions. The EPA also has remediated industrial property in the area,
including the former vermiculite expanding plant, at a cost of $1.0 million. The EPA has submitted proofs of claims for $12.4
for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or
the former plant site.

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or expanded vermiculite conc
that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants that Grace currently
or formerly operated. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective ac
investigations at six of these sites. The EPA has filed proofs of claims for 10 of these sites (exclusive of Libby, Montana), and
three other sites never owned or operated by Grace. The amount claimed with respect to these 13 sites is $26 million. In additi
another governmental agency has commenced a separate investigation at 28 of the 245 facilities, 22 of which Grace currently
or formerly operated. Grace does not have sufficient information to determine whether this separate investigation is likely to r
any additional liability.

As a result of the ruling by the District Court in Montana in *United States v. W. R. Grace & Company et al.*, and Grace's evalu
probable remediation costs in and around Libby and at vermiculite processing sites that Grace currently operates or formerly
Grace estimates its total liability for vermiculite-related remediation, including liability related to the matters described in the
preceding paragraphs at $226.2 million. The estimate does not include the cost to clean-up the Grace-owned mine site at Libby
is not currently estimable but which may be material. Grace's estimate of expected costs is based on public comments regardi
EPA's spending plans, discussions of spending forecasts with EPA representatives, and analysis of other information made av
from the EPA. As the EPA's spending on these matters increases, Grace's liability for remediation will increase. Any paymen
EPA would be subject to the outcome of the Chapter 11 proceedings.

### New Jersey Lawsuit

On June 1, 2005, the New Jersey Department of Environmental Protection, or NJDEP filed a lawsuit against Grace and two fo
employees in the Superior Court of New Jersey Law Division: Mercer County (*N. J. Dept. of Environmental Protection v. W.
Grace & Co. et al.*) seeking civil penalties for alleged misrepresentations and false statements made in a Preliminary Assessm
Investigation Report and Negative Declarations submitted by Grace to the NJDEP in 1995 pursuant to the New Jersey Industr
Recovery Act. Grace submitted the report, which was prepared by an independent environmental consultant, in connection wi
closing of Grace's former plant in Hamilton Township, New Jersey. Grace is also aware that the State of New Jersey and U.S.
Department of Justice each are conducting criminal investigations related to Grace's former operations of the Hamilton plant.

Grace purchased the Hamilton plant assets in 1963 and ceased operations in 1994. During the operating period, Grace produce
on fire protection products and vermiculite-based products at this plant. The current property owners are conducting remediati
activities as directed by the EPA. The property owners and the EPA have filed proofs of claim against Grace in the amount of
approximately $4 million with respect to the Hamilton plant site.

Grace is unable at this time to assess the effect of this lawsuit or the pending criminal investigations on Grace's results of oper
cash flows, or liquidity, or on its bankruptcy proceeding.

### Non-Vermiculite-Related Environmental Proceedings

The EPA has designated Grace (together, in most cases, with many other companies) as a potentially responsible party, or PRI
respect to paying the costs of investigating and remediating pollution at various sites. As of December 31, 2005, proceedings v
pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides th
PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also co
investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11
proceeding, Grace has not been participating (except in a limited number of special cases) in the joint funding of investigation
remediation at non-owned sites where Grace is a PRP.

Based on Grace's analysis of environmental-related claims submitted prior to the March 31, 2003 bar date and other available
information, Grace estimates that its aggregate liability for environmental remediation, including liability with respect to

25

non-owned sites where Grace is a PRP, but excluding remediation related to its former vermiculite mining and processing ope
(discussed above), is $115.8 million as of December 31, 2005; however, Grace's ultimate liability with respect to many of the
will be determined as part of the Chapter 11 proceeding. These environmental liabilities are reassessed whenever circumstanc
become better defined or remediation efforts and their costs can be better estimated. Grace evaluates these liabilities quarterly
on currently available information, including the progress of remedial investigation at each site, the current status of discussio
regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in
contaminated site remediation and the apportionment of costs among PRPs. Grace believes that its estimated aggregate liabili
change materially as additional information becomes available or circumstances change.

Grace is a party to other legal proceedings and claims involving U.S. federal, state and/or local government agencies and priva
parties regarding its responsibility for alleged noncompliance with environmental laws and regulations that are unrelated to its
vermiculite mining and processing activities. Although Grace cannot predict the outcome of these proceedings, Grace intends
vigorously to defend itself. Grace may incur material liability in connection with future actions of governmental agencies or p
parties relating to its past or future practices with respect to the generation, storage, handling, discharge, disposition or stewar
hazardous wastes and other materials.

For further information, see "Environmental, Health and Safety Matters" under Item 1 above and Note 14 to the Consolidate
Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the
Financial Supplement.

## MONTANA CRIMINAL PROCEEDING

On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment ag

Grace and seven current and former senior level employees (*United States of America v. W. R. Grace & Co. et al*) relating to G former vermiculite mining and processing activities in Libby, Montana. Two of the counts have since been dismissed. The ind accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations federal Clean Air Act; and (3) obstruction of justice. The U.S. District Court for the District of Montana has entered a schedul order setting a trial date of September 11, 2006.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. Th jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surr Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional a for restitution to victims. The indictment alleges that such after tax profits were $140 million. Grace has categorically denied a criminal wrongdoing and intends to vigorously defend itself at trial.

The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth u appropriate state corporate law. For the year ended December 31, 2005, total expense for Grace and the employees was $20.0 Among the former employees for whom Grace is advancing legal and defense costs is Robert J. Bettacchi, a former Senior Vic President of Grace and President of GPC who was an executive officer until February 7, 2005. For the year ended December 3 Grace advanced approximately $1,243,800 for Mr. Bettacchi's defense in this proceeding.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. However, Grace expects legal f this matter could range from $7 million to $10 million per quarter through the trial date.

## LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

In September 2000, Grace was named in a purported class action suit filed in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. a 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (*Abner, et al., v. W Grace & Co., et al.*). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserti personal injury or wrongful death claims against any of the defendants. After *Abner*, and prior to the Chapter 11 filing, two ot similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee o Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of Grace's

bankruptcy estate. On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in prin with these Committees to settle asbestos, successor liability and fraudulent transfer claims related to such transactions. Under terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 to the Grace estate as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, subject to fulfillment of certain conditions, Cryovac Inc., a subsidiary of Sealed Air, would make a payment of $512.5 million (plus inte 5.5% per annum, compounded annually, commencing on December 21, 2002) and nine million shares of Sealed Air common s valued at $1,108.3 million as of December 31, 2005, as directed by the Bankruptcy Court upon confirmation of Grace's plan o reorganization. In June 2005, the Sealed Air settlement was approved by the Bankruptcy Court. Upon the effectiveness of thes settlements *Abner* and all similar actions will be dismissed. These settlements are an integral part of the plan of reorganization

## TAX CLAIMS

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest a related penalties for calendar years 1993 through 1998 against a Grace subsidiary that formerly operated a temporary staffing for nurses and other health care personnel. The assessments, aggregating $61.9 million, were made in connection with a meal

incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grac the business. (The statute of limitations has expired with respect to 1999.) The IRS contends that certain per diem reimbursem should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its pe and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidar the IRS. Grace has a right to indemnification from its former partner in the business for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998. The matter is currently pending in the Uni States Court of Claims. Grace has tentatively agreed with the Department of Justice and IRS on a settlement amount and certa terms that would resolve the matter. The preliminary settlement is subject to the execution of written closing agreements with and a written settlement agreement with the Department of Justice, and to Bankruptcy Court approval.

## ERISA LAWSUITS

In June 2004, a purported class action complaint (*Evans v. Akers et al.*) was filed in U.S. District Court for the District of Massachusetts against the Board of Directors, certain of current and former Grace officers and employees, and others, relating Grace 401(k) Savings and Investment Plan. The complaint alleges that the decline in the price of Grace common stock from Ju through February 2004 resulted in significant losses to S&I Plan participants. The complaint further alleges that the defendant breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, or ERISA, by failir or take other appropriate action with regard to Grace common stock held by the S&I Plan during that period, and by failing to to S&I Plan participants the risk of investing in Grace common stock. The complaint seeks compensatory damages for the S& from the defendants.

