UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
               Debtors.   .
                          .    October 27, 2008
. . . . . . . . . . . . . .    9:06 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                               CRAIG BRUENS, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               CHRISTOPHER GRECO, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


Audio Operator:           Janet Heller
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>      NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| For the Debtors: | ARPC<br>By:  AMY BROCKMAN, ESQ. |
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>      JAY HUGHES, ESQ.<br>      WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  GREGORY HOROWITZ, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>      SCOTT BAENA, ESQ.<br>      JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |

For the Future          Orrick, Herrington & Sutcliffe
Claimants                  LLP
Representatives:        By:  ROGER FRANKEL, ESQ.
                             RICHARD WYRON, ESQ.
                             ANTHONY KIM, ESQ.
                             RAYMOND MULLADY, ESQ.
                             JOHN ANSBRO, ESQ.
                        Washington Harbour
                        3050 K Street, N.W.
                        Washington, D.C.  20007

For Committee of        Campbell & Levine
Asbestos Personal       By:  MARK T. HURFORD, ESQ.
Injury Claimants:       800 North King Street
                        Suite 300
                        Wilmington, DE  19701

For Maryland Casualty:  Connelly Bove Lodge & Hutz, LLP
                        By:  JEFFREY WISLER, ESQ.
                        The Nemours Building
                        1007 North Orange Street
                        Wilmington, DE  19899

For Maryland Casualty:  Eckert Seamans Cherin & Mellott, LLC
                        By:  EDWARD LONGOSZ, II, ESQ.
                        1747 Pennsylvania Avenue, N.W.
                        Suite 1200
                        Washington, D.C.  20006

                        STB
                        By:  STERLING MARSHALL, ESQ.

For Sealed Air:         Skadden, Arps, Slate, Meagher & Flom,
                          LLP
                        By:  MARK CHEHI, ESQ.
                             DAVID TURETSKY, ESQ.
                        One Rodney Square
                        Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| Co-Counsel to Libby<br>Claimants: | Cohn, Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For Libby Claimants: | Landis Rath & Cobb, LLP<br>By:  RICHARD S. COBB, ESQ.<br>    KERRI KING MUMFORD, ESQ.<br>919 Market Street<br>Wilmington, DE  19801 |
| For Sealed Air: | NERA Economic Consulting<br>By:  STEPHANIE PLANCICH<br>1166 Avenue of the Americas<br>28th Floor<br>New York, NY  10036 |
| For W.R. Grace: | NERA<br>By:  ELENA ZAPRYANOVA<br>    LINDA SHEN |
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For Serengeti: | By:  BILLAL SIKANDER |
| For Silver Point<br>Capital: | Silver Point Capital<br>By:  JOHN KU<br>    SERGEI FILIPOV, ESQ. |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Unsecured<br>Creditors' Committee: | Strook & Strook & Lavan<br>By:  LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

```
For Ad Hoc Committee:      Weil, Gotshal & Manges
                           By:  M. JARRAD WRIGHT, ESQ.
                           1300 Eye Street NW, Suite 900
                           Washington, D.C.  20005

For Official Committee     Kramer Levin Naftalis & Frankel
of Equity Holders:          LLP
                           By:  DOUG MANNAL, ESQ.
                           919 Third Avenue
                           New York, NY  10022
For Continental
Casualty Company:          Ford, Marrin, Esposito,
                           Witmeyer & Gleser, LLP
                           By:  ELIZABETH DeCRISTOFARO, ESQ.
                           Wall Street Plaza, 23rd Floor
                           New York, NY  10005-1875

For Official Committee     Dies & Hile, LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1601 Rio Grande, Suite 330
                           Austin, TX  78701

                           ELIZABETH DEVINE, ESQ.

For Various Claimant       Stutzman, Bromberg, Esserman & Plifka
Firms:                     By:  DAVID J. PARSONS, ESQ.
                                VAN J. HOOKER, ESQ.
                                SANDER L. ESSERMAN, ESQ.
                           2323 Bryan Street
                           Suite 2200
                           Dallas, TX  75201

For Fireman's Fund:        Stevens & Lee, P.C.
                           By:  JOHN DEMMY, ESQ.
                                DAVID R. BEANE, ESQ.
                           1105 North Market Street, 7th Fl.
                           Wilmington, DE  19801

For Owens-Illinois:        McCarter & English
                           By:  DANIEL SILVER, ESQ.
                           Renaissance Centre, 405 N. King St.
                           Wilmington, DE  19801
```

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Asbestos Property          Scott Law Group
Damage Claimants:              By:  DARRELL SCOTT, ESQ.
                               1001 East Main Street, Suite 500
                               Sevierville, TN  37864

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  MATTHEW RUSSELL, ESQ.
                                    ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For the Future                 Orrick, Herrington & Sutcliffe,
Claimants                         LLP
Representatives:               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007 For

For Federal Insurance          Cozen O'Connor
Company:                       By:  JEFFREY WAXMAN, ESQ.
                               Chase Manhattan Centre
                               1201 North Market Street
                               Wilmington, DE  19801

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For W.R. Grace:                W.R. Grace
                               By: WILLIAM CORCORAN, ESQ.
                               7500 Grace Drive
                               Columbia, MD  21044

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For W.R. Grace: | Kirkland & Ellis, LLP<br>By:  ELLEN AHERN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| | Kirkland & Ellis, LLP<br>By:  DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |
| For State of Montana<br>Department of<br>Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |
| For State of Montana: | Christensen, Moore, Cockrell<br>By:  DALE R. COCKRELL, ESQ. |
| For Official Committee<br>of Asbestos Personal<br>Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For W.R. Grace: | Cohn Whitesell & Goldberg, LLP<br>By:  NATHAN SOUCY, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For CNA: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>     BRIAN MURKHERJEE, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Grace Certain<br>Cancer Claimants: | Montgomery, McCracken, Walker &<br>Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern,<br>the Future Claimants'<br>Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| | Tre Angeli, LLC<br>By:  JOSEPH RADECKI, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JONATHAN BROWNSTEIN, ESQ. |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones, LLP<br>By:  TIMOTHY P. CAIRNS, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos<br>Creditors' Committee: | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>       BERNARD BAILOR, ESQ.<br>       JEANNA RICKARDS, ESQ.<br>       JAMES WEHNER, ESQ.<br>       LESLIE KELLEHER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the Asbestos<br>Creditors' Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>   Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Pepsi: | Butler Rubin Salfarelli & Boyd, LLP<br>By:  KIRK T. HARTLEY, ESQ.<br>70 West Madison Street<br>Suite 1800<br>Chicago, IL  60602 |
| For Official Committee<br>of Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By: THOMAS BRANDI, ESQ.<br>      TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For the State of CA, Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd, et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>     ALAN RUNYAN, ESQ.<br>     MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Royal Insurance: | Wilson Elser Moskowitz Edelman<br> & Dicker, LLP<br>By:  CATHERINE CHEN, ESQ.<br>     150 East 42nd Street<br>     New York, NY  10017 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Official Committee of Asbestos Property Claimants: | LECG<br>By:  ALAN MADIAN, ESQ. |

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Official Committee<br>of Asbestos Property<br>Claimants: | Richardson Patrick Westbrook &<br>  Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| | Hamilton, Rabinovitz & Alshuler<br>By:  JOSHUA KATZ, ESQ.<br>     FRANCINE RABINOVITZ, ESQ. |
| | Conway Del Genio, Gries & Co, LLC<br>By:  GREGORY BOYER, ESQ.<br>Lieff, Cabraser, Heinmann &<br>Bernstein<br>By:  ELIZABETH J. CABRASER, ESQ. |
| | Pryor Cashman LLP<br>By:  RICHARD LEVY, ESQ. |
| | Riker, Danzig, Scherer, Hyland<br>& Perretti, LLP<br>By:  CURTIS PLAZA, ESQ.<br>One Speedwell Avenue<br>P.O. Box 1981<br>Morristown, NJ  07962 |
| For Avenue Capital<br>Group: | CHELSEA CLINTON, ESQ. |
| For W.R. Grace: | WILLIAM SPARKS, ESQ. |
| For Ivory Investment: | Ivory Investment<br>By:  DHANANJAY PATWARDHAN |
| For Linden Advisors: | Linden Advisors, LP<br>By:  CRAIG GILBERT |
| For O'Conner: | O'Conner<br>By:  JOHN R. WOLLEN |
| For Credit Suisse<br>First Boston: | Credit Suisse First Boston<br>By:  TIM McARDLE |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For King Street Capital Management, LLC: | King Street Capital Management, LLC<br>By:  KIM CHRISTENSEN, ESQ. |
| For the Blackstone Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Dune Capital Mgmt: | Dune Capital Management<br>By:  GUY BARON |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By:  JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  ASHOK VASVANI |
| For Durham Asset Management: | Durham Asset Management<br>By:  JEFFREY A. ROSENKRANZ |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By:  STEPHANIE KWONG |
| For Levin Capital Strategies: | JOHN P. MACKIN, ESQ. |
| For Morgan Stanley Senior Funding, Inc.: | Katten, Muchin, Rosenman LLP<br>By:  NOAH HELLER, ESQ.<br>MERRITT PARDINI, ESQ.<br>JEFF FRIEDMAN, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Irwin H. Zandman:    Irwin H. Zandman
                            By:  IRWIN H. ZANDMAN

For Venor Capital:       MICHAEL SCOTT, ESQ.
                            Washington, DC

For Asbestos Claimants: Brayton Purcell, LLP
                            By:  CHRISTINA SKUBIC, ESQ.
                            222 Rush Landing Road
                            Novato, CA  94948

For Halycon Asset
Management LLC:         Halcyon Asset Management, LLC
                            By:  JOHN GREENE

For The Scotts Co.:     Vorys, Sater, Seymour and Pease,
                              LLP
                            By:  MATTHEW DAIKER, ESQ.
                            52 East Gay Street
                            P.O. Box 1008
                            Columbus, OH  43216

For Private Investors:  WILLIAM M. WAGNER

For Bank of New York:   ANDREW HAIN, ESQ.

For WR Grace
Shareholder:           Tocqueville Asset Management
                            By:  PETER SHAWN

For Everest Reinsurance  Crowell & Moring, LLP
Co. & McKinley Ins. Co.: By:  MARK D. PLEVIN, ESQ.
                                  LESLIE A. EPLEY, ESQ.
                                  LESLIE DAVIS, ESQ.
                          1001 Pennsylvania Avenue, NW
                        Washington, DC  20004

For Everest Reinsurance  Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.: Courtney, P.C.
                            By:  JOHN D. MATTEY, ESQ.
                        BRIAN KASPRZAK, ESQ.
                      913 North Market St., Suite 800
                      Wilmington, DE  19801

**APPEARANCES (CONT'D):**

For ERISA:                    Lowenstein Sandler PC
                              By:  IRA LEVEE, ESQ.
                                   MICHAEL ETKIN, ESQ.

For Equity Committee:         RICHARD WESCHLER, ESQ.

For Kaneb Pipe Line
Operating Partnership:        Fulbright & Jaworski
                              By: STEVE PEIRCE, ESQ.

For Laura Hammond:            Dune Capital Management
                              By:  LAURA HAMMOND

For Her Majesty the
Queen in Right of
Canada:                       Office of the Attorney General
                              By:  JACQUELINE DAIS-VISCA, ESQ.

For Creditors'
Claimants:                    Reaud Morgan & Quinn LLP
                              By:  CHRIS PORTNER, ESQ.

For Bank of America:          Richards, Layton & Finger, P.A.
                              By:  MARCOS A. RAMOS, ESQ.
                              One Rodney Square
                              920 N. King Street
                              P.O. Box 551
                              Wilmington, DE 19899


For Travelers Ins. Co.        Simpson, Thacher & Bartlett, LLP
                              By:  ELISA ALCABES, ESQ.
                              425 Lexington Avenue
                              New York, NY  10017

For BNSF:                     Pepper Hamilton
                              By:  ANNE HARANSON, ESQ.


For PD/FCR:                   ALAN RICH, ESQ.

For Loan Maker/
Long Acre:                    Pepper Hamilton
                              By:  DENNIS VERY, ESQ.

For the U.S. Trustee:         JOSEPH FORNARI, ESQ.


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Seaton Ins. Co.:        Drinker Biddle & Reath LLP
                            By:  MICHAEL F. BROWN, ESQ.
                            One Logan Square
                            18th & Cherry Streets
                            Philadelphia, PA  19103


For Royal Indemnity:        Wilson, Elser, Moskowitz, Edelman
                            & Dicker, LLP
                            By: CARL PERNICONE, ESQ.
                            New York, NY 10019

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Please be seated.  This is the matter of

2   W.R. Grace, Bankruptcy Number 01-1139.  I have a list of

3   participants by phone.

4           Michael Davis, Ashok Vasvani, Robert Guttmann,

5   Theodore Tacconelli, Sander Esserman, Peg Brickley, Marti

6   Murray, John Mattey, Mark Plevin, Brian Kasprzak, Kerri

7   Mumford, Sergei Filipov, Arlene Krieger, Lisa Esayian, David

8   Parsons, Ira Levee, Jonathan Lewinsohn, Joshua Katz, Richard

9   Levy, Marion Fairey, Jennifer Whitener, Andrew Craig, John

10  Mackin, Natalie Ramsey, Noah Heller, Curtis Plaza, Chelsea

11  Clinton, Janet Baer, Matthew Kramer, Thomas Brandi, William

12  Sparks, Christina Kang, Terrence Edwards, Richard Cobb, Scott

13  Baena, Alex Mueller, Theodore Freedman, Christopher Greco,

14  Barbara Harding, Shayne Spencer, Brian Murkherjee, Ari Berman

15  Richard Weschler, Martin Dies, Mark Shelnitz, Dale Cockrell,

16  Leslie Davis, Joseph Radecki, Daniel Hogan, Steve Peirce,

17  Merritt Pardini, Edward Westbrook, Laura Hammond, Robert

18  Horkovich, John Phillips, Michael Etkin, Jacqueline Dais-Visca,

19  Francine Rabinovitz, Jay Sakalo, Elizabeth Devine, Chris

20  Portner, Jeff Friedman, Gregory Boyer, Darrell Scott, Debra

21  Felder, David Bernick, Daniel Speights, Alan Runyan and

22  Elizabeth Cabraser.

23          I'll take entries in court, good morning.

24          MR. BERNICK:  Good morning, David Bernick for Grace.

25          MR. FREEDMAN:  Good morning, Your Honor, Theodore

1 Freedman for Grace.

2          MS. BAER:  Good morning, Your Honor, Janet Baer for

3 Grace.

4          MR. BRUENS:  Good morning, Your Honor, Craig Bruens

5 for Grace.

6          MR. MANNAL:  Good morning, Your Honor, Doug Mannal

7 for --

8          THE COURT:  One second, please.  I'm sorry, your

9 name?

10          MR. MANNAL: Doug Mannal, Kramer Levin.

11          THE COURT:  Thank you.

12          MR. O'NEILL:  Good morning, Your Honor, James O'Neill

13 for Grace.

14          MR. LOCKWOOD:  Good morning, Your Honor, Peter

15 Lockwood for the Asbestos Claimants Committee.

16          MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

17 for the PI Future Claimants Representative.

18          MR. WYRON:  Good morning, Your Honor, Richard Wyron

19 also for the PI FCR.

20          MR. PASQUALE:  Good morning, Your Honor, Ken Pasquale

21 from Stroock for the Unsecured Creditors' Committee.  With me

22 in court is Arlene Krieger of Stroock.

23          MS. KRIEGER:  Good morning.

24          MR. SAKALO:  Good morning, Your Honor, Jay Sakalo on

25 behalf of the Property Damage --

1          THE COURT:  Wait, I'm sorry, you're going too fast

2 for me.

3          MR. SAKALO:  I'm sorry.

4          THE COURT:  Okay, thank you, sir.

5          MR. SAKALO:  Good morning, Jay Sakalo on behalf of

6 the Property Damage Committee.

7          THE COURT:  Thank you.

8          MR. BAENA:  Good morning, Judge, Scott Baena on

9 behalf of the Property Damage Committee.

10          THE COURT:  Good morning.

11          MR. SPEIGHTS:  Good morning, Your Honor Dan Speights

12 on behalf of Anderson Memorial Hospital.

13          MR. FORNARI:  Good morning, Your Honor, Joseph

14 Fornari on behalf of the United States Trustee.

15          MR. COBB:  Good morning, Your Honor, Richard Cobb, of

16 Landis, Rath and Cobb on behalf of certain of the bank lenders.

17          MR. BROWN:  Good morning, Your Honor, Michael Brown

18 on behalf of Seaton Insurance Company and One Beacon America

19 Insurance Company.

20          MS. DeCRISTOFARO:  Good morning, Your Honor,

21 Elizabeth DeCristofaro for Continental Casualty Company.

22          MR. GLOSBAND:  Good morning, Your Honor, Dan Glosband

23 also for Continental Casualty Company.

24          MR. PERNICONE:  Good morning, Your Honor, Carl

25 Pernicone in for Arrowwood Indemnity, formerly Royal Indemnity

1  Company.

2          MR. COHN:  Good morning, Your Honor, Jacob Cohn for

3  Federal Insurance Company.

4          THE COURT:  Good morning.

5          MR. DEMMY:  Good morning, Your Honor, John Demmy of

6  Stevens and Lee for Fireman's Fund Insurance Company.

7          MR. COHN:  Good morning, Your Honor, Daniel Cohn for

8  the Libby claimants.

9          THE COURT:  Good morning.

10          MR. RAMOS:  Good morning, Your Honor, Marcos Ramos,

11 Richards, Layton and Finger on behalf of Bank of America.

12          MR. CHEHI:  Good morning, Mark Chehi of Skadden Arps,

13 and my colleague David Turetsky for Sealed Air Corporation.

14          MR. LEVY:  Richard Levy of Pryor Cashman on behalf of

15 the Property Damage Claimants, represented by Dies & Hile.

16          MS. ALCABES:  Good morning, Your Honor, Elisa Alcabes

17 from Simpson Thacher for Travelers.

18          MS. HARANSON:  Good morning, Your  Honor, Anne

19 Haranson from Pepper Hamilton, for BNSF Railway.

20          MS. COBB:  Good morning, Your Honor, Tiffany Cobb of

21 the Vorys, Sater, Seymour and Pease law firm on behalf of the

22 Scotts Company.

23          MR. RICH:  Good morning, Your Honor, Alan Rich for

24 the PD FCR.

25          THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. VERY:  Good morning, Your Honor, Dennis Very for

2    Long Acre.

3           MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

4    on behalf of Maryland Casualty Company and on behalf of Zurich

5    Insurance Company and Zurich International Inc.

6           MR. CRAIG:  Good morning, Andrew Craig on behalf of

7    Allstate Insurance Company.

8           MR. MONACO:  Good morning, Your Honor, Frank Monaco

9    on behalf of the Crown and State of Montana.

10          THE COURT:  Anyone else?  Okay, Mr. Bernick, Mr.

11   Freedman?

12          MR. FREEDMAN:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. FREEDMAN:  So, today, this happy day, marks the

15   beginning of the disclosure statement hearing in connection

16   with the joint plan that was filed by the debtors, the Asbestos

17   Claimants Committee, the Asbestos Claimants Future

18   Representative and the Equity Committee.

19          The plan was filed on September 19th and then a

20   motion to approve the disclosure statement and solicitation

21   procedures was filed on the 20th, excuse me the 25th.  The

22   deadline for objections was October 17th and we are now moving

23   forward to address all of the various objections that were

24   filed.

25          Your Honor, we submitted a brief last Friday, excuse

1 me, last Thursday, which set forth all of the objections in a

2 Schedule B, and as we proceed forward today, I'd like to work

3 from that schedule although for purposes of the presentation, I

4 want to reorganize it a bit, in order to get through the

5 materials in what I believe the Court will find to be an

6 efficient way.

7 　　　　　We've also prepared and I'd like to hand up to the

8 Court, a kind of a cross reference chart which actually

9 identifies the particular objection, where it sits on the

10 Court's agenda, so that the Court can refer to it from the

11 books that she has.  And the particular objection items that

12 are identified on the chart.

13 　　　　　THE COURT:  Okay, thank you.

14 　　　　　MR. FREEDMAN:  It seemed to us that the best way to

15 proceed on this, Your Honor, is to kind of organize our

16 presentation in the following way.

17 　　　　　We'd like to start by walking the Court through a

18 number of matters that are kind of big picture matters that

19 relate to either amendments, which will affect the language of

20 the plan or additional pleadings that remain to be filed in

21 order for the plan to be a complete package and we believe that

22 many of the objections that were filed will be disposed of when

23 these various steps are taken.  But I'd like to bring the Court

24 up to date on that.

25 　　　　　After we've gone through that, I'd like to talk to

1  the Court about three categories of objections that fall into a

2  logical block, those being objections to the disclosure

3  statement as to which an objector had identified certain

4  language that the proponents and particularly the debtors will

5  agree to accept and while we haven't filed an amended

6  disclosure statement, we will file with that language and we

7  can point to the Court the precise language.

8         Secondly would be matters as to which we have agreed

9  in principle that additional disclosure is required, but it

10  will require some drafting and talking with the objector in

11  order to get to a point where we can at least see if we can get

12  to mutually acceptable language.

13         And then the last is a category of objections where

14  we haven't concluded that the objection should be overruled as

15  to the approval of the disclosure statement, but we want to

16  take some time and look at the issue and will supplement the

17  disclosure statement after we've had a chance to consider it.

18  All of those matters we will walk through this morning.

19         After that, Your Honor, it seemed to us that the next

20  appropriate matter for the Court today would be to address the

21  block of objections which the debtors regard as being plan

22  objections, and ask the Court to rule that those matters, which

23  we've identified as plan confirmation objections should be

24  deferred until the confirmation hearing, so that we don't need

25  to spend further time dealing with disclosure statement issues

1 that relate to something that should really be dealt with as a

2 confirmation objection.

3         And then, finally, having got through all of that

4 material I'd like to go back and talk about a relatively few

5 number of objections to the disclosure statement that are

6 objections to, which the Court, we believe should overrule, as

7 not being appropriate for further disclosure.  But it would be

8 most efficient to get to that category after we've gotten

9 through the stuff that I've indicated first.

10         THE COURT:  All right.

11         MR. FREEDMAN:  So, with the Court's permission, I'd

12 like to now turn to the matters as to which we think there will

13 be amendments to the plan, or additional filings that will

14 amend the plan documents and so forth.

15         And if you'll just bear with me here, first off, Your

16 Honor, a number of parties have raised an issue about whether

17 or not claimants in Class 9, general unsecured creditors in

18 Class 9, who are not part of the lender group, should be

19 permitted the opportunity to come forward and demonstrate that

20 under applicable bankruptcy or non-bankruptcy law, they should

21 be entitled to a rate of interest, pendency interest which is

22 different from the rate that is provided in the plan.

23         And the debtors have agreed to amend the plan to

24 provide a procedure similar to the one that was adopted in the

25 USG plan, which would permit that process to occur.

1          For reference, Your Honor, because it will be useful

2  to know which objections we're talking about as being disposed

3  of by this amendment and I'll do this as we go through each one

4  of these, the General Unsecured Committee has raised this

5  objection in items 1, 2, 7 and 70 of the chart and the U.S.

6  Trustee has also raised the objection in item 13 on the chart

7  and if that way of referring to it is acceptable, I'll just use

8  that practice throughout.

9          THE COURT:  That's fine.

10          MR. FREEDMAN:  So, again, what we're going to do is

11  to amend the plan, to include a procedure similar to USG

12  whereby holders of creditors in Class 9 can come forward prior

13  to confirmation and seek, that is, they will note their intent

14  to come forward prior to confirmation and seek -- request that

15  they be paid post petition interest at a rate different from

16  what's provided in the plan.  The procedures for actually

17  determining that they are so entitled will incur after the

18  effective date and those procedures will be governed by claims

19  allowance rules as if the objection was being held

20  pre-effective date but the actual objection process will be a

21  claims allowance objection that will be post effective date.

22          The only issue that would relate to such objections

23  would be the rate of pendency interest.  The claimant, for this

24  purpose, would not have to demonstrate the entire amount of

25  their claim, there may be other objections that we

1 affirmatively file with respect to their claim that will

2 implicate different procedures, but as to ths particular

3 amendment, which we refer to as the USG procedure, it will be

4 solely directed to the appropriate pendency interest rate that

5 the claimant is entitled to.

6          And I should note, Your Honor --

7          THE COURT:  I'm sorry, so this will not, to the

8 extent that someone has an objection to claim, the process will

9 not involve an allowance process but only a determination of

10 the interest rate?

11          MR. FREEDMAN:  No, Your Honor.  There are two

12 potential objections that may be raised to general unsecured

13 claims.  One objection will be that the claim itself is

14 invalid.  And to the extent that it is an objection to that

15 claim, then the process will involve all issues related to the

16 validity of the claim.

17          To the extent that the issue is whether or not the

18 particular creditor is entitled to a rate of interest different

19 from the rate of interest contemplated by the plan, but the

20 debtor otherwise does not dispute the merits of the claim, the

21 only issue would be the rate of interest.  Does that answer the

22 Court's question?

23          THE COURT:  I just wanted to make sure I wasn't going

24 through two objection processes for one claim.

25          MR. FREEDMAN:  I appreciate your pointing that out

**J&J COURT TRANSCRIBERS, INC.**

1  and we haven't drafted the language, so we will make sure that

2  the language is clear on that point.

3         THE COURT:  Okay.  Does anyone -- do you want to find

4  out whether people want to be heard on these issues as you go

5  along, maybe it would make sense to --

6         MR. FREEDMAN:  Sure.

7         THE COURT:  -- sort of put them to bed one at a time.

8  Does anyone have an objection to that resolution?

9         MR. PASQUALE:  Your Honor, Ken Pasquale for the

10  Unsecured Creditors' Committee.  We do not have an objection to

11  that resolution.  Of course, the proof is in the pudding we

12  need to see the language, but the process is certainly one we

13  raised in our objection.

14         THE COURT:  Okay, fine.  All right, Mr. Freedman,

15  thanks.

16         MR. FREEDMAN:  Your Honor, would it be possible just

17  to turn off this --

18         THE COURT:  Turn it off?  Yes, sure.

19         MR. FREEDMAN:  Thank you.  The next plan amendment

20  that the debtors intend to make which is implicated by General

21  Unsecured Creditors' Committee objections identified on the

22  chart as number 6, 8, 70, 75 and 74, and also Long Acre

23  objection number 16, have to do with the process for making

24  objections to claims and also providing a notice that certain

25  claims, certain general unsecured claims will not be objected

1 to.  And the debtors intend to file a list of claims for which

2 they have no objections and the plan will incorporate that

3 concept.  And also propose to amend the plan to provide that

4 requests for extensions of the objection deadline may only be

5 obtained on notice to the claimants.  The plan was unclear,

6 frankly, about that point, whose claims are still pending.

7           There is also an objection that falls into this

8 category that relates to the timing for payment of the claim

9 itself.  The plan in two places both in the actual treatment

10 section on the general unsecured claim and also in the general

11 statement about what it means to say that a claim is going to

12 be paid on the effective date, contemplates that the payment

13 would be made on the effective date or as soon as reasonably

14 practical thereafter.

15          That language is ubiquitous in plans of this sort,

16 the debtors have not inserted that language with any hidden

17 agenda to delay making payment and intend to make the payment

18 on the effective date, or as soon as reasonably practicable

19 thereafter.  Some claimants have raised a disclosure statement

20 objection that the disclosure of that point is not adequate and

21 we would certainly make clear that that is the process that

22 would be used.  It's not clear to me whether or not there may

23 also be a confirmation objection that goes to that issue and we

24 can defer any such discussion of that point, which we believe

25 not to be a meritorious argument.

1              THE COURT:  Was it a feasibility issue?  Or is it

2    simply a disclosure that the disclosure statement is not clear

3    as to when the debtor intends to pay?

4              MR. FREEDMAN:  I believe this was part of what the

5    General Unsecured Creditors' Committee complained about and

6    maybe Mr. Pasquale could elaborate on his objection on that

7    point.

8              THE COURT:  Mr. Pasquale.

9              MR. PASQUALE:  Thank you, Your Honor.  Yes, the

10   disclosure statement has no description, whatsoever, about what

11   the debtors intend by, as reasonably practical as to payment.

12   There is no end date to that, whatsoever.  Theoretically, it

13   could go till the end of time.

14             THE COURT:  Oh, so you wanted something like when the

15   claim is allowed, so many days after the claim is allowed.

16              MR. PASQUALE:  There needs to be some finite date on

17   that, so everyone understands when payment would be expected.

18             THE COURT:  Okay.  All right, can the debtor add

19   something?

20             MR. FREEDMAN:  Sure, we would do that, Your Honor.

21             THE COURT:  All right.

22             MR. FREEDMAN:  The next issue that we intend to amend

23   the plan on has to do with the objection of the General

24   Unsecured Creditors' Committee expressed in item number 79 on

25   the chart, identified in item number 79 on the chart, as to the

1  plan's inadequate provision for the continued existence of the

2  General Unsecured Creditors' Committee after the effective

3  date.  It's the intention of the debtors to provide in the plan

4  that the General Unsecured Creditors' Committee will have a

5  continuing existence past the effective date for purposes that

6  are consistent with the continued existence of the other

7  committees that are already provided for in the plan.

8          The precise language and exactly what the details of

9  that are, remain to be worked out with the General Unsecured

10  Creditors' Committee.  We hope we can work it out so that the

11  Court won't ever hear of the issue again.  But we will be

12  amending the plan in that respect.

13          THE COURT:  All right.  Mr. Pasquale, I take it you

14  just need to talk to the debtor about this.

15          MR. PASQUALE:  We need to work out the language, Your

16  Honor, and we also need to consider the ongoing litigation

17  regarding the post petition interest issues.

18          MR. FREEDMAN:  The next one, Your Honor, is with

19  respect to the plan's treatment of the assumption of executory

20  contracts and that's identified on line item 78 of the chart

21  and the General Unsecured Creditors' Committee has asked that

22  the plan be amended to provide for a process regarding notice

23  of cure, that is the amounts that would be required to cure to

24  holders of executory contracts and also an opportunity to

25  object to the assumption.  The debtors will amend the plan

1 procedures in Section 9.1 to provide for that.

2            THE COURT:  Okay.  Mr. Pasquale, okay?

3            MR. PASQUALE:  Yes, Your Honor.

4            THE COURT:  All right.

5            MR. FREEDMAN:  Your Honor, the next one is an

6 objection that is raised by CNA in line items 50 and 108 of the

7 chart and also item 76 on the chart of the General Unsecured

8 Creditors' Committee.

9            And, that issue has to do with the way in which

10 claims are deemed to be allowed or disallowed under the plan

11 and the relevant effect of Section 502(e) with respect to the

12 allowance of claims as it relates to the TDP.  Also whether or

13 not a general unsecured claim would be deemed disallowed if no

14 formal objection has been filed.

15            As to the matters that don't relate to asbestos

16 claims that are going to be covered by the channeling

17 injunction and treated under the TDP, the debtors would amend

18 the plan to make clear that if a proof of claim has been filed,

19 it will be deemed objected to only if there is a formal

20 objection filed to the claim, with the exception of the certain

21 employee claims which under the plan the debtors contend are

22 properly treated by -- saying that the plan constitutes a

23 deemed objection, that's a matter to be discussed subsequently.

24 But as to other than these employee claims, we would have to

25 file a notice of objection for a matter that is subject to a

1  proof of claim, which we believe is what the law requires.

2        As to the matters that are related to the way in

3  which the TDP treats asbestos claims that will be handled under

4  the TDP, I'll just summarize it by saying that we think that,

5  and I believe that the Asbestos Claimants Committee and the FCR

6  agree that the TDP may be somewhat ambiguous on the concepts of

7  allowance and disallowance as it relates to the TDP and we're

8  going to examine that language and amend the TDP to the extent

9  it's appropriate.  Is that --

10        MR. LOCKWOOD:  That's correct.

11        THE COURT:  Okay.  I didn't understand the point

12  about the employee claims, that the plan is going to be deemed

13  an objection?

14        MR. FREEDMAN:  The plan contemplates that there are

15  a number of employee benefits claims and as to those employee

16  benefits claims, the plan constitutes a deemed objection to

17  those claims.  We will deal with issues related to notice and

18  solicitation, that will allow those claimants to be properly

19  noticed of their objection subsequently, as we get to the

20  point.  But what we've in effect provided and the disclosure

21  will be absolutely clear on this, is that as to this package of

22  claims filed by employees for benefits, many of which the

23  debtors would dispute, that the debtors -- that the plan itself

24  constitutes a deemed objection to those claims, which will

25  permit the debtors to not have to start a formal claims

1  allowance process by filing an objection as to each one of

2  those claims.

3        And we think that that procedure in this particular

4  case, is an appropriate procedure that's permitted for dealing

5  with that kind of a claim.

6        THE COURT:  Well, are these current employees?

7        MR. FREEDMAN:  Some are current, and some are

8  retirees.  The point, Your Honor, though, is that all of them

9  will be very clearly notified about the fact that the debtor is

10 intending to deal with their claims in this way and they will

11 have the opportunity to contest their claims like every other

12 claims allowance process but there are many, 7,000 claims that

13 fall within this category and it seemed the most efficient way

14 to treat it, by providing that kind of --

15       THE COURT:  Well, maybe as long ss they're not going

16 to get this in another package of, you know, plan disclosure

17 statement issues and it gets buried somewhere because that's

18 not effective notice and that's the problem.  They need a

19 separate piece of paper and a separate mailing, or something

20 that is going to be real effective notice, not just something

21 slipped into another, you know, 45 pages or 100 page worth of

22 documents so that it gets slipped by.

23       So, you know, it's one thing to say that the plan

24 deems -- it is deemed the objection, I'm not sure that makes

25 much difference, but they need some real effective notice.  So,

1 you can work with the various committees to figure out what

2 that is.  I don't have a problem with the plan being deemed the

3 objection, but I do have a problem with the notice.

4 　　　　MR. FREEDMAN:  Thank you, Your Honor, we understand

5 that.

6 　　　　THE COURT:  Okay.

7 　　　　MR. PASQUALE:  Your Honor, excuse me, may I --

8 　　　　THE COURT:  Yes.

9 　　　　MR. PASQUALE: -- Ken Pasquale for the committee.  Mr.

10 Freedman mixed a couple of concepts in that last presentation.

11 There is also a provision in the disclosure statement, I think

12 what I heard Mr. Freedman say is with respect to, let's call

13 them non-employee claims, that the provision now in the plan

14 that would deem disallowed as of the effective date claims even

15 where no objection has been filed, that that is going to be

16 changed.  In other words a claim objection must be filed for a

17 claim to be disallowed.

18 　　　　MR. FREEDMAN:  Yes.  Right, we intend to change that,

19 Your Honor.

20 　　　　MR. PASQUALE:  Okay.

21 　　　　MR. FREEDMAN:  Next, Your Honor, are --

22 　　　　THE COURT:  Wait one second, Mr. Freedman, I'm sorry.

23 Give me a chance to get caught up here.

24 　　　　　　　　　　(Pause)

25 　　　　THE COURT:  The employee claims that this is

1  affecting, are they all in Class 9?

2          MR. FREEDMAN:  They're a separate class, Your Honor.

3          THE COURT:  They're a separate class, okay.

4          MR. FREEDMAN:  Yes.

5          THE COURT:  So they are going to be deemed an

6  impaired class.

7          MR. FREEDMAN:  No, they'll be paid a hundred cent

8  dollars, it's just an issue of whether or not they are going to

9  be objected to and how the plan objection to the allowance of

10 the claim as opposed to the issue of impairment.

11         THE COURT:  Oh.

12         MR. FREEDMAN:  But they will get a solicitation

13 package for non-consenting classes and also a separate and

14 clear notice that the plan constitutes an objection to their

15 claim.

16         THE COURT:  Okay.  They're not in Class 9.  Okay, so

17 you're still planning to pay 100 percent of whatever their

18 benefits are, it's just that you're objecting -- why are you

19 objecting to them if you're going to pay them?

20         MR. FREEDMAN:  95 percent of the employee claims we

21 believe are legitimate, but there are some that are, in our

22 view, clearly not appropriate for allowance and subject to

23 objection.  Just amounts that are overreaching and not

24 reflecting what the debtor believes its obligations to these

25 employees are.  And we will be objecting to those claims.

1        THE COURT:  I see.  So, you're going to pay 100

2   percent of the allowed claims but these 7,000 are the ones that

3   you think are objectionable.

4        MR. FREEDMAN:  The 7,000 are all the employee claims,

5   the ones that we think are objectionable are the smaller group.

6        THE COURT:  Within that set.

7        MR. FREEDMAN:  Within that 7,000.

8        THE COURT:  Okay, you confused me.  I thought you

9   were saying there were 7,000 that you were filing objections

10  to.

11       MR. FREEDMAN:  No.  We are not --

12       THE COURT:  All right.  Can you start it again and

13  tell me what is it, with respect to these employee claims that

14  you're objecting to.

15       MS. BAER:  Your Honor, we have about 7,000 employee

16  claims, we have not gone through claim by claim by claim and

17  done an objection process for them.  What we've seen is that

18  most of these are typical, they're fine.  They were employees,

19  they were former employees, they're owed something by W.R.

20  Grace and under the plan that obligation passes through the

21  reorganized debtor, they will be paid in the ordinary course of

22  Grace, pursuant to the various pension plan employee claim

23  related documents.

24       But there are some that are filed as employee claims

25  that are not employee claims, they were never an employee,

1    they're not a former employee, they're just something that was

2    filed this way, but clearly is not an employee claim.

3         What the mechanism will do is basically say if you've

4    got an employee claim, you fall within X category, your claim

5    is fine, it passes through, but if you don't fit within this

6    category, you don't fit this definition, this plan constitutes

7    an objection to your claim.

8         THE COURT:  Well, how are the folks going to know

9    whether or not you are or are not objecting?  I mean, you have

10   to identify who it is that you're objecting to, because

11   otherwise somebody who has filed a claim is going to say, well,

12   my claim is okay, I filed it and I was an employee.  Unless you

13   tell a person that you are objecting to that claim, they won't

14   know that you've objected to the claim.

15        MS. BAER:  It's done by definition.  If they fall

16   within the definition they're fine, if they don't fall within

17   the definition it's being objected to.

18        THE COURT:  No, that won't work, no.  You can't do

19   that.  You have to notify each claimant that you are objecting

20   to their claim or not.  That's the way it works. You've got to

21   do that.  You have to undertake that process.

22        MS. BAER:  What we can do then is, we can build in

23   the mechanism, but build in the list, if you will.

24        THE COURT:  You have to build in the list, because

25   otherwise they won't know whether you're paying them or not

**J&J COURT TRANSCRIBERS, INC.**

1  paying them and that may or may not affect their vote and that

2  will definitely affect what the reorganized debtors'

3  obligations are.

4          MS. BAER:  They won't be voting, though, it's an

5  impaired class.  I mean, not -- an unimpaired class.  If they

6  have an allowed claim, they get paid 100 percent.

7          THE COURT:  But they won't know whether they have an

8  allowed claim.

9          MS. BAER:  Right, that's the objection process.

10         THE COURT:  So, you have to build in whether you are

11 or are not objecting to that treatment.  You have to give them

12 a list that says, you know, person A, I'm objecting to your

13 claim, person B I'm not objecting to yours.  You must tell the

14 person who has filed the claim that you are or are not

15 objecting to their claim.

16         MS. BAER:  Okay.

17         MR. FREEDMAN:  That's fine, Your Honor.  We

18 understand your instructions.

19         All right, the next category, Your Honor, relates to

20 --

21         THE COURT:  I'm sorry someone else wants to be heard.

22         MR. GLOSBAND:  The first part of the colloquy dealt

23 with CNA objection --

24         MS. HELLER:  Your name?

25         MR. GLOSBAND:  My name is Daniel Glosband for CNA,

1  from Goodwin Procter.  And, Mr. Freedman acknowledged that the

2  TDP's would be amended to resolve an ambiguity with respect to

3  the implications of the use of references to Sections 502(e)

4  and 509(c), and I simply wanted to say that no one has told us

5  how they intend to resolve it or what the ambiguity is going to

6  mean when it's been clarified, so we reserve our rights on that

7  issue pending seeing what they say.

8            MR. FREEDMAN:  We understand that.

9            THE COURT:  Okay.

10           MR. FREEDMAN:  All right.

11           THE COURT:  Is this an issue that's going to be put

12 back on the November 14th, whatever that is?

13           MR. FREEDMAN:  Virtually all of these issues will be

14 back on that in the sense that the language of the disclosure

15 statement and the plan both will be amended and to the extent

16 that those amendments are filed before the hearing on the 14th,

17 people will obviously have a right to object to the amended

18 language.

19           THE COURT:  Okay.

20           MR. FREEDMAN:  Your Honor, the next issue relates to

21 some language in the plan that some of the objectors felt was

22 ambiguous with respect to the ability of the plan proponents to

23 amend the plan after the effective date.  Now, the debtors --

24 or the plan proponents do not intend to provide for a license

25 to amend the plan that would exceed what's permitted under

1  Section 1127 and the language in the plan will be clear about

2  that.

3          That is not to say that some of the plan documents

4  don't, within their terms, contemplate the ability to amend it

5  by the parties to those documents going forward.  For instance,

6  the TDP is a document that the trustees will have the ability

7  to provide for amendment on certain provisions, post

8  confirmation.  That's all expressed on the terms of those

9  documents, but the underlying plan itself will clearly be

10  governed by the rules, in particular Section 1127 and we'll

11  amend the plan to be clear about that.

12          THE COURT:  All right.

13          MR. FREEDMAN:  And, those are General Unsecured

14  Creditors' Committee objections number 72 and Libby objection

15  number 32.

16          THE COURT:  I'm sorry, and?

17          MR. FREEDMAN:  Number 32, Libby objection number 32.

18          THE COURT:  All right.

19          MR. FREEDMAN:  The State of Montana, in objection

20  number 29 and Libby claimants in objection number 30, raised

21  the issue about the TDP not yet providing for an initial

22  payment percentage number.  We understand that and the TDP will

23  be amended to provide for -- to address that issue.

24          THE COURT:  Okay, when?

25          MR. FREEDMAN:  Well, clearly before the disclosure

1  statement is approved, and we would expect to have that

2  amendment in time to address at the November 14th hearing.

3          THE COURT:  Okay.

4          MR. FREEDMAN:  Your Honor, CNA raised an objection,

5  number 107, that relates to the definition of settled insurance

6  companies, and the procedures that would be built into that

7  definition, to make clear how a current -- an insurance company

8  that has open coverage currently would be permitted to be

9  included within the definition of settled insurance companies

10 which is a group of insurance companies that get the benefit of

11 the Section 524(g) injunction.

12         We will be amending the plan to more clearly provide

13 for those procedures.

14         The ERISA claimants, Your Honor, filed a couple of

15 objections, number 88 and 121 which go to the issue of the

16 filing of the plan supplement.  And the debtors are going to

17 amend the plan to provide that it would be filed within 10 days

18 prior to the confirmation date.

19         THE COURT:  All right.

20         MR. FREEDMAN:  Your Honor, the General Unsecured

21 Creditors' Committee --

22         THE COURT:  Excuse me, Mr. Freedman, I'm sorry.

23 Before the start of the confirmation hearing, ten days before

24 the start of the confirmation hearing?

25         MR. FREEDMAN:  Yes, confirmation hearing, I

1  apologize, I misspoke.

2            THE COURT:  Okay.

3            MR. FREEDMAN:  The General Unsecured Creditors'

4  Committee raised an objection on number 77 that went to the

5  inclusion in one of the release provisions of the plan, Section

6  8.8.8 of a reference to any third parties without going into

7  the implications of what that language meant.  That language

8  will be deleted from the plan.

9            Excuse me, Your Honor.  It's ten days before the

10 confirmation -- the plan supplement will be filed ten days

11 before the confirmation objection deadline.  So, that it's even

12 more --

13           THE COURT:  Okay.  All right, thank you.

14           MR. FREEDMAN:  The Property Damages Committee, the

15 Libby claimant, in objection number 12, the Libby claimants in

16 objection number 38 and the State of Montana in objection

17 number 28, objected to the situation that the plan has not

18 included some of the documents related to the treatment of

19 property damages claims and all of those documents will be

20 timely filed before the conclusion of the disclosure statement

21 hearing and in a way that will permit people to file objections

22 or raise any issues with respect to those documents, the way in

23 which the plan reads in the face of those documents and the

24 disclosure that's made with respect to that.

25           As the Court knows, the Future Claimants

1  Representative for property damages has just been appointed and

2  will have a voice in how those documents read, and the debtors

3  are in the process of addressing those issues.

4          THE COURT:  All right.

5          MR. FREEDMAN:  The debtors' plan -- excuse me, the

6  disclosure statement itself, does not include a reference to

7  Exhibit 19 or did not have attached to it Exhibit 19, which are

8  the list of retained causes of action.  That will be filed

9  before the conclusion of the disclosure statement hearing and,

10 obviously, with appropriate notice and I would expect before

11 the hearing on the 14th.

12          Your Honor, a very significant issue that is actually

13 a solicitation issue but implicates other issues with respect

14 to the plan itself, has to do with the way in which the

15 debtors, or the plan will treat the right to vote of the

16 General Unsecured Creditors' Committee.

17          As the Court understands, I believe, the debtors

18 believe that that class, that is Class 9, general unsecured

19 creditors, will be not impaired by the plan.  But, and in

20 particular, as a result of the amendment that the debtors have

21 agreed to make with respect to the USG procedures, the plan, in

22 the debtors' view, clearly provides that those claimants will

23 get all that they're entitled to under law, and thus fall

24 within the definition of non-impairment.

25          Having said that, the debtors have agreed to permit a

1  provisional vote, to solicit a provisional vote of Class 9 and

2  the general unsecured creditors have indicated that with the

3  debtors agreement to take that provisional vote as part of the

4  solicitation, the issue of whether or not Class 9 is impaired

5  will be deferred to the confirmation hearing.

6           THE COURT:  Mr. Pasquale?

7           MR. PASQUALE:  Ken Pasquale for the committee, Your

8  Honor.  Yes, that's agreeable, so long as - we'll need to see,

9  of course, the form of ballot and the like, but yes, so long as

10 the class is voting, I don't see a distinction, however, Mr.

11 Freedman pointed out the USG type provision that's going to be

12 added for other unsecured creditors, it's one class, bank

13 claims and all other.  So either the class is impaired or the

14 class is not impaired, but we do agree that that is an issue we

15 can argue at confirmation, so long as the vote is taken.

16          MR. COBB:  Your Honor, Richard Cobb, on behalf of

17 certain bank lenders.  Your Honor, I understand that is the

18 agreement between the bank lenders and the debtors.

19          THE COURT:  Okay.

20          MR. FREEDMAN:  Your Honor, just a housekeeping

21 matter, I neglected to point out to the Court that with respect

22 to the filing of Exhibit 9 that was raised by Kaneb, objection

23 number 42, with respect to the provisional vote.  That

24 addresses objections by the U.S. Trustee, in item 13 by the

25 General Unsecured Creditors' Committee in item 115 and by Long

1  Acre in item 118.

2         We've already discussed the issue of amending the

3  plan with respect to, and really, and the solicitation program,

4  with respect to the deemed objections to employee claims.  We

5  understand the Court's instructions on that.  That is

6  implicated by General Unsecured Creditors' Committee objection

7  number 150.

8         THE COURT:  Okay.

9         MR. FREEDMAN:   And then finally, Your Honor, we have

10 filed Exhibits 5 and 6 to the plan.  Those were filed on Friday

11 of last week.  Excuse me, Thursday of last week, and over the

12 weekend -- Thursday we filed Exhibit 5, which is the list of

13 the settled insurance company and over the weekend with respect

14 to Exhibit 6, which is the insurance assignment agreement.  A

15 number of objections were raised by insurance companies that

16 complained about the fact that those items were not filed and

17 we've now disposed of that.

18         THE COURT:  All right.

19         MR. FREEDMAN:  So, Your Honor, that covers the

20 package of matters which will require amendments to the plan or

21 the filing of additional -- which will involve either amending

22 the plan, amending the solicitation procedures, or filing some

23 additional documents that go to completing the plan.

24         I would also say that there are -- there still needs

25 to be filed the transactional documents between the debtors and

1  the personal injury trust, and those documents will be filed,

2  hopefully, by the commencement of the November 14th hearing.

3       THE COURT:  Anyone have any comments with respect to

4  what Mr. Freedman has put on the record so far or -- good

5  morning.

6       MR. BROWN:  Good morning, Your Honor, Michael Brown

7  for Seaton Insurance Company.  Just one comment and we're

8  working with the debtor on this issue.

9       The Exhibit 5 that was recently filed has errors in

10  it.  There is a policy from my client Seaton that was

11  originally described as being resolved under the old plan,

12  which is now listed as settled only as to products and my

13  understanding is that the debtor has deferred to Mr. Horkovich,

14  the insurance counsel for the committee to resolve that issue.

15       THE COURT:  Okay.

16       MR. PERNICONE:  May I be heard, too?

17       THE COURT:  Ye, sir.

18       MR. PERNICONE:  Carl Pernicone for Arrowwood

19  Indemnity, formerly known as Royal Indemnity Company.  We're in

20  the same boat as Seaton.  The settlement agreement that we had

21  reached with Grace 13 years ago with respect to these online

22  policies, our understanding for 13 years that it fully resolved

23  all coverage issues.  This exhibits opens that and suggests

24  that it's a products only settlement.  We vehemently disagree

25  with that and, obviously, we will be working to see what we can

1 do about that.

2        THE COURT:  Okay.  Well, I think to the extent that

3 there are those types of issues, hopefully between now and

4 November 14th, you're going to get them resolved, and if you

5 don't then, you know, we'll have issues.

6        MR. PERNICONE:  That's our intention, Your Honor.  We

7 only got it, really, one and a half business days before today,

8 so obviously, we're in no position to have a dialogue, but

9 that's the expectation.

10        THE COURT:  Yes.

11        MR. PERNICONE:  Thank you.

12        THE COURT:  All right.  Good morning.

13        MR. COHN:  Good morning, Your Honor, Daniel Cohn, for

14 the Libby claimants.  I really wanted to say a couple of words

15 about Exhibit 5, which is the list of settled insurance

16 companies.

17        This is one of the documents as to which there is an

18 unlimited ability to amend, apparently, without time limit and

19 we remain concerned about that.  Obviously, if there are

20 typographical errors in policy numbers, that kind of thing, of

21 course, needs to corrected and there needs to be a mechanism to

22 timely do so, but to the extent that insurance companies are

23 going to be added or subtracted or as in Mr. Pernicone's case,

24 for example, if there were going to be a change in the exhibit

25 as it relates to what coverages were deemed settled, a

1  substantive matter not merely a typographical error, there

2  would need to be adequate chance for all parties to respond,

3  especially the Libby claimants because what he's talking about

4  is coverage for Libby claims.

5         The other observation I wanted to make, Your Honor,

6  is that while Exhibit 5 is certainly helpful disclosure, we now

7  know who the settled insurance companies are, and what the

8  coverages are that are purported to be settled, there are

9  additional disclosure issues that we should talk about, whether

10 now or at some other appropriate point in the hearing, for

11 example, what consideration is being paid by the settled

12 insurance companies in exchange for the Section 524(g)

13 protection.

14         THE COURT:  Well, I thought --

15         MR. FREEDMAN:  Your Honor --

16         THE COURT:  -- excuse me, I thought that Exhibit 5

17 was previously settled policies not to be settled policies.

18         MR. FREEDMAN:  Exhibit 5 will --

19         MS. HELLER:  Please use the microphone.

20         MR. FREEDMAN:  Exhibit 5 will identify all the

21 settled insurance companies.  So if a company makes a

22 settlement that is -- that permits it to be included within

23 Exhibit 5, that company would have that option.  And I'm not

24 quite sure what Mr. Cohn is referring to about a need to know

25 the consideration.

1          THE COURT:  Well, it has to be, if it's a settlement,

2    it's going to have to come before the Court.  I'm not going to

3    permit the debtor to just add insurance policies to Exhibit 5

4    without bringing a 9019 motion.

5          MR. FREEDMAN:  I think that that's everybody's --

6          MR. LOCKWOOD:  I think that's everybody's

7    understanding.  And if Mr. Cohn had some different

8    understanding, he's confused.

9          MR. FREEDMAN:  Yes.

10          THE COURT:  So, right now, my understanding is that

11   Exhibit 5, as of now, should only be already settled policies.

12   Is there something on it that's other than already settled

13   polices?

14          MR. FREEDMAN:  Your Honor, I'll confirm this, but I

15   don't believe so.  I don't believe that there's been any

16   settlement that hasn't, indeed, been brought before this Court.

17   I'm sure that if it was done post petition, it was brought

18   before the Court and if it was done prepetition, it was already

19   settled.

20          THE COURT:  Right.  So, it should --

21          MR. COHN:  Your Honor, that's my understanding also.

22   I don't think that anything that's on there, that I know of, is

23   a newly settled insurance policy.

24          THE COURT:  Okay.

25          MR. COHN:  The distinction, the point I was getting

1  at, Your Honor, is that there may be some policies on there

2  that represent post petition settlements that were approved by

3  this Court.  There are other companies listed on there,

4  apparently, and of course we have incomplete knowledge on this,

5  but apparently because they entered into settlements that were

6  long ago, prepetition settlements.  And in the case of

7  prepetition settled policy, the question would be, what

8  consideration is being offered in terms of the funding of this

9  plan, in exchange for the Section 524(g) protection because

10  otherwise it would the Libby claimants position that an

11  insurance company is not entitled to the protection of a

12  Section 524(g) injunction without making a substantial

13  contribution to the plan.  Not money that was turned over to

14  Grace years ago, and which Grace expended years ago on lord

15  knows what.

16         THE COURT:  Oh, I see.  You're contentions is that

17  Exhibit 5 is something more than just settled insurance

18  policies, it's settled insurance policies entitled to a 524(g)

19  injunction.

20         MR. COHN:  That's the way it flows through the plan,

21  Your Honor.

22         MR. FREEDMAN:  But, Your Honor --

23         MR. PERNICONE:  Your Honor, may I be heard, too,

24  because they're talking about the Arrowwood policies.  Carl

25  Pernicone, again, for Arrowwood Indemnity, formerly Royal

1  Indemnity.

2          The Zonolite policies that we're describing were

3  listed in 2004 by Grace as fully resolved policies.  On

4  September 19th, when Grace filed its disclosure statement, I

5  think it's on Page 42, the text says that all of the primary

6  coverage including the primary Zonolite coverage, was fully

7  resolved, so our position is, that these policies aren't going

8  to be contributing anything to the trust because they're fully

9  settled.

10         THE COURT:  Well, that may be, that may be, but Mr.

11 Cohn's point is, they may be fully settled, but having fully

12 settled doesn't get you a 524(g) injunction, it simply gets you

13 a settlement.

14         MR. PERNICONE:  I understand that, but I wanted Your

15 Honor to understand that the change in position, this is in

16 2004, these were described as fully resolved policies, on

17 September 19th they were described as fully settled, now we're

18 changing something.

19         THE COURT:  I understand.

20         MR. FREEDMAN:  Your Honor, counsel is injecting into

21 this procedure something that has absolutely nothing to do with

22 what the Court is being asked to consider at this point.

23         MR. PERNICONE:  I'm trying to inform the Court,

24 fully, about the nature of the settlements that were described

25 --

1          MR. FREEDMAN:  We understand what counsel is trying

2  to inform the Court of, but the fact of the matter is, these

3  are quintessential plan confirmation issues --

4          THE COURT:  They are but folks we are going to take

5  this up at plan confirmation if it's not resolved.  So, a word

6  to the wise, get it fixed, one way or another, get it fixed

7  because this one will not be ducked for confirmation, it will

8  not be ducked.  So, get it fixed, one way or another.

9          MR. PERNICONE:  Thank you, Your Honor.

10          MR. COHN:  Your Honor, the point about disclosure

11  here, which is what I understand we're primarily here for, is

12  simply that to the extent that there is -- well, whatever the

13  consideration is or was, for the settlement that entitles these

14  people to be listed on Exhibit 5, should be disclosed, so that

15  everybody knows what it is and can formulate, if necessary, the

16  appropriate confirmation objections.

17          THE COURT:  Well, I don't think for disclosure

18  statement purposes the issue is how much the settlement was

19  prepetition.  I mean, the debtor -- let me just pick a

20  hypothetical.  Let's say a policy was settled in 1990, for

21  example, the debtor undoubtedly took those funds into its

22  general revenue stream at some point, used the funds for

23  whatever purpose they were used, what difference does it make

24  at this point if the settlement was a million dollars or $20

25  million, it's gone.

1          MR. COHN:  No, I -- Your Honor, it's not so much that

2    as that if there is going to be any new consideration offered

3    and maybe that just goes to your point of a few minutes ago

4    that any new settlement would need Court approval anyway.

5          THE COURT:  Exactly.

6          MR. COHN:  So, in that case, I think we have covered

7    the universe.

8          THE COURT:  Right.

9          MR. COHN:  Thank you.

10          THE COURT:  Okay.

11          MR. FREEDMAN:  Your Honor, just to be clear then,

12    because this issue does actually come up subsequently with

13    respect to some disclosure statement objections which we

14    believe the Libby claimants have made, which we believe should

15    be overruled, it is absolutely unnecessary in the debtors'

16    view, to go into the particulars of each of these prepetition

17    settlements in the disclosure statement and if Mr. Cohn or

18    somebody else has a problem with extending 524(g) relief to any

19    particular settled insurance company, under any theory, they

20    will be permitted to pursue their arguments at the confirmation

21    hearing.

22          THE COURT:  And they'll get discovery, so just

23    understand, it's a discovery issue and if it takes time and it

24    defers the confirmation hearing because they need discovery,

25    that's going to be the consequence and I won't hear no

1  discovery on this issue because you're not going to disclose

2  it.  So, you can't have the cake and eat it, too.  That's going

3  to be the issue, folks.  If you want a break for a few  minutes

4  to discuss it, I'll let you confer with your litigation counsel

5  --

6           MR. LOCKWOOD:  Your Honor, Your Honor --

7           THE COURT:  Mr. Lockwood, I'm telling you, that's how

8  it's going to be.

9           MR. LOCKWOOD:  They'll be informed, Mr. Cohn will be

10  informed.  Mr. Cohn is trying to get, as Your Honor has

11  correctly identified, discovery in support of confirmation

12  objections.

13          THE COURT:  Yes.

14          MR. LOCKWOOD:  Okay.  He has a legal position which

15  is, you've got to put new consideration in.  The statute talks

16  about consideration on behalf of something.  It will become

17  clear in the fullness of time, that Grace has indemnified many,

18  if not all of these companies from the earlier settlements.  It

19  will become clear that Grace is taking the position and the

20  plan proponents have accepted the position that part of the

21  consideration that Grace is paying, is on behalf of companies

22  with which it has settled prepetition and indemnified because

23  it has an interest, a financial interest in not having

24  indemnity claims come back to Grace.

25          THE COURT:  And it may very well.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LOCKWOOD:  That is not an issue for today, Your

2    Honor.

3          THE COURT:  It's not.

4          MR. LOCKWOOD:  And the insurers will be -- and Mr.

5    Cohn, will be told at an appropriate time, whether, if at all,

6    any new consideration is coming from these insurers.  You are

7    correct, he's entitled to know it, but we don't have to put

8    every possible confirmation objection that Mr. Cohn

9    anticipates, in a disclosure statement in which he's the only

10   person that's interested in it.  But it will be disclosed.

11         THE COURT:  That was the only point, Mr. Lockwood.

12   All I said was, it's a discovery issue, and it is a discovery

13   issue.

14         MR. LOCKWOOD:  We agree, Your Honor.

15         THE COURT:  Okay, thank you.

16         MR. FREEDMAN:  Your Honor --

17         THE COURT:  What more Mr. --

18         MS. DeCRISTOFARO:  Your Honor, I just wanted to make

19   clear that Exhibit 5 will have other issues raised, it seems to

20   be incomplete to a number of us who have settlements and things

21   and I just -- I'm not raising anything now, but I want to let

22   you know that there is a lot attendant to that listing.

23         MR. FREEDMAN:  Your Honor, for the Court's

24   information, the debtors have reached out to all of the

25   insurance companies that have raised objections, and indicated

54

1  our desire to talk to them about their objections, and the

2  exhibits that have been filed and the debtors will be fully

3  cooperative in terms of addressing any problems that are

4  raised.

5         THE COURT:  Mr. Freedman, in any every asbestos case

6  the equivalent of Exhibit 5 is always the subject of a lot of

7  negotiation from the time it's filed, until the plan

8  confirmation hearing, so I have no doubt the debtor is going to

9  be talking to a whole lot of folks about a lot of things on

10 Exhibit 5.

11        MR. FREEDMAN:   Thank you.

12        THE COURT:  Okay.

13        MR. FREEDMAN:  Actually, I'd like to add that we've

14 also reached out to all the other objectors who have filed

15 objections to the disclosure statement in order to discuss with

16 them whether or not there are any changes that can be resolved

17 before the conclusion of the hearing.

18        THE COURT:  All right.

19        MR. FREEDMAN:  And we intend to be fully cooperative

20 on that.  And I'd like to then turn to where we are --

21        THE COURT:  One more.

22        MR. MONACO:  One more.  Good morning, again, Your

23 Honor, Frank Monaco for the State of Montana.  Your Honor, the

24 proposed changes made by debtors' counsel are acceptable to the

25 State of Montana.  There is, however, one, I hope is a

1  non-controversial change regarding language and accuracy.

2          Your Honor, we pointed out in our objection that at

3  Section 2.8.1.3, of the disclosure statement which discusses

4  the ORR decision, the debtors state that the Montana State

5  Supreme Court overruled the federal district court.  If that

6  were true, we would be overturning longstanding principles of

7  federal preemption.  I think they meant state district court,

8  and I would just ask that that be changed, to be accurate.

9          MR. FREEDMAN:  Well, we'll correct any inaccuracy.

10          THE COURT:  All right.

11          MR. FREEDMAN:  If I could turn to a non-controversial

12  bit of housekeeping, just to make sure that it's on the record.

13          With respect to the objections that were filed by

14  insurance companies, based on the fact that the debtors had not

15  then filed Exhibits 5 and 6, those were objections number 45,

16  filed by Kaneb, which is not an insurance company, Maryland

17  Casualty number 46, Continental Casualty number 47, Zurich, 51,

18  Century Indemnity, 52 and Seaton Insurance, 54.

19          THE COURT:  Okay.

20          MR. FREEDMAN:  What I'd like to do now, Your Honor,

21  is start going through the various substantive objections to

22  the disclosure statement that were filed by various parties and

23  there are three categories that I'm going to cover in this

24  portion of the presentation.

25          First, those matters as to which the objector has

1  requested specific language and the debtors have agreed to

2  incorporate that language, I'll identify that for you.

3       Second, with respect to matters where the debtor

4  agrees that further disclosure is required, but the language

5  needs to be worked out, and finally, there are some that are

6  going to require more attention before the debtors can make a

7  decision whether it agrees that specific disclosure is

8  appropriate or not, and will identify what falls into that

9  category.

10       THE COURT:  All right.

11       MR. FREEDMAN:  So, I'll just start going through that

12  list, with the Court's indulgence.

13       The General Unsecured Creditors' Committee in item,

14  or in Section 3 of the chart, said that there are improper

15  disclosures or inaccurate disclosures with respect to the

16  claims of J.P. Morgan, one of the lenders and they have

17  provided us with proposed language which is identified on the

18  chart, that we have agreed to include.  I can certainly read

19  the language into the record, but it's identified on the chart

20  and with the Court's indulgence, I'll just refer to that.

21       THE COURT:  That's fine.  Mr. Pasquale, do you need

22  the language read in?

23       MR. PASQUALE:  No, not at all, Your Honor.  Obviously

24  it's all subject to seeing it in the amended disclosure

25  statement but we appreciate the accepting of our language.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  That's fine.

2          MR. FREEDMAN:  The General Unsecured Creditors'

3  Committee has also asked for certain language that's identified

4  in Section 1 of the chart, with respect to their position on

5  the plan, and that they are not a co-proponent to the plan,

6  we've agreed to accept that language.  That's also identified

7  in the chart.

8          THE COURT:  All right, that's fine, too.

9          MR. FREEDMAN:  And then the committee, again, has

10  asked that there be a full disclosure and a more accurate

11  disclosure of the composition of the committee, and certain

12  other representatives of the committee and we have agreed to

13  that disclosure.  That's under Section 4 of the chart.

14          And then with respect to the issues related to the

15  debtors' position that the lenders are not entitled to the full

16  rate of default interest that is provided in their agreements,

17  but a lesser rate, as provided in the plan, the General

18  Unsecured Committee has asked that there be certain disclosure

19  with respect to the existence of that dispute.  That's

20  identified in Section 10 of the chart and we have agreed to the

21  language that identifies that dispute.

22          THE COURT:  All right.  Any need to put anything more

23  --

24          MR. PASQUALE:  Well, Section 10 of the chart does not

25  have the actual language describing the litigation that we

1  propose.  We understand that we will work with the debtors to

2  come to agreeable language with respect to the actual

3  description, but with that caveat, Your Honor, this is

4  acceptable.

5        THE COURT:  Okay.

6        MR. FREEDMAN:  The actual agreement, just to be

7  perfectly precise, as identified in our response on Section 10

8  of the chart, is a cross reference in Section 2.9.3.1 of the

9  disclosure statement to a new Section 3.2.8.4 of the disclosure

10 statement which we do need to spell out and work through with

11 the Creditors' Committee.  But the cross reference language is

12 going to be included and we've agreed to the cross referencing.

13       THE COURT:  Okay.  That's fine.

14       MR. FREEDMAN:  Now I'm going to turn to the matters

15 that are identified as being ones where the debtor has agreed

16 in principle to expand the disclosure, but has not yet actually

17 resolved the language.

18       The first one is the objection identified in Section

19 1 of the chart, that has to do with the treatment of -- the

20 position of the Creditors' Committee with respect to the

21 treatment under the plan of Class 9 claims, and the default

22 litigation.  The Creditors' Committee, is of record, that they

23 disagree with the debtors' position about how we're going to

24 pay the lenders and the Creditors' Committee has indicated that

25 they believe that notwithstanding the changes that the debtors

have agreed to with respect to the treatment of Class 9 claims

that I previously discussed, nevertheless, Class 9 is still

impaired, and there will be appropriate disclosure of that

position of the Creditors' Committee in the disclosure

statement.  That implicates objections identified as 1 and 5 on

the chart.  Ken?

MR. PASQUALE:  Yes, that's correct, Your Honor.

We'll work on language.

THE COURT:  Okay.

MR. FREEDMAN:  A similar objection is with respect to

number 8 of the chart.  And, again, that involves language of

the Creditors' Committee's position regarding the treatment of

general unsecured claims, which is, they would like expanded

language in Section 4.3.1.9 of the disclosure statement.  We've

agreed to work on that language.

THE COURT:  I'm sorry, Section 8 in the extension of

time to object to claims?  Am I looking at the right place?

MR. FREEDMAN:  Your Honor, I may have put the wrong

--

THE COURT:  I'm sorry, what section of the plan did

you refer to?  I think I -- maybe I'm not looking at the same

-- I think it's 5 on the chart that I'm looking at.

MR. FREEDMAN:  Okay.  Your Honor, I apologize.  The

reference in my notes was, unfortunately wrong, and what we're

going to do is to file a list of claims, as we indicated

1  before.  We're going to file the list of claims as to which

2  they have no objection and to provide a deadline for filing

3  objections and rules about extending the deadline for objection

4  to general unsecured claims to which the committee objects. All

5  of those procedures will be laid out in both the disclosure

6  statement and plan amendments.

7          THE COURT:  All right.

8          MR. FREEDMAN:  And I apologize for the confusing

9  reference.

10         With respect to the issue of the employee claims

11  that's identified in Section 73 of the chart, the debtors will

12  revise the solicitation materials as the Court has instructed,

13  and there will be appropriate disclosure in the disclosure

14  statement.

15         The U.S. Trustee has asked for amended disclosure to

16  make clear that all pre-confirmation quarterly fees owed will

17  be paid on the effective date of the plan and that after the

18  effective date the debtor will file operating reports and pay

19  quarterly fees pursuant to the provision, the relevant

20  statutory provisions, until an order is entered closing the

21  case, disclosure will be provided on that.

22         THE COURT:   Okay, what section is that, I'm sorry,

23  I've lost it? I had it, oh, 14?

24         MR. FREEDMAN:  That is objection number 14, filed by

25  the United States Trustee.

1          THE COURT:  14, okay, thank you.

2          MR. FREEDMAN:  The ERISA plaintiffs have identified

3  certain inaccuracies and a request for additional disclosure

4  which they think will provided better disclosure with respect

5  to the ERISA litigation.  Those matters are identified in

6  Section 19 of the chart and we will be -- the debtors will be

7  providing appropriate disclosure to address those inaccuracies

8  and expand the disclosure.

9          THE COURT:  All right.

10          MR. FREEDMAN:  Those are the matters that the debtors

11  have agreed to make specific provision for, but the precise

12  language has not been agreed to.

13          THE COURT:  Okay.

14          MR. FREEDMAN:  Now, I'd like to turn to the group of

15  disclosure statement objections where the debtors -- where

16  objection is noted, the debtor is not prepared to agree that

17  appropriate disclosure is required, but needs some time to

18  consider the issue.

19          The Unsecured Creditors' Committee has asked that the

20  plan itself, or has indicated that they have a problem with the

21  fact that the plan itself does not provide a cash reserve for

22  the payment of general unsecured claims and that there be

23  corresponding disclosure with respect to that issue.  That's

24  articulated in Section 9 of the chart, their objection is

25  identified in Section 9 of the chart and the debtors are

1  considering how to address that matter.

2           THE COURT:  So, with respect to these, do you simply

3  want these deferred till November 14th, or do you want a ruling

4  on them today?  I mean --

5           MR. FREEDMAN:  Well, Your Honor, I'm simply trying to

6  put onto the record where we are on these and I'd be happy,

7  frankly, to just simply identify the particular matters that

8  are -- or the particular line items on the chart, without going

9  into detail of the substance, if the Court would prefer not to

10  have me stand up here and explain what the issue is.  I'd be

11  happy to do it either way.

12           THE COURT:  Well, I guess my question is this. I'm

13  willing to defer anything and everything that you want until

14  November 14th, it doesn't make any difference to me.  The

15  problem is, if you haven't got everything resolved on November

16  14th and we then have a full blown disclosure statement hearing

17  and you need rulings because you haven't got everything

18  resolved, what happens if something is ruled against you and

19  you need more time to -- I don't know do further disclosures?

20           MR. FREEDMAN:  Well, Your Honor, we think it's

21  helpful to just continue to work through identifying these

22  specific issues so that all the parties here are aware of what

23  the issues are and anybody can be heard on an appropriate

24  comment with respect to where we are right now, with respect to

25  these matters.

1          MR. BERNICK: We're cognizant, Your Honor, very

2    cognizant of the need to get these resolved promptly and the

3    fact that we have November 14.  I think all we're doing at this

4    point is identifying for the Court what the status is of these

5    various matters that are, in fact, being deferred until

6    November the 14th.

7          THE COURT:  Okay.  That's fine.

8          MR. BERNICK:  And I don't think that there's any -- I

9    mean, given the volume of paper that's come through, it's

10   obviously a logistical problem just to get to closure on some

11   of these things, even though as you can see that in many, many

12   instances we should be able to resolve the matter with

13   appropriate language.

14         THE COURT:  All right.

15         MR. BERNICK:  So, I think this is where we are.

16         THE COURT:  Okay.

17         MR. FREEDMAN:  So, with the Court's indulgence, I'll

18   continue.

19         THE COURT:  One second.  Mr. Brown?

20              (Counsel speaking among themselves)

21         MR. FREEDMAN:  Your Honor, to be clear about what I'm

22   doing right now, I'm first going through the items that fall

23   into this category of pending and subject to consideration

24   which do not relate to insurance companies.  The second part of

25   this will be to just identify the ones that relate to the

1 insurance companies issues.

2          THE COURT:  All right.

3          MR. FREEDMAN:  The Official Committee of Unsecured

4 Creditors has indicated in Section 11 of the chart that there

5 is inadequate -- or has stated in Section 11 of the chart that

6 there is inadequate information to determine issues related to

7 the principal and interest components of Class 9 claims.  That

8 information, or relevant information is provided in the plan,

9 they think that there is a need for expanded disclosure, the

10 debtor is considering whether or not that expanded disclosure

11 is appropriate.

12          A number of claimants who would fall within the

13 category of indirect trust claims, which is a category of

14 claims that would be channeled to the personal injury trust,

15 under the channeling injunction, have indicated that there

16 needs to be more expanded disclosure with respect to how that

17 works, what the mechanism is under the plan and what the plan

18 actually defines as an indirect trust claim, and the debtors

19 are putting together appropriate disclosure to address those

20 objections.  Those objections have been filed by Bank of

21 America, number 15, Scotts, number 20, BNSF number 25, and the

22 State of Montana, number 21.

23          THE COURT:  Okay.  Just a minute, Mr. Freedman.

24          MR. RAMOS:  Good morning, Your Honor, Marcos Ramos,

25 Richards, Layton and Finger on behalf of Bank of America.

1          Obviously, when Bank of America filed its objection

2    it had a lot of questions, I don't believe that even when we

3    filed our objection the trust distribution agreement had been

4    filed.  We have even more questions since we've been looking at

5    that document, so we look forward to discussions with counsel

6    regarding many questions we have as to how we fit within the

7    mechanisms that are set out in those agreements, or whether we

8    do.  Thank you.

9          MR. FREEDMAN:  Your Honor, for the record, the trust

10   distribution agreement -- trust distribution procedures were

11   filed on September 19th with the plan and disclosure statement,

12   but that's not to say that counsels need to have time to

13   examine those issues isn't appropriate, but the TDP was filed

14   when we filed the plan.

15         THE COURT:  Okay.  I expect that since the debtor is

16   indicating that it intends to try to get these things together,

17   that any party who has not yet worked language out with the

18   debtor should be back in touch with the debtor.  What Mr.

19   Freedman just said is that the debtor is working on language to

20   explain this mechanism, so maybe a time frame, Mr. Freedman, if

21   you can give one, to Bank of America, Scotts, BNSF and Montana,

22   since they're particularly interested in this might be helpful

23   so they know when they can maybe expect something?

24         MR. FREEDMAN:  Your Honor, I would expect that by the

25   end of this week we could get to some language that would at

1 least have a consensus with among the plan proponents and then

2 circulate to those folks.

3        THE COURT:  Okay, so by the end of the week, so

4 hopefully, next week you folks will have a chance to start

5 looking at this and the get back in touch with the debtor and

6 plan proponents to see what you can negotiate for some

7 acceptable language in the disclosure statement.

8        All right, Ms. Cobb?

9        MS. COBB:  That's fine.  Your Honor, I just wanted to

10 make clear that we --

11        MS. HELLER:  Please use the microphone.

12        MS. COBB:  Sorry, I just want to make clear that we

13 preserve any rights to further object because we haven't had an

14 opportunity to, obviously, evaluate or hear what that proposal

15 is.

16        THE COURT:  Everybody's rights are preserved.  This

17 is only a preliminary, the debtor hasn't even resolved these

18 objections and I'm not making any rulings because the debtor is

19 only indicating that it hasn't even decided whether it's going

20 to expand the disclosure statement.  So, I'm obviously, not

21 making any rulings, I haven't even heard from the debtor yet

22 whether the debtor is going to attempt to consensually resolve

23 these, but as to this one, Mr. Freedman has made a statement,

24 the debtor is working on language and going to circulate

25 something.  Mr. Wisler?

1          MR. WISLER:   Thank you, Your Honor, on behalf of

2   Maryland Casualty Company, we filed a reply to some of these

3   issues raised by Scotts and BNSF and I'd just ask counsel if

4   everybody was going to get that language and I'm not sure the

5   answer to that, but I think we will get that.

6          MR. FREEDMAN:   Clearly, Maryland Casualty will get

7   that language.   Everybody who has raised an objection that goes

8   to this issue, Maryland Casualty and frankly, anybody else who

9   requests affirmatively that they'd like to see it, we'll be

10  happy to share it with them.

11         THE COURT:   All right.   Okay, Mr. Freedman, thank

12  you.

13         MR. FREEDMAN:   All right.   Scotts, in objections

14  number 22 and 23, have raised issues with respect to the

15  disclosure about the effect of confirmation on the declaratory

16  judgment actions and Scotts' claims.   The debtors are

17  considering how to address that language and I can't tell the

18  Court that we have agreed that further disclosure is required,

19  but we'd be pleased to talk with Scotts directly about what

20  they'd like to see and see if we can come to some further

21  disclosure that would make them happy about that.

22         THE COURT:   Okay.   Ms. Cobb?

23         MS. COBB:   What was described -- okay.   That was a

24  little bit different than my discussions earlier.   As long as

25  we're going to have a dialogue and some proposed language,

1 we'll just wait to see what that leads us to.

2          THE COURT:  Okay.

3          MS. COBB:  Thanks.

4          MR. BROWN:  Your Honor, on that same point, there are

5 a number of insurers that are also parties to that DJ, we'd

6 like to be included in that dialogue.

7          THE COURT:  All right.

8          MR. FREEDMAN:  Your Honor, it may make more sense at

9 this point, given the nature of these objections, to maybe try

10 and shortcut it a little bit by simply identifying the

11 sections of the chart as to which we have intended to provided

12 additional disclosure or to consider whether or not additional

13 disclosure, not get into so much granularity, if you will,

14 about what that disclosure would involve, and the folks can at

15 least be aware that if they have an interest in that section,

16 we're working on it and would like to talk with them and it

17 might move things along a bit.

18          THE COURT:  Yes, I think that would be helpful.  If

19 I'm not making rulings, in my view, they're all continued to

20 November 14th, you folks will either work it out, or I'll hear

21 whatever objections are filed on November 14th.  You know, if

22 the debtor adds language and everybody is happy with it, there

23 wont be additional disclosure statement objections and if

24 people aren't happy with whatever has happened, the debtor will

25 let me know and I'll hear them on November 14th.  So, I think

1 if you just identify the sections, that would be fine.

2

3          MR. FREEDMAN:  Okay.  Well, Your Honor, what we are

4 considering, the particular line items on the chart that we are

5 considering and the objectors that are relevant to those line

6 items are Seaton Insurance Company's objection noted on line

7 53, the Libby claimants objection noted on line 37, and also on

8 39.  Kaneb's objections, on line items 40, 41, 43 and 44, and

9 as to Kaneb's Your Honor, I'm pleased to say that we're

10 actually exchanging language right now, so we've made some

11 progress in terms of moving things along with Kaneb.

12          THE COURT:  All right.

13          MR. FREEDMAN:  So, Your Honor, I think the Court will

14 find, if you've been checking boxes off on the chart, Ms. Baer

15 has been doing it, that we've actually made quite a bit of

16 progress in terms of identifying where we're going to be with

17 much of what's in the disclosure statement.

18          As I said, there are two remaining, excuse me, Your

19 Honor, I did want to mention also that on the same vein we do

20 have some insurance objections that we are considering and,

21 again, without getting specific, those are Continental

22 Casualty, number 49, Fireman's Fund, number 60, 63, 65, 66, 67,

23 68 and 69.  We would be pleased to engage with those two

24 insurance companies in a discussion about appropriate further

25 disclosure and we are considering whether or not as to all of

1  those items, that any further disclosure is required.

2              THE COURT:  Okay.

3              MR. FREEDMAN:  Now, having said that, again, where we

4  are is that we have gone through objections that are going to

5  be addressed by amendments, or further filings, and by matters

6  as to which the debtor is either accepting language, we'll work

7  on language, but accepted the concept of principle, or is

8  considering it and working with the claimant or desires working

9  with the objector, to resolve the issue.

10             Two other categories of disclosure statement are

11 relevant at this point, and then finally we do have some

12 objections related to the solicitation procedures which we

13 should also take up today.

14             With respect to the disclosure statement, there are

15 numerous objections that were raised as disclosure statement

16 objections that are actually confirmation objections and those

17 matters the debtor believes should entirely be deferred until

18 the confirmation hearing.  Mr. Bernick will be presenting the

19 debtors' views about that.

20             We thought it would be appropriate to get through

21 that discussion at this point and then after that, turn back to

22 some remaining cats and dogs, if you will, objections in the

23 disclosure statement that are ones which the debtors believe

24 the Court could overrule today.   And we would raise those but

25 it would make sense to have all the proceeding discussion

1  worked through before we get to those last bunch of disclosure

2  statement objections.

3          THE COURT:  All right.  Why don't we take a five

4  minute recess and then we'll start with the plan objections.

5  Okay.

6                    (Recess in proceedings)

7          THE COURT:  It looks like everyone is back, Mr.

8  Bernick, whenever you're ready.

9          MR. BERNICK:  Your Honor, we have, and I think we

10  have a handout --

11          THE COURT:  Thank you.

12          MR. BERNICK:  By way of trying to expedite the

13  process of going through this category, this category is

14  comprised of all of the disclosure statement objections which

15  we believe are properly considered to be confirmation

16  objections and, therefore, should be taken up at that time

17  rather than in connection with the disclosure statement

18  approval.

19          And so, what this chart does, essentially, is to go

20  through and group all of the different items that appear on

21  your chart, according to what the overall objection is, so

22  that, for example, with respect to impairment, we have that as

23  number one, we then list the objecting parties and then the

24  corresponding numbers.  So, it's a similar cross reference to

25  what it is that Mr. Freedman gave orally.

1          THE COURT:  Excuse me, Mr. Bernick.  Mona, you may

2 want to get a copy of what they're handing out, it'll be easier

3 for you to follow.  Get a copy of what they're handing out.

4          MR. BERNICK:  Sure.

5          THE COURT:  Thank you.  I'm sorry, Mr. Bernick, go

6 ahead.

7          MR. BERNICK:  No problem.  The first on the list is

8 impairment, the second is the absolute priority rule and I'm

9 going to take those up together because they essentially are

10 very, very closely tied together.

11          With respect to impairment, there are really two

12 different aspects of impairment that have been raised.  There's

13 first of all voting impairment, that is whether people are

14 given the opportunity to vote or not, and the secondly,

15 impairment in connection with plan treatment, and that, of

16 course, ultimately also prompts consideration of the absolute

17 priority rule objection.

18          On the first, which is voting for impairment of

19 voting rights, that claim and that objection, as Mr. Freedman

20 recited, we've agreed to give a provisional vote to Class 9 and

21 people who have objected on grounds that they didn't have a

22 right to vote are all in Class 9 and that should have the

23 effective of mooting the objection, that is, they're going to

24 get the right to vote.

25          With respect to plan impairment, the absolute

1 priority rule, the situation there is somewhat different.

2 While the issue of impairment is deferred to plan confirmation

3 in the sense of whether the determination of the post petition

4 interests will constitute an impairment or not.  That, as a

5 technical matter, can be deferred, but we want to be clear that

6 the absolute priority rule is a live issue, that's been fully

7 briefed and submitted to the Court for a decision, insofar as

8 the Class 9 lenders are concerned.  So, nothing that appears in

9 our responses and our position today is designed to defer the

10 Court's determination of the impact of the absolute priority

11 rule because it's implicated by the fundamental question raised

12 by our objection to post petition interest which is whether

13 such post petition interest, there's an entitlement to post

14 petition interest.

15         As Your Honor is very, very well familiar, as  a

16 result of the briefing that's occurred, it is our view that

17 there is no entitlement to post petition interest beyond what

18 we have put in the plan and to the extent that post petition

19 interest implicates or is tied to the solvency issue, that

20 gives rise under a line of cases to application of the fair and

21 equitable standards.

22         So, by raising the issue in our objection of whether

23 Class 9 bank lenders are entitled, as a matter of law t o get

24 post petition interest and if so, at what amount, we have

25 necessarily brought into the process, into that briefing

1  process, the impact, if any, of the absolute priority rule and

2  the impact, if any, of the fair and equitable standard and we

3  intend -- we are asking the Court, we have asked the Court to

4  resolve that issue now, precisely because it is so important to

5  the plan process and we're not withdrawing that, that remains a

6  live issue.

7          MR. PASQUALE:  Your Honor, excuse me, just a simple

8  question.  Before you were asking for responses in turn, are

9  you going to do that here or should we just at the end --

10         THE COURT:  I think we'll do them in -- yes, because

11 I think it'll be easier to track my notes if we do them in

12 turn.   Yes.

13         MR. BERNICK:  Yes.  And if you'd give me a moment, I

14 will finish and then you can -- I would expect that you would

15 stand up and respond.

16         Now, this relates, all that I've said relates to the

17 Class 9 lenders.  With respect to the balance of Class 9 which

18 includes trade creditors, we do ask that the issue of plan

19 impairment and the absolute priority rule be deferred until

20 confirmation, indeed, with respect to the non-lender Class 9

21 claimants.  We have agreed to follow the USG procedure for the

22 determination of what, if any, post petition interest they're

23 entitled to, so that is not a live issue now.

24         The other objector with respect to the absolute

25 priority rule was the State of Montana and then also the Crown.

**J&J COURT TRANSCRIBERS, INC.**

1  With respect to those, we understand that as a result of the

2  determination that was made in Canada, that the Class 6 -- or

3  excuse me, the issue that's been raised, the objection that's

4  been raised by the Crown, has effectively been decided.

5          With respect to the State of Montana, they raise an

6  absolute priority rule issue and they are, obviously because

7  they're part of Class 6, not Class 9, it remains to be seen

8  whether their issue will really have any potential impact at

9  all, because if Class 6 is an accepting class, we don't have to

10 address the question of whether there's an absolute priority

11 rule problem with respect to the State of Montana.

12         So, to review, we believe that the impairment for

13 voting purposes is a moot issue because the provisional vote

14 has been given to Class 9, with respect to plan impairment and

15 the absolute priority rule, the Class 9 lenders, that issue has

16 already been joined and it's before the Court.  With respect to

17 trade debt, or to the non-Class 9 lenders, creditors, not

18 included in the lenders, but still part of Class 9, we believe

19 that that should be deferred in the State of Montana, which is

20 part of Class 6, we believe that impairment of the -- I'm

21 sorry, the absolute priority rule there as well, should be

22 deferred pending the vote.

23         THE COURT:  Mr. Pasquale?

24         MR. PASQUALE:  Thank you, Your Honor. I think at the

25 end I agree with where Mr. Bernick ended up, but it's in the

**J&J COURT TRANSCRIBERS, INC.**

1  niceties leading to that, that I disagree.

2       Impairment is a confirmation issue so long as the

3  vote is taken.  We've heard that, there will be a provisional

4  vote taken of all of Class 9, bank lenders and what is labeled

5  other unsecured creditors within Class 9.

6       That does not moot the issue.  It defers it for

7  confirmation but the issue is live, it is not a moot issue.

8  Adopting procedures like the USG procedure, again, is something

9  that we have been asking the debtors to do for quite some time.

10 We need to see what that language is, but again that doesn't

11 resolve the impairment issue with respect to Class 9.  Class 9

12 includes that group that will be subject to those provisions as

13 well as a group of lenders that are not subject, is not subject

14 to those provisions.

15       THE COURT:  Wait, I'm sorry, you lost me.

16       MR. PASQUALE:  Okay.  The USG type procedures --

17       THE COURT:  Oh.

18       MR. PASQUALE:  -- would only apply to the other

19 unsecured creditors.

20       THE COURT:  Right.

21       MR. PASQUALE:  Okay.  Mr. Bernick said that adopting

22 those procedures takes care of the impairment issue with

23 respect to those creditors.  Well, impairment doesn't work that

24 way.  Impairment works with respect to the class.  The class as

25 a whole, it is our position, remains impaired.  That's an

1  argument we're perfectly happy to defer to a confirmation.  I

2  just wanted to be clear that whatever these procedures are, are

3  not going to take away that issue.

4         As far as what is before the Court on the litigation

5  involving the lenders, we believe impairment is not directly

6  addressed in those papers.  To the extent it is, it's simply in

7  the context of a claim objection brought by the debtors.

8  Again, I don't think and Your Honor will make that

9  determination when she looks at that, but at the end of the day

10 absolute priority and impairment are confirmation issues and we

11 do expect to litigate and argue those issues at that time.

12        THE COURT:  Okay.

13        MR. PASQUALE:  Thank you, Your Honor.

14        MR. COBB:  Your Honor, Richard Cobb, on behalf of

15 certain bank lenders.  Your Honor, I concur with Mr. Pasquale's

16 comments.  I agree with Mr. Bernick to the extent that there

17 has been some preliminary settlement reached with regard to

18 voting impairment and we have to work out some language, but we

19 agree that that issue, for purposes of disclosure statement,

20 the disclosure statement hearing today, that has been, or may

21 be resolved depending on when we see the language, and dot the

22 I's and cross the T's.  But with regard to plan impairment, the

23 absolute priority rule, the Court is not going to issue any

24 ruling today with regard to those issues.  Those issues are

25 deferred until plan confirmation and at that time we'll address

1  those issues and Mr. Bernick, I'm sure, will argue that that is

2  already before the Court, and the bank lenders disagree, that's

3  not a today issue and the Court is not being asked, I believe,

4  to make any ruling with regard to what's considered, you know,

5  before the Court today and what's not on those two issues.

6         I agree -- that was my reaction, Your Honor, when I

7  heard Mr. Bernick's description with regard to, you know,

8  something is pending before the Court with regard to impairment

9  and absolute priority, and something needs to be addressed at

10  plan confirmation.  It's very simple, Your Honor.  Voting

11  impairment is being dealt with in the disclosure statement

12  context, in a settlement.   The plan impairment will be dealt

13  with at plan confirmation, as well as the absolute priority

14  rule issues.

15         MR. BERNICK:  When Mr. Cobb started out on point one,

16  which is voting impairment, I said, I agree with that and I

17  disagree with what Mr. Pasquale said, but when he got to the

18  absolute priority rule, I said, no, no, no, I disagree with

19  that and I agree with what Mr. -- I think that in terms of the

20  ultimate result, we're probably all in the same place.

21         When I distinguished and said voting impairment, I

22  meant purely whether we're going to take a vote or not.  And as

23  Mr. Cobb recognizes, that issue is resolved in principle, we

24  are going to take the vote and I agree with him that if there

25  are -- God knows if there are language and detail issues, I'm

1 sure they will be raised and resolved, but I don't think the

2 Court has to address impairment for voting purposes in the

3 sense of whether a vote will be taken because we've agreed to

4 do that.

5      With respect to the absolute priority rule in

6 impairment for confirmation purposes, in a way this is a little

7 bit premature because we have to get to confirmation and then

8 we have to see what Your Honor does with respect to the matters

9 that are before the Court and to the extent that we're trying

10 to address now what impact, if any, Your Honor's determination

11 of those pending matters that are still active before the

12 Court, everyone agrees they're active before the Court,

13 everyone wants the Court to resolve them, determine their

14 impact however they're resolved on confirmation, is for another

15 day.  However, there's no question but that both the impairment

16 and absolute priority rules and laws have specifically been

17 teed up for decision in the context of the question of whether

18 the bank lenders are entitled to receive post petition

19 interest.

20      It may be that ultimate confirmation is technically

21 and procedurally a different stage of the case, but there's

22 something called estoppel or res judicata.  If Your Honor,

23 indeed, does address those matters, as I believe, and I think

24 that everybody agrees, that you must address those matters in

25 determining whether there's an entitlement to post petition

1 interest beyond what's in the plan, those matters will, in
2 fact, have been resolved.

3        So, all that we're saying today is that all of what
4 has been placed before Your Honor, in connection with the
5 litigation of the post petition interest is actively before
6 Your Honor, we're hoping and expecting that Your Honor will
7 issue a decision.  What impact that decision will have
8 ultimately on the confirmation of the plan, I suppose we can
9 argue about at another time, but we don't want the -- what we
10 do want is to have those matters that have been put before Your
11 Honor resolved by Your Honor now as opposed to later on.

12        I don't know if that confuses things, helps things,
13 but that's why we're coming up and stating the position that we
14 are.

15        THE COURT:  Well, my view of the world was that it
16 ought to be resolved in conjunction with the plan confirmation
17 because I think it's an issue that not necessarily drives
18 confirmation but is an issue that goes more toward an
19 entitlement under the plan to what the plan provides by way of
20 a distribution than anything else.  I guess I'm going to have
21 to go back and look at the papers and see what --

22        MR. BERNICK:  Well, it -- you know, maybe that would
23 be appropriate.   The reason that we teed it up and Your Honor,
24 and I will dust off a little bit of memory here, because this
25 has happened relatively quickly and for a reason.   The term

1  sheet made certain provisions regarding the payment of post

2  petition interest.

3           THE COURT:  Right.

4           MR. BERNICK:  We, because of the letter that we

5  received determined that we had no choice that if we wanted to

6  keep this plan together, we needed to get a determination

7  earlier rather than later, as to whether we or they were right

8  about post petition interest.  So, we objected and Teed up the

9  issue, by way of objection in allowance and disallowance.

10          However, the case law in examining the issue of

11 whether there is, in effect, an exception to 502, for a solvent

12 debtor, looks at that in terms of fair and equitable treatment

13 and the other side raised the issue of the absolute priority

14 rule.  Well, we didn't raise the issue of the absolute priority

15 rule, they raised the issue of the absolute priority rule.

16          So, at this point, both as a function of the case law

17 which was effectively a gloss on a 502, and as a function of an

18 issue that the other side has raised, now have two principles

19 of law, that generally get taken up in connection with

20 confirmation, now raised before the Court in connection with

21 the issue of whether there is entitlement under the law to

22 these things.

23          And, in the course of that briefing, one of the

24 things, one of the issues that was raised by the bank lenders,

25 was, well, why do we have to resolve this now?  And that was --

1  there was a little bit of schizophrenia on that because the

2  bank lenders said, why do we have to resolve it now but, in

3  fact, the committee said, we should resolve it now.  And then

4  we went through a whole process of saying, can we resolve it

5  now, when we haven't had a full estimation and that, itself,

6  was litigated.

7         So, for all those reasons that have already been put

8  before the Court, we believe that it A, can be resolved now, B,

9  should be resolved now and, C, there's no reason that it, by

10 law, cannot be resolved now.

11        Your Honor can take up, even at this time, the

12 application of confirmation principles, particularly when it

13 presents an issue that has been, that is so important to get

14 resolved.  There's no further record that's going to be before

15 the Court with respect to the vote on this issue, we know what

16 their vote is going to be.  So, this is one of these situations

17 where, yeah, we're at a disclosure statement hearing, and yet

18 there's a confirmation issue that's fairly ripe but it's not

19 the fact of being a disclosure that has prompted this to be

20 raised now.  It was because it's so important to the plan and

21 they made evident their disagreement with it right away, that

22 we wanted to raise it early on.

23        So, for all those reasons, while it is always within

24 the Court's discretion about whether to take it up now or later

25 on, for all of the reasons that we've previously indicated, we

1  think it's critical to take it up now and our agreement to

2  provide a vote, a provisional vote, was not designed to cause

3  people to say, oh, well, now it's all deferred.  The agreement

4  to give a vote was to say, we can go ahead and take the vote if

5  Your Honor -- that way Your Honor's determination of the issue

6  that's been briefed doesn't have to hold out or hold up the

7  disclosure statement approval and the voting process.  But

8  that's not to say that we then want to have that issue float

9  all the way down the road, we can't.  It's a very expensive

10 issue and it's one that's important for us.

11         And I know, having now agreed partly with both sides

12 and then made a speech, that Mr. Pasquale, I'm sure, will have

13 something further to say as well as Mr. Cobb --

14         MR. PASQUALE:  Ken Pasquale for the committee and Mr.

15 Bernick is right.  Since we argued this for four hours in

16 Delaware, Your Honor --

17         THE COURT:  I don't need a re-argument, I simply --

18         MR. PASQUALE:  Yes, and I'm not looking for -- that's

19 exactly what I was trying to avoid.  Let me just remind the

20 Court, we are not asking to defer it, but I think when Your

21 Honor looks back at the papers, you'll see it's in a context of

22 an abstract plan.  The debtors started that contested matter as

23 a claim objection, it was always litigated as a claim

24 objection.  There is no plan in the context of the papers that

25 were filed, the plan was not filed until days before the

1 hearing.

2          MR. BERNICK:  Your Honor, that is really --

3          MR. PASQUALE:  Check the date --

4          MR. BERNICK:  -- it was specifically, Your Honor, it

5 specifically said, file the plan, make sure they have it.  The

6 plan was filed, it was filed, I think even before their last

7 papers were due, I'm not sure about that, but it was certainly

8 filed before the argument took place.

9          MR. PASQUALE:  You know what, we can submit the dates

10 to Your Honor, it's just days before the oral argument, not in

11 time for any of the papers.

12          THE COURT:  Folks, gentlemen, it has been very

13 cordial in this courtroom up til now, I haven't had to threaten

14 the toothbrush for a long time, let's not get there now.  Mr.

15 Cobb.

16          MR. COBB:  Your Honor, very simple.  The debtors'

17 objection and the responses are before the Court, for such --

18 Your Honor will either decide them between now and confirmation

19 or you will not.  You've heard arguments in the papers as to

20 why they should be decided before confirmation, you've heard

21 arguments as to why it should be deferred.

22          I don't understand why we spent ten minutes here

23 having this long discussion, but I think that clarifies where

24 we're at.  For voting purposes, we're resolved, subject to

25 language.  For plan confirmation purposes, you'll either

1 resolve it and if you do resolve it, Your Honor, we may suggest

2 that well, you didn't get all of it, and so we do need to

3 address solvency, or something else in the plan.  But that's a

4 fight we will have down the road.  We don't need to take up the

5 parties' time today, discussing this issue any further, in my

6 opinion.

7          THE COURT:  Mr. Monaco?

8          MR. MONACO:  Good morning, again, Your Honor.  My

9 co-counsel, Jacqueline Dais-Visca would like to address the

10 Court with respect to the Crown's objection.

11          THE COURT:  All right.

12          MR. MONACO:  Thank you.

13          THE COURT:  Good morning.

14          MS. DAIS-VISCA:  Good morning, Your Honor.  The

15 claimants filed an -- pardon me?

16          MS. HELLER:  State your name for the record.

17          MS. DAIS-VISCA:  Last name, Dais-Visca, D-a-i-s

18 hyphen, V, as in Victor i-s-c-a.  First name Jacqueline.

19          The Crown filed an objection in these proceedings.

20 Subsequent to filing that objection, Mr. Justice Morowitz of

21 the Ontario Superior Court acting under the CCAA, released his

22 reasons for a decision as well as the order approving the

23 Canadian settlement.  In the context of his reasons he did two

24 things that are of import for the purposes of the outstanding

25 objection from the Crown.  The first was, he approved the

1  settlement and in so doing, he recognized that the Canadian

2  representative counsel had authority to negotiate on behalf of

3  the Crown, and the second thing he did was, recognize a CCAA

4  release in favor of the Crown for any of the Crown claims

5  seeking contribution and indemnity from Grace.

6         As a result of that, our objection is effectively

7  moot now.  We are no longer able to appear before you as we now

8  are represented by the Canadian representative counsel.  There

9  is an appeal period of 15 days, under the Ontario rules.

10  Subject to the expiration of that appeal period, it would look

11  like the Crown's participation in these proceedings, apart from

12  any claims that may be filed against the Canadian PD fund in

13  Canada, would appear to be at an end.

14         THE COURT:  All right.  And when does that expire,

15  and does the Crown know whether it's going to appeal?

16         MS. DAIS-VISCA:  The Crown will not be seeking leave

17  to appeal, it's a leave to appeal procedures and we have not

18  heard from the plaintiff as to whether or not -- the

19  representative counsel, as to whether or not they will be

20  appealing, but that 15 day period should be expiring, the

21  Monday, two weeks ago from Friday, so the 2nd, week of

22  November, some time.  But a decision, the actual reasons were

23  released on the Friday, and the decision itself was released on

24  the Monday.  So we have another week or so.

25         THE COURT:  Okay.  Thank you very much.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DAIS-VISCA:  Thank you.

2          MR. MONACO:  Good morning, again, Your Honor, Frank

3  Monaco for the State of Montana.

4          Your Honor, I know the Court is painfully familiar

5  with the background of our matter and I will not burden the

6  record with providing more background, but our primary concern

7  is how our contribution indemnification claims are being

8  treated under the plan and while we realize that the crux of

9  our objections are, essentially plan objections, we do believe,

10 however, that it is important to the reader of the disclosure

11 statement that they understand the significance of these

12 disputes because they could render the plan un-confirmable.

13         Your Honor, with respect to the absolute priority

14 rule, just so the Court is aware, from our position, the plan

15 classifies our contribution indemnification claims as Class 6

16 asbestos personal injury claims, which are impaired under the

17 plan.  We are on par with the Class 7 asbestos PD claims and

18 the Class 9 general unsecured claims which are unimpaired under

19 the plan.

20         Also, Your Honor, the Class 11 equity interest in

21 non-parent debtors are unimpaired.  And, I think Your Honor,

22 it's important that the disclosure statement reveal that if

23 Class 6 rejects this plan, that it will be rendered

24 un-confirmable as a result of the absolute priority rule.

25         Your Honor, I think it is a risk factor which the

**J&J COURT TRANSCRIBERS, INC.**

1  debtor is required to disclose in a disclosure statement and

2  certainly a very, very important issue and I really don't

3  understand why the debtor will not put language in the

4  disclosure statement to discuss this issue, state our position

5  and state their position.  The disclosure statement is already

6  150 pages, I don't see where a few more paragraphs or pages are

7  going to matter in the scale of things.

8          So, that's our position on the absolute priority

9  rule, Your Honor.  We think there should be some language, that

10  we're happy to work out with the debtor, that discusses this

11  issue.  Thank you.  Happy to answer any questions Your Honor

12  has.

13          THE COURT:  Okay.  Mr. Bernick?

14          MR. BERNICK:  Yes.  That's actually a different issue

15  than the one that I addressed, that's a question of what the

16  disclosure statement says, and I'll address that in a moment,

17  but the matters that I came up to address are whether the Court

18  needs to resolve the absolute priority rule as a substantive

19  matter at this point in time.

20          I take it from counsel's remarks the State of Montana

21  agrees that the issue does not have to be resolved at ths time.

22  I think that that's -- I'm reading that right, although I

23  haven't heard it from Mr. Monaco.

24          THE COURT:  I think that's what he's saying, yes.

25  His issue is whether or not the fact that there's a risk factor

1 in the event that Class 6 rejects the plan, should be disclosed

2 in the disclosure statement and I think what I heard Mr.

3 Freedman say earlier, but I'm not positive now, is that that

4 was one of the issues that the debtor was going to talk about,

5 but I guess I have to go back --

6          MR. BERNICK:  It may well -- I mean, you know from --

7          THE COURT:   No, I'm not sure.  I don't think that is

8 one of the issues that I have to --

9          MR. BERNICK:  From our point of view, I mean, any

10 number of different potential implications that will flow from

11 different people's legal positions, we can always say well, it

12 is the position of the objectors that X, Y and Z, that position

13 is based upon X, Y and Z, if turns out to be true, it has A, B,

14 C consequences, I think that that really is in the nature of a

15 legal, not legal speculation, but it's not a factual matter.

16 And, therefore, I don't -- I'll defer to Mr. Freedman, but I

17 don't know why we would seek to pick out this particular

18 objection to trace through the legal consequences of it.

19          Be that as it may, Mr. Freedman is going to address

20 that issue and all that I'm up here to say is, and I think Mr.

21 Monaco agrees, that the absolute priority rule in terms of the

22 State of Montana's objection, is a matter for confirmation.

23          MR. MONACO:  I agree, Your Honor, that it is a plan

24 confirmation issue, however, the debtor has a section in its

25 disclosure statement which deals with risk factors, one of them

1 is confirmability of the plan, I think this is a significant

2 issue that should be discussed and disclosed.

3          And I really don't understand why the debtor is

4 willing to, or at least consider putting in language dealing

5 with our issue on classification under the 524(g) trust and not

6 this issue.   I don't understand the distinction of why they're

7 reluctant to do so.

8          MR. BERNICK:  A risk factor, Your Honor, is something

9 that pertains to one, if, in fact, the plan is adopted what

10 risks will adhere to the claimant in terms of the treatment

11 that they're actually going to be afforded.   There are -- if

12 you wanted to list as a risk factor all the different legal

13 issues that might arise between now and the time of plan

14 confirmation, we could go through an encyclopedia of all those,

15 we could submit all the briefs and basically say, gee, we'll

16 read all the briefs, these are all a bunch of issues.

17          THE COURT:  I think this is one that could be --

18          MR. BERNICK:  But I --

19          THE COURT:  -- addressed quite easily in the

20 disclosure statement, frankly, and it may not be worth worrying

21 about, by simply adding a sentence that indicates that in the

22 event that an impaired class does not vote in favor of the plan

23 and the plan is un-confirmable, then there are consequences,

24 one of which is, either the debtor has to file a plan that is

25 confirmable or the case has to be dismissed or the case has to

1  be converted.  I mean --

2         MR. LOCKWOOD:  Your Honor, in Section 9.2.3 of the

3  disclosure statement has an explicit paragraph on this subject.

4         THE COURT:  9. --

5         MR. LOCKWOOD:  9.2.3 on Page 129 of the disclosure

6  statement.

7         MR. BERNICK:  Is it specific to these folks or --

8         THE COURT:  Okay.

9         MR. LOCKWOOD:  It's specific -- the possibility of

10 getting the vote of an impaired class or not, and having a

11 problem with 1129, if you don't get it, it doesn't mention

12 Montana.  I grant you that.  And it doesn't mention Montana's

13 specific contention as such, but I believe if Your Honor looks

14 at this paragraph, you will see that it adequately discloses

15 the risk of not getting a vote.  That's correct, as Mr. Monaco

16 just observed, it's generic.

17        MR. MONACO:  Your Honor, as we stated in our

18 objection, the problem with that provision and we did cit to it

19 in our objection, it's generic.  We think that the disclosure

20 statement should go a step further and actually outline the

21 specific issues I've just stated on the record.  I don't talk

22 about adding a couple more sentences.  This is more than

23 hypothetical, this is something the debtors are proposing, that

24 if they don't get Class 6 to accept this plan will not be

25 confirmable.

1          MR. BERNICK:  But that's true with -- I think that

2   Your Honor gave some language, it turns out that Mr. Lockwood

3   was prescient, and we have a paragraph, we'll rest on that.

4          THE COURT:  But this isn't the only impaired class in

5   the plan and that's -- I mean, what you're stating, I think,

6   Mr. Monaco is true with respect to every impaired class.   The

7   debtor only needs on impaired class to vote and then it's in

8   cram down, I agree, but the issue is whether or not the debtor

9   can cram down the plan as to any impaired class as long as it

10  has one that votes and the debtors' plan has impaired classes

11  other than Class 6.

12         So, why is this language not sufficient as to

13  impaired classes, plural?  I mean, the issue is to state what

14  classes are impaired, doesn't the ballot -- isn't the ballot

15  going to essentially be delivered to impaired classes?

16         MR. MONACO:   Yes, Your Honor, but I think that we

17  are pointing out that this is specific to Class 6.

18         THE COURT:  Yes.

19         MR. MONACO:  And that if Class 6 doesn't accept, then

20  the plan will be un-confirmable.  I don't understand why the

21  debtor can't specifically point out this issue.

22         THE COURT:  Why would it -- why can the plan not be

23  crammed down against Class 6 if it could be crammed down

24  against any other impaired class?   I mean, the debtor has a

25  burden of proof to meet.

1          MR. MONACO: Well, it's my understanding if Class 6

2  rejects, it's un-confirmable, you haven't met the standards for

3  confirmability.  Even if there is some other unimpaired class.

4          THE COURT:  Okay.  Well, isn't that a plan

5  confirmation issue?

6          MR. MONACO:  It is, Your Honor, but again, it's our

7  position this should be stated clearly in risk factors.

8          THE COURT:  Okay.

9          MR. BERNICK:  This is so perplexing, Your Honor, too.

10  I confess to be nothing, a bankruptcy lawyer, is why it's kind

11  of protesteth too much.  Why is it so critical in this regard,

12  to have this particular language put in there.  I mean,

13  attempting to say, sure we'll put it in because we can stop

14  arguing about it. You kind of wonder, though, what the purpose

15  of it really is at the end of the day.

16          We all know that with respect to the indirect

17  claimants, they're pretty much already participating actively

18  in the case, it's not as if the disclosure is going to wake

19  them up to something.  And with respect to Class 6 in terms of

20  the direct claimants, they're co-proponents of the plan.

21          You know, I'd like to say, let's just stop it and

22  we'll put it in, but then God knows, I'm probably going to hear

23  in the course of the next 24 hours, that all kinds of other

24  people want to have the same type of stuff put in.  And at a

25  certain point it becomes unproductive.

1          THE COURT:  Well, I think -- the only thing that I
2 can see at this point, is that that's a plan confirmation
3 issue.  If I'm missing something and, in fact, this plan is
4 absolutely un-confirmable if Class 6 rejects the plan, then I
5 think you folks need to talk about some language.  If it's
6 simply an issue of cram down, then it's an issue of cram down
7 and I think the language that's there is sufficient.

8          MR. LOCKWOOD:  Your Honor, I hate to have to say
9 this, but I have to.  It is -- the plan proponents differ on
10 this issue.  As you will recall, Mr. Bernick's original plan
11 had a deemed unimpairment of Class 6.

12          THE COURT:  It did.

13          MR. LOCKWOOD:  And it would have deemed it to have
14 accepted and we had a position that said, that doesn't work
15 with the 524(g) requirement or the 75 percent vote is absolute.
16 We have agreed as part of this compromise that we aren't going
17 to litigate with one another the question of whether or not
18 what I think Mr. Monaco is really saying is right, i.e,,
19 whether there is or is not an absolute 75 percent vote
20 requirement regardless of deeming and regardless of any other
21 kind of arguments that somebody might make.

22          So, what Mr. Monaco is, in effect, asking Your Honor
23 to do is to rule, I would like this, frankly, this is why I
24 hate to get up and say this, I would love Your Honor to say,
25 the 75 percent vote requirement is absolute, you can't cram

1  down.

2         But that happens to be a residual unresolved issue

3  which the debtors might, in fact, want to reup, depending upon

4  how the confirmation proceeding goes, it's a little hard to see

5  how you could do it in terms of a compromised plan as opposed

6  to reverting back and having an estimation, which would really

7  be the original predicate for that argument.  But, I don't see

8  why we have to get into that debate when we've got a section

9  that says, if you don't get the vote, you may not get the plan

10  confirmed, because that's all we're really saying at the end of

11  the day to the voters.

12         THE COURT:  And I still think that's sufficient

13  because if you don't get the vote, the debtor still has

14  options, including redoing the plan, or moving for a dismissal

15  or converting the case and if that's what you need to add into

16  that section, fine, add a couple of sentences as to what the

17  legal consequences are, basically that you're going to go back

18  to square one, somehow, or square 25 in this case.

19         MR. BERNICK:  Yes.  This is -- and this is what

20  bothers me a little bit, just in terms of our process.  If

21  we're going to have to go through these kinds of things with

22  all the different constituencies here, it creates a real

23  logistical issue whereas the substance of it, I mean to be able

24  to say, which is I think, probably, what we would end up

25  saying, that if the vote is not in favor of the plan in Class

1  6, and cram down does not take place, then this plan cannot be

2  confirmed is almost tautological but we can go ahead and state

3  that but then how many other tautologies are we going to have

4  to state in connection with this process?

5         THE COURT:  I don't know.

6         MR. BERNICK:  So, we'll go do that one, and we'll

7  see, I guess, what happens.

8         THE COURT:  Okay.

9         MR. BERNICK:  Okay.  Third party releases is the next

10  category and this includes the question of the scope of the

11  exculpation clause and as Your Honor can see from the chart

12  there is a series of objecting parties, the U.S. Trustee, the

13  ERISA plaintiffs, the Libby claimants, Kaneb, and I can't

14  figure out whether that's Caneb or Kaneb, and Fireman's Fund, I

15  have a question mark on that, I don't even know what that

16  exactly means, I think that there are essentially three issues

17  that get bound up in this category.

18         One is the availability of a third party release,

19  absent consent, called the availability for a non-consensual

20  third party release.  And, incorporated in that is the question

21  of whether people should be given the opportunity to

22  affirmatively opt in.

23         Second issue is the scope of the third party release

24  in terms of what third parties are picked up in the release.

25         And the third is the scope of the exculpation clause.

1 Now, the scope of the exculpation clause is something that

2 doesn't really bear upon voting and, therefore, is plainly a

3 confirmation issue.

4       The second, and that was the third one that I

5 mentioned.  The second one, which is the scope of the third

6 party release in terms of what third parties are picked up.

7 This is a matter that's raised by the Libby claimants, they

8 raise the question of whether the scope of the third party

9 release that's proposed is consistent or inconsistent with the

10 categories that are set forth in 524(g).

11       Again, that's something that's plainly a confirmation

12 issue.  We can seek to negotiate, further refine, or basically

13 see if we're at an impasse with respect to what third parties

14 should be picked up.  But that, again, is a confirmation issue.

15       The issue of whether, in fact, third party releases

16 are available absent the affirmative consent of the creditors

17 does pose a voting issue to the extent that Your Honor would

18 consider that you have to provide for an opt in, which

19 essentially is a way of saying that the creditors or claimants

20 must affirmatively decide that they're agreeing, which means

21 that it must be consensual.  And that, therefore, would have

22 some relevance and ripeness today.

23       But it is our position that at the end of the day

24 non-consensual releases are appropriate and we're prepared to

25 litigate the issue, that is whether non-consensual releases are

**J&J COURT TRANSCRIBERS, INC.**

1 appropriate at the time of confirmation as if there is no

2 voting opportunity.  That is, that we're prepared to take that

3 issue on squarely in connection with confirmation, whether a

4 non-consensual release is appropriate.

5        We think that as that issue gets litigated if, in

6 fact, it is litigated at the time of confirmation, it will be

7 different in terms of its application to the asbestos claimants

8 versus the non-asbestos claimants.  With respect to the

9 asbestos claimants, obviously 524(g), we believe, states a

10 principle that does not require the acquiescence of all of the

11 different asbestos claimants, that's why it's got the voting

12 requirement of 75 percent.  So, we think it's a non-issue with

13 respect to 524(g), with respect to asbestos.

14        With respect to non-asbestos claimants, we think that

15 that issue does not, obviously, implicate 524(g).  Because it

16 doesn't implicate 524(g), it doesn't implicate the CE decision

17 which says that 524(g) is exhaustive with respect to asbestos

18 matters, it therefore, has to be decided outside the context of

19 CE, Combustion Engineering.  At that point, then have to deal

20 with the Continental decision of the Third Circuit and as we

21 know, Continental left open the question of whether

22 non-consensual third party releases could be appropriate, said

23 it was not going to decide that issue as a general proposition

24 and, in fact, in the footnote that was associated with that

25 discussion, gave specific recognition to the fact that it might

1  be that a different and special rule is appropriate in the case

2  of mass torts, because you'll recall that both the Johns

3  Manville decision out of the Second Circuit, Fourth Circuit's

4  decision in A.H. Robbins, as well as the Dow-Corning decision

5  out of the Sixth Circuit, all provide for and approve

6  non-consensual third party releases in mass tort.  So, we would

7  be arguing that those same principles should be adopted with

8  respect to the non-asbestos claims and for a very simple

9  reason, which is, if you don't do it, you get the squeaky wheel

10  problem.  In fact, in the Dow-Corning case, it was, I think,

11  all of 50 claimants in the entire case that held up the

12  ultimate confirmation of the Dow-Corning case for a number of

13  years.  The Sixth Circuit ultimately ruled that they didn't

14  have the ability to do that.  The third party releases would be

15  good, even as to them, even though they were not -- they didn't

16  vote in favor of, indeed, objected to the confirmation of that

17  plan.

18        But what happens under 524(g), what happens with

19  respect to non-asbestos claims and Continental is an issue for

20  another day, we're prepared to address that issue without the

21  benefit of an opted provision and, therefore, we would say that

22  that issue, too, should be deferred until the time of

23  confirmation.

24        THE COURT:  Well, what are the releases as to the

25  non-asbestos claims that the debtor is trying to get and for

1 whom?

2        MR. BERNICK:  I would have to go through, Your Honor,

3 I'm not actually prepared to do that, I'm sure that Mr.

4 Freedman could, the specific language of those different

5 releases.  They're non-asbestos and they seek to cover -- well,

6 maybe, Ted if you could address that, that would be fine.

7        MR. FREEDMAN:  The provision that relates to this

8 discussion is Section 8.8.7 of the plan and what that provision

9 essentially provides is that a creditor who votes for the plan

10 or takes property under the plan will be deemed to give a

11 release to a number of constituencies, those being the asbestos

12 insurance parties, the asbestos insurance entities, the

13 Unsecured Creditors' Committee, the Asbestos PI Committee, the

14 Asbestos PD Committee, the Equity Committee, Asbestos PI FCR,

15 the Asbestos PE FCR, and each parties' representatives with

16 respect to essentially any matters involving Grace.  And that's

17 what the releases involve.  That it's for people that vote for

18 the plan and people that accept assets under it.

19        THE COURT:  Okay.

20        MR. BERNICK:  I don't know if anybody had --

21        THE COURT:  Mr. Cohn.

22        MR. COHN:  Yes, Your Honor.  Let me start off by just

23 addressing this distinction between disclosure statement

24 issues, and plan confirmation issues.  We've objected to a

25 whole slew of provisions of the plan.  They are plan

1  confirmation issues, Your Honor.  They will surely need to be

2  addressed at the time of plan confirmation.  However, there is

3  lots of case law out there that says that just as a matter of

4  judicial economy one ought not to go through a very expensive

5  and time-consuming solicitation process if the plan is really

6  going to be dead on arrival by reason of certain of its

7  provisions.  And so I think what we might do today, and that's

8  productive, would be to identify whether there are any of those

9  types of provisions here.  We have objected on a number of

10 grounds to the scope of the releases and the exculpations and

11 the injunctions.  And I do not propose to go through all of

12 that right now, but I would like to identify two provisions

13 which I think are just blatantly -- render the plan blatantly

14 unconfirmable, which I think this Court ought appropriately to

15 take up right now.

16        One of those is the provision that Mr. Freedman just

17 read.  The key words are -- we all understand that one can --

18 that one can say if you vote in favor of the plan, you're given

19 the release.  What this provision does is it goes beyond that,

20 and it says that even if you voted against the plan, if you

21 accept any consideration pursuant to the plan, then you are

22 giving a release as a creditor.

23        Judge Walrath in the _Zenith_ decision went through

24 that very issue and has said as a matter of law that you can't

25 -- unless you vote in favor of the plan, you can't require

1  somebody to be providing a release of third parties.  That's

2  just a clear issue of law.  The debtors have overreached -- the

3  plan proponents, I should say, really overreached.  Worse yet,

4  they've done it in a self-dealing kind of context, because the

5  -- among the beneficiaries are the Asbestos Claimants Committee

6  as a co-proponent of the plan.  So what they're basically

7  saying is the Libby claimants, even if they vote against the

8  plan, are providing a release.  Here's a release of whatever

9  claims we may have against you.

10        I understand separate issue, Your Honor.  Maybe they

11  get there anyway under an exculpation clause, but it is clearly

12  -- you clearly cannot say that simply by getting --

13        THE COURT:  I think you're right, Mr. Cohn.  I think

14  you and the U.S. Trustee are right on this one.  I don't think

15  just by taking property under the plan you can require someone

16  to give a release.  I think it's a voting issue, and if you

17  vote against the plan, you're clearly not giving a release.  I

18  think it's a confirmation and disclosure issue, and this one

19  has to be changed.  It simply has to be changed.  And I agree

20  with Judge Walrath.  I think -- I don't think Continental goes

21  this far, and I think it simply has to be changed.

22        MR. FREEDMAN:  To clarify the Court's ruling, is the

23  Court saying that the language that needs to be changed is the

24  taking of property under the plan?

25        THE COURT:  Yes.  Yes, you -- I think you can vote,

1  you know, for -- if you vote for the plan, I think you can

2  provide the release, although I think the U.S. Trustee's Office

3  is correct that it should be an opt in.  But where it is --

4  where you can combine this with an exculpation provision, why

5  don't you just do it that way?  The law in the Third Circuit's

6  pretty clear that you can do it as as exculpation provision

7  where it's the professionals and the committees and the Future

8  Claims Rep that that is what you're trying to protect.  Those

9  are the entities you're trying to protect, so why don't you do

10 it as an exculpation provision rather than release?

11          MR. BERNICK:  But, Your Honor, I --

12          THE COURT:  Because they're not providing

13 consideration.  You're going to have a contract issue if you

14 don't do it as an opt in with a special provision on the ballot

15 in this Circuit.  So why don't you just do it as an exculpation

16 provision?

17          MR. BERNICK:  We'd be happy to do that, but we're

18 talking here about the Libby claimants.  The Libby claimants

19 are asbestos claimants.

20          THE COURT:  Yes, they are.

21          MR. BERNICK:  The asbestos claimants, if they get out

22 voted under 524(g) -- 524(g) is dispositive.  It's not a

23 Continental issue at all.  We're talking about Continental

24 would have application --

25          THE COURT:  I don't --

**J&J COURT TRANSCRIBERS, INC.**

1           MR. BERNICK:  -- in the case of a non-asbestos claim.

2           THE COURT:  Yes.

3           MR. BERNICK:  524(g) contemplates specifically that

4  the squeaky wheel can't upset the plan.

5           THE COURT:  I don't -- I still don't think that you

6  can force someone who votes against the plan to provide

7  release.  By virtue of the fact that they take property under

8  the plan, you are forcing them to give a release.  I don't

9  think that's appropriate in a voting context.

10          MR. BERNICK:  They don't have the ability to resist

11 the release that flows from 524(g), period.

12          THE COURT:  Oh, they don't.  Under 524(g) I agree.

13          MR. BERNICK:  Well, that's the whole --

14          THE COURT:  It's a 75 percent vote.

15          MR. BERNICK:  That's the whole -- that's the whole --

16 again there will be a more interesting question with respect to

17 the non-asbestos claimants.

18          THE COURT:  I thought that that's what we're talking

19 about.

20          MR. BERNICK:  No.  No.  No.  Mr. Cohn is representing

21 the asbestos -- the Libby asbestos claimants.

22          THE COURT:  524(g) has its own provisions that the --

23 that the statute builds in.  That's the 75 percent vote.

24 There's nothing that you can do about the language of 524(g).

25 There's a substantial contribution issue that is much different

1  from the <u>Continental</u> standard.  I apologize.

2           MR. BERNICK:  Yes, so --

3           THE COURT:  I thought you were talking about -- I

4  thought you were rising, Mr. Cohn, in response to the release

5  provisions under the <u>Continental</u> standards not under 524(g).

6  The Court can't do anything about the statutory provision of

7  524(g).

8           MR. BERNICK:  Right, and that's why with respect to

9  the people who are under 524(g) the issue doesn't go to dead on

10 arrival for the plan.  It goes to whether we have exceeded the

11 scope of 524(g) in the language that we have provided.  That's

12 a confirmation issue, but it doesn't go to the question of

13 whether the plan, in fact, can be -- you know, is dead on

14 arrival, because we got people who are non-consensual people.

15          Non-asbestos claimants is a different proposition.,

16 but with respect to the non-asbestos claimants, we're not

17 talking about -- we're not talking about 524(g).  There we're

18 talking about <u>Continental</u> --

19          THE COURT:  Well --

20          MR. BERNICK:  -- and under those circumstances I

21 think you get the issue of whether <u>Continental</u> actually

22 forecloses this.  And we don't believe that it does, but that's

23 not Mr. Cohn's clients.  He represents PI claimants.

24          THE COURT:  You're talk -- I would prefer to put it

25 in these terms.  I don't know that the nature of the claim

1  governs.  I think the provision of the plan that is either a

2  524(g) injunction versus a different type of injunction is the

3  standard that would govern.  And, Mr. Cohn, it seems to me that

4  if there's an issue under 524(g) that hasn't yet been briefed

5  or decided somewhere, I'll treat it as a confirmation issue not

6  a disclosure statement issue.  To the extent that it's a

7  Continental issue though, that issue I think the plan has to be

8  modified to take out the acceptance of property, because I

9  think Judge Walrath is quite correct in the Zenith case as to

10 that issue.  But for 524(g) purposes I think -- Congress has

11 been very clear that certain entities -- certain entities who

12 make substantial contributions to the plan are entitled to

13 particular types of injunctions, but those entities are not

14 going to encompass the professionals who work for the

15 committees, the committees, the FCR, and so forth.  They will

16 not be entitled to a 524(g) injunction.

17        MR. COHN:  Well, first of all, Your Honor, the

18 provision that we're talking about, I'm sorry, is a release not

19 an injunction?  Everything you've said about injunctions I

20 agree with.  We obviously have issues about the scope of the

21 injunction.  I'm not raising those as we stand here.

22        THE COURT:  Okay.  Well, 524(g) --

23        MR. COHN:  The issue is purely --

24        THE COURT:  -- doesn't provide a release.  It

25 provides an injunction.

1          MR. COHN:  Exactly, and what they have done in the

2     plan -- the specific provision that we're talking about is not

3     the injunction provision under 524(g).  It is a purported

4     release.  It says that if you accept property --

5          THE COURT:  Show me the language that we're talking

6     about, so that I'm sure we're talking the same paragraph,

7     because now you've confused me.  Is --

8          MR. COHN:  Sure, Your Honor.  It is --

9          THE COURT:  8.8.7?

10         MR. COHN:  8.8.7.

11         THE COURT:  Okay.  We're back to 8.8.7.  It's the

12    same one Mr. Freedman talked about.  This is simply saying,

13    "Without limiting any other provisions of the plan, each holder

14    of a claim or equity interest who votes in favor of this plan

15    or receives or retains any property under the plan shall be

16    deemed to unconditionally have released the asbestos protected

17    parties."  That goes -- that is too broad.  Whether -- this is

18    not a 524(g) injunction issue.  This is saying that simply

19    because you get property under the plan, you've provided a

20    release to, among others, the asbestos protected parties.

21    524(g) doesn't provide a release.  It provides an injunction.

22    So I'm back to what I said before.  This provision is too

23    broad, and, in my view, it's unconfirmable.  So, Mr. Cohn, I

24    agree with you.

25         MR. COHN:  Thank you, Your Honor.

1          MR. BERNICK:  Well, I want to confer with Mr.

2  Freedman on this, and we may be back to the Court, but I

3  understand what Your Honor is saying.

4          THE COURT:  Okay.  It's simply the or retains any

5  property that I'm concerned about.

6          MR. BERNICK:  I understand that.

7          THE COURT:  Okay.

8          MR. COHN:  I'm sorry.  There was one other issue.

9          MR. BERNICK:  Sure.

10         MR. COHN:  The other issue, Your Honor, you might

11 recall that throughout this case you've heard reference to the

12 independent claims that the Libby claimants have against

13 parties such as the State of Montana and others and without --

14 and including -- including Maryland Casualty Company, but not

15 in its role as the debtors' insurer but rather based on its own

16 independent torts.  And in some cases you have seen fit to

17 enjoin our pursuit of those claims during the case,  and others

18 you've ruled that you have no jurisdiction to do it.

19         But I mention all this only by way of background to

20 just focus you on those independent claims.  It is clear that

21 those independent claims cannot be enjoined under Section

22 524(g).  Section 524(g), as you've just recited, is limited by

23 its terms to those four categories of people who can receive

24 the protection of an injunction, and those four categories of

25 claims that can be protected do not include any independent

1 claim that -- of the type that the -- that the Libby claimants

2 have against the State of Montana, against Maryland Casualty

3 Company, and so on.

4         And we would respectfully submit that apart from all

5 other issues concerning 524(g) injunctions, this one is clear.

6 No one, you might recall, Your Honor, when we had discussions

7 about this Court's jurisdiction to issue the preliminary

8 injunction, nobody contended that they would have the right to

9 get a final injunction or a plan injunction against those

10 claims.  It was totally a matter of what was going to be done

11 during the Chapter 11 case.  So given the fact that this is

12 really an uncontested and uncontestable interpretation of

13 Section 524(g), there's just no reason why they should be

14 permitted to go out and solicit acceptances of a plan that

15 contains language that goes well beyond this.  And we quote the

16 language in our papers, Your Honor, but if you wanted to look

17 at a section of the plan, Section 8.2.1, which is the

18 channeling injunction?

19         MR. LOCKWOOD:  Your Honor, we were talking about

20 third party releases here.  I can't understand where Mr. Cohn

21 -- he seems to be talking about the scope of the 524(g)

22 injunction, which --

23         MR. COHN:  This is the second -- the second issue as

24 to which I've said the plan is blatantly unconfirmable.

25         MR. LOCKWOOD:  So, in other --

**J&J COURT TRANSCRIBERS, INC.**

1              MR. COHN:  It is a different issue from the releases.

2              MR. LOCKWOOD:  So, in other words, Mr. Cohn has sort

3    of taken over the order of presentation and is going to decide

4    which issues we're going to talk about as plan confirmation

5    issues?  I mean Mr. Bernick hasn't addressed this issue at this

6    point.

7              MR. COHN:  I'm sorry, Your Honor.  I didn't see a

8    separate entry for injunction issues on Mr. Bernick's chart,

9    and so I thought this was the appropriate place.  I'm happy to

10   do it at some later point if that was what you had in mind, Mr.

11   Bernick.

12             THE COURT:  Well, I --

13             MR. COHN:  I realize the importance of keeping this

14   record --

15             THE COURT:  Okay.  At the moment let -- I'm into this

16   now.  Let's finish this issue.  But after this, yes, let's

17   finish Mr. Bernick's trend, but I don't want to have to back up

18   to this now.  So what is this about the channeling injunction,

19   Mr. Cohn?

20             MR. COHN:  Section 8. --

21             THE COURT:  I'm there.

22             MR. COHN:  -- 8.2.1.

23             THE COURT:  Yes.

24             MR. COHN:  All right.  If you look at the language,

25   it says, "All present and future holders of asbestos PI

1 claims."  And, by the way, this starts -- if you'll hang on

2 just a second, Your Honor?  Because we quoted the except in our

3 papers, and I'm just -- I just want to make sure that I get

4 this correctly in context.

5                           (Pause)

6           MR. BERNICK:  Which page of your brief?

7           MR. LOCKWOOD:  Which page of your brief are you

8 talking about, Mr. Cohen?  I mean I'm having trouble following

9 where you're coming from.

10          MR. COHN:  Page 82.

11          THE COURT:  I'm not certain why whatever this is

12 isn't related to a confirmation issue, Mr. Cohn.

13          MR. COHN:  It is.  It's because it -- it's because

14 the language goes so clearly and uncontestedly beyond anything

15 that you could do under Section 524(g).  It just ought to be

16 pruned back, ought to be clarified.  It says basically, Your

17 Honor, that anybody -- if you have a claim against any --

18          MR. LOCKWOOD:  Your Honor --

19          MR. COHN:  -- any --

20          MR. LOCKWOOD:  Your Honor, I can interject something.

21 This is -- he's pointed out an ambiguity that we're going to

22 have to address.  I really -- now that he's given me the point

23 in his brief that he's talking about, we -- the plan proponents

24 have actually not had a chance to -- I think what he's doing is

25 reading in some language here that if you parse through the

1  definitions, it's -- it doesn't mean what he says it does, but

2  it's conceivable that we might have a language fix on this.  I

3  don't know -- I mean we're certainly not in a position to

4  accept his characterization of what this language says, because

5  what he's saying is that this language says that anybody that

6  has an asbestos PI claim is enjoined from suing everybody in

7  the universe not limiting it to asbestos protected parties.

8  And that's clearly not what it's intended to do, and I think if

9  we parse the language very closely, I think that we could

10  conclude that it doesn't do that, but I will defer to the

11  debtors, but I really don't --

12          THE COURT:  All right.  Get together and work on a

13  fix.

14          MR. COHN:  Yes, Your Honor, that's what I was going

15  to suggest.  Shall we put this over --

16          THE COURT:  Yes.

17          MR. COHN:  -- to the November 14th --

18          THE COURT:  Yes.

19          MR. COHN:  -- hearing?

20          MR. BERNICK:  I'm sorry.  Mr. Cohn has not only put

21  an issue before the Court that wasn't encompassed by the point

22  that we were making and a confirmation issue, but he's now

23  said, well, we're going to resolve this on November the 14th.

24  This is -- plainly goes to the scope of the injunction that is

25  plainly a confirmation issue.  We'll take a look at it, as Mr.

1  Lockwood said, but the idea that this is actually now

2  appropriate for resolution in the context of November the 14th,

3  I don't know whether that really is appropriate.  It's not that

4  we're going to delay it, but it seems that Mr. Cohn is angling,

5  angling, angling to have this matter be a confirmation issue

6  that actually is taken up in connection with the disclosure

7  statement process.  And, again, what is the need for this?

8  We're talking about fine tuning the scope of the injunction.

9       THE COURT:  Well, Mr. Cohn's position is that the

10  plan is unconfirmable, because it's the asbestos channeling

11  injunction is too broad, and then it encompasses parties who

12  would not be entitled to the scope of the injunction, because

13  it encompasses direct claims that would be those direct claims

14  by parties who were not subject to the scope of the injunction,

15  i.e., the ZAI plaintiffs whose direct claims against, for

16  example, Maryland Casualty would be encompassed within the

17  scope, and, therefore, the scope is too broad.  I think if you

18  folks talk about it, if it's a language issue, you'll get it

19  fixed, so just talk.

20       MR. BERNICK:  We will do that, Your Honor, but this

21  is not a confirmation issue that --

22       THE COURT:  It is a confirmation issue.

23       MR. BERNICK:  I mean it is a confirmation issue.

24  It's not a confirmation issue that ultimately undercuts all the

25  underpinnings of the plan such that we're going down a path by

1 sending this plan out for vote fruitlessly.  This deals with

2 what the scope of the injunction is.  It is a confirmation

3 issue.  It's precisely not the kind of confirmation issue that

4 says we shouldn't go forward with the vote, because it doesn't

5 go to the fundamental underlying question of whether the plan

6 is viable.

7          THE COURT:  Okay.

8          MR. BERNICK:  It's a fine tuning issue.  That's all

9 that I'm saying.

10          THE COURT:  Fine.  Work on the language.

11          MR. COHN:  I shall work with the plan proponents,

12 Your Honor.

13          THE COURT:  All right.  Mr. Fornari.

14          MR. FORNARI:  Your Honor, Joseph Fornari on behalf of

15 the United States Trustee.  At the risk of pushing on an open

16 door, I'd like a clarification, if I could, on the Court's

17 ruling.  As I understand it, the Court has sustained the

18 objection of the United States Trustee, which was premised on

19 In Re:  Zenith and In re:  Continental Airlines, and has now

20 required that the plan proponents amend the disclosure

21 statement in conformity with your ruling and also to include in

22 the ballot form a specific affirmative opt-in provision.

23          THE COURT:  Well, what I required is that this

24 language in 8.8.7 that requires the or retains any property be

25 deleted, because I believe that the language of the plan is

1 unconfirmable.  I don't think you can force a release of this

2 nature on someone who may have voted against the plan, but,

3 nonetheless, because the class has voted affirmatively in favor

4 of the plan has received property under the plan.  So I don't

5 think that's appropriate.  I do agree with the U.S. Trustee's

6 position that in order to give a release of certain types, that

7 a vote in favor -- affirmative vote in favor should be

8 required, but I've also asked the debtors why, when this is the

9 nature of the release that they're attempting to get, they

10 don't do it by way of an exculpation instead of release, which

11 would, I think, moot this whole concept out at least as to the

12 professionals, the Committee, the Future Claims Rep, and so

13 forth.  I think as to the asbestos protected parties though,

14 they do need an affirmative vote, because as to those, under

15 the -- for the non-asbestos claimants who would be releasing

16 asbestos parties, I think that does take an affirmative vote if

17 it's going to, in fact, be a release under <u>Continental</u> I think

18 in this Circuit.  And then the issue is, you know, going to be

19 whether or not there's some form of appropriate release.  But

20 we don't need to worry about that.  But so, yes, I think they

21 do need an affirmative opt-in ballot.

22          MR. FORNARI:  Thank you, Your Honor.

23          MR. FREEDMAN:  Your Honor, to be clear, there are

24 really two issues that the United States Trustee is raising.

25 One has to do with whether or not an affirmative vote is

1  required.

2           THE CLERK:  Stand near a mike.

3           MR. FREEDMAN:  One has to do whether or not an

4  affirmative vote is required, which is what the provision would

5  require.  The second has to do with whether on top of that

6  affirmative vote the claimant is somehow required under

7  applicable Third Circuit law to be asked to opt in to the

8  release.  We do not believe that Third Circuit law requires

9  that.  We don't think that there is authority in the Third

10 Circuit, contrary to what the United States Trustee is arguing,

11 that says that on top of the affirmative vote there is a

12 requirement for an affirmative opt in, and we would --

13          THE COURT:  Oh, I see.  I think, Mr. Freedman, the

14 issue actually in the Third Circuit is not so much an opt in.

15 It's really a disclosure issue.  And the issue, as I have seen

16 most of the cases come down, is you don't necessarily have to

17 have a box on the ballot that says I opt in, but you do need in

18 very highlighted, bold, separately segregated language

19 somewhere a provision that indicates what the release is in no

20 uncertain terms, or else essentially those ballots won't be

21 counted.  So if you don't put a separate checkoff box that says

22 I opt in, then you better make sure that the disclosure is very

23 prominently displayed, and then the ballot may be able to be

24 counted.  The safer practice is simply to have a separate opt

25 in ballot, because in almost every instance people check it

1 anyway.  So --

2          MR. FREEDMAN:  Your Honor, we believe that under the

3 circumstances of this plan to have a separate opt in ballot,

4 particularly in the context of a plan that contemplates a

5 524(g) injunction, you would create confusion as to that and --

6          THE COURT:  But you don't need it for the 524(g)

7 folks.

8          MR. FREEDMAN:  You don't need it, but a creditor that

9 is voting may not fully understand the implications of that. We

10 believe that --

11          THE COURT:  Why?  It'll only be your Class 9 people

12 for the most part.  Everybody else is going to be under the

13 524(g).  Aren't they?

14          MR. FREEDMAN:  That may be the case, Your Honor,

15 but --

16          THE COURT:  So those folks ought to understand.  The

17 trade creditors vote all the time, and your bank lenders will

18 certainly understand.

19          MR. FREEDMAN:  We believe that it would impose a

20 burden --

21          THE COURT:  I don't.  I don't think it will impose

22 any burden.

23          MR. FREEDMAN:  Is the Court now instructing us that

24 we need to put the affirmative opt in box or just the

25 affirmative vote on the ballot for the general unsecured

**J&J COURT TRANSCRIBERS, INC.**

 1 creditors in Class 9 --

 2          THE COURT:  Well --

 3          MR. FREEDMAN:  -- that are being asked to

 4 provisionally vote for the plan?

 5          THE COURT:  I'm asking what ballots it has to go on.

 6 I'm not even sure under the voting structure of this plan who

 7 all is covered by that language, because I -- I'm not sure I

 8 know the class structure well enough to know who all --

 9          MR. FREEDMAN:  The current impaired classes are Class

10 6, the Canadian ZAI class, and the Equity Class.  And as to

11 those classes, we think that the plan should not provide for an

12 affirmative opt in but simply provide in very clear language

13 that the effect of a vote for the plan is to grant that

14 release, and we will so make clear in the solicitation

15 materials.

16          We are also soliciting Class 9 provisionally, so we

17 have to address the issue for that purpose.  That class is

18 getting paid 100 cents dollars on their allowed claim, and we

19 again believe that under those circumstances we don't need to

20 provide an affirmative opt in but simply have a structure that

21 says that if you vote for the plan, with very clear disclosure

22 about the impact of that vote, that that's adequate to satisfy

23 the standards.

24          THE COURT:  Well, let's see.  So, actually, the

25 524(g) ballot -- you're actually asking not -- the people in

1  Class 6 to provide a release not just to get the injunction, so

2  they would need to affirmatively vote, because you're asking

3  them to release the asbestos-protected parties not just to get

4  an injunction in favor of them.   Why?

5         MR. FREEDMAN:  But they have to vote -- they have to

6  vote anyway for a 75 percent vote.

7         THE COURT:  But why are they providing a release in

8  addition to getting an injunction?

9         MR. FREEDMAN:  There are --

10         THE COURT:  You need to use a --

11         MR. FREEDMAN:  In a complicated case like this, which

12  has gone on for as long as this case has gone on, it is

13  appropriate to provide that there be a release for the various

14  parties that are identified in the plan in addition to the

15  protection of the injunction.

16         THE COURT:  Why?  Why do the asbestos-protected

17  parties need a release?  The automatic stay has prevented them

18  from doing anything for the past six years, so why do they need

19  a release?  If you want to break out the professionals and so

20  forth in the case, then the exculpation provisions, as I've

21  articulated earlier, I think eliminate the whole need for this

22  voting issue in the first place.  As to the asbestos-protected

23  parties, what are they contributing in addition to the

24  contributions that would get them a 524(g)injunction that

25  require a release?

1      MR. BERNICK:  Your Honor, we're getting close to the

2  lunch hour anyhow, and I'm not suggesting we take a break, but

3  rather than -- I think the U.S. Trustee was asking for Your

4  Honor to state at this point the objection is sustained X, Y,

5  Z.  I think that in light of all the discussion that we have

6  had, maybe we ought to caucus a little bit and report back to

7  the Court after lunch what it is that we are -- where we're at

8  on this.  I suspect that Your Honor has talked about the

9  exculpation clause, and it may be that that is a way of

10  eliminating the whole issue.  I don't -- I think what we're

11  really -- what we --

12      THE COURT:  Well, it is for the professionals.

13  Excuse me.

14      MR. BERNICK:  Right.

15      THE COURT:  Yes --

16      MR. BERNICK:  What we don't want to get into --

17      THE COURT:  -- and the committees.

18      MR. BERNICK:  -- though is soliciting, and the

19  solicitation with respect to the other impaired classes, and

20  I'm setting aside Class 9, is whether it's impaired or not is

21  an issue.

22      THE COURT:  Yes.

23      MR. BERNICK:  But with respect to the other classes

24  that are impaired classes, what we want to avoid is having to

25  send out a ballot that is unnecessarily confusing.  Your Honor

1  then raises the question, well, why do you need the release at

2  all, and that's something that I want to make sure that before

3  we articulate it to the Court that we thought through pretty

4  carefully exactly what our articulation is.  As I take it, the

5  force of Your Honor's query is that if they are already covered

6  by 524(g), you don't need the release, and, therefore, we don't

7  have to go down this road at all.  And that's something that I

8  think we have to think about before we address further with the

9  Court.

10          THE COURT:  All right.

11          MR. CHEHI:  And if I may, Your Honor -- Mark Chehi

12  for Sealed Air -- just point out for the Court's information

13  and the parties here that the Sealed Air settlement agreement

14  contains many important terms that relate to releases that have

15  to be incorporated in the plan for the benefit of Sealed Air.

16  Indemnities and the like are implicated.  And that this issue

17  of the terms of releases and injunctions in the plan under

18  524(g) and otherwise bear heavily upon whether or not the plan

19  will indeed be able to vindicate the Sealed Air settlement, so

20  that Sealed Air can support it.  And we just want to make sure

21  that the parties understand that.

22          THE COURT:  Well, that may be the case, too, but I'm

23  not sure it has to be in that specific provision encompassed

24  the way it is, but okay.  Mr. Fornari, I guess until after

25  lunch I won't give you a ruling.  After lunch, when I hear the

1 need for the releases and whether or not this provision's going

2 to be modified, then I guess I'll give you a ruling.

3          MR. FORNARI:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. BERNICK:  If we can continue to move -- oh, I'm

6 sorry.  There's somebody else who wanted to speak.

7          MR. DEMMY:  Your Honor, John Demmy on behalf of

8 Fireman's Fund Insurance Company.  And Mr. Bernick's question

9 mark on the chart here on this item prompts me to rise to say

10 just a couple of words, because I don't think we really made an

11 objection on the third party releases in the exculpation per

12 se.  What we did in our objection was reference a couple of

13 provisions that relate to insurers, one being what we assume to

14 be the discharge provisions of the plan that would affect the

15 debtors' continuing obligations under insurance contracts, and

16 also the injunction with respect to contribution claims, that

17 being the ability of a non-settling insurer to assert a

18 contribution claim against a settling insurer.

19          And we raise both of those points in the context of

20 the debtors' plan provisions regarding insurance neutrality,

21 Your Honor.  And I think these comments will probably be

22 applicable to the other Fireman's Fund items that are on the

23 chart, but I'm not getting to those.  I just note that as my

24 perception.

25          Your Honor, it -- the insurers I think, speaking for

1  Fireman's Fund and perhaps for some others, are interested in

2  having discussion with the plan proponents about neutrality.

3  It's been something that we really haven't been able to do,

4  because some of the key documents have not been filed or only

5  recently filed, including the Exhibit 5 that we've heard about,

6  Exhibit 6, the transfer agreement, which was only filed over

7  the weekend, and also Fireman's Fund raised the missing

8  cooperation agreement, which I believe is Exhibit 10 in the

9  book, which I don't believe has yet been filed, but the debtors

10  have indicated that it would be at some point I think prior to

11  the close of the disclosure statement hearing.

12          But, Your Honor, with those agreements and noting

13  that we haven't really even had a chance to review them with

14  our clients yet, but we intend to do so and proceed forward, we

15  think it would be appropriate for there to be some discussion

16  on neutrality and other provisions that relate to insurers.  I

17  don't want to suggest that I'm going to be arguing confirmation

18  issues.  What I'm suggesting is I think we could work through a

19  lot of these issues, so that we perhaps don't have to fight

20  about some of the confirmation issues that are noted on the

21  chart here.

22          THE COURT:  All right.

23          MR. BERNICK:  Your Honor, our anticipation was to

24  deal with the -- and I appreciate counsel's rising because of

25  Fireman's Fund and the question mark reference that's made in

1  Category 3, but we did intend to raise the insurance issues as

2  a group in connection with Category 7, and, fundamentally, they

3  do go to the question of neutrality and the neutrality

4  language.  And, again, it is our view, and it's quite simple,

5  that those are confirmation issues that do not have to hang up

6  the sending of this document out for a vote, but we'll be happy

7  to address that in connection with Category 7.

8          On Category 4, which are the classification issues,

9  essentially, classification is raised by two parties -- two

10  objectors.  One are the Libby folks, and two are the people who

11  hold indirect claims.  And I think that, you know, the

12  threshold issue again is whether this is something that has to

13  be dealt with now.  Clearly, the Court does have the discretion

14  to take up classification issues at the disclosure statement

15  stage, but in this instance none of these classification issues

16  actually threaten to affect what I'll call swing votes and key

17  classes.  That is to say the Libby folks want a separate class,

18  but the inclusion of them in the Class 6 is not going to affect

19  the Class 6 vote in all likelihood.

20          Likewise, with respect to the indirect personal

21  injury claimants, which we would construe to affect, does, in

22  fact, include both Bank of America that has objected as well as

23  CNA, which is one of the insurers of the State of Montana.

24  They would seek to be in Class 9.  Class 9 is likely to be a

25  vote no class anyhow.

1         So but what we would say with respect to

2    classification is that these matters not only be taken up in

3    connection with confirmation, but they're really not going to

4    present much of an issue.  In at least all my experience in

5    connection with these asbestos cases is that they do not, and

6    in the particular -- it's particularly true here.  Libby -- the

7    Libby claimants -- and I know that Mr. Lockwood may have

8    additional observations on this, but the Libby claimants are

9    basically saying that we've already -- we've basically taken a

10   classification scheme that is very middle of the road.  It's

11   the same kind of classification scheme that was used in

12   Armstrong and USG.  It's a classification scheme that neither

13   is too general in the sense of lumping everybody together, nor

14   does it take the risk of there being a gerrymander issue by

15   being too specialized.  So we have not simply grouped everybody

16   as an unsecured claimant, which technically would include PD,

17   PI, as well as the commercial creditors, nor have we gone

18   within the different subgroups and divided them further.  So

19   it's really pretty much right down the middle.

20        So the Libby people say, well, gee, it's not really

21   good enough that you've got personal injury asbestos.  You

22   should have personal injury asbestos that is specific to a

23   particular location.  They can't say that the asbestos as a

24   material is somehow different at Libby, because that same

25   asbestos, to the extent that it was a natural contaminant at

1  Libby, also is present, although we believe in extremely small

2  amounts, in a variety of other Grace products that were sent

3  out.

4        So the Libby people basically say they ought to have

5  their own individual specific class, and that it has

6  classically a situation which runs afoul of what is essentially

7  the latitude that's afforded to plan proponents to have more

8  general groupings.  Indeed there's kind of a presumption in

9  favor of more general groupings.  This is the same general

10 grouping, i.e., the personal injury claimants that was again

11 used in Armstrong and also was used in USG and probably a

12 variety of others as well.

13       So the objection the Libby people really have is to

14 the TDP that they have in the -- with respect to the personal

15 injury trust, and that is a different matter.  It's not really

16 a classification matter at all.  And given the standards of the

17 platy classification, we don't believe that their claim is

18 going -- of discrimination, or improper classification, I

19 should say -- that their claim of improper classification is

20 going to hold the cart up too much at confirmation, but it is a

21 confirmation issue.

22       With respect to the indirect personal injury

23 claimants which include both insurers to a certain extent but

24 also Bank of America, the answer is relatively simple, which is

25 that 524(g) specifically contemplates that all claims arising

1   from a personal injury liability basically get channeled to and

2   handled by a 524(g) trust.  And so again for that basic reason

3   it makes sense to classify that as being one class that is

4   commensurate with the trust, and the idea of putting not only

5   direct personal injury claims but indirect personal injury

6   claims in the same class for precisely that reason is not

7   novel.  It was done in <u>Armstrong</u>.  It was done in <u>USG</u>.  It's

8   probably been done in others that I'm less familiar with.  It

9   was specifically upheld by Judge Robreno in connection with the

10  <u>Armstrong</u> case.

11          So again the classification issue is really not a

12  difficult issue.  We think it could be taken up in connection

13  with the confirmation.  But even were it to be taken up now,

14  we've not done anything that's novel in this plan at all.  It

15  follows the mainstream of classification, and under the rules

16  that apply to that we believe it's totally appropriate.

17          THE COURT:  Mr. Cohn.

18          MR. COHN:  Yes, Your Honor.  As we stated in our

19  papers, Libby asbestos is different.  It is amphibole asbestos,

20  whereas, the asbestos that Grace used everywhere else in its

21  products was a serpentine asbestos, or we call it chrysotile.

22  So it is a different asbestos.  It is -- it has -- it results

23  in a different disease.  Mr. Bernick said, well, but it's not

24  just in Libby.  It would be in trace amounts in others of

25  Grace's products, but we know of no claims that are based on

1  Libby asbestos disease outside of Libby.

2          So you do have a type of asbestos which is unique,

3  and you have a set of claimants who claim disease under that

4  form of asbestos not from Grace's products and not the

5  chrysotile asbestos that was used that generates really all the

6  rest of the claims against Grace.

7          The second distinction between Libby claimants and

8  the rest of the asbestos PI claimants has to do with insurance

9  rights.  Because the Libby claims arose out of Grace's

10 operations basically blanketing this small town in Montana with

11 toxic asbestos dust.  The way that those claims are insured

12 under insurance policies is through what's called premises or

13 operations coverage as opposed to products or completed

14 operations coverage.  And what's important about that

15 distinction, Your Honor, is that products coverage is subject

16 to aggregate caps.  That's the way that -- that's the way that

17 it was done in the comprehensive general liability policy

18 industry and the way that Grace's policies work, too.

19         So there are aggregate limits on products coverage,

20 which necessitate having the coverage administered by a PI

21 trust.  It's the only fair way to do it when you -- to provide

22 everybody a ratable share of what insurance coverage there is.

23 But when you have coverage that's not subject to an aggregate

24 cap, there's no particular reason why it needs to be

25 centralized, why the administration of it needs to be

1 centralized, or why you can't just let the claimants go and

2 pursue the insurance coverage for their particular claim.   It

3 doesn't take anything away from any other claimant.

4         Now, that's a different legal right.   Remember

5 classification has to do with what are your legal rights.   The

6 first one was when you talk about the type of asbestos, you're

7 talking about a legal right as against the debtor.   When you

8 talk about insurance coverage, of course, you're talking about

9 a legal right against a third party, but it's the third party

10 who's going to be the subject of an injunction under the plan,

11 at least as it's now written.   And so it's the exact same

12 thing.   You have to measure the legal rights that are being

13 taken away under the plan.   And for purposes of the legal

14 rights that are being taken away under the plan, the Libby

15 claimants' rights are very different from everybody else's

16 rights, and for that reason they are entitled to a separate

17 class, because those claims are not substantially similar to

18 the other asbestos PI claims.

19         Now, this is not just an abstract principle, Your

20 Honor.   You've seen the way that it's played through in this

21 particular plan, which is that the asbestos PI claimants as a

22 group have written a TDP that serves their purposes but does

23 not treat fairly the Libby claimants, and now they're trying to

24 disenfranchise the Libby claimants by throwing us into the same

25 class as everybody else and having our votes be swamped by the

1 votes of the vast majority of asbestos PI claimants.  These

2 claims arise from exposure to Grace's products, or I should say

3 alleged exposure to Grace's products, because as Grace has

4 pointed out on numerous occasions, there are all sorts of

5 questions about the validity of any of those claims.  But we're

6 going to get swamped by those hundreds of thousands of votes,

7 and these are votes of people who have very different legal

8 rights than the Libby claimants do, which presumably is why

9 they are willing apparently to vote in favor of the plan as now

10 constituted by the Libby claimants or not.

11          So in order to enfranchise the Libby claimants as the

12 classification scheme of the Bankruptcy Code clearly envisions

13 because of our separate legal rights, separation classification

14 is required.  And, you know, why -- and, of course, as to

15 whether this is a fundamental issue, it obviously -- it goes to

16 the very heart of whether this plan is a confirmable plan,

17 because if that classification is wrong, then this plan is

18 clearly unconfirmable, and we would really just be wasting our

19 time to send it out to a vote.  Thank you.

20          MR. LOCKWOOD:  This is not an evidentiary hearing,

21 and Mr. Cohn is not an expert witness.  Mr. Cohn has gotten up

22 here and asked this Court to determine today in connection with

23 the disclosure statement hearing, based on his assertions of

24 fact, that this plan is unconfirmable, because it improperly

25 classifies Libby claimants with everybody else.

1              Your Honor, I'm not going to explain the manifold

2    different ways in which Mr. Cohn is mistaken in the assertions

3    that he's made to you.  All I will say -- well, I will say two

4    things.  The first and most important is this is the subject of

5    an evidentiary hearing is required to determine whether what he

6    says has any basis in fact, and the appropriate evidentiary

7    hearing for that is a confirmation hearing.  There is no

8    evidentiary hearing proposed for a disclosure statement

9    hearing, and one would not be appropriate if it were being

10   proposed.  These are very complicated matters and his

11   assertions about them are not -- I mean there are enough

12   aspects of what he says that are correct that in order to

13   explain why his ultimate conclusions about where he's going are

14   incorrect is not simple.

15             To just touch briefly on what the types of factual

16   issues that are presented by his assertions, he's essentially

17   given you three different grounds on which there should be no

18   classification of the Libby claimants with everybody else.  I

19   would note, however, to start with that there has never been an

20   asbestos plan confirmed that I am aware of, and certainly none

21   that Your Honor has confirmed, where we have had multiple

22   classes of asbestos personal injury claimants, because one

23   class -- one subgroup felt that it wanted better treatment.

24   And indeed Your Honor has rejected in a couple of cases efforts

25   by the holders who have settled claims to be separately

1  classified by asserting that they have contract claims rather

2  than tort claims.  Here the Libby claimants could have tort

3  claims, and they're unliquidated tort claims, so you don't even

4  have that type of a we're different argument.

5       Now, what are his three points?  He says, well, Libby

6  asbestos is a different kind of asbestos.  It's an amphibole.

7  It's not chrysotile.  There's lots of different kinds of

8  amphibole asbestos, Your Honor.  The so-called what used to be

9  referred to by the Libby claimants as Tremolite, which is now

10 being referred to as Winterite, and God knows what it's going

11 to morph into the next time we get further refinements on it,

12 is simply one kind of amphibole asbestos, and there are many

13 other kinds and many companies that had asbestos-containing

14 products, had some with chrysotile in them and some with other

15 kinds of amphiboles in them.  And while it is generally

16 accepted that the amphiboles are more dangerous than

17 chrysotile, at the end of the day nobody has ever made a

18 distinction between -- on that basis.

19      Secondly, Monokote, Grace's spray-on product,

20 contained vermiculite, so the notion that somehow or another

21 the only form of amphibole asbestos that any Grace claimant

22 ever got exposed to was in Libby, this is factually incorrect.

23 I mean you can make arguments about the differing natures of

24 their exposure and it's non-occupational, and it's, you know, I

25 mean -- but that gets you into what the Supreme Court decided

1  outside of bankruptcy in the <u>Ortiz</u> and <u>AmChem</u> cases which says

2  everybody has got a unique kind of claim.  In some sense

3  they've got different exposure.  They've got different disease.

4  They've got different earnings capacity.  They've got different

5  numbers of dependents.  I mean there's -- every claim is

6  different, and indeed 524(g) says that in effect you can't

7  identify all of the claims and everything.  That sort of --

8  it's sort of a given.  So that simply isn't going to work at

9  the confirmation hearing, but it certainly can't work at a

10  situation what we're having is Mr. Cohn's assertions presented

11  as fact.

12        The second one has to do with insurance rights.

13  Again, while there is -- Mr. Cohn is correct that there are

14  different types of insurance coverage and CGL policies,

15  sometimes called products versus non-products, sometimes called

16  products and completed operations versus premises and

17  operations, and generally speaking, products has aggregate

18  limits, and frequently non-products does not have aggregate

19  limits, it does not flow from that that the Libby claimants

20  once again are uniquely situated in that regard, or that

21  individual claimants have direct rights against individual

22  insurance, which in some way or another are being, quote, taken

23  away from them in a situation where insurance proceeds are

24  being transferred to a trust.

25        The whole issue of insurance is complex.  This

1 insurance is being assigned to a trust to the extent that it's

2 unsettled, which is most of what he's talking about.  The

3 trust, if it is ever going to be settled, it will not be

4 settled by having individual Libby claimants and the individual

5 other kind of claimants pursuing the insurers as a matter of

6 state coverage law.  If you're -- if the idea is, as I think is

7 implicit in Mr. Cohn's suggestion that you're going to pass

8 these insurance rights through the trust into the hands of the

9 individual claimants, you can't even sue an insurer under most

10 state law until you've got a judgment or consented to

11 settlement with the insured, which in this case is either going

12 to be Grace pre-petition or the trust.

13          And so the idea that we'll just sort of, oh, well, I

14 have a different right, you're taking away my right to get this

15 insurance, and I need to be separately classified in order to

16 protect that is a gross oversimplification and will require, if

17 we go to confirmation on this, expert testimony from insurance

18 lawyers about how this is actually (a) works under the

19 insurance law, (b) works in a bankruptcy case, and © how a

20 trust could ever deal with this in a post-consummation

21 environment if you had the sort of pass through that Mr. Cohn

22 sort of cavalierly discusses here.

23          Finally, asbestos claimants are being disenfranchised

24 by being swamped by other claims.  Well, I mean again, any

25 minority that wants separate treatment and better treatment --

1 and let there be no doubt about what we're talking about here.

2 The Libby claimants want better treatment.  If you read their

3 brief, all 97 pages of it, the vast bulk of it consists of

4 saying we want more money, and the reason they're being

5 disenfranchised, and they claim having their -- the Committee's

6 fiduciary obligations to them violated, is that because

7 although the Committee, as we will explain in confirmation, has

8 put in a number of special Libby provisions that are -- never

9 been in any other TDP that Your Honor has seen before.  We

10 haven't put enough of them in.  The values aren't high enough.

11 The special treatment isn't good enough.  And if the notion is

12 that in order to get a separate class, you come in and say,

13 well, I don't like the way I think the plan as a whole works

14 for my class, and the other people in my class are going to out

15 vote me, and that means I get disenfranchised, where's the end

16 of it.  I mean you have -- I mean anybody who doesn't like the

17 deal for the class as a whole could come in and make the exact

18 same argument.  It's sort of a reductio ad absurdum by its own

19 terms.

20      So, I repeat, this is a confirmation issue.  We will,

21 at an appropriate time, counter whatever evidence the Libby

22 claimants propose to put on about how they're unfairly being

23 treated, which I might add, by the way, there's another

24 entertaining argument, which we'll get to maybe later on when

25 they attack the TDP.  On the one hand, they want to get

1  separately classified.  On the other hand, in the argument that

2  there's unequal treatment under 1123(a)(4) their argument

3  basically is they're being unequally treated, because they're

4  being equally treated, and I mean this is simply not something

5  that is appropriate or even feasible to deal with in a

6  disclosure statement context, Your Honor.  Thank you.

7          MR. BERNICK:  Your Honor, I just want to add a couple

8  things, because Mr. Lockwood is -- the ACC and the FCR have

9  been overwhelmingly responsible for dealing with Libby-related

10  issues as is appropriate.  Obviously, the debtor is cognizant

11  of them and is on board with them, but there have been -- Mr.

12  Lockwood perhaps in a show of professional modesty here really

13  has probably under -- or has not presented fully to the Court

14  how extensive the dialogue has been with the Libby claimants to

15  bring them on board.  Not only counsel for the ACC and the FCR

16  but actually, you know, individuals who are on the Committee

17  have been very active in seeking out and trying to bring on

18  board the Libby claimants in particular.  The result of that

19  being, as Mr. Lockwood indicates, many provisions that were

20  really, you know, as part of the TDP hand tailored to meet what

21  were set to be the special needs of the Libby claimants.

22          I rise only to point out a couple -- one additional

23  -- two additional facts and then to make an observation about

24  the issue that we really face here.  The two additional facts

25  add to what were -- what was Mr. Lockwood's theme, which is the

1  inability to kind of draw a bright line with respect to the

2  position that the Libby folks attempt to take here.  They are

3  not the only ones who have made claims for exposure to

4  vermiculite that contains asbestos.  Vermiculite that contains

5  some element of asbestos contamination was sold to expanding

6  plants or to other customers who operated expanding plants.  It

7  is in different kinds of products, and, in fact, I'm told that

8  there are many claimants, indeed in the thousands of claimants,

9  who have filed personal injury proofs of claim timely under the

10  bar date that do not claim exposure to other products that

11  contain the chrysotile.  So when Mr. Cohn rises to say that

12  they had exposure to an entirely different kind of asbestos,

13  that is not unique to the Libby claimants, and, therefore, the

14  category that he would seek to explain is not a neatly defined

15  category, and it's not specific to the Libby people.

16         When he says that there's a different disease, not

17  only is Mr. Lockwood correct that there are evidentiary issues

18  about whether that really is, in fact, so, it certainly is the

19  case that for voting purposes it would be very difficult to

20  begin to draw that line.  They claim pleural disease.  There

21  are all kinds of people who claim pleural disease.  They say

22  it's a different pleural disease.  How easy is it to really

23  draw that line?

24         And that really brings me to my central point, which

25  I think is almost a legal point here, which is that what we're

1    talking about is the vote.  We're not talking about equal

2    treatment under 524(g).  That is a separate issue that I know

3    that Mr. Lockwood is going to be addressing.  We're talking

4    about whether they should be classified differently for voting

5    purposes, and these kinds of differentiations that the Libby

6    people attempt to draw we believe incorrect -- with an

7    incorrectly or misleading aspiration to precision really would

8    be impossible to execute in the context of a vote.  What do you

9    do, have a doctor's diagnosis that -- that has to be determined

10   to be unique before your vote is counted in one category or

11   another?  That's not the nature of classification for voting

12   purposes.

13           It also even more fundamentally not only presents a

14   feasibility issue, it presents a real threat to 524(g).  The

15   whole idea of 524(g) is that the 75 percent vote is designed to

16   be able to structure a trust that has certain properties.  If

17   we require gerrymandering, which is exactly the opposite of

18   what's supposed to be done for classification -- voting for

19   classification purposes, effectively we create smaller and

20   smaller groups of people, every one of which will then say

21   that, well, gee, it's got to be 75 percent of my group, in

22   which case effectively the 75 percent voting requirement of

23   524(g) for purposes of setting up a trust then becomes

24   fractionated, which defeats the whole purpose of 524(g), which

25   is to enable very special treatment for a certain kind of

1  claimant, i.e., a personal injury asbestos claimant, which is

2  what we have here.

3        So I think that Mr. Lockwood's points are not only

4  accurate, but they really go to the whole question of what

5  classification we're talking about.  It's a classification for

6  voting purposes that has a particularly important dimension in

7  the context of 524(g).  Whether or not the Libby asbestos

8  claimants are being adequately treated under the TDP is a

9  separate issue.  I suspect Mr. Lockwood will say again as a

10 matter -- where evidence is going to be required, but none of

11 this really goes to the question of what the appropriate

12 classification is, and we have followed again the absolute

13 mainstream of the cases in saying that the classification

14 should be the personal injury asbestos claimants.

15       MR. RAMOS:  Good afternoon, Your Honor.  Marcos

16 Ramos, Richards, Layton, and Finger on behalf of Bank of

17 America.  Your Honor, we appreciate counsel's comments that

18 some of the issues -- these issues that Bank of America raised

19 in its opposition are more appropriate for the confirmation

20 hearing.  Obviously, we don't disagree with that.  They will be

21 confirmation issues.  For the reasons that we set forth in our

22 opposition, we think that they're also appropriate for the

23 Court to consider at this stage.  You know, let me give you

24 just two seconds of background in terms of the Bank of America

25 circumstances.

1        We're parties to a letter of credit, and these were

2   pre-petition letters of credit.  There were three of them.  And

3   during the course of this bankruptcy proceeding they were drawn

4   upon.  During this bankruptcy proceeding the debtors entered

5   into a settlement agreement with Bank of America regarding its

6   claims related to those letters of credit.  There was a

7   settlement -- a 9019 motion presented to the Court.  The Court

8   entered an order.  The settlement stipulation was approved.

9   Bank of America has an allowed claim in these cases based on

10  the draws under the letter of credit, and to my understanding

11  standing here today, the amount of that claim is approximately

12  -- the allowed claim is approximately 16.5 million or so.

13       And I was struck during the discussion by prior -- by

14  immediately proceeding counsel with regards to the Class 6

15  where we believe that Bank of America has been improperly

16  placed.  They were speaking regarding the products that give

17  rise to various sorts of liabilities, and there's a lot of

18  discussion of the details.  We're not that type of claimant.

19  Our claim is based on a financial transaction.  It's a

20  transaction with the debtor.  It was in favor of not asbestos

21  claimants but companies, insurance companies, and various of

22  them.  We had letters of credit that did not provide use

23  restrictions in terms of the use of the funds under the letter

24  of credit.  We gave money out, and that money went wherever it

25  went, but it wasn't something that we had a role in in terms of

1  the disposition of those funds.

2       And the classification, as described by counsel,

3  presumes some relationship -- it's stated to have some

4  relationship to this underlying asbestos liability, but there's

5  no explanation in the disclosure statement other than that bare

6  assertion as to why -- that our relationship -- the specifics

7  of our relationship give rise to that sort of classification.

8  That's it.  It's one statement in the disclosure statement.

9  There's nothing more beyond it that explains the position as to

10  why our letter of credit didn't involve payment to these

11  claimants and involve these -- a regular pre-petition financing

12  transaction is being put into a Class 6.

13       And it's not only the lack of discretion, Your Honor.

14  The fact of the matter is, as I mentioned, we had an agreement

15  with the debtors during the course of the bankruptcy

16  proceeding, which was approved by the Court by separate order.

17  We are very surprised to be put into this classification.  To

18  our eye, we were -- we have an allowed claim.  That's what the

19  stipulation says.  It's an unsecured -- excuse me, Your Honor

20  -- unsecured claim.  And we feel strongly that, based on the

21  mere fact of our circumstance, that clearly we've been put into

22  the wrong classification.

23       Even if you look at the procedures that are set out

24  in terms of how the trust is going to proceed, there are a lot

25  of procedures in terms of the TDP.  Specifically under the plan

1 it states that claims subject to the TDP are neither allowed or

2 disallowed, but we have an order of the Court allowing our

3 claim.  There are procedures under the TDP in terms of

4 applicable percentage and payment percentage and maximum

5 percentage, and I understand that counsel's going to get back

6 to us by the end of this week with maybe the percentage -- the

7 payment percentage under the plan -- the TDP, and then we can

8 get some better understanding of how those mechanics work in

9 our discussions with them.

10        But we're -- we have an allowed claim already, not

11 subject to further determination by the Trustee under the TDP.

12 We're just not in that circumstance.  We've got an allowed

13 claim, and we're -- it's based on a financial instrument which

14 is unrelated to asbestos liability.  It's a letter of credit.

15 It's a contract.  So, Your Honor, we think that's appropriate

16 for Your Honor to consider today, because of the reasons that

17 we set forth in our opposition, and I don't want to belabor it.

18 We think we've set those out pretty strongly in the opposition

19 and for the reasons that I've discussed today.

20        Obviously, if we have to take it up just at the

21 confirmation hearing, we'll do so, prepare for such, and try to

22 figure out why other sort of financial transactions are in

23 Class 9, and we're in Class 6.  But we do think it's -- it

24 actually is appropriate for today, because clearly on the

25 facts, which are as a matter of public record, because we have

1 a settlement stipulation approved by order of the Court, it's

2 known and accepted by both parties as to what our claim

3 actually is.

4           THE COURT:  Okay, so the letters of credit were not

5 designated in any way to pay for anything specific.  They were

6 just posted by the debtor for no purpose?

7           MR. RAMOS:  Well, Your Honor, I've taken a look at

8 the letters of credit.  They identify certain companies that

9 can make draw under them.  I'm not aware of any provision in

10 the letter of credit that says the purpose for which the draw

11 will be made.  There are various companies across three letters

12 of credit, and -- but is there a use restriction?  I didn't see

13 in my review of the letter of credit, Your Honor, a presentment

14 in terms of the notice requirement.

15           Obviously, we think that based on the information in

16 the record that the majority of the funds under the three

17 letters of credit, one -- excuse me, Your Honor.  Under two of

18 the letters of credit have been fully drawn by National Union

19 pursuant to separate agreements with the debtor.  And but in

20 terms of the letters of credit itself, we think we provided

21 money, a fungible good.  The use was -- the agreement was

22 between the debtors.  The beneficiaries were not the asbestos

23 claimants.  We're just differently situated in terms of our

24 claim status which seems directly at odds with the way that the

25 debtor -- the plan proponents have described the claims subject

1  to the TDP.

2         There are a lot of mechanical issues that just don't

3  seem to work, and we'll get into those I guess in our

4  discussions more deeply with the plan proponents. But for

5  today's purposes we do feel that those facts, as  approved by

6  the Court in its order, are sufficient to take us out of the

7  scope of what otherwise seems to be the Class 6 issues.

8         THE COURT:  Okay.

9         MR. BERNICK:  Your Honor, the issue again goes back

10  to the scope of 524(g) and what 524(g) is about.  524(g) by its

11  terms deals with liabilities that arise from asbestos exposure.

12  There are any number of different kinds of arrangements that

13  will result in a given company or a given party being liable

14  for that underlying liability.  Bank of America has a letter of

15  credit.  We can talk about that in a moment.  But there's a

16  whole group called the indirect asbestos personal injury

17  claimants, every one of whom has got a different hook that

18  makes them responsible for an underlying asbestos liability.

19         But the underlying liability is what drives the

20  liability of these people.  They are -- there could be

21  indemnifications.  There could be contributions.  In this case

22  there is a letter of credit.  Because 524(g) is designed to

23  give complete closure, it specifically contemplates -- indeed

24  by its terms covers indirect personal injury claims, every one

25  of which is being -- implicates somebody who is not a

1  tortfeasor or many companies that are not tortfeasors.  It

2  could also be tortfeasors, but many companies are not

3  tortfeasors, people with indemnity obligations, people who have

4  some other kind of obligation that gives rise to their

5  liability, but the underlying liability is tort.  524(g) by its

6  terms is designed to be precisely that broad, so you get

7  complete closure.

8         The only question, therefore, that arises in

9  connection with Bank of America is whether by virtue of what

10 counsel says, as counsel indicated, the assertion that in some

11 fashion the letter of credit had no relationship to the

12 underlying tort liability.  If it was a totally standalone

13 liability, had nothing to do with any of that, that would be a

14 different point.  At least my understanding is that of the $16

15 million that's involved with that letter of credit, at least 10

16 million of that is specifically pegged to, was it National

17 Union?  And National Union was the guarantor for --

18         UNIDENTIFIED ATTORNEY:  The bonding company.

19         MR. BERNICK:  I'm sorry, the bonding company for the

20 underlying liability, which was a liability for a case

21 involving Reaud, Morgan, and Quinn.  So the underlying

22 liability with respect to at least that portion of the Bank of

23 America letter of credit is specifically geared to -- indeed

24 was specifically generated as a result of the underlying tort

25 liability.

1        At that point 524(g) does kick in.  Now, counsel says

2  that in connection with this matter there was an agreement or a

3  stipulation to an allowed amount of the claim.  The fact of

4  there being a stipulation to the allowed amount of the claim

5  says nothing about whether it's covered by 524(g) or by

6  something else.  It simply says there's an agreement about the

7  allowed amount of the claim.  It doesn't say in any way, shape,

8  or form, or imply in any way, shape, or form that somehow this

9  is outside the scope of 524(g) or outside the scope of a class

10 or outside the scope of the trust, and indeed it specifically

11 is not.

12       Now, it may be that in negotiating that stipulation

13 there was an absence of a negotiation about whether that

14 allowed amount would be paid 100-cent dollars, because it would

15 be treated under Class 9.  Maybe there is.  We know that in the

16 case of the property damage claimants they specifically

17 negotiated that they would be paid the allowed amount.  That is

18 there was a negotiated resolution of their claims for an

19 allowed amount, and under the terms of those very settlements,

20 the property damage claims who have settled -- claimants who

21 have settled will get 100 cents of that allowed amount.  It

22 appears that that discussion did not take place.  That is there

23 was not a discussion leading to that stipulation that said not

24 only is this the allowed amount, but that is actually 100-cent

25 dollars what you are going to be paid.

1          But that is not a flaw of the classification system.

2     All that that says is that there was a limitation on the

3     undertaking that was made.  The only undertaking that was made

4     was an undertaking that says the claim will be allowed at $16.7

5     million.  It didn't say it will actually get paid 100-cent

6     dollars, at which point whatever that stipulation is, that's

7     what it covered, and you go back to the nature of the claim.

8     The nature of the claim is defined under 524(g) about whether

9     it arises from an asbestos liability.  This clearly does.  So

10    we don't think there's properly a classification issue that's

11    being raised.  It's a question about what the nature of the

12    stipulation was with Bank of America.  In this case that

13    stipulation did not extend to the terms on which the letter of

14    credit would be paid in the context of the bankruptcy.  Your

15    Honor is frowning a little bit like --

16         THE COURT:  I thought that the bonding was used to

17    pay National Union 100 percent of what it in turn paid Reaud,

18    Morgan, and Quinn.  So the letter of credit was drawn in full,

19    because it was the collateral that was used to pay the

20    insurance company 100 percent of what was used to pay the

21    settlement amount of the Reaud, Morgan, and Quinn amount.  So

22    I'm confused as --

23         MR. BERNICK:  It all -- no, that -- what's happened

24    here is that you have an underlying tort claim by Reaud,

25    Morgan, and Quinn.  It is then the subject of the arrangement

1  with the insurance company, and you have the letter of credit

2  that is then used to pay off that arrangement.  But whether --

3  but if you go back to National Union, National Union's ability

4  to take 100-cent dollars is limited by the terms of whatever

5  the -- whatever the -- you know, the plan calls for in the

6  classification scheme that it has.  That is to say Reaud,

7  Morgan, and Quinn has got a claim for $16 million, but that is

8  a tort claim.  It gets paid no more than any other tort claim

9  would be paid under the terms of whatever plan calls for that

10 produces a vote under 524(g).

11         THE COURT:  Wait.  I think Reaud was already paid.

12 Wasn't it?  That -- Reaud was paid by National Union --

13         MR. BERNICK:  Reaud gets paid --

14         THE COURT:  -- which was in turn paid by Bank of

15 America.

16         MR. BERNICK:  That's correct, but the question is

17 whether --

18         THE COURT:  That's how it works.  So Bank of

19 America's left with the claim.

20         MR. BERNICK:  The question is who takes the risk of

21 non-payment.

22         THE COURT:  Right, and Bank of America did, because

23 it posted the letter.

24         MR. BERNICK:  Right, as did National Union in the

25 first instance by being the bonding company.

1          THE COURT:  Right.

2          MR. BERNICK:  As did Reaud, Morgan, and Quinn, which

3   originally had the tort liability.  All these people are taking

4   into a relationship that began with Reaud, Morgan, and Quinn.

5   Reaud --

6          THE COURT:  Well, their clients.

7          MR. BERNICK:  Well, it's their clients.  So that is a

8   $16 million -- it's a $16 million claim.  Reaud, Morgan, and

9   Quinn had no assurance, even if there were a settlement, that

10  it would get paid 100-cent dollars.

11         THE COURT:  Well, it did, because it had a bonding

12  company --

13         MR. BERNICK:  It had a bonding company, but the

14  bonding --

15         THE COURT:  -- and backed up by a letter of credit.

16         MR. BERNICK:  But the bonding company -- the bonding

17  company takes no more -- takes no greater rights than Reaud,

18  Morgan, and Quinn or their clients had in the first instance.

19  They took a risk when they did the bond that the underlying

20  liability might actually be less, and the same thing then

21  applies going up the chain.  That is to say Reaud, Morgan, and

22  Quinn had a claim that was settled.  Under the law that claim

23  as settled when it gets into bankruptcy may not get 100-cent

24  dollars.  Maybe it only gets 50-cent dollars.

25         THE COURT:  Well, okay, but we're past that, because

**J&J COURT TRANSCRIBERS, INC.**

1  the reality is that for all the various reasons and all the

2  litigation that went on we're down to the fact that it got paid

3  the 16 and -- or got paid whatever the amounts were.  I'm not

4  sure that it was 16 and a half.

5         MR. BERNICK:  Sure.  The question is now who takes

6  the risk of the difference.  We didn't pay Reaud, Morgan, and

7  Quinn.  Somebody else took on responsibility.  The bonding

8  company took on responsibility for paying Reaud, Morgan, and

9  Quinn's client.  At that point Reaud, Morgan, and Quinn may

10 have gotten off pretty well, gotten through pretty well,

11 because they got paid 100-cent dollars on their settled claim.

12 That doesn't make the debtor responsible for the fact that

13 Reaud, Morgan, and Quinn got paid that amount of money.

14        THE COURT:  So basically what you're saying is that

15 the nature of the stipulation doesn't extend to the nature of

16 the claim.  It simply --

17        MR. BERNICK:  That's correct.  I mean the stipulation

18 is what it is.  It's the same kind of stipulation that we

19 entered into with property damage claimants.  That we are going

20 to say they -- their claim will be allowed in a certain amount.

21 There's then this further step, well, does that claim get then

22 paid 100-cent dollars with respect to that allowed amount.

23 That second step of the negotiation took place in connection

24 with the property damage claimants as part of the settlement.

25 They said we want to get paid that under the plan.  So, in

1  fact, that negotiation took place, and it had this result.

2           That hasn't taken place with respect to Bank of

3  America.  All that happened with respect to Bank of America is

4  that there was an agreement that would be the allowed amount.

5  There was not the second stage of the discussion, which is how

6  much of that allowed amount actually gets paid.  That hasn't

7  taken place.  So I think that this again is a confirmation

8  issue.  It's not a voting issue, and it's a little bit more

9  complex and perhaps somewhat factually oriented than we can

10 resolve here today.  And I think that that's where the current

11 state of play is.  Right now there's no record before the Court

12 even --

13          THE COURT:  Yes, I think --

14          MR. BERNICK:  -- about all the circumstances

15 surrounding that stipulation.

16          THE COURT:  I think what's going to have to do with

17 -- be done with respect to these various voting issues is that

18 these ballots are simply going to have to be counted two ways.

19 That is the way that the debtor wants them counted and the way

20 that the objecting parties want them counted.  And then we'll

21 see what happens, because at the moment I'm not sure I can

22 decide any of these legal issues that are encompassed within

23 this litigation issues, because it appears that there are some

24 potential legal issues.  And I agree with you all, they are

25 really plan confirmation issues, and I can't, based on this

1 non-evidentiary record, decide the underlying legal issues.  I

2 don't have the facts to be able to understand how the law

3 applies to them.  I don't think the law is that complicated,

4 but the facts certainly are.  So I think that's the issue.

5         From what I'm hearing from the debtors, to the extent

6 that the underlying liability on which the claim evolves is, in

7 fact, a tort liability, it's probability correctly classified,

8 but I don't have a clue as to what the original financial

9 transaction between the debtor and your client was and how that

10 plays out in a 524(g) context.  It's going to take a brief.

11         MR. RAMOS:  Your Honor, we'll be guided by those

12 statements.  Obviously, I want to put on the record I disagree

13 with the description of counsel of the negotiations regarding

14 the settlement stipulation and what was not -- what was and

15 what was not done.  I'm sure his statements will come as a

16 great surprise to my client.  We'll reserve all of our other

17 rights, and we'll pursue discussions with the plan proponents

18 and get back to Your Honor with regards to the legal issues.

19         THE COURT:  All right.  I think that would be

20 helpful.  So I think we'll just reserve this to a plan issue,

21 and what I'm going to order the debtor to do is simply as to

22 anybody who's objecting to classification reserve this to a

23 plan issue, simply put the votes -- and send the ballots out

24 the way the debtor plans to send them out, but then to have the

25 ballot agent count them two ways and have the debtor do the

1  solicitation -- I'm sorry -- the ballot summary two ways, the

2  way the debtor wants it done and then the way the objecting

3  party wants it done.  We'll see whether -- it may not even make

4  a difference in the long run, so there's no sense worrying

5  about it.  If it ends up not making a difference, then there's

6  no sense making a difference with respect to this Bank of

7  America issue.

8          With respect to the Zonolite issue, the Libby

9  claimants issue, that too I think is going to end up being a

10 legal issue that I agree, Mr. Lockwood, I don't have the

11 underlying facts at this point to know whether the form of

12 asbestos is or isn't different, whether the type of disease is

13 or isn't different.  Those types of things, to know whether or

14 not they're a separate classification, even possible, I can't

15 make on the basis of this record.

16         What I can say on the basis of this record is that

17 the debtor has the absolute right for purposes of

18 classification to put similarly class -- similarly situated

19 claims into the same class, and if the debtor has chosen to do

20 that, that is an appropriate classification.  From what I am

21 hearing, it sounds as though these are similarly situated

22 claims.  Are they identical?  Probably not.  I don't know that

23 any two claims are ever identical, particularly when they're

24 personal injury claims.

25         I think the Supreme Court, as you pointed out

1 earlier, in the non-bankruptcy context went even so far as to

2 say that in class action litigation.  That in which the --

3 probably the reason we have asbestos bankruptcies is, because

4 the Supreme Court said that in non-bankruptcy asbestos-related

5 class litigation.  So I don't think that comes as any surprise

6 to anyone, but these do seem to be similarly situated, but I'm

7 not going to make findings about that.  If it's a

8 classification issue for plan confirmation purposes, I'll deal

9 with it then.  So I want the ballots counted both ways and a

10 ballot summary prepared both ways, and that will be true for

11 anybody who's raising classification issues, because it's just

12 not something I can deal with now.  Mr. Monaco.

13         MR. MONACO:  Thank you, Your Honor.  Again for the

14 record, Frank Monaco for the State of Montana.  I just want

15 more of a point of clarification from the debtor's counsel.  I

16 thought Mr. Freedman said at the beginning of his presentation

17 and has indicated at Page 24 of their chart that's attached to

18 their reply to the disclosure statement objections that they

19 were going to work on language that would reflect Montana's

20 concerns with respect to classification.  And if that's the

21 case, there's no sense having to say anything more.  We can

22 discuss it, and if we can't resolve it, I guess we'll come back

23 on the 14th.  And I just wanted to see if that is correct.

24         THE COURT:  Mr. Freedman.

25         MR. FREEDMAN:  Yes, Your Honor, we did indicate that

1 we will talk with the State of Montana about appropriate

2 disclosure on that issue.

3          MR. MONACO:  Okay.  That's all, because Mr. Bernick's

4 presentation seemed to indicate that we were going to argue

5 this, and if we're going to -- they're going to consider

6 language and be heard at the 14th, then we don't have to get

7 into it now.

8          THE COURT:  Okay.

9          MR. MONACO:  Your Honor, one other thing to sort of

10 move the --

11          MR. BERNICK:  Just to be clear, that is true with

12 respect to the disclosure statement language.  That's true with

13 respect to the disclosure statement language.  We're not going

14 to be talking about on the 14th the classification for ultimate

15 plan purposes.  That is, as Your Honor has indicated, to get

16 the vote, we'll just go get the vote, and then they'll be

17 counted two ways.  I don't know what -- if you're speaking to

18 that issue, or if you're speaking, Mr. Monaco, to the question

19 of the disclosure statement.

20          THE COURT:  No, I -- let me make -- in the event that

21 I confused the record, let me try to clarify it.  Mr. Freedman

22 is going to talk to you, Mr. Monaco, about working out language

23 in the disclosure statement about the classification issue.

24 Correct, Mr. Freedman?

25          MR. FREEDMAN:  Yes.

1          THE COURT:  Okay.  What I was attempting to do was

2  say that what I want for purposes of the ballots is to have the

3  votes counted the way the debtor is proposing to classify the

4  claims, however that works out in the ultimate disclosure

5  statement and ballots.  And then I also want them, to the

6  extent there is still an objection, that on November 14th, to

7  the classification, I also want the ballot summaries recounted,

8  so it's done twice, for any objecting party, so I will have two

9  forms of ballot summaries, the debtors' way and the objecting

10  parties' way.  That way I'll see whether it even makes a

11  difference.  It may not make a difference.

12          MR. MONACO:  That's fine.  I just want the record to

13  be clear.  We -- to the extent that we have suffered a loss in

14  our contribution indemnification claims prior to confirmation,

15  it's our position that it's a Class 9 general unsecured claim,

16  so we would expect to receive a ballot for a Class 9 claim.

17          MR. FREEDMAN:  We have not in any way agreed to that.

18  We will submit them a ballot and count it two ways as the Court

19  has instructed, but we have not in any way agreed to anything

20  that suggests that they submitted a loss under the contribution

21  indemnification claim.  It should be classified as anything

22  other than asbestos, period.

23          MR. MONACO:  I'm not asking them to agree to that

24  today, Your Honor.  I'm just saying we -- if -- it's understood

25  our rights are reserved on that point.

1          THE COURT:  Everybody's rights are preserved, because

2 it's not something I think I can --

3          MR. MONACO:  Right.

4          THE COURT:  -- straighten out at the disclosure

5 statement hearing.

6          MR. MONACO:  Okay.  And, Your Honor, just --

7          THE COURT:  But make sure you brief it, folks,

8 because --

9          MR. MONACO:  We will, Your Honor.

10          THE COURT:  Okay.

11          MR. BERNICK:  For confirmation.

12          THE COURT:  For confirmation, yes.

13          MR. MONACO:  Yes, we intend to do so, Your Honor.

14 One thing just to move the process along.  I note Mr. Bernick's

15 Category Number 5 on his chart.

16          THE COURT:  Yes.

17          MR. MONACO:  Well, the Crown's objection has been

18 moot, and Montana's not going to pursue the good faith issue,

19 so I think we could dispense with that and move on --

20          THE COURT:  All right.  Thank you.

21          MR. MONACO:  -- to the next one.

22          THE COURT:  Are we done with Number 4 before I mark

23 number 5, good faith, as moot?  Okay.  Number 4 we're done

24 with.  Let me make a note, so I know what I've said about

25 Number 4, please.

1                        (Pause)

2          THE COURT:  I know we said we were going to break at

3  four.  I'm not sure how close to the end you are.  Do you want

4  to push through and not take a lunch, so you get done or --

5          MR. BERNICK:  I think that -- I just, in fact -- I

6  had the same thought in mind.

7          THE COURT:  But I am going to need a ruling on the

8  U.S. Trustee's issue, and I think you need to confer.

9          MR. BERNICK:  Yes, I've got that marked for over --

10 maybe what we can do is just a very short lunch or just take a

11 break.  Mr. Freedman tells me that he thinks that the last

12 category, which are actual disclosure statement issues that we

13 would like the Court to rule on, that is that we don't think

14 that they're appropriate, and the other side believes that they

15 are appropriate, will take about 40/45 minutes.

16         MR. FREEDMAN:  I would think so, Your Honor, and then

17 there's also some issues related to the solicitation which we

18 could proceed forward on today.

19         THE COURT:  All right.

20         MR. BERNICK:  So what's the total time for all that?

21         MR. FREEDMAN:  That should go very quicky.

22         MR. BERNICK:  Okay.

23         MR. FREEDMAN:  20 minutes.

24         MR. BERNICK:  20 minutes.  So that tells me probably

25 an hour and a half for the two of them, because nothing ever

1  goes as quickly as everybody would hope.  Which then means

2  we've got mechanics of the TDP and insurance.  On mechanics of

3  the TDP, Peter?

4          MR. LOCKWOOD:  I would anticipate being fairly short.

5  I suspect Mr. Cohn -- I don't know what he's going to do.  He's

6  got a lot of material in his brief.

7          MR. BERNICK:  I'm assuming that we're not going to

8  deal with evidentiary matters today.  My sense is that if we

9  took -- if it would be possible to take like, you know, maybe a

10  half hour break, that would put us at 1:20, even call it 1:30,

11  which would then give us a total of two and a half hours.

12  Maybe we've got a shot at getting it done.

13          THE COURT:  All right.  Let's be in recess until

14  1:20.  By the time everybody gets back, it'll probably be 1:30,

15  so we'll say 1:20.  All right.  We're in recess.

16                          (Recess)

17          THE COURT:  Okay.  We're ready to begin court again

18  now, so before I lose track of this, have you come to some

19  resolution of the issue that's left with respect to the U.S.

20  Trustee?

21          MR. BERNICK:  Yes and no.  It appears that we know

22  that exculpation is another question that Your Honor has raised

23  is whether and to what extent the need for the release, that is

24  the release to the extent it goes beyond the four corners of

25  524(g).  And the answer to that is hard driven by what

                    **J&J COURT TRANSCRIBERS, INC.**

1 knowledge is required in order to meet the terms of any

2 settlement agreement that we have with Sealed Air and

3 Fresenius.  It's probably not something (indiscernible).

4          THE CLERK:  (Indiscernible) on the bottom there.

5          MR. BERNICK:  Does that help?

6          THE COURT:  That's --

7          THE CLERK:  Yes.

8          THE COURT:  Yes, thank you.

9          MR. BERNICK:  Okay.  And I'm told by Sealed Air that

10 they'd have to check, but they're not sure that there is a

11 provision in their agreement.  The agreement, again let me

12 stress, will control.  They're not sure that there is a

13 provision in their agreement that would require this release.

14          THE COURT:  All right.

15          MR. BERNICK:  I am told by counsel for Fresenius that

16 there is a provision in their agreement that would require this

17 release.

18          THE COURT:  All right.

19          MR. BERNICK:  So I think that is still a live issue,

20 and so I think we're going to have to work on it.  I think that

21 where it came down, Your Honor, though is that Your Honor was

22 -- the question is whether under the Zenith case there has to

23 be a consensual release.  And I think that the issue then

24 becomes, in terms of the mechanics if we want to meet the

25 requirements of the Zenith case -- and, obviously, we have a --

1  we advanced a different view to the Court, which the Court has

2  indicated will be rejected.  But if we want it to comply with

3  that principle that says that there must be a consensual

4  release, what constitutes the consent?  And under the language

5  of the release as we've now drafted it, it would be either a

6  vote or the receipt of property.

7       Now, I would think that with respect to the vote that

8  really is more or less a question of the disclosure that's made

9  in connection with the vote.  We would again say that having

10 them check off a box is more confusing than anything else,

11 because it basically requires that you interpret the failure to

12 check out the box, and whether it really means that they were

13 saying no, they don't want to agree to it or not.

14      So what I would propose is that we put a hyphen on

15 that issue and specifically reserve it until the 14th of

16 November notwithstanding my disinclination to reserve anymore

17 to the 14th of November.  I think on this one, in light of the

18 language of the Fresenius agreement, we need to become very

19 much more focused on this, but for the Fresenius agreement I

20 don't think that we would still be here talking.

21      But with that, we're talking about value for the

22 estate and for all the different constituencies, so we had to

23 figure out a way to make Mr. Rosenblum agree that he's not

24 going to stand in the way of this enterprise.  Being from

25 Chicago, he's back there smiling.  I think that we might -- no,

1  in fairness to him, we have to figure out a way to address this

2  issue in light of the concerns that Your Honor's expressed and

3  see if we can't craft this in a way that meets Your Honor's

4  concerns.

5          THE COURT:  Okay.  I'm not overly concerned, provided

6  that the disclosure is very clear and very adequate whether or

7  not there is a check off the box on the front of the ballot

8  with respect to the release for Fresenius and Sealed Air if the

9  settlements provide for it, as long as the disclosure statement

10  picks up the fact that the settlements provided for it and

11  there is a disclosure somewhere that specifies it.  There are

12  other asbestos-related parties though.  I think it's not

13  necessarily clear what the extent of the release is and what

14  it's going to encompass.  So my issue is I want something on

15  the front of the ballot itself that's going to tell the

16  impaired classes -- the voting classes what the effect of that

17  vote will be if, in fact, they vote, and then they're held to

18  give those releases.  That's number one.

19          Number two, I think the release versus exculpation

20  for the committees, the future claims representatives, and the

21  professionals could be an exculpation clause.  You could

22  bifurcate that out.  You don't need to take them on as a

23  release issue --

24          MR. BERNICK:  Yes.

25          THE COURT:  -- I think.  Now, I don't get a line item

1  veto, but I do think you could make this a cleaner issue under

2  the Third Circuit without taking on that --

3          MR. BERNICK:  All right.

4          THE COURT:  -- revision.

5          MR. BERNICK:  Well, we still have to figure out how

6  to deal with the receipt of property, because having glanced

7  over Mr. Rosenblum's shoulder, the receipt of property also is

8  part of the -- basically, the Fresenius deal, as he showed it

9  to me, incorporates the language that we've now put into the

10 thing.

11         THE COURT:  Oh.

12         MR. BERNICK:  So I have to think that one through,

13 too.

14         THE COURT:  Okay.  Well, that one I can't help out

15 with at the moment, so --

16         MR. LOCKWOOD:  Your Honor, one thing to keep in mind,

17 which is I believe -- and I'm doing this from memory, so I

18 could be wrong, but I believe the proof of -- the TDPs and the

19 proofs of claims, et cetera, require a release from any

20 asbestos claimant who submits a claim to the trust and gets it

21 resolved, to give a release to the asbestos-protected parties,

22 et cetera.  So that's going to -- while 524(g), as we discussed

23 before lunch, doesn't deal with that, routinely the trusts deal

24 with that when the individual claimant doesn't, and it's part

25 of the release.  And so it's possible that either we've got

1  that in it, or we can put that in it, and that might go a ways

2  toward resolving any concerns that somebody like Fresenius

3  might have, at least if not 100 percent, you know, a very large

4  extent.  So we --

5            THE COURT:  Okay.

6            MR. LOCKWOOD:  -- can explore that, too.

7            MR. BERNICK:  I could already sense that Mr.

8  Rosenblum's back there kind of expressing some open-eyed

9  optimism here.

10           THE COURT:  Okay.  All right.  Mr. Fornari, I will

11  have to defer this issue until November 14th --

12           MR. FORNARI:  Yes.

13           THE COURT:  -- with respect -- I think so that the

14  debtor can take a look at the settlements that were previously

15  approved in this case numbers of years ago by the District

16  Court.

17           MR. BERNICK:  Number 6 --

18           THE COURT:  He's coming forward.  Just a second, Mr.

19  Bernick.

20           MR. BERNICK:  Oh, I didn't see him.

21           MR. FORNARI:  Thank you, Your Honor.  Not to delay

22  any matters, but the entire issue raised in the U.S. Trustee's

23  objection then is deferred until November 14th.

24           THE COURT:  With respect to this issue of the -- of

25  whether or not the release has to be put on the front of the

1 ballot as a voting -- an affirmative vote issue.

2          MR. FORNARI:  Yes, Your Honor.  Thank you.

3          THE COURT:  Yes.  Okay, Mr. Bernick.  Thank you.

4          MR. BERNICK:  Item 6 are the mechanics of the TDP,

5 and I think it's principally Mr. Lockhead -- Lockhead.  I did

6 have a client once named Lockhead.  So it's Mr. Lockwood who is

7 going to be addressing that.

8          MR. LOCKWOOD:  I'm beginning to think that's a

9 Freudian slip.  Your Honor, the vast bulk of the Item 6 issues

10 are the Libby claimants.  If you look at Mr. Bernick's chart,

11 you'll see there is Items 93, 95, 97, 98, 99, and 102 on the

12 chart.  And I guess I had heard Mr. Cohn earlier to say that he

13 had accepted the notion that, you know, we were going to mostly

14 do confirmation objections at the confirmation hearing except

15 for two that he discussed with the Court earlier.  And so

16 rather than go through some extended discussion of these, I

17 guess it might be appropriate to ask Mr. Cohn whether or not he

18 is accepting of the notion that these are confirmation

19 objections, and we'll deal with the confirmation hearing, or

20 whether he wants to press them as disclosure statement

21 objections now.

22          THE COURT:  Mr. Cohn.

23          MR. COHN:  Yes, Your Honor, the two that I was

24 referring to were the two issues we've -- regarding releases

25 and injunctions not -- I wasn't saying more broadly that we

1 were considering everything else we raised in our papers to be

2 confirmation issues.  So we do need to go forward.

3          THE COURT:  All right.

4          MR. LOCKWOOD:  Well, the -- Your Honor, using the

5 chart as a sort of a handy shorthand here, you'll see -- let's

6 take -- start with Number 93.  You'll see that essentially the

7 Libby claimants assert that the plan is unconfirmable, because

8 the TDP does not adequately address, for the most part, the

9 Libby claimants' assertions that they have unique, special

10 claims, et cetera.  And for the reasons that I discussed

11 earlier, that is an evidentiary matter as to the extent which

12 the Libby claims are or are not special, and the extent to

13 which they should or should not be entitled to some kind of

14 differential treatment.

15          As I said earlier, we put in what the majority of the

16 Committee believed were appropriate responses to the Libby

17 claimants' assertions that they were different.  We put in

18 various provisions.  The Libby claimants, not I guess too

19 surprisingly based on their performance in this case today,

20 were not of the view that that's adequate.  I -- again we would

21 be in a situation of debating those factual matters on the

22 basis of statements of counsel at this hearing in the

23 disclosure statement context if we were actually trying to

24 resolve these issues.  And I don't really see any reason why we

25 should treat this particular set of objections any differently

1  than the one that Mr. Cohn wanted to assert as disclosure

2  statement objections earlier and --

3      THE COURT:  If I look at -- 93 talks about the TDP

4  being deficient and discriminatory in various ways.  95 talks

5  about the plan being unconfirmable because of violating an

6  equal distribution policy.  97 talks about the plan being

7  unconfirmable because of providing different treatment for

8  claims in the same class.  98, because it denies a right to a

9  jury trial.  99, because it violates the right to have claims

10  allowed according to non -- I'm sorry -- according to

11  applicable non-bankruptcy law.  And 102, because it allegedly

12  improperly disallows punitive damage claims and wrongful death

13  claims.  I -- just from looking at this, I -- Mr. Cohn, I need

14  to know from you why those are disclosure statement issues as

15  opposed to plan confirmation issues, because they really do

16  seem to me to be plan confirmation issues.

17      MR. COHN:  Well, Your Honor, the first one,

18  consistent with the discussion earlier, the Section 524(g)

19  injunction and issues that would arise concerning its

20  permissible scope -- I think consistent with that, Your Honor,

21  that first set would be confirmation -- or call it solely

22  confirmation issues.

23      THE COURT:  All right.

24      MR. COHN:  But the other ones, Your Honor -- you

25  know, some of those raise issues that are really pure issues of

1  law, and let me perhaps talk about most important of those, and

2  then, you know, you can tell me whether you want to go forward

3  today or whether you want to simply defer them to confirmation.

4       The essence of the Libby claimants' situation, Your

5  Honor, is that because of the severity of their asbestos

6  disease and because of the fact really that you die from Libby

7  asbestos -- is you have probability of death.  Because of that,

8  Your Honor, and because of the fact that Libby claimants do not

9  have any problem proving causation, it was obvious that Grace

10  caused the harm to them.  They have gotten a history of very

11  high verdicts and settlements compared to other asbestos

12  claimants, and the TDP recites that its purpose is to allow

13  claims or to liquidate claims at their tort system values.

14  And, of course, it cannot be otherwise, because under the

15  <u>Buttner</u> case the Supreme Court has said claims get allowed in

16  bankruptcy in accordance with their rights under state law.

17  And so if you have a claim with a tort system value of X under

18  state law, then you have a right to a bankruptcy claim of X.

19  So that's the basic problem that then runs through the TDP.

20       The equality of distribution issue, Your Honor,

21  <u>Combustion Engineering</u> says that the TDP must provide for

22  appropriate distribution within the asbestos claimant group.

23  That, Your Honor, is going to be fact based.  I -- consistent

24  with what you said earlier, I'm not going to talk about that

25  right now, Your Honor.  But that is the fundamental issue that

1 we will -- that we're raising here, which is that the TDP does

2 not provide for equality of distribution to the Libby

3 claimants.

4          But that plays out through a number of legal

5 deficiencies in the TDP as well.  For example, Your Honor, the

6 right to a trial by jury.  The way this -- these TDPs work, and

7 I know you've seen a number of them, is that you go through

8 several steps in the adjudicatory process within -- with the

9 trust, but ultimately if you can't reach agreement with the

10 trust, then what happens is you can resort to the tort system

11 to liquidate the amount of your claim.  And that system -- that

12 provision is absolutely required, because, as you know, the

13 right to a trial by jury is preserved in bankruptcy cases.  I

14 know that there's, of course, debate about how that plays out

15 in the estimation context, but there is no debate whatsoever

16 about how that plays out in the distribution context.  And

17 this, the TDP, does provide for the fixing of the amount of

18 claims in the context of distribution for purposes of

19 distribution.  And so, therefore, the Libby claimants have a

20 right to a trial by jury.

21          What the TDP does is it says, yes, it is true that if

22 you follow the myriad steps through the TDP and then you're not

23 satisfied with the result, you can go out and go get a jury

24 verdict.  But then it says that that jury verdict will be

25 capped for purposes of your distribution under the case at the

1  so-called maximum value as defined in the TDP, and those

2  maximum values are far below what the history of verdicts and

3  settlements indicates is the tort system value of the Libby

4  claims.

5  So that provision takes away the Libby claimant's

6  right to a trial by jury.  That's a simple legal issue.  I

7  don't think it even depends on the correctness of the factual

8  premise that, in fact, these maximum values are far below the

9  tort system value of the Libby claims, because if you have a

10  right to trial by jury, that's what you have.  You have a right

11  to trial by jury, which means you go out and you get a jury

12  verdict, you bring it back to the trust, and that's the allowed

13  amount of your claim for purposes of the TDP.

14  In addition, the TDP discriminates against those who

15  go out and do this.  And, ironically, Your Honor, bear in mind,

16  you know, this is the -- this is a group of personal injury

17  lawyers who have drafted this thing, but they've decided that

18  if you go and you actually exercise your right to trial by

19  jury, then -- and you end up with a claim value through the

20  tort system, and to the extent that that value that you get

21  exceeds the trust's last offer to you, the amount of the

22  judgment does not get paid in accordance with the usual terms

23  of the TDP, but instead you get nothing on it for five years.

24  And then in years 6 through 10 you get paid, and all of this is

25  done without interest.  So those provisions are clearly

1  designed to discriminate against those who exercise their right

2  to trial by jury, and I would respectfully submit, Your Honor,

3  that as a matter of law, a TDP with those provisions contained

4  in it will render the plan non-confirmable.

5       THE COURT:  Okay.  Well, I do believe that that's

6  going to be a plan confirmation issue, because it does affect

7  the plan.  With respect to the right to trial by jury though, I

8  think as a legal matter, that does not -- the fact that a claim

9  will not be paid in full once it's allowed doesn't mean that

10 that deprives the person of the right to liquidate the claim in

11 whatever forum the law provides the right to liquidate the

12 claim in.  It simply means that the debtor has a right to a

13 discharge of particular types of claims.  524 provides that the

14 debtor can discharge claims without paying them in full under

15 certain circumstances, and this is the circumstance.

16      Now, whether or not the distribution scheme in terms

17 of paying in years 6 to 10 after you've liquidated is fair and

18 reasonable, that may be an argument, but I don't think that

19 just because you liquidate at a jury trial level that your

20 judgment and the distribution scheme says it's not going to be

21 paid in full deprives you of the jury trial right.  I'm not

22 sure that's the sine qua non, but nonetheless, I think --

23      MR. COHN:  Well, I'm sorry, Your Honor, that was not

24 the argument, and we -- the issue is not whether claims get

25 paid in full at the amount of the jury verdict.  We take it for

1  granted that the claims are going to be paid at a percentage,

2  and the TDP provides for there to be a payment percentage that

3  all claims are to be paid at except for claims determined by a

4  jury trial.  They do not get that payment percentage.  Whatever

5  it turns out to be, if you go out and you get a jury verdict,

6  and it's higher than the maximum value defined in the TDP for

7  your particular claim, then you don't get the payment

8  percentage multiplied by -- I'm sorry -- you don't get your

9  jury verdict multiplied by the same payment percentage as

10 everybody else.  You get just --

11         THE COURT:  The maximum value.  Right.  Because all

12 payment -- all claims within that class get paid the maximum

13 value and nothing more regardless of how the claim's

14 liquidated.

15         MR. COHN:  Yes, Your Honor, and we would submit that

16 that deprives claimants of their right to trial by jury.  That

17 you can't -- it is meaningless to say that you can go and get a

18 jury verdict if, when you then take it back to the trust, that

19 jury verdict does not determine the allowed amount of your

20 claim for purposes of then saying you get that amount times the

21 distribution percentage.

22         THE COURT:  Okay.  Well, I think it's an issue that

23 can be briefed, but I do think it's a confirmation issue.  I

24 think the issue of the deferred payment in years 6 to 10 -- you

25 know, I'm a little bit more sympathetic to why it's going to be

1  stretched out over that period of time as opposed to a little

2  sooner.  There may be some logic with respect to the financial

3  components of the trust that I -- that is not intuitive to me

4  that I'm not picking up on, but, nonetheless, that one I would

5  have to hear a little longer.  But I do think it's a plan

6  confirmation issue, Mr. Cohn.  I think you should talk to the

7  people who created the TDP.

8      MR. COHN:  Well, I'd be delighted to talk with them

9  if they would talk with me.

10      THE COURT:  Well, let me order them to talk to you.

11  Now they'll talk to you.  They're ordered to talk to you.

12      MR. COHN:  All right.  Well, thank you, Your Honor.

13  I would say -- well, all right, let -- I guess we should then

14  move to other issues, although I have a feeling that you may

15  reach the same conclusion, but I at least want to provide the

16  opportunity in terms of timing to consider them now or to defer

17  them.

18      The TDP contains a categorical, I think, disallowance

19  of wrongful death claims, and this is significant, because

20  we've -- you know, Libby claimants die, and when they die,

21  their families typically get wrongful death claims under

22  Montana law, and these have been substantial.  The value of

23  them will be in excess of $300,000.  Again, that's liquidated

24  value not necessarily what percentage you could expect to get

25  paid in the context of a bankruptcy.  But they are valid claims

1   under state law, and you have Supreme Court precedent in the

2   form of the <u>Nolan</u> decision and reorganized F&I which says that

3   claims cannot be categorically disallowed under the Bankruptcy

4   Code, and yet this TDP apparently -- because it isn't quite

5   clear from the language of the TDP.  But,  apparently, this TDP

6   envisions that wrongful death claims will be automatically

7   disallowed.  That, Your Honor, I would respectfully submit is

8   an issue of law which could be considered now.

9          THE COURT:  All right.  Mr. Lockwood.

10         MR. LOCKWOOD:  First, Your Honor, I want to make a

11   comment.  Mr. Cohn made some remark in response to Your Honor's

12   question about talking to the Committee and the Futures Rep and

13   announced that nobody talked to him.  That is an outright

14   falsehood.  Mr. Cohn -- as Mr. Bernick pointed out earlier,

15   this -- there have been negotiations between Mr. Cohn, Mr.

16   Cohn's clients, members of the Committee, counsel to the

17   Committee, for months going over this TDP on various things, A.

18   B, some of these objections that we are hearing today have

19   never been proffered by Mr. Cohn before they showed up in his

20   objection papers.  Now -- and most of them, to the extent that

21   they have any surface plausibility, are largely so, because

22   they are basically that, superficial.

23         I'm going to take the two that Your Honor seemed to

24   have a little traction with Your Honor on.  One is the right to

25   trial by jury.  It is by no means clear that you have a right

1   to trial by jury in a 524(g) plan.  For openers, as we have

2   discussed in -- various times in this and other cases, the

3   524(g) trust procedure is not an allowance procedure.  It is a

4   post-consummation resolution of claims by a trust.  And one of

5   the requirements for that trust that's built into the statute

6   is that the trust itself -- this is in Section

7   524(g)(2)(B)(ii)(v), and it talks about one of the requirements

8   of the trust is that, "The trust will operate through

9   mechanisms such as structured, periodic, or supplemental

10  payments, pro rata distributions, matrices, or periodic review

11  of numbers and the values of present claims and future demands

12  or other comparable mechanisms that provide reasonable

13  assurance that the trust will value and be in a financial

14  position to pay present claims and future demands that involve

15  similar claims in substantially the same manner."

16          Now, that section contemplates at least two different

17  things.  One is the creation of payment percentages and the

18  monitoring of them in such a way as to minimize the possible

19  fluctuation in values arising out of the fact that you've got

20  some people at the front of the line, and you've got some

21  people at the back of the line.  It is by no means clear that

22  an unrestricted right to juries is consistent with that.  I

23  mean Your Honor is well aware of the vagaries of the jury

24  system.  Indeed Mr. Bernick has waxed eloquent from time to

25  time on that subject.

1          With all due respect to Mr. Cohn's enthusiasm for the

2 value of his Libby claimants, he's not the only counsel who

3 represents people that have gotten blockbuster results out of

4 the jury system.  For example, one of the things that Your

5 Honor may be familiar with is the so-called Edwards judgment in

6 this case.  That's a judgment for $43 million plus interest on

7 five claims, four of which were non-malignancy and three of

8 which, if my memory serves me, were unimpaired.  With all due

9 respect, there's never been a judgment in Libby remotely

10 comparable to that.  And you can talk about values of claims

11 and juries.  Madison County, I believe Your Honor has heard

12 about --

13          THE COURT:  We don't need to talk about this.  We

14 need to get done today, Mr. Lockwood.

15          MR. LOCKWOOD:  Okay.

16          THE COURT:  Let's move on.

17          MR. LOCKWOOD:  The point being that --

18          MR. BERNICK:  I was just getting interested in this.

19          MR. LOCKWOOD:  The point being is that it would be

20 highly inappropriate for Your Honor to decide at a disclosure

21 statement hearing with no evidence of the sort of things that

22 we're talking about based on Mr. Cohn's say so that his people

23 get higher verdicts and higher jury trials and 524(g) is an

24 absolute right to jury trials, et cetera.

25          THE COURT:  I think what I said is that even if

1  there's a right to a jury trial, that I don't see how it's lost

2  by virtue of the fact that you're put into a payment percentage

3  in a matrix in the trust.

4          MR. LOCKWOOD:  He's arguing --

5          THE COURT:  I think that's what I said.

6          MR. LOCKWOOD:  What his argument is, Your Honor, just

7  so the record is clear, he's saying first you apply the payment

8  percentage, but then you also have this capping the amount of

9  the jury verdict and the stretch out of the payments of the

10  jury verdict.  And, frankly, the reason I gave my little spiel

11  about the vagaries of jury verdicts -- and this will, you know,

12  be the subject of evidence, if necessary, at the hearing.  One

13  of the things that the trust has to do and the ACC and the FCR

14  and everybody else has to do is say, well, okay, if we're going

15  to give a trial by jury right here, which this trust does, how

16  restricted or unrestricted is it going to be to make the trust

17  work in the manner that the statute requires it to.

18          And, frankly, there is a disincentive to go through

19  the process and get a jury trial.  This is supposed to be --

20  the matrix -- the expedited review is a standing settlement

21  offer by the trust to resolve claims for those people that want

22  to.  The Libby claimants don't have to accept it.

23          You then have an alternative dispute resolution

24  process that goes in that the Court is familiar with.  If you

25  don't like the results of that, ultimately, the plaintiffs'

1  lawyers, as Mr. Cohn pointed out, have built in something that

2  preserves a trial by jury as to the merits of the claim,

3  liability, value, a bunch of things.  But there is this

4  limitation, and the justification for that limitation is more

5  or less what I have in a somewhat simplified fashion described

6  it as.  But again, I mean the -- we're not -- it seems to me

7  we're not here today for Your Honor to make a ruling about

8  whether you think my presentation about that rationale is or is

9  not a winner.

10         The other thing is this categorical disallowance of

11  wrongful death claims.  He also complains about the categorical

12  disallowance of punitive damage claims, and he cites Nolan,

13  which was a punitive damage claim case.  Well, as Your Honor

14  decided, I believe it was Pittsburgh Corning, there's a

15  difference between a judgment for punitive damages or wrongful

16  death, neither of which the trust eliminates.  It's -- we tried

17  it in Pittsburgh Corning.  Your Honor, cited Nolan to us and

18  said we couldn't do it.

19         But in a case, for example, where you're paying less

20  than 100-cent dollars percentages to people, there's -- there

21  is a legitimate question about what kinds of claims you're

22  going to pay for.  Punitive damages -- anybody in the world --

23  the Libby claimants aren't the only people that could assert

24  punitive damages.  Anybody that was a claimant except in a

25  state that disallows them entirely -- and I'm not sure how many

1  states there are, but there's certainly plenty of states you

2  could allege punitive damages.  Libby claimants aren't unique

3  to that.  And the reason that you disallow them is, because the

4  feeling is you ought to get paid for your compensation for your

5  injuries rather than allowing people at the front end of the

6  trust to get big punitive damage verdicts.  In a sense it's

7  similar to the jury trial issue in that regard.  You're trying

8  to create a structure that, you know, gives everybody a

9  reasonable shot at getting compensated for their injuries.

10         Wrongful death, the fact is that the wrongful death

11  -- when somebody dies, you wind up having their claim

12  bifurcated in a sense.  The heirs and the personal

13  representative will get those elements of the trust that remain

14  in the estate.  There are certain statutory beneficiaries of

15  wrongful death claims.  The way that's -- the way the trusts

16  are set up to work is that the idea is that all of those people

17  whose rights arise out of the single claim of the decedent at

18  the end of the day will have to agree on how to whack up, if

19  you will, among themselves the values.  And that's why, as will

20  be explained, to the extent again necessary at the confirmation

21  hearing, the way the trusts work is that the estate has to get

22  releases from the holders of the wrongful death claims in order

23  to get paid on a claim.  And what -- in order to get those

24  releases, which are not involuntary, the heirs and the wrongful

25  death beneficiaries have to figure out among themselves how to

1  divide up the proceeds of this what was again a single claim

2  here.

3        And Mr. -- <u>Nolan</u> doesn't apply to that anymore than

4  it applies to unliquidated and unadjudicated -- I'm having a

5  senior moment here -- punitive damage claims.  And so again I

6  mean this is complicated stuff, these TDPs.  This TDP, other

7  than the special provisions for Libby claimants that have been

8  affirmatively put into it, these provisions about wrongful

9  death and punitive damages are in every single trust that Your

10  Honor has confirmed today.  The Libby claimants are the only

11  people that have now shown up to complain about them, and again

12  all I can say is that it seems to me that if we're going to

13  have a debate on this subject, the proper place to do it is at

14  the confirmation hearing with evidence and briefing and not

15  sort of naked assertions of fact and objections and arguments

16  of counsel.

17        THE COURT:  Well, I agree that if there is -- I

18  believe that these are plan confirmation issues, and I think we

19  should be doing this at the plan confirmation hearing.  So I

20  think we need simply a list of the issues that are going to be

21  plan confirmation objections.  These appear to be in that list,

22  and they should be teed up for whatever is going to be

23  appropriate for briefing at that time.  So let's get back to

24  the objections.  I think that will perhaps be something that

25  can be addressed today, because I don't think these can be.

1  So, Mr. Cohn, I'm going to defer these to the confirmation

2  issues hearing.

3           MR. COHN:  Thank you, Your Honor.

4           MR. BERNICK:  I don't know if there's anybody else

5  that wants to speak to the mechanics of the TDP.  We have --

6           THE COURT:  Montana or Fireman's Fund?

7           MR. BERNICK:  I don't want to prompt anybody to rise,

8  but I'm just asking if there's anybody else who's going to

9  address that.  Here we go.

10           THE COURT:  Mr. Demmy.

11           MR. DEMMY:  Yes, Your Honor, I just rise, because I

12  wanted to reinforce my earlier comments.  I don't intend to

13  pursue any of the confirmation objections really for -- that

14  are noted on 6 and 7, so I'll just confirm that for two reasons

15  really.  One is that as to really all of these in prior

16  colloquy with the Court, the debtor has advised -- and it's set

17  forth in a chart that additional language is going to be added

18  to the disclosure statement, which deals with many of these on

19  a disclosure basis, so we'll look at that language.

20           And part of what our objection was, was that it

21  wasn't dealt with either in the disclosure statement or

22  otherwise.  So we're not going to proceed with that.  And also,

23  as I stated earlier, we think that many of these issues can be

24  discussed among the parties, and we stand ready to do that.

25           THE COURT:  All right.  Okay.  I think that takes you

1 to the insurance issues, Mr. Bernick.

2         MR. BERNICK:  Well, it takes us to the insurance

3 issues, and I think that effectively if you go through the

4 chart, you'll see that there are -- excuse me -- there's a list

5 of these issues that appears beginning of 109 for Fireman's

6 Fund, and then 105 for CNA, and, effectively, they all speak to

7 the issue of insurance neutrality.  And on the issue of

8 insurance neutrality, we would again suggest to the Court that

9 is an issue for confirmation.

10         I would add that the issues that have been raised are

11 not novel issues.  The question of whether the assignment

12 provisions of the plan or whether the TDP of the plan affect

13 contractual insurance rights is something that is not at all

14 unique to this case.  So we would ask that the items -- the

15 chart items that are listed here, 105 and 109, 11, 12, 13, and

16 14, be raised if they're going to be raised in connection with

17 the plan confirmation process.

18         THE COURT:  All right.  Is the debtor going to try to

19 work with these parties to get some language that's acceptable

20 to both sides?

21         MR. BERNICK:  Yes.  Well, I know that that's already

22 happened in the case.  I really do think that insurance is --

23 you know, it's cut from the same cloth that has evolved in

24 connection with the other cases, but these are all matters

25 where when it comes to the disclosure statement itself, you

1  know, we -- and I think that Mr. Freedman has gone through

2  that.  We've expressed pretty much an open door policy to

3  working out language.  I mean it is logistically a challenge to

4  deal with everybody, but we're committed to do that.  There's

5  no hesitancy about that.  But substantively on insurance we

6  think also this is pretty much another time round the same

7  basic track that's been worn pretty well in connection with

8  prior cases.

9       THE COURT:  Okay.  Other than to try to work with the

10  debtor to get some acceptable language for insurance

11  neutrality, does anybody wish to be heard on Number 7?

12                     (No verbal response)

13       THE COURT:  Okay.  Mr. Bernick.

14       MR. BERNICK:  Okay.  I think that that --

15       THE COURT:  Mr. Freedman.

16       MR. BERNICK:  -- brings us to the last category which

17  Mr. Freedman is going to cover, and these are the items of

18  disclosure where we believe that the matters come to the point

19  where it's ripe, and we don't believe that it should be

20  necessary to include these statements, and then I think we'll

21  be done for this session.

22       THE COURT:  All right.

23       MR. FREEDMAN:  So again, Your Honor, what we're now

24  talking about are disclosure statement objections which the

25  debtor believes the Court can now overrule and permit us to go

1 forward without making the requested disclosure.  First off,

2 there were two objections filed by the Crown, which would've

3 fallen into this category, Objection 18 and Objection 17.

4 After the representations of the Crown counsel, I won't take up

5 anybody's time on those.

6           THE COURT:  All right.

7           MR. FREEDMAN:  Scotts has filed an objection that's

8 identified on the chart as Number 21, and that has to do with a

9 complaint that the disclosure statement fails to disclose why

10 Scotts' claim, if they are indirect PI trust claims, are not

11 state common law claims that accrue close to confirmation and

12 not subject to a discharge.  That just fundamentally misstates

13 what Section 524(g) requires.

14           I point the Court to Page 8 of Scotts' objection, and

15 if the Court indulges me, I'll read the language of what they

16 say is wrong with the plan.  They say, "Moreover, if the joint

17 plan proponents intend to treat Scotts' claims as indirect PI

18 trust claims, then they must further provide full disclosure as

19 to why the Scotts' claims are not state common law claims that

20 accrue post-confirmation and are, therefore, deemed post-

21 confirmation claims against the reorganized debtors not subject

22 to compromise and discharge in a plan," citing the <u>Frenville</u>

23 case.

24           That law just simply doesn't apply in the context of

25 Section 524(g) and disclosure of the kind that they're asking

1 is inappropriate.  We request that the Court deny that request

2 for further disclosure.

3          THE COURT:  Okay.  Ms. Cobb.

4          MS. COBB:  Thank you, Your Honor.  Ms. Tiffany Cobb

5 on behalf of the Scotts Company.  And I don't know if it might

6 make some sense to go through each of the Scotts' objections,

7 because there is quite a lot of overlay.  To put this in its

8 proper context, there really are two separate issues for the

9 Scott Company.

10          One deals with the extent to which the Scotts Company

11 may have post-confirmation indemnity or other state law claims.

12 I believe that the debtors have indicated this morning that

13 they are going to provide as yet unreceived clarifying language

14 for the disclosure statement, and unless and until we see that

15 clarifying language, it's a little bit of a guessing game.  But

16 the point raised in the objection was if the debtors' intent is

17 to classify those state law future common law indemnification

18 or state law -- other state law claims and to capture them into

19 their definition of the asbestos personal injury claims, then

20 we are asking for adequate information in the disclosure

21 statement to so state that and to explain how that

22 characterization -- classification can be accomplished given

23 Third Circuit authority in the _Frenville_ case.  We disagree

24 that the Scotts Company has an asbestos claim.

25          MR. FREEDMAN:  Well, Your Honor --

1            THE CLERK:  Use the microphone.

2            MR. FREEDMAN:   -- to the extent that we're getting

3 into this issue that may well end up being a confirmation

4 issue, but the issue would then be if Scotts' potential claims

5 in the future fall within the category of indirect trust

6 claims, then under Section 524(g) they would still be channeled

7 to the trust, and they would still be subject to their

8 treatment as a PI trust claim.  To the extent that Scotts wants

9 to raise that treatment as a disclosure statement issue, it

10 should be considered in that context.  But to the extent that

11 Scotts is asking for some kind of disclosure, that they have

12 some rights that are different than what I've just articulated,

13 we think that that would be an incorrect statement, and we

14 don't believe that there is any further need for disclosure.

15            THE COURT:  Okay.

16            MS. COBB:  Well, and just to be clear, I had

17 understood the debtor's argument here today to be overruled a

18 Frenville argument.  I don't think that's appropriate today.

19 We have heard time and time again we are here today to address

20 whether or not there's adequate information in the disclosure

21 statement.  And it may be -- it may be unnecessary to go down

22 that path depending upon the --

23            THE COURT:  Show me in the disclosure statement

24 specifically where Scotts' claim is addressed, what you're

25 arguing about with respect to this Scotts claim.  The whole

                J&J COURT TRANSCRIBERS, INC.

1 issue is whether or not the disclosure statement adequately

2 addresses the Scotts claim.  Let me just see it in the context

3 in the disclosure statement.

4        MR. FREEDMAN:  Your Honor, I might be able to help a

5 little bit in the sense that the debtors intend to supplement

6 the disclosure statement, as I believe I explained earlier, to

7 provide a much more extensive discussion of what constitutes an

8 indirect trust claim and the kind of claim that would fall into

9 that category, and that discussion will include language that

10 would make it clear that Scotts' claims, whether they are

11 claims that exist today or if the <u>Frenville</u> ruling might apply,

12 would end up being demands, that is claims that don't exist

13 today but may come into existence in the future, would still be

14 channeled to the trust under Section 524(g).  We will make all

15 of that clear in the disclosure statement.  We agree that there

16 should be further exposition in the disclosure statement on

17 those points.

18        THE COURT:  Okay.  Well, if that's the case, I think

19 you two need to work out some language.  And to the extent that

20 Scotts still isn't satisfied, then I need to hear this in

21 November.  I think at this point I'm ruling on language that

22 isn't here, so why don't you two talk and see if you can't get

23 all of Scotts issues addressed, and if they're not addressed,

24 then I'll take this on in November.  I think at this point I'd

25 be giving a ruling on something that doesn't exist.  It doesn't

1 really make sense.

2         MR. FREEDMAN:  Your Honor, there are other --

3         THE CLERK:  Use a mike.

4         MS. COBB:  If you're moving on, know I'd like to make

5 one additional point --

6         MR. FREEDMAN:  Okay.

7         MS. COBB:  -- while we're on this.  Your Honor, if I

8 understood the discussion before the lunch break regarding

9 classification to be correct, again -- I mean I'm being asked

10 to speculate at this point until we've seen the clarifying

11 language.

12         THE COURT:  Yes.

13         MS. COBB:  But certainly to the extent that with that

14 clarifying language the Scotts Company disagrees with that

15 classification, it would be our understanding that as with

16 other interested parties today who have raised similar

17 classification objections, that there would need to similarly

18 be the two different voting --

19         THE COURT:  Yes, you just -- everyone who is unhappy

20 with their classification is going to file something, and in

21 whatever the time schedule is that's worked out that says I

22 think I should be in Class X, and whatever class you think you

23 should be in, the debtor will have the votes counted the way

24 the debtor thinks they should be counted and the way the

25 objecting party thinks they should be counted.  And if it makes

1  a difference, then I'll have a classification issue I have to

2  determine.  If it doesn't make a difference either way, it

3  won't make a difference.  I don't have to worry about it.  So

4  far, in every plan I've seen it wouldn't have made a

5  difference, so I may not have to worry about it.  If I do, then

6  I'll figure it out then.

7          MS. COBB:  Okay.

8                  (Pause)

9          MR. FREEDMAN:  Your Honor, just to short circuit it,

10 BNSF has filed a similar kind of objection.  It's identified as

11 Number 25 in the chart and goes to the same point that is

12 appropriate disclosure about how BNF's claims would be properly

13 treated and whether or not the potential future claims that

14 relate to BNF -- BNSF's rights would be dealt with under the

15 plan, and we should just defer dealing with that issue in the

16 same way.

17          THE COURT:  Okay.  I think to the extent the debtor

18 is going to attempt to work out new language, there isn't

19 really much point in discussing anything today, because I don't

20 have anything rule on today.  So, counsel, do you agree simply

21 to defer this until November?

22          MS. HARANSON:  That's fine, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MR. FREEDMAN:  Again for Scotts and BNSF there are

25 two objections that raise a similar issue about the impact of

1  their asserted rights against the Grace insurance policies.

2  That would be BN -- well, that would be Scotts' objection

3  Number 24 and BNSF's objection Number 27.  And the question

4  that was raised in these objections as a disclosure statement

5  matter was -- the objection that was raised was that the

6  debtors didn't properly disclose that there was some impact on

7  their -- these parties' rights to certain insurance policies.

8           The disclosure statement makes clear that it is only

9  transferring the debtors' rights to the trust -- the debtors'

10 insurance rights to the trust.  There's nothing in the

11 disclosure statement that suggests that any third parties'

12 rights are being transferred to the trust, and the debtors

13 don't believe that there's any need for further disclosure in

14 the disclosure statement that goes to those issues.

15          THE COURT:  Well, okay, but does it hurt to put a

16 sentence in that says that debtor is not transferring any third

17 parties' rights to insurance policies to the trust?

18          MR. FREEDMAN:  We're happy to do that, Your Honor.

19          THE COURT:  All right.  Add a sentence.  Thank you.

20          MS. COBB:  If I may on that?

21          MR. FREEDMAN:  Sure.

22          MS. COBB:  Your Honor, Tiffany Cobb on behalf of the

23 Scotts Company.  I appreciate that suggestion, and I agree with

24 it, but I think we need to go a little further than that.

25 There is a -- in looking at the chart for the Scotts Company,

1  24 -- Number 24, and consistent with what debtors' counsel has

2  said, it's interesting to look at the words used.  It says,

3  "The plan on its face only purports to transfer the debtor's

4  insurance rights, not any alleged rights that the Scotts may

5  have.  That is very different, Your Honor, than saying the plan

6  on its face does not purport to affect any rights --

7          THE COURT:  Well, it may affect rights.

8          MS. COBB:  -- that the Scotts may have.

9          THE COURT:  It may affect rights.  I mean how does

10  anybody know what it's going to affect?

11          MS. COBB:  Well, and we are looking for a statement

12  or statements in the disclosure statement to explain what the

13  debtors' intent is with respect to --

14          THE COURT:  It has that in it.  It says, "It purports

15  to transfer the debtors' rights, not any alleged rights that

16  Scotts has."  That's it's intent.

17          MS. COBB:  What is its intent, for example, with

18  respect to the -- there is no -- well, let me give one of many

19  examples.  I don't know if that intention means that the Scotts

20  Company's claims against the insurance carriers will now be

21  against the trust with the asbestos trustee stepping in the

22  shoes of Grace with litigation occurring to adjudicate the

23  rights that Your Honor has said that the Scotts Company is

24  entitled to litigate, or if it means that through this --

25  through the language in this disclosure statement the -- well,

1  there's an absence of language whether their intention is to

2  essentially release those rights --

3          MR. FREEDMAN:  Your Honor --

4          MS. COBB:  -- because of the broad release language

5  given to the insurance carriers.  All we're looking is for a

6  statement or an explanation from W.R. Grace as to what their

7  intent is vis-a-vis the Scotts Company's claim against the

8  insurance carrier.  There's nothing in this disclosure

9  statement period as to what the affect of this plan is on the

10 Scotts Company's claims against the insurance carrier.

11 Nothing.

12         MR. FREEDMAN:  Well, Your Honor, counsel --

13         THE CLERK:  Use a microphone.

14         MR. FREEDMAN:  One of these days I'm going to learn.

15 Counsel has raised sort of two independent points, one of which

16 we've agreed to, and one of which she keeps on coming back to

17 that is impossible to speak to at this point.  We've agreed

18 that we will add a sentence to the disclosure statement that

19 says that the debtor is only transferring its rights and making

20 clear that we're not transferring anybody else's rights.  And

21 it will be absolutely clear that Scotts' rights or BNSF's

22 rights or anybody else's rights are not being affected by our

23 transfer.

24         Once the trust has those rights, then it will be up

25 to the trustees to decide how to access the insurance, how to

1    deal with the insurance, and so forth.  And it may be that in

2    the course of that some rights that Scotts has might be

3    affected just as happens in every situation where you'd have

4    multiple beneficiaries of an insurance policy.  It's impossible

5    to provide disclosure on that point other than to indicate that

6    the debtors are only seeking to transfer their rights.  So we

7    think that our disclosure with the sentence the Court asked for

8    would be all that's required.

9            THE COURT:  I think that's all the debtors can do.

10           MS. COBB:  Well, what debtors' counsel just stated on

11   the record is what we're looking for them to say in their

12   disclosure statement.  I believe counsel stated that they're

13   only intending to transfer whatever rights the debtor has, and

14   they are not intending to affect the Scotts Company's rights.

15   If that's the case, then not say it in the disclosure

16   statement.

17           THE COURT:  He said he would indicate that their

18   intent -- that the debtor is transferring the debtors' interest

19   in the policies not third parties' interests in the policies.

20   That's what he can state, and I agree.  And to the extent that

21   it's not clear, they'll so state.  Okay.  And that thereafter

22   it'll be up to the trust to access and deal with the insurance

23   policies.

24           MS. COBB:  Are you interpreting that to mean then,

25   Your Honor, that the Scotts Company's declaratory judgment

1  action would then continue?

2         THE COURT:  I'm not interpreting it to do anything.

3  I'm simply ruling on what's adequate information in the

4  disclosure statement, and it seems to me that the issue is

5  what's the debtor transferring.

6         MS. COBB:  Well, I -- respectfully, I think that the

7  way that the debtor is intending to affect our rights needs to

8  be spelled out, so we can -- I mean do we have a due process

9  issue here?  I don't know, because they aren't telling me.

10        THE COURT:  How does the debtor -- how can the debtor

11 affect your rights?  You're asking for a legal conclusion --

12        MS. COBB:  I'm not asking --

13        THE COURT:  -- that is not --

14        MS. COBB:  I'm looking for their intent.

15        THE COURT:  You are asking for a legal conclusion and

16 probably a statement of fact that may or may not assist in a

17 particular litigation, and I'm not going to compel the debtor

18 to do that.  There is a litigation issue going on.  This is the

19 disclosure statement.  It is not an adversary proceeding.  That

20 adversary proceeding is stayed, and I'm not going to compel the

21 debtors to take a position in an adversary proceeding that may

22 affect their substantial rights in this disclosure statement.

23 The objection's overruled.  I've said what they have to add.

24 That's it.  That's what you're getting.

25        MS. COBB:  Well, I apologize.  I was not looking for

1  the debtors' position on the merits.  We can --

2          THE COURT:  Well, but you are.

3          MS. COBB:  No, I --

4          THE COURT:  You're asking for a statement of intent.

5          MS. COBB:  To me, that's different, and I apologize

6  if I wasn't artful in the way I explained this.  The Scotts

7  Company has certain rights.  We can disagree as to what those

8  are.  We -- I understand that, Your Honor.  That issue has not

9  been litigated.  That's not the question.  The question is

10 whatever rights those are, the disclosure statement should tell

11 us how they're going to be affected.

12         THE COURT:  The debtor doesn't even know what rights

13 you have potentially.  How can the debtor say what affect the

14 debtor is going to have on rights that the debtor doesn't even

15 necessarily agree that Scotts has?  That hasn't been litigated

16 yet. It's an issue that Scotts is making a claim against

17 policies that the debtor doesn't even know yet at this point in

18 time whether the debtor has.  I mean the debtor's disclosed

19 certain policies.  Scotts may or may not know that it -- or the

20 debtor may or may not know that there are other policies out

21 there.

22         The debtor cannot make the assertions in good faith

23 that you're asking the debtor to make.  What the debtor can say

24 is we know we have certain policies.  We're transferring those

25 policies to the trust.  We don't intend to transfer anybody's

1  interests in those policies but ours.  And the debtor is

2  willing to say that and to clarify that whatever rights anybody

3  else has in those policies are not being transferred, and

4  that's what the debtor can say.  We're not transferring anybody

5  else's interests but ours.  The debtor can say that, and that's

6  what the debtor's willing to say.

7          MS. COBB:  Okay.  Well, it still remains unclear what

8  happens to the declaratory judgment action if the plan as

9  written is confirmed.

10          THE COURT:  Well, that you folks need to talk about.

11  If, in fact, there's an affect on the declaratory judgment

12  action, that's a different issue than transferring the

13  insurance policy.  So that you should discuss.

14          MR. FREEDMAN:  We're pleased to talk to counsel --

15  we're pleased to talk to counsel about that issue.

16          THE COURT:  Okay.

17          MR. FREEDMAN:  Your Honor, the next objection is

18  Number 48 filed by Continental Casualty, CNA.  That objection

19  says that they need to know if the injunction under Section 8.2

20  of the plan -- they need to know in the disclosure statement if

21  the injunction under Section 8.2 of the plan prevents the

22  insurers once the trust is up and running from taking discovery

23  with respect to their rights with -- under the debtors and if

24  they're exercising state law rights limits somehow their

25  discovery.  The debtors do not believe that there's anything in

1   the plan that even raises the prospect of some limitation on

2   insurers' rights to take discovery in proceedings that are

3   unrelated to this Chapter 11 case, and particularly once the

4   effective date has passed and there's no stay, that binds them.

5   So -- or if there's litigation with the trust, and the trust is

6   seeking to access coverage under the policies and there's some

7   sort of state law -- State Court litigation with respect to a

8   dispute that involves the trust accessing coverage under the

9   policies and the insurers need to take discovery, there's

10  nothing in the plan that suggests that they wouldn't have any

11  and all of their rights.  We don't see any need for further

12  disclosure on that kind of a point.

13              THE COURT:  Okay.  Does CNA want to be heard on this

14  issue?

15              MR. GLOSBAND:  Dan Glosband for CNA.  Just to confirm

16  what Mr. Freedman said, we would expect to put something like

17  what he just said into our neutrality proposal.

18              THE COURT:  In the neutrality proposal?

19              MR. GLOSBAND:  If the plan is to be insurance

20  neutral, it's got to be neutral in respect to our discovery

21  rights as well, and so we're intending to have conversations

22  with them about the specific details of the neutrality

23  language, and I would think that would be an appropriate thing

24  to add just to confirm that what Mr. Freedman said will apply

25  to us post-confirmation.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.   You folks talk.

2          MR. FREEDMAN:  We'll discuss the propriety of that.

3  Your Honor, the next group of objections are all ones filed by

4  Fireman's Fund.  They are objections Number 55, 56, 58, 59, and

5  64, and I believe I can summarize all of these objections in

6  the following way.

7          What they do is they request that there be disclosure

8  about how the trust, once it's up and running, will access

9  coverage that is relating to open insurance policies.  And the

10 debtors are not in a position to write a hypothetical

11 description of how a trustee might decide to access coverage

12 in, you know, two years when the trust is up and running.  So

13 we don't believe that there's any need for or any requirement

14 of disclosure with respect to those kinds of issues, and we'd

15 ask the Court to overrule any requests to supplement the

16 disclosure statement with those kinds of descriptions.

17          THE COURT:  Mr. Demmy.

18          MR. DEMMY:  Yes, Your Honor, my response is very

19 simple to this group, and it relates -- I think all the

20 objections that are raised in the group that were just

21 identified relate in some way to the -- at the time the

22 objection was filed the missing exhibits.  The transfer

23 agreement, which was filed Saturday, and the cooperation

24 agreement, which has not been filed yet, I think that some of

25 what we're looking for may very well be in those documents.  My

1  suggestion would be since we just -- we had zero business days'

2  notice of the -- or opportunity to look at the transfer

3  agreement -- we haven't yet seen the cooperation agreement --

4  we ought to put these over to November 14 to give us an

5  opportunity just to look at those agreements and see if we can

6  come to a landing on this grouping.

7           THE COURT:  All right.

8           MR. DEMMY:  Thank you, Your Honor.

9           MR. FREEDMAN:  Your Honor, I don't have a problem --

10          THE CLERK:  Use a mike.

11          MR. FREEDMAN:  I don't have a problem with counsel

12  raising any objections that are implicated by the agreement,

13  but we'd like to know that we don't have to be providing

14  disclosure on hypothetical situations which --

15          THE COURT:  Well,  you don't need to provide

16  disclosure on a hypothetical situation, because you obviously

17  can't describe how the trust will access coverage.  You won't

18  be part of the trust, so that's -- that issue I think, as

19  stated, is -- has to be overruled.  But, nonetheless, I think

20  Mr. Demmy's correct that some of the exhibits themselves may

21  provide the information that they're looking for.  So to the

22  extent that there may be objections that are not resolved,

23  they're going to come up November 14th, so I think you folks

24  can talk.  But, no, the debtor cannot provide disclosure about

25  a hypothetical that the debtor won't be involved in.

1          MR. DEMMY:  Your Honor, as a matter of concept, I

2    don't disagree with the Court's statement, and I think that

3    once we have a chance to look at the documents, if there's

4    something about them that still we have a problem with, we'll

5    raise it, and we'll deal with it.

6          THE COURT:  Okay.

7          MR. FREEDMAN:  Counsel for Fireman's Fund may want to

8    just remain at the podium, because there are about three of

9    them that relate to him now.  Objection Number 57 asks for a

10   disclosure with respect to the proposition that the claims

11   liquidation process may have the effect of diminishing

12   recoveries by holders of asbestos PI claims from the asbestos

13   PI trust, and in particular, I gather the real substance of

14   their objection is that the TDP might have some adverse affect

15   on the rights of the trust vis-a-vis the insurance coverage

16   that's still open in terms of being able to access that

17   coverage, and they want further disclosure on that.

18         We don't think that such disclosure's appropriate

19   beyond what we've already said that we would disclose, and the

20   debtors have agreed in the disclosure statement to add language

21   that we'd be glad to work with the insurance companies to pin

22   down that relates to the general proposition that insurance

23   proceeds are going to be subject to -- recovery of insurance

24   proceeds are going to be subject to defenses of the insurance

25   companies, and that the asbestos PI trust in its attempt to get

1  access to the insurance coverage will have to address those

2  defenses.

3          THE COURT:  Okay.

4          MR. DEMMY:  Your Honor, as to fifty -- I don't think

5  we have an issue with 57.  I think in parts it's a transfer

6  agreement problem, and we're deferring that.  And also the

7  debtors in the chart indicated they were putting some language

8  in about the risk factors and so forth, so we'd have to take a

9  look at that as well.  So I don't think we have anything to

10 talk about on 57 at the moment.

11         THE COURT:  Okay.

12         MR. FREEDMAN:  On Pages 19 and twenty -- through 22

13 of the Fireman's Fund objection they essentially ask that the

14 debtors disclose that under the TDP they're agreeing to fund

15 and have to pay non-meritorious claims, and the --

16         THE COURT:  That's overruled.

17         MR. FREEDMAN:  Okay.

18         THE COURT:  Obviously, the debtors are not going to

19 agree that they're going to pay non-meritorious claims, and

20 that the Court would not be confirming a plan in which the

21 debtors would agree to pay non-meritorious claims.  So I --

22         MR. DEMMY:  I'm not going to ask Your Honor to go

23 back on that.  I think what we were getting at was a more

24 fundamental issue.  In the disclosure statement there are only

25 two pages out of about 140 that relate to the estimation

1 proceedings, and only about a paragraph that relates

2 specifically to the settlement that is -- was made in

3 connection with the estimation proceedings, and we felt that

4 the disclosure statement would be benefitted by a more fulsome

5 discussion with respect to the factors that went into the

6 settlement in connection with the estimation.  I think really

7 that's what the objection was getting to, not to how it was

8 characterized, but I think Your Honor might have the same

9 response.  But I did want to make the record clear on that

10 point.

11        THE COURT:  All right.  Well, Mr. Lockwood, would the

12 asbestos personal injury claimants benefit from more detail

13 with respect to how the settlement numbers were arrived at,

14 because it seems to me that this objection, although raised by

15 an insurance company, is for the benefit of the asbestos

16 personal injury claimants.

17        MR. LOCKWOOD:  Your Honor, the asbestos claimants got

18 subjected to personal injury questionnaires, over 100,000 of

19 them, a settled claim bar date notice.

20        THE COURT:  It's a yes or no answer.

21        MR. LOCKWOOD:  It's a -- it was a global deal.  No.

22        THE COURT:  Okay.

23        MR. LOCKWOOD:  They don't need anything more.

24        THE COURT:  I don't think they need anything more,

25 Mr. Demmy.  Thank you.  Okay.  That one's overruled.  I think

1 they'll probably have understood how it finally came to pass,

2 Mr. Demmy.  Okay, Mr. Freedman.

3         MR. FREEDMAN:  The last one that was raised by

4 Fireman's Fund on Page 29 of their objection is that the

5 debtors failed to disclose the effect of any substantive

6 consolidation on claims made under the non-settled insurer

7 policies.  Basically, the point here is that the plan does

8 provide that a claim filed against one of the debtors is deemed

9 to be a claim filed against all of the debtors, and that the

10 debtors are substantively consolidated for that purpose.

11 There's no intent in providing that -- that there was any

12 limitation on the substantive rights of the insurers with

13 respect to their policies, and, therefore, we don't believe

14 that there's any need for further disclosure that relates to

15 that point.  It has to do more with a issue of permitting

16 claims to be against the consolidated debtors than affecting

17 the rights of insurers with respect to which of the debtors

18 they're responsible for covering.

19         THE COURT:  Well, Mr. Demmy, if you don't think it's

20 clear, this one may affect the insurance companies.

21         MR. DEMMY:  Your Honor, I would accept what the

22 debtor put in the chart, which was a little fuller statement or

23 rendition of Mr. Freedman's statement with regard to -- that

24 there was not to be any affect on insurers.  There's -- it's a

25 one-sentence -- the second sentence in the chart for Number 62,

1  that second sentence would be acceptable to us.

2          THE COURT:  All right.

3          MR. DEMMY:  So I think that adequately explains what

4  Mr. Freedman just said.

5          MR. LOCKWOOD:  Your Honor, we're happy --

6          THE COURT:  I'm sorry.

7          MR. LOCKWOOD:  Your Honor, we're happy to have the

8  debtors put in a sentence that says that substantive

9  consolidation is not intended nor shall it operate to somehow

10  or another result in the insurers insuring an entity that they

11  didn't insure.

12          THE COURT:  All right.  Well, are you happy with that

13  -- with the information that's in Number 62 as the response to?

14  If so, that seems to be a pretty fair explanation.

15          MR. FREEDMAN:  The debtors will include that

16  language.

17          MR. LOCKWOOD:  Yes, that's fine, Your Honor.

18          THE COURT:  All right.  Just add that then.

19          MR. FREEDMAN:  All right.  Your Honor, there are

20  several objections that were filed by the Libby claimants.

21  Most of those would be handled by Mr. Lockwood.  One I'd like

22  to just address.  That's Number 32 where the Libby claimants

23  say that the disclosure statement violates the requirements of

24  due process of law, because (1) it does not provide adequate

25  time to object, (2) lacks basic information necessary for a

1  meaningful response, and (3) allows the plan proponents to

2  modify the plan without further disclosure.

3        As to the third one, we've already made clear that

4  the plan proponents could only modify the plan as committed

5  under Section 1127, which clearly provides that after a

6  modification is made claimants who have previously voted for

7  the plan and are impaired by that modification will have a

8  chance to vote again, and after the effective date no

9  modifications can be made to the plan.  So we don't believe

10 that that has any merit at all and requires any further

11 disclosure.

12       With respect to the basic information necessary for a

13 meaningful response, we're certainly working with all the

14 parties who have made useful suggestions to add information

15 that we believe is appropriate, and we think that that's a

16 sufficient response to this point.

17       And as to the adequate time to object, as we pointed

18 out in our brief, number one, we provided all the notice that

19 is required both under the Bankruptcy Code and the local rules.

20 And, number two, the Libby claimants were able within that time

21 to file a 102-page objection, so they certainly had time to

22 consider what the plan provides.  And I will note, as Mr.

23 Lockwood indicated, that the Libby claimants were very much

24 involved in the negotiation of the TDP we understand from the

25 Creditors' Committee.  So they certainly have had plenty of

1 notice about that very important provision of the plan.  So we

2 don't think that any of those objections require further

3 discussion.

4          THE COURT:  Mr. Cohn.

5          MR. COHN:  Your Honor, as to the first two points,

6 I'll just rest on my papers, but I did want to address the

7 third, which I think Mr. Freedman addressed first, which is the

8 matter of how the plan gets amended and what notice and what

9 disclosure there is for due process purposes.  And I really

10 just wanted to ask whether we could have a clarification for

11 the record that what we mean by modification of the plan

12 includes a modification of the exhibits of the plan.

13          MR. FREEDMAN:  Your Honor, the exhibits to the plan

14 -- and I think Mr. Cohn's probably talking about the TDP, and

15 so Mr. Lockwood could address that.  But the exhibits to the

16 plan carry within them certain provisions that relate to

17 whether or not the parties to those exhibits can modify them

18 under certain rules and standards that are laid out in each

19 exhibit.  All of these are transactional documents of one kind

20 or another.  They're ubiquitous in the sense that every 524(g)

21 case that's come before this Court has had similar kinds of

22 plan documents, if you will, all of which carry within them the

23 ability for the parties to amend it as appropriate.  That is

24 very different from amending the plan.  Those are the documents

25 that express various elements of obligations which are

1 incorporated into the plan, and we don't believe that there

2 should be any limitation other than what's set forth in the

3 documents about the ability to amend those.

4     THE COURT:  Well, Mr. Cohn, I don't think that the

5 exhibits to the plan have to or even can follow the same

6 modification requirements as 11:27 for a number or reasons, not

7 the least of which is that the trust and the trust -- the TDP,

8 for example, will last for 50 to 70 years, and 1127 may not be

9 around that long to speak of, so -- and certainly,

10 unfortunately, but I won't, and so most of us in this room

11 probably won't.  So I don't think that they can carry quite the

12 same parameters, but they certainly can require some form of

13 either notice or a hearing as appropriate in some

14 circumstances.  I think that is a plan issue.

15     Some of the TDPs in some cases require some form of

16 notice if material changes are being made, some don't.  It

17 depends on the circumstances and what it is that's being

18 changed.  And so I think to the extent that some modification

19 is in order, that is really a plan issue, and each document

20 should be looked at.

21     If there's an objection to a specific type of

22 modification, I think you should raise it at the plan, and I'll

23 take a look at it.  But I haven't seen all the documents yet,

24 so I don't even know what they all say.  But I can't -- I just

25 don't think 1127 can be implemented with respect to each of

1 those exhibits.  It just would not work.

2          MR. COHN:  Your Honor, I'm actually apparently being

3 given credit for making a more subtle point that I was meaning

4 to make.

5          THE COURT:  Okay.

6          MR. COHN:  That I agree would be a plan confirmation

7 issue if the self-amendatory provisions of one of the exhibits

8 were challengeable.  I'm just raising the point that to take

9 the TDP as an example, supposing you decide to drop Section 5

10 and insert a new Section 5, and that's then going to be the

11 plan that's being presented for confirmation, I just wanted to

12 make clear that there would need to be both adequate notice

13 from a due process standpoint and also a following of Section

14 1127 with respect to --

15          THE COURT:  Oh, before confirmation?

16          MR. COHN:  Yes, Your Honor.

17          THE COURT:  Oh, for sure before confirmation --

18          MR. LOCKWOOD:  Your Honor --

19          THE COURT:  -- they've got to -- there will have to

20 be notice.

21          MR. LOCKWOOD:  Your Honor, there will clearly be --

22 the TDP amendatory provisions don't become effective until the

23 TDP is effective, and that won't be until the effective date.

24 So up until the effective date any changes to the TDP or any

25 other plan document would be a change in the plan and would be

1 subject to 1127 --

2          THE COURT:  Absolutely.

3          MR. LOCKWOOD:  -- and there's no dispute about that.

4          THE COURT:  Okay.

5          MR. LOCKWOOD:  If it's material.

6          MR. FREEDMAN:  The debtors concur in that.

7          THE COURT:  Okay.

8          MR. FREEDMAN:  Your Honor, that leaves us with a few

9 -- that leaves us with a few exhibits -- excuse me -- a few

10 objections that have been raised by the Libby claimants, and

11 Mr. Lockwood will address those, and then after that is

12 completed we'd like to address some objections that relate to

13 the solicitation procedures.

14          THE COURT:  All right.

15          MR. LOCKWOOD:  Your Honor, I'm going to address the

16 items that are shown on the chart as -- on Pages 11 and 12 as

17 Items 31, 33, 34, 35, and 36, which are all Libby claimant

18 objections, disclosure statement matters.

19          Item 31 is an objection that says that, "The

20 disclosure statement does not disclose the nature and amount of

21 the asbestos PI claims expected to seek or obtain designation

22 as extraordinary claims."  The extraordinary claims are a

23 limited subset of claims that get individual review.  They're

24 not resolved by the claimant under the expedited review matrix.

25 They go through individual review, and they are limited to

1 persons whose exposure is either 75 percent, in which it meant

2 they could get a five times multiple of the claim value, or 95

3 percent exposure to Grace products.  Essentially people who --

4 who don't have much opportunity to go against other defendants

5 in the tort system.

6        To discuss this, I think a couple of points need to

7 be made by way of context.  First, this is a level of detail of

8 projection which nobody's ever done in any asbestos bankruptcy

9 before.  We've never broken down into the projections of future

10 claims into individual bite-size pieces of subsets of those

11 claims.

12       Secondly, this objection is coming from the Libby

13 claimants, who, through their counsel, have made it perfectly

14 clear that they understand enough about this plan already that

15 they intend to vote against it.  So there is a certain

16 crocodile tear quality to their pleas that there's inadequate

17 disclosure for somebody who needs to decide how they're going

18 to vote with respect to this sort of objection.

19       Thirdly, it's also apparent, I believe, that what

20 this really is is an effort to try and get discovery of the TDP

21 underpinnings by way of a disclosure statement objection for

22 people who already intend to object to the plan not only vote

23 against it but object to it at confirmation.  If you ask

24 yourself why would anybody need to know what the nature and

25 amount -- I mean they say expected to seek or obtain

1  designation as extraordinary claims.  I mean what sort of --
2  what does that mean, expected by whom for what purpose?  Why
3  would you even bother?

4           To the extent that I can figure out what the
5  rationale for asking of this level of detail would be, it has
6  to be, I believe, some notion that you're going to try and use
7  this information to either challenge the payment percentage,
8  because somehow or another you have -- you don't -- you haven't
9  accurately projected enough extraordinary claims coming from
10  Libby, or you've over projected the number of extraordinary
11  claims coming from somebody else, or you haven't projected the
12  extraordinary claims as a subset, and you need to do that in
13  order to arrive at the payment percentage or something.  But in
14  terms of trying to figure out whether you should vote for or
15  against this plan, which is what these disclosure statement
16  objections are supposed to be all about, it simply does not
17  seem to be necessary, appropriate, or even reasonable to compel
18  people to go out and generate information that they don't have.
19  I will tell you right now I -- we don't know the answer to this
20  question, and to come up with it, I guess we'd have to go back
21  to claims -- the claims estimation experts in this case for the
22  ACC and the FCR and see to what extent they could break out
23  this subset and make an estimation.  And then simply because
24  it's requested by the Libby claimants on some notion -- on some
25  generalized statement that we need it in order to know how to

1  vote, put it in the disclosure statement.  And that just

2  doesn't seem to be a reasonable thing to ask anybody to do,

3  Your Honor.

4         THE COURT:  Well, Mr. Lockwood, may I ask is it going

5  to be necessary to do it in order to make the initial payment

6  percentage determination?

7         MR. LOCKWOOD:  No, Your Honor, certainly not in the

8  form in which it's requested.  And, moreover, as you've heard

9  already, their -- one of their earlier objections was that we

10 didn't have the payment percentage in the plan.

11        THE COURT:  Yes.

12        MR. LOCKWOOD:  You had -- we've said we're going to

13 have to -- we're going to put something in, and it's going to

14 describe that.  Well, part of the problem is that because of

15 the -- and this will show up with some of these other

16 disclosure statement objections.  Because of the turmoil in the

17 markets and the fact that the plan consideration described in

18 the plan and the disclosure statement consists in a number of

19 instances of stock and notes and securities and stuff, the

20 payment percentage in the normal case is the value of the

21 assets in the numerator, the estimated total claims in the

22 denominator, and that's the payment percentage.

23        Here the numerator is, you know, I mean the value,

24 for example, of the warrants that the trust is getting, was

25 going from in the money by something like, I don't know, eight

1  or nine or ten dollars a share to out of the money by about

2  eight or nine or ten dollars a share in a month.  And we're

3  getting Sealed Air stock, and there's a number of complexities

4  that we're wrestling with.  How are we going to do this in a

5  manner that is sensible.

6          In that connection this number here, the

7  extraordinary claim number is -- would be a small piece of the

8  denominator, because effectively what you're saying is that

9  there would be -- you'd estimate the number of claims that

10 would take expedited review, and then you get individual

11 review, and some of the individual review claims would be

12 extraordinary claims, and how many of that, and what value

13 would they have in relationship to all the other value, and is

14 that an amount that would make a meaningful difference in the

15 dollar value of the denominator?  I can't answer that, because

16 I'm not an estimator, but my -- the point I'm trying to make is

17 that there's no showing here, no intelligible articulation here

18 of why drilling down to that level of detail, if it were

19 possible -- and frankly, I'm not sure it is possible.  But if

20 it were possible, why it would be a useful exercise.  What

21 would -- how would it help anybody that's reading this

22 disclosure statement to decide whether they voted for or

23 against this plan?

24          THE COURT:  Okay.

25          MR. LOCKWOOD:  That takes me to Number 33, which is a

1 similar -- contains many of the same sorts of requests about

2 making predictions that involve sort of in various different

3 ways parsing the components of the payment percentage.  The

4 first one is how many asbestos PI claims are projected.  That's

5 just presumably a number.  It doesn't tell you the value, so

6 without the values, it's a meaningless number.

7        But if you want to attack the denominator, then that

8 would be one of the pieces that you would want to have

9 information about that would enable you to start putting

10 together your attack, which is why I made this comment about

11 it's really a form of discovery to the claimants.  Whether

12 there's a million claims or 500,000 claims or whatever, by

13 itself that information isn't going to tell them anything,

14 because it isn't going to tell them how many -- what the claims

15 are worth and what the -- and how much they're going to get

16 paid, all of which is a function -- everything in a sense backs

17 into the payment percentage, because that's what they care

18 about.

19        They're going to get a pile of assets, and they're

20 going to -- the trust is going to assume a pile of liabilities,

21 and at the end of the day the person looks in and they figure

22 out this is my claim, and this is the payment percentage I'm

23 going to get, and I'm either going to get the -- go for the

24 expedited value, or my lawyer will tell me you ought to go for

25 individual review.  If you go for individual review, you don't

know how much you're going to get on your claim, because that's

by hypothesis individual review, much less if you go through

and go to a jury, but you'll at least know how much the payment

percentage is.  And this is a global settlement.  This -- what

we're talking about here ultimately is money that first goes

into the trust, that's the basic deal, and then it gets divided

up pursuant to the processes set forth in the TDP.

So how many asbestos claimants projected by itself is

not a meaningful number?  What types are projected?  Again, I

mean it's another subset of the number.  How much the trust

expects to pay PI claims.  Well, I mean you multiply the type

of claim by the payment percentage.  That's already going to be

in there.  If you want to go beyond that, and I'm not sure, you

know, whether you're talking cash flow or whatever, it's a

level of detail that there's no showing that anybody is simply

thinking about voting needs to know, but which somebody who

might be planning on objecting might find helpful.

When claims will be paid?  I've already -- I'm

glossing over initial payment percentage, because I've already

said that you've got to come up with that.

Process to pay.  Well, the TDP sets forth in gory

detail, you know, how you file your claim, what you get in

payment.  You get in a processing queue.  You get in a payment

queue.  The liquidated claims get paid before the unliquidated.

I mean I -- beyond sort of referring one to the TDP, it's hard

1  to know what more would be warrant with that, but again the TDP

2  gives people and like the same TDP in eight or ten other

3  bankruptcy cases, most of which Your Honor has presided over,

4  nobody but the Libby claimants has ever announced that they

5  couldn't figure out what the process to pay was from reading

6  the TDP.

7           Which insurers are protected by the channeling

8  injunction and what consideration they are paying for the

9  injunction?  Well, that Exhibit 5 has been added, and the --

10          THE COURT:  Yes, that should take care of --

11          MR. LOCKWOOD:  -- the issue of the consideration we

12  adverted to briefly, that's probably a confirmation objection.

13  If they take the position that the insurer -- a settled insurer

14  who settled pre-petition and has an indemnity right has to pay

15  more money to now to get 524(g), that'll be a confirmation

16  objection.

17          THE COURT:  Well, and Exhibit 5 obviously might need

18  some changes to it.  It's usually a work in progress until --

19          MR. LOCKWOOD:  That's correct, and we've already

20  heard from some of the insurers that there are some mistakes,

21  and, certainly, the Libby claimants will be given updated

22  versions of that, so nobody's trying to hide any balls on that.

23  How many judgments are under -- outstanding and unpaid?  Again,

24  that's just a part of the denominator fraction.  This is the

25  liquidated judgments versus the unliquidated claims.  How many

1   settlements are outstanding unpaid?  Same comment.

2           Wrongful death claims.  I don't know whether that's

3   liquidated, unliquidated, but it's clearly an effort to try and

4   get quantification evidence for support of the confirmation

5   objection that says they're being disallowed.

6           THE COURT:  Well, let me just bypass this one.  I --

7           MR. LOCKWOOD:  Request for punitive damages.  I

8   mean --

9           THE COURT:  Let me just bypass this one.  I'm going

10  to hear from Mr. Cohn, but on this one I don't believe that

11  this level of detail that's being requested is necessary for

12  the disclosure statement.  I really don't think that most of

13  the people who would vote in this class would care about this

14  information.  What they're going to want to know, I think, is

15  the initial payment percentage and how it will apply, if at

16  all, to their claim.  They will want to know that.

17          MR. LOCKWOOD:  And we --

18          THE COURT:  And so that payment percentage --

19          MR. LOCKWOOD:  We are not disputing that that's

20  something that has to be in there.  The only reason it's not in

21  there is, as I said, we're having a little more difficulty

22  working it out than we would've normally expected to be having

23  absent this once in 80-year financial meltdown.

24          THE COURT:  Okay, but whether -- you know, the

25  feasibility issues, whether or not this trust will, in fact,

1 have the funds to be able to pay that claim, and that, of

2 course, is a confirmation issue.  But for disclosure statement

3 purposes, sufficient information for a claimant to assess

4 whether or not the funds will be available -- I'm talking

5 disclosure statement issues -- what that payment percentage

6 will be and the time frame within which it will be paid, and it

7 can be in the trust distribution procedures provided that the

8 claimants are getting those distribution procedures in a

9 fashion that they'll understand I think takes care of these

10 issues.

11          MR. LOCKWOOD:  Well, I would -- in response to Your

12 Honor's last observation, I would just note one thing.  That

13 the -- as we had in earlier discussion, one of the

14 characteristics of the TDP is that they have a provision to

15 permit their amendment.  The reason for that has to do with the

16 requirement that there be a periodic review.  This is in the

17 statute, the same subsection I read Your Honor earlier talks

18 about periodic review, and the reason for the periodic review

19 is, because the value of assets can go up.  The value of assets

20 could go down.  The number of claims and value of claims can go

21 up.  The number and value of claims can go down.

22          As we saw, for example, with non-malignancy claims

23 during Your Honor's tenure in these cases after 2003, there was

24 a dramatic reduction in them, and forecasts have had to have

25 been adjusted for that.  So on the one hand you can't say that

1 the payment percentage is going to be the same for the life of

2 the trust, although some of Mr. Cohn's objections seem to

3 suggest that he regards that it has, but that's just

4 inconsistent with the statute and not possible, then you would

5 have feasibility objections.  But the flip side of that is,

6 because the trustees do do the periodic reviews, there will

7 never be an insolvency of the trust, because if, in fact, the

8 value of the assets go down and the -- and -- or the

9 liabilities go up, they'll reduce the payment percentage, so

10 that the people at the end of the line who'd be the ones that

11 would be affected by insolvencies would be protected.  They

12 might get less.  On the other hand, they might get more.  Some

13 of the trusts have actually increased their payment

14 percentages.

15        THE COURT:  All I'm saying is for disclosure

16 statement purposes, you just need to have enough information in

17 it that the claimant voting understands the basic concept.

18 That's all.  I don't think the claimant voting is going to want

19 to -- especially to the extent that there's a master ballot

20 that's going to be submitted, the attorneys already understand

21 this process.  They've been through it probably 15, 20, if not

22 more times.  They don't need this information, and that's what

23 I'm looking at, the hypothetical person who's going to vote.

24        So this information is not necessary for the class

25 for which those entities are going to vote for which it's being

1  asked to be submitted.  I don't think it's necessary in that

2  context.  So it may be necessary for plan confirmation.  It may

3  be a discovery issue, but it's not necessary for the disclosure

4  statement, but the payment percentage clearly is.  We've

5  addressed that.  Okay.

6         MR. LOCKWOOD:  That takes us, Your Honor, to Number

7  34 on the chart, which is a two-part one, one of which it's

8  been resolved already, which is the missing Exhibit 5.

9         And then it says, "The disclosure statement fails to

10  accurately and completely describe asbestos insurance rights

11  especially those related to premises completed operations

12  coverage."  This again ties to one of the earlier objections we

13  heard from the Libby claimants.  The reason that they want some

14  valuation, if you will, of the premises coverage is, because

15  it's their position that they have a unique and special right

16  to go after it, and this is sort of discovery in aid of saying

17  that it's worth a lot of money, and, therefore, Judge, you --

18  we're being --

19         THE COURT:  Aren't the rights being transferred to

20  the trust?

21         MR. LOCKWOOD:  Yes, that's the answer.

22         THE COURT:  Well, that is the answer.

23         MR. LOCKWOOD:  And that's in the plan, and that's in

24  the disclosure statement, and --

25         THE COURT:  Well, that's the answer.

1                 MR. LOCKWOOD:  Number 35.  35 is to some extent the

2       same thing as 33 that we just talked about.  They want to know

3       more details regarding which claims are eligible for payment

4       under the PI trust while the TDP has all kinds of criteria

5       about eligibility, exposure requirements, disease requirements

6       in the medical -- in the matrix description.  It goes on for

7       pages.

8                 THE COURT:  Well, I guess the question is can the

9       matrix be put into some, you know, chart summary form that

10      could --

11                MR. LOCKWOOD:  The matrix -- there are, in fact,

12      charts and summaries in the TDP themselves.  If you look at the

13      TDP, there's a chart showing the exposure requirements by

14      disease and disease level.  There's a chart showing the values

15      -- expedited values.  There's the third chart showing the

16      expedited average and maximum values.

17                THE COURT:  Well, are the TDPs going out with the

18      disclosure --

19                MR. LOCKWOOD:  Yes, they are an exhibit to the

20      disclosure statement in the form that --

21                THE COURT:  Okay.

22                MR. LOCKWOOD:  -- it has been presented to the Court.

23                THE COURT:  Then it doesn't need -- then nothing

24      further needs to be done.

25                MR. LOCKWOOD:  The second category is the value of

1 assets that will fund the trust.  To the extent that that isn't

2 subject to a moving target problem that we've been discussing

3 earlier, the assets that are going to the trust are, in fact,

4 described in Section 1.2.8 of the disclosure statement.  What I

5 gather is being sought here is, for example, there's a

6 description of the warrants.  We're being asked to put a dollar

7 value on the description of the warrants, despite the fact that

8 that value is going up and down on a daily basis.  There's,

9 among other -- there's Sealed Air stock that's going in which

10 describe the number of shares, for example, of the Sealed Air

11 stock.  Again, that goes up and down on --

12        THE COURT:  Well, what about putting something in

13 that says that the valuation is going to be determined or is

14 going -- evidence of the valuation is going to be provided to

15 the Court at the plan confirmation that there's so much

16 volatility in the market right now that that -- that any --

17 that it's changing on a day-to-day basis?

18        MR. LOCKWOOD:  Well, we --

19        THE COURT:  I --

20        MR. LOCKWOOD:  It may well be, Your Honor -- I don't

21 want to jump the gun here, but it may well be in describing

22 what mechanism we come up with on the payment percentage that

23 we may have to make some description of that --

24        THE COURT:  That's the thing.  You do.

25        MR. LOCKWOOD:  -- because the problems we're having

**J&J COURT TRANSCRIBERS, INC.**

1  with them -- I mean these values -- again, this is the

2  numerator going back to the payment percentage, and that's the

3  only relevance of it to the -- Mr. Cohn's constituency.  It was

4  an asbestos claimant.  So we'll have to say something about

5  totality of the value of the numerator which includes these

6  fluctuating components and beyond that, getting into each piece

7  of it -- I mean, among other things, there's, for example, the

8  insurance that is uncollected and contested by -- potentially

9  by insurers.  We've never tried to put a value on how much --

10  predict how much of it we're going to collect, because that

11  depends on the uncertainties associated with the hypothetical

12  efforts by the trustees that Mr. Freedman was talking about

13  earlier, how successful they're going to be.

14          And indeed one of the risk factors is going to be if

15  the insurers are right about the transfer and the -- their

16  coverage defenses and how the trust is going to buy -- the

17  answer would be zero, but that wouldn't be because the

18  insurance rights themselves were worth zero.  It would be that

19  the defenses to the insurance rights transfer were good enough

20  that you couldn't collect on it.  So there's --

21          THE COURT:  But you can put in minimums and maximums.

22  You can say that if the insurance companies are right, nothing

23  is collected, zero, but the face value of the policies is

24  worth, you know, whatever --

25          MR. LOCKWOOD:  Well --

1            THE COURT:  -- $50 million.

2            MR. LOCKWOOD:  Well again I come back to the notion

3   let us work on that in terms of how we describe the payment

4   percentage resolution, and maybe we can come up with something

5   that would -- Your Honor would --

6            THE COURT:  Yes, some value has to be put in.  I mean

7   if it can't --

8            MR. LOCKWOOD:  Well, clearly, the numerator has to be

9   valued --

10           THE COURT:  Exactly.

11           MR. LOCKWOOD:  -- in some way or another.  The

12  question is whether we do it by a formula rather than by a

13  number.  That's one of the issues that we're trying to wrestle

14  with.

15           THE COURT:  Okay.  Well, some number has to go in,

16  and at the confirmation hearing I'm going to want some evidence

17  of what that value is.  So, you know, if you want to put a

18  number in for disclosure statement purposes and say that some

19  evidence of value is going to be given at confirmation, that's

20  fine, but some evidence has to be -- or something's got to be

21  put in.

22           MR. LOCKWOOD:  Well, I'm -- we're really reluctant to

23  put in a number if we think that the fluctuations in that

24  number on a short-term basis are potentially large in

25  magnitude, because we don't want to have people voting saying,

1  well, we're going to get a 30 percent payment, and by the time

2  the effective date comes around we can only afford a 20 percent

3  payment --

4            THE COURT:  I understand.

5            MR. LOCKWOOD:  -- or something like that.  I mean it

6  -- that's why the current situation is so unusual in that

7  regard.

8            THE COURT:  Well, that's what I'm saying.  If you

9  don't want to put in a number now and say that because of the,

10 you know, unusual market conditions that the evidence is going

11 to be presented at confirmation, but based on what you know

12 now, you expect the additional payment percentage to be X.  I

13 think under these very unusual times that we're living in, that

14 would be sufficient, but at the confirmation hearing I want

15 some evidence, so --

16           MR. LOCKWOOD:  Well, as I said, we'll -- we will

17 satisfy Your Honor one way or another on this point.

18           THE COURT:  Okay, but for disclosure statement you've

19 got to have something in there.  I mean there has to be

20 something.

21           MR. LOCKWOOD:  We will have -- whatever we come up

22 with, and it'll be back here on November the 14th --

23           THE COURT:  Right.

24           MR. LOCKWOOD:  -- it's clearly not something that

25 we're going to get resolved today.

1          THE COURT:  Okay.

2          MR. LOCKWOOD:  The next one is the liquidated amount

3  of each claim to be paid.  I mean, you know -- and we were

4  going to process 100,000 claims.  How could you possibly know

5  what the liquidated amount of each claim with individual review

6  and -- I mean --

7          THE COURT:  Well, I don't even know how at this point

8  you -- well, you may know each claim if the proof of claim bar

9  date will hold, but they haven't all been liquidated, so --

10          MR. LOCKWOOD:  And most of -- the vast majority of

11  these claims have not been liquidated.  The future claims

12  haven't been liquidated.  I mean just --

13          THE COURT:  So that's an impossibility.  I don't see

14  how the debtor could provide that information.

15          MR. LOCKWOOD:  Romanette four is payment percentage.

16  We've discussed that.

17          Five, protected -- projected sources and uses of

18  trust assets.  That sounds like they want a cash flow

19  projection for some indefinite future period.  I mean again

20  what -- people want to know what the payment percentage is

21  trying to get us --

22          THE COURT:  I'm sorry.  I've lost you.  Which one are

23  you up to?

24          MR. LOCKWOOD:  This is thirty -- I'm still on 35,

25  Your Honor.  This is Romanette five.

1          THE COURT:  Oh, I'm sorry.  Okay.

2          MR. LOCKWOOD:  It says projected sources and uses of

3 trust assets.  That's a cash flow statement in accounting

4 parlance, and the trusts cash flow I mean the payment

5 percentage people care about.  If you're trying to figure out

6 how you're going to implement the payment percentage through a

7 sources and uses analysis, essentially, again you're trying to

8 get discovery that would enable you to say, well, if you

9 compare the sources and uses, it doesn't jive with the payment

10 percentage --

11          THE COURT:  Well --

12          MR. LOCKWOOD:  -- or something.

13          THE COURT:  Is the trust going to be filing annual

14 reports?

15          MR. LOCKWOOD:  Yes, with this court.

16          THE COURT:  Then it seems to me that the thing to say

17 is that with respect to sources and uses, the trust will be

18 filing annual reports.  I mean --

19          MR. LOCKWOOD:  I believe --

20          THE COURT:  -- right now you don't even have assets

21 sources and uses.

22          MR. LOCKWOOD:  If the disclosure statement doesn't

23 say that the trust will file, we can probably put in a sentence

24 to that effect, Your Honor.

25          Risk of trust insolvency I believe I addressed

1  earlier about -- in the discussion about adjusting the payment

2  percentage.  There won't be any risk of trust insolvency.  What

3  there will be is a risk of a reduction in the payment

4  percentage which is (indiscernible) that there may be a chance

5  of an increase in the payment percentage.

6        THE COURT:  Well, what happens if it gets to the

7  point where the trust can't make any additional payments?  I

8  mean is then it just --

9        MR. LOCKWOOD:  It shouldn't ever get to that point --

10        THE COURT:  I know.

11        MR. LOCKWOOD:  -- because the trustees are required

12  annually, semi -- and that's -- if there's one responsibility

13  that is preeminent from the particulars in the prospective of

14  the Futures Representative, who is going to be monitoring the

15  trustees in this regard --

16        THE COURT:  I know, but then you also do have

17  instances where trustees breach fiduciary duties, and I

18  understand that that is not the common thing, but it has been

19  known --

20        MR. LOCKWOOD:  So I'm supposed to put in --

21        THE COURT:  -- to happen.

22        MR. LOCKWOOD:  -- something disclosing that the risk

23  of the trustee -- what is the risk of the trustee's breaching

24  their fiduciary?  I don't know how I could quantify that, Your

25  Honor.  I would suggest to the Court it's quite low, since

1  they'll be being supervised by the Court.

2          THE COURT:  I think it's -- even when trustees are

3  supervised by the Court, they've been known to do things which

4  breach --

5          MR. LOCKWOOD:  If you'll tell me how I should

6  describe it and quantify that risk, Your Honor, I'll endeavor

7  to try and do it, but I really suggest that this is -- this is

8  to some extent a debater's point by Mr. Cohn.  I really --

9          THE COURT:  Well, I think that the issue with respect

10  to the risk of the trust insolvency is as you stated it, that

11  the trust has an obligation -- a statutory obligation to review

12  its own payment percentages, its assets and its uses of those

13  assets, that it will file an annual report, and it will do its

14  very best not ever to be insolvent, since it has fiduciary

15  obligations and a responsibility to insure that it continues to

16  be funded for the length of the time that it's going to be in

17  existence, and so it's a very low risk.

18          MR. BERNICK:  And, Your Honor, I think it's actually

19  inherent to 524(g) that there's uncertainty.  One is that this

20  -- the way that this plan is being set up tries to constrain

21  that uncertainty but is not unique.  There's no exogenous --

22  there's no endogenous risk factor with respect to this plan

23  that's different from others.

24          THE COURT:  No, there isn't.  It -- Mr. Bernick, I

25  think it's really just an effort to put something in that

1    resolves an objection.  I don't think it's something that's

2    going to affect anything much more one way or the other

3    frankly.  But to the extent that somebody thinks there is some

4    risk -- you know, if it were not for breaches of fiduciary duty

5    recently, I wouldn't even give it another thought.  But they're

6    there, so I think, you know, a sentence that indicates that

7    there is very little risk of trust insolvency because of the

8    overarching responsibilities of the trustees, the trust

9    advisors, the filing of the annual reports, the supervision of

10   the Court, and so forth, then I think you just put a sentence

11   in.  You have to add a sentence anyway.

12            MR. LOCKWOOD:  Yes, I'm turning toward the debtor,

13   because they control the pen, Your Honor.

14            THE COURT:  All right.  A couple of sentences.  All

15   right.  Next.

16            MR. LOCKWOOD:  The final one I believe, Your Honor,

17   is Number 36, which says that, "The disclosure statement

18   provides no explanation for how the asbestos PI trust claims

19   will be liquidated by the asbestos PI trust."  All I could tell

20   you is that Exhibit 4 to the plan -- to the disclosure

21   statement is the trust distribution procedures, and there's

22   some -- I count them -- 57 pages about how the trust is going

23   to liquidate asbestos PI claims.  And if people want to know,

24   and as you pointed out earlier, most of these are plaintiffs'

25   lawyers, and they've seen this before, and they can read it

1  again, and I really can't imagine what more we need on that

2  subject.

3        THE COURT:  All right.  I don't know whether this is

4  just a technical issue that they're not, in fact, being

5  liquidated.  They're simply being I'll use the word resolved.

6        MR. LOCKWOOD:  Resolved.  Well, that's the word we

7  usually use, Your Honor.  I mean technically I suppose you

8  could say they're being liquidated, because that's not a

9  bankruptcy term.  What they're not being done is allowed.

10        THE COURT:  That's fine.

11        MR. LOCKWOOD:  But --

12        THE COURT:  Whatever they are, they're being --

13        MR. LOCKWOOD:  But they're being --

14        THE COURT:  -- resolved.

15        MR. LOCKWOOD:  They're being resolved by the trust,

16  and how they're being resolved is set out in the TDP.

17        THE COURT:  Yes, and I don't know what more you can

18  do.  That's the whole purpose of 524.

19        MR. LOCKWOOD:  And that's the whole purpose for

20  sending the exhibit along to allow people to figure out for

21  themselves if they want to go into that level of detail to know

22  exactly how the trust is going to go about liquidating or

23  resolving their claims.  And it describes the matrix and the

24  individual review and the arbitration and the mediation and the

25  exit to the tort system, if you want, and the caps that Mr.

1 | Cohn was complaining -- it's all in there.

2 |      THE COURT:  Okay.

3 |      MR. LOCKWOOD:  Thank you, Your Honor.

4 |      THE COURT:  Mr. Cohn, I think there was one back here

5 | that I --

6 |            (Pause)

7 |      THE COURT:  I think I made -- tried to make rulings,

8 | Mr. Cohn.  I did take a look at all of the papers.  I want to

9 | -- I want you to understand as I was going through these I

10 | really think this disclosure statement has information in it

11 | that satisfies these things to the extent that most of the

12 | information is incorporated in the TDP that will be attached.

13 | I know I have overruled some things.  I've asked for some

14 | things to go in, so let me hear what else you have to say based

15 | on what I've done already.

16 |      MR. COHN:  Well, yes, Your Honor, since you ruled on

17 | all the objections, I think what I'll do is I'll confine myself

18 | observations rather than -- you know, rather than argument.

19 | Obviously, our papers say it as articulately as we could why it

20 | is we felt the additional information was necessary.  So let me

21 | just make two observations.

22 |      One is that first point about extraordinary claims.

23 | Mr. Lockwood went to great length to explain why it is that one

24 | couldn't, shouldn't, needn't, et cetera, say anything about

25 | extraordinary claims.  One of the key points of discussion in

1  these extensive discussions you've heard so much about between

2  the Libby claimants and the Asbestos PI Committee -- one of the

3  key points was extraordinary claims, because the Libby

4  claimants are people who are exposed to, you know, 95 percent

5  or more of Grace's asbestos.  I mean if you're going to design

6  an extraordinary claims provision, you certainly ought to

7  design it with Libby claimants in mind.

8          And I just think it is telling that presented with an

9  opportunity to stand here at this podium and say, Your Honor,

10 the Libby claims are extraordinary claims, we think that

11 they're going to be -- this is how they're going to be handled,

12 they're going to be allowed on that basis, or excuse me,

13 liquidated or resolved on that basis, to have them say on the

14 record that which he asked us to rely upon in the context of

15 these negotiations would've been comforting, and it's very

16 telling that that was not a statement that he chose to make.

17         The second observation, Your Honor, I'd like to make

18 is that we've been criticized in the context of these

19 disclosure requests for seeking discovery.  We're well aware

20 that there's going to be the need for discovery on these issues

21 and on many more in conjunction with the confirmation hearing,

22 and we will, of course, proceed on that basis.  We do

23 understand the distinction.  We do feel that people -- that it

24 would've been helpful to have on the record -- helpful for all

25 purposes, not just for the Libby claimants but for others as

1  well, to have had more information, but, you know, you've made

2  the rulings that you've made, and we will obtain the

3  information anyway for our own, you know, purpose of contesting

4  confirmation.  So that's really all I have to say, Your Honor.

5           THE COURT:  Okay.  Mr. Cohn, just on this

6  extraordinary claims issue, I think just because the Libby

7  claims may be in the 95 percent exposure category does not

8  necessarily mean that they're all going to want to go into the

9  extraordinary claims review, and I think that's the problem

10  that the plan proponents have, plus they may not be the only

11  entities that will be in the 95 percent exposure category.  The

12  debtor really doesn't know or the trust doesn't really know

13  who's going to fall in or make that claim, whether legitimate

14  or not legitimate.  That's the difficulty that they face at

15  this stage of the proceeding.

16           MR. COHN:  Well, they have -- obviously, the members

17  of the -- the Committee majority, Your Honor, controls a very

18  high percentage of the claims in this case.  They certainly

19  know, based on their own claims, whether they have claims that

20  would qualify.  They also have vast experience in the other

21  cases in which the same group of lawyers has basically

22  developed the same way of dealing with the claims.  And so we

23  think there's more information that could be developed on this

24  that would be genuinely useful for everyone but will develop in

25  the context of discovery, Your Honor.

1            THE COURT:  All right.

2            MR. LOCKWOOD:  Your Honor, taking Mr. Cohn at face

3  value, (a) I thought I had said that the Libby claims would

4  most likely be the ones that would qualify for extraordinary

5  treatment as we understand them from Mr. Cohn and the Committee

6  member he represents.  But Mr. Cohn and his Committee member

7  know vastly more about the Libby claims and whether they had

8  other exposures that would take them out of the 95 percent

9  category or the 75 percent category than we do, so how can they

10 possibly be asking somebody that knows less about those claims

11 to tell them what they know more about than we do?

12           I mean if it needs to be said, the reason -- the

13 reason we have an eight times category and a 95 percent

14 requirement is, because that's something that's unique to the

15 Libby claims.  All the other extraordinary claims procedure,

16 which he dismissively talks about the members of the Committee

17 and controlling all the other cases are the five times level

18 with 75 percent, and they relate to situations which we've

19 never been confronted with anybody who had a lot of

20 occupational and non-occupational claims from a single

21 defendant before.  So for him to say that we're just blowing

22 off in effect the Libby claims here is inaccurate and unfair.

23           THE COURT:  Okay.

24           MR. BERNICK:  I'm hearing this discussion evolve a

25 little bit, and I know from having conferred with the ACC and

1  the FCR for the personal injury claims that an awful work -- a

2  lot of work has been done by them, and that they're going to be

3  -- they assure me, and I'm thus far convinced, very able to

4  respond to all the matters that are implicated by the

5  confirmation hearing.

6          But the more that I hear, I just hear the list of all

7  the different requests that are being made.  It seems as if in

8  some fashion the Libby claimants anticipate that there's going

9  to be the necessity of having almost a full-blown estimation

10 proceeding in connection with the Libby claims.  You hear the

11 questions.  It sounds like, well, tell us how many there are

12 going to be and what the cash flow requirements, et cetera, et

13 cetera, are going to be.

14         I certainly never thought that in connection with the

15 issue of a TDP we're going to get into the need for that level

16 of granularity, and I certainly don't know where it's required

17 as a matter of law.  But one thing is for very definitely sure,

18 which is the -- if the Libby people really intend to place

19 these matters at issue, and with that degree of granularity,

20 they're saying they know that now, the discovery is going to be

21 principally from them.  And in light of that, we ought to be

22 seeing the beginning of the information that they have.

23         It's been extraordinarily difficult to get

24 information about the Libby claimants for a whole variety of

25 reasons, and they're now here.  They're now before the Court.

1   I think that really in a sense it's incumbent upon Mr. Cohn's

2   clients to answer the very same questions that were propounded

3   to the ACC and the FCR, and it shouldn't hold up the

4   confirmation process in this case.  We shouldn't have to go

5   extensively litigate that.  They should let us know what's

6   already there.  It's already in there files.  So -- I know

7   that's probably for another day, but I think it's going to come

8   up fairly shortly, because it's something that bears upon the

9   schedule for confirmation.

10          THE COURT:  Well, if you want to get a discovery

11  order together, so that we get started on it, you know, let's

12  do a discovery order.  But let's finish today's agenda first.

13                      (Laughter)

14          MR. FREEDMAN:  Your Honor, I started out --

15          MR. BERNICK:  We'll wait til tomorrow.

16          MR. FREEDMAN:  I'm about to get yelled at another

17  time.  I started out today saying it was a happy day, and it's

18  now 3:35, and I think we're down to probably just one issue

19  that would have any substance of discussion in connection with

20  the solicitation procedures.

21                      (Pause)

22          MR. FREEDMAN:  We have now gone through the

23  disclosure statement objections, and in one fashion or another

24  addressed all of them, I believe.  And we have our

25  instructions, and we've indicated to the Court what we're going

1   to do next.  So it seems to us that we should turn to the

2   objections to the solicitation procedures motion.  There are

3   only five of them which have not been completely addressed, and

4   most of these, as you'll see, have actually been talked about

5   at some length during the hearing, and only one of them might

6   require some discussion in my estimation.

7          The first one which was raised by the Creditors'

8   Committee at 115 in <u>Longacre</u> at 118 has to do with a

9   solicitation of Class 9, and as the Court now understands,

10  we've agreed to a provisional solicitation for that.  So we

11  will provide for those procedures, and the Court will see what

12  we've done on the 14th.

13         The second one, the U.S. Trustee in Section 116 has

14  said that the debtors ought to provide for procedures in the

15  solicitation context for creditors to come forward and get

16  provisional allowance of their claims under Rule 3018.  We will

17  so provide and work with the U.S. Trustee in terms of the

18  language.  But we'll provide for that kind of a procedure, so

19  that creditors know what they have to do in order to be

20  temporarily allowed for voting purposes.

21         The Court has already instructed us with respect to

22  the U.S. Trustee's objection Number 117 relating to the opt-in

23  provision, and that we understand will be deferred until the

24  14th, and we understand the Court's comments so far with

25  respect to that.

1       The next one was raised both by the Crown, which has

2  now withdrawn its objections, and by the State of Montana, and

3  that has to do with the provision in the solicitation

4  procedures that indirect claims which are not liquidated should

5  be valued at one dollar.  That is a common practice in these

6  cases.  We're talking about contingent claims that actually

7  under the Bankruptcy Code at this stage would be disallowed

8  pursuant to Section 502(e) I believe.

9       In any event, we're providing for them to have the

10 right to vote.  I don't believe that when they think about it,

11 they will actually want to put a liquidated amount on to the

12 amount of their contingent future liability, so it seemed to us

13 that the one dollar procedure was more than appropriate.  And,

14 as I said, that seems to be the practice in all of the cases

15 that we've canvassed when we were constructing these

16 procedures.

17      So we'd urge the Court to approve that particular

18 provision and overrule the objections filed with respect to

19 that.  And maybe I could stop here and let Mr. Monaco, if he's

20 still in the courtroom, speak to that issue if he wants to.

21          THE COURT:  Mr. Monaco.

22          MR. MONACO:  For the record, Frank Monaco for the

23 State of Montana.  Your Honor, our point was more of a

24 disclosure statement objection as opposed to the solicitation.

25 I think our point is that explanation should be put in the

1 disclosure statement.  The debtor has a statement at Pages 24

2 and 25 of its omnibus response.  I think if they will put --

3 agree to put that explanation in an appropriate place in the

4 disclosure statement, we're done.  We're not the only ones with

5 a CI claim that's been valued at one dollar, and so there's

6 probably other parties in interest who would be interested in

7 how they arrived at that.

8         THE COURT:  Oh, okay.

9         MR. FREEDMAN:  Your Honor, that's fine.  We will put

10 appropriate disclosure of that kind into the disclosure

11 statement.  And then, lastly, we have the now withdrawn issues

12 with -- that the Crown raised about having the Canadian

13 representative vote their claim.  That's 119.  That's no longer

14 on the table.  So, Your Honor, I believe, unless one of my

15 colleagues tells me that I've missed something, that we have

16 completely covered all of the objections that were filed to the

17 disclosure statement and the solicitation motion and got the

18 Court's thoughts and rulings and everything that we needed.

19         THE COURT:  Okay, so the solicitation package you

20 still can't get done though until the 14th because of this

21 issue with the U.S. Trustee that's deferred until then?

22         MR. FREEDMAN:  Your Honor, that's correct.

23         THE COURT:  Correct.  Okay.

24         MR. FREEDMAN:  Plus we have to construct the

25 provisional vote --

1              THE COURT:  Yes, for the Class 9.

2              MR. FREEDMAN:  -- for Class 9, and we're also going

3    to want to perhaps put in a disclosure that may even go into

4    the solicitation on the USG procedures.  It's not clear how

5    that's going to fit in.

6              THE COURT:  Okay.  Mr. Pasquale.

7              MR. PASQUALE:  Thank you, Your Honor.  Just a point

8    of process.  I mean we understand -- at least my understanding

9    is we're going to see at some point between now and the 14th an

10   amended disclosure statement.  There are -- I mean none of our

11   issues are resolved, as I stand here today, although I'm very

12   happy with the progress we've been making.  I'm not sure what

13   happens next.  Does the Court expect a supplemental objection

14   to the extent language is not agreeable?  We're going to have

15   to have a process to address any remaining issues.  I hope

16   there are none.

17             THE COURT:  I think I do need just -- I don't think a

18   supplemental.  I actually think I need a new round of

19   objections, if there are any, to the new disclosure statement,

20   because I think the ones that have been addressed today are

21   basically hopefully going to be moot, and we should just scrap

22   what's here and start over with a new document, I think.

23             MR. PASQUALE:  So we'll just need to talk about the

24   schedule for that, Your Honor.

25             THE COURT:  I think.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes, Judge, and I -- I'm not the master

2    of this by any stretch of the imagination, but I think that the

3    key thing we're down to a series of provisions, and I think

4    that what we need to do is to think through a process that

5    maximizes the amount of time that we have among the various

6    constituencies to get closure on those provisions as opposed to

7    there being a deadline for the overall draft that is in a sense

8    too early.  That is to say I would suspect that by the time

9    that Your Honor gets at the most useful, you will want to have

10   a complete document, but the thing that you're actually going

11   to look at is the side-by-side --

12          THE COURT:  Yes.

13          MR. BERNICK:  -- of competing provisions.  And so in

14   a sense probably our work product ought to be geared towards

15   creating those side-by-sides, so that they then get submitted

16   to the Court in a timely fashion.  The full document then will

17   be something that they'll want to have done by the 14th, but

18   I'd rather have us have more time to get the side-by-sides done

19   as opposed to turning around a whole document, and then people

20   having --

21          THE COURT:  Well, what about the debtor submitting

22   its next draft?  Well, I suppose what's going to happen is,

23   frankly, you're going to negotiate piecemeal with the various

24   constituents --

25          MR. BERNICK:  Yes.


                    **J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  -- and get the -- get this thing together

2 in sections.

3           MR. BERNICK:  That's right.

4           THE COURT:  Then at a certain point you're going to

5 have to submit a draft to everyone, so that you can then get

6 comments, objections, whatever you want to call them, back, and

7 then hopefully do a real draft that you will then file with the

8 Court.

9           MR. BERNICK:  Well, what I'm thinking -- and again

10 Mr. Freedman would -- will be the person who decides this for

11 our team.  But that actually what might make sense is to in a

12 sense get the side-by-side competing language done.  As soon as

13 it's done or we reached impasse, that's really what gets

14 circulated to whoever's on the circulation list, so that

15 they're not waiting to get the final redraft before they see

16 all the issues on a rolling basis --

17           THE COURT:  Okay.

18           MR. BERNICK:  -- and that way the final draft doesn't

19 really need to be -- everyone's going to want to review it, but

20 there should be no new news.  That the issues, to the extent

21 that they're issues, what we might be able to do is to in a

22 sense work with that spreadsheet that we have, the chart that

23 you have is essentially a spreadsheet, to let people know on an

24 ongoing basis what's happening with respect to the dialogue

25 that's taking place.  So that at any given point in time, if

1  people want to know what's happening with respect to other

2  objections or language changes, that to the extent, you know,

3  feasible day by day we can get different -- new versions of the

4  spreadsheet out, and everyone can take a look at them and see

5  where the dialogue stands, and that way we don't -- it just

6  makes much -- what I'm looking to do is to eliminate a lot of

7  the time that just takes place in communication, so that people

8  are in the loop as the dialogue unfolds between, of course, the

9  principal interlocutories, which are Mr. Lockwood and Mr. Cohn,

10  as an example, people know where that goes on an ongoing basis

11  as opposed to the end of the day.

12         THE COURT:  Okay.  I think that's -- I think that's

13  okay.  What I'm a little worried about is that -- let's say

14  that any particular provision goes through four or five drafts,

15  I'm not sure how you're going to actually get -- let me start

16  this again.  That wasn't very articulate.

17         I was hoping to be able to get a black-lined version

18  of what's currently here with a new -- with a final version.

19  I'm not sure if the process that you're envisioning let's you

20  do that, because you may go through 15 different changes for

21  one provision, and what started off as the beginning and what

22  ends up may not give you a black-lined version.

23         MR. BERNICK:  Well, in terms of what gets submitted

24  to the Court, obviously, you have -- we'll have what we have

25  today.  We'll have the final version, and we'll have the side-

1  by-sides.  What I am suggesting though is that rather than have

2  to build in a lot of time on the back end --

3            THE COURT:  Yes.

4            MR. BERNICK:  -- so that people -- not Your Honor but

5  people within this room have the opportunity to see things for

6  the first time --

7            THE COURT:  Right.  I agree.

8            MR. BERNICK:  -- that to the extent possible we'll

9  try to give, you know, snapshots, you know, maybe at some

10 interval using the spreadsheet just to show what's already been

11 agreed --

12           THE COURT:  Sure it makes sense.

13           MR. BERNICK:  -- or what's not been agreed.

14           THE COURT:  Right.

15           MR. BERNICK:  You know, that's the best that I could

16 think of.

17           THE COURT:  Mr. Pasquale.

18           MR. PASQUALE:  Thank you, Your Honor.  I just have

19 just the one caveat.  The chart was an excellent attempt to get

20 everything together.  It's not 100 percent complete.  I know as

21 to our points, I don't know about others in the room, it was --

22 I don't mean to be critical of it, but to use that as the basis

23 is fine, but we need to recognize there are -- there are going

24 to be some pieces not now in there.

25           THE COURT:  Well, that --

1          MR. BERNICK:  We will endeavor to upgrade to meet the

2     necessary standards, and I mean that.  That's not being

3     critical.  It was done at -- on an ongoing basis, but using

4     that organization, I think that we now got the organization

5     largely in place.  It'll be better.

6          THE COURT:  Well, if you think something's missing,

7     you could send an email to the debtor and say --

8          MR. PASQUALE:  Already have, Your Honor.

9          THE COURT:  Okay.  You know, so the thing can be

10    updated, too.

11         MR. J. COHN:  I want to speak very briefly.  You've

12    heard nothing from me today, and I want to make it as likely as

13    possible that this will be the standard here.  But my client at

14    least is committed to as much as possible getting out of

15    peoples' way, and we have a pretty good dynamic, at least with

16    other debtors, with the ACCs, and the FCRs.  You saw very

17    useful stipulations in <u>Kaiser</u> and in <u>Federal Mogul</u>, and we'd

18    like to eliminate and, you know -- and push off to coverage

19    litigation as many issues as we can and recognize the ones we

20    can't and maybe have some fights over the ones we can't.

21         But I just want to emphasize that we have been

22    getting information very slowly and very late in this process,

23    and it makes it more difficult for me to sit down and say

24    nothing if we're at the end of the line.  And I just want to

25    encourage everybody please get us the information we need

1  quickly, so that we can have these discussions and arrive

2  hopefully at a consensual stipulation as to as many things as

3  we can.

4          THE COURT:  Well, I think everybody needs it pretty

5  promptly since you only have two weeks.

6          MR. J. COHN:  Right.

7          THE COURT:  So maybe everything needs to be

8  circulated to everybody at this point.  I don't know.

9          MR. BERNICK:  That's what we're -- that's what the --

10 my idea with the spreadsheet was designed to try to accomplish.

11         THE COURT:  Okay.  Well, let me work backwards from

12 dates.

13                         (Pause)

14         MR. FREEDMAN:  Your Honor, just to make a factual

15 observation, we have only three hours on the 14th.  We want to

16 proceed on that date, obviously.  We also have the 25th open.

17         THE COURT:  No, actually, you don't.  My staff

18 thought you did, but you don't --

19         MR. FREEDMAN:  Oh.

20         THE COURT:  -- have that day.  That's what I was just

21 looking to see if there was something else, but let me work

22 from the 25th for a moment.  I'm sorry, from the 14th for a

23 moment.  I don't know why it's listed as only three hours on

24 the 14th.  I'm trying to double check this.  I'm not seeing any

25 reason why it's only listed as three hours.

1              MS. BAER:  Your Honor, when I originally received the

2      date, there was something on your afternoon calendar.  Now that

3      could have changed, because I was given 9 to noon with the

4      thought that there was something else in the afternoon.

5              THE COURT:  Okay.  Let me just double check.  I'm not

6      seeing anything.  I think the whole 14th is open.  Does that

7      solve the problem if the whole day is open on the 14th?

8              MR. BERNICK:  I think it -- I really think that it

9      should.  I think that most of the things we're talking about

10     now, we have a substantive matter that involves the third party

11     release.  Maybe that can be resolved with language, but that

12     may be a substantive matter.  But then I think most of the rest

13     of the things really are language issues.  I should hope we can

14     finish them today.

15             THE COURT:  Well, the other thing is I think I

16     have --

17             MR. BERNICK:  The omnibus day.  Is there any time on

18     the omnibus day?

19             THE COURT:  Well, I think I have part of the day

20     before.  I have something -- some little Chapter 13, it looks

21     like, in the afternoon, but, frankly, I don't even know what

22     this is, so I'm not sure if it's an accident that it's on my

23     calendar or something that got specially set that I just don't

24     know about.

25             (The Court speaks with the Clerk at this time.)

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right, so I may have about three

2    hours, but I do have a conference call that I have to be

3    involved in at 5:00 that day.  So I'd have three hours --

4          MR. BERNICK:  Okay.

5          THE COURT:  -- in the afternoon that day and the

6    whole next day, if that would help.

7          MR. BERNICK:  I think that that ought to -- that

8    definitely should be able to do it in part, because if we start

9    then, we can -- at least the lawyers can have the time in the

10   evening while they're sipping their martinis to resolve further

11   language problems.

12         THE COURT:  That's the trouble with being a judge and

13   not being a lawyer anymore.

14         MR. BERNICK:  Mr. Cohn likes martinis.  Doesn't he?

15   We already know Mr. Speights does.

16         THE COURT:  All right, so do you want to do that --

17         MR. BERNICK:  Yes, I think that that's --

18         THE COURT:  -- November 13th?

19         MR. BERNICK:  Yes.

20         THE COURT:  We can start on the 13th?

21         MR. BERNICK:  Yes.

22         THE COURT:  Okay.  That's going to shorten the time a

23   little bit though.

24         MR. BERNICK:  Right, so --

25         THE COURT:  All right.

1          MR. BERNICK:  -- working back from that --

2          THE COURT:  Okay.  Working back from that, I need the

3  documents by Monday the 10th, because I'm not going to have

4  access to the computer on the 11th.  I have a Chapter 13 day on

5  the 12th, which means I'll have absolutely no time to read

6  anything on the 12th.  So I need anything you're going to

7  submit at the latest by the 10th.  I'd prefer them the Friday

8  before, but I know that's pretty much impossible.  So if you

9  can get them to me Monday the 10th.

10          MR. PASQUALE:  Objections, Your Honor, is that what

11  we're discussing?

12          THE COURT:  Everything.

13          MR. PASQUALE:  Everything.

14          THE COURT:  I need the --

15          MR. PASQUALE:  Okay.

16          THE COURT:  -- the chart.  I need Mr. Bernick's

17  office to file the side-by-side chart, the completed disclosure

18  statement, the objections, everything filed with me by the

19  10th.  So that means whatever you're circulating among

20  yourselves, so that I can get a complete package filed by the

21  10th, has to be finished in time for him to do it.

22          MR. BERNICK:  Well, the -- in order to alleviate the

23  -- what I suppose would be the consequent burden on everybody,

24  if we're working with competing language, Your Honor already

25  has got the objections that have been lodged.  Maybe there are

1 new objections that will be lodged, but I think that -- and I

2 guess this is an open question both to the Court and to the

3 parties about really what makes sense in the way of work

4 product be delivered to the Court is, in fact, to have, you

5 know, this little spreadsheet where you have the number, you

6 have the party that's objecting.  We already have what the

7 objections are.  They can be corrected if people want to send

8 in corrections or whatever.  You then have the competing

9 language, and that way you don't have to wrestle with the whole

10 new round of briefs on the subject.  I think we --

11          THE COURT:  I don't need -- I don't -- I really don't

12 need new briefs.  I really at this point in time need --

13          MR. BERNICK:  Language.

14          THE COURT:  -- language.

15          MR. BERNICK:  Okay.

16          THE COURT:  In fact, I don't even really want more

17 briefs, but I would like new language.

18          MR. BERNICK:  Now, of course, with respect to

19 property damage, because the personal injury FCR has now been

20 appointed, we, in fact, have -- I know that the property damage

21 FCR has just been appointed.  We, in fact, know that Judge

22 Sanders is already at work coming up to speed and having

23 meetings, but our hope and expectation is to be able to play

24 the property damage side of the equation in at the same time.

25 That's probably more than any other single item what will be up

1  for discussion at least on the 14th, because that will be the

2  first opportunity that the property damage people will have had

3  to stand up and talk about their objections.

4          Now, without getting into a lot of the detail on

5  that, there are additional documents that are still being done

6  for property damage, because we now have a new Futures

7  Representative for PD, and so that is a more substantive area

8  of continuing work because of that new development.  But our

9  goal -- and I know that Judge Sanders is trying to meet the

10  needs of a very accelerated process and still do his job.

11  Judge Sanders knows that there's a need to proceed promptly and

12  is working along to accomplish it.  But I think in fairness to

13  the Court and all the other parties, that will be a significant

14  piece of our time on the 13th and 14th.

15          MR. PASQUALE:  Just asking, Your Honor, the 13th and

16  14th is here in Pittsburgh?

17          THE COURT:  Yes, I'm here.

18          MR. PASQUALE:  Thank you.

19          THE COURT:  All right.  Anybody not able to make it

20  on the 13th and 14th, since this change in schedule?  Is this

21  all right with everyone?

22                  (No verbal response)

23          THE COURT:  Okay, 13th from 2 to 5 --

24          MR. COHN:  The 13th I have another disclosure

25  statement hearing.  I'm going to try to move it, so that's why

1  you haven't heard from me today, but I guess there's a small

2  chance that the Judge might get mad and tell me no, but I will

3  definitely be here on the 14th no matter what.

4           THE COURT:  Who's the other judge?

5           MR. COHN:  Judge Rosenthal.

6           THE COURT:  Oh, I'll just call him.  I'll beg and

7  plead.

8           MR. COHN:  If you would, that might help.

9           THE COURT:  What's the case?  Is it a big case?

10          MR. COHN:  No.  No.  No, not so much, and I don't

11 think it'll be a problem, but I'll let your chambers know if it

12 is.

13          THE COURT:  All right.

14          MR. LOCKWOOD:  Your Honor, I have a problem, too, on

15 the 13th.  I didn't have my Trio on, so I couldn't tell, but

16 fortunately, one of my colleagues -- I have a hearing in Newark

17 the morning of the 13th.  If they could do the PD stuff the

18 afternoon of the 13th and then maybe we could do the rest on

19 the 14th?

20          THE COURT:  Oh, sure, would that work for you, too,

21 Mr. Cohn?

22          MR. COHN:  That would be terrific.

23          THE COURT:  Okay.  Well, that's fine with me.  Does

24 that work for everyone else?  And then, Mr. Cohn, that's all

25 right with you, too?

1          MR. COHN:  Yes.  Yes, that would be great.  Thank

2 you, Your Honor.

3          THE COURT:  All right, so we'll do the property

4 damage on the 13th, and then start and continue with the

5 disclosure statement on the 14th.  Mr. Speights, do you have a

6 problem on the 14th?

7          MR. SPEIGHTS:  I have no problem on the 13th or on

8 the 14th, Your Honor.

9          THE COURT:  Okay.

10          MR. SPEIGHTS:  Although I don't know that I need to

11 be there.  I did have a matter if you're finished with the

12 scheduling issues.

13          THE COURT:  Let me make --

14          MR. SPEIGHTS:  Day of travel --

15          THE COURT:  Let me make sure I am.  Am I finished

16 with the scheduling issues?

17          MR. FREEDMAN:  Yes, Your Honor.

18          THE COURT:  Mr. Freedman.

19          UNIDENTIFIED ATTORNEY:  We've got one more.

20          MR. RICH:  One more, Your Honor.

21          THE COURT:  All right.

22          MR. RICH:  Alan Rich for the -- Judge Sanders.  I'm

23 currently set for a hearing in Dallas in Federal Court on

24 Thursday, the 13th.  Is it Thursday, the 13th?

25          THE COURT:  Yes.

1          MR. RICH:  Yes, Thursday the 13th in the morning.  I

2    will endeavor to reset that hearing with the Federal Magistrate

3    Judge, but I may need a phone call.

4          THE COURT:  Okay.

5          MR. RICH:  -- if necessary.  I'll --

6          THE COURT:  That's fine.

7          MR. RICH:  -- try to get it moved myself tomorrow,

8    but --

9          THE COURT:  All right.

10          MR. RICH:  Thank you.

11          THE COURT:  I heard about this body attachment

12    process that they apparently use in New Jersey, Mr. Rich, which

13    I had not heard of, but I sort of like that term, so if I can

14    attach your body, then that's the process that I'll try to use

15    for the --

16          MR. RICH:  That's the best offer I've had in a while.

17    Thank you.

18          THE COURT:  Okay.  If you need something, just let my

19    chambers know.  All right, Mr. Speights.

20          MR. SPEIGHTS:  May it please the Court, and I realize

21    it's two til four, and if the non-property damage people want

22    to get up and leave, I won't be insulted.  This will probably

23    take about five minutes, but --

24          THE COURT:  All right.  Anybody who is -- oh, what's

25    the issue, Mr. Speights, so they know?

1          MR. SPEIGHTS:  The issue is at the last hearing, as

2    you recall, in Wilmington I brought up the issue of the two

3    Anderson class claims.

4          THE COURT:  Okay.  If anybody is not interested in

5    Anderson class claims and wishes to leave, they're free to do.

6                    (Pause)

7          THE COURT:  Okay, Mr. Speights, thank you.

8          MR. SPEIGHTS:  Thank you, Your Honor.  You'll recall

9    on Monday I traveled to Wilmington, and I brought up the fact

10   that in the proposed plan and disclosure statement --

11         MR. BERNICK:  Excuse me, Mr. Speights, if you could

12   just speak up a little bit?  It's very hard to hear.

13         MR. SPEIGHTS:  I pointed out in Wilmington that the

14   plan and disclosure statement listed three Anderson claims.

15   We, in fact, filed three Anderson claims, the claim for the

16   hospital, the statewide class claim, and the so-called

17   worldwide class claim, and all three are listed as active

18   claims in the documents before the Court.  And I brought that

19   to the attention of the Court in response to Mr. Restivo's

20   status report and pointed out that previously he had not

21   mentioned the fact that there were three claims, and we went

22   round and round about it, during which Your Honor suggested

23   that it probably would've been best if as a part of your

24   certification and our certification you had expunged the two

25   class claims at that time.  The certification order actually

1 says with  prejudice, but it does not say those claims are

2 dismissed and expunged.

3          In any event, Grace was not prepared to deal with it

4 at that time, and you directed us to see if we could resolve

5 it, and if not, to bring it up at the disclosure statement

6 hearing, because, among other things, there's several issues

7 involved here.  It goes to the question of voting and goes to

8 the status of those claims in case we want to file objections,

9 et cetera, et cetera.  So I have returned this time to

10 Pittsburgh, albeit not a Tuesday, to see if we could resolve

11 the issue.

12          If Your Honor remains of the view that you should've

13 just dismissed those claims as a part of the certification

14 order -- and again the two claims I'm talking about are the two

15 class claims not the individual Anderson claims -- then I

16 suggest that the simplest way to do it, Your Honor, is for your

17 to sign a one-sentence order expunging and dismissing those

18 claims.  I am not making a motion to have my own claims

19 expunged, but if that was Your Honor's intent or if that's the

20 practical effect of where we are, then I would suggest that

21 that is the simplest solution to carry out what Your Honor

22 intended to do.  And, in fact, I have a proposed one-sentence

23 order which I'll pass up if Your Honor wants to do that.

24          In the alternative, if the claims are not expunged,

25 then they are active claims.  The debtor filed objections to

1  the claims.  It did not file motions for summary judgment, but

2  we need to move on with respect to those claims, and I suppose

3  have a hearing on the debtor's objections to those two claims.

4  The debtor has suggested on Saturday afternoon that it would

5  deal with the voting issue by saying that, well, the Anderson

6  Hospital claim would have any and all votes.  I don't know more

7  than one vote.  I think in 524(g) you vote by claimant, but I'm

8  not an authority on 524(g), but would afford no votes to the

9  class proof of claims, which again is evidence, in the debtors'

10  mind, apparently those claims ended with the Court's

11  certification order.

12         The bottom line is, Your Honor, I just want to

13  resolve the status of those two class claims, and if Your Honor

14  intended for them or believes they should be expunged, I would

15  request you enter that order.  And if they are for trial, I

16  would like to set up a schedule and get them to trial.

17         THE COURT:  Okay.  I don't think, Mr. Speights, that

18  I really gave much thought to whether they were live claims or

19  not live claims.  I think what Mr. Bernick was arguing at the

20  last hearing was that all you -- all the class proof of claim -

21  - all the certification motion did was certify whether or not

22  Anderson as a lead plaintiff could represent a class or not.

23  It doesn't represent a different proof of claim I think was his

24  argument.

25         So he said, as I recall -- I hope I'm not misstating

1 this -- that he would take a look at the issue as to whether or

2 not there was, in fact, a different proof of claim.  But in his

3 view as he was arguing it, there was really only one claim.

4 The issue was simply whether or not Anderson would be certified

5 to represent a class, and then that class itself may hold some

6 different status.

7         But, in fact, the class wasn't certified either

8 statewide or on some broader basis.  There was no

9 representational capacity for Anderson.  So since it doesn't

10 represent anything in a representational capacity, those proofs

11 of claim are out there, but they don't have any effect, because

12 they're basically duplicative of Anderson's claim, and that's

13 my concern.  I simply think the docket needs to get cleaned up,

14 because at this point it looks to me like Anderson's got three

15 proofs of claim filed, because it's got three proofs of claim.

16         It's asked for class representational status in two

17 of them which has currently been denied, and I think they're

18 duplicative claims at this point, because it's got three claims

19 out there as Anderson Memorial Hospital asking to be a class

20 representative in two of them and on its own behalf in one.  I

21 think it -- for bankruptcy purposes it's really one claim, and

22 two of them probably should be made to go away, so that it's --

23 so that the docket's clear, but that's the only thing.

24         Then if I'm reversed on appeal, those proofs of claim

25 would have to be at some point reactivated, or Anderson's own

1  claim at that point would have to -- well, I'm not sure the

2  right word's bifurcated, but it would have to be treated in

3  some capacity both in its individual capacity and in some

4  representational capacity, would have to deal with that down

5  the road.  But that's my only concern.  It's a docket cleanup

6  issue, nothing more, from my point of view.

7          I wasn't trying to make work for anybody.  I was

8  simply trying to take account of the fact that I think the

9  docket's got duplicative claims there.

10         MR. SPEIGHTS:  Well, and the short answer to that,

11 Your Honor -- I have a long answer, but I hope I don't have to

12 get to the long answer.  The short answer is the way you

13 normally deal with duplicative claims is you dismiss and

14 expunge claims, so that there's only one claim left.  And if

15 that's what Your Honor's prepared to do, that's what my

16 proposed order would say.  You expunge the two class claims,

17 and we have left the individual Anderson claims.

18         Of course, Your Honor knows we're trying to appeal

19 the class claims, and, hopefully, I'll be back one day alive

20 and well.  But, in any event, that would clean up the docket.

21 And I don't know what the objection is.  I can go into a lot

22 more history, but if that's what Your Honor's inclination is,

23 I'm happy to pass up a proposed order and go to South Carolina.

24         THE COURT:  Okay.  Ms. Baer, Mr. Bernick, I'm not --

25 Mr. Bernick.

1          MR. BERNICK:  This is -- well, I won't make a

2  comment.  I'll simply recite what I believe the facts of the

3  law are.  With respect to the law, Rule 23 does not change

4  substantive or procedural bankruptcy law.  It just doesn't.  It

5  is -- it's something that's a device that can be deployed

6  within the context of bankruptcy, but it doesn't change rights.

7  It doesn't create claims.  It doesn't create rights under

8  bankruptcy law.  The same thing the other way around.  It's a

9  bankruptcy procedure including the claims and objection process

10 doesn't modify Rule 23.

11         Mr. Speights seems to believe that because a proof of

12 claim has been filed that purports to be a class proof of

13 claim, that there comes into existence some thing called a

14 class claim that has a life that it would never have under Rule

15 23 and has a life that it would never have under bankruptcy

16 procedure such that even when class is denied, it still exists

17 and it can be tried as a class.  And if class is denied, it

18 must undergo the further step of being expunged.  I'm not aware

19 of any such beast under the rules.  I don't think that there is

20 any case that has said anything like that, and I don't believe

21 that the Court should give it any kind of recognition.

22         So we then get to the question of whether because the

23 debtor has said it's an active claim, that that all of a sudden

24 -- that is the debtors' statement in its papers then creates

25 this hybrid beast that has some separate juridical existence,

1  and that is relatively easily handled.  So I put those two

2  points together, and I say this.  Anderson Memorial has a claim

3  as an individual claimant.  That claim is an active claim.

4  It's not been dismissed or expunged.

5         There are two additional claims that to the extent of

6  Anderson individually are no different than the first claim,

7  and, therefore, they don't need to be adjudicated or pursued in

8  order for Anderson Memorial to have the ability to prosecute

9  their individual rights.  The other portion of those two claims

10 is a -- what's effectively the incorporation of a motion or a

11 request that says that Anderson would also like to act as a

12 representative with respect to the class.  That portion has

13 been denied, and until there's a final order with respect to

14 Anderson Memorial individually, there's always the right to

15 seek to take an appeal at some further stage.

16        So it seems to me that the appropriate way for the

17 Court to treat this is to say -- and the debtor will amend its

18 documents to so recite -- is that the Anderson Memorial

19 individual claim, whatever that docket number would be, would

20 be active.  That the second two claims would be inactive and

21 held in suspense.  To the extent that they are Anderson

22 Memorial individually, they are duplicative of the first one

23 and need not be pursued.  To the extent that they're Anderson

24 Memorial seeking to act in a representative capacity, they're

25 held in suspense until a final disposition of the individual

1  Anderson claim.

2           Therefore, going forward there's no need to expunge.

3  There's no need to try a claim that doesn't exist or try a

4  status that doesn't exist and indeed has been denied.  And

5  there's also no lack of clarity on the docket, whenever we talk

6  about an Anderson Memorial as an active claim, it will be the

7  individual Anderson Memorial case.

8           I think that what Mr. Speights is trying to do is to

9  create a dichotomy where there are three options not two.  He'd

10  like to say that claims are either active or expunged, so that

11  if the Anderson Memorial claim is active, he can say it goes to

12  trial.  If it's expunged, he can then say, well, it's now been

13  dismissed, and he now has the right to renew his request to

14  take an appeal based on the dismissal, and that's not

15  necessary.  We can simply hold the other two claims in

16  suspense.

17          So we would ask that the Court not enter the order

18  that Mr. Speights is anxious to get signed.  We will submit an

19  alternative order that simply recites that the second two

20  claims are inactive, and we will amend our documents to make

21  the -- to reflect the same status.

22          THE COURT:  Okay.  What are the proof of claim

23  numbers?  I think I actually need to look at the proofs of

24  claim.

25          MR. SPEIGHTS:  Your Honor, the proof of claim numbers

1 are 009911, that's the worldwide claim, and 009914, that's the

2 statewide claim.

3            THE COURT:  And the individual?

4            MR. SPEIGHTS:  I think it's 009911.

5            MR. BERNICK:  We have it down as 11008.

6            MR. SPEIGHTS:  Is it 8?

7            THE COURT:  Wait.  I'm sorry.  Would you give me

8 that?

9            MR. SPEIGHTS:  I'm sorry.

10            THE COURT:  The individual one.  I --

11            MR. SPEIGHTS:  009908?

12            MR. BERNICK:  No, I -- we have it as 11008.

13            THE COURT:  Okay.  I don't have any of them, so I'm

14 probably going to need to get copies from the claims agent

15 anyway.

16            MR. SPEIGHTS:  I have them.  I have them right here,

17 Your Honor.  I'm sorry.  I was trying to read it off of the

18 proposed order.

19            MR. BERNICK:  Actually, it would probably make --

20            MR. SPEIGHTS:  This is the Exhibit 21 to the exhibit

21 of the unresolved claims according to Grace, and the worldwide

22 claim is 009911.

23            THE COURT:  Okay.

24            MR. SPEIGHTS:  The statewide claim is 009914.

25            THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  And the individual claim is 011008.

2          THE COURT:  011008.

3          MR. SPEIGHTS:  Yes, Your Honor.  Now, if I could

4  respond to what Mr. Bernick said, I don't -- unless I was

5  interrupting, Your Honor.  The worldwide class claim, which I

6  have in my hand, a very thick claim which has, of course,

7  Anderson as a worldwide class representative and I think about

8  3,000 job sites attached attempting to follow Judge

9  Gambardella's decision is a separate claim.  The statewide

10 claim has different attachments filed specifically as a

11 statewide claim but different attachments of job sites in South

12 Carolina.  And the individual claim, separate claim, separate

13 claim number, filed on behalf of the hospital with information

14 about the Anderson Memorial Hospital.

15         Grace files objections to each of those claims.  They

16 filed those objections on September 1, 2005.  Thereafter, we

17 file a motion for certification.  Now, I don't understand, Your

18 Honor -- and maybe I'm missing something here.  I don't

19 understand why we should do anything other than your immediate

20 reaction if as a result of your class certification order their

21 statewide and worldwide claims are nothing more than Anderson

22 and are duplicative and should be dismissed and expunged.

23 That's a normal straightforward way of dealing with the

24 bankruptcy docket as I understand it.

25         So then the question comes up what is Mr. Bernick's

1  problem, and maybe we all have been, you know, not quite candid

2  enough with the Court to say what's really going on here,

3  because among other things, and there are several reasons

4  involved, Mr. Bernick wants to take the position any way

5  possible to keep the expungement of these two claims, which

6  Your Honor would not certify and said at the last hearing, you

7  know, they in effect are duplicative now -- he wants to do

8  anything he can to prevent Your Honor from entering an order

9  expunging them, because he believes I believe that that would

10 give me a right to appeal your certification order not as a

11 matter of discretion with the District Court, because a matter

12 of right, because you've dismissed.  And, Your Honor, you've

13 ruled, and I understand your ruling, and I respect your ruling,

14 but every lawyer in America, every judge in America, knows that

15 you've got a right to appeal.  There's nothing bad about

16 appealing.  That's what lawyers do.  So why are we down here

17 arguing two months -- on two hearings about the status of these

18 claims?  You ruled.  You think you -- you said at the last

19 hearing you should've just expunged them at the time.

20        THE COURT:  No.  No, I did not say that.  I -- what I

21 think I said at the time was that maybe the debtors should've

22 asked for that relief at the time.  I don't think I was

23 attempting to infer that I should've on my own expunged the

24 claims, Mr. Speights.  At least that's not what I was

25 attempting to get to.  What I was attempting to get to was if

1  they're duplicative, I think something should be done to get

2  them off the record if, in fact, they're duplicative.

3         But I also have the problem that if they're not

4  duplicative, and maybe they're not, because they're asking for

5  different sets of relief if they've got different attachments

6  attached, then -- and I'm reversed on appeal, then we've got to

7  reinstate the claims.  May I see them?  Could I just take a

8  look at your --

9         MR. SPEIGHTS:  Yes, Your Honor.

10        THE COURT:  And I'll pass them back up to you.

11        MR. SPEIGHTS:  I brought a copy.  I've got a copy for

12 the debtor, although he has many copies.

13        MR. BERNICK:  Okay.  Well, I've looked at them.

14        MR. SPEIGHTS:  Tab A is worldwide, Tab B is

15 statewide, and Tab C is the individual claim.

16        THE COURT:  Okay.  It's just been a while since I --

17        MR. BERNICK:  Yes, it -- Your Honor, I'm sorry.  Are

18 you looking at the proofs of claim?

19        THE COURT:  Yes.

20        MR. BERNICK:  Okay.  I really -- my -- I don't need

21 them.  I don't want to interrupt the Court, but I really think

22 that this has almost nothing to do with the proofs of claim

23 themselves, because there are simply pieces of paper that got

24 submitted by the bar date that were crafted by Mr. Speights.

25 The real question here does deal -- as Mr. Speights indicated

1  and as I indicated in my remarks, does deal with the right of

2  appeal.  And the real question is whether in some fashion -- I

3  don't believe that the expungement of these claims is right to

4  a right of appeal, in any event, but what I do know is that Mr.

5  Speights has been very diligent in seeking to prosecute any and

6  all manner of appeals, and the real question is do we

7  facilitate yet another effort on his part to get appealed

8  before the Court -- the District Court and Court of Appeals

9  what's already been denied.

10        THE COURT:  Okay.  Well, I'm looking at the face of

11  the proof of claim just to see whether, in fact, they are

12  simply as filed duplicative, and they're not.  The name of the

13  claimant is the same.  It's filed as Anderson Memorial Hospital

14  on the individual claim.  The statewide is filed as -- pardon

15  me a second -- Anderson Memorial Hospital, see attached.  And

16  then the attached states various locations statewide in the

17  United States, commercial property, and then two boxes are

18  checked for when the property was built, before 1969 and then

19  1969 to 1973.

20        The individual indicates a specific address for the

21  building at 800 North Front Street in Anderson, South Carolina.

22  That it's a commercial building that was purchased between 1969

23  and 1973.  And then the worldwide class indicates that the

24  claimant is Anderson Memorial Hospital, see attached, with

25  various locations worldwide listed as the address as a

1 commercial building with again two boxes checked, property

2 built before 1969 and 1969 to 1973.

3        So although I think what may be left still is a

4 duplicative claim in the sense that the only thing that can be

5 left at this point is a claim by Anderson, because I've struck

6 at this point -- or I shouldn't say struck -- I've not

7 certified at this point the request for class certification by

8 Anderson.  The only thing that's left is the Anderson Memorial

9 claim.

10        But, nonetheless, if I am reversed on appeal at some

11 point, I think these two claims are different from the

12 individual claim, if, in fact, it's sent back to the Court.  If

13 it's not sent back at some point, I think we have to do

14 something with these claims to get them off the docket, because

15 they're not going to be addressed in the debtors' bankruptcy

16 proceeding.  But I think the debtors' plan information is

17 incorrect.  That they are not at this point live claims,

18 because Anderson can have only one claim that states the same

19 address for Anderson's building.  So --

20        MR. SPEIGHTS:  But, Your Honor, if they are not live

21 claims, something had to happen to make them -- to kill them.

22 I guess that was the certification order.  And then I would

23 ask, well, what is the status of the debtors' objections to

24 those claims?  It filed individual objections to all three

25 claims.  So are those objections overruled?  Are they

1  dismissed?  Have they gone?

2          THE COURT:  Well, I thought the only objection that

3  was filed as to the two class claims was to the class

4  certification.  If I'm incorrect, then I need to go back and

5  take a look at those objections to claims.

6          MR. SPEIGHTS:  I believe you are incorrect, Your

7  Honor --

8          THE COURT:  Okay.

9          MR. SPEIGHTS:  -- because the objections were filed

10  before the motion to certify was filed, and we would all have

11  to go back and look at them, and I do think that -- that there

12  are some related issues to that, for example, authority to file

13  on behalf of others and that sort of thing.  But those --

14  unless Mr. Bernick has a withdrawal in his pocket he's about to

15  hand me, those objections are sitting there, and that's why I

16  keep going back.  If there's a claim and an objection, there

17  should be a resolution.  One resolution would be to dismiss.

18  Another resolution would be to hear the objections.

19          THE COURT:  Okay.  Well, I thought that I addressed

20  everything, but maybe I haven't, Mr. Speights.

21          MR. BERNICK:  Yes, there's a -- Mr. Speights is

22  encyclopedic in his recall of the proceedings here, and I say

23  this with complete respect, and he's raised a matter before the

24  Court.  There's a legal side of this, and then there's a

25  factual side of this.  I have spoken to the legal side of it,

1  which is that the second two proofs of claim purport to have

2  Anderson be a representative.  That part of those claims is

3  purely a request.  It's not actually -- there's no authority.

4  There's nothing that says that it is a class claim.  It has to

5  be certified before it is a class claim, and those have not

6  been certified.  And the certification aspects of those claims

7  are inactive and in suspense until there's a final order such

8  that if there is to be an appeal on final order of the class

9  certification motion, that that would then become timely.

10       The interim -- the idea of an interim appeal was

11  already exhausted.  Rule 23(f) spells out specifically that

12  there's a right -- there's a -- not a right but the opportunity

13  to permit an appeal.  That was explored by Anderson Memorial.

14  The motion for interlocutory review of the certification -- of

15  the denial certification was denied.

16       So under the rule -- Rule 23, which governs, there is

17  no right of appeal beyond the -- there is no opportunity for

18  appeal prior to final judgment beyond the one that was already

19  taken, and that was denied.  And, Mr. Speights is correct, we

20  are anxious not to have yet another request made, which we

21  believe would be frivolous but would -- might still be made.

22  We're anxious to avoid another request being made, because he

23  believes it's appropriate as a matter of docket cleanliness to

24  have an expungement.

25       The rules are exhaustive.  The one procedure that's

1  available has been used.  It's been denied, denied, and,

2  therefore, with respect to the class component of those two

3  proofs of claim, they are inactive and should not be pursued

4  until there's a final order in Anderson.

5         Now, there's a factual side that Your Honor has now

6  brought out by reviewing and making reference to the second two

7  proofs of claim, which is that these two proofs of claim also

8  recited certain building locations, and that is correct.  What

9  happened was that the -- those building locations were cited,

10 but there were also claims that were brought for those building

11 locations individually.  And those were the ones that were then

12 the subject of the expungement orders that were entered in

13 connection with the process of winnowing away what it is that

14 Mr. Speights had the authority to pursue and what he didn't

15 have the authority to pursue.

16        So with respect to the balance, that is the non-class

17 portion of those claims, to the extent that those claims

18 purport to recite claims for other sites and locations, they

19 have been dealt with in the course of the individual claim

20 objection and expungement process as individual claims.  Recall

21 in the case, for example, of the South Carolina class --

22        THE COURT:  Gentlemen, push your button down, so we

23 don't hear you when you're speaking.  Thank you.

24        MR. SPEIGHTS:  I'm glad I didn't say something

25 unkind, Your Honor.

1          MR. BERNICK:  Yes.

2          MR. SPEIGHTS:  Apologize.

3          THE COURT:  I just hear whispering, but I mean I

4   can't understand the words, but it still carries.  Go ahead.

5          MR. BERNICK:  Recall in connection with Anderson

6   Memorial, we actually got down to the point the South Carolina

7   class had only one member in it, and that was Anderson

8   Memorial.  And what that really reflects is that the same

9   claims were then made the subject of individual claims, and

10  they were dealt with in the ordinary course.  So I think -- and

11  I suppose we can reconcile now and double check, triple check,

12  to take a look at all those individual locations and see what

13  has happened to those individual locations as individual

14  locations and see if any of those individual locations are

15  duplicative of other individual claims that have already been

16  dealt with.  And we can do the same thing with respect to

17  worldwide.  I think the result will be the same.

18          But under no circumstances are the claims -- the

19  class portion of those class claims active.  They're not

20  active, and they should be held in suspense.  And we would say

21  that today even the individual locations that populate those

22  proofs of claim, that portion of those proofs of claim could be

23  held in suspense, because we need to check and see if there is

24  anything in there that actually remains to be taken care of.

25          If there are individual claims that fall within those

1  second two proofs of claim that have not been the subject of

2  some other order or disposition of the Court as individual

3  claims, we can identify them, and then presumably they're like

4  many other proofs of claim or individual claims that are out

5  there that are the subject of motion, not the subject of

6  motion.  They remain out there, but under no case, under no set

7  of circumstances is there a class claim that is active or in

8  any fashion needs to be litigated, because that matter is now

9  at rest until there's a final order in connection with the

10 Anderson Memorial individual case.

11          Now, I haven't said a word so far today about whether

12 this matter is procedurally appropriate to be taken up today.

13 Mr. Speights made the request at the last omnibus to raise this

14 issue and to have us meet and confer.  We have.  We've been

15 very settled in our notion and haven't changed our view with

16 respect to the class status portion of those claims.  We've

17 articulated that today.  We will certainly amend our papers.

18          But if Mr. Speights wants to pursue now any

19 individual location that's the subject of one of those proofs

20 of claim, then we'll go back and take a look at that, and then

21 if he believes he needs some relief with respect to some of

22 these other addresses, or he wants to say for some reason those

23 need to be pursued as individual claims while everything else

24 is marching down the road to plan conformation, he ought to

25 then file a request with this Court if he wants to take some

1 step with respect to that.

2        We will have a dialogue with Mr. Speights to see are

3 there any individual addresses or claims that have fallen

4 between the cracks.  But if he wants to do something to

5 litigate those matters, he ought to make an application to the

6 Court.  We've responded to his request to meet and confer, and

7 we have apprised the Court of what our position is with respect

8 to that.

9        THE COURT:  Okay.  I'm sorry.  I'm a day late and a

10 dollar short here.  I never picked up on the fact that some of

11 these individual -- some of these buildings listed in these two

12 class proofs of claim may not have already been the subject of

13 individual claims filed.

14        MR. BERNICK:  I believe that there are none.  I

15 believe that they all were at one point the subject of an

16 individual claim file, and that's why we had all these

17 unauthorized claims that were then in some fashion withdrawn,

18 expunged, whatever.  So I believe that the only portion of

19 those second two proofs of claim that is out there today is the

20 individual Anderson Memorial claim and the denied request for

21 class certification.  I don't believe that the individual sites

22 have any separate existence in those proofs of claim.  They've

23 all been handled elsewhere.  But I don't know -- we have to go

24 back and make sure that that is so.  It is very distinct in my

25 mind that with respect certainly to the South Carolina class

1 that was down --

2          THE COURT:  To one.

3          MR. BERNICK:  -- to one --

4          THE COURT:  Right.

5          MR. BERNICK:  -- which is Anderson Memorial 1,

6 Anderson Memorial 2, and Anderson 3.  There's three different

7 proofs of claim, but the only individual claimant that was left

8 was Anderson Memorial.  With respect to the worldwide, I think

9 it was the same thing, but I'd have to double check to make

10 sure.  I just don't know the answer to that.

11          THE COURT:  Okay.

12          MR. BERNICK:  So but I mean we've got Anderson

13 Memorial.  That's one.  Then you've got Anderson Memorial plus

14 1, 2, 3, 4 in the class.  Then you've got Anderson Memorial

15 plus 4, 5, 6, 7 -- 5, 6, 7 plus (indiscernible).  I think that

16 in South Carolina these were all disposed of, that is the 1, 2,

17 3, 4.  With respect to worldwide, I believe that these were all

18 disposed of.  I'm not positive about them.  But under any set

19 of circumstances -- under any set of circumstances the class

20 portion of those claims is dormant and doesn't need to be

21 pursued.  It's inactive.

22          We'll double check to see whether there are any of

23 these listed addresses that were actually the subject of a live

24 claim or are a live claim and in some fashion need to be the

25 subject of some further proceeding.  But they're not -- none of

1  that is class.  Class is inactive, dormant until there's a

2  final judgment in Anderson Memorial.

3          THE COURT:  All right, but I thought I just

4  understood Mr. Speights to say that there is still something

5  that I didn't adjudicate in the debtors' objection to claim

6  that was filed along with the objection to the class

7  certification.

8          MR. BERNICK:  Yes, that -- because the debtor

9  objected to all of these proofs of claim.

10         THE COURT:  Yes.

11         MR. BERNICK:  Okay, and the objection -- when we

12  filed the objection, the -- that then made those claims to --

13  all those claims into contested matters, and thereby teed up

14  this omnibus procedure that we had.  They then -- it was their

15  burden to move for class certification on the class portion,

16  which they did.  That was denied, so the class portion is out.

17  It wasn't granted, and that can't be revisited, if at all,

18  until later on.

19         Because we though also objected in the omnibus

20  objections to each one of these proofs of claim but also the

21  individual proofs of claim, the question then on the table is

22  is there some aspect of these proofs of claim not as concerns

23  the class but as concerns these individual locations that are

24  included within the class that somehow hasn't been dealt with

25  in connection with those same locations filed as individual

claims.

THE COURT:  Okay, but that was not still in -- I didn't think that was in connection with the objection to the class certification.  I thought that was --

MR. BERNICK:  No, it's totally different.  That's --

THE COURT:  Well, that's what I thought.

MR. BERNICK:  Yes.

THE COURT:  I'm confused.  All right.  That's what I thought.

MR. BERNICK:  Yes.

THE COURT:  That it was a separate objection, and that they had all been disposed of.

MR. BERNICK:  I believe that that's correct.  The omnibus -- the omnibus objection process would've spoken to all of that, and whatever came out of that is where we are on the -- I mean there are -- there are some claims that have come through the omnibus objection process that still remain.  I'm not sure if there are any that are Mr. Speights' claims other than the Canadian claims that are sub judice.  But again my impression is the same as the Court's.  All of the individual claims went through the omnibus process.  Mr. Restivo made all those reports, and that should've included any one of these individual locations that populates these claims, because we think we're correct that there were individual proofs of claim that were filed as well.

1           THE COURT:  Okay.

2           MR. BERNICK:  And it may be that this ultimately goes

3  back to the fact that Mr. Speights agreed to withdraw let's say

4  Claim 1 from the South Carolina class, and it was agreed -- it

5  was withdrawn under agreement.  I don't know if he also

6  withdrew on the docket the part of the South Carolina claim

7  that was Location 1.  And maybe what we have here is really an

8  artifact of the withdrawal process of these individual claims.

9  Don't know the answer to that.  Do know that we should continue

10  the dialogue with Mr. Speights, but there's no reason -- and

11  certainly a lot of reasons not to enter any kind of expungement

12  order then as backup to determine whether there's some new

13  right of appeal.

14           THE COURT:  Okay.  Mr. Speights.

15           MR. BERNICK:  And I'm sorry for the confusion, Your

16  Honor.

17           MR. SPEIGHTS:  I actually understand the facts, Your

18  Honor, but this is to me incredibly simple.  It involves one

19  word, suspense.  I'm not familiar with that term in connection

20  with the claims.  I know that with the 44 claims you dismissed,

21  you rejected ratification.  You dismissed them.  We're on

22  appeal.  If I convince the Third Circuit Your Honor was

23  mistaken, we'll come back, and the claims will be reinstated.

24           I'm familiar with allowance, and I'm familiar with

25  expungement.  I don't know what this suspense is.  It's sort of

1  a -- apparently, it's a purgatory of bankruptcy, but I've never

2  been there before, and I really don't want to go there, and I

3  don't know that there's such a procedure to be there.   For

4  example, if you put my two claims in purgatory, in suspense,

5  can they vote?   Okay.   There's been no determination of that.

6  If you put my two claims in purgatory, what happens to Grace's

7  objections to those claims?   They've got other objections.

8  They've never resolved themselves.   They didn't object on these

9  claims being duplicative.   They objected on hazard and probably

10  product I.D. and all other stuff.   We never got to that.

11            THE COURT:   As to Anderson?

12            MR. SPEIGHTS:   As to Anderson.

13            THE COURT:   Okay.

14            MR. SPEIGHTS:   As to Anderson, they filed separate

15  objections to each of these three claims, and I don't know --

16            THE COURT:   Only as to the hospital.

17            MR. SPEIGHTS:   No, all three.

18            THE COURT:   No.

19            MR. SPEIGHTS:   They filed objections to each one of

20  those three claim numbers, Your Honor.

21            THE COURT:   Yes, but wait.   That's what I'm trying to

22  get to.   I think that as to each of the buildings, other than

23  the hospital itself, that there have been orders that have

24  adjudicated each of the buildings behind the worldwide class

25  and behind the state class, except the hospital building

1 itself.  Am I in error?

2          MR. SPEIGHTS:  You might not be in error, Your Honor.

3          THE COURT:  Okay.

4          MR. SPEIGHTS:  Although that would send us down a

5 long road to discuss the history of everything that's happened,

6 and I believe that you -- you said to me that you don't need to

7 do a class claim and individual claim, so I'm going to dismiss

8 the individual claims, and I believe without prejudice to the

9 class claim, and then you later ruled against me on the class

10 claims.  But I believe you have probably dealt with -- I'm not

11 sure.  Let me say I'm about 75 percent sure you've dealt with

12 the individual buildings of the statewide claim and of the --

13          THE COURT:  Worldwide.

14          MR. SPEIGHTS:  -- worldwide --

15          THE COURT:  Right.

16          MR. SPEIGHTS:  -- on the individual basis.

17          THE COURT:  Right.

18          MR. SPEIGHTS:  Which leads me -- well, then maybe --

19 as I said earlier, maybe that's a reason coupled with the class

20 certification issue to now expunge those claims.

21          THE COURT:  Well, I don't know that they need to be

22 expunged.  I think if that's the case, if -- I think both you

23 and the debtor need to check the worldwide class proof of claim

24 and the statewide class proof of claim.  And if it is the case

25 that every building except the hospital itself has been dealt

1  with, the reality is that those two claims are moot.  There is

2  nothing more to be adjudicated, because the Anderson claim is a

3  live claim at whatever the number is that you gave me, the 011

4  number.  All of the other buildings have been adjudicated by

5  substantive orders that have been entered one way or another in

6  all of those claims.  So there is nothing left to adjudicate in

7  either the statewide class or the other class.  So they're

8  simply moot.  There's nothing left to be done.

9          MR. SPEIGHTS:  Your Honor, what is wrong -- I mean

10 let's assume all that's correct, and I believe there's a good

11 chance it is.  We've got a -- the term moot.  What is wrong

12 with an order saying they're dismissed?

13         MR. BERNICK:  Because a class --

14         MR. SPEIGHTS:  Because I mean I don't know what it

15 means they are moot.  I mean normally you allow or you disallow

16 claims.

17         THE COURT:  There's nothing there to allow or

18 disallow, because they've already been taken care of by

19 substantive orders except for Anderson, which is being

20 addressed in a different action.  So there's nothing there for

21 me to adjudicate.  I've already addressed them in other

22 proceedings.

23         MR. BERNICK:  In --

24         MR. SPEIGHTS:  Would Your Honor in that circumstance

25 then entertain a written order calling them moot or whatever

1 you want to call them, so that there is some record of the

2 status of those?  I mean, Your Honor, we'd have to go to all

3 the transcripts and try to explain it to some Appellate Court,

4 you know, because it's a problem, because we -- Mr. Bernick and

5 I argue in other courtrooms besides this one, and lawyers are

6 like politicians in a way, they put their own spin on things.

7 So maybe we need a written order from the Court.  I --

8        MR. BERNICK:  Your Honor, if they want to make an

9 application for a written order, that's fine.  We would be

10 prepared to submit something to the Court that recites the

11 facts as they are, and if the right word for the individual

12 constituents of these other two claims is moot, that's

13 appropriate.  But the thing that's key is that the class

14 portion of -- to the extent that these purport state class

15 claims that that is not dismissed and it's not expunged,

16 because it's subject ultimately to the possibility of an appeal

17 upon final order in the Anderson Memorial case, and, therefore,

18 any order that Mr. Speights would want to get signed expunging

19 or dismissing is simply an effort to get a further

20 interlocutory review.  That would be improper.  So --

21        THE COURT:  No, I think to the extent that these

22 claims are simply at this point redundant, because they've been

23 addressed elsewhere, I'm not going to create a new appeal time.

24 To the extent they're moot, they're moot, because there's

25 nothing before me to adjudicate, because they've already been

1  addressed in other orders.  And probably what would make sense

2  is to tee up by proof of claim number -- let's say -- I'm just

3  going to make up an address.  Let's say a building is located

4  at 100 State Street, and there has been an order that's

5  addressed the building at 100 State Street.  It can say this

6  proof of claim -- you know, that address is 100 State Street

7  and the state proof of claim was addressed by order dated such

8  and such at docket number such and such.  And then if you want

9  a record, Mr. Speights, it'll show you where the record is.  If

10  that's the issue, tracking the record, you can track the

11  record.

12          MR. BERNICK:  That's fine.

13          MR. SPEIGHTS:  Mr. Bernick just said something that's

14  very educational.  He said I don't want to create -- Your Honor

15  shouldn't create another avenue of appeal.  The problem is,

16  Your Honor, that Mr Bernick takes the position that the

17  previous order was interlocutory, and we had no right to

18  appeal.

19          MR. BERNICK:  No, that's not true.

20          MR. SPEIGHTS:  And I take the position --

21          MR. BERNICK:  I'm sorry, Your Honor.  This is just --

22  again, we're now -- this is five minutes turning to 45.  I know

23  you will listen to him --

24          THE COURT:  It doesn't matter, gentlemen.  I don't

25  have anything to say about whether they're appealable or not.

1   I  entered the order I thought was proper.  The District

2   Court's going to say whether it is or isn't at some point in

3   time, and if it isn't, I'm going to get it back, and we're

4   going to go battle on a class proof of claim.  And if the

5   District Court says it's right, or the Circuit or wherever it

6   goes, that's just the way it's going to be.  I mean I don't

7   determine what's appealable and what isn't.

8          MR. SPEIGHTS:  But you do, Your Honor, and you do,

9   because if you dismiss and expunge these two separate class

10  claims, then I believe -- Mr. Bernick will -- if I say the sun

11  rises in the east, he being a good lawyer will say it rises in

12  the west.  But I believe that that will give me a right to

13  appeal.  In the alternative, if you take Mr. Bernick's plan, he

14  would have our appeal from the certification, be it down the

15  road a year or two or three, and he will be arguing to some

16  court equitable, moot, and this and everything else to try to

17  prevent Anderson from ever getting an appeal.  So I would

18  respectfully say, Your Honor, you -- if you dismiss the claims

19  rather than put them in suspense, then I think that probably

20  would give Anderson a right to appeal.

21         THE COURT:  Well, I think the first thing I want to

22  know is whether or not there really is anything that has to be

23  addressed with respect to these claims.  It seems to me that

24  if, in fact, there have already been orders that have addressed

25  everything that's out there attached to these claims, and

1  there's nothing before me, I don't have any basis doing

2  anything with respect to these claims.  If they're moot,

3  they're moot.

4          To the extent that Anderson is the only building

5  that's left, and the claim is already filed of record at

6  another claim, that's simply redundant.  And as to Anderson

7  itself, not with respect to the class certification and the

8  other buildings, I don't have any problem saying that that

9  claim of Anderson Memorial Hospital itself is duplicative of

10  the other Anderson Memorial Hospital claim.  But that's not

11  going to get you an appeal issue with respect to the other

12  buildings.

13          MR. SPEIGHTS:  I'm not going to argue anymore today,

14  Your Honor.  I'm sure those trying to catch planes will be

15  happy.  What is a piece of paper that I can present to you to

16  inform you of what you've asked?  Should it be a status report

17  maybe or --

18          THE COURT:  Yes, why don't you just tell me on

19  November whatever, 13th or 14th?  You can appear by phone, Mr.

20  Speights.  You don't need to make a --

21          MR. SPEIGHTS:  Well, I like -- I may file a piece of

22  paper or two, and I'll -- you've said before we could do status

23  reports.

24          THE COURT:  Yes, that's fine.  Do it by -- just if

25  you file something by November the 10th, so that you folks both

1 have a chance to take a look at the record, if you file

2 something -- I don't know if I have it linked to anything.  I

3 don't know what I can link it to.  Just file a status report

4 regarding the three proofs of claim, and if you will put the

5 proofs of claim number, Mr. Speights, on the document, so that

6 I know what it's linked to and tell me whether, in fact, there

7 have been orders that have been entered that have addressed the

8 buildings that are attached to those two proofs of claim.

9 That's really what I'm looking for at this point.  And whatever

10 relief you think you would like, you can attach an order.  I'll

11 -- I just -- I have to give it some thought, but I don't -- I

12 think if they're moot, I'm probably not going to be entering

13 some order that expunges the claims.  I don't think I have

14 claims before me to expunge.

15          MR. SPEIGHTS:  Thank you, Your Honor.

16          THE COURT:  Okay.

17          MR. BERNICK:  That's fine.  Thank you.

18          THE COURT:  Mr. Bernick, the debtor can do the same

19 thing.

20          MR. BERNICK:  If I, you know -- yes, well wait to see

21 what Mr. Speights files.  We'll just wait and see --

22          THE COURT:  All right.

23          MR. BERNICK:  -- but I think Your Honor already

24 grasps what the issue is.

25          THE COURT:  Okay.  Anything else?

1                    (No verbal response)

2          THE COURT:  We're adjourned.  Thank you.

3          ALL:  Thank you, Your Honor.

4          MR. BERNICK:  I do think we have to give --

5                    *  *  *  *  *

## C E R T I F I C A T I O N

        We, ELAINE HOWELL and PATRICIA C. REPKO, court

approved transcribers, certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter, and to the best of

our ability.


/s/ Elaine Howell                    DATE:  November 3, 2008
ELAINE HOWELL


/s/ Patricia C. Repko
PATRICIA C. REPKO

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**