## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FEE APPLICATION OF KIRKLAND & ELLIS LLP
## FOR THE TWENTY-NINTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Fee Application of Kirkland & Ellis LLP for the Twenty-Ninth Interim Period</u>.

## BACKGROUND

1.      Kirkland & Ellis LLP ("K&E") was retained as counsel to the Debtors.  In the Application, K&E seeks approval of fees totaling $5,838,105.50 and expenses totaling $2,737,629.13 for its services from April 1, 2008 through June 30, 2008 (the "Application Period").

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2008, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, Issued January 30, 1996 (the "U.S. Trustee Guidelines"), as well as for consistency with precedent established in the

United States Bankruptcy Court for the District of Delaware, the United States District Court for the

District of Delaware, and the Third Circuit Court of Appeals.  We served an initial report on K&E,

and received a response from K&E, portions of which response are quoted herein.

## DISCUSSION

3.      In our initial report, we noted that on both days of the estimation trial, April 1 and 7, 2008,

K&E had in attendance 13 professionals and paraprofessionals.  The total time billed for these two

days of the trial, including non-working travel, was 155.80 hours for total fees of $69,438.00.  The

time entries are listed on Exhibit "A."  Paragraph II.D.5. of the U.S. Trustee Guidelines provides:

"If more than one professional from the applicant firm attends a hearing or conference, the applicant

should explain the need for multiple attendees."  We understand that this was a continuation of the

estimation trial of March 24-31, 2008, and that K&E provided an explanation for most of the

attendees in its response to our initial report for the Twenty-Eighth Interim Period.  However, at the

continued estimation hearing on April 1 and 7, 2008, there were three new participants not present

earlier: associates, Matthew E. Nirider and Henry A. Thompson, II, and case assistant, Ayesha

Johnson.  Thus, we asked K&E to provide an explanation of each of their roles at the hearing and

why it was necessary for them to be in attendance, particularly since the hearing was already heavily

attended.  In addition, we asked K&E to confirm whether its previous response set forth in Response

Exhibit "1" holds true for the current Application Period.  K&E provided an additional response,

which response we have included as Response Exhibit 1-A.  We accept K&E's response and have

no objection to these fees.

4.      In our initial report, we noted that on April 22, 2008, seven K&E professionals and one K&E

legal assistant attended the ZAI hearing.  The total time spent, including non-working travel time,

was 37.20 hours for total fees of $22,757.00. The time entries are listed on Exhibit "B." In light of Paragraph II.D.5. of the U. S. Trustee Guidelines, cited above, we asked K&E to explain why it was necessary for each attendee to be present at the hearing, as well as the role of each attendee. K&E provided a response, which response we have included as Response Exhibit "2." We accept K&E's response and have no objection to these fees.

5.      In our initial report, we noted that on June 2, 2008, seven K&E attorneys and one K&E project assistant attended an omnibus hearing. The total time spent, including non-working travel, was 61.10 hours, for total fees of $36,348.00. The time entries are listed on Exhibit "C."  In light of Paragraph II.D.5. of the U. S. Trustee Guidelines, cited above, we asked K&E to explain why it was necessary for each attendee to be present at the hearing, as well as the role of each attendee. K&E provided the following response:

> June 2nd Omnibus Hearing (¶ 5 and Exhibit "C")
> Erskine, Boll, Baer, Bianca, Bernick, Freedman, Harding, McMillin
>
> Paragraph 5 of the Initial Report requests greater explanation concerning the attendance of seven K&E attorneys and one K&E legal assistant at the June 2nd, 2008 omnibus hearing.
>
> ZAI Matters
> A number of significant matters were up at the June omnibus hearing, not the least of which were the five ZAI matters continued from the April 22nd ZAI hearing. Because of the number and importance of the ZAI matters up on June 2nd, members of the ZAI team attended that portion of the hearing (all attended telephonically) in order to fulfill their ZAI-related responsibilities. ZAI team members telephonically attending were: Ted Freedman, Barb Harding, Scott McMillin, Deanna Boll, and Sal Bianca. These professionals attended in their respective roles described under Paragraph 2 above. David Bernick attended the entire hearing in person and presented all ZAI-related matters.
>
> *(In response to our follow-up inquiry, K&E provided the following additional information concerning the attendance of Mr. Bianca and Mr. McMillin at the hearing:)*

. . . With respect to Sal Bianca and Scott McMillin, I add this further explanation. Subsequent to the April 22, hearing, numerous ZAI issues arose that required further analysis and research. Sal and Scott were brought onto the ZAI team to assist with these issues. Scott was asked to take the lead in addressing these new issues and developing a new strategy for dealing with ZAI issues as the Debtors moved toward preparation of a new Chapter 11 Plan. Sal was the associate assigned to assist Scott in this new work. Sal and Scott both attended the relevant portion of the June 2nd hearing telephonically to obtain insight into the issues and well as to lend assistance to David Bernick on these new issues arising during David's presentation of the ZAI bar date and related arguments.

> Non-ZAI Matters
> In addition to ZAI, several other significant matters were up at the June 2nd hearing, including a settlement agreement regarding the U.S. Government's claim regarding certain environmental matters (the "multi-site settlement"), a status conference on the City of Charleston's motion for relief from stay, and the Debtors' motion to authorize settlement resolving and paying U.S. Government claims regarding the Libby, Montana site. I presented all of these matters, and David Bernick also presented a portion of the Libby environmental settlement matter. Andrew Erskine was the legal assistant who assisted David Bernick and me during the entire course of the hearing. He was tasked with preparing hearing materials, tracking materials and exhibits used during the course of the hearing, and responding to any requests made by the presenting attorneys during the course of the hearing.

We accept K&E's response and have no objection to these fees.

6.      In our initial report, we noted that legal assistant, James J. Son, billing at an hourly rate of

$190.00, spent  5 hours for total fees of $950.00 for what appear to be administrative tasks:

> 6/6/2008        James J Son   5.00    950.00             Perform    administrative tasks re
>                                                          criminal defense...

