## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 4 TO EXHIBIT BOOK
## REVISED TRUST DISTRIBUTION PROCEDURES

**EXHIBIT 4**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**DRAFT:  11/21/08**

**MARKED TO SHOW CHANGES TO FILED VERSION**

**W.R. GRACE & CO.**

**ASBESTOS PERSONAL INJURY SETTLEMENT TRUST
DISTRIBUTION PROCEDURES**

# W.R. GRACE & CO.

## ASBESTOS PERSONAL INJURY SETTLEMENT TRUST DISTRIBUTION PROCEDURES

### TABLE OF CONTENTS

Page

SECTION I — Introduction ........................................................................ 2

    1.1    Purpose ............................................................................... 2
    1.2    Interpretation ...................................................................... 2

SECTION II — Overview ......................................................................... 2

    2.1    PI Trust Goals ..................................................................... 2
    2.2    Claims Liquidation Procedures .............................................. 3
    2.3    Application of the Payment Percentage ................................... 5
    2.4    PI Trust's Determination of the Maximum Annual Payment
          and Maximum Available Payment ................................. 6̶ 7
    2.5    Claims Payment Ratio ......................................................... 8
    2.6    Indirect PI Trust Claims ..................................................... 10

SECTION III — TDP Administration .......................................................... 10

    3.1    Trust Advisory Committee and Futures Representative ........................ 10
    3.2    Consent and Consultation Procedures .................................. 10

SECTION IV — Payment Percentage; Periodic Estimates ............................. 11

    4.1    Uncertainty of Grace's Personal Injury Asbestos Liabilities .................. 11
    4.2    Computation of Payment Percentage ................................... 11
    4.3    Applicability of the Payment Percentage ............................... 13

SECTION V — Resolution of PI Trust Claims .................................................. 15

   5.1    Ordering, Processing and Payment of Claims ...................................... 15
        (a)    Ordering of Claims .......................................................... 15
             (1)    Establishment of the FIFO Processing Queue ............... 15
             (2)    Effect of Statutes of Limitations and Repose ................ 16
        (b)    Processing of Claims........................................................ 17
        (c)    Payment of Claims .......................................................... 17
   5.2    Resolution of Pre-Petition Liquidated PI Trust Claims .......................... 18
        (a)    Processing and Payment .................................................. 18
        (b)    Marshalling of Security ................................................... 20
   5.3    Resolution of Unliquidated PI Trust Claims ........................................ 20
        (a)    Expedited Review Process ............................................... 21
             (1)    In General .......................................................... 21
             (2)    Claims Processing Under Expedited Review ................. 22
             (3)    Disease Levels, Scheduled Values
                    and Medical/Exposure Criteria ................................. 23
        (b)    Individual Review Process ............................................... 27
             (1)    In General .......................................................... 27
                  (A)    Review of Medical/Exposure Criteria ............... 29
                  (B)    Review of Liquidated Value ............................ 29
             (2)    Valuation Factors to Be Considered in
                    Individual Review ..................................................... 30
             (3)    Scheduled, Average and Maximum Values ................... 31
   5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship.............. 32
        (a)    Extraordinary Claims ...................................................... 32
        (b)    Exigent Hardship Claims ................................................. 33
   5.5    Secondary Exposure Claims .............................................................. 34
   5.6    Indirect PI Trust Claims ................................................................... 34[3]**35**[4]
   5.7    Evidentiary Requirements ................................................................. 37
        (a)    Medical Evidence ........................................................... 37
             (1)    In General .......................................................... 37
                  (A)    Disease Levels I–IV....................................... 37[5]**38**[6]
                  (B)    Disease Levels V–VIII ..................................... 39
                  (C)    Exception to the Exception for Certain
                      Pre-Petition Claims.......................................... 39
             (2)    Credibility of Medical Evidence .................................. 39[7]**40**[8]
        (b)    Exposure Evidence.......................................................... 40[9]**41**[10]
             (1)    In General .......................................................... 40[11]**41**[12]
             (2)    Significant Occupational Exposure................................ 41[13]**42**[14]
             (3)    Grace Exposure .................................................. 41[15]**42**[16]
   5.8    Claims Audit Program ...................................................................... 43
   5.9    Second Disease Claims ..................................................................... 44

5.10    Arbitration .................................................................................... 44[17]**45**[18]
      (a)    Establishment of ADR Procedures ............................................ 44[19]**45**[20]
      (b)    Claims Eligible for Arbitration ................................................ 45[21]**46**[22]
      (c)    Limitations on and Payment of Arbitration Awards ................... 46
5.11    Litigation ..................................................................................... 46[23]**47**[24]

SECTION VI — Claims Materials ................................................................. 46[25]**47**[26]

6.1    Claims Materials ........................................................................... 46[27]**47**[28]
6.2    Content of Claims Materials ......................................................... 47
6.3    Withdrawal or Deferral of Claims ................................................ 47[29]**48**[30]
6.4    Filing Requirements and Fees ...................................................... 48
6.5    Confidentiality of Claimants' Submissions ................................... 48[31]**49**[32]

SECTION VII — General Guidelines for Liquidating and Paying Claims ................... 50

7.1    Showing Required    ..................................................................... 50
7.2    Costs Considered ......................................................................... 50
7.3    Discretion to Vary the Order and Amounts of Payments in
        Event of Limited Liquidity ............................................... 50[33]**51**[34]
7.4    Punitive Damages ......................................................................... 51[35]**52**[36]
7.5    Sequencing Adjustment ................................................................ 52[37]**53**[38]
      (a)    In General ............................................................................... 52[39]**53**[40]
      (b)    Unliquidated PI Trust Claims ................................................. 52[41]**53**[42]
      (c)    Liquidated Pre-Petition Claims .............................................. 53[43]**54**[44]
7.6    Suits in the Tort System ............................................................... 54
7.7    Payment of Judgments for Money Damages ................................. 54[45]**55**[46]
7.8    Releases ....................................................................................... 55[47]**56**[48]
7.9    Third-Party Services .................................................................... 55[49]**56**[50]
7.10    PI Trust Disclosure of Information .............................................. 56

