UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No. 01-01139(JKF) |
| | . | |
| | . | |
| W. R. GRACE & CO., | . | |
| | . | 5414 USX Tower Building |
| | . | Pittsburgh, PA  15222 |
| | . | |
| Debtor. | . | |
| | . | November 14, 2008 |
| . . . . . . . . . . . . . . | .. | 10:18 a.m. |

TRANSCRIPT OF HEARING ON DISCLOSURE STATEMENT
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP |
| | By:  DAVID BERNICK, ESQ. |
| | BARBARA HARDING, ESQ. |
| | JANET BAER, ESQ. |
| | LISA ESAYIAN, ESQ. |
| | CRAIG BRUENS, ESQ. |
| | 200 East Randolph Drive |
| | Chicago, IL  60601 |
| | |
| For the Debtors: | Kirkland & Ellis, LLP |
| | By:  THEODORE FREEDMAN, ESQ. |
| | CHRISTOPHER GRECO, ESQ. |
| | DEANNA BOLL, ESQ. |
| | RASHAD W. EVANS, ESQ. |
| | Citigroup Center, 153 East 53rd St. |
| | New York, NY  10022 |
| | |
| For the Asbestos | Caplin & Drysdale, Chartered |
| Creditors Committee: | By:  PETER LOCKWOOD, ESQ. |
| | JEFF LIESEMER, ESQ. |
| | One Thomas Circle, NW |
| | Washington, D.C.  20005 |
| | |
| Audio Operator: | Cathy Younker |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311      Fax No. (609) 587-3599

```
APPEARANCES (Contd'):

For the                 Stroock & Stroock & Lavan
Unsecured Creditors'    By:  KENNETH PASQUALE, ESQ.
Committee:                   ARLENE KRIEGER, ESQ.
                             LEWIS KRUGER, ESQ.
                        180 Maiden Lane
                        New York, NY  10038-4982

For the Property
Damage Committee:       Bilzin Sumberg Baena Price &
                          Axelrod LLP
                        By:  MATTHEW KRAMER, ESQ.
                             SCOTT BAENA, ESQ.
                             JAY SAKALO, ESQ.
                        200 South Biscayne Boulevard
                        Suite 2500
                        Miami, FL  33131

For the Ad Hoc          Dewey & LeBoeuf, LLP
Committee of Equity By: JENNIFER WHITENER, ESQ.
Sec. Holders:           125 West 55th Street
                        New York, NY  10019

For the Future          Orrick, Herrington & Sutcliffe, LLP
Claimants               By:  ROGER FRANKEL, ESQ.
Representatives:             RICHARD WYRON, ESQ.
                        Washington Harbour
                        3050 K Street, N.W.
                        Washington, D.C.  20007

For Maryland Casualty   Connelly Bove Lodge & Hutz, LLP
and Zurich Intl.:       By:  JEFFREY WISLER, ESQ.
                        The Nemours Building
                        1007 North Orange Street
                        Wilmington, DE  19899

For Sealed Air:         Skadden, Arps, Slate, Meagher &
                          Flom, LLP
                        By:  DAVID TURETSKY, ESQ.
                             JAN BAKER, ESQ.
                        One Rodney Square
                        Wilmington, DE  19801

Co-Counsel to Libby     Cohn, Whitesell & Goldberg, LLP
Claimants:              By:  DANIEL C. COHN, ESQ.
                             CHRISTOPHER CANDON, ESQ.
                        101 Arch Street
                        Boston, MA  02110
```

APPEARANCES (Contd'):

For the Bank Lenders:        Landis Rath & Cobb, LLP
                            By:  RICHARD S. COBB, ESQ.
                                KERRI KING MUMFORD, ESQ.
                            919 Market Street
                            Wilmington, DE  19801

                             Paul Weiss Rifkind Wharton
                              & Garrison, LLP.
                             By:  MARGARET A. PHILLIPS, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201

For the Debtors:             Pachulski, Stang, Ziehl &Jones
                             By:  JAMES O'NEILL, ESQ.
                             919 North Market Street
                             17th Floor
                             Wilmington, DE  19899-8705

For the Unsecured            Stroock & Stroock & Lavan
Creditors' Committee:        By:  KEN PASQUALE, ESQ.
                                ARLENE KRIEGER, ESQ.
                             180 Maiden Lane
                             New York, NY 10038

For Continental
Casualty Company:            Ford, Marrin, Esposito,
                              Witmeyer & Gleser, LLP
                             By:  ELIZABETH DeCRISTOFARO, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For Official Committee       Dies & Hile, LLP
of Asbestos Property         By:  MARTIN DIES, ESQ.
Damage Claimants:            1601 Rio Grande, Suite 330
                             Austin, TX  78701

                             LECG
                             By:  ELIZABETH DEVINE, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd'):

For Various Claimant          Stutzman, Bromberg, Esserman &
Firms:                             Plifka
                              By:  DAVID J. PARSONS, ESQ.
                                   SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201


For Firemen's Fund:           Stevens & Lee, P.C.
                              By:  JOHN DEMMY, ESQ.
                              1105 North Market Street, 7th Fl.
                              Wilmington, DE  19801


For Owens-Illinois:           McCarter & English
                              By:  KATHARINE MAYER, ESQ.
                              Renaissance Centre, 405 N. King St.
                              Wilmington, DE  19801


For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864


For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  MATTHEW RUSSELL, ESQ.
                                   ROBERT GUTTMANN, ESQ.
                                   MICHAEL DAVIS, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022


For the Future               Orrick, Herrington & Sutcliffe, LLP
Claimants                    By:  DEBRA FELDER, ESQ.
Representatives:                   JOSHUA CUTLER, ESQ.
                              Washington Harbour
                              3050 K Street, N.W.
                              Washington, D.C.  20007 For


For Federal Insurance        Cozen O'Connor
Company:                     By:  JACOB C. COHN, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103


For Allstate Insurance:      Cuyler Burk, LLP
                             By:  ANDREW CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd'):

```
For W.R. Grace:            W.R. Grace
                           By: WILLIAM CORCORAN, ESQ.
                           7500 Grace Drive
                           Columbia, MD  21044

For State of Montana       Womble Carlyle Sandridge & Rice
Department of              By:  FRANCIS MONACO, ESQ.
Environmental Quality:     222 Delaware Avenue
                           Suite 1501
                           Wilmington, DE  19801

For State of Montana:      Christensen, Moore, Cockrell, Cummings
                            & Axelberg, P.C.
                           By:  DALE R. COCKRELL, ESQ.
                           Two Medicine Building
                           160 Heritage Way
                           Suite 104
                           Kalispell, MT  59904

For Official Committee     Anderson Kill & Olick
of Asbestos Personal       By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:          1251 Avenue of the Americas
                           New York, NY  10020-1186

For CNA:                   Goodwin Procter, LLP
                           By:  DANIEL GLOSBAND, ESQ.
                                BRIAN MUKHERJEE, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For Grace Certain          Montgomery, McCracken, Walker
Cancer Claimants:           & Rhoads, LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801

For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

                           Tre Angeli, LLC
                           By:  JOSEPH RADECKI, ESQ.
```

