UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      . Case No. 01-01139(JKF)
                            .
                            .
W. R. GRACE & CO.,          .
                            . 5414 USX Tower Building
                            . Pittsburgh, PA  15222
                            .
            Debtors.        .
                            . November 24, 2008
. . . . . . . . . . . . . . 1:04 p.m.
```

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                                 JANET BAER, ESQ.
                                 LISA ESAYIAN, ESQ.
                                 CRAIG BRUENS, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                                 CHRISTOPHER GRECO, ESQ.
                                 DEANNA BOLL, ESQ.
                                 RASHAD W. EVANS, ESQ.
                                 MARC LEWINSTEIN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022

For the Debtors:            Reed Smith LLP
                            By:  JAMES RESTIVO, ESQ.
                                 TRACI REA, ESQ.
                            435 Sixth Avenue
                            Pittsburgh, PA  15219

Audio Operator:             Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

**APPEARANCES (Contd'):**

| | |
|---|---|
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>      JEFF LIESEMER, ESQ.<br>      NATHAN FINCH. ESQ.<br>      WALTER SLOCOMBE, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the Unsecured<br>Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE KRIEGER, ESQ.<br>      LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>      SCOTT BAENA, ESQ.<br>      JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  ROGER FRANKEL, ESQ.<br>      RICHARD WYRON, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Maryland Casualty<br>and Zurich Intl.: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher &<br>Flom, LLP<br>By:  DAVID TURETSKY, ESQ.<br>      JAN BAKER, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |

**APPEARANCES (Cont'd):**

Co-Counsel to Libby            Cohn, Whitesell & Goldberg, LLP
Claimants:                     By: DANIEL C. COHN, ESQ.
                                   CHRISTOPHER CANDON, ESQ.
                               101 Arch Street
                               Boston, MA  02110

For the Bank Lenders:          Landis Rath & Cobb, LLP
                               By:  RICHARD S. COBB, ESQ.
                                    KERRI KING MUMFORD, ESQ.
                               919 Market Street
                               Wilmington, DE  19801

                               Paul Weiss Rifkind Wharton
                               & Garrison, LLP.
                               By:  MARGARET A. PHILLIPS, ESQ.
                               1285 Avenue of the Americas
                               New York, NY  10019

For Serengeti:                 Vinson & Elkins, LLP
                               By:  ARI BERMAN, ESQ.
                               Trammell Crow Center
                               2001 Ross Avenue, Suite 3700
                               Dallas, TX  75201

For the Debtors:               Pachulski, Stang, Ziehl &Jones
                               By:  JAMES O'NEILL, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE  19899-8705

For Continental
Casualty Company:              Ford, Marrin, Esposito,
                               Witmeyer & Gleser, LLP
                               By: ELIZABETH DeCRISTOFARO, ESQ.
                               Wall Street Plaza, 23rd Floor
                               New York, NY  10005-1875

For Official Committee         Dies & Hile, LLP
of Asbestos Property           By:  MARTIN DIES, ESQ.
Damage Claimants:              1601 Rio Grande, Suite 330
                               Austin, TX  78701

                               LECG
                               By:  ELIZABETH DEVINE, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Various Claimant Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>    SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Firemen's Fund: | Stevens & Lee, P.C.<br>By:  JOHN DEMMY, ESQ.<br>1105 North Market Street, 7th Fl.<br>Wilmington, DE  19801 |
| For Fireman's Fund: | Stevens & Lee<br>By:  DAVID R. BEANE, ESQ.<br>111 North Sixth Street<br>P.O. Box 679<br>Reading, PA  19603 |
| For Owens-Illinois: | McCarter & English<br>By: KATHARINE MAYER, ESQ.<br>Renaissance Centre, 405 N. King St.<br>Wilmington, DE  19801 |
| For Asbestos Property Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |
| For National Union Fire Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MATTHEW RUSSELL, ESQ.<br>    ROBERT GUTTMANN, ESQ.<br>    MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>    JOSHUA CUTLER, ESQ.<br>    JONATHAN GUY, ESQ<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>      MARK SHELNITZ, ESQ.<br>      PAUL NORRIS, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |
| For State of Montana: | Christensen, Moore, Cockrell,<br>Cummings & Axelberg, P.C.<br>By:  DALE R. COCKRELL, ESQ.<br>Two Medicine Building<br>160 Heritage Way<br>Suite 104<br>Kalispell, MT  59904 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For CNA: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>      BRIAN MUKHERJEE, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Grace Certain<br>Cancer Claimants: | Montgomery, McCracken, Walker<br>& Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern,<br>the Future Claimants'<br>Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| | Tre Angeli, LLC<br>By:  JOSEPH RADECKI, ESQ. |
| For the Property<br>Damage Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By: THOMAS BRANDI, ESQ.<br>    TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA,<br>Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd,<br>et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>    ALAN RUNYAN, ESQ.<br>    MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |

**APPEARANCES (Cont'd):**

For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                                  ROBERT J. SIDMAN, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property         Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

For Official Committee       Hamilton, Rabinovitz & Alschuler
of Asbestos Property         By:  FRANCINE RABINOVITZ, ESQ.
Claimants:                   26384 Carmel Rancho Lane, Suite 202
                             Carmel, CA  93923

                             Conway Del Genio, Gries & Co, LLC
                             By:  GREGORY BOYER, ESQ.

                             Lieff, Cabraser, Heinmann &
                             Bernstein
                             By:  ELIZABETH J. CABRASER, ESQ.

                             Pryor Cashman LLP
                             By:  RICHARD LEVY, ESQ.

                             Riker, Danzig, Scherer, Hyland
                             & Perretti, LLP
                             By:  CURTIS PLAZA, ESQ.
                             One Speedwell Avenue
                             Morristown, NJ  07962

For W.R. Grace:              WILLIAM SPARKS, ESQ.

For Lehman Brothers:         Lehman Brothers
                             By:  ANDREW CHAN

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

For Citadel Investment       Citadel Investment Group
Group:                       By:  ASHOK VASVANI

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

For Murray Capital            Murray Capital Management, Inc.
Management                    By:  MARTI MURRAY

For Morgan Stanley            Katten, Muchin, Rosenman LLP
Senior Funding, Inc.:         By:  NOAH HELLER, ESQ.
                                   MERRITT PARDINI, ESQ.
                                   JEFF FRIEDMAN, ESQ.

For ERISA:                    Lowenstein Sandler PC
                              By:  IRA LEVEE, ESQ.
                              65 Livingston Avenue
                              Roseland, NJ   07068

For Her Majesty the           Office of the Attorney General
Queen in Right of             By:  JACQUELINE DAIS-VISCA, ESQ.
Canada:

For Bank of America:          Richards, Layton & Finger, P.A.
                              By:  JASON MADRON, ESQ.
                              One Rodney Square
                              920 N. King Street
                              Wilmington, DE 19899

For PD/FCR:                   ALAN RICH, ESQ.

For Loan Maker/
Long Acre:                    Pepper Hamilton
                              By:  DENNIS VERY, ESQ.

For Seaton Ins. Co.:          Drinker Biddle & Reath LLP
                              By:  MICHAEL F. BROWN, ESQ.
                                   WARREN PRATT, ESQ.
                              One Logan Square
                              18th & Cherry Streets
                              Philadelphia, PA   19103

For Arrowood Indemnity        Wilson, Elser, Moskowitz, Edelman
f/k/a Royal Indemnity:        & Dicker, LLP
                              By: CARL PERNICONE, ESQ.
                              New York, NY 10019

                              Bifferato, Gentilotti, Biden
                              & Balick, LLC
                              By:  GARVAN McDANIEL, ESQ.
                              800 N. King Street
                              Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Arrowwood Indemnity<br>f/k/a Royal Indemnity: | O'Melveney & Meyers, LLP<br>By:  TANCRID SCHIAVONI, ESQ.<br>Times Square Tower, 7 Times Square<br>New York, NY  10036 |
| For JD Capital: | JD Capital<br>By:  RYAN DUFFY, ESQ.<br>     TAI CURION |
| For the Equity Committee: | Kramer, Levin, Naftalis & Frankel,<br>LLP<br>By:  KEITH MARTORANA, ESQ.<br>1177 Avenue of the Americas<br>New York, NY  10036 |
| For the Blackstone<br>Group: | The Blackstone Group<br>By:  BRIAN BRESNAHAN |
| For the U.S. Trustee: | United States Trustee Department<br>By:  DAVID KLAUDER, AUSA<br>833 Chestnut Street<br>Suite 500<br>Philadelphia, PA  19107 |
| For Fair Harbor Capital<br>LLC: | Fair Harbor Capital, LLC<br>By:  FRED GLASS |
| For Fresenius Medical<br>Care Holdings, Inc.: | McDermott, Will & Emery<br>By:  DAVID S. ROSENBLOOM, ESQ.<br>227 West Monroe Street<br>Chicago, IL  60606 |
| For Century Indemnity: | White & Williams, LLP<br>By:  JOSEPH GIBBONS, ESQ.<br>1800 One Liberty Place<br>Philadelphia, PA  19103 |
| For Loeb Partners: | Paul Weiss Rifkind Wharton<br>& Garrison, LLP.<br>By:  ANDREW ROSENBERG, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| For Kaneb Pipe Line<br>Operating Partnership,<br>et al.: | Fulbright & Jaworski<br>By:  STEVE PEIRCE, ESQ.<br>300 Convent Street<br>Suite 2200<br>San Antonio, TX  78205 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

For Bloomberg, LLP                Bloomberg, LLP
                                  By:  STEVEN H. CHURCH

For Travelers:                    Simpson, Thacher & Bartlett
                                  By:  ELISA ALCABES, ESQ.
                                  425 Lexington Avenue
                                  New York, NY  10017

For Anderson Hospital:            BUD FERRY, ESQ.

For London Market                 Mendes & Mount, LLP
Companies:                        By:  ALEXANDER MUELLER, ESQ.
                                  750 Seventh Avenue
                                  New York, NY  10019-6829

For Everest Reinsurance           Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:          Courtney, P.C.
                                  By: JOHN D. MATTEY, ESQ.
                                       BRIAN KASPRZAK, ESQ.
                                  913 North Market St., Suite 800
                                  Wilmington, DE  19801

For Everest Reinsurance           Crowell & Moring, LLP
Co. & McKinley Ins. Co.:          By: MARK D. PLEVIN, ESQ.
                                       LESLIE A. EPLEY, ESQ.
                                       LESLIE DAVIS, ESQ.
                                  1001 Pennsylvania Avenue, NW
                                  Washington, DC  20004

For Borrowers Committee:          Zuckerman Spaeder LLP
                                  By:  VIRGINIA GULDI, ESQ.
                                  1800 M. Street, N.W. Suite 1000
                                  Washington, D.C.  20036

For SNSF Railway Co:              Pepper Hamilton, LLP
                                  By:  ANNE MARIE AARONSON, ESQ.
                                  3000 Two Logan Square
                                  18th & Arch Streets
                                  Philadelphia, PA  19103

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good afternoon, please be seated.  This

2  is the matter of W.R. Grace, Bankruptcy Number 01-1139.

3          The participants I have by phone Daniel Hogan, Garvan

4  McDaniel, Andrew Craig, Debra Felder, Ari Berman, Francis

5  Monaco, Alex Mueller, Anne Marie Aaronson, Natalie Ramsey, John

6  Mattey, Christopher Candon, Jacqueline Dais-Visca, Curtis

7  Plaza, Janet Baer, Nathan Finch, Jennifer Whitener, Richard

8  Levy, Carl Pernicone.

9               (Court speaks to clerk about papers)

10          THE COURT:  Jason Solganick, David Klauder, Jonathan

11  Guy, Sandy Esserman, Leslie Davis, Jay Sakalo, Peter Shawn,

12  Mark Lewinstein, Elizabeth Devine, Thomas Brandi, James

13  O'Neill, Francine Rabinovitz, Brian Bresnahan, Susette Smith,

14  Theodore Freedman, Craig Bruens, Lisa Easyian, Dale Cockrell,

15  Jeffrey Liesemer, Christopher Greco, Barbara Harding, David

16  Rosenbloom, Edward Westbrook, Douglas Mannal, Shayne Spencer,

17  Merritt Pardini, Terrence Edwards, Daniel Speights, David

18  Beane, Peg Brickley, Robert Guttmann, Tiffany Cobb, Mark

19  Plevin, John Phillips, Brian Kasprzak, Peter Lockwood, Paul

20  Norris, David Parsons, Joseph Radecki, Andrew Chan, Martin

21  Dies, Ken Pasquale, Michael Davis, Robert Horkovich, David

22  Siegel, Elizabeth Cabraser, Scott Baena, Brian Murkhejee,

23  Christina Kang, Rashad Evans, Marion Fairey, Mark Shelnitz,

24  Darrell Scott, Virginia Guldi, Theodore Tacconeli, Walter

25  Slocombe, Steven Church, Matthew Kramer, David Bernick, Jacob

1  Cohn, Alan Runyan, Deanna Boll and Mark Hurford.

2                (Court speaking to clerk about papers)

3                THE COURT:  I'll take entries in court, please.

4  Thank you.

5                MR. BERNICK:  Good afternoon, Your Honor, David

6  Bernick for Grace.

7                MR. FREEDMAN:  Theodore Freedman for Grace.

8                MS. BAER:  Janet Baer for Grace.

9                MR. RESTIVO:  James Restivo and Traci Rea for the

10  debtor.

11                MR. MANNAL:  Doug Mannal from Kramer Levin for the

12  Equity Committee.

13                MR. LOCKWOOD:  Peter Lockwood and Jeffrey Liesemer

14  for the ACC.

15                THE COURT:  Oh, wait, one second.  Thank you.

16                MR. FRANKEL:  Good afternoon, Your Honor, Roger

17  Frankel from Orrick Herrington for the Personal Injury, Future

18  Claimants Representative and Richard Wyron is also with me here

19  in the courtroom.

20                THE COURT:  Thank you.

21                MR. RICH:  Good afternoon, Your Honor, Alan Rich for

22  the PD FCR.

23                MR. SAKALO:  Good afternoon, Your Honor, Jay Sakalo

24  on behalf of the Property Damage Committee.

25                THE COURT:  Thank you.

1          MS. KRIEGER:  Good afternoon, Your Honor, Arlene
2    Krieger on behalf of the Unsecured Creditors Committee.
3          MR. O'NEILL:  Good afternoon, Your Honor, James
4    O'Neill for Grace.
5          MR. D.COHN:  Good afternoon, Your Honor, Dan Cohn,
6    for Libby claimants.
7          MR. PERNICONE:  Good afternoon, Your Honor, Carl
8    Pernicone for Arrowood Indemnity, formerly Royal Indemnity.
9    I'm here with my co-counsel Tancrid Schiavoni.
10         THE COURT:  Thank you.
11         MR. BROWN:  Good afternoon, Your Honor, Michael Brown
12   for One Beacon America Insurance Company and Seaton Insurance
13   Company.
14         MR. WESTBROOK:  Good afternoon, Your Honor, Ed
15   Westbrook for the ZAI claimants.
16         MR. SCOTT:  Good afternoon, Your Honor, Darrell Scott
17   on behalf of Zonolite Attic Insulation claimants.
18         THE COURT:  Good afternoon.
19         MS. COBB:  Good afternoon, Your Honor, Tiffany Cobb
20   on behalf of the Scotts Company.
21         MR. COHN:  Good afternoon, Your Honor, Jacob Cohn,
22   Federal Insurance Company from Cozen O'Connor.
23         THE COURT:  Good afternoon.
24         MS. DeCRISTOFARO:  Good afternoon, Your Honor,
25   Elizabeth DeCristofaro for Continental Casualty Company.

1          MR. BAKER:  Good afternoon, Judge, Jan Baker and

2  David Turetsky for Sealed Air.

3          MR. DEMMY:  Your Honor, John Demmy of Stevens and Lee

4  for Firemans Fund Insurance Company.

5          MR. MADRON:  Good afternoon, Your Honor, Jason Madron

6  of Richards, Layton & Finger on behalf of Bank of America.

7          MR. FERRY:  Good afternoon, Your Honor, Bud Ferry for

8  Anderson Hospital, Canadian claimants.

9          MR. GLOSBAND:  Good afternoon, Your Honor, Dan

10  Glosband from Goodwin Proctor also for Continental Casualty

11  Company.

12          MR. COBB:  Good afternoon, Your Honor, Richard Cobb,

13  Landis, Rath and Cobb on behalf of certain bank lenders.

14          MR. WISLER:  Good afternoon, Your Honor, Jeffrey

15  Wisler from Connolly, Bove, Lodge & Hutz, on behalf of Maryland

16  Casualty and Zurich.

17          THE COURT:  Mr. Bernick.

18          MR. BERNICK:  Your Honor, Mr. Freedman is going to

19  begin this afternoon by providing an update on disclosure

20  statement issues.  Again, what we would propose is to take up

21  the items in the agenda in the following order.

22          First is items 12 and 13, which would be the

23  continued disclosure statement and solicitation hearing and Mr.

24  Freedman will make a report on that.

25          We'll then take up default interest, the status on

1  that.  I'll address that, that'll be very brief.  Then we have

2  item seven, which is the ZAI Washington class matter and I

3  believe that Mr. Westbrook will be addressing that.  And then

4  before we get to what are essentially miscellaneous matters,

5  one through five, which Ms. Baer will handle, we want to have a

6  discussion of a pretrial order that we have tendered to the

7  Court and has been the subject of fairly extensive discussions

8  among the parties over the last few days.  I'll be addressing

9  that and that may take a little bit of time.

10         Then we would do the miscellaneous things, one

11  through five and then, finally, we would take up all the

12  property damage matters, that would begin with Anderson

13  Memorial, which is item 14 and then Mr. Restivo will be

14  handling the balance of the PD related matters, eight and nine,

15  which are the settlements, PD status, which is item number 10

16  and then number 11, which is the argument concerning the

17  Canadian PD claims.

18         So, basically, that's the order, disclosure first,

19  default interests, ZAI, CMO, miscellaneous matters and then

20  property damage matters at the end.

21              THE COURT:  All right.

22              MR. BERNICK:  And that's designed to see if we can't

23  have people who don't want to listen to the whole thing be able

24  to find other things to do earlier on.  And with that, I'll

25  turn over --

1          THE COURT:  Okay, that's fine.  Thank you.  Mr.

2  Freedman.

3          MR. FREEDMAN:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. FREEDMAN:  Your Honor --

6          COURT CLERK:  Please just repeat your name for the

7  record.

8          MR. FREEDMAN:  Theodore Freedman for the debtors.

9          Your Honor, on Friday afternoon we filed a

10  certification of counsel, the debtors' counsel filed a

11  certification of counsel which brought the Court and the

12  parties up to date on substantial further progress that we've

13  made with respect to amendments to the disclosure statement,

14  the plan itself, and the solicitation materials, all of which

15  was done to address numerous issues and objections and concerns

16  that various parties have raised.

17          And, I believe, Your Honor, that at this point, we

18  are down to just three matters that I'm aware of which,

19  frankly, I do not believe would be fruitful for us to get into

20  any argument on today and are better served by further

21  discussions.  I'd like, though, to advise the Court of those

22  matters.

23          First off, just for the record, it's my understanding

24  that one set of issues which had to do with some concerns about

25  the disclosure that's provided in Section 2.10.2.2 of the

1  disclosure statement as to the relevant interests of Royal

2  Insurance and some concerns that the Libby claimants had, that

3  the disclosure that was filed with the certification of counsel

4  on November 21st is, in fact, satisfactory to both sides so

5  that some concerns that were addressed over the weekend about

6  what that paragraph was going to say are no longer extant and

7  that all parties are satisfied with what the disclosure says as

8  to those matters.

9       And if I could just proceed and then if anybody wants

10 to get up and raise an issue about something that I've missed

11 or said wrong, maybe that's the most efficient way to proceed.

12        THE COURT:  All right, that's fine.

13        MR. FREEDMAN:  So, Your Honor, I believe that that

14 leaves two disclosure statement matters and one plan related

15 issue, which as I said, it would seem to us, would be best

16 served not by getting into any further discussion today, but

17 allow the parties to continue to address them.

18        For the record, what those are are disclosures in

19 Section 3.2.8.2 of the disclosure statement and these have to

20 do with the way in which the disclosure statement addresses the

21 ability of the Scotts Company to certain claims that it says it

22 has against Maryland Casualty and the effect of the plan on

23 those claims.

24        The parties have been discussing those, we've gone

25 back and forth on the best way to resolve that and, again, I

1  think that we should continue to discuss that rather than get

2  into an argument about it today.

3         Secondly, counsel for One Beacon and Uniguard, Mr.

4  Wisler -- excuse me, Mr. Brown, provided us with some

5  disclosure late in the day on Friday with respect to Section

6  3.2.5.2 of the disclosure statement that has to do with the way

7  in which the asserted rights of those entities are treated

8  under the plan and, again, while I don't think that the

9  disclosure that was provided has been agreed to, we would like

10  to continue to discuss with those parties how best to address

11  that issue.

12         Finally, there is some suggested plan modifications

13  that the Libby claimants have offered up with respect to the

14  way in which the channeling injunction treats settled insurance

15  companies.  Their suggestions are being considered.  Obviously,

16  those are very sensitive matters and rather than getting into

17  any argument on that, at this point, before the positions of

18  the parties are fully formulated, we'd like to address that the

19  next time around.

20         THE COURT:  All right.

21         MR. FREEDMAN:  So, I think, Your Honor, that that

22  covers all of the issues that are currently pending with

23  respect to the disclosure statement and the way in which the

24  disclosure statement describes treatment under the plan.  At

25  least the ones that I am aware of.

1        If somebody has something else to say about that, I
2   think this would be the time to do that.

3            THE COURT:  All right.  Mr. Cohn.

4            MR. D.COHN:  Yes, Your Honor.  May I have just a
5   moment with Mr. Freedman?

6            THE COURT:  Sure.

7            MR. FREEDMAN:  Your Honor, Mr. Cohn has asked us to
8   consider some further additional language to the Section
9   2.10.2.2 language that I thought had been agreed to, and rather
10  than getting into a discussion and taking the Court's time on
11  that, we'll talk with Mr. Cohn about that and get back to the
12  Court the next time.

13           THE COURT:  All right.   Mr. Brown?

14           MR. BROWN:  Thank you, Your Honor, Michael Brown on
15  behalf of One Beacon and Seaton.

16       I first want to quarrel with the notion that we
17  provided language late to the debtor.  In point of fact, these
18  are issues that we've been raising with the debtor since,
19  really since 2004 and with the latest joint plan, since
20  September.  We did give them some language to put into the
21  disclosure statement on Friday, which was alternative language
22  in response to some language that had previously been rejected
23  and the alternative language was also rejected and some
24  language that Grace wanted put in the plan.

25       I'm always happy to talk and try to discuss the issue

1   and resolve it, but one of the things I have a concern about is

2   that there is an interplay, and an important one, between the

3   two provisions in the disclosure statement that Mr. Freedman

4   referred to and those are 3.2.8.2. --

5          MR. FREEDMAN:  Your Honor, if we're going to arguing

6   this in December, clearly, Mr. Brown has now embarked on an

7   argument that should be argued in December after we've had a

8   chance to fully vet the issues that he's raising.

9          It is correct that we've been discussing this, but I

10  don't think that any of the parties in interest are prepared to

11  address this issue now, and, indeed, I think that this is

12  something where we may be able to make progress, to refine the

13  issues if not satisfy Mr. Brown, by December.  So, I ask that

14  we not be addressing this now and that Mr. Brown not be arguing

15  it now.

16         THE COURT:  Well, okay, but you know, the risk the

17  debtor has is you're pushing back the plan dates again today

18  and if they're not resolved by December, you might be pushing

19  them back again, and there are only so many days that I already

20  have between January and the end of December next year, so

21  you're running risks, but okay.

22         MR. BROWN:  Your Honor, if I could just finish the

23  thought and then circle back.

24         THE COURT:  Yes, sir.

25         MR. BROWN:  The two provisions that I wanted to refer

1 to are 3.2.8.2 and 3.2.5.2.  Those are the two that Mr.

2 Freedman referred to.

3          One of the concerns I have with the notion of putting

4 this off, I didn't realize we were going to put this off till

5 December.  Indeed, ten days ago, when we were here, we were

6 told to show up if we were going to argue, and so, I'm here.

7          I'm happy to put it off, but I don't know how we can

8 put these issues off and the Mr. Bernick is going to discuss in

9 a few moments the CMO that he wants and moving forward with an

10 extremely aggressive schedule and I'm still waiting around

11 until December some time to figure out exactly how my clients'

12 claims are going to be treated.

13          And I don't think -- there's a disconnect there and

14 it's not going to work.

15          THE COURT:  Well, I guess I'll hear you on that issue

16 when I get to the CMO, if you think the schedule is not going

17 to be adequate.  I mean there is, even built into ths schedule

18 there's at least five -- well, I guess four, four months of

19 discovery starting in January until we get to the insure issues

20 for the plan confirmation if we pick a date in April.  So, I'm

21 not sure what -- since the feasibility section isn't to start

22 until some time in June --

23          MR. BROWN:  Well --

24          MR. BERNICK:  Your Honor, with due respect to

**J&J COURT TRANSCRIBERS, INC.**

1  counsel, the CMO matter will take these things up, we'll have

2  plenty of time to talk about timing, all that this is is an

3  argument about why he should be able to preview this with the

4  Court today.  And --

5           THE COURT:  Well, pardon me, I thought today was the

6  day to do the argument.  I told everybody to show up in the

7  event that there was an argument today.

8           MR. BERNICK:  But the fact of the matter is that Mr.

9  Freedman has been very diligent in trying to resolve these

10 matters, has not been successful --

11          THE COURT:  I appreciate that.

12          MR. BROWN:  -- and I don't think we're going to make

13 any headway in connection with any of these issues today if all

14 we're going to do is preview them.  It's just really not going

15 to advance the cause.

16          THE COURT:  Well, I appreciate that but the reality

17 is that this was to be the day that we were going to be

18 resolving these.  Nonetheless, Mr. Brown, I think the debtor

19 seems intent on trying to get the disclosure statement issues

20 resolved.

21          MR. BROWN:  Your Honor, I'm happy to work with the

22 debtor and try to get these issues resolved.  Part of what I

23 was going to do was to explain to the Court how significant

24 these issues are and one of the concerns that we have is that

25 we're now going to be talking about a MOC on a confirmation

1  hearing and we haven't yet even sorted out the disclosure

2  statement.  And this is not an issue that we raised recently,

3  this is an issue we raised for the first time four years ago.

4  My partner, Warren Pratt, raised it in June of this year and,

5  you know, here we are now and the debtors want to push forward

6  with the aggressive schedule and yet we don't -- and I'll add,

7  Your Honor, that I'm representing two clients, we're not the

8  only ones in this position.  So, I'm happy to put it off, but I

9  hope Your Honor will consider that in conjunction with the CMO

10  because the schedule just simply doesn't work the way they've

11  presented it.

12          THE COURT:  All right.  I'll consider it when we get

13  to the scheduling order, Mr. Brown.

14          MR. BROWN:  Thank you.

15          THE COURT:  For everybody, everyone. I don't need to

16  hear complaints about the CMO now, I'll do it when we get

17  there.  Mr. Madron.

18          MR. MADRON:  Thank you, Your Honor.  Again, Jason

19  Madron for Bank of America.

20          Your Honor, we have filed both an objection and then

21  a supplemental objection to the disclosure statement, subject

22  to one clarification and having the debtors' counsel confirm a

23  matter on the record.

24          I believe that our objection, as it pertains to the

25  disclosure statement, at least as it goes to adequacy of

1  information, is resolved.   The two clarifications are one, we

2  are, of course, mindful of Your Honor's statements on the

3  records from the October 27 hearing with respect to

4  classification issues.

5       As Your Honor knows from our papers, we have a

6  serious dispute as to the classification of our claim.   The

7  debtors have it currently in Class 6, we adamantly dispute

8  that, and believe it should be in Class 9.

9       With the reservation that, you know, that dispute is

10  there and it will be taken up in connection with confirmation

11  and all of our rights with respect to contest the

12  classification, we are happy to put that off as far as that

13  confirmation matter, as opposed to going forward in the

14  disclosure context.

15       And the other two points, Your Honor, that I would

16  ask the debtors' counsel to confirm, in resolution of our

17  objection is, one, that we, on account of the letter of credit

18  claims, will receive both a Class 6 and a Class 9 provisional

19  ballot without the need to file any type of a 3018 motion, or

20  submit a declaration.   I believe that counsel has agreed to

21  provide us with that.   And, secondly, Your Honor, that we will

22  be permitted to vote the full, approximately $16.5 million of

23  the claim as opposed to the debtors original proposed treatment

24  of only giving it a dollar vote.

25       So, if counsel can confirm that, our objections as to

1  the disclosure statement are resolved.

2          MR. FREEDMAN:  We do confirm both those points, Your

3  Honor.

4          MR. MADRON:  Thank you.

5          THE COURT:  All right.

6          MR. WISLER:  Jeff Wisler on behalf of Maryland

7  Casualty.  Your Honor, debtor is correct, we still have issues

8  with 3.2.8.2 and we understand that we'll continue to work with

9  the debtors and the plan proponents to resolve those and we'll

10 deal with any changes that are made as a result of any issues

11 that the Libby claimants have.

12         THE COURT:  All right.

13         MR. WISLER:  Thank you.

14         MS. COBB:  Your Honor, Tiffany Cobb on behalf of the

15 Scotts Company.

16         Just for the record, it was the Scotts Company's

17 understanding that the filing on Friday, that was filed under

18 certification of counsel, would reflect the revisions and

19 through the communications that we have received, it was our

20 belief that the language in Section 3.2.8.2 was resolved.  I'm

21 certainly, in a way, happy that I'm here today, to the extent

22 that Your Honor is intending to take argument on the issue, but

23 just for the record, it was our understanding that the language

24 had been resolved.

25         THE COURT:  Okay.  I'm not intending to take argument

1   on the changes to the disclosure statement.  I thought what I

2   just agreed to do was consider whether the schedule that's

3   proposed by the debtor is adequate for the insurers and those

4   whose objections to confirmation may be coming up for hearing

5   on the more expedited scheduled, rather then in the full

6   feasibility trial stage of the plan confirmation hearing in

7   considering the CMO.  I thought that's what I just agreed to

8   do.  If that wasn't clear, that is what I said I'd do.  Okay,

9   Mr. Freedman.

10          MR. FREEDMAN:  Well, Your Honor, I believe, then,

11  that subject to the three matters that I identified previously,

12  the disclosure statement is fully resolved with respect to

13  those portions of the plan that are completed and, therefore,

14  we will, at this point, continue to work on the matters that

15  are open, but I don't believe there are any pending objections

16  to the disclosure statement.  I'm happy to say that there are

17  no other pending objections to the disclosure statement.

18          THE COURT:  All right.  Except for the matters that

19  have just been addressed, does anyone else have an issue with

20  respect to the disclosure statement?

21          MR. BERNICK:  Clarify it was --

22          MR. FREEDMAN:  Well, Your Honor, as we've said a

23  number of times, we do not have a complete plan as it relates

24  to PD.  We will be talking about where we stand with PD, but

25  that portion of the disclosure statement continues to be

1  subject to pending negotiations and, therefore, the plan itself

2  is not finished on that matter.

3           MR. BERNICK:  And, Your Honor, we will be talking

4  about how that lays into the schedule, that we're going to be

5  presenting here in a little while.  That is not new news and

6  there's going to be also an announcement, I believe, with

7  respect to ZAI, that bears upon that, in just a moment.

