# Disclosure Statement
## *(Blackline)*

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Joint Chapter 11 Plan of Reorganization. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and it has not yet been approved by the Bankruptcy Court.

Further, the Plan Proponents provide no assurance that the Disclosure Statement, including any exhibits to the Disclosure Statement, that is ultimately approved in the Chapter 11 Cases (1) will contain any of the terms in the current document or (2) will not contain different, additional, material terms that do not appear in the current document. Therefore, making investment decisions based upon the information contained in this Disclosure Statement, the Plan and the exhibits in the Exhibit Book is *highly speculative,* and the documents should not be relied upon in making such investment decisions with respect to (1) the Debtors or (2) any other parties that may be affected by the Chapter 11 Cases.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO., et al.,**[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |

**DEBTORS' DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED AS OF _____, 2008**

## IMPORTANT DATES

- Date by which Ballots and Master Ballots must be received by the Voting Agent: [_____], 2009
- Date by which objections to the Plan must be filed and served: [_____], 2009
- Hearing on Confirmation of the Plan: [_____], 2009

| | | |
|---|---|---|
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** | **PACHULSKI STANG ZIEHL & JONES LLP** |
| David M. Bernick, P.C. | Theodore L. Freedman | Laura Davis Jones (Bar No. 2436) |
| Janet S. Baer | Deanna D. Boll | James E. O'Neill (Bar No. 4042) |
| 200 East Randolph Drive | Craig A. Bruens | Timothy P. Cairns (Bar No. 4228) |
| Chicago, Illinois 60601 | 153 East 53rd Street | 919 North Market Street, 17th Floor |
| Telephone: (312) 861-2000 | New York, New York 10022 | P.O. Box 8705 |
| | Telephone: (212) 446-4800 | Wilmington, Delaware 19899-8705 |
| | | (Courier 19801) |
| | | Telephone: (302) 652-4100 |

*Co-Counsel for the Debtors and Debtors in Possession*

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

---

1   The "Debtors," and all capitalized terms not defined in this Disclosure Statement, are defined in the Plan. The Exhibit Book (and each exhibit thereto) is incorporated by reference into this Disclosure Statement.

## NOTICE TO HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS AND GENERAL DISCLAIMERS WITH RESPECT TO THIS DISCLOSURE STATEMENT

### PLEASE READ THIS IMPORTANT INFORMATION

The Bankruptcy Code requires that a party proposing a chapter 11 plan of reorganization prepare and file a document with the Bankruptcy Court called a "Disclosure Statement." This document is the Debtors' proposed Disclosure Statement for the Joint Chapter 11 Plan of Reorganization filed by the Debtors, the Asbestos PI Committee, the Asbestos PI FCR and the Equity Committee. All Exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein, including the Definitions section of the Plan wherein many of the capitalized terms used herein are defined.

The Debtors are providing the information in this Disclosure Statement solely for the purposes of providing information concerning the Plan to Holders of Claims against or Equity Interests in the Debtors so that those who are entitled to vote on the Plan can make an informed decision with respect to voting on acceptance or rejection of the Plan.

No one is authorized to provide to any other party information concerning the Plan other than the contents of this Disclosure Statement. Except as set forth in this Disclosure Statement, no representations concerning the Debtors, their assets, past or future business operations, their financial information or the Plan are authorized, nor should any such representations be relied upon in arriving at a decision with respect to the Plan. Holders of Claims or Equity Interests should not rely on any information, representations, or inducements made to obtain acceptance or rejection of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan. Any representations made to secure acceptance or rejection of the Plan other than those contained in this Disclosure Statement should be reported to counsel for the Debtors. The statements and information about the Debtors, including all historical financial information included as, or incorporated by reference into, Exhibit 12 in the Exhibit Book (the "Financial Information") and information regarding Claims or Equity Interests contained herein, have been prepared from documents and information prepared by the Debtors or their Professionals.

Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Plan Proponents for purposes of any pending or future litigation matter or proceeding. Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact or liability, a stipulation, or a waiver. Instead, this Disclosure Statement should be construed as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.

The Plan constitutes a settlement of all Claims and Demands against the Debtors on, and subject to, the terms described in the Plan and the other Plan Documents. Nothing in the Plan Documents constitutes an admission by the Debtors as to the existence, merits or amount of the Debtors' actual present or future liability on account of any Claim or Demand except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

The description herein of the Plan is only a summary, and Holders of Claims and/or Equity Interests are urged to review the entire Plan, which is included as Exhibit 1 to the Exhibit Book.  In the event that there is any inconsistency or conflict between this Disclosure Statement and the Plan, the terms of the Plan shall control.

This Disclosure Statement also summarizes Financial Information and other documents. The Financial Information and other documents incorporated by reference herein are qualified in their entirety by reference to those documents.  In the event there is any inconsistency or discrepancy between a description in this Disclosure Statement and the Financial Information or other documents so described, the underlying Financial Information or other documents, as the case may be, shall govern for all purposes.

Further, each Holder of a Claim and/or Equity Interest that is entitled to vote is encouraged to seek the advice of its own counsel before casting a Ballot and/or Master Ballot, as applicable.

Although certain of the attorneys, accountants, advisors and other Professionals retained and/or employed by the Plan Proponents have assisted in preparing this Disclosure Statement, which is based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information.  The attorneys, accountants, advisors, and other Professionals retained and/or employed by the Plan Proponents do not provide any warranty, representation or guaranty regarding the accuracy of any information contained in this Disclosure Statement or any of the Plan Documents and shall have no liability for any inaccurate, untrue or incomplete information contained in this Disclosure Statement or any of the Plan Documents.

Further, there has been no independent audit of the pro forma or prospective financial information contained in this Disclosure Statement, and no fairness opinion has been obtained regarding the value of the Debtors' assets and the amount of their liabilities.  The factual information regarding the Debtors and their assets and liabilities has been provided by the Debtors or otherwise derived from the Debtors' schedules, available public records, pleadings, reports on file with the Court, the Debtors' internal documents and related documents specifically identified herein.  While the Debtors endeavored to provide accurate information herein, the Debtors cannot, and do not, warrant or represent that the information contained in this Disclosure Statement does not contain any material inaccuracy.

The Debtors and their Professionals have also endeavored to identify in this Disclosure Statement and the Plan certain pending litigation claims and potential causes of action and objections to Claims.  However, no reliance should be placed on the fact that a particular litigation claim or potential cause of action or objection to a Claim is, or is not, identified in this Disclosure Statement, the Plan, or any Plan Document.  The Debtors, the Reorganized Debtors, the Asbestos PI Trust or the Asbestos PD Trust, as applicable may seek to investigate, file and prosecute litigation claims and projected causes of action and objections to Claims after the Effective Date of the Plan, irrespective of whether this Disclosure Statement, the Plan or any Plan Document identifies any such claims, causes of action, or objections to Claims.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan, an endorsement of the Plan or a guarantee of the accuracy or completeness of the information contained herein.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY, NOR HAS THE SEC OR ANY OTHER FEDERAL OR STATE REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.    ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The securities described herein will be issued in reliance on the exemptions set forth in Bankruptcy Code § 1145 and without registration under the Securities Act, or any similar federal, state or local law.    The Debtors recommend that potential recipients of any securities pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

This Disclosure Statement contains forward-looking statements, that is, information related to future, not past, events.    Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, including, without limitation, the liquidation analyses, pro forma and prospective financial information, and the timing and amounts of actual distributions to Claimants, the Debtors claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.    The Debtors are subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect.    Factors that could cause actual results to materially differ from those contained in the forward-looking statements include:    the Debtors' bankruptcy, plans of reorganization proposed by the Debtors and others, the Debtors' legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, the Debtors' unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth herein in Article 9 under the caption "Important Considerations and Risk Factors" and in the Parent's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, Quarterly Reports on Form 10-Q for the first and second quarters ending March 31, 2008 and June 30, 2008 respectively, and current reports on Form 8-K, all of which have been filed with the Securities and Exchange Commission and are readily available on the Internet at http://investor.grace.com or http://www.sec.gov.    Reported results should not be considered as an indication of future performance.    Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof.    The Debtors undertake no obligation to publicly release any revisions to the forward-looking statements contained in this Disclosure Statement, or to update them to reflect events or circumstances occurring after the date of this Disclosure Statement.

The Debtors make the statements and provide the Financial Information contained herein as of the date hereof unless otherwise specified.    Holders of Claims and/or Equity Interests reviewing this Disclosure Statement should not infer at the time of such review that the facts set

forth herein have not changed since the date hereof unless so specified. Each Holder of an impaired Claim or Equity Interest that is entitled to vote should therefore carefully review all of the Plan Documents. *See* Article 9 of this Disclosure Statement for a discussion of various considerations and risk factors to be considered in deciding whether to accept the Plan.

This Disclosure Statement does not constitute legal, business, securities, financial or tax advice. All Entities desiring such advice or any other advice should consult with their own advisors. Further, neither this Disclosure Statement (including the Plan and all of the Exhibits in the Exhibit Book) nor any of the Plan Documents should be relied upon in making any investment decisions with respect to the Debtors or any other parties that may be affected by the Plan.

A vote by a Claimant or Holder of an Equity Interest - whether for or against the Plan - does not constitute a waiver or release of any claims or rights of the Debtors (or any party in interest) to object to that Claimant's Claim against or Holder's Equity Interest in estate assets, regardless of whether any claims or defenses of the Debtors or their respective estates are specifically or generally identified herein.

K&E DRAFT DATED 12/19/2008

## TABLE OF CONTENTS

Page

1.    EXECUTIVE SUMMARY OF THE PLAN ................................................................12
    1.1    The Disclosure Statement ....................................................................13
    1.2    The Plan ................................................................................................13
            1.2.1    What Claims and Equity Interests Are Affected by the Plan?.............13
            1.2.2    How Will Asbestos Claims be Treated? .............................................19
            1.2.3    How Will the Treatment of Asbestos PI Claims be Effectuated?.........19
            1.2.4    How Will the Treatment of Asbestos PD Claims be
                      Effectuated?........................................................................................19
            1.2.5    How Will the Treatment of CDN ZAI PD Claims be
                      Effectuated?........................................................................................20
            1.2.6    How Will Non-Asbestos Claims be Treated Under the Plan?..............20
            1.2.7    How Will Equity Interests be Treated Under the Plan?........................20
             1.2.8    How Will the Plan be Funded? ...........................................................20

