manufacturing agreement with Flexia whereby Flexia will construct Tri-Flex® products on behalf of the Debtors and authorization to construct a production line for the manufacture of Tri-Flex® products at the Debtors' Chicago facility.

July 2005      The Debtors obtained approval to expend up to $20 million to establish an additional manufacturing facility for the Specialty Building Materials ("SBM") business of Grace Construction Products. The SBM business was growing at such a pace that the business was projected to outgrow its plant capacity in late 2006. The Debtors constructed the facility on land purchased in Mount Pleasant, Tennessee, and the facility began operations in May 2007.

August 2005      The Debtors obtained permission to acquire the technology and certain other assets of Single-Site Catalysts, LLC ("SSCL"). (Docket No. 9292). The transaction provided for purchase of SSCL's metallocene catalyst technology and components, related trademarks, inventory, and customer contracts for $1.5 million, plus payments equal to 3% of net sales of products manufactured using the acquired technology below $5 million, 8% of net sales between $5 million and $10 million, and 5.5% of net sales exceeding $10 million.

June 2006      The Debtors obtained permission to acquire the assets located in central, New Jersey of a privately held chemical company in order to expand the Debtors' operations in the polymerization catalyst business. (Docket No. 12438). The purchase price was $20 million, with a post-closing adjustment based on any change in the working capital of the businesses from a specified base amount of $3.5 million.

June 2007      ART made an investment in the shares of Kuwait Catalyst Company of Shuaiba, Kuwait, a manufacturer of hydroprocessing catalysts.

February 2008      The Debtors obtained authority to acquire a preferred stock interest in CeraTech, Inc. (Docket No. 17859). The transaction consisted of a $3 million investment  plus an option for CeraTech to request, or Grace at its own option to provide, an additional $3 million investment. CeraTech has developed technology to make products that Construction Products wished to add to its product portfolio. The Debtors and CeraTech also entered into an exclusive sales, marketing and distribution agreement under which the Debtors have the exclusive rights to manufacture and sell products utilizing the CeraTech technology.

### 3.2.13.2    Significant Asset Dispositions

During the course of the Debtors' bankruptcy cases, there has been only one significant disposition of assets. In August, 2007, the Debtors sold their Washcoat business to Rhodia, Inc. The Washcoat business was a business whereby the Debtors designed, manufactured, and marketed materials used in catalytic converters for automotive and other engines. The Bankruptcy Court approved the motion to sell the business on July 23, 2007 (Docket No. 16374) and the Debtors closed the sale of the Washcoat business on August 1, 2007, realizing proceeds of $21.9 million.

The Debtors have also from time to time during the course of these chapter 11 cases disposed of other assets valued at less than $5 million pursuant to the Debtors' Procedures for the Sale and Abandonment of *De Minimus* Assets dated August 2, 2001 (Docket No. 833).

### 3.2.14  Tax Related Motions and Settlements

### 3.2.14.1    Tax Related Motions

In order to limit the trading of its shares to prevent a change in control of the Parent for tax purposes, the Debtors filed a motion seeking an order to require notice and waiting periods on transfers of Parent Common Stock to give the Debtors time to review the purchases for tax purposes. The order imposes notice requirements and potential restrictions on stock acquisitions by those persons or entities that (a) currently own 4.75% or more of Parent Common Stock or (b) seek to acquire 4.75% or more of Parent Common Stock. A change in control of the Parent would severely limit the Debtors' ability to use their net operating losses to offset taxes on future income. Under the order, the Debtors have the right to object in Bankruptcy Court to those persons or entities acquiring Parent Common Stock if the acquisition poses a material risk of adversely affecting the Debtors' ability to use their net operating losses. A final order granting the request was entered on January 24, 2005 (Docket No. 7611). This order will terminate on the Effective Date.

On September 17, 2007, the Debtors filed a motion for approval of an Optimization Plan to (a) establish a more tax-efficient global capital structure, that serves as the foundation for chapter 11 emergence financing, (b) reduces foreign cash taxes, and (c) preserves the Debtors' anticipated U.S. federal consolidated net operating losses. The Bankruptcy Court entered an order approving the motion on October 30, 2007 (Docket No. 17216).

On March 17, 2008, the Debtors filed a motion seeking authorization to pay up to $1.4 million to satisfy certain pre-petition real property tax claims and to stem the continued accrual of interest at the applicable statutory tax rates. The Bankruptcy Court entered an order approving the motion on April 21, 2008 (Docket No. 18579). The Debtors have already made approximately $1.1 million in payments to resolve four of the largest claims.

### 3.2.14.2    Tax-Related Settlements

In 1988 and 1989, the Debtors acquired COLI policies on the lives of certain employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums were funded in part by loans issued against the cash

surrender value of the COLI policies and the Debtors claimed a total of approximately $258 million in deductions attributable to interest accrued on such loans though the 1998 tax year, after which such deductions were no longer permitted by law.    The IRS challenged the deductions of interest for years prior to 1999.  In 2000, the Debtors paid $21.2 million of tax and interest related to this issue for the tax years 1990 through 1992.  Subsequent to 1992, the Debtors deducted approximately $163.2 million in interest attributable to the COLI policy loans. On October 13, 2004, the Bankruptcy Court entered an order authorizing Grace to enter into a settlement agreement with the IRS that provided that the government allowed 20% of the aggregate amount of the COLI interest deductions and that the Debtors owed federal income tax and interest with respect to the remaining 80% of the COLI interest deductions disallowed (Docket No. 6606).  This settlement agreement also provided that, with respect to the termination of the COLI policies, the Debtors included 20% of the gain realized in taxable income, with the government exempting 80% of such gain from tax.  On January 20, 2005, the Debtors executed the COLI settlement agreement.

On February 14, 2005, the Debtors filed a motion with the Bankruptcy Court seeking an order (a) authorizing the Debtors to enter into a settlement agreement with the IRS with respect to certain issues relating to the taxable years ending December 31, 1993 through December 31, 1994 (the "1993-1996 Settlement Agreement"), and (b) directing the Debtors to pay to the IRS no later than April 15, 2005 the certain taxes owing under the 1993-1996 Settlement Agreement. The 1993-1996 Settlement Agreement resolved all issues for that audit period with the exception of a tax controversy with respect to research credits and research and experimentation expenditures, discussed below.  On April 12, 2005, the Bankruptcy Court issued the requested order and on April 14, 2005, the Debtors made a tax payment in the amount of $90 million under the 1993-1996 Settlement Agreement.

The IRS asserted approximately $62 million of additional federal income tax withholding and Federal Insurance Contributions Act (FICA) taxes plus interest and related penalties against one of the Debtors' subsidiaries that operated a temporary health care staffing business until its sale in 1999.  The IRS contended that certain per diem reimbursements made by the business should have been treated as wages subject to employment taxes and federal income tax withholding.  The Debtors contended that the per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS.  On September 18, 2006, the Debtors filed a motion seeking to settle these claims in the amount of $13 million, which settlement was approved by the Bankruptcy Court on October 30, 2006 (Docket No. 13513).

In 1999, Grace and de maximis, inc. ("de maximis"), an environmental project management company, formed a special purpose environmental remediation management joint venture, Remedium Group, Inc. ("Remedium"), to centralize, manage and minimize environmental expenditures associated with certain Grace remediation sites.  The joint venture was created by virtue of de maximis acquiring Remedium Class B stock.  Grace reported a $128.6 million capital loss from that sale.  In September 2004, the IRS concluded that Grace's capital loss should be disallowed but that no penalties should be imposed.  On January 18, 2008, the Debtors filed a motion seeking authority to settle this matter with the IRS whereby the Debtors would be allowed  a capital loss in the amount of $32.15 million or 25%, in lieu of the $128.6 million capital loss that they originally claimed on its 1999 federal income tax return.

The Bankruptcy Court entered an order approving the motion on March 7, 2008 (Docket No. 18247).

On June 16, 2008, the Debtors filed a motion seeking authorization to settle a federal income tax controversy relating to research credits and research experimentation expenditures (R&E Settlement Agreement) claimed for the taxable years ending December 31, 1993 through December 31, 1996. The R&E Settlement Agreement gives the Debtors a significant portion of the research credits in dispute and, if approved, will result in a refund in the amount of approximately $6.3 million of tax plus interest. The Bankruptcy Court entered an order on July 21, 2008 approving the R&E Settlement (Docket No. 19111) and the settlement has been approved by the Joint Committee on Taxation.

### 3.2.15 The Tersigni Investigation

On August 24, 2007, the United States Trustee filed a motion for the appointment of an examiner related to the conduct of L. Tersigni Consulting, P.C. ("Tersigni"), former financial advisor to the Asbestos PI Committee in these Chapter 11 Cases and several other asbestos chapter 11 cases. The Bankruptcy Court approved the appointment of an examiner on November 13, 2007 to investigate the billing practices and related conduct of Tersigni to determine whether the Debtors have any cause of action against Tersigni. On November 19, 2007, Tersigni filed for chapter 11 bankruptcy protection in Connecticut. The Connecticut bankruptcy judge appointed Hugh M. Ray of Andrews Kurth LLP as examiner in the chapter 11 case. The examiner is responsible for investigating both whether the various asbestos debtors have any causes of action against Tersigni as well as whether Tersigni is owed any money by the various asbestos debtors, including the Debtors. Although the Connecticut bankruptcy court also authorized Mr. Ray to act as a mediator, the Debtors elected to negotiate directly with Tersigni to resolve their claims. The Debtors have reached an agreement to settle those claims for a reimbursement to the Debtors in an amount approximating 11% of the fees previously paid to Tersigni. The agreement has been approved by both the Connecticut bankruptcy court and the Bankruptcy Court.

### 3.2.16 Various Additional Claim Settlements During the Course of the Chapter 11 Cases

On May 12, 2005, the Bankruptcy Court entered an order approving a settlement agreement and a remediation agreement concerning the Hatco site in New Jersey and approving an associated professional service agreement. Under this settlement, the Hatco claim against the Debtors in the amount of $34 million was settled through a liability transfer program under which, in exchange for a one-time payment of $21,353,794, a third-party environmental contractor assumed in perpetuity the Debtors' and others' environmental remediation and environmental legal liability in connection with a site in the State of New Jersey formerly owned and operated by the Debtors.

On July 7, 2005, the Bankruptcy Court entered an Order approving a settlement Agreement with Cytec Industries, Inc. ("Cytec") and Wyeth Holdings Corporation ("Wyeth"). Under the settlement agreement, Cytec, for itself and as indemnitor for Wyeth, committed to pay the Debtors $5.25 million in settlement of liability for remediation costs at property now owned by the Debtors in Concord, Massachusetts, but formerly owned by Wyeth's predecessor, American Cyanamid & Chemical Corporation. The settlement agreement was structured

whereby the first million dollars was paid immediately upon approval of the agreement, and the remaining $4.25 million was placed into a qualified settlement fund to be held in trust, and used by the Debtors to pay or reimburse response costs and fees with respect to the investigation and remediation of the property. The full $5.25 million was paid to the Debtors as of November 27, 2007.

On November 14, 2005, the Bankruptcy Court entered an order authorizing the Debtors to settle certain claims filed by Bank of America N.A. ("Bank of America") in the Debtors' Chapter 11 cases. By this stipulation, the Debtors agreed to allow Bank of America's unsecured claim, in the amount of $9,779,720, representing drawn amounts on certain letters of credit and recognizing its contingent non-priority claim, in the amount of $8,650,110, representing undrawn amounts under certain outstanding letters of credit. Under the agreement and, in the event any of the outstanding letters of credit are drawn, the amount drawn would be added to the allowed claim, and the contingent claim amount would be so reduced. In late December 2007, letters of credit in the amount of $6,710,110 were drawn by National Union pursuant to the Settlement Agreement discussed in Section 3.2.5.2 *supra*. As a result, Bank of America now has an additional allowed liquidated claim of $6,710,110 for those drawn letters of credit.

On September 25, 2007, the Bankruptcy Court entered an order authorizing the Debtors to enter into a settlement agreement with Continental Casualty Company ("CCC"). Pursuant to the terms of the settlement agreement, CCC agreed to pay nearly $4 million to certain claimants who had filed non-asbestos fireproofing claims against the Debtors and the Debtors agreed to pay the remaining portion of the claims due to the deductibles under the CCC insurance policy (Docket No. 16912).

On August 26, 2008, the Bankruptcy Court entered an order authorizing the Debtors to enter into certain settlement agreements with Weja Inc., Sunrich, Shell and Sunoco, among others. Pursuant to the terms of the settlement agreements, the Debtors are receiving $1,130,000 to compensate the Debtors for certain response costs pursuant to claims asserted under the New Jersey Spill Compensation and Control Act and common law, and for leasehold damages (Docket No. 19374).

The Debtors entered into additional non-asbestos related settlements. A discussion of these settlements is included in Sections 2.8.1.1 and 2.8.2 *supra*.

### 3.2.17  Various Motions Filed on an Annual Basis

During the course of these Chapter 11 Cases, the Debtors have periodically filed motions for authorization to make legally required minimum contributions to the Debtors' defined benefit pension plans covering the Debtors' employees. The latest in the series of these motions was filed on May 19, 2008 (Docket No. 18746) and was approved on June 18, 2008 (Docket No. 18943). The Debtors have sought and received authority to make contributions in the amount of approximately $48.5 million in 2003, $20 million in 2004, $24.1 million in 2005, $101.4 million in 2006, $76 million in 2007, $32.7 million for the period from January 1, 2008 to July 14, 2008; and $24.0 million for the period from July 15, 2008 to January 15, 2009.

