UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        . Case No. 01-01139(JKF)
                              .
                              .
W. R. GRACE & CO.,            .
                              . 5414 USX Tower Building
                              . Pittsburgh, PA  15222
                              .
              Debtors.        .
                              . December 15, 2008
. . . . . . . . . . . . . . . 1:08 p.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                               CRAIG BRUENS, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               CHRISTOPHER GRECO, ESQ.
                               DEANNA BOLL, ESQ.
                               RASHAD W. EVANS, ESQ.
                               MARC LEWINSTEIN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

For the Debtors:          Reed Smith LLP
                          By:  JAMES RESTIVO, ESQ.
                               TRACI REA, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA  15219

Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

**APPEARANCES (Contd'):**

```
For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For Official Committee:     Caplin & Drysdale, Chartered
of Asbestos Personal        By:  PETER LOCKWOOD, ESQ.
Injury Claimants:                JEFF LIESEMER, ESQ.
                                 NATHAN FINCH. ESQ.
                                 WALTER SLOCOMBE, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005


                            Caplin & Drysdale, Chartered
                            By:  RITA TOBIN, ESQ.
                            375 Park Avenue
                            New York, NY  10152


For the Unsecured           Stroock & Stroock & Lavan
Creditors' Committee:       By:  KENNETH PASQUALE, ESQ.
                                 ARLENE KRIEGER, ESQ.
                                 LEWIS KRUGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

For Official Committee      Duane Morris LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Ste 1200
                            Wilmington, DE  19801-1246

For the Property
Damage Committee:           Bilzin Sumberg Baena Price &
                            Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                                 SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Ad Hoc              Dewey & LeBoeuf, LLP
Committee of Equity         By:  JENNIFER WHITENER, ESQ.
Sec. Holders:               125 West 55th Street
                            New York, NY  10019
```

3

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  ROGER FRANKEL, ESQ.<br>     RICHARD WYRON, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Maryland Casualty<br>and Zurich Intl.: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| | Eckert Seamans Cherin & Mellott,<br>LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher &<br>Flom, LLP<br>By:  DAVID TURETSKY, ESQ.<br>     JAN BAKER, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| Co-Counsel to Libby<br>Claimants: | Cohn, Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>     CHRISTOPHER CANDON, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For the Bank Lenders: | Landis Rath & Cobb, LLP<br>By:  RICHARD S. COBB, ESQ.<br>     KERRI KING MUMFORD, ESQ.<br>     JAMES GREEN, JR., ESQ.<br>919 Market Street<br>Wilmington, DE  19801 |
| | Paul Weiss Rifkind Wharton<br>& Garrison, LLP.<br>By:  REBECCA ZUBATY, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Continental<br>Casualty Company: | Ford, Marrin, Esposito,<br>Witmeyer & Gleser, LLP<br>By: ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza, 23rd Floor<br>New York, NY  10005-1875 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| | LECG<br>By:  ELIZABETH DEVINE, ESQ. |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman &<br>Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>     SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Firemen's Fund: | Stevens & Lee, P.C.<br>By:  JOHN DEMMY, ESQ.<br>1105 North Market Street, 7th Fl.<br>Wilmington, DE  19801 |
| For Fireman's Fund: | Stevens & Lee<br>By:  DAVID R. BEANE, ESQ.<br>111 North Sixth Street<br>P.O. Box 679<br>Reading, PA  19603 |
| For Owens-Illinois: | McCarter & English<br>By: KATHARINE MAYER, ESQ.<br>Renaissance Centre, 405 N. King St.<br>Wilmington, DE  19801 |
| For Asbestos Property<br>Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

For National Union Fire            Zeichner Ellman & Krause, LLP
Insurance Co.:                     By:   MATTHEW RUSSELL, ESQ.
                                         ROBERT GUTTMANN, ESQ.
                                         MICHAEL DAVIS, ESQ.
                                   575 Lexington Avenue
                                   New York, NY  10022

For the Future                     Orrick, Herrington & Sutcliffe, LLP
Claimants                          By:  DEBRA FELDER, ESQ.
Representatives:                         JOSHUA CUTLER, ESQ.
                                         JONATHAN GUY, ESQ
                                   Washington Harbour
                                   3050 K Street, N.W.
                                   Washington, D.C.  20007 For

For Federal Insurance              Cozen O'Connor
Company:                           By:  JACOB C. COHN, ESQ.
                                   1900 Market Street
                                   Philadelphia, PA  19103

For Federal Insurance
Company:                           Cozen O'Connor
                                   By:  JEFFREY WAXMAN, ESQ.
                                   Chase Manhattan Centre
                                   1201 North Market Street
                                   Wilmington, DE  19801

For Allstate Insurance:            Cuyler Burk, LLP
                                   By:  ANDREW CRAIG, ESQ.
                                   Parsippany Corporate Center
                                   Four Century Drive
                                   Parsippany, NJ  07054

For W.R. Grace:                    W.R. Grace
                                   By: WILLIAM CORCORAN, ESQ.
                                       MARK SHELNITZ, ESQ.
                                       PAUL NORRIS, ESQ.
                                   7500 Grace Drive
                                   Columbia, MD  21044

For State of Montana               Womble Carlyle Sandridge & Rice
Department of                      By:  FRANCIS MONACO, ESQ.
Environmental Quality:             222 Delaware Avenue
                                   Suite 1501
                                   Wilmington, DE  19801

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For State of Montana: | Christensen, Moore, Cockrell,<br>Cummings & Axelberg, P.C.<br>By:  DALE R. COCKRELL, ESQ.<br>Two Medicine Building<br>160 Heritage Way<br>Suite 104<br>Kalispell, MT  59904 |
| For Official Committee<br>of Asbestos Personal<br>Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For Official Committee<br>ov Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For CNA: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>     BRIAN MUKHERJEE, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Grace Certain<br>Cancer Claimants: | Montgomery, McCracken, Walker<br>& Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern,<br>the Future Claimants'<br>Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806<br><br>Tre Angeli, LLC<br>By:  JOSEPH RADECKI, ESQ. |
| For the Property<br>Damage Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Official Committee of Asbestos Property Damage Claimants: | Brandi Law Firm<br>By: THOMAS BRANDI, ESQ.<br>    TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA, Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd, et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>    ALAN RUNYAN, ESQ.<br>    MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Scotts Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>    ROBERT J. SIDMAN, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For Official Committee of Asbestos Property Claimants: | Hamilton, Rabinovitz & Alschuler<br>By:  FRANCINE RABINOVITZ, ESQ.<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, CA  93923<br><br>Conway Del Genio, Gries & Co, LLC<br>By:  GREGORY BOYER, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Lieff, Cabraser, Heinmann & Bernstein<br>By:  ELIZABETH J. CABRASER, ESQ.<br><br>Pryor Cashman LLP<br>By:  RICHARD LEVY, ESQ.<br><br>Riker, Danzig, Scherer, Hyland & Perretti, LLP<br>By:  CURTIS PLAZA, ESQ.<br>One Speedwell Avenue<br>Morristown, NJ  07962 |
| For W.R. Grace: | WILLIAM SPARKS, ESQ. |
| For W.R. Grace: | DAVID SIEGEL<br>PAUL NORRIS |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  ASHOK VASVANI |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Morgan Stanley Senior Funding, Inc.: | Katten, Muchin, Rosenman LLP<br>By:  NOAH HELLER, ESQ.<br>     MERRITT PARDINI, ESQ.<br>     JEFF FRIEDMAN, ESQ. |
| For ERISA: | Lowenstein Sandler PC<br>By:  IRA LEVEE, ESQ.<br>65 Livingston Avenue<br>Roseland, NJ  07068 |
| For Her Majesty the Queen in Right of Canada: | Office of the Attorney General<br>By:  JACQUELINE DAIS-VISCA, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Bank of America: | Richards, Layton & Finger, P.A.<br>By:  JASON MADRON, ESQ.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, DE 19899 |
| For PD/FCR: | ALAN RICH, ESQ. |
| For Loan Maker/<br>Long Acre: | Pepper Hamilton<br>By:  DENNIS VERY, ESQ. |
| For Seaton Ins. Co.: | Drinker Biddle & Reath LLP<br>By:  MICHAEL F. BROWN, ESQ.<br>     WARREN PRATT, ESQ.<br>One Logan Square<br>18th & Cherry Streets<br>Philadelphia, PA  19103 |
| For Arrowwood Indemnity<br>f/k/a Royal Indemnity: | Wilson, Elser, Moskowitz, Edelman<br>& Dicker, LLP<br>By: CARL PERNICONE, ESQ.<br>New York, NY 10019<br><br>Bifferato, Gentilotti, Biden<br>& Balick, LLC<br>By:  GARVAN McDANIEL, ESQ.<br>800 N. King Street<br>Wilmington, DE  19899 |
| For Arrowwood Indemnity<br>f/k/a Royal Indemnity: | O'Melveney & Meyers, LLP<br>By:  TANCRID SCHIAVONI, ESQ.<br>Times Square Tower, 7 Times Square<br>New York, NY  10036 |
| For JD Capital: | JD Capital<br>By:  RYAN DUFFY, ESQ.<br>     TAI CURION |
| For the Equity Committee: | Kramer, Levin, Naftalis & Frankel,<br>LLP<br>By:  DOUGLAS MANNAL, ESQ.<br>     DAVID BLAVEY, ESQ.<br>1177 Avenue of the Americas<br>New York, NY  10036 |
| For the Blackstone<br>Group: | The Blackstone Group<br>By:  BRIAN BRESNAHAN |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For the U.S. Trustee: | United States Trustee Department<br>By:  DAVID KLAUDER, AUSA<br>833 Chestnut Street<br>Suite 500<br>Philadelphia, PA  19107 |
| For Fair Harbor Capital<br>LLC: | Fair Harbor Capital, LLC<br>By:  FRED GLASS |
| For Fresenius Medical<br>Care Holdings, Inc.: | McDermott, Will & Emery<br>By:  DAVID S. ROSENBLOOM, ESQ.<br>227 West Monroe Street<br>Chicago, IL  60606 |
| For Century Indemnity: | White & Williams, LLP<br>By:  JOSEPH GIBBONS, ESQ.<br>1800 One Liberty Place<br>Philadelphia, PA  19103 |
| For Loeb Partners: | Paul Weiss Rifkind Wharton<br>& Garrison, LLP.<br>By:  ANDREW ROSENBERG, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| For Kaneb Pipe Line<br>Operating Partnership,<br>et al.: | Fulbright & Jaworski<br>By:  STEVE PEIRCE, ESQ.<br>300 Convent Street<br>Suite 2200<br>San Antonio, TX  78205 |
| For Bloomberg, LLP | Bloomberg, LLP<br>By:  STEVEN H. CHURCH |
| For Travelers: | Simpson, Thacher & Bartlett<br>By:  ELISA ALCABES, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |
| For Anderson Hospital: | BUD FERRY, ESQ. |
| For London Market<br>Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

```
For Everest Reinsurance      Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:     Courtney, P.C.
                             By:  JOHN D. MATTEY, ESQ.
                                  BRIAN KASPRZAK, ESQ.
                             913 North Market St., Suite 800
                             Wilmington, DE  19801


For Everest Reinsurance      Crowell & Moring, LLP
Co. & McKinley Ins. Co.:     By: MARK D. PLEVIN, ESQ.
                                 LESLIE A. EPLEY, ESQ.
                                 LESLIE DAVIS, ESQ.
                             1001 Pennsylvania Avenue, NW
                             Washington, DC  20004


For Borrowers Committee:     Zuckerman Spaeder LLP
                             By:  VIRGINIA GULDI, ESQ.
                             1800 M. Street, N.W. Suite 1000
                             Washington, D.C.  20036


For SNSF Railway Co:         Pepper Hamilton, LLP
                             By:  LINDA CASEY, ESQ.
                             3000 Two Logan Square
                             18th & Arch Streets
                             Philadelphia, PA  19103


For Fee Auditor:             Warren H. Smith & Associates PC
                             By:  WARREN H. SMITH


For Hartford Financial
Service Group:               Wilmer, Cutler, Pickering, Hale
                             & Dorr LLP
                             By:  MELANIE DRITZ, ESQ.
                             399 Park Avenue
                             New York, NY  10022


For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201
```

**J&J COURT TRANSCRIBERS, INC.**

1        COURT CLERK:  All rise.

2        THE COURT:  Good afternoon everyone, please be

3 seated.

4        This is the matter of W.R. Grace, Bankruptcy Number

5 01-1139.  The list of participants I have by phone is Michael

6 Davis, Jeffrey Liesemer, Jason Solganick, Melanie Dritz,

7 Barbara Harding, Daniel Cohn, Walter Slocombe, Nathan Finch,

8 Peter Lockwood, Brian Bresnahan, Mark Hurford, Jonathan Guy,

9 Rita Tobin, Arlene Krieger, William Sparks, James O'Neill,

10 Theodore Tacconelli, Andrew Craig, Jacob Cohn, Christina Kang,

11 Susette Smith, Garvan McDaniel, Michael Lastowski, Daniel

12 Hogan, David Siegel, Paul Norris, John Demmy, Natalie Ramsey,

13 Jennifer Whitener, Theodore Freedman, John Phillips, Kerri

14 Mumford, Sandy Esserman, Martin Dies, Peg Brickley, Jeff

15 Waxman, Christopher Candon, Douglas Mannal, Darrell Scott,

16 Scott Baena, David Klauder, Debra Felder, Edward Westbrook,

17 Curtis Plaza, Warren Smith, Joseph Radecki, Thomas Brandi,

18 Francis Monaco, Jay Sakalo, Marion Fairey, Elizabeth Devine,

19 Andrew Chan, Daniel Speights, Elizabeth Cabraser, Alan Runyan,

20 David Beane, David Bernick, David Parsons, Janet Baer, Deanne

21 Boll, Lisa Esayian, Tiffany Cobb, Marti Murray, Christopher

22 Greco, Craig Bruens, Rashad Evans, Rebecca Zubaty, Matthew

23 Kramer, Brian Mukherjee, Richard Levy, Terence Edwards, Robert

24 Guttmann, Robert Horkovich, Shayne Spencer, Linda Casey, James

25 Green, and Ari Berman.

1        I don't see anybody present in Delaware.  Is anyone

2  present in court in Delaware?

3        COURT CLERK:  No, Judge.

4        THE COURT:  Okay.  There's no one there.  We'll wait

5  a few minutes to see if anyone does appear and if not, we'll

6  terminate the video conference there, but we'll wait about 15

7  minutes to make sure that no one appears there.  So, I'll take

8  entries in Pittsburgh, please.  Good afternoon.

9        MR. BERNICK:  Good afternoon, David Bernick for

10  Grace.

11        MR. FREEDMAN:  Theodore Freedman for Grace.

12        MS. BAER: Janet Baer for Grace.

13        MR. BLAVEY:  Dave Blavey, Kramer --

14        THE COURT:  I'm sorry, I can't hear you, sir.  Would

15  you press the button, make sure your microphone is on?

16        MR. BLAVEY:  I apologize.  Dave Blavey, from Kramer

17  Levin for the Equity Committee.

18        MR. O'NEILL:  Thank you.  Good afternoon, Your Honor,

19  James O'Neill for the debtors.

20        MR. RESTIVO:  James Restivo for the debtor, Your

21  Honor.

22        MR. LOCKWOOD:  Peter Lockwood for the ACC, Your

23  Honor.  And with me is my partner, Nathan Finch.

24        MR. RICH:  Alan Rich for Judge Sanders.

25        MR. FRANKEL:  Good afternoon, Your Honor.  Roger

1 Frankel for the PI FCR, Mr. Austern and with me is Richard

2 Wyron, my partner.

3        MR. PASQUALE:  Good afternoon, Your Honor, Ken

4 Pasquale, Stroock & Stroock & Lavan, for the Unsecured

5 Creditors Committee.

6        MR. GREEN:  James Green for the certain lenders under

7 the prepetition bank credit facilities.

8        MS. COBB:  Good afternoon, Tiffany Cobb, of the

9 Vorys, Sater, Seymour & Pease law firm on behalf of the Scotts

10 Company.

11        MR. COHN:  Good afternoon, Your Honor, Daniel Cohn on

12 behalf of the Libby claimants.

13        MR. BROWN:  Good afternoon, Your Honor, Michael Brown

14 on behalf of Seaton and One Beacon.

15        MR. PERNICONE:  Good afternoon, Your Honor, Carl

16 Pernicone for Arrowwood Indemnity, formerly Royal Indemnity.

17 I'm here with my co-counsel, Tancred Schiavoni.  Thank you.

18        THE COURT:  Excuse me.   Okay, thanks.

19        MR. COHN:  Good afternoon, Your Honor, Jacob Cohn,

20 for Federal Insurance Company.

21        MR. DEMMY:  Your Honor, John Demmy for Firemen's

22 Insurance Company.

23        MR. HORKOVICH:  Good afternoon, Your Honor, Robert

24 Horkovich, insurance counsel to the ACC.

25        MR. MUELLER:  Good afternoon, Your Honor, Alex

1  Mueller from Mendes & Mount for the London Market Companies.

2          MS. DeCRISTOFARO:  Good afternoon, Your Honor,

3  Elizabeth DeCristofaro on behalf of Continental Casualty

4  Company.

5          MR. GLOSBAND:  Good afternoon, Your Honor Dan

6  Glosband also for Continental Casualty Company.

7          MR. TURETSKY:  Good afternoon, Your Honor, David

8  Turetsky of Skadden Arps for Sealed Air Corporation.

9          MR. RAMOS:  Good afternoon, Your Honor, Marcos Ramos,

10 Richards, Layton & Finger, Bank of America.

11         MR. ESSERMAN:  Good afternoon, Your Honor, Sander

12 Esserman on behalf of various firms.

13         MS. RAMSEY:  Good afternoon, Your Honor, Natalie

14 Ramsey on behalf of the MMWR firms.

15         MR. WISLER:  Good afternoon, Your Honor, Jeffrey

16 Wisler on behalf of Maryland Casualty and Zurich.

17         THE COURT:  Ms. Baer, before you start with the

18 agenda, so that I don't lose track of this, I'd like to pose a

19 question while I have everybody here and that has to do with

20 the January hearing dates for the plan confirmation.

21         First of all, are any of them going to be used for

22 anything?

23         MS. BAER:  As of right now all of them are going to

24 be used.

25         THE COURT:  Okay, that's a problem.  My daughter is

1  transferring college and --

2  UNIDENTIFIED FEMALE SPEAKER:  Excuse me, Judge, I

3  just lost my connection.

4  THE COURT:  Okay.  Well, let me -- this doesn't have

5  to be on record anyway.

6  (Court speaking to counsel about schedule)

7  THE COURT:  Okay.

8  MS. BAER:  Thank you, Your Honor.  What we'd like to

9  do, Your Honor, is take one matter out of order on the agenda

10  and that is matter 11 with respect to Mr. Restivo and Mr.

11  Speights and report to you on an issue that came up last

12  hearing about certain Canadian claims and they promise it will

13  take no more than 60 seconds.

14  THE COURT:  All right.  Mr. Restivo.  If it has to do

15  with the S, the settlement word, that would be great.

16  MR. RESTIVO:  No, Your Honor,

17  THE COURT:  Oh.  In that case, go sit back down, Mr.

18  Restivo.

19  MR. RESTIVO:  Your Honor may recall that there was

20  one claim from the province of Manitoba which has a 30 year,

21  ultimate statute of repose, that's claim number 11620.  The

22  Court may recall that with respect to that claim, there was an

23  issue as to the installation date of the product.  Mr. Speights

24  and I have had a number of conversations and I can report to

25  the Court that the parties are in agreement that the claim form

1  states that the fireproofing material at issue was installed in

2  1956 and the parties are also in agreement that, in fact, the

3  material at issue was installed in 1956.  And so, the Court can

4  include those facts in its decision when it deals with the

5  Manitoba claim.

6          THE COURT:  All right, thank you.

7          MR. RESTIVO:  May I be excused, Your Honor?

8          THE COURT:  Yes, sir.  Thank you.

9          MR. RESTIVO:  Thank you.

10         MS. BAER:  Your Honor, that takes us to the top of

11 the agenda.  Items one and two on the agenda are claim related

12 matters that we're working through.  Those are going to be

13 continued again and I will hand up an order continuing those to

14 the January 26th omnibus hearing.

15         THE COURT:  All right.

16         MS. BAER:  Your Honor, number three is the quarterly

17 fee application matter.  An order has been submitted, I believe

18 it is on agreement of all parties and there were no objections.

19 And I do have another copy of that for Your Honor if you do not

20 have it.

21         THE COURT:  Was that entered?

22         MS. BAER:  It was sent to you, Your Honor.

23         THE COURT:  It was send already, okay.  I believe I

24 already signed that order or asked my staff to stamp that

25 order, Ms. Baer.  It may just not have hit the docket yet.

1           MS. BAER:  Okay, thank you, Your Honor.  Your Honor,
2   you already entered an order on number four, which was the Tyco
3   claims settlement.

4           MR. SMITH:  Your Honor, I'm sorry, this is Warren
5   Smith, the fee auditor.  If that concludes the fee audit
6   matters or the fee application matters, if I could be excused,
7   Your Honor.

8           THE COURT:  Anyone who is interested only in the fee
9   matters is excused, yes, sir.  Thank you.

10          MR. SMITH:  Thank you.

11          MS. BAER:  Your Honor, as I indicated, number four
12  has already been entered.  That takes us to agenda item number
13  five, which is the debtors' motion for approval of the sale of
14  certain real property in Charleston.

15          Your Honor, as you may recall, the Charleston
16  property was the subject of a previous motion to sell as part
17  of an environmental package that did not go forward.
18  Charleston had separately filed a motion to modify the
19  automatic stay so that they could, in fact, take the property
20  via eminent domain.  They had made a decision, they wanted to
21  use it for a public works project.

22          We negotiated with Charleston and are happy to report
23  that we've agreed to sell the property to Charleston for $3.8
24  million.  The transaction is to close by the end of December.
25  There are post closing issues with respect to environmental

1  cleanup that's been ongoing on the property.  Those have all

2  been worked out between Grace and the City of Charleston and

3  there have been no objections to our request to enter the

4  order, so we'd ask that the sale be approved today.

5          THE COURT:  Is anybody present for the City of

6  Charleston?  Is there anything else to report with respect to

7  this matter?

8                    (No audible response)

9          THE COURT:  Okay.  Do you have an order, Ms. Baer?

10          MS. BAER:  I do, Your Honor.

11          THE COURT:  Okay.  I'll take them with respect to one

12  and two, too, if you want to hand those up at the same time.

13          MS. BAER:  Sure.

14          THE COURT:  Thank you.  Okay.  I have signed the

15  orders with respect to items one, two and five.

