IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| Debtor. | * | Case No. 01-01139 (JKF) (Jointly Administered) |
| . | * | Related Docket Nos. 19579, 20204 |

----------------------------------------------------------x

## PRELIMINARY OBJECTIONS OF CNA COMPANIES TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION

Continental Casualty Company and Continental Insurance Company, on their behalf and on behalf of their predecessor companies, affiliates and subsidiaries which issued insurance policies to the Debtors (individually or collectively "CNA"), as insurer and creditor of the Debtors, hereby submits its preliminary objections to the First Amended Joint Plan of Reorganization, as amended, (the "Plan") [Docket No. 19579], jointly submitted by the Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Equity Security Holders and the Asbestos PI Future Claimants' Representative (collectively, the "Plan Proponents").[1] These objections are submitted pursuant to the Initial Case Management Order Related To First Amended Joint Plan of Reorganization [Docket No. 20204] (the "CMO"), are preliminary and summary in nature and are without prejudice to CNA's rights to submit Final Plan Objections (as contemplated by the CMO), whether or not such Final Plan Objections are

_____

[1]   Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

within the scope of these preliminary objections, and to present evidence and arguments in support of the Final Plan Objections.

## INTRODUCTION

CNA is a creditor of the Debtors by way of claims for reimbursement, contribution and indemnity and possible premium adjustments related to those claims. CNA is also a creditor by virtue of its claims for retrospective premiums, deductible reimbursements and related charges owing under various loss-sensitive programs of insurance.

CNA is also an Asbestos Insurance Entity that issued insurance policies to the Debtors, as detailed in Exhibit 5 to the Plan (the "CNA Policies"). CNA has entered into several settlements with the Debtors and CNA is a Settled Asbestos Insurance Company with respect to some of those Agreements.[2] CNA is party to pending coverage litigation with the Debtors and others, as discussed in Section 2.10.2.2 of the Disclosure Statement. Because the Plan diminishes CNA's property (its rights to recoveries from the Debtors), may increase CNA's burdens (enforcing its obligations while abrogating the Debtors') and impairs its rights (in the many ways detailed below), the Plan is not "insurance neutral" as to CNA. In re Combustion Engineering, Inc., 391 F. 3d 190, 218 (3d Cir. 2004). The lack of insurance neutrality, improper treatment of CNA under the Plan and other defects in the Plan and Plan Documents prevent satisfaction of the confirmation requirements of Section 1129 of the Bankruptcy Code.

With regard to the workers compensation portion of its program, most of CNA's potential issues are resolved by the decision to treat CNA's workers compensation-

---

[2]    CNA believes that Exhibit 5 does not properly reflect all of its Asbestos Insurance Settlement Agreements that qualify it as a Settled Asbestos Insurance Company.

2

related claims as unimpaired. See Plan, ¶ 3.14. However, the Plan contains certain other provisions that might arguably be considered inconsistent with CNA's non-impaired status. These provisions must be amended or clarified in order for the Plan to be confirmed.

- **THE PLAN IS NOT INSURANCE NEUTRAL AS TO CNA**

1.      Section 7.15 of the Plan purports to make the Plan "insurance neutral." Specifically, pursuant to Section 7.15, "notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents," nothing in the Plan "shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect." Notwithstanding this language in Section 7.15, however, other provisions in the Plan - including Section 7.15 itself - do in fact operate to impair CNA's rights under the insurance policies it issued to the Debtors.

(a)      The Plan provides for the transfer of all Asbestos Insurance Rights by the Insurance Contributors to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement. Plan, Section 7.2.2(d). However, Asbestos Insurer Coverage Defenses, which are supposedly preserved by the Plan in order to afford insurance neutrality (Plan, Section 7.15(f)), "do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code, or (ii) the transfer of Asbestos Insurance Rights . . . is prohibited by any Asbestos Insurance Policy, any Asbestos Insurance Settlement Agreement, any Asbestos In-Place Insurance Coverage or applicable non-bankruptcy law." Plan, Definition 15.

