# EXHIBIT K7

Merger Agreement (without attachments)

GRA 01550



STS AGREEMENT AND PLAN OF MERGER
dated
DECEMBER 21, 1992

PLAINTIFF'S
EXHIBIT

23
97-05135

KPOP 0040

STS AGREEMENT AND PLAN OF MERGER
dated
DECEMBER 21, 1992

## INDEX OF CLOSING DOCUMENTS

1.  STS Agreement and Plan of Merger dated December 21, 1992 among Grace Energy Corporation, Support Terminal Services, Inc., StanTrans, Inc., Standard Transpipe Corp. and Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

2.  Exhibits and Schedules to STS Agreement and Plan of Merger:

| | |
|---|---|
| Exhibit A - | Owned and Leased Real Property |
| Exhibit B - | Opinion of Counsel for GEC |
| Exhibit C - | Opinion of Kaneb General Counsel |
| Schedule 4.02(m) - | Inventory Custody Transfer |
| Schedule 5.02 - | Unaudited Consolidated Balance Sheet on a Legal Entity Basis as of November 30, 1992 |
| Schedule 6.01(b) - | Jurisdiction of Incorporation and Qualifications of Each Corporation |
| Schedule 6.03 - | Consents and Approvals |
| Schedule 6.04(a) - | Capitalization of Each Corporation |
| Schedule 6.05(a) - | Management Reports - Unaudited Balance Sheets as of 12/31/89-90-91 and Unaudited Income Statements for each of the three years ended 12/31/91 |
| Schedule 6.05(b) - | Management Reports - Unaudited Balance Sheets as of 11/30/91 and Unaudited Income Statements for each of the 11 months ended 11/30/91-92. |
| Schedule 6.05(c) - | Exceptions |
| Schedule 6.05(d) - | Reconciliation of 11/30/92 Legal Entity Balance Sheet to 11/30/92 Management Report |
| Schedule 6.06 - | Litigation |
| Schedule 6.07(a) - | Union Contracts |
| Schedule 6.07(b) - | Employment Agreements |
| Schedule 6.07(c) - | Labor Practices |
| Schedule 6.08 - | Insurance |
| Schedule 6.09 - | Contracts |
| Schedule 6.10 - | Employee Benefit Plans |
| Schedule 6.11 - | Environmental Matters |
| Schedule 6.12 - | Exceptions to Ordinary Course of Operations of Corporations |
| Schedule 6.13 - | Liens and Encumbrances |

KPOP 0041

**STS AGREEMENT AND PLAN OF MERGER**
dated
**DECEMBER 21, 1992**

## INDEX OF CLOSING DOCUMENTS

Schedule 6.14 -    Liabilities
Schedule 6.15 -    Trademarks & Tradenames; Intellectual Property
Schedule 6.16 -    Compliance with Applicable Law
Schedule 6.17 -    Customers
Schedule 6.19 -    Properties, Licenses & Permits
Schedule 6.22 -    Personal Property
Schedule 6.23 -    Audits and Claims
Schedule 14.05 -    Guaranteed Agreements

3.  Guaranty Agreement dated December 21, 1992 among W. R. Grace & Co.-Conn. and Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc., and NSTI, Inc.

4.  Employee Benefits Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Grace Energy Corporation, Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

5.  Tax Procedures Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

6.  Insurance Procedures Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

KPOP 0042

KPOP 0043



**STS AGREEMENT AND PLAN OF MERGER**

**KPOP 0044**

**TABLE OF CONTENTS**

**ARTICLE 1**

Definitions . . . . . . . . . . .   1

**ARTICLE 2**
STI Merger and STS Merger; Consideration . . . .  8
2.01     STV Merger . . . . . . . . . . . . . . . .  8
2.02     STP Merger . . . . . . . . . . . . . . . . 10
2.03     STI Merger . . . . . . . . . . . . . . . . 12
2.04     STS Merger . . . . . . . . . . . . . . . . 14
2.05     Consideration . . . . . . . . . . . . . . 16

**ARTICLE 3**
Closing Date; Termination . . . . . . . . 18
3.01     Scheduled Closing Date . . . . . . . . . . 18
3.02     Termination . . . . . . . . . . . . . . . 18

**ARTICLE 4**
Actions at Closing; Discharge of Certain Obligations;
        Further Assurances . . . . . . . . 19
4.01     Closing . . . . . . . . . . . . . . . . . 19
4.02     Actions at the Closing . . . . . . . . . . 19
4.03     Effectiveness of Closing . . . . . . . . . 21
4.04     Discharge    of    Certain    Intercompany
Liabilities. . . . . . . . . . . . . . . . . . . . 21
4.05     Further Assurances . . . . . . . . . . . . 22

**ARTICLE 5**
Adjustment of Purchase Price; Other Post-Closing
Adjustments . . . . . . . . . . . . . . . . . . . 22
5.01     Procedure . . . . . . . . . . . . . . . . 22
5.02     Preparation of Closing Statement . . . . . 22
5.03     Dispute Resolution . . . . . . . . . . . . 24
5.04     Fees and Expenses of Arbitrator . . . . . 24
5.05     Adjusting Payment . . . . . . . . . . . . 25
5.06     Transactions with Grace Entities . . . . . 26

**ARTICLE 6**
Representations and Warranties by GEC . . . . . 26
6.01     Incorporation . . . . . . . . . . . . . . 27
6.02     Authorization . . . . . . . . . . . . . . 27
6.03     No Conflict or Consents . . . . . . . . . 28
6.04     Capitalization . . . . . . . . . . . . . . 29
6.05     Financial Statements . . . . . . . . . . . 29
6.06     Litigation and Claims . . . . . . . . . . 31
6.07     Labor and Employment . . . . . . . . . . . 31
6.08     Insurance . . . . . . . . . . . . . . . . 32
6.09     Contracts . . . . . . . . . . . . . . . . 32
6.10     Employees; Benefit Plans . . . . . . . . . 33
6.11     Environmental Compliance . . . . . . . . . 35
6.12     Operation in Ordinary Course . . . . . . . 35

i

KPOP 0045

| 6.13 | Absence of Liens and Encumbrances | 35 |
|------|-----------------------------------|-----|
| 6.14 | Liabilities | 36 |
| 6.15 | Trademarks and Tradenames; Intellectual Property | 36 |
| 6.16 | Compliance with Applicable Law | 37 |
| 6.17 | Customers | 37 |
| 6.18 | Real Property | 37 |
| 6.19 | Property, Licenses and Permits | 38 |
| 6.20 | Grace and Grace-Conn | 38 |
| 6.21 | Consents | 38 |
| 6.22 | Personal Property | 38 |
| 6.23 | Taxes | 38 |

**ARTICLE 7**
**Representations and Warranties by OLP** . . . . . 40

| 7.01 | Incorporation | 40 |
| 7.02 | Authorization | 40 |
| 7.03 | No Conflict | 41 |

**ARTICLE 8**
**Disclaimer of Additional and Implied Warranties** . . 41

| 8.01 | Investigation and Evaluation | 41 |
| 8.02 | Forecasts, Projections, etc | 43 |
| 8.03 | Effect of Contemplated Transactions | 43 |

**ARTICLE 9**
**Covenants of GEC and OLP** . . . . . 44

| 9.01 | Access and Inquiry | 44 |
| 9.02 | Hart-Scott-Rodino Act | 44 |
| 9.03 | Permits and Licenses | 45 |
| 9.04 | Notices to Third Parties | 45 |
| 9.05 | Material Adverse Effect | 45 |
| 9.06 | Reasonable Efforts | 46 |
| 9.07 | Tax Matters | 46 |

**ARTICLE 10**
**Conduct of Business Prior to the Closing** . . . . 47

| 10.01 | Operation in Ordinary Course | 47 |
| 10.02 | Disposition of Assets | 47 |
| 10.03 | Material Agreements | 47 |
| 10.04 | Business Organization and Customer Relations | 47 |
| 10.05 | Dividends | 48 |

**ARTICLE 11**
**Conditions Precedent to the Obligations of OLP** . . 48

| 11.01 | Accuracy of Representations and Warranties | 48 |
| 11.02 | Performance of Covenants and Agreements | 48 |
| 11.03 | Hart-Scott-Rodino Act | 48 |
| 11.04 | Permits, Consents, etc | 49 |
| 11.05 | Litigation | 49 |
| 11.06 | Certificate of GEC | 50 |
| 11.07 | Opinion of GEC's Counsel | 50 |

KPOP 0046

11.08    No Material Adverse Effect . . . . . . . . . .    50
11.09    Recorded Liens . . . . . . . . . . . . . . .    50
11.10    Financing . . . . . . . . . . . . . . . . .    51

ARTICLE 12
Conditions Precedent to the Obligations of GEC    51
12.01    Accuracy of Representations and Warranties . .    51
12.02    Performance of Covenants and Agreements . . .    51
12.03    Hart-Scott-Rodino Act . . . . . . . . . . .    51
12.04    Permits, Consents, etc . . . . . . . . . . .    52
12.05    Litigation . . . . . . . . . . . . . . . . .    52
12.06    Certificate of OLP . . . . . . . . . . . . .    53
12.07    Opinion of OLP's Counsel . . . . . . . . . .    53

ARTICLE 13
Indemnification; Survival of Representations . . .    53
13.01    Definitions . . . . . . . . . . . . . . . .    53
13.02    Indemnification by OLP . . . . . . . . . . .    54
13.03    Indemnification by GEC . . . . . . . . . . .    55
13.04    Limitations . . . . . . . . . . . . . . . .    56
13.05    Defense of Third Party Claims . . . . . . .    58
13.06    Consequential and Lost Profit Damages . . .    60
13.07    Indemnification Payments . . . . . . . . . .    60

ARTICLE 14
Cooperation in Various Matters . . . . . .    60
14.01    Mutual Cooperation . . . . . . . . . . . . .    60
14.02    Preservation of OLP's Files and Records . . .    61
14.03    Preservation of GEC's Files and Records . . .    61
14.04    Preparation of Reports, etc . . . . . . . .    62
14.05    Amendment of Guaranteed Agreements, etc . . .    62

ARTICLE 15
Expenses; Termination of Services;
Broker's Fees; Guaranty Agreement . . . . . .    63
15.01    Expenses . . . . . . . . . . . . . . . . . .    63
15.02    Termination of GEC Services . . . . . . . .    63
15.03    Broker's Fees . . . . . . . . . . . . . . .    64
15.04    Guaranty Agreement . . . . . . . . . . . . .    64

ARTICLE 16
Notices . . . . . . . . . . .    64
16.01    Procedure and Addresses . . . . . . . . . .    64
16.02    Change of Notice Address . . . . . . . . . .    65

