# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 2 TO EXHIBIT BOOK
## ASBESTOS PI TRUST AGREEMENT

**EXHIBIT 2**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**WRG ASBESTOS PI TRUST AGREEMENT**

# WRG ASBESTOS PI TRUST AGREEMENT

# TABLE OF CONTENTS

SECTION 1 — Agreement of Trust .............................................................. 3

    1.1    Creation and Name .................................................................. 3
    1.2    Purpose ..................................................................................... 3
    1.3    Transfer of Assets .................................................................... 4
    1.4    Acceptance of Assets and Assumption of Liabilities ............... 4


SECTION 2 — Powers and Trust Administration ....................................... 5

    2.1    Powers ...................................................................................... 5
    2.2    General Administration ............................................................ 9
    2.3    Claims Administration ............................................................. 13
    2.4    Sealed Air Settlement Agreement ........................................... 13


SECTION 3 — Accounts, Investments, and Payments ............................... 18

    3.1    Accounts ................................................................................... 18
    3.2    Investments .............................................................................. 18
    3.3    Source of Payments ................................................................. 20


SECTION 4 — Trustees; Delaware Trustee ................................................ 21

    4.1    Number .................................................................................... 21
    4.2    Term of Service ....................................................................... 21
    4.3    Appointment of Successor Trustees ......................................... 22
    4.4    Liability of Trustees, Members of the TAC and
             the Futures Representative ....................................................... 23
    4.5    Compensation and Expenses of Trustees ................................ 23
    4.6    Indemnification ........................................................................ 24
    4.7    Lien    ....................................................................................... 25
    4.8    Trustees' Employment of Experts; Delaware Trustee's
             Employment of Counsel .......................................................... 25
    4.9    Trustees' Independence ........................................................... 26
    4.10   Bond ........................................................................................ 26
    4.11   Delaware Trustee .................................................................... 26

SECTION 5 — Trust Advisory Committee .................................................................... 28

    5.1    Members ................................................................................................ 28
    5.2    Duties .................................................................................................... 28
    5.3    Term of Office ...................................................................................... 29
    5.4    Appointment of Successor ................................................................... 29
    5.5    TAC's Employment of Professionals .................................................. 30
    5.6    Compensation and Expenses of the TAC ............................................ 32
    5.7    Procedures for Consultation With and Obtaining the
            Consent of the TAC ............................................................................ 32
            (a)    Consultation Process ................................................................ 32
            (b)    Consent Process ....................................................................... 33


SECTION 6 — The Futures' Representative ................................................................. 34

    6.1    Duties ................................................................................................... 34
    6.2    Term of Office ...................................................................................... 34
    6.3    Appointment of Successor ................................................................... 35
    6.4    Futures Representative's Employment of Professionals ..................... 35
    6.5    Compensation and Expenses of the Futures Representative ................... 37
    6.6    Procedures for Consultation with and Obtaining the
            Consent of the Futures Representative ............................................... 37
            (a)    Consultation Process ................................................................ 37
            (b)    Consent Process ....................................................................... 38

SECTION 7 — General Provisions .............................................................................. 39

    7.1    Irrevocability ........................................................................................ 39
    7.2    Term; Termination ............................................................................... 40
    7.3    Amendments ........................................................................................ 41
    7.4    Meetings ............................................................................................... 42
    7.5    Severability .......................................................................................... 42
    7.6    Notices ................................................................................................. 43
    7.7    Successors and Assigns ....................................................................... 45
    7.8    Limitation on Claim Interests for Securities Laws Purposes ............... 45
    7.9    Entire Agreement; No Waiver ............................................................. 45
    7.10   Headings .............................................................................................. 46
    7.11   Governing Law .................................................................................... 46
    7.12   Settlors' Representative and Cooperation ............................................ 46
    7.13   Dispute Resolution .............................................................................. 46
    7.14   Enforcement and Administration ......................................................... 47
    7.15   Effectiveness ....................................................................................... 47
    7.16   Counterpart Signatures ........................................................................ 47

## WRG ASBESTOS PI TRUST AGREEMENT

This WRG Asbestos PI Trust Agreement (this "**PI Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 3, 2009 (as it may be amended or supplemented, the "**Plan**"),[1] by W.R. Grace & Co. and the other Debtors (collectively referred to as the "**Debtors**," "**Grace**," or the "**Settlors**"), the debtors and debtors-in-possession whose chapter 11 cases are jointly administered under Case No. 01-1139-JKF in the United States Bankruptcy Court for the District of Delaware; the Asbestos PI Future Claimants' Representative (the "**Futures Representative**"); the Official Committee of Asbestos Personal Injury Claimants (the "**ACC**"); the Asbestos PI Trustees (the "**Trustees**"); Wilmington Trust Company (the "**Delaware Trustee**"); and the members of the Trust Advisory Committee (the "**TAC**") identified on the signature page hereof; and

**WHEREAS**, the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code in cases filed in the United States Bankruptcy Court for the District of

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference; *provided, however,* that "Asbestos PI Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims**." All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

Delaware, jointly administered and known as <u>In re W.R. Grace & Co., et al.</u>, Case No. 01-1139-JKF; and

WHEREAS, the Confirmation Order has been entered by the Bankruptcy Court and affirmed by the District Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the WRG Asbestos PI Trust (the "**PI Trust**"); and

WHEREAS, pursuant to the Plan, the PI Trust is to use its assets and income to satisfy all PI Trust Claims; and

