**W. R. GRACE & CO. AND SUBSIDIARIES
PRO FORMA AND PROSPECTIVE
FINANCIAL INFORMATION**

**[FEBRUARY 27, 2009]**

## W. R. GRACE & CO. AND SUBSIDIARIES
## PRO FORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following pro forma and prospective financial information (the "Financial Information") of W. R. Grace & Co. and its Subsidiaries ("Grace") has been prepared for the sole purpose of evaluating the feasibility of the proposed Joint Plan of Reorganization (as such plan may be amended or modified, the "Plan") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") of W. R. Grace & Co., certain of its Subsidiaries, the Official Committee of Asbestos Personal Injury Claimants, the [**Personal Injury** ]Future Claimants' Representative, and the Official Committee of Equity Security Holders.  The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed.  The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code. [**Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.**]

**WHILE GRACE BELIEVES THAT THE ASSUMPTIONS UNDERLYING THE PRO FORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, ITS ADVISORS, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PRO FORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS.  GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION[ TO REFLECT EVENTS OR CIRCUMSTANCES OCCURRING AFTER THE DATE OF THE FINANCIAL INFORMATION].**

The Financial Information [**contains forward-looking statements, that is, information related to future, not past, events.  Such information generally includes the words "assumes," "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions.  For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.  **]All estimates and assumptions underlying the Financial Information were developed by Grace.  Estimates of projected operating performance and cash flows were based upon Grace's current operating plans and strategic plans which include consideration of recent historic performance, expected future economic conditions, investment plans and other relevant factors.  The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information.  Although Grace believes the

assumptions used are reasonable under the circumstances, {~~such assumptions are subject to significant uncertainties which include, but are not limited to the following:  changes in the terms of the Plan before it is final;~~}**[Grace is subject to risks and uncertainties that could cause actual results to differ materially from the assumptions, estimates and results projected in these forward-looking statements.  Factors that could cause actual results to materially differ from the assumptions, estimates and results projected in these forward-looking statements include: Grace's bankruptcy and proposed plan of reorganization,]** the availability of {~~exit financing on terms satisfactory to Grace; changes in the economic, competitive or political environment; changes in demand for Grace's products; technological breakthroughs, product innovations or competitive pricing strategies that negatively affect the profitability of a product or line of business; the availability and cost of raw materials, energy and labor; changes in foreign currency exchange rates or interest rates; the outcome of ongoing legal proceedings (specifically~~}**[financing for Grace's proposed plan of reorganization, Grace's legal proceedings (especially]** the Montana criminal proceeding{~~); and other factors affecting Grace's operations as~~}**[ and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially security, regulation and currency risks, and those factors]** set forth in Grace's {~~2007 Form 10-K~~}**[most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the ]**<u>United States Securities and Exchange Commission ("</u>**[SEC") and are readily available on the Internet at www.sec.gov]**.  Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty.  Consequently, actual financial results will likely vary from those shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace using guidelines promulgated by the ~~United States Securities and Exchange Commission ("{SEC")}~~**[SEC]** and the American Institute of Certified Public Accountants ("AICPA")**[; however, the Financial Information is prepared in a format that may not be comparable to information in our financial statements included in our filings with the SEC.  As a result, investors in Grace common stock should not rely upon the Financial Information]**.  The Financial Information has not been audited or reviewed by registered independent accountants.

## I.   FINANCIAL INFORMATION PRESENTED

The Financial Information includes:

- Pro forma condensed consolidated balance sheet of Grace as of {~~June 30,~~}**[December 31,]** 2008, reflecting the accounting effects of the Plan as if it {~~were~~}**[became]** effective on that date.

- Pro forma consolidated statements of operations of Grace for the year ended December 31, {~~2007 and for the six months ended June 30, 2008,~~}**[2008]** reflecting

the accounting effects of the Plan as if it {were in effect at the beginning of each period presented. }[**became effective on December 31, 2007.**]

Projected condensed consolidated balance sheets of Grace as of December 31, {2008}[**2009**] and {2009,}[**2010,**] as if the Plan {were}[**became**] effective {at}[**on**] December 31, {2008,}[**2009,**] together with historical information as of December 31, {2005, 2006}[**2006, 2007**] and {2007. }[**2008.**]

Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, {2008}[**2009**] and {2009,}[**2010,**] as if the Plan {were}[**became**] effective on December 31, {2008,}[**2009,**] together with historical information for the years ended December 31, {2005, 2006}[**2006, 2007**] and {2007. }[**2008.**]

Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, {2008}[**2009**] and {2009,}[**2010,**] as if the Plan {were}[**became**] effective on December 31, {2008,}[**2009,**] together with historical information for the years ended December 31, {2005, 2006}[**2006, 2007**] and {2007. }[**2008.**]

The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with {those}[**the accounting policies**] currently used by Grace in the preparation of its consolidated financial statements{, except as noted below and discussed further on pages 9-10.}[**.**] A detailed explanation of Grace's accounting policies is provided in Grace's [**2008** ]Form 10-K{ for the year ended December 31, 2007.}[**.**] The Plan will be accounted for in accordance with AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("SOP 90-7").{ Effective with reports issued for the third quarter 2008, Grace will value its U.S. inventories under the first-in/first-out (FIFO) method, and the prospective Financial Information contained herein reflects this change in accounting method.}

The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, {2007}[**2008**] contained in Grace's {2007 Form 10-K and with the consolidated financial statements for the six months ended June 30, 2008 contained in Grace's second quarter 2008 Form 10-Q}[**2008 Form 10-K**]. The historical financial information included herein was derived from such {documents}[**document**]. The {Forms}[**2008 Form**] 10-K {and 10-Q are}[**is**] available at www.grace.com or from the SEC's EDGAR system at www.sec.gov.

