(ii) STP shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STP in effect at the STV Effective Time which shall remain unchanged and unaffected by the STV Merger.

(iv) The persons who are the directors of STP at the STV Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STP at the STV Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STP issued and outstanding immediately prior to the STV Effective Time, and all rights in respect thereof, shall be unaffected by the STV Merger.

(B) The shares of capital stock of STV issued and outstanding immediately prior to the STV Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

(b) At the STV Effective Time the constituent corporations shall become a single corporation and STP shall continue to exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in STP without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in STP (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

2.02    STP Merger. Pursuant to Section 253 of the DGCL, upon the terms and subject to the conditions of this Agreement, immediately after the STV Effective Time, STP shall merge with and into STS (the "STP Merger").

(a) At the time the STP Merger becomes effective (the "STP Effective Time"):

(i) STP shall be merged with and into STS and the separate existence of STP shall cease.

(ii) STS shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STS in effect at the STP Effective Time which shall remain unchanged and unaffected by the STP Merger.

(iv) The persons who are the directors of STS at the STP Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STS at the STP Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STS issued and outstanding immediately prior to the STP Effective Time, and all rights in respect thereof, shall be unaffected by the STP Merger.

(B) The shares of capital stock of STP issued and outstanding immediately prior to the STP Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

(b) At the STP Effective Time the constituent corporations shall become a single corporation and STS shall continue to exist as the surviving corporation and shall thereupon and there-

after possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in STS without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in STS (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

2.03  STI Merger.  Upon the terms and subject to the conditions of this Agreement immediately after the STP Effective Time, STI shall merge with and into NSTI (the "STI Merger").

(a) At the time the STI Merger becomes effective (the "STI Effective Time"):

(i) STI shall be merged with and into NSTI and the separate existence of STI shall cease.

(ii) NSTI shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of NSTI in effect at the STI Effective Time which shall remain unchanged and unaffected by the Merger, except that Article 1 of the Certificate of

Incorporation of the surviving corporation shall be amended at the STI Effective Time to read as follows:

"The name of the Corporation is StanTrans, Inc."

(iv) The persons who are the directors of NSTI at the STI Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of NSTI at the STI Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of NSTI issued and outstanding immediately prior to the STI Effective Time, and all rights in respect thereof, shall be unaffected by the STI Merger.

(B) In lieu of and in exchange for the issued and outstanding shares of capital stock of STI held by STS immediately prior to the STI Effective Time, OLP shall pay to GEC consideration as set forth in Section 2.05.

(b) At the STI Effective Time the constituent corporations shall become a single corporation and NSTI shall continue to exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be

subject to all the liabilities and obligations of each of the
constituent corporations; all property, real, personal, and mixed,
belonging to each of the constituent corporations shall be vested
in NSTI without further act or deed and without any transfer or
assignment having occurred, and all debts due on whatever account,
and all other choses in action, and all and every other interest,
of or belonging to or due to each of the constituent corporations
shall thenceforth be taken and deemed to be vested in NSTI (not
pursuant to contract but by operation of law), without further act
or deed and without any transfer or assignment having occurred.

(c) In the manner prescribed by Section 228 of the DGCL,
STS as the sole stockholder of STI, and OLP as the sole stockholder
of NSTI, hereby approve this Agreement as the agreement of merger
for the STI Merger as required by Section 251(c) of the DGCL.

2.04  <u>STS Merger</u>.  Upon the terms and subject to the
conditions of this Agreement, immediately after the STI Effective
Time, STS shall merge with and into NSTS (the "STS Merger").

(a) At the time the STS Merger becomes effective (the
"STS Effective Time"):

(i) STS shall be merged with and into NSTS and the
separate existence of STS shall cease.

(ii) NSTS shall be the surviving corporation, and shall
continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the
surviving corporation shall be the Certificate of
Incorporation and By-laws of NSTS in effect at the STS

Effective Time which shall remain unchanged and unaffected by the STS Merger, except that Article 1 of the Certificate of Incorporation of the surviving corporation shall be amended at the STS Effective Time to read as follows:

"The name of the Corporation is Support Terminal Services, Inc."

(iv) The persons who are the directors of NSTS at the STS Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of NSTS at the STS Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of NSTS issued and outstanding immediately prior to the STS Effective Time, and all rights in respect thereof, shall be unaffected by the STS Merger.

(B) In lieu of and in exchange for the issued and outstanding shares of capital stock of STS held by GEC immediately prior to the STS Effective Time, OLP shall pay to GEC consideration as set forth in Section 2.05.

(b) At the STS Effective Time the constituent corporations shall become a single corporation and NSTS shall continue to

exist as the surviving corporation and shall thereupon and there-
after possess all the rights, privileges, immunities and
franchises, as well of a public as of a private nature, and be
subject to all the liabilities and obligations of each of the
constituent corporations; all property, real, personal, and mixed,
belonging to each of the constituent corporations shall be vested
in NSTS without further act or deed and without any transfer or
assignment having occurred, and all debts due on whatever account,
and all other choses in action, and all and every other interest,
of or belonging to or due to each of the constituent corporations
shall thenceforth be taken and deemed to be vested in NSTS (not
pursuant to contract but by operation of law), without further act
or deed and without any transfer or assignment having occurred.

(c)   In the manner prescribed by Section 228 of the DGCL,
GEC as the sole stockholder of STS, and OLP as the sole stockholder
of NSTS, hereby approve this Agreement as the agreement of merger
for the STS Merger as required by Section 251(c) of the DGCL.

2.05   Consideration.   (a)   Upon delivery of this
Agreement, OLP has paid GEC a down payment of $2,500,000 (the "Down
Payment") in immediately available United States funds to an
account previously designated by GEC, and GEC hereby acknowledges
receipt of such payment. If the Closing occurs in accordance with
the terms and provisions hereof, the Down Payment plus interest at
the LIBOR Based Rate for the number of days from and including the
date hereof, to and excluding the Closing Date, shall be credited
against what OLP owes to GEC at the Closing pursuant to Section

4.02(h).  If the condition contained in Section 11.10 has not been satisfied, and all the other conditions set forth in Article 11 have been satisfied or satisfaction thereof tendered, and OLP declines to close the transaction contemplated by this Agreement, then upon termination of this Agreement, notwithstanding any other term or provision hereof, GEC shall be entitled to retain the Down Payment (and any interest accrued thereon) in its entirety and OLP shall have no further liability under this Agreement or the Ancillary Agreements or any other documents or agreements related hereto or thereto except for breaches, if any, by OLP of its covenants and agreements set forth in this Agreement and Ancillary Agreements and any other documents or agreements related hereto or thereto.  If this Agreement is terminated other than in the circumstances described in the immediately preceding sentence, then GEC shall reimburse OLP for the Down Payment, with interest at the LIBOR Based Rate for the number of days from and including the date hereof to and excluding the date of reimbursement; provided that such right to reimbursement shall not affect any liability or obligation that OLP has to GEC as a result of any breach by OLP of the covenants and agreements contained in this Agreement.

