# Exhibit A

**Expert Report of H. Sean Mathis**

## I.  EXECUTIVE SUMMARY

### Engagement

Certain Insurers[1] have requested that I render my expert opinion as to the value of certain warrants (the "Warrants") to be issued to the Asbestos PI Trust under the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co. et al (the "Company"), the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative and the Official Committee of Equity Security Holders dated February 27, 2009 (the "Plan"). I have also been asked to state an opinion as to the probability that the Warrants will be exercised for the economic benefit of the holders prior to the expiration date of the Warrants.

The Warrants will be issued pursuant to the terms of the warrant agreement by and among the Company, the WRG Asbestos Trust, and the Warrant Agent (the "Warrant Agreement"), which is attached as an exhibit to the Plan. The Warrants give the holders the right to purchase up to 10,000,000 shares of the Company's common shares (hereinafter "Common Stock") at a price of $17.00 per share (the "Strike Price") for a period of one year from the date of issuance. The valuation of the Warrants contained herein is based on the assumption that the Company will emerge from bankruptcy protection on the terms described in the Plan on or about December 31, 2009 (hereinafter the "Effective Date") and continue to operate as a going concern through the expiration date of the Warrants on or about December 31, 2010 (hereinafter the "Expiration Date").[2]

I have 25 years of experience in the restructuring and bankruptcy advisory businesses and am the founder of Mathis & Co., LLC ("Mathis"), an investment banking firm. Attached hereto is Appendix D, which contains a copy of my CV. I have been retained to provide an expert report to the Certain Insurers for a fee of $50,000 plus reasonable expenses.

### Methodology and Conclusions

In conducting my analysis, I led a team of professionals at Mathis, consisting of a Managing Director and a senior analyst, who valued the Warrants, performed valuation analyses of the Company and researched the industry and comparable companies. I have primarily relied upon (i) information provided in the Plan, (ii) public filings of the Company, including current reports for the Company on Form 8-K, quarterly reports of the Company on Form 10-Q and annual reports of the Company on Form 10-K, (iii) public filings by comparable companies, (iv) applicable published research reports and relevant press releases, (v) as well as my knowledge

---

[1] The Certain Insurers are Continental Casualty Company and Continental Insurance Company and affiliated companies, Fireman's Fund Insurance Company (and possibly other related companies) and Allianz S.p.A., f/k/a Riunione Adriatica Di Sicurta, Arrowood Indemnity Company f/k/a Royal Indemnity Company, OneBeacon America Insurance Company, Seaton Insurance Company, Government Employees Insurance Company, Columbia Insurance Company f/k/a Republic Insurance Company, Zurich Insurance Company, Zurich International (Bermuda) Ltd., and Maryland Casualty Company.

[2] Pursuant to the terms of the Warrant Agreement, the Warrants may be issued up to five business days after the Effective Date. For the purpose of this report, it is assumed that the issuance date of the Warrants is on or about the Effective Date of the Plan.

and experience accumulated over 25 years as a financial advisor and principal investor.  See Appendix E for a list of materials reviewed in forming my opinion.

Based on my review of the materials described above and certain assumptions described herein, I am of the opinion that, upon the Effective Date of the Company's reorganization, pursuant to the Black-Scholes model, the theoretical value of the Warrants is between $0 and $400,000.

While the Black-Scholes model estimates a trading value for the Warrants on the Effective Date, the actual economic value of the Warrants from a practical point of view can only be realized by the holder if the Common Stock trades above the Strike Price and the holder exercises the Warrants. If the Common Stock price does not exceed the Strike Price during the life of the Warrants, then the Warrants will have no economic value to the holder.  Based on a comparable company analysis, I estimate the high end of the estimated range of the Common Stock price on or before the Expiration Date to be $12.00 per share.  I am accordingly of the opinion that the Warrants will have no actual economic value to the holder prior to the Expiration Date and will expire without being exercised.


**Basis for Conclusions**

In valuing the Warrants, I used the Black-Scholes option pricing model, which is an industry standard for option and warrant valuation models (See Appendix B for a description of the Black-Scholes formula).  A range of values for the Warrants was developed based on an analysis of net equity values for the Company and historical volatility of the Common Stock.

In traditional warrant valuations, the market value of the Common Stock underlying the Warrants would be sufficient to value the Warrants; however, numerous factors are affecting the current Common Stock price. These factors include, but are not limited to, the uncertainty and risk of the Company's bankruptcy, and the possible inability of the Company, in a restricted credit market, to raise additional capital in the amount and on the terms proposed to enable it to emerge from the bankruptcy proceeding.  As a result, I performed an independent valuation of the Company's net equity value per share, on a pro-forma basis, as of the Effective Date.

The independent Company valuation analysis yields a going-concern value ("Enterprise Value") of **$2.10 billion** based on the weighted results of a discounted cash flow ("DCF"), comparable company and precedent transaction analysis.  I over-weighted the DCF analysis in determining the Warrants' final value, as this methodology more accurately reflects the specifics of a particular company's near term operating performance expectations.  For further discussion of my weighting rationale, please see Appendix C attached hereto, which describes the DCF, comparable company and precedent transaction analyses.

