# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

### AFFIDAVIT OF NICK BUBNOVICH IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE IMPLEMENTATION OF THE 2009-2011 LONG-TERM INCENTIVE PROGRAM FOR KEY EMPLOYEES

Nick Bubnovich, being duly sworn, deposes and says:

1. I am a senior consultant at Watson Wyatt Worldwide ("Watson Wyatt"), which maintains an office at 191 North Wacker Drive, Chicago, Illinois, and in other cities. I submit this affidavit in support of the Debtors' Motion for Entry of an Order Authorizing the Implementation of the Debtors' 2009-2011 Long-Term Incentive Plan for Key Employees (the "Motion").[2]

2. I have personal knowledge of, or am otherwise competent to testify as to, the matters set forth herein.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Any term not defined herein shall have the meaning ascribed thereto in the Motion.

3.  Watson Wyatt is a global consulting firm focused on human capital and financial management. Watson Wyatt specializes in four areas: employee benefits, human capital strategies, technology solutions, and insurance and financial services. Watson Wyatt combines human capital and financial expertise to deliver business solutions that drive shareholder value. Watson Wyatt employs approximately 6,000 associates in 30 countries. Watson Wyatt's human capital group of 170 associates helps clients achieve competitive advantage by aligning their workforce with their business strategy, and it assists clients in developing and implementing strategies for attracting, retaining, and motivating their employees.

4.  I have worked in executive compensation consulting for approximately 25 years. I consult and advise companies on a variety of compensation and benefit issues. I work with companies on salary administration and incentive compensation design, annual incentive plans, and long-term incentive plans. I also assist clients in developing severance programs, negotiating employment agreements, and designing bankruptcy compensation programs.

5.  I have provided compensation-consulting services for the Debtors for approximately nine years. In the course of that work I have developed an understanding of the Debtors' business and compensation programs.

6.  The Debtors' long-time strategy (antedating its Chapter 11 filing) has been to provide long-term incentive opportunities at or about the 60th percentile of their specialty chemicals industry peer group for top executives and the broader market for other Key Employees. It was this level of opportunities in the aggregate that comprised the Debtors' original Chapter 11 LTIP, approved by this Court on August 26, 2002 [Docket No. 2615]. At that time, the Court also set an aggregate targeted award cap of $11.8 million (excluding the Debtors' CEO).

2

7. The CEO's long-term incentive award opportunity (whether the current or prior CEO) has always been in addition to the aggregate targeted award cap. At present, the CEO's targeted long-term incentive opportunity is $1.7 million, as originally set forth in his employment agreement, approved by this Court on April 24, 2005 [Docket No. 8340].

8. In 2008, the aggregate targeted award cap (excluding the Debtors' CEO) was increased to $15.8 million to reflect that most of the Debtors' peer companies were making efforts to increase variable and performance-based pay and that the Debtors' were lagging the market.

9. At the request of the Compensation Committee, Watson Wyatt, under my supervision, updated a study of the competitive long-term incentive compensation opportunities for the CEO and Key Employees.

10. For the CEO, Watson Wyatt analyzed in January 2009 the most recent CEO proxy pay data (2008) from the Debtors' specialty chemicals industry peer group. (This is the same group referred to in the Debtors' executive compensation disclosure in its 2007 and 2008 Form 10-K, and has been historically used to benchmark each element of the CEO's pay. This group is comprised of Albemarle, Cabot, Eastman Chemical, EcoLab, Fuller H.B., Hercules, International Flavors & Fragrances, PP&G, Rohm & Haas, and Sigma Aldrich.) The findings were that the median CEO long-term incentive opportunity at the median was approximately $3.3 million.

11. Based on myriad factors, including the recent significant drop in stock prices in general, and other circumstances that are a result of the current economic downturn, Watson Wyatt recommended that the Debtors reset their long-term incentive award strategy to provide opportunities at or about the 50th percentile of their specialty chemicals industry peer group for

top executives and the broader market for other Key Employees, instead of the 60th percentile that was used to derive the total award value when implementing the 2008-2010 LTIP.

12. For purposes of benchmarking the peer companies' CEO pay, Watson Wyatt valued all equity-based awards using the values reported by each peer group company in its proxy or 10-K. Thus, we valued time-vested restricted stock awards at face value and stock options or SARs at their "Black-Scholes" or other option-pricing model value. Cash awards were valued using the target value, as reported in the proxy.

13. For approximately 185 other employees, Watson Wyatt computed their long term incentive opportunities in January 2009 by reference to its 2008/2009 Report on Long-Term Incentives, Policies, and Practices. Using long-term incentive survey data from the manufacturing industry, Watson Wyatt calculated the 50th percentile opportunities for each Key Employee. These calculations were regressed, using $3.1 billion as the Debtors' revenue. (Regression is a statistical technique, which analyzes the relationship between two variables. In compensation analysis, it is used to measure the relationship between compensation and company revenue, the latter being a factor that strongly suggests the scope of a position.) The aggregate 50th percentile awards for this group were approximately $15 million.

14. Debtors' management subsequently made adjustments to this group, reducing the number of participants (the "Key Employees") and making other adjustments in award size based on such factors as individual performance, tenure, and contribution, resulting in an aggregate total (at the 50th percentile) of approximately $12.5 million.

15. Accordingly, I consider an increase in the CEO's long-term incentive opportunity to $3.2 million from the level of the opportunity approved nearly four years ago to be consistent with the Debtors' strategy of providing an opportunity at or about the 50th percentile.

Importantly, too, I consider such an opportunity to be well within the range of competitive practice. In addition, I believe that decreasing the aggregate long-term incentive opportunities for the other Key Employees to an aggregate of approximately $12.5 million is consistent with current economic and market conditions. I also consider opportunities at the 50th percentile of the Debtors' industry peer group to be within the range of competitive practice.

AFFIANT FURTHER SAYETH NOT

Dated this 23rd day of March, 2009.

_Nick Bubnovich_
Nick Bubnovich

SUBSCRIBED AND SWORN TO BEFORE ME
this 23rd day of March, 2009.

_Natalie K. Rozak_

Notary Public

My Commission Expires: 10-09-11

```
OFFICIAL SEAL
NATALIE K ROZAK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/09/11
```