IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Re: Docket No.: 20622

## NOTICE OF FILING REBUTTAL EXPERT REPORT OF DR. HOWARD ORY

In Accordance with the Second Amended Case Management Order Related to the

First Amended Joint Plan of Reorganization entered by the Court on January 29, 2009 (Docket

No. 20622), the Debtors hereby file the attached *Rebuttal Expert Report of Dr. Howard Ory*.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G 11 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Dated:  April 6, 2009

KIRKLAND & ELLIS LLP
Theodore L. Freedman
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:  (212) 446 - 4800
Facsimile:  (212) 446 - 4900

and

PACHULSKI STANG ZIEHL & JONES LLP

*James E. O'Neill*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

2

**Rebuttal Expert Report of Dr. Howard Ory**

I. Introduction

A. Educational Background and Professional Experience

My name is Howard William Ory, MD., M.Sc. I received my medical degree from Tufts University in 1969 and a master's degree in epidemiology from Harvard University, School of Public Health, in 1974. I am a fellow of the American College of Preventive Medicine. I am a member of the American Epidemiologic Society as well as a member of the Society of Epidemiological Research. I am licensed to practice medicine in Georgia and I am board certified in preventive medicine.

I spent approximately twenty-three years of my professional career working for the United States Centers for Disease Control ("CDC"). During my tenure at the CDC, I served in the following capacities: Deputy Director for Research, Epidemiology Program Office; Deputy Director, Division of Reproductive Health; Chief of the Epidemiologic Studies Branch, Family Planning Division; and Director of the Information Resources Management Office. In these positions, my responsibilities included not only teaching epidemiologic methods to epidemiologists in training but also teaching continuing education courses to the CDC's senior epidemiologists.

After my retirement from the CDC in 1994, I was employed by the Prudential Center for Health Care Research. I served as Vice President and Senior Scientist until my retirement in1996, at which time I became a private consultant.

I have served as a member of, and consultant to, committees of the World Health Organization, the United States Food and Drug Administration, and the CDC. I have written extensively on epidemiological issues and my work has been published widely in peer reviewed, professional literature.

I have extensive experience in the areas of conducting epidemiologic studies, teaching others how to perform epidemiologic analyses, as well as disease surveillance and disease estimation methodology. I have authored or co-authored over 100 articles in the medical literature. Many of these articles pertain to case-control and cohort epidemiologic studies, chronic diseases such as cancer, or issues of epidemiologic study design. Among these more recent reports include a long term mortality follow-up from the cancer and steroid hormone study. I prepared the epidemiologic study design for and carried out the Cancer and Steroid Hormone Study conducted by the CDC and sponsored by the National Institutes of Health (NIH). This study involved nearly 10,000 subjects. It took 3 years to develop the protocol, 3 years to interview the subjects and, while its main results were published in the late 1980s, data from it are still being analyzed and form the basis of scientific reports some 20 years later.

B. Tasks I Have Been Asked to Perform

I have been asked to review Dr. Alan Whitehouse's expert report dated December 29, 2008 as well as his March 12, 2009 supplemental report and comment on the scientific validity of the reports. In particular I've been asked to comment on the CARD mortality data reported by Dr. Whitehouse in that expert report and the 2004 Whitehouse published paper "Asbestos-related Pleural Disease Due to Tremolite Associated with Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana."

C. Materials I have reviewed

I reviewed Dr. Whitehouse's 2004 and 2008 published reports on pleural disease and

mesothelioma in Libby, Montana. I have reviewed Dr. Whitehouse's expert report dated

12/29/2008. Further, I have reviewed Dr. Whitehouse's recent deposition dated March 19, 2009

as well as his March 4, 2009 testimony in the *U.S. v. W.R. Grace*. I have also reviewed Dr.

Arthur Frank's December 23, 2008 expert report, Dr. Whitehouse General affidavit to Libby

Opposition (June 2005), Dr. Whitehouse Questionnaire Affidavit to Libby Opposition (June

2005), and Dr. Whitehouse Expert Disclosure for *U.S. v. W.R. Grace* (September 2005). In

addition, I reviewed the several reports and publications by the ATSDR about their examinations

of the people in Libby Montana, including the published Peipins report, November 2003;

Mortality in Libby Montana, 1979-1998, both the first (12/12/2000) and updated

reports(8/8/2002); Preliminary Findings of Medical Testing of Individuals Potentially Exposed to

Asbestiform Minerals Associated with Vermiculite in Libby Montana: An Interim Report,

February 22, 2001 as well as the final report 8/23/2001; and A Review of Asbestos Related

Abnormalities Among a Group of Patients from Libby Montana: A Pilot Study of Environmental

Cases, Final Report, August 2002. I also rely on the published documents cited in this report.

II. Epidemiologic methods

If a scientist wishes to study the effects of an exposure such as asbestos in a group of people, he

would conduct a controlled epidemiologic study. One type of controlled epidemiologic study is a

cohort study. A cohort study consists of a group of people with the exposure of interest (in this

instance Libby vermiculite) and a group of control people who are as similar as possible to the

people with exposure to Libby vermiculite, except that the control people have not been exposed to

3

Libby vermiculite (the unexposed). The two groups of people are followed over time. The rates of

occurrence of the disease (or diseases) of interest are compared between the exposed and unexposed

people. Unless the rate of occurrence of the disease is statistically significantly higher in the people

with exposure to Libby vermiculite compared to people without such exposure, no excess risk of the

disease exists in the group with the purported exposure, and no scientist or medical doctor can

validly state that Libby vermiculite causes the disease in question.

One of the early and classic examples of a cohort study is the study performed by Doll and Hill

looking and lung cancer incidence and mortality in British doctors that was first published in 1950.

In that study, the authors attempted to enroll all British physicians into a study that began by having

them fill out a questionnaire about their smoking habits as well as other personal characteristics.

Based on that information, two cohorts were formed: those who never smoked (the unexposed

cohort) and those who smoked more than 100 cigarettes in their lifetime (the exposed cohort).

Those who smoked were further subdivided by the amount they smoked and the length of time they

had smoked. Thus the exposure in these cohorts, the first half of a valid scientific study, was

characterized at baseline in a systematic and scientifically valid way. The other half of a valid

scientific study, the outcome event, was also systematically measured. The physicians were

followed for the rest of their lives with periodic questionnaires concerning their health and by

matching their identifying information against death certificates. Thus, the authors were able to

compute incidence rates of lung cancer (and other diseases) in those exposed and not exposed to

cigarette smoking.

4

The primary goal of such a controlled cohort study is to compare the ratio of the incidence rates in the exposed and unexposed and in so doing compute the relative risk of lung cancer and other diseases by smoking status.  The keys to making this possible are:

1.  the cohorts must be comparable (compare-able) to one another, that is, the 2 groups are similar except that one group is exposed to the exposure of interest; and

2.  the information about both cohorts has to be collected in a comparable manner, that is, the information about the exposure and the outcome was collected in a way that is well-defined by a protocol, systematic, as free from bias as possible and as complete as possible.

In the Doll and Hill cohort study, the smokers and non-smokers were comparable to one another and the information about lung cancer was collected in a comparable manner in both groups.  Thus, it was valid to compare the rates of lung cancer in the two groups and compute relative risks from the ratio of the incidence rates.  Furthermore within the group who smoked cigarettes, the authors have valid information about how much and how long they smoked, so the authors were able to compare the different rates of lung cancer by number of cigarettes smoked (dose) and number of years smoked (duration).

I have just described how a study is constructed in an internally valid way, where the two cohorts are comparable and selected in a defined fashion. It is also important that the cohorts be externally valid, that we understand in what ways they are representative of the larger population from which they are drawn. In this case, the investigators studied all male physicians under the implicit assumption that they represent men in general, that men in general are not biologically different from male physicians. Another way the study results can be representative of the population at large

is by getting the information specifically by age, dose, and duration and apply those specific risks in an age, dose and duration specific manner to the population at large.

A variation on the cohort approach that is often done in occupational or environmental exposure settings when it is not possible to identify a true control group, is to use an outside standard of disease incidence rates or death rates as a stand-in for a control group. The ATSDR uses this approach to compute standardized mortality ratios (SMR) using either United States mortality or Montana mortality as the stand-in control group. The SMR approach is described in detail in the December 12, 2000 ATSDR report on mortality from asbestosis in Libby, Montana (page 8). Briefly, the SMR approach consists of taking mortality rates from a reference population, men living in Montana, for example, and multiplying these rates by the number of men living in Libby. In this way, an expected number of deaths for any given disease, asbestosis for example, is generated for men living in Libby. The observed number of deaths from asbestosis is divided by the expected number to yield a mortality ratio that essentially compares the number of deaths from asbestosis in Libby to the number of deaths from asbestosis in Montana. Ninety-five percent confidence intervals are also calculated to deal with the issue of statistical significance of this mortality ratio. In actual practice, an expected number of deaths is computed for each five-year age group and added together to compute a total expected standardized for age. When that age standardized expected value is compared to the observed value, the result is a standardized mortality ratio or SMR.

