UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      .   Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .   USX Tower - 54th Floor
                            .   600 Grant Street
                            .   Pittsburgh, PA 15219
              Debtors.      .
                            .   April 1, 2009
. . . . . . . . . . . . .   .   10:29 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtors:        Kirkland & Ellis, LLP
                        By:  DAVID BERNICK, ESQ.
                             BARBARA HARDING, ESQ.
                             JANET BAER, ESQ.
                             LISA ESAYIAN, ESQ.
                             CRAIG BRUENS, ESQ.
                             BRIAN STANSBURY, ESQ.
                             SAL BIANCA, ESQ.
                             RAINA JONES, ESQ.
                             HENRY THOMPSON, ESQ.
                             SCOTT McMILLAN, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601


For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                             DEANNA BOLL, ESQ.
                             CHRISTOPHER GRECO, ESQ.
                             MAGALI LEE, ESQ.
                             MARC LEWINSTEIN, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022


Audio Operator:         Nickita Barksdale
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For the Debtors: | Reed Smith, LLP<br>By:  DOUGLAS E. CAMERON, ESQ.<br>      JAMES RESTIVO, ESQ.<br>435 Sixth Avenue<br>Pittsburgh, PA  15219 |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>      NATHAN FINCH, ESQ.<br>      JEFFREY LIESEMER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| | Campbell & Levine, LLC<br>By:  BERNARD CONAWAY, ESQ.<br>800 N. King Street<br>Suite 300<br>Wilmington, DE  19801 |
| For the Debtors: | ARPC<br>By:  AMY BROCKMAN, ESQ. |
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>      JAY HUGHES, ESQ.<br>      WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  GREGORY HOROWITZ, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>      SCOTT BAENA, ESQ.<br>      JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe<br>  LLP<br>By:  ROGER FRANKEL, ESQ.<br>      RICHARD WYRON, ESQ.<br>      ANTHONY KIM, ESQ.<br>      RAYMOND MULLADY, ESQ.<br>      JOHN ANSBRO, ESQ.<br>      JONATHAN GUY, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**


For Maryland Casualty:     Eckert Seamans Cherin & Mellott, LLC
                           By:  EDWARD LONGOSZ, II, ESQ.
                           1747 Pennsylvania Avenue, N.W.
                           Suite 1200
                           Washington, D.C.  20006

                           STB
                           By:  STERLING MARSHALL, ESQ.


For Sealed Air:            Skadden, Arps, Slate, Meagher & Flom,
                             LLP
                           By:  MARK CHEHI, ESQ.
                                DAVID TURETSKY, ESQ.
                           One Rodney Square
                           Wilmington, DE  19801

Co-Counsel to Libby        Cohn, Whitesell & Goldberg, LLP
Claimants:                 By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For Libby Claimants:       Landis Rath & Cobb, LLP
                           By:  RICHARD S. COBB, ESQ.
                                KERRI KING MUMFORD, ESQ.
                           919 Market Street
                           Wilmington, DE  19801


For Sealed Air:            NERA Economic Consulting
                           By:  STEPHANIE PLANCICH
                           1166 Avenue of the Americas
                           28th Floor
                           New York, NY  10036

For W.R. Grace:            NERA
                           By:  ELENA ZAPRYANOVA
                                LINDA SHEN

For Serengeti:             Vinson & Elkins, LLP
                           By:  ARI BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201


For Serengeti:             By:  BILLAL SIKANDER


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Silver Point
Capital:                    Silver Point Capital
                            By:  JOHN KU
                                 SERGEI FILIPOV, ESQ.


For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705


For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:       By:  LEWIS KRUGER, ESQ.
                            180 Maiden Lane
                            New York, NY 10038


For Ad Hoc Committee:       Weil, Gotshal & Manges
                            By:  M. JARRAD WRIGHT, ESQ.
                            1300 Eye Street NW, Suite 900
                            Washington, D.C.  20005

For Official Committee      Kramer Levin Naftalis & Frankel
of Equity Holders:           LLP
                            By:  DOUG MANNAL, ESQ.
                            919 Third Avenue
                            New York, NY  10022
For Continental
Casualty Company:           Ford, Marrin, Esposito,
                            Witmeyer & Gleser, LLP
                            By:  ELIZABETH DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875


For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            ELIZABETH DEVINE, ESQ.


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Various Claimant Stutzman, Bromberg, Esserman & Plifka
Firms: By:  DAVID J. PARSONS, ESQ.
   VAN J. HOOKER, ESQ.
   SANDER L. ESSERMAN, ESQ.
 2323 Bryan Street
 Suite 2200
 Dallas, TX  75201

For Fireman's Fund: Stevens & Lee, P.C.
 By:  JOHN DEMMY, ESQ.
   DAVID R. BEANE, ESQ.
 1105 North Market Street, 7th Fl.
 Wilmington, DE  19801

For Owens-Illinois: McCarter & English
 By:  DANIEL SILVER, ESQ.
 Renaissance Centre, 405 N. King St.
 Wilmington, DE  19801

For Asbestos Property Scott Law Group
Damage Claimants: By:  DARRELL SCOTT, ESQ.
 1001 East Main Street, Suite 500
 Sevierville, TN  37864

For National Union Fire Zeichner Ellman & Krause, LLP
Insurance Co.: By:  MATTHEW RUSSELL, ESQ.
   ROBERT GUTTMANN, ESQ.
   MICHAEL DAVIS, ESQ.
 575 Lexington Avenue
 New York, NY  10022

For the Future Orrick, Herrington & Sutcliffe,
Claimants  LLP
Representatives: By:  DEBRA FELDER, ESQ.
   JOSHUA CUTLER, ESQ.
 Washington Harbour
 3050 K Street, N.W.
 Washington, D.C.  20007 For

For Federal Insurance Cozen O'Connor
Company: By:  JEFFREY WAXMAN, ESQ.
 Chase Manhattan Centre
 1201 North Market Street
 Wilmington, DE  19801

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For W.R. Grace: | Kirkland & Ellis, LLP<br>By:  ELLEN AHERN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601<br><br>Kirkland & Ellis, LLP<br>By:  DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |
| For State of Montana: | Christensen, Moore, Cockrell<br>By:  DALE R. COCKRELL, ESQ. |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For W.R. Grace: | Cohn Whitesell & Goldberg, LLP<br>By:  NATHAN SOUCY, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For CNA:                        Goodwin Procter, LLP
                                By:  DANIEL GLOSBAND, ESQ.
                                     BRIAN MURKHERJEE, ESQ.
                                Exchange Place
                                Boston, MA  02109-2881

For Grace Certain               Montgomery, McCracken, Walker &
Cancer Claimants:               Rhoads, LLP
                                By:  NATALIE D. RAMSEY, ESQ.
                                300 Delaware Avenue, Ste. 750
                                Wilmington, DE  19801


For David T. Austern,           Phillips, Goldman & Spence, P.A.
the Future Claimants'           By:  JOHN C. PHILLIPS, ESQ.
Representative:                 1200 North Broom Street
                                Wilmington, DE  19806

                                Tre Angeli, LLC
                                By:  JOSEPH RADECKI, ESQ.

For David T. Austern:           Piper Jaffray & Co.
                                By:  JONATHAN BROWNSTEIN, ESQ.

For W.R. Grace:                 Pachulski, Stang, Ziehl & Jones, LLP
                                By:  TIMOTHY P. CAIRNS, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE  19899-8705

For the Asbestos                Caplin & Drysdale, Chartered
Creditors' Committee:           By:  WALTER SLOCOMBE, ESQ.
                                     BERNARD BAILOR, ESQ.
                                     JEANNA RICKARDS, ESQ.
                                     JAMES WEHNER, ESQ.
                                     LESLIE KELLEHER, ESQ.
                                One Thomas Circle, NW
                                Washington, D.C.  20005

For the Asbestos                Ferry Joseph & Pearce, P.A.
Creditors' Committee:           By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 19899
                                Wilmington, DE  19899


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Pepsi: | Butler Rubin Salfarelli & Boyd, LLP<br>By:  KIRK T. HARTLEY, ESQ.<br>70 West Madison Street<br>Suite 1800<br>Chicago, IL  60602 |
| For Official Committee of Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |
| For Official Committee of Asbestos Property Damage Claimants: | Law Firm<br>By: THOMAS BRANDI, ESQ.<br>     TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA, Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd, et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>     ALAN RUNYAN, ESQ.<br>     MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Royal Insurance: | Wilson Elser Moskowitz Edelman & Dicker, LLP<br>By:  CATHERINE CHEN, ESQ.<br>     150 East 42nd Street<br>     New York, NY  10017 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK


For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For London Market            Mendes & Mount, LLP
Companies:                   By:  ALEXANDER MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019-6829


For Official Committee       LECG
of Asbestos Property         By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property         Brickman, P.C.
Claimants/ZAI Clmts.:        By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

                             Hamilton, Rabinovitz & Alshuler
                             By:  JOSHUA KATZ, ESQ.
                                  FRANCINE RABINOVITZ, ESQ.

                             Conway Del Genio, Gries & Co, LLC
                             By:  GREGORY BOYER, ESQ.

                             Lieff, Cabraser, Heinmann &
                             Bernstein
                             By:  ELIZABETH J. CABRASER, ESQ.

                             Pryor Cashman LLP
                             By:  RICHARD LEVY, ESQ.

                             Riker, Danzig, Scherer, Hyland
                             & Perretti, LLP
                             By:  CURTIS PLAZA, ESQ.
                             One Speedwell Avenue
                             P.O. Box 1981
                             Morristown, NJ  07962


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants/ZAI Clmnts: | Sullivan Hazeltine & Allinson<br>By:  WILLIAM D. SULLIVAN, ESQ.<br>4 East 8th Street<br>Wilmington, DE |
| For Avenue Capital Group: | CHELSEA CLINTON, ESQ. |
| For W.R. Grace: | WILLIAM SPARKS, ESQ. |
| For Ivory Investment: | Ivory Investment<br>By:  DHANANJAY PATWARDHAN |
| For Linden Advisors: | Linden Advisors, LP<br>By:  CRAIG GILBERT |
| For O'Conner: | O'Conner<br>By:  JOHN R. WOLLEN |
| For Credit Suisse First Boston: | Credit Suisse First Boston<br>By:  TIM McARDLE |
| For King Street Capital Management, LLC: | King Street Capital Management, LLC<br>By:  KIM CHRISTENSEN, ESQ. |
| For the Blackstone Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Dune Capital Mgmt: | Dune Capital Management<br>By:  GUY BARON |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Caxton Associates:          Caxton Associates, LLC
                                By:  JAMES RIEGER

For Dow Jones                   Dow Jones News Wires
News Wires:                     By:  PEG BRICKLEY

For Citadel Investment          Citadel Investment Group
Group:                          By:  ASHOK VASVANI

For Durham Asset                Durham Asset Management
Management:                     By:  JEFFREY A. ROSENKRANZ

For Murray Capital              Murray Capital Management, Inc.
Management                      By:  MARTI MURRAY

For Korn Capital, LLC:          Korn Capital, LLC
                                By:  STEPHANIE KWONG

For Levin Capital
Strategies:                     JOHN P. MACKIN, ESQ.

For Morgan Stanley
Senior Funding, Inc.:           Katten, Muchin, Rosenman LLP
                                By:  NOAH HELLER, ESQ.
                                     MERRITT PARDINI, ESQ.
                                     JEFF FRIEDMAN, ESQ.

For Irwin H. Zandman:           Irwin H. Zandman
                                By:  IRWIN H. ZANDMAN

For Venor Capital:              MICHAEL SCOTT, ESQ.
                                Washington, DC

For Asbestos Claimants:         Brayton Purcell, LLP
                                By:  CHRISTINA SKUBIC, ESQ.
                                222 Rush Landing Road
                                Novato, CA  94948

For Halcyon Asset
Management LLC:                  Halcyon Asset Management, LLC
                                By:  JOHN GREENE

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For The Scotts Co.:          Vorys, Sater, Seymour and Pease,
                               LLP
                             By:  MATTHEW DAIKER, ESQ.
                             52 East Gay Street
                             P.O. Box 1008
                             Columbus, OH  43216

For Private Investors:       WILLIAM M. WAGNER

For Bank of New York:        ANDREW HAIN, ESQ.

For WR Grace
Shareholder:                 Tocqueville Asset Management
                             By:  PETER SHAWN


For Everest Reinsurance      Crowell & Moring, LLP
Co. & McKinley Ins. Co.:     By:  MARK D. PLEVIN, ESQ.
                                  LESLIE A. EPLEY, ESQ.
                                  LESLIE DAVIS, ESQ.
                             1001 Pennsylvania Avenue, NW
                             Washington, DC  20004

For Everest Reinsurance      Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:     Courtney, P.C.
                             By:  JOHN D. MATTEY, ESQ.
                                  BRIAN KASPRZAK, ESQ.
                             913 North Market St., Suite 800
                             Wilmington, DE  19801

For ERISA:                   Lowenstein Sandler PC
                             By:  IRA LEVEE, ESQ.
                                  MICHAEL ETKIN, ESQ.

For Equity Committee:        RICHARD WESCHLER, ESQ.

For Kaneb Pipe Line
Operating Partnership:       Fulbright & Jaworski
                             By: STEVE PEIRCE, ESQ.
                                 MARK PLATT, ESQ.
                             2200 Ross Avenue
                             Dalla, TX

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**


For Kaneb Pipe Line
Operating Partnership:          Gilbert & Renton LLC
                                By:  ROBERT GILBERT, ESQ.
                                344 N. Main Street
                                Andover, MA  01810

                                Smith, Katzenstein & Furlow LLP
                                By:  KATHLEEN M. MILLER, ESQ.
                                The Corporate Plaza
                                800 Delaware Avenue
                                P.O. Box 410
                                Wilmington, DE  19899

For Laura Hammond:              Dune Capital Management
                                By:  LAURA HAMMOND

For Her Majesty the
Queen in Right of
Canada:                         Office of the Attorney General
                                By:  JACQUELINE DAIS-VISCA, ESQ.

For Creditors'
Claimants:                      Reaud Morgan & Quinn LLP
                                By:  CHRIS PORTNER, ESQ.

For Bank of America:            Richards, Layton & Finger, P.A.
                                By:  MARCOS A. RAMOS, ESQ.
                                One Rodney Square
                                920 N. King Street
                                P.O. Box 551
                                Wilmington, DE 19899

For Travelers Ins. Co.          Simpson, Thacher & Bartlett, LLP
                                By:  ELISA ALCABES, ESQ.
                                     SAMUEL RUBIN, ESQ.
                                425 Lexington Avenue
                                New York, NY  10017

For BNSF:                       Pepper Hamilton
                                By:  LINDA CASEY, ESQ.

For PD/FCR:                     ALAN RICH, ESQ.


**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Loan Maker/
Long Acre:                      Pepper Hamilton
                                By:  DENNIS VERY, ESQ.

For the U.S. Trustee:    JOSEPH FORNARI, ESQ.

For One Amercian Insurance
Co., & Seaton Ins. Co.:  Drinker Biddle & Reath LLP
                                By:  MICHAEL F. BROWN, ESQ.
                                One Logan Square
                                18th & Cherry Streets
                                Philadelphia, PA  19103

For Hartford Financial
Service Group, Inc.:     Wilmer, Cutler & Pickering
                                By:  MELANIE DRITZ, ESQ.
                                399 Park Avenue
                                New York, NY  10022

For Century Indemnity
Co.:                            White and Williams LLP
                                By:  JOSEPH GIBBONS, ESQ.
                                1800 One Liberty Place
                                Philadelphia, PA  19103

For the Bank Lender
Group:                          Paul, Weiss, Rifkind, Wharton
                                & Garrison LLP
                                By:  MARGARET PHILLIPS, ESQ.
                                     REBECCA ZUBATY, ESQ.
                                1285 Avenue of the Americas
                                New York, NY 10019

For AXA Belgium:         Tucker Arensberg, P.C.
                                By:  MICHAEL A. SHINER, ESQ.
                                1500 One PPG Place
                                Pittsburgh, PA  15222

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (CONT'D):**

For Arrowood:                O'Melveny & Myers, LLP
                            By:  TANCRED SCHIAVONI, ESQ.
                                 ALLEN SCHWARTZ, ESQ.
                            7 Times Square
                            New York, NY

                            Bifferato, Bifferato & Gentilotti
                            By:  GARVAN McDANIEL, ESQ.
                            Buckner Building
                            1308 Delaware Avenue
                            P.O. Box 2165
                            Wilmington, DE  19899


For Arrowood:               Wilson, Elser, Moskowitz, Edelman
                            & Dicker, LLP
                            By: CARL PERNICONE, ESQ.
                            New York, NY 10019


For PD FCR:                 Sanders & Nettles, LLC
                            By: ALEXANDER SANDERS, ESQ.
                            2008 Lincoln Street
                            Columbia, SC  29201


For the Department
of Justice:                 ELIZABETH YU, ESQ.


