# EXHIBIT G

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In Re:                        )
                              ) Chapter 11
W.R. GRACE & CO., et al,      )
                              ) Case No. 01-1139 (JKF)
        Debtors.              )
_____ ) Volume I



VIDEOTAPED DEPOSITION OF ALAN C. WHITEHOUSE, M.D.

Taken at the instance of the Debtors






March 19, 2009

8:30 a.m.

818 W. Riverside Avenue

Spokane, Washington






BRIDGES REPORTING & LEGAL VIDEO
Certified Shorthand Reporters
1312 N. Monroe Street
Spokane, Washington  99201
(509) 456-0586 - (800) 358-2345

2

1       BE IT REMEMBERED that the videotaped

2   deposition of ALAN C. WHITEHOUSE, M.D., was taken in

3   behalf of the Debtors pursuant to the Federal Rules of

4   Civil Procedure before William J. Bridges, Certified

5   Shorthand Reporter for Washington, Idaho and Oregon, on

6   Thursday, the 19th day of March, 2009, at the law offices

7   of Evans, Craven & Lackie, 818 W. Riverside Avenue, Suite

8   250, Spokane, Washington, commencing at the hour of 8:30

9   a.m.

10

11          *              *              *

12

13                  APPEARANCES:

14

15  For W.R. GRACE & CO.:

16
                        BRIAN THOMAS STANSBURY, ESQ.
17                      Kirkland & Ellis
                        Attorneys at Law
18                      655 Fifteenth Street N.W.
                        Washington, D.C.  20005
19                      (202) 879-5969
                        bstansbury@kirkland.com
20

21
                        KAREN F. LEE, ESQ.
22                      Kirkland & Ellis
                        Attorneys at Law
23                      655 Fifteenth Street N.W.
                        Washington, D.C.  20005
24                      (202) 879-5969
                        kflee@kirkland.com
25

3

```
 1                    APPEARANCES (Cont'd):

 2

 3       For Libby claimants:        JON L. HEBERLING, ESQ.
                                     McGarvey, Heberling, Sullivan &
 4                                     McGarvey
                                     Attorneys at Law
 5                                   745 South Main
                                     Kalispell, MT    59901
 6                                   (406) 752-5566
                                     jheberling@mcgarveylaw.com
 7

 8

 9       For Arrowwood:              TANCRED V. SCHIAVONI, ESQ.
                                     O'Melveny & Myers
10                                   Attorneys at Law
                                     Times Square Tower
11                                   7 Times Square
                                     New York, New York   10036
12                                   (212) 326-2000
                                     tschiavoni@omm.com
13

14

15       For Future Claimants       JONATHAN P. GUY, ESQ.
         Representatives for         Orrick, Herrington & Sutcliffe
16       P.I. Claims:               Attorneys at Law
                                     1152 15th Street N.W.
17       (via telephone)            Washington, D.C.   20005-1706
                                     (202) 339-8516
18                                   jguy@orrick.com

19

20

21       For Maryland Casualty       LAURA G. STOVER, ESQ.
         Company and Zurich          Eckert, Seamans, Cherin &
22       American Insurance            Mellot
         Company:                    Attorneys at Law
                                     1747 Pennsylvania Avenue N.W.
23       (via telephone)            Washington, D.C.   20006-4604
                                     (202) 659-6629
24                                   lstover@eckertseamans.com

25
```

4

1                        APPEARANCES (Cont'd):

2


3   For Asbestos Claimants        BARNARD S. BAILOR, ESQ.
    Committee:                    Caplin & Drysdale
4                                 Attorneys at Law
    (via telephone)              One Thomas Circle N.W.
5                                    Suite 1100
                                  Washington, D.C.   20005
6                                 (202) 862-5049
                                  bsb@capdale.com
7


8
    For Equity Committee:         DAVID E. BLABEY, JR., ESQ.
9                                 Kramer, Levin, Naftalis &
    (via telephone)                 Frankel
10                                Attorneys at Law
                                  1177 Avenue of the Americas
11                                New York, New York   10036
                                  (212) 715-9248
12                                dblabey@kramerlevin.com

13


14
    For Continental Casualty      ELIZABETH M. DeCRISTOFARO
15  Company:                      Ford, Marrin, Esposito,
                                  Witmeyer & Gleser
16  (via telephone)              Attorneys at Law
                                  88 Pine Street
17                                   23rd Floor
                                  New York, New York   10005-1809
18                                (212) 269-4900
                                  emdecristofaro@fmew.com
19


20

21  For Property Damage           ALAN RICH, ESQ.
    Future Claimant               Law Offices of Alan Rich
22  Representatives:              Attorney at Law
                                  1401 Elm Street
23  (via telephone)                  Suite 4620
                                  Dallas, TX  752202
24                                (214) 744-5100

25

5

1                        APPEARANCES (Cont'd)

2

3    For the State of          DALE R. COCKRELL, ESQ.
     Montana:                  Christensen, Moore, Cockrell,
4                                 Cummings & Axelberg
                               Attorneys at Law
5                              145 Commons Way
                               Kalispell, MT  59901
6                              (406) 751-6003
                               dcockrell@cmccalaw.com
7

8

9
     Also present:            GREG GLOVER, videographer
10                            Bridges Reporting & Legal Video
                              1312 North Monroe
11                            Spokane, WA  99201
                              (509) 456-0586
12

