IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                    ) Chapter 11
                          )
W. R. GRACE & CO.,        ) Case No. 01-01139 JKF
et al                     )
                          )
        Debtors           )

        Deposition of RICHARD CHARLES FINKE
taken pursuant to notice at the law offices of
Drinker, Biddle & Reath, LLP, 1100 North Market
Street, Suite 1000, Wilmington, Delaware,
beginning at 9:35 a.m., on Monday, March 30,
2009, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

APPEARANCES:

        LISA G. ESAYIAN, ESQUIRE
        KIRKLAND & ELLIS, LLP
        200 East Randolph Drive
        Chicago, IL 60601
            For - Debtors
        DANIEL A. SPEIGHTS, ESQUIRE
        SPEIGHTS & RUNYAN
        200 Jackson Avenue, East
        Hampton, SC 29924

        For - Anderson Memorial Hospital

----------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



RECEIVED
APR 1 3 2009
COPY

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

**WILCOX & FETZER LTD.**
Registered Professional Reporters

```
 1   APPEARANCES:  CONTINUED
 2        JOHN W. KOZYAK, ESQUIRE
          KOZYAK TROPIN THROCKMORTON
 3        2525 Ponce de Leon, 9th Floor
          Miami, FL 33134
 4
              For - Anderson Memorial Hospital
 5
          MATTHEW I. KRAMER, ESQUIRE
 6        BILZIN, SUMBERG, BAENA, PRICE
          & AXELROD, LLP
 7        200 S. Biscayne Boulevard, Suite 2500
          Miami, FL 33131-5340
 8
              For - PD Committee
 9
          ARLENE G. KRIEGER, ESQUIRE
10        STROOCK & STROOCK & LAVAN, LLP
          180 Maiden Lane
11        New York, NY 10038-4982
12            For - Official Committee of
                    Unsecured Creditors
13
          ALAN B. RICH, ESQUIRE
14        Elm Place
          1401 Elm Street, Suite 4620
15        Dallas, TX 75202
16            For - PD FCR
17        ELISA ALCABES, ESQUIRE
          SIMPSON, THACHER & BARTLETT, LLP
18        425 Lexington Avenue
          New York, NY 10017-3954
19
              For - Travelers Casualty & Surety
20                  Company
21        KATHLEEN A. ORR, ESQUIRE
          ORRICK, HERRINGTON & SUTLIFFE, LLP
22        1152 15th Street, N.W.
          Washington, D.C. 20005
23
              For - David Anstern, Asbestos PI
24
```



```
 1   APPEARANCES:  CONTINUED
 2        MICHAEL F. BROWN, ESQUIRE
          DRINKER, BIDDLE & REATH, LLP
 3        One Logan Square
          18th and Cherry Streets
 4        Philadelphia, PA 19103-6996
 5            For - Government Employees Insurance
                    Company, Columbia Insurance,
 6                  One Beacon America Insurance
                    Company and Seaton Insurance
 7                  Company
 8        SHANNON L. GRIFFIN, ESQUIRE
          O'MELVENY & MYERS, LLP
 9        Times Square Tower
          7 Times Square
10        New York, NY 10036
11            For - Arrowood Indemnity Company,
                    f/k/a Royal Indemnity Co.
12
          MARNIE E. SIMON, ESQUIRE
13        STEVENS & LEE
          1818 Market Street, 29th Floor
14        Philadelphia, PA 19103-1702
                - and -
15        JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
          STEVENS & LEE
16        1105 North Market Street, 7th Floor
          Wilmington, DE 19801
17
              For - Fireman's Fund Insurance
18                  Company
19        SHAYNE W. SPENCER, ESQUIRE
          ELIZABETH DeCRISTOFARO, ESQUIRE (VIA
20        TELEPHONE)
          FORD, MARRIN, ESPOSITO, WITMEYER
21        & GLESER, LLP
          Wall Street Plaza
22        New York, NY 10005-1875
23            For - CNA Insurance Company
24
```

4

1    APPEARANCES:   CONTINUED
2          ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
           CUYLER BURK, LLP
3          Parsippany Corporate Center
           Four Century Drive
4          Parsippany, NJ 07054
5              For - Allstate Insurance Company
6          LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
           NEARHOOD LAW OFFICES
7          7537 E. McDonald Drive
           Scottsdale, AZ 85250
8                  - and -
           GABRIELLA V. CELLAROSI, ESQUIRE
9          (VIA TELEPHONE)
           ECKERT SEAMANS
10         1747 Pennsylvania Avenue, N.W.
           Suite 200
11         Washington, D.C. 20006-4604
12             For - Maryland Casualty Insurance
                        Company and Zurick
13                      Insurance Company
14                  * * * * * *
15                 RICHARD CHARLES FINKE,
16         the deponent herein, having first been
17         duly sworn on oath, was examined and
18         testified as follows:
19                    EXAMINATION
20    BY MR. SPEIGHTS:
21         Q.   Would you state your full name, please,
22    sir?
23         A.   Yes.   Richard Charles Finke, F-i-n-k-e.
24         Q.   Mr. Finke, who are you employed by?

RICHARD CHARLES FINKE

5

1       A.    W. R. Grace & Co.

2       Q.    How long have you been employed by Grace?

3       A.    Twenty years.

4       Q.    Can you tell me the approximate date you

5    started?

6       A.    No.    I can tell you the exact date I

7    started.    February 27, 1989.

8       Q.    Who do you presently report to?

9       A.    Mark Shelnitz, general counsel of W. R.

10   Grace.

11      Q.    How long have you reported to

12   Mr. Shelnitz?

13      A.    Since he became general counsel, which

14   was three or four years ago.    I forget how long.

15      Q.    Does April 2005 seem about right?

16      A.    It seems about right, yes.

17      Q.    Would you give me the positions you have

18   held at Grace and the approximate dates you held

19   each position?

20      A.    When I was hired, I held the position of

21   senior litigation counsel and I became assistant

22   general counsel for litigation in -- it was

23   around March of 2006.

24      Q.    Is that your present position?

RICHARD CHARLES FINKE

6

1      A.   Yes.

2      Q.   When you initially went to work at Grace,

3   who did you report to?

4      A.   I reported to Robert Beber, B-e-b-e-r.

5      Q.   And how long did you report to Mr. Beber?

6      A.   Until he retired.  He was general counsel

7   of W. R. Grace.  When he retired, I frankly don't

8   recall the year or the date.

9      Q.   Who did you report to between the

10  retirement of Mr. Beber and Mr. Shelnitz taking

11  over as general counsel?

12     A.   I reported to David Siegel, S-i-e-g-e-l,

13  who became general counsel after Mr. Beber.

14     Q.   Were you reporting to Mr. Siegel when

15  Grace filed its petition for reorganization?

16     A.   Yes.

17          MS. GRIFFIN:  May I interrupt?  I

18  apologize.  I'm Shannon Griffin with O'Melveny &

19  Myers.  I represent Arrowood Indemnity.  And I

20  thought we were going to do introductions.  So I

21  apologize for the interruption.

22          But I would like to enter an exhibit

23  before we take off on Arrowwood's objections,

24  which were filed last night.  Everyone should

7

1    have received a copy.  And I have copies for

2    everybody here.  But I would like to mark this as

3    Exhibit 1 so I don't have to keep objecting

4    throughout.

5            MR. SPEIGHTS:  I have not seen it so

6    I would like to see it before you mark it.

7            MS. GRIFFIN:  Sure.

8            (Finke Deposition Exhibit No. 1 was

9    marked for identification.)

10           MR. SPEIGHTS:  Although it's normal

11   for a party to mark its exhibits during its own

12   examination, I certainly don't object to counsel

13   marking it now to avoid having to state these

14   same objections orally or restate them

15   innumerable times.

