65

1              THE WITNESS:  I don't believe we did,

2    no.

3    BY MR. SPEIGHTS:

4        Q.  You don't believe there were any

5    settlement discussions?

6        A.  I don't believe there were any settlement

7    discussions concerning ZAI before the bankruptcy.

8        Q.  Were there any settlement discussions

9    with PI before the bankruptcy?

10       A.  I don't know.

11       Q.  Do you recall in early 2001 learning that

12   Judge Hayes had signed an order certifying the

13   Anderson class as to Grace based upon a rule to

14   show cause which discussed the potential

15   bankruptcy?

16       A.  I recall what we referred to as the

17   conditional certification that was done under the

18   circumstances you have described, yes.

19       Q.  How did you learn of that?

20       A.  I believe it would have come from the

21   Ogletree Deakins firm.

22       Q.  And did you understand at that time that

23   Judge Hayes was providing a hearing for Grace's

24   counsel to be heard on that issue?

1        A.   Yes.

2        Q.   And did you work with counsel, Ogletree

3     or Mr. Castel, in connection with that hearing?

4        A.   I would say yes but I had very little

5     involvement.

6        Q.   Did Mr. Beber have some involvement with

7     that?

8        A.   He might have.   It wouldn't surprise me

9     if he did.

10        Q.   Do you recall what your understanding was

11     that Judge Hayes did at that hearing in which

12     Grace appeared?   Not what you now know or now

13     read.   I'm back in your mind in March of 2001.

14        A.   I really don't know.   No, I don't recall.

15        Q.   Would it be fair to say that either

16     Mr. Cockrill or Mr. Castel would have reported to

17     you on what happened at the hearing?

18        A.   Or Mr. Beber.

19        Q.   They might have called Mr. Beber

20     directly?

21        A.   Yes.   He had more experience with class

22     actions than I did.   So he took more of a direct

23     role in the Anderson case at that stage than was

24     typical.

67

1      Q.   Do you recall any meetings with

2    Mr. Cockrill or Mr. Castel regarding Anderson in

3    2001?

4      A.   No.

5      Q.   Did you have any involvement with the

6    motion for CMO that Grace filed shortly after the

7    bankruptcy?  The CMO originally asked --

8    actually, it's a motion for case management order

9    which asked for CMO's for PI, ZAI and traditional

10   PD.

11     A.   I may have reviewed a draft but I don't

12   recall that.  If I had any involvement, it was --

13   that would have been it, the extent of any

14   involvement.

15     Q.   Did you have any involvement in the

16   traditional PD bar date notice?

17     A.   Yes, I reviewed drafts and provided

18   input.

19     Q.   Who did you work with in that connection?

20     A.   Jan Baer with Kirkland & Ellis.  And most

21   likely other Kirkland & Ellis attorneys.  But I

22   don't recall specific individuals at this point.

23     Q.   Did you make suggestions to the

24   questionnaire or the bar date notice?

68

1      A.   Yes.

2      Q.   Was this done by telephone, by e-mail, in

3   person?

4      A.   It would have been a combination of

5   e-mail and telephone.

6      Q.   And how long did you participate in that

7   process?  The original motion was filed shortly

8   after the bankruptcy and the bar date was not

9   issued until almost a year later.  Were you

10  working on this throughout this period of time?

11     A.   No, I don't think so.  But I don't have a

12  recollection of the timing of any involvement.

13     Q.   Would you have a file back at Boca or

14  somewhere else on the PD bar date issue?

15     A.   No.  I would only have the notice itself

16  and the claim form.

17     Q.   Did you begin a review of the information

18  being filed on traditional PD claims before the

19  bar date, that is during the year or so when

20  people could file, or did you wait until after

21  March 31, 2003, to start that process?

22     A.   It was after.

23     Q.   And tell me what you did?

24          MS. ESAYIAN:  Him personally?

1          MR. SPEIGHTS:  Yes.

2          THE WITNESS:  Well, in general, after

3    BMC had obtained all of the proofs of claims for

4    traditional PD, we obtained a set of the proofs

5    of claim from BMC.  Let's see.  I think we had

6    the -- our legal assistants identify those -- let

7    me back up.

8          It was either our legal assistants or

9    it was from BMC that we were able to identify

10   those proofs of claim that provided substantive

11   information in the proofs of claim concerning

12   type of material alleged to be in the building,

13   the amount of the asbestos-containing material

14   alleged to be in the building, the size of the

15   building, whether the proof of claim was

16   supported by documents with substantive

17   information such as asbestos surveys, abatement

18   specifications or the like.

19          And through that process, I then

20   commenced a claim by claim review of those claims

21   that provided that type of substantive

22   information, which would allow us to evaluate the

23   merits of the claim.  And I proceeded to do that

24   with however many claims provided sufficient

70

1    information to allow such a review.

2    BY MR. SPEIGHTS:

3        Q.   Well, suppose a claim did not have any

4    Grace product ID information, would you review it

5    or would you put it in the other stack?

6        A.   I think at that time, I don't believe I

7    would have reviewed it for other purposes.

8        Q.   Who was assisting you in this?

9        A.   Staff in the Boca Raton office consisting

10   primarily of legal assistants.

11       Q.   You say primarily.  Who else besides --

12       A.   Mr. Senftleben and another in-house

13   attorney, Fred Zarenby, Z-a-r-e-n-b-y, assisted

14   in the review.

15       Q.   When did you finish this review?

16       A.   Well, that's difficult to say.  Because

17   there was a process by which we identified

18   deficiencies in the proofs of claim and claimants

19   were permitted to supplement their proofs of

20   claim.  And as supplemental documentation and

21   information was provided, the number of claims

22   that were reviewed to assess their merits would

23   increase.  And that was -- turned out to be a

24   lengthy process.

71

1       Q.  When did your initial review end, that is

2    your review that was filed before March 31?

3       A.  That review didn't commence until

4    sometime in the spring of 2004.  I believe it

5    took the rest of the year.  So it was probably

6    about -- the initial review was probably at least

7    a six month -- six to nine month process.

8       Q.  What did you have with you in New Orleans

9    in November '03?  The bar date ends March 31,

10   '03.  And you had a bunch of information casting

11   aspersions about my claims in November '03.  What

12   did you have with you?

13              MS. ESAYIAN:  Objection to form.

14              THE WITNESS:  I don't recall what I

15   had with me in November of 2003.  If that's when

16   the meeting was, I honestly don't know what I

17   would have had concerning your claims at this

18   point.  Because I don't believe BMC had much

19   information available at that point.

20   BY MR. SPEIGHTS:

21      Q.  So you think that your initial review of

22   traditional PD claims would have taken place in

23   2004, maybe going even into early 2005?

