121

1      that.

2          Q.   Leaving aside how you and I might

3      describe it differently, when did you first see

4      that?

5          A.   Shortly after the hearing.  Whatever the

6      most recent hearing was.  Before Judge Fitzgerald

7      when I believe you mentioned, I don't know if it

8      was in open court or if it was, you know, off the

9      record.  But you had mentioned that ZAI had filed

10     a class claim.  And that was the first that I had

11     become aware of that claim.  So I asked someone

12     to send it to me.

13         Q.   Do you know if anyone else involved with

14     the ZAI negotiations had seen that claim prior to

15     the execution of the memorandum of agreement in

16     November?

17         A.   I do not know.

18         Q.   Do you recall that we had a claim for ZAI

19     in the underlying case?

20         A.   I recall that you claim you have a claim,

21     yes.

22         Q.   Do you recall that the court found that

23     we did have a ZAI claim?

24         A.   I was not aware of that until you



122

1    mentioned it in court.  And on checking the court

2    order in which attic insulation was included

3    within the definition of asbestos containing

4    surfacing material, I noted that the court order

5    was issued after Grace had filed its petition for

6    Chapter 11 protection.  So, consequently, you

7    inferred that you would convince the court to

8    include attic insulation as a surfacing material,

9    which is a position that Grace would strongly

10   object to had it been given the opportunity to so

11   object.  But since we were not involved in that

12   post-petition order, then I would -- Grace would

13   take the position that that order is ineffective

14   as to Grace.

15      Q.   Well, that's a lot to chew on.  But let's

16   go back a little bit.

17           Were you aware at the time of the

18   certification evidentiary hearing that Anderson

19   claimed that ZAI and masonry fill were part of

20   the class?

21      A.   No, I was not aware at that time.

22      Q.   Were you aware between that time in early

23   September 2000 and what you call the conditional

24   order by Judge Hayes, that Anderson claimed that



1    ZAI and masonry fill were part of the class?

2        A.    Let me answer it this way.    The first

3    time I think I became aware of Anderson's

4    position that surfacing material included attic

5    insulation and masonry fill was when I first saw

6    Mr. Ferry's affidavit setting forth certain --

7    reporting certain facts or what purport to be

8    facts from Grace documents concerning shipments

9    of Vermiculite in South Carolina.    Something to

10   that effect.    And I don't have the date of that

11   affidavit.    But it would have been about that

12   time.

13       Q.    Did you review the transcript of the

14   evidentiary hearing on Anderson's motion to

15   certify in South Carolina?

16       A.    No, I did not.

17       Q.    Do you recall submitting, I believe I

18   asked you this earlier, an affidavit of Morton

19   Corn on whether ZAI is a surfacing material?

20       A.    No.

21       Q.    Let me show you, Mr. Finke, a certain

22   defendant's post-hearing brief in opposition to

23   class certification dated October 23, 2000, in

24   the Anderson case.    I know you see a lot of



1    pleadings.  But would you look at this and tell
2    me if this is the type of pleading that you
3    normally would have reviewed?
4        A.   I'm sorry.  Your question is have I
5    reviewed Dr. Corn's affidavit?
6        Q.   I haven't gotten there yet.  But you
7    answered my next question.
8                First of all, you recognize that as a
9    pleading Grace submitted in the certification
10   battle in South Carolina?
11       A.   Yes.
12       Q.   And I believe your affidavit is attached
13   as well, isn't it?
14       A.   Yes.
15       Q.   And Dr. Corn's affidavit is attached
16   addressing this specific issue that you were
17   addressing then?
18       A.   Yes.
19       Q.   Whether ZAI is a surfacing material?
20       A.   Yes.
21       Q.   Now, I understand that's been nine years
22   ago, eight and a half.  But would you agree with
23   me now that, when we were arguing about
24   certification in South Carolina, Anderson was

1    claiming ZAI was part of the class and Grace was

2    claiming it was not part of the class?

3       A.   I would have to agree based on this, yes.

4       Q.   Is your opinion about masonry fill the

5    same as ZAI, that is, is it your view that

6    masonry fill is not a surfacing material in the

7    same way that, in your opinion, and in Dr. Corn's

8    opinion, that ZAI is not a surfacing material?

9       A.   Yes, same opinion.

10      Q.   Is masonry fill covered by the bar date

11   in the March 31, 2003, bar date for traditional

12   PD claims?

13      A.   I believe it is.

14      Q.   Do you know why masonry fill is covered

15   by that bar date and ZAI is not, or vice-versa?

16      A.   Well, ZAI was specifically excluded, I

17   believe.

18      Q.   Yes.

19      A.   From the bar date.

20      Q.   Well, do you know why ZAI and masonry

21   fill are not treated as the same other than

22   that's just what the judge did?

23      A.   I don't recall the reasons why it was

24   done that way.

126

1    Q.   Well, does Grace have a position that

2    there is some difference that would require

3    different types of treatment in a plan of

4    reorganization?

5    A.   Well, there are differences in nature of

6    the product and nature of the defenses that would

7    be raised in response to claims based on those

8    products.  But if you're asking -- if you're

9    asking me from a bankruptcy standpoint whether

10   there are -- they should be treated in different

11   classes or subclasses, then the short answer is,

12   I don't know.  Maybe I just don't understand your

13   question.

14   Q.   Well, Monokote and Versakote and

15   acoustical plastic are all treated the same way

16   subject to the same bar date order, right?

17   A.   Right.

18   Q.   And masonry fill is treated the same way

19   as Monokote and Versakote and acoustical plastic

20   and, at least as far as a bar date order is

21   concerned, and I'm trying to get from your

22   perspective, the man who has been doing this for

23   a few years, whether, at least from an academic

24   standpoint, masonry fill really should be treated

1    with Zonolite attic insulation?

2        A.    Well, I may have misspoken.    I don't -- I

3    don't frankly recall whether masonry fill was

4    included in the March 31, 2003 bar date or not.

5    I'd have to look at the bar date and order.

6        Q.    You can assume that it is.    Because,

7    frankly, I agree with you that it is listed in

8    the bar date materials.

9        A.    Again, you may be right.    I'm not

10    disputing it.    But I just don't recall enough --

11    with enough certainty to say one way or the

12    other.

13        Q.    Who is more likely to notice that it has

14    Grace's product, a homeowner with Zonolite attic

15    insulation in the ceiling or a building owner

16    with masonry fill in the crevices of its concrete

17    block?

18            MS. ESAYIAN:    Objection to the form

19    of the question.    You can answer, if you can.

