1    claims?

2        A.   Pam Zilly was involved in some of the

3    discussions as well.   She is with Blackstone.

4    She is our financial advisor.

5        Q.   What was her role?

6        A.   Beyond being financial adviser, I don't

7    know.   I wasn't directly involved.

8        Q.   What was Mr. Festa's role?

9        A.   I think primarily to ensure that the

10   other parties understood that the Grace

11   representatives there spoke with the full

12   authority of the company, but, again, I was not

13   present at the meetings and discussions that he

14   attended with the personal injury

15   representatives.

16       Q.   Were you at any of the meetings with the

17   personal injury representatives?

18       A.   No.

19       Q.   I gather Mr. Hughes was?

20       A.   I believe he was, yes.

21       Q.   And Mr. Shelnitz?

22       A.   Yes.

23       Q.   Okay.   I want to shift gears for a second

24   and turn to insurance.   And, again, looking at

176

1      the issue pre-petition.  Have you had any role or

2      did you have any role in connection with Grace's

3      liability insurance program before the petition

4      date?

5          A.   No.

6          Q.   Who was responsible for this at Grace?

7          A.   Bob Beber handled it from the litigation

8      standpoint.  And Jeff Posner was in charge of our

9      risk management function, including insurance.

10         Q.   When did Mr. Posner leave Grace?

11         A.   I honestly don't know.  I don't recall.

12         Q.   Was it after the petition date?

13         A.   I believe it was before.

14         Q.   And his title immediately before he left

15     was risk manager?

16         A.   I don't know.

17         Q.   But that's the function that he had, was

18     risk manager for Grace?

19         A.   Yes.

20         Q.   Post-petition, have you had any role in

21     connection with Grace's liability insurance

22     program?

23         A.   A limited one.  Limited to the extent of

24     motions that have been made or objections



| | |
|---|---|
| 1 | asserted by insurance.   To the extent an  issue is |
| 2 | being litigated, I have been involved in |
| 3 | reviewing motion papers and related documents, |
| 4 | participating in conference calls on strategy. |
| 5 | Q.   For dealing with the insurance? |
| 6 | A.   For dealing with the insurance.   Some of |
| 7 | the insurance issues.   Certainly not all of them. |
| 8 | Q.   Can you tell me which issues you're |
| 9 | talking about? |
| 10 | A.   Issues related to the claims by Keneb |
| 11 | pipeline that they believe they are entitled to |
| 12 | insurance coverage.   In connection with |
| 13 | remediation costs or potential responsibility for |
| 14 | remediation costs in connection with the Otis |
| 15 | pipeline. |
| 16 | There were a few others.   I'm just |
| 17 | drawing a blank right now. |
| 18 | Q.   Have you had any role in the Scotts |
| 19 | adversary proceeding? |
| 20 | A.   Yes.   Thank you.   Yes, I have reviewed |
| 21 | the papers, not that there have been much -- |
| 22 | there has been much recently.   But I did review |
| 23 | the adversary proceeding papers when Scotts first |
| 24 | commenced its adversary proceeding.   And, again, |

1    participated in conference calls relating to

2    their claim that they are entitled to coverage.

3        Q.   And with whom were these conference calls

4    that you participated?

5        A.   Outside counsel from Kirkland & Ellis.

6    And Mr. Posner is often on those calls.  I think

7    that's -- and it's usually the same group.

8        Q.   Did you play any role in the manner in

9    which insurance is handled under the plan?

10       A.   No.

11       Q.   Who did?

12       A.   Other than Kirkland & Ellis, I don't know

13   who else was involved.

14       Q.   Other than what you have just described,

15   have you had any role in the manner in which

16   insurance, unsettled insurance, is handled under

17   the plan?

18       A.   No.

19       Q.   How about any role in connection with the

20   manner in which settled insurance is handled

21   under the plan?

22       A.   No.

23       Q.   Did anyone replace Mr. Posner as the risk

24   manager?



1          A.   No.   He basically still serves the same

2     function but as an outside consultant.

3          Q.   Okay.   Thank you.

4                    (Finke Deposition Exhibit No. 12

5     was marked for identification.)

6     BY MR. BROWN:

7          Q.   Mr. Finke, you have what's been marked

8     Exhibit 12.   If you would take a few moments to

9     look at it.   My first question is going to be

10    whether you have ever seen it before?

11         A.   Yes, I have seen it before.

12         Q.   Can you identify it for me?

13         A.   It's Form 8K that Grace filed with the

14    SEC announcing its agreement in principle with

15    the personal injury committee and others to

16    resolve present and future asbestos related PI

17    claims.

18         Q.   When did you first see it?

19         A.   I believe it was shortly after it was

20    filed.   A day or two after it was filed.

21         Q.   Had you seen drafts of it before it was

22    filed?

23         A.   I don't believe I did.   But I -- I cannot

24    be a hundred percent sure I didn't see a draft.

1    But I don't think that I did.

2        Q.   Do you know, if it wasn't you, do you

3    know who was involved at Grace in the preparation

4    of this document?

5            And just for clarification, it's an

6    8-K.  It has attachments to it.  You probably

7    noted.

8        A.   Right.

9        Q.   One is a pre release and the other is a

10   terms sheet.  So we can probably take -- why

11   don't we take them one by one.

12       A.   Typically, the 8-K's are prepared by an

13   in-house attorney, Michael Conron, who obtains

14   input and facts from persons who are involved

15   firsthand with the events being reported.  In

16   this case, I believe he would have obtained the

17   details from Mark Shelnitz since Mr. Shelnitz was

18   personally involved in the negotiations.

19       Q.   Did he receive any information from you?

20       A.   No.

21       Q.   Okay.  How about the press release that's

22   attached to it?  There is a couple of names at

23   the top from media relations and investor

24   relations.  But do you know who prepared the

1    press release?

