IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | **Hearing Date: June 1, 2009 at 10:30 a.m.** |
| | ) | **Responses Due: May 15, 2009 at 4:00 p.m.** |

## DEBTORS' OBJECTION TO CLAIMS FILED BY
## MARYLAND CASUALTY COMPANY

The above-captioned debtors (the "Debtors") object to Claim Nos. 15376 through

15436 and Claim No. 15439 (collectively, the "Proofs of Claim") filed by one of their prepetition

insurers, Maryland Casualty Company ("Maryland Casualty"). In support of this Objection, the

Debtors state the following:

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Preliminary Statement**

2.　　On March 29, 2004, Maryland Casualty, on behalf of itself and certain of its affiliates and related companies, filed 62 proofs of claim against the Debtors (one against each debtor entity) pursuant to a stipulation with the Debtors dated March 31, 2003 permitting Maryland Casualty to file its claims after the bar date established by the Bankruptcy Court (the "Court"). In their Twenty-First Omnibus Objection to Claims (Substantive) filed on February 26, 2007, the Debtors sought entry of an order expunging and disallowing some of Maryland Casualty's claims on the basis that they were cross-debtor duplicate claims.

3.　　Maryland Casualty opposed the Debtors' objection, and the Debtors subsequently withdrew their objection "without prejudice to the Debtors' rights to object to such claims in the future on any grounds." Second Order Regarding Relief Sought in Debtors' Twenty-First Omnibus Objection (Dkt. No. 14680).

4.　　Having preserved their rights to object to the Proofs of Claim on any grounds, by this Objection the Debtors request that this Court disallow all of the Proofs of Claim because the claims either (i) incorrectly assert liability of the Debtors to Maryland Casualty on account of Maryland Casualty's independent liability for its own tortious conduct or for worker's compensation policies that it issued, or (ii) are contingent claims for reimbursement or contribution relating to a joint liability of the Debtors and Maryland Casualty, and thus should be disallowed pursuant to section 502(e) of the Bankruptcy Code.

**Jurisdiction**

5.　　This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

6.　　The statutory bases for the relief requested herein are 11 U.S.C. §§ 105(a), 502(b) and 502(e)(1)(B) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

6

Code") and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

## Background

**A.    The Debtors' Prepetition Relationship with Maryland Casualty,
Including Settlements of Insurance Coverage Disputes**

7.    Maryland Casualty was the Debtors' primary general liability insurer between

1962 and 1973. The liability policies that the Debtors maintained with Maryland Casualty

generally afforded coverage to certain of the Debtors for claims brought by third-parties and not

employees of the Debtors. In addition, Maryland Casualty issued worker's compensation

policies, which generally provided coverage to certain of the Debtors for claims brought by their

employees.

8.    The Debtors and Maryland Casualty are parties to six settlement agreements (the

"Settlement Agreements") with respect to disputes concerning Maryland Casualty's prior

insurance coverage. Only three of the Settlement Agreements are relevant to this Objection and

are described below.[3]

9.    In September 1991, W.R. Grace & Co.-Conn. ("Grace-Conn.") and Maryland

Casualty entered into a settlement agreement (the "1991 Settlement Agreement") following

litigation concerning insurance coverage for then-pending thousands of asbestos-related claims.

The 1991 Settlement Agreement provided that (a) Grace-Conn. would receive a cash settlement

which would exhaust the aggregate policy limits on Maryland Casualty's primary policies (the

---

[3]    In 1993, Grace-Conn. and Maryland Casualty entered into three other settlement agreements, one dated July 29,
1993 and two dated November 9, 1993. These three agreements are not relevant to this Objection, because
none of them provided Maryland Casualty with a right to indemnity from the Debtors and, thus, none of the
agreements can serve as a basis for any of the claims against the Debtors asserted by Maryland Casualty in its
Proofs of Claim.

"Primary Policies"), (b) Maryland Casualty was to be indemnified by Grace-Conn. against specified future claims under the policies and (c) Maryland Casualty was to be discharged of its obligations under the Primary Policies for asbestos-related claims against Grace-Conn.

10.    Grace-Conn.'s indemnification obligations in the 1991 Settlement Agreement are set forth in Paragraph 7 of that agreement, which provides that Grace-Conn. agrees to indemnify Maryland Casualty for any claims that:

(a)    involve liability or alleged liability on the part of Grace-Conn. subject to the Aggregate Product Limits set forth in any of the Primary Policies;

(b)    involve Asbestos-Related Claims that are covered, or have been or may be alleged by Grace-Conn. to be covered, by any of the Primary Policies;

(c)    arise out of the existence or extent of Maryland's obligations to any Person with respect to claims involving liability or alleged liability on the part of Grace-Conn. subject to the Aggregate Product Limits set forth in any of the Primary Policies;

(d)    arise out of the existence or extent of Maryland's obligations to any Person with respect to Asbestos-Related Claims that are covered, or have been or may be alleged by Grace-Conn. to be covered, by any of the Primary Policies; or

(e)    involve payments made by Maryland under this Agreement or otherwise with respect to Asbestos-Related Claims that are covered, or have been or may be alleged by Grace-Conn. to be covered, by any of the Primary Policies, or with respect to any other liability or alleged liability on the part of Grace-Conn. subject to the Aggregate Product Limits set forth in any of the Primary Policies.

11.    In 1996, Grace-Conn. and Maryland Casualty entered into two settlement agreements (the "1996 Settlement Agreements" and together with the 1991 Settlement Agreement, the "Relevant Agreements"), one with respect to coverage for asbestos claims and any other claims subject to aggregate limits ("ACM/Aggregate Claims") under Maryland Casualty's excess liability policies (the "Excess Policies"), and one for claims other than asbestos-related claims ("Other Claims") under Maryland Casualty's Excess Policies.

