# EXHIBIT D

1  Jon L. Heberling
   McGarvey, Heberling, Sullivan & McGarvey
2  745 South Main
   Kalispell, MT 59901
3  (406) 752-5566

4  Attorneys for Plaintiffs

COPY

̄ 23   10 17 AM '0̄

FILED NANCY SWEENEY
BY

5  MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

6

7  ALFRED V. PENNOCK and BETTY L.          )   CAUSE NO. CDV-2002- 233
   PENNOCK, husband and wife,              )

8  ROBERT K. FULLER and BONNIE E.          )
   FULLER, husband and wife,               )

9
   CLAUDE D. PAUL and BEVERLY PAUL,        )
10 husband and wife,                       )

11 ALFRED M. DICKERMAN and LOIS D.         )
   DICKERMAN, husband and wife,            )          COMPLAINT AND
12                                         )   DEMAND FOR TRIAL BY JURY
   PATRICIA HELEN KENWORTHY, Personal      )
13 Representative for JACK D. KENWORTHY,   )
   deceased,                               )
14                                         )
   ROBERT O. BEAGLE and SHERRY L.          )
15 BEAGLE, husband and wife,               )
                                           )
16 FRANKLIN D. WIDIC and SANDRA WIDIC,     )
   husband and wife,                       )
17                                         )
   GERALD CHALLINOR and NONA               )
18 CHALLINOR, husband and wife,            )
                                           )
19              Plaintiffs,                )
                                           )
20      v.                                 )
                                           )
21 MARYLAND CASUALTY COMPANY,              )
   a Maryland Corporation, CNA             )
22 INSURANCE COMPANIES, a corporation,     )
   CONTINENTAL CASUALTY COMPANY,           )
23 a corporation, TRANSPORTATION           )
   INSURANCE COMPANY, a corporation,       )
24 and STATE OF MONTANA, a                 )
   governmental entity,                    )
25                                         )
                Defendants.                )
26

LAW OFFICES
McGARVEY, HEBERLING,
SULLIVAN & McGARVEY
KALISPELL, MONTANA    Complaint and Demand for Trial by Jury                    1

1    COME NOW the plaintiffs and allege as follows.

**PARTIES**

2    1.   Plaintiffs are listed on Exhibit "A" attached hereto.

3    2.   Maryland Casualty is a Maryland corporation with its principal place

4    of business in Maryland.

5    3.   CNA Insurance Companies (CNA) is a corporation doing business in

the State of Montana.   Continental Casualty Company and Transportation

6    Insurance Company are companies owned or operated by CAN, and are included

7    in references herein to CNA.

8    4.   The State of Montana is a governmental entity.

**FIRST CLAIM**

9    **(Negligence v. Maryland Casualty)**

10   5.   Plaintiffs were employed by W.R. Grace and Company or its

11   predecessor, at its Zonolite or vermiculite mining and manufacturing operations

in Lincoln County, Montana.

12   6.   Throughout the years of plaintiffs' employment, they worked in an

13   environment that caused them to be exposed to and to inhale asbestos dust.

14   7.   At all times plaintiffs were ignorant of the nature and extent of the

life threatening risks and injury involved, and would not have continued to work

15   in such an environment if they had known the true facts.

16   8.   W.R. Grace provided its workers no coveralls and no showers. As a

17   result workers went home with asbestos dust on their clothing and in their cars,

thereby contaminating family members as well.

18   9.   Without knowledge of the nature and extent of the asbestos hazard,

19   plaintiffs were denied the options of avoiding exposure, demanding protective

devices, demanding safer operations, or changing jobs.

20   10.   Plaintiffs Pennock, Paul, Kenworthy and Challinor make the following

21   claims against Maryland Casualty Company.

22   11.   Maryland Casualty Company was the workers' compensation carrier

23   for W.R. Grace from June 30, 1962 to June 30, 1973.

