IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case Nos. 01-1139 through 01-1200 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PERSONAL INJURY CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION and | ) | |
| CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PERSONAL INJURY CLAIMANTS and | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PROPERTY DAMAGE CLAIMANTS OF | ) | |
| W.R. GRACE & CO., suing in behalf of the | ) | |
| Chapter 11 Bankruptcy Estate of W.R. | ) | |
| GRACE & CO., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2211 |
| | ) | |
| FRESENIUS MEDICAL CARE HOLDINGS, | ) | Affects Docket 02-2211 only |
| INC. and NATIONAL MEDICAL CARE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

FIRST AMENDED SETTLEMENT AGREEMENT
AND RELEASE OF CLAIMS

First Amended Settlement Agreement
and Release of Claims

This Settlement Agreement and Release of Claims (the "Agreement") is made as of the 6th day of February, 2003, by and among Fresenius Medical Care Holdings, Inc. (taxpayer identification number 13-3461988) ("FMCH"), National Medical Care, Inc. (taxpayer identification number 04-2835488) ("NMC"), the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and collectively with the PI Committee, the "Asbestos Committees"), both of the Asbestos Committees in their respective capacities as plaintiffs on behalf of the estates of the Debtors in the Asbestos Claimants' Adversary Proceeding.

## ARTICLE I

### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined) assigned to such terms in Appendix A attached hereto or in the Preamble above.  Appendix A is incorporated herein by reference, and is fully part of this Agreement.

## ARTICLE II

### TERMS OF SETTLEMENT OF CLAIMS

2.01    Moving Parties to Seek Approval of Settlement.  Within forty-five (45) days of the Settlement Execution Date, the Moving Parties shall move the Court to enter an order binding on all of the Estate Parties (including the Settling Parties) approving this Agreement and obligating each of the Estate Parties to the terms and conditions of this Agreement as if each of the Estate Parties had executed this Agreement.

2.02    Preconditions to Settlement Payment Obligation.  As a condition precedent to the obligation of the NMC Defendants to make the Settlement Payment, each and every of the

First Amended Settlement Agreement
and Release of Claims

following preconditions shall have occurred, unless the NMC Defendants, in their sole discretion, have provided written notice to the other Settling Parties and the Court that they waive one or more of the preconditions:

(A)    <u>Releases by the Estate Parties</u>. The Plan of Reorganization shall provide that: (i) upon the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will fully, finally, and forever release, relinquish and discharge each and every of the NMC Defendants from any and all Grace-Related Claims that the Asbestos Committees or the Estate Parties have asserted or could have asserted in this or any other forum against any of the NMC Defendants; and (ii) prior to the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will deliver to the NMC Defendants the Release that is attached as <u>Appendix B</u> hereto, which by its terms shall become effective upon the making of the Settlement Payment.

(B)    <u>Releases by Plan Claimants</u>. The Plan of Reorganization shall provide that any Person that votes in favor of the Plan or that receives property under the Plan shall thereby be deemed, upon the making of the Settlement Payment, to have fully and finally released each and every of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

(C)    <u>Releases by Trust Claimants</u>. The Plan of Reorganization shall provide for the establishment of a trust or trusts under state law and pursuant to Section 524(g) of the Bankruptcy Code (the "Asbestos Trust"), and the Plan of Reorganization further shall provide that any Person that receives property from the Asbestos Trust shall thereby be deemed, upon and after the making of the Settlement Payment, to have fully and finally released each and every

-2-

of the NMC Defendants from all Grace-Related Claims that the Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

   (D) <u>Bar Order</u>. The Court shall have issued, pursuant to Section 105(a) of the Bankruptcy Code, a Final Order, effective upon the making of the Settlement Payment, permanently and forever enjoining, restraining and barring any Person from commencing or continuing any suit, action or other proceeding, or from taking any other action, for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim against any of the NMC Defendants.

   (E) <u>Channelling Injunction</u>. In addition to the injunction described in (D) above, the Final Order confirming the Plan of Reorganization shall provide that, effective upon the making of the Settlement Payment, the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code, which injunction shall permanently bar any Person from commencing or continuing any suit, action, or other proceeding, or from taking any other action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Asbestos-Related Claim that the Person asserted or could have asserted, against any of the NMC Defendants.

   (F) <u>Indemnification</u>. The Plan of Reorganization shall provide that the Estate Parties, jointly and severally, upon the making of the Settlement Payment, shall indemnify, defend and hold harmless the NMC Defendants for any loss, cost or expense (including attorneys' fees and other costs of defense) arising out of any and all Grace-Related Claims, commenced or continued in this or any other forum against any of the NMC Defendants. Such indemnification specifically shall not apply to the costs and expenses (including lawyers' fees and accountants' fees) incurred by the NMC Defendants in (i) defending the Asbestos Claimant's

First Amended Settlement Agreement
and Release of Claims

Adversary Proceeding or any other proceedings or controversies arising out of or based upon

Asbestos-Related Claims prior to the Settlement Execution Date, or (ii) defending any

proceedings or controversies arising out of or based upon Grace-Related Claims, other than

Asbestos-Related claims, prior to the Settlement Effective Date.

(G) Dismissals. Upon the filing of timely motions to dismiss by the NMC

Defendants, and the best efforts of the other Settling Parties in support of such motions, each

court with jurisdiction over the following actions shall have dismissed by Final Order, effective

upon the making of the Settlement Payment, each of the following actions with prejudice as

against the NMC Defendants:

(i) *Mesquita v. W.R. Grace & Co., et al.*, amended as *Abner v. W.R.

Grace & Co. et al.*, No. 315465, Superior Court of California, County of San Francisco,

(since transferred to the Court as Adversary Proceeding No. 01-08883);

(ii) *Woodward v. Sealed Air Corporation (US) et al.*, No. 01-10547

PBS, U.S. District Court, District of Massachusetts, (since transferred to the Court as

Case No. 01-CV-412);

(iii) *Lewis v. W.R. Grace & Co. et al.*, U.S. Bankruptcy Court, District

of Delaware, Bkr. Case No. D. Del. 01-001139/Adv. Case No. 01-08810; and

(iv) The Asbestos Claimants Adversary Proceeding.

(H) Successors. The Final Order confirming the Plan of Reorganization shall

include a determination by the Court that, as of the Plan Effective Date, the Estate Parties have

the ability to pay and satisfy in the ordinary course of business their respective obligations and

liabilities, including without limitation, all Indemnified Taxes and all obligations under this

Agreement.

-4-

First Amended Settlement Agreement
and Release of Claims

(I)    Court Approval. The Court by Final Order shall approve this Agreement, and each of the Estate Parties shall become obligated to, and entitled to the benefits of, the terms and conditions of this Agreement.

(J)    Implementation. Prior to the Settlement Approval Date, none of the Estate Parties shall take any action that would be a breach of such Person's duties under Article III of this Agreement if such action had been taken after the Settlement Approval Date.

2.03    Payment Obligations of the NMC Defendants. Within five (5) business days of the Settlement Effective Date the NMC Defendants shall wire transfer, subject to the provisions of Section 3.08, one hundred fifteen million dollars ($115,000,000) cash as designated by the Court in the Final Order approving the Plan of Reorganization.

2.04    Release of Sealed Air Defendants. Upon the Settlement Effective Date, the NMC Defendants will execute a release, acceptable in form and substance to the NMC Defendants, that fully, finally, and forever releases, relinquishes and discharges Sealed Air and Cryovac from any and all Tax claims or Asbestos-Related Claims (including but not limited to claims for lawyers' fees and the costs of litigation related thereto) that the NMC Defendants have asserted or could have asserted in this or any other forum against Sealed Air or Cryovac.

2.05    Publicity. Before making any public statements or announcements prior to the Settlement Approval Date, each of the Settling Parties shall obtain approval from the other Settling Parties of the text of any such public statement or announcement (including in any filing not under seal in the Court) to be made by such party or its parents, which approval shall not be unreasonably withheld. If the Settling Parties are not able to agree on or approve the text of such a public statement or announcement and the legal counsel for any party proposing to make a

-5-

public statement or announcement is of the opinion that such public statement or announcement is required by law or the rules of any stock exchange on which such party's securities, or the securities of a parent corporation of such party, are traded, then such party or the parent may make or issue the legally required statement or announcement.

2.06 · The NMC Defendants Solely Responsible for Settlement Payment. Notwithstanding any other provision of this Agreement, or any prior Agreements, the NMC Defendants will not seek indemnification from the Estate Parties, Sealed Air, or Cryovac for the Settlement Payment.

2.07 Purpose of Payment and Consistency of Treatment. The Settling Parties agree, and the Plan of Reorganization shall provide that the Estate Parties acknowledge and agree, that FMCH and NMC have entered into this Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos-Related Claims, as well as other Grace-Related Claims against the NMC Defendants. The Settlement Payment is intended and shall be treated by the Settling Parties as a payment by the NMC Defendants of an ordinary and necessary expense incurred by the NMC Defendants and as income of the Estate Parties in the same amount. Any indemnification payments made by Grace-Conn. to the NMC Defendants, to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn., shall be treated by the Settling Parties as a payment by Grace-Conn. of an ordinary and necessary expense incurred by Grace-Conn. and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the NMC Defendants, as income of the NMC Defendants. None of the Settling Parties shall take a position inconsistent with the foregoing in any Tax Return or with any tax authority.

2.08   <u>No Limitation on Estate Parties' Ability to Propose Plan</u>.   Notwithstanding any other provision of this Agreement, it shall not be a breach of this Agreement, act of bad faith, tortious interference with a contractual relationship, or any other malfeasance for the Estate Parties to propose or support a plan of reorganization that does not provide for the establishment of an Asbestos Trust or the issuance of an injunction pursuant to Section 524(g) of the Bankruptcy Code, provided however, the Estate Parties shall use their best efforts to cause all of the preconditions set forth in Section 2.02, other than those set forth in paragraphs (C) and (E) of Section 2.02, to occur.  For the avoidance of doubt, if the Plan of Reorganization, as well as the Final Order of confirmation respecting the Plan of Reorganization, do not satisfy the preconditions set forth in paragraphs (C) and (E) of Section 2.02, the NMC Defendants may in their sole discretion waive or decline to waive, as set forth in Section 2.02, the failure of those preconditions as conditions precedent to the Settlement Payment.

2.09   <u>Best Efforts By Asbestos Committees Respecting Plan</u>.  The Asbestos Committees shall use their respective best efforts to cause the occurrence of all the preconditions to the obligation of the NMC Defendants to make the Settlement Payment set forth in Section 2.02, except to the extent the NMC Defendants may in their sole discretion waive, as set forth in Section 2.02, the failure of those preconditions as conditions precedent to the Settlement Payment.

**ARTICLE III**

**SPECIFIED DUTIES REGARDING TAXES.**

3.01   <u>Termination of TSIA</u>.  From the Settlement Execution Date through the Settlement Effective Date, as among the Settling Parties, the terms of this Agreement shall supercede the terms of the TSIA, except that Section 4.04 of the TSIA shall remain in force and

First Amended Settlement Agreement
and Release of Claims

is incorporated by reference herein. Upon the Settlement Effective Date, the TSIA shall be terminated and no party to such TSIA shall have any obligation to any other party to such TSIA in respect thereof, whether such obligation shall have accrued before or after the Settlement Approval Date, except that Section 4.04 of the TSIA shall remain in force and is incorporated by reference herein.

3.02    Estate Parties' Duty to Pay Indemnified Taxes. From and after the Settlement Approval Date, the Estate Parties promptly shall pay any Indemnified Taxes as such Taxes become due and payable to tax authorities pursuant to a Final Determination, provided that the Estate Parties have obtained authorization from the Court to pay currently any such Indemnified Taxes. To the extent Indemnified Taxes become due and payable, the Estate Parties shall use their best efforts to obtain authorization from the Court to pay currently such Indemnified Taxes. The other Settling Parties shall cooperate in the Estate Parties' efforts to obtain such authorization from the Court to pay currently such Indemnified Taxes, provided however, that the foregoing does not modify the obligations of members of the FMCH Group as set forth in Section 3.04(A). The Settling Parties agree that any such payments by the Estate Parties of Indemnified Taxes are, for purposes of this Agreement and the administration of the Debtors' estates, the payment of the Taxes of the Estate Parties.

3.03    Grace-Conn. Control of Indemnified Tax Matters.

(A)    Grace-Conn. Authority over Indemnified Taxes. Upon the Settlement Approval Date, subject to the limitations in Sections 3.03(B) and (C), Grace-Conn. solely shall be authorized to act for the Grace New York Group in its sole discretion with respect to Indemnified Taxes. Notwithstanding the authority granted in the previous sentence, Grace-Conn. and the other Estate Parties shall use their respective best efforts to defer any Final

Determination of any Indemnified Taxes until such time as the Estate Parties have obtained authorization from the Court to pay currently such Indemnified Taxes, and the other Settling Parties shall cooperate in the effort to defer any Final Determination of any Indemnified Taxes prior to authorization from the Court to pay such Indemnified Taxes, provided however, that the foregoing does not modify the obligations of members of the FMCH Group as set forth in Section 3.04(A). FMCH will provide to Grace-Conn. and its agents from time to time Powers of Attorney with respect to Indemnified Taxes so that Grace-Conn. can act as the agent of the Grace New York Group with respect to Indemnified Taxes. The NMC Defendants agree that, pursuant to the cooperation obligations set forth in Section 3.04(A), they will respect such authority of Grace-Conn. and do nothing to derogate from such authority with respect to Indemnified Taxes, and, so long as none of the Estate Parties are in breach of this Agreement, the NMC Defendants will not initiate communications with any tax authority concerning Indemnified Taxes without obtaining the written consent of Grace-Conn. or the permission of the Court. As requested by Grace-Conn., amendments to Consolidated Tax Returns for or attributable to all Tax Periods of the Grace New York Group ending on or before December 31, 1996 shall be prepared by Grace-Conn. and filed by FMCH on behalf of Grace-Conn.

      (B)   <u>Limitations on Agreement To Final Determinations</u>. Neither Grace-Conn. nor any other Estate Party shall voluntarily agree to the payment, assessment, resolution or other Final Determination of any Indemnified Tax prior to the Settlement Effective Date, except to the extent the Estate Parties have obtained authorization from the Court to pay promptly in full any such Indemnified Taxes, or to the extent FMCH hereafter has consented in its sole discretion in writing to the Estate Parties' agreement to such payment, assessment, resolution or other Final Determination.

First Amended Settlement Agreement
and Release of Claims

(C)    <u>Tax Refunds</u>.  Grace-Conn. shall control any Tax Refund of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, credited or payable to any member of the Grace New York Group, except that:

(i) any such Tax Refund credited or paid to any member of the Grace New York Group prior to the time the Estate Parties have received authority from the Court to make payments under Section 3.02 above of Indemnified Taxes as they become due and payable shall be repaid to the tax authority as a payment of Indemnified Taxes (whether or not then due and payable) if, in the reasonable determination of FMCH, Indemnified Taxes are expected to become due and payable to such tax authority, provided however, if there is a dispute as to whether additional Indemnified Taxes are expected to become due and payable to such tax authority Grace-Conn. shall first have the opportunity to seek a determination from the Court that additional Indemnified Taxes are not expected to become due and payable to such tax authority and Grace-Conn. therefore should be permitted by the Court to receive and retain such refund; and

(ii) any Tax Refund attributable to the NMC Business with respect to any Tax Period ending on or before December 31, 1996, (I) shall first be applied to satisfaction of NMC Indemnified Taxes and (II) thereafter shall be applied to the satisfaction of Indemnified Taxes or if there are no such NMC Indemnified Taxes or Indemnified Taxes then due and payable, or in the reasonable determination of Grace-Conn. expected to become due and payable within eighteen (18) months, promptly shall be paid to FMCH.  None of the Estate Parties shall seek the refund of any previously paid Taxes of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, if in the reasonable determination of either FMCH or Grace-Conn. Indemnified Taxes are expected to become due and payable to such tax authority for Tax Periods ending on or before December 31, 1996.

-10-

First Amended Settlement Agreement
and Release of Claims

3.04    Cooperation.

(A)    Cooperation by FMCH. From and after the Settlement Approval Date, FMCH from time to time shall provide such cooperation as Grace-Conn. shall reasonably request, including (i) the implementation of its rights and responsibilities under this Agreement with respect to Indemnified Taxes, and (ii) provide such Powers of Attorney as provided in Section 3.03(A), and FMCH will not seek indemnification for the costs and expenses (including lawyers' fees and accountants' fees) of such cooperation, provided that FMCH will not be required to incur any unreasonable cost or expense in respect of such cooperation. Whenever FMCH or other member of the FMCH Group receives notice or demand from any tax authority with respect to any Tax Item which could increase or decrease the liability for, or give rise to a Tax Refund with respect to, any Indemnified Tax, FMCH shall in good faith promptly give notice to Grace-Conn. of such Indemnified Tax related issue, in accordance with Section 5.07.

(B)    Cooperation by Estate Parties. Upon the request of FMCH, each of the Estate Parties from time to time shall provide such cooperation as FMCH shall reasonably request, including (i) the implementation of its rights and responsibilities under this Agreement with respect to NMC Indemnified Taxes and (ii) provide such Powers of Attorney relating to NMC Indemnified Taxes as FMCH shall request with respect to Tax Periods ending on or before December 31, 1996, and the Estate Parties will not seek indemnification for the costs and expenses (including lawyers' fees and accountants' fees) of such cooperation, provided that the Estate Parties will not be required to incur any unreasonable cost or expense in respect of such cooperation. Whenever any of the Estate Parties receives notice or demand from any tax authority with respect to any Tax Item which could increase or decrease the liability for, or give rise to a Tax Refund with respect to, any NMC Indemnified Tax, Grace-Conn. shall in good faith

-11-

First Amended Settlement Agreement
and Release of Claims

promptly give notice to FMCH of such NMC Indemnified Tax related issue, in accordance with Section 5.07. Grace-Conn. shall provide prompt notice from time to time to FMCH of (i) revenue agents' reports, adjustments to Tax Items that may increase Indemnified Taxes, demands for payment of Indemnified Taxes, notices of proposed assessments and Final Determinations respecting Indemnified Taxes and similar correspondence, notices and demands from tax authorities and (ii) confirmation that Indemnified Taxes have been paid by the Estate Parties.

3.05    FMCH Group Protection for Indemnified Taxes. The Estate Parties jointly and severally shall indemnify, defend and hold harmless FMCH and each member of the FMCH Group from and against any loss in respect of (i) Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from FMCH or any of the other NMC Defendants for any Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

3.06    Estate Parties' Protection for NMC Indemnified Taxes. FMCH and the other members of the FMCH Group jointly and severally shall indemnify, defend and hold harmless each of the Estate Parties from and against any loss in respect of (i) NMC Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from any of the Estate Parties for any NMC Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

3.07    Payment of Indemnified Taxes by FMCH. Notwithstanding the obligations of the Estate Parties in Section 3.02, in the event that any tax authority shall demand of FMCH or any

-12-

First Amended Settlement Agreement
and Release of Claims

other members of the FMCH Group payment of any Indemnified Taxes, and FMCH or such other members of the FMCH Group pays such Indemnified Taxes, each of the Estate Parties promptly and unconditionally shall be obligated jointly and severally to and shall repay such amount of the Indemnified Taxes to FMCH or the other members of the FMCH Group, as applicable, with interest from the date of payment at the Hot Interest Rate. To the extent such Indemnified Taxes and interest are not set off against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise pursuant to Section 3.08 below, FMCH or the other members of the FMCH Group, as applicable, shall have an allowed claim to the extent of such payment, including interest thereon at the Hot Interest Rate, against the estates of the Debtors. On and after the Settlement Effective Date, in addition to any other rights and remedies under this Agreement, each such claim for Indemnified Taxes and interest shall be an Allowed Administrative Claim against the Estate Parties.

     3.08   <u>Right of Setoff</u>. Notwithstanding anything herein to the contrary, FMCH and each member of the FMCH Group shall have a right of setoff or recoupment, including a right of setoff under Section 553 of the Bankruptcy Code, against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise, for the amount of any obligation of any of the Estate Parties under this Agreement, including without limitation indemnification obligations for Indemnified Taxes, that any of the Estate Parties has failed to pay to FMCH or the members of the FMCH Group.

     3.09   <u>Remedies for Breach</u>. In the event of any breach of this Agreement, including any obligation for indemnification, (i) by the Estate Parties or any member of the New Grace Group, then the Estate Parties shall be jointly and severally liable for and shall indemnify, defend

and hold harmless the NMC Defendants from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach, and the NMC Defendants shall have, among other remedies, an allowed Administrative Claim against each of the Estate Parties for any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach; or (ii) by the NMC Defendants or any member of the FMCH Group, then the NMC Defendants shall be jointly and severally liable for and shall indemnify, defend and hold harmless the Estate Parties from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach.

3.10    Preservation of Rights. In the event that a member of the New Grace Group, or their respective successors or assigns, shall fail to perform any obligation to indemnify, defend and hold harmless FMCH or any member of the FMCH Group, as provided in this Agreement, or prior to its termination, the TSIA, nothing herein shall preclude or estop such member of the FMCH Group from asserting any causes of action on the grounds that one or more of the members of the New Grace Group or of the Sealed Air/Grace Group is primarily liable for such obligation under general principles of law determined without reference to this Agreement or the TSIA.

**ARTICLE IV**

**COVENANTS NOT TO SUE AND TOLLING.**

4.01    Claims Against the NMC Defendants. The Asbestos Committees and the Estate Parties shall not commence or prosecute, or cooperate in the commencement or prosecution of, any suit, demand, claim, or cause of action, whether asserted directly or derivatively, against any

First Amended Settlement Agreement
and Release of Claims

of the NMC Defendants for any Grace-Related Claims, including the Asbestos Claimants'
Adversary Proceeding, except (i) as permitted in Section 4.03 below or (ii) to enforce this
Agreement.

4.02    <u>Sealed Air Indemnity Litigation</u>.  In connection with the Sealed Air Settlement
Agreement, the Asbestos Committees shall use their best efforts to obtain from Sealed Air and
Cryovac, an agreement acceptable in form and substance to the NMC Defendants, which
provides for the stay, and if necessary the reinstatement, of the Sealed Air Indemnity Litigation
pending the Settlement Effective Date.  If Sealed Air and Cryovac do not agree to a stay of the
Sealed Air Indemnity Litigation, then notwithstanding any other provision of this Agreement,
prior to the Settlement Effective Date the NMC Defendants shall remain free to pursue all rights
and remedies they may have against Sealed Air and Cryovac, in any court of competent
jurisdiction.

4.03    <u>Reinstatement of Litigation Upon Failure of Conditions Precedent</u>.  The Asbestos
Committees or the Estate Parties may reinstate the Asbestos Claimants Adversary Proceeding on
the active docket if the Court determines by Final Order (the "Litigation Reinstatement Date")
that despite the best efforts of the Estate Parties and the Asbestos Committees one or more
conditions in Section 2.02 above will not be able to be satisfied, and the failure of such
precondition has not been waived by the NMC Defendants.  For purposes of statutes of
limitation, statutes of repose, and any procedural bars to the prosecutions of claims, all claims,
counterclaims, cross-claims, and claims for contribution or indemnity the Settling Parties have
asserted or could have asserted in the Court or any other forum will be deemed to have been
tolled during the time period between the Settlement Execution Date and the Litigation
Reinstatement Date.

-15-

## ARTICLE V

## MISCELLANEOUS PROVISIONS.

5.01    Expenses.  Unless otherwise expressly provided in this Agreement, each Person

shall bear any and all expenses (including legal and accounting) that arise from its respective

obligations under this Agreement.

5.02    Amendment; Agency. This Agreement may not be amended except by an

agreement in writing, signed by the Settling Parties with the approval of the Court.  The Settling

Parties agree that FMCH shall be entitled to receive notices and to act on behalf of each member

of the FMCH Group and each of the NMC Defendants and that Grace-Conn. shall be entitled to

receive notices and to act on behalf of New Grace, the other Estate Parties and the New Grace

Group, and each member of the New Grace Group, in respect of all matters under this

Agreement.

5.03    Settlement Inadmissible for Other Purposes.  The Settling Parties agree that the

terms of this Agreement reflect a good faith settlement of the Grace-Related Claims and of the other

terms and conditions contained herein, reached voluntarily after consultation with experienced legal

counsel.  Neither this Agreement nor the settlements contained herein, nor any act performed,

document executed, or statement made pursuant to or in support of or in furtherance of this

Agreement or the settlements contained herein: (i) is or may be deemed to be or may be used as an

admission of, or evidence of, the validity or amount of any Grace-Related Claim or any other claim,

or of any wrongdoing or liability; or (ii) is or may be deemed to be or may be used as an admission

of, or evidence of, any fault or omission of any Settling Party in any proceeding in any court,

administrative agency, or other tribunal.  Any Settling Party or other Person released by the terms or

implementation of this Agreement may file this Agreement in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, accord and satisfaction, bar order, channelling injunction, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim. The Settling Parties may file this Agreement in any proceeding brought to enforce any of its terms.

5.04    Signed Counterparts. This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the Settling Parties shall exchange among themselves signed counterparts of this Agreement.

5.05    Confidentiality of Information. All agreements made between and among the Settling Parties and orders entered during the course of the Asbestos Claimants Adversary Proceeding relating to the confidentiality of information shall survive this Agreement.

5.06    Agreement Drafted Equally. This Agreement shall not be construed more strictly against one party than another merely because it, or any part of it, may have been prepared by counsel for one of the parties. The Settling Parties acknowledge and agree that the Agreement is the result of arm's-length negotiations between the parties and all parties have contributed substantially and materially to the preparation of this Agreement.

5.07    Notices. All notices and other communications hereunder shall be in writing and shall be delivered by hand including overnight business courier or mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice) and shall be deemed given on the date on which such notice is received:

To Grace-Conn. or any member of the New Grace Group:

> W.R. Grace & Co.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention:    Secretary
> Phone: (410) 531-4212
> Fax:    (410) 531-4783

With a copy to:

> David M. Bernick
> Kirkland & Ellis
> 200 East Randolph Drive
> Chicago, Illinois 60601
> Phone: (312) 861-2000
> Fax (312) 861-2200
> Email: david_bernick@chicago.kirkland.com

To the Official Committee of Asbestos Personal Injury Claimants :

> Peter Van N. Lockwood
> Caplin & Drysdale, Chartered
> 1 Thomas Circle N.W.
> Washington, D.C. 20005
> Phone: (202) 862-5000
> Fax (202) 429-3301
> Email: pvnl@capdale.com

To the Official Committee of Asbestos Property Damage Claimants:

> Scott L. Baena
> Bilzin Sumberg Baena Price & Axelrod LLP
> 200 South Biscayne Blvd., Suite 2500
> Miami, Florida 33131
> Phone: (305) 374-7580
> Fax: (305) 374-7593
> Email: sbaena@bilzin.com

First Amended Settlement Agreement
and Release of Claims

To FMCH or any member of the FMCH Group:

> c/o Fresenius Medical Care North America
> Corporate Headquarters
> General Counsel
> Corporate Law Department
> 95 Hayden Avenue
> Lexington, MA 02420-9192
> Phone: (781) 402-9000
> Fax: (781) 402-9713

With a copy to:

> David S. Rosenbloom
> McDermott, Will & Emery
> 227 W. Monroe, Suite 4400
> Chicago, Illinois 60606
> Phone: (312) 372-2000
> Fax: (312) 984-7700
> Email: drosenbloom@mwe.com

    5.08   <u>Resolution of Disputes</u>.  Any claim or dispute arising out of or relating in any way to this Agreement must be brought before the Court, which shall retain jurisdiction of this matter and the Settling Parties for the purposes of enforcing and implementing the terms and conditions of this Agreement and resolving disputes as to the rights and obligations of the Settling Parties hereunder, provided however that section 524(g)(2) shall govern jurisdiction over any proceeding that involves any injunction entered in accordance with section 524(g) of the Bankruptcy Code. The Settling Parties submit to the jurisdiction of the Court for these purposes.

    5.09   <u>Titles and Headings</u>.  Titles and headings to sections herein are inserted for the convenience of reference only and are not intended to be a part or to affect the meaning or interpretation of this Agreement.

    5.10   <u>Legal Enforceability</u>.  Without prejudice to any rights or remedies otherwise available to any party hereto, each party hereto acknowledges that damages would be an

-19-

inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations of the Settling Parties hereunder shall be specifically enforceable.

    5.11    _Governing Law._ This Agreement shall be governed by the laws of the State of Delaware (without giving effect to its provisions on conflict of laws), and without affecting any determination as to the law applicable to the Asbestos Claimants' Adversary Proceeding.

    5.12    _Successors and Assigns._ This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Settling Parties, including without limitation the other Estate Parties; provided that (i) neither this Agreement nor any substantial right or obligation hereunder may be assigned by FMCH, on the one hand, and New Grace or Grace-Conn., on the other, without the consent of the other Settling Parties, which consent shall not be unreasonably withheld, and (ii) none of the Estate Parties shall transfer or agree to transfer a substantial part of their respective assets (in one or a series of transactions, whether or not related) to any Person or Persons, without a prior determination of the Court by Final Order that at the time of each such transaction New Grace and Grace-Conn., or any such successors who agree to be jointly and severally liable for the obligations of New Grace and Grace-Conn., will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including without limitation, all Indemnified Taxes and all obligations under this Agreement; provided, however, that this clause (ii) shall not apply at any time when the following two conditions in subclauses (x) and (y) are both satisfied: (x) (I) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the NMC Defendants (including assessment and collection pursuant to Section 6901 of the Code) is barred by such statutes of limitations and (II) all Indemnified Taxes have been paid in accordance with Section 3.02 of this Settlement Agreement

and the NMC Defendants have received from the Estate Parties (or adequate provision satisfactory to the NMC Defendants has been made for the payment of) all indemnification and other payments claimed by the NMC Defendants against the Estate Parties in respect of Indemnified Taxes and related matters in accordance with Sections 3.03, 3.05, and 3.07 of this Settlement Agreement; and (y) the injunctions required by Sections 2.02(D) and (E) of this Settlement Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (I) alleging a Grace-Related Claim and seeking to impose liability on one or more of the NMC Defendants notwithstanding the existence and continuing operative effect of such injunctions or (II) challenging in any manner the continuance or operative effect of such injunctions in respect of the NMC Defendants.

First Amended Settlement Agreement
and Release of Claims

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS

By: _____
Name

_____
Title

3/19/03
Date

THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE
CLAIMANTS

By: _____
Name

_____
Title

_____
Date

-22-

First Amended Settlement Agreement
and Release of Claims

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS

By: _____
    Name

_____
Title

_____
Date

THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE
CLAIMANTS

By: _____
    Name

Counsel
Title

4-11-03
Date

-22-

FRESENIUS MEDICAL CARE HOLDINGS, INC.

By: _~lll _7_Kuuc_´ _____
    Name

_Senior Vice President_ _____
    Title

_4/14/03_ _____
    Date

NATIONAL MEDICAL CARE, INC.

By: _~lll _7_Kuuc_´ _____
    Name

_Senior Vice President_ _____
    Title

_4/14/03_ _____
    Date

First Amended Settlement Agreement
and Release of Claims

-23-

W.R. GRACE & CO.

By: _Robert M. Tarola_____

Name   Robert M. Tarola
Senior Vice President and
Chief Financial Officer
Title

April 14, 2003
Date

W.R. GRACE & CO.—CONN.

By: _Robert M. Tarola_____

Name   Robert M. Tarola
Senior Vice President and
Chief Financial Officer
Title

April 14, 2003
Date

-24-

First Amended Settlement Agreement
and Release of Claims

(as to each other Debtor)

By: _Robert M. Tarola_

Name  Robert M. Tarola
Vice President or
Authorized Representative
Title

April 14, 2003
Date

CH099 4061081-1.052942.0033

**APPENDIX A**
**TO SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS**

**DEFINITIONS**

As used in the Settlement Agreement and Release of Claims, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

1.01    "Administrative Claim" shall mean a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors' chapter 11 bankruptcy estates for costs and expenses of administration under Sections 503(a) or 507(a)(1) of the Bankruptcy Code.

1.02    "Asbestos Claimants Adversary Proceeding" shall mean the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.*, Adversary Proceeding No. 02-2211, which the Court consolidated with Adversary Proceeding No. 02-2210, by Order dated March 28, 2002.

1.03    "Asbestos-Related Claim" shall mean any claim, (including but not limited to personal injury, wrongful death, property damage or medical monitoring) whether sounding in tort, contract, warranty, statute, or any other theory of law or equity, based on or arising by reason of direct or indirect damages allegedly caused by consumption, use, storage, manufacturing, assembly, distribution, installation, exposure to, or the presence of asbestos or asbestos containing products or by-products, or products which contain asbestos in any form, consumed, used, stored, manufactured, assembled, distributed, disposed of, or installed by or on behalf of any Grace-Conn. Business.

A-1

First Amended Settlement Agreement
and Release of Claims

1.04    "Asbestos Trust" shall have the meaning ascribed to such term in Section 2.02(C).

1.05    "Bankruptcy Code" shall mean title 11 of the United States Code, as amended.

1.06    "Code" shall mean the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of any subsequently enacted federal income tax laws.

1.07    "Common Parent" shall mean the common parent, as defined in Treasury Regulation Section 1.1502-77, of those corporations that joined, or hereafter join, in filing a Consolidated Tax Return under Section 1501 of the Code, and the Treasury Regulations thereunder, or a Consolidated Tax Return under comparable provisions of Tax law of other jurisdictions (domestic or foreign).

1.08    "Consolidated Tax Return" shall mean (i) a federal consolidated income Tax Return, within the meaning of Section 1501 of the Code and the Treasury Regulations under Section 1502 of the Code, and (ii) any combined, joint, consolidated or other Tax Return respecting Taxes under the laws of any jurisdiction (domestic or foreign).

1.09    "Court" shall mean the court in which the Asbestos Claimants' Adversary Proceeding is pending, or if no longer pending, the United States Bankruptcy Court for the District of Delaware.

1.10    "Cryovac" shall mean Cryovac, Inc. (f/k/a Grace Communications, Inc.) (taxpayer identification number 13-2830262).

1.11    "Debtor" shall mean each of W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc.,

Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I,

Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management

Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities

Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace

Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace

Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel

Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings,

Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated,

Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace

Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-

Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc.,

Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC

Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises,

Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings

Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc.

(f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability

Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &

Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a

Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

    1.12    "Estate Parties" shall mean each of the Debtors, the estate of each Debtor, the

post-confirmation estate of each Debtor, each of the reorganized Debtors, and any trustee that

may be appointed in any of the Debtors' cases under the Bankruptcy Code.

First Amended Settlement Agreement
and Release of Claims

1.13    "Final Determination" shall mean any assessment or resolution of liability for any

Tax for a Tax Period, (i) by Form 870 or 870-AD or by Form 5701 (or any successor forms

thereto), on the date of acceptance or agreement by or on behalf of the taxpayer, or by

comparable forms respecting Taxes under the laws of other jurisdictions (domestic or foreign);

(ii) by a decision, judgment, decree, or other order by a court of competent jurisdiction, which

has become final and unappealable; (iii) by a closing agreement or accepted offer in compromise

under Section 7121 or 7122 of the Code, or comparable agreements respecting Taxes under the

laws of other jurisdictions (domestic or foreign); (iv) by any allowance of a refund or credit in

respect of an overpayment of Tax, but only after the expiration of all periods during which such

refund may be recovered (including by way of offset) by the Tax imposing jurisdiction (domestic

or foreign); or (v) by any other final disposition, including by reason of Section 6213(b)(3) of the

Code on account of an excessive tentative carryback allowance under Section 6411 of the Code

or comparable provisions of other jurisdictions (domestic or foreign), the expiration of the

applicable statute of limitations, or by mutual agreement of the parties.

1.14    "Final Order" shall mean an order or judgment of the Court , or other court of

competent jurisdiction with respect to the subject matter, which has not been reversed, stayed,

modified or amended, and as to which the time to appeal or seek certiorari has expired and no

appeal or petition for certiorari has been timely taken, or as to which any appeal that has been

taken or any petition for certiorari that has been or may be filed has been resolved by the highest

court to which the order or judgment was appealed or from which certiorari was sought.

1.15    "FMCH Group" shall mean that group of corporations, immediately after

December 31, 1996, that were members of the affiliated group of corporations of which FMCH

(taxpayer identification number 13-3461988) was and on the date hereof continues to be the Common Parent.

1.16    "Form 1139" shall mean a Corporate Application for Tentative Refund on Internal Revenue Service Form 1139, or any successors to such form, or comparable forms for Taxes of any other jurisdiction (domestic or foreign).

1.17    "Grace-Conn." shall mean W.R. Grace & Co.—Conn. (taxpayer identification number 13-5114230).

1.18    "Grace-Conn. Business" shall mean all of the businesses and operations of Grace-Conn. and its parents or subsidiaries at any time, other than the NMC Business.

1.19    "Grace New York" shall mean W.R. Grace & Co., a New York corporation, now known as FMCH, (taxpayer identification number 13-3461988).

1.20    "Grace New York Group" shall mean that group of corporations, including Grace-Conn., Cryovac, and Sealed Air, that were members through September 29, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of Section 1504 of the Code, and the Treasury Regulations thereunder, of which Grace New York was the Common Parent, including, with respect to Taxes of other jurisdictions (domestic or foreign), that group of corporations which included Grace New York or one or more of the members of the Grace New York Group with respect to a Consolidated Tax Return.

1.21    "Grace-Related Claim" shall mean, collectively, all claims (including unknown claims), demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, direct or indirect, whether concealed or hidden, from the beginning of time up to and including the Settlement Effective Date, asserted or that might have been asserted (including without limitation claims for fraudulent conveyance, successor liability, piercing of

corporate veil, negligence, gross negligence, professional negligence, breach of duty of care, breach of duty of loyalty, breach of duty of candor, fraud, breach of fiduciary duty, mismanagement, corporate waste, breach of contract, negligent misrepresentation, contribution, indemnification, any other common law or equitable claims, and violations of any state or federal statutes, rules or regulations), which are either Asbestos-Related Claims or that are based upon or arise out of the NMC Transaction, or the conduct or operations of any Grace-Conn. Business, including without limitation, any liability or obligation of a Grace-Conn. Business under environmental law, but not including any claims based on or arising out of the conduct or operations of the NMC Business or any act or omission of the NMC Defendants in connection with the operation of the NMC Business.

    1.22   "Hot Interest Rate" shall mean the rate of interest charged from time to time on Taxes under Section 6621(c)(1) of the Code.

    1.23   "Indemnified Taxes" shall mean all Taxes for or attributable to Tax Periods ending on or before December 31, 1996, other than NMC Indemnified Taxes.

    1.24   "Litigation Reinstatement Date" shall have the meaning ascribed to such term in Section 4.03.

    1.25   "Moving Parties" shall mean each of FMCH, NMC, the PI Committee, and the PD Committee.

    1.26   "New Grace" shall mean W.R. Grace & Co., f/k/a Grace Specialty Chemicals, Inc. (taxpayer identification number 65-0773649).

    1.27   "New Grace Group" shall mean that group of corporations, including Grace-Conn., that were, or hereafter become, members of that affiliated group of corporations under Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join,

First Amended Settlement Agreement
and Release of Claims

in filing a Consolidated Tax Return of which New Grace, or any successor to New Grace, including any reorganized Debtor successor to New Grace, was or is the Common Parent.

1.28    "NMC Business" shall mean all of the worldwide healthcare business and operations conducted by NMC and the NMC Subsidiaries at any time, whether prior to or after September 29, 1996.

1.29    "NMC Defendants" shall mean FMCH, NMC, and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including but not limited to Fresenius Medical Care AG and Fresenius AG, but not including the Estate Parties, Sealed Air and Cryovac.

1.30    "NMC Group" shall mean NMC and the NMC Subsidiaries, whether members of the Grace New York Group or members of the FMCH Group.

1.31    "NMC Indemnified Taxes" shall mean all Taxes of or attributable to any Tax Period arising from Tax Items relating to the NMC Business conducted by a member of the FMCH Group (net of benefits from Tax Items relating to the NMC Business from one or more Tax Periods not previously paid to, or applied for the benefit of, any member of the FMCH Group) which have not previously been paid to (i) one of the Estate Parties, (ii) Grace New York prior to the NMC Transaction or (iii) the applicable tax authority, by any member of the FMCH Group.

1.32    "NMC Subsidiaries" shall mean all direct and indirect subsidiaries of NMC through which Grace New York or FMCH conducts or conducted the NMC Business.

1.33    "NMC Transaction" shall mean the series of transactions that became effective on September 27 - 30, 1996, whereby, *inter alia,* (i) NMC distributed approximately $2.3 billion in

First Amended Settlement Agreement
and Release of Claims

cash and assumed debt to Grace-Conn; (ii) Grace-Conn. distributed 100% of the common shares of NMC stock to Grace-New York; (iii) Grace New York contributed 100% of the common shares of Grace-Conn. stock to Sealed Air; (iv) Grace New York distributed 100% of the common shares of Sealed Air stock to its shareholders; and (v) Grace New York merged with a subsidiary of Fresenius Medical Care AG, all of which are more fully described in that certain Distribution Agreement dated as of February 4, 1996, among Grace New York, Grace-Conn. and Fresenius AG, and that certain Contribution Agreement dated as of February 4, 1996, among Fresenius AG, Sterilpharma GmbH, and Grace-Conn.

1.34    "Person" shall mean a natural person, individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, association, joint venture, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, executors, administrators, predecessors, successors, representatives, or assigns.

1.35    "Plan Effective Date" shall mean the date specified as such in the Plan of Reorganization.

1.36    "Plan of Reorganization" shall mean the plan of reorganization of the Debtors under the Bankruptcy Code approved by a Final Order of confirmation of the Court.

1.37    "Power of Attorney" shall mean any agency under a power of attorney or other authorization which authorizes a Person to act on behalf of another Person with respect to Taxes, including Form 2848.

1.38    "Sealed Air" shall mean Sealed Air Corporation, f/k/a Grace Holding, Inc. (taxpayer identification number 65-0654331).

First Amended Settlement Agreement
and Release of Claims

1.39    "Sealed Air/Grace Group" shall mean the group of corporations, including but not limited to Cryovac, Inc., that were from on or about September 29, 1996, or hereafter become, members of the affiliated group of corporations under Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join, in filing a Consolidated Tax Return of which Sealed Air Corporation, or any successor to Sealed Air, was or is the Common Parent.

1.40    "Sealed Air Indemnity Litigation" shall mean the litigation captioned *Sealed Air Corporation vs. Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc.; National Medical Care, Inc.; and Fresenius USA, Inc.,* (No. 600300/02 N.Y. Sup. Ct.).

1.41    "Sealed Air Settlement Agreement" shall mean the definitive agreement implementing the settlement of the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Sealed Air Corporation. and Cryovac, Inc.,* Adversary Proceeding No. 02-2210, which settlement is reflected in the Acknowledgement of principal terms filed with the Court on November 27, 2002.

1.42    "Settlement Approval Date" shall mean the date the Court enters the orders described in Section 2.01.

1.43    "Settlement Effective Date" shall mean the later of: (i) the Plan Effective Date, or (ii) the satisfaction of all preconditions to payment described in Section 2.02, to the extent each such precondition has not been waived by the NMC Defendants.

1.44    "Settlement Execution Date" shall mean February 6, 2003.

First Amended Settlement Agreement
and Release of Claims

1.45    "Settling Parties" shall mean (i) each of FMCH, NMC, the PI Committee, and the PD Committee, and (ii) either upon the satisfaction of the precondition in Section 2.02(I) or upon the execution of this Agreement by New Grace and Grace-Conn, New Grace and Grace-Conn., and (iii) the respective members of the affiliated groups of each of the other Settling Parties.

1.46    "Settlement Payment" shall mean the payment by the NMC Defendants provided for in Section 2.03, as reduced by the items of setoff or recoupment, if any, referred to in Section 3.08.

1.47    "Taxes" shall mean all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federation or other body, and without limiting the generality of the foregoing, shall include income (including alternative minimum), sales, use, *ad valorem*, gross receipts, license, value added, franchise, transfer, recording, withholding, payroll, employment, excise, occupation, unemployment insurance, social security, business license, business organization, stamp, environmental, premium and property taxes, together with any related interest, penalties and additions to any such tax, or additional amounts imposed by any taxing authority (domestic or foreign) upon the FMCH Group, the New Grace Group, the Grace New York Group, the Sealed Air Group or any of their respective members or divisions or branches.

1.48    "Tax Item" shall mean any item of income, gain, loss, deduction, credit, provisions for reserves, recapture of credit, net operating loss, net capital loss, tax credit, sales, revenues, property or asset values, capital or any other item which increases or decreases Taxes paid or payable, including an adjustment under Code Section 481 (or comparable provisions of the Tax law of any other jurisdiction (domestic or foreign)) resulting from a change in accounting method, the allowance or disallowance in whole or in part of, or assessment with

First Amended Settlement Agreement
and Release of Claims

respect to, a tentative allowance of refund claimed on Form 1139, the allowance or disallowance in whole or in part of a net operating loss, net capital loss or tax credit claimed on a Tax Return, an amended Tax Return or claim for refund, or an adjustment attributable to a quick refund of overpayment of estimated tax.

1.49    "Tax Period" shall mean any period for, or with respect to, which a Tax Return is or has been filed, is required to be filed or may be filed.

1.50    "Tax Refund" shall mean an overpayment of, refund of, or credit against, Taxes, including a tentative allowance of refund claimed on Form 1139.

1.51    "Tax Return" shall mean any return, filing, questionnaire, information return or other document required or permitted to be filed, including requests for extensions of time, filings made with estimated tax payments, claims for refund, Forms 1139 and amended returns, that has been, or hereafter may, be filed for any Tax Period with any tax authority (whether domestic or foreign) in connection with any Tax (whether or not a payment is required to be made, or an overpayment, refund, or credit may be allowed, with respect to such filing).

1.52    "TSIA" shall mean that certain Tax Sharing and Indemnification Agreement made as of September 27, 1996, by and among Grace New York, Grace-Conn., and Fresenius AG, an Aktiengesellshaft organized under the laws of the Federal Republic of Germany and an indirect parent of FMCH.

First Amended Settlement Agreement
and Release of Claims

# **EXHIBIT D**

## I.  STATEMENT OF FACTS

### A.  The Company

#### 1.  Taxpayer Information

Grace-Conn. is a Connecticut corporation that was incorporated on November 18, 1899.[1] Grace-Conn. is a direct, wholly owned subsidiary of the common parent of an affiliated group of corporations that files a consolidated return, uses the accrual method of accounting, and has a tax year-end of December 31. Further information about the consolidated group and its history is provided below.

#### 2.  Description of Business Operations

Grace-Conn., through its subsidiaries, is principally involved in the manufacture and sale of specialty chemicals and materials through two business segments (referred to herein as the "Davison Chemicals Business" and the "Performance Chemicals Business"). Grace-Conn. has been engaged in both the Davison Chemicals Business and the Performance Chemicals Business for at least 50 years. With the exception of the stock of two relatively small subsidiaries of the parent of the group, Grace-Conn. (a first-tier subsidiary) owns all of the assets, properties, and rights of the group, either directly or through its direct and indirect subsidiaries.

From its incorporation in 1899, Grace-Conn.'s business grew through internal expansion and external acquisitions to encompass a wide variety of industries. By 1988, Grace-Conn.'s businesses included a business based on a trademarked pioneering food packaging product known as Cryovac®, oil & gas exploration and drilling, cocoa products, book wholesaling, distribution services, textiles, animal genetics, and health care.

### B.  History of Corporate Structure

As described above, Grace-Conn. was formed on November 18, 1899. Until May 25, 1988, Grace-Conn. was the common parent of an affiliated group of corporations (the "Historic Grace-Conn. Group"), and the primary operating company of the group. From 1953 through May 25, 1988, the stock of Grace-Conn. was widely held and publicly traded. The Historic Grace-Conn. Group has filed a consolidated federal income tax return for more than 50 years.

#### 1.  1988 Holding Company Transaction

In 1988, Grace-Conn.'s board of directors and management decided to adopt a holding company structure with a newly formed New York corporation serving as the holding company for the group. Grace-Conn.'s board of directors and management believed that a holding company structure would provide greater flexibility in financing, aid expansion of existing businesses, and facilitate investment in new lines of business. In addition, the directors believed

---

[1] Prior to 1988, Grace-Conn.'s legal name was W. R. Grace & Co. For purposes of this protest, we have referred to Grace-Conn. as "Grace-Conn." both before and after its name change.

that having a New York corporation as the holding company would be beneficial to the group because they believed that New York corporate law was more flexible and predictable than Connecticut corporate law.

To achieve the holding company structure, Grace-Conn. engaged in the following transaction steps (the "1988 Holding Company Transaction"): (i) Grace-Conn. formed W. R. Grace & Co., a New York corporation ("Grace-NY") as a wholly owned subsidiary; (ii) Grace-NY formed a wholly owed subsidiary ("MergerCo"); and (iii) Grace-NY caused MergerCo to merge with and into Grace-Conn., with Grace-Conn. surviving. The merger was effective May 25, 1988, and qualified as a tax-free reorganization under section 368(a)(2)(E).[2] In the merger, each share of Grace-Conn. was automatically converted into a share of Grace-NY and Grace-Conn. became a first-tier subsidiary of Grace-NY.

The Historic Grace-Conn. Group did not terminate as a result of the 1988 Holding Company Transaction because the transaction qualified as a "Group Continuation Transaction." Under the general rule of Treas. Reg. § 1.1502-75(d)(1), a consolidated group terminates if its common parent does not remain as the common parent of the group. However, as discussed below, the regulations and administrative pronouncements issued by the Internal Revenue Service (the "Service") provide that a consolidated group does not terminate even if the group's common parent (i) ceases to exist in a transaction described in Treas. Reg. § 1.1502-75(d)(2) or (ii) becomes a subsidiary of an existing or new member of the group in a transaction described in Rev. Rul. 82-152.[3] These two types of transactions are referred to as "Group Continuation Transactions." As discussed in greater detail below, the 1988 Holding Company Transaction was a Group Continuation Transaction because it was identical to the transaction described in Rev. Rul. 82-152.

## 2. The Disposition of Grace-Conn. From the Historic Grace-Conn. Group

In 1996, as a result of a spin-off transaction qualifying as tax-free under section 355, Grace-Conn. ceased to be a member of the Historic Grace-Conn. Group and became a member of a different consolidated group.[4] From 1996 through March 31, 1998, Grace-Conn. was a subsidiary of a holding company ("Grace-Delaware #1") and a member of the consolidated group of which Grace Delaware #1 was the common parent (the "Grace-Delaware #1 Group"). Grace-NY continued to be the common parent of the Historic Grace-Conn. Group.

Effective March 31, 1998, as a result of a spin-off transaction qualifying as tax-free under section 355, Grace-Conn. ceased to be a member of the Grace-Delaware #1 Group and became a

---

[2] Unless otherwise specified, all section references are to the Internal Revenue Code of 1986 (the "Code") or the regulations promulgated thereunder ("Treas. Reg. §"), both as amended through 1989, the tax year for which the Taxpayer is claiming the refund at issue.

[3] 1982-2 C.B. 205.

[4] The 1996 transaction is not addressed in greater detail in this protest. It is relevant to the proposed adjustment only because, at that point in time, Grace-Conn. left the Historic Grace-Conn. Group.

member of a different consolidated group.[5]  From April 1, 1998 through the date of this protest, Grace-Conn. has been a subsidiary of a holding company ("Grace-Delaware #2") and a member of the consolidated group of which Grace-Delaware #2 is the common parent (the "Grace-Delaware #2 Group").

## C.    Protested Adjustment

As described above, Grace-Conn. was a member of the Grace-Delaware #1 Group for a portion of the Grace-Delaware #1 Group's 1998 tax year (January 1 through March 31).  For its 1998 tax year, the Grace-Delaware #1 Group reported a consolidated net operating loss ("NOL") of approximately $190 million and consolidated specified liability losses of approximately $131.4 million.  Grace-Conn. was allocated approximately $131.4 million of the Grace-Delaware #1 Group's 1998 specified liability losses, which could be carried back ten years pursuant to section 172(f).[6]  Grace-Conn. filed a Form 1139 to carry these losses back ten years to the taxable year of the Historic Grace-Conn. Group ending December 31, 1989 (the "Grace-Conn. Carryback"), in order to obtain a refund of taxes paid for that year (the "Refund").  Grace-Conn. requested the Refund based on the position that the Grace-Conn. Carryback was not limited by the "separate return limitation year" ("SRLY") rules in Treas. Reg. § 1.1502-21(c) to the extent that the loss was carried back to the 1989 tax year of the Historic Grace-Conn. Group.  In May 2000, the Service granted the Refund and wired approximately $28.8 million to Grace-NY. Grace-NY then issued a check to Grace-Conn. in the same amount pursuant to pre-existing agreements between the companies.

On November 8, 2005, the Service issued a Notice of Proposed Adjustment (the "NOPA") with respect to the Grace-Conn. Carryback and the Refund.  The NOPA disallowed the Refund based on the position that the Grace-Conn. Carryback was subject to the SRLY limitations, and that such limitations prevented the use of the 1998 NOLs allocated to Grace-Conn. by the Historic Grace-Conn. Group in Grace-Conn.'s 1989 tax year.  On March 31, 2006, the Service issued a 30-day letter (the "30-Day Letter").[7]

---

[5] Since the 1998 transaction is not relevant to the issue addressed in this protest, it is not addressed in greater detail herein.

[6] The Grace-Delaware #1 Group had both a consolidated NOL and a consolidated specified liability loss that were allocable, in part, to Grace-Conn.  For purposes of this protest, the specified liability losses allocated to Grace-Conn. are referred to as "NOLs."

[7] The 30-Day Letter does not contain the following: (i) a summary of the facts underlying the proposed adjustment, (ii) the revenue agent's legal position for the proposed adjustment, (iii) the Taxpayer's position, or (iv) arguments supporting the revenue agent's legal position. *But see* IRM § 4.10.8.10.6; IRM § 4.10.8.10.2; Treas. Reg. § 601.105(d).  Instead, the 30-Day Letter contains only a series of computer-generated calculations, without incorporating by reference the NOPA or its discussion of the relevant legal issues.  To clarify matters, the Taxpayer sent a letter to the revenue agent asking for confirmation that the 30-Day Letter was based on or incorporated the legal positions set forth in the NOPA.  The Taxpayer has not received any written confirmation of that fact. Nonetheless, in light of the fact that the 30-Day Letter does not contain any reference to applicable law or the revenue agent's position in support of the proposed adjustment, the Taxpayer is assuming that the discussion set forth in the NOPA represents the legal position underlying the 30-Day Letter.  Accordingly, the Taxpayer is responding in this protest to the discussion contained in the NOPA.

## II.    NOPA's POSITION

The specific issue addressed in the NOPA is whether Grace-Conn.'s 1998 NOL carryback to the Historic Grace-Conn. Group's 1989 tax year is subject to the SRLY limitation and therefore permitted only to the extent of Grace-Conn.'s separate company income. The proposed adjustment denying the Grace-Conn. Carryback and the Refund is based on the conclusion that the exception to the SRLY limitation provided in Treas. Reg. § 1.1502-1(f)(2)(i) does not apply to the Grace-Conn. Carryback. Treas. Reg. § 1.1502-1(f)(2)(i) provides in part: "The term *separate return limitation* year (or SRLY) does not include:  A separate return year of the corporation which is the common parent for the consolidated return year to which the tax attribute is to be carried (except as provided in § 1.1502-75(d)(2)(ii) …)."  (Italics in original). This rule is referred to as the "Lonely Parent Rule." The Lonely Parent Rule excepts from the SRLY limitation losses incurred by the corporation identified as the "Lonely Parent." The NOPA concludes that the Lonely Parent Rule does not apply to the Grace-Conn. Carryback. As a result, the NOPA concludes that the Grace-Conn. Carryback is subject to, and ultimately precluded by, the SRLY limitation.

The NOPA argues that, notwithstanding that Grace-Conn.'s 1988 Holding Company Transaction was a Group Continuation Transaction that is described in Rev. Rul. 82-152, neither the regulations nor the revenue ruling provides for the application of the Lonely Parent Rule to such transactions. The NOPA also argues that the Lonely Parent Rule does not apply to loss carrybacks following any Group Continuation Transaction. In connection with these arguments, the NOPA asserts that Grace-Conn. may not be treated as the corporation to which the Lonely Parent Rule applies because (i) Grace-Conn. was not the common parent of the Historic Grace-Conn. Group in 1989 (the tax year at issue) and (ii) there can only be one common parent of a consolidated group at a given time.

## III.    SUMMARY OF TAXPAYER'S POSITION

The Grace-Conn. Carryback is not subject to the SRLY limitation because (i) Grace-Conn. is the Lonely Parent for purposes of applying the Lonely Parent Rule to the Historic Grace-Conn. Group's 1989 tax year and (ii) the Lonely Parent Rule applies to loss carrybacks as well as loss carryforwards.

The NOPA's  suggestion that Grace-Conn. is not the Lonely Parent because the regulations do not apply the Lonely Parent Rule after a Group Continuation Transaction described in Rev. Rul. 82-152 (an "82-152 Transaction") is incorrect. The regulations specifically provide for the application of the Lonely Parent Rule following a Group Continuation Transaction described in Treas. Reg. § 1.1502-75(d)(2)(ii) (a "-75(d)(2) Transaction"), and the Service concluded in Rev. Rul. 82-152 that an 82-152 Transaction is "indistinguishable in substance" from a -75(d)(2) Transaction.

In addition, the NOPA incorrectly posits that the Lonely Parent Rule does not apply to loss carrybacks following a Group Continuation Transaction described in Rev. Rul. 82-152. The Lonely Parent Rule applies equally to loss carryforwards and loss carrybacks. The regulatory language (as well as the policies underlying those regulations) makes no distinction between loss

- -                                                                                                          4

carryforwards and loss carrybacks and supports the application of the Lonely Parent Rule to the Grace-Conn. Carryback.

The NOPA also reflects a concern that the Taxpayer's position would result in two common parents of the Historic Grace-Conn. Group in 1989, and suggests that this proves that the Taxpayer's position is incorrect. The premise of the NOPA's argument, however, is simply wrong -- the Taxpayer's position does not result in two common parents. Moreover, the Taxpayer's position results in a single Lonely Parent following an 82-152 Transaction for both loss carryforwards and loss carrybacks.

As noted above and discussed in detail below, -75(d)(2) Transactions and 82-152 Transactions are indistinguishable in substance. Accordingly, the rules applicable to -75(d)(2) Transactions -- including the special rules relating to the Lonely Parent Rule -- apply similarly to 82-152 Transactions. If there is any ambiguity as to the application of the Lonely Parent Rule to 82-152 Transactions, such ambiguity is of the Service's making and must be held against the Service. As a result, the proposed adjustment is incorrect.

Section X of this protest summarizes the Taxpayer's arguments. Section XI describes the applicable law. Section XII applies the law to the Taxpayer's facts, and explains why the Taxpayer's position is correct.

## IV.    SUMMARY OF TAXPAYER'S ARGUMENT

### A.    Background

If a consolidated group terminates, subsequent losses of a former group member can be carried back to the old consolidated group for tax years in which the former member was a member of the group. Similarly, if a member leaves a consolidated group and either files a separate return or files as a member of a different consolidated group, subsequent losses of the former member can be carried back to the old consolidated group for years in which the former member was a member. However, in each case, such loss carrybacks are limited by the so-called SRLY regulations, unless an exception applies.[8] The Lonely Parent Rule is an exception to the SRLY limitation. If a former member qualifies as the corporation described in the Lonely Parent Rule (the "Lonely Parent"), the SRLY limitation does not apply to that corporation's losses.

Treas. Reg. § 1.1502-75(d)(2)(ii) provides that a consolidated group does not terminate when the parent corporation ceases to exist if the members of the affiliated group succeed to and become the owners of substantially all of the assets of the former parent and certain other requirements are met. Treas. Reg. § 1.1502-75(d)(2)(ii) further provides that, following such a transaction, "the former parent, and not the new common parent, shall be considered to be the corporation described in [the Lonely Parent Rule]." Thus, after a -75(d)(2) Transaction, the

---

[8] For the year at issue (1989), the SRLY regulations limit the carryback of a former member's losses to the portion of the old consolidated group's income that was attributable to the former member for the year to which the losses are carried. As noted below, the SRLY regulations were modified in the late 1990s; however, those modifications do not apply to losses carried back to 1989. *See infra* note 20.

former common parent continues to be treated as the Lonely Parent -- even though the former parent is no longer the actual group parent and, in fact, does not even exist.

The regulations specifically applying the Lonely Parent Rule following a -75(d)(2) Transaction reflect sound policy for two related reasons. First, those regulations prevent losses of the former common parent from becoming subject to the SRLY limitation merely because of a Group Continuation Transaction described in Treas. Reg. § 1.1502-75(d)(2). Second, those regulations prevent a consolidated group from undertaking a -75(d)(2) Transaction in order to change the corporation whose NOL carryforwards can be used by the group free from the SRLY restrictions by reason of the Lonely Parent Rule. In fact, but for those regulations, a group could engage in a series of -75(d)(2) Transactions over time in order to allow multiple corporations to be treated as the Lonely Parent over a period of years.

Rev. Rul. 82-152 concludes that a consolidated group similarly does not terminate when the common parent becomes a subsidiary of an existing or newly formed member of the group. In Rev. Rul. 82-152, P owned the stock of S, which owned the stock of T. P, S and T were a consolidated group, with P as the common parent. T merged into P, with P surviving and the P shareholders exchanging their P stock for S stock. Thus, the P shareholders ended up owning the stock of S, which owned the stock of P. P thus became a subsidiary of S. Because P continued to exist as a subsidiary of S, a literal application of the group termination rules would have terminated the P group, because P ceased to be the common parent but continued to exist (whereas in a -75(d)(2) Transaction P merged into a subsidiary member and thus ceased to exist). The Service, however, refused to apply the group termination rules (and hence the SRLY regulations) literally; instead, applying substance-over-form principles, the Service held that the transaction at issue (an 82-152 Transaction) did not cause the termination of a consolidated group. The Service reasoned that 82-152 Transactions were "indistinguishable in substance" from the transaction described in Treas. Reg. § 1.1502-75(d)(2)(ii) (a -75(d)(2) Transaction), which the regulations specifically provide is a Group Continuation Transaction. Accordingly, the Service concluded that 82-152 Transactions similarly should be treated as a Group Continuation Transaction.

## B.    Application of the Lonely Parent Rule in the Context of 82-152 Transactions

The NOPA is incorrect in arguing that the Lonely Parent Rule does not apply in the context of transactions described in Rev. Rul. 82-152. The regulations specifically provide for the application of the Lonely Parent Rule where the common parent ceases to be the common parent in a -75(d)(2) Transaction. Not surprisingly, the regulations do not similarly provide for the application of the Lonely Parent Rule where the common parent ceases to be the common parent in an 82-152 Transaction, because, as discussed in detail below, such transactions are themselves not discussed in the regulations. Presumably, the failure of the regulations to address 82-152 Transactions when the regulations were originally issued (1966) reflects the fact that such transactions involve a reverse triangular merger qualifying as a reorganization pursuant to section 368(a)(2)(E) and section 368(a)(2)(E) had not been added to the Code at that time.

However, the Service has already concluded in Rev. Rul. 82-152 that 82-152 Transactions are "indistinguishable in substance" from -75(d)(2) Transactions, and that as a result such transactions must be treated similarly. Accordingly, the Lonely Parent Rule must

also apply in the context of 82-152 Transactions. Put differently, the conclusion in Rev. Rul. 82-152 that the group continues following an 82-152 Transaction "because it is indistinguishable in substance from a -75(d)(2) Transaction" has as its corollary that the effects of a -75(d)(2) Transaction -- including the application of the Lonely Parent Rule -- also must apply to an 82-152 Transaction.[9]

Moreover, the same policy concerns that arise in connection with -75(d)(2) Transactions arise in connection with 82-152 Transactions. As described more fully below, unless the former common parent continues to be the Lonely Parent after an 82-152 Transaction, such a transaction would cause losses of the former common parent to become subject to the SRLY limitation even though an 82-152 Transaction, like a -75(d)(2) Transaction, has no real effect on the group. Perhaps more important, unless the former common parent continues to be the Lonely Parent after an 82-152 Transaction, a group could engage in a series of 82-152 Transactions over time in order to allow multiple corporations to be treated as the Lonely Parent over a period of years. This would enable taxpayers to avoid the SRLY limitations.

Finally, the Service itself has applied the Lonely Parent Rule in the context of an 82-152 Transaction in at least two private letter rulings (discussed below).[10]

## C.    Application of the Lonely Parent Rule to Loss Carrybacks

The NOPA is also incorrect in concluding that the Lonely Parent Rule applies only to NOL carryforwards and not to carrybacks. Neither the SRLY regulations nor the Lonely Parent Rule distinguishes between NOL carryforwards and carrybacks. For the reasons summarized above (and discussed in detail below), Grace-Conn. was the Lonely Parent for the Historic Grace-Conn. Group's 1989 tax year. As a result, pursuant to the Lonely Parent Rule, the Grace Conn. Carryback is not subject to the SRLY limitation.

The premise of the NOPA's argument to the contrary -- that the corporation that is treated generally as the common parent of the group must be treated as the Lonely Parent -- is simply wrong. Treas. Reg. § 1.1502-75(d)(2)(ii) makes clear that, <u>for purposes of applying the SRLY regulations after a -75(d)(2) Transaction</u>, a corporation other than the common parent is treated as the Lonely Parent. For the reasons summarized above, Rev. Rul. 82-152 similarly requires

---

[9] The NOPA suggests that Rev. Rul. 82-152 does not equate 82-152 Transactions with -75(d)(2) Transactions for purposes other than the continuation of the group. The continuation of the group and the Lonely Parent Rule, however, are inextricably intertwined. The Lonely Parent Rule is an exception to the SRLY limitations and the SRLY limitations are based, in part, on whether the group continues. The regulations confirm this connection by providing special rules for the application of the Lonely Parent Rule following the Group Continuation Transaction addressed in Treas. Reg. § 1.1502-75(d)(2).

[10] Private letter rulings, technical advice memoranda, and Chief Counsel advice do not have precedential value. *See* section 6110(k)(3). However, private letter rulings and technical advice memoranda issued after October 31, 1976 and general counsel memoranda issued after March 12, 1981 do constitute substantial authority for purposes of avoiding the substantial understatement penalty imposed by section 6662. *See* Treas. Reg. § 1.6662-4(d)(3)(iii). In addition, such administrative pronouncements indicate the position the Service has taken in similar situations.

that a corporation other than the common parent be treated as the Lonely Parent after an 82-152 Transaction.

The NOPA appears to take the position that the new common parent (Grace-NY), rather than the old common parent (Grace-Conn.), should be viewed as the Lonely Parent for purposes of loss carrybacks. As is discussed in greater detail below, this conclusion is inconsistent with the language and policy of the applicable regulatory provisions and could lead to abuse of the SRLY limitations, since taxpayers could free a subsidiary member's losses from the SRLY limitation merely by restructuring and causing that subsidiary to become the parent of the group. The NOPA also asserts that the Taxpayer's position results in two Lonely Parents. As is demonstrated below, the Taxpayer's position does not result in two Lonely Parents; rather, the NOPA's position results in two Lonely Parents for the same tax year, one for loss carryforwards and one for loss carrybacks.

### D.     The Absence of Specific Guidance Requires Adoption of the Taxpayer's Position

The fact that the Service has not modified its regulations to address 82-152 Transactions and to provide specific guidance on these questions is not a sufficient rationale to reject the Taxpayer's position. To the contrary, the fact that the Service has failed to revise its regulations to reflect positions taken by the Service in Revenue Rulings, together with the fact that the Taxpayer has applied the Service's published guidance in a reasonable and consistent fashion, require that the Taxpayer's position be adopted and the NOPA's position, together with the proposed adjustment, be rejected. These factors also are discussed in greater detail below.

## V.     APPLICABLE LAW

### A.     Rules Regarding Continuation of the Consolidated Group

The SRLY rules apply to limit the use of an NOL carryforward or carryback where the member in question incurred the NOL at a time when it either filed a separate return or joined in the filing of a consolidated return of another group. Thus, whether a particular consolidated group remains in existence or terminates as a result of a transaction is critical in determining whether the SRLY rules apply to limit the use of an NOL.

### 1.     General Rule -- Treas. Reg. § 1.1502-75(d)(1)

Generally, a consolidated group remains in existence for a tax year only if the common parent remains as the common parent and at least one subsidiary remains affiliated with the parent, whether or not such subsidiary was a member of the group in a prior year and whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed.[11] Thus, absent other rules, if the parent of a consolidated group merges downstream into

---

[11] *See* Treas. Reg. § 1.1502-75(d)(1) (as in effect for 1989). This was the rule in effect under Treas. Reg. § 1.1502-75(d)(1) for 1989. Treas. Reg. § 1.1502-75(d)(1) was modified in 1994, effective January 1, 1995. *See* T.D. 8560, 1994-2 C.B. 200 (Aug. 1, 1994). The modification was not effective for 1989 and thus is not relevant to the issues addressed herein.

a subsidiary member of the group (or otherwise transfers all of its assets to a subsidiary member of the group) and goes out of existence, the group terminates even though no assets have left the group (since the former parent no longer exists and hence cannot remain as the common parent). Similarly, absent other rules, if the parent becomes a subsidiary of an existing member or of a new holding company, the group terminates even though no assets have left the group (since the former parent ceases to be the common parent).

2.    **Exception for Certain Downstream Transactions -- Treas. Reg. § 1.1502-75(d)(2)**

Treas. Reg. § 1.1502-75(d)(2)(ii) provides a special rule for certain downstream transactions. That provision states in part:

> The group shall be considered as remaining in existence notwithstanding that the common parent is no longer in existence if the members of the affiliated group succeed to and become the owners of substantially all of the assets of such former parent and there remains one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation and which was a member of the group prior to the date such former parent ceases to exist.

The classic example of this type of transaction is where the common parent merges downstream into one of its first tier subsidiaries. For example, assume that P is the common parent of a consolidated group. P owns all of the stock of S and T. P merges downstream into S, with P's shareholders receiving S stock in the transaction. P would cease to exist, and S would own all of P's assets, including the stock of T. This example of a -75(d)(2) Transaction is illustrated below:



Absent the group continuation rule of Treas. Reg. § 1.1502-75(d)(2), the P group would terminate upon the downstream merger because the common parent (P) ceases to exist (and

9

hence ceases to be the common parent). Treas. Reg. § 1.1502-75(d)(2)(ii), however, provides that the P group continues to exist with S as the new common parent.[12]

## 2.    Rev. Rul. 82-152

In Rev. Rul. 82-152, the Service addressed the application of the group continuation rules of Treas. Reg. § 1.1502-75(d) to a transaction in which the common parent became a subsidiary of a newly formed holding company but continued to exist. Under the general rule of Treas. Reg. § 1.1502-75(d)(1), the group would terminate even though no assets left the group (since the historic parent no longer was the common parent). Moreover, the group continuation rule of Treas. Reg. § 1.1502-75(d)(2) would not apply because the parent did not cease to exist in the transaction. In fact, the regulations do not provide a specific rule for these transactions. Presumably, the regulations do not address the transaction described in Rev. Rul. 82-152 because such transactions involve a reverse triangular merger qualifying as a reorganization pursuant to section 368(a)(2)(E) and, at the time Treas. Reg. § 1.1502-75(d)(2)(ii) was issued (1966), section 368(a)(2)(E) had not yet been added to the Code. *See* P.L. 91-693, § 1(a), enacted January 12, 1971 (adding a new subparagraph (E) to section 368(a)(2), applicable to statutory mergers occurring after December 31, 1970). Thus, under the regulations, transactions described in Rev. Rul. 82-152 literally caused the group to terminate. Nevertheless, in Rev. Rul. 82-152, the Service held that such transactions did not cause the group to terminate; the Service reasoned that such transactions were "indistinguishable in substance" from the downstream transaction described in Treas. Reg. § 1.1502-75(d)(2)(ii) and thus should be treated similarly.[13]

In Rev. Rul. 82-152, P owned all of the stock of S, which owned all of the stock of T.  P was the common parent of a consolidated group consisting of P, S, and T.  T merged into P, with P surviving.  In the merger, the former P shareholders exchanged all of their P stock for S stock.

---

[12] Treas. Reg. § 1.1502-75(d)(2)(iii)(a) further provides that if a -75(d)(2) Transaction is an acquisition to which section 381 applies, the former common parent's tax year does not close and prior years of the former common parent shall be treated as tax years of the acquiring corporation. Furthermore, Treas. Reg. § 1.1502-75(d)(2)(iii)(b) provides that the acquiring subsidiary will close its tax year as of the date of the acquisition and all of its prior years will be treated as tax years of the acquired corporation. In the most common type of -75(d)(2) Transaction, a downstream merger of the common parent into one of its first tier subsidiaries, these provisions effectively mean that post-transaction NOLs that are allocable to the acquiring subsidiary (S in the above illustration) will be carried back to the tax years of the former common parent (P in the above illustration) and not to the subsidiary's (S's) tax years. Thus, in this situation, the transaction is viewed as though the parent (P) acquired the subsidiary (S) rather than as if the subsidiary (S) acquired the parent (P).

Generally, under section 381(b)(3), NOLs that occur after the merger of two corporations can only be carried back to the survivor's prior years and not the target's. However, Treas. Reg. § 1.1502-75(d)(2)(iii) provides that in the case of a transaction to which Treas. Reg. § 1.1502-75(d)(2)(ii) applies (*e.g.*, parent merging downstream into subsidiary), for purposes of section 381(b)(3), the post-transaction NOLs of the combined companies must be carried back to the taxable years of the acquired corporation (i.e., the former common parent, P), not the surviving corporation (S).

[13] Indeed, it would be a seriously flawed system for the old group to continue when the old parent ceases to exist but not when the old parent merely becomes a subsidiary of an existing group member or of a new holding company. This approach would make it purely elective whether a consolidated group continues even though the Group Continuation Rules are intended to focus on substance rather than form.

The S stock owned by P was cancelled. Thus, P received all of T's assets and became a wholly owned first tier subsidiary of S. These facts are illustrated below:



The Service concluded that the transaction did not satisfy the literal requirements of Treas. Reg. § 1.1502-75(d)(2)(ii) because P did not cease to exist in the transaction. The Service also concluded that the transaction did not qualify as a reverse acquisition under Treas. Reg. § 1.1502-75(d)(3) because the corporations were affiliated with one another prior to the transaction.[14] Thus, the Service effectively concluded that a literal application of Treas. Reg. § 1.1502-75(d) to the transaction would cause the P group to terminate.

Nevertheless, the Service held that the merger of T into P was "indistinguishable in substance" from a -75(d)(2) Transaction because there was no change in the underlying assets of the group, no change in the shareholder composition of the group, and no change in the economic substance of the group. Accordingly, the Service ruled that the P group would be treated as remaining in existence after the transaction, with S becoming the common parent of the group. Moreover, the Service also concluded that the tax year of the P group would not change and that no member's tax year (other than the tax year of T, the subsidiary that ceased to exist) would terminate. In short, the Service concluded that the group's termination should not depend on whether P merged into T (a -75(d)(2) Transaction) or T merged into P (an 82-152 Transaction). To conclude otherwise would have established a set of rules that permitted a consolidated group to cause its termination and thus to cease filing a consolidated return by engaging in a transaction that does not have a significant economic effect on the group.

**B.    The SRLY Rules**

---

[14] The reverse acquisition rules of Treas. Reg. § 1.1502-75(d)(3) are not relevant to the proposed adjustment and are not discussed further in this protest.

- -                                                                                                                11

Generally, when a corporation's tax attributes, which include NOLs, are carried from a "separate return limitation year" to a consolidated return year, the SRLY rules apply to limit the group's use of the NOLs in such consolidated return year.[15] In general, these rules limit the use of such NOLs to the income attributable to such corporation. A separate return limitation year is generally defined as a separate return year of a member.[16] A separate return year is a taxable year of a corporation for which it files a separate return or joins in the filing of a consolidated return of another group.[17]

Originally adopted in 1966, the SRLY rules attempt to prevent trafficking in NOLs (i.e., a profitable corporation acquiring a loss corporation for the purpose of using the loss corporation's losses against the profitable corporation's income) by providing that the utilization of NOL carryovers and carrybacks from SRLY years to a consolidated return year is permitted only to the extent that consolidated taxable income is increased by the items of income of the member with the SRLY NOL.[18] The SRLY rules apply equally to both NOL carryovers and carrybacks from a separate return year of a member to a consolidated return year.[19] Therefore, if a corporation incurs an NOL prior to joining a consolidated group, such NOL can be carried over to and used by the consolidated group only to the extent of the acquired corporation's income (i.e., subject to the SRLY limitations). Similarly, if a corporation incurs an NOL following its departure from a consolidated group, such NOL can be carried back to and used by the prior consolidated group only to the extent of the departing member's contribution to the taxable income of the prior group.[20]

---

[15] Treas. Reg. § 1.1502-21(c)(1)(i).

[16] Treas. Reg. § 1.1502-1(f).

[17] Treas. Reg. § 1.1502-1(e).

[18] T.D. 6894, 1966-2 C.B. 362 (Jan. 1, 1966).

[19] Treas. Reg. § 1.1502-21A(c).

[20] For the year at issue (1989), the SRLY regulations limit the carryback of a former member's losses to the portion of the old consolidated group's income that was attributable to the former member. The SRLY regulations were amended twice in the late 1990s. See T.D. 8677, 1996-2 C.B. 119 (June 26, 1996); T.D. 8823, 1999-2 C.B. 34 (June 25, 1999). However, those amendments do not apply to the Grace-Conn. Carryback, since they were not effective for 1989 and the SRLY regulations that apply to a particular NOL are the rules in effect for the tax year to which the NOL is to be carried (i.e., 1989). See Treas. Reg. § 1.1502-21A(h) (providing that the former SRLY regulations apply to consolidated return years beginning before January 1, 1997).

Under the current SRLY regulations, generally effective for tax years for which the consolidated return due date is after June 25, 1999, the SRLY limitation is determined by reference to the income of the "SRLY subgroup" as a whole. See Treas. Reg. § 1.1502-21(c)(2) (1999). Current Treas. Reg. § 1.1502-21(c)(2)(ii) (1999) provides that in the case of a carryback, the SRLY subgroup is composed of the member carrying back the loss and each other member that has been continuously affiliated with the member from the year to which the loss is carried back to the year that the loss is generated. If these subgroup rules were applied to determine the SRLY limitation with respect to the Grace-Conn. Carryback, the SRLY limitation would be sufficient to permit the carryback. This is the case because Grace-Conn. and its subsidiaries that were spun-off by Grace-NY in 1996 (i.e., the "Grace-Conn. Subgroup") had sufficient income in the Historic Grace-Conn. Group's 1989 tax year to utilize the entire Grace-Conn. Carryback.

## C.    The Lonely Parent Rule

### 1.    Description of the Lonely Parent Rule

The regulations provide several exceptions to the SRLY rules by excluding certain situations from the definition of a separate return limitation year. One such exception is the so-called "Lonely Parent Rule" of Treas. Reg. § 1.1502-1(f)(2)(i). The Lonely Parent Rule provides that the term "separate return limitation year" does not include a "separate return year of the corporation that is the common parent for the consolidated return year <u>to which</u> the tax attribute is to be carried."[21]

Consider the following example. In Year 1, P is a stand-alone corporation that incurs an NOL. In Year 2, P acquires or forms a subsidiary, S, and elects to file a consolidated return with S. Absent the Lonely Parent Rule, the NOL generated by P in Year 1 would be limited by the SRLY rules when carried forward to Year 2 because Year 1 meets the definition of a separate return limitation year (i.e., a taxable year in which the corporation files a separate return or joins in the filing of a consolidated return with another group). However, the Lonely Parent Rule excludes P's Year 1 NOL from the SRLY limitations because P is the common parent for the consolidated return year to which the NOL is carried (i.e., Year 2). This example is illustrated below:



Lonely Parent Rule:  NOL Carryforwards

Year 1

P

P separate return year NOL

Year 2

P

S

P-S consolidated return year

**P** is the "Lonely Parent" –
**No** SRLY limitation on P's Y1 NOL carryforward to Y2

---

[21] Treas. Reg. § 1.1502-1(f)(2)(i) (emphasis added).

Similarly, consider the situation where P is the common parent of a consolidated group in Year 1. At the end of Year 2, P sells or liquidates all of its subsidiaries and the group thus terminates. In Year 3, when P is a stand-alone corporation, P incurs an NOL. Absent the Lonely Parent Rule, the carryback of P's Year 3 NOL to Year 1 would be limited by the SRLY rules because Year 3 meets the definition of a SRLY (i.e., a taxable year in which P files a separate return or joins in the filing of a consolidated return with another group). However, the Lonely Parent Rule provides that P's Year 3 NOL is not subject to the SRLY rules when carried back to Year 1 because P was the common parent of the consolidated group in Year 1 (i.e., the year to which the NOL is carried). This example is illustrated below:



These examples illustrate two important aspects of the Lonely Parent Rule:

- First, the Lonely Parent Rule applies for both loss carryforwards and loss carrybacks. Indeed, the Lonely Parent Rule does not distinguish between carryforwards and carrybacks.

- Second, eligibility for the Lonely Parent Rule is determined by reference to the year to which the loss is carried, not the year in which the loss is incurred. Therefore, the question at issue with respect to the Lonely Parent Rule is whether the corporation that is either carrying forward or carrying back the NOL is treated as the Lonely Parent for the year to which the NOL is to be carried.

**2.    Application of the Lonely Parent Rule in the Context of -75(d)(2) Transactions**

Absent some modification, the Lonely Parent Rule would not operate properly following a -75(d)(2) Transaction because the common parent ceases to exist in the transaction and another corporation becomes the common parent of the group (as noted above, the group itself continues to exist by reason of Treas. Reg. § 1.1502-75(d)(2)(ii)). The regulations could have provided that such a transaction ends the application of the Lonely Parent Rule because the former parent ceases to exist. Alternatively, the regulations could have provided that the Lonely Parent Rule continues to apply, but that the new parent corporation becomes the Lonely Parent for purposes of applying the Lonely Parent Rule. The regulations, however, neither end the application of the Lonely Parent Rule nor treat the new parent corporation as the Lonely Parent. Instead, the regulations provide special rules for the application of the Lonely Parent Rule after a -75(d)(2) Transaction. These special rules reflect the premise underlying the group continuation rule of Treas. Reg. § 1.1502-75(d)(2) -- that a -75(d)(2) Transaction does not effect a significant change in the consolidated group and thus should not affect either (i) the continuation of the group or (ii) the availability of the Lonely Parent Rule.

Specifically, Treas. Reg. § 1.1502-1(f)(2)(i) provides that the Lonely Parent Rule is modified to the extent provided in Treas. Reg. § 1.1502-75(d)(2)(ii). Treas. Reg. § 1.1502-75(d)(2)(ii), in turn, provides as follows:

> [F]or purposes of applying [the Lonely Parent Rule] to separate return years ending on or before the date on which the former parent ceases to exist, such former parent, and not the new common parent, shall be considered to be the corporation described in such paragraph.

The application, and importance, of this special rule is illustrated by the following example:

> Example of Lonely Parent Rule After a -75(d)(2) Transaction:  P, S, and T are separate return taxpayers in Year 1.  In Year 1, P and S each has a $50 NOL that it cannot carry back to a prior year.  As a result, P and S each has a $50 NOL carryforward.  T has no income or loss in Year 1.  On January 1 of Year 2, P acquires all of the stock of both S and T, and the three corporations elect to file a consolidated return beginning in Year 2.  In Year 2, the P group has $10 of consolidated taxable income, all of which is attributable to T.  In Year 3, the P group has no income or loss and on December 31 of Year 3 P merges with and into S, with S surviving, in a -75(d)(2) Transaction.  In the transaction, P's shareholders receive S stock, P ceases to exist, and S receives all of P's assets (including the stock of T).  In Year 4, the group has $30 of consolidated taxable income, all of which is attributable to T.

This example is illustrated below:



The SRLY limitation of Treas. Reg. § 1.1502-21 (discussed above) precludes the P group from using S's Year 1 NOL to offset the group's Year 2 income because S's Year 1 NOL was a separate return limitation year loss with respect to the P group and S has no income in Year 2. Similarly, but for the Lonely Parent Rule, the SRLY limitation also would apply to P's Year 1 NOL. However, the Lonely Parent Rule provides that "[t]he term *separate return limitation year* (or SRLY) does not include: (i) A separate return year of the corporation which is the common parent for the consolidated return year to which the tax attribute is to be carried (except as provided in § 1.1502-75(d)(2)(ii) …)." Treas. Reg. § 1.1502-1(f)(2) (italics in original). Thus, because of the Lonely Parent Rule, P's Year 1 loss can be used by the P group to offset the group's Year 2 income.

The P group had no consolidated income or loss in Year 3. However, the merger transaction at the end of Year 3 is a -75(d)(2) Transaction. As a result, the P group continues to exist, with S as the common parent (and T as the other group member).

Nevertheless, Treas. Reg. § 1.1502-75(d)(2)(ii) provides that, "for purposes of applying [the Lonely Parent Rule] to separate return years [(e.g., Year 1)] ending on or before the date on which the former parent ceases to exist [(December 31 of Year 3)], such former parent [P], and not the new common parent [S], shall be considered to be the corporation described in [the

Lonely Parent Rule of Treas. Reg. § 1.1502-1(f)(2)(i)]." Accordingly, P continues to be treated as the Lonely Parent in Year 4, the Lonely Parent Rule continues to apply to P's Year 1 NOL, and, as a result, P's Year 1 NOL can be used to offset the group's Year 4 income without regard to the SRLY limitation.

By contrast, the SRLY limitation of Treas. Reg. § 1.1502-21 continues to apply in Year 4 to S's Year 1 NOL. Although S is the common parent of the group in Year 4, Treas. Reg. § 1.1502-75(d)(2)(ii) modifies the Lonely Parent Rule to provide that S is not treated as the Lonely Parent. This is the case notwithstanding that S is now the common parent for other purposes. Because of Treas. Reg. § 1.1502-75(d)(2)(ii), the -75(d)(2) Transaction does not affect the application of the Lonely Parent Rule; more specifically, the -75(d)(2) Transaction does not cause a different corporation (S) to be the Lonely Parent. As a result, the -75(d)(2) Transaction does not allow a different corporation's losses (S's losses) to be absorbed by the group free of the SRLY limitation. In other words, for the limited purpose of applying the Lonely Parent Rule to the SRLY limitation, S is not treated as the common parent of the group.

The special provision in Treas. Reg. § 1.1502-75(d)(2)(ii) relating to the Lonely Parent Rule does not, however, affect the identity of the common parent for other consolidated return purposes. [22] Thus, following the -75(d)(2) Transaction, S is the common parent of the continuing group. It is only "for purposes of applying [the Lonely Parent Rule]" that P is treated as the Lonely Parent.

The special rule of Treas. Reg. § 1.1502-75(d)(2)(ii) prevents a -75(d)(2) Transaction from affecting the application of the Lonely Parent Rule. This special rule reflects sound policy for two related reasons.

First, the special rule prevents losses of the former common parent (P) from becoming subject to the SRLY limitation merely because of a -75(d)(2) Transaction. As discussed above, the regulations correctly reflect the view that a -75(d)(2) Transaction has no real effect on a group even though the parent corporation ceases to exist. This is why the regulations specify that the group continues to exist. The special rule relating to the Lonely Parent Rule promotes this treatment by specifying that the losses of the former parent (P) continue to be subject to the Lonely Parent Rule, just as if the -75(d)(2) Transaction had not occurred and P remained as the common parent. But for the special rule of Treas. Reg. § 1.1502-75(d)(2)(ii), the regulations would reach the unintended result that a -75(d)(2) Transaction does not cause a group to terminate, even though the parent ceases to exist, but that such a Transaction nevertheless does cause the former parent's NOLs to become subject to the SRLY restrictions as if the former parent were a subsidiary member.

Second, the special rule prevents a consolidated group from undertaking a -75(d)(2) Transaction in order to change the corporation whose NOL carryforwards can be used by the group free from the SRLY restrictions by reason of the Lonely Parent Rule. For example, assume in the example above that P had only $10 of NOLs in Year 1. In this case, the Lonely

---

[22] *See, e.g.,* Treas. Reg. § 1.1502-77(a)(4)(iii) (relating to the new common parent acting as agent for the group).

Parent Rule would not benefit the P group after Year 2 (since the group would use all of P's NOL carryforwards in Year 2). Moreover, prior to P's merger into S, S's $50 NOL carryforward from Year 1 would not qualify under the Lonely Parent Rule and hence would be subject to the SRLY restrictions. Absent the modification of the Lonely Parent Rule in Treas. Reg. § 1.1502-75(d)(2)(ii), the group could cause P to merge into S (or T) in Year 3, and thereby cause S to become the common parent. The group then could claim, under the Lonely Parent Rule, that S's $50 NOL from Year 1 could be carried forward to the consolidated group free of the SRLY restrictions. Thus, S's Year 1 NOLs could be used to offset the group's Year 4 income free of the SRLY restrictions. Such a result effectively would allow consolidated groups to determine which member's pre-consolidated NOLs should be exempted from the SRLY restrictions. In fact, such a result effectively would allow consolidated groups to engage in a series of -75(d)(2) Transactions over time in order to allow multiple corporations to become the common parent and be treated as the Lonely Parent over a period of years -- and thereby allow losses of multiple corporations to be exempted from the SRLY limitation under the Lonely Parent Rule. The modification of the Lonely Parent Rule in Treas. Reg. § 1.1502-75(d)(2)(ii), however, properly prevents this. That modification precludes a -75(d)(2) Transaction from changing the identity of the corporation whose losses can be exempted from the SRLY restrictions by specifying that the former parent continues to be the Lonely Parent after the -75(d)(2) Transaction -- and that the new parent does not become the Lonely Parent.

### 3.    Application of the Lonely Parent Rule to 82-152 Transactions

Since an 82-152 Transaction is not described in the regulations, it is not surprising that the regulations do not address the application of the Lonely Parent Rule in the context of an 82-152 Transaction. However, in two private letter rulings, PLR 8821071 (Mar. 1, 1988) and PLR 8827058 (Apr. 13, 1988) (supplementing PLR 8821071), the Service expressly concluded that the former common parent should be treated as the Lonely Parent immediately after a transaction similar to an 82-152 Transaction. In reaching its conclusion, the Service stated that the transaction that resulted in a holding company structure was indistinguishable in substance from a -75(d)(2) Transaction.[23]

In PLR 8821071, in a transaction similar to the one described in Rev. Rul. 82-152, the Service ruled that the former common parent would be considered the common parent immediately after the transaction for purposes of applying the SRLY rules. As authority, the Service cited Treas. Reg. §§ 1.1502-75(d)(2)(ii) and 1.1502-1(f)(2)(i). In PLR 8821071, a corporation ("Former Parent") had a wholly owned subsidiary ("Sub 1"). Prior to the proposed transaction, Former Parent and Sub 1 filed separate returns. In the transaction, Former Parent formed a corporation ("Holdings") and contributed $100 to Holdings in exchange for 100 shares of Holdings common stock. Subsequently, each share of outstanding Former Parent common stock was exchanged for one share of Holdings common stock, and the Holdings common stock

---

[23] In a number of other private rulings, the Service also has suggested that, following an 82-152 Transaction, there are situations where the former parent will be treated as the common parent of the affiliated group. *See* PLR 8903086 (Oct. 27, 1988) (new parent is the common parent of the group for all purposes except when the regulations specifically provide that the old common parent must be treated as the common parent); PLR 8747035 (Aug. 25, 1987) (same); PLR 8739005 (June 5, 1987) (same); PLR 8702016 (Oct. 9, 1986) (same); PLR 8628040 (April 7, 1986) (same); and PLR 8541027 (July 18, 1985) (same).

held by Former Parent was cancelled. After this exchange, Former Parent was a wholly owned subsidiary of Holdings. After the transaction, Holdings, Former Parent, and Sub 1 elected to file a consolidated tax return. As discussed above, the Service concluded that the Former Parent, and not Holdings, would be treated as the common parent for purposes of applying the SRLY rules after the transaction, citing as authority Treas. Reg. §§ 1.1502-75(d)(2) and 1.1502-1(f)(2)(i).

In PLR 8827058, the Service issued a supplemental ruling to PLR 8821071. In PLR 8827058, addressing the same transaction as discussed in the prior ruling, the Service concluded that the NOL carryover and investment tax credit carryover of the Former Parent would not be subject to the SRLY rules. Once again, the Service cited as authority the Lonely Parent Rule. More specifically, the Service cited Treas. Reg. §§ 1.1502-75(d)(2)(ii) and 1.1502-1(f)(2)(i).[24]

These two private letters rulings are not surprising. They reflect the same policies that motivated the Service to issue Rev. Rul. 82-152. Specifically, the rulings reflect the view that a transaction in which the former parent becomes a subsidiary member of the group, and either an existing group member or a newly formed member becomes the parent, should not cause the historic group to terminate and, correspondingly, should not cause the historic parent's NOLs to become subject to the SRLY limitations. The rulings further reflect the view that such a transaction should not cause NOLs of the new parent to become free of any SRLY taint that existed prior to the transaction. In PLRs 8821071 and 8827058, the Service correctly applied Treas. Reg. § 1.1502-75(d)(2)(ii) and Rev. Rul 82-152 to implement the those policies to a transaction that was similar to an 82-152 Transaction.

## VI.    ANALYSIS

### A.    1988 Holding Company Transaction

The 1988 Holding Company Transaction was identical to the transaction described in Rev. Rul. 82-152 (i.e., it was an 82-152 Transaction). The 1988 Holding Company Transaction was "indistinguishable in substance" from a -75(d)(2) Transaction, because, as in a -75(d)(2) Transaction, there was no change in the underlying assets of the group, no change in the shareholder composition of the group, and no change in the economic substance of the group. There was no change in the underlying assets of the group because Grace-Conn. (and its subsidiaries) still owned the same assets as they did before the transaction and no new assets were added to the group in the transaction. Moreover, there was no change in the composition of the shareholder group because the same shareholders that previously owned Grace-Conn. stock now owned the same relative percentage of Grace-NY stock. Finally, there was no change in the economic substance of the group because the only result of the transaction was that a newly-formed holding company held all of the stock of Grace-Conn. and the former shareholders of Grace-Conn. held all of the stock of the new holding company.[25]

---

[24] The Service has issued several other private letter rulings that are consistent with applying the Lonely Parent Rule to an 82-152 Transaction. *See* PLR 9033028 (May 21, 1990); PLR 8609036 (Nov. 29, 1985); and PLR 8433016 (May 9, 1984).

[25] Certain transactions occurred several years after the 1988 Holding Company Transaction that altered the assets of the group. These later transactions, however, were unrelated to the 1988 Holding Company Transaction.

Pursuant to Rev. Rul. 82-152 (but not a literal application of the consolidated return regulations), the Grace-Conn. consolidated group that was in existence before the 1988 Holding Company Transaction (i.e., the Historic Grace-Conn. Group) did not terminate as a result of the transaction. Instead, the Historic Grace-Conn. Group remained in existence (with Grace-NY as the common parent).

As discussed above, Grace-Conn. left the Historic Grace-Conn. Group in 1996.[26] The Taxpayer seeks to carry back a loss attributable to Grace-Conn. from 1998 to the Historic Grace-Conn. Group's 1989 tax year. The only issue in dispute is whether it can do so under the Lonely Parent Rule.

The NOPA concludes that Grace-Conn. cannot carry back its loss to the Historic Grace-Conn. Group's 1989 tax year for two reasons: (i) the Lonely Parent Rule does not apply in the context of 82-152 Transactions; and (ii) the Lonely Parent Rule does not apply to loss carrybacks. Neither rationale is correct. In addition, the NOPA asserts that the Taxpayer's position results in two Lonely Parents for the same year. This assertion also is incorrect.

## B.    Application of the Lonely Parent Rule to the Grace-Conn. Carryback

### 1.    The Lonely Parent Rule Applies to 82-152 Transactions

Consistent with the holding in Rev. Rul. 82-152 that an 82-152 Transaction is essentially equivalent to a -75(d)(2) Transaction, the Lonely Parent Rule (as modified by Treas. Reg. § 1.1502-75(d)(2)(ii)) must also apply in the context of an 82-152 Transaction. If an 82-152 Transaction is treated as not terminating the group (despite clear regulatory language to the contrary) solely because the Service has concluded that such a Transaction is indistinguishable from a -75(d)(2) Transaction, then the Lonely Parent Rule must be applied to an 82-152 Transaction in a corresponding manner. The NOPA's argument that the Lonely Parent Rule does not apply in the context of an 82-152 Transaction simply because such application is not specifically provided for in the regulations is inconsistent with the Service's policy, reflected in Rev. Rul. 82-152 (among other places), of applying the group termination regulations consistent with their purpose rather than their literal language.[27]

It is evident that both the Lonely Parent Rule and Treas. Reg. § 1.1502-75(d)(2)(ii) were written without considering the transaction described in Rev. Rul. 82-152. As a result, the regulatory language does not fit an 82-152 Transaction (for example, the regulations speak of years prior to the year in which P ceases to exist while in an 82-152 Transaction P does not cease to exist). Nevertheless, the Service reached the following conclusions in Rev. Rul. 82-152:

---

[26] *See supra* Section I.B.2.

[27] Indeed, the Service's policy to apply the various provisions of Treas. Reg. § 1.1502-75 based on their purpose rather than their literal terms is well-known. *See, e.g.,* Thomas F. Wessel, Jeffrey G. Davis, Jeffrey L. Vogel & Bryan P. Collins, *The Consolidated Group: Continuation And Termination Issues,* in TAX STRATEGIES FOR CORPORATE ACQUISITIONS, DISPOSITIONS, SPIN-OFFS, JOINT VENTURES, FINANCINGS, REORGANIZATIONS & RESTRUCTURINGS 2005 (PLI ed. 2005).

(i) -75(d)(2) Transactions and 82-152 Transactions are indistinguishable in substance; and, therefore, (ii) the group continues after an 82-152 Transaction notwithstanding that the regulations do not provide for that conclusion.

The NOPA implies that the failure of the regulations to apply the Lonely Parent Rule expressly in the context of an 82-152 Transaction (as they do in the context of a -75(d)(2) Transaction) indicates that the regulation drafters did not intend for the Lonely Parent Rule to apply in the context of 82-152 Transactions. That implication is wrong. As discussed above, an 82-152 Transaction involves a reverse triangular merger qualifying as a reorganization pursuant to section 368(a)(2)(E). At the time Treas. Reg. § 1.1502-75(d)(2)(ii) was issued (1966), section 368(a)(2)(E) had not yet been added to the Code. *See* P.L. 91-693, § 1(a), enacted January 12, 1971 (adding a new subparagraph (E) to section 368(a)(2), applicable to statutory mergers occurring after December 31, 1970). Hence, it is not surprising that the regulation does not address 82-152 Transactions explicitly, and no implication regarding the application of the Lonely Parent Rule in the context of such transactions can be drawn.

Moreover, the policies underlying the application of the Lonely Parent Rule after a -75(d)(2) Transaction apply equally following an 82-152 Transaction. First, pre-consolidated losses of a group parent that were not subject to the SRLY limitation under the Lonely Parent Rule prior to the 82-152 Transaction should not become subject to the SRLY limitation merely because the parent becomes a subsidiary member of the group in an 82-152 Transaction. Thus, the former parent should, as a matter of policy, continue to be the Lonely Parent following an 82-152 Transaction. Otherwise, a transaction that is treated as a Group Continuation Transaction because it is viewed as having no real effect on the group would cause the former parent's pre-consolidated losses to become subject to the SRLY limitation rules.

Second, pre-consolidated losses of the new parent (previously a group subsidiary) should not lose their SRLY taint merely because the former subsidiary becomes the new parent in an 82-152 Transaction. As discussed above, if the new common parent is considered the Lonely Parent for years following a -75(d)(2) Transaction or an 82-152 Transaction, NOLs of the new parent that formerly were subject to the SRLY limitation would be cleansed of their SRLY taint. For example, assume that P files a consolidated return with its subsidiary S. In Year 1, P purchases T. T has an NOL carryforward from prior years, subject to the SRLY limitations with respect to the P group. In Year 2, if P merged downstream into T in a -75(d)(2) Transaction and T were treated as the Lonely Parent, T's SRLY NOL carryforwards from its separate return years would be freed from the SRLY limitations by the transaction.[28] As discussed above, the regulations do not allow that result. *See* Treas. Reg. § 1.1502-75(d)(2)(ii). If instead T formed X, and X merged into P (with P surviving as a subsidiary of T) in an 82-152 Transaction and T were treated as the Lonely Parent, T's SRLY NOL carryforwards from its separate return years likewise would be freed from the SRLY limitations by the transaction. The NOPA's interpretation of the Lonely Parent Rule and Rev. Rul. 82-152 would allow for that clearly incorrect result. These alternate fact patterns are illustrated below:

---

[28] *See supra* Section V.C.2. (discussing this policy issue in the context of -75(d)(2) Transactions).



An 82-152 Transaction, like a -75(d)(2) Transaction, should not cleanse the SRLY loss carryforwards of the new parent (T in both the -75(d)(2) Transaction and the 82-152 Transaction) of their SRLY taint. Thus, the new parent should not, as a matter of policy, become the Lonely Parent following an 82-152 Transaction. Rather, the old parent (P) should remain the Lonely Parent as in a -75(d)(2) Transaction.

Finally, as discussed above, the National Office has on two occasions specifically concluded that the Lonely Parent Rule applies in the context of an 82-152 Transaction. *See* PLR 8821071 (Mar. 1, 1998); PLR 8827058 (Apr. 13, 1988) (supplementing PLR 8821071).

-  -

22

## 2.    The Lonely Parent Rule Applies to Carrybacks

The NOPA's position that the SRLY regulations and the Lonely Parent Rule apply differently for carryforwards and carrybacks is also without support. Neither the SRLY rules nor the Lonely Parent Rule distinguishes between carryforwards and carrybacks. This can best be illustrated by two examples.

Assume that in Year 1, P is a separate return taxpayer and incurs a $100 NOL. On December 31 of Year 1, P acquires T and, effective January 1 of Year 2, P and T file a consolidated return. During Year 2, the P group has zero consolidated taxable income. In Year 3, the P group has $300 of consolidated taxable income, all of which is attributable to T. In Year 4, the P group has zero consolidated taxable income. At the end of Year 4, P sells T, and the P group terminates. Thus, both P and T are separate return taxpayers in Year 5. In Year 5, P incurs a $50 NOL. This fact pattern is illustrated below:



But for the Lonely Parent Rule, P's Year 1 NOL and Year 5 NOL would be subject to the SRLY limitation, which would be zero because none of the group's consolidated taxable income in Year 3 was attributable to P. Thus, but for the Lonely Parent Rule, neither P's Year 1 NOL nor P's Year 5 NOL could be used to offset the P group's Year 3 consolidated taxable income. However, the Lonely Parent Rule provides that "[t]he term *separate return limitation year* (or

SRLY) does not include: (i) A separate return year of the corporation which is the common parent for the consolidated return year to which the tax attribute is to be carried (except as provided in § 1.1502-75(d)(2)(ii) ...)." Treas. Reg. § 1.1502-1(f)(2) (italics in original). Under the Lonely Parent Rule, P is the Lonely Parent; consequently, both P's Year 1 $100 NOL carryforward and P's Year 5 $50 NOL carryback are not subject to the SRLY limitation. Accordingly, P's Year 1 NOL can be carried forward and used to offset $100 of the P group's Year 3 consolidated taxable income, and P's Year 5 NOL can be carried back and used to offset $50 of the P group's Year 3 consolidated taxable income. The Lonely Parent Rule of Treas. Reg. § 1.1502-1(f)(2)(i) simply does not allow for any other result.

Assume the same facts as in the preceding example, except that an 82-152 Transaction occurs at the end of Year 2 and the stock of P is sold at the end of Year 4. In the 82-152 Transaction, T forms a subsidiary (S) and S merges with and into P, with P surviving. As a result of the transaction, T becomes the owner of P. These revised facts are illustrated below:



As discussed above, Rev. Rul. 82-152 holds that the P group continues in Years 3 and 4, with T as the common parent. Moreover, as discussed above, P (as the former parent) must continue to be the Lonely Parent. Thus, under the Lonely Parent Rule, P's $100 NOL from Year 1 is not subject to the SRLY limitation and thus can be carried forward and used by the P group

in Year 3 to offset $100 of the P group's consolidated taxable income.[29]  Similarly, under the same Lonely Parent Rule, P's $50 NOL from Year 5 is not subject to the SRLY limitation and thus can be carried back and used by the P group in Year 3 to offset $50 of the P group's consolidated taxable income.  Once again, the Lonely Parent Rule of Treas. Reg. § 1.1502-1(f)(2)(i) simply does not allow for any other result.

This example is, in effect, the Taxpayer's case.  Grace-Conn. was the parent of the Historic Grace-Conn. Group prior to the 1988 Holding Company Transaction, which was an 82-152 Transaction.  In that transaction, Grace-Conn. became a subsidiary of Grace-NY.  However, under Rev. Rul. 82-152, the Historic Grace-Conn. Group continued to exist, with Grace-NY as the common parent.  Nevertheless, just as Grace Conn. was the Lonely Parent before the 82-152 Transaction, Grace-Conn. (as the former parent) continued to be the Lonely Parent after the 82-152 Transaction.  In 1996, Grace-Conn. ceased to be a member of the Historic Grace-Conn. Group.  But for the Lonely Parent Rule, the carryback of Grace-Conn. losses from subsequent years (such as the 1998 losses comprising the Grace-Conn. Carryback) to the Historic Grace-Conn. Group would be subject to the SRLY limitation.  However, under the Lonely Parent Rule, Grace-Conn. losses from years in which Grace-Conn. was no longer a member the Historic Grace-Conn. Group are not subject to the SRLY limitation.  This is because Grace-Conn. is the Lonely Parent in 1989, for loss carrybacks as well as loss carryforwards.  As noted above, the Lonely Parent Rule of Treas. Reg. § 1.1502-1(f)(2)(i) simply does not allow for any other result.

Accordingly, Grace-Conn. must be treated as the Lonely Parent of the Historic Grace-Conn. Group in 1989.

### 3.    The Taxpayer's Position Does Not Result in Two Lonely Parents

As noted above, in the context of a -75(d)(2) Transaction, the Lonely Parent Rule expressly provides that the former parent is treated as the Lonely Parent.  This is not to say that the former parent is, in fact, the common parent of the group.  Nor is it to say that there are two parents of the group.  It is simply to say that, for purposes of applying the Lonely Parent Rule -- for both loss carryforwards and carrybacks -- the former parent continues to be treated as the Lonely Parent.  This also means that the new common parent does not become the Lonely Parent.

Contrary to the NOPA's assertion, the Taxpayer's position does not result in two Lonely Parents.  Rather, the Taxpayer's position results in one Lonely Parent with respect to each consolidated return year to which NOLs may be carried forward or carried back.  For example, assume that P files a separate return in Year 1.  In Year 2, P acquires T and T's subsidiary S.  P, T, and S file a consolidated return.  At the end of Year 3, S merges into P in an 82-152 Transaction with P surviving.  As a result of the merger, P becomes a subsidiary of T.  For purposes of filing tax returns and acting as the agent for the group, T becomes the new common parent of the P group.  In Year 4, assume that the P group generates consolidated income.  Under Treas. Reg. § 1.1502-75(d)(2)(ii) (as applied to 82-152 Transactions), P is the only Lonely Parent

---

[29] As noted above, the National Office of the Service already has adopted this position in the two private letter rulings discussed above.  *See* PLR 8821071 (Mar. 1, 1988); PLR 8827058 (Apr. 13, 1988) (supplementing PLR 8821071).

in Year 4. This is true for purposes of carrying forward P NOLs from Year 1, as well as carrying back P's separate return NOLs generated in future years (*e.g.,* if P deconsolidates at the end of Year 4 and carries a separate return NOL generated in Year 5 back to Year 4). As this example indicates, the Taxpayer's position results in only one Lonely Parent for each consolidated return year.



**A Single Lonely Parent**

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|--------|--------|--------|--------|--------|
| P | P | P | | T |
| T | T | T | T | |
| S | S | S | P | P |
| Separate return year for P, T, and S | P acquires T; P-T-S consolidated return year. | S merges into P (an 82-152 Transaction) | P-T consolidated return year; P group has income | P and T separate return year |

--In Years 2 and 3, P is the common parent and the Lonely Parent for carryforwards from Year 1 and carrybacks from Year 5;

--In Year 4, P continues to the Lonely Parent for carryforwards from Year 1 and carrybacks from Year 5.

The NOPA's position, by contrast, causes different corporations to be the Lonely Parent for the same tax year, depending on whether losses are being carried forward or carried back. Applying the NOPA's position to the example of the preceding paragraph, for example, P would be the Lonely Parent for NOL carryforwards to Year 4 while T would be the Lonely Parent for NOL carrybacks to the same year. The presence of two Lonely Parents in a single year is contrary to the intent <u>and language</u> of the Lonely Parent Rule, which is to identify "<u>*the*</u> corporation which is the common parent for the consolidated return year to which the tax attribute is to be carried (except as provided in § 1.1502-75(d)(2)(ii) …)."[30] Moreover, as discussed above, the Lonely Parent Rule does not distinguish between carryforwards and carrybacks. Thus, the same corporation must be the Lonely Parent for purposes of carrying

---

[30] Treas. Reg. § 1.1502-1(f)(2)(i) (emphasis added).

losses forward and back to a given consolidated return year. The NOPA's position fails to satisfy this basic requirement.

In short, the Taxpayer's position does not result in more than one common group parent. Nor does the Taxpayer's position result in more than one Lonely Parent. The NOPA's position does result in more than one Lonely Parent, however, and thus must be rejected.

### 4.    Additional NOPA Arguments are Incorrect

Notwithstanding the above, the NOPA argues that the language of Treas. Reg. § 1.1502-75(d)(2)(ii) supports the NOPA's position that, after an 82-152 Transaction, the new parent rather than the former parent should be the Lonely Parent for loss carrybacks. The NOPA emphasizes the following language of Treas. Reg. § 1.1502-75(d)(2)(ii): "[F]or purposes of applying [the Lonely Parent Rule] to separate return years ending on or before the date on which the former parent ceases to exist, such former parent, and not the new common parent, shall be considered to be the corporation described in such paragraph." (Emphasis added).

The emphasized language has no relevance to the Taxpayer's case, since Grace-Conn. did not cease to exist. In a -75(d)(2) Transaction, where the former parent ceases to exist, the former parent cannot by definition have losses in subsequent years to carry back to the group. The regulation's reference to the years ending on or before the date on which the former parent ceases to exist encompasses all of the years from which the former parent could have losses that could be carried to the group, since the former parent then ceases to exist. In short, that regulatory language is simply irrelevant where the former parent continues to exist, where the former parent is thereafter deconsolidated, and where the former parent has losses in subsequent years that it seeks to carry back to the group.

### 5.    The Absence of Specific Guidance Requires the Adoption of the Taxpayer's Position

The Service has not modified Treas. Reg. § 1.1502-75(d)(2)(ii) to incorporate 82-152 Transactions, and has therefore failed to address in regulations how the Group Continuation Rules apply to 82-152 Transactions. Although the 2001-2002 and 2002-2003 Priority Guidance Plans indicated that the Service and the Treasury Department would be issuing guidance regarding continuation of a consolidated group in certain transactions, no revisions to Treas. Reg. § 1.1502-75 have been published, and this project was dropped from the 2003-2004, 2004-2005, and 2005-2006 Priority Guidance Plans.[31] As a result, taxpayers are left only with the guidance that -75(d)(2) Transactions and 82-152 Transactions are indistinguishable in substance.

In the absence of express regulatory guidance, taxpayers are generally allowed to adopt a reasonable approach to the application of the consolidated return rules. In *Gottesman &*

---

[31] *See* Treasury Department Office of Tax Policy and Internal Revenue Service, *2005-2006 Priority Guidance Plan* (August 8, 2005); Treasury Department Office of Tax Policy and Internal Revenue Service, *2004-2005 Priority Guidance Plan* (July 26, 2004); Treasury Department Office of Tax Policy and Internal Revenue Service, *2003-2004 Priority Guidance Plan* (July 24, 2003); Treasury Department Office of Tax Policy and Internal Revenue Service, *2002-2003 Priority Guidance Plan* (July 10, 2002); and Treasury Department Office of Tax Policy and Internal Revenue Service, *2001-2002 Priority Guidance Plan* (April 26, 2001).

*Company, Inc. v. Commissioner*, the Tax Court addressed the application of the consolidated return regulations to the calculation of the accumulated earnings tax under section 531.[32] The court held that the taxpayer's interpretation that its accumulated taxable income should be determined by reference to its separate taxable income and not on a consolidated basis was reasonable, given the lack of guidance in the consolidated return regulations applicable to the tax years at issue as to how accumulated taxable income is computed in the consolidated return context. In so holding, the court stated,

> We cannot fault [taxpayer] for not knowing what the law was in this area when the Commissioner, charged by Congress to announce the law (sec. 1502), never decided what it was himself. . . . We find that the Commissioner's regulations regarding the manner in which the accumulated earnings tax was to be imposed on corporations making consolidated returns were ambiguous during the years at issue. This ambiguity was of the Commissioner's making, and, as such, must be held against him. . . . [Taxpayer's] interpretation of these regulations was reasonable under the circumstances.[33]

It would, of course, be helpful if the regulations expressly provided for 82-152 Transactions. The regulations could, for example, expressly provide that 82-152 Transactions do not cause a consolidated group to terminate. The issuance of such a regulation would eliminate the current conflict between the general group termination provisions of Treas. Reg. § 1.1502-75(d)(1), which provide literally that an 82-152 Transaction terminates a group, and Rev. Rul. 82-152, which provides that such a transaction does not terminate a group.[34] The regulations similarly could specify whether the former parent or the new common parent is the Lonely Parent after an 82-152 Transaction. Such regulations presumably would be helpful to both taxpayers and Service personnel.

However, such regulations have not been issued, even though the Service has known for at least 20 years that the regulations do not address 82-152 transactions adequately. Commentators have repeatedly noted that Treas. Reg. § 1.1502-75(d) does not work; presumably, the Service and the Treasury agree, since the plan to revise that regulation was included in the Priority Guidance Plan in previous years. Despite the plan to produce such guidance, it has failed to materialize. Absent such guidance, the Taxpayer is entitled to rely on whatever published guidance exists and apply such guidance reasonably. Consistent with the Tax Court's holding in *Gottesman*, the Taxpayer's position is a reasonable interpretation of the application of the SRLY regulations and the Lonely Parent Rule to 82-152 Transactions. Moreover, the Taxpayer's position is consistent with the purposes of the SRLY regulations (and Rev. Rul. 82-152). As such, the fact that the Service has not modified its regulations to address

---

[32] 77 T.C. 1149 (1981).

[33] *Id.* at 1157-1158.

[34] In fact, a group wishing to deconsolidate could argue that an 82-152 Transaction terminates the group notwithstanding Rev. Rul. 82-152. The issuance of a Revenue Ruling inconsistent with the result required by the regulations cannot be binding on taxpayers. *See* Treas. Reg. § 601.601(d)(2).

82-152 Transactions requires that the Taxpayer's position be adopted and the proposed adjustment be rejected.

**F.    Conclusion**

For the reasons discussed above, the carryback of Grace-Conn.'s NOL from its 1998 tax year should not be limited by the SRLY rules in Treas. Reg. § 1.1502-21(c) to the extent that it is carried back to the 1989 tax year of the Historic Grace-Conn. Group. This is the case because, for purposes of determining the application of the SRLY rules to the Grace-Conn. Carryback, Grace-Conn. is the Lonely Parent of the Historic Grace-Conn. Group in the 1989 carryback year.

Under penalties of perjury, I declare that I examined the facts stated in this protest, including any accompanying documents, and, to the best of my knowledge and belief, they are true, correct, and complete.

W. R. Grace & Co. and Subsidiaries

_____

Elyse Filon
Agent (pursuant to attached power of attorney)
Fresenius Medical Care Holdings, Inc.

30

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | | Docket Ref. No. _____ |

## ORDER MODIFYING THE AUTOMATIC STAY SO THAT DEBTORS MAY COMMENCE TAX COURT LITIGATION TO RESOLVE CERTAIN TAX CLAIMS

Upon the motion (the "Motion") [1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (1) modifying the automatic stay in order to permit the Debtors to file litigation (the "Tax Suit") in the United States Tax Court against the Commissioner of the Internal Revenue Service ("IRS"), with respect to certain tax claims potentially affecting Debtors' 1989 tax year and (2) authorizing Debtor W. R. Grace & Co.-Conn. to take such action as is necessary to proceed with the Tax Suit; and due and adequate notice having been given under the circumstances; and it appearing that no other notice need be given; and it appearing that the relief requested in the Motion is in the best interest of the Debtors, their estates and creditors; after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that the Motion is hereby granted; and it is further

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

ORDERED, that the automatic stay is hereby modified so as to permit the Debtors to file the Tax Suit in the United States Tax Court against the IRS, with respect to certain tax claims potentially affecting Debtors' 1989 tax year; and it is further

ORDERED, that Debtor W. R. Grace & Co.-Conn. is authorized to take such action as is necessary to proceed with the Tax Suit; and it is further

ORDERED, that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2007

_____
Honorable Judith K. Fitzgerald