## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | Related Docket No .21245 |
| | ) | Objection Deadline:  May 8, 2009 |
| | ) | Hearing Date: May 14, 2009 |

## DEBTORS' RESPONSE IN SUPPORT OF THE
## MOTION TO STRIKE WHITEHOUSE EXPERT REPORT

W.R. Grace & Co. and its affiliate companies (collectively, the "Debtors") respectfully request that the Court grant Arrowood Indemnity's motion to strike Dr. Alan Whitehouse's expert report because the Libby Claimants have failed to produce databases and documents upon which Dr. Whitehouse relies in forming his opinions.  Such relief is warranted for several reasons.

*First*, the law is clear that a party cannot withhold information upon which its testifying expert relies on the ground that it is "confidential".  To do so would violate both the plain language and purpose of Rule 26.  At bottom, claimants simply seek to shield their expert's fundamentally flawed opinions from any sort of scrutiny by refusing to produce documents upon which he expressly relies.  While Dr. Whitehouse's opinions are unreliable on their face and have been universally criticized (most recently by the district court that presided over the criminal trial in Montana, which struck certain parts of Dr. Whitehouse's testimony on the ground that it was scientifically flawed and unreliable), production of the documents upon which he purports to rely would undoubtedly further refute his theory that the Libby Claimants suffer from a "unique" asbestos-related disease that is not recognized by established science.

*Second*, movants correctly observe that the Libby Claimants have put their medical conditions at issue in these proceedings, and thus under established law have waived any assertion of confidentiality. Even if their expert had not expressly relied upon these materials, claimants cannot put their claims at issue and at the same time shield them from scrutiny.

*Third*, not only do claimants lack any legal basis for withholding these documents, but their prior treatment of the same material makes clear that their assertions of confidentiality are simply baseless. Claimants have repeatedly disclosed such information to other third parties, did not assert that there was any issue as to their confidentiality when the Court entered its confidentiality order in December, and have produced selected records despite their claim that they need a protective order. In sum, claimants have absolutely no basis for withholding this information; they have done so simply to gain an unfair advantage over adverse parties in these proceedings.

*Finally*, the Libby Claimants have in the past refused to produce nearly *half* of the medical records upon which Dr. Whitehouse's opinions are based, regardless of whether the Court enters a confidentiality order. While they admit that Dr. Whitehouse has access to these materials, and his report expressly discusses and relies upon them, claimants' counsel refused to produce these records on the specious ground that they are not medical records of their "clients". Claimants' sole basis for refusing to produce these expert reliance materials was that their lawyers allegedly did not have "control" over them; however, they admit that their *expert* has access to these records and used them in formulating his opinions. If Dr. Whitehouse did not have permission to use the records of "non-clients" or to disclose them during discovery, then he should not have expressly relied upon these materials for the opinions contained in his expert

report.  Under Rule 26, an expert *must* disclose all reliance materials; if he cannot do so, his testimony should be barred.

Accordingly, Debtors agree that this Court should strike Dr. Whitehouse's expert report.  However, they submit this separate response to underscore that, regardless of the relief the Court orders, this dispute should not be allowed to impact the carefully crafted schedule contained in this Court's Case Management Order.  The discovery schedule is specifically tied to the hearings the Court has ordered, which cannot be altered.  Moreover, any delay in the proceedings would severely prejudice the Debtors and other parties.  Accordingly, Debtors respectfully request that the Court grant the requested relief and reaffirm the schedule set forth in the Court's Case Management Order.

## SUPPLEMENTAL STATEMENT OF FACTS

The relevant facts are laid out in the motion to strike, and the Debtors will not repeat them here.  However, they wish to bring to the Court's attention certain additional information that is relevant to the motion.

## I.    Dr. Whitehouse's Review of Medical Records for 1,800 Libby Patients.

The Libby Claimants have proffered Dr. Whitehouse's expert report to criticize the medical criteria under the Grace/ACC Trust Distribution Procedures ("TDP"), asserting that the Libby Claimants are at risk for a "unique" asbestos-related disease that they claim is not adequately considered under the scientifically established criteria adopted by the TDP. However, Dr. Whitehouse is not an epidemiologist and did not apply any epidemiological principles that would allow him to provide any reliable testimony regarding the Libby Claimants' risk of developing a "unique" asbestos-related disease.  Rather, he is a physician who purports to provide a "common sense" analysis based on a series of cases he has reviewed

3

involving Libby patients. (*See United States v. W.R. Grace*, No. 05-cr-00007, Trial Tr. vol. 7 at 1693 (Mar. 4, 2009), Ex. A.)

In his expert reports submitted in connection with the confirmation and estimation proceedings, Dr. Whitehouse relies heavily on his claim that he has examined 1,800 patients at the Center for Asbestos Related Disease (CARD) Clinic whom he asserts were exposed to tremolite in Libby, Montana. (*See* 12/29/08 Whitehouse Report ¶¶ 5, 31-32, 34-36, 40-43, 47, 49-50, 69-73, 75-80, Ex. B; 9/25/06 Whitehouse Report ¶¶ 5, 28-32, 45, 49-50, 52, 64, Schwartz Decl. Ex. H; *see also* 3/12/09 Supplemental Whitehouse Report.) According to Dr. Whitehouse, information about these patients has been entered into a database upon which he relies. (*See* 9/25/06 Whitehouse Report ¶¶ 5, 67, Schwartz Decl. Ex. H.)

Based on this review of medical records from 1,800 patients and this database, Dr. Whitehouse asserts that individuals exposed to tremolite in Libby, Montana have a "unique disease" caused by asbestos and that the scientifically established criteria in the TDP would not properly compensate individuals who, under his definition, have developed this unique "asbestos-related" condition. (*See* 12/29/08 Whitehouse Report ¶ 34, Ex. B ("There generally appears to be a distinct pattern for Libby asbestos disease."); *id.* ¶ 38 ("To my knowledge, no study of asbestos disease from predominantly chrysotile exposure shows overall progression rates for lung function loss anything like those seen in Libby, where most patients have had relatively light exposures."); 9/25/06 Whitehouse Report ¶¶ 27, 49, Schwartz Decl. Ex. H (TDP definition of asbestosis "is highly exclusionary upon the Libby cohort").)

Dr. Whitehouse's opinions are premised on the use of diagnostic criteria and methodologies that have been rejected by the scientific and medical community as unreliable. For example, in reviewing Dr. Whitehouse's patient files as part of its pilot case study of

4

potential environmental disease cases in Libby, Montana, the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") rejected two-thirds of the cases that Dr. Whitehouse submitted. The ATSDR found that of the 27 cases that Dr. Whitehouse had diagnosed with asbestos disease from environmental exposure in Libby, only 8 individuals had any asbestos-related abnormality that could potentially be associated exclusively with environmental exposure in Libby, concluding instead that many did not have any disease at all and that most had other significant, non-Libby occupational exposure to asbestos. (3/19/09 Whitehouse Dep. at 150-51, Ex. C.)

Likewise, in his testimony during the criminal trial in Montana, Dr. Whitehouse admitted that he has no scientific basis for his opinion that a wave of "unique" asbestos-related disease in Libby will continue into the future:

Q. . . . And you don't have the science to make a scientific prediction, do you?

A.     Not to the numbers, no.

. . . .

Q.     You don't have the exposure numbers and you don't have a curve.  True or not?

A.     I don't have exposure numbers and I do not have a curve.

(*See United States v. W.R. Grace*, No. 05-cr-00007, Trial Tr. vol. 7, at 1693 (Mar. 4, 2009), Ex. A.)  Based on this testimony, the court found that "Dr. Whitehouse does not possess specialized knowledge in the field of epidemiology[]," and held that Dr. Whitehouse's "opinion testimony on the future pattern of disease and general causation is therefore inadmissible under Rules 701(c) and 702." (*See U.S. v. W.R. Grace*, Doc. No. 1103, Apr. 21, 2009 Order at 4, Ex. D.)

Dr. Whitehouse's opinions have also been heavily criticized by experts in these proceedings.  As Gary K. Friedman, a pulmonologist at the Texas Lung Institute and expert retained by the Trustees in several asbestos-related bankruptcies has observed, Dr. Whitehouse's

opinions are "flawed and unreliable"; his "theory of a unique disease due to 'Libby Asbestos' is without scientific basis and should be disregarded"; and "[t]he methodology which he employs in diagnosing asbestosis is inconsistent with the Guidelines or Standards upon which he claims to rely." (4/9/09 Friedman Report at 6-7, 9, Docket No. 21205.) Dr. Laura S. Welch, an expert in occupational medicine, who testifies almost exclusively on behalf of plaintiffs in asbestos litigation, likewise concludes that Dr. Whitehouse's opinions regarding deaths from asbestos-related disease in the Libby population are "not valid," and that Dr. Whitehouse advocates medical criteria that are not "reliable or specific enough" to use as a means of determining compensation, while at the same time rejecting criteria that have "consistently been used for both epidemiological purposes and by medical practitioners as a shorthand way to read x-rays both for diagnosis and assessment of severity." (4/6/09 Welch Report at 5, 18-19, Docket No. 21205.) Dr. Gail Stockman, formerly of the University of Texas M.D. Anderson Hospital and currently practicing at the Rocky Mountain Heart and Lung Clinic in Kalispell, Montana, noted that Dr. Whitehouse's "conclusions are at best meaningless, and at worse, deceptive," and had "resulted in a gross inflation of the estimation of significant asbestos-related disease in the Libby population." (4/6/09 Stockman Report at 7, 17, Docket No. 21205.) Finally, Dr. John Parker, the former Chief of the Examination Processing Branch and former Acting Chief of the Epidemiological Branch at the Division of Respiratory Disease Studies for NIOSH, also rejects Dr. Whitehouse's contention that there is "a unique or distinct pattern of lung injury from exposure to tremolite or amphibole contaminants within the Libby vermiculite." (4/6/09 Parker Report at 10, Docket No. 21221, Ex. E.) Based on his extensive experience studying the Libby population,[1] Dr. Parker concludes that the accepted "diagnostic methodology and medical

---

[1] While at NIOSH, Dr. Parker conducted the initial review of NIOSH's epidemiological study of the Grace vermiculite workers and was the NIOSH medical professional who traveled to Libby to explain the findings of that

standards" used to evaluate and diagnose asbestos disease generally "are appropriate for evaluating people exposed to fibrous minerals from Libby." (*Id.* at 3.)

## II.    Claimants' Refusal to Produce the Medical Records Dr. Whitehouse Reviewed.

Despite the fact that Dr. Whitehouse's expert opinions are based almost entirely on his review of the medical records of these 1,800 individuals, the Libby Claimants have steadfastly refused to produce them. As recounted in the motion, the Libby Claimants have refused to produce such documents to the insurer movants on the ground that they are "confidential" or that they are outside their control. (Mot. at 8-9.) Debtors have been equally unsuccessful in obtaining full disclosure.

Under the Court's Second Amended Case Management Order, expert reports and accompanying disclosures were due by March 16, 2009. (Second Amended Case Management Order ¶ 6, docket no. 20622, Jan. 29, 2009.) The Court's order unequivocally stated that "[s]imultaneously with the service of the expert reports, the parties shall also serve other interested parties with all documents on which the expert relies in forming his or her opinion which are not publicly available (e.g., medical journal articles)." (*Id.* ¶ 4.) While the Libby Claimants produced Dr. Whitehouse's expert report, they failed to produce the documents or databases upon which his opinions were based by the deadline set by the Court.

The movants specifically requested these materials, but the Libby Claimants still had not produced them by the scheduled date of Dr. Whitehouse's deposition, which occurred on March 19, 2009, in Spokane, Washington. During his deposition, Dr. Whitehouse continued to rely on the records and databases for all 1,800 patients and testified that the records for all 1,800

---

study to the Libby workers. (4/6/09 Parker Report at 3, Docket No. 21221.) Dr. Parker also served as the third B-reader in the ATSDR's screening study of the Libby population, was a co-author of the high-resolution computed tomography (HRCT) study conducted in Libby, and continues to read x-rays and HRCTs of individuals from Libby for the ATSDR. (*Id*).

patients were relevant to his opinions in this case. (*See* 3/19/09 Whitehouse Dep. at 69, Ex. C.) After approximately four hours, he unilaterally terminated the deposition and walked out of the room. (*See id.* at 268-69.)

Both the movants and the Debtors continued to attempt to obtain Dr. Whitehouse's reliance materials after his deposition. (*See* 4/8/09 B. Stansbury, letter to J. Heberling, Ex. F.) In their correspondence with claimants' counsel, the Debtors observed that the Libby Claimants had no legitimate ground for refusing production, given that Dr. Whitehouse had testified that he relied upon the medical records of all 1,800 patients in formulating his opinions. (*Id.* at 2.)

In response, the Libby Claimants continued to refuse to produce any of the materials absent a new protective order. (*See* 4/13/09 J. Heberling, letter to B. Stansbury at 3, Ex. G.) Moreover, claimants' counsel categorically refused to produce medical records that Dr. Whitehouse had reviewed for individuals who were not their "clients", regardless of whether the parties agreed to a protective order, asserting "we do not have access to or control over the medical records of patients who are not clients." (*Id.*) While they acknowledged that Dr. Whitehouse had "access to these records," they nonetheless refused to produce such documents —which constituted nearly half the records Dr. Whitehouse claimed he had reviewed—asserting that Debtors' request for the materials on which Dr. Whitehouse based his opinions constituted "intentional harassment." (*Id.* at 3-4.)

## ARGUMENT

### I.  Claimants' Refusal To Produce Medical Records Upon Which Their Testifying Expert Expressly Relies Violates Rule 26 And This Court's Case Management Order.

Debtors agree with movants that production of the materials upon which Dr. Whitehouse relies is clearly required under Federal Rule of Civil Procedure 26(a)(2)(B), which

mandates the production of all expert reliance material. Fed. R. Civ. P. 26(a)(2)(B) (made applicable by Federal Rule of Bankruptcy Procedure 7026). Rule 37 requires that the Court exclude an expert's opinions where the expert fails to make such production, except where the failure to produce the information "was substantially justified or is harmless." *See* Fed. R. Civ. P. 37(c)(1) (made applicable by Federal Rule of Bankruptcy Procedure 7037); *United States v. 68.94 Acres of Land*, 918 F.2d 389, 396-97 (3d Cir. 1990) (upholding exclusion of expert testimony where expert relied on data that plaintiffs had failed to disclosure); *Johnson v. Vanguard Mfg., Inc.*, 34 Fed. Appx. 858, 859 (3d Cir. 2002) ("A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless."); *Hagans v. Henry Weber Aircraft Distribs., Inc.*, 852 F.2d 60, 64 (3d Cir. 1988) (exclusion of expert testimony was appropriate where plaintiff failed to disclose all bases for expert's opinion).

The sanctions authorized under the rules recognize the inherent prejudice an opposing party will suffer if the basis for an expert's opinions are not fully disclosed early in the proceedings. "The purpose of [Rule 26(a)(2)(B)] is to give opposing parties a reasonable opportunity to prepare for effective cross examination or to secure their own expert witness." *McMillan v. Weeks Marine, Inc.*, 478 F. Supp. 2d 651, 659 (D. Del. 2007). The rules thus recognize that "being forced to cross-examine an opposing expert without the benefit of a meaningful opportunity to depose him puts a party at a substantial disadvantage." *Brooks v. Price*, 121 Fed. Appx. 961, 965 (3d Cir. 2005).

Here, the Libby Claimants failed to produce the core information on which Dr. Whitehouse based his testimony. Moreover, they did so in direct defiance of this Court's order governing case management. While Dr. Whitehouse's opinions suffer from a number of flaws

on their face, review of the underlying documents and data he claims support his opinions is necessary for their full evaluation.   Moreover, such review would undoubtedly further demonstrate what both the district court presiding over the criminal trial and the experts who have reviewed his work uniformly recognize—that his theory that the Libby Claimants have a "unique" asbestos-related disease is contrary to established science.   Under the plain language of Rule 37 and the Court's orders, Dr. Whitehouse's opinions should be stricken. *See, e.g., 68.94 Acres of Land*, 918 F.2d at 396-97 (upholding exclusion of expert testimony); *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 833 (8th Cir. 2008) (affirming exclusion of portions of expert's testimony where expert had failed to disclose new study data); *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (affirming district court decision striking untimely expert disclosure); *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 213-14 (D.N.J. 2001) (granting motion to strike expert memorandum because of failure to include "the basis and reasons" for purported expert's opinions); *Smith v. Jacobs Eng'g Group, Inc.*, No. 4:06cv496-WS, 2008 WL 4264718, at *5-7 (N.D. Fla. Mar. 20, 2008), *adopted by* 2008 WL 4280167 (N.D. Fla. Sept. 12, 2008) (recommending that expert opinion be excluded from trial, where defendant failed to disclose "data or other information" its expert relied upon in forming his opinion).

## II.   Claimants Waived Any Claim Of Confidentiality By Putting Their Medical Conditions At Issue.

Debtors also agree that claimants waived any claim of confidentiality by putting their medical conditions at issue in these proceedings. (*See* Mot. at 14-15.) *See, e.g., Williams v. Rene*, 72 F.3d 1096, 1103 (3d Cir. 1995) ("by putting his physical condition at issue, plaintiff waived the physician-patient privilege with respect to the injuries claimed to have been incurred in the accident"); *In re Asbestos Prods. Liab. Litig. (No. VI)*, No. MDL 875, 2009 WL 466381, at *3 (E.D. Pa. Feb. 25, 2009) ("By bringing suit based on diagnoses of asbestosis, Plaintiffs have

10

essentially released to the world their own medical information and waived any privilege to the privacy of that information."); Mont. R. Civ. P. 35(b)(2) (party waives any physician patient privilege by "commencing an action or asserting a defense which places in issue the mental or physical condition of a party to the action"); Del. Uniform Rules Evid. 503(b)(3) ("There is no privilege under this rule for a communication relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of the patient's claim or defense.").

Accordingly, even if claimants' testifying expert had not expressly relied upon these materials, they would still be subject to disclosure. Claimants have no expectation of privacy given that they have expressly placed their medical conditions at issue in these proceedings. The fact that they have retained an expert to analyze their medical records and provide testimony regarding their claims only further underscores that they have no legitimate expectation of privacy in such information.

## III.   Claimants' Prior Conduct Demonstrates That Their Assertions Of Confidentiality Are Baseless.

Not only do claimants lack any legal basis for asserting confidentiality, but claimants' prior conduct shows that their claims of confidentially are factually dubious. *First*, claimants have repeatedly disclosed the documents they claim are confidential to other third parties. Indeed, in these proceedings, claimants have produced a selected portion of the records upon which Dr. Whitehouse relies, cherrypicking those that they believe may bolster his opinions. (*See* 4/8/09 B. Stansbury, letter to J. Heberling at 2, Ex. F.) Moreover, as movants observe, Dr. Whitehouse's expert report has been posted on the web site of a local newspaper in Montana, apparently without objection from claimants or their counsel. (*See* Mot. at 9 n.29,

citing Tristan Scott, *Bankruptcy Trial Reveals More Details of Asbestos Contamination*, Missoulian, April 5, 2009, http://missoulian.com/articles/2009/04/05/news/local/news03.txt.)

*Second*, claimants did not raise any issue as to confidentiality in the proceedings leading to the Court's December 17, 2008 confidentiality order. As movant correctly observed, the Libby Claimants participated extensively in those proceedings. (*See* Mot. at 1.) However, they never raised any confidentiality concerns as to the documents and databases upon which Dr. Whitehouse relies. (*See id.*) Instead, they unilaterally refused to comply with the requirements of the Federal Rules and this Court's order at the eleventh hour, alleging that they cannot produce any information absent a protective order.

*Finally*, the Libby Claimants refused to produce the information even after movants made clear that they would "agree to treat any personal medical information as confidential." (*See* 3/16/09 Schwartz letter to Cohn, Schwartz Decl. Ex. C; *see also* Schwartz Decl. Ex. W.) Despite these assurances, claimants still refused to provide the information, demonstrating that their alleged concerns regarding confidentiality are merely a pretext to shield their expert's opinions from scrutiny.

## IV.    Claimants Refused To Produce Nearly Half of the Records Upon Which Dr. Whitehouse Relies Even If The Court Entered A New Confidentiality Order.

Claimants' claims of confidentiality are further belied by the fact that they refused to produce nearly half the records upon which Dr. Whitehouse relies *even if* this Court entered a new confidentiality order. (*See* 4/13/09 J. Heberling, letter to J. Stansbury at 3, Ex. G.) Their sole basis for this refusal was their assertion that claimants' counsel did not have "control or custody" over records of Libby patients who were not their "clients". (*Id.*) However, at the same time, they *acknowledged* that Dr. Whitehouse has such access and, indeed, his expert report is filled with references to, and reliance on, such documents. *See supra.*

Claimants' blanket refusal to produce nearly half the documents upon which Dr. Whitehouse relied is plainly improper. A party cannot shield an expert's opinions from scrutiny by refusing to produce documents upon which the expert expressly bases his testimony. If Dr. Whitehouse did not have permission to use the records of "non-clients" or to disclose them during discovery, then he should not have submitted a widely-publicized expert report in which he expressly cites the documents to support his conclusions. Indeed, counsel for the Libby Claimants acknowledged as much, offering to "stipulate" that Dr. Whitehouse's opinions would be "limited" to the medical records from the "900+" claimants who are their "clients." (*See* 4/13/09 J. Heberling, letter to J. Stansbury at 4, Ex. G.) However, Dr. Whitehouse testified that he could not limit his opinions in this manner because documents from *all* 1,800 of the Libby patients—including the "non-clients"—were relevant to his opinions, and his expert report is filled with statistics based on the *entire* CARD population he claims to have reviewed. (*See* 3/19/09 Whitehouse Dep. at 68-69, Ex. C.)

Recognizing that their position is indefensible, the Libby Claimants have now suggested—contrary to their consistent position during these proceedings—that they may be willing to produce such documents in redacted form. However, production of these documents in redacted form at this late stage in the proceedings will not solve the problem. Redaction of the documents would preclude the proper evaluation of Dr. Whitehouse's contentions because the parties will not be able to tell (1) who the patients are, and (2) whether they had community or occupational exposures, other asbestos-related exposures, or other relevant non-asbestos exposures or medical conditions. Accordingly, under the plain language of the Rules and the compelling circumstances here, an order striking Dr. Whitehouse's report is fully warranted.

13

**V.    Claimants' Failure To Produce Required Information Should Not Be Used As An Excuse To Delay The Confirmation Proceedings.**

Finally, regardless of the relief the Court ultimately orders, the Libby Claimants' failure to comply with the Federal Rules and this Court's Case Management Order should not be used as an excuse to delay the confirmation proceedings. As noted above, the most appropriate relief and that expressly contemplated under Rule 37, is to strike Dr. Whitehouse's opinions. Such relief is fully warranted under the Rules and applicable case law. Moreover, it is the most appropriate relief given the Libby Claimants' blatant failure to comply with their discovery obligations and the Court's order directing timely production of expert reliance materials. To the Debtors' knowledge, *no party* in these proceedings has been provided with a complete set of Dr. Whitehouse's reliance materials. Accordingly, this is not a situation in which the Court could simply "tailor an existing protective order to allow other parties in interest access to documents otherwise protected from public disclosure." (*See* Mot. at 16.)[2] Nor are all these documents "already in the Plan Proponents possession." (*See id.* at 18.) Rather, the Libby Claimants have sought to shield Dr. Whitehouse's opinions from scrutiny by *any* of the parties.

Moreover, as demonstrated by their recent motion to amend the schedule contained in the Court's Case Management Order and postpone the confirmation hearing, the Libby Claimants' refusal to produce these materials appears to be part of a deliberate strategy designed to delay the confirmation proceedings. (*See* Libby Claimants' Mot. to Amend Plan Confirmation Case Management Order And Postpone Confirmation Hr'g, Docket No. 21428, ¶ 7 (April 27, 2009).) Such tactics should not be tolerated, and Dr. Whitehouse's report should be stricken.

---

[2] Nor does Bankruptcy Rule 9018 purport to trump Federal Rule of Civil Procedure 37, which requires the exclusion of expert testimony where a party fails to produce the materials upon which an expert relies. (*See* Mot. at 16.)

However, to the extent the Court entertains movants' request that the Court enter alternative relief ordering the production of the material Dr. Whitehouse reviewed in connection with his report and testimony, Debtors request that the Court make clear that such relief will not alter the schedule the Court set forth in the Case Management Order. (*See* First Case Management Order, Docket No. 20204, Dec. 5, 2009; Second Am. Case Management Order, Docket No. 20622, Jan. 29, 2009; Third Am. Case Management Order, Docket No. 21544, May 5, 2009.)[3]  That schedule was the result of extensive negotiation by the parties and careful consideration by the Court and should not be disturbed because the Libby Claimants continue to refuse to produce all of the materials supporting Dr. Whitehouse's opinions (something they have never done during the course of these proceedings, or any other proceedings for that matter).  Should the Court grant movants' alternative relief in the form of an order requiring production, it should make clear that such production cannot be used as an excuse to further delay the confirmation proceedings pursuant to the schedule set forth in this Court's Case Management Order.  A contrary result would allow the Libby Claimants to benefit from their failure to comply with their discovery obligations, while at the same time significantly prejudicing the Debtors.[4]

---

[3] In addition to the Libby Claimants' express request that the confirmation hearing be postponed, movants assert that because the Libby Claimants have failed to produce Dr. Whitehouse's reliance materials, they "have been precluded from preparing rebuttal opinions relating to Libby issues, which were due on April 6, 2009," thereby suggesting that they will seek to file additional rebuttal reports if Dr. Whitehouse's opinions are not stricken and production is ordered. (Mot. at 13.)

[4] The Debtors also join in movants' request for an order directing the Libby Claimants to pay attorney fees and costs to reimburse the parties "for traveling to southeastern-Washington State for the deposition that Dr. Whitehouse unilaterally walked out of after four hours." Reimbursement of costs and fees is an appropriate sanction where a deponent "impedes, delays, or frustrates," a deposition. Fed. R. Civ. P. 30(d)(2); *see Johnson v. Wayne Manor Apartments*, 152 F.R.D. 56, 59-60 (E.D. Pa. 1993) (granting plaintiff's motion to compel deposition and for sanctions); *Biovail Labs., Inc. v. Anchen Pharm., Inc.*, 233 F.R.D. 648, 654-55 (C.D. Cal. 2006) (granting defendant's request for monetary sanctions, including videographer and court report costs, roundtrip airfare, and lodging); *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 199 (E.D. Pa. 2008) (awarding $13,000 in costs and fees under Rule 37(a) associated with the motion to compel).

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that the Court grant Arrowood's

motion to strike Dr. Whitehouse's expert report and exclude his opinions.


Dated: May 8, 2009                          Respectfully submitted,


                                            KIRKLAND & ELLIS LLP
                                            David M. Bernick, P.C.
                                            Theodore L. Freedman
                                            Citigroup Center
                                            153 East 53rd Street
                                            New York, New York 10022
                                            (212) 446-4800

                                            Barbara M. Harding
                                            Brian T. Stansbury
                                            655 Fifteenth Street, N.W.
                                            Washington, D.C. 20005
                                            (202) 879-5200

                                            -and-

                                            THE LAW OFFICES OF JANET S. BAER P.C.
                                            Janet S Baer
                                            70 W. Madison St., Suite 2100
                                            Chicago, IL 60602
                                            (312) 641-2162

                                            -and-

---

Such relief is fully warranted here given that Dr. Whitehouse unilaterally terminated the deposition well before it had ended, stating "I don't care whether you have [more time] or not. You are not going to have another chance, another crack at me. I'm done, Okay?" (3/19/09 Whitehouse Dep. at 267-68, Ex. C.) Debtors have requested that the Libby Claimants reimburse the Debtors for the cost of this deposition and have conferred extensively about the matter, but counsel for the Libby Claimants has refused. (*See* 3/26/09 B. Stansbury letter, to J. Heberling, Ex. H (seeking $17,487.70 in fees and costs incurred by the Debtors for the deposition); 4/8/09 B. Stansbury letter, to J. Heberling, Ex. F; 4/13/09 J. Heberling letter, to B. Stansbury, Ex. G (refusing to reimburse W.R. Grace for any costs and fees incurred as a result of the incomplete deposition).)

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (#2436)
James E. O'Neill (#4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession