# Exhibit G

*Law Offices of*
## McGarvey, Heberling, Sullivan & McGarvey, P.C.

Dale L. McGarvey
Jon L. Heberling
Roger M. Sullivan, Jr.
Allan M. McGarvey
John F. Lacey

745 South Main
Kalispell, Montana
59904-5399

*Telephones:*
(406) 752-5566
1-800-345-1763 (in State)
1-800-406-7544 (out of State)
*Fax:* (406) 752-7124

*Emails:*  dmcgarvey@mcgarveylaw.com
jheberling@mcgarveylaw.com
amcgarvey@mcgarveylaw.com
rsullivan@mcgarveylaw.com
jlacey@mcgarveylaw.com

April 13, 2009

Brian Stansbury
Kirkland & Ellis LLP
655 15th Street NW, Suite 1200
Washington DC  20005

RE:   Dr. Whitehouse deposition 3/19/09

Dear Brian:

This is in response to yours of 4/8/09. I have attached a copy of the e-mails leading up to the deposition. Your letter of 4/8/09 refers to the "agreement to limit the deposition to eight hours," including both the 3/19/09 deposition and the deposition after experts' reports are in.

1.   **End of the deposition.**

Your letter of 4/8/09, p.2, describes Dr. Whitehouse as "walking out of the deposition." This statement does not tell the full story. Dr. Whitehouse had been ill in the days before the deposition. As we discussed before the deposition, it was better for him to start early (before 9:00 a.m.) for this reason, and we appreciate that you started the deposition early to accommodate him. The e-mail history confirms that he had a "medical issue," which I did disclose to you. On departing from the deposition, Dr. Whitehouse stated, at 268:13:

> A.   And you know, I am tired, and I don't feel very well, and I'm going to end the deposition now okay.

You objected, and I later stated, at 269:13:

> Mr. Heberling: When you're 71 years old maybe you will understand this. I mean you have been at him since 8:30 this morning.

Brian Stansbury
Page Two
April 13, 2009

It was after 2:00 p.m. at the time, 270:2.

    For the following reasons, we do not believe that Grace has any legitimate basis to complain about Dr. Whitehouse's departure from the deposition:

1. He was ill.
2. It was after 2:00 p.m.
3. Grace had used 4½ hours of deposition time. We had agreed the total was eight hours for the two depositions. The ACC had informed that they wanted two hours. Royal Indemnity's attorney was present. The State of Montana's attorney was present. Other attorneys were on speaker phone. It appeared that Grace was near the end of its time remaining.
4. Grace will have "another crack" at Dr. Whitehouse at the second deposition. 268:19. The parties deposing Dr. Whitehouse will receive the full eight hours to which they are entitled.

**2.    Grace's claim of "improper objection" and delay.**

    Putting aside the issue of whether the objection was proper, the event consumed what - two minutes? We will grant Grace five additional minutes to more than cure any issue of delay.

    There is more on improper delay. Repeatedly counsel for Grace argued with the witness, often failing to even ask a question. The argumentative approach drew many objections. Often the question had already been asked and answered. Please refer to the Deposition of Dr. Whitehouse, at 94:25 - 97:9, 105:3-22, 106:8-23, 109:2-25, 116:4, 120:25, 139:13, 139:19, 140:18, 141:24 - 142:8, 144:1, 144:9, 145:17, 168:8, 165:17, 190:7, 190:16, 191:25, 196:19, 214:3, 215:20, 216:3, 230:17, 234:10, 237:2, 240:12, 242:6, 248:12, 250:7, 252:19, 258:17, 262:18, 263:4, 264:13. If one is looking for delay in the deposition, here it is.

**3.    Discovery issues.**

    We have nearly completed scanning over 900 Libby claimant files of medical records from the Center for Asbestos Related Disease (CARD) Clinic

Brian Stansbury
Page Three
April 13, 2009

in Libby, together with scanned copies of all other doctors' medical records in our possession. We have had people scanning records for months, including all night long. On top of that, we have sent out new release forms to all clients to be delivered eventually to Grace, in response to Grace's request for all other providers' medical records as well.

Delivery of these medical records awaits Grace's signature on a stipulation for protective order. We agreed with the Plan proponents on a protective order weeks ago. Then Grace added a demand that all medical records produced in the bankruptcy case be available for use in the criminal case, and backed off the previously - agreed provision to protect confidential patient data. Our contingent fee agreement does not extend to use of client personal medical information in cases where we do not appear as counsel. The clients have no expectation that we would make such use of their medical records. The demand is also inconsistent with Montana law.

To date, discovery has been a one way street. We have hired additional staff to copy and send Grace and the ACC many hundreds of documents. Grace refused our document requests. Grace also refused our requests that Grace state its contentions. We are four months into the Court's Case Management Order, and Libby is still in the dark as to Grace's contentions. A motion will be made.

### a. Grace's request for "medical records and radiology for all 1,800 patients in Dr. Whitehouse's practice," letter 4/8/09, p.2.

We responded to the Grace request for production, informing that we are sending medical records on the 900+ Libby claimants, but that we do not have access to or control over the medical records of patients who are not clients. As treating pulmonologist Dr. Whitehouse has access to these records, but no control. He does not control CARD or the St. John's Hospital, which has the films.

What is reasonable here? Certainly the 900+ patients who are clients of the two law firms present examples of all of the medical observations Dr. Whitehouse will testify to. We are quite willing to stipulate that his

Brian Stansbury
Page Four
April 13, 2009


testimony be based on observations on the 900+ clients (except, of course, where patients are specifically identified by initials in the Dr. Whitehouse report). That would seem to be a reasonable solution to Grace's request. Demanding 1,800 files where 900 are presented certainly looks like intentional harassment. This is especially so in that Grace obtained copies of CARD patient files in 2006 in the criminal case, and again in 2009, when I understand Grace represented to the U.S. District Court, in Missoula, Montana, that it had lost track of its numbering system and had to start over.

If all patients Dr. Whitehouse has seen are deemed to contribute to form the basis for his opinions, then this principle would need to be applied to all other doctors as well. As an expert physician for Grace, Dr. Weill would need to supply medical records on all asbestos disease patients he has ever seen. Likewise, as expert physicians for Grace Dr. Ory, Dr. Parker, Dr. Henry, and Dr. Moolgavkar would need to supply medical records on all asbestos disease patients they have ever seen. Similarly, as expert physicians for the ACC, Dr. Freidman, Dr. Stockman, Dr. Hammar, and Dr. Welch would need to supply medical records on all asbestos disease patients they have ever seen. We suggest that a reasonable point to end the production of "information considered" is at the 900+ patients of CARD who are clients of the two Montana law firms.

### b. Grace's request for drafts of the rapid progression paper and the continuum paper.

The paper on the continuum leading from pleural plaques to diffuse pleural thickening to inclusion of interstitial fibrosis is easy. The deposition established that Dr. Whitehouse knows of the paper, but does not establish that he has a copy of it. At our request, Dr. Whitehouse has checked his computer and he does not have a copy of it.

The rapid progression paper is on six individuals. 71:1. Rapid progression is discussed in the 12/28/08 report and we delivered data and films on 20 rapid progression subjects. Exh. 6 to the report. Grace will have films on 900+ patients if it makes requests to the St. John's Hospital.

Brian Stansbury
Page Five
April 13, 2009


Grace can analyze progression rates in the 900. The rough draft paper should not be subject to demand, because the law should not intrude on the process of medical journal publication. Nevertheless, we have requested from Dr. Whitehouse a copy of the rough paper.

### c. Medical records on the patients in the Whitehouse (2004) article.

Your letter, p.2, acknowledges that a CD of medical records on patients in the study was delivered with Dr. Whitehouse's December 2008 report. Your letter, p.2, acknowledges that Dr. Whitehouse has "uncertainty about the accuracy of the unique identifier assigned (by Grace) to these individuals." That is correct. Dr. Whitehouse was not involved in the 2006 production "in the criminal case in the spring of 2006." The 2006 production was in redacted form. Now you have the same records on the 123 patients in unredacted form (except as to five non-clients), and you can match them with your redacted sets of records.

You complain, at p.2, that the "CD does not include complete charts for these individuals." You claim that the records are "cherry picked medical records." If you spend time in Libby, Montana, you will find that the people are refreshingly honest. It's a bit like going back in time to a more wholesome era. We like it that way. I assure you that no one at CARD "cherry picked" records. Nor would anyone in our office in Kalispell, Montana, a town of 14,000, do so. Any experienced trial lawyer knows that medical offices can have all sorts of problems copying records. Some records are elsewhere in the office during the copying. Personnel copying may leave some out. Any number of things can happen. Insulting Dr. Whitehouse in this way is demeaning to you, Brian.

As to films on the 123 subjects in the Whitehouse (2004) study, your letter, p.3, states: "Moreover you have not provided the x-rays and HRCTs for these individuals, which were produced in the spring of 2006." So, let's get this straight. Grace has them since 2006. Dr. Whitehouse does not have them. Our law firm does not have them. CARD does not have them (except through St. John's digital system). Now Grace is asking that we produce them again? In fact, Grace did make this request in RFP #1, and we

Brian Stansbury
Page Six
April 13, 2009

have responded by setting out to obtain releases from 900 clients so that Grace can obtain the films from St. John's. St. John's will require an Order from the court. I assume this can be obtained as soon as Grace signs a protective order. You will have our consent to the motion so it can be obtained on an expedited basis.

    Please let me know any questions you may have on the above.

                      Yours sincerely,

                      McGARVEY, HEBERLING, SULLIVAN
                             & McGARVEY

                      JON L. HEBERLING

JLH(joh)

cc:    Nate Finch