## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | **Ref. Nos. 21245, 21492, & 21523** |

### LIBBY CLAIMANTS' (A) RESPONSE TO MOTION TO STRIKE WHITEHOUSE EXPERT REPORT OR, ALTERNATIVELY, COMPEL THE PRODUCTION OF DOCUMENTS AND DATABASES ON WHICH HE RELIES AND FOR ENTRY OF A CONFIDENTIALITY ORDER AND JOINDERS FILED BY VARIOUS INSURERS AND (B) CROSS-MOTION FOR ENTRY OF PROTECTIVE ORDER

The claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby (a) respond to the Motion to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of Document and Databases On Which He Relies and For Entry of a Confidentiality Order filed on April 9, 2009 [Docket No. 21245] (the "Motion") by Arrowood Indemnity Company ("Arrowood"), Joinder of Maryland Casualty Company to Motion to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of Document and Databases On Which He Relies and For Entry of a Confidentiality Order filed on April 30, 2009 [Docket No. 21492], and Joinder of Continental Casualty Company to Motion to Strike Whitehouse Expert Report or, Alternatively, Compel the Production of Document and Databases On Which He Relies and For Entry of a Confidentiality Order filed on May 4, 2009 [Docket No. 21523] and (b) move this Court for entry of a Protective Order, in the form attached hereto as Exhibit A, to protect the confidential medical information

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [Docket No. 21365], as it may be amended and restated from time to time.

of the Libby Claimants produced in connection with Plan Confirmation.   In support of this

Response and Cross-Motion, the Libby Claimants state:

## Introduction

1.      Lost in the mass of attacks on Dr. Alan C. Whitehouse, the Libby Claimants'

treating pulmonologist and expert witness in these Plan Confirmation proceedings, and

innuendos against the Libby Claimants, there is a motion.   After some hunting, the basic facts

(though distorted) are found at page 8 of the Motion.   The key documents leading up to the

Motion include Arrowood's letters of March 10 and 17, 2009.   See Exhibits B and D to the

Schwartz Decl. attached to the Motion.   By those two letters, Arrowood makes three document

requests:

Letter dated March 17, 2009:

      1.      Dr. Whitehouse's 550 database; and

      2.      The law firm Libby Claimants' database.

Letter dated March 10, 2009:

      3.      Attached exhibits to the Libby Claimants' response to the document
           request propounded by the Asbestos PI Claimants' Committee ("ACC").

2.      The response to the Motion is simple.   Dr. Whitehouse's 550 database has not

been maintained since about 2005 or 2006, and was not a part of the "information considered"

for the Expert Report of Dr. Alan C. Whitehouse of 12/28/08.   See Affidavit of Dr. Whitehouse

(May 7, 2009), ¶¶ 4, 6, attached hereto as Exhibit B.   Even though not required to do so, on May

1, 2009, the Libby Claimants delivered Dr. Whitehouse's 550 database to counsel for Arrowood.

Any excitement Arrowood may have had for the database will surely fizzle upon reviewing it.

The Motion is titled "Motion to Strike Whitehouse Expert Report or, Alternatively, Compel the

Documents and Databases on Which He Relies and for Entry of a Confidentiality Order."   Other

than the exhibits produced with Dr. Whitehouse's report, there is no evidence that Dr. Whitehouse relied upon the databases in question. Indeed, he did not.

3.      As for the request for the law firm database, the information attached to Dr. Whitehouse's report (Exhibits 4, 8, and 10) contains all the "information considered" by Dr. Whitehouse. Id. ¶ 7. This is undisputed. Dr. Whitehouse did not review more law firm data than what was supplied with the report. Id.

4.      As for Arrowood's request for the exhibits to the Libby Claimants' response to the ACC's document requests, as will be explained in more detail below, these exhibits contain personal medical information. Delivery of the information was withheld while parties were consensually negotiating the terms of a protective order. The ACC understood the status of the negotiations and did not seek to compel the production during the negotiations. Arrowood— which did not join in the discovery request by the ACC and, thus, has no standing to demand the production of documents—insisted that the documents be delivered and proposed an alternative form of protective order than had been the subject of (and essentially agreed to) ongoing negotiations among all other parties, including the Plan Proponents, Maryland Casualty Company ("MCC"), Continental Casualty Company ("CCC"), and other insurers.

5.      As will be discussed below, those negotiations ultimately broke down, requiring the Libby Claimants to move herein for a protective order concerning medical information. Despite the present lack of a signed protective order to address Libby Claimant medical information but comforted by this Court's statement on the record at the April 27, 2009 telephonic hearing that confidentiality of medical information would be protected and the privacy of Libby Claimants would be assured by referring to them in testimony solely by code number rather than by name, the Libby Claimants have delivered to the Plan Proponents and

certain interested Plan Objectors, including Arrowood, MCC, and CCC, documents responsive to the requests propounded by the ACC and the Debtors.[2]  The information was provided on the condition that it would be treated as confidential and to be used only in Plan Confirmation.  See also D. Del. LR 26.2.  Accordingly, Arrowood is now in possession of all documents which it erroneously claims were improperly withheld.

6.    In this regard, the Libby Claimants have been more forthcoming than the Plan Proponents and the insurers.  The Plan Proponents—based on what the Libby Claimants understand to be concern about the insistence of insurers, including Arrowood, on enforcing the Debtors' contractual confidentiality obligations—have withheld from the Libby Claimants all document discovery on the basis that a protective order has not yet been entered.  As explained below, the Libby Claimants have cooperated with the Plan Proponents and insurers by giving their assent to a form of protective order concerning non-medical confidential information, which was recently submitted to this Court under certification of counsel but has not yet been entered.  Perhaps as a stratagem to take their shot at striking Dr. Whitehouse's report and, in the process, further their goal of "poisoning the well" by attempting to prejudice this Court against Dr. Whitehouse, the Plan Proponents and Arrowood have withheld their consent to the form of protective order proposed by the Libby Claimants.

## Background

7.    Before this Court is the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated February 27, 2009 [Docket No. 20872], jointly submitted by the Debtors together with the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative (collectively, the "Plan Proponents").  In accordance with the Initial

---

[2] The Libby Claimants have also offered the information to the other Plan Objectors.

Case Management Order related to the First Amended Joint Plan of Reorganization dated
December 5, 2008 (the "CMO") [Docket No. 20204],[3] the Libby Claimants filed a preliminary
objection to the Plan (the "Libby Plan Objection") [Docket No. 20313].    The Libby Plan
Objection contends, *inter alia*, that:

- The Plan violates the Bankruptcy Code's requirement of equal distribution, as set forth in In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004) because the Plan and the related TDP and Asbestos PI Trust discriminate against the Libby Claimants on numerous grounds.

- In violation of the U.S. Constitution, the Montana Constitution, and 28 U.S.C. § 1411(a), the Plan denies the Libby Claimants their right to trial by jury by (a) capping the liquidated amount of Asbestos PI Claims at the Maximum Value of the particular claim even if the claimant obtains a jury verdict in a greater amount, and (b) providing delayed and riskier payment terms for claims based on jury verdicts.

- In violation of the Bankruptcy Code and Supreme Court caselaw, the Plan violates the Libby Claimants' right to have their claims allowed in accordance with applicable nonbankruptcy law.

- The Plan violates conditions of the Bankruptcy Code designed to ensure fairness of classification and voting.

- The Plan provides for injunctions that are not authorized by Section 524(g) of the Bankruptcy Code and Combustion Engineering.

8.      Pursuant to the CMO, on December 31, 2008, the Libby Claimants served the
expert reports of Dr. Alan C. Whitehouse, Dr. Arthur Frank, and Dr. Terry Spear, and on March
16, 2009 served the supplemental expert reports of Dr. Whitehouse and Dr. Frank.  During this
period, the Plan Proponents and various parties that have filed preliminary objections to the Plan
(the "Plan Objectors") exchanged numerous written discovery requests in connection with Plan
Confirmation.  While the Libby Claimants propounded discovery on the Plan Proponents and
various insurers, the Libby Claimants received discovery requests only from the ACC (joined by

---

[3] The CMO has subsequently been amended twice [Docket Nos. 20622 and 21544].

MCC) and the Debtors.  Arrowood did not propound or file a joinder of any discovery sought from the Libby Claimants.

9.      Because the discovery necessarily required the production of confidential information, including all medical records of over 900 Libby Claimants and other Libby Claimant personal identifying information such as social security numbers, the Plan Proponents, the Libby Claimants and other Plan Objectors engaged in a negotiation concerning a protective order governing medical as well as non-medical confidential materials.  Copies of the document requests propounded on the Libby Claimants by the Debtors and the ACC and the Libby Claimants' responses are attached hereto as Exhibits C and D respectively.

10.     On February 17 and 25, 2009, Debtors' counsel emailed a proposed form of protective order and requested comments from the Plan Objectors.  On February 25, 2009, counsel to the Libby Claimants circulated a revised draft of the proposed protective order, specifically including the protection of medical records and, among other things, providing that claimants will be identified in the case only by number, not by name.  On March 8, 2009, counsel to the Debtors again circulated a draft of the protective order, incorporating many of the changes requested by the Libby Claimants.  After further correspondence between the Libby Claimants, the ACC and Debtors, on March 18, 2009, the Debtors circulated a form of protective order governing medical as well as non-medical confidential materials, and reported that all comments received since the previous draft had been incorporated, and stated: "We would like to proceed with submitting this to the Court.  Accordingly, if you have any final comments, please let us know by close of business on Thursday, March 19.  We will then submit this to the Court."

11.    On March 27, 2009, having not submitted the agreed upon protective order to the Court the week before, the Debtors proposed to the Libby Claimants further revisions to the protective order.  These revisions would have permitted the Debtors to use in the then-pending criminal proceeding the Libby Claimants' medical records produced in connection with plan confirmation and eliminated the safeguard of using numbers instead of claimant names when referring to claimants' medical information in the bankruptcy case.  The Libby Claimants declined to accept these changes.  The Debtors then reverted to substantially the same protective order as was circulated on March 18, 2009.  The Debtors circulated that form of protective order on Friday, April 17, 2009.  On Tuesday, April 21, 2009, counsel to the Libby Claimants confirmed to the Debtors that the Libby Claimants approved the form of protective order.

12.    Two days later, on April 23, 2009, at a "meet and confer" teleconference among the Debtors, Arrowood and the Libby Claimants, the Libby Claimants learned that the Debtors had reversed course and would not submit to the Court a protective order that included protection for medical information.  The Debtors' change of position, presumably influenced by Arrowood, set back the effort, beneficial to all parties, of obtaining entry of a protective order for medical information.  Not wanting to stand in the way of a protective order for non-medical information, the Libby Claimants gave their assent to entry of a non-medical information protective order, with the understanding that medical information would be the subject of a separate protective order.  The above described correspondence is attached as Exhibit E.

13.    At the April 27, 2009 omnibus hearing, this Court was informed that a proposed non-medical information protective order had been submitted under certification of counsel. During a discussion concerning a protective order for medical information, the Court indicated the appropriateness of a protective order protecting confidentiality and providing that claimants

7

will be identified in testimony only by number, not by name.  Following the April 27 hearing, efforts by the Libby Claimants to reach an agreed form of medical information protective order with counsel to the Debtors and Arrowood were unsuccessful.

14.    In light of the developments described above, in the past week, the Libby Claimants, seeking to avoid any further delay, provided all documents to the Plan Proponents and certain interested Plan Objectors, including Arrowood, MCC, and CCC,[4] that they had been holding pending the entry of a protective order governing medical information.  As noted above, the documents were provided on the specific condition that they will be treated as confidential information and would be used only in Plan Confirmation.  See also D. Del. LR 26.2.

<u>Response</u>

A.    **The Motion to Strike Dr. Whitehouse's Opinion Should Be Denied**

15.    As explained above, Dr. Whitehouse has not failed to produce the databases and documents that he relied upon in his Plan Confirmation expert reports.  Arrowood's main argument is that Dr. Whitehouse's 550 database was withheld.  This database was not relied upon by Dr. Whitehouse in his most recent reports.  <u>Affidavit of Dr. Whitehouse</u>, ¶ 6.  Indeed, after three pages of legal cites on expert disclosure obligations, on page 13 of the Motion, Arrowood states: "Here, Dr, Whitehouse actually refers to the databases that he used in formulating his opinions."  This statement is completely and intentionally misleading.  In reviewing Arrowood's supporting footnote, Arrowood cites Dr. Whitehouse's 2006 expert report in the estimation proceeding, not his expert reports submitted in the Plan Confirmation proceedings.  A 22-page memorandum seeking to strike an expert report in which the only support given consists of cites from a different expert report than has been served in the Plan Confirmation proceedings demonstrates that the Motion is meritless and should never have been

---

[4] As noted above, the Libby Claimants have also offered the information to the other Plan Objectors.

filed.  Transparently its purpose was to "poison the well" and harass the Libby Claimants.  The Motion should be denied.

**B.    The Libby Claimants' Proposed Protective Order Governing Medical Information is Appropriate**

16.    The Libby Claimants agree with Arrowood that a protective order governing medical information is appropriate.  Such order would long since have been entered by consent of all parties, but for Arrowood's gamesmanship.  Attached is a proposed form of order that is generally consistent with the form of the non-medical information protective order that was submitted to the Court on April 24, 2009, except that it specifically includes the protection of medical records and provides that claimants will be identified in the case only by number, not by name (see ¶ 9).  The only differences between the proposals made by Arrowood and the Libby Claimants are that the Libby Claimants' proposal (i) does not permit the Debtors to use in the recently completed criminal proceeding the Libby Claimants' medical records produced in connection with Plan Confirmation and (ii) provides the safeguard of using numbers instead of claimant names when referring to claimants and their medical information in the bankruptcy case.  A blackline comparing the two proposals is attached hereto as Exhibit F.  These issues should both be decided in the Libby Claimants' favor as (i) the criminal trial is no longer pending and (ii) this Court indicated at the April 27th hearing that it favored the protection of patient names and identifying information by using a number system.

17.    The Libby Claimants' proposed protective order for medical information does not address whether the production of non-Libby Claimants' medical records in unredacted form is appropriate or required in response to confirmation discovery requests, as part of an expert report, as expert reliance materials, or otherwise.  The Libby Claimants assert that that they, their expert witnesses, and for that matter all other expert witnesses are barred by privacy laws from

9

producing in the course of confirmation discovery medical information for patients other than

Libby Claimants except either (a) in redacted form, or (b) with the patient's consent.  The Libby

Claimants will be prepared to address this issue in Court, but see no reason why their proposed

protective order should not be entered as it is completely neutral on the issue.  The protective

order simply provides that whatever the form in which medical information is produced

(redacted or unredacted), it will be used in testimony and otherwise in public only with the

patient's identity concealed through use of an identifying number rather than a name.

### C.   Arrowood's Attacks on Dr. Whitehouse and on the Libby Claimants are Incorrect or Misleading.

18.     Arrowood seeks to "poison the well" for the Libby Claimants in court, just as the

Debtors poisoned the Libby community and caused over 295 deaths in a small community.  <u>See</u>

Expert Report of Dr. Alan C. Whitehouse 3/14/09, ¶ 47.  In the Motion, Arrowood presents a

"Statement of Facts" containing allegations and innuendos that are incorrect, misleading,

distorted and legally irrelevant to the Motion.  Instead, Arrowood abuses the process by using a

discovery motion to make attacks on Dr. Whitehouse and the Libby Claimants.  While the Libby

Claimants cannot prevent the Debtors and its insurance company from launching attacks, the

Libby Claimants must respond to preserve their right to an opportunity for justice.

### (1)   "There generally appears to be a distinct pattern for Libby asbestos disease." Expert Report of Dr. Alan C. Whitehouse, 12/28/08, ¶ 34.

19.     Arrowood sends the above statement to the spin doctor, and turns it into the

following statement:  "(Dr. Whitehouse's) opinion is that people in Libby, Montana, have a

**singularly unique** and different asbestos related disease than those in other locations who have

been exposed to asbestos."  <u>Motion</u> at p.4 (emphasis added).  This is a far cry from Dr.

Whitehouse's statement at ¶ 34, quoted above, and explained in ¶ 34.  Arrowood's twist of the

10

statement compromises the credibility of its author.  First, some people in "other locations" outside Libby have also been exposed to Libby winchite asbestos and may have this disease pattern.  Second, nowhere does Dr. Whitehouse, Dr. Frank, or any other doctor working to help the Libby patients describe their disease as "unique."  This is a difference in degree, especially a difference in severity of pleural disease, but not a "unique" disease.

###### (2)    Dr. Whitehouse's studies are epidemiological studies.

20.    In the Motion, Arrowood states:    "Dr. Whitehouse did not perform epidemiological studies to reach any of his conclusions."  Motion at p. 5.  Not so.  Dr. Whitehouse's publications and other studies described in his expert report are epidemiologic studies.

"Epidemiology" is defined as follows:

> A study of the distribution and determinants of health-related states
> or events in specified populations, and the application of this study
> to control health problems.

John M. Last, Ed., A Dictionary of Epidemiology (4th Ed.), p.62.  There is "descriptive" epidemiology and "analytic" epidemiology.  See Epidemiologic Research by Klenbaum, Kupper, and Morgenstern, Wiley & Sons, p.47.  Referring to the publication Whitehouse (2004), "Asbestos-related Pleural Disease Due to Tremolite Associated with Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana", Am J Ind Med 46:219-225, Dr. Whitehouse testified at his March 19, 2009 deposition:

242:1.      A.    It's also a study to document the severity of losses of lung
                function.  It doesn't require a B reader.

            Q.    So this is not an epidemiologic study?

            . . .

A.    Yeah, this is an epidemiologic study.

.  .  .

243:22.    A.    The study started out to be a study at looking at what happened to these people diagnostically with their pulmonary function.  It is an epidemiologic study in the sense that it describes what happened over that period of time to these people.

Dr. Whitehouse's study fits the definition of "epidemiology" in that it tracked a patient population over time and applied statistics to it.  It was a "study of the distribution and determinants of health-related states or events in specified populations," per the definition of "epidemiology" above stated.  Use of epidemiology will be further clarified by Libby rebuttal witness Dr. Craig Molgaard, Professor of Epidemiology at the University of Montana, Missoula.

21.    Arrowood also offers the following brash statement:  "There is no other academic support for his opinion in his expert report."    Motion at p. 5.    A quick perusal of Dr. Whitehouse's Expert Report, 12/28/08 reveals a wealth of medical literature quoted and cited in support of the opinions contained therein.

(3)    **"Causation by asbestos" is determined on every patient with every diagnosis of asbestos disease.**

22.    Arrowood argues that Dr. Whitehouse's testimony is unreliable, because "he failed to conduct epidemiological studies before opining about causation."    Motion at pp. 6-7. Arrowood presents a wrong view of asbestos medicine.  Dr. Whitehouse and the vast majority of pulmonologists follow the standards set by the American Thoracic Society at ATS (2004) "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," Am J Respir Crit Care Med, 170:691-715.  Three diagnostic criteria for diagnosis of asbestos-related are presented.    Criterion #2 is "evidence of causation by asbestos as documented by the occupational and environmental history . . ."  The Center for Asbestos Related Disease Clinic

12

doctors, in entering over 1,800 diagnoses of asbestos-related disease, has recorded 1,800 cases of "causation by asbestos." The cases may be sorted in a number of ways, by demographics, by subtype of disease, by severity, but they remain 1,800 cases of "causation by asbestos." No epidemiologic study is required before "causation by asbestos" is found. It is well accepted that asbestos exposure causes asbestos-related disease. In the Motion, Arrowood quotes Dr. Whitehouse, explaining the above:

> You know, I see 11 cases of mesothelioma come out of Libby, there's a lot of exposure there, that's causation as far as I am concerned. And from a practice standpoint from a physician, that's what you need, and that's the sort of thing that physicians relay on, basically.

Motion at p. 7. The Debtors and its insurers may try to play the "epidemiology game"—suggesting that there is no causation without an analytic epidemiology study—but in medicine this is not the case.

> **(4)    Due to long latency periods, the wave of asbestos disease in Libby will continue into the future.**

23.    The publication: Whitehouse, A.C., Black, C.B., Heppe, M.S., Ruckdeschel, J., and Levin, S.M., "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am J Ind Med, 2008, 51(11):877-80, is a descriptive epidemiologic study. In the last paragraph, the five authors state as follows:

> The latency period for mesotheliomas attributable to environmental exposures in Libby has therefore not nearly be completed and the extent of the epidemic of environmental mesothelioma due to exposures based at Libby will probably not peak for another 10-20 years. This is a public health problem of considerable magnitude and points to the need for surveillance and early detection of the disease, in a hope that the mortality from mesothelioma in Libby can be reduced.

See Expert Report of Dr. Alan C. Whitehouse 12/28/08, Exh. 3. This is the conclusion of a descriptive epidemiologic study. In medicine, observations are made upon a scientific basis.

13

24.    At page 7 of the Motion, Arrowood asserts "Dr. Whitehouse also testified at the criminal trial that he has no scientific basis for his opinion that a wave of asbestos related disease in Libby will continue into the future:

Q.    . . . and you don't have the science to make a scientific prediction, do you?

A.    Not to the numbers, no.

Q.    You don't have the exposure numbers and you don't have curve. True or not?

A.    I don't have the exposure numbers and I do not have a curve.

Dr. Whitehouse could not make a specific prediction "to the numbers," but it is established in the literature that Libby can continue to expect increased risk of asbestos disease.  This is science.

**(5)    Many renowned doctors in the field of asbestos medicine concur with Dr. Whitehouse.**

25.    In the Motion, Arrowood attacks, stating:  "Five world-renowned scientists and medical doctors, who are leaders in their respective fields, have reviewed Dr. Whitehouse's reports and found them unscientific and deeply flawed."  Motion at p. 7.  More than five renowned doctors in the field of asbestos medicine concur with Dr. Whitehouse.  In addition to Dr. Arthur Frank, Professor of Medicine, Drexel University School of Medicine, Philadelphia, PA, who is an expert witness for Libby, Dr. John Ruckdelshel of Karmanos Cancer Institute, Detroit, Michigan, and Dr. Stephen Levin of the Mount Sinai School of Medicine, New York, New York, are co-authors on Whitehouse et al (2008).  Dr. James Lockey, of NIOSH, performed peer review on the Whitehouse (2004) study, and concurred in its findings.

14

393.001-26249.doc

26.    A significant difference between the doctors listed above and the "renowned" doctors who will testify for the Debtors and the ACC[5] is that the doctors who testify for the Debtors and the ACC offer purchased opinions.    Of the doctors who concur with Dr. Whitehouse, none are paid for their opinions, with the sole exception of Dr. Frank.

27.    There is another major difference between the Debtors and ACC doctors and Dr. Whitehouse.  None of the Debtors' and ACC's doctors can testify that they spent over 25 years in pulmonary medicine, getting up in the middle of the night two to four times per week to rush to the hospital to help a patient with severe respiratory disease.  Dr. Whitehouse did that.  Many thank him deeply for it.  And no one can match the expertise built up by Dr. Whitehouse over that period of time in the characteristics and course of asbestos disease in Libby.

**(6)    No one funds the lawyers for the Libby Claimants.**

28.    Arrowood refers to the "plaintiffs' lawyers who are funding the lawyers representing the Libby Claimants." Motion at p. 5.  No evidence is offered for this assertion.  In fact, the lawyers for the asbestos disease patients in Libby are not funded by anyone.  This results in a major disparity of resources when huge firms in New York and Chicago set out to "poison the well," so as to take away the Libby Claimants opportunity for justice before they even get to court.

**(7)    The Whitehouse (2004) study is not improper because perhaps 3-5 patients were initially referred by attorneys.**

29.    In the Motion, Arrowood nitpicks the Whitehouse (2004) study, because perhaps 3-5 of the patients were initially referred to Dr. Whitehouse by attorneys.  Motion at p. 5.  The matter is reviewed at the deposition of Dr. Whitehouse on March 19, 2009, pages 206-215.  One

---

[5]The claims of these "renowned" doctors quoted by Arrowood present disputed questions of fact, to be determined by the court after trial.

393.001-26249.doc

cannot tell if patients were referred were among the 123 in the Whitehouse (2004) study, or

whether they were in the larger patient group of 491 patients.

**(8)    Dr. Whitehouse's departure from the 3/19/09 deposition was justified under the circumstances.**

30.    Arrowood states that Dr. Whitehouse "unilaterally declared the deposition over

and walked out of the room." Motion at p. 2.  This statement does not tell the full story.  Dr.

Whitehouse had been ill in the days before the deposition.  The e-mail history confirms that he

had a "medical issue." On departing from the deposition, Dr. Whitehouse stated:

> 268:13.    A.    And you know, I am tired, and I don't feel very well, and
> I'm going to end the deposition now okay.

Counsel for the Debtors objected.  Then counsel for the Libby Claimants stated:

> 269:13:    Mr. Heberling:    When you're 71 years old maybe you will
> understand this.  I mean you have been at
> him since 8:30 this morning.

It was 2:00 p.m. at the time.  270:2.

**b.    Arrowood attempts to distract the court from the issues at the heart of the case.**

31.    To put the Motion into perspective, striking the Expert Report of Dr. Alan C.

Whitehouse as proposed by Arrowood would largely foreclose the Libby Claimants' day in court

to seek fair compensation for their injuries.  The Debtors have caused the deaths of over 295

people in the small community of Libby, Montana.   An established wrongdoer, it has been

judicially established that the Debtors intentionally or fraudulently harmed its workers.  Proof

met Montana's high standard for punitive damages.  Mont. Code Ann. § 27-1-221.  Finstad v.

W.R. Grace & Co., 301 Mont. 240, 8 P.3d 778.  Grasping for the not-guilty verdict that it would

eventually achieve, Grace acknowledged in the opening statement at the criminal trial on

February 24, 2009:

393.001-26249.doc

No one disputes that miners were exposed to asbestos dust and then carried it home on their clothes, (Bernick) said.

"There is no question that miners and their families suffered tragic losses as a consequence of the operation of this mine." Bernick said.

Daily Inter Lake, Kalispell, Montana 2/24/09.

32.     The issue in the instant case is whether the Debtors' plan of reorganization can inflict a second injury upon the Libby Claimants, by largely excluding them from compensation. If the Plan is confirmed, it appears that the Libby Claimants will be entitled to liquidated claims averaging perhaps $10,000 each, which will be paid at the rate of 25 to 35 cents on the dollar. This is a mere 2.5% of tort system value, based upon what Grace was paying as of 2000.  By contrast, non-Libby mesotheliomas, lung cancers, and asbestosis claims are compensated based on liquidated claims at 100% of tort value.  The TDP creates, for Libby according to the ACC, a "severe and disabling pleural" disease category.  But the medical criteria are so strict that only about 18% of those who died from non-malignant asbestos-related disease can qualify.  This treatment is clearly discriminatory as prohibited by In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004).  Against this backdrop, it is not surprising that the Plan Proponents and parties aligned with them are desperate to deprive the Libby Claimants of a hearing on the merits.  The Motion should be denied, and the Libby Claimants allowed to have their day in court.

## Conclusion

Based on the foregoing, the Arrowood's Motion should be denied and the attached

proposed form of protective order governing confidential medical information entered.

Dated: May 8, 2009          **LANDIS RATH & COBB LLP**
   Wilmington, Delaware

_(signature)_

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

    - and -

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA 02110
Telephone:  (617) 951-2505
Facsimile:  (617) 951-0679

_Counsel for Libby Claimants_

393.001-26249.doc