# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., *et al.* | : | Case No. 01-01139 JKF |
| | : | |
| Debtors. | : | **Docket Reference No. 20872** |

## FINAL OBJECTIONS OF ONEBEACON AMERICA INSURANCE COMPANY AND SEATON INSURANCE COMPANY TO CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION

OneBeacon America Insurance Company ("OneBeacon") and Seaton Insurance Company ("Seaton") (together, "Claimants") submit the following final objections to confirmation of the Joint Plan of Reorganization proposed by the Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, as amended from time to time (the "Plan"):

## I.    Statement of Interest and Standing

1.    OneBeacon is a creditor, holding contract claims against the Debtors that arise out of certain settlement agreements (described below).  Certain of OneBeacon's contract claims have been classified by the Plan Proponents as Class 6 Claims (Asbestos PI Claims), while others have been classified as Class 9 Claims (General Unsecured Claims).  (*See* Ex. "1" (Class 6 and Class 9 Ballots)).[1]  In addition, OneBeacon has contract claims against non-debtors Fresenius Medical Care Holdings, Inc. and Sealed Air Corporation, and perhaps others, which claims are adversely impacted by the various injunctions, releases, and exculpation provisions set forth in the Plan.

---

[1] The exhibits referenced herein are exhibits to the Declaration of Jeffrey M. Boerger, dated May 20, 2009, submitted in support hereof, unless otherwise indicated.

2.      Seaton is a creditor, holding contract claims against the Debtors that arise out of prepetition settlement agreements (described below).  Seaton's contract claims have been classified by the Plan Proponents as Class 6 Claims (Asbestos PI Claims). (*See* Ex. "2" (Class 6 Ballot)).  In addition, Seaton has contract claims, and possibly other claims, against non-debtors Fresenius Medical Care Holdings, Inc. and Sealed Air Corporation, and perhaps others, which claims are adversely impacted by the various injunctions, releases, and exculpation provisions set forth in the Plan.  In addition, the Plan Proponents appear to contend that one of the general liability insurance policies issued by Seaton's predecessor (*i.e.*, Unigard Mutual Insurance Company) provides additional asbestos-related insurance coverage to the Debtors.  (*See* Dkt. No. 20874, Ex. "5" thereto at 9).  Seaton disputes that contention.  But, if such coverage did exist, then Seaton would also be an insurer of the Debtors, in addition to a creditor.[2]

3.      As creditors, both OneBeacon and Seaton have standing to object to confirmation of the Plan.  They also have standing to object to confirmation as parties-in-interest whose respective claims and rights against certain non-debtors will be adversely and improperly impacted if the Plan is confirmed.  And, so long as the Plan Proponents contend that Seaton remains an insurer of the Debtors, then Seaton also has standing as a party-in-interest (*i.e.*, an insurer whose policy rights are adversely impacted by the Plan) to object to confirmation.  *See* 11 U.S.C. §§ 1109(b) and 1128(b); *see also, e.g., Baron &*

_____

[2]  The Plan Proponents appear to contend that Seaton has residual asbestos-related policy obligations to the Debtors under Unigard Policy No. 1-2517.  (*See* Dkt. No. "20874," Ex. "5" thereto at 9).  Therefore, Unigard Policy No. 1-2517 is submitted herewith and its terms and conditions are incorporated herein by reference.  (Ex. "3" at ¶ 4 (Ex. "A" thereto)).  In addition, Seaton joins in the Final Objections of Government Employees Insurance Company and Republic Insurance Company n/k/a Starr Indemnity & Liability Company to Confirmation of the Amended Joint Plan of Reorganization.

*Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D. N.J. 2005).

## II.    Background

### The Commercial Union Settlement Agreements

4.    OneBeacon is the successor-in-interest to Commercial Union Insurance Company which, in turn, is the successor-in-interest to Employers' Commercial Union Insurance Company of America and Employers' Commercial Union Insurance Company, and American Employers' Insurance Company (collectively, "Commercial Union").

5.    In May 1993, Commercial Union Insurance Company and what was then American Employers' Insurance Company entered into a settlement agreement with the company then known as "W. R. Grace & Co." and W. R. Grace & Co. – Conn. (the "May 1993 CU Agreement"). Pursuant to the May 1993 CU Agreement, the insurers agreed to, and did, pay the Grace-parties the aggregate amount of $81,200,000. (*See* Ex. "4" (Deposition of Jeffrey Posner ("Posner Dep.")) at 270-73, Ex. "15" thereto at OB-000011). In exchange for said sum, the company then known as "W. R. Grace & Co." and W. R. Grace & Co. – Conn. agreed to a release with respect to "Products Claims" and "Asbestos-Related Claims" (as defined therein), under the Grace insurance policies listed on Exhibit "A" (the "Commercial Union Policies") to the May 1993 CU Agreement. (*Id.* at OB-000013 to OB-000015). They also agreed to indemnify the insurers with respect to any subsequent "Products Claims" and "Asbestos-Related Claims" asserted by any third parties. (*Id.* at OB-000015 to OB-000020).[3]

---

[3]  The description of the May 1993 CU Agreement, and the settlement agreements in the paragraphs that follow, are not intended to fully describe the breadth of the releases and indemnification provisions set forth in said agreements. The descriptions herein should not, therefore, be construed as limiting the scope of the releases or indemnity provisions. The actual settlement agreements control.

6.    The company known as "W. R. Grace & Co." in May 1993, which is a party to the May 1993 CU Agreement, is now named Fresenius Medical Care Holdings, Inc. ("Fresenius"), a non-debtor.  (*See* Dkt. No. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "5" (Fresenius Complaint) ¶¶ 14, 19; Ex. "6" (Fresenius Answer) ¶¶ 14, 19; Ex. "7" (Fresenius Transaction Form S-4) at 7-9, 16, 20-21, 57).  The company known as W. R. Grace & Co. – Conn. in May 1993 remains W. R. Grace & Co. – Conn. today, *i.e.*, one of the Debtors.

7.    In December 1996, Commercial Union entered into a second settlement agreement with W. R. Grace & Co. – Conn. and the companies then known as "W. R. Grace & Co. – Del."  and "W. R. Grace & Co. (a New York Corporation, which changed its name to Fresenius Medical Care Holdings, Inc.)"  (the "December 1996 CU Agreement").  Pursuant to the December 1996 CU Agreement, the insurers agreed to, and did, pay the Grace-parties the aggregate amount of $12,000,000.  (*See* Ex. "4" (Posner Dep.) at 273-77, Ex. "16" thereto at OB-000040 to OB-000041).  In exchange for said sum, the companies then known as "W. R. Grace & Co. – Del." and "W. R. Grace & Co. (a New York Corporation, which changed its name to Fresenius Medical Care Holdings, Inc.)" and W. R. Grace & Co. – Conn. agreed to a release with respect to "Hatco-Related Environmental Claims" (as defined therein), under the Commercial Union Policies.  (*Id.* at OB-000041 to OB-000043).  They also agreed to indemnify Commercial Union with respect to any subsequent "Hatco-Related Environmental Claims" asserted by any third parties.  (*Id.* at OB-000045 to OB-000052).

8.    The company known as "W. R. Grace & Co. – Del." in December 1996, which is a party to the December 1996 CU Agreement, is now named Sealed Air

Corporation, a non-debtor.  (*See* Dkt. No. 20872, § 1.1(92), § 1.1(152), § 1.1(192); Ex. "8" (Sealed Air Complaint) ¶¶ 15, 20; Ex. "9" (Sealed Air Answer) ¶¶ 15, 20; Ex. "10" (Cryovac Transaction Form S-4) at 10, 23, 51-52).  The company described as "W. R. Grace & Co. (a New York Corporation, which changed its name to Fresenius Medical Care Holdings, Inc.)" in December 1996, which is also a party to the December 1996 CU Agreement, is now named Fresenius Medical Care Holdings, Inc. ("Fresenius"), a non-debtor.  (*See* Dkt. No. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "5" at ¶¶ 14, 19; Ex. "6" at ¶¶ 14, 19; Ex. "7" at 7-9, 16, 20-21, 57).  The company known as W. R. Grace & Co. – Conn. in December 1996 remains W. R. Grace & Co. – Conn. today, *i.e.*, one of the Debtors.

9.      In October 1998, Commercial Union entered into a third settlement agreement with the company then, and now, known as "W. R. Grace & Co."  (the "October 1998 CU Agreement").  Pursuant to the October 1998 CU Agreement, the insurers agreed to, and did, pay W. R. Grace & Co. the aggregate amount of $57,600,000.  (*See* Ex. "4" (Posner Dep.) at 277-79, Ex. "17" thereto at OB-000072).  In exchange for said sum, W. R. Grace & Co. agreed to a release with respect to all "Claims" (as defined therein), under the Commercial Union Policies.  (*Id.* at OB-000072 to OB-000075).  They also agreed to indemnify Commercial Union with respect to any subsequent "Claims" asserted by third parties.  (*Id.* at OB-000076 to OB-000078).

10.     The company known as "W. R. Grace & Co." in October 1998, which is a party to the October 1998 CU Agreement, is still W. R. Grace & Co. today, *i.e.*, the lead Debtor.

**The Unigard Settlement Agreements**

11.     Seaton Insurance Company is the successor-in-interest to Unigard Security Insurance Company, formerly Unigard Mutual Insurance Company.

12.     In August 1992, Unigard Security Insurance Company ("Unigard") entered into a settlement agreement with W. R. Grace & Co. – Conn.  (the "August 1992 Unigard Agreement").  Pursuant to the August 1992 Unigard Agreement, Unigard agreed to, and did, pay W. R. Grace & Co. – Conn. the aggregate amount of $10,000,000.  (*See* Ex. "4" (Posner Dep.) at 279-80, Ex. "18" thereto at SEA-000005 to SEA-000006).  In exchange for said sum, W. R. Grace & Co. – Conn. agreed to a release with respect to "Products Claims" (as defined therein), under Unigard Policy No. 1-2517.  (*Id.* at SEA-000006 to SEA-000007).  It also agreed to indemnify Unigard with respect to any subsequent "Products Claims," again as defined therein, asserted by any third parties relating to Unigard Policy No. 1-2517.  (*Id.* at SEA-000007 to SEA-000009).

13.     The company known as "W. R. Grace & Co. – Conn." in August 1992, which is a party to the August 1992 Unigard Agreement, is still W. R. Grace & Co. – Conn. today, *i.e.*, one of the Debtors.

14.     In May 1995, Unigard entered into a second settlement agreement with W. R. Grace & Co. – Conn.  and the company then known as "W.R. Grace & Co." (the "May 1995 Unigard Agreement").  Pursuant to the May 1995 Unigard Agreement, Unigard agreed to, and did, pay the Grace-parties the aggregate amount of $32,500,000.  (*See* Ex. "4" (Posner Dep.) at 280-83, Ex. "19" thereto at SEA-000021 to SEA-000022).  In exchange for said sum, W. R. Grace & Co. – Conn. and the company then known as W.R. Grace & Co. agreed to a release with respect to "Products Claims" and "Asbestos-

Related Claims" (both as defined therein), under Unigard Policy No. 1-0589.  (*Id.* at SEA-000022 to SEA-000023).  They also agreed to indemnify Unigard with respect to any subsequent "Products Claims" and "Asbestos-Related Claims, again as defined therein, asserted by any third parties relating to Unigard Policy No. 1-0589.  (*Id.* at SEA-000023 to SEA-000025).

15.     The company known as "W. R. Grace & Co." in May 1995, which is a party to the May 1995 Unigard Agreement, is now named Fresenius Medical Care Holdings, Inc. ("Fresenius"), a non-debtor.  (*See* Dkt. No. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex. "5" at ¶¶ 14, 19; Ex. "6" at ¶¶ 14, 19; Ex. "7" at 7-9, 16, 20-21, 57).  The company known as W. R. Grace & Co. – Conn. in May 1995 remains W. R. Grace & Co. – Conn. today, *i.e.*, one of the Debtors.

16.     In July 1996, Unigard entered into a third settlement agreement with W. R. Grace & Co. – Conn. and the company then known as "W. R. Grace & Co."  (the "July1996 Unigard Agreement").  Pursuant to the July 1996 Unigard Agreement, Unigard agreed to, and did, pay the Grace-parties the aggregate amount of $2,000,000.  (*See* Ex. "4" (Posner Dep.) at 283-85, Ex. "20" thereto at SEA-000036).  In exchange for said sum, W. R. Grace & Co. – Conn. and the company then known as "W. R. Grace & Co." agreed to a release with respect to "Environmental Claims" arising out of the "Hatco Site" (both as defined therein), under Unigard Policy Nos. 1-2517 and 1-0589.  (*Id.* at SEA-000037).  They also agreed to indemnify Unigard with respect to any subsequent "Environmental Claims" arising out of the "Hatco Site" asserted by any third parties.  (*Id.* at SEA-000038 to SEA-000040).

17.     The company known as "W. R. Grace & Co." in July 1996, which is a

party to the July 1996 Unigard Agreement, is now named Fresenius Medical Care

Holdings, Inc. ("Fresenius"), a non-debtor.  (*See* Dkt. No. 20872, § 1.1(115), § 1.1(124),

§ 1.1(130); Ex. "5" at ¶¶ 14, 19; Ex. "6" at ¶¶ 14, 19; Ex. "7" at 7-9, 16, 20-21, 57).  The

company known as W. R. Grace & Co. – Conn. in July 1996 remains W. R. Grace & Co.

– Conn. today, *i.e.*, one of the Debtors.

18.     In March 1997, Unigard entered into a fourth settlement agreement with

W. R. Grace & Co. – Conn. and the companies then known as "W. R. Grace & Co. (a

Delaware Corporation)" and "W. R. Grace & Co. (a New York corporation which

changed its name to Fresenius National Medical Care Holdings, Inc.)"  (the "March 1997

Unigard Agreement").  Pursuant to the March 1997 Unigard Agreement, Unigard agreed

to, and did, pay the Grace-parties the aggregate amount of $2,000,000.  (*See* Ex. "4"

(Posner Dep.) at 285-90, Ex. "21" thereto at SEA-000052).  In exchange for said sum, W.

R. Grace & Co. – Conn. and the companies then known as "W. R. Grace & Co. (a

Delaware Corporation)" and "W. R. Grace & Co. (a New York corporation which

changed its name to Fresenius National Medical Care Holdings, Inc.)" agreed to a release

with respect to "Environmental Claims" (as defined therein), under Unigard Policy Nos.

1-2517 and 1-0589.  (*Id.* at SEA-000053 to SEA-000054).

19.     The company known as "W. R. Grace & Co. (a Delaware Corporation),"

which is a party to the March 1997 Unigard Agreement, is now named Sealed Air

Corporation, a non-debtor.  (*See* Dkt. No. 20872, § 1.1(92), § 1.1(152), § 1.1(192); Ex.

"8" at ¶¶ 15, 20; Ex. "9" at ¶¶ 15, 20; Ex. "10" at 10, 23, 51-52).  The company known as

known as "W. R. Grace & Co. (a New York corporation which changed its name to

Fresenius National Medical Care Holdings, Inc.)," which is also a party to the March

1997 Unigard Agreement, is now named Fresenius Medical Care Holdings, Inc.

("Fresenius"), a non-debtor. (*See* Dkt. No. 20872, § 1.1(115), § 1.1(124), § 1.1(130); Ex.

"5" at ¶¶ 14, 19; Ex. "6" at ¶¶ 14, 19; Ex. "7" at 7-9, 16, 20-21, 57). The company

known as W. R. Grace & Co. – Conn. in March 1997 remains W. R. Grace & Co. –

Conn. today, *i.e.*, one of the Debtors.

20.    Although the March 1997 Unigard Agreement does not contain a

contractual indemnity provision, Seaton believes that it may have claims against the

counterparties to said agreement, including non-debtors Sealed Air and Fresenius for

breach of contract, misrepresentation, or otherwise. In the agreement, "Grace" is defined

as "W. R. Grace & Co. – Conn., a Connecticut corporation, W. R. Grace & Co., a New

York Corporation which changed its name to Fresenius National Medical Care Holdings,

Inc., [*i.e.*, Fresenius] and W. R. Grace & Co., a Delaware Corporation [*i.e.*, Sealed Air],

and their respective predecessors, successors, and subsidiary companies or corporations."

(*See* Ex. "4" (Posner Dep.), Ex. "21" thereto at SEA-000050). In Section V, "Grace

represents that as of the date of execution of this Agreement [*i.e.*, March 3, 1997], it is

not aware of any Environmental Claims contemplated being made against the Unigard

Policies by any former subsidiary of Grace or any other entity which may be entitled to

coverage under the Unigard Policies." (*Id.* at SEA-000053 to SEA-000054). There is

evidence to suggest that this representation may have been false when "Grace" made it.

21.    In June 1997, Grace Energy Corporation ("GEC"), a Debtor, filed a

complaint against, *inter alia*, Support Terminal Services, Inc. ("STS"), a company that is

alleged by Plan Objectors Kaneb Pipe Line Operating Partnership, L.P. and STS to be a

"former Grace subsidiary." (Dkt. No. 20538 at 17). In the complaint, GEC sought a

declaration that STS, not GEC, bore legal responsibility for environmental liabilities arising from the Otis Pipeline site in Massachusetts.  (*See* Dkt. No. 20538, Ex. D-1).  In April 1997, two months before it filed its complaint, GEC admits to having discussed the matter with STS.  (*See* Dkt. No. 20538, Ex. D-1 at ¶ 12).  GEC also admits that it first learned of the Otis Pipeline environmental liabilities in January 1997, at which time it "conducted a review of the ownership of the Otis Pipeline."  (*Id.* at ¶ 9).  After that, but before the April discussion with STS, "Grace" represented to Unigard in the March 1997 Unigard Agreement that it was "not aware of any Environmental Claims contemplated being made against the Unigard Policies by any former subsidiary of Grace or any other entity which may be entitled to coverage under the Unigard Policies."  If STS was, in fact, a former subsidiary of Grace, that representation may well have been false when made.  If so, Seaton may have claims for breach of contract, misrepresentation, or otherwise against both Sealed Air and Fresenius.

### Third-Party Claims Against Settled OneBeacon and Seaton Policies

22.    Since the Petition Date various non-debtor third-parties have asserted, or claimed that they have rights to, insurance coverage under certain settled policies issued by Commercial Union (*i.e.*, OneBeacon) and Unigard (*i.e.*, Seaton).  Those third parties include The Scotts Company ("Scotts") and Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. (together "Kaneb").  (*See* Ex. "11" (Scotts Adversary Complaint) and Dkt. Nos. 20538, 20846, 20984, 21062, 20703, 20704, 20706, and 21262).  Other parties may assert such rights.  To the extent such rights have been, or will be, asserted, they have already triggered, and will continue to trigger, OneBeacon's and Seaton's contractual indemnity rights under the settlement agreements described

above against both the Debtors and non-debtors Fresenius and/or Sealed Air.

### III.    Plan Objections

### The Contract Claims of OneBeacon and Seaton Are Not Properly Classified.

23.    Under the Plan, certain contract claims of OneBeacon and Seaton against the Debtors – for indemnity with respect to underlying asbestos-related tort claims – are improperly classified as Class 6 claims.  OneBeacon's and Seaton's contractual indemnity claims are substantially dissimilar to, and broader in scope than, the asbestos-related tort claims that dominate Class 6.  Moreover, OneBeacon's and Seaton's contract claims are treated differently than other Class 6 claims, and less favorably than other contractual indemnity claims – those of Fresenius and Sealed Air – that are, in fact, substantially similar.

24.    Certain of OneBeacon's contract claims arise out of the May 1993 CU Agreement and the October 1998 CU Agreement.  Under the May 1993 CU Agreement, the Debtors (and Fresenius) are obligated to indemnify OneBeacon with respect to "Products Claims" and "Asbestos-Related Claims" asserted by any third parties, which expressly includes payment of attorneys' fees and costs incurred in the defense of OneBeacon.  (*See* Ex. "4" (Posner Dep.) at 270-73, Ex. 15 thereto at OB-000015 to OB-000020).  Similarly, under the October 1998 CU Agreement, Debtors are obligated to indemnify OneBeacon with respect to "Claims" asserted by third parties, which expressly includes payment of attorneys' fees and costs incurred in the defense of OneBeacon. (*See* Ex. "4" (Posner Dep.) at 277-79, Ex. 17 thereto at OB-000076 to OB-000078).

25.    Certain of Seaton's contract claims arise out of the August 1992 Unigard Agreement and the May 1995 Unigard Agreement.  Under the August 1992 Unigard

- 11 -

Agreement, the Debtors are obligated to indemnify Seaton with respect to "Products Claims" asserted by third parties relating to Unigard Policy No. 1-2517, which expressly includes payment of attorneys' fees and costs incurred in the defense of Seaton.  (*See* Ex. "4" (Posner Dep.) at 279-80, Ex. 18 thereto at SEA-000007 to SEA-000009).  Similarly, under the May 1995 Unigard Agreement, the Debtors (and Fresenius) are obligated to indemnify Seaton with respect to "Products Claims" and "Asbestos-Related Claims" asserted by third parties relating to Unigard Policy No. 1-0589, which also expressly includes payment of attorneys' fees and costs incurred in the defense of Seaton.  (*See* Ex. "4" (Posner Dep.) at 280-83, Ex. 19 thereto at SEA-000023 to SEA-000025).

26.    Under the Plan, "Class 6 consists of all Asbestos PI Claims against the Debtors."  (*See* Dkt. No. 20872 at § 3.16(a)).  The term "Asbestos PI Claim" is defined broadly to include, among other things, contract-based indemnity claims against the Debtors "based on, or arising out of, resulting from, or attributable to, directly or indirectly," asbestos-related wrongful death or personal injury.  (*See* Dkt. No. 20872 at 11-13).  Thus, to the extent that OneBeacon and Seaton seek indemnification from the Debtors in connection with asbestos-related coverage claims asserted by third parties, pursuant to the indemnification provisions of their various settlement agreements, the Plan provides that such claims are Class 6 claims.

27.    Section 1123(a)(1) of the Bankruptcy Code provides that a plan must designate classes of claims and interests.  Under Section 1122(a), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Claims that are not "substantially similar" may not be placed in the same class.  *See In re Combustion*

*Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987).

28.    The contract claims asserted by OneBeacon and Seaton are not "substantially similar" to the asbestos-related tort claims that dominate Class 6.  First, the claims asserted by OneBeacon and Seaton are dissimilar in nature to those asserted by asbestos-related tort claimants.  OneBeacon and Seaton assert contract claims, the scope and nature of which are defined and governed by the terms of the written agreements negotiated and specifically subscribed to by the Debtors and their insurers, whereas the personal injury claims that dominate Class 6 are tort claims defined and governed by statute or by common law.

29.    Second, the contract claims asserted by OneBeacon and Seaton are substantially broader than those asserted by the tort claimants.  Under the settlement agreements, OneBeacon and Seaton are entitled to seek reimbursement not only of indemnity payments made to third parties, but they are also entitled to reimbursement of attorney fees and expenses incurred in defending OneBeacon and Seaton from coverage claims asserted by third parties, and reimbursement of indemnity payments made to third parties asserting direct claims for coverage as alleged former subsidiaries of the Debtors or as alleged additional insureds.[4]

30.    Moreover, OneBeacon's and Seaton's contract claims also encompass claims for indemnification arising from third-party claims for coverage under settled

---

[4] For example, Scotts alleges that it is entitled to coverage for certain asbestos-related liabilities directly as an additional insured pursuant to certain "vendor" endorsements, rather than derivatively as a judgment creditor against Debtors.  (*See* Ex. "4").

policies with respect to underlying non-asbestos products claims and environmental claims.[5]  Claims such as these cannot be properly be channeled to the Asbestos PI Trust. *See* 11 U.S.C. § 524(g).

31.     Even if their placement in Class 6 were proper, OneBeacon's and Seaton's Class 6 contract claims are treated differently from other Class 6 claims.  Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4); *see also Combustion Eng'g*, 391 F.3d at 239.  While the TDP provides a comprehensive mechanism for payment of asbestos-related tort claims, it provides no mechanism whatsoever for payment of contractual indemnity claims.  Nor does it provide any mechanism to pay claims, such as the direct "vendor" coverage claims asserted against OneBeacon and Seaton by Scotts, or claims for reimbursement of attorneys' fees and expenses incurred in defending the insurers from coverage claims.

32.     Also, OneBeacon's and Seaton's contract claims are treated differently from other Class 6 contract claims.  Fresenius and Sealed Air each have submitted proofs of claim against the Debtors asserting prepetition claims for contractual indemnity with respect to asbestos-related, environmental, and other liabilities, pursuant to indemnity agreements executed in connection with the Fresenius Transaction and the Cryovac Transaction.  (*See* Ex. "12" and Ex. "13").  But unlike OneBeacon and Seaton, or any other creditor that has asserted a contractual indemnity claim against the Debtors, the

---

[5] For example, Kaneb alleges that it is entitled to coverage for certain environmental liabilities directly as a named insured, purportedly as a former subsidiary of W.R. Grace & Co.  (*See* Dkt. No. 20538 (Kaneb Lift-Stay Motion)).

Plan includes broad indemnification provisions with respect to Fresenius and Sealed Air, under which the Reorganized Debtor is obligated to fully indemnify Fresenius and Sealed Air for asbestos-related claims, including attorneys' fees and expenses.  (*See* Dkt. No. 20872, §§ 8.81, 8.83).  The protection afforded by these indemnification provisions is over and above any (partial) recovery that may be obtained by submitting an asbestos-related contractual indemnity claim to the Asbestos PI Trust for payment.  Thus, by virtue of these post-confirmation indemnity provisions, any asbestos-related loss by Fresenius and Sealed Air will be made whole by the Reorganized Debtors, whereas any other contractual indemnitees are limited to partial recovery, capped by the prevailing Payment Percentage, as provided by the Asbestos PI TDP.  This amounts to preferential treatment of one claim over another substantially similar claim, and thus violates the Bankruptcy Code's "bedrock principle of equality of distribution."  *See In re Congoleum Corp.*, 362 B.R. 167, 185 (Bankr. D. N.J. 2007).

33.    Finally, OneBeacon and Seaton contend that their contract claims are properly classified as Class 9 claims, rather than Class 6 claims, and that their improper placement in Class 6 (dominated by substantially dissimilar tort claims) results in their being treated less favorably than other contractual indemnity claims with which they are, in fact, substantially similar.

34.    Under the Plan, all Asbestos PI Claims placed in Class 6 are impaired.[6] General unsecured claims placed in Class 9, however, are unimpaired.  There is no substantive distinction between contractual indemnity claims involving underlying

---

[6] Save for any Fresenius and Sealed Air contractual indemnity claims, which although limited in their recovery from the Asbestos PI Trust, are ultimately made whole by the Reorganized Debtors pursuant to separate indemnification provisions in the Plan.  (*See* Dkt. No. 20872, §§ 8.81, 8.83).

asbestos-related liabilities, which are relegated to the impaired Class 6, and contractual indemnity claims involving underlying liabilities that are not asbestos-related, which are placed in the unimpaired Class 9.  Both sets of claims arise under contract – indeed, in some cases they may arise under the very same contracts – seeking enforcement of obligations defined by and limited to the terms of written agreements negotiated by and specifically subscribed to by the Debtors and their counterparties.  Neither set would exist at common law in the absence of an underlying contract.  Yet by separating these substantially similar contract claims into asbestos-related Class 6 claims, which are impaired, and general unsecured Class 9 claims, which are not, the Plan arbitrarily treats the Class 6 contractual indemnity claims less favorably than it does Class 9 contractual indemnity claims.

35.     The Bankruptcy Code does not necessarily prohibit the placement of substantially similar claims in different classes, but the classification scheme itself must be reasonable.  *See John Hancock*, 987 F.2d at 158, 159; *Jersey City Med. Ctr.*, 817 F.2d at 1060-61.  Separate classification and disparate treatment of substantially similar claims renders a plan unconfirmable, because "'[e]quality of distribution among creditors is a central policy of the Bankruptcy Code.'"  *See Congoleum*, 362 B.R. at 182 (quoting *Combustion Eng'g*, 391 F.3d at 239).

36.     The Plan's separate classification and less favorable treatment of OneBeacon's and Seaton's Class 6 contractual indemnity claims, which are substantially similar to the unimpaired Class 9 contractual indemnity claims, violates the Bankruptcy Code's "bedrock principle of equality of distribution," and thus renders the Plan unconfirmable.  *See Congoleum*, 362 B.R. at 185.

**This Court Lacks Subject Matter Jurisdiction to Enjoin OneBeacon's and
Seaton's Contract Claims Against Non-Debtors Fresenius and Sealed Air.**

37.     The contract claims that OneBeacon and Seaton have against non-debtors
Fresenius and Sealed Air are direct claims; that is, they are not in any way derivative of
claims against the Debtors.  The reason for that is simple: The claims that OneBeacon
and Seaton have against Fresenius and Sealed Air arise from contracts (*i.e.*, settlement
agreements) that Fresenius and Sealed Air signed on their own behalf.  Thus, their
liability to OneBeacon and Seaton under the indemnity provisions contained in those
contracts is not derivative of the Debtors' liability under those contracts.  Both the
Debtors and the non-debtors Fresenius and Sealed Air signed the contracts and, therefore,
both have independent, non-derivative contractual obligations to OneBeacon and Seaton.

38.     To the extent that the contractual indemnity claims held by OneBeacon
and Seaton against non-debtors Fresenius and Sealed Air arise from, for example, the
underlying asbestos-related coverage claims asserted by non-debtor third-parties such as
Scotts, the Plan – through its proposed Asbestos PI Channeling Injunction – proposes to
enjoin such claims and channel them to the Asbestos PI Trust for resolution under § 5.6
and/or § 5.13 of the Asbestos PI Trust Distribution Procedures ("TDP").  This Court,
however, lacks subject matter jurisdiction to issue an injunction that enjoins the direct
contract claims that non-debtors OneBeacon and Seaton have against non-debtors
Fresenius and Sealed Air.  *See Combustion Eng'g*, 391 F.3d at 227-33.

39.     "The source of the bankruptcy court's subject matter jurisdiction is neither
the Bankruptcy Code nor the express terms of the Plan.  The source  . . .  is 28 U.S.C.
§§ 1334 and 157."  *In re Resorts Int'l, Inc.*, 372 F.3d  154, 161 (3d Cir. 2004).  Section
1334(b) confers upon the district courts "original and exclusive jurisdiction of all cases

under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b). "Section 157(a) of the Bankruptcy Code permits district courts to refer most matters to a bankruptcy court."  *Combustion Eng'g*, 391 F.3d at 225.  Here, the issue is whether this Court has "related to" jurisdiction to issue an injunction that enjoins non-derivative contract claims that non-debtors OneBeacon and Seaton have against non-debtors Fresenius and Sealed Air.

40.      "Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), *as well as suits between third parties that conceivably may have an effect on the bankruptcy estate*."  *Combustion Eng'g*, 391 F.3d at 226 (emphasis added); *In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984).  "The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit."  300 F.3d at 382. Here, the "allegedly related lawsuit" would be a contract action by OneBeacon or Seaton against Fresenius and/or Sealed Air based on one or more of the settlement agreements to which Fresenius and/or Sealed Air are parties.

41.      Fresenius and/or Sealed Air appear have certain indemnity rights against the Debtors.  However, a successful lawsuit by OneBeacon or Seaton against Fresenius and/or Sealed Air would not "automatically" (*i.e.*, without the intervention of yet another lawsuit) result in indemnification liability against the Debtors, as required by *Pacor*.  743 F.2d at 995.  To the contrary, it is quite possible that the Debtors would contest the scope

of their indemnity obligations to Fresenius and Sealed Air, which would thereby require the intervention of another lawsuit.

42.     In *Combustion Eng'g*, the Third Circuit considered various factors that might bear upon a bankruptcy court's subject matter jurisdiction over non-derivative claims against non-debtors.  391 F.3d at 227-34.  Those factors were (1) Corporate Affiliation, (2) Financial Contributions, (3) Related Liability, and (4) Shared Insurance. *Id.* at 227-33.  None of those factors, however, weighs in favor of the exercise of subject matter jurisdiction here.

43.     First, there is no "corporate affiliation" or relationship between the Debtors, on the one hand, and Fresenius and Sealed Air, on the other.  (*See* Ex. "14" (Deposition of Richard Finke (Rule 30(b)(6) Designee) ("Finke Rule 30(b)(6) Dep.") at 118-20).

44.     Second, the financial contributions of Fresenius and Sealed Air to the Debtors' estates, just like the financial contribution of ABB in the *Combustion Eng'g* case, cannot support subject matter jurisdiction.  391 F.3d at 228 ("If that were true, a debtor could create subject matter jurisdiction over any non-debtor third party by structuring a plan in such a way that it depended upon third-party contributions.  As we have made clear, 'subject matter jurisdiction cannot be conferred by consent of the parties.  Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.'").

45.     Third, although the Debtors may owe indemnity obligations to Fresenius and Sealed Air, as noted earlier, a successful contract claim by OneBeacon or Seaton against Fresenius or Sealed Air would not "automatically" (*i.e.*, without the intervention

of yet another lawsuit) result in indemnification liability against the Debtors.

46.     Fourth, there is apparently no "shared insurance" between the Debtors and Fresenius or Sealed Air.  (*See* Ex. "14" (Finke Rule 30(b)(6) Dep.) at 120-21).

47.     As a result, this Court lacks subject matter jurisdiction to issue any injunction – whether the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, or the Successor Claims Injunction – insofar as it purports to enjoin the contract claims of non-debtors OneBeacon and Seaton against non-debtors Fresenius and/or Sealed Air.

**The Contract Claims of OneBeacon and Seaton Against Non-Debtors Fresenius and Sealed Air Cannot Be Enjoined and/or Channeled to the Asbestos PI Trust Under § 524(g) or § 105(a) of the Bankruptcy Code.**

48.     Even if this Court had subject matter jurisdiction, however, it lacks the statutory authority under Bankruptcy Code § 524(g) to issue a channeling injunction that would enjoin the direct contract claims of OneBeacon and Seaton against non-debtor Fresenius.  In relevant part, § 524(g) states:

> (4)(A)(i)  Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.
>
> (ii)  Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of the injunction (by name or as part of an identifiable group) and *is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor* to the extent such alleged liability of such third party arises by reason of . . . .

11 U.S.C. § 524(g)(4)(A)(i) and (ii) (emphasis added).

49.     Here, the claims at issue are the contract claims that OneBeacon and Seaton have against Fresenius under certain settlement agreements.  Specifically, the Asbestos PI Channeling Injunction purports to enjoin, *inter alia*, the contractual

indemnity claims that OneBeacon and Seaton have against Fresenius that arise from or are triggered by, for example, the "vendor" coverage claims that have been asserted by Scotts. With respect to those contract claims, Fresenius is not "*alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor.*" 11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added). To the contrary, Fresenius' liability to OneBeacon and/or Seaton is a direct liability of its <u>own</u> based upon the simple fact that Fresenius is a party to the very contracts that give rise to its <u>own</u> indemnity obligations to OneBeacon and Seaton. Thus, to the extent that the Asbestos PI Channeling Injunction purports to enjoin such claims, and channel them to the Asbestos PI Trust, it is illegal because it exceeds the statutory authority afforded by § 524(g).

50. Putting aside the Asbestos PI Channeling Injunction, which is purely a § 524(g) injunction, the Plan also has a so-called Successor Claims Injunction. (*See* Dkt. No. 20872, § 8.5). The purported legal authority for this injunction – which appears to be primarily designed to protect Fresenius and Sealed Air – is Bankruptcy Code § 105(a). The scope and purpose of the Successor Claims Injunction is difficult to ascertain. By its terms, it enjoins the pursuit of "Successor Claims," which includes so-called "SA Successor Claims and/or Grace-Related Claims." (Dkt. No. "20872" at 38). The term "Grace-Related Claim" includes "Asbestos-Related Claims (as defined in the Fresenius Settlement Agreement)." (*Id.* at 28). The same term "Asbestos-Related Claim" appears both in the Plan and the Fresenius Settlement Agreement, but to confuse matters, it has a totally different definition in each. (Compare Dkt. No. 20872 at 16 with Dkt. No. 20874, Ex. "13" at A-1). Suffice it to say, however, that while not entirely clear, it appears that the § 105(a) Successor Claims Injunction would enjoin some or all of the contract claims

that non-debtors OneBeacon and Seaton have against non-debtor Fresenius and,

therefore, it has the effect of circumventing the more specific requirements of § 524(g).

That is not permitted.  *See Combustion Eng'g*, 391 F.3d at 235-38.

51.    Seaton and OneBeacon also have, or may have, contract claims or other

claims against Fresenius and/or Sealed Air arising from the settlement agreements that

released products and/or environmental coverage under their policies.  Even if the Court

had jurisdiction, Bankruptcy Code § 105(a) may not be used to enjoin such claims absent

a significant showing that the Plan Proponents cannot make here.  *Cf. In re Dow Corning*

*Corp.*, 280 F.3d 648, 658 (6th Cir. 2002).

52.    Under the circumstances presented here, an injunction barring the contract

claims of OneBeacon and Seaton against non-debtors Fresenius and Sealed Air would

violate the Fifth Amendment of the U.S. Constitution by depriving them of their property,

increasing their burdens, and impairing their rights without due process of law.

**The Proposed TAC Members Are Burdened By Irreconcilable
Conflicts of Interest and Should Not Be Approved By The Court.**

53.    Pursuant to the Asbestos PI Trust Agreement (the "Trust Agreement"), the

proposed Asbestos PI Trust (the "Trust") – a successor to the Debtors and assignee of the

Debtors' Asbestos Insurance Rights under the Plan – is to have three Asbestos PI

Trustees (the "Trustees").  The three Trustees are Harry Huge, Lewis Sifford, and Dean

Trafelet, each of whom has several years of experience with one or more asbestos

bankruptcy trusts.  (*See* Ex. "15" (Deposition of David T. Austern ("Austern Dep.")) at

76-80).

54.    In addition to the Trustees, the Trust will also have a "Futures

Representative" and a "Trust Advisory Committee."  (*See* Dkt. No. 20874, Ex. "2"

(Section V and VI).  The designated Futures Representative for the Trust is David T.
Austern, the same individual appointed by this Court as the statutory "legal
representative" under 11 U.S.C. § 524(g)(4)(B)(i).  The designated members of the Trust
Advisory Committee ("TAC") are Russell W. Budd, Esq. of the law firm Baron & Budd,
PC; John D. Cooney, Esq. of the law firm Cooney & Conway; Joseph F. Rice, Esq. of the
law firm Motley Rice LLC; and Perry Weitz, Esq. of the law firm Weitz & Luxenberg.
(*See* Dkt. No. 20874, Ex. "2" at 43-50).  Messrs. Budd, Cooney, Rice, and Weitz were
selected to be the TAC members by the Asbestos PI Committee.  (*See* Dkt. No. 20872,
§ 7.2.6).  The Asbestos PI Committee – which consists of asbestos personal injury
claimants – was appointed on April 13, 2001 by the U.S. Trustee.  (*See* Dkt. No. 20873,
at 53).  Each TAC member's law firm has a client on the Asbestos PI Committee, and
those clients delegate to the law firm that represents them their duties as a member of
Asbestos PI Committee.  (Ex. "16" Deposition of Peter van N. Lockwood ("Lockwood
Rule 30(b)(6) Dep.") at 121-25).  So, as a practical matter, Messrs. Budd, Cooney, Rice,
and Weitz were directly involved in their own selection as TAC members.  (*Id.* at 124-25
("But, at the end of the day, through some sort of nomination or informal self-
nomination, speeches, lobbying, discussions, what have you, there came a time at which
the committee voted to select these four members.").

  55. There is no requirement under Bankruptcy Code § 524(g) for the Trust to
have a TAC.  Nor is there any requirement for a "Futures Representative" once a
§ 524(g) trust is formed.  The statute only requires that the Court appoint a legal
representative for the purpose of protecting the rights of the holders of future demands in
connection with the proceedings leading to the issuance of the channeling injunction, not

thereafter.  *See* 11 U.S.C. § 524(g)(4)(B)(i).  Thus, the Trust has a TAC and Futures

Representative not because it is statutorily-mandated, but rather merely because the ACC

and FCR wanted it, and the other Plan Proponents agreed to it.

56.     Under the Trust Agreement, the TAC wields considerable control and

influence over the Trustees and the governance of the Trust.  The Trustees are required to

<u>consult</u> with the TAC on a variety of issues including, among others, the general

implementation and administration of the Trust and Trust Distribution Procedures

("TDP").  (*See* Dkt. No. "20874", Ex. "2" at § 2.2(e), Ex. "4" ("TDP")).  In addition, the

Trustees are required to obtain the <u>consent</u> of the TAC before they may take any of a

multitude of different actions including, but not limited to, changing the Payment

Percentage, changing Disease Levels, Scheduled Values, and/or Medical/Exposure

Criteria, establishing or changing Claims Materials, settling with any insurer, amending

the Trust Agreement or TDP, complying with the Trust's obligations under insurance

policies, etc.  (*See* Dkt. No. "20874", Ex. "2" at § 2.2(f), Ex. "4" ("TDP")).

57.     The TAC members also play a significant role with respect to the

continued service of the Trustees, and the Trustees' compensation, which gives the TAC

additional control and influence over Trustee decision making. (*See* Dkt. No. "20874,"

Ex. "2" at §§ 2.2(f)(ix), 4.2(c), and 4.3(a)).  By contrast, nothing in the Trust Agreement

gives the Trustees the power to remove TAC members.  The net effect of these structural

features, as well as others, is that the TAC, not the Trustees, have a dominant role in the

affairs of the Trust.

58.     The Trust Agreement states: "The members of the TAC shall serve in a

*fiduciary capacity representing all holders* of present PI Trust Claims."  (Dkt. No.

"20874," Ex. "2" at § 5.2) (emphasis added).  The term "PI Trust Claim" in the Trust

Agreement means "Asbestos PI Claim," as defined in the Plan.  (*Id.* at 1 n.1).  It includes

not only asbestos personal injury claims against the Debtors, but also "Indirect PI Trust

Claims," as well as "Insurance-Related TDP Claims" and "Indemnified Insurer TDP

Claims," as described in §§ 5.12 and 5.13 of the TDP.  The contract claims held by

OneBeacon and Seaton against the Debtors are supposedly "Indirect PI Trust Claims" or

"Indemnified Insurer TDP Claims" or both.  (*See* Exs. "1" and "2"; Dkt. No. 20874, Ex.

"4," § 5.13).  Either way, however, they are classified (improperly so) as Asbestos PI

Claims under the Plan and, therefore, the TAC members owe both OneBeacon and

Seaton fiduciary duties, just as they owe fiduciary duties to all other holders of Asbestos

PI Claims.

      59.     Each TAC member, however, is also lawyer with a law firm that

represents at least 1,000 individual holders of an Asbestos PI Claim (*i.e.*, "PI Trust

Claims").  (*See* Ex. "17" at 34).  In his capacity as a lawyer for his clients with Asbestos

PI Claims, each TAC member is also bound by the applicable Rules of Professional

Conduct.  Every state, except Texas, has adopted Rule 1.7 of the Model Rules of

Professional Conduct.  Rule 1.7 (entitled "Conflict of Interest: Current Clients") provides,

in part, as follows:

        (a)     Except as provided in paragraph (b), a lawyer shall not represent a
                client if the representation involves a concurrent conflict of
                interest.  A concurrent conflict of interest exists if:

              …

        (2)     there is a significant risk that the representation of one or
                more clients will be materially limited by the lawyer's
                responsibilities to another client, a former client *or third*
                *person* or by a personal interest of the lawyer.

Rule 1.7, Model Rules of Professional Conduct (emphasis added).  The Explanatory

Comment to this Rule 1.7 says: "In addition to conflicts with other current clients, a

lawyer's duties of loyalty and independence may be materially limited by responsibilities

to former clients under Rule 1.9 *or by the lawyer's responsibilities to other persons, such*

*as fiduciary duties arising from a lawyer's service as a trustee*, executor or corporate

director" (emphasis added).

      60.     Here, the fiduciary duties that Messrs. Budd, Cooney, Rice, and Weitz

have under the Trust Agreement as TAC members to the holders of all Asbestos PI

Claims are in direct conflict with their ethical obligations to their respective clients under

Rule 1.7.  As lawyers for their private clients, of course, they get paid, usually pursuant to

a contingent fee arrangement.  The customary contingency fee charged by personal injury

lawyers ranges from 33.33% to 40% of their clients' recoveries.  As lawyers, therefore,

they are both ethically bound and financially motivated to maximize their clients'

recoveries from the Trust.  By contrast, as TAC members, they have a fiduciary duty to

treat all holders of Asbestos PI Claims fairly, not just those for whom they, or their

respective law firm, act as private counsel.  These conflicting roles cannot be reconciled.

(*See* Ex. "18" (Expert Report of James B. Shein)).

      61.     If the TAC member fully complies with his fiduciary duties to all holders

of Asbestos PI Claims under the Trust Agreement, he will necessarily be compromising

his ethical obligations to his individual clients.  Similarly, if the TAC member complies

with his ethical obligations to his individual clients, he necessarily will be violating his

fiduciary duties as a TAC member to the remaining holders of Asbestos PI Claims for

whom he is not private counsel.  Thus, it is not a question of whether he will, or will not,

act properly.  There is simply a structural infirmity because the Trust Agreement permits

TAC members to represent asbestos claimants.  This is not permitted of the Trustees: "No

Trustee shall act as an attorney for any person who holds an asbestos claim."  (*See* Dkt.

No. "20874," Ex. "2" at § 4.9).  There is a good reason for this prohibition, as noted by

the Asbestos PI FCR David Austern: "Well, you are a trustee of a Plan paying somebody;

you shouldn't be paying your client."  (*See* Ex. "15" (Austern Dep.) at 80).  If the Trust is

going to have a TAC, the same prohibition should apply to the TAC, especially given the

undue influence they wield over Trustees and Trust affairs as outlined earlier.

62.     These are not just a theoretical concerns; they are real concerns, regardless

of the specific individual asbestos personal injury lawyers chosen to be TAC members.

The concern, however, is even more heightened with respect to four TAC members that

self-selected themselves to serve in this case, *i.e.*, Messrs. Budd, Cooney, Rice, and

Weitz.  Each has already been involved in one or more asbestos bankruptcy cases in

which a court found that they acted in a manner that advanced their own clients' interests

to the detriment of asbestos claimants that they did not represent.  *See, e.g.*, *In re

ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) (finding that a "pre-petition asbestos

plaintiffs committee" that included Messrs. Budd, Cooney, Rice, and Weitz engaged in

"obvious self-dealing" to the detriment of claimants that were not their clients); *In re:

Congoleum Corporation*, Bankruptcy Case No. 03-51524, Slip Op. (Bankr. D. N.J. 2009)

(ruling that a § 524(g) plan, negotiated by Messrs. Weitz and Rice, was unconfirmable

because it failed to achieve equality of distribution among creditors).

63.     These structural defects and built-in conflicts of interest are further

exacerbated by the indemnification and exculpation provisions contained in the Plan and

Trust Agreement.  Those provisions significantly immunize members of the TAC from any liability resulting from negligent breach of their fiduciary duties to the Trust, its beneficiaries, and to their individual clients.  (*See* Ex. "18" (Shein Report) at ¶¶ 29-37).

64.     The foregoing structural defects of the Trust, violate Bankruptcy Code §§ 1129(a)(3) and 1129 (a)(5)(A)(ii).

65.     In addition, the provisions of the Trust Agreement and TDP empowering the TAC to exercise control over the management of the Trust improperly purport to legitimize the same forms of economic conflict of interest condemned by legal doctrines prohibiting policyholder-claimant collusion.  (*See* Ex. "19" (Declaration of George L. Priest), at pp. 15-16, 18).  *See also Elliot v. Metropolitan Cas. Ins. Co. of N.Y.*, 250 F.2d 680, 683-84 (10th Cir. 1957) and *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 627-28 (2d Cir. 1996) (applying New York law).

66.     Certain contract claims held by OneBeacon and Seaton against the Debtors are classified as Class 6 Asbestos PI Claims and, therefore, are channeled to the Trust.  In addition, certain contract claims held by OneBeacon and Seaton against non-debtor Fresenius are also channeled to the Trust.  Accordingly, as creditors, OneBeacon and Seaton have standing to object to the Trust's structural defects and to its built-in conflicts of interest.

67.     OneBeacon and Seaton also have standing to object to the Trust's structural defects and built-in conflicts of interest as Asbestos Insurance Entities.  *See In re Congoleum Corp.*, 426 F.3d 675, 685-87 (3d Cir. 2005) ("we are persuaded that, in the circumstances here, the insurers and their attorneys have standing to present this appeal."); *In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D. Pa. 2004)

("Lumbermens' counsel has standing to object to the application to employ GHR"), *aff'd*,

*In re Pittsburgh Corning Corp.*, Case No. 04-1199 (W.D. Pa. 2005) (objecting insurers

"had standing to object to the application to employ GHR and have standing to defend

the order denying that application").

### The Plan Does Not Comply With § 524(g)'s Requirements.

68.    Certain of the contract claims held by OneBeacon and Seaton (*i.e.*, their

so-called "Indemnified Insurer TDP Claims") are to be channeled to and paid by the

Asbestos PI Trust.  (*See* Dkt. No. 20874, Ex. "4," § 5.13).

69.    Although OneBeacon and Seaton dispute the classification and treatment

of their contract claims, absent a proper re-classification, OneBeacon and Seaton have a

direct financial interest in the proper funding of the Trust.

70.    Bankruptcy Code § 524(g) has strict trust funding requirements:

The requirements of this subparagraph are that –

(i) the injunction is to be implemented in connection with a trust that,
pursuant to the plan of reorganization –

…

> (II) is to be funded in whole or in part by the *securities of 1 or
> more debtors involved in such plan and by the obligation of such
> debtor or debtors to make future payments, including dividends*;
>
> (III) *is to own, or by the exercise of rights granted under such plan
> would be entitled to own if specified contingencies occur, a
> majority of the voting shares of* –
>
>> (aa) each such debtor; or
>>
>> (bb) the parent corporation of each such debtor; or
>>
>> (cc) a subsidiary of each such debtor that is also a debtor …

11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) (emphasis added).  The Plan fails to comply with

these funding requirements.

71.     The Asbestos PI Trust will not be funded in whole or in part by the

*securities of 1 or more debtors involved in such plan and by the obligation of such debtor*

*or debtors to make future payments, including dividends*.  The Plan Proponents argue that

both the Warrants and the Asbestos PI Deferred Payment Agreement purportedly qualify

as "securities" as that term is used in § 524(g)(2)(B)(i)(II).  They are, no doubt, relying

upon the definition of "security" set forth in § 101(49), which includes both a "warrant"

and a "note."  11 U.S.C. § 101(49).  (*See* Ex. "16" (Lockwood Rule 30(b)(6) Dep.) at

126-27).  However, neither the Warrant nor the Asbestos PI Deferred Payment

Agreement qualifies as "securities" as that term is used in § 524(g).

72.     In the Third Circuit, the term "securities" as used in § 524(g) has been

construed to mean equity in the debtor.  *See Congoleum*, 426 F.3d at 680 ("***Notably,***

*neither Congoleum nor related entities were required to contribute **equity** to the trust*")

(emphasis added); *Congoleum*, 362 B.R. at 175 ("Despite the express requirements of

§ 524(g), and the explicit concern expressed by the Third Circuit, it was not until the

Seventh Modified Joint Plan was filed on February 3, 2006, that the Debtors and ABI

proposed contributing any **equity** toward the Plan Trust") (emphasis added); *see also*

*Combustion Eng'g*, 391 F.3d at 248 ("[t]he implication of this requirement is that the

reorganized debtor must be a going concern, such that it is able to make future payments

into the trust to provide an *'evergreen' funding source* for future asbestos claimants")

(emphasis added).

73.     The Third Circuit's reading of the "securities" requirement contained in

§ 524(g)(2)(B)(i)(II) is not only correct, it is the only rational reading in light of the

statute's legislative history.  Congress modeled § 524(g) on the plan of reorganization in

*Johns-Manville*.  *See* 140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994).  Its purpose was

to remove lingering uncertainty concerning the validity of the Johns-Manville plan of

reorganization, as well as to provide a statutory basis for other asbestos companies to

structure their own plans.  *See Id.*  In *Johns-Manville*, the Second Circuit observed:

> The cornerstone of the Plan is the Asbestos Health Trust (the "Trust"), a
> mechanism designed to satisfy the claims of all asbestos health victims,
> both present and future.  The Trust is funded with the proceeds from
> Manville's settlements with its insurers; certain cash, receivables, and
> *stock of the reorganized Manville Corporation*; long term notes; and the
> right to receive up to 20% of Manville's yearly profits for as long as it
> takes to satisfy all health claims.

843 F.2d at 640 (emphasis added).

74.    The legislative history of § 524(g) underscores just what Congress had in

mind in enacting the statute – namely, a trust-funding mechanism that includes stock.

Indeed, the Congressional Committee that recommended adoption of § 524(g) said:

> Asbestos claimants would have a stake in Johns-Manville's successful
> reorganization, because the company's success would *increase both the
> value of the stock held by the trust* and the company profits set aside for it
> . . . the Committee also recognizes that the interests of future claimants are
> ill-served if Johns-Manville *and other asbestos companies* are forced into
> liquidation and lose their ability to *generate stock value* and profits that
> can be used to satisfy claims.

140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) (emphasis added).  This legislative

intent was also evident in the Senate:

> [T]he proposed amendment would codify a court's existing authority to
> issue a permanent injunction to channel claims to an independent trust
> *funded by the securities and future earnings of the debtor*.  In plain
> English, this means that when an asbestos-producing company goes into
> bankruptcy and is faced with present and future asbestos-related claims,
> the bankruptcy court can set up a trust to pay the victims.  *The underlying
> company funds the trust with securities* and the company remains viable.
> Thus, the company continues to generate assets to pay claims today and

into the future.  In essence, *the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.*

Without a clear statement in the code of a court's authority to issue such injunctions, *the financial markets tend to discount the securities of the reorganized debtor.  This in turn diminishes the trust's assets and its resources to pay victims.  The amendment is intended to eliminate that speculation so that the marketplace values the trust's assets fairly.*

*This amendment is about growing the pie available to victims.  The result could be significant.  In the case of one such trust, for instance, every dollar increase in the value of the reorganized company's stock translates to $96 million more for compensating victims.*

140 Cong. Rec. S4522, S4523 (daily ed. Apr. 20, 1994) (emphasis added).  The same

legislative intent was echoed by Senator Heflin:

To qualify under the statute, such a trust is to be funded in whole or in part by the securities of the reorganized company, *which at some time could be borrowed against, or more likely sold outright, to raise cash to pay claims*; and the reorganized obligation to make future payments, including dividends, to the asbestos victims' trust. . . .  Mr. President, this statutory affirmation of the court's existing injunctive authority is designed to help asbestos victims receive maximum value.  It does so by assuring investors, lenders, and employees that the reorganized debtor has indeed emerged from Chapter 11 free and clear of all asbestos-related liabilities other than those defined in the confirmed plan of reorganization, and that all asbestos-related claims and demands must be made against the court-approved trust.  *This added certainty will ensure that the full value of such trust's assets – the securities upon which it relies in order to generate resources to pay asbestos claims – can be realized.*

140 Cong. Rec. S14,464 (daily ed. Oct. 6, 1994) (emphasis added)

75.    Nowhere does the legislative history discuss the use of a warrant or

deferred payment agreement, in lieu of stock, as a funding source for an asbestos trust.

Rather, the references are either to stock or to securities.  And, where the latter term is

used, the context makes clear that stock was intended.

76.    With the backdrop of *Johns-Manville*, the legislative intent of Congress is

obvious.  It wanted a statutory scheme to legitimize the concept of the channeling

injunction to deal with future demands.  That would eliminate the lingering doubts in the

financial markets as to whether Manville would remain free of asbestos liability.  That, in

turn, would enable the Manville Trust to realize the full value of the Manville stock it

owned in order to satisfy future claims.  The statutory scheme represents a delicate

balance pursuant to which future claimants have their rights against the debtor cut off in

exchange for, *inter alia*, an equity stake in and, therefore, potential upside in the company

that injured them, which by virtue of the injunction is free of its asbestos liability.

77.     The Warrants are, of course, not stock.  Rather, they are a right to

purchase stock at a given price (*i.e.*, the strike price) within a given period of time.  Here,

the Warrant Agreement provides for Warrants to purchase in the aggregate, 10,000,000

shares of common stock of W.R. Grace & Co. at a strike price of $17.00 per share.  (Dkt.

No. "20874," Ex. "24" at 3).  The Warrants have a term of one year from the Issue Date.

(*Id.* at 2).  The share price of W.R. Grace & Co. stock is currently well below the $17.00

strike price.  On April 7, 2008, the day after the Plan Proponents executed their "Term

Sheet for Resolution of Asbestos Personal Injury Claims," which included the Warrants

with a $17.00 strike price, Grace stock closed at $26.83 per share.  By contrast,

yesterday, the stock closed at $12.95 per share.  Thus, the Warrants are currently well

"out of the money" and, as a practical matter, are of little economic value to the Asbestos

PI Trust.  (*See* Ex. "20" (Expert Report of H. Sean Mathis)).   Moreover, even if the

Warrants have value, it is still unlikely that the $17.00 strike price will be reached within

the one year term.  As a consequence, the Warrants will likely expire without ever being

exercised by the Asbestos PI Trust.  (*Id.*).  If they are not exercised, the Asbestos PI Trust

will not be funded with "securities" (*i.e.*, stock) of Grace.  Nor will the Asbestos PI Trust

be funded with "dividends" because dividends would only be paid to the Asbestos PI

Trust if it owned Grace stock.  As a result, the Warrants do not satisfy the funding

requirements of § 524(g)(2)(B)(i)(II).

78.     Likewise, the Asbestos PI Deferred Payment Agreement does not qualify

as "securities" of the Debtors.  It has a set value – *i.e.*, the present value of $1.55 billion

in future payments.  (Dkt. No. 20874, Ex. "11" at 12-13).  No matter how well Grace

does in the future – once freed of its asbestos liabilities – the payments Grace is obliged

to make under the Asbestos PI Deferred Payment Agreement will not change.  Nor will

the Asbestos PI Deferred Payment Agreement generate any interest income during its

term.  In short, the Asbestos PI Deferred Payment Agreement does not qualify as

"equity" and, therefore, does not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).

*See Congoleum*, 426 F.3d at 680.

79.     The Plan also fails to comply with 11 U.S.C. § 524(g)(2)(B)(i)(III).  The

Plan calls for two separate and distinct § 524(g) trusts – namely, the Asbestos PI Trust

and the Asbestos PD Trust.  (*See* Dkt. No. 20874, Exs. "2" and "3").  Each is to be

governed pursuant to a different trust agreement, and each trust will have its own trustees,

TAC, Futures Representative, and TDP (or its equivalent).  Each of these trusts must, of

course, comply with the funding requirements of § 524(g)(2)(B)(i)(III), but because there

are to be two separate and distinct trusts, neither can comply.  There can be, for example,

no "specified contingency" that would entitle each of the Asbestos PI Trust and the

Asbestos PD Trust to own a majority of voting shares of Grace because, for each to have

a majority, the total would have to exceed 100%.  In the event of a default under the

Asbestos PI Deferred Payment Agreement, it appears that – at best – the Asbestos PI

Trust and the Asbestos PD Trust might share ownership of a majority of the voting shares

of Grace.  (*See* Dkt. No. 20874, Ex. "26").  This funding scheme does not satisfy

§ 524(g)(2)(B)(i)(III).

80.     The Plan may also fail to satisfy § 524(g)(2)(B)(II)(I), (II), and (III), as

there appears be to little or no evidence that the Debtors will face asbestos-related "future

demands" involving property damage.  (*See* Dkt. No. 20872, § 7.7(j); Ex. "16"

(Lockwood Rule 30(b)(6) Dep.) at 642-44).

**The Plan Has Impermissibly Overbroad Release and Exculpation Provisions.**

81.     The release and exculpation provisions set forth in the Plan are overly

broad and illegal.  For example, the Plan's Exculpation provision provides broad

immunity from liability to the "Reorganized Debtors, the Debtors, the Non-Debtor

Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties," and

various official committees and professionals, and to their respective "Representatives."

(*See* Dkt. No. 20872, § 11.9).  Meanwhile, the term "Representatives" is defined in the

Plan to include past and present directors, officers, and employees of the various

referenced entities.  (*See* Dkt. No. 20872 at 33).  This exculpation provision is overly

broad, and there is no factual support to justify it.  *See Congoleum*, 362 B.R. at 190, 195-

96; *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001).

82.     Indeed, the Exculpation provision goes even further, seeking to confer

immunity from liability not only for activities related to the prosecution of the bankruptcy

case and related proceedings, but also for activities related to "administration of this Plan

or the property to be distributed under this Plan," which includes the post-Effective Date

administration of the Asbestos PI Trust and Asbestos PD Trust.  This prospective
immunity from liability is plainly improper.

83.     The Plan also provides for certain illegal non-debtor releases as well.  For
example, § 8.8.7 of the Plan provides that:

> In addition to the foregoing, each Holder of a Claim or Equity Interest
> who receives or retains any property under this Plan shall also be deemed
> to unconditionally release the Fresenius Indemnified Parties  . . . .

(*See* Dkt. No. 20872, § 8.8.7).

84.     This release is illegal on its face.  In *Congoleum*, the bankruptcy court
held that "a consensual release cannot be based solely on a vote in favor of a plan.  For a
release to be consensual, the creditor must have 'unambiguously manifested assent to the
release of the nondebtor from liability on its debt."  *See Congoleum*, 362 B.R. at 194.
Mere inclusion of a statement in plan documents that voting to accept the plan constitutes
consent to a release is not sufficient.  *See id.*  This release is even further from being
consensual, because it is triggered by the Claim Holder's receipt of a distribution under
the Plan, which may occur even over the Claim Holder's vote against the Plan.

85.     Moreover, this Court has held that releases of non-derivative third-party
claims against a non-debtor generally "cannot be accomplished without the affirmative
agreement of the creditor affected."  *See In re Zenith Elec. Corp.*, 241 B.R. 92, 111
(Bankr. D. Del. 1999); *see also Genesis Health Ventures*, 266 B.R. at 607-608
(recognizing that only in "rare" and "exceptional circumstances may a non-consensual
release be validated, and only provided that the release is necessary to the feasibility of
the plan, and that the non-consenting creditors receive fair consideration in exchange for
the release).  Here, there has been no showing that the § 8.8.7 release is necessary to the

feasibility of the Plan.  And, for their part, OneBeacon and Seaton definitively state that they have not, and do not, consent to the release of any claims they have as against the Fresenius Indemnified Parties or the Sealed Air Indemnified Parties, nor have they received any, let alone "fair," consideration in exchange for this non-consensual release.

**********

Claimants hereby join in the final plan objections of other parties-in-interest, to the extent pertinent (although Claimants take no position here concerning the validity or amount of any claim that other parties may have asserted against the Debtors, or any question of insurance coverage relating to policies issued by other insurers).  In addition, pursuant to the Third Amended Case Management Order, Claimants will file a Trial Brief in support of their Phase I objections on or before June 1, 2009 and a Trial Brief in support of their Phase II objections on or before July 13, 2009.

Dated:  May 20, 2009                          Respectfully submitted,

                                              */s/ David P. Primack*
                                              _____
                                              Warren T. Pratt (4334)
                                              David P. Primack (4449)
                                              DRINKER BIDDLE & REATH LLP
                                              1100 N. Market Street, Suite 1000
                                              Wilmington, DE  19801-1254
                                              Telephone:  302-467-4200

                                              Michael F. Brown
                                              Jeffrey M. Boerger
                                              DRINKER BIDDLE & REATH LLP
                                              One Logan Square
                                              Philadelphia, PA  19103-6996
                                              Telephone:  215-988-2700

                                              Counsel for Claimants
                                              Seaton Insurance Company and
                                              OneBeacon America Insurance Company