# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
_____X
In Re:                          Chapter 11

                                Case No.
                                01-01139 JKF
W.R. Grace & Co., et al.,

                                (Jointly
            Debtors.            Administered)
_____X
```

—    —    —

May 6, 2009

—    —    —

DEPOSITION of JEFFREY POSNER, held

at the offices of Kirkland & Ellis, 655

Fifteenth Street, N.W., Washington, DC,

commencing at 9:08 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified Court

Reporter, License No. XI00825, and

Certified Realtime Reporter

—    —    —

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor

1635 Market Street

Philadelphia, PA  19103

1.866.MAGNA.21

## Page 2

```
 1   A P P E A R A N C E S :
 2
     DRINKER BIDDLE & REATH, LLP
 3   BY: MICHAEL F. BROWN, ESQUIRE
     One Logan Square
 4   18th and Cherry Streets
     Philadelphia, Pennsylvania 19103-6996
 5   (brownmf@dbr.com)
     Representing OneBeacon America Insurance
 6   Company, Seaton Insurance Company,
     Government Employees Insurance Company,
 7   Columbia Insurance Company f/k/a Republic
     Insurance Company
 8
 9   ANDERSON KILL & OLICK, PC
     BY: ROBERT M. HORKOVICH, ESQUIRE
10   1251 Avenue of the Americas
     New York, New York 10020
11   212.278.1322
     (rhorkovich@andersonkill.com)
12   Representing Grace, Official Committee of
     Asbestos Personal Injury Claimants ("ACC")
13
14   W.R. GRACE & CO.
     BY: RICHARD C. FINKE, ESQUIRE*
15     ASSISTANT GENERAL COUNSEL
       (*VIA TELECONFERENCE)
16   5400 Broken Sound Boulevard, NW
     Suite 300
17   Boca Raton, Florida 33487
     561.362.1533
18   Representing W.R. Grace & Co.
19
     KIRKLAND & ELLIS, LP
20   BY: LISA G. ESAYIAN, ESQUIRE
     300 North LaSalle Street
21   Chicago, Illinois 60654
     312.862.2226
22   (lisa.esayian@kirkland.com)
     Representing the Debtors
23
24
```

## Page 3

```
 1   A P P E A R A N C E S : (continued)
 2   SIMPSON THACHER & BARTLETT, LLP
     BY: MARY BETH FORSHAW, ESQUIRE
 3   425 Lexington Avenue
     New York, New York 10017-3954
 4   212.455.2846
     (mbforshaw@stblaw.com)
 5   Representing Travelers Casualty and Surety
     Company
 6
 7   VORYS, SATER, SEYMOUR AND PEASE, LLP
     BY: WILLIAM J. POHLMAN, ESQUIRE
 8   52 East Gay Street
     Columbus, Ohio 43215
 9   614.464.8349
     (wjpohlman@vorys.com)
10   Representing The Scotts Company, LLC
11
     COHN WHITESELL & GOLDBERG, LLP
12   BY: DANIEL C. COHN, ESQUIRE
     101 Arch Street
13   Boston, Massachusetts 02110
     617.951.2505
14   (cohn@cwgll.com)
     Representing the Libby Claimants
15
16   LEWIS, SLOVAK & KOVACICH, PC
     BY: MARK M. KOVACICH, ESQUIRE
17   P.O. Box 2325
     723 Third Avenue
18   Great Falls, Montana 59403
     406.761.5595
19   mark@lsklaw.net
     Representing the Libby Claimants
20
     SPEIGHTS & RUNYAN
21   BY: DANIEL H. SPEIGHTS, ESQUIRE*
       (*VIA TELECONFERENCE)
     200 Jackson Avenue East
23   P.O. Box 685
     Hampton, South Carolina 29924
24   803.943.4444
```

## Page 4

```
 1   Representing Anderson Memorial Hospital
 2   A P P E A R A N C E S : (continued)
 3
     MENDES & MOUNT, LLP
 4   BY: CAROLINA ACEVEDO, ESQUIRE
     750 Seventh Avenue
 5   New York, New York 10019
     212.261.8262
 6   (carolina.acevedo@mendes.com)
     Representing AXA Belgium as Successor to
 7   Royale Belge SSA
 8
     MENDES & MOUNT, LLP
 9   BY: ALEXANDER MUELLER, ESQUIRE
     750 Seventh Avenue
10   New York, New York 10019
     212.261.8296
11   (alexander.mueller@mendes.com)
     Representing London Market Companies
12
13   FORD MARRIN ESPOSITO & WITNEYER & GLESER
     BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE
14   Wall Street Plaza
     New York, New York 10005-1875
15   212.269.4900
     Representing Continental Casualty Company
16   and Continental Insurance Company
17
     BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
18   BY: MATTHEW I. KRAMER, ESQUIRE*
       (*VIA TELECONFERENCE)
19   200 South Biscayne Boulevard
     Suite 2500
20   Miami, Florida 33131-5340
     305.450.7246
21   (mkramer@bilzin.com)
     Representing Property Damage Committee
22
23
24
```

## Page 5

```
 1   A P P E A R A N C E S : (continued)
 2
     STROOCK & STROOCK & LAVAN, LLP
 3   BY: ARLENE G. KRIEGER, ESQUIRE*
       (*VIA TELECONFERENCE)
 4   180 Maiden Lane
     New York, New York 10038-4982
 5   212.806.5400
     (akrieger@stroock.com)
 6   Representing Official Committee of
     Unsecured Creditors
 7
     CROWELL & MORING, LLP
 8   BY: PATRICIA CONNALLY, ESQUIRE
     1001 Pennsylvania Avenue, N.W.
 9   Washington, DC 20004-2595
     202.624.2913
10   (pconnally@crowell.com)
     Representing Fireman's Fund Insurance
11   (Surety Bond)
12
     STEVENS & LEE, P.C.
13   BY: JOHN D. DEMMY, ESQUIRE*
       (*VIA TELECONFERENCE)
14   1105 North Market Street, 7th Floor
     Wilmington, Delaware 19801
15   302.654.5180
16   (jdd@stevenslee.com)
     Representing Fireman's Fund Insurance
17
18   LAW OFFICES OF ALAN B. RICH
     BY: ALAN B. RICH, ESQUIRE
19   Elm Place, Suite 4620
     1401 Elm Street
20   Dallas, Texas 75202
     214.744.5100
21   (arich@alanrichlaw.com)
     Representing Property Damage PCR
22
23
24
```

## Page 6

1  A P P E A R A N C E S: (continued)
2
    CONNOLLY BOVE LODGE & HUTZ, LLP
3  BY: JEFFREY C. WISLER, ESQUIRE
    The Nemours Building
4  1007 North Orange Street
    P.O. Box 2207
5  Wilmington, Delaware 19899
    302.888.6528
6  (jwisler@cblh.com)
    Representing Maryland Casualty
7
8  ECKERT SEAMANS CHERIN & MELLOTT, LLC
    BY: EDWARD J. LONGOSZ, II, ESQUIRE
9  1747 Pennsylvania Avenue, N.W.
    12th Floor
10 Washington, DC 20006
    202.659.6619
11 (elongosz@eckertseamans.com)
    Representing Maryland Casualty and Zurich
12
13 WILEY REIN, LLP
    BY: KARALEE C. MORELL, ESQUIRE
14 1776 K Street NW
    Washington, DC 20006
15 202.719.7520
    (kmorell@wileyrein.com)
16 Representing Maryland Casualty and Zurich
17
    COZEN O'CONNOR
18 BY: ILAN ROSENBERG, ESQUIRE*
    (*VIA TELECONFERENCE)
19 1900 Market Street
    Philadelphia, Pennsylvania 19103-3508
20 215.665.4621
    (irosenberg@cozen.com)
21 Representing Federal Insurance Company
22
23
·1

## Page 7

1  A P P E A R A N C E S: (continued)
2
3  ORRICK HERRINGTON & SUTCLIFFE, LLP
    BY: JONATHAN P. GUY, ESQUIRE
4    PERI N. MAHALEY, ESQUIRE
    Columbia Center
5  1152 15th Street, N.W.
    Washington, DC 20005-1706
6  202.339.8516
    (jguy@orrick.com)
7  (pmahaley@orrick.com)
    Representing PI Future Claimants'
8  Representative
9
    CUYLER BURK, P.C.
10 BY: ANDREW CRAIG, ESQUIRE*
    (*VIA TELECONFERENCE)
11 4 Century Drive
    Parsippany, New Jersey 07054
12 973.734.3200
    (acraig@cuyler.com)
13 Representing Allstate Insurance Company
14
15 WILSON ELSER MOSKOWITZ
    EDELMAN & DICKER, LLP
    BY: CARL J. PERNICONE, ESQUIRE
16 150 East 42nd Street
    New York, New York 10017-5639
17 212.915.5656
    (carl.pernicone@wilsonelser.com)
18 Representing Arrowood Indemnity Company
19
    O'MELVENY & MEYERS LLP
·0 BY: TANCRED SCHIAVONI, ESQUIRE
    7 Times Square
·1 New York, New York 10036
    212.326.2267
22 (tschiavoni@omm.com)
    Representing Arrowood Indemnity Company
23
24

## Page 8

1  A P P E A R A N C E S: (continued)
2
    WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
3  BY: KEVIN J. MANGAN, ESQUIRE*
    (*VIA TELECONFERENCE)
4  222 Delaware Avenue
    Suite 1501
5  Wilmington, Delaware 19801
    302.252.4361
6  (kmangan@wcsr.com)
    Representing State of Montana
7
8  PEPPER HAMILTON, LLP
    BY: LINDA J. CASEY, ESQUIRE*
9  (*VIA TELECONFERENCE)
    3000 Two Logan Square
10 Philadelphia, Pennsylvania 19103
    215.981.4000
11 (caseyl@pepperlaw.com)
    Representing BNSF Railway Company
12
13
    ALSO PRESENT:
14
    ALLEN SCHWARTZ, O'Melveny & Meyers LLP
15
16          – – –
17
18
19
20
21
22
23
24

## Page 9

1           INDEX
            EXAMINATION
2
    Witness Name              Page
3  JEFFREY POSNER
4    BY MS. FORSHAW          14
5    BY MR. KOVACICH         108
6    BY MR. MUELLER          229
7    BY MS. CASEY            236
8    BY MR. LONGOZ           256
9    BY MR. BROWN            269
10   BY MS. DeCRISTOFARO     294, 338
11   BY MR. SCHIAVONI        308, 334
12   BY MR. POHLMAN          314
13   BY MR. SPEIGHTS         339
14          EXHIBITS
15 EXHIBIT                   ID
16 Exhibit 1                 14
    Notice of Deposition of Jeffery
17 Posner
18 Exhibit 2                 14
    Curriculum vitae of Jeffery M.
19 Posner
20 Exhibit 3                 14
    Affidavit Under 11 USC 327(e)
21
22 Exhibit 4                 41
    Asbestos Settlement Agreement
    between W.R. Grace & Company-Conn.
23 and the Aetna Casualty & Surety
    Company dated May 12th, 1996
24

Page 10

```
1          EXHIBITS
      EXHIBIT              ID
2
3     Exhibit 5           68
      Exhibit 4 to Exhibit Book Trust
      Distribution Procedures
4
5     Exhibit 6           82
      First Amended Joint Plan of
      Reorganization
6
7     Exhibit 7           96
      Agreement between W.R. Grace &
      Company-Connecticut and the
8     Travelers Casualty & Surety
      Company dated February 20, 1992
9
10    Exhibit 8          106
      Exhibit 19 to Exhibit Book,
      Retained Causes of Action
11
12    Exhibit 9          113
      Answer, Cross-claims and
      Counterclaims of Defendant W.R.
13    Grace in re: Maryland Casualty v.
      Grace, et al.
14
15    Exhibit 10         118
      Royal Indemnity Company
16    declaration sheets and
      endorsements SA-870, 891, 939,
      945-946
17
18    Exhibit 11         137
      Letter dated December 9, 1999 to
      Royal & SunAlliance from Marsh USA
19
20    Exhibit 12         143
      Letter dated January 12, 2000 from
      Royal and SunAlliance to J.M.
21    Posner, Inc., two pages
22    Exhibit 13         196
      E-mail string between Janet Baer
23    and Dan Cohn, three pages
24
```

Page 11

```
1          EXHIBITS
      EXHIBIT              ID
2
3     Exhibit 14         216
      Monthly asbestos litigation
      summary Bates stamped 91-1614
4     through 1639
5     Exhibit 15         270
      Settlement agreement Bates stamped
6     OB 1 through 33
7     Exhibit 16         273
      Settlement Agreement and Release
8     Bates stamped OB 34 through 66
9     Exhibit 17         277
      Settlement Agreement and Release
10    Bates stamped OB 67 through 92
11    Exhibit 18         279
      Settlement Agreement, Release and
12    Indemnification/Hold Harmless
      Agreement Bates stamped SEA 1
13    through 16
14    Exhibit 19         280
      Settlement Agreement, Release and
15    Indemnification/Hold Harmless
      Agreement Bates stamped SEA 17
16    through 31
17    Exhibit 20         283
      Settlement Agreement, Release and
18    Indemnification/Hold Harmless
      Agreement Bates stamped SEA 32
19    through 47
20    Exhibit 21         285
      Settlement Agreement & Release
      Bates stamped SEA 48 through 61
22    Exhibit 22         294
      LexisNexis printout in re:
23    Maryland Casualty v. Grace, et al.
24
```

Page 12

```
1          EXHIBITS
      EXHIBIT              ID
2
      Exhibit 23         317
3     Exhibit 6 to Exhibit Book,
      Asbestos Insurance Transfer
4     Agreement
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 13

```
1     DEPOSITION SUPPORT INDEX
2
      Direction to Witness Not To Answer
3     Page  Line   Page  Line
      209    1     239    6
4
      Request For Production of Documents
5     Page  Line   Page  Line
      142   11     149   24
6     169   18
7     Stipulations
      Page  Line   Page  Line
8     (None)
9     Questions Marked
      Page  Line   Page  Line
10    (None)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 14

1          (Notice of Deposition of
2   Jeffery Posner received and marked
3   for identification as Posner
4   Exhibit 1.)
5          (Curriculum vitae of
6   Jeffery M. Posner received and
7   marked for identification as Posner
8   Exhibit 2.)
9          (Affidavit Under 11 USC
10   327(e) received and marked for
11   identification as Posner Exhibit
12   3.)
13
14   J E F F R E Y   P O S N E R,
15          having been sworn by the Notary
16   Public of the States of New York
17   and New Jersey, was examined and
18   testified as follows:
19
20   EXAMINATION BY
21   MS. FORSHAW:
22          Q.   Good morning.  Mr. Posner.
23          A.   Good morning.
24          Q.   Good to see you again.  I

Page 15

1   know you've been through this drill many
2   times.  If I talk too fast, just stop me.
3   If you have any questions about my
4   questions, let me know.  If you need to
5   take a break, let me know.
6          A.   Definitely.
7          Q.    Okay.  I'm just --
8          MR. KRAMER:  I'm sorry.
9   Who's asking the questions, please?
10          MS. FORSHAW:  Sure.  It's
11   Mary Beth Forshaw from Simpson
12   Thacher representing Travelers
13   Casualty.  If you guys have a hard
14   team hearing us, will you let us
15   know?
16          MS. KRIEGER:  Yes, we will.
17   Thank you.
18          Q.   Mr. Posner, I'm going to
19   put before you a Notice of Deposition of
20   Jeffery Posner.  Do you understand you're
21   here to testify in response to that notice
22   today?
23          A.   Yes, I do.
24          MS. FORSHAW:  I have eight

Page 16

1   or nine copies of exhibits which
2   I'll pass out through the
3   deposition.  You can put that
4   aside.  For the record, I've marked
5   the Notice of Deposition of Jeffery
6   Posner as Exhibit 1.
7   BY MS. FORSHAW:
8          Q.   Mr. Posner, let me put
9   before you what I've marked as Exhibit 2,
10   which is a resume of Jeffery Posner.  Do
11   you recognize this document as your
12   resume?
13          A.   Yes, but it appears to me
14   to be an outdated copy of it.
15          Q.   Okay.  And for the record,
16   can you tell us in what way is this resume
17   outdated?
18          A.   My business address, it's
19   an old business address which leads me to
20   believe that's a version that I kept
21   several years ago.
22          Q.   Is the professional
23   experience described in your resume true
24   and accurate?

Page 17

1          A.   Yes, I'm sure it is.
2          Q.   And this resume indicates
3   that you were employed at W.R.
4   Grace & Company from 1982 to 1999.  Is
5   that correct?
6          A.   Yes, it is.
7          Q.   And for the record, can you
8   give us an overview of your employment
9   experience at W.R. Grace listing your
10   positions and the approximate years you
11   held each position?
12          A.   I started with Grace in
13   1982 as an assistant claims manager.  In
14   1986 I assumed the duties of a risk
15   analyst.  Thereafter I became the
16   assistant director of risk management
17   sometime, I think, in 1987 and then in
18   1988 I was promoted to the director of
19   risk management and I became an assistant
20   vice president of the company.
21          Q.   And during your tenure at
22   W.R. Grace, were you responsible for
23   overseeing asbestos-related coverage
24   litigations?

Page 262

1    A.  In what sense? I don't --
2    **Q.  Well, are you aware of any**
3  **of the obligations provided for, for**
4  **example, the release or indemnity**
5  **obligations under the settlement**
6  **agreements, that the Trust will not be**
7  **able to perform?**
8         MS. ESAYIAN:  Objection to
9     form.
10         MR. HORKOVICH:  Objection
11     to form.
12    A.  You keep saying "not be
13  able to". You mean not be able to because
14  they don't have the money to do it or they
15  don't have the manpower? I'm not trying
16  to be cute. But you're saying "would not
17  be able to". Why wouldn't --
18    **Q.  Well, are you aware of any?**
19         MR. HORKOVICH:  Objection
20     to form.
21    A.  I mean, I don't really know
22  that much about the Trust to know what
23  their capabilities are, whether it be
24  financial capabilities or otherwise. I

Page 263

1  mean, my assumption is that they will do
2  that but I don't know what their
3  capabilities are. I don't even know that
4  it's been formed yet.
5    **Q.  Is it your understanding**
6  **that the Trust will indemnify Maryland**
7  **Casualty under the settlement agreements**
8  **in the same way that Grace agreed to**
9  **indemnify Maryland Casualty?**
10         MR. HORKOVICH:  Objection
11     to form.
12    A.  Again, that's my non-legal
13  assumption.
14    **Q.  Okay. And that would apply**
15  **to Zurich as well --**
16         MR. HORKOVICH:
17     Objection.
18    **Q.  -- under a settlement**
19  **agreement, to the extent there's**
20  **obligations.**
21    A.  To the extent --
22         MR. HORKOVICH:
23     Objection.
24    A.  To the extent there's an

Page 264

1  indemnity agreement, again, that's my
2  non-legal assumption.
3    **Q.  You would agree that the**
4  **settlement agreements with Maryland**
5  **Casualty and Zurich are being transferred**
6  **and will be transferred to the asbestos PI**
7  **Trust upon confirmation and that all**
8  **rights and obligations thereunder? You**
9  **would agree with me on that?**
10         MR. HORKOVICH:  Objection
11     to form.
12    A.  You know, the Plan speaks
13  for itself. Again, that is what I
14  understand but I'm not an expert on the
15  Plan but that's my understanding.
16    **Q.  And that understanding is**
17  **consistent with your prior testimony today**
18  **with respect to Travelers? It's the same**
19  **answer?**
20    A.  Correct, yes.
21         MR. LONGOSZ:  Just bear
22     with me. I'm trying to cut down on
23     the questions.
24         That's it. Thank you.

Page 265

1         THE WITNESS:  Thank you,
2     sir.
3         (Off the record.)
4         MR. BROWN:  We've just had
5     a discussion off the record
6     concerning Grace policies and the
7     proposal on the table to avoid the
8     necessity of showing Mr. Posner a
9     whole bunch of policies is that the
10     parties, or at least certain of the
11     parties, who were interested in
12     having a stipulation only on the
13     authenticity and admissibility of
14     policies will work outside this
15     deposition on such a stipulation
16     with the notion being that that
17     stipulation would apply for
18     purposes of the bankruptcy case
19     only.
20         And for my clients, GEICO,
21     Republic and Seaton in particular,
22     it would involve our policies as
23     well as the underlying policies
24     issued by London and possibly CNA

Page 266

1  that may have implications for the
2  terms of our policies.
3      Does that accurately state
4  what we're attempting to do?
5      MR. HORKOVICH: It's fine
6  with the ACC that we enter into a
7  stipulation with regard to the
8  terms and conditions of the
9  insurance policies limited -- the
10 stipulation limited only for
11 purposes of the bankruptcy
12 proceeding and not being applicable
13 for any ensuing insurance coverage
14 litigation.
15     MR. BROWN: Is that true
16 for the debtors as well?
17     MS. ESAYIAN: It's fine for
18 the debtors. I'm happy to do it
19 that way.
20     MR. MUELLER: On behalf of
21 the London Market Companies, I
22 don't think we're opposed in
23 principle to a stipulation, but
24 today is really the first time it's

Page 267

1  been discussed with me so I'm not
2  prepared to say that we'd be
3  willing to enter into one today.
4      MR. COHN: And what's
5  Royal's position on that in terms
6  of authentication of those
7  policies?
8      MR. SCHIAVONI: If policies
9  are missing or there's no proof of
10 their existence, I'm not going to
11 stipulate to them. Why should I?
12 I don't understand your position.
13     MS. ESAYIAN: I'm not sure
14 that that's what anybody said.
15     MR. COHN: As to the former
16 policies that can be -- where
17 somebody can produce a copy of a
18 policy, are you prepared --
19     MR. SCHIAVONI: Didn't you
20 listen to the testimony about the
21 settlements? There was disputes
22 about the existence of the
23 policies.
24     MR. COHN: I understood his

Page 268

1  testimony to be that there were
2  disputes as to pre-1953 policies.
3      MR. SCHIAVONI: Are you
4  going to ratify the settlement
5  agreement --
6      MS. ESAYIAN: Okay, wait a
7  minute. Time out. Michael has the
8  floor for questioning. He either
9  has questions about his insurance
10 policies or not. You guys, we can
11 work this out separately for the
12 Royal policies. It's not -- we
13 shouldn't be taking Mr. Posner's
14 time on this right now because
15 that's not --
16     MR. HORKOVICH: OneBeacon
17 has the floor.
18     MS. ESAYIAN: -- what
19 Michael's issue is.
20     MR. BROWN: Jonathan, on
21 behalf of the PI FCR, you're on
22 board with this proposal?
23     MR. GUY: On behalf of the
24 PI FCR, we are on board with trying

Page 269

1  to work through the authenticity
2  and admissibility of insurance
3  policies by stipulating as to those
4  particular policies.
5      MR. BROWN: All right.
6      MR. SCHIAVONI: Dan, if you
7  have questions about the policy,
8  you should ask them now.
9      MR. BROWN: After I finish.
10 EXAMINATION BY
11 MR. BROWN:
12     Q.  Mr. Posner, Michael Brown.
13 I'm here on behalf of OneBeacon American
14 Insurance Company, Seaton Insurance
15 Company, GEICO and Republic.
16     Are you generally familiar with the
17 restructuring transactions involving
18 Grace, the one that took place in or
19 around May -- excuse me -- in or around
20 September 1996 and the other in March of
21 1998?
22     A.  I'm generally familiar,
23 yes.
24     Q.  Okay.

Page 270

1      (Settlement agreement Bates
2   stamped OB 1 through 33 received
3   and marked for identification as
4   Posner Exhibit 15.)
5      MR. BROWN:  The document
6   that's been marked as Posner-15 is
7   a settlement agreement and I want
8   to go back for a moment to the
9   discussion we had at the outset at
10  the deposition.  I'm going to show
11  Mr. Posner a series of settlement
12  agreements from my clients and I
13  understand that this deposition as
14  a whole is subject to the
15  protective order.
16     For purposes of this line
17  of questioning, I'd just like the
18  ability if we so choose to waive
19  the protection afforded with
20  respect to this portion of the
21  testimony Mr. Posner gives today if
22  we so elect without having to check
23  with the 25 people in the room.  Is
24  that acceptable?

Page 271

1      MS. ESAYIAN:  Well, that's
2   acceptable to Grace.  I don't know
3   that I can speak for the 25 people
4   in the room.
5      MR. BROWN:  Does anyone
6   have an objection to that?
7      MS. MORELL:  Just limited
8   to your portion of the transcript?
9      MR. BROWN:  Correct.
10  Hearing no objection.
11     Q.   Mr. Posner, can you
12  identify what's been marked Posner-15?
13     A.   Yes.  This appears to be
14  the settlement agreement that Grace
15  entered into with Commercial Union and its
16  affiliated companies as respects coverage
17  for asbestos claims.  The agreement was
18  entered into in May of 1993.
19     Q.   Okay.  And if you look at
20  page -- I'll give you the Bates label.
21  It's OB 31.
22     A.   Yes.
23     Q.   You'll see there's some
24  signatures there.  Can you identify the

Page 272

1   signatures and the party on behalf of whom
2   the individuals are signing?
3      A.   Well, Robert Beber signed
4   it on behalf of Grace.
5      Q.   And you recognize his
6   signature?
7      A.   Well, I kind of recognize
8   it.  I'm not sure.  It's...
9      Q.   How about the one next to
10  his?
11     A.   That's my signature.  I
12  witnessed it.
13     Q.   Okay.
14     A.   And then it's signed by a
15  number of -- well, it's signed by Richard
16  Jordan of Commercial Union and witnessed
17  by Harvey Lewis.
18     Q.   Were you involved in the
19  negotiations of this agreement?
20     A.   Yes, I was.
21     Q.   And did this payment --
22  excuse me.
23     Did this agreement call for certain
24  payments to be made by Commercial Union

Page 273

1   and its affiliates?
2      A.   Yes, it did.
3      Q.   And were those payments
4   made?
5      A.   Yes, they were.
6      Q.   All right.
7      (Settlement Agreement and
8   Release Bates stamped OB 34 through
9   66 received and marked for
10  identification as Posner Exhibit
11  16.)
12     Q.   Mr. Posner, can you take a
13  look at what's been marked Posner-16 and
14  identify it for me?
15     A.   Yeah.  This is an agreement
16  that Grace entered into with Commercial
17  Union and its affiliated companies
18  concerning claims emanating out of what
19  I'm going to refer to as the Hatco
20  environmental site in New Jersey.
21     Q.   Can you identify the
22  parties that signed the agreement?
23     A.   Yes.  It appears that I
24  signed it on behalf of Grace and Harvey

Page 274

1   Lewis signed it on behalf of Commercial
2   Union.
3       Q.   Okay.  Now, when you --
4   well, let me ask you this:  Did you
5   participate in the negotiations of this
6   agreement?
7       A.   Yes, I did.
8       Q.   And were the payments by
9   Commercial Union and its affiliates that
10  are set forth in this agreement actually
11  made?
12      A.   Yes, they were.
13      Q.   All right.  You indicated
14  that you signed this on behalf of Grace
15  and there are two Grace entities listed on
16  page 32 and there is a third Grace entity
17  listed on -- well, let me use the Bates
18  numbers.  On page 65 and 66 there's W.R.
19  Grace & Company-Conn, there is W.R. Grace
20  & Co.-Delaware and then on the next page
21  W.R. Grace & Co., a New York corporation
22  which has changed its name to Fresenius
23  National Medical Care Holdings, Inc.  Do
1   you see that?

Page 275

1       A.   Yes.
2       Q.   At the time that this
3   agreement was executed in 1996, this was
4   immediately following one of the two
5   restructurings of Grace.  Is that
6   correct?
7       A.   I don't remember the date
8   of the restructuring, but obviously it was
9   after the -- I guess it had to be because
10  it references the -- I'm going to call it
11  the National Medical Care restructuring.
12  So I'm presuming that was executed after
13  that restructuring took place and I think
14  that took place after the Sealed Air
15  transaction so I think this is being
16  signed after both transactions.  That is
17  my recollection.
18      Q.   Let's look at page 66.
19      A.   Okay.
20      Q.   When you signed this
21  document back on December 17th, 1996 on
22  behalf of W.R. Grace & Co., a New York
23  corporation, et cetera, you were obviously
24  authorized to do so?

Page 276

1       A.   Yes.
2       Q.   Okay.  Is the company that
3   you signed the document on behalf of back
4   then now known as Fresenius Medical Care
5   Holdings, Inc.?
6       A.   It was at one time. I
7   don't know if today it is.  It may be.  I
8   haven't heard that it's changed its name
9   but I don't think I've heard much about
10  but, yeah, I believe certainly that was
11  the name at the time.
12      Q.   Is it your understanding
13  that that entity is a non-debtor?
14          MS. ESAYIAN: If you know.
15          MR. HORKOVICH: Objection
16  to form.
17      A.   Yeah, I believe that entity
18  would be a non-debtor.
19      Q.   Okay.  And if you go back
20  to page 65, do you know what the name of
21  the company is today that back in December
22  of 1996 was called W.R. Grace &
23  Co.-Delaware?
24      A.   I think it's W.R. Grace &

Page 277

1   Co.-Delaware today, unless it's changed
2   its name.  I don't recall.  I thought it
3   was Delaware today as well, unless they
4   took the Delaware out of it.
5       Q.   It's not Sealed Air
6   Corporation?
7          MS. ESAYIAN: Objection to
8   foundation.  You can answer if you
9   can.
10          THE WITNESS: I'm thinking.
11      A.   Sitting here, I don't
12  know.
13      Q.   Okay.
14          (Settlement Agreement and
15      Release Bates stamped OB 67 through
16      92 received and marked for
17      identification as Posner Exhibit
18      17.)
19      Q.   Take a few moments to look
20  at what's been marked as Posner-17,
21  please.
22      A.   Okay, I looked at it.
23      Q.   Can you identify this
24  document?

Page 278

1      A.    This is the settlement
2  agreement entered into by Grace and
3  Commercial Union in 1998, I'm going to
4  call it, relating to environmental claims
5  but it may encompass more than that but I
6  remember it as the environmental
7  settlement agreement.
8      Q.    Okay.  Do you recognize the
9  signatures on page 25 and 26?
10     A.    Yes, I do.
11     Q.    Who signed on behalf of
12  W.R. Grace & Co.?
13     A.    Paul McMahon signed on
14  behalf of Grace and James McKay signed on
15  behalf of Commercial Union.
16     Q.    Were you involved in the
17  negotiation of this settlement
18  agreement?
19     A.    Yes, I was.
20     Q.    And were the payments that
21  were contemplated by this settlement
22  agreement made?
23     A.    Yes, they were.
24     Q.    Do you know whether the

Page 279

1  company on page 35 that's listed as W.R.
2  Grace & Co. is the lead debtor in this
3  bankruptcy case today?
4      MS. ESAYIAN:  Page 25, you
5  mean?
6      MR. BROWN:  Yes, page 25.
7  OB 91 is the Bates number.
8      A.    I assume that it is but
9  it's an assumption.
10     Q.    Okay.
11      (Settlement Agreement,
12     Release and Indemnification/Hold
13     Harmless Agreement Bates stamped
14     SEA 1 through 16 received and
15     marked for identification as Posner
16     Exhibit 18.)
17     Q.    You have before you a
18  document marked Posner-18 and my first
19  question is:  Can you identify this
20  document?
21     A.    This is a settlement
22  agreement entered into by Grace with
23  Unigard -- it's called Unigard Insurance
24  Company here -- relating to

Page 280

1  asbestos-related claims under an excess
2  policy issued by Unigard to Grace.
3      Q.    Were you involved in the
4  negotiation of this agreement?
5      A.    Yes, I was.
6      Q.    Can you identify the
7  signatures that appear on page 16, SEA
8  16?
9      A.    Yeah, Brian Burns signed it
10  on behalf of W.R. Grace and I can't make
11  out the signature of the Unigard person.
12     Q.    Okay.  Were the payments
13  contemplated by this agreement made?
14     A.    Yes.
15      (Settlement Agreement,
16     Release and Indemnification/Hold
17     Harmless Agreement Bates stamped
18     SEA 17 through 31 received and
19     marked for identification as Posner
20     Exhibit 19.)
21     Q.    All right, Mr. Posner, you
22  now have before you Posner-19 and my first
23  question with respect to this document is:
24  Can you identify it for me?

Page 281

1      A.    This is another agreement
2  between Grace and Unigard -- here it says
3  Unigard Security Insurance Company.  I
4  guess the other one does as well --
5  involving another excess policy that
6  Unigard had issued to Grace and this
7  settlement appears to relate to
8  asbestos-related claims.
9      Q.    And it's dated from May of
10  1995?
11     A.    That is correct.
12     Q.    And the two Grace entities
13  that executed the agreement are W.R. Grace
14  & Co.-Conn. and W.R. Grace & Co.,
15  correct?
16     A.    Correct.
17     Q.    And you signed it on behalf
18  of both of those entities?
19     A.    That is correct.
20     Q.    Can you tell me what name
21  W.R. Grace & Co. goes by today that is the
22  entity that signed this agreement?
23     A.    Well, W.R. Grace &
24  Co.-Conn. still exists.  W.R. Grace & Co.

Page 282

1    -- I think when this was signed, I think
2    the W.R. Grace & Co. listed here, I think,
3    was a New York corporation, although maybe
4    I'm confused, so much time has passed.
5    And I think this may be the entity that
6    changed its name to Fresenius. I'm not
7    quite sure. There's been a number of
8    changes over the years.
9        Q.    If it is Fresenius,
10   **Fresenius is the -- that's Medical Care**
11   **Holdings, Inc.?**
12       A.    Yes.
13       Q.    Okay.
14       A.    If it is. I'm just not
15   sure. I'm using recollection now. It's
16   going back 14 years. But Conn is listed.
17   I seem to recall the original company was
18   Grace & Co., and Grace & Co. changed its
19   name to W.R. Grace & Co.-Conn. and then
20   they created another corporation, W.R.
21   Grace & Co., and I think that was a New
22   York corporation.
23       Q.    Okay.
24       A.    But again I'm speaking from

Page 283

1    recollection.
2        Q.    **And Fresenius Medical Care**
3    **Holdings, Inc. is not a debtor, correct?**
4        A.    They are not a debtor,
5    that's correct.
6        Q.    **Were you involved in the**
7    **negotiations of this agreement?**
8        A.    Yes.
9        Q.    **And were the payments that**
10   **were contemplated by this agreement made**
11   **by Unigard?**
12       A.    Yes.
13           (Settlement Agreement,
14       Release and Indemnification/Hold
15       Harmless Agreement Bates stamped
16       SEA 32 through 47 received and
17       marked for identification as Posner
18       Exhibit 20.)
19       Q.    **All right, Mr. Posner, you**
20   **have before you Posner-20. Again, the**
21   **first question is:  Can you identify the**
22   **document for me?**
23       A.    Yeah. This is an
24   agreement -- another agreement entered

Page 284

1    into by Grace and Unigard Security
2    Insurance and this one appears to relate
3    to the Hatco -- I'll call it the Hatco
4    environmental site which is in New Jersey,
5    and this agreement was entered into in
6    July of 1996.
7        Q.    Okay. And who were the
8    **entities that are parties to the**
9    **agreement?**
10       A.    W.R. Grace & Co.-Conn.,
11   W.R. Grace & Co. and Unigard Security
12   Insurance Company are the ones that
13   executed the agreement.
14       Q.    And you executed it on
15   **behalf of both of the Grace entities?**
16       A.    That is correct, yes.
17       Q.    And that was on or around
18   **July 11th, 1996?**
19       A.    That is correct.
20       Q.    Were you involved in the
21   **negotiations of this agreement?**
22       A.    Yes, I was.
23       Q.    And I may have asked you
24   **this, but were the payments contemplated**

Page 285

1    **by this agreement made by Unigard?**
2        A.    Yes.
3        Q.    Okay. The entity W.R.
4    **Grace & Co. that executed this agreement**
5    **is, to the best of your understanding,**
6    **Fresenius Medical Care Holdings, Inc.**
7    **today. Is that correct?**
8        A.    Now again I'm speaking from
9    recollection so I think so but I'm just
10   not 100 percent sure because again I think
11   it's the New York corporation. Conn is
12   certainly the Connecticut corporation and
13   Grace & Co. at the time was a New York
14   corporation but I'm speaking from
15   recollection. I mean, it is what it is.
16       Q.    Okay.
17       A.    That's my best
18   recollection.
19           MR. BROWN: Last one.
20           (Settlement Agreement &
21       Release Bates stamped SEA 48
22       through 61 received and marked for
23       identification as Posner Exhibit
24       21.)

Page 286

1      Q.    Mr. Posner, you now have
2  before you Posner-21. First question:
3  Can you identify the document?
4      A.    This is yet another
5  settlement agreement entered into between
6  Grace and Unigard Security. This one
7  relates to environmental claims and is
8  dated March 1997.
9      Q.    And who were the parties to
10  the agreement?
11      A.    The parties to this
12  agreement are W.R. Grace & Co., a Delaware
13  corporation; W.R. Grace & Co., a New York
14  corporation which changed its name to
15  Fresenius National Medical Care Holdings,
16  Inc., W.R. Grace & Co.-Conn., and Unigard
17  Security Insurance Company.
18      Q.    And am I correct that you
19  signed this agreement on behalf of all
20  three of the Grace entities?
21      A.    That is correct.
22      Q.    And were you involved in
23  the negotiations of this agreement?
1      A.    Yes, I was.

Page 287

1          MS. ESAYIAN: I just want
2  to note for the record that when
3  Mr. Posner said "W.R. Grace & Co.,
4  a New York corporation which
5  changed its name to Fresenius
6  Medical Care" that he was reading
7  this document. Okay? I mean his
8  testimony earlier was he thought
9  that.
10          MR. BROWN: Right. This
11  one actually says it.
12          MS. ESAYIAN: But there he
13  was -- I just want the record to be
14  that he was reading the document as
15  opposed to offering testimony that
16  definitively that company was under
17  that name now. See what I'm
18  saying?
19          MR. BROWN: Yes.
20          MS. ESAYIAN: Okay.
21      Q.    All right. I may have
22  asked you this, Mr. Posner. You were
23  involved in the negotiation of this
24  agreement?

Page 288

1      A.    Yes, I was.
2      Q.    Okay. And were the
3  payments contemplated by this agreement in
4  fact made by Unigard?
5      A.    Yes, they were.
6      Q.    Okay. Can you look at
7  pages 60 and 61 and tell me the name of --
8  tell me what the name of each of the Grace
9  entities that signed this agreement --
10  what its name is today, if you can?
11      A.    I'm a little vague on it
12  because I see here W.R. Grace & Co., a
13  Delaware corporation. You suggested to me
14  before that that's become Sealed Air
15  Corporation so I'm just not 100 percent
16  sure. W.R. Grace & Co.-Conn. still exists
17  and W.R. Grace & Co., the New York
18  corporation, changed its named to
19  Fresenius National Medical Care Holdings,
20  Inc. so --
21      Q.    Does that help you
22  ascertain whether the other one is the one
23  that became Sealed Air which appears on
24  SEA 60?

Page 289

1      A.    It may very well have been.
2  You suggested that and I simply don't
3  know. I have to check to make sure that's
4  accurate.
5      Q.    Sealed Air is a non-debtor
6  as well, correct?
7      A.    Correct.
8      Q.    I want to shift gears for a
9  moment. Are you familiar with an
10  environmental claim involving the Otis
11  Pipeline in Massachusetts?
12      A.    I am familiar with it to
13  the extent that I know that a company
14  called Kaneb has made claims relating to
15  that.
16      Q.    And do you understand Kaneb
17  to be at least arguing that it is the
18  successor in interest to Support Terminal
19  Services, Inc.?
20      A.    That is my understanding,
21  yes.
22      Q.    And their position is that
23  Support Terminal Services, Inc. is a
24  former subsidiary of W.R. Grace; is that

Page 290

1  correct?
2      A.   That is my recollection.
3      Q.   Okay.  Are you also
4  familiar with a lawsuit filed by Grace
5  Energy Corporation in Texas back in June
6  of 1997 against, among other defendants,
7  Support Terminal Services, Inc. concerning
8  which party had liability for
9  environmental exposures that involve the
10 Otis Pipeline?
11     A.   I'm not familiar with that.
12 I may have been at one time but, sitting
13 here, I don't remember it.
14     Q.   Were you involved in any
15 discussions with representatives of
16 Support Terminal Services, Inc. in 1997
17 concerning the Otis Pipeline
18 liabilities?
19     A.   I don't have a recollection
20 of being involved.
21     Q.   Okay.
22     A.   I mean, I may have.  I just
23 don't have a recollection of it.
24     Q.   Can you give me some idea

Page 291

1  of who was the likely individual at Grace
2  that would have been involved in such
3  discussions if they took place?
4      A.   And this is a claim by?
5      Q.   Well, this is a lawsuit
6  brought by Grace Energy Corp. among --
7  against Support Terminal Services, Inc.
8  among other defendants in Texas in 1997.
9      A.   Well, I could tell you that
10 the -- I don't know if his precise title
11 was general counsel, but the head lawyer
12 for Grace Energy was a gentleman by the
13 name of Anthony Riddlesberger.  So my best
14 guess would be that Anthony/Tony/Mr.
15 Riddlesberger would have been involved and
16 maybe there was some Grace lawyers at the
17 headquarters that were involved along with
18 him.
19     Q.   Would that -- would Mr.
20 Hughes or Mr. Finke have been involved in
21 that?
22     A.   I would think not because
23 Mr. Finke and Mr. Hughes at the time were
24 primarily focused on asbestos-related

Page 292

1  issues.  To the extent there was an
2  environmental-related issue, it could have
3  been a gentleman by the name of Mark
4  Stoler, who was the environmental counsel
5  for Grace at the time.  And to the extent
6  there were business lawyers involved,
7  there would have been other Grace lawyers
8  involved.  I don't believe Mr. Finke or
9  Mr. Hughes would have been involved, but
10 obviously that question would be better
11 put to them.
12     Q.   Okay, just bear with me one
13 second here.  Can you go to page SEA 50 on
14 the last document we marked, which I think
15 was Posner-21.
16     A.   Okay.
17     Q.   You'll see under -- take a
18 moment, if you would, to read the
19 definition of Grace.
20     A.   Okay.
21     Q.   When you executed this
22 agreement on behalf of the three entities
23 that appear -- the three Grace entities
24 that appear on pages 60 and 61, did you

Page 293

1  understand that you were signing on behalf
2  of all of the entities as described in
3  definition A on page SEA 50?
4      A.   That would be my
5  understanding.
6      Q.   And am I correct that at
7  that time Grace Energy Corporation would
8  have been one of those entities?
9      A.   No, I don't believe so.  I
10 believe Grace Energy Corporation was Grace
11 Energy Corporation.  I'm not -- I'm not an
12 expert on the structure of the company,
13 but I think Grace Energy Corporation was a
14 separate corporation.
15     Q.   Understood that it was a
16 separate corporation.
17     Was it a subsidiary of W.R. Grace &
18 Co.-Conn., W.R. Grace & Co.-New York
19 and/or W.R. Grace & Co.-Delaware at the
20 time this document was executed?
21     MS. ESAYIAN:  Objection,
22 foundation.  You can answer if you
23 can.
24     A.   I would assume that it was

Page 294

1    a sub of one of the entities.
2        MR. BROWN: Okay, all
3    right. Subject to --
4        A.  That's an assumption.
5        MR. BROWN: Subject to
6    other -- follow-up after others
7    have questioned, I am complete.
8    Thank you, Mr. Posner.
9        THE WITNESS: Thank you.
10        MS. DeCRISTOFARO: Could we
11    take a five-minute break?
12        MS. ESAYIAN: Sure.
13        (Recess taken.)
14        (LexisNexis printout in re:
15    Maryland Casualty v. Grace, et al.
16    received and marked for
17    identification as Posner Exhibit
18    22.)
19    EXAMINATION BY
20    MS. DeCRISTOFARO:
21        Q.  Good afternoon, Mr. Posner.
22        A.  Good afternoon.
23        Q.  I'm Elizabeth DeCristofaro.
24    I represent Continental Casualty. I have

Page 295

1    a few follow-up questions to issues that
2    you addressed earlier.
3        I just asked the reporter to mark a
4    copy of a legal case in one of the series
5    of cases known as Maryland Casualty v.
6    W.R. Grace. It's a decision of the Second
7    Circuit. It is generally referred to as
8    the installation trigger case, and I do
9    not have any questions related to the law
10    or the holding. I'm only marking this as
11    a matter of convenience with respect to
12    some of the factual recitation.
13        And I direct you to what is
14    considered page four of the exhibit and in
15    the right-hand column, the first full
16    paragraph, the next to the last sentence
17    says: "According to Grace, as of early
18    1992, it had spent 184.6 million dollars
19    to settle claims or satisfy judgments in
20    property damage asbestos lawsuits and 194
21    million to defend itself."
22        Now, is that statement generally
23    consistent with your recollection of Grace
24    spending large amounts of money to defend

Page 296

1    itself in asbestos litigation?
2        A.  Yes. As I indicated
3    before, you know, Grace had spent
4    significant amounts of money. And,
5    obviously, if they put this in here, then
6    we must have submitted information or
7    stated that we had spent that amount of
8    money so it would be consistent with what
9    I knew at the time, I think.
10        Q.  And during the course of
11    this afternoon you indicated that you were
12    involved in the negotiations of the
13    settlement agreements both with the
14    primary and the excess insurers --
15        A.  Correct.
16        Q.  -- of Grace; is that
17    correct?
18        And you generally included where it
19    was proper a provision that those
20    agreements would provide reimbursement to
21    Grace for defense costs. Is that
22    correct?
23        A.  Correct. Some of the
24    agreements are what I'm going to call

Page 297

1    coverage in place agreements that had
2    ongoing obligations for the insurance
3    carriers to reimburse Grace for defense
4    costs. Some of the agreements were I'm
5    going to call buy-outs of the policies in
6    which there was no ongoing obligation.
7        Q.  And when negotiating those
8    agreements, it was the understanding of
9    both parties that Grace was going to
10    vigorously defend itself and probably
11    expend money in defense costs; is that
12    correct?
13        MR. HORKOVICH: Objection
14    to form.
15        A.  Well, yeah. I mean, I
16    think it was the understanding that, you
17    know, Grace would use its best efforts to
18    defend itself as best it could, you know,
19    considering all factors.
20        Q.  And the next sentence of
21    that paragraph, the last sentence says,
22    "Continental has exhausted the limits of
23    its insurance coverage by paying 117
24    million dollars in defense costs and 70



Δ π EXHIBIT 15

Deponent Posner

Date 5-6-09 Rptr. LL

WWW.DEPOBOOK.COM

## SETTLEMENT AGREEMENT

This Agreement ("Agreement") is made and entered into by and between, on the one hand, W. R. GRACE & CO.-CONN. and W. R. GRACE & CO. and, on the other hand, COMMERCIAL UNION INSURANCE COMPANY as successor in interest to EMPLOYERS' COMMERCIAL UNION INSURANCE COMPANY OF AMERICA and EMPLOYERS' COMMERCIAL UNION INSURANCE COMPANY, and AMERICAN EMPLOYERS' INSURANCE COMPANY.

### RECITALS

WHEREAS, the Party Insurers issued or are alleged to have issued certain liability insurance policies to Grace, which Policies are more particularly described below; and

WHEREAS, Grace has been, is and expects to be in the future, a defendant in numerous Asbestos-Related Claims and lawsuits asserted by or on behalf of persons alleging (1) personal injury, bodily injury, sickness, disease and/or death as a result of exposure to asbestos, and (2) damages for injury or damage to buildings and property allegedly caused by asbestos or asbestos-containing materials; and

WHEREAS, certain disputes and differences have arisen between Grace and the Party Insurers as to their respective rights and obligations as to the administration, defense, payment and disposition of the Asbestos-Related Claims, and Grace and the Party Insurers wish to settle those disputes and differences in accordance with the terms of this Agreement; and

WHEREAS, one or more of the Party Insurers are parties to various actions involving claims by Grace or others against one or

1

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

more of the Party Insurers relating to Asbestos-Related Claims; and

WHEREAS, Grace and the Party Insurers have entered into this Agreement solely to resolve their disputes concerning coverage for Products Claims and Asbestos-Related Claims, to afford the Party Insurers final and complete repose with respect to their alleged obligations under or by virtue of the Policies for Products Claims and Asbestos-Related Claims, and to avoid, among other things, the uncertainty and expense attendant to such disputes and the related litigation; and

WHEREAS, by virtue of this Agreement, neither Grace nor the Party Insurers admit or concede in any way the validity of the positions or arguments advanced by the other or by any third party;

NOW, THEREFORE, in consideration of the mutual covenants and subject to the terms and conditions herein contained, Grace and the Party Insurers hereby agree as follows:

## I.   DEFINITIONS

1.0   Agreement shall mean this settlement agreement entered into by Grace and the Party Insurers.

1.1   Grace means W. R. Grace & Co.-Conn. and/or W. R. Grace & Co., their respective predecessors-in-interest and successors-in-interest.

1.2   Indemnitor means W. R. Grace & Co. and W. R. Grace & Co.-Conn. and their respective successors-in-interest.

1.3   Party Insurers means Commercial Union Insurance Company as successor in interest to Employers' Commercial Union Insurance

2

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000002

Company of America and Employers' Commercial Union Insurance Company, and American Employers' Insurance Company and their respective predecessors-in-interest, and successors-in-interest, divisions, subdivisions, departments, subsidiaries, parents, agents, employees, officers, affiliates, assigns and companies or corporations owned, controlled or under common control or ownership with the Party Insurers.

1.4  <u>Party and/or Parties</u> shall mean Grace and the Party Insurers.

1.5  <u>Policy or Policies</u> means the insurance policies, issued or alleged by Grace to have been issued, to or for the benefit of Grace by the Party Insurers, which policies are listed in Exhibit "A". The Party Insurers represent and warrant that they are unaware of any other contracts of insurance they issued or are alleged to have issued to Grace except those listed in Exhibit "A". Grace represents and warrants that it is unaware of having purchased any comprehensive general liability insurance from the Party Insurers except those policies listed in Exhibit "A". To the extent the World Auxiliary Insurance Corporation could be considered contained within the definition of "Party Insurers", which the Party Insurers specifically deny, Grace's representation and warranty specifically excludes any and all contracts of insurance issued by the World Auxiliary Insurance Corporation.

1.6  <u>Aggregate Product Limits</u> means the total aggregate limits of liability contained within the Policies of the Party Insurers for all personal injury claims, bodily injury claims, property damage claims and advertising liability claims included within the "products - completed operations hazards" definitions. For

3

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000003

purposes of this Agreement, any claim for occupational disease shall be included within the definition of Aggregate Product Limits.

1.7 <u>Bodily Injury Claim Plaintiff</u> means any entity, person, assignee, executor or administrator who has, at any time, threatened, asserted or filed any claim, right, demand, lawsuit, cause of action or proceeding arising out of personal injury, bodily injury, employer's liability or advertising liability involving any entity, person, assignee, executor or administrator who does so in the future.

1.8 <u>Building Damage Claim Plaintiff</u> means any entity, person, assignee, executor or administrator who has, at any time, threatened, asserted or filed any claim, right, demand, lawsuit, cause of action or proceeding arising out of alleged property damage or advertising liability involving or relating to asbestos in buildings or any entity, person, assignee, executor or administrator who does so in the future. By agreeing to this term, the Party Insurers seek to resolve their dispute with Grace and do not acknowledge that any Asbestos-Related Claims arising from buildings, other structures or property involve property damage.

1.9 <u>Asbestos-Related Claim</u> means a claim brought by a Bodily Injury Claim Plaintiff or a Building Damage Claim Plaintiff for advertising liability, personal injury, bodily injury, employer's liability, sickness or disease and/or death at any time as a result of exposure or alleged exposure to asbestos or asbestos-containing products and/or a claim arising from asbestos- containing products in buildings, other structures, or property and/or a claim arising

4

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000004

from injury or damage to buildings, other structures or property caused or allegedly caused by asbestos or asbestos-containing products. "Asbestos-Related Claim" shall also include any claim for unfair competition and/or invasion of right or privacy either committed or alleged to have been committed in any publication or video or audio transmission and arising out of Grace's advertising activities concerning the mining, distribution and/or sale of asbestos and asbestos-containing products. "Asbestos-Related Claim" shall also include any claim for conspiracy, concert of action, intentional tort, fraud, misrepresentation, gross negligence and/or punitive damages, fines or penalties arising from the mining, distribution, and/or sale of asbestos and asbestos-containing products.

1.10  <u>Products Claims</u> means all claims which allege personal injury, bodily injury, property damage or advertising liability that fall within the Aggregate Product Limits in each of the Policies. "Products Claims" shall also include any claim for extra-contractual damages, whether statutory or common law, asserted by Grace and/or its assignees and/or judgment creditor/garnishors that alleges misconduct, bad faith, unfair claims practices, violations of an insurance code or other statutory scheme, or any other alleged wrongdoing of the Party Insurers in connection with or relating in any respect to the performance by the Party Insurers of their alleged obligations under or by virtue of any of the Policies concerning any claim which alleges personal injury, bodily injury, property damage or

5

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000005

advertising liability that falls within the Aggregate Product Limits.

1.11 <u>Effective Date</u> means the date both Grace and the Party Insurers exchange executed Agreements.

1.12 <u>Coverage Actions</u> shall mean those actions involving claims between Grace and the Party Insurers relating to insurance coverage for Products Claims and/or Asbestos-Related Claims. These actions include, but are not limited to:

(1) <u>Maryland Casualty Company v. W. R. Grace & Co., et al.</u>, No. 88 Civ. 2613 (SWK), filed in the United States District Court for the Southern District of New York;

(2) <u>Moore, ex rel. State of Mississippi v. The Flintkote Co., et al. v. Maryland Casualty Co., et al.</u>, No. 89-5138(2), filed in the Circuit Court of Jackson County Mississippi;

(3) <u>Independent School District 197, et al. and W. R. Grace & Co.-Conn. v. Accident & Casualty Insurance of Winterthur, et al.</u>, No. 19-C4-88-007950, filed in the District Court of the County of Dakota, Minnesota;

(4) <u>W.R. Grace & Co.-Conn. v. Admiral Insurance Co., et al.</u>, No. 91-048251, filed in the District Court of Harris County, Texas;

(5) <u>Dayton Independent School District, et al. v. United States Mineral Products Co. and W. R. Grace & Co.-Conn. v. Admiral Insurance Co., et al.</u>, No. B-87-00507, filed in the United States District Court for the Eastern District of Texas, Beaumont;

(6) <u>W. R. Grace & Co.-Conn. v. Admiral Insurance Company, et al.</u>, No. BC 050432, filed in the Superior Court of the County of Los Angeles, California; and

(7) <u>American Employers Insurance Company, et al. v. W. R. Grace & Co.-Conn., et al.</u>, No. 6241-92, filed in the Supreme Court of the State of New York, County of New York.

1.13 <u>Confidential Documents and Information</u> means those documents, transcripts, writings, photographs and that information

6

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

so designated pursuant to any case management order or protective order entered, stipulated or agreed to in any of the Coverage Actions. Documents may be designated as "Confidential Documents and Information" by the Parties after execution of this Agreement by identifying such document, transcript, writing, photograph or information in writing to a Party and by designating that such document, transcript, writing, photograph and/or information is a "Confidential Document and Information".

## II.   SCOPE OF AGREEMENT

2.0  It is the intention of the Parties to resolve, terminate and cancel any and all obligations, alleged or actual, past, present, future, known or unknown, that the Party Insurers had or may have had under the Policies with respect to Products Claims and Asbestos-Related Claims.

2.1  This Agreement is the product of informed negotiations between the Parties assisted by counsel and involves compromises of previously stated legal positions.  This Agreement does not necessarily reflect the view of any of the Parties as to rights and obligations with regard to matters outside of this Agreement.  For all other purposes and in all other matters, each Party reserves all previously held positions and all other rights and privileges.

2.2  This Agreement is intended to confer rights, benefits and obligations only upon Grace and the Party Insurers, and is not intended to confer any right, benefit or obligation upon any other person.  No person other than Grace or the Party Insurers shall

7

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000007

have any legally enforceable right under this Agreement.

2.3   The Party Insurers and Grace request all courts to take notice of the underlying scope and purpose of this Agreement and to accord the Parties and their representatives full privilege and protection with respect to the disclosure of their actions, statements, documents, papers and other materials relating to this Agreement, including its development and implementation.

2.4   This Agreement is the entire agreement between Grace and the Party Insurers relating to coverage for Products Claims and Asbestos-Related Claims under the Policies.   All antecedent or contemporaneous extrinsic representations, warranties or collateral provisions concerning the negotiation and preparation of this Agreement are intended to be discharged and nullified.

2.5   This Agreement is not a contract of insurance and the Parties agree that it shall not be interpreted according to the rules of construction applicable to insurance contracts.   In particular, with respect to interpretation of this Agreement, the Parties waive any benefits from the principles of contra proferentum or other principles which would result in the interpretation of any ambiguities against a Party.  No Party shall be deemed to be the drafter of this Agreement or of any particular provision or provisions, and no part of this Agreement shall be construed against any Party on the basis of the Party's identity as an insurance company or as the drafter of any part of this Agreement.

2.6   Grace hereby represents and warrants to the Party

8

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000008

Insurers as follows:

(a)    Grace is a corporation, duly organized, validly existing and in good standing under the laws of its jurisdictions of incorporation with full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

(b)    The execution and delivery of this Agreement by Grace and the performance by Grace of its obligations hereunder have been duly authorized by the Board of Directors of Grace and by all other necessary corporate action of Grace.

(c)    This Agreement has been duly executed and validly delivered by Grace and constitutes a valid and binding obligation of Grace enforceable against Grace in accordance with its terms.

(d)    The execution and delivery of this Agreement by Grace and the performance by Grace of its obligations hereunder will not violate any provision of its charter or by-laws or any consent or order of any governmental authority by which it may be bound.

(e)    Grace has read this entire Agreement and knows the contents hereof and that the terms hereof are contractual and not in any way a recital; Grace has executed this Agreement as its own free act.

(f)    In making this Agreement, Grace has obtained the advice of legal counsel.

2.7    The Party Insurers, jointly and severally, hereby represent and warrant to Grace as follows:

(a)    Each of the Party Insurers is a corporation, duly

9

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000009

organized, validly existing and in good standing under the laws of its jurisdiction of incorporation with full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

(b)  The execution and delivery of this Agreement by the Party Insurers and the performance by the Party Insurers of their obligations hereunder have been duly authorized by all persons with necessary authority to act on behalf of the Party Insurers.

(c)  This Agreement has been duly executed and validly delivered by each of the Party Insurers and constitutes a valid and binding obligation of each of the Party Insurers enforceable against the Party Insurers in accordance with its terms.

(d)  The execution and delivery of this Agreement by each of the Party Insurers and the performance by the Party Insurers of their respective obligations hereunder will not violate any provisions of the charter or by-laws of any of the Party Insurers or any consent or order of any governmental authority by which any of the Party Insurers may be bound.

(e)  Each of the Party Insurers has read this entire Agreement and knows the contents hereof and that the terms hereof are contractual and not in any way a recital; each of the Party Insurers has executed this Agreement as its own free act.

(f)  In making this Agreement, each of the Party Insurers has obtained the advice of legal counsel.

2.8  Each Party agrees as to its own breach of any warranty expressly stated in this Agreement to indemnify and hold harmless

10

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000010

the other Parties.

### III.   CANCELLATION OF COVERAGE; SETTLEMENT PAYMENTS

3.0   Upon the Effective Date of this Agreement, Grace hereby agrees to the cancellation of all insurance coverage for Products Claims and Asbestos-Related Claims under the Policies in exchange for payments by the Party Insurers to Grace in the aggregate amount of Eighty-One Million, Two Hundred Thousand Dollars ($81,200,000) as provided in Section 3.1.

3.1   (a)    Within three (3) business days after the Effective Date, the Party Insurers shall make a settlement payment to Grace in the amount of Twenty-Five Million Dollars ($25,000,000).

(b)   Within three (3) business days after the anniversary of the Effective Date in each year through 1999, commencing in 1994 and ending in 1999, the Party Insurers shall make a settlement payment to Grace, as follows:

| | | |
|---|---|---|
| (i) | 1994 - | Ten Million Dollars ($10,000,000) |
| (ii) | 1995 - | Ten Million Dollars ($10,000,000) |
| (iii) | 1996 - | Nine Million Fifty  Thousand Dollars ($ 9,050,000) |
| (iv) | 1997 - | Nine Million Fifty Thousand Dollars ($ 9,050,000) |
| (v) | 1998 - | Nine Million Fifty Thousand Dollars ($ 9,050,000) |
| (vi) | 1999 - | Nine Million Fifty Thousand Dollars ($ 9,050,000) |

11

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000011

(c)   In the event that the anniversary of the Effective Date falls on a holiday or weekend day, the anniversary date and all obligations of payment attendant thereto shall be deemed to fall on the next business day.  If the Party Insurers fail to make all or any portion of any payment to Grace provided for in this Section on or before the due date thereof, the Party Insurers shall pay interest to Grace on the unpaid amount of that particular payment for the period commencing on the date such amount was due and ending on the actual date of payment at a rate of interest equal to five percentage points over the rate of interest of the then prevailing prime rate as announced by the main office of Citibank N.A. in New York, New York.

3.2  All settlement payments to Grace under Section 3.1 shall be made by wire transfer to Grace's account at ~~Morgan Guaranty~~ Chemical Bank (ABA Number ~~021000238~~ 021000128, Account Number ~~090-04-901,~~ 016001257 further identified as W. R. Grace & Co. account) or to such other account as may be specified by Grace in a written notice to the Party Insurers in accordance with Section 9.2.

3.3  The Party Insurers shall not have the right to seek contribution or indemnity from other insurers of Grace for settlement payments made to Grace under Section 3.1.  The Parties recognize that various excess insurers other than the Party Insurers have available remaining aggregate limits for contracts of insurance which may underlie the Policies.  Nothing in this section is intended to preclude or limit in any way the Party Insurers' rights to pursue recovery from their reinsurers, if any, for some

· 12

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000012

or all settlement payments made to Grace under Section 3.1.

3.4   The Parties also acknowledge that Grace's acceptance of the payments provided in Section 3.1 is in full satisfaction of the Party Insurers' obligations with respect to Products Claims and Asbestos-Related Claims under the Policies, notwithstanding the amount of the Aggregate Product Limits for all of the Policies.

3.5 It is the intention of the Parties that such settlement payments by the Party Insurers shall not be construed as constituting a set-off for other insurers under contracts of insurance issued by such other insurers which may underlie the Policies.

3.6 The liability of the Party Insurers for the payments to be made to Grace pursuant to this Section shall be joint and several.

## IV.   DISMISSALS AND RELEASES

4.0   Concurrently with the  exchange of executed Agreements by all Parties, Grace shall deliver to the Party Insurers executed dismissals with prejudice of the claims brought by Grace and shall use all reasonable efforts to obtain executed dismissals with prejudice of the claims brought by Grace's assignees and/or judgment creditor/garnishors in the Coverage Actions with respect to any and all allegations or claims against the Party Insurers for declaratory relief, damage or other relief relating to the application of insurance to the investigation, settlement, defense or indemnification of claims set forth in the various applicable pleadings in the Coverage Actions.   Said dismissals with prejudice

13

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000013

shall include all claims by Grace and/or its assignees and/or judgment creditor/garnishors for extra-contractual damages including, but not limited to, liens of garnishors, bad faith tort claims, and statutory claims for damages, punitive or actual, for the alleged failure of the Party Insurers to defend, settle or handle any Products Claim and/or Asbestos-Related Claim under the Policies. The Party Insurers will file and serve said dismissals with prejudice. Said dismissals with prejudice shall indicate that the Parties will bear their own attorneys' fees and costs incurred prior to the filing and service of said dismissals with prejudice in connection with the Coverage Actions. Grace shall file all documents necessary to satisfy and cancel any and all judgments of record against the Party Insurers, release all supersedeas bonds and dismiss all appeals related to the Coverage Actions.

4.1    Concurrently with the exchange of executed Agreements by all Parties, the Party Insurers shall deliver to Grace executed dismissals with prejudice of the applicable Coverage Actions with respect to any and all allegations or claims against Grace or the other insurers in said Coverage Actions or for declaratory relief, damage or other relief. Grace will file and serve said dismissals with prejudice. Said dismissals with prejudice shall indicate that the Parties will bear their own attorney's fees and costs incurred prior to the filing and service of said dismissals with prejudice in connection with the Coverage Actions. The Party Insurers shall also take all necessary steps to dismiss all appeals related to the Coverage Actions.

14

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000014

4.2  Except for the obligations set forth in this Agreement, Grace releases and forever discharges the Party Insurers of and from any and all actions, causes of action in law or in equity, suits, debts, liens, contracts, indemnity and defense obligations, agreements, promises, liabilities, claims, demands, losses, costs or expenses of any kind or nature, known or unknown, fixed or contingent, direct or indirect, which Grace now has or may have against the Party Insurers in any way relating to Products Claims and/or Asbestos-Related Claims under the Policies.

4.3  Except as to the obligations set forth in this Agreement, the Party Insurers hereby release and forever discharge Grace of and from any and all actions, causes of action in law or in equity, suits, debts, liens, contracts, indemnity and defense obligations, agreements, promises, liabilities, claims, demands, losses, costs or expenses of any kind or nature, known or unknown, fixed or contingent, direct or indirect, which the Party Insurers now have or may have against Grace in any way relating to Products Claims and/or Asbestos-Related Claims under the Policies.

## V.   INDEMNIFICATION

5.0  The Indemnitor shall indemnify and hold the Party Insurers harmless at all times from and after the Effective Date from and against any and all liability, loss, cost or expense whenever arising   (except as otherwise provided in Section 5.1(a)(ii)) imposed upon or incurred by any Party Insurer as a result of any known or unknown, past, pending, future, or

15

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000015

threatened claims, rights, demands, lawsuits, causes of action or proceedings that are asserted, initiated or continued by Grace or any person or entity not a party to this Agreement against such Party Insurer in any way relating to Products Claims and/or Asbestos-Related Claims under the Policies.

   5.1   (a)(i)   After receipt by a Party Insurer of notice of any complaint or the commencement or continuation of any action or proceeding with respect to which indemnification is being sought hereunder, such Party Insurer shall notify Grace in accordance with Section 9.2 and as soon as practicable in writing of such complaint or of the commencement or continuation of such action or proceeding and shall thereafter tender the defense thereof to Grace.   Should Grace fail to obtain executed dismissals with prejudice of the claims brought by Grace's assignees and/or judgment-creditor/garnishors in any Coverage Action, Grace is deemed to have notice of the continuation of the Coverage Action and a tender of the defense by the Party Insurers of the Coverage Action.

      (ii) Any failure by such Party Insurer to so notify Grace or to so tender the defense of such action or proceeding will relieve the Indemnitor from any indemnification obligation with respect thereto.

   (b)   After Grace receives any notice pursuant to Section 5.1(a)(i), the Indemnitor shall promptly determine whether it will respond to that notice and assume the

16

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000016

defense of a Party Insurer named in a complaint or the commencement or continuation of any action.

(c)  (i)  If the Indemnitor so elects, the Indemnitor will assume the defense of such action or proceeding. The Indemnitor and the Party Insurers shall mutually agree upon a choice of counsel to represent the Party Insurers (which may not include counsel presently representing either Grace or the Indemnitor), and the Indemnitor shall assume the payment of the fees and disbursements of such counsel. The Indemnitor will consult with and allow the Party Insurers complete control over the positions asserted in the interpretation of the language of the Policies, and will consult with the Party Insurers in the defense of any notice of any complaint or the defense of the commencement or continuation of any action.

(ii)  The Indemnitor and the Party Insurers will consult to the extent practicable about all decisions to be made, either procedural or substantive, by counsel retained on behalf of the Party Insurers pertaining in any material manner to the Party Insurers. The Indemnitor will have such time as is practicable to review each matter and to present its views to the Party Insurers. The Party Insurers will make reasonable efforts to accommodate the litigation suggestions of the Indemnitor before directing counsel to take any action.

17

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000017

In the event the Parties are unable to agree, the final decision with respect to the defense of the Party Insurers, either procedural or substantive, with the exception of settlement or compromise of the action, will rest with the Party Insurers.  The Indemnitor will not dispute any decision of the Party Insurers that is lawful and that is reasonably made within the discretion of the Party Insurers.

(iii)  The Indemnitor shall keep the involved Party Insurer apprised in a timely manner of all significant developments in such defense and shall provide the Party Insurer, at the Party Insurer's request, status reports that advise the Party Insurer of such developments.

(iv) Any settlement or compromise made by the Indemnitor on behalf of any Party Insurer shall not require that Party Insurer's approval, but shall provide that it is not an admission of liability by the Party Insurer, is without precedent beyond the scope of the matters addressed by such compromise or settlement.  The Indemnitor shall give notice and provide reasonable and timely disclosure as soon as is practicable to the Party Insurers of any proposed settlement or compromise.  The Party Insurers shall have such time as is practicable to review the proposed settlement or compromise and to present their views to the Indemnitor.  The Indemnitor will make reasonable efforts to accommodate the Party

18

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000018

Insurers before agreeing to any settlement or compromise. The Party Insurers will not dispute any decision that was lawful and that was reasonably made within the discretion of the Indemnitor. The Indemnitor shall use best efforts to keep such settlement or compromise confidential.

(v)   In any action or proceeding in which  the Indemnitor assumes the defense of a Party Insurer, such Party Insurer will have the right to participate in such litigation and to retain its own counsel at such Party Insurer's own expense.

(d)   (i)   If  the Indemnitor fails, or declines, to assume the defense of the action or proceeding in a timely manner, then such Party Insurer may employ and exclusively direct counsel to represent or defend it in any such action or proceeding, and the Indemnitor will pay the reasonable fees and disbursements of such counsel; provided, however, that  the Indemnitor shall not be required to pay the fees and disbursements of more than one law firm  for all Party Insurers in any jurisdiction in any single action or proceeding.

(ii) If the Party Insurers settle any such claims without previously obtaining  the Indemnitor's consent, which consent shall not be unreasonably withheld, then the Indemnitor shall be relieved of any obligation to indemnify the Party Insurers for such settlement.  The Party Insurers shall use best efforts to keep such

19

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000019

settlement or compromise confidential.

(e)  Nothing herein shall constitute any waiver of each Party Insurer's attorney-client privilege, which privilege shall extend only to such counsel retained to represent the particular Party Insurer and shall not extend to the Indemnitor or its counsel unless specifically waived by the Party Insurer in writing with reference to a particular attorney-client communication.

5.2  The Party Insurers and the Indemnitor shall cooperate reasonably with each other to protect their respective interests with respect to claims for which the Indemnitor may be liable for indemnification under Article V.

5.3  If the Indemnitor has assumed the defense of any action or proceeding, the Party Insurers shall comply in a timely manner with the Indemnitor's appointed counsel's requests for access to documentation or information requested by the Indemnitor's appointed counsel for purposes of defense.  The Indemnitor shall cooperate with the Party Insurers to avoid taking any positions in such litigation which are adverse to the general business interests of the Party Insurers.

5.4  If the Indemnitor has failed or declined to assume the defense of any action or proceeding, the Indemnitor shall comply in a timely manner with any Party Insurer's requests for access to documentation or information requested by that Party Insurer for purposes of such defense.

20

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000020

## VI.   RESERVATION OF RIGHTS

6.0  Nothing in this Agreement, nor in any aspect of its implementation or negotiation, shall be construed or asserted by any person as admissible or relevant in any case or proceeding as giving rise to or creating any waiver or estoppel of the Party Insurers or Grace with respect to any of their rights under any Policies, or as constituting or evidencing either an interpretation by the Party Insurers or Grace of any portion of any Policies or a course of performance (or non-performance) thereunder.   Except as otherwise provided under this Agreement, all of the Party Insurers' and Grace's rights, duties and privileges under the provisions, exclusions, conditions, endorsements and other terms of the Policies issued to Grace are hereby preserved.

6.1  No Party may assign this Agreement or any of its rights, benefits or obligations hereunder without the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld.  All rights of action for any breach of this Agreement are hereby reserved to Grace and the Party Insurers.  All actions taken and statements made by the Parties or their representatives relating to their participation in this Agreement, including its development and implementation, are taken and made in the context of privileged settlement negotiations, shall be without prejudice or value as precedent and shall not be taken as the standard by which other matters may be judged or against which other matters may be compared.  This Agreement is the product of arm's length negotiations.   It is the compromise of disputed

21

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000021

claims, and it is not intended to be, nor shall it be construed as, an admission of coverage or a policy interpretation or evidence of any Party's conduct or response to claims of any kind, including by way of example and without limitation, Asbestos-Related Claims. Neither this Agreement nor any statement made by any Party in negotiating, executing or performing this Agreement shall be used in court, or formal or informal dispute resolution proceedings, or otherwise, to create or interpret any obligation by any Party under any insurance policy, including but not limited to the Policies. The Party Insurers do not admit coverage by entering into this Agreement and enter into it for business reasons and in the spirit of compromise.

6.2 Nothing in this Agreement is intended to create any rights in any person or entity as to any Policy or alleged policy or certificate of insurance. Neither this Agreement nor any part hereof may be used as evidence or in any other manner in any litigation, dispute resolution or other proceeding, to create, prove, or interpret the respective rights, duties or obligations of Grace and the Party Insurers or any of them. This restriction shall not apply to any litigation or proceeding brought to enforce or defend the terms of this Agreement. This Agreement shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar state law provisions.

6.3 The cancellation of insurance coverage for Products Claims and Asbestos-Related Claims under the Policies shall not

22

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000022

affect the alleged rights and alleged obligations of Grace and the
Party Insurers, if any, under the Policies with respect to
insurance coverage for other claims that do not constitute Products
Claims or Asbestos-Related Claims.

6.4 Neither the terms of this Agreement nor its negotiation,
execution, or any action in performance of this Agreement shall be
invoked by any of the Parties hereto or their attorneys or agents
in any proceeding for the purpose of attempting to establish or
prove the acceptance by the Party Insurers or Grace of any
particular interpretation of any insurance policy with respect to
any claim.

## VII. CONFIDENTIALITY

7.0 This Agreement and all matters relating to its existence,
terms, negotiations and implementation are confidential. This
Agreement and the implementation of its terms are to be disclosed
pursuant only to an order of court or by written agreement by all
the Parties except that:

(a) the Agreement may be disclosed to the reinsurers of
the Party Insurers provided that the entity to which
disclosure is made is advised that the disclosure is subject
to this confidentiality provision and agrees to be bound;

(b) the Agreement may be disclosed in any action to
enforce its terms;

(c) to the extent necessary to obtain insurance coverage
from an entity other than a Party Insurer, the Agreement may

23

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000023

be disclosed, provided that the entity to which disclosure is made is advised that the disclosure is subject to this confidentiality provision and agrees to be bound;

(d) any Party may make copies of this Agreement available to its accountants, to its counsel, to its lenders or underwriters and to counsel for such lenders or underwriters, provided, that the entity to which disclosure is made is advised that the disclosure is subject to this confidentiality provision and agrees to be bound; and

(e) any Party may make reference to or describe this Agreement to the extent that such disclosure is required to comply with any government, regulatory or accounting/auditing requirement applicable to a Party, but shall not make available a copy of the Agreement nor shall the reporting Party identify any other Parties to this Agreement.   In the event that either a governmental agency or any other entity requests a copy of the Agreement or requests the identity of the other Parties to the Agreement, the Party to whom the request is made shall, prior to disclosure, and as soon as practicable, notify all other Parties to permit a Party(ies) the opportunity to participate in opposing such request.   The Parties must agree upon the wording of any press release or governmental or public filing relating to this Agreement.   The Parties shall limit any responses to press or public inquiry to the information contained within the above-mentioned press release.

24

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000024

7.1    (a)    Except as expressly set forth in Section 7.0, in the event that any entity not a Party shall seek disclosure of this Agreement from any Party, the Party from whom disclosure is sought shall notify the other Parties. The Parties shall confer and, if all Parties consent, the Parties may provide this Agreement to an entity not a Party under such terms and conditions as the Parties shall designate.

(b)    Where one or more Parties object to disclosure of the Agreement to the entity not a Party, the objecting Party shall be responsible for taking all necessary actions to prevent disclosure of this Agreement to the entity not a Party.  The costs associated with the prevention of disclosure of this Agreement shall be borne equally by the Parties and each Party shall take such steps as are necessary to aid the objecting Party in attempting to prevent disclosure of this Agreement to an entity not a Party.

7.2    Except as expressly set forth in Section 7.0, in any action in which a Party has been ordered to produce this Agreement, related communications and drafts, the producing Party shall seek a protective order limiting the use of this Agreement, related communications and drafts, to the particular purpose of the pending litigation in which it is produced and take all steps necessary to bar the disclosure to any entity not a Party.

7.3    Except as expressly set forth in Section 7.0, any Party which has produced Confidential Documents and Information may require the other Parties to return all specifically designated

25

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000025

Confidential Documents and Information in their possession, as well as in the possession of their counsel, retained experts, and/or consultants, including all copies. In lieu of returning all such Confidential Documents and Information, the Party from whom the Confidential Documents and Information has been requested may certify in writing that all such requested Confidential Documents and Information have been destroyed.

7.4  The provisions of this Article VII shall also apply to the files, records, papers and documents generated in connection with any dispute resolution pursuant to Section 8.0.

## VIII.  ARBITRATION

8.0  The Parties agree to resolve any dispute which arises regarding the terms of this Agreement or the implementation thereof (a "Dispute") by way of binding arbitration in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes (the "Rules") and the provisions of this Section.

(a)  In the event any Dispute arises that the Parties are unable to resolve by agreement, any Party to such Dispute shall have the right to commence binding arbitration of such Dispute under this Section 8.0 by sending written notice to the other Parties in accordance with Section 9.2 demanding such arbitration. Such notice shall briefly describe the Dispute as well as the relief sought by the Party demanding arbitration.    Promptly following receipt of any such notice, the Parties shall attempt to

26

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000026

agree upon the selection of an arbitrator (the "Arbitrator") to resolve such Dispute. If the Parties have not agreed upon the selection of the Arbitrator by the fifteenth day following delivery of the notice demanding arbitration, then any Party may request the Center for Public Resources to select the Arbitrator, provided that any Arbitrator selected by the Center for Public Resources shall be conclusive and binding on the Parties.

(b)    All arbitrations under this Section 8.0 shall be conducted in accordance with the Rules and the Parties shall faithfully abide by the Rules and abide by and perform any award rendered by the Arbitrator. All such arbitrations shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 and judgment upon the award may be entered by any court having jurisdiction thereof. Any such arbitration shall be conducted in New York, New York.

## IX.    MISCELLANEOUS PROVISIONS

9.0    This Agreement shall become binding upon each Party from and after the Effective Date.

9.1    (a)    Grace acknowledges that, notwithstanding the cancellation of coverage under the Policies for Products Claims and Asbestos-Related Claims pursuant to this Agreement, the Party Insurers may require information concerning Products Claims and Asbestos-Related Claims for purposes of establishing their rights with respect to their reinsurers. Grace shall cooperate reasonably with the Party Insurers for such purposes by providing to the Party

27

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000027

Insurers on a continuing basis non-privileged information about the progress and resolution of the litigation of Products Claims and Asbestos-Related Claims as well as access to non-privileged documentation with respect thereto, including but not limited to the right to audit individual claim files at a mutually agreed upon location.

      (b)   From and after the Effective Date, Grace agrees to obtain, if reasonably possible, and make available to the Party Insurers, information and documentation concerning:

            (i)   exposure to asbestos and asbestos-containing products and diagnosis, death, first claim and filing of all Asbestos-Related Claims against Grace of each Bodily Injury Claim Plaintiff;

            (ii)   installation of asbestos-containing materials in buildings by Building  Damage Claim Plaintiffs with Asbestos-Related Claims against Grace as well as knowledge of the presence of asbestos products and/or the existence of asbestos requiring remediation and/or encapsulation in buildings owned, leased or occupied by Building Damage Claim Plaintiffs with Asbestos-Related Claims against Grace; and

            (iii) other Products Claims.

      (c)   Upon reasonable notice, Grace shall allow the Party Insurers to review all books and records maintained by Grace and/or those entities under its control to ascertain and establish the amount of payment of defense costs and costs of judgments and settlements of Products Claims and Asbestos-Related Claims.

28

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

9.2  All notifications, notices, bills, demands, payments, accounting or other communications which any Party desires or is required to give to another Party, shall be given in writing and shall be deemed to have been given as if hand delivered, sent by Certified U.S. Mail, Federal Express or overnight equivalent or by courier service, addressed to the Party or Parties at the address set forth below or such other address as a Party may designate in writing from time to time by notice to the other Parties in accordance with this Section:

If to Grace:

> W.R. Grace & Co.
> One Town Center Road
> Boca Raton, Florida   33486-1010
> ATTENTION:   Secretary

If to the Party Insurers:

> Commercial Union Insurance Co.
> Executive Offices   B10-09
> One Beacon Street
> Boston, MA 02108-3100
> ATTENTION:  Mr. Joseph Dalton, AVP

9.3  This Agreement may be amended, modified, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument which specifically states that it amends, modifies, supersedes or cancels this Agreement, executed by each and all of the Parties.

9.4  In the case of a waiver, the Party waiving compliance may unilaterally execute a written instrument evidencing its waiver. The failure of any Party at any time or times to require performance of any provision of this Agreement shall in no manner

29

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000029

affect the right at a later time to enforce the same. No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or a waiver of any other condition or of any breach of any other term, covenant or warranty.

9.5  The article headings contained in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation of this Agreement.

9.6  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

9.7  This Agreement shall be construed in accordance with the laws of the state of New York. However, nothing contained herein shall be an admission by the Parties of the law or laws applicable to the interpretation of the Policies.

IN WITNESS WHEREOF, this Agreement has been read and signed by the duly authorized officers of the Parties, effective as of the Effective Date.

W. R. GRACE & CO.

WITNESS
Jeffrey M. Posner

By
Robert H. Beber
Senior Vice President

One Town Center Road Boca Raton Fl.
ADDRESS
Date 5/7/93

Date 5/7/93

30

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000030

W. R. GRACE & CO. - CONN.

WITNESS
Jeffrey M. Posner

ADDRESS
Date  5/7/53

By
Robert H. Beber
Senior Vice President

Date  5/7/53

COMMERCIAL     UNION     INSURANCE
COMPANY AS SUCCESSOR IN
INTEREST       TO      EMPLOYERS'
COMMERCIAL     UNION     INSURANCE
COMPANY     OF     AMERICA     AND
EMPLOYERS'      COMMERCIAL     UNION
INSURANCE COMPANY

WITNESS
Harvey G. Lewis

ADDRESS
ONE BEACON ST., BOSTON MASS.
Date 5/10/93

By
Richard A. Jordan
Senior Vice President

Date 5/10/93

AMERICAN EMPLOYERS' INSURANCE
COMPANY

WITNESS
Harvey G. Lewis

ADDRESS
ONE BEACON ST., BOSTON, MASS.
Date 5/10/93

By
Richard A. Jordan
Senior Vice President

Date 5/10/93

31

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000031

# SETTLEMENT AGREEMENT

## EXHIBIT "A"

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000032

Insurance Policies Issued Or Alleged To Have Been Issued

| Insurance Company | Policy No. | Coverage Period |
|---|---|---|
| American Employers' Insurance Company | A15-2127-51 | October 20, 1962 through October 20, 1965 |
| | A15-8138-001 | January 27, 1965 through October 20, 1965 |
| | A16-8220-001 | October 20, 1965 through October 20, 1968 |
| | A16-8220-002 | October 20, 1965 through October 20, 1968 |
| | A16-8220-003 | October 20, 1968 through June 30, 1971 |
| | A16-8220-004 | October 20, 1968 through June 30, 1971 |
| Employers' Commercial Union Insurance Company (of America) | EY-8220-005 | June 30, 1971 through June 30, 1974 |
| Employers' Commercial Union Insurance Company (of America) | EY-8220-006 | June 30, 1971 through June 30, 1974 |

14323

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000033

RECEIVED

JAN 7 1997

HARVEY G. LEWIS



Δ π EXHIBIT 16
Deponent Posner
Date 5.6.07 Rptr.
WWW.DEPOBOOK.COM

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release of all claims and policy
obligations with respect to Hatco-Related Environmental Claims (as
defined in Section 2(C)) (this "Agreement") is entered into on this
17th day of December, 1996 by and between Grace, as defined in
Section 2(A), and American Employers' Insurance Company and
Employers Commercial Union Insurance Company (collectively referred
to herein as "Commercial Union," as defined in Section 2(B)),
collectively referred to as the "Parties."

### RECITALS

WHEREAS, Commercial Union issued or is alleged to have
issued various policies of umbrella or excess liability insurance
to Grace (the "Policies"), as defined in Section 2(D);

WHEREAS, Grace has asserted that, pursuant to the
Policies, Commercial Union is responsible to defend and indemnify
Grace for the Hatco-Related Environmental Claims ("Hatco-Related
Environmental Claims"), as defined in paragraph 2(C) below, arising
out of the Hatco Site, located in Fords, New Jersey ("Hatco Site");

114821.1

1

**FILE COPY**

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000034

WHEREAS, W.R. Grace & Co. -- Conn., a Connecticut Corporation is the successor to the named insured under the Policies that owned and operated a chemical company at the Hatco Site;

WHEREAS, Commercial Union denies any obligation to pay under the Policies for the defense of or to indemnify Grace in connection with any Hatco-Related Environmental Claims arising out of the Hatco Site;

WHEREAS, the dispute between Grace and Commercial Union is the subject of a third-party complaint filed by Grace against a number of insurance companies, including Commercial Union in pending litigation entitled Hatco Corp. v. W.R. Grace & Co. -- Conn., et al., No. 89-1031, filed in the United States District Court for the District of New Jersey ("Pending Litigation");

WHEREAS, the Parties to this Agreement believe that it is in their mutual interest to reach a full and final amicable resolution of the rights and obligations of the Parties under the Policies with respect to any and all Hatco-Related Environmental Claims arising out of the Hatco Site, without admission of liability by any Party or any further adjudication of any issue of

114821.1

2

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000035

fact or law, and to resolve past, present or future disputes relating to Commercial Union's obligations to Grace under the Policies with respect to any and all Hatco-Related Environmental Claims arising out of the Hatco Site.

<u>**AGREEMENT**</u>

NOW THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1.    The foregoing recitals are incorporated herein as if fully set forth in the text of this Agreement.

I.    DEFINITIONS

2.    (A)   As used in this Agreement, "Grace" shall mean W.R. Grace & Co. -- Conn., a Connecticut Corporation; W.R. Grace & Co., a New York Corporation, which has changed its name to Fresenius National Medical Care Holdings, Inc.; W.R. Grace & Co. -- Del., a

114821.1

· 3 ·

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000036

Delaware  Corporation;  and  their  respective  predecessors  and
successors.

(B)  As used in this Agreement, "Commercial Union" shall
mean  Commercial  Union  Insurance  Company,  American  Employers'
Insurance Company, and Employers Commercial Union Insurance Company
of America, and their respective predecessors and successors.

(C)  "Hatco-Related Environmental Claims" shall mean the
claims,  whether  sounding  in  tort,  contract,  equity,  nuisance,
invasion of privacy, trespass, negligence, strict liability or any
statutory  or  common  law  cause  of  action  of  any  sort,  involving
alleged, actual, threatened or potential pollution or contamination
or  exposure  to  smoke,  vapors,  soot,  fumes,  acids,  alkalies,  toxic
chemicals, liquids or gases, petroleum, including crude oil or any
fraction  thereof,  natural  gas,  natural  gas  liquids,  liquified
natural  gas,  or  synthetic  gas  usable  for  fuel  (or  mixtures  of
natural gas and synthetic gas), waste materials or other irritants,
contaminants,  or  pollutants,  or  any  form  of  toxic  or  hazardous
substance or material including without limitation, any "hazardous
substance" as that term is defined in 42 U.S.C. §9601 which are the
subject of the Pending Litigation and arising out of or relating to

114821.1

4

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000037

the Hatco Site, with the exception of claims concerning the Kin-
Buc Landfill and any other landfill or disposal area where waste
from the Hatco Site was, or was alleged to have been transported,
but otherwise including but not limited to (1) any past, present
and/or future claim, demand, action, suit, arbitration or mediation
demand or statutory or regulatory obligation, proceeding and/or
notice of partial or total responsibility, Potentially Responsible
Party ("PRP") notice made, asserted or filed, whether at law or in
equity, against Grace by Hatco; (2) any past, present and/or future
claim, demand, action, suit, arbitration or mediation demand or
statutory or regulatory obligation, proceeding and/or notice of
partial or total responsibility, Potentially Responsible Party
("PRP") notice made, asserted or filed, whether at law or in equity
against Grace by any federal, state, or local authority or other
environmental agencies and/or private parties for environmental
liabilities, at and/or arising from and/or in connection with the
Hatco Site, whether presently known, unknown, or unknowable,
involving actual, alleged, threatened, or potential personal
injury, bodily injury, or property damage, or injury to property or
damage to natural resources, including but not limited to those
provided by 42 U.S.C. §9601(6), et seq. (including but not limited
to costs incurred and sums expended, or which may in the future be

114821.1

5

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000038

incurred or expended for investigation, removal, distribution, treatment, or containment) involving actual, alleged, threatened or potential personal injury or bodily injury that was caused at any time by conduct related to direct exposure to the Hatco Site; and (3) any third-party claim for injury to property or damage to natural resources, as defined above, involving pollution, contamination, or other injurious environmental condition that was caused at any time by conduct related to the cleanup and remediation of the Hatco Site.

(D) "Policy or "Policies" means the insurance policies, issued or alleged by Grace to have been issued to or for the benefit of Grace by Commercial Union, which are set forth below. Commercial Union represents and warrants that it is unaware of any other contracts of insurance issued or alleged to have been issued to Grace except those listed below. Grace represents and warrants that it is unaware of having purchased any comprehensive general liability insurance from Commercial Union except those Policies listed below:

| Company | Policy No. | Policy Period |
|---|---|---|
| American Employers' Insurance Company ("AEIC") | A15-2127-51 | 10/20/62 – 10/20/65 |

114821.1

6

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000039

| AEIC | A16-8220-001 | 10/20/65 - 10/20/68 |
|---|---|---|
| AEIC | A16-8220-002 | 10/20/65 - 10/20/68 |
| AEIC | A15-8138-001 | 01/27/65 - 10/20/65 |
| AEIC | A16-8220-003 | 10/20/68 - 06/30/71 |
| AEIC | A16-8220-004 | 10/20/68 - 06/30/71 |
| Employers' Commercial Union Insurance Company (of America) | EY-8220-005 | 06/30/71 - 06/30/74 |
| Employers' Commercial Union Insurance Company (of America) | EY-8220-006 | 06/30/71 - 06/30/74 |

Commercial Union does not admit to the applicability of any or all of the Policies to any claims, including but not limited to Hatco-Related Environmental Claims presented by Grace to Commercial Union.

(E) "Effective Date" means the last date any signatory hereto executes this Agreement.

II.  SETTLEMENT AMOUNT TO BE PAID BY COMMERCIAL UNION

3.  Commercial Union shall pay to W.R. Grace & Co. -- Conn. the sum of Twelve Million Dollars ($12,000,000) (the "Settlement Amount").  Payment of the Settlement Amount shall be made by

114821.1

7

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000040

Commercial Union to W.R. Grace & Co. -- Conn. in the following sums
and on the following dates: the sum of Four Million Dollars
($4,000,000) on January 15, 1997; the sum of Six Million Dollars
($6,000,000) on January 15, 1998; and the sum of Two Million
Dollars ($2,000,000) on January 15, 1999.

III. RELEASES AND RESERVATIONS

4.    (A)  Grace  hereby  fully  and  forever  releases  and
discharges  Commercial  Union  from  any  and  all  past,  present  and
future  actions,  causes  of  action  in  law  or  in  equity,  suits,  debts,
liens,    contracts,    promises,    claims,    losses,    liabilities,
obligations,  duties  and  responsibilities,  known  or  unknown,  fixed
or  contingent,  direct  or  indirect,  that  have  been  or  could  have
been  or  might  be  in  the  future  asserted  against  Commercial  Union
with  respect  to  Hatco-Related  Environmental  Claims  arising  under
any  and  all  of  the  Policies,  from  the  beginning  of  time  forward  to
the  end  of  the  world,  as  if  the  Policies  never  existed  with  respect
to  Hatco-Related  Environmental  Claims.   A  complete  extinguishment
and  termination  of  the  Policies  with  respect  to  Hatco-Related
Environmental  Claims,  and  any  and  all  rights  and  obligations
thereunder  with  respect  to  Hatco-Related  Environmental  Claims  is

114821.1

8

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000041

hereby effected, provided, however, that the aforesaid release and discharge with respect to any claim involving actual, alleged, threatened or potential personal injury (other than damage to real estate released above) or bodily injury that was caused at any time by conduct related to direct exposure to or conditions at the Hatco Site shall be limited to the aggregate sum of Five Million ($5,000,000), which sum shall have been paid by way of settlement or judgment of said personal injury (other than damage to real estate released above) or bodily injury claims.

(B) Grace hereby further releases and discharges Commercial Union from any and all claims for compensatory, punitive, exemplary or statutory damages relating to or based upon any allegations of bad faith, unfair claim practice, unfair trade practice or other acts or state of affairs or failure to act in connection with the investigations, handling, adjustment, litigation, defense or settlement of any and all Hatco-Related Environmental Claims arising out of or relating to the Pending Litigation under the Policies.

(C) Grace expressly assumes the risk that the alleged costs of the Hatco-Related Environmental Claims may be greater than

114821.1

9

Grace currently realizes, that the alleged costs may increase in amount or in severity over time and that the costs and/or claims may be progressive, cumulative, unknown and/or unforeseeable, and that there may be hidden, unknown and unknowable damages or costs. Grace nevertheless waives, surrenders, and abandons any rights under the Policies with respect to such costs or liabilities in connection with Hatco-Related Environmental Claims in the Pending Litigation, except as provided in Paragraph 4 (A) herein.

(D)    Because it is the intention of the Parties that this Agreement operate as and constitute a full release and extinguishment of the Policies with respect to Hatco-Related Environmental Claims, except as provided in Paragraph 4 (A) herein, Grace expressly waives any and all rights it may have under any statute, code or ordinance which may limit or restrict the effect of a general release as to claims which the releasor does not know or suspect to exist in his favor at the time of the execution of the release.

IV.   DISMISSAL WITH PREJUDICE

5.    Grace will dismiss, with prejudice, and without costs, its prosecution of its claims against Commercial Union in the

114821.1

· 10

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000043

Pending Litigation.   Grace agrees to file a stipulation of dismissal with prejudice of the third-party complaint against Commercial Union in the Pending Litigation within thirty (30) days of the Effective Date.  Grace and Commercial Union shall bear their own past costs and attorneys' fees incurred in connection with the Pending Litigation and the filing of the stipulation of dismissal with prejudice.  The Parties further agree that they will bear their respective costs, expenses and fees, including those of their counsel, in connection with the negotiations for and execution of this Agreement.

V.   COVENANT NOT TO SUE

6.   Commercial Union hereby covenants not to sue or otherwise to seek to recover the Settlement Amount paid to Grace made under this Agreement from Hatco Corp. or any other insurance company that wrote insurance coverage for Grace, to the extent that such other parties do not sue or otherwise seek to recover from Commercial Union any monies paid to Grace or expenses incurred by such other parties for Hatco-Related Environmental Claims, provided, however, that said covenant shall not preclude the right of Commercial Union to pursue recovery from its reinsurers, if any, for some or all of the Settlement Amount.

114821.1

11

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000044

VI.   INDEMNIFICATION, HOLD HARMLESS AND DEFENSE

7.    (A)   From and after the Effective Date, except for W.R. Grace & Co., a New York Corporation, which had changed its name to Fresenius National Medical Care Holdings, Inc., Grace as defined herein shall, at the option of Grace, defend Commercial Union and shall indemnify and hold Commercial Union harmless at the sole expense of Grace from and against any and all liability, loss, costs or expenses, imposed upon Commercial Union as a result of any claims, demands, lawsuits, causes of action or proceedings that are asserted, initiated or continued by any person or entity against Commercial Union and that are based upon the Policies and Hatco-Related Environmental Claims except as otherwise provided in this Paragraph 7.   The matters for which Grace is obligated pursuant to this Paragraph 7 to indemnify and hold harmless Commercial Union, or for which Grace has an option to defend Commercial Union, are hereinafter referred to as "Indemnifiable Claims."

(B)   Grace shall have no obligation to indemnify and hold Commercial Union harmless from and against any and all liability as a result of any claims, demands, law suits, causes of action or proceedings that are asserted, initiated or continued by any person

114821.1

· 12

or entity against Commercial Union for personal injury (other than damage to real estate released above) or bodily injury and that are based upon the Policies and Hatco-Related Environmental Claims.

(C)  Grace's obligation to indemnify and hold harmless Commercial Union, or Grace's option to defend Commercial Union, for Indemnifiable Claims with respect to the Policies shall be subject to an aggregate limit equal to the Settlement Amount.  Once Grace has paid any liabilities for Indemnifiable Claims of Commercial Union in an amount equal to the Settlement Amount, Grace shall not be obligated to indemnify and hold harmless Commercial Union for further Indemnifiable Claims with respect to the Policies.  Grace is under no obligation, under this Agreement or otherwise, to assume the defense of an Indemnifiable Claim.

(D) (1)    After receipt by Commercial Union of notice of any complaint or the commencement or continuation of any action or proceeding with respect to which indemnification is being sought hereunder, Commercial Union shall notify Grace in accordance with Section 18 and as soon as practicable in writing of such complaint or of the commencement or continuation of such action or proceeding and shall thereafter tender the defense thereof to Grace.

114821.1

13

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000046

(D)(2)    Any failure by Commercial Union to notify Grace of such action or proceeding will relieve Grace from any indemnification obligation with respect thereto.

(E)    After Grace receives any notice pursuant to Section 7(D)(1), Grace shall promptly determine whether it will respond to that notice and assume the defense of Commercial Union named in a complaint or the commencement or continuation of any action.

(F)(1)    If Grace so elects, Grace will assume the defense of such action or proceeding.    Grace and Commercial Union shall mutually agree upon a choice of counsel to represent Commercial Union (which may not include counsel presently representing either Grace or Commercial Union), and Grace shall assume the payment of the fees and disbursements of such counsel.    Grace will consult with and allow Commercial Union complete control over the positions asserted in the interpretation of the language of the Policies, and will consult with Commercial Union in the defense of any notice of any complaint or the defense of the commencement or continuation of any action.

114821.1

14

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000047

(F)(2)    Grace and Commercial Union will consult to the extent practicable about all decisions to be made, either procedural or substantive, pertaining in any material manner to any Indemnifiable Claim. The Parties will make reasonable efforts to accommodate the litigation suggestions of each other before directing counsel to take any action. The Parties will not dispute any decision that each makes which is lawful and is reasonably made in their discretion.

(F)(3)    The Parties shall keep each other apprised in a timely manner of all significant developments in the defense of Commercial Union in any indemnifiable claim and shall upon reasonable request supply each other with status reports.

(F)(4)    Any settlement or compromise made by Grace on behalf of Commercial Union shall provide that it is not an admission of liability by Commercial Union and is without precedent to Commercial Union. Grace shall provide reasonable and timely disclosure as soon as is practicable to Commercial Union of any proposed settlement or compromise. Commercial Union shall have such time as is practicable to review the proposed settlement or compromise and to present its view to Grace. Any settlement of the

114821.1

15

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000048

Indemnifiable Claims in the amount of or less than the Settlement Amount may be made by Grace without Commercial Union's consent. Any settlement greater than the Settlement Amount may be made by Grace only with Commercial Union's consent, which shall not be unreasonably withheld. Grace shall use best efforts to keep such settlement or compromise confidential.

(F)(5)    If Grace declines to assume the defense of any Indemnifiable Claims, then Commercial Union shall employ counsel to defend against such Indemnifiable Claims, and Commercial Union shall pay the fees and disbursements of such counsel. Commercial Union shall provide reasonable and timely disclosure as soon as is practicable to Grace of any proposed settlement or compromise and Grace shall have such time as is practicable to review the proposed settlement or compromise and to present its view to Commercial Union. Any settlement of the Indemnifiable Claims may be made by Commercial Union only with Grace's consent, which shall not be unreasonably withheld. Commercial Union shall keep such settlement or compromise confidential.

(F)(6)    In any action or proceeding in which Grace assumes the defense of Commercial Union, Commercial Union will have the

114821.1

16

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

right to participate in such litigation and to retain its own counsel at Commercial Union's own expense.

(G)   If Commercial Union settles any such claims without previously obtaining Grace's consent, which consent shall not be unreasonably withheld, then Grace shall be relieved of any obligation to indemnify Commercial Union for such settlement. Commercial Union shall use best efforts to keep such settlement or compromise confidential.

(H)   Nothing herein shall constitute any waiver of Commercial Union's attorney-client privilege, which privilege shall extend only to such counsel retained to represent Commercial Union and shall not extend to Grace or its counsel unless specifically waived by Commercial Union in writing with reference to a particular attorney-client communication.

(I)   Commercial Union and Grace shall cooperate reasonably with each other to protect their respective interests with respect to claims for which Grace may be liable for indemnification under Section 7.

114821.1

17

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000050

(J)  If Grace has assumed the defense of any action or proceeding, Commercial Union shall comply in a timely manner with Grace appointed counsel's requests for access to documentation or information requested by Grace appointed counsel for purposes of defense.  The Parties shall cooperate with each other to avoid taking any positions in such litigation which are adverse to thier respective general business interests.

(K)  If Grace has failed or declined to assume the defense of any action or proceeding, Grace shall comply in a timely manner with Commercial Union's requests for access to documentation or information requested by Commercial Union for purposes of such defense.

(L)  Commercial Union and Grace shall cooperate reasonably with each other with respect to Indemnifiable Claims.  If Grace has assumed the defense of any action or proceeding, Commercial Union shall comply in a timely manner with Grace's appointed counsel's request for access to documentation or information requested by Grace's appointed counsel for purposes of defense.  If Grace has declined to assume the defense of any action or proceeding, Grace shall comply in a timely manner with Commercial Union's requests

114821.1

18

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000051

for access to documentation or information pertaining to such defense.

## VII. CONFIDENTIALITY OF AGREEMENT

8.    Except as expressly provided in Paragraph 8 (A), (B), (C), (D) and (E), this Agreement and all matters relating to its existence, terms, negotiations and implementation shall be kept strictly confidential.  This Agreement and the implementation of its terms are to be disclosed pursuant only to an order of court or by written agreement by all the Parties, except that:

(A)  The Agreement may be disclosed provided that the entity making a disclosure provides at least 30 days written notice prior to disclosure, setting forth the information proposed to be disclosed, the statute, tribunal or other legal authority requiring disclosure and the circumstances pursuant to which disclosure is proposed to be made, along with a request to consent to such disclosure.  Further, the entity to which disclosure is made must be advised that the disclosure is subject to this confidentiality provision and agrees to be bound.

114821.1

19

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000052

(B) No part of this Agreement, its existence, terms, negotiation, development, implementation or performance shall be admissible or used in any manner in any litigation, claims or other proceeding, provided, however, that such evidence may be offered in any action seeking solely to enforce its terms or in connection with any litigation between Commercial Union and any of its reinsurers.

(C)  To the extent necessary to obtain insurance coverage for a Hatco-Related Environmental Claim from an entity other than Commercial Union, the Agreement may be disclosed, provided that the entity to which disclosure is made is advised that the disclosure is subject to this confidentiality provision and agrees to be bound.

(D) Any party may make copies of this Agreement available to its accountants, to its counsel, to its lenders, underwriters or reinsurers and to counsel for such lenders, underwriters or reinsurers, provided, that the entity to which disclosure is made is advised that the disclosure is subject to this confidentiality provision and agrees to be bound.

114821.1

20

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000053

(E)  Any Party may make reference to or describe this Agreement to the extent that such disclosure is required to comply with any court, governmental agency, regulatory, arbitration tribunal or accounting/auditing requirement or otherwise required by law applicable to a party, but shall not make available a copy of the Agreement nor shall the reporting Party identify any other Parties to this Agreement.  In the event that either a governmental agency or any other entity requests a copy of the Agreement or requests the identity of the other Parties to the Agreement, the Party to whom the request is made shall, prior to disclosure, and as soon as practicable, notify all other Parties to permit a Party(ies) the opportunity to participate in opposing such request.

8.1 (A)  Except as expressly set forth in Paragraph 8, where one or more Parties object to disclosure of the Agreement to the entity not a Party, the objecting Party shall be responsible for taking all necessary actions to prevent disclosure of this Agreement to the entity not a Party.  The costs associated with the prevention of disclosure of this Agreement shall be borne by the objector to the disclosure.

114821.1

21

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000054

8.2   Except as expressly set forth in Paragraph 8, in any action in which a Party has been ordered to produce this Agreement, related communications and drafts, the producing Party shall seek a protective order limiting the use of this Agreement, related communications and drafts, to the particular purpose of the pending litigation in which it is produced and take all steps necessary to bar the disclosure to any entity not a Party.

8.3   Except as expressly set forth in Paragraph 8, any Party which has produced Confidential Documents and Information may require the other parties to return all specifically designated Confidential Documents and Information in their possession, as well as in the possession of their counsel, retained experts, and/or consultants, including all copies. In lieu of returning all such Confidential Documents and Information, the Party from whom the Confidential Documents and Information has been requested may certify in writing that all such requested Confidential Documents and Information have been destroyed.

VIII.    RESERVATION OF RIGHTS

114821.1

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000055

9.   Commercial Union reserves all of its rights, without limitation, to deny or dispute coverage to Grace on any and all grounds for any and all claims for coverage which are not released in this Agreement.

10.   Grace reserves all of its rights, without limitation, to enforce coverage provided by Commercial Union on any and all grounds for any and all claims for coverage which are not released in this Agreement.

IX.   SETTLEMENT NOT AN ADMISSION

11.   Grace acknowledges that Commercial Union disputes coverage under the Policies with respect to Hatco-Related Environmental Claims.   Grace recognizes that Commercial Union's payment of the Settlement Amount is to be made in compromise of disputed coverage demands and is not, and cannot be construed as an admission by Commercial Union that any defense, indemnity or other coverage or obligation to pay exists under any of the Polices, or that Commercial Union has any other obligation of any nature whatsoever (other than those arising under this Agreement) with respect to Hatco-Related Environmental Claims.   Except as otherwise

114821.1

23

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

stated herein, with respect to rights and obligations regarding all matters outside the scope of this Agreement or asserted by any person not a party to this Agreement, the Parties reserve all positions and all other rights, defenses and privileges concerning such matters.

12. The Parties agree that none of the terms of this Agreement, nor any aspect of its negotiation or performance shall be used in any manner by any person in any future action or proceeding as evidence of the rights, duties or obligations of the Parties under the Policies.

X. APPLICATION OF AGREEMENT ONLY TO THE PARTIES

13. This Agreement is intended to confer rights and benefits only upon the Parties hereto, and not upon any other party or entity; no party or entity other than the Parties hereto shall have any legal enforceable rights under this Agreement. Any right of action for breach of this Agreement is reserved to the Parties only.

114821.1

24

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000057

14.  This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, this Agreement does not reflect upon the Parties' views as to their rights and obligations with respect to matters or persons outside the scope of this Agreement.  No part of this Agreement, it negotiations, development, implementation, or performance may be used in any manner as evidence of the rights, duties, or obligations of Grace or Commercial Union with respect to matters, persons or entities outside the scope of this Agreement.

XI.  ASSISTANCE AND COOPERATION

15.  Each of the Parties further agrees that it will execute and deliver to the other Party all instruments and do such further acts and things as the other Party may reasonably request when they are necessary to effectuate the purposes of this Agreement.

16.  Should any person or entity not a party hereto challenge the validity of this Agreement, or any term thereof, the Parties shall provide to each other such cooperation and assistance as the other Party may reasonably request in order to resist such a challenge.

114821.1

25

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000058

## XII. EXECUTION

17.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deeded one and the same instrument.   This Agreement consists of 33 typewritten pages, inclusive of signature pages.

## XIII.      NOTICE

18.  Any statements, communications, or notices to be provided pursuant to this Agreement shall be sent to the attention of the persons indicated below until such time as notice of any change of person to be notified or change of address is forwarded to the Parties hereto:

     (a)  W.R. Grace & Co. — Conn.
          One Town Center Road
          Boca Raton, Florida 33486
          Attn:  Secretary

          with a copy to: Director of Corporate Risk Management

          (and copy to)

          Anthony J. Marchetta, Esquire
          Pitney, Hardin, Kipp, Szuch

114821.1

26

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000059

P.O. Box 1945
Morristown, NJ 07962-1945

(b)   Commercial Union Insurance Company
      One Beacon Street
      Boston, MA  02108
      Attn:  Harvey G. Lewis

      (and copy to)

      James W. Christie, Esquire
      Christie, Pabarue, Mortensen
        and Young
      A Professional Corporation
      1880 JFK Boulevard
      10th Floor
      Philadelphia, PA  19103


## XIV. PARTIAL INVALIDITY

19.   If any provision of this Agreement, or the application of
any term or provision, is held to be illegal, invalid, or
unenforceable under present or future laws, such provisions shall
be fully severable.   In such event:  (a) the Agreement shall be
construed and enforced as if such illegal, invalid, or
unenforceable provision has never comprised a part of the
Agreement; (b) the remaining provisions of the Agreement shall
remain in full force and effect and shall not be affected by the
illegal, invalid, or unenforceable provisions, or by its severance
from this Agreement, unless the effect of severance of such

114821.1

27

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000060

provision shall conclusively make continued performance under this Agreement impossible; and (c) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and as may be legal, valid, or enforceable.

XV.  REMEDY FOR BREACH

20.  If any Party to this Agreement contends that any other Party has materially breached the terms of the Agreement, such Party shall give the other Party to this Agreement notice thereof by certified mail.  The Party which contends that the Agreement has been materially breached shall give the other Party ten (10) days from the date of the notice to cure the alleged breach before taking any legal action and the Party to whom written notice of a breach has been given shall not take any legal action under this Agreement within that ten day period.  However, the failure of a Party to object to one or more breaches or violations of this Agreement shall not constitute a waiver or limitation upon the right of such Party to object to any other breach or violation of this Agreement.

114321.1

28

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000061

## XVI. ENTIRE AGREEMENT AND AMENDMENTS TO AGREEMENT

21. This Agreement is the complete and entire agreement of the Parties and may not be modified, changed, contradicted, added to, or altered in any way by any previous or concurrent written or oral agreements or any subsequent oral agreements. No amendments or variations of the terms of this Agreement shall be valid unless made in writing and signed by both Parties.

## XVII.    NO CONSTRUCTION AGAINST EITHER PARTY

22. This Agreement was negotiated at arms-length with all Parties receiving advice from independent legal counsel. The Parties read this entire Agreement and know the contents hereof, that the terms hereof are contractual and not merely recitals, and that they have signed this Agreement of their own free act. It is the intent of the Parties that no part of this Agreement be construed against any of the Parties because of the identity of the drafter or the fact that Commercial Union is an insurance company.

## XVIII.    REPRESENTATION AND WARRANTIES

114821.1

29

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000062

23.   Grace represents that as of the date of execution of this Agreement, (a) it is not aware of any Hatco-Related Environmental Claim being made against the subject Policies by any entity formerly owned by, related or affiliated with Grace, and on whose behalf Grace does not have the authority to bind to this Agreement, and (b) it is not aware of any Hatco-Related Environmental Claim that is going to be made or that is contemplated being made by any entity formerly owned by, related to, or affiliated with Grace against the subject Policies after execution of this Agreement.

24.   No Party shall assign transfer, convey or sell, or purport to assign, transfer, convey or sell to any entity or person, any cause of action, chose in action, or part thereof, arising out of or connected with the matters released herein, without first obtaining the written consent of the other Parties; provided, however, that this sentence shall not prohibit any assignment by a Party by merger, consolidation, operation of law or to a Party who succeeds to all or substantially all of such Party's assets.   Subject to the foregoing, this Agreement shall extend to and be binding upon the successors and assigns of the Parties hereto.

114821.1

30

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000063

25.   The Parties represent, warrant and agree that they (a) are the sole and lawful owners of all right, title, and interest in and to every claim or matter released herein; (b) have not assigned or transferred or purported to or attempted to assign or transfer to any person or entity any claim or other matter released herein; and (c) have taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or other internal approval is necessary.

26.   The making and performance of this Agreement will not violate any provision of law or of its respective articles of incorporation, charter or by-laws.

27.   The article headings contained in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation of this Agreement.

28.   Each of the Parties represents, warrants and certifies that the person signing this Agreement on its behalf is authorized to execute this Agreement, and that this Agreement constitutes a valid and binding obligation.

114821.1

31

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000064

IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN READ AND SIGNED IN
DUPLICATE ORIGINALS BY THE DULY AUTHORIZED REPRESENTATIVES OF THE
PARTIES:

W.R. GRACE & CO. -- CONN.

By: _____ AVP          Date: 12/17/96
Name and Title
W.R. Grace & Co. -- Conn.
One Town Center Road
Boca Raton, Florida 33486

Witness: _____          Date: 12/17/96

Address: 1360 SW 1 St Boca R33486

SWORN to and SUBSCRIBED
before me this 17th day
of DECEMBER, 1996.

_____
Notary Public

JODY M. CROSSMAN
MY COMMISSION # CC 294590
EXPIRES: June 14, 1997
Bonded Thru Notary Public Underwriters

W.R. GRACE & CO. -- DEL.

By: _____ AVP          Date: 12/17/96
Name and Title
W.R. Grace & Co. -- Del.
One Town Center Road
Boca Raton, Florida 33486

Witness: _____          Date: 12/17/96

Address: 1360 SW 1 St Boca FL 33486

SWORN to and SUBSCRIBED
before me this 17th day
of DECEMBER, 1996.

_____
Notary Public

JODY M. CROSSMAN
MY COMMISSION # CC 294590
EXPIRES: June 14, 1997
Bonded Thru Notary Public Underwriters

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

114821.1

32

OB-000065

W.R. GRACE & CO. (a New York Corporation,
which has changed its name to Fresenius
National Medical Care Holdings, Inc.)

By: _____ AVP          Date: _12/17/96_
    Name and Title
    W.R. Grace & Co. -- Conn.
    One Town Center Road
    Boca Raton, Florida 33486

    Attorney-in-Fact for
    W.R. Grace & Co. (a New York Corporation,
    which has changed its name to Fresenius
    National Medical Care Holdings, Inc.)

Witness: _____     Date: _12/17/96_

Address: _1360 SW 1 St Boca FL 33486_

SWORN to and SUBSCRIBED
before me this _17th_ day
of _DECEMBER_, 1996.

_____
[Notary Public]

> JODY M. CROSSMAN
> MY COMMISSION # CC 294590
> EXPIRES: June 14, 1997
> Bonded Thru Notary Public Underwriters

COMMERCIAL UNION INSURANCE COMPANY

By: _____          Date: _12/13/96_
    Harvey G. Lewis, Vice President

Witness: _____     Date: _12/13/96_

Address: _29 Meridian St, Malden Ma._

SWORN to and SUBSCRIBED
before me this _13th_ day
of _December_, 1996.

_____               MICHAEL F. LINCOLN
    Notary Public                    Notary Public
                              My Commission Expires Dec. 20, 1996

**CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER**

OB-000066



## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release of all claims and policy obligations ("Agreement") is entered into on this  7  day of October , 1998 by and between Grace (as defined in Section I.A.) and Commercial Union (as defined in Section I.B.).

WHEREAS, Commercial Union issued or is alleged to have issued various policies of insurance to Grace ("Policies", as hereinafter defined);

WHEREAS, Grace has made Claims for insurance coverage under the Policies;

WHEREAS, Grace filed a third-party complaint against Commercial Union in an action entitled Maryland Casualty Co. v. W. R. Grace & Co., No. 88 Civ. 4337 (JSM), venued in the Southern District of New York, which case was consolidated with a second action, Unigard Security Ins. Co. v. W. R. Grace & Co. - Conn., No. 97 Civ. 8941 (JSM), also venued in the Southern District of New York;

WHEREAS, it is in the mutual best interest of Grace and Commercial Union to reach a full and final amicable resolution of their rights and obligations under the Policies with respect to any and all Claims, without admission of liability by either Grace or Commercial Union, or any further adjudication of any issue of

**CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER**

fact or law, and to resolve all past and present disputes, and avoid all future disputes, relating to Commercial Union's and Grace's rights and obligations under the Policies;

NOW THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Commercial Union and Grace agree as follows:

I.   DEFINITIONS

A.   "Grace" means W.R. Grace & Co., a Delaware Corporation, and all its subsidiaries, predecessors in interest, successors in interest, assigns, and all other persons, corporations, and entities claiming a right as a named insured, additional named insured, or other insured under the Policies, to the extent Grace has the legal capacity to bind such persons, corporations and entities to obligations arising under this Agreement.

B.   "Commercial Union" means Commercial Union Insurance Company, CGU, American Employers' Insurance Company, and Employers Commercial Union Insurance Company, and their respective predecessors-in-interest, successors-in-interest and assigns.

C.   "Claim" and "Claims" mean any and all past, present and future claims or demands for coverage under the Policies, whether

2

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000068

known or unknown, fixed or contingent, direct or indirect, that have been, could have been, are, or may in the future be, asserted, in whatever fashion, including but not limited to claims, promises, orders, requests, actions, causes of actions, cross-claims, third-party claims, counter-claims, directives, decrees, demands, proceedings, suits, Potentially Responsible Party notices and/or notices of partial or total responsibility. "Claim" and "Claims" include every and all coverages afforded or allegedly afforded under the Policies, including but not limited to coverage or alleged coverage for property damage, bodily injury, personal injury, advertising liability, operations liability, products liability, medical monitoring, natural resources damage, eviction liability, occupational disease, maritime, and workers' compensation. "Claim" and "Claims" do not include those claims that are the subject of the "Settlement Agreement and Release" dated December 17, 1996 entered into between Grace and Commercial Union in the case captioned Hatco Corp. v. W.R. Grace & Co. - Conn., No. 89-1031, venued in the United States District Court for the District of New Jersey, nor those claims that are the subject of the "Settlement Agreement" dated May 7, 1993 entered into between Grace and Commercial Union in various cases, including but not limited to Maryland Casualty Company v. W.R. Grace & Co., et al., No. 88 Civ. 2613 (SWK), venued in the United States District Court for the Southern

3

CONFIDENTIAL SUBJECT TO MARCH
2009 PROTECTIVE ORDER

OB-000069