On October 26, 2004, a purported class action complaint (*Bunch et al. v. W. R. Grace & Co. et al.*) also related to the S&I Plan filed in the U.S. District Court for the Eastern District of Kentucky against Grace, the Investment and Benefits Committee, the of Directors, certain current and former Grace officers and employees, and others. The complaint alleges that Grace and its inv advisors breached fiduciary duties under ERISA by selling Grace common stock from the S&I Plan at a distressed price. The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, t investment manager for the S&I Plan that Grace retained in December 2003, to rapidly liquidate all of the employees' Grace c stock investment at an artificially low sales price.

On July 21, 2005, the U.S. District Court for the Eastern District of Kentucky granted the defendants' motion to transfer the *B* action to the U.S. District Court for the District of Massachusetts. On August 23, 2005, the Massachusetts District Court conso into one case both the *Bunch* action and the *Evans* action. Grace expects that it would have an obligation to indemnify the othe defendants for any liability arising out of the consolidated lawsuit. Although Grace cannot predict the outcome, Grace intends vigorously defend this consolidated lawsuit. Grace has $50 million of employers' fiduciary liability insurance coverage that Gr believes would be available to pay liabilities arising out of this consolidated lawsuit. Since all Grace employees who had inter the S&I Plan during the relevant periods are members of the purported class and Messrs. Bettacchi, Corcoran, McGowan, Nor Poling, Shelnitz and Tarola had interests in the S&I Plan during these periods, they have interests in this litigation that may be to Grace.

27

---

## OTHER CLAIMS RECEIVED PRIOR TO THE BAR DATE

The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related pro damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related personal inju claims or claims related to ZAI, which will be dealt with separately.

Approximately 14,900 proofs of claim were filed by the bar date. Of these claims, approximately 9,400 were non-asbestos rela approximately 4,300 were for asbestos-related property damage (discussed above), and approximately 1,000 were for medical monitoring. The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's produ operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. In addition, approximately 765 proofs of claim were filed after the bar date.

Approximately 7,000 of the non-asbestos related claims involve claims by employees or former employees for future retireme

benefits such as pension and retiree medical coverage. Grace views most of these claims as contingent and has proposed a pla reorganization that would retain such benefits. The other non-asbestos related claims include claims for payment of goods an services, taxes, product warranties, principal and interest under pre-petition credit facilities, amounts due under leases and oth contracts, leases and other executory contracts rejected in the Bankruptcy Court, environmental remediation, indemnification contribution to actual or potential co-defendants in asbestos-related and other litigation, pending non-asbestos-related litigatio non-asbestos-related personal injury.

Grace has analyzed the claims as filed and has found that many are duplicates, represent the same claim filed against more tha the debtors in the Chapter 11 proceeding, lack any supporting documentation, or provide insufficient supporting documentatio December 31, 2005, Grace had filed objections to approximately 5,400 claims (approximately 100 of which were subsequentl withdrawn), approximately 3,950 of which were asbestos property damage claims. Of the 5,300 claims, approximately 2,100 been expunged, approximately 200 have been resolved, approximately 1,800 have been withdrawn by claimants, and the rema approximately 1,200 will be addressed through the claims objection process and the dispute resolution procedures approved b Bankruptcy Court.

Grace believes that its recorded liabilities for claims subject to the bar date represent a reasonable estimate of the ultimate allo amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate the merit and est value of the claim. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

### Item 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of our security holders during the fourth quarter of 2005.

28

---

## PART II

### Item 5.   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading ''Fir Summary'' opposite the caption ''Other Statistics – Common shareholders of record'' (page F-44); under the heading ''Quart Summary and Statistical Information – Unaudited'' opposite the caption ''Market price of common stock'' (page F-43); and i 15 to the Consolidated Financial Statements (pages F-32 through F-33).

On March 31, 1998, we paid a dividend of one Preferred Stock Purchase Right on each share of Grace common stock. Subject prior redemption for $.01 per right, rights will become exercisable on the earlier of:

• 10 days after an acquiring person, comprised of an individual or group, has acquired beneficial ownership of 20% or mo the outstanding Grace common stock or

• 10 business days (or a later date fixed by the Board of Directors) after an acquiring person commences (or announces th intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the outstanding Gra common stock.

Until these events occur, the rights will automatically trade with the Grace common stock, and separate certificates for the rig not be distributed. The rights do not have voting or dividend rights.

Generally, each right not owned by an acquiring person:

• will initially entitle the holder to buy from Grace one hundredth of a share of the Grace Junior Participating Preferred St an exercise price of $100, subject to adjustment;

• will entitle such holder to receive upon exercise, in lieu of shares of Grace junior preferred stock, that number of shares

10-K 1 file001.htm FORM 10-K

================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2004        Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
        State of Delaware                              65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:

|  | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS | WHICH REGISTERED |
| ------------------- | ----------------------- |
| Common Stock, $.01 par value          } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights       } | |

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). Yes [X] No [_]

The aggregate market value of W. R. Grace & Co. voting and non-voting common
equity held by non-affiliates as of June 30, 2004 (the last business day of the
registrant's most recently completed second fiscal quarter) was $298,002,498.

At February 18, 2005, 66,663,392 shares of W. R. Grace & Co. Common Stock, $.01
par value, were outstanding.

Cumulatively through the Filing Date, 16,354 asbestos personal injury lawsuits involving approximately 35,720 claims were dismissed without payment of any

F-19

damages or settlement amounts (primarily on the basis that Grace products were not involved) and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the Filing Date, 129,191 claims for personal injury were pending against Grace. Grace believes that a substantial number of additional personal injury claims would have been received between the Filing Date and December 31, 2004 had such claims not been stayed by the Bankruptcy Court.

ASBESTOS-RELATED LIABILITY - The total asbestos-related liability balances as of December 31, 2004 and December 31, 2003 were $1,700 million and $992.3 million, respectively, and are included in "liabilities subject to compromise." Grace adjusted its asbestos-related liability in the fourth quarter of 2004 based on its proposed plan of reorganization as discussed in Note 2. The amount recorded at December 31, 2004 includes the $1,613 million maximum amount reflected as a condition precedent to the Plan and $87 million related to pre-Chapter 11 contracts and court rulings included in the general unsecured claims.

Under the Plan, Grace is requesting that the Bankruptcy Court determine the aggregate dollar amount, on a net present value basis (the "Funding Amount"), that must be funded on the effective date of the Plan into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all allowed pending and future asbestos-related personal injury and property damage claims (including ZAI) and related trust administration costs and expenses on the later of the effective date of the Plan or when allowed. It is a condition to confirmation of the Plan that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, is based in part on Grace's evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from ZAI litigation, (4) proposed claim payments reflected in the Plan, and (5) the cost of the trust administration and litigation. This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

Grace has requested that the Bankruptcy Court implement a process for estimating the Funding Amount, which will be primarily a function of the number of allowed property damage (including ZAI) and personal injury claims, and the amount payable per claim. Using this process, which involves the use of detailed claim forms, questionnaires, and expert testimony, Grace will seek to demonstrate that the vast majority of claims should not be allowed because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. Grace also will seek Bankruptcy Court approval of Grace's proposed payouts for allowed personal injury claims, which will vary depending upon the type of claim and/or the claimant's medical condition. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

Conversely, the asbestos claimants committees and the future claimants

representative have objected to Grace's proposed estimation process and are likely to continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of funds from Sealed Air under the settlement agreement described in Note 2), during the fourth quarter of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2004 to $1,700 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

INSURANCE RIGHTS - Grace previously purchased insurance policies that provide coverage for the 1962 - 1985 period with respect to asbestos-related lawsuits

F-20

and claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

Grace's primary insurance coverage is in the amount of $1 million per occurrence with annual aggregate product-liability limits ranging from $1 to $2 million. With one exception, coverage disputes regarding primary insurance policies have been settled, and the settlement amounts paid in full.

Grace's excess coverage is for loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others. As of December 31, 2004, after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $978 million of excess coverage from more than 30 presently solvent insurers.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount available under these settlement agreements is approximately $495 million. With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage, which is at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Plan were approved at the recorded asbestos-related liability of $1,700 million. Grace believes that the ZAI claims also are covered under the settlement

agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

Grace has approximately $355 million of excess coverage with insolvent or non-paying insurance carriers. (Non-paying carriers are those that, although technically not insolvent, are not currently meeting their obligations to pay claims.) Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $18.7 million in 2004, $13.2 million in 2003, and $10.8 million in 2002.

Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, it should be entitled to approximately $500 million, on a net present value basis, of insurance recovery.

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES (In millions) | 2004 | 2003 |
|---|---|---|
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year .... | $269.4 | $282.6 |
| Proceeds received under asbestos-related insurance settlements ............................................... | (7.6) | (13.2) |
| Insurance receivable adjustment ............................ | 238.2 | -- |
| | ------ | ------ |
| Asbestos-related insurance receivable, end of year expected to be realized as claims are paid ....................................... | $500.0 | $269.4 |

---

4.   INCOME TAXES

---

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2004, 2003, and 2002 are as follows:

| INCOME TAXES - CONSOLIDATED OPERATIONS (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Income (loss) before income taxes: | | | |
| Domestic ...................................... | $(541.2) | $(175.7) | $(44.6) |
| Foreign ....................................... | 140.0 | 126.2 | 104.8 |
| Intercompany eliminations ..................... | (2.6) | (18.0) | (0.1) |
| | ------- | ------- | ------ |
| | $(403.8) | $ (67.5) | $ 60.1 |
| | ======= | ======= | ====== |
| Benefit from (provision for) income taxes: | | | |
| Federal - current ............................ | $  32.1 | $   9.9 | $  8.1 |
| Federal - deferred ........................... | 14.8 | 34.5 | (11.0) |
| State and local - current .................... | (0.3) | 3.8 | (1.0) |
| Foreign - current ............................ | (25.1) | (34.3) | (27.6) |
| Foreign - deferred ........................... | (20.0) | (1.6) | (6.5) |

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>file001.txt
<DESCRIPTION>FORM 10-K
<TEXT>
<PAGE>
```

===============================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
--------------------------------
FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2003        Commission file number 1-13953


W. R. GRACE & CO.

Incorporated under the Laws of the        I.R.S. Employer Identification No.
     State of Delaware                              65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|                                 | NAME OF EACH EXCHANGE ON  |
| TITLE OF EACH CLASS             | WHICH REGISTERED          |
| -------------------             | ---------------           |
| Common Stock, $.01 par value  } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights } |                         |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common
equity held by non-affiliates as of June 30, 2003 (the last business day of the
registrant's most recently completed second fiscal quarter) was $239,410,239.

stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, Grace has implemented key elements of the new Responsible Care(R) Security Code for its operations and systems. It has completed a review of existing company security (including cyber-security) vulnerability, and is in the process of taking actions to enhance security systems and protect company assets.

    For additional information, see Item 3 of this Report, and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

ITEM 2. PROPERTIES

    Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit. Grace owns all of its major manufacturing facilities. Substantially all of its U.S. properties are subject to security interests under Grace's debtor-in-possession borrowing facility. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

                                    10
<PAGE>

    Davison Chemicals operates out of 16 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 11 |
| Europe | 3 |
| Latin America | 1 |
| Asia Pacific | 1 |

Its largest facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany.

    Performance Chemicals operates out of 62 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 26 |
| Europe | 12 |
| Latin America | 6 |
| Asia Pacific | 18 |

Its largest facilities are located in Cambridge, Massachusetts; Chicago, Illinois; Slough, England; Epernon, France; and Singapore. Because of the nature of its products, Performance Chemicals requires a greater number of facilities to service its customers than Davison. Also, these facilities are generally smaller and less capital intensive than Davison's facilities.

ITEM 3. LEGAL PROCEEDINGS

    Asbestos Litigation. Grace is a defendant in property damage and bodily
injury lawsuits relating to previously sold asbestos-containing products. In
most of the bodily injury lawsuits, Grace is one of many defendants. As a result
of the Chapter 11 filing, all asbestos-related litigation has been stayed and no
party may commence any new proceedings against Grace.

    Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001,
the date of Grace's Chapter 11 filing. Seventeen of such lawsuits involve claims
for property damage, nine relating to Grace's former Zonolite attic insulation
("ZAI") product (one of which has since been dismissed) and eight relating to a
number of former asbestos-containing products (two of which also involve ZAI).
The remainder of such lawsuits involve 129,191 claims for bodily injury.

    The plaintiffs in property damage lawsuits generally seek to have the
defendants pay the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings. Cumulatively through
April 2, 2001, 140 asbestos property damage cases were dismissed without payment
of any damages or settlement amounts; judgments were entered in favor of Grace
in nine cases (excluding cases settled following appeals of judgments in favor
of Grace); judgments were entered in favor of the plaintiffs in eight cases for
a total of $86.1 million (one of which is on appeal); and 207 property damage
cases were settled for a total of $696.8 million.

    In February 2000 a purported class action lawsuit was filed in the U.S.
District Court for the Eastern District of Massachusetts against the Company
(Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI,
a product formerly sold by Grace that may contain trace amounts of asbestos. The
action seeks damages and equitable relief, including the removal, replacement
and/or disposal of all such insulation. After Lindholm was filed, nine
additional purported class action ZAI lawsuits were initiated

                                      11
<PAGE>

against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in
various state and federal courts asserting similar claims and seeking damages
similar to those in Lindholm. One of the purported federal class actions has
been consolidated with Lindholm. As a result of the Chapter 11 filing, all of
these cases have been transferred to the U.S. Bankruptcy Court for the District
of Delaware.

    The plaintiffs in the ZAI lawsuits assert that this product is in millions
of homes throughout the U.S. and that the cost of removal could be several
thousand dollars per home. Based on Grace's investigation of the claims
described in these lawsuits, and testing and analysis of this product by Grace
and others, Grace believes that the product was and continues to be safe for its
intended purpose and poses little or no threat to human health. In July 2002,
the Bankruptcy Court approved special counsel to represent the ZAI claimants, at
Grace's expense, in a proceeding to determine certain threshold scientific
issues regarding ZAI. The parties have completed discovery with respect to these
threshold issues and have filed motions asking the Bankruptcy Court to resolve a
number of important legal and factual issues regarding the ZAI claims. Grace
expects the Bankruptcy Court to establish a schedule for determining the pending
motions following the next status conference in May 2004. At this time, Grace is
not able to assess the extent of any possible liability related to this matter.

    As part of the Chapter 11 process, the Bankruptcy Court established a bar

date of March 31, 2003 for submission of asbestos-related property damage claims. (The bar date did not apply to asbestos-related bodily injury claims or claims related to ZAI.) Approximately 4,000 additional property damage claims were filed prior to the bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims failed to provide sufficient information to permit an evaluation. With respect to the remainder of such claims, based on its experience in valuing property damage claims, Grace estimates the cost to resolve such claims to be $30 million. This estimate is subject to change based on the receipt of additional information or other developments in the Chapter 11 proceeding.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and analysis of trends in asbestos bodily injury litigation, Grace has endeavored to project the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. Grace has accrued $992 million at December 31, 2003 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all pending property damage cases (including the additional claims filed prior to the bar date described above) for which sufficient information is available to form a reasonable estimate of the cost of resolution. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. Grace does not expect to adjust this estimate (other than for normal costs of continuing claims administration) unless developments in the Chapter 11 proceeding provide a reasonable basis for a revised estimate. Grace intends to use the Chapter 11 process to determine the validity and ultimate amount of its aggregate liability for asbestos-related claims. Due to the uncertainties of asbestos-related litigation and the Chapter 11 process, Grace's ultimate liability could differ materially from the recorded liability.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic

12

<PAGE>

insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $1.054 billion prior to 2001, as well as payments totaling $78.8

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>file001.txt
<DESCRIPTION>ANNUAL REPORT
<TEXT>
<PAGE>
```
================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

-------------------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002      Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
        State of Delaware                              65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

                                                NAME OF EACH EXCHANGE ON
        TITLE OF EACH CLASS                         WHICH REGISTERED

Common Stock, $.01 par value        }           New York Stock Exchange, Inc.
Preferred Stock Purchase Rights     }

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Specific information regarding Grace's properties by business segment is set forth in Item 1 above.

ITEM 3.    LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. In most of the bodily injury lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace. However, Grace expects that it will receive additional asbestos-related claims during the Chapter 11 process.

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Seventeen of such lawsuits involve claims for property damage, nine relating to Grace's former Zonolite attic insulation ("ZAI") product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also involve ZAI). The remainder of such lawsuits involve 129,191 claims for bodily injury. As part of the Chapter 11 process, the Bankruptcy Court established a bar date of March 31, 2003 for submission of additional asbestos-related property damage claims. (The bar date does not apply to asbestos-related bodily injury claims or claims related to ZAI, which will be addressed separately by the court.) As new claims are filed, Grace will be cataloguing and assessing their validity.

The plaintiffs in property damage lawsuits generally seek to have the defendants pay the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through April 2, 2001, 140 asbestos property damage cases were dismissed without payment of any damages or settlement

10

<PAGE>

amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases for a total of $86.1 million (one of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI, a product formerly sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. After Lindholm was filed, nine

additional purported class action ZAI lawsuits were initiated against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm.  As a result of the Chapter 11 filing, all of these cases have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

The plaintiffs in the ZAI lawsuits assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. While Grace has not completed its investigation of the claims described in these lawsuits, testing and analysis of this product by Grace and others supports Grace's belief that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at Grace's expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in the third quarter of 2003. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and analysis of trends in asbestos bodily injury litigation, Grace has endeavored to project the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. Grace has accrued $973.2 million at December 31, 2002 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all pending property damage cases for which sufficient information is available to form a reasonable estimate of the cost of resolution. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. Grace does not expect to adjust this estimate (other than for normal costs of continuing claims administration) unless developments in the Chapter 11 proceeding provide a reasonable basis for a revised estimate. Grace intends to use the Chapter 11 process to determine the validity and ultimate amount of its aggregate liability for asbestos-related claims. Due to the uncertainties of asbestos-related litigation, Grace's ultimate liability for asbestos-related litigation could differ materially from the recorded liability.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement

11

<PAGE>

agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $968.5 million prior to 2000, as well as payments totaling $85.6 million in 2000, $78.8 million in 2001, and $10.8 million in 2002. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $282.6 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

Since its Chapter 11 filing, Grace is aware that asbestos bodily injury lawsuits have continued to be filed against co-defendant companies, and at higher than historical rates. As asbestos bodily injury claims are typically filed against numerous defendants, Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together, in most cases, with many other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to paying the costs of investigating and remediating pollution at various sites. At year-end 2002, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace does not expect to participate (except in a limited number of special cases) in the joint funding of investigation and remediation, or other settlements, at non-owned sites where it is a PRP. Grace's ultimate

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>file001.txt
<DESCRIPTION>ANNUAL REPORT
<TEXT>
<PAGE>
```

================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

-------------------------------
FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2001      Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                      65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|                                  | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS              | WHICH REGISTERED         |
| -------------------              | ----------------         |
| Common Stock, $.01 par value    } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights } |                          |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes X  No
                   ---   ---

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. X
         ---

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates (consisting of all voting stock other than stock held by directors
and executive officers) was approximately $150,000,000 at March 1, 2002.

At March 1, 2002, 65,478,959 shares of W. R. Grace & Co. Common Stock, $.01 par
value, were outstanding.

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. In most of these lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace. However, Grace expects that it will receive additional asbestos-related claims during the Chapter 11 process.

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Sixteen of such lawsuits involve claims for property damage, eight relating to Grace's former attic insulation product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also involve the attic insulation product). The remainder of such lawsuits involve 129,191 claims for bodily injury. At year-end 2000, Grace was a defendant in 61,395 lawsuits, 15 involving claims for property damage, and the remainder involving 124,907 claims for bodily injury.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through December 31, 2001, 141 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing Zonolite(R) attic insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. Since Lindholm was filed, nine additional purported class action lawsuits have been filed against Grace in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm. As a result of the Chapter 11 filing, all of these cases have been transferred to the U.S. Bankruptcy Court for the District of Delaware. While Grace has not completed its investigation of the claims described in these lawsuits, Grace believes that this product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

10

<PAGE>

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating

to probable and estimable liabilities. Grace has accrued $996.3 million at December 31, 2001 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all property damage cases for which sufficient information is available to form a reasonable estimate of the cost to resolve. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, Grace's ultimate liability for asbestos-related litigation could differ materially from the recorded liability.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $895.4 million prior to 1999, as well as payments totaling $73.1 million in 1999, $85.6 million in 2000, and $78.8 million in 2001. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $293.4 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

11

<PAGE>

```
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>FORM 10-K WITH ITEM 405 CHECKED-OFF ON COVER
<TEXT>

<PAGE>
```

================================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

-------------------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2000        Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

|  | NAME OF EACH EXCHANGE ON |
| TITLE OF EACH CLASS | WHICH REGISTERED |
| ------------------- | ---------------- |

| Common Stock, $.01 par value         } | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights      } | |
| | |
| 7-3/4% Notes Due 2002                } | |
| (issued by W. R. Grace & Co.-Conn.,  } | New York Stock Exchange, Inc. |
| a wholly owned subsidiary) and       } | |
| related Guarantees                   } | |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

The aggregate market value of W. R. Grace & Co. voting stock held by

embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

10

<PAGE>

        See Item 3 below for information concerning environmental proceedings to which Grace is a party.

ITEM 2.  PROPERTIES

        Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit, and since the disposition of the Packaging Business, some plants and facilities are shared with Sealed Air Corporation. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 20 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

        Additional information regarding Grace's properties is set forth in Item 1 above.

ITEM 3.  LEGAL PROCEEDINGS

        Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products and expects that it will receive additional asbestos-related claims in the future. Grace was a defendant in 61,395 asbestos-related lawsuits at December 31, 2000 (15 involving claims for property damages, including 8 relating to Grace's former attic insulation product, and the remainder involving 124,907 claims for bodily injury), as compared to 50,342 lawsuits at year-end 1999 (11 involving claims for property damage, none of which relates to attic insulation, and the remainder involving 105,670 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.

        The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 2000, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

        In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such

insulation. Since Lindholm was filed, eight additional purported class action lawsuits have been filed against Grace in various state and federal courts asserting similar claims and seeking similar damages to those in Lindholm. One of the purported federal class actions has been consolidated with

11

<PAGE>

Lindholm, and all the purported federal class actions have been transferred to the U.S. District Court for the Eastern District of Massachusetts. Purported class actions in California, Minnesota, Illinois and Washington were pending in state courts at the time of Grace's Chapter 11 filing. While Grace has not completed its investigation of the claims described in these lawsuits, Grace believes that this product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through December 31, 2000, approximately 16,200 bodily injury lawsuits involving approximately 35,500 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 53,400 lawsuits involving approximately 151,800 claims were disposed of for a total of $561.8 million.

Based on Grace's experience and trends in asbestos bodily injury litigation, Grace has endeavored to reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on measures governed by generally accepted accounting principles relating to probable and estimable liabilities. Grace has accrued $1,105.9 million at December 31, 2000 as its estimate of liability for all asbestos-related property damage and bodily injury cases and claims then pending (except for the cases and claims related to Grace's attic fill litigation as described above), as well as all bodily injury claims expected to be filed in the future. (However, due to the Chapter 11 filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability.)

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $821.4 million prior to 1998, as well as payments totaling $74.0 million in 1998, $73.1 million in 1999, and $85.6 million in 2000. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded receivables to reflect the amounts expected to be recovered as asbestos-related claims are paid. At December 31, 2000, Grace had recorded a receivable of $369.3 million, as well as notes receivable of $2.7 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims.

During 2000, the number of bodily injury claims made against Grace increased significantly compared to 1999 and prior year claim levels, with a

```
<DOCUMENT>
<TYPE>10-K/A
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>AMENDED ANNUAL REPORT
<TEXT>
```

<PAGE>


UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------------
FORM 10-K/A
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1999        Commission file number 1-13953


W. R. GRACE & CO.

Incorporated under the Laws of the        I.R.S. Employer Identification No.
State of Delaware                                  65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION
12(B) OF THE ACT:


|                                          |   | NAME OF EACH EXCHANGE ON        |
| TITLE OF EACH CLASS                      |   | WHICH REGISTERED                |
| -------------------                      |   | ----------------                |
| Common Stock, $.01 par value             | } | New York Stock Exchange, Inc.   |
| Preferred Stock Purchase Rights          | } |                                 |
|                                          |   |                                 |
| 7-3/4% Notes Due 2002                    | } |                                 |
| (issued by W. R. Grace & Co.-Conn.,      | } | New York Stock Exchange, Inc.   |
| a wholly owned subsidiary) and           | } |                                 |
| related Guarantees                       | } |                                 |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X]  No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in the Proxy Statement incorporated by
reference in Part III of the previously filed 1999 Form 10-K. [X]

The aggregate market value of W. R. Grace & Co. voting stock held by

PROPERTY DAMAGE LITIGATION

The plaintiffs in property damage lawsuits generally seek to have the
defendants absorb the cost of removing, containing or repairing the
asbestos-containing materials in the affected buildings. Each property damage
case is unique in that the age, type, size and use of the building, and the
difficulty of asbestos abatement, if necessary, vary from structure to
structure. Thus, the amounts involved in prior dispositions of property damage
cases are not necessarily indicative of the amounts that may be required to
dispose of cases in the future. Information regarding product identification,
the amount of product in the building, the age, type, size and use of the
building, the jurisdictional history of prior cases and the court in which the
case is pending provide meaningful guidance as to the range of potential costs.
Grace has recorded an accrual for all existing property damage cases for which
sufficient information is available to form a reasonable estimate of such
exposure.

Through December 31, 1999, 140 asbestos property damage cases were dismissed
without payment of any damages or settlement amounts; judgments were entered in
favor of Grace in nine cases (excluding cases settled following appeals of
judgments in favor of Grace); judgments were entered in favor of the plaintiffs
in seven cases for a total of $60.3 million; and 203 property damage cases were
settled for a total of $603.8 million.

| PROPERTY DAMAGE CASE ACTIVITY | 1999 | 1998 |
| --- | --- | --- |
| Cases outstanding, beginning of year ......................... | 14 | 18 |
| New cases filed .............. | -- | 2 |
| Settlements .................. | (3) | (5) |
| Dismissals ................... | -- | (1) |
| Judgments .................... | -- | -- |
| Cases outstanding, end of year | 11 | 14 |

BODILY INJURY LITIGATION

Bodily injury claims are generally similar to each other (differing primarily in
the type of asbestos-related illness allegedly suffered by the plaintiff).
However, Grace's estimated liability for such claims is influenced by numerous
variables, including the solvency of other former asbestos producers,
cross-claims by co-defendants, the rate at which new claims are filed, the
jurisdiction in which the filings are made, and the defense and disposition
costs associated with these claims. Grace's bodily injury liability reflects
management's estimate of the number and ultimate cost of present and future
bodily injury claims expected to be asserted against Grace given demographic
assumptions of possible exposure to asbestos products manufactured by Grace.

F-10

<PAGE>

Through December 31, 1999, approximately 14,700 asbestos bodily injury lawsuits
involving approximately 32,800 claims were dismissed without payment of any
damages or settlement amounts (primarily on the basis that Grace products were

not involved), and approximately 48,200 lawsuits involving approximately 124,900 claims were disposed of (through settlement and judgments) for a total of $410.3 million. Bodily injury claim activity for 1999 and 1998 was as follows:

| BODILY INJURY CLAIM ACTIVITY | 1999 | 1998 |
|---|---|---|
| Claims outstanding, beginning of year | 97,017 | 96,933 |
| New claims | 26,941 | 20,993 |
| Settlements | (16,174) | (19,503) |
| Dismissals | (2,109) | (1,399) |
| Judgments | (5) | (7) |
| Claims outstanding, end of year | 105,670 | 97,017 |

ASBESTOS-RELATED LIABILITY

Grace estimates its property damage and bodily injury liabilities based on its experience with, and recent trends in, asbestos litigation. These estimates include property damage and bodily injury indemnity as well as defense costs. Grace regularly evaluates its financial exposure to asbestos-related lawsuits and the adequacy of related recorded liabilities. The amounts recorded at each balance sheet date reflect Grace's best estimate of probable and estimable liabilities in all material respects. However, changes to estimates of probable liabilities may occur as actual experience is gained over time. In the fourth quarter of 1998, a change in the accrual period for asbestos-related bodily injury litigation resulted in a noncash net pre-tax charge of $376.1 million ($244.4 million after-tax). The provision consisted of an addition of $576.9 million to the asbestos liability primarily for bodily injury indemnity and defense costs, partially offset by expected recoveries from insurance carriers of $200.8 million ($130.5 million after-tax).

| ESTIMATED LIABILITY FOR ASBESTOS-RELATED LITIGATION (Dollars in millions) | 1999 | 1998 |
|---|---|---|
| Asbestos-related liability expected to be satisfied within one year | $ 199.3 | $ 95.5 |
| Asbestos-related liability expected to be satisfied after one year | 884.7 | 1,104.4 |
| Total asbestos-related liability | $1,084.0 | $1,199.9 |

The current portion of Grace's asbestos-related liability is based on management's estimate of indemnity payments and defense costs expected to be paid within one year.

ASBESTOS-RELATED INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Activity in Grace's notes receivable from insurance carriers and asbestos-related insurance receivable during 1999 and 1998 was as follows:

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES (Dollars in millions) | 1999 | 1998 |
|---|---|---|
| **NOTES RECEIVABLE** | | |
| Notes receivable from insurance carriers, beginning of year, net of discount of $2.3 (1998 - $4.8) .. | $ 18.0 | $ 31.3 |
| Proceeds received under asbestos-related insurance settlements ..................... | (14.2) | (15.8) |
| Current year amortization of discount | 1.5 | 2.5 |
| Notes receivable from insurance carriers, end of year, net of discount of $0.8 (1998 - $2.3) .................. | 5.3 | 18.0 |
| **INSURANCE RECEIVABLE** | | |
| Asbestos-related insurance receivable, beginning of year ............... | 425.0 | 282.4 |
| Proceeds received under asbestos-related insurance settlements ..................... | (58.9) | (58.2) |
| Increase in asbestos-related insurance receivable ....................... | -- | 200.8 |
| Asbestos-related insurance receivable, end of year ......... | 366.1 | 425.0 |
| Total amounts due from insurance carriers ......................... | 371.4 | 443.0 |
| Expected to be realized within one year ............................. | (75.2) | (66.7) |
| Expected to be realized after one year ............................. | $ 296.2 | $ 376.3 |

Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for bodily injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related bodily injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements relate to property damage and bodily injury cases and claims pending at year-end 1999 and bodily injury claims expected to be filed in the future.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Nr2RSlBZnTKtzvdKQSRiYY8+P6KirIhpc7RDQup6IB1xUUwmUjJFaBl5uEECGPfe
 3IF+W7OSGoM4n2UbA1wHWA==

<SEC-DOCUMENT>0000950136-00-000425.txt : 20000329
<SEC-HEADER>0000950136-00-000425.hdr.sgml : 20000329
ACCESSION NUMBER:		0000950136-00-000425
CONFORMED SUBMISSION TYPE:	10-K
PUBLIC DOCUMENT COUNT:		6
CONFORMED PERIOD OF REPORT:	19991231
FILED AS OF DATE:		20000328

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			W R GRACE & CO
		CENTRAL INDEX KEY:			0001045309
		STANDARD INDUSTRIAL CLASSIFICATION:	CHEMICALS & ALLIED PRODUCTS
		IRS NUMBER:				650773649
		STATE OF INCORPORATION:			DE
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		10-K
		SEC ACT:
		SEC FILE NUMBER:	001-13953
		FILM NUMBER:		581600

	BUSINESS ADDRESS:
		STREET 1:		1750 CLINT MOORE ROAD
		CITY:			BOCA RATON
		STATE:			FL
		ZIP:			33487-2707
		BUSINESS PHONE:		5613622000

	MAIL ADDRESS:
		STREET 1:		1750 CLINT MOORE ROAD
		CITY:			BOCA RATON
		STATE:			FL
		ZIP:			33487-2707

	FORMER COMPANY:
		FORMER CONFORMED NAME:	GRACE SPECIALTY CHEMICALS INC
		DATE OF NAME CHANGE:	19970902
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>


<PAGE>


                UNITED STATES SECURITIES AND EXCHANGE COMMISSION

injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in 50,342 asbestos-related lawsuits at December 31, 1999 (11 involving claims for property damage and the remainder involving 105,670 claims for bodily injury), as compared to 45,086 lawsuits at year-end 1998 (14 involving claims for property damage and the remainder involving 97,017 claims for bodily injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 1999, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 203 property damage cases were settled for a total of $603.8 million.

Included in the asbestos property damage cases pending against Grace and others at December 31, 1999 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials, which Grace has moved to decertify (Central Wesleyan College, et al. v. W. R. Grace, et al.). During the fourth quarter of 1999, the parties agreed to a preliminary settlement of this action pending final approval by the court; and (ii) a purported class action (Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all

10

<PAGE>

entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

In February 2000 an action filed as a class action lawsuit was filed in U.S. District Court in Boston, Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing Zonolite(R) attic fill insulation, a product previously sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. While Grace has not completed its investigation of the claims described in this lawsuit, Grace believes that this product is safe for its intended purpose and poses little or no threat to human health. At this time Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through December 31, 1999, approximately 14,700 bodily injury lawsuits involving 32,800 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 48,200 such suits involving approximately 124,900 claims were disposed of for a total of $410.3 million.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for both property damage and bodily injury cases and claims with the exception of two carriers that wrote policies Grace believes are available for bodily injury claims. Grace is currently in litigation with these two excess insurance carriers, whose policies represent layers of coverage Grace has not yet reached, in the action Maryland Casualty Co. v. W. R. Grace & Co. (filed April 13, 1988), pending in the U.S. District Court for the Southern District of New York. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $752.7 million prior to 1997, as well as payments totaling $68.7 million in 1997, $74.0 million in 1998 and $73.1 million in 1999. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded receivables to reflect the expected amounts to be recovered as asbestos-related claims are paid.

In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related bodily injury claims. Since 1996, Grace had been accruing for all current asbestos-related bodily injury claims and those expected to be asserted over the ensuing five-year period. Based on Grace's experience and recent trends in asbestos bodily injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future bodily injury claims expected to be asserted, and now has accrued for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1999 was $1,084.0 million; this amount reflects all asbestos-related property damage and bodily injury

11

<PAGE>

cases and claims then pending (except for the Lindholm case referenced above with respect to Grace's attic fill insulation, which was not filed until February 2000 and for which insufficient information exists to estimate any potential liability), as well as all bodily injury claims expected to be filed in the future.

Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the actual number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs. At December 31, 1999, Grace had recorded a receivable of $366.1 million, as well as notes receivable of $5.3 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims, including all projected bodily injury cases as described above. In Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other sources of funds, will be available to satisfy the property damage and bodily injury cases and claims pending at December 31, 1999, as well as bodily injury claims expected to be filed in the future.

See Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 IX5vPXlE2ddkvJ91SeaTd2QtXWE1ro8ZsaM79tduAGS9HOW8aZ5BJgctKEMf1m6+
 xpJdPRBTIZ7iGlHZwD/Flg==

<SEC-DOCUMENT>0000950136-99-000385.txt : 19990330
<SEC-HEADER>0000950136-99-000385.hdr.sgml : 19990330
ACCESSION NUMBER:               0000950136-99-000385
CONFORMED SUBMISSION TYPE:      10-K
PUBLIC DOCUMENT COUNT:          7
CONFORMED PERIOD OF REPORT:     19981231
FILED AS OF DATE:               19990329

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           W R GRACE & CO
                CENTRAL INDEX KEY:                0001045309
                STANDARD INDUSTRIAL CLASSIFICATION:  CHEMICALS & ALLIED PRODUCTS
                IRS NUMBER:                       650773649
                STATE OF INCORPORATION:           DE
                FISCAL YEAR END:                  1231

        FILING VALUES:
                FORM TYPE:           10-K
                SEC ACT:
                SEC FILE NUMBER:     001-13953
                FILM NUMBER:         99575400

        BUSINESS ADDRESS:
                STREET 1:            1750 CLINT MOORE ROAD
                CITY:                BOCA RATON
                STATE:               FL
                ZIP:                 33487-2707
                BUSINESS PHONE:      5613622000

        MAIL ADDRESS:
                STREET 1:            1750 CLINT MOORE ROAD
                CITY:                BOCA RATON
                STATE:               FL
                ZIP:                 33487-2707

        FORMER COMPANY:
                FORMER CONFORMED NAME:  GRACE SPECIALTY CHEMICALS INC
                DATE OF NAME CHANGE:    19970902
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>

<PAGE>
```

objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention.

        See Item 3 below for information concerning environmental proceedings to which Grace is a party.

ITEM 2.        PROPERTIES.

        Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by two or more of Grace's business units, and since the disposition of the Packaging Business, some plants and facilities are shared with Sealed Air Corporation. Grace considers its major operating properties to be in good oper ating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 17 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

        Additional information regarding Grace's properties is set forth in Item 1 above and in Notes 1, 8 and 11 to the Consolidated Financial Statements.

ITEM 3.        LEGAL PROCEEDINGS.

        Asbestos Litigation. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 45,100 asbestos-related lawsuits at December 31, 1998 (14 involving claims for property damage and the remainder involving approximately 97,000 claims for personal injury), as compared to approximately 40,600 lawsuits at year-end 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury). In most of these lawsuits, Grace is one of many defendants.

        The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through December 31, 1998, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 200 property damage cases were settled for a total of $587.9 million.

                                10

<PAGE>

Included in the asbestos property damage cases pending against Grace and others at December 31, 1998 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials, which Grace has moved to decertify (Central Wesleyan College, et al. v. W. R. Grace, et al.); and (ii) a purported class action (Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

Cumulatively through December 31, 1998, approximately 13,700 personal injury lawsuits involving 30,700 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 43,900 such suits involving approximately 108,700 claims were disposed of for a total of $347.3 million. See "Insurance Litigation" below.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

In the fourth quarter of 1998, Grace changed the period for accruing for asbestos-related personal injury claims. Since 1996, Grace had been accruing for all current asbestos-related personal injury claims and those expected to be asserted over the ensuing five year period. Based on Grace's experience and recent trends in asbestos personal injury litigation, Grace believes that it can now reasonably forecast the number and ultimate cost of all present and future personal injury claims expected to be asserted, and now will accrue for this ultimate cost. Under the new accrual period, Grace's gross aggregate accrual for asbestos liabilities at December 31, 1998 was $1,194.1 million; this amount reflects all asbestos-related property damage and personal injury cases and claims then pending (except for one property damage case as to which liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings), as well as all personal injury claims expected to be filed in the future. Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the actual number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs.

11

<PAGE>

At December 31, 1998, Grace had recorded a receivable of $425 million, as well as notes receivable of $18 million from insurance carriers, reflecting the estimated recovery from insurance carriers with respect to pending and projected asbestos cases and claims, including all projected personal injury cases as described above.

A May 1994 decision of the U.S. Court of Appeals for the Second Circuit limited the amount of insurance coverage available to Grace with respect to property damage cases. Because Grace's insurance covers both property damage and personal injury cases and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos personal injury claims. However, in Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at December 31, 1998, as well as personal injury claims expected to be filed in the future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

See "Insurance Litigation" and Note 2 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1998, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. U.S. federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

In November 1995, Grace received a letter from the U.S. Department of Energy ("DOE") inquiring as to Grace's willingness to contribute to the continued cleanup of a former Grace property located in Wayne, New Jersey. The operations conducted by Grace at the Wayne site (from 1955 to 1970) included work done on radioactive materials under contract with the U.S. government. In 1998, Grace and the U.S. government executed a consent decree in settlement of this claim. Under the terms of the decree, Grace would pay $31.77 million to the U.S. government. Grace has placed $25.77 million into an escrow account pending approval of the decree by the United States District Court in New Jersey.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 H6GPkpTKnepeIJsUT4R2GIHBGNKXZGgeISv2Zqf/a/UUxxA+KvKXyY3h1wUmoic4
 bRrk5i8ytvwj/NMm20KFSg==

<SEC-DOCUMENT>0000950144-98-003611.txt : 19980331
<SEC-HEADER>0000950144-98-003611.hdr.sgml : 19980331
ACCESSION NUMBER:               0000950144-98-003611
CONFORMED SUBMISSION TYPE:      10-K405
PUBLIC DOCUMENT COUNT:          5
CONFORMED PERIOD OF REPORT:     19971231
FILED AS OF DATE:               19980330
SROS:                 NONE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:              GRACE SPECIALTY CHEMICALS IN
                CENTRAL INDEX KEY:                   0001045309
                STANDARD INDUSTRIAL CLASSIFICATION:  CHEMICALS & ALLIED PRODUCTS
                IRS NUMBER:                          650773649
                STATE OF INCORPORATION:              DE
                FISCAL YEAR END:                     1231

        FILING VALUES:
                FORM TYPE:          10-K405
                SEC ACT:
                SEC FILE NUMBER:    001-13953
                FILM NUMBER:        98578470

        BUSINESS ADDRESS:
                STREET 1:           ONE TOWN CENTER ROAD
                CITY:               BOCA RATON
                STATE:              FL
                ZIP:                33486-1010
                BUSINESS PHONE:     5613622000

        MAIL ADDRESS:
                STREET 1:           ONE TOWN CENTER ROAD
                CITY:               BOCA RATON
                STATE:              FL
                ZIP:                33486-1010
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>GRACE SPECIALTY CHEMICALS, INC. 10-K405 12/31/97
<TEXT>

<PAGE>  1
===============================================================================

                    SECURITIES AND EXCHANGE COMMISSION
                         WASHINGTON, D.C. 20549
```

See Item 3 below for information concerning environmental proceedings to which Grace is a party and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning environmental matters.

ITEM 2.    PROPERTIES.

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by two or more of Grace's business units, and after the disposition of the Packaging Business, some plants and facilities may also be shared with the combined business of Sealed Air and the Packaging Business. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See Note 18 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Additional information regarding Grace's properties is set forth in Item 1 above and in Notes 1, 8 and 11 to the Consolidated Financial Statements.

ITEM 3.    LEGAL PROCEEDINGS.

ASBESTOS LITIGATION. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products and expects that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 40,600 asbestos-related lawsuits at December 31, 1997 (18 involving claims for property damage and the remainder involving approximately 96,900 claims for personal injury), as compared to approximately 41,500 lawsuits at year-end 1996 (31 involving claims for property damage and the remainder involving approximately 91,500 claims for personal injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through December 31, 1997, 139 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in seven cases for a total of $60.3 million (none of which is on appeal); and 195 property damage cases were settled for a total of $476.6 million.

- 10 -

<PAGE>    13

Included in the asbestos property damage cases pending against Grace and others at December 31, 1997 were the following class actions: (i) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in

1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials (CENTRAL WESLEYAN COLLEGE, ET AL. V. W. R. GRACE, ET AL.); and (ii) a purported class action (ANDERSON MEMORIAL HOSPITAL, ET AL. V. W. R. GRACE & CO., ET AL.), filed in 1992 in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in Anderson Memorial Hospital, et al. v. W. R. Grace & Co., et al. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision.

Through December 31, 1997, approximately 12,700 personal injury lawsuits involving 29,300 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 38,900 such suits involving approximately 89,200 claims were disposed of for a total of $255.6 million. See "Insurance Litigation" below.

In 1991, the Judicial Panel on Multi-District Litigation consolidated in the U.S. District Court for the Eastern District of Pennsylvania, for pre-trial purposes, all asbestos personal injury cases then pending in the U.S. federal courts, including approximately 7,000 cases then pending against Grace; 3,600 new cases involving 7,200 claims against Grace have subsequently been added to the consolidated cases. To date, no action has been taken by the court handling the consolidated cases that would indicate whether the consolidation will affect Grace's cost of disposing of these cases or its defense costs.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace also has settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace's aggregate accrual for asbestos liabilities at December 31, 1997, was $855.9 million; this amount reflects all asbestos-related property damage and personal injury cases and claims then pending (except for two property damage cases as to which liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings), as well as personal injury claims expected to be filed through 2002. Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the number and nature of claims filed and the extent to which insurance will cover damages for which it may be liable, amounts paid in settlement and litigation costs. At December 31, 1997, Grace had recorded a receivable of $282.4 million, the amount Grace estimated to

- 11 -

1
================================================================================
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1996     Commission file number 1-12139

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
    State of Delaware                                 65-0654331

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
561/362-2000
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:


                                                NAME OF EACH EXCHANGE ON
        TITLE OF EACH CLASS                        WHICH REGISTERED
        -------------------                     -----------------------


Common Stock, $.01 par value             }      New York Stock Exchange, Inc.
Preferred Stock Purchase Rights          }

7-3/4% Notes Due 2002                     }
  (issued by W. R. Grace & Co.-Conn.,    }      New York Stock Exchange, Inc.
  a wholly owned subsidiary) and         }
  related Guarantees                     }


                SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

                                    None

        Indicate by check mark whether the registrant (including its
predecessor) (1) has filed all reports required to be filed by Section 13 or
15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and
(2) has been subject to such filing requirements for the past 90 days.
  Yes X     No
    ---     ---

        Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and will not be contained,
to the best of registrant's knowledge, in the Proxy Statement incorporated by
reference in Part III of this Form 10-K or any amendment to this
Form 10-K. X
        ---

        The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $3.8 billion at January 31, 1997.

        At February 28, 1997, 74,048,314 shares of W. R. Grace & Co. Common
Stock, $.01 par value, were outstanding.

                DOCUMENTS INCORPORATED BY REFERENCE

        Document                                Where Incorporated
        --------                                ------------------
  Proxy Statement for Annual Meeting to be
    held May 9, 1997 (specified portions)               Part III


================================================================================

16

See Item 3 below for information concerning environmental proceedings to which Grace is a party and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning environmental matters.

ITEM 2.    PROPERTIES.

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world, some of which are shared by two or more of Grace's product lines. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Although Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth, it conducts ongoing, long-range forecasting of its capital requirements to assure that additional capacity will be available when and as needed. Accordingly, Grace does not anticipate that its operations or income will be materially affected by the absence of available capacity. See "Management's Discussion and Analysis of Results of Operations and Financial Condition" and page F-25 of the Financial Supplement for information regarding Grace's capital expenditures.

Additional information regarding Grace's properties is set forth in Item 1 above and in Notes 1, 8 and 11 to the Consolidated Financial Statements.

ITEM 3.    LEGAL PROCEEDINGS.

ASBESTOS LITIGATION. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products, and anticipates that it will be named as a defendant in additional asbestos-related lawsuits in the future. Grace was a defendant in approximately 41,500 asbestos-related lawsuits at year-end 1996 (31 involving claims for property damage and the remainder involving approximately 91,500 claims for personal injury), as compared to approximately 40,800 lawsuits at year-end 1995 (47 involving claims for property damage and the remainder involving approximately 92,400 claims for personal injury). In most of these lawsuits, Grace is one of many defendants.

The plaintiffs in property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through 1996, 135 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in 9 cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in 7 cases

-14-

17

for a total of $60.3 million (none of which is on appeal); and 186 property damage cases were settled for a total of $450.5 million.

Included in the asbestos property damage cases pending against Grace and others at year-end 1996 were the following class actions: (a) an action, conditionally certified by the U.S. Court of Appeals for the Fourth Circuit in 1993 and pending in the U.S. District Court for the District of South Carolina, covering all public and private colleges and universities in the U.S. whose buildings contain asbestos materials (CENTRAL WESLEYAN COLLEGE, ET AL. V. W. R. GRACE, ET AL.); and (b) a purported class action (ANDERSON MEMORIAL HOSPITAL, ET AL. V. W. R. GRACE & CO., ET AL.), filed in 1992, in the Court of Common Pleas for Hampton County, South Carolina, on behalf of all entities that own, in whole or in part, any building containing asbestos materials manufactured by Grace or one of the other named defendants, other than buildings subject to the class action lawsuit described above and any building owned by the federal or any state government. In July 1994, the claims of most class members in ANDERSON MEMORIAL HOSPITAL, ET AL., V. W. R. GRACE & CO., ET AL. were dismissed due to a ruling that a South Carolina statute prohibits nonresidents from pursuing claims in the South Carolina state courts with respect to buildings located outside the state. The plaintiffs have requested that the court reconsider its decision. In December 1995, Grace entered into an agreement to settle the claims under PRINCE GEORGE CENTER, INC. V. U.S. GYPSUM COMPANY, ET AL., a class action covering all commercial buildings in the U.S. leased, in whole or in part, to the U.S. government on or after May 30, 1986. The terms of the settlement agreement (which were approved by the Court of Common Pleas of Philadelphia County in July 1996) are not expected to have a significant effect on Grace's consolidated results of operations or financial position.

Through year-end 1996, approximately 11,800 personal injury lawsuits involving 27,400 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 30,500 such suits involving 66,200 claims were disposed of for a total of $186 million (see "Insurance Litigation" below).

In 1991, the Judicial Panel on Multi-District Litigation consolidated in the U.S. District Court for the Eastern District of Pennsylvania, for pre-trial purposes, all asbestos personal injury cases pending in the U.S. federal courts, including approximately 7,000 cases then pending against Grace; 3,600 new cases involving 7,200 claims against Grace have subsequently been added to the consolidated cases. To date, no action has been taken by the court handling the consolidated cases that would indicate whether the consolidation will affect Grace's cost of disposing of these cases or its defense costs.

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Grace has settled with and been paid by its primary insurance carriers with respect to both property damage and personal injury cases and claims. With one minor exception, Grace also has settled with its excess insurance carriers that wrote

-15-

18

policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. In addition, Grace has settled with many excess insurance carriers that wrote policies available for personal injury claims. Grace is currently in litigation with certain remaining excess insurance carriers whose policies generally represent layers of coverage Grace has not yet reached. Such policies are believed by Grace to be available for asbestos-related personal injury lawsuits. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace's aggregate accrual for asbestos liabilities at December 31, 1996 was $994.1 million; this amount reflects all asbestos-related property damage and personal injury cases and claims then pending (except for one property damage case as to which liability is not yet estimable because Grace has not yet been able to obtain sufficient information through discovery proceedings), as well as personal injury claims expected to be filed through 2001. Grace's ultimate exposure with respect to its asbestos-related cases and claims will depend on the extent to which its insurance will cover damages for which it may be held liable, amounts paid in settlement and litigation costs. At December 31, 1996, Grace had recorded a receivable of $331.3 million, the amount Grace estimated to be the probable recovery from its insurance carriers with respect to pending and projected asbestos cases and claims. A May 1994 decision of the U.S. Court of Appeals for the Second Circuit limited the amount of insurance coverage available to Grace with respect to property damage cases. Because Grace's insurance covers both property damage and personal injury cases and claims, the May 1994 decision has had the concomitant effect of reducing the insurance coverage available with respect to Grace's asbestos personal injury claims. However, in Grace's opinion (which is not based on a formal opinion of counsel), it is probable that recoveries from its insurance carriers, along with other funds, will be available to satisfy the property damage and personal injury cases and claims pending at year-end 1996, as well as personal injury claims expected to be filed in the foreseeable future. Consequently, Grace believes that the resolution of its asbestos-related litigation will not have a material adverse effect on its consolidated financial position.

See "Insurance Litigation" below and Note 2 to the Consolidated Financial Statements for additional information.

ENVIRONMENTAL PROCEEDINGS. Grace (together with certain other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to absorbing the costs of investigating and remediating pollution at various sites. At year-end 1996, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP. Federal law provides that all PRPs may be held jointly and severally liable for the costs of investigating and remediating a site. Grace also is conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities.

-16-

1

===============================================================================

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------

FORM 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1995      Commission file number 1-3720

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
       State of New York                              13-3461988

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
407/362-2000
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|---|
| Common Stock, $1 par value | } | New York Stock Exchange, Inc. |
| Common Stock Purchase Rights | } | Chicago Stock Exchange, Incorporated |
| 7-3/4% Notes Due 2002 | } | |
| (issued by W. R. Grace & Co.-Conn., | } | New York Stock Exchange, Inc. |
| a wholly owned subsidiary) and | } | |
| related Guarantees | } | |

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months and (2) has been subject to such filing
requirements for the past 90 days.  Yes  X      No
                                        ---        ---

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to
the best of registrant's knowledge, in the Proxy Statement incorporated by
reference in Part III of this Form 10-K or any amendment to this Form 10-K.
                                                                        ---

The aggregate market value of W. R. Grace & Co. voting stock held by
nonaffiliates was approximately $6.0 billion at February 1, 1996.

At March 1, 1996, 98,038,423 shares of W. R. Grace & Co. Common Stock, $1
par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

| Document | Where Incorporated |
|---|---|
| Proxy Statement for Annual Meeting to be held May 10, 1996 (specified portions) | Part III |

===============================================================================

denied review of this decision, the parties agreed to settlements in
1995 and early 1996.

Prior to 1993, Grace received payments totaling $97.7 million from
insurance carriers, the majority of which represented the aggregate remaining
obligations owed to Grace by those carriers for primary-level insurance
coverage written for the period June 30, 1962 through June 30, 1987.  In 1993
and 1994, Grace settled with insurance carriers for a total of $300.2 million
(portions of which were paid or will be paid in subsequent years) in
reimbursement for amounts expended by Grace in connection with asbestos-related
litigation.  In 1995, Grace settled with a primary-level insurer for $100
million, and with other insurers for a total of $200.3 million, including
future payments of approximately $70 million.  As a result of these
settlements, insurance litigations were dismissed as to the primary-level
product liability insurance coverage previously sold by the relevant insurers
to Grace; however, litigations continue as to certain excess-level carriers.

In a 1995 settlement included in the amounts set forth above, Grace
settled with an affiliated group of excess-level carriers that had agreed to a
settlement in 1993, had made a series of payments under that agreement and had
subsequently notified Grace that it would no longer honor the agreement.
Pursuant to the 1995 settlement, the group of carriers paid Grace $44 million
in 1995, and agreed to make additional payments totaling $60.2 million in 1996
and 1997.  Pursuant to a settlement with another group of carriers, Grace
received $26.8 million in 1995 and $9.7 million in early 1996.  Grace will also
continue to receive payments under these agreements based on future cash
outflows for asbestos-related litigation and claims; such payments are
estimated to represent approximately $237.3 million of the asbestos-related
receivable of $321.2 million at December 31, 1995.

See Note 2 to the Consolidated Financial Statements and "Management's
Discussion and Analysis of Results of Operations and Financial Condition" in
the Financial Supplement for additional information.

Fumed Silica Plant Litigation.  In 1993, Grace initiated legal action
in the Belgian courts against the Flemish government to recover losses
resulting from the closing of Grace's fumed silica plant in Puurs, Belgium.
Grace is seeking damages in excess of four billion Belgian francs
(approximately $135.5 million at the December 29, 1995 exchange rate), plus
interest and lost profits.  This claim was dismissed at the trial court level
and is now being appealed by Grace.  The trial court also determined that Grace
should repay approximately 239 million Belgian francs (approximately $8.1
million at the December 29, 1995 exchange rate) plus

-25-