Thus, we asked K&E to provide a more detailed description of the work which Mr. Son was

performing in this time entry.   K&E responded as follows:

> The Initial Report identifies 5.0 hours of legal assistant James Son's time on June 6th which was entered as "perform administrative tasks re criminal defense" and requests additional detail about James' tasks on that date. James works under Los Angeles litigation partner Walter Lancaster on Grace's criminal defense matter. His work on June 6th consisted of reviewing materials in order to assist with factual development

needed to develop cross-examination outlines. In addition, he reviewed and identified key documents to be used for cross-examination purposes. Because of the substantive nature of James' work, K&E respectfully requests full reimbursement for his time.

We accept K&E's response and have no objection to these fees.

7.     In our initial report, we noted the following time entries in which there was a discrepancy

between the total time billed and the time recorded in parentheses:

     a.     The time billed below is 9.20 hours for total fees of $7,314.00. However, the time recorded in parentheses totals 8.90 hours for total fees of $7,075.50. Thus, it appears that there is an overcharge of $238.50.

| 4/10/2008 | Janet S Baer | 9.20 | Review final draft of Capstone responses on Libby agreement and confer with R. Emmett re same (.3); prepare correspondence re same (.2); review draft information for FCR response on Libby settlement (.2); confer with Creditors' committee re Libby settlement (.7); confer with R. Finke re Montana appeal motion (.2); review and further revise and reorganize Montana injunction motion and confer re same (5.); review NJDEP notices of appeal and confer re same (.3); confer with W. Corcoran re Libby settlement conference and related issues (.3); confer with states re ELT agreement issues (.5); further confer with M. Obradovic re same (.3); confer with J. Monahan re same (.3); confer with A. Running re Libby claimants objection to Libby settlement (.3); confer re cite-checks for Montana motion (.3). |
|---|---|---|---|

     b.     The time billed below is 7.30 hours for total fees of $3,577.00. However, the time recorded in parentheses totals 6.70 hours for total fees of $3,283.00. Thus, it appears that there is an overcharge of $294.00.

| 4/10/2008 | Holly Bull | 7.30 | Review and edit first-round time and expenses (3.0); correspond with multiple billers re various billing issues (1.8); further revise invoices per responses/additional information for March fee application (1.9). |
|---|---|---|---|

Thus, we asked K&E whether or not it agreed that fee reductions are warranted in these instances.

K&E responded as follows:

The Initial Report identifies two time entries with respect to which the total time billed exceeds the time recorded in parentheses.  K&E agrees that the two entries contain addition errors, and agrees to a total reduction of $532.50 as suggested in the Initial Report.

We appreciate K&E's response and recommend a reduction of $532.50 in fees.

8.    In our initial report, we noted a total of $3,875.25 billed for "Scanned Images."  It appeared that K&E had billed these scanned images at $0.15 per page.  Thus, we asked K&E to explain why these scanned pages should be charged at a higher rate than the $0.10 per page allowed for photocopies in this District.  K&E responded as follows:

The Initial Report requests an explanation for why scanned images are charged at $0.15 per page instead of the $0.10 per page charge allowed for photocopies pursuant to the applicable local Bankruptcy Rule.  K&E agrees to a reduction of $1,291.75 with regard to the period covered by the Initial Report (during the period covered by the Initial Report, K&E scanned 25,835 pages at a charge of $0.15 per page, for a total charge of $3,875.25.  Reducing the charge to $0.10 per page results in a charge of $2,583.50, a reduction of $1,291.75.)  In addition, going forward, K&E will ensure that scanned images will be charged to the Debtors at $0.10 per page rather than $0.15 per page.

We appreciate K&E's response and recommend a reduction of $1,291.75 in expenses.

9.    In our initial report, we noted a total of $2,238.15 billed for "Standard Prints NY" or "Standard Copies or Prints NY."  These copies and prints appeared to have been billed at a rate of $0.15 per page.  The current per page limit for photocopies is $0.10 per page in this District.  Thus, we asked K&E whether it would agree to reduce these copies to $0.10 per page in order to comply with the Local Rule.  K&E responded as follows:

The Initial Report notes that K&E billed $0.15 a page for copies made in its New York office.  Given that the applicable Local Rule limits photocopy charges to $0.10 per page, K&E has no objection to an expense reduction of $746.05.  (In the time period covered by the Initial Report, K&E billed $0.15 a page for 14,921 pages of "NY" copies, for a total charge of $2,238.15.  Reducing the per-page charge to $0.10 lowers the total charge to $1,492.10).  As we indicated in our Prior Response, we

have put into place a system designed to ensure that no copies are charged to the Debtors at the $0.15 per page rate. (This system went into effect August 4, 2008, so all copy charges after that date will appear at the $0.10 per page rate.)

We appreciate K&E's response and recommend a reduction of $746.05 in expenses.

## CONCLUSION

10.     Thus, we recommend approval of $5,837,573.00 in fees ($5,838,105.50 minus $532.50) and $2,735,591.33 in expenses ($2,737,629.13 minus $2,037.80) for K&E's services for the Application Period.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul Street, Suite 1250
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served by First Class United States mail to the attached service list on this 20th day of November, 2008.

_____
Warren H. Smith

**SERVICE LIST**
<u>Notice Parties</u>

**<u>The Applicant</u>**
Janet S. Baer
David M. Bernick, P.C.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

jbaer@kirkland.com
dbernick@kirkland.com

**<u>The Debtor</u>**
William Sparks
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
william.sparks@grace.com

**<u>Counsel for the Debtors</u>**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
James R. O'Neill
Pachulski, Stang, Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**<u>Counsel for the Official Committee of
Unsecured Creditors</u>**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**<u>Counsel to the Official Committee of Property
Damage Claimants</u>**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**<u>Counsel to the Official Committee of Personal
Injury Claimants</u>**
Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**<u>Official Committee of Equity Holders</u>**
Gary M. Becker
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

**<u>United States Trustee</u>**
David Klauder
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

## EXHIBITS "A" through "C"

*(See attached Excel spreadsheets.)*

## RESPONSE EXHIBIT 1

The time period covered by the Fee Application was the first quarter of 2008 which was the period in which Grace commenced its trial on Asbestos Personal Injury estimation.  As a result, it was essentially the most time intensive and costly period, to date, in Grace's seven year chapter 11 history.  During that time period, K&E attorneys and legal assistants were working around the clock either preparing for or conducting the trial on these matters.  The work that the K&E estimation team has been doing since essentially January 2005, finally culminated in the trial and demanded the support of every member of the estimation team as well as support from the Restructuring team.

With that background, K&E hereby responds to the Initial Report.  Each of K&E's responses in this letter corresponds to the paragraph in the Initial Report raising particular concerns regarding the Fee Application.

1.      Attendance at PI Estimation Trial (¶ 3 and Exhibit A)

The Initial Report requests greater explanation concerning multiple professionals' attendance at, and preparation for, the personal injury ("PI") estimation trial dates occurring in January and March of 2008.

The PI estimation trial commenced January 14, 2008 and continued, on scheduled dates, until the parties reached settlement in early April, 2008.  The work performed by K&E during the period covered by the Initial Report represents the great majority of the trial time.  As has been explained in prior responses, it is not K&E's routine practice to have multiple K&E professionals attend hearings or meetings.  However, a trial of this magnitude required participation by numerous members of the trial team who all had very distinct and vital roles at the trial.  In addition, it required the participation of many more attorneys and paraprofessionals on site in Pittsburgh to support the trial team.

The specific roles and responsibilities of the members of the PI litigation team, which we have expounded upon at length in prior responses, continued throughout the trial.  Specifically, we refer you to our two most recent responses (replying to your initial report regarding the Twenty-Fifth Interim Period, your initial report regarding the Twenty-Sixth Interim Period and your initial report regarding the Twenty-Seventh Interim Period, respectively (collectively, the "Prior Reports")), for detailed discussions of the roles and responsibilities of the PI team members whose trial time is at issue here.

The following lettered paragraphs list, in the order listed in Exhibit A to the Initial Report, each of the professionals whose time is listed in Exhibit A, together with such professional's specific trial role and responsibilities.

        (a)      Amanda Basta

Amanda, the senior-most associate on the D.C. estimation litigation team, played a large role in the estimation proceedings. She was primarily responsible for all materials regarding the PI Proofs of Claim and Questionnaires which formed the basis for much of the Expert work for the trial. She was also the associate responsible for third party fact discovery. On January 14th, her role was to support David Bernick in his opening statement and *Daubert* presentations. She was available to conduct research and answer questions on issues on which she had worked. Her role on January 16th was much the same. Amanda's presence in Court was required on most days because of her extensive work on the PI Questionnaires which touched almost all of the evidence presented by Grace's witnesses at the trial in one way or the other. Amanda attended trial on January 23rd because she was responsible for preparing the doctors and screeners whose video depositions were being presented that day, and in that capacity, she assisted presenting attorney Barbara Harding. In particular, Amanda was tasked with handling evidentiary issues that arose in connection with the video presentations. Amanda's March 25th and 26th trial date work was similar. Again, she attended the trial in order to address PI Questionnaire and third party discovery issues and to provide support to the presenting attorneys. On March 26th, she attended in order to support David Bernick in his presentation with regard to evidentiary issues relating to the admissibility of certain Rule 1006 summaries.

(b)     Raina Jones

D.C. PI litigation team associate Raina Jones attended portions of three trial days. On January 14th, she spent 3.3 hours reviewing expert testimony to assist with the creation of trial outlines, and 7.3 hours attending the trial. Her courtroom duties included responding to any factual issues that arose during the course of the witness examinations, and researching legal issues as they arose. On January 22nd and March 26th, Raina again attended the trial, and performed the same tasks with regard to the witnesses testifying on that day.

(c)     Elli Leibenstein

Elli is the litigation partner on the trial team responsible for working with Grace's ultimate estimate expert witnesses, Thomas Florence, Elizabeth Anderson and others. Elli has been doing this very specialized expert work for the past several years and is uniquely qualified to provide such expertise. Since the trial was focused on the estimated value of Grace's asbestos liability, Elli's role was key to the ultimate presentation and outcome of the trial. During the trial, Elli's role was to prepare the witnesses for their testimony, assist with the preparation of the witness' demonstratives and counsel David Bernick at trial in questioning such witness. Elli attended Court on January 14th in order to support David Bernick in his opening presentation with respect to the ultimate estimation conclusions and the expert reports relied upon to reach such conclusions. Elli's subsequent appearances at the trial on January 16, January 22, March 25, March 26 and March 31 were all necessary in order for him to assist with the witnesses that were testifying on estimation issues.

(d)     Brian Stansbury

Brian is the D.C. litigation associate on the estimation team most directly responsible for medical issues relevant to the estimation case. As such, his attendance and assistance at the estimation trial was critical. Specifically, during the January 14th proceedings, Brian assisted during David Bernick's presentation of the Debtors' opening statement, by advising David on the medical criteria and medical graphics used therein. On January 16th, Brian sat second chair for expert witness Dr. Howard Ory's testimony. In that capacity, he assisted Barbara Harding with her direct and redirect examinations of Dr. Ory, ensuring that Barbara addressed all relevant issues and preparing redirect questions and exhibits. On January 16th, Brian sat second chair for both David Bernick's direct and redirect examinations of Dr. David Weill, and for Scott McMillin's direct and redirect examinations of Dr. Daniel Henry. His roles with regard to both these witnesses was the same as that on January 14th. On March 25th, Brian again sat second chair, and assisted Barbara Harding with her examination of Dr. Suresh Moolgavkar. On March 26th, he attended in order to advise the presenting attorneys on any medical criteria issues arising during the course of Dr. Elizabeth Anderson's testimony.

    (e)    David Mendelson

David Mendelson was the D.C. litigation partner responsible for all discovery responses provided by Grace related to the PI Estimation case. He also was responsible for issues at trial relating to the Debtors' corporate conduct, historical settlement practices, and insurance coverage issues. He worked in the trial site in Pittsburgh during the trial in order to be continually available to assist on these issues. He attended portions of the trial only when his attendance was necessary on the dates in question (January 14th, 16th, 22nd, and 23rd) in such capacity.

    (f)    Deanna Boll

New York restructuring partner Deanna Boll was not a full-time member of the estimation team, and attended the trial only for a portion of the first day. Her role was to assist David Bernick and Ted Freedman with bankruptcy-related concepts and case law interpretation that was especially relevant to the opening portion of the trial. She analyzed issues and conducted research regarding PI claims estimation for the purposes of claims allowance under the Bankruptcy Code. In addition, Deanna prepared related trial materials, and conferred with David prior to and during his opening statement presentation.

    (g)    Janet S. Baer

I was the only restructuring attorney who was generally present for most of the trial. As you will recall, I have been the restructuring partner in charge of the Grace case on a daily basis for the last number of years. I am also the only member of the Grace team, other than David Bernick, who has essentially worked on the case from the date of the Chapter 11 filing on April 2, 2001 to date. As a result, my presence was required at the trial both to provide historical continuity for the case but to also assist with Bankruptcy related issues that arose during the trial. I worked out of our Pittsburgh trial site for the majority of the trial and attended portions of the

Jan. 14th,  Jan. 16, Jan. 22, March 24, March 26 and March 31 hearing when my presence was needed to provide historical information or Bankruptcy expertise.

(h)      Salvatore Bianca

Sal Bianca is a senior Chicago litigation associate who was formerly a restructuring associate.  Sal has worked on the Grace case for several years and plays a key support role in the Bankruptcy case in general, the Estimation proceedings and the Criminal case.  He did not have a specific assigned role in the trial but instead was asked to support the trail team in Pittsburgh to perform various tasks as they came up.  Sal attended the first day of trial, January 14 (approx. 6.5 hrs) and spent about 1.5 hrs in preparation.  Prior to the hearing, he helped prepare materials re Grace's opening statement, potential responses to the claimants' opening and *Daubert* arguments. He attended the hearing because he has been involved in various aspects of the estimation since 2004 (including the drafting of portions of the *Daubert* briefs addressed at the hearing) and has a familiarity with the case that required his presence in court so that he could address any issues that arose at a moment's notice.  Sal attended portions of the January 15 hearing specifically related to the direct and cross examinations of Howard William Ory and Joseph Rodricks.  Sal attended these portions of the hearing because he was familiar with both experts' work in the case and assisted in the preparation of Dr. Ory for his testimony.  On January 22, Sal attended the full examination of David Weil and portions of the examination of Daniel Henry.  He attended the hearing because he worked in preparing Dr. Weil for the trial.  He is also familiar with the studies addressed by Dr. Weil as well as studies the asbestos claimants would potentially raise on cross-examination.  On January 23, he attended the portion of the hearing regarding the deposition designations of doctors and screening companies.  Sal conducted one of the depositions addressed at the hearing and wrote portions of the estimation briefs regarding claims being manufactured through the screening process.  On March 26, Sal attended portions of the Elizabeth Anderson examination because he was familiar with her risk assessment work in both the civil and the criminal case.  He is one of the attorneys on the criminal case in charge of addressing risk assessment issues and his presence was necessary at the trial to assure continuity and consistency as well as to lend factual support.

(i)      Scott McMillin

Scott McMillin is a litigation partner in the Chicago office who is on both the Estimation trial team and the Criminal team.  His role in the trial was to prepare and try the scientific aspects of the estimation trial.  He worked extensively with the physicians, industrial hygienists, risk assessors and epidemiologists who testified at trial.  On January 22, Scott put on the testimony of physician Dr. Daniel Henry.  On March 24, Scott put on the testimony of industrial hygienist, Dr. Peter Lees. Scott was also integrally involved in preparing the other physicians, risk assessor and epidemiologists who both prepared reports and testified at trial.  In this regard, Scott supported David Bernick in preparing and putting those witnesses on the stand.

(j)      Daniel Rooney

Chicago-based senior legal assistant Dan Rooney headed up the split Washington, D.C./Chicago trial support team.  He and his team were charged with preparing and organizing all exhibits and graphics for trial each day.  This task included not just the preparation of documents that were in fact used, but also procuring topic-based documents and information used for analyses by the Debtors' entire trial team of attorneys and experts.  Dan's exhibit and graphics role was detail-oriented and document-intensive; he and his team were literally in charge of locating, organizing and keeping running track of millions of records.  In addition, he was in charge of trial logistics.  He coordinated the logistics of the remote trial site and served as the liaison between the trial team and the trial site building owners.  On January 14th, Dan assisted in the setup of the presentation system in court.  He also prepared opening statement and *Daubert* argument exhibits and graphics for David Bernick's use.  He remained in court in order to respond to trial team document and information requests that were made during the course of the day.  Dan's work on January 16th and January 22nd was much the same.  On January 23rd, he prepared transcripts and video for presentation in connection with the Debtors' tendering of numerous witnesses via deposition designation.

(k)    Ellen Ahern

Ellen is a litigation partner and member of the Chicago PI litigation team who has worked with Barbara Harding and Scott McMillin on the development of expert testimony.  On January 14th, Ellen prepared and revised graphics used by David Bernick in his opening statement.  In addition, she worked on doctor and screener investigative matters and other non-party discovery related themes.  On January 16th, she attended the trial to assist with the examination of Dr. Rodricks and to coordinate testimony amongst science experts, including the March 26th testimony of Dr. Elizabeth Anderson on risk assessment.  On January 22nd and 23rd, she attended portions of the witness examinations in order to provide support on specific science experts testifying and again to coordinate amongst the experts.  On March 26th, Ellen prepared for and attended the trial in order to work up the substantive materials for the examination of Dr. Anderson.  Finally, on March 31st, Ellen attended the oral argument on the Rule 408 motion, providing legal analysis and case law discussion on the same, and also attended the direct examination of Dr. Thomas Florence in order to coordinate doctor and screener testimony issues as they related to estimation analysis and testimony.

(l)    David Bernick

As you are well aware, David Bernick is lead counsel for Grace.  David is a litigation equity partner who has led the Grace team and litigation strategy since the petition date.  He was the lead trial lawyer at the Estimation trial, the lead architect of the Estimation strategy and the final word on all witness testimony at trial and all materials presented at the Trial.  David's participation at every trial day was absolutely required by the client and necessary to the process.  On those occasions when Scott McMillin or Barbara Harding put on witnesses rather than David, David was at Scott or Barbara's side counseling with them and directing and approving final questions and exhibits.

(m)     Theodore Freedman

Ted Freedman is the senior restructuring partner on the Grace team. I refer to Ted as "the professor." Ted has experience with the representation of companies with Asbestos issues that spans over at least the last 25 years. Ted is a world renowned expert in the field and the final word on the Grace case on Bankruptcy related issues. Ted has worked with David Bernick on all of the Asbestos chapter 11 cases that Kirkland & Ellis has been involved in. Ted was vital to the preparation of the legal memorandum and briefs that supported Grace's estimation request and counseled the Grace trial team on ultimate Bankruptcy issues. Ted worked directly with David Bernick on the Bankruptcy legal aspects of his opening statement and was asked by David to attend the first day of the trial in order to counsel David on Bankruptcy issues for the opening statement and to help David address and counter the statements made by the PI Committee and FCR in their opening statements. Ted was on site in Pittsburgh for preparation for the opening statement and attended only the first day of trial.

(n)     Travis Langenkamp

Travis is a senior legal assistant and the senior-most member of the D.C. PI litigation support team. At trial, he was charged with supporting the needs of trial attorneys Barbara Harding, David Mendelson, Amanda Basta, Brian Stansbury and Raina Jones. On January 14th, Travis procured backup materials to support the presenting attorneys' *Daubert* argument. On this day as well as January 16th and 22nd, he prepared materials to support K&E's slide presentations, put together binders for attorneys' courtroom reference, pulled case law upon request, prepared exhibits, researched deposition testimony issues, and worked with the trial technology group to prepare demonstratives. In addition, Travis assisted the trial attorneys with any in-court requests.

(o)     Barbara Harding

D.C.-based litigation partner Barbara Harding was the second most senior litigation partner on the estimation litigation team. Barbara second chaired the entire trial along side David Bernick. As discussed in prior responses, Barbara is the litigation partner who was in charge of the day to day PI estimation case and has functioned as David Bernick's quarterback on the expert side of the case. In addition, Barbara is an integral part of the Criminal team and as such was responsible for providing a bridge between the two teams and making sure that information from the Criminal proceedings was shared with and integrated into the estimation side of the case, as appropriate. Barbara's trial responsibilities were many, and included overall responsibility for preparing and conducting the examinations of many of the Debtors' expert witnesses. Specifically, on January 16th, Barbara conducted the direct and redirect examinations of Dr. Howard Ory and, on March 25th, she conducted the direct and redirect examinations of Dr. Suresh Moolgavkar. When Barbara was not introducing testimony, she acted as David Bernick's right hand in presenting evidence and witnesses for the entire case.

(p)    Timothy Fitzsimmons

Tim, who holds a doctorate in biomedical sciences, is a legal assistant analyst member of the D.C. estimation team.  His role in the trial, as has been the case throughout the estimation process, has been to review and analyze many of the underlying documents related to the expert witnesses - in the case of the trial, the testifying expert witnesses.  He was heavily involved in the preparation of those testifying witnesses.  On each of the dates in question (January 16th, March 25th, and March 26th), he attended only those portions of the trial in which expert witnesses testified.  On these trial dates, he recommended issues and citations for use on redirect examinations of the Debtors' witnesses.  He helped the trial team understand the biomedical aspects of the cross-examination themes then being developed, and assisted the trial attorneys with the medical and scientific aspects of the witnesses testimony.

(q)    Andrew Erskine

Project assistant Andrew Erskine was a member of Dan Rooney's Chicago estimation trial support team.  His questioned time entries (March 24th, 25th, 26th, and 31st) are all trial dates, and Andrew was present in the courtroom for the entirety of the proceedings on those days.  He sat at the counsel table and traced the exhibits and demonstratives used by the presenting attorneys (by recording which were used in court, by whom, and whether each was offered, admitted or rejected).  In conjunction, he continually updated the trial team's exhibits list database.  Andrew was tasked with tracking and making immediately available all physical copies of documents in the courtroom.  In addition, he acted as liaison between the courtroom and K&E's remote trial site, communicating with the team at the remote site and ensuring that all requests made to team members at the remote site were carried through.  Finally, he came to the courtroom early each day in order to set up the trial team's materials and supplies before the start of the trial day.

(r)    Laura Durity

Associate Laura Durity, a junior associate on the D.C. estimation litigation team, aided in the preparation of direct examinations of the Debtors' expert witnesses, conducting requested research and reviewing and editing graphics.  In addition, Laura researched evidentiary issues that arose during the trial relating to admissions and motion responses.  She also reviewed reliance materials of claimants' witnesses in order to assist the Debtors' attorneys with their cross-examinations of such witnesses.  On the weekend dates in question, Laura was tasked with managing the support team to ensure that the proper documents for each Debtors' witness direct or cross examination were ready in advance of the scheduled examinations.  On trial days, Laura was not physically present in court, but instead worked at K&E's remote trial office, monitoring the live feed of the testimony and continuously responding to messages from courtroom participants about needed documents and conducting legal research.

(s)    Ritu Kelotra

D.C. estimation litigation team associate Ritu Kelotra was also tasked with assisting presenting attorneys with direct and redirect examinations of the Debtors' expert witnesses.  On March 25th, she assisted David Bernick, Barbara Harding and Brian Stansbury in court during the examination of Dr. Moolgavkar, by procuring appropriate exhibits and expert witness reliance materials.  She also prepared exhibits for Dr. Moolgavkar's redirect during his cross examination.  On March 26th, she performed the same tasks in regard to Dr. Anderson's testimony.

 (t)  Andrew Ross

D.C. case assistant Andrew Ross prepared the trial exhibits for both of the Debtors' witnesses (Dr. Moolgavkar and Dr. Anderson) who testified on March 25th - 26th.  He attended court each of those days in order to assist with the presentation of those exhibits and provided both process and substantive expertise with respect to those exhibits as they were used by the presenting attorneys.  Andrew also prepared demonstratives in connection with these two witnesses that were likewise used by the trial team.

**RESPONSE EXHIBIT 1-A**

The time period covered by the Fee Application was April 1st - June 30th, 2008 (the 2nd quarter of 2008, or the <u>Response Period</u>"), during which period Grace reached a settlement (the "PI Settlement") with the Asbestos Personal Injury Creditors Committee (the "ACC"), the Asbestos Personal Injury Future Claimants' Representative ( the "FCR") and the Equity Committee (collectively the "Co-Proponents") which ultimately halted the Asbestos Personal Injury estimation trial (the "PI Trial"). The first day of the Response Period, April 1, 2008 was an estimation trial date which was followed by five days and nights of virtually continual trial preparation by K&E's estimation trial team in preparation for the next scheduled PI Trial date of April 7th. At the same time, certain members of the trial team also negotiated and prepared a term sheet for the PI Settlement. The PI Settlement was ultimately reached just before commencement of the PI Trial on April 7 and instead of proceeding to trial on April 7, the PI Settlement was announced.

With that background, K & E hereby responds to the Initial Report. Each of K&E's responses in this letter corresponds to the paragraph in the Initial Report raising particular concerns regarding the Fee Application.

1.    <u>Attendance at PI Estimation Trial Dates April 1st and April 7th (¶ 3 and Exhibit A)</u>

Paragraph 3 of the Initial Report requests greater explanation concerning the attendance of multiple K&E professionals at the April 1st and April 7th, 2008 PI Trial. In particular, the Initial Report identifies three professionals -- Henry Thompson, Matthew Nirider, and Ayesha Johnson -- for whom the Initial Report requests an explanation of their respective roles at these two hearing dates. Additionally, the Initial Report asks K&E to confirm that our previous descriptions of the other PI team members' roles and responsibilities, which we provided in our response to the Fee Auditor's Report Regarding the Fee Application of K&E for the Twenty-Eighth Interim Period (such response, the "<u>Prior Response</u>"), remained accurate in the second quarter of 2008. We address these issues in order below.

(a)    <u>Matthew E. Nirider</u>

Matt has been a junior associate on the Grace PI team since January of 2007. The large portion of his work has consisted of assisting Scott McMillin with preparation for expert witness depositions and examinations. With regard to Matt's specific time questioned in the Initial Report, on April 6th, Matt traveled to Pittsburgh to assist Scott in preparing for the cross-examination of expert witness Dr. Steven Hays, which was scheduled for the following week. Since Matt had previously assisted Scott with preparing for Dr. Hays' deposition, he was already familiar with many of the issues expected to arise during the witness' examination at trial. Of course, since the parties settled on April 7th, Dr. Hays never took the stand, and Matt flew back from the trial on that day. He attended only the portion of the April 7th hearing during which the PI Settlement was announced in open court.

(b)    Henry A. Thompson, II

Henry has been a junior associate on the Grace PI team since late 2006. The majority of Henry's work on the team involved defensive discovery projects assigned to him by David Mendelson (until David left K&E in February of 2008) and Barbara Harding. During trial, he was assigned to conduct any requested research and conduct any required logistical support on a real-time basis as needed by the senior attorneys on the trial team. He spent less than an hour in court on April 7th, attending only that portion of the hearing during which the PI Settlement was announced.

(c)    Ayesha Johnson

Case assistant Ayesha Johnson joined the Grace PI litigation team in October of 2007 under lead legal assistant Travis Langenkamp. Her general role was to assist PI team attorneys with document productions, deposition preparation, and other pre-trial matters. During trial, she compiled, organized, cite-checked and updated materials pertaining to witness examinations, including demonstratives and designations. On the April 1st trial date, she provided this type of support with respect to the cross-examination of PI expert witness Dr. Arnold Brody. On April 2nd, she did the same with respect to the examinations of Drs. Victor Roggli and Steven Hays. Finally, on April 6th, a trial preparation day, Ayesha assisted with preparation for the scheduled upcoming examination of Dr. Laura Welch.

The Initial Report also requests that we confirm that our Prior Response description of the roles of the rest of the PI team remained current during the Response Period. As the PI Trial was suspended on April 7th as a result of the PI Settlement, the first week of April was the only portion of the Response Period applicable to this request. Apart from the effect of David Mendelson's departure from the firm, which occurred in February, we confirm that our prior descriptions of PI team member's roles and responsibilities did not change before the end of the PI Trial, and so remained current during the relevant portion of the Response Period. The only significant change was that Scott McMillin, Ellen Ahern and Amanda Basta picked up responsibility for some of the tasks that David Mendelson was handling prior to his departure. (Of course, the specific dates listed in the Prior Response descriptions relate to the first quarter 2008, but individuals' general team roles and responsibilities did not change.) Our description of the status of the case we presented in the Prior Response also remained current, with, of course, the update that the trial was suspended on April 7th due to the PI Settlement.

Since Exhibit A to the Initial Report lists particular professionals' time spent on the estimation matter from April 1 - 7th, below we briefly describe (in the order listed on Exhibit A) those professionals' specific tasks on the questioned dates. Rather than repeat each professional's general PI team role and responsibilities here, we refer you to our Prior Response for such descriptions. We also note one other important fact to keep in mind re the April 1-7 period of the case. April 1 was one of the first days that the ACC and FCR presented their case in chief. The Debtors had just rested their case. As a result, it was important for most of the PI Trial team to

participate in the preparation for the April 1 testimony and attend the hearing so that the Trial Team could begin to understand the ACC/FCR's approach to the case and character and style of their direct examinations and presentation of evidence.

### Andrew Erskine

Andrew attended court on April 1st with precisely the same responsibilities he had throughout the PI trial -- he tracked exhibits and demonstratives used by the presenting attorneys, continually updated the trial team's exhibits list database, and tracked and made immediately available all physical copies of documents in the courtroom. He also set up the trial team's materials and supplies before the start of court, and continued to serve as liaison between the courtroom and K&E's remote trial site.

### Jan Baer

On April 1st, I attended court for only one hour, specifically for the purpose of lending historical support regarding specific matters addressed by the witnesses testifying that day. The remainder of the day, I lent support from the remote trial site as Bankruptcy related issues arose. I did not travel to Pittsburgh for the April 7 hearing and only participated telephonically in the Court hearing that day. I consulted with the PI Trial team with respect to the PI Settlement and procedural and scheduling issues that arose with respect to the PI Settlement and Plan Confirmation issues affected by the PI Settlement.

### Sal Bianca

On April 1st, Sal assisted David Bernick with preparations for the cross and re-cross examinations of the testifying witness that day -- PI claimants' witness Dr. Andrew Brody. Sal lent litigation support on evidentiary issues that were expected to arise during Dr. Brody's testimony, helped prepare questions and materials for the Brody cross examination and attended court to assist David during Dr. Brody's testimony. Sal also provided continuity with respect to issues that simultaneously have arisen during the course of the preparation on the Montana Criminal matter in which Sal is also participating.

*(In response to our follow-up inquiry, K&E provided the following additional information concerning Mr. Bianca's attendance at the hearing:)*

. . . Further, throughout the month leading up to the April 1st hearing, Sal focused his time on reviewing expert reports and related reliance materials. Sal's presence at the April 1 hearing was also necessary to hear Dr. Brody's testimony because of its importance to Sal's responsibility in preparing for cross-examinations of other of the ACC and FCR witnesses scheduled to testify on later dates.

<u>Amanda Basta</u>

On April 1st, Amanda attended trial to support David Bernick in his cross and re-cross examinations of Dr. Brody, performing essentially the same discrete trial tasks as listed in our Prior Response description of her role that related primarily to documentary discovery as it affected the Brody testimony.  On April 7th, she attended only that portion of the hearing during which the PI Settlement was announced.

*(In response to our follow-up inquiry, K&E provided the following additional information concerning Ms. Basta's attendance at the hearing:)*

As the associate primarily responsible for third party discovery issues throughout the PI Trial, during the month leading up to the April 1st trial date, Amanda prepared for and attended numerous depositions of expert witnesses, prepared the related deposition designations (as well as responses and objections to the ACC and FCR witness designations), prepared relevant testimonial summaries on hearing dates, and continued to retain responsibility for documentary discovery issues as a whole.  With respect to April 1st, she prepared certain portions of the outline and many of the graphics used by David Bernick in his cross-examination of Dr. Brody wherein documents discovered in the third party discovery process were used.  David requested Amanda's presence at the hearing for real time counsel on these documents.

<u>Brian Stansbury</u>

Brian's role as PI team litigation associate most directly responsible for medical issues did not change in the first week of April.  On April 1st, Brian, together with Barbara Harding, second-chaired David's cross and re-cross examination of Dr. Brody whose substantive testimony directly related to Brian's scope of responsibility.

<u>Tim Fitzsimmons</u>

Legal assistant analyst Tim Fitzsimmons attended portions of the hearing on April 1st to fulfill his responsibility to assist the trial attorneys (David, Barbara and Brian, in this case) with their understanding of the medical and scientific aspects of Dr. Brody's testimony during the witness' direct and redirect examinations.  He recommended issues and citations for use on K&E's cross and re-cross examinations of Dr. Brody.

*(In response to our follow-up inquiry, K&E provided the following additional information concerning Mr. Fitzsimmons' attendance at the hearing:)*

As the only member of the PI team who holds a PhD in biomedical sciences, Tim is uniquely qualified to analyze many of the underlying documents related to the testifying expert witnesses for both the Debtors and the ACC/FCR.  Throughout the PI Trial, Tim

helped K&E presenting attorneys develop themes for examination of scientific witnesses. He attended the PI Trial each day on which a scientific witness testified for whom Tim had helped develop examination strategy. His attendance for Dr. Brody's examination was necessary to assure continuity with respect to the biomedical testimony presented since he was the PI Team member in possession of the academic scientific background needed to interpret and analyze such testimony.

Laura Durity

Laura assisted with David's preparation for Dr. Brody's cross and re-cross examinations, and, on April 1st, worked in K&E's remote trial office, monitoring the live feed of the testimony and responding to requests from courtroom participants for needed documents and legal research. On April 6th, as on prior weekend days during the trial, she was tasked with managing the support team to ensure that the proper documents were ready for the witnesses scheduled to testify the following week. On April 7th, she again worked in the remote trial office monitoring live feed from the courtroom until the settlement was announced.

Ayesha Johnson -  see description above

Ellen Ahern

As described in her time entry shown on the Initial Report Exhibit A, Ellen spent 5 hours on April 1st preparing materials for the motions *in limine* regarding PI claimants' witnesses Peter Krause and Stephen Snyder which motions were argued by David in court that day. In addition, she attended court for a half-hour during David's cross-examination of Dr. Brody, in order to provide support on specific aspects of Dr. Brody's testimony. She attended only that portion of the hearing on April 7th during which the settlement was announced.

David Bernick

On April 1st, David conducted the cross and re-cross examinations of PI claimants' witness Dr. Andrew Brody. As described above, he also argued motions *in limine* relating to two claimants' witnesses and proffered Grace's remaining evidence in the case. On April 7th, David met with Scott McMillin to review the just-reached PI Settlement and to prepare for David's presentation of the PI Settlement to the Judge. He and Scott then met with the Judge prior to Court and presented the PI Settlement term sheet. Finally, David then conducted the short hearing on April 7 during which the settlement was announced in open court.

Elli Leibenstein

Elli attended a portion of the trial on April 1st in order to counsel David at trial in questioning Dr. Brody during the witness' cross and re-cross examinations. Elli's assistance related specifically to points addressed by Grace's estimation experts to which Dr. Brody was responding. On April 7th, she attended Court for the presentation of the PI Settlement.

*(In response to our follow-up inquiry, K&E provided the following additional information concerning Mr. Leibenstein's attendance at the hearing:)*

As we have previously described, Elli's PI team role was as resident "estimation expert," and he worked directly and extensively with Grace's estimation experts to develop the key expert reports in the case wherein the estimated Grace PI Liability was addressed. Elli attended a portion of the trial on April 1st in order to counsel David Bernick with regard to specific estimation issues arising during David's questioning of Dr. Brody. Dr. Brody was one of several of the PI Committee's experts whose testimony was intended to discredit the estimation expert reports that Elli worked on with Grace's experts.

Barbara Harding

Barbara second-chaired David Bernick's cross and re-cross examinations of Dr. Brody on April 1st. In this respect, her duties as second chair have been described previously.

Scott McMillin

Scott continued to focus on the scientific aspects of the PI Trial, and, on April 1st, he assisted David in preparing for the cross and re-cross examinations of Dr. Brody with respect to these scientific issues. On April 7th, Scott met with David Bernick to discuss the specifics of the PI Settlement just then reached, and to prepare for meeting with the Judge to present the Settlement's terms. Scott then accompanied David to the Judge's chambers to apprise the Judge of the Settlement, outline its terms, and to discuss how to proceed in the PI Trial at that point.

*(In response to our follow-up inquiry, K&E provided the following additional information concerning Mr. McMillin's attendance at the hearing:)*

During the time period leading up to the April 1 hearing, Scott assisted David in preparing for certain scientific aspects of the cross and re-cross examinations of Dr. Brody. Scott's intricate knowledge of the details of the scientific aspects of the testimony of the Debtors' numerous testifying expert witnesses was of key relevance as Grace began to cross examine the ACC/FCR expert witnesses such as Dr. Brody. David Bernick asked Scott to be present during the Brody testimony to lend assistance and continuity given Scott's detailed

knowledge of the other scientific experts that had testified, many of whom Scott had questioned during the Debtors' case in chief.

Matthew Nirider -- see description above.

Raina Jones

Raina's PI team role remained the same as that previously described, save for her added responsibility of preparing a daily memo to Grace summarizing each day's trial events. On April 7th, she attended only the portion of the hearing during which the settlement was announced.

Henry Thompson - see description above.

Ritu Kelotra

Ritu also attended only that portion of the April 7th hearing during which the settlement was announced.

**RESPONSE EXHIBIT 2**

April 22nd ZAI Hearing (¶ 4 and Exhibit "B")

Bruens, Love, Boll, Baer, Dierkes, Esayian, Freedman, Harding

Paragraph 4 of the Initial Report requests greater explanation concerning the attendance of seven K&E attorneys and one K&E legal assistant at the April 22nd, 2008 hearing concerning Zonolite Attic Insulation ("ZAI") claims.

A number of ZAI-related motions were at issue at the April 22nd hearing: the Debtors' motion for a ZAI proof of claim bar date and approval of a ZAI claim form and notice program, and four motions by the ZAI claimants: motion to recognize a Washington State class claim, motion to dismiss an individual ZAI claim, motion to show cause why an expert witness should not be designated, and expedited motion to lift the stay.

The following lettered paragraphs list, in the order listed in Exhibit B to the Initial Report, each of the professionals whose time is listed in Exhibit B, together with such professional's role and responsibilities with regard to the ZAI hearing/litigation.

Craig Bruens

Craig, a Restructuring partner, joined K&E, and the Grace team, on March 31, 2008. Together with senior Restructuring partner Ted Freedman, Craig has been tasked with a good portion of developing Grace's Chapter 11 plan and bankruptcy emergence strategy with respect to ZAI and other asbestos property damage ("PD") claims. He attended the April 22nd hearing in order to develop his understanding and knowledge of the history and status of ZAI issues for purposes of developing and drafting relevant sections of the Debtors' Chapter 11 plan. He also assisted in the review of certain legal issues that were raised in the ZAI Claimant's requests for Class Certification.

Kimberly Love

At the end of March 2008, Kim took over from Michael Rosenberg as the legal assistant responsible for ZAI and PD claims. Kim works mainly with Lisa Esayian, Michael Dierkes and me. She also is the legal assistant in charge of lending support at all hearings where legal assistant support is required. In this respect, she accompanied the attorneys to the April 22 hearing and assisted on site with the preparation of materials for the hearing. During the hearing, she then provided the K&E attorneys with assistance with documents, claims files, pleadings and demonstrative materials.

Deanna Boll

New York Restructuring partner Deanna Boll was heavily involved in ZAI matters. She drafted the ZAI bar date motion that was at issue at the hearing and negotiated with the PD Committee and other objectors with respect to the ZAI bar date notice, publication requirements and claim forms. Deanna attended the hearing telephonically in order to provide real-time assistance and

needed information/backup to David Bernick (who conducted the majority of the hearing) concerning the bar date motion. Deanna also prepared the demonstratives David used during the hearing. Further, she had also performed a comparison of the Debtors' ZAI notice program to the notice program previously submitted by the PD Committee. Her telephonic attendance at the ZAI hearing was necessary in order for her to be able to assist David with questions and issues about the bar date motion and notice program that arose during the course of the hearing.

Janet Baer

From day one of the Chapter 11 cases, I have been involved in ZAI related matters, including two previous attempts to secure a ZAI Bar Date. I also was the main partner in charge of the previous bar date and publication program for other PD claims. My role with respect to the ZAI matters addressed on April 22, was to provide historical context regarding the previous bar date and publication parameters. I also reviewed and ultimately provided comments on all materials prepared for the hearing and submitted to the Court, including matters related to Class Claims.

I was asked specifically by the client to attend the ZAI hearing in person in order to provide any and all historical information necessary during the course of the hearing. I also previously worked with our media expert with respect to the Bar Date program and consulted with Deanna Boll with respect to the structure of the current program. And, finally, I lend Bankruptcy support to David Bernick during the hearing.

Michael Dierkes

Michael, the key Litigation associate responsible for ZAI and Asbestos Property Damage matters in the case, attended the April 22nd hearing by phone. He assisted Litigation partner Lisa Esayian with the Debtors' brief in opposition to the ZAI claimants' motion to certify a Washington State ZAI class action -- one of the matters David Bernick argued at the hearing. Michael also assisted David with preparations for oral argument on the class action issue, by compiling, preparing and organizing demonstratives and other materials for David to use at the hearing. Because he continued to work with Lisa Esayian on the class action issue following the hearing, Michael needed to listen to the arguments so he could understand the issues and positions going forward.

Lisa Esayian

Lisa , the Litigation partner responsible for ZAI class action issues, attended the hearing telephonically. She had drafted the brief in opposition to the ZAI claimants' motion to certify a Washington State ZAI class and supervised associate Michael Dierkes in compiling and organizing materials to prepare David Bernick for oral argument at the hearing. She listened to the class action arguments made during the hearing and was responsible for all follow up from that hearing on class issues.

Theodore Freedman

Ted's role with respect to ZAI was to analyze the Bankruptcy aspects of the Class Action request. Ted worked with Lisa and Mike to complete the ZAI Class brief. Ted had previously done extensive research on ZAI issues, the affect of the ZAI Science Opinion on the case and potential

Chapter 11 Plan and alternatives to the Class Action approach.

Ted attended the ZAI hearing in person in order to provide real time assistance to David Bernick on the legal issues associated with the Class Action request.

<u>Barbara Harding</u>
Barb is currently the partner in charge of many aspects of the Libby Criminal matter.  She also was previously the partner in charge of the day to day activities of the PI Estimation team.  Barb attended portions of the ZAI hearing telephonically in order to be immediately aware of the arguments being raised by all parties and assess their potential affect on the Libby Criminal matter. She also attended to provide historical support on certain factual issues that arose that were related to the PI Estimation discovery.