SECTION VIII — Miscellaneous    ............................................................... 56[51]**57**[52]

8.1    Amendments ................................................................................ 56[53]**57**[54]
8.2    Severability .................................................................................. 56[55]**57**[56]
8.3    Governing Law ............................................................................ 57[57]**58**[58]

# W.R. GRACE & CO.

## ASBESTOS PERSONAL INJURY SETTLEMENT TRUST DISTRIBUTION PROCEDURES

The W.R. Grace & Co. Asbestos Personal Injury Settlement Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving all "Asbestos ~~Personal Injury~~[59]**PI**[60] Claims" as defined in the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., *et al.*, the Official Committee of Asbestos Personal Injury Claimants, the **Asbestos PI** [61]Future Claimants' Representative, and the Official Committee of Equity Security Holders, dated as of September ~~—~~;[62]**19,**[63] 2008 (as it may be amended or modified, the "**Plan**"),[1] including**, without limitation,**[64] all asbestos-related personal injury and death claims caused by conduct of, and/or exposure to products for which, W.R. Grace & Co. and/or the other Debtors (collectively referred to as "**Grace**"), and their predecessors, successors, and assigns, have legal responsibility as provided in and required by the Plan and the W.R. Grace & Co. Asbestos Personal Injury Settlement Trust Agreement (the "**PI Trust Agreement**").  The Plan and PI Trust Agreement establish the WRG Asbestos **PI**[65]Trust (the "**PI Trust**").  The Trustees of the PI Trust (the "**Trustees**") shall implement and administer this TDP in accordance with the PI Trust Agreement.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement; *provided, however*, that "Asbestos PI Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims.**"

## SECTION I

## Introduction

**1.1     Purpose.**  This TDP has been adopted pursuant to the PI Trust Agreement.  It is designed to provide fair, equitable and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2     Interpretation.**  Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits provided herein to holders of PI Trust Claims shall vest in such holders as of the Effective Date.

## SECTION II

## Overview

**2.1     PI Trust Goals.**  The goal of the PI Trust is to treat all claimants equitably.  This TDP furthers that goal by setting forth procedures for processing and paying Grace's several share of the unpaid portion of the ~~liquidated~~ [66] value of ~~PI Trust Claims~~[67]**asbestos personal injury claims**[68] generally on an impartial, first-in-first-out (**"FIFO"**) basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[2]  To this end, the TDP establishes a schedule of eight asbestos-related diseases (**"Disease Levels"**), seven of which have presumptive medical and exposure requirements (**"Medical/Exposure Criteria"**) and specific liquidated values (**"Scheduled Values"**), and seven of which have anticipated average values (**"Average Values"**) and caps on their liquidated values (**"Maximum Values"**).  The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values,

---

[2]      As used in this TDP, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the PI Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement histories of Grace and the rights claimants would have in the tort system absent the bankruptcy.

      **2.2    Claims Liquidation Procedures.** PI Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below. The PI Trust shall take all reasonable steps to resolve PI Trust Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below. The PI Trust shall also make every effort to resolve each year at least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

      The PI Trust shall liquidate all PI Trust Claims except Foreign Claims (as defined below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I–V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below. Claims involving Disease Levels I–V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section 5.3(b) below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the

claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Claimants holding claims involving Disease Levels II-VIII may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the PI Trust's Individual Review Process.  However, the liquidated value of a claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in Section 5.4(a) for such claims.  Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the PI Trust's Individual Review Process.

Based upon Grace's claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under the ADR Procedures that are provided in Attachment A hereto.  PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections

- 4 -

5.11 and 7.6 below.  However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

      **2.3**      **Application of the Payment Percentage.**  After the liquidated value of a PI Trust Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on a Payment Percentage described in Section 4.2 below.  The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

      ~~The~~[69] **An**[70] Initial Payment Percentage ~~has been set at ____% and~~[71] ~~shall apply to all PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust~~[72] ~~pursuant to the consent of~~[73] **shall be set pursuant to Section 4.2 below promptly after the PI Trust is established by the Trustees after consultation with**[74] the PI Trust Advisory Committee (the "**TAC**") and the Legal Representative for Future Claimants (the "**Futures Representative**") (who are described in Section 3.1 below)**.**  [75] ~~The~~[76] **Initial Payment Percentage**[77] shall apply to all PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust [78]**with the consent of the TAC and the Futures Representative**[79] pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event the Initial Payment Percentage is changed.  The term "**PI Trust Voting Claims**" includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against Grace in the tort system or actually submitted to Grace pursuant to an administrative settlement

agreement prior to the Petition Date of April 2, 2001; and (iii) all asbestos claims filed against another defendant in the tort system prior to September 19, 2008, the date the Plan was filed with the Bankruptcy Court (the "**Plan Filing Date**"); provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her PI Trust Voting Claim; and provided further that (2) the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below.  The Initial Payment Percentage ~~has been~~[80]**shall be**[81] calculated on the assumption that the Average Values set forth in Section 5.3(b)(3) below shall be achieved with respect to existing present claims and projected future claims involving Disease Levels II–VIII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the PI Trust with the consent of the TAC and the Futures Representative to reflect then-current estimates of the PI Trust's assets and its liabilities, as well as then-estimated value of then-pending and future claims.  Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below.  If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.2 below.  Because there is uncertainty in the prediction of both the number and severity of future PI Trust Claims, and the amount of the PI Trust's

assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated value.

**2.4     PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment.**  The PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds shall be available to treat all present and future holders of PI Trust Claims as similarly as possible.  In each year, the PI Trust shall be empowered to pay out all of the income earned during the year (net of taxes payable with respect thereto), together with a portion of its principal, calculated so that the application of PI Trust funds over its life shall correspond with the needs created by the estimated initial backlog of claims and the estimated anticipated future flow of claims (the "**Maximum Annual Payment**"), taking into account the Payment Percentage provisions set forth in Section 2.3 above and Sections 4.2 and 4.3 below.  The PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the PI Trust shall first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims; (b) PI Trust Claims involving Disease Level I (Cash Discount Payment) which have been liquidated by the PI Trust; (c) any PI Trust Claims based on a diagnosis dated prior to the Effective Date ("Existing Claims") and (d) Exigent Hardship Claims (as defined in Section 5.4(b) below).  Should the Maximum Annual Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue.  Claims in any group for which there are insufficient funds shall be carried over to the next year, and placed at the head of their FIFO Payment Queue.

The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated PI Trust Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below.  Claims in the groups described in (a), (b), (c) and (d) above shall not be subject to the Claims Payment Ratio.

      **2.5**    **Claims Payment Ratio.**  Based upon Grace's claims settlement histories and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 88% for Category A claims, which consist of PI Trust Claims involving severe asbestosis, severe disabling pleural disease and malignancies (Disease Levels IV–VIII) and at 12% for Category B claims, which are PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III).

      In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 88% of that amount shall be available to pay Category A claims and 12% shall be available to pay Category B claims that have been liquidated since the Petition Date except for claims which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(c) below, which shall be based upon the date of claim liquidation.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for

that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 88%/12% Claims Payment Ratio and its rollover provision shall apply to all PI Trust Voting Claims as defined in Section 2.3 above (except Pre-Petition Liquidated Claims, Other Asbestos Disease claims (Disease Level I – Cash Discount Payment), Existing Claims and Exigent Hardship Claims), and shall not be amended until the third anniversary of the date the PI Trust first accepts for processing proof of claim forms and other materials required to file a claim with the PI Trust.  Thereafter, both the Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice.  However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio shall not, in and of itself, constitute such circumstances.  In addition, an increase in the numbers of Category B claims beyond those predicted or expected shall not be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment.  In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

In any event, no amendment to the Claims Payment Ratio to reduce the percentage allocated to Category A claims may be made without the unanimous consent of the TAC

members and the consent of the Futures Representative, and the percentage allocated to Category

A claims may not be increased without the consent of the TAC and the Futures Representative.

The consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement shall apply

in the event of any amendments to the Claims Payment Ratio.  The Trustees, with the consent of

the TAC and the Futures Representative, may offer the option of a reduced Payment Percentage

to holders of claims in either Category A or Category B in return for prompter payment (the

"**Reduced Payment Option**").

       **2.6**     **Indirect PI Trust Claims.**  As set forth in Section 5.6 below, Indirect PI Trust

Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of

this TDP as all other PI Trust Claims.

**SECTION III**

**TDP Administration**

       **3.1**     **Trust Advisory Committee and Futures Representative.**  Pursuant to the Plan

and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in

consultation with the TAC, which represents the interests of holders of present PI Trust Claims,

and the Futures Representative, who represents the interests of holders of PI Trust Claims that

shall be asserted in the future.  The Trustees shall obtain the consent of the TAC and the Futures

Representative on any amendments to this TDP pursuant to Section 8.1 below, and on such other

matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement.  The

Trustees shall also consult with the TAC and the Futures Representative on such matters as are

provided below and in Section 2.2(e) of the PI Trust Agreement.  The initial Trustees, the initial

members of the TAC and the initial Futures Representative are identified in the PI Trust

Agreement.

**3.2     Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the Futures Representative of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the PI Trust Agreement, respectively.

**SECTION IV**

**Payment Percentage; Periodic Estimates**

**4.1     Uncertainty of Grace's Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding Grace's total asbestos-related tort liabilities, as well as the total value of the assets available to the PI Trust to pay PI Trust Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims shall receive.  To seek to ensure substantially equivalent treatment of all present and future PI Trust Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future PI Trust Claims shall be likely to receive, *i.e.*, the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2     Computation of Payment Percentage.**  As provided in Section 2.3 above, the Initial Payment Percentage shall be ——[82]**set by the Trustees after consultation with the TAC and the Futures Representative promptly after the date the PI Trust is established.  The Initial Payment Percentage shall be between 25% and 35**[83]% and shall apply to all PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Futures Representative, determine that the Initial Payment Percentage should be changed to assure that the PI Trust shall be in a financial position to pay holders of unliquidated and/or

unpaid PI Trust Voting Claims and present and future PI Trust Claims in substantially the same manner.

In making any such adjustment, the Trustees, the TAC and the Futures Representative shall take into account the fact that the holders of PI Trust Voting Claims voted on the Plan relying on the findings of experts that the Initial Payment Percentage **range** [84] represented a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of PI Trust Voting Claimants that the Initial Payment Percentage would be applied to their PI Trust Claims.

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees with the consent of the TAC and Futures Representative determine that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Futures Representative.  The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Futures Representative.

The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of

funds to pay a comparable percentage of full value to all holders of PI Trust Claims. When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

   **4.3**   **Applicability of the Payment Percentage.** Except as set forth below in this Section 4.3 with respect to supplemental payments, no holder of a PI Trust Voting Claim, other than a PI Trust Voting Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined in Section 5.3(a)(3) below, shall receive a payment that exceeds the Initial Payment Percentage times the liquidated value of the claim. Except as otherwise provided in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which approval of the PI Trust's offer by a court or through a probate process is required, no holder of any other PI Trust Claim, other than a PI Trust Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. PI Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

   If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the Futures Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently

adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

There is uncertainty surrounding the amount of the PI Trust's future assets.  There is also uncertainty surrounding the totality of the PI Trust Claims to be paid over time, as well as the extent to which changes in existing federal and state law could affect the PI Trust's liabilities under this TDP.  If the value of the PI Trust's future assets increases significantly and/or if the value or volume of PI Trust Claims actually filed with the PI Trust is significantly lower than originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustees, with the consent of the TAC and the Futures Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the PI Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental

payment/payments that was/were also suspended because it/they would have been less than $100.00.  However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

## SECTION V

## Resolution of PI Trust Claims.

**5.1**    **Ordering, Processing and Payment of Claims.**

**5.1(a)  Ordering of Claims.**

**5.1(a)(1)  Establishment of the FIFO Processing Queue.**  The PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed on or before the date six (6) months after the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust (such six month anniversary being referred to herein as the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to April 2, 2001 (the "**Petition Date**") that the specific claim was either filed against Grace in the tort system or was actually submitted to Grace pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with Grace; provided, however, that if a claimant was barred from pursuing other defendants in the tort system by the terms of a preliminary injunction or other stay entered by the Court in the Grace bankruptcy proceedings and such claimant files an asbestos claim against another defendant in the tort system within one year after such preliminary injunction or other stay is lifted, the claimant shall be deemed to have filed the asbestos claim against the other defendant

on the date the preliminary injunction or other stay was first entered; (iii) the date after the

Petition Date but before the date that the PI Trust first makes available the proof of claim forms

and other claims materials required to file a claim with the PI Trust that the asbestos claim was

filed against another defendant in the tort system; (iv) the date after the Petition Date but before

the Effective Date that a proof of claim was filed by the claimant against Grace in the Chapter 11

Cases; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to

accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing

Queue shall be determined by the date the claim is filed with the PI Trust.  If any claims are filed

on the same date, the claimant's position in the FIFO Processing Queue shall be determined by

the date of the diagnosis of the asbestos-related disease.  If any claims are filed and diagnosed on

the same date, the claimant's position in the FIFO Processing Queue shall be determined by the

claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2)  Effect of Statutes of Limitation and Repose.**  All unliquidated

PI Trust Claims must meet either (i) for claims first filed in the tort system against Grace prior to

the Petition Date, the applicable federal, state and foreign statute of limitation and repose that

was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed

against Grace in the tort system prior to the Petition Date, the applicable federal, state or foreign

statute of limitation that was in effect at the time of the filing with the PI Trust.  However, the

running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual

filing of the claim against Grace prior to the Petition Date, whether in the tort system or by

submission of the claim to Grace pursuant to an administrative settlement agreement; (B) the

tolling of the claim against Grace prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the PI Trust within three (3) years after the Initial Claims Filing Date.  In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitation or repose, may be filed with the PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.  However, the processing of any PI Trust Claim by the PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

5.1(b)  **Processing of Claims.**  As a general practice, the PI Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

5.1(c)  **Payment of Claims.**  PI Trust Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.  Pre-Petition Liquidated Claims, as defined in Section 5.2 below,

shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

>    **5.2    Resolution of Pre-Petition Liquidated PI Trust Claims.**

>    **5.2(a)    Processing and Payment.**  As soon as practicable after the Effective Date, the PI Trust shall pay, upon submission by the claimant of the appropriate documentation, all PI Trust Claims that were liquidated ~~by~~ [85](i) **by** [86]a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) **by** [87]a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date,

provided there is no supersedeas bond associated with such verdict or judgment, ~~or~~[88] (iii) by a judgment that became final and non-appealable prior to the Petition Date**, or (iv) as a result of being allowed by the Bankruptcy Court**[89] (collectively "**Pre-Petition Liquidated Claims**"). In order to receive payment from the PI Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the PI Trust that the claim was liquidated in the manner described in the preceding sentence, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable) ~~or~~[90]**,**[91] a final judgment **(if applicable), or the Bankruptcy Court's order allowing the claim**[92] (if applicable) and (B) **except in the case of a Pre-Petition Liquidated Claim arising from the Bankruptcy Court's order allowing the claim,** [93]the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer. **Indirect PI Trust Claims that are Pre-Petition Liquidated Claims are not subject to the provisions of Section 5.6 of this TDP.**[94]

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment, **the unpaid portion of the amount of the final judgment,** [95]or the unpaid portion of the amount ~~of~~[96]**allowed by**[97] the ~~final judgment~~[98]**Bankruptcy Court**[99], as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages.  In addition, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio and

the Maximum Available Payment limitations, but shall be subject to the Maximum Annual

Payment and Payment Percentage provisions.  In the absence of a Final Order of the Bankruptcy

Court determining whether a settlement agreement is binding and judicially enforceable, a

dispute between the claimant and the PI Trust over this issue shall be resolved pursuant to the

same procedures in this TDP that are provided for resolving the validity and/or liquidated value

of a PI Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10

and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order

in a separate FIFO queue to be established by the PI Trust based on the date the PI Trust received

all required documentation for the particular claim.  If any Pre-Petition Liquidated Claims were

filed on the same date, the claimants' position in the FIFO queue for such claims shall be

determined by the date on which the claim was liquidated.  If any Pre-Petition Liquidated Claims

were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue

shall be determined by the dates of the claimants' birth, with older claimants given priority over

younger claimants.

**5.2(b)  Marshalling of Security.**  Holders of Pre-Petition Liquidated Claims that

are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their

rights against any applicable security or surety before making a claim against the PI Trust.  Only

in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in

full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

**5.3  Resolution of Unliquidated PI Trust Claims.**  Within six (6) months after the

establishment of the PI Trust, the Trustees, with the consent of the TAC and the Futures

Representative, shall adopt procedures for reviewing and liquidating all unliquidated PI Trust

Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking resolution of unliquidated PI Trust Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  It is anticipated that the PI Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.  A claimant who has received payment for a Disease Level IV-A claim or a Disease Level IV-B claim may not assert or receive payment for another Disease Level IV claim.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.  The PI Trust shall provide the claimant with six (6) months notice of the date by which it expects to reach the claim in the FIFO Processing Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(b) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level.  If a claimant fails to respond to the PI Trust's notice prior to the

reaching of the claim in the FIFO Processing Queue, the PI Trust shall process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

       **5.3(a)  Expedited Review Process.**

       **5.3(a)(1)  In General.**  The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all PI Trust Claims (except those involving Lung Cancer 2 – Disease Level VI and all Foreign Claims (as defined below), which shall only be liquidated pursuant to the PI Trust's Individual Review Process), where the claim can easily be verified by the PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing PI Trust Claims than does the Individual Review Process described in Section 5.3(b) below.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below.  However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth above; provided, however, that Existing Claims shall not be subject to the Maximum Available Payment or the Claims Payment Ratio.  Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive

Medical/Exposure Criteria for the relevant Disease Level may elect the PI Trust's Individual

Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8, the claimant's eligibility to receive the

Scheduled Value for his or her PI Trust Claim pursuant to the Expedited Review Process shall be

determined solely by reference to the Medical/Exposure Criteria set forth below for each of the

Disease Levels eligible for Expedited Review.

**5.3(a)(2)  Claims Processing Under Expedited Review.**  All claimants

seeking liquidation of their claims pursuant to Expedited Review shall file the PI Trust's proof of

claim form.  As a proof of claim form is reached in the FIFO Processing Queue, the PI Trust

shall determine whether the claim described therein meets the Medical/Exposure Criteria for one

of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its

determination.  If a Disease Level is determined, the PI Trust shall tender to the claimant an offer

of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable

Payment Percentage, together with a form of release approved by the PI Trust.  If the claimant

accepts the Scheduled Value and returns the release properly executed, the claim shall be placed

in the FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the

limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**5.3(a)(3)  Disease Levels, Scheduled Values and Medical/Exposure**

**Criteria.**  The eight Disease Levels covered by this TDP, together with the Medical/Exposure

Criteria for each and the Scheduled Values for the seven Disease Levels eligible for Expedited

Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure

Criteria shall apply to all PI Trust Voting Claims filed with the PI Trust (except Pre-Petition

Liquidated Claims) on or before the Initial Claims Filing Date provided in Section 5.1 above for

which the claimant elects the Expedited Review Process.  Thereafter, for purposes of administering the Expedited Review Process and with the consent of the TAC and the Futures Representative, the Trustees may add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.

[100]

[101]**Disease Level**

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $180,000 | (1) Diagnosis[3] of mesothelioma; and (2) Grace Exposure as defined in Section 5.7(b)(3). |
| Lung Cancer 1 (Level VII) | $42,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[4], (2) six months Grace Exposure, (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, Significant Occupational Exposure[5] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 | None | (1) Diagnosis of a primary lung cancer; (2) |

---

[3]     The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[4]     Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.  Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report).  Solely for asbestos claims filed against Grace or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of PI Trust Claims.

[5]     The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| [101]**Disease Level** | **Scheduled Value** | **Medical/Exposure Criteria** |
|---|---|---|
| (Level VI) | | Grace Exposure, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| | | Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VII) claims.  All claims in this Disease Level shall be individually evaluated.  The estimated likely average of the individual evaluation awards for this category is $14,000, with such awards capped at $33,000 unless the claim qualifies for Extraordinary Claim treatment. |
| | | Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[6] In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level V) | $20,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Grace Exposure, (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, Significant Occupational Exposure to asbestos, |

[6]     There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust.  In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $42,000 Scheduled Value for Lung Cancer 1 (Level VII) shown above.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| [101]Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV-A) | $50,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Grace Exposure, (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Severe Disabling Pleural Disease (Level IV-B) | $50,000 | (1) Diagnosis of diffuse pleural thickening of at least extent "2" and at least width "a" as one component of a bilateral non-malignant asbestos related disease based on definitions as set forth in the 2000 revision of the ILO classification[7], plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Grace Exposure, (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, Significant Occupational Exposure to asbestos and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | $7,500 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six |

---

[7] The definitions of *diffuse pleural thickening, extent* and *width* must come from the 2000 ILO Classification for Pneumoconiosis. The 2000 ILO classification restricts diffuse pleural thickening to cases where there is associated blunting of the costophrenic angle; this is a change from the prior versions of the ILO classification. Use of this category must require adherence to the 2000 classification: International Labour Office (ILO). *Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses, Revised Edition 2000* (Occupational Safety and Health Series, No. 22). International Labour Office: Geneva, 2002.

| [101]**Disease Level** | **Scheduled Value** | **Medical/Exposure Criteria** |
|---|---|---|
| | | months Grace Exposure, (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | $2,500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Grace Exposure, and (3) for claimants whose Grace Exposure is not described in clause (ii) of the definition of Grace Exposure, five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I – Cash Discount Payment) | $300 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) Grace Exposure. |

### 5.3(b)  Individual Review Process.

**5.3(b)(1)  In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.  In addition or alternatively, a claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of claim involving Disease Levels II, III, IV-A, IV-B, V, VII or VIII exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited

Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under this TDP shall be established only under the PI Trust's Individual Review process.  PI Trust Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process.  Accordingly, a "**Foreign Claim**" is a PI Trust Claim with respect to which the claimant's exposure to an asbestos-containing product or conduct for which Grace has legal responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below.  The PI Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review process for Foreign Claims, the Trustees, with the consent of the TAC and the Futures Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to all Foreign Claims channeled to the PI Trust; provided however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Asbestos Trustees, with the consent of the TAC and the Futures Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

**5.3(b)(1)(A)  Review of Medical/Exposure Criteria.**  The PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I–V, VII or VIII.  In such a case, the PI Trust shall either deny the claim or, if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

**5.3(b)(1)(B)  Review of Liquidated Value.**  Claimants holding claims in Disease Levels II–VIII shall also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence.  The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels II–VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.4(a) for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial

time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their PI Trust Claims later than would have been the case had the claimant elected the Expedited Review Process.  Subject to the provisions of Section 5.8, the PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

### 5.3(b)(2)  Valuation Factors to Be Considered in Individual Review.

The PI Trust shall liquidate the value of each PI Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level.  The PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility prior to the relevant date set forth in the definition of Grace Exposure in Section 5.7(b)(3) below (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against Grace in the tort system prior to the Petition Date.  If the claim was

- 31 -

not filed against Grace in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.  The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant, and, to the extent the PI Trust seeks recovery from any entity that provided insurance coverage to Grace, the Alabama Wrongful Death Statute shall govern.

**5.3(b)(3)  Scheduled, Average and Maximum Values.**  The Scheduled, Average and Maximum Values for claims involving Disease Levels I–VIII  are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
| --- | --- | --- | --- |
| Mesothelioma (Level VIII) | $180,000 | $225,000 | $450,000 |
| Lung Cancer 1 (Level VII) | $42,000 | $45,000 | $95,000 |
| Lung Cancer 2 (Level VI) | None | $14,000 | $33,000 |

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Other Cancer (Level V) | 20,000 | $20,500 | $35,000 |
| Severe Asbestosis (Level IV-A) | $50,000 | $62,240 | $100,000 |
| Severe Disabling Pleural Disease (Level IV-B) | $50,000 | $62,240 | $100,000 |
| Asbestosis/Pleural Disease (Level III) | $7,500 | $8,500 | $15,000 |
| Asbestosis/Pleural Disease (Level II) | $2,500 | $3,000 | $5,000 |
| Other Asbestos Disease – Cash Discount Payment (Level I) | $300 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above.  Thereafter, the PI Trust, with the consent of the TAC and the Futures Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.  In addition, commencing on the second anniversary of the Effective Date, the PI Trust shall adjust the valuation amounts for yearly inflation based on the *Consumer Price Index for Urban Wage Earners and Clerical Workers* ("CPI-W") published by the United States Department of Labor, Bureau of Labor Statistics.  The CPI-W adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

**5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship.**

**5.4(a)  Extraordinary Claims.**  "Extraordinary Claim" means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II–VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a

manufacturing facility of Grace during a period in which Grace was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels II–V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage; provided, however, that if the claimant's exposure to asbestos was 95% the result of exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility, the maximum extraordinary value shall be eight (8) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels II-V, VII and VIII and eight (8) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the PI Trust with the consent of the TAC and the Futures Representative.  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I Claims, Existing Claims and Exigent Hardship Claims, which shall be paid first, based on its date of liquidation, subject to the Maximum Available Payment and Claims Payment Ratio described above.

**5.4(b)  Exigent Hardship Claims.**  At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may

be considered separately no matter what the order of processing otherwise would have been under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I Claims and Existing Claims, which claims, together with the Exigent Hardship Claims, shall be paid in accordance with the provisions of Section 2.4 hereof. A PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V–VIII), and the PI Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.5    Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Section 5.3(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the PI Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under this TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos or asbestos-containing products manufactured, produced or distributed by Grace or to conduct for which Grace has legal

responsibility, and that such secondary exposure was a cause of the claimed disease.  All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

**5.6    Indirect PI Trust Claims.**  Indirect PI Trust Claims[8][102] asserted against the PI Trust ~~based on theories of contribution or indemnity ("**Indirect PI Trust Claims**")~~[103] shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if ~~(a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the Bankruptcy Code, and, and (b)~~[104] the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant,

---

[8]  Indirect PI Trust Claims are defined in the Plan to mean any Claim or remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy, liability, or Demand are known or unknown, that is (x)(i) held by (A) any Entity (other than a director or officer entitled to indemnification pursuant to Section 8.6 of the Plan) who has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability or (B) any assignee or transferee of such Entity and (ii) on account of alleged liability of the Debtors for payment, repayment, reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action or (y) held by any Entity that is a claim seeking payment, repayment, reimbursement, indemnification, subrogation, or contribution from the Debtors with respect to any surety bond, letter of credit, or other financial assurance issued by any Entity on account of, or with respect to, Asbestos PI Claims; *provided, however,* that for the avoidance of doubt, the term "Indirect PI Trust Claim" shall not include or pertain to any Asbestos PD Claim, CDN ZAI PD Claim, Environmental Claim, or Workers' Compensation Claim.

and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment.  In addition, no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant as of the Effective Date[105].  If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage.  However, in no event shall such reimbursement to the

Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled.  Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.10 below and set forth in Attachment A hereto.  If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims.  Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims.  Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

**5.7    Evidentiary Requirements.**

**5.7(a)  Medical Evidence.**

**5.7(a)(1)  In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the PI Trust as a diagnosis.

**5.7(a)(1)(A)  Disease Levels I–IV.**  Except for asbestos claims filed against Grace or any other defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide (i) for Disease Levels I–III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii) for Disease Level IV-A,[9106][9107] an ILO reading of 2/1 or greater or pathological evidence of asbestosis; (iii) for Disease Level IV-B, evidence of diffuse pleural thickening of at least extent "2" and at least width "a"; and (iv) for Disease Levels III, IV-A and IV-B, pulmonary function testing.[9108][10109]

---

[9]      All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the PI Trust may rebut such presumptions.

[10]      "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I–III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV-A, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and for Disease Level IV-B, evidence of diffuse pleural thickening of at least extent "2" and at least width "a;" and (iv) for Disease Level III, IV-A or IV-B, pulmonary function testing.

**5.7(a)(1)(B)  Disease Levels V–VIII.**  All diagnoses of an asbestos-related malignancy (Disease Levels V–VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("**JCAHO**").

**5.7(a)(1)(C)  Exception to the Exception for Certain Pre-Petition Claims.**  If the holder of a PI Trust Claim that was filed against Grace or any other

---

on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in an JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Sections 5.7(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence to the PI Trust notwithstanding the exception in Section 5.7(a)(1)(A).

      **5.7(a)(2)  Credibility of Medical Evidence.**  Before making any payment to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to Grace to settle for payment similar disease cases prior to Grace's bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption.  In addition, claimants who otherwise meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.

However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

**5.7(b)  Exposure Evidence.**

**5.7(b)(1)  In General.**  As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to (a) any products or materials containing asbestos that were manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by Grace (or any past or present Grace Affiliate, or any of the predecessors of Grace or any of their past or present Affiliates, or any other Entity for whose products or operations Grace allegedly has liability or is otherwise liable) or (b) asbestos-containing vermiculite mined, milled or processed by Grace (or any past or present Grace Affiliate, or any of the predecessors of Grace or any of their past or present Affiliates, or any other Entity for whose products or operations Grace allegedly has liability or is otherwise liable). Claims based on conspiracy theories that involve no exposure to such products or materials are not compensable under this TDP.  To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Grace Exposure as defined in Section 5.7(b)(3) below; (ii) for Asbestos/Pleural Disease Level II, six (6) months Grace Exposure, plus, for certain types of Grace Exposure, five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV-A), Severe Disabling Pleural Disease (Disease Level IV-B), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six (6) months Grace Exposure, plus, for certain types of Grace Exposure, Significant

Occupational Exposure to asbestos.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) of his or her claim based on exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility.

**5.7(b)(2)  Significant Occupational Exposure.**  "**Significant Occupational Exposure**" means employment for a cumulative period of at least five (5) years with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

**5.7(b)(3)  Grace Exposure.**  The claimant must demonstrate either (i) meaningful and credible exposure, which occurred prior to December 31, 1982, to (a) any products or materials containing asbestos that were manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by Grace (or any past or present Grace Affiliate, or any of the predecessors of Grace or any of their past or present Affiliates, or any other Entity for whose products or operations Grace allegedly has liability or is otherwise liable) or (b) asbestos-containing winchite asbestos or asbestos-containing vermiculite mined, milled or processed by Grace (or any past or present Grace Affiliate, or any of the predecessors of Grace or any of their past or present Affiliates, or any other Entity for whose products or operations Grace allegedly has liability or is otherwise liable) or (ii) meaningful and credible exposure

- 43 -

which occurred prior to the Effective Date to (a) asbestos, asbestos-containing winchite asbestos or unexpanded asbestos-containing vermiculite ore in Lincoln County, Montana or (b) asbestos, asbestos-containing winchite asbestos or asbestos-containing vermiculite ore from Lincoln County, Montana during transport or use prior to the completion of a finished product at an expansion plant ("**Grace Exposure**").  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence.  The specific exposure information required by the PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the PI Trust.  The PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of Grace Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system.  The PI Trust has no need for, and therefore claimants are not required to furnish the PI Trust with evidence of, exposure to specific asbestos or asbestos-containing products other than those for which Grace has legal responsibility, except to the extent such evidence is required elsewhere in this TDP.  Similarly, failure to identify Grace products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

**5.8    Claims Audit Program.**  The PI Trust, with the consent of the TAC and the Futures Representative, may develop methods for auditing the reliability of medical evidence,

including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by Grace.  In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by disallowing the PI Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

**5.9    Second Disease Claims.**  The holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I–IV) may assert a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V–VIII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to the original claim involving the non-malignant disease.

The holder of a PI Trust Claim involving a Disease Level I, II or III claim may assert a new PI Trust Claim against the PI Trust for a Disease Level IV-A or Disease Level IV-B claim that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such subsequent claim shall be reduced by the amount paid for the prior claim.

**5.10    Arbitration.**

**5.10(a)  Establishment of ADR Procedures.**  The PI Trust, with the consent of the TAC and the Futures Representative, shall institute binding and non-binding arbitration procedures in accordance with the Alternative Dispute Resolution ("**ADR**") Procedures included in Attachment A hereto for resolving disputes concerning whether a pre-petition settlement agreement with Grace is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I–VIII. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels II–VIII, as well as disputes over Grace's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes over the validity of an Indirect PI Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above. In the case of an arbitration involving the liquidated value of a claim involving Disease Levels II–VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above. In order to facilitate the Individual Review Process with respect to such claims, the PI Trust may from time to time develop a valuation model that enables the PI Trust to efficiently make initial liquidated value

offers on those claims in the Individual Review setting.  In an arbitration involving any such claim, the PI Trust shall neither offer into evidence or describe any such model nor assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration.  The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten (10) days prior to the arbitration proceeding.  With respect to all claims eligible for arbitration, the claimant, but not the PI Trust, may elect either non-binding or binding arbitration.  The ADR Procedures set forth in Attachment A hereto may be modified by the PI Trust with the consent of the TAC and the Futures Representative.

        **5.10(b)  Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the claimant must first complete the Individual Review Process with respect to the disputed issue as well as either the Pro Bono Evaluation or the Mediation process set forth in the ADR Procedures.  Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in writing.  Individual Review shall also be treated as completed if the PI Trust has rejected the claim.

        **5.10(c)  Limitations on and Payment of Arbitration Awards.**  In the case of a claim involving Disease Level I, the arbitrator shall not return an award in excess of the Scheduled Value for such claim.  In the case of a non-Extraordinary Claim involving Disease Levels II–VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim involving

one of those Disease Levels, the arbitrator shall not return an award greater than the maximum

extraordinary value for such a claim as set forth in Section 5.4(a) above.  A claimant who submits

to arbitration and who accepts the arbitral award shall receive payments in the same manner as one

who accepts the PI Trust's original valuation of the claim.

**5.11    Litigation.**  Claimants who elect non-binding arbitration and then reject their

arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust

pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment

for monetary damages obtained in the tort system from the PI Trust's available cash only as

provided in Section 7.7 below.

**SECTION VI**

**Claims Materials**

**6.1    Claims Materials.**  The PI Trust shall prepare suitable and efficient claims

materials ("**Claims Materials**") for all PI Trust Claims, and shall provide such Claims Materials

upon a written request for such materials to the PI Trust.  The proof of claim form to be

submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which

the claim qualifies at the time of filing.  The proof of claim form shall also include a certification

by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the

Federal Rules of Civil Procedure.  In developing its claim filing procedures, the PI Trust shall

make every effort to provide claimants with the opportunity to utilize currently available

technology at their discretion, including filing claims and supporting documentation over the

internet and electronically by disk or CD-rom.  The proof of claim form to be used by the PI

Trust shall be developed by the PI Trust and submitted to the TAC and the Futures

Representatives for approval; it may be changed by the PI Trust with the consent of the TAC and the Futures Representative.

6.2     **Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  If feasible, the forms used by the PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.  If requested by the claimant, the PI Trust shall accept information provided electronically.  The claimant may, but shall not be required to, provide the PI Trust with evidence of recovery from other defendants and claims resolution organizations.

6.3     **Withdrawal or Deferral of Claims.**  A claimant can withdraw a PI Trust Claim at any time upon written notice to the PI Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant can also request that the processing of his or her PI Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the period of such deferral, a sequencing adjustment on such claimant's PI Trust Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the PI Trust's written offer of payment or

rejection of the claim.  Upon written request and good cause, the PI Trust may extend the withdrawal or deferral period for an additional six (6) months.

      **6.4**    **Filing Requirements and Fees.**  The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, (a) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the PI Trust and (b) whether a filing fee should be required for any PI Trust Claims.

      **6.5**    **Confidentiality of Claimants' Submissions.**  All submissions to the PI Trust by a holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the PI Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions.  The PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware.  Furthermore, the PI Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served.  The PI Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto.  Notwithstanding anything in the foregoing to the

contrary, with the consent of the TAC and the Futures Representative, the PI Trust may, in

specific limited circumstances, disclose information, documents or other materials reasonably

necessary in the PI Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply

with an applicable obligation under an insurance policy or settlement agreement within the

Asbestos Insurance Policies or the Asbestos Insurance Settlement Agreements; provided,

however, that the PI Trust shall take any and all steps reasonably feasible in its judgment to

preserve the further confidentiality of such information, documents and materials, and prior to

the disclosure of such information, documents or materials to a third party, the PI Trust shall

receive from such third party a written agreement of confidentiality that (a) ensures that the

information, documents and materials provided by the PI Trust shall be used solely by the

receiving party for the purpose stated in the agreement and (b) prohibits any other use or further

dissemination of the information, documents and materials by the third party.  Nothing in this

TDP, the Plan or the PI Trust Agreement expands, limits or impairs the obligation under

applicable law of a claimant to respond fully to lawful discovery in an underlying civil action

regarding his or her submission of factual information to the PI Trust for the purpose of

obtaining compensation for asbestos-related injuries from the PI Trust.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1    Showing Required.**  To establish a valid PI Trust Claim, a claimant must meet

the requirements set forth in this TDP.  The PI Trust may require the submission of X-rays, CT

scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other

evidence to support or verify the PI Trust Claim, and may further require that medical evidence

submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2    **Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above.

7.3    **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised

in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the PI Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the PI Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Futures Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and may offer a Reduced Payment Option as described in Section 2.5 above.

**7.4     Punitive Damages.**  Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated PI Trust Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles.  The choice of law provision in Section 7.4 herein applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant including, but not

limited to, suits in the tort system pursuant to Section 7.6, and to the extent the PI Trust seeks recovery from any entity that provided insurance to Grace, the Alabama Wrongful Death Statute shall govern.

**7.5    Sequencing Adjustment.**

**7.5(a)  In General.**  Except for any PI Trust Claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a sequencing adjustment shall be paid on all PI Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of six (6) years.  The sequencing adjustment factor shall be five percent (5%) per annum for each of the first five (5) years after the Effective Date; thereafter, the PI Trust shall have the discretion to change the sequencing adjustment factor with the consent of the TAC and the Futures Representative.

**7.5(b)  Unliquidated PI Trust Claims.**  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements of Disease Levels II–V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below.  The sequencing adjustment on an unliquidated PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against Grace prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; provided, however,

that if a claimant was barred from pursuing other defendants in the tort system by the terms of a preliminary injunction or other stay entered by the Court in the Grace bankruptcy proceedings and such claimant files an asbestos claim against another defendant in the tort system within one year after such preliminary injunction or other stay is lifted, the claimant shall be deemed to have filed the asbestos claim against the other defendant on the date the preliminary injunction or other stay was first entered; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the PI Trust after the Effective Date.

   **7.5(c)  Liquidated Pre-Petition Claims.**  A sequencing adjustment shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, the sequencing adjustment shall be measured from the date of payment back to the date that is one year after the date that the verdict or judgment was entered.  In the case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement, the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the Petition Date.

  **7.6**  **Suits in the Tort System.**  If the holder of a disputed claim disagrees with the PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit **against the PI Trust**[110] in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above.  Any such lawsuit must be filed by the claimant in her or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All

defenses (including, with respect to the PI Trust, all defenses which could have been asserted by Grace) shall be available to both sides at trial; however, the PI Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.  **Holders of PI Trust Claims remain subject to, and bound by, the Plan, including the Asbestos PI Channeling Injunction, the Successor Claims Injunction, and any other injunction and release issued or granted in favor of Sealed Air (to the extent applicable to such Holders) contained in the Plan.**[111]

      **7.7**      **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; *provided, however*[112], that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of a claim involving Disease Level I, the total amounts paid with respect to such claim shall not exceed the Scheduled Value for such Disease Level.  In the case of non-Extraordinary claims involving Disease Levels II–VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.4(a) above.  Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.8    Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the PI Trust.  As a condition to making any payment to a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the PI Trust, constitute such a release.

**7.9    Third-Party Services.**  Nothing in this TDP shall preclude the PI Trust from contracting with another asbestos claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10    PI Trust Disclosure of Information.**  Periodically, but not less often than once a year, the PI Trust shall make available to claimants and other interested parties, the number of

claims by Disease Levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

### Miscellaneous

**8.1     Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions **(but not the final sentence of Section 7.6)**[113] of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the Futures Representatives from proposing to the Trustees, in writing, amendments to this TDP. Any amendment proposed by the TAC or the Futures Representatives shall remain subject to Section 7.3 of the PI Trust Agreement.

**8.2     Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to Grace's obligations to any insurance company providing insurance coverage to Grace in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility, the PI Trust with the consent of the TAC and the Futures Representative may

amend this TDP and/or the PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of Grace to said insurance company.

**8.3     Governing Law.**  Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

Document comparison done by DeltaView on Friday, November 21, 2008 6:59:18 PM

| Input: | |
|---|---|
| Document 1 | PowerDocs://DOCS/288785/13 |
| Document 2 | PowerDocs://DOCS/288785/15 |
| Rendering set | Standard no color |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 61 |
| Deletions | 47 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 1 |
| Total changes | 113 |