APPEARANCES (Contd'):

```
For the Property         Ferry Joseph & Pearce, P.A.
Damage Committee:        By:  THEODORE TACCONELLI, ESQ.
                         824 Market Street, Suite 19899
                         Wilmington, DE  19899

For Ford, Marin,         Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer        Gleser
& Gleser:                By:  SHAYNE SPENCER, ESQ.
                         Wall Street Plaza
                         New York, NY  10005

For Official Committee   Brandi Law Firm
of Asbestos Property     By: THOMAS BRANDI, ESQ.
Damage Claimants:            TERENCE D. EDWARDS, ESQ.
                         44 Montgomery St., Suite 1050
                         San Francisco, CA  94104

For the State of CA,     Hahn & Hessen, LLP
Dept. of Gen. Services:  By:  CHRISTINA J. KANG, ESQ.
                         488 Madison Avenue, 14th Fl.
                         New York, NY  10022

For Baron & Budd,        Hogan Firm Attorneys at Law
et al.:                  By:  DANIEL K. HOGAN, ESQ.
                         1311 Delaware Avenue
                         Wilmington, DE  19801

For the PD Committee:    Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                              ALAN RUNYAN, ESQ.
                              MARION FAIREY, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

For David T. Austern:    Piper Jaffray & Co.
                         By:  JASON SOLGANICK

For Scott Company:       Vorys, Sater, Seymour & Pease, LLP
                         By:  TIFFANY COBB, ESQ.
                              ROBERT J. SIDMAN, ESQ.
                         52 East Gay Street
                         Columbus, OH  43216

For Official Committee   Richardson Patrick Westbrook &
of Asbestos Property      Brickman, P.C.
Claimants:               By:  EDWARD J. WESTBROOK, ESQ.
                         174 East Bay Street
                         Charleston, SC  29401
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd'):

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Hamilton, Rabinovitz & Alschuler<br>By:   FRANCINE RABINOVITZ, ESQ.<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, CA  93923 |
| | Conway Del Genio, Gries & Co, LLC<br>By:   GREGORY BOYER, ESQ. |
| | Lieff, Cabraser, Heinmann & Bernstein<br>By:   ELIZABETH J. CABRASER, ESQ. |
| | Pryor Cashman LLP<br>By:   RICHARD LEVY, ESQ. |
| | Riker, Danzig, Scherer, Hyland<br>& Perretti, LLP<br>By:   CURTIS PLAZA, ESQ.<br>One Speedwell Avenue<br>Morristown, NJ  07962 |
| For W.R. Grace: | WILLIAM SPARKS, ESQ. |
| For Lehman Brothers: | Lehman Brothers<br>By:   ANDREW CHAN |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:   PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:   ASHOK VASVANI |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:   MARTI MURRAY |
| For Morgan Stanley Senior Funding, Inc.: | Katten, Muchin, Rosenman LLP<br>By:   NOAH HELLER, ESQ.<br>        MERRITT PARDINI, ESQ.<br>        JEFF FRIEDMAN, ESQ. |
| For ERISA: | Lowenstein Sandler PC<br>By:   IRA LEVEE, ESQ.<br>65 Livingston Avenue<br>Roseland, NJ  07068 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd'):

For Her Majesty the          Office of the Attorney General
Queen in Right of            By:  JACQUELINE DAIS-VISCA, ESQ.
Canada:

For Bank of America:         Richards, Layton & Finger, P.A.
                             By:  MARCOS A. RAMOS, ESQ.
                             One Rodney Square
                             920 N. King Street
                             Wilmington, DE 19899

For PD/FCR:                  ALAN RICH, ESQ.

For Loan Maker/
Long Acre:                   Pepper Hamilton
                             By:  DENNIS VERY, ESQ.

For Seaton Ins. Co.:         Drinker Biddle & Reath LLP
                             By:  MICHAEL F. BROWN, ESQ.
                                  WARREN PRATT, ESQ.
                             One Logan Square
                             18th & Cherry Streets
                             Philadelphia, PA  19103

For Arrowood Indemnity  Wilson, Elser, Moskowitz, Edelman
f/k/a Royal Indemnity:    & Dicker, LLP
                             By: CARL PERNICONE, ESQ.
                             New York, NY 10019

                             Bifferato, Gentilotti, Biden
                              & Balick, LLC
                             By:  GARVAN McDANIEL, ESQ.
                             800 N. King Street
                             Wilmington, DE  19899

                             O'Melveney & Meyers, LLP
                             By:  TANCRID SCHIAVONI, ESQ.
                             Times Square Tower, 7 Times Square
                             New York, NY  10036

For JD Capital:              JD Capital
                             By:  RYAN DUFFY, ESQ.

For the Equity               Kramer, Levin, Naftalis & Frankel, LLP
Committee:                   By:  KEITH MARTORANA, ESQ.
                             1177 Avenue of the Americas
                             New York, NY  10036

APPEARANCES (Contd'):

| | |
|---|---|
| For the Blackstone Group: | The Blackstone Group<br>By:  BRIAN BRESNAHAN |
| For the U.S. Trustee: | United States Trustee Department<br>By:  DAVID KLAUDER, AUSA<br>833 Chestnut Street<br>Suite 500<br>Philadelphia, PA  19107 |
| For Fair Harbor Capital LLC: | Fair Harbor Capital, LLC<br>By:  FRED GLASS |
| For Fresenius Medical Care Holdings, Inc.: | McDermott, Will & Emery<br>By:  DAVID S. ROSENBLOOM, ESQ.<br>227 West Monroe Street<br>Chicago, IL  60606 |
| For Century Indemnity: | White & Williams, LLP<br>By:  JOSEPH GIBBONS, ESQ.<br>1800 One Liberty Place<br>Philadelphia, PA  19103 |
| For Loeb Partners: | Paul Weiss Rifkind Wharton<br> & Garrison, LLP.<br>By:  ANDREW ROSENBERG, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| For Kaneb Pipe Line Operating Partnership, et al.: | Fulbright & Jaworski<br>By:  STEVE PEIRCE, ESQ.<br>300 Convent Street<br>Suite 2200<br>San Antonio, TX  78205 |
| For JD Capital: | JD Capital<br>By:  TAI CURION |
| For Bloomberg, LLP | Bloomberg, LLP<br>By:  STEVEN H. CHURCH |
| For Travelers: | Simpson, Thacher & Bartlett<br>By:  ELISA ALCABES, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-1139.  This is the time set for the

3    continuation of the hearing on the disclosure statement.

4    Participating by phone, Robert Sidman, Christopher Greco,

5    Warren Pratt, Deanna Boll, Ari Berman, Craig Bruens, Andrew

6    Craig, Rashad Evans, Brian Mukherjee, Brian Bresnahan, Kerri

7    Mumford, Katharine Mayer, Margaret Phillips, Garvan McDaniel,

8    Francine Rabinovitz, Scott Baena, Matthew Kramer, Michael

9    Brown, David Klauder, Lisa Esayian, Ira Levee, Barbara Harding,

10   Daniel Hogan, Janet Baer, Theodore Freedman, David Bernick,

11   Merritt Pardini, Jeff Friedman, Noah Heller, Theodore

12   Tacconelli, Christina Kang, Marion Fairey, Michael Davis, Ashok

13   Vasvani, Fred Glass, Martin Dies, Robert Guttmann, David

14   Rosenbloom, John Phillips, Joseph Gibbons, Terrence Edwards,

15   Jennifer Whitener, Andrew Rosenberg, Daniel Speights, Gregory

16   Boyer, Jay Sakalo, Elizabeth Devine, Darrel Scott, Ryan Duffy,

17   Alan Runyon, Steve Pierce, Elizabeth Cabraser, Tal Gurion,

18   Steven Church, Edward Westbrook, Daniel Cohn, Sandy Esserman,

19   David Parsons, Christopher Candon, Lewis Kruger, Andrew Chan,

20   Debra Felder, James O'Neill, Curtis Plaza, Richard Levy,

21   William Sparks, Peg Brickley, Jacqueline Dais-Visca, Thomas

22   Brandi, Robert Horkovich, Marti Murray, Dale Cockrell, Joseph

23   Radecki, Natalie Ramsey, Jason Solganick, Shayne Spencer and

24   Elisa Alcabes.  I'll take entries in the court.  Good morning.

25          MR. FREEDMAN:  Good morning, Your Honor, Theodore

1  Freedman, Kirkland and Ellis for the debtors.

2         MS. BAER:  Good morning, Your Honor, Janet Baer on

3  behalf of the debtors.

4         MR. MARTORANA:  Good morning, Your Honor.  Keith

5  Martorana on behalf of the Equity Committee.

6         MR. LOCKWOOD:  Good morning, Your Honor.  Peter

7  Lockwood on behalf of the Asbestos Claimants' Committee.  And

8  with me today is my partner, Jeff Liesemer.

9         MR. LIESEMER:  Good morning, Your Honor.

10         MR. FRANKEL:  Good morning, Your Honor.  Roger

11  Frankel from Orrick Herrington for the Future Claims

12  representative.  With me is Richard Wyron.

13         THE COURT:  Thank you.

14         MR. WYRON:   Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. RICH:  Alan Rich, Your Honor, for the Property

17  Damage Future Claims representative.

18         MR. PASQUALE:  Good morning, Your Honor.  Ken

19  Pasquale from Stroock and Stroock and Lavan for the Unsecured

20  Creditors' Committee.  My colleague as well is with me today,

21  Arlene Krieger from Stroock.

22         MS. KRIEGER:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24         MR. O'NEILL:  Good morning, Your Honor.  James

25  O'Neill for Grace.

1          THE COURT:  Excuse me one second.  I made a typo here

2    I need to correct.  Okay.  Thank you.  Good morning.

3          MR. COHN:  Yes, good morning, Your Honor.  Daniel

4    Cohn for the Libby claimants.

5          MR. VERY:  Good morning, Your Honor.  Dennis Very

6    with Pepper Hamilton for Longacre.

7          MR. COBB:  Good morning, Your Honor.  Richard Cobb,

8    Landis, Rath and Cobb on behalf of the bank lenders.

9          MS. DeCRISTOFARO:  Good morning, Your Honor.

10   Elizabeth DeCristofaro for Continental Casualty Company.

11         MS. COBB:  Good morning, Your Honor.  Tiffany Cobb of

12   the Law Firm Vorys, Sater, Seymour and Pease on behalf of the

13   Scotts Company.

14         MR. PERNICONE:  Good morning, Your Honor.  Carl

15   Pernicone for Arrowood Indemnity, formerly known as Royal

16   Indemnity.  And with me this morning is my co-counsel, Tancrid

17   Schiavoni of O'Melveny and Meyers.

18         THE COURT:  Okay.  Thank you.  One second.  Okay,

19   thank you.

20         MR. PERNICONE:  Thank you, Your Honor.

21         MR. GLOSBAND:  Good morning, Your Honor.  Dan

22   Glosband from Goodwin Procter for Continental Casualty Company.

23         MR. BROWN:  Good morning, Your Honor.  Michael Brown

24   for Beacon Insurance Company and One Beacon America Insurance

25   Company.

1          MR. COHN:  Good morning, Your Honor.  Jacob Cohn from

2    Cozen O'Connor for Federal Insurance Company.

3          THE COURT:  Good morning.

4          MR. BAKER:  Good morning, Your Honor.  Jan Baker and

5    David Turetsky from Skadden, on behalf of Sealed Air.

6          MR. MONACO:  Good morning, Your Honor.  Frank Monaco

7    for the State of Montana.

8          MR. DEMMY:  Good morning, Your Honor.  John Demmy of

9    Stevens and Lee for Firemen's Fund Insurance Company.

10          MR. RAMOS:  Good morning, Your Honor.  Marcos Ramos,

11    Richards, Layton and Finger on behalf of Bank of America.

12          THE COURT:  Good morning.

13          MR. WISLER:  Good morning, Your Honor.  Jeffrey

14    Wisler from Connolly, Bove, Lodge and Hutz on behalf of

15    Maryland Casualty Company, Zurich Insurance Company and Zurich

16    International.

17          THE COURT:  Mr. Freedman, before we start the agenda,

18    I need to know what the debtor is doing with respect to the

19    Tersigni matter because apparently, but for Grace, there have

20    been motions to approve settlements with Tersigni in all of the

21    Delaware cases that are set for the omnibus hearings in

22    December.  So, if somebody could give me a status report so I

23    can figure out whether I can do all of them on that omnibus,

24    that would be helpful.

25          MS. BAER:  Your Honor, we filed a negative notice

1  with respect to the Tersigni settlement.  It's under a million

2  dollars, so we did not have to file a full-fledged motion.  The

3  negative notice has been filed and has been sent out and the

4  20-day deadline has almost passed.  So, by the time of the

5  December hearing, it will be done and over.

6          THE COURT:  Okay.  So, is it set for December 15 in

7  the event that there is an objection?

8          MS. BAER:  The way it works is if there was an

9  objection, we would then have to set it for an omnibus hearing.

10 So, it isn't actually set on the hearing, but once the negative

11 notice period passes, if there was an objection, then we would

12 have to set it for something.   And that negative notice period

13 will be passed by the December 15th hearing.

14         THE COURT:  Mr. Klauder, is that the only thing that

15 the U.S. Trustee's Office then is waiting for with respect to

16 the Tersigni matters?

17         MR. KLAUDER:  That is correct, Your Honor.  I didn't

18 realize Grace had put it on for that type of procedure.  And I

19 don't have an objection with it.  The only issue would come up

20 is, how do we then deal with the order, the examiner order.  As

21 you recall when we discussed it the other day, it was thought

22 that when the settlements come up for hearing we can then just

23 dispose of the examiner orders at that time.

24         THE COURT:  Well, you'll be submitting an order that

25 will approve the settlement anyway, correct, Ms. Baer?

1           MS. BAER:  No, Your Honor, it's not necessary in the

2  negative notice procedure.  It's just done, it's approved.

3           THE COURT:  Well, I need something that's going to

4  kick the examiner motion.  How will -- do you want to just put

5  that on the December 15th -- or is that your omnibus date too,

6  December 15th?

7           MS. BAER:  It is.

8           THE COURT:  Mr. Klauder, how about that, if I just

9  have Ms. Baer put the examiner motion on and they can do a

10 certification of counsel or a certificate indicating that the

11 settlement has gone through, if in fact it has.

12          MR. KLAUDER:  That's fine.

13          THE COURT:  Is that okay, Ms. Baer?

14          MS. BAER:  That's fine.

15          THE COURT:  You can do a certification that indicates

16 that the settlement has been approved, assuming it has.

17          MS. BAER:  Yes.

18          THE COURT:  And Grace is either receiving or has

19 received whatever the status is with the funds, then we can

20 deal with the examiner motion on December 15th.

21          MS. BAER:  Sure.

22          THE COURT:  Okay.  That's what I needed to know.

23 Thank you.  All right, now we can turn to the disclosure

24 statement hearing.  Mr. Freedman?

25          MR. FREEDMAN:  Good morning, Your Honor.  As you

1  indicated at the beginning, this is a continued date for the

2  disclosure statement hearing.  And to bring the Court up to

3  date, at the conclusion of the last hearing, we went through an

4  extensive list of open matters which we felt could largely be

5  resolved by further dialogue with the various constituencies

6  who raised problems with the disclosure statement or problems

7  with the plan that related back to the disclosure statement.

8        The debtors, as the Court instructed, engaged in

9  extensive negotiations with all of the parties who raised these

10 kinds of issues.  And I'm happy to report that we have made

11 substantial progress in resolving the matters that were before

12 the Court.

13       The bulk of those issues are plainly set forth in the

14 revised chart that we filed with the Court, and I'd like to

15 propose to the Court that except for matters which are worth

16 taking the Court's time up today, we simply refer to that chart

17 for those matters where we indicate that there has been

18 resolution of the issue.  The chart is cross referenced to the

19 plan and to the disclosure statement so the Court will not have

20 to listen to me go through 108 different potential matters and

21 how they've been resolved.

22       THE COURT:  Yes, I've looked at the chart and it

23 does, I think, cross reference, so unless anybody has some

24 comment to make about what the debtor thinks is resolved, I

25 think we can bypass them.  So, how about if I just ask?  Is

1 there anybody who has seen the chart who thinks that what the

2 debtor thinks is resolved is not resolved?  Mr. Brown?

3          MR. BROWN:  Your Honor, our two objections were for

4 Numbers 53 and 54 on the chart.  They're for Seaton and One

5 Beacon.  Our objections are not resolved, but I had a

6 conversation with Ms. Baer before the hearing.  Grace is

7 working on language with Maryland Casualty and we're going to

8 be included in that discussion going forward.  And that

9 discussion may, in fact, resolve one of those objections,

10 Number 53.  And the idea was to put that over until the 24th,

11 and we would address it again at that point.

12          THE COURT:  All right.

13          MR. BROWN:  Objection 54 relates to Exhibit 5.  And

14 Exhibit 5 was amended last night.  I saw a copy of it this

15 morning.  And there was one policy in Exhibit 5 that we were

16 not in agreement with the description of.  There's a new

17 description, but frankly I don't understand, but I haven't had

18 a chance yet to have a discussion with Grace about that.  And I

19 would propose to put that one over and we'll discuss that in

20 the interim, as well.

21          THE COURT:  Mr. Freedman?

22          MR. FREEDMAN:  That's fine, Your Honor.

23          THE COURT:  Okay.  Those two matters are continued

24 until November 24 then.  Excuse me one second here.  Mr. Cohn?

25          MR. COHN:  Yes, Your Honor.  Similarly, the Libby

1  claimants have a concern about that, the version of Exhibit 5

2  that just crossed the wire late yesterday I think it was.  And

3  there's -- I'm not sure there's much point in going through it

4  today, because we'd really like to see clarification before we

5  pursue the objection on the record.  So, I would just ask that

6  that be continued until the 24th.

7          MR. FREEDMAN:  Again, that's fine, Your Honor.

8          THE COURT:  Okay.  So, is everybody simply going to

9  want Exhibit 5 discussions continued until November 24?  If so,

10  maybe -- yes, I'm getting a lot of nods.  Wait, I need Mr.

11  Freedman's attention.

12          MR. FREEDMAN:  I'm sorry, Your Honor.

13          THE COURT:  I'm getting a lot of nods about the fact

14  that many people are going to ask to have discussions about

15  Exhibit 5 continued to November 24th because they haven't had

16  time to really digest it yet, is that what the debtor's going

17  to propose, too?

18          MR. FREEDMAN:  Yes.  That is precisely what we intend

19  to propose.

20          THE COURT:  All right.  Discussions about the new

21  Exhibit 5 that was filed yesterday are continued until November

22  24.  Kathy, can you adjust my mic down?  I'm getting feedback

23  -- I think it's mine -- I'm getting awful feedback up here.  I

24  don't know if you're getting it out there, but it's pretty bad.

25          MS. YOUNKER:  You think it's too high?

1              THE COURT:  Yes.  And I tried it up here -- yes,

2  that's better.  Thank you.  Mr. Demmy?

3              MR. DEMMY:  Yes, Your Honor.  Thank you.  John Demmy

4  for Firemen's Fund Insurance Company.  I'll omit the Exhibit 5

5  discussion, you just dealt with it.  And I rise to advise the

6  parties and the Court that simply, and I'm not sure I agree

7  with the characterizations of the status of the various

8  objections Firemen's Fund made, which are 55 through 69 in the

9  list, but it's unimportant, I don't want to argue about

10  collateral issues such as that.  The important point is that

11  for disclosure purposes, we're content to let the matter roll

12  forward in light of some of the changes that have been made in

13  the additional exhibits that have been filed, of course

14  reserving our rights with respect to other issues, confirmation

15  issues and scheduling and so forth.

16              But, for the purposes of disclosure, and not wanting

17  to argue about the way things were characterized either as

18  resolved or overruled and so forth, I think we can just move

19  forward in that vein with regard to the Firemen's Fund

20  objections.

21              THE COURT:  Okay.

22              MR. SCHIAVONI:  Your Honor, Tanc Schiavoni for Royal.

23  We're listed on the chart as I think under discussion, but the

24  good news is, we've reached a resolution, so we should

25  hopefully be added to the resolution column.  Mr. Freedman has

1  a statement he's going to provide the Court in connection with

2  that resolution.  Part of that resolution deals with Exhibit 5.

3  I was sort of hoping not to have to come back another day.  If

4  the Court really thinks that that makes sense, then I'm happy

5  to do so, but if we could resolve it today, that would save me

6  a trip.

7            THE COURT:  That's fine.  If there's something that

8  is resolved, I don't need to continue it.  Anybody who wants

9  the discussion about Exhibit 5 continued until November 24th,

10 it's continued.  If you've got a resolution, please do tell me.

11 I don't want you to come back either if it's been resolved.

12           MR. SCHIAVONI:  Thank you.  Debtor's counsel will

13 provide it.

14           THE COURT:  All right.

15           MR. VERY:  Your Honor, Dennis Very for Longacre.

16 There was something that we did not see on the chart that we

17 wanted to have addressed.  If the Court would like to hear that

18 now or after we go through this, whatever the Court would like.

19           THE COURT:  Have you mentioned it to Mr. Freedman

20 yet?

21           MR. VERY:  I did talk this morning to Ms. Baer.

22           THE COURT:  Ms. Baer, okay.  And are you going to get

23 it on, is it a resolution that you've come to or is something

24 we need to take up?

25           MS. BAER:  We need to take up.

1          MR. FREEDMAN:  We won't be taking that up in due

2  course today, Your Honor.

3          THE COURT:  Oh, okay.

4          MR. VERY:  Fine.

5          THE COURT:  All right.  All I'm dealing with at the

6  moment is anything that is on the chart that's marked as

7  resolved.  And the question is, if the debtor thinks it's

8  resolved and you don't, that's all I want to hear right now.

9          MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

10 for the Unsecured Creditors' Committee.  Just a clarification.

11 The debtors in the chart have a footnote on Page 27 with

12 respect to overruled objections with respect to the disclosure

13 statement and the footnote sum and substance says that any

14 confirmation objections are preserved, which we of course agree

15 with.

16          I just wanted it to be clear that even other matters

17 that we have resolved with respect to disclosure issues, the

18 characterization of things here as confirmation objections

19 versus disclosure objections was the debtor's.  So long as all

20 of the issues, as approved, be preserved for confirmation, I

21 just wanted to stand and make sure that we have that

22 clarification.  Not simply the way the debtors have put in this

23 footnote that it's only the overruled objections to

24 confirmation objections which were labeled as such by the

1  debtors.

2           THE COURT:  I don't know what you just said.

3           MR. PASQUALE:  I can try it again, Your Honor.

4           THE COURT:  My ruling was this.  To the extent that I

5  made a ruling that said that an objection was raised to the

6  disclosure statement that was in fact properly raised to the

7  plan, then plan objections are preserved to the plan.  Raise

8  them in connection with the plan and I will hear them in

9  connection with the plan.  So, nothing that you raised in

10 connection with the disclosure statement that was overruled

11 because it wasn't properly raised at that time obviates the

12 objection to the plan.  So, when the plan comes up and the

13 objection period is set for the plan, re-raise it as a plan

14 objection and I'll hear it in connection with the plan.  That's

15 what I was trying to accomplish.

16          MR. PASQUALE:  And that's what I was standing to

17 hear, Your Honor.  Thank you.

18          THE COURT:  Okay.

19          MR. FREEDMAN:  Thank you, Your Honor.  And I

20 appreciate us having gone through that exercise at this point

21 in the hearing, because at the conclusion of this hearing, we

22 would like to establish for the record that except as noted on

23 the record in this hearing, we've resolved all disclosure

24 statement objections.  We understand that there will be some

25 additional issues that might arise because of things that are

1  yet to be filed with the Court and updates that we are going to

2  be making.  And as to those matters, of course, somebody should

3  not be precluded, if they have a disclosure statement

4  objection.  But, as to things that are already in the

5  disclosure statement that are before the Court and that are

6  settled, we believe that unless we put it on the record today,

7  we have resolution of those issues.

8       THE COURT:  Okay.  I think Ms. Cobb has something she

9  wants to get up here.  Okay, Ms. Cobb?

10      MS. COBB:  Good morning, Your Honor.  Tiffany Cobb on

11  behalf of the Scotts Company.  Just for the record, the numbers

12  for the Scotts Company objections on the Grace chart are

13  Numbers 20 through 24.  We believe we're close to resolving

14  those issues, but we are still exchanging language and having

15  discussions.  And just to be clear, those matters have not been

16  resolved, and I believe everyone's in agreement that they

17  remain pending and should be continued until the 24th.

18      MR. FREEDMAN:  Your Honor, that is correct.  And at a

19  certain point, as I describe to you where we are, I do intend

20  to identify those matters which we have a list of so that it

21  will supplement what counsel have already put on the record as

22  what they believe needs to be subject to further discussion.

23      THE COURT:  All right.

24      MR. FREEDMAN:  So, Your Honor, I think it would be

25  useful to bring the Court up to date on those things which are

1  still open and where we are on that.  First, with respect to

2  the personal injury class, which is Class 6, we did file the

3  TDP and that document is substantially complete.  Because of

4  some discussions that have gone on with certain of the parties

5  that have come forward and the period between the last

6  disclosure statement hearing and today, there may need to be

7  some additional tweaks to that document.  But, as of this

8  point, the major gap in that document, if you will, which was a

9  discussion of the initial payment percentage, has been resolved

10 in a TDP that addresses, that is now of record and has been for

11 several days.

12        The transactional documents that are involved in the

13 post-effective date relationship between Grace and the personal

14 injury trust are still under negotiation.  I'm happy to report

15 that we have narrowed the issues down to a very few issues.

16 But, these are quite complex documents.  They relate to matters

17 that are forward-looking and challenging, frankly, in terms of

18 how to come to a fair deal from both sides.  So, there are a

19 few matters that still need to be pinned down on that.  We'll

20 have a further status report hopefully with a report on

21 substantial status on the 24th.

22        With respect to PD, as the Court knows, we recently

23 appointed -- the Court recently authorized the appointment of a

24 property damage future claimants' representative, and we are in

25 discussions with the three principal constituencies that are

1  involved in the PD side; those being the PD Committee, the PD

2  future claimants' representative, whose counsel is in the room,

3  and also the representatives of the ZAI claimants, who have

4  separately stood before the Court on their issues to try and

5  resolve a package that will be acceptable to all of those

6  constituencies.  Those negotiations, I believe, are going well,

7  but we do not have a final deal at this point and there will be

8  documentation of that deal that will be required to be done

9  before we can present to the Court a complete plan and

10  disclosure statement.  I will again hopefully be in a position

11  to report substantial progress on those PD related matters on

12  the 24th.

13         Having said that, I think it would be useful to the

14  Court to turn back to some headline issues, if you will, that

15  relate to the plan.  These are matters that I think probably

16  caught the Court's attention and are ones where I would like to

17  perhaps brief the Court on some of the agreements that have

18  been made and the progress that has been made.  And it might

19  seem a little bit out of order, there are really two motions

20  that are before the Court as part of this hearing.  One is the

21  approval of the disclosure statement.  And the other is the

22  approval of our voting procedures' order.  In fact, those

23  issues are intricately intertwined.  And it may seem a little

24  bit out of order, but what I'd like first to do is to walk the

25  Court through some of the principal changes to voting

1 procedures which we have agreed to in discussions with the

2 General Unsecured Creditors' Committee and the United States

3 Trustee and other constituencies so that the Court understands

4 how some of the difficult issues on voting, in this case, have

5 been resolved.

6       First, as we reported at the last hearing, we were

7 going to provide that Class 9, which is the general unsecured

8 claims class, be given a provisional vote.  And the principal

9 points involved in that provisional vote is that ballots will

10 be sent to holders of general unsecured claims on a provisional

11 basis, if you will.  The ballots must be returned by the voting

12 deadline and will be counted, but the votes will only be given

13 effect if it is determined that Class 9 is impaired.

14       I would note as a footnote for future discussion at

15 the confirmation hearing that if the Court were to rule that

16 Class 9 was impaired, that wouldn't be the end of the matter,

17 there will still be substantial issues about confirmation.  The

18 debtor frankly believes that that class could be subject to a

19 cramdown based on the treatment, but that will be a

20 confirmation issue should the Court rule that the class is

21 impaired.

22       And finally, the holders of claims arising from the

23 post-petition credit facility shall be entitled to

24 provisionally vote their claims as to the principal amount of

25 the claims, notwithstanding the pending objection to the

1  post-petition interest.  The debtors do not dispute the

2  principal amount and we've agreed that they would be permitted

3  to vote that amount.

4          THE COURT:  All right.

5          MR. FREEDMAN:  Secondly, there was a fair amount of

6  discussion at the hearing last time about the Section 8.8.7

7  release, which is a release which is originally drafted, was

8  one that would be given by creditors who voted for the plan and

9  creditors who accepted property under the plan, creditors or

10 equity holders, who accepted property under the plan.  On the

11 voting side of that issue, following comments of the Court and

12 extensive discussions with the United States Trustee, the

13 ballot is very clear that a claimant who votes for the plan

14 will be giving the release that is provided in that section.

15 And the voting procedures, which are sent out with the ballot

16 will very clearly outline all of the terms of that release.

17 We've discussed with Mr. Klauder and the Unsecured Creditors

18 Committee how that will look and we believe we have no

19 objection to the terms of the voting procedures or the

20 construction of the ballot.  So, we believe that we have a

21 consensus and agreement on how that should proceed.

22          I will go a little bit out of order here, because I'm

23 on this section of the plan, and inform the Court about the

24 other element of Section 8.8.7 which is the issue with respect

25 to entities that receive assets under the plan, a property

1  under the plan.  That provision has been eliminated except as

2  to Fresenius.  The Fresenius settlement agreement actually

3  provided that as a condition to that agreement, persons who

4  received property under the plan were deemed to release

5  Fresenius and the order approving that agreement recited those

6  terms.  All parties have acceded to the concept that in view of

7  those orders and the terms of that agreement, it is appropriate

8  that Fresenius receive that treatment under the plan.  And

9  frankly, we believe that under the terms of the Third Circuit's

10 Continental decision, this would be an appropriate situation

11 for that kind of treatment in any circumstances.

12        THE COURT:  All right.

13        MR. FREEDMAN:  So, we have no objection there.  With

14 respect to classification of objections, any holder of a claim

15 who intends to pursue an objection to the confirmation of the

16 plan on the grounds that such holder's claim is not properly

17 classified will be permitted to request a ballot from the

18 voting agent for provisional voting under another class.  And

19 the way the voting procedures are constructed, the claimant

20 must file a disputed classification declaration by the voting

21 deadline with the Court which must attach both ballots; that

22 is, the original and the provisional ballot, indicating the

23 vote under each scenario and summarize the basis for the

24 claimant's classification objection.

25        The actual substance of classification objection,

1  should a claimant decide to make it, would be made in the

2  context of the confirmation hearing.  But, for voting purposes,

3  they'd have to submit the ballot and this provisional

4  declaration with a statement of why they believe they're

5  entitled to that.  And again, that is a procedure which parties

6  have agreed to, and the debtors will report the results of the

7  original and the provisional vote to the Court.

8        THE COURT:  All right.

9        MR. FREEDMAN:  The voting motions have been changed

10  so that parties will be permitted to file motions disputing

11  their claim amount by the voting deadline and also the

12  classification amount by the voting deadline.  Originally, we

13  had suggested that it be 20 days before.  We've now moved that

14  back to the voting deadline, and they would be heard after the

15  voting deadline and presumably as part of or before the

16  confirmation hearing as the procedures make sense at the time.

17        And then a couple of loose ends.  We've provided for

18  a publication notice that is a reader-friendly notice which

19  will be used in consumer oriented publications.  There will be

20  a notice going out to claimants who are subject to objections

21  that they are not eligible to vote, even on a provisional basis

22  because of the objection.  That will permit them then to come

23  forward and ask for temporary allowance by the voting deadline.

24  And the notice of counter-parties to executory contracts and

25  unexpired leases will be sent to non-debtor parties to those

1 documents to inform them of their treatment at the time that we

2 are soliciting.  That summarizes the agreements of all the

3 parties on the voting issues.  If the Court has any questions.

4          THE COURT:  Mr. Cohn?

5          MR. COHN:  I'm a little puzzled to the reference that

6 there were discussions among all the parties and there was no

7 objection among all the parties on the issue of the release and

8 the automatic release by reason of retention of property

9 because the Libby claimants were not consulted in that whole

10 process, whatever it was.

11          THE COURT:  No, he said that that's been taken out,

12 except for the Fresenius settlement.

13          MR. COHN:  Correct, right.  And as to the retention

14 of Fresenius, we were not consulted.  And as of this moment,

15 what I would say is, we are not necessarily on board with that

16 as a substantive matter.  So, that objection will be pursued,

17 if at all, in connection with the confirmation hearing.

18          THE COURT:  All right.

19          MR. COHN:  As a disclosure matter, Your Honor, we now

20 have no, we would have no dispute that there has been proper

21 disclosure made as to what the effect of the plan would be.

22 But, I just want to know for the record that despite the

23 inclusion on the ballot now of a statement that says that if

24 you receive property you're deemed to have given this now more

25 limited release, that the objection is preserved, if it is made

1  at the confirmation hearing.

2          THE COURT:  Well, it can be preserved, but I don't

3  know how it's not res judicata if the order that approved the

4  settlement, which was entered years ago, provided for it.

5          MR. COHN:  It might be, Your Honor, it's just that

6  whatever the process was by which this agreement was arrived

7  at, we simply weren't consulted.  Nobody has walked us through

8  that.  And so all I'm doing today, Your Honor, is simply

9  preserving for the record what might be an objection --

10         THE COURT:  Okay.

11         MR. COHN:  -- or might not.

12         THE COURT:  Any plan objections are preserved, Mr.

13 Cohn.  I mean, whatever they are, however they come up, they're

14 all preserved.  I've tried to make clear that in addressing the

15 disclosure statement I'm not addressing plan objections.  So,

16 when they're raised in connection with the plan, they'll be

17 dealt with.

18         MR. COHN:  You did, Your Honor.  I was concerned

19 about this one only because there's now a legend on the ballot.

20         THE COURT:  Okay.

21         MR. COHN:  And I just didn't want that to be

22 construed that if you cast a ballot, even a ballot rejecting

23 the plan, that somehow you've acceded to this automatic release

24 upon retention of property.

25         THE COURT:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. COHN:  So, that's the sole reason for the

2     otherwise excessive reservation of rights, Your Honor.

3          THE COURT:  All right.

4          MR. COHN:  I did want to make one more comment on

5     another aspect of the voting procedures as it relates to

6     classification objections.  The way that the voting procedures

7     are worded appears to envision that a classification objection

8     would simply be that I don't belong in this class, Class 6,

9     let's say, I belong in Class 9.  But, it is also possible, and

10    indeed the Libby claimants have placed on the record the fact

11    that they think that there should be a separate class for

12    Libby.  And I just wanted to state for the record that we --

13    that despite the way it's worded, we construe that these

14    procedures will permit us to cast ballots and preserve and

15    reserve the objection and have it be -- have the ballots be

16    counted as though Libby were a separate class, so that this

17    Court can determine that issue at confirmation.

18         THE COURT:  Sure.  I mean, I don't think the debtor's

19    plan provides for a separate class, so I'm not sure how you're

20    going to vote in a separate class.  But, if that's how you want

21    to be classified, I've never seen a plan come up that asked the

22    Court to confirm a plan that doesn't have a class in it,

23    actually.

24         MR. COHN:  Right.  And this is -- yes, and obviously

25    if there has been separate class -- if there has been improper

J&J COURT TRANSCRIBERS, INC.

1 classification in that regard, Your Honor, then it couldn't --

2 well it --

3         THE COURT:  It couldn't be confirmed.

4         MR. COHN:  Well, it couldn't be confirmed in that

5 form.

6         THE COURT:  Right.

7         MR. COHN:  It could conceivably be amended to provide

8 for a separate class, and then you just get into the question

9 as to whether that modification of the plan required

10 re-solicitation, which I have no comment on at this time.  But,

11 --

12         THE COURT:  All right.  Let me throw something out,

13 because, you know, as Mr. Sable likes to tell me from time to

14 time, I don't get a line item veto on the plan.  So, let me see

15 whether to get past the potential need for modification, and I

16 understand I'm talking to more than just the debtor, any plan

17 proponent.  Is there a possible structure in this plan for

18 raising up front?  You know that the Libby claimants are going

19 to raise this issue, they've been telling you this for a long

20 time, the fact that there is -- there may be the need to have

21 this separate class added so that in the event that the Court

22 should determine that there is this need for a separate class

23 it can be added into the plan if that determination's made

24 without having to go through a modification process?

25         MR. FREEDMAN:  Your Honor, I'll let Mr. Lockwood

1  speak to some of the substantive issues, and we'd be glad --

2  from the debtor's standpoint would be glad to accommodate one

3  element of Mr. Cohn's request, which has to do with the

4  tabulation, if we can figure out, frankly, how to identify

5  Libby claimants from other claimants who are voting --

6       THE COURT:  Well, they'll have to tell you.

7       MR. COHN:  -- and report to the Court a tabulation.

8  My initial reaction to what the Court is asking about a

9  separate class is that that would be such a fundamental change

10  to the terms of the plan that, quite frankly, I'm not sure that

11  it's something that could be anticipated in the structure of

12  the plan.  But, I'll ask Mr. Lockwood to speak to it.

13       THE COURT:  Well, what I was wildly thinking perhaps

14  is that it might be a subclass within a class.  You know, if

15  it's subdivided between Class 9(a) and 9(b), for example, for

16  voting purposes so that if you break out Libby as a "separate

17  section within that class," so we know who they are, that's

18  what I guess I'm trying to get to.

19       MR. FREEDMAN:  Your Honor, I frankly don't see how

20  there is any basis under the facts for identifying Libby

21  claimants from any other group of claimants, other than the

22  fact that Mr. Cohn may represent a bunch of them.  And so even

23  going so far as to say that this is a properly identified

24  subclass goes in a direction which I frankly have a lot of

25  trouble with.

1        THE COURT:  Okay.

2        MR. LOCKWOOD:  Your Honor, I agree that it's easy to

3 segregate the Libby claimants' votes, determine what the

4 outcome, hypothetically, would be, but let's not kid ourselves.

5 The purpose of having the separate subclass here is so the

6 Libby claimants could vote against the plan.  The Libby

7 claimants are classic asbestos personal injury claimants.  So,

8 if they were to prevail that they were entitled to a separate

9 class and if that class, as Mr. Cohn certainly expects it to,

10 were to -- or the subclass -- were to vote against it, then

11 you'd have a number of issues.  One of them would be, if it was

12 a subclass, whether you could lump the subclass votes with the

13 other subclass votes to say that 524(g) contemplated a single

14 vote by all the asbestos for 75 percent voting --

15        THE COURT:  Let me stop you, Mr. Lockwood.  I didn't

16 mean to restructure the plan that way.  I'm simply trying to

17 figure out for the ballot agents' purposes how to identify the

18 Libby claimants, that's all.  I'm not trying to restructure the

19 plan.  Let me back up.  I am not trying to restructure the

20 plan.

21        MR. LOCKWOOD:  Okay.

22        THE COURT:  I'm just trying to figure out how to --

23 because they're going to vote in Class 9 and --

24        MR. LOCKWOOD:  I believe the Libby claimants' counsel

25 could --

1           THE COURT:  -- or 6, I'm sorry.  Class 6, I

2    apologize.

3           MR. LOCKWOOD:  -- identify for the Court the name of

4    the Libby claimants, and the ballot agent presumably keeps

5    track of the names of the people that vote.  And so you tell

6    the ballot agent, here's a list that Mr. Cohn provides of the

7    Libby claimants, tally their votes on a separate tally sheet

8    and --

9           THE COURT:  Okay.

10          MR. LOCKWOOD:  -- I think it's pretty easy.

11          THE COURT:  Well that's all -- all I was trying to do

12   was get to how were we going to tally who the Libby claimants

13   are.  And it wasn't -- I wasn't asking for a plan change, I'm

14   just asking for a summary sheet change.

15          MR. COHN:  Right.  And I do think that Mr. Freedman's

16   procedure for having a declaration of -- I'm sorry, I forget

17   the exact term -- but there's a process whereby you identify

18   that you think you should be separately classified.  And we can

19   -- the Libby claimants can utilize that process to identify

20   themselves and to state what the classification should be.

21          THE COURT:  Okay.  Well, that's all I was trying to

22   get to, how to answer Mr. Freedman's question is how is it

23   going to happen.  I think the Libby claimants have to

24   self-identify who they are, and then I think the ballot agent

25   needs to know that yes, there does have to be this separate

1  true-up somehow.  That's all I was trying to get to.

2          MR. FREEDMAN:  And to be clear, Your Honor, and we're

3  happy to instruct the ballot agent along those lines, but it's

4  got to be very clear that the debtors in no way would agree

5  that there is any integrity, if you will, to identifying the

6  Libby claimants as some, a properly separate group for any

7  purpose --

8          THE COURT:  I understand.

9          MR. FREEDMAN:  -- other than perhaps that they're Mr.

10 Cohn's clients.

11         THE COURT:  I understand completely.  All I'm trying

12 to do is, I've told folks before that if they've had a

13 disagreement with classification that I'd hear it in

14 conjunction with the plan, and I'm just trying to honor that

15 statement that I made.  So, I simply want to know how am I

16 going to figure out who they are and I just want to have a

17 means in figuring out who they are, that's all.  I'm not asking

18 for plan changes.

19         MR. FREEDMAN:  Thank you, Your Honor.

20         Very briefly, Your Honor, one other set of issues

21 that relates to voting.  One of the constituents that came

22 forward and discussed some of the voting issues is the State of

23 Montana.  There are a number of issues that we worked through

24 with the State of Montana, and I believe it would be correct to

25 say that the State of Montana has agreed to the language in the

1  plan and disclosure statement as it relates to the voting and

2  to describing the State of Montana's rights.  They are

3  reserving, like all other claimants, anything that they want to

4  argue at confirmation.  I'm not suggesting otherwise.  But, on

5  the voting side, if I could just report to the Court that the

6  debtors will agree to send to the State of Montana both a Class

7  6 ballot and a Class 9 ballot, we know that they're going to

8  want one and we're not going to make them wait to request it.

9  We'll just provide that to them.  And again, that is without

10  prejudice to the debtor's view that the State of Montana's

11  indirect claim, which is properly in Class 6.  But, we will

12  provide them the ballot so that they can make a provisional

13  vote and file a voting declaration as otherwise provided in the

14  plan.

15         And so those procedures will still apply, but we're

16  going to cooperate with them in that respect.  And we'll report

17  their vote as part of the tabulation of those claimants who

18  think that they are not properly in Class 6 and rather should

19  be classed in Class 9, and then their objections to

20  confirmation with respect to the classification would be heard

21  at the confirmation hearing.

22         THE COURT:  All right.  Mr. Monaco?

23         MR. MONACO:  Good morning again, Your Honor.  Frank

24  Monaco for the State of Montana.  What Mr. Freedman has related

25  to the Court is correct.  Unfortunately, what happened was, the

1 draft that we had didn't contain the current version, and when

2 we filed our supplemental objection it crossed in cyberspace

3 with the latest draft.  And what he has stated is acceptable to

4 the State of Montana.

5          THE COURT:  Okay, thank you.

6          MR. FREEDMAN:  Thank you, Mr. Monaco.  There were a

7 number of other constituencies that came forward and raised

8 issues between the last hearing and today.  Some by way of

9 filing objections or statements of provisional objection, some

10 just by e-mail, and if I could briefly state for the record

11 where those are.

12          With respect to Maryland Casualty, I believe we made

13 substantial progress on the points that they have raised to us

14 in discussions.  They did file a reservation of rights, if you

15 will.  There are a couple of points that still need to be

16 worked through, so the issues with Maryland Casualty will

17 provide a further report, too, on the 24th.

18          THE COURT:  All right.

19          MR. FREEDMAN:  And we understand that Seaton and One

20 Beacon have looked at the language changes as to Maryland

21 Casualty and that their issues, we hope, will be resolved

22 through the same process and pretty much the same language.

23          THE COURT:  All right.

24          MR. FREEDMAN:  Bank of America, there are again a

25 number of issues related to disclosure statement items and a

40

1 few plan issues that they have raised.  We think we've made

2 substantial progress in terms of resolving those.  There again,

3 we'll give the Court an update on the 24th.

4       Royal Insurance, as Mr. Schiavoni indicated, we now

5 believe we have an agreement done, and I'd like to spell out

6 the gist of that without going into the granular detail on what

7 it is.  Grace has agreed, and the ACC and the Future claimants'

8 representative assent that the Royal primary policies

9 identified in the 1995 settlement agreement are fully settled.

10 The plan proponents are revising the disclosure statement to

11 say that and the plan proponents have filed a revised Exhibit

12 5, which states that pursuant to that settlement agreement,

13 these Royal primary policies are entitled to protections

14 afforded in the plan and the settlement agreement to the extent

15 of the indemnities that are provided there as set forth --

16       THE COURT:  All right.

17       MR. FREEDMAN:  -- in the settlement.  And we have

18 amended both the disclosure statement -- we've agreed to

19 language in the disclosure statement and language in Exhibit 5

20 which will put this into effect.  I think the Exhibit 5

21 language has now been filed.  The disclosure statement language

22 we've circulated to Royal and to the ACC and the FCR and we

23 have an agreement on what that language should say.  So, by the

24 time that we come before the Court on the 24th, the disclosure

25 statement will be amended to reflect the deal with Royal.  And

1  I believe that puts to bed their disclosure statement

2  objections.

3          MR. SCHIAVONI:  Your Honor, just one clarification on

4  that.

5          THE CLERK:  Your name please?

6          MR. SCHIAVONI:  Tanc Schiavoni.  Could I just see the

7  -- as we understand it, the plan proponents have filed a

8  revised Exhibit 5 stating that pursuant to the '95 settlement

9  agreement, these were all primary policies and are entitled to

10  the protections afforded in the plan, to the settled asbestos

11  insurance (indiscernible).  That's how we see it.  We don't see

12  it subject to any other limitations.

13          MR. FREEDMAN:  That's what I intended.

14          THE COURT:  That's what I understood him to say.

15          MR. FREEDMAN:  That's what I intended.

16          MR. SCHIAVONI:  Thank you.

17          THE COURT:  Okay.

18          MR. LOCKWOOD:  The language of Exhibit 5 spells out

19  exactly what is provided.  I don't -- Mr. Schiavoni's summary

20  of it is not complete.  I'm not saying I disagree necessarily

21  with it, but the language is quite precise and it is what it

22  is.

23          THE COURT:  Mr. Cohn?

24          MR. COHN:  Your Honor, if I may, for the Libby

25  claimants.  What appears to have just happened here, if I

1  understand the explanation, is that the premises coverage under

2  those policies, in other words, the type of coverage that would

3  be available for the Libby claimants, has just been dealt away,

4  and it appears that Grace, the ACC and the FCR are now agreeing

5  that this premises coverage no longer exists even though the

6  settlement agreement appears to us to be clear that premises

7  coverage was preserved.

8        As a matter of disclosure, Your Honor, I guess so

9  long as the disclosure statement ends up being clear that

10 that's their position, I'm not sure that I have anything to say

11 about it.  But, I must say I'm rather shocked that Grace would,

12 a week ago or two weeks ago, have filed an Exhibit 5 saying

13 that premises coverage was not settled under those policies and

14 then still exists for the benefit of, I think it's my clients

15 and my clients alone, Your Honor, and that now a week or two

16 later they're reversing course and simply dealing away this

17 very valuable asset.

18        MR. FREEDMAN:  Your Honor, if Mr. Cohn believes that

19 there is some prejudice to his clients' rights in the

20 amendments to the disclosure statement that we filed that will

21 actually have a substantive impact on his rights he could raise

22 those in his confirmation objections.  Grace is stating what

23 its position is in the disclosure statement.  The amendments

24 that we filed were filed to clarify precisely what Grace

25 believes it did in the course of the settlement with Royal

1  Insurance and the disclosure statement simply provides Grace's

2  view of what that settlement did.

3      MR. LOCKWOOD:  Your Honor, Mr. Cohn took the occasion

4  to take a shot at the Committee and the futures "rep" on this

5  and so I -- just to give a brief response to that.

6      First, as we previously pointed out in our papers,

7  the so-called premises coverage is not limited to the Libby

8  claimants, despite Mr. Cohn's assertions to the contrary.  And

9  therefore, the Committee, in considering this issue, was not

10 somehow or another focusing on whether or not they should give

11 away the Libby claimants' rights as opposed to the rights of

12 others, all claimants that might be entitled to that coverage.

13      Secondly, there has been a lot of perhaps

14 unfortunately belated, but due diligence done by the Committee,

15 the futures "rep", the Committee's insurance counsel in

16 connection with this alteration of position, if you will, from

17 what was originally set forth in the disclosure statement,

18 which was, after all, simply a description of matters.  And the

19 Committee somewhat reluctantly, I have to say, concluded that

20 it was not going to fight with Grace and Royal about their

21 views on what that settlement agreement did or did not

22 accomplish.

23      That stated, as Mr. Freedman pointed out, if the

24 Libby claimants believe that notwithstanding what we have

25 learned about the context of this policy and how it was

1 negotiated and what it was intended to cover, that they are

2 being deprived of some sort of rights that are unique to them

3 or discriminatory against them in some way or another, as Mr.

4 Freedman said, they can certainly assert that as a confirmation

5 objection.

6          THE COURT:  Okay.  I think on this issue, perhaps a

7 little discovery for the Libby claimants might go a long way.

8 If the Committee has finally been satisfied that in fact the

9 premises coverage has been settled perhaps --

10          MR. LOCKWOOD:  We will be happy to explain to Mr.

11 Cohn the considerations that prompted the Committee and its

12 insurance counsel to arrive at the conclusions that they

13 reached and that I just summarized very briefly, Your Honor.

14          THE COURT:  All right.

15          MR. FREEDMAN:  And, Your Honor, your comment

16 anticipates something that I wanted to turn to as the last item

17 on the agenda today -- excuse me -- which is, in fact, a

18 procedure that we'd like to put before the Court for proceeding

19 with discovery on these kinds of issues.  Mr. Bernick, who's

20 not here, but who is with us by phone, will be describing that

21 to the Court when we get to it on the agenda.

22          THE COURT:  Okay.  Let's finish whatever we need to

23 finish before we get to discovery so I understand what the

24 scope of all of this is going to be.

25          MR. FREEDMAN:  Sure.  Your Honor, I think that only

1  one -- well there are two other constituencies in this vein,

2  BNSF and Scotts, both of them have raised some issues about how

3  their claims or interests are treated in the disclosure

4  statement.  With respect to BNSF, we have agreed to some

5  language, and that will be put into the disclosure statement by

6  the 24th.

7          With respect to Scotts, there are ongoing discussions

8  with Scotts, and we believe that those should be completed by

9  the 24th, so they'll be resolved by then.  That leaves us, Your

10  Honor, with just a few other issues to discuss.

11          THE COURT:  Get Mr. Very here.

12          MR. VERY:  Your Honor, on the BNSF issue, there's

13  another little tweak to that language that I didn't have an

14  opportunity to discuss.  So, hopefully at a break we can take

15  care of that and what counsel said would be exactly what

16  happens.  But, I just wanted to indicate that there's just one

17  little tweak to that language.

18          THE COURT:  Okay.  If it's continued until November

19  24th, that's fine.  I appreciate the fact that maybe the debtor

20  thinks it's done, you think it's not.  But, it's continued

21  until November 24th, because I don't have anything before me

22  that I can say, okay, it's fine, because you don't have an

23  agreement yet, so, I don't have the language yet, so, all

24  right.

25          MR. VERY:  Thank you, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Okay.  Mr. Brown?

2           MR. BROWN:  Your Honor, on the same issue, as we try

3  to work the language out with the debtor, that is Maryland

4  Casualty, One Beacon and Seaton, it would be helpful if we

5  could see the language that they're discussing with Scotts and

6  BNSF before the 24th so that we don't have additional issues

7  created by conflicts in the language.

8           THE COURT:  Okay.

9           MS. BAER:  That's fine, Your Honor.  I was

10  contemplating sending out the language on Monday and I'll make

11  sure it has everybody's --

12           THE COURT:  Okay.

13           MR. BROWN:  Okay, thank you.

14           MR. FREEDMAN:  Your Honor, that just leaves, as I

15  understand it, a couple of issues to discuss today.  The first

16  one of those has to do with some objections to the procedures

17  with respect to the list of plan claims as to which we have no

18  objection and when we file that.  Section 5.1 of the plan

19  provides that that list of claims would be filed ten days

20  before the effective date.  That is a period of time which is

21  necessary because there are a multitude of claims and it's

22  going to take quite a long time to get through all of those

23  claims, and we simply feel that we need the time to file it ten

24  days prior to the effective date.

25           Longacre has said that they want this list filed

1  prior to the voting deadline.  The only reason we believe that

2  they would have an interest in having it filed prior to the

3  voting deadline is if their claim was identified as one to

4  which the debtors objected to, and if it was one that the

5  debtors objected to, then they will have to come in and ask for

6  an authority to vote their claim.

7         As of this time I believe there is no objection to

8  their claim and under those circumstances, they have a proof of

9  claim and they're permitted to vote their claim because there

10  is no objection to their claim, which is black letter

11  bankruptcy law as I understand it.  So, there's no prejudice to

12  them in having that list filed by the -- or not having that

13  list filed by the voting deadline and I think that their

14  interest is fully accommodated because there is no objection to

15  their claim at this point.

16         THE COURT:  Okay.  Mr. Very?

17         MR. VERY:  Your Honor, it's Longacre's position that

18  the list of the allowed claims should be published before the

19  voting deadline for the reason that I'd like the opportunity to

20  know whether their claims are allowed and whether if there's

21  going to be litigation involved it might go to their

22  determination of whether they want to vote for or against the

23  plan, Your Honor.

24         And obviously this case is quite old, seven years,

25  and I don't think it's unreasonable that the debtor should have

1 some idea, some indication of what claims are allowable at this

2 point and whether -- even if it's to whatever that point is,

3 whatever claims they know at this point are allowable, we feel

4 should be published before the voting deadline.

5        THE COURT:  Well, I mean, it's really not traditional

6 in a big case like this that you know what claims are allowed

7 before the voting deadline.  I mean, most claims objections

8 come in after the voting deadline and sometimes well after the

9 voting deadline and sometimes there isn't a whole lot of reason

10 for the debtor to even undertake a claims objection process

11 until you know whether the plan's confirmed.  Because if it

12 isn't, then why does the debtor care necessarily?

13        So maybe, Mr. Freedman, as to Longacre, you can let

14 Longacre know whether you're going to file an objection to

15 Longacre's claim.  And, I mean, no one else has asked and I'm

16 not opening up Pandora's Box either, but maybe as to Longacre

17 you can let Longacre know if you intend to file an objection to

18 Longacre's claim.

19        MR. FREEDMAN:  Your Honor, subject to the size of

20 that list and the burden on Grace Management in providing a

21 response, we'd be glad to at least receive the list from

22 Longacre.  Understand that the context of this issue is that

23 Longacre is a company that bought these claims from other

24 creditors who actually -- as to whom Grace incurred the

25 obligation.  They're a claims trader, in effect.  And these are

1  claims that would be classified in Class 9.  To the extent that

2  they're allowed, they'll be paid 100 cents on the dollar.

3  We've provided the procedures that were involved with USG as we

4  discussed last time where they will --

5      THE COURT:  Oh, so it's a provisional vote in any

6  event.

7      MR. FREEDMAN:  -- it's a provisional vote in any

8  event.  So it's hard for us to understand why any burden should

9  be placed on Grace Management to look at this list and provide

10  an answer.  We're happy to receive the list and we're happy to

11  tell them whether or not it would be something we could

12  accommodate or it's too burdensome to accommodate at this

13  point.  But, beyond that, Your Honor, it seems like there's no

14  real interest to be served here.

15      THE COURT:  It doesn't seem like there's a real

16  interest to be served.  It's a provisional vote in any event.

17  I don't even know at this point if a class is to be paid 100

18  percent of the allowed claims at this point, how the class is

19  impaired.  So, if that's the case, you know, the allowance

20  process may go forward at a later date.  Why does the debtor

21  need to through this exercise now?

22      MR. VERY:  Like I said, Your Honor, it may go into

23  their determination of how they're going to vote on the plan.

24      THE COURT:  Well, I mean, that's the risk you take

25  when you buy a claim, isn't it, whether you get paid or not and

1  how much?  You factor that into the amount that you pay for a

2  claim when you're a claims trader.

3          MR. VERY:  Well, we'll move forward, most likely, and

4  send the list over and see where the debtor goes with that.

5          THE COURT:  Okay, that's fine.

6          MR. VERY:  Thank you, Your Honor.

7          THE COURT:  All right, Mr. Freedman, if you can

8  accommodate Longacre, that would be wonderful.

9          MR. FREEDMAN:  Thank you, Your Honor.  Your Honor,

10 there are remaining, I believe, just two constituencies to talk

11 about.  One, the General Unsecured Creditor's Committee has two

12 issues which we'd like to mention to the Court today and one

13 actually address at least, perhaps both.  And secondly, we

14 would like to talk with the Court about moving forward on the

15 Libby issues in terms of discovery and related matters.  I'd

16 ask if there's anybody who feels that we have not covered some

17 item that they'd like to raise?

18         THE COURT:  Mr. Monaco?

19         MR. MONACO:  Your Honor, Frank Monaco for the State

20 of Montana.  Your Honor, I just want the record to reflect, we

21 filed a supplemental objection and the crux of our objection

22 did deal with the voting/estimation issues.  We also had a

23 number of other requested additions which were either addressed

24 in the revised disclosure statement that was filed on the tenth

25 or I've had subsequent discussions with debtor's counsel about,

1  you know, satisfying the concerns that weren't addressed in the

2  revised amended disclosure statement.

3         There was one remaining issue that wasn't actually in

4  our written objection and that dealt with the Montana criminal

5  case.  There was a status report in the federal court there on

6  October 24th and debtor's counsels agreed to provide an update

7  for that status report.  Other than that, Your Honor, all of

8  our concerns that were raised in our written objection have

9  been satisfied by the language or the agreements that we've

10 reached afterwards.

11        THE COURT:  All right.  Thank you.

12        MR. MONACO:  Thank you.

13        MR. GLOSBAND:  Your Honor, I just wanted to note that

14 Continental Casualty has issues along the same lines as those

15 articulated by Maryland Casualty and Seaton.  So, we're

16 actually involved in the same process of reviewing and

17 considering that language between now and November 24th.

18        THE COURT:  So, Ms. Baer, Mr. Glosband, I guess,

19 needs the same orders then?  All right.

20        MR. GLOSBAND:  Thank you.

21        THE COURT:  Thank you.

22        MR. FREEDMAN:  Your Honor, then, turning to the two

23 matters raised by the General Unsecured Creditors' Committee,

24 I'd first call the Court's attention to Item 9 on the chart.

25 What that item relates to is that the Unsecured Creditors'

1  Committee has indicated that they believe that the plan should

2  provide for a cash reserve in the amount that is adequate to

3  pay those Class 9 claims which are not paid on the effective

4  date.  And that there should be -- that the debtors disagree

5  that such a cash reserve is appropriate, and that the

6  disclosure statement should so make clear.

7        The debtors do, in fact, vehemently disagree that it

8  was be appropriate in this case to have a cash reserve.  If the

9  General Unsecured Creditors' Committee has a concern about the

10 debtor's ability to pay its commitments under the plan, it is

11 certainly free to raise those as feasibility issues at the

12 confirmation hearing.  But, the debtors are very confident that

13 they would be able to meet those obligations and that there is

14 absolutely no reason to impose the burden on the debtor's

15 capital of a cash reserve to do that.  So, let that be a

16 feasibility issue if at the time of the confirmation hearing

17 the General Unsecured Creditors' Committee wants to raise it.

18       THE COURT:  And what's the amount of the claims that

19 you expect to be in that class?

20       MS. BAER:  I guess the question is, is it the amount

21 of claims we expect to not pay on the effective date versus

22 what we are going to pay?

23       THE COURT:  Yes.

24       MS. BAER:  I can actually, if I looked at the

25 disclosure statement I can tell you if I can look at it.


                    **J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.

2           MR. FREEDMAN:  Your Honor, with respect to the

3  disclosure of that item, in effect what the General Unsecured

4  Creditors' Committee is asking the debtors to do is to disclose

5  the fact that they have some hypothetical concern over a need

6  for a cash reserve.  They have not provided the debtors with

7  any indication of why such a thing would be provided or

8  necessary.  They just simply have asserted that they think it's

9  required.  And we do not believe that that kind of a disclosure

10 is appropriate to assuage some concern that they have about the

11 debtor's ability to meet its obligations under the plan.

12          In addition, this is again Class 9 that we're talking

13 about.  The class that the debtors believe will be unimpaired

14 and whose vote should not be counted.  Yes, there will be a

15 provisional vote, and yes it is clear that they're going to

16 argue that the class is impaired, but that will then turn into

17 an issue about whether or not the plan is feasible when the

18 debtors say that they will be able to pay 100 percent of their

19 claims.  If the Court finds that there's an issue about that,

20 that's the time to talk about it.  The debtors see no reason at

21 this time to raise that issue in their disclosure statement.

22          THE COURT:  Mr. Pasquale?

23          MR. PASQUALE:  Thank you, Your Honor.  Let's not

24 confuse things.  This is a disclosure issue as we stand here

25 today.  I agree ultimately at confirmation, you know, the issue

1  will be feasibility.  But for today, it's disclosure, and we've

2  provided disclosure that we asked the debtors to put in the

3  disclosure statement and as you've heard, they've just blanket

4  refused.

5           I think we need to understand that Class 9 -- and the

6  impairment issue that Mr. Freedman raised, that's a bootstrap

7  at this point.  That will be or will not be at confirmation.

8  For purposes of disclosure, if we're correct, unsecured

9  creditors need as much information as the bankruptcy code

10 provides to make an informed decision.  As we read the plan,

11 the only group of unsecured creditors that does not get paid or

12 a trust funded on the effective date is Class 9.

13          It's our constituency that has whatever risk there

14 might be, and we're looking into at least March for a

15 confirmation hearing at this point, that the debtors will not

16 be able to fund obligations.  And we all know it's a brave, new

17 world out there these days, and so there is a risk.

18          The debtors concede the risk in at least two places

19 in the disclosure statement.  It's now 9.5.1 -- excuse me --

20 yes, the disclosure statement, 9.5.1 and 9.5.2, where they

21 acknowledge a risk that they may not be able to achieve their

22 financial results and that they might not be able to satisfy

23 their post-reorganization obligations.

24          So, with those risks, Your Honor, all we've asked for

25 is a disclosure to be added that says that it's the Committee's

1 position that a reserve should be established.  We can't compel

2 the debtors to do that.  Again, that's a confirmation issue.

3 We see no legitimate reason why the language should not be

4 added to the disclosure statement.

5        THE COURT:  But, isn't that what committees are all

6 about?  You can send out your own solicitation letter or own

7 information letter.  Why does the debtor have to put your

8 information in the debtor's disclosure statement?

9        MR. PASQUALE:  We can do that, Your Honor.  I mean,

10 it's a few lines.  You know, it seems very simple for this to

11 be done in the context of the plan.

12        THE COURT:  Well it does, but if the debtors don't

13 want to do it, I think, I can't compel them to put in that kind

14 of contrary information.  I don't think the code requires the

15 reserve to be set up.  It may be a big feasability issue,

16 perhaps, but I don't think that as a disclosure matter that the

17 debtors have to say, and oh, by the way, the committees want a

18 reserve and we're not providing one.  I think the Committee has

19 the ability, if it chooses to, to send out a letter saying, you

20 know, vote against this plan because the plan doesn't provide

21 for a reserve and we think there should be one because... but I

22 don't think I can compel the debtors to put the language in.

23 If the debtors want to save, you know, the expense of having a

24 negative solicitation letter and want to put in a sentence that

25 says the committees want us to set up a reserve and we're not

1  going to, you know, I think they can, and I don't think I can

2  compel them to.

3        MR. PASQUALE:  Okay.  Is Your Honor suggesting that

4  that letter go with these same packages?

5        THE COURT:  I don't think I can compel that either.

6  But, that would certainly save some additional expense --

7        MR. PASQUALE:  Right.

8        THE COURT:  -- especially if it's going out to a

9  whole lot of creditors, which I take this, it would be.  So why

10 don't we take that issue up when we get to the solicitation

11 issues.  But, Mr. Freedman, if you want to put one sentence in

12 that says the Creditors' Committee think a reserve ought to be

13 established and the debtors disagree and aren't establishing

14 one, or --

15       MR. FREEDMAN:  Your Honor, and we strive to be

16 helpful and cooperative here.  This one is, in our view, so

17 beyond the pale that we don't think it's appropriate for the

18 plan -- for our disclosure statement.  And I would point out,

19 in answer to the Court's question, there's about 1.15 billion

20 in Class 9 claims that the debtors have identified in the

21 disclosure statement as being subject to that treatment.  That

22 of those, we expect 826.3 million to be paid at the effective

23 date which would leave about $320 million.  That number,

24 frankly, pales by comparison to the obligations that the

25 debtors will incur under its commitments to the PI trust.  And

1  then there will be additional obligations to the PD trust,

2  neither of which are requiring a cash reserve.

3       So, it's actually incorrect what Mr. Pasquale said,

4  that they are the only constituency that is being asked to wait

5  for the money.  Indeed, the PI Trust, which, believe me,

6  scrubbed the debtor's finances to the finest degree, was

7  content to accept a very substantial deferral of payment

8  without any security.  So, it seems to us that there again,

9  this request for a cash reserve is just inappropriate in the

10 context of W.R. Grace.

11      THE COURT:  Okay.  Well, I've already said, Mr.

12 Freedman, I can't compel the debtor and I'm not going to

13 attempt to compel the debtor to put this in.  But, it seems to

14 me that the explanation you just gave, if the negative

15 solicitation letter does go out, the debtor is probably going

16 to want to file or set some kind of response out to it that

17 says what you just said, which is going to cause additional

18 expense.  So, maybe you want to take the bull by the horn and

19 explain all that.  Mr. Lockwood?

20      MR. LOCKWOOD:  Your Honor, the Unsecured Creditors'

21 Committee is already going to tell everybody to vote against

22 the plan because it doesn't pay them enough post-petition

23 interest.  This is really kind of an absurd proposition.  What

24 Mr. Pasquale is, in effect, saying is, if you'll put in

25 something that tells them that they're also not going to create

1  a cash reserve, that will somehow or another change their

2  voting information.  The plan clearly doesn't provide for it.

3  Anybody that reads it can tell that it doesn't provide for it.

4  These are bank lenders and such that are pretty sophisticated,

5  and the Creditors' Committee has already stated in language

6  that the debtors have agreed to in various places in their

7  disclosure statement, that the Creditors' Committee recommends

8  voting against this plan because it doesn't provide what they

9  believe is an adequate post-petition interest.  So, how could

10 this possibly be a material additional issue?  They're going to

11 tell them to vote against that.

12         And, theoretically, somebody is going to say, well, I

13 don't care that I don't get post-petition interest, but, boy,

14 if I'm not going to get a cash reserve, too, then I'm going to

15 vote against it when otherwise I would have voted in favor of

16 it.  Ask yourself whether that makes any sense at all, Your

17 Honor.

18         THE COURT:  I've already --

19         MR. PASQUALE:  Your Honor, excuse me, wait.  Mr.

20 Lockwood is now confusing issues.  This is not only about

21 post-petition interest.  There's a whole body of other non-bank

22 claims which need not be paid on the effective date.  There's

23 at least 180 days after the effective date where objections can

24 still be filed.  So, this is not only about post-petition

25 interests.  It's also about trade creditors who don't get paid

1  until well after the effective date.  And the only exposed

2  group is Class 9.  The PI -- excuse me, Your Honor -- the PI

3  Group, they have a backstop.  They're protected.  Everyone else

4  is protected.  The only exposed group is the Unsecured

5  Creditors in Class 9.  That's the point.  Thank you, Your

6  Honor.

7        MR. LOCKWOOD:  Your Honor, as Mr. Freedman pointed

8  out, the bulk of the money that the Class 6 creditors through

9  the trust are getting is in deferred payment obligations from

10 Grace, which exceed a billion dollars and aren't going to start

11 getting paid until ten years down the road.  For him to say

12 that Class 9 is the only people that aren't getting cash on the

13 effective date is a ludicrous misstatement.  And moreover, with

14 respect to the trade creditors, the Committee would prefer that

15 the trade creditors get paid a higher rate of interest faster

16 and they've said so in their objections and stuff.

17        The question is materiality.  This is a disclosure

18 statement.  It's supposed to allow a relatively informed

19 investor to figure out adequate information to know whether

20 he's going to vote or not on this plan.  And what Mr. Pasquale

21 really is attempting to do is to hijack the debtor's disclosure

22 statement to make further efforts on its own behalf to get

23 people to vote against it.

24        THE COURT:  Okay.  Enough.  What I've already said

25 is, I can't compel the plan proponents to put this information

J&J COURT TRANSCRIBERS, INC.

1 in.  I think that in order to save expenses, the plan

2 proponents may want to consider whether they want to state the

3 situation in their terms, because if the Creditors' Committee

4 goes out with negative solicitation and states it their way and

5 then somebody wants to follow up and restate it your own way,

6 it's just going to create additional expense.  That's all I

7 said.  So, if you want to put it in, fine.  Do I think it's

8 material?  No.  Am I compelling it?  No.

9         MR. FREEDMAN:  Your Honor, the only observation I'll

10 make for the record and then I'll drop the issue, is that in

11 point of fact since the general unsecured claimants other than

12 the bank lenders are clearly being treated in a way that will

13 assure them of all of their rights, including any post-petition

14 interests, and the lenders are going to be resolved before the

15 confirmation.  So, that issue will be resolved as to whether or

16 not they are being paid the full amount of their claims.

17         Indeed, it would be very appropriate for the General

18 Unsecured Creditors' Committee to send out a letter

19 recommending that its constituency vote for the plan since

20 they're going to be paid in full.  And so that separate

21 solicitation is not going to be avoided anyway and we should

22 move on.

23         THE COURT:  All right.

24         MR. FREEDMAN:  That then, Your Honor, leaves us, I

25 believe, with the Libby issues.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. FREEDMAN:  Excuse me, Your Honor, there is one

3 other issue with respect to the General Unsecured Creditors'

4 Committee.  That issue has to do with the provision of the plan

5 that deals with the continuing role of the General Unsecured

6 Creditors' Committee after the effective date.  And what we did

7 is to amend the plan to provide that the General Unsecured

8 Creditors' Committee will have all of the rights of the other

9 committees with respect to post-effective date, with respect to

10 standing and capacity to participate in post-effective date

11 claims allowance proceedings and similar kinds of matters.

12          We did make clear that as to all of the committees

13 and the future claimants' representatives for both PD and the

14 PI that there was nothing in that right to continue to

15 participate after the effective date which would allow them to

16 serve the interest of some individual creditors as opposed to

17 the broader constituency for which they're appointed.  And

18 we've added language in the plan to that effect.

19          My understanding is that Mr. Pasquale used that as an

20 issue, which, if he's inclined to raise it, he would raise it

21 at the confirmation hearing and that at this point he would not

22 seek to have a discussion about that additional language at

23 this point.

24          MR. PASQUALE:  Your Honor, for the Unsecured

25 Creditors' Committee, what we want to do at this point is flag

1  the issue.  We're not asking for any additional language.

2  There is no language in the disclosure statement about the role

3  of any of the committee's post-effective date.  We're not

4  asking that any language be put in at this time.  We will, if

5  necessary, raise it at confirmation.  Frankly, it depends on

6  the status of the bank litigation, because let's not kid

7  ourselves, the sole reason for this language, although there's

8  words in there that makes it apply to all the other committees,

9  it's there solely to preclude the Unofficial Creditors'

10 Committee from continuing with the bank litigation on appeal.

11 But, we'll argue that at the confirmation hearing depending

12 upon the status of that litigation at the time.

13            THE COURT:  Okay.

14            MR. PASQUALE:  Thank you.

15            MR. FREEDMAN:  Again, not to belabor a point, Your

16 Honor, but that plan specifically provides that that matter has

17 to be resolved as a condition to confirmation, so it should not

18 have any life past the confirmation hearing.

19            That then, Your Honor, brings us to the Libby issues

20 related to moving forward with the various issues that Mr. Cohn

21 has raised.  Mr. Cohn did provide the Asbestos Claimants'

22 Committee and the Asbestos PI FCR with a few specific points

23 related to plan amendments and collateral disclosure statement

24 amendments that were serious points which we are considering

25 and which we hope to work out by the next hearing.  So, let's

1 defer the discussion of those matters until the 24th.

2        If Mr. Bernick is on the phone, then we'd like to get

3 into a conversation with the Court about the broader discovery

4 issues that are implicated by the Libby position.

5        MR. BERNICK:  Yes, Mr. Bernick is on the phone.  Good

6 morning, Your Honor.  I'm sorry I couldn't make it this

7 morning.  I got to the airport and could hardly see the runway,

8 so it was quite clear that I wasn't going to get out of New

9 York this morning.  I apologize for not being there,

10 personally.

11        THE COURT:  All right, Mr. Bernick.   Go ahead.

12        MR. BERNICK:  I don't know if Your Honor has before

13 you a draft case management order that I know was circulated to

14 the parties.  Does the Court have that there?

15        THE COURT:  I will in one second.

16        MR. COHN:  Your Honor, if I might interject.  This

17 was circulated a couple of days ago with an e-mail from Ms.

18 Baer saying this is for discussion among counsel.  That

19 discussion has not yet taken place.  So, I would submit that

20 the discussion of this is premature unless it's just for the

21 purpose of flagging that there's going to be this discussion

22 then that perhaps this is something appropriate to be heard by

23 the Court upon proper notice, perhaps on the 24th or perhaps

24 some other time.

25        MR. BERNICK:  That's fair, Your Honor.  The purpose

1  was to essentially make a status report on this matter and to

2  alert Your Honor to the fact that we do intend to raise it on

3  the 24th.  But, pretty specifically, because of Mr. Cohn's

4  client, we wanted to make sure that this did come to the

5  Court's attention.  Because with respect to his client

6  particularly, there may be others that obviously there's going

7  to be a need for some significant discovery.  That discovery

8  really ought to commence.  There's no reason for it not to

9  commence right away.  And we just didn't want the passage of

10 time between the time that we circulated this and the 24th to

11 be a reason why the dates that are set forth here as proposed

12 dates should still be viable with respect at least to discovery

13 that we know is going to have to take place.

14          And all I'll really focus on here, the order was

15 designed to establish some basic date that would take us from

16 where we are now to the time of confirmation.  And they're not

17 just specific to the Libby claimants, they would cover other

18 people who want to raise objections and the like in connection

19 with the plan.  It also covers some other matters that relate

20 to the plan process, including the dates for objection.  So,

21 all I really wanted to focus though, on, were the kind of

22 earlier dates that relate specifically to discovery.  We would

23 propose that written fact discovery be propounded by the middle

24 of December, December 11, depositions of fact witnesses may

25 commence immediately after December 22nd, shall be completed by

1 February 12th.  And then there's a further provision that deals

2 with expert reports at Paragraph 5 and expert depositions, that

3 paragraph -- I believe that was Paragraph 4, expert depositions

4 Paragraph 5.

5 　　　　The goal here is to commence the discovery process

6 soon, so that we don't have problems with the completion of

7 that discovery process threatening the date for a confirmation

8 hearing.  And we do know that the Libby claimants have made

9 objections.  We do know what their objections are likely to be.

10 We do know they are presenting matters that, as Mr. Lockwood

11 identified on the last hearing, really are going to turn on

12 evidence.  So, we don't want to be squeezed by having the

13 discovery lag so long that it threatens confirmation hearing

14 dates, which we know are difficult to obtain given the Court's

15 busy schedule.

16 　　　　So, that's it.  We would ask, as we have asked, and

17 as Mr. Cohn has properly pointed out, that any other party who

18 has an interest in this matter reach out to us if they've got

19 problems with these dates so that we can understand what those

20 problems are and maybe make some specific provisions.

21 　　　　We're also sensitive, of course, to the fact that

22 there, as Mr. Freedman has indicated in his overview remarks,

23 there are in a sense, different tracks of interested parties'

24 issues of this case, and particular, with reference to the

25 property damage constituency.  There's documentation that's

1 still in the process of being completed because there are

2 active negotiations that are still in the process of being

3 completed.  So, obviously we recognize the property is likely

4 to be in a somewhat different place, and we're sensitive to

5 that, although we're also hopeful that the issues that we have

6 with respect to property damage can actually be resolved,

7 thereby obviating the need for a lot of discovery and objection

8 to the plan.

9           So, it's really an information item, a status report,

10 and we look forward to hearing from Mr. Cohn or anybody else

11 with respect to their reactions of the dates that are set forth

12 here.

13           THE COURT:  Mr. Cohn?

14           MR. COHN:  That's fair.  We will be able to respond

15 and we anticipate discussing this with Grace's counsel next

16 week.

17           THE COURT:  Okay.  Well, I'm a little concerned about

18 the fact that you're -- oh, you're talking about propounding

19 the written discovery by December 11, not concluding it by

20 then.

21           MR. BERNICK:  Yes, that's correct.

22           THE COURT:  All right.  So, that seems fair.  We can

23 take that issue up on November 24th.  That should be sufficient

24 time if this order -- or if the proposed order has been

25 circulating, to let everybody start to get the discovery

1  together now.  Because I tend to agree with you, Mr. Bernick,

2  that I know the documentation isn't complete, but the

3  disclosure statement at this point is in pretty complete form.

4  I mean, people are still obviously asking for some additional

5  disclosure here and there, but in form and substance, the

6  disclosure statement itself has pretty much the information in

7  it that the debtor's going to put in.

8        And the plan -- most of the documentation at this

9  point is finished -- the plan overall, the structure of the

10  plan's known to everyone.  So I think the discovery actually

11  can get underway.  So to the extent that the parties want to

12  start discovery and start propounding the discovery, it seems

13  to me that that process can get started.  So, I think we should

14  take up the issue of the exact deadlines on November 24th.

15  But, to the extent that you want to get started, I think you

16  can.

17        MR. BERNICK:  Thank you, Your Honor.

18        MR. COHN:  Thank you.

19        THE COURT:  Okay.  So, we'll take up that issue on

20  November 24th then.

21        MR. FREEDMAN:  Your Honor, it's now quarter of 12.

22  We have until four, but I believe we've completed our agenda.

23        THE COURT:  Oh, all right.  Well, anybody else have

24  any issues?  Mr. Wisler?

25        MR. GIBBONS:  Your Honor, this is Joe Gibbons for

**J&J COURT TRANSCRIBERS, INC.**

1  Century Indemnity Company.  I just wanted to clarify something
2  on the record.  Prior to to last hearing, we had reached an
3  agreement for modifications to Plan Exhibit 5 that would result
4  in our withdrawing our objection.  We didn't get the revised
5  Exhibit 5 until today -- or, you know, last night, and we still
6  have one or two issues.  Those issues are going to be carried
7  over, but I didn't want anybody to be surprised because, you
8  know, our objection is listed as withdrawn, but it was
9  withdrawn contingent on certain language being in Exhibit 5.
10 So, I just didn't want anybody to be surprised about that.  We
11 had planned to talk to debtor's counsel and the committees and
12 see if we can't resolve it.

13          MR. FREEDMAN:  That's fine, Your Honor.

14          THE COURT:  All right.  Thank you.  Mr. Wisler?

15          MR. WISLER:  Thank you, Your Honor.  Jeff Wisler on
16 behalf of Maryland Casualty.  Your Honor, I just wanted to talk
17 about scheduling for a minute, because before today we had on
18 the 24th starting at one o'clock, the omnibus and then the
19 property damage.  So, I don't know what Your Honor's calendar
20 is like.  I was trying not to be here on the afternoon of the
21 24th.  But, if there are any PI side disclosure statement
22 issues unresolved by anybody, I would have to be here.  So, I
23 didn't know whether Your Honor was going to try to squeeze
24 everything in that one o'clock forward time period or whether
25 you had something earlier.

1          THE COURT:  I don't have anything earlier that day.

2   I actually have an omnibus calendar that looks as though it's

3   going forward that day.  So, I don't think I'm going to get

4   started sooner.  I am not sure at this point what's happening.

5   I mean, I thought -- and in addition I have two hours of that

6   day reserved for the Canadian statute of limitations and its

7   argument.

8          MR. WISLER:  This is after one o'clock, or one

9   o'clock forward?

10          THE COURT:  Yes.  So, there is not a lot of time for

11   disclosure statement issues that day.  But, I was assured that

12   it wasn't going to take long.  So, I'm not the right person to

13   ask, Mr. Wisler, I think they're seated over there.

14          MR. WISLER:  Well, I have Your Honor's calendar now,

15   so that helps.  Thank you.

16          THE COURT:  So, why don't you ask them and then --

17   in fact, why don't I ask so we can get a schedule that makes

18   sense.  Mr. Freedman, what is the proposal, because it looks

19   to me like that's going to be a pretty busy day, too?

20          MR. FREEDMAN:  Your Honor, I think that the 24th is

21   likely to be in the nature of a status report where we expect

22   to provide the Court with substantial progress and we'd like to

23   move forward to the extent that time allows us to giving this,

24   that I don't expect that there are going to be substantial

25   arguments about any of the disclosure items because we're at a

1 stage now where we're really working on just closing deals, if

2 you will, and that's what we intend to report to the Court.

3 So, whether or not we have a complete and fully baked plan or

4 disclosure statement by that time that we'd ask the Court to

5 rule on, I think it's unlikely that we'll be fully there.  But,

6 we will have substantial progress by that date.

7           THE COURT:  So, there isn't much point having the PI

8 people back on November 24th is what I think I'm hearing?

9           MR. FREEDMAN:  Well, I'm not sure what the PI people

10 would need to be here for with respect to the plan and the

11 disclosure statement, other than issues that implicate their

12 interest.  We would hope to be able to report progress at

13 Maryland Casualty and we would hope to be able to report

14 progress in some of the items that Maryland Casualty would be

15 interested in.  That's how I envision the hearing.  I don't

16 understand that there's a need for them to be here, at least as

17 it relates to the plan and disclosure statement, beyond

18 participating in that status.

19           THE COURT:  Well, can I -- I guess -- I don't want to

20 do substantial argument on disclosure statements by phone.

21 It's too difficult because too many people jump into the fray.

22 If it's going to be a status report truly, with a couple of

23 comments here and there, I don't mind people appearing by

24 phone.  But, I don't want full-blown arguments with, you know,

25 five or six people taking up an issue by phone.  That is really

1 just too difficult to follow.  But, if what you're telling me

2 is you're going to report on whether or not you have come to a

3 resolution and what it is, and if you haven't come to a

4 resolution, you're just going to tell me that you need yet

5 another continuance.  I don't mind people appearing by phone

6 for that purpose.

7        MR. FREEDMAN:  That's precisely what I would expect

8 us to be doing.

9        THE COURT:  All right.  Then, Mr. Wisler, I don't

10 mind Court Call for that purpose.

11        MR. WISLER:  Thank you very much, Your Honor.  If

12 it's just a status report, that's perfect.

13        THE COURT:  Okay.  But, I don't want substantial

14 argument.  If anybody has a major argument that you intend to

15 raise, I expect your smiling faces here in court.  If it's just

16 an, okay, we agree that we're continuing, or yes, this is the

17 resolution, or yes, the debtor thinks that we resolved it, but

18 we didn't and we need to talk, that I can handle by phone.

19        MR. LOCKWOOD:  Your Honor, I sympathize with the

20 debtors on this, but there's -- I'm a little bit concerned

21 about if anybody wants to make a big argument they should show

22 up because we need to know.  I mean, if I'm not the one that

23 wants to make a big argument, so I'm planning on not showing

24 up, but somebody else shows up and wants to make a big argument

25 then I'm in my office and I can't argue.  So, as I heard the

1 debtor, the debtor says, we're going to give a progress report,

2 and to the extent that we report disagreement with any

3 objector, we're not going to argue that the Court should

4 someway or another make a ruling on who's right, the debtor or

5 the objector.  If that's what's going to go on, then that's

6 fine.  I think a lot of us can absent ourselves from that.

7 But,if people are going to be permitted to show up and say,

8 well, he said that we were in disagreement and I want to urge

9 you not only to accept the fact we're in disagreement, but

10 here's my position and I want you to tell the debtor that

11 they've got to change their plan in some way or another to

12 reflect that, then that's a whole different kettle of fish.

13          THE COURT:  It is.  Okay, Mr. Freedman, maybe I was a

14 little off base in what I was expecting to happen.  Am I going

15 to be asked to rule on disagreements or if you are still not

16 fully resolved, are you simply going to be saying we want more

17 time to try to work out the disagreements?

18          MR. FREEDMAN:  Your Honor, understanding where we are

19 on our discussions with various parties, I'm frankly optimistic

20 that you won't be asked to rule on disagreements.  But,I can't

21 promise the Court that that's going to be the case.  I think

22 that we are making, as I said, very substantial progress in

23 winnowing down the disclosure statement issues that would be

24 appropriate to bring before the Court.  So, it would be my hope

25 that we're not going to bring any such arguments before you.

1 Can I promise that there won't be an issue that somebody

2 doesn't want to argue at that time?  I'm not in a position to

3 do that.

4        MR. BERNICK:  Your Honor, this is David Bernick.  I'm

5 sorry to inject myself here, but I think in order to be a

6 little bit more explicit about what I think is probably driving

7 Mr. Freedman's remarks.  Where this has been obviously an

8 arduous process, it always is, but momentum is very key, as I'm

9 sure Your Honor is familiar, with getting these issues

10 resolved.  And I think that that momentum is there and our hope

11 and desire is to get all these issues wrapped up.  And our

12 concern would be that if all we do on the 24th is to have a

13 status conference and continue the matter for further

14 discussion that, in fact, people don't really have to exert

15 themselves to reach resolution by the 24th, and therefore

16 automatically we don't make progress.

17        So, I think our goal is to get things done.  In light

18 of that goal, I think we probably have to reserve some time, I

19 think it will be a modest amount of time, and if people do have

20 arguments that they want to make, they should show up and be

21 prepared to make them.

22        THE COURT:  Okay.  If you've got a resolution, you do

23 not need to appear, you can appear by Court Call.  If it's not

24 resolved and you're going to ask me to make a ruling, then you

25 need to be here so that I can hear the argument.  So, if you've

1  got something resolved, even if the language hasn't been worked

2  out, but you've got the resolution and you're comfortable that

3  the debtor will be reporting that you have a resolution subject

4  to a language documentation change, that's fine, you can appear

5  by Court Call.  If you disagree that there is a resolution, be

6  here.  That's the best I can tell you.  Because I hope to get

7  this done on November 24th, at least by way of making rulings

8  so that we can go forward.

9          Frankly, I don't see how you're going to keep the

10  confirmation dates if you don't have an order from me at least

11  that says -- at least a ruling from me on November 24th.  I

12  think the confirmation dates are off if I can't give you

13  rulings on the 24th subject to final word changes.  I just

14  don't see how it's going to happen.  So, I think you need

15  rulings from me by the 24th.

16          MR. BERNICK:  Thank you.

17          MR. FREEDMAN:  Thank you, Your Honor.

18          THE COURT:  Okay.  Is that clear enough?  If you have

19  no disagreement or it's just subject to word changes, appear by

20  phone.  If you are not satisfied with the disclosure statement

21  even still, then be here, we'll figure it out.  And just so you

22  know, the 24th is here in Pittsburgh.  Okay, thanks.

23          We're going to take a recess for ten minutes and then

24  we'll -- I want to make sure that we've covered everything.  We

25  are going to be in recess for ten minutes.

**J&J COURT TRANSCRIBERS, INC.**

1                       (Recess)

2          THE COURT:  Mr. Wisler?

3          MR. WISLER:  Your Honor, when I was standing up here

4  just a minute ago, it was just going to be a status conference

5  and now it's not, and that's fine.  Unless anybody objects, I

6  guess I would request that perhaps we, at the beginning of the

7  hearing on the 24th, we deal with what's left of the PI

8  disclosure statement issues, putting it in front of omnibus,

9  Canadian, PD.

10         THE COURT:  I think that's fair so we can accomplish

11 any PI issues first and get them over with.  That's fine.

12         MR. WISLER:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         MR. FREEDMAN:  Your Honor, we don't believe we have

15 anything further to bring before you on the plan and disclosure

16 statement or voting procedures today.

17         THE COURT:  Okay.  Anybody else have any issues that

18 need to be addressed?  Okay, we're adjourned then.  Thank you.

19                       * * * * *

20

21

22

23

24

25

## C E R T I F I C A T I O N

I, RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Rita Bergen                    DATE:  November 24,  2008

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.

(CR)

J&J COURT TRANSCRIBERS, INC.