8           THE COURT:  All right.

9           MR. BERNICK:  So, the PD has always been on a

10  different track.

11           THE COURT:  Mr. Brown.

12           MR. BROWN:  Just for clarification, Your Honor, just

13  on the Seaton and One Beacon objections.  Those were number 53

14  and 54 on the chart that Grace had previously prepared.

15           THE COURT:  Okay.  Thank you.

16           MR. BROWN:  Thank you.

17           MR. BERNICK:  With respect to a default interest,

18  Your Honor, I think I can do that really just from --

19           THE COURT:  Excuse me, Mr. Bernick, just one second.

20           MR. BERNICK:  I'm sorry.

21           THE COURT:  With respect to the solicitation, is

22  there anything you want to go into today or are you just

23  continuing all of that until December?

24           MR. FREEDMAN:  Your Honor, we do not -- we're not

25  aware of any further matters with respect to the solicitation

1  materials, or pending objections with respect to the

2  solicitation materials.  There will be changes as it relates to

3  PD, that's part of the whole structure of the PD transaction,

4  but that's not for today.

5          THE COURT:  All right.  So, that's just continued

6  until December.  All right, Mr. Bernick, thank you.

7          MR. BERNICK:  I'm sorry.  Default interest status,

8  that is item six on the agenda, we wanted to have that on there

9  solely to inquire humbly, what Your Honor might have in mind as

10 a date for deciding the motions that are pending with respect

11 to pendency interest.

12         THE COURT:  Actually, I don't have a date in mind.  I

13 have a staff person looking at those issues and that's the best

14 I can tell you right now.

15         MR. BERNICK:  Okay.  That remains -- I understand

16 that all these other things have kind of come into the

17 courtroom and are front and center, but that does remain, at

18 least from the debtors' point of view, as critical as it was

19 before, in terms of priorities here, and we understand, of

20 course, the Court's docket as being very busy.

21         And, that then brings us to ZAI, which is item seven

22 on the agenda and I think Mr. Westbrook is going to address

23 that.

24         THE COURT:  Mr. Westbrook.

25         MR. WESTBROOK:  Good afternoon, Your Honor.

1                THE COURT:  Good afternoon.

2                MR. WESTBROOK:  You get two for the price of one this

3    afternoon.

4                THE COURT:  Okay.

5                MR. WESTBROOK:  I have Mr. Darrell Scott here with

6    me, Your Honor.

7                THE COURT:  Mr. Scott.

8                MR. WESTBROOK:  And Darrell is up here today, Your

9    Honor, with me --

10               COURT CLERK:  Please restate your name for the

11   record.

12               MR. WESTBROOK:  Edward Westbrook for the ZAI

13   claimants.

14               Your Honor, Mr. Scott is here with me today because

15   we started the ZAI litigation together in 2000, before this

16   bankruptcy.  And today we're up here to announce to the Court

17   that we have reached a comprehensive resolution of all U.S. ZAI

18   matters with Grace and the Equity Committee and other parties

19   involved.

20               Late Friday we signed an agreement in principle,

21   which will be followed by more comprehensive documents, but it

22   will resolved all current ZAI claims, the over 16,000 claims

23   filed by the bar date, as well as the future ZAI claims.  All

24   those claims will be handled in a 524(g) trust.

25               Mr. Rich is here on behalf of the Future PD claimants

**J&J COURT TRANSCRIBERS, INC.**

1  representative who provided very valuable assistance and input

2  in getting the deal done.

3          Your Honor, we think that the agreement, while

4  certainly not perfect, meets the goals we started out with

5  many, many years ago and the Court will hear about the details

6  in due time, but the agreement does include in broad parameters

7  an education campaign to alert people to what they may have in

8  their homes, a facility to provide assistance and financial

9  assistance when and if time comes where folks have to take the

10 ZAI out of their homes.

11          We are very pleased to have been able to reach this

12 resolution and take this controversy off the Court's radar

13 screen.

14          THE COURT:  Can I throw away my, let's see, one, two,

15 three, six or seven shelves worth of binders now for the --

16          MR. BERNICK:  No.

17          THE COURT:  No.

18          MR. BERNICK:  No.

19          MR. WESTBROOK:  Not yet.  Soon.

20          MR. BERNICK:  Soon, but not yet.

21          MR. WESTBROOK:  Soon.

22          THE COURT:  Okay.  Well, I'll know it's a real

23 settlement when I can throw those binders away.  Mr. Scott.

24          MR. SCOTT:  Good day, Your Honor, Darrell Scott on

25 behalf of Zonolite claimants.  As this Court knows, the

1  Zonolite litigation from its inception, has been designed to

2  achieve some practical remedies for actual Zonolite homeowners

3  who have actual expenses associated with Zonolite and to do it

4  in a fashion that not only holds that litigation in a favorable

5  light, but achieves some economies for the debtor and also

6  holds this Court in a favorable light for the effort it has

7  committed over the years, towards trying to resolve the

8  Zonolite claims.

9       I am here to give the Court assurance, as a counsel

10  who has been engaged in this for years, that the settlement

11  we've achieved, I think, satisfies all of the objectives that

12  we had sought from the inception and that is one that I think

13  the Court is going to be as thankful for and as delighted with

14  this as I am.

15       THE COURT:  Well, that's good.  It's good news.  I'm

16  glad I'll look forward to seeing the papers when they're

17  actually filed.  Thank you.

18       MR. SCOTT:  Thank you, Your Honor.

19       THE COURT:  Okay.  When will I see the papers?

20       MR. BERNICK:  That's part of the CMO discussion.

21       THE COURT:  All right.

22       MR. BERNICK:  And, I guess, that's where we are. I

23  can take the Court through it a little bit.

24       MS. BAER:  Your Honor, this is the one we held over

25  --

1          COURT CLERK:  Please come to the microphone, for the

2   record, and state your name.

3          MS. BAER:  Janet Baer, on behalf of W.R. Grace.

4   Your Honor, we e-mailed over a version at about 11:30 this

5   morning.  That's the one that I have copies of for whoever in

6   court needs it.

7          THE COURT:  Okay.

8          MR. BERNICK:  David Bernick for Grace.  Where are we?

9   Well, a lot of progress has been made in trying to reach

10  closure in different parts of the case.  Probably now is the

11  appropriate time to just give a little overview for that.

12         Your Honor, of course, is very familiar with the

13  history of negotiations leading up to the agreement in

14  principle, with the personal injury claimants and then all the

15  work that's now been done on the plan and related disclosure

16  statement work in that regard.

17         That is not why we are continuing to have schedule

18  extension, that's not the reason for it.  The reason for it,

19  really is that the PD part of the equation has taken somewhat

20  longer and the reason it has taken somewhat longer is that

21  there are different constituencies and foremost among

22  everything was the issue of ZAI.

23         Your Honor is very familiar with the fact that when

24  it comes to the traditional property damage claims, those have

25  been actively litigated over a period of time and then equally

1    actively resolved.  Mr. Restivo is going to make the latest

2    progress report on that today, but that's been a pretty mature

3    aspect of the case, and yet because ZAI was out there as being

4    essentially a still litigated issue, but not a settled issue,

5    that affected the overall picture with respect to property

6    damage.

7                And so, for that reason, while we have plan

8    provisions and have had for some time regarding the totality of

9    property damage, and we've had disclosure statement treatment

10   of property damage, we weren't able to engage in a dialogue to

11   see how we could resolve the difference that we knew were there

12   until we had a better sense of where to go with ZAI and,

13   indeed, ideally a resolution for ZAI which we have here today.

14               So, with ZAI now in place as a settlement and Your

15   Honor can believe it today, because we've worked very hard to

16   get there and we, too, are very pleased that it's now been

17   resolved, but with ZAI in place today, we can turn back to the

18   question about how the overall plan with respect to PD should

19   read out, how the disclosure statement should read out, because

20   that was still unresolved and now needs to be resolved, it's

21   really that that drives the extension of the schedule.

22               My hope and expectation would otherwise have been, if

23   that had been in place or been on the same track as PI, that

24   all the various issues that are still kind of percolating out

25   there, in fact, would have been resolved because there would be

1  a more pressing need to get them resolved because nothing else

2  is out there to be done.  But because PD still requires some

3  work, we know that we can't send out the plan or the plan for a

4  vote, you know, next week, week after that, it's going to take

5  a little bit of time.

6        So, where we are, essentially, is that as Mr.

7  Freedman described, we have a handful of issues that remain

8  with respect to various people, mostly involving indirect or

9  insurance claims, we'll be back on the 15th of December to try

10  to resolve those finally, in terms of a disclosure statement.

11        But we still won't be in a position to then send the

12  plan out for a vote because we think we're still probably going

13  to be working on PD.  PD is going to have to take some time and

14  attention.

15        And, therefore, we are projecting that we will be

16  back on the 12th and 13th of January, which we understand to be

17  in the Court's schedule, subject to that being confirmed by the

18  Court, that will probably take up a variety of matters that

19  relate to property damage.  They'll include further matters

20  relating to ZAI, in all likelihood, and they'll include plan

21  and disclosure statement issues with respect to PD, generally,

22  but our hope and expectation is with ZAI now in place that, in

23  fact, we'll be able to have a final disclosure statement

24  hearing, including any and all issues that remain, which by

25  that time should just be PD and then get the plan out for a

1  vote.

2          If we follow that schedule, we believe that the

3  solicitation period will be 60 days, thereby bringing us to

4  mid-March and with a mid-March closing date for the voting

5  process, we believe it's appropriate to then move forward with

6  confirmation.

7          Confirmation, then, because, there are, again, a

8  variety of issues, variety of constituencies, we don't want to

9  get everything all jammed up at the end, we thought we would

10  essentially bifurcate or take in two phases.  First phase would

11  focus on the issues that are overwhelmingly legal issues in

12  nature.

13          And we've identified those in the CMO that we've

14  tendered for the Court.  They would be various issues raised by

15  the insurers and specifically those issues raised by the

16  insurers that are specific to the insurers.  We recognize that

17  they may seek to raise other issues that are not specific to

18  them and those wouldn't be taken up in the first phase, only

19  those issues specific to them.  Issues specific to the lenders,

20  under the prepetition credit facilities and then the question

21  of classification of people who have these indirect claims, are

22  they Class 6 or Class 9, those are matters that would all be

23  taken up in the first phase.

24          And then the second phase of confirmation would be

25  devoted to all other remaining issues associated with

1  confirmation of the plan and probably the most labor intensive

2  of those would end up being the issues that are being raised by

3  the Libby claimants.  Although as different constituencies have

4  pointed out, there's also the potential issue of feasibility

5  particularly given the status of the credit markets as we see

6  it evolve.  We hope that those are not real issues by that

7  time, but we have to recognize that those are issues that we

8  need to preserve time to address, we'd have to do that in any

9  event.

10        So, we're basically talking about two essential

11 phases, one are the three categories of very specific, we

12 think, legal issues and the second is kind of everything else.

13        We've consulted with Your Honor's staff and

14 understand that there is time during April for two days

15 back-to-back in the early part of April, the time then becomes

16 very tight in May, and that in June we have other dates, early

17 June that are also back-to-back dates.

18        THE COURT:  Actually late June, not early June.  I

19 was able to go through this calendar a little bit for June and

20 if I do a little rescheduling, I can actually get four days in

21 a row, in June, which I think would make the most sense.

22        MR. BERNICK:  Okay.  I think that that certainly

23 would be desirable.  At the behest of counsel for the Libby

24 claimants, we've also put in a provision for a pretrial

25 conference to take place in May with respect to the Phase II

1   issues.   They wanted a pretrial conference, we don't really

2   have any opposition to that.

3        So, working with that as an overall structure, you

4   can say, well, it's expedited, don't really think it's

5   particularly expedited especially because a lot of these issues

6   are old issues, but essentially between today and the time that

7   people would have to file their final objections to

8   confirmation, is a period -- final objections under our

9   schedule wouldn't be due until mid-March.

10        So, while people have to submit preliminary

11   objections in December, there actually is a significant period

12   of time, even with respect to Phase I matters allowed on the

13   schedule.

14        So, what we did is, we highlighted to the Court last

15   time the desire to move forward with a process like this in

16   order to agree to a schedule.   People have been very, very

17   cooperative in the process of putting this schedule together.

18   We circulated our first draft, we then had people email in

19   comments, whatever.   We had two different meet and confer calls

20   last week and people have continued to supply us with input and

21   I think pretty much we have tried to include, I won't say

22   everything, but just about everything.   We know that there are

23   going to be other outstanding objections and issues out there.

24   We tried as best we could to be accommodating and to be

25   flexible with respect to concerns that people had.   And the

1  result is this order.

2          And I want to point out at the very beginning, so

3  that Your Honor understands this as people come forward, I

4  don't know if they're going to want to come forward, in light

5  of these reservations and rights, but we have very broad

6  reservations of rights in this order.  Essentially paragraphs

7  15 and 16 are very broad reservations of rights.  Basically all

8  rights are reserved, including to seek supplements to the case

9  management order and in order to address additional concerns.

10 We've listed some of the issues that had been raised that we

11 think are, frankly, kind of down the road issues.  Maybe some

12 of them are, maybe some of them aren't, but the idea is that

13 this order shouldn't prejudice the ability of anybody to come

14 forward with a more specific issue and ask for a

15 supplementation.

16          Indeed, you know, at the December 15th omnibus, the

17 idea was not to have this be once and for all, but to get down

18 as much as could be gotten down and agreed right now, without

19 prejudice to people coming back later on.

20          The second reservation that's important is paragraph

21 16, which is apart from subject matters, makes it very clear

22 that the deadlines that are set forth in this document are

23 subject to modification because we all know that this process

24 sometimes produces unexpected developments and with those

25 unexpected developments, or even right now with expected

1  developments, there may be a need to do modifications.  Nothing

2  in this order in anyway compromises the ability of people to

3  come back and raise that.

4        And we hope that as a result of having these two very

5  broad reservations of rights, that all we were really doing and

6  all would be understood that we're doing today, is to take

7  snapshot of where we are, get a schedule in place that meets as

8  many concerns as we think is feasible to achieve today, and

9  then at least open to other people to come back and ask for a

10  change if they want.

11        So, with those two major, major caveats, the basic

12  schedule that's called out is set forth on Page 2 and,

13  effectively, what we do is ask for preliminary objections

14  because there was a feeling, based upon Your Honor's practice

15  in prior cases, that that was a useful exercise.  So, we have

16  those in mid-December.  Basically in mid-December written fact

17  discovery is served with respect to Phase I.  Phase II is

18  somewhat delayed, as it takes place a month later.  Other fact

19  discovery commences at the same time in mid-December, and then

20  we basically roll forward to expert reports, again, regarding

21  Phase I, supplemental expert reports, again, regarding Phase I,

22  expert depositions and the like.

23        And, effectively, if you work back from a date in

24  July, Phase I schedule essentially aims at being done with

25  everything that has to be done, by mid-March.  That is, by

1  mid-March, you actually have trial briefs, as well as, you

2  know, all the other stuff, final witness lists, et cetera, et

3  cetera.  Exchange of exhibits is then 14 days before the

4  hearing.  So, Your Honor, we get the trial briefs by mid-March,

5  in connection with a hearing on the first phase in April.

6        With respect to Phase II, it is essentially the same

7  kind of approach, but now looking at a hearing in June.  The

8  only caveat there is that where we are dealing with feasibility

9  issues, and this was really the input from Mr. Pasquale on

10  behalf of the Unsecured Creditors Committee, who suggested and

11  we agreed, that feasibility, because it does depend upon the

12  state of the market, that that discovery would be best

13  conducted as close to the hearing as possible.

14        So, there are really a series of special deadlines,

15  really a special calendar, almost, for feasibility and we

16  wouldn't have written discovery on feasibility until April 15,

17  we'd have essentially the bulk of the discovery done during May

18  and then feasibility would get wrapped into the second

19  confirmation hearing in June.

20        So, it is, you know, I wouldn't say it's expedited,

21  I wouldn't say it's a slow schedule, it's a very deliberate

22  kind of schedule but it is designed, after all, to put into

23  confirmation a plan that's been extremely heavily negotiated

24  and has been out there for a significant period of time.

25        The remainder of the provisions that are set forth in

1    this order are really not worth going through and taking up the

2    Court's time, because they're fairly routine matters.

3              THE COURT:  Well, one is because I don't understand

4    it.

5              MR. BERNICK:  Okay.  Your Honor, which one?

6              THE COURT:  Number nine.

7              MR. BERNICK:  Number nine.  Yes.  The idea here is

8    that -- well, the basic concept that often happens in

9    litigation is that you have interrogatories that ask for the

10   identification of knowledgeable witnesses, those will happen

11   here.  They get answered, but if it turns out that the final

12   witness list has somebody new who, for whatever reason hasn't

13   been deposed, this was designed to provide an opportunity for

14   depositions of people actually on the final witness list who

15   had not been disclosed previously, to be deposed.  So there

16   aren't surprises.  Now, that was the concept --

17             THE COURT:  Oh, so the word previously is missing.

18             MR. BERNICK:  I'm sorry?

19             THE COURT:  So, the word previously is missing.  Any

20   person named on the final witness disclosure list whose

21   identity was not --

22             MR. BERNICK:  Ah, ha.

23             THE COURT:  -- disclosed previously.

24             MR. BERNICK:  Yes, yes, yes.

25             THE COURT:   I couldn't understand how you have

1  somebody on the witness list and their identity wasn't

2  disclosed.

3          MR. BERNICK:  Yes, well, I could see that.  Yes.  How

4  can you disclose what's still secret?  Okay, so, yes, that's

5  the idea.

6          THE COURT:  Okay.

7          MR. BERNICK:  Not previously disclosed.  And, we also

8  amended the date so that there'd be 30 days rather than 14 days

9  at the request of one of the constituencies.

10          Let's see.  There is a matter that probably does

11  require at least some, well, paragraph 13 carves out PD.

12  Rather than trying to have a detailed schedule with respect to

13  PD, we know that we're going to be spending many fine and

14  enjoyable and cooperative hours with the PD people over the

15  next few weeks, so why not wrap in scheduling as well.  So, the

16  thinking was that we would just not treat them in this order

17  because there are too many other things that are going on.

18          I do want to flag the historical claims database.

19  Your Honor knows that that was produced in connection with the

20  estimation process.  There is at least one insurer that wants

21  it here and we don't have a problem with that in principle, but

22  there are some, you'll remember all the discussion that we had

23  about what could and couldn't be done with the information.  We

24  have to go back through and find out whether we've got a

25  problem with that here.  And to the extent that we do, we'll

1  try to resolve it.  There's no opposition that we have to that.

2  That was a specific issue.

3        And then with respect to paragraph 15, you'll see

4  that there's a reference to who responds to discovery with

5  respect to Libby claimants' objections.  Is it the PI committee

6  or is it individual PI lawyers?  That's a matter that I know

7  that Mr. Cohn is anxious to have resolved.  We don't have a

8  problem with having it resolved, can't resolve it today.  We've

9  suggested that this be heard on the 15th of December.  We don't

10 really have, I shouldn't say this, but we don't see that we

11 have a dog in this fight and maybe it'll turn out that we do,

12 but it's just something that Mr. Cohn is anxious to get

13 resolved before there's substantive discovery.  We're

14 sympathetic with that notion, so we've tried to put that down

15 for the 15th of December.

16        Now, there are other matters that people I know have

17 raised on the telephone calls, and I suppose anybody who wants

18 to talk about this now is more than free to do it but, again,

19 I'd emphasize that this was not designed to be completely

20 comprehensive, that's why we do have the reservations.

21        The only thing I can think of is that -- well, maybe

22 there's nothing else to be said at this point and I guess I'll

23 let other people take -- oh, yes, on interrogatories, I don't

24 know if Mr. Cohn intends to raise that.  Are you going to raise

25 that?  Well, I may as well put it out on the table.

1       One comment by Mr. Cohn that we were not able to

2  accommodate, dealt with the number of interrogatories that

3  could be served and I believe that his proposal on behalf of

4  this constituency is that we should lift the limit on the

5  number of interrogatories that can be served and, essentially,

6  if somebody objects, they can come back in.

7       We're not taking that issue off the table, in the

8  sense that there may well turn out to be an issue about the

9  number of interrogatories as there was, as you'll recall in

10 connection with the last go round, we're not necessarily

11 inflexible on the idea of there being more than the provided

12 for limit in the rules, we just don't want to see that lifted

13 today.  We think that that's something that really ought to be

14 taken up in a more concrete context of a particular party and a

15 particular set of interrogatories so that if Your Honor decides

16 to let out the string, it's taking place on a basis that day

17 one is, you know, transparent to the Court about how many of

18 these things that we're really having.

19      So, again, it's not a hard and fast rule, we just

20 don't want to lift the thing today.

21      THE COURT:  Okay.  Let me address the schedule

22 before I hear from other parties, so that we can talk specifics

23 about dates.  That might be a bit helpful.  Were you asking for

24 two dates in April, was that the intent?

25      MR. BERNICK:  Yes, that's the intent, is two days in

1  April.

2         THE COURT:  All right.  Well, I have three days in

3  April available in a row.  It's the only three that I have.

4  That is the 6th, 7th and 8th of April.

5         MR. BERNICK:  Okay.

6         THE COURT:  Now, I have nothing in May.

7         MR. BERNICK:  Right.  Do you have time, though, for a

8  pretrial conference of one day?

9         THE COURT:  Oh, I could, yes.  I -- frankly didn't

10 look for that, because I can always get a pretrial in.

11        MR. BERNICK:  We don't have to fill -- unless Mr.

12 Cohn, he's flexible on that one, so we don't have to fill that

13 in, as long as Your Honor will look for something and fill --

14        THE COURT:  Well, I can tell you the two days that

15 would be best right now, so that you can pick.  Let me see

16 first if I have anything -- actually, I don't have a May

17 Delaware date.  I think because of the Third Circuit conference

18 or something, my recollection is not really good about that,

19 that got pushed to June.  So, if you wanted to do the pretrial

20 conference in connection with the omnibus date, that's June

21 1st.  If you want it earlier than that, here in Pittsburgh, I

22 have Thursday, May the 7th, which is the day after the Third

23 Circuit conference, that is what stopped the May date.  Or I

24 have, let me double check this.  Well, right now I have Friday,

25 May 22nd, but I don't suggest that because Monday, May 25th, is

1  the Memorial Day holiday and that's probably going to be an

2  awful travel day for those of you who don't have to travel on

3  that weekend.   Experience says that's a really bad day if you

4  don't have to travel then.

5           MR. BERNICK:  Well, what are the dates in June?

6  Because maybe, although the 1st is not May, if the June dates

7  are later on, it will be okay with Mr. Cohn.

8           THE COURT:  Well, what I was going to propose was, I

9  could -- right now I have the 22nd, and 23rd scheduled for

10 Virgin Islands hearings, but it so happens that I have the 15th

11 and 16th clear.  So, I was going to change my 22nd and 23rd

12 dates to be on the 15th and 16th, and then I could give you

13 folks the 22nd through the 25th and give you four days in a

14 row.

15          MR. BERNICK:  That would be terrific.

16          THE COURT:  Which I thought should --

17          MR. BERNICK:  And then I think a pretrial on the 1st

18 of June would also work.

19          THE COURT:  Should work.

20          MR. BERNICK:   That'd be okay?  Yes.  So, maybe we

21 should shoot for that.

22          THE COURT:  So, the pretrial, then would be in

23 Delaware on your omnibus date.

24          MR. BERNICK:  Okay.

25          THE COURT:  And then I could give you the 22nd,

1    through the 25th of June, if those dates work.  Now, you didn't

2    ask for this, but let me throw this out anyway, but give me a

3    second until I find them.  Because I'm a little afraid that

4    maybe this schedule is a bit ambitious.  And let me see here.

5    I could also, if you wanted four days in July, do the 20th

6    through the 23rd, of July.  I can juggle a couple of things

7    that week, move two dates that week and give you the 20th

8    through the 23rd of July.

9         MR. BERNICK:  Your Honor, I have to say that, I know

10   that we're going to have a chorus here because, you know, the

11   question of time has other business and strategic dimensions to

12   it, but right now we believe that really the -- particularly

13   with respect to the issues that we have in April, we are

14   talking about narrow issues that are not factually intensive,

15   and could probably be argued even long in advance of that.  And

16   if we were to slip the schedule 30 days, we'd still have the

17   problem with May.  So, then you're really talking about

18   slipping Phase I which would otherwise be April to June or to

19   July, and every bit of my experience tells me that the more

20   time that there is, it really isn't critical time, A) more

21   issues evolve and, B) the more you get jammed up at the end.

22        THE COURT:  Well, then what I'm going to do is,

23   reserve the 20th and the 21st of July for potential closing

24   arguments.

25        MR. BERNICK:  That's fair enough.

1          THE COURT:  Because I don't know whether you'll be
2     finished with your presentation in June.  If you are, we can do
3     the closing arguments then.  But if you don't want all four
4     days I'm not going to change my schedule then, I'll just
5     reserve the 20th and the 21st, only two days in July, unless
6     you tell me now.

7          MR. BERNICK:  That's fine.  Although --

8          THE COURT:  Because if I don't do it now, I won't be
9     able to do it later.

10         MR. BERNICK:  -- we appreciate that, that's fine.
11    You know, I know we'll disagree about this today, but it is
12    definitely the debtors' perception that principally because of
13    all the hard work that's been done, and the fact that we have
14    closure with personal injury and we hope to get complete
15    closure with respect to PD, the issues that we're talking about
16    are going to be fairly focused issues.

17         And, again, that could change but today we don't
18    think that this is going to be that extensive a process.  With
19    the sole potential exception of Libby and Libby, we're pretty
20    smart already, so we think -- and in a bankruptcy context,
21    Libby is also somewhat constrained as an issue before --

22         THE COURT:  All right.  Well, just so you know, if
23    you miss those dates, you're looking at the end of August
24    before we get more days in a row.

25         MR. BERNICK:  I understand that.


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  So, okay.

2          MR. BERNICK:  Okay.  Is that all right?

3          THE COURT:  All right, who wants to go next?  Mr.

4  Lockwood.

5          MR. LOCKWOOD:  I rise because of Mr. Bernick's no dog

6  in this fight comment.

7          The last sentence of paragraph 15 of the CMO is

8  something which apparently arrived in this document because of

9  a proposal that Mr. Cohn made this morning to debtors' counsel

10  who stuck it in the document, without any discussion with us.

11          I don't, in principle, object to the notion of having

12  this matter dealt with on December the 15th, I do have some

13  concern about how the matter is going to get teed up for

14  December the 15th, because I'm not sure I even know what this

15  about.  I rather suspect that I can guess what it's about and I

16  rather suspect that we're going to have a fight about it, but

17  the question is, if Your Honor is going to be asked to referee

18  that fight, how is the matter going to be presented in the form

19  that on December the 15th, Your Honor can, in fact, do it and I

20  would suggest that since this appears to be something that Mr.

21  Cohn is raising that he be directed to file something in

22  writing explaining what it is he wants and why he wants it,

23  well in advance of the hearing so that we could file a response

24  of some sort, unless Your Honor would rather have a free form,

25  make it up as we go along, oral argument, which --

1          THE COURT:  Unlike the rest of the arguments in this

2  case?

3          MR. LOCKWOOD:  I'm not Mr. Bernick, Your Honor.

4          THE COURT:  No, the other -- I guess my concern is,

5  I'm not sure who the individual plaintiffs' lawyers are who are

6  going to be asked to respond to discovery and how we're going

7  to notify them that they may have to respond to whatever it is

8  we're going to hear on December 15th.

9          So, I don't care about having an argument on December

10  15th, as long as I've got all parties in interest aware of the

11  fact that we're having one, a motion and an opportunity to

12  respond to it that I'm going to hear, but I don't know what I'm

13  hearing, they're --

14          MR. LOCKWOOD:  Well, that's why I suggest Mr. Cohn

15  explain at least preliminarily what it is he wants.  I rather

16  suspect that he's going to try to do something that the Court

17  already refused to permit the debtors to do and run up to the

18  estimation proceeding which is to take individual members of

19  the committee, present discovery demands to their lawyers, not

20  about their claims but about the claims of the lawyers law

21  firms and we're going to have some sort of, I don't know, I

22  mean, frankly, don't even know what the relevance of it is, and

23  whether we're having a reprise of the estimation or what, but

24  it seemed to me if we're going to have this teed up on December

25  15th, the parties involved ought to have some idea what it is

1  we're teeing up and I would suggest that the appropriate place

2  to start is to ask Mr. Cohn what he contemplates.

3           THE COURT:  All right.  I guess I'll do that, then.

4  Mr. Cohn.

5           MR. D.COHN:  Yes, first of all, we have actually made

6  some progress on procedural matters with respect to the CMO.  I

7  did want to commend Mr. Bernick and maybe the last time I do it

8  in the context of these proceedings, but the fact is that Grace

9  did, indeed, have a meet and confer process which resulted in

10 adopting many of the things that we wanted.

11          And it may be that we can achieve the same thing with

12 this issue of, you know, what kinds of things and in what form

13 we can obtain from the lawyers who serve on the Asbestos PI

14 Committee.  So rather than T up the issue at this moment, what

15 I'd like to do is to have a chance to confer with Mr. Lockwood

16 and to confer also with representatives of the members

17 themselves because one thing that Mr. Lockwood has been

18 strained to maintain is this distinction between the committee

19 and the individual members of the committee and I respect that.

20 We, obviously, have to as you just pointed out, provide notice

21 to them of what it is that we're looking for.

22          So, with that in mind, I have no problem if those

23 discussions don't lead to an agreement, I have no problem

24 filing something with this Court to T up the issue.  I'd just

25 like to have a little while to try and reach an agreement.

1        THE COURT:  Okay.  So, at this point, the only

2   individual personal injury lawyers that you're talking about

3   are those who either are on or serve as lawyers for the members

4   of the Asbestos PI Committee?

5        MR. D.COHN:  Correct.

6        THE COURT:  Okay.

7        MR. D.COHN:  Correct.  So, if you want to set a date,

8   say, two weeks ahead of the December 15th hearing for us to

9   file something if --

10        THE COURT:  Well, you'd have to comply with the case

11   management order because otherwise the information won't get

12   into my binders and I won't see it and I'm not sure whether --

13   isn't it already out of time?

14        MR. D.COHN:  Yes.  That's why this CMO draft actually

15   provides for this issue to be dealt with on December 15th.

16        THE COURT:  But I still need the time to hear and see

17   it and I'm trying a case in the Virgin Islands the whole week

18   before this hearing.

19        MR. D.COHN:  That sounds lovely.

20        THE COURT:  No, it's not actually, but -- I mean the

21   place is lovely, but it would be lovely to be there not trying

22   something I guess would be the way to say it.  But yes.  So, I

23   mean it's just a practical matter of time.  I mean, if you're

24   going to be giving me a complicated issue, I need time to be

25   able to read it and digest it.

1      MR. D.COHN:  Okay.  So --

2      THE COURT:  Does it need to be done in December or

3 can it be addressed in the January omnibus?

4      MR. D.COHN: Well, that's where we get into a concern

5 about the time frames for discovery because there is a lot that

6 the parties are going to attempt to do in a very short period

7 of time considering the complexity of the issues, to lead to a

8 June confirmation hearing and Libby is on board trying to do

9 that, but if a basic issue, such as what written discovery we

10 can obtain from members of the PI committee is left until

11 January, we just start to have concerns about the whole process

12 and we'd be unable to execute a discovery program in the time

13 that's provided.  So, that's why we wanted to T up the issue

14 for  December 15th.

15      THE COURT:  All right, just a second.  Well, I mean,

16 next Monday is already two weeks before the hearing.  Today is

17 the 24th, next Monday is the 1st, that's already two weeks

18 before the hearing, so if you file something Monday, the 1st,

19 and the committee has until the 8th to answer, then I'm sure my

20 staff can get me sometime during the course of the week

21 whatever it is that you've filed and whatever the responses

22 are.

23      MR. D.COHN:  Yes, we'll do that, Your Honor, and, of

24 course, you know, with the Thanksgiving holiday and such it's

25 going to be hard to have a discussion before that but if we

1  can't just get it resolved, Your Honor then, yes, we will put

2  out there what it is that we want, in the form of a motion and

3  we'll file that on December 1st.

4       MR. LOCKWOOD:  Well, Your Honor, I've written down in

5  my notes that Mr. Cohn is going to tell us --

6       COURT CLERK:  Please state your name for the record.

7       MR. LOCKWOOD:  Peter Lockwood for the committee.

8  I've written down in my notes what Mr. Cohn has told us he

9  wants.  He wants "what kinds of things can be obtained" from

10  the committee and its members.

11       If you have any idea what he's talking about, Your

12  Honor, you're way ahead of me.  And, you know, I really -- I

13  mean here we are setting a schedule for him to file a motion

14  and us to file a response and I don't know what he wants and he

15  hasn't said anything in writing or anything else on this

16  subject and if what he wants, let me try and bring this to a

17  head.  If want he wants is to tell a law firm whose member

18  represents a member of the committee, no lawyers are members of

19  the committee, individual claimants are members of the

20  committee, and if his view is that he can somehow or other

21  serve discovery on either the committee or the member or a

22  lawyer for the member and say, tell us about all the claims

23  information that the firm that that lawyer is part of has about

24  claims against Grace, A) we're not going to agree to it; B)

25  we've briefed this issue in a couple other cases including this

1  one in front of Your Honor and our position that you can't

2  obtain that type of discovery in that manner has been upheld,

3  uniformly.  So, I mean, I just -- really I don't know what to

4  say.  I mean, if he wants to file a motion on December the 1st,

5  I mean, I guess he can.  I'm not sure why we're playing sort of

6  hide the ball on this, but so be it.

7          MR. D.COHN:  Nobody is playing hide the ball.  Mr.

8  Lockwood has articulate the issue, we'll go ahead and file

9  something.

10         THE COURT:  Okay.

11         MR. D.COHN:  Assuming that he really means that he

12 doesn't want to have a discussion as to whether there's some

13 agreed upon way to do this.

14         THE COURT:  No, you folks have to have a discussion.

15 I don't want any discovery motions, of any type, whatsoever,

16 without you folks having a discussion first.  So, talk.  Okay.

17         MR. D.COHN:  I'm happy to do it, Your Honor.

18         MR. BERNICK:  Your Honor, if this is that issue, then

19 I had thought that this issue kind of went to some more

20 fundamental question about how the committee responds to some

21 -- if this all about getting claims data, then yeah, the debtor

22 has got some interest in this because it's the same issue about

23 privacy, it's already been kind of raised informally with us

24 and we're happy to see if we can't figure out an answer to the

25 privacy issues in this respect as well.


**J&J COURT TRANSCRIBERS, INC.**

1          But I do think that A) the debtor, we do have a dog

2     in the fight; B) the debtor would like to be included in these

3     discussions and C) I also don't see what the emergency is

4     either, because if that's the issue, it is more factually

5     intensive than simply who occupies what role in connection with

6     responding to discovery matters that are directed to the PI

7     committee, it has to do with discovery and claims data, and I

8     don't know that that can actually be teed up in a meaningful

9     way by December the 15th.

10          I don't want to get in the way of Mr. Cohn filing a

11    motion, it seems to me that's appropriate.  Don't want to get

12    in the way of Mr. Lockwood having to respond promptly, I always

13    like to make his life miserable, and I'm not even opposed to

14    the idea of taking it up on the 15th, but this is not really an

15    expedited, emergency problem.

16          THE COURT:  But that's not what this paragraph says.

17          MR. BERNICK:  Well, I can't see that in the paragraph

18    either, but Mr. Cohn just suggested that Mr. Lockwood's

19    rendition was not too far from the truth.

20          THE COURT:  No, the paragraph says, the

21    responsibilities of the PI committee and individual PI lawyers

22    to response to discovery in respect of the Libby claimants'

23    objections, shall be heard at the December 15th omnibus

24    hearing, unless an agreement is reached by the parties before

25    then.  It doesn't say that the scope of the discovery request

1  is going to be heard then.  I don't even have a discovery

2  motion pending.

3       MR. BERNICK:  I know, but all I'm observing is, I

4  would have read it the way that you did, Your Honor, and look

5  at this as roles and responsibilities for discovery, which is

6  kind of a general thing, but the issue that Mr. Lockwood

7  highlighted is actually a substantive issue and if that's

8  what's driving the equation, then that really is a substantive

9  discovery matter.

10      THE COURT:  Well, look, if it's a substantive

11 discovery matter, I think the -- I don't know if the rules, the

12 case management order, my own practice, I don't know where

13 exactly this is all going to come down, but I can tell you what

14 I need.  I need a substantive request outstanding, that

15 somebody has refused to answer or has inadequately responded

16 to, from the point of view of the requesting party, and then I

17 need a reason why the information is not sufficient so that I

18 can put it in a context.  I mean, just saying who it is who has

19 to answer doesn't tell me anything, so I'm not sure, Mr. Cohn,

20 that I can take up that issue, absent an actual request to

21 someone, because I can't just, I think, in blank say, you know,

22 lawyer X, you have to answer this in that kind of context.

23      MR. LOCKWOOD:  Well, Your Honor, I might add that the

24 schedule shows Phase II discovery which is the Libby claimants

25 written fact discovery being served on January the 23rd, '09,

1  which is --

2        MR. BERNICK:  By that date.

3        THE COURT:  By that date.

4        MR. LOCKWOOD:  By that date.  Yes, served.  So that

5  means Mr. Cohn would be serving his discovery, if I understand

6  this, of the committee on or before January 23rd, '09.

7        THE COURT:  Okay.

8        MR. LOCKWOOD:  And we're having a hearing on who has

9  to respond to it on December the 15 '08.

10       THE COURT:  Yes.  I think -- I don't see how it's

11  going to -- I'm not sure what I'm going to have.  All I know is

12  this.  There's an issue as to who is going to have to respond

13  between the committee and individual lawyers and you can notify

14  individual lawyers that you're going to demand of them some

15  response and they want to fight about it and we can T the issue

16  up for December, whatever the date is, 15th, I'm happy to hear

17  it.  But I don't think I can give you a substantive ruling on

18  what you can get from particular entities until there is an

19  actual request that's outstanding, the appropriate period of

20  time to respond has gone by and there is no response, because I

21  can't give an advisory opinion and I don't know how I could do

22  anything but that, except for the process that I've already

23  articulated.

24       MR. BERNICK:  Mr. Cohn, before you -- I can see if

25  that is the issue and we're all speculating about what it is,

1  but not entirely, I can do something that I think will help.

2  Mr. Cohn, I think, is concerned on behalf of his client, about

3  the time that it's going to take to get this information, if

4  they're going to get it.

5          THE COURT:    Yes.

6          MR. BERNICK:    And, I undertook in response to one of

7  the insurers' request with respect to the historical claims

8  database, that they said, well, we should have a date for the

9  production of that database and my answer to that originally

10  was, the same as Your Honor's, which is, this is just a

11  discovery matter, we'll get to it, but in order to try to move

12  the ball forward, I said that we would report to the Court on

13  the question of access to the historical claims database which

14  includes the issue of privacy and confidentiality, we'd make a

15  report to the Court on December the 15th.  We could extend that

16  undertaking to include information that was obtained during the

17  course of discovery in this case, of the claimants.  That is to

18  say, to the extent that Mr. Cohn wants to know about claimants

19  against Grace and what they have said and the extent to which

20  they're the same or different as what Libby people have said,

21  you know, there may be information that's obtainable from the

22  PIQ process, but you get sort of the issue of privacy and

23  confidentiality because the PIQ data also is the subject of a

24  pretty strongly articulated protective order.

25          But we could certainly report to the Court on the

1 15th of December on that data and whether it's the same or

2 different in terms of protection as the claims database data.

3         MR. D.COHN:  Well, I think, I am beginning to think

4 that, perhaps, the issue -- could somebody remind me of the

5 omnibus date in January?

6         MR. BERNICK:  I'm going to say the date in January

7 is, January, I think the  --

8         THE COURT:  26th.

9         MR. BERNICK:  26th, yes, Your Honor.  Well, I'm

10 actually the last person to address things like that.  Do you

11 have --

12         THE COURT:  It's the 26th.

13         MR. D.COHN:  And the close, the last date to serve

14 written discovery is the 23rd, under this.  I think, what,

15 perhaps, we should do, Your Honor, is -- we don't mind at all

16 by the way Teeing it up in the form of a specific discovery

17 request.  In fact, there's a lot to be said for that because

18 then you'll have in front of you the information that we're

19 looking for and you can judge whether this is appropriate

20 information and the appropriate way to seek it. So, that would

21 be fine.  That's not, I think, going to happen by the 15th.

22         MR. BERNICK:  The discovery, you can't make the

23 discovery request by -- well, you can certainly make the

24 discovery request at any time under this order.

25         MR. D.COHN:  Right, exactly.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes, right.

2          MR. D.COHN:  But I don't think in terms of people

3   having the chance to respond and so forth --

4          MR. BERNICK:  Correct.

5          MR. D.COHN:  -- I think it can be teed up on that

6   basis by the 15th.

7          And, I guess, is there any date earlier in January

8   that might be available for consideration of this discrete

9   issue if we can get it teed up by then?

10          THE COURT:  Mona, can you check to see whether

11   January 9th, I think was supposed to be the Hamm & Barry trial

12   that settled.  I'm sorry January 8th, I'm sorry, I said the

13   9th, I think, I meant the 8th, I apologize, Thursday the 8th.

14          And you also told me you're not using the 14th,

15   correct, for the confirmation hearing?

16          MR. BERNICK:  That's also correct.

17          THE COURT:  So, I have the 14th.  I know I have the

18   14th, it's already reserved for Grace.

19          MR. D.COHN:  If that's -- I blocked it off for Grace,

20   too.  If that's all right with other parties, maybe we should

21   plan to aim for that, on the same schedule, which would be a

22   week before the hearing, the committee or members of the

23   committee would respond, and so, two weeks before the hearing

24   we would file a motion if we need to.

25          THE COURT:  Two weeks before is December 31st.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. D.COHN: Yes.

2          THE COURT:  Okay.  I'm just pointing it out.  So if

3   you're going out New Years Eve, I don't know whether you want

4   to do that, that's all.  I'm just advising.

5          MR. D.COHN:  Well, I'd love to have a later date if I

6   could, Your Honor.

7          THE COURT:  No, it would have to be an earlier date,

8   because I need that intervening weekend.  I cannot -- I just

9   can't get any work done for this kind of a preparation during

10  the day, I'm too busy.  I have to have the weekend to get --

11         MR. LOCKWOOD:  Your Honor, if we're going to get a

12  week to respond, why does Mr. Cohn need over a month to

13  propound?  I mean, he, supposedly, has identified this issue in

14  such a manner that he was willing to have it argued on December

15  the 15th and now all of a sudden, as Mr. Bernick pointed out,

16  there's nothing that prohibits you from serving discovery prior

17  to January 23rd, '09 and he --

18         MR. D.COHN: For the record, we will do it well in

19  advance, but then we want to have the opportunity to meet and

20  confer with Mr. Lockwood and/or lawyers for the committee to

21  find out whether it's possible to reach an agreement.  We take

22  that seriously, Your Honor.

23         THE COURT:  All right.  How about this, how about

24  filing whatever it is that you're going to file, not later

25  than, let's say the 29th, which is Monday, rather than

1  Wednesday, two weeks before the hearing, giving the committee

2  still until the 7th, that's ten days, that will still give the

3  intervening weekend and we'll do the argument on the 14th.

4          MR. D.COHN: That's fine with Libby, Your Honor.

5          MR. LOCKWOOD:  Okay, Your Honor.

6          THE COURT:  All right.  Now, that means any

7  individual lawyer because I don't know how many lawyers you're

8  going to be serving, too.

9          MR. D.COHN:  It's just the members of the committee,

10 Your Honor.  It's a small -- you know so it's a small number.

11 But we'll make sure that they receive individual notice.

12         THE COURT:  Okay.  Now, we were going to start --

13         MR. LOCKWOOD:  Are you going to be serving the

14 members of the committee or the lawyers for the members of the

15 committee, Mr. Cohn?

16         UNIDENTIFIED MALE SPEAKER:  Oh, don't give away state

17 secrets.

18         THE COURT:  Wait, I don't need to get involved in

19 this.  This is something you can take outside.  We have enough

20 to do today.  We'll start a nine o'clock on the 14th.

21         MR. D.COHN:  And is that here in Pittsburgh?

22         THE COURT:  Yes, that's here.  Oh, wait.  Is that

23 here?  Yes, that's here.

24         MR. D.COHN:  All right.  If you had a time later in

25 the day it's just more convenient for travel, Your Honor, but

J&J COURT TRANSCRIBERS, INC.

1  --

2          THE COURT:  Well, you're going to be here anyway,

3  aren't you for the confirmation issues?  I understood that we

4  were still using the 12th and 13th?

5          UNIDENTIFIED ATTORNEY:  For ZAI.

6          MR. BERNICK:  Yes, it's for the last of the

7  disclosure statement issues.

8          THE COURT:  I'm sorry, yes, I apologize.

9          MR. BERNICK:  Yes.

10         THE COURT:  So, will you be here anyway?

11         MR. D.COHN:  That's probably right and if not, Your

12  Honor, then I can just coordinate with Mr. Bernick to put it

13  someplace on the agenda that's far enough down that I can

14  arrive.

15         MR. BERNICK:  We'll see, we'll see.

16         THE COURT:  Okay.  Whatever works for you, I'm going

17  to be here, I don't care.  So, it's fine.

18         MR. BERNICK:  Okay

19         THE COURT:  I'll make a note, reserve January 14th,

20  for Grace, starting at 9 a.m. eastern, to argue discovery

21  matters.  Okay, thank you.

22         MR. D.COHN:  Now, should we take up the question of

23  interrogatories right now and the numerical limit on

24  interrogatories?

25         THE COURT:  I think in that respect, well, I guess if

1  you're going to be serving them, maybe we should.

2         MR. D.COHN:  Yes.  Here's the issue, Your Honor.  We

3  understand that, obviously, well, the starting point is that in

4  a matter of this complexity 25 interrogatories is, obviously,

5  not going make it.  We also understand that there's some number

6  between 25 and infinity, where it starts to become

7  unreasonable.  So, what we drafted and would like the Court to

8  consider, is simply that parties be restrained by a requirement

9  of reasonableness.  That is to say, they serve interrogatories

10  in a reasonable number, and that if anybody disagrees as to the

11  reasonableness or, obviously, has any other objection to the

12  interrogatories, that they can -- well, first, of course, the

13  parties should meet and confer, but in the absence of being

14  able to reach an agreement on that, that they can then T it up

15  with the Court, but the idea of being restricted up front to 25

16  when we know that that number doesn't work, it just seems to me

17  to be injecting an additional step into the process that once

18  again is a pretty expedited process already, and which we

19  shouldn't simply --

20         THE COURT:  Well, Mr. Cohn, you probably know what is

21  that you have in mind, why don't you just tell me how many you

22  think you're going to need to serve and let me figure out right

23  now whether that's likely to be reasonable.

24         MR. D.COHN:  Well, on the medical issues, Your Honor,

25  I am looking at a draft that was prepared by Montana counsel.

1  The problem is that we have to figure out, you know, it's got

2  parts and sub-parts and, you know, we just have to count them

3  up and, frankly, I haven't done that, Your Honor.  Each one is

4  really easy, just like, you know, fill in a number of types  of

5  claims of this type that exist.  But that does mean a lot of

6  different numbers and answers that we're asking for.

7          MR. BERNICK:  Your Honor -- go ahead.

8          MR. D.COHN:  Well, and so, but it's that type of

9  thing, Your Honor.  So, we're happy to be bound by a

10 reasonableness standard.  It's just that we don't -- we know

11 that 25 is not going to be enough.

12         THE COURT:  I'm unhappy with the reasonableness

13 standard, Mr. Cohn, because reasonableness is, you know, kind

14 of like the beauty of a rose, it's in the eye of the beholder

15 and I will be getting objections from everybody.  So, I want an

16 absolute number.  If you think, or if anybody thinks they need

17 to vary it, I'd much rather take that issue on than trying to

18 judge reasonableness.  So, tell me how much you think you need,

19 how many you think you need now, and we'll start with that.

20 We'll start with a number now.

21         Mr. Bernick, how many questions were in the PIQ?

22         MR LOCKWOOD:  Including sub-parts?

23         THE COURT:  Yes.

24         MR. BERNICK:  No, those were check the boxes, that's

25 different.  I think, I don't know, I think that there probably

1 were about 35 or 40, something like that.  But the difficulty

2 that I have, we had the same issue really before in connection

3 with estimation process, and ultimately, I don't think that the

4 25 limit was ever lifted in the estimation process at all.  It

5 became a subject of great contention, but it was never lifted.

6 And the problem that I have is that I told Mr. Cohn, and,

7 indeed what this order contemplates is that he, A) can draft

8 them, call me in advance, and see if we'll agree to lift the

9 limit and we may well agree to lift the limit, but I don't

10 think that it's appropriate to ask that that be done in the

11 abstract.  I don't know what Mr. Cohn is going to come up with

12 here.  Whatever Your Honor says, of course, we'll comply with,

13 but I'm worried about everybody else in the room doing exactly

14 the same kind of thing, or something like it.

15         And I, frankly, don't even see the need for it in Mr.

16 Cohn's case, but I can't address it without even seeing what

17 he's suggesting.  So, what I would propose is to have this

18 issue, again, deferred, until a time when there's a concrete

19 request, and I'd say the same thing to everybody else in the

20 courtroom, as I did in connection with this order.  I know how

21 Your Honor deals with discovery issues.  As much as I like to

22 say no, forget it, Your Honor looks for a middle course.  So,

23 what I've said to everybody on the phone is, I will not refuse

24 reasonable requests because I know it will just come back to

25 the Court.   And I would treat this the same way.

1          So, all I need to see is a concrete proposal and

2  we'll definitely react to it promptly, with a view of resolving

3  it.

4          THE COURT:  You're probably going to do better with

5  him than you are with me Mr. Cohn.

6          MR. D.COHN:  Well, I think maybe we'll do better with

7  the concrete than we would in the abstract, which is, I think,

8  actually a fair point that Mr. Bernick is making, which is that

9  when there's a set of interrogatories in front of you, you can

10  certainly rule as to whether they're reasonable.

11          And so, if that's the direction that you would be

12  most comfortable with, then we can do it that way, Your Honor.

13          THE COURT:  All right.  I'll wait till I get

14  objections or requests, whichever it's coming up with.  Okay.

15          MR. D.COHN:  Thank you.

16          THE COURT:  We'll start with the 25 or whatever you

17  folks agree to.

18          MR. COHN:  The other Mr. Cohn.

19          THE COURT:  Yes, sir.

20          MR. COHN:  Jacob Cohn for Federal Insurance Company.

21  I'm speaking today for Federal and for some of the other

22  insurers in the room.

23          MR. BERNICK:  I'm sorry, I can't hear Mr. Cohn.  Can

24  he step a little closer, yes.

25          THE COURT:  It doesn't -- yes, it doesn't pull up.

1          MR. COHN:  Is this better?

2          THE COURT:  I think you just need to -- you were

3    probably just facing away from it a little bit, that's all.

4          MR. BERNICK:  Speak up.

5          MR. COHN:  Okay.  We took the latest draft that came

6    across the transom, you know, 20 minutes before we got here and

7    made some markups that I'd like to hand this up to discuss some

8    revisions we would like to see made.

9          THE COURT:  All right.

10          UNIDENTIFIED ATTORNEY:  Can you spare another copy?

11          MR. COHN:  Sure, we have a few copies.

12          MR. BERNICK:  It should be noted for the record, Your

13    Honor, it was actually sent out — one was sent out last night

14    and then there was a couple things that changed today, really

15    only a couple in response to Mr. Cohn's further questions.

16          MR. COHN:  We, really, only propose two significant

17    changes, one of which is that if you look at paragraph four, we

18    would like some basic information that is available to the FCR

19    and is available to the ACC, and is available to the debtors,

20    but as of right now has not been made available to us.  And

21    that is the claims databases that Your Honor will recall were

22    part of the Sealed Air discovery, part of the estimation

23    discovery, the registers of the exhaustive insurance and then

24    with respect to the estimation proceeding, we basically would

25    like to be let into the confidentiality bubble and have access

1  to the unexpurgated expert reports and exhibits and the

2  proceedings that happened in the estimation proceeding.  We'd

3  like that two weeks before we have to decide what kind of

4  discovery we wish to propound in the confirmation proceedings

5  and the other change, fundamentally, that we propose is

6  whatever the Court decides to do with phasing the consideration

7  of confirmation issues, there should only be one set of

8  discovery deadlines.  And there's no reason to rush us into

9  some truncated discovery process, especially if what Mr. -- I

10  heard Mr. Bernick say is, what he wants to present in April are

11  basically legal issues anyway, that aren't going to be

12  factually intensive.

13        And just by way of context, I promised you in October

14  I was only going to stand up when something really important to

15  my client was at issue and this is really important.

16        There are bookends to this.  The first bookend was

17  the service upon non-settled insurers, very recently, of

18  settlement demands from Mr. Horkovich, on behalf of the ACC,

19  the FCR and the debtors, and the other end of the bookend,

20  which has been artificially established by the plan proponents,

21  is the date of the confirmation order, because unlike in

22  Federal Mogul, for example, where you just got a motion from

23  Allstate, post confirmation, they've settled, they'd like their

24  524(g) protection.  The plan proponents here, for whatever

25  reason, have established 524(g) protection as a wasting asset.

1  They do not provide in the plan for post confirmation 524(g)

2  protection.

3          So what you have here is a period of time within

4  which insurers can settle and obtain the benefit of 524(g)

5  protection.  On the other hand, the plan proponents are

6  offering some degree of insurer neutrality where with certain

7  exceptions they're saying, go litigate all of your other

8  issues, post confirmation, so we're sort of in this

9  artificially created bind in that there is a certain pressure

10 on us and from our view the trust stands to probably get more

11 money if they could sell us 524(g) protection than if they, you

12 know, throw it out with the bath water and we'd like to get

13 going and consider the settlement proposals with the same body

14 of information that is available to the other side.

15         And at the same time we would like to have that

16 information so we could consider the offer of neutrality to

17 decide whether or not we'd like to accept that, or we like to

18 fight certain battles here.  So that's our reasoning and it's

19 really quite simple, the stuff that we want up front are things

20 that have been produced, have been created in the context of

21 the estimation, all the Court really needs to do is say, okay,

22 you're in the circle of trust if you will, you're in the

23 confidentiality so that you can see these things that are

24 otherwise presumptively public documents and simply provide

25 that they will produce those things to us by December 8th so

1 that we could go forward with the deadlines.

2         THE COURT:  I think I'm missing something.  I'm

3 missing the concept of accepting the offer of neutrality.  I

4 mean, if, in fact, the plan is insurance neutral, it's not an

5 offer of accepting neutrality, it's that the plan is insurance

6 neutral, you don't have standing and there's nothing to

7 litigate.

8         MR. COHN:  Well, it's not fully insurance neutral and

9 the plan as written right now, does not say you're being thrown

10 out.  It says, if you choose to litigate some things here, some

11 consequences may follow.

12         And it may very well be that my client, at the end of

13 the day, would be very happy to have the insurance neutrality,

14 but let me just get back to the practicality of the point.  If

15 the idea is, you'd like to see as few as possible of us at

16 confirmation time, because as many as possible of us are --

17         THE COURT:  I love you folks.

18         MR. COHN:  -- we'll be back in the next bankruptcy,

19 Your Honor.  But you know, in Mogul and Kaiser, even in USG,

20 where there weren't any insurers, my client found a way to be a

21 settled insurer.  And as a practical matter, whether you call

22 this plan discovery or you just want to talk about our now

23 entitlement to access to records that had been held from us

24 because we were sent out on neutrality from the estimation, I

25 think the easiest thing to do here is to fold it into this

1  schedule, if you prefer us to come at it separately, we can do

2  that, but it's going to slow things down.

3          I mean, the faster we have -- practically speaking

4  confirmation objections and litigation aside, the faster we

5  have this body of information the faster we can start

6  evaluating this demand and trying to get to yes.

7          MR. BERNICK:  Your Honor, if I could help on this.

8  First of all, I'm entirely sympathetic with the idea of trying

9  to have the trust reach successful settlements with the

10 carriers and get some money into the trust (indiscernible) with

11 the claims process, I don't really know that it's useful or

12 germane to the CMO which is really focused on what has to take

13 place by way of litigation in any event.  I really can't

14 express the settlement features, it's not our job, it's the

15 trusts' job.

16          That said, this already comes down --

17          THE COURT:  Oh, I'm sorry.  Something just happened

18 and I just got a terrible feedback.  I apologize.  It really --

19 it just went through my ears like a pain.

20          MR. BERNICK:  If you can raise that volume with

21 respect to counsel's mic (indiscernible).

22          THE COURT:  No, I think maybe your microphone is not

23 on and they must have been attempting to adjust it.

24          MR. BERNICK:  I'll tell you what, that's probably --

25 is that better?

1            THE COURT:  That's it, yes.  Thank you.

2            MR. BERNICK:  Okay.  I'm sorry.  So, be that as it

3  may, I think that as I heard counsel speak, there were two

4  matters.  One, and I think most of the time was spent with

5  respect to what they have as their paragraph four, which

6  basically says that before December the 8th, which is, you

7  know, a modest week, or two weeks or so from now, the debtors

8  shall complete production to the insurers of one, the claims

9  databases; two, the policy registers and other documents used

10  to record the exhaustion of underlying coverage; and, three,

11  basically, the unredacted record in the estimation process.

12            Now, this was discussed specifically, my initial

13  response to all of this when we were discussing in the meet and

14  confer is that it's a discovery issue, just like the last one

15  that was raised.  In fact, this one is related to it.  But

16  that, nonetheless, because I understood that the carriers

17  really wanted this information, I said, really the only problem

18  is and what our order recites, is that we have not objection in

19  principle to this at all.  But we have to know that we're not

20  creating privacy issues.

21            So, I said, I'd report on the 15th, which is a week

22  later than when they say they want it all produced.  I can't

23  make resolution to the privacy and confidentiality issues

24  happen any faster than they can be resolved.  I said I'd report

25  on the 15th.  I think that that's timely.

1        With respect to the substantive matters, we've

2   already addressed the claims databases, they never even raised

3   the policy registers and the unredacted copies of the

4   estimation record, but we're certainly happy to consider that

5   and provide it to them.   If there's no confidentiality issue,

6   we don't care about their little Roman III.

7        So, I'm prepared to agree, informally, to produce

8   those materials as soon as reasonably can take place.   I don't

9   think he's going to do any better if he asks for motion

10  practice.   All this is is a disguised motion to compel and an

11  order, it's not really a CMO deal.

12        I've already said we'd be prepared to do that.   So,

13  we'll make a report on the 15th, if there are materials that we

14  can produce without dealing with confidentiality issues, we

15  will produce them to the insurers.   We'll produce them to one,

16  maybe the can make copies for however many people there are and

17  then when Your Honor hears the privacy issues, maybe we can

18  find a way to resolve that.

19        But, again, this is not something that's appropriate

20  to raise on the record that we have here.   It's an involved

21  matter where the debtor has said from the beginning, and the

22  discussions that led to this proposal, we are not a problem, we

23  are prepared to produce it, it's a question of whether we can

24  produce it, given the interests of third parties.

25        The second issue they raise, basically, if you take a

1  look at what they've done, they kind of say, well, why should

2  we have to go through this process twice, why should there be

3  two discovery tracks.  Well, that's not really very candid.

4  What they're saying is, we shouldn't have a Phase I.  We should

5  just have a Phase II.  So, they don't want to have the

6  litigation of the threshold issues early on.  We feel very

7  strongly that there's no reason for that, they can be

8  litigated. If it turns out that it's not feasible, then Your

9  Honor can push it back.  But for the present time, we think

10 it's a very reasonable approach to dealing with what at the end

11 of the day are going to be much more limited issues.

12       MR. COHN:  Well, if they're limited issues, Your

13 Honor, our point -- let there be a discovery schedule, don't

14 artificially shove us in somewhere -- we don't even know what

15 the issues are yet, and we're not going to know what the issues

16 are for a little while and if they want to go forward in April

17 with an issue, then they'll identify it at some point and we'll

18 have to hurry up and get our discovery done at that point.

19 There's no reason to do it now.

20       The second thing, what I'm hearing is, the only

21 drawback here is confidentiality issues, Your Honor.  If they

22 don't have a problem, we're the debtors' insurers.  If they

23 don't want to tell us about claims and exhaustion information,

24 I don't understand the problem, but the short answer is, we're

25 willing to keep it confidential for now, we're willing to abide

1 by, for now, by the protective order that you entered in

2 connection with the estimation.  We're just asking to be let

3 into that circle.

4         MR. BERNICK:  And, again, we don't have a problem

5 with that at all.

6         MR. COHN:  There's not a problem, maybe --

7         MR. BERNICK:  It's not our -- that's not our issue.

8 You have to deal with the people who represent those claimants

9 who are actively involved in this process and agreed to furnish

10 that material subject to the protective order.  So, you can't

11 make us do what we don't have the latitude to do.  As an order

12 that's extant in this case, we are bound by it.  Everybody's

13 bound it.  And it doesn't include you all, at least so far as I

14 know.  And I don't know how I can do more than to say, we're

15 going to try to make it happen for the insurers.  And why we

16 have to sit here and argue about this now when we have zero

17 record.

18         THE COURT:  Yes, I'm not sure either.  It seems to me

19 that this is a pure and simple discovery issue.  And the order

20 builds in a time for raising discovery.  So, I really do think

21 that that's an issue that should be raised by a discovery

22 motion if in fact you demand it and the debtor doesn't produce

23 it.  I'd like to get past the issues, too, but I think this

24 order does build in time for discovery.

25         And I have to say the same thing to you that I said

1   to the other Mr. Cohn, which is I can only address discovery

2   issues in the context of a discovery request.  Otherwise I'm

3   giving advisory opinions which I like to do, but I can't in

4   this context because I don't even have the request here to do.

5         So, I think Mr. Bernick's position here is well

6   founded that the debtor's promising to do the best it can to

7   get this information to the insurers as soon as it can.  If by

8   December 15th, the debtor has concluded that it can't produce

9   something, you'll know, and you'll know why, and you'll

10   expedite something.  And if by December 15th, the debtor has

11   produced everything, there won't be an issue.

12         MR. COHN:  Your Honor, to the scheduling issue, then,

13   we do think -- we agree with Your Honor that the overall

14   schedule is overly aggressive, but we just ask that we not be

15   placed in a more hamstrung position then, you know, what

16   there's now called the Phase II discovery issues.  And we'll

17   leave it to Your Honor's discretion.

18         THE COURT:  You mean in terms of bifurcating the

19   legal issues out?

20         MR. COHN:  Well, bifurcating the discovery deadlines

21   to Phase I and Phase -- legal issues, we'll deal with them as

22   they come up.  We'll deal with them whenever the Court decides

23   that Your Honor is going to resolve them.

24         MR. BERNICK:  Well, that's the whole point is that

25   the legal issue is teed up for Phase I.  There'll probably be

1  some discovery that's associated with it.  I'm assuming that

2  they'll want that discovery.  That's why it's made available to

3  them.  But, the legal issues that are teed up is, well, do you

4  treat -- how do you classify these claims.  They are the issues

5  raised by the lenders under the prepetition credit facilities.

6  Again, we don't think that that's factually intensive.  And

7  then we have the issues that are specific to the insurers which

8  mostly have to do with indirect claims.

9          We don't think that any of those are factually

10 intensive at all.  They are basically --

11         MR. COHN:  Well --

12         MR. BERNICK:  Excuse me.  They are basically legal

13 issues, but we afforded room in the schedule to have the

14 discovery take place anyhow.  And so the real issue is why they

15 need more than -- let's see, January, February, March -- why

16 they need more than three months worth of discovery -- more

17 than three months worth of discovery in order to get ready for

18 these matters.  And if in fact, it turns out that they do, they

19 can then make the request.  But at this point with the scope

20 and nature of these issues, we believe that there should -- can

21 and should be two phases.

22         MR. COHN:  Your Honor --

23         MR. BERNICK:  There's no showing to the Court that it

24 can't be done, that this is somehow a problem.  There's just a

25 say so.

1          MR. COHN:  If I may, if what he's talking -- what Mr.

2    Bernick is talking about is the indirect claims issue of what's

3    being channeled to the trust, I am going to step back and allow

4    Mr. Brown to discuss that because his client is much more

5    directly involved in that issue.

6          THE COURT:  Okay.

7          MR. BROWN:  Good afternoon, Your Honor, Michael Brown

8    for Seaton and Onebeacon.  I think it is important to draw a

9    distinction that has not been drawn.  The insurers tend to be

10   all put in a group labeled insurers, and we'll deal with

11   insurer issues.  There are really sort of two classes of

12   insurers, and there are hybrids between various classes.

13   You've got insurers that have settled with the debtor,

14   Onebeacon and Seaton are among those insurers.  And then, you

15   have the insurers that Mr. Cohn was just talking about, the

16   unsettled insurers.  And they have their own issues with

17   respect to the confirmation schedule.

18         At the outset of this hearing, what I heard, at least

19   with respect to my client's disclosure statement objections is

20   that they will be taken up now on December 15th.  Our first

21   deadline on this schedule is seven days later which doesn't

22   leave a whole lot of time to get issues resolved.  We have an

23   expert witness deadline of 12/31 under this schedule.  And it

24   just seems to me what is aggressive generally for everyone is

25   particularly aggressive for certain insurers who's issues

1 haven't yet even been resolved at the disclosure statement

2 level.

3        And I don't know how they're going to be resolved at

4 this point, Your Honor.  So, it's a little hard to gauge

5 exactly what we're going to be required to do in mid-December

6 as the holidays begin and we're trying to scramble around

7 finding experts, or doing whatever else it is that we need to

8 do.

9        So, this schedule -- the schedule that the insurers

10 have put together, to us makes sense because it gives a little

11 bit more breathing room.  We don't see the need necessarily to

12 have a two-phased confirmation hearing.  It seems to me with

13 the dates that Your Honor outlined in June and July, there

14 would be ample to take up everything and then not have this

15 phasing process in confirmation.

16        And it seems to me it's also important from another

17 perspective.  And that is, this whole confirmation process is a

18 moving target.  And what you're going to be asked to presumably

19 in Phase I is decide issues that may thereafter be impacted by

20 what happens in Phase II.  And we can't sit here and predict

21 whether they will or they won't, but it certainly a distinct

22 possibility.

23        And so it seems to us that having a single phase is

24 fine and it's a way we all go forward, And then to the extent

25 that the debtors and the proponents want to deal with certain

1  issues first in the confirmation hearing in June, that that's

2  perfectly fine.  But, we do think that the issues should be

3  left open by the Court pending the close of the confirmation

4  hearing as a whole so that the insurers, whether they're

5  settled or unsettled aren't prejudiced one way or the other.

6          I just want to also raise, briefly, the issue -- and

7  I heard Mr. Bernick in terms of getting the claims added to

8  unsettled insurers.  I will also be representing an unsettled

9  insurer.  And in Pittsburgh Corning, this was a database that

10 was made available to the insurers very early on.  Under a

11 confidentiality agreement, it was used in connection with a

12 confirmation hearing.  And it is to me, at least, ironic that

13 there would be information that the insured would have that

14 would be shared with their litigation opponents in the

15 underlying litigation, but they can't yet share it with their

16 insurers.  That strikes me as a little bit odd.

17         THE COURT:  Well, I think in Pittsburgh Corning,

18 didn't the debtor have the claims database as its own data,

19 though?  It maintained that database.  It wasn't something that

20 came in through the PIQ.  I think the methodology by which the

21 database or are you talking about the same claims date, not the

22 PIQ date that you --

23         MR. BROWN:  It was.  Mr. Restivo will probably know

24 that.  It was a claims database that from -- that was

25 maintained by Pittsburgh Corning --

**J&J COURT TRANSCRIBERS, INC.**

1                THE COURT:    -- Pittsburgh Corning.

2                MR. BROWN:    -- but I think it had much of the same

3    information.

4                MR. LOCKWOOD:    It was the prepetition settlement

5    claims database.

6                THE COURT:    Okay.

7                MR. LOCKWOOD:    And I did not understand this proposal

8    that the insurers put in the trust, in the CMO that Mr. Cohn --

9    the other Mr. Cohn spoke about earlier to include some sort of

10   newly created personal injury questionnaire summaries or

11   whatever was done there.

12               THE COURT:    No, he's saying, no, it doesn't.

13               MR. BERNICK:    They're just talking about the

14   database?

15               MR. LOCKWOOD:    Yes.

16               THE COURT:    Yes, just the database.

17               MR. BERNICK:    Yes, right.    And --

18               MR. LOCKWOOD:    Just the database.

19               THE COURT:    He's affirming that he just wants the

20   database, yes.

21               MR. LOCKWOOD:    Yes, and we don't --

22               MR. BERNICK:    And again --

23               THE COURT:    He's sitting in the back of the room, so

24   I can see him, you can't.

25               MR. LOCKWOOD:    We don't --

**J&J COURT TRANSCRIBERS, INC.**

1         MR. BROWN:  I'll let him speak to that.

2         MR. LOCKWOOD:  We don't in principle have any

3  objection to that, Your Honor.  I mean, there maybe some

4  restrictions on use having to do with individual claimants,

5  settlement amounts, and telling who they -- I mean, as Your

6  Honor may recall -- and this came up in Pittsburgh Corning, the

7  principal concern is not allowing the various plaintiff's

8  lawyers to know what the other plaintiff's lawyers are doing.

9         THE COURT:  Right.

10        MR. LOCKWOOD:  And so, if you give somebody an

11 unrestricted ability to disseminate the claims database, you

12 create some problems.  But, I can't imagine that we can't work

13 something out with the insurers that would be similar to what

14 we work out with the insureds.

15        MR. BERNICK:  I really am at a loss, Your Honor, this

16 is exactly the same point that was just covered in the prior

17 argument; that is, what happens with the databases.  Why are we

18 going -- why is counsel going back all over the same thing all

19 over again?  I can't say anything more than I said the last

20 time.  And I think Your Honor has already commented on that.

21 I'm happy to address the scheduling issue, but why are we

22 revisiting this all over again?

23        MR. BROWN:  Your Honor, if I can, I'll answer that

24 question.  I wanted to remind Your Honor of what had happened

25 in Pittsburgh Corning and the fact that this information had

1  been made available to the insurers.

2         THE COURT:  It was made available in that case.  And

3  I think what Mr. Bernick's telling you here is he's trying to

4  figure out how to get it available to you without violating --

5         MR. BROWN:  Understood.

6         THE COURT:  Okay.

7         MR. BROWN:  And I think the unsettled insurers are

8  more than happy to work with the debtors in doing that.  But,

9  again, we are now looking at a schedule that is, as Your Honor

10  observed at the outset, is a very aggressive schedule with

11  respect to insurance related issues, whether they be from the

12  standpoint of unsettled insurers or the settled insurers who

13  don't even know how their claims are being treated at this

14  point.

15         THE COURT:  Well, that's the issue that I think it's

16  not so much the -- the entities who have resolved their issues,

17  the disclosure statement issues with the debtor obviously have

18  a handle on what the disclosure statement's going to say and

19  know what the basic plan objections are going to be.  They may

20  not know them all.  Obviously, there's  property component to

21  the plan that isn't finished.  But, for the most part, the

22  insurers have an understanding of what this plan says with

23  respect to their claims, where they're going to be treated, and

24  how and what objections they're going to raise.

25         As to the disclosure statement issues that are

1  unresolved, if that affects plan treatment, then you may not

2  know what preliminary objections you want to raise with respect

3  to the plan if in fact the disclosure statement issue isn't

4  resolved.  I don't know totally what the disclosure statement

5  issues are because I've been told very little about what they

6  are.  And as a result, I don't have a view about whether that's

7  going to --

8            MR. BROWN:  I was happy to share that, Your Honor.

9            THE COURT:  I know.

10           MR. BROWN:  But, the debtors would like to defer that

11  issue for the moment.

12           THE COURT:  But, I don't have a view as to whether

13  that does or doesn't inform the plan objections.  I simply

14  don't know.

15           MR. BERNICK:  They don't have to make plan objections

16  until mid-March.

17           THE COURT:  Well, no, they have to raise their

18  preliminary objections by December 22nd.

19           MR. BERNICK:  Right.  And at the behest of counsel

20  for one of the lenders, we included very specific language in

21  the balance of the order that basically said, yeah, you've got

22  to give us the preliminary objections, but it doesn't actually

23  mean an awful lot.  Preliminary objections shall be -- but

24  they'll be without prejudice to the inclusion of new objections

25  after the completion of discovery.

1          THE COURT:  THE COURT:  Well, obviously, but the

2  whole point to doing the preliminary is so that you folks can

3  be talking to try to resolve this.  So, you know, if you're

4  going to make the best use of this time, you want to do the

5  best job you can in getting the preliminaries there.  There's

6  no point putting your pen to paper and raising a lot of

7  objections that are meaningless.  It's --

8          MR. BERNICK:  I would agree with that, Your Honor.

9          THE COURT:  Okay.

10         MR. BROWN:  And Your Honor, there are other deadlines

11 in here, too.  I mean we have one --

12         MR. BERNICK:  If we could just deal with one at a

13 time because this is -- again, this is one carrier standing up

14 and frankly saying two entirely different things.  A few

15 minutes ago, this carrier was saying, we've known about these

16 issues.  Grace knew about these issues in 2004.  Then -- now,

17 today, it's saying, well, we don't really know what the

18 disposition of the disclosure statement issue is going to be.

19         And there's a core truth that actually underpins both

20 of those statements that's not being put on the table.  These

21 people know exactly what their objection is to the plan because

22 they object to the TDP.  They object to the TDP and how it

23 affects what they believe their rights under either settled or

24 unsettled policies.  They've sat down with us and discussed

25 this in painful detail.


**J&J COURT TRANSCRIBERS, INC.**

1          The disclosure statement issue is not an issue about

2    these guys being in the dark.  They know 100, a 1,000 percent

3    of exactly what it is they want to do.

4          THE COURT:  Regardless --

5          MR. BERNICK:  The issue is how we describe it in the

6    disclosure statement hearing.

7          THE COURT:  Well, regardless, I think the point is

8    that there isn't going to be at this point at least a

9    definitive ruling until a week before the discovery has to be

10   served for purposes of getting to the hearing that's going to

11   take place in April.  And that seems to be the concern.  I

12   guess my question is whether or not for those entities, let's

13   see, who still have some issue pending as of the 15th and only

14   for those entities, can the --

15         MR. BERNICK:  15th of December?

16         THE COURT:  Yes.

17         MR. BERNICK:  Yes, I don't have a -- again, it was

18   never actually put to us to defer that first date.  All that

19   they've always wanted is to defer everything so they don't have

20   to do anything until the one confirmation hearing, which will

21   be the later one.  If they want to push back that first date

22   for serving written discovery, they can have another month as

23   far as I'm concerned.  That's fine.

24         THE COURT:  Well, that's what I'm wondering, whether

25   just the preliminary objection and the written fact discovery

1  date for those three objections that are still left, and two of

2  them actually -- I guess two, really.  One seems to be a plan

3  objection not really a discovery -- pardon me, a disclosure

4  statement objection -- could be just pushed back a little

5  because the rest of the schedule, I think, still works.

6        Now, with respect to the concept of not doing the

7  legal objections to the disclosure statement in April, but

8  starting those in June, you know, it's really in the nature of

9  a summary judgment to the extent that somebody is raising a

10 legal objection to the plan, there really isn't any reason that

11 can't start earlier and some argument can't be made.

12       Whether I can make rulings before I get to the plan

13 confirmation trial phase or not, I don't know.  But, I won't

14 know that until I hear the arguments.  I don't see any reason

15 why that can't start, though, in April if everybody is ready to

16 go.  And under this schedule, at least some of those issues --

17 I would think, the classification issues ought to be ready to

18 go.

19       MR. BROWN:  Your Honor, in terms of the description

20 of Phase I, it doesn't -- I mean I understand that Mr. Bernick

21 has mentioned that he's contemplating the legal issues.  I

22 don't know that it necessarily will be legal issues.

23       And I do want to respond to one thing that Mr.

24 Bernick said.  We raised the issue of the treatment of our

25 claims four years ago.  The issue of how the claims are being

1  treated is the one that's still left open.  It hasn't been

2  answered.  And that's why we are where we are today on those

3  issues.  It was raised.

4         THE COURT:  Okay.  Well, I guess the issue in terms

5  of what's going to happen in Phase I if someone raises a Phase

6  I issue and somebody else objects and it's not a legal issue, I

7  can only assure you now I'm not going to be prepared for

8  factual issues by that point in time because the discovery

9  won't have been concluded.  So, I'm not likely to say, okay,

10  we'll do factual hearings at that point in time because

11  discovery won't have been finished.

12         MR. BERNICK:  Well, the idea, Your Honor, is actually

13  the factual -- is the factual matters that would be relevant

14  would be done by that time.  That's why there's the opportunity

15  for discovery.

16         THE COURT:  No, I'm talking about what you're talking

17  about in terms of an evidentiary trial hearing, that fact --

18         MR. BERNICK:  I don't anticipate an evidentiary trial

19  in April.  And this is not -- I don't know is the ELMO on here?

20  This is not, I feel, beyond that screen.  This is not --

21  there's no real mystery here.  This is in the disclosure

22  statement language they want to have included, is they're

23  taking issue --

24         THE COURT:  No, wait.  You just said you didn't want

25  to do this today.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Well, no, no.  But, I want to say it's

2    the contention that's being made, Your Honor, they don't know

3    what it is they're talking about.

4          THE COURT:  Well --

5          MR. BERNICK:  I won't even have to show this.  The

6    TDP is their problem.  They've known about the TDP for weeks

7    and months.  They don't like the TDP.  This is not some kind of

8    mystery here.

9          THE COURT:  It's not a surprise that the insurers

10   don't like the TDPs.

11         MR. BERNICK:  Well, that's certainly true.  But, to

12   maintain that somehow they have no idea what they're doing and

13   all the rest, they know exactly what they're doing.  That's not

14   really an accurate statement, Your Honor.

15         MR. BROWN:  Your Honor, I just want to make an

16   observation.  Again, distinguishing your insurers.  When I'm --

17         MR. BERNICK:  This insurer.  This insurer.

18         MR. BROWN:  When I'm speaking of Seaton and

19   Onebeacon, we're speaking as a creditor because that's what the

20   issue is.  We didn't want to discuss what that issue was today,

21   but that's -- their claims have been described as indirect PI

22   trust claims.  And it's the manner in which those are going to

23   be treated, okay?  That's the issue for the settlement insurers

24   that I represent.

25         THE COURT:  All right.

1          MR. BROWN:  But, Your Honor, I mean, we talked about

2    pushing out some dates.  We have an expert date.  I don't know

3    whether it's going to be necessary for me have an expert or

4    not.  I just don't know at this point.  But it seems to me all

5    those dates that are in December have to be pushed back so that

6    there's ample time to address them.

7          THE COURT:  Okay.

8          MR. BERNICK:  Well, so which date are we talking

9    about?  Your Honor, again, we spent days going over this and

10   trying to accommodate every single specific proposal.  There

11   was --

12         THE COURT:  We're only talking about the claims that

13   are going to have to be deferred until December 15th.  This

14   schedule has not been objected to by anybody whose claims have

15   already been resolved between the debtor and the creditor.  So,

16   we're only talking about those entities whose claims are

17   deferred -- objections to the disclosure statement are deferred

18   until December 15th.

19         MR. BERNICK:  Yes, that is not an -- well, those are

20   insurers.  And it's Scotts and who else?

21         THE COURT:  Scotts, I thought just said there's was

22   resolved.

23         MR. BERNICK:  Well, they -- I don't know if in fact

24   it is resolved or not.  They originally -- one of the issues --

25   if it's been resolved, that's great.  We can take Scotts off.

1          MR. FREEDMAN:  Well, actually, Scotts and Maryland

2  Casualty have some language that relates to a dispute as to the

3  impact of the plan which is completely unrelated to any factual

4  discovery just reading the plan.  And that dispute and the

5  articulation of those rights is the disclosure statement issue

6  that's being resolved.

7          THE COURT:  Right.

8          MR. BERNICK:  Okay.  That's fine.  So, the

9  difficulty, Your Honor, is that again in the meet and confer

10  process, people have the opportunity to (a) talk about specific

11  dates and (b) talk about why.  There was no proposal that was

12  made to defer individual dates.  Rather, the overall proposal

13  was to defer all of the dates.

14          Counsel is now saying, I need more time to serve

15  written discovery.  I see no basis for that.  There's no record

16  for it.  We can go through all these other things and counsel

17  can say, gee, give me a little bit more time here or there or

18  here or there --

19          THE COURT:  Wait.  Mr. Bernick, stop.  Paragraph 15

20  says, all parties reserve rights and objections.  We're simply

21  dealing with a party whose reserved right and objection.

22          MR. BERNICK:  That's right.

23          THE COURT:  We're dealing with two entities who have

24  claims -- or who have objections to the disclosure statement

25  that are going to be heard on December 15th.  I don't see why

1   two dates can't be pushed back for the benefit of those two

2   parties that are dealing in December dates.  It won't change

3   the argument dates in April.

4           MR. BERNICK:  Two dates?  That's fine.

5           THE COURT:  Two parties.

6           MR. BERNICK:  Two parties.

7           THE COURT:  All right.  Mr. Brown, what's a

8   reasonable proposal keeping in mind that the April 6th through

9   8th argument dates are going to stay the same?

10          MR. BROWN:  And assuming that we have our disclosure

11  statement objections resolved on the 15th.

12          THE COURT:  Yes, if not before.

13          MR. BROWN:  Your Honor, I'd push it back three weeks

14  on preliminary objections, three weeks on written discovery,

15  and three weeks, I guess, on the expert deadlines.

16          MR. BERNICK:  The first expert deadline.  Because

17  otherwise, expert deadlines goes all the way down to the

18  depositions.  You were talking about the expert reports.  I

19  mean, it seems to me the reasonable -- we should do -- I don't

20  really care about anything until we get to the expert reports.

21  I think we can push those back two weeks.  And then the

22  supplemental report, same thing.

23          But, I think after that, you start to impinge upon

24  the overall schedule.  Whatever Your Honor wants to do.  I

25  don't mind the dates in December.  I get nervous about dates in

1  January.

2          MS. DeCRISTOFARO:  Your Honor, Elizabeth --

3          THE COURT:  Just a minute, please.

4                      (Pause)

5          THE COURT:  Mr. Brown, what about two weeks rather

6  than three?  Two weeks, and I think basically when you get down

7  to final plan objections, that can stay at March 16th.  Trial

8  briefs can stay at March 16th.  I think the other dates can be

9  pushed back two weeks.  And this whole -- the rest of the

10 schedule will work.  I shouldn't say -- pardon me.  I think if

11 you pushed back everything except dates in March -- all the

12 March dates should stay fixed, everything else could go back

13 two weeks and the schedule would still work.

14         MR. BROWN:  That's fine.

15         THE COURT:  So, if I just go down preliminary

16 objections, rather than December 22nd, they would be due

17 January 5th.  Fact discovery January 5th.  Other fact

18 discovery, instead of February 16th would be March 2nd, I

19 think.  Wait, I want to make sure I did that right.  Yes, March

20 2nd.  Expert reports, January 5th.  Supplemental experts,

21 February 3rd.  Expert depositions, February 26th.  Preliminary

22 witness lists, February 23rd.  No, I'm sorry, wait, February

23 16.  I'm sorry, February 16.

24         MR. BROWN:  I'm sorry?  Your Honor, I'm sorry, I

25 didn't hear that.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And then February 16 for preliminary

2   witness list.

3          MR. BROWN:  Thank you.

4          THE COURT:  And then everything else will stay the

5   same.

6          MS. DeCRISTOFARO:  Your Honor, because I didn't want

7   you to have to go through everything twice --

8          UNIDENTIFIED SPEAKER:  Your name again?

9          MS. DeCRISTOFARO:  This is Elizabeth DeCristofaro for

10  Continental Casualty Company.  Just to be clear, this schedule

11  in an effort to accede to Mr. Bernick's that we coordinate was

12  submitted on behalf of a number of the insurers here, both

13  settled and unsettled.  It was taking into account the

14  paragraph that we added for preliminary disclosure which Mr.

15  Bernick is going to report to us on December 15th which is

16  fine, except that it makes the schedule unworkable for a

17  different reason in the sequencing.

18         The number one problem we have, as Mr. Cohn went

19  through, we were not a part of the estimation.  We have access

20  to nothing at the moment.  We're not going to hear whether

21  we're going to have anything until December 15th.  But, our

22  expert reports would be due right over the holidays with no

23  information.  It's just not possible.

24         THE COURT:  All right.  Well, then --

25         MS. DeCRISTOFARO:  Wait.  I'm not even assuming, you

1  know --

2          THE COURT:  Pardon me.

3          MS. DeCRISTOFARO:  -- people may or may not.

4          THE COURT:  Pardon me.

5          MS. DeCRISTOFARO:  I'm sorry.

6          THE COURT:  Does this schedule, this adjustment work,

7  Mr. Bernick, without causing too much undue difficulty for

8  everybody, this readjustment keeping all the dates the same

9  from March on, but this two-week adjustment for the December

10 and January and February dates?

11         MR. BERNICK:  For everybody beyond the insurers?

12         THE COURT:  For the -- well, I guess for the insurers

13 because if they need to know about this reporting, if you're

14 not able to produce the reports by then.

15         MR. BERNICK:  Well, the database, I think, is going

16 to be produced.  And I think that the best way to deal with

17 that problem is that if it's not going to be produced, then you

18 can consider the schedule at that time, the claims database.

19         Most of the estimation material does not include

20 claimant specific information because by the time the experts

21 did their reports, the -- we specifically, because we wanted to

22 maintain public record access to the case, we didn't have

23 individual claimant information.  So, overwhelmingly, that

24 material there.

25         The trial -- they say they don't know anything -- the

1  trial was all on the record.  None of it was sealed.  The

2  testimony that took place, all on the record.  None of it was

3  sealed.  They have access to that right now.  So, I think that

4  with respect to matters that don't contain privacy information,

5  they're going to start to get it as soon as we can start to

6  copy it.

7          And therefore, rather than trying to -- I still have

8  no clue on how any of that information bears upon the issues

9  that they've raised.  And they've raised their issues.  I think

10 it bears more on their settlement posture.  But, be that as it

11 may, I think by December the 15th, they're going to have a lot

12 of material.  If they then want to say, gee, we still don't

13 have enough, we want to push the dates back, I suppose they can

14 do that.  But, I don't think that -- I struggle with what in

15 the world the nexus is between that data and any of these

16 dates.

17         Bottom line, though, Your Honor, if you'd like to do

18 it today, I don't care about any of the dates prior to the time

19 that we get to the March dates.

20         THE COURT:  All right.

21         MR. BERNICK:  And if they got preliminary objections,

22 they've already -- they've already told us in words on paper

23 what the preliminary objections are.  I don't think any of

24 that's really affected.  They want 'til the two weeks that you

25 gave them for all the dates in February, fine.

1          THE COURT:  All right.  Let's just do that

2    adjustment.  And we'll just do it now.  I'm not sure it's going

3    to make that much difference anyway.

4          MS. DeCRISTOFARO:  Your Honor, the primary concern is

5    the sequencing of document production, service of discovery,

6    getting things, and the experts' reports.  If experts' reports

7    were moved back to early February without changing the April, I

8    think we'd be okay because all of that will have taken place.

9    And if there's an issue as to if somebody wants to designate an

10   expert -- and again, maybe some of this may turn out to be,

11   from a point of view of the insurers, not necessary, but things

12   need to unfold.  This schedule doesn't allow for any unfolding

13   with respect to that.  So --

14         THE COURT:  Why don't we do this.  Why don't we just

15   change the dates that I've just articulated.  And if in fact

16   there is a problem with it, you can let me know on the 15th if

17   in fact you haven't gotten the production that seems to be

18   coming up.  I'm not sure that it's going to be an issue.  And I

19   don't think you'll know either until the 15th.

20         MS. DeCRISTOFARO:  Your Honor, what date do you

21   presently have for expert reports then for --

22         THE COURT:  I have January 15th.

23         MS. DeCRISTOFARO:  January 15th?

24         THE COURT:  These are the dates I have.  December

25   22nd would be January 5th.  February 16th would be March 2nd.


**J&J COURT TRANSCRIBERS, INC.**

1  I'm looking at Phase I by the way.

2         MR. BERNICK:  Not February, Your Honor --

3         THE COURT:  February 16th would be March 2nd.

4  January -- I'm sorry, December 31st will be January 15.

5  January 21 would be February 3rd.  February 12 would be

6  February 26.  And February 2nd would be February 16.  The rest

7  of the days in the Phase I will remain the same.

8         MR. BERNICK:  Your Honor, if I could be heard on

9  this.  I think it's inevitable that what we're going to hear --

10  there's not been any articulation today -- and this is the

11  problem with this whole thing -- about exactly what their issue

12  is.  We know what it is.  They've written to us on it.  And

13  then why it drives any discovery whatsoever, much less

14  discovery of the databases.  I'm very leery of giving any

15  flexibility on these things absent a justification because next

16  time we're going to hear, oh, well we've now got the material

17  and it turns out that our experts are going to take nine months

18  to digest it.  And we'll see all the dates slip.

19         They have not -- this is not a situation where the

20  arguments that they've advanced somehow hinge upon analyzing

21  claimant data.  If they did, they should have been in here long

22  ago raising issues about getting access to the claimant data.

23         THE COURT:  I'm not sure what --

24         MR. BERNICK:  They've known about the claimant data

25  for years.

1        THE COURT:  I'm not sure what it's going to do about

2   analyzing claimant data either, but I'm also not sure that this

3   two week slippage is going to make any difference.  It's not

4   going to affect the hearing that is set for April 6th to 8th.

5   And starting with the final witness lists that are due March

6   2nd, none of the dates after that slipped.

7        MR. BERNICK:  I agree with that, Your Honor.  If we

8   had closure today with --

9        THE COURT:  So, let's move on to something else.

10       MR. BERNICK:  -- closure today with that --

11       THE COURT:  Yes?

12       MR. BERNICK:  -- I'm fine.  But, then it really ought

13  to be the schedule -- we've already told them what we're going

14  to do with the data.  They've had te ability to request that

15  data for years.  This should be it.

16       THE COURT:  I just said that.  Let's move on to

17  something else.  We've been on this for over an hour already.

18  And we're never going to get to the rest of the agenda.  And

19  folks, you know, it's getting late.  I'm sure you want to get

20  out of here tonight.  The weather doesn't look very good.  I

21  just propose that --

22       MR. BERNICK:  Well, I -- absolutely.

23       MS. DeCRISTOFARO:  Your Honor, with all due respect,

24  also, on the disclosure statement, they still haven't filed the

25  cooperation agreement.  We all filed the objections that it was

1  missing.  So, I mean, there are a lot of open issues.  And

2  there's a lot of things to be resolved that are in flux.  The

3  idea that we have to file an expert report on New Year's Eve is

4  purely tactical.  It has nothing to do with really pushing this

5  forward.  So, I don't think the request is --

6          THE COURT:  I just changed the dates.

7          MS. DeCRISTOFARO:  Okay.  I'm sorry, Your Honor.  But

8  there are a lot of things that are not complete and are in

9  flux.  So, I think with that -- do you have anything else on

10 that?

11         MR. BROWN:  Yes, Your Honor, and this is just -- and

12 if you could run -- I got confused when you were going through

13 the dates.  If we could just start with the Phase I preliminary

14 objections and go down the due dates for the conclusion of

15 those?

16         THE COURT:  Preliminary objections, January 5.

17 Written fact discovery, January 5.  Other fact discovery, March

18 2.  Expert reports, January 15.  Supplemental expert reports,

19 February 3rd.  Expert depositions, February 26th.  Preliminary

20 witness lists, February 16.  And from then on, they're all the

21 same.

22         MR. BROWN:  Thank you, Your Honor.

23         THE COURT:  Okay.  Now, I'm going to address Phase

24 II.  That's Phase I.  Ms. Cobb?

25         MS. COBB:  Your Honor, Tiffany Cobb on behalf of the

1 Scotts Company.  Earlier, just for clarification, I was stating

2 that it was my understanding that the disclosure statement

3 objections that we had had been resolved as of Friday.

4          THE COURT:  Yes.

5          MS. COBB:  But, at the beginning of today, it was

6 reported otherwise.  The Scotts Company objection as I

7 understood the debtors' counsel -- earlier I was going to say

8 this morning -- earlier today is that that will be taken up on

9 December 15.

10          THE COURT:  Oh.

11          MS. COBB:  And clearly those dates should equally

12 apply then as to the Scotts Company as one of the few remaining

13 objectors whose issues have yet to be fully resolved.

14          THE COURT:  Oh, I'm sorry.  I misunderstood.  I

15 thought there was a report that it had been resolved.  I

16 apologize.

17          MS. COBB:  So --

18          MR. BERNICK:  I don't know if it hasn't been

19 resolved.

20          MR. FREEDMAN:  It has not bee resolved.  And it will

21 be taken up --

22          UNIDENTIFIED SPEAKER:  Speech.

23          MR. FREEDMAN:  It has not been resolved and it will

24 be taken up on December 15th.

25          THE COURT:  Then it applies to you -- your client, as

1  well, yes.

2        MS. COBB:  Thank you.

3        MR. COBB:  Your Honor, I'm the last, I guess, of the

4  troika, of the major constituents out there that seem to need

5  to be heard today.  Your Honor, Richard Cobb on behalf of the

6  bank lenders.  Several points, Your Honor, I'm still unclear

7  and we'd ask the debtors for a description of what they mean by

8  the debtors' lenders, and all the issues raised by and specific

9  to the debtors' lenders under the prepetition credit facilities

10  will be dealt with in Phase I.

11        Now, if I could an explanation from the debtors, then

12  perhaps this may resolve our questions about how, you know,

13  this tight schedule.  If it is an objection that only the

14  lenders have raised and no one else has raised, that may be

15  helpful in resolving our issues, but I need to hear from Mr.

16  Bernick on that.

17        MR. BERNICK:  This is -- Mr. Pasquale has discussed

18  these matters in detail in papers.  There's no mystery about

19  it.  The reference is a shorthand reference.  It's a reference

20  to the very matters that he raised that are specific to the

21  same clients, which are the Class VI lenders who are the

22  subject of the pendency interest issues.  They have issues that

23  go to -- but that are specific to them.  So, they have issues

24  about feasibility, that's for Phase II.  They have issues that

25  are particular to the lenders, that's for Phase I.  And that

1  includes for example whether the -- if Your Honor rules against

2  them on pendency interest, that constitutes impairment of --

3  for purposes of voting.  That's an issue.

4         But, there's no mystery here.  This has all been the

5  subject of detailed objections that they have already lodged in

6  connection with the disclosure statement.  Remember many people

7  in connection with the disclosure statement actually advanced

8  their substantive objections.  The class -- the bank lenders

9  were among that group.  So, it's very easy, just go back and

10 take a look at those.  Those are the issues that we want to

11 take up in connection with --

12        THE COURT:  Somebody's going to file something so

13 that all of us know what it is that's going to be taken up.

14 And I think the way to do this is to have the debtors actually

15 file it.  And maybe what we need to do is build in here because

16 it says preliminary objections and final objections, but no

17 where in here does it build in where the debtor is actually

18 going to file something that says, this is where the Phase I

19 issues are going to be identified.  Why don't we build in that

20 date?

21        MR. BERNICK:  We can do that very easily because we

22 can do that in the next ten days.

23        THE COURT:  Fine.

24        MR. BERNICK:  Well, then we're just going to go to

25 their papers and pick out the objections that they themselves

1 have already have made.

2        THE COURT:  Well, with all due respect, it ought to

3 be after the preliminary objections come in so that you're sure

4 that in fact there is a plan objection that has to be

5 addressed.  I don't want to see --

6        MR. BERNICK:  I have no problem with that.

7        THE COURT:  Okay.  So, pick -- build a date that's

8 after the preliminary objections for the debtor to raise what

9 will be the Plan I objections and a date for the responses to

10 come in.

11        MR. BERNICK:  Okay.  We can probably -- it's a

12 designation of what's in Phase I --

13        THE COURT:  Yes.

14        MR. BERNICK:  And we'll do that within 14 days after

15 getting the preliminary objections, if not sooner.

16        THE COURT:  All right.  So, Phase I's due January 5.

17 So, you're going to file that by January 20.

18        MR. BERNICK:  Right.

19        THE COURT:  Designation of Phase I issues.

20        MR. BERNICK:  No, no, with respect to Mr. Cobb who's

21 standing up, his preliminary objections are going to be due on

22 December 22nd because he's not one of the lucky few who's got

23 disclosure statement --

24        THE COURT:  I only want one set.  I don't want them

25 coming in piecemeal, please.

 1            MR. BERNICK:  Okay.  Well, then we should then go --

 2            THE COURT:  One set.

 3            MR. BERNICK:  We should then go with two weeks after

 4  your amended date for the --

 5            THE COURT:  Yes.

 6            MR. BERNICK:  -- preliminary objections.

 7            THE COURT:  January 20 with responses by everybody

 8  because I only want one set of all of these things.  So, with

 9  responses -- so, fact discovery is going to go forward -- let's

10  see here -- in case the debtor wants to do any discovery on any

11  of these things, when do you want responses in by?  Two weeks

12  after that?

13            MR. BERNICK:  I'm not -- you've lost me.

14            THE COURT:  The 20th of January would be the -- say,

15  4th of February?

16            MR. BERNICK:  Yes.  But, I don't view -- I mean,

17  again, the discovery is going to start any time.

18            THE COURT:  Yes.

19            MR. BERNICK:  So, we don't need -- if we -- if they

20  say, here's what our preliminary objections are -- and frankly,

21  we're not going to be awaiting that with bated breath because

22  we already know what they are -- and then we have to turn out a

23  schedule that says which ones of those preliminary objections

24  are part of the hearing in Phase I.  And we probably don't even

25  14 days, we can do it in seven days.  These are all very

1  unmysterious.  That's why I really believe, Your Honor, that we

2  can articulate what the Phase I matters are without waiting

3  until getting their contentions.

4        THE COURT:  I would prefer to make sure that in fact

5  you haven't resolved some of these things, that you wait 'til

6  you get the preliminary objections so that I'm sure that we're

7  actually going to have a hearing on something that somebody's

8  raised.

9        MR. BERNICK:  Here's the issue that Your Honor raises

10  -- that raises, Your Honor, we don't want to have that

11  interfere with the process of moving forward on discovery and

12  getting it done.  And I'm concerned that if we post -- if we

13  take more time to articulate what's in Phase I, then I'm sure

14  one of the very able lawyers in this courtroom will say, oh,

15  well, we only just learned that our issues are Phase I.

16        THE COURT:  All right.  Fair enough.  Then, what I'll

17  do is ask the debtor to put together a trial brief or a hearing

18  binder for me that will put them all together.  You can file

19  them whenever you want, just when you get to trial, I want --

20  or when you get to the hearing, I want them all in a section

21  together.

22        MR. BERNICK:  That's fine.

23        THE COURT:  Fine.  Seven days after the

24  preliminaries are filed, then, with responses due a week after

25  the initial issue statement is due.

1           MR. BERNICK:  That's fine.

2           MR. COBB:  Your Honor, could you please recapsulize

3  for me then?  We have -- that would be helpful.

4           THE COURT:  Yes.  Whenever the Phase I preliminary

5  objections are due, a week later -- a week later, the debtor is

6  going to file its designation of the issues for the Phase I

7  hearing.  And a week after that, the responses -- if you have

8  any responses to the issues, you know, I don't want to do this

9  that day for whatever reason, or I think the issue ought to be

10  this, you're going to file that.

11          MR. COBB:  Thank you, Your Honor.  I think that's

12  very helpful.  Related to that, Your Honor, as I heard -- I

13  think I heard from Mr. Bernick that what will happen in Phase I

14  is we will not have an evidentiary hearing?

15          THE COURT:  Correct.

16          MR. COBB:  Okay.  So, that maybe a possible grounds

17  to object or respond to the debtors' identification of issues

18  to be tried if someone says, hey, we think that -- we need a

19  witness or we need evidence to be heard.

20          MR. BERNICK:  Oh, well, now wait -- we've almost

21  never had evidentiary hearings on most matters that are before

22  the Court.  They're often handled on the basis of submissions

23  without the need for live testimony.  If this is now going to

24  turn into an opportunity to say, well, this can't be heard then

25  because we want to call witnesses, then we will never get

1  anything done and these are all ways that people are using to

2  say they don't want to have a confirmation --

3          The April issues are going to tee up facts.  You

4  can't talk about a case without talking about facts.  We don't

5  believe that it's going to be necessary for Your Honor to

6  resolve issues about the credibility of witnesses in connection

7  with any of these facts.  And so, no, we don't believe Your

8  Honor's going to have to weigh and balance the credibility of

9  witnesses when it comes to these issues.

10          Will they have factual content, yes, they will.  Will

11  somebody be able to say, well, I'd like to call a witness?

12  Sure, they can always say they'd like to call a witness.  The

13  question is whether the mere fact that they're saying they'd

14  like to call witness means that all of a sudden everything is

15  on spec to Phase II.

16          THE COURT:  All right.  Then it will be an

17  evidentiary hearing if necessary.

18          MR. COBB:  Thank you, Your Honor.  Your Honor, the

19  one issue that we had raised with the debtors that we haven't

20  heard a response back on is the solvency issue.  Your Honor may

21  recall that at our oral argument, I believe it was in October,

22  with regard to pendency interest, there was -- I think the

23  Court had said, well, if I make a determination that solvency

24  -- that this issue may turn on solvency, then we'll reserve

25  that for a later day.  The later day, I think, is coming, Your

1  Honor.  We now have a confirmation schedule in front of us --

2  pre-hearing schedule.  That's not at -- solvency point is not -

3  - or that issue is not addressed in this schedule.

4       We could -- we had suggested, let's put that under

5  feasibility so that if it becomes an issue, then we can deal

6  with it in a context of feasibility discovery.  And that would,

7  I guess, assume Your Honor that we have a decision from the

8  Court prior to the feasibility discovery starting.

9       And I, Your Honor, was raised to never ask the Court

10  when a decision will be issued.  So, I will not ask that now,

11  but --

12       THE COURT:  I certainly hope it's going to be before

13  April 15th.

14       MR. BERNICK:  Your Honor, with regard to that, I'm

15  aware that counsel asked to have some consideration of solvency

16  and make room for it some place.  I never heard, at least, that

17  it was supposed to be part of feasibility and there's no way it

18  could be part of feasibility.  If we're going to have a full

19  blown de novo solvency determination in this case, that is

20  obviously going to have a major impact on the confirmation of

21  this plan.  There's no question about that.

22       That is why we'd like, obviously, to see what Your

23  Honor is going to do with respect to the pending matters.  But

24  I think the reason that we say this should be reserved is that

25  I think we should wait and see if any of this is material as

1  opposed to academic based upon how Your Honor addresses the

2  pendency interest issue because we can't if we have a de novo

3  determination of insolvency, this schedule simply does not

4  address it.  So, I don't think that there's any point in

5  saying, well, we'll scoot solvency under feasibility because

6  that's just an unreal world discussion.

7          THE COURT:  I think we should do what I had suggested

8  when I had the issue raised, which is, let's put it back on for

9  a discussion of solvency on the next omnibus hearing after I

10 issue an opinion.

11         MR. COBB:  That's fine, Your Honor, I just didn't

12 want to hear from the debtors that we'd waived the ability to

13 raise solvency because we didn't raise it today.

14         THE COURT:  No, you have not raised it.

15         MR. BERNICK:  No, well, that --

16         THE COURT:  And so you know, because of user --

17 because of user lose time --

18         MR. COBB:  Thanks, David.

19         THE COURT:  Folks.  -- you're probably not going to

20 get an opinion on that issue before the end of the year, but I

21 hope to have it in January.  Not a promise, but I hope to have

22 it in January.

23         MR. COBB:  Your Honor, last -- thank you, Your Honor.

24 Last point is, it seems a bit odd that they have scheduled

25 final plan objections two weeks after the trial briefs are due

1 with regard to Section 1.  It would seem -- I'm sorry, the

2 first phase of the confirmation hearing -- it would seem to me

3 we should make those dates consistent.  And I think that's just

4 a matter of --

5          THE COURT:  I'm sorry, Mr. Cobb, I'm missing -- what

6 objection?

7          MR. COBB:  Your Honor, final plan objections --

8          THE COURT:  Yes.

9          MR. COBB:  -- except as to feasibility are due March

10 16th.

11          THE COURT:  Yes.

12          MR. COBB:  Trial briefs are due March 2nd.  It would

13 seem to me, Your Honor, if there is --

14          THE COURT:  No, it says, except refeasibility.

15          MR. BERNICK:  No, I think -- I would agree with Mr.

16 Cobb.  That's designed -- because feasibility has got its own

17 little dates later on.

18          THE COURT:  Right.

19          MR. BERNICK:  And he's correct that under this

20 sequence, we ask for the trial briefs to be turned in by March

21 the 2nd before the final objections.  And the reason for that

22 is relatively simple, which is the final objections as a date

23 should await the close of voting.  But, we are sensitive to the

24 fact that Your Honor likes to have the trial briefs

25 significantly in advance of the actual hearing.

1          So, what we thought was -- and we still think it
2    makes sense -- is that people should file their trial briefs.
3    If they're then final plan objections, they can be filed on the
4    16th.  We don't think that the space and time really
5    substantively means anything.  Everybody's going to know what
6    their objections are because they're not going to hinge upon
7    the outcome of the vote.  They're going to hinge --

8          THE COURT:  I'm missing something.  Mine says, trial
9    briefs by objectors due March 2nd, except refeasibility.

10          MR. BERNICK:  Yes, because feasibility, Your Honor,
11    has a whole series of its own dates further below --

12          THE COURT:  Right.  So, there's no conflict.

13          MR. COBB:  Your Honor, if you move a little -- three
14    lines up?

15          THE COURT:  Yes?

16          MR. COBB:  It says that final plan objections except
17    refeasibility are due March 16th.

18          THE COURT:  Right.

19          MR. COBB:  And so, you have a situation where trial
20    briefs would be filed.  And then if there are additional plan
21    objections, they would actually be put before the Court after
22    the trial briefs are filed.  And therefore, probably wouldn't
23    be briefed.

24          THE COURT:  Oh, I see.  Okay.

25          MR. COBB:  So, I think, Your Honor, if we just -- we

1  make the final plan objections and the trial briefs by

2  objectors due on the same date.  I think we have a little more

3  room now because you moved it, Your Honor, into April.

4          MR. BERNICK:  Yes, I don't have a problem as long as

5  Your Honor is okay with the trial briefs coming in on the 16th.

6          THE COURT:  That's fine.

7          MR. BERNICK:  Okay.

8          MR. FRANKEL:  Well, what about the plan proponents

9  trial brief?

10          UNIDENTIFIED ATTORNEY:  That would have to be moved

11  back.

12          MR. BERNICK:  That will move by two weeks.

13          THE COURT:  Well --

14          MR. BERNICK:  Yes, we're not going to be able to move

15  it back two weeks, Roger because that's too close to the

16  hearing.

17          THE COURT:  No, that's okay.  That's -- March 30th is

18  still a full week before the hearing.  That still gives me

19  actually two intervening weekends.  It gives me the weekend --

20  no, I'm sorry.  It gives me the intervening weekend of April

21  3rd.  Wait one second.  That's fine.

22          MR. COBB:  That's fine, Your Honor?

23          THE COURT:  Yes.

24          MR. COBB:  Thank you, Your Honor, that's all that I

25  have.

1              THE COURT:  Okay.  Mr. Madron?

2              MR. MADRON:  Your Honor, good afternoon, again, Jason

3    Madron for Bank of America.  Your Honor, I'll be brief.  In

4    sum, Bank of America has no objection to a two-phased

5    confirmation process.  But, our basic position is that we

6    should be included in the Phase II group, not the Phase I

7    group.  The reason is simple, because Mr. Bernick had pointed

8    out that he looked at the Phase I group as not fact intensive.

9    We look at the Bank of America issues as extraordinarily fact

10   intensive.

11             To the extent that our claim is left in Class VI

12   which is where it is now, we would expect a substantial amount

13   of fact discovery which would include the taking of a number of

14   depositions.  By way of illustration, the way that Phase I

15   procedures -- and I'm working off the dates that had originally

16   been proposed by the debtors, the deadline to propound the

17   discovery would be the 22nd of December.  You know, assuming 30

18   days to respond, you're at late January getting your responses.

19   Assuming the responses are fulsome, you're left with shy of

20   three weeks to complete what we would believe to be a number of

21   depositions, both related to the use of proceeds, the use of

22   funds for Class IX claimants, as well as depositions that are

23   very fact specific and may involve witnesses on the November

24   11th, 2005 claim stipulation that was entered into by and

25   between the debtors and my client.

1          Therefore, given the very fact intensive nature and

2   where we would see this going from a discovery perspective, you

3   know, Bank of America is certainly not looking to derail the

4   debtors' confirmation timing overall.  We're not looking to

5   push things beyond the January -- excuse me, beyond the June

6   time frame proposed by the debtor.  But, we believe that we

7   should be entitled to a reasonable amount of time for what is

8   foreseeable and substantial discovery that we would need to

9   take.  And we believe that the deadlines set forth in the Phase

10  II cycle are far more meaningful in that regard and would give

11  our client, you know, the respective due process rights to

12  conduct the amount of discovery they feel they'll need.

13          MR. BERNICK:  Your Honor, we actually had an

14  extensive discussion regarding situation with respect to this

15  particular claimant.  And we're very familiar with the

16  background of it.  Actually, most of the discovery would

17  probably be discovery propounded by Grace rather than by Bank

18  of America because of the circumstances giving rise to that

19  stipulation.

20          Be that as it may, the issue really is we can start

21  that discovery next week.  It's very, very simple.  It's a very

22  simple, small, little packet of facts.  If they really want to

23  go forward and they're concerned about time, it's very, very

24  easy.  There are a couple of people that they'll probably want

25  to depose.  There are a handful of documents.  That's all.  We

1 had a stipulation that was entered into in this court.  Most of

2 the facts actually relating to Bank of America will all be

3 stipulated facts because there's nothing to dispute.

4          So, what I suggested to counsel before he stood up

5 is, I'm going to argue against the idea of moving you to Phase

6 II because I don't believe it's necessary.  But, I'm also

7 prepared to have this issue put over so we can talk about it in

8 more detail because I believe that that's most appropriate.

9 And that is still what I would say.  It maybe that they should

10 be in Phase II.  I sincerely doubt it, but I don't think

11 they've made any kind of showing today that there's some reason

12 why they need to be putting it over except that their counsel

13 stands up and offers the conclusion, it's very, very fact

14 intensive.

15          We don't think it's very, very fact intensive, but

16 we're prepared to have a further dialogue on that subject.

17          THE COURT:  Well, let's -- because it's going to be a

18 classification issue and at least the debtors' initial intent

19 is to put the classification issues into the Phase I and it may

20 be fact intensive, it might also not be.  It's hard to tell at

21 the moment.  I simply don't know.

22          Why don't we start off in Phase I and if it gets to

23 the point where in the process of this discovery schedule,

24 you're not making it for whatever reason and the debtor turns

25 out to be incorrect, raise it.  This order, unlike most orders,

1  I sign regarding discovery does build in leeway.  Most of them

2  don't.  This one does.  So, raise it then.

3  　　　　　MR. MADRON:  Thank you, Your Honor.  Obviously, we

4  would look forward to continuing productive conversations with

5  the debtors' counsel and appreciate Mr. Bernick's statements

6  about the way -- the reasonable manner in which he would

7  approach these types of requests.  So, if we do get into the

8  process and it is as involved as we think it would be, if we

9  have to go that route, it is entirely possible that we would be

10 back before Your Honor.  We appreciate that invitation.

11 　　　　　Just one other point of clarification before I sit

12 down to allow the process to move along.  The dates that Your

13 Honor had proposed the two-week push in Phase I, would that

14 apply for all Phase I parties?

15 　　　　　THE COURT:  No -- well, I intended it to apply to the

16 insurers and the parties whose disclosure statement objections

17 were continued 'til December 15.  I don't really see the need

18 for it to apply to anybody else.

19 　　　　　MR. MADRON:  Okay.  I was going to make the offer

20 that, you know, perhaps at least as a starting point given the

21 vastly different plane that Mr. Bernick and I see for the

22 discovery here, if could at least get the additional two weeks,

23 because that would allow, you know, us to get the process of

24 serving out written discovery earlier, you know, rather than

25 later.  I would provide --

1          THE COURT:  Well, you can start now.

2          MR. BERNICK:  You can start now.

3          MR. MADRON:  Correct.  But, my point being that I

4  don't even know if we were to start right away, if that would

5  be sufficient time.  I'm just trying to build in somewhat of a

6  cushion so we're not back before Your Honor, you know, perhaps

7  more quickly than we might have to be.  I think the extra two

8  weeks might be helpful in that regard.

9          MR. BERNICK:  Your Honor, again, happy to talk about

10  it.  But, all this is a request to simply provide two weeks.

11  There's no predicate for it.  There's no disclosure statement

12  issue with respect to Bank of America.  We all are totally

13  versed in the Bank of America issue.  Happy to talk about how

14  to expedite the discovery, don't see any need to push the date

15  at this point in time to be revisited later.

16          THE COURT:  Okay.  I honestly don't either, Mr.

17  Madron.  I'll consider it if it has to come up at a later time.

18  But, I think based on this one, this is a mature issue.  You

19  folks do understand what this one's about.  I don't think there

20  is even a disclosure statement issue left over this one.  I

21  think this discovery can get started and get going.  So, I

22  think I'll keep the dates the way they are with respect to Bank

23  of America.  You're right -- your client's rights are preserved

24  under this order.  So, I think this one should work.  This

25  schedule should work for now.

1          MR. MADRON:  Very good.  We appreciate that, Your

2     Honor.  Thank you.

3          All right.  We're going to be in recess.  I have a

4     proceeding that I need to do for another judge for a few

5     minutes.  It's going to take me at least 15 minutes.  So, we're

6     taking a recess for 15 minutes.  We'll reconvene at that time.

7     I'll wait to get a revised order from the debtor with respect

8     to this matter.

9          MR. BERNICK:  Thank you.

10                    (Recess)

11         THE COURT:  Please be seated.  Mr. Bernick?

12         MR. BERNICK:  Thank you, Your Honor.  And I

13    appreciate your being patient with us yet here this afternoon.

14    I think the next matter that we want to take up was the

15    Anderson Memorial issue.  And then I don't know --

16         MS. BAER:  The omnibus stuff.

17         MR. BERNICK:  The omnibus stuff.  How long will the

18    omnibus stuff --

19         MS. BAER:  Three minutes.

20         MR. BERNICK:  Maybe we should just do that now.

21         THE COURT:  Yes, let's --

22         MR. BERNICK:  Items 1 through 5 on the agenda.

23         THE COURT:  Okay.  Ms. Baer?

24         MS. BAER:  Thank you, Your Honor.  Wrong folder.

25    Your Honor, Agenda Item Number 1 is a continued claims matter

1  regarding Massachusetts taxes.  We are going to be continuing

2  that to the 12/15 hearing.  And I have an order in that regard.

3           THE COURT:  All right.

4           MS. BAER:  Agenda Item Number 2 is the 25th omnibus

5  objection.  Your Honor, we have one matter that's been

6  resolved.  That is the claim of Old Castle APG Northeast.  It

7  is being -- it's an $8 million claim -- two claims.  Sorry --

8  an $8 million claim and a $200,000 claim that are both being

9  disallowed and expunged.  The rest of the claims remaining from

10 omnibus 25 are being continued.  And I have an order, Your

11 Honor, in that respect.

12          THE COURT:  All right.

13          MS. BAER:  Agenda Item Number 3, Your Honor, was the

14 Alco Iron sale.  That was the sale of the debtors' premises in

15 San Leandro, California.  I understand that earlier this

16 morning, you entered the amended order on that matter.

17          THE COURT:  Yes.

18          MS. BAER:  Okay.  Thank you.  Agenda Item Number 4,

19 Your Honor, is the Scotts adversary.  I spoke with Scotts'

20 counsel and we agreed that while we're working through the

21 disclosure statement and plan issues, it made sense to continue

22 that matter.  And we agreed we would have it continue to the

23 December 15th omnibus hearing.

24          THE COURT:  Okay.

25          MR. BROWN:  Your Honor, could just interrupt on that

1 --

2          THE COURT:  Yes.

3          MR. BROWN:  -- a couple of --

4          THE COURT:  Mr. Brown?

5          MR. BROWN:  Your Honor, the Scotts' adversary is a

6 case that's against both the debtors and -- I don't know the

7 exact number, perhaps a half a dozen or so insurance companies

8 that include Seaton and Onebeacon.  It was filed, I believe, in

9 the fall of 2004.  And it's been effectively stayed since then.

10 It -- we made pretty clear at the outset that it was our

11 preference that the case go forward so that it could resolve

12 these issues.  It has not.  I understand that's not going to

13 happen today.  But, I just wanted to point out that there is a

14 interrelationship between what's going on in the Scotts'

15 adversary and the issues we talked about earlier today in terms

16 of the claims.

17          THE COURT:  Okay.  Thank you.

18          MS. BAER:  Your Honor, Agenda Item Number 5 is the

19 Charleston lift stay matter.  Your Honor, a couple of weeks

20 ago, we filed a motion to sell the Charleston property to the

21 City of Charleston.  That matter is up on the December 15th

22 hearing.  Under those circumstances, we'd like to continue this

23 matter to December 15th and once that order is entered, this

24 will become moot.

25          And Your Honor, the last omnibus matter on the agenda

1   is actually Omnibus Item Number 15.  That, Your Honor, is the

2   Tersigni matter.  We have already filed the motion for approval

3   of the Tersigni settlement.  It was a negative notice.  There

4   were no objections.  It is now effective.  And so, the Tersigni

5   settlement is final as to the Grace case.

6           As a result, Your Honor, we have prepared an order

7   which will withdraw Your Honor's previous order entered

8   appointing an examiner for Tersigni.  And Your Honor, I have an

9   order in that respect.  And I understand the United States

10  Trustee has seen the order and is agreeable to it.

11          THE COURT:  All right.  Is the United States Trustee

12  still on the phone?

13          MR. KLAUDER:  Your Honor, this is David Klauder for

14  United States Trustee.  I've actually been in and out of this

15  hearing.  I've seen the order.  I was going to suggest that we

16  submit it under COC.  I just wanted to check internally if it

17  was okay.  I don't think it will be a problem.  But, I think,

18  the thing was sent to me today.  So, really haven't had a

19  chance to digest it.

20          THE COURT:  Ms. Baer?

21          MS. BAER:  That's fine, Your Honor.  All the order

22  says is that your order granting the motion to appoint the

23  examiner is being vacated.  But, that's fine, we can enter it

24  on a COC.

25          THE COURT:  Okay.  I'm not sure what else it can do,

1  Mr. Klauder, but --

2         MR. KLAUDER:  I'm not sure either, Your Honor.  I

3  just wanted a chance -- again, I just saw it today.  So, I just

4  wanted a chance to talk about it internally.  I mean, if Your

5  Honor feels that it's appropriate to enter, so be it.  But, I

6  just --

7         THE COURT:  Well, I'm happy to get it on a COC.  I'll

8  just continue Item 15 'til December 15th unless I get an order

9  that vacates the order on a COC before then.

10        MS. BAER:  Your Honor, those are all of the regular

11 omnibus matters on the agenda.  I have these orders here for

12 one and two and that's it.

13        THE COURT:  Okay.  You can just hand them to the

14 staff, Ms. Baer, I'll make sure they get entered.  Thank you.

15        MS. BAER:   Thank you.

16        MR. BERNICK:  I believe the next matter that we're

17 going to take up is the Anderson Memorial motion which is Item

18 14.  And then, with Your Honor's permission, I will excuse

19 myself and go see if I can find a plane to take me some place.

20 And then there are some other property damage matters including

21 an argument that Mr. Restivo will make with respect to the

22 Canadian claims.

23        THE COURT:  All right.

24        MR. BERNICK:  But, on Anderson Memorial, I'm happy to

25 have -- Mr. Speights is rising from the last row there and will

1 come up -- he promised me before hand that he only had a half a

2 piece of paper, now, I see there's a whole sheath of papers.

3 But, I'm sure it will be succinct and charming as always.

4          THE COURT:  Well, I've read all the papers on this

5 one.  So, I think you can both be succinct and charming because

6 I've read the papers.  So, Mr. Speights?

7          MR. SPEIGHTS:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. SPEIGHTS:  Your Honor, Dan Speights representing

10 Anderson Memorial Hospital.  Your Honor, as reflected in the

11 papers, there are a number of outstanding objections to the two

12 class claims at issue.  And I won't cite them -- all of those.

13 But, they are those objections.  And there has never been a

14 hearing on those objections.  In fact at a hearing on

15 objections to other claims, Your Honor specifically said that

16 you would not reach those objections during that hearing.

17          So, the fundamental question is, what is the status

18 of those objections to those two class claims?  And I almost

19 want to sit down and say, well, once somebody tells me that,

20 then I'll say what we should do.  However, if I sit down, I may

21 not be heard again for awhile because Mr. Bernick may have a

22 long explanation.  I would suggest to Your Honor that the

23 alternatives are, as I've said at the previous two hearings,

24 either set them down for a hearing or if Your Honor feels that

25 the class action certification order disposed of them, then

J&J COURT TRANSCRIBERS, INC.

1  simply expunge the claims.

2       We're ready to go forward.  If Your Honor is not

3  going to expunge the claims, we're ready to go forward.  And we

4  would ask that you provide us a date to argue those objections

5  and maybe a date to file briefs on those objections.  And we'll

6  be heard and Your Honor will make a decision.

7       The suggestion by Mr. Bernick that somehow they

8  should be in suspense was not only a suggestion which was

9  foreign to me when he made it at the last hearing, but upon

10 research of the issue, we can find no precedent for placing a

11 matter in suspense.  Under the definition of what a claim is

12 and -- which we have filed a claim.  The claim should be

13 resolved one way or the other.  I'll probably have more to say

14 after Mr. Bernick speaks, but that's essentially it.  We're

15 ready for a hearing on these claims if Your Honor is not going

16 to expunge it.

17      MR. BERNICK:  I think where this matter was -- David

18 Bernick for the debtor -- where this matter was last time is

19 that Your Honor very acutely asked a question as to whether --

20 what claims were included within the class; that is, which

21 claims were listed in the complaints as being comprised of --

22 individual claims were listed in the complaints.

23      And at least to my understanding, the purpose of the

24 status report was to address that issue rather than going back

25 over everything all over again.  I think the answer to the

1   question has now been offered up, Your Honor.  I've seen it in

2   the briefs which is with respect to the South Carolina class,

3   there was no list attached.  And therefore, all you're talking

4   about are the Anderson Memorial claims themselves -- claim

5   itself.

6          And then with respect to the worldwide class, there

7   was a list.  But, there were no claimants listed as plaintiffs

8   -- individual plaintiffs -- in the worldwide class that were

9   different from claimants who otherwise pursued their claims

10  individually.  And therefore, to the extent that the individual

11  claims have been resolved or disposed of, they've whittled down

12  the individual claims that populate the class.  And the only

13  claims that are left in the worldwide class as individual

14  claimants are those that are either Anderson Memorial or one of

15  the 55 claims -- Canadian claims that are before the Court.

16         In other words, there were never any individual

17  plaintiffs who were encompassed in the class action claims who

18  were not also -- or who did not also pursue at some time an

19  individual claim, which is, I think, the question that was

20  posed.

21         So, with that report, I think we really come back

22  down to the same issue that we had before, which is what's the

23  proper status of a purported class action where the class

24  certification has been denied?  And my only further observation

25  on that score beyond the suggestion that we've always made is

1   that a class claim can only be filed -- can only be recognized

2   as a class claim if certification is granted.  There is no such

3   thing as a class claim in the abstract.  It's simply a creation

4   of a granted motion under Rule 26.  That motion has been

5   denied.

6          And so, all that's really left is a denied request

7   for certification.  And the most appropriate way to indicate

8   that in the docket is the class request is inactive because the

9   only way that it will continue to have any activity is for

10  purposes of any ultimate appeal.  So, we stand by the proposal

11  that we made before which is that they be -- we'll recast them

12  on Exhibit 21, or whatever it is, as being a docket entry that

13  is inactive pending the outcome of the case.

14          MR. SPEIGHTS:  Well, at least both of us have an

15  unusual way of being succinct.  However --

16          THE COURT:  That's true.

17          MR. SPEIGHTS:  However, three points.  Let me go to

18  Mr. Bernick's last point.  He says, there's no way we can have

19  a class claim.  Then the answer to that is expunge these

20  claims.  But, I want to go back to history.  And this is cited

21  in our status report.  Mr. Bernick refers to the fact that all

22  of the claims of the claimants attached to these class claims,

23  which is not only the attachment to the claims themselves, but

24  they are -- is an extensive supplementation which was made as a

25  matter of right to these claims.

1    He says, well, they were disposed of in the

2  objections to the individual claims.  However, Your Honor

3  specifically indicated when you did that that that was without

4  prejudice to their seeking recovery as part of this other claim

5  which you were not getting to at that hearing.

6         THE COURT:  The individual claim.

7         MR. SPEIGHTS:  Right.  You dealt with them because we

8  also filed -- and I believe we did so, you know, at least with

9  the understanding of the alternative the Court set forth.  We

10  don't need to get into that day.  But, we also filed the

11  individual claims on behalf of these putative members of the

12  class.  And when we did that, Your Honor said no, that's not

13  the route you should go at this hearing.  In the fall of 2005,

14  you filed class claim and we'll take it up with respect to the

15  class claim.  And these are the class claims.  But you didn't

16  dismiss them --

17         THE COURT:  I said to take up what?  I'm sorry, I

18  just lost what you were arguing, Mr. Speights.

19         MR. SPEIGHTS:  The individual claims did not come

20  before you on substantive objections.

21         THE COURT:  Right.  That's right.

22         MR. SPEIGHTS:  They came before you on authority

23  objections.

24         THE COURT:  That's correct.

25         MR. SPEIGHTS:  So, that was my third point.  It's not

1 that they've been dismissed on the merits, they were dismissed

2 because Your Honor decided that Anderson did not have authority

3 to file the individual claims. But you did so at the same

4 hearing when you said, I'm not judging now the class proof of

5 claim or the class proofs of claim, the two class proofs of

6 claim that are here. And both of those class proofs of claim,

7 of course, had the same individual claims attached to them.

8 　　　　　And while Grace made an authority objection among

9 others to these two class proofs of claim, you never heard

10 that. You still have not heard that. And that would be one of

11 the objections that we believe Your Honor should hear, whether

12 we had the authority to file those class proofs of claim if

13 Your Honor decides not to expunge them.

14 　　　　　I know this is --

15 　　　　　THE COURT:  I got lost. I'm sorry. I apologize. I

16 got lost.

17 　　　　　MR. SPEIGHTS:  I understand.

18 　　　　　THE COURT:  I heard the -- I decided that not that

19 Anderson didn't have the authority to file the individual

20 claims, but that your law firm hadn't been given the authority

21 to file the class proofs of claim. And then I looked at the

22 ratification issue because I thought perhaps it could be

23 ratified and decided as a matter of law that they couldn't --

24 the authority couldn't be given after the fact, and so

25 ratification wasn't appropriate.

1        So, the individual claims were dismissed on the basis

2   of the lack of authority to file, not on whether the claim

3   itself had some merit, but simply on the fact that it couldn't

4   be filed.  That had nothing to do with the class proof of

5   claim.  Then I looked at the class proof of claim and decided

6   for the reasons in the memorandum opinion that the class itself

7   was not able to be certified as a class.

8        So, what I'm left with, I think, is a class proof of

9   claim that has one member in it, but that class proof of claim

10  -- in allegedly in a representative capacity -- but it doesn't

11  represent anything because there's no class behind it.  And

12  that same representative also has filed an individual proof of

13  claim which hasn't come before me for any kind of adjudication.

14       So, I think I'm left with what looks to be something

15  of a duplicative record, but it isn't necessarily duplicative

16  because Anderson Memorial Hospital's underlying substantive

17  proof of claim is being adjudicated in its individual proof of

18  claim basis.  It's representational capacity is the basis for

19  the class proof of claim.  And unless and until I'm reversed on

20  appeal with respect to my rulings on the class issue, there's

21  nothing more that can be done, I don't think, on the class

22  proof of claim issue because there's no class there.  Just on

23  the statewide.  Let's just talk for a minute on the statewide.

24  I think.

25       MR. SPEIGHTS:  Well, let me try again.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.

2          MR. SPEIGHTS:  And actually, I agree with 80 to 90

3    percent of what Your Honor said and to history about the

4    hearing, I think you and I are on the same wavelength, but it

5    is what it is.  We're now at a fork in the road.  And I try to

6    keep them separate because I believe Your Honor needs to go

7    either left or right here.  Mr. Bernick purposes something in

8    the middle between the two positions.

9          One fork in the road is, you turn left, and you

10   expunge the claims because of your class action decision.

11   There is now no appeal.  The District Court has ruled and

12   re-ruled that we cannot appeal.  The District Court has not

13   considered the merits of an appeal, it just says we cannot

14   appeal now.  And if the District Court is right, we won't be

15   able to appeal given the present state of the record for

16   perhaps for years until all this gets resolved somehow, the

17   Anderson claims, et cetera, et cetera.

18         So, we say to you that one way to resolve it is to

19   simply dismiss the two class proofs of claims for reasons you

20   have generally explained that there is nothing their but the

21   Anderson building.  And the Anderson building has its own

22   claim.

23         Now, as I said last time, I don't want to be the

24   person asking for dismissal of my client's claims, but that's

25   one fork in the road which I understand the logic of what Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor has previously said that Anderson might be the only

2  claimant there.  And therefore, it's duplicative and therefore,

3  Anderson still has its claim, and just get rid of those other

4  two claims in light of the certification decision.

5        The other fork in the road, of course, is here we

6  have these two proofs of claim, one for South Carolina and one

7  for the worldwide.  And the worldwide includes the South

8  Carolina buildings, by the way, they are listed in there.

9  Okay, Your Honor has said it can't be a class, but they have

10  these other objections to it.  And one of the other objections

11  is, authority.

12        While Your Honor may say there should not be a class

13  action for not just these people, but for the entire universe

14  of traditional property damage claims within the definition of

15  the class including these people, Your Honor has not dealt with

16  the claims on behalf of these people as a part of the class

17  claim.  Your Honor has dealt that Speights and Runyan didn't

18  have authority to file individual claims on their behalf.  Your

19  Honor has never dealt with the objection as to whether we had

20  authority to file claims on their behalf as part of a class

21  action.

22        And if Your Honor would say that we did have

23  authority and that we could overcome the other objections, then

24  we have a situation in which we have a proof of claim filed on

25  behalf of a bunch of people.  You may decide, well, it should

1  be segregated.  It shouldn't be all in one claim form, it

2  cetera, et cetera.  But that issue has never been addressed by

3  Your Honor.  The authority -- we claim we had authority to file

4  a class proof of claim which would have included these specific

5  building owners, less than the total universe of the class, but

6  owned by half of these specific building owners.

7        And we think you need to address that if you don't

8  expunge the claim.  We're ready to argue if we did have

9  authority to file the class claim, the other decision is not

10 dispositive of that, your decision that we didn't have

11 authority to individual claims.  We think we had authority to

12 file the class claim.  We have these specific building owners.

13 And we think we have authority to try to recover on behalf of

14 these specific building owners attached to the class proof of

15 claim.

16       You might disagree.  But, we think the appropriate

17 time to have that argument is in the context of a hearing on

18 their objections.  And their first objection out of the box

19 was, we didn't have authority to file this class proof of

20 claim.

21       So, Your Honor, I keep going back to where we were.

22 You know, we think there is no authority in the world on a

23 proposition -- and we found none.  And I'm pretty confident

24 there's none because not only did we find none, they cited none

25 in their status report for the proposition of purgatory, the

1  proposition that these claims are just here until, you know,

2  sleeping, or dormant, or moot, or suspense, or whatever for

3  ever and ever.

4          I just don't think that.  If there's some decision on

5  point, it's even that people are entitled to have claims and

6  lawsuits resolved.  President Clinton learned that in <u>Jones v.</u>

7  <u>Clinton</u>.  He said, I'm president.  I got to take care of other

8  things.  And Ms. Jones' lawyer said, no, man, she's entitled to

9  her day in court.  Well, these claimants are entitled to their

10 day in court.  Either they need to be dismissed or we need to

11 have a hearing on the objections.  And I've said the same thing

12 for three hearings.  And I don't know that I can say it any

13 other way, but we'd ask you either to -- if you're not going to

14 dismiss them, set them down for a hearing.

15         THE COURT:  Okay.

16         MR. BERNICK:  Why this is a torrent of words and

17 distinctions that has no relationship to class action practice,

18 Rule 26 or anything else.  And, you know, we'll go through it.

19 First of all, he says, dismiss the class proof of claim.  You

20 should dismiss the class proof of claim.  And the answer is

21 that there is nothing to dismiss.  The nature of a class claim,

22 it is a creature of a decision under Rule 26.  There's no --

23 class claims don't exist in the air.  They exist purely and

24 simply as a feature of procedural practice under the Bankruptcy

25 Code going all the way back to <u>American Reserve</u>, you can't file

1  a motion for class certification within the context of a

2  bankruptcy proceeding where there's an adversary matter.  That

3  was somewhat controversial at the time, but it's been accepted

4  by many courts.

5         So, what means is that as you would in an ordinary

6  case outside of Chapter 11, you can file a motion for class

7  certification.

8         There -- if the motion for class certification is

9  granted, then a class claim can be pursued, and only in that

10  instance.  So, there is a direct lock and key tie between a

11  granted motion for class certification and the pursuit of a

12  class claim.  If you don't have a motion that's been granted,

13  there is no class claim.  You may have a piece of paper just

14  like you have a class action complaint outside of Chapter 11,

15  but there's no class action.

16         Class certification is denied outside of bankruptcy.

17  You don't continue to refer to it as a class action.  You just

18  refer to it as an individual claim brought by the named

19  representative on his or her own behalf.  The practice is no

20  different in bankruptcy.  All the bankruptcy does is

21  incorporate Rule 26.  It doesn't change the substantive or the

22  procedural law of Rule 26.

23         So, he says, I have filed a class proof of claim.

24  They decided to go ahead and do it.  It isn't a claim.  It's a

25  piece of paper because it seeks and depends upon certification

1  of the class.  So, in the first alternative, you just simply

2  dismiss the class proof of claim.  That suggests there is

3  something to dismiss.  There's nothing to dismiss.  It is

4  simply a piece of paper.  Class certification has been denied.

5  It might be revived again later on as Mr. Speights

6  acknowledges, maybe it'll happen years later.

7         But there is no proof of claim period.  A piece of

8  paper, yes, just like you have a class action complaint, yes.

9  But once certification is denied, there's no class action,

10 there's no class claim because --

11        THE COURT:  But, there is a complaint.

12        MR. BERNICK:  There is a complaint but you -- in

13 ordinary Rule 26 practice --

14        THE COURT:  I think I have the resolution to this.  I

15 think the only thing that's left in these two class proofs of

16 claim, the worldwide and the state is Anderson Memorial.  Why

17 can't I consolidate all three class -- all three proofs of

18 claim into the one Anderson Memorial that is pending?

19        MR. BERNICK:  As being an Anderson Memorial claim.

20        THE COURT:  Memorial -- yes.

21        MR. BERNICK:  But, only as an individual claim.

22        THE COURT:  Yes.  That's all that's left.

23        MR. BERNICK:  That's true.  That's all that's -- that

24 is absolutely all that's left.

25        THE COURT:  That takes --

1          MR. BERNICK:  If you were to consolidate all of them,

2   that's a neat solution, you would have then the residue of

3   whatever was left from the class claims.  And you would have

4   the individual -- that's the representative -- let's call it

5   the representative claim.  And you'd have Anderson Memorial

6   individual claim.  That's correct.

7          But at that time, I'm highly confident that Mr.

8   Speights would come back and say, well, yeah, you've

9   consolidated it, but now you still have to figure out what to

10  do with the balance of the claim, that is the class portions of

11  the claim  --

12         THE COURT:  There are no class portions of the claim.

13         MR. BERNICK:  That's correct.  And then the further

14  argument that he raises -- and I'm not disputing Your Honor's

15  move, but just to get maybe to the end game here so that we can

16  move on -- he suggests that there remain live issues as a

17  consequence of those class claims having been filed.

18         Which live issues have not been resolved.  And the

19  answer to that is that there are none.  He has said, well,

20  Grace made objections to the classes.  Yes, that's true that

21  Grace did make objections to the classes; it made a lot of

22  different objections.  But none of those objections need to be

23  resolved because there is no class with respect to which they

24  pertain.

25         So, his idea that somehow we've made all these

1  objections, let's go ahead and rule on the merits of the

2  objections is false because those objections were made on the

3  assumption that there was a real claim to answer.  If there is

4  no class certification and there's no class claim, there's no

5  need to address any of those objections.

6           THE COURT:  Well, then you can withdraw them.

7           MR. BERNICK:  Well, but we had to be careful we can't

8  withdraw them because in the event that the class claim is

9  later recognized when Mr. Speights ultimately has an appeal, we

10 don't want to be accused of having waived our rights or

11 withdrawn our objections to class -- if Your Honor were

12 ultimately to be reversed, we'd want to have those objections

13 there.  But they're certainly not right because the predicate

14 for their being an objection to something is no longer there;

15 that is, the class claim.

16          The third argument that he makes, he says that

17 there's live issue, is also wrong.  He suggests that well, Your

18 Honor, determined -- and we went along with it, he says -- that

19 there was no authority to file the individual claims, no

20 authority within Speights and Runyan to file the individual

21 claims.  He thereby suggests however that there was still out

22 there, the issue of whether Speights and Runyan now acting as

23 counsel to Anderson Memorial as a class representative had the

24 authority through Anderson Memorial as a class representative

25 to file a class action including the individual claims that

1    Speights and Runyan did not have the authority to file as

2    individual claims.

3        And you know it's a lot of words, but it again makes

4    the same fundamental mistake.  It doesn't make any difference

5    if Mr. Speights had the authority to file the class action as a

6    class action because if the class doesn't exist because there's

7    no certification, you never have to reach the authority issue

8    which is exactly where we are.

9        There's no way that Mr. Speights having the authority

10   to file the class action -- if he did ever have the authority

11   to do that -- thereby acquired the right on behalf of his firm

12   to include as individual members filing claims as part of that

13   class the same individual claimants that Your Honor found that

14   he didn't have the authority to pursue individually.

15       And that's where his torrent of words becomes

16   confusing is that you have the individual claimants.  They're

17   the same people with their individuals here as if they are

18   individuals who are named as individual plaintiffs in the class

19   action.  He can't have any more authority to represent them

20   individually when filing individual claims than he can have to

21   include them as individual claimants who are as part of the

22   class.

23       So, if he didn't have any individual -- any authority

24   to file them individually outside of class, he has no authority

25   to file them individually as part of the same action that Mr.

1 Anderson Memorial is bringing in his representative capacity.

2 There is no separate authority issue.

3        So, the only question is, well, what about the

4 authority to file the class, that is, for him to file Mr.

5 Anderson Memorial's claim as a representative?  We don't

6 dispute that he had the authority of Mr. Anderson to file both

7 of those things.  It's irrelevant though because we don't

8 dispute that he can proceed on behalf of Anderson Memorial

9 individually.  And although, he may have had the authority to

10 represent Mr. Anderson in filing Anderson as a representative,

11 the representative status has been denied.

12        So, there's nothing about any of that; that is,

13 Anderson as individual, Anderson as representative that in any

14 way confers an additional authority to represent the

15 individuals either outside of the class or in the class.  And

16 that's where he tries to create the appearance of their being

17 an active issue whereas in fact there is none.

18        So, we don't think you need to dismiss the class

19 proof of claim.  There's nothing to dismiss.  We have no

20 objection to the consolidation.  But, we don't believe

21 therefore that it's necessary to do anything beyond the

22 consolidation.  If the consolidation takes place, things stand

23 exactly where they are.  We've got no issue with that at all.

24        THE COURT:  Mr. Speights?

25        MR. SPEIGHTS:  Well, we certainly get less and less

J&J COURT TRANSCRIBERS, INC.

1  succinct as we go along and be off on a torrent of words.  Just

2  let me say this directly, Your Honor.  We would not agree, we

3  would not consent to the consolidation.  We believe that if

4  such a procedure is going to be proposed, it ought to be

5  proposed by a motion from the debtor at which time we would

6  brief that.  Of course, Your Honor, has raised that for the

7  first time here.  And I'm not sure I've thought it through, but

8  we certainly think it should be by motion and by briefing for

9  Your Honor on whether that's a remedy.

10       But, we don't think is -- reacting to it initially --

11 that that really is a representation of what -- a fair

12 representation of what's happened here because if you

13 consolidate it, in a sense, you're dismissing it.  You are

14 saying that there's nothing there anymore except the Anderson

15 claims.  And if that's the case, then they should just go by

16 the wayside.  We think there is something there for reasons I

17 keep saying.

18       We think there is a question of the objection.  They

19 could have objected and moved to consolidate back in 2005.

20 They chose to file separate objections to the separate claims.

21 And they chose to file separate objections to these separate

22 claims.  And they chose as we all know to even include them

23 separately in their plan as active claims now.

24       And the fact that there is no class as of now -- Your

25 Honor has ruled and we understand that -- does not mean that

1   these people, these claimants do not have arguments to make

2   with respect to the claim that has been filed on their behalf.

3   We didn't have authority to do it the other way.  Your Honor,

4   just has not reached the issue of whether we had the authority

5   to do it this way.  They file an objection to authority.  Let's

6   tee it up and hear whether we have the authority.

7           THE COURT:  Well, how would you have the authority to

8   do indirectly what you don't have the authority to do directly?

9           MR. SPEIGHTS:  Because of the case law, Your Honor,

10  we believe -- first of all, there are three ways that were

11  discussed doing it in 2002.  I've actually spent many an hour

12  reading all three hearings in 2002 on this.  And there were

13  three reasons -- three ways to discuss with the Court.  One way

14  was to file just a class proof of claim, no attachments.  And

15  Your Honor recognized that some courts had said, that's okay,

16  do it that way.

17          Second way would be to do what was presented in the

18  Interregional case was to file a class proof of claim but

19  attach the list of buildings or claimants that would be in the

20  class action.  And Your Honor said something kind about the way

21  Judge Gambardella did it in that situation.

22          And the third way would be to file, in Your Honor's

23  words, either a list or individual claims on behalf of these

24  other people, that that's also a possibility of doing it.

25          And we did it all three ways.  And Your Honor has

clearly and unmistakably said, Number 3 is a no.  We don't need
individual proofs of claim especially when we have the class
proof of claim, and in this situation especially when they have
the class proof of claim with these -- with our list -- Judge
Gambardella list as I would call them.

So, you ruled on three.  You ruled I can't be a
class, but we believe we had authority to do it the way Judge
Gambardella said to do it even if we didn't have authority to
file individual claims on their behalf.  And we're really
seeping into the merits now, but that's what we would argue if
we had a hearing on their objections to do these two class
proofs of claims.

The real issue is suppose Your Honor says, okay, I
think you did have authority to do it that way and you filed
these individual -- you attached these individual claims, what
next?  And I'm sure Mr. Bernick would argue strenuously, so
what?  Dismiss them.  And I've got an answer to that, too.  But
that's when we argue the merits if and when we argue the merits
of their objections to these claims.

THE COURT:  Okay.  I will give this some thought.  My
-- I think my instinct at this point is telling me that given
the current status of the case -- of the claims, that the best
way to do this is to consolidate them.  They can always be
deconsolidated in the event that the Circuit or the District
Court decides that there was a mistake on my part and that

1 there should have been some class certification.  They can be

2 deconsolidated if in fact there are additional claims that have

3 to be litigated.

4 　　　　But right now, based on my ruling, there is only one

5 claim that has to be litigated and that's Anderson Memorial's.

6 So, I think that the best way to keep the claims alive because

7 I don't -- I disagree, Mr. Speights, consolidating them doesn't

8 dismiss them, in fact, it keeps them open.  So, I think the way

9 to keep them open and to get a fair resolution is to

10 consolidate them.  That will let them go marching down whatever

11 path is there.  And in the event that I'm reversed, the claims

12 will still be there.

13 　　　　I don't think it's appropriate to dismiss them to the

14 extent that they -- well, I guess they could be dismissed

15 without prejudice in the event that I'm reversed, then they can

16 always be reinstated.  In fact, the Appellate Court will

17 undoubtedly say to reinstate them, and that's how -- that's

18 what would happen.  So, I don't think that the claimants would

19 be prejudiced in any respect.  In any event, I suppose that's

20 another way to do it.  But, I'm not sure that it's necessary.

21 I think consolidation might be the way.

22 　　　　So, I'll take a look at it.  But I'm fairly certain

23 that that's what might be appropriate.  If you want to file

24 something supplemental, I'll give you a couple days to do it.

25 If you -- I know I've raised this for the first time today,

**J&J COURT TRANSCRIBERS, INC.**

1 didn't really occur to me until today, Mr. Speights, so you

2 want to take a look at this issue, I'll give you some time.

3 But, I'm inclined to think that that may be the best way to

4 proceed.

5      MR. SPEIGHTS:  I'll advise your assistant whether we

6 wish to file anything on that issue.  I'll certainly will let

7 her know in the next couple of days whether we want to file

8 something.

9      THE COURT:  I'll just build in some time and I won't

10 issue a ruling before that date.  I know the holidays are

11 coming up.  Just tell me how much time you'd like and I'll just

12 wait that long.  And if you file something, I'll read it.  And

13 if you don't, I'll know you're not going to.  And this goes for

14 the debtor, too, both sides because --

15      MR. SPEIGHTS:  Ten days is enough, Your Honor.

16      THE COURT:  All right.  Parties may file a brief on

17 -- and it can be a letter brief, it doesn't have to be anything

18 formal.  A letter brief is fine -- on the issue of

19 consolidating the proofs of claim by -- how about December 7?

20 And if not, file -- if nothing is filed, this is a matter under

21 advisement at that time.

22      MR. SPEIGHTS:  And Your Honor, just to be clear, if

23 we don't --

24      THE COURT:  Oh, I'm sorry, Mr. Speights, I was

25 looking -- I apologize.  I was looking at the 2009 calendar,

1  that's a Sunday.  So, I'm actually going to make this December

2  15.  I'm going to be out of town all of that week trying a case

3  any way.  So, I'll say by December 15, that's when I get back.

4  If I don't have anything from you by then, then I'm going to go

5  ahead and take a look at this issue.  I apologize, sir.

6           MR. SPEIGHTS:  I understand, Your Honor.  Just for

7  the record, if we decide not to file something, it won't be

8  interpreted as any waiver of our position that we should not be

9  doing this?

10           THE COURT:  Oh, no, no, no.  No, certainly.

11           MR. SPEIGHTS:  Thank you, Your Honor.

12           MR. BERNICK:  Your Honor, I doubt that we'll need --

13  I'd like not to file a piece of paper until I see what -- if

14  Mr. Speights files and if so, what he has to say.  So, would it

15  be appropriate -- can we just wait to see what he says and then

16  file a response if we think it's appropriate or --

17           THE COURT:  Well, I was hoping that maybe I could get

18  both parties together.  But, okay, then let me see --

19           MR. SPEIGHTS:  Your Honor, I'd rather move up my time

20  so we don't delay this unnecessarily.  So, you can give me a

21  little less time.

22           THE COURT:  All right.  How much time would you like

23  then, Mr. Speights?

24           MR. SPEIGHTS:  Ten days is fine, Your Honor.

25           THE COURT:  All right.  That would be by December

1  8th.

2           MR. BERNICK:  And we can file by December 15 if we

3  have anything.

4           THE COURT:  All right.  That's fine.

5           MR. BERNICK:  Thank you.

6           THE COURT:  Okay.  And if I don't get anything by

7  anyone then, then I'll take a look at the issue at that time.

8  Okay.  Thank you.

9           MR. BERNICK:  May I please be excused, Your Honor?

10          THE COURT:  Yes, sir, thank you.

11          MR. BERNICK:  And let Mr. Restivo who as always has

12  been most patient.

13          MS. BAER:  Your Honor, I'm going to ask to be

14  excused, too.

15          THE COURT:  Okay.  This was -- I'm sorry -- Item 14,

16  correct?

17          MR. BERNICK:  Right.

18          THE COURT:  All right.  Thank you.  Yes, Happy

19  Thanksgiving everybody who's leaving.

20          MR. BERNICK:  Thank you, Your Honor.

21          MS. BAER:  Thank you.

22          MR. FRANKEL:  Your Honor, we're also going to be

23  leaving.  Thank you.

24          THE COURT:  Thank you.  Mr. Restivo?

25          MR. RESTIVO:  I think I've cleared the house, Your

1 Honor.

2        THE COURT:  It's -- I don't know if that's a good

3 thing or a bad thing, but --

4        MR. RESTIVO:  I'll approach it this way, Your Honor.

5 Item Number 8 was the settlement of 50 University of California

6 cases.  The Court signed an order on that.  Item Number 9 was

7 settlement of Children's Hospital.  An order has been signed on

8 that.  As promised, Your Honor, once we got all three of the

9 hospitals signed up, we would submit to the Court a consent

10 order dismissing as moot, the motion to alter or amend with

11 respect to those three hospitals.  And Mr. Speights and I have

12 agreed that now that Children's Hospital has been entered, we

13 will send him a draft order and then provide it to the Court.

14        THE COURT:  All right.

15        MR. RESTIVO:  Your Honor, initially argument on

16 Grace's motion for summary judgment on the Canadian cases was

17 set up with the idea that there wasn't much on the agenda.  We

18 would start arguing about 3 o'clock and that we would have no

19 more than an hour apiece.  I will try to be brief.  I know Mr.

20 Ferry will try to be brief.  But we do have an argument on the

21 Canadian claims.

22        The good news is the fact that we had this argument

23 was very helpful in that on Friday, the 19 Canadian cases which

24 were subject only to the regular statute of limitations were

25 settled.  It's true that we have a regular statute of

1  limitations argument also on the remaining 35 cases. We're

2  going to defer that argument.  We don't think we need it.

3  Speights & Runyan agree that if we have to raise that later

4  we'll raise it later, but we should shorten the argument and

5  only deal with the ultimate statute of limitations today.

6        THE COURT:  Okay.  And are you going to be filing a

7  motion -- a 9019 motion on those 19?  How --

8        MR. RESTIVO: Yes, Your Honor.  We owe you some

9  settlement papers on the remaining American cases and we also

10 will have to draft up a settlement on those.

11       THE COURT:  All right.

12       MR. RESTIVO:  With respect to what's left, Your

13 Honor, I'm going to hand to your staff a new order which

14 disallows and expunges 35 Canadian claims barred by the

15 ultimate statute of limitations because any of the draft orders

16 you have are now incorrect.  They deal with 55 or 54 claims.

17 The remaining 35 are on this proposed order.

18       THE COURT:  All right.  But this isn't consented.

19 This is for today's argument.

20       MR. RESTIVO:  No, no, this is not consented.  And I

21 gave a copy to Mr. Fairey.  He needs to check the numbers.  I

22 think they're correct, but anything you have now as proposed

23 orders are clearly incorrect given the settlements.

24       THE COURT:  All right.

25       MR. RESTIVO:  It is not filed.

1          THE COURT:  Just hang on to it.

2          MR. SPEIGHTS:  Your Honor, I'm just -- I'm going to

3   respond to the settlement which we negotiated on Friday.  I

4   actually don't have a list of the claims with me.  I think Mr.

5   Restivo's numbers are probably right, but I'm not positive.

6   But what we settled was those outstanding Canadian claims which

7   did not involve an ultimate statute of limitations argument.

8   Ultimate's being argued today.  And, of course, the settlement

9   is subject to client approval.  Mr. Beeper and I who negotiated

10  the settlement understand that and we're going to quickly try

11  to get all of that done.

12         THE COURT:  All right.  Let me just make a note.

13  Okay, now what item are we on on the agenda, Mr. Restivo?

14         MR. RESTIVO:  This would be Item 11, Your Honor.

15         THE COURT:  Okay.  Thank you.

16         MR. RESTIVO:  And, Your Honor, to make things clear,

17  our original motion dealt with 88 Canadian claims.  And the

18  briefs which you have in your bench books will variously talk

19  about 88 or 89 Canadian claims or 55 Canadian claims.  We are

20  now down to 35 Canadian claims.  The law in the briefs are

21  still good, but it's a little bit confusing because the numbers

22  have changed.  The 35 Canadian claims, Your Honor, consist of

23  one in the Province of British Columbia, one in Manitoba, and

24  33 in Alberta.

25         I need to give a brief procedural background as part

**J&J COURT TRANSCRIBERS, INC.**

1  of this reargument.  We filed the motion in February 2007, we

2  supported the motion, Your Honor, with an expert report of

3  Graeme Mew the foremost authority on statutes of limitations in

4  Canada.  We also filed with our motion admissions from the

5  claims files dealing with installation dates, and an affidavit

6  verifying that Grace stopped selling products in Canada at the

7  end of 1975.

8          In March of 2007 Speights & Runyan responded.  They

9  filed an opposition to our motion.  In that opposition they

10  argued that any Canadian limitation periods were tolled, but in

11  1992 Anderson Memorial putative class action filing.  On March

12  23 we replied to that and we included an affidavit of Graeme

13  Mew addressing the class action tolling argument.  And then in

14  April of 2007 we were going to argue the motion.  Mr. Speights

15  indicated that he needed to take Mew's deposition a second

16  time.  The Court said that was fine, and so he did that on May

17  11.  Your Honor, also raised an issue in response to some

18  arguments whether or not the expert report of Mew constituted

19  hearsay.  We advised the Court and Speights & Runyan that when

20  he retook the deposition of Mew we would then ask questions to

21  avoid the argument that the report was hearsay, and we did

22  that.

23          On May 30, 2007 Your Honor ruled on an issue that had

24  been raised as to whether or not ultimate statute of

25  limitations had been raised as a defense.  The Court decided

1  that it had.  When the Court made that ruling Mr. Speights

2  indicated that in light of that ruling he may have to retain an

3  expert not only on class action tolling, but also on ultimate

4  limitations in Canada.  Mr. Speights retained Professor John

5  Irvine.  We got Irvine's report at the end of July.  We noticed

6  the deposition of Professor Irvine notwithstanding the fact

7  that he admitted that he wasn't qualified to testify on class

8  action tolling or conflicts of law or American law.  When Mr.

9  Cameron showed up at the deposition in Chicago on August 22

10  Professor Irvine had a draft of a new report that he hadn't

11  finished yet.  I believe we bellyached a little bit to this

12  Court.  I think we bellyached to Speights & Runyan and as a

13  result we were able to redepose Mr. Irvine on August 31.  Given

14  all that Your Honor said the parties could submit supplemental

15  materials on September 6th, and we did so.

16      The material submitted, Your Honor, today are in six

17  binders which bear the legend, Matter Number 11 Canadian

18  Claims."  Binder 1 is our original summary judgment motion with

19  attachments.  Binder 2 is the Speights & Runyan response with

20  attachment.  Binder 3 are our replies to the response of

21  Anderson Memorial.  Included in that are extracts from the

22  depositions of Mr. Irvine.  Binders 4 and 5 have reported

23  decisions and some legislative history.  And binder 6 contains

24  the rest of that plus a post-hearing memorandum filed by

25  Anderson Memorial.

1          Now, Your Honor, despite the fact that there are six

2    binders of material the debtor's motion is very simple and is

3    based on undisputed, discreet, well established facts and law.

4    As Graeme Mew has explained the Canadian ultimate limitations

5    periods are ultimate cutoff points within which time a claim

6    must be brought regardless of when the claims were or ought to

7    have been discovered.  In other words, the Canadian ultimate

8    limitations periods run from a date certain regardless of

9    knowledge.  In that respect in the past I have compared them to

10   statutes of repose in the United States.  There's no dispute on

11   that point and both Mr. Mew and Mr. Irvine are in complete

12   agreement on that issue.

13          I've indicated the three Canadian provinces.  In

14   Alberta the ultimate limitation period is ten years, and in

15   British Columbia and Manitoba it's 30 years.  The simple legal

16   issue for this Court to decide is when does the ultimate

17   statute of limitations period begin to run under Canadian law.

18   As Mr. Mew has made clear under Canadian law the ultimate

19   limitations periods runs upon the installation of an allegedly

20   defective product.  The claimants here do not dispute the dates

21   the products were installed.  Based upon when they were

22   installed they are barred under Canadian law these asbestos and

23   building claims are only recognized as claims for pure economic

24   loss.  I believe both experts agree with that.  In any event

25   it's controlled by the Supreme Court of Canada decision in the

1 <u>Winnipeg Condo Corp</u> case.  And in <u>Winnipeg Condo</u> the Court held

2 that a claim for the cost of replacing the external material on

3 a building after a large hunk of masonry fell down years after

4 construction was a claim for pure economic loss and it did not

5 arise from any injury to persons or property.

6        Prior to <u>Winnipeg Condo</u> such a claim didn't even

7 exist in Canada.  <u>Winnipeg Condo</u> created an exception to that

8 rule by saying if the allegedly defective product posed a real

9 and substantial danger you could have a claim for pure economic

10 loss.  Therefore these claims in Canada for asbestos property

11 damage are negligent claims for pure economic loss.  Graeme Mew

12 says it, Professor Irvine says it, and the only asbestos and

13 building case in Canada, <u>Privest</u> says it.  <u>Privest</u>, Your Honor,

14 comes out of the British of Columbia and so I want to start

15 with the one British of Columbia claim first.

16        British of Columbia has a 30 year ultimate statute of

17 limitations.  It specifically says it begins to run on the date

18 on which the right to do so arose.  To do so meaning to have a

19 claim.  <u>Privest</u> dealt specifically with this language, not with

20 the ultimate statute of limitations, but with a normal statute

21 of limitation which contains the same language.  And in <u>Privest</u>

22 the Court first assumed that there was something wrong with the

23 product.  In other words, the Canadian court recognized that

24 Grace, in order to raise the statute of limitations, didn't

25 have to first come in and admit that its product was defective

1  or that its product was dangerous.  Grace could assert no

2  danger to the product and also assert a statute of limitations

3  defense.

4        Judge Drost asked when did the cause of action arise?

5  He concluded that in British Columbia, as in the other

6  provinces, the cause of action accrues when all constituent

7  elements exist.  And he held as a matter of law that all of the

8  elements existed.  "They came into existence during the period

9  1973 to 1975 when the MK3 was installed in the building.  The

10  Court then applied Winnipeg Condo to the claim and hailed that

11  the cause of action was for economic loss under Winnipeg Condo,

12  and that it was barred by the six year statute of limitations

13  because more than six years had elapsed before plaintiff filed

14  suit from the date of installation.

15        There's no dispute that Privest is the only Canadian

16  opinion to deal with this issue.  There's no dispute what

17  Privest holds.  Mr. Irvine agrees.  Mr. Irvine agrees that the

18  Court in Privest adopted installation as the trigger period for

19  the running of a limitations period, he agrees that the

20  adoption of the installation trigger was an issue of law, he

21  agrees that the adoption of the installation trigger has never

22  been challenged in the more than ten years since Privest was

23  decided.  And he agrees that Privest was affirmed on appeal.

24  Thus, under Privest British Columbia's ultimate limitation

25  period ran from the date of the installation of Grace's

1  products.

2          I indicated, Your Honor, that <u>Privest</u> was

3  subsequently followed by the British of Columbia courts, the

4  cases are cited in our brief.  A short survey in the <u>Emm's</u> case

5  (phonetic) the Court held that, "Negligent inspection and

6  negligent construction of a building on unstable ground in 1972

7  were time barred even though plaintiffs did not become aware of

8  the defect until 1996 because of the statute of limitations."

9  The British Columbia Court of Appeal in <u>Dayu</u> (phonetic) applied

10  the ultimate statute of limitations after <u>Privest</u> with respect

11  to defective construction and inspection of an apartment

12  building in 1968 which didn't cause damage until 2002.

13          In <u>Armstrong v. West Vancouver</u> the British Columbia

14  Court of Appeal applied <u>Privest</u> in a negligent inspection and

15  construction that occurred in 1963 and the defect was not

16  noticed until expiration of the ultimate period.  Accordingly,

17  it's not surprising that in his original report Professor

18  Irvine concluded as follows, "Hence on authority one must

19  conclude that in British Columbia the cause of action in this

20  class of case arises not when damage becomes discoverable, but

21  as soon as it is inflicted, and in economic loss cases found

22  that ultimately on <u>Winnipeg Condo</u> it will be deemed to have

23  been inflicted as soon as the defective elements are

24  incorporated in the building whether or not it threatens

25  danger."

1       Claim number 11632 states that the product was

2  installed in the 1960s therefore the 30 year ultimate statute

3  has run.  The only -- I'm not going to say the only -- an

4  argument --

5       THE COURT:  I'm sorry, give me the claim number,

6  please.

7       MR. RESTIVO:  Yes.  It is claim number 11632.  An

8  argument claimants seem to make to get away from this

9  conclusion is a citation to the British Columbia Law of Reform

10  Commission report which are in the Court's bench binders.  And

11  it is true as they cite in one of their briefs that that

12  commission stated, "Allowing time to run from the act or

13  omission could result in the denial of recovery before damages

14  even occur."  The commission did say that, and they cited it

15  correctly.  What they neglected to provide to Your Honor in

16  their brief was the next sentence of that report which says,

17  "As objectionable as this might seem to bar a cause of action

18  before it comes into being the advantages of certainty as to

19  the commencement of the ultimate limitation period outweigh the

20  disadvantage of barring a small number of inchoate claims."

21  And so the commission concludes that where an action is based

22  upon an act, omission or breach of duty the ultimate limitation

23  period should run from the date of the act, omission or breach,

24  and that's exactly what the statute in British Columbia does.

25       I'll turn to the Province of Alberta.  There are 33

1 Alberta claims, Your Honor.  They are all barred by Alberta's

2 ten year ultimate limitation period.  That period begins to run

3 when debtor's conduct occur and that can be no later than when

4 the Grace products were installed.  The issue under the Alberta

5 statute like the other statute of when damages occurs is

6 irrelevant for purposes of the ultimate statute of limitations.

7 This is made clear in the legislative history which are in the

8 Court's binders.

9        The drafters of the ultimate limitation period made

10 it clear that for good policy reasons the ultimate limitation

11 period has to commence with the alleged negligent conduct and

12 not with the result or consequence of that conduct.  And so in

13 1986 ALRI which is the commission in that province said, "The

14 ultimate period must begin at the time of a defendant's

15 negligent conduct even though that conduct will not be legally

16 wrongful unless it produces damage at sometime, perhaps many

17 years later."

18        In 1989 a similar commission issued a similar report

19 saying a claim based on breach of duty arises when the conduct,

20 act or omission occurred.  The ALRI also noted that it's true

21 when you have an ultimate statute or what I call a statute of

22 repose in the U.S., it's true that the limitation period may

23 expire before the claim has even accrued and maybe before

24 damage has even occurred.  And they noted, "This problem of

25 legal principle is inescapable because there is no feasible

1  alternative consistent with the limitation policy."  The

2  limitation policy being things must come to an end, you must

3  have a date certain to measure ultimate limitations.

4         The case law in Alberta is consistent with this

5  legislative history.  We cite the <u>Meek</u> case from the Alberta

6  Court of Appeals.  There an oil company did not realize it was

7  supposed to pay royalties to trust beneficiaries.  The

8  royalties discovered that they weren't -- the beneficiaries

9  discovered many years later that they hadn't been paid

10 royalties.  The Court rejected some theory of continuing course

11 of conduct and applied the ultimate statute of limitations

12 holding that even though the beneficiaries didn't know and

13 perhaps couldn't know you can have no effective stop loss

14 statute unless you have a date certain when it begins and a

15 date certain when it ends.

16        In <u>Bowes v. Edmonton</u> the same Court ruled that

17 construction of railroad banks which collapsed after the

18 expiration of the ultimate limitation period were barred by the

19 ultimate limitation statute.  The same court took the same

20 position where there was an initial infestation of weeds on

21 farmlands in 1986 and more than ten years later the weeds

22 became evident.  Even Professor Irvine, plaintiff's expert,

23 agrees that the intendment of the statute is that acts and

24 omissions commence the ultimate limitation period and damage is

25 irrelevant.

1          There's no dispute as to either the dates of

2    construction where the eight Alberta claimants gave date, or

3    that Grace stopped selling at the end of 1975 under the actual

4    dates for the 1975 stoppage plus ten years, the 33 Alberta

5    claims are barred.

6          There's a suggestion in Alberta from Speights &

7    Runyan that maybe the ultimate statute refers only to breach of

8    duty cases, and what they really have are property damage cases

9    and so maybe they can dodge the ultimate statute on that basis.

10   Privest and Winnipeg Condo clearly state this is a breach of

11   duty case.  And in any event negligent property damage claims

12   are negligence claims and negligence starts with a breach of

13   duty and that argument simply will not hold water.  Therefore

14   it's not surprising that in Professor Irvine's original report

15   he concludes, quote -- this is on Page 28, "Therefore, if

16   Alberta claimants are deemed in law now to be outside the class

17   action their situation is perilous."  The only change Grace

18   would make to that quote is it's not only perilous it's fatal.

19         Finally, Your Honor, there's one claim in Manitoba

20   which has a 30 year ultimate statute.  This is claim number

21   11620.  The Grace product there was installed in 1956.  Grace's

22   expert Professor Irvine conceded that under these

23   circumstances, quote --

24         THE COURT:  Grace's expert?

25         MR. RESTIVO:  I'm sorry, Your Honor, plaintiff's

1 | expert, Professor Irvine, --

2 |         THE COURT:  Okay.

3 |         MR. RESTIVO:  -- conceded, "It is very, very likely

4 | that the ultimate limitations period would cut short this

5 | action."

6 |         I should point out, Your Honor, that at the argument

7 | in September of last year while the Court made no rulings the

8 | Court's reaction was not unlike that of Professor Irvine.  Your

9 | Honor indicated at pages 101, 102, "For the ultimate

10 | limitations period the knowledge is irrelevant.  It's simply a

11 | time period from the date of installation."  You go on to talk

12 | about whether it's a statute of repose in the United States or

13 | whether it's this Canadian one, an injury that manifest itself

14 | later.  It's too bad.  You're out of court when the repose

15 | period's over.  That's the purpose of the ultimate limitations

16 | period.

17 |         With respect to Manitoba there's a suggestion in some

18 | of the papers from Speights & Runyan, I believe, that one might

19 | be able to toll the running of the statute in Manitoba by

20 | fraudulent concealment.  If that is their argument that simply

21 | is incorrect as a legal matter.  In the Manitoba case of <u>Emm v.</u>

22 | <u>Roman Catholic Church</u> decided by the Manitoba Court of Appeals

23 | in 2001, Indians who were allegedly sexually abused as children

24 | in a church school filed an action more than 30 years from the

25 | date of the alleged harassment or sexual abuse.  The Appellate

1 Court in Manitoba cited the law of reform commission of British

2 Columbia for the proposition that the limitations period

3 commences when damage occurs whether the plaintiff has the

4 means of knowing the fact or not.

5   A legislative long stop provision, what I call a

6 statute of repose, in Canada is called a long stop provision.

7 That's what the ultimate statute is called in the case law and

8 in some of the legislative history.  A legislative long stop

9 provision proscribes a date by which courts and parties alike

10 are obliged to recognize that there has been closure.  Not

11 surprisingly they cite Graeme Mew's book on the statute of

12 limitations.  And most importantly they say quote -- and

13 they're talking now about the British Columbia statute and

14 report which they are using to interpret the Manitoba statute.

15 "Once again a postponement under Section 6 (postponement of

16 concealed causes of action) resulting from plaintiff's

17 ignorance of the material facts will not affect the running of

18 time under the ultimate limitations period which operate

19 independently of plaintiff's state of knowledge."

20   So these 35 claim are barred by the ultimate statute

21 on the merits and will quickly deal with some arguments I think

22 Speights & Runyan have made.  First they say the running of the

23 ultimate statute was tolled by the Anderson Memorial class

24 action in South Carolina in 1992.  There are at least four

25 reasons why this is not a strong or a good or a valid legal

1  argument.  First, as a matter of law, U.S. law, the Canadian

2  claimants were never members of the Anderson Memorial putative

3  class.  South Carolina's door closing statute precludes

4  nonresidents whose claims did not arise in South Carolina from

5  suing there, and we know that the Anderson Memorial Court made

6  that clear in a decision of the Court has heard a lot about

7  already.

8         Secondly, if you look at Canadian law as explained by

9  Mr. Mew the Anderson Memorial case did not and could not toll

10  any Canadian limitations periods because the Canada class

11  action tolling provisions were not even in effect when Anderson

12  Memorial was filed, and they do not apply retroactively.  The

13  class proceedings act enacted in these provinces by their terms

14  do not apply to actions begun prior to their effective date and

15  there's no dispute that the effective date was after Anderson

16  Memorial.

17         Third, as Mr. Mew explains there's simply no Canadian

18  authority for the proposition that a foreign class action can

19  toll a Canadian limitation period.  Not only is there no law

20  that suggests that the only case in the area seems to suggest

21  to the contrary in Canada.

22         And finally, as explained by Mr. Mew any theoretical

23  tolling would run afoul of the Canadian ultimate limitations

24  policy which is to have a date certain for the start and a date

25  certain for the finish of the ultimate limitation period.

**J&J COURT TRANSCRIBERS, INC.**

1  Therefore the class action argument is of no avail.  In any

2  event, the 33 Alberta claims and the one Manitoba claim would

3  still be barred.  One, because of the ten year statute, the

4  other because construction was in 1956.  They would be barred

5  before Anderson was filed.

6        I think I've dealt with and won't dwell on an

7  argument that in order for Grace to raise the statute of

8  limitations Grace has to first concede that its product was

9  defective or that its product was dangerous.  That is not the

10  law in Canada.  I believe at the last argument in September

11  this Court raised some questions as to whether that would be

12  the law even in the United States.

13        Another attempt to avoid the effect of the statute is

14  to argue, I believe, that there are other causes of action

15  surrounding this asbestos property damage case, that this is

16  something more than pure economic loss or that the only

17  decision on point was tried under the wrong theory by the

18  plaintiff's counsel.  Neither of those approaches make any

19  sense, Your Honor, and are contrary to Winnipeg Condominium and

20  Privest which clearly evaluated issues like that and clearly

21  indicated that the cause of action for defective or dangerous

22  product allegedly installed in a building is one for economic

23  loss.

24        Fraudulent concealment, I believe I've already talked

25  about, but in addition to the M v. Catholic Church case there

1  are other cases cited in our brief.  In addition, fraudulent

2  concealment as a matter of Canadian law could not apply here

3  because in order to have fraudulent concealment you need to

4  have a special relationship, and Grace was simply a supplier of

5  a product.  You may hear that the statute did not begin on the

6  date of installation or if it did because of a continuing duty

7  to warn it continued for each day thereafter.  The Meek case I

8  talked about on oil royalties, the Day v. Central Okanagan case

9  cited in the papers and Privest all say you cannot create an

10 exception to the ultimate statute by alleging continuing duty

11 to warn.

12          In short, Your Honor, these 35 remaining Canadian

13 claims are barred by the ultimate statute of limitations which

14 statute under the law and the language in each province begins

15 when the act or omission occurred or begins when the product

16 was installed.  One then counts ten years or 30 years as the

17 case may be.  And in all 35 instances the ultimate statute has

18 run and these claims should be expunged as untimely.  Thank

19 you, Your Honor.

20          THE COURT:  Mr. Fairey.

21          MR. FAIREY:  May it please the Court.  It has been 14

22 months since we argued this before Your Honor, and a few things

23 have changed.  Some have not.  Obviously some claims have been

24 settled.  And taken Mr. Restivo's word for it there are

25 apparently 35 claims left.  We're here before Your Honor on a

1  motion for summary judgment on the remaining 35 claims.  In

2  other words, the debtor has to establish that there's no issue

3  of material fact, period, on any of these 35 claims.  I agree

4  with Mr. Restivo, my count was there were 33 in Alberta.  All

5  but three of those are school buildings.  Only six of those 33

6  involved Monokote.  The rest of them involved a different

7  product Grace manufactured.  It was an acoustical plaster.  The

8  one British Columbia claim that also was not Monokote.  That

9  was an acoustical plaster product that Grace manufactured that

10 had asbestos in it.  And then the one Manitoba claim was a

11 Monokote claim.

12        The primary issues that I want to address, and I

13 realize we argued this before, Your Honor, and if I'm too

14 detailed you can waive me on and I'll move on if you

15 understand.  I don't want to waste as lot of time.  But the

16 primary issues that I want to talk about today are whether

17 under the law of the various provinces, and I want to be

18 careful about that, because Grace would like to lump all this

19 into Canadian law.  I heard Mr. Restivo say Canadian law,

20 Canadian law.  But Canada is actually divided up into a number

21 of provinces and each one is its own jurisdictional entity.

22 The law in one does not necessarily apply to the law of the

23 other.

24        We're dealing with three today.  But when we're

25 dealing with the law of those provinces what is the trigger for

an economic loss <u>Winnipeg Condo</u> type case?  And can that ever
be decided on a motion for summary judgment?  Because there is
a large number -- a growing number of cases in Canada coming
out on that very issue that say no.  That's not appropriate for
summary judgment because of the complexity of these issues.

        The second thing that I want to go over is the --
whether the -- or what the trigger is for these economic loss
<u>Winnipeg Condo</u> and whether it is always installation or whether
it's what the statute -- these ultimate statutes of limitations
are statutes in the book and you have to look at what they say
not how they're interpreted or what the policy is behind them.
In other words, is it always the mere presence or the
installation of the asbestos product that's going to trigger
these?

        And then third, do these ultimate statutes even apply
and if they do what do they say?  I want to go over all that
today.  The first thing in the primary opinion of Dr. Irvine,
and we've heard a lot about Dr. Irvine today.  Some of the
quotes you heard were from Dr. Irvine's draft report.  Dr.
Irvine's opinions are in his final report.  And his opinions
are not what Mr. Restivo said.  He said under oath and in a
final report.  But his primary opinion was is that in a case
like this in these -- the asbestos products and buildings cases
what the real injury is is that the product has to be so
dangerous that it creates a real and substantial danger in the

1 building, and that these types of cases, the types of <u>Winnipeg</u>

2 <u>Condo</u> cases that are based on that are not appropriate for

3 summary judgment.

4        Your Honor, even the one case that dealt with this, a

5 trial court opinion in British Columbia, was a trial on the

6 merits.  It was a full trial.  The opinion was issued -- Grace

7 went to great lengths to say this was a, you know, however many

8 days it was tried and however many pages the opinion.  I can

9 assure you it's very long having read it several times.  But it

10 was decided after a full trial, not on summary proceedings.

11       Apart from that, as I've said, there's a growing

12 number of Canadian decisions, Appellate Court decisions, on

13 this very issue that have held that a proper determination of

14 when a cause of action accrues in a real and substantial danger

15 defective building case should be made in the context -- only

16 be made in the context of a fully developed factual background

17 which can only be made after a full trial.  Just for example,

18 Your Honor, we cited a number of cases, Professor Irvine cited

19 a number of cases, we cited a number of cases.

20       One of the cases, and this is from the Manitoba Court

21 of Appeals dealing with the <u>Winnipeg Condo</u> type case.  "If this

22 action is categorized as one of economic loss due to defective

23 structure the damage is not inflicted until the building is

24 found to contain defects which pose a real and substantial

25 danger to the occupants of the building or other property.  It

1    is only when a defect poses a real and substantial danger or

2    there is an imminent possibility of such a danger that the

3    cause of action is complete."

4            That case went on -- that was on a summary dismissal

5    of a case that had happened in the trial court that the statute

6    of limitations had run.  Went up to the court of appeals, they

7    said no, we reversed it.  We sent it back down so you can

8    develop a full record.  Another case, this one is again cited

9    in the papers.  This one's <u>Valley Agricultural v.</u>

10   <u>Bealand,</u>(phonetic), again, from the Manitoba Court of Appeals

11   reversing a trial court.

12           "In my opinion it is not an appropriate case for

13   summary judgment based on affidavit evidence alone.  This is

14   because there is a lack of evidence to establish the essential

15   factual background to enable the Court to decide the complex

16   and unresolved point of law that this case raises."  Again,

17   this was a defective building, <u>Winnipeg Condo</u> type of case.

18           Most recently, October 27th of this year the Manitoba

19   Court of Appeals again reversed a trial court summary dismissal

20   of a claim.  This is a case called <u>Multicourt v. AG Penner</u>.

21   This is not cited in any of the materials because it's so new,

22   but the citation would be to the Manitoba Court of Appeals 2008

23   at Page 119.  And this is the quote from that case.  "These

24   issues, in my opinion," and this is a little background on this

25   case.  This was a building -- a hog farm -- hog barn that was

1  built in 1994.  A fan system was put into it and in 2001, seven

2  years later, the fan system caught fire and the entire

3  structure burned down to the ground.  The issue came up as to

4  whether the cause of action accrued when the fans were

5  installed in 1994 or when the fire occurred in 2001.

6          And the appellate court said, "These issues, in my

7  opinion, can only be satisfactorily dealt with after all

8  relevant facts have been established at trial.  It is not

9  appropriate that this issue be resolved solely on the basis of

10 the pleadings given the factual vacuum that is inevitably

11 present at this early stage of the proceedings."  And then they

12 go on to cite another case that says, "There is virtue in

13 deciding when the cause of action arose based on the trial

14 evidence.  At this stage we do not know the nature of the laws

15 -- of the flaws or who was responsible for them.  We do not

16 know who knew what when.  We do not know whether the work done

17 in 1982 was significant or not."

18         Why are these decisions being made?  Why are these

19 courts of appeal not making the decision on summary records to

20 dismiss these cases?  Why do they want them decided after a

21 full record?  Let's look at the cases that we have here.  First

22 of all, of the claims that are remaining that are subject to

23 this argument only seven of them dealt with Monokote 3.  The

24 remaining -- I think that's right.  The remaining 20 -- I think

25 the remaining 26 or 27 involved a different product altogether.

1   An acoustical ceiling plaster.

2            Grace cites _Privest_ at every opportunity.  And if I

3   had that case on my side I would too.  But _Privest_ was a

4   Monokote 3 case.  The question in that case was whether

5   Monokote 3 was dangerous or defective in that particular

6   building.  That was -- this is a different product.  And to

7   look at what happened in another case which is not binding on

8   anybody and say well, that tells us that the moment Monokote 3

9   was -- because Monokote 3 was installed in a building and a

10  judge determined that that was when the statute accrued then it

11  automatically translates into every other single product that

12  might have any amount, a little or a lot or however that

13  product is made or what its constituents are it's a leap to get

14  there.

15           THE COURT:  Well, does it apply to the seven or

16  however many buildings had Monokote 3 in it?

17           MR. FAIREY:  Well, I'm going to address that, too,

18  Your Honor.  _Privest_ is not a binding -- those findings are not

19  binding on anybody except _Privest_.  That was a trial court

20  decision, and the statute of limitations issues weren't

21  addressed by the court of appeals.  Again, Grace likes to say

22  it was affirmed.  It was affirmed, but it was not affirmed on

23  the statute of limitations.  It was affirmed on the fact that

24  the plaintiff hadn't made its case that Monokote 3 was

25  defective.  And it recognized there was evidence both ways.

1  But it wasn't going to overrule what the finder of fact did.

2        The second thing, why do we need to have a factual

3  development, why would it help us in these cases?  A large

4  number of these buildings are school buildings.  School

5  buildings are used differently than commercial buildings.

6  School buildings are, I guess, how they're anticipated to be

7  used.  School buildings sometimes go years and years and years

8  without any renovation or any things like that.  Commercial

9  buildings you have renters that come in every five years, you

10 tear the space out and rebuild it to suit a new renter.  The

11 use that these buildings are put to are completely different.

12 And for each individual case you need to look at what's that

13 building like, what it's being used for, and is the product in

14 that scenario a real and substantial danger.

15       And it could be, and you know, again, not to get into

16 the -- but to give some examples of how that might differ, you

17 could have a storage building in a school district that one

18 person goes in four times a year to flip a switch or to change

19 a piece of equipment and nobody else goes in there.  Maybe

20 that's not unreasonably dangerous to have an asbestos product

21 in there.  Maybe that product will never be dangerous in that

22 scenario.  You may have the same product installed in a

23 gymnasium where children are throwing balls against the wall

24 seven hours a day for however many days they're in school.

25 That could create an incredible danger because of the fiber

1  release.

2          To look at whether the product is defective in a

3  particular building under these cases you have to look at the

4  individual facts of the building.  And then even if we were to

5  just blindly follow <u>Privest</u> again as I pointed out that was a

6  Monokote 3 in a commercial rental building in downtown.  To

7  give you some quotations from Grace's expert, Mr. Mew, the

8  expert about the statute of limitations.  The question to him

9  at his deposition.  "Under the <u>Winnipeg</u> case does the court

10 provide authority for bringing a case in economic loss where

11 the product is shown to be harmful?"  Answer, "Yes."

12          Question, "In that situation in your opinion are you

13 telling me that the statute of limitations still runs from

14 installation?"  Answer, "It depends on what the product is.  It

15 depends on what the circumstances are."  Question, "Are you

16 telling me that in all situations where you have a case of

17 economic loss where the product is harmful, and the statute

18 commences to run upon installation?"  Answer, "No."

19          Professor Clar, their expert on tort, Canadian tort

20 law.  Question, "Is it a fair statement of Canadian law that in

21 order to establish a claim based upon negligent design and

22 construction the plaintiff's cause of action requires the

23 existence of damages considerably beyond minimal or nominal in

24 order for a suit for pure economic loss to succeed?"  Answer,

25 "I would say that in order for a plaintiff to succeed in a

1  claim for pure economic loss to repair or restore a building to

2  a nondangerous state or a product the building must pose a real

3  and substantial danger to persons or property.  In order for a

4  claim to succeed that must be established.  And when that

5  occurs, as a matter of fact, based upon particular

6  circumstances of each building would you agree with that?"

7  "Yes, I would.  It would be a question of fact.  When a product

8  or a building poses a real and substantial danger that would be

9  a question of fact."

10        There is no Canadian case or other authority that

11  addressed the liability of when a statute of limitations might

12  run for a zone like plaster claim which is different than

13  Monokote.  Based upon Canadian precedent it's clear that

14  Canadian courts would not do so in summary proceedings or upon

15  summary judgment.  The only trial we've had that's gone all the

16  way is a Monokote trial.  The only thing that we can

17  conclusively say about that is that the plaintiff didn't prove

18  his case in that trial.  And what we can also take from these

19  decisions is that the time that a real and substantial danger

20  would occur varies significantly from building to building.

21        Now, what is the appropriate trigger under the

22  Winnipeg Condo type cases?  Again, this is Professor Irvine's

23  opinion set forth in his report and in his deposition.  "The

24  trigger is when a building presents a situation of actual or

25  impending danger sufficiently substantial to warrant the

1  undertaking of prompt remedial intervention." This is what's

2  defined in that case. Another thing that you have to be

3  careful about the Winnipeg Condo was economic loss for one very

4  specific type of claim, and that is shoddy or dangerous

5  construction.

6        There are four other types of economic loss claims

7  that Canadian courts have recognized from time to time. And

8  Grace likes to lump all those in together, but the policy

9  reasons and the factual scenarios that lead up to them are

10 different. But I say all that to lead into Professor Irvine's

11 opinion was that you cannot across the board unilaterally say

12 that an economic loss is triggered upon installation or upon

13 the date of construction. First of all, there are different

14 statutes in different provinces. Each one of them is worded

15 differently. They mean different things. They are not always

16 applied in the same way or to the same type of economic loss

17 case.

18        Number two, the Winnipeg Condo case itself does not

19 fit the installation model. Manitoba has a six year statute of

20 limitation with no discovery rule. The Winnipeg Condo case

21 involved a defective cladding on the front of the building. It

22 fell off and landed on the ground some stories below.

23 Obviously that created a real danger. Pieces of the building

24 falling off and hitting somebody. That building was

25 constructed in the '70s. It went up first on whether they

1    could state a cause of action or not.  The Canadian Supreme

2    Court said yes, we'll recognize a cause of action for shoddy or

3    defective buildings.

4         Later that case went down and Professor Irvine cites

5    this, I'm not sure anybody else has cited it, but there were

6    further proceedings in that case.  Once there was a cause of

7    action established the defendants immediately said well the

8    statute's run.  The building was built in 1970 whatever -- I

9    think it was '78.  The lawsuit wasn't brought until 1989.  The

10   statute's run, there's no discovery rule in Manitoba.  And the

11   trial court agreed with that and went to the Manitoba Court of

12   Appeals again.  The Manitoba Court of Appeals said no, not so

13   fast.  This is a new cause of action.  To prove the cause of

14   action you have to establish that there's a real and

15   substantial danger.  We can't say that without a full factual

16   inquiry that that was manifest from the moment the building was

17   created, or the building was constructed.  And it sent it back

18   down for further trial -- a full trial on the merits.  So the

19   Winnipeg Condo case if you follow out its history doesn't even

20   fit the installation model.

21        Professor Irvine also points out that sister

22   jurisdictions -- and this is aside from the United States.  At

23   the first hearing Mr Speights went into a long explanation of

24   what accrual is in the United States.  But apart from the

25   United States other jurisdictions that Canadian courts look to

1   that Professor Clar and Professor Mew both agree that they

2   looked to, New Zealand, England, that's where they looked to

3   for common law.  Where these types of claims have been

4   recognized, where shoddy building claims have been recognized

5   in those jurisdictions they have consistently rejected the

6   argument that installation of the defect is the trigger.  The

7   trigger is when the danger becomes real and substantial.  That

8   is when the injury occurs, that's when the cause of action

9   becomes complete.

10          Finally, the Privest case.  Again, you know, if I

11  were Grace I would cite this case all the time.  But when you

12  look at what the Privest case actually held it's really not

13  that impressive on this issue.  The trial court -- this is what

14  the trial court said about the statute of limitations.  "I

15  think it is clear that all the elements necessary to the

16  plaintiff's cause of action came into existence during the

17  period 1973 to 1975 when the MK3 was installed in the building.

18  Accordingly the limitation period began to run in or about the

19  month of September 1975 when the installation was complete."

20  That's it.  That is the discussion.  There's no discussion

21  about what the elements were.  There's no discussion about what

22  occurred to cause the elements to exist.  There's no basis for

23  this reason given in the case.

24          When it gets to the Appellate Court the Appellate

25  Court says -- obviously the statute of limitations is one of

1  the issues raised on appeal -- the Appellate Court says, "For

2  the reasons which follow we have concluded that Mr. -- Justice

3  Drost did not err in finding on the evidence before him that

4  MK3 was not an inherently dangerous product.  Since our

5  conclusion in that regard is determinative of the appeal it is

6  unnecessary for us to deal with the other issues raised.  We

7  would therefore dismiss the appeal."  And again, it goes on

8  later and says, "We're affirming the appeal because we don't

9  think that plaintiff offered enough evidence for us to overturn

10 the factual finding made by the trial court.  It has nothing to

11 do with the statute of limitations."

12        And then finally the decision of <u>Winnipeg Condo</u>

13 itself.  If it were contemplated that the installation or the

14 date of construction would be the trigger for that type of

15 claim again, the <u>Winnipeg Condo</u> case goes on and on and

16 explains the policy reasons behind recognizing this type of

17 action in Canada.  It goes on and it says, you know, it

18 considers the policy of whether defective buildings -- the

19 contractor of a defective building it too remote from an

20 ultimate purchaser of the building.  And there's a lot of

21 discussion about, you know, we have to -- the law has to

22 recognize this issue of remoteness.  We have to recognize that

23 it's unfair to hold somebody liable to somebody who's so far

24 out that it's not foreseeable that they would be injured by

25 this.

1          But ultimately the member of the Canadian Supreme

2   Court who wrote the opinion, Justice LaForest explained and

3   went into great explanation and detail as to why it actually

4   was fair and it was reasonable under the law to hold the person

5   who constructed a building initially liable to someone who

6   ultimately purchased the building years down the road.

7   Buildings are meant to last a long time, and, you know, they

8   have a long service life and they have certain things that

9   they're going to be used for.  And this whole -- and it goes on

10  for paragraphs, but this whole discussion would be completely

11  irrational and irrelevant if the ultimate finding was but the

12  statute begins to run the minute the building's constructed.

13  This long analysis of whether or not someone who constructed a

14  building could possibly be liable to somebody years down the

15  road when the building became dangerous would be just complete

16  circle to the opinion.

17          THE COURT:  Well, what was the statute of

18  limitations?

19          MR. FAIREY:  Ma'am?

20          THE COURT:  I mean, I'm not sure if the issue is a

21  limitation issue or whether it's a --

22          MR. FAIREY:  I'm getting ready to connect that up

23  with the ultimate because I believe that the ultimate statute

24  and the actual statutes themselves when you read them they

25  apply the same type of trigger.  The difference between the

1 ultimate statute and the regular statute is there is no

2 discovery involved in the ultimate statute.  There is in the --

3 that is the difference between the two under these three

4 provinces.

5      Finally, the case, and this is the case, the

6 Armstrong case Mr. Restivo mentioned, it's the one Mr. New

7 relies on most.  That case was a very different case than

8 Privest.  It's a very different case than what these cases are.

9 The Armstrong case was a negligent inspection case.  Apparently

10 in Canada under the doctrine of economic loss you can hold a

11 city building inspector liable if he gives a certificate of

12 occupancy and he failed to property inspect the building and

13 find what would have been an obvious danger.  And that line of

14 cases goes way back in Canada much farther than the Winnipeg

15 Condo, but that's a completely separate branch of economic

16 loss.  That case, it had nothing to do with an asbestos and

17 building case, and the facts there are completely different

18 from what we have here.

19      Now the ultimate statute and why are these triggers

20 important.  I want to quickly walk through the statutes.  All

21 the statutes are attached to our brief.  I know they're in the

22 record.  First of all, and I'll start with Alberta.  That has

23 33 claims, that's the biggest one.  The Alberta does have a ten

24 year statute of repose.  It was enacted in 1999.  It is only

25 applicable to claims brought after it was enacted in -- I think

1  actually what is says in March 1st, 1999.  The reason Anderson

2  apart from tolling is important is because Anderson was filed

3  before 1999.  So while Mr. Mew had argued that the specific

4  tolling provisions of the Alberta class action statute wouldn't

5  apply because it was enacted after the Anderson case was filed

6  we would likewise argue that this ultimate statute of

7  limitations does not apply because the Anderson case was filed

8  before 1999.

9          Now, I'm not going to revisit all the Anderson case,

10 Your Honor is very familiar with that, the door closing issue,

11 except to say this.  The door closing order that was issued in

12 that case was not final, it wasn't appealable.  And if you look

13 at the policy behind the class action tolling in Canada it's

14 clear from the statute whether it applies or not, but it's

15 clear from the statute that the intent is to make sure that an

16 absent class member is protected from a statute of limitations

17 not when he's dismissed by the trial court, but when that is

18 ultimately decided by an appellate court.  And that's a very

19 big distinction.

20         But we believe because the Anderson case was filed

21 before this case was -- this statute was enacted that the

22 ultimate statute doesn't apply.  But even if it were to apply

23 you have to look at what the statute actually says.  And I

24 understand both sides have cited the law commission reports,

25 and that certainly has some commentary about what the statutes

1 mean, but ultimately you have to look at what the statute says.

2 And first of all, under Alberta the ultimate limitations period

3 has a concealment provision.  The operation of the limitations

4 period provided by 3(1)(b) the repose provision of ten years is

5 suspended during any period of time that the defendant

6 fraudulently concealed the fact the injury for which the

7 remedial order is sought has occurred.

8           The comments to that -- these are the same comments

9 that Mr. Restivo read from -- but the comments to that note

10 that this section of the Alberta ultimate statute of limitation

11 suspends the operation of the ultimate limitation period

12 indefinitely on the ground that the fraudulent concealment by

13 defendant of the fact that an injury had occurred should not be

14 rewarded by limitations defense.  The effect of this section is

15 to suspend the operation of the limitation period until the

16 time of discovery.  No exception from the operation of the

17 discovery of limitation period is required because the

18 discovery period will not begin to operate until the claimant

19 has the requisite knowledge.

20           Because there is no ultimate limitation period a

21 defendant will always be subject to an allegation of fraudulent

22 concealment and can never be certain that he will be entitled

23 to a limitations defense to a claim.  Defendants in some

24 vulnerable categories would therefore be advised to retain

25 defensive files for an indefinite period.  And this is the law

1  commission telling people we realize the policy behind an

2  ultimate limitations, but we are not going to apply it where

3  there is evidence of fraudulent concealment.

4        Now, the question is what injury -- what do they --

5  what would Grace have to conceal?  Well, first of all MK3 and I

6  believe Zonolite -- Mr. Speights will correct me if I'm wrong

7  -- it was not self-evident that those products had asbestos in

8  them.  They were not marketed as asbestos containing products.

9  They did not come in packages that identified them as

10 containing asbestos.  The sales literature and technical

11 literature that were provided to architects did not mention

12 that these products contained asbestos.

13       And Mr. Restivo mentioned the binders.  We submitted

14 a great deal of exhibits.  And this was in support of our

15 original response to Grace's omnibus objection.  We had a long

16 factual statement of facts and we've submitted the exhibits to

17 back those up.  But Grace actually -- the salesman selling

18 Grace, and we have cited a number of examples, but sold these

19 products didn't know they contained asbestos in them.  So the

20 question number one is what does that mean for an installation

21 trigger if there's no reason to know that it has asbestos in it

22 or to suspect it.  Or number two if Grace consciously did not

23 inform people of that.  That's number one.

24       Then, number two, the statute, the Alberta statute of

25 the ultimate limitations lifts out which specific causes of

1  action it is applicable to.  And it includes in the

2  definitional section economic loss and along with personal,

3  injury, property damage, nonperformance.  And then it says in

4  the absence -- and then it goes on to say, and in the absence

5  of any of those specific things the breach of a duty.  It's

6  clear that these types of cases, and again, that is not

7  disputed, but under Winnipeg Condo the injury that's defined as

8  a real and substantial danger is a economic loss.  It fits

9  squarely within that definition.  And there's a question of

10  fact as to whether Grace concealed in its products under

11  foreseeable circumstances whether these products would have

12  even had asbestos in them or that they would present a real and

13  substantial danger.

14         But the definition of injury under the ultimate

15  statute that includes that also puts this type of claim under

16  the general category in the ultimate statute of limitations

17  statute.  And that is ten year statute of repose which begins

18  to run ten years after the claim arose.  This is the general

19  stated in the statute.  And it's the rule that applies to

20  economic loss, personal injury, property damage.  The case that

21  Mr. Restivo cited was a breach of duty case.  It was a

22  fiduciary duty case.  So it would fall into the rubric of other

23  breach of a duty.  And that's important because the specific

24  statute of repose that applies to those claims are a claim

25  based on a breach of a duty arises when the conduct act or

1  omission occurred.  And that's when the ultimate statute of

2  limitation is triggered in that type of case.  It's a ten year

3  statute that applies when the act or omission occurred.

4       The ultimate statute for economic loss in the others

5  isn't triggered until the claim arose.  And under Winnipeg

6  Condo type case that is when there is a real and substantial

7  danger.  That's the proper way to interpret the statute because

8  if you interpret it the way Grace is trying to then this

9  distinction is swallowed up.  There is no point in having the

10 general rule.  It wouldn't apply to anything other than --

11 because everything, every legal claim involves a breach of some

12 duty.  So there would be no reason to have the two separate

13 pieces of the thing.

14      So because of that in Alberta the ultimate statute

15 isn't triggered when the act or omission occurred, it's

16 triggered when the cause of action arose.  And, of course, we

17 believe that the cause of action arose in a Winnipeg Condo case

18 when the real and substantial danger was created.  When the

19 product -- not when it was installed, not as it sat there using

20 the building, but when it deteriorated and released so much

21 asbestos that it actually posed a danger to the people in the

22 building.  And this is evident again going back to the Winnipeg

23 Condo case itself.  And this is after it had come back down

24 from the Canadian Supreme Court.

25      "Unless the defect is very gross it may never lead to

**J&J COURT TRANSCRIBERS, INC.**

1   any damage at all to the building.  It would be analogous to a

2   predisposition or natural weakness in the human body which may

3   never develop into disease or injury.  The plaintiff's cause of

4   action will not accrue until damage occurs which will commonly

5   consist of cracks coming into existence as a result of the

6   defect even though the crack or the defect may be

7   undiscoverable.  There may perhaps be cases where the defect is

8   so gross that the building is doomed from the start and where

9   the owner's cause of action will accrue as soon as it is built.

10  But it seems unlikely that such a defect would not be

11  discovered within the limitation period."

12          So, again, when the cause of action arose, not when

13  the last act or omission occurred.  But even if the last act or

14  omission occurred, again, Canada law expressly recognizes post-

15  sale duties that manufacturers owe to consumers.  And we've

16  cited that case, <u>Hollis v. Dow Corning</u>, and there clearly is a

17  post-sale duty to warn of known dangers to consumers from the

18  manufacturers of products.

19          Moving on now to British Columbia, Manitoba, and I

20  won't spend as much time on those, there's only a couple of

21  claims.  But I do think it's important.  In British Columbia

22  the statute of -- the ultimate statute of limitation is Section

23  8.1.  And it is written in terms of the ultimate limitations

24  commences from the date on which the right to do so arose.  The

25  right to bring an action arose.  Reading from the law

1 commission report, and I was accused of only giving you some of

2 it, we attached the whole thing to our brief and I will --

3                          (Pause)

4          MR. FAIREY:  This is on two pages, but this

5 discussion under British Columbia law as it exists now.  This

6 was written in 1990, but this is a discussion of the

7 commencement of the ultimate limitation period.  And it says,

8 "At the present time Section 8.1 prevents the commencement of

9 an action after a stated number of years from the date on which

10 the right to do so arose.  This wording similar to that in

11 Section 3 creating the basis limitation period has a running of

12 time to the point at which a cause of action accrues according

13 to common law principals.

14          As the accrual of a cause of action takes place only

15 when all of its elements are present the ultimate limitation

16 period may start to run at a point considerably removed from

17 the act or omission which gave rise to the damage that is

18 subject of the action.  This is often apparent in professional

19 negligence cases where there has been reliance on faulty

20 advice, actual damage may not be suffered until the plaintiff

21 has acted on the basis of the advice received.  The problem of

22 light and damage resulting from the commission of an error in

23 the past is graphically illustrated by the example of defective

24 buildings.  An error in the original design or in the

25 construction of a building may remain undetected for decades

1 before any physical damage arises from it.

2       A further refinement of the problem may be that the

3 physical damage may occur to the structure at some point

4 distant in time from the error which caused it, but the damage

5 itself may be hidden from view and undetectable until even

6 later.  The cause of action for negligence, however, would

7 accrue when the damage occurred whether it was discoverable or

8 not.  While Section 6.3 of the limitations act would postpone

9 the basic limitations period in either case until the damage

10 was discoverable the wording of Section 8.1 as it now stands

11 presents a difficulty as it links the start of the ultimate

12 limitation period to the time at which the right to sue arose,

13 it forces the Court to make a finding as to the point in time

14 when actual damage occurred.  Where damage has gone undetected

15 for some time this may be a daunting task.  Uncertainty is

16 created which can only be resolved after a full trial with the

17 issue.

18       The fact that the commencement of the ultimate

19 limitations period is tied to the occurrence of actual damage

20 and actions based on negligence means that providers of goods

21 and services cannot know for certain when the dangers of

22 litigation have finally passed in relation to the particular

23 transactions.  Greater certainty would be provided if the

24 ultimate limitation period ran from the act, omission or breach

25 of some legal duty giving rise to the damage rather than from

1  the accrual of the cause of action.  In most cases this would

2  provide a relatively precise reference point.  This solution

3  was adopted in the English light and damage act of 1986."

4        And this report goes on at the end to suggest this

5  very change in the statute.  Change it to the last act or

6  omission.  Unfortunately for Grace the acts stands as it did in

7  1990.  It hasn't been changed, it hasn't been amended.  So that

8  is the language that we have to deal with under the British

9  Columbia statute.

10       Finally I'd point out, Your Honor, as far as British

11  Columbia goes, again, they've cited _Privest_.  _Privest_ did not

12  deal with the ultimate statute of limitations.  The cryptic

13  reference to the normal statute of limitations, the failure of

14  the Court of Appeals to address the issue I think does not give

15  them much of a foothold to stand on especially in the later

16  development of the case law of the _Winnipeg Condo_ cases which

17  require the existence of a real and substantial danger to

18  trigger the right to sue.

19       Finally, Manitoba.  And this will be the shortest

20  one.  In Manitoba, Manitoba unlike every other Canadian

21  province its statute of limitations is completely different.

22  There is no discovery rule in Manitoba.  So the normal statute

23  of limitations runs from the date the injury occurs.  What

24  Manitoba does instead of having a discovery rule is they have a

25  procedure that allows a plaintiff to go to court ex parte and

1  make an ex parte application in the case where they have

2  discovered an injury only after the statute of limitations has

3  run.

4         They can make this application only within one year

5  of the date they discover the injury.  And then the Court will

6  look at it and decide whether or not it will grant them leave

7  to file a case apart from the statute of limitations.  It's a

8  very arcane procedure, and it is not applicable in this case.

9  The general statute of limitations is, but this procedure is

10  not because it's a procedural rule in Manitoba courts.

11         The problem with the Manitoba ultimate statute of

12  limitations is it's tied into this procedure.  What the

13  Manitoba rule says is that a claimant who has been injured and

14  has discovered its injury after the statute of limitations has

15  run, because there's no discovery rule, doesn't discover his

16  injury until later cannot make that ex parte application under

17  any circumstances if the act or omission occurred more than 30

18  years prior to the date of the application.  So again, I

19  understand the intent of that.  I'm sure the intent is what is

20  stated and that's to end at some point litigation, but it's a

21  -- because of the procedure there it's not applicable in these

22  instances.  It's only applicable -- it would be applicable if

23  we went to Manitoba and tried to make an application for a late

24  discovered injury.

25         Now, what is applicable in Manitoba is all of the

1  court of appeals decisions which have addressed <u>Winnipeg Condo</u>.

2  <u>Winnipeg Condo</u> was a case that came from Manitoba, went up to

3  the Canadian Supreme Court for Manitoba and a lot of the

4  appellate litigation that I've cited to Your Honor has come

5  through Manitoba.  So this is the court that's deal with these

6  issues and those courts have never addressed the ultimate

7  limitations in respect to <u>Winnipeg Condo</u> type case.  What they

8  have found instead is that they've certainly recognized the

9  argument and recognized that it makes sense that a <u>Winnipeg</u>

10  <u>Condo</u> cause of action does not accrue, the injury does not

11  occur until there is real and substantial danger.

12        So they've never had to address this ultimate statute

13  of limitations because all the cases have been in time.  But

14  ultimately, I guess, if you had a real and substantial danger

15  in your building and you waited 30 years and then claimed you

16  just discovered it you couldn't go and make an application to

17  the Manitoba court to get that permission to sue.

18        There's one other anomaly on the Manitoba claim and

19  it is this.  And this is information -- the best information we

20  have, but this is an issue on summary judgment Grace has the

21  burden of proof on.  Grace claims it's undisputed, and as far

22  as I know it is, that this building was built in 1956.   The

23  problem with the claim, and that being the trigger for the

24  statute of limitations is, to may knowledge, and I've never

25  seen any evidence of this, Monokote, and this is a Monokote

1  building, Monokote didn't exist in 1956.  Monokote 3 wasn't a

2  product until 1961 in the U.S. where it was approved.  So there

3  is a disconnect between when this building was built and when

4  the product was installed.

5       And if you look back at the <u>Privest</u> case even if you

6  again, if you blindly apply <u>Privest</u> to this fact situation it's

7  not when the building is built, it's when the product was

8  installed.  And I don't think there's adequate evidence of when

9  the product was installed and it certainly can't be 1956 based

10  on the record.

11       In closing, Your Honor, and I appreciate your

12  patience, this is two more hours you've heard of this argument.

13  But the -- what I would emphasize in closing is that this clear

14  trend of emerging law around <u>Winnipeg Condo</u> in the appellate

15  courts in Canada that these cases do not lend themselves to

16  summary judgment.  These cases need full factual development.

17  To establish the cause of action to determine when a cause of

18  action accrues it is tied to when the damage occurs and whether

19  there is damage.  And this emerging law in Canada has clearly

20  made the decision we're not going to do that in a summary

21  fashion.  We're going to look at each individual building.

22  We're going to see what are the facts there, how was that

23  building used, why is this product dangerous in that particular

24  circumstance?  You know, is this particular product that's in

25  this building dangerous?  Those are all things that have to be

1  looked at to determine when the cause of action accrues.

2         And none of that, of course, you know, the existence

3  of _Privest_, you know, again, which was a very long decision

4  that was a case that was heard on the merits.  And whatever

5  decision was made in that case was made after a full trial with

6  a full factual development.  It's clearly not binding on the

7  limitations not on this Court, not on any court.  Not on any

8  person except for _Privest_.  _Privest_ doesn't deal with the type

9  of building that 90 percent of the remaining Canadian claims

10 have, and it doesn't deal with the same product that 80 percent

11 of the remaining Canadian claimants have.  And we think that

12 the only way that this issue can be dealt with is after a full

13 trial and full factual inquiry.

14         THE COURT:  Okay.

15         MR. RESTIVO:  I will try to be extremely brief, Your

16 Honor.  There was a suggestion that in my remarks I was quoting

17 Mr. Irvine's initial report, not his filed report.  In fact,

18 Your Honor, I was quoting language that appears in both.  For

19 the record, in binder 3 at tab A at Page 27 he concludes, "If

20 it be authoritatively determined that they are out of the class

21 action their position under the law of limitations will be

22 distinctly more precarious."  That's in both his original

23 report and his filed report.  At Page 28, "If Alberta claimants

24 are deemed in law are now to be outside the class action their

25 situation is perilous."  It goes on and talks about the

1  limitation clock.  At Page 31 of his filed report, "The

2  Manitoba claimants in our present proceedings face a peculiarly

3  daunting challenge in regards to limitations issues."  And so

4  it doesn't matter whether it was his initial report or the

5  final one after his deposition, his conclusions are in both.

6         Secondly there was a suggestion with a question and

7  answer that perhaps Mr. Mew's opinion is shaky or is not

8  definitive or is not what I stated it was.  Mr. Mew's report is

9  in binder 3 at tab B at Page 4 in the executive summary.  He

10  states, "In my opinion all the claims against Grace are time

11  barred as a result of the law of limitations."  He then does

12  that in terms of each of the applicable provinces.  He states

13  the same on Page 16 with respect to Alberta and with respect to

14  British Columbia and Manitoba.  There's no softness in his

15  position.  These claims are barred.

16         Third, Your Honor, we get into a kind of a discussion

17  about whether Grace salesmen knew and whether Grace salesmen

18  knew that Monokote of Zonolite acoustical plaster had asbestos

19  in it.  I did not hear any answer to the unequivocal law in

20  Canada that states in order for there to even be a theoretical

21  fraudulent concealment claim there must be a special

22  relationship between the parties.  No special relationship has

23  been or can be alleged.  Grace simply provided product to the

24  building, and so while fraudulent concealment doesn't apply and

25  cannot apply to ultimate statutes, and I've given the Court

1  case law on it, in any event fraudulent concealment cannot

2  apply here because under the undisputed facts there's no

3  special relationship.  We ask the Court to enter our motion for

4  summary judgment expunging these 35 remaining Canadian claims.

5         THE COURT:  What about the last issue about the 1956

6  building but the fact that Monokote 3 was not available until

7  1961?

8         MR. RESTIVO:  I frankly Your Honor, don't know

9  whether it was available in '56 or '61.  If you add the

10  ultimate statute years in either event the ultimate statute has

11  run.  The same is true when you take the undisputed Santanni

12  (phonetic) affidavit that says Grace sold no products in Canada

13  after 1975.  No matter what way you look at it while we may not

14  have a precise installation date whenever it occurred had to be

15  well within the expiration of the ultimate limitations period.

16         THE COURT:  Mr. Fairey.

17         MR. FAIREY:  If I may.  Very, very briefly.  First of

18  all, precarious is not dead on arrival.  Perilous is not dead

19  on arrival.  I understand we have significant burdens, but

20  those are fact intensive decisions.  And he's saying that

21  because it's a ten year ultimate statute.  But the ultimate

22  statute again is triggered by in Alberta when the claim arose,

23  not as Grace argues when the last act or omission occurred.

24         And as to the Manitoba building I wasn't suggesting

25  1961 is the date.  That's the earliest date it could have been.

1 My suggestion is we don't know if Monokote 3 was installed in

2 that building in 1961 or 1975.  It could have been installed in

3 a later renovation of the building.

4           THE COURT:  But it wasn't sold -- it wasn't available

5 after 1975.

6           MR. FAIREY:  It wasn't available after 1975, but in

7 1975 in Manitoba even if that statute -- that procedural

8 statute applied that's a 30 year statute.  So if it was applied

9 in 1975 the 30 year statute, even if it applied, wouldn't be a

10 bar to this bankruptcy claim, because it's less than 30 years.

11 My only point was that Grace hasn't established it they just --

12 and the evidence they presented on that particular one is

13 inconsistent with reality.

14           THE COURT:  Well, that seems to be the case.  I think

15 I need some factual evidence because this claim may not have

16 been barred if it's installed in 1975.

17           MR. RESTIVO:  I guess my answer to that, Your Honor,

18 is if in determining whether to grant their motion for summary

19 judgment you determine that there is a factual issue in dispute

20 on that one building I guess we could then ask for discovery

21 and ask the building owner when precisely was it installed.

22 It's not clear to me, Your Honor, that we have the burden on

23 this.  It is their claim and they claim it's in the building.

24 I don't know that they've proven up their claim, but if that is

25 an issue and they don't want to simply fess up as to the date

1 of installation and the Court finds it's a significant fact

2 then we will have one remaining Canadian building, and I guess

3 we'll do discovery and we'll try it.  It sounds awful silly to

4 me if they have evidence of an installation date that's in 1975

5 and they show it to us we'll take it out of the motion.  But I

6 understand what the Court is saying.

7          THE COURT:  Well, I think -- I mean, I think that's

8 an issue.  If the building's built in '56, the product's not

9 available until '61 at the earliest and unavailable after '75,

10 but the limitations period then doesn't expire until 2005 then

11 -- and this -- I don't know when the proof of claim bar date

12 was.  I don't remember.  2000 -- it was before 2005.  It was --

13          MR. RESTIVO:  It was, Your Honor.  Your Honor, I

14 understand the issue.  I'm suggesting that it's not clear to me

15 where the burden is.

16          THE COURT:  Well, it's your motion for summary

17 judgment.

18          MR. RESTIVO:  It is our motion for summary judgment.

19          THE COURT:  So you have to prove that there are no

20 material facts in dispute.

21          MR. RESTIVO:  Well, they did state when the building

22 was built.  I don't know that he put on -- I don't know if

23 there's any evidence --

24          THE COURT:  An affidavit?

25          MR. RESTIVO:  -- on the record as to his -- I'm not

J&J COURT TRANSCRIBERS, INC.

1 saying he's wrong.  I just simply don't know when Monokote was

2 available in Canada.  He has made a statement.

3          THE COURT:  I see.

4          MR. RESTIVO:  I don't know if that statement is a

5 fact in evidence.

6     THE COURT:  Do I have any facts in evidence to tell me

7 when the product's available then?

8          MR. RESTIVO:  The only fact you have in evidence is

9 when the building was built, and when Grace no longer sold

10 product.  To me a practical answer would be they ought to

11 simply tell us when the product was installed.  If they have

12 evidence that it was installed so that the factual issue

13 precludes summary judgment I'd be happy to take this one out.

14 But to go into discovery and a trial on a simple issue that

15 they have control of the information to me is kind of silly.

16 If for purposes of this motion we want to suspend that building

17 on that issue where the Court finds there's a factual issue I

18 think I'm still entitled to summary judgment on the remaining

19 34 and I'd like to get it.

20          THE COURT:  The debtor has produced affidavits with

21 the basis facts.  Their duty is to contest it with additional

22 facts.  And I don't remember seeing in the record an affidavit

23 that contests the facts.  And you're correct, counsel's

24 argument isn't the statement of fact.  So if I don't have a

25 factual contest then I don't have a factual contest.  But I

1  also don't want to be making a mistake that indicates that

2  there in fact is a factual contest either.

3        MR. FAIREY:  Your Honor, I do believe that those

4  dates that you're looking for were in Grace's informational

5  brief.  They're in the record of this bankruptcy.

6        THE COURT:  Well, I think what -- what dates?

7        MR. FAIREY:  The dates that Monokote was manufactured

8  and sold.

9        THE COURT:  Well, but that's not an affidavit when in

10  support of a summary judgment issue.  I mean you're burdened

11  when somebody submits an affidavit is to contest it.  Otherwise

12  I don't have a contest on the factual record.  So at this point

13  if it's undisputed it's undisputed.  If you've got some basis

14  to show that it was installed after the -- or let me say within

15  a date that would make it a live claim I think you should

16  produce it to Grace.

17        MR. FAIREY:  I hear you, Your Honor.  I understand.

18        THE COURT:  All right.  I'll take the matters under

19  advisement.

20        MR. RESTIVO:  Thank you, Your Honor.

21        THE COURT:  All right.  Happy holiday.

22        MR. RESTIVO:  Your Honor, a housekeeping matter.

23        THE COURT:  Yes.

24        MR. RESTIVO:  Unless I work Ms. Ray more than I

25  should, could we leave all these volumes here, we'll have our

1  people pick them up in the morning?

2          THE COURT:  No, I think you should work her really

3  hard tonight.  Yes.

4          MR. RESTIVO:  Thank you, Your Honor.

5          THE COURT:  What time do you want to come in?  I'll

6  just have -- well, you can check with my staff in the morning

7  when you get here and they'll unlock the courtroom for you.

8          MR. RESTIVO:  We'll call.  Thank you, Your Honor.

9          THE COURT:  All right.

10                         *  *  *  *  *

11            **C E R T I F I C A T I O N**

12          We, ELAINE HOWELL, VIDHYA VEERAPPAN, and KIMBERLY

13  UPSHUR, court approved transcribers, certify that the foregoing

14  is a correct transcript from the official electronic sound

15  recording of the proceedings in the above-entitled matter, and

16  to the best of our ability.

17

18  /s/ Elaine Howell         DATE:  December 2, 2008
    ELAINE HOWELL

17

18  /s/ Vidhya Veerappan
    VIDHYA VEERAPPAN

19

20  /s/ Kimberly Upshur
    KIMBERLY UPSHUR
21  J&J COURT TRANSCRIBERS, INC.

22

23