2.    DESCRIPTION OF THE DEBTORS .....................................................................21
    2.1    General Overview of the Debtors .........................................................21
    2.2    The Debtors' Current Businesses..........................................................22
            2.2.1    Grace Davison Operating Segment......................................................22
                    2.2.1.1    Refining Technologies......................................................22
                    2.2.1.2    Materials Technologies.....................................................22
                    2.2.1.3    Specialty Technologies.....................................................23
             2.2.2    Grace Construction Products Operating Segment..................................23
             2.2.3    Additional Information........................................................................23
    2.3    Business Strategy ..................................................................................23
    2.4    Employees.............................................................................................24
    2.5    Properties ..............................................................................................24
    2.6    Genesis of the Debtors' Asbestos Liabilities ........................................25
            2.6.1    Asbestos-Added Products ...................................................................25
             2.6.2    Libby Vermiculite ..............................................................................25
             2.6.3    Zonolite Attic Insulation ....................................................................26
    2.7    The Debtors' Asbestos-Related Litigation............................................27
            2.7.1    Asbestos Personal Injury Litigation....................................................28
            2.7.2    Asbestos Property Damage Litigation .................................................28
             2.7.3    Litigation Related to Zonolite Attic Insulation and Bar Date..............30
            2.7.4    Asbestos Medical Monitoring Claims..................................................31
    2.8    The Debtors' Other Litigation -- Settled and Ongoing Matters............31
            2.8.1    Libby and Vermiculite-Related Proceedings .......................................32
                    2.8.1.1    Libby, Montana.................................................................32
                    2.8.1.2    Libby Property Owners.....................................................32
                    2.8.1.3    State of Montana's Claims Against the Debtors................33
                    2.8.1.4    Former Plant in Minneapolis, Minnesota..........................33

i

| | 2.8.2 | The Multi-Site Settlement Agreement with the EPA and Other Settling Federal Agencies | 34 |
| | 2.8.3 | Other Significant Environmental Proceedings and Claims | 36 |
| | | 2.8.3.1 | Cape Cod Pipeline Remediation | 36 |
| | | 2.8.3.2 | Massachusetts Department of Environmental Protection Settlement | 37 |
| | | 2.8.3.3 | City of Cambridge Claim | 37 |
| | | 2.8.3.4 | Samson Hydrocarbons Claims | 38 |
| | | 2.8.3.5 | Jersey City Chromium Contamination Remediation | 38 |
| | | 2.8.3.6 | New Jersey Department of Environmental Protection Claim | 38 |
| | | 2.8.3.7 | Environmental Insurance Litigation | 39 |
| | 2.8.4 | Fraudulent Transfer Litigation | 40 |
| | 2.8.5 | Tax Claims | 41 |
| | | 2.8.5.1 | IRS Proposed Tax Adjustments | 41 |
| | | 2.8.5.2 | Bekaert Textiles N.V. | 42 |
| | | 2.8.5.3 | State Income Tax Claims | 42 |
| 2.9 | Liabilities Other than Litigation Claims | | 42 |
| | 2.9.1 | Current Liabilities not Subject to Compromise Under the Bankruptcy Code | 42 |
| | 2.9.2 | Non-Current Liabilities not Subject to Compromise Under the Bankruptcy Code | 42 |
| | 2.9.3 | Liabilities Subject to Compromise Under the Bankruptcy Code | 43 |
| | | 2.9.3.1 | Debt and Accrued Interest | 43 |
| | | 2.9.3.2 | Income Taxes | 43 |
| | | 2.9.3.3 | Post-Retirement Benefits Other than Pensions | 43 |
| | | 2.9.3.4 | Unfunded Special Pension Arrangements | 44 |
| | | 2.9.3.5 | Accounts Payable | 44 |
| | | 2.9.3.6 | Other Accrued Liabilities | 44 |
| 2.10 | Assets and Other Rights | | 44 |
| | 2.10.1 | Excess Real Property | 44 |
| | 2.10.2 | Insurance Rights | 45 |
| | | 2.10.2.1 | Overview | 45 |
| | | 2.10.2.2 | Primary Insurance Coverage | 45 |
| | | 2.10.2.3 | Excess Insurance Coverage | 46 |
| | | 2.10.2.4 | Estimated Insurance Recoveries | 47 |
| | 2.10.3 | Debtors' Retained Causes of Action | 47 |
| | | 2.10.3.1 | Preservation of Causes of Action | 47 |
| | | 2.10.3.2 | Maintenance of Causes of Action | 49 |
| | | 2.10.3.3 | Avoidance Actions | 50 |
| | | 2.10.3.4 | Preservation of All Causes of Action not Expressly Settled or Released | 50 |
| 2.11 | Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates | | 50 |

| | 2.11.1 | Reorganized Enterprise Value of the Reorganized Debtors and Non-Debtor Affiliates | 51 |
| | | 2.11.1.1 Comparable Public Company Analysis | 51 |
| | | 2.11.1.2 The Precedent Transaction Analysis | 51 |
| | 2.11.2 | Calculation of Reorganized Equity Value | 52 |
| | | 2.11.2.1 Net Debt | 52 |
| | | 2.11.2.2 Minority Interest | 52 |
| | | 2.11.2.3 Non-Core Liabilities | 52 |
| | | 2.11.2.4 Deferred Payment Agreement | 53 |
| | | 2.11.2.5 Warrant Issued to Trust | 53 |
| | | 2.11.2.6 Summary | 53 |

3. THE CHAPTER 11 FILINGS AND RELATED CANADIAN PROCEEDINGS ........... 54

3.1 Overview of Chapter 11 ................................................................................. 54

3.2 Significant Events During the Course of the Chapter 11 Cases ..................... 54

| | 3.2.1 | First Day Motions and Further Developments in the Chapter 11 Cases | 55 |
| | | 3.2.1.1 Retention and Employment of Professionals by the Debtors | 55 |
| | | 3.2.1.2 Financing and Critical Trade Motions | 55 |
| | | 3.2.1.3 Operational Motions | 56 |
| | 3.2.2 | Motions to Assume Pre-petition Executory Contracts and Leases | 56 |
| | 3.2.3 | Appointment of Official Committees of Creditors, the Official Equity Committee and the Future Claims Representative | 56 |
| | | 3.2.3.1 Official Committees of Creditors | 56 |
| | | 3.2.3.1.1 Unsecured Creditors' Committee | 56 |
| | | 3.2.3.1.2 Asbestos PI Committee | 57 |
| | | 3.2.3.1.3 Asbestos PD Committee | 57 |
| | | 3.2.3.2 Official Equity Committee | 57 |
| | | 3.2.3.3 Representative for Future Asbestos Claimants | 58 |
| | 3.2.4 | Section 341(a) Meeting of Creditors | 58 |
| | 3.2.5 | Selected Adversary Proceedings | 58 |
| | | 3.2.5.1 Stay of Asbestos-Related Litigation Against Various Affiliates | 58 |
| | | 3.2.5.2 Indirect PI Trust Claims | 61 |
| | | 3.2.5.3 Indirect PD Trust Claims | 64 |
| | | 3.2.5.4 Enjoining Bond Payments by National Union | 64 |
| | 3.2.6 | Extension of Exclusivity Period and Termination of Exclusivity Period | 65 |
| | 3.2.7 | Motions to Lift the Automatic Stay | 65 |
| | 3.2.8 | Certain Post-Petition Litigation Matters | 66 |
| | | 3.2.8.1 Litigation Related to the Debtors' Savings and Investment Plan | 66 |

|  |  | 3.2.8.2 | The Scotts Company Litigation .........................................67 |
|  |  | 3.2.8.3 | Montana Clean Air Act Criminal Litigation.....................68 |
|  |  | 3.2.8.4 | Bank Claims Default Interest Litigation...........................69 |
|  | 3.2.9 | | Motion for Entry of Case Management Order, the Estimation Hearing, and Settlement of all Asbestos PI Claims .............................70 |
|  | 3.2.10 | | Debtors' Bar Date for Asbestos PD Claims (Excluding US ZAI PD Claims), Non-Asbestos Claims, and Asbestos Medical Monitoring Claims ............................................................................72 |
|  | 3.2.11 | | The ADR Program .................................................................73 |
|  | 3.2.12 | | The Judge Wolin Mandamus and Recusal Proceedings .......73 |
|  | 3.2.13 | | Significant Asset Purchases and Dispositions .....................73 |
|  |  | 3.2.13.1 | Significant Asset Purchases and Investments....................73 |
|  |  | 3.2.13.2 | Significant Asset Dispositions ...........................................75 |
|  | 3.2.14 | | Tax Related Motions and Settlements ..................................75 |
|  |  | 3.2.14.1 | Tax Related Motions...........................................................75 |
|  |  | 3.2.14.2 | Tax Related Settlements .....................................................76 |
|  | 3.2.15 | | The Tersigni Investigation ...................................................77 |
|  | 3.2.16 | | Various Additional Claim Settlements During the Course of the Chapter 11 Cases...................................................................78 |
|  | 3.2.17 | | Various Motions Filed on an Annual Basis ..........................79 |
|  | 3.2.18 | | Previous Plans .....................................................................79 |
| 3.3 | | | The Canadian Proceedings..........................................................79 |
|  | 3.3.1 | | General Information .............................................................79 |
|  | 3.3.2 | | Notice of the Canadian Proceedings ....................................80 |
|  | 3.3.3 | | Quarterly Reports ................................................................80 |
|  | 3.3.4 | | Court Orders in the Canadian Proceedings ..........................81 |
|  |  | 3.3.4.1 | Orders Extending the Stay of Proceedings in Canada...............................................................................81 |
|  |  | 3.3.4.2 | Recognition of the Debtors' March 2003 Bar Date Order ...................................................................................81 |
|  |  | 3.3.4.3 | The Corporate Reorganization Order.................................82 |
|  | 3.3.5 | | Pre-petition Canadian Lawsuits ...........................................82 |
|  |  | 3.3.5.1 | Canadian Asbestos Personal Injury Lawsuits....................82 |
|  |  | 3.3.5.2 | Asbestos Property Damage Claims for Buildings Located in Canada..............................................................82 |
|  | 3.3.6 | | Post-Petition Canadian Lawsuits .........................................83 |
|  | 3.3.7 | | Canadian Claims .................................................................85 |
| 4. | | | SUMMARY OF THE PLAN ...............................................................85 |
| 4.1 | | | Overview of the Chapter 11 Plan................................................85 |
| 4.2 | | | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ....................................................86 |
| 4.3 | | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................................................................87 |

| | | | |
|---|---|---|---|
| 4.3.1 | Summary | .....................................................................................87 | |
| | 4.3.1.1 | Class 1. Priority Claims .....................................................87 | |
| | 4.3.1.2 | Class 2. Secured Claims.....................................................87 | |
| | 4.3.1.3 | Class 3. Employee Benefit Claims.....................................88 | |
| | 4.3.1.4 | Class 4. Workers' Compensation Claims ...........................89 | |
| | 4.3.1.5 | Class 5. Intercompany Claims ...........................................89 | |
| | 4.3.1.6 | Class 6. Asbestos PI Claims...............................................89 | |
| | 4.3.1.7 | Class 7. Asbestos PD Claims..............................................90 | |
| | 4.3.1.8 | Class 8. CDN ZAI PD Claims ...........................................90 | |
| | 4.3.1.9 | Class 9. General Unsecured Claims....................................91 | |
| | 4.3.1.10 | Class 10. Equity Interests in the Parent ............................96 | |
| | 4.3.1.11 | Class 11. Equity Interests in the Debtors Other than the Parent ............................................................................96 | |
| 4.4 | MODIFICATION OR WITHDRAWAL OF THE PLAN ...................................96 | | |
| 4.5 | PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS  AND ASBESTOS CLAIMS GENERALLY ................................................................96 | | |
| | 4.5.1 | Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims...........................................................................96 | |
| | 4.5.2 | Resolution of Asbestos PI Claims........................................................97 | |
| | 4.5.3 | Resolution of Asbestos PD Claims ......................................................97 | |
| | 4.5.4 | Resolution of CDN ZAI PD Claims.....................................................97 | |
| 4.6 | ACCEPTANCE OR REJECTION OF THE PLAN .............................................97 | | |
| 4.7 | IMPLEMENTATION OF THE PLAN ................................................................98 | | |
| | 4.7.1 | Corporate Governance ........................................................................98 | |
| | | 4.7.1.1 | Amendment of Certificates of Incorporation of the Debtors.................................................................................98 |
| | | 4.7.1.2 | Amendment of By-Laws of the Parent ...............................98 |
| | | 4.7.1.3 | Precedence of Share Issuance Obligations ........................98 |
| | | 4.7.1.4 | Warrant ...............................................................................99 |
| | 4.7.2 | The Asbestos PI Trust ......................................................................100 | |
| | | 4.7.2.1 | Creation of the Asbestos PI Trust....................................100 |
| | | 4.7.2.2 | Funding of the Asbestos PI Trust......................................100 |
| | | 4.7.2.3 | Transfer of Claims and Demands to the Asbestos PI Trust..................................................................................102 |
| | | 4.7.2.4 | Assignment and Enforcement of Trust Causes of Action.................................................................................102 |
| | | 4.7.2.5 | Appointment and Termination of Trustees.......................102 |
| | | 4.7.2.6 | Creation and Termination of the TAC..............................102 |
| | | 4.7.2.7 | Cooperation Agreement....................................................102 |
| | | 4.7.2.8 | Institution and Maintenance of Legal and Other Proceedings......................................................................103 |
| | 4.7.3 | The Asbestos PD Trust .....................................................................103 | |
| | | 4.7.3.1 | Creation of the Asbestos PD Trust...................................103 |

|  |  | 4.7.3.2 | Funding of the Asbestos PD Trust | 103 |
|--|--|--|--|--|
|  |  | 4.7.3.3 | Transfer of Claims and Demands to the Asbestos PD Trust | 104 |
|  |  | 4.7.3.4 | Appointment and Termination of Asbestos PD Trustee | 104 |
|  | 4.7.4 | Payments and Distributions Under the Plan | | 104 |
|  | 4.7.5 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | 105 |
|  | 4.7.6 | Payments Under the Plan | | 105 |
|  | 4.7.7 | Conditions to Occurrence of the Confirmation Date | | 105 |
|  | 4.7.8 | Conditions to Occurrence of the Effective Date | | 106 |
|  | 4.7.9 | Management of the Reorganized Debtors | | 106 |
|  | 4.7.10 | Corporate Action | | 107 |
|  | 4.7.11 | Effectuating Documents and Further Transactions | | 107 |
|  | 4.7.12 | Allocation of Plan Distributions Between Principal and Interest | | 107 |
|  | 4.7.13 | No Successor Liability | | 107 |
|  | 4.7.14 | Deemed Consolidation of the Debtors for Plan Purposes Only | | 108 |
|  | 4.7.15 | Insurance Neutrality | | 108 |
| 4.8 | Injunctions, Releases and Discharge | | | 109 |
|  | 4.8.1 | Discharge | | 109 |
|  |  | 4.8.1.1 | Discharge of the Debtors and Related Discharge Injunction | 109 |
|  |  | 4.8.1.2 | Discharge of Liabilities to Holders of Asbestos PI Claims | 110 |
|  |  | 4.8.1.3 | Discharge of Liabilities to Holders of Asbestos PD Claims | 110 |
|  |  | 4.8.1.4 | Discharge of Liabilities to Holders of CDN ZAI PD Claims | 110 |
|  |  | 4.8.1.5 | Disallowed Claims and Disallowed Equity Interests | 110 |
|  |  | 4.8.1.6 | Non-Dischargeable ERISA Liability | 110 |
|  | 4.8.2 | The Asbestos PI Channeling Injunction | | 111 |
|  |  | 4.8.2.1 | Asbestos PI Channeling Injunction | 111 |
|  |  | 4.8.2.2 | Reservations from Asbestos PI Channeling Injunction | 112 |
|  | 4.8.3 | The Asbestos PD Channeling Injunction | | 113 |
|  |  | 4.8.3.1 | Asbestos PD Channeling Injunction | 113 |
|  |  | 4.8.3.2 | Reservations from Asbestos PD Channeling Injunction | 114 |
|  | 4.8.4 | Asbestos Insurance Entity Injunction(s) | | 115 |
|  |  | 4.8.4.1 | Asbestos Insurance Entity Injunctions | 115 |
|  |  |  | 4.8.4.1.1 Injunction for the Benefit of the Asbestos PI Trust | 115 |

|  |  | 4.8.4.1.2 | Reservations from the Injunction for the Benefit of the Asbestos PI Trust..........116 |
|  | 4.8.5 | Successor Claims Injunction.............................................................116 |  |
|  |  | 4.8.5.1 | Injunction ..........................................................117 |
|  | 4.8.6 | Injunctions and Releases Related to the Sealed Air Indemnified Parties and Fresenius Indemnified Parties ..........................................117 |  |
|  | 4.8.7 | Terms of Certain Injunctions and the Automatic Stay.......................118 |  |
|  |  | 4.8.7.1 | Injunctions and/or Automatic Stays in Existence Immediately Prior to Confirmation...................................118 |
|  |  | 4.8.7.2 | Injunctions Provided for in the Plan .................................118 |
|  | 4.8.8 | Additional Releases and Indemnification ...........................................118 |  |
|  |  | 4.8.8.1 | Release of Sealed Air Indemnified Parties ......................118 |
|  |  | 4.8.8.2 | Reservation of Rights With Respect to Cryovac Transaction Contractual Obligations .............................119 |
|  |  | 4.8.8.3 | Release of Fresenius Indemnified Parties........................120 |
|  |  | 4.8.8.4 | Assumption of the 1998 Tax Sharing Agreement and Section 4.04 of the TSIA..........................................120 |
|  |  | 4.8.8.5 | Effect of the Fresenius Settlement Agreement, the Fresenius Settlement Order, the Sealed Air Settlement Agreement, and the Sealed Air Settlement Order ....................................................121 |
|  |  | 4.8.8.6 | Release of Avoidance Actions.........................................121 |
|  |  | 4.8.8.7 | Specific Releases by Holders of Claims or Equity Interests.............................................................121 |
|  |  | 4.8.8.8 | Release by Debtors and Estate Parties.............................122 |
|  |  | 4.8.8.9 | Indemnification of Representatives of the Debtors and Non-Debtor Affiliates ...............................................122 |
|  |  | 4.8.8.10 | Indemnification of Reorganized Debtors and Their Representatives by the Asbestos PI Trust.......................123 |
|  | 4.9 | EXECUTORY CONTRACTS, UNEXPIRED LEASES, LETTERS OF CREDIT, SURETY BONDS, COMPENSATION, INDEMNITY AND BENEFIT PROGRAMS ...............................................................123 |  |
|  | 4.10 | RETENTION OF JURISDICTION .....................................................125 |  |
|  | 4.11 | MISCELLANEOUS PROVISIONS......................................................125 |  |
| 5. |  | TRANSACTIONAL DOCUMENTS TO BE EXECUTED IN CONJUNCTION WITH THE PLAN AND EFFECTIVE DATE .............................................129 |  |
|  | 5.1 | Deferred Payment Agreement............................................................129 |  |
|  | 5.2 | Grace Guaranty .................................................................................129 |  |
|  | 5.3 | Share Issuance Agreement..................................................................129 |  |
|  | 5.4 | Warrant .............................................................................................130 |  |
|  | 5.5 | Plan Registration Rights Agreement...................................................130 |  |
|  | 5.6 | Asbestos PD Note .............................................................................130 |  |

6.    LIMITED SUBSTANTIVE CONSOLIDATION ...........................................................130

7.    VOTING AND CONFIRMATION PROCEDURES......................................................132
      7.1    Voting Procedures...................................................................................132
             7.1.1    Voting Instructions and Deadline.....................................................133
      7.2    Confirmation Procedures .........................................................................134
             7.2.1    Confirmation Hearing ......................................................................134
             7.2.2    Objections to Confirmation of the Plan ...........................................134
             7.2.3    Questions About the Disclosure Statement, Plan, or Ballots and
                      Master Ballots ..................................................................................136

8.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN...........................137
      8.1    Bankruptcy Code § 1129 Generally..........................................................137
      8.2    Vote Required for Class Acceptance ........................................................139
             8.2.1    Cram Down .......................................................................................139
      8.3    Feasibility of the Plan .............................................................................141
      8.4    Best Interests Test ...................................................................................142
      8.5    Information About Corporate Governance, Officers, and Directors of the
             Reorganized Debtors, and the Management of the Debtors .............................142
             8.5.1    Corporate Governance; Limitation of Director Liability....................142
             8.5.2    Management Compensation and Incentive Program ..........................143

9.    IMPORTANT CONSIDERATIONS AND RISK FACTORS.......................................144
      9.1    General....................................................................................................144
      9.2    Certain Bankruptcy and Mass Tort Law Considerations.....................................144
             9.2.1    Parties in Interest May Object to the Debtors' Classification of
                      Claims and Equity Interests .................................................................144
             9.2.2    A Delay in Plan Confirmation May Disrupt the Debtors'
                      Operations and Have Potential Adverse Effects of Prolonged
                      Confirmation Process........................................................................144
             9.2.3    The Debtors May Not be Able to Secure Confirmation or
                      Consummation of the Plan.................................................................144
             9.2.4    There is a Risk of Post-Confirmation Default....................................145
             9.2.5    Resale of Parent Common Stock May be Subject to
                      Requirements Under Applicable Securities Laws ..............................146
      9.3    Factors Affecting the Distributions to Holders of Allowed Claims After
             the Effective Date ...................................................................................146
             9.3.1    Financial Information is Based on the Debtors' Books and
                      Records and, Unless Otherwise Stated, No Audit Was
                      Performed........................................................................................146
             9.3.2    Variance from the Pro Forma and Prospective Financial
                      Information.......................................................................................146
             9.3.3    Risk that Amounts of Allowed Claims Will Exceed the
                      Debtors' Projections.........................................................................147

| | | | |
|---|---|---|---|
| 9.4 | | Insurance-Related Risk Factors | 147 |
| 9.5 | | Factors Affecting the Parent Common Stock | 148 |
| | 9.5.1 | The Reorganized Debtors May Not be Able to Achieve Projected Financial Results | 149 |
| | 9.5.2 | The Reorganized Debtors May Not be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures | 149 |
| | 9.5.3 | Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors | 149 |
| 9.6 | | Factors Associated with the Business | 149 |
| | 9.6.1 | Reorganized Grace May Not Obtain Post-Confirmation Financing | 149 |
| | 9.6.2 | Certain Debtors are Currently Under Criminal Indictment in Connection with the Former Vermiculite Mining and Processing Activities in Libby, Montana | 149 |
| | 9.6.3 | The Debtors are Subject to Environmental Clean-up Fines, Penalties and Damage Claims that have been and Continue to be Costly | 150 |
| | 9.6.4 | The Debtors' Ability to Use Future NOL Carryovers to Reduce Future Tax Payments May be Limited if there is a Change in Ownership of the Debtors or if the Debtors do not Generate Sufficient U.S. Taxable Income | 150 |
| | 9.6.5 | The Debtors have Unfunded and Underfunded Pension Plan Liabilities which will Likely Require them to use Current and Future Operating Cash Flow to Fund the Shortfall but There is no Assurance that the Debtors will Generate Sufficient Cash Flow to Satisfy these Obligations | 151 |
| | 9.6.6 | The International Scope of the Debtors' Operations Subjects them to the Risks of Doing Business in Foreign Countries, which could Adversely Affect their Business, Financial Condition and Results of Operations | 151 |
| | 9.6.7 | The Debtors are Exposed to Currency Exchange Rate Fluctuations that Could Impact their Profitability | 152 |
| | 9.6.8 | There are many Business Factors that Create Risks for the Debtors' Current Business Operations, as well as Reorganized Grace's Future Operations | 152 |
| 9.7 | | Risk that the Information in this Disclosure Statement May be Inaccurate | 153 |
| 10. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 154 |
| 10.1 | | Continuation of the Chapter 11 Cases | 154 |
| 10.2 | | Alternative Plans of Reorganization | 155 |
| 10.3 | | Chapter 7 Liquidation | 155 |

11.   FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................... 156
    11.1   Federal Income Tax Consequences to the Debtors ............................................. 157
        11.1.1   General Discussion ............................................................................. 157
        11.1.2   Deduction of Amounts Transferred to Satisfy Asbestos Claims ........ 157
        11.1.3   Cancellation of Debt Income ............................................................. 158
        11.1.4   Net Operating Losses ........................................................................ 158
    11.2   Federal Income Tax Consequences to Holders of Claims, the Asbestos PI
        Trust and the Asbestos PD Trust ..................................................................... 159
        11.2.1   Holders of Asbestos PI Claims and Holders of PD Claims ................ 159
        11.2.2   Treatment of the Asbestos PI Trust and the Asbestos PD Trust ......... 159
        11.2.3   Consequences to Holders of General Unsecured Claims .................... 159
        11.2.4   Consequences to Holders of Equity Interests .................................... 160
    11.3   Backup Withholding ...................................................................................... 160

12.   SECURITIES LAW MATTERS ................................................................................ 160
    12.1   Plan Securities .............................................................................................. 160
    12.2   Issuance Of Plan Securities Under The Plan ................................................... 160
    12.3   Resales Of Plan Securities ............................................................................. 161

13.   CONCLUSION AND RECOMMENDATION ............................................................ 163

## PRELIMINARY STATEMENT

Through this Disclosure Statement, the Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit 1. The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of Claims (and, in this case, Demands) against and Equity Interests in a debtor, is the overriding purpose of a chapter 11 case.

The Plan resolves, among other things, asbestos personal injury litigation against the Debtors that dates back to the 1980s, as well as lengthy chapter 11 cases that commenced on April 2, 2001. As of the Petition Date, the Parent and certain of its subsidiaries were defendants in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury.

Since the inception of these Chapter 11 Cases, the amount of the Debtors' present and future asbestos liabilities has been the subject of significant dispute. This dispute has led to a protracted chapter 11 case, involving litigation in both the Bankruptcy Court and the District Court. The issues in such litigation have included the estimation of the amount of the Debtors' asbestos personal injury liability, the determination of whether the Debtors' ZAI product created an unreasonable risk of harm and the adjudication of objections to in excess of 4,000 Asbestos PD Claims. For a further description of this litigation, *see* Sections 2.7 and 2.8.

On April 6, 2008, in the midst of litigation concerning the estimation of the Debtors' liability for Asbestos PI Claims, the Debtors, the Asbestos PI Committee, the Asbestos PI FCR and the Equity Committee reached an agreement in principle (the "Asbestos PI Settlement") to resolve all Asbestos PI Claims against the Debtors and to cooperate in the confirmation of a plan of reorganization. The Asbestos PI Settlement, which is the foundation for the Plan and will be implemented pursuant to the terms of the Plan, requires the following assets to be paid into the Asbestos PI Trust to be established pursuant to section 524(g) of the Bankruptcy Code:

- Cash in the amount of $250 million plus interest thereon from January 1, 2009 until (and including) the Effective Date at the same rate applicable to the Debtors' senior debt;

- A Warrant to acquire 10 million shares of the Parent's common stock at an exercise price of $17.00 per share, expiring one year from the effective date of the Plan;

- Rights to proceeds under the Debtors' asbestos-related insurance coverage;

- Certain cash and stock under certain litigation settlement agreements with Sealed Air Corporation, Cryovac, Inc. and Fresenius Medical Care Holdings, Inc.; and

- Deferred payments at $110 million per year for five years, beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments will be obligations of the Reorganized Debtors backed by 50.1% of the Parent's common stock to meet the requirements of section 524(g) of the Bankruptcy Code.

The Asbestos PI Trust will provide for the resolution of all Asbestos PI Claims and Successor Claims arising out of or based on any Asbestos PI Claim, including those arising subsequent to the date hereof. In addition, the Asbestos PI Settlement sets forth the treatment of other key classes of Claims against the Debtors, thereby forming the basis for the treatment of such Claims under the Plan. Section 3.2.9 and Article 5 provide a further description of the Asbestos PI Settlement and the transactional documents contemplated thereby, which will be executed in connection with the implementation of the Plan.

The Plan also provides for the resolution of Unresolved Asbestos PD Claims, including US ZAI PD Claims. Pursuant to the Plan, all Asbestos PD Claims, and Successor Claims arising out of or based on any Asbestos PD Claim, including those arising subsequent to the date hereof, will be channeled to the Asbestos PD Trust and all Allowed Asbestos PD Claims shall be paid in full by the Asbestos PD Trust, and CDN ZAI PD Claims will be channeled to the CDN ZAI PD Claims Fund and resolved in accordance with the terms of the CDN ZAI Minutes of Settlement. In connection with confirmation of the Plan, the Debtors will ask the Court to enter a case management order**the PD Case Management Order** setting forth the procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims.

The Plan is also intended to be consistent with and incorporate the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement by which a total of more than $1 billion in Cash and other consideration will be transferred to the Asbestos PI Trust and the Asbestos PD Trust. Except as may be expressly agreed in writing by Sealed Air Corporation, Cryovac, Inc., and Fresenius in their absolute discretion, nothing in the Plan or any Plan Document shall be deemed to alter, modify, amend, or otherwise change, in any way the Sealed Air Settlement Agreement or the Fresenius Settlement Agreement. Those settlements are described more fully in Section 2.8.4 herein.

The Asbestos PI Settlement and the Plan reflect a delicate compromise reached by the Plan Proponents to resolve all issues and allocate values to various constituencies. The Debtors' Boards of Directors believe that the Plan is in the best interests of all of the Debtors' creditors and other stakeholders. The Asbestos PI Committee and the Equity Committee support the Plan and encourage their constituencies to vote in favor of the Plan. The Asbestos PI FCR also supports the Plan. The Plan allocates recoveries for all parties on a fair and equitable basis as set forth on the treatment chart in Section 1.2.1. Further, the Plan provides a mechanism for the Debtors to fully discharge all Asbestos PI Claims, Asbestos PD Claims and CDN ZAI PD Claims through the creation of the Asbestos PI Trust, the Asbestos PD Trust and the CDN ZAI PD Claims Fund.

The Unsecured Creditors' Committee is not a co-proponent of the Plan. For a more detailed discussion of the Unsecured Creditors' Committee's objections to the treatment of Class 9 Claims, *see* the discussion in Section 4.3.1.9.

## 1.   EXECUTIVE SUMMARY OF THE PLAN

The following is a brief summary of this Disclosure Statement and of the Plan. This summary is just that - a summary. It is incomplete by definition and is qualified in its entirety by

12

reference to the more detailed information appearing elsewhere in this Disclosure Statement, in the Plan, and in the other Plan Documents.

## 1.1 The Disclosure Statement

This Disclosure Statement describes the Debtors (in Article 2), discusses the events leading to the filing of the Chapter 11 Cases (in Article 2), and describes the main events that have occurred in the Chapter 11 Cases (in Article 3), including the related international proceedings (in Section 3.3) and proposed limited substantive consolidation (in Article 6).

This Disclosure Statement goes on to summarize the Plan's contents (in Article 4), describe the chapter 11 voting procedures (in Article 7), and the process the Court will follow in determining whether to confirm the Plan (in Articles 7, 8). This Disclosure Statement then outlines risk factors associated with the Plan (in Article 9), alternatives to the Plan (in Article 10), certain potential federal income tax consequences (in Article 11), and securities implications of the Plan (Article 12). Finally, this Disclosure Statement makes clear that the Debtors recommend that Holders of Claims and Equity Interests who are eligible to vote on the Plan vote to accept the Plan (in Article 13).

## 1.2 The Plan

### 1.2.1 What Claims and Equity Interests Are Affected by the Plan?

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan. The figures in the column entitled "Estimated Amount of Allowed Claims" are consistent with the Debtors' books and records and include the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be estimated or valued significantly higher or lower.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|-------|---------------------|----------|--------------------------|--------------------------------|------------------------------|
| N/A | Administrative Expense Claims | N/A | Subject to the provisions of Bankruptcy Code §§ 330(a), 331, and 503, each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Administrative Expense Claim either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense Claim and the Reorganized Debtors or otherwise established | $33.8 million[3] | 100% |

---

2   This estimate is for the principal amount of the Claim only. The payment will include interest, at the applicable rate as provided for in the Plan or otherwise ordered by the Court.

3   Includes amounts to be paid on the Effective Date or as soon as practicable thereafter ($33,734,229) and unliquidated amounts that would be paid as Administrative Expense Claims if and when allowed ($25,197).

13

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | pursuant to an order of the Bankruptcy Court; *provided* that (A) Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession on or after the Petition Date or assumed by the Debtors in Possession pursuant to the Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court and (B) Allowed Administrative Expense Claims of Professionals shall be paid pursuant to an order of the Bankruptcy Court. | | |
| N/A | Priority Tax Claims | N/A | Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in Cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other terms as may be agreed upon by the Holder of an Allowed Priority Tax Claim and approved by the Bankruptcy Court, or (iii) in equal quarterly Cash payments commencing on the Initial Tax Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 4.19% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms (including such other rate of interest) determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; *provided, however*, that each Holder of a Priority Tax Claim which by operation of the Fresenius Settlement Agreement is an obligation for Fresenius Indemnified Taxes promptly shall be paid in full in Cash as such Fresenius Indemnified Taxes become due and payable. | $33.4 million | 100% |
| Class 1 | Priority Claims | No | Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim plus interest at 4.19%, from the Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate, at the option of the Reorganized Debtors, either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such | $709,873[4] | 100% |

---

4    Includes amounts to be paid on the Effective Date or as soon as practicable thereafter ($209,873) and unliquidated amounts that would be Class 1 Claims if and when allowed and paid in accordance with their terms ($500,000).

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be agreed upon by the Holder of an Allowed Priority Claim. | | |
| Class 2 | Secured Claims | No | Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim plus interest at 4.19%, from the Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate, at the option of the Reorganized Debtors, either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be agreed upon by the Holder of an Allowed Secured Claim; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Secured Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). | $5,754,496[5] | 100% |
| Class 3 | Employee Benefit Claims | No | Employee Benefit Claims shall be reinstated under the Plan and paid pursuant to the written benefit plan or plans that the Debtors intend to continue pursuant to Section 9.3.1 of the Plan, subject to the terms and conditions of such plans. Thus, the Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. | $165.3 million[6] | 100% |
| Class 4 | Workers' Compensation Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each Workers' Compensation Claim entitles the Holder of such Workers' Compensation Claim.  For the avoidance of doubt, in no event shall any of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties have any liability with respect to any Workers' Compensation Claim. | Allowed Claims have already been paid pursuant to first day orders of the Bankruptcy Court and continue to be paid in the ordinary course | 100% |

---

5    Includes amounts to be paid on the Effective Date or as soon as practicable thereafter ($562,100), amounts paid after the Effective Date in accordance with their terms ($3,500,000) and unliquidated amounts that would be Class 2 claims if and when allowed ($1,692,396).

6    Includes approximately $70.9 million of post-retirement benefits other than pensions as described in Section 2.9.3.3 herein and approximately $94.4 million of unfunded special pension arrangements as described in Section 2.9.3.4 herein.  Includes amounts to be paid on the Effective Date or as soon as practicable thereafter ($15.8 million) and amounts paid after the Effective Date in accordance with their terms ($149.5 million).

15

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | | as they become due. | |
| Class 5 | Intercompany Claims | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each Intercompany Claim entitles the Holder of such Intercompany Claim. | For pro forma cash flow purposes all Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. | 100% |
| Class 6 | Asbestos PI Claims | Yes | All Asbestos PI Claims shall be resolved in accordance with the terms, provisions, and procedures of the Asbestos PI Trust Agreement and the TDP (unless previously allowed pursuant to an order of the Court or agreement of the Parties). All Asbestos PI Claims shall be paid by the Asbestos PI Trust solely out of the Asbestos PI Trust Assets as and to the extent provided in the TDP. Asbestos PI Claims shall not be deemed allowed or Disallowed (unless an order or agreement approved by the Court allowing such Claim has been previously entered) but rather, shall be resolved by the Asbestos PI Trust pursuant to the terms of the TDP. | N/A | Unknown |
| Class 7 | Asbestos PD Claims | No | Each Holder of an Asbestos PD Claim that is Allowed as of the Effective Date pursuant to a PD Settlement Agreement, or other stipulation, order or agreement, shall be paid the Allowed Amount of its Allowed Asbestos PD Claim in Cash in full pursuant to the terms of the respective PD Settlement Agreements, or other stipulation, order or agreement, by the Asbestos PD Trust pursuant to the terms of the Asbestos PD Trust Agreement. Asbestos PD Claims, other than US ZAI PD Claims, that are unresolved prior to the Effective Date are identified in Exhibit 21 in the Exhibit Book. Such Asbestos PD Claims, together with the US ZAI PD Claims, are known as the "Unresolved Asbestos PD Claims," and shall be paid pursuant to the following procedures: (i) in connection with confirmation of the Plan, the Court shall enter a ~~case management order~~the PD Case Management Order setting forth procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims; and (ii) | $109 million[7] | 100% |

---

7    Represents amount of Asbestos PD Initial Payment. Amounts in excess of the Asbestos PD Initial Payment, if any, will be paid by the Asbestos PD Note.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Allowed Unresolved Asbestos PD Claims shall be paid in full, in Cash, by the Asbestos PD Trust pursuant to the terms of the Asbestos PD Trust Agreement. All Allowed Asbestos PD Claims shall be paid in full by the Asbestos PD Trust solely from the Asbestos PD Trust Assets. The inclusion of Demands as Asbestos PD Claims and US ZAI PD Claims and any reference to Demands related to Asbestos PD Claims or US ZAI PD Claims in the Plan does not constitute an admission by the Debtors and the other Plan Proponents that an Entity which did not have an allowable US ZAI PD Claim or other Asbestos PD Claim against the Debtors as of the Effective Date could assert a valid claim against the Asbestos PD Trust contemplated under the Plan, and all rights and defenses to the allowance of such a claim by the Asbestos PD Trust are expressly reserved pursuant to the Plan. | | |
| Class 8 | CDN ZAI PD Claims | Yes | All CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement. All CDN ZAI PD Claims shall be paid from the CDN ZAI PD Claims Fund in the manner set out in the CDN ZAI Minutes of Settlement. CDN ZAI PD Claims shall not be deemed Allowed or Disallowed, but rather shall be resolved as set forth in the CDN ZAI Minutes of Settlement. Confirmation of the Plan shall constitute approval by the Bankruptcy Court of the settlement reflected in the CDN ZAI Minutes of Settlement for all purposes including to the extent required by Bankruptcy Rule 9019. | $6.5 million[8] | Unknown |
| Class 9 | General Unsecured Claims | No[9] | Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its Allowed General Unsecured Claim plus post-petition interest on such Claim either (i) in Cash in full on the later of (A) the Effective Date or (B) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or (ii) on such other less favorable terms as have been agreed upon by the Holder of an Allowed General Unsecured Claim and the Debtors or the | $826.3 million[10] | 100% |

---

8    Represents amount of the Debtors' contribution to the CDN ZAI PD Claims Fund under the CDN ZAI Minutes of Settlement.

9    The Unsecured Creditors' Committee believes that the Plan impairs the rights of Class 9 Claims. *See* Section 4.3.1.9 herein for a discussion of the Committee's position in this regard.

10   Includes amounts to be paid on the Effective Date or as soon as practicable thereafter of $666.6 million ($30.3 million accounts payable, $500.0 million under the Debtors' Pre-petition Credit Facilities, $24.2 million under drawn letters of credit and other debt, $76.3 million of Environmental Claims and $35.8 million of other General Unsecured Claims) and amounts to be paid after the Effective Date in accordance with their terms of $159.7 million ($69.8 million of Environmental Claims, $67.2 million of tax reserves and $22.7 million of other General Unsecured Claims).

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| | | | Reorganized Debtors. Subject to Section 3.1.9(d) of the Plan, post-petition interest on Allowed General Unsecured Claims shall be calculated as follows: (i) either (A) for General Unsecured Claims arising from the Pre-petition Credit Facilities, post-petition interest shall be calculated from the Petition Date through December 31, 2005 at the rate of 6.09% and thereafter at floating prime, in each case compounded quarterly through the Effective Date; (B) for General Unsecured Claims arising from Environmental Claims that include a liquidated amount for post-petition or future cleanup liability, post-petition interest shall be calculated at the rate of 4.19% from the date specified in any order allowing the Environmental Claim in such liquidated amount, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; (C) for General Unsecured Claims arising from an existing contract that specifies payment of interest at a non-default rate of interest, post-petition interest shall be calculated at the non-default rate of interest provided in such contract from the Petition Date, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; or (D) for all other General Unsecured Claims, post-petition interest shall be calculated at the rate of 4.19% from the Petition Date, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; or (ii) on such other less favorable terms as those that have been agreed upon by the Holder of an Allowed General Unsecured Claim and the Debtors or the Reorganized Debtors, including an agreement whereby no post-petition interest is paid on the Claim or post-petition interest begins to accrue on the Claim on a date other than the Petition Date.    The Plan also provides procedures whereby the Holders of Class 9 Claims, other than Holders of Claims based on the Debtors' Pre-petition Credit Facilities, may request a determination of whether they are entitled to post-petition interest at a rate or calculation other than the treatment provided for in the Plan. *See* Section 4.3.1.9 herein for a further discussion of these procedures. | | |
| Class 10 | Equity Interests in the Parent | Yes | On the Effective Date, Class 10 Equity Interests in the Parent shall be retained, subject to the issuance of the Warrant and the terms of the Share Issuance Agreement. | N/A | N/A |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED | TREATMENT UNDER THE PLAN | ESTIMATED AMOUNT OF ALLOWED CLAIMS[2] | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|---|
| Class 11 | Equity Interests in Debtors Other than the Parent | No | The Plan leaves unaltered the legal, equitable, and contractual rights to which each Equity Interest in the Debtors other than the Parent entitles the Holder of such Equity Interest. | N/A | 100% |

### 1.2.2    How Will Asbestos Claims be Treated?

The Plan divides Asbestos Claims into three categories: (1) Asbestos PI Claims (Class 6), (2) Asbestos PD Claims (Class 7) and (3) CDN ZAI PD Claims (Class 8).  Asbestos PI Claims will be channeled to the Asbestos PI Trust to be resolved and paid by the Asbestos PI Trust pursuant to the TDP, and Asbestos PD Claims will be channeled to the Asbestos PD Trust and those Allowed will be paid in Cash in full from the Asbestos PD Trust.  CDN ZAI PD Claims will be channeled to, and paid from, the CDN ZAI PD Claims Fund according to the CDN ZAI Minutes of Settlement.

### 1.2.3    How Will the Treatment of Asbestos PI Claims be Effectuated?

The Asbestos PI Trust will, among other things, (1) assume liability for all Asbestos PI Claims (whether now existing or arising at any time in the future), (2) process and resolve all Asbestos PI Claims, and (3) pay all Asbestos PI Claims in accordance with the Plan, the Asbestos PI Trust Agreement and the TDP.  The Reorganized Debtors have certain deferred payment obligations to the Asbestos PI Trust for a period of 15 years beginning in 2019, backed by a guaranty from the Parent.

The Asbestos PI Trust will be the only Entity that a Holder of an Asbestos PI Claim may look to for recovery on account of such a Claim.  Article 8 of the Plan (Injunctions, Releases & Discharge) makes this clear.  The Asbestos PI Trust Agreement and the TDP govern more specifically the operation of the Asbestos PI Trust.

### 1.2.4    How Will the Treatment of Asbestos PD Claims be Effectuated?

The Asbestos PD Trust will, among other things, (1) assume liability for all Asbestos PD Claims (whether now existing or arising at any time in the future to the extent such future claims could occur) and (2) pay all Allowed Asbestos PD Claims in Cash in full pursuant to the terms of the Asbestos PD Trust Agreement, PD Settlement Agreements and any Final Orders of the Bankruptcy Court allowing such claims.  In connection with confirmation of the Plan, the Court shall enter a case management order**the PD Case Management Order** setting forth the procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims.   **The PD Case Management Order includes a list of Unresolved Asbestos PD Claims and a scheduling order for resolving such Claims.  The PD Case Management Order is attached in the form of Exhibit 25 included in the Exhibit Book.**

The Asbestos PD Trust will be the only Entity that a Holder of an Asbestos PD Claim may look to for recovery on account of such a Claim.  Article 8 of the Plan (Injunctions, Releases & Discharge) makes this clear.  The Asbestos PD Trust Agreement governs more specifically the operation of the Asbestos PD Trust.

19

### 1.2.5    How Will the Treatment of CDN ZAI PD Claims be Effectuated?

CDN ZAI PD Claims will be channeled to, and paid from, the CDN ZAI PD Claims Fund according to the CDN ZAI Minutes of Settlement. The CDN ZAI PD Claims Fund will be the only Entity that a Holder of an CDN ZAI PD Claim may look to for recovery on account of such a Claim. Article 8 of the Plan (Injunctions, Releases & Discharge) makes this clear.

### 1.2.6    How Will Non-Asbestos Claims be Treated Under the Plan?

The Plan provides that all Holders of General Unsecured Claims will be paid the value of their Allowed Claims in Cash in full. Unless previously agreed to by a Holder of a General Unsecured Claim, such Holder will be entitled to payment of interest on such General Unsecured Claim at the applicable rate specified in the Plan. There is a dispute between the Debtors and the Unsecured Creditors' Committee regarding whether all General Unsecured Claims are receiving under the Plan Cash in the full amount of their respective Claims with post-petition interest. *See* the more detailed discussion in Section 4.3.1.9 herein.

The Debtors will satisfy certain other of their non-asbestos related liabilities, including tax, workers' compensation, employee-related benefits, pension and retirement medical obligations, and Intercompany Claims, as they become due and payable over time. In essence, these claims against the Debtors will "pass through" confirmation and be paid by the Reorganized Debtors in the ordinary course of their business unless any of such claims are expunged.

### 1.2.7    How Will Equity Interests be Treated Under the Plan?

The Plan provides that Parent Common Stock will remain outstanding. However, the interests of existing stockholders will be subject to dilution by, among other things, the issuance of Parent Common Stock upon exercise of the Warrant or under the Parent's obligation to issue shares of the Parent Common Stock if the Parent fails to perform its guaranty of Grace-Conn's obligations to make deferred payments to the Asbestos PI Trust and the Asbestos PD Trust under the PI Deferred Payment Agreement and the PD Deferred Payment Agreement.

### 1.2.8    How Will the Plan be Funded?

Funding of the Asbestos PI Trust will come from several sources, including: (1) $250 million in Cash plus certain interest from the Debtors; (2) a Warrant to acquire 10 million shares of Parent Common Stock at an exercise price of $17.00 per share; (3) deferred payments of $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024, as further set forth in the Deferred Payment Agreement, backed by a guaranty; (4) insurance rights and proceeds; (5) the Cryovac Payment (comprised of a combination of Cash in the amount of $512.5 million plus interest and 18 million shares of common stock of Sealed Air, each of which is subject to adjustment under the terms of the Sealed Air Settlement Agreement) reduced by Cryovac, Inc.'s direct transfer to the Asbestos PD Trust as part of the Asbestos PD Initial Payment, which will be transferred by Cryovac, Inc. directly to the Asbestos PI Trust; (6) the Fresenius Payment (Cash in the amount of $115 million) reduced by the amount of Fresenius's direct transfer to the Asbestos PD Trust as part of the Asbestos PD Initial Payment, which will be transferred by Fresenius directly to the Asbestos

PI Trust; (7) an amount in Cash equal to the Asbestos PD Initial Payment from the Parent; (8) the Trust Causes of Action; and (9) following the transfer or vesting of the foregoing to or in the Asbestos PI Trust, any proceeds thereof and earnings and income thereon.

The initial payment percentage ("IPP") shall be set promptly after the Effective Date by the Trustees, after consultation with the TAC and the FCR. The IPP shall be between 25% and 35%. The ACC and the FCR believe it is prudent to set the precise IPP at that time to more accurately reflect the value of certain assets being transferred or contributed to the Asbestos PI Trust, including the Warrant, the Sealed Air Common Stock and the Asbestos Insurance Rights. The Warrant and the Sealed Air Common Stock are especially subject to market fluctuations which have recently been extraordinary and may continue to fluctuate at any time. Further, the value of the Asbestos Insurance Rights are also impossible to predict with any certainty at this point as the various insurers have notified the Plan Proponents that they may contest their applicable insurance contracts.

Funding of the Asbestos PD Trust will come from the Asbestos PD Trust Assets, which shall be comprised of (1) the Asbestos PD Initial Payment, which is an amount in Cash equal to the sum of (A) $109 million, the total payments due under settled Asbestos PD Claims, and (B) an amount agreed to by the Parent, Sealed Air Corporation, Cryovac, Inc., Fresenius, and the Asbestos PD FCR, constituting an estimate of the first six months of the Asbestos PD Trust Expenses, to be transferred equally by Cryovac, Inc. and Fresenius directly to the Asbestos PD Trust on the Effective Date, *provided, however*, that the Fresenius payment to the Asbestos PD Trust shall not exceed 65% of the Fresenius Payment; and (2) the Asbestos PD Note, pursuant to which the Parent shall commit to pay the Asbestos PD Trust on January 1 and July 1 of each year, a dollar amount equal to (A) the amount of the Asbestos PD Claims that were Allowed against the Asbestos PD Trust during the preceding six-month period, plus interest thereon accruing at the then-applicable federal judgment rate per annum from the date of allowance of each such Asbestos PD Claim; and (B) the Asbestos PD Trust Expenses payment for the next succeeding six-month period following the Asbestos PD Trust Expenses payment paid as part of the Asbestos PD Initial Payment. The Asbestos PD Note shall be secured by Parent's obligation to issue 50.1% of Parent Common Stock as of the Effective Date.

On the Effective Date, the Asbestos PD Trust shall also be funded with all funding as set forth in the CDN ZAI Minutes of Settlement, and the Asbestos PD Trust shall immediately transfer such amounts to the CDN ZAI PD Claims Fund to be used in the manner set forth in the CDN ZAI Minutes of Settlement

The Reorganized Debtors will fund distributions to all other Classes directly, with funds from a number of sources including: (1) Cash on hand; (2) the Exit Financing; and (3) cash flow from future operations.

## 2.    DESCRIPTION OF THE DEBTORS

### 2.1    General Overview of the Debtors

W. R. Grace & Co. (the "Parent") is a global holding company that conducts substantially all of its business through a direct, wholly-owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn"). Grace-Conn owns substantially all of Grace's United States assets, properties, and

rights directly or through direct or indirect U.S. and non-U.S. subsidiaries.[11] The Parent and 61 of its 76 direct or indirect U.S. subsidiaries, including Grace-Conn, are Debtors in the Chapter 11 Cases. The Parent's other domestic subsidiaries and its non-U.S. subsidiaries are Non-Debtor Affiliates; however, their outstanding ownership interests are assets of the Debtors and the Debtors control such entities. The Debtors, the Non-Debtor Affiliates, and their respective businesses are managed on a consolidated basis by the Board of Directors and officers of the Parent.

Grace is engaged in specialty chemicals and materials businesses, operating on a global basis through two operating segments: Grace Davison and Grace Construction Products.

## 2.2    The Debtors' Current Businesses

### 2.2.1    Grace Davison Operating Segment

Grace Davison accounted for approximately 64% of Grace's 2007 sales. Grace Davison markets its products to a wide range of industrial customers, including those in the energy and refining industry, consumer, industrial and packaging industries, petro-/bio- chemical industry and the pharmaceutical and life sciences industry. Grace Davison includes the following product groups:

#### 2.2.1.1    Refining Technologies

Refining Technologies includes: (a) fluid catalytic cracking, or FCC, catalysts, that help to "crack" the hydrocarbon chain in distilled crude oil to produce transportation fuels, such as gasoline and diesel fuels, and other petroleum-based products; and FCC additives used to reduce sulfur in gasoline, maximize propylene production from refinery FCC units, and reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from refinery FCC units; and (b) hydroprocessing catalysts, marketed through the Advanced Refining Technologies, LLC joint venture with Chevron Products Company, in which Grace holds a 55% economic interest, that are used in process reactors to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen, sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process.

#### 2.2.1.2    Materials Technologies

Materials Technologies includes: (a) silica-based and silica-alumina-based engineered materials used in (i) industrial applications, such as rubber and tires, plastics, precision investment casting, refractory, insulating glass windows, and drying applications, fulfilling various functions such as reinforcement, high temperature binding and moisture scavenging, (ii) consumer applications, as a free-flow, carrier or processing aid in food and personal care products, as a toothpaste abrasive, and for the processing and stabilization of edible oils and beverages, and (iii) coatings and print media applications consisting of functional additives that:

---

11    As used within Article 2 of this Disclosure Statement, "Grace" means either the Debtors and the Non-Debtor Affiliates, or the business of the Parent and its subsidiaries in general, as the context requires.

provide matting effects and corrosion protection for industrial coatings, enable enhanced media and paper quality in ink jet coatings, and act as a functional filler and retention aid in paper; and (b) sealants and coatings used in rigid food and beverage packaging, including can and closure sealants used to seal and enhance the shelf life of can and bottle contents, and coatings for cans and closures that prevent metal corrosion, protect package contents from the influence of metal and ensure proper adhesion of sealing compounds and technologies designed to reduce off-taste effects and extend the shelf-life of packaged products.

### 2.2.1.3    Specialty Technologies

Specialty Technologies includes:  (a) polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial, environmental and consumer applications, and (b) silica-based materials and chromatography columns, instruments, consumables and accessories used in analytical chemistry applications and life sciences.

### 2.2.2    Grace Construction Products Operating Segment

Grace Construction Products ("GCP") accounted for approximately 36% of Grace's 2007 sales.  GCP produces and sells specialty construction chemicals and materials, including: concrete admixtures and fibers used to improve the durability and working properties of concrete; additives used in cement processing to improve energy efficiency, enhance the characteristics of finished cement and improve ease of use; building materials used in commercial and residential construction and renovation to protect buildings from water, vapor and air penetration; and fireproofing materials used to protect buildings in the event of fire.

GCP is organized into geographic regions and most product lines, with certain regional variations, are offered in each region.  GCP manages its business under a geographic organizational structure that focuses on the following regions:  Americas – including North, Central and South America; Europe – including Eastern and Western Europe, the Middle East, Africa and India; and Asia – including China, Japan, South Korea, South Asia (excluding India), Pacific Rim countries, Australia and New Zealand.

### 2.2.3    Additional Information

For additional information about the Debtors' business operations, please refer to the Parent's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, Quarterly Reports on Form 10-Q for the first and second quarters of 2008 respectively, and any other recent report to the Securities and Exchange Commission.  These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec/gov or the Debtors' website at http://investor.grace.com.

### 2.3    Business Strategy

Grace's business strategy is to seek increased enterprise value by profitably growing its specialty chemicals and materials businesses in the global marketplace and achieving high levels of efficiency.  To achieve these objectives, Grace plans to:  invest in research and development activities, with the goals of introducing new high-performance, technically differentiated

products and services while continuing to enhance manufacturing processes and operations; expand sales and manufacturing into geographic areas with emerging market economies, including China, India, Eastern Europe, Latin America, South America, Africa and the Middle East; pursue selected acquisitions and alliances that complement current product offerings or provide opportunities for faster penetration of desirable market or geographic segments; and continue Grace's commitment to process and productivity improvements and cost-management, such as rigorous controls on working capital and capital spending, integration of functional support services worldwide, and programs for supply chain management, which include both procurement and materials management.

### 2.4    Employees

As of December 31, 2007, Grace employed approximately 6,500 persons, of whom approximately 3,050 were employed in the United States. Of Grace's total employees, approximately 3,850 work in Grace Davison facilities, approximately 1,850 work in GCP facilities, and approximately 800 are dedicated to corporate activities and/or are shared through globally managed professional groups such as financial and legal services, human resources, information technology, supply chain and environmental health and safety.

### 2.5    Properties

Grace operates manufacturing and other types of plants and facilities (including office, warehouse, and other service facilities) throughout the world. Some of these plants and facilities are shared by both operating segments. Grace owns all of its major manufacturing facilities. Substantially all of Grace's U.S. properties are subject to security interests under the Debtors' debtor-in-possession borrowing facility. As of December 31, 2007, Grace Davison operated 40 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 15 |
| Europe | 12 |
| Latin America | 2 |
| Asia Pacific | 11 |

Grace's largest Grace Davison facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany. Grace Davison also operates sales offices and warehouses in various regions.

24

As of December 31, 2007, GCP operated out of 55 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 23 |
| Europe | 13 |
| Latin America | 3 |
| Asia Pacific | 16 |

The largest GCP facilities are located in Cambridge, Massachusetts; Chicago, Illinois; and Slough, England. Because of the nature of GCP's products and markets, GCP requires a greater number of facilities to service customers than Grace Davison. These facilities are generally smaller and less capital intensive than Grace Davison facilities. Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044.

### 2.6    Genesis of the Debtors' Asbestos Liabilities

Grace's first significant involvement in the manufacture and sale of asbestos-containing products began in 1963, when its Dewey & Almy Division purchased the business and assets of Zonolite Company ("Zonolite"). Zonolite purchased asbestos from commercial suppliers and incorporated it into certain building products. It also mined and processed vermiculite from a mine near Libby, Montana and another mine in South Carolina. At the Libby mine, the vermiculite product contained small amounts of asbestos, as more fully described below. Grace ended U.S. sales of asbestos-added products in 1973 and Canadian sales of such products in 1976. Grace closed the Libby vermiculite mine in 1990 and ceased shipping Libby vermiculite in April, 1993.

### 2.6.1    Asbestos-Added Products

The principal asbestos-added products produced by Grace were spray-on fireproofing, acoustical plasters and textured ceiling finishes. They consisted of binders, insulating materials (e.g. gypsum, cement, clay, vermiculite), and added asbestos purchased from asbestos producers. The fireproofing product, Monokote-3 ("MK-3"), was sprayed on steel structural-components of buildings to prevent or delay the steel from collapsing in the event of a fire.

### 2.6.2    Libby Vermiculite

From 1963 to 1990, Grace owned and operated a mining and processing facility in Libby, Montana at which it mined vermiculite and processed vermiculite products. Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated. This exfoliated or expanded vermiculite is lightweight and fire-resistant, and thus can be used for insulation, fireproofing, potting soil and other applications. Vermiculite is itself an inert mineral that is not a form of asbestos and has no known toxic properties. Vermiculite ore from the Libby mine, however, contained numerous secondary minerals, including a form of asbestos consisting of

25

asbestiform amphiboles.[12]  Claimants injured by exposure to asbestos from Grace's operations in Lincoln County, Montana (the "Libby Claimants")[13] assert that amphibole asbestos is far more deadly than the more common chrysotile asbestos.  The Libby Claimants assert that the long, needle-like amphibole asbestos fibers can easily become embedded in the lungs and cause a highly progressive form of asbestos pleural disease, which is often fatal.

The Libby facility milled the mined ore into a concentrate through a crushing, screening, washing and flotation separation process that Grace alleges removed most impurities, including the amphibole.  The asbestos content of the vermiculite concentrate after milling trended downward during the 1970's and, by the 1980's, the vermiculite concentrate contained 1-3% on average and generally less than 1% asbestos.  At Grace's "expansion plants" throughout the country, the concentrate was passed through furnaces at temperatures approaching 2,000 degrees Fahrenheit, which resulted in the further reduction of asbestos content.  The expanded vermiculite was bagged and sold under the Zonolite trademark.

### 2.6.2.1 Personal Injury Claims from Libby Operations

The Libby Claimants assert that over 1,500 Libby residents – workers at the Libby mine, their families, and townspeople – have been diagnosed with asbestos disease stemming from amphibole asbestos from Libby.  The Libby Claimants assert that over 200 people have died as a result of this exposure and others are approaching the end stage.  According to the Libby Claimants, there is no question concerning exposure to Grace's asbestos or Grace's responsibility for the Libby Claimants' injury.  Grace and other parties in interest dispute the validity of many of the Libby Claimants' claims.

### 2.6.3    Zonolite Attic Insulation

One of Grace's principal commercial vermiculite products was a loose-fill attic insulation product that was sold primarily under the brand name Zonolite Attic Insulation ("ZAI").  ZAI was poured into attics in houses and other buildings.  Like other expanded Libby vermiculite, ZAI often contained trace quantities of asbestos.  Asbestos was not added to ZAI and, as noted above, the milling and expansion processes removed nearly all asbestos contaminants from the vermiculite ore.  Because the asbestos impurities were reduced to trace levels, ZAI is not an asbestos-containing product as defined in federal regulations.[14]    Nonetheless, and notwithstanding the preceding note regarding federal regulations, Asbestos PI Claims and Asbestos PD Claims include within their scope Claims relating to ZAI (including CDN ZAI PI Claims and US ZAI PD Claims).  Moreover, although the Asbestos PD Committee and ZAI

---

12    Asbestiform amphibole impurities in vermiculite are atypical and not characteristic of most vermiculite deposits.  Grace believes that the amount of impurities is related to the extreme depth of the ore deposit in Libby. Most vermiculite deposits — such as those at Grace's Enoree, South Carolina mine — are relatively shallow.

13    As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 18664], as it may be amended and restated from time to time.

14    Under federal regulations, "materials" containing less than 1% asbestos by weight are not included in the regulations as "asbestos-containing materials."  *See, e.g.*, 40 Code of Federal Regulations §§ 61.141 and 763.83.

claimants have asserted that ZAI has been found to contain more than 1% asbestos, the Debtors have concluded that such samples are exceedingly rare and have no relevance to the question of whether ZAI poses an unreasonable risk of harm. As discussed in Section 2.7.3 *infra*, the Bankruptcy Court has ruled ZAI does not pose an unreasonable risk of harm.

## 2.7    The Debtors' Asbestos-Related Litigation

The pre-chapter 11 litigation and Claims against the Debtors alleging asbestos-related injuries and damages ("Asbestos Claims," as defined more fully in the Plan) are primarily the following: Claims for personal injury from asbestos exposure; and asbestos-related property damage Claims, including US ZAI PD Claims. The majority of claims stemmed from asbestos exposure from Grace's products with added asbestos, but some claims have been based on asbestos exposure from Grace's vermiculite products.

For many years, the Debtors faced a substantial volume of Asbestos Claims, but were able to resolve such Claims primarily through negotiated settlements. Although the Debtors believed that a high percentage of these Asbestos Claims were without merit, they agreed to settle most of these Claims rather than incur the significant costs and practical difficulties associated with simultaneously litigating thousands of independent Claims in multiple jurisdictions nationwide. This strategy of negotiated settlements was initially successful, as the amounts and number of Asbestos Claims were manageable, and the funds required to satisfy such Claims were fairly predictable. Prior to 2000, the Debtors were able to resolve asbestos-related claims through direct negotiations and litigation, a process which resulted in payments and legal costs totaling over $2 billion over a 20-year period.

However, beginning in the year 2000, the Debtors experienced a precipitous increase in the number of personal injury Claims and the amount of money required to resolve such Claims. Specifically, in 2000 and the first quarter of 2001, the litigation environment changed with an unexpected 81% increase in personal injury Claims filed against the Debtors, which the Debtors believe was caused by a surge in unmeritorious claims. The Debtors also became defendants in class action lawsuits alleging damages from ZAI. Trends in claims filing and settlement demands showed no sign of returning to pre-2000 levels and these unfavorable trends were exacerbated by the bankruptcy filings of several of the Debtors' co-defendants in asbestos personal injury litigation. These trends greatly increased the risk that the Debtors would not be able to resolve their pending and future asbestos-related claims under the state court system. Furthermore, this increase seriously threatened the Debtors' core business operations, and the Debtors concluded that there was no way to define and resolve their asbestos liabilities while preserving the value and viability of their core business operations, other than to reorganize under chapter 11 of the Bankruptcy Code.

As of the Petition Date, the Parent and certain of its subsidiaries were defendants in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury. Due to the filing of the petitions for relief commencing the Chapter 11 Cases, holders of Asbestos Claims have been stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors.

27

### 2.7.1    Asbestos Personal Injury Litigation

Asbestos PI Claimants allege adverse health effects due to asbestos exposure from products formerly manufactured by certain of the Debtors and vermiculite products and vermiculite mined and processed by the Debtors. Historically, the Debtors' cost to resolve such claims has been influenced by numerous variables, including the nature of the disease alleged, the proof of exposure to a Debtor's product, the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense costs associated with these claims.

Cumulatively through the Petition Date, 16,354 asbestos personal injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Debtors' products were not involved) and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the Petition Date, 129,191 claims for personal injury were pending against the Debtors.[15] The Debtors believe that a substantial number of additional personal injury claims would have been received after the Petition Date had such claims not been stayed by the Bankruptcy Court.

### 2.7.2    Asbestos Property Damage Litigation

Asbestos PD Claims generally seek payment for the cost of removing or containing asbestos in buildings. On the Petition Date,[16] there were eight asbestos property damage lawsuits (not including the nine ZAI lawsuits described in Section 2.7.3 below) pending against the Debtors.[17] However, approximately 4,300 Asbestos PD Claims were submitted prior to the March 2003 Bar Date.[18] In 2005, the Debtors filed omnibus non-substantive and substantive

---

15    One personal injury case is on appeal, *Edwards*, which relates to a judgment entered by the Texas state court on March 28, 2000 in the sum of $39,427,617.78 plus interest. Grace sought to appeal the case and was required to post a Supersedeas Bond. The Bond was obtained from Fireman's Fund Insurance Company in the amount of $43,038,931.91. The Fireman's Fund Bond is backed by a letter of credit issued by Wachovia Bank N.A. in the current amount of $11,877,500. Under the Plan, claims based on payment of the Bond and Letter of Credit are treated as Indirect PI Trust Claims to be channeled to the Asbestos PI Trust.

16    Prior to the Petition Date, out of 380 asbestos property damage cases filed, 140 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of the Debtors in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 asbestos property damage cases were settled for a total of $696.8 million; and 16 cases remained pending as described herein.

17    Plaintiffs in these eight traditional property damage lawsuits are seeking damages allegedly arising from the effects of Grace's asbestos-containing acoustical plaster as well as Monokote-3 fireproofing in their buildings. Debtors are aware of approximately 300 buildings involved. Two cases are currently on appeal (*Solow* -- judgment against Grace -- and *Ohio Hospital* -- summary judgment granted for Grace); one case has been stayed since 1990 (*Jefferson Parish*) and Grace was dismissed at the trial level in another case (*District of Columbia* -- not a final order). Four cases are pending: *Anderson Memorial* (motion to certify the class granted after the Petition Date as to the other defendants but not as to Grace), *Orange County* (putative class action served), *Pacific Freeholds* (case pending against but stayed as to Grace) and *Prudential* (case pending against but stayed as to Grace). Proofs of Claim were filed with respect to buildings at issue in each of the above actions except *District of Columbia*. The *Solow* judgment is for $25.8 million plus interest and Grace obtained an Undertaking on Appeal (Appeal Bond) with respect to that appeal from St. Paul Companies. Under the Plan, claims based on payment of the Appeal Bond are treated as Indirect PD Trust Claims to be channeled to the Asbestos PD Trust.

18    Of these approximately 4,300 Asbestos PD Claims, approximately 280 claims originally categorized as Asbestos PD Claims were recategorized to different claim category types. Therefore, the total number of Asbestos PD Claims was 4,035.

28

objections to almost all of these claims on a number of different grounds, including lack of authority from the claimants at the time the claims were filed, superseded or duplicative claims, lack of product identification, statute of limitations, and lack of proof of hazard.

In late 2005, various claimants responded to these objections, with general responses as well as specific responses for certain claims. Some claimants also supplemented their proof of Claim forms. Most of the non-evidentiary objections were heard and adjudicated during asbestos property damage claims hearings conducted by the Bankruptcy Court from January 24 to 26, 2006, as a result of which a large number of Asbestos PD Claims were disallowed, withdrawn or reclassified. The Bankruptcy Court disallowed and expunged additional Asbestos PD Claims in mid and late 2006, including Minnesota stigma claims, certain claims for buildings located in the State of Georgia,[19] and certain claims for which the claimants' counsel did not obtain claimants' signatures.

In August 2006, the Bankruptcy Court directed the Debtors and the Asbestos PD Claimants to negotiate a case management order establishing a process for adjudicating certain issues applicable to many of the Asbestos PD Claims. Pursuant to the Asbestos PD Claims case management order approved by the Bankruptcy Court in August 2006 and amended on October 13, 2006, summary judgment motions regarding the Debtors' substantive objections related to product identification, statute of limitations, and properties located in Libby, Montana were filed on November 16, 2006 and February 16, 2007 and were argued before the Bankruptcy Court on April 9, 2007 and September 10, 2007. As a result of the April 9, 2007 summary judgment arguments, shortly thereafter the Bankruptcy Court disallowed and expunged approximately 70 Asbestos PD Claims. Also, from April 23-25, 2007, the Bankruptcy Court held a hearing to adjudicate product identification objections to 19 claims. As a result of this hearing, 3 Asbestos PD Claims were disallowed and expunged. On October 10, 2008, the Bankruptcy Court granted the Debtors' motion for summary judgment regarding California Asbestos PD Claims. Claimants filed a notice of appeal, which was docketed in the District Court on November 20, 2008. On November 21, 2008, the District Court issued a Notice of Docketing indicating that the appeal shall be referred to the Appellate Mediation Panel and briefing will be deferred. The Bankruptcy Court has not yet ruled on pending motions for summary judgment that the Debtors filed in February 2007 with respect to the statute of limitations for Canadian Claims and certain Claims located in multiple states but subject to Delaware's statute of limitations. ~~Oral~~**On November 24, 2008, the Bankruptcy Court heard oral** argument regarding the Debtors' Canadian limitations motion ~~is scheduled for November 24, 2008.~~**.**

On April 17, 2007, the Bankruptcy Court also disallowed and expunged 44 claims filed by the Speights & Runyan firm without authority from the claimants (Docket Nos. 15209, 15210). On December 6, 2007, the District Court affirmed this ruling (District Court of Delaware Case Nos. 07-287 - 07-330). The claimants have appealed the ruling to the Third Circuit Court of Appeals (Third Circuit Case No. 08-1044). The appeal is fully briefed ~~and~~**. On November 26, 2008,** the Third Circuit ~~has set~~**issued a letter advising counsel that the appeal**

---

19      The claimant appealed the order expunging its claims (District Court of Delaware Case No. 06-745). Oral argument was set for April 2, 2007. However, the District Court adjourned such argument because a settlement was reached. The case was closed on March 27, 2008.

**will be decided on the briefs and there will be no** oral argument for December 12, 2008., In addition, between April 2007 and November 2008, the Debtors entered into settlements with 377 Asbestos PD Claimants, the Bankruptcy Court approved these settlements, no appeals were filed, and the time period for appeals has expired. The settlements allow such Asbestos PD Claims in the total amount of approximately $93 million.

As of November 19,December 17, 2008, following the reclassification, withdrawal, expungement or settlement of claims, there remain 110 active non-settled Asbestos PD Claims -- 55 for buildings located in Canada and 38 for buildings located in the United States.

On July 5, 2007, the Bankruptcy Court heard argument with respect to a motion for class certification, seeking certification of a class of current and future Asbestos PD Claimants, filed by the Speights & Runyan firm on behalf of Anderson Memorial Hospital. On May 29, 2008, the Bankruptcy Court denied the motion (Docket No. 18821). On June 9, 2008, Anderson Memorial Hospital filed a notice of appeal to the District Court and a motion for leave to appeal (District Court of Delaware Case Nos. 08-118 and 08-431). On June 19, 2008, the Debtors filed their opposition to the motion for leave to appeal. On July 7, 2008, Anderson Memorial Hospital filed a reply brief in support of their motion for leave to appeal, and a request for oral argument in the District Court. On July 15, 2008, the Debtors filed a sur-reply in opposition to the motion for leave to appeal. On August 4, 2008, the District Court entered an order staying the briefing schedule for the appeal pending resolution of the motion for leave to appeal. On September 4, 2008, the District Court entered an order and issued a memorandum opinion denying the motion for leave to appeal. On November 13, 2008, the District Court entered an order and issued a memorandum opinion denying Anderson Memorial Hospital's motion for reconsideration of the denial of the motion for leave to appeal.

Under the Plan, those Asbestos PD Claims not consensually resolved or disallowed through the objection process will be paid in Cash in full upon allowance.

### 2.7.3    Litigation Related to Zonolite Attic Insulation and Bar Date

In 2000 and 2001, prior to the Petition Date, nine lawsuits (one of which has since been dismissed) styled as class actions were filed in various jurisdictions on behalf of owners of homes allegedly containing ZAI, seeking damages and other relief, including removal of the attic insulation, because of its alleged asbestos content. Some of the lawsuits were filed on behalf of residents of particular states while others purport to be nationwide in scope. As of the Petition Date, many of the lawsuits had not proceeded beyond the initial pleadings. Four of the federal class actions were consolidated for pretrial purposes in a multi-district litigation proceeding; a motion for class certification was pending in that proceeding as of the Petition Date. A statewide class was certified by a trial court in a Washington state case, but the Debtors' Motion for Leave to Appeal that certification order was pending as of the Petition Date. None of the cases reached a decision on the merits, although the Washington state court denied a motion seeking a preliminary injunction that would have required the Debtors to warn all state residents of the alleged hazards of ZAI. In October 2004, two class action lawsuits were filed in Canada. Thereafter, an additional eight class action suits asserting similar claims were filed as further described in Section 3.3.6 *infra*. The plaintiffs allege that ZAI is in millions of homes and that removal would cost several thousand dollars per home.

In April 2002, the Debtors filed ten proofs of Claim on behalf of individual Claimants for Claims relating to ZAI and subsequently filed objections thereto to establish a forum for determining whether ZAI creates an unreasonable risk of harm (the "ZAI Science Trial"). The US ZAI PD Claims and objections, and subsequent responses and summary judgment motions, formed the basis for the ZAI Science Trial. The Bankruptcy Court held a hearing on the ZAI Science Trial motions on October 18, 2004. On December 14, 2006, the Bankruptcy Court issued an opinion and order holding that, although ZAI is contaminated with asbestos and can release asbestos fibers when disturbed, there is no unreasonable risk of harm from ZAI. The ZAI claimants sought an interlocutory appeal of the opinion and order with the District Court (District Court of Delaware Case No. 07-005). On March 26, 2007, the District Court denied this request. On April 19, 2007, the District Court also denied the ZAI claimants' motion for reconsideration. The ZAI claimants have indicated they still intend to appeal such opinion and order when it becomes a final order.

On March 18, 2008, the Debtors asked the Bankruptcy Court to establish a bar date for US ZAI PD Claims and approve a related notice program that would require persons with a ZAI Claim to submit individual proofs of Claim. On the same date, the ZAI claimants asked the Bankruptcy Court for various forms of relief: (1) to take such actions as would finalize the December 14, 2006 order and permit an appeal to be taken; (2) to allow the US ZAI PD Claims to return to the state court tort system; (3) to appoint an expert to estimate the number of homes containing ZAI; and (4) to permit the filing of a class proof of Claim on behalf of Washington state residents. Objections to these motions were raised by the Debtors, ZAI Claimants, the Crown, and the Canadian claimants. The Bankruptcy Court ordered the Debtors and ZAI claimants to submit to mediation on April 22, 2008, and on May 7, 2008, the Honorable Kevin Gross was appointed as Settlement Judge. The mediation did not result in a settlement. On June 2, 2008, the Bankruptcy Court ordered a bar date of October 31, 2008 (the "ZAI Bar Date") for all US ZAI PD Claims and denied the ZAI Claimants' motions for relief other than the class request (Docket Nos. 18934, 18936 and 18937). The **Washington State** class motion was argued on July 22, 2008 and taken under advisement by the Bankruptcy Court. The ZAI Claimants had filed 16,218 Claims as of the ZAI Bar Date~~, and, on.~~ **On** October 29, 2008, the ZAI Claimants filed a motion for certification of a nationwide class, which is not set for hearing. **On November 21, 2008, the Debtors, the Equity Committee the US ZAI Claimants' counsel and the counsel for the Asbestos PD FCR entered into a Term Sheet for the resolution of US ZAI Claims via a class action settlement. On December 15, 2008, the US ZAI Claimants filed a Motion for Preliminary Approval of the US ZAI Class Settlement, which motion attached the proposed class action settlement. The Motion is set for hearing on January 13, 2009.**

### 2.7.4   Asbestos Medical Monitoring Claims

Approximately 1,000 proofs of Claim for asbestos medical monitoring based on alleged asbestos exposure were filed against the Debtors prior to the March 2003 Bar Date. However, a substantial number of those Claims were for personal injury. Under the Plan, Asbestos Medical Monitoring Claims are included within the Class of Asbestos PI Claims (Class 6).

## 2.8    The Debtors' Other Litigation -- Settled and Ongoing Matters

The Debtors are also parties to a number of pre-petition legal proceedings that do not involve Claims for personal injury arising out of exposure to asbestos, or property damage arising out of the installation of asbestos-containing products in buildings. Except as otherwise indicated, Claims with respect to such litigation will be treated as Class 9 General Unsecured Claims. Based on the amount that the Debtors reasonably believe to be involved, the following are the significant legal proceedings to which the Debtors are subject.

### 2.8.1    Libby and Vermiculite-Related Proceedings

#### 2.8.1.1    Libby, Montana

In March 2001, the EPA filed a lawsuit in the Montana federal district court seeking recovery of costs allegedly incurred in response to the release or threatened release of asbestos in the Libby area relating to former vermiculite mining and processing activities. On August 26, 2003, the Montana federal district court issued a ruling in favor of the United States that requires the Debtors to reimburse the EPA for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. The Ninth Circuit Court of Appeals affirmed the judgment of the Montana federal district court. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. The U.S. Supreme Court denied certiorari. The United States provided documentation for approximately $108 million in additional EPA response costs incurred at the Libby site from January 1, 2002 to December 31, 2005. The EPA has incurred additional response costs since that date, and will continue to incur response costs in the future.

To avoid further costly and protracted litigation with the United States over this matter, on March 12, 2008, the Debtors filed a motion seeking approval of a settlement agreement they had negotiated with the United States resolving the United States' proofs of Claim for the Libby site (the "Libby Settlement"). The Libby Settlement covers all past and future remediation costs in the Libby area, except for those relating to the Grace-owned mine (OU-3), for a total of $250 million, plus interest, as further specified in the settlement agreement. The Libby Settlement also calls for the entire settlement amount (including interest) to be paid by the Debtors within 30 days of the Bankruptcy Court's entry of a final order approving the settlement. In return, the EPA agreed to take no action against the Debtors with respect to the Libby site. The Bankruptcy Court entered an order approving the Libby Settlement on June 3, 2008 (Docket No. 18848). On June 12, 2008, the Debtors wired to the EPA an initial payment of $100 million plus then-accrued interest of $1.6 million. On July 2, 2008, the Debtors paid the remaining $150 million due plus $356,000 of interest accrued since June 11, 2008 on the $150 million balance.

#### 2.8.1.2    Libby Property Owners

A class-action lawsuit was filed against certain of the Debtors in the Montana federal district court in February 2000 on behalf of all owners of improved private real property situated within 12 miles of Libby (District Court of Montana, Case No. CV-00-035-M). The complaint alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from the Debtors' former vermiculite mining and processing

32

operations, and seeks remediation, property damages, and punitive damages. This case has been stayed as a result of the Chapter 11 Cases. Class members filed proofs of Claim in the Chapter 11 Cases (e.g., proof of Claim 5567) but these Claims have been expunged. In addition, as described above, the EPA has been conducting remediation activities in and around Libby that include the remediation of private real property and the Debtors have recently settled the EPA's claims related to Libby as described in Section 2.8.1.1 *supra*. Accordingly, the Debtors have no reason to believe that they will incur material liability in addition to the amount of the EPA's recoverable costs for cleanup activities around Libby.

### 2.8.1.3    State of Montana's Claims Against the Debtors

After the Petition Date, certain residents of Libby, Montana filed an action captioned *Orr v. State of Mont.*, alleging that the State of Montana negligently failed to warn them of the hazardous conditions at the mine, as a result of which they suffered grave injuries. The Montana state district court dismissed the lawsuit but, on December 14, 2004, the Montana Supreme Court reversed the Montana state district court ruling and held that once the State was aware of the dangerously high asbestos levels in the Libby mine, it was required by law to protect the miners by warning them of the known hazards of working in the mine. The State of Montana has filed a proof of Claim in an unliquidated amount seeking indemnification from the Debtors for this lawsuit. As further detailed in Section 3.2.5.1 *infra*, the Debtors filed a motion to expand their preliminary injunction to include actions against the State of Montana, but the Bankruptcy Court denied the motion and the District Court affirmed that ruling. The matter is currently on appeal to the Third Circuit. To the extent that the State of Montana ultimately pursues its claim, it will be treated as an Indirect PI Trust Claim and will be channeled to the Asbestos PI Trust. However, the Debtors maintain that they have no indemnification obligation as the lawsuit relates to the state's own duty to warn.

The State of Montana has also filed two proofs of Claim against the Debtors in the approximate amount of $15.6 million for the cost of future and past Medicaid reimbursement. The State alleges that the Debtors are responsible for such reimbursement. To the extent that the Claim is Allowed, it will be treated as a General Unsecured Claim. However, the Debtors maintain that they have no such reimbursement obligation.

The State of Montana Department of Environmental Quality ("MDEQ") also filed four proofs of Claim against the Debtors for clean-up costs in excess of $55 million associated with the Libby site. Two of the Claims filed were expunged. The MDEQ and the Debtors have settled, contingent on Bankruptcy Court approval, the remaining Claims for $5,167,000, except for liabilities associated with the property in or around the Zonolite mine owned by the Debtors (OU-3), which liabilities were specifically reserved. On July 21, 2008, the Bankruptcy Court approved the settlement.

### 2.8.1.4    Former Plant in Minneapolis, Minnesota

A class action lawsuit was filed in the Minnesota federal district court in October 2000, alleging loss of property values in the vicinity of a former Grace plant in Minneapolis (the Western Minerals Processing Site), which processed vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 Cases. However, during the course of the Chapter 11 Cases, the EPA engaged in a program of removing suspected vermiculite processing by-

products from the yards and driveways of houses near the former Minneapolis plant. The Debtors settled the EPA's costs related to residential cleanup actions and remediation of industrial property in the area, including the former vermiculite processing plant for $13.3 million as part of the overall Multi-Site Settlement Agreement. *See* Section 2.8.2 *infra*. Additionally, the Debtors resolved the Minnesota Pollution Control Agency (MPCA) claim for past and present remediation costs associated with the same site for $360,000 (Docket No. 15809).

### 2.8.2    The Multi-Site Settlement Agreement with the EPA and Other Settling Federal Agencies

The EPA has designated certain of the Debtors (together, in most cases, with many other companies) as "potentially responsible parties" ("PRPs") for paying the costs of investigating and remediating pollution at various sites under the jurisdiction of federal, state, and/or local authorities.

On or about December 17, 2007, the Debtors and the EPA, the United States Department of Agriculture Forest Services, the United States Department of the Interior, the National Oceanic and Atmospheric Administration of the United States Department of Commerce, and the United States Army Corps of Engineers (collectively, the "Settling Federal Agencies") entered into an agreement whereby the Debtors have agreed to settle the environmental claims at 35 sites around the country for a total of $44.1 million, of which approximately $36.3 million is payable to the United States on behalf of the EPA and the remainder is payable to seven PRPs to resolve their non-governmental claims against the Debtors (Motion at Docket No. 17670). The $44.1 million settlement is divided between (a) administrative claims of $2.3 million for certain post-petition costs at Debtor-owned sites, of which the Debtors requested that they be permitted to pay $672,574.42 within 30 days of Bankruptcy Court approval of the settlement agreement, and (b) general unsecured claims of $41.8 million. The balance of the claims will be paid pursuant to confirmation of the Plan but with respect to the remaining administrative claim, the United States reserved its rights to request earlier payment of that balance. In response to comments from creditor groups and the public, the parties revised and executed an amended settlement agreement (the "Multi-Site Settlement Agreement") and, on May 23, 2008, filed the Multi-Site Settlement Agreement with the Bankruptcy Court (Docket No. 18783).

The Bankruptcy Court entered an order approving the Multi-Site Settlement Agreement on June 3, 2008 (Docket No. 18847). On July 2, 2008, the Debtors timely wired to the EPA the $672,574.42 of post-petition costs due within 30 days of the Bankruptcy Court's approval of the settlement. The Multi-Site Settlement Agreement is incorporated into the Plan, and the rights of the Settling Federal Agencies and the Debtors with respect to "Debtor Owned Sites," "Additional Sites," "Work Consent Decrees" and "Work Administrative Orders," as defined in the Multi-Site Settlement Agreement, shall be governed by the Multi-Site Settlement Agreement notwithstanding any other provision of the Plan or Confirmation Order to the contrary.

The sites that are liquidated in the Multi-Site Settlement Agreement are the following:

1.    Acton Plant Site in Acton, Massachusetts
2.    Amber Oil (Eco-Tech) Site in Milwaukee, Wisconsin
3.    Aqua Tech Site in Greer, South Carolina