Also during the course of these Chapter 11 Cases, the Debtors have periodically filed motions for authorization to implement the Debtors' Long Term Incentive Plan for certain key

employees, as part of a continuing long-term, performance-based incentive compensation program for key employees.  The latest in the series of these motions was with respect to the 2008-2010 Long Term Incentive Plan, which was approved on August 26, 2008 (Docket No. 19375).

### 3.2.18  Previous Plans

On November 13, 2004 the Debtors filed the Debtors' Plan of Reorganization (Docket No. 6895 ), Disclosure Statement for the Debtors' Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (Docket No. 6896) and various related documents, including a Motion for Entry of An Order Approving Solicitation and Confirmation Procedures and Schedule (Docket No. 6900) (the "Previous Confirmation Procedures Motion").  On January 13, 2005 the Debtors filed their Amended Joint Plan of Reorganization (Docket No. 7560) and Amended Disclosure Statement for the Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (Docket No. 7559).  On November 5, 2007, the Asbestos PI Committee and Asbestos PI FCR filed their Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative for W. R. Grace & Co. et al., Dated as of November 5, 2007 (Docket No. 17306) (collectively the "Previous Plans").  The current Plan, Disclosure Statement and related documents supersede all of the Previous Plans and the Previous Confirmation Procedures Motion.

### 3.3     The Canadian Proceedings

#### 3.3.1    General Information

Although the Debtors' Canadian operating subsidiary Grace Canada, Inc. ("Grace Canada") is not a Debtor, the Debtors believed that Grace Canada could potentially become subject to asbestos-related Claims.  Accordingly, the Debtors sought and obtained ancillary relief in Canada with respect to Grace Canada.

On April 4, 2001, the Canadian Court granted Grace Canada an order (the "Canadian Order"), pursuant to section 18.6(4) of the Canadian Companies' Creditors Arrangement Act, R.S.C. 1985 c.C-36, as amended ("CCAA"), which, among other things (a) recognized the Chapter 11 Cases in Canada as foreign proceedings under the CCAA, (b) prohibited the commencement or continuation of any asbestos-related suits against Grace Canada, and (c) appointed Pierre Le Bourdais as Grace Canada's Information Officer.  The Information Officer is responsible for submitting interim information reports to the Canadian Court which address the Chapter 11 Cases, Grace Canada, and the development of any process for dealing with asbestos claims.  On February 8, 2006, the Canadian Court granted an order discharging Mr. Le Bourdais as Information Officer and appointing Mr. Richard Finke as the new Information Officer of Grace Canada.

#### 3.3.2    Notice of the Canadian Proceedings

In accordance with the terms of the Canadian Order, Grace Canada published notice of the Canadian proceedings in newspapers of national circulation in Canada on each of April 11 and April 12, 2001.  These notices (a) advised Entities of the Chapter 11 Cases and the Canadian

proceedings, (b) stated that Grace Canada could seek further relief from the Canadian Court to ensure fair and equal access for Canadians with Asbestos Claims against Grace Canada, and (c) instructed any Entity who wished to be made a party to the Canadian proceedings to contact counsel to Grace Canada.  The parties to the service list are as follows:

- Ernst & Young Inc., financial advisor to The Attorney General of Canada (Her Majesty the Queen in Right of Canada);

- Aikins, MacAulay & Thorvaldson LLP, solicitors for Raven Thundersky and Rebecca Bruce;

- Lauzon Bélanger S.E.N.C., co-solicitors for Association Des Consommateurs Pour La Qualité Dans La Construction and Jean-Charles Dextras;

- Scarfone Hawkins LLP, co-solicitors for Association Des Consommateurs Pour La Qualité Dans La Construction and Jean-Charles Dextras;

- Department of Justice Canada, solicitors for Health Canada; and

- Merchant Law Group, counsel for various plaintiffs in proposed class action proceedings in the Federal Court, Saskatchewan, Alberta, and British Columbia, against the Debtors and others.

### 3.3.3    Quarterly Reports

In accordance with the terms of the Canadian Order, the Information Officer has filed twenty-six (26) quarterly reports with the Canadian Court.  These reports have provided the Canadian Court with a description of matters affecting Grace Canada, as well as provided a summary of all material events taking place in the Chapter 11 Cases.  Through these reports, the Information Officer has kept the Canadian Court informed as to the Debtors' reorganization process.

### 3.3.4    Court Orders in the Canadian Proceedings

Since the date of the Canadian Order, Grace Canada has appeared before the Canadian Court on numerous occasions and has received approval or recognition of a number of orders granted in the United States in connection with the Chapter 11 Cases.  The following represents a summary of material matters approved by the Canadian Court:

- Since the date of the initial order, Grace Canada has, from time to time, applied to have the stay extended.  The stay currently expires on April 1, 2009;

- On December 5, 2002, the Canadian Court granted an order recognizing the Bankruptcy Court's March 2003 Bar Date Order with respect to claims in Canada in accordance with its terms;

- On November 14, 2005, the Canadian Court recognized in Canada the modified preliminary injunction issued in Adv. Pro. No. 01-771 in accordance with its

terms.  The effect of the order was to, among other things, stay ten separate class actions asserting CDN ZAI Claims which had been commenced in Canada against Grace Canada, certain of the Debtors' affiliated entities, and certain third parties including Sealed Air Canada.  The order also stayed the CDN ZAI Claims against the Crown.  The Crown had been named as a defendant in the class action lawsuits; and

- On February 8, 2006, the Canadian Court granted an order appointing Lauzon Belanger S.E.N.C.R.L. and Scarfone Hawkins LLP collectively as CCAA Representative Counsel on behalf of Canadian claimants who assert CDN ZAI Claims and appointing Mr. Richard C. Finke as the new Information Officer.

### 3.3.4.1      Orders Extending the Stay of Proceedings in Canada

The stay of proceedings granted in the Canadian Order was originally set to expire on October 1, 2001.  The Canadian Court has extended this deadline.  The current stay of proceedings will expire on October 1, 2008, unless extended prior to that date.

### 3.3.4.2      Recognition of the Debtors' March 2003 Bar Date Order

As indicated above, on December 5, 2002, in order to give effect to the March 2003 Bar Date Order, the Canadian Court granted an order recognizing the March 2003 Bar Date with respect to non-asbestos claims, Asbestos PD Claims and Asbestos Medical Monitoring Claims in Canada in accordance with its terms.

### 3.3.4.3      The Corporate Reorganization Order

On April 14, 2004, Grace Canada applied for, and the Canadian Court granted, an Order (the "Canadian Reorganization Order") approving a corporate reorganization involving Grace Canada and certain of the Debtors.  The proposed reorganization contemplated, *inter alia*, that Grace Canada would acquire, for valuable consideration, shares or debt in a number of the Debtors' Latin American subsidiaries with its equity investments replacing intercompany loans and trade credit from the Debtors.  The Canadian Reorganization Order was to be effective subject to the filing of a certificate of the directors of Grace Canada that they were satisfied that Grace Canada was receiving true value on a reasonable and realistic basis in respect of the assets being acquired.  Grace Canada has now received the results of the appraisals for the property to be acquired and is in the process of reviewing and considering the results.  The certificate of the directors of Grace Canada has not yet been filed and, accordingly, the Canadian Reorganization Order is not yet effective.

### 3.3.5    Pre-petition Canadian Lawsuits

### 3.3.5.1      Canadian Asbestos Personal Injury Lawsuits

On the Petition Date, there were no Canadian asbestos personal injury lawsuits pending against the Canadian Entities or any of the Debtors.  All of the 44 asbestos personal injury lawsuits that were filed pre-petition in Canada against certain of the Debtors and the Canadian Entities were dismissed.

82

In addition to these lawsuits, there were also hundreds of lawsuits filed in the early 1990s in Texas state court involving Canadian plaintiffs. Under Canadian law, a provincial workers' compensation agency who pays benefits is subrogated to the workers' rights against third parties for work related injuries. Liberal Texas venue rules at that time allowed these cases to be filed in the Texas state courts. The Debtors believe that these lawsuits were either settled or dismissed.

### 3.3.5.2    Asbestos Property Damage Claims for Buildings Located in Canada

On the Petition Date, there were no Canadian asbestos property damage lawsuits pending against the Canadian Entities or any of the Debtors. Approximately 24 asbestos property damage lawsuits were filed pre-petition in Canada against certain of the Debtors and the Canadian Entities. One case was tried and resulted in a verdict in favor of the defendants; most of the remaining cases were settled or withdrawn voluntarily by the plaintiffs. Holders of Asbestos PD Claims concerning Canadian properties filed 439 proofs of Claim in the Debtors' Chapter 11 Cases. The Debtors objected to all of these Claims on a variety of grounds. Most of these Claims have been withdrawn or expunged for the reasons set forth in Section 2.7.2 above. As of June 30, 2008, 55 Asbestos PD Claims concerning Canadian properties remain. All but one of these Asbestos PD Claims are subject to the Debtors' pending summary judgment motion regarding Canadian limitations periods.

### 3.3.6    Post-Petition Canadian Lawsuits

Between 2004 and 2005, eleven potential class actions were commenced across Canada in relation to the manufacture, distribution and sale of ZAI. Grace Canada, certain of the Debtors and Sealed Air Canada were named as defendants, as was the Attorney General of Canada. Those actions are as follows:

- On October 25, 2004, Raven Thundersky and Rebecca Bruce filed a complaint with the Queens' Bench for Winnipeg Centre against certain of the Debtors, certain of the Debtors' former Canadian subsidiaries, the Attorney General of Canada, and others. The complaint is styled as a purported class-action and seeks recovery for alleged injuries suffered by any Canadian resident as a result of the Debtors' marketing, selling, processing, manufacturing, distributing and/or delivering asbestos or asbestos-containing products in Canada.

- On October 29, 2004, two motions for authorization to institute a class action and to obtain the status of representative were filed by (a) Viviane Brosseau & Leotine Roberge-Turgeon and (b) the Association des Consummateurs Pour la Qualité Dans La Construction and Jean-Charles Dextras in the Superior Court for the Province of Quebec, District of Montreal. The motions seek authorization to institute a class-action lawsuit against Grace Canada, Inc. and the Attorney General of Canada on behalf of (1) every person who is the owner of a building insulated with vermiculite that was marketed under the brand name "Zonolite Attic Insulation" and (2) every person (or their heirs and successors, if applicable) who lives or has lived in a building insulated with ZAI and who has suffered, is suffering or will suffer from asbestosis, mesothelioma, or cancer of the lung.

- Eight additional class actions asserting similar claims to those described immediately above have been filed:

  o *Merv Nordick, et al. v. The Attorney General of Canada, et al.*, Queen's Bench, Regina, Saskatchewan, Case No. Q.B.C. No. 696 of 2005;

  o *Merv Nordick, et al. v. The Attorney General of Canada, et al.*, Federal Court, Regina, Saskatchewan, Case No. T-1503-05;

  o *Merv Nordick, et al. v. Department of National Defense and Canadian Forces, et al.*, Supreme Court, Vancouver, British Columbia, Case No. L-052352;

  o *Merv Nordick, et al. v. The Attorney General of Canada, et al.*, Queen's Bench, Alberta, Calgary, Case No. 0501-07100;

  o *Merv Nordick, et al. v. The Attorney General of Canada, et al.*, Superior Court of Quebec, 550-06-00002-058;

  o *Ernest Spencer, et al. v. Department of National Defense and Canadian Forces, et al.*, Superior Court of Justice, Ottawa, Ontario, Case No. 05-CV-32367;

  o *Her Majesty The Queen In Right of the Province of Manitoba v. The Attorney General of Canada (Her Majesty The Queen In Right of Canada), et al.*, Queen's Bench, Winnipeg, Manitoba, Case No. C1-05-01-41069; and

  o *Ernest Spencer, et al. v. Department of National Defense and Canadian Forces, et al.*, Queen's Bench, Winnipeg, Manitoba, Case No. C1-05-01-44628.

On February 8, 2006, the Canadian Court granted an order appointing representative counsel for the plaintiffs in the above actions. The Debtors have retained Ogilvy Renault LLP to represent them in these proposed class actions.

The Crown and the Canadian claimants filed numerous objections in connection with the Debtors' request for the ZAI Bar Date and related motions. *See* Section 2.7.3 *supra*.

In November 2007, CCAA Representative Counsel brought a motion (the "Representative Counsel Motion") before the Canadian Court seeking, among other things:

- an order lifting the stay of proceedings;

- an order for direction on a protocol for communication between the Canadian Court and the Bankruptcy Court for purposes of facilitating development and implementation of a Canadian Litigation Procedure; and

- an order for direction of the Canadian Court on the establishment of a process pursuant to which advance costs/interim costs can be sought in favour of representative counsel, and for the appointment of a monitor for that purpose.

The Representative Counsel Motion was adjourned on a number of occasions and, on March 26, 2008, due to ongoing settlement discussions, the parties agreed to withdraw the motion without prejudice and without costs. However, settlement discussions subsequently broke down and, on May 15, 2008, CCAA Representative Counsel gave notice of its intention to have the CCAA Representative Counsel Motion heard. Additionally, CCAA Representative Counsel gave notice of a motion seeking the following relief: (a) leave to allow CCAA Representative Counsel to conduct oral and documentary discovery of records and information in the possession and control of the Crown relating to homes in Canada that may be insulated with ZAI; and (b) directions regarding the oral documentary discovery of records and information of the Crown relating to the identity of homes in Canada that may be insulated with ZAI. No date for these motions have been scheduled.

On September 2, 2008, the Debtors, Grace Canada and CCAA Representative Counsel entered into the CDN ZAI Minutes of Settlement to settle all the Canadian ZAI Claims. The Canadian settlement contemplates, among other things, a claims bar date for Canadian ZAI PD Claims (the "CDN ZAI PD Bar Date"). On October 17, 2008, the Canadian Court approved the CDN ZAI Minutes of Settlement. On October 20, 2008, the Bankruptcy Court entered an order setting a CDN ZAI PD Bar Date of August 31, 2009, and a notice program, intended to comprehensively reach unknown Holders of CDN ZAI PD Claims, by the Bankruptcy Court. Confirmation of the Plan shall constitute approval by the Bankruptcy Court of the settlement reflected in the CDN ZAI Minutes of Settlement for all purposes including to the extent required by Bankruptcy Rule 9019. A copy of the CDN ZAI Minutes of Settlement is Exhibit 9 in the Exhibit Book.

### 3.3.7    Canadian Claims

Upon confirmation, Canadian Claims related to personal injury, including CDN ZAI PI Claims, shall be channeled to the Asbestos PI Trust along with all Asbestos PI Claims, and shall be resolved in accordance with the TDP. Any Canadian property damage claims related to traditional asbestos property damage shall be channeled to the Asbestos PD Trust and resolved in accordance with the Plan and the ~~case management order~~**PD Case Management Order** setting forth procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims.

If the Canadian Settlement described immediately above is approved by the Canadian Court, CDN ZAI PD Claims shall be separately classified, channeled to (and paid from) the CDN ZAI PD Claims Fund and resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement. CDN ZAI PD Claims shall not be deemed Allowed or Disallowed, but rather shall be resolved as set forth in the CDN ZAI Minutes of Settlement.

## 4.    SUMMARY OF THE PLAN[26]

### 4.1    Overview of the Chapter 11 Plan

THE DISCUSSION OF THE PLAN SET FORTH BELOW IS MORE DETAILED THAN THE EXECUTIVE SUMMARY CONTAINED IN ARTICLE 1 OF THIS DISCLOSURE STATEMENT, BUT IT IS NOT A COMPLETE RECITATION OF THE TERMS OF THE PLAN.  MOREOVER, CERTAIN KEY ASPECTS OF THE PLAN ARE HIGHLIGHTED IN THE EXECUTIVE SUMMARY BUT ARE NOT REPEATED IN THIS SECTION.

THE DEBTORS HAVE ATTEMPTED TO SUMMARIZE, IN THIS DISCLOSURE STATEMENT, THE KEY PROVISIONS OF THE PLAN, BUT SUCH A SUMMARY IS BY ITS VERY NATURE HIGHLY SUBJECTIVE AND PRONE TO DISPUTE.  THEREFORE, THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE EXHIBITS IN THE EXHIBIT BOOK, THE TERMS OF WHICH ARE CONTROLLING.

A TRUE AND CORRECT COPY OF THE PLAN IS ATTACHED AS EXHIBIT 1 IN THE EXHIBIT BOOK.  HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### 4.2    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

Section 2.1 of the Plan deals with unclassified Claims.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of the Plan.  These Claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code or upon such other less favorable terms as may be mutually agreed upon between the Holder of such unclassified Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court; *provided, however,* that (A) Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession on or after the Petition Date or assumed by the Debtors in Possession pursuant to the Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court, (B) Allowed Administrative Expense Claims of Professionals shall be paid pursuant to an order of the Bankruptcy Court, and (C) each Holder of a Claim which by operation of the Fresenius

---

[26]    The section number references in this Article 4 match up one-to-one with the section numbers of the Plan.  For example, Section 4.3.1 of this Disclosure Statement correlates to Section 3.1 of the Plan; Section 4.5.1 of this Disclosure Statement correlates to Section 5.1 of the Plan.

Settlement Agreement is an obligation for Fresenius Indemnified Taxes promptly shall be paid in full in Cash as such Fresenius Indemnified Taxes become due and payable.

Unless otherwise ordered by the Bankruptcy Court, except for Administrative Expense Claims for amounts incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, the Confirmation Order shall operate to set a bar date for Administrative Expense Claims against the Debtors (the "Administrative Claims Bar Date"), which bar date shall be the first Business Day that is the 90th day after the Effective Date. Claimants holding Administrative Expense Claims against the Debtors not paid prior to the Administrative Claims Bar Date may submit a request for payment of administrative expense on or before such bar date. The notice of confirmation to be served and delivered pursuant to Bankruptcy Rules 2002 and 3020(c) will set forth such date and constitute notice of the Administrative Claims Bar Date. The Reorganized Debtors and any other party in interest will have 270 days after the Administrative Claims Bar Date to review and object to such Claims before a hearing for determination of such Administrative Expense Claims is held by the Bankruptcy Court, *provided, however*, that such time may be extended by the Bankruptcy Court upon request of the Reorganized Debtors.

The Debtors estimate the total of all Allowed Administrative Expense Claims to be approximately $33.8 million. Of this amount, approximately $30.0 million relates to the accrual of professional fees and an estimate of other professional fees which will be incurred. The remaining $1.8 million includes approximately $1.6 million of administrative environmental Claims and unliquidated amounts of $25,197 that would be Administrative Expense Claims if and when allowed. The remaining $112,524 of Allowed Administrative Expense Claims is entitled to interest from the Petition Date at 4.19% per annum, compounded annually.

The Debtors estimate the total of all Allowed Priority Tax Claims to be approximately $33.0 million, which relates to state tax claims to be paid at emergence.[27]

The remainder of Article 2 of the Plan delineates in detail the treatment of these unclassified Claims, including treatment of liabilities incurred in the ordinary course of business, fee applications by Professionals and payment of interest to Holders of Priority Tax Claims.

### 4.3    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Article 3 of the Plan deals with classification and treatment of Claims and Equity Interest.

#### 4.3.1    Summary

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

---

[27]    Each of these figures in this Section 4.2 is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

#### 4.3.1.1     Class 1.     Priority Claims

Class 1 consists of all Priority Claims against the Debtors.  Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim plus interest at 4.19%, from the Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate, at the option of the Reorganized Debtors, either (a) in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (b) upon such other less favorable terms as may be agreed upon by the Holder of an Allowed Priority Claim.  The Debtors estimate that there is approximately $709,873 of Allowed Priority Claims, plus interest at the applicable rate, if any.  This amount includes unliquidated liabilities of $500,000 that would be Class 1 Claims if and when Allowed.  As of June 30, 2008, the estimated amount of Allowed Priority Claims, including interest, was approximately $782,607. Class 1 is unimpaired.  The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

#### 4.3.1.2     Class 2.     Secured Claims

Class 2 consists of all Secured Claims against the Debtors.  Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim plus interest at 4.19%, from the Petition Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate, at the option of the Reorganized Debtors, either (a) in full, in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (b) upon such other less favorable terms as may be agreed upon by the Holder of an Allowed Secured Claim; (c) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (d) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D).  The Debtors estimate the total of all Allowed Secured Claims on the Effective Date to be approximately $5.7 million plus interest at the applicable rate, if any.  This amount includes unliquidated liabilities of $1.7 million that would be Class 2 Claims if and when Allowed.  As of June 30, 2008, the estimated amount of Allowed Secured Claims, including interest, was approximately $6.4 million.  To the extent an asserted Secured Claim is Allowed as a Secured Claim, it will be treated as a Secured Claim under the Plan.  Class 2 is unimpaired.  The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

#### 4.3.1.3     Class 3.     Employee Benefit Claims

Class 3 consists of all Employee Benefit Claims. Employee Benefit Claims are all Claims, including accrued but unpaid pension Claims from the Petition Date, for compensation or benefits arising out of Claimants' employment with the Debtors, but only to the extent and amount provided for under a written benefit plan sponsored by the Debtors. Workers Compensation Claims, Asbestos Claims or other Claims asserted by current or former employees are not Employee Benefit Claims under the Plan.  Further, any Claim for damages or other relief asserted by a current or former employee that is not for compensation or benefits in an amount

K&E 13317902.49 13317902.55

permitted pursuant to the Debtors' written benefit plans is not an Employee Benefit Claim. Pursuant to Section 3.1.3 of the Plan, Employee Benefit Claims shall be reinstated under the Plan and paid pursuant to the written benefit plan or plans that the Debtors intend to continue pursuant to Section 9.3.1 of the Plan, subject to the terms and conditions of such plans. Thus, the Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

The Debtors estimate the total of all Allowed Employee Benefit Claims, as of June 30, 2008, to be approximately $165.3 million.[28]  This amount includes approximately $70.9 million of post-retirement benefits other than pensions as described in Section 2.9.3.3 *supra* and approximately $94.4 million of unfunded special pension arrangements as described in Section 2.9.3.4 *supra*.

All other Allowed Employee Benefit Claims have already been paid pursuant to first day orders of the Bankruptcy Court or will be paid in the ordinary course as they become due.  Class 3 is unimpaired.  The Holders of the Employee Benefit Claims in Class 3 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

#### 4.3.1.4    Class 4.    Workers' Compensation Claims

Class 4 consists of all Workers' Compensation Claims against the Debtors.  The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.  For the avoidance of doubt, in no event shall any of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties have any liability with respect to any Workers' Compensation Claim.  All Allowed Workers' Compensation Claims have been paid pursuant to first day orders or will be paid in the ordinary course as they become due.  Class 4 is unimpaired.  The Holders of the Workers' Compensation Claims in Class 4 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

#### 4.3.1.5    Class 5.    Intercompany Claims

Class 5 consists of all Intercompany Claims.  The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. For pro forma cash flow purposes, all Intercompany Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated.  Class 5 is unimpaired.  The Holders of Intercompany Claims in Class 5 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

#### 4.3.1.6    Class 6.    Asbestos PI Claims

Class 6 consists of all Asbestos PI Claims against the Debtors.  All Asbestos PI Claims shall be resolved in accordance with the terms, provisions, and procedures of the Asbestos PI

---

28   This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

Trust Agreement and the TDP (unless previously allowed pursuant to an order of the Court or agreement of the parties). All Asbestos PI Claims shall be paid by the Asbestos PI Trust solely out of the Asbestos PI Trust Assets as and to the extent provided in the TDP. Asbestos PI Claims shall not be deemed allowed or Disallowed (unless an order or agreement approved by the Court allowing the Claim has been previously entered) but rather, shall be resolved by the Asbestos PI Trust pursuant to the terms of the TDP.

The sole recourse of the Holder of an Asbestos PI Claim (whether or not such Asbestos PI Claim has been previously ~~Aa~~llowed pursuant to an order of the Court or agreement of the parties) on account of such Asbestos PI Claim shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction, the Asbestos PI Trust Agreement, and the TDP.

Class 6 is impaired. The Debtors are soliciting the votes of Holders of the Asbestos PI Claims in Class 6 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.7    Class 7.    Asbestos PD Claims

Class 7 consists of all Asbestos PD Claims against the Debtors.

Each Holder of an Asbestos PD Claim that is Allowed as of the Effective Date pursuant to a PD Settlement Agreement, or other stipulation, order, or agreement, shall be paid the Allowed Amount of its Allowed Asbestos PD Claim in full in Cash, pursuant to the terms of the respective PD Settlement Agreements, or other stipulation, order, or agreement, by the Asbestos PD Trust pursuant to the terms of the Asbestos PD Trust Agreement. Asbestos PD Claims that are unresolved prior to the Effective Date, other than US ZAI PD Claims, are identified in Exhibit 21 in the Exhibit Book. Such Asbestos PD Claims, together with the US ZAI PD Claims, are known as the "Unresolved Asbestos PD Claims," and shall be paid pursuant to the following procedures: (a) in connection with confirmation of the Plan, the Court shall enter ~~a case management order~~**the PD Case Management Order** setting forth procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims; and (b) Allowed Unresolved Asbestos PD Claims shall be paid in full, in Cash, by the Asbestos PD Trust pursuant to the terms of the Asbestos PD Trust Agreement. All Allowed Asbestos PD Claims shall be paid in full by the Asbestos PD Trust solely from the Asbestos PD Trust Assets. The inclusion of Demands as Asbestos PD Claims and US ZAI PD Claims and any reference to Demands related to Asbestos PD Claims or US ZAI PD Claims in the Plan does not constitute an admission by the Debtors and the other Plan Proponents that an Entity which did not have an allowable US ZAI PD Claim or other Asbestos PD Claim against the Debtors as of the Effective Date could assert a valid claim against the Asbestos PD Trust contemplated under the Plan, and all rights and defenses to the allowance of such a claim by the Asbestos PD Trust are expressly reserved pursuant to the Plan.

The sole recourse of the Holder of an Asbestos PD Claim on account of such Asbestos PD Claim (whether or not such Asbestos PD Claim is Allowed as of the Effective Date) shall be to the Asbestos PD Trust pursuant to the provisions of the Asbestos PD Channeling Injunction,

the Asbestos PD Trust Agreement, and any orders entered by the Bankruptcy Court allowing such Asbestos PD Claims.

Class 7 is unimpaired. The Debtors have agreed to solicit the votes of Holders of the Asbestos PD Claims in Class 7 to accept or reject the Plan solely for purposes of section 524(g) of the Bankruptcy Code in the manner and to the extent provided in the Confirmation Procedures Order. Notwithstanding the foregoing, the Debtors' agreement to solicit the acceptances of the Holders of US ZAI PD Claims or other Asbestos PD Claims is without prejudice to the Debtors' right to object to such claims, and seek to disqualify such claims for voting purposes prior to the Confirmation Date.

### 4.3.1.8    Class 8.    CDN ZAI PD Claims

Class 8 consists of all CDN ZAI PD Claims against the Debtors.

All CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement. All CDN ZAI PD Claims shall be paid from the CDN ZAI PD Claims Fund in the manner set out in the CDN ZAI Minutes of Settlement. CDN ZAI PD Claims shall not be deemed Allowed or Disallowed, but rather shall be resolved as set forth in the CDN ZAI Minutes of Settlement. Confirmation of the Plan shall constitute approval by the Court of the settlement reflected in the CDN ZAI Minutes of Settlement for all purposes including to the extent required by Bankruptcy Rule 9019.

The sole recourse of the Holder of a CDN ZAI PD Claim on account of such CDN ZAI PD Claim shall be to the CDN ZAI PD Claims Fund pursuant to the provisions of the CDN ZAI Minutes of Settlement, the Asbestos PD Channeling Injunction, and any orders by the Canadian Court allowing such CDN ZAI PD Claims.

Class 8 is impaired. The CCAA Representative Counsel shall be entitled to vote to accept or reject the Plan on behalf of holders of CDN ZAI PD Claims in the manner and to the extent provided in the CDN ZAI Minutes of Settlement and the Canadian Settlement Approval Order.

### 4.3.1.9    Class 9.    General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its Allowed General Unsecured Claim plus post-petition interest on such Claim either (a) in Cash in full on the later of (i) the Effective Date or (ii) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or (b) on such other less favorable terms as have been agreed upon by the Holder of an Allowed General Unsecured Claim and the Debtors or the Reorganized Debtors. Subject to Section 3.1.9(d) of the Plan, post-petition interest on Allowed General Unsecured Claims shall be calculated as follows: (a) either (i) for General Unsecured Claims arising from the Pre-petition Credit Facilities, post-petition interest shall be calculated from the Petition Date through December 31, 2005 at the rate of 6.09% and thereafter at floating prime, in each case compounded quarterly through the Effective Date; (ii) for General Unsecured Claims arising from Environmental Claims that include a liquidated amount for post-petition or

future cleanup liability, post-petition interest shall be calculated at the rate of 4.19% from the date specified in any order allowing the Environmental Claim in such liquidated amount, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; (iii) for General Unsecured Claims arising from an existing contract that specifies payment of interest at a non-default rate of interest, post-petition interest shall be calculated at the non-default rate of interest provided in such contract from the Petition Date, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; or (iv) for all other General Unsecured Claims, post-petition interest shall be calculated from the Petition Date at the rate of 4.19%, compounded annually through the Effective Date or the date of payment of such General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; or (b) on such other less favorable terms as those that have been agreed upon by the Holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors, including an agreement whereby no post-petition interest is paid on the Claim or post-petition interest begins to accrue on the Claim on a date other than the Petition Date.

The Debtors' obligations under the Multi-Site Settlement Agreement approved by the Bankruptcy Court on June 3, 2008 (Docket No. 18847) constitute Class 9 Claims, except for those obligations specifically identified therein as Allowed Administrative Expense Claims. The Multi-Site Settlement Agreement is incorporated into the Plan, and the rights of the Settling Federal Agencies and the Debtors with respect to "Debtor Owned Sites," "Additional Sites," "Work Consent Decrees" and "Work Administrative Orders," as defined in the Multi-Site Settlement Agreement, shall be governed by the Multi-Site Settlement Agreement notwithstanding any other provision of the Plan or Confirmation Order to the contrary.

If any Holder of a General Unsecured Claim, other than a Holder of a General Unsecured Claim arising from the Pre-petition Credit Facilities (which Claims are subject to a pending objection and litigation concerning the amount of post-petition interest to which the Holders are entitled) believes that it is entitled to post-petition interest at a rate or calculation other than the treatment set forth in Section 3.1.9(b) of the Plan, such Holder may File with the Bankruptcy Court a "Post-Petition Interest Determination Notice" by no later than the deadline established by the Bankruptcy Court for Claimants to vote to accept or reject the Plan. Any Post-Petition Interest Determination Notice that is Filed shall (a) identify the Claim and the requested rate of post-petition interest applicable to such Claim and (b) attach documentation supporting the payment of such rate of interest for the Claim. Failure to timely File a Post-Petition Interest Determination Notice with the required information and supporting documentation will be deemed an agreement to accept the post-petition interest treatment provided for in Section 3.1.9(b) of the Plan. The Debtors shall provide notice of the deadline to File a Post-Petition Interest Determination Notice in the manner and to the extent provided in the Confirmation Procedures Order.

The Debtors or Reorganized Debtors, as applicable, may dispute any Post-Petition Interest Determination Notice by Filing an objection thereto by no later than 60 days after the Effective Date. In objecting to a Post-Petition Interest Determination Notice, the Debtors or Reorganized Debtors, as applicable, may assert that the Holder of the General Unsecured Claim that Filed the Post-petition Interest Determination Notice is entitled to no post-petition interest

under applicable law or that an amount of post-petition interest less than the amount provided for in Section 3.1.9(b) of the Plan should be paid on account of such Claim, and the Bankruptcy Court may so find in accordance with any such objection asserted by the Debtors or the Reorganized Debtors.  If the Debtors or Reorganized Debtors, as applicable, object to a Post-Petition Interest Determination Notice, then they shall also assert any and all objections that they may have to the underlying General Unsecured Claim within the same objection notwithstanding the time to file such other objections set forth in Section 5.1 of the Plan.

The Debtors shall pay the principal amount of any Allowed General Unsecured Claim to which a Post-Petition Interest Determination Notice relates on the Effective Date or on the date on which such Claim becomes an Allowed General Unsecured Claim in accordance with the applicable provisions of the Plan, *provided, however,* that no payment of post-petition interest will be made with respect to any General Unsecured Claim for which a Post-Petition Interest Determination Notice has been Filed until the Post-Petition Interest Determination Notice has been resolved in accordance with Section 3.1.9(d) of the Plan.  In addition, the Debtors shall pay the principal amount of the General Unsecured Claims arising from the Pre-petition Credit Facilities on the Effective Date, *provided, however*, that no payment of post-petition interest will be made with respect to such General Unsecured Claims until the Debtors' objection in relation thereto has been resolved by a Final Order.  Post-petition interest shall not accrue with respect to any General Unsecured Claim after the Debtors have paid the principal amount of such Claim.

At any time, if the Debtors or Reorganized Debtors, as applicable, determine that the post-petition interest rate or calculation asserted in a Post-Petition Interest Determination Notice is appropriate, the Debtors or Reorganized Debtors, as applicable, may File a certificate of no objection with respect to such notice (without prejudice to their rights in relation to any other Post-Petition Interest Determination Notice).  No hearing is required by the Bankruptcy Court with respect to any Post-Petition Interest Determination Notice for which a certificate of no objection is Filed or to which the Debtors or Reorganized Debtors, as applicable, do not timely File an objection, and the respective amount of post-petition interest shall be paid on the Post-Effective Distribution Date with respect thereto.

If the Debtors or Reorganized Debtors, as applicable, object to a Post-Petition Interest Determination Notice and no stipulation or agreement is reached with respect to the rate or calculation of post-petition interest for such General Unsecured Claim, the Debtors or Reorganized Debtors, as applicable, will ask the Bankruptcy Court to schedule a hearing on the particular Post-Petition Interest Determination Notice and the related objection at an appropriate time and shall pay the amount of post-petition interest determined by a Final Order in relation to such Post-Petition Interest Determination Notice on the Post-Effective Distribution Date in relation thereto.  All litigation with respect to a disputed Post-Petition Interest Determination Notice shall be conducted in the Bankruptcy Court as claims allowance litigation, subject to the same bankruptcy rules and procedures that would have applied had the litigation been conducted before the Effective Date.

The Debtors or Reorganized Debtors, as applicable, and the Holder of the General Unsecured Claim that Filed the Post-Petition Interest Determination Notice at any time may enter into a stipulation or agreement as to the appropriate rate or calculation of post-petition interest with respect to such General Unsecured Claim without further action of the Bankruptcy

Court and without any prejudice to the Debtors' or the Reorganized Debtors' objections to any other Post-Petition Interest Determination Notice.

Any Holder of a General Unsecured Claim, other than a Holder of a General Unsecured Claim arising from the Pre-petition Credit Facilities, who does not dispute the manner in which post-petition interest shall be calculated as provided for in Section 3.1.9(b)(i)(C) of the Plan, but who wishes to substantiate the existence of an existing contract that specifies payment of interest at a non-default rate of interest as contemplated by Section 3.1.9(b)(i)(C) of the Plan, shall submit a "Notice of Non-Default Contract Rate of Interest" to the Debtors' voting and claims reconciliation agent, BMC Group, Inc., by no later than the deadline established by the Bankruptcy Court for Claimants to vote to accept or reject the Plan. Any Notice of Non-Default Contract Rate of Interest shall (a) identify the Claim and the non-default contractual rate of interest applicable to such Claim, (b) attach a copy of the contract relating to such Claim and (c) be signed by the Holder of the Claim or its authorized representative under penalty of perjury. A Notice of Non-Default Contract Rate of Interest does not need to be Filed with the Bankruptcy Court. Provided that a Holder of a General Unsecured Claim or its authorized representative has not Filed a Post-Petition Interest Determination Notice, failure by a Holder of a General Unsecured Claim or its authorized representative to timely submit a Notice of Non-Default Contract Rate of Interest will be deemed an admission that no non-default contract rate of interest exists with respect to such Holder's General Unsecured Claim, and said Holder of the General Unsecured Claim shall receive interest as set forth in Section 3.1.9(b)(i)(D) of the Plan. The Debtors shall provide notice of the deadline to submit a Notice of Non-Default Contract Rate of Interest in the manner and to the extent provided in the Confirmation Procedures Order.

The Debtors may dispute any Notice of Non-Default Contract Rate of Interest by serving a written objection at any time before the Effective Date upon the Holder of a General Unsecured Claim who has submitted a Notice of Non-Default Contract Rate of Interest. After a written objection to a Notice of Non-Default Contract Rate of Interest has been served, the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable General Unsecured Claim shall negotiate to resolve the objection. If a resolution is not reached, the Holder of the General Unsecured Claim may request a hearing before the Bankruptcy Court to resolve the objection to its Notice of Non-Default Contract Rate of Interest, *provided, however,* that such request must be made no later than 60 days after the Effective Date and that the only issue to be determined by the Bankruptcy Court at such a hearing shall be the appropriate amount of non-default contract interest with respect to the General Unsecured Claim, which shall be paid on the Post-Effective Distribution Date in relation to a Final Order making such determination. If the Debtors do not dispute a Notice of Non-Default Contract Rate of Interest by serving a written objection upon the Holder of a General Unsecured Claim who has submitted a Notice of Non-Default Contract Rate of Interest, then the interest rate contained in the Notice of Non-Default Contract Rate of Interest shall govern and be paid.

To the extent that a Notice of Non-Default Contract Rate of Interest relates to an Allowed General Unsecured Claim and does not relate to a Claim that is also subject to a Post-Petition Interest Determination Notice, the Debtors shall pay, on the Effective Date or on the date on which such Claim becomes an Allowed General Unsecured Claim, the principal amount of the Allowed General Unsecured Claim to which such notice relates plus post-petition interest at the rate of 4.19% from the Petition Date or, if applicable, the non-default contract rate of interest

according to the Debtors' books and records, compounded annually, in accordance with the applicable provisions of the Plan pending resolution of any dispute concerning the amount of non-default contract rate of interest in the Notice of Non-Default Contract Rate of Interest. Post-petition interest shall not accrue with respect to any General Unsecured Claim after the Debtors have paid the principal amount of such Claim.

The Debtors assert that Class 9 is unimpaired and that the Holders of the General Unsecured Claims in Class 9 are deemed to have voted to accept the Plan. Notwithstanding the foregoing, the Debtors have agreed to provisionally solicit the votes of Holders of General Unsecured Claims in Class 9 in the manner and to the extent provided in the Confirmation Procedures Order.

The Unsecured Creditors' Committee contends that Class 9 is impaired because the Debtors' Plan impairs the rights of the Class 9 Creditors, as it does not leave the creditors' rights entirely unaltered. For a discussion of the parties' current positions and litigation with respect to the appropriate interest to be paid under the Debtors' Pre-petition Credit Facilities *see* Section 3.2.8.4 above. The Committee argues that the Debtors' Pre-petition Credit Facilities that govern the rights of certain holders of Class 9 Claims call for a payment equal to the Prime Rate plus 2% in the event of default, compounded quarterly. The current Plan calls for Class 9 creditors to receive post-petition rates selected by the Plan Proponents that the Committee alleges have no foundation in the Pre-petition Credit Facilities (6.09% interest through December 31, 2005 and thereafter at the floating Prime Rate compounded quarterly, with no default interest). The Committee alleges that the impairment is impermissible because it results solely from the treatment of the Class in the Plan. In addition, although the Plan now provides for a procedure by which "other" General Unsecured Creditors may litigate the post-petition interest amounts due them, the rights of such creditors are also altered by the Plan. Therefore, under the Plan, the Committee alleges that Class 9 must be classified as impaired. The Debtors and Unsecured Creditors' Committee agreed on the record at the court hearing held on October 27, 2008 that the Unsecured Creditors' Committee's arguments with respect to the impairment of Class 9 are preserved and will be raised by the Unsecured Creditors' Committee as an objection to confirmation of the Plan.

The Debtors contend that Class 9 is not impaired, because all Class 9 Creditors will be paid the full Allowed Amount of their Claims plus post-petition interest as set forth in the Plan. The Debtors assert that any alteration of the rights of Class 9 Creditors is a function of the Bankruptcy Code rather than the Plan itself and thus does not constitute impairment. In this regard, it is the Debtors' position that the amount of post-petition interest provided in the Plan to Holders of Claims arising from the Pre-petition Credit Facilities is all that such Holders of Claims are entitled to as a matter of law and equity based upon the specific facts of these cases. Among the factors that the Debtors believe support their position is that the Unsecured Creditors' Committee previously negotiated, and agreed to, the rate of post-petition interest set forth in the Plan in connection with the Debtors' January 2005 plan of reorganization (an agreement modified by those parties in February 2006). Thus, the Debtors believe that the Holders of such Claims are not impaired. Lastly, the Debtors contend that the Holders of "other" General Unsecured Claims are not impaired, because the Plan provides a mechanism for such Holders to assert their rights, if any, to obtain a payment of post-petition interest in an amount different than that set forth in the Plan.

The Debtors estimate the total of all Allowed General Unsecured Claims (including interest calculated in accordance with the terms above) to be approximately $1,155.8 million as of June 30, 2008.[29]  This amount consists of $500.0 million of principal under the Debtors' Pre-petition Credit Facilities and approximately $305.1 million of accrued interest, approximately $154.4 million of Environmental Claims, approximately $27.6 million under drawn letters of credit and other debt ($24.2 million of principal plus $3.4 million of accrued interest), approximately $40.9 million of accounts payable ($30.3 million of principal plus $10.6 million of accrued interest) and approximately $127.9 million of other liabilities ($67.2 million of tax reserves and $58.5 million of other accrued liabilities plus $2.2 million  of interest).

### 4.3.1.10    Class 10.   Equity Interests in the Parent

Class 10 consists of Equity Interests in the Parent.  On the Effective Date, Class 10 Equity Interests in the Parent shall be retained, subject to the issuance of the Warrant and the terms of the Share Issuance Agreement.  Class 10 is impaired.  The Debtors are soliciting the votes of Holders of the Equity Interests in the Parent in Class 10 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.11    Class 11.   Equity Interests in the Debtors Other than the Parent

Class 11 consists of Equity Interests in the Debtors other than the Parent.  The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest in the Debtors other than the Parent entitles the Holder of such Equity Interest.  Class 11 is unimpaired.  The Holders of the Equity Interests in the Debtors other than the Parent in Class 11 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.4    MODIFICATION OR WITHDRAWAL OF THE PLAN

Sections 4.1 and 4.2 of the Plan set forth the Plan Proponents' collective right to modify, amend or withdraw the Plan and/or the Plan Documents, and the effect of any such withdrawal. Section 4.1 provides that after the Confirmation Date, the Plan can be altered, amended or modified but only before its substantial consummation in accordance with Bankruptcy Code § 1127(b).  These sections further provide, however, that in no event may the Plan Proponents or any other party amend, modify or supplement the Plan or any other Plan Document in a manner that (a) conflicts with the Sealed Air Settlement Agreement except to the extent that the modification or amendment is expressly consented to in writing by each of Sealed Air Corporation and Cryovac, Inc. or (b) conflicts with the Fresenius Settlement Agreement except to the extent that the modification or amendment is expressly consented to in writing by Fresenius.

---

29    This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

### 4.5 PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY

#### 4.5.1 Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims

Section 5.1 of the Plan sets forth the right of the Debtors or Reorganized Debtors, as applicable, and the United States Trustee, to object to the allowance of any Claims, other than Asbestos Claims. Unless otherwise provided for in the Plan or in an order of the Bankruptcy Court, the Reorganized Debtors have up to 180 days after the Effective Date to serve and File objections to Plan Claims and may seek additional extensions of their time to object to Plan Claims on notice to all Holders of Plan Claims (other than Asbestos Claims) that are still pending allowance and are not subject to a pending objection. It also delineates the ways in which such objections may be resolved.

Not later than ten (10) days before the Effective Date, the Debtors shall File with the Bankruptcy Court an exhibit listing all Plan Claims (other than Asbestos Claims) that the Debtors have already analyzed and to which the Debtors have no objection (the "Undisputed Claims Exhibit"). Plan Claims listed on the Undisputed Claims Exhibit shall be Allowed Claims as set forth in Section 1.1.4 of the Plan. The Debtors or the Reorganized Debtors, as applicable, may File additional Undisputed Claims Exhibits with the Court at any time after the Filing of the initial Undisputed Claims Exhibit with respect to any remaining Plan Claims (other than Asbestos Claims) if they have determined not to object to any of such Claims.

#### 4.5.2 Resolution of Asbestos PI Claims

Section 5.3 of the Plan sets forth the way in which Asbestos PI Claims will be resolved by reference to the Asbestos PI Trust Agreement and the TDP.

#### 4.5.3 Resolution of Asbestos PD Claims

Section 5.4 of the Plan sets forth the way in which Asbestos PD Claims will be resolved by reference to the Asbestos PD Trust Agreement and the ~~case management order~~**PD Case Management Order** setting forth procedures for determining the allowance or disallowance of Unresolved Asbestos PD Claims.

#### 4.5.4 Resolution of CDN ZAI PD Claims

Section 5.5 of the Plan sets forth the resolution of CDN ZAI PD Claims, which will be resolved by reference to the CDN ZAI Minutes of Settlement.

### 4.6 ACCEPTANCE OR REJECTION OF THE PLAN

Article 6 of the Plan discusses which Classes are impaired and which are not. Each Holder of a Plan Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Plan and the Confirmation Procedures Order. In addition, the Debtors have agreed to solicit the votes of Holders of the Asbestos PD Claims in Class 7 to accept or reject the Plan for purposes of section 524(g) of the Bankruptcy Code as described in Section 3.1.7(d) of the Plan. Notwithstanding the foregoing,

the Debtors' agreement to solicit the acceptances of the Holders of US ZAI PD Claims or other Asbestos PD Claims is without prejudice to the Debtors' right to object to such claims, and seek to disqualify such claims for voting purposes prior to the Confirmation Date. Further, the Debtors have agreed to solicit and tabulate the votes of the Holders of General Unsecured Claims in Class 9. Whether those votes will be given effect is subject to it being determined that Class 9 is an impaired Class.

Classes 1, 2, 3, 4, 5, 7, 9 and 11 of Plan Claims and Equity Interests in Debtors other than the Parent are unimpaired. Under Bankruptcy Code § 1126(f), the Holders of Plan Claims and Equity Interests in such Classes (except for Class 7 with respect to section 524(g) of the Bankruptcy Code) are conclusively presumed to have voted to accept the Plan.

Section 6.5.1 of the Plan deals with confirmation in the event an impaired Class rejects the Plan. Impaired Equity Interests in the Parent and/or impaired Classes of Plan Claims that fail to accept the Plan may be "crammed down" in accordance with Bankruptcy Code § 1129(b). *See also* Section 8.2.1 of this Disclosure Statement for further discussion.

Section 6.5.2 of the Plan provides that if the Plan fails to be accepted by the requisite number and amount of the Holders of Plan Claims and Equity Interests required to satisfy Bankruptcy Code §§ 524(g) and 1129, then, notwithstanding any other provision of the Plan to the contrary, the Plan Proponents reserve the right to amend the Plan; *provided, however*, that in no event may the Plan Proponents amend, modify or supplement the Plan in a manner that (a) conflicts with the Sealed Air Settlement Agreement except to the extent that the amendment, modification or supplement is expressly consented to in writing by each of Sealed Air Corporation and Cryovac, Inc. or (b) conflicts with the Fresenius Settlement Agreement except to the extent expressly consented to in writing by Fresenius.

## 4.7    IMPLEMENTATION OF THE PLAN

### 4.7.1   Corporate Governance

#### 4.7.1.1    Amendment of Certificates of Incorporation of the Debtors

Section 7.1.1 of the Plan provides that the Certificates of Incorporation of each of the Debtors that is a corporation shall be amended as of the Effective Date. The amended Certificates of Incorporation of the Debtors shall, among other things: (a) prohibit the issuance of nonvoting equity securities, (b) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, and (c) effectuate any other provisions of the Plan. The amended Certificates of Incorporation shall be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date.

### 4.7.1.2    Amendment of By-Laws of the Parent

Section 7.1.2 of the Plan deals with amendments to the Parent's by-laws. The form of the Parent's by-laws shall be filed as part of the Plan Supplement.

### 4.7.1.3    Precedence of Share Issuance Obligations

The covenants and agreements of the Parent (for purposes of Section 7.1.3 of the Plan and this Section 4.7.1.3 of the Disclosure Statement, as defined in the Share Issuance Agreement) under Section 5(d) of the Share Issuance Agreement shall take precedence and prevail over any inconsistent or contrary provision contained in the certificate of incorporation or by-laws of the Parent or any of its subsidiaries or in any contract, agreement or other instrument to which Parent or any of its subsidiaries is a party or otherwise bound (other than provisions, if any, that are inconsistent with, or contrary to, provisions of the Sealed Air Settlement Agreement or the Fresenius Settlement Agreement), and, to the fullest extent permitted by applicable law, any such inconsistent or contrary provision shall be nugatory and of no force and effect and shall not dilute, restrict, or impair the value or ownership rights of the shares issued to the Asbestos PI Trust thereunder. The issuance of stock to the Asbestos PI Trust pursuant to the Share Issuance Agreement shall not be subject to or trigger any "poison pill," shareholder or stockholder rights plan, or other anti-takeover or takeover defense plan, contract, agreement, instrument, or provision adopted or implemented by the Parent.

### 4.7.1.4    Warrant

The Board of Directors of Reorganized Parent shall take all actions necessary so that the Asbestos PI Trust shall not be an "Acquiring Person" within the meaning of the Amended and Restated Rights Agreement, dated as of March 25, 2008, by and between the Reorganized Parent and Mellon Investor Services, LLC, as rights agent (as amended from time to time, the "Rights Agreement"). The Reorganized Parent shall not lower the Beneficial Ownership percentage in the Rights Agreement's definition of "Acquiring Person" until such time as the Asbestos PI Trust no longer owns the Warrant (either because of its transfer or expiration) or any shares of Parent Common Stock issued to the Asbestos PI Trust upon exercise of the Warrant. No "poison pill," shareholder or stockholder rights plan, or other anti-takeover or takeover defense plan, contract, agreement, instrument, or provision adopted or implemented by the Reorganized Parent shall apply to or be triggered by the issuance of the Warrant to, or the purchase of, Parent Common Stock upon exercise of the Warrant by, the Asbestos PI Trust.

If, prior to issuance of the Warrant to the Asbestos PI Trust, the Reorganized Parent shall issue or sell any shares of Parent Common Stock, other than Excluded Stock, or any rights to purchase or acquire, or securities convertible into or exchangeable for, shares of Parent Common Stock (including without limitation any (x) options (other than Excluded Options), warrants or other rights (whether or not at the time exercisable) to purchase or acquire Parent Common Stock, other than Excluded Stock, (y) securities by their terms convertible into or exchangeable (whether at the time so convertible or exchangeable) for Parent Common Stock, other than Excluded Stock or (z) options (other than Excluded Options), warrants or rights to purchase such convertible or exchangeable securities), for no consideration or for a consideration per share that is less than the securities exchange average closing price per share of Parent Common Stock for the twenty consecutive trading days preceding (and not including) the last trading day

99

immediately prior to the day of such issuance or sale (the "Market Price"), then and in each such case (a "Trigger Issuance") the per share exercise price of the Warrant (initially, $17.00) shall be reduced, immediately upon such Trigger Issuance, to the price determined by multiplying such exercise price by a fraction, (1) the numerator of which shall be (x) the number of shares of Parent Common Stock outstanding immediately prior to such issuance or sale plus (y) the number of shares of Parent Common Stock which the aggregate consideration received (or to be received) by the Reorganized Parent for the total number of such additional shares of Parent Common Stock so issued or sold (or issuable upon exercise, conversion or exchange) would purchase at the Market Price and (2) the denominator of which shall be the number of shares of Parent Common Stock outstanding (or issuable upon exercise, conversion or exchange) immediately after such Trigger Issuance. In the event of such an adjustment of such exercise price, the number of shares of Parent Common Stock issuable upon the exercise of the Warrant (initially, 10,000,000 shares of Parent Common Stock) shall be increased to a number obtained by dividing (1) the product of (x) the number of shares of Parent Common Stock issuable upon the exercise of the Warrant before such adjustment, and (y) the exercise price thereof in effect immediately prior to the Trigger Issuance by (2) the new exercise price determined in accordance with the immediately preceding sentence. Such adjustments shall be made whenever such shares of Common Stock or such rights, options (other than Excluded Options) or warrants or convertible securities are issued or sold. "Excluded Stock" means shares of Parent Common Stock issued and sold in a registered firm commitment underwritten public offering pursuant to a registration statement declared effective in accordance with the Securities Act, or any successor statute thereto. Excluded Stock shall not include a private placement of shares, including without limitation one which is followed by a public offering thereof. "Excluded Options" means options to purchase shares of Parent Common Stock issued to directors, officers, employees and consultants of any Reorganized Debtor (i) pursuant to an option plan or arrangement approved by either the stockholders of Parent or Reorganized Parent or the Bankruptcy Court and (ii) with an exercise price equal to the average of the high and the low trading prices of Parent Common Stock on the New York Stock Exchange (or if Parent Common Stock is not traded on the New York Stock Exchange, on the principal stock exchange on which it trades) on the date of grant of the option.

At the time of issuance, the exercise price of, and number of shares issuable pursuant to, the Warrant shall be reflect any adjustment made pursuant to the preceding paragraph.

### 4.7.2   The Asbestos PI Trust

#### 4.7.2.1   Creation of the Asbestos PI Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos PI Trust shall be created pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan Documents. The Asbestos PI Trust shall be a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to section 468B of the IRC.

The purpose of the Asbestos PI Trust shall be to, among other things: (a) assume the liabilities of the Debtors with respect to all Asbestos PI Claims; (b) process, liquidate, pay and satisfy all Asbestos PI Claims in accordance, as applicable, with the Plan, the Asbestos PI Trust

Agreement and the TDP and in such a way that provides reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present and future Asbestos PI Claims (including Demands that involve similar claims) in substantially the same manner and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (c) preserve, hold, manage, and maximize the assets of the Asbestos PI Trust for use in paying and satisfying Asbestos PI Claims entitled to payment; (d) qualify at all times as a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to Section 468B of the IRC; and (e) otherwise carry out the provisions of the Asbestos PI Trust Agreement and any other agreements into which the Asbestos PI Trustees have entered or will enter in connection with the Plan.

### 4.7.2.2    Funding of the Asbestos PI Trust

(a)    On the Effective Date, Grace-Conn or Parent shall transfer to the Asbestos PI Trust (i) the sum of $250 million in Cash that is part of the Asbestos PI Trust Assets, plus interest thereon from January 1, 2009 until (and including) the Effective Date at the same rate applicable to the Debtors' senior debt and (ii) an amount in Cash equal to the Asbestos PD Initial Payment. In addition to the foregoing, on the Effective Date, Grace-Conn or Parent, on behalf of the Reorganized Debtors and the Non-Debtor Affiliates, shall transfer, or cause the transfer of all other Asbestos PI Trust Assets that are not otherwise identified, transferred, or assigned in Section 7.2.2 of the Plan and Section 7.2.4 of the Plan to the Asbestos PI Trust.

(b)    On the Effective Date, Cryovac, Inc. shall transfer the Cryovac Payment (reduced by the amount of Cryovac, Inc.'s transfer to the Asbestos PD Trust as part of the Asbestos PD Initial Payment) directly to the Asbestos PI Trust. Simultaneous with, and in exchange for, such direct transfer and payment to the Asbestos PI Trust and Cryovac. Inc.'s transfer to the Asbestos PD Trust described in section 7.3.2 of the Plan, the Plaintiffs shall deliver to Sealed Air: (i) the "Release" (as defined in the Sealed Air Settlement Agreement) duly executed by each of the Plaintiffs and the SA Debtors; (ii) a copy of the Plan, (iii) a copy of the Confirmation Order, and (iv) a duly executed Stipulation of Dismissal with Prejudice of the Sealed Air Action in the form annexed as Exhibit 4 to the Sealed Air Settlement Agreement, denying any other recovery against the Sealed Air Indemnified Parties, and (v) the Registration Rights Agreement, in the form annexed as Exhibit 1 to the Sealed Air Settlement Agreement, with appropriate insertions therein, duly executed by the "Initial Holders" (as defined in the Sealed Air Settlement Agreement).

(c)    On the Effective Date, Fresenius shall transfer the Fresenius Payment (reduced by the amount of Fresenius' transfer to the Asbestos PD Trust as part of the Asbestos PD Initial Payment) directly to the Asbestos PI Trust.

(d)    (i)    On the Effective Date, the Insurance Contributors shall execute and deliver the Asbestos Insurance Transfer Agreement to the Asbestos PI Trust.

(ii)    All Asbestos Insurance Rights, and all claims and causes of action asserted or to be asserted in furtherance of or connection therewith, shall be preserved for the benefit of the Asbestos PI Trust, for prosecution either by the applicable Insurance Contributor or the Asbestos PI Trust in accordance with the Asbestos Insurance Transfer Agreement. Upon

execution and delivery of the Asbestos Insurance Transfer Agreement, all Asbestos Insurance Rights shall be irrevocably transferred to and vested in the Asbestos PI Trust, without any further action by the Debtors, the other Insurance Contributors, the Asbestos PI Trust, or the Bankruptcy Court. Asbestos Insurance Rights shall be so vested free and clear of all Encumbrances, liens, security interests, and other Claims or causes of action, except that all Asbestos Insurer Coverage Defenses are preserved.

(iii) Upon its execution and delivery, the Asbestos Insurance Transfer Agreement shall be valid, binding, and enforceable. However, if a court of competent jurisdiction determines the Asbestos Insurance Transfer Agreement to be invalid, non-binding, or unenforceable, in whole or in part, then each Insurance Contributor shall (A) upon request by the Asbestos PI Trust and at the reasonable expense of the Asbestos PI Trust, take all reasonable actions to pursue any of the Asbestos Insurance Rights for the benefit of, and to the extent requested by, the Asbestos PI Trust and (B) immediately transfer any amounts recovered under or on account of any of the Asbestos Insurance Rights to the Asbestos PI Trust; *provided, however*, that while any such amounts are held by or under the control of any Insurance Contributor, such amounts shall be held in trust for the benefit of the Asbestos PI Trust.

### 4.7.2.3    Transfer of Claims and Demands to the Asbestos PI Trust

On the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party with respect to all Asbestos PI Claims shall be channeled to and assumed by the Asbestos PI Trust. Section 7.2.3 of the Plan is intended to further effect the Asbestos PI Channeling Injunction described in Section 8.2 of the Plan and the discharge described in Section 8.1 of the Plan. Section 7.2.3 of the Plan is not intended to, and it shall not, serve as a waiver of any defense to any claim the Debtors, the Asbestos PI Trust, or any other Asbestos Protected Party would otherwise have.

### 4.7.2.4    Assignment and Enforcement of Trust Causes of Action

On the Effective Date, by virtue of the confirmation of the Plan, without further notice, action, or deed, the Trust Causes of Action shall be automatically transferred and assigned to, and indefeasibly vested in, the Asbestos PI Trust, and the Asbestos PI Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Trust Causes of Action, with the exclusive right to enforce the Trust Causes of Action, and the proceeds of the recoveries of such Trust Causes of Action shall be deposited in and shall become the property of the Asbestos PI Trust; *provided, however*, that nothing in the Plan shall alter, amend, or modify the injunctions and/or releases provided under the Plan including the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, the Successor Claims Injunction and the Asbestos Insurance Entity Injunction.

### 4.7.2.5    Appointment and Termination of Trustees

The three initial Asbestos PI Trustees of the Asbestos PI Trust shall be the persons identified in the Asbestos PI Trust Agreement. All successor Asbestos PI Trustees shall be appointed in accordance with the terms of the Asbestos PI Trust Agreement. Upon termination of the Asbestos PI Trust, the Asbestos PI Trustees' employment shall be deemed terminated and the Asbestos PI Trustees shall be released and discharged of and from all further authority,

duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 4.7.2.6    Creation and Termination of the TAC

The Trust Advisory Committee shall be established pursuant to the Asbestos PI Trust Agreement. The TAC shall have four members and shall have the functions, duties and rights provided in the Asbestos PI Trust Agreement. On or before the Confirmation Date, the initial members of the TAC shall be selected by the Asbestos PI Committee. Upon termination of the Asbestos PI Trust, the TAC shall be deemed dissolved and the TAC shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 4.7.2.7    Cooperation Agreement

On the Effective Date, the Reorganized Debtors and the Asbestos PI Trust shall enter into a cooperation agreement substantially in the form included as Exhibit 10 in the Exhibit Book.

### 4.7.2.8    Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, without any further action of the Bankruptcy Court or any Entity, the Asbestos PI Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos PI Trust, including the Trust Causes of Action.

### 4.7.3    The Asbestos PD Trust

### 4.7.3.1    Creation of the Asbestos PD Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos PD Trust shall be created pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan Documents. The Asbestos PD Trust shall be a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to section 468B of the IRC.

The purpose of the Asbestos PD Trust shall be to, among other things, (a) assume the liabilities of the Debtors with respect to all Asbestos PD Claims, (b) pay and satisfy all Asbestos PD Claims in accordance, as applicable, with the Plan, the Asbestos PD Trust Agreement, the PD Settlement Agreements, and the Final Orders by the Bankruptcy Court determining the Allowed Amount of the Unresolved Asbestos PD Claims in such a way that provides reasonable assurance that the Asbestos PD Trust will value, and be in a financial position to pay, present and future Asbestos PD Claims (including Demands, if any, that involve similar claims) in substantially the same manner and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (c) preserve, hold, manage, and maximize the assets of the Asbestos PD Trust for use in paying and satisfying Asbestos PD Claims entitled to payment; (d) qualify at all times as a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to Section 468B of the IRC; and (e) otherwise carry out the provisions of the

103

Asbestos PD Trust Agreement and any other agreements into which the Asbestos PD Trustees have entered or will enter in connection with the Plan.

### 4.7.3.2    Funding of the Asbestos PD Trust

(a)    The Asbestos PD Trust Assets shall be collectively comprised of (i) the Asbestos PD Initial Payment, which is an amount in Cash equal to the sum of (A) $109 million, the total payments due under settled Asbestos PD Claims, and (B) an amount agreed to by the Parent, Sealed Air Corporation, Cryovac, Inc., Fresenius, and the Asbestos PD FCR, constituting an estimate of the first six months of the Asbestos PD Trust Expenses, to be transferred equally by Cryovac, Inc. and Fresenius directly to the Asbestos PD Trust on the Effective Date, *provided, however*, that the Fresenius payment to the Asbestos PD Trust shall not exceed 65% of the Fresenius Payment; and (ii) the Asbestos PD Note, pursuant to which the Parent shall commit to pay the Asbestos PD Trust on January 1 and July 1 of each year, a dollar amount equal to (A) the amount of the Asbestos PD Claims that were Allowed against the Asbestos PD Trust during the preceding six-month period, plus interest thereon accruing at the then-applicable federal judgment rate per annum from the date of allowance of each such Asbestos PD Claim; and (B) the Asbestos PD Trust Expenses payment for the next succeeding six-month period following the Asbestos PD Trust Expenses payment paid as part of the Asbestos PD Initial Payment. The Asbestos PD Note shall be secured by Parent's obligation to issue 50.1% of Parent Common Stock as of the Effective Date.

(b)    On the Effective Date, (i) Cryovac, Inc. shall transfer directly to the Asbestos PD Trust its equal share of the amount of the Asbestos PD Initial Payment and Fresenius shall transfer directly to the Asbestos PD Trust its equal share of the amount of the Asbestos PD Initial Payment; and (ii) Grace-Conn or the Parent, on behalf of the Reorganized Debtors and the Non-Debtor Affiliates, shall transfer to the Asbestos PD Trust (A) the Asbestos PD Note and (B) all funds as set forth in the CDN ZAI Minutes of Settlement; and the Asbestos PD Trust shall immediately transfer the amounts set forth in the CDN ZAI Minutes of Settlement to the CDN ZAI PD Claims Fund to be used in the manner set forth in the CDN ZAI Minutes of Settlement. In no event shall the Asbestos PD Initial Payment (or any portion thereof) be transferred to the CDN ZAI PD Claims Fund.

### 4.7.3.3    Transfer of Claims and Demands to the Asbestos PD Trust

On the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party with respect to all Asbestos PD Claims shall be channeled to and assumed by the Asbestos PD Trust. Section 7.3.3 of the Plan is intended to further effect the Asbestos PD Channeling Injunction described in Section 8.3 of the Plan, and the discharge described in Section 8.1 of the Plan. Section 7.3.3 of the Plan is not intended to, and it shall not, serve as a waiver of any defense to any claim the Debtors, the Asbestos PD Trust, or any other Asbestos Protected Party would otherwise have.

### 4.7.3.4    Appointment and Termination of Asbestos PD Trustee

The initial Asbestos PD Trustee of the Asbestos PD Trust shall be the person identified in the Asbestos PD Trust Agreement. All successor Asbestos PD Trustees shall be appointed in accordance with the terms of the Asbestos PD Trust Agreement. Upon termination of the

104

Asbestos PD Trust, the Asbestos PD Trustee's employment shall be deemed terminated and the Asbestos PD Trustee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 4.7.4    Payments and Distributions Under the Plan

Section 7.4 of the Plan sets forth the mechanics of Asbestos PI Trust payments, Asbestos PD Trust payments, and Distributions under the Plan.  Among other things, Section 7.4 of the Plan provides that payments to Holders of Asbestos PI Claims shall be made by the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the TDP and payments to Holders of Asbestos PD Claims shall be made by the Asbestos PD Trust in accordance with the Asbestos PD Trust Agreement, PD Settlement Agreements, and any Final Orders of the Bankruptcy Court allowing such claims.  Payments to Holders of CDN ZAI PD Claims shall be made pursuant to the CDN ZAI Minutes of Settlement by the CDN ZAI PD Claims Fund.  All other Distributions or payments required or permitted to be made under the Plan (other than to Professionals) shall be made by the Reorganized Debtors or, in their discretion, by a disbursing agent employed by the Reorganized Debtors, in accordance with the treatment specified for each such Holder as specified in the Plan (unless otherwise ordered by the Bankruptcy Court); *provided, however,* that Distributions and transfers to the Asbestos PI Trust of the Asbestos PI Trust Assets shall be made on the Effective Date, and Distributions and transfers to the Asbestos PD Trust of the Asbestos PD Trust Assets and the funds set forth in the CDN ZAI Minutes of Settlement payable to the CDN ZAI PD Claims Fund shall be made on the Effective Date.  Distributions to be made on the date that a Plan Claim becomes an Allowed Claim, rather than on the Effective Date, shall be deemed actually made on such date if made on or before the Post-Effective Distribution Date with respect to such Claim.  Notwithstanding that Distributions to Allowed Claims may be deemed made on the date that a Plan Claim becomes an Allowed Claim as per the preceding sentence, nothing in Section 7.4.1 of the Plan shall modify the calculation of post-petition interest through the date of payment for General Unsecured Claims that become Allowed General Unsecured Claims after the Effective Date as set forth in Section 3.1.9(b) of the Plan.  Except as otherwise provided herein, Professionals shall be paid pursuant to orders of the Bankruptcy Court.

Under no circumstances shall any fractional shares of Sealed Air Common Stock be transferred pursuant to the Asbestos PI Trust Agreement such that any Entity shall be the transferee of less than one thousand shares of Sealed Air Common Stock, *provided, however,* that in no event shall the Asbestos PI Trust incur any costs or expenses associated with such one thousand share limitation.

### 4.7.5    Delivery    of    Distributions    and    Undeliverable    or    Unclaimed Distributions

Section 7.5.1 of the Plan provides that payments by the Asbestos PI Trust to Holders of Asbestos PI Claims shall be made in accordance with the Asbestos PI Trust Agreement and the TDP, payments to Holders of Asbestos PD Claims shall be made by the Asbestos PD Trust in accordance with the Asbestos PD Trust Agreement, PD Settlement Agreements, and any Final Orders of the Bankruptcy Court allowing such claims, and payments to Holders of CDN ZAI PD Claims shall be made by the CDN ZAI PD Claims Fund in accordance with the procedures set

forth in the CDN ZAI Minutes of Settlement, while other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Allowed Claim as set forth on the Schedules, unless superseded by a new address, or as set forth in a further writing, including a filed proof of Claim.  Section 7.5.2 of the Plan also provides for a mechanism to deal with undeliverable Distributions.

### 4.7.6    Payments Under the Plan

Section 7.6 of the Plan deals with the manner of Cash payments under the Plan and provides a mechanism to deal with fractional payments.

### 4.7.7    Conditions to Occurrence of the Confirmation Date

Section 7.7 of the Plan sets forth conditions precedent to confirmation of the Plan. Unless the Court makes all of the findings of fact, conclusions of law, orders and/or decrees listed in Section 7.7 of the Plan, the Plan cannot be confirmed.  Among other things, these findings of fact and/or conclusions of law relate to:  (a) compliance with all sections of the Bankruptcy Code, including all subsections of Bankruptcy Code § 524(g); (b) the Asbestos PI Trust and the Asbestos PD Trust owning, or by the exercise of rights granted under the Plan entitled to own if specified contingencies occur, a majority of the voting shares of the Reorganized Parent; (c) the assumption by the Asbestos PI Trust of all liabilities of the Debtors with respect to all Asbestos PI Claims; (d) the assumption by the Asbestos PD Trust of all liabilities of the Debtors with respect to all Asbestos PD Claims; (e) the assumption by the CDN ZAI PD Claims Fund contemplated by the CDN ZAI Minutes of Settlement of the liabilities of the Debtors with respect to all CDN ZAI PD Claims; (f) the essential and integral importance of each of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement to the Plan; (g) the Reorganized Debtors' ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities as required by the Plan, the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement;  (h) the effectiveness of the various injunctions and releases provided for in the Plan, including those required under the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; (i) insurance matters; (j) effectiveness of the Deferred Payment Agreement, Share Issuance Agreement, Grace Guaranty, the Plan Registration Rights Agreement and Warrant; (k) findings relating to the rate for post-petition interest on account of the General Unsecured Claims arising from the Pre-petition Credit Facilities; and (l) entry of the Canadian Settlement Approval Order.

The Confirmation Order shall also be in a form and substance acceptable to (a) each of the Plan Proponents; (b) with respect to provisions that are required by, or related to, the Sealed Air Settlement Agreement, Sealed Air; and (c) with respect to provisions that are required by, or related to, the Fresenius Settlement Agreement, Fresenius.

### 4.7.8    Conditions to Occurrence of the Effective Date

Section 7.8 of the Plan sets forth conditions precedent to the Effective Date of the Plan. Until the conditions set forth in Section 7.8 of the Plan occur (or are waived in accordance with the requirements of Section 7.8 of the Plan), the Effective Date shall not occur and the Plan shall be of no force or effect.  The conditions precedent to the Effective Date include, without limitation, entry of the Confirmation Order as specified; entry, issuance or affirmation of the

order by the District Court approving or recognizing the Confirmation Order; the Confirmation Order shall have become a Final Order; transfer of the Asbestos PI Trust Assets and the Asbestos PD Trust Assets to the Asbestos PI Trust and the Asbestos PD Trust, respectively; approval and affirmation of the various injunctions and releases specified in the Plan; the execution of all Plan Documents, including each of the exhibits and attachments to the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement each being in full force and effect and all of the conditions precedent contained therein having been satisfied or waived; filing of the necessary corporate documents; the making of payments required under the CDN ZAI Minutes of Settlement; obtaining the necessary exit financing; and executing or finalizing various other documents or agreements.

### 4.7.9    Management of the Reorganized Debtors

Section 7.9 of the Plan sets forth the post-confirmation governance of the Reorganized Debtors, including specifications relating to the Board of Directors of the Reorganized Parent.

### 4.7.10  Corporate Action

Section 7.10 of the Plan provides that the approval and effectiveness of matters provided under the Plan related to the corporate structure of the Reorganized Debtors shall be deemed to have occurred and to have been authorized.

### 4.7.11  Effectuating Documents and Further Transactions

Section 7.11 of the Plan authorizes each of the officers of the Debtors and the Reorganized Debtors to execute, deliver, file, or record such agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate the Plan.

### 4.7.12  Allocation of Plan Distributions Between Principal and Interest

Section 7.12 of the Plan allocates Plan Distributions made under the Plan between principal and interest.

### 4.7.13  No Successor Liability

Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the Asbestos PI FCR, the Asbestos PD FCR, the CCAA Representative Counsel and the Asbestos Protected Parties will not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date.  Neither the Asbestos Protected Parties, the Reorganized Debtors, the Asbestos PI Trust, the Asbestos PD Trust, nor the CDN ZAI PD Claims Fund is, or shall be, a successor to the Debtors or any of the

Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors, the Asbestos PI Trust, the Asbestos PD Trust, and the CDN ZAI PD Claims Fund shall assume the obligations specified in the Plan and the Confirmation Order.

Except as otherwise expressly provided in the Plan, effective automatically on the Effective Date, the Asbestos Protected Parties shall be unconditionally, irrevocably and fully released from (a) any and all Asbestos-Related Claims, including (i) any and all Successor Claims, based on or arising from, in whole or in part, directly or indirectly, or related to the Cryovac Transaction and (ii) any and all Asbestos Claims, (b) any and all SA Claims, SA Debts, SA Damages, including Successor Claims, based on, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, and (c) any other claims and causes of action arising under chapter 5 of the Bankruptcy Code or similar claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date. Notwithstanding the foregoing, nothing herein shall release any Asbestos Insurance Entity from its obligations under any Asbestos Insurance Settlement Agreement or Asbestos In-Place Insurance Coverage.

### 4.7.14  Deemed Consolidation of the Debtors for Plan Purposes Only

Section 7.14 of the Plan provides for the limited substantive consolidation of the Debtors as follows: Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under the Plan and as set forth above in Section 7.14 of the Plan) affect: (a) the legal and organizational structure of the Debtors; (b) any Encumbrances that are required to be maintained under the Plan (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (ii) pursuant to the Plan, or (iii) in connection with any Exit Financing; (c) the Sealed Air Settlement Agreement; and (d) the Fresenius Settlement Agreement.

Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Plan Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the Holders of any such Plan Claims are entitled shall be left unaltered by the Plan. In addition, notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on Asbestos Insurance Rights, and the deemed consolidation shall not expand insurers' coverage obligations, or cause insurers to assume liability on behalf of non-consolidated Debtors whom the insurers did not originally contract to cover.

K&E 13317902.4913317902.55

### 4.7.15  Insurance Neutrality

Section 7.15 of the Plan provides, among other things, that, except as set forth therein, none of the Confirmation Order, the Plan, or any of the Plan Documents will operate to, or have the effect of impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect. The provisions further detail that no action of the Court shall, with respect to any Asbestos Insurance Entity, constitute a trial or hearing on the merits or an adjudication or judgment under any of the Asbestos Insurance Policies, except that the Asbestos Insurance Entities shall be bound by the Court's findings and conclusions that under the Bankruptcy Code, the transfer of rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against each Asbestos Insurance Entity notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Settlement Agreement or applicable non-bankruptcy law.

If a non-settling Asbestos Insurance Entity asserts that it has rights of contribution, indemnity, reimbursement, subrogation or other similar claims (collectively, for purposes of Section 7.15(i) of the Plan, "Contribution Claims") against a Settled Asbestos Insurance Company, (a) such Contribution Claims may be asserted as a defense or offset against the Asbestos PI Trust or the Reorganized Debtors (as applicable) in any Asbestos Insurance Action including such non-settling Asbestos Insurance Entity, and the Asbestos PI Trust or the Reorganized Debtors (as applicable) may assert the legal or equitable rights, if any, of the Settling Asbestos Insurance Entity, and (b) to the extent such Contribution Claim is determined to be valid, pursuant to a Final Order, the liability (if any) of such non-settling Asbestos Insurance Entity to the Asbestos PI Trust or the Reorganized Debtors (as applicable) shall be reduced by the amount of such Contribution Claim.

Despite the inclusion of these Insurance Neutrality provisions, certain insurers (collectively, "Objecting Insurers") contend that the Plan is not fully "insurance neutral." Their contentions, and the fact that the Plan Proponents dispute their contentions, are discussed more fully in Section 9.4 below. Certain Objecting Insurers also contend that the Plan is not fully insurance neutral because the injunction provided under section 524(g) of the Bankruptcy Code and Section 8.2 of the Plan may prevent insurers who submit Indirect PI Trust Claims for contribution and indemnity to the Asbestos PI Trust, or who become involved in coverage litigation with the Asbestos PI Trust, from exercising their rights under state law to take discovery of the Debtors. The Plan Proponents do not believe that the injunction provisions or anything else in the Plan impair the insurers' state law rights to take such discovery.

### 4.8     Injunctions, Releases and Discharge

Section 7.13 and Article 8 of the Plan work together to shield the Debtors and certain other parties from any liability for any Claims dealt with under the Plan.

Article 8 of the Plan provides the following:

### 4.8.1    Discharge

#### 4.8.1.1    Discharge of the Debtors and Related Discharge Injunction

The rights afforded in the Plan and the treatment of all Claims, Plan Claims, Demands and Equity Interests in the Plan shall be in exchange for and shall discharge all Claims, Plan Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all Claims, Plan Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be discharged.  The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to the Plan.  All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims, Plan Claims, or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in the Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtors, whether or not the discharge of such debt is waived; *provided, however*, that the obligations of the Reorganized Debtors under the Plan and the other Plan Documents to be entered into on the Effective Date are not so discharged.

#### 4.8.1.2    Discharge of Liabilities to Holders of Asbestos PI Claims

The transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets as contemplated by the Plan, among other things, shall discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos PI Claims, subject to the reservations listed in Section 8.2.2 of the Plan.  On the Effective Date, the Asbestos PI Trust shall assume the liabilities of the Debtors with respect to all Asbestos PI Claims and shall pay Asbestos PI Claims entitled to payment in accordance with the Asbestos PI Trust Agreement and the TDP.

#### 4.8.1.3    Discharge of Liabilities to Holders of Asbestos PD Claims

The transfer to, vesting in, and assumption by the Asbestos PD Trust of the Asbestos PD Trust Assets as contemplated by the Plan, among other things, shall discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos PD Claims, subject to the reservations listed in Section 8.3.2 of the Plan.  On the Effective Date, the Asbestos PD Trust shall assume the liabilities of the Debtors with respect to all Asbestos PD Claims and shall pay Asbestos PD Claims entitled to payment in accordance with the Asbestos PD Trust Agreement and any Final Orders of the Bankruptcy Court allowing such claims.

#### 4.8.1.4    Discharge of Liabilities to Holders of CDN ZAI PD Claims

The transfer to, vesting in, and assumption by the CDN ZAI PD Claims Fund of the CDN ZAI PD Claims as contemplated by the CDN ZAI Minutes of Settlement and the Plan, among other things, shall discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all CDN ZAI PD Claims, subject to the reservations listed in Section 8.3.2 of the Plan. On the Effective Date, the CDN ZAI PD Claims Fund shall assume the liabilities of the Debtors with respect to all CDN ZAI PD Claims and shall pay CDN ZAI PD Claims entitled to payment in accordance with the terms of the CDN ZAI Minutes of Settlement.

#### 4.8.1.5    Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

#### 4.8.1.6    Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the ERISA applies (the "Pension Plans"). The Debtors intend that the Reorganized Parent will continue to be the continuing sponsor of the Pension Plans. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and section 412 of the IRC. Should the Pension Plans be underfunded and should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC.

Nothing contained in the Plan, the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the PBGC with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release, and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy, or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos PI Trust or any of the Asbestos PI Trust Assets, or the Asbestos PD Trust or any of the Asbestos PD Trust Assets.

### 4.8.2    The Asbestos PI Channeling Injunction

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141, 524(a), and 105 and as described in Article 8 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 524(g), the Confirmation Order shall provide for issuance of the Asbestos PI Channeling Injunction to take effect as of the Effective Date.

#### 4.8.2.1    Asbestos PI Channeling Injunction

On and after the Effective Date, the sole recourse of the Holder of an Asbestos PI Claim or a Successor Claim arising out of or based on any Asbestos PI Claim on account thereof shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction and the TDP and such Holder shall have no right whatsoever at any time to assert its Asbestos PI Claim or Successor Claim arising out of or based on any Asbestos PI Claim against the Debtors, the Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to the Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos PI Channeling Injunction shall apply to all present and future Holders of Asbestos PI Claims or Successor Claims arising out of or based on any Asbestos PI Claim, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any Demand against any Asbestos Protected Party or any property or interest (including Distributions made pursuant to the Plan) in property of any Asbestos Protected Party for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos PI Claims or Successor Claims arising out of or based on any Asbestos PI Claims other than from the Asbestos PI Trust in accordance with the Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the TDP, including:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly,

112

any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e)    proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos PI Trust, except in conformity and compliance with the Asbestos PI Trust Agreement and the TDP.

### 4.8.2.2    Reservations from Asbestos PI Channeling Injunction

Notwithstanding anything to the contrary in Section 8.2.1 of the Plan, the Asbestos PI Channeling Injunction issued pursuant to Section 8.2.1 of the Plan shall not enjoin:

(a)    the rights of Entities to the treatment accorded them under the Plan, including the rights of Entities with Asbestos PI Claims to assert such Asbestos PI Claims in accordance with the TDP;

(b)    the rights of Entities to assert any claim, debt, obligation, or liability for payment of expenses of the Asbestos PI Trust solely against the Asbestos PI Trust or the Asbestos PI Trust Assets;

(c)    the rights of the Asbestos PI Trust and, to the extent permitted by the Asbestos Insurance Transfer Agreement, the Insurance Contributors, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity (but not the Sealed Air Indemnified Parties), including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights; and

(d)    the rights of the Asbestos PI Trust and, to the extent permitted by the Asbestos Insurance Transfer Agreement, the Insurance Contributors, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity (but not the Sealed Air Indemnified Parties) including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights.

Except as otherwise expressly provided in the Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos PI Trust may have against any Entity in connection with or arising out of or based on any Asbestos PI Claim.

### 4.8.3    The Asbestos PD Channeling Injunction

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141, 524(a), and 105 and as described in Article 8 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 524(g), the Confirmation Order shall provide for issuance of the Asbestos PD Channeling Injunction to take effect as of the Effective Date. In connection with confirmation of the Plan, the Court shall enter ~~a case management order~~the PD Case Management Order

setting forth procedures for determining the allowance or disallowance of the Unresolved Asbestos PD Claims.

### 4.8.3.1    Asbestos PD Channeling Injunction

On and after the Effective Date, (1) the sole recourse of the Holder of an Asbestos PD Claim, or a Successor Claim arising out of or based on any Asbestos PD Claim on account thereof, shall be to the Asbestos PD Trust; and (2) the sole recourse of a Holder of a CDN ZAI PD Claim, or a Successor Claim arising out of or based on any CDN ZAI PD Claim, shall be to the CDN ZAI PD Claims Fund as set forth in the CDN ZAI Minutes of Settlement, pursuant to the provisions of the Asbestos PD Channeling Injunction and any Final Orders of the Bankruptcy Court allowing such claims, and such Holders shall have no right whatsoever at any time to assert their Asbestos PD Claim, Successor Claim arising out of or based on any Asbestos PD Claim, CDN ZAI PD Claim, or Successor Claim arising out of or based on any CDN ZAI PD Claim against the Debtors, Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to the Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party.  Without limiting the foregoing, from and after the Effective Date, the Asbestos PD Channeling Injunction shall apply to all present and future Holders of Asbestos PD Claims, Successor Claims arising out of or based on any Asbestos PD Claim, CDN ZAI PD Claims, and Successor Claims arising out of or based on any CDN ZAI PD Claim, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any Demand for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos PD Claims, Successor Claims arising out of or based on any Asbestos PD Claim, CDN ZAI PD Claims, or Successor Claims arising out of or based on any CDN ZAI PD Claim other than from the Asbestos PD Trust in accordance with the Asbestos PD Channeling Injunction and pursuant to the Asbestos PD Trust Agreement in the case of Asbestos PD Claims or in accordance with the Asbestos PD Channeling Injunction and pursuant to the CDN ZAI Minutes of Settlement in the case of CDN ZAI PD Claims, including:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d)      setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e)      proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos PD Trust, except in conformity and compliance with the Asbestos PD Trust Agreement in the case of Asbestos PD Claims, or proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the CDN ZAI Minutes of Settlement in the case of CDN ZAI PD Claims.

### 4.8.3.2      Reservations from Asbestos PD Channeling Injunction

Notwithstanding anything to the contrary in Section 8.3.1 of the Plan, the Asbestos PD Channeling Injunction issued pursuant to Section 8.3.1 of the Plan shall not enjoin:

(a)      the rights of Entities to the treatment accorded them under the Plan, including the rights of Entities with Asbestos PD Claims to assert such Asbestos PD Claims in accordance with the ~~case management order~~**PD Case Management Order** to be entered by the Bankruptcy Court that will address such claims, and the rights of Entities with CDN ZAI PD Claims to assert such CDN ZAI PD Claims in accordance with the provisions set forth in the CDN ZAI Minutes of Settlement; and

(b)      the rights of Entities to assert any claim, debt, obligation, or liability for payment of expenses of the Asbestos PD Trust solely against the Asbestos PD Trust or the Asbestos PD Trust Assets.

Except as otherwise expressly provided in the Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos PD Trust may have against any Entity in connection with or arising out of or based on any Asbestos PD Claim or CDN ZAI PD Claim.

### 4.8.4    Asbestos Insurance Entity Injunction(s)

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

### 4.8.4.1      Asbestos Insurance Entity Injunction

#### 4.8.4.1.1    Injunction for the Benefit of the Asbestos PI Trust

(a)      All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert, any claim or cause of action against any Asbestos Insurance Entity, based upon, or arising out of, any Asbestos PI Claim against the Debtors or any

Asbestos Insurance Rights, whenever and wherever arisen or asserted (including all claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such claim or cause of action, including:

> (i)   commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding in any forum) against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

> (ii)   enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

> (iii)   creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

> (iv)   setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity; and

> (v)   proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos PI Trust, except in conformity and compliance with the Asbestos PI Trust Agreement, the TDP, and the appropriate Asbestos Insurance Settlement Agreements.

(b)   The Asbestos PI Trust shall have the sole and exclusive authority at any time to terminate, reduce or limit the scope of, the Asbestos Insurance Entity Injunction issued pursuant to Section 8.4.1.1 of the Plan as it may apply to any Asbestos Insurance Entity upon express written notice to that Asbestos Insurance Entity; and

(c)   The Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is or may become a third-party beneficiary of the Asbestos Insurance Entity Injunction.

116

### 4.8.4.1.2   Reservations from the Injunction for the Benefit of the Asbestos PI Trust

Notwithstanding anything to the contrary in Section 8.4.1.1 of the Plan, the Asbestos Insurance Entity Injunction issued pursuant to Section 8.4.1.1 of the Plan shall not enjoin:

(a)   the rights of any Entity to the treatment accorded it under the Plan;

(b)   the rights of the Asbestos PI Trust or, to the extent provided in the Asbestos Insurance Transfer Agreement, any of the Insurance Contributors, to prosecute any cause of action or to assert any claim, demand, debt, obligation, or liability for payment against any Entity (but not the Sealed Air Indemnified Parties), including any Asbestos Insurance Entity or any property or interest in property of any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Asbestos PI Trust's benefit; and

(c)   the rights of the Asbestos PI Trust or, to the extent provided in the Asbestos Insurance Transfer Agreement, any of the Insurance Contributors, to receive any settlement, award, payment of Cash, or other property of any kind whatsoever from any Entity (but not the Sealed Air Indemnified Parties), including any Asbestos Insurance Entity or any property or interest in property of any Asbestos Insurance Entity, in satisfaction of any Asbestos Insurance Rights that the Asbestos PI Trust or any of the Insurance Contributors, may have against any of the foregoing.

### 4.8.5   Successor Claims Injunction

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Successor Claim Injunction to take effect as of the Effective Date.

### 4.8.5.1   Injunction

All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert, any Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or Fresenius Transaction (other than Successor Claims arising out of or based on any Asbestos PI Claim, Asbestos PD Claim or CDN ZAI PD Claim) against any Asbestos Protected Party shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any demand for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such Successor Claim, including:

(a)   commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

117

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e)    proceeding in any other manner with regard to any Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or Fresenius Transaction (other than Successor Claims arising out of or based on any Asbestos PI Claim, Asbestos PD Claim or CDN ZAI PD Claim).

### 4.8.6    Injunctions and Releases Related to the Sealed Air Indemnified Parties and Fresenius Indemnified Parties

As required by the Sealed Air Settlement Agreement, the Sealed Air Settlement Order, the Fresenius Settlement Agreement, and the Fresenius Settlement Order, the injunctions and releases outlined in the Plan, including the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction provided under Bankruptcy Code § 524(g) and the Successor Claims Injunction provided under Bankruptcy Code § 105(a), shall absolutely and unequivocally extend to and protect the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties.

### 4.8.7    Terms of Certain Injunctions and the Automatic Stay

#### 4.8.7.1    Injunctions and/or Automatic Stays in Existence Immediately Prior to Confirmation

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code §§ 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in the Plan become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after the Confirmation Date, the Reorganized Debtors or the Plan Proponents, acting together, may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

#### 4.8.7.2    Injunctions Provided for in the Plan

Each of the injunctions provided for in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those

to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date. The Libby Claimants object to the scope of certain of the injunctions provided for in the Plan.

### 4.8.8    Additional Releases and Indemnification

#### 4.8.8.1    Release of Sealed Air Indemnified Parties

On or prior to the Effective Date, (a) the SA Debtors, the Asbestos PI Committee and the Asbestos PD Committee shall execute and deliver the "Release" (as defined in the Sealed Air Settlement Agreement); (b) the "Government Plaintiff" (as defined in the Sealed Air Settlement Agreement) shall execute and deliver the "Government Release" (as defined in the Sealed Air Settlement Agreement); and (c) the Asbestos PI Committee and the Asbestos PD Committee shall deliver the Fresenius Release (as defined in the Sealed Air Settlement Agreement), all as provided for in the Sealed Air Settlement Agreement. In addition, in consideration for the Cryovac Payment, each of the SA Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all present and future Asbestos-Related Claims and Demands related thereto and any and all present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, and arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Entity any and all present and future Asbestos-Related Claims and Demands related thereto, and any and all claims, present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction.

The SA Debtors and the Reorganized Debtors shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth, in the Sealed Air Settlement Agreement.

The SA Debtors shall, jointly and severally, at their sole expense, indemnify, defend, and hold harmless the Sealed Air Indemnified Parties from and against (a) any and all present and future Asbestos-Related Claims and Demands related thereto and all SA Indemnified Taxes, (b) any and all losses, costs, and expenses incurred as a result of any breach of any of the SA Debtors' or SA Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in the Sealed Air Settlement Agreement, including any such obligation, covenant, or agreement of any SA Debtor or SA Non-Debtor Affiliates set forth in the Plan or Confirmation Order, (c) if any SA Non-Debtor Affiliate has not executed and delivered a "Release" (as defined in the Sealed Air Settlement Agreement), any and all Asbestos-Related Claims and Demands related thereto based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such SA Non-Debtor Affiliate and (d) any and all attorneys' fees or costs and expenses attributable to any "SA Indemnity Claim" (as defined below) (such indemnity obligations, collectively, the "SA Debtors' Indemnity Obligation"; and any and all SA Claims, SA Debts, or SA Damages that could be asserted by any of the Sealed Air Indemnified Parties under the SA Debtors' Indemnity Obligation, the "SA Indemnity Claims"); *provided, however*, that in each

119