16          MS. BAER:  Thank you, Your Honor.  Your Honor, the

17  City of Charleston matter also relates to agenda item number 10

18  which was Charleston's motion to lift stay.  Now that we have

19  an agreement and have an order approving our sale of the

20  property, that matter becomes moot and we'd ask Your Honor to

21  indicate that.  We have not prepared an order.  If that would

22  make it easier, we can certainly do so.

23          THE COURT:  I think an order should be entered

24  because that will terminate it on the record, so that would be

25  helpful.

1          MS. BAER:  We'll do that, Your Honor, and we'll

2 circulate it to Charleston just to make sure they're okey with

3 the form.

4          THE COURT:  All right.

5          MS. BAER:  Your Honor, that takes us to agenda item

6 number six.  This is the debtors' motion to approve the sale of

7 its limited partnership interest in a partnership known as

8 Colowyo.  Two debtors are involved, Your Honor, Gray Col. I and

9 Gray Col. II which are, in fact, some of the named debtors

10 here.

11          At this point, all they have is a limited partnership

12 interest left in the property.  They are selling the limited

13 partnership interest to a company called Rio Tinto who already

14 has general partnership interests in the partnership.  The sale

15 price, Your Honor, we believe is fair and reasonable.  It's $8

16 million in cash.  The only way in which the debtors could

17 recover from this is in the event of certain things happening

18 with respect to coal sales.  They have not been recovering much

19 in the last few years and things have actually gotten worse.

20          Under these circumstances, we believed it was  in the

21 best interest to get out of this business entirely, which is

22 not something we do for a living and take advantage of the

23 opportunity to sell to Rio Tinto.

24          Your Honor, we had originally submitted an order to

25 the Court and the trustee for the bondholders, who are entitled

1  to recoveries under the coal contracts, the bonds were issued

2  when we sold our general partnership interests in the property

3  back in 1994.  The trustee had some issues about certain Grace

4  undertakings.

5          Under the agreement among the parties, Rio Tinto is

6  assuming Grace's obligation to post a letter of credit

7  replacing the one that Grace had to post to secure the bonds.

8  Rio Tinto is also agreeing to obtain certain business

9  interruption insurance that, in fact, we were not able to

10 obtain while we were in Chapter 11.

11         The only thing that Rio Tinto is not agreeing to

12 assume of any significance, is an indemnity obligation that

13 Grace had given back in 1994 when it sold its general

14 partnership interest.  This indemnity obligation related to any

15 claims that creditors of Grace may assert against Grace's

16 former interest in the coal contracts which it no longer has

17 any interest in, since it had sold that back in 1994.  This is

18 not being assumed by Rio Tinto, this is, in fact, remaining

19 with the reorganized Grace and under Section 363 with liens

20 attaching to the proceeds, to the extent there are any liens,

21 they'll attach to the proceeds.

22         Your Honor, we know of no liens, but we are, of

23 course, willing to continue with that obligation.  The trustee

24 was uncomfortable it with it not being explicit in the order,

25 that this -- the obligations are being assumed and assigned to

1 Rio Tinto, but Grace remains with this indemnity obligation.

2 They, therefore, ask that we amend the order to make that very

3 clear.

4         We have, in fact, amended the order to make that

5 clear and to make it clear that the trustee is essentially held

6 harmless for the entry of the order and complying with the

7 terms of the order including its acceptance of this assumption

8 and assignment and the attaching of the proceedings with

9 respect to this remaining lien.

10        Under these circumstances, if this order is entered,

11 the objection that the trustees filed would be withdrawn and

12 under those circumstances, Your Honor, we believe it's

13 everybody's best interest that this revised order be signed in

14 the revised form.

15        THE COURT:  All right.  Anybody present on behalf of

16 the bondholders who wish to speak?  The revised form is fine.

17 All right, I'll take the order.

18        MS. BAER:  Thank you, Your Honor.

19        THE COURT:  Thank you.  All right, that order is

20 signed.

21        MS. BAER:  Thank you, Your Honor.  Your Honor, the

22 matter on the agenda, item number seven, is the ZAI claimants'

23 counsels' application for fees.  No objections have been filed.

24 I actually don't see counsel in court today, but as I

25 indicated, no objection were filed to the application.  I

believe he filed a certificate of no objections, although I

don't have a note of it here.  I can check on that.

THE COURT:  All right.  I'm not aware of a CNO having

been filed, or I would have entered the order.

MR. HOGAN:  Your Honor?

THE COURT:  Yes.

MR. HOGAN:  Daniel Hogan here on behalf of the

Canadian Zonolite claimants.  It's my application, Your Honor

and, in fact, a certificate of no objection regarding this

application was filed on December 4th, docket number 20190.

And I've also forwarded that to your chambers and can do so

again Your Honor, without problem.

THE COURT:  That's fine, Mr. Hogan.  I probably just

didn't see it because of, you know, transmittal issues.  By any

chance -- you don't have an order with you about this, do you,

Ms. Baer?

MS. BAER:  Our Delaware counsel will check.  I know I

didn't bring it, but it probably is in the order binder.  And,

so, if you can give us a few minutes, we may be able to find

it.

THE COURT:  All right.

MS. BAER:  Your Honor, should I go on then while we

look for that?

THE COURT:  Yes.  Let me just make a note here so I

can come back to this one, if need be.  They'll look for an

1  order, Mr. Hogan, to see whether or not they've got one in

2  their order binder and if so, I'll use theirs.

3          Okay, yes, I'll come back to that.  Thank you.

4          MR. HOGAN:  Thank you.

5          MS. BAER:  Your Honor, agenda item number eight is a

6  motion that the debtors filed to hold the Maricopa County,

7  Arizona and certain parties who purchased, or attempted to

8  purchase Grace real estate in Maricopa County, in violation of

9  the automatic stay, to stop what they're doing and, in fact,

10 for sanctions.

11         Your Honor, we are speaking with both Maricopa County

12 and with the purchaser of the Grace property, trying to work

13 through this and we have agreed to continue this matter to

14 January 26th omnibus hearing and in exchange, both Maricopa

15 County and First -- forgetting the last name, the purchaser of

16 the tax sale, have both agreed by stipulation that they will

17 take no action with respect to the property or Grace's

18 operations on the property, pending the hearing on January

19 26th.  So, that's simply being continued.

20         THE COURT:  All right, one second.  Okay, thank you.

21         MS. BAER:  Your Honor, agenda item number nine is a

22 status on the Scotts adversary.  That is related to issues with

23 respect to outstanding matters on the disclosure statement and

24 Chapter 11 plan, which is the next item up.  So, I would

25 suggest that that all be taken up at one time and I'll turn to

1 my colleagues to address those matters.

2          THE COURT:  Okay.  Before you do, let me see whether

3 or not I've got an order on item seven.  If so, I'll take it

4 first so I don't lose track of this.

5          MS. BAER:  Your Honor, we do have a copy, you may

6 want to cross out the markings.  It has the old docket numbers

7 of the filing when it was originally filed, but this is the

8 order.

9          THE COURT:  Okay.  Well, it still refers to docket

10 19980, though, correct?

11          MR. HOGAN:  19980, Your Honor, was the original

12 application.

13          THE COURT:  Right.  And so, this will still have to

14 be docketed in connection with that motion, with that

15 application.

16          MS. BAER:  That's correct.

17          THE COURT:  So, that's still the correct number, all

18 right.

19          MS. BAER:  Yes.

20          THE COURT:  All right.

21          MS. BAER:  It was the docketing numbers on the bottom

22 we were concerned about because, obviously, the new order will

23 get a new docket number.

24          THE COURT:  Oh, I see what you're saying, all right.

25 They have handed me up an order, Mr. Hogan, so I have signed

1  the order and just to make clear, this is for $321,109 as

2  compensation and 11,566.90 in costs and expenses.

3          MR. HOGAN:  That's my understanding, that's correct,

4  Your Honor.  I'm looking at that form of order as well.  Thank

5  you.

6          THE COURT:  All right.

7          MR. HOGAN:  Thank you for signing the order.  Merry

8  Christmas.

9          THE COURT:  Thank you, same to you.  Okay.  I'm

10 ready, then, for items nine and ten.

11         MS. BAER:  It's actually item nine and 12 and 13.

12         THE COURT:  And 12, okay.

13         MS. BAER:  We've already dealt with ten and 11.

14         THE COURT:  Okay, thank you.

15         MR. BERNICK:  Good afternoon, Your Honor.  With

16 respect to items nine, 12 and 13, it really is 12 and 13,

17 there's almost more or less a footnote with respect to nine.

18 It probably would be appropriate to give Your Honor an overview

19 on where we stand with respect to the plan and disclosure

20 statement and a particular references to the disclosure

21 statement issues which were carried over from last time, to be

22 considered today.

23         Bear in mind that the overall time frame that we have

24 put in place, through the CMO, and through prior proceedings

25 before the Court, anticipates that we would get closure with

1  respect to the disclosure statement by the middle of January,

2  so we could send the plan for a vote, anticipating the first

3  round of confirmation hearings in April and then, thereafter,

4  in June.

5       There are some outstanding issues that were carried

6  over today that mostly relate to, indeed, exclusively relate

7  to personal injury matters.  The property damage side of the

8  case, as Your Honor is familiar, is still in process, although

9  it is at least to this point and we think will remain, a

10 consensual process which we think thereby will expedite the

11 process of getting sign off on the disclosure statement, and

12 documents are being worked on and I'll talk about that in a

13 moment.

14      With respect to personal injury, there were some

15 carryover issues and they mostly affected the insurance

16 carriers and Scotts and also the Libby claimants.  And we have

17 amended the plan and we've also amended the disclosure

18 statement and we've done a lot of work with the other plan

19 proponents.  Indeed, a lot of this work was done those

20 proponents other than Grace in order to figure out a way in

21 which to make the plan more streamline and more clear with

22 respect to these kinds of indirect claims.  And I think we've

23 made a lot of progress.  Indeed, I think that for disclosure

24 statement purposes today, they have been solved.

25      And, if I can go over to the board, thinking about

1    these indirect claims always turns my brain into farina.  And,

2    I have a little diagram that at least helps me try to keep

3    track of what it is that we're actually talking about.  And

4    we're talking about two different kinds contexts in which

5    indirect claims arise for purposes of our discussion today.

6              The first is the context in which Scotts, which

7    claims to be a co-insured through a vendor's endorsement of

8    insurance policies, sues under those policies, those policies

9    have been settled, vis-a-vis, Grace and with an indemnity and,

10   therefore, the settled insurers then would have an action over

11   -- or would seek to assert an action over against Grace under

12   the indemnity.

13             So, the first question is, how were the claims by

14   Scotts against those settled insurance policies, handled under

15   the plan and the secondly what about the rights of the

16   insurers, vis-a-vis, Grace?  And what we did in order to make

17   this very clear, is to basically include language in the

18   disclosure statement that comes right out and proclaims that --

19   this is Section 3.2.8.2, it says that the claims that Scotts

20   may have against the debtors or against any other asbestos

21   protected party, including any settled asbestos insurance

22   company, will be included within the channeling injunction and

23   will be discharged.  That is to say that the asbestos settled

24   insurance companies are protected parties within the meaning of

25   524(g) and for purpose of claims that Scotts would assert

against them, arising out of their claim of vendor coverage.

And, so, we think that that is crystal clear. Scotts, we included also a statement at the bottom of the paragraph saying Scotts contests the right of the debtors in the plan to channel certain of its claims against settled asbestos insurance companies to the asbestos PI trust. But that, obviously, is a confirmation issue not a disclosure statement issue.

And so, I think that fairly taken, Scotts own statement, as they've told us in an email, that the TDP is not inadequate and must be amended, acknowledges that this is no longer a disclosure statement issue, that is it's clear how their claims are being treated under the plan, rather it is a confirmation issue that they wish to preserve. So we think that that has been handled.

With respect to the second step, which we only would get if the first step failed, that is, if the settled insurers failed -- if this protection fails, the settled insurers are concerned with what happens to their action over against Grace. The simple answer to that is, that if this fails, if they're not protected parties, we've got a more significant problem under the plan. But we also did address the question of indirect claims, and clarified that the indirect claims and this is Section 1.1.124 of the plan, specifically includes in indirect PI trust claims, claims with respect to the insurance

1  settlement agreements entered into with respect to Grace.

2          So, to the extent that there were to be indirect

3  claims and this is really in a sense carryover language from

4  the last iteration, those would also be channeled and the

5  disclosure statement, then -- and that's not new.  This, again,

6  makes clear what was there before.  Indeed, because of that

7  provision before, they have their Class 9 category or Class 9

8  category issue with respect to their treatment in the plan.

9  Again, not a disclosure statement issue, but a plan issue.

10         So, this is not really a new concept, it's just

11 clearer language and then the disclosure statement itself goes

12 on and talks about, in Section 3.2.5.2, talks about the same

13 matters, basically making clear that all of these claims are

14 channeled and further making it clear that they also enjoy

15 rights and this is, again, part of the same section, they

16 enjoy rights under the TDP and there's a whole paragraph that

17 deals with this.  So, we think we've taken care of both things.

18         Now, we understand that these particular language

19 amendments were only agreed between the plan proponents as a

20 result of a very intensive discussion period last week.  So,

21 the particular language that we're dealing with was not

22 forwarded to the insurance carriers until Friday afternoon.

23 However, it is not new in concept, it's the same concept and

24 it's not rocket science, and we hope and expect that the

25 insurance companies, although they tell us today that they

1   haven't had an opportunity to talk with their client, we don't

2   see why we are sitting here today with people unable to make

3   telephone calls and get at least a position with respect to

4   whether there's a disclosure statement issue.  No one is

5   waiving any rights to raise confirmation issues, but these

6   provisions, in the document, are clear and are not different in

7   concept from the prior iteration of the documents.

8           So, we think that it's appropriate to have these

9   matters discussed and resolved here this morning.

10          With respect to the second prong, these are claims

11  that are brought by the Libby claimants against Maryland Casual

12  Company.  And, Your Honor, is familiar with them, that's been

13  the subject of proceedings in connection with the injunction

14  and with the stay and that whole thing went up to the Third

15  Circuit at one point.

16          But the Libby claimants wanted to have clear language

17  on the respect in which, if at all, these claims against

18  Maryland Casualty would be channeled and with respect to which

19  Maryland Casualty would be protected.  So there was further

20  discussion on this prong and then language that we proposed in

21  the plan that would make clear that those claims are channeled

22  and the extent to which they are channeled is really just

23  driven flat and simply by 524(g) itself.  That rather than get

24  into some broader philosophical discussion about how to parse

25  these claims, the language and intent of the plan is to track

1 524(g).

2          That language also was circulated on Friday, I had a
3 discussion with Mr. Schiavoni this morning, just now, and he
4 proposed some language that is very similar, albeit, perhaps a
5 little bit more clear, and then I was scuttling around back
6 there talking with Mr. Cohn, and then Mr. Lockwood and Mr.
7 Frankel and Mr. Wyron, we wanted to include Mr. Pasquale so he
8 wouldn't feel left out, but didn't think it was his issue, and
9 as a consequence, I think that we have agreement on some
10 language, at least with respect to those people.  I don't know
11 whether the other carriers have a view, but the basic language
12 is as here.  See, it says, the most important part is okay.

13          And, we will, obviously, substitute the language
14 here, but basically before in the language that was circulated,
15 provided further for the avoidance of doubt, an asbestos
16 insurance entity is not a settled dadada (sic) in respect of
17 any claims against it that does not arise, and we have the
18 language out of 524(g), by reason of the asbestos insurance
19 entities provision of insurance to acts, any of the debtors
20 dadada (sic).   This has the same hook to 524(g), but it's a
21 little bit more flowery.  It says, and further provided for the
22 avoidance of doubt, that an asbestos insurance entity is a
23 settled asbestos insurance company to the fullest extent, but
24 only to the extent provided by Section 524(g) in respect of any
25 claim that arises by reason of -- that's again the same

1 language, but instead of confining it to the provision of

2 insurance, it would really be any one of the activities that's

3 enumerated in 524(g).  The idea being that if for some reason

4 they're able to get protection under one of the other

5 predicates for protection or available paths to protection

6 under 524(g), the intent of the plan is not to limit them in

7 their effort to get that kind of protection.  We're agreeable

8 to that.  The futures representative is agreeable to that, Mr.

9 Cohn is agreeable to that.  That was his language right there.

10 Mr. Lockwood, on behalf of the ACC is agreeable to it.  I'm

11 agreeable to it.  Mr. Freedman is agreeable to it, even Ms.

12 Baer is agreeable to it.

13        But I don't know about the people who didn't get time

14 to make their telephone call here this morning.  I'm sure that

15 if they're not agreeable to it, they'll let the Court know.

16        So, I think where we are today with respect to both

17 of these matters is that --

18        UNIDENTIFIED MALE SPEAKER:  Judge, Mr. Bernick has my

19 vote on that, too.

20        THE COURT:  At least one person on the other side

21 agrees, Mr. Bernick.

22        MR. BERNICK:   And I do appreciate the willingness to

23 do this drafting here in court, but that really would mean that

24 with respect to Scotts, Scotts knows where they stand, they

25 don't agree, but they know where they stand.  The Libby people

1  know where they stand.  They don't necessarily agree, but they

2  know where they stand.  And the insurance companies, I think

3  know where they stand, I don't think they agree, but I think

4  they know where they stand with the possible exception of some

5  people that didn't manage to reach their client in the several

6  hours that's passed this morning before the hearing.  So, we

7  think that that addresses all of the disclosure statement

8  issues.

9       I'll add the one footnote and then I'm sure other

10 people want to speak to this, but this is the substance of what

11 we have to discuss today as concerns the disclosure statement

12 and the personal injury claims.  I'll talk in a minute about PD

13 and CAI.

14      The footnote is that with respect to the Scotts

15 adversary, we do think it would be important to get teed up the

16 issue of whether Scotts is, in fact, covered by vendors

17 endorsement, during the course of these proceedings before

18 confirmation.  We think it's a very discrete issue, relatively

19 simple issue and that would provide, we think, a lot of closure

20 to this whole thing.  So that instead of being a series of

21 provisions, the impact of which we determine later on, the

22 vendor's endorsement is very plain and Your Honor can, we

23 think, resolve that matter in the context of the Scott's

24 adversary and that would be it and with that, I'll let anybody

25 else speak who wants to be heard.

1          THE COURT:  Ms. Cobb?

2          MS. COBB:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MS. COBB:  How are?  Tiffany Cobb on behalf of the

5   Scotts Company.

6          I'll sort of start with the end comment because I

7   found it a little humorous.  As you know, Your Honor, back in

8   2004, we were seeking to litigate an issue that at that time

9   was deemed to be far too complex and time consuming, and too

10  distracting for the then reorganized efforts and, I'm not sure

11  what has cause that material change in perspective, but I can

12  guess.

13         Your Honor, since the hearing last week, just for

14  some context, at least from where the Scotts Company is coming

15  from, the additional revisions to the plan documents were not

16  provided to Scotts until 4:55 p.m. on Friday.  So, to the

17  extent there's a perception that two weeks has gone on and

18  parties have been diligently working together, that's really

19  not a fair assessment from our perspective.  So, Scotts has not

20  had a meaningful opportunity to address with the plan

21  proponents the inadequacies of the plan documents in light of

22  these December 12th changes.

23         Scotts, as Mr. Bernick pointed out, did convey it's

24  position that the TDP, the trust distribution procedures, are

25  wholly inadequate when looked at through the lens of how an

1  insurance claim by the Scotts Company, or otherwise, would be

2  addressed.

3          Specifically, if Scotts' insurance claims are to be

4  channeled, in whole or in part to the trust, the TDP simply

5  must provide a mechanism for how those claims would be

6  resolved.

7          From a disclosure standpoint, the plan proponents are

8  not telling us everything.  They're not telling Scotts, or any

9  other voters on the plan what they need to know.  There in

10 nothing in the current TDP that applies to insurance coverage

11 claims, we can't go to the trust with an x-ray, we can't fall

12 -- if you look under the indirect PI claim provision, it talks

13 in terms of proving that in a common law indemnification arena,

14 for example, an indirect claim under the TDP would require some

15 showing of either of a lease by the injured party or would have

16 some setoff provision.  That simply does not apply to Scotts

17 insurance coverage claim.  And, the disclosure statement is,

18 thus, deficient.   They are not telling the voters of this plan

19 how those claims are being treated.

20         We view the last minute changes to the extent that it

21 seeks to channel the insurance claims as being, in essence, a

22 last minute change, contrary to prior assurances provided

23 during the plan disclosure standpoint.

24         THE COURT:  Could I interrupt a second.  Is what

25 you're asking for the procedural mechanism by which Scotts

1  would file its claim and then how it will be procedurally

2  adjudicated within the trust?

3          MS. COBB:  No.  It is -- for the plan proponents to

4  say that Scotts insurance coverage claim will be handled

5  through the trust distribution procedure, if you look at the

6  trust distribution procedures, that's like fitting a square peg

7  through a hole.  There's simply -- I mean, I'd be happy to have

8  Mr. Bernick or Mr. Lockwood point to how the trust procedures

9  tell us how those claims will be resolved.

10         THE COURT:  So, you want the procedural mechanism by

11  which it's going to be resolved.

12         MS. COBB:  In some -- exactly.  To disclose how that

13  claim is going to be treated.  It can't go into a black hole.

14         THE COURT:  Okay.

15         MS. COBB:  And they've managed to make, you know,

16  they've managed to think this type of disclosure is important

17  for the personal injury claimants, and for those who have

18  common law indemnification claims.  I don't see why there would

19  be an objection, through the disclosure process, just tell us

20  how you're going to treat the claim.  It may obviate a need for

21  any type of plan objection.

22         THE COURT:  Okay.  So, but I'm still trying to figure

23  out because all I want to know is what the parameter of this

24  objection is.  Are you looking for the forms that Scotts would

25  have to provide because in another case that I have currently

1  that's been an issue.  Where the TDP didn't lay out that

2  process and so, well after confirmation I had to go back though

3  this process and the forms had to be addressed because they

4  hadn't been addressed because it simply wasn't something, I

5  think, that the parties thought was going to be an issue and it

6  became an issue.  And not for an insurer, but for a different

7  type of matter but, nonetheless, it came up.

8         So, is it an issue where you want to know the forms

9  that have to be filled out and then how the trust is going to

10 go about adjudicating whether or not A) the forms are properly

11 completed and B) whether or not you've met the burden of proof

12 that you will have to meet to satisfy the trust that, in fact,

13 you have an indirect claim.  Is that what you're looking for?

14        MS. COBB:  That is not.

15        THE COURT:  Okay.  What are you looking for?

16        MS. COBB:  What I am looking for, if you by

17 comparison, were to look at Section 5.6 of the trust

18 distribution procedures, it says indirect trust claims asserted

19 against the PI trust shall be treated as presumptively valid.

20 They go on to say what constitutes a presumptively valid claim.

21 Then they say if it's not, you can request independent review.

22        What I'm saying is, 5.6 simply cannot apply in an

23 insurance context -- in the insurance arena, by definition.  If

24 I'm pursuing an insurance company on behalf of the Scotts

25 Company, I'm never going to be able to show the PI trust that

1  the claimant has paid all or a portion of a liability or

2  obligation that the PI trust had to the direct claimant because

3  it doesn't apply in the insurance context.  That applies when I

4  have a common law indemnification claim after, perhaps, the

5  Scotts Company has been sued and there's a judgment and I have

6  to go through that.

7          All I want is, basically, the equivalent of a 5.6,

8  tell me how an insurance claim is going to be treated under

9  these procedures and the reason that that's an important

10  disclosure is it's telling all of the voters of the plan,

11  Scotts included, how the heck are you treating these claims?

12          THE COURT:  So, you want to know whether the trust is

13  going to say, go back into state court and litigate your claim

14  before you come to us?

15          MS. COBB:  Or you assert your claim before the trust,

16  period.  There's nothing in here that currently says that.

17          THE COURT:  Okay.  So, you simply want to know where

18  you pursue the claim in the first instance.

19          MS. COBB:  And what is it state court?  Is it before

20  the -- do we file a lawsuit and name the trustee of the trust?

21  There's no -- there's simply nothing in the trust distribution

22  procedures that even pretends to speak to a situation where a

23  company like the Scotts Company, is pursuing an independent

24  claim against a non-debtor insurance carrier for insurance

25  coverage, as an insured under that policy.

1          I mean, we do obviously, we agree that for plan

2    confirmation purposes whether or not that's a proper

3    classification, that can wait.  For plan objection, all I'm

4    saying is, if they tell me how they're dealing with the claim,

5    then the Scotts Company can appreciate how its claim is not

6    only classified but how it's purportedly being treated, it may

7    obviate the need for any plan objection in the first place.

8          THE COURT:  Okay.  Mr. Bernick?

9          MR. BERNICK:  Yes, I really think that there's a --

10   there are literally paragraphs and pages that deal -- there's a

11   whole section of the disclosure statement called 3.2.5.2.  And

12   3.2.5.2 deals with indirect PI trust claims.  And there are

13   many stripes and varieties of potential indirect claims that

14   can exist.  There can be contributions claims, there can be

15   contractual indemnification claims, there can be insurance

16   coverage claims and the like.

17         You don't have a TDP that spells out a schedule as

18   you would for personal injury claims because personal injury

19   claims are by virtue of the nature of the claim itself, have

20   great specificity.  There are mesothelioma claims, there are

21   lung cancer claims and the like.  The source there of the

22   liability and the delineation of the claim is the tort law and

23   the specific nature of asbestos injury.

24         When it comes to the indirect claims, the source of

25   the obligation is a sharing obligation under law.  They're

1   common law, or contract or insurance policy.  So, you don't

2   have -- well, if you have an indemnity claim that arises under,

3   you know, Colorado law, here's how you satisfy the following

4   elements of Colorado law.  Instead, the language is more

5   general.  The language says, basically, if you can establish

6   that you've paid all or a portion of the underlying liability,

7   the you are eligible to be paid.  It doesn't have that degree

8   of specificity because we don't have that degree of specificity

9   in the nature of the contractual relationship and we're not

10  going to sit there and say, oh, we have a whole new schedule of

11  what kind of compensation applies to the indirect claim portion

12  of the underlying liability.  It's just not feasible to do.

13          So, we do -- there's no question about the procedure.

14  The procedure is spelled out in black and white and Ms. Cobb

15  read from certain parts of the language but basically this

16  whole section deals with this.  The paragraph that she only

17  quoted in part from says, if there's not -- you can't meet the

18  presumptive requirements set forth above, et cetera, et cetera,

19  the indirect claimant may request the PI trust review the

20  indirect claim individually, individual review is part and

21  parcel of all of the TDPs, to determine whether the indirect

22  claimant can establish that the indirect claimant has paid all

23  or a portion of a liability or obligation of the PI trust,

24  respecting an asbestos PI claim.  If the claimant can show that

25  it has paid all or a portion of such liability or obligation,

1  or its claim has previously been allowed, the PI trust shall

2  reimburse the indirect claimant the amount of the liability or

3  obligation so paid, times the then applicable payment

4  percentage and payment percentage as a defined term, applies to

5  everybody who takes under the trust.   And there's a proviso

6  basically that applies a cap.

7         It goes on to say that any dispute will be subject to

8  ADR and if the dispute is not resolved by ADR, the indirect

9  claimant may litigate the dispute in the tort system.  So, in

10  terms of Your Honor's question, which is what is the procedure,

11  the procedure is identical, they make a claim against the

12  asbestos personal injury trust, if it's not presumptively

13  valid, it goes through individual review to determine what is

14  really the key point which is, have you paid a portion of the

15  debtors' liability, which is, after all, what an indirect claim

16  would need to show to be able to be entitled under the trust to

17  anything, and if you can you get paid, and you get paid as a

18  multiple of the payment percentage.  If that can't be done, you

19  have ADR and then you have the tort system which is identical.

20         Now, how that would apply to Scotts in particular,

21  given the particular nature of the claims made against Scotts,

22  isn't spelled out.  It doesn't need to be spelled out.  The

23  issue here is, what is the procedure with respect to which

24  these claims are treated.  The issue is not, here is what you

25  are going to be able to qualify for, because that cannot be

1   addressed in the abstract.  It's addressed in concrete terms

2   and they have all of the latitude in the world.  They can come

3   in with anything that they want in order to show that they've

4   paid part of the underlying liability.  And if they're

5   successful in doing that, the trust -- the documents are

6   unequivocal that they'll be paid that portion that they

7   themselves have paid multiplied by the payment percentage.

8   That's all that we have to do at this point.

9        So -- and that's exactly why Ms. Cobb said in her

10  email at 4:15, she didn't take any in order to be able to

11  respond to this, she knew exactly what the story was, she read

12  it clearly within minutes, understood what the impact was and

13  that's why she said, that's inadequate.  It didn't she didn't

14  understand, it said the TDP is inadequate, not I don't

15  understand, what in the world does this mean.

16       So, I think that the statements that are being made

17  here today are not quite the same as what was being said last

18  Friday, where we did this specifically in order to make clear

19  for disclosure statement purposes, what the treatment would be.

20  I appreciate Mr. Brown stepping to one side so that I could

21  respond directly.

22       MR. LOCKWOOD:  One additional point, Your Honor.

23  This is not a disclosure statement issue in the following

24  sense.  The TDP is what it is.  It either does do what Mr.

25  Bernick says it does or it fails to do what Ms. Cobb says it

1  does.   If the TDP in Ms. Cobb's view does not provide for

2  treatment of her claim, her client's claim, then that's a

3  confirmation objection.   You're channeling my claim to a trust

4  and there's no mechanism for paying it.

5          I say that because the ACC and the FCR are willing to

6  sit down with Scotts and discuss, not in open court, but in a

7  time frame that would enable us like other confirmation

8  objections, to see if we can resolve this confirmation

9  objection if it is, in fact, necessary to make changes to the

10 TDP.   And the time to do that is the time when we're resolving

11 or hoping to resolve other confirmation objections.

12         With respect to Ms. Cobb's argument that the other

13 voters, the claimants whose claims are also going to the trust

14 need to know this information, all they need to know is that

15 Scotts' claims are going to the trust.   They don't need to know

16 how Scotts' claims are going to be handled procedurally by the

17 trust, because they don't have Scotts' claims, only Scotts has

18 those claims and, therefore, the procedural mechanism by which

19 those claims are asserted against and resolved by the trust, is

20 of interest only to Scotts.

21         So, I would respectfully suggest that rather than

22 have an argument here today about whether a plan document is in

23 adequate, or not, doesn't do what the disclosure statement says

24 it's supposed to do, i.e., provide a mechanism for treatment of

25 Scotts claims, that the disclosure statement says, Scotts'

1  claims are going to the trust, it says Scotts disagrees with

2  that, which you certainly heard Mr. Cobb articulate because her

3  view is, you can't send my claims to the trust if you don't

4  provide a treatment for them.

5         And, so, we can have that discussion and we'll

6  resolve it however we resolve it.  We'll either agree and we'll

7  make some changes in the TDP or won't agree and we'll come back

8  at the confirmation hearing and attempt to persuade Your Honor

9  that, you know, we're right, or she's right, or whatever, but

10  today is not the day for that debate.  Thank you, Your Honor.

11         THE COURT:  Mr. Brown?

12         MR. BROWN:  Good afternoon, Your Honor.  Michael

13  Brown on behalf of Seaton and One Beacon.

14         I don't know whether Your Honor has had an

15  opportunity, we filed a supplement to our disclosure statement

16  objection.

17         THE COURT:  No, I didn't see it, I'm sorry.

18         MR. BROWN:  Your Honor, it's agenda item 12dd and

19  there's a diagram that's attached to that which, I don't know

20  whether Your Honor has that handy or not, I can provide it.

21  It's a color diagram, so you may not have it in color.

22         THE COURT:  Actually, I don't think I have it.  Let

23  me see here.

24         UNIDENTIFIED MALE SPEAKER:  Do you heed an extra

25  copy?

1              THE COURT:  I don't have it.

2              MR. BROWN:  May I hand it up, Your Honor?

3              THE COURT:  Yes, please.  Thank you.

4              MR. BROWN:  Your Honor, just before I get to the

5  diagram, just a little bit of background on my two clients and

6  why you're hearing a lot about the Scotts issue, both from the

7  perspective of Scotts and also from the settled asbestos

8  insurers.

9              My clients both settled with Grace back in the mid

10  1990s, for very substantial sums, and in exchange for those

11  sums, they received a contractual indemnity --

12                        (Telephone ringing)

13              MR. BERNICK:  Somebody is multitasking and put us on

14  hold.

15              THE COURT:  Or we lost court call.

16              UNIDENTIFIED MALE SPEAKER:  No, Your Honor, we're

17  still here.

18              THE COURT:  Oh, okay.  Can you find out where the

19  phone line is ringing?

20              UNIDENTIFIED MALE SPEAKER:  We did and we --

21              THE COURT:  All right, thank you very much.  I'm

22  sorry, Mr. Brown, go ahead.

23              MR. BROWN:  No problem, Your Honor.  In exchange for

24  the settlement payments, Your Honor, Grace agreed to

25  contractually indemnify my clients in the event that any third

**J&J COURT TRANSCRIBERS, INC.**

1 parties asserted claims against the policies that were the

2 subject of the settlement agreements.  And, of course, the

3 Scotts adversary is exactly one of those claims, which is why

4 four years ago we were seeking to have the case move forward so

5 that you could get the issue resolved in time for confirmation.

6          But it creates a number of different issues and the

7 disclosure statement and the changes that have been made to the

8 disclosure statement are addressing them, but in many cases

9 they're dancing around the issues.

10          When we prepared this diagram, which I think will

11 help illustrate what the problems are both that my clients and

12 Ms. Cobb's client is having with  --

13          THE COURT:  Mr. Freedman, hit the microphone button

14 when you talk so that your -- we don't pick up your --

15          MR. BERNICK:  Oh, I'm sorry, that's my problem, I

16 didn't turn off the thing back here.

17          THE COURT:  Okay, thank you.  Sorry, go ahead Mr.

18 Brown.

19          MR. BROWN:  Your Honor, if I could direct you to the

20 diagram, at the top of the diagram there's a block that says

21 Asbestos Claimants.  It's initial cap A, initial cap C, but

22 it's not a defined terms, it's just asbestos claimants.

23          THE COURT:  All right.

24          MR. BROWN:  You'll see that there is a claim coming

25 out to the right, number one, and that leads down to the PI

1  trust, and that claim is sort of your bread and butter asbestos

2  PI claim under the amended joint plan.

3       The asbestos claimants also have and have asserted,

4  at least certain of them, claims against Scotts and that's

5  depicted on this diagram as claim number two and claim number

6  two may have many different components to it but at least

7  theoretically they have a Grace component to it that is a

8  proportion share of liability of Grace, and it may have a

9  proportionate share of liability of Scotts.  In any event, when

10 those claimants are suing Scotts, they're seeking a full

11 recovery and Scotts has to defend against those claims and as I

12 understand it, is defending against those claims.

13      Scotts has claim number three, which was the claim

14 that Ms. Cobb was talking about which is a common law

15 contribution claim against the asbestos PI trust.  That's

16 essentially the same claim as claim one and that is treated

17 under the plan fairly clearly as an indirect PI trust claim.  I

18 don't have any problems with the way that's handled.

19      Scotts has then asserted its vendor endorsement claim

20 in the Scotts adversary and that is depicted on this diagram as

21 claim number four, and you'll note, Your Honor, that we've

22 indicated that that was unclear.  It may be getting clearer as

23 to whether that claim is or is not channeled, but that's

24 depicted as claim four and that is a claim against, perhaps,

25 among other, Grace's settled asbestos insurers.

1          The question then becomes, if that claim goes

2 forward, and if that claim is not enjoined it gives rise to a

3 contractual indemnity claim by my clients against something,

4 someone.  Obviously, it's supposed to be Grace and although on

5 this diagram you'll see claims five and six as I think Mr.

6 Bernick described with his diagram over here, Grace views that

7 entire claim as being a claim five and being channeled to the

8 asbestos trust.

9          The problem when you get to the asbestos trust with

10 that claim, is that there is no mechanism to address how that

11 claim is resolved and what it's paid.  It's the same problem

12 that  Ms. Cobb identified with respect to claim four.

13          Mr. Bernick indicated that claim four is an indirect

14 PI trust claim.  It is not.  It does not fit within the

15 definition of indirect PI trust claim because an indirect PI

16 trust claim has to be against the debtor and that claim, as you

17 can see on the diagram, is not against the debtor, it's against

18 the settled asbestos insurers.

19          So, there's a question as to how claim four --

20          MR. LOCKWOOD:  Your Honor, the definition of asbestos

21 personal injury claim is against the debtor or an asbestos

22 protected party.  And Mr. Brown's client is an asbestos

23 protected party.  So, if he's going to make representations

24 about what the plan definitions mean, he should get it correct.

25          MR. BROWN:  Your Honor, I did have it correct,

1  actually.  An indirect PI trust claim has to be against the

2  debtor.

3        MR. LOCKWOOD:  Which is --

4        MR. BROWN:  An asbestos PI claim can be against the

5  debtor or an asbestos protected party.

6        MR. LOCKWOOD:  -- an asbestos PI trust claim is a

7  claim for indemnity, arising out of exposure to the debtors'

8  products and we've said in this disclosure statement that Mr.

9  Bernick read, the amendments that were sent out, that the

10 claims against -- of Scotts, if any, were channeled to the

11 trust.

12        If the problem here is that we've described those as

13 indirect trust claims rather than direct trust claims, then I

14 guess we can change that language if it's really necessary.

15        THE COURT:  Well, look of it's a definitional

16 problem, then fix the definition.

17        MR. LOCKWOOD:  It's a --

18        MR. BROWN:  Your Honor, Mr. Bernick put the language

19 up there and there's an ambiguity.  In the language that was

20 circulated on Friday, I think it can be read two ways, but I

21 would agree probably the better reading of it is that the claim

22 number four on this diagram is, in fact, an asbestos PI claim

23 as opposed to an indirect PI claim.

24        MR. BERNICK:  It doesn't --

25        COURT CLERK:  I'm not picking you up.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Your microphone is not on.

2          MR. BERNICK:  The point of the matter is, as the

3  document reflect, all of these are, in fact, channeled.  No

4  matter which way you take it, they're all channeled.  We don't

5  -- this diagram is an interesting diagram.  In fact, when it

6  came in from Mr. Brown, I got a call that says, you really

7  ought to look at Mr. Brown's diagram because he wrote -- did a

8  good job of setting out what his issue is, but this is exactly

9  -- it was already in the documents, but we made it totally

10 clear that the claim by Scotts is channeled to the trust.  And

11 if that's true, none of the stuff over here makes any

12 difference whatsoever.  The plan, however, says that if there

13 are these kinds of things, they're channeled too.

14          So, one way or another the plan handles both Scotts

15 claim against the settled companies and the settled companies

16 against the trust, although the latter is irrelevant --

17          THE COURT:  Look, I have the solution to this.  If

18 this diagram, in fact, with mere changes Mr. Bernick, is

19 correct, then let's figure out where in the disclosure

20 statement and/or the plan, wherever it is or in the TDP,

21 wherever the relevant sections are, that shows where your

22 modifications to the diagram actually show how this is

23 channeled work, let's put it on the diagram, and then include

24 the diagram.

25          MR. LOCKWOOD:  Your Honor -- Your Honor --


                    J&J COURT TRANSCRIBERS, INC.

1            MR. BERNICK:  This is it.

2            THE COURT:  Then put it on the chart and everybody

3  will know, including me --

4            MR. LOCKWOOD:  -- the problem --

5            THE COURT:  -- because I can't figure it out.  There

6  are so many words at the -- I can't figure it out right now

7  sitting here.  I didn't get these documents until half an hour

8  before court.  So, I haven't seen any of them.

9            MR. BROWN:  Your Honor, if I could use Mr. Bernick's

10  diagram, I mean we actually may have some agreement here.

11            THE COURT:  All right.

12            MR. BERNICK:  Well, wait a minute, wait a minute.

13  I'm going to -- of course the answer to that is, of course, of

14  course.  And if Mr. Brown will agree with me that, in fact, if

15  the documents call for claims by Scotts that would otherwise be

16  against them, to be channeled to the trust, and in the event

17  that this fails which again is hypothetical, that the documents

18  also call for their claims five and six to be channeled to the

19  trust, then we're on the same page.

20            THE COURT:  Well --

21            MR. BROWN:  We're getting there, Your Honor.  I have

22  a couple of points to add to that.

23            THE COURT:  All right.  You folks, number one, this

24  record is not going to make any sense to anybody, it's not even

25  making sense to me and I'm here.  So, that's all I can tell

53

1  you, at the moment.

2         MR. BROWN:  I thought the diagram would help, Your

3  Honor.

4         THE COURT:  Okay.

5         MR. BROWN:  If I can just follow up on Mr. Bernick.

6  We're fine with having, instead of the claim four going to the

7  settled asbestos insurers, going to the asbestos PI trust.

8         COURT CLERK:  Speak into the mike please.

9         MR. BROWN:  We're fine with the arrow as he's

10 indicated it, on his diagram with the claim four running from

11 Scotts into the asbestos PI trust, that's where we've always

12 wanted it to go.  And I agree with Mr. Bernick that insofar as

13 that works and is effective, then I don't have a big concern

14 with how the claim, my contractual indemnity claim, will be

15 treated because at the end of the day it won't amount to much.

16 That's the issue that we have been going back and forth with

17 for the last month and a half, was to try to get some

18 resolution of that.

19        MR. BERNICK:  That's the plan language, it couldn't

20 be simpler.

21        MR. BROWN:  Let me -- well let me point to some other

22 plan language.  And, Your Honor, you know, we did not have an

23 opportunity to discuss this before the hearing, but in the

24 language that Mr. Bernick was referring you to earlier --

25        THE COURT:  Turn your microphone off, please, Mr.

1  Bernick.

2           MR. BROWN:   He read from the revised section 3.2.8.2.

3  language that says, on the effective date all claims against

4  the debtors shall be discharged and all asbestos PI claims

5  including such claims initial Cap C, that Scotts may have

6  against the debtors or against any other asbestos protected

7  party, including any settled asbestos insurance company, will

8  be channeled to and resolved by the asbestos PI trust.

9           There's a problem with that language and that is that

10  claim, initial Cap C is a defined term and under this plan,

11  unlike under the bankruptcy code, it's a claim against the

12  debtor and the claims we're talking about here are not claims

13  against the debtor, they are claims against the settled

14  asbestos insurers.

15          So, there are opportunities, Your Honor, to resolve

16  some of these issues but it's not clear yet how the claims are

17  being treated and in the event that the injunction doesn't work

18  and we believe that it should, there ought to be a payment

19  mechanism in the TDP if that's where the claims of the insurers

20  are being channeled and there is no payment mechanism.  And Mr.

21  Lockwood was saying earlier that you can't expect everything to

22  be in the TDP, but in point of fact, the asbestos claimants

23  know how their claims are going to be treated, they have a

24  matrix, they know the numbers, they know the criteria they have

25  to meet.  If you look at the same claim that the settled

1  asbestos insurers have, you won't have a clue how it's treated

2  in the TDP, it just gets channeled in there and it's lost which

3  incidentally is the same point that Ms. Cobb was making about

4  her clients claim which would be claim four on the diagram that

5  Mr. Bernick edited.

6          So, the long and short of it, Your Honor, is I don't

7  think we're at a point yet where these issues can be -- where

8  the disclosure statement can be approved on these issues

9  because there's still a lot of open ends.

10          We're happy to work but, you know, I want to -- I do

11  want to react to one point that Mr. Bernick mentioned.  We

12  received -- I received a phone call from Mr. Freedman about an

13  hour before the new language was circulated on Friday, giving

14  me a heads up of what was coming and then we got the language

15  at 4:55.  I had sought twice before then with emails to get a

16  status and update on where things stood and you know just

17  before five o'clock on a Friday is when we get the language.

18  It leaves very little opportunity to have any kind of dialogue

19  or meaningful dialogue, either with our clients or,

20  alternatively, with the plan proponents.  So, I think we need

21  more time on it, Your Honor.  I think it can be worked out, but

22  I think we need more time on it.

23          THE COURT:  Okay.  Mr. Lockwood.

24          MR. LOCKWOOD:  The critical feature of Mr. Brown's

25  diagram which I think we need to focus on is item four, which

1 he said in his key charge is "unclear".

2        The disclosure statement makes it clear that claims
3 by Scotts against Grace's settled insurance carriers, which are
4 asbestos protected parties, are channeled to the trust.

5        Now, if they are channeled to the trust, then all
6 this stuff about five and six, is completely moot because there
7 aren't ever going to be any claims by the Grace settled
8 insurers against reorganized Grace or against the trust because
9 the claims that would have been made against them as this
10 diagram hypothesizes, have already been cut off and channeled
11 to the trust.

12        Now, Mr. Brown says a couple things.  First, he says,
13 and there's a certain quality of shooting yourself in the foot
14 about what he says, because he says, well, what happens if they
15 don't get channeled to the trust?  Well, if they don't get
16 channeled to the trust, then why haven't they been channeled to
17 the trust, is because Scotts or somebody else has asserted, as
18 a confirmation objection, that they can't be channeled to the
19 trust, because they don't -- they're not eligible under 524(g).

20        So, he says well, that might happen and, therefore, I
21 need to have a TDP provision that deals with this contingency.
22 Well, I would respectfully suggest that if that doesn't happen
23 Your Honor has refused to confirm the plan because that's what
24 the plan says is supposed to happen.  And if you've refused to
25 confirm the plan, then we will have to renegotiate the plan to

1  provide some alternative treatment.  That it seems to me is

2  the time to worry about whether the TDP deals adequately with

3  Mr. Brown's hypothetical indemnity claims that are now being

4  channeled to the trust.

5       At least Scotts has its first order claim going to

6  the trust.  So, they can at least posit that, you know, we've

7  got a claim and we're told it's going to the trust and the TDP

8  doesn't deal with it.  The settled insurers, whether it's One

9  Beacon or any of the other insurers, that are asbestos

10 protected parties, aren't ever going to face the Scotts claims

11 if this plan is confirmed.

12      Now, that said, if, in fact, there is a defect in the

13 plan language as Mr. Brown urged and I was -- not having my

14 plan here with me, I was unfortunately unable to kind of follow

15 exactly, if there's some defect in the actual language that

16 somehow or other fails to channel the claim despite that's what

17 A) the intention of the plan proponents is, and B) what we're

18 telling in the disclosure statement with no ambiguity, is

19 what's going to happen, then, again, like the situation with

20 Scotts, that's an objection to the plan and we can work it out.

21      And if, in fact, we don't work it out, then like

22 Scotts, One Beacon and Seaton have a confirmation objection.

23 But, again, what's happening here, to some extent, is that

24 confirmation objections which Your Honor have previously ruled

25 were going to be dealt with at confirmation, are kind of

1  sneaking in through the back door as disclosure statement

2  objections, under the guise of not the voters at large on the

3  plan who have no interest really, or very little interest in

4  these disputes, but particular entities either some insurance

5  companies or Scotts are saying, I have parsed the disclosure

6  statement, I have parsed the plan, I've raised issues, the

7  disclosure statement now addresses the issues, I still think

8  there's a problem with the plan or the TDP, the underlying

9  document and, therefore, I want to resolve my objection to the

10 inadequacy of the underlying document with respect to my rights

11 at the disclosure statement hearing.

12        And God knows we have plenty of incentive to avoid

13 confirmation objections.  So that if, in fact, they can show us

14 that there's some lacunae here that need to be filled, we are

15 amply incentivized to do that.  The question is, when.  And,

16 again, I would urge the Court that the answer is, you know,

17 during the confirmation process, we can work out if there

18 really are these types of language issues, we can work them out

19 and they'll either get resolved or they won't and if they don't

20 get resolved, there will be a confirmation objection issue.

21        THE COURT:  Okay.  Well, I think for disclosure

22 statement purposes, the issue is whether or not each entities

23 claim is placed somewhere so that everyone, everyone who is

24 going to vote on the plan knows that the major issues have been

25 put somewhere in the plan.  And that, you know, it's -- not

1  everybody agrees that where the plan proponents intend to

2  address the claims is acceptable to the people whose claims are

3  going to be treated there.

4         And I haven't seen this most recent version yet, so

5  -- I've seen it here in court, but I haven't seen the whole

6  thing put together and I take it that's what the insurers are

7  saying, too.  What I've seen here does seem to clarify what was

8  gone over in court the last time we were here and filed, before

9  court last time and it seems to me that everybody's claims are

10  addressed somewhere.

11         Now, it's also clear that not everyone likes their

12  treatment under the plan, that's one reason why the

13  classification issues are going to be addressed, the disclosure

14  statement I think makes it clear that not everybody likes their

15  classification issues.  I'm sorry, I don't know where that

16  squeak is coming from.  I apologize, it's awful.  It's clear

17  that not everybody likes their classification issues and that

18  will be a confirmation issue that will have to be addressed.

19         So, I think at this point in time this disclosure

20  statement has so much information that it's going to get to the

21  point where nobody will understand it, if it has too much more.

22  So, I'm not really sure, in fact, I'm starting to wonder

23  whether some summary of the plan isn't going to be required.

24  I'm serious.  I'm starting to wonder whether a summary of the

25  plan isn't going to be required because it's so complex at this

1  point in time that, you know, I agree with you that many

2  creditors don't care but some may.  I care, I'm not a creditor,

3  but I care.  I want to understand what it is I'm going to be

4  asked to confirm and it's getting to the point where I'm not

5  sure I will.  There have been so many changes, I'm really not

6  sure that I will.

7        MR. BERNICK:  If I could address that, Your Honor.  I

8  appreciate the complexity of it.  Any time you need a diagram

9  that looks like this, things aren't going so well, and yet the

10 fact of the matter is, that the reason that this diagram is as

11 complicated as it is, is not because the trust is complicated

12 or for that matter, the case is complicated, it's because

13 you're trying to serve the purposes of 524(g)in the context of

14 preexisting relationships and 524(g) is complicated and the

15 preexisting relationships are complicated.  All this says is,

16 is that the asbestos claimants sue other defendants, those

17 other defendants in turn are going after Grace's policies,

18 which are settled.  That's not overwhelmingly complex.

19        But to be able to have a plan that speaks to these

20 issues, you've got to speak to those issues with some level of

21 specificity.

22        I think if we get into a world of the summary, we're

23 asking for yet more time for the insurance carriers to go place

24 calls to their clients, we've worked very hard to accommodate

25 their specific issues.  And this one here, this one line here

1   is very, very simple and I did have, through Mr. Freedman, God

2   bless, a copy of the operative language.  The question is, what

3   happens to Scotts claims.  Scotts claims are against all the

4   insurers to the extent that their settled insurers are asbestos

5   protected parties.  In other words, if an insurance company

6   settles, they are an asbestos protected party.

7          And so, the question is well, what about the claims

8   of Scotts against an asbestos protected party?  That is right

9   in the definition of an asbestos PI claim, which is definition

10  32.

11         A claim, including all these things, against an

12  asbestos protected party is, in fact, an asbestos PI claim.

13  All asbestos PI claims are channeled to the trust, they all get

14  handled pursuant to the same language in the disclosure

15  statement that I went over when Ms. Cobb was standing up, to

16  describe how the TDP will apply with respect to people who have

17  indirect claims.  So that one little definition there, that

18  little definition at 32, accomplishes together with the

19  channeling injunction that relates to all asbestos personal

20  injury claims, exactly what is said in four and that's where

21  the claims by Scotts, against the carriers, get channeled to

22  the PI trust.

23         Now, Scotts raises the question about whether the TDP

24  is clear enough.  One Beacon raises the question about whether

25  the TDP is clear enough, but to make a telephone call to the

1   client saying, take a look at your chart, see where it says

2   four, that's now been switched over, that's not overwhelmingly

3   complicated.  Everybody knows that that's now where Scotts is

4   being handled, and that is the operative language, that

5   definition 32 and it makes total sense to do it that way.  It's

6   the simplest thing in the world.  The trust deals with all

7   asbestos PI claims, we define asbestos PI claims broadly enough

8   to include claims by an entity against an asbestos protected

9   party.

10          THE COURT:  I don't think that Scotts objection,

11  though.  Scotts objection is not that it's not in the TDP, it's

12  that it doesn't know how it's going to be treated in the TDP.

13          MR. BERNICK:  No, but that's -- I understand that.

14  One Beacon was saying that they were unclear --

15          THE COURT:  About whether it's in.

16          MR. BERNICK:  -- yeah, about whether it's in and Mr.

17  Brown said, oh, well, the problem in the amended 3.2.8.2 is the

18  claim was upper case instead of lower case c, thereby making

19  everything very complex.  Well, it's not really complex.  All

20  claims against the debtor shall be discharged and all asbestos

21  PI claims, with that definition, including such claims that

22  Scotts may have against the debtors, dadada, will be channeled.

23  It's not very complex.

24          Now, if that C should not have been an upper case, it

25  should have been a lower case, we'll correct it to make it a

1  lower case and save the need for Mr. Brown to complete that

2  difficult telephone call to his client.  But 3.2.8.2. was

3  totally transparent that the answer to his question is yes,

4  the claims by Scotts, that is number four, go to the trust.

5         And no amount of further discussion, I think, is

6  really necessary, I understand people would always say they

7  need more time and we, on behalf of the debtor, and the other

8  plan proponents although I'll say in the context of an apology

9  on behalf of the debtor, apologize that we were not able to get

10 closure on this among the group of people here before last

11 Friday, that's the fact of the matter, that's the way it

12 occurred, and we tried to do this in an effort to be very clear

13 and transparent about making this chart here, which is so

14 complicated, much simpler, which is what that chart there --

15 that chart there, a very simple chart.  You don't need to go

16 through all of this to get to that simple chart and that's what

17 the plan now does.

18        THE COURT:  Okay.  Well, it doesn't seem to me that

19 this portion of it is that unclear.  I think the two issues

20 that I still see left are Scotts issue as to how its claim is

21 going to be treated and the PD issues, because I'm still not in

22 a position to approve a disclosure statement because I still

23 don't have one.

24        MS. COBB:  That's what I was going to suggest, Your

25 Honor.  It seems like today is an artificial deadline to

1  resolve something.  We've heard Mr. Lockwood say he's all game

2  for discussion to avoid a plan confirmation objection, well,

3  then let's all talk and see if you can add maybe two sentences

4  to this TDP and it's no longer an issue.

5          MR. BERNICK:  Well it's --

6          MS. COBB:  Excuse me, I let you talk David, give me

7  just a few minutes to talk.

8          MR. BERNICK:  I'm sorry.

9          MS. COBB:  If you look at the TDP, just as an

10  example, Your Honor, on Page 2, it says, to this end, the TDP

11  establishes a schedule of eight asbestos related diseases.  It

12  goes on to talk about the different diseases in the category.

13  An insurance claim, that does not fall within that type of a

14  category, there's no way to determine how an insurance claim

15  would be treated under that scenario.  Under the indirect claim

16  I thought it was almost amusing that what was highlighted was

17  the very language that I find problematic and inapplicable.

18          Maybe I need to take a step back.  There are two

19  different types of claims that Scotts has.  Scotts does have

20  common law indemnification claims against Grace and as an

21  indirect PI claim, following the TDP with respect to an

22  indemnification claim against Grace, sure, it makes perfect

23  sense that in order for the Scotts Company to get paid, you

24  look to the TDP, I have to show I paid a portion of the

25  liability, that simply does not apply when a company is seeking

1  insurance company from a non-debtor entity.

2          Everyone knows that insurance companies provide, for

3  example, a defense before there has ever been any liability.

4  So, you could absolutely have a scenario where the Scotts

5  Company is pursuing insurance coverage where it is necessarily

6  not paying a portion of anybody's liability but it is,

7  nonetheless, entitled to insurance coverage.

8          I think this is an easier fix.  I mean all I'm

9  suggesting is that we have an opportunity to talk with the

10 parties who are making these objections and, perhaps, we can

11 resolve this and maybe this is much to do about nothing.

12         But getting the revision at 4:55 p.m. when the

13 revisions as provided ran 180 degree contrary to assurances

14 previously provided, with respect to how Scotts claims are

15 treated, I think it's a reasonable suggestion and I'm not sure

16 what the objection is to having that dialogue.

17         THE COURT:  Well, I think you need to talk because

18 I'm not in a position to be able to approve the disclosure

19 statement today anyway, it's still not done.

20         MR. BERNICK:  Well, I understand that, Your Honor,

21 but to be very clear about this, sure, it's always tempting to

22 say, well, it's not the last moment yet.  And  yet, everything

23 that we've done in this case has been only doable because we

24 take it in pieces.  And, certainly we'll sit down and talk

25 about the TDP or I should say my colleagues over here at the

1  other table will, but as soon as it becomes a disclosure

2  statement issue, then the next time we're up here, the question

3  will be well is the TDP now satisfactory, I think adequate, for

4  Scotts.  That is not something that we want to have to wrestle

5  to ground in the middle of January.  It's not designed to be

6  "adequate", it is designed to be there, as Mr. Lockwood says,

7  it is what it is.  What is important for disclosure statement

8  purposes is, that this arrow out-takes any claim that Scotts

9  has and sends it to the TDP.  And the terms of the TDP, I would

10 disagree with her.  I think it's very -- it's not very hard to

11 say, well, what does it mean to pay the liability of another?

12 The defense cost is a good question, and that's a reasonable

13 question to raise, but that deals with the adequacy of the TDP,

14 how much is paid, not whether your sole remedy is to make a

15 claim against the trust, pursuant to the TDP.

16       So for disclosure statement purposes, we don't want

17 to be back in January, now dealing with the translation of a

18 substantive treatment issue into a disclosure statement issue.

19 I don't believe that that's necessary or appropriate, on the

20 TDP -- I'm sorry, on PD.  Let me explain to the Court where it

21 is that we are.

22       As Your Honor knows, there has been a settlement in

23 principle with the ZAI claimants and that is now being

24 documented.  In order to get the PD part of the equation into

25 the disclosure statement process, we need to do two things.

**J&J COURT TRANSCRIBERS, INC.**

1  One is that we need to finalize those documents and the second

2  is that we need to get the futures representative for the PD

3  claims to take a final position with respect to what they're

4  prepared to do, insofar as the rest of the PD treatment is

5  concerned.

6          Judge Sanders is the Futures Representative not only

7  with respect to ZAI, but also with respect to traditional.  We

8  had a meeting to discuss those matters, it was a productive

9  meeting and we think we're moving -- we know that we're moving

10 forward, counsel for Judge Sanders, Mr. Rich is here, is very

11 cognizant of our desire and the need to proceed expeditiously.

12 We're hopeful that when it comes to PD there won't be

13 objections because the whole purpose of the exercise that we're

14 engaged in is, in fact, to reach agreement not only with

15 respect to the underlying terms, but also the disclosure

16 statement.

17         So, I think that that really is more or less a

18 question of the logistics of getting Judge Sanders and other

19 people within the committee to be comfortable with the

20 documentation and that will be available in January.  If we do

21 have issues, we'll have to raise them, but that is not -- we

22 don't see that as being a problem in reaching the point of

23 having a final disclosure statement order in the middle of

24 January.

25         Now, I want to alert the Court because the ZAI

1  settlement with respect to current claimants is a class

2  settlement, it's a class embedded within the plan of

3  reorganization.  We need to get a motion for certification

4  heard by the Court and we want that to be heard at that same

5  time.   The motion for certification should be filed yet today.

6  It's been finalized, will be filed today.  So, we know the time

7  is a little short, but we'd like to notice that up for whatever

8  the day is that will be appropriate.

9       Again, we don't think that that's really going to be

10  an issue, it's really a question of getting a preliminary

11  certification and then allowing that notice to go out at the

12  same time as the plan itself goes out.  Under the class action

13  rules, if you have a settlement you have to have an opt out in

14  any event, so it's very important to get the settlement in

15  place as preliminarily --  motion for certification on file

16  that will have the settlement there so everybody has notice of

17  what the proposed settlement is, at the time that they're also

18  looking at the plan of reorganization.

19       THE COURT:  How are you going to have an opt out for

20  class treatment --

21       MR. BERNICK:  I don't know that it's really going to

22  be --

23       THE COURT:  --  under a plan?

24       MR. BERNICK:  -- that's something -- it's going to be

25  odd because, in fact, the opt out will be an opt out that

J&J COURT TRANSCRIBERS, INC.

1  simply preserves a right to vote against the plan and we're

2  going to have to explain this.  But you're right, Your Honor,

3  because it's nested within the plan, at the end of the day the

4  plan is what provides the closure.  But we think it's very

5  important for purpose of helping the class to understand what

6  the deal is, the fact that counsel for the class approves of

7  the deal, class counsel approves of the deal, and the deal then

8  can be explained and they can become active in the process of

9  explaining it, we are persuaded and as you know, Your Honor, we

10 have not been tremendous advocates of class action procedure

11 but, in point of fact, this particular class action, as you'll

12 see how it's styled, we think is properly certifiable under

13 Rule 23.  It's a very specifically styled class and Your Honor

14 will see by the motion.

15       But the end of it is, that the utility of having a

16 class settlement is that it facilitates the process of getting

17 people who are claimants, filed their claims by the bar date,

18 who are claimants, to understand the nature of the settlement

19 and the fact that its recommended and we think that that's very

20 critical to getting a smooth voting process with respect to the

21 plan.

22       So, we would like to have that matter heard on the

23 same day, the motion should be filed yet this afternoon, and

24 that would mean that in mid January we would have A) disclosure

25 statement with respect to PD, which we hope will not be

1  objected to, and B) the motion for class certification in ZAI

2  which, again, we hope will not be objected to.

3       Those will be the two main events and the Mr. Cohn

4  has his further issue to take up with respect to discovery on

5  the PI Committee.

6       If, in fact, we have issues, that time will be well

7  spent on those other matters and I think that Your Honor has

8  called it just as it is, there's been a huge amount of very

9  refined and focused work on these indirect claim issues.  We

10 are certainly happy to keep on working on them, but to take,

11 you know, hours in January to resolve what are essentially not

12 disclosure statement issues, we don't think is necessary or

13 appropriate.

14      So, that's where we are on PD.  Things are on track.

15 I know that we need to talk about the schedule, but things are

16 going according to plan at this point.

17      THE COURT:  All right, Mr. Brown?

18      MR. BROWN:  Your Honor, I'll be very brief.  I do

19 think that there's an opportunity to advance the ball on an

20 umber of these issues.  Mr. Bernick mentioned the definition

21 with an initial Cap C and 3.2.8.2.  We'll take him up on his

22 offer to change that to a lower case c.  I think he should also

23 put in there that the claims that Scotts has against the

24 settled asbestos insurers are enjoined and channeled, that's

25 something that Mr. Bernick mentioned in his presentation.

1          It would also be helpful, I think Your Honor, if we

2    could use his diagram, which I like and, perhaps, make it part

3    of today's record if there's no objection.

4          MR. BERNICK:  I'm sorry, what, you mean your diagram?

5          MR. BROWN:  As marked up by you.

6          MR. BERNICK:  Well, this diagram is part of -- there

7    are all kinds of stuff in here that we don't think is

8    necessarily accurate and is argumentative and is part of a

9    brief.   The brief is in the record, our markup was for

10   illustrative purposes.  If you want to put a diagram in, I

11   think that that one has got the merit of being both accurate

12   and simple and I'm referring to the one on the flip chart, but

13   I don't think it's necessary to have -- Your Honor, I think in

14   fact the only reason that it's being sought is that there's

15   some advantage to be associated with it.  The question is, what

16   language is appropriate in the plan documents and that's what

17   we should be focused on, not creating ground work for further

18   disputes about what the plan means.

19         MR. BROWN:  Your Honor, that wasn't the purpose.  I

20   just -- I thought we had made some progress.  We could make it

21   an exhibit to the disclosure statement.  I do think it helps

22   clarify exactly how these claims are being treated.

23         THE COURT:  I'm not going to create another issue.

24   If the plan proponents don't agree that it's accurate I'm not

25   going to force the plan proponents to put in a diagram that

1  they think is inaccurate.

2          MR. BROWN:  I wanted it for Mr. Bernick's edits, not

3  for my own diagram.

4          THE COURT:  I know, but he apparently thinks there's

5  something not accurate, even with his edits.  So I'm not going

6  to force a diagram.

7          MR. BERNICK:  It's not my edits, it's what they are

8  edits of.

9          THE COURT:  I understand.

10          MR. BROWN:  Your Honor, one final point.  Mr. Bernick

11  mentioned it.  It was the first time that I had heard it, that

12  I guess there's some interest now for the debtor to try to

13  pursue the Scotts -- a resolution of the Scotts adversary

14  proceeding, and I don't know whether that was going to be taken

15  up during the status conference for that or not, but obviously

16  we would like to explore that.  But I didn't hear it until it

17  was mentioned here today.

18          THE COURT:  Yes.  I'll get to that in a few minutes

19  when I understand what we're dealing with with respect to the

20  disclosure statement.  So, let me finish the disclosure

21  statement --

22          MR. BROWN:  Okay.  Thank you.

23          THE COURT:  -- and then I'll get to the adversary.

24  Mr. Wisler?

25          MR. WISLER:  Good afternoon again, Your Honor.  Jeff

1 Wisler on behalf of Maryland Casualty.  Your Honor, like

2 everybody but you, I got four sets of changes on Friday

3 afternoon.  The two I had concerns with were, one, the one that

4 Mr. Brown has addressed, and with the two changes he requested,

5 that is the lower case C, and the insert of enjoined and

6 channeled, we're satisfied with that language.  But, Your

7 Honor, the other concern I have is, you know, Mr. Bernick made

8 his chart on the right and talked about how Libby liked his new

9 language on the definition of settled asbestos insurance

10 company and everybody up front liked it, but as Your Honor

11 sees, MCC is right in the middle of that, and right now I don't

12 know whether I like it or not.  And I only stand here to say,

13 Your Honor, as far as we're concerned that may be resolved, it

14 may not, but I'm asking Your Honor not to close that issue

15 today.  We'd like an opportunity to analyze it, discuss it with

16 our client, discuss it with the plan proponents, and see if it

17 can be resolved, probably without another hearing.

18      MR. BERNICK:  Yes.  We have no problem in -- I can

19 attest that you were extremely well represented by Mr.

20 Schiavoni here.  We had a vigorous debate in the back of the

21 courtroom, and he is much more capable, physically, than I am,

22 so I was just --

23           (Laughter)

24      MR. BERNICK:  -- quailing in his presence there, but

25 certainly we'll circulate the language that he developed, and

1  that Mr. Cohn added to in order to obtain your consent, as

2  well.

3          THE COURT:  I can't close anything today, Mr. Wisler.

4  I don't have a complete disclosure statement.  So, I would like

5  to get past these issues, but I don't have a finished document,

6  so --

7          MR. WISLER:  I understand, Your Honor.  Thank you.

8          THE COURT:  Anybody else need to address anything?

9  Mr. Glosband?

10          MR. GLOSBAND:  Very briefly, Your Honor.  We, instead

11  of relying on Mr. Bernick to lead the charge on this issue and

12  Mr. Wisler, so, just two comments.  One, we want to stay in the

13  loop for the final revision of the language, and secondly,

14  Continental Casualty should be in that first line right under

15  MCC, and I've spoke to Mr. Freedman about that, and he's agreed

16  to make the change.  I just wanted to put that on the record.

17          THE COURT:  All right.

18          MR. GLOSBAND:  So, that will be a change to 3.2.5.2

19  in the disclosure statement.

20          THE COURT:  3.5 -- I'm sorry.  Point --

21          MR. FREEDMAN:  3.2.5.2.  There was language in there

22  that prior the last draft included Continental as within the

23  same category, essentially, as Maryland Casualty.  It was

24  stricken in the draft that we received Friday --

25          THE COURT:  Okay.


                    J&J COURT TRANSCRIBERS, INC.

1          MR. FREEDMAN:  -- night.  It will go back in.

2          THE COURT:  All right.

3          MR. FREEDMAN:  Thank you.

4          MR. BERNICK:  Shall we take up the question of the

5    Scotts adversary, Your Honor?  Or -- I mean, that's just really

6    -- there's not too much to say about it other than to say that

7    the plan proponents, through probably that adversary

8    proceeding, will put before the Court the issue of whether

9    Scotts, in fact, Scotts' claims, in fact -- Scotts, I should

10   say, through the products that it obtained and then made,

11   qualifies under the vendor's endorsement, which is very

12   specific by its terms and we don't think covers Scotts at all.

13   But that would probably be the mechanism, and we'd do that

14   promptly, because we think it just can be done on the papers.

15   It's not a very difficult thing to do.

16          THE COURT:  Ms. Cobb?

17          MS. COBB:  I wish I had the multitude of pages where

18   -- that the reverse was stated on the record and we could have

19   perhaps resolved this simple matter four years ago.  I disagree

20   that the litigation on the insurance coverage would be a simple

21   one.  But that aside, I would just note -- ironically, when we

22   were talking about adjourning the adversary proceeding I was

23   going to stand up and say we are -- at least we have made some

24   headway with the plan in terms of clarifying that the insurance

25   rights that are being transferred to the trust are the

1  insurance rights of the insurance -- I forget the term of art,

2  but it's the debtor's insurance rights and not any rights that

3  the Scotts Company may have, and consequently we view this as

4  nothing more than a non-debtor issue, the Scotts Company

5  against non-debtor's insurance companies because back in 2004

6  we obviously had Grace asserting a right as to those policies,

7  but since the Grace insurance rights are being transferred to

8  the trust it really does amount to a non-debtor issue against a

9  non-debtor.  And I do reiterate the fact that if the -- did

10 that not make sense?

11         THE COURT:  No.

12         MR. BERNICK:  The --

13         THE COURT:  Or, it may have, but I might have just

14 lost -- but I lost it.

15         MS. COBB:  The Scotts Company believes that it is

16 entitled to insurance coverage under certain policies that

17 contain vendor endorsements, and when we filed the declaratory

18 judgment action back in 2004, that was before a point in time

19 where Grace was transferring its rights separate and apart from

20 Scotts to a trust.  So, Grace and these insurers as we knew

21 them at that time based on public records, we did not have all

22 of the policies to know the extent to which vendor endorsements

23 were contained in other policies.  We did bring that action.

24 My point is today, because the currently proposed plan seeks to

25 transfer only Grace's insurance rights and not any rights that

1  Scotts may allege to have, it really removes Grace from the

2  picture, leaving this as a claim by -- a coverage claim by the

3  Scotts Company against non-debtor insurance entities.

4          MR. BERNICK:  Your Honor --

5          MS. COBB:  And I do believe -- you know, to the

6  extent that the trust distribution procedures can more clearly

7  provide how that issue may or may not be resolved post-

8  confirmation, again, it may resolve all of the issues.  It may

9  obviate the need for any plan objection.  But I do think we're

10 now at a non-debtor against a non-debtor claim, and I simply

11 highlight that for Your Honor.

12         MR. BERNICK:  Your Honor, very -- number one, the

13 plan is not effective, so there hasn't been any transfer yet,

14 and number two, with respect to the settled insurance policies,

15 the settled insurance policies are different.  And the settled

16 insurance policies now pertain to protected parties.  Protected

17 parties are entitled to a 524(g) channeling injunction, so this

18 is very much a part of a -- an important part of the plan,

19 which is now subject to confirmation, so the matter clearly is

20 ripe, and clearly is within the scope of Your Honor to

21 determine in connection with the confirmation of the plan.

22         THE COURT:  Is Scotts claiming against both settled

23 and non-settled policies?

24         MR. BERNICK:  I don't know if they're claiming

25 against non-settled policies.  I'm not aware of that.  I do

1  know that they're claiming against settled policies, and that's

2  -- that with respect to which we would litigate the vendor's

3  endorsement.

4        MS. DeCRISTOFARO:  Your Honor, Elizabeth DeCristofaro

5  for Continental Casualty Company.  The Scotts Company, when it

6  filed its adversary, sued both a settled company, a settled and

7  exhausted company, and an unsettled insurance company that I

8  represent.  And we were not aware that this issue was going to

9  be pursued today, but we do want to make clear that if the

10  Scotts Company were to pursue coverage there's more than one

11  issue about their rights to coverage.  This is a very discrete

12  issue, but there is -- they would step into the shoes of Grace

13  under the policies, and there is all kinds of issues.  It's not

14  simple about whether or not they have insurance coverage.  We

15  have pending insurance coverage litigation that was stayed by

16  this bankruptcy.  I also have five settlement agreements

17  related to all of our coverage.  So, this is not quite so

18  simple, one issue.  And I just want to make that clear.  And we

19  may have other issues to raise regarding pursuing this, but I

20  just want to make that clear, that there's not just this one

21  issue about whether Scotts would be entitled to coverage under

22  that.

23        THE COURT:  Well, if the debtor is only talking about

24  the settled and exhausted policies, that may be a different

25  issue from the non-settled policies.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  We're focused on the settled policies

2     because it's the settled policies that give rise to this

3     indirect claim issue, the indemnity issue.

4          MS. DeCRISTOFARO:  I'm not sure there would be a

5     distinction between the issues, so there isn't going to be that

6     issue --

7          MR. BERNICK:  Well, I -- I'm explaining why it is

8     that Grace is raising this in the context of the settled

9     insurance.  And there may well be a bunch of other defenses to

10    coverage.  I don't know.  But I'm assuming that if we were

11    successful in determining that your clients don't have to pay

12    pursuant to the vendor's endorsement, that would be something

13    that you would like.

14         MR. DeCRISTOFARO:  You're missing the point, Mr.

15    Bernick.

16                         (Laughter)

17         THE COURT:  Well, I think the issue is --

18         MR. BERNICK:  If you don't trust us to litigate that

19    issue, we'd be happy to have you litigate the issue, too, in

20    the -- but the point is that it's germane for confirmation

21    purposes to whether that indemnity claim that would be asserted

22    by the settled insurers is even material to the case.  That's

23    the only reason we're teeing it up.

24         MS. DeCRISTOFARO:  I understand that that's your

25    issue, but I am a named defendant in that adversary proceeding

1  with respect to two companies.

2      MR. BERNICK:  Well, I'm not saying that the adversary

3  proceeding would be litigated to conclusion on all issues.  I'm

4  suggesting that we would tee up the issue of the vendor

5  endorsement.

6      MS. DeCRISTOFARO:  And I'm not here formally raising

7  some problems we may have.  I just want to let the Court know

8  that there are those issues, and that -- settled and unsettled

9  are participants in that adversary.

10      THE COURT:  Okay.  But I think if I'm understanding

11  correctly, the only issue that would be relevant to be teed up

12  would be as to the settled policies as to which the debtor

13  received the funds and in exchange gave an indemnity, because

14  it's the contractual indemnity that the debtor would be seeking

15  to figure out what the effect is for terms of transferring any

16  rights and/or liabilities to the trust.

17      MR. BERNICK:  And for purposes of determining whether

18  the threat of that liability, be it against Grace or the trust

19  -- well, it is against the trust, whether the threat of that

20  liability is academic because the first step isn't there, that

21  is Scotts doesn't have coverage as a vendor, or under the

22  vendor endorsement.

23      MS. DeCRISTOFARO:  I just wanted the breadth of the

24  issues to be raised at this time, Your Honor.

25      THE COURT:  Yes.  I -- at this point, Ms.

1  DeCristofaro, so far, through I'm not sure how many, but maybe

2  something like 17 or 18 mass tort asbestos cases, I have so far

3  successfully avoided all insurance coverage litigation.

4                    (Laughter)

5            THE COURT:  With any luck I'm going to do it in the

6  next three or four cases.

7            MS. DeCRISTOFARO:  I had a feeling Your Honor wanted

8  to.  But I just wanted to raise that issue.

9            MR. BERNICK:  We were --

10           MS. COBB:  I think it's a little bit of a chicken and

11 the egg --

12           MR. BERNICK:  We were --

13           MS. COBB:  Sorry.

14           MR. BERNICK:  Go ahead.

15           MS. COBB:  I think it's a little bit of a chicken and

16 the egg situation because obviously --

17           THE CLERK:  Can you use a mike, please?

18           MS. COBB:  Tiffany Cobb on behalf of the Scotts

19 Company.  It's a little bit of a chicken and the egg situation,

20 Your Honor, because obviously there could be plan confirmation

21 issues about the ability of a pre-petition settling insurance

22 company to even obtain 524(g) protection, and of course then it

23 becomes a -- it takes this outside of the entire bankruptcy

24 case.  It becomes a post-confirmation claim against insurance

25 companies.


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well -- okay.  I think the issue at the

2     moment, though -- that's still related to the plan confirmation

3     issue and whether or not 524(g) is appropriately construed and

4     the plan is confirmable.  So, one way or another that is still

5     a bankruptcy issue as to which this Court can assert the

6     jurisdiction.  So, that one doesn't trouble me much.  It

7     doesn't sound like an insurance coverage issue.  It sounds like

8     a bankruptcy issue, and I'm happy to do bankruptcy work, so --

9     okay.  Mr. Lockwood?

10          MR. LOCKWOOD:  Two points.  One, the settled

11     insurance is not being transferred to the trust because it

12     doesn't exist anymore insofar as the plan is concerned.  And

13     number two, the point Ms. Cobb just made, the statute uses the

14     language contribution on behalf of --

15          THE COURT:  That's right.

16          MR. LOCKWOOD:  -- not by.  And I agree with Your

17     Honor, that's a confirmation objection.  I mean, if they want

18     to come in and say -- and assuming that they -- they probably

19     do have standing, and assuming that they do, then they can

20     raise that and argue that it's got to mean by.  But that --

21     that's pure bankruptcy.  So, both of those basically, it seems

22     to me, while I assume Scotts, if it wanted to, could try and

23     raise a related to jurisdiction issue in whatever papers they

24     file, it's certainly not something that Your Honor could decide

25     today.  There's clearly no jurisdiction on behalf of Grace's

1  effort to, you know, tee this issue up.

2          THE COURT:  Okay.  Well, I just want to make it clear

3  at the moment that I'm not attempting, I do not want, and to

4  the extent that I can in any way duck the insurance coverage

5  litigation issues, I intend to do all of the above.  To the

6  extent, however, that I have to undertake, you know, some

7  bankruptcy issues, then I'm going to undertake the bankruptcy

8  issues.  That's my job.  So --

9          MR. BERNICK:  Your Honor, at this point I think that

10  the other remaining item -- I'm mindful of the time -- the

11  other remaining item for discussion this afternoon focuses on

12  the confidentiality of information that the insurers --

13          THE COURT:  Wait.  Before we move to that, Mr.

14  Bernick, I guess I needed to know what the schedule is that

15  you're anticipating --

16          MR. BERNICK:  I was going to say that --

17          THE COURT:  Okay.

18          MR. BERNICK:  -- that that's the only issue that I'm

19  aware of that really remains, and that does have, at least in

20  the minds of the insurers, some implications for the schedule,

21  but I don't think it implicates the hearing date matters.  So,

22  if we come back to the question of what would suit Your Honor's

23  convenience in the schedule, maybe we can try to tie that down

24  and have people then take a short break, which will also enable

25  Mr. Cohn and I to confer about confidentiality matters, and

1  then come back and be able to firm up the schedule and take up

2  that last issue, if that's appropriate.

3        THE COURT:  That's fine.  Okay.  So, what does the

4  debtor -- I take it the debtor is going to file something with

5  respect to teeing up something in the adversary?

6        MR. BERNICK:  On the Scotts adversary issue, I can't

7  say right now when that will occur.  I just wanted to alert the

8  Court -- I'm now happy that I did -- to the fact that that's

9  something that we will want to do, but I'm not asking the Court

10 set a schedule for it.  That's something we can probably take

11 up in connection with the -- with perhaps the hearing in mid-

12 January.

13       But what I would anticipate is that we would probably

14 file a motion for partial summary judgment with respect to an

15 issue that is insurance coverage, and raise that -- we'd have

16 to think through what the appropriate nexus would be, not that

17 it lacks one, but what's the easiest nexus that exists between

18 that and the confirmation process.  But I'm not really able to

19 propose a schedule today.  I haven't had the opportunity to

20 discuss that with my colleagues here.

21       I think the issue that Your Honor raised was when

22 should we be back in January, and you were focused on January

23 the 15th, and we would -- or, one of those days --

24       THE COURT:  The 13th.

25       MR. BERNICK:  My sense is that we've got Mr. Cohn's

1  issue, we've got class certification, and we've got any

2  remaining disclosure statement issues.  I think we should be

3  able to accomplish that in one day.

4       THE COURT:  Well, I was focused on the 13th and 14th

5  rather than the 12th and 13th.

6       MR. BERNICK:  Right.  And --

7       THE COURT:  We originally talked the 12th and 13th.

8  I was just trying to push it back.  I have three days currently

9  reserved for Grace, the 12th, 13th and 14th, but last month we

10 were talking about using the 12th and 13th, but I had said I

11 wasn't taking the 14th off my calendar because this case has a

12 way, sometimes, of needing more time.  So, now I was proposing

13 instead to use the 13th and 14th and not the 12th.

14      MR. BERNICK:  Yes.  I think actually we could do --

15 we may even be able to do the -- just the 14th.

16      THE COURT:  I'm not going to take the 13th off my

17 calendar for the same reason.

18      MR. BERNICK:  Okay.

19      THE COURT:  So --

20      MR. BERNICK:  That's fine.  The 13th and 14th we find

21 that we would notice the class certification for the ZAI class

22 to be on one of those days, but probably on the 14th.

23      THE COURT:  If you want a recess, why don't you talk

24 to folks --

25      MR. BERNICK:  Sure.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  -- and let me know.  But if it's at all

2   possible I would appreciate not using the 12th, since I really

3   need not to be here at the 12th if that's at all possible.

4        MR. BERNICK:  So, she's transferring where?

5        THE COURT:  To Columbia.  Bryn Mawr, tiny, confined.

6        MR. BERNICK:  Yes.  Right, right.

7                    (Laughter)

8        THE COURT:  A mother is always the last to know.

9        MR. BERNICK:  I would venture to say, though, Your

10  Honor -- I'd venture to say that if she ever wanted to know of

11  a lawyer who may be able to help her out with anything -- or

12  you could probably find lots of New York lawyers that would be

13  able to provide you --

14       THE COURT:  Probably.

15       MR. BERNICK:  -- with a reference to some lawyer that

16  would be appropriate.

17       THE COURT:  Gee, thanks.

18                    (Laughter)

19       MR. LOCKWOOD:  Look on the bright side, Your Honor,

20  prices are going down in the Big Apple right now.

21       THE COURT:  One would never know that by looking at

22  the web site.  But -- okay.  We'll be in recess for ten

23  minutes.

24                    (Recess)

25       MR. BERNICK:  I'm just clearing my head from all the

J&J COURT TRANSCRIBERS, INC.

1 little conversations to one side or the other.  Janet?

2          THE COURT:  Ms. Baer?

3          MR. BERNICK:  We're fine with the 13th and 14th, and

4 I think that -- and that's when we would have any remaining

5 disclosure statement issues, including PD, we would have the

6 motion on class certification, which should be, incidently,

7 filed, my expectation is, this afternoon.  And I think that --

8 and I haven't heard -- nobody has come up to me to say, you

9 know, that doesn't work, and I don't know if anybody believes

10 that it doesn't work, and maybe if Your Honor wants to inquire,

11 because otherwise I think we can take up the confidentiality --

12 the confidential information part of the agenda and talk that

13 through.

14          THE COURT:  All right.

15          MR. BERNICK:  And I think that's where we're at.

16          THE COURT:  Does anybody have a problem with the 13th

17 and 14th?  I mean, they were reserved days before, so I don't

18 think anybody should, but -- no, no one is saying that they

19 have any issues, so --

20          MR. BERNICK:  Okay.

21          MR. SCOTT:  Your Honor?  This is Darrell Scott.

22          THE COURT:  Yes?

23          MR. SCOTT:  It's also necessary to set an objection

24 deadline for the class certification motion, which will be

25 today and then heard on the 13th or 14th.  I'd recommend

1  January 2nd.

2          THE COURT:  Well, is there no objection deadline --

3          MS. BAER:  Because it's a specially set hearing date

4  --

5          THE COURT:  Oh.

6          MS. BAER:  -- there are no deadlines that go with it.

7          THE COURT:  Okay.  So, I need to get the binders by

8  -- it will just be a final binder, not a preliminary, for this?

9          MS. BAER:  Normally unless you want -- if I -- I'm

10 not -- forgive me, Your Honor.

11                       (Pause)

12          MS. BAER:  Your Honor, unless you want it a different

13 way there's no -- again, there are no dates set right now.

14 There's no order that would apply to it.

15          THE COURT:  I think I can deal with a final binder

16 for this, and so, if I get it on the sixth that's fine.  So, an

17 objection deadline of the second is fine with me.

18          MR. BERNICK:  Okay.

19          MR. SCOTT:  Thank you, Your Honor.

20          MR. BERNICK:  That, then, brings us to the protective

21 order and the confidentiality issues.  We've had a very active

22 dialogue on this, and the plan proponents appreciate the

23 willingness of all interested parties to participate on a

24 fairly expedited schedule, and I would especially make note of

25 Mr. Esserman and Ms. Ramsey's availability in this process, and

1  I think that we have made a progress.

2          Where we are is that we have taken -- at one point

3  there was a stipulation, a proposed stipulation that was

4  circulated, and I think that Mr. Schiavoni for his client

5  signed that, and got the historical Grace database.  Others

6  wanted to talk more extensively, and ultimately we were

7  concerned that if we didn't reach a stipulation we wouldn't

8  have an order, so we basically converted the text of the

9  stipulation with changes in this running language to be a

10 proposed protective order, and that's what's been submitted to

11 Your Honor.  There are two significant areas where --

12          MS. BAER:  The Judge does not have this.

13          MR. BERNICK:  I thought she had it by e-mail.

14          MS. BAER:  No.  It was circulated to the parties --

15          MR. BERNICK:  Oh.  Okay.  Well, then -- I'm sorry.

16          MS. BAER:  Your Honor, there's a clean and a black

17 line behind it which was compared to what was filed.

18          THE COURT:  Okay.  Thank you.

19          MR. BERNICK:  The things of -- the matters of

20 significance that have been added to this protective order that

21 were not set forth in the stipulation is that the insurance

22 carriers wanted an affirmative statement of what it is that

23 Grace was prepared to actually provide, and that appears at

24 Paragraph 3.  And while there is an exception to -- there's a

25 description of carve outs in Paragraph 7 that we'll get to.

1  Essentially Paragraph 3, Sub 1 says, "subject to execution of a
2  confidential agreement or entry of this protective order."  We
3  would change that by striking out execution of a confidential
4  agreement or, so it just refers to entry of this protective
5  order, and that's important because we don't want there to be
6  two competing documents out there.  This will become the
7  controlling document.  So, it will be subject to entry of this
8  protective order.  Debtor's historical case management system
9  database, and debtor's insurance policy registers and related
10 information regarding the underlying insurance coverage.
11 That's the first chunk.

12          THE COURT:  I'm sorry, but what I'm looking at, the
13 black lined version, is Paragraph 5.

14          MR. BERNICK:  Yes.  It's now become Paragraph 3.  Do
15 you --

16          MS. BAER:  For some reason the numbering got screwy.
17 If you look at the clean, it's become Paragraph 3.

18          MR. BERNICK:  Yes.  I'm sorry, Your Honor.

19          THE COURT:  All right.  Okay.  Let me check -- all
20 right.  I'll follow along with the clean version.  Okay.

21          MR. BERNICK:  So, we would change that lead in, but
22 that otherwise three, sub one would basically call for the
23 production of the claims management system database, the
24 historical database, and then these registers and related
25 information, and that is what we understand to be what the

1  carriers want.  And then, romanette ii is a, and this was

2  simply our idea for how to expedite the provision of a very

3  large amount of information, we'd create a virtual data room to

4  which the insurers will be provided access to all non-

5  confidential expert reports, deposition transcripts, exhibits

6  used at the trial, trial demonstratives, and the trial

7  transcripts for the asbestos personal injury estimation

8  proceedings.  And in order to -- so, that's essentially the

9  scope of what will end up in that room.

10        What we have to do, however, in order to make that

11  happen, is we have to go Paragraph -- what is now Paragraph 7,

12  because Paragraph 7 creates a carve out, and Jan, you'd also

13  have to refresh me on the language that Sandy gave us, the

14  except -- where the except is.  I'll come to that in a minute.

15        MS. BAER:  Okay.

16        MR. BERNICK:  But basically, Paragraph 7, the new

17  Paragraph 7, defines obligation -- the carve outs.  It says,

18  "Debtors, however, shall not produce information previously

19  protected by the orders outlined in Paragraph 22 below, or any

20  other such orders with respect to:  (1) personal claimant

21  identifying information, names and social security numbers; (2)

22  information that may contain or cite to law firm

23  interrogatories previously provided in the estimation

24  proceedings; or (3) information with respect to claimants'

25  settlements with defendants other than the debtors under this

1 protective order, etcetera, etcetera."

2        Those carve outs were specifically framed at the

3 request of -- or based upon the input of counsel for the law

4 firms, and that's not only the law firms that Mr. Esserman

5 represents, but also -- that Ms. Ramsey represents, but also

6 the Motley Rice folks submitted an objection, as well.  So, we

7 created those carve outs as part of an effort to enable the

8 carriers to get what it is that they needed, but still would

9 not produce a problem of obtaining consent from all of these --

10 not obtaining consent, but litigating with all these different

11 law firms about whether these carve outs are appropriate.  Your

12 Honor will recall that the orders protecting the confidential

13 information were very important to the law firms and their

14 clients, and all that information was provided for use in the

15 estimation proceeding only, so the expansion, or the use of

16 this information for an expanded purpose, or different purpose,

17 is something that has not been agreed to by these other firms.

18        So, we've inserted those matters, and we think that

19 with these provisions we have done what the carriers have asked

20 for, save only that they've raised a question about the timing

21 of the production of this information in reference to the

22 current schedule, which we would like to take up separately.

23 But insofar as the provision of the information is concerned,

24 we think that this meets the needs and demands of the insurance

25 carriers.

<div align="center"><strong>J&J COURT TRANSCRIBERS, INC.</strong></div>

1          There is one further language change.  What's the

2    other language change?

3          MS. BAER:  It's in Paragraph 4, the introductory

4    words with the added, "except as provided in Paragraph 7

5    herein."  So, making it specific that the information we're not

6    going to be providing and taking out is taken out.

7          MR. BERNICK:  Okay.  There would then be -- we need,

8    Ms. Ramsey, what's the global term?  We're just alerting --

9    we'll provide a conformed copy for the Court, but --

10          MS. BAER:  There's a term, PI counsel, which relates

11    to all of the PI counsel that have objected to the protective

12    order as it was originally scheduled.  There are some languages

13    in here where we talk about plan proponents, but we need to add

14    in and PI counsel in terms of consents, and notices, and things

15    like that.

16          MR. BERNICK:  Okay.  So, as we understand it, with

17    these amendments, counsel for the different law firms that --

18    whose information we're talking about here, are agreeable to

19    this order.  We know that the plan proponents are agreeable to

20    this order.  This order only relates to the insurance

21    companies.  We have a separate discussion that we need to take

22    up with respect to the Libby claimants.  They are not included

23    within this order, albeit they would like to have a similar

24    order, but we have a disagreement there.  So, that's not --

25    we're not there yet.  But with respect to the insurers, we

1  don't know, we haven't heard whether the insurers are agreeable

2  to this order as we have now amended it in light of the

3  requests that they've made.  And maybe the appropriate step now

4  is to find out whether they disagree.

5           THE COURT:  Mr. Schiavoni?

6           MR. SCHIAVONI:  Your Honor, Tancred Schiavoni for

7  Arrowwood Royal, and I negotiated this with the debtors.  The

8  big picture here, Judge, is that the debtors have proposed a

9  very aggressive schedule by any calculation.  We have expert

10 reports now due in 30 days from today, and for those of us who

11 are obligated to take a couple of days off for Christmas and

12 the holidays, we don't really even have the full 30 days to get

13 ready for those expert reports.

14          The notion here that when the debtors approached us

15 with an expedited schedule we said, look, we'll work with you

16 on the schedule but we'd like to have, up front, some

17 commitment from you that you're going to work with us, that

18 you're going to get to us some basic information, information

19 that really levels the playing field here so that we can go

20 ahead with you on this schedule, so that we're prepared to have

21 the basic information to put expert reports in, and also,

22 Judge, and I think we've made this very clear, that we only got

23 demands from the ACC on our open coverage very, very recently,

24 in the last couple of weeks.  There's no complaining about

25 that, but all of us have -- or most of us have expressed an

1 intention of wanting to sit down and see if we could work out

2 our differences quickly, meaning before the expert reports were

3 due.  This information essentially kills two birds with one

4 stone.  It's intended to basically facilitate productive

5 negotiations before we move into a litigation phase on January

6 15th.  It's also intended to put us in a position where our due

7 process rights really aren't impaired and we can actually

8 participate in a schedule that really lasts only about 40 days.

9         The information that we requested, Judge, is the

10 information that every other participant in this case has, that

11 every other participant in this case used as part of Court

12 proceedings.  That's precisely what's at issue.

13         With that as background, I only have three comments

14 to the revised form of the order that we were given by the

15 debtors.  One is, and I'm using their black line, which I guess

16 maybe has different numbers, but in Paragraph 6 what they talk

17 -- they sort of set this up so they say, in these two romanette

18 bullet points they're going to give us under five, the

19 information that is sort of publicly -- is non-confidential,

20 the information here that's posed the problem is the

21 information that is, of course, under seal that the other

22 parties to the bankruptcy have and we don't.

23         And the three points we have are, one, in Paragraph 6

24 there's a sentence, "The debtors may also produce to the

25 insurers certain unredacted or sealed confidential --" and then

1  it lists the materials that everybody else has, the expert

2  reports, depositions, transcripts.  And we'd just ask that that

3  says the debtors will produce to the insurers the unredacted

4  materials.  That's what we want, after all, we want some

5  certainty that, in fact, we're going to get it.  And we'd also

6  ask, Judge, that some sort of date be set on that, because it's

7  not going to do us any good to get that information in June.

8  And we'd ask that December 31st would be a candidate as a date,

9  but any date before the expert reports would be due.  That's

10  one change we have.

11          MR. BERNICK:  I'm sorry.  So, if I can interrupt?  I

12  think my microphone that produces the feedback, Your Honor.

13  You want Paragraph 4 --

14          MS. BAER:  Paragraph 6 of the black line, Paragraph 4

15  of --

16          MR. BERNICK:  Yes.  But -- I take it that -- that's

17  just the same thing as this.  So -- I don't even know that we

18  need four anymore.

19          MR. SCHIAVONI:  Do you want to look at it while I'm

20  talking?

21          MR. BERNICK:  Yes.  I think -- well, no, I think it

22  is.  I think, actually, that --

23          MR. SCHIAVONI:  The information is different.

24          MR. BERNICK:  Why?  I'll take a look at it.

25          MR. SCHIAVONI:  The other point, Judge, is just --

there’s a clause that appears on Page 9 -- this is my point, too, Paragraph 9. This is the clause where the two sets of plaintiff’s firms -- I think there’s 13 or 14 firms objected to the production of this information. You know, what’s essentially happened here is during these prior proceedings, as you will recall, you entered a series of protective orders. All we’re asking for is that those protective orders be extended to us under the same exact terms, and we commit ourselves to use the material exclusively with respect to this bankruptcy, and we’ll commit ourselves to meet all the other terms of the protective orders. I think what’s happened here is the plaintiffs’ firms that have objected to this information, I don’t think they have any sort of leeway to negotiate it. I think they have to go back to their constituents and tell them we resisted, they need an order in order to produce it.

Without an order sort of putting us under the same protective order as everybody else, there is going to create sort of chaos about trying to figure out what’s what, how to produce what, how to figure out what falls under this carve out, what doesn’t. So, we’d ask you to overrule this objection, but we’re not asking you to do anything that you haven’t, in a sense, done exactly before. We’re asking to fall exactly under the prior protective orders that were entered here, and we’ll abide by all those terms, and we’ll only use

1 the material specifically in connection with this case.

2          In fact, we're willing to go a step further in this

3 regard, Judge, and that is we're willing to put in here

4 something that didn't apply to the other plan proponents, and

5 that would be that it would be for attorney's eyes only, the

6 materials, so it wouldn't even go to the clients, so there

7 wouldn't be any question about the client misusing the

8 information.

9          I don't think there's ultimately really a legitimate

10 protective order objection from the claimants to extending the

11 protective order because, after all, if they gave the material

12 to Grace and they gave it to other claimants' lawyers, what

13 reason could there possibly be not to give it to Grace's

14 insurers, which, after all, have some obligation to sort of

15 process the claims at some point or another, Judge, and

16 regularly deal with this information?  But again, we're dealing

17 with it on an all attorney's eyes only basis.  So, that's the

18 second point.

19          The third point here is really simple.  I think

20 there's a typo in 20 and 22 that I pointed out to Jan Baer that

21 -- just -- converting it from a stipulation to an order.  I

22 think it should be in the nature of ordering clauses instead of

23 people agreeing clauses.  And that, Judge, is all we have.  We

24 want to move ahead quickly with the debtor.  We're prepared to

25 accommodate them.  And all we're seeking is this basic

1  information to sort of go ahead with it.

2      And just to preclude sort of an extensive discussion

3  about relevance and everything else, Judge, this case is

4  different from a lot of your other cases in that we have --

5  most of us who are here as insurers have proofs of claim in

6  that are unobjected to, that are potentially substantial proofs

7  of claim.  My client paid $100 million pre-petition.  And we

8  have a series of indemnity rights and whatnot that we think are

9  co-extensive with those claims.

10     So, we think we have general standing to make these,

11 but again, we want the information to kill two birds with one

12 stone.  If we can use this to get out of the case before expert

13 reports are due everybody is going to benefit, and this type of

14 information goes to that.  It also goes to what our

15 confirmation objections would be.  Thank you, Your Honor.

16     THE COURT:  Okay.  So -- I'm confused.  If you've

17 prepaid the insurance and there is an indemnity right so that

18 if you're sued and you've got to pay, the debtor has to

19 indemnify you -- oh, but the claims are still made against the

20 policy, and if you have to pay, the debtor has to reimburse

21 you.  That's the nature of the way the policy buyouts were

22 done?

23     MR. SCHIAVONI:  There were indemnities granted in

24 connection with the payments on the policies.

25     THE COURT:  So, the policies are not terminated?

1  You're still liable to pay the claims on the policy, but the

2  debtor has to pay you?

3         MR. SCHIAVONI:   No, no, no.   Judge, what would

4  happen is if there's an effort to -- if we -- if claims were

5  tendered to us and we ended up having to pay them, despite

6  having entered into the settlement, and despite having paid

7  under the settlement, then we would be -- we would have a -- we

8  would contend we would have an indemnity claim in that

9  situation.   Do you understand the -- the indemnity was intended

10  to back up the release and the payment that was made in

11  connection with the settlements.

12         THE COURT:   Yes.   So, how is the entity going to sue

13  you rather than the debtor if the claim goes against the debtor

14  and the debtor doesn't pursue the insurance because they've

15  already settled the claim?

16         MR. SCHIAVONI:   Judge, you're putting me really in a

17  difficult position here, asking me to become a plaintiff's

18  lawyer on how I would sue myself, and to sort of lay that out

19  with a lot of plaintiffs' lawyers in the room.   I --

20                    (Laughter)

21         MR. SCHIAVONI:   I don't think that should ever

22  happen, and I think that settlement is completely done.   And

23  it's in the disclosure statement that it's done.   I have one

24  other policy in the case that's not part of the settlement.

25  We'd like to talk to the folks here about resolving it, and

1  hopefully I won't be here again before you other than with a

2  9019 motion at some point.  But the point here is that we have

3  different issues.  Among the insurers we have different issues,

4  but we all have proofs of claim to back up those issues.

5          MR. BERNICK:  Well, but if I can understand Your

6  Honor's question, the question is if it's true that all the

7  claims are, in fact, channeled with respect to the settled

8  policies --

9          THE COURT:  Right.

10         MR. BERNICK:  -- their action would be an indemnity

11 action over --

12         THE COURT:  Right.  So, why do they need this

13 information?

14         MR. BERNICK:  Well -- right.

15         THE COURT:  Right.

16         MR. LOCKWOOD:  Good question.

17         MR. BERNICK:  Can I --

18         MR. SCHIAVONI:  Well, you know, terrific, Judge.  If

19 we could, maybe, add a few lines to the disclosure statement

20 making that a hundred percent clear, and we could prevent -- or

21 preclude the Libby claimants from making any objections to

22 confirmation, maybe we're done.  At this point we're not there.

23 I don't know where we're going post December 31st, and again,

24 we'd like to be done before then.

25         MR. BERNICK:  Is there going to be anybody else who

1 is going to speak for the carriers on -- I'm sorry.

2            THE COURT:  Okay.  Thank you.  Ms. DeCristofaro?

3            MS. DeCRISTOFARO:  Yes, Your Honor.  And I'll be

4 extremely brief.  My problem with the order is I just need it

5 to be clear that this isn't any type of ruling about materials

6 that we're seeking.  It does have carve outs in it that Mr. --

7 and I join in his explanation as to why those should just be

8 taken care of by an extension of the confidentiality order, but

9 to the extent there is anything in here, and we've already had

10 a discussion where we thought something was subsumed in our

11 request that the debtor doesn't -- presently doesn't consider,

12 I just want to make it clear this is without prejudice even

13 though it reads overruling objections, that there's been no

14 substantive rulings on anything we're requesting, and I think

15 that's important.

16           Your Honor entered an order because we had submitted

17 a case management order that had provisions in it allowing us

18 time to file expert reports after we received materials, and at

19 the last time -- at the last omnibus when I raised this, Mr.

20 Bernick said, oh, you'll have stuff before the December 15th

21 hearing.  We still don't have anything.  Some of this is just

22 so that we can evaluate whether we need to file expert reports,

23 whether we want to participate in certain things, and I think

24 it's in the debtors' interest to give us a little more time,

25 and as Mr. Schiavoni said, there is room for discussions and

1  everything.  So, I would again raise adjustments in three

2  dates.  Not to Mr. Bernick's overall April target date, but

3  into the dates for filing objections, for filing fact

4  discovery, and filing expert reports.  The first two dates I

5  would move back by ten days, because December 15th -- if we get

6  materials I'm not going to be able to get an expert to look at

7  them if I need to.  I'm not going to be able to file a report

8  if need to.  And if people want to have discussions it's more

9  productive to allow a little more time for that to occur than

10  for us to have these -- where we're trying to cover everything

11  that we could possibly say and do.  I think it's in the debtor

12  and the plan proponents experts to allow a little more time on

13  that, especially where we stand today, with we have not

14  received anything.  So, those are the two points I'd like to

15  add to that.

16          THE COURT:  Mr. Wisler?

17          MR. WISLER:  Thank you, Your Honor.  Briefly, Jeff

18  Wisler on behalf of Maryland Casualty and Zurich.  Your Honor,

19  we're okay with this protective order.  We just want to make it

20  clear that from Maryland Casualty and Zurich's standpoint, and

21  I think from the Court's standpoint, entering the order, this

22  order facilitates the production of certain information, but

23  it's not a ruling on anything we can't get in the future, and

24  it's not a waiver of anything we might be asked in Court.

25          THE COURT:  Well, I mean, if no one has an objection

1  to the entry of the order, then I don't have an objection to

2  allowing the insurance companies to get the information.  To

3  the extent that it's going to attempt to facilitate some

4  negotiated plan, it would be helpful to everybody to have a

5  negotiated plan.  And to the extent the insurance companies are

6  willing to have it for attorney's eyes only, restricted to use

7  in this case, it seems to me that that's fine.  I'm just not

8  exactly sure if, in fact, there are indemnities out there, what

9  use it's going to be.  But that's, I guess at this point, not

10 something I need to worry about if everybody is in agreement

11 with this.

12        MR. BERNICK:  Your Honor, maybe we can -- maybe if we

13 can go through -- I mean, we would like -- it is not only a

14 question -- what this order does is to enable the plan

15 proponents to turn over information with the consent of the law

16 firms and --

17        THE COURT:  Yes.

18        MR. BERNICK:  -- their clients that provided it.  And

19 absent that consent we can't do anything.  So, to the extent

20 that the order is agreed to, and only to the extent that the

21 order is agreed to by those firms, can we do anything that's

22 undertaken in this.

23        THE COURT:  Yes.

24        MR. BERNICK:  So, we don't seek to preclude any other

25 discovery rights that the insurers may assert at some point in

1  time.  They're always free to come back to the Court, and if

2  they want language that reserves their right to ask for

3  additional discovery, we'll provide that language.  That's not

4  a problem.  But this order affirmatively undertakes or imposes

5  upon the debtor an obligation to produce certain of those

6  materials and produce them very, very quickly, which is

7  important from the debtor and the plan proponents' point of

8  view because it keeps the case moving.  So, this order becomes

9  very critical not only as an area where there is no objection,

10  but also because it imposes obligations on the debtor, which

11  obligations, if met, also then means that we keep to a tight

12  timetable that's important for us in the case.  So, what I'd

13  like to do is go through and basically talk about what we

14  agreed to, because I think that there are probably very few

15  things that we -- that have been raised that we don't agree to.

16         THE COURT:  Well, I think if everybody has seen it

17  that's -- everyone -- has it been circulated?

18         MR. BERNICK:  It has -- this has been circulated,

19  yes.

20         THE COURT:  All right.  Then I think the issue is

21  does anybody object to it?

22         MR. BERNICK:  Well, we have to -- I think that I

23  heard Mr. Schiavoni raise a series of edits that he wants to

24  have --

25         THE COURT:  Oh.  Okay.

1            MR. BERNICK:  -- take place.

2            THE COURT:  Okay.  Fine.

3            MR. BERNICK:  And so, I want to say which ones of

4  those we agree to --

5            THE COURT:  Oh.  I'm sorry.

6            MR. BERNICK:  -- so we can just take the off the

7  table.

8            THE COURT:  I misunderstood.  Okay.

9            MR. BERNICK:  That's -- I'm sorry.  So, Paragraph 4,

10 which is the paragraph that used to be probably --

11           UNIDENTIFIED ATTORNEY:  Six.

12           MR. BERNICK:  Six.  He says, well, why can't the

13 debtors will, instead of may, and we're agreeable to that.  He

14 also asks for a date on or before 12/31, and we think that we

15 can meet that date, as well, so, we're happy to have this be

16 before 12/31.  There are some typos later on that we'll

17 correct.

18           THE COURT:  Wait.  On the December 31st date, can the

19 debtor -- especially if the debtor is setting up a virtual

20 room, that may not be able to be accomplished on a rolling

21 date.  I don't know.  But to the extent that the debtors are

22 doing any other type of production, can it be done on a rolling

23 basis?

24           MR. BERNICK:  No.  This is simply a deadline.  What

25 we're going to do with this -- in fact, we would have produced

1  the historical database to everybody if they had signed the

2  original stipulation.  We already produced it with respect to

3  Mr. Schiavoni's client, so we have no problem with -- that will

4  be in there very promptly.  The virtual room is set up --

5          THE COURT:  All right.

6          MR. BERNICK:  -- it's just a question of loading it.

7  And so, the database can go in very quickly.  If Your Honor

8  executes this order, we will put it -- it will be in there --

9          MS. BAER:  Tomorrow.  I mean --

10          MR. BERNICK:  Yes.

11          MS. BAER:  -- I have copies today.

12          MR. BERNICK:  The only part of this that takes time

13  is that we have to go through these various expert materials,

14  and to the extent that they contain information that the other

15  firms object to, that is the -- providing firms of the carve

16  outs, we have to carve that out.  That's the only thing that

17  takes time.  We don't think it's going to take very much time,

18  and we'll certainly be able to, therefore, put in there right

19  away anything -- any expert reports that we know don't raise

20  issues.  Certainly the trial transcript and exhibits, that can

21  be in there right away.  They could have gotten the trial

22  transcript and exhibits anyhow.  So, 12/31 is a drop dead date

23  for everything, but we will produce on a rolling basis prior to

24  December 31.  How about that?

25          THE COURT:  All right.

1          MR. BERNICK:  The substantive matters that have been

2    raised, and I want to put to one side the scheduling issue, the

3    only other substantive matter that I think is out there is that

4    counsel for the insurance companies has said, well, why can't

5    we simply extend the protective order, including the reference

6    to attorney's eyes only to include the carve out, so that the

7    personal identifying information, the law firm interrogatories

8    and the like, would also be available to counsel on attorney's

9    eyes only basis?  The answer to that is that the law firms are

10   not agreeable to that.  We've basically raised that whole move,

11   which is to confine the scope of people, or the number of

12   people that get access, and I've been told in very clear terms

13   that this -- and we had to push to get these be the only carve

14   outs, are, in fact, the carve outs that these clients insist

15   upon.

16          And you then, therefore, have to get back to the

17   question about of what conceivable relevance or use is this

18   information?  And, first of all, talking about personal

19   claimant identifying information, how any insurance company on

20   any kind of basis whatsoever needs to have personal identifying

21   information for these folks is unexplained and unexplainable,

22   and in any event not agreed to.  How the law firms answered the

23   interrogatories, again, it's -- we all know, and I can't say

24   the substance of it, but it was, at the end of the day, not a

25   very productive exercise --

1              (Laughter)

2         MR. BERNICK:  Of course, we never knew until we went

3   through it, but it was not a productive exercise, but it

4   certainly doesn't have information, there's been no indication

5   that in some fashion this information is germane to any issue

6   that any of the carriers had.  And then, with respect to

7   settlements with other defendants, again, what business is it

8   of theirs?  And this really brings me back to a more

9   fundamental point, which is that, number one, we can't change

10  what these law firms -- they made the information available for

11  a specific purpose after great litigation.  I can't, and

12  certainly the insurers can't compel anybody to produce that

13  information for their purposes in the case.  We know it's

14  basically not going to happen.  You know, if we want to

15  litigate it it doesn't do any good because at the end of the

16  day these people are going to say, look, an order is an order,

17  an agreement is an agreement, that is what it is.

18         The real issue, though, is, well, what are we really

19  talking about?  With respect to the settled policies we know

20  that the only issue is whether there is some action over in the

21  event the protection is not available to them, and that is

22  something that none of this information bears upon in any way,

23  shape, or form, and it's an academic, as to this point a

24  speculative issue because we're pretty confident that the

25  settled insurers are going to be protected under 524(g).  It

1  doesn't get more clear that they are protected parties under

2  524(g).  So, with respect to the settled policies this is all,

3  I think, really totally and utterly beside the point.  What

4  they really want this information for, and I think they've been

5  pretty clear about it, is they want to be able to use this to

6  inform their own decisions about whether to settle their

7  unsettled policies.

8        Now, I -- you know, God knows that's really not our

9  affair.  It's the affair of the folks who are going to be the

10  beneficiaries of the trust, but certainly I'm confident that

11  efforts to settle would be welcome.  And to the extent that

12  this information helps them in that process, that's fine.  But

13  that is not what this order is about.  This order is an order

14  about people making objections and litigating.  Folks are

15  always prepared, always able to settle if they want.  There's

16  no such thing as saying, gee, before I get in my litigation

17  mode I need to know whether I'm going to settle or not.  That's

18  not how the --

19                (Noise heard in background)

20                      (Laughter)

21        MR. LOCKWOOD:  There's always a critic somewhere.

22        MR. BERNICK:  I won't ask the Court operator to try

23  to narrow that one down.

24                      (Laughter)

25        MR. BERNICK:  But I take the point.  There's -- look,

1  this is a litigation.  People can always settle, and the

2  settlement process should not impair our ability to go forward

3  and move forward here.  So, we don't think it's -- we don't

4  think that they really have any kind of ability to compel

5  people who are not parties to this case to produce personal

6  information and settlement information so that they can make

7  their own judgment about how they want to settle, and that's

8  essentially what they're asking for.  There is no basis for

9  saying that this information is relevant to the litigation

10 process, and as a consequence we think that this order, with

11 the changes that I've indicated, there will be a reservation of

12 rights, there will be the agreements that are -- or the orders,

13 the operative orders that are reflected in Paragraphs 3 and 4,

14 including changing the word may to will in Paragraph 4, those

15 orders will be further amended to say that there will be

16 rolling -- that materials will be produced on a rolling basis

17 by December 31, and then we would ask the Court to reject the

18 idea that the order called for the production of the carved out

19 information on any basis, including attorney's eyes only,

20 because we do not have the power to comply with that order as

21 its known today.

22        With respect to the overall schedule, the same

23 remarks apply.  Remember that the schedule already was pushed

24 for two or three weeks -- was it -- two weeks --

25        MS. BAER:  Two weeks.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  -- the last time, to accommodate all of

2  this, and we don't think it's really necessary to push it

3  again.  If these folks want to settle, there's always time to

4  do that, and that schedule is very important to keeping this

5  case moving.  We're not taking up Libby -- Libby is separate.

6          MR. COHN:  I'm not taking up Libby right now, Your

7  Honor.

8          THE COURT:  Okay.

9          MR. COHN:  Dan Cohn for the Libby claimants.  I just

10 couldn't let pass the statement on the record that it is so

11 clear that the settled insurance companies are covered by

12 Section 524(g), because, in fact, that's one of the objections

13 that we -- well, it's already set forth in our disclosure

14 statement objection as a preview of what we're objecting to

15 under the plan.  The issue there being, and it's a very

16 important one, that these insurers that are providing no new

17 consideration, and so, you know, contrary to all the case law

18 that says there has to be substantial consideration in order to

19 get protected under 524(g), so that will be a confirmation

20 objection.  Thank you.

21         THE COURT:  All right.

22         MR. LOCKWOOD:  I would just add, or to some extent

23 reiterate, just one point that Mr. Bernick made.  This is a

24 consensual deal to produce stuff voluntarily in advance of

25 discovery being served, and so, as far as the claimants are

1   concerned, and their lawyers, the question is how much should

2   the debtors be able to do voluntarily, and how much should be

3   reserved if there's going to be a dispute about things?  And

4   the carve out that Mr. Bernick referred to is a limitation on

5   what the law firms involved here are willing to agree that

6   Grace can produce voluntarily.

7           If the insurers believe that they need, really need

8   this information for whatever purposes, and that they're

9   entitled to get it, they can file discovery requesting it,

10  people can make an objection to the discovery, and that

11  objection can be resolved in the normal course, the way

12  discovery disputes get resolved.  But I don't think it's fair

13  to the insurers to, in effect, file a motion to compel orally

14  by objecting to the carve outs, and ask the Court to rule that

15  because in an estimation proceeding, which I don't think we're

16  going to have at confirmation, some -- this Court permitted

17  certain types of materials to be discovered under a protective

18  order, that it necessarily follows that for all other purposes

19  in the case somebody -- anybody that wants to should have the

20  same access.

21          THE COURT:  Well, the settled insurance companies --

22  well, I don't know, they may -- I guess -- never mind.  I won't

23  make that comment.  It's not -- it's possible that what I was

24  thinking won't be correct, so -- okay.

25          MR. LOCKWOOD:  The place to resolve whether or not

1  those insurers settle, unsettled, can compel the production of

2  this material --

3         THE COURT:  Right.  It's not here.

4         MR. LOCKWOOD:  -- it's not here and now.  That's my

5  only point, Your Honor.

6         THE COURT:  I agree with that.  Mr. Schiavoni?

7         MR. SCHIAVONI:  Judge, some of the things you've

8  heard are just actually fundamentally wrong.  We filed document

9  requests several weeks ago.  We were told in response to those

10  document requests that we would not be getting the productions

11  because the documents were subject to confidentiality orders.

12  We then moved on an expedited basis on consent with the plan

13  proponents, not just for confidentiality, but in the order that

14  we submitted, Judge, it specifically requests the turnover of

15  this very material.  We are here properly before the Court on a

16  motion not just for confidentiality, but also to compel the

17  production of these documents.

18         THE COURT:  Okay.  But I --

19         MR. SCHIAVONI:  Your Honor -- Your Honor, everyone's

20  been noticed.  You -- this is not something that has to be done

21  on consent.  The plaintiff's lawyer, objections from Mr.

22  Esserman, you will get those no matter what.  He is honor bound

23  to say that he objects.

24         THE COURT:  But I don't understand the need for it.

25  I don't understand what the relevance of needing, for example,

1   the names of all of the plaintiffs just to pick something, and

2   their social security numbers, just to pick something, is to

3   the insurance companies who have already settled their

4   liabilities and whose claims are against the debtor on an

5   indemnity claim.

6         MR. SCHIAVONI:  Let me help you with this, Judge, and

7   here's, in part, the answer.  We've been told that the

8   documents that are under seal are infected with this

9   information throughout.

10        THE COURT:  Are infected?

11        MR. SCHIAVONI:  Infected to the extent that there's a

12   citation here, a citation there, that that's why all the stuff

13   that's under seal is under seal, and that by keeping it under

14   seal it will prevent the production of a huge amount of

15   material.  It's not just the specific line items.  They're not

16   -- it's just not --

17        UNIDENTIFIED ATTORNEY:  That's just not true, Your

18   Honor.

19        THE COURT:  The information, Mr. Schiavoni, as I

20   recall, is basically in spreadsheet form, and so, particular

21   columns of spreadsheets can be eliminated, for instance, the

22   names and social security columns of the spreadsheets need not

23   be produced.  And I see absolutely no reason why the names and

24   social security columns of spreadsheets need to be produced.

25        MR. SCHIAVONI:  It's --

1          THE COURT:  I don't see a relevance to the insurance

2    companies at this stage of the proceedings for settled

3    insurance companies whose claims, if any, in this estate are

4    going to be on indemnity contracts against the debtors have to

5    be produced, because the claims at this point, to the extent

6    they're going to go through a trust in the first instance, and

7    have to be rejected by the trust and then go through the whole

8    trust distribution procedure before they ever end up in the lap

9    of an insurance company, and if they do ever end up in the lap

10   of an insurance company somehow, some way, by some stretch of

11   the imagination on a settled insurance claim, are then only

12   going to be able to be adjudicated the same way that the

13   underlying claim would be through the trust distribution

14   procedure anyway.  At that point maybe you need some

15   information with respect to whether or not that claimant ever

16   filed a claim, and if so, how and when it was going to be

17   adjudicated.  But that's a far cry from today.

18          MR. SCHIAVONI:  Well, Judge, I think we stand before

19   you with generalized standing as a result of the proofs of

20   claim that we have.  We have standing to bring before you at

21   confirmation objections to the good faith of the plan.

22          THE COURT:  Maybe you do.

23          MR. SCHIAVONI:  This plan was negotiated and brought

24   about as a result of these -- of the production of these

25   documents and the estimation proceeding that took place.

1          THE COURT:  Regardless.

2          MR. SCHIAVONI:  We'd like to have access to the same

3    material that the debtor stood before this Court and told the

4    Court about all the reasons why these claims shouldn't be paid,

5    and why they weren't qualified to be paid, and then promptly

6    turned around and entered into an agreement whereby we have

7    TDPs that provide them to be paid.

8          THE COURT:  Wait.  You have --

9          MR. SCHIAVONI:  Those would be objections we would

10   like to make --

11         THE COURT:  You have no --

12         MR. SCHIAVONI:  -- and we would like this information

13   to make it.

14         THE COURT:  But you have no claim except on the

15   indemnity.  You've settled with the debtor.  You've settled

16   your claims with the debtor.  How are you standing here telling

17   me that you can object to the TDP when you've settled with the

18   debtor?  I'm missing something here.

19         MR. BERNICK:  Maybe if I can help Mr. Schiavoni just

20   a little bit, because -- the statement that these carve outs

21   infect this information is just wrong.

22         THE COURT:  It is wrong.

23         MR. BERNICK:  So, and it's even simpler.  The

24   materials that we've -- the materials that we've undertaken to

25   produce, including the depositions, the expert reports and the

1  like, at that level the expert reports were all based on

2  extracted data and numbers, and the details of why the debtor

3  believed that these claims did not have the same value as the

4  ACC and the FCR did are all set out in the experts' reports,

5  driven by that data.  We expect that there will be very, very

6  little that will have to be redacted from the expert reports

7  because the personal identifying information, the other

8  settlements, and the interrogatory answers were frankly of

9  almost -- they were, without --

10         THE COURT:  Well --

11         MR. BERNICK:  -- exception, of no consequence to the

12  estimation case.  We never made an argument based upon the

13  other settlements.  We never made an argument based upon

14  personal identifying information.  We never made an argument

15  based upon the vaunted interrogatory answers.

16         THE COURT:  Well, certainly to the extent that the

17  expert reports so far have been introduced into Evidence in

18  that proceeding, and there are not a lot of them that have, but

19  nonetheless some have, there is not that kind of personal

20  identifying information in those documents, and they are of

21  record.  They are of record in the trial proceedings.

22         MR. BERNICK:  The only relevance of the personal

23  identifying information was literally to track cases, period,

24  end of statement.  The expert reports were all based upon other

25  factual matters, and they're -- and they are just -- it's just

1  -- none of this really -- that's why we can produce this stuff

2  so promptly.

3        THE COURT:  All right.  At this stage I do not see,

4  without the agreement of all parties, why the names and social

5  security numbers need to be produced, especially for attorney's

6  eyes only.  I simply do not see the need for that information.

7  But it's without prejudice if, in fact, when you get the rest

8  of the information you see some need, it's without prejudice to

9  filing some motion saying why you need it.  And that's a

10  different issue.  But for this, as a voluntary resolution of

11  the matter, it seems to me that this should be sufficient for

12  the insurance company's needs to assess whether you do or don't

13  want to settle, whether you do or don't want to file some

14  objection to the plan, and whether or not the information that

15  you're getting is, in fact, sufficient to meet whatever it is

16  that you're looking for in the course of discovery.  But it

17  will be without prejudice to asking for that additional

18  information.  I don't see the need for it right now.  I don't

19  understand the need for it now, but it will be without

20  prejudice.

21        MR. SCHIAVONI:  Okay.  Thank you, Your Honor.  You

22  have our objection.

23        THE COURT:  All right.  Mr. Esserman?

24        MR. ESSERMAN:  Sorry, Your Honor.  And I thought this

25  was done two years ago.  We're fine with the order as proposed

1  by Mr. Bernick.  I just wanted to make sure that that was

2  clear.  We don't see a need for any alterations to the carve

3  out.  A lot of that information was provided.  We consider it

4  to be attorney-client information, confidential privileged

5  information, information that should not have been produced in

6  the first place.

7              THE COURT:  What, the names?

8              MR. ESSERMAN:  No, no, no.  Just all the carve out

9  information.

10             THE COURT:  Okay.  Because names are certainly not

11  attorney-client information.

12             MR. ESSERMAN:  No.  We understand that.

13                          (Laughter)

14             MR. ESSERMAN:  We understand that.  Although social

15  security are confidential -- it's a --

16             THE COURT:  It's a confidential -- yes, because the

17  administrative office has certainly defined certain portions of

18  the --

19             MR. ESSERMAN:  Yes.

20             THE COURT:  -- social security numbers to be

21  confidential, but the names of the clients are certainly not

22  attorney-client information.  Okay.

23             MR. ESSERMAN:  But we understand the need to get

24  information quickly.  We've reacted quickly in a matter of

25  weeks, and the order as described by Mr. Bernick is fine with

1 us.

2         THE COURT:  All right.  Thank you.  Ms. Ramsey, are

3 you standing to say something, too?

4         MR. BERNICK:  We always like to hear from Ms. Ramsey,

5 so we would be disappointed if there weren't --

6         MS. RAMSEY:  Thank you, Your Honor.  I was standing

7 in case it was necessary for me to say something, but I think

8 Mr. Esserman and Mr. Bernick have covered the points that I

9 would like to make.

10         THE COURT:  All right.  Thank you.

11         MR. BERNICK:  Your Honor, we have a marked up copy of

12 the order that I've given to Mr. Schiavoni over there, and

13 we're hopeful that he can read through it.  And maybe in the

14 interim we can take up the last issue, which relates to the

15 Libby claimants.

16         THE COURT:  All right.

17         MR. BERNICK:  And this order does not cover the Libby

18 claimants.  However, Mr. Cohn is anxious to get clarity on what

19 his clients are going to get because it bears upon his position

20 with respect to scheduling.  I think that where we are with

21 respect to the Libby claimants is that they're agreeable to

22 this same order, and also -- well, I think where we are with

23 respect to the Libby claimants, and let me be more specific

24 about it, is that the only issue that remains insofar as we are

25 concerned with the Libby claimants is their ability to get the

1  other settlement information.  Am I correct about that, Mr.

2  Cohn?

3           THE COURT:  I don't know what you mean by the other

4  settlement information.

5           MR. BERNICK:  The third carve out is for --

6           THE COURT:  Oh, the third carve out?

7           MR. BERNICK:  Oh -- I mean the second carve out is

8  for --

9           THE COURT:  All right.

10          MR. BERNICK:  -- the settlement information relating

11 to settlement with others.

12          THE COURT:  Other attorneys.

13          MR. BERNICK:  And so, I -- I think that where we are

14 is that we're able to reach an agreement with Mr. Cohn and his

15 clients except on the question of their desire to get

16 information about other settlements that have been reached.

17 And I know that Mr. Cohn has some arguments to make on that

18 score that are specific to his claimants, and therefore it

19 might be appropriate while the carriers look at the order that

20 relates to them if we could have that matter heard.

21          THE COURT:  All right.  Mr. Cohn?

22          MR. COHN:  Yes.  Thank you, Your Honor.  I do need to

23 point out that we have -- that we have been asking for slightly

24 different information from what the carriers wanted.  It's

25 information that's very specific to our objections that you're

1  already somewhat familiar with from the disclosure statement

2  stage.  The three items of information that we wanted are, one,

3  the Grace pre-bankruptcy database.  My understanding is there's

4  no issue about that, but I'd just raise that as background.

5  The second is the personal injury questionnaires that were

6  submitted as part of the estimation process, and then the third

7  is the Rust Consulting Group compilation of the data from the

8  personal injury questionnaires.  And these are directly

9  pertinent to our objections because as you know the objection

10 is based on discrimination against the Libby claimants, both as

11 to medical criteria, exposure criteria, and also as it relates

12 to the fact that Libby claimants have -- indisputably were

13 harmed by Grace's asbestos as opposed to somebody else's,

14 whereas other claimants have all sorts of issues in proving

15 both exposure to Grace's asbestos and that the harm came from

16 Grace's particular asbestos.  And corresponding to that, they

17 have all sorts of other asbestos producers whom they can

18 pursue.

19            And so, it's against that backdrop, Your Honor, that

20 the -- this information about other claims is directly

21 relevant, and in particular settlement data about what kinds of

22 settlements other claimants can be getting from other asbestos

23 producers is very important and material to our case.

24            Now, in discussions with --

25            THE COURT:  Why, if they don't have claims against

1  any other settlement -- any other producers, does it matter

2  what other settlements the claimants got from other producers?

3          MR. COHN:  I'm sorry.  If the Libby claimants don't

4  have --

5          THE COURT:  Claims against other producers does it

6  matter what other claimants got as settlements from other

7  producers?

8          MR. COHN:  Because the issue is discrimination under

9  the TDP, Your Honor.  If the TDP were to pay -- let's just say

10  that a Libby claimant had a claim against Grace, having

11  suffered $50,000 of damages, and so did some other person had

12  some claim against Grace and suffered $50,000 of damages, if

13  both of those claims are liquidated at $50,000, that's actually

14  discriminatory against the Libby claimants because the other

15  guy has, maybe 20, 25, 30 other pockets to look to for his

16  exposure.  It's not clear -- it may not even be clear that he

17  was exposed to Grace's asbestos at all, but even if he was

18  exposed to Grace's asbestos there are so many other people who

19  are responsible to one degree or another that that claim should

20  not be allowed against Grace on the same basis that a Libby

21  claimant's claim would get allowed based on indisputable

22  exposure to Grace's asbestos, and that clearly the damage could

23  only have been done by Grace's asbestos.

24          So, that's why these trust distribution procedures

25  have traditionally contained the phenomenon -- what's defined

1   as an extraordinary claim, Your Honor, which says that if you

2   were exposed to just this producer's asbestos, then you get a

3   claim -- you get a multiple of the -- what would otherwise have

4   been the liquidated value of your claim.  But the question is,

5   okay, are those provisions fair to the Libby claimants?  And

6   that's the issue that we need discovery on.  And that directly

7   bears on --

8            THE COURT:  So, you're unhappy with the multiple?

9            MR. COHN:  We're unhappy with the multiple and with

10  the criteria under the TDP whereby there is complete discretion

11  on the part of the trustees to take any Libby claim and say,

12  well, yes, it's true that your exposure was only to Grace's

13  asbestos, but we're not going to give you the multiple, so

14  that, in essence, is the objection.

15           THE COURT:  But if they don't like that, the decision

16  of the trustee, then they have the same remedy under the TDP

17  that everybody else has, don't they, which is to then pursue

18  the next remedy, you know, that ADR, or to take it back into

19  the tort system for liquidating the claim.

20           MR. COHN:  Well, that's the very problem, Your Honor.

21  First of all, the TDP says that the decision of the

22  extraordinary claims panel, which is who resolves this --

23           THE COURT:  Right.

24           MR. COHN:  -- is final.  Those are the words of the

25  TDP.  So, it would appear to us on our reading of the TDP that,

1  in fact, on that particular issue there is no recourse.  There

2  may be recourse on other issues, but there's no recourse on

3  that issue.  Second, Your Honor, even when you have recourse,

4  you know, let's say you -- it -- let's say it's not an

5  extraordinary claim issue, and so you can go to ADR, you go to

6  -- you know, you go to mediation, and then if that fails you go

7  to the tort system, there is a cap imposed on what you can get

8  through the tort system.

9            THE COURT:  Yes.

10           MR. COHN:  And that also is directly relevant to

11 whether our claims are being treated discriminatorily in the

12 sense that Libby claims are being paid less than their fair

13 share of the assets of the trust based on what a Libby claimant

14 could obtain through the tort system compared to what a non-

15 Libby claimant could obtain through the tort system.  So,

16 that's the nature of the objection, and we do intend to prove

17 that, Your Honor.  But among the things that we need to prove

18 -- among the items of discovery that we need to obtain is

19 information about these other claims, because when you're

20 talking about discrimination you are inherently comparing your

21 claim, the Libby claim, to how other claims are being treated.

22 Now, we have -- we have -- I said that --

23           THE COURT:  There are other sources for that

24 information, though, that don't violate the confidentiality

25 order that this Court agreed to in compelling those claimants

**J&J COURT TRANSCRIBERS, INC.**

1  to submit that information to this Court for purposes of the

2  estimation hearing.

3          MR. COHN:  Your Honor, it is conceivably true that we

4  could do a -- we could do discovery directly against the law

5  firms that represent these folks --

6          THE COURT:  Or the other trusts, like the debtor did.

7          MR. COHN:  We could, Your Honor, and in that case

8  we'd be back here trying to confirm this plan some time in 2010

9  or 2011 because, as you know, that was a very lengthy process.

10 What we've been trying to here, Your Honor, is we are trying to

11 work within the time frames that the debtor wants to work

12 through in order to have that confirmation hearing occur within

13 the most expedited possible framework.  We're trying to work

14 with the debtor on this, Your Honor.  And the debtor, to be

15 candid, has worked with us.

16          The background of this, Your Honor, is that we

17 reached agreement with the plan proponents on a form of order

18 that would be issued that could address these issues of

19 confidentiality.  That was circulated to any party that might

20 be interested, and there arrived back, in effect, an objection

21 by Mr. Esserman and Ms. Ramsey on the issue of what we thought

22 was an issue of privacy, which is that there's this personal

23 identifying information.  It's inherently a part of these

24 personal -- these PI questionnaires, and it's part of the Rust

25 database.

1        And so, the way we said we'd accommodate that is,

2   well, we don't actually -- we may not care about personal

3   identifying information.  We can say we don't need that right

4   now because right now we could just look at the Rust database.

5   The debtors can redact from it the personal identifying

6   information so that we'd just have, in effect, claimants by

7   number, if you will, and that may well prove to be all that we

8   ever need.  And the only thing that we needed -- and the only

9   thing that we needed in order to make that work was an

10  agreement by the plan proponents that if we ever needed to

11  introduce any part of the Rust database that the fact that we

12  had the redacted version would not be used to contest

13  admissibility, which I understand they are willing to say.  So,

14  in terms of the Libby claimants and the plan proponents, we are

15  -- you know, we are in sync.  We've reached a compromise, and

16  we're willing to proceed on that basis.

17       The remaining issue, having addressed the personal

18  identifying information issue, which, by the way, you know, as

19  personal injury people ourselves, I mean, we're very sensitive

20  to that.  We were -- we felt strongly that that information

21  should be protected when we went through the estimation

22  proceeding, so we're happy to respect that in this context.

23  But that leaves the remaining issue of the fact that among the

24  items of information that were filed with -- or part of the

25  Rust database as a result of being culled from the personal

1 injury questionnaires, are settlements with other parties.   And

2 as to that we understand Ms. Ramsey and Mr. Esserman -- or at

3 least Ms Ramsey to still have a problem with.   And maybe I

4 should let her speak for herself, but I think we've articulated

5 what the relevance is to the Libby claimants' objections to

6 confirmation.   It's very important information going, you know,

7 right to the heart of this issue of discrimination.   And I

8 don't see how we can -- I don't see how we can pursue our case

9 without having access to that information.

10       And then the question of how we get access to it,

11 well, this is clearly the most expedited way for us to get

12 access to it compared to pursuing what you might call

13 traditional discovery against the various other sources of

14 information, and that's solely an issue of time, Your Honor.

15 We're happy to pursue this discovery in the traditional way.

16 It's just that we'll then have to come back to you and ask for

17 the additional time within which to do it.

18       And what purpose, what interest of Ms. Ramsey or her

19 clients would that serve?   I mean, it's not -- this is not

20 information that we could possibly be precluded from having

21 because it is clearly relevant, and it -- clearly it's the Rule

22 26 standard, it doesn't even have to be relevant, it has to

23 lead to potentially admissible information.   So --

24       THE COURT:   But again, you don't need the personal

25 information.   You simply need the substance behind it.

1          MR. COHN:  We're past personal information, Your

2    Honor.  We're willing to agree --

3          THE COURT:  Even on the settlements?

4          MR. COHN:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. COHN:  Yes.  Yes, Your Honor.  Yes.  I'm sorry.

7    Maybe I should have made that clearer.  So, this is solely --

8    this is not an issue of whether it's legitimate information for

9    us to have, it's just the question of what kind of gauntlet

10   will we have to run in order to get this information?  And we

11   would respectfully submit that the -- with a confirmation

12   hearing looming next year, the fact is that the only feasible

13   way for us to get this information is to use the compilation

14   that already exists in the form of the Rust database.

15         THE COURT:  All right.

16         MR. FINCH:  Your Honor, just so it's clear, the ACC

17   --

18         THE CLERK:  Your name, please?

19         MR. FINCH:  Nathan Finch for the asbestos claimants'

20   committee.  The ACC, and I believe the other plan proponents,

21   as well, would dispute the accuracy of many of Mr. Cohn's

22   factual contentions about the Libby claims, and we don't

23   concede the relevance of any of this.  As a way to try to

24   accommodate them as to the confidentiality issues, the ACC

25   takes no position on whether or not they can get access to this

1  confidential data; however, we don't have the right to weigh

2  the confidentiality protections of Mr. Esserman's clients or

3  Ms. Ramsey's with respect to settlements with other defendants

4  in -- either individually or in the aggregate.  And Your Honor

5  is correct.  There are a lot of other sources of publicly

6  available information about what the value of an all-in

7  mesothelioma case would be that Mr. Cohn could seek without

8  having to get access to this information.  But just by way of

9  example, when Grace settled cases it paid it several share of

10 the case.  Libby's right.  They only had typically Grace to

11 shoot at.  But the all-in value of a mesothelioma case

12 historically from Libby is a tiny, tiny percentage compared to

13 the all-in value of a mesothelioma case in other parts of the

14 country -- Texas, New York City, in California.  Mesothelioma

15 cases might be worth ten or 20 times what they are in Libby,

16 Montana, and that's the basis of the function of the caliber of

17 lawyers bringing them, and the jurisdictions which they try

18 them in.  And that available -- you can get that from the <u>Rand</u>

19 <u>Report</u> in 2005 that talks about those jurisdictional

20 differences.  And you can get them from open Court testimony

21 and other plan confirmation hearings, so I'm not conceding at

22 all that this is relevant.  I am saying that we're not going to

23 stand on confidentiality issues because it's not my issue, but

24 don't be taking my silence as to the relevance as an agreement

25 that it is relevant discovery.


**J&J COURT TRANSCRIBERS, INC.**

1           MR. BERNICK:  Your Honor, I think that the answer
2    here is very comparable to the answer that you gave with
3    respect to the insurers, albeit the context is slightly
4    different.  In both cases we're dealing with information that
5    the debtor and the plan proponents cannot control.  They only
6    have it pursuant to Court order, and therefore we have no
7    ability to agree to any other disposition, nor does the Court
8    really have the ability to say, well, I'm going to abrogate my
9    prior orders.  You would have to have before you the same
10   claimants and the same law firms, and be litigating anew the
11   question of whether, now, for this different purpose the
12   information should be compelled from people who are, at least
13   with respect to the insurers, as we know, and also with respect
14   to the Libby people, are clearly third parties.  We're talking
15   about information relating to a variety of other claimants.
16   Those claimants are third parties when it comes to the issue
17   that's been raised by the Libby claimants.  The Libby claimants
18   essentially are seeking discovery from third parties in order
19   to foster their own dispute with the plan proponents.  So, you
20   would have to have some kind of process that's served with
21   respect to the same people, same information.  We'd have to
22   have them hailed into Court for this purpose now, a different
23   purpose, and there would have to be some kind of proceeding.
24   So, really, Mr. Finch spoke to the desire of the ACC to be
25   cooperative in this.  That same desire has been demonstrated by

1  the law firms and their clients, as well, that is, Mr.

2  Esserman's clients, Ms. Ramsey's clients had been prepared to

3  be flexible and to say here's what we will agree to as a way of

4  resolving this problem, but there's no way, shape, or form that

5  the Libby claimants can really say I'm sorry, that's not

6  enough.  It's not really up to them to be able to say it.  And

7  the other way in which it's very similar to the situation with

8  respect to the insureds -- the insurers, is that the factual,

9  or the -- the predicate of relevance here is really -- is

10  really just not there at all, in the same fashion as it was for

11  the carriers.  They're really focused on their unsettled

12  policies, not litigation over the indemnity.  Here the argument

13  that is being made for relevance is one that, again, doesn't

14  hold very much weight, not that it can be dispositively

15  resolved.  But the TDP pays a multiplier under certain

16  conditions that -- and Mr. Cohn has problems with them, but

17  pays a certain multiplier, and he says on behalf of his clients

18  that that's discriminatory, it's not fair because it really

19  means that they're not treated the same way as other people.

20  And he says that that's so because really they have no other

21  recourse that Libby claimants, other than to sue Grace, whereas

22  other folks have the ability to sue lots and lots of other

23  people.

24       The comparison of fairness is an interesting thing,

25  but the point -- the basis of which fairness can be established

**J&J COURT TRANSCRIBERS, INC.**

1   is completely the opposite of what Mr. Cohn has argued.  The

2   TDP -- the people of Libby only have the ability to argue

3   fairness by reference to the value of their claims, and their

4   claims can't be pursued against all of these other people.

5   They can only be pursued against Grace, but that's the way that

6   it was before the bankruptcy occurred.  So, the real issue is

7   does the TDP -- the real issue that Mr. Cohn is raising, and

8   I'm not saying it's a valid issue, or it's my issue, I'm not

9   characterizing it, but the real issue that Mr. Cohn seems to be

10  raising is a question of fairness that should be answered by

11  reference to, well, how did you guys fare in the tort system

12  previously?  So, the point of comparison has nothing to do with

13  how the TDP for other claims against other products compares to

14  their prior settlements, or to their settlements against others

15  in the tort system.  Those claims involved completely different

16  products, completely different other joint defendants, other

17  sources of money, and therefore there's no relationship.  The

18  point of comparison for his fairness point is with prior

19  settlements.  Well, the prior settlements are all set forth in

20  the claims of the database, so he should be doing a comparison

21  between how his clients -- again, according to his logic and

22  his issue, how the TDP fares by reference to what they will be

23  able to obtain as compared to prior settlements in Libby.

24          There is simply no relationship whatsoever between

25  the pie that exists with respect to settlements in the

J&J COURT TRANSCRIBERS, INC.

1   aggregate for people who are suing Monokote who worked on

2   construction sites and had all kinds of other people to sue,

3   and the people who were at Libby who were exposed to Monokote,

4   but Libby operations, and have only one defendant to sue.  So,

5   he has made no showing today that this world, this unbelievably

6   complicated world of settlements, of claims involving other

7   products, other exposures, other clients, has any relevance

8   whatsoever to his own theory of fairness, the benchmark for

9   which presumably would be prior settlements that took place in

10  the tort system by Libby claimants.

11          In any event, we're not going to be able to get this

12  issue answered today in any way that breaches the agreement

13  that already has been articulated by Mr. Esserman and Ms.

14  Ramsey.  The fact of the matter is that Mr. Cohn does not have

15  any kind of process that has been put before the Court that

16  would acquire power over these people for purposes of this

17  litigation.  So, what I would suggest is that we do what we can

18  do.  We get a protective order that follows form to the order

19  here.  Of course there are -- Mr. Cohn wants the Rust database.

20  We would have to call that out specifically.  But that we get

21  that done.  And if, then, at some point he wants to come in and

22  argue for something additionally, we can certainly entertain

23  that.  But then I think he's got to follow a process pursuant

24  to which he can obtain jurisdiction over these other folks for

25  this purpose of the case.

1          MR. COHN:  Your Honor, Mr. Bernick is incorrect on

2   both points.  First on the relevancy point, Your Honor, if this

3   were a hundred cent case I would have to acknowledge who cares

4   what other people are getting because the only point of

5   relevancy would be whether Libby claimants are getting what

6   they have historically been entitled to through the tort

7   system.  But for the asbestos PI claimants it's not a hundred

8   cent case, even thought it's a hundred cent case for everybody

9   else.  And I think it's a genuine curiosity as to why that

10  should be so.  And the reason --

11         THE COURT:  It's not a hundred percent case for any

12  personal injury claimant.

13         MR. COHN:  Yes, Your Honor.  But it is a hundred cent

14  case for all other creditors.

15         THE COURT:  Oh.  Yes.  I thought you meant the

16  personal injury -- other personal injury claimants were getting

17  --

18         MR. COHN:  No --

19         THE COURT:  -- a hundred cents.  They're not, either.

20  Everybody is subject to the -- to the same matrix.

21         MR. COHN:  No, that's -- well, yes, Your Honor, but

22  why is it that general unsecured claimants who have contract

23  claims are getting 100 cents on the dollar plus interest?  Here

24  you're being called upon to make rulings about what the right

25  interest rate should be.  Why are they getting a hundred cents

1  on the dollar plus interest when personal injury claimants are

2  receiving a percentage which is now being estimated at

3  somewhere in the range of 25 to 35 percent?  The answer --

4  well, I'd love to hear your answer.

5          THE COURT:  I -- I may have to adjudicate an issue

6  about that, Mr. Cohn, so I will keep my comments to myself

7  right now.

8          MR. COHN:  All right.  Well --

9          MR. BERNICK:  I think it's pretty simple, because

10 it's part of an overall consensual resolution, and he has -- he

11 and his clients have the right to vote against it, but there

12 hasn't been any explanation about why this discovery is

13 relevant to some legal objection to the agreement.

14         MR. COHN:  The explanation is, Your Honor, that other

15 -- that someone has apparently determined that it's worth

16 compromising asbestos personal injury claims at basically less

17 than a third of their value, their alleged value, and that

18 means I -- that there was something wrong with the strength of

19 the claims, or that the claims were valued wrong, or something,

20 because otherwise it would be --

21         THE COURT:  Or that the debtor needs the contract

22 claims to stay in business in order to pay the personal injury

23 claims.

24         MR. COHN:  Well, but that wouldn't explain why the

25 financial creditors, who Grace doesn't need ever again, that

J&J COURT TRANSCRIBERS, INC.

1  wouldn't explain why the financial creditors are getting paid a
2  hundred cents on the dollar.  So, even -- I understand your
3  point, Your Honor, that if you're doing business with a vendor
4  there might be valid business reasons to discriminate, but here
5  a vast majority of the general unsecured claims that are being
6  paid in full plus interest, are mere financial --

7        THE COURT:  But that's not the point for today.
8  Here's the issue for today, Mr. Cohn.  The point is this.
9  There is a consensual agreement to do something today that gets
10 at least discovery started and underway unless you get
11 something.  So, the question is, do I sign an order today that
12 at least gets discovery started, or do I not sign any order,
13 have some process started because at this point I don't know --
14 I just don't know who has been served in terms of the personal
15 injury lawyers who -- who represent the clients who have
16 submitted the data -- the information in the database to start
17 with, because they probably will wish to be heard as to some of
18 what you're requesting, and I don't -- I am having some
19 difficulty at the moment without some, I think, disclosure
20 statement that's approved and plan on the table, putting the
21 relevance into context.

22       Now, maybe when I get the absolute disclosure
23 statement that I know is going forward, and the plan that I
24 know is going forward, maybe I'll see it.  I think for today
25 the best resolution would simply be let's do what everybody has

1  agreed upon.  Let's at least get this discovery underway and

2  start somewhere.  Maybe when you see what everybody has agreed

3  on you may decide that you really don't need the additional

4  information.  You may decide you do.  But it's without -- if I

5  enter this order it will be without prejudice to your coming

6  back saying I really do need the information because, or in the

7  meantime starting the discovery against any of the other groups

8  that are not subject to my confidentiality order.

9          MR. COHN:  Well, that's the second point, Your Honor.

10 And by the way, to answer your question, of course, you know,

11 we're happy to get whatever discovery this Court thinks it can

12 permit as of today, so we want to get started.  It's not an all

13 or nothing proposition.

14         THE COURT:  Okay.

15         MR. COHN:  But there is obviously the practical

16 consideration of what impact is this remaining discovery that

17 we don't get today going to have on the schedule for confirming

18 the plan.  And so, in that regard I do want to raise a

19 procedural issue concerning how we would go about getting this

20 information.  This information is in the debtor's possession.

21 This is now the debtor's information obtained through

22 discovery.  Remember in the estimation proceeding, while the

23 personal injury questionnaires were perhaps a novel form of

24 discovery, it was discovery, and that was the basis on which

25 Grace sought and this Court supplied the information.  So, that

1  information is now in Grace's hands.  The only party from whom

2  we need discovery is Grace.  To go to the Manville Trust, for

3  example, to get information that the Manville Trust only got

4  because other people gave it to them seems like a horribly

5  indirect and inefficient way to obtain information that is now

6  in the debtors' hands.

7          So, what I would respectfully submit, Your Honor, is

8  that procedurally what we should do is set up a procedure and a

9  time frame whereby we can -- we'll file a motion.  The motion

10 will be to obtain discovery from the debtor, but it should be

11 on notice to those who supplied the information, and we'll get

12 as complete a list of those people as we can based on, if you

13 -- I assume the debtor will supply this to us, you know, based

14 on what was done in the estimation proceeding.

15         MR. BERNICK:  Your Honor, if I can just raise a point

16 of process -- and excuse me, Mr. Cohn.  I -- there is very bad

17 weather that's coming through, and I'm very concerned that -- I

18 don't know if any of the others are concerned, that the flights

19 are, you know, we've got to get out to the airport.  And with

20 due respect to Mr. Cohn, if he wants to file a motion on this

21 subject, you know, I'm happy to accommodate whatever schedule

22 is appropriate.  I don't know -- if it's a motion directed

23 against Grace, that's certainly true.  If it's a motion that

24 would require relief from others, and I suspect that it will,

25 then he's going to have to be in contact with those folks.  I

1 can't agree.  But Grace would be agreeable to an expedited

2 schedule if he wants to tee up this issue with respect to

3 Grace.

4          And I will say in advance our position will be we

5 can't breach the orders that Your Honor has entered, but there

6 is no motion that's pending before the Court today.  I think

7 Your Honor has provided us with a certain amount of guidance.

8 We'll sit down with Mr. Cohn and see how much we can agree to

9 so we can get that process going, and then if there's a further

10 motion that Mr. Cohn wants to make, we're happy to have that

11 heard.  But I think that at this point we're kind of off into a

12 world of process that we are not going to be able to resolve

13 today, and the hour, respectfully, Mr. Cohn, is late.  I know

14 that we've circulated -- we've given a copy of our protective

15 order marked up to the insurers.  We hope to get that resolved.

16 And it may be that that's really what we can focus on today, if

17 Mr. Cohn is okay with that.

18          THE COURT:  Well, that, plus I think the additional

19 information that you had requested form the Rust database I

20 think that -- wasn't there something extra on the one from --

21 you had agreed to something in addition, I think, with Mr.

22 Cohn.

23          MR. BERNICK:  We're prepared on the Rust database --

24          THE COURT:  Fine.

25          MR. BERNICK:  -- to go forward on the Rust database.

1          THE COURT:  That's fine.

2          MR. BERNICK:  -- with the same carve out.  That's the

3    -- there's no issue with respect to that.  I mean, that's why I

4    had thought that if we got this resolved we can go forward and

5    give him the Rust database.

6          THE COURT:  All right.  That's fine.

7          MR. MONACO:  Your Honor, this is Frank Monaco.  May I

8    be heard on this matter?

9          THE COURT:  Yes, sir.

10          MR. MONACO:  Thank you, Your Honor.  For the record,

11   Frank Monaco for the State of Montana.  Your Honor, we filed a

12   joinder to the Arrowood motion, and since we're on the Libby

13   claimants' order as well, I think this is the appropriate time

14   for me to speak up.

15          THE COURT:  Mr. Monaco, are you on a speaker phone?

16          MR. MONACO:  No, Your Honor.

17          THE COURT:  Okay.  I'm sorry.  You're just going in

18   and out.  Maybe it's the weather.  Go ahead.  I'm sorry.

19          MR. MONACO:  Okay.  I'll try to speak up.  Is that

20   better?

21          THE COURT:  Yes, sir.

22          MR. MONACO:  Okay.  Thank you.  Your Honor, as you

23   are well aware, we have asserted contribution indemnification

24   claims against the estate, and have filed disclosure statement

25   objections based on those claims, and intend to file plan

1  objections, as well.  We have requested on an informal basis

2  the information and documents from the debtor for months that

3  is similar to that requested by the insurers and the Libby

4  claimants.  We requested this information months ago and were

5  told by the debtors that they will get around to it, that

6  they're busy, and for whatever reason we haven't seen it yet.

7          Now that we are proceeding down the confirmation

8  trail we really need to have this information to formulate our

9  objections and to otherwise protect our interests in this case.

10 Your Honor, the State of Montana is willing to enter into the

11 confidentiality stipulations and consent orders that are

12 similar to those that are proposed today for the insurers and

13 the Libby claimants.  We see no prejudice to the debtor or any

14 other party since we're really just piggy-backing on what the

15 other orders state and request the same or similar information

16 be provided to us.  And, Your Honor, we would request that the

17 Court direct the debtors to enter into a similar order with us,

18 and we would be more than willing to work with the debtors to

19 fashion appropriate confidentiality stipulations and consent

20 orders.

21         MR. BERNICK:  Yes.  I -- Your Honor, this is a non-

22 issue from our point of view.  I'm not sure what Mr. Monaco is

23 referring to with all these efforts over many months, but I

24 don't think it's really particularly germane at this point.

25 There are obviously issues that we have faced in trying to get

1  agreement from people.  We've now gotten the agreement, and if

2  the State of Montana wants to get the same information that the

3  insurers are getting subject to the same limitations, we don't

4  have a problem with that.  With respect to the Libby claimants,

5  I'm now told that the Rust database may present additional

6  issues, and so I think the bottom line on the Libby claimants

7  is that we're going to have to have some dialogue with Mr. Cohn

8  and his clients to see what agreement we can reach, and that's

9  just because we're learning that the -- that there are features

10 of the Rust database that may not be agreed to.  And I -- you

11 know, in the interest of time, again, I just think we're going

12 to take a little bit more -- we're going to need a little bit

13 more time to work that out.  We will continue to work on an

14 expedited basis.  I'm sure Ms. Ramsey and others will be as

15 accommodating procedurally as they've been in the past, but I

16 don't know that we're really going to resolve any of these

17 issues today.

18           THE COURT:  Ms. Ramsey?

19           MS. RAMSEY:  Your Honor, and I share Mr. Bernick's

20 concern about the time and travel, but I do want to put on the

21 record there is no pending motion.  We became aware of the

22 Libby claimants' request because of our on-going discussions

23 with the debtor.  But with respect to the Libby claimants'

24 request, a fair amount of the information that was provided

25 with respect to the questionnaires was provided after

1  significant litigation and only after this Court entered orders

2  that restricted the use of that information to estimation very

3  clearly, and that was -- a big concern of the claimants was

4  that it not be used for any other purpose, and we are very

5  concerned about slippage with respect to the circumstances

6  under which the claimants provided that information.  And so,

7  this is an important issue.  It's not something that we can

8  sort of casually or quickly address.  And with respect to the

9  Rust database, that database will include information such as

10 who the witnesses were that were identified by the claimants.

11 That's information from which you could go back to identify a

12 claimant, and that probably would require such redaction and

13 time that it would not be feasible.

14        So, I do think that with respect to the Rust database

15 it's a much more complicated issue.  With respect to what we

16 have agreed to for the insurers we are agreeable to having the

17 Libby claimants and the State of Montana both have that same

18 access under a protective order.  Thank you.

19        THE COURT:  All right.  Look, I have some time on

20 Wednesday, this Wednesday, December 17th, at -- I have an hour,

21 exactly, probably exactly about an hour, at 2:30 in the

22 afternoon.  Why don't I simply continue this issue to Wednesday

23 at 2:30 by phone?

24        MR. BERNICK:  Okay.  That's fine.

25        THE COURT:  And see what you folks can work out

1   between now and Wednesday at 2:30 so you can all leave.  If you

2   get the insurer issue resolved you can submit that order on a

3   certification of counsel.  I think you've got those issues --

4   it sounds as though you've got the issues that you agreed upon

5   resolved.  Simply make it clear that this is without prejudice

6   to additional requests by the insurers in formal discovery,

7   that is in formal, two words, formal discovery.  And as to the

8   Libby claimants, if you get it resolved, the same thing.  If I

9   get a C.O.C. before noon on Wednesday as to both of these

10  matters, I don't need a call -- if I don't, this matter, both

11  matters, the discovery issue, the confidentiality issues

12  continue until Wednesday, December 17th at 2:30.  I will alert

13  Court Call that anybody who calls in may do so because you're

14  not going to have time to comply with the case management

15  order.  So, call in.  It's only by phone.  Anybody who wants to

16  participate may do so.  I'll set it up with Court Call, and

17  that's the only way I'll have to be able to address this so

18  that you can all go.  Mr. Esserman has somehow or other not

19  worked his magic, and it appears that we do not have a bright,

20  sunny day here in Pittsburgh today, so --

21          MS. COBB:  Your Honor, I apologize.  We'll be two

22  minutes.  It's a housekeeping matter relating to the

23  outstanding disclosure statement issues.  You may recall last

24  time around that we kicked dates for Scotts and the insurers

25  because of those continuing issues, and it seems to make some

1  sense to kick our dates to still keep the final plan objection

2  date, the trial brief, everything relevant to make sure we're

3  still hitting April, but kick the dates to just seven days

4  after the hearing on the 14th so that we're not objecting

5  before we have the hearing.  The hearing may resolve those

6  objections.

7           MR. BERNICK:  Which hearing on the --

8           MS. COBB:  The hearing on the 13th and 14th.

9           MR. BERNICK:  Absolutely not.  We already made

10  accommodations for this in the order.  It seems to me that this

11  -- if they really want to raise this yet again -- Ms.

12  DeCristofaro wants to raise it again --

13          THE COURT:  Why don't we take this up -- you folks

14  talk --

15          MS. COBB:  Okay.

16          MR. BERNICK:  Yes.

17          THE COURT:  -- we'll take it up on Wednesday so you

18  can all leave.  I'm a little concerned about your ability to

19  get out of here, so --

20          MR. BERNICK:  Thank you very much, Your Honor.

21          THE COURT:  Okay.

22          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25          THE COURT:  Mr. Cohn, I hope that's okay.


                    **J&J COURT TRANSCRIBERS, INC.**

1

\* \* \* \* \*

## C E R T I F I C A T I O N

We, ELAINE HOWELL and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Elaine Howell
ELAINE HOWELL



/s/ Tammy DeRisi                    Date:  December 23, 2008
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**