3

(b)     CNA's Asbestos Insurance Policies provide that assignments made without CNA's consent will not bind CNA. This restriction on assignment is typically stated as follows: "Assignment of interest under this policy shall not bind the Company [CNA] until its consent is endorsed hereon." Policy for period 6/30/73 – 6/30/76. The restriction on assignment is central to the risks CNA contracted to assume under the policies, is enforceable under applicable state law, is not eliminated or pre-empted by the Bankruptcy Code, and its breach gives rise to a coverage defense no different and certainly no less important than any other coverage defense. By eliminating this defense, the Plan impairs CNA's rights under its policies and applicable state law, thereby making the Plan non-insurance neutral.

(c)     Section 7.15, when read in conjunction with Sections 7.13 and 8.1.1 of the Plan, also creates confusion as to whether, by virtue of the transfer of Asbestos Insurance Rights to the Asbestos PI Trust, the Debtors and the Trust are relieved of the duties and obligations of the insured under the policies (including, among other things, the duties to provide notice of accidents, occurrences, and claims to CNA, the duty to cooperate with CNA in the defense of claims, and the duty to not settle claims made against the insured or otherwise make voluntary payments without CNA's consent). At Section 7.7(tt) and Section 7.7(uu), the Plan requires the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished or reduced by the discharge of the Debtors from Asbestos Insurance Claims and the assumption of those claims by the Asbestos PI Trust, and that the Asbestos Insurance Transfer Agreement is binding "notwithstanding any anti-assignment provision . . . ." While the duties and obligations of the insurers are decreed to be undiminished, nowhere does the Plan

4

expressly state that the Debtors' obligations under the Asbestos Insurance Policies remain

undiminished and/or are transferred to the Asbestos PI Trust. Sections 7.13 and 8.1.1 of

the Plan state that, except as otherwise provided in the Plan, any obligations of the

Debtors that are not specifically retained are eliminated. CNA presumes that Section

7.15 (dealing with insurance neutrality) trumps Sections 7.1 and 8.1.1 with respect to

elimination of the Debtors' obligations under the policies, because Section 7.15 provides

that it applies "notwithstanding anything to the contrary" in the Plan. CNA also

presumes that unless all obligations and conditions have been satisfied under the policies

(including the obligations and duties specified above), the Trust would have no "right" to

recovery of proceeds, and therefore, again, the Plan cannot be read to eliminate the duties

and obligations of the Debtors under the Policies. Nonetheless, to the extent that Section

7.15 does not trump Sections 7.1.3 and 8.1.1 of the Plan in this respect, the Plan would

clearly impair CNA's rights under its policies, including its rights to defend against

claims based on the Debtors' failure to comply with its obligations under the policies

(including the obligations to cooperate, to give notice of claims, accidents and

occurrences, and to not settle any claims without CNA's consent).

        (d)      The Plan must be clear that CNA retains all its rights under the

Policies and that the insured (and the Trust) retain all of the obligations under the

Policies. This is crucial, because the Plan eliminates the rights insurers have under their

policies to defend and resolve claims on behalf of the Debtors in the state tort law system,

and instead gives the Trustees of the Asbestos PI Trust sole responsibility for resolving

Asbestos PI Claims, based upon Trust Distribution Procedures ("TDP") that were drafted

without any input from CNA and without its consent, and without involving CNA in the

litigation or settlement process with respect to any individual Asbestos PI Claim. Indeed, under Section 7.6 of the TDP, the Trustees can waive *any* defense, once a claim enters the state tort system, and under Section 5.7(a)(2), a claim can be paid even if it would not be payable in the state tort system. Moreover, the terms of the TDP can be unilaterally modified by the Trustees and by the Trust Advisory Committee ("TAC") without any involvement of the insurers. To the extent that the Plan eliminates CNA's rights to defend coverage litigation with the Trust on the grounds that these procedures violate the insured's duties under the Policies, then the Plan is not insurance neutral.

(e)     The Plan also excludes from Asbestos Insurer Coverage Defenses any defense that the Plan and the Plan Documents do not comply with the Bankruptcy Code. It is unclear what this provision means, but CNA is concerned that it could create a potential weapon for use by creative counsel for the Asbestos PI Trust in any subsequent coverage litigation. For instance, since Plan Confirmation requires the Court to find that the Plan was proposed in good faith, counsel for the Trust might argue in subsequent Asbestos Insurance Actions that elimination of any defense that the Plan does not comply with the Bankruptcy Code means that both the terms of the Plan and the TDP that were negotiated without any insurer input or consent represent a reasonable valuation of the Asbestos PI Claims, either individually or as a group, or that resolution of such claims without the insurer's involvement is itself reasonable and/or appropriate. This provision (eliminating any defense based upon the failure of the Plan to comply with the Bankruptcy Code) could also potentially be used by Trust counsel to argue that this Court has in fact valued, as part of the estimation process or the Plan Confirmation process, the loss that was experienced by the Debtors in connection with Asbestos PI Claims, thereby

6

triggering or accelerating any obligations of any Asbestos Insurance Entity under any Asbestos Insurance Policy. The exception to Asbestos Insurer Coverage Defenses that the Plan or Plan Documents do not comply with the Bankruptcy Code should therefore be eliminated, or at least the Plan should make clear that it does not give rise to the circumstances discussed above.

The risks to CNA from the situation described above are enormous because the Asbestos PI Trust has no incentive to challenge or litigate unmeritorious claims to contain liability to the minimum. Rather, because asbestos plaintiffs' lawyers control the Asbestos PI Trust, the Trust will be motivated to allow and pay claims to the maximum extent possible and then seek to recover the potentially inflated amounts from the insurers.

2.      Section 7.15 of the Plan contains another possible violation of insurer neutrality by setting out principles of claim preclusion that could differ from those that would ordinarily be applicable in coverage litigation. The Plan provides that "otherwise applicable principles of res judicata or collateral estoppel" will be applied against Asbestos Insurance Entities with respect to any issue that is actually litigated by Asbestos Insurance Entities as part of objections to confirmation of the Plan. See Plan § 7.15(e). The provision in the Plan relating to res judicata or collateral estoppel creates uncertainty about whether the Plan would be engrafting some new claims preclusion principles over and above those that might otherwise be applied by a court adjudicating a coverage dispute. Moreover, since it is the court in a subsequent action that properly considers and decides whether and to what extent to apply such preclusive doctrines, it is not clear whether the Plan envisions that this Court would attempt to dictate the rulings of the

7

court in the later action (which CNA contends would exceed the scope of this Court's subject matter jurisdiction, authority, and discretion).

• **THE PLAN DOES NOT SATISFY THE REQUIREMENTS FOR CONFIRMATION OR FOR ISSUANCE OF A §524 (g) INJUNCTION**

3.     Confirmation of the Plan is governed by Section 1129 of the Bankruptcy Code. Section 1129(a) contains a list of mandatory requirements for confirmation and the Plan fails to satisfy these requirements in several respects. Sections 1129(a)(1) and (3) of the Code provide as follows:

*The court shall confirm a plan only if all of the following requirements are met:*

*(1) The plan complies with the applicable provisions of this title . . .*

*(3) The plan has been proposed in good faith and not by any means forbidden by law.*

4.     The proposed assignment of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement violates Sections 1129(a)(1) and (3) because the assignment is prohibited by applicable non-bankruptcy law and is not authorized by the Bankruptcy Code.

          (a)     While there are circumstances where the proceeds of an insurance policy can be assigned, the Plan does not purport to assign only insurance proceeds. To the contrary, the Plan embodies an assignment of *all* the insured's rights under the Asbestos Insurance Policies.[3]  The definition of Asbestos Insurance Rights includes Asbestos Insurance Actions within the scope of the assigned rights. Plan, Definition 12. Asbestos Insurance Actions include claims for failure to provide coverage or pay claims.

---

[3]     The Third Circuit's treatment of the assignment of a debtor's rights to insurance proceeds is not clear and is the subject of appeal in the Federal Mogul case as discussed in ¶4(d) below. See In re Combustion Engineering, Inc., 391 F.3d 190, 206, 216, 218 (3d Cir. 2004).

8

Plan, Definition 8. The two definitions are comprehensive and are by no means limited to "proceeds." Consequently, the Plan effectively purports to transfer the Asbestos Insurance Policies to the Asbestos PI Trust.

      (b)    As noted above, the assignment of any interest or rights under CNA's Asbestos Insurance Policies is prohibited by each such policy without CNA's consent. The Asbestos Insurance Policies are property of the Debtors' estates, having been transferred automatically pursuant to Section 541 of the Bankruptcy Code. Nonetheless, determination of the rights of the Debtors, the other Insurance Contributors and the Asbestos Insurance Entities in those policies is a matter of applicable state law. Butner v. United States, 440 U.S. 48, 54-55 (1979). The restriction on assignment will be enforced under the applicable governing law (in this case, New York law), as applied in the coverage action pending in the Southern District of New York federal district court entitled Continental Casualty Company v. W. R. Grace & Co., No. 00-4524 (S.D.N.Y. filed June 19, 2000).

      (d)    While this Court has ruled that insurance policies can be assigned "once an event occurs that gives rise to the insurer's liability under the policy," that ruling is the subject a pending appeal, and CNA respectfully submits that such ruling does not accurately reflect the applicable law. In re Federal-Mogul Inc., 385 B.R. 560, 567 (Bankr. D. Del. 2008), appeal docketed, No. 08-00229 (D. Del. Apr. 22, 2008). Nothing in New York law permits an assignment of an insurance policy because an event has occurred that *may* result in a loss. The New York law that enforces restrictions on assignment of an insurance policy is not pre-empted by the Bankruptcy Code and remains effective to prevent the proposed transfer of Asbestos Insurance Rights.

9

5.     The proposed assignment of Asbestos Insurance Rights pursuant to the
Asbestos Insurance Transfer Agreement also violates Sections 1129(a)(1) and (3) to the
extent it imposes on non-Debtor parties, the Asbestos Insurance Entities, modifications of
contract rights that are not authorized by the Bankruptcy Code and that violate applicable
state law.

(a)     The Plan transfers the rights of the Insurance Contributors under
the Policies to the Asbestos PI Trust. However, as noted above, it is not clear that the
attendant obligations of the Insurance Contributors remain with the Contributors or are
also transferred. Nothing in the Bankruptcy Code or in applicable state law permits a
unilateral modification of contract rights. If a contract is transferred (assuming that
transfer is permitted), the contract must remain intact with the rights and obligations of
neither side altered.

(b)     In addition, the Plan has not been proposed in good faith because
the TDP has not been entered into in good faith, and is subject to abuse. The TDP was
adopted without any input from, or any consent by, CNA. Regardless of whether the
medical, exposure and other criteria would, if considered in isolation, be deemed
reasonable, these standards will be enforced by the Trustees who are controlled by the
TAC (composed of asbestos personal injury lawyers), and therefore the Trustees will
have no incentive to reject unmeritorious claims or seek to contest potentially
unmeritorious claims. To the contrary, the incentive will be to pay *all* claims, so that the
TAC attorneys can get contingency fees and so that suits can be brought against insurers
to recover on these inflated recoveries. In this regard, the TDP allows payment of certain
claims that would certainly not be payable under the policies under any circumstances,

10

including medical monitoring claims. Moreover, the TDP specifically provides that a claimant can recover, notwithstanding that such claimant has lost in the state tort system. The bad faith characteristics of the TDP accordingly result in the failure of the Plan to satisfy Section 1129(a)(3).

6.     The Plan also violates Section 1129(a)(1) of the Bankruptcy Code because it fails to comply with the following requirements contained in Section1123(a)(4):

*Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall— (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.*

(a)     Indirect PI Trust Claims are included within the definition of Asbestos PI Claim and thus are included within Class 6 of the Plan. However, the Plan does not provide the same treatment for Indirect PI Trust Claims as for "direct" Asbestos PI Claims. Indirect PI Trust Claimants must establish more than a right to payment under state law, since they must prove that they paid a liability that would otherwise be payable by the Trust. Under applicable state law, CNA could pursue a cross-claim or a claim for contribution under a statute that provided for shared liability among joint tortfeasors without first paying the plaintiff. While a "direct" claimant can be paid based on its rights under state law, an Indirect PI Trust Claimant cannot in all cases be paid just based on its rights. Direct Class 6 claims can be paid directly "on the date their liquidation becomes final." TDP, Section 5.1(c). Indirect PI Trust Claims, however, cannot have their "liquidation" determined as part of the determination of the Trust's liability to the "direct" claimant as they could under state law.

(b)     In addition, the TDP provides that Indirect PI Trust claims be processed in accordance with procedures "to be developed and implemented by the

11

Trustees" in order to determine the validity, allowability and enforceability of such claims, and the liquidation and payment of such claims. See TDP, Section 5.6. Thus, it is unclear whether Indirect PI Trust claims will be treated in the same manner as direct PI Trust claims (either procedurally or substantively) and whether they will be subject to equivalent payments as direct PI claims. In this regard, it is noteworthy that the TAC, which has overall authority for modifications to the TDP, is composed of asbestos plaintiffs' attorneys, who would not have in mind the interests of Indirect PI Claimants.

(c)     It is also not clear that all rights to payment that CNA may have by virtue of its Indirect PI Claims will be entitled to resolution and payment by the Asbestos PI Trust. Due to various settlements that have been reached between CNA and the Debtors, CNA may have rights to indemnity due to direct actions that may be brought against CNA by Asbestos PI Claimants, Asbestos PD Claimants or non-asbestos claimants. Neither the provisions for resolution of Indirect PI Claims, nor any other terms of the Plan, provide for reimbursement to CNA of any liabilities that it may incur as a result of such claims.

- **THE PLAN LACKS ADEQUATE MEANS FOR IMPLEMENTATION**

7.     Section 1123(a)(5) of the Bankruptcy Code requires that a Plan contain adequate means for its implementation. 11 U.S.C. § 1123(a)(5). While the Bankruptcy Code provides a list of examples of "adequate means" for plan implementation, the list is not exhaustive. In re Lisanti Foods, Inc., 329 B.R. 491, 506 (D. N.J. 2005). Indeed, where a Debtor has significant asbestos-related liabilities, the injunction allowed under Section 524(g) of the Bankruptcy Code is considered a primary means for adequately implementing a plan of reorganization. See In re Armstrong World Indus., Inc., 348 B.R. 136, 156 (Bankr. D. Del. 2006).

12

(a)    Here, although one of the most significant aspects of the Plan is its provision for a channeling injunction under Section 524(g) of the Bankruptcy Code, the Plan and Disclosure Statement make clear that a non-settling insurance company that enters into a post-confirmation settlement agreement cannot obtain the benefits of the Section 524(g) injunction.[4]  Since the transfer of Asbestos Insurance Rights to the Trust is designed to partially fund the Trust's ability to pay Asbestos PI Claims, including Demands, it should be structured to permit the maximum potential recovery from Asbestos Insurance Entities.  If the Plan does not permit an insurance company that has not settled by the Confirmation Date to obtain the protection of the channeling injunction permitted by Section 524(g)(4)(A)(ii)(III), the likelihood of future settlements with insurance companies will be diminished, and in addition, insurance companies that do settle will not be willing to pay as much as they would if they were able to obtain the benefit of the Section 524(g) injunction.

(b)    In this respect, therefore, the Plan's failure to allow for post-confirmation settling insurance companies to gain the benefit of the channeling injunction results in the Plan lacking sufficient means for implementation. The Plan should both contain a mechanism for a non-settling insurance company that enters into a post-confirmation settlement agreement with the Debtors or the Asbestos PI Trust to obtain the protection of the Section 524(g) injunction and should provide that the Court will retain jurisdiction for this purpose. Unless the Plan is so modified, it is not capable of implementation and cannot be confirmed.

---

[4]    Definition 186 of the Plan defines "Settled Asbestos Insurance Company" to mean "any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement *prior to the conclusion of the Confirmation Hearing.*" (Emphasis added.)

13

8.    The Plan's failure to extend Section 524(g) injunctive protection to insurers that settle post-confirmation also violates Sections 1129(a)(1) and (2) since it involves a violation of the provisions of the Bankruptcy Code by the Plan and the Plan Proponents. The supplemental injunction that may issue under Section 524(g) is the province of the Court and not of the Plan Proponents. It is not limited in time as to when it can issue but it is instead limited by specific criteria that, as to an insurer, could as well be satisfied after confirmation as before. By usurping the judicial function to enter a supplemental injunction, the Plan and the Plan Proponents fail to satisfy the confirmation requirements of Section 1129.

9.    The Plan violates Section 1123(a)(5) in another respect. As noted above, pursuant to settlement agreements reached between CNA and the Debtors, CNA has rights to be indemnified with respect to costs and liabilities that it might incur with respect to claims in addition to Asbestos PI Claims, should direct actions be brought against it in connection with Asbestos PD Claims or any non-Asbestos Claims. CNA would also be entitled to any defense costs it would incur in connection with any such Claims. The Plan, however, does not make provision for payment of any such liabilities that CNA may incur. Moreover, such claims are not enjoined under the Asbestos Insurance Entity Injunction provided for by the Plan. Claims against CNA for which CNA has indemnity rights against the Debtors should be separately and specifically enjoined under Section 105 of the Bankruptcy Code. The failure to provide such injunctive protection is a failure to provide adequate means for the Plan's implementation and violates Section 1123(a)(5).

- **THE PLAN FAILS TO COMPLY WITH SECTION 524(g)**

14

10.     The Plan fails to comply with the clear requirements of Sections
524(g)(2)(B)(i)(II) and (III) that it be funded in whole or in part by securities of the
Debtors and by the obligations of the Debtors to make future payments, including
dividends, and that the Trust gain voting control of the Debtors on the occurrence of
specified contingencies.   This provision was designed to make available to asbestos
claimants the going concern value of the Debtors that was preserved by cabining future
asbestos claims in the Trust. Instead, the Plan provides only "out of the money warrants"
and a right to reach stock as collateral for a payment obligation. The immediate funding
by company stock is illusory, while the control right provides little protection. If the
Debtors cannot meet their payment obligation, then the value of the stock at such time is
likely to be minimal and it may be too late for control rights to be useful.

- **VARIOUS PROVISIONS OF THE PLAN AND THE TRUST
  AGREEMENT ARE UNLAWFUL**

11.     The Plan cannot satisfy the requirements of Sections 1129(a)(1) and (3)
for the additional reasons that various provisions of the Plan and the Trust Agreement are
unlawful.  Specifically:

> (a)     The plaintiffs' attorneys who will serve on the TAC will be unable
> to meet their fiduciary duties to deal impartially with the Trust
> beneficiaries due to their pre-existing and conflicting duties to their
> current asbestos claimants clients and their personal financial interests;
>
> (b)     The TAC members have conflicts of interests, and there is no
> evidence that their clients have expressly waived such conflicts; and
>
> (c)     The Trust Agreement's exculpation provision is impermissibly
> broad because it violates the rule against prospective waivers of
> malpractice claims, and it may also violate applicable state trust law.

15

The members of the TAC are all attorneys who currently represent numerous Asbestos PI Claimants. The TAC members owe fiduciary duties to all holders of Asbestos PI Claims, not just their existing clients. However, because the Trust beneficiaries are asserting competing claims against the Trust and its assets, the TAC members will have conflicting fiduciary duties to their clients and the other Trust beneficiaries, as well as conflicts that arise from their own personal financial interest in the distribution of Trust assets. For example, the TAC members will have no interest in assuring that insurers such as CNA obtain appropriate recovery for any Indirect PI Claims that they may hold.

- **CERTAIN PLAN PROVISIONS MUST BE AMENDED OR CLARIFIED IN ORDER TO ASSURE THAT CNA'S WORKERS COMPENSATION-RELATED CLAIMS REMAIN UNIMPAIRED**

12. The Plan provides that CNA's rights and claims under the workers compensation portion of its program remain unimpaired. *See* Plan, ¶¶ 1.1(207), 3.14. However, other Plan provisions are arguably inconsistent with non-impairment, or unclear as to how CNA's workers compensation-related rights and claims will be preserved. These provisions must be amended or clarified in order for the Plan to be confirmed.

13. As a preliminary matter, ¶ 3.14 contains a limitation on non-impairment:

> [f]or the avoidance of doubt, in no event shall any of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties have any liability with respect to any Workers Compensation Claim.

See Plan, ¶ 3.14(b). This provision ignores the fact that the Sealed Air and Fresenius entities are insured entities under various CNA policies and agreements, and have independent contractual obligations thereunder. To the extent it purports to limit or extinguish those separate contractual undertakings, the Plan cannot be confirmed. See 11 U.S.C. §§ 524(e), 1129(a)(1).

16

14.     In a similar vein, the Plan contains extraordinarily broad release and injunction provisions for the benefit of numerous non-debtor parties. See generally Plan, Article 8. Whatever the merits of these non-debtor releases, this provision should not and cannot be used to extinguish the independent contractual obligations and liabilities the released parties may owe to CNA. See 11 U.S.C. §§ 524(e), 1129(a)(1). To the extent it purports to modify or extinguish these independent obligations and liabilities, the Plan cannot be confirmed. Id.

15.     The Plan's discharge provisions do not expressly preserve or carve-out CNA's rights of setoff and recoupment under applicable non-bankruptcy law. In order for the Plan to be confirmed, those rights must be preserved, particularly with regard to the non-impaired portion of CNA's program. See 11 U.S.C. §§ 553, 1129(a)(1).

16.     The Plan is unclear as to whether the secured portion of CNA's claim will be resolved through payment of cash, surrender of collateral, or both. See generally Plan, ¶ 3.12(b). To the extent it impairs or interferes with CNA's right to retain and draw its collateral, the Plan is violative of applicable law and cannot be confirmed. See 11 U.S.C. § 1129(a)(1), (b)(2)(A).

17.     Finally, the Plan is unclear as to how and when the remaining obligations under the CNA insurance program will be paid. By treating the workers compensation obligations as unimpaired, the Plan suggests that these obligations will be paid as and when they come due. See Plan at ¶3.14(b). However, the Plan also provides that general unsecured claims are to be liquidated and paid in full, with interest. See Plan at ¶ 3.19(b). Because CNA's insurance program is loss sensitive, the amounts owing thereunder continue to develop over time, as claims are handled, settled, litigated and paid under the

17

program. It is therefore unclear whether CNA's corresponding deductible reimbursement claims are to be estimated and liquidated on the front end, or billed and paid over time. The proposed treatment of this portion of CNA's claim needs to be clarified, and CNA reserves the right to support or oppose either option.

## CONCLUSION

For the reasons set forth above, CNA respectfully requests that the Court not confirm the Plan, and provide such further relief as is just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

By:

Edward B. Rosenthal (*Bar No. 3131*)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
FACSIMILE: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Brian H. Mukherjee (*pro hac vice*)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
facsimile: (617) 523-1231

FORD MARRIN ESPOSITO WITMEYER
& GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
FACSIMILE: (212) 344-4294

WILDMAN, HARROLD, ALLEN &
DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662
FACSIMILE:  (312) 416-4524

*Counsel for Continental Casualty Company,*
*Transportation Insurance Company*
*and their American insurance affiliates*

Dated:  January 5, 2009

LIBA/1955350.6