ARTICLE 17
General . . . . . . . . .    65
17.01    Entire Agreement . . . . . . . . . . . . . .    65
17.02    No Other Representations, etc . . . . . . .    65
17.03    Headings . . . . . . . . . . . . . . . . . .    66
17.04    Governing Law . . . . . . . . . . . . . . .    66
17.05    Counterparts;    Telecopy    Execution    and

iii

|  | Delivery . . . . . . . . . . . . . . . . . . . | 66 |
| 17.06 | **Binding Agreement; Assignment** . . . . . . . . | 67 |
| 17.07 | **Amendment** . . . . . . . . . . . . . . . . . | 67 |
| 17.08 | **No Waiver** . . . . . . . . . . . . . . . . . | 67 |

| Exhibit A | List of Properties |
|---|---|
| Exhibit B | Opinion of Counsel for GEC |
| Exhibit C | Opinion of Counsel for OLP |
| | |
| Schedule 4.02(m) | Inventory Custody Transfer |
| Schedule 5.02 | November 30, 1992 Balance Sheet |
| Schedule 6.01(b) | Jurisdictions of incorporation and qualification of each Corporation |
| Schedule 6.03 | Consents and Approvals |
| Schedule 6.04(a) | Capitalization of each Corporation |
| Schedule 6.05 | Management Reports |
| Schedule 6.06 | Litigation |
| Schedule 6.07(a) | Union contracts |
| Schedule 6.07(b) | Employment agreements |
| Schedule 6.07(c) | Labor Practices |
| Schedule 6.08 | Insurance |
| Schedule 6.09 | Contracts |
| Schedule 6.10 | Employee benefit plans |
| Schedule 6.11 | Environmental matters |
| Schedule 6.12 | Exceptions to ordinary course operation of Corporations |
| Schedule 6.13 | Liens and encumbrances |
| Schedule 6.14 | Liabilities |
| Schedule 6.15 | Trademarks and Tradenames |
| Schedule 6.16 | Legal compliance |
| Schedule 6.17 | Customers |
| Schedule 6.19 | Properties, Licenses and Permits |
| Schedule 6.22 | Personal Property |
| Schedule 6.23 | Taxes |

iv

KPOP 0048

## STS AGREEMENT AND PLAN OF MERGER

STS AGREEMENT AND PLAN OF MERGER dated December 21, 1992 by and between GRACE ENERGY CORPORATION, a Delaware corporation having executive offices at Two Galleria Tower, Suite 1500, 13455 Noel Road, Dallas, Texas 75240-6681, SUPPORT TERMINAL SERVICES, INC., a Delaware corporation, STANTRANS, INC., a Delaware corporation, STANDARD TRANSPIPE CORP., a Delaware corporation, each having executive officers at 17304 Preston Road, Suite 1000, Dallas, Texas 75252, and KANEB PIPE LINE OPERATING PARTNERSHIP, L.P., a Delaware limited partnership, NSTS, INC., a Delaware corporation, and NSTI, INC., a Delaware corporation, each having executive offices at 2400 Lakeside Boulevard, Suite 600, Richardson, Texas 75082.

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### ARTICLE 1

### Definitions

As used in this Agreement, the following terms have the meanings set forth in this Article 1. All Article, Section, Exhibit and schedule numbers and references used herein refer to Articles and Sections of this Agreement and Exhibits and schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically described.

1.1 "Affiliate" or "affiliate" of a specified person or entity means any officer, director, employee or agent of, or person

KPOP 0049

2

or entity controlling, controlled by, or under common control with such specified person or entity.

1.2 "This Agreement" or "this Agreement" means this STS Agreement and Plan of Merger.

1.3 "Ancillary Agreements" means the following agreements:

     (a)  Employee Benefits Agreement;

     (b)  Tax Procedures Agreement; and

     (c)  Insurance Procedures Agreement.

1.4 "Arbitrator" has the meaning specified in Section 5.03(b).

1.5 "Closing" means the consummation of the transactions contemplated by this Agreement.

1.6 "Closing Date" means the date on which the Closing occurs.

1.7 "Closing Statement" has the meaning specified in Section 5.02.

1.8 "Code" has the meaning specified in Section 6.10.

1.9 "Commonly Controlled Entity" has the meaning specified in Section 6.10.

1.10 "Confidential Information Memorandum" and "Supplemental Information I" means the Confidential Information Memorandum and Supplemental Information I, each dated August 1992, prepared by Kidder, Peabody & Co. Incorporated regarding the sale of STS.

1.11 "Confidentiality Agreement" means the letter agreement dated September 21, 1992, between the General Partner and GEC and Grace regarding the keeping confidential of certain information furnished to the General Partner in connection with its evaluation of an acquisition of STS.

1.12 "Corporation Executives" has the meaning set forth in the first paragraph of Article 6 hereof.

1.13 "Corporations" means STS and the STS Subsidiaries.

1.14 "DGCL" means the General Corporation Law of the State of Delaware.

1.15 "DOJ" means the United States Department of Justice.

1.16 "Employee Benefits Agreement" means the Employee Benefits Agreement of even date herewith entered into between GEC and OLP relating to retirement, employee benefit and similar plans and programs for the Corporations' employees, and other personnel matters related to the Corporations.

1.17 "Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, which relates to or otherwise imposes liability, obligations, or standards with respect to pollution or the protection of the environment.

1.18 "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.19 "Estimated Purchase Price" has the meaning set forth in Section 4.02(h).

4

1.20 "Facilities" means the liquid storage facilities, pipelines, buildings and improvements owned or leased by the Corporations.

1.21 "FTC" means the Federal Trade Commission.

1.22 "GEC" means Grace Energy Corporation, a Delaware corporation.

1.23 "GEC Executives" has the meaning set forth in the first paragraph of Article 6 hereof.

1.24 "General Partner" means Kaneb Pipe Line Company, a Delaware corporation and the sole general partner of OLP.

1.25 "Governmental Authority" means the government of the United States of America, any state of the United States of America, or any political subdivision thereof, or any agency, board, bureau, department or commission of any of the foregoing.

1.26 "Grace" means W. R. Grace & Co., a New York corporation.

1.27 "Grace Accounting Principles" means the principles contained in Grace's Financial Accounting Policy Statements manual, which has been provided for review by OLP and Price Waterhouse, its independent public accountants.

1.28 "Grace-Conn." means W.R. Grace & Co.-Conn., a Connecticut corporation.

1.29 "Grace Entity" means Grace or any of its subsidiaries or affiliates, except for the Corporations.

5

1.30 "Guaranty Agreement" means the Guaranty Agreement of even date herewith by Grace-Conn. in favor of OLP and the OLP Corporations.

1.31 "HSR" or "HSR Act" means the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

1.32 "Insurance Procedures Agreement" means the Insurance Procedures Agreement of even date herewith between Grace, Grace-Conn., GEC and OLP regarding certain insurance matters.

1.33 "Legal Entity Balance Sheet" has the meaning specified in Section 5.02.

1.34 "LIBOR Based Rate" means (a) the London Interbank Offered Rate for three months published in The Wall Street Journal, Southwest Edition, for the date hereof, plus (b) 50 basis points.

1.35 "Material Adverse Effect" means a material adverse effect upon the business, financial condition or results of operations of the Corporations taken as a whole.

1.36 "NSTI" means NSTI, Inc., a Delaware corporation and a wholly owned subsidiary of OLP.

1.37 "NSTS" means NSTS, Inc., a Delaware corporation and a wholly owned subsidiary of OLP.

1.38 "OLP" means Kaneb Pipe Line Operating Partnership, L.P., a Delaware limited partnership.

1.39 "OLP Corporations" means NSTS and NSTI.

1.40 "Operations" means the liquid storage, pipeline and related operations presently conducted by the Corporations at the Facilities.

1.41 "Plan" has the meaning specified in Section 6.10.

1.42 "Properties" means the real property owned and leased by the Corporations, as described in Exhibit A.

1.43 "Purchase Price" means (i) $63,000,000 plus (ii) the Working Capital Amount less (iii) $100,000.

1.44 "Reasonable Efforts" shall mean the taking by a party of such action as would be in accordance with reasonable commercial practices as applied to the particular matter in question.

1.45 "Recorded Liens" has the meaning specified in Section 6.13.

1.46 "Scheduled Closing Date" has the meaning specified in Section 3.01.

1.47 "Shares" means the STI Shares, the STP Shares, the STS Shares and the STV Shares.

1.48 "STI" means StanTrans, Inc., a Delaware corporation and a wholly owned subsidiary of STS.

1.49 "STI Effective Time" has the meaning specified in Section 2.03(a).

1.50 "STI Merger" has the meaning specified in Section 2.03.

1.51 "STI Shares" means the issued and outstanding shares of capital stock of STI.

7

1.52 "STP Shares" means the issued and outstanding shares of capital stock of STP.

1.53 "STP" means Standard TransPipe Corp., a Delaware corporation and a wholly owned subsidiary of STS.

1.54 "STP Effective Time" has the meaning specified in Section 2.02(a).

1.55 "STP Merger" has the meaning specified in Section 2.02.

1.56 "STS" means Support Terminal Services, Inc., a Delaware corporation and a wholly owned subsidiary of GEC.

1.57 "STS Effective Time" has the meaning specified in Section 2.04(a).

1.58 "STS Merger" has the meaning specified in Section 2.04.

1.59 "STS Shares" means the issued and outstanding shares of capital stock of STS.

1.60 "STS Subsidiaries" means STI, STP and STV.

1.61 "STV" means Standard TransPipe (Virginia) Inc., a Virginia corporation and a wholly owned subsidiary of STP.

1.62 "STV Effective Time" has the meaning specified in Section 2.01(a).

1.63 "STV Merger" has the meaning specified in Section 2.01.

1.64 "STV Shares" means the issued and outstanding shares of capital stock of STV.

8

1.65 "Surviving Intercompany Accounts" has the meaning set forth in Section 5.06.

1.66 "Tax" means any federal, state, local, foreign or other governmental tax, levy, withholding, assessment or other similar governmental charge, including import duties, whether or not measured (in whole or in part) by or imposed upon income, and any interest, penalties, additions to tax and fines assessed on any such tax, levy, withholding, assessment, governmental charge or import duties.

1.67 "Tax Procedures Agreement" means the Tax Procedures Agreement of even date herewith between Grace, Grace-Conn., GEC, OLP and the OLP Corporations regarding certain tax matters.

1.68 "Tax Returns" has the meaning specified in Section 6.23(a).

1.69 "Working Capital Amount" has the meaning specified in Section 5.02.

## ARTICLE 2

## STI Merger and STS Merger: Consideration

2.01  STV Merger.  Upon the terms and subject to the conditions of this Agreement, STV shall merge with and into STP (the "STV Merger").

(a)  At the time the STV Merger becomes effective (the "STV Effective Time"):

(i)  STV shall be merged with and into STP and the separate existence of STV shall cease.

(ii) STP shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STP in effect at the STV Effective Time which shall remain unchanged and unaffected by the STV Merger.

(iv) The persons who are the directors of STP at the STV Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STP at the STV Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STP issued and outstanding immediately prior to the STV Effective Time, and all rights in respect thereof, shall be unaffected by the STV Merger.

(B) The shares of capital stock of STV issued and outstanding immediately prior to the STV Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

KPOP 0057

10

(b)  At the STV Effective Time the constituent corpora-
tions shall become a single corporation and STP shall continue to
exist as the surviving corporation and shall thereupon and there-
after possess all the rights, privileges, immunities and
franchises, as well of a public as of a private nature, and be
subject to all the liabilities and obligations of each of the
constituent corporations; all property, real, personal, and mixed,
belonging to each of the constituent corporations shall be vested
in STP without further act or deed and without any transfer or
assignment having occurred, and all debts due on whatever account,
and all other choses in action, and all and every other interest,
of or belonging to or due to each of the constituent corporations
shall thenceforth be taken and deemed to be vested in STP (not
pursuant to contract but by operation of law), without further act
or deed and without any transfer or assignment having occurred.

2.02  _STP Merger_.  Pursuant to Section 253 of the DGCL,
upon the terms and subject to the conditions of this Agreement,
immediately after the STV Effective Time, STP shall merge with and
into STS (the "STP Merger").

(a) At the time the STP Merger becomes effective (the
"STP Effective Time"):

(i)  STP shall be merged with and into STS and the
separate existence of STP shall cease.

(ii) STS shall be the surviving corporation, and shall
continue for all purposes whatsoever.

KPOP 0058

11

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STS in effect at the STP Effective Time which shall remain unchanged and unaffected by the STP Merger.

(iv) The persons who are the directors of STS at the STP Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STS at the STP Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STS issued and outstanding immediately prior to the STP Effective Time, and all rights in respect thereof, shall be unaffected by the STP Merger.

(B) The shares of capital stock of STP issued and outstanding immediately prior to the STP Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

(b)    At the STP Effective Time the constituent corporations shall become a single corporation and STS shall continue to exist as the surviving corporation and shall thereupon and there-

12

after - possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in STS without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in STS (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

2.03   STI Merger.   Upon the terms and subject to the conditions of this Agreement immediately after the STP Effective Time, STI shall merge with and into NSTI (the "STI Merger").

(a) At the time the STI Merger becomes effective (the "STI Effective Time"):

(i) STI shall be merged with and into NSTI and the separate existence of STI shall cease.

(ii) NSTI shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of NSTI in effect at the STI Effective Time which shall remain unchanged and unaffected by the Merger, except that Article 1 of the Certificate of

13

Incorporation of the surviving corporation shall be amended at the STI Effective Time to read as follows:

"The name of the Corporation is StanTrans, Inc."

(iv) The persons who are the directors of NSTI at the STI Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of NSTI at the STI Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of NSTI issued and outstanding immediately prior to the STI Effective Time, and all rights in respect thereof, shall be unaffected by the STI Merger.

(B) In lieu of and in exchange for the issued and outstanding shares of capital stock of STI held by STS immediately prior to the STI Effective Time, OLP shall pay to GEC consideration as set forth in Section 2.05.

(b) At the STI Effective Time the constituent corporations shall become a single corporation and NSTI shall continue to exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be

14

subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in NSTI without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in NSTI (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

(c) In the manner prescribed by Section 228 of the DGCL, STS as the sole stockholder of STI, and OLP as the sole stockholder of NSTI, hereby approve this Agreement as the agreement of merger for the STI Merger as required by Section 251(c) of the DGCL.

2.04    STS Merger.    Upon the terms and subject to the conditions of this Agreement, immediately after the STI Effective Time, STS shall merge with and into NSTS (the "STS Merger").

(a) At the time the STS Merger becomes effective (the "STS Effective Time"):

(i) STS shall be merged with and into NSTS and the separate existence of STS shall cease.

(ii) NSTS shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of NSTS in effect at the STS

Effective Time which shall remain unchanged and unaffected by the STS Merger, except that Article 1 of the Certificate of Incorporation of the surviving corporation shall be amended at the STS Effective Time to read as follows:

"The name of the Corporation is Support Terminal Services, Inc."

(iv) The persons who are the directors of NSTS at the STS Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of NSTS at the STS Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of NSTS issued and outstanding immediately prior to the STS Effective Time, and all rights in respect thereof, shall be unaffected by the STS Merger.

(B) In lieu of and in exchange for the issued and outstanding shares of capital stock of STS held by GEC immediately prior to the STS Effective Time, OLP shall pay to GEC consideration as set forth in Section 2.05.

(b)  At the STS Effective Time the constituent corporations shall become a single corporation and NSTS shall continue to

16

exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in NSTS without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in NSTS (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

(c)    In the manner prescribed by Section 228 of the DGCL, GEC as the sole stockholder of STS, and OLP as the sole stockholder of NSTS, hereby approve this Agreement as the agreement of merger for the STS Merger as required by Section 251(c) of the DGCL.

2.05    <u>Consideration</u>.    (a) Upon delivery of this Agreement, OLP has paid GEC a down payment of $2,500,000 (the "Down Payment") in immediately available United States funds to an account previously designated by GEC, and GEC hereby acknowledges receipt of such payment. If the Closing occurs in accordance with the terms and provisions hereof, the Down Payment plus interest at the LIBOR Based Rate for the number of days from and including the date hereof, to and excluding the Closing Date, shall be credited against what OLP owes to GEC at the Closing pursuant to Section

17

4.02(h).  If the condition contained in Section 11.10 has not been satisfied, and all the other conditions set forth in Article 11 have been satisfied or satisfaction thereof tendered, and OLP declines to close the transaction contemplated by this Agreement, then upon termination of this Agreement, notwithstanding any other term or provision hereof, GEC shall be entitled to retain the Down Payment (and any interest accrued thereon) in its entirety and OLP shall have no further liability under this Agreement or the Ancillary Agreements or any other documents or agreements related hereto or thereto except for breaches, if any, by OLP of its covenants and agreements set forth in this Agreement and Ancillary Agreements and any other documents or agreements related hereto or thereto.  If this Agreement is terminated other than in the circumstances described in the immediately preceding sentence, then GEC shall reimburse OLP for the Down Payment, with interest at the LIBOR Based Rate for the number of days from and including the date hereof to and excluding the date of reimbursement; provided that such right to reimbursement shall not affect any liability or obligation that OLP has to GEC as a result of any breach by OLP of the covenants and agreements contained in this Agreement.

(b)  In lieu of and in exchange for the STI Shares and the STS Shares, OLP shall pay to GEC the Purchase Price in the manner described in Section 4.02(h) and Article 5; provided that the payment for the STI Shares shall be deemed to be a payment to STS that was distributed to GEC.

KPOP 0065

18

## ARTICLE 3

## Closing Date; Termination

3.01    <u>Scheduled Closing Date</u>.  The "Scheduled Closing Date" shall be a date agreed upon by GEC and OLP in writing, which date shall be no later than the 30th business day following the fulfillment or waiver of the conditions set forth in Sections 11.03 and 12.03, unless GEC and OLP shall agree to a different Scheduled Closing Date in an amendment to this Agreement executed and delivered in accordance with Section 17.07.  For purposes of this Article, "business day" shall mean a day which is not a Saturday or Sunday, nor a day on which banks are generally closed in the City of Dallas.

3.02    <u>Termination</u>.    (a)    This Agreement may be terminated at any time prior to the Closing by mutual written agreement of the parties.

(b) If the conditions set forth in Sections 11.03 and 12.03 have not all been fulfilled or waived by the party entitled to waive such conditions on or before 60 days after the date hereof, unless the parties shall agree otherwise in an amendment to this Agreement executed and delivered in accordance with Section 17.07, then either GEC or OLP may terminate this Agreement by giving notice to the other, in the manner provided in Section 16.01, at any time prior to the fulfillment or waiver of all such conditions.

(c) If for any reason the Closing shall not have been consummated on or before the Scheduled Closing Date, either GEC or

19

OLP shall have the right to terminate this Agreement at any time thereafter by giving at least three days' advance notice of such termination to the other.

(d) The termination of this Agreement, whether in accordance with any of the preceding provisions of this Agreement or otherwise, shall not affect the rights of either GEC or OLP against the other for breach of any covenant or agreement contained in this Agreement; provided, however, that upon termination in accordance with the preceding provisions of this Section, the parties shall be released from any and all liability for breach of any of the representations and warranties contained in Article 6 or Article 7.

(e) OLP and GEC hereby agree that the provisions of this Section 3.02, Article 13 (as it relates to breach of covenants but not as it relates to breach of representations and warranties), and Sections 2.05(a), 15.01, 15.03 and 15.04 shall survive any termination of this Agreement.

### ARTICLE 4

#### Actions at Closing; Discharge of Certain Obligations; Further Assurances

4.01    Closing.    The Closing shall take place at 10:00 a.m. local time at the offices of Vinson & Elkins, L.L.P. at Dallas, Texas, or at such other time and place as the parties hereto shall agree in writing.

4.02    Actions at the Closing.    At the Closing the following actions shall take place in the order in which they appear below:

KPOP 0067

20

(a) GEC shall cause to be filed with the State Corporation Commission of Virginia the appropriate documents to effect the STV Merger.

(b) GEC shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of ownership and merger to effect the STP Merger pursuant to Section 253 of the DGCL.

(c) [This section is intentionally left blank.]

(d) GEC and OLP shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of merger to effect the STI Merger pursuant to Section 251 of the DGCL.

(e) STS shall deliver to OLP certificates representing the STI Shares, duly endorsed in blank or together with executed stock powers duly endorsed in blank.

(f) GEC and OLP shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of merger to effect the STS Merger pursuant to Section 251 of the DGCL.

(g) GEC shall deliver to OLP certificates representing the STS Shares, duly endorsed in blank or together with executed stock powers duly endorsed in blank.

(h) OLP shall deliver to GEC (i) $63,680,000, representing GEC's and OLP's estimate of the Purchase Price (the "Estimated Purchase Price"), minus (ii) the $2,500,000 down payment and interest thereon described in Section 2.05(a), in immediately

21

available United States funds by wire transfer to an account designated by GEC.

(i) [This section is intentionally left blank.]

(j) GEC shall deliver to OLP any minute books and stock transfer books and corporate seals of the Corporations that are not then in the possession of the Corporations.

(k) GEC shall deliver to OLP the certificate and opinion of counsel described in Sections 11.06 and 11.07.

(l) OLP shall deliver to GEC the certificate and opinion of counsel described in Sections 12.06 and 12.07.

(m) Transfer of custody of product inventory shall take place as provided in the schedule to this Section.

4.03    Effectiveness of Closing.  No action to be taken or delivery to be made at the Closing shall be effective until all of the actions to be taken and deliveries to be made at the Closing are complete; provided that the mergers described in Sections 4.02(a) through (f) shall take place in the order set forth in Section 4.02.

4.04    Discharge of Certain Intercompany Liabilities.
(a) Except for the Surviving Intercompany Accounts, any amounts owed by any Grace Entity to any Corporation, or by any Corporation to any Grace Entity, shall be deemed paid and discharged, effective upon the occurrence of the Closing, except as may be otherwise provided in the Ancillary Agreements.

(b)    All obligations of the Corporations to reimburse Grace for checks written by the Corporations in the ordinary course

KPOP 0069

22

of business prior to the Closing Date, and honored by Grace, shall be deemed paid and discharged, effective as of the Closing. All funds in the Corporation's depository accounts and imprest accounts on the Closing Date shall be the property of Grace, except for a disbursement account and an imprest payroll account to be opened by STS, each of which shall have a balance of $1,000.00 at the Closing and signatories designated by OLP.

4.05    <u>Further Assurances</u>. At any time and from time to time from and after the Closing, each of GEC and OLP shall, at the request of the other, take all such actions as the other shall reasonably request in order to fully carry out the transactions contemplated by this Agreement.

## ARTICLE 5

### <u>Adjustment of Purchase Price; Other Post-Closing Adjustments</u>

5.01    <u>Procedure</u>. As of the close of business on the Closing Date, representatives of GEC and OLP shall cooperate to close the books of the Corporations to the extent required to establish the Working Capital Amount as provided in Section 5.02 for the purpose of determining the Purchase Price. OLP shall make reasonably available to GEC the services of the Corporations' employees and shall provide GEC with reasonable access to facilities for such purposes. GEC and OLP each shall be permitted to have its representatives and advisors observe the closing of the books and the other actions to be taken pursuant to this Article.

5.02    <u>Preparation of Closing Statement</u>. As soon as practicable after the Closing Date, but in no event later than

thirty days after the closing of the books of the Corporation (subject to reasonable extension for unforeseen circumstances), GEC shall prepare and deliver to OLP a consolidated statement of working capital (the "Closing Statement") of the Corporations as of the close of business on the Closing Date, setting forth the Working Capital Amount.  The "Working Capital Amount" shall be equal to the dollar value of the consolidated current assets of the Corporations less the dollar value of the consolidated current liabilities of the Corporations, except that all cash accounts (other than petty cash and the accounts described in the exception to the second sentence of Section 4.04(b)) and those current assets and current liabilities which are to be discharged pursuant to Section 4.04, or retained or assumed by any Grace Entity as of the Closing Date in accordance with any of the Ancillary Agreements, shall be excluded from the calculation of the Working Capital Amount.  The Closing Statement shall be prepared on a going concern basis using the Grace Accounting Principles and the same levels of materiality, account classifications and procedures as used to prepare the unaudited consolidated balance sheet as of November 30, 1992 of the Corporations prepared on a legal entity basis (the "Legal Entity Balance Sheet"), a complete copy of which is attached to the schedule to this Section.  If OLP does not object to the Working Capital Amount shown on the Closing Statement, by written notice to GEC within 45 days after receipt by OLP of the Closing Statement, setting forth objections thereto in reasonable detail,

24

then the Working Capital Amount set forth on the Closing Statement shall be deemed conclusive and binding on the parties.

5.03   <u>Dispute Resolution</u>.  (a) If OLP does so object to the Working Capital Amount shown on the Closing Statement, then GEC and OLP shall promptly endeavor to agree upon the proper amount of the Working Capital Amount.

(b)  If a written agreement determining the Working Capital Amount has not been reached within 30 days after GEC's receipt of OLP's notice of objection to the Closing Statement, then either party may, by notice to the other, submit for determination to Ernst & Young (the "Arbitrator") what adjustments, if any, must be made in the Closing Statement in order for the Working Capital Amount to be determined in accordance with the provisions of this Agreement.   Any such determination by the Arbitrator shall be conclusive and binding on the parties.

5.04   <u>Fees and Expenses of Arbitrator</u>.  The fees and expenses of the Arbitrator shall be shared by GEC and OLP or borne by GEC or OLP as follows.  If the Working Capital Amount as determined by the Arbitrator is between the Working Capital Amounts proposed by GEC and OLP, respectively, then GEC and OLP shall each bear that portion of such fees and expenses equal to the total fees and expenses multiplied by a fraction, the numerator of which shall be the difference between the Working Capital Amount as determined by the Arbitrator and the Working Capital Amount as proposed by GEC and OLP, respectively, and the denominator of which shall be the difference between the Working Capital Amount as proposed by GEC

25

and the Working Capital Amount as proposed by OLP. If the Working Capital Amount as determined by the Arbitrator is not between the Working Capital Amounts proposed by GEC and OLP, respectively, then the party whose proposed Working Capital Amount differs most from the Working Capital Amount proposed by the Arbitrator shall bear all of the fees and expenses of the Arbitrator. Nothing herein shall be construed to (a) authorize or permit the Arbitrator to determine any question or matter whatever under or in connection with this Agreement except the determination of what adjustments, if any, must be made in the amounts set forth on the Closing Statement delivered by GEC in order for the Working Capital Amount to be determined in accordance with the provisions of this Agreement, or (b) require the Arbitrator to follow the rules or procedures of the American Arbitration Association.

5.05 <u>Adjusting Payment</u>. Promptly after determination of the Working Capital Amount, whether by notice without objection as provided in Section 5.02, by written agreement between GEC and OLP as provided in Section 5.03(a), or pursuant to the dispute resolution procedures described in Section 5.03(b), an adjusting payment shall be made by GEC to OLP or by OLP to GEC in accordance with this Section. If the Purchase Price exceeds the Estimated Purchase Price, then OLP shall promptly pay to GEC an amount equal to such excess in immediately available funds. If the Estimated Purchase Price exceeds the Purchase Price, then GEC shall promptly pay to OLP an amount equal to such excess in immediately available funds. If the adjusting payment made pursuant to this Section 5.05

exceeds $100,000, the payor under this Section 5.05 shall, at the same time such adjusting payment is made, pay interest to payee under this Section 5.05 at the LIBOR Based Rate for the number of days from and including the Closing Date to and excluding the date of payment.

5.06    <u>Transactions with Grace Entities</u>.  From and after the Closing, any amounts which are owed by any Grace Entity to any of the Corporations, or are owed by any of the Corporations to a Grace Entity, for transportation or storage services provided in the ordinary course of business (collectively, the "Surviving Intercompany Accounts"), shall be paid in cash by such Corporation to such Grace Entity, or by such Grace Entity to such Corporation, as the case may be, in accordance with past practice (but not to exceed a reasonable period of time for payment).

## ARTICLE 6

## Representations and Warranties by GEC

The representations and warranties set forth in this Article as to the knowledge of the GEC Executives are as to the actual present personal knowledge, awareness and good faith belief of such individuals at the date of this Agreement and as of the Closing Date for purposes of Sections 11.01 and 11.06.   For purposes of this Agreement, "GEC Executives" means Donald E. Grimm (President), Lawrence G. Besson (Senior Vice President and Chief Financial and Administrative Officer), Frank L. Ryan II (Vice President-Finance), Ralph R. Mills (Vice President-Controller) and James Roderick Clark (Vice President-Development); and "Corporation

KPOP 0074

27

Executives" means Fred T. Johnson (President), Ned L. Hoover (Executive Vice President), Ronald D. Scoggins (Senior Vice President), Philip J. Lewis (Vice President-Finance) and Arthur (Lee) Ellis (Vice President-Operations).

GEC hereby represents and warrants to OLP and the OLP Corporations as follows:

6.01    Incorporation.    (a)    GEC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with full corporate power and authority to enter into this Agreement and the Ancillary Agreements and perform its obligations hereunder and thereunder.

(b)    Each of the Corporations is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and operate its business as currently conducted.    The schedule to this Section sets forth (i) the jurisdiction of incorporation of each Corporation and (ii) the jurisdictions where each Corporation is authorized or otherwise qualified to do business as a foreign corporation.

6.02    Authorization.    The execution and delivery of this Agreement and the Ancillary Agreements by those of GEC and the Corporations that are respectively parties thereto, and the performance by GEC and the Corporations of their respective obligations hereunder and thereunder, have been duly and validly authorized by all necessary corporate action of GEC and the Corporations.    This

KPOP 0075

28

Agreement and the Ancillary Agreements to which they are respectively parties have been duly executed and validly delivered by GEC and the Corporations and are legally binding on those of GEC and the Corporations that are respectively parties hereto and thereto.

6.03   <u>No Conflict or Consents</u>.   The execution and delivery of this Agreement and the Ancillary Agreements to which they are respectively parties by GEC and the Corporations, and the performance by GEC and the Corporations of their respective obligations hereunder and thereunder, do not (a) conflict with their respective corporate charters or by-laws, or (b) result in any breach of any of the provisions of, or constitute a default under, any statute, law, rule, regulation, judgment, order, decree, writ or injunction of any court or Governmental Authority, or any agreement, understanding or restriction, to which any of GEC and the Corporations is a party or by which it or any of its assets are bound, which breach or default would adversely affect the ability of GEC or the Corporations to perform its obligations under this Agreement.  Except as set forth on the schedule to this Section and except for compliance with HSR, and except for the permits, licenses, filings, notices and consents to be obtained pursuant to Sections 9.03 and 9.04, the execution and delivery by each of GEC and the Corporations of this Agreement and the Ancillary Agreements to which it is a party, and its performance of its obligations hereunder and thereunder, will not require it to obtain or make any waiver, consent, notice, approval or authorization of, or filing

with, any third party or Governmental Authority, other than the filings contemplated by this Agreement.

6.04    _Capitalization_.  (a)  The schedule to this Section sets forth the authorized, issued and outstanding capital stock of each of the Corporations.

(b)  GEC is the sole record and beneficial owner of all the STS Shares; STS is the sole record and beneficial owner of all the STI Shares and the STP Shares; and STP is the sole record and beneficial owner of all the STV Shares, in each case free and clear of all claims, liens, security interests, pledges, options, encumbrances, charges, agreements, voting trusts and proxies or other restrictions.

(c)  The issued and outstanding shares of the capital stock of each of the Corporations have been duly and validly issued and are fully paid and nonassessable.

(d)  There are no rights, subscriptions, warrants, options, conversion rights, commitments or agreements of any kind binding on GEC or any of the Corporations that are outstanding or in effect to purchase or otherwise acquire (i) the capital stock of any Corporation or (ii) any obligations of any kind convertible into or exchangeable for any shares of capital stock of any Corporation, or pursuant to which GEC or any of the Corporations may be obligated to issue, sell, purchase or redeem any shares of capital stock or other securities of any Corporation.

6.05    _Financial Statements_.  GEC has delivered to OLP and the schedule to this Section contains complete copies of the

following consolidated financial statements of the Corporations (the "Management Reports"): (a) unaudited balance sheets as of December 31, 1989, 1990, and 1991 and unaudited income statements for each of the three years ended December 31, 1989, 1990, and 1991; and (b) unaudited balance sheets as of November 30, 1991 and 1992 and unaudited income statements for each of the eleven months ended November 30, 1991 and 1992. The Management Reports have been prepared by the accounting staffs of the Corporations in the regular course of business for purposes of reporting the financial position and results of operations of the Corporations to the management of GEC and Grace. Except as set forth in the schedule to this Section, the Management Reports have been prepared in accordance with the Grace Accounting Principles and fairly present in all material respects, in accordance with the Grace Accounting Principles, the consolidated financial condition and results of operations of the Corporations for the dates and periods covered by the Management Reports, subject to normal recurring year-end adjustments. GEC has delivered to OLP and the schedule to this Section contains a statement setting forth a reconciliation of the differences between the Legal Entity Balance Sheet and the corresponding balance sheet in the Management Reports. Except as set forth on the schedule to this Section, the Legal Entity Balance Sheet was prepared using the same levels of materiality, account classifications and procedures as used to prepare such corresponding balance sheet.

6.06    <u>Litigation and Claims</u>.  Except as set forth in the schedule to this Section, and except for matters relating to Environmental Laws (which matters are covered by Section 6.11), there are no claims, actions, suits or proceedings, judgments, orders, writs, or injunctions of any court or Governmental Authority pending or presently in effect or, to the knowledge of the GEC Executives, after consultation with the Corporation Executives, threatened against GEC or any Corporation which would reasonably be expected to (i) adversely affect the ability of GEC to execute, deliver or perform its obligations under this Agreement or (ii) have an adverse effect on the business, financial condition or results of operations of the Corporations.

6.07    <u>Labor and Employment</u>.   The schedule to this Section sets forth a list of (a) all collective bargaining or other agreements with labor unions to which any Corporation is a party, and (b) all written employment agreements to which any Corporation is a party which will remain in effect after the Closing.  GEC has delivered to OLP true and complete copies of all such agreements. Except as set forth on the schedule to this Section, there is no unfair labor practice complaint against the Corporations relating to any of their employees pending or, to the knowledge of the GEC Executives, after consultation with the Corporation Executives, threatened before the National Labor Relations Board or any strike, lockout, material dispute, slowdown or stoppage pending against the Corporations.

32

6.08    Insurance. The schedule to this Section describes the property and casualty and all other insurance coverage maintained by or on behalf of each Corporation.  Such policies are in full force and effect as of the date hereof.

6.09    Contracts. The schedule to this Section lists all contracts and agreements to which any Corporation is a party (a) which cannot be canceled upon notice of one year or less and under which it is reasonably expected that such Corporation will make expenditures or obtain receipts of more than $100,000 for the current fiscal year, or (b) under which it is reasonably expected that such Corporation will make expenditures or obtain receipts of more than $250,000 for the current fiscal year (collectively, the "Contracts").  GEC has heretofore delivered to OLP true and complete copies of all the Contracts, all of which are currently in full force and effect and no Corporation is in default under any Contract.  The schedule to this Section also lists all contracts and agreements to which any Corporation is a party that contain currently effective provisions for indemnification of or by any Corporation for environmental matters, excluding contracts and agreements for purchase or sale of goods or services in the ordinary course of business.  GEC has heretofore delivered to OLP true and complete copies of all such contracts and agreements containing such indemnification provisions, which provisions are in full force and effect, subject to applicable statutes of limitation, and no Corporation is in default under any such

33

provision, in a manner such that the result of the default would be to adversely affect the ability of such Corporation to enforce its rights under such indemnity.

6.10    <u>Employees; Benefit Plans</u>.  (a) Schedule 6.10 sets forth the name of each employee benefit plan, as such term is defined in Section 3(3) of ERISA, which currently benefits employees of a Corporation or in which a Corporation is a participating employer (individually, a "Plan" and collectively, the "Plans").    The Corporations do not have any outstanding liability with respect to, or arising out of, any employee benefit plan, as such term in defined in Section 3(3) of ERISA, which formerly benefited, but does not currently benefit, employees of a Corporation or in which a Corporation was, but is not currently, a participating employer.

(b)  None of the Corporations contribute to, or have had an obligation to contribute to, a multiemployer plan within the meaning of Section 3(37) of ERISA.

(c)  Except as set forth in the schedule to this Section: (i) the Plans have been maintained in compliance in all material respects with the applicable provisions of ERISA and the Internal Revenue Code of 1986, as amended (the "Code"); (ii) each Plan intended to be qualified under Section 401(a) of the Code satisfies in all material respects the requirements of such Section; (iii) no act, omission or transaction has occurred which would result in imposition on the Corporations of a civil penalty or tax for a prohibited transaction (as such term is defined in either Section

KPOP 0081

34

406 of ERISA or Section 4975 of the Code); (iv) no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred with respect to any Plan; (v) no lien imposed under Section 412(n) of the Code exists in favor of any Plan under any property belonging to the Corporations; and (vi) no Plan which is subject to Title IV of ERISA has been terminated and no event or condition exists which presents a material risk of termination of any Plan by the Pension Benefit Guaranty Corporation ("PBGC").

(d)   With respect to any employee benefit plan, within the meaning of Section 3(3) of ERISA, which is not listed in the schedule to this Section but which is sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to within five years prior to the Closing Date, by any corporation, trade, business or entity under common control with the Corporations, within the meaning of Section 414(b), (c) or (m) of the Code or Section 4001 of ERISA ("Commonly Controlled Entity"): (i) no withdrawal liability, within the meaning of Section 4201 of ERISA, has been incurred, which withdrawal liability has not been satisfied; (ii) no liability to the PBGC has been incurred by any Commonly Controlled Entity, which liability has not been satisfied; (iii) no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred; and (iv) all contributions (including installments) to such plan required by Section 302 of ERISA and Section 412 of the Code have been timely made.

6.11    <u>Environmental Compliance</u>.  Except as set forth in
the schedule to this Section: (a) the Operations and business of
the Corporations are in compliance with all, and the Corporations
have no liability with respect to any, Environmental Laws; and (b)
there are no claims, actions, suits or proceedings, judgments,
orders, writs, or injunctions of any court or Governmental
Authority pending or presently in effect or, to the knowledge of
the GEC Executives, after consultation with the Corporation
Executives, threatened against GEC or any Corporation relating to
Environmental Laws, which would reasonably be expected to (i)
adversely affect the ability of GEC to execute, deliver or perform
its obligations under this Agreement or (ii) have an adverse effect
on the business, financial condition or results or operations of
the Corporations.

6.12    <u>Operation in Ordinary Course</u>.  Except as set forth
in the schedule to this Section or in the ordinary course of
business or otherwise in accordance with the Corporations' normal
business practices, since December 31, 1991, none of the
Corporations has disposed of, or suffered an uninsured casualty
loss with respect to, any of its assets whose fair market value at
the time of such disposition or loss was greater than $100,000.

6.13    <u>Absence of Liens and Encumbrances</u>.  Except as
described in the schedule to this Section, all the assets included
in the balance sheet as of November 30, 1992 in the Management
Reports (other than those assets sold or otherwise disposed of by
the Corporations in the ordinary course of business or otherwise

KPOP 0083

36

in accordance with the Corporations' normal business practices since such date) are owned or held by the Corporations free and clear of all liens, mortgages, security interests, pledges or other encumbrances of any nature whatsoever, except for (i) those for taxes not yet due and payable, (ii) those of record as of the date hereof (the "Recorded Liens"), (iii) mechanic's, materialmen's and similar liens securing obligations which are not overdue by more than 30 days or which are being contested in good faith, (iv) those which have been disclosed in this Agreement or the schedules to this Agreement, or (v) those which will have been released on or prior to the Closing Date.

6.14   Liabilities. Except (i) as set forth or reflected in the balance sheet as of November 30, 1992 in the Management Reports, (ii) as disclosed in this Agreement, the schedule to this Section or the other schedules hereto, (iii) for liabilities incurred since the date of such balance sheet in the ordinary course of business, and (iv) for liabilities which will have been satisfied on or prior to the Closing Date, the Corporations have no liabilities that would be required to be reflected on or described in the notes to a consolidated balance sheet of the Corporations as of the dates this representation is made (including the date covered by the condition to Closing in Section 11.01) had such balance sheet been prepared in accordance with generally accepted accounting principles.

6.15   Trademarks and Tradenames; Intellectual Property.

The Corporations use the unregistered trademarks and tradenames set forth in the schedule to this Section. No other trademarks and tradenames are material to the business of the Corporations. Except for licenses associated with goods and services used by the Corporations, no third-party intellectual property is material to the business of the Corporations.

6.16  <u>Compliance with Applicable Law</u>. Except as described in the schedule to this Section, and except with respect to environmental compliance, which is addressed in Section 6.11 above, the Corporations are in compliance in all material respects with all laws, rules, regulations, ordinances, orders, judgments and decrees applicable to the Operations and business as presently conducted and, to the knowledge of the GEC Executives, after consultation with the Corporation Executives, GEC has not received any notification that any of the Corporations is not presently in compliance therewith in any material respect.

6.17  <u>Customers</u>. The schedule to this Section sets forth a list which includes all current customers of the Corporations that have paid $250,000 or more to the Corporations in the current fiscal year to date.

6.18  <u>Real Property</u>. Exhibit A lists the real property, including tanks and pipeline rights of way and easements, owned by the Corporations (the "Owned Real Property") or leased by the Corporations (the "Leased Real Property"). GEC has heretofore furnished OLP with true and complete copies of the leases for the Leased Real Property (the "Real Property Leases"). Except as set

38

forth in Exhibit A, the Real Property Leases are in full force and effect and no default exists with respect to any thereof.

6.19    <u>Property, Licenses and Permits</u>.  Except as set forth in the schedule to this Section, the Corporations (a) own or have the right to use the real (including rights of way and easements) and personal property, and (b) hold the licenses and permits; in each case that are necessary to operate the Operations as currently conducted.

6.20    <u>Grace and Grace-Conn</u>.  Grace is a holding company and has no substantial operations other than those conducted by Grace-Conn. and its subsidiaries.  The assets, pretax income and net worth of Grace-Conn. and its consolidated subsidiaries are substantially equivalent to those of Grace and its consolidated subsidiaries.

6.21    <u>Consents</u>.  The schedule to Section 6.09 and Exhibit A to this Agreement identify which of the Contracts or leases listed therein require by their explicit terms consent to a change of control or merger or the assignment of such Contract or lease of or by the Corporation which is a party thereto.

6.22    <u>Personal Property</u>.  The schedule to this Section sets forth a list of the personal property having a book value in excess of $2,500 that is owned by the Corporations as of the date set forth on the schedule, which list is true and correct as of such date.

6.23    <u>Taxes</u>.  Except as set forth in the schedule to this Section, (a) all returns (including without limitation,

39

income, franchise, sales and use, excise, severance, property, gross receipts, payroll and withholding tax returns and information returns), deposits and reports (all such returns, deposits and reports herein referred to collectively as "Tax Returns" or singularly as a "Tax Return") of or relating to any Tax that are required to be filed or deposited (taking into account all extensions) on or before the date hereof for, by, on behalf of or with respect to any of the Corporations, including, but not limited to, those relating to the income, business, operations or property of any of the Corporations, have been filed or deposited with the appropriate federal, state, local and foreign authorities on or before the date hereof, and all Taxes shown to be due and payable on such Tax Returns have been paid in full on or before the date hereof; and (b) None of the Tax Returns described in Section 6.23(a) are now under audit by any federal, state, local or foreign authority and there are no agreements, waivers or other arrangements providing for an extension of time with respect to the assessment or collection of any Tax or deficiency of any nature against any of the Corporations or with respect to any such Tax Return; and there are no suits or other judicial or administrative proceedings or claims pending with respect to any such Tax Return.

40

## ARTICLE 7

## Representations and Warranties by OLP

OLP hereby represents and warrants to GEC as follows:

7.01    <u>Incorporation</u>. OLP is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, with full partnership power and authority to enter into this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. Each of the OLP Corporations is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.

7.02    <u>Authorization</u>. The execution and delivery of this Agreement and the Ancillary Agreements to which they are respectively parties by OLP and the OLP Corporations, and the performance by OLP and the OLP Corporations of their respective obligations hereunder and thereunder, have been duly and validly authorized by all necessary action of OLP and all necessary corporate action of the General Partner and of the OLP Corporations. This Agreement and the Ancillary Agreements to which they are respectively parties have been duly executed and validly delivered by OLP and the OLP Corporations and are legally binding on those of OLP and the OLP Corporations that are respectively parties hereto and thereto.

7.03  __No Conflict__.  The execution and delivery of this Agreement and the Ancillary Agreements to which they are respectively parties by OLP and the OLP Corporations, and the performance by OLP and the OLP Corporations of their respective obligations hereunder and thereunder, do not (a) conflict with the certificate or agreement of limited partnership, as amended, of OLP, or the corporate charters or by-laws of the OLP Corporations or (b) result in the breach of any of the provisions of, or constitute a default under, any statute, law, rule, regulation, judgment, writ, order, decree or injunction of any court or Governmental Authority, or any agreement, understanding or restriction, to which any of OLP or the OLP Corporations is a party or by which it or any of its assets is bound, which breach or default would reasonably be expected to adversely affect its ability to perform its obligations under this Agreement. Except in connection with compliance with HSR, the execution and delivery by each of OLP and the OLP Corporations of this Agreement and the Ancillary Documents to which it is a party, and its performance of its obligations hereunder and thereunder, will not require it to obtain or make any waiver, consent, notice, approval or authorization of, or filing with, any third party or Governmental Authority other than the filings contemplated by this Agreement.

## ARTICLE 8

## Disclaimer of Additional and Implied Warranties

8.01  __Investigation and Evaluation__.  OLP acknowledges that (a) OLP and its directors, officers, attorneys, accountants

42

and advisors have been given the opportunity to examine to the full extent deemed necessary and desirable by OLP all books, records and other information with respect to the Corporations, the Properties, the Facilities and the Operations, (b) OLP has taken full responsibility for determining the scope of its investigations of the Corporations, the Properties, the Facilities and the Opera- tions, and for the manner in which such investigations have been conducted, and has examined the Corporations, the Properties, the Facilities and the Operations to OLP's full satisfaction, (c) OLP is fully capable of evaluating the adequacy and accuracy of the information and material obtained by OLP in the course of such investigations, (d) OLP has not relied on GEC with respect to any matter in connection with OLP's evaluation of the Corporations, the Properties, the Facilities and the Operations, except as set forth in the Agreement (including its Exhibits and schedules) and (e) GEC is making no representations or warranties, express or implied, of any nature whatever with respect to the Corporations, the Properties, the Facilities or the Operations, other than the representations and warranties of GEC specifically set forth in Article 6, AND WITH RESPECT TO PERSONAL PROPERTY AND EQUIPMENT OF THE CORPORATIONS, GEC EXPRESSLY DISCLAIMS AND NEGATES ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSES, AND OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS. Nothing in this Section 8.01 shall be deemed to limit OLP's remedies under Section 13.03.

43

8.02  **Forecasts. Projections. etc.** OLP acknowledges that (a) OLP has taken full responsibility for evaluating the adequacy, completeness and accuracy of various forecasts, projections, opinions and similar material heretofore furnished by GEC, the Corporations or their representatives to OLP in connection with OLP's investigations of the Corporations, the Properties, the Facilities and the Operations and (b) there are uncertainties inherent in attempting to make projections and forecasts and render opinions, that OLP is familiar with such uncertainties, and that OLP is not relying on any projections, forecasts or opinions (other than legal opinions) furnished to it by GEC, the Corporations or any affiliate thereof or any of their representatives. Nothing in this Section 8.02 shall be deemed to limit OLP's remedies under Section 13.03.

8.03  **Effect of Contemplated Transactions**. Except as expressly set forth in Section 6.21 and Section 13.03(a)(ii) (as it relates to Section 6.21), (i) OLP acknowledges that it has taken full responsibility for evaluating whether the transactions contemplated by this Agreement require consent, approval or notice under any lease or other agreement to which any of the Corporations is a party, and (ii) GEC shall have no liability for the failure to obtain or give any such consent, approval or notice.

## ARTICLE 9

### Covenants of GEC and OLP

9.01  Access and Inquiry.  Between the date of this Agreement and the Closing Date, OLP shall have reasonable access to the Facilities and will, upon request, be permitted to contact and make reasonable inquiry of GEC's and the Corporations' personnel regarding the Operations.  GEC shall make available to OLP all books, records, relevant purchasing and other financial data and files of GEC and the Corporations relating to the Operations to the extent reasonably requested by OLP.  OLP agrees that the terms of the Confidentiality Agreement shall apply to information gained by OLP pursuant to the foregoing and/or previously made available to OLP to the same extent as if OLP were a party thereto and bound by the confidentiality provisions thereof.

9.02  Hart-Scott-Rodino Act.  As promptly as practicable after the date of this Agreement, GEC and OLP shall file appropriate Notification and Report Forms under the HSR Act with respect to this Agreement and the transactions contemplated hereby. GEC and OLP shall cooperate to coordinate such filings, and to make reasonable efforts to respond to any governmental request or inquiry with respect thereto; but neither GEC, OLP nor any of their respective affiliates shall be required to make any payment (other than for reasonable legal fees and, with respect to OLP, for the filing fee required to be made by the acquiring entity under the HSR Act) that it is not presently contractually required to make,

KPOP 0092

45

divest any assets (including but not limited to assets of any of the Corporations), make any change in the conduct of its business or that of any Corporation, accept any limitation on the future conduct of its business or that of any Corporation, enter into any other agreement or arrangement with any person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

9.03    <u>Permits and Licenses</u>.  As soon as practicable after the date hereof, GEC shall cooperate with OLP to identify and secure any and all federal, state and local permits and licenses required for the Corporations to operate (in the same manner as presently operated) the Facilities under ownership of OLP.

9.04    <u>Notices to Third Parties</u>.  GEC and OLP shall cooperate to make all other filings and to give notice to and obtain consents from all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement (including the continuation of the Operations in the hands of OLP and NSTI as currently conducted and the maintenance in effect in the hands of OLP and NSTI of agreements and leases to which the Corporations are party).

9.05    <u>Material Adverse Effect Notice</u>.  GEC has instructed the Corporation Executives to give GEC prompt notice of any event or events that become known to them and individually or in the aggregate have a Material Adverse Effect; and GEC will

KPOP 0093

46

promptly notify OLP of any such event or events which become known to any GEC Executive prior to the Closing Date.

9.06  **Reasonable Efforts**.  Each of OLP and GEC will use its Reasonable Efforts to consummate the Closing under this Agreement.

9.07  **Tax Matters**.  (a) GEC will file or deposit, or cause to be filed or deposited, all Tax Returns of or relating to any Tax that are required to be filed or deposited (taking into account all extensions) on or before the Closing Date for, by, on behalf of or with respect to any of the Corporations, including, but not limited to, those relating to the income, business, operations or property of any of the Corporations, with the appropriate federal, state, local and foreign authorities on or before the Closing Date, and GEC will pay, or cause to be paid, in full all Taxes shown to be due and payable on such Tax Returns on or before the Closing Date; and

(b)  GEC will prepare and file all required Tax Returns for all periods ending on or before the Closing Date, which Tax Returns will include as required, the income, business, operations and property of each of the Corporations for the periods ending on or before the Closing Date on a basis consistent with past practice of the Grace Entities and the Corporations and in accordance with all applicable laws and regulations.

KPOP 0094

47

## ARTICLE 10

### Conduct of Business Prior to the Closing

Except as otherwise consented to by OLP, from the date of this Agreement until the Closing:

10.01  <u>Operation in Ordinary Course</u>.  GEC shall cause the Corporations to conduct the Operations only in the ordinary course of business or otherwise in accordance with the Corporation's normal business practices in all material respects.

10.02  <u>Disposition of Assets</u>.  GEC shall not permit any of the Corporations, other than in the ordinary course of business or otherwise in accordance with the Corporations' normal business practices, to sell, lease (as lessor), transfer, mortgage, pledge, encumber, license (as licensor), or otherwise dispose of, any asset (tangible or intangible) material to the Operations.

10.03  <u>Material Agreements</u>.  GEC shall not permit any of the Corporations, other than in the ordinary course of business, (i) to enter into any agreement with third parties material to the Operations, (ii) to modify, extend or terminate any existing material agreements, (iii) to create, incur or assume any indebtedness for borrowed money or to guarantee or otherwise become liable for the obligations of any other person or to make any loans or advances to any other person, nor (iv) to increase the compensation of any employee of the Corporations.

10.04  <u>Business Organization and Customer Relations</u>.

48

GEC shall cause the Corporations to use reasonable efforts to preserve the Corporations' business organization and satisfactory relations with customers, suppliers and employees.

10.05 <u>Dividends</u>. GEC shall not permit the declaration or payment of any dividend in respect of, or the repurchase or redemption of any of, the capital stock of STS or the STS Subsidiaries.

## ARTICLE 11

### Conditions Precedent to the Obligations of OLP

All obligations of OLP under this Agreement are subject, at OLP's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of GEC under this Agreement shall be true and accurate in all material respects as of the date hereof and as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect.

11.02 <u>Performance of Covenants and Agreements</u>. GEC shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by GEC at or prior to the Closing in accordance with this Agreement.

11.03 <u>Hart-Scott-Rodino Act</u>. All waiting periods under the HSR Act applicable to the transactions contemplated by this

49

Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

11.04  **Permits, Consents, etc**.    There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority or other person or entity required in connection with the transactions contemplated by this Agreement (including the continuation of the Operations in the hands of OLP and NSTI as currently conducted and the maintenance in effect in the hands of OLP and NSTI of agreements and leases to which the Corporations are a party) which has not been accomplished or obtained and which may not be reasonably accomplished or obtained after the Closing.

11.05  **Litigation**.    No colorable action, suit or proceeding by any third person (including but not limited to any Governmental Authority) or investigation or inquiry by any Governmental Authority shall have been instituted or threatened against GEC or OLP or any of their respective affiliates that questions the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby which, if successful, would materially adversely affect the right of OLP to consummate the transactions contemplated by this

Agreement or to continue the Operations substantially as currently operated.

11.06  <u>Certificate of GEC</u>.  GEC shall have delivered to OLP a certificate of GEC signed by the President or any Vice President of GEC certifying that (i) each and every representation and warranty of GEC under this Agreement was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect; and (ii) GEC has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by GEC at or prior to the Closing in accordance with this Agreement.

11.07  <u>Opinion of GEC's Counsel</u>.  GEC shall have delivered to OLP an opinion of its General Counsel, dated the Closing Date, in the form of <u>Exhibit B</u>.

11.08  <u>No Material Adverse Effect</u>.  Since the date of this Agreement, no event or events shall have occurred that, individually or in the aggregate, have had a Material Adverse Effect.

11.09  <u>Recorded Liens</u>.  As of the Closing, there shall be no Recorded Lien that adversely affects the ability of OLP to conduct the Operations after the Closing, the release of which would require costs and expenses of more than $10,000; provided that with respect to any such Recorded Lien, GEC shall be deemed

51

to have satisfied the foregoing condition if it shall elect in writing to have the costs and expenses of release of such Lien deemed Damages indemnifiable under Section 13.03(a), whereupon such costs and expenses shall be so indemnifiable.

11.10  Financing.  The financing for OLP's payment of the Estimated Purchase Price shall have been consummated.

### ARTICLE 12

### Conditions Precedent to the Obligations of GEC

All obligations of GEC under this Agreement are subject, at GEC's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

12.01  Accuracy of Representations and Warranties.  Each and every representation and warranty of OLP under this Agreement shall be true and accurate in all material respects as of the date hereof and as of the Closing.

12.02  Performance of Covenants and Agreements.  OLP shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by OLP at or prior to the Closing in accordance with this Agreement.

12.03  Hart-Scott-Rodino Act.  All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any

52

reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

12.04 _Permits. Consents, etc_. There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority or other person or entity required in connection with the transactions contemplated by this Agreement (including the continuation of the Operations as currently conducted and maintenance in effect of agreements and leases to which the Corporations are a party) which has not been accomplished or obtained and which may not be reasonably accomplished or obtained after the Closing, and which could reasonably be expected to cause any Grace Entity to incur any liability.

12.05 _Litigation_. No colorable action, suit or proceeding by any third person (including but not limited to any Governmental Authority) or investigation or inquiry by any Governmental Authority shall have been instituted or threatened against GEC or OLP or any of their respective affiliates that questions the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby which, if successful, would materially adversely affect the right of GEC to consummate the transactions contemplated hereby or would involve possible material liability on the part of GEC or any of its subsidiaries or affiliates.

KPOP 0100

12.06  <u>Certificate of OLP</u>.  OLP shall have delivered to GEC a certificate of OLP signed by the President or a Vice President of OLP certifying that: (i) each and every representation and warranty of OLP under this Agreement was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing; and (ii) OLP has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by OLP at or prior to the Closing in accordance with this Agreement.

12.07  <u>Opinion of OLP's Counsel</u>.  OLP shall have delivered to GEC an opinion of Stephen M. Hoffner, Esq., General Counsel for OLP, dated the Closing Date, in the form of <u>Exhibit C</u>.

## ARTICLE 13

### <u>Indemnification; Survival of Representations</u>

13.01  <u>Definitions</u>.  As used in this Article:

(a)  "Damages" means any and all penalties, fines, damages, liabilities, losses, expenses, payments, settlements or costs (including, without limitation, Litigation Expenses incident to Third Party Claims, but excluding consequential damages and damages for lost profits), on an after-tax basis and net of any correlative insurance proceeds realized or to be realized by the indemnified party.

(b)  "Direct Claims" means claims other than Third Party Claims.

KPOP 0101

54

(c)    "Environmental Claims" means claims for indemnification against GEC under this Article for breach of Section 6.11.

(d)    "General Claims" means claims for indemnification against GEC under this Article other than Environmental Claims.

(e)    "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a claim.

(f)    "Third Party Claims" means any and all claims, demands, suits, actions or proceedings by any person or entity, or Governmental Authority, other than OLP or GEC or their respective affiliates, which could give rise to a right of indemnification under this Article.

13.02  Indemnification by OLP.    (a)    Subject to the terms, conditions and limitations of this Article, OLP shall indemnify all of the Grace Entities and save and hold all of the Grace Entities harmless from and against any Damages caused by or arising out of (i) the failure of OLP to perform or fulfill any agreement or covenant to be performed or fulfilled by it under this Agreement or any Ancillary Agreement, or (ii) any inaccuracy in any representation or breach of any warranty of OLP set forth in Article 7 or any Ancillary Agreement, or in the certificate referred to in Section 12.06.

(b)    The representations and warranties of OLP set forth in Article 7 shall survive the Closing.

KPOP 0102

55

(c)  Subject to the terms, conditions and limitations of
this Article, OLP shall indemnify and hold harmless all of the
Grace Entities from and against any and all Damages caused by or
arising  out  of  obligations  or  liabilities  of  any  of  the
Corporations for which any of the Grace Entities is liable, except
obligations  or  liabilities  which  constitute  a  breach  of  any
representation or warranty of GEC in Article 6 or any Ancillary
Agreement or the certificate described in Section 11.06 (without
reference for this purpose to the exception contained in clause (i)
of Section 11.06).

13.03  <u>Indemnification by GEC</u>.    (a)    Subject to the
terms, conditions and limitations of this Article, GEC shall
indemnify OLP (and, while they are controlled by OLP or any
affiliate of Kaneb Services, Inc., the OLP Corporations) and save
and hold OLP (and, while they are controlled by OLP or any
affiliate of Kaneb Services, Inc., the OLP Corporations) harmless
from and against any Damages caused by or arising out of (i) the
failure of GEC to perform or fulfill any agreement or covenant to
be performed or fulfilled by it under this Agreement, or (ii) any
inaccuracy in any representation or breach of any warranty of GEC
in Article 6 or any Ancillary Agreement or the certificate
described in Section 11.06 (without reference for this purpose to
the exception contained in clause (i) of Section 11.06).

(b)  The representations and warranties of GEC set forth
in sections 6.01 through 6.04 and 6.20 shall survive the Closing.
The representations and warranties set forth in Sections 6.05

through 6.10, 6.12 through 6.19, 6.21 and 6.22 shall survive the Closing but shall expire and be of no further force and effect on the second anniversary of the Closing Date, the representations and warranties set forth in Section 6.11 shall survive the Closing but shall expire and be of no force and effect on the fifth anniversary of the Closing Date, and the representations and warranties set forth in Section 6.23 shall survive the Closing but shall expire and be of no force and effect 20 days after the expiration of all applicable statutes of limitation (including all extensions thereof); except in each case with respect to claims OLP has asserted against GEC in writing, setting forth with reasonable specificity the nature of such claims, on or before the applicable expiration date.

(c)   GEC shall have no liability for or in connection with any provision of Section 10.01 or 10.04, it being the intention of the parties that the effect of any nonperformance thereof be limited to nonfulfillment of the conditions set forth in Section 11.02.

13.04  Limitations.   (a) None of OLP and the OLP Corporations (i) may assert a General Claim unless the condition, event, occurrence, action or omission which gives rise to such General Claim gives rise to Damages in excess of $7,500; and (ii) may assert any General Claim unless and until the aggregate amount of General Claims that may be asserted under clause (i) of this subsection shall exceed $1,000,000, and then only with respect to the excess of such General Claims over said $1,000,000.

(b) None of OLP and the OLP Corporations may assert an Environmental Claim unless the occurrence at a location which gives rise to such Environmental Claim gives rise to Damages in excess of $100,000, and then only with respect to the excess of such Environmental Claim over said $100,000. OLP and the OLP Corporations shall be indemnified by GEC for 60%, and only 60% of the amount by which any Environmental Claim exceeds said $100,000; provided that in no event shall GEC be required to indemnify OLP and the OLP Corporations for more than $10,000,000 (that is, 60% of an aggregate of $16,666,667 of Environmental Claims in excess of such $100,000 limit) of Environmental Claims in the aggregate. For purposes of this subsection, "occurrence" shall mean any condition, event, action or omission which took place prior to the Closing and which constitutes a breach of Section 6.11. For purposes of this subsection, repeated occurrences arising from a single cause shall be deemed to be a single occurrence. For purposes of this subsection, separate occurrences that cause indivisible harm or require indivisible remedial action shall also be deemed to be a single occurrence if such harm or remedial action cannot reasonably be allocated among such separate occurrences.

(c) The dollar threshold and limitations set forth in this Section have been negotiated for the special purposes of the provisions in which they appear, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the transactions

contemplated by this Agreement under which a level of materiality might be an issue.

(d)   The indemnification under Section 13.03 and the Guaranty Agreement shall be the sole remedy of OLP and its affiliates, including, after the Closing, the Corporations, against GEC and its affiliates for Damages with respect to any inaccuracy in or breach of any representation, warranty, covenant or agreement contained in this Agreement or any other agreement or document (other than the Ancillary Agreements, which shall not be subject to this limitation) related hereto or thereto (including the certificates described in Section 11.06), whether such claims are brought under this Article 13 or otherwise.

(e)   The indemnification under Section 13.02 shall be the sole remedy of GEC and its affiliates against OLP and its affiliates for Damages with respect to any inaccuracy in or breach of any representation, warranty, covenant or agreement contained in this Agreement or in the Ancillary Agreements or any other agreement or document related hereto or thereto (including the certificate described in Section 12.06), whether such claims are brought under this Article 13 or otherwise.

13.05   Defense of Third Party Claims.   Any claims for indemnification by the OLP Corporations shall be made only on their behalf by OLP.   OLP shall notify GEC in writing promptly after learning of any Third Party Claim.   It shall be a necessary condition of any claim by OLP for indemnification under this Article with respect to any Third Party Claim, that OLP tender the

59

defense thereof (including control over all negotiation, trial, appeal or other proceedings) to GEC, provided that GEC shall keep OLP reasonably informed at GEC's expense regarding such defense. If OLP does not so notify and tender such defense within 30 days of learning of such Third Party Claim, OLP's right to indemnification hereunder shall not be impaired except to the extent that GEC shall have been prejudiced by such failure and except that GEC shall not be liable for any expenses incurred during the period in which OLP failed to give notice. GEC may undertake such defense by notice to OLP not later than 30 days after receipt of a notice that the defense is tendered to it. Failure by GEC to so notify OLP that it will undertake such defense shall be deemed to be a waiver of GEC's right to undertake such defense. If GEC undertakes defense of any Third Party Claim, OLP shall cooperate with GEC and its counsel in the investigation and defense thereof, and may participate (at its own expense) in such investigation and defense, but GEC shall retain control of the negotiation, tactics, trial, appeals and other matters and proceedings related thereto. If GEC does not undertake the defense of any Third Party Claim, OLP shall permit GEC, at its own expense, to participate in the investigation and defense thereof, but OLP shall control such investigation and defense. OLP and GEC agree to make available to each other, their counsel and other representatives, all information and documents available to them which relate to any Third Party Claim, and to render to each other such assistance as may reasonably be required in order to ensure

KPOP 0107

60

the proper and adequate defense of such Third Party Claim. Except pursuant to a final judgment rendered thereon, OLP shall not pay or settle any Third Party Claim, whether or not any action or proceeding has been commenced thereon, without the prior written consent of GEC, which consent shall not be unreasonably withheld or delayed by GEC. If OLP pays or settles any Third Party Claim prior to a judgment thereon without such consent, OLP shall be deemed to have waived all rights to indemnification or payment with respect to such Third Party Claim, unless such consent is unreasonably withheld or delayed.

13.06 _Consequential and Lost Profit Damages_. Neither party shall seek consequential damages or damages for lost profits in any claim for indemnification under this Article, nor shall it accept payment of any award or judgment to the extent that such award or judgment includes consequential damages or damages for lost profits.

13.07 _Indemnification Payments_. Payments of amounts owed under this Article 13 shall be made within ten days after final determination thereof.


ARTICLE 14

Cooperation in Various Matters

14.01 _Mutual Cooperation_. Each party to this Agreement shall cooperate with the other party, which cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the

61

whereabouts of former employees, as reasonably requested by such other party in connection with the prosecution or defense of any claims by third parties or Governmental Authorities or other matters (other than claims against each other) relating to the Corporations or the Operations.

14.02 <u>Preservation of OLP's Files and Records</u>. For a period of seven years after the Closing, OLP shall use reasonable efforts to preserve all files and records in OLP's or the Corporations' possession relating to the Corporations and the Operations that are less than seven years old, shall allow GEC reasonable access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours, and shall not dispose of any thereof, provided that commencing four years after the Closing, OLP may give GEC written notice of its intention to dispose of any part thereof, specifying the items to be disposed of in reasonable detail. GEC may, within a period of sixty days after receipt of any such notice, notify OLP of GEC's desire to retain one or more of the items to be disposed of. OLP shall, upon receipt of such a notice from GEC, deliver to GEC, at GEC's expense, the items specified in OLP's notice to GEC which GEC has elected to retain.

14.03 <u>Preservation of GEC's Files and Records</u>. For a period of seven years after the Closing, GEC shall use reasonable efforts to preserve all files and records in GEC's possession relating to the Corporations and the Operations that are less than seven years old, shall allow OLP reasonable access to such files

KPOP 0109

62

and records and the right to make copies and extracts therefrom at any time during normal business hours, and shall not dispose of any thereof, provided that commencing four years after the Closing, GEC may give OLP written notice of its intention to dispose of any part thereof, specifying the items to be disposed of in reasonable detail.  OLP may, within a period of sixty days after receipt of any such notice, notify GEC of OLP's desire to retain one or more of the items to be disposed of.  GEC shall, upon receipt of such a notice from OLP, deliver to OLP at OLP's expense, the items specified in GEC's notice to OLP which OLP has elected to retain.

14.04  <u>Preparation of Reports, etc</u>.  GEC and OLP shall cooperate and cause their employees and those of the Corporations to cooperate in the timely preparation of financial and other reports and statements relating to the Corporations and the Operations, for periods ending on or prior to the Closing Date, in accordance with the reasonable request of the party responsible for the preparation of the report in question.

14.05  <u>Amendment of Guaranteed Agreements, etc</u>.  Without the prior written consent of GEC, which consent may be granted or refused at GEC's discretion, OLP shall not and shall not permit any of the Corporations to amend, modify or extend the term of any lease or other agreement listed in the schedule to this Section, at any time during which any GEC Entity has a guaranty obligation with respect to such lease or other agreement.

KPOP 0110

63

## ARTICLE 15

### Expenses: Termination of Services: Broker's Fees: Guaranty Agreement

15.01    **Expenses.**    Each party to this Agreement shall pay all expenses incurred by it in connection with the preparation, authorization, execution and performance of this Agreement and the Ancillary Agreements (except as may be provided elsewhere herein), including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants engaged by it, except that OLP shall be solely responsible for (a) the cost of obtaining title insurance with respect to the Properties, (b) any sales, use, transfer and similar taxes and all recording and similar fees applicable to the transactions contemplated by this Agreement, and (c) the costs and expenses incurred in connection with obtaining all permits and licenses required by OLP or any of the Corporations to operate the Operations and the Facilities after the Closing.

15.02    **Termination of GEC Services.**    All contracts, agreements, commitments or other arrangements, whether written or oral, and whether express or implied, pursuant to which GEC or any of its affiliates provides legal, financial, accounting, insurance or other services to the Corporations or the Operations shall be terminated as of the Closing except as provided under the Ancillary Agreements.    OLP shall execute and deliver to GEC, at GEC's request, documents necessary or desirable to release GEC and any such affiliate from any obligations with respect to such terminated contracts, agreements, commitments and arrangements and to otherwise confirm such termination.

KPOP 0111

64

15.03  <u>Broker's Fees</u>.  Each party to this Agreement shall hold the other party harmless with respect to any broker's, finder's or other similar agent's fee with respect to the transactions contemplated hereby claimed by any broker, finder or similar agent engaged, employed by or otherwise acting on behalf of the indemnifying party.

15.04  <u>Guaranty Agreement</u>.  Contemporaneously with the execution of this Agreement, Grace-Conn has executed and delivered to OLP the Guaranty Agreement.

ARTICLE 16

<u>Notices</u>

16.01  <u>Procedure and Addresses</u>.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be deemed to have been duly given effective upon receipt if in writing and delivered personally or by facsimile transmission or courier service, at the following addresses:

If to GEC or any of the Corporations:

```
Grace Energy Corporation
Two Galleria Tower
Suite 1500
13455 Noel Road
Dallas, Texas 75240-6681
Attention:  Chief Counsel
Facsimile number:    (214) 772-0215
Confirmation number: (214) 770-0200
```

With a copy to:

```
W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida  33486-1010
Attention: Secretary
Facsimile number:    (407) 362-1635
Confirmation number: (407) 362-1645
```

KPOP 0112

65

If to OLP or any of the OLP Corporations:

    Kaneb Pipe Line Operating Partnership, L.P.
    2400 Lakeside Boulevard
    Suite 600
    Richardson, Texas   75082
    Attention:  Edward D. Doherty
    Facsimile number:    (214) 699-1894
    Confirmation number: (214) 699-4047

With a copy to:

    Kaneb Services, Inc.
    2400 Lakeside Boulevard
    Suite 600
    Richardson, Texas   75082
    Attention:  Stephen M. Hoffner, Esq.
    Facsimile number:    (214) 699-1894
    Confirmation number: (214) 699-4047

16.02  _Change of Notice Address_.  Any party may change the address to which such communications are to be directed to it by giving written notice to the other party in the manner provided in Section 16.01.

ARTICLE 17

General

17.01  _Entire Agreement_.  This Agreement, the Ancillary Agreements, the Guaranty Agreement, and the other agreements, documents and instruments being delivered at the Closing set forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof, whether written or oral.

17.02  _No Other Representations, etc_.  No representation, promise, inducement or statement of intention relating to the transactions contemplated by this Agreement has been made by or on

KPOP 0113

behalf of any party hereto which is not set forth in this Agreement, the Guaranty Agreement or the Ancillary Agreements.

17.03  Headings.  The Article and Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

17.04  Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction.

17.05  Counterparts; Telecopy Execution and Delivery. (a) This Agreement may be executed in multiple counterparts (including counterparts executed by one party), each of which shall be an original, but all of which shall constitute a single agreement.

(b) A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

KPOP 0114

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

Attest:                                 GRACE ENERGY CORPORATION

_A. H. Riddleyor_                        By _Frank L. Ryan_

                                         KANEB PIPE LINE OPERATING
Attest:                                  PARTNERSHIP, L.P.

_One Fred Amer_                          By KANEB PIPE LINE COMPANY,
                                         general partner

                                         By _Douglas M. Emm_

Attest:                                  SUPPORT TERMINAL SERVICES, INC.

_A. H. Riddleyor_                        By _Fred X. Per_

Attest:                                  STANTRANS, INC.

_A. H. Riddleyor_                        By _Fred X. Per_

Attest:                                  STANDARD TRANSPIPE CORP.

_A. H. Riddleyor_                        By _____

KPOP 0115