WHEREAS, it is the intent of Grace, the Trustees, the ACC, the TAC, and the Futures Representative that the PI Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the PI Trust will satisfy all PI Trust Claims pursuant to the WRG Asbestos PI Trust Distribution Procedures (the "**TDP**") that are attached hereto as Exhibit 1 in substantially the same manner, and in strict compliance with the terms of this PI Trust Agreement; and

WHEREAS, all rights of the holders of PI Trust Claims arising under this PI Trust Agreement and the TDP shall vest upon the Effective Date; and

WHEREAS, pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

WHEREAS, the Bankruptcy Court has determined that the PI Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all PI Trust Claims, and such injunction has been entered in connection with the Confirmation Order;

NOW, **THEREFORE**, it is hereby agreed as follows:

## SECTION I

## AGREEMENT OF TRUST

**1.1**   **Creation and Name.**   The Debtors as Settlors hereby create a trust known as the "WRG Asbestos PI Trust," which is the Asbestos PI Trust provided for and referred to in the Plan.  The Trustees of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include a Trustee or Trustees acting on behalf of the Trust.  It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document, together with the by-laws described herein, constitute the governing instruments of the PI Trust.  The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

**1.2**   **Purpose.**   The purpose of the PI Trust is to assume all liabilities and responsibility for all PI Trust Claims, and, among other things to:  (a) direct the processing, liquidation and payment of all PI Trust Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the PI Trust for use in paying and satisfying PI Trust Claims; and (c) qualify at all times as a qualified settlement fund.  The PI Trust is to use the PI Trust's assets and income to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

1.3    **Transfer of Assets.**  Pursuant to, and in accordance with, Sections **[7.2.2]** and **[7.2.4]**[2] of the Plan, the PI Trust has received the Asbestos PI Trust Assets (collectively, the "**PI Trust Assets**") to fund the PI Trust and settle, discharge or channel all PI Trust Claims.  As part of such transfer, Cryovac, Inc. has directly transferred to the PI Trust the Cryovac Payment (reduced by the amount of Cryovac, Inc.'s transfer to the Asbestos PD Trust as part of the Asbestos PD Initial Payment), and Fresenius has transferred to the PI Trust the Fresenius Payment (reduced by the amount of Fresenius' transfer to the PD Trust as part of the Asbestos PD Initial Payment).  In all events, the PI Trust Assets or any other assets to be transferred to the PI Trust under the Plan will be transferred to the PI Trust free and clear of any liens or other claims by the Debtors, Reorganized Debtors, any creditor, or other entity except as otherwise provided in the Plan.  The Debtors, the Reorganized Debtors, and the other Insurance Contributors shall also execute and deliver such documents to the PI Trust as the Trustees reasonably request to transfer and assign any PI Trust Assets to the PI Trust.

1.4    **Acceptance of Assets and Assumption of Liabilities.**

(a)    In furtherance of the purposes of the PI Trust, the PI Trust hereby expressly accepts the transfer to the PI Trust of the PI Trust Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

(b)    In furtherance of the purposes of the PI Trust, the PI Trust expressly assumes all liabilities and responsibility for all PI Trust Claims, and the Reorganized Debtors, the Sealed Air Indemnified Parties, and the Fresenius Indemnified Parties shall have no further

---

[2] **[ALL REFERENCES TO THE PLAN AND TDP NEED TO BE UPDATED WHEN FINAL DOCUMENTS ARE AVAILABLE.]**

financial or other responsibility or liability therefor.  Except as otherwise provided in this PI

Trust Agreement and the TDP, the PI Trust shall have all defenses, cross-claims, offsets, and

recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights,

regarding such claims that Grace or the Reorganized Debtors have or would have had under

applicable law.  Regardless of the foregoing, however, a claimant must meet otherwise

applicable federal, state and foreign statutes of limitations and repose, except as otherwise

provided in Section **[5.1(a)(2)]** of the TDP.

(c)       No provision herein or in the TDP shall be construed or implemented in a

manner that would cause the PI Trust to fail to qualify as a "qualified settlement fund" under the

QSF Regulations.

(d)       Nothing in this PI Trust Agreement shall be construed in any way to limit

(i) the scope, enforceability, or effectiveness of the Asbestos PI Channeling Injunction, the

Successor Claims Injunction, or any other injunction or release issued or granted in favor of any

(or all) of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties in connection

with the Plan or (ii) subject to the provisions of Section 1.4(b) above, the PI Trust's assumption

of all liability for PI Trust Claims.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1**   **Powers.**

(a)       The Trustees are and shall act as the fiduciaries to the PI Trust in

accordance with the provisions of this PI Trust Agreement and the Plan.  The Trustees shall, at

all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set

forth in Section 1.2 above.  Subject to the limitations set forth in this PI Trust Agreement, the

- 5 -

Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)     receive and hold the PI Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the PI Trust Assets;

(ii)     invest the monies held from time to time by the PI Trust;

(iii)     sell, transfer, or exchange any or all of the PI Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this PI Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the PI Trust to operate;

(v)     pay liabilities and expenses of the PI Trust;

(vi)     establish such funds, reserves, and accounts within the PI Trust estate, as deemed by the Trustees to be useful in carrying out the purposes of the PI Trust;

(vii)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)    establish, supervise, and administer the PI Trust in accordance with this PI Trust Agreement and the TDP and the terms thereof;

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this PI Trust;

(x)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)    compensate the Trustees, the Delaware Trustee, the TAC members, and the Futures Representative as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the Delaware Trustee, the TAC members, and the Futures Representatives all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustees consider proper in administering the PI Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this PI Trust Agreement;

(xiv)    indemnify the Reorganized Debtors and their Representatives as provided in Section **[8.6.9]** of the Plan and, in accordance with Section 4.6 below, defend,

indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustees, the Delaware Trustee, the members of the TAC, and the Futures Representative, and (B) the officers and employees of the PI Trust, and any agents, advisors and consultants of the PI Trust, the TAC, or the Futures Representative (the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvi)   consult with the TAC and the Futures Representative at such times and with respect to such issues relating to the conduct of the PI Trust as the Trustees consider desirable; and

(xvii)  make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the PI Trust, any claim, right, action, or cause of action included in the PI Trust Assets, including, but not limited to, insurance recoveries, before any court of competent jurisdiction.

(d)    The Trustees shall not have the power to guarantee any debt of other persons.

(e)    The Trustees agree to take the actions of the PI Trust required hereunder.

(f)     The Trustees shall give the TAC and the Futures Representative prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

**2.2**     **General Administration.**

(a)     The Trustees shall act in accordance with the PI Trust Agreement.  The Trustees shall adopt and act in accordance with PI Trust Bylaws.  To the extent not inconsistent with the terms of this PI Trust Agreement, the PI Trust Bylaws shall govern the affairs of the PI Trust.  In the event of an inconsistency between the PI Trust Bylaws and this PI Trust Agreement, this PI Trust Agreement shall govern.

(b)     The Trustees shall (i) timely file such income tax and other returns and statements and shall timely pay all taxes required to be paid by the PI Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the PI Trust as a qualified settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the PI Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(c)     The Trustees shall timely account to the Bankruptcy Court as follows:

(i)     The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing financial statements of the PI Trust (including, without limitation, a balance sheet of the PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and

investments available for the payment of claims and as to the conformity of the financial statements with generally accepted accounting principles.  The Trustees shall provide a copy of such Annual Report to the TAC and the Futures Representative when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with the filing of the Annual Report, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements.  The Trustees shall provide a copy of such report to the TAC and the Futures Representatives when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**").

(d)    The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.  The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section **[2.4]** of the TDP, and the Claims Payment Ratio pursuant to Section **[2.5]** of the TDP.  The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the Futures Representative.

(e)    The Trustees shall consult with the TAC and the Futures Representative (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this PI Trust Agreement and the TDP.

(f)    The Trustees shall be required to obtain the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)    to redetermine the Payment Percentage described in Section **[2.3]** of the TDP as provided in Section **[4.2]** of the TDP;

(ii)    to change the Claims Payment Ratio described in Section **[2.5]** of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(iii)    to change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section **[5.3(a)(3)]** of the TDP, and/or the Average Values and/or Maximum Values set forth in Section **[5.3(b)(3)]** and Section **[5.4(a)]** of the TDP;

(iv)    to establish and/or to change the Claims Materials to be provided to holders of PI Trust Claims under Section **[6.1]** of the TDP;

(v)    to require that claimants provide additional kinds of medical evidence pursuant to Section **[7.1]** of the TDP;

(vi)    to change the form of release to be provided pursuant to Section **[7.8]** of the TDP;

(vii)    to terminate the PI Trust pursuant to Section 7.2 below;

(viii)    to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)    to change the compensation and/or per diem of the members of the TAC, the Futures Representative, the Delaware Trustee or the Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(x)    to take actions to minimize any tax on the PI Trust Assets; provided that no such action prevents the PI Trust from qualifying as a qualified settlement fund within the meaning of the QSF Regulations or requires an election for the PI Trust to be treated as a grantor trust for tax purposes;

(xi)    to adopt the PI Trust Bylaws in accordance with Section 2.2(a) above or thereafter to amend the PI Trust Bylaws in accordance with the terms thereof;

(xii)    to amend any provision of this PI Trust Agreement or the TDP in accordance with the terms thereof;

(xiii)    to vote the stock of a Reorganized Debtor for purposes of appointing members of the Board of Directors of a Reorganized Debtor;

(xiv)    to acquire an interest in or to merge any claims resolution organization formed by the PI Trust with another claims resolution organization that is not specifically created by this PI Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this PI Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the PI Trust pursuant to the PI Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder shall not (a) subject the Reorganized Debtors or any Asbestos Protected Party, or any successors in interest thereto, to any risk of having any PI Trust Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Asbestos PI Channeling Injunction, the Successor Claims Injunction, or any other injunction or release issued or granted in favor of any (or all) of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties in connection with the Plan; and provided further that the terms of such merger will require the surviving organization to make decisions about the allowability and

value of claims in accordance with Section **[2.1]** of the TDP which requires that such decisions be based on the provisions of the TDP; or

(xv)    if and to the extent required by Section **[6.5]** of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section **[6.5]** of the TDP.

(g)    The Trustees shall meet with the TAC and the Futures Representative no less often than quarterly.  The Trustees shall meet in the interim with the TAC and the Futures Representative when so requested by either.

(h)    The Trustees, upon notice from either the TAC or the Futures Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Futures Representative consider issues submitted by the TAC or the Futures Representative.

**2.3**    **Claims Administration.**  The Trustees shall promptly proceed to implement the TDP.

**2.4**    **Sealed Air Settlement Agreement.**  Notwithstanding anything in this PI Trust Agreement, and not by way of limitation of the Sealed Air Settlement Agreement or the Plan, the PI Trust, the Trustees, the Delaware Trustee, and any of their successors shall (unless otherwise agreed to in writing by each of Sealed Air Corporation and Cryovac, Inc. in its absolute discretion):

(a)    unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement), (1) file all Tax Returns required to be filed by the PI Trust, if any, consistent with the provisions of this Section 2.4(a) and shall take all other Defined Actions

- 13 -

(as defined in the Sealed Air Settlement Agreement) that are reasonably requested by Sealed Air

Corporation and consistent with the provisions of this Section 2.4(a), and (2) be prohibited from

taking any Defined Action (as defined in the Sealed Air Settlement Agreement) that may result

in the disqualification of the PI Trust as a Qualified Settlement Fund (as defined in the Sealed

Air Settlement Agreement) or be inconsistent with Cryovac, Inc. being treated as a "transferor"

(as defined under Treasury Regulations section 1.468B-1(d)) (for purposes of this Section 2.4 the

"**Transferor**") of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial

Payment) directly to the PI Trust pursuant to Section 7.2.2 of the Plan and the Confirmation

Order, *provided, however,* that it shall not be required to take, or be prohibited from taking, as

the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as

required pursuant to this Section 2.4(a) if each of the following four requirements has been

previously satisfied (i) it has fully performed all of its obligations set forth in paragraph VI(f) of

the Sealed Air Settlement Agreement, (ii) it has received a Contrary Opinion (as defined in the

Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed

Air Settlement Agreement) required or prohibited pursuant to this Section 2.4(a), (iii) it has

provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement)

to Sealed Air Corporation, and (iv) within forty-five days of the receipt by Sealed Air

Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement),

Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed

Air Settlement Agreement);

(b)    unless otherwise required by a Final Determination (as defined in the

Sealed Air Settlement Agreement), treat for all Tax purposes any and all payments by Cryovac,

Inc. pursuant to Section 7.2.2 of the Plan and the Confirmation Order, as a direct payment by

Cryovac, Inc. to the PI Trust, for Asbestos PI Claims that constitutes an ordinary and necessary expense of Cryovac, Inc.; and shall, unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement): (1) be prohibited from taking any Defined Action (as defined in the Sealed Air Settlement Agreement) that is inconsistent with the foregoing provisions of this Section 2.4(b), and (2) take all Defined Actions (as defined in the Sealed Air Settlement Agreement) that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this Section 2.4(b); *provided, however,* that it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to sub-clauses (1) and (2) of this Section 2.4(b) if each of the following four requirements has been previously satisfied (i) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement, (ii) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this Section 2.4(b), (iii) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (iv) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement);

(c)      if it has determined that an issue (for the purposes of this Section 2.4 such issue, a "**Paragraph VI(f) Issue**") may exist with respect to its taking, or the failure to take, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to paragraph II(c)(ix) or (x), of the Sealed Air Settlement Agreement or Sections 2.4(a) and 2.4(b),

of this PI Trust Agreement, as the case may be, then, prior to delivering a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) in accordance with the provisos set forth in paragraph II(c)(ix) or (x) of the Sealed Air Settlement Agreement, or Sections 2.4(a) and 2.4(b), of this PI Trust Agreement, as the case may be, each of the Trustees, the Delaware Trustee, and any of their successors, as the case may be, shall (1) provide to Sealed Air Corporation, as promptly as practicable, a written notice identifying such Defined Action (as defined in the Sealed Air Settlement Agreement) and describing in detail the Paragraph VI(f) Issue and (2) without limiting any obligation of Sealed Air Corporation to consult and act in good faith set forth in paragraph VI(f)(ii) of the Sealed Air Settlement Agreement, consult and act (and cause its advisors (including accountants and tax attorneys, as the case may be) to, consult and act) in good faith to determine and resolve (i) if such issue relates to a Tax issue, whether, as a result of a Change in Circumstances (as defined in the Sealed Air Settlement Agreement), there is no "reasonable basis", as defined in IRC section 6662 (or successor provision thereof), for the taking of, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) or (ii) if such issue relates to an accounting issue, whether, as a result of a Change in Circumstances (as defined in the Sealed Air Settlement Agreement), the taking, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) is inconsistent with generally accepted accounting principles;

(d)     cause the PI Trust to acquire the Sealed Air Common Stock for the PI Trust's own account for investment and not with a view toward distribution in a manner which would violate the Securities Act;

(e)        comply with all filing and other reporting obligations under all applicable laws which shall be applicable to the PI Trust with respect to the Sealed Air Common Stock;

(f)        without limiting any obligation of Sealed Air Corporation to comply fully with the Registration Rights Agreement (as defined in the Sealed Air Settlement Agreement), comply fully with the Registration Rights Agreement (as defined in the Sealed Air Settlement Agreement) including, without limitation, by not registering under the Securities Act the Sealed Air Common Stock that is transferred to the PI Trust except to the extent permitted under (and subject to the requirements of) the Registration Rights Agreement (as defined in the Sealed Air Settlement Agreement);

(g)        not, under any circumstances, transfer any fractional shares of the Sealed Air Common Stock such that any Entity shall be the transferee of less than one thousand shares of Sealed Air Common Stock, provided, however, that in no event shall the Asbestos PI Trust incur any costs or expenses associated with such one thousand share limitation; and

(h)        without limiting any obligation of Sealed Air Corporation or Cryovac, Inc. to comply fully with the Sealed Air Settlement Agreement, comply fully with the Sealed Air Settlement Agreement, including, without limitation, by performing all other actions required, and refraining from taking any other actions precluded, by the Sealed Air Settlement Agreement.

The TAC and the Futures Representative shall not cause or advise the PI Trust, the Trustees, the Delaware Trustee, or any of their successors to (i) take any action that is contrary to Section 2.4(a) through (h) of this PI Trust Agreement or (ii) refrain from taking any action that is required to comply with Section 2.4(a) through (h) of this PI Trust Agreement.

**SECTION III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

3.1    **Accounts.**

(a)    The Trustees may, from time to time, create such accounts and reserves within the PI Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of PI Trust Claims and may, with respect to any such account or reserve, restrict the use of monies therein.

(b)    The Trustees shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the Futures Representative pursuant to Section 2.2(c)(i) above.

3.2    **Investments.**  Investment of monies held in the PI Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

(a)    The PI Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index.  The PI Trust shall not acquire, directly or indirectly, equity in any entity (other than a Reorganized Debtor or any successor to a Reorganized Debtor) or business enterprise if, immediately following such acquisition, the PI Trust would hold more than 5% of the equity in such entity or business enterprise.  The PI Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity (other than Sealed

- 18 -

Air Corporation (by virtue of the Sealed Air Common Stock that is transferred directly to the PI Trust by Cryovac, Inc.), a Reorganized Debtor, or any successor to a Reorganized Debtor) or business enterprise.

(b)      The PI Trust shall not acquire or hold any long-term debt securities unless (i) such securities are PI Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("**S&P's**"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled investment vehicles where pooled assets receive an investment grade rating (i.e., "BBB" rating or above) by a nationally recognized rating agency.

(c)      The PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's, or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)      The PI Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the PI Trust would exceed 5% of the then current aggregate value of the PI Trust's assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)      The PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate

of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)    The PI Trust may acquire and hold any securities or instruments issued by a Reorganized Debtor or any successor to a Reorganized Debtor or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(e) above.

(g)    The PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(h)    The PI Trust may allow its investment managers to acquire prudently or hold derivative instruments, including, without limitation, options, futures and swaps in the normal course of portfolio management.  Specifically, the PI Trust may acquire or hold derivatives to help manage or mitigate portfolio risk, including, without limitation, interest rate risk and equity market risk.  Using derivative instruments to leverage a portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(i)    The PI Trust may lend securities on a short-term basis, subject to adequate, normal and customary collateral arrangements.

(j)    Notwithstanding (a) above, the PI Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the PI Trust complies with the provisions of Section 2.2(f)(xiv) hereof with respect to the acquisition.

### 3.3    <u>Source of Payments</u>.

(a)    All PI Trust expenses and payments and all liabilities with respect to claims shall be payable solely by the Trustees out of the PI Trust Assets.  Neither the Debtors,

the Reorganized Debtors, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties,
their subsidiaries, any successor in interest, the present or former directors, officers, employees
or agents of the Debtors, the Reorganized Debtors, the Sealed Air Indemnified Parties, or the
Fresenius Indemnified Parties, nor the Trustees, the TAC or Futures Representative, or any of
their officers, agents, advisors, or employees shall be liable for the payment of any PI Trust
expense or any other liability of the PI Trust, except to the extent provided in the Plan or Plan
Documents.

(b)    The Trustees shall include a reasonably detailed description of any
payments made in accordance with this Section 3.3 in the Annual Report.

## SECTION IV

## TRUSTEES; DELAWARE TRUSTEE

**4.1    Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11,
there shall be three (3) Trustees who shall be those persons named on the signature page hereof.

**4.2    Term of Service.**

(a)    The initial Trustees named pursuant to Article 4.1 above shall serve
staggered terms of three (3), four (4) and five (5) years shown on the signature pages hereof.
Thereafter each term of service shall be five (5) years.  The initial Trustees shall serve from the
Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her
resignation pursuant to Section 4.2(b) below, (iv) his or her removal pursuant to Section 4.2(c)
below, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b)    A Trustee may resign at any time by written notice to the remaining
Trustees, the TAC, and the Futures Representative.  Such notice shall specify a date when such

resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A Trustee may be removed (i) by unanimous vote of the remaining Trustees or (ii) at the recommendation of the TAC and the Futures Representative with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**4.3**     **Appointment of Successor Trustees.**

(a)     In the event of a vacancy in the position of a Trustee, whether by death, term expiration, resignation, or removal, the remaining Trustees shall consult with the TAC and the Futures Representative concerning appointment of a successor Trustee.  The vacancy shall be filled by the unanimous vote of the remaining Trustees unless a majority of the TAC or the Futures Representative vetoes the appointment.  In the event that the remaining Trustees cannot agree on a successor Trustee, or a majority of the TAC or the Futures Representative vetoes the appointment of a successor Trustee, the Bankruptcy Court shall make the appointment.  Nothing shall prevent the reappointment of a Trustee for an additional term or terms, and there shall be no limit on the number of terms that a Trustee may serve.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and

undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)     Each successor Trustee shall serve until the earlier of (i) the end of a full term of five (5) years if the predecessor Trustee completed his or her term, (ii) the end of the remainder of the term of the Trustee whom he or she is replacing if said predecessor Trustee did not complete said term, (iii) his or her death, (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**4.4     Liability of Trustees, Members of the TAC and the Futures Representative.** The Trustees, the Members of the TAC and the Futures Representative shall not be liable to the PI Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation.

**4.5     Compensation and Expenses of Trustees.**

(a)     Each Trustee shall receive a retainer from the PI Trust for his or her service as a Trustee in the amount of $60,000.00 per annum, which amount shall be payable in quarterly installments.  In addition, for all time expended attending Trustee meetings, preparing for such meetings, and working on authorized special projects, the Trustees shall receive the sum of $500 per hour, and the sum of $250 per hour for non-working travel time, in both cases computed on a quarter-hour basis.  The Trustees shall record all hourly time to be charged to the Trust on a daily basis.  The per annum retainer and hourly compensation payable to the Trustees hereunder shall be reviewed every year by the Trustees and, after consultation with the members of the TAC and the Futures Representative, appropriately adjusted by the Trustees for changes in

the cost of living.  The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)	The PI Trust will promptly reimburse the Trustees and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustees or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)	The PI Trust shall include a description of the amounts paid under this Section 4.5 in the Annual Report.

**4.6**	**Indemnification.**

(a)	The PI Trust shall indemnify and defend the Trustees, the members of the TAC and the Futures Representative in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the PI Trust.  The PI Trust may indemnify any of the Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment or funding of the PI Trust.  Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs)

incurred by or on behalf of a Trustee, a member of the TAC, the Futures Representative or

Additional Indemnitee in connection with any action, suit, or proceeding, whether civil,

administrative or arbitrative, from which they are indemnified by the PI Trust pursuant to

Section 4.6(a) above, shall be paid by the PI Trust in advance of the final disposition thereof

upon receipt of an undertaking, by or on behalf of the Trustees, the members of the TAC, the

Futures Representative or Additional Indemnitee, to repay such amount in the event that it shall

be determined ultimately by final order that such Trustee, member of the TAC, the Futures

Representative or Additional Indemnitee is not entitled to be indemnified by the PI Trust.

(c)     The Trustees may purchase and maintain reasonable amounts and types of

insurance on behalf of an individual who is or was a Trustee, member of the TAC, the Futures

Representative or Additional Indemnitee, including against liability asserted against or incurred

by such individual in that capacity or arising from his or her status as a Trustee, TAC member,

Futures Representative, an officer or an employee of the PI Trust, or an advisor, consultant or

agent of the PI Trust, the TAC or the Futures Representative.

**4.7**    **Lien.**  The Trustees, members of the TAC, the Futures Representative and the

Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the

payment of any amounts payable to them pursuant to Section 4.6 above.

**4.8**    **Trustees' Employment of Experts; Delaware Trustee's Employment of**

**Counsel.**

(a)     The Trustees may, but shall not be required to, retain and/or consult with

counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors

and such other parties deemed by the Trustees to be qualified as experts on the matters submitted

to them (the "**Trust Professionals**"), and in the absence of gross negligence, the written opinion

of or information provided by any such party deemed by the Trustees to be an expert on the

particular matter submitted to such party shall be full and complete authorization and protection

in respect of any action taken or not taken by the Trustees hereunder in good faith and in

accordance with the written opinion of or information provided by any such party.

(b)      The Delaware Trustee shall be permitted to retain counsel only in such

circumstances as required in the exercise of its obligations hereunder and compliance with the

advice of such counsel shall be full and complete authorization and protection for actions taken

or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9**      **Trustees' Independence.**  The Trustees shall not, during the term of their service,

hold a financial interest in, act as attorney or agent for, or serve as any other professional for a

Reorganized Debtor.  Notwithstanding the foregoing, any Trustee may serve, without any

additional compensation other than the per diem compensation to be paid by the PI Trust

pursuant to Section 4.5(a) above, as a director of the Reorganized Parent.  No Trustee shall act as

an attorney for any person who holds an asbestos claim.  For the avoidance of doubt, this Section

shall not be applicable to the Delaware Trustee.

**4.10**      **Bond.**  The Trustees and the Delaware Trustee shall not be required to post any

bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11**      **Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee.  The Delaware Trustee

shall either be (i) a natural person who is at least 21 years of age and a resident of the State of

Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware,

otherwise meets the requirements of applicable Delaware law and shall act through one or more

persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)        The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustees set forth herein.  The Delaware Trustee shall be one of the trustees of the PI Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PI Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)        The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 4.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 4.11(d) below. If the Trustees do not act within such 60-day period, the Delaware

Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees and any fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this PI Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this PI Trust Agreement.

## SECTION V

## TRUST ADVISORY COMMITTEE

5.1    **Members.**  The TAC shall consist of four (4) members, who shall initially be the persons named on the signature page hereof.

5.2    **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present PI Trust Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.

**5.3**     **Term of Office.**

(a)     The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Futures Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4**     **Appointment of Successor.**

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor.  If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor.  If (i) a

member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if such members cannot agree on a successor, the Bankruptcy Court.  Nothing in this Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms, and there shall be no limit on the number of terms that a TAC member may serve.

(b)     Each successor TAC member shall serve until the earlier of (i) the end of the full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**5.5     TAC's Employment of Professionals.**

(a)     The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**").  The TAC and the TAC Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees provided that any information provided by the

Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence of gross negligence, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The PI Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The PI Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however,* that (i) the TAC has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such TAC Professional, and (B) why the TAC cannot rely on Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the PI Trust has approved the TAC's request for reimbursement in writing. If the PI Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a PI Trust expense. If the PI Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the PI Trust's expense, the TAC and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

5.6     **Compensation and Expenses of the TAC**.

The members of the TAC shall receive compensation from the PI Trust for their services as TAC members in the form of a reasonable hourly rate set by the Trustees for attendance at meetings or other conduct of PI Trust business. The members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the Futures Representative and the TAC pursuant to Section 2.2(c)(i).

5.7     **Procedures for Consultation With and Obtaining the Consent of the TAC**.

(a)     **Consultation Process**.

(i)      In the event the Trustees are required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with

its own independent financial or investment advisors as to such matter.  In any event, the

Trustees shall not take definitive action on any such matter until at least thirty (30) days after

providing the TAC with the initial written notice that such matter is under consideration by the

Trustees, unless such time period is waived by the TAC.

        (b)    **Consent Process.**

        (i)    In the event the Trustees are required to obtain the consent of the

TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written notice

stating that their consent is being sought pursuant to that provision, describing in detail the nature

and scope of the action the Trustees propose to take, and explaining in detail the reasons why the

Trustees desire to take such action.  The Trustees shall provide the TAC as much relevant

additional information concerning the proposed action as is reasonably practicable under the

circumstances.  The Trustees shall also provide the TAC with such reasonable access to the Trust

Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may

reasonably request during the time that the Trustees are considering such action, and shall also

provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to

discuss and comment on such action with the Trustees.

        (ii)    The TAC must consider in good faith and in a timely fashion any

request for its consent by the Trustees, and must in any event advise the Trustees in writing of its

consent or its objection to the proposed action within thirty (30) days of receiving the original

request for consent from the Trustees.  The TAC may not withhold its consent unreasonably.  If

the TAC decides to withhold its consent, it must explain in detail its objections to the proposed

action.  If the TAC does not advise the Trustees in writing of its consent or its objections to the

action within thirty (30) days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION VI

## THE FUTURES REPRESENTATIVE

**6.1    Duties.**  The initial Futures Representative shall be the individual identified on the signature pages hereto.  He shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons.  The Trustees must consult with the Futures Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Futures Representative on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the Futures Representative.

**6.2    Term of Office.**

(a)    The Futures Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b)     The Futures Representative may resign at any time by written notice to the Trustees.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Futures Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

**6.3**     **Appointment of Successor.**  A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Futures Representative, and a vacancy caused by removal of the Futures Representative shall be filled with an individual nominated by the Trustees in consultation with the TAC, subject, in each case, to the approval of the Bankruptcy Court.  In the event a majority of the Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

**6.4**     **Futures Representative's Employment of Professionals.**

(a)     The Futures Representative may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Futures Representative to be qualified as experts on matters submitted to the Futures Representative (the "**Futures Representative Professionals**").  The Futures Representative and the Futures Representative Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them

or otherwise available to the PI Trust or the Trustees provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, the written opinion of or information provided by any Futures Representative Professional or Trust Professional deemed by the Futures Representative to be qualified as an expert on the particular matter submitted to the Futures Representative shall be full and complete authorization and protection in support of any action taken, or not taken, by the Futures Representative in good faith and in accordance with the written opinion of or information provided by the Futures Representative Professional or Trust Professional.

(b)     The PI Trust shall promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of legal counsel pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder.  The PI Trust shall also promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of any other Futures Representative Professionals pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder; *provided, however*, that (i) the Futures Representative has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the Futures Representative desires to employ the Futures Representative Professional, and (B) why the Futures Representative cannot rely on Trust Professionals to meet the need of the Futures Representative for such expertise or advice, and (ii) the PI Trust has approved the Futures Representative's request for reimbursement in writing.  If the PI Trust agrees to pay for the Futures Representative Professional, such reimbursement shall be treated as a PI Trust expense.  If the PI Trust declines to pay for the

Futures Representative Professional, it must set forth its reasons in writing. If the Futures Representative still desires to employ the Futures Representative Professional at the PI Trust's expense, the Futures Representative and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

      **6.5**    **Compensation and Expenses of the Futures Representative.**  The Futures Representative shall receive compensation from the PI Trust in the form of payment at the Futures Representative's normal hourly rate for services performed. The PI Trust will promptly reimburse the Futures Representative for all reasonable out-of-pocket costs and expenses incurred by the Futures Representative in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed a PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the Futures Representative and the TAC pursuant to Section 2.2(c)(i).

      **6.6**    **Procedures for Consultation with and Obtaining the Consent of the Futures Representative.**

        (a)    **Consultation Process.**

          (i)    In the event the Trustees are required to consult with the Futures Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Futures Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the Futures Representative with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Futures Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Futures Representative the

opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)    In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.6(a), the Trustees shall take into consideration the time required for the Futures Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter. In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the Futures Representative with the initial written notice that such matter is under consideration by the Trustees, unless such period is waived by the Futures Representative.

(b)    **Consent Process.**

(i)    In the event the Trustees are required to obtain the consent of the Futures Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Futures Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action.  The Trustees shall provide the Futures Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustees shall also provide the Futures Representative with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Futures Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Futures Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The Futures Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustees.  The Futures Representative may not withhold his or her consent unreasonably.  If the Futures Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action.  If the Futures Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustees regarding such consent, the Futures Representative's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.6(b), the Futures Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the Futures Representative shall resolve their dispute pursuant to Section 7.13.  However, the burden of proof with respect to the validity of the Futures Representative's objection and withholding of his or her consent shall be on the Futures Representative.

## SECTION VII

## GENERAL PROVISIONS

**7.1**    **Irrevocability.**  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

7.2      **Term; Termination.**

(a)      The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.2 below.

(b)      The PI Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

(i)      the date on which the Trustees decide to dissolve the PI Trust because (A) they deem it unlikely that new asbestos claims will be filed against the PI Trust, (B) all PI Trust Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this PI Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new asbestos claim has been filed with the PI Trust; or

(ii)      if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the PI Trust in a manner consistent with this PI Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)      to the extent that any rule against perpetuities shall be deemed applicable to the PI Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)      On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the PI Trust's affairs by the Trustees and payment of all the PI Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the PI Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos related lung disease or disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code.  Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(c) cannot be modified or amended.

(d)      Following the dissolution and distribution of the assets of the PI Trust, the PI Trust shall terminate and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this PI Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**7.3**      **Amendments.**  The Trustees, after consultation with the TAC and the Futures Representative, and subject to the unanimous consent of the TAC and the Futures Representative, may modify or amend this PI Trust Agreement and the PI Trust By-laws.  The Trustees, after consultation with the TAC and the Futures Representative, and subject to the consent of the TAC and the Futures Representative, may modify or amend the TDP; *provided,*

*however*, that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein, and in particular the provisions limiting amendment of the Claims Payment Ratio set forth in Section **[2.5]** of the TDP and of the Payment Percentage set forth in Section **[4.2]** of the TDP.  Any modification or amendment made pursuant to this Article must be done in writing.  Notwithstanding anything contained in this PI Trust Agreement or the TDP to the contrary, neither this PI Trust Agreement, the PI Trust Bylaws, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) Section 2.4 of this PI Trust Agreement unless expressly consented to in writing by each of Sealed Air Corporation and Cryovac, Inc. in its absolute discretion, (ii) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the Confirmation Order, (iii) the efficacy or enforceability of the Asbestos PI Channeling Injunction, the Successor Claims Injunction, or any other injunction or release issued or granted in favor of any (or all) of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties in connection with the Plan, (iv) the PI Trust's qualified settlement fund status under the QSF Regulations, or (v) any provision, condition, or restriction relating to or with respect to the Sealed Air Common Stock in the Plan, the Confirmation Order, the Sealed Air Settlement Agreement, or in this PI Trust Agreement (unless expressly consented to in writing by each of Sealed Air Corporation and Cryovac, Inc. in its absolute discretion).

      7.4    **Meetings.**  The Delaware Trustee shall not be required nor permitted to attend meetings relating to the PI Trust.

      7.5    **Severability.**  Should any provision in this PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI Trust Agreement.

     **7.6**    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Trust Claim.

     (a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustees:

     [TO COME]


To the Delaware Trustee:

     Wilmington Trust Company
     1100 N. Market Street
     Wilmington, DE 19890-1625
     Attention:  Corporate Custody


To the TAC:

     Russell Budd, Esq.
     Baron & Budd, PC
     3102 Oak Lawn Avenue, Suite 1100
     Dallas, TX  75219
     Facsimile:  (214) 520-1181
     E-mail:  rbudd@baronbudd.com

John D. Cooney, Esq.
Cooney & Conway
120 N. LaSalle Street, 30th Floor
Chicago, IL  60602
Facsimile:  (312) 236-3029
E-mail:  jcooney@cooneyconway.com

Joseph F. Rice, Esq.
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, NC  29464
Facsimile:  (843) 216-9450
E-mail:  jrice@motleyrice.com

Perry Weitz, Esq.
Weitz & Luxenberg
180 Maiden Lane
New York, NY  10038
Facsimile:  (212) 344-5461
E-mail:  pweitz@weitzlux.com


To the Futures Representative:

David T. Austern, Esq.
Futures Representative
3110 Fairview Park Drive, Suite 200
P.O. Box 12003
Falls Church, VA 22042
Facsimile:  (703) 205-6249
E-mail: daustern@claimsres.com

To the Reorganized Debtors:

W.R. Grace & Co.
Attn:  _____

_____

_____


(b)      All such notices and communications if mailed shall be effective when physically

delivered at the designated addresses or, if electronically transmitted, when the communication is

received at the designated addresses and confirmed by the recipient by return transmission.

- 44 -

**7.7** **Successors and Assigns.** The provisions of this PI Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Trust, the Trustees, and the Reorganized Debtors, and their respective successors and assigns, except that neither the Debtors, the PI Trust, the Trustees, nor the Reorganized Debtors may assign or otherwise transfer any of its, or their, rights or obligations, if any, under this PI Trust Agreement except, in the case of the PI Trust and the Trustees, as contemplated by Section 2.1 above.

**7.8** **Limitation on Claim Interests for Securities Laws Purposes.** PI Trust Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a PI Trust Claim as a result of its satisfaction of such PI Trust Claim.

**7.9** **Entire Agreement; No Waiver.** The entire agreement of the parties relating to the subject matter of this PI Trust Agreement is contained herein and in the documents referred to herein, and this PI Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

     **7.10**   **Headings.**  The headings used in this PI Trust Agreement are inserted for convenience only and do not constitute a portion of this PI Trust Agreement, nor in any manner affect the construction of the provisions of this PI Trust Agreement.

     **7.11**   **Governing Law.**  This PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

     **7.12**   **Settlors' Representative and Cooperation.**  The Debtors are hereby irrevocably designated as the Settlors, and they are hereby authorized to take any action required of the Settlors by the Trustees in connection with the PI Trust Agreement.  The Reorganized Debtors agree to cooperate in implementing the goals and objectives of this PI Trust Agreement.

     **7.13**   **Dispute Resolution.**  Any disputes that arise under this PI Trust Agreement or under the TDP among the parties hereto shall be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Futures Representative), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustees determine that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustees

shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

**7.14**   **Enforcement and Administration.**   The provisions of this PI Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15**   **Effectiveness.**   This PI Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16**   **Counterpart Signatures.**   This PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this PI Trust Agreement this

_____ day of _____, 2009.

**W.R. GRACE & CO.**


By:_____


Title:  _____


**[ADD NAMES OF OTHER DEBTORS]**


By:_____


Title:_____

**TRUSTEES**                                    **ASBESTOS CLAIMANTS COMMITTEE**


_____    By:_____
Name:  Harry Huge
Expiration Date of Initial Term:  _____
Anniversary of the date of this PI Trust Agreement    **DELAWARE TRUSTEE**


_____    By:_____
Name:  Lewis Sifford
Expiration Date of Initial Term:  _____
Anniversary of the date of this PI Trust Agreement


_____
Name:  Dean Trafelet
Expiration Date of Initial Term:  _____
Anniversary of the date of this PI Trust Agreement

**TRUST ADVISORY COMMITTEE**

_____
Name:  Russell W. Budd
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  John D. Cooney
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  Joseph F. Rice
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  Perry Weitz
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


**FUTURES REPRESENTATIVE**

_____
David T. Austern