## II. THE [PLAN OF ]REORGANIZATION{ PLAN}

## A. GENERAL TERMS AND ASSUMPTIONS

The Plan is considered a "hypothetical assumption" (as defined under AICPA guidance for prospective financial information) until confirmed by the Bankruptcy Court. The Plan may change significantly as proceedings under Grace's Chapter 11 {case}[**cases**] continue.

The Financial Information assumes [**that Grace will emerge from Bankruptcy on December 31, 2009 (the Effective Date) with a confirmed Plan that includes** ]the following [**major** ]terms{ of the Plan}:

### *Asbestos [-]Related Claims:*

Asbestos{ related} personal injury claims ("Asbestos PI Claims") [**and asbestos property damage claims ("Asbestos PD Claims")** ]will be resolved {as outlined in the Plan through the contribution of cash, warrants, deferred payments and proceeds received under third party arrangements to a trust}[**through the creation of two separate trusts**] (the "Asbestos PI Trust"{)}[ **and the "Asbestos PD Trust"), both**] established {under}[**pursuant to section 524(g) of the**] Bankruptcy Code{ Section 524(g)} ("Section 524(g)"). The specific components of the Grace contribution to the Asbestos PI Trust are:

Cash of {$359}[**approximately $392**] million{;}[ (**plus interest**)] including $250 million pursuant to the asbestos personal injury settlement announced in April 2008 and {$109}[**approximately $142**] million pursuant to the arrangement described below{.}[**:**]

In order to ensure that the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties obtain Section 524(g) protection with respect to {all asbestos personal injury and }property damage claims, Cryovac and Fresenius will pay a total of {$109}[**approximately $142**] million[ (**plus interest and certain Trust expenses**)] to the Asbestos PD Trust{ (defined below)}, which amount would otherwise have been paid by Grace for resolved property damage claims. As an offset, the Cryovac and Fresenius payments to the Asbestos PI Trust will be reduced {by a total of $109 million }and Grace's payment to the Asbestos PI Trust will {be increased by $109 million}[**correspondingly increase**].

Warrants ("Warrants") to acquire 10 million shares of Grace common stock at an exercise price of $17 per share expiring one year after the Effective Date{ (defined below)}.

Deferred payments ("[**PI** ]Deferred Payments") of $110 million per year for five years beginning January 2, 2019 and of $100 million per year for ten years beginning January 2, 2024.

Rights to proceeds under Grace's asbestos-related insurance coverage.

Asbestos{ ~~related property damage claims ("Asbestos~~} PD Claims{~~"), including the US ZAI PD Claims,~~} will be resolved as outlined in the Plan through the payment by Cryovac and Fresenius of {~~$109 million to a trust (the "Asbestos PD Trust")~~ ~~established under Section 524(g) as described above and the contribution by Grace of~~ ~~the Asbestos PD Note. The Asbestos PD Note will represent an obligation of Grace~~ ~~to pay the Asbestos PD Trust for Asbestos PD Claims allowed~~} ~~after the Effective~~ ~~Date{. At the Effective Date, the Asbestos PD Note will have no balance. The~~ ~~Financial Information assumes no payments for US ZAI PD Claims. Grace will~~ ~~resolve the Canadian ZAI PD Claims through the payment of approximately $6.4~~ ~~million to the CDN ZAI PD Claim Fund as set forth in the Plan.~~[**approximately $142 million (plus interest and certain Trust expenses) to the Asbestos PD Trust. This amount includes the $30 million payment for US ZAI PD Claims to be made at the Effective Date. Grace will contribute to the Asbestos PD Trust:** ]

[

- [**With respect to Class 7A Claims (Asbestos PD claims, excluding US and Canadian ZAI PD Claims), a deferred payment obligation to fund Allowed Claims resolved**] after the Effective Date[ **and Asbestos PD Trust Expenses.**]

[

- [**With respect to Class 7B Claims (US ZAI PD Claims), a deferred payment obligation of $30 million payable on the third anniversary of the Effective Date (the "ZAI Deferred Payment") and up to ten contingent payments of $8 million per year during the 20-year period beginning on the fifth anniversary of the Effective Date. These contingent payments will be made only in the event certain conditions are met, including that the assets available in the Asbestos PD Trust to pay Class 7B Claims fall below $10 million in value.**]

[

- [**With respect to Canadian ZAI PD Claims, a payment of approximately CDN $6.5**] million to the CDN ZAI PD Claim Fund[**.** ]

Cryovac will contribute directly to the Asbestos PI Trust and the Asbestos PD Trust a total of (i) cash of ${~~512.5~~}[**512**] million plus accrued interest of 5.5% from December 21, 2002, and (ii) 18 million shares of Sealed Air Corporation common stock.

Fresenius will contribute directly to the Asbestos PI Trust and Asbestos PD Trust a total of $115 million.

### *Other Claims[ and Emergence Contingencies]:*

Grace will pay approximately ${~~1,049~~}[**1,083**] million (estimated as of {~~June 30,~~}[**December 31,**] 2008) {~~of cash,~~}[**plus accrued interest**] to satisfy other claims payable at the Effective Date. In addition, "Emergence Contingencies" in the amount of ${~~125 million have been included for bank fees, legal fees, and other allowable claims.~~}[**100 million are assumed to be paid at the Effective Date.**]

***Ongoing Liabilities:***

    Grace will satisfy all other liabilities subject to compromise{~~,~~} as they become due and payable {~~over time~~}[**after emergence**].   Such liabilities are estimated at approximately ${~~352~~}[**381**] million as of {~~June 30,~~}[**December 31,**] 2008 and include amounts for {~~post retirement~~}[**postretirement**] benefits{~~, environmental remediation~~}, income tax contingencies, [**environmental contingencies,** ]and probable [**and estimable** ]payments {~~under~~}[**to**] the Asbestos PD {~~Note.~~}[**Trust.** ]

The Financial Information[ **assumes payment to Holders**] as set forth in the Plan.[ **It**] assumes no payments for contingencies not contemplated by the Plan, including but not limited to default interest on Grace's pre-petition bank debt [**claims** ](as demanded by the pre-petition bank debt holders) and resolution of the Libby criminal case.  (The Financial Information assumes [**that** ]payments for Libby defense costs continue {~~through~~}[**in**] 2009.)    If any of such contingencies become probable and estimable, Grace {~~will~~}[**intends to**] record a liability at that time.

## B.  EXIT FINANCING

The Financial Information assumes [**that** ]Grace {~~pays~~}[**will pay**] claims with existing cash and investments, future operating cash flow[ **and** ]borrowings under a new credit facility{ ~~and~~ }~~future operating cash flow~~.   The Financial Information assumes a new ${~~1,750~~}[**1,250**] million credit facility to fund allowed claims payable on the Effective Date and to provide working capital and letters of credit for {~~continuing~~}[**post emergence**] operations.  Of such amount, ${~~1,500~~}[**1,000**] million is assumed {~~funded at emergence~~}[**borrowed on the Effective Date**], with $250 million of revolver capacity undrawn and available for future needs.  {~~In addition, Grace is assumed to have cash and investment securities of approximately $381 million on the Effective Date to fund working capital and strategic capital needs and any contingencies, including but not limited to the contingencies referred to in the preceding paragraph.~~ }[**For purposes of the pro forma balance sheet only, the exit financing requirement is $1,150 million. The difference of $150 million reflects the benefit of additional net cash flow assumed to be generated during 2009.   We expect our actual exit financing requirement to be approximately $1,000 million.**]

The Financial Information assumes a 9% {~~interest~~}[**coupon**] rate on outstanding borrowings[**.   The exit financing may be issued at a discount.  The possibility of such a discount was considered in developing the amount of the assumed Emergence Contingency**].

Obtaining exit financing in an amount and on terms satisfactory to Grace is a condition to the occurrence of the Effective Date.  {~~The Financial Information has been prepared at a time of significant uncertainty with respect to the condition of financial markets as they relate to Grace's exit financing requirements.  If exit financing is not available to Grace in the amounts assumed, Grace could reduce the amount of funded financing by up to~~

~~$250 million based on the assumed amount of cash and investments as of the Effective Date.~~}**[If we are unable to obtain the necessary financing on acceptable terms, Grace's emergence from Chapter 11 may be delayed.]**

{~~C.~~   *~~EFFECTIVE DATE~~*}

~~The Financial Information {assumes an emergence date of December 31, 2008 (the "Effective Date"), although Grace anticipates that emergence will actually occur in 2009. This assumption is made to present full-year 2009 results without the effects of the bankruptcy proceedings and the emergence. Legal and other expenses expected to be incurred between December 31, 2008 and the actual emergence date in 2009 are included in projected 2008 results as Emergence Contingencies as described above.~~}

## III.   *PRO FORMA FINANCIAL INFORMATION*

**A.   *PRO FORMA BALANCE SHEET*** {-}[–] The pro forma balance sheet as of {~~June 30,~~}[**December 31,**] 2008 reflects the accounting effects of the Plan as if it {~~were~~}[**became**] effective on that date.   The income tax effects of the pro forma adjustments have been computed at a 35% Federal tax rate (state deferred income tax assets carry a full valuation allowance and do not change).

Following is a description of the pro forma adjustments:

1.   **Adjustment to Liability and Additional Expense** – Reflects a reduction of approximately ${~~421~~}[**399**] million of asbestos-related contingencies {~~reflecting~~}[**under**] the terms of the Plan, partially offset by a ${~~125~~}[**100**] million liability for Emergence Contingencies, {~~including bank fees, legal fees, and other allowable claims. It is assumed that approximately 20% of such Emergence Contingencies will be treated for tax purposes as nondeductible reorganization expenses~~}[**which are assumed fully deductible for tax purposes**].   The {~~net~~}reduction of [**total** ]liabilities {~~will~~}[**subject to compromise would**] reduce deferred tax assets.

2.   **Borrowings Under New {~~Debt~~}[Credit] Agreements** – {~~Reflects $1,500~~}[**For purposes of the pro forma balance sheet as of December 31, 2008 only, reflects $1,150**] million of debt funded at emergence{~~,~~} and the implementation of {~~assumed~~}tax planning strategies that allow Grace to place up to {~~approximately $550~~}[**$300**] million of debt in its foreign subsidiaries on a tax efficient basis.   The anticipated tax planning strategies are {~~expected~~}[**assumed**] to generate U.S. taxable income and to use approximately ${~~195~~}[**105**] million (on a tax-effected basis) of net operating loss ("NOL") carryforwards.   The anticipated strategy {~~will~~}[**is assumed to**] generate tax deductions in the foreign subsidiaries that {~~will~~}[**would**] immediately reduce cash taxes in those subsidiaries.

**[For purposes of the projections, the exit financing requirement is assumed to be $1,000 million as of December 31, 2009.   The difference of $150 million reflects the**

benefit of additional net cash flow assumed to be generated during 2009.  We expect our actual exit financing requirement to be approximately $1,000 million.]

3.  **Disposition of COLI** – Reflects the net proceeds of the sale or surrender of corporate-owned life insurance polices{, assumed to be liquidated} to provide additional cash at emergence.  {The related $13 million deferred tax liability is reclassified to reduce NOL carryforward.}

4.  **Consideration to the Asbestos {PI Trust}[Trusts]** – Reflects the transfer by Grace to the Asbestos PI Trust [**and the Asbestos PD Trust** ]of (i) cash of {$359 million (including} $250 million pursuant to the asbestos personal injury settlement announced in April {2008)}[**approximately $397 million**], (ii) the Warrants, (iii) the [**PI** ]Deferred Payments, {and }(iv) [**the PD Deferred Payment, and (v)** ]rights to proceeds from Grace's product liability insurance policies.[ **The cash payment includes**] $250 million pursuant to the asbestos personal injury settlement announced in April [**2008, $112 million of asbestos property damage settlements, $30 million pursuant to the US ZAI settlement and CDN$6.5 million pursuant to the Canadian ZAI Settlement.**]

The Warrants{, recorded}[ **are assumed to be valued**] at approximately ${50 million, are valued using an assumed Grace common stock price of approximately $21 based on the valuation estimates in Section 2.11 of the Disclosure Statement}[**5 million**].   The value of the Warrants {is}[**would be**] deductible for tax purposes when transferred to the Asbestos PI Trust.   The related deferred income tax assets are reclassified from temporary differences to NOL carryforward.

{The}[**Both the PI**] Deferred Payments[ **and the $30 million ZAI Deferred Payment**] are valued using a 10% discount rate and have an [**aggregate** ]estimated net present value of approximately ${338}[**361**] million{.}[ **as of December 31, 2008.**]   Grace {will}[**would**] recognize income tax deductions on the Deferred Payments when cash payments are made to the {Asbestos PI Trust}[**respective Asbestos PI and PD Trusts. We assume that payments of the US ZAI contingent payments are not probable, and no such payments are included in this amount**].

The transfer of rights to insurance proceeds has no net tax effect as insurance income {is}[**would be**] offset by deductions generated from the transfer to the Asbestos PI Trust.

5.  **Payment of Remaining Pre-Petition Liabilities** – Reflects [**the** ]payment of all remaining claims payable on the Effective Date, including{ the Canadian ZAI PD Claims and} the Emergence Contingencies.   The related deferred income tax assets are reclassified from temporary differences to NOL carryforward.

{6.   **Environmental Settlement** —  Assumes that the $250 million environmental settlement with the U.S. Government was fully paid as of June 30, 2008 (the June 30, 2008 balance sheet includes a liability of $150 million for the unpaid portion of this settlement; the settlement amount was fully paid in July 2008).  The related deferred income taxes are reclassified to NOL carryforward.}

**6.** {7. **NOLs** {—Assumes}**[and Future Tax Deductions – The Financial Information assumes]** that Grace will receive federal and state income tax deductions attributable to its payment of certain bankruptcy claims. {These deductions will result in NOL carryforwards. }After [**the** ]pro forma adjustments to the {June 30,}**[December 31,]** 2008 balance sheet, NOL carryforwards are increased to approximately ${458}[**561**] million (tax effected at approximately ${160 million)}[**196 million), with future anticipated deductions of $1,580 million attributable to the PI Deferred Payments and the $30 million ZAI Deferred Payment**]. It is assumed that use of {federal NOLs}[**these tax benefits**] will be unrestricted and that a valuation allowance will not be established. However, the realization of the tax benefits {of NOL carryforwards }depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events{.—}[ **that would apply in the event that Grace undergoes an "ownership change" (as defined by the Internal Revenue Code). If Grace were to undergo an ownership change, NOLs and future deductions could be severely restricted or even eliminated in whole or in part. Accordingly, the Plan provides the Board of Directors with authority, under certain prescribed circumstances, to impose restrictions on the transfer of Grace stock. These restrictions would generally only apply to certain 5% shareholders as provided in the Plan.**]

The pro forma balance sheet [**at December 31, 2008 also** ]reflects the effects of anticipated tax planning strategies related to the placement of debt in Grace's foreign subsidiaries that {will}[**would**] reduce cash taxes paid during the projection period.

***B. PRO FORMA STATEMENTS OF OPERATIONS*** – The pro forma statements of operations reflect the accounting effects of the Plan {(i)—}as if it {were put into effect}[**became effective**] on December 31, 2007 for the {reporting period ended June 30, 2008, and (ii) as if it were put into effect on}[**year ended**] December 31, {2006 for the reporting period ended December 31, 2007.}[**2008**]

The pro forma income adjustments consist of:

1. {A reduction}[**Reduction**] of selling, general and administrative expenses to reflect lower insurance, legal and other non-continuing, non-core costs.

2. {The elimination}[**Elimination**] of interest expense for the pre-petition debt and the addition of interest expense for the {$1,500 million in }exit financing. The Financial Information assumes a 9% {interest}[**coupon**] rate on outstanding borrowings under the new credit facility.

3. {Additional}[**Imputed**] interest expense accrued on the[ **PI and ZAI**] Deferred Payments, assuming a 10% accrual rate.

4. {A reduction}[**Reduction**] in Chapter 11 expenses (net of interest income) reflecting the conclusion of the Chapter 11 cases. Chapter 11 expenses incurred in the year after emergence are assumed to be $20 million.

5. {~~A reclassification~~}[**Reclassification**] of interest income from Chapter 11 expenses to other income to reflect the accounting classification expected to be used after emergence.

6. {~~The tax effects of the pro forma adjustments at a 35% effective tax rate.~~}[**Tax effects of the pro forma adjustments at a 35% effective tax rate.**]

{~~Pro forma earnings per share are adjusted to reflect the dilutive effect of the Warrants, estimated to be approximately 2.2 million shares.~~}

{~~Grace has recently initiated an employee stock option~~} ~~incentive compensation program~~{~~. Options granted will have an exercise price equal to the fair market value of Grace's common stock on the grant date. Such stock option grants may dilute earnings per share if the market price of Grace's common stock increases above the option exercise prices. An initial grant was made on September 11, 2008. The Financial Information reflects the dilutive effects of this grant based on the exercise price and an assumed Grace common stock price of approximately $21 (based on the valuation estimates in Section 2.11 of the Disclosure Statement).~~}

## IV. PROSPECTIVE FINANCIAL INFORMATION – SIGNIFICANT ASSUMPTIONS

### A. GENERAL ECONOMIC AND INDUSTRY FACTORS

The prospective financial information has been prepared at a time of heightened [**global** ]economic uncertainty{~~, including significant uncertainty with respect to (1) the rate of economic growth~~}[. **Economic growth has slowed or turned negative**] in North America, Europe{~~,~~} and[ **the**] other regions in which {~~Grace operates, (2) the amount of raw material and energy cost inflation, (3) the value of the U.S. dollar compared to other currencies, particularly the euro, and (4) the condition of financial markets as they relate to Grace's exit financing requirements~~}[**we operate. We experienced a sharp decline in customer demand during the fourth quarter of 2008, and we assume customer demand in 2009 will remain well below trend levels. Raw materials and energy costs have increased and become more volatile. We experienced very significant cost increases through most of 2008. The cost of certain materials has since moderated, but many costs remain high. Foreign currency exchange rates have become more volatile. The U.S. dollar/euro exchange rate has traded over a wide range since the beginning of 2008. The U.S. dollar/euro exchange rate was $1.40/euro on December 31, 2008, and was $1.27/euro as of February 26, 2009. Credit markets have experienced significant disruptions since the third quarter of 2008. In addition, the U.S. and foreign governments have initiated or are considering policy initiatives that may further impact economic conditions. Together, these factors make forecasting future economic trends difficult**].

Grace has made assumptions about economic growth, inflation, and currency exchange rates in order to develop the prospective financial information. Although Grace believes

the assumptions made are reasonable under the circumstances, such assumptions are subject to significant uncertainties.  Actual economic conditions will likely vary from those assumed in the prospective financial information, and such variations could have a material effect on Grace's actual consolidated financial position, results of operations, and cash flows.

Grace's sales are affected by the rate of economic growth and general economic conditions in the regions in which it operates and the level of demand in the petroleum refining industry and the construction industry (among other industries).  Both industries are currently experiencing increased uncertainty with respect to overall industry conditions and reduced demand {in}[**for**] certain products and in certain {geographies}[**regions**].  Economic growth in North America and Europe is assumed to {slow during the projection period.  In the aggregate, Grace has assumed market growth of less than 1% for the industries it serves in 2009.}[**be negative in 2009.  Growth in these regions in 2010 is assumed to be moderately positive.**]

{Grace has experienced significant cost inflation during 2008, and the prospective financial information assumes costs continue to increase in 2009.  Total raw material and energy cost inflation in 2009 is assumed to be approximately $100 million to $120 million, an assumed increase of approximately 8% in 2009 versus an assumed increase of approximately 15% in 2008.}
[**Inflation on raw materials (excluding metals) and energy costs totaled approximately $160 million in 2008, an increase of approximately 15% compared with 2007.  Certain raw materials costs began to decline by late fourth quarter, and we assume that this deflationary trend continues through 2009.  Raw materials and energy costs are assumed to increase moderately in 2010 assuming global economic conditions begin to recover in that year.**]

Grace manages its operations to maximize sales, earnings and cash flow based on actual and expected economic conditions.  The prospective financial information assumes operating strategies appropriate to the economic assumptions described above{, including, for example, significant price increases based on expectations of significant raw material cost inflation}.  As economic conditions further develop in {2008}[**2009**] and {2009,}[**2010,**] Grace will adjust its operating strategies as appropriate.  Actual operating strategies may vary from those assumed in the prospective financial information, and such variations could have a material effect on Grace's results.

{*B.  Change in Inventory Accounting*}

{Through June 30, 2008, Grace has valued its U.S. inventories under the last-in/first-out (LIFO) method and its non-U.S. inventories under the first-in/first-out (FIFO) method.  As Grace has grown its businesses outside the U.S., an increasing proportion of its inventories have been valued under the FIFO method.  As of June 30, 2008, 50.1% of Grace's inventories were valued under the FIFO method and 49.9% of Grace's inventories were valued under the LIFO method.  Effective in the third quarter of 2008, Grace is changing its accounting method to FIFO for all inventories.  This change will provide for a consistent, global inventory valuation standard.}

{The Financial Information presents inventories and earnings under the LIFO method for U.S. inventories for the historical periods presented, consistent with Grace's existing historical financial statements. Grace will restate its historical financial statements for public reporting purposes on a retrospective basis as required by SFAS No. 154 beginning with reports issued for the third quarter 2008. Inventories and earnings are presented under the FIFO method for all inventories for the projected periods presented, consistent with Grace's expected accounting method for those periods.}

{The following table summarizes the effects of the change in accounting method for inventories, pretax income from core operations (Core EBIT) and net income for the historical periods included in the Financial Information. The change in inventory valuation between the LIFO and FIFO methods relates primarily to price increases of raw materials, commodity metals, and energy used in Grace Davison products and production processes.}

{The change in accounting method has no effect on cash during the projection period due to Grace's NOLs in the U.S.}

[**In 2008, we began managing cash flow more aggressively in order to reduce our exit financing requirements and in response to declining customer demand. During the fourth quarter, we reduced net working capital by approximately $132 million driven by improvements in inventory management, extended payment terms with our suppliers, and more effective collection efforts. Significant additional working capital improvements are targeted in 2009. In 2009, we expect our annual**] incentive compensation program[ **to be focused primarily on operating free cash flow.**]

{C}[B]. *CURRENCY*

Grace operates in over 40 countries and generates {approximately}[**more than**] two-thirds of its sales outside the United States. Accordingly, Grace is exposed to currency exchange rate fluctuations that impact reported sales, earnings, and cash. Grace's most significant foreign currency exposure is to the euro. The Financial Information assumes a U.S. dollar/euro exchange rate of ${1.40}[**1.30**]/euro for the projected {portion}[**periods**] of {2008}[**2009**] and {$1.38/euro for 2009. }[**2010. **]The U.S. dollar/euro exchange rate as of {September 19, 2008 was $1.45}[**February 26, 2009 was $1.27/euro. The average U.S. dollar/euro exchange rate used by Grace in 2008 was $1.51**]/euro. No other foreign currency accounts for more than 5% of Grace's sales or earnings.

{D}[C]. *SALES*

Sales are assumed to {increase approximately 9.1% from 2007 to 2008 and approximately 2.9% from 2008 to 2009. Before the effects of currency translation, sales are assumed to increase approximately 6.2% from 2007 to 2008 and approximately 6.0% from 2008 to 2009. The assumed level of sales in 2009 is based on (1) assumed lower

~~levels of growth in the regions in which Grace operates and in the industries Grace serves and (2) unfavorable~~}[**decrease approximately 11% from 2008 to 2009 and to increase almost 6% from 2009 to 2010.  The assumed 2009 decrease in sales is primarily based on assumed weaker customer demand and assumed unfavorable foreign**] currency translation effects{~~ (based on the assumed level of U.S. dollar/euro exchange rates), partially offset by (3) the benefit of assumed~~}[**.  Partially offsetting these effects is the assumed benefit of**] price increases {~~in response to higher raw material costs and (4) the execution~~}[**implemented in 2008 and 2009, and the assumed benefit**] of Grace's growth strategies, including {~~increased~~}[**increasing**] business with existing customers, acquisition of new customers, commercialization of new products, and penetration of new geographic {~~markets~~}[**regions.  Sales growth in 2010 is assumed to benefit from an improvement in economic conditions and customer demand**].  Grace expects sales growth to return to historical levels as global economic growth returns to its trend levels, although this is expected to occur after {~~2009.~~}[**2010.** ]

*{E.  ][D.  Cost of Goods Sold and ]Operating Expenses*

Cost of goods sold is assumed to {~~increase based on sales volumes, assumed levels of inflation for~~}[**decrease in 2009.  Gross profit percentage is assumed to increase to 30.9% from 29.5% in 2008 based primarily on assumed declines in**] raw materials and energy{~~, as discussed above, and changes in labor and other manufacturing expenses.  Other expenses such as selling~~}[ **costs and assumed productivity initiatives.  Many raw materials are expected to decrease in cost in 2009, however, raw materials such as caustic soda and some rare earths remain high.  In response to high raw materials costs, we are reviewing pricing in our contracts with suppliers more frequently, and we have accelerated programs to identify alternate suppliers and to qualify substitute raw materials where doing so will help us further reduce costs.  Gross profit percentage is assumed to increase to 31.7% in 2010 to reflect the assumed benefit of increased volumes and continuing productivity improvement initiatives.**]

[**Raw materials and energy costs reached a peak for Grace in the fourth quarter of 2008.  These high costs will be included in cost of goods sold in 2009, significantly unfavorably affecting gross profit as discussed further in Note L below.  We assume reduced levels of production in 2009 in order to further reduce inventory levels, continuing the strategy we implemented in the fourth quarter of 2008.  As a result, manufacturing costs that were or would otherwise have been capitalized in inventories will be charged to cost of goods sold.**]

[**Selling**], general and administrative expenses {~~and research and development expenses are assumed to increase based on Grace's operating strategies and assumed levels of inflation for wages and other costs.~~}[**are assumed to decrease in 2009 and 2010 reflecting cost reduction actions, including the restructuring actions announced in 2009.**]

[**Together with cost reduction actions completed in 2008, these actions are expected to yield approximately $40 million of annualized cost savings by 2010.  Grace**]

expects to record a charge of approximately $20 million in the first quarter of 2009 related to these restructuring actions.]

*{F. ]*[E. ]E~ARNINGS~

Pretax income from core operations ("Core EBIT") is assumed to {~increase approximately 7.7% from 2007 to 2008 and approximately 6.3% from 2008 to 2009. Before the effects of currency translation, Core EBIT is assumed to increase approximately 2.1% from 2007 to 2008 and approximately 12.2% from 2008 to 2009.~}[**decrease approximately 20% from 2008 to 2009 and to increase approximately 14% from 2009 to 2010.**]  Pre-tax income from core operations before depreciation and amortization ("Core EBITDA") is assumed to [**decrease approximately 15% and to** ]increase approximately {~7.4% and 6.6~}[**10**]% over the same periods. {~Before the effects of currency translation,~}[**The decline in**] Core EBITDA is assumed to {~increase approximately 1.8% and 12.0% over the same periods. Earnings~}[**be greater than the decline in sales in 2009 primarily due to the decrease of manufacturing costs capitalized in inventory, increased pension expense, and the restructuring charge. Core EBITDA**] growth is assumed to exceed sales growth in {~2009 due to the effects of Grace's pricing, product, and productivity strategies. Core EBIT and Core EBITDA margins have been negatively affected during 2008 due to significant raw material and energy cost inflation, which has outpaced price improvements and productivity gains. Grace expects margins to improve as inflation moderates and prices fully reflect the higher raw material and energy costs. Grace expects the growth of Core EBIT and Core EBITDA~}[**2010 primarily due to improved gross profit percentage from higher production volumes. Earnings growth rates during the projection period reflect the unfavorable effect of the global economic downturn. Grace expects earnings growth**] to return to historical levels as global economic growth {~and inflation return~}[**returns**] to {~their~}[**its**] trend levels, although this is expected to occur after {~2009.~}[**2010.**]

*{G. ]*[F. ]I~NTEREST~ E~XPENSE~{*~-AND INTEREST INCOME~*}

The Financial Information assumes a 9% {~interest~}[**coupon**] rate on outstanding borrowings under the new debt facility. {~Interest income is assumed on available cash balances at an investment earnings rate of 2.5%.~}[**The exit financing may be issued at a discount. The possibility of such a discount was considered in developing the assumed amount of the Emergence Contingency, but is not reflected in the assumptions regarding interest expense.** ]

*{H. ]*[G. ]C~HAPTER~ 11 E~XPENSES~

Chapter 11 expenses are projected in {~2008~}[**2009**] based upon expected levels of activity in the Chapter 11 cases. Chapter 11 expenses incurred in {~the year after emergence~}[**2010**] are assumed to be $20 million.

*{I.]*[H] I~NCOME~ T~AXES~

{~Income tax expense is calculated at an effective U.S. Federal rate of 35% and an effective foreign rate of 30.0%. Due~}[**The effective tax rate on income before taxes**

**and minority interest is approximately 33% in 2009 and 34% in 2010.  The increase in tax rate is caused primarily by the effect of placing debt in non-U.S. jurisdictions where the tax rate is lower than the U.S. rate.  Placing debt in non-U.S. subsidiaries generates net cash tax savings since, due]** to the availability of NOLs, Grace does not expect to pay cash taxes in the U.S. in {2009.}[**2009 or 2010.**]  Foreign subsidiaries are {expected}[**assumed**] to pay cash taxes {as}[**in the amount**] expensed each year.

*{J. Working Capital }*

*[I. Cash Flow]*

[**We assume net cash provided by operating activities before Chapter 11 expenses and settlements to be $343 million in 2009 and $278 million in 2010.  We assume significant improvements in net working capital during the projection period, reflecting improvements in inventory management, extended payment terms with our suppliers, and more effective collection efforts.**]

[**Capital expenditures are assumed to decrease over 20% in 2009 reflecting reduced investments in new capacity and reduced maintenance requirements due to reduced production levels.  Capital expenditures are assumed to increase in 2010 as we invest in new capacity to support expected growth in 2010 and 2011.**]

The Financial Information assumes that {net working capital requirements decline from June 30, 2008 to December 31, 2008, consistent with the historical seasonality of Grace's working capital requirements.  Projected working capital amounts also reflect the benefit of current cash productivity initiatives that are expected to continue through 2009.}[**we generate approximately $25 million in earnings and approximately $46 million in cash flow in 2009 from sales of non-strategic assets.  The proceeds of these sales are assumed to reduce our exit financing requirements.**]

*{K. Pension Liabilities and Pension Expense}*

[**Based on these efforts and others, the Financial Information reflects a reduction of $500 million in the assumed level of exit financing and a reduction of $45 million in the assumed level of annual interest expense when compared to previous estimates.  Such reductions also reflect improvements in cash forecasting and cash management within Grace, permitting us to operate with lower levels of cash on hand.**]

*[J. Pensions]*

The Financial Information assumes that Grace will continue to fund all minimum required payments under {the}[**our**] U.S. qualified plans{;} and to fund non-U.S. pension plans based on applicable legal requirements and actuarial and trustee recommendations.

It is {~~also~~ }assumed that unfunded pay-as-you-go plan benefits will continue to be paid as they become due.  The Financial Information assumes cash payments of ${~~54~~}[**59**] million for the pension plans in {~~2009.  Such amount is based on completed actuarial studies and is~~}[**2009 and $88 million in 2010, compared to $68 million in 2008.  The 2010 funding levels assume that Grace elects to smooth losses incurred in 2008 over a three year period as permitted under ERISA for U.S. qualified plans.  These amounts are**] not expected to vary significantly as a result of any changes in the returns on pension assets or the discount rates used to measure pension obligations[**; however changes in U.S. or foreign regulations over funding requirements could impact these projections**].

The Financial Information assumes pension expense of ${~~56~~}[**89**] million in {~~2009, consistent with the amount assumed for 2008.~~ }[**2009 and 2010.** ]Pension expense {~~in 2009~~}[**for 2010**] could vary significantly [**from this amount** ]based on{ ~~actual market factors, including~~} the actual return on pension assets [**in 2009** ]compared to {~~expected~~}[**the assumed**] returns and {~~changes in~~ }the[ **actual**] discount {~~rates~~}[**rate**] used to measure pension obligations{~~.  Lower than expected returns on pension assets and decreases in the discount rates would result in higher pension expense in future periods~~}[ **in 2010 compared to the assumed rate**].  Changes in service cost and other actuarial assumptions may also affect pension expense in subsequent periods.

{*[L.  Warrants ]*}

{~~The Warrants are assumed to be exercised on December 31, 2009.  The $170 million in cash exercise proceeds is assumed to be used to repay outstanding debt and is recorded as an increase to paid-in capital at the time of exercise.~~}

[*K.  Warrants*]

[**Our advisors have estimated the equity value of Grace as of the Effective Date using the methodology described in Section 2.11 of the Disclosure Statement.  Based on such methodology, our advisors have estimated the per share equity value of Grace to be between $5.96 and $11.38 as of the Effective Date.  These estimates are hypothetical values developed solely for purposes of the Plan and may not reflect actual trading prices.  The actual closing price on the New York Stock Exchange of Grace's common shares averaged $6.40 for the ten trading days preceding the filing of this Financial Information.**]

[**We assume a mid-point value for the Warrant of approximately $5 million at the Effective Date.  We assume that the valuation of Grace's common stock will improve as we approach the Effective Date and significant remaining uncertainties related to our Chapter 11 cases and the Montana criminal proceeding are resolved.**]

[**We assume that the Warrant is exercised on December 31, 2010, and that the proceeds are used to repay outstanding debt.  We assume that the valuation of Grace's common stock will improve after the Effective Date as our Chapter 11 cases**]

become final and our growth and earnings prospects improve with improvements in global economic conditions.]

[L.  FIRST QUARTER, 2009]

[For the full year 2009, we assume Core EBIT of $241 million and net cash provided by operating activities before Chapter 11 expenses and settlements of $343 million.]

[For the first quarter of 2009, however, we assume Core EBIT to be negative.  We assume first quarter earnings to be unfavorably affected by three significant factors.]

[First, we assume sales volumes to be lower in the first quarter than in the remaining quarters of the year.  Sales volumes in our construction products segment are typically lowest in the first quarter of each year due to seasonal factors.]

[Second, we expect our cost of goods sold in the first quarter to reflect the peak raw materials and energy costs experienced in the fourth quarter of 2008 (which costs were capitalized in inventory in the fourth quarter of 2008).  In addition, we assume reduced levels of production in order to further reduce inventory levels, continuing the strategy we implemented in the fourth quarter of 2008.  As a result, we will experience less favorable fixed cost absorption resulting in lower gross profit.  Together, these effects are assumed to reduce first quarter gross profit by over $50 million when compared to the first quarter of 2008.  These effects are assumed to not be material in the second quarter of 2009 and are assumed to begin to have a significant positive effect by the third quarter.]

[Third, we assume restructuring charges of approximately $20 million in the first quarter resulting from previously announced restructuring actions.]

[We assume Core EBIT will improve in the remaining quarters of 2009 as sales volumes improve in our seasonal construction products segment and as high cost inventory is sold.]

[We assume cash flow to be positive for the first quarter.  We assume significant improvements in net working capital, including the reduction in inventories referenced above, and a significant reduction in capital expenditures.  Further, we assume that first quarter Core EBIT will include over $30 million of non-cash costs, including the expensing of inventory costs capitalized in prior quarters and the non-cash increase in pension expense.]