(b)   In lieu of and in exchange for the STI Shares and the STS Shares, OLP shall pay to GEC the Purchase Price in the manner described in Section 4.02(h) and Article 5; provided that the payment for the STI Shares shall be deemed to be a payment to STS that was distributed to GEC.

## ARTICLE 3

### Closing Date: Termination

3.01    <u>Scheduled Closing Date</u>.    The "Scheduled Closing Date" shall be a date agreed upon by GEC and OLP in writing, which date shall be no later than the 30th business day following the fulfillment or waiver of the conditions set forth in Sections 11.03 and 12.03, unless GEC and OLP shall agree to a different Scheduled Closing Date in an amendment to this Agreement executed and delivered in accordance with Section 17.07.    For purposes of this Article, "business day" shall mean a day which is not a Saturday or Sunday, nor a day on which banks are generally closed in the city of Dallas.

3.02    <u>Termination</u>.    (a)    This Agreement may be terminated at any time prior to the Closing by mutual written agreement of the parties.

(b) If the conditions set forth in Sections 11.03 and 12.03 have not all been fulfilled or waived by the party entitled to waive such conditions on or before 60 days after the date hereof, unless the parties shall agree otherwise in an amendment to this Agreement executed and delivered in accordance with Section 17.07, then either GEC or OLP may terminate this Agreement by giving notice to the other, in the manner provided in Section 16.01, at any time prior to the fulfillment or waiver of all such conditions.

(c) If for any reason the Closing shall not have been consummated on or before the Scheduled Closing Date, either GEC or

19

OLP shall have the right to terminate this Agreement at any time thereafter by giving at least three days' advance notice of such termination to the other.

(d)    The termination of this Agreement, whether in accordance with any of the preceding provisions of this Agreement or otherwise, shall not affect the rights of either GEC or OLP against the other for breach of any covenant or agreement contained in this Agreement; provided, however, that upon termination in accordance with the preceding provisions of this Section, the parties shall be released from any and all liability for breach of any of the representations and warranties contained in Article 6 or Article 7.

(e)    OLP and GEC hereby agree that the provisions of this Section 3.02, Article 13 (as it relates to breach of covenants but not as it relates to breach of representations and warranties), and Sections 2.05(a), 15.01, 15.03 and 15.04 shall survive any termination of this Agreement.

## ARTICLE 4

### Actions at Closing; Discharge of Certain Obligations; Further Assurances

4.01    Closing.    The Closing shall take place at 10:00 a.m. local time at the offices of Vinson & Elkins, L.L.P. at Dallas, Texas, or at such other time and place as the parties hereto shall agree in writing.

4.02    Actions at the Closing.    At the Closing the following actions shall take place in the order in which they appear below:

(a)  GEC  shall  cause  to  be  filed  with  the  State Corporation Commission of Virginia the appropriate documents to effect the STV Merger.

(b) GEC shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of ownership and merger to effect the STP Merger pursuant to Section 253 of the DGCL.

(c) [This section is intentionally left blank.]

(d) GEC and OLP shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of merger to effect the STI Merger pursuant to Section 251 of the DGCL.

(e) STS shall deliver to OLP certificates representing the STI Shares, duly endorsed in blank or together with executed stock powers duly endorsed in blank.

(f) GEC and OLP shall cause to be executed, acknowledged and filed with the Secretary of State of Delaware a certificate of merger to effect the STS Merger pursuant to Section 251 of the DGCL.

(g) GEC shall deliver to OLP certificates representing the STS Shares, duly endorsed in blank or together with executed stock powers duly endorsed in blank.

(h)    OLP  shall  deliver  to  GEC  (i)  $63,680,000, representing GEC's and OLP's estimate of the Purchase Price (the "Estimated Purchase Price"), minus (ii) the $2,500,000 down payment and interest thereon described in Section 2.05(a), in immediately

available United States funds by wire transfer to an account designated by GEC.

(i) [This section is intentionally left blank.]

(j) GEC shall deliver to OLP any minute books and stock transfer books and corporate seals of the Corporations that are not then in the possession of the Corporations.

(k) GEC shall deliver to OLP the certificate and opinion of counsel described in Sections 11.06 and 11.07.

(l) OLP shall deliver to GEC the certificate and opinion of counsel described in Sections 12.06 and 12.07.

(m) Transfer of custody of product inventory shall take place as provided in the schedule to this Section.

4.03   Effectiveness of Closing.   No action to be taken or delivery to be made at the Closing shall be effective until all of the actions to be taken and deliveries to be made at the Closing are complete; provided that the mergers described in Sections 4.02(a) through (f) shall take place in the order set forth in Section 4.02.

4.04   Discharge of Certain Intercompany Liabilities.
(a) Except for the Surviving Intercompany Accounts, any amounts owed by any Grace Entity to any Corporation, or by any Corporation to any Grace Entity, shall be deemed paid and discharged, effective upon the occurrence of the Closing, except as may be otherwise provided in the Ancillary Agreements.

(b)   All obligations of the Corporations to reimburse Grace for checks written by the Corporations in the ordinary course

of business prior to the Closing Date, and honored by Grace, shall be deemed paid and discharged, effective as of the Closing.    All funds in the Corporation's depository accounts and imprest accounts on the Closing Date shall be the property of Grace, except for a disbursement account and an imprest payroll account to be opened by STS, each of which shall have a balance of $1,000.00 at the Closing and signatories designated by OLP.

   4.05 <u>Further Assurances</u>.    At any time and from time to time from and after the Closing, each of GEC and OLP shall, at the request of the other, take all such actions as the other shall reasonably request in order to fully carry out the transactions contemplated by this Agreement.

ARTICLE 5

<u>Adjustment of Purchase Price; Other Post-Closing Adjustments</u>

   5.01 <u>Procedure</u>.    As of the close of business on the Closing Date, representatives of GEC and OLP shall cooperate to close the books of the Corporations to the extent required to establish the Working Capital Amount as provided in Section 5.02 for the purpose of determining the Purchase Price.    OLP shall make reasonably available to GEC the services of the Corporations' employees and shall provide GEC with reasonable access to facilities for such purposes.    GEC and OLP each shall be permitted to have its representatives and advisors observe the closing of the books and the other actions to be taken pursuant to this Article.

   5.02 <u>Preparation of Closing Statement</u>.    As soon as practicable after the Closing Date, but in no event later than

thirty days after the closing of the books of the Corporation
(subject to reasonable extension for unforeseen circumstances), GEC
shall prepare and deliver to OLP a consolidated statement of
working capital (the "Closing Statement") of the Corporations as
of the close of business on the Closing Date, setting forth the
Working Capital Amount.   The "Working Capital Amount" shall be
equal to the dollar value of the consolidated current assets of the
Corporations less the dollar value of the consolidated current
liabilities of the Corporations, except that all cash accounts
(other than petty cash and the accounts described in the exception
to the second sentence of Section 4.04(b)) and those current assets
and current liabilities which are to be discharged pursuant to
Section 4.04, or retained or assumed by any Grace Entity as of the
Closing Date in accordance with any of the Ancillary Agreements,
shall be excluded from the calculation of the Working Capital
Amount.   The Closing Statement shall be prepared on a going concern
basis using the Grace Accounting Principles and the same levels of
materiality, account classifications and procedures as used to
prepare the unaudited consolidated balance sheet as of November 30,
1992 of the Corporations prepared on a legal entity basis (the
"Legal Entity Balance Sheet"), a complete copy of which is attached
to the schedule to this Section.   If OLP does not object to the
Working Capital Amount shown on the Closing Statement, by written
notice to GEC within 45 days after receipt by OLP of the Closing
Statement, setting forth objections thereto in reasonable detail,

then the Working Capital Amount set forth on the Closing Statement shall be deemed conclusive and binding on the parties.

5.03  Dispute Resolution.  (a) If OLP does so object to the Working Capital Amount shown on the Closing Statement, then GEC and OLP shall promptly endeavor to agree upon the proper amount of the Working Capital Amount.

(b)  If a written agreement determining the Working Capital Amount has not been reached within 30 days after GEC's receipt of OLP's notice of objection to the Closing Statement, then either party may, by notice to the other, submit for determination to Ernst & Young (the "Arbitrator") what adjustments, if any, must be made in the Closing Statement in order for the Working Capital Amount to be determined in accordance with the provisions of this Agreement.  Any such determination by the Arbitrator shall be conclusive and binding on the parties.

5.04  Fees and Expenses of Arbitrator.  The fees and expenses of the Arbitrator shall be shared by GEC and OLP or borne by GEC or OLP as follows.  If the Working Capital Amount as determined by the Arbitrator is between the Working Capital Amounts proposed by GEC and OLP, respectively, then GEC and OLP shall each bear that portion of such fees and expenses equal to the total fees and expenses multiplied by a fraction, the numerator of which shall be the difference between the Working Capital Amount as determined by the Arbitrator and the Working Capital Amount as proposed by GEC and OLP, respectively, and the denominator of which shall be the difference between the Working Capital Amount as proposed by GEC

and the Working Capital Amount as proposed by OLP.  If the Working
Capital Amount as determined by the Arbitrator is not between the
Working Capital Amounts proposed by GEC and OLP, respectively, then
the party whose proposed Working Capital Amount differs most from
the Working Capital Amount proposed by the Arbitrator shall bear
all of the fees and expenses of the Arbitrator.  Nothing herein
shall be construed to (a) authorize or permit the Arbitrator to
determine any question or matter whatever under or in connection
with this Agreement except the determination of what adjustments,
if any, must be made in the amounts set forth on the Closing
Statement delivered by GEC in order for the Working Capital Amount
to be determined in accordance with the provisions of this
Agreement, or (b) require the Arbitrator to follow the rules or
procedures of the American Arbitration Association.

          5.05  Adjusting Payment.  Promptly after determination
of the Working Capital Amount, whether by notice without objection
as provided in Section 5.02, by written agreement between GEC and
OLP as provided in Section 5.03(a), or pursuant to the dispute
resolution procedures described in Section 5.03(b), an adjusting
payment shall be made by GEC to OLP or by OLP to GEC in accordance
with this Section.  If the Purchase Price exceeds the Estimated
Purchase Price, then OLP shall promptly pay to GEC an amount equal
to such excess in immediately available funds.  If the Estimated
Purchase Price exceeds the Purchase Price, then GEC shall promptly
pay to OLP an amount equal to such excess in immediately available
funds.  If the adjusting payment made pursuant to this Section 5.05

exceeds $100,000, the payor under this Section 5.05 shall, at the same time such adjusting payment is made, pay interest to payee under this Section 5.05 at the LIBOR Based Rate for the number of days from and including the Closing Date to and excluding the date of payment.

    5.06   <u>Transactions with Grace Entities</u>. From and after the Closing, any amounts which are owed by any Grace Entity to any of the Corporations, or are owed by any of the Corporations to a Grace Entity, for transportation or storage services provided in the ordinary course of business (collectively, the "Surviving Intercompany Accounts"), shall be paid in cash by such Corporation to such Grace Entity, or by such Grace Entity to such Corporation, as the case may be, in accordance with past practice (but not to exceed a reasonable period of time for payment).

ARTICLE 6

<u>Representations and Warranties by GEC</u>

    The representations and warranties set forth in this Article as to the knowledge of the GEC Executives are as to the actual present personal knowledge, awareness and good faith belief of such individuals at the date of this Agreement and as of the Closing Date for purposes of Sections 11.01 and 11.06. For purposes of this Agreement, "GEC Executives" means Donald E. Grimm (President), Lawrence G. Besson (Senior Vice President and Chief Financial and Administrative Officer), Frank L. Ryan II (Vice President-Finance), Ralph R. Mills (Vice President-Controller) and James Roderick Clark (Vice President-Development); and "Corporation

Executives" means Fred T. Johnson (President), Ned L. Hoover (Executive Vice President), Ronald D. Scoggins (Senior Vice President), Philip J. Lewis (Vice President-Finance) and Arthur (Lee) Ellis (Vice President-Operations).

GEC hereby represents and warrants to OLP and the OLP Corporations as follows:

6.01    Incorporation.    (a)    GEC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with full corporate power and authority to enter into this Agreement and the Ancillary Agreements and perform its obligations hereunder and thereunder.

(b) Each of the Corporations is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and operate its business as currently conducted. The schedule to this Section sets forth (i) the jurisdiction of incorporation of each Corporation and (ii) the jurisdictions where each Corporation is authorized or otherwise qualified to do business as a foreign corporation.

6.02    Authorization.    The execution and delivery of this Agreement and the Ancillary Agreements by those of GEC and the Corporations that are respectively parties thereto, and the performance by GEC and the Corporations of their respective obligations hereunder and thereunder, have been duly and validly authorized by all necessary corporate action of GEC and the Corporations.    This

Agreement and the Ancillary Agreements to which they are respectively parties have been duly executed and validly delivered by GEC and the Corporations and are legally binding on those of GEC and the Corporations that are respectively parties hereto and thereto.

6.03   No Conflict or Consents.   The execution and delivery of this Agreement and the Ancillary Agreements to which they are respectively parties by GEC and the Corporations, and the performance by GEC and the Corporations of their respective obligations hereunder and thereunder, do not (a) conflict with their respective corporate charters or by-laws, or (b) result in any breach of any of the provisions of, or constitute a default under, any statute, law, rule, regulation, judgment, order, decree, writ or injunction of any court or Governmental Authority, or any agreement, understanding or restriction, to which any of GEC and the Corporations is a party or by which it or any of its assets are bound, which breach or default would adversely affect the ability of GEC or the Corporations to perform its obligations under this Agreement.  Except as set forth on the schedule to this Section and except for compliance with HSR, and except for the permits, licenses, filings, notices and consents to be obtained pursuant to Sections 9.03 and 9.04, the execution and delivery by each of GEC and the Corporations of this Agreement and the Ancillary Agreements to which it is a party, and its performance of its obligations hereunder and thereunder, will not require it to obtain or make any waiver, consent, notice, approval or authorization of, or filing

with, any third party or Governmental Authority, other than the filings contemplated by this Agreement.

6.04   <u>Capitalization</u>. (a) The schedule to this Section sets forth the authorized, issued and outstanding capital stock of each of the Corporations.

(b)   GEC is the sole record and beneficial owner of all the STS Shares; STS is the sole record and beneficial owner of all the STI Shares and the STP Shares; and STP is the sole record and beneficial owner of all the STV Shares, in each case free and clear of all claims, liens, security interests, pledges, options, encumbrances, charges, agreements, voting trusts and proxies or other restrictions.

(c)   The issued and outstanding shares of the capital stock of each of the Corporations have been duly and validly issued and are fully paid and nonassessable.

(d)   There are no rights, subscriptions, warrants, options, conversion rights, commitments or agreements of any kind binding on GEC or any of the Corporations that are outstanding or in effect to purchase or otherwise acquire (i) the capital stock of any Corporation or (ii) any obligations of any kind convertible into or exchangeable for any shares of capital stock of any Corporation, or pursuant to which GEC or any of the Corporations may be obligated to issue, sell, purchase or redeem any shares of capital stock or other securities of any Corporation.

6.05   <u>Financial Statements</u>.   GEC has delivered to OLP and the schedule to this Section contains complete copies of the

following consolidated financial statements of the Corporations (the "Management Reports"): (a) unaudited balance sheets as of December 31, 1989, 1990, and 1991 and unaudited income statements for each of the three years ended December 31, 1989, 1990, and 1991; and (b) unaudited balance sheets as of November 30, 1991 and 1992 and unaudited income statements for each of the eleven months ended November 30, 1991 and 1992. The Management Reports have been prepared by the accounting staffs of the Corporations in the regular course of business for purposes of reporting the financial position and results of operations of the Corporations to the management of GEC and Grace. Except as set forth in the schedule to this Section, the Management Reports have been prepared in accordance with the Grace Accounting Principles and fairly present in all material respects, in accordance with the Grace Accounting Principles, the consolidated financial condition and results of operations of the Corporations for the dates and periods covered by the Management Reports, subject to normal recurring year-end adjustments. GEC has delivered to OLP and the schedule to this Section contains a statement setting forth a reconciliation of the differences between _the Legal Entity Balance Sheet and the corresponding balance sheet in the Management Reports. Except as set forth on the schedule to this Section, the Legal Entity Balance Sheet was prepared using the same levels of materiality, account classifications and procedures as used to prepare such corresponding balance sheet.

6.06    Litigation and Claims.    Except as set forth in the
schedule to this Section, and except for matters relating to
Environmental Laws (which matters are covered by Section 6.11),
there are no claims, actions, suits or proceedings, judgments,
orders, writs, or injunctions of any court or Governmental
Authority pending or presently in effect or, to the knowledge of
the GEC Executives, after consultation with the Corporation
Executives, threatened against GEC or any Corporation which would
reasonably be expected to (i) adversely affect the ability of GEC
to execute, deliver or perform its obligations under this Agreement
or (ii) have an adverse effect on the business, financial condition
or results of operations of the Corporations.

6.07    Labor and Employment.    The schedule to this
Section sets forth a list of (a) all collective bargaining or other
agreements with labor unions to which any Corporation is a party,
and (b) all written employment agreements to which any Corporation
is a party which will remain in effect after the Closing. GEC has
delivered to OLP true and complete copies of all such agreements.
Except as set forth on the schedule to this Section, there is no
unfair labor practice complaint against the Corporations relating
to any of their employees pending or, to the knowledge of the GEC
Executives, after consultation with the Corporation Executives,
threatened before the National Labor Relations Board or any strike,
lockout, material dispute, slowdown or stoppage pending against the
Corporations.

6.08    _Insurance_.  The schedule to this Section describes the property and casualty and all other insurance coverage maintained by or on behalf of each Corporation.  Such policies are in full force and effect as of the date hereof.

6.09    _Contracts_.  The schedule to this Section lists all contracts and agreements to which any Corporation is a party (a) which cannot be canceled upon notice of one year or less and under which it is reasonably expected that such Corporation will make expenditures or obtain receipts of more than $100,000 for the current fiscal year, or (b) under which it is reasonably expected that such Corporation will make expenditures or obtain receipts of more than $250,000 for the current fiscal year (collectively, the "Contracts").  GEC has heretofore delivered to OLP true and complete copies of all the Contracts, all of which are currently in full force and effect and no Corporation is in default under any Contract.  The schedule to this Section also lists all contracts and agreements to which any Corporation is a party that contain currently effective provisions for indemnification of or by any Corporation for environmental matters, excluding contracts and agreements for purchase or sale of goods or services in the ordinary course of business.  GEC has heretofore delivered to OLP true and complete copies of all such contracts and agreements containing such indemnification provisions, which provisions are in full force and effect, subject to applicable statutes of limitation, and no Corporation is in default under any such

provision, in a manner such that the result of the default would be to adversely affect the ability of such Corporation to enforce its rights under such indemnity.

6.10   Employees; Benefit Plans.   (a) Schedule 6.10 sets forth the name of each employee benefit plan, as such term is defined in Section 3(3) of ERISA, which currently benefits employees of a Corporation or in which a Corporation is a participating employer (individually, a "Plan" and collectively, the "Plans").   The Corporations do not have any outstanding liability with respect to, or arising out of, any employee benefit plan, as such term in defined in Section 3(3) of ERISA, which formerly benefited, but does not currently benefit, employees of a Corporation or in which a Corporation was, but is not currently, a participating employer.

(b)   None of the Corporations contribute to, or have had an obligation to contribute to, a multiemployer plan within the meaning of Section 3(37) of ERISA.

(c)   Except as set forth in the schedule to this Section: (i) the Plans have been maintained in compliance in all material respects with the applicable provisions of ERISA and the Internal Revenue Code of 1986, as amended (the "Code"); (ii) each Plan intended to be qualified under Section 401(a) of the Code satisfies in all material respects the requirements of such Section; (iii) no act, omission or transaction has occurred which would result in imposition on the Corporations of a civil penalty or tax for a prohibited transaction (as such term is defined in either Section

406 of ERISA or Section 4975 of the Code); (iv) no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred with respect to any Plan; (v) no lien imposed under Section 412(n) of the Code exists in favor of any Plan under any property belonging to the Corporations; and (vi) no Plan which is subject to Title IV of ERISA has been terminated and no event or condition exists which presents a material risk of termination of any Plan by the Pension Benefit Guaranty Corporation ("PBGC").

(d)    With respect to any employee benefit plan, within the meaning of Section 3(3) of ERISA, which is not listed in the schedule to this Section but which is sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to within five years prior to the Closing Date, by any corporation, trade, business or entity under common control with the Corporations, within the meaning of Section 414(b), (c) or (m) of the Code or Section 4001 of ERISA ("Commonly Controlled Entity"): (i) no withdrawal liability, within the meaning of Section 4201 of ERISA, has been incurred, which withdrawal liability has not been satisfied; (ii) no liability to the PBGC has been incurred by any Commonly Controlled Entity, which liability has not been satisfied; (iii) no accumulated funding deficiency, whether or not waived, within the meaning of Section 302 of ERISA or Section 412 of the Code has been incurred; and (iv) all contributions (including installments) to such plan required by Section 302 of ERISA and Section 412 of the Code have been timely made.

6.11   <u>Environmental Compliance</u>.  Except as set forth in
the schedule to this Section: (a) the Operations and business of
the Corporations are in compliance with all, and the Corporations
have no liability with respect to any, Environmental Laws; and (b)
there are no claims, actions, suits or proceedings, judgments,
orders, writs, or injunctions of any court or Governmental
Authority pending or presently in effect or, to the knowledge of
the GEC Executives, after consultation with the Corporation
Executives, threatened against GEC or any Corporation relating to
Environmental Laws, which would reasonably be expected to (i)
adversely affect the ability of GEC to execute, deliver or perform
its obligations under this Agreement or (ii) have an adverse effect
on the business, financial condition or results or operations of
the Corporations.

6.12   <u>Operation in Ordinary Course</u>.  Except as set forth
in the schedule to this Section or in the ordinary course of
business or otherwise in accordance with the Corporations' normal
business practices, since December 31, 1991, none of the
Corporations has disposed of, or suffered an uninsured casualty
loss with respect to, any of its assets whose fair market value at
the time of such disposition or loss was greater than $100,000.

6.13   <u>Absence of Liens and Encumbrances</u>.  Except as
described in the schedule to this Section, all the assets included
in the balance sheet as of November 30, 1992 in the Management
Reports (other than those assets sold or otherwise disposed of by
the Corporations in the ordinary course of business or otherwise

in accordance with the Corporations' normal business practices since such date) are owned or held by the Corporations free and clear of all liens, mortgages, security interests, pledges or other encumbrances of any nature whatsoever, except for (i) those for taxes not yet due and payable, (ii) those of record as of the date hereof (the "Recorded Liens"), (iii) mechanic's, materialmen's and similar liens securing obligations which are not overdue by more than 30 days or which are being contested in good faith, (iv) those which have been disclosed in this Agreement or the schedules to this Agreement, or (v) those which will have been released on or prior to the Closing Date.

6.14   <u>Liabilities</u>. Except (i) as set forth or reflected in the balance sheet as of November 30, 1992 in the Management Reports, (ii) as disclosed in this Agreement, the schedule to this Section or the other schedules hereto, (iii) for liabilities incurred since the date of such balance sheet in the ordinary course of business, and (iv) for liabilities which will have been satisfied on or prior to the Closing Date, the Corporations have no liabilities that would be required to be reflected on or described in the notes to a consolidated balance sheet of the Corporations as of the dates this representation is made (including the date covered by the condition to Closing in Section 11.01) had such balance sheet been prepared in accordance with generally accepted accounting principles.

6.15   <u>Trademarks and Tradenames; Intellectual Property</u>.

The Corporations use the unregistered trademarks and tradenames
set forth in the schedule to this Section.  No other trademarks and
tradenames are material to the business of the Corporations.
Except for licenses associated with goods and services used by the
Corporations, no third-party intellectual property is material to
the business of the Corporations.

6.16   Compliance with Applicable Law.   Except as
described in the schedule to this Section, and except with respect
to environmental compliance, which is addressed in Section 6.11
above, the Corporations are in compliance in all material respects
with all laws, rules, regulations, ordinances, orders, judgments
and decrees applicable to the Operations and business as presently
conducted and, to the knowledge of the GEC Executives, after
consultation with the Corporation Executives, GEC has not received
any notification that any of the Corporations is not presently in
compliance therewith in any material respect.

6.17   Customers.   The schedule to this Section sets
forth a list which includes all current customers of the
Corporations that have paid $250,000 or more to the Corporations
in the current fiscal-year to date.

6.18   Real Property.  Exhibit A lists the real property,
including tanks and pipeline rights of way and easements, owned by
the Corporations (the "Owned Real Property") or leased by the
Corporations (the "Leased Real Property").   GEC has heretofore
furnished OLP with true and complete copies of the leases for the
Leased Real Property (the "Real Property Leases").   Except as set

forth in Exhibit A, the Real Property Leases are in full force and effect and no default exists with respect to any thereof.

6.19    <u>Property, Licenses and Permits</u>.   Except as set forth in the schedule to this Section, the Corporations (a) own or have the right to use the real (including rights of way and easements) and personal property, and (b) hold the licenses and permits; in each case that are necessary to operate the Operations as currently conducted.

6.20    <u>Grace and Grace-Conn</u>.   Grace is a holding company and has no substantial operations other than those conducted by Grace-Conn. and its subsidiaries.   The assets, pretax income and net worth of Grace-Conn. and its consolidated subsidiaries are substantially equivalent to those of Grace and its consolidated subsidiaries.

6.21    <u>Consents</u>.   The schedule to Section 6.09 and Exhibit A to this Agreement identify which of the Contracts or leases listed therein require by their explicit terms consent to a change of control or merger or the assignment of such Contract or lease of or by the Corporation which is a party thereto.

6.22    <u>Personal Property</u>.   The schedule to this Section sets forth a list of the personal property having a book value in excess of $2,500 that is owned by the Corporations as of the date set forth on the schedule, which list is true and correct as of such date.

6.23    <u>Taxes</u>.   Except as set forth in the schedule to this Section, (a) all returns (including without limitation,

income, franchise, sales and use, excise, severance, property, gross receipts, payroll and withholding tax returns and information returns), deposits and reports (all such returns, deposits and reports herein referred to collectively as "Tax Returns" or singularly as a "Tax Return") of or relating to any Tax that are required to be filed or deposited (taking into account all extensions) on or before the date hereof for, by, on behalf of or with respect to any of the Corporations, including, but not limited to, those relating to the income, business, operations or property of any of the Corporations, have been filed or deposited with the appropriate federal, state, local and foreign authorities on or before the date hereof, and all Taxes shown to be due and payable on such Tax Returns have been paid in full on or before the date hereof; and (b) None of the Tax Returns described in Section 6.23(a) are now under audit by any federal, state, local or foreign authority and there are no agreements, waivers or other arrangements providing for an extension of time with respect to the assessment or collection of any Tax or deficiency of any nature against any of the Corporations or with respect to any such Tax Return; and there are no suits or other judicial or administrative proceedings or claims pending with respect to any such Tax Return.

## ARTICLE 7

### Representations and Warranties by OLP

OLP hereby represents and warrants to GEC as follows:

7.01   Incorporation.  OLP is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, with full partnership power and authority to enter into this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. Each of the OLP Corporations is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.

7.02   Authorization.  The execution and delivery of this Agreement and the Ancillary Agreements to which they are respectively parties by OLP and the OLP Corporations, and the performance by OLP and the OLP Corporations of their respective obligations hereunder and thereunder, have been duly and validly authorized by all necessary action of OLP and all necessary corporate action of the General Partner and of the OLP Corporations.  This Agreement and the Ancillary Agreements to which they are respectively parties have been duly executed and validly delivered by OLP and the OLP Corporations and are legally binding on those of OLP and the OLP Corporations that are respectively parties hereto and thereto.

7.03   <u>No Conflict</u>. · The execution and delivery of this
Agreement and the Ancillary Agreements to which they are
respectively parties by OLP and the OLP Corporations, and ·the
performance by OLP and the OLP Corporations of their respective
obligations hereunder and thereunder, do not (a) conflict with the
certificate or agreement of limited partnership, as amended, of
OLP, or the corporate charters or by-laws of the OLP Corporations
or (b) result in the breach of any of the provisions of, or
constitute a default under, any statute, law, rule, regulation,
judgment, writ, order, decree or injunction of any court or
Governmental Authority, or any agreement, understanding or
restriction, to which any of OLP or the OLP Corporations is a party
or by which it or any of its assets is bound, which breach or
default would reasonably be expected to.adversely affect its
ability to perform its obligations under this Agreement.   Except
in connection with compliance with HSR, the execution and delivery
by each of OLP and the OLP Corporations of this Agreement and the
Ancillary Documents to which it is a party, and its performance of
its obligations hereunder and thereunder, will not require it to
obtain or make any· waiver, consent, notice, approval or
authorization ·of, or filing with, any third party or Governmental
Authority other than the filings contemplated by this Agreement.

ARTICLE 8

<u>Disclaimer of Additional and Implied Warranties</u>

8.01   <u>Investigation and Evaluation</u>.   OLP acknowledges
that (a) OLP and its directors, officers, attorneys, accountants

and advisors have been given the opportunity to examine to the full extent deemed necessary and desirable by OLP all books, records and other information with respect to the Corporations, the Properties, the Facilities and the Operations, (b) OLP has taken full responsibility for determining the scope of its investigations of the Corporations, the Properties, the Facilities and the Operations, and for the manner in which such investigations have been conducted, and has examined the Corporations, the Properties, the Facilities and the Operations to OLP's full satisfaction, (c) OLP is fully capable of evaluating the adequacy and accuracy of the information and material obtained by OLP in the course of such investigations, (d) OLP has not relied on GEC with respect to any matter in connection with OLP's evaluation of the Corporations, the Properties, the Facilities and the Operations, except as set forth in the Agreement (including its Exhibits and schedules) and (e) GEC is making no representations or warranties, express or implied, of any nature whatever with respect to the Corporations, the Properties, the Facilities or the Operations, other than the representations and warranties of GEC specifically set forth in Article 6, AND WITH RESPECT TO PERSONAL PROPERTY AND EQUIPMENT OF THE CORPORATIONS, GEC EXPRESSLY DISCLAIMS AND NEGATES ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSES, AND OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS. Nothing in this Section 8.01 shall be deemed to limit OLP's remedies under Section 13.03.

8.02   <u>Forecasts, Projections, etc</u>.   OLP acknowledges
that (a) OLP has taken full responsibility for evaluating the
adequacy,   completeness   and   accuracy   of   various   forecasts,
projections, opinions and similar material heretofore furnished by
GEC, the Corporations or their representatives to OLP in connection
with OLP's investigations of the Corporations, the Properties, the
Facilities and the Operations and (b) there are uncertainties
inherent in attempting to make projections and forecasts and render
opinions, that OLP is familiar with such uncertainties, and that
OLP is not relying on any projections, forecasts or opinions (other
than legal opinions) furnished to it by GEC, the Corporations or
any affiliate thereof or any of their representatives.   Nothing in
this Section 8.02 shall be deemed to limit OLP's remedies under
Section 13.03.

8.03   <u>Effect of Contemplated Transactions</u>.   Except as
expressly set forth in Section 6.21 and Section 13.03(a)(ii) (as
it relates to Section 6.21), (i) OLP acknowledges that it has taken
full responsibility for evaluating whether the transactions
contemplated by this Agreement require consent, approval or notice
under any lease or other agreement to which any of the Corporations
is a party, and (ii) GEC shall have no liability for the failure
to obtain or give any such consent, approval or notice.

44

## ARTICLE 9

### Covenants of GEC and OLP

9.01    Access and Inquiry.    Between the date of this Agreement and the Closing Date, OLP shall have reasonable access to the Facilities and will, upon request, be permitted to contact and make reasonable inquiry of GEC's and the Corporations' personnel regarding the Operations.  GEC shall make available to OLP all books, records, relevant purchasing and other financial data and files of GEC and the Corporations relating to the Operations to the extent reasonably requested by OLP.  OLP agrees that the terms of the Confidentiality Agreement shall apply to information gained by OLP pursuant to the foregoing and/or previously made available to OLP to the same extent as if OLP were a party thereto and bound by the confidentiality provisions thereof.

9.02    Hart-Scott-Rodino Act.    As promptly as practicable after the date of this Agreement, GEC and OLP shall file appropriate Notification and Report Forms under the HSR Act with respect to this Agreement and the transactions contemplated hereby. GEC and OLP shall cooperate to coordinate such filings, and to make reasonable efforts to respond to any governmental request or inquiry with respect thereto; but neither GEC, OLP nor any of their respective affiliates shall be required to make any payment (other than for reasonable legal fees and, with respect to OLP, for the filing fee required to be made by the acquiring entity under the HSR Act) that it is not presently contractually required to make,

45

divest any assets (including but not limited to assets of any of the Corporations), make any change in the conduct of its business or that of any Corporation, accept any limitation on the future conduct of its business or that of any Corporation, enter into any other agreement or arrangement with any person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

9.03    Permits and Licenses.    As soon as practicable after the date hereof, GEC shall cooperate with OLP to identify and secure any and all federal, state and local permits and licenses required for the Corporations to operate (in the same manner as presently operated) the Facilities under ownership of OLP.

9.04    Notices to Third Parties.    GEC and OLP shall cooperate to make all other filings and to give notice to and obtain consents from all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement (including the continuation of the Operations in the hands of OLP and NSTI as currently conducted and the maintenance in effect in the hands of OLP and NSTI of agreements and leases to which the Corporations are party).

9.05    Material Adverse Effect Notice.    GEC has instructed the Corporation Executives to give GEC prompt notice of any event or events that become known to them and individually or in the aggregate have a Material Adverse Effect; and GEC will

46

promptly notify OLP of any such event or events which become known
to any GEC Executive prior to the Closing Date.

9.06   Reasonable Efforts.   Each of OLP and GEC will use
its Reasonable Efforts to consummate the Closing under this
Agreement.

9.07   Tax Matters.   (a) GEC will file or deposit, or
cause to be filed or deposited, all Tax Returns of or relating to
any Tax that are required to be filed or deposited (taking into
account all extensions) on or before the Closing Date for, by, on
behalf of or with respect to any of the Corporations, including,
but not limited to, those relating to the income, business,
operations or property of any of the Corporations, with the
appropriate federal, state, local and foreign authorities on or
before the Closing Date, and GEC will pay, or cause to be paid, in
full all Taxes shown to be due and payable on such Tax Returns on
or before the Closing Date; and

(b)   GEC will prepare and file all required Tax Returns
for all periods ending on or before the Closing Date, which Tax
Returns will include as required, the income, business, operations
and property of each of the Corporations for the periods ending on
or before the Closing Date on a basis consistent with past practice
of the Grace Entities and the Corporations and in accordance with
all applicable laws and regulations.

ARTICLE 10

Conduct of Business Prior to the Closing

Except as otherwise consented to by OLP, from the date of this Agreement until the Closing:

10.01   Operation in Ordinary Course. GEC shall cause the Corporations to conduct the Operations only in the ordinary course of business or otherwise in accordance with the Corporation's normal business practices in all material respects.

10.02   Disposition of Assets. GEC shall not permit any of the Corporations, other than in the ordinary course of business or otherwise in accordance with the Corporations' normal business practices, to sell, lease (as lessor), transfer, mortgage, pledge, encumber, license (as licensor), or otherwise dispose of, any asset (tangible or intangible) material to the Operations.

10.03   Material Agreements. GEC shall not permit any of the Corporations, other than in the ordinary course of business, (i) to enter into any agreement with third parties material to the Operations; (ii) to modify, extend or terminate any existing material agreements, (iii) to create, incur or assume any indebtedness for borrowed money or to guarantee or otherwise become liable for the obligations of any other person or to make any loans or advances to any other person, nor (iv) to increase the compensation of any employee of the Corporations.

10.04   Business Organization and Customer Relations.

48

GEC shall cause the Corporations to use reasonable efforts to preserve the Corporations' business organization and satisfactory relations with customers, suppliers and employees.

10.05  Dividends.  GEC shall not permit the declaration or payment of any dividend in respect of, or the repurchase or redemption of any of, the capital stock of STS or the STS Subsidiaries.

ARTICLE 11

Conditions Precedent to the Obligations of OLP

All obligations of OLP under this Agreement are subject, at OLP's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01  Accuracy of Representations and Warranties.  Each and every representation and warranty of GEC under this Agreement shall be true and accurate in all material respects as of the date hereof and as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect.

11.02  Performance of Covenants and Agreements.  GEC shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by GEC at or prior to the Closing in accordance with this Agreement.

11.03  Hart-Scott-Rodino Act.  All waiting periods under the HSR Act applicable to the transactions contemplated by this

Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

11.04 <u>Permits, Consents, etc</u>.    There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority or other person or entity required in connection with the transactions contemplated by this Agreement (including the continuation of the Operations in the hands of OLP and NSTI as currently conducted and the maintenance in effect in the hands of OLP and NSTI of agreements and leases to which the Corporations are a party) which has not been accomplished or obtained and which may not be reasonably accomplished or obtained after the Closing.

11.05 <u>Litigation</u>.    No colorable action, suit or proceeding by any third person (including but not limited to any Governmental Authority) or investigation or inquiry by any Governmental Authority shall have been instituted or threatened against GEC or OLP or any of their respective affiliates that questions the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby which, if successful, would materially adversely affect the right of OLP to consummate the transactions contemplated by this

Agreement or to continue the Operations substantially as currently operated.

11.06 <u>Certificate of GEC</u>. GEC shall have delivered to OLP a certificate of GEC signed by the President or any Vice President of GEC certifying that (i) each and every representation and warranty of GEC under this Agreement was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect; and (ii) GEC has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by GEC at or prior to the Closing in accordance with this Agreement.

11.07 <u>Opinion of GEC's Counsel</u>. GEC shall have delivered to OLP an opinion of its General Counsel, dated the Closing Date, in the form of <u>Exhibit B</u>.

11.08 <u>No Material Adverse Effect</u>. Since the date of this Agreement, no event or events shall have occurred that, individually or in the aggregate, have had a Material Adverse Effect.

11.09 <u>Recorded Liens</u>. As of the Closing, there shall be no Recorded Lien that adversely affects the ability of OLP to conduct the Operations after the Closing, the release of which would require costs and expenses of more than $10,000; provided that with respect to any such Recorded Lien, GEC shall be deemed

to have satisfied the foregoing condition if it shall elect in writing to have the costs and expenses of release of such Lien deemed Damages indemnifiable under Section 13.03(a), whereupon such costs and expenses shall be so indemnifiable.

11.10  Financing. The financing for OLP's payment of the Estimated Purchase Price shall have been consummated.

### ARTICLE 12

### Conditions Precedent to the Obligations of GEC

All obligations of GEC under this Agreement are subject, at GEC's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

12.01  Accuracy of Representations and Warranties. Each and every representation and warranty of OLP under this Agreement shall be true and accurate in all material respects as of the date hereof and as of the Closing.

12.02  Performance of Covenants and Agreements.  OLP shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by OLP at or prior to the Closing in accordance with this Agreement.

12.03  Hart-Scott-Rodino Act. All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any

reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.

12.04 <u>Permits, Consents, etc</u>.  There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority or other person or entity required in connection with the transactions contemplated by this Agreement (including the continuation of the Operations as currently conducted and maintenance in effect of agreements and leases to which the Corporations are a party) which has not been accomplished or obtained and which may not be reasonably accomplished or obtained after the Closing, and which could reasonably be expected to cause any Grace Entity to incur any liability.

12.05 <u>Litigation</u>.  No colorable action, suit or proceeding by any third person (including but not limited to any Governmental Authority) or investigation or inquiry by any Governmental Authority shall have been instituted or threatened against GEC or OLP or any of their respective affiliates that questions the validity or legality of this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby which, if successful, would materially adversely affect the right of GEC to consummate the transactions contemplated hereby or would involve possible material liability on the part of GEC or any of its subsidiaries or affiliates.

12.06  Certificate of OLP.  OLP shall have delivered to GEC a certificate of OLP signed by the President or a Vice President of OLP certifying that: (i) each and every representation and warranty of OLP under this Agreement was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing; and (ii) OLP has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by OLP at or prior to the Closing in accordance with this Agreement.

12.07  Opinion of OLP's Counsel.  OLP shall have delivered to GEC an opinion of Stephen M. Hoffner, Esq., General Counsel for OLP, dated the Closing Date, in the form of Exhibit C.

ARTICLE 13

Indemnification; Survival of Representations

13.01  Definitions.  As used in this Article:

(a)  "Damages" means any and all penalties, fines, damages, liabilities, losses, expenses, payments, settlements or costs (including, without limitation, Litigation Expenses incident to Third-Party Claims, but excluding consequential damages and damages for lost profits), on an after-tax basis and net of any correlative insurance proceeds realized or to be realized by the indemnified party.

(b)  "Direct Claims" means claims other than Third Party Claims.

54

(c)      "Environmental   Claims"   means   claims   for indemnification against GEC under this Article for breach of Section 6.11.

(d)   "General Claims" means claims for indemnification against GEC under this Article other than Environmental Claims.

(e)   "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a claim.

(f)   "Third Party Claims" means any and all claims, demands, suits, actions or proceedings by any person or entity, or Governmental Authority, other than OLP or GEC or their respective affiliates, which could give rise to a right of indemnification under this Article.

13.02   Indemnification by OLP.   (a)   Subject to the terms, conditions and limitations of this Article, OLP shall indemnify all of the Grace Entities and save and hold all of the Grace Entities harmless from and against any Damages caused by or arising out of (i) the failure of OLP to perform or fulfill any agreement or covenant to be performed or fulfilled by it under this Agreement or any Ancillary Agreement, or (ii) any inaccuracy in any representation or breach of any warranty of OLP set forth in Article 7 or any Ancillary Agreement, or in the certificate referred to in Section 12.06.

(b)   The representations and warranties of OLP set forth in Article 7 shall survive the Closing.