To determine the Company's net equity value (*i.e.*, the amount of value available to the Company's existing shareholders), I adjusted the Company's Enterprise Value by deducting its estimated pro-forma Net Debt[3] of $1.67 billion, as described in section "2.11.2-Calculation of Reorganized Equity Value" in the Plan.  The result is a net equity value of **$430.0 million**. Assuming the Company has 72.2 million shares outstanding, as described in the Plan, the net equity value per share of Common Stock is **$5.96**.  As discussed below, I do not believe that the

---

[3] Net Debt is the sum of the pro forma value of total funded debt, minority interest, non-core liabilities, obligations under the Asbestos PI Deferred Payment Agreement and the Class 7A Asbestos PD Deferred Payment Agreement.

value of a share of Common Stock or the price at which such shares will trade during the term of the Warrants will result in the Warrants having an actual economic value that would support their exercise.

Please see Appendix A for additional information about the Company.

This report is respectfully submitted on March 16, 2009,

By:

H. Sean Mathis

Managing Director

Mathis & Co, LLC

**APPENDIX A**

## COMPANY BACKGROUND[4]

The Company is engaged in the production and sale of specialty chemicals and specialty materials on a global basis through its two operating segments, Grace Davison and Grace Construction Products. The Company sells its products to a wide range of industries, notably to the energy and refining, construction and oil refining industries, among others. The Company is the successor to a company that originated in 1854 and became a public company in 1953.

On April 2, 2001, W. R. Grace & Co. voluntarily filed for Chapter 11 reorganization in response to an increasing number of asbestos claims. The Company's asbestos liabilities largely stem from commercially purchased chrysotile asbestos that was added to some of its fire protection products. The Company and seven of its former executives remain defendants in a criminal indictment in a case pending in Montana, resulting from the sale of asbestos containing vermiculite products.

On September 19, 2008, the Company, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative and the Official Committee of Equity Security Holders filed a joint plan of reorganization and an accompanying disclosure statement with the U.S. Bankruptcy Court in Delaware. On February 27, 2009, the Company, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative and the Official Committee of Equity Security Holders filed their First Amended and Restated Plan and Disclosure Statement for the Plan.

### *2008 versus 2007 operating results of the Company*

The Company's revenue for the year ended December 31, 2008 was $3.31 billion compared with $3.12 billion for the prior year, a 6.5% increase (3.5% increase before the effects of currency translation). The Company attributed the net increase to higher selling prices in response to rising raw materials costs and favorable currency translation.

The Company's pre-tax income from core operations, as described in the Company's 2008 annual filing on form 10-K,  was $299.7 million for the year ended December 31, 2008, up 0.8% from the prior year. Price increases totaled approximately $150.0 million in the year ended December 31, 2008, increasing sales approximately 4.8% when compared with the prior year. Inflation on raw materials (excluding metals) and energy costs totaled approximately $160.0 million in the year ended December 31, 2008, increasing costs approximately 15% when compared with the prior year.

Net cash provided by operating activities for the full year ended December 31, 2008 was $1.6 million, compared with $88.2 million for the prior year. In response to lower customer demand during the fourth quarter of 2008, production at over 50 of the Company's plants worldwide was stopped or slowed and raw materials purchases were significantly reduced. As a result of these actions and ongoing cash productivity initiatives, net working capital was reduced by $132.0 million during the fourth quarter. Net cash provided by operating activities in 2008 includes a payment of $252.0 million related to the previously announced settlement of certain environmental claims relating to its former vermiculite operations in Libby, Montana.

---

[4] Portions excerpted from the Company's 10-K and fourth quarter 2008 press release.  I have supplied the underlining for emphasis.

***Fourth Quarter 2008 results***

Sales for the fourth quarter were $768.4 million compared with $803.7 million in the prior year quarter, a 4.4% decrease (0.8% decrease before the effects of currency translation). The sales decrease was attributable primarily to lower volumes and unfavorable currency translation, partially offset by higher selling prices in both operating segments. Price increases yielded approximately $55 million in the fourth quarter, increasing sales by 6.8% over the prior year quarter. Sales were down 1.4% in North America and 15.0% in Europe Africa, and up 6.3% in Asia Pacific and 23.2% in Latin America.

Net income for the fourth quarter was $43.4 million, or $0.60 per diluted share, compared with net income of $37.2 million, or $0.52 per diluted share, in the prior year quarter. The fourth quarter 2008 and 2007 results were negatively affected by Chapter 11 expenses, litigation and other matters not related to core operations. Excluding Chapter 11 expenses, the loss on non-core activities, and their tax effects, net income would have been $25.0 million for the fourth quarter of 2008 compared with $27.4 million calculated on the same basis for the prior year quarter, an 8.8% decrease.

Pre-tax income from core operations was $47.4 million in the fourth quarter compared with $54.9 million in the prior year quarter, a 13.7% decrease. Inflation on raw materials (excluding molybdenum and other metals) and energy costs totaled approximately $53 million in the fourth quarter, increasing costs approximately 19% when compared with the prior year quarter.

***First Quarter Outlook[5]***

For the first quarter of 2009, the Company expects pre-tax income from core operations to be negative. They expect first quarter results to be unfavorably affected by three factors as follows:

> The Company Construction Products sales volumes are typically lowest in the first quarter of each year due to seasonal factors.

> The Company expects costs of goods sold in the first quarter to reflect the high raw materials and energy costs that they experienced in the fourth quarter of 2008.

> The Company intends to further reduce production volumes and inventory levels in the first quarter and, as a result, will experience less favorable fixed cost absorption resulting in a lower gross profit percentage.

The Company expects cash flow to be positive for the first quarter and expects improvements in net working capital, including the reduction in inventories referenced above, and reductions in capital expenditures. In addition, the Company expects pre-tax income from core operations to include significant non-cash costs in the first quarter, including in cost of goods sold as discussed above and in pension expense.

---

[5] Portions excerpted from the Company's 10-k for the fiscal year 2008.  I have supplied the underlining for emphasis.

**APPENDIX B**

## WARRANT VALUATION ANALYSIS

The industry standard option pricing model for warrant and option valuation is the Black-Scholes formula. Black–Scholes pricing is widely used for its ease in calculating and explicitly modeling the relationship of all the variables to be considered in such valuation. It is a useful approximation, particularly when analyzing the directionality of price movement at certain critical points. It is typically used both as a quoting convention and as a basis for more refined models. Although volatility is not constant, results from the model are often useful in practice and helpful even if the results are not completely accurate, because they can be used as a first approximation to which adjustments can be made.

Results using the Black–Scholes model differ from actual prices, due to the simplifying assumptions of the model. One significant limitation is that security prices do not follow a strict stationary log-normal process in real time, nor is the risk-free interest rate actually known (and is not constant over time). Pricing discrepancies between empirical and the Black-Scholes model have long been observed in options that are significantly "out of the money" (*i.e.*, the stock price is below the strike price) and such discrepancies correspond to the likelihood of extreme price changes.

As mentioned above, an important feature of the Black–Scholes model is that the results can be further adjusted to overcome some of its analytical limitations. For example, the method considers certain parameters as constants; however, these parameters can be further manipulated to treat certain items as variable (such as volatility or interest rates) and thus added sources of risk.

The following inputs were used to generate a range of value[6] to value the Warrants:

Stock Price[7]:            $4.93 and $ 5.96

Strike Price:             $17.00 per share

Term:                     365 Days[8]

Volatility[9]:             41.7% and 52.2%

Risk-Free Rate[10]:        0.68%

---

[6] Source: Economic Research Institute Black-Scholes Calculator

[7] To determine a range of values for the Warrants, I used the closing price of the Common Stock as of March 12, 2009 and the pro-forma net equity per share estimated as of the Effective Date.

[8] When using the closing market price, I extended the term to 1.75 years to reflect the estimated Expiration Date.

[9] Volatility was determined by calculating annualized movement in the price of the Common Stock during a certain time frame. The volatility range applied to this analysis is the volatility of the lower price points over the prior three month period and the volatility of the highest price points over the last two year period.

The following table reflects the range of value of one warrant based upon the historical volatility of the Common Stock Price:

| Volatility | Market Price | Estimated Net Equity Value |
|---|---|---|
| | $4.93 | $5.96 |
| 41.7% | $0.02 | $0.01 |
| 52.2% | $0.09 | $0.04 |

Base on the foregoing the theoretical value of the Warrants is between **$0 and $400,000.**


**Probability of Exercise of the Warrants**

The Black-Scholes model ascribes a value to options and warrants even if those options and warrants are significantly "out of the money". In this case, the one-year term of the Warrants requires a practical look as to the likelihood that these Warrants will be exercised at any time prior to the Expiration Date.  Unless the underlying Common Stock price exceeds the Strike Price of the Warrants prior to the Expiration Date, there is no rational reason for a holder to exercise the Warrants when the Common Stock can be purchased at a lower price in the open market. If the Common Stock price does not exceed the Strike Price during the life of the Warrants, then the Warrants will have no economic value to the holder.

To determine the probability that the Common Stock price would exceed the Strike Price during the term of the Warrants, I applied the current comparable company valuation multiple to the 2010 projected operating results of the Company:

| | 2010 Projected | Comparable  Multiples | | Implied Stock Price | |
|---|---|---|---|---|---|
| | | High | Low | High | Low |
| EBITDA | 384.0 | 6.2 | 4.1 | $ 9.84 | NM |
| Earnings per Share | $ 0.91 | 13.2 | 8.0 | $ 12.01 | $ 7.28 |

Based on the forgoing, I estimated that the high end of the range for the Common Stock is $12.00 per share.

In addition, I calculated the implied valuation multiples necessary for the Common Stock to trade at the Strike Price.  I utilized the Company's projected financial results and based this analysis on the assumption that the Company will achieve its projected operating results for the period ended December 31, 2010.  The EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) and P/E (Price/Earnings multiple required to achieve a net equity value per share of $17.00 is 7.5.x and 18.7x respectively, which represents 36.0 % and 87% expansion relative to current industry market multiples.  Given the unprecedented turmoil in the economy and the Congressional Budget Office's projected outlook of 1.5% growth for real GDP in 2010, I do not

---

[10] The yield on the one year treasury as of March 12, 2009

believe the market multiples will expand sufficiently to justify a $17.00 share price for the Common Stock.

Pursuant to its public filings, the Company has identified various other factors which may effect the long term Common Stock price relative to the industry, including but not limited to, the availability of financing for the Company's proposed plan of reorganization, the Company's various legal proceedings, the cost and availability of raw materials and energy, the Company's unfunded pension liabilities and costs of environmental compliance.

These factors and the general state of the financial markets make it unlikely that the Company's Common Stock will trade at or above the Strike Price prior to the Expiration Date of the Warrants.

**APPENDIX C**

## COMPANY VALUATION ANALYSIS

The Company valuation analysis was conducted using three generally accepted valuation methodologies: discounted cash flow ("DCF") (Exhibit 1), comparable publicly traded companies analysis (Exhibit 2) and precedent transactions analysis (Exhibit 3).

For valuation purposes, I value the Company under each of the three methodologies and establish the relevant weight each method carries in the overall valuation based on current market conditions, (e.g., availability of capital, M&A activity), industry dynamics and economic prospects. For this valuation, the DCF analysis was the most heavily weighted (85%), as this methodology most accurately reflects the specifics of a particular company's near term operating performance expectations, which I believe is the most relevant to this valuation. The comparable company method receives less weight than the DCF, while the precedent transaction analysis was not given any weight, as discussed below.

For further discussion of my weighting rationale, see the detailed description of the methodologies below.

| Methodology | Metric: 2010E EBITDA | Multiple | Implied EV | Weight | Weighted EV |
|---|---|---|---|---|---|
| Discounted Cash Flow | - | - | $2,056.8 | 85.0% | $1,748.3 |
| Comparable Companies | $384.0 | 5.5x | $2,112.0 | 15.0% | $316.8 |
| Precedent Transactions | $384.0 | 9.9x | $3,801.6 | 0.0% | $0.0 |
| | | | | **Weighted EV** | **$2,065.1** |

The primary source of financial information used in the valuation was the Pro Forma and Prospective Financial Information provided by the Company in Exhibit 12 to the Plan. For the purposes of this valuation, no adjustment was made to management's projected financial results for 2009 and 2010, however, I would note that I have reservations and concerns as to the Company's ability to meet and/or exceed these projections.

As stated in the Plan and the Company's Annual Report on Form 10-K for the fiscal year ended 2008 the Company is operating in "a time of heightened economic uncertainty" and the worldwide economic downturn has had substantial effects on the Company's operating results in the fourth quarter of 2008 and the first quarter of 2009. While the Company asserts that it has taken these economic factors into consideration in its projections, these assumptions must be qualified by the fact that there is no assurance that the Company's business will stabilize in the second half of 2009 and revenue will grow 5.6% in 2010 as reflected in the projections. According to "The Budget and Economic Outlook: Fiscal Year 2009 to 2019" issued by the United States Congressional Budget Office, real GDP is expected to decline by 2.2% in 2009 and increase by 1.5% in 2010. These projections represent downward revisions from +1.1% and +3.6%, respectively, in the Congressional Budget Office's September 2008 report.

# Valuation Analysis

## Financial Summary

*($ in millions)*

| | Historical | | 2008 Pro-forma | Estimated 2009E | Projected | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **FY Ending December** | **2006** | **2007** | | | **2010P** | **2011P** | **2012P** | **2013P** | **2014P** |
| **Income Statement Summary** | | | | | | | | | |
| Net Sales | $2,826.5 | $3,115.2 | $3,317.0 | $2,957.0 | $3,123.0 | $3,279.2 | $3,443.1 | $3,615.3 | $3,796.0 |
| % Growth | - | 10.2% | 6.5% | (10.9%) | 5.6% | 5.0% | 5.0% | 5.0% | 5.0% |
| Gross Profit | 879.7 | 987.3 | 978.3 | 913.0 | 991.0 | 1,040.6 | 1,092.6 | 1,147.2 | 1,204.6 |
| % Margin | 31.1% | 31.7% | 29.5% | 30.9% | 31.7% | 31.7% | 31.7% | 31.7% | 31.7% |
| Operating Expenses | 723.1 | 732.7 | 727.3 | 747.0 | 725.0 | 761.3 | 799.3 | 839.3 | 881.2 |
| % Revenue | 25.6% | 23.5% | 21.9% | 25.3% | 23.2% | 23.2% | 23.2% | 23.2% | 23.2% |
| EBIT | 156.6 | 254.6 | 251.0 | 166.0 | 266.0 | 279.3 | 293.3 | 307.9 | 323.3 |
| % Margin | 5.5% | 8.2% | 7.6% | 5.6% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% |
| EBITDA | 270.1 | 368.0 | 369.7 | 282.0 | 384.0 | 410.5 | 431.0 | 452.5 | 475.2 |
| % Margin | 9.6% | 11.8% | 11.1% | 9.5% | 12.3% | 12.5% | 12.5% | 12.5% | 12.5% |
| **Cash Flow Items** | | | | | | | | | |
| Depreciation and Amortization | 113.5 | 113.4 | 118.7 | 116.0 | 118.0 | 131.2 | 137.7 | 144.6 | 151.8 |
| % of Revenue | 4.0% | 3.6% | 3.6% | 3.9% | 3.8% | 4.0% | 4.0% | 4.0% | 4.0% |
| Capital Expenditures | 119.2 | 136.9 | 132.2 | 104.0 | 139.0 | 131.2 | 137.7 | 144.6 | 151.8 |
| % of Revenue | 4.2% | 4.4% | 4.0% | 3.5% | 4.5% | 4.0% | 4.0% | 4.0% | 4.0% |
| Working Capital | 386.9 | 427.9 | 381.6 | 254.0 | 220.0 | 238.2 | 250.1 | 262.6 | 275.7 |
| % of Net Sales | 13.7% | 13.7% | 11.5% | 8.6% | 7.0% | 7.3% | 7.3% | 7.3% | 7.3% |

Source: Projections reflect Mathis & Co. assumptions and forecasts reflected in Exhibit 12, "The Plan."

**Exhibit 1.**    **Discounted Cash Flow Analysis (DCF)**

Under the DCF methodology, a company's enterprise value is calculated as the sum of the present value of its projected un-levered free cash flows and the present value of the Company's terminal value. For purposes of this discussion, "un-levered free cash flow" represents a company's cash flow assuming no debt in its capital structure.

In order to calculate present value, projected un-levered free cash flows are discounted by the weighted average cost of capital or "WACC", which is the weighted average of (i) the expected rate of return earned by the Company's creditors (i.e., the "Cost of Debt"), adjusted for the tax deductibility of interest, and (ii) the expected rate of return earned by the Company's shareholders (i.e., the "Cost of Equity"). These expected returns are weighted by the proportion of debt and equity in the Company's capital structure as a going concern.

A company's "terminal value" represents its enterprise value at the end of a projected period. It assumes that a company will continue to exist as a going concern in perpetuity beyond the last year of the projections. In my analysis, I extended the Company's projections through 2014, assuming 3.0% growth in revenue per year from 2011 – 2014 and operating margins consistent with the Company's 2010 projections. The terminal value under this analysis reflects the Company's enterprise value as a going concern at the end of 2014.

Traditionally the DCF methodology yields a valuation most closely related to the specific factors affecting the company. The DCF uses financial projections provided by the Company's management which reflects the specific dynamics of the Company and is less influenced by factors affecting the companies in its peer group. Therefore given the specific issues related to the Company as a result of its bankruptcy proceeding, I placed a high weighting on the DCF.

In my DCF analysis for the Company, I used a range of discount rates between 12.0% and 14.0%, as suggested by the weighted average cost of capital analysis below:

| Weighted Average Cost of Capital | Inputs |
|---|---|
| Cost of Equity [1] | 16.12% |
| Cost of Debt [2] | 10.00% |
| Target Capital Structure [3] | 49.8% Debt, 50.2% Equity |
| Tax Rate | 35.00% |
| Size Premium | 1.65% |
| **WACC CALCULATION** | **12.98%** |

Notes:

Cost of Equity [1] – Calculated using the Capital Asset Pricing Model. Assumes a risk free rate equivalent to the 5 year T-Bill at 1.85%, a beta of 2.008 as per Bloomberg LLC and a market premium of 7.1% as per Bank of America Securities.

Cost of Debt [2] – Reflects expected future cost of debt

Target Capital Structure [3] – Reflects the average capital structure based on the selected peer group to more accurately represent the Company's capital structure as it emerges from bankruptcy.

To calculate the terminal value I used a range of EBITDA multiples between 4.0x and 6.0x, consistent with the comparable companies analysis described below.

My DCF analysis resulted in an enterprise value of **$2.056 billion** for the Company.

# Valuation Analysis
## Discounted Cash Flow Analysis

### Key Operating Assumptions

| FY Ending December | Estimated 2009E | Projected 2010P | 2011P | 2012P | 2013P | 2014P | CAGR 2010P - 2014P |
|---|---|---|---|---|---|---|---|
| Revenue | $ 2,957.0 | $ 3,123.0 | $ 3,279.2 | $ 3,443.1 | $ 3,615.3 | $ 3,796.0 | 5.0% |
| EBITDA | 282.0 | 384.0 | 410.5 | 431.0 | 452.5 | 475.2 | 5.5% |
| EBIT | 166.0 | 266.0 | 279.3 | 293.3 | 307.9 | 323.3 | 5.0% |
| % Margin | 5.6% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | |
| Less: Cash Taxes @35.0% | (58.1) | (93.1) | (97.8) | (102.6) | (107.8) | (113.2) | |
| Tax-adjusted EBIT | $ 107.9 | $ 172.9 | $ 181.5 | $ 190.6 | $ 200.2 | $ 210.2 | |
| Plus: Depreciation and Amortization | 116.0 | 118.0 | 131.2 | 137.7 | 144.6 | 151.8 | |
| % Revenue | | 3.8% | 4.0% | 4.0% | 4.0% | 4.0% | |
| Less: Capital Expenditures | (104.0) | (139.0) | (131.2) | (137.7) | (144.6) | (151.8) | |
| Less: Change in Working Capital | 127.6 | 34.0 | (18.2) | (11.9) | (12.5) | (13.1) | |
| Unlevered Free Cash Flow | $ 247.5 | $ 185.9 | $ 163.4 | $ 178.7 | $ 187.6 | $ 197.0 | |

### DCF Summary

| Discount Rate | 12.0% | | | 13.0% | | | 14.0% | | |
|---|---|---|---|---|---|---|---|---|---|
| Terminal EBITDA Multiple | 5.00x | 5.50x | 6.00x | 5.00x | 5.50x | 6.00x | 5.00x | 5.50x | 6.00x |
| 2014P EBITDA | $ 475.2 | 475.2 | 475.2 | $ 475.2 | 475.2 | 475.2 | $ 475.2 | 475.2 | 475.2 |
| Terminal Value | 2,375.8 | 2,613.4 | 2,851.0 | 2,375.8 | 2,613.4 | 2,851.0 | 2,375.8 | 2,613.4 | 2,851.0 |
| PV of Terminal Value | 1,348.1 | 1,482.9 | 1,617.7 | 1,289.5 | 1,418.5 | 1,547.4 | 1,233.9 | 1,357.3 | 1,480.7 |
| PV of Free Cash Flows | 654.5 | 654.5 | 654.5 | 638.3 | 638.3 | 638.3 | 622.8 | 622.8 | 622.8 |
| Implied Enterprise Value | $ 2,002.6 | 2,137.4 | 2,272.2 | $ 1,927.8 | 2,056.8 | 2,185.7 | $ 1,856.8 | 1,980.2 | 2,103.6 |

### Key Implied Metrics

| | 12.0% | | | 13.0% | | | 14.0% | | |
|---|---|---|---|---|---|---|---|---|---|
| | 5.00x | 5.50x | 6.00x | 5.00x | 5.50x | 6.00x | 5.00x | 5.50x | 6.00x |
| Free Cash Flows % of Enterprise Value | 32.7% | 30.6% | 28.8% | 33.1% | 31.0% | 29.2% | 33.5% | 31.5% | 29.6% |
| Terminal Value % of Enterprise Value | 67.3% | 69.4% | 71.2% | 66.9% | 69.0% | 70.8% | 66.5% | 68.5% | 70.4% |
| Implied Enterprise Value / 2009E EBITDA | 7.1 x | 7.6 x | 8.1 x | 6.8 x | 7.3 x | 7.8 x | 6.6 x | 7.0 x | 7.5 x |
| Implied Enterprise Value / 2010P EBITDA | 5.2 x | 5.6 x | 5.9 x | 5.0 x | 5.4 x | 5.7 x | 4.8 x | 5.2 x | 5.5 x |

Source: Projections reflect Mathis & Co. assumptions and forecasts reflected in Exhibit 12, "The Plan."

**Exhibit 2.    Comparable Company Analysis**

Under the comparable company methodology, a company is benchmarked on the basis of its financial metrics to similar companies whose securities are publicly-traded in the marketplace. For my analysis I used earnings before interest taxes depreciation and amortization ("EBITDA"). Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, geographic focus and size. The Enterprise Value of each of the selected companies, as indicated by the market value of its securities, is then divided by its EBITDA in order to calculate its implied EBITDA multiple. These implied multiples are then applied to the EBITDA of the company being valued in order to calculate its enterprise value.

I selected the following comparable companies for my analysis: Albemarle Corp., Cabot Corp., Dow Chemical, E. I. DuPont, Eastman Chemical, Huntsman Corp. and PPG Industries, Inc.[11] These publicly-traded manufacturers of diversified and specialty chemicals are based in North America and have annual revenue of between $2.5 and $57.0 billion.

In my comparable company analysis, I used the EBITDA multiples, which are the more standard valuation multiples used in industrial manufacturing companies.  The analysis shows the peer group trades at 4.5x – 6.2x projected 2009 EBITDA. I based my valuation on 2009 projected EBITDA multiples due to the unprecedented economic decline experienced in the late stage of 2008, as I believe the market has discounted trailing operating results in the face of the new economic environment.  I do not believe that the 2008 multiples are a solid indication of companies' value going forward.  As a result, I underweighted the comparable company analysis due to the reliance on third party estimates of future operating results.

In order to estimate the Company's Enterprise Value at the Effective Date, I applied the forward looking 2009 EBITDA multiples from my comparable group to the projected 2010 financial results of the Company.

My comparable company analysis resulted in an estimated enterprise value of **$2.11 billion** for the Company.

---

[11] I did not use Rohm & Haas in my comparable company analysis, as it is the target of a takeover attempt by Dow Chemical. Upon review of the trading activity in the stock it became apparent that Rohm & Haas stock was trading based on a strategic takeover value and therefore the transaction should not be viewed as a precedent transaction.

# Valuation Analysis
## Comparable Companies

*($ in millions, except share price)*

|  | Company | Share Price | Equity Value | Enterprise Value | Enterprise Value as a Multiple of: Revenue 2009E | Revenue 2010E | EBITDA 2009E | EBITDA 2010E | Equity Value as a Multiple of: P/E 2009E | P/E 2010E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Comparable Chemical Companies** | DuPont | $19.06 | $17,202.2 | $23,802.2 | 0.82x | 0.77x | 5.6x | 5.2x | 9.7x | 8.5x |
| | Dow Chemical | 7.00 | 6,470.4 | 16,095.4 | 0.32x | 0.32x | 4.1x | 3.2x | 13.2x | 6.9x |
| | PPG Industries | 34.34 | 5,639.8 | 8,686.8 | 0.62x | 0.61x | 5.5x | 4.9x | 10.9x | 8.9x |
| | Huntsman Corp | 2.96 | 693.9 | 3,946.9 | 0.44x | 0.43x | 6.2x | 5.5x | NM | NM |
| | Eastman Chemical | 22.83 | 1,656.3 | 2,724.3 | 0.46x | 0.43x | 4.5x | 3.7x | 10.2x | 7.5x |
| | Albemarle Corp | 18.00 | 1,649.9 | 2,616.6 | 1.13x | 1.08x | 5.6x | 5.2x | 9.3x | 8.0x |
| | Cabot Corp | 9.12 | 596.3 | 1,257.3 | 0.44x | 0.41x | 5.0x | NA | 8.0x | 4.6x |
| | **Average** | | | | 0.60x | 0.58x | 5.2x | 4.6x | 10.2x | 7.4x |
| | **Median** | | | | 0.46x | 0.43x | 5.5x | 5.0x | 10.0x | 7.7x |

### Range of Multiples

| | 5.0x | 5.5x | 6.0x |
|---|---|---|---|
| Implied EV | $1,920.0 | $2,112.0 | $2,304.0 |

**Implied Enterprise Value based off of 2010E EBITDA of $384.0**

$384.0

Source: Capital IQ and publicly available information.
Note: Pricing as of March 12, 2009.

**Exhibit 3.    Precedent Transactions Analysis**

Precedent transaction analysis estimates value by examining public merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals acquisition multiples for companies in similar lines of business to the company being valued. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the company being valued. I focused on prices paid as a multiple of EBITDA of each company acquired. These multiples are then applied to the company's EBITDA to determine enterprise value.

Due to the fact that the transaction values from precedent transactions often reflect a control premium, synergies of the combined entity and a competitive dynamic from multiple bidders, the valuation multiples determined by this analysis may not accurately illustrate a company's inherent asset or operating value.  Furthermore, a qualitative approach must be taken when determining valuation considerations, as each acquisition transaction is unique to the asset being considered as well as the financial conditions under which the transaction is taking place.

I considered transactions in the relevant industry from 2004 – 2008 in order to determine a median multiple of enterprise value to EBITDA that I could apply to the Company's EBITDA.

After examining the transactions, current M&A market conditions as well as the state of the capital markets for the past six months and the near term prospects, I have determined that the precedent transaction analysis does not provide relevant insight as to the value of the Company for the term of the Warrants. Prior to mid 2007, the excessive availability and low cost of acquisition financing provided for a high volume of merger and acquisition activity. During 2008, the capital markets have experienced such extreme contraction that financing has become very difficult to obtain, which in turn has curtailed acquisition activity significantly.

Based on the forgoing I did not use the precedent transaction analysis as a basis for my valuation.

# Valuation Analysis
## Precedent Transactions

*($ in millions)*

| Acquiror | Target | Announcement Date | Transaction Value | Implied TEV/ Sales | Implied TEV/ EBITDA | Target Business Description |
|---|---|---|---|---|---|---|
| Dow Chemical | Rohm & Haas | 7/10/2008 | $18,792.0 | 1.93x | 11.7x | Rohm and Haas Company provides various specialty materials in North America, Europe, the Asia-Pacific, and Latin America. |
| Calumet Specialty Products Partners LP | Penreco | 10/19/2007 | 267.0 | 0.61 | 8.9 | Penreco engages in the production and marketing of chemical specialties for consumer and industrial applications. |
| Israel Chemicals Ltd. | Supresta, LLC | 6/24/2007 | 352.0 | 1.41 | 9.9 | Supresta, LLC manufactures, distributes, and services phosphorus-based flame retardants, functional fluids, plasticizers, lubricants, cleaners, anti-wear additives, and wetting agents. |
| Court Square Capital Partners; Weston Presidio | MacDermid Inc. | 8/31/2006 | 1,349.4 | 1.63 | 10.1 | MacDermid, Incorporated engages in the research, development, acquisition, manufacture, marketing, and service of specialty chemicals. The company operates through Advanced Surface Finishing (ASF) and Printing Solutions segments. |
| Illinois Tool Works Inc. | CFC International Inc. | 6/19/2006 | 116.0 | 1.24 | 8.9 | CFC International, Inc. engages in the formulation, manufacture, and sale of chemically-complex, multilayered functional coatings worldwide. |
| Henkel Corporation | Sovereign Specialty Chemicals Inc. | 10/6/2004 | 581.5 | 1.43 | 11.1 | Sovereign Specialty Chemicals, Inc. engages in the development, production, and distribution of adhesives, sealants, and coatings primarily for use in packaging and converting, industrial, and construction markets. |
| | | **Mean** | | 1.38x | 10.09x | |
| | | **Median** | | 1.42x | 9.99x | |

Source: Capital IQ and publicly available information.

**APENDIX D**

## CV of H. Sean Mathis

H. Sean Mathis is currently a Managing Director of Mathis & Co., LLC, a restructuring advisory firm and the President of Litchfield Asset Holdings, an investment advisory company he founded in 1983. He is also a member of the Board of Directors of PTV Europe, a media company going through restructuring. Previously he was a Managing Director of Morgan Joseph (2003-2004) and Financo, Inc. (2002-2003), investment banking firms where he specialized in restructuring.

He was Chairman of the Board of Allis Chalmers, Inc. an industrial manufacturer, whose main asset is a net operating loss tax carries forward, from 1996 to 1999. From 1996 to 1997, Mr. Mathis was Chairman of Universal Gym Equipment, a private exercise equipment manufacturer. In 1997, Universal Gym Equipment filed for protection under the Federal Bankruptcy laws. From 1991 to 1993, Mr. Mathis was President of RCL, a predecessor firm of Allied Digital Technologies, and from 1993 to 1998 as a Director of Allied Digital, which is engaged in the duplication and manufacture of audio cassettes, video tapes, CD's and CD-ROMs. From 1993 to 1995, Mr. Mathis was President and a director of RCL Capital Corporation, which was merged into DISC Graphics in November 1995.

From 1988 to October 1993, Mr. Mathis was a Director and Chief Operating Officer of Ameriscribe Corporation ("Ameriscribe"), a national provider of reprographic and related facilities management services whose stock was listed on the New York Stock Exchange. From August 1992 to May 1994, Mr. Mathis acted as the Federal Court Appointed Trustee for International Wire News Service Liquidation Corp., formerly United Press International ("UPI"). From November 1991 through July 1992, Mr. Mathis was Vice Chairman and a director of UPI (then a news syndication service). In August 1991, as part of a restructuring program, UPI filed for protection under the Federal Bankruptcy laws. Mr. Mathis was a managing director of International Financial Group Inc. ("IFG"), a merchant banking firm, from 1987 to 1990. He was a director of Thousand Trails, Inc., an operator of recreational parks, and ARCH Communications Group, Inc., a communications company, and Kasper A.S.L., Ltd., a manufacturer and designer of women's fashions.

Throughout his career, Mr. Mathis has had extensive experience as an investor in, and advisor to businesses. In the 1980's, as an investor and as a Managing Director of First City Financial (1980-1984) and Jessup & Lamont (1984-1987), both investment banking firms, he was instrumental in realizing value for equity holders in restructuring situations, serving as Chairman of the Equity Shareholders Committee for A.H. Robins Co., Inc., Salant Corporation, Allis-Chalmers Corporation and Revere Copper and Brass during their bankruptcy proceedings and successful reorganizations. Shareholder gains resulting from these reorganizations were often substantial. In another transaction, Mr. Mathis obtained an exclusive right to purchase the Charter Security Life Insurance Company, a division of the bankrupt Charter Oil Company specializing in single premium deferred 12 annuities. After a series of intense negotiations with investment banks and insurance firms, Charter Life was eventually sold to Metropolitan Life Insurance Company.

As an investment banker, with Lehman Bros., Inc., in the 1970's Mr. Mathis worked steadily and intensively with banks, shareholders, bondholders, directors and management in turnarounds and workouts. In particular, he was deeply involved in the restructuring of the troubled REIT industry during the 1970's. For clients such as GAC Corporation, Guardian Mortgage Investors, Citizens and Southern Reality, and Chase Manhattan Realty Investors, he successfully completed a variety of activities, in and out of Chapter 11 proceedings, including the restructuring of balance sheets, the design and executions of securities exchange offers, the development of business plans, and the creation and execution of asset sales strategies. Mr. Mathis was the principal financial advisor

to Wheeling-Pittsburgh Steel Corporation in its bankruptcy. He was also responsible for the reorganization and restructuring of Service Resources Corporation, which resulted in The Company selling a majority of its money-losing operations and reducing The Company to its core business of Facilities Management, which now represents over $400 million in annual sales and is highly profitable. As a result of the restructuring activities, Service Resources was able to refinance all its debt and became known as Ameriscribe Corporation. Ameriscribe Corporation subsequently had a secondary stock offering, which substantially paid down its funded indebtedness.  Ameriscribe was sold to Pitney-Bowes in November 1993.

Mr. Mathis received his B.A. from Allegheny College and his M.B.A. from Wharton Graduate School of Business, University of Pennsylvania.

**APPENDIX E**

## MATERIALS REVIEWED

Mr. Mathis reviewed the following in developing his conclusions:

- Debtor's First Amended Disclosure Statement dated February 27, 2009 for the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co et al, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative and the Official Committee of Equity Security Holders dated February 27, 2009

- W. R. Grace & Co. and Subsidiaries Pro Forma and Prospective Financial Information dated February 27, 2009, Exhibit 12 to the Plan

- SEC filings of the Company

- SEC filings of comparable companies

- Congress of the United States Congressional Budget Office report dated January 2009- "The Budget and Economic Outlook: Fiscal Years 2009 to 2019"

- • Capital IQ financial database online research database

- • Bloomberg Professional Services and Data Products distributed by Bloomberg Financial. LLP