Like the cohort approach, in order for the SMR approach to be valid, the number of deaths occurring the Libby area has to be ascertained under a well-defined protocol in a systematic fashion, as free from bias as possible and as complete as possible.

Yet another variation on the cohort approach, though producing information that is more problematic to interpret, is to compute a proportional mortality ratio (PMR). This approach is used when numbers of deaths are available for the population of interest, but information on the numbers of people in the underlying population from which the deaths came is not available. For example, if all we knew were the numbers of people who died in Libby and did not know the number of people living in Libby, we would have to use a proportional mortality analysis. In this approach, the percentage distribution of cause of death from an outside standard such as the United States or the state of Montana would be compared to the distribution of deaths for the city of Libby, for example, to generate a proportional mortality ratio (PMR). An example will demonstrate why the PMR is inferior to the SMR. Suppose for some reason in the rest of Montana, an unusually large number of people died from heart disease. This would cause the proportion dying from some other disease of interest, lung cancer, for example, to be unrealistically low because the percentage distribution of deaths in Montana has to add to 100%. In other words, if one cause of death is disproportionately high, all other causes of death will be disproportionately low. So when, for example, the PMR for lung cancer in Libby is computed from the Montana distribution of causes of death, the Libby PMR for lung cancer would be elevated, not because it is truly elevated, but because the proportion of lung cancer in the comparison group was unrealistically low.

Even though the PMR approach is more problematic to interpret than the SMR or cohort approach, the same basic rules apply. In order to have any chance of the PMR being a valid measure of risk, the group of deaths being studied must be collected in a way that is well-defined by a protocol, systematic, as free from bias as possible, and as complete as possible.

7

III.    CARD mortality data reported by Dr. Whitehouse into December 29, 2008 expert report

A.    Selection of Subjects in Dr. Whitehouse's data compared to a valid scientific approach to assembling a cohort.

Dr. Whitehouse describes the data he reports on as all patients seen either at CARD or by him in Spokane with asbestos-related disease diagnosis and chest films (paragraph 31, 2008 expert report). In fact, this is a haphazard collection of people who he has seen, who have asbestos-related disease diagnosis chest films and who have died. He does not tell us if everyone he has seen meet those criteria. He begins with 227 potential subjects; 41 were excluded for not meeting the study criteria, leaving 186 in his mortality data. Data was gathered from patient charts and available death certificates including those available through local law firms. This is not an epidemiologically valid approach. In particular, there appears to be no protocol, there is no defined selection process that explains how the 227 individuals are drawn from the larger population of people living in Libby, and Dr. Whitehouse rarely performs statistical tests on this data. In contrast to the ATSDR reports and the mortality study of W.R. Grace employees, Dr. Whitehouse makes no attempt to validly define exposures to Libby vermiculite. Without having followed even rudimentary epidemiological methods, his observations cannot be considered to be scientifically valid.

First, it should be noted that the number of subjects presented in paragraph 31, p 186, Whitehouse 2008 expert report, is inconsistent with data presented in paragraph 35 where Dr. Whitehouse states that "the CARD clinic has diagnosed over 1800 patients with asbestos-related disease..." Dr. Whitehouse includes in his report data on only about one out of every 10 people diagnosed by the CARD clinic with asbestos-related disease. Further he does not describe the

8

criteria by which the 1800 are selected or reduced to 186 other than what is noted above. In particular, he does not tell us whether it is everyone who has died. A scientist would describe this as a haphazard sampling procedure as opposed to a systematic or random sampling procedure.

One need only compare the CARD mortality data to the various published and unpublished mortality studies among the Libby/Lincoln County residents performed by the ATSDR to highlight what is lacking in the CARD data. The CARD data is a haphazard collection of subjects whose sampling method is not defined or systematic. If it were an epidemiologic study, it would begin with a description of a population and then a well-defined and systematic set of criteria would be developed to select deaths. The method by which patients show up in one doctor's practice is subject to the vagaries of how the patients get referred to the practice. For example, it is possible that people in Libby and Spokane know that Dr. Whitehouse is interested in pleural disease. As such, he may be referred a disproportionately high number of people with pleural disease relative to the distribution of people with pleural disease in Libby. Furthermore, he notes that some of his patients come from a law practice that seems to have an interest in people with pleural disease. Given such a haphazard selection process, it is virtually certain that the 186 people that Dr. Whitehouse reports on are not representative of the Libby population in general. In fact, because of the haphazard and undefined selection process, data on these 186 people cannot be extrapolated to any other population. This would be true for any 186 people selected in such an unscientific fashion. Furthermore, this is true for Dr. Whitehouse or anyone else, including Dr. Arthur Frank, attempting to make statements based on the CARD mortality data.

B.      Community exposure claims by Dr. Whitehouse

In subparagraph one of the aforementioned paragraph 31, Dr. Whitehouse notes that 34% of

those who died of nonmalignant disease were mine workers while 66% were community

members and family members of mine workers.  Even if those percentages were correct, as we

have seen in the above paragraph, they would not be representative of the Libby population in

general.  However, in August 2002, the ATSDR reported a review of environmental cases.  The

ATSDR set out to evaluate 27 potential environmental cases of asbestos-related lung disease.

Among the 22 who agreed to participate, ATSDR confirmed only eight as having no

occupationally related asbestos exposure.  That is, by ATSDR's definition, only eight were

potentially environmentally exposed.  Of these eight, ATSDR confirmed seven as having x-ray

evidence consistent with asbestos-related lung disease.  In other words, ATSDR only confirmed

approximately 1/3 of the cases that Dr. Whitehouse describes as being solely environmentally

exposed cases as having no occupational exposure to asbestos.  Clearly, far fewer than the 66%

that Dr. Whitehouse reports in subparagraph one were exposed to asbestos solely through

environmental exposure.

In addition, the August 23, 2001 ATSDR report concerning the medical testing of individuals

concludes on page 26 that "the odds of finding a pleural abnormality was almost eight times

greater for former W.R.G. workers when compared to non-workers of the same age." From this,

I conclude that the W.R.G. worker exposure and community exposure are of completely different

orders of magnitude.

It follows directly from the above ATSDR results that Dr. Whitehouse's comments in

subparagraph two are also incorrect.  The ATSDR report demonstrates that Dr. Whitehouse does

not know with scientific certainty which subjects in his data are solely environmentally exposed. Therefore, his claim in that subparagraph that the death rate from asbestos disease is not greatly different between mine workers and community members is not based on scientifically valid data. The same would be true for anyone else attempting to use the CARD mortality data to make such a claim.

In addition to the above deficiencies, Dr. Whitehouse pays little attention to the concept of statistical significance. On page 16 of his expert report, where he discusses the CARD mortality data, he notes that "the death rate from asbestos disease was not greatly different as between mineworkers (72%-39/54) who generally had heavy exposures, and community members (54%-58/108), who had light exposures." If Dr. Whitehouse had done a statistical test on this data, he would have noted that the mineworkers had a significantly higher proportion of death from asbestos disease than the community members. His lack of statistical testing further undermines any scientist's ability to draw valid inferences from his report

C.    Age at death

Dr. Whitehouse reports in subparagraph nine of paragraph 31 of his 2008 expert report that the mean age at death in the CARD mortality cohort was 76.3. In paragraph 32 of his 2008 report, he presents a table comparing CARD mortality data to data from the insulator cohort initiated by Selikoff and updated in 1997 by Markowitz (page 22). In that table, the average age at death in the CARD mortality cohort is presented as 76.0 years. Putting aside the inconsistency in his numbers concerning the life expectancy of people in the CARD mortality data, Dr. Whitehouse compares the age at death for patients in the CARD mortality data with the age at death in the insulator cohort, which is 65.9 years. I calculate, that according to US vital data, in the year

2005, the average at death for white men over 20, that is, those old enough to be in the workforce, was 71.3 years (derived from NCHS worktable 310 found at http://www.cdc.gov/nchs/data/dvs/mortfinal2005_worktable_310.pdf, last accessed March 28, 2009). Since we do not know what the appropriate comparison group is for men in the CARD data, I also calculate that, on average, the age at death for white US males 55 and older is 76.8 years. The age of death of the subjects in the CARD mortality data, does not appear to be unusual.

Several scientific conclusions are immediately apparent from this data. The average age at death of subjects in the CARD mortality data is certainly no worse than that of white US men of working age. Secondly, the asbestos exposure that the insulator cohort had was unequivocally far more lethal than that experienced by the CARD mortality cohort subjects. That is, the insulators died more than 10 years younger on average than did subjects in the CARD mortality data.

That insulators died on average more than 10 years younger than those in the CARD mortality data is not surprising. Dr. Whitehouse himself notes on paragraph 32, page 19 of his expert report that "the experience of the cohort of asbestos insulation workers provide the context for comparison of Libby mortality from asbestos-related disease. The asbestos insulators had extremely heavy exposures to asbestos dust, often working in clouds of dust. The Libby patients, on the other hand, are mostly community members who had relatively light exposure to asbestos from casual exposure, such as breathing the air in the Libby area." Given Dr. Whitehouse's own description of the differences in exposure between the insulators and residents of Libby, it is not hard to understand why the insulators died on average 10 years younger than those in the CARD

12

mortality data. What is surprising is that Dr. Whitehouse presents this quote to demonstrate that the people of Libby were exposed to a more toxic asbestos situation than the insulators.

It is not scientifically valid to interpret the age at death data the way Dr. Whitehouse does. In paragraph 32, page 21, 2008 Whitehouse expert report, he states that "it is apparent that exposure to Libby asbestos is considerably more toxic to humans than was the predominantly chrysotile exposure of the insulation workers." In paragraph 35 on the same subject of the purported differential toxicity of the Libby vermiculite, Dr. Whitehouse states that "an important aspect of Libby area exposures is that residents had a 24-hour exposure, with no respite away from exposure to clear out airways. This appears to be generally different from exposures reported elsewhere". (Whitehouse 2008 report, page 26) His argument is scientifically inconsistent. How could exposure to Libby asbestos be more toxic to human beings than the exposure experienced by the insulator cohort, given that the insulators died on average more than 10 years earlier than the CARD mortality data? This seems especially inconsistent when one considers Whitehouse's claim that one of the factors that made Libby exposure more toxic was that it was 24/7.

D.    'Death Rate' in the CARD mortality data

In paragraph 32, page 19 of his expert report, Dr. Whitehouse states that "the 62% death rate from asbestos disease appears to be the highest reported for any cohort in the United States." This statement is logically impossible, because as noted above, the CARD mortality data contains only dead subjects. One computes a mortality (death) rate by dividing the number of people who die by the total number of people alive in any group of interest. I believe what Dr. Whitehouse is trying to say is that the proportional mortality from asbestos disease in this

13

haphazardly selected cohort is 62%.  Given the lack of meaningful selection criteria,

interpretation of this proportion is not possible.  As noted above, there is no scientifically valid

way to compare such a proportion to any other group of people.

E.      ATSDR mortality study and community exposure to Libby Vermiculite

Let us now turn to the updated mortality study of deaths occurring in Libby, Montana from 1979

to 1998, conducted by ATSDR and reported in August of 2002.  As noted above, this study is a

classic SMR-type study.  That means that information on all deaths that occur in a defined group

of people, in this case all residents of Libby and the surrounding area of central Lincoln County,

are located under a well-defined protocol for ascertaining deaths, cause of death, location of

death.  Information on which decedents were employed in the Libby facilities was collected from

two separate sources and then combined.  The first was an employment database consisting of

historical records on over 1800 employees from the vermiculite mine and milling facility in

Libby.  The second source was information obtained during ATSDR's medical screening

program conducted in Libby during the summers of 2000 and 2001.  In all, data on over 1950

previous employees of W.R. Grace were compiled through these sources.  The mortality data

was compared to the W.R. Grace database to determine if deceased subjects had ever been

employed at the facility.  The W.R. Grace database was also used to determine the length of

employment for any decedents that were previous workers.  Using this systematically collected

information about deaths occurring in the Libby area, the ATSDR concluded (in 2002) that

"most of the excess and respiratory mortality can likely be attributed to occupational exposures

since several decedents (12%, 64/542) were former workers at the mining and milling facility.

Asbestosis and mesothelioma mortality were found almost exclusively in former workers.

Increases in lung cancer mortality also could be explained by occupational association with the mine and milling facility." (ATSDR 2002, page 10).

Table 8 of the ATSDR study directly addresses Dr. Whitehouse's claims of excess respiratory disease mortality in non-occupationally exposed residents of Libby, Montana. The SMR, using either Montana or the United States as a comparison from combined respiratory disease causes, shows no overall excess of mortality from respiratory disease in non-occupationally exposed residents of central Lincoln County, Montana. This epidemiologically valid SMR analysis presents quite different results than Dr. Whitehouse claims the CARD mortality data analysis shows. Compared to Dr. Whitehouse's study, the ATSDR mortality study uses a valid selection process for cases and a valid application of the SMR approach. As a result, the ATSDR analysis produces information on which a scientist can make scientifically valid inferences; Dr. Whitehouse's analysis does not produce information on which a scientist can make scientifically valid inferences.

In his March 19, 2009 deposition, Dr. Whitehouse dismisses the ATSDR Mortality Study as "garbage." (Whitehouse Deposition, 3/19/09, page 136). Dr. Whitehouse identifies a number of alleged deficiencies with the ATSDR Mortality Study. First, Dr. Whitehouse criticizes the fact that ATSDR relied on death certificates alone and did not review medical chards in conjunction with death certificates. (Whitehouse Deposition, 3/19/09, page 136 – 138). Second, Dr. Whitehouse claims that many asbestosis deaths had been misclassified as COPD deaths. (Whitehouse Deposition, 3/19/09, page 135 – 146). Third, Dr. Whitehouse, in his expert report, claimed that the ATSDR Mortality Study is overly conservative because it only counted primary cause of death and did not consider underlying conditions. (December 2008 Whitehouse Expert

Report, page 39, paragraph 48)  Fourth, Dr. Whitehouse, also in his expert report, criticizes the

ATSDR Mortality Study for only collecting death certificates for those individuals who were

Libby residents at time of death.  (December 2008 Whitehouse Expert Report, page 39,

paragraph 48)  Finally, Dr. Whitehouse describes the ATSDR Mortality Study as based on

"crummy data."  (Whitehouse Deposition, 3/19/09, page 139, 141).

With respect to his first criticism - relying on death certificates alone - Dr. Whitehouse himself

relied on the ATSDR's findings with respect to the increased mortality from asbestosis as a

result of working for W.R. Grace, specifically, that the worker's "standardized mortality ratio

[was] 65X higher than that of the U.S. reference population" with respect to asbestosis.

(Whitehouse Deposition, 3/19/09, page 38 – 39).  Moreover, this method of evaluating mortality

based on death certificates alone is a well-defined, standardized, and frequently employed

method for investigating illnesses suspected of being caused by workplace or environmental

exposures, utilized by NIOSH, ATSDR, CDC, and other public health organizations and

university-based personnel.

Dr. Whitehouse's second criticism, that asbestosis deaths were misclassified as COPD deaths, is

also misplaced.  As Dr. Nicholson noted in his seminal work, the problem of misclassification of

death is ameliorated when considering an entire class of diseases, such as all respiratory diseases.

(Nicholson et al. Occupational Exposure to Asbestos: Population at Risk and Projected Mortality

– 1980-2030. Am J of Ind Med, 1982, p. 290).  If a death was misclassified as COPD rather than

asbestosis, there would still be an excess in mortality when looking at all respiratory diseases

combined.  Moreover, if as Whitehouse claims, asbestosis deaths are misclassified as COPD

deaths, there should be an excess of COPD deaths.  However, when examining the data in Table

8 of the ATSDR Mortality Study, there is not an elevated mortality risk for either COPD or all respiratory causes combined. At his deposition, Dr. Whitehouse acknowledged this fact. (Whitehouse Deposition, 3/19/09, page 139 – 142). The absence of elevated mortality risk in the COPD and all respiratory disease combined listed on Table 8 negates Dr. Whitehouse's criticism that the asbestosis deaths in the community in Libby were misclassified as COPD. Likewise, Table 7 of the ATSDR Mortality Study shows an elevated mortality risk from asbestosis among workers and no elevated risk for COPD compared to the Montana population. This suggests that asbestosis is being correctly identified on death certificates in Libby, and not lumped into COPD as Whitehouse claims.

Dr. Whitehouse's third criticism of the ATSDR Mortality Study correctly notes that the ATSDR only looked at primary cause of death and did not consider underlying conditions. In Table 7 of the 2002 report, the ATSDR notes 12 asbestosis deaths among the 506 total deaths they examined. Based on this data from Table 7, I calculate that 2.4% of all deaths studied by ATSDR were caused by asbestosis. Over approximately the same years encompassed by the ATSDR study, 1979 - 1998, NIOSH has consistently shown that, in the United States as a whole, for every death attributed to asbestosis on a death certificate, there are about two more in which asbestosis is a contributing cause. Even if we multiplied the 2.4% by three to account for asbestosis as an underlying cause, the NIOSH data would suggest that about 7.2% of all deaths involve asbestosis. In order to get to the 40 to 60% of deaths attributable to asbestosis that Whitehouse claims, we would have to make the scientifically indefensible assumption that every one of the 253 deaths from combined respiratory mortality shown in Table 7 would have to involve asbestosis (253/506 = 50%). That we would have to make such an untenable assumption

demonstrates just how unrepresentative Dr. Whitehouse's CARD mortality data is of the general Libby area population.

Dr. Whitehouse's fourth criticism, that the ATSDR only collected death certificates for people who were Libby residents at time of death, simply is not true. On page 2 of the August of 2002 ATSDR Mortality Study, it states "for those Libby residents dying outside of Montana, death certificates were sought from their respective states . . . ." Eleven states were listed in the report.

Finally, Dr. Whitehouse asserts that the ATSDR Mortality Study was based on "crummy data." In his March 2009 deposition, when pressed as to why he thought the data was "crummy," he acknowledged that he had never reviewed the data (Whitehouse Deposition, 3/19/09, pages 143 – 145). This is a surprising admission.

F.    Asbestosis in the ATSDR mortality cohort compared to CARD mortality data

One can get an idea of how unrepresentative people in the CARD mortality data are by looking at asbestosis in the CARD mortality data compared to the ATSDR mortality data. Referring again to the table (page 22, paragraph 32 of Whitehouse's 2008 report) data is presented showing that asbestosis accounts for 42% of all deaths. In paragraph 42, page 31 of his report, Dr. Whitehouse notes that "65% (117/186) of deceased patients of CARD died of asbestos disease, meaning that asbestos-related disease was at least a significant contributing factor in the death." Further along in that paragraph he notes that "in contrast, a patient diagnosed with asbestos disease from predominantly chrysotile exposure has a much lower likelihood of death." Again, putting aside the obvious inconsistency in the presentation of his data, he claims that at least 42% of deaths are related to asbestosis.

The lack of validity of Dr. Whitehouse's claim that non-occupationally exposed Libby residents have dramatically high mortality from asbestosis becomes even more apparent when we look at the data in Table 8 where there is only one death from asbestosis among 195 total deaths in people who have no occupational exposure. Again, making the invalid assumption that all 195 deaths from respiratory causes involve asbestosis, yields only 38.5% attributed to asbestosis under this extreme and untenable assumption. This data from Table 8 of the ATSDR study further puts Dr. Whitehouse's comments in context. In paragraph 32, page 23 of his 2008 expert report, Dr. Whitehouse states "the most striking observation is that the CARD patient's death rate from asbestosis is about 4X that of the insulators (42% to 11%). This result appears despite the important difference in exposure levels. 63% (50/79) of the CARD patient's were a family or community members with light exposures, whereas insulators had industrial exposures to asbestos which were generally quite extreme." Given that the ATSDR attributes one death to asbestosis among people with no occupational exposure to asbestos, Dr. Whitehouse's "striking observation" is truly striking; however, what's truly striking is just how far removed Dr. Whitehouse's claim is from the systematically and scientifically collected ATSDR mortality. The ATSDR notes in its executive summary, "this comparison of worker records with mortality data demonstrated that the majority (92%, 11/12) of asbestosis decedents... were prior employees at the vermiculite facility."

G.      Comparisons of Dr. Whitehouse's CARD data with the results of the 2007 Sullivan Study

In 2007, Dr. Sullivan published a further follow-up to the Amandus occupational mortality study ascertaining deaths through 2001. (Sullivan PA. Vermiculite, Respiratory Disease, and Asbestos Exposure in Libby, Montana: Update of a Cohort Mortality Study. Env Health Perspect 115:579-

585 (2007)). In this report, which focuses on the 1672 white male Libby workers identified by company records, Sullivan was able to make exposure specific estimates of risk of respiratory diseases for these occupationally exposed workers. It is noteworthy that 19 of the 22 deaths attributable to asbestosis occurred in those workers with cumulative exposure to asbestos greater than 50 fibers/cc-years. This dose response finding with respect to asbestosis strongly contradicts Dr. Whitehouse's contention that Libby residents with scant environmental exposures have high risks of developing asbestosis. Moreover, it certainly undermines Dr. Whitehouse's contention that individuals whose only exposures were light environmental exposures have risks of asbestosis greater than the very heavily exposed men in the insulators cohort.

It is noteworthy that Sullivan says on page 583 that "SMR observed here for asbestos exposed vermiculite workers are similar to those reported in other studies of asbestos exposed workers." Sullivan's own conclusions further undermine Dr. Whitehouse's contention that the results of asbestos exposure in Libby are unique and unseen elsewhere.

H.      Dr. Whitehouse asserts in paragraph 32, page 22 of his 2008 expert report when speaking of the Markowitz study compared to the CARD mortality data that "though the studies differ in minor respects, they are epidemiologically comparable." The Markowitz study is one of a number of reports published on the Selikoff cohort of insulators which was established in 1967 and followed forward in time. The insulator study established a cohort of all members of one union (International Association of Heat and Frost Insulators and Asbestos Workers) whose members had exposure to asbestos as insulators. All union members were invited to enroll; information was collected by questionnaire about personal characteristics and every time a member dies the union notifies the study personnel. This cohort meets the standard of having

20

information collected in a way that is well-defined by a protocol, systematic, as free from bias as possible and as complete as possible. The Markowitz study attempts to study a subset of the original insulator cohort who were still alive in 1981. As such, the Markowitz study is based on a group of people who were alive and exposed to asbestos who were followed forward in time. The diseases that they developed were carefully ascertained and were turned into incidence rates by dividing the number of people developing each disease by the number originally enrolled. As we have seen the people who are described by the CARD mortality data are haphazardly identified sample of people, not followed under protocol, some of whom were referred from a law firm. The sampling method used to enroll people into the CARD mortality data required that they all be exposed to asbestos and dead. At best, I would describe this study as a group of haphazardly collected deaths. It is simply incorrect to say that the CARD mortality data and information deriving from it are comparable to the carefully constructed and followed insulator cohort. They couldn't be more different.

IV. Other Assertions made by Dr. Whitehouse

A.      In paragraph 35, page 27, Dr. Whitehouse states in his 2008 expert report that "very few patients had exposures to other asbestos outside the Libby area." In the August 2002 study of environmental cases by the ATSDR mentioned above, the ATSDR notes that that 4/22 patients had been exposed to commercial asbestos from non-vermiculite sources. Almost 1/5 of the ATSDR sample was exposed to other asbestos outside the Libby area. Describing this as "very few" is inaccurate. Further down on page 27, Dr. Whitehouse claims that "all patients in the over 1800 diagnosed above have asbestos disease due to exposure to Libby asbestos with its source in the W.R. Grace and Zonolite company mining and other activities." Considering the above

ATSDR data, it is demonstratively false to claim that all patients who have asbestos disease in

Libby developed that disease solely from their exposure to W.R. Grace vermiculite.

B        In his 2004 paper, Dr. Whitehouse purports to study asbestos-pleural disease from

tremolite exposure, which he claims is associated with a progressive loss of lung function. He

begins by choosing 491 patients from his clinical practice. Dr. Whitehouse does not indicate

how he selected these 491 patients but does note that they are not among the 1,000 plus

individuals who were identified by the ATSDR Screening Study as having pleural abnormalities

(Whitehouse, 2004, page 220). (I have subsequently been shown data comparing those screened

positive by ATSDR with the 491 people identified in Whitehouse 2004 (Master Cross-Over

Spreadsheet compiled by Dr. David Weill). It is clear from this spreadsheet that there is overlap,

and that his statement in the published paper is incorrect). Clearly, Dr. Whitehouse did not

specify from what population the 491 individuals were selected. From these 491 individuals, he

selects 153 individuals whom he states have two or more pulmonary function tests (Whitehouse

2004, page 221). He then states "these subjects are representative of the Libby area population

and the practice group of 491 patients" (Whitehouse 2004, page 221). From these 153, it appears

that 123 form the basis of the 2004 paper. He does not explicitly tell us how the 153 are

decremented to the 123 that make up the study subjects of the 2004 report. There is a statement

on page 220 that 30 subjects were removed from the study at some unspecified point for various

reasons. (In any case, whenever they were removed, it appears that this was not a true statement

as Dr. Whitehouse, at his March 19, 2009 deposition, acknowledged that selection criteria may

not have been applied as stated in the paper. Surprisingly, when asked whether he thinks it was

important for the paper to reflect what was actually done, he responded "not necessarily").

Dr. Whitehouse, nevertheless, makes the claim in his paper that the 153 individuals "are representative of the Libby area population and the practice group of 491 patients" (Whitehouse 2004, page 221). As discussed above, the claim that a sample or sub-group is representative of a larger population is a meaningful statement in epidemiology. Without establishing the ways in which a sub-group is representative of a larger population, there is no possibility of making a valid extrapolation from the sub-group to the larger population. To say one group is representative of another requires looking at the selection process and comparing the general characteristics of the sub-group to the larger group -- in this case, specific characteristics such as work history and exposure history. In Whitehouse 2004, there are two assertions with respect to representativeness: This group of 153 is representative of the Libby area population, generally, and these 153 people are representative of the 491 people in his clinic.

With respect to the claim that the 153 individuals are representative of the Libby area population, he gives us no supporting information for his claim of representativeness. And in fact, in his March 19, 2009 deposition, Dr. Whitehouse backs away from his claim that these 153/123 individuals are representative of the Libby area population (Whitehouse Deposition, 3/19/2009, page 196). When asked whether it is an issue as to whether the 153/123 are actually representative of the Libby area population, Dr. Whitehouse simply says no (Whitehouse Deposition, 3/19/2009, page 198). Again, this is a rather surprising statement. In the same deposition, Dr. Whitehouse acknowledges that he does not have good criteria for determining whether one group is representative of another (Whitehouse Deposition, 3/19/2009, page 235).

With respect to the claim that the 123 are representative of the 491, examining Whitehouse's own data of the work history and exposure history of his subjects reveals that this is not true. Dr.

Whitehouse reports that 70% of the 123 people ultimately included in the study were former Grace workers, whereas only 45% of the 491 patients were former Grace workers. Moreover, only 8% of the people in the 123 people in the study were alleged environmentally exposed individuals, whereas 31% of the people in the 491 person patient group were alleged environmentally exposed individuals.

Other data that would enable us to determine whether the 123/153 were in fact representative of the 491 patient group include specific information about the nature of past asbestos exposures, the duration and intensity of exposures, how long they lived in Libby, and the age and gender of the two groups. While Whitehouse (2004) does identify the average age and gender of the 123/153, it provides no similar information on the 491 person patient group. In addition, there is no specific information about their exposures, making it impossible to support the statement about their exposures. Lacking such exposure information makes it impossible to support the statement that the 123/153 are representative of the 491 person patient group.

Furthermore, two or more PFTs are required to enter this study. Because of this requirement, the 123 will likely include people who have more advanced disease than those with one PFT, those in the 491 patient group who were not in the study. At the very least I would have expected Dr. Whitehouse to tell us how the baseline PFT for the 123/153 compared to the single PFT administered to the remaining people in the 491 person patient group. Without this information we cannot determine to what extent the disease severity in the 123 is like the disease severity in the 491.

Dr. Whitehouse provides no supporting information that his study population of 123 is representative of the Libby population. As such neither he nor any other scientist can validly

claim that the findings in these 123 people are representative of the Libby population or for that matter any population other than 123 people themselves.

Dated this 6th day of April, 2009

Howard W Ory, MD,MSc

26

Works Cited

NCHS worktable 310 found at

http://www.cdc.gov/nchs/data/dvs/mortfinal2005_worktable_310.pdf, last accessed March 28,
2009).

Nicholson et al. Occupational Exposure to Asbestos: Population at Risk and Projected Mortality
– 1980-2030. Am J of Ind Med, 1982, pp 259-311.

Sullivan PA. Vermiculite, Respiratory Disease, and Asbestos Exposure in Libby, Montana:
Update of a Cohort Mortality Study. Env Health Perspect 115:579-585 (2007).

# CURRICULUM VITAE

## Howard William Ory

April, 2009

**BORN:**
October 1, 1944
Worcester, Massachusetts

**EDUCATION:**
BS--University of Wisconsin, Madison, Wisconsin, 1966
MD--Tufts University School of Medicine, Boston, Massachusetts, 1969
MSc (Epidemiology)--Harvard School of Public Health, Boston, Massachusetts, 1974

**HONORS:**
Career Development USPHS--1973-1974
United States Public Health Service Commendation Medal, 1978
Elected to membership in the American Epidemiologic Society, 1980
Accelerated Promotion to 0-6 (Colonel) for "exceptional capability," 1980
Elected as an Associate Fellow of the American College of Obstetricians and Gynecologists, 1981
Arthur S. Flemming Award, 1983. "One of the Ten Outstanding Young Men and Women in the Federal Service."
Philip S. Brachman Award, 1985. "in Recognition of Outstanding Service in the Education of EIS Officers."
PHS Meritorious Service Medal, 1987
Interagency Committee on Information Management Award for Management Administrative Excellence, June 1989
PHS Outstanding Service Medal, 1990
PHS Unit Commendation Medal, 1991
PHS Commendation Medal, 1991
PHS Unit Commendation Medal, 1992
PHS Distinguished Service Medal, 1993

**EMPLOYMENT HISTORY:**
Consultant in Epidemiology and Health Care Information Systems, 12/96 to present
VP, Health Care Information Systems, Prudential Health Care Systems, 4/95 to 12/96
VP and Senior Researcher, Prudential Center for Health Care Research, 6/94 to 12/96
Consultant in Epidemiology and Health Care Information Systems, 1/1994 to 6/94
Director, Information Resources Management Office, Office of Program Support, Centers for Disease Control, 4/85 through 12/93.
Deputy Director for Research, Epidemiology Program Office, Centers for Disease Control, 4/83-3/85.
Deputy Director, Division of Reproductive Health (Formerly Family Planning Evaluation Division), Centers for Disease Control, 7/82-3/83.
Chief, Epidemiologic Studies Branch, Family Planning Evaluation Division, Center for Disease Control, 10/74-6/82.
Medical Officer--Family Planning Evaluation Division, Bureau of Epidemiology, Center for Disease Control, 7/71-9/74.
Medical Resident--Metropolitan Hospital, New York City, New York, 7/70-6/71.
Medical Intern--Metropolitan Hospital, New York City, New York, 7/69-6/70.

**APPOINTMENTS:**
Consultant to the Human Reproduction Program, World Health Organization, January, 1997
Adjunct Professor, Department of Epidemiology, Emory University School of Public Health, 1975-Present.
Member, Obstetrics and Gynecology Advisory Committee of the United States Food and Drug Administration, 1976-1979.
Consultant, Obstetrics and Gynecology Advisory Committee of the USFDA, 1979-1985.

Interdisciplinary Group in Community Health and Health Care Delivery, Emory School of Medicine, 1976-1983.

National Medical Committee--Planned Parenthood--World Population, 1977-1979.

Nominating Committee, National Medical Committee, Planned Parenthood, 1977-1979.

Vice Chairman, Research Committee, Planned Parenthood, 1977-1979.

DHEW-DES Task Force, 1978.

World Health Organization Task Force on Neoplasia and Steroid Contraceptives, 1978.

Biomedical Advisory Committee, Population Resource Center, 1978-present.

Steering Committee, Women's Health Study, 1975-1980.

Member, India-United States Task Force on Reproduction and Contraception Research, 1979.

Member, US Delegation on Population and Family Planning under US-China Science and Technology Agreement, 1981.

BOARDS:           Preventive Medicine, 1976, #410

LICENSURE TO
PRACTICE
MEDICINE:         New York State #106735
                  Georgia #17257

GRANTS:           National Science Foundation grant to do research on reproductive endocrinology at the Worcester Foundation for Experimental Biology, 1964 (Summer).

                  National Science Foundation grant to do research on reproductive endocrinology at the Worcester Foundation for Experimental Biology, 1965 (Summer).

                  National Science Foundation grant to do research on reproductive endocrinology at Tufts University School of Medicine, 1966 (Summer).

                  Principal Investigator - Interagency Agreement between NIH and CDC to study the association of hepatocellular adenomas and oral contraceptives, 1976.

                  Principal Investigator - Interagency Agreement between NIH and CDC to develop a study of the Association of Breast, Ovary, and Uterine Cancers and Oral Contraceptives, 1978 to 1983.

PROFESSIONAL
AFFILIATIONS:     National Organizations--American Public Health Association:
                      Member, APHA Epidemiology Section, 1973 - present.
                  Society for Epidemiologic Research, 1974 - present.
                  American College of Preventive Medicine, 1977 - present.
                  Fellow, American College of Preventive Medicine, #2410.
                  American Epidemiology Society, 1981 - present.
                  Fellow, American College of Epidemiology, 1998 – present.

PUBLICATIONS:

Cancer and Steroid Hormone Study Group (CASH)

Dr. Ory initiated the Cancer and Steroid Hormone Study in October, 1977.  A pilot study was run in 1979 and the full-scale data collection was run in 1980-81.  Subsequent to that, a series of papers were produced.  From its inception until 1983, Dr. Ory was Principal Investigator of the study.  Since that time he has remained as a consultant to the project.  The following manuscripts have resulted from that study.

<u>1982</u>

Centers for Disease Control (including <u>Ory HW</u>).  Oral contraceptives and cancer risk.  Morbidity and Mortality Weekly Report 1982;31:393-394.

<u>1983</u>

Layde PM, Webster LA, Wingo PA, Schlesselman JJ, <u>Ory HW</u>, and the Cancer and Steroid Hormone Study Group.  Long-term oral contraceptive use and the risk of breast cancer. JAMA 1983;249:1591-1595.

Dicker RC, Webster LA, Layde PM, Wingo PA, <u>Ory HW</u>, and the Cancer and Steroid Hormone Study Group.  Oral contraceptive use and the risk of ovarian cancer. JAMA 1983;249:1596-1599.

Rubin GL, Wingo PA, Layde PM, Webster LA, <u>Ory HW</u>, and the Cancer and Steroid Hormone Study Group.  Oral contraceptive use and the risk of endometrial cancer. JAMA 1983;249:1600-1604.

Webster LA, Layde PM, Wingo PA, <u>Ory HW</u>.  Alcohol consumption and risk of breast cancer.  Lancet 1983; 1:724-726.

<u>1984</u>

Rubin GL.  Oral contraceptives and neoplasia.  New Perspectives on Oral Contraception.  KPR Informedia Newsletter April 1984;1:#2.

<u>1985</u>

Tyler CW Jr., Webster LA, <u>Ory HW</u>, Rubin GL.  Endometrial cancer:  How does cigarette smoking influence the risk of women under age 55 years having this tumor?  Am J Obstet Gynecol 1985;151:899-905.

Sattin RW, Rubin GL, Webster LA, Huezo CM, Wingo PA, <u>Ory HW</u>, Layde PM.  Family history and the risk of breast cancer. JAMA 1985;253:1908-1913.

Rubin GL, Peterson HB.  Researchers can now investigate long-term effects of OCs on cancer.  Contraceptive Technology Update 1985;6:7-12.

Stadel BS, Rubin GL, Webster LA, Schlesselman JJ, Wingo PA, the Cancer and Steroid Hormone Study Group (<u>Ory HW</u>, Principal Investigator).  Oral contraceptives and breast cancer in young women.  Lancet Nov 1985;2:970-973.

<u>1986</u>

Lee NC, Wingo PA, Peterson HB, Rubin GL, Sattin RW.  Estrogen therapy and the risk of breast, ovarian and endometrial cancer.  ed. Mastroianni L, Paulsen CA, Aging, Reproduction and the Climacteric.  Plenum Press, New York, 1986.

Stadel BV, Rubin GL, Wingo PA, Schlesselman JJ.  Oral contraceptives and breast cancer in young women:  Reply to letters to the editor.  Lancet 1986;1:436-437.

Sattin RW, Rubin GL, Wingo PA, Webster LA, <u>Ory HW</u>, and the Cancer and Steroid Hormone Study Group.  Oral contraceptive use and the risk of breast cancer. N Engl J Med 1986;315:405-411.

Gwinn ML, Webster LA, Lee NC, Layde PM, Rubin GL, the Cancer and Steroid Hormone Study Group (<u>Ory HW</u>, Principal Investigator).  Alcohol consumption and ovarian cancer risk.  Am J Epidemiol 1986;123:759-766.

<u>1987</u>    Wingo PA, Layde PM, Lee NC, Rubin GL, <u>Ory HW</u>.  The risk of breast cancer in postmenopausal women
            who have used estrogen replacement therapy.  JAMA 1987;257:209-215.
        Franks AL, Kendrick JS, Tyler CW.  Postmenopausal smoking, estrogen replacement therapy, and the risk
            of endometrial cancer.  Am J of Ob Gyn 1987;156:20-23.
        Sattin RW, Wingo PA, Lee NC.  Oral contraceptive use and the risk of breast cancer:  Reply to letters to
            the editor.  N Engl J Med 1987;316:163-164.
        Kendrick JS, Wingo PA, Rubin GL, Lee NC, Webster LA, <u>Ory HW</u>, and the Cancer and Steroid Hormone
            Study Group.  Combination oral contraceptive use and the risk of endometrial cancer.  JAMA
            1987;257:796-800.
        Lee NC, Wingo PA, Gwinn ML, Rubin GL, Kendrick JS, Webster LA, <u>Ory HW</u>.  The reduction in risk of
            ovarian cancer associated with oral contraceptive use.  N Engl J Med 1987;316:650-655.

<u>1988</u>    Wingo PA, <u>Ory HW</u>, Layde, PM, Lee NC.  The evaluation of the data collection process for a multicenter,
            population-based, case-control design.  Am J Epidemiol 1988;123:206-217.

<u>1989</u>    Layde PM, Webster LA, Baughman AL, Wingo PA, Rubin GL, <u>Ory HW</u>. The independent associations of
            parity, age at first full term pregnancy, and duration of breastfeeding with the risk of breast cancer.  J
            Clin Epidemiol 1989;42:963-973.

<u>1990</u>    Wingo PA, Lee NC, <u>Ory HW</u>, et al.  Oral contraceptives and the risk of breast cancer.  Ch. 4, in <u>Oral
            Contraceptives and Breast Cancer:  The Implications of the Present Findings for Informed Consent and
            Informed Choice</u> ed. RD Mann.  Parthenon Publishing Group Ltd.  Lancs, UK, 1990.

<u>1991</u>    Wingo PA, Lee NC, <u>Ory HW</u>, Beral V, Peterson HB, Rhodes PH.  Age-specific differences in the
            relationship between oral contraceptive use and breast cancer.  Obstet Gynecol 1991;78:161-170.

OTHER
PUBLICATIONS:

1968          Hopkins TF, <u>Ory H</u>, Despres E, et al.  The effects of rat pituitary and hypothalamic tissue transplanted in
              super-ovulated immature rats.  J Endocr 1968;40:363-369.

1973          The Boston Collaborative Drug Surveillance Program and Greenblatt DJ, <u>Ory HW</u>, Levy M.  Oral
              contraceptives and venous thromboembolic disease, surgically confirmed gallbladder disease, and
              breast tumours.  Lancet 1973; I:1399-1404.

1974          The Boston Collaborative Drug Surveillance Program and <u>Ory HW</u>.  Functional ovarian cysts and oral
              contraceptives. JAMA 1974;228:68-69.
              <u>Ory HW</u>, Conger B, Richart R, Barron B:  Relation of type 2 herpesvirus antibodies to cervical neoplasia.
              Obstet Gynecol 1974;43:901-904.
              Munford RS, <u>Ory HW</u>, Brooks GF, Feldman RA:  An analysis of factors contributing to death from
              diphtheria in the United States, 1959-1970.  JAMA 1974;229:1890.

1975          <u>Ory HW</u>, Jenkins R, Byrd JY, et al.  Cervical neoplasia in residents of a low income housing project:  An
              epidemiologic study.  Am J Obstet Gynecol 1975;123:275-277.
              <u>Ory HW</u>, Allen DT, Conger SB, et al.  The epidemiology and interrelationship of cervical dysplasia and
              type 2 herpes virus antibodies in a low income housing project.  Am J Obstet Gynecol 1975;123:269-
              274.

1976          <u>Ory HW</u>, Naib Z, Conger SB, et al.  Contraceptive choice and prevalence of cervical dysplasia and
              carcinoma-in-situ. Am J Obstet Gynecol 1976;124:573-577.
              <u>Ory HW</u>, Cole PT, MacMahon B, Hoover R.  Oral contraceptives and reduced risk of benign breast
              diseases.  N Engl J Med 1976;294:419-422.
              Faulkner WL, <u>Ory HW</u>.  Intrauterine devices and acute pelvic inflammatory disease.  JAMA
              1976;235:1851-1853.
              Cates W Jr., <u>Ory HW</u>, Rochat RW, Tyler CW Jr.  The intrauterine device and deaths from spontaneous
              abortion.  N Engl J Med 1976;295:1155-1159.

1977          <u>Ory HW</u>, Conger SB, Naib Z, et al.  A preliminary analysis of oral contraceptive use and risk of developing
              premalignant lesions of the uterine cervix. In:  Garattini S and Berendes HW (eds).  Pharmacology of
              steroid contraceptive drugs.  New York: Raven Press, 1977:211-218.
              <u>Ory HW</u>.  Oral contraceptive use and breast diseases.  In:  Garattini S and Berendes HW (eds).
              Pharmacology of steroid contraceptive drugs.  New York: Raven Press, 1977:179-183.
              <u>Ory HW</u>.  The association of oral contraceptives and myocardial infarction: a review.  JAMA
              1977;237:2619-2622.
              Morisson A, Jick H, <u>Ory HW</u>.  Oral contraceptives and hepatitis.  Lancet 1977;2:1142-1143.
              Rochat RW, Morris L, Cates W Jr., <u>Ory HW</u>.  Control de fecundidad y planificacion familiar en EEUU.
              Accepted for PAHO Bulletin.
              <u>Ory HW</u>, Rooks JPB.  Oral contraceptives and benign tumors:  a review.  In:  Colombo F, et al. (eds).
              Epidemiologic evaluation of drugs.  Amsterdam: Elsevier, 1977:193-200.
              Cates W Jr, Grimes DA, <u>Ory HW</u>, Tyler CW Jr.  Publicity and the public health:  the elimination of IUD-
              related abortion deaths.  Fam Plann Perspect 1977;9:138-140.
              White MK, <u>Ory HW</u>, Goldenberg LA.  A case-control study of uterine perforations documented at
              laparoscopy.  Am J Obstet Gynecol 1977;129:623-625.
              Rooks JB, <u>Ory HW</u>, Ishak KG, Strauss LT, Greenspan JR, Tyler CW Jr.  The association between oral
              contraception and hepatocellular adenoma--a preliminary report.  Int J Gynaecol Obstet 1977;15:143-
              144.

1978      Ory HW. A review of the association between intrauterine devices and acute pelvic inflammatory disease. J Reprod Med 1978;20:200-204.

Rochat RW, Ory HW, Schulz KF. Methods for measuring safety and health hazards of currently available fertility-regulating agents in the developing world. Singapore Journal of Obstetrics and Gynecology 1978; 9:1-16.

WHO Scientific Group (Including Ory HW). Steroid contraception and the risk of neoplasia, WHO Technical Report Series No. 619, 1978.

Cates W Jr, Grimes DA, Schulz KF, Ory HW, Tyler CW Jr. World Health Organization studies of prostaglandins versus saline as abortifacients: a re-appraisal. Obstet Gynecol 1978;52:493-498.

Hill, AP, Pike MC, Smith PG, Ory HW. Stratified analysis of case-control studies with the factor under study taking multiple values. J Chron Dis 1978; 31:546-555.

Kim-Farley RJ, Cates W Jr, Ory HW, Hatcher RA. Febrile spontaneous abortion and the IUD. Contraception 1978; 18:561-570.

Ory HW, Tyler CW Jr, Rochat RW, Cates W Jr. Building a flexible program to evaluate the effects of fertility control. In: Kellhammer U and Uberla K (eds). Long-term studies on side-effects of contraception--state and planning. Symposium Munich, 17-29 Sept. 1977. New York:Springer-Verlag, 1978:45-57.

1979      Cates W Jr, Ory HW. IUD Complications: infection, death, and ectopic pregnancy. In: Moghissi, K (ed). Controversies in contraception. Baltimore: Williams and Wilkins, 1979:187-201.

Ory HW. The health effects of fertility control. In: Contraception: science, technology and application--Proceedings of a Symposium, 16-17 May 1978. Washington, DC: National Academy of Sciences, 1979:110-121.

Rooks JB, Ory HW, Ishak KG, et al. Epidemiology of hepatocellular adenoma: the role of oral contraceptive use. JAMA 1979;242:644-648.

Center for Disease Control (including Ory HW). Surgical sterilization surveillance; tubal sterilization 1970-1975. Atlanta, Ga.: Center for Disease Control, 1979.

1980      Layde PM, Fleming D, Greenspan JR, Smith JC, Ory HW. Demographic trends in tubal sterilization in the United States, 1970-1975. Am J Pub Health 1980;70:808-813.

Greenspan JR, Hatcher RA, Moore M, Rosenberg MJ, Ory HW. The association of depo-medroxyprogesterone acetate and breast cancer. Contraception 1980;21:563-569.

Center for Disease Control (including Ory HW). Surgical sterilization surveillance; hysterectomy in women aged 15-44, 1970-1975. Atlanta, Ga.: Center for Disease Control, 1980.

White MK, Ory HW, Rooks JB, Rochat RW. Intrauterine device termination rates and the menstrual cycle day of insertion. Obstet Gynecol 1980;55:220-224.

Ory HW, Rosenfeld A, Landman LC. The pill at 20: an assessment. Fam Plann Perspect 1980;12:278-283.

Dixon GW, Schlesselman JJ, Ory HW, Blye RP. Ethynyl estradiol and conjugated estrogens as postcoital contraceptives. JAMA 1980;244:1336-1339.

1981      Layde PM, Ory HW, Peterson HB, et al. The declining length of hospitalization for tubal sterilization. JAMA 1981; 245:714-718.

Ory HW and the Women's Health Study: Ectopic pregnancy and intrauterine contraceptive devices: new perspectives. Obstet Gynecol 1981;57:137-144.

Peterson HB, Ory HW, Greenspan JR, Tyler CW Jr. Deaths associated with laparoscopic sterilization by unipolar electrocoagulation devices, 1978 and 1979. Am J Obstet Gynecol 1981;139:141-143.

Burkman RT and the Women's Health Study (including Ory HW). Association between intrauterine device and pelvic inflammatory disease. Obstet Gynecol 1981;57:269-276.

Peterson HB, Greenspan JR, DeStefano F, Ory HW, Layde PM. The impact of laparoscopy on tubal sterilization trends in United States hospitals, 1970 and 1975 to 1978. Am J Obstet Gynecol 1981;140:811-814.

Peterson HB, Greenspan JR, Ory HW, DeStefano F. Tubal sterilization mortality surveillance, United States, 1978-1979. Advances in Planned Parenthood. 1981;16(2):71-76.

Centers for Disease Control (including Ory HW). Deaths following female sterilization with unipolar electrocoagulating devices. Morbidity and Mortality Weekly Report 1981;30:149-151.

Center for Disease Control (including Ory HW). Surgical sterilization surveillance; hysterectomy in women aged 15-44, 1976-1978. Atlanta, Ga.: Centers for Disease Control, 1981.

Centers for Disease Control (including Ory HW). Surgical sterilization surveillance; tubal sterilization 1976- 1978. Atlanta, Ga.: Centers for Disease Control, 1981.

Centers for Disease Control (including Ory HW). Hysterectomy in women aged 15-44, United States, 1970-1978. Morbidity and Mortality Weekly Report 1981;30:173-176.

Huggins GR and the Women's Health Study (including Ory HW). IUD use and unexplained vaginal bleeding. Obstet Gynecol 1981; 58:409-416.

Foreman H, Stadel BV, Schlesselman S, and the Women's Health Study (including Ory HW). IUD usage and fetal loss. Obstet Gynecol 1981;58:669-677.

Tyler CW Jr, Ory HW. Reliability of fertility control. Jugosl Ginekol Opstet 1981;21:27-35.

1982

Centers for Disease Control (including Ory HW). Oral contraceptives and cancer risk. Morbidity and Mortality Weekly Report 1982;31:393-394.

Centers for Disease Control (including Ory HW). Ectopic pregnancy surveillance, 1970-1978. Atlanta, Ga.: Centers for Disease Control, 1982.

Peterson HB, Greenspan JR, DeStefano F, and Ory HW. Deaths associated with laparoscopic sterilization in the United States, 1977-1979. J Reprod Med 1982;27:345-347.

Ory HW. The noncontraceptive health benefits from oral contraceptive use. Fam Plann Perspect 1982;14:182-184.

Layde PM, Ory HW. Oral Contraceptives, smoking and cardiovascular disease: response to F. M. Sturtevant. Int J Fertility 1982;27:14-15.

Peterson BP, Greenspan JR, Ory HW. Death following puncture of the aorta during laparoscopic sterilization. Obstet Gynecol 1982;59:133-134.

Ory HW. The extra-contraceptive benefits and effects of oral contraceptives. In: Brosens I (ed). New considerations in oral contraception. New York: Biomedical Information Corporation, 1982:83-96.

Nolan TF, Ory HW, Layde PM, Maze JM, Greenspan JR. Cumulative prevalence rates and corrected incidence rates of surgical sterilization among women in the United States, 1971-1978. Am J Epidemiol 1982;116:776-781.

Rubin GL, Ory HW, Layde PM. Oral contraceptives and pelvic inflammatory disease. Am J Obstet Gynecol 1982;144:630-635.

DeStefano F, Greenspan JR, Ory HW, et al. Demographic trends in tubal sterilization: United States, 1970-1978. Am J Public Health 1982;72:480-484.

Peterson HB, DeStefano F, Greenspan JR, Ory HW. Mortality risk associated with tubal sterilization in United States hospitals. Am J Obstet Gynecol 1982;143:125-129.

Kelaghan JW, Rubin GL, Ory HW, Layde PM. Barrier-method contraceptives and pelvic inflammatory disease. JAMA 1982;248:184-187.

Layde PM, Ory HW, Schlesselman JJ. The risk of myocardial infarction in former users of oral contraceptives. Fam Plann Perspect 1982;14:78-80.

DeStefano F, Peterson HB, Ory HW, Layde PM. Oral contraceptives and postoperative venous thrombosis. Am J Obstet Gynecol 1982;143:227-228.

Dicker RC, Scally MJ, Greenspan JR, Layde PM, Ory HW, et al. Hysterectomy among women of reproductive age. Trends in the United States, 1970-1978. JAMA 1982;248:323-327.

Dicker RC, Greenspan JR, Strauss LT, Cowart MR, Scally MJ, Peterson HB, DeStefano F, Rubin GL, Ory HW. Complications of abdominal and vaginal hysterectomy among women of reproductive age in the United States. The Collaborative Review of Sterilization. Am J Obstet Gynecol 1982;144:841-848.

Rubin GL, Ory HW, Layde PM. Mortality risk of voluntary surgical contraception. Biomedical Bulletin 1982;3(2):1-5.

1983

Layde PM, Ory HW, Kay CR. Incidence of arterial cardiovascular disease among oral contraceptive users. J Royal Coll Gen Practitioners 1983;33:75-82.

Peterson HB, DeStefano F, Rubin GL, Greenspan JR, Lee NC, Ory HW. Deaths attributable to tubal sterilization in the United States, 1977 to 1981. AM J Obstet Gynecol 1983;146:131-136.

Heartwell S and the Women's Health Study (including <u>Ory HW</u>). Risk of uterine perforation among users of IUD's. Obstet Gynecol 1983;61:31-36.

Rosenberg M, Layde P, Strauss L, Rooks J, <u>Ory HW</u>. Agreement between women's histories of oral contraceptive use and physicians' records. Int J Epidemiol 1983;12:34-87.

DeStefano F, Greenspan JR, Dicker RC, Peterson HB, SchulzKF, Strauss LT, Rubin GL, <u>Ory HW</u>. Complications of interval laparoscopic tubal sterilization. Obstet Gynecol 1983;61:153-158.

<u>Ory HW</u>. Mortality associated with fertility and fertility control: 1983. Fam Plann Perspect 1983;15:57-63.

Rubin GL, Peterson HB, Dorfman SF, Layde PM, Maze JM, <u>Ory HW</u>, Cates W Jr. Ectopic pregnancy in the United States: 1970 through 1978. JAMA 1983;249:1725-1729.

Cates W Jr and <u>Ory HW</u>. What matching achieves. Contemporary OB/GYN 1983;22:171-175.

Peterson HB, Lubell I, DeStefano F, <u>Ory HW</u>. The safety and efficacy of tubal sterilization: an international overview. Int J Gynaecol Obstet 1983;21:139-144.

Trevathan E, Layde P, Adams J, Benignd B, <u>Ory HW</u>. Cigarette smoking and dysplasia and carcinoma <u>in situ</u> of the uterine cervix. JAMA 1983;250:499-502.

Huezo CM, DeStefano F, Rubin GL, <u>Ory HW</u>. Risk of wound and pelvic infection after laparoscopic tubal sterilization: instrument disinfection versus sterilization. Obstet Gynecol 1983;61:598-602.

Lee NC, Rubin GL, <u>Ory HW</u>, Burkman RT. Type of intrauterine device and the risk of pelvic inflammatory disease. Obstet Gynecol 1983;62:1-6.

Grubb G, <u>Ory HW</u>. IUD's and pelvic infection. Planned Parenthood Medical Digest. June 1983:1-2.

<u>Ory HW</u>. Questions and answers about the Pill. Planned Parenthood Medical Digest. December 1983:1-2,5.

Cates W Jr, <u>Ory HW</u>. How to spot a well-controlled study. Contemporary OB/GYN 1983;21(6):192-195.

<u>Ory HW</u>, Forrest JD, Lincoln R. Making Choices. Evaluating the health risks and benefits of birth control methods. Washington, DC: The Alan Guttmacher Institute, 1983.

Destefano F, Huezo CM, Peterson HB, Rubin GL, Layde PM, <u>Ory HW</u>. Menstrual changes after tubal sterilization. Obstet Gynecol 1983;62:673-681.

Layde PM, Peterson HB, Dicker RC, DeStefano F, Rubin GL, <u>Ory HW</u>. Risk factors for complications of interval tubal sterilization by laparotomy. Obstet Gynecol 1983;62:180-184.

<u>Ory HW</u>. Contraceptive safety: The need for epidemiologic research. In: Diczfalusy E and Diczfalusy A (eds). Research on the regulation of human fertility: Needs of developing countries and priorities for the future. Copenhagen: Scriptor Publishers, 1983:133-156.

1984

<u>Ory HW</u>, Rubin GL, Jones V, et al. Mortality among young black women using contraceptives. JAMA 1984;251: 1044-1048.

Greenspan JR, Phillips JM, Rubin GL, Rhodenhiser EM, <u>Ory HW</u>. Tubal sterilizations performed in freestanding, ambulatory-care surgical facilities in the U.S. in 1980. J Reprod Med 1984;29:237-241.

Lee NC, Dicker RC, Rubin GL, <u>Ory HW</u>. Confirmation of the preoperative diagnoses for hysterectomy. Am J Obstet Gynecol 1984;150:283-287.

1985

Wingo PA, Huezo CM, Rubin GL, <u>Ory HW</u>, Peterson HB. The mortality risk associated with hysterectomy. Am J Obstet Gynecol 1985;152:803-808.

1986

<u>Ory HW</u>, Koplan JP, Allen JR. Assessment of screening as a preventive technology: The example of HTLV-III/LAV antibody testing. Is J Med Sci 1986;22:524-528.

1991

Burkman RT; Lee NC; <u>Ory HW</u>; Rubin GL. Response to "The intrauterine device and pelvic inflammatory disease: the Women's Health Study reanalyzed" [comment]. J Clin Epidemiol 1991; 44(2):123-5

1993

Friede A; Reid JA; <u>Ory HW</u>. CDC WONDER: a comprehensive on-line public health information system of the Centers for Disease Control and Prevention. Am J Public Health 1993; 83(9):1289-94

1995        WHO Consultants Report (including Ory HW).  Information management for improving relevance and
            efficiency in the health sector: a framework for the development of health information systems.
            WHO/HRH/95.4, 1995

1996        Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW).  Breast cancer and
            hormonal contraceptives: collaborative reanalysis of individual data on 53,297 women with breast
            cancer and 100,239 women without breast cancer from 54 epidemiological studies. Lancet
            1996;347:1713-27

            Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW).  Breast cancer and
            hormonal contraceptives: Further results.  Contraception 1996;54:1S-106S

1997        Carr BK, Ory HW.  Estrogen and Progestin Components of Oral Contraceptives: Relationship to Vascular
            Disease. Contraception 1997;55:267-72

            Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW).  Breast cancer and
            hormone replacement therapy: collaborative reanalysis of data from 51 epidemiological studies of 52 705
            women with breast cancer and 108 411 women without breast cancer.  Lancet 1997; 350: 1047-59

1998        Ory HW.  Cardiovascular safety of oral contraceptives: what has changed in the last decade.  Contraception
            1998, 58:S9-S13

1999        Schwingl PJ,  Ory HW, Visness C.  Estimates Of The Risk Of Cardiovascular Death Attributable To Low
            Dose Oral Contraceptives In The US. Am J of Obstet Gynecol 1999;180:241-9

            Burkman RT, Sonnenberg FA, Ory HW, Speroff T, and Plucinski R.  The Costs and Health Effects of the
            Intrauterine Contraceptive Device. Submitted to Am J of Obstet Gynecol

2001        Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW). Familial Breast cancer:
            collaborative reanalysis of individual data from 52 epidemiological studies of 58,209 women with breast
            cancer and 101,986 women without the disease.  Lancet 2001,358: 1389-1399

2002        Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW). Breast cancer and
            breastfeeding: collaborative reanalysis of individual data from 47 epidemiological studies in 30 countries,
            including 50,302 women with breast cancer and 96,973 women without the disease.  Lancet 2002,360: 187-
            195

2002        Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW). Alcohol, Tobacco and
            Breast cancer : collaborative reanalysis of individual data from 53 epidemiological studies, including 58515
            women with breast cancer and 95067 without the disease. British J Cancer 2002, 87, 1234-45

2004        Collaborative Group on Hormonal Factors in Breast Cancer (including Ory HW). Breast cancer and
            abortion: collaborative reanalysis of individual data from 53 epidemiological studies, including 83,000
            women with breast cancer from 16 countries. Lancet 2004,363: 1007-1016

2007        Wingo PA, Austin H, Marchbanks PA, Whiteman M, Hsia J, Mandel MG, Peterson HB, and Ory HW.
            Oral Contraceptives and the Risk of Death from Breast Cancer.  Obstetrics and Gynecology 2007, 110:793-
            800

Testimony History

In the last 4 years, I was deposed on October 30, 2007 in conjunction with the testimony I gave in early 2008 in the WR Grace Bankruptcy Trial before Judge Fitzgerald.

My fee is $500 per hour of consultation, deposition or testimony.