For Anderson Memorial
Hospital                     Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson East
                             Hampton, SC  29924

                             Kozyak, Tropin & Throckmorton PA
                             By:  JOHN KOZYAK, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, FL


**J&J COURT TRANSCRIBERS, INC.**

1           COURT CLERK:  All rise.

2           THE COURT:  Good morning, please be seated.  This is

3    the matter of W.R. Grace, Bankruptcy Number 01-1139.

4           The participants I have listed by phone are Scott

5    Baena, Brandon Baer, Janet Baer, Ari Berman, David Bernick,

6    Deanna Boll, Thomas Brandi, Elizabeth Cabraser, Douglas

7    Cameron, Linda Casey, Tiffany Cobb, Dale Cockrell, Daniel Cohn,

8    Andrew Craig, Michael Davis, Elizabeth DeCristofaro, Elizabeth

9    Devine, Martin Dies, Melanie Dritz, Terrance Edwards, Lisa

10   Esayian, Sander Esserman, Marion Fairey, Roger Frankel,

11   Theodore Freedman, Joseph Gibbons, Christopher Greco, Robert

12   Guttmann, Jonathan Guy, Barbara Harding, Robert Horkovich,

13   Christina Kang, Matthew Kramer, Arlene Krieger, Magali Lee,

14   Richard Levy, Marc Lewinstein, Jeffrey Liesemer, Peter

15   Lockwood, Douglas Manal, Francis Monaco, Brian Mukherjee, Marti

16   Murray, David Parsons, Margaret Phillips, John Phillips, Joseph

17   Radecki, James Restivo, Samuel Rubin, Alan Runyan., Jay Sakalo,

18   Darrell Scott, Mark Shelnitz, Michael Shiner, David Siegel,

19   Walter Slocombe, Warren Smith, Jason Solganick, Daniel

20   Speights, Shayne Spencer, Theodore Tacconelli, David Turetsky,

21   Edward Westbrook, Jennifer Whitener, Richard Wyron and Rebecca

22   Zubaty.

23           I'll take entries in court, please.  Good morning.

24           MR. FREEDMAN:  Good morning, Your Honor, Theodore

25   Freedman for the debtors.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Good morning, Your Honor, Janet Baer for

2 the debtors.

3          MR. O'NEILL:  Good morning, Your Honor, James O'Neill

4 for the debtors.

5          MR. WESTBROOK:  Good morning, Your Honor, Edward

6 Westbrook for the US ZAI Certified Class.

7          MR. SCOTT:  Good morning, You Honor, Darrell Scott on

8 behalf of the Zonolite Class.

9          MS. CABRASER:  Good morning, Your Honor, Elizabeth

10 Cabraser on behalf of the Zonolite Class.

11          MR. PASQUALE:  Good morning, Your Honor, Pat Pasquale

12 for the Unsecured Creditors Committee.

13          THE COURT:  Wait, I'm sorry.  Thank you.

14          MR. KRAMER:  Sorry, Your Honor, Matt Kramer, Bilzin

15 Sumberg on behalf of the Property Damage Committee.

16          THE COURT:  Thank you.

17          MR. RICH:  Allen Rich for the PD FCR.

18          MR. LOCKWOOD:  Peter Lockwood for the ACC, Your

19 Honor.

20          MR. WYRON:  Good morning, Your Honor, Richard Wyron

21 for the PI FCR.

22          MR. McDANIEL:  Good morning, Your Honor, Garvan

23 McDaniel for Arrowood and with me is Carl Pernicone, Allen --

24          THE COURT:  I'm sorry, I can't hear you.

25          MR. McDANIEL:  I'm sorry.  With me is Carl Pernicone

1  --

2         THE COURT:  Who are you representing Mr. McDaniel?

3         MR. McDANIEL:  Arrowood.

4         THE COURT:  Arrowood, thank you.

5         MR. McDANIEL:  Carl Pernicone, Tanc Schiavoni and

6  Allen Schwartz.

7         UNIDENTIFIED MALE SPEAKER:  Good morning.  Thank you.

8         THE COURT:  Good morning.

9         MR. KOZYAK:  Your Honor, John Kozyak, Kozyak, Tropin

10  and Throckmorton in Miami on behalf of Anderson Memorial

11  Hospital with co-counsel Mr. Speights.

12         THE COURT:  Thank you.

13         MR. SANDERS:  Good morning, Your Honor, Alex Sanders,

14  PD FCR.

15         MS. MILLER:  Good morning, Your Honor, Kathy Miller

16  on behalf of Kaneb.  And with me are my co-counsel, Mark Pratt,

17  Steve Peirce and Bob Gilbert.

18         MS. ALCABES:  Good morning, Your Honor, Elisa

19  Alcabes, for Travelers.

20         MS. YU:  Good morning, Your Honor, Elizabeth Yu on

21  behalf of the United States, observing.

22         MS. DeCRISTOFARO:  Good morning, Your Honor,

23  Elizabeth DeCristofaro for Continental Casualty Company.

24         MR. GLOSBAND:  Good morning, Your Honor, Dan Glosband

25  also for Continental Casualty Company.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROWN:  Good morning, Your Honor, Michael Brown

2   for One Beacon America Insurance Company and Seaton Insurance

3   Company.

4          MR. TACCONELLI:  Good morning, Your Honor, Theodore

5   Tacconelli for the Property Damage Committee.

6          MR. DEMMY:  Your Honor, John Demmy for Firemans' Fund

7   Insurance Company.

8          THE COURT:  Ms. Baer.

9          MS. BAER:  Good morning, Your Honor.  Your Honor,

10  items on the agenda number one and two are claims related

11  matters that we'll ask be continued again to the April 27th,

12  omnibus hearing.

13         THE COURT:  All right.

14         MS. BAER:  And we'll present orders at the end of the

15  call with respect to those orders.

16         THE COURT:  All right.

17         MS. BAER:  Your Honor, matter number three is the

18  quarterly fee application.  There are, as I understand, no

19  objections.  I have an agreed order to present to Your Honor

20  that outlines all of the fees and expenses being allowed.

21         THE COURT:  I thought I had an order stamped this

22  morning.   I thought it was entered, it may not have been, but

23  I believe that there was an order attached to the COC that I

24  had entered this morning.

25         MS. BAER:  There was an order attached, Your Honor,

1 and if that's the case, we will not confuse the issue with

2 another one.

3             THE COURT:  All right.

4             MS. BAER:  Your Honor, agenda item number four has

5 been entered.

6             MR. SMITH:  Your Honor, I'm sorry, if that concludes

7 the fee maters, Your Honor, this is Warren Smith, the fee

8 auditor and if I could be excused on the telephone.

9             THE COURT:  Yes, sir, thank you.  Anyone who is only

10 interested in fees or any other item on which orders have

11 already been entered, you're automatically excused.  Thank you.

12 Okay, Ms. Baer, I'm sorry.

13             MS. BAER:  Your Honor, agenda item number five, that

14 item, Your Honor, was dismissed without prejudice due to a

15 procedural error.  It has been refiled and it will be up on

16 April 27th.

17             Agenda item number six, Your Honor, you've already

18 entered an order on that.  That's the pension matter.

19             Your Honor, that takes us to the contested portion of

20 the agenda.  Agenda item seven and eight relate to two motions

21 filed by Kaneb Pipeline, and agenda item number nine relates to

22 the ZAI Class motion.

23             By agreement of all counsel, we've agreed to switch

24 the order.  Judge Sanders and Mr. Westbrook have airplanes that

25 leave in a much shorter time and it's difficult to get where

1  they're getting, so the ZAI Class matter will go first and I'll

2  turn that over to Mr. Westbrook.

3              THE COURT:  All right.  Mr. Westbrook.

4              MR. WESTBROOK:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. WESTBROOK:  Ed Westbrook for the US ZAI Certified

7  Class.  Your Honor, I am very happy to have with me this

8  morning a co-counsel, co-class counsel, Darrell Scott and

9  Elizabeth Cabraser.

10             Your Honor, we're here this morning on our motion for

11  final approval of the US ZAI Class settlement.  And, Your

12  Honor, what a difference a year makes.  Just about a year ago,

13  in April 2008, we stood here in Wilmington and we were in the

14  throes of a most contentious period in the ZAI litigation.  We

15  had motions concerning the bar date, we had motions concerning

16  relief from stay, motions concerning appellate matters, motions

17  concerning the Barbanti Class and Your Honor heard those matter

18  and we discussed a number of those matters and the Court urged

19  us on April 22nd, was the day we were here, to get serious

20  about settlement.  And, Your Honor, I'm happy to report that

21  both sides did get serious about settlement.  We had a

22  mediation with Judge Gross which did not get us there, it was

23  not successful and then, Your Honor, through actually the

24  intervention of members of the PI Committee and the Equity

25  Committee, who brought the parties back together, we got on a

1  track that over many, many series of meetings and negotiations,

2  got us to where we are today, to our motion for final approval.

3         Your Honor, in this circuit a motion for final

4  approval of a class settlement is judged by a number of factors

5  called the Gersh Prudential factors.   Some courts group them

6  as nine, some as 13, but they all go basically to the same

7  fundamental issue.   Is the settlement fair, reasonable and

8  adequate.   Not is it perfect, but is it fair, reasonable and

9  adequate.

10        And, Your Honor, to help the discussion move along

11 this morning, I have a chart in which I have grouped the

12 factors and I'm going to discuss them in that order, if I may

13 hand one to the Court.

14        THE COURT:  All right.

15        MR. WESTBROOK:  Your Honor, beginning on the upper

16 left hand side of the chart, with the factor of complexity,

17 expense and duration and the ZAI litigation, the courts look at

18 what was the nature of the litigation that's being settled,

19 what lay ahead for the parties if there wasn't settlement.  And

20 this Court well knows from being in the thick of it, that the

21 ZAI litigation was, perhaps, one of the most complex, expensive

22 and promised to be long lived matters in this very complex

23 bankruptcy.  We, obviously, had many years ahead of us, not

24 only in this court, but obviously from disappointed parties in

25 appellate courts if we didn't reach a resolution.  So, the

1 complexity of those matters going ahead countenanced a

2 reasonable settlement if it could be reached.  So, that first

3 factor certainly argues in favor of a fair, reasonable and

4 adequate settlement.

5       Second, Your Honor, moving around clockwise we have,

6 what were the risks faced by the class in establishing

7 liability and damages and this Court is more familiar than most

8 trial courts, even approving settlements, because you, Your

9 Honor, were at the helm on the issue of risks, not the ZAI

10 risk, but the litigation risk.  We had the Science trial

11 summary judgment proceedings, we had all the other proceedings

12 that we were facing, trying to get released from this court to

13 try our claims in the tort system.  The Court indicated pretty

14 clearly to us that was not going to happen.  We had the risk of

15 appellate review in some timely basis, we had been denied

16 interlocutory review.

17       We firmly and truly believed in the merit of the ZAI

18 claims that we could ultimately prevail, but we recognized

19 realistically that there were tremendous risks, risks that if

20 we went ahead, and things didn't turn out the way we hoped they

21 would be, the class could get very little, or nothing.  So, we

22 had significant risks of liability.

23       Going beyond that, Your Honor, we faced the issues of

24 damages.  Out in the tort system, we had used our contamination

25 evidence in traditional asbestos property damage cases, to

1  establish damages.  We know that in this forum we were going to

2  have some issues about what that contamination showed, was

3  contamination enough, or were we going to have to have air

4  levels that rose to some degree that would be unreasonable to

5  recover.  Would consumer protection statutes be allowed to be

6  applied?  Again, we firmly believed in our position, Grace

7  firmly believed in its position, but we knew there were

8  significant risks in establishing damages.

9      In addition, in this context, we knew that we had the

10  ZAI bar date.  If the bar date were ruled and upheld to be the

11  cutoff for all claims, we knew that there would be no claims

12  beyond the 16,000 or so that had been filed, greatly limiting

13  the number of people who could participate.

14      So, we had tremendous risks there that we were

15  facing.  We very realistically evaluated them in negotiating

16  the settlement.  That factor also favors a fair, reasonable and

17  adequate resolution.

18      Next, Your Honor, moving around, the stage of the

19  proceedings and experience of counsel.  This factor looks at,

20  was this a quickie settlement, did the parties rush in shortly

21  after litigation began said, Your Honor, this is how we want to

22  resolve it, did we have some counsel who were novices in the

23  area, don't know what they're talking about.  I don't think

24  anyone in this courtroom would say that we settled this case

25  early in the proceedings.  If we weren't in the bottom of the

1 ninth inning, we at least were on the ninth inning as we got

2 serious on discussions.

3        As to the experience of counsel, Your Honor, Ms.

4 Cabraser is a nationally recognized authority on toxic tort and

5 class action litigation.  Mr. Scott probably knows more about

6 consumer protection statutes nationally, than anyone in the

7 country, and more about ZAI than anyone in the country, and for

8 my part, Your Honor, I added whatever asbestos expertise I had

9 and I'll leave it at that.  But I think that the stage of

10 proceedings, we were late in the proceedings, we had done

11 tremendous discovery, we're knowledgeable counsel.  That factor

12 also favors approval of the settlement.

13        Next, Your Honor, we have the reasonableness of the

14 settlement amount and the claims process.  Here, Your Honor, we

15 have a fund, variable fund,  we can rise up to $140 million,

16 depending on claims.  The reason we have it funded that way,

17 Your Honor and I think it was a very creative solution, reached

18 by both sides, is that Grace sincerely believes that despite

19 what we say, people are just not going to be that concerned

20 about ZAI and they're not going to come forward to do anything

21 about it.  We believe they will.  But in order to address

22 Grace's concern that it didn't want to leave a large pot of

23 money stranded, where it will never be used, and our concern

24 that people are likely to come forward, although they're not

25 coming forward tomorrow, we agreed to an innovative approach

1  whereby the settlement fund is funded incrementally, and we

2  have a facility that will remain open for at least 20 years,

3  maybe as much as 25 or more years, as claimants come forward.

4  So, the remedy fits the problem, Your Honor.

5        We have a situation where claimants will be able to

6  receive a 55 percent contribution toward their abatement

7  expenses.  Now, Your Honor, is that what we wanted?  Is that

8  perfect?  Absolutely not.  Would we have wanted 100 percent,

9  certainly.  Was that feasible?  No.  We have to recognize the

10  reality of life, that a 55 percent contribution is a fair,

11  reasonable and adequate contribution.

12        We also have in the settlement, Your Honor, a very

13  important component which is a multi year, comprehensive,

14  educational program to keep people from unknowingly

15  encountering ZAI because although Grace does not share our view

16  of the potential harm from ZAI, Grace in the settlement

17  discussions acknowledged that we do have that view and agreed

18  that the fund can be used up to $2 million in the first three

19  years, and the $500,000 over periods going along, to educate

20  people.  Don't go up there, don't unnecessarily disturb it.

21  Regardless of what they believe in their firmly held view, they

22  agreed as part of the settlement to acknowledge our view.

23        The claims process itself, Your Honor, is not a

24  situation where we've made it so complicated that people aren't

25  ever going to be able to access it.  The claims process is

1  intended to be very simple.  Homeowners will have to show that

2  they have an ownership interest in the property, that they have

3  ZAI, and that they're taking remediation action, in which case,

4  they'll be able to received Grace's or the trust's

5  contribution.

6          So, Your Honor, we believe that the settlement

7  amount, could Grace have been asked to pay more?  Sure.  We

8  asked them to pay more.  Is it realistic to expect Grace to pay

9  more?  In our best judgment, we did not believe so, under all

10 the circumstances.  This factor, as well, favors the fair,

11 reasonable and adequate finding as to the settlement

12         Moving around, Your Honor, next factor, the class

13 members reaction.  What did class members have to say?  Class

14 members had until March 13th to file comments about the

15 settlement.  We've received absolutely no adverse reaction from

16 any class member, no one opposing the fairness, reasonableness

17 or adequacy of the settlement.  We attached the two comments

18 that were field.  One was from a claimant who had a personal

19 injury claim, I sent it to Mr. Inselbuch to take care of and

20 the other letter was from a claimant who asked to be

21 represented by class counsel and we certainly are doing that,

22 willing to do that.

23         The opt out issue is also very instructive, Your

24 Honor.  We have over 16,000 class members, we received about a

25 196 initial opt out forms.  In talking with some of the opt

1 outs, Mr. Scott's office learned that some of these folks

2 thought the opt out form was a claim form, some of them were

3 actually returning the opt out form with a bag of Zonolite.

4 Some of them were also sending in their abatement information,

5 so we contacted them and we said, do you understand opt out

6 puts you out of the class.  To date, Your Honor, 40 of those

7 people, about 20 percent of the opt outs said, we made a

8 mistake, we thought it was the claim form.  So, now Your Honor,

9 the number has changed a little bit, but we have about 156

10 people out of 16,000 who have opted out, so less than 1 percent

11 opt outs.  And that's an infinitesimal number of opt outs in

12 our experience.  So, we think the class members reaction, as

13 well as the very small number of opt outs, also favors a

14 finding that the settlement is fair, reasonable and adequate.

15         Next, Your Honor, the courts look at, well, what's

16 the defendant's ability to withstand a greater judgment?  Was

17 it realistic to think that Grace could pay much more if we were

18 to persevere for years.  And on that, Your Honor, I'm reminded

19 of what you said a year ago, almost, on April 22nd, you said,

20 on Page 65 of the transcript, "So the reality is that in order

21 to keep the debtor functioning and contributing to the trust --

22 you were talking about a potential resolution like this -- and

23 operating a business and making money, there are always

24 limitations on resources.  You know, there has to be

25 limitations on resources and people have to take haircuts, it

1  just has to happen".

2         And, Your Honor, we recognize that this settlement is
3  a haircut from the perfect world, but we don't live in perfect
4  world.  We think that the $140 million, which is potentially
5  there, is fair, reasonable and adequate and that understanding
6  that Grace has many other creditors, Grace already has a
7  situation where it'll have to borrow a lot of money to get out
8  of bankruptcy, we think that well, not perfect, this certainly
9  fits the bill.

10        Moving around, Your Honor, to the attorneys fees
11  provisions.  Courts look to see, is this a settlement where the
12  attorneys have negotiated a big fee for themselves, and the
13  class is getting nothing or a coupon.  Certainly, I don't think
14  anyone would make that contention here, Your Honor.  We have
15  not only the $140 million fund, we have the educational
16  campaign, we have the 20 year facility, we have the remedy
17  which fits the problem and we think that it's a reasonable
18  resolution.  In attorneys fees, we have agreed that we're not
19  going to seek any fee until we're successful.  That is, until
20  we get final approval of the settlement, until the settlement
21  is incorporated into a successful plan of reorganization, until
22  we advise people about their rights and we do all the things
23  that we're supposed to do to get to success.  And when we do,
24  then we'll come to the Court under the normal Third Circuit
25  standards and seek a fee, but there's been no separate

1  agreement as to a fee.  This provision, Your Honor, favors the

2  settlement as well.

3          Finally, Your Honor, bankruptcy considerations.  In a

4  bankruptcy settlement, the courts look to say, does this fit in

5  the overall context of the bankruptcy?  Are we trying to

6  unfairly disadvantage some creditor?  Are we taking money from

7  some creditor?  Obviously, not, Your Honor.  This was a

8  bankruptcy resolution, not only that is fair to the class, but

9  it's fair to the overall bankruptcy, it's supported and was

10 facilitated by the personal injury interests, by the Equity

11 Committee interest and there has been absolutely no creditor,

12 no class member, no litigant, who has filed any paper saying

13 this settlement is not fair, reasonable or adequate.

14         Which brings me to my final point, Your Honor.  We

15 did receive one filing, by the Anderson Memorial Hospital,

16 represented by my good longtime friend, Mr. Speights.  Anderson

17 makes a point to say that it is not challenging this settlement

18 as fair, reasonable or adequate, but what it asks the Court to

19 do is just to delay this for five months until September, until

20 Anderson can have, apparently, a challenge to the plan because

21 Anderson is an opt out, it's not a member of the class, it's

22 not affected by this settlement, Anderson wants to have

23 everything delayed so that it can raise a plan objection,

24 apparently, in five months.

25         Your Honor, tomorrow, I believe, is the eighth

1  anniversary of this bankruptcy, we will enter our ninth year,

2  we think that any request for delay on an important matter like

3  this, should be viewed very dimly by the Court and we ask the

4  Court not to delay its decision today, but to grant our motion

5  for final approval because by all accounts, by unanimous view

6  of everyone involved, this settlement is fair, reasonable and

7  adequate.  Thank you.

8          THE COURT:  Mr. Scott, Ms. Cabraser, are you adding

9  anything or are you relying on Mr. Westbrook's presentation?

10          MR. SCOTT:  I'm perfectly happy with Mr. Westbrook's

11  presentation.

12          MS. CABRASER:  Also perfectly happy.

13          THE COURT:  All right. Anyone else speaking in favor

14  of the settlement today?  Okay.  Mr. Freedman.

15          MR. FREEDMAN:  Your Honor, obviously, the debtor

16  fully supports the settlement and thinks it should be approved.

17          THE COURT:  Mr. Speights -- oh, Mr. Lockwood.

18          MR. LOCKWOOD:  For what it's worth, Your Honor, the

19  Asbestos PI Committee, one of the plan proponents also supports

20  the settlement.

21          THE COURT:  Mr. Speights, are you speaking for

22  Anderson?

23          MR. SPEIGHTS:  Mr. Kozyak will be speaking for

24  Anderson.

25          THE COURT:  All right.  Mr. Kozyak.

1              MR. KOZYAK:  Thank you, Your Honor.  Your Honor,

2    John Kozyak for Anderson Memorial Hospital, with Mr. Speights.

3    Your Honor, despite the characterization of us, Anderson

4    Memorial, I'd like to just get to the -- neither the

5    supplemental or the reply, addressed our basic limited

6    objection, and that was that the motion and the settlements do

7    not appropriately address the treatment of the opt outs, and

8    Anderson Memorial is here to protect its right as an opt out.

9              And it seeks deferral and postponement, and wrapping

10   this up into the plan process because it's integral to the plan

11   process.

12             Your Honor, the notice of the settlement clearly

13   provided that there would be an opportunity for people to opt

14   out and this Court is very familiar with the difference between

15   a permissive class and a mandatory class.  And this Court is

16   also familiar with the disclosure statement objections that we

17   had last month, early last month.  When we pushed, no one else

18   pushed, we pushed to make sure that it was described what would

19   happen to the opt outs.  It wasn't clear in the plan, it

20   certainly wasn't addressed in the settlement motions and it

21   certainly was not addressed in the disclosure statement.  And

22   what we learned in that objection hearing, was that even if you

23   do opt out, you get routed right back into the trust fund,

24   pursuant to the plan.

25             So the settlement that Mr. Westbrook talks about is

1  contingent upon the plan being confirmed, as we know, and it

2  also requires that the people who opt out of this class, the

3  150 or the 190, the ones that Mr. Westbrook has not yet talked

4  to and persuaded that they were wrong, those people have a

5  right under class action law, to opt out and they should have

6  that right preserved.

7         Now, it is true that I did not object or Anderson

8  Memorial, did not object in our moving papers, because the

9  notice says, if you opt out, you don't get to object to the

10 fairness or adequacy of the plan.  We voted with our feet.  Our

11 silence is not to say that we support it, we voted saying we

12 want to opt out and go forward in the tort system, out outside

13 of the class plan.  And there is no -- and I think some

14 background is appropriate, Your Honor.

15        And, I'm sure that the Court has read the papers,

16 talking about who Anderson Memorial is, I know the Court is

17 familiar who Anderson Memorial is,  but there is absolutely no

18 doubt that we had a class action pending before the bankruptcy

19 was filed that includes residences.  The reply filed by the

20 debtor is that the ZAI product was used primarily, primarily,

21 in residences.  I'm not disputing that today, but there's no

22 evidence that it was not used in commercial properties, and our

23 class action said it was used, and asserted that it was in

24 commercial properties and residences, and although the adequacy

25 of Anderson was disputed below, as a class rep., the issue of

1  whether it was adequate representative for ZAI, or residences

2  --

3          THE COURT:  I'm sorry,  so the issue of what, I

4  apologize.

5          MR. KOZYAK:  The adequacy of Anderson as a class

6  rep., that was never contested below as to these two issues,

7  residences or ZAI product.

8          So, and how this started in this bankruptcy case, as

9  the Court was familiar with our class action, Mr. Westbrook

10 filed an adversary complaint in this case, I think it's called

11 01-08810-JFK, which is styled class action complaint seeking

12 Zonolite attic insulation relief, Mrs. Jackie Lewis, et al.,

13 versus W.R. Grace, et al.  On Page 23, paragraph 81, where they

14 define the class it says, all owners or occupiers of real

15 property, et cetera, and then it goes, except excluded from the

16 class are, and then there's a number of people, the class

17 certified in Anderson versus W.R. Grace and Company,

18 92-CP-25-279 South Carolina Common Pleas, Hampton County.

19         So, when they filed the class action they excluded

20 Anderson Memorial and the South Carolina class action.

21         When they did the negotiations, they excluded both

22 Anderson Memorial and the PD Committee which represents the ZAI

23 claimants, including the ones who opt in, or stay in, or don't

24 do anything and those that opt out.

25         So, since this is contingent, Your Honor, upon plan

1  confirmation, and because it does affect the rights of people

2  who haves opted out, including Anderson Memorial, as class rep.

3  I believe that this should be deferred and dealt with in the

4  plan confirmation process.  Both the class claimants and the

5  debtors have said, we're not trying to affect your plan rights,

6  but I do believe they are.  I believe that this is a sub rosa

7  mandatory class.

8         And, Your Honor, in the Federal Mogul case that you

9  also handled, Anderson Memorial had a class action, brought

10  before the Court, strong support, no objections, the Court

11  continued it twice and rolled it over and combined it with the

12  confirmation hearing.  I don't believe there's any demonstrated

13  need to go forward.

14         THE COURT:  That was a different issue because that

15  class had actually been certified against Federal Mogul, this

16  one hasn't been certified against Grace.  And there's a world

17  of difference.  This class action, in South Carolina, has never

18  been certified against Grace and Anderson continues to insist

19  that it has and it hasn't, and that issue is -- it simply makes

20  a world of difference.  Anderson, at this point, is not a final

21  certified class against Grace and the Court's opinion makes it

22  clear that it wasn't certifying the class against Grace, it

23  couldn't certify the class against Grace, Grace was in

24  bankruptcy at the time.

25         MR. KOZYAK:  Before that order, that was entered

1 after Grace was in bankruptcy, Your Honor, the class was

2 conditionally certified against Grace.

3          THE COURT:  Yes, conditionally certified, and not

4 finally certified.

5          MR. KOZYAK:  Well, it was certified.

6          THE COURT:  No.  It was not certified, it was

7 conditionally certified, not finally certified.  It has never

8 been adjudicated a class action against Grace on a final basis.

9 And it could not be adjudicated against Grace on a final basis

10 because Grace was in bankruptcy.

11          MR. KOZYAK:  Your Honor, I don't believe there's any

12 demonstrated need to go forward and not with the settlement

13 today.  I think it should be combined with the class action.

14 Mr. Westbrook and Scott in their affidavits, which I object to

15 there being introduced for purposes of evidence, it's not an

16 evidentiary hearing, if there are any contested matters, then I

17 would request a CMO and an opportunity to present evidence, but

18 they have talked to these class members, they're going to give

19 them advice as voting for the plan.  That's not the issue, the

20 issue is the rights of the opt outs, and much is said as

21 there's only one person who said anything, there's only one

22 person who is standing up here.  The reason is, we're the only

23 people who know about this that have opted out.  The disclosure

24 statement, I don't know if it went out yesterday, or this week,

25 I remember at the disclosure statement hearing they represented

1  it was going to go out before the end of the month, today is

2  April 1st, no one would know about that.  If you were an opt

3  out, you would have no idea today, that your plan -- that the

4  treatment of your case was going to be wrapped back up into the

5  plan.

6            And so for those reasons, we preserve our rights at

7  the confirmation and we seek that this hearing be deferred.

8            THE COURT:  Well, there is, you know, there is the

9  complication, I think, of the bankruptcy spin here, which is

10 that if you haven't filed a claim, then this class action

11 process will, I think, provide because of the settlement, your

12 opportunity to receive something that you otherwise may not

13 have.

14           If you have filed a claim and you're an opt into the

15 class, then you'll be treated per the class.  If you filed a

16 claim and you're an opt out, you're going back into the plan.

17 That's the way life is in bankruptcy.

18           So, you know, you've got -- you've basically got two

19 choices.  You can opt in and be treated under the class or you

20 can file a claim and then either be treated under the class or

21 opt out and be treated under the plan, otherwise, you have no

22 claim, do you?

23           So, I don't see --

24           MR. KOZYAK:  No, but, Your Honor, you follow it --

25           THE COURT:  I'm sorry?

1          MR. KOZYAK:  -- you follow it --

2          THE COURT:  You follow --

3          MR. KOZYAK:  -- you do -- you do understand it except

4    the last piece, I respect.  Yes.  If you're in the class, you

5    get treated under this fund.

6          THE COURT:  Yes, right.

7          MR. KOZYAK:  The fund that Mr. Westbrook negotiated.

8          THE COURT:  Exactly.

9          MR. KOZYAK:  Okay.  If you opt out, you get treated

10   under the same fund.  That should not be fair.

11         THE COURT:  Well, no.  No, if you opt out --

12         MR. KOZYAK:  Because if you are PD claimant, if

13   you're a PD claimant under the plan, then you should be able to

14   be paid a hundred cents on the plan, that's the treatment and

15   that's not what is said.  That is not what's provided.  They

16   say if you have a ZA related claim, whether you don't say a

17   word or you opt out, stand on your head, you go back into the

18   same fund, under the plan.

19         THE COURT:  Well, I mean that's a plan confirmation

20   issue, isn't it?  If ZAI claimants believe that they have an

21   opt out issue, and ought to be in a different class under the

22   plan, that's a classification issue and their rights to either

23   vote against the plan, or to seek classification are still

24   preserved.  That's not a settlement issue, that's a plan

25   confirmation issue.

1          So, their remedy, as an opt out plaintiff with a ZAI

2  property damage claim, is A) file a claim, and B) challenge the

3  plan and the classification under the plan.  So, I don't see

4  how the settlement at that point takes away any plan

5  confirmation right, there may be a plan confirmation issue that

6  is preserved, but I don't see how the settlement does away with

7  that.  You're either an opt in or an opt out under the

8  settlement and that's appropriate for class action treatment

9  under the Third Circuit standards for approving the class

10 action as final settlement.

11         So, what I'm not --

12         MR. KOZYAK:  You've addressed my point.

13         THE COURT:  Okay.

14         MR. KOZYAK:  Thank you.

15         THE COURT:  All right, Mr. Freedman.

16         MR. FREEDMAN:  Yes, Your Honor. I have to confess I'm

17 not sure I understand Mr. Kozyak's point, but I think that what

18 his general message, is that there somehow is some injustice

19 being done to his client as an opt out because of the way that

20 this is working, and it seems to be that the facts just clearly

21 demonstrate that there is no such injustice.

22         It's helpful to look at it in terms of two

23 perspectives.  Disclosure, that is what has been told to

24 people, ZAI claimants, since the beginning about this process

25 and the process itself, how it's going to work in terms of

**J&J COURT TRANSCRIBERS, INC.**

1  going forward with the plan and, frankly, his rights as an opt

2  out.

3        So, in terms of disclosure, on January 16th, the

4  Court approved preliminarily the settlement and the notices

5  that were related to the settlement.  In the motion that was

6  made in connection with the settlement, class counsel attached

7  the term sheet and the term sheet made absolutely clear that

8  the class claims would be paid pursuant to a trust, and that

9  that trust would be structured so as to satisfy the terms of

10 Section 524(g).

11       Subsequently -- that happened in mid-January.  On

12 February 3rd, the debtors filed an amended disclosure statement

13 which was largely intended to address PD claim and ZAI claims

14 and that was the first time that the terms of this ZAI

15 resolution that are contemplated by the settlement were

16 included in the plan.  And the disclosure statement makes

17 absolutely clear, starting on Page 2, right before the

18 executive summary, and this was in materials that Anderson

19 Memorial did not object to, but it was -- and it has been there

20 since the February 3rd filing, that the treatment of ZAI claims

21 would apply to all ZAI claims.  That there was a plan Chapter

22 11 class created, Class 7B under the plan that applies to all

23 U.S. ZAI claims.  And that created a Chapter 11 class of which

24 this settlement class is a very large subset, but entities that

25 opted out were still, and are still clearly members of the

42

1    that.

2            Subsequently, and when we came before the Court on

3    March 9th to get final approval of the disclosure statement,

4    Anderson Memorial came forward and it said that it wanted to

5    make clear that there was -- that this language would apply to

6    somebody that opted out, they suggested language which the

7    debtors acceded to, to resolve that problem and that took care

8    of it and now we have a mailing.

9            So, there has been complete and full disclosure since

10   at least February 3rd, and very shortly after the class motion

11   was first made, that this plan process applies to all U.S. ZAI

12   claims and to have Anderson Memorial somehow now say that in

13   some way there was some lack of disclosure, and lack of notice

14   about this, when indeed the notice that is now going out for

15   voting was notice that they helped us fashion, just rings

16   hollow.

17           Secondly, looking at the process.  Every single U.S.

18   ZAI claim that filed a proof of claim will get a ballot and

19   will be entitled to vote for or against the plan.  The fact

20   that they opted into the class or opted out of the class has no

21   bearing on their ability to vote for the plan.  The procedures

22   that the Court approved which were not contested by anybody,

23   including Anderson, say that the class representative can then

24   cast a ballot for those people who are in the class, who did

25   not cast their own ballot, but every single ZAI claimant that

1 filed a claim and I should amend what I said, and has an

2 allowed claim or one that's permitted to vote which, frankly

3 does not apply to Anderson because there is an objection based

4 on the patent inadequacies of their claim, but every ZAI

5 claimant who has a right to vote will have the ability to vote

6 and the fact that they are part of the class makes no

7 difference.

8 Secondly, there is absolutely no limitation on a ZAI

9 claimant who has standing.  Again, we would argue that does not

10 apply to Anderson because their claim is so objectionable, but

11 every ZAI claimant who has standing can come forward and raise

12 any issue about confirmation of the plan that they feel like

13 they're entitled to raise.

14 So, the fact that the opt outs are swept into the

15 plan, has absolutely no bearing on whether or not this

16 settlement should or should not be approved and I think the

17 class counsel has made a very clear and compelling case that it

18 should be approved now, so that we can go forward and allow the

19 class to function the way it ought to, to move the case

20 forward.

21 THE COURT:  Mr. Lockwood.

22 MR. LOCKWOOD:  Your Honor, while I don't disagree

23 with anything Mr. Freedman said, I think much of it, to some

24 extent, is beside the point.

25 THE COURT:  Mr. Lockwood, I'm sorry, I'm having

1  trouble hearing you.  Could you just move the microphone?

2           MR. LOCKWOOD:  I don't disagree, indeed, I agree with

3  everything Mr. Freedman said, I, however, believe that much of

4  it is, in effect, beside the point because as I understand it,

5  Mr. Kozyak got up at the end of his colloquy with you, when you

6  said you have your right to object to confirmation of the plan

7  and he said, that answers my point, and that's really all this

8  is about.  He's trying to get -- he tried to, in effect, get

9  you to rule on a plan issue, which is the treatment of opt

10  outs, you pointed out this wasn't the time or place to do that,

11  but that he reserved that right, he said, okay, that's the end

12  of it.

13           THE COURT:  Well, I don't know that I said he

14  reserves -- I mean that Anderson Memorial reserved that right,

15  I said that opt outs.

16           MR. LOCKWOOD:  Well no -- opt outs.

17           THE COURT:  Yes.

18           MR. LOCKWOOD:  Anybody that's opt out, as Mr.

19  Freedman said, has the right to object at confirmation, and

20  this isn't a sub rosa plan confirmation.

21           THE COURT:  Right.

22           MR. LOCKWOOD:  The objections may well be meritless

23  and we certainly all reserve the right to contest their merit,

24  but at the end of the day all we're here on today is the

25  approval of this settlement from the plan proponents

**J&J COURT TRANSCRIBERS, INC.**

1 perspective.  They would like to know whether or not this

2 settlement is going to be in place as part of the run up to the

3 confirmation process or not and, therefore, we would urge Your

4 Honor to approve it since there has been no intelligible

5 objection expressed to the class settlement, per se. Thank you.

6          THE COURT:  Well, yes, I don't think that the

7 settlement, approval of a settlement in any way affects

8 anybody, either opt in or opt outs ability to vote on the plan

9 or object to the plan.  If that's the purpose of raising this

10 issue, then I hope that ruling is clear.

11          Okay, Mr. Westbrook?

12          MR. WESTBROOK:  Nothing further, Your Honor.

13          THE COURT:  All right.  Mr. Kozyak.

14          MR. KOZYAK:  Nothing further.

15          THE COURT:  Okay.  The objection to the extent, then,

16 that it is one by Anderson Memorial is overruled for that

17 reason, because the objection states that it is not an

18 objection to the settlement, it is simply a request to delay

19 the approval of the settlement until the plan confirmation

20 process.  I don't see the need for that because the settlement

21 does not affect anybody's ability to object to confirmation of

22 the plan or to vote on the plan.  So, those issues are

23 preserved for both opt ins and opt outs and I believe that the

24 class settlement does, indeed, represent a fair, reasonable and

25 adequate settlement of the issues between and among the

1 parties.

2       In terms of the complexity, expense and duration of

3 the potential ZAI litigation, it has been going on for years.

4 The little piece of it that I did see in terms of the Science

5 trial that affected only the enumerated claims and not all of

6 the members of the class who have already opted in, let alone

7 those who may potentially or have already opted out, convinces

8 me that this litigation could go on potentially for decades,

9 not just years, and as a result I think that that factor alone

10 could probably justify settlement but, nonetheless, I think Mr.

11 Westbrook did a very adequate job in explaining all of the

12 factors that the Court is compelled to take into consideration

13 and I will accept his analysis of those factors, not just on

14 the oral argument but also in the papers that have been filed

15 by the parties in the case.

16       And so, I don't see any need to review those factors

17 here today, I simply will accept them.  I will state for the

18 record that I have read those papers and I have listened to the

19 argument and based on those reviews and having heard that

20 argument today, I will accept them and the reason for my

21 overruling Anderson's objection, I think, has been made clear,

22 that the ability to object to the plan and to vote on the plan

23 is preserved.

24       So, I will take an order if someone has one,

25 approving.

1          MR. WESTBROOK:  Thank you, Your Honor.  Yes, Your

2    Honor, I have another copy of the order that was proposed and

3    attached to our papers.

4          THE COURT:  Thank you.  I think congratulations are

5    in order.

6          MR. WESTBROOK:  Thank you, Your Honor.

7          UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

8          THE COURT:  All right.  Items seven and eight, Ms.

9    Baer.  Anyone who is interested in only that matter, are free

10   to leave, thank you.

11         UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

12         MS. BAER:  Your Honor, before we take that up, Mr.

13   Kozyak raised the issue of whether the mailing had gone out.

14   Yes, the mailing has gone out, on a timely basis, and Your

15   Honor, I'd like to hand up to you a copy of the CD that went

16   with the mailing which we have found incredibly helpful because

17   it's all bookmarked so you can find all of the plan documents

18   very easily on you computer and you don't have to carry around

19   a lot of papers.

20         THE COURT:  Ah, thank you very much.  That would be

21   helpful.  Is this a copy that has to be left here for filing or

22   is -- thank you.  Do I need to file this copy with the clerk or

23   can I take this back?

24         MS. BAER:  No, Your Honor, that's your own copy.

25   We'll take care of making sure that the final documents are all

48

1 filed with the clerk.

2          THE COURT:  All right.

3          MS. BAER:  And I don't know if they want a CD but if

4 they do, we'll talk to them.

5          THE COURT:  All right.

6          MS. BAER:  And make sure they get what they  need.

7          THE COURT:  Okay.  Thank you.

8          MR. KOZYAK:  Your Honor, I haven't had a full chance

9 to read this.  Can I -- this order.

10          THE COURT:  Yes.

11          MR. KOZYAK:  I object to footnote number one.  I

12 haven't had a chance to look at it.  Can I just -- can we just

13 look at this for five more minutes, please?

14          MS. BAER:  I was going to say, isn't it the same

15 order that was attached to the papers that were filed?

16          THE COURT:  It is, I believe, the same order.

17          MS. BAER:  Yes.  It hasn't changed.

18          UNIDENTIFIED MALE SPEAKER:  Yeah, it's the same

19 order.

20          THE COURT:  It's -- Anderson is concerned about the

21 lack of standing issue.  Frankly, I don't think Anderson does

22 have standing to object to the class settlement, but for

23 purposes of this ruling, I don't think it's an issue.  I've

24 heard Anderson's argument.  To the extent that the last

25 sentence preserves the issue it says, in any event, Anderson's

**J&J COURT TRANSCRIBERS, INC.**

1 concern with the treatment of its ZAI claim under the plan if,

2 indeed, it has, ZAI is a confirmation matter and not a reason

3 to deny approval of the class settlement.  That seems to me to

4 be the basis for my ruling.  Let's see.

5          I will strike the intervening two sentences and leave

6 in the first sentence and the last sentence simply because I

7 don't find it necessary at this point to rule on the standing

8 question.  I will find it necessary to rule on that question

9 for plan confirmation purposes, so if Anderson thinks it has

10 standing to raise these issues, to either on its on, or to

11 represent any other building owner who may have ZAI, then I

12 want a brief on Anderson's standing for plan confirmation

13 purposes, but I don't find it necessary to rule on it now.

14          So, footnote one now reads: "One former class member,

15 Anderson Memorial Hospital opted out of the class and then

16 filed a limited objection in which it does not challenge the

17 fairness, reasonableness or adequacy of the settlement.

18 Instead, it asked the Court to defer considering settlement

19 approval until plan confirmation, Docket Number 20981 at 1.  In

20 any event, Anderson's concern with the treatment of its ZAI

21 claim under the plan if, indeed, it has ZAI is a confirmation

22 matter and not a reason to deny approval of this class

23 settlement".  Is that acceptable to Anderson?

24          MR. KOZYAK:  Yes, thank you, Your Honor.

25          THE COURT:  All right.  Footnote one reads that.

1  Yes, you may take a moment to look at the rest of the order,

2  but I've made that change to the order.

3       Okay.  One second until I get back to where I was

4  with respect to the CD.

5       I would suggest, then, perhaps, anybody interested in

6  the ZAI litigation remain a few minutes until Mr. Kozyak has a

7  chance to take a look at the order.  So, ten minutes and then

8  I'll excuse anybody from the ZAI presentation, but meanwhile,

9  I'm going forwards with items seven and eight on the agenda.

10 Okay.  Ms. Baer.

11      MS. BAER:  Your Honor, items seven and eight are two

12 motions filed by Kaneb Pipeline, for lifting of the stay.  The

13 debtors oppose both motions and believe that lifting the stay

14 at this time, on these matters, would be highly prejudicial to

15 the debtors for several reasons, which we will go into in our

16 response.  You also have objections from CNA and a limited

17 objection from One Beacon Insurance Company.

18      THE COURT:  All right, thank you.  Ms. Miller.

19      MS. MILLER:  Good morning, Your Honor, Kathy Miller

20 for Kaneb.  Your Honor, Mr. Platt will be handling the lift

21 stay motion with respect to the appeal and Mr. Gilbert will

22 handling the lift stay motion with respect to the insurance.

23      Mr. Gilbert and Mr. Pierce have already been admitted

24 pro hac.  We filed Mr. Platt's last week, but a check

25 yesterday, the order had not yet been signed and with Your

1 Honor's permission, may he address the Court today?

2          THE COURT:  I actually haven't seen it but I will --

3 I'm happy to admit Mr. -- I'm sorry, whose hasn't been filed?

4          MR. MILLER:  Platt, Mark Platt.

5          THE COURT:  Mr. Platt's.  I haven't seen it, but I'm

6 happy to admit Mr. Platt for today and I'll ask that the docket

7 be searched for it.  I just haven't seen the motion.

8          MS. MILLER:  Thank you, Your Honor.

9          THE COURT:  Let me make a note, please.  Okay.  Good

10 morning.

11          MR. PLATT:  Good morning, Your Honor.  Again for the

12 record, Mark Platt from Fulbright and Jaworski on behalf of New

13 Star Pipeline Operating Partnership LP.  I'm going to go ahead

14 and identify the full name of the client, and New Star Terminal

15 Services, Inc., which are relatively new names for respectively

16 Kaneb Pipeline Operating Partnership, LP and Support Terminal

17 Services, Inc.  But for simplicity, we will refer to our client

18 as Kaneb.

19          THE COURT:  All right.

20          MR. PLATT:  And I apologize, Your Honor, for the late

21 filing of the pro hac papers.  Mr. Gerber had planned on making

22 this argument, he got stuck handling a major filing down in

23 Dallas, and absolutely no offense to you, but I'm here in his

24 stead, and we're prepared to proceed.

25          THE COURT:  All right, Mr. Platt go ahead.  Thank

1  you.

2          MR. PLATT:  One other piece of housekeeping, all of

3  the exhibits that we attached to our motion, they're in the

4  record, but we've placed them in some binders if that's helpful

5  to the Court.

6          THE COURT:  All right, that's fine.

7          MR. PLATT:  And don't fret, we will not be referring

8  to all of the exhibits this morning.  And I forgot to, again,

9  announce that Mr. Bob Gilbert will be -- he will be the one

10 making the argument with regard to the insurance coverage

11 issues.

12         So, why are we here, Your Honor?  On October 30,

13 2008, Kaneb received a very serious letter from the Department

14 of Justice which is attached as Exhibit K-8 to our motions,

15 seeking reimbursement of costs expended by the federal

16 government in remediation efforts in connection with a jet fuel

17 release at what is referred to as the Otis Pipe Line.

18         It's generally believed that the overall exposure

19 related to that environmental cleanup will ultimately be in the

20 $70 to $75 million range, potentially.  The good news for Kaneb

21 which acquired certain subsidiaries of the debtor, Grace Energy

22 Corporation, or what I'll refer to today as GEC, in 1993, is

23 that any liability on the part of Kaneb is subject to direct

24 claims by Kaneb against a number of insurance policies.  And

25 also, in any event, that liability, if any, is GEC's.

                    **J&J COURT TRANSCRIBERS, INC.**

1            The bad news, however, is that GEC is seeking to use

2   the automatic stay here as a sword to fend off any attempt by

3   Kaneb to either assert insurance coverage claims, insurance

4   coverage claims or assert claims against GEC, even in a

5   defensive posture.

6            Even worse, at least one of the insurance carriers,

7   Continental Casualty Company is essentially invoking the

8   automatic stay on its part to prevent Kaneb from protecting its

9   property rights, arguing that any coverage litigation between

10  it and Kaneb would be "chaotic and counterproductive".

11           GEC's purported indemnity concern here is its main

12  basis as we understand it, to object to relief here.  GEC

13  claims that to the extent that Kaneb asserts direct claims

14  against the insurance carriers, those carriers will turn to GEC

15  for indemnity.  However, as Mr. Gilbert with discuss in detail

16  shortly, only one of the insurance carriers, One Beacon, has

17  any indemnity rights against the debtor, even potentially

18  applicable to what Kaneb is seeking in these motions.  And that

19  potential obligation involves only a single policy with limits

20  of only $5 million.  And nobody contests that to the extent

21  that any of the carriers have an indemnity claim against GEC,

22  that claim will survive the bankruptcy.

23           So, GEC is merely attempting to delay the inevitable

24  here.  It will have to take responsibility for its indemnity

25  obligations to the extent that they do exist some day.

1          Meanwhile, Kaneb faces immediate exposure with the

2 Department of Justice, and I'd point out that Ms. Elizabeth Yu

3 is in the courtroom today representing the Department of

4 Justice, very interested in these proceedings.

5          Kaneb intends to work with the DOJ to mediate their

6 dispute, but unless Kaneb is permitted to bring its insurance

7 claims, a discussion will only go so far to resolve their

8 dispute.

9          Kaneb submits that it is that scenario that would be

10 chaotic and counterproductive.  In fact, it is almost certainly

11 in the debtors and the estates best interest not to pass up the

12 opportunity to have all parties at the table.  And so, we bring

13 these two lift stay motions.

14          It's important to note that there are two facets of

15 these motions.  One, we're seeking to lift the stay to pursue

16 insurance coverage with regard to two potential -- two

17 environmental issues.  One with regard to the Otis Pipe Line

18 and one with regard to another site, what's referred to as the

19 Macon, Georgia site.

20          Again, Mr. Gilbert is going to address these

21 insurance coverage issues.

22          Secondly, we're seeking to lift the stay to pursue

23 the appeal in the Texas state court litigation with regard to

24 the Otis Pipe Line only.  Again, I will discuss that after Mr.

25 Gilbert is done with the insurance coverage issues.

1    These are independent grounds and it's not necessary

2  to grant one if you grant the other.  Before I turn the podium

3  over to Mr. Gilbert, let me give some background with regard to

4  the Otis Pipe Line and the Macon, Georgia sites.

5    What is referred to as the Otis Pipe Line is a fuel

6  pipeline -- the Otis Pipe Line issue refers to a fuel pipeline

7  release that allegedly occurred in the 1970s on the

8  Massachusetts Military Reservation in Sandwich, Massachusetts,

9  in Cape Cod.   What's referred to as the Macon, Georgia site is

10  an issue with regard to some alleged jet fuel releases from the

11  pipeline in Macon, Georgia, serving Warner Robbins Air Force

12  Base.

13    Again, as I said, in 1993, there was a merger

14  agreement which is attached as Exhibit K-7, whereby, several

15  important things happened.  Kaneb acquired certain GEC

16  subsidiaries, GEC pursuant to that agreement represented and

17  warranted that the subsidiaries had no environmental

18  liabilities and were in compliance with all environmental laws.

19  GEC agreed to indemnify Kaneb to the extent of a breach of

20  those warranties.  And, very importantly, but operation of law

21  Kaneb became a co-insured with respect to the insurance

22  policies covering, among other things, environmental

23  liabilities.

24    So, in both motions, Kaneb seeks to lift the stay in

25  order to pursue its direct rights against the insurance

1 carriers.

2          Mr. Gilbert is going to address this in a moment, and

3 then I will address the appeal issue which is simply, with

4 regard to the Otis Pipe Line, that we're seeking to lift the

5 stay to pursue the appeal of the Texas state court action which

6 has been stayed since April of 2001, the filing of this case.

7 So, I'll now turn it over Mr. Bob Gilbert.

8          THE COURT:  All right.  Well, tell me about Macon

9 first, because that claim has already been disallowed or

10 stricken, so I'm not sure why at this point I'm granting relief

11 from stay as to a claim that doesn't exist any more.

12          MR. PLATT:  It's with regard to the insurance

13 carriers.

14          THE COURT:  Okay, but there's no claim that can be

15 pursued against the debtor, so you want to go against the

16 insurance, recognizing that you can never go against the debtor

17 for anything more than the insurance?

18          MR. PLATT:   We have a direct claim against the

19 insurance carriers.

20          THE COURT:  The insurance policy, okay.

21          MR. PLATT:  That's correct.

22          THE COURT:  All right.

23          MR. GILBERT:  Good morning, Your Honor, Bob Gilbert,

24 I'll be addressing the insurance issues on behalf of Kaneb.

25          As Mr. Platt said, this motion is seeking a couple of

1  things.  What I am addressing is the ability for Kaneb to bring

2  its direct claims against the insurers that we have identified

3  in the exhibits to the policy, or the exhibits to the motion.

4        What we are attempting to do is recover our insurance

5  rights, our property rights under these policies that Kaneb

6  obtained pursuant to its merger when it brought in that former

7  Grace subsidiary.  That former Grace subsidiary had its own

8  separate insurance rights as a co-insured under these policies.

9  We're seeking standalone relief.  So, regardless of what Your

10 Honor ultimately rules with respect to the ability of Kabeb to

11 pursue its appeal rights in Texas, that's independent of the

12 relief that we're seeking here, with respect to the insurance

13 rights.

14       And this motion does not seek to create a right or a

15 remedy that the debtors or the insurers appear to deny exists.

16 There doesn't seem to be any dispute that there are independent

17 insurance rights that Kaneb has in these policies, so what

18 we're pursuing are our own property rights, not property of the

19 estate.  And that's an important point too, because all of

20 these policies, for the relevant provisions under which Kaneb

21 proposes to seek coverage, do not have aggregate limits, so

22 they only pay out on a per claim basis.   The New Star claim or

23 the Kaneb claim for Otis will not diminish any of the existing

24 rights that the debtors would have in these same policies, nor

25 would the Macon claim reduce any rights.

1        THE COURT:  Well, I understood the debtor to say that

2   there was no policy with respect to Macon, but I guess that's a

3   different issue.

4        MR. GILBERT:  If there is no policy with respect to

5   Macon, then I am quite confident the insurers will tell us

6   there is none.  We certainly believe that that is not the case.

7        THE COURT:  Well, shouldn't you find that out before

8   I grant relief from stay to pursue it?

9        MR. GILBERT:  Well, we do believe -- I don't know how

10  to respond to the statement that there's no coverage, or no

11  policy with respect to Macon, because, in fact, these policies

12  exist and our view is that they are -- we can't see any reason

13  why they would not be broad enough to provide coverage for each

14  of the sites at which there's potentially liability.

15       THE COURT:  Well, okay.  But I'm not inclined to

16  grant relief from stay as to a policy that may or may not

17  exist, that drags the debtor and the committee and this entire

18  estate into potential coverage litigation as to something that

19  doesn't exist.  That makes no sense to me.

20       MR. GILBERT:  The policies do exist, Your Honor.   We

21  have defined the policies that we are seeking coverage under.

22  We don't know what the basis would be for any contention that

23  the policies to not exist.  We've attached them.  And, the

24  policies apply broadly to cover property damage liability that

25  is incurred by one of the insureds.  Its' on a worldwide basis.

1           If they are aware of some exclusion that we haven't

2   seen that says that Macon is not covered, we would certainly be

3   interested to see that.  But we have come forward and shown you

4   the policies and the language, the coverage grant, that

5   probably applies.  So, I don't think that -- with respect, I

6   don't think that's anything that we could address any more

7   fully.  There may be disputes on whether, ultimately, we are

8   entitled because of some exclusion or some term or condition

9   from getting coverage, but that's something not to be decided

10  in bankruptcy, that's the burden that we bear and the insurers

11  bear in separate coverage litigation.

12          The debtors appear to be requesting not that we don't

13  be allowed to ever pursue the insurers, but that just that it

14  be delayed to some indefinite time in the future, when the plan

15  is confirmed, it becomes presumably final on appeal, which

16  could be years and years.

17          As Mr. Platt pointed out, unfortunately, we've got

18  something that's pressing us in the face right now, which is a

19  $71 million claim from the Department of Justice, and an effort

20  by the Department of Justice to begin engaging immediately in

21  mediation efforts.

22          So, we face present harm.  Your Honor is well aware

23  of the importance of having all parties at the table in a

24  mediation and also similarly aware of the difficulty of doing

25  that where there is no pressing obligation for the insurers to

1  appear or to provide any sort of input.

2          THE COURT:  And that's both as to Otis and as to

3  Macon?

4          MR. GILBERT:  As to Otis, the mediation is a present

5  concern, as to Macon, the liability has largely been incurred,

6  it is continuing to grow, but $6 million has been incurred.

7  There's not a mediation that's pending in that, Your Honor, but

8  we don't see any compelling -- as I will get into, a bit later

9  in my argument, there's no compelling reason not to join both

10  of these sites together.

11          THE COURT:  Well, I'm not sure and I think for

12  purposes for this argument, it might be helpful if you would

13  distinguish the facts for me, because as I understand the

14  responses, there may be significant differences.

15          MR. GILBERT:  All right.  I will do that, Your Honor.

16  To put this in perspective, we are seeking approximately $71

17  million in coverage with respect to the Otis site and

18  approximately $7 million, $6 to $7 million in coverage, with

19  that amount likely to grow at the Macon site.  So, we're

20  seeking approximately $80 million.

21          We have parsed through the settlement agreements upon

22  which debtor claims create an indemnity obligation on their

23  part and our analysis and I'm sure that they will correct me if

24  I'm incorrect, is that there is only one policy with a $5

25  million limit.  An umbrella policy, not even a primary policy

                    **J&J COURT TRANSCRIBERS, INC.**

1  that's even potentially implicated by the coverage that we're

2  seeking under these policies.  I'll go into detail on that, but

3  there's a $5 million nut, potentially, that is weighing down on

4  debtor, an $80 million issue that's weighing down, currently,

5  on the debtor, so that goes to what my colleague will discuss

6  at the end of this, which is the balance of harms that each

7  side faces.

8          And so, what the issue will boil down to is, is there

9  a compelling reason to force Kaneb to wait to pursue coverage

10 until some indefinite point in the future and we think the

11 answer to that would be no.

12         The principle argument that's been raised is, if this

13 goes forward now, debtors will be thrust into a highly

14 disruptive and distracting coverage litigation.  I don't think

15 that's true and I think I can demonstrate why that is.

16         As an initial matter, I've been doing coverage

17 litigation for 22 years and it is unusual, or unprecedented for

18 a co-insured to have to join all other insureds under the

19 policy who have nothing to do with the coverage issues that are

20 being litigated, who have no exposure, whose rights are not

21 going to be diminished because of the absence of aggregate

22 limits.  And so as a general principle, there's no reason, and

23 none has bee cited, why a co-insured, such as the debtors,

24 would be a necessary or even a useful party, or an

25 indispensable party to the coverage litigation.  So, it only

1  boils down to whether the indemnities that have been alleged

2  are going to force debtor to do something that would be

3  "disruptive or justify a lengthy delay" in these non-debtors

4  pursuing their property rights.

5          Our attention has been called to nine different

6  settlement agreements that have been provided to us and upon

7  which debtors are relying and claiming that there's an

8  indemnity obligation.  Three of those involve Continental

9  Casualty, which is the primary carrier from 1972 through 1985.

10 Four of those involve a Uniguard policy that was in the early

11 1970s, it's a single policy under which we're -- it involves

12 many policies, but we're seeking coverage only with respect to

13 one of those policies.  And there were four separate insurance

14 settlement agreements that potentially affect that.  And then

15 there are two agreements that were -- I'm sorry, there were two

16 Continental agreements and then three One Beacon agreements.

17 I'll briefly go through each of those on the relevant terms to

18 demonstrate why they don't impact what's at issue here.

19         The Seaton agreements can be disregarded out of hand.

20 The first agreement was in August 6th, 1992, and it provided a

21 release and an indemnity solely with respect to product

22 liability claims.  There is no product liability issue involved

23 in what Kaneb is seeking from the insurers.  So, any indemnity

24 in that agreement would be irrelevant.

25         Similarly, there was a May 15th, 1992 settlement

1 agreement.  It involves asbestos and product liability claims.

2 Again, nothing in the Kaneb suit involves either of those

3 issues.  The third agreement was on July 11th, 1992.  It was an

4 environmental agreement, but it only involves the Hatco site in

5 New Jersey.  The Hatco site is not at issue, Kaneb has no

6 involvement and never has had any involvement to my knowledge

7 with anything involving Hatco.

8         And, then finally, on March 5th, 1997, there is an

9 agreement which purported to release all environmental claims

10 that Grace had and that provided nothing more.  There's no

11 indemnity obligation in that agreement.

12         And so, the concern the debtors express with respect

13 to the Uniguard settlements is non-existent.  There is no

14 indemnity in the only agreement that pertains to the subject

15 matter for which Kaneb is seeking coverage.

16         There are two separate Continental agreements that

17 were entered into and, similarly, for reasons I'll explain,

18 those are of no moment here.  On May 30th, 1997, there was an

19 agreement that released and created an indemnity with respect

20 to number one, the Hatco site which is irrelevant here and,

21 number two, claims under a provision of the Continental

22 policies that provided what are called gradual pollution

23 limits.

24         Now, we didn't attach the gradual pollution limits to

25 the policy excerpts and the reason is, we have no intent at

1  this time to seek coverage under the gradual pollution limits.

2  Those are sub-limits that appear to provide X amount of

3  coverage, subject to an aggregate limit, we understand that

4  payments have been with respect to those gradual pollution

5  limits, that there has been a complete release and in theory

6  and exhaustion of those, we have no ability to independently

7  verify those, but we are willing to stipulate on the record

8  that our claims have never involved, and at this time we will

9  agree that the stay will not lift with respect to any claim

10 involving gradual pollution limits.

11          Instead, the only thing that Kaneb is seeking

12 permission to do at this time is to pursue coverage under the

13 Continental primary policies with respect to the general

14 liability limits for property damage, which are not subject to

15 aggregate limits and which are subject to providing coverage

16 for sudden and accidental releases of contamination.

17          So, we can -- and we will file a stipulation to that

18 affect, or the order could so reflect, gradual pollution limits

19 are not something that we have any interest in.  There's no

20 other indemnity obligation under that agreement.  Hatco,

21 gradual pollution limits, but nothing else.

22          And then the second agreement is December 14th, 2004

23 and that releases all insurance coverage for environmental

24 claims against W.R. Grace and its affiliates, but only "to the

25 extent that W.R. Grace has the legal capacity to bind such

**J&J COURT TRANSCRIBERS, INC.**

1  entities".  That's right out of the agreement.

2         In 2004, that was 11 years after the merger

3  transaction, W.R. Grace no longer had any ability to bind

4  Support Terminal Services and, therefore, on its face, that

5  agreement does not apply, the release does not apply and the

6  indemnity does not apply to any claim that Kaneb, which could

7  not be bound by Grace, might have under these policies.

8         And so, that finally brings us to the One Beacon

9  Insurance policy.  One Beacon is the new name for American

10 Employers' Insurance Company.  They issued one policy that is

11 on the list of policies that we're seeking to get coverage

12 under.  That policy was very early in the 1970s, it's an

13 umbrella policy, it has $5 million in limits and there is an

14 agreement dated October 7th, 1998, pursuant to which the

15 debtors agreed to defend and indemnity One Beacon with respect

16 to any entities claim under that particular policy was well as

17 several other policies under which we are not seeking

18 permission to pursue coverage at this time.

19        But with respect to that one policy, it appears to us

20 that yes, there would be an indemnity obligation.  Debtors may

21 have their own defenses to it, but we're not going to stand

22 here and argue that there does not appear to be one, that there

23 does appear to be an indemnity obligation under that.  So, the

24 issue really boils down to, could one indemnity obligation,

25 under an umbrella policy, not even the principle policies that

1 we would be pursuing in the first instance for defense costs,

2 but under the umbrella policy, for $5 should that tail allow

3 the -- be allowed to wag the entire dog of the claim that we

4 want to bring against 58 insurance policies, issued by 19

5 different insurers, for close to $80 million in coverage, a the

6 two sites.

7      So, that, I think, really puts it into focus in

8 weighing what the balance of harms would be.  We think the

9 balance of harms plainly favors Kaneb in this case.  The DOJ

10 mediation of the massive pipe -- of the Otis Pipe Line matter,

11 would presumably occur this summer, that appears to be what the

12 DOJ is pressing for, and as experience dictates, meaningful

13 success at the mediation is impossible without meaningful

14 participation by our insurers.  Meaningful participation by

15 insurers never happens if they don't have any obligation to

16 participate at that point.  It would simply be unfeasible to

17 expect that they would show up and we certainly would have no

18 means to push them or demand that they show up in this case.

19 So, we think that it's essential that we be allowed to formally

20 pursue our insurance rights against those insurers.

21      There is no dispute that Kaneb has its own separate

22 rights in these policies, nor is there any dispute that

23 recovery by Kaneb would diminish any of the debtors' rights in

24 those policies, thus, this relief doesn't implicate any

25 property of the bankrupt estate.  And it's, for that reason, we

1  think that it's a very tenuous proposition that we should be

2  barred in any instance from pursuing these policies.

3        And, not even the debtors dispute Kaneb's legal

4  entitlement to pursue these insurance claims.  So, the only

5  question is whether debtor will suffer any serious distraction

6  by reason of that one indemnity obligation that they would have

7  under the One Beacon or American Employers' policy.

8        They complain about the distraction being dragged

9  into these cases, but I think that concern is widely overblown.

10  Putting any putative indemnity concern to one side for the

11  moment, debtor is not a necessary or indispensable party.

12  There's literally no reason other than the indemnity for

13  debtors to be involved.  Looking at the indemnity, it's only

14  one policy out of approximately 58.

15        THE COURT:  Yes, you've said that.  Do you want to

16  tell me something new?

17        MR. GILBERT:  Yes, okay.  I do want to get to the

18  issue of what their participation would look like.  Their

19  involvement would be minuscule, perhaps, reimbursing the costs

20  of one of the 19 carriers who involve the defense costs -- who

21  is involved or they could step in and take over the defense,

22  however, the indemnity provides that the insurer has the right

23  to dictate what positions would be taken with respect to

24  insurance policy interpretation issues.

25        Finally, this is a very specialized form of

68

1 litigation and it would be very unlikely that the lawyers

2 involved in representing W.R. Grace in the bankruptcy

3 proceedings, would be involved with respect to this lawsuit, it

4 would be a different set of attorneys.  And, finally, it would

5 be an immaterial exposure to the debtors, $5 million which in

6 the context of this multibillion dollar bankruptcy, we just

7 don't think that that would create a financial distraction or

8 chaos.

9       So, for that reason, particularly with respect to the

10 Otis Pipe Line site, we think it's essential that we proceed

11 immediately.

12       With respect to the Macon site, the issue is very

13 simple.  The exposure to date is approximately $6 million, and

14 since we are stipulating not to pursue the gradual pollution

15 limits at this time, under the Continental policies, the risk

16 of debtor getting entangled in this litigation, in any

17 meaningful way, is very low because the policies available

18 under the Continental -- the limits available under the

19 Continental policies are more than double the exposure that we

20 have. So, whether we would even reach the One Beacon policies,

21 the One Beacon policy, is not at all clear.  So, we think that

22 there is de minimis risk of debtor being entangled in any

23 meaningful way.

24       So, for that reason, we would request that the stay

25 be lifted with respect to the insurance claims.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  I'm going to defer, Mr. Platt, the

2     rest of your recitation until I hear the ZAI issues, since

3     there are people who have to catch planes and I see they are

4     still here.  So, I'm going to just defer to go back to that for

5     a minute.  Mr. Westbrook.

6          MR. WESTBROOK:  Yes, Your Honor.  We have solved

7     Anderson's problem for today by agreeing to insert the word

8     class in two different places in the proposed order.

9          The first, Your Honor, is at the top of Page 4, in

10    the second line after the word ZAI, just put the word class in

11    there, so it reads U.S. ZAI class claimants.

12         THE COURT:  All right.

13         MR. WESTBROOK:  And then the other place, Your Honor,

14    is on the final page, Page 5, first line, the Court also finds

15    that the -- in front of the word settlement, put the word class

16    settlement.

17         THE COURT:  Okay.  That's a bit redundant.  That's,

18    obviously, what I'm approving but fine.  Mr. Freedman, does the

19    debtor have any objection to those?

20         MR. FREEDMAN:  No objections, Your Honor.

21         THE COURT:  Mr. Lockwood, does the committee have any

22    objection?

23         MR. LOCKWOOD:  No, Your Honor.

24         THE COURT:  Anybody have any objection?

25                   (No audible response)

1              THE COURT:  Okay.  Does anybody have any objection to

2  the modification I was making to footnote one?

3              MR. WESTBROOK:  Not from the class, Your Honor.

4              THE COURT:  Okay.  Then I am -- I have signed the

5  order with those modifications.

6              MR. WESTBROOK:  Thank you, Your Honor.

7              UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

8              THE COURT:  All right, thank you.  Mr. Platt, I'm

9  back on the record on items seven and eight again, thank you.

10             MR. PLATT:  Thank you, Your Honor, and before I get

11 to the appeal, just one thing that I will mention is that Mr.

12 Gilbert did bring copies of the settlement agreements that have

13 been referenced and that were brought to our attention by the

14 debtor.  They were produced to us pursuant to a protective

15 agreement, not an actual protective order, and so we are

16 prepared to present them to you if it would be helpful for you

17 to see -- if this argument alone was not enough to explain why

18 there really is only one policy that is at issue indemnity

19 wise.

20             THE COURT:  Okay.  Well, I think I need to find out

21 whether that's disputed before I need to see it.

22             MR. PLATT: Sure, sure.

23             THE COURT:  Okay.

24             MR. PLATT:  I just thought I'd bring that to your

25 attention.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.

2           MR. PLATT:  As to the appeal, Your Honor, I will be

3 brief, because the papers explain the history of the appeal.

4           In 1997, GEC filed suit against Kaneb seeking

5 declaratory relief that Kaneb, not GEC, was responsible for

6 alleged liabilities associated with the Otis Pipe Line.

7           At issue were whether the Otis Pipe Line was owned by

8 GEC's subsidiary, acquired by Kaneb, pursuant to the merger

9 agreement; GEC's indemnity obligation for inaccurate

10 representations and warranties, and damages for breach of the

11 merger agreement.

12           In August of 2000, a jury trial took place and the

13 state court judgment was entered declaring that the liability

14 for the Otis Pipe Line release had transferred to Kaneb, that

15 GEC did not owe indemnity to Kaneb for any liabilities related

16 to the Otis Pipe Line and that neither party was entitled to an

17 award on its affirmative defense claims.

18           In October of 2000, both sides timely filed notices

19 of appeal, however, no briefing has taken place in that appeal

20 as a result of the automatic stay that has been in place since

21 April of 2001.

22           So, the question is, should the stay lift for that

23 appeal to proceed.  I think there are three things that you

24 need to look at.  One, prejudice to the debtor; two, the

25 balance of harms; and three, the likelihood of success.

1        The debtor is essentially -- as far as the prejudice

2   to the debtor, the debtor is essentially claiming that it would

3   be an annoyance to have to pursue this appeal along with us and

4   nothing more than annoyance, they would have to, not --

5   probably not the bankruptcy counsel, but other counsel would

6   have to file papers in the appeal.  So just as with the

7   insurance coverage issue, if we are not permitted to proceed,

8   this could potentially affect the impact of the Department of

9   Justice dispute.  And that's why the balance of harm here

10  significantly is on the side of Kaneb.

11       Kaneb would be subject to issue preclusion and faced

12  with tremendous potential liabilities here, without any

13  recourse.  I think that you will need to look no further than

14  the In re Wilson case, out of the Third Circuit.  In In re

15  Wilson, a litigant who lost a malicious prosecution lawsuit in

16  the trial court sought to lift the stay to pursue that appeal.

17  The bankruptcy court denied the motion and the district court

18  affirmed the bankruptcy court's denial and the Third Circuit

19  reversed, holding a couple important points.

20       On the issue of preclusion point, the Third Circuit

21  held that if the bankruptcy continued without stay relief on

22  behalf of the malicious prosecution litigant, the issue

23  preclusion would prevent the potential creditor from

24  challenging the affect of the state court judgment in the

25  bankruptcy.

1          The court also discussed the Rooker-Feldman doctrine,

2   which, of course, prohibits lower federal courts from sitting

3   as effective courts of appeal for state court judgments.  Since

4   the litigant in that case could not re-litigate the adverse

5   trial court judgment in bankruptcy court, she would have no

6   opportunity to challenge the adverse judgment before the

7   bankruptcy proceedings were complete.

8          The same situation is here, Your Honor.  If this

9   bankruptcy continues without any relief from stay and, again,

10   that could happen indefinitely, Kaneb will be faced with not

11   being able to assert claims against GEC, even in a defensive

12   posture.

13          Likelihood of success.  We have to keep in mind no

14   briefs have been filed in this appeal, so it is, perhaps,

15   premature to discuss the merits of the appeal. I will say, of

16   course, that Kaneb believes very strongly that it has very

17   strong points on appeal, but the real success here would be

18   certainty.  Kaneb would like the appeal to conclude, but the

19   debtor here wants indefinite uncertainty.

20          THE COURT:  Well, I think the debtor is convinced

21   that it has certainty.  It has a judgment, what more does it

22   need?

23          MR. PLATT:  Well, it asserts that the discharge would

24   not affect our ability to assert defensive -- to assert claims

25   in a defensive posture, and that's essentially what we want

1  stay relief from an order to do.

2          We recognize that from an affirmative standpoint,

3  we're in a difficult position, but from a defensive posture, as

4  it relates to the DOJ issue, there is a potential for issue

5  preclusion that if the stay is allowed to continue, we will not

6  be able to challenge.  And so --

7          THE COURT:  Wait, I'm sorry, say that again.

8          MR. PLATT:  Well, the debtors' position is that the

9  discharge injunction will not affect our rights to assert a

10 defensive position.  Recoupment.

11         THE COURT:  Right.

12         MR. PLATT:  Assert recoupment rights.

13         THE COURT:  Okay.

14         MR. PLATT:  And --

15         THE COURT:  Recoupment rights as to what?

16         MR. PLATT:  Recoupment rights as a basis for the

17 appeal.

18         THE COURT:  They -- recoupment rights for what?

19         MR. PLATT:  Recoupment rights -- well --

20         THE COURT:  For the Otis cleanup?

21         MR. PLATT:  Yes.

22         THE COURT:  Even though -- you've suffered an adverse

23 judgment.

24         MR. PLATT:  We have suffered an adverse judgment and

25 we'd like --

1          THE COURT:  Right.  That says that you don't have any

2   rights against the debtor.

3          MR. PLATT:  If the stay is lifted, we will have an

4   opportunity to pursue that appeal, though, Your Honor.

5          THE COURT:  But you haven't filed a proof of claim.

6   So, no matter how you get it, how you get to it, you have no

7   rights against the debtor, even affirmatively, or defensively.

8          MR. PLATT:  Well, Your Honor, we do have -- the

9   merger, pursuant to the merger agreement, the indemnity rights

10  that -- we do have mutual indemnity rights between Kaneb and

11  the debtor.

12         THE COURT:  Wasn't here a time limit with respect to

13  those rights?

14         MR. PLATT:  No, Your Honor.  Well, that was stayed

15  because of the automatic stay.

16         THE COURT:  Indemnity rights are stayed?

17         MR. PLATT:  Yes, Your Honor.

18         THE COURT:  Okay.  I thought -- maybe I misread the

19  information.  I thought the merger agreement was in 1993, and

20  the indemnity rights lasted for five years, the bankruptcy was

21  filed in 2001, so the indemnity rights would have expired in

22  1998, therefore, they were gone.  Section 108 doesn't reinstate

23  rights that have already expired.  There are no indemnity

24  rights.

25         MR. PLATT:  But, Your Honor -- but litigation was

76

1  pending.

2            THE COURT:  So?

3            MR. PLATT:  So that stays the rights.

4            THE COURT:  What litigation was pending, the appeal?

5            MR. PLATT:  The appeal.

6            THE COURT:  Because the adverse judgment terminated

7  the rights, because you lost.  So, unless the judgment is

8  reinstated --

9            MR. PLATT:  Right, but we perfected our appeal, Your

10  Honor.

11            THE COURT:  You perfected the appeal, prepetition, by

12  filing the appeal, which is stayed.

13            MR. PLATT:  Correct.  That's correct.

14            THE COURT:   And so the debtor can deal with whatever

15  rights the debtor thinks you have in the plan.  You haven't

16  filed a proof of claim.  So, why on earth should the appeal go

17  forward when you haven't filed a proof of claim, and the plan

18  can deal with the issue, whatever the contingent rights may be,

19  because they've been lost because your client hasn't filed a

20  proof of claim.  What benefit would there possibly be to

21  allowing an appeal to go forward?

22            MR. PLATT:  Well, Your Honor, the appeal -- the

23  reason the appeal should be able to go forward and, again,

24  unlike the insurance claims, we do not seek, necessarily seek

25  the immediate lifting of that stay, we would be willing to wait

1  until, perhaps, October of this year, which is past the time

2  that, I believe the current plan hearing is set, but -- and so,

3  we're willing to give the debtors some relief on that issue but

4  the reason it would be -- it's necessary from Kaneb's

5  perspective for the appeal to go forward, is that if we are not

6  allowed to assert our position, again, from a defensive

7  posture, then we are potentially subjected to issue preclusion

8  that the DOJ could assert against us.

9       THE COURT:  But -- even if you're successful on

10  appeal, as against the debtor, you haven't filed a proof of

11  claim and the bar date is gone.  So, even if you win on appeal,

12  and can retry the case, and get a judgment, you can't collect.

13  So, there's absolutely no point in pursuing an appeal that

14  would allow you, even if you win, to go back, retry the case,

15  get a judgment and not be able to collect it against the

16  debtor.  That is a waste of all kinds of resources, not just

17  the debtors, but judicial, at all levels.

18       MR. PLATT:  But --

19       MR. GILBERT:  Your Honor, if I may, there would be

20  one insurance aspect that would be --

21       THE COURT:  I'm not talking about the insurance, I'm

22  talking about the rights against the debtor, which is what Mr.

23  Platt is arguing.  You've told me about the insurance.

24       MR. GILBERT:  But there would be another aspect of

25  the insurance.  To the extent we obtain a judgment against the

1  debtors in the Texas appeal, at that point, precedent which we

2  have cited in our papers, would permit us to pursue the debtor

3  nominally, in order to procure any insurance rights that they

4  would have with respect to that obligation.

5         THE COURT:  Yes, I understand as to insurance, that

6  there may be some right, but there's certainly, absolutely no

7  need to make the debtor defend an appeal at this point in time

8  to allow some other third party to pursue insurance rights.

9  There's absolutely no need to derail a potential plan process

10 for that, especially when this case has been going on for,

11 tomorrow, the end of eight years and Kaneb hasn't seen fit to

12 come forward this long, to pursue that issue.  And we're now,

13 hopefully, near the end of this process.  There's simply no

14 need for this.

15        MR. PLATT:  And, Your Honor, just to address the non-

16 filing of a proof of claim, that simply meant that Kaneb did

17 not assert a right to payment.

18        THE COURT:  Yes.

19        MR. PLATT:  That did not affect our rights with

20 regard to say, declaratory judgment relief that's been asserted

21 against us and our rights to seek to overturn that.

22        THE COURT:  The declaratory judgment relief asserted

23 by the debtor against Kaneb.  I'm sorry, declaratory judgment

24 --

25        MR. PLATT:  Declaratory judgment relief that's been

1  asserted against Kaneb.

2           THE COURT:  By?

3           MR. PLATT:  By the debtor.

4           THE COURT:  Okay, but that's -- regardless, I've just

5  stated that issue.  Regardless of who started the lawsuit, the

6  result of the lawsuit was that Kaneb lost.  Even if Kaneb wins

7  on appeal, and the process starts all over again, Kaneb has not

8  filed a proof of claim.  This bankruptcy and the discharge are

9  forever going to resolve that issue.  The debtor is never going

10 to be liable for that claim, regardless, because it was a

11 prepetition claim, regardless of how that lawsuit ends up.

12          Now, as to the debtors' insurers, the need to name

13 the debtor nominally to pursue insurance, that may be a horse

14 of a different color at some point, but there is certainly no

15 need to start that process now.  This lawsuit has been pending,

16 the appeal has been pending since 2000, this is 2009.  I mean,

17 there is no reason why, that this Court can see, that there's

18 any urgency for taking a look at that issue now.

19          MR. PLATT:  And, Your Honor, I hear you, and, again,

20 our argument with regard to the appeal is, the debtors'

21 position is that we should wait indefinitely to pursue our

22 rights with regard to the declaratory judgment relief, and we

23 are seeking some certainty at some point in time, which at this

24 point, we're unable to get the way the current plan is

25 structured.

**J&J COURT TRANSCRIBERS, INC.**

1          So, and with that, Your Honor, I will --

2          THE COURT:  That one I didn't follow, Mr. Platt,

3  maybe I didn't -- maybe I'm not familiar with the treatment

4  under the plan, I'm sorry.

5          MR. PLATT:  Well, in the sense -- I'm sorry.  In the

6  sense that if this -- the automatic stay could go on for years,

7  to the extent that the plan is confirmed and yet appealed.

8          THE COURT:  Oh, Mr. Platt, we're going to resolve the

9  plan issues, to get to final confirmation, after all this time.

10  Hope springs eternal.

11          MR. PLATT:  Well, I'll take that for what it is, Your

12  Honor.

13          THE COURT:  Okay.

14          MR. PLATT:  So, just to conclude and also to

15  crystalize the distinction between the insurance issues, again,

16  and the appellate issues, we would ask you to look broadly at

17  the balance of harm.  Again, Kaneb is being put in a position

18  of $70 to $75 million, perhaps, $80 million, of exposure

19  immediately, and what the debtor is likely to argue is that

20  they should not have to be bothered with the annoyance of any

21  of, even the insurance litigation, even though that will not be

22  a direct litigation against the debtor.

23          We are seeking the immediate lifting of the stay to

24  pursue the insurance coverage.  We're willing to wait some time

25  with regard to the appellate issues.  We would prefer not to

1  wait for some indefinite period of time with regard to the

2  appellate issues.

3          And, again, as I stated, depending on what the debtor

4  and the insurers get up and say, we do have the settlement

5  agreements that have been referred to.

6          THE COURT:  All right.  Thank you.

7          MR. PLATT:  Thank you, Your Honor.

8          THE COURT:  Ms. Baer.

9          MS. BAER:  Your Honor, with regard to the Texas

10  appeal, I don't think there's really very much I need to say in

11  light of what you already have said.  Just a couple points

12  there.

13          The Texas appeal, the problem is, Kaneb lost.  The

14  problem is, Kaneb lost and the EPA has done the cleanup and

15  they want to get reimbursement.  And those are just simply the

16  facts of the case.  Kaneb cannot assert an affirmative claim

17  against the debtor because they didn't file a claim by the bar

18  date.  All Kaneb can do is really defend themselves if the

19  appeal ultimately goes forward, nut, Your Honor, it makes

20  absolutely no sense as you've indicated for that appeal to go

21  forward now and there would be a lot of prejudice to the

22  debtor.

23          We are, of course, in the posture of being in the

24  throes of confirmation discovery and litigation.  Over 50

25  affirmative written discovery demands have been made of the

1  plan proponents, that doesn't even count the ones the plan

2  proponents have served, or the ones that third parties have

3  served on each other.

4       Ninety witnesses have been designated as potential

5  witnesses for the confirmation hearing and we hope that won't

6  ultimately be the case, but we are in the throes of this and

7  this would be a tremendous distraction, frankly, Your Honor.

8       The assistant general counsel of Grace in charge of

9  litigation is in charge of this litigation.  He also happens,

10 as his number one job, to be to get this company out of

11 bankruptcy.  He supervises all the Chapter 11.  The

12 environmental lawyer at Grace who is involved in Kaneb today,

13 was not at Grace when this litigation took place, nine and ten

14 years ago.

15      Your Honor, under those circumstances, there's

16 extreme prejudice and the balance of harms here, Your Honor,

17 there's no question. Kaneb has been in this position for a very

18 long time, they didn't file a claim.  They do have to deal with

19 the DOJ, and they are currently responsible.  And that is

20 simply a fact of the case.

21      Your Honor, the DOJ has contacted all parties about a

22 mediation.  We have not yet responded but we have indicated to

23 the DOJ that Kaneb seeks to point the finger at Grace, Samson

24 Hydrocarbons, who is another party involved here, seeks to

25 point the finger at Grace and the insurers, which I'll get to

1  in a moment, seek to point the finger at Grace.

2          If a mediation does go forward, Grace will be forced

3  to participate.  We don't have a choice.  We're not a

4  potentially responsible party, we're not a party to any of the

5  current proceedings over that but everybody is pointing their

6  finger at Grace, which is also the case when we get to the

7  insurance issues.

8          Under those circumstances, Your Honor, there's no

9  question that the prejudice far outweighs -- the harm to Grace

10  far outweighs Kaneb's prejudice.

11          And, Your Honor, the likelihood of success on the

12  merits here for Kaneb is not good.  This was a jury trial, Your

13  Honor, and it was a jury verdict and appellate courts are very

14  loathe to overturn jury verdicts.

15          In addition to that, there were motions for

16  reconsideration filed by Kaneb, there were motions to alter and

17  amend filed by Kaneb and, essentially, ultimately, the judgment

18  was entered, finding that Kaneb is responsible for these

19  environmental liabilities.

20          Under these circumstances, Your Honor, there really

21  is no grounds for lifting the stay so that the Texas appeal

22  could go forward.

23          I now want to turn to the insurance issues and at

24  least clear up a little bit of confusion.  Your Honor, the

25  Macon, Georgia site and the Otis Pipe Line site are both part

1  of the same merger transaction.  And in that respect the

2  insurance coverage is identical.

3            THE COURT:  They're part of the same what, I'm sorry?

4            MS. BAER:  They're part of the same transaction.  The

5  merger that took place in the 90s included both sites, and the

6  responsibility for both sites and, therefore, all the insurance

7  coverage that related to Otis Pipe Line also relates to the

8  Macon site.

9            Your Honor, part of Kaneb's papers was an affidavit

10 from Ellen Presby, which is actually very interesting and very

11 enlightening, because in that affidavit she laid out the

12 insurance coverage that Kaneb seeks to tap into, in a way that

13 is much more logical than just listing various carriers.  She

14 laid it out in terms of the primary policies and the excess

15 policies and the dates that are covered here.

16            Your Honor, the primary policies that are applicable

17 here, are all CNA policies.  CNA has made it perfectly clear

18 that they believe that they have settled all liability with

19 respect to these policies and that they have an indemnity from

20 Grace and that Grace will be responsible for indemnifying them

21 in the event that there are, in fact, any obligations owing to

22 Kaneb.  We don't agree, Your Honor, we don't agree that we have

23 that kind of indemnity.  We agree that the -- we believe that

24 the indemnity is more limited.

25            Frankly, I don't know how to react to Kaneb now

1  saying that they will stipulate that gradual pollution coverage

2  is not implicated.  I know that from CNA's perspective and they

3  are here and they are an objector and they are objecting to the

4  automatic stay being lifted, CNA is pointing the finger at

5  Grace, saying it's our responsibility, that we have an

6  indemnity and that there's no more coverage.  We do know that

7  there were settlements, we do know that there are settlements

8  for some coverage, we also do know that there is pending and

9  stayed in the New York state court system, major coverage

10  litigation with CNA that's implicated here.

11          And we also know that Your Honor has no desire to get

12  involved in coverage disputes.  And lifting the stay here is

13  going to come right back into your lap because there are going

14  to be coverage disputes, and there are going to be disputes

15  about the debtors' participation and the debtors'

16  responsibility and, again, this is a horrible time to get

17  involved in serious coverage litigation with CNA, which is what

18  lifting the stay would do.

19          Your Honor, if you look, then, forward to -- after

20  the primary policies, comes the excess policies and, Your

21  Honor, for the period of time here, when this spill occurred,

22  the American Employers' policy is the first excess layer policy

23  and that is, in fact, the one that's been settled, there is a

24  settlement agreement, and there is a full indemnity and Grace

25  does not dispute that.

1          The second layer is a Home Insurance policy which,

2    Your Honor, has also been settled.  And it's, in fact,

3    indicated that on the plan exhibit that lists the various

4    settlement agreements, it's also on there.  Home Insurance has

5    not been participating in this matter with respect to Kaneb,

6    but I'm certain they would have a lot to say about that, once

7    they realize that Kaneb wanted to come after them.

8          Your Honor, when you move down Ms. Presley's

9    affidavit, or Presby's affidavit, excuse me, you see again now

10   the insurance policies are listed by dates and by coverage

11   layers.  I am not an insurance lawyer, I don't desire to become

12   an insurance lawyer.  I understand that this is very

13   complicated to figure out which layer applies and how and you

14   have to exhaust the primary before you get to the next one.

15   And under those circumstances, Your Honor, Kaneb can say all

16   they want about these 19 different insurance carriers, but the

17   fact of the matter is, in the first instance this comes down to

18   litigation with CNA and One Beacon, over coverage because those

19   are the primary and first sources of insurance here and until

20   that's done, you don't even get to whether or not the other

21   layers would apply.

22         Your Honor, under these circumstances, I guarantee

23   you that lifting the stay means that you will hear end upon

24   end, on every omnibus hearing, all of the problems and all of

25   the issues and all of the complications that are involved with

1 the debtor, and CNA and the other carriers, implicating the

2 debtor and implicating indemnities and settlement agreements

3 and whether or not certain coverages apply.

4       THE COURT:  The litigation in Texas that Kaneb lost

5 is the same litigation that they're now trying to access

6 insurance coverage, saying that the debtor has an indemnity

7 when a jury verdict has told them that there is no indemnity?

8 Is it the same series of transactions?

9       MS. BAER:  Yes, Your Honor.

10      THE COURT:  Well, if there's no indemnity whether --

11 but Kaneb is saying there's a direct action against the

12 insurance companies even though there's no indemnity.

13      MS. BAER:  Right.

14      THE COURT:  So, the issue is that Kaneb -- and the

15 debtor is not contesting that through the merger Kaneb has

16 direct access to insurance coverage?

17      MS. BAER:  No, Your Honor.  We're not admitting that.

18 We have not taken a position on that.  Frankly, I think that,

19 in and of itself, is another complication as to whether or not

20 Kaneb has direct access and I know that CNA certainly is

21 challenging whether they have direct access.  I think there's a

22 serious question as to whether they have direct access and what

23 it would be and that, Your Honor, is coverage litigation.

24 That's what it's all about.  Whether they have direct access,

25 whether or not they are in an exception to the direct access,

1  whether or not the coverage is applied to what they're
2  claiming, all of these coverage issues would be implicated and,
3  no, the debtor has not taken a position, we do not agree that
4  they necessarily have direct action against these insurance
5  carriers.

6          You know, Your Honor, every time I represent a debtor
7  I get an insurance company saying exactly the same thing.  We
8  just want to name you nominally, you're not involved, we just
9  want to go after your carriers, and every single time it comes
10  back to the debtor.  That's exactly what we have here, Your
11  Honor, and under these circumstances, of all times, this would
12  be the worst time to lift the automatic stay, so that either
13  that litigation or the insurance coverage matters could go
14  forward.  Thank you.

15          THE COURT:  Ms. DeCristofaro.

16          MS. DeCRISTOFARO:  Good afternoon, Your Honor.  I
17  think Ms. Baer is quite right, we do think this is Grace's
18  problem.  I will start out by saying that as Your Honor has
19  probably gleaned from all of us over the years, there was a
20  tremendous amount of Grace insurance coverage prior to this
21  bankruptcy.

22          In particular, there were two cases involving
23  environmental property damage claims.  The claim that -- the
24  indemnity claim that we assert here arises from one of two
25  parallel litigations that were going on.  In one, there was a

1  particular site at issue, in which the insurers were third

2  partied in and the second was a global, it was deemed by the

3  judge, by Judge Martin in the Southern District, to be a global

4  environmental coverage litigation.  That litigation began in

5  1988 and Your Honor signed off on the final settlement

6  agreement in 2004.

7        That's how long and complicated the issues arising

8  from settlement took.  It took from 1988 to 2004.

9        I did want to point out to Your Honor, Page 4 of

10 Kaneb's papers.  Although they come now saying that they

11 require precedence because of this situation, their recitation

12 on Page 4 says, they were aware of these liabilities, for which

13 Your Honor signed off on a specific release for the Otis Pipe

14 Line site, from Grace to us, from the 90s, while the coverage

15 litigation was going on, before a settlement was reached.  And

16 Ms. Baer has pointed out and we agree, there is issues as to

17 whether or not they're entitled to coverage.

18       Certainly, one of the things that we're certainly

19 going to need Grace on is the corporate transactions.  It's not

20 clear to us by virtue of these corporate transactions that they

21 have any rights under those policies.  There's also issues,

22 since the coverage litigation seeking a declaration of the

23 rights with respect to these sites, was pending while they were

24 still a part of Grace, whether or not they are bound by this

25 settlement or not.  The earlier settlements.

1        Now, one thing that I found throughout this whole
2   recitation was the selectiveness and the misleading
3   presentation by Kaneb right now.  You have a party here who has
4   obviously waived certain of their rights and they're now trying
5   to resuscitate things.

6        What they -- they deliberately left out key parts of
7   the policy that affect the settlement and affect our claims
8   against Grace.  They're saying to you, oh, we're not claiming
9   against the gradual pollution limits, however, the policies
10  say, notwithstanding the other limits, this is the limit for
11  gradual pollution.  So, it's not there is an either or, and
12  they can waive gradual pollution, if the claims are property
13  damaging claims arising out of gradual pollution limits,
14  they're done, they're over, they're exhausted, Grace agreed
15  with us after many years of coverage litigation, and they owe
16  us an indemnity for that, because that's what we wanted, we
17  wanted to be done with it after all those years.

18        So, we have, yes, the original agreement with Grace
19  was dated May 30th 1997 and in that, a highly contested matter,
20  we agreed that we would make a payment and they agreed that's
21  it, claims for gradual pollution are done.  What happened was,
22  we kept open the dispute with respect to defense costs, global
23  litigation in New York that continued until Your Honor signed
24  off on the settlement agreement in 2004, which resolved all.

25        Included in the 2004 settlement agreement was a

1   provision that everything that was in the 1997 agreement would

2   continue to apply, which meant our indemnity, and specific

3   releases for sites that were included in multiple litigations.

4   That included the Otis Pipe Line site.  So when they stand up

5   and say, oh, we have a right to pursue the appeal against Grace

6   because we have a claim as a judgment creditor, they do not.

7   Grace released us.  They have no rights as a judgment creditor

8   against Grace, that was part of the settlement agreement Your

9   Honor approved.

10         So, in our view, this is Grace's problem.  This is

11   not our problem.  We litigated long and hard and resolved these

12   issues and Grace does owe us an indemnity and, Your Honor, we

13   did set out our -- the other thing that I find extremely

14   misleading here is, you have parties who have been litigating

15   since the 90s, about a site that we know nothing about.

16   They're carrying on that they would not involve the debtor, but

17   apparently there's a huge case regarding this site, apparently

18   they've known since 1995 that they're being pursued to that.

19   We found 40 documents going back quite some time that they have

20   tons of information that show that this is a leaking pipeline

21   case.  Multiple leaks, over a period of time.  And, in fact, as

22   we pointed out to Grace, the regulatory authority said it had

23   to be going on for a long time.   This is a document dated

24   1995, they know this.

25         So, there's a lot left out in the Kaneb presentation

1  here with respect to the coverage that's inapplicable, to how

2  the settlement agreements work and to their rights as a

3  judgment creditor, they have none, because Grace has no further

4  rights against us.

5        We totally disagree that this would be any kind of

6  streamline litigation.  We pointed out there are still, after

7  nearly 30 years, coverage points left.  To the extent they

8  weren't settled by the 2004 settlement agreement, they are

9  still in a coverage action that was stayed as a result of the

10 bankruptcy filing and, in fact, we've asked in the past whether

11 we should proceed with that, however, in the current plan,

12 Grace purports to assign the rights to that litigation to the

13 ACC.

14       So, on the same policies, to the extent we haven't

15 resolved everything and we still have fights about it, there is

16 already a pending coverage litigation involving a very

17 significant party to this litigation.

18       What Kaneb is seeking is precedence over that long

19 pending action so they can pursue their claims that they've

20 know about since 1995.  They could have stepped in the coverage

21 action that was pending in New York.  They did not.

22       So, for all those reasons, Your Honor, we just think

23 that -- it is our position, this is Grace's problem, Grace owes

24 us indemnity here.

25       Your Honor, I would like to hand up our -- we put out

1   our position for Grace, and I'd like to give Your Honor a copy

2   of that.

3          THE COURT:  I'm sorry, what is it that you're handing

4   up?

5          MS. DeCRISTOFARO:  It's our letter to Grace setting

6   forth our indemnification claim.  We've already provided a copy

7   and served on Kaneb.

8          THE COURT:  All right.

9          MS. DeCRISTOFARO:  Dated March 25th.

10          THE COURT:  Is this something you've filed?

11          MS. DeCRISTOFARO:  No, Your Honor, it was something

12   that was after the papers were filed.

13          THE COURT:  All right.  You'll have to file it

14   though.  I'll take it, but you'll have to electronically file

15   it if it's something you want on the public record.

16          MS. DeCRISTOFARO:  Your Honor, because it involves

17   our settlement agreement, and all the matters relating to the

18   settlement agreement are deemed confidential, we've been

19   treating all these papers, including this as confidential.  So,

20   when we file it, we'll file it under seal.

21          THE COURT:  Okay.  Then why are you giving me this,

22   I guess is the question?

23          MS. DeCRISTOFARO:  Okay. I mean I can do it formally,

24   Your Honor. I just wanted to refer to it during the argument

25   that's all.

1        THE COURT:  Okay.  If you don't want it on the public

2   record, it's probably better that you not submit it at all.  I

3   guess that's the issue.

4        MS. DeCRISTOFARO:  Okay, all right.

5        THE COURT:  I guess -- does Kaneb have any objection

6   to my reading this document?

7        MR. GILBERT:  No objection, Your Honor.

8        THE COURT:  Does the debtor have any objection to my

9   reading it?

10        MS. BAER:  Your Honor, I have no objection at all.

11   I think the only point is that CNA has served us with a demand

12   letter with respect to the Kaneb request.

13        MS. DeCRISTOFARO:  And it is supported by documents

14   going back to the 90s, as to why we have indemnification.

15        THE COURT:  All right.  I'm going to mark this as CNA

16   Exhibit 1 and I'll simply accept it since everybody has agreed

17   that I can read it as CNA Exhibit 1 for purposes of this

18   argument.

19        MR. LOCKWOOD:  With respect to the confidentiality --

20        THE COURT:  You need to use a microphone, Mr.

21   Lockwood, I'm sorry.

22        MS. DeCRISTOFARO:  Sure.

23        MR. LOCKWOOD:  With respect to the confidentiality,

24   and taking Ms. DeCristofaro's comment about assignments to the

25   PI trust, are we going to be permitted to take a look at this?

1          MS. DeCRISTOFARO:  We sent it to you.

2          MR. LOCKWOOD:  We will, okay.

3          MS. BAER:  We forwarded it to you.

4          MS DeCRISTOFARO:  Well, that gets us back to other

5    issues, but we won't address right now.

6          In any event, Your Honor, from our point of view,

7    there's been a number of misleading mistatements regarding the

8    extent of the coverage, regarding the application of the

9    settlement agreement, regarding the fact that this could be

10   somehow standalone litigation that would not -- I've been doing

11   this for a long time and I can tell you, there's no such thing

12   as a simple coverage litigation, that wouldn't impact.  As I

13   said, we've litigated 16 years with Grace on the environmental

14   property damage claims and there is no way that there wouldn't

15   be overlap with coverage litigation on the same policies, on

16   the same -- on broader issues and it would be very difficult --

17   from our point of view, it would be impossible not to involve

18   the debtor.  Given the long litigation about the rights to who

19   -- it turns out that Grace has no liability.  That may also

20   mean that Kaneb has no rights under the policies.  There's a

21   whole lot of things involved here.

22         And so, we do not agree that they have rights under

23   the policies, we think that as Ms. Baer said, it would be a

24   highly contested matter that would implicate all of the

25   litigation between Kaneb and Grace.  We have a release from

1  Grace on the site that was signed off by Your Honor, we have

2  indemnity rights under the policies, there's no such thing as

3  separate coverage.  All the claims would be subject to the

4  gradual pollution rights for which Grace released us, and gave

5  us indemnity.

6         So, for all those reasons, we think it would be

7  inappropriate to go forward with coverage litigation separately

8  with Kaneb at this time.

9         THE COURT:  All right.

10        MR. BROWN:  Your Honor, I'll be very brief.  Michael

11 Brown on behalf of One Beacon and Seaton.

12        As Your Honor saw from our papers, we filed papers on

13 behalf of One Beacon, not Seaton.  We are not taking any

14 position on the request for the lifting of the stay.  We

15 certainly agree with Kaneb for One Beacon, that Grace has

16 brought indemnity rights to One Beacon with respect to Kaneb's

17 claims.  We have served discovery on both Kaneb and the debtors

18 in an effort to understand more about these claims.  We've

19 gotten some limited responses, but we're still very much

20 shooting in the dark as to what the claims are all about.

21        I note that Mr. Gilbert said that there was no

22 dispute that Kaneb has separate rights. I think that will be a

23 hotly disputed issue, as will a number of other coverage

24 issues, and I didn't want my silence to be construed as

25 agreement with those propositions.  Indeed, I don't think want

1  my silence on any of these issues to be construed as agreeing

2  with the debtors or Kaneb or, frankly, even CNA on the coverage

3  issues that have been discussed here today.  Thank you.

4           THE COURT:  Okay.

5           MR. GILBERT:  I'll be brief, Your Honor.

6           THE COURT:  Mr. Gilbert.

7           MR. GILBERT:  Bob Gilbert, I have no more than two

8  hours of -- I did want to address a couple of things.

9           Perhaps the most important is that you have to look

10  at what the source of these alleged indemnity obligations is,

11  because there have been a lot of broad assertions here of me

12  somehow being misleading, although they don't provide policy

13  excerpts that show that I am, or settlement agreement excerpts

14  that show that I've misled the Court in anyway.  I haven't

15  misled the Court.

16          A parade of horribles, of a very indistinct variety

17  has been presented by Ms. Baer and by Ms. DeCristofaro, but

18  they don't bear out under scrutiny and we would propose to file

19  under seal the settlement agreements and provide within seven

20  days a very brief, not more that five page supplemental

21  memorandum pointing Your Honor to the exact provisions that

22  allegedly apply or don't apply, to demonstrate why the

23  indemnity obligations are hugely overblown.

24          I want to talk very quickly about the CNA,

25  Continental policies because that's the starting point.  They

1  are the primary polices.  There are two settlement agreements.

2  The first one provided an indemnity with respect to gradual

3  pollution limits.  We have already stipulated that was never

4  our intent and it's not our intent.  We are not seeking to have

5  the stay lifted with respect to the gradual pollution limit

6  coverage.  If Ms. DeCristofaro believes that she has solid

7  coverage defenses, then she can knock out the case right away.

8  We don't think she'll be able to because strongly disagree, but

9  that's something for a different court.  It's not something

10 that Your Honor has to decide.  And it will not impact in any

11 way debtors because their indemnity goes solely to the gradual

12 pollution limits.

13        The second agreement, Your Honor, signed in 2004,

14 does not even contain an indemnity in it.  Grace has no

15 responsibilities with respect to that.  The second agreement

16 binds only Grace, it does not apply by its terms to any entity

17 for which Grace lacked legal authority to bind them.  So, the

18 second agreement, the global environmental release, by its

19 terms, could not affect any rights that Kaneb has and by its

20 terms there is no indemnity that would bring debtors back in.

21 And Ms. DeCristofaro points to none of those.  That's why we

22 think it's essential that we provide under seal those

23 settlement agreements and explain why it is inaccurate to

24 describe it in the way that they have.

25        With respect to the One Beacon policy, I don't really

have a whole lot else to add except for the fact that it
ultimately amounts to the tail wagging the dog.  It is such a
tiny slice.  There are a couple of broader points regarding
entanglement or alleged entanglement or alleged complication in
this case.

It's easy for they to say, oh, my gosh, Your Honor,
you will have a parade of lawyers in here arguing over this,
that or the other thing.  Arguing over what?  The debtors --
I'm sorry, the plan provides that the claims of the insurers
are treated as unsecured claims for which they will have full
rights after plan discharge.  They have not come in here
seeking the right to lift the stay to pursue whatever indemnity
claims they assert that they have and they certainly have the
ability to pursue those once the plan has been approved.

If debtors believe that they need to be involved, the
only conceivable involvement that they would have and it's been
documented, put aside the parade of horribles, the indistinct
cloud of smoke out there, that they're pointing to, the only
thing that they've pointed to, that has any real bearing is the
One Beacon policy.  That's a tiny sliver with minimal
entanglement and they haven't shown where the rubber meets the
road and where they actually would be supremely distracted in
any way, shape or form.  We just think overall the balance of
equities strongly, strongly favors allowing Kaneb to pursue its
own insurance rights, not the rights that they could pursue on

1 behalf of debtor, we're not seeking that at this point and we

2 won't seek that, unless and until we win the appeal.  But

3 pursuing the insurance rights that we have under the policies

4 is for another court to determine, if we're right or wrong, or

5 to what extent we're right with respect to our coverage rights,

6 but they do belong to us and we should be entitled to our day

7 in court so that we can address, especially with respect to

8 Otis Pipe Line this pressing issue that is bearing down on us

9 right now.

10      THE COURT:  All right.  Well, I will accept

11 supplemental papers. I don't know how they're going to impact

12 this, but there is an allegation that whatever they say is more

13 than whatever has been represented to me that they say.  So, I

14 think I need to see them in the context and I think you need to

15 articulate for me where you think they say what they say and

16 then anybody else can articulate what they think they say and

17 then, perhaps, I'll have a more fulsome record on which I can

18 determine what I think they say.

19      So, how much time do you need to submit the

20 settlement agreements?

21      MR. GILBERT:  I can submit the settlement agreements

22 right now, under seal.  They're in an envelope with a notice of

23 filing under seal.  And then, perhaps, we can file, each side

24 can file within seven days whatever views they have with

25 respect to how the settlement agreements impact these

1 proceedings.

2       MS. BAER:  Your Honor, I completely object to that

3 process.  I don't know what the heck he's going to say, I don't

4 know what he's going to get into but I guarantee you it's going

5 to be a complicated bunch of insurance issues that we're going

6 to have to get someone on, so it can't be simultaneous briefs.

7       If he wants to file in seven days that's fine, but

8 Your Honor, I'd ask for at least 21 days to respond.

9       THE COURT:  Okay.  When's the next omnibus?

10      MR. GILBERT:  The 27th.

11      MS. BAER:  It's April 27th.

12      THE COURT:  Okay.  This probably isn't going to get

13 onto that.  What's the one after that?

14      MR. GILBERT:  May 23.

15      THE COURT:  May 23rd?

16      MR. GILBERT:  Yes.

17      THE COURT:  I may need some additional argument after

18 I see this.  I just don't know.  Why don't you folks get up

19 with a briefing schedule.  I'm not sure, Ms. DeCristofaro, Mr.

20 Brown, are you going to need to submit something?  You don't

21 know until you see what's been submitted by Kaneb?

22      MS. DeCRISTOFARO:  I agree with Ma. Baer, I mean, I

23 don't know what -- they've already had an extra chance to reply

24 --

25      THE COURT:  Use the microphone.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DeCRISTOFARO:  I'm sorry, Your Honor.  They

2    already filed an additional reply after all of us filed our

3    papers.

4          THE COURT:  Yes, they have.

5          MS. DeCRISTOFARO:  And they've already have our

6    settlement agreements.  It seems to me what they're asking for

7    is just another bite of the apple here.

8          I mean, I think there's a bottom line issue here,

9    which is, they're unilaterally deciding that their claims which

10   -- and the reason I felt compelled to hand up my letter was, it

11   made clear in black and white that they are subject to gradual

12   pollution limits.  What they're saying is, we get to declare

13   they're not and, therefore, there's no indemnity.  And then we

14   get back into what we would litigate and what we litigated for

15   Grace for multiple years.  Are they gradual pollution or not?

16         THE COURT:  Okay.

17         MS. DeCRISTOFARO:  What's important is, that we have

18   a claim.  So my only point on briefing is, one, I agree with

19   Ms. Baer, I think this is -- they don't need a second bite of

20   the apple because they had it.

21         THE COURT:  Look.  The issue is, you've stated that

22   they have misrepresented the content of the documents, I'm

23   giving counsel an opportunity to show that they either haven't

24   or have, misrepresented the content of the documents and then

25   everybody else an opportunity to respond.  That's a serious

1  allegation.  I want it clarified on the record.  That's what

2  this is about.  It's not a second bite at the apple, I'm not

3  accepting additional briefs in terms of the arguments that have

4  been stated, but I do want a clarity as to what the documents

5  actually show.  That's the purpose of accepting supplemental

6  submissions.

7          MS. DeCRISTOFARO:  So, it would be limited to that

8  purpose, Your Honor?

9          THE COURT:   Yes, that's the purpose.

10          MS. DeCRISTOFARO:  But I still think we would

11  probably -- I would agree with Ms. Baer on that.

12          THE COURT:  All right.  So, you want a week to file

13  the documents under seal.

14          MR. GILBERT:  Your Honor, if we could have until next

15  Friday.

16          THE COURT:  All right.  Kaneb may file the settlement

17  agreements that it deems --

18          MR. GILBERT:  Your Honor, we would propose to file

19  the settlement agreements at ths time since they're large.

20          THE COURT:  -- relevant. I'm not sure whether they

21  need to be filed electronically in order to keep them -- I

22  don't know the process here.

23          MS. BAER:  No, they can't be.

24          THE COURT:  They cannot, all right fine.

25          MS. BAER:  I think because they're under seal, it's

1  just the hard copy envelope.

2          THE COURT:  Okay.  I'll take them, then.  If they're

3  appropriately marked.

4              (Counsel speaking with one another)

5          MR. GILBERT:  Okay, we will work with local counsel

6  to do it appropriately over the next couple of days.

7          THE COURT:  All right.  And then make sure -- I think

8  it would be helpful if you send two copies so that one is kept

9  here in the sealed file and another set can be transmitted to

10 me.  Actually, Ms. Miller, if you don't mind, just send me a

11 set to Pittsburgh, marked under seal.  All right?

12         MS. MILLER:  I will.  Yes, yes.

13         THE COURT:  Okay.  All right.  So they're going to be

14 filed by -- are you talking about by April 3rd, or by April

15 10th?

16         MR. GILBERT:  We would like to have until April 10th,

17 although I'm informed that that's a state holiday.

18         THE COURT:  That's fine.

19         MR. GILBERT:  So, we may have to go to the following

20 Monday, the 13th?

21         THE COURT:  Okay.  It's not a federal holiday, as far

22 as I know.  Oh, but that's fine, courts may be closed anyway.

23 Sure, April 13th, is fine.

24         The settlement agreements, along with -- I'll call it

25 a memo, not to exceed five pages, so that you can point out

1    whatever it is that you feel you need to point out regarding

2    those agreements.

3            MR. GILBERT:  Thank you.

4            THE COURT:  All right.  Now, and the debtor, CNA and

5    One Beacon, if you choose, may file additional documents, if

6    they're necessary, also under seal, and five page memos, also

7    explaining whatever it is that you're filing, by -- and you

8    want until when?

9            MS. BAER:  Your Honor, could we have until May 8th?

10   I know I've got -- I'm going to be out of town all before then.

11           THE COURT:  All right, by May 8th.  Then, I'm sorry,

12   would you please just put this back on, on May 23rd, just in

13   the event that I need any additional argument.  Frankly, I

14   don't think I will and I will attempt to have my staff cancel

15   that if necessary.  I would suggest for those of you who are

16   out of town, you just make arrangements to call in.  I really

17   don't think I will need anything more and I don't want you to

18   waste the time to come here, if I don't and I may not get to

19   this until a day or so before the hearing.  So, I don't want

20   you to incur expenses that are necessary.

21           So, if you could, please put this high up on the list

22   of the agenda matters, contested agenda matters and then I'll

23   just tell you whether, at that time, whether I do or don't

24   think I need additional explanation.

25           MR. GILBERT:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right, Mr. Brown.

2           MR. BROWN:  Your Honor, that's all fine with One

3   Beacon and Seaton.  I guess the one concern I have is, neither

4   One Beacon or Seaton has taken a position on the lift stay

5   motion and I'm not sure where this process is going to wind up,

6   but it sounds like there could be interpretation of settlement

7   agreements and/or policies and that puts us in sort of an

8   awkward position because I don't know ultimately where that's

9   going to lead and whether the Court is going to be making

10  rulings on the scope of the indemnity provisions or the scope

11  of the policies, or what coverage is at issue and it puts us in

12  a --

13          THE COURT:  You're striking terror into my heart, Mr.

14  Brown.

15          MR. BROWN:  Well -- and mine too, Your Honor.  I mean

16  the concern here is that we've not taken a position on the

17  motion so I'd just as soon be silent. I'm not sure I'm going to

18  be able to be silent and I'm not sure that in the context of a

19  lift stay motion Your Honor isn't going to be making rulings

20  that may have repercussions, either with respect to plan

21  confirmation or for that matter, subsequent coverage

22  litigation.

23          THE COURT:  And I don't know.  I just don't know.

24  With respect to the relief from stay concerning the appeal, I

25  have not heard anything today that convinces me that that

1  appeal needs to go forward now.  So, my inclination now is to

2  simply deny that motion, without prejudice, because I simply am

3  not convinced that there is any need for the appeal to be

4  pursued at this time.  I think the prejudice to the debtor,

5  particularly inasmuch as litigation counsel for the debtor

6  would have to be involved in that and is also involved in

7  getting the plan process concluded, which I think at this point

8  is the most important thing that the debtor needs to undertake,

9  outweighs every other consideration and as a result, is simply

10 -- particularly because the debtor has already won that

11 litigation, both through a jury verdict and from what Ms. Baer

12 has said, and I take it this is not contested, through a motion

13 through reconsideration, in a motion to amend the verdict. Even

14 after those processes were concluded, the judgment was still

15 entered in favor of the debtor and against Kaneb at that stage.

16      I think the likelihood of success on appeal is

17 measured to a degree by those activities and Kaneb's likelihood

18 of success is not as high as may otherwise be anticipated and

19 as a result, that appeal can wait.  So, my inclination is to

20 deny that motion without prejudice at this time and let's

21 focus, instead, on the insurance issues.  So, I am prepared to

22 take an order that will deny that portion of this motion

23 without prejudice, but I think it can wait until the May 23rd

24 hearing.  Perhaps I can do all of this at one time.

25      To the extent, the reason I'm doing this, Mr. Brown,

**J&J COURT TRANSCRIBERS, INC.**

1  to the extent that One Beacon is concerned about that issue,

2  that's my ruling with respect to that issue.  On the insurance

3  issues, though, I just don't know until I see the additional

4  documents.

5        MR. BROWN:  Your Honor, it's actually the insurance

6  issues that are of a bigger concern and there are really two.

7  One is Kaneb seeking coverage as a judgment creditor which is

8  what you've just addressed and --

9        THE COURT:  Yes.

10        MR. BROWN;  -- and the other is seeking independent

11  rights under the policies.  Could I just make a suggestion in

12  light of your concerns and my concerns, that we actually do go

13  forward with the hearing in May so that if it looks like we're

14  skating into areas that we shouldn't be skating into because

15  they're to be dealt with in subsequent coverage litigation, we

16  can at least bring that to Your Honor's attention?

17        THE COURT:  All right, that's fine.  Then we'll just

18  put it on the calendar, but still ask that it be put close to

19  the top of the list and parties still may appear by phone.

20  It's not going to be a long complicated argument.  I'm not

21  redoing the arguments that I've heard today.

22        MR. BROWN:  Okay.  Thank you, Your Honor.

23        THE COURT:  All right.

24        MS. BAER:  Your Honor, one administrative issue.  You

25  had indicated that the memo accompanying whatever documents,

1 should be five pages.  I wanted to make sure that was for both

2 sides, Kaneb as well the debtor?

3           THE COURT:  Yes, each side.  Anybody who is filing a

4 memo is limited to five pages.

5           MS. BAER:  Thank you, Your Honor.

6           THE COURT:  And the agreement -- any documents that

7 you file should be filed under seal.  But please, also send me

8 a courtesy copy to Pittsburgh since time may be short.  I'd

9 like to receive them there, please.

10          I'm sorry, maybe I -- I think -- number seven

11 involved Otis and number eight involved Macon, is that correct?

12 It's not that one involved the appeal?

13          MR. GILBERT:  That's correct.

14          MS. BAER:  That's correct, Your Honor.

15          THE COURT:  Okay.  So, I have -- I still do need to

16 wait until May, I think, to adjudicate the motion in that

17 fashion.  Okay.

18          MS. BAER:  Yeah.  In number seven, they asked for

19 both the appeal to go forward as well as the right to pursue

20 insurance coverage.  So it's both of them in t hat motion and

21 in Macon, it's only insurance coverage.

22          THE COURT:  Okay.  As to Macon, I'm a little -- I'm

23 also a little troubled as to the need to pursue Macon at this

24 time.  I don't, number one, I don't think the liability on

25 behalf of Kaneb is nearly as substantial as it is with respect

**J&J COURT TRANSCRIBERS, INC.**

1  to Otis. I understand that the coverage issues may be somewhat

2  the same from what you folks are arguing and so, perhaps, the

3  Court needs to adjudicate the issues at one time, in any event.

4  But to the extent that the contractual indemnity provision is

5  there, the circuit has been pretty clear about the fact that

6  when you've got a contractual indemnity that's a pretty good

7  reason not to lift the automatic stay.  In fact, you can use

8  that as a basis to extend the automatic stay to certain other

9  entities in certain circumstances.

10      So, I think you've got an uphill battle with respect

11 to Macon that may not, or may exist with respect with Otis, but

12 is not the same as the battle with respect to Otis.  So, my

13 inclination as to Macon is, I'm not sure I understand as fully

14 in that context, where there is as much of a necessity,

15 particularly since mediation is not scheduled there.  I'm not

16 seeing the urgency in Kaneb's argument with respect to Macon

17 that I'm seeing with respect to Otis.

18      So, just as a precursor for May, my inclination at

19 the moment as to Macon is to say that I'm not seeing the need

20 for relief from stay on that project right now, either.  If you

21 folks have any desire to talk to each other, perhaps, that will

22 serve as the basis for your talking between now and the May

23 hearing.  Okay.

24      MR. GILBERT:  Thank you, Your Honor.

25      MS. BAER:  Thank you, Your Honor.  Your Honor, that

**J&J COURT TRANSCRIBERS, INC.**

1  concludes the agenda unless there's anything else someone needs

2  to take up.

3          THE COURT:  Anyone have any housekeeping matters to

4  address?

5                      (No audible response)

6          THE COURT:  Okay, we're adjourned.  Thank you.

7          MS. BAER:  Thank you.

8                          * * * * *

9                  **C E R T I F I C A T I O N**

10

11      I, ELAINE HOWELL, court approved transcriber, certify that

12  the foregoing is a correct transcript from the official

13  electronic sound recording of the proceedings in the

14  above-entitled matter and to the best of my ability.

15

16

17

18  _____   Date:  April 9, 2009

19  ELAINE HOWELL

20  J&J COURT TRANSCRIBERS, INC.

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**