13

14
                              TIM FITZSIMMONS
15

16

17
                              MORGAN ROHRHOFER
18

19

20

21

22

23           *                    *                    *

24

25

6

1                          I N D E X :

2

3    W.R. GRACE & CO., et al

4

5    Case No. 01-1139 (JKF)

6    March 19, 2009

7

8

9                       T E S T I M O N Y

10

11   ALAN C. WHITEHOUSE                            PAGE NO:

12
         Examination by Mr. Stansbury              12 - 271
13

14

15

16

17

18
                      PRODUCTION REQUESTS:
19

20
     X-rays or CT's for Raymond Siefke in Dr.           117
21   Whitehouse's possession or CARD Clinic's possession

22

23

24

25

7

E X H I B I T S:

No:                    Identification:                    Page:


1     Notice of Deposition, Dr. Alan C. Whitehouse        16
          March 19, 2009


2     Libby Claimants' Preliminary Objections to          16
          First    Amended Joint Chapter 11 Plan,
          Bates 2009_08086 - 93


3     3-ring binder, Expert Report by Dr. Alan C          75
          Whitehouse, with CD's and 24 exhibits attached


4     Imaging Report, 2/23/06, St. John's Lutheran        82
          Hospital, Bates 2009-L550-512_0008177


5     Imaging Report, 4/2/08, St. John's Lutheran         83
          Hospital, Bates 2009-L550-481_0008987


6     Imaging Report, 7/7/08, St. John's Lutheran         85
          Hospital, Bates 2009-LP006_0009251


7     X-ray Report, 3/12/01, St. John's Lutheran          85
          Hospital, Bates L550-093-R-MRC-00005


8     Imaging Report, 8/11/08, St. John's Lutheran        86
          Hospital, Bates 2009-L550-015_0009095


9     Imaging Report, 6/25/07, St. John's Lutheran        89
          Hospital, Bates 2009-L550-426_0009133


10    Imaging Report, 10/27/08, St. John's Lutheran       98
          Hospital, Bates 2009-L550-219_0009172

8

| No: | Identification: | Page: |
|-----|-----------------|-------|
| 11 | X-ray Report, 1/25/99, St. John's Lutheran Hospital, Bates L550-464-R-MRC-00007 | 99 |
| 12 | Imaging Report, 3/23/08, St. John's Lutheran Hospital, Bates 2009-L550-494_0009011 | 101 |
| 13 | X-ray Report, 1/25/99, Raymond Siefke, St. John's Lutheran Hospital | 101 |
| 14 | Exercise Stress Test, 11/16/94, Raymond Siefke St. John's Lutheran Hospital | 102 |
| 15 | Office Chart, 2/28/01, Raymond Siefke, by Dr. Whitehouse | 103 |
| 16 | Cardiac Clinic Note, 3/15/95, Raymond Siefke St. John's Lutheran Hospital | 118 |
| 17 | Office note, 3/13/02, Raymond Siefke, by Dr. Whitehouse | 109 |
| 18 | Certificate of Death, Raymond Siefke, State of Montana | --- |
| 21 | Article, "The Morbidity and Mortality of Vermiculite Miners and Millers Exposed to Tremolite-Actinolite: Part I, Exposure Estimates," American Journal of Industrial Medicine, 1987, Bates 2009_05546 - 59 | 125 |
| 25 | Mortality in Libby, Montana, 1979-1998 Executive Summary, Bates ASD2000001 - 34 | 135 |

9

| No: | Identification: | Page: |
|-----|-----------------|-------|
| 26 | Review of Asbestos-Related Abnormalities Among a Group of Patients from Libby, Montana, A Pilot Study of Environmental Cases, Final Report, August 2002, Bates 2009_01594 - 638 | 146 |
| 27 | Letter, 3/21/01, Dr. Whitehouse to Jon Heberling, Bates 2009_00531 | 147 |
| 28 | Deposition of Dannie C. Middleton, 8/12/02 USA vs. W.R. Grace & Company, et al, Bates 2009_00806 - 90 | 149 |
| 30 | Libby Claimants' Disclosure of Potential Expert Witnesses, 8/21/06 | 155 |
| 31 | Letter, Bruce Case to Donna Rossie, ATSDR with draft peer review document, Bates 2009_05838 - 49 | 156 |
| 34 | Consensus Report, Asbestos, Asbestosis, and Cancer; the Helsinki criteria for diagnosis and attribution, Bates 2009_04731 - 36 | 163 |
| 35 | Asbestos-Related Disease Associated with Exposure to Asbestiform tremolite, American Journal of Industrial Medicine, 1994, Bates 2009_08075 - 85 | 168 |
| 36 | The Diagnosis of Nonmalignant Diseases Related to Asbestos, American Thoracic Society, Bates 2009_00053 - 58 | 173 |
| 37 | Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos, American Thoracic Society Documents, Bates 2009_00661 - 85 | 175 |

10

| No: | Identification: | Page: |
|---|---|---|
| 44 | Asbestos-Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana, American Journal of Industrial Medicine, 2004, Bates 2009_01096 - 102 | 192 |
| 46 | Libby Expert's Response to Dr. Weill report by Dr. Whitehouse and Dr. Frank, 5/8/07, Bates 2009-01103 - 30 | 195 |
| 56 | Videotaped Deposition of Dr. Whitehouse 10/18/07, Bates 2009_00237 - 505 | 204 |
| 57 | Letter, 12/14/95, Dr. Whitehouse, Bates LP072-ME-MRC-00002 - 3 | 206 |
| 58 | Letter, 12/14/95, Dr. Whitehouse to Jon Heberling, Bates L550-493-ME-MRC-00014 - 15 | 207 |
| 59 | Letter, 10/30/95, Jon Heberling to Dr. Whitehouse, Bates L550-493-ME-MRC-00059 | 208 |
| 60 | Handwritten note given to Dr. Whitehouse by Nurse Kimberly Rowse at the CARD Clinic | 209 |
| 61 | Letter, 8/13/97, Dr. Whitehouse to blank, Bates LP055-ME-MRC-00004, 2009_03262 | 209 |
| 62 | Letter, 8/13/97, Dr. Whitehouse to blank, Bates LP055-ME-MRC-00004, 2009_03262 | 210 |
| 63 | Letter, 9/25/96, Dr. Whitehouse to blank, Bates LP076-ME-MRC-00002, 2009_03403 | 213 |

11

| No: | Identification: | Page: |
|-----|-----------------|-------|
| 64 | Letter, 9/25/96, Dr. Whitehouse to Jon Heberling<br>Bates L550-538-ME-MRC-00045, 2009_03465 | 213 |
| 65 | Letter, 12/14/95, Dr. Whitehouse to Jon<br>Heberling, Bates 2009_04351 - 52 | 215 |
| 66 | Chart note, 2/14/01, Dr. Whitehouse, Bates<br>LP098-ME-MRC-00015 | 249 |
| 69 | Chart notes, 4/18/89, 4/24/89, Dr. Whitehouse<br>Bates LP029-ME-MRC-00002 | 254 |
| 70 | Series "ATS/ERS Task Force: Standarisation<br>of Lung Function Testing," Interpretative<br>strategies for lung function tests, European<br>Respiratory Journal, Bates 2009_08391 - 411 | 255 |

\*                    \*                    \*

12

1          THE VIDEOGRAPHER:  Good morning.  Here

2   begins the deposition of Dr. Alan C. Whitehouse in

3   regarding W.R. Grace & Co. in the United States

4   Bankruptcy Court for the District of Delaware.  The case

5   number is 01-1139 (JKF).

6          Today's date is March 19, 2009.  The time is

7   approximately 8:32.  The deposition is being taken at

8   Evans, Craven & Lackie, 818 West Riverside, Suite 250,

9   Spokane, Washington.

10          The videographer is Greg Glover, the court

11   reporter is William Bridges, both here on behalf of

12   Bridges Reporting and Legal Video located at 1312 North

13   Monroe, Spokane, Washington, 99201.

14          Would counsel and all present please identify

15   yourselves and state whom you represent.

16          MR. STANSBURY:  Brian Stansbury of

17   Kirkland & Ellis, and I represent W.R. Grace & Company.

18          MR. HEBERLING:  Jon Heberling of

19   McGarvey, Heberling, Sullivan & McGarvey, representing

20   the Libby claimants.

21          MR. SCHIAVONI:  Good morning, Doctor.

22   Tancred Schiaoni from O'Melveny & Myers.  I represent

23   Arrow Wood.

24          MS. LEE:  Karen Lee, Kirkland & Ellis,

25   representing W.R. Grace.

13

1           MR. STANSBURY:  People on the phone,

2    could you introduce yourselves please, again, for the

3    benefit of the court reporter.

4           MS. STOVER:  Laura Stover, Eckert

5    Seamans, Cherin & Mellot, representing Maryland Casualty

6    Company and Zurich American Insurance Company.

7           MR. BAILOR:  Bernard Bailor from Caplin &

8    Drysdale, Washington, D.C., representing the Asbestos

9    Claimants Committee.

10          MR. GUY:  Jonathan Guy, Orrick,

11   Herrington & Sutcliffe, representing the Future Claimants

12   Representatives for P.I. claims.

13          MR. BLABEY:  David Blabey, Kramer, Levin,

14   Naftalis & Frankel, representing the Equity Committee.

15          MS. DeCRISTOFARO:  Elizabeth

16   DeCristofaro, Ford, Marrin, Esposito, Witmeyer & Gleser,

17   for Continental Casualty Company.

18          THE VIDEOGRAPHER:  Would the court

19   reporter please swear in the witness.

20

21          (ALAN C. WHITEHOUSE, called as a witness by

22   the Debtors, being first duly sworn to tell the truth,

23   the whole truth and nothing but the truth, was examined

24   and testified as follows:)

25

14

1                        EXAMINATION

2

3    BY MR. STANSBURY:

4         Q.      Good morning, sir.

5         A.      Good morning.

6         Q.      Could you please state your name for the

7    record?

8         A.      Alan Whitehouse.

9         Q.      And you are a medical doctor, right?

10        A.      I am.

11        Q.      Dr. Whitehouse, my name is Brian Stansbury.

12   I represent W.R. Grace.

13               Before we get started, I wanted to go over a

14   few background issues just to make sure we were on the

15   same page.  I know this isn't your first time at the

16   rodeo.  But I wanted to ask you a few questions.

17               First of all, I'm going to assume you

18   understand my question, unless you say otherwise.

19               Is that fair?

20        A.      That's fair.  I have some hearing problems,

21   though.

22        Q.      Okay.  Please let me know if at any time I'm

23   talking too fast or you do not understand my question.

24   Okay?

25        A.      Okay.

15

1           Q.     Additionally, I will ask that when I am

2     asking a question, that you will allow me to finish the

3     question before answering, and I will strive to do the

4     same when you are answering the questions.  That way the

5     court reporter keeps the record clear.

6                  Does that sound good?

7           A.     Okay.

8           Q.     Additionally, when answering questions, I

9     will ask that you answer with an audible yes or no, as

10    opposed to a nod, just, again, so the record is clear.

11                 Is that fair?

12          A.     Yes.

13          Q.     Are you under any medication today that would

14    affect your ability to answer questions?

15          A.     I don't think so.

16          Q.     Okay.  All right.  Dr. Whitehouse, I'm

17    handing you what's been marked as Exhibit 1.  And this is

18    a deposition notice for today.

19                 And you are Dr. Alan C. Whitehouse, correct?

20          A.     That's correct.

21          Q.     Okay.  And you intend to offer expert

22    testimony in the matter of In re:  W.R. Grace & Company,

23    correct?

24          A.     I do.

25          Q.     Okay.  And it is March 19th, 2009, correct?

16

1      A.      Yes.

2      Q.      Okay.  Now, I'm going to hand you what's been

3  marked as Exhibit 2.  And this document is entitled Libby

4  Claimants' Preliminary Objections to First Amended Joint

5  Chapter 11 Plan.

6              Have you ever seen this document before?

7                          (Pause in the proceedings).

8      A.      I have not seen this specific document.  I am

9  familiar with what's in it, though.

10     Q.      All right.

11     A.      But I am reading it right now.

12     Q.      All right.  The reason I present this to you

13  is it is my understanding that the Libby claimants are

14  objecting to the proponents' plan.

15              And on page 2 there's a list of criticisms.

16  And I think you may have opinions with respect to some of

17  them.  And I wanted to ensure that you do or do not.

18              The first, and I'll read, and tell me if I am

19  reading this correctly, "The TDP excludes legitimate

20  Libby claims by requiring the blunting of the

21  costophrenic angle as a criterion for disease level."

22              Do you see that?

23     A.      Yes.

24     Q.      Did I read that correctly?

25     A.      Yes.

17

1    Q.    Do you agree with that statement?

2    A.    I do.

3    Q.    Okay.  Next statement.  "The TDP excludes

4 legitimate Libby claims by requiring a minimum three

5 millimeter pleural thickening as a criterion for disease

6 level."

7          Do you see that statement?

8    A.    Yes.

9    Q.    Do you agree with that?

10   A.    Yes.

11   Q.    Okay.  Next, "The TDP excludes legitimate

12 Libby claims by requiring pleural thickening coverage of

13 over 25 percent as a criterion for disease level."

14         Did I read that correctly?

15   A.    Yes.

16   Q.    Do you agree with that statement?

17   A.    I do.

18   Q.    Next, "The TDP excludes legitimate Libby

19 claims by not permitting the use of DLCO to establish

20 severity and impairment of asbestos-related disease."

21         Did I read that correctly?

22   A.    Yes.

23   Q.    Do you agree with that statement?

24   A.    I do.

25   Q.    Next, "The TDP excludes legitimate Libby

18

1    claims by requiring an FEV1/FVC ratio over 65 percent as

2    a criterion for disease level."

3              Did I read that correctly?

4    A.    Yes.

5    Q.    And do you agree with that statement?

6    A.    I do.

7    Q.    Now, you intend to offer opinions at a

8    hearing related to the disease that various Libby

9    claimants have, is that correct?

10   A.    That's correct.

11   Q.    And based on these statements, it is your

12   belief that the current mechanism for assessing claims

13   does not properly characterize Libby disease?

14             Is that true?

15             MR. HEBERLING:  Objection.  Calls for a

16   legal conclusion.

17             THE WITNESS:  Basically -- Repeat the

18   question again.

19             MR. STANSBURY:  Would you read back the

20   last question, please sir.

21                                  (Record read).

22             THE WITNESS:  I agree.

23   Q.    (BY MR. STANSBURY:)  And just so I am clear,

24   when we are talking about disease and Libby, are we

25   talking primarily about the interstitial disease in Libby

19

1    or the pleural disease in Libby?

2        A.      We are talking about everything, but

3    predominantly the pleural disease.

4        Q.      So, your objection is really to the way we

5    are dealing with pleural disease, is that correct?

6        A.      Not entirely.

7        Q.      Primarily?

8        A.      Primarily.

9        Q.      And do you believe that the pleural disease

10   suffered by people in Libby exposed to tremolite from

11   Libby is distinct from pleural disease other people

12   exposed to other asbestos may have?

13       A.      Well, to begin with, your statement is

14   incorrect, because it's not tremolite that we are talking

15   about.  We are talking about winchite, richterite and

16   tiny amounts of tremolite.

17               So, we're talking about a different category

18   of asbestos, in part.

19       Q.      And so I am clear, that that mixture of

20   minerals has been referred to in the past as the Libby

21   amphibole, is that correct?

22       A.      That's correct.

23       Q.      Okay.  So, with that caveat, is it your

24   belief that people who have been exposed to this

25   winchite, richterite, tremolite hybrid are -- have a

20

1    pleural disease that is distinct from individuals who

2    have been exposed to other forms of asbestos?

3         A.    "Distinct" is a difficult word to use in that

4    situation.

5              There are manifestations of it that are

6    frequently different.  They are much more severe in

7    general.  Any of these findings may be seen in other

8    types of asbestos.  It is just the degree.  We have to

9    clarify what we are talking about.

10        Q.    All right.  Well, let's clarify what we are

11   talking about, just so we are clear.   Do you believe

12   that people who have been exposed to winchite,

13   richterite, tremolite from Libby have a more severe form

14   of pleural disease than people exposed to, let's say,

15   chrysotile?

16        A.    Yes.  Clearly.

17        Q.    Okay.  Do you believe that people exposed to

18   winchite, richterite, tremolite from Libby have a more

19   severe pleural disease than people exposed to amosite?

20        A.    That's not been totally established,

21   because there's -- You might want to use the term

22   amphiboles.  Okay?

23        Q.    Okay.  Let me back up, just so that I am

24   clear.

25        A.    Why don't you back it up, put it into a

21

1    category that works.

2        Q.    Sure.  Sure.  So, on the -- and maybe this is

3    important, then.  So, perhaps it's not winchite,

4    richterite, tremolite that it creating the more severe

5    pleural disease, it is all amphiboles in general, is that

6    correct?

7        A.    There's two parts -- There's more than one

8    part of the answer to that.

9            One is that all amphiboles seem to have more

10   pleural disease, and that's true from the Australian

11   studies and other studies.

12           But in addition, it would appear as if Libby

13   asbestos, and this is somewhat preliminary, is worse than

14   amosite, not yet established whether it's worse than

15   Australian crocidolite.  It may very well be.

16       Q.    All right.  So, you've said a lot there, and

17   let's unpack that.

18           Chrysotile you firmly believe does not cause

19   the same severe pleural disease that winchite,

20   richterite, tremolite does, correct?

21       A.    Yes.

22       Q.    Okay.  And as you just said, amosite likely

23   does not cause as severe pleural disease as winchite,

24   richterite, tremolite do, is that correct?

25       A.    When you look at the studies of, like,

22

1    insulators, they were exposed to both chrysotile and

2    amosite, because that was the mixture that was in most of

3    the asbestos on the East Coast.

4            So, how you distinguish those two clearly,

5    one from the other, is difficult to do, because you can't

6    do both exposures at the same time.

7            To my knowledge, there are a few studies

8    relative to amosite alone.  I'm not really very familiar

9    with those.

10       Q.    Okay.  So, you're more familiar, then, with

11   studies involving chrysotile, crocidolite, and I believe

12   you mentioned --

13       A.    Uh-huh.

14       Q.    -- the experience with it when you were in

15   Australia?

16       A.    Yes.

17       Q.    And those are studies authored be Cookson, is

18   that correct?

19       A.    And others.

20       Q.    And others.  But Cookson has written studies

21   about -- -

22       A.    Cookson, and other people.

23       Q.    So, you don't necessarily have an opinion at

24   this time as to how pleural disease from exposure to

25   winchite, richterite, tremolite, compares to amosite,

41

1      A.      No, not necessarily.  I think the other two

2  physicians that work up in the CARD clinic, Dr. Black,

3  and Dr. Heppe, both recognize that just as well as I do.

4          I would dare say, though, that there are a

5  limited number of people in this country that really

6  understand the significance of that, and those are the

7  people that work, and generally are pulmonologists who

8  work all the time with people with asbestos disease.

9      Q.      What is Dr. Heppe's first name?

10      A.      Mark.

11      Q.      Mark.  And what is his background?

12      A.      He's an internist.

13      Q.      What is an internist?

14      A.      That's a physician that practices general

15  internal medicine.  He's done that for years.  He's very

16  experienced.  And he's been at the clinic for a couple of

17  years.  And he's also been seeing this stuff for years in

18  the emergency room at the hospital.

19      Q.      Did he do a residency in pulmonology?

20      A.      No.

21      Q.      Did he do a residency in radiology?

22      A.      No.

23      Q.      Did he do a residency in occupational

24  medicine?

25      A.      No.

42

1      Q.    Did he do a fellowship in radiology?

2      A.    No.  All of these questions are going to be

3    no, and you know it, even before you ask me.

4      Q.    Well, I just want to make sure, just so he

5    have this understanding.

6      A.    Well, you're making the assumption that

7    because you had all of this particular training, that you

8    can't see things, you know.

9            Competent physicians with an open mind who

10   are inquisitive see these things.  And they understand.

11   And it doesn't take them very long.  They read the

12   literature.  And we have a wealth of literature up there

13   available to us.  And they get it.

14     Q.    So, Dr. Heppe has not completed a residency

15   or fellowship in radiology, pulmonology or occupational

16   medicine, correct?

17     A.    No.

18     Q.    Okay.  The other physician is Dr. Brad Black,

19   is that correct?

20     A.    That's correct.

21     Q.    And Dr. Brad Black has not completed a

22   residency or a fellowship in radiology, pulmonology or

23   occupational medicine, correct?

24     A.    That's correct.

25     Q.    His primary training is a pediatrician,

43

1   correct?

2       A.    Originally, yes.

3       Q.    Okay.  But correct, yes?

4       A.    Yes.  That's correct.

5       Q.    Okay.  And asbestos disease is not very

6   common in children, is it?

7       A.    I'm not so sure about that anymore.  But

8   probably not.

9       Q.    When they --

10      A.    We're going to find that out in about 10

11  years.

12      Q.    We're going to find that out in 10 years.

13  Why is that?

14      A.    Because we've got a ton of children that have

15  been exposed to this stuff.

16      Q.    When?  Do you know?

17      A.    All along here.

18      Q.    All along?

19      A.    But particularly, all along from, regardless

20  of when they were born.  But in the last 10, 20 years, as

21  well.

22      Q.    Currently, ongoing?

23      A.    Probably.  But I don't know the extent of it

24  now.

25      Q.    Do you know anything about the levels of

206

1    didn't get referral letters from lawyers sending me

2    patients at all." That is your testimony?

3        A.    I believe so. I don't recall getting any.

4        Q.    I'm handing you what has been marked as

5    Exhibit 57. Actually, let me see that for one second,

6    please, if I could have that back. Sorry about that.

7              I'm handing you what has been marked as

8    Exhibit 57. This was a record produced to W.R. Grace in

9    March of 2006 by the CARD Clinic under the direction of

10   the U.S. Government in connection with the criminal case,

11   and these were the records for the individuals whose

12   records were the basis of your published study.

13             And here we see a letter dated December 14th,

14   1995, and it begins, "Thank you for referring" blank, and

15   the person's name is redacted, "for evaluation of

16   asbestosis."

17             Did I read that correctly?

18       A.    Yes.

19       Q.    And the recipient of this will is redacted,

20   correct?

21       A.    Yes.

22       Q.    If you will turn to the next page, please.

23       A.    All right.

24       Q.    Last line before "Sincerely yours."

25       A.    Okay.

207

1      Q.     "Thank you for referring him for an

2   evaluation."

3            Did I read that correctly?

4      A.     Yes.

5      Q.     All right.  Now I am going to hand you what

6   has been marked as Exhibit 58.  Keep this letter here,

7   please.  This letter was produced to us a month later,

8   redacted, by the U.S. Government, and I believe that you

9   will see that Exhibits 57 and 58 are identical.

10            Do you see that?

11      A.     Obviously I wrote a letter.

12      Q.     Now, who was the recipient of the letter on

13   the December 14th, 1995 letter?

14      A.     Mr. Heberling.

15      Q.     Jon Heberling.  So, this is an example of a

16   referral from an attorney, correct?

17      A.     I guess you would have to consider that, yes.

18   I made an error.

19      Q.     You said "Thank you for referring," correct?

20      A.     Yes.

21      Q.     But you had also said that there were no

22   letters, correct?

23      A.     I didn't recall any at the time that I was

24   deposed.

25      Q.     Okay.  I'm handing you what has been marked

208

1    as Exhibit 59.  And if you will compare this document to
2    Exhibit 58, the patient identifier, 550-493.
3                              (Pause in the proceedings).
4        Q.    And this is indeed, if I am not mistaken, a
5    letter from Mr. Heberling, referring this individual to
6    you, correct?
7        A.    And then on the bottom it says DNKA, did not
8    keep his appointment.
9        Q.    Did not keep his appointment.  But judging by
10   your letter here --
11       A.    He must have later, yeah.
12       Q.    All right.
13       A.    He had an appointment in October, and he
14   didn't show.
15       Q.    Okay.  This was a person referred by Mr.
16   Heberling, then, correct?
17       A.    I assume it, yeah.
18       Q.    Which would be inconsistent with your earlier
19   testimony, correct?
20       A.    Which would be what?
21       Q.    Inconsistent in your testimony in the
22   previous deposition, in which you said there were no
23   referrals and no letters.
24       A.    I guess you are right.  Unfortunately, the
25   reason it got dropped is because the guy didn't show up

209

1    the first time.

2        Q.    Okay.

3        A.    And then did on his own.

4        Q.    I'm handing you what has been marked as

5    Exhibit 60.  Do you recognize the handwriting on this

6    piece of paper?

7        A.    No.

8        Q.    This was a note given to me by Nurse Kimberly

9    Rowse at the CARD Clinic.  Is that Nurse Rowse's

10   handwriting?

11       A.    It probably is, yes.

12       Q.    She's the head nurse at the CARD Clinic?

13       A.    Yes, she is.  Yeah.  Well, she's sort of the

14   manager there, yeah.  I guess that is her handwriting.

15   It is in pencil, isn't it.

16       Q.    I am handing you what has been marked as

17   Exhibit 61, and this is a letter dated October 13 --

18   August 13, 1997.  Once again, for LP055.  Another

19   individual from your study.  This is produced in March of

20   2006 where the redactions were handled through the CARD

21   Clinic.

22             What does it say above the addressee of this

23   letter, which has been redacted?

24             MR. HEBERLING:  Objection.  We don't know

25   that this person is from the study.  I mean, you're

210

1   representing that.  But the record does not so reflect as

2   of yet.

3                    THE WITNESS:  I can't read it.

4        Q.    (BY MR. STANSBURY:)  What about before "Thank

5   you"?  What does that say?

6        A.    "Referring M.D."

7        Q.    What does that mean?

8        A.    I don't know.

9        Q.    What does "referring M.D." mean?

10       A.    It means that there was an M.D. that may have

11   referred the patient.  But it says, "Thank you for

12   referring him," and there is something crossed out.  It

13   is very short.  So, I don't know what it is.

14       Q.    Okay.

15       A.    I have no idea whether it was anybody even in

16   this study.

17       Q.    But the doctor who referred this has been

18   redacted, correct?

19       A.    I guess.  I'm sure it is, yeah.

20       Q.    Okay.  I'm handing you what's been marked as

21   Exhibit 62.  If you will look, this is also a letter from

22   August 13th, 1997.  This was produced in April of 2006.

23   The redactions were handled by the U.S. Government at

24   this time.

25                    Now we see under what was "referring M.D." on

211

1    the previous exhibit, the recipient of this letter was

2    Jon Heberling, attorney.

3         A.    I see that.  And again, who's the patient?

4         Q.    The patient, the information has been

5    redacted from us, is LP, if you look at the document.  He

6    was LP055, was how it was produced to us in March of

7    2006.  We were not permitted to know the names, and

8    personal identifiable information was redacted.

9              The broader patient records were produced to

10   us in April of 2006, and we received this record, and

11   this 550 was from the 550 database that you referenced in

12   your report.

13        A.    Yeah.  But that wasn't necessarily the ones

14   that were in here either.

15        Q.    But that's the same person, isn't it?  Look

16   at those letters.

17        A.    Oh, yeah.  It's the same person, yeah.

18        Q.    So, the first letter, the LP055.

19        A.    Yeah.

20        Q.    Okay.  This is clearly a referral from Jon

21   Heberling, is it not?

22        A.    Well, it is or it is not.  It says "Enclosed

23   is a copy of the workup I did."  I write sometimes --

24   what happens is I ask the patient about referring

25   physicians or anybody that they want me to send the

212

1    workup to, and then I will send it with a cover letter.

2    And this is a typical cover letter.

3              When somebody refers it, I usually say, thank

4    you for referring somebody.  This one says, "Enclosed is

5    a copy of the workup."

6              I don't know that he referred the patient at

7    all.  I have no idea.

8         Q.    If you will look at the bottom of Exhibit --

9    I'm sorry.  Which Exhibit Number is unredacted?

10        A.    This one?

11        Q.    Yeah.  What Exhibit Number is that?

12        A.    What is the number?

13        Q.    Yes.  Exhibit Number.

14        A.    Oh.  62.

15        Q.    At the bottom of Exhibit 62 does it not

16    say, "Jon, thank you for referring him."  Is that

17    correct?

18        A.    Well, I guess it does, yes.

19        Q.    So, it sounds to me like this is again

20    another referral.

21        A.    It may very well be.

22        Q.    Okay.  So, once again, the prior testimony,

23    about there being no referrals in this study, may not be

24    accurate, correct?

25        A.    It may be.

213

1          Q.      Okay.   I'm handing you what has been marked

2    as Exhibit 63, which is a medical record for LP076 dated

3    September 25th, 1996.

4                  Once again, the recipient of the letter has

5    been redacted in this version produced in March of 2006,

6    but as it says, "Thank you for referring him."

7                  We do not know who the addressee is.   Is that

8    correct?

9          A.      It's covered up here.

10         Q.      Right.

11         A.      I assume you have another copy of it.

12         Q.      You assume correctly.   I'm handing you what

13   has been marked as Exhibit 64, which is the same letter,

14   also dated September 25th, 1996, for 550-538.   Again,

15   this is produced under the direction and redaction of the

16   U.S. government, and once again, the recipient of the

17   letter is Jon Heberling, is it not?

18         A.      How do I know that any of these were in this

19   study?

20         Q.      Well, you produced those records in March of

21   2006.

22         A.      Yeah.   But we produced 500 and some odd

23   records.

24         Q.      In March of 2006 you produced 123.

25                 MR. HEBERLING:   Brian, you're going to

214

1   have to establish this in the record in another way.  You

2   can't ask him these questions.

3       Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, you

4   produced these records through the U.S. government, they

5   were made available for use in the bankruptcy.

6                   MR. HEBERLING:  Objection, misstates the

7   record.

8                   THE WITNESS:  The government also has the

9   records on the whole database.

10      Q.    (BY MR. STANSBURY:)  Which whole database?

11      A.    The 550 that were in my database.

12      Q.    That's exactly what that second record is.

13  It came from --

14      A.    Yeah.  But what does it have to do

15  necessarily with this paper?

16      Q.    Because they are the same people.

17                  MR. HEBERLING:  Objection, argumentative.

18  Ask him questions.

19                  THE WITNESS:  Tell me that it's one of

20  the ones in here, and prove to me that it's one of the

21  ones in here, not just one that's in the 550.

22      Q.    (BY MR. STANSBURY:)  Was Jay Swennes in your

23  study?

24                  COURT REPORTER:  Say that again?

25                  MR. STANSBURY:  Jay Swennes.

215

1    S-W-E-N-N-E-S.

2        A.    I think he was, yes.

3        Q.    All right.

4        A.    Jay Swennes -- There's two Swennes'.  There's

5    a Jeff and a Jay.

6        Q.    Excuse me.  Jeff.  Was Jeff Swennes in your

7    study?

8        A.    I believe he was.

9                MR. STANSBURY:  What Exhibit Number are

10    we on?

11                THE WITNESS:  This was long before that

12    study was even thought about, five years before that.

13                MR. STANSBURY:  What exhibit number are

14    we on?

15                MS. LEE:   65.

16        Q.    (BY MR. STANSBURY:)  I'm handing you Exhibit

17    65, which is another copy of the December 15th, 1995

18    letter where you are thanking Jon Heberling for the

19    referral.  This letter was produced as part of a PIQ.

20    Again, we see that it is Jeff Swennes --

21                MR. HEBERLING:  Objection.  Argumentative

22    and lack of foundation.

23                Just ask him questions.  Don't argue with

24    him.

25        Q.    (BY MR. STANSBURY:)  If you want to, you can

216

1    compare that to this letter right here, tell me if they

2    are the same letter, Exhibit 57.  They should match.

3              This confusion over who is who is an issue of

4    CARD's creation, not --

5              MR. HEBERLING:  Objection, argumentative.

6        Q.    (BY MR. STANSBURY:)  Is that the same person,

7    Dr. Whitehouse?

8              MR. HEBERLING:  CARD --

9              THE WITNESS:  It looks like it was.  But,

10   you know, I didn't create any -- If you have problems

11   with CARD, it's nothing that I had anything to do with.

12   Your people came in there, made copies of charts.  The

13   feds made copies of charts.  I had nothing to do with any

14   of that.

15       Q.    (BY MR. STANSBURY:)  Well, clearly --

16       A.    So, don't put it on me.

17             MR. HEBERLING:  In the criminal case,

18   Grace obtained permission to go back to CARD in the two

19   or three weeks before the criminal case started on the

20   representation to the court that they had screwed up all

21   the identifications of the patient numbers, and they

22   didn't know what they had.  So, they had to copy it all

23   over again.

24       Q.    (BY MR. STANSBURY:)  Is Jeff Swennes in your

25   study, sir?

217

1           MR. HEBERLING:  So, if you want to get

2     into an argument on the issues, I think that's a good

3     one.

4           THE WITNESS:  I don't know.  Because I

5     don't have my computer here.  He may be.  He may very

6     well be.  I'm very familiar with Jeff.

7     Q.     (BY MR. STANSBURY:)  And is that the same

8     letter as Exhibit 57?

9           MR. HEBERLING:  Objection, unclear as to

10    what he is referring to.

11    Q.     (BY MR. STANSBURY:)  Which exhibit do you

12    have in your hand?

13    A.     Well, wait a minute.  It is not.  The typing

14    is different.  It's very different.  Look at this.  This

15    thing is big, broad type.  This is little tiny type.

16    Q.     I believe the copies are different.  But if

17    you want to look word for word, Dr. Whitehouse, I believe

18    these are the exact same letters.  If you can find any

19    words that are different that are unredacted, please do

20    so.

21          But one looks like it was copied in a much

22    larger font than another.  But these are the same

23    letters.  Jeff Swennes, as this letter indicates, was

24    referred by Mr. Heberling.

25          MR. HEBERLING:   Objection, argument,

218

1    lack of foundation.  None of this is in the record.

2                         (Pause in the proceedings).

3                    THE WITNESS:  Whose copy is this

4    (indicating)?

5         Q.    (BY MR. STANSBURY:)  That was a copy I pulled

6    out.

7         A.    I see.

8                    MR. SCHIAVONI:  I've never in my career

9    seen someone intervene in a bankruptcy and not say who

10   they are as a client.  And I have a standing objection to

11   that process taking place here.  None of the other --

12                    I don't know what's happened with Grace, but

13   no creditor in this case has consented to people

14   appearing in the bankruptcy secretly.

15                    To the extent we can't cross-examine them

16   because their names are blotted out, I'm being

17   substantially prejudiced.

18        Q.    (BY MR. STANSBURY:)  Just so the record is

19   clear, Exhibit 57, a letter that was produced and marked

20   LP072, December 14, 1995, thanking Mr. Heberling for a

21   referral, is the same letter as Exhibit 65, December 14,

22   1995, in which it's clear that the recipient of this

23   letter was Jon Heberling.  It was redacted in Exhibit 57.

24   It isn't here.

25                    Do you still stand by your statement --

268

1    disease causes DLCO, that you did not take into account

2    the statements in this ATS statement, this ATS/ERS

3    statement regarding lung function?

4        A.    No.    Do you want me to take into account

5    every statement that you've come up relative to this?

6              This is something that I'm not intimately

7    familiar with.  So, you can read a statement out of that

8    and I'm supposed to agree or disagree with it, when I've

9    got another statement that may be contrary with that.

10   And that's basically what you're doing here.

11       Q.    Well, let's continue with the rest of this

12   paragraph.

13       A.    And, you know, I'm tired, and I don't feel

14   very well, and I'm going to end this deposition now.

15   Okay.

16       Q.    Dr. Whitehouse, we have not gotten through

17   all of the material.  I still have more time.

18       A.    I don't care whether you have or not.  You

19   are going to have another chance, another crack at me.

20   I'm done.  Okay?

21       Q.    Dr. Whitehouse --

22              MR. HEBERLING:  I'm sorry, Brian --

23       Q.    (BY MR. STANSBURY:)  --  let's take a break.

24   Are you walking out of this deposition?

25       A.    I'm walking out.

269

1          MR. HEBERLING:  He's already gone beyond

2    probably what he should have.  Now, he's not been well.

3          MR. STANSBURY:  This is not what we

4    agreed to.

5          MR. HEBERLING:  You can't agree on what

6    his condition's going to be at the time of deposition.

7          MR. STANSBURY:  We will depose you again.

8          MR. HEBERLING:  Oh, yes.  You may do

9    that.

10         THE WITNESS:  You'll get your other crack

11   at me.  But we're done for today.  That's all there is

12   to it.

13         MR. HEBERLING:  When you're 71 years old,

14   maybe you will understand this.  I mean, you've been at

15   him since 8:30 this morning.

16         THE VIDEOGRAPHER:  Are we going --

17         MR. STANSBURY:  Stay on the record.

18         MR. SCHIAVONI:  John, I don't need to go

19   on.  I will just reserve my rights.  Is that acceptable?

20         MR. HEBERLING:  Certainly you may reserve

21   your rights.  You'll get another chance.  But, you know,

22   I'll bet we've gone farther than we should have gone

23   already.

24         MR. STANSBURY:  And what is the time,

25   sir?

270

1                   THE VIDEOGRAPHER:  The time is --

2                   MR. HEBERLING:  Two o'clock.

3                   MR. STANSBURY:  No, no, the time of the

4       deposition.

5                   THE VIDEOGRAPHER:  Oh.  The total time.

6                   THE WITNESS:  Six hours.

7                   MR. STANSBURY:  No, it is not.

8                   THE WITNESS:  Well, five hours.  Excuse

9       me.  We had a half an hour for lunch.

10                                  (Pause in the proceedings).

11                  THE VIDEOGRAPHER:  It is four hours 24

12      minutes.

13                  MR. HEBERLING:  Okay.  Brian, off the

14      record.  Do you really need a copy of that?  You've got

15      one.  I mean, there's nothing, I will represent to you,

16      that that is the thing that -- the same thing that we

17      delivered to everybody in December.

18                  MR. STANSBURY:  You didn't deliver it to

19      Tanc.  We will copy it.  Tanc will get a copy.  And then

20      we will send the original back to you.

21                  MR. SCHIAVONI:  Is that all right?

22                  MR. HEBERLING:  Sure.  I mean, he's got

23      several others.  I've got others.

24                  Doctor, this is formal proceeding, and that's

25      the way it's going to be.