16           MS. GRIFFIN:  Thank you.

17           MR. BROWN:  While we are doing that,

18   so that we can avoid it.  My clients, Government

19   Employees Insurance Company, Columbia Insurance

20   Company and Seaton Insurance Company and One

21   Beacon America Insurance Company, join in those

22   objections.

23           MS. ALCABES:  My clients as well,

24   Travelers Casualty & Surety Company, also joins

RICHARD CHARLES FINKE

8

1    in the objection.

2              And to the extent that the debtor

3    implied on Friday that this was the one and only

4    time that this witness would be provided, we

5    object to any implication of that sort and

6    reserve our rights to take another deposition as

7    required.

8              MS. SIMON:  And my clients, Firemen's

9    Fund Insurance Company, also joins in the

10   objections and reserves its rights to depose the

11   deponent at that time, if necessary.

12             MR. SPENCER:  Continental Casualty

13   also joins in the objection and reserves its

14   rights as stated by all other counsel previously.

15             MS. ESAYIAN:  From the debtor's

16   perspective, everyone's reservations of rights

17   are noted and I believe our position was clearly

18   stated on Friday.  And I won't take more time

19   here.

20   BY MR. SPEIGHTS:

21      Q.   Mr. Finke, were your general duties and

22   responsibilities the same from 1989 until the

23   bankruptcy?

24      A.   Yes.

RICHARD CHARLES FINKE

9

1    Q.   Can you generally describe what your

2    duties and responsibilities were during that

3    period?

4    A.   Primarily, I was responsible for

5    oversight and management of asbestos property

6    damage cases, including reporting to Grace

7    management on the status or developments in those

8    cases.

9         I also was responsible for oversight

10    of expert witnesses that Grace retained or

11    Grace's counsel retained to testify in the

12    asbestos property damage litigation.

13    Q.   Were you part of a, for lack of a better

14    term, a team of lawyers working under Mr. Beber?

15    A.   Yes.

16    Q.   And what did you call the team?

17    A.   Just the asbestos litigation group

18    informally.

19    Q.   When a case was filed against Grace, how

20    was it decided which member of the group would be

21    responsible for that case?

22    A.   Early in the process or shortly after the

23    team was formed, the caseload was divided

24    geographically so that each person of the team

RICHARD CHARLES FINKE

10

1    was responsible for cases filed within certain

2    states.

3        Q.  For example, you got North Dakota?

4        A.  Yes, I did.

5        Q.  Who had South Carolina?

6        A.  Amy Klein.

7        Q.  And after her untimely death, who had

8    South Carolina?

9        A.  Correct.

10       Q.  Who did?

11       A.  I did.  I'm sorry.

12       Q.  Do you remember about when that was?

13       A.  No, offhand, I don't.

14           I'm sorry.  I take it back.  Another

15   attorney, Jerry Sheinman, took over for Amy after

16   she passed away.  And I then took over for Jerry.

17       Q.  Do you know whether you took over on or

18   after Anderson Memorial filed its case in

19   December of 1992?

20       A.  It would have been after.

21       Q.  Would Jerry Sheinman have been the

22   attorney responsible for Anderson when it was

23   originally filed?

24       A.  No, I believe Amy Klein was responsible

RICHARD CHARLES FINKE

11

1    at that time.

2        Q.   Let me take a case as an example and kind

3    of walk through it as a means of understanding

4    what you did.

5            I believe you were responsible for

6    the Montana/Dakota Utilities lawsuit filed in

7    North Dakota, which we referred to as MDU, is

8    that correct?

9        A.   Yes.

10       Q.   When that case was filed, of course, it

11   was assigned to you because it was a North Dakota

12   case, did you open a file?

13       A.   Yes.

14       Q.   Where was the file maintained?

15       A.   In Boca Raton, where the litigation group

16   was based.

17       Q.   Did you receive copies of the various

18   pleadings that were filed in that case?

19       A.   Yes.

20       Q.   And would you file those in your file at

21   Boca Raton?

22       A.   Yes.

23       Q.   Was somebody responsible for doing the

24   filing?



RICHARD CHARLES FINKE

12

1      A.   Yes.  A paralegal.

2      Q.   Who was that?

3      A.   Her first name was Gail.  And her last

4   name will come to me.  But she has been -- she

5   has not been with the company for quite a while.

6   I don't recall her last name.

7      Q.   And if you recall it during the

8   deposition, just stop me and say I'm now

9   recalling.

10           Would you review the pleadings as

11   they were filed in the case?

12      A.   Yes.

13      Q.   Would you have regular contact with the

14   lawyer assigned to the case; that is, litigation

15   counsel?

16      A.   You're referring to outside counsel?

17      Q.   Outside counsel.  In this case,

18   Mr. Plunkett?

19      A.   Yes.  Yes, I would have regular contact

20   with him or his members of his staff.

21      Q.   In addition to telephone calls with

22   outside counsel, did you have correspondence or

23   e-mails with outside counsel?

24      A.   Yes.

RICHARD CHARLES FINKE

13

1    Q.   Would a copy of the correspondence have

2    been maintained in the file?

3    A.   Yes.

4    Q.   How about e-mails?  Would you have kept

5    those in the file?

6    A.   To the extent we had e-mails then, and I

7    frankly don't recall at what point we started

8    using e-mail; and, if I had printed out hard

9    copies, they would have been maintained in the

10   file, yes.

11   Q.   Where would the MDU file be today?

12   A.   Probably in storage, in a facility in

13   Miami.  Although the trial transcript is

14   maintained in the Boca Raton office.

15   Q.   Do you maintain all trial transcripts in

16   the Boca Raton office of PD cases?

17   A.   Yes.

18   Q.   How about depositions taken in the MDU

19   case, expert or lay, do you maintain copies at

20   Boca?

21   A.   Expert deposition transcripts would be

22   maintained and are maintained in the Boca Raton

23   office.  Case specific transcripts would most

24   likely be with the case file, which I believe

RICHARD CHARLES FINKE

14

1   would be in storage.

2      Q.   Who is responsible for that storage?   Is

3   that an outside vendor?

4      A.   Yes.   Iron Mountain.

5      Q.   Were you aware that Anderson was filed in

6   1992 even though it was not assigned to you at

7   that time?

8      A.   Yes.

9      Q.   Was it a case that generated some

10  discussion among the group?

11     A.   Yes.

12     Q.   Was it a case that was discussed, not

13  only among the group, but with Mr. Beber as well?

14     A.   Yes.

15     Q.   Would it be fair to say it was not just

16  another case?

17     A.   Yes, I think that's fair.

18     Q.   Were you assigned to particular experts

19  during this period of time before the bankruptcy?

20     A.   Yes.

21     Q.   Which experts were you assigned to or

22  which experts were assigned to you I suppose is

23  correct as well?

24     A.   In general, I was responsible for what we

15

1    referred to as the scientific and technical

2    experts.   Those included Dr. Richard Lee,

3    Dr. Morton Corn, Charles Blake, Roger Morse.

4    From time to time, we did use other industrial

5    hygiene experts, although I don't recall names

6    right now.

7        Q.   Would you attend depositions of these

8    experts on occasion when they were being deposed

9    in cases which were not assigned to you?

10       A.   Yes.

11       Q.   Would you attend all of their

12   depositions?

13       A.   Nearly all of them.

14       Q.   Which plaintiffs' experts were assigned

15   to you?

16       A.   The plaintiffs' experts in the same field

17   and they included Dr. William Longo, Dr. James

18   Millette, Richard Hatfield, William Ewing, Dale

19   Keyes, K-e-y-e-s, Dr. Arthur Rohl, R-o-h-l.  And,

20   again, there were others.  I remember a gentleman

21   named I believe last name Mayer, M-a-y-e-r.

22       Q.   Dave Mayer?

23       A.   Yes.  There were probably a few others in

24   those fields.  But, again, the names don't come

RICHARD CHARLES FINKE

16

1    to me right now.

2        Q.   How about Steve Hayes?

3        A.   Yes, Steve Hayes would be another.

4        Q.   And did you generally attend the

5    depositions of these plaintiffs' experts even

6    when they testified in cases that had not been

7    assigned to you?

8        A.   In general, yes.

9        Q.   Now, when you attended a deposition such

10   as a deposition of Dr. Longo, I think you

11   attended a few of them, did you prepare any sort

12   of report of the deposition?

13       A.   Generally, no.

14       Q.   Did you take notes during the deposition?

15       A.   Yes.

16       Q.   What would you do with your notes?

17       A.   I would put -- either put the notes in a

18   file or do a memo to the file of any salient

19   points or novel points that were raised during

20   the deposition that might be of use in future

21   depositions.

22       Q.   And those memos would go in the file as

23   well?

24       A.   Yes.

RICHARD CHARLES FINKE

17

1      Q.   And are we now talking about files

2    organized by expert?

3      A.   Yes.

4      Q.   And I believe we said this.   But those

5    files would still be at Boca?

6      A.   That's correct.

7      Q.   And when you did these memos on those

8    occasions that you did memos, would you copy the

9    other members of the team?

10     A.   No, not typically.

11     Q.   Did you have any involvement with Grace

12    insurance issues before the bankruptcy?

13     A.   No.

14     Q.   Who did?

15     A.   Mr. Beber and an employee named Jeff

16    Posner was involved or I should say in charge of

17    risk management at the time.

18     Q.   Is he still with Grace?

19     A.   He is not.   But he is a consultant to

20    Grace.

21     Q.   Where is he located?

22     A.   In Florida.   South Florida.

23     Q.   Did you have any involvement with the

24    Safe Buildings Alliance or the SBA before the

1    bankruptcy?

2              MS. ESAYIAN:   Him personally?

3              MR. SPEIGHTS:   Yes.

4              THE WITNESS:   Occasionally -- I had

5    occasional communications with attorneys at

6    Kirkland & Ellis who represented the Safe

7    Buildings Alliance.   I probably attended a few

8    meetings.   But beyond that, I was not a regular

9    attendee at meetings or did not hold a position

10   within the Safe Buildings Alliance.

11   BY MR. SPEIGHTS:

12      Q.   Was there any person within your group

13   who had more contact with the Safe Buildings

14   Alliance than you did?

15      A.   I'm sure there was.   But I'm not sure who

16   that would have been.

17      Q.   Do you recall there being a contact

18   person at Grace while at the Safe Buildings

19   Alliance?

20      A.   Initially, I believe a Grace employee

21   named Ken Millian, M-i-l-l-i-a-n, was either the

22   contact person or liaison between or for Grace,

23   between Grace and the SBA.   But I do not know how

24   long he was in that role.



19

1        Q.   Which attorneys at K&E did you have

2    dealings with about SBA?

3        A.   Mark Wine, W-i-n-e, and Tim Hardy.

4        Q.   Did you have contact with John Welch when

5    he was a director?

6        A.   I attended a couple of meetings where

7    John Welch was present.  I don't recall -- and I

8    may have communicated with him, although it would

9    not have been frequently.  But I don't recall any

10   specific communications with him.

11       Q.   Where were those meetings held that you

12   attended?

13       A.   Either at Grace headquarters in New York

14   at the time or in -- at Kirkland & Ellis in

15   Washington.

16       Q.   Who took Mr. Welch's place when he left

17   the SBA?

18       A.   I don't know if anyone took his place.

19   If someone did, I don't know who.

20       Q.   Is the SBA still alive today?

21       A.   It still exists, yes.

22       Q.   And where is it located today?

23       A.   I believe the address is the Kirkland &

24   Ellis offices in Washington.

RICHARD CHARLES FINKE

20

1    Q.    What does it do today?

2    A.    I'm not aware that it does anything

3    today.

4    Q.    Did you work with Grace's experts in

5    providing them data for medical or scientific

6    articles?

7    A.    I can't rule out that I did.  But the

8    vast majority of data provided to them was in

9    connection with pending lawsuits for which they

10   were retained to appear on Grace's behalf.  I

11   think there was -- I seem to recall one article

12   that Dr. Corn was preparing where he based the

13   article on data that had been provided to him in

14   connection with one or more of the lawsuits.  And

15   he asked for some supplemental data for the

16   purpose of writing an article.  And we would have

17   provided any additional data he requested.

18   Q.    Was that the 71 school study?

19   A.    No.  I believe it was one of the

20   maintenance worker studies that he -- which he

21   published.

22   Q.    Dr. Corn also published a paper about the

23   71 schools.  Do you recall that?

24   A.    Yes.

21

1    Q.   Were you involved in providing him the
2    data for that study?
3    A.   No.
4    Q.   Where did he get the data from?
5    A.   I believe that he and Dr. Lee had
6    obtained that data during lawsuits that preceded
7    my involvement at Grace.
8    Q.   On the maintenance worker study, when you
9    would provide Dr. Corn some information, would
10   you have a cover letter somewhere in the file
11   showing what you sent him?
12   A.   I may have.  I don't know.
13   Q.   If you did, it would be in Dr. Corn's
14   file at Boca?
15   A.   Most likely, yes.
16   Q.   Were you involved at all with the Harvard
17   symposium?
18   A.   No, I was not.
19   Q.   Do you know whether anybody within the
20   group was involved with that symposium?
21   A.   I believe the group was formed after the
22   symposium.  So my answer would be no.
23   Q.   Did you have any involvement in the
24   slightest with the science article?

RICHARD CHARLES FINKE

22

1    A.   Not knowingly.  I don't believe so, no.

2    Q.   Did you know the science article was

3    going to be published before it was published?

4    A.   I don't recall knowing that, no.

5    Q.   Do you recall any discussions with

6    Dr. Corn about this article he was working on

7    with Dr. Mossman and others?

8    A.   No, I have no recollection of any such

9    discussion.

10   Q.   Have you had any involvement again in the

11   slightest with any other medical or scientific

12   articles that were published relating to

13   asbestos?

14   A.   Well, I already mentioned that I provided

15   data and the Grace team provided data to our

16   experts during the course of litigation.  And

17   some of the experts used that data as the basis

18   of published articles.

19        I am confident that I would have

20   discussed articles that the experts were

21   preparing concerning the content of the articles.

22   I don't have any specific conversations in mind.

23   But I do recall that Dr. Lee, for example, would

24   tell me that he was working on an article based

1    on data obtained during the litigation.  And so

2    I'm sure I discussed what he was going to say in

3    the article, where he was going to try to get it

4    published, when it might be published.  That sort

5    of thing.

6         Q.   Did you encourage Dr. Lee and other

7    experts to publish articles?

8         A.   Yes, we did.

9         Q.   You said a moment ago that you supplied

10   data to some of the experts and you told me about

11   the maintenance worker study data that you

12   supplied to Dr. Corn.  What other experts did you

13   supply data to?

14        A.   Well, to Dr. Lee.  We provided data to

15   Dr. Steven Mlynarek.  M-l-y-n-a-r-e-k.  When he

16   was a graduate student of Dr. Corn's.  And we

17   later, after Dr. Mylnarek obtained his Ph.D., we

18   did retain him for some work in some attic

19   insulation litigation.

20             There may have been a couple of other

21   experts that we provided data to other than the

22   ones I have already mentioned.  But right now, I

23   don't recall.

24        Q.   Did W. R. Grace pay any of these experts

24

1    for the time spent in analyzing this data which

2    they put together and published in some form?

3         A.   Well, we paid them for their work as an

4    expert in the litigation.  And to the extent that

5    worked involved analyzing data, that they then

6    later used for an article, I guess the answer to

7    that extent would be yes.  We did not, at least I

8    don't recall any instance where we paid them

9    solely to analyze data or do other work for the

10   purpose of publishing an article.

11        Q.   After Dr. Corn testified at the MDU

12   trial, I assume he sent a bill to W. R. Grace; is

13   that a fair statement?

14        A.   Yes.

15        Q.   How would that bill be processed?  First

16   of all, would he send it to you?

17        A.   Yes.

18        Q.   And what would you do with the bill?

19        A.   Review it.  If it seemed reasonable based

20   on the work involved, I would approve it and give

21   it to our accounting people to process for

22   payment.

23        Q.   Where were your accounting people

24   located?



RICHARD CHARLES FINKE

25

1    A.   In Boca Raton.

2    Q.   Would you just walk it over or have

3  somebody walk it over or would there be some

4  e-mail or letter or note or memo or something of

5  that nature?

6    A.   I would just probably give it to my

7  secretary to give to the accounting people.

8    Q.   Would you have maintained copies of the

9  bills of experts under your charge?

10   A.   Generally not.

11   Q.   Is the accounting group that paid these

12 bills still located at Boca?

13   A.   Yes.

14   Q.   Do you know whether they still have the

15 bills?

16   A.   I don't know if they have the bills from

17 that time period.   I believe we are still

18 referring to pre-petition?

19   Q.   Yes.

20   A.   They certainly have records of all those

21 bills in their system.

22   Q.   Would Dr. Corn's bill be an itemized bill

23 setting forth what he did by time?

24            MS. ESAYIAN:   I'm going to object and

RICHARD CHARLES FINKE

26

1    allow you to answer generally to that.  To the

2    extent that it's invading any sort of a privilege

3    as to what was communicated in the bill, I object

4    on that ground.  And also that we don't have the

5    bill in front of us.

6             THE WITNESS:  My recollection is that

7    typically Dr. Corn's bills did not itemize the

8    work performed.

9    BY MR. SPEIGHTS:

10       Q.  Did some of the experts itemize the work

11   performed?

12       A.  I would say Dr. Lee provided some

13   itemization, yes.

14       Q.  How about the litigation counsel?  Did

15   they itemize their bills?

16       A.  Yes.  If you're referring to outside

17   litigation counsel?

18       Q.  Yes.

19       A.  Yes, they did.

20       Q.  Would they go to you if you were

21   responsible for the case?

22       A.  Yes.

23       Q.  So once you took over Anderson,

24   Mr. Cockrill's bill would go to you?

1       A.    Yes.

2       Q.    And Mr. Castel's bill would go to you?

3       A.    Yes.

4       Q.    And both would be itemized?

5       A.    I'm sorry.  Going back to Mr. Castel's

6    bills.  I don't recall because the Cahill Gordon

7    firm worked on a number of matters and I don't

8    recall if I would have seen the entire bill from

9    that firm or would have only reviewed the portion

10   that dealt with Anderson.

11      Q.    Would you have seen the portion of the

12   Cahill Gordon bill that dealt with Anderson?

13      A.    I believe so.

14      Q.    And would the procedure in paying those

15   bills, if they met your approval, be the same for

16   paying Dr. Corn's bill?

17      A.    In general, yes.  With respect to the

18   Cahill situation, I probably would not have

19   indicated my approval anywhere.  I would have

20   just told whoever was, probably Mr. Beber, that

21   the Anderson portion looked fine whereas

22   typically I would make a notation, would sign

23   outside counsel bills before sending them to

24   accounting.

28

1      Q.   Did you have any involvement with the

2   documents depository located in Boston?

3      A.   Not really, other than communicating with

4   the Kastner & Edwards firm concerning either

5   requests for documents or visits to the

6   repository by plaintiff's counsel or other

7   matters relating to the repository.

8      Q.   Was there anybody in your group that had

9   more involvement with the depository?

10     A.   I believe, yes.  Initially, an attorney

11  named Troy Cloud had primary responsibility for

12  preparing discovery responses in all of the

13  property damage cases.  He would have had and did

14  have more occasion to communicate with the

15  Kastner & Edwards attorneys concerning the

16  repository than the rest of us.  And then later

17  on Mr. Cloud's responsibilities were taken over

18  by another attorney, Dan Hirschman.  And, again,

19  Mr. Hirschman would have had more occasion to

20  deal with the Kastner attorneys concerning the

21  repository than we would.

22     Q.   Is Mr. Cloud still employed by Grace?

23     A.   No.

24     Q.   Where is he located now?



1    A.    No one knows.   The last contact from Troy

2   Cloud, he was in the Far East somewhere.

3    Q.   Where did he go to law school?

4    A.   I don't know.

5    Q.   Where was he from originally?

6    A.   I don't recall.

7    Q.   Is Mr. Hirschman still with Grace?

8    A.   No, he is not.

9    Q.   When did he leave Grace, before or after

10   the petition?

11    A.   It was right around the time of the

12   Chapter 11 petition.   I can't recall whether it

13   was just before or just after.

14    Q.   Where is he located now?

15    A.   He lives in West Palm Beach, Florida, and

16   is employed by Wackenhut Security in West Palm

17   Beach.

18    Q.   Did you have access to an index of the

19   documents in the depository?

20    A.   Yes.

21    Q.   Was it a hard copy or computer copy?

22    A.   Computer.

23    Q.   Could you log in and go to the index?

24    A.   Our office could.   I personally never



1    did.

2        Q.   Was it searchable?

3        A.   To a limited extent, yes.

4        Q.   Who in your office was the person that

5    you would go to if you needed something searched?

6        A.   I would have gone to my paralegal.

7    Initially, it was Gail, whose last name I can't

8    recall.  And after Gail, to my paralegal that's

9    still with us, Adie Hammond.  A-d-i-e.

10       Q.   H-a-m-m-o-n-d?

11       A.   Yes.

12       Q.   Have you seen pages of the index?

13       A.   Yes.

14       Q.   Have you seen the entire index printed

15   out?

16       A.   No.

17       Q.   Do you know how long the index would be,

18   how many pages if you printed it out or how many

19   gigabytes or whatever these computer people call

20   the amount of it in the computer?

21       A.   No, I don't know.  I think it would be

22   extremely voluminous if it were printed out in

23   hard copy.  But I don't know by how much.

24       Q.   Does the index actually show the document



1    like in a PDF format or is it just a list of the

2    documents with certain information?

3         A.   It's a list of the documents with certain

4    fields.

5         Q.   What fields?

6         A.   Product type, job sites, product names,

7    dates, names of addressees, names of the sender

8    or author.  And number, a number had been

9    assigned to each document.  So the document

10   number would appear.  I don't recall what else.

11        Q.   Would that be a Bates stamp number?

12        A.   Yes.

13        Q.   And, as I understand it, someone with

14   computer skills could search it by any of these

15   fields?

16        A.   That's correct.

17        Q.   Did you have any involvement with the

18   personal injury litigation before the bankruptcy?

19        A.   Very little.

20        Q.   What little did you have?

21        A.   On occasion, there may be an issue in a

22   personal injury case that came to my attention or

23   an expert involved in the property damage

24   litigation would be appearing in a personal

RICHARD CHARLES FINKE

32

1    injury case.  And then I would talk to Jay Hughes

2    about that issue or the expert to determine

3    either if he needed assistance relating to that

4    issue or expert or if -- or just for my own

5    edification to see if anything going on in this

6    personal injury case might impact the property

7    damage.

8        Q.  Who is Jay Hughes?

9        A.  Jay Hughes is an attorney with W. R.

10   Grace.  He has been with Grace longer than I

11   have.  He is still with Grace.  And Jay's primary

12   responsibility at Grace was to oversee the

13   personal injury litigation.

14       Q.  Did he report to Mr. Beber before

15   Mr. Beber's retirement?

16       A.  Yes.

17       Q.  And did he then report to Mr. Siegel

18   while he was general counsel?

19       A.  Yes.

20       Q.  And does he presently report to

21   Mr. Shelnitz?

22       A.  He presently reports to me.

23       Q.  I'd like to talk about Anderson before

24   the bankruptcy a few minutes.  First of all, see

33

1    if we can try to pin down when you had

2    responsibility for Anderson.  Did you have

3    responsibility for Anderson when the venue motion

4    was decided and the judge said it could be

5    maintained in Hampton County?

6        A.   No.

7        Q.   Did you have responsibility for Anderson

8    at the time of the evidentiary hearing on

9    certification?

10       A.   Yes.

11       Q.   Did you have responsibility for Anderson

12   when the motion to certify was filed and briefed?

13       A.   I believe so.  I do recall reading the

14   briefs.  I don't recall specifically if that --

15   if I did that because they had already been filed

16   when I took over the case or if I had already

17   assumed responsibility for the case and then they

18   were filed.  I just don't recall.

19       Q.   Do you recall whether you were involved

20   in the decision to challenge the adequacy of

21   Speights & Runyan?

22       A.   Yes.

23       Q.   And, yes, you recall you were involved?

24       A.   Yes.



RICHARD CHARLES FINKE

34

1      Q.   Do you think you had the Anderson case

2   when that decision was discussed?

3      A.   Yes.

4      Q.   Who participated in that decision,

5   Mr. Finke?

6      A.   Mr. Beber, Mr. Castel, Mr. Cockrill.

7      Q.   Was there a meeting at which that was

8   discussed?

9      A.   Not that I recall.

10      Q.   Was it by telephone?

11      A.   Probably.

12      Q.   Was it discussed on more than one

13   occasion?

14      A.   I don't recall.

15      Q.   Who prepared the main briefs on that

16   issue?

17      A.   I don't know for sure.  It would have

18   been either the Cahill Gordon firm in New York or

19   the Ogletree Deakins firm in South Carolina.  I

20   believe it would be the Cahill Gordon firm.  But

21   I can't be sure about that.

22      Q.   Do you know of any lawyers at Cahill that

23   worked on the certification briefs, including the

24   adequacy issue, beside Kevin Castel?

RICHARD CHARLES FINKE

35

1    A.    No, I don't recall.

2    Q.    Now, would you typically review briefs of

3    litigation counsel, outside counsel, before they

4    were filed?

5    A.    Yes.

6    Q.    Would you have reviewed the certification

7    briefs prepared by outside counsel before they

8    were filed?

9    A.    Yes.

10    Q.    Would Mr. Beber have reviewed those

11    briefs as well?  I'm not asking all briefs.  I'm

12    talking about the certification briefs.

13              MS. ESAYIAN:  If you know.

14              THE WITNESS:  Probably not.  But I

15    don't know with respect to that, those specific

16    briefs.

17    BY MR. SPEIGHTS:

18    Q.    Do you recall that Mr. Beber attended

19    part of the certification hearing?

20    A.    Yes.

21    Q.    And Mr. Beber and you filed affidavits in

22    that proceeding?  Do you recall that?

23    A.    No, I don't, actually.

24    Q.    Do you recall either one of you filing an



1     affidavit?

2          A.   No, I don't.

3          Q.   Did you get a report on the evidentiary

4     hearing from Mr. Beber after you attended?

5          A.   Yes.

6          Q.   And did counsel, Mr. Castel and

7     Mr. Cockrill, also report to you about what

8     occurred?

9          A.   I don't recall that they did.

10          Q.   Do you recall ever discussing the

11     certification issues with representatives of any

12     other defendant in the case?

13          A.   No.

14          Q.   Did you review the post-evidentiary

15     hearing briefing that was done?

16               MS. ESAYIAN:   You mean before it

17     was -- you mean in draft form?

18               MR. SPEIGHTS:   Yes.   Before it was

19     filed.

20               THE WITNESS:   First of all, I don't

21     recall that there was post-evidentiary hearing

22     briefings.   If there were, then I would have

23     reviewed them, those prepared by Grace, yes.

24     BY MR. SPEIGHTS:

37

1      Q.   When Anderson was brought, did you

2    communicate to -- not you but whoever was in

3    charge of the file then, presumably Ms. Klein.

4    Would she have communicated to the insurers that

5    we have this new case?

6      A.   The usual process was to communicate the

7    filing of a new case to either Jeff Posner or

8    someone working for him.  And they were

9    responsible for notifying insurers.

10     Q.   Were there reserves on cases established?

11          MS. ESAYIAN:   Cases generally?

12   BY MR. SPEIGHTS:

13     Q.   Property damages case, MDU, Anderson, One

14   Post.  Whatever.

15     A.   On some.

16     Q.   What was the rule of thumb on why for

17   some and not for others?

18     A.   I don't know.

19     Q.   Who did that?

20     A.   Mr. Beber.

21     Q.   At what point in a case's life would he

22   do that?

23     A.   I don't know.

24     Q.   Did he talk to you on occasion about the



RICHARD CHARLES FINKE

38

 1    amount it should be reserved for?

 2         A.   No.

 3         Q.   How do you know he did it?

 4         A.   I learned later that there were reserves

 5    on certain cases.

 6         Q.   Was there a reserve on Anderson?

 7         A.   Yes.

 8         Q.   When was the reserve made on Anderson?

 9         A.   I don't know.

10         Q.   Was it before or after you were

11    responsible for Anderson?

12         A.   I don't know.

13         Q.   When did you learn that there was a

14    reserve on Anderson?

15         A.   After we filed our petition in Chapter

16    11.

17         Q.   Was it in connection with discovery that

18    I served?

19         A.   I don't believe so.

20         Q.   Did you learn about reserves for other

21    cases at the same time or was this just a

22    specific Anderson piece of information that you

23    obtained?

24              MS. ESAYIAN:  Objection to form.

RICHARD CHARLES FINKE

39

1           THE WITNESS:  I learned about it in

2    connection with reserves on other cases as well

3    as Anderson.

4    BY MR. SPEIGHTS:

5       Q.  Was that in connection with the Sealed

6    Air litigation?

7       A.  I don't recall.

8       Q.  How did you happen to find out or go

9    looking for this information, Mr. Finke?

10      A.  Someone at some point presented me with a

11   chart, gave me a chart, with those reserves on

12   it.

13      Q.  Did you ask for it?

14      A.  No.

15      Q.  Who gave it to you?

16      A.  I don't recall.

17      Q.  Who prepared it?

18      A.  I don't know.

19      Q.  Did you discuss it with anyone?

20      A.  At some point, yes.

21      Q.  Who?

22      A.  With our former CFO, Robert Tarola, with

23   the general counsel, David Siegel.  Later with

24   current general counsel, Mark Shelnitz.  There

RICHARD CHARLES FINKE

40

1 may have been others present during one or more

2 of those discussions.  I don't recall

3 specifically who from Grace, you know, would have

4 been present during those discussions.

5  Q. What was the general subject matter of

6 the discussions which led to a discussion of the

7 reserves?

8  A. The value of asbestos property damage

9 claims.

10  Q. Have you had multiple discussions with

11 Mr. Beber and Mr. Shelnitz and Mr. Siegel about

12 that subject?

13  A. Yes.

14  Q. Was One Post on the list?

15  A. I believe One Post was the USG case, is

16 that correct?

17  Q. It might be.  Mr. Runyan has One Post and

18 100 Pine.  Did I flip them?

19  A. Yes.

20  Q. Was 100 Pine on the list?

21  A. It was on the list of asbestos property

22 damage claims discussed, yes.

23  Q. But my question is, was it on a list

24 which had a reserve?

RICHARD CHARLES FINKE

41

1    A.   I don't recall if it did or not.

2    Q.   How about Solo?

3    A.   Yes, it had a reserve.

4    Q.   How much was the reserve by Anderson?

5         MS. ESAYIAN:  Objection.  Instruct

6    the witness not to answer.  Basis of

7    attorney-client privilege.

8         THE WITNESS:  And attorney work

9    product.

10        MS. ESAYIAN:  And attorney work

11   product.

12   BY MR. SPEIGHTS:

13   Q.   Where is that piece of paper with the

14   reserves on it as we sit here today?

15   A.   My copy is in my office.

16   Q.   In Boca?

17   A.   No, Columbia, Maryland.

18   Q.   I didn't ask you this at the beginning.

19   Do you split time between Boca and Columbia?

20   A.   Yes, I do.

21   Q.   What is your legal address?

22   A.   I live in Boca Raton, Florida.

23   Q.   How much of your work time is spent in

24   Boca versus Columbia?



1      A.   More than fifty percent.

2      Q.   More than fifty percent is in Boca?

3      A.   Yes.

4      Q.   Do you have your copy or a copy of this

5    document in your computer?

6      A.   Probably.

7      Q.   Was the reserve put on Anderson before

8    the bankruptcy?

9      A.   My understanding is that it was, yes.

10      Q.   Were you aware of Mr. Beber's efforts to

11    settle Anderson before the certification hearing?

12      A.   I don't recall being aware of that, no.

13      Q.   Is it fair to say that sometimes

14    Mr. Beber would do such things and not tell you

15    or other members of the team about it?

16      A.   Very fair, yes.

17      Q.   Were you aware that Mr. Castel had had

18    discussions with Anderson's counsel about

19    settling the case before the certification

20    hearing?

21      A.   Again, I may have.  But I certainly don't

22    recall it.

23      Q.   Let me back up a minute.  I forgot to ask

24    you what involvement you had with ZAI or Zonolite

43

1    attic insulation litigation before the

2    bankruptcy.  And putting Anderson aside.  We'll

3    discuss Anderson and ZAI in a while.  What

4    involvement did you have with ZAI before the

5    bankruptcy?

6         A.   I was assigned to oversee and manage the

7    first ZAI complaint that was filed.

8         Q.   Was that the Barbani case?

9         A.   It was either Barbani or Lynn Home.  I

10   can't recall which actually was filed first.

11        Q.   Where was it filed, the first one?

12        A.   Lynn Home was filed in Massachusetts.

13   Barbani was filed in Spokane, Washington.  And I

14   don't recall which one was first.

15        Q.   Were both assigned to you?

16        A.   Yes.

17        Q.   Did that solely, ZAI, complaint,

18   whichever the first one was, precipitate some

19   discussion within the group as to who is going to

20   run with this or was it because it was in a

21   particular state which you had responsibility

22   for?

23        A.   No, it did not depend on geography.

24   Since the first one or two were filed as class



1    actions, I believe Mr. Siegel would have

2    determined that, you know, one person should be

3    responsible for the litigation as opposed to

4    cases filed based on geography.

5        Q.  So were you responsible for all of the

6    ZAI cases filed before the bankruptcy?

7        A.  Yes.

8        Q.  Did anybody assist you in these cases

9    other than staff?

10       A.  Well, other attorneys.

11       Q.  What other attorneys were involved?

12       A.  William Sparks, Richard Senftleben.

13   S-e-n-f-t-l-e-b-e-n.  And to a lesser extent, Jay

14   Hughes.

15       Q.  Did you know these cases were coming

16   before they arrived?

17       A.  No.

18       Q.  Had you had any involvement, direct or

19   indirect, with EPA's interest in ZAI?

20                MS. ESAYIAN:  Objection to form.  You

21   can answer, if you can.

22                THE WITNESS:  Yeah, I'd have to ask

23   you to clarify it.  Because EPA had an interest

24   in it in the 1980s.  Notwithstanding statements

RICHARD CHARLES FINKE

45

1    by EPA in more recent times to the contrary.

2                And EPA developed an interest in ZAI

3    either shortly before or shortly after we filed

4    Chapter 11.

5    BY MR. SPEIGHTS:

6        Q.   At the time these first cases, first Solo

7    ZAI cases were filed, had EPA expressed public

8    interest in this subject matter in the nineties?

9        A.   EPA had done an assessment of Vermiculite

10   in the early 1990s, which I believe mentions

11   attic insulation.  There is a published report

12   from 1991 or 1992 that resulted from EPA's

13   assessment.  I'm not aware of any interest by EPA

14   in Vermiculite attic insulation after that report

15   was published until the year 2000 or 2001.

16       Q.   Once you took charge of the ZAI

17   litigation, what did you do to prepare yourself

18   for that task?

19       A.   We retained outside counsel to represent

20   us in the litigation.  We commenced internally an

21   investigation into potentially relevant

22   documents, attempted to identify knowledgeable

23   witnesses relating to attic insulation and

24   conducted strategy, discussion, concerning how to

1    defend the lawsuits.  I'm sure we also discussed

2    the fact of the filing of these lawsuits with our

3    experts to obtain their input concerning their

4    particular areas of expertise as they might

5    relate to Zonolite attic insulation.

6       Q.   Was there any difference between Zonolite

7    attic insulation and masonry fill?

8       A.   Yes.

9       Q.   What's the difference?

10      A.   One difference is the size of the

11   Vermiculite used to manufacture those products.

12   Attic insulation was made with the largest sizes

13   of Vermiculite.  Sizes one and two.  Whereas

14   masonry fill I believe was made with size or

15   grade three of Vermiculite, which was smaller in

16   size than one and two.

17            Zonolite attic insulation was made

18   almost exclusively with Vermiculite from the

19   Libby, Montana mine.  Since the Enoree, South

20   Carolina, mine did not have any or much of any

21   sizes one and two Vermiculite at that deposit.

22            Masonry fill, on the other hand, was

23   made with either Libby Vermiculite or South

24   Carolina Vermiculite.  The intended uses of the

1    products were different.   Zonolite attic

2    insulation was intended to be poured into attics

3    as a supplemental insulation material whereas

4    masonry fill was intended to be used as an

5    insulation material in the empty spaces in

6    cinderblock and similar construction materials.

7    And there may have been other differences such as

8    price and packaging.  But I'm not familiar with

9    those.

10        Q.   Why was size three Vermiculite not

11   appropriate for attic insulation?

12        A.   I believe it was too small, either to

13   provide the required insulation properties for

14   attics and I believe there was also more of a

15   tendency for it to sift through or into any

16   cracks or open spaces between the attic and the

17   rest of the structure.

18        Q.   I believe you said that almost all of the

19   ZAI used Libby Vermiculite?

20        A.   Um-hmm.

21        Q.   Were there occasions when other

22   Vermiculite was used?

23        A.   There was a short period in the mid 1970s

24   when there was inadequate supplies of one and two



RICHARD CHARLES FINKE

48

1    from Libby due to the construction of the wet

2    mill at the Libby mine site.  Because of that

3    construction, the amount of Vermiculite processed

4    had to be reduced substantially.  So there was an

5    attempt to use size three Vermiculite for attic

6    insulation but it was determined to be

7    unsatisfactory.

8        Q.  Was some of it sold with size three?

9        A.  I don't know.

10       Q.  Is there any difference between the

11   amount of -- I'm not sure what's the popular term

12   today.  But back in the old days, called it

13   tremolite or actinolite.  Whatever the asbestosy

14   is in Libby Vermiculite, is there any difference

15   between the amount in size one and two and size

16   three?

17       A.  I don't know.

18       Q.  How many plants took the Libby

19   Vermiculite and produced the ZAI, roughly, if you

20   don't know the number?

21       A.  I don't know the answer.  I could not

22   even give an estimate.  I really don't know.

23       Q.  Was it generally made at the old Zonolite

24   expanding plants?

RICHARD CHARLES FINKE

49

1       A.   It's my understanding that it was

2   primarily sold in cold weather states.  So I

3   would have to infer from that that it would not

4   have been produced in expanding plants in warmer

5   states.  But I have never researched that or

6   looked at records to determine which plants made

7   attic insulation and which did not.

8       Q.   During what period of time did Grace sell

9   ZAI, Grace or its predecessors?

10      A.   We do not know exactly when Grace's --

11  well, when other companies were selling --

12  started selling Zonolite attic insulation.  We

13  believe it was in the 1920s or 1930s when the

14  product was first sold.  Grace purchased the

15  Zonolite company in 1963.  So Grace sold the

16  product from 1963 until 1984.

17      Q.   How about masonry fill?

18      A.   I don't know.

19      Q.   How does Grace believe it is appropriate

20  to determine whether a product is its own ZAI?

21  Do you understand the question?  It wasn't worded

22  the best in the world.

23      A.   I'm not sure of what the question means.

24      Q.   Well, when we know if something is

1    Monokote, we let Dr. Lee or Dr. Longo look at it

2    and look at the sales records.  In the absence of

3    paper, how do you believe you should determine

4    whether a product is ZAI?

5        A.   We would have to have Dr. Lee, his lab,

6    analyze a sample.  And he is able to distinguish

7    Libby Vermiculite from Vermiculite from other

8    sources.

9        Q.   Does he have a protocol for that?

10       A.   I don't know.

11       Q.   What instruments does he use to do this?

12       A.   I don't know that either.

13       Q.   Is this an expensive thing like, you

14   know, for Monokote or something or was it just

15   essentially a light microscope he is using?

16       A.   I believe it is just a light microscope

17   analysis.  And the differential is made based on

18   the light, both the color and light necessary of

19   the Vermiculite.

20       Q.   And has he done that on occasion at

21   Grace's request?

22       A.   Yes, he has.

23            MS. ESAYIAN:  Do you want to take a

24   short break?

51

```
 1            MR. SPEIGHTS:   Five minutes.   I'm
 2   about to go to bankruptcy.
 3            (Deposition recessed from 10:48 a.m.
 4   to 10:57 a.m.)
 5   BY MR. SPEIGHTS:
 6       Q.   Mr. Finke, let me back up a minute.
 7            Before going into bankruptcy, were
 8   the reserves that we discussed earlier
 9   incorporated in any SEC filings?
10            MS. ESAYIAN:   Objection to form and
11   foundation.   You can answer, if you can.
12            THE WITNESS:   Certainly not the
13   individual reserves or reserves for individual
14   cases or matters.   I do not know if they -- if
15   the total was disclosed in an SEC filing.
16   BY MR. SPEIGHTS:
17       Q.   Over the years, have you worked with
18   anyone in providing information on the asbestos
19   PD side of the ledger with respect to the filing
20   of Grace's SEC statements?
21       A.   Yes.   Only after we went into Chapter 11.
22       Q.   Who did you work with on that?
23       A.   That would be Mark Shelnitz initially.
24   And more recently Michael Conron.   C-o-n-r-o-n.
```

RICHARD CHARLES FINKE

52

1    Q.    When you worked with Mr. Shelnitz, was

2    that before he assumed his present job as general

3    counsel?

4    A.    Yes.

5    Q.    What was his position then?

6    A.    He was corporate attorney at Grace.    I

7    don't recall his title.    I believe it was either

8    assistant or associate general counsel.

9    Q.    And what is Mr. Conron's position?

10    A.    He is a corporate attorney in-house at

11    Grace.    I don't know his title.

12    Q.    And what generally have you supplied of

13    these gentlemen in connection with the SEC

14    filings?

15    A.    Number of claims filed, number of claims

16    dismissed, number of claims settled, total dollar

17    amounts of settlements.    Really any other related

18    information concerning property damage claims and

19    the attic insulation claims.

20    Q.    Where did you have to go to get this

21    information?

22    A.    I obtained much of the information from

23    Kirkland & Ellis, attorneys, or from BMC, which

24    is a data base vendor that Grace retained for

RICHARD CHARLES FINKE

53

1    this bankruptcy.    Other information I would have

2    had from my own knowledge.

3        Q.    Did you say B as in Bob, M as in man, Z

4    as in zebra?

5        A.    No.    It should be BMC, C as in Charles.

6        Q.    And what has that vendor done for Grace

7    during the bankruptcy?

8        A.    It has collected all of the claims

9    entered, basic information about the claims on

10   the data take base, maintained data bases, issued

11   reports at our request of certain types of

12   claims.

13       Q.    Would those include the property damage

14   claims?

15       A.    Yes.

16       Q.    Would they include ZAI claims?

17       A.    I believe so.    But I honestly don't know.

18       Q.    Would they include the PI claims?

19       A.    I believe so.

20       Q.    Going back to the property damage claims.

21   Would all claims that Speitz & Runyan have filed

22   about which Mrs. Browdy spoke about so

23   affectionately had been entered into that data

24   base?

RICHARD CHARLES FINKE

54

1      A.   Yes.

2      Q.   Did you work with them about entering

3    that information into the data base?

4      A.   No.

5      Q.   You didn't supply the information?

6      A.   Correct.

7      Q.   Did K&E supply that information?

8      A.   No.  I believe they obtained copies of

9    all of the claims, proofs of claim and supporting

10   documents that were filed and obtained them from

11   Rust Consulting and then entered the data into

12   the data base based on the proofs of claim.

13     Q.   Can you go online somehow and get

14   information from this data base or do you have to

15   contact them if you want a report of something?

16   And by you, I mean including whatever computer

17   person you have available to you.

18     A.   I believe we have to go to BMC and ask

19   them for information.

20     Q.   Do they have a number of fields?

21     A.   I believe so.

22     Q.   What fields?

23     A.   I don't recall.  It's been a long time

24   since I saw any reports from BMC relating to

55

1   property damage.  And I'm sitting here right now

2   and I'm having a hard time recalling just what

3   information was available and what fields they

4   used.

5       Q.  The bar date was March 2003.  How long

6   after that was it before BMC had the PD claims in

7   the data base?

8       A.  My recollection was it was about six

9   months.

10      Q.  I'm skipping way ahead.  But do you

11  recall a meeting you attended in New Orleans with

12  Mr. Beber and Mr. Siegel and me and Mr. Dies?

13      A.  Yes.

14      Q.  And do you recall at that meeting you had

15  some information about my claims printouts and

16  other information?

17      A.  Yes.

18      Q.  Was that the BMC stuff you had with you

19  or was that something else?

20      A.  That would have been my own work product.

21      Q.  Do you have a copy, a hard copy, of the

22  BMC PD stuff?

23      A.  Probably, yes.

24      Q.  And if it was on this table, how high



RICHARD CHARLES FINKE

56

1    would it be?

2        A.   I'm sorry.   For all claims or just

3    Speights & Runyan claims?

4        Q.   For all traditional PD claims.

5        A.   A foot, foot and a half tall.

6        Q.   Would it be eight by 11?

7        A.   I believe so.

8        Q.   What PI data or what was the source of PI

9    data for the BMC data base?

10       A.   I don't know.   I'm assuming that they did

11   the same thing with personal injury claims in

12   terms of creating a data base that they did with

13   property damage.   But I have never seen it.

14       Q.   But there was no PI bar date, correct?

15   There was a questionnaire but not a PI bar date,

16   correct?

17       A.   I thought there was a PI bar date.

18       Q.   Well, leaving that aside.

19            Would Mr. Hughes be the person most

20   knowledgeable of that within Grace?

21       A.   If anyone is, yes.

22       Q.   I want to talk about the information

23   Mr. Hughes has a minute since his name has come

24   up again.

RICHARD CHARLES FINKE

57

1          Was Grace ever a member of CCR?

2     A.   I don't believe so.

3     Q.   Where does Grace maintain all of its PI

4  documents from the lawsuits that were filed

5  against it before the bankruptcy?  Not what's

6  been generated since the bankruptcy by all the

7  requests to produce, but the stuff that it had at

8  the time of the bankruptcy?

9     A.   That would be in Boca Raton.

10    Q.   And Mr. Hughes would be generally

11  responsible for that?

12    A.   Yes.

13    Q.   When somebody sued Grace in Beaumont,

14  Texas, and the complaint came in, would you set

15  up a separate file for that?

16    A.   Yes.

17    Q.   Would he record the information anywhere

18  on any data base?

19    A.   I believe so.  But I don't have any

20  firsthand experience with that.

21    Q.   And when you say you believe so, of

22  course, Mr. Hughes now reports to you.  But I'm

23  asking you before that occurred.  What is your

24  general understanding of the kind of data base he

58

1    would have had back then?

2        A.   My understanding is that staff that

3    Mr. Hughes had then would enter the basic

4    information from the complaint into a data base.

5        Q.   Would he supplement that information as

6    discovery revealed more information?

7        A.   I do not know.

8        Q.   Well, suppose a personal injury claimant

9    who filed a case in Beaumont, Texas, claimed that

10   he was exposed to Monokote at the DFW Airport,

11   among other exposures, would that there be noted

12   anywhere?

13       A.   If it was in the initial filing, yes, I

14   believe it would be.

15       Q.   But if it was not in the initial filing,

16   you don't know whether it would be later recorded

17   somewhere or not?

18       A.   That's correct, I don't know.

19       Q.   My understanding, Mr. Finke, is that the

20   depository did not contain all of the licensee

21   documents.  Is that your recollection?

22               MS. ESAYIAN:   The depository in

23   Boston?

24               MR. SPEIGHTS:   Yes.



59

1          THE WITNESS:  Yes.  With the

2    qualification that it did not contain many

3    documents from licensees that Grace never owned.

4    There were licensees -- there was some licensees

5    that Grace acquired.  And I believe documents

6    from those licensees were included in the

7    repository.

8    BY MR. SPEIGHTS:

9       Q.  Were the documents produced in litigation

10   from licensees Grace never owned stored

11   somewhere?

12      A.  They might have been but not by Grace.

13      Q.  Could they have been stored by Grace's

14   litigation counsel, outside counsel, during the

15   case as a part of the case where they were

16   produced?

17      A.  No.  What I was referring to was that the

18   licensee may have a repository and some

19   documents.  But we, we meaning Grace, did not

20   collect documents from licensees when the

21   repository was compiled.

22      Q.  Did Grace ever purchase Texas

23   Vermiculite?

24      A.  I don't recall.



RICHARD CHARLES FINKE

60

1      Q.   Let's just assume a minute without going

2      through each licensee for our group today.   Let's

3      assume it never purchased Texas Vermiculite and

4      let's assume that Mr. Budd or Mr. Dies were

5      litigating against Grace in Texas and served a

6      subpoena on Texas Vermiculite and they produced a

7      lot of documents, depositions defended by Grace.

8      The case was later settled.   Grace's outside

9      counsel had those documents.   Would those

10     documents be maintained by Grace or by its

11     counsel?

12     A.   They would have been maintained by

13     counsel.   There were supplements made to the

14     repository from time to time.   I do not know

15     whether those -- any of those supplements

16     included licensee documents, document sets of the

17     type you're describing.   The Kastner & Edwards

18     firm would be able to answer that question.

19     Q.   Well, I understand they could answer

20     what's there.   What I'm trying to figure out is

21     what's not there.   Does anybody that you know of

22     know or attempted to determine what documents

23     have been produced in the litigation involving

24     licenses not purchased by Grace that are in

61

1     existence somewhere out there in the country but

2     have never been transferred?

3          A.    I do not know.

4          Q.    If you wanted to find that out, how would

5     you go about finding it out?

6          A.    I would talk to Matt Murphy at the

7     Kastner firm in the first instance.

8          Q.    Why do you think Matt Murphy would know

9     what had not been sent to him?

10         A.    Well, he would be able to tell me what

11    had been sent to him.  And, again, in the first

12    instance, I think he would be most likely to know

13    if there were other document sets out there.

14    Even if they had not been sent to him.

15         Q.    How long before Grace filed Chapter 11

16    did you know that Grace might be filing Chapter

17    11?

18         A.    The first rumor that I heard, and it was

19    a rumor, was in January of 2001.  So the answer

20    to your question would be sometime between

21    January and late March of 2001.  But where in

22    that time frame, I don't know.

23         Q.    Would it be fair to say what was a rumor

24    became an understanding at some point that Grace

RICHARD CHARLES FINKE

62

1   was considering it?

2       A.   Yes.

3       Q.   Did you assist in providing information

4   for use in Grace's initial filings in the

5   bankruptcy such as the informational brief?

6       A.   Well, yeah, I certainly reviewed the

7   draft of the informational brief and provided

8   input.

9       Q.   Well, there is a section in there that we

10   need to start pulling documents.  We might do

11   that.  But there is a section in there about the

12   traditional PD cases and the seven existing

13   cases, et cetera.  It looks like something

14   Mr. Finke would have provided somebody.  Did you

15   provide that to somebody?

16       A.   It's possible.  I don't recall.

17       Q.   How much time before the actual

18   bankruptcy did you review the informational

19   brief?

20       A.   I don't recall.

21       Q.   If you needed to find that out, Mr.

22   Shelnitz said, Mr. Finke, I need to know when you

23   first reviewed the informational brief, could you

24   go back and look somewhere and determine that?

63

1     A.   I don't believe so.   Unless the Kirkland

2    & Ellis firm has records that would help me

3    determine that.

4     Q.   When did you first work with Kirkland &

5    Ellis regarding this bankruptcy?

6     A.   Very shortly before the filing.

7     Q.   Shortly meaning hours, days or weeks?

8     A.   I don't recall.

9     Q.   How did you learn that Grace was filing

10   Chapter 11?

11    A.   I believe I learned it from the general

12   counsel at the time.

13    Q.   Mr. Siegel?

14    A.   Yes.

15    Q.   Was that a one-on-one conversation or did

16   he tell some other people besides you at the same

17   time?

18    A.   I don't recall.

19    Q.   And, again, you don't recall how long

20   before the actual date that was?

21    A.   No, I don't.

22    Q.   Did you attend the initial meeting of

23   creditors?

24    A.   No.



RICHARD CHARLES FINKE

64

1       Q.   Did you have any discussions with

2    Mr. Siegel about the property damage constituency

3    prior to the initial meeting of creditors?

4       A.   I don't believe so.

5       Q.   Did you have any input or suggestions to

6    anyone as to who the property damage committee

7    should be composed of?

8       A.   No.

9       Q.   Did you provide Professor Hazzard's

10   affidavit to anybody involved in the initial

11   meeting of creditors?

12      A.   No.

13      Q.   Do you recall any discussions whatsoever

14   with Mr. Siegel regarding Anderson or

15   Mr. Speights or Speights & Runyan in connection

16   with the committee?

17      A.   No.

18      Q.   Were you involved in any settlement

19   discussions regarding ZAI before Grace filed

20   Chapter 11?

21             MS. ESAYIAN:   You mean any ZAI case?

22             MR. SPEIGHTS:   Any.  Or a group of

23   cases or a treatment under the bankruptcy or any

24   other way directly or indirectly.