24      A.  Wait a minute.  I'm sorry.  I'm getting



1    my bar dates mixed up.  I'm thinking end of

2    October, which was the ZAI bar date when, as you

3    said, the traditional PD bar date was end of

4    March.  I apologize.

5        Q.  Let's rewind it and tell me correctly.

6        A.  Yes.

7        Q.  When did you do your review of the PD bar

8    date, which everybody I think would agree with as

9    March 31, 2003?

10       A.  Right now, I don't recall.  I don't

11   recall when we got the hard copy set of the

12   proofs of claim, which is when, you know, our

13   group in Boca would have first started reviewing

14   these.

15       Q.  Well --

16       A.  I do remember it took six to nine months

17   to go through the claim by claim review of those

18   claims that had sufficient supporting information

19   and documentation.  But by that time, though, we

20   would have had BMC's report of, you know, its

21   entry of the basic claim information, which would

22   have told me that a vast majority of the claims

23   filed by your firm did not have any supporting

24   documentation and did not provide sufficient

73

1    information on which to assess merits of the

2    claim.

3              It would also have told me that, by

4    November 2003, we would have known that most of

5    your claims were filed on behalf of private

6    building owners, which, in our belief, would have

7    been subject to applicable statutes of

8    limitation, unlike, for example, governmental

9    entities that might be immune from the running of

10   statutes of limitation and repose.

11             So we would have had certain basic

12   information about your claims by November 2003.

13       Q.   Did you start your review before you got

14   the information from BMC?

15       A.   I don't believe so, no.

16       Q.   And could you -- I don't mean at this

17   moment.  But could you determine when you got the

18   information from BMC?

19       A.   Possibly.

20       Q.   Well, I'll probably come back to this

21   after lunch.  But if you have an epiphany or

22   somebody gives you a call or whatever.  Because I

23   really want to try to pin down the dates when you

24   had certain information.  And if not, we'll go

1    about it in a more circuitous route.

2              Would it also be fair to say that we

3    filed a large number of claims on behalf of the

4    California state system and the Board of Regents

5    system, which were not commercial buildings,

6    albeit Grace contended that the statute of

7    limitations ran.  Is that a fair statement?

8        A.   Yes.

9        Q.   Do you recall that in the fall, perhaps

10   November of 2004, Grace and the various

11   constituencies engaged in serious settlement

12   discussions in Washington, D.C., without the

13   outside lawyers being present?

14       A.   No, I don't recall that.

15       Q.   Did you attend that meeting, such a

16   meeting?

17       A.   Again, I don't recall the meeting.  So I

18   don't recall attending it.

19       Q.   Do you recall that the date or deadline

20   for Grace to file its plan of reorganization was

21   delayed based upon discussions between the

22   various constituencies in late 2004?

23       A.   I have no recollection.

24       Q.   Do you recall that I traveled to Boca

1    Raton in early 2005 and met with you and

2    Mr. Beber?

3    A.  I don't recall the date.  I recall that

4    we met, yes.

5    Q.  And we met and discussed the Speights &

6    Runyan claims?

7    A.  Yes.

8    Q.  And as a result of that meeting, again,

9    we'll discuss it in more detail after lunch.  I'm

10    trying to understand generally what your

11    recollection is.  But do you recall at that

12    meeting there was an agreement that a stipulation

13    would be prepared?

14    A.  That sounds familiar.

15    Q.  Okay.  Do you recall preparing such a

16    stipulation?

17    A.  Yes.

18    Q.  Do you recall getting my changes back to

19    your proposed stipulation?

20    A.  That also sounds familiar, yes.

21    Q.  Without getting into details now, would

22    you agree with me that, for whatever reasons,

23    those discussions ended?

24    A.  Yes.

RICHARD CHARLES FINKE

76

1    Q.   At that time?

2    A.   Yes.

3    Q.   Now, during that period of time, would it

4    be fair to say that Mr. Shelnitz replaced

5    Mr. Siegel as general counsel?

6    A.   I think I said earlier, I don't recall

7    when he became general counsel.  You suggested a

8    date which sounded great.  Again, I don't

9    really -- I mean that's something we can easily

10   check out.  But I don't recall when he became

11   general counsel.

12   Q.   Did you discuss our discussions, that is

13   the Beber/Finke/Speights discussions, that

14   started in Boca Raton and the e-mails that came

15   afterward and the draft stipulation, did you

16   discuss that with lawyers at K&E?

17           MS. ESAYIAN:   I'll allow the witness

18   to answer yes or no.

19           THE WITNESS:   Yeah.  We discussed the

20   fact of them, yes.

21   BY MR. SPEIGHTS:

22   Q.   Did you provide the details to lawyers at

23   K&E, the details of our discussions?

24           MS. ESAYIAN:   Again, you can answer

RICHARD CHARLES FINKE

77

1    yes or no.

2              THE WITNESS:   I don't recall.

3    BY MR. SPEIGHTS:

4      Q.   Did you discuss our discussions with

5    Mr. Siegel?

6      A.   We would have, yes.

7      Q.   Did you have discussions with

8    Mr. Shelnitz once he took over for Mr. Siegel?

9      A.   That I don't recall.

10      Q.   Do you know whether you or anyone else

11    ever told Mr. Shelnitz about our discussions that

12    took place starting in Boca Raton in early 2005?

13      A.   My answer would be probably.  My answer

14    is, probably, we did.  But I don't have a

15    specific recollection of discussing that with

16    him.

17      Q.   Do you recall attending a meeting in

18    Washington, D.C., at Kirkland & Ellis after Grace

19    launched discovery against Speights & Runyan

20    regarding these claims?

21      A.   No.

22      Q.   See if I can refresh your memory.  If you

23    don't, you don't.  A meeting attended by you and

24    Mr. Beber, Mr. Bernick, Ms. Browdy, Mr. Runyan

1      and an associate in my office, Mr. Solomon, in

2      which we were having a discovery conference to

3      see if we could avoid some issues and which took

4      place in either June or July 2005?  You have no

5      recollection of such a meeting?

6          A.   No, I don't.

7          Q.   If you had attended such a meeting, would

8      you have some documents reflecting that you

9      attended a meeting, a travel log or expense

10     voucher or something of that nature?

11         A.   My secretary probably would have an

12     expense voucher, expense report.

13         Q.   Would you have prepared a memo on such a

14     meeting if you had attended?

15         A.   Probably not.

16         Q.   Why not?

17         A.   Given your description of the meeting, it

18     sounds like it would be something that outside

19     counsel would be handling.  And it doesn't sound

20     like there would be a need for me to do a memo.

21         Q.   Would there be any way for you to refresh

22     your recollection about such a meeting?

23         A.   If there were any documents describing

24     the meeting or related to the meeting, it's

RICHARD CHARLES FINKE

79

1    possible.

2        Q.   What I'm getting at, Mr. Finke, is if I

3    or some other attendee at that meeting would aver

4    that Mr. Bernick said something and you were at

5    that meeting, do you have any way to testify or

6    state whether that occurred or did not occur?

7        A.   Unless there was some, again, unless

8    there was some document that reflected the

9    statement, I don't know of any way to -- I could

10   ask the other attendees, you know, their

11   recollection.  But beyond that, I don't know what

12   else I can do.

13       Q.   I don't want to be surprised if later on

14   I say Mr. Bernick said X and you come along and

15   say, well, I was at that meeting and he never

16   said X?

17       A.   I suppose it depends on what X is.  I

18   think things of what people say would have a

19   greater tendency to stick in one's mind than

20   other things.  But sitting here today, I don't

21   recall attending the meeting.

22       Q.   Therefore, you don't recall anything

23   said?

24       A.   I don't recall anything said.

1      Q.   Were you aware of an article published

2   about me in Forbes Magazine?

3      A.   That sounds familiar.

4      Q.   Did you read it?

5      A.   Probably.

6      Q.   Did you know that it was going to be in

7   there before you read it?

8      A.   No.

9      Q.   Did you have any contact with the author

10  of that article?

11     A.   I don't know who the author was.

12     Q.   Did you supply the author any

13  information?

14     A.   No.

15     Q.   Were you involved at all in the authority

16  objections?

17     A.   I was involved to the extent of

18  discussing the objections with outside counsel

19  and reviewing papers prepared by or in connection

20  with that objection or those objections.

21     Q.   Did you offer your views on whether

22  certain objections should be filed or not filed?

23     A.   I would have, yes.

24     Q.   For example, did you offer your views as



81

1        to whether Grace should object to our filing of

2        100 Pine based upon lack of authority?

3            A.   I think -- I don't think I can answer

4        that question without divulging attorney-client

5        communications.

6            Q.   Did you have a discussion with K&E about

7        the authority objection to 100 Pine?

8            A.   Yes.

9            Q.   Did you have a discussion with K&E about

10       the authority objections to the Board of Regents'

11       claims?

12           A.   Yes.

13           Q.   Did you have a discussion with K&E about

14       the authority objections to the Cal State claims?

15           A.   When you asked the prior question, I was

16       thinking of California universities in general.

17       I don't recall if we had a discussion regarding

18       the authority to file Regent -- claims on behalf

19       of the Regents versus claims on behalf of

20       California State or if it was just -- if they

21       were bunched together in the discussion.

22           Q.   Did you review the Speights & Runyan 2019

23       when it was filed?

24           A.   No.



RICHARD CHARLES FINKE

82

1    Q.    Did you ever review it?

2    A.    No.

3    Q.    Did you ever see what the basis of

4    authority was for any of the claims set forth on

5    the 2019?

6    A.    I don't recall.  I remember the 2019

7    being an issue but I honestly don't recall if I

8    ever read it or saw it.

9    Q.    Was anybody else at Grace involved with

10   Kirkland in connection with the authority

11   objections?

12   A.    I don't recall anyone else being

13   involved.

14   Q.    Were you the point person at Grace?

15   A.    Yes.

16   Q.    Did you provide any reports to K&E about

17   the Speights & Runyan claims, either e-mail or

18   memos?

19   A.    Certainly there were communications

20   between me and K&E concerning the Speights &

21   Runyan claims.  And it would have been a

22   combination of telephone discussions and e-mails.

23   Q.    Well, the authority objections were made,

24   and actually later 15 substantive objections were

RICHARD CHARLES FINKE

83

1    made in 2005.  Would it be fair to say by that

2    time you had completed your review of the claims?

3        A.  I'm sorry.  By what time?

4        Q.  By September 1, 2005.

5        A.  Yes.  With the exception of any

6    additional materials that might have been

7    submitted after that time.

8        Q.  So did you do a report of what you found?

9        A.  I did not send that to Kirkland & Ellis,

10   no.

11       Q.  That's not my question yet.

12       A.  I apologize.

13       Q.  Did you do a report?

14       A.  Yes.

15       Q.  What was the report called?

16       A.  Asbestos Property Damage Evaluation.  I

17   forget if I put the word summary at the end of

18   that or not.

19       Q.  Was this just for Speights & Runyan or

20   for all traditional PD claims?

21       A.  All traditional PD claims.

22       Q.  Did we have a special section of that

23   report or was it just intermingled with the

24   others?

1        A.    There were separate reports for each law

2    firm or claimant, as the case may be, that filed

3    property damage claims.

4        Q.    When was that report, at least the first

5    draft of it, finished?

6        A.    I'm sorry.  The report for Speights &

7    Runyan claims?

8        Q.    I thought it was just -- that Speights &

9    Runyan was just part of the overall report.  Was

10   there a separate?

11       A.    No.  I'm trying to -- I probably didn't

12   say it well enough.  There were separate reports

13   for claims filed by Dies & Hile.  There was a

14   separate report for Speights & Runyan claims, a

15   separate report for claims filed by Prudential.

16       Q.    Let's just do the Speights & Runyan.

17   When was that finished, at least the first draft?

18       A.    I don't recall.

19            MS. ESAYIAN:  Mr. Speights, we are

20   certainly trying to give you a lot of latitude to

21   ask questions connected with all sorts of issues

22   that might be relevant to confirmation.  But

23   since the late authority issues have been

24   resolved, this is, in our view, really going far

1    afield.  So let's try to keep it to something

2    relevant to confirmation.

3           I'm going to object to anymore

4    questions.  I'll allow the witness to answer but

5    I'm going to object to anymore questions on late

6    authority issues on relevance grounds.

7    BY MR. SPEIGHTS:

8      Q.  Did the report that you have now

9    mentioned deal with just authority or all

10   objections to Speights & Runyan claims?

11     A.  It was an evaluation of the value of each

12   claim, which took into account all possible

13   defenses.

14     Q.  Did you supplement that report from time

15   to time as I have met with you and convinced you

16   that they were worth ten times more or did you

17   supplement it to change it or was this basically

18   one report?

19     A.  No, it was revised over time as more

20   information became available.

21     Q.  Now, you say you did not share the report

22   itself with K&E, is that correct?

23     A.  That is correct.

24     Q.  Who did you share it with?



RICHARD CHARLES FINKE

86

1    A.   With the general counsel of Grace.

2    Q.   Mr. Shelnitz?

3    A.   Yes.

4         And some of the information from the

5    report was shared with the CEO, Fred Festa,

6    F-e-s-t-a.   Our former CFO, Robert Tarola.   I

7    think just those three.

8    Q.   Did you have discussions with the CEO or

9    financial officer, let's start with those two,

10   about your report on Speights & Runyan claims?

11   A.   Yes.   I should also add that I did

12   discuss, specific to Speights & Runyan claims, I

13   did share the report with Robert Beber.

14   Q.   Did you discuss it with the financial

15   officer and the CEO at the same time or at

16   separate times?

17   A.   At the same time.

18   Q.   And did you discuss it with the general

19   counsel at that same time or a different time?

20   A.   Both.

21   Q.   Was there some meeting with the CEO and

22   financial officer and general counsel in which

23   Speights & Runyan claims were discussed?

24   A.   There were a number of meetings where the

RICHARD CHARLES FINKE

87

1    Speights & Runyan claims came up.  And there was

2    also an annual report that I prepared for those

3    three individuals, which summarized my assessment

4    of all of the outstanding property damage claims.

5        Q.  When was the annual report done that

6    summarized everything?

7        A.  In January or February of each year,

8    starting with I want to say 2004.  But it could

9    be -- it could be 2005.  I'd have to go look to

10   be sure.

11       Q.  Where would you look?

12       A.  My office.

13       Q.  Where in your office?

14       A.  Columbia, Maryland.

15       Q.  No.  What would you look at in your

16   office to find that out, the reports themselves?

17       A.  Yes.

18       Q.  So you still have the reports?

19       A.  Yes.

20       Q.  Now, you said you attended a number of

21   meetings with the CEO and financial officer and

22   general counsel in which Speights & Runyan claims

23   were discussed.  What, generally, were these

24   meetings?  What were the subjects of these

RICHARD CHARLES FINKE

88

1    meetings?  It wasn't just Speights & Runyan, was

2    it?

3        A.   No.   It was any issues relevant to the

4    reorganization.

5        Q.   Where did these meetings take place?

6        A.   They typically take place in the

7    conference room next to Mr. Festa's office.

8        Q.   In Columbia, Maryland?

9        A.   Yes.

10       Q.   Were minutes taken?

11       A.   No.

12       Q.   Did you hand out anything besides the

13   annual report at these meetings dealing with

14   Speights & Runyan claims?

15       A.   I didn't hand out the report at these

16   meetings.

17       Q.   That's fair.  Let me rephrase it.

18            Did you provide any written materials

19   to any of the attendees of these meetings dealing

20   with Speights & Runyan?

21       A.   No.  I sent the reports to Mr. Festa,

22   Mr. Tarola and Mr. Shelnitz by e-mail when they

23   were prepared.

24       Q.   How many meetings do you think you

1    attended in which Speights & Runyan claims were

2    discussed?

3        A.    I want to distinguish between Speights &

4    Runyan claims and anything and everything related

5    to them and these reports which really relate to

6    the value of the claims.  I mean there were

7    issues or discussions about Speights & Runyan

8    claims that didn't relate to, at least not

9    directly to our evaluation of the claims.  So if

10   you ask -- there were very few discussions

11   concerning the value of the claims.  But there

12   were many discussions in which was discussed

13   either pending motions relating to Speights &

14   Runyan claims, arguments, appeals, et cetera,

15   relating to Speights & Runyan claims.  Your

16   question I think was broad enough to encompass

17   all of them.

18       Q.    Did any outside counsel attend these

19   meetings?

20       A.    Yes.  By telephone.

21       Q.    Who?

22       A.    Jan Baer of Kirkland & Ellis.  And

23   possibly Ted Freedman of Kirkland & Ellis.

24       Q.    What part of these meetings -- and I know

1    this is a rough number.  But what, approximately,

2    would have dealt with Speights & Runyan claims as

3    opposed to the other issues that you would be

4    discussing?

5        A.   Not a very large part.  I don't think I

6    can put a number on it.  But these meetings are

7    designed to discuss any and all reorganization

8    related issues.  And property damage usually did

9    not occupy that -- a very large percentage of the

10   discussions.

11       Q.   And by property damage, you mean just

12   traditional PD or are you talking about

13   traditional PD and ZAI?

14       A.   I was referring to traditional PD in my

15   last answer.

16       Q.   Would ZAI have occupied more discussion

17   time than traditional PD or less?

18       A.   At certain points in time, more.  Such as

19   around the time of the ZAI science proceedings or

20   the ZAI settlement discussions.

21            MR. SPEIGHTS:  I need about two

22   minutes.  There is no need to take a break unless

23   you want to.  But if you want to expand it to

24   five, you can do it.

RICHARD CHARLES FINKE

91

1          (Deposition recessed from 12:07 p.m.

2     to 12:11 p.m.)

3     BY MR. SPEIGHTS:

4          Q.  Let me back up a minute, Mr. Finke, to

5     the so-called gateway objections.  Do you

6     remember those?

7          A.  Yes.

8          Q.  I couldn't remember the term earlier.  So

9     I skipped over it.

10              But back some period of time around

11    2004, we had some meetings about gateway

12    objections that Grace was going to file.

13              Were you involved with the gateway

14    objections?

15         A.  Yes.

16         Q.  What was your involvement with the

17    gateway objections?

18         A.  Providing input as to types of objections

19    that Grace might be able to assert to these types

20    of claims and then reviewing drafts of the 15th

21    omnibus objection.

22         Q.  Was it your understanding that the

23    gateway objections were objections to the

24    insufficiency of the information furnished with

1    the proof of claim form?

2        A.    Yeah, I might be confusing the gateway

3    objections with the 15th omnibus objections.

4        Q.    Well --

5        A.    So I would have to backtrack myself and

6    say, when you asked me if I'm familiar with the

7    gateway objections, no.  Sitting here right now,

8    I'm not sure which objections are encompassed by

9    the phrase gateway objections.

10       Q.    Let me see if I can refresh your

11   recollection.

12             My recollection is that, after the

13   bar date, Grace asked to be able to file gateway

14   objections because some claimants had not

15   attached all the information that the bar order

16   arguably required and that the judge granted the

17   request about but provided claimants a period of

18   time to supplement their claims.  And then we

19   were to proceed down a path of gateway

20   objections.  This occurred before the authority

21   objections and before the 15th omnibus objection.

22   Does that refresh your recollection?

23       A.    Yes.

24       Q.    And were you involved in that process, at

1    least advising Grace where the deficiencies were

2    in the claimant's claim forms?

3        A.   I was involved in discussions with

4    outside counsel, yes.

5        Q.   Did you provide outside counsel with the

6    information about which claims were deficient for

7    which reasons?

8        A.   I believe our Boca staff reviewed the

9    claims for that purpose.  And, yes, provided that

10   information to outside counsel.

11       Q.   And would that have been as a result of

12   the work we discussed earlier when you got from

13   BMC the information on the claims and then over

14   six or nine months you --

15       A.   I believe so, yes, it would have been

16   part of that.

17       Q.   Now, as I have examined the record, I

18   don't see where Grace ever pursued the gateway

19   objection separately after that process, after

20   the supplementation.  But instead had filed a

21   15th omnibus objection which included those and

22   other objections.  Is that your recollection?

23       A.   As a general matter, yes.  But I don't --

24   what I don't recall is whether we filed further

RICHARD CHARLES FINKE

94

1    objections, further objections based on the

2    missing or insufficient information that was the

3    focus of the gateway objections.

4        Q.   And that's my question is, assuming Grace

5    didn't file separate objections, separate gateway

6    objections after claimant supplemented, why

7    didn't it?

8             MS. ESAYIAN:   If you know.  I'm going

9    to instruct you not to the answer to the extent

10   it invades the attorney-client privilege.

11   BY MR. SPEIGHTS:

12       Q.   Do you know?

13       A.   Sitting here today, no, I don't.

14       Q.   Let's talk about ZAI again for a few

15   minutes.

16             You told me earlier that you're not

17   aware of any discussion, settlement discussions,

18   involving ZAI before the bankruptcy.

19       A.   I don't recall any.

20       Q.   Trace for me the history, not who said

21   what and when, but the history of settlement

22   discussions of ZAI during the course of the

23   bankruptcy.

24       A.   My first involvement with settlement

1    discussions regarding ZAI was in June or July of

2    2007.   I attended a meeting with Bob Beber and

3    Ted Freedman in Charlotte, North Carolina.   That

4    was also attended by Ed Westbrook and Darrell

5    Scott.

6             If there were any discussions prior

7    to that meeting, I'm -- well, I certainly wasn't

8    a party to them and I don't -- I don't recall,

9    you know, whether there, in fact, were any.

10   Let's see.

11            The next discussion that I'm aware of

12   is that Mr. Beber and Mr. Westbrook agreed to

13   meet in the Atlanta airport.   That was early in

14   2008.   January or February.   Which I attended.

15            Then the next meeting took place in

16   May of 2008.   I'm not aware, again, I certainly

17   wasn't party to any discussions prior to May 2008

18   other than the ones I've mentioned, the two

19   meetings that I've mentioned.   If there were

20   other discussions, I don't know about them.

21            But a meeting was set up in May of

22   2008 in Washington.   Again, with Mr. Westbrook

23   and Mr. Scott.   Grace was represented at that

24   meeting by Mark Shelnitz.   Hudson LaForce was our

1    current CFO, and me.  Ted Weschler representing

2    the equity committee also attended.  And Joe Rice

3    of the Motley Rice law firm attended.

4            There were some discussions,

5    telephone discussions, after that.  I

6    participated in a few of those.  Those were

7    primarily, maybe exclusively, with Mr. Westbrook.

8    And that led to a September meeting, September

9    2008 meeting, in Mr. Westbrook's office in I

10   think it's technically Mount Pleasant, South

11   Carolina.  Near Charleston.  And that was

12   attended by David Bernick, myself, Mark Shelnitz,

13   Mr. Westbrook, Judge Sanders, who had been

14   appointed the property damage future claimant's

15   representative and his attorney, Alan Rich.

16           Darrell Scott may have attended.  I

17   honestly don't remember if Darrell Scott was

18   there.

19           And then there were a number of

20   discussions and e-mails after that meeting

21   concerning the preparation of the ZAI terms

22   sheet, which the parties signed toward the end of

23   November.

24       Q.  Did you attend a mediation before Judge



1    Gross in Delaware?

2         A.   Yes.   I apologize for leaving that out.

3    There was a mediation.   When was that?   Maybe

4    that's the one.   I forget the date of that.   But

5    there was a mediation in Delaware before U.S.

6    Magistrate Judge Gross.   It involved a number of

7    people, including the Canadian ZAI claimants'

8    representative counsel.   I believe counsel for

9    the property damage committee attended.   Of

10   course, Grace attended with its counsel.

11   Mr. Westbrook and Mr. Scott attended.   There may

12   have been others.   There was a large crowd.

13        Q.   I believe it was in May of 2008,

14   Mr. Finke.

15        A.   Okay.

16        Q.   But do you recall whether it was before

17   or after the Washington meeting?

18        A.   It was definitely before.   Now, I'm -- I

19   have to call into question my recollection of the

20   date of the Washington meeting.   Because that

21   doesn't sound right that those two would have

22   been so close in time.

23             Yeah.   I don't think there is

24   anything else I can say at the moment concerning

1     the time of the Washington meeting.  I would have

2     to think about that.  I'm not sure now that it

3     was in May.  Assuming the mediation was in May.

4         Q.   Well, you would agree with me that the

5     mediation was between the Atlanta meeting and the

6     Washington meeting?

7         A.   Yes.

8         Q.   Now, in June or July of '07, when you and

9     Mr. Beber and Mr. Freedman met with Mr. Westbrook

10    and Mr. Scott in Charlotte, what ZAI claims were

11    you discussing?

12        A.   All ZAI claims in general.

13        Q.   Was an offer made by Grace or demand made

14    by Mr. Westbrook or Mr. Scott?

15             MS. ESAYIAN:  I'm going to object and

16    instruct the witness not to answer at this point

17    on grounds of privileged settlement negotiations.

18    BY MR. SPEIGHTS:

19        Q.   Did you engage in settlement negotiations

20    at this meeting?

21        A.   Yes.

22        Q.   Were the Canadian ZAI claims part of the

23    discussions in June and July of '07?

24             MS. ESAYIAN:  Okay.  I'm going to

1    object and instruct Mr. Finke not to answer on

2    the same grounds.

3    BY MR. SPEIGHTS:

4        Q.   Why were you having settlement

5    discussions with just Mr. Westbrook and Mr. Scott

6    and not the PD committee?

7        A.   I would be speculating as to why or how

8    that came about.

9        Q.   Was that your decision?

10       A.   No.

11       Q.   Who made that decision on behalf of

12   Grace?

13       A.   I'm sorry.  Which decision?

14       Q.   The decision to discuss a settlement, or

15   what you earlier described as all ZAI claims,

16   with just Mr. Westbrook and Mr. Scott rather than

17   the property damage committee?

18       A.   The question assumes that that question

19   or issue arose.  And I don't know that it did.  I

20   don't recall that it did.

21       Q.   Do you recall whether Grace contacted

22   Mr. Westbrook and Mr. Scott or Mr. Westbrook and

23   Mr. Scott contacted Grace?

24       A.   I do not recall.



1      Q.   Who was the person talking most to

2    Mr. Westbrook and Mr. Scott in '07 on behalf of

3    Grace?  Was that Mr. Beber?

4              MS. ESAYIAN:  In general or at a

5    meeting in particular or just in general?

6    BY MR. SPEIGHTS:

7      Q.   About a resolution of the ZAI claims.

8      A.   It would have been Mr. Beber.

9      Q.   Would it be fair to say that no agreement

10   was reached at the Charlotte meeting?

11     A.   Yes, that's accurate.

12     Q.   Was information exchanged, written

13   information exchanged, before, during or in

14   connection with the Charlotte meeting?

15     A.   No, I don't believe so.

16     Q.   Now, let's go west to Atlanta in early

17   2008.  You said that you and Mr. Beber and

18   someone else attended on behalf of Grace.  Who

19   was that someone else?  I can't read my writing.

20     A.   I'm sorry.  Which meeting is this?

21     Q.   The Atlanta meeting.  The second meeting.

22     A.   It was just Mr. Beber and me and

23   Mr. Westbrook.

24     Q.   How long did this meeting last?

RICHARD CHARLES FINKE

101

1       A.   An hour.

2       Q.   Did you engage in settlement negotiations

3   during this meeting?

4       A.   Yes.

5       Q.   Was a demand made?

6            MS. ESAYIAN:   Same instruction.   Same

7   objection.   Same instruction.

8   BY MR. SPEIGHTS:

9       Q.   Did Grace offer any money?

10           MS. ESAYIAN:   Same objection.   Same

11  instruction.

12  BY MR. SPEIGHTS:

13      Q.   What ZAI claims were you discussing at

14  this meeting?

15           MS. ESAYIAN:   I'll allow you to

16  answer generally.

17           THE WITNESS:   Just generally ZAI

18  claims.

19  BY MR. SPEIGHTS:

20      Q.   Had there been any discussion that you

21  know of during or prior to the Atlanta meeting as

22  to why you were negotiating with Mr. Westbrook

23  rather than the PD committee?

24      A.   I don't recall any such discussion.

RICHARD CHARLES FINKE

102

1      Q.   Did you reach an agreement in Atlanta?

2      A.   No.

3      Q.   Did you make any progress?

4      A.   Am I allowed to answer that one?

5           MS. ESAYIAN:   I'll allow you to

6      answer yes or no.

7           THE WITNESS:   In my opinion, no.

8    BY MR. SPEIGHTS:

9      Q.   In your discussions at these first two

10   meetings, did you negotiate issues other than

11   dollars?

12     A.   I'll answer yes.   The answer is yes.   But

13   I'm not going to discuss what issues.

14     Q.   Did you discuss the structure of any

15   proposed settlement?

16          MS. ESAYIAN:   Objection and instruct

17   the witness not to answer.

18   BY MR. SPEIGHTS:

19     Q.   In 2007 at the meeting in Charlotte, did

20   the name Anderson or Speights come up?

21          MS. ESAYIAN:   You can answer.

22          THE WITNESS:   I don't believe so.

23   BY MR. SPEIGHTS:

24     Q.   At the meeting in Atlanta in early 2008,

1    did the name Anderson or Speights come up?

2        A.   I don't believe so.

3        Q.   Who represented Grace at the Wilmington

4    mediation?

5        A.   The Reed Smith firm in the person of Jim

6    Restivo and Doug Cameron.  And Derrick Tay of the

7    Ogilvy Renault firm in Toronto with respect to

8    Canadian ZAI claims.

9        Q.   Mr. Beber didn't attend?

10       A.   No.  I'm sorry.  It was not Derrick Tay.

11   He couldn't make it.  Orestes Pasparakis

12   represented us at that mediation.

13       Q.   No one else from Grace attended in-house

14   other than you, correct?

15       A.   That's correct.

16       Q.   And did you have discussions with ZAI

17   representatives and the mediator in Wilmington?

18            MS. ESAYIAN:  What was the question?

19   Could you repeat the question?

20   BY MR. SPEIGHTS:

21       Q.   Did you have discussions with the

22   mediator and ZAI representatives as a part of

23   this mediation?

24       A.   There was one discussion where the



104

1    mediator, ZAI representatives and Grace

2    representatives were in the same room.

3        Q.   And who were the ZAI representatives in

4    that room?

5        A.   Mr. Westbrook and Mr. Scott.

6        Q.   Isn't it correct that PD committee

7    counsel, Mr. Bano, was at the mediation?

8        A.   That is my recollection, yes.

9        Q.   Was there a decision made to keep him out

10   of that session?

11       A.   Not by Grace.

12       Q.   Did you see any discussion about

13   including the PD committee in this negotiation or

14   mediation between ZAI and Grace?

15              MS. ESAYIAN:   Discussion with whom?

16              MR. SPEIGHTS:   With anybody.

17   BY MR. SPEIGHTS:

18       Q.   That you're aware of?

19       A.   Not that I'm aware of.

20       Q.   Was any progress made at mediation?

21       A.   In my opinion, no.

22       Q.   Did you discuss structure?

23              MS. ESAYIAN:   Objection.   Same

24   objection.   Instruct him not to answer.

RICHARD CHARLES FINKE

105

1    BY MR. SPEIGHTS:

2        Q.   Was Mr. Speights or Anderson mentioned at

3    this mediation?

4        A.   I don't believe so.

5        Q.   That brings us to what you formerly

6    thought was in May 2008.  But whenever it was,

7    the Washington meeting.  Did this take place at

8    K&E's office in Washington?

9        A.   I'm sorry.  Yes.

10       Q.   Was there any discussion before the

11   Washington meeting, that you're aware of, about

12   including the PD committee?

13            MS. ESAYIAN:  I'll instruct you not

14   to answer to the extent it's discussions with

15   counsel.  Otherwise, you can answer.

16            THE WITNESS:  I don't recall any

17   discussion about the PD committee.

18   BY MR. SPEIGHTS:

19       Q.   What was Mr. Rice's role, that is which

20   hat was he wearing at this meeting?

21       A.   My understanding is that he had had

22   discussions with Mr. Weschler.  And so he -- and

23   he was described as helping to facilitate putting

24   the meeting together.  And at the meeting, he

1    acted I would say as a mediator.

2        Q.   Was progress made at this meeting?

3        A.   Yes.

4        Q.   Was a tentative settlement reached at

5    this meeting?

6        A.   Yes, I believe there was.

7        Q.   Did the name Anderson or Speights come up

8    at this meeting?

9        A.   I don't recall it coming up.

10        Q.   And at this meeting, was it your

11    understanding that Mr. Westbrook and Mr. Scott

12    represented all ZAI claimants?

13                MS. ESAYIAN:   All U.S.?

14                MR. SPEIGHTS:   That's fine.   All U.S.

15                THE WITNESS:   No.

16    BY MR. SPEIGHTS:

17        Q.   What was your understanding about who

18    they represented?

19        A.   That they represented I think ten

20    claimants who had filed proofs of claim fairly

21    early in the Chapter 11 proceedings.   And that --

22    well, I'll end it right there.   That's who they

23    represented.

24        Q.   Were there any major differences or

1    significant differences between a tentative

2    agreement reached in May 2008 and what you

3    executed in November 2008 in the memorandum of

4    understanding?

5            MS. ESAYIAN:  I'll allow you to

6    answer yes or no.

7            THE WITNESS:  I'm going to have to

8    ask you to read it back or say it again.

9            MR. SPEIGHTS:  Okay.  I'll repeat it.

10            THE WITNESS:  My problem is, that

11    I'm -- the timing of these meetings.

12            When you said the May meeting, were

13    you referring to the Washington meeting?

14    BY MR. SPEIGHTS:

15      Q.   Yes.  I'm sorry.

16      A.   Okay.  Because I'm still --

17      Q.   I'll repeat the question.

18      A.   I'm bothered by the fact that I can't

19    pinpoint the data of the Washington meeting.

20      Q.   I hope you'll recall it over the break.

21    Even if you had to make a telephone call.

22      A.   For my own sake, I will try to pinpoint

23    that date, yes.

24      Q.   Was a tentative agreement reached at the



1    Washington meeting essentially the same agreement

2    that was documented in the memorandum of

3    understanding executed in November of 2008?

4        A.   The structure was the same.   There were I

5    think some significant changes made in some of

6    the terms between the Washington meeting and the

7    execution of the terms sheet.

8        Q.   And were those negotiated, those

9    additions, once Judge Sanders entered the case?

10       A.   Yes.

11       Q.   Did he get some more money?

12              MS. ESAYIAN:   I'm going to object and

13   instruct you not to answer.

14              MR. SPEIGHTS:   I wanted to see if

15   Mr. Rich was alive down there.

16              MS. ESAYIAN:   Maybe Mr. Rich can tell

17   you the answer to that.

18              MR. RICH:   It's not my deposition.

19              THE WITNESS:   Yet.

20              MR. RICH:   Yet.

21   BY MR. SPEIGHTS:

22       Q.   In the meeting of May 2008, is that the

23   meeting of the session that resulted in there

24   being a future claimant's representative

109

1     appointed to property damage?

2               MS. ESAYIAN:  With the clarification

3     again that we don't think it was in May of 2008.

4               MR. SPEIGHTS:  Excuse me.

5     BY MR. SPEIGHTS:

6        Q.   The Washington meeting.

7        A.   Yes.  The answer is yes.

8        Q.   Was it understood at that meeting that

9     the future claimant's representative would be the

10    future claimant's representative for traditional

11    PD as well as ZAI?

12       A.   I don't recall if it was -- if that

13    understanding was held at the meeting or shortly

14    after the meeting.

15       Q.   Was --

16       A.   Excuse me.  I was going to say, it was

17    about the same time.  But I can't recall if it

18    was at the meeting or afterwards.

19       Q.   Was the tentative agreement reduced to

20    writing in any way, either by your own internal

21    memos or some piece of paper shared with all the

22    participants or anything of that nature?

23       A.   Not at the meeting.

24       Q.   When was it first done?



1      A.  I drafted the first draft of the terms

2    sheet shortly after the meeting.

3      Q.  And did you circulate it to various

4    people?

5      A.  Yes.

6      Q.  Who did you circulate it to?

7      A.  First internally with Mr. Shelnitz.  And

8    with Kirkland & Ellis.  And then subsequently to

9    Mr. Westbrook and Mr. Scott.

10     Q.  How about the equity gentleman?

11     A.  I believe -- yes, I believe it was sent

12   to him.  I don't recall if I sent it or if

13   Mr. Shelnitz sent it.  But I believe it was sent.

14   I'm pretty sure it was sent to Mr. Weschler.

15     Q.  And was Mr. Beber involved at all in the

16   ZAI discussions at this point?

17     A.  I'm sure I discussed it with him.  He was

18   not involved in the negotiations with

19   representatives of ZAI claims.

20     Q.  Did you send a copy of your initial terms

21   sheet to Mr. Rice?

22     A.  I don't recall.

23     Q.  What happened between the Washington

24   meeting and the Mount Pleasant meeting in

111

1    September?  You told me there were telephone

2    conversations.  Can you be more specific about

3    what you were talking about and who you were

4    talking to during this period of time?

5        A.   Okay.  If I can go back to the timing,

6    which I -- and I do apologize for --

7        Q.   It doesn't bother me.  But whoever is

8    reading the record is probably going to criticize

9    you.

10       A.   No doubt.

11            I am pretty sure, the more I think

12   about it, that the -- and I will still try to

13   verify this.  That the Washington meeting took

14   place in September and the Mount Pleasant meeting

15   took place in early November.

16       Q.   Okay.  What happened between Washington

17   and Mount Pleasant?

18       A.   Exchanges of drafts.

19       Q.   Between whom?

20       A.   The individuals that I have previously

21   mentioned.  On the Grace side, Mr. Weschler and

22   Mr. Westbrook and Mr. Scott.  There were

23   telephone discussions over various terms.  There

24   were additional discussions concerning getting --

RICHARD CHARLES FINKE

112

1    having a futures claimant representative

2    appointed.  And putting materials together to

3    provide to the FCR.

4        Q.  So prior to the Mount Pleasant meeting,

5    is it fair to say that Grace had had no

6    discussions with Judge Sanders or Mr. Rich?

7        A.  I don't believe there were any

8    discussions with Judge Sanders prior to the Mount

9    Pleasant meeting.  I don't recall if there were

10   discussions with Mr. Rich before then.

11       Q.  Now, prior to the Mount Pleasant meeting,

12   had the name Speights or Anderson come up during

13   any conversation, telephone, meeting, you name

14   it, concerning ZAI?

15       A.  I don't recall it coming up.

16       Q.  Prior to the Mount Pleasant meeting, do

17   you recall any discussion about the position of

18   the PD committee regarding the ZAI settlement and

19   whether they should be included or consulted with

20   or informed or anything else?

21           MS. ESAYIAN:  I'll allow you to

22   answer to the extent it's not calling for

23   discussions with counsel, to the extent that you

24   don't reveal discussions with counsel.

RICHARD CHARLES FINKE

113

1          THE WITNESS:  I don't recall.

2    BY MR. SPEIGHTS:

3      Q.  Now, what was the discussion about?  What

4    was the meeting about in Mount Pleasant in

5    November 2000?

6      A.  It concerned --

7      Q.  Excuse me.  November 2008.

8      A.  The Mount Pleasant meeting was -- seemed

9    by Grace, anyway, as an opportunity to obtain

10   input from the PD FCR and his counsel concerning

11   the proposed ZAI terms sheet.

12     Q.  Was a memorandum of agreement signed at

13   the Mount Pleasant meeting?

14     A.  No.

15     Q.  At the end of the Mount Pleasant meeting,

16   did you have an agreement?

17     A.  Not on all terms, no.

18     Q.  Did you have an agreement on the money?

19     A.  I don't recall.

20     Q.  Did you have an agreement on the

21   structure?

22     A.  Am I allowed to answer that?

23          MS. ESAYIAN:  I'll allow you to

24   answer yes or no, if you can.



RICHARD CHARLES FINKE

114

1          THE WITNESS:  I would say yes.

2    BY MR. SPEIGHTS:

3       Q.   I cannot remember whether I asked you

4    this question to include the November of '08

5    meeting.  But just to make sure.  Did the name

6    Speights or Anderson come up at the November '08

7    meeting?

8       A.   I don't recall it coming up.

9       Q.   How long did the November '08 meeting

10   last considering Mr. Bernick was there?

11      A.   A couple of hours.  Maybe a little

12   longer.  I really don't have a good recollection

13   of the length of the meeting.

14      Q.   Well, again, at this meeting, ZAI was

15   represented by Mr. Westbrook.  And you can't

16   remember whether Mr. Scott was present, correct?

17      A.   Right.

18      Q.   And was Mr. Westbrook still representing

19   who you said he represented at the Washington

20   meeting, that is these ten claimants?

21      A.   By that time, we understood that

22   Mr. Westbrook and Mr. Scott had each filed some,

23   I don't know the number, but some number of ZAI

24   proofs of claim on behalf of clients.  So I think

115

1      I would have to say that by that time they

2      represented claimants in addition to those

3      initial ten.  But I don't -- if I knew how many

4      at the time, I don't recall now how many.

5          Q.   They represented ten plus those they had

6      filed?

7          A.   Right.

8          Q.   And, again, at this meeting in November

9      2008, you don't remember any issue about the PD

10     committee being discussed or mentioned in any

11     way?

12         A.   I do not.

13              MS. ESAYIAN:   Is now a good time for

14     a break or shortly?

15              MR. SPEIGHTS:   Shortly.

16     BY MR. SPEIGHTS:

17         Q.   After this meeting, you told me you had a

18     series of telephone calls and e-mails which

19     resulted in the ZAI terms sheet being signed

20     later that month, correct?

21         A.   Yes.

22         Q.   What were the issues that had to be

23     pinned down that had not already been resolved as

24     opposed to just language?



1          MS. ESAYIAN:  Answer generally, if

2     you can.

3          THE WITNESS:  I don't recall the

4     specific issues.

5     BY MR. SPEIGHTS:

6        Q.  At what point during these negotiations

7     did the establishment of a PD trust for ZAI

8     claims start being discussed?

9          MS. ESAYIAN:  Do you recall?

10          I'm going to object and instruct the

11     witness not to answer on the same ground as

12     previously stated.

13     BY MR. SPEIGHTS:

14        Q.  Mr. Finke, my understanding is that the

15     ZAI agreement, as of today, is that the ZAI

16     claims within the class will be determined by the

17     PD trust, is that correct?

18          MS. ESAYIAN:  Objection to form.

19          THE WITNESS:  I don't understand the

20     question.

21     BY MR. SPEIGHTS:

22        Q.  How is it determined under the agreement

23     whether a ZAI claimant within the class, whether

24     its claim is allowed or disallowed?

1          MS. ESAYIAN:  Objection.  The

2     document speaks for itself.

3          You can answer, if you can.

4          THE WITNESS:  The ZAI trust

5     distribution procedure is set up.

6     BY MR. SPEIGHTS:

7     Q.  Right.

8     A.  Requirements for each claimant to submit

9     certain documentation relating to demonstrate the

10    claimant had or has ZAI in its home has expended

11    funds to remove or abate ZAI.  And maybe one or

12    two other minor requirements.  But assuming a

13    claimant satisfies those requirements, then the

14    TDP spells out the amount to be paid to the

15    claimant in satisfaction of its claim.

16    Q.  Who determines whether the claim is

17    allowed or disallowed?  Who determines whether

18    the claimant has met that criteria?

19    A.  The trustee, I believe.

20    Q.  Okay.  Now, if a -- and the amount that

21    that claimant within the class receives is

22    determined as a part of those procedures and the

23    agreement?

24    A.  Yes.



RICHARD CHARLES FINKE

1      Q.  Now, if somebody opts out of that class,

2    is he or it treated the same way?

3               MS. ESAYIAN:  Same objection.  Te

4    document speaks for itself.  You can answer, if

5    you can.

6               THE WITNESS:  I believe that is

7    correct.  But before giving a definite answer, I

8    would want to review the documents.

9    BY MR. SPEIGHTS:

10     Q.  And which documents would you want to

11   review?

12     A.  The ZAI TDP's, the terms sheet.  Those

13   would be the start.  I don't know if I need to

14   review the trust agreement or not.

15     Q.  Was the issue of how opt outs are to be

16   treated discussed during the negotiations which

17   led up to this terms sheet?

18               MS. ESAYIAN:  I'm going to object and

19   instruct the witness not to answer.

20   BY MR. SPEIGHTS:

21     Q.  Can an opt out claimant choose to

22   litigate its ZAI claim in some form and either

23   get nothing or a hundred cents on the dollar?

24     A.  I don't know without reviewing.  Without

RICHARD CHARLES FINKE

119

1    reviewing the documents, I don't know.

2       Q.   Was that ever a point of discussion in

3    the negotiations which led to this agreement?

4              MS. ESAYIAN:   Same objection.   Same

5    instruction.

6    BY MR. SPEIGHTS:

7       Q.   I understand you had a series of e-mails

8    and telephone calls concerning the terms sheet

9    before it was executed in November.   Who were

10   these e-mails and TC's with?

11      A.   It would have involved some combination

12   at various times with outside counsel, meaning

13   Kirkland & Ellis, Mr. Rich and I think

14   Mr. Westbrook.

15      Q.   When was the --

16      A.   But not all, though not everybody being

17   on every call.

18      Q.   When was the ZAI TDP done?

19      A.   I think January or February of this year.

20      Q.   Who did it?

21      A.   I believe Mr. Westbrook or Mr. Scott.

22              MR. SPEIGHTS:   Well, let's go to

23   lunch.

24              (A luncheon recess was taken from

1    1:06 p.m. to 2:07 p.m.)

2    BY MR. SPEIGHTS:

3       Q.  Mr. Finke, did you have an opportunity to

4    reflect, consult or otherwise attempt to come up

5    with any of the missing dates or set your mind a

6    little more in order about what happened when on

7    ZAI or with respect to the study of the PD

8    claims?

9       A.  I did with respect to the ZAI

10   negotiations.  The meeting in Washington, D.C.,

11   at the Kirkland & Ellis offices, took place in

12   September of 2008.  And the next face-to-face

13   meeting was in early November at Mr. Westbrook's

14   firm in Mount Pleasant, South Carolina.

15      Q.  Did you find out anything else over lunch

16   to either correct or elaborate on anything you

17   had said earlier that you're not comfortable with

18   now?

19      A.  No, I don't think so.

20      Q.  Did you see the ZAI proofs of claim as

21   they were filed?

22      A.  No.  The only ZAI proof of claim that I

23   have seen was the putative class claim filed by

24   Anderson Memorial Hospital.  I'll leave it at