20            THE WITNESS:    I don't know how to

21    answer that question.

22    BY MR. SPEIGHTS:

23        Q.    I mean, do you have an opinion?    I mean

24    here is Grace who wants to give notice to people

1     to file a claim by a certain date.  Does Grace

2     believe that people are more likely to know they

3     have Zonolite attic insulation or masonry fill?

4                 MS. ESAYIAN:  Same objection.

5                 THE WITNESS:  More likely in what

6     context?

7     BY MR. SPEIGHTS:

8        Q.  More likely to know that they've got the

9     product so they would know to file a claim before

10    a bar date.

11       A.  At what point in time?

12       Q.  Between 2003 and 2008.

13       A.  At that time, in that time frame, I think

14    it's more likely they would know they would have

15    Zonolite attic insulation than masonry fill.  To

16    the extent they would know either.

17       Q.  Mr. Finke, the debtors have recently

18    filed Docket 21033 and notice of filing the

19    debtors' property damage expert report.  And this

20    expert report is by Denise Neumann-Martin.  Are

21    you familiar with that report?

22       A.  Yes, I am.

23       Q.  What involvement, if any, have you had

24    with the generation and production of this

1   report?

2       A.   I reviewed a couple of drafts and

3   provided some comments on the drafts.

4       Q.   Were you the contact person at Grace

5   itself to deal with is it Dr. Martin?

6       A.   Offhand, I don't know.

7       Q.   All right.   Were you the contact --

8       A.   I have not met her and don't recall.

9       Q.   Were you the contact person to deal with

10  expert Martin?

11          MS. ESAYIAN:   The contact person at

12  the company?

13          MR. SPEIGHTS:   At the company.

14          THE WITNESS:   Well, even that's

15  ambiguous.

16  BY MR. SPEIGHTS:

17      Q.   All right.   What involvement have you had

18  with expert Martin?

19      A.   Other than receiving a couple of drafts

20  of her report and providing input via e-mail,

21  that's the extent of my involvement.

22      Q.   Who chose her as an expert for Grace?

23      A.   Outside counsel, I believe.

24      Q.   I believe you said this.   But you had

1   never worked with her before in any matter before

2   she prepared this?

3       A.   Correct.

4       Q.   And does this report of expert Martin

5   represent Grace's position in this bankruptcy

6   regarding the matters she addresses?

7       A.   Yes.

8       Q.   Do you know anyone else who dealt with

9   expert Martin besides you?

10      A.   Attorneys at both Kirkland & Ellis and

11  Reed Smith.

12      Q.   Which attorneys at Kirkland?

13      A.   That's a good question.  I believe Ted

14  Freedman and possibly Deanna Boll at Kirkland &

15  Ellis.  And Doug Cameron at Reed Smith.

16      Q.   The report that I have seen does not have

17  certain referenced attachments.  Have you seen

18  the attachments?

19      A.   Refresh my recollection on what

20  attachments were supposed to be included.

21      Q.   I may have misstated that as attachments.

22           She refers to a number of documents

23  upon which she bases her views or opinions.  Do

24  you have copies of those sources?

RICHARD CHARLES FINKE

131

1      A.   Not all of them, no.

2      Q.   When she supplied you with the copy of

3   her final report or any interim drafts, did they

4   have copies of what she relied on?

5      A.   No.

6      Q.   What you had you already had?

7      A.   Correct.

8      Q.   Are you familiar with the Redbook, EPA

9   Redbook?

10     A.   No, I'm not.

11     Q.   Did you supply her with any of the

12   materials she reviewed?

13     A.   I believe we did supply her with a couple

14   of them.

15     Q.   And let me hand you the report.  You can

16   tell me what you supplied her.

17     A.   Is this the list, Mr. Speights?  I'm

18   sorry, on page three.

19     Q.   I believe so.  But we'll let you answer

20   that, just page three of the report.

21     A.   Okay.  We sent to the expert item one,

22   list of historical Class 7A and Class 7B claim

23   filings.  And item six, which is a paper

24   concerning the number of buildings in Canada

RICHARD CHARLES FINKE

132

1    containing the ZAI.

2              We might have also sent number two,

3    data bases of Class 7A and Class 7B claims.  But

4    I don't know that for a fact.

5      Q.   7A would include the traditional products

6    such as Monokote, is that correct?

7      A.   Yes.

8      Q.   The list of historical Class A ... claim

9    filings, what list did you supply her?

10     A.   I believe it was just a list of case

11   names, of cases that had been filed against

12   Grace.

13     Q.   How did you generate that list?

14     A.   My legal assistant generated it from our

15   case management system data base that we have in-

16   house.

17     Q.   And Class 7B claim filings, that would be

18   Zonolite claims, right?

19     A.   Yes.

20     Q.   And did your assistant do the same thing

21   there?

22     A.   Yes.

23     Q.   And you said possibly two data bases of

24   Class 7A and Class 7B claims, et cetera.  Is that

RICHARD CHARLES FINKE

133

1      the BMC data or is that something else?

2          A.   I'm not sure.  That's why -- I'm not sure

3      what that refers to.  If it is a data base

4      relating to claims filed in the bankruptcy

5      proceedings, then I don't think -- I don't think

6      we provided that.

7          Q.   I think I covered this as thoroughly as I

8      possibly could have.  But to make sure, I'm going

9      to go back and ask you one more time.

10             Do you recall the name Anderson,

11     Speights or opt outs ever being discussed in all

12     of your negotiations and your in-house

13     discussions about the ZAI settlement?

14             MS. ESAYIAN:  I'm going to object to

15     the form of that question in that there are

16     multiple questions rolled into one there.  If you

17     can answer, go ahead.

18             THE WITNESS:  I do not recall any

19     discussion of Anderson, Speights or opt outs.  I

20     would not rule out the possibility that at one

21     point in the many discussions one or all of those

22     terms were raised or mentioned.  But I do not

23     recall there being any discussion about them.

24     BY MR. SPEIGHTS:

RICHARD CHARLES FINKE

134

1    Q.   Mr. Finke, let me show you what purports

2    to be a W. R. Grace invoice for MK3.   Would you

3    agree with me that is what that document is?

4    A.   Yes, I would agree with that.

5    Q.   And is that the type of document that you

6    have seen on many occasions, a document, an

7    invoice generated by Grace historically showing

8    the sale of a product?

9    A.   Yes.

10   Q.   And do you have some of those documents

11   in the document depository?

12   A.   Yes.

13   Q.   And do you produce some of those

14   documents when properly requested by plaintiffs,

15   or did you before the bankruptcy?

16   A.   Yes.

17   Q.   And would you agree with me that in that

18   case it shows Monokote being shipped to a job

19   site in South Carolina, Byars Machine Co.?

20   A.   No, I would not characterize -- I would

21   not necessarily characterize Byars Machine Co.

22   as a job site.

23   Q.   All right.   May I see it a minute?

24   A.   Yes.

1      Q.   Would you agree it was sold to Byars

2    Machine Co., Post Office Box 486, Laurens, South

3    Carolina?

4      A.   Yes.   I can't make out the post office

5    box number.   I assume that's not terribly

6    important.

7            MR. SPEIGHTS:   Let me mark this as

8    Exhibit 2.

9            (Finke Deposition Exhibit No. 2 was

10   marked for identification.)

11   BY MR. SPEIGHTS:

12     Q.   Let me show you another one.   I'll refer

13   to it as the Landmark job.   Is this another

14   invoice showing the sale of Monokote?

15     A.   Yes.

16     Q.   And would the same be true for this

17   invoice as a prior one, this would be the type of

18   document that you might have in the documents

19   depository?

20     A.   Yes.

21     Q.   And do you agree with respect to that

22   one, it shows the job site as being the Landmark,

23   I can't remember if it's Motel or Hotel?

24     A.   It's possible that Landmark job refers to



1    a job site.  But it's not -- it doesn't really

2    refer to a building.  Landmark could be the name

3    of an owner.  To me, it's ambiguous as to whether

4    that's a job site.  But it was shipped to that

5    location, yes.

6        Q.   The Landmark job, 1501 South Ocean

7    Boulevard, Myrtle Beach, correct?

8        A.   Yes.

9        Q.   And we have over here sold to was the

10   Columbia Plastering, which would appear to be the

11   applicator, correct?

12       A.   I would agree with that, yes.

13               MR. SPEIGHTS:  Let's mark that as the

14   next exhibit, please.

15               (Finke Deposition Exhibit No. 3 was

16   marked for identification.)

17   BY MR. SPEIGHTS:

18       Q.   Let me show you another one shipped to

19   St. Francis Hospital, Greenville, South Carolina.

20   Do you agree that that was material sold for use

21   in the St. Francis Hospital in Greenville, South

22   Carolina?

23       A.   I would agree that it's likely that the

24   Monokote reflected in this invoice was shipped



RICHARD CHARLES FINKE

1    for installation into the St. Francis Hospital.

2    I would not say it's conclusive because we do

3    know that there were, on occasion, was not the

4    norm but on occasion a plasterer would have

5    enough Monokote shipped to a particular site for

6    use on more than one construction site.

7        Q.   You're just telling me that some of the

8    Monokote shipped to St. Francis could have been

9    used elsewhere, correct?

10       A.   Correct.  As reflected on this invoice,

11   correct.

12               MR. SPEIGHTS:  Let's mark that as the

13   next exhibit, the St. Francis invoice.

14               (Finke Deposition Exhibit No. 4 was

15   marked for identification.)

16   BY MR. SPEIGHTS:

17       Q.   Let me show you one for the South

18   Carolina National Bank job.  Another invoice.

19               Do you agree that that shows that

20   Monokote was used for the South Carolina bank job

21   in Columbia, South Carolina?

22       A.   I would agree that at least some of it

23   was, yes.

24               MR. SPEIGHTS:  Mark that, please.

1          (Finke Deposition Exhibit No. 5 was

2     marked for identification.)

3     BY MR. SPEIGHTS:

4     Q.  I'll assure you that I'm not going to

5     mark every invoice, Mr. Finke, but two or three

6     more.

7          The next one is shipped to Roper

8     Hospital, Charleston, South Carolina.  Would you

9     agree that that's an invoice for a Monokote

10    material to be used at Roper Hospital?

11    A.  Yes, I would agree with that, that it

12    reflects Monokote shipped for use in whole or in

13    part to Roper Hospital.

14          MR. SPEIGHTS:  Mark that, please.

15          (Finke Deposition Exhibit No. 6 was

16    marked for identification.)

17    BY MR. SPEIGHTS:

18    Q.  And, lastly, one for First Federal

19    Savings & Loan, Main Street in Columbia, South

20    Carolina.  Would you agree that's Monokote for

21    that savings and loan?

22    A.  Yes, I would.

23          MR. SPEIGHTS:  Let's mark this as

24    Exhibit 7.

1              (Finke Deposition Exhibit No. 7 was

2      marked for identification.)

3      BY MR. SPEIGHTS:

4         Q.   Do you know how many invoices Grace has

5      in its documents depository for asbestos-

6      containing surface treatment?

7              MS. ESAYIAN:  I'm going to object to

8      the term asbestos containing surface treatment

9      materials since actually you used the term

10     asbestos containing surface treatment which isn't

11     even --

12             MR. SPEIGHTS:  Actually, I

13     intentionally used the term asbestos containing

14     surface treatment as opposed to surfacing

15     materials.  And Mr. Finke and I disagree about

16     whether there is a difference.  I understand

17     that.  We have been disagreeing since 2000.

18             MS. ESAYIAN:  Right.  Preserve that

19     objection.

20             THE WITNESS:  No, I do not know how

21     many invoices are in the repository.

22     BY MR. SPEIGHTS:

23        Q.   Would you say a minimum of hundreds?

24        A.   Yes.

RICHARD CHARLES FINKE

140

1    Q.    Thousands?

2    A.    Yes.

3    Q.    Now, we talked earlier about the

4    computerized data base to the documents in the

5    depository in one of the fields, which is job

6    sites, correct?

7    A.    I believe so, yes.

8    Q.    Now, if we wanted to see if there were

9    any job sites on Columbia, South Carolina, could

10   you search it by location?  Could you search

11   Columbia?

12   A.    I believe so.

13   Q.    Could you search by specific job sites

14   like First Federal Savings & Loan?

15   A.    Yes.

16   Q.    Could you search by date?

17   A.    Yes.  The date of the document, yes.

18   Q.    The date of the invoice?

19   A.    Right.  In this case, an invoice, yes.

20   Q.    Now, are there other job site types of

21   documents that fall into the category of job site

22   in that data base beside invoices?

23   A.    I don't know.  I was not involved.  I

24   wasn't even employed by Grace at the time they

1    coded these.  So I don't know.

2        Q.  Earlier, Mr. Finke, we discussed our Boca

3    Raton meeting in early 2005 and some exchange of

4    documents.  Let me show you an e-mail from you to

5    me of March 4, 2005, and the attached

6    stipulation, and ask if that is an e-mail you

7    sent to me on this date and the attached

8    stipulation dealing with certain types of claims

9    that we had agreed to, quote, put on the shelf?

10              MS. ESAYIAN:  Do you have the

11    exhibit?

12              MR. SPEIGHTS:  Do I have what?

13              MS. ESAYIAN:  The exhibit.

14              MR. SPEIGHTS:  What exhibit?

15              MS. ESAYIAN:  The exhibit in

16    reference to the stipulation.

17              MR. SPEIGHTS:  No.  The stipulation

18    was never filed.

19              MS. ESAYIAN:  But do you have the

20    exhibit that was -- you don't have the exhibit?

21              MR. SPEIGHTS:  I printed Mr. Finke's

22    e-mail and the attachment.

23              MS. ESAYIAN:  All right.

24              THE WITNESS:  Yes, I certainly sent

RICHARD CHARLES FINKE

142

1    the e-mail.  And I have no reason to think this

2    wasn't the attachment that was sent with the

3    e-mail.

4                MR. SPEIGHTS:  Let's mark this as the

5    next exhibit.  That is the e-mail and the

6    attached stipulation.

7                (Finke Deposition Exhibit No. 8 was

8    marked for identification.)

9    BY MR. SPEIGHTS:

10       Q.  Now let me show you two e-mails of March

11   17, one at 12:29 and one at 12:45, from me to

12   you, and ask if that reflects that I sent you

13   back a revised stipulation, one in Word and one

14   in Word Perfect?  That's the reason for the two

15   e-mails.

16       A.  I agree that's what the documents say.

17       Q.  And I believe you earlier said that you

18   recall you sent me a stipulation and I sent you

19   something back, isn't that correct?

20       A.  I believe that's correct, yes.

21               MR. SPEIGHTS:  Let's mark these two

22   e-mails as the next exhibit.

23               (Finke Deposition Exhibit No. 9 was

24   marked for identification.)



1    BY MR. SPEIGHTS:

2        Q.   Now let me hand you, finally, an e-mail

3    from me to you of April 7, 2005, stating, quote,

4    I just want to confirm that the ball is in your

5    court.  End quote.

6                Did you receive that e-mail from me,

7    Mr. Finke?

8        A.   I don't have an independent recollection

9    of receiving it.  But I don't have any reason to

10   believe that I didn't.

11               MR. SPEIGHTS:  Let's mark it, then,

12   as the next exhibit.

13               (Finke Deposition Exhibit No. 10 was

14   marked for identification.)

15   BY MR. SPEIGHTS:

16       Q.   Mr. Finke, you and I have dealt with each

17   other for close to 20 years, I think.  I never

18   recall, except for this one instance, of your not

19   getting back to me.  Without yet discussing why

20   or what happened or anything else, do you agree

21   that after I sent you the revised stipulation,

22   you did not get back to me concerning this

23   stipulation?

24       A.   I would agree with that.



RICHARD CHARLES FINKE

144

```
 1        Q.   Did Grace decide to proceed in another
 2    direction?
 3        A.   I cannot answer that question without
 4    divulging privileged communications.
 5        Q.   Would that be privileged communications
 6    with outside counsel?
 7        A.   No.
 8        Q.   Would that be privileged communications
 9    with the general counsel of W. R. Grace?
10        A.   Yes.
11        Q.   And by the, would that have been
12    Mr. Shelnitz?
13        A.   That's what I'm taking my time about.
14    I'm not sure who was general counsel at that
15    particular point in time.
16        Q.   Would it be fair to say that somebody
17    other than Richard Finke decided to change
18    directions?
19              MS. ESAYIAN:   Objection to form.
20              THE WITNESS:   Yes.
21    BY MR. SPEIGHTS:
22        Q.   Would it be fair to say that somebody
23    beside Richard Finke decided not to give me a
24    telephone call or contact me and tell me Grace
```



RICHARD CHARLES FINKE

145

1    was changing directions?

2        A.  I don't agree with the wording of your

3    question.  You are correct, it was not my

4    decision.

5        Q.  Thank you, sir.

6            It was not Bob Beber's decision

7    either, was it?

8            MS. ESAYIAN:  Objection to the extent

9    that that invades the privilege that he has

10   already attested to.

11           MR. SPEIGHTS:  I'll withdraw the

12   question.  I'll withdraw it.

13   BY MR. SPEIGHTS:

14       Q.  Let me back up with some little

15   housecleaning I have highlighted on my sheet over

16   lunch.

17           Who is in charge of the SBA today?

18       A.  I don't know.  I really have no idea.

19       Q.  Why is it still in existence?

20       A.  I don't know that either.  I have had no

21   contact with anybody from SBA or representing

22   SBA.

23       Q.  If I wanted to notice --

24       A.  For a long time.



146

1       Q.   Excuse me.   If I wanted to find out if it

2   is still in existence, who would you suggest that

3   I talk to about a conversation about a

4   deposition?

5              MS. ESAYIAN:   Objection to

6   foundation.   You can answer, if you can.

7              THE WITNESS:   She is going to kill

8   me.

9              The Grace person who is liaison with

10  SBA is Dori Kuchinsky.

11  BY MR. SPEIGHTS:

12      Q.   I actually know Ms. Kuchinsky.   And

13  you're probably right.   But leaving that aside.

14              Is she still in Washington?

15      A.   She has an office in Leesburg, Virginia.

16  And also occasionally comes to the Columbia

17  headquarters.

18      Q.   Is she full-time with Grace?

19      A.   Yes, she is.

20      Q.   What's her job?

21      A.   Senior litigation council.

22      Q.   Mr. Finke, I will show you an excerpt

23  from the debtors' memorandum in support of motion

24  for entry of a case management order, motion to

1    establish bar date, motion to approve claim forms

2    and motion to approve notice program dated June

3    27, 2001, Docket 587. And you can look at the

4    whole excerpt I have. But it has a section here

5    on this motion for CMO and sometimes we call it

6    the bar date motion. But the memorandum on

7    traditional asbestos property damage claims.

8         Do you recall either reading that

9    section at the time or did you contribute to this

10   section back in 2001?

11        MS. ESAYIAN: Since this is only an

12   excerpt, are you representing for the record that

13   this excerpt is the only portion of this pleading

14   that discusses traditional PD claims?

15        MR. SPEIGHTS: No. I will be glad to

16   go download the entire hundreds of pages if you

17   like. But that's the only one I'm interested in.

18   There is a statement in that section that I'm

19   interested in asking him about. And I may have

20   included two sections in the document that is in

21   front of you now.

22        THE WITNESS: I don't recall if I

23   reviewed this document at the time or whether I

24   contributed to it. I forget exactly what your

RICHARD CHARLES FINKE

148

1    question was.

2    BY MR. SPEIGHTS:

3        Q.    Okay.    Let me go ahead and have the court

4    reporter mark the excerpt and then I will ask you

5    about a couple sentences in it.    Even though you

6    might not have been the author of it.

7                    (Finke Deposition Exhibit No. 11 was

8    marked for identification.)

9    BY MR. SPEIGHTS:

10       Q.    First of all, in the discussion on the

11   traditional asbestos property damage claims, it

12   refers to seven cases that were active or semi-

13   active at the time.    Do you recall that?

14       A.    I saw that in the document, yes, when I

15   just reviewed it.

16       Q.    And let me go over the seven and make

17   sure I understand what the seven were.

18                    It says one has been on the suspense

19   calendar since 1990 in Louisiana.    That was

20   Mr. Dies' Jefferson case, is that right?

21       A.    Jefferson Parish, yes.

22       Q.    That was a school case, correct?

23       A.    Yes.

24       Q.    Next, Grace was awaiting a dismissal



1    order in the second case due to product

2    misidentification.

3              What was that case?

4        A.   The District of Columbia case.

5        Q.   The next one was one awaiting a decision

6    by the Ohio Supreme Court.

7              What was that case?

8        A.   That was the Trumble Hospital, I believe,

9    that Mr. McLean brought against us in Ohio.

10       Q.   Has that case been resolved now?

11       A.   The claim that Trumble filed in the

12   Chapter 11 is the subject of a settlement,

13   approved settlement agreement.

14       Q.   Next is a fourth case that was on appeal

15   in New York State after the trial court entered a

16   verdict against Grace despite the jury's

17   apportionment of 62 percent liability to

18   plaintiffs.

19              That would be Mr. Westbrook's Solo

20   case, wouldn't it?

21       A.   Yes.

22       Q.   And then it has, lastly, three cases were

23   in pretrial litigation.  One of those cases,

24   Prudential, was dismissed last week.

1              Was it dismissed as to Grace or

2    dismissed as to U.S. Gypsum?

3         A.   I believe it was dismissed with prejudice

4    as to U.S. Gypsum.  I don't recall if it was with

5    prejudice.  I believe it was dismissed with

6    respect to Grace.  But I don't recall if it was

7    with prejudice.

8         Q.   And that leaves two and the two are not

9    listed.  But I believe the two would be Anderson

10   and 100 Pine; am I right?

11        A.   Yes.

12        Q.   So is it fair to say that Speights &

13   Runyan, by itself, or with co-counsel, had the

14   only two active cases at the time of the

15   bankruptcy, active traditional as opposed to

16   property damage cases?

17        A.   No.

18        Q.   Why is that not correct?

19        A.   Because there should have been an 8th

20   case.

21        Q.   Is that Mr. Dies' Texas case?

22        A.   Yes.

23        Q.   It was not listed in that section, right?

24        A.   No, it was not.



RICHARD CHARLES FINKE

151

1    Q.    And is that one of his Orange County

2    cases?

3    A.    Yes.  I believe it was captioned Orange

4    County.

5    Q.    Was it a putative class action?

6    A.    Yes, I believe it was.

7    Q.    So there were three active cases, Mr.

8    Dies had one and Mr. Speights had two, correct?

9    A.    Yes.

10   Q.    Now, on the last page over here, page 47,

11   Grace has as its proposal by the asbestos

12   property damage litigation track.  I think I know

13   who came up with the word track.  But leaving

14   that aside, it says -- maybe we could prevail

15   upon our host to make us several copies of this

16   last page.  I want one for the witness and co-

17   counsel and anybody else.

18                    (Deposition recessed from 3:06 p.m.

19   to 3:08 p.m.)

20   BY MR. SPEIGHTS:

21   Q.    In this proposal in the initial case

22   management motion, I want to go down to June 1,

23   2002.  And it says, as a part of its preliminary

24   report to the court.

1            Let me just stop there.

2            Do you recall anything about Grace

3    providing a preliminary report to the court after

4    the PD bar date?  And you're welcome to read the

5    rest of the paragraph, if that will help place it

6    in context for you.

7            MS. ESAYIAN:  Just note an objection

8    for the record that, as we have discussed

9    earlier, we don't have the complete document

10   here.

11           THE WITNESS:  I guess the part of

12   your question that's got me confused is a report

13   after the bar date.  And, yet, this refers to

14   June 1, 2002.

15   BY MR. SPEIGHTS:

16     Q.  This was filed in 2001 when Grace was

17   seeking a much earlier bar date, if I can provide

18   an explanation.

19           But, regardless, do you recall it

20   initially Grace had suggested that it would

21   provide a preliminary report to the court about

22   what was filed in response to the bar date with

23   respect to traditional PD claims?

24     A.  No, I don't recall one way or the other.



RICHARD CHARLES FINKE

153

1    Q.   And then it says, Grace will identify

2    pending cases that would continue to be litigated

3    in other Courts subject to regular reporting to

4    the court.

5          Do you recall that Grace had taken

6    the position early on that certain cases would

7    continue to be litigated in other Courts subject

8    to regular reporting?

9    A.   I do have a vague recollection of that

10   being an option or a possible course of action,

11   yes.

12   Q.   And would one of those cases have been

13   Anderson, which was one of the two still active?

14   A.   I don't know.  I mean that was a pending

15   case.

16   Q.   It was pretty logical that one of the

17   active cases would be -- would continue to be

18   litigated, isn't it?

19   A.   Well, the only problem I have, and the

20   reason I hesitate just agreeing with your

21   statement, is that the subparagraphs are prefaced

22   with the statement, Grace will identify, which

23   suggests to me that Grace may have been intending

24   to select some cases as opposed to others.

RICHARD CHARLES FINKE

154

1      Possibly to exclude certain cases from one or

2      more of these subparagraphs.

3          Q.   Do you recall having discussions with

4      anyone about this option to go to the tort

5      system?

6          A.   I don't.  No, I don't recall discussions

7      about it at this point.

8          Q.   Do you know what happened to that option

9      or was it still available for people to take?

10         A.   I think the plans that have been filed by

11     Grace would not or do not permit that option.

12         Q.   Isn't it correct that the plan filed by

13     Grace would prohibit only Anderson of the pre-

14     filed cases from litigating its claim in the tort

15     system; that is, all future PD cases can

16     eventually get to the tort system if they get

17     through all the hoops?

18         A.   There are other cases pending at the time

19     we filed for Chapter 11.  So those cases would

20     not be permitted to go back into the tort system

21     once a bar date was established.

22         Q.   Let me approach it a different way.  I

23     don't think you and I have a meeting of the minds

24     on the question and the answer.

1        Under the plan of reorganization that

2   Grace has proposed, Solo will be allowed to go

3   back to the tort system to finish its appeal with

4   Grace, correct?

5        A.   The only part of your question that I

6   have a problem with is the word allowed.   It is

7   my understanding that absent a settlement

8   resolution of the Solo claim, Grace has no choice

9   but to allow that case to return to the New York

10   appellate courts.

11        Q.   That's one down and six to go.

12             Orange County has been settled,

13   correct?

14        A.   Correct.

15        Q.   It wasn't part of the seven but it was

16   the 8th.   All right.

17             So we have six other cases.   100 Pine

18   has settled, correct?

19        A.   That is correct.

20        Q.   So we have five other cases.

21             You settled Mr. McLean's case,

22   correct?

23        A.   Yes.

24        Q.   We have four other cases.



RICHARD CHARLES FINKE

156

1          Prudential you settled, correct?

2     A.   Correct.

3     Q.   You have three other cases.

4          What are the other three?

5     A.   There is Jefferson Parish.

6     Q.   You settled that?

7     A.   Correct.

8     Q.   We are down to two.

9     A.   District of Columbia, which I believe did

10   not file a proof of claim by the bar date.

11    Q.   Okay.  We are down to one.  Isn't

12   Anderson the only one of the seven or eight left

13   and doesn't the plan provide that Anderson must

14   be tried before Judge Fitzgerald?

15    A.   Yes.

16    Q.   And isn't it true that the plan provides

17   that, for the future traditional PD claims, they

18   can go to the tort system for trial if they go

19   through certain hoops before Judge Fitzgerald or

20   some other bankruptcy judge?

21    A.   Correct.

22    Q.   Who devised that scheme?

23              MS. ESAYIAN:  Objection to form.

24              THE WITNESS:  Grace's bankruptcy



RICHARD CHARLES FINKE

157

1  counsel.

2  BY MR. SPEIGHTS:

3     Q.  Kirkland & Ellis?

4     A.  Yes.

5          MR. SPEIGHTS:  Let's take a break,

6  please.  Maybe ten minutes this time.

7          (Deposition recessed from 3:15 p.m.

8  to 3:33 p.m.)

9  BY MR. SPEIGHTS:

10    Q.  Did Grace or any of its affiliated

11 companies ever sell any fireproofing to countries

12 other than the United States and Canada?

13    A.  I believe we sold -- you said asbestos

14 containing fireproofing or just fireproofing?

15    Q.  No.  Fireproofing.

16    A.  Just fireproofing?

17    Q.  I'll come back to that.

18    A.  Japan and Australia.  I don't know if we

19 sold anyone else, fireproofing to anyone else.

20    Q.  Was that handling through the

21 construction products division or another

22 division of Grace?

23    A.  It would have been construction products.

24    Q.  Do you have any records showing job sites

RICHARD CHARLES FINKE

158

1    of Japanese and Australian building owners who

2    got fireproofing?

3        A.    I am not aware of any.

4        Q.    Does the bar date purport to bar those

5    claimants?

6        A.    I don't think so.

7        Q.    Did Grace sell any asbestos containing

8    materials of any kind outside of the United

9    States and Canada?

10       A.    My understanding is we did sell them some

11   Japan and Australia.

12       Q.    Are you back to fireproofing now or other

13   products as well?

14       A.    My knowledge is limited to asbestos

15   containing fireproofing.  We also did ship or

16   there were shipments of Libby Vermiculite to

17   Japan.  Although we don't consider that asbestos

18   containing material as defined by U.S. regulatory

19   agencies.  Some people might since presumably

20   such shipments contained some small amount of

21   amphibole asbestos.

22       Q.    Is Zonolite attic insulation used in

23   facilities other than homes?

24       A.    I'm sure it could have been.  Offhand,

1    though, I don't recall an example of a building

2    other than a home in which we have found it.

3        Q.   Does a bar date for ZAI, whatever

4    Canadian bar date there is, bar Japanese ZAI

5    claims?

6        A.   I don't believe so.

7        Q.   To your knowledge, has Grace had any

8    communication from the Japanese, the Japanese

9    government or homeowners, et cetera, concerning

10    its ZAI product?

11        A.   To my knowledge, no, we have not.

12        Q.   What is ZAI known as in Japan?

13        A.   I don't even know if ZAI was sold in

14    Japan.  There were shipments of Libby Vermiculite

15    sent to Japan.  I did not know to what uses that

16    Vermiculite was put.

17        Q.   Was the expanding plant in Japan?

18        A.   I believe there was.  But I don't know

19    that for certain.

20        Q.   Do you know whether it still exists?

21        A.   I don't.

22        Q.   Where would you go to determine the

23    records that exist regarding the shipment of

24    Vermiculite to Japan?

RICHARD CHARLES FINKE

160

1    A.   We would look at our Vermiculite

2    documents.

3    Q.   Were those produced to Messrs. Westbrook

4    and Scott during the litigation?

5    A.   Yes.

6    Q.   So that they would have the ability to

7    look up what shipments were made to Japan, what

8    Vermiculite shipments were made to Japan?

9    A.   Assuming such records exist in those --

10   in that document set, yes.

11   Q.   Well, do you believe there are records

12   that show shipments to Japan?

13   A.   I have no way of knowing or I have no

14   basis to have an opinion one way or the other.

15   Q.   Would you agree with me that the Anderson

16   class included residences?

17   A.   I don't recall.

18   Q.   Does Grace have copies of sales documents

19   showing where its texture products such as

20   Versakote were sold?

21   A.   I believe there are some records such as

22   invoices that reflect sales of Versakote.  And I

23   would assume that they would have, on the

24   invoice, the location where the Versakote was

RICHARD CHARLES FINKE

161

1    shipped to.

2        Q.   Would those be in the document

3    depository?

4        A.   Yes.

5        Q.   Other than what's in the documents

6    depository, is there some stash of sales

7    information about texture products?  Mr. Egan

8    always said that wasn't under his umbrella.

9        A.   There shouldn't be.  All those documents

10   should be in Winthrop Square.

11       Q.   Have you ever seen the so-called BOMA

12   list of BOMA members in the United States which

13   SBA used for mailouts?

14       A.   No, I haven't seen that.

15       Q.   Did you know about it?

16       A.   I know of BOMA.  I assume they have a

17   list of members.  But I don't know what list

18   you're referring to specifically.

19       Q.   If after the plan of confirmation is

20   confirmed, if that, indeed, happens, and somebody

21   sues a building owner for asbestos disease caused

22   by exposure to ZAI in a home, can the homeowner

23   look to reorganize Grace or the PI trust or

24   somebody, someone else to indemnify it?

1      A.   My understanding is that the homeowner

2    would have a claim against the personal injury

3    trust.

4      Q.   Where is that set forth?

5      A.   I believe that's in the plan under the

6    definition of indirect PI trust claim.  I may not

7    have the exact terminology there.

8      Q.   Does the indemnification cover defense as

9    well as payment of the claim?

10     A.   That would be set forth in the PI TDP.

11   And I would refer to that document before trying

12   to answer your question.  Because I'm not sure of

13   the answer.

14     Q.   If somebody had sued Grace in 1979 for

15   exposure to Monokote in the Jordan Hospital in

16   Plymouth, Massachusetts, would someone at Grace

17   have gone to see whether it had any records of

18   Monokote being in the Jordan Hospital?

19     A.   This is a hypothetical lawsuit before

20   1979?

21     Q.   No.  In 1999.  I said before the

22   bankruptcy.  I meant to say that.  I may have

23   misspoken.

24     A.   Maybe I misheard it.  Okay.  I'm sorry.

RICHARD CHARLES FINKE

163

1      Q.   1999.   Somebody serves a complaint

2   alleging mesothelioma exposure in the Jordan

3   Hospital in Plymouth, Mass, would the Grace

4   person handling the PI claims check to see if

5   there were any records showing Monokote had been

6   installed in the Jordan Hospital?

7      A.   I don't know.

8      Q.   Who would be the best person to ask that

9   question to?

10      A.   Jay Hughes.

11      Q.   Is Mr. Hughes in Columbia or Boca?

12      A.   He is based in Cambridge, Massachusetts.

13           MR. SPEIGHTS:   That's all I have at

14   this time, Mr. Finke.   I reserve my position to

15   be able to pursue those questions which counsel

16   has instructed you not to answer and other

17   questions that flow from that, if I am permitted

18   to proceed along those lines.

19           Would somebody who wants to question

20   the witness like to have this chair or can we do

21   it from wherever you are?

22           MR. BROWN:   Does anyone else on the

23   PD side have any questions?

24           Okay.   Why don't we take a five

1        minute break.

2                    (The deposition was recessed from

3        3:46 p.m. to 3:53 p.m.)

4                    EXAMINATION

5        BY MR. BROWN:

6            Q.    Mr. Finke, my name is Michael Brown and I

7        represent the cast of foreign insurance companies

8        that I identified earlier.

9                    I want to go back and fill in some of

10       the blanks in terms of your employment history

11       with Grace.   And I want to start by asking the

12       role that you had pre-petition and then go to

13       post-petition.

14                   As I understand it, you were senior

15       litigation counsel at the time the petition was

16       filed?

17           A.    Yes.

18           Q.    And prior to that, your primary

19       responsibility was with PD claims, is that

20       correct?

21           A.    Yes.

22           Q.    And I think you identified some minimal

23       involvement on the PI side?

24           A.    Right.   Very sporadic.

1       Q.   And that was primarily when there was a

2   PD expert, as I understood it, that may have some

3   application to PI claims?

4       A.   More or less, yes.  Or was involved in

5   some way in a property -- I'm sorry, personal

6   injury case, which might have ramifications for

7   property damage litigation.

8       Q.   Okay.  And then other than what you

9   described earlier, you had no involvement on the

10  PI side?

11      A.   That's right.

12      Q.   Okay.  Who did have the involvement on

13  the PI side?

14      A.   Jay Hughes.

15      Q.   And what was Mr. Hughes' title

16  pre-petition?

17      A.   I believe it was also senior litigation

18  counsel.

19      Q.   Okay.  So you were senior litigation

20  counsel on PD, he was senior litigation counsel

21  on PI?

22      A.   Correct.

23      Q.   And who did you report to at that time?

24      A.   When I first started, it was in 1989, it



1    was Robert Beber.

2        Q.  How do you say that?

3        A.  Beber.  B-e-b-e-r.

4        Q.  Okay.  Beber?

5        A.  Right.

6            I don't recall his title at the time.

7    He was not general counsel.  He became general

8    counsel a year to two after that.

9        Q.  Okay.  And at the time of the petition,

10   that's who you were reporting to?

11       A.  At the time of the Chapter 11 petition, I

12   was reporting to David Siegel, general counsel.

13       Q.  Okay.  Mr. Siegel had replaced Mr. Beber

14   by that point?

15       A.  Yes.

16       Q.  Okay.  And how about Mr. Hughes at the

17   time of the petition?  Who did he report to

18   directly?

19       A.  Also to Mr. Siegel.

20       Q.  And Mr. Siegel was the GC at that time?

21       A.  Yes.

22       Q.  Did Grace have national coordinating

23   counsel for PI claims pre-petition?

24       A.  I don't know if they were actually deemed



1    or considered national coordinating counsel.  But

2    the Casner & Edwards law firm in Boston --

3        Q.   I'm sorry.  What was the name of that?

4        A.   Casner & Edwards, C-a-s-n-e-r, & Edwards

5    law firm in Boston performed some of the

6    functions of national coordinating counsel.

7        Q.   Okay.  Were they also local counsel for

8    the Boston area?

9        A.   I believe they were, yes.  Yes, in fact,

10   I think they were.

11       Q.   Okay.  And what were the national

12   coordinating counsel functions that they

13   undertook?

14       A.   Supported local counsel throughout the

15   country in terms of providing documents and

16   transcripts, coordinating the use of experts.  I

17   think they were also involved in responding to

18   standard discovery requests.

19       Q.   And how many sets of counsel around the

20   country did Grace have with respect to the

21   defense of PI claims?

22       A.   Probably -- I'm going to say 25.  That's

23   just a little bit more than a guess.  As I said,

24   I wasn't involved with the litigation of the

1    personal injury cases.

2        Q.   Okay.   Mr. Hughes was the individual who

3    dealt primarily with the outside counsel handling

4    PI claims?

5        A.   Yes.

6        Q.   Who else at Grace was involved in the

7    handling of PI claims?

8        A.   Really, no one else.   He had a staff of

9    legal assistants that helped to maintain the

10   files.   But Jay was really the only in-house

11   attorney involved with the personal injury cases.

12       Q.   What about Mr. Beber?

13       A.   He would have been involved as well to

14   the extent of being Jay's superior.

15       Q.   And then Mr. Siegel after Mr. Beber?

16       A.   After Mr. Beber, right.

17       Q.   All right.   You I believe testified

18   earlier this morning that you became assistant GC

19   for litigation in March of 2006, is that correct?

20       A.   I think so.

21       Q.   Was that a new position?

22       A.   Yes.

23       Q.   Okay.   And if I understood your testimony

24   earlier today, that from that point forward,



1    Mr. Hughes reported to you rather than reporting

2    to the general counsel?

3        A.   Yes.

4        Q.   Okay.  So from March of 2006 on, is it

5    fair to say you have played some role on the PI

6    side?

7        A.   Yes.  But I would describe it still as a

8    minor role.

9        Q.   Can you describe for me what the role has

10   been?

11       A.   More coordination with the other parts of

12   our reorganization effort to make sure that

13   others working on the reorganization such as

14   finance, such as those who prepare our SEC

15   disclosure documents, were kept informed of

16   developments, facts, relating to the personal

17   injury claims in the Chapter 11.

18       Q.   I think you used the term you were

19   coordinating the parts.  Can you tell me what you

20   mean by the parts?

21       A.   Well, yes.  When I -- part of the role of

22   assistant general counsel in the Chapter 11 was

23   to coordinate and oversee all of the individuals

24   involved, both at Grace as well as outside

1    counsel as well as certain outside consultants.

2    And in coordinating meetings, making sure

3    essential documents were distributed

4    appropriately.  And reporting to management on

5    any developments in the Chapter 11, any issues or

6    problems that were arising or had arisen.  All of

7    this was in support of the general counsel who

8    also denoted our chief restructuring officer and

9    had ultimate responsibility for and continues to

10   have ultimate responsibility for the

11   reorganization effort.

12      Q.   Okay.  When did Mr. Shelnitz become the

13   GC?

14      A.   I think it was in the spring of 2005.

15      Q.   Okay.  And did I hear you right, that he

16   is also the chief restructuring officer?

17      A.   Yes.

18      Q.   And he is also the secretary of the

19   corporation?

20      A.   I believe.  Well, I know he was.  I think

21   he still is.

22      Q.   Does he have any other titles?

23      A.   No, I don't think so.

24      Q.   So is it fair to say that you and



RICHARD CHARLES FINKE

171

```
 1     Mr. Shelnitz were the point people at Grace for
 2     the restructuring effort?
 3         A.  Yes.
 4         Q.  Was he primarily responsible for it and
 5     you secondarily responsible?
 6         A.  Yes.
 7         Q.  And it was in that capacity that you had
 8     involvement on the PI side after you became the
 9     assistant GC for litigation?
10         A.  Yes.
11         Q.  Okay.  And can you describe for me
12     precisely what role you played on the PI side?
13         A.  Essentially, it was participating in
14     numerous conference calls and meetings to stay
15     abreast of issues and problems relating to the
16     personal injury claims and any potential
17     resolution of them and coordinating with outside
18     counsel, make sure that they had what they needed
19     in the way of either information or documents or
20     guidance, to obtain that information, documents
21     or guidance, which, quite frankly, often involved
22     having Jay Hughes either research anything that
23     he didn't know off the top of his head and
24     provide it to whoever needed it since Jay is the
```

1    I wouldn't say sole source but he is certainly by

2    far the principal source of information relating

3    to not only the personal injury claims

4    litigation, but the settlements that were worked

5    out pre-petition of those claims, dealings with

6    and relationships with outside counsel, both our

7    own as well as plaintiff's counsel.  Reviewing

8    any documents, whether they are, you know,

9    pleadings or otherwise.  Really relating to most

10    of the issues and proceedings in the

11    reorganization but particularly those relating to

12    asbestos claims, which would include personal

13    injury claims.

14        Q.  You mentioned dealing with your own

15    counsel and also dealing with plaintiff's

16    counsel.  Which plaintiff's attorneys did you

17    deal with?

18        A.  I did not deal with personal injury

19    plaintiffs.  Jay had, over the years of managing

20    the outside, managing the personal injury

21    litigation, and he worked on most, if not all, of

22    the settlements that were negotiated with the

23    plaintiff's counsel.

24        Q.  You're talking pre-petition now?



RICHARD CHARLES FINKE

173

1    A.    Pre-petition, yes.

2    Q.    What about post-petition?

3    A.    Jay was certainly part of the group that

4    negotiated the resolution of personal injury

5    claims that is embodied in the plan.  But that

6    group included others as well.

7    Q.    Others within Grace?

8    A.    Others within Grace as well as, of

9    course, outside counsel.  And I was not directly

10   involved in those discussions or negotiations.

11   Q.    With whom did Mr. Hughes negotiate?

12   Which individuals are you talking about?

13   A.    The representatives of the personal

14   injury claimant's committee.

15   Q.    Do you know the actual names of the

16   attorneys?

17   A.    I can make some assumptions.  I can't be

18   a hundred percent sure that they are correct.

19   Elihu Inselbuch, Peter Lockwood, Roger Frankel,

20   Rick Wiram and -- I feel like I'm leaving some

21   out.  But those are the names that come to mind.

22   Q.    Did he have any dealings with the

23   individuals that have been designated to be the

24   TAC members?

RICHARD CHARLES FINKE

174

1    A.    Pre-petition or post-petition?

2    Q.    Post-petition we are talking about.  As

3    you were describing his role in the negotiations.

4    A.    I don't know.

5    Q.    And was your role in dealing with PI

6    issues and the resolution of PI issues indirect

7    in the sense that Mr. Hughes reported to you or

8    did you have any direct involvement?

9    A.    It was really indirect.

10   Q.    And besides Mr. Hughes, who else was

11   involved in that effort on the Grace side?

12   A.    Mark Shelnitz, the general counsel.

13   Robert Tarola.

14   Q.    I'm sorry?

15   A.    Robert Tarola, T-a-r-o-l-a, the former

16   CFO.  The CEO, Fred Festa, had some involvement.

17   And outside counsel, David Bernick.  And I

18   believe -- I don't know if Ted Freedman was

19   involved with the negotiations or came in after a

20   deal had been reached.

21   Q.    Other than the individuals you have just

22   run through on the Grace side, was there anyone

23   else that you can recall that was on the Grace

24   negotiating team for the resolution of the PI