2        A.   Where are you at?  I'm not finding it.

3        Q.   I think it's probably page five it starts

4    at.

5        A.   Okay.  Okay.  There we go.  William

6    Corcoran is -- I forget if he is executive

7    vice-president or senior vice-president.  And he

8    is in charge of media relations, among other

9    things.  Typically, Mr. Corcoran prepares press

10   releases.  In the same manner as I described, I

11   described Mr. Conron preparing 8-K's.  He would

12   have obtained the information from whoever was

13   personally involved.

14       Q.   And would that have been Mr. Shelnitz or

15   someone else?

16       A.   I'm pretty confident it would have been

17   Mr. Shelnitz.

18       Q.   But it was not you?

19       A.   Correct.

20       Q.   Let's go to the terms sheet, which

21   appears to begin on page eight.

22       A.   Um-hmm.

23       Q.   Had you seen this terms sheet prior to

24   the filing of the 8-K?



1       A.  I believe I did.

2       Q.  When?

3       A.  I think I saw it in a prior draft.

4   Within a few days of the final, the final

5   version.

6       Q.  Were you involved in preparing any of the

7   drafts?

8       A.  No, I was not.

9       Q.  Do you know who was?

10      A.  No, I don't.  I believe Mr. Shelnitz was

11  involved along with outside counsel.

12      Q.  How about Mr. Hughes?

13      A.  I don't know.

14      Q.  Do you know who was involved for the

15  other constituencies that are a party to the

16  terms sheet?

17      A.  No, I do not.

18      Q.  In the first line of the text, it says,

19  this term sheet sets forth certain of the

20  principal terms and conditions.

21          Are there other principal terms and

22  conditions that are not reflected or were not

23  reflected in the terms sheet?

24      A.  I don't know.  I wasn't involved in the



1    discussions.  I don't know if there were other

2    principal terms and conditions that have been

3    agreed upon at that time and not included.

4        Q.   Were any of Grace's insurers involved in

5    the discussions that led up to the execution of

6    the terms sheet?

7        A.   Not to my knowledge.  But, again, I

8    wasn't personally involved in the discussions.

9        Q.   Do you know whether Grace's insurers were

10    purposely left out of any discussions leading up

11    to the terms sheet?

12        A.   Not that I know of.

13        Q.   Who would be the individual at Grace, to

14    your knowledge, that would know the answer to

15    those questions?

16        A.   Mr. Shelnitz.

17        Q.   If you look on the first page down at

18    I.A.1.b, titled, Insurance?

19        A.   Yes.

20        Q.   There is a reference there to the

21    assignment of insurance policies and all

22    insurance proceeds.  Do you see that?

23        A.   Yes.

24        Q.   Did Grace, to your knowledge, seek the

1    consent of any of its insurers prior to agreeing

2    to that term with the other constituencies to the

3    terms sheet?

4        A.   I don't know.

5        Q.   Who would know?

6        A.   Mr. Shelnitz.

7        Q.   If you turn to the next page on page nine

8    under v.   I want to direct your attention to the

9    second paragraph that begins with the word,

10   provided.

11       A.   Okay.

12       Q.   Do you understand what's being referred

13   to in that section?

14       A.   No, I'm not sure what's being referred to

15   by the foregoing.

16              (Finke Deposition Exhibit Nos. 13 and

17   14 were marked for identification.)

18   BY MR. BROWN:

19       Q.   Mr. Finke, you have two documents that

20   have been marked Exhibit 13 and one is Exhibit 14

21   in front of you.   Can you just identify them both

22   for me?

23       A.   Exhibit 13 is debtor's preliminary list

24   of witnesses that they intend to call during the

1    confirmation hearing and is dated March 13, 2009.

2              Exhibit 14 is the second amended case

3    management order related to the first amended

4    joint plan of reorganization and was ordered on

5    January 29, 2009.

6        Q.   Would I be correct if I said that you

7    have seen both of these documents before?

8        A.   Yes, you would.

9        Q.   If you look at the witness list, you'll

10   note that your name appears first?

11       A.   Yes.

12       Q.   As someone who, at least on a preliminary

13   basis, is going to testify in Phases I and II of

14   the confirmation hearing?

15       A.   Um-hmm.

16       Q.   About company information.

17              What is the company information that

18   you possess relevant to plan confirmation?

19              MS. ESAYIAN:   Objection to the form

20   of the question.   You can answer, if you can.

21              THE WITNESS:   I was asked by outside

22   counsel to be available to testify at one or both

23   of the confirmation hearings to the extent they

24   needed someone to present their basic company

1    information, such as anything from the nature of

2    our businesses to number of employees and more

3    specifically with respect to our asbestos

4    litigation and claims, both historical, meaning

5    pre-petition litigation history relating to

6    asbestos claims, as well as the asbestos related

7    claims filed in the Chapter 11.

8         The only thing I wanted to add was,

9    in a subsequent discussion, it was decided that

10   Jay Hughes would most likely handle any issues

11   relating or testimony relating to personal

12   injury -- asbestos personal injury claims and

13   issues.

14   BY MR. BROWN:

15      Q.   That was going to be my question.  You

16   used the generic term asbestos litigation.  Did

17   you mean PD asbestos litigation?

18      A.   Well, initially the discussion was

19   generic.  But, as I say, subsequently it was

20   narrowed to property damage and attic insulation

21   within my purview.

22      Q.   To your knowledge, you're not going to be

23   proffering any testimony on PI issues?

24      A.   That is my understanding, yes.



RICHARD CHARLES FINKE

187

1    Q.   Would your answer be the same with

2    respect to insurance related issues?

3    A.   Yes.

4    Q.   How about with the manner in which

5    indirect asbestos PI trust claims are handled

6    under the plan?

7    A.   I would expect that Jay Hughes would

8    handle that.

9    Q.   Okay.   If you can look at what's been

10   marked as Exhibit 14, the second amended case

11   management order.   I want to direct your

12   attention specifically to paragraph two.

13            The second sentence in paragraph two

14   talks about the first phase of the confirmation

15   hearing.   Do you see that?

16   A.   Yes.

17   Q.   And there are three Romanettes in that

18   sentence.

19            Do I understand you correctly that

20   you are not, to your knowledge, being proffered

21   to offer any testimony relevant to i or ii?

22   A.   That's correct.

23   Q.   And if you go to the next sentence, which

24   talks about the topics to be addressed in the

188

1  second phase of the confirmation hearing, are

2  you, to your knowledge, being proffered to offer

3  any testimony with respect to i or iii?

4       A.   I think that's unknown at this point.

5       Q.   Is that true for both i and iii?

6       A.   Yes.

7       Q.   Okay.  I want to go back to the

8  preliminary witness list.  And I think most of

9  these individuals on here we have already

10 identified in terms of what their acknowledge is.

11 Pam Zilly, she is with the Blackstone Group, she

12 is the financial person?

13      A.   Correct.

14      Q.   I believe you said Denise Martin is a PD

15 expert?

16      A.   Yes, she is an expert.  She'll offer

17 expert testimony concerning the likelihood that

18 future property damage and ZAI claims will be

19 brought.

20      Q.   Okay.  I believe I heard earlier the name

21 Hudson LaForce.  Who is that?

22      A.   He is our current chief financial

23 officer.

24      Q.   And Derrick Tay?

1      A.   He is a Canadian restructuring attorney

2    who represents Grace in Canada concerning the

3    Canadian ZAI claimants.

4      Q.   And Mr. Dunbar, he is an outside

5    modelling consultant?

6      A.   Yes, I believe that's right.

7      Q.   Mr. Hughes we have talked about.

8           What about all the doctors?

9      A.   Can you be more specific what you're

10   asking?

11     Q.   What's the area?  Have each of the other

12   witnesses listed here starting with I guess

13   Dr. Florence, are they all experts?

14     A.   Other than Jay Hughes, yes.

15     Q.   And they have all submitted reports at

16   this point?

17     A.   I presume so.

18           (Finke Deposition Exhibit No. 15 was

19   marked for identification.)

20   BY MR. BROWN:

21     Q.   All right.  Mr. Finke, you have before

22   you a document marked Exhibit 15.  The first

23   question is, can you identify it?

24     A.   Exhibit 15 is debtors' response to

1    Government Employees Insurance Company and

2    Columbia Insurance Company's requests for

3    admission, interrogatories and requests for

4    production of documents.

5         Q.   And I gather you have seen this document

6    before?

7         A.   Yes, I have.

8         Q.   Okay.  If you would turn to the last

9    page.

10        A.   Um-hmm.

11        Q.   Is that your signature on the

12   verification?

13        A.   Yes, it is.

14        Q.   The verification is worded a little

15   oddly.  At least in my experience.

16             The first question I have for you is

17   that, do you actually have any personal knowledge

18   of the information that's contained in the

19   responses to the interrogatories that you

20   verified?

21        A.   Well, I'm just going to note for the

22   record that it's a rather long document.  So if

23   you want him to read the whole thing, that's

24   going to take a while.

1    Q.   I don't want him to read the whole thing.

2    If you turn to page 50.

3    A.   I was just going to read the -- review

4    the answers to interrogatories.

5              In general, no, I would not have

6    firsthand knowledge of most of the facts or the

7    facts asserted in the responses to the

8    interrogatories.

9    Q.   In your verification, you note, sort of

10   the middle or halfway down, that the responses

11   are true and correct to the best of my personal

12   knowledge or based on information supplied to me

13   by others.

14   A.   Right.

15   Q.   Who are the others?

16   A.   Primarily counsel at Kirkland & Ellis.

17   Q.   Anyone else?

18   A.   No, I don't believe so.

19   Q.   Okay.  Can I direct your attention to the

20   first interrogatory?

21   A.   Um-hmm.

22   Q.   Just let me know when you're finished

23   reading it.

24   A.   Okay.  I'm ready.

1    Q.   It says that, prior to September 19,

2    2008, which is when the initial joint plan was

3    filed, correct?

4    A.   Yes.

5    Q.   Okay.  It says, prior to that time,

6    debtors did not communicate or consult with GEICO

7    or Columbia regarding the proposed terms of the

8    plan, asbestos PI trust agreement, asbestos

9    insurance transfer agreement with TDP.

10            Why not?

11    A.   I was not involved in whatever decision

12    was made concerning communicating or consulting

13    with the insurers.

14    Q.   And would that have been Mr. Shelnitz

15    again that was involved in that?

16    A.   I don't know that.  But that is who I

17    would -- who I would ask.

18    Q.   I want to direct your attention to the

19    fourth interrogatory.

20    A.   Okay.

21    Q.   In Grace's response to interrogatory

22    four, the latter portion of it, it says, but also

23    does not prohibit participation.  Do you see

24    that?



RICHARD CHARLES FINKE

193

1    A.   Yes.

2    Q.   Could you describe for me your

3    understanding of the manner in which Grace's

4    insurance companies could participate in the

5    investigation and evaluation defense in allowance

6    or settlement of the asbestos PI claims in the

7    event the plan is confirmed?

8    A.   My understanding of that provision is the

9    insurers could negotiate with the PI trust for

10   whatever role the insurers would seek to have

11   with respect to the claim submitted to the PI

12   trust.

13   Q.   And with whom would they be negotiating

14   specifically, the individuals?

15   A.   Well, the trustees.  Whoever that is.

16   Q.   Would the TAC be involved in that

17   process?

18   A.   I would not know that.  I do not know

19   that.

20   Q.   So it's your understanding that the only

21   way in which the insurers would be involved was

22   through some sort of negotiation with the trust?

23        MS. ESAYIAN:  Objection to

24   foundation.  But you can answer, if you can.

194

1          ·          THE WITNESS:  I wouldn't say it's the

2      only way because I haven't -- I'm not

3      knowledgeable enough about the manner in which

4      the trust would operate to know whether that's

5      the only avenue.

6      BY MR. BROWN:

7          Q.   It's the only one you're aware of?

8          A.   It is the only one I am aware of, yes.

9          Q.   Is there someone that has some knowledge

10     about other mechanisms by which Grace's insurers

11     could be involved in the topics that are

12     identified in interrogatory number four?

13         A.   I doubt very much that anyone at Grace

14     would have such knowledge since I don't believe

15     anybody at Grace has been involved in

16     bankruptcies before or asbestos 524 G trusts.

17         Q.   If not at Grace, where or who?

18         A.   You would have to consult with

19     experienced bankruptcy counsel.

20         Q.   Kirkland & Ellis?

21         A.   They are taken.

22         Q.   Okay.

23              MR. BROWN:  Why don't we take a five

24     minute break.

1          THE WITNESS:   Okay.

2          (Deposition recessed from 4:52 p.m.

3    to 5:03 p.m.)

4    BY MR. BROWN:

5       Q.   Mr. Finke, I understand you had a

6    clarification on one of your responses?

7       A.   Yes.   With respect to Exhibit 15, I had

8    identified counsel as Kirkland & Ellis as having

9    supplied information upon which I relied in

10   connection with the debtor's interrogatory

11   responses.   An additional person that I forgot

12   about was, but who did review the interrogatory

13   responses, was Jeff Posner.   I also relied on his

14   review and comments concerning the answers.

15      Q.   Did Mr. Posner review all of the answers

16   or were there certain ones that he passed on?

17      A.   My understanding is he reviewed all of

18   them.

19      Q.   The question will probably come up.   But

20   there is a lot of other insurers here that served

21   interrogatories on you, on Grace.   Is the answer

22   the same for all of them as well?

23      A.   Yes.   As far as I know, he reviewed all

24   of the interrogatory answers or answers to

196

1    interrogatories that have been propounded by

2    insurers.

3        Q.   Is it fair to say that you didn't have

4    any independent knowledge of any of the responses

5    that were given to the insurance companies?

6        A.   The answer is if I had -- if I had any,

7    it would be very little.  I hate to make the

8    sweeping statement that there is not a single

9    answer.

10       Q.   I'm just trying to save you the question

11   from seven other lawyers.

12       A.   I understand.  I just don't want to be

13   caught with a generalization where somebody finds

14   an exception.

15       Q.   Okay.  Fair enough.

16            Have you either pre-petition or

17   post-petition had occasion to review the terms of

18   any of Grace's insurance policies?

19       A.   Certain specific provisions I have

20   reviewed.  I have not read any of the policies in

21   their entirety.  But, for example, in connection

22   with the Scotts adversary proceeding, I did

23   review the I guess relevant provisions of the

24   policy that Scotts is relying on.

RICHARD CHARLES FINKE

197

1    Q.   By that, do you mean the vendor

2    endorsement?

3    A.   Yes.

4    Q.   Anything else?

5    A.   There might have been a few, very few

6    other portions of policies that I reviewed.  But

7    nothing specific comes to mind.

8    Q.   How about in connection with Keneb's

9    claims?  Have you reviewed any policies in

10   connection with that?

11   A.   I have not.

12   Q.   You're aware, are you not, that Grace had

13   a number of pre-petition settlement agreements

14   with various insurers?

15   A.   Yes.

16   Q.   Have you reviewed any of those

17   agreements?

18   A.   I have not.

19   Q.   You mentioned I guess that you had

20   reviewed the complaint, I think, in the Scotts

21   adversary?

22   A.   Yes.

23   Q.   When is the last time you reviewed that

24   complaint?

1        A.   I don't think I have reviewed it since

2    shortly after they filed it.

3        Q.   Back in the fall of 2004?

4        A.   That sounds right, yeah.

5        Q.   Is that when you reviewed the vendor

6    endorsement that you just referred to?

7        A.   Yes.  All at the same time.

8        Q.   Do you have an understanding as to how

9    the claims that Scotts has against the various

10   insurers that are named in the adversary

11   proceeding, how those claims are treated under

12   the plan?

13       A.   I believe they are treated as indirect PI

14   trust claims under the plan.

15       Q.   And what does that mean in real terms?

16       A.   That the insurers' claims would be

17   presented to the or submitted to the PI trust.

18            MS. ESAYIAN:  Are you asking about

19   the insurers claims or Scotts' claims?

20            MR. BROWN:  I was asking about the

21   Scotts claims against the insurers.

22            THE WITNESS:  I apologize.  I thought

23   you were referring to any insurers' claims

24   resulting from coverage of Scotts' claims.

RICHARD CHARLES FINKE

199

1            Scotts' claims, I believe those are

2      also indirect PI trust claims.

3      BY MR. BROWN:

4         Q.   And is it your understanding that they

5      are enjoined in their entirety as against the

6      insurers?

7              MS. ESAYIAN:   Objection to form.   But

8      you can answer, if you can.

9              THE WITNESS:   I don't know.

10     BY MR. BROWN:

11        Q.   Do you have an understanding as to

12     whether the claims that Keneb is asserting give

13     rise to any claims by certain insurers against

14     Grace?

15        A.   I think, in theory, my understanding is

16     that, in theory, it could, they could, Keneb's

17     claims could give rise.   But that the likelihood

18     that there is any coverage available is very

19     small.

20        Q.   Coverage available to --

21        A.   Keneb.

22        Q.   Do you understand what the reason for

23     that is or the basis is for that statement?

24        A.   Only that what coverage might otherwise

RICHARD CHARLES FINKE

200

1    have been available has been exhausted.

2        Q.   To the extent that the claims by Keneb do

3    give rise to claims by the insurers, how are they

4    treated under the plan, to your knowledge?

5        A.   That I do not know.

6                 (Finke Deposition Exhibit No. 16 was

7    marked for identification.)

8    BY MR. BROWN:

9        Q.   All right, Mr. Finke, you have before you

10   Exhibit 16.  Can you identify this document?

11       A.   Yes.  This is the debtors' response to

12   One Beacon America Insurance Company and Seaton

13   Insurance Company's requests for admission,

14   interrogatories and requests for production of

15   documents.

16       Q.   Okay.  And you'll note that on page 21,

17   the interrogatory responses begin?

18       A.   Yes.

19       Q.   And your verification, I believe, is

20   essentially identically worded to the one we just

21   looked at for GEICO and Columbia, is that

22   correct?

23       A.   Correct.

24       Q.   And am I correct that the direct source

RICHARD CHARLES FINKE

201

1      of any knowledge with respect to the responses

2      comes either from Kirkland & Ellis or from

3      Mr. Posner?

4          A.   That's correct.

5          Q.   You don't have any personal knowledge of

6      the responses?

7          A.   No, I do not.

8          Q.   Let me direct your attention to

9      interrogatory number three and the response to

10     it.

11         A.   Okay.

12         Q.   Were you involved in the events leading

13     up to the January 13, 2005 amended joint plan

14     that Grace filed?

15         A.   I was involved in certain aspects or

16     certain sections of the plan.

17         Q.   Did you play a role with that plan

18     similar to the one you played with the joint

19     plan?

20         A.   In general, yes.

21         Q.   Are you familiar with the term resolved

22     that was used to describe the insurance policies

23     under that prior plan?

24         A.   I remember the prior plan included that

1    term.   And I remember quite a while ago reading

2    and understanding the defined terms in which that

3    word was used.

4        Q.   What did you understand that word to mean

5    under the prior plan?

6        A.   Unless I have it in front of me, I really

7    don't feel comfortable answering.   Those

8    definitions, at least I found that those

9    definitions of the plan to be difficult to

10   distinguish and differentiate from one another.

11       Q.   Well, I haven't gone back and looked at

12   it myself recently.   But I don't actually think

13   it was defined under the prior plan.

14       A.   Interesting.   Under any of the --

15       Q.   I don't believe so.

16       A.   Okay.

17       Q.   So you don't have any understanding as to

18   what it meant, assuming I'm correct, that it

19   wasn't a defined term?

20       A.   If it was not, then, no, I would not

21   know.

22       Q.   Let me direct your attention to the

23   response to interrogatory number four.

24       A.   Okay.



1        Q.   There is a phrase in the response that

2    begins or, to the extent permitted by the

3    asbestos insurance transfer agreement, an

4    asbestos insurance contributor.  It's talking

5    about the assertion of claims.

6              MS. SIMON:  I'm sorry.  Are they

7    still on the phone?  I just got a message that

8    they got kicked off.

9              MR. BROWN:  Hello?  Is anyone on the

10   line?

11             MS. SIMPSON:  I'm sorry.

12             (Deposition recessed from 5:18 p.m.

13   to 5:20 p.m.)

14             MS. STOVER:  This is Laura Stover for

15   Maryland Casualty and Zurich.

16             It was unclear earlier in the

17   deposition whether or not Exhibit 1 was for all

18   insurers to join in.  I want to clarify for the

19   record that Maryland Casualty Company and Zurich

20   also joins in to Exhibit 1.

21             MR. BROWN:  Okay.

22   BY MR. BROWN:

23        Q.   Mr. Finke, before we lost our crowd on

24   the telephone, I was directing your attention to

204

1    the response to interrogatory number four.  And a

2    particular phrase, which I read earlier.

3           Do you know whether there is any

4    provisions in the plan of insurance contributors

5    to assert claims against One Beacon under the

6    Commercial Union policies?

7    A.   I don't know.

8    Q.   Would Mr. Posner be the right individual

9    to question on that subject or would it be an

10   attorney from Kirkland & Ellis?

11   A.   I'm not sure.

12   Q.   All right.  I want to turn to

13   interrogatory number eight.  Okay?

14           Who, to your knowledge, decides the

15   validity of the claims that are referred to in

16   interrogatory number eight?

17   A.   The trustees of the asbestos PI trust.

18   Q.   And what are the criteria that the

19   trustees use to determine the validity?

20   A.   Those are set forth I believe in the PI

21   TDP's.  I don't know.  I don't have them

22   memorized.

23   Q.   Are there any criteria other than what

24   appears in the PI TDP's?



RICHARD CHARLES FINKE

205

1    A.   Not that I know of.

2    Q.   Okay.  You can put that aside.

3         I don't think Mr. Speights asked you

4    at the beginning of the deposition.  So I will.

5         Did you review any documents in

6    preparation for this deposition?

7    A.   Yes.

8    Q.   Can you tell me what documents you

9    reviewed?

10   A.   The ZAI terms sheet, ZAI class

11   settlement, the expert report of Denise Martin,

12   the Class 7A case management order, my calendar

13   over the past year and my notes from certain

14   meetings, settlement negotiations that occurred

15   over the past year.

16   Q.   And let's start with the last one.  What

17   meetings?

18   A.   The ZAI mediation and settlement

19   discussions that I discussed with Mr. Speights.

20   Q.   Okay.  None of them related to meetings

21   involving a resolution of PI claims?

22   A.   Correct.

23   Q.   You mentioned the Class 7A CMO.  I'm not

24   sure I know what that is.

1        A.    It's a proposed case management order to

2    govern the treatment of traditional property

3    damage claims.    I'm pretty sure it's one of the

4    exhibits to the plan.

5        Q.    Okay.    Got it.

6            MR. BROWN:    All right.    I'm going to

7    pass the witness.    Thank you.

8                        EXAMINATION

9    BY MS. ALCABES:

10       Q.    Good afternoon, Mr. Finke.    My name is

11   Elisa Alcabes with Simpson, Thacher & Bartlett.

12   We represent Travelers Insurance Company.    I'll

13   try not to repeat anything that's said already.

14   I know it's been getting late.

15            You did say you hadn't reviewed any

16   pre-petition insurance settlement agreements, is

17   that correct?

18       A.    That is correct.

19       Q.    So is it fair to say you don't have any

20   familiarity with any settlements between Grace

21   and Travelers that were executed pre-petition?

22       A.    That's correct.

23       Q.    Did you ever have any discussions with

24   anyone after the bankruptcy started regarding



1 insurance for asbestos PD claims?

2  A. Yes. Not recently. But I know early on

3 we discussed with Jeff Posner whether there was

4 any insurance coverage available for property

5 damage claims.

6  Q. Go ahead.

7  A. And I was going to say, and by property

8 damage, I'm including attic insulation claims.

9  Q. And do you recall anything specific about

10 those discussions?

11  A. I don't know if I would call it specific.

12 What I do recall is that in general there is --

13 the answer is there is no coverage for

14 traditional property damage claims. But that

15 there might be coverage for Zonolite attic

16 insulation claims depending upon the date of

17 installation.

18  Q. And did you discuss any specific

19 insurance companies that might be providing that

20 coverage?

21  A. No.

22  Q. Do you remember the details of the

23 criteria that would apply in terms of whether the

24 insurance would be triggered?



RICHARD CHARLES FINKE

208

1      A.   Only that we would likely be required to
2   establish the date of installation.   And there
3   was a question as to whether we have or would
4   have the sufficient documentation or other
5   evidence to do so.
6      Q.   And did you look at any documentation
7   relating to insurance for ZAI claims?
8      A.   No.
9      Q.   Did Mr. Posner, as far as you know?
10      A.   I don't know.
11      Q.   Do you regard Mr. Posner as more
12   knowledgeable or less knowledgeable about those
13   issues?
14      A.   Extremely more knowledgeable.
15      Q.   Okay.   Do you have knowledge as to
16   whether any insurance is going to be used to pay
17   for any asbestos PD claims under the plan?
18      A.   I don't believe so.   But I'm not certain.
19   I guess I'd say it's my understanding that there
20   isn't.   But I'm not sure of how accurate that is.
21      Q.   Is there someone else who would be more
22   certain?
23      A.   Mr. Posner.
24      Q.   Okay.   And this may be related.   But do

1    you know whether the PD trust will have any

2    rights under any insurance contracts, whether

3    it's policies or settlement agreements?

4        A.    I don't believe they do or will.

5        Q.    But, again, would Mr. Posner have more

6    knowledge of that?

7        A.    I don't know whether there is any

8    available coverage.  I don't know that he would

9    know what rights the PD trust would have or won't

10   have.

11       Q.    And what about the reorganized debtors?

12   Do you have any knowledge of whether the

13   reorganized debtors will have any rights to

14   coverage for PD claims?

15       A.    I don't believe they will.

16       Q.    Do you know who was principally

17   responsible for participating in the drafting of

18   the insurance provisions in the plan for Grace?

19       A.    No.    I believe it was outside counsel but

20   I don't know.

21       Q.    Was there anyone at Grace that was sort

22   of a point person for the insurance provisions?

23       A.    No, not that I know of.

24       Q.    Because there were quite a few sort of

1    insurance specific definitions in the plan, for

2    example.

3              So is outside counsel responsible,

4    was outside counsel responsible for that?

5       A.   Yes.

6       Q.   Did they work with anyone?  To your

7    knowledge, did they work with anyone at Grace?

8       A.   I believe they worked with Mr. Posner

9    from time to time.  But to what extent and with

10    respect to what provisions, I couldn't say.

11       Q.   Did you have any involvement in preparing

12    or reviewing responses to requests for admissions

13    that were served by Grace?

14       A.   I reviewed them.  They were drafted by

15    outside counsel.  I reviewed them.  I don't

16    recall if I had any comments or input.

17       Q.   Do you recall whether you had any input

18    on the insurance issues that would have come up

19    in any of the requests for admissions?

20       A.   Offhand, I don't recall having any.  But

21    I would probably have to look at the requests and

22    the responses.

23              (Finke Deposition Exhibit No. 17

24    was marked for identification.)



RICHARD CHARLES FINKE

211

1  BY MS. ALCABES:

2      Q.   Can you just identify it for the record?

3      A.   Exhibit 17 is debtors' responses and

4  objections to Travelers Casualty & Surety

5  Company's first set of requests for admission to

6  debtors.

7      Q.   Do you recall seeing this document

8  before?

9      A.   Yes.

10     Q.   Did you review it before it was served on

11 Travelers?

12     A.   Yes.

13     Q.   Did you comment on it?

14     A.   I did not.

15     Q.   Did you participate in drafting any of

16 the answers?

17     A.   No.

18     Q.   And do you have any specific knowledge of

19 the basis for any of the answers?

20     A.   No.   That's why I didn't comment on it.

21          MS. ALCABES:   Thank you.   I have no

22 further questions.   I pass the witness.

23                       EXAMINATION

24 By MS. SIMON:

1    Q.   Hi.   My name is Marnie Simon and I'm

2    representing Firemen's Fund today.

3              Is it fair to say that if I showed

4    you debtor's responses to Firemen's Fund and AXA

5    Belgium, we were defined as certain insurers.   If

6    I showed you debtor's responses to our discovery,

7    that your responses would be similar to the ones

8    from Travelers?

9    A.   Yeah, I expect they would be, they would

10   be the same.

11   Q.   You don't recall having any specific

12   factual information with specific regard to

13   Firemen's Fund or AXA Belgium?

14   A.   No, I do not.

15   Q.   Other than from insurance, do you have

16   any familiarity with how the debtors financed its

17   asbestos PI obligations pre-petition?

18   A.   No, I really don't have any knowledge of

19   that.

20   Q.   You don't have any knowledge about

21   whether or not the debtors had to borrow from its

22   lenders in order to finance its asbestos PI

23   obligations?

24   A.   No, I don't know.



RICHARD CHARLES FINKE

213

1          MS. SIMON:  Okay.  I don't have any

2     further questions.

3                    EXAMINATION

4     BY MS. GRIFFIN:

5     Q.  My name is Shannon Griffin.  I'm with the

6     law firm of O'Melveny & Myers and we represent

7     Arrowood formerly known as Royal Indemnity.  I

8     just have a few questions.  I think a lot of them

9     were answered already so I won't repeat them.

10              Are you familiar with the disclosure

11    statement filed in the bankruptcy?

12    A.  Yes.

13    Q.  Is it fair to say that the disclosure

14    statement was accurate at the time it was filed?

15    A.  Yes.

16    Q.  I'm going to read a section to you.  It's

17    Section 2.10.2.2 on page 39 of my copy, which I'm

18    not sure if that's accurate on all the copies.

19    But it's entitled, Primary Insurance Coverage.

20              About four sentences down, it starts

21    with, the coverage issued by Royal Indemnity

22    Company to Zonolite from March 31st, 1953, to

23    April 1st, 1963, was fully settled as to all

24    asbestos related claims in a January 5th, 1995

214

1    settlement agreement in which Grace Con released

2    Royal for claims, quote, in any way relating to

3    the New York primary action and/or payment or

4    handling of asbestos-related claims and other

5    product claims under the primary policies, end

6    quotes, as provided in, open paren, and as those

7    terms are defined, closed paren, in the

8    settlement agreement.

9            To your knowledge, was that a true

10   and accurate statement at the time it was

11   written?

12       A.   I have no knowledge of the facts that you

13   just described or the agreements.  So I would

14   only say, in general, Grace filed the disclosure

15   statement believing that the statements in them

16   were true and accurate.  But I can't speak to

17   that specifically with any firsthand knowledge to

18   the portion that you just read into the record.

19       Q.   Okay.  But you have no reason to believe

20   that it's not accurate, is that correct?

21       A.   Correct.

22       Q.   Is it fair to say that, under the plan,

23   the Royal high level access policies are to be

24   assigned to the trust?



RICHARD CHARLES FINKE

215

1     A.   I don't know enough about it to be able

2     to comment.

3     Q.   Is it fair to say that the plan

4     contemplated assigning Grace's unsettled policies

5     to the trust whether or not the insurers consent

6     to the assignment?

7     A.   Can you read that again or repeat it?

8              (The previous question was read back

9     by the reporter.)

10             MS. ESAYIAN:   Objection to form.   You

11    can answer, if you can.

12             THE WITNESS:   I believe that's

13    accurate.

14    BY MS. GRIFFIN:

15    Q.   Is it true that there are explicit anti

16    assignment provisions in the Royal policies?

17    A.   I have no knowledge of what's in the

18    Royal policies.

19    Q.   You have no personal knowledge as to any

20    of the policies issued to Grace by Royal?

21    A.   Correct.

22    Q.   Okay.   And I think this is going to

23    repeat.   But just for clarification.

24             You have no personal knowledge of the

RICHARD CHARLES FINKE

216

1       settlement agreement between Grace and Royal?

2           A.   That's correct.

3           Q.   Do you have any personal knowledge about

4       the exculpation clause under the plan?

5           A.   Only that I have read it.

6           Q.   Is it fair to say that, under that

7       clause, the plan proponents are seeking to impair

8       the rights of their insurers?

9                   MS. ESAYIAN:   Objection to form.   The

10      document speaks for itself.

11                  THE WITNESS:   Do I have to answer

12      that one?

13                  MS. ESAYIAN:   You can answer, if you

14      can.

15                  THE WITNESS:   I would want to read

16      it.

17                  MS. GRIFFIN:   Okay.   I think if you

18      give me two minutes, it may not be necessary.

19      Give me one second.

20                  MS. SIMON:   Can I actually ask a

21      follow-up question before we go on break?

22                  MS. GRIFFIN:   Sure.

23                       EXAMINATION

24      BY MS. SIMON:

1         Q.   I asked you earlier about how Grace,

2    other than through insurance, funded its asbestos

3    PI obligations.  And you, to be clear, said you

4    didn't know, correct?

5         A.   Correct.

6         Q.   Do you know who at Grace would have such

7    knowledge?

8         A.   These are pre-petition?

9         Q.   Both pre-petition and post-petition.

10        A.   I think the three general counsels I

11   mentioned would probably be able to answer that.

12        Q.   And anyone else besides them?

13        A.   Jay Hughes might know.

14        Q.   What about Mr. Posner?  Would he know?

15        A.   I don't know if he would.

16        Q.   Anyone else?

17        A.   Not that I can think of.

18             MS. SIMON:   Okay.  Thank you.  That's

19   all.

20             MS. GRIFFIN:   Just a two minute break

21   and we might be done.

22             (Deposition recessed from 5:46 p.m.

23   to 5:52 p.m.)

24                  EXAMINATION



RICHARD CHARLES FINKE

218

1    BY MS. GRIFFIN:

2        Q.   Before we took the break, the last

3    question I asked you was whether or not the

4    exculpation clause sought to impair the rights of

5    the insurer.  And you said you would have to read

6    it, is that correct?

7        A.   Yes.

8        Q.   If I showed it to you, would you be just

9    giving your personal opinion?

10       A.   Yes.

11       Q.   Okay.  All right.  Then we won't have to

12   do that.  And I am finished with my questions.

13   But I think someone else has one more.

14                    EXAMINATION

15   BY MR. SPENCER:

16       Q.   Hi.  My name is Shane Spencer

17   representing Continental Casualty Company and

18   Continental Insurance Company.  Just hopefully

19   one question.

20            With regard to debtors' responses to

21   the discovery served by Continental Casualty

22   Company and Continental Insurance Company, would

23   your answers to that discovery be based on your

24   personal knowledge and also with regard to the

1    verification, would your answer be pretty much

2    the same as you had answered to the other

3    questions regarding discovery by each insurer?

4              MS. ESAYIAN:  Objection to form.  You

5    can answer, if you can.

6              MR. SPENCER:  Sorry about that.

7              MS. ESAYIAN:  Just go ahead and try

8    to answer.

9              MR. SPENCER:  Sorry about that.  It's

10   a long day.  First question.

11             THE WITNESS:  I expect that none of

12   the answers would have been based on -- none of

13   the debtors' answers would have been based on my

14   personal knowledge.  And I expect that my answers

15   would be the same with respect to reliance on

16   information supplied by others as I described in

17   response to questions from the other insurers.

18             MR. SPENCER:  I have no further

19   questions.

20             MR. BROWN:  Lisa, I think we are

21   finished with the caveat that there is still

22   obviously outstanding discovery and documents

23   that haven't been produced.  So we reserve our

24   right to recall him.  I think that, Mr. Finke, I

RICHARD CHARLES FINKE

220

1    think that's true of all the insurers.  I'm sure

2    you reserve all of your rights as well.

3              MS. ESAYIAN:  That sounds good.

4              Anybody else?  Nobody else?

5              MS. ALCABES:  Well, we all join in

6    that.

7              MS. ESAYIAN:  Right.

8              Anybody else for questions?

9              All right.

10             (Deposition concluded at 5:59 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    I N D E X
 2   DEPONENT:  RICHARD CHARLES FINKE           PAGE
 3        Examination by Mr. Speights             4
         Examination by Mr. Brown               164
 4        Examination by Ms. Alcabes            206
         Examination by Ms. Simon              211
 5        Examination by Ms. Griffin            213
         Examination by Ms. Simon              216
 6        Examination by Ms. Griffin            217
         Examination by Mr. Spencer            218
 7
 8                    E X H I B I T S
 9        FINKE DEPOSITION
10   NUMBER              DESCRIPTION            MARKED
11     1      Arrowood's Objections to            7
              Anderson Memorial's Notice
12            of Deposition of Richard
              Finke and the Debtors'
13            Response
14     2      Zonolite invoice to Byars         135
              Machine Co.
15
       3      Zonolite invoice to Columbia      136
16            Plastering Co.
17     4      Zonolite invoice to Ranger        137
              Construction Co.
18
       5      Zonolite invoice to Columbia      137
19            Plastering Co.
20     6      Zonolite invoice to C. W.         138
              Kirkland Plastering Co.
21
       7      Zonolite invoice to Bank of       138
22            America Corp.
23     8      E-mail from Richard Finke         142
              dated March 4, 2005, to Dan
24            Speights with attached document
```

```
  1                       I N D E X
  2                   E X H I B I T S
  3
             FINKE DEPOSITION
  4
  5      NUMBER              DESCRIPTION            MARKED
  6        9        E-mail from Dan Speights          142
                    dated March 17, 2005, to
  7                 Richard Finke, with attached
                    document
  8
        10          E-mail from Dan Speights          143
  9                 Dated April 7, 2005, to
                    Richard Finke
 10
        11          Debtors' Memorandum in Support    148
 11                 of Motion for Entry of Case
                    Management Order, Motion to
 12                 Establish Bar Date, Motion to
                    Approve Claim forms, and
 13                 Motion to Approve Notice Program
 14     12          Securities and Exchange           179
                    Commission Form 8-K
 15
        13          Debtors' Preliminary List of      184
 16                 Witnesses That They Intend to
                    Call During the Confirmation
 17                 Hearing
 18     14          Second Amended Case Management     184
                    Order Related to the First
 19                 Amended Joint Plan of Reorganization
 20     15          Debtors' Response to Government    189
                    Employees Insurance Company and
 21                 Columbia Insurance Company's
                    Requests for Admission,
 22                 Interrogatories and Requests for
                    Production of Documents
 23
 24
```

```
 1                        I N D E X

 2
                        E X H I B I T S
 3

 4         FINKE DEPOSITION

 5     NUMBER              DESCRIPTION              MARKED

 6      16        Debtors' Response to One Beacon   200
                  America Insurance Company and
 7                Seaton Insurance Company's
                  Requests for Admission,
 8                Interrogatories and Requests
                  for Production of Documents

 9

        17        Debtors' Responses and Objections 210
10                to Travelers Casualty and Surety
                  Company's First Set of Requests
11                for Admission to Debtors

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1

2

3          REPLACE THIS PAGE

4          WITH THE ERRATA SHEET

5          AFTER IT HAS BEEN

6          COMPLETED AND SIGNED

7          BY THE DEPONENT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

State of Delaware )
                 )
New Castle County )

### CERTIFICATE OF REPORTER

I, Allen S. Blank, Registered Merit
Reporter and Notary Public, do hereby certify
that there came before me on the 30th day of
March, 2009, the deponent herein, RICHARD CHARLES
FINKE, who was duly sworn by me and thereafter
examined by counsel for the respective parties;
that the questions asked of said deponent and the
answers given were taken down by me in Stenotype
notes and thereafter transcribed by use of
computer-aided transcription and computer printer
under my direction.

I further certify that the foregoing is a
true and correct transcript of the testimony
given at said examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or
otherwise interested in the event of this suit.

_____
        Allen S. Blank, RMR
     Certification No. 103-RPR
     (Expires January 31, 2011)

DATED:  April 3, 2009

COPY