8

12.     In Paragraph 8 of the 1996 Settlement Agreements, Grace-Conn. agreed to

indemnify Maryland Casualty for any claims that:

> (a)     arise out of [ACM/Aggregate Claims/Other Claims] covered or allegedly covered under the Excess Policies;
>
> (b)     involve the existence of Maryland's obligations to any Person with respect to [ACM/Aggregate Claims/Other Claims] covered or allegedly covered under the Excess Policies;
>
> (c)     arise out of alleged misconduct, bad faith, violation of any insurance regulation or law, or any other alleged wrongdoing of Maryland in connection with or relating in any respect to the performance by Maryland of its obligations regarding any [ACM/Aggregate Claims/Other Claims] covered or allegedly covered under the Excess Policies; or
>
> (d)     arise out of an assignment by Grace-Conn. to a Person or an agreement with any Bodily Injury Claims Plaintiff or Property Damage Claims Plaintiff described in Paragraph 13 below.

**B.      The Debtors' Chapter 11 Cases and the Court's
         <u>Injunction of Claims Against Maryland Casualty</u>**

13.     The Debtors commenced these chapter 11 cases on April 2, 2001 (the "<u>Petition</u>

<u>Date</u>").  On the Petition Date, in addition to various motions requesting "first-day" relief, the

Debtors filed an adversary proceeding seeking a temporary restraining order and a preliminary

injunction with respect to asbestos-related claims being asserted against the Debtors, specified

affiliates and co-insured non-debtor affiliates.  The Court granted the requested temporary

restraining order on the Petition Date and stayed the prosecution of claims of various asbestos

claimants (the "<u>Asbestos Claimants</u>") against the Debtors.  The temporary restraining order,

though, did not stay claims made against Maryland Casualty in which the Asbestos Claimants

asserted causes of action relating to the Debtors' conduct as well as Maryland Casualty's

independent negligent and intentional misconduct.

14.     On May 1, 2001, the Debtors filed a motion with the Court requesting that

Maryland Casualty be added as a party protected by the temporary restraining order for a variety

9

of reasons, including the indemnification provision in the 1991 Settlement Agreement. Adv. Proc. 01-00771, Dkt. No. 27. On May 3, 2001, the Court granted the Debtors' motion and entered a preliminary injunction (the "Preliminary Injunction"), which, among other things, specifically enjoined the Asbestos Claimants' then-pending actions against Maryland Casualty. Adv. Proc. 01-00771, Dkt. No. 32. After applications to modify the Preliminary Injunction to add other affiliated entities and extended hearings, on January 22, 2002, the Court entered an order continuing the Preliminary Injunction and barring actions against Maryland Casualty arising from asbestos exposure directly or indirectly allegedly caused by the Debtors. Adv. Proc. 01-00771, Dkt. No. 87.

15.    On February 4, 2002, claimant Carol Gerard filed a motion to clarify or modify the scope of the Preliminary Injunction and specifically sought leave to proceed against Maryland Casualty in a pending Maryland state court action. Adv. Proc. 01-00771, Dkt. No. 86. Shortly thereafter, other Asbestos Claimants filed similar complaints against Maryland Casualty in Montana. On June 20, 2002, the Court denied Gerard's motion and stayed her pending Maryland action as well as the other claimants' Montana actions. Adv. Proc. 01-00771, Dkt. No. 109. The Court denied a Motion to Reconsider by an order dated September 12, 2002. Adv. Proc. 01-00771, Dkt. Nos. 110, 126, 133.

16.    On October 18, 2002, the Asbestos Claimants appealed the denial of their Motion to Reconsider to the District Court. The District Court vacated the Court's June 20, 2002 order and remanded the matter to this Court. 7/21/03 Mem. Op., Case No. 1:02-cv-01549-AMW, Dkt. No. 19. The District Court held that the plaintiffs' claims against Maryland Casualty did not "relate to" the Debtors' chapter 11 cases and, thus, the Court did not have jurisdiction to enjoin them. *Id.* at 18. The District Court based that holding on its determinations that (a) the lawsuits

at issue alleged liability by Maryland Casualty wholly independent of the Debtors, (b) the

Debtors had no indemnity obligation to Maryland Casualty for such claims, and (c) any findings

made in the state court suits against Maryland Casualty will not have collateral estoppel effect

against the Debtors. *Id.* at 14-15.

17.    As part of its finding that the Debtors had no indemnity obligation to Maryland

Casualty for the claims of the Asbestos Claimants, the District Court found "[t]he [1991]

Settlement Agreement neither in its general terms nor in its specific indemnification language

provides for the Debtors to indemnify Maryland Casualty for Maryland Casualty's own

negligence. The Agreement relates only to insurance coverage and establishes that the

settlement was complete with respect to all Maryland Casualty's insurance obligations for

asbestos-related claims against Grace." *Id.* at 14.

18.    Maryland Casualty appealed the District Court's order to the Third Circuit. The

Debtors appeared as an appellee in support of the District Court judgment. To the Third Circuit,

the Debtors argued that the District Court's determinations were correct, but that if the Third

Circuit were to disturb any of those determinations, or to conclude that they are not entitled to

collateral estoppel effect, then the Asbestos Claimants' claims would be related to the Debtors'

bankruptcy.

19.    The Third Circuit held that the Bankruptcy Court did not err in refusing to modify

its previous grant of an injunction broad enough in scope to include a stay of the Asbestos

Claimants' suits against Maryland Casualty, and therefore vacated the District Court's judgment.

*Gerard v. W.R. Grace & Co. (In re W.R. Grace)*, 115 Fed. Appx. 565, 569-70 (3d Cir. Oct. 28,

2004). The Third Circuit found that it was "apparent that discovery from Grace would be needed

if the case proceeded against Maryland Casualty, and, further, that Grace's absence would

11

disadvantage both Maryland Casualty and Grace as a practical and legal matter." *Id.* at 569.

While describing the Court's view of the underlying allegations as to the Debtors and Maryland

Casualty,[4] the Third Circuit made no findings as to whether the Debtors owed or may owe any

indemnity to Maryland Casualty under the 1991 Settlement Agreement, or whether the

underlying suits allege some independent misconduct by Maryland Casualty.

20.    As a result of the Third Circuit's decision, the Asbestos Claimants' lawsuits

against Maryland Casualty have remained stayed pursuant to the Preliminary Injunction during

the pendency of these chapter 11 cases.

## C.    Further Description of the Enjoined Claims of the Asbestos Claimants against Maryland Casualty

21.    As more thoroughly described below, in various lawsuits involving Maryland

Casualty that are enjoined by the Preliminary Injunction, the Asbestos Claimants seek damages

for asbestos-related injuries alleged to have occurred to them as residents of the Libby, Montana

area, where the Debtors operated a mining, milling and processing facility for vermiculite from

1963 until 1990. The Debtors purchased the mine and related operations from the Zonolite

Company in 1963. The Asbestos Claimants allege in their complaints that the processing of the

vermiculite generated asbestos-containing dust, allegedly causing injury to the plant workers,

their families and other community members. Gerard Compl. ¶ 7; Schull Compl. ¶ 5; Pennock

Compl. ¶¶ 5, 6.

---

[4] "The Bankruptcy Court properly noted the practical difficulty and inevitable implication on the debtor of findings that might be made in The Lawsuit in view of the fact that, while Maryland Casualty may have played a role in the design of the system, Grace was the company that constructed it and was responsible for its operation. It noted theories of the Complaint including conspiracy of Grace and Maryland Casualty and aiding and abetting on behalf of Maryland Casualty, thus clearly targeting Grace." *Id.*

12

22.     The Asbestos Claimants have filed dozens of lawsuits involving Maryland Casualty. One of them, *Carol Gerard v. W. R. Grace & Co., et al.*, Case No. 00-001554, was filed in the Circuit Court for Baltimore City, Maryland in December 2000.[5] Gerard was not an employee of the Debtors and instead lived in Libby, Montana and worked at a dental clinic there for a period of time. In the lawsuit, she asserted that she had been exposed to dust in the air and on mine workers' clothing at her place of business. The defendants are the Debtors and Maryland Casualty.[6]

23.     A second lawsuit, *Billie J. Schull and Carolyn Schull, et al. v. State of Montana, et al.*, Case No. CDV-2001-704, was originally filed in the Montana First Judicial District, Lewis and Clark County in 2001. It was amended in March 2002.[7] The plaintiffs are former employees of the Debtors (mine workers in Libby) and/or their family members. The defendants are Maryland Casualty and the State of Montana.

24.     A third lawsuit, *Alfred Pennock and Betty L. Pennock, et al. v. Maryland Casualty Co., et al.*, Case No. CDV-2002-233, was also filed in the Montana First Judicial District, Lewis and Clark County, in March 2002.[8] The plaintiffs are former employees of the Debtors (Libby miners) and/or their family members. The defendants are Maryland Casualty, several other insurance companies, and the State of Montana.

---

[5]    A copy of the Gerard complaint is attached hereto as Exhibit B.

[6]    Gerard also filed several similar suits in the Circuit Court for Baltimore City against Maryland Casualty only. Objection of Maryland Casualty to Carol Gerard's Motion to Clarify the Scope of the Preliminary Injunction, Adv. No. A-01-00771, April 29, 2002.

[7]    A copy of the amended Schull complaint is attached hereto as Exhibit C.

[8]    A copy of the Pennock complaint is attached hereto as Exhibit D.

25.    In each of the above lawsuits, and in other lawsuits, the Asbestos Claimants have asserted that, commencing in 1964, Maryland Casualty, through its engineering division and medical division, undertook to design an industrial hygiene program to control and prevent asbestos dust in Libby.  Gerard Compl. ¶ 13; Schull Compl. ¶ 71; Pennock Compl. ¶ 20.

26.    In undertaking to design dust control programs, the Asbestos Claimants contend that Maryland Casualty undertook a duty to the workers, their families and the Libby community to exercise reasonable care in relation to the programs.  Gerard Compl. ¶¶ 37-38; Schull Compl. ¶¶ 72, 75, 78; Pennock Compl. ¶ 21.  They allege that Maryland Casualty negligently and intentionally failed to fulfill this duty. *See, e.g.*, Gerard Compl. ¶ 14 ("Despite Maryland Casualty's promise and undertaking to do so, Maryland Casualty never formulated a proper dust control program and never took the necessary steps to prevent individuals from being exposed to the asbestos dust . . ."); Schull Compl. ¶¶ 73, 76; Pennock Compl. ¶¶ 22, 25.

27.    The complaints state that Maryland Casualty undertook to render industrial hygiene services, and made regular inspections, and gathered information, but never warned the workers or the Libby community of asbestos hazards.  Gerard Compl. ¶ 39; Schull Compl. ¶ 73; Pennock Compl. ¶ 22.  The complaints also allege that Maryland Casualty's professional staff included industrial hygienists and doctors with expertise in occupational disease who were well aware of asbestos hazards.  Schull Compl. ¶ 63; Pennock Compl. ¶ 12.

28.    The complaints further allege that Maryland Casualty's professional industrial hygienists did not meet industrial hygiene standards, which at all times: (a) required that asbestos dust not go home or into the community on the clothes of the workers; and (b) required showers, work coveralls, and separate lockers for street clothes.  According to the complaints, Maryland

14

Casualty failed to require these protections. Gerard Compl. ¶ 39; Schull Compl. ¶¶ 77-79; Pennock Compl. ¶ 25.

29.    In their complaints, the Asbestos Claimants allege that Maryland Casualty's wrongful conduct included (a) omitting to educate workers about the hazards of asbestos exposure, (b) failing to warn workers' families and the community of these hazards, (c) taking insufficient measures to establish standards for dust control through housekeeping, ventilation and exhaust air cleaning, (d) omitting sufficient measures and standards for the maintenance of equipment and premises and (e) providing insufficient medical monitoring programs. Gerard Compl. ¶ 39; Schull Compl. ¶ 73; Pennock Compl. ¶ 25.

30.    The Asbestos Claimants claim to possess statements from Maryland Casualty's staff's records showing a geometric increase in people dying of asbestos disease and with abnormal chest x-rays, and evidence that Maryland Casualty knew that there was a lack of showers and coveralls for the workers and that workers went home each day into the community covered with asbestos dust, a hazard to all who might come in contact with them. Gerard Compl. ¶ 39; Schull Compl. ¶¶ 66-70; Pennock Compl. ¶ 19.

31.    The Asbestos Claimants also allege intentional misconduct, including the concealment of the asbestos hazard Maryland Casualty had agreed to address. *See, e.g.*, Gerard Compl. ¶¶ 21, 25 ("Maryland Casualty's conduct was fraudulent and malicious and done with wanton reckless disregard for the rights, health and safety of individuals . . . Maryland Casualty consciously and intentionally suppressed information regarding those dangers . . . ").

32.    Thus, in summary, in the pending litigation against Maryland Casualty that has been enjoined as a result of the Preliminary Injunction, Asbestos Claimants have asserted at least four causes of action for independent, direct tort liability by Maryland Casualty: (a) negligent

15

design of the industrial hygiene program, (b) negligent undertaking of professional service, (c)

negligent inspections, and (d) intentional misconduct. *Id.*; Schull Compl. ¶¶ 76, 79; Pennock

Compl. ¶¶ 25, 28.

D.     **Maryland Casualty's Proofs of Claim**

        33.     On March 29, 2004, Maryland Casualty, on behalf of itself and certain of its

affiliates and related companies, filed the 62 Proofs of Claim[9] against the Debtors pursuant to a

stipulation permitting the filing of such claims after the bar date established by the Court. The

Proofs of Claims have been designated as Claim Nos. 15376 through 15436 and Claim No.

15439, by the claims agent in these chapter 11 cases.

        34.     The Proofs of Claim assert claims against the Debtors arising from the Settlement

Agreements and the indemnity obligations of the Debtors thereunder. In particular, the Proofs of

Claim assert that the Debtors have defaulted on certain obligations under four[10] of the Settlement

Agreements since the filing of the bankruptcy petitions and that Maryland Casualty "has

expended and incurred liability and expense costs compensable under the Agreements." Proof of

Claim ¶ 2. The Proofs of Claim do not quantify the amount of costs incurred to date that

Maryland Casualty believes are compensable under the Settlement Agreements or include any

documentation of such expenses, but they do state that records reflecting such expenses are

available. It is unclear why the expenses purportedly were incurred . *Id.* ¶ 3. The Proofs of

Claim also purport to reserve Maryland Casualty's rights to assert common law contribution and

---

[9]     A copy of Claim No. 15376 against W.R. Grace & Co. is attached hereto as <u>Exhibit A</u>. The remaining Proofs of
        Claim are identical to Claim No. 15376 except they are asserted against different debtors.

[10]    As noted in note 2 above, of the six settlement agreements with Maryland Casualty with respect to disputes
        concerning prior insurance coverage, only three of the agreements are relevant to this Objection.

16

indemnification claims against the Debtors, but do not assert such claims despite Maryland

Casualty clearly being aware of such alleged claims at the time the Proofs of Claim were filed.[11]

### Relief Requested

35.    By this Objection, the Debtors request that this Court disallow all of the Proofs of

Claim because such claims either (a) incorrectly assert liability of the Debtors to Maryland

Casualty on account of Maryland Casualty's independent liability for its own tortious conduct or

for worker's compensation policies that it issued, or (b) are contingent claims for reimbursement

or contribution relating to a joint liability of the Debtors and Maryland Casualty, and thus should

be disallowed pursuant to section 502(e) of the Bankruptcy Code.

### Argument

36.    The Court should disallow the Proofs of Claim for three reasons: First, although

the Proofs of Claim fail to specify the lawsuits for which Maryland Casualty seeks

indemnification, it is clear from the litigation following the commencement of these chapter 11

cases that Maryland Casualty is the subject of lawsuits alleging direct liability to Asbestos

Claimants on account of Maryland Casualty's own independent tortious conduct. And,

Maryland Casualty's independent conduct is not covered by the indemnity provisions in the

Relevant Agreements. Second, it is also clear that there are lawsuits against Maryland Casualty

alleging liability of Maryland Casualty on account of the worker's compensation policies that it

provided to the Debtors. Maryland Casualty's worker's compensation liability also is not

---

[11]  In its pleadings in the *Gerard* matter, Maryland Casualty has stated "Grace is clearly subject to claims for
contribution and indemnification. First, a cross-claim for contribution against Grace remains pending in the
Baltimore City Court by virtue of the Court's standing 'deeming order,' which deems cross-claims to have been
filed for contribution between defendants. Second, Maryland Casualty will pursue both contractual and non-
contractual indemnification claims against Grace." Objection of Maryland Casualty to Carol Gerard's Motion
to Clarify the Scope of the Preliminary Injunction, Adv. No. A-01-00771, April 29, 2002, ¶ 12.

covered by the indemnity provisions in any of the Settlement Agreements. Third, to the extent

that lawsuits filed against Maryland Casualty allege liability of Maryland Casualty as a result of

claims which could be made against the Debtors which may be covered by the Primary or Excess

Policies issued to the Debtors, not including any worker's compensation policies, such liability

may be covered by the indemnity provisions of the Relevant Agreements, but if it is, Maryland

Casualty's claims for indemnification and contribution with respect to that liability are

contingent and should be disallowed under section 502(e) of the Bankruptcy Code.

A.     **Maryland Casualty's Claims For Indemnification
       For Its Independent Misconduct Should be Disallowed**

37.     As described earlier, the Asbestos Claimants are, at least in part, suing Maryland

Casualty for its own professional negligence and other tortious conduct.

38.     Because the Asbestos Claimants are suing Maryland Casualty for its own tortious

actions, the claims are not claims for which there may be coverage under the primary insurance

policies as required by the indemnity in the Relevant Agreements. No one can assert a claim

under the Debtors' insurance policies for the insurer's negligence, and so the Debtors cannot

possibly have taken on the obligation to indemnify their insurer for losses resulting from such

claims. The Debtors did not procure insurance coverage from their insurers for the insurers'

independent acts or omissions. As the indemnification agreement shows, at most the Debtors are

obligated to indemnify Maryland Casualty for claims that could have been covered under the

Debtors' insurance policies.

39.     The District Court's reasoning on this issue is compelling:[12]

---

[12]   Although the Third Circuit vacated the District Court's judgment, it did not comment upon or reject the District
Court's analysis of the scope of the indemnity.

> The [September 1991] Settlement Agreement neither in its general terms
> nor in its specific indemnification language provides for Grace to
> indemnify Maryland Casualty for Maryland Casualty's own negligence.
> The Agreement relates only to insurance coverage and establishes that the
> settlement was complete with respect to all Maryland Casualty's insurance
> obligations for asbestos-related claims against Grace.
>
> Moreover, the plain language of the Agreement is the most reasonable.
> One would not expect that a settlement agreement between insurer and
> insured would cover more than the then-existing claims under the policies
> extant and in dispute at the time the settlement agreement was entered
> into. There was no issue between Grace and Maryland Casualty relating
> to the insurer's independent responsibility for its own torts. Nowhere
> within the four corners of the agreement is there the slightest hint that
> Grace so indemnified Maryland Casualty.

7/21/03 Mem. Op. at 14.

40.     Maryland Casualty plainly may be required to defend, and may be found liable

for, such independent misconduct. Courts have often found insurance companies liable for

negligent inspections of worksites or plants. *See, e.g., Pratt v. Liberty Mut. Ins. Co.*, 952 F.2d

667, 671 (2d Cir. 1990); *Phillips v. Liberty Mut. Ins. Co.*, 813 F.2d 1173, 1174-75 (11th Cir.

1987); *Smith v. Universal Underwriters Ins. Co.*, 752 F.2d 1535, 1537 (11th Cir. 1985); *Kohr v.

Johns-Manville Corp.*, 534 F. Supp. 256, 259 (E.D. Pa. 1982); *Silva v. Hodge*, 583 So.2d 231,

234 (Ala. 1991); *Brown v. Michigan Millers Mut. Ins.*, 665 S.W.2d 630, 635 (Mo. Ct. App.

1983); *Sims v. American Cas. Co.*, 206 S.E.2d 121, *aff'd*, 209 S.E.2d 61 (Ga. Ct. App. 1974).

41.     Under well-established precedent, indemnity provisions cannot be construed to

cover the indemnitee's own negligence. In *United States v. Seckinger*, 397 U.S. 203, 211 (1970),

the Supreme Court recognized that "a contractual provision should not be construed to permit an

indemnitee to recover for his own negligence unless the court is firmly convinced that such an

interpretation reflects the intention of the various parties. This principle, though variously

articulated, is accepted with virtual unanimity among American jurisdictions." Several other

courts, including the Court of Appeals for the Third Circuit, have interpreted this rule to require

19

that indemnification for an indemnitee's own negligence must be stated in "unequivocal terms."

*See Jacobs Constructors v. NPS Energy Servs.*, 264 F.3d 365, 371 (3d Cir. 2001) (applying

Pennsylvania law); *Foreman v. Exxon Corp.*, 770 F.2d 490, 498 (5th Cir. 1985); *Travelers*

*Indem. Co. v. AMR Servs. Corp.*, 921 F.Supp. 176, 186 (S.D.N.Y. 1996). In holding that the

general terms of an indemnification agreement between a contractor and subcontractor could not

be construed to include the indemnitee's own negligence, the Court in *Jacobs Constructors*

relied on the earlier reasoning of the Pennsylvania Supreme Court:

> The liability on such indemnity is so hazardous, and the character
> of the indemnity so unusual and extraordinary, that there can be no
> presumption that the indemnitor intended to assume the
> responsibility unless the contract puts it beyond doubt by express
> stipulation. No inference from words of general import can
> establish it.

264 F.3d at 371-72 (quoting *Perry v. Payne*, 66 A. 553, 557 (Pa. 1907)).

42.      There is no specific and unequivocal language in the Relevant Agreements

providing for the Debtors to indemnify Maryland Casualty for its own negligence. To the

contrary, the Relevant Agreements cover only disputes between Grace and Maryland Casualty

with respect to insurance coverage on thousands of asbestos-related claims for which Grace

demanded coverage under the Primary Policies and Excess Policies, respectively. Nowhere in

the Relevant Agreements is there even a general indication of an intent by the Debtors to

indemnify Maryland Casualty for claims based on Maryland Casualty's own, independent torts.

The Relevant Agreements cannot be construed to cover Maryland Casualty's independent torts.

There was no need for and no reason for any language in the Relevant Agreements concerning

Maryland Casualty's own misconduct. The only dispute between the Debtors and Maryland

Casualty concerned coverage issues.

20

43.     The 1991 Settlement Agreement by its terms was intended to resolve disputes

concerning the Debtors' "coverage demands under the Primary Policies," Maryland Casualty's

denial and disputes over "the existence or extent of defense and indemnity coverage under the

Primary Policies," and the "disagree[ment] over insurance coverage for certain Asbestos-Related

Claims." 1991 Settlement Agreement p. 2. Maryland Casualty paid the Debtors a cash

settlement, which was a final and complete settlement with respect to all of Maryland Casualty's

obligations under or by virtue of the Primary Policies for asbestos-related claims against the

Debtors. The 1991 Settlement Agreement does not purport to be a blanket indemnification that

makes the Debtors liable for Maryland Casualty's own wrongs.

44.     Similarly, the 1996 Settlement Agreements were intended to resolve disputes

concerning the Debtors' "coverage demands . . . under the Excess Policies," Maryland

Casualty's denial and disputes over "the existence or extent of coverage under the Excess

Policies," and "disagree[ment] over insurance coverage for certain Asbestos-Related Claims."

1996 Settlement Agreements p. 2. The 1996 Settlement Agreements do not purport to be a

blanket indemnification that makes the Debtor liable for Maryland Casualty's own wrongs. The

1996 Settlement Agreements do state that Grace-Conn. agreed to indemnify Maryland Casualty

for any claims that "arise out of alleged misconduct, bad faith, violation of any insurance

regulation or law, or any other alleged wrongdoing of Maryland in connection with or relating in

any respect to the performance by Maryland of its obligations regarding any [ACM/Aggregate

Claims/Other Claims] *covered or allegedly covered under the Excess Policies*." 1996 Settlement

Agreements ¶ 8.A.iii (emphasis added). However, this indemnity is expressly limited to any

misconduct of Maryland Casualty with respect to claims "covered or allegedly covered under the

Excess Policies." *Id.* Clearly, the actions brought by the Asbestos Claimants against Maryland

21

Casualty for Maryland Casualty's independent tortious conduct would be not claims "covered or allegedly covered under the Excess Policies." The Excess Policies were insurance policies provided by Maryland Casualty to Grace-Conn. for Grace-Conn.'s benefit, not for Maryland Casualty's own benefit. Therefore, the 1996 Settlement Agreements did not indemnify Maryland Casualty for its independent misconduct, but rather, for its misconduct "in connection with . . . claims . . . covered or allegedly covered under the Excess Policies." *Id.*

45.     Furthermore, the *Gerard*, *Schull* and *Pennock* complaints, for example, predominantly allege intentional misconduct by Maryland Casualty, not mere negligence. With respect to allegations of intentional misconduct against Maryland Casualty, such conduct is not indemnifiable, because indemnity for intentional misconduct is void as against public policy. It is black-letter law that a party cannot be indemnified for liability arising out of intentional wrongdoing. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 195 (1); 1 R. Long, THE LAW OF LIABILITY INSURANCE § 1.02 (2008)(and cases cited therein); 7 COUCH ON INS. § 101:22 (2008) ("In general, it is against public policy for an insurance contract to provide coverage for the intentional or willful misconduct of an insured."); *First American Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1118 (D.D.C. 1996) ("[T]here is simply no doubt that a defendant may not obtain indemnification for liabilities arising out of intentional tortious acts.") (citations omitted); *National R.R. Passenger Corp. v. Consol. Rail Corp.*, 698 F. Supp. 951, 971-72 (D.D.C. 1988) (under D.C. law, contract provision providing for indemnifying intentional conduct is void as

22

against public policy),[13] *vacated on other grounds*, 892 F.2d 1066 (D.C. Cir. 1990) ("Indemnity is generally unavailable for intentional misconduct").

46.     Parties may not contractually circumvent this public policy by seeking indemnification against intentional misconduct. *See, e.g., Indus. Sugars, Inc. v. Standard Accident Ins. Co.*, 338 F.2d 673, 676 (7th Cir. 1964) ("A contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and the courts will not construe a contract to provide such coverage"). Indeed, courts have found contracts purporting to indemnify for intentional misconduct void as against public policy. In *St. Paul Ins. Cos. v. Talladega Nursing Home, Inc.*, 606 F.2d 631 (5th Cir. 1979), the Fifth Circuit held that regardless of the parties' agreed-upon terms, "contracts insuring against loss from intentional wrongs are void . . . as against public policy." *Id.* at 633. Despite St. Paul's agreement to pay "'all loss by reason of the liability imposed by law or contract upon the Insured for damages . . . on account of . . . bodily and personal-injury claims (such as libel, slander, invasion of privacy, false detention, etc.),'" the court held that the insurer had no obligation to indemnify a nursing home against civil actions alleging slander, interference with business relations, and violations of federal antitrust laws because the allegations stemmed from a series of intentional wrongful actions. *Id.* Thus, despite a clear contractual obligation to indemnify, the Fifth Circuit held that the insurer had no duty to indemnify where the only theory of liability alleged in the complaint was the deliberate and intentional misconduct of the

---

[13]     Citing *Chicago, Rock Island & Pacific R.R. v. Chicago, Burlington & Quincy R.R.*, 437 F.2d 6, 10 (7th Cir. 1971), *cert. denied*, 402 U.S. 996 (1971); *Inland Container Corp. v. Atlantic Coast Line R.R.*, 266 F.2d 857 (5th Cir. 1959).

23

insureds. *Id.*; *see also Nielsen v. St. Paul Cos.*, 583 P.2d 545, 547 (Or. 1978) (insurer may be relieved of its duty to indemnify if complaint alleges solely intentional injury).

47.     The reason for this rule is that reimbursement for losses arising from such conduct would encourage bad acts. *See St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 162 (E.D. Va. 1993); *Decorative Ctr. of Houston v. Employers Cas. Co.*, 833 S.W.2d 257, 260 (Tex. Ct. App. 1992); *Ranger Ins. Co. v. Bal Harbor Club*, 549 So.2d 1005, 1007 (Fla. 1989) ("[T]he availability of insurance will directly stimulate the intentional wrongdoer to violate the law"); *Central Dauphin School Dist. v. American Cas. Co.*, 426 A.2d 94 (Pa. 1981) ("Undoubtedly, if the direct purpose of an insurance contract were to promote, encourage, or effect a violation of law or if the insured sought indemnity for loss arising from his or her own intentional, fraudulent, reckless, or criminal conduct, public policy would preclude enforcement") (citations omitted). Moreover, to allow indemnification for intentional misconduct would allow insureds to benefit from their own wrongdoing. *See, e.g., Jacobson*, 826 F. Supp. at 163. The "public policy exclusion depriv[ing] intentional wrongdoers of the economic benefits arising from coverage of their wrongful acts" thus "reaffirms the moral principle that no person should be permitted to allege his own turpitude as a ground for recovery." *Id.* (citation, internal quotation marks, and internal brackets omitted). Without such a public policy exclusion, an indemnitee would be more likely to harm society by engaging in intentional misconduct because it would believe that it will not have to bear the financial burden of its intentional misconduct. *See, e.g., id.*; *see also Decorative Ctr. of Houston*, 833 S.W.2d at 260.

48.     In sum, because the Asbestos Claimants are suing Maryland Casualty for its own tortious actions, the claims are not claims for which there may be coverage under the Primary

24

Policies or under the Excess Policies, as required by the indemnity in the Relevant Agreements.

Therefore, the Court should disallow the Proofs of Claim to the extent that they purport to seek

indemnification for liability on account of Maryland Casualty's own professional negligence and

other tortious conduct.

**B.      Maryland Casualty's Claims For Indemnification
         For Its Worker's Compensation Policies Should be Disallowed**

49.      The Debtors also seek disallowance of the Proofs of Claim to the extent that they

purport to seek indemnification from the Debtors for Maryland Casualty's alleged liability under

the worker's compensation policies that Maryland Casualty provided to the Debtors.

50.      The *Schull* and *Pennock* complaints, for example, allege claims against Maryland

Casualty with respect to the worker's compensation policies that it provided to the Debtors.

Schull Compl. ¶ 62; Pennock Compl. ¶ 11.[14] All of the plaintiffs in both the *Schull* and the

*Pennock* actions are former employees (or family members of employees) of the Debtors, at its

Zonolite or vermiculite mining and manufacturing operations in Lincoln County, Montana.

Schull Compl. ¶  4; Pennock Compl. ¶ 5.

51.      The Third Circuit twice acknowledged that the *Schull* and *Pennock* complaints

were suits against Maryland Casualty. at least in part, in its capacity as the Debtors' worker

compensation carrier.  The Third Circuit explained that "the Plaintiffs in The Lawsuit contend

that, as the Debtors' worker's compensation carrier, Maryland Casualty undertook a duty to the

workers, their families and the community of Libby, Montana to exercise reasonable care in

relation to the mine safety program and that Maryland Casualty breached this duty," *Gerard v.*

---

[14]   Plaintiff Gerard has expressly stated that she is not an employee of Grace and is not asserting (and cannot
       assert) a worker's compensation claim that would be covered under Maryland Casualty's workers'
       compensation policies. *See, e.g.*, Gerard's Reply in Support of Motion to Clarify Scope of Preliminary
       Injunction, Adv. Proc. 01-00771, Dkt. No. 90, March 6, 2002, at pp. 1-2.

*W.R. Grace & Co.*, 115 Fed. Appx. at 566-67, and that Maryland Casualty "did so as its worker's

compensation carrier, and its liability, if any, would be for injury to Plaintiffs from asbestos." *Id.*

at 568.

52.     These statements from the Third Circuit are important for two reasons.  First, the

court acknowledged that the *Schull* and *Pennock* suits involved Maryland Casualty's potential

liability, at least in part, under the worker's compensation policies.  And second, the court noted

that any potential liability of Maryland Casualty would be for injury to the plaintiffs from

asbestos.

53.     On the first point, the Debtors never agreed in any of the Relevant Agreements to

indemnify Maryland Casualty for liability under the worker's compensation policies. *See supra*

¶¶ 9-12.  In fact, such an indemnity agreement may even violate public policy. *See, e.g.,*

*Fulgham v. Daniel J. Keating Co.*, 285 F.Supp.2d 52 (D.N.J. 2003) (holding that indemnification

agreements falling under the Pennsylvania Worker's Compensation Act must contain clear and

unequivocal language to support their validity; these types of agreements are not favored by the

law and must be construed against the party seeking indemnification).  Because the *Schull* and

*Pennock* complaints, for example, allege liability in connection with the worker's compensation

policies, and because the Debtors never agreed to indemnify Maryland Casualty for such

policies, the Proofs of Claim should be disallowed to the extent that they purport to seek

indemnification on account of the worker's compensation policies.

54.     On the second point, if the Third Circuit was correct when it stated in dicta that

"[Maryland Casualty's] liability, if any, would be for injury to Plaintiffs from asbestos" then this

Court should disallow Maryland Casualty's claims completely because their claims would be

26

contingent indemnity claims. *See* 11 U.S.C. § 502(e)(1)(b). This second point is explained in further detail in Section C below.

55.    In sum, because worker's compensation policies are not the subject of any Settlement Agreements between the Debtors and Maryland Casualty, the Debtors owe no contractual indemnity to Maryland Casualty for worker's compensation claims. Therefore, the Court should disallow the Proofs of Claim to the extent that they purport to seek indemnification for liability on account of claims asserted by the Asbestos Claimants related to the worker's compensation policies.

**C.    Maryland Casualty's Contingent Claims For Indemnification and Contribution Should be Disallowed**

56.    To the extent that the Proofs of Claim seek indemnification and contribution for claims that are subject to the indemnification provisions of the Relevant Agreements, such claims should be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.

57.    Section 502(e)(1)(B) provides in relevant part that "the court shall disallow any claim of any entity from which property is recoverable . . . to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . ." 11 U.S.C. § 502(e)(1)(B).

58.    This section furthers several policy goals. First, a debtor's estate should not be burdened by unliquidated claims contingent in nature. *Sorenson v. Drexel-Burnham Lambert Group, Inc. (In re Drexel-Burnham Lambert Group, Inc.)*, 146 B.R. 92, 97 (S.D.N.Y. 1992). Second, section 502(e)(1)(B) is intended to "prevent competition between a creditor and his guarantor for the limited proceeds of the estate." *Juniper Dev. Group v. Kahn (In re Hemingway Transp.)*, 993 F.2d 915, 923 (1st Cir. 1993). And third, this provision prevents double recovery

27

on identical claims. *Aetna Cas. and Surety Co. v. Georgia Tubing Co. (In re Chateaugay Corp.)*,
1995 U.S. Dist. LEXIS 10120, at *8 (S.D.N.Y. July 20, 1995).

59.     For a claim to be disallowed under section 502(e)(1)(B), three requirements must
be satisfied: "(1) the claim must be one for reimbursement or contribution; (2) the entity
asserting the claim for reimbursement or contribution must be 'liable with the debtor' on the
claim; and (3) the claim must be contingent at the time of its allowance or disallowance." *In re
APCO Liquidating Trust*, 370 B.R. 625, 630-31 (Bankr. D. Del. 2007).

60.     Maryland Casualty's claims satisfy the first requirement.  Section 502(e)(1)(B)
expressly applies to "reimbursement or contribution," *see* 11 U.S.C. § 502(e)(1)(B), and courts
also interpret it to apply to indemnification. *See, e.g., In re RNI Wind Down Corp.*, 369 B.R.
174, 181-82 (Bankr. D. Del. 2007) ("Courts have consistently held that 'the concept of
reimbursement includes indemnity.'") (quoting *In re Vectrix Bus. Solutions, Inc.*, 2005 WL
3244199, at *3 (Bankr. N.D. Tex. Sept. 1, 2005) (citing *In re Wedtech Corp.*, 85 B.R. 285, 289
(Bankr. S.D.N.Y. 1988)); *In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 92, 96 (S.D.N.Y.
1992) ("[I]t is well-established that contingent claims for indemnity are covered by §
502(e)(1)(B) where the claimant is co-liable with the debtor on the underlying claim.").  The
Proofs of Claim expressly seek indemnification and contribution from the Debtors. *See* Proof of
Claim ¶ 2.

61.     Second, if the Court disallows the indemnity claims arising from allegations of
Maryland Casualty's own independent misconduct, then the only remaining potential claims will
be claims where Maryland Casualty is "liable with the debtor."  The co-liability prong of the
section 502(e)(1)(B) analysis "is to be interpreted to require a finding that the causes of action in

28

the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay." *In re RNI Wind Down Corp.*, 369 B.R. at 188.

62.     Third, Maryland Casualty's contractual indemnification and common law contribution claims are contingent at the present time. A claim is "contingent" for purposes of section 502(e)(1)(B) until the claimant's liability is established and the claimant has paid its creditor. 11 U.S.C. § 502(e)(1)(B); *In re APCO Liquidating Trust*, 370 B.R. at 625. In this case, Maryland Casualty has presented no evidence in the Proofs of Claim that it has incurred any liability by paying creditors who have asserted claims against it. Nor can it do so, because litigation against Maryland Casualty has been stayed pursuant to the Preliminary Injunction. Thus, section 502(e)(1)(B)'s third requirement is satisfied.

63.     Once the Court disallows the portion of the Proofs of Claim to the extent that they allege indemnity for (a) Maryland Casualty's independent tortious conduct and (b) the worker's compensation policies for the reasons explained above, the Court should disallow the remaining portion of the Proofs of Claim under section 502(e)(1)(B) as contingent claims that could result in the Debtors paying twice for the same liability. As a result, the Debtors submit that the Proofs of Claim should be disallowed in their entirety.

**D.      Maryland Casualty's Duplicate Claims**
**Should be Disallowed**

64.     Lastly, if the Court does not disallow the Proofs of Claim in their entirety, the Court should disallow the duplicate claims asserted against the 60 debtor entities other than Grace and Grace-Conn. (the "Duplicate Claims"). Claims Nos. 15377 through 15414, 15416 through 15436, and 15439 assert exactly the same claims as Claim Nos. 15376 and 15415, the claims against Grace and Grace-Conn., respectively.   It is unlikely that the specific entity named in each of the Duplicate Claims will be relevant for purposes of any potential distribution made

on account of the Duplicate Claims pursuant to the Debtors' anticipated plan of reorganization. It is anticipated that the plan will provide for the limited consolidation of all of the Debtors for purposes of the plan and that each and every claim filed or to be filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed one claim against the consolidated Debtors.  Accordingly, all of the Debtors' collective assets will likely be available to satisfy their collective liabilities.  Thus, if the Court does not disallow the Proofs of Claim in their entirety, the Court should at least disallow the Duplicate Claims.

## Conclusion

65.     The Debtors' Objection should be sustained and the Proofs of Claim should be disallowed in their entirety, because the claims improperly seek indemnification for Maryland Casualty's independent tortious conduct or conduct in relation to worker's compensation policies, both of which are not covered by the indemnity provisions of the Relevant Agreements, and/or are contingent indemnification and contribution claims that should be disallowed under section 502(e) of the Bankruptcy Code.

## Notice

66.     The Debtors will serve copies of this Objection (with all exhibits) on (a) the Office of the United States Trustee, (b) Maryland Casualty and (c) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002.  The Debtors submit that notice of this Objection is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

## No Previous Request

67.     No previous request, other than the Debtors' withdrawn request in the Twenty-First Omnibus Objection, for the specific relief set forth herein has been made to this or any other court.

DOCS_DE:147288.1

**WHEREFORE**, the Debtors respectfully request that this Court disallow all of

the Proofs of Claim because those claims either (a) incorrectly assert liability of the Debtors to

Maryland Casualty on account of Maryland Casualty's independent liability for its own tortious

conduct or for worker's compensation policies that it issued, or (b) are contingent claims for

reimbursement or contribution relating to a joint liability of the Debtors and Maryland Casualty,

and thus should be disallowed pursuant to section 502(e) of the Bankruptcy Code.

Dated: April 21, 2009                    Respectfully submitted,

                                         KIRKLAND & ELLIS LLP
                                         David M. Bernick, P.C.
                                         Theodore L. Freedman
                                         Citigroup Center
                                         153 East 53rd Street
                                         New York, NY 10022
                                         Telephone: (212) 446-4800
                                         Facsimile: (212) 446-4900

                                         THE LAW OFFICES OF JANET S. BAER, P.C.
                                         Janet S. Baer, P.C.
                                         70 W. Madison St.
                                         Suite 2100
                                         Chicago, IL 60602
                                         Telephone: (312) 641-2162

                                         and

                                         PACHULSKI STANG ZIEHL & JONES LLP

                                         Laura Davis Jones (Bar No. 2436)
                                         James E. O'Neill (Bar No. 4042)
                                         Kathleen P. Makowski (Bar No. 3648)
                                         Timothy P. Cairns (Bar No. 4228)
                                         919 North Market Street, 17th Floor
                                         P.O. Box 8705
                                         Wilmington, DE 19899-8705 (Courier 19801)
                                         Telephone: (302) 652-4100

                                         *Co-Counsel for the Debtors and Debtors in Possession*

31