24   12.   Maryland Casualty's professional staff included industrial hygienists

and medical doctors with expertise in occupational disease. Maryland Casualty

25   was well aware of the hazards of asbestos exposure.

26   13.   At all times, Maryland Casualty knew of the asbestos disease

exposure at the Grace Libby operations, and that workers were diseased and dying from asbestos exposure, and that a hazardous condition existed.

14. Maryland Casualty knew that at all times asbestos dust readings exceeded the asbestos standard, and knew or should have known that at Grace wherever there was visible dust in the air, there was a violation of the asbestos standard.

15. Maryland Casualty knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

16. Maryland Casualty knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

17. Maryland Casualty knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

18. Maryland Casualty knew or should have known that from 1961 forward men were dying of asbestos disease, and that each year more became diseased.

19. Maryland Casualty knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

20. Maryland Casualty's engineering division and medical division undertook to design an industrial hygiene program for control and prevention of asbestos dust and disease for the benefit of the Libby workers, their families and the community.

21. In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and the community.

22. Maryland Casualty was negligent in design of the industrial hygiene program:

    (a)   in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

    (b)   in failing to include measures to warn workers, their families, and the community of the hazards of asbestos exposure;

    (c)   in failing to include sufficient measures and standards for dust control

through housekeeping, ventilation and exhaust air cleaning;

(d)   in failing to include sufficient measures and standards for maintenance of equipment and premises; and

(e)   in failing to include a sufficient medical monitoring program.

23.   Maryland Casualty undertook to provide industrial hygiene services for the benefit of Grace employees, their families and the community.

24.   In so doing, Maryland Casualty had a duty of care to the Libby workers, their families and to the community.

25.   Maryland Casualty was negligent is this undertaking to provide services:

(a)   in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring;

(b)   in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(c)   in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d)   in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

26.   Maryland Casualty's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

27.   In so doing, Maryland Casualty had a duty of reasonable care to the Libby workers, their families and to the community.

28.   Maryland Casualty was negligent in inspection of the Grace Libby operations, in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

29.   Plaintiffs above listed were exposed to asbestos dust and fibers as stated on the chart Exh. A hereto.

30. As a direct and proximate result of the negligence of Maryland Casualty, Plaintiffs above listed have been diagnosed with asbestosis disease on the dates stated on the chart Exh. A hereto, and Jack Kenworthy died of asbestos disease on August 18, 2000.

## SECOND CLAIM
### (Aiding and Abetting v. Maryland Casualty)

31. All paragraphs above are incorporated by this reference.

32. Maryland Casualty knew the Grace Libby operations were dangerously substandard, and hazardous to workers, family members and community members who came into contact with asbestos dust.

33. Maryland Casualty encouraged, advised, aided, supported, assisted and abetted Grace in its dangerously substandard operation.

34. Maryland Casualty aided Grace with its professional industrial hygiene services.

35. Maryland Casualty designed a dust control program for the Grace Libby operation.

36. Maryland Casualty gave Grace substantial assistance in concealing the asbestos hazard from the workers, the unions and the public. At the time of the first worker's compensation case for asbestosis, Maryland Casualty knew that the only persons aware of the 25% plus incidence of abnormal chest x-rays in the Libby workers was Dr. Little, the radiologist, and Grace. Maryland Casualty recommended that the case be settled to avoid disclosure of the results to the union and to the general public. Also, Maryland Casualty knew of the industrial hygiene reports by the State of Montana, and the findings of dangerous levels of asbestos at Grace. Again, Maryland Casualty recommended settlement to avoid disclosure of the state reports to the unions and to the general public.

37. Maryland Casualty aided and abetted Grace's course of action by concealing the asbestos hazard, and the extent of disease and death, and by failing to warn the workers, their families and the community.

## THIRD CLAIM
### (Consortium v. Maryland Casualty)

38. All paragraphs above are incorporated by this reference.

39. As a result of the acts of the State of Montana above described, the plaintiffs' spouses listed on Exhibit "A" attached hereto have substantially lost

1  and will lose the care, comfort and society of their spouses, all to their damage
2  and detriment.

### FOURTH CLAIM
### (Negligence v. CNA)

4  Plaintiffs Pennock, Fuller, Paul, Dickerman, Kenworthy, Beagle, Widic and
5  Challinor make the following claims against CNA.

40.  All paragraphs above are incorporated by this reference.

41.  CNA, through Continental Casualty Co., was the workers'
compensation carrier for W.R. Grace from July 1, 1973 to July 1, 1976. CNA,
through Transportation Ins. Co. or Continental Casualty Co., was the workers'
compensation carrier for W.R. Grace from July 1, 1976 to 1996.

42.  CNA is professional staff included industrial hygienists and medical
doctors with expertise in occupational disease. At all times CNA was well aware
of the hazards of asbestos exposure.

43.  At all times, CNA knew of the asbestos disease exposure at the
Grace Libby operations, and that workers were diseased and dying from asbestos
exposure, and that a hazardous condition existed.

44.  CNA knew or should have known that there were no showers for
workers, no coveralls for workers, and that workers went home and into the
community covered with asbestos dust, which was hazardous to all those who
might come into contact with it.

45.  CNA undertook to provide industrial hygiene services for the benefit
of Grace employees, their families and the community.

46.  In so doing, CNA had a duty of care to the Libby workers, their
families and to the community.

47.  CNA was negligent is this undertaking to provide services:

(a)  in failing to recommend or require sufficient measures and standards
      for employee education, warning the workers, their families and the
      community, protection against asbestos dust going into workers'
      homes and into the community, dust control (including housekeeping,
      ventilation, exhaust air cleaning and maintenance) and medical
      monitoring;

(b)  in failing to sufficiently test and monitor the effectiveness of dust
      control at all locations where there was dust;

(c) in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d) in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

48. CNA's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

49. In so doing, CNA had a duty of reasonable care to the Libby workers, their families and to the community.

50. CNA was negligent in inspection of the Grace Libby operations, in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

51. As a direct and proximate result of the negligence of CNA, Plaintiffs above listed have been diagnosed with asbestosis disease on the dates stated on the chart Exh. A hereto, and Jack Kenworthy died of asbestos disease on August 18, 2000.

## FIFTH CLAIM
### (Consortium v. CNA)

52. All paragraphs above are incorporated by this reference.

53. As a result of the acts of CNA above described, the plaintiffs' spouses listed on Exhibit "A" attached hereto have substantially lost and will lose the care, comfort and society of their spouses, all to their damage and detriment.

## SIXTH CLAIM
### (Negligence v. State of Montana)

54. The listed plaintiffs were employed by W.R. Grace and Company or its predecessor, at its Zonolite or vermiculite mining and manufacturing operations in Lincoln County, Montana.

55. Throughout the years of plaintiffs' employment, they worked in an environment that caused them to be exposed to and to inhale asbestos dust.

56. At all times plaintiffs were ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to work in such an environment if they had known the true facts.

57.   W.R. Grace provided its workers no coveralls and no showers.  As a result workers went home with asbestos dust on their clothing and in their cars, thereby contaminating family members as well.  Listed plaintiffs are workers and family members who contracted asbestos disease due to asbestos dust brought home by workers.

58.   Without knowledge of the nature and extent of the asbestos hazard, plaintiffs were denied the options of avoiding exposure, demanding protective devices, demanding safer operations, or changing jobs.

- 59.   RCM 1947 § 69-105 (effective 1955 to 1967) provided that the State Board of Health "shall . . . have general supervision of the interests of health and life of the citizens".

60.   RCM 1947 § 69-201 (effective 1955 to 1967) provided that the "Board . . . shall . . . execute all of the duties in the field of industrial hygiene".

61.   RCM 1947 § 69-4106 (effective 1967 to 1971) provided that the Board "shall . . . (d) . . . enforce . . . for the preservation of public health and prevention of disease".

62.   RCM 1947 § 69-4207, now § 50-70-102, MCA (effective 1971 to date) provides for a State policy that "(1) will protect human health and safety . . . (2) [and for a ] . . . program of abatement . . . of occupational diseases".

63.   RCM 1947 § 69-105 (effective 1955 to 1967) provided that the Board of Health "shall make sanitary investigations and inquiries regarding . . . employment . . .".

64.   RCM 1947 § 69-202 (effective 1955 to 1967) provided that the Board of Health "shall . . . (3) make investigations of the sanitary conditions . . . in the various industries".

65.   RCM 1947 § 69-4203 (effective 1967 to 1971) provided that the Board of Health "shall . . . investigate the conditions of work . . .".

66.   RCM 1947 § 69-4110, now § 50-1-202, MCA (effective 1967 to date) provides that the Board "shall . . . (2) study conditions effecting citizens . . . (3) make investigations . . .".

67.   RCM 1947 § 69-4211.1, now § 50-70-105, MCA (effective 1974 to 1999) provided that the Board "shall . . . (6) determine . . . degree of hazard at any workplace".

68.   RCM 1947 § 69-202 (effective 1955 to 1967) provided that the

Board "shall . . . (5) . . . work with such industries to remedy unsanitary conditions".

69.    RCM 1947 § 69-4203 (effective 1967 to 1971) provided that the Board "shall . . . (4) . . . cooperate with the industry . . . in . . . correcting conditions which are hazardous to health".

70.    RCM 1947 § 69-4211, now § 50-70-105, MCA (effective 1971 to 1999) provided that the Board "shall . . . (3) . . . issue orders necessary to carry out this act".

71.    RCM 1947 § 69-4211.1, now § 50-70-105, MCA (effective 1974 to 1999) provided that the Board "shall (1) enforce board orders . . . (3) develop . . . plan for . . . abatement . . . of occupational diseases".

72.    Montana Constitution, Article IX § 1(1) (effective 1973 to date) provides that "the State and each person shall maintain and improve a clean and healthful environment in Montana . . .".

73.    RCM 1947 § 69-105 (effective 1955 to 1967) provides that the Board "shall gather information . . . as it may deem proper for diffusion".

74.    RCM 1947 § 69-4110, now § 50-1-202, MCA (effective 1967 to date) provides that the Board "shall . . . (3) make investigations, disseminate information . . .".

75.    RCM 1947 § 69-4211.1, now § 50-70-105, MCA (effective 1974 to 1999) provides that the Board "shall . . . (7) disseminate information".

76.    In 1956 the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation at Libby, Montana "to determine if any of the components of this company were detrimental to the health of the employees." The 1956 report, p. 3, found high dust levels, that the dust contained asbestos, and that "the asbestos dust and the dust in the air is of considerable toxicity." The report cited medical literature and described the disease asbestosis. The report cited the 1954 edition of Drinker and Hatch, Industrial Dust, which describes the lung damage done by asbestosis as "permanent" (p.37). Drinker and Hatch note the 1947 total of 160 deaths from asbestosis in Great Britain (p.39). Drinker and Hatch also demonstrate a ten times greater than normal incidence of lung cancer in asbestosis cases (p.46). The 1956 report found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The 1956 report, p. 6, states:

1    Full recognition should be given to the fact that direct control
     measures alone are usually not enough to insure safe working
2    conditions.    The method of operations, proper maintenance of
     equipment and of housekeeping are equally essential to maintain
3    healthful conditions.

4    That until such time as the repair and maintenance of both the
     exhaust and ore conveying systems have been complete, all the men
5    in the dry mill be provided with and required to wear an adequate
     respirator.

6
     No further action was taken in 1956 and 1957.
7
          77.    In 1958, the State Board of Health, Division of Disease Control,
8    undertook another industrial hygiene study of the Zonolite mine and mill operation
9    "to determine if any of the components of this company found to be detrimental
     to the health of the employees during the last study in August, 1956 had been
10   reduced or alleviated since that time." The report again found dust levels greatly
11   exceeding the asbestos limit, and recommended dust control measures.  The
12   report, at p. 8, cites medical literature showing that asbestosis is "a progressive
     disease with a bad prognosis," often fatal.  The report, at p. 8, finds that
13   asbestos dust "concentrations had, as yet, not been reduced to a satisfactory
14   level over all . . .  The dry mill still required a considerable amount of work to
15   reduce the dust in this area to an acceptable level." No further action was taken
     in 1958, 1959, 1960, or 1961.
16
          78.    In 1959, the State of Montana, State Tuberculosis Sanitarium treated
17   Glenn Taylor, a Libby Zonolite mine worker, for shortness of breath and
18   asbestosis.

19        79.    In 1961, the State of Montana, through formal death certificate
     reporting procedures, had notice that Glenn Taylor, a millwright at Zonolite in
20   Libby died of asbestosis, and that Charles Wagner, a mechanic at Zonolite in
21   Libby, died of pulmonary fibrosis.

22        80.    In 1962, the State Board of Health, Division of Disease Control,
     undertook an industrial hygiene study of the Zonolite mine and mill operation "to
23   determine if any of the components of the operations continued to be a threat to
24   the health of the employees." The report again found dust levels far in excess of
     the asbestos limit, and recommended dust control measures. The report, at p. 4,
25   concludes "as indicated in the findings of this study, it appeared that no progress
26   had been made in reducing dust concentrations in the dry mill to an acceptable

1  level and that, indeed, the dust concentrations had been increased, substantially,
2  over those in the past."

3     81.    In 1963, the State Board of Health, Division of Disease Control,
   undertook an industrial hygiene study of the Grace/Zonolite mine and mill. The
4  report again found dust levels greatly exceeding the asbestos limit, and
5  recommended dust control measures. The report, at p. 3, found a "hazardous
   condition existing at this plant." No further action was taken in 1963.
6
      82.    In April of 1964, the State Board of Health, Division of Disease
7  Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill
8  "to determine if compliance with previous recommendations for the control of
   dust had been achieved." The report again found dust levels greatly exceeding
9  the asbestos limit, and recommended dust control measures. The report cited an
10 article by Dr. Irving Selikoff (1964), finding dangerous levels of asbestos disease
11 in asbestos insulation workers with "light intermittent exposure to asbestos." The
   State knew that the Libby workers had heavy and frequent exposure to asbestos.
12 The 1964 report states at p. 3, "the asbestos content of the material with which
13 you are working appears to provide some serious potential for the development
14 of disease if not properly controlled. In addition, the discharge of large volumes
   of asbestos-laden dust at ground levels sets up a condition where all members of
15 the plant can be exposed in addition to those who work in the dry mill." The
16 1964 report, p.3, also warns of "possible widespread carcinogenic air pollution."

17     83.    In September, 1964, the State Board of Health, Division of Disease
18 Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill
   "to determine if.the concentrations were excessive as has been found in many
19 previous studies." The report again found dust levels greatly exceeding the
20 asbestos limit, and recommended dust control measures. The report states at p.
   3 "the dust discharged at ground level from the main dust collection fan was
21 continuously contaminating the whole plant work area and needs to be either
22 raised substantially so the dust-laden air discharges substantially above the plant
23 area or that cleaning be provided. There was much reentry of this dust into the
   working environment." The report concludes at p. 3 with the "hope that
24 continued work to reduce dust concentrations will be done and that a continuous
25 operation at acceptable levels will be achieved soon."

26     84.    In 1964, the State of Montana, through formal death certificate

1    procedures, had notice that Albert Barney, a mill worker at Zonolite in Libby died
2    of cor-pulmonale.

3            85.    In 1966, the State of Montana, through formal death certificate
     reporting procedures, had notice that Walter McQueen, a miner from Libby, died
4    of asbestosis.

5            86.    In 1967, the State Board of Health, Division of Disease Control,
     undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to
6    determine compliance with previous recommendations." The report, at p. 2,
7    concluded "as in the past, the need for particularly close attention to the
8    functioning of the dust control system, condition of duct work, . . . was apparent.
     It was also apparent that a strict housekeeping program must be maintained."

9            87.    In November 1967, evidence was presented to the Chairman of the
10   State Industrial Accident Board that another worker at the Grace/Zonolite mine
11   and mill had been diagnosed with asbestosis from work in the warehouse.

12           88.    In 1974 the Montana State Department of Health performed an
     investigation of the airborne asbestos exposure at the Grace mine and mill. No
13   action was taken.

14           89.    From 1967 to about 1974, Grace regularly reported on the status of
15   dust control at its operations in Libby to the State of Montana.

16           90.    All the above described reports of the State of Montana, Division of
     Disease Control, were delivered to W.R. Grace & Co., or its predecessor. None
17   of the reports were made public, nor were the Grace workers or their families
     warned of what the State had found.

18           91.    In 1971-1976, a number of federal agency inspections of the Grace
19   mine and mill showed violations of asbestos dust control requirements. The State
20   of Montana was either a participant in said inspections or was copied in on the
     reports of said inspections. Federal inspections in 1971, 1972, 1973, 1974 and
21   1975 found dangerous levels of asbestos dust at the Grace mine and mill. Again
22   the State of Montana did nothing to warn the workers or their families of the
23   dangers of asbestos disease.

24           92.    From 1976 to a date after 1990, the State of Montana continued to
     inspect the Grace mine and mill for occupational health hazards. In the 1980s and
25   up to 1998, the State of Montana had many occasions to review and act upon
26   matters relating to the W.R. Grace operations. The State never did warn or act

1    to protect the plaintiffs.

2      93.    By 1971, 14 workers at the Grace mine and mill had died of asbestos

3    disease.

      94.    The cause of action in this case arose after July 1, 1973, and there

4    is no sovereign immunity. (Art. II §18, 1972 Montana Constitution.)

5      95.    Plaintiffs as employees at the Grace/Zonolite mine and mill operation

6    at Libby, Montana, and family members of employees, were at all times members

7    of the class of persons the above statutes intended to protect from exposure to

8    toxic asbestos dust, found hazardous by the State Board of Health, Division of

     Disease Control.

9      96.    At all times pertinent herein, the State of Montana had a continuing

     duty to plaintiffs to gather information, to protect and to warn plaintiffs.

10      97.    The State Board of Health, Division of Disease Control, undertook

11    specific action to cause corrective measures to be taken to protect plaintiffs.

12      98.    The State of Montana negligently failed to take sufficient action to

     protect plaintiffs from known hazards of asbestos exposure.

13      99.    The State of Montana negligently failed to gather sufficient

14    information as to the extent of disease in workers at the Grace/Zonolite mine and

     mill operation.

15      100. The State of Montana negligently failed to warn plaintiffs of the

16    hazards of asbestos exposure.

17      101. As a direct and proximate result of the conduct of the State of

18    Montana, its agencies and agents as described above, plaintiffs suffer from

     asbestos disease which was diagnosed on the dates listed on Exhibit "A" attached

19    hereto, due to asbestos exposure from the Grace/Zonolite mine and mill.

20                      **SEVENTH CLAIM**

           **(Violation of the Montana Constitution)**

21      102. All paragraphs above are incorporated by this reference.

22      103. Plaintiffs have the following inalienable rights, pursuant to the

23    Montana Constitution, Article II, § 3:

24      All persons are born free and have certain inalienable rights. They

25      include the right to a clean and healthful environment and the rights
     of pursuing life's basic necessities, enjoying and defending their lives

26      and liberties, acquiring, possessing and protecting property, and
     seeking their safety, health and happiness in all lawful ways.

104. Plaintiffs have the further constitutional rights pursuant to the Montana Constitution, Article IX, § 1:

> The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.

105. The past, present and continuing tremolite asbestos exposures caused and allowed by the State of Montana violate the inalienable right of plaintiffs to a clean and healthful environment, and breach the State's duty to maintain and improve a clean and healthful environment for plaintiffs.

106. As a direct, proximate and legal result of the conduct of the State of Montana, plaintiffs have been exposed to and harmed by dangerous tremolite asbestos.

## DAMAGES

107. As a direct and proximate result of the acts of the State of Montana, the plaintiffs have suffered and will suffer:

a.   Loss of enjoyment of their established course of life;

b.   Loss of services which can no longer be performed;

c.   Physical, mental and emotional pain and suffering;

d.   Medical expenses, rehabilitation expenses and related expenses; and

e.   Loss of insurability for medical coverage.

## EIGHTH CLAIM
### (Consortium v. State of Montana)

108. All paragraphs above are incorporated by this reference.

109. As a result of the acts of the State of Montana above described, the plaintiffs' spouses listed on Exhibit "A" attached hereto have substantially lost and will lose the care, comfort and society of their spouses, all to their damage and detriment.

## DAMAGES

110. As a direct and proximate result of the acts of Maryland Casualty, CNA, and the State of Montana the plaintiffs have suffered and will suffer:

a.   Loss of enjoyment of their established course of life;

b.   Loss of services which can no longer be performed;

c.    Physical, mental and emotional pain and suffering;

d.    Medical expenses, rehabilitation expenses and related expenses;

e.    Loss of insurability for medical coverage; and

f.    The heirs of Jack D. Kenworthy have suffered and will suffer loss of his care, comfort and society and other damages.

### PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray for damages against Maryland Casualty, CNA, and the State of Montana (not to exceed $750,000 per claim as against the State of Montana) as follows:

1.    Reasonable damages for lost enjoyment of established course of life, past and future.

2.    Reasonable damages for loss of services which can no longer be performed.

3.    Reasonable damages for physical, mental and emotional pain and suffering, past and future.

4.    Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future.

5.    Reasonable damages for loss of care, comfort and society.

6.    For costs of suit; and

7.    For such further relief as is just under the circumstances.

### DEMAND FOR TRIAL BY JURY

Claimants hereby demand a trial by jury.

DATED this _27ᵗʰ_ day of March, 2002.

McGARVEY, HEBERLING, SULLIVAN & McGARVEY

By: _Jon L. Heberling_
Jon L. Heberling
Attorneys for Plaintiffs

EXHIBIT

| Plaintiff | Spouse | Place of Residence | Plaintiff's work at W.R. Grace | Family Member | Family Member worked at W.R. Grace | Date of Diagnosis/ Death |
|---|---|---|---|---|---|---|
| Bannock | Betty L. | Elko NV | 3/2/89 - 9/1/90 | | | 4/8/99 |
| Fuller | Bonnie E. | Elko NV | 4/20/65 - 9/21/90 | | | 5/27/99 |
| Paul | Beverly | Lovelock NV | 3/21/89 - 1/1/88 | | | 6/10/99 |
| Bleecker | Cole D. | | 3/11/88 - 10/3/83 | | | 4/13/00 |
| Family PR | Jack D. | Helena MT | | Jack D. Kenworthy | 4/10/68 - 4/2/84 | 8/18/00 death |
| | Sherry L. | | 4/21/89 - 1/1/92 | | | 5/30/00 |
| Widick | Sandra | Spring Creek NV | 5/2/67 - 1/1/91 | | | 10/3/00 |
| Mallinor | Nona | Elko NV | 3/2/66 - 9/1/90 | | | 7/18/01 |