non-voting preferred shares with common stock-like features to effect
acquisitions or other transactions in the future. See "DESCRIPTION OF CAPITAL
STOCK OF FRESENIUS MEDICAL CARE -- FMC Preferred Shares."

DEPENDENCE ON PHYSICIAN AND OTHER REFERRALS

     The provider business of Fresenius Medical Care will be dependent upon
referrals of dialysis patients by physicians specializing in nephrology who
practice in the communities served by Fresenius Medical Care's dialysis centers.
At most centers, a few physicians account for all or a significant portion of
the patient referral base, and such physicians may move their patients to
competing centers at any time, including centers established by such physicians.
The loss of a significant number of referring physicians at Fresenius Medical
Care's centers could have a material adverse effect on the operations of those
centers and could materially adversely affect Fresenius Medical Care's overall
operations. Fresenius Medical Care's operations are also affected by referrals
from hospitals, managed care plans and other sources. Financial arrangements
with physicians and other referral sources in the U.S. and many other countries,
and decisions with respect to purchases of supplies, are highly regulated. NMC
is the subject of a government investigation with respect to these matters in
the U.S. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal
Matters -- Legal and Regulatory Proceedings -- OIG Investigation." The decision
to purchase Fresenius Medical Care or competing dialysis products will be made
by medical directors ("Medical Directors") and other referring physicians at
Fresenius Medical Care centers and by the managing medical personnel and
referring physicians at other centers. A decline in physician recommendations
and/or purchases of Fresenius Medical Care products could materially adversely
affect the business and operations of Fresenius Medical Care. See "BUSINESS OF
FRESENIUS MEDICAL CARE -- Business of NMC -- DSD Operations" and
"-- Competition."

INTERNATIONAL OPERATIONS

     Fresenius Medical Care intends to expand its international presence. As a
result, Fresenius Medical Care expects that revenues from countries other than
the U.S. and Germany will account for an increasing portion of future revenues.

                                       22

<PAGE>   47

     Revenues from international operations are subject to a number of risks,
including the following: fluctuations in exchange rates could adversely affect
profitability; agreements may be difficult to enforce and accounts receivable
difficult to collect under certain countries' legal systems; local regulations
may restrict Fresenius Medical Care's ability to obtain a direct ownership
interest in dialysis centers or other operations; lack of governmental funding
may limit the demand for Fresenius Medical Care's services and products; certain
customers and governments may have longer payment cycles; and some countries
could impose additional withholding taxes or otherwise tax Fresenius Medical
Care's income, impose tariffs or adopt other restrictions on foreign trade
affecting Fresenius Medical Care products. There can be no assurance that these
factors will not have a material adverse effect on Fresenius Medical Care's
business, financial position and results of operations. See "BUSINESS OF
FRESENIUS MEDICAL CARE -- Strategy" and "-- Business of NMC -- DSD
Operations -- International Dialysis Services."

RISKS RELATING TO REGULATORY MATTERS

PENDING INVESTIGATIONS

     In October 1995, NMC received five investigatory subpoenas from the Office
of the Inspector General ("OIG") of the Department of Health and Human Services
("HHS"). The subpoenas call for the production of extensive documents and were
issued in conjunction with an investigation being conducted by the OIG, the U.S.
Attorney for the District of Massachusetts and others concerning possible
violations of federal laws relating to health care payments and reimbursements
(the "OIG Investigation"). NMC is cooperating with the OIG Investigation and has
made and expects to continue to make extensive document production in response
to the subpoenas. The results of the OIG Investigation and its impact, if any,
cannot be predicted at this time. However, the costs of responding to the
government's requests are substantial and the pendency of, and any adverse
resolution of, the OIG Investigation could have an adverse effect on Fresenius
Medical Care's reputation, including, among other things, its relationships in
the medical community. In the event that a U.S. government agency or a state
agency believes that any wrongdoing has occurred, civil and/or criminal
proceedings could be instituted and if such proceedings were to be instituted
and the outcome were to be unfavorable, NMC or one or more of its subsidiaries
could be excluded from government reimbursement programs or have their payments
suspended. Such result would have a material adverse effect on the business,
financial position and results of operations of NMC and Fresenius Medical Care.
In addition, in the event that a U.S. government or state agency attempts to
recover a significant amount of revenues of NMC for prior periods which such
agency believes were improperly received, Fresenius Medical Care could suffer a
material adverse effect on its business, financial condition and results of
operations. In this regard, it should be noted that applicable laws authorize
the imposition of penalties of significant magnitude even if the underlying
claim is for a relatively immaterial amount. Further, any restrictions on NMC's
future operations resulting from the resolution of the OIG Investigation could
adversely affect Fresenius Medical Care's profitability in future periods. In
addition, any or all of the subjects of the OIG Investigation could be the
subject of civil claims by private parties, such as patients or insurers or
other private payors, seeking to recoup payments made to NMC, or seeking other
remedies, including, without limitation, suspension or exclusion from
reimbursement programs and punitive damages. Such claims, if adversely

determined, could have a material adverse effect on Fresenius Medical Care's business, financial position and results of operations. This matter is discussed further under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation" and that section should be carefully reviewed. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Agreements" for information regarding agreements relating to the OIG investigation among NMC, Grace Chemicals, Fresenius Medical Care and the United States entered into relative to the Reorganization.

In December 1994, a subsidiary of NMC received a subpoena from a federal grand jury in the Eastern District of Virginia investigating the contractual relationships between subsidiaries of NMC that provide dialysis services and third parties that provide medical directorship and related services to those subsidiaries. The outcome of these investigations and their effect, if any, on NMC cannot be predicted at this time. See

23

<PAGE>    48

"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- Eastern District of Virginia."

On September 22, 1995, June 7, 1996, and June 21, 1996, NMC's LifeChem laboratory subsidiary ("LifeChem") voluntarily disclosed certain billing problems, which NMC believes have been corrected. The matters disclosed in LifeChem's voluntary disclosure of September 22, 1995 are also a subject of the OIG Investigation. For a further discussion of this matter, see "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation."

NMC has received multiple subpoenas from a federal grand jury in the District of New Jersey investigating a number of issues. On February 12, 1996, NMC received a letter from the U.S. Attorney for the District of New Jersey indicating that it is the target of a federal grand jury investigation into possible violations of criminal law in connection with its efforts to persuade the U.S. Food and Drug Administration (the "FDA") to lift a January 1991 import hold issued with respect to NMC's Dublin, Ireland manufacturing facility. In June 1996, NMC received a letter from the U.S. Attorney for the District of New Jersey indicating that the U.S. Attorney had declined to prosecute NMC with respect to a submission related to NMC's effort to lift the import hold. The letter added that NMC remains a subject of a federal grand jury's investigation into other matters. The outcome of this investigation and its impact, if any, on NMC's business or results of operations cannot be predicted at this time. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- District of New Jersey Investigation."

HEALTH CARE REFORM

Proposals to modify the current health care system in the U.S. to improve access and control costs are being considered by the federal and certain state governments. Fresenius Medical Care anticipates that the U.S. Congress and state legislatures will continue to review and assess alternative health care reforms, and Fresenius Medical Care cannot predict whether any such reform proposals will be adopted, when they may be adopted or what impact they may have on Fresenius Medical Care. Such legislation could, among other things, restrict Fresenius Medical Care's ability to establish prices and to contract independently with health care providers in the U.S., thereby having a material adverse effect on the business and operations of Fresenius Medical Care.

In the U.S., Medicare reimbursement is currently available for dialysis equipment and/or treatment for most end-stage renal disease ("ESRD") patients at approximately the same dollars per treatment level that prevailed in 1983 (representing a significant decrease in real dollars per treatment). Health care reform proposals are intended, among other things, to reduce Medicare spending growth significantly as part of an effort to reduce the federal budget deficit. Because the demand for Fresenius Medical Care's products and the profitability of its services are affected by the availability and level of Medicare reimbursement, any spending decreases or other significant changes in the Medicare program could have a material adverse effect on the business and operations of Fresenius Medical Care.

Other countries, especially those in Western Europe, have also considered health care reform proposals and could materially alter their government-sponsored health care programs by reducing reimbursement payments. Such reductions could affect the pricing of the products of Fresenius Medical Care and the profitability of its services, and therefore could have a material adverse effect on the business, financial position and results of operations of Fresenius Medical Care. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Reimbursement -- Non-U.S."

OPERATIONS SUBJECT TO AND POTENTIAL EFFECTS OF GOVERNMENTAL REGULATION

The operations of Fresenius Medical Care will be subject to extensive governmental regulation in virtually every nation in which it operates. The applicable regulations, which differ from country to country, relate in general to the safety and efficacy of medical products and supplies, the operation of manufacturing facilities, laboratories and dialysis centers, and the rate of, and accurate reporting and billing for, government and third-party reimbursement.

24

<PAGE>    49

Any inability to obtain material required licenses, certifications, or other approvals, or significant delays in obtaining such items, loss of any significant licenses and certifications required to operate, or termination of Fresenius Medical Care's authorization to participate in the Medicare or Medicaid programs under the laws of any other governmental authority from which a substantial portion of its revenues is derived, would have a material adverse effect on the business, financial position and results of operations of Fresenius Medical Care. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters."

RISKS RELATING TO FDA MATTERS

The FDA is the U.S. agency that regulates the testing, manufacturing and marketing of medical products and supplies. From 1991 through 1993, the FDA issued warning letters concerning four of NMC's six renal products division ("RPD") facilities in the U.S., as well as import alerts concerning hemodialysis bloodlines manufactured at NMC's Reynosa, Mexico facility and Focus(R) brand hemodialyzers manufactured at NMC's Dublin, Ireland facility. Under the import alerts, NMC was prohibited from importing the products covered by the alerts into the U.S. until the FDA confirmed compliance with Good Manufacturing Practices ("GMP") at the facilities where such products were manufactured. In January 1994, NMC and certain members of its senior management entered into a consent decree providing, among other things, for the terms upon which such import prohibition would be lifted (the "Consent Decree"). As a result of the warning letters and the Consent Decree, NMC's U.S. facilities were required to undertake significant GMP improvements, but production continued at all U.S. facilities. Violation of the Consent Decree could result in civil enforcement actions, such as seizure and injunctive actions; administrative proceedings, such as civil penalties and mandatory recalls; and/or criminal contempt proceedings, any of which could have a material adverse effect on Fresenius Medical Care's business, financial position and results of operations. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

DEPENDENCE ON GOVERNMENT REIMBURSEMENT

A significant portion of Fresenius Medical Care's revenues will be derived directly or indirectly from reimbursement payments received under the Medicare and Medicaid programs. For example, in 1995 approximately 62% of NMC's total net revenues, including approximately 62% of the revenues of DSD, approximately 78% of the revenues of LifeChem, and approximately 50% of the revenues of NMC Homecare, resulted from Medicare and Medicaid reimbursement. In addition, a significant portion of the net revenues of Fresenius USA and RPD are derived from Medicare, either indirectly by selling renal products to dialysis centers, which in turn seek Medicare reimbursement, or by furnishing products to patients receiving treatment at home and directly seeking Medicare reimbursement.

Reimbursement under the Medicare program for chronic dialysis services provided to ESRD patients at NMC's dialysis centers is paid in accordance with a payment methodology commonly referred to as the composite rate method (the "Composite Rate"). All Medicare reimbursement rates, including the Composite Rate, Medicare rates for other dialysis-related services such as the administration of Erythropoietin ("EPO"), and Medicare rates for other services provided by Fresenius Medical Care, as well as the scope of Medicare coverage, are subject to legislative change as a result of deficit reduction and other measures. Deficit reduction measures have resulted in reimbursement rate reductions in the past and may result in further rate reductions in the future. Congress is actively considering proposals to reduce materially the amounts spent under the Medicare and Medicaid programs. Medicare has also recently proposed a new policy restricting coverage for clinical laboratory tests furnished to dialysis patients. A change in Medicare rates or other terms and conditions of Medicare and Medicaid reimbursement could have a material adverse effect on the business, financial position and results of operations of Fresenius Medical Care as would the result of a regulatory proceeding or investigation excluding NMC or one or more of its subsidiaries from participating in the Medicare reimbursement program. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Reimbursement."

25

<PAGE>    50

POTENTIAL LOSS OF IDPN REIMBURSEMENT

As discussed under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Reimbursement -- U.S. -- IDPN," the number of claims by NMC Homecare for reimbursement relating to the administration of Intradialytic Parenteral Nutrition ("IDPN") that have been approved by Medicare has been sharply reduced since late 1993. Under the Medicare Parenteral and Enteral Nutrition ("PEN") program NMC believes that the reduction in IDPN claims paid by Medicare represents an unauthorized coverage policy change. Accordingly, NMC is pursuing various administrative and legal avenues, including legal action for injunctive and declaratory relief and administrative appeals, to address this problem. No assurance can be given that NMC will prevail in pursuing such remedies or that the claims on appeal will be approved for payment.

Medicare claims are processed by private companies under contract with the federal government. In April 1996, the Medicare claims processors issued a new coverage policy, which is effective for services billed on and after July 1, 1996. While the new policy permits continued coverage of PEN therapies, including IDPN therapy, and while the potential impact of the new policy is subject to further analysis, NMC believes that the new policy will make it substantially more difficult to qualify patients for future coverage by, among other things, requiring certain patients to undergo onerous and/or invasive tests in order to qualify for coverage. The new policy also eliminates all

reimbursement for infusion pumps used to administer IDPN therapy. NMC, together
with other interested parties, may seek to effect certain changes in the new
policy, other than with respect to the elimination of reimbursement for infusion
pumps, and NMC has developed changes to its patient qualification procedures in
order to comply with the policy. However, if NMC is unable to effect changes in
the new policy, or, if NMC is unable to change its operating procedures to
conform to changes in the new policy, if physicians and patients fail to accept
the new qualification procedures and/or if patients fail to qualify under such
procedures, the policy could significantly reduce the number of patients
eligible for Medicare coverage of IDPN and other PEN therapies, which would have
a material adverse effect on NMC's financial position and results of operations.
IDPN claims represent substantial accounts receivable of NMC Homecare
(approximately $103 million as of March 31, 1996, with the receivables
increasing at a rate of approximately $6 million per month) and substantially
all of NMC Homecare's operating income in recent quarters. The new policy
eliminates reimbursement for infusion pumps, which may adversely impact revenue
by approximately $11 million on an annualized basis. For purposes of financial
and operational planning, NMC estimates that as much as 50% of NMC's current
patient level may no longer qualify for continued IDPN coverage under the new
policy, which would adversely impact revenues by up to $42 million annually.

     If NMC is unable to collect its IDPN accounts receivable, or if IDPN/PEN
coverage is reduced or eliminated, Fresenius Medical Care's business, financial
position and results of operations could be materially adversely affected. The
use of IDPN by NMC and certain of its billing practices related to IDPN are also
a subject of the OIG Investigation. See "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Reimbursement" and "-- Legal and
Regulatory Proceedings," and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS -- NMC."

     RISKS RELATING TO OBRA 93 DISPUTE

     The Omnibus Budget Reconciliation Act of 1993 ("OBRA 93") amended the
statutory ESRD Medicare Secondary Payor ("MSP") provisions affecting the
coordination of benefits between Medicare and employer health plans in the case
of ESRD patients age 65 and over who are eligible for Medicare and also covered
by an employer health plan ("dual eligible ESRD patients"). The vast majority of
NMC's patients affected by this amendment were retirees eligible for Medicare on
the basis of age who subsequently became eligible for Medicare on the basis of
ESRD and whose employer group health plan had been the supplemental payor to
Medicare. The original implementation of this provision of OBRA 93 by the Health
Care Financing Administration ("HCFA") of HHS, which administers the Medicare
and Medicaid programs, required all employer health plans to recognize a new
18-month coordination of benefits period during which such

                                       26

<PAGE>    51

employer health plans would be the primary payors for dialysis treatment for
such dual eligible ESRD patients. Under that interpretation, primary Medicare
coverage begins only after the 18-month coordination of benefits period, even if
Medicare was the primary payor for an affected retiree before ESRD entitlement
arose. Upon implementation of these OBRA 93 provisions with respect to dual
eligible ESRD patients, NMC adopted a procedure for rebilling private payors for
certain amounts previously billed to Medicare and crediting Medicare with an
overpayment. NMC's treatment of the overpayments relating to implementation of
OBRA 93 is a subject of the OIG Investigation. See "BUSINESS OF FRESENIUS
MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory
Proceedings."

     On April 24, 1995, HCFA reversed its original interpretation of the OBRA 93
provisions by taking the new position that primary Medicare coverage begins
immediately (rather than after an 18-month coordination of benefits period) in
the case of individuals who are already age eligible for Medicare when ESRD
entitlement arises. HCFA proposed that the reversal be effective retroactively
for services provided after August 10, 1993, the effective date of OBRA 93. On
May 5, 1995, NMC filed a complaint in the U.S. District Court for the District
of Columbia seeking to preclude HCFA from enforcing its new policy. NMC moved
for a preliminary injunction to preclude HCFA from enforcing its new policy
retroactively (i.e., to billings for services provided between August 10, 1993
and April 23, 1995), which injunction was granted on June 6, 1995. The
litigation is continuing with respect to NMC's request to enjoin HCFA's new
policy, both retroactively and prospectively, on a permanent basis. Pending the
outcome of the litigation, HCFA's new policy remains effective for services
provided after April 23, 1995. See "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

     HCFA's initial interpretation of the MSP provisions of OBRA 93 had a
positive impact on DSD's revenues because during the 18-month coordination of
benefits period, the employer health plan was responsible for payment at its
negotiated rate or, in the absence of such a rate, at NMC's usual and customary
rate (which is generally in excess of the Medicare rate). If HCFA's retroactive
implementation of its revised interpretation of OBRA 93 is upheld, NMC may be
required to refund the payments received from employer health plans for services
provided after August 10, 1993 under HCFA's original implementation and to
rebill Medicare for the same services, which would result in a net loss to NMC
of approximately $120 million as of December 31, 1995. As of July 1, 1995, NMC
ceased to recognize the incremental revenue realized under the original
implementation, but continued to bill employer health plans as primary payors
until December 31, 1995. If HCFA's revised interpretation is upheld, NMC's and
Fresenius Medical Care's business, financial position and results of operations
would be materially adversely affected, particularly if the revised
interpretation is applied retroactively. See "MANAGEMENT'S DISCUSSION AND
ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC" and "BUSINESS

OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters."

RISKS RELATING TO NON-GOVERNMENTAL PAYORS

Fresenius Medical Care derives a significant portion of its revenues from reimbursement provided by non-governmental third-party payors in the U.S. A substantial portion of third-party health insurance is now furnished through some form of managed care, including health maintenance organizations ("HMOs"). Managed care plans are increasing their market share, and this trend may accelerate as a result of the consolidation in the health care industry as well as the interest of members of Congress and the executive branch in ways to increase the number of Medicare and Medicaid beneficiaries served through managed care plans.

Reimbursement by non-governmental payors is generally at higher rates than reimbursement by governmental payors such as Medicare. However, managed care plans are becoming more aggressive in selectively contracting with a smaller number of health care providers willing to furnish services for lower rates and subject themselves to a variety of service restrictions. For example, managed care plans and traditional indemnity third-party payors are increasingly demanding alternative fee structures, such as capitation, pursuant to which a health care provider receives a fixed payment per month per enrollee and bears the risk of loss if the costs of treating such enrollee exceed the capitation payment. These market-driven changes are

27

<PAGE>   52

creating significant downward pressure on the reimbursement NMC receives for services and products, particularly at NMC Homecare.

As managed care programs increase market share and gain greater bargaining power vis-a-vis health care providers, there will be increasing pressure to reduce the amounts paid for services and products furnished by Fresenius Medical Care. These trends will be accelerated if future changes to the Medicare ESRD program require private payors to assume a greater percentage of the total cost of care given to dialysis patients over the term of their illness. Although Fresenius Medical Care intends to seek to increase the portion of its revenues attributable to non-governmental private payors, the historically higher rates of reimbursement paid by non-governmental payors may not be maintained at such levels. For example, with respect to homecare services, managed care programs are currently providing levels of reimbursement below those of Medicare. If substantially more patients of Fresenius Medical Care join managed care plans or such plans reduce reimbursements, Fresenius Medical Care's business, financial position and results of operations could be materially adversely affected. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings" and "-- Changes in the Health Care Industry," and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

OTHER RISKS

EFFECTS OF INDEBTEDNESS

After the Reorganization and as a result of the incurrence of debt under a new credit agreement to be entered into by NMC (the "NMC Credit Agreement") and the making of the Distribution Payment, NMC (and, therefore, Fresenius Medical Care, on a consolidated basis) will have substantial debt. Assuming the Reorganization had been consummated as of March 31, 1996, on a pro forma basis, Fresenius Medical Care would have had consolidated total debt of approximately $2.224 billion and consolidated total shareholders' equity of $1.695 billion as of such date, resulting in a consolidated ratio of total debt to equity of approximately 1.31 to 1. On a pro forma basis, assuming the Reorganization had been consummated as of January 1, 1995, Fresenius Medical Care would have had coverage ratios of earnings before interest, taxes, depreciation and amortization ("EBITDA") to interest expense of approximately 2.98 to 1 for the year ended December 31, 1995 and 3.17 to 1 for the three months ended March 31, 1996. Included are $41,693 and $10,268, respectively, of depreciation and amortization classified as cost of sales and selling, general and administrative expenses in the Fresenius Worldwide Dialysis Combined Financial Statements. See "FRESENIUS MEDICAL CARE AG UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION."

NMC will have significant interest expense and principal repayment obligations under the NMC Credit Agreement. While management of Fresenius Medical Care believes that such obligations will be paid as they become due, if NMC's operating cash flow is not sufficient to satisfy its cash requirements, including debt service, Fresenius Medical Care may be required to supplement NMC's operating cash flow, or Fresenius Medical Care and/or NMC may be required to effect capital spending reductions or limit or defer acquisition and expansion plans. There can be no assurance that Fresenius Medical Care would supplement NMC's cash flow or would do so in an amount sufficient to satisfy the cash requirements of NMC.

The NMC Credit Agreement is expected to include certain covenants which, among other things, may restrict or have the effect of restricting the ability of NMC and its subsidiaries to dispose of assets, incur debt, pay dividends, create liens or make capital expenditures, investments or acquisitions, and which may otherwise limit activities of NMC and its subsidiaries. The NMC Credit Agreement also is expected to include certain covenants that will require NMC to maintain certain financial ratios. The breach of any of the covenants could result in a default under the NMC Credit Agreement. See "FINANCING." As described under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Agreements", NMC has agreed

to deliver to the United States a letter of credit in the principal amount of
$150 million in connection with the OIG investigation.

In connection with the NMC Credit Agreement, Grace Chemicals has agreed to
guarantee Facility 3 (which provides for a maximum of $500 million of available
credit) and Facility 2 up to a maximum of

28

<PAGE>   53

$450 million. The NMC Credit Agreement is expected to provide that these
guarantees will be released as to $800 million upon the occurrence of certain
events after 45 days, but within 60 days, following the Effective Date,
including (a) the receipt of an unconditional joint and several guarantee from
Fresenius Medical Care and certain of its subsidiaries for the full amount of
the NMC Credit Facility; or (b) the receipt of a letter of credit or other
acceptable financial accommodation for the account of Grace Chemicals or
Fresenius Medical Care in form and substance satisfactory to the Lenders; or (c)
a prepayment in certain specified amounts under the NMC Credit Facility. If such
guarantees are not released within 60 days following the Effective Date, demand
for payment will be made on Grace Chemicals under such guarantees as to $800
million. It is the intention of Fresenius Medical Care to provide the
unconditional joint and several guarantees referred to in the preceding sentence
in a manner so as to cause the release of Grace Chemicals' guarantees as to $800
million not before 46 days, but on or prior to 50 days, following the Effective
Date. However, no assurance can be given that such guarantees will be provided
or that either or both of Grace Chemicals' guarantees will be released. In the
event that Fresenius Medical Care does not provide such guarantees or otherwise
effect the release of the Grace Chemicals guarantees as to $800 million, Grace
Chemicals would be required to provide the letters of credit or repay the
amounts specified in the NMC Credit Agreement and, thereafter, be subrogated to
the rights of Lenders with respect to such repaid amounts after the demand
under the respective facilities have been repaid in full; and Grace Chemicals
has undertaken to the Lenders to maintain unused available credit in an amount
to be determined while the Grace Chemicals guarantees are outstanding in order
to facilitate such actions. In connection with Grace Chemicals' agreement to
extend guarantees under the NMC Credit Agreement, Fresenius Medical Care and
Grace Chemicals intend to enter into an agreement to induce Fresenius Medical
Care to cause such guarantees to be released as to $800 million not later than
the 50th day following the Effective Date. The balance of the Grace Chemicals
guarantees under Facility 2 will be released upon NMC (or Fresenius Medical
Care, if Fresenius Medical Care guarantees the NMC Credit Facility), on a
consolidated basis, achieving a ratio of senior debt to EBITDA of equal to or
less than 3.5. See "FINANCING -- NMC Credit Agreement."

CERTAIN U.S. TAX CONSIDERATIONS RELATED TO THE DISTRIBUTION

Prior to the Distribution, the stock of NMC will be distributed by Grace
Chemicals to Grace (the "NMC Distribution"). If the NMC Distribution were not to
qualify as a tax-free spin-off under Section 355 of the Internal Revenue Code of
1986, as amended (the "Code"), Grace Chemicals would recognize taxable gain upon
consummation of the Distribution in an amount equal to the excess of the fair
market value of the NMC stock over Grace Chemicals' tax basis in such stock
immediately prior to the NMC Distribution. This tax would be payable by Grace
Chemicals. If the Distribution were not to qualify as a tax-free spin-off under
Section 355 of the Code, then, in general, Grace would recognize taxable gain in
an amount equal to the excess of the fair market value of the New Grace Common
Stock over Grace's tax basis in the New Grace Common Stock immediately prior to
the Distribution. This tax would be payable by FNMC. Although, pursuant to the
Grace Tax Sharing and Indemnification Agreement to be entered into upon the
closing of the Reorganization, Grace Chemicals will, under certain
circumstances, indemnify FNMC for such tax liability, there can be no assurance
that Grace Chemicals' indemnification obligation will be applicable or that
Grace Chemicals will be able to satisfy any such obligation. See "THE
REORGANIZATION -- The Grace Tax Sharing and Indemnification Agreement."

Additionally, if the Distribution were not to qualify as a tax-free
spin-off, each holder of Grace Common Stock as of the Time of Distribution would
be treated as having received a taxable dividend equal to the fair market value
of the New Grace Common Stock received, if and to the extent that Grace (as
expected) has sufficient current and accumulated earnings and profits as of the
end of the taxable year in which the Distribution takes place. If and to the
extent that the fair market value of the New Grace Common Stock exceeds Grace's
earnings and profits as so determined, each such shareholder would first reduce
such shareholder's tax basis in such shareholder's Grace Common Stock (but not
below zero) to the extent that the value of the New Grace Common Stock received
exceeds such shareholder's pro rata share of such earnings and profits, and then
recognize gain from the Distribution to the extent that the value of the New
Grace Common Stock received exceeds both such shareholder's pro rata share of
earnings and profits and tax basis in such shareholder's Grace Common Stock. See
"CERTAIN FEDERAL INCOME TAX CONSE-

29

<PAGE>   54

QUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS -- Consequences of
the Distribution."

CERTAIN LIABILITIES FOR OBLIGATIONS OF GRACE CHEMICALS

As of March 31, 1996, Grace was the guarantor of approximately $2 billion
of indebtedness of Grace Chemicals. Although Grace Chemicals has agreed to seek
releases from such guarantees, such releases may not be obtained and the receipt
of such releases is not a condition to the consummation of the Reorganization.

In addition, Grace Chemicals has had, and is expected to continue to have, significant liabilities arising out of asbestos-related litigation and other claims. If Grace Chemicals were unable to (or otherwise did not) satisfy such liabilities, an unpaid claimant of Grace Chemicals might seek to assert such liabilities against Fresenius Medical Care, FNMC and/or NMC. Although Grace Chemicals has agreed to indemnify Fresenius Medical Care, FNMC and NMC against such guarantees and asbestos claims, there can be no assurance that Grace Chemicals will be able to fulfill its indemnity obligation.

FRAUDULENT TRANSFER AND RELATED CONSIDERATIONS

It is a condition to the Grace Merger that the NMC Distribution shall have occurred. Under applicable law, the NMC Distribution would constitute a "fraudulent transfer" if (a) New Grace or Grace Chemicals is insolvent, (b) the effect of the NMC Distribution would render New Grace or Grace Chemicals insolvent, (c) the NMC Distribution would leave New Grace or Grace Chemicals engaged in a business or transaction for which its remaining assets constituted unreasonably small capital, or (d) New Grace or Grace Chemicals intended to incur, or believed it would incur, debts beyond its ability to pay as such debts mature. Generally, an entity is considered insolvent if it is unable to pay its debts as they come due or if the fair value of its assets is less than the amount of its actual and expected liabilities. In addition, the NMC Distribution may be made only out of surplus (net assets minus capital) and not out of capital.

Grace believes that, based on the factors considered in connection with the NMC Distribution, the NMC Distribution will not be a fraudulent transfer and will be made out of surplus in accordance with applicable law. There is no certainty, however, that a court would reach the same conclusions in determining that New Grace and Grace Chemicals have satisfied the applicable standards. In this regard, it should be noted that Grace Chemicals has had, and is expected to continue to have, significant liabilities arising out of asbestos-related litigation and claims. For more information regarding such liabilities, see Item 3 of Grace's 1995 Annual Report on Form 10-K and note 2 to the consolidated financial statements included in such Report. See also "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Grace Board."

If, in a lawsuit filed by an unpaid creditor or a representative of unpaid creditors or a trustee in bankruptcy, a court were to find that, at the time the NMC Distribution was consummated or after giving effect thereto, either New Grace or Grace Chemicals, as the case may be, (a) was insolvent, (b) was rendered insolvent by reason of the NMC Distribution, (c) was engaged in a business or transaction for which its remaining assets constituted unreasonably small capital, or (d) intended to incur, or believed it would incur, debts beyond its ability to pay as such debts matured, then such court might require FNMC or NMC to fund certain liabilities of New Grace or Grace Chemicals, as the case may be, for the benefit of New Grace's or Grace Chemicals' creditors. The same consequences would also apply were a court to find that the NMC Distribution was not made out of the surplus of Grace Chemicals.

It is a condition to the Reorganization that the Distribution and the Distribution Payment shall have occurred. Under applicable law, the Distribution and the Distribution Payment could be challenged if either were a fraudulent conveyance or were not made out of surplus. Grace believes that, based on the factors considered in connection with the Reorganization, each of the Distribution and the Distribution Payment will not be a fraudulent transfer and will be made out of surplus in accordance with applicable law. There is no certainty, however, that a court would reach the same conclusions in determining that Grace or NMC have satisfied the applicable standards. In this regard, it should be noted that Grace or NMC may have significant liabilities relating to regulatory matters. For more information regarding such potential liabilities, see

                                        30
<PAGE>   55

"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

Under the OIG Agreements, the United States has granted certain releases with respect to possible fraudulent transfer claims to Grace Chemicals, NMC, Fresenius Medical Care and others. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Agreements."

CONTROL BY FRESENIUS AG; ANTI-TAKEOVER EFFECT

Fresenius AG will hold at least 50.3% of Fresenius Medical Care's voting securities immediately following the Reorganization. Accordingly, Fresenius AG will possess the ability, through its voting power and its power to elect the members of the Supervisory Board (Aufsichtsrat) of Fresenius Medical Care (the "FMC Supervisory Board"), to control many of the actions of Fresenius Medical Care and to approve many actions requiring the vote of Fresenius Medical Care's shareholders. This controlling ownership has the effect of, among other things, preventing a change in control of, or the declaration or payment of dividends by, Fresenius Medical Care without the agreement of Fresenius AG. In addition, ultimate control of Fresenius Medical Care would pass upon a change of control of Fresenius AG without the requirement of a vote of, or a premium for, Fresenius Medical Care shareholders. See "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius AG" with regard to control of Fresenius AG.

Fresenius AG has agreed that one-third of the members of the FMC

Supervisory Board (but not less than two such members) will be persons who do not have any substantial business or professional relationship with Fresenius AG or Fresenius Medical Care, or any of their affiliates. Fresenius AG has agreed to cause Fresenius Medical Care to provide certain protections for minority shareholders in certain provisions of Fresenius Medical Care's Articles of Association and in the Pooling Agreement. These protections include FMC Supervisory Board approval for certain transactions between Fresenius AG and Fresenius Medical Care, standstill protections for a period of three years following the Reorganization and other restrictions on the disposition of FMC Ordinary Shares by Fresenius AG. The Pooling Agreement provides that it will be enforceable in the state and federal courts in New York. See "DESCRIPTION OF THE POOLING AGREEMENT." However, there can be no assurance that these protections will be adequate or that German courts, applying German conflicts of law rules, will enforce these provisions or New York judgments obtained with respect to these provisions. See "DESCRIPTION OF THE POOLING AGREEMENT" and "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."

NO CURRENT MARKET

There is currently no public market for the ADSs, the FMC Ordinary Shares or the New Preferred Shares. While Fresenius Medical Care will apply to list the ADSs on the NYSE and the FMC Ordinary Shares on the Frankfurt Stock Exchange and, after the Reorganization, FMC intends to seek to list the New Preferred Shares on a national stock exchange, there can be no assurance that applicable listing criteria will be satisfied, as to the volume of trading and liquidity that will develop or as to the prices at which the FMC Ordinary Shares, the ADSs or the New Preferred Shares will trade after the Reorganization. Moreover, until the ADSs, FMC Ordinary Shares and the New Preferred Shares are fully distributed and orderly markets develop, the prices at which trading in such securities occurs may fluctuate significantly.

SPECIAL DIVIDEND

The New Preferred Shares are not entitled to receive any dividend payments from FNMC other than the Special Dividend, the accrual of which will be contingent upon the aggregate amount of adjusted cash flow generated by Fresenius Medical Care during the period from January 1, 1997 to December 31, 2001. See "DESCRIPTION OF NEW PREFERRED SHARES" for a discussion of such requirements. FNMC also

31

<PAGE>    56

must have adequate surplus in order for the payment of the Special Dividend to be lawful under New York corporate law. Fresenius Medical Care's ability to generate cash flow is subject to many factors, including the risk factors set forth herein. There can be no assurance that Fresenius Medical Care will generate sufficient cash flow to require accrual of the Special Dividend on the New Preferred Shares or that FNMC will have adequate surplus for the payment of the Special Dividend. The terms of the New Preferred Shares do not obligate Fresenius Medical Care to make a capital contribution to FNMC in order to provide FNMC with adequate surplus to make such payments. The failure or inability of FNMC to pay the Special Dividend does not prevent Fresenius Medical Care from paying dividends on FMC Ordinary Shares. However, if the Special Dividend is payable but not declared by the FNMC Board, or if any installment of the Special Dividend is not paid on the applicable Payment Date, FNMC may not pay dividends on FNMC Common Stock, which, in turn, might limit Fresenius Medical Care's ability to pay dividends on the FMC Ordinary Shares. The amount of the Special Dividend would be reduced by certain amounts payable in connection with the matters underlying the OIG Investigation. In addition, the Special Dividend will only begin to accrue after payment of interest on amounts outstanding under the NMC Credit Agreement and other indebtedness and will be subject to limitation by covenants regarding restricted payments contained in such debt. Therefore, such indebtedness will have a negative impact on the likelihood and size of any payment of the Special Dividend. See "DESCRIPTION OF NEW PREFERRED SHARES."

VALUE OF NEW PREFERRED SHARES

The New Preferred Shares are not entitled to receive any dividend payments other than the Special Dividend, the accrual of which will be dependent on Fresenius Medical Care having an adjusted operating performance from January 1, 1997 through December 31, 2001 in excess of an established target amount for such period. In addition, certain expenses incurred in connection with regulatory investigations are included in determining such operating performance levels. Aside from the Special Dividend, the New Preferred Shares have only a nominal liquidation preference. Therefore, the Special Dividend may never be paid and the New Preferred Shares may have minimal or no value. In addition, the market price of the New Preferred Shares can be expected to fluctuate with changes in the market and economic conditions, the financial condition and prospects of FNMC and Fresenius Medical Care and other factors that generally affect the market prices of securities.

ORGANIZATION UNDER GERMAN LAW

Fresenius Medical Care will be organized under German law. The preferences, rights and privileges of shareholders under German law, as well as the rights of minority shareholders and other substantive provisions, differ materially from those that shareholders of Grace and Fresenius USA currently possess under New York and Massachusetts law, respectively. See "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."

Fresenius Medical Care will be a "foreign private issuer," as defined in the Commission's rules, and consequently will not be subject to certain

disclosure requirements applicable to domestic issuers. Fresenius Medical Care will not be subject to the Commission's proxy rules or the Commission's rules requiring the filing of quarterly reports, and annual reports filed by Fresenius Medical Care with the Commission will contain less detailed disclosure than reports of domestic issuers regarding such matters as management, executive compensation and outstanding options, beneficial ownership of Fresenius Medical Care's securities and certain related party transactions. Also, officers, directors and 10% beneficial owners of Fresenius Medical Care's equity securities will not be subject to the reporting requirements and short-swing profit recovery provisions of Section 16 of the Exchange Act. However, Fresenius Medical Care has agreed that as long as the Pooling Agreement is in effect, Fresenius Medical Care will file quarterly reports under cover of Form 6-K, will prepare its annual and quarterly financial statements in accordance with US GAAP and will file with the Commission and provide to shareholders (including holders of ADRs) certain materials with respect to its annual and special meetings of shareholders. See "DESCRIPTION OF THE POOLING AGREEMENT -- Listing of American Depository Shares; SEC Filings" and "-- Term."

<div align="center">32</div>

&lt;PAGE&gt;    57

<div align="center">THE SPECIAL MEETINGS</div>

GENERAL

    This Joint Proxy Statement-Prospectus is being furnished to holders of Grace Common Stock and Grace Preferred Stock in connection with the solicitation of proxies by the Grace Board for use at the Grace Special Meeting, to be held on September 16, 1996. The purposes of the Grace Special Meeting are to consider and vote upon a proposal to approve and adopt the Reorganization Agreement and the transactions contemplated thereby (including the Grace Merger and the Distribution), to approve and adopt the Grace Amendment and to transact such other business as may properly come before the Grace Special Meeting.

    This Joint Proxy Statement-Prospectus is being furnished to holders of Fresenius USA Common Stock in connection with the solicitation of proxies by the Fresenius USA Board for use at the Fresenius USA Special Meeting to be held on September 16, 1996. The purposes of the Fresenius USA Special Meeting are to consider and vote upon a proposal to approve and adopt the Reorganization Agreement and the transactions contemplated thereby, including, without limitation, the Fresenius USA Merger, to approve and adopt the Fresenius USA Plan Amendment and to transact such other business as may properly come before the Fresenius USA Special Meeting.

    Each copy of this Joint Proxy Statement-Prospectus mailed to shareholders of Grace is accompanied by a form of proxy for use at the Grace Special Meeting, and has attached as Annex A the New Grace Prospectus. Each copy of this Joint Proxy Statement-Prospectus mailed to stockholders of Fresenius USA is accompanied by a form of proxy for use at the Fresenius USA Special Meeting.

    This Joint Proxy Statement-Prospectus is also being furnished to holders of Grace Common Stock and Fresenius USA Common Stock as a Prospectus of Fresenius Medical Care in connection with the issuance of FMC Ordinary Shares represented by ADSs in connection with the Reorganization and to holders of Grace Common Stock as a Prospectus of Grace in connection with the issuance of the shares of the New Preferred Shares by Grace in connection with the Recapitalization. See "AVAILABLE INFORMATION."

DATE, PLACE AND TIME

    The Grace Special Meeting will be held at Grace's headquarters at One Town Center Road, Boca Raton, Florida, on September 16, 1996, at 10:00 a.m. local time.

    The Fresenius USA Special Meeting will be held at the 52nd floor conference center of O'Melveny & Myers LLP, 153 East 53rd Street, New York, New York, 10022, on September 16, 1996, at 10:00 a.m. local time.

RECORD DATES

    GRACE

    The Grace Board has fixed the close of business on July 29, 1996 as the Grace Record Date for the determination of the holders of Grace Common Stock and Grace Preferred Stock entitled to receive notice of and to vote at the Grace Special Meeting.

    FRESENIUS USA

    The Fresenius USA Board has fixed the close of business on July 29, 1996 as the Fresenius USA Record Date for the determination of the holders of Fresenius USA Common Stock entitled to receive notice of and to vote at the Fresenius USA Special Meeting.

<div align="center">33</div>

&lt;PAGE&gt;    58

VOTES REQUIRED

    GRACE

    As of July 15, 1996, the following shares of the following classes of Grace's capital stock were outstanding and entitled to the following votes:

```
<TABLE>
<CAPTION>
                                                          SHARES        VOTES PER
                       CLASS                            OUTSTANDING       SHARE
---------------------------------------------------     -----------     ---------
<S>                                                         <C>            <C>
  Grace 6% Preferred Stock............................      36,460          160
  Grace Class A Preferred Stock.......................      16,256           16
  Grace Class B Preferred Stock.......................      21,577           16
  Grace Common Stock..................................  92,001,176            1
</TABLE>
```

        In addition to the classes of stock listed above, Grace has authorized
Class C Preferred Stock. There currently are no shares of Grace Class C
Preferred Stock outstanding.

        Votes Required.  Holders of Grace Common Stock and Grace Preferred Stock
will vote together as one class. Approval of the Reorganization Agreement and
the transactions contemplated thereby requires the affirmative vote of
two-thirds (and, in the case of the Grace Amendment, a majority) of the total
voting power of Grace's outstanding capital stock. As a result, failing to vote
or abstaining on any such proposal has the same effect as voting against the
proposal.

        Beneficial Ownership of Management.  At June 15, 1996, Grace's directors
and executive officers and their affiliates beneficially owned in the aggregate
Grace Common Stock and Grace Preferred Stock representing less than 1% of the
total voting power of all of Grace's stock entitled to vote at the Grace Special
Meeting. Each of the directors and executive officers of Grace is expected to
vote in favor of the proposals to be voted at the Grace Special Meeting.

        The presence in person or by proxy at the Grace Special Meeting of the
holders of a majority of the total voting power of Grace's outstanding capital
stock is necessary to constitute a quorum for the transaction of business. Under
the rules of the NYSE, brokers who hold shares in street name for customers will
not have the authority to vote on the Reorganization unless they receive
specific instructions from beneficial owners. Under the NYBCL, such a broker
non-vote will not be counted as present for purposes of a quorum and will
otherwise have the same effect as a vote against the Reorganization.

        At July 23, 1996, the directors and executive officers of Fresenius USA
beneficially owned 360 shares of Grace Common Stock and no shares of Grace
Preferred Stock.

    FRESENIUS USA

        At the Fresenius USA Record Date, there were 26,374,218 shares of Fresenius
USA Common Stock outstanding. Each share of Fresenius USA Common Stock
outstanding on the Fresenius USA Record Date is entitled to one vote upon each
matter properly submitted at the Fresenius USA Special Meeting.

        The affirmative vote of the holders of record of at least two-thirds of the
outstanding shares of Fresenius USA Common Stock entitled to vote at the
Fresenius USA Special Meeting is necessary to approve the Reorganization
Agreement and the transactions contemplated thereby. The affirmative vote of the
holders of record of a majority of the shares of Fresenius USA Common Stock
entitled to vote at the Fresenius USA Special Meeting is necessary to approve
the Fresenius USA Plan Amendment.

        The presence in person or by proxy at the Fresenius USA Special Meeting of
holders of a majority of the outstanding shares of Fresenius USA Common Stock is
necessary to constitute a quorum for the transaction of business. Abstentions
will be counted as present for the purposes of determining whether a quorum is
present. Since the Reorganization requires the approval of two-thirds of the
outstanding shares of Fresenius USA Common Stock, and the Fresenius USA Plan
Amendment requires the approval of a majority of the outstanding shares of
Fresenius USA Common Stock, abstentions will have the same effect as negative
votes. Under the rules of the AMEX, brokers who hold shares in street name for
customers will not have the

                                      34

    <PAGE>   59

authority to vote on the Reorganization or the Fresenius USA Plan Amendment
unless they receive specific instructions from beneficial owners. Such non-votes
will have the same effect as negative votes.

        Fresenius AG is currently the beneficial owner of 18,438,545 shares of
Fresenius USA Common Stock including 3,129,883 shares of Fresenius USA Common
Stock acquired upon conversion of the Fresenius USA Series F Preferred Stock and
1,515,221 shares of Fresenius USA Common Stock acquired upon the exercise of
certain warrants to purchase Fresenius USA Common Stock. Fresenius AG has
informed Fresenius USA of its intention to vote all of its 18,438,545 shares of
Fresenius USA Common Stock in favor of the Reorganization Agreement and the
transactions contemplated thereby and the Fresenius USA Plan Amendment. Such
shares represent approximately 70.3% of the total shares entitled to vote on
such matters at the Fresenius USA Special Meeting. Accordingly, such affirmative
vote by Fresenius AG will result in the approval of the Reorganization and the
Fresenius USA Plan Amendment. In addition, directors and executive officers of
Fresenius USA who beneficially owned a total of 262,166 shares of Fresenius USA
Common Stock at July 23, 1996 (excluding shares which may be acquired upon
exercise of employee or director stock options), or approximately 1% of the
Fresenius USA Common Stock then outstanding, are expected to vote such shares in
favor of the Reorganization and the Fresenius USA Plan Amendment. See "SECURITY

OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of
Fresenius USA."

At July 15, 1996, the directors and executive officers of Grace owned no
shares of Fresenius USA Common Stock.

VOTING AND REVOCATION OF PROXIES

Shares of Grace Common Stock, Grace Preferred Stock and Fresenius USA
Common Stock represented by a proxy properly signed and received at or prior to
the appropriate Special Meeting, unless subsequently revoked, will be voted in
accordance with the instructions thereon. IF A PROXY IS SIGNED AND RETURNED
WITHOUT INDICATING ANY VOTING INSTRUCTIONS, SHARES OF GRACE COMMON STOCK AND
GRACE PREFERRED STOCK REPRESENTED BY THE PROXY WILL BE VOTED FOR THE PROPOSAL TO
ADOPT AND APPROVE THE REORGANIZATION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED
THEREBY, AND FOR THE PROPOSAL TO APPROVE AND ADOPT THE GRACE AMENDMENT, AND
SHARES OF FRESENIUS USA COMMON STOCK REPRESENTED BY THE PROXY WILL BE VOTED FOR
THE PROPOSAL TO APPROVE AND ADOPT THE REORGANIZATION AGREEMENT AND THE
TRANSACTIONS CONTEMPLATED THEREBY, AND FOR THE PROPOSAL TO APPROVE AND ADOPT THE
FRESENIUS USA PLAN AMENDMENT. Both Grace and Fresenius USA proxy holders may, in
their discretion, vote shares to adjourn the Grace Special Meeting or the
Fresenius USA Special Meeting, respectively, to solicit additional proxies in
favor of such proposals. However, shares of Grace Common Stock, Grace Preferred
Stock and Fresenius USA Common Stock with respect to which a proxy is signed and
returned indicating a vote against any proposal will not be so voted to adjourn.
Any proxy given pursuant to this solicitation may be revoked by the person
giving it at any time before the proxy is voted by the filing of an instrument
revoking it or of a duly executed proxy bearing a later date with the Secretary
of Grace, for Grace shareholders, or with the Clerk of Fresenius USA, for
Fresenius USA stockholders, prior to or at the appropriate Special Meeting, or
by voting in person at the appropriate Special Meeting. All written notices of
revocation and other communications with respect to revocation of Grace proxies
should be addressed to W. R. Grace & Co., One Town Center Road, Boca Raton,
Florida 33486-1010, Attention: Secretary. All written notices of revocation and
other communications with respect to revocation of Fresenius USA proxies should
be addressed to Fresenius USA, Inc., 2637 Shadelands Drive, Walnut Creek,
California 94598, Attention: Clerk. Attendance at a Special Meeting will not in
and of itself constitute a revocation of a proxy.

The Grace Board and the Fresenius USA Board are not currently aware of any
business to be acted upon at the Special Meeting of their respective
shareholders other than as described herein. If, however, other matters are
properly brought before either Special Meeting, the persons appointed as proxies
will have discretion to vote or act thereon according to their best judgment.

Neither shareholders of Grace nor stockholders of Fresenius USA will be
entitled to present any matters for consideration at either Special Meeting.

                                    35

<PAGE>    60

SOLICITATION OF PROXIES

In addition to solicitation by mail, directors, officers and employees of
Grace and Fresenius USA, who will not be specifically compensated for such
services, may solicit proxies from the shareholders of Grace and Fresenius USA,
respectively, personally or by telephone, telecopy or telegram or other forms of
communication. Brokers, nominees, fiduciaries and other custodians will be
requested to forward soliciting materials to beneficial owners and will be
reimbursed for their reasonable expenses incurred in sending proxy materials to
beneficial owners.

In addition, Grace has retained D. F. King & Co. to assist in the
solicitation of proxies. The fees to be paid to such firm for such services by
Grace are not expected to exceed $15,000, plus reasonable out-of-pocket costs
and expenses. Services also will be provided to Fresenius USA by American Stock
Transfer and Trust Company in soliciting banks and brokers holding stock in
their names or in custody or in the names of nominees for others. Fresenius USA
does not anticipate paying any additional fee for such services. Grace and
Fresenius USA each will bear its own expenses in connection with the
solicitation of proxies for its Special Meeting, except that, if the
Reorganization is consummated, Fresenius Medical Care will pay the costs
incurred in printing this Joint Proxy Statement-Prospectus.

GRACE AMENDMENT

At the Grace Meeting, Grace shareholders will consider and vote upon a
proposal (proposal 2 in the Grace Notice of Special Meeting of Shareholders
mailed herewith) to adopt the Grace Amendment which will establish authority for
the issuance of the New Preferred Shares and will change the legal name of Grace
to "Fresenius National Medical Care, Inc." Approval of such Grace Amendment is
being sought to establish the New Preferred Shares, and, therefore, indirectly,
to consummate the Recapitalization, and to permit Grace's historical name to
continue to be used by Grace's chemicals businesses. However, in the event that
the Grace Amendment is not approved at the Grace Meeting, the sequence of the
transactions comprising the Reorganization and/or certain immaterial terms of
the New Preferred Shares may be changed so that the Reorganization may be
consummated without effecting the Grace Amendment. For information with respect
to the New Preferred Shares, see "DESCRIPTION OF NEW PREFERRED SHARES." The
Grace Amendment is set forth in Appendix B hereto.

                                    36

<PAGE>    61

BACKGROUND AND REASONS

BACKGROUND OF THE REORGANIZATION; REASONS FOR THE RECOMMENDATION OF THE GRACE
BOARD

On May 4, 1995, Mr. Albert J. Costello, the President and Chief Executive
Officer of Grace, was advised by Dr. Constantine L. Hampers, the Chief Executive
Officer of NMC, that, in order to solve certain management issues (such as the
desire for greater independence by NMC management, and NMC management's concern
that, as part of a diversified conglomerate, NMC's abilities to achieve its
potential could be constrained) at NMC, Grace should undertake a 100% spin-off
or sale of NMC and offered that NMC management would be willing to buy NMC for
$3.5 billion if a sale were to be considered. Grace management, together with
its financial and legal advisors, evaluated Dr. Hampers' proposals in light of
other alternatives available with respect to NMC.

On June 14, 1995, the Grace Board met to consider Grace's options regarding
NMC. Following presentations by Grace's management and its financial and legal
advisors, the Grace Board authorized management to proceed with a plan pursuant
to which Grace would spin off NMC to Grace shareholders on a
one-share-for-one-share basis. In connection with its review and determination
that the spin-off of NMC was the best alternative for Grace and its
shareholders, the Grace Board considered, among other things, a proposal by
Vivra Incorporated ("Vivra") that NMC be merged with Vivra in a stock-for-stock
transaction in connection with a proposed NMC spin-off. Vivra proposed that such
merger would offer an unspecified premium to Vivra shareholders over the current
market price and would result in certain operational synergies. The Grace Board
had reservations about the achievability of the operational synergies Vivra
suggested, given Vivra's relatively small size. Moreover, the Grace Board felt
that the proposal contained contingencies and uncertainties not present in a
pure spin-off, and considered that Vivra itself had recognized that the bulk of
the value created through the Vivra proposal would be through the spin-off, and
not through the merger with Vivra. Since the Vivra proposal would add, at best,
a marginal benefit to the spin-off transaction, the Grace Board felt that it
would not be prudent to jeopardize the spin-off to pursue that possible marginal
benefit. In addition, the Grace Board considered that NMC would not be precluded
from pursuing any synergistic transactions, such as a merger with Vivra, after
the spin-off. The Grace Board took into account that Grace's financial advisors
had made discrete solicitations of interest in NMC and that, despite such
solicitations and the publicized nature of the transaction, no third party other
than Vivra had made a proposal for NMC.

During the summer and early fall of 1995, Grace management, together with
Grace's financial and legal advisors, took steps toward the consummation of the
spin-off. On October 17, 1995, NMC received five subpoenas from the OIG, the
United States Attorney's Office for the District of Massachusetts and others, as
discussed herein under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and
Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation." On
October 18, 1995, Grace announced that, in light of the subpoenas, completion of
the previously announced spin-off of NMC was expected to occur in the first
quarter of 1996, rather than in the fourth quarter of 1995.

In the fall of 1995, representatives of Fresenius AG notified
representatives of Grace that Fresenius AG was interested in pursuing a
transaction in which NMC would be combined with Fresenius Worldwide Dialysis and
were advised by Grace representatives that, as a result of the delay in the
proposed spin-off, Grace might be receptive to alternatives to the previously
announced spin-off. On October 20, 1995, Grace and Fresenius AG entered into a
confidentiality agreement (which included standstill provisions) and began to
exchange certain information in connection with their evaluation of a
transaction. More advanced discussions respecting a possible transaction began
in late November 1995. At the onset of such discussions, Grace informed
Fresenius AG that its primary objective was to maximize the value of NMC for the
benefit of the Grace shareholders, and that it also had a strong preference for
a transaction structure in which (i) Grace could separate its non-health care
businesses from NMC in a tax-free spin-off, simultaneously combining NMC with
another dialysis business through a merger, (ii) there would be a substantial
tax-free distribution of cash (or assumption of debt) for the benefit of Grace
Chemicals and (iii) NMC would be responsible for all of its liabilities,
including any regulatory liabilities, Grace Chemicals would be responsible only
for non-health care liabilities, and each party would indemnify the other with
respect to its respective liabilities. Fresenius AG indicated that, subject to
its completion of due diligence, it was willing to pursue a transaction
structured in this manner. Discussions with Fresenius AG continued through the
remainder of 1995 and January 1996.

37

<PAGE>   62

By mid-January 1996, Fresenius AG informed Grace that its preliminary due
diligence investigation had been completed and asked that both parties focus
their efforts in an attempt to reach closure with respect to open issues. Grace
management determined that discussions with respect to a transaction with
Fresenius AG had significantly advanced and could likely be reduced to
definitive agreements. Therefore, on January 13, 1996, Grace and Fresenius AG
agreed that, until February 4, 1996, Grace would negotiate exclusively with
Fresenius AG with a view toward entering into definitive agreements respecting a
transaction along the lines of Grace's preferred structure, provided that if any
third party submitted a proposal to Grace, Grace would be free to consider and
evaluate such proposal (including by way of discussions with such third party
and its representatives). If Grace management believed that such proposal would
reasonably be expected to be more attractive to Grace and its shareholders,
Grace agreed to offer Fresenius AG the opportunity to improve its proposal
reasonably promptly to be satisfactory to Grace; and, if Grace management

determined that Fresenius AG had not sufficiently improved its proposal, it would so advise Fresenius AG and Grace could then negotiate with such third party. However, Fresenius AG agreed that Grace would not be precluded in any way from making (or not making) any recommendation to the Grace Board or from accepting any proposal for NMC that it considered to be in the best interest of Grace and its shareholders. Negotiations between Grace and Fresenius AG proceeded intensively thereafter on the basis of this agreement. Dr. Hampers played virtually no role in Grace's negotiations with Fresenius AG. Such negotiations involved a structure in which, following the Reorganization, New Grace would retain its interests in GN Holdings, Inc. and the Amicon filtration business, which historically were managed, but only partly owned, by NMC, with the remainder owned by Grace Chemicals. Although such businesses had a reporting relationship to NMC, the revenues of such businesses were immaterial to NMC, and NMC believes that such assets are not integral to its business. The decision to exclude such assets was made by Grace and Fresenius AG as part of the negotiation of the debt and equity levels, and the Distribution Payment, resulting from the Reorganization.

On January 31, 1996, Baxter International, Inc. ("Baxter") sent Grace a proposal involving a spin-off of NMC and a subsequent merger with a Baxter subsidiary that Baxter valued at $3.8 billion. Baxter had indicated interest in NMC on a sporadic basis during the fall and winter of 1995-96, had met with Grace management and its advisors on several occasions and had made various proposals to Grace for investments in NMC coupled with supply arrangements. Baxter had been unwilling to sign a confidentiality agreement with Grace containing terms similar to those agreed to by Fresenius AG and, therefore, was not provided with confidential information regarding NMC. Under Baxter's January 31 proposal, NMC would borrow $1.275 billion and dividend such amount, together with a $300 million pay-in-kind note (the payment of which would be due in full on completion of the subsequent merger) to Grace; Baxter would guarantee $450 million of such borrowing if the subsequent merger occurred or, otherwise, commit to purchase $450 million of NMC stock; NMC would enter into a long-term supply agreement with Baxter; and Grace would spin off NMC to Grace's shareholders. Following 35 days of public trading in NMC stock after the spin-off, NMC shareholders would vote on a merger of NMC with a Baxter subsidiary in which NMC shareholders would receive $1.8 billion of Baxter stock. Following such merger, Grace would be responsible for all governmental and regulatory liabilities or undisclosed liabilities of NMC in excess of $100 million. Baxter's proposal stated that it was subject to the negotiation of definitive agreements and due diligence. Baxter's proposal also stated that consummation of the merger would be subject to certain conditions and that Baxter would be entitled to a termination fee of 3% of the total transaction value (which Baxter had stated was $3.8 billion) in the event that the transaction was not consummated.

Grace management, together with its legal and financial advisors, evaluated Baxter's January 31 proposal and concluded that the proposal was less attractive to Grace and its shareholders than the Fresenius AG proposal in several respects: (a) the total transaction value was lower than the estimated Fresenius AG proposal; (b) Grace Chemicals would be responsible for any regulatory and other liabilities of NMC in excess of $100 million following the spin-off, which could create uncertainty over the valuation of Grace Chemicals and frustrate the separation of the businesses on an ongoing basis; (c) the proposal presented a risk that the long-term supply agreement (which, together with the 3% termination fee, might deter other buyers of NMC) and the spin-off might be consummated without certainty that the subsequent merger would be consummated, thereby depriving the Grace shareholders of the opportunity to achieve maximum value; and (d) the structure outlined in the proposal was more novel from a tax perspective than the "Morris Trust" structure

38

<PAGE>    63

contemplated by the Fresenius AG proposal. In addition, the Fresenius AG proposal under discussion (a) was close to final agreement and (b) was on terms which did not preclude termination to enter into a more favorable transaction with another party.

On February 2, 1996, Baxter publicly announced that it had made the January 31 proposal.

In December 1995, representatives of Vivra informed representatives of Grace that Vivra was still interested in a transaction substantially the same as the transaction proposed in June 1995. In addition, Grace was aware that at this time other dialysis companies even smaller than Vivra were willing to pursue such a transaction. However, no such transactions were pursued because Grace believed, and was advised by its financial advisors, that greater value would be available from a transaction with Fresenius AG or Baxter.

At a meeting of the Grace Board held on February 4, 1996, the Grace Board considered the Reorganization and the proposed agreements relating thereto as well as the January 31 Baxter proposal. At the meeting, Grace's management and its legal and financial advisors made detailed presentations concerning the proposed transaction. The Grace Board concluded that a transaction with a third party was preferable at the time to the previously proposed spin-off of NMC, which involved execution risks in light of the difficulties in obtaining financing during the pendency of the OIG Investigation. As noted above, the Grace Board was advised that the most likely third-party candidates for a transaction were Baxter and Fresenius AG. The Grace Board concluded that the Fresenius AG proposal (which, as described in detail under "-- Presentation by Grace Financial Advisors -- Comparison of Baxter Proposal," Grace Financial Advisors estimated provided between approximately $3.675 billion and approximately $3.975 billion of value to Grace on a tax-free basis plus entitled Grace to retain certain cash flows of NMC prior to the Reorganization and

provided for the issuance of the New Preferred Shares) was preferable to the
January 31 Baxter proposal (which Baxter had stated was valued at $3.8 billion)
for the reasons described in the third preceding paragraph. After such
presentations, and taking into account the alternatives available the Grace
Board unanimously determined that the Reorganization and the proposed agreements
relating thereto were fair to and in the best interests of Grace and its
shareholders, authorized Grace to enter into the agreements and to consummate
the transactions contemplated thereby, and resolved to recommend that Grace
shareholders approve such agreements and the transactions contemplated thereby.

In connection with its approval and recommendation, the Grace Board
considered, among other things, the following factors:

(a) the terms of the proposed transactions and the proposed agreements
relating thereto, including, among other things, the requirement for Grace
shareholder approval and the other conditions to consummation, the
circumstances under which the agreements could be terminated and the
termination fees payable in connection therewith;

(b) the "Morris Trust" structure and the tax treatment of the
transaction;

(c) other available alternatives, including the Baxter proposal, and
the ability to enter into an agreement respecting a higher offer under
certain circumstances under the Fresenius AG transaction;

(d) the presentation by representatives of CS First Boston and Merrill
Lynch which included, among other things, valuation analyses with respect
to Fresenius Medical Care and NMC and each such firm's opinion that the
Distribution Payment and the Grace Merger, taken together, were fair, from
a financial point of view, to holders of Grace Common Stock, such opinion
and presentations being based on certain assumptions and subject to certain
limitations (see "-- Financial Advisors to Grace");

(e) the business rationales for the transaction, including that the
combination of NMC and Fresenius Worldwide Dialysis had the potential to
enhance shareholder value through operating synergies as an integrated
dialysis products and services company, although there can be no assurance
that synergies will be achieved or as to the amount thereof, and that
Fresenius Medical Care could take advantage of unique marketplace strengths
in the U.S. and other markets, notwithstanding the competitive and other
risks associated with combining a products company and a services company;

39

<PAGE>    64

(f) the operating and financial strength of the combined entity,
although the Grace Board did consider the substantial goodwill charges
which would be associated with the Reorganization;

(g) the impact of the transaction on Grace's remaining specialty
chemicals businesses, including that the transaction would result in the
payment of a significant amount of cash to Grace Chemicals and enable Grace
Chemicals (or New Grace) to use such cash to reduce debt, repurchase stock
and/or invest in core specialty chemical operations;

(h) the retention by NMC of all health care liabilities, including any
regulatory liability relating to the governmental investigations, the
indemnity to be provided to Grace's specialty chemicals businesses with
respect to such liabilities and the concern that such liabilities would
impact the valuation of Fresenius Medical Care which might affect the
trading market for FMC Ordinary Shares; and

(i) the arrangements which had been made with respect to corporate
governance of Fresenius Medical Care and related issues; and

(j) the unfamiliarity of Fresenius Worldwide Dialysis to U.S.
investors.

The foregoing discussion of the information and factors considered and
given weight by the Grace Board is not intended to be exhaustive but includes
all material factors considered by the Grace Board. In addition, in reaching the
determination to approve and recommend the Reorganization, the Grace Board did
not assign any relative or specific weights to the foregoing factors.

THE GRACE BOARD RECOMMENDS THAT GRACE SHAREHOLDERS VOTE FOR APPROVAL OF THE
REORGANIZATION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY.

FINANCIAL ADVISORS TO GRACE

CS First Boston and Merrill Lynch were retained to act as the Grace
Financial Advisors in connection with Grace's exploration of strategic
alternatives for NMC. CS First Boston and Merrill Lynch were selected by Grace
because of their familiarity with Grace and NMC and their respective businesses
and their qualifications and expertise in providing advice to companies in the
businesses in which Grace and NMC are engaged, as well as their reputations as
internationally recognized investment banking firms. Each of CS First Boston and
Merrill Lynch has consented to the reprinting of its fairness opinion and the
summary of such firm's activities included herein.

Opinions of Grace Financial Advisors.  At the request of the Grace Board,
on February 4, 1996, each of CS First Boston and Merrill Lynch delivered a
written opinion to the Grace Board that, based upon and subject to the matters
set forth in its written opinion, as of such date, the terms of the Distribution

Payment and the Grace Merger, taken together, were fair, from a financial point
of view, to the holders of Grace Common Stock. In preparing these opinions,
these firms performed a variety of financial and comparative analyses and made a
detailed presentation to the Grace Board with respect to, among other things,
the valuations of Fresenius Medical Care and NMC. The Grace Board, in accepting
the opinions of the Grace Financial Advisors, was aware that the Grace Financial
Advisors relied upon certain financial information, projections and other
information provided by Grace management and that the opinions of such firms
relied, in part, on certain assumptions and are subject to certain limitations.
While the Grace Board did not perform an independent review of the financial
information, projections and other information provided to the Grace Financial
Advisors, the Grace Financial Advisors and management did review certain
financial information and projections with the Grace Board. The Grace Board
relied on the Grace Financial Advisors, whom it considered to be experts in such
matters, to select the appropriate methodologies to determine fairness. No
updates of such opinions have been requested because such opinions were provided
solely in connection with the decisions of the Grace Board taken on February 4,
1996. While the pro forma financial information included herein was not
available on February 4, 1996, Grace believes that such pro forma financial
information is not materially different from the information available on
February 4, 1996 so as to impact on fairness.

                                        40

<PAGE>   65

     THE FULL TEXTS OF THE WRITTEN OPINIONS OF CS FIRST BOSTON AND MERRILL LYNCH
ARE SET FORTH IN APPENDIX C TO THIS JOINT PROXY STATEMENT-PROSPECTUS AND
DESCRIBE THE ASSUMPTIONS MADE, MATTERS CONSIDERED AND LIMITS ON THE REVIEW
UNDERTAKEN. THE OPINIONS OF CS FIRST BOSTON AND MERRILL LYNCH WERE FURNISHED FOR
THE INFORMATION OF THE GRACE BOARD IN CONNECTION WITH ITS CONSIDERATION OF THE
REORGANIZATION, AND DO NOT CONSTITUTE A RECOMMENDATION TO ANY GRACE SHAREHOLDER
AS TO HOW SUCH SHAREHOLDER SHOULD VOTE ON THE REORGANIZATION. GRACE SHAREHOLDERS
ARE URGED TO READ THE OPINIONS IN THEIR ENTIRETY.

     Opinion of CS First Boston.  In connection with its opinion, CS First
Boston reviewed certain publicly available business and financial information
relating to Grace, NMC and Fresenius Worldwide Dialysis, as well as the
Reorganization Agreement, the Contribution Agreement and the Distribution
Agreement (collectively, the "Transaction Agreements"). CS First Boston also
reviewed certain other information, including financial forecasts and certain
information with respect to potential synergies which may result from the
Reorganization, provided to CS First Boston by Grace and Fresenius AG, and met
with the managements of Grace, Fresenius AG and Fresenius USA to discuss the
business and prospects of NMC, Fresenius Worldwide Dialysis and Fresenius USA.
CS First Boston also considered certain financial data of NMC, Fresenius
Worldwide Dialysis and Fresenius USA and compared that data with similar data
for other publicly-held companies in businesses similar to those of NMC,
Fresenius Worldwide Dialysis and Fresenius USA and considered the financial
terms of certain other business combinations and other transactions. CS First
Boston also considered such other information, financial studies, analyses and
investigations and financial, economic and market criteria which it deemed
relevant.

     In connection with its review, CS First Boston did not assume any
responsibility for independent verification of any of the foregoing information
and relied on its being complete and accurate in all material respects. With
respect to the financial forecasts, CS First Boston assumed that such forecasts
were reasonably prepared on bases reflecting the best currently available
estimates and judgments of Grace's and Fresenius AG's managements as to the
future financial performance of NMC and Fresenius Worldwide Dialysis. CS First
Boston also relied upon the views of Grace's and Fresenius AG's managements
concerning the business, operational and strategic benefits and implications of
the Reorganization, including financial forecasts provided to CS First Boston by
Grace and Fresenius AG relating to synergistic benefits to Fresenius Worldwide
Dialysis and NMC. CS First Boston did not make an independent evaluation or
appraisal of the assets or liabilities (contingent or otherwise) of NMC or
Fresenius Worldwide Dialysis, nor was CS First Boston furnished with any such
evaluations or appraisals. CS First Boston's opinion was necessarily based upon
financial, economic, market and other conditions as they existed and could be
evaluated on the date of its opinion. CS First Boston did not express any
opinion as to what the value of the ADSs actually would be when issued to
holders of Grace Common Stock or the prices at which the ADSs would trade
subsequent to the Reorganization. In addition, CS First Boston understood that
NMC was the target of certain governmental and regulatory investigations
relating to the conduct of its business, which could result in substantial
liabilities and obligations being incurred by NMC in the future, the amount of
which the management of Grace was unable to predict. CS First Boston also
understood that the financial statements, pro forma financial statements and
registration statement of Fresenius Medical Care had not yet been prepared.

     CS First Boston assumed, with Grace's consent, that the transactions
contemplated by the Transaction Agreements would comply with applicable U.S.,
foreign, federal and state laws, including, without limitation, laws relating to
the payment of dividends, bankruptcy, insolvency, reorganization, fraudulent
conveyance, fraudulent transfer or other similar laws affecting creditors'
rights generally. CS First Boston assumed, with Grace's consent, that receipt of
the ADSs would be tax-free for federal income tax purposes to holders of Grace
Common Stock and that none of Grace, NMC, Fresenius Worldwide Dialysis,
Fresenius USA and Fresenius Medical Care would recognize income, gain or loss as
a result of the transactions contemplated by the Transaction Agreements. In
addition, CS First Boston assumed, with Grace's consent, that Grace Chemicals
and Fresenius AG would perform their respective indemnification obligations
which may arise under the Distribution Agreement and the Contribution Agreement
in accordance with their respective terms.

41

<PAGE>    66

    Based upon and subject to the foregoing, CS First Boston rendered its
opinion that, as of the date of such opinion, the terms of the Distribution
Payment and the Grace Merger, taken together, were fair, from a financial point
of view, to the holders of Grace Common Stock.

    Opinion of Merrill Lynch.  In connection with its opinion, Merrill Lynch
reviewed Grace's Annual Reports, Forms 10-K and related financial information
for the five fiscal years ended December 31, 1994 and its Forms 10-Q and the
related unaudited financial information for the quarterly periods ending March
31, 1995, June 30, 1995 and September 30, 1995; reviewed certain historical
financial information with respect to NMC furnished to Merrill Lynch by Grace
and reviewed NMC's Form 10 filed with the Commission on September 25, 1995 which
included audited financial information for the three fiscal years ended December
31, 1994 and unaudited financial information for the six month periods ending
June 30, 1995 and June 30, 1994; reviewed certain historical financial
information with respect to Fresenius AG and Fresenius Worldwide Dialysis
furnished to Merrill Lynch by Fresenius AG and reviewed Fresenius USA's Annual
Reports, Forms 10-K and related financial information for the five fiscal years
ended December 31, 1994 and its Forms 10-Q and the related unaudited financial
information for the quarterly periods ending March 31, 1995, June 30, 1995 and
September 30, 1995; reviewed certain information, including financial forecasts,
relating to the business, earnings, cash flow, assets and prospects of NMC,
Fresenius Worldwide Dialysis and Fresenius USA, furnished to Merrill Lynch by
Grace, Fresenius AG and Fresenius USA, including certain information with
respect to potential synergies which may result from the Reorganization;
conducted discussions with members of senior management of Grace and NMC, and
with Fresenius AG and Fresenius USA, with respect to the businesses, operations
and prospects of NMC, Fresenius Worldwide Dialysis and Fresenius USA,
respectively; compared the results of operations of NMC and Fresenius Worldwide
Dialysis with those of certain other companies which Merrill Lynch deemed to be
reasonably similar to NMC and Fresenius Worldwide Dialysis; considered certain
terms of the documents which govern the rights of stockholders of Fresenius AG
and Fresenius Medical Care; compared the proposed financial terms of the
Reorganization with the financial terms of certain other mergers and
acquisitions which Merrill Lynch deemed relevant; reviewed the financial terms
and conditions of the proposed forms of the Transaction Agreements; reviewed the
terms of the letter from Baxter to Grace dated January 31, 1996, setting forth a
proposal for the acquisition by Baxter of NMC; and reviewed such other financial
studies and analyses and performed such other investigations and took into
account such other matters as Merrill Lynch deemed necessary.  '

    In preparing its opinion, Merrill Lynch relied on the accuracy and
completeness of all information supplied or otherwise made available to it by
Grace and Fresenius AG, and did not independently verify such information or
undertake an independent appraisal of the assets of Grace or Fresenius Worldwide
Dialysis. With respect to the financial forecasts furnished by Grace and
Fresenius AG, Merrill Lynch assumed that such forecasts were reasonably prepared
and reflected the best currently available estimates and judgments of the
managements of Grace and NMC or Fresenius AG as to the expected future financial
performance of Grace, NMC or Fresenius Worldwide Dialysis, as the case may be.
Merrill Lynch also relied upon the views of Grace's and Fresenius AG's
managements concerning the business, operational and strategic benefits and
implications of the Reorganization, including financial forecasts provided to
Merrill Lynch by Grace and Fresenius AG relating to synergistic benefits to
Fresenius Worldwide Dialysis and NMC. Merrill Lynch's opinion was necessarily
based upon financial, economic, market and other conditions as they existed and
could be evaluated on the date of such opinion. Merrill Lynch did not express
any opinion as to what the value of the ADSs actually would be when issued to
Grace shareholders pursuant to the Reorganization or the prices at which the
ADSs would trade subsequent to the Reorganization. In addition, Merrill Lynch
understood that NMC was the target of certain governmental and regulatory
investigations relating to the conduct of its business, which could result in
substantial liabilities and obligations being incurred by NMC in the future, the
amount of which management of Grace was unable to predict. Merrill Lynch also
understood that the financial statements, pro forma financial statements and
registration statement of Fresenius Medical Care had not yet been prepared.

    Merrill Lynch assumed, with Grace's consent, that the transactions
contemplated by the Transaction Agreements would comply with applicable U.S.,
foreign, federal and state laws, including, without limitation,

42

<PAGE>    67

laws relating to the payment of dividends, bankruptcy, insolvency,
reorganization, fraudulent conveyance, fraudulent transfer or other similar laws
affecting creditors' rights generally. Merrill Lynch assumed, with Grace's
consent, that receipt of the ADSs would be tax-free for federal income tax
purposes to the shareholders of Grace and that none of Grace, NMC, Fresenius
Worldwide Dialysis, Fresenius USA and Fresenius Medical Care would recognize
income, gain or loss as a result of the transactions contemplated by the
Transaction Agreements. In addition, Merrill Lynch assumed, with Grace's
consent, that Grace Chemicals and Fresenius AG would perform their respective
indemnification obligations which may arise under the Distribution Agreement and
the Contribution Agreement in accordance with their respective terms.

    Based upon and subject to the foregoing, Merrill Lynch rendered its opinion
that, as of the date of such opinion, the terms of the Distribution Payment and
the Grace Merger, taken together, were fair, from a financial point of view, to

the holders of Grace Common Stock.

In preparing their opinions to the Grace Board, the Grace Financial Advisors performed a variety of financial and comparative analyses, including those described under "-- Presentation by Grace Financial Advisors." The summary of the Grace Financial Advisors' analyses set forth below does not purport to be a complete description of the analyses underlying the Grace Financial Advisors' opinions, but includes a summary of all material valuation methodologies performed by the Grace Financial Advisors. The preparation of a fairness opinion is a complex analytic process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to summary description. In arriving at their opinions, the Grace Financial Advisors made qualitative judgments as to the significance and relevance of each analysis and factor considered by it. Accordingly, the Grace Financial Advisors believe that their analyses must be considered as a whole and that selecting portions of their analyses and factors, without considering all analyses and factors, could create a misleading or incomplete view of the processes underlying such analyses and their opinions. In their analyses, the Grace Financial Advisors made numerous assumptions with respect to Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care, industry performance, regulatory, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care. No company, transaction or business used in such analyses as a comparison is identical to Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care or the Reorganization, nor is an evaluation of the results of such analyses entirely mathematical; rather, it involves complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the acquisition, public trading or other values of the companies, business segments or transactions being analyzed. The estimates contained in such analyses and the ranges of valuations resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than those suggested by such analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, because such estimates are inherently subject to substantial uncertainty, none of Grace, NMC, Fresenius AG, Fresenius Worldwide Dialysis, Fresenius USA, Fresenius Medical Care, the Grace Financial Advisors or any other person assumes responsibility for their accuracy.

PRESENTATION BY GRACE FINANCIAL ADVISORS

At the meeting of the Grace Board on February 4, 1996, the Grace Financial Advisors made a presentation to the Grace Board of their analyses as of such date delivered in connection with their opinions, a summary of which appears below.

The following quantitative information, to the extent it is based on market data, is based on market data as it existed at February 4, 1996, and is not necessarily indicative of current market conditions.

Historical and Pro Forma Financial Data.  The Grace Financial Advisors reviewed historical revenues, EBITDA and earnings before interest and taxes ("EBIT") of each of NMC and Fresenius Worldwide Dialysis and analyzed pro forma revenues, EBITDA, EBIT and net income of Fresenius Medical Care based on certain forecasted financial information and certain information with regard to possible synergies resulting

43

<PAGE>  68

from the Reorganization provided by management of Grace, NMC, Fresenius USA and Fresenius Worldwide Dialysis. Assuming that the closing of the Reorganization occurred on January 1, 1996, such analysis indicated that, on a pro forma basis, for the year ending December 31, 1996, Fresenius Medical Care would have revenues of approximately $3.415 billion, EBITDA of approximately $794.1 million, EBIT of approximately $525.6 million and net income of approximately $156.3 million.

The Grace Financial Advisors also analyzed certain pro forma credit statistics for Fresenius Medical Care giving effect to the Reorganization, based upon certain forecasted financial information and certain information with regard to possible synergies resulting from the Reorganization provided by management of Grace, NMC, Fresenius USA and Fresenius Worldwide Dialysis. These credit statistics consisted of ratio of EBIT to net interest expense, ratio of EBITDA to net interest expense, total debt as a percentage of capitalization, ratio of total debt to EBITDA, total debt, shareholders' equity and total capitalization. Assuming that the closing of the Reorganization occurred on January 1, 1996, such analysis indicated that, on a pro forma basis, as of and for the year ending December 31, 1996, such credit statistics for Fresenius Medical Care would be as follows: ratio of EBIT to net interest expense, 2.8x; ratio of EBITDA to net interest expense, 4.2x; total debt as a percentage of capitalization, 52.7%; ratio of total debt to EBITDA, 3.1x; total debt, approximately $2.425 billion; shareholders' equity, approximately $2.173 billion; and total capitalization, approximately $4.598 billion.

Comparable Company Analysis.  The Grace Financial Advisors analyzed the ratio of stock price to estimated 1996 earnings for six renal care companies, consisting of Fresenius USA, Fresenius AG, Gambro AB, Vivra, Total Renal Care Inc. and Renal Treatment Centers Inc. (the "Comparable Companies"). The price/estimated 1996 earnings ratios for the Comparable Companies were 20.5x, 25.4x, 19.5x, 18.5x, 35.0x and 28.1x, respectively. The Grace Financial Advisors

estimated that the FMC Ordinary Shares would trade at a price/estimated 1996
earnings ratio ranging from 19.0x to 23.0x.

Valuation of Distribution Payment and Grace Merger.  The Grace Financial
Advisors analyzed the value to Grace shareholders of the Grace Merger assuming
estimated pro forma 1996 net income of Fresenius Medical Care of $156.3 million
and a stock price to estimated 1996 earnings ratio for Fresenius Medical Care of
19.0x to 23.0x. Based upon the foregoing assumptions, the Grace Financial
Advisors estimated that the total equity trading value of Fresenius Medical Care
would range from approximately $2.97 billion to approximately $3.595 billion (of
which Grace shareholders' ownership interest would be 44.8% or between
approximately $1.331 billion and $1.611 billion). In addition, the
Grace Financial Advisors noted that NMC would retain or assume approximately
$2.263 billion of indebtedness, resulting in an aggregate value to Grace
shareholders of between approximately $3.594 billion and $3.874 billion.
Further, the Grace Financial Advisors noted that NMC would distribute to New
Grace its Amicon Bioseparations Division ("Amicon") and other assets, with an
estimated value of between $75 million and $100 million, and that Grace
Chemicals would be entitled to retain certain cash flows of NMC prior to the
Reorganization, which Grace management estimated would range from approximately
$150 million to approximately $200 million. Accordingly, the Grace Financial
Advisors estimated that the aggregate value to be received in connection with
the Distribution Payment and the Grace Merger ranged from approximately $3.819
billion to approximately $4.174 billion. The Grace Financial Advisors also noted
that holders of Grace Common Stock would also receive the New Preferred Shares
in the Recapitalization which would remain outstanding following the Grace
Merger and that, under certain circumstances, the holders of the New Preferred
Shares could receive certain special dividend payments in the future. See
"DESCRIPTION OF NEW PREFERRED SHARES."

Discounted Cash Flow Analysis of Fresenius Medical Care.  The Grace
Financial Advisors analyzed the discounted cash flow value of the equity of
Fresenius Medical Care using discount rates ranging from 12.5% to 13.5% and
terminal EBITDA multiples ranging from 7.5x to 8.5x. Based upon the foregoing,
the Grace Financial Advisors estimated that the discounted cash flow value of
the equity of Fresenius Medical Care ranged from approximately $3.742 billion to
approximately $4.792 billion (as compared with the trading valuation of the
equity of Fresenius Medical Care of between approximately $2.97 billion and
approximately $3.595 billion described under "-- Valuation of Distribution
Payment and Grace Merger").

<center>44</center>

<PAGE>  69

NMC Stand-Alone Valuation.  The Grace Financial Advisors performed analyses
of the enterprise value of NMC on a stand-alone basis (excluding the value of
Amicon and other assets to be transferred to or retained by New Grace) based
upon the trading valuation of the Comparable Companies, comparable acquisition
transactions and discounted cash flow (using discount rates ranging from 12.5%
to 13.5% and terminal EBITDA multiples ranging from 7.0x to 8.0x). Such analyses
resulted in the following ranges of enterprise value for NMC on a stand-alone
basis: comparable company analysis -- between approximately $3.175 billion and
approximately $3.5 billion; comparable acquisitions analysis -- between
approximately $3.35 billion and approximately $4.0 billion; and discounted cash
flow analysis -- between approximately $3.15 billion and approximately $3.725
billion (as compared with the estimated total value of the Grace shareholders'
interest in the equity of Fresenius Medical Care and the Distribution Payment of
between approximately $3.594 billion and approximately $3.875 billion described
under "-- Valuation of Distribution Payment and Grace Merger").

Comparison of Baxter Proposal.  The Grace Financial Advisors compared the
terms of the Distribution Payment and the Grace Merger with the proposal letter
received by Grace from Baxter on January 31, 1996. The Grace Financial Advisors
noted that the Fresenius AG transaction was a fully negotiated transaction with
limited conditions to closing which provided, in their opinion, between
approximately $3.675 billion and approximately $3.975 billion of value to Grace
on a tax-free basis, that Grace Chemicals would be entitled to retain certain
cash flows of NMC prior to the Reorganization, estimated by Grace management to
be between approximately $150 million and approximately $200 million, that
holders of Grace Common Stock would also receive the New Preferred Shares, and
that financing commitments for the Fresenius AG transaction had been received.
Furthermore, NMC would retain all liabilities, if any, arising out of the OIG
Investigation. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal
Matters -- Legal and Regulatory Proceedings -- OIG Investigation."

The Grace Financial Advisors noted that the Baxter proposal stated that it
provided $3.8 billion of value on a tax-free basis (although the Grace Financial
Advisors understood, based upon the advice of counsel to Grace, that some of
such consideration could potentially be deemed taxable consideration unless
Baxter were to accept the "Morris Trust" structure agreed to by Fresenius AG or
otherwise modify the form of its proposed transaction). The Grace Financial
Advisors also noted that, under the terms of its proposal, Baxter would assume
undisclosed liabilities, including any liability related to the OIG
Investigation only up to $100 million. Moreover, the Baxter proposal was subject
to negotiation, due diligence and documentation.

New Preferred Shares.  In the Reorganization, holders of Grace Common Stock
will receive the New Preferred Shares, which shares will remain outstanding
following the Grace Merger. As described under "DESCRIPTION OF NEW PREFERRED
SHARES," holders of the New Preferred Shares may receive certain Special
Dividend payments beginning in 2002, based upon the adjusted cash flow of
Fresenius Medical Care for the five-year period from January 1, 1997 to December
31, 2001. Apart from such Special Dividend rights, the New Preferred Shares have
no dividend rights, and such shares have a Liquidation Preference of $.10 per

share. Because there is substantial uncertainty whether any Special Dividend payments will become payable on the New Preferred Shares, the Grace Financial Advisors valued the New Preferred Shares at zero for the purpose of their analyses. Accordingly, any amounts ultimately realized by holders of Grace Common Stock in respect of the New Preferred Shares held by them would represent additional value above the value taken into account by the Grace Financial Advisors in rendering their opinions as to the fairness of the Distribution Payment and the Grace Merger.

    OIG Investigation.  As described under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation," NMC is the target of certain governmental and regulatory investigations relating to the conduct of its business, which could result in substantial liabilities and obligations being incurred by NMC in the future. The Grace Financial Advisors took into account the uncertainty regarding such investigations in their estimate of the range of price/earnings ratios for the FMC Ordinary Shares described under "-- Comparable Company Analysis" and "-- Valuation of Distribution Payment and Grace Merger." In their analyses described under "-- Discounted Cash Flow Analysis of Fresenius Medical Care" and "-- NMC Stand-Alone Valuation," the Grace Financial Advisors took into account, solely for the purpose of their analyses, payments to the federal government in connection

<div align="center">45</div>

<PAGE>   70

with previous settlements of regulatory investigations of companies in the health care industry. This did not, and was not intended to, reflect a judgment as to the potential outcome of the investigations, the comparability of the NMC investigations to said previous investigations or the merits of any aspect of such investigations. The Grace Financial Advisors were advised by management of Grace and NMC that management was unable to predict the amount of liabilities and obligations which may be incurred by NMC arising out of the foregoing investigations. The Grace Financial Advisors noted that, depending upon the actual amount of liabilities and obligations incurred by NMC, the resolution of these issues could have a material adverse impact on NMC in the future (although, by reason of the Reorganization, only 44.8% of such impact would be borne by Grace shareholders).

    The foregoing is a summary of the material terms of the presentation by the Grace Financial Advisors to the Grace Board on February 4, 1996, and does not purport to be a complete description of such presentation. The analyses by the Grace Financial Advisors in connection with such presentation do not purport to be appraisals or necessarily reflect the prices at which businesses or securities actually may be sold. As described above, the opinions of the Grace Financial Advisors and their presentation to the Grace Board were one of a number of factors considered by the Grace Board in connection with its approval of the Reorganization.

    FINANCIAL ADVISORY FEES

    For their financial advisory services in connection with the Reorganization, each of CS First Boston and Merrill Lynch will receive a fee equal to 0.225% of the Aggregate Consideration in connection with the Reorganization. For this purpose, "Aggregate Consideration" means the total fair market value (at the time of closing) of all consideration (including cash, securities, property, all debt for borrowed money remaining on NMC's financial statements at closing and any other form of consideration) paid or payable, or otherwise to be distributed, directly or indirectly, to Grace, NMC or Grace's shareholders in connection with the Reorganization. In addition, since September 1, 1995, each of CS First Boston and Merrill Lynch has been receiving a financial advisory fee of $500,000, payable on a quarterly basis in arrears, which will be fully creditable against the fee described above. Grace has also agreed to reimburse each of CS First Boston and Merrill Lynch for its reasonable out-of-pocket expenses, including the fees and expenses of legal counsel and any other advisors retained by them, and to indemnify each of CS First Boston and Merrill Lynch and certain of their related persons against certain liabilities in connection with their engagement, including certain liabilities under the federal securities laws. Based upon the aggregate value to be received in connection with the Distribution Payment and the Grace Merger (between approximately $3.819 billion and approximately $4.174 billion, as estimated by the Grace Financial Advisors as of February 4, 1996 and described under "-- Valuation of Distribution Payment and Grace Merger"), the "Aggregate Consideration" for purposes of calculating the fee payable to each of the Grace Financial Advisors would be between approximately $3.819 billion and approximately $4.174 billion and the fee payable to each of the Grace Financial Advisors would be between approximately $8,592,750 and approximately $9,391,500, against which the quarterly financial advisory fees of $500,000 received by each of the Grace Financial Advisors beginning September 1, 1995 would be credited. The foregoing is provided solely as an illustration and does not constitute an estimate with respect to either the actual value to be received by Grace or the holders of Grace Common Stock in connection with the Distribution Payment and the Merger or the actual amount of the fees payable to the Grace Financial Advisors. The actual amount of the Aggregate Consideration can only be calculated by reference to the actual date of consummation of the Reorganization and will be based upon, among other things, closing market prices for the FMC Ordinary Shares over a 20-trading day period beginning with the commencement of regular-way trading. In addition, there may be material changes with respect to Fresenius Medical Care and NMC and financial market, industry and general economic conditions between February 4, 1996 and the date of the Reorganization. For these reasons, the actual amount of the Aggregate Consideration and the fees payable to the Grace Financial Advisors may be materially greater or less than the amounts described in the foregoing illustration.

In the ordinary course of their respective businesses, CS First Boston and
Merrill Lynch may actively trade in the debt and equity securities of Grace,
Fresenius AG and Fresenius USA (and, after the Reorganization, Fresenius Medical
Care) for their own account or for the accounts of their customers and,

46

<PAGE>    71

accordingly, may at any time hold long or short positions in such securities. In
addition, CS First Boston is currently in discussions with Fresenius Medical
Care to act as an underwriter of securities of Fresenius Medical Care, the
proceeds of which may be used to refinance a portion of NMC's bank debt
following consummation of the Reorganization. See "FINANCING -- Refinancing."

BACKGROUND OF THE REORGANIZATION; REASONS FOR THE RECOMMENDATION OF THE
FRESENIUS USA BOARD

     The following discussion regarding the reasons for the recommendation of
the Fresenius USA Board reflects the initial proposed capitalization for
Fresenius Medical Care of 217,170,000 FMC Ordinary Shares (with each ADS
evidencing one FMC Ordinary Share) and has not been adjusted to reflect the
final capitalization of 70,000,000 FMC Ordinary Shares (or the fact that three
ADSs represent one FMC Ordinary Share).

     The Fresenius USA Board has unanimously approved the Reorganization and the
transactions contemplated thereby, including the Fresenius USA Merger and the
Fresenius USA Plan Amendment, and has determined that such transactions are fair
to, and in the best interests of, the stockholders of Fresenius USA. The
Fresenius USA Board unanimously recommends that Fresenius USA stockholders vote
for approval of the Reorganization Agreement including the Fresenius USA Merger,
and the Fresenius USA Plan Amendment.

     At a meeting of the Fresenius USA Board on January 25, 1996, Fresenius AG
informed the Fresenius USA Board of the proposed Reorganization. After a
discussion concerning the structure of the proposed Reorganization, the
Fresenius USA Board voted unanimously to establish the Fresenius USA Independent
Committee comprised of the three Fresenius USA independent directors, Robert S.
Ehrlich, James F. Marten and Francis E. Baker, and delegated to the Fresenius
USA Independent Committee the authority to consider, negotiate, and authorize
the economic terms of the participation of the public stockholders of Fresenius
USA, other than Fresenius AG, Grace and their respective subsidiaries (the
"Fresenius USA Public Stockholders") in the proposed Reorganization. The
Fresenius USA Board further authorized the Fresenius USA Independent Committee
to retain, at Fresenius USA's expense, necessary advisors, including an
investment banking firm and legal counsel.

     The Fresenius USA Independent Committee met later that day by telephone to
discuss the selection of financial and legal advisors. The Fresenius USA
Independent Committee discussed the importance of retaining a financial advisor
with the experience and expertise appropriate to review whether the proposed
Reorganization was fair to the public stockholders of Fresenius USA from a
financial viewpoint, and also agreed that experience in the health care industry
was a significant consideration. The Fresenius USA Independent Committee decided
to retain Ropes & Gray as its legal advisor because of its experience
representing Fresenius USA and in particular its experience representing
Fresenius USA's public minority in previous arm's-length negotiations between
Fresenius USA and Fresenius AG. Ropes & Gray informed the Fresenius USA
Independent Committee that, in connection with its role as counsel to Fresenius
USA, Ropes & Gray has, from time to time, rendered advice to directors and
officers of Fresenius USA regarding how to structure certain personal
transactions involving securities of Fresenius USA. The Fresenius USA
Independent Committee met again several times during the ensuing week, during
which time it elected Mr. Ehrlich Chairman and conferred with, and received
legal advice from, Ropes & Gray.

     After the execution of the Reorganization Agreement by Fresenius AG and
Grace on February 4, 1996, Fresenius AG orally conveyed a proposal to the
Fresenius USA Independent Committee to exchange 3.8% of the equity of Fresenius
Medical Care, or .77 of an FMC Ordinary Share per share of Fresenius USA Common
Stock, on a fully diluted basis, as the consideration to the Fresenius USA
Public Stockholders in the proposed Fresenius USA Merger (the "First Proposal").
Fresenius USA issued a press release on February 5, 1996, announcing its receipt
of the First Proposal.

     On February 12, 1996, Fresenius AG's financial advisor, Dresdner Securities
(USA) Inc. ("Dresdner Securities"), presented the First Proposal and explained
the calculation thereof to the Fresenius USA Independent Committee and its legal
counsel. Dresdner Securities and Fresenius AG also summarized the terms of the
Reorganization and the Reorganization Agreement, and responded to questions from
the

47

<PAGE>    72

Fresenius USA Independent Committee and its counsel concerning the structure of
the Reorganization, the future financing needs of Fresenius Medical Care, the
debt to be assumed by Fresenius Medical Care in the Reorganization, and the
value of the FMC Ordinary Shares.

     On February 13, 1996, after considering proposals and interviewing numerous
prospective financial advisors, the Fresenius USA Independent Committee retained
Salomon Brothers as its financial advisor, and signed an engagement letter,
dated February 13, 1996, to that effect. The Committee directed Salomon Brothers
to undertake an evaluation of the Reorganization and to communicate with

Fresenius AG's financial advisors in order to assist the Fresenius USA Independent Committee in its negotiations with Fresenius AG. In addition, Salomon Brothers was charged with evaluating the fairness, from a financial point of view, of the proposals made by Fresenius AG with regard to the exchange ratio for the exchange of Fresenius USA Common Stock for FMC Ordinary Shares held by the Fresenius USA Public Stockholders under the terms of the proposed Reorganization.

On February 13, 1996, Dresdner Securities explained to Salomon Brothers the financial terms of the First Proposal and described the methodology and basis for calculating the share exchange ratio underlying the First Proposal. Dresdner Securities and Fresenius AG also summarized the terms of the Reorganization and the Reorganization Agreement.

Between February 13 and March 19, 1996, the Fresenius USA Independent Committee and its legal and financial advisors met on a regular basis to discuss the First Proposal and the transactions contemplated by the Reorganization Agreement. Ropes & Gray and Salomon Brothers performed an extensive due diligence review of Fresenius AG, NMC and the proposed transactions, and Salomon Brothers conducted comprehensive and detailed economic valuations of Fresenius USA, Fresenius Worldwide Dialysis, NMC and Fresenius Medical Care. In addition, during this time, Mr. Ehrlich met several times with Salomon Brothers and discussed in detail the economic models that Salomon Brothers would use for valuing Fresenius USA, NMC, Fresenius Worldwide Dialysis, and Fresenius Medical Care.

The Fresenius USA Independent Committee met on March 19, 1996 with its legal and financial advisors. Ropes & Gray presented the Fresenius USA Independent Committee with the results of its review of Fresenius AG and NMC, tax issues implicated by the transaction, the OIG Investigation and other government investigations of NMC and the potential asbestos liability of New Grace. Salomon Brothers then presented its analysis. As described below in "-- Recommendation of the Fresenius USA Independent Committee and the Board of Directors -- Opinion of Salomon Brothers," this analysis included a preliminary valuation of Fresenius Medical Care (based on the component parts -- NMC and Fresenius Worldwide Dialysis) and Fresenius USA. This analysis included but was not limited to the following methodologies to value the business: the historical and current market for certain other companies comparable to Fresenius USA, Fresenius Worldwide Dialysis, NMC or Fresenius Medical Care; discounted cash flow analysis of each of Fresenius USA, NMC and Fresenius Worldwide Dialysis; and the nature and terms of certain other transactions believed to be relevant. This analysis also included a revision of the First Proposal. Salomon Brothers explained that, in evaluating the offer made to the Fresenius USA Public Stockholders, Salomon Brothers' analysis focused on the future prospects of each of the component companies of Fresenius Medical Care. Salomon Brothers described the various methodologies used in valuing Fresenius Medical Care and the possible synergies created by the Reorganization, and advised the Fresenius USA Independent Committee that the First Proposal was below market value and that the Fresenius USA Independent Committee should continue to negotiate to maximize stockholder value.

Between March 19 and the end of April 1996, the Fresenius USA Independent Committee met at least twice weekly by telephone conference call to receive advice from and give direction to its legal and financial advisors in connection with its review of the Reorganization. At the request of the Fresenius USA Independent Committee, Salomon Brothers met with Dresdner Securities on March 21, 1996, to discuss Fresenius AG's First Proposal. Salomon Brothers informed Dresdner Securities that Salomon Brothers disagreed, as an economic matter, with Dresdner Securities' valuation assumptions, methodologies, and conclusions, and further stated that Salomon Brothers believed that the First Proposal was inadequate and that

48

<PAGE>    73

the Fresenius USA Independent Committee would require the best price reasonably available to the Fresenius USA Public Stockholders. Salomon Brothers stated that the Fresenius USA Independent Committee was flexible as to how the consideration could be structured.

The Fresenius USA Independent Committee informed Fresenius AG on March 26 that the Fresenius USA Independent Committee believed that the public stockholders of Fresenius USA should receive a premium above the current market value. The Fresenius USA Independent Committee asked Fresenius AG to meet with representatives of Salomon Brothers so that they could present their valuations of the Reorganization and the entities created thereby. Salomon Brothers presented its valuation to Dr. Gerd Krick, Chairman of the Management Board of Fresenius AG (the "Fresenius AG Management Board"), on March 29, 1996. Salomon Brothers informed Fresenius AG that the Fresenius USA Independent Committee believed the First Proposal was inadequate. Between April 3 and April 11, 1996, Salomon Brothers and Dresdner Securities met on several occasions and explored different means of providing the Fresenius USA Public Stockholders with the greatest consideration reasonably available, including the use of consideration other than FMC Ordinary Shares.

At a meeting on April 11, 1996, Salomon Brothers informed the Fresenius USA Independent Committee that Fresenius AG was exploring the possibility of offering Fresenius USA's stockholders a non-voting preferred stock instead of FMC Ordinary Shares and advised that such a security would trade at a discount to FMC Ordinary Shares. A discussion ensued regarding the value of different forms of consideration and the strengths and weaknesses of each form for the Fresenius USA Public Stockholders. Salomon Brothers advised that the Fresenius USA Independent Committee negotiate further with Fresenius AG to maximize the

value offered to the Fresenius USA Public Stockholders in exchange for their
shares of Fresenius USA Common Stock.

On April 16, 1996, Fresenius AG informed the Fresenius USA Independent
Committee that it would offer 1.045 FMC Ordinary Shares for each publicly held
share of Fresenius USA Common Stock (assuming that Fresenius Medical Care would
issue 217,170,000 FMC Ordinary Shares and assuming a maximum of 10,183,123
shares of Fresenius USA Common Stock) (the "Second Proposal"). After
consultation with its advisors, the Fresenius USA Independent Committee rejected
the Second Proposal as providing, in the Fresenius USA Independent Committee's
view, inadequate value for the Fresenius USA Public Stockholders. The Fresenius
USA Independent Committee proposed including cash as a portion of the
consideration paid to the Fresenius USA Public Stockholders and were told that
Fresenius AG would not pay cash for any portion of the Fresenius USA Common
Stock.

On April 18, 1996, Salomon Brothers participated with Ropes & Gray in
further negotiations with representatives of Fresenius AG. On April 21, 1996,
Fresenius AG presented to the Fresenius USA Independent Committee its offer to
exchange 1.15 FMC Ordinary Shares for each share of Fresenius USA Common Stock
held by the Fresenius USA Public Stockholders (assuming that Fresenius Medical
Care would issue 217,170,000 FMC Ordinary Shares and assuming a maximum of
9,253,331 outstanding shares of Fresenius USA Common Stock held by persons other
than Fresenius AG, Grace and their respective subsidiaries), (the "Third
Proposal"). The Fresenius USA Independent Committee sought from and explored
with Fresenius AG the possibility of additional consideration and were informed
by Fresenius AG that the Third Proposal was its highest offer. The Fresenius USA
Independent Committee discussed the Third Proposal with its legal and financial
advisors at a meeting on April 22, 1996. After extensive consultation, the
Fresenius USA Independent Committee, believing that it had negotiated the
highest consideration reasonably attainable for the Fresenius USA Public
Stockholders, determined that the Third Proposal was a strong offer and that it
would make a decision with respect to whether the offer was fair to, and in the
best interests of, the Fresenius USA Public Stockholders when it received a
formal opinion from its financial advisors. On April 25, 1996, Salomon Brothers
gave its oral opinion as to the fairness from a financial point of view of the
Third Proposal. Subsequently, the Fresenius USA Independent Committee was
informed that Fresenius Medical Care would issue 70,000,000 FMC Ordinary Shares
(instead of 217,170,000 as previously anticipated) and that the Third Proposal
was, therefore, equivalent to an exchange of 0.37067735 FMC Ordinary Shares for
each share of Fresenius USA Common Stock held by the Fresenius USA Public
Stockholders.

49

<PAGE>   74

On May 8, 1996, Salomon Brothers delivered its written opinion to the
Fresenius USA Independent Committee that the exchange ratio of 0.37067735 FMC
Ordinary Shares (having given effect to the new capitalization) to be issued in
exchange for each share of Fresenius USA Common Stock was fair to the public
stockholders of Fresenius USA from a financial point of view. After full and
frank discussion, the Fresenius USA Independent Committee determined unanimously
that the Reorganization Agreement and the Fresenius USA Merger were fair to and
in the best interests of the Fresenius USA Public Stockholders. See
"-- Recommendation of the Fresenius USA Independent Committee and the Board of
Directors -- Opinion of Salomon Brothers." The Fresenius USA Independent
Committee then voted unanimously to recommend that the Fresenius USA Board
approve the Reorganization Agreement and the Fresenius USA Merger, and to
recommend to the Fresenius USA Public Stockholders that they vote in favor of
the Reorganization Agreement and the Fresenius USA Merger.

RECOMMENDATION OF THE FRESENIUS USA INDEPENDENT COMMITTEE AND THE BOARD OF
DIRECTORS

At a meeting held on May 8, 1996, the Fresenius USA Independent Committee
recommended unanimously to the full Fresenius USA Board that it approve the
Reorganization Agreement and the Fresenius USA Merger. Immediately thereafter,
the full Fresenius USA Board met and voted unanimously to approve the
Reorganization Agreement and to recommend that the holders of Fresenius USA
Common Stock vote in favor of the Reorganization Agreement and the Fresenius USA
Merger. The Fresenius USA Board, including all of the Fresenius USA Independent
Directors, believes that the transactions contemplated by the Reorganization
Agreement and the Fresenius USA Merger are in the best interests of Fresenius
USA and its stockholders. The terms of the Reorganization are the result of
arm's-length negotiations between Fresenius AG and Grace, each party conducting
its own analysis and acting with the advice of its own legal counsel,
independent accountants and financial advisors. The consideration payable to
Fresenius USA Public Stockholders was determined as a result of arm's-length
negotiations between the Fresenius USA Independent Committee and Fresenius AG.

In reaching their conclusion to recommend approval of the Reorganization
Agreement and the Fresenius USA Merger, the Fresenius USA Independent Committee
took into account a number of factors, including the factors discussed below in
"-- Opinion of Salomon Brothers" and the following:

    - the holders of Fresenius USA Common Stock will hold equity interests in
      the new global dialysis company, Fresenius Medical Care, and will be able
      to benefit from the synergies which the Fresenius USA Independent
      Committee and its advisors believe will result from the Reorganization;

    - the opinion of Salomon Brothers, the Fresenius USA Independent
      Committee's financial advisors, that the consideration per share to be
      received by the holders of Fresenius USA Common Stock in the Fresenius USA
      Merger is fair to such holders (other than Fresenius AG, Grace and their

respective subsidiaries) from a financial point of view (see "-- Opinion
of Salomon Brothers");

- the FMC Ordinary Shares to be issued in the Fresenius USA Merger will
  trade on the NYSE as ADRs representing ADSs;

- the tax effects of the proposed Reorganization to Fresenius Medical Care
  and to Fresenius USA and its stockholders, as described under "CERTAIN
  INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA
  COMMON STOCK;"

- the Reorganization Agreement expressly provides that nothing in such
  agreement shall be construed to prevent the Fresenius USA Independent
  Committee from making a determination with respect to the adequacy of the
  consideration payable to the Fresenius USA Public Stockholders or the
  entire fairness of the transaction to the public stockholders of Fresenius
  USA, consistent with their fiduciary duties;

- the fact that, while Fresenius AG would own a majority of the voting
  securities of Fresenius Medical Care, Fresenius AG has agreed that at
  least two members of the FMC Supervisory Board to be elected by the
  shareholders will be persons who do not have any substantial professional
  relationship with Fresenius Medical Care, Fresenius AG, or any of their
  respective affiliates, and has also agreed to

                                    50

<PAGE>    75

certain protections for minority shareholders as set forth under
"DESCRIPTION OF THE POOLING AGREEMENT;"

- the belief of the Fresenius USA Independent Committee, based in part on
  the presentation by representatives of Salomon Brothers which included,
  among other things, valuation analyses with respect to Fresenius Medical
  Care and Fresenius USA, that the per share consideration payable to the
  Fresenius USA Public Stockholders was, on May 8, 1996, worth more than the
  then current fair market value of a share of Fresenius USA Common Stock;
  and

- the various risks involved in the Reorganization that are more fully
  described under "RISK FACTORS."

     The negotiations between the Fresenius USA Independent Committee and
Fresenius AG dealt solely with the economic terms for the participation of the
Fresenius USA Public Stockholders in the Reorganization. The Fresenius USA
Independent Committee did not propose or request any changes or revisions to the
provisions of the Reorganization Agreement allocating 44.8% of the equity
securities of Fresenius Medical Care to Grace and 55.2% of such equity
securities to Fresenius AG and the Fresenius USA Public Stockholders, to the
requirement of the Reorganization Agreement that Fresenius AG receive not less
than 51% of Fresenius Medical Care's outstanding securities on a fully diluted
basis, or to any other provisions of the Reorganization Agreement as to Grace
and Fresenius AG. However, as a result of those negotiations, Grace agreed that
the percentage of FMC Ordinary Shares required to be held by Fresenius AG would
be reduced to 50.3%. See "THE REORGANIZATION -- Additional Agreements of
Fresenius USA."

     The foregoing discussion of the information and factors taken into account
by the Fresenius USA Independent Committee, though not exhaustive, includes all
the material factors considered by the Fresenius USA Independent Committee. With
the exception of the regulatory and governmental investigations relating to the
conduct of NMC's business, the Fresenius USA Independent Committee does not
believe that any of these factors can generally be characterized as positive or
negative, but involve matters of valuation and business judgment.
(See -- "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters").

     THE FRESENIUS USA BOARD UNANIMOUSLY RECOMMENDS THAT FRESENIUS USA
STOCKHOLDERS VOTE FOR APPROVAL AND ADOPTION OF THE REORGANIZATION AGREEMENT AND
THE TRANSACTIONS CONTEMPLATED THEREBY, AND FOR APPROVAL OF THE FRESENIUS USA
PLAN AMENDMENT.

     See "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius
USA -- Material Contracts between Fresenius AG and Fresenius USA" for a
description of certain historical relationships between Fresenius AG and
Fresenius USA.

OPINION OF SALOMON BROTHERS

     Salomon Brothers was retained subsequent to the execution by Fresenius AG
and Grace of the Reorganization Agreement to act as a financial advisor to the
Fresenius USA Independent Committee to assist the Fresenius USA Independent
Committee in connection with the Reorganization. Salomon Brothers was selected
by the Fresenius USA Independent Committee because of its reputation, its
experience with similar transactions and its knowledge of the health care
industry. Salomon Brothers is an internationally recognized investment banking
firm continuously engaged in the valuation of businesses and their securities in
connection with mergers and acquisitions, negotiated underwritings, competitive
bidding, secondary distributions, and for corporate and other purposes.

     On April 25, 1996, Salomon Brothers orally rendered its opinion to the
effect subsequently set forth in its written opinion described below. Salomon
Brothers has delivered its written opinion, dated May 8, 1996, to the Fresenius
USA Independent Committee to the effect that, based upon and subject to various
considerations set forth in such opinion, as of that date, the exchange ratio

(the "Fresenius USA Public Stockholder Exchange Ratio") of 0.37067735 FMC
Ordinary Shares (having given effect to the new capitalization) to be issued in
exchange for each share of Fresenius USA Common Stock held by the Fresenius USA
Public

51

<PAGE>   76

Stockholders in the Fresenius USA Merger, pursuant to the Reorganization
Agreement, was fair from a financial point of view to the holders of Fresenius
USA Common Stock (other than Fresenius AG and Grace and their subsidiaries). In
rendering its opinion Salomon Brothers assumed, with the consent of the
Fresenius USA Independent Committee, that pursuant to the Reorganization
Agreement, immediately after the consummation of the Reorganization there would
be 70,000,000 outstanding FMC Ordinary Shares on a fully diluted basis,
resulting in the Fresenius USA public stockholders owning an aggregate of 4.9%
of FMC Ordinary Shares outstanding on a fully diluted basis immediately
following the Reorganization. Salomon Brothers also assumed that immediately
prior to the Fresenius USA Merger, there would be outstanding no more than
9,253,331 Fresenius USA Common Share Equivalents (i.e., the aggregate number of
shares of Fresenius USA Common Stock (i) outstanding and (ii) underlying
options, warrants and convertible securities of Fresenius USA) as required by
the Reorganization Agreement.

     THE FULL TEXT OF SALOMON BROTHERS' OPINION TO THE FRESENIUS USA INDEPENDENT
COMMITTEE, DATED MAY 8, 1996, WHICH SETS FORTH ASSUMPTIONS MADE, MATTERS
CONSIDERED AND LIMITS ON THE REVIEW UNDERTAKEN BY SALOMON BROTHERS, IS ATTACHED
AS APPENDIX D TO THIS JOINT PROXY STATEMENT-PROSPECTUS AND IS INCORPORATED
HEREIN BY REFERENCE. SALOMON BROTHERS' OPINION DELIVERED TO THE INDEPENDENT
COMMITTEE WAS DIRECTED ONLY TO THE FRESENIUS USA PUBLIC STOCKHOLDER EXCHANGE
RATIO IN THE FRESENIUS USA MERGER AND DOES NOT CONSTITUTE A RECOMMENDATION TO
ANY FRESENIUS USA STOCKHOLDER AS TO HOW SUCH STOCKHOLDER SHOULD VOTE AT THE
FRESENIUS USA SPECIAL MEETING. THE SUMMARY OF THE SALOMON BROTHERS OPINION SET
FORTH IN THIS JOINT PROXY STATEMENT-PROSPECTUS IS QUALIFIED IN ITS ENTIRETY BY
REFERENCE TO THE FULL TEXT OF SUCH OPINION. FRESENIUS USA STOCKHOLDERS ARE URGED
TO READ CAREFULLY SUCH OPINION IN ITS ENTIRETY.

     In arriving at its opinion, Salomon Brothers reviewed and analyzed (i) the
Reorganization Agreement, the Distribution Agreement and the Contribution
Agreement, (ii) a draft of this Joint Proxy Statement-Prospectus, (iii) certain
publicly available information concerning Fresenius USA, Grace, NMC and
Fresenius AG, (iv) certain pro forma financial and other information concerning
Fresenius Worldwide Dialysis furnished to Salomon Brothers by Fresenius AG, (v)
certain other internal information, primarily financial in nature, including
projections, concerning the business and operations of each of Fresenius USA,
NMC and Fresenius Worldwide Dialysis furnished to Salomon Brothers by the
respective companies, (vi) certain estimates of anticipated synergies furnished
to Salomon Brothers by Fresenius USA, NMC, Grace and Fresenius AG, (vii) certain
publicly available information concerning the trading of, and the trading market
for, Fresenius USA Common Stock, Grace Common Stock and Fresenius AG Ordinary
Shares, (viii) certain publicly available information with respect to certain
other companies that Salomon Brothers believed to be comparable to Fresenius
USA, NMC or Fresenius Worldwide Dialysis and the trading markets for certain of
such other companies' securities, and (ix) certain publicly available
information concerning the nature and terms of certain other transactions that
Salomon Brothers considered relevant to its inquiry. The information reviewed by
Salomon Brothers included preliminary versions of the pro forma financial
information of Fresenius Medical Care contained in this Joint Proxy
Statement-Prospectus. Salomon Brothers believes that the differences between the
pro forma financial information of Fresenius Medical Care contained in this
Joint Proxy Statement-Prospectus and the preliminary versions of such financial
information reviewed by Salomon Brothers would not have had a material effect on
Salomon Brothers' analysis. Salomon Brothers also considered such other
information, studies, analyses, and financial, economic, market criteria as it
deemed relevant. In addition, Salomon Brothers discussed the foregoing as well
as other matters it believed relevant to its inquiry with certain officers,
employees and representatives of Fresenius USA, NMC, Fresenius Worldwide
Dialysis, Grace and Fresenius AG.

     In arriving at its opinion, and in its April 25, 1996 presentation to the
Fresenius USA Independent Committee referred to below, Salomon Brothers did not
assume any obligations to verify any of the foregoing information and relied on
such information being complete and accurate in all material respects. With
respect to the projections as to the future financial performances of Fresenius
USA, NMC, Fresenius Worldwide

52

<PAGE>   77

Dialysis and the estimates of synergies for Fresenius Medical Care, Salomon
Brothers assumed they had been reasonably prepared on bases reflecting the best
currently available estimates and judgments of the managements of Fresenius USA,
NMC and Fresenius Worldwide Dialysis, and Salomon Brothers expressed no opinion
with respect to such projections or estimates or the assumptions on which they
were based. Salomon Brothers did not make or obtain or assume any responsibility
for making or obtaining any independent evaluations or appraisals of any of the
properties or facilities of Fresenius USA, NMC or Fresenius Worldwide Dialysis.

     While the Fresenius USA Independent Committee did not perform an
independent review of the financial information, projections and assumptions
provided to Salomon Brothers, Salomon Brothers did review certain financial
information and projections with the Fresenius USA Independent Committee. When
it accepted Salomon Brothers' fairness opinion, the Fresenius USA Independent
Committee was aware of Salomon Brothers' reliance on the information provided by

the managements of Fresenius USA, NMC and Fresenius AG.

    In arriving at its opinion, Salomon Brothers considered such financial and
other factors as it deemed appropriate under the circumstances including, among
others, the following: (i) the historical and current financial position and
results of operations of Fresenius USA, NMC and Fresenius Worldwide Dialysis;
(ii) the business prospects of Fresenius USA, NMC, Fresenius Worldwide Dialysis
and Fresenius Medical Care; (iii) the historical and current market for
Fresenius USA Common Stock and for the equity securities of certain other
companies that Salomon Brothers believed to be comparable to Fresenius USA,
Fresenius Worldwide Dialysis, NMC or Fresenius Medical Care; and (iv) the nature
and terms of certain other transactions that Salomon Brothers believed to be
relevant. Salomon Brothers also took into account its assessment of general
economic, market and financial conditions as well as its experience in
connection with similar transactions and securities valuation generally. No
limitations were imposed by either Fresenius USA or Fresenius AG with respect to
the investigations made or the procedures followed by Salomon Brothers in
rendering its opinion. However, since Fresenius AG owns a majority of the
fully-diluted outstanding shares of Fresenius USA Common Stock and, pursuant to
the Reorganization Agreement, was prohibited from selling such shares, Salomon
Brothers was not authorized to, and did not, solicit potential third parties
that might have been interested in acquiring Fresenius USA.

    In arriving at its opinion, Salomon Brothers understood that NMC is the
target of certain governmental and regulatory investigations relating to the
conduct of its business, which may result in substantial liabilities and
obligations being incurred by NMC in the future, as described in this Joint
Proxy Statement-Prospectus under "RISK FACTORS -- Risks Relating to Regulatory
Matters." While Salomon Brothers participated with the Fresenius USA Independent
Committee in discussions with the special counsel of the Fresenius USA
Independent Committee with respect to the potential outcome thereof, it was not
possible to predict that outcome and Salomon Brothers expressed no view with
respect thereto, although, in conducting its analysis and rendering its opinion,
it did, with the consent of the Fresenius USA Independent Committee, make
certain assumptions with respect thereto. In addition, in rendering its opinion,
Salomon Brothers assumed, with the consent of the Fresenius USA Independent
Committee, that (i) the Fresenius USA Merger would qualify as a tax-free
transaction under Section 351 of the Code; (ii) the transactions contemplated by
the Distribution Agreement would qualify as a tax-free distribution under
Section 355 of the Code; (iii) following the transactions contemplated by the
Distribution Agreement, Grace would have no material liabilities other than the
liabilities of NMC; (iv) Grace Chemicals and Fresenius AG would perform their
respective obligations (including indemnification obligations) under the
Distribution Agreement and the Contribution Agreement in accordance with their
respective terms; and (v) the Reorganization would not constitute a fraudulent
conveyance or fraudulent transfer under any applicable law and that the
Reorganization would comply with applicable U.S., foreign, federal and state
laws, including, without limitation, laws limiting payments of dividends and
distributions to stockholders.

    Salomon Brothers' opinion was necessarily based upon conditions as they
existed upon, and could be evaluated as of, the date of its opinion, and Salomon
Brothers assumed no responsibility to update or revise its opinion based upon
circumstances or events occurring after the date of its opinion. Salomon
Brothers' opinion related solely to the fairness, from a financial point of
view, of the Public Stockholder Exchange Ratio to the

                                      53

<PAGE>   78

holders of Fresenius USA Common Stock (other than Fresenius AG and Grace and
their subsidiaries) and did not address Fresenius USA's underlying business
decision to effect the Fresenius USA Merger or constitute a recommendation to
any holder of Fresenius USA Common Stock as to how such holder should vote with
respect to the Fresenius USA Merger.

    In connection with its opinion, Salomon Brothers made a presentation to the
Fresenius USA Independent Committee on April 25, 1996, with respect to certain
analyses performed by Salomon Brothers in arriving at its opinion and other
considerations. While the Fresenius USA Independent Committee was familiar with
the methodologies and analyses performed by Salomon Brothers and believed them
to be appropriate, it relied on Salomon Brothers' expertise in such matters with
respect to the choice and application of the methodologies used in determining
the fairness of the Reorganization. At the time of this presentation, the
parties contemplated, and Salomon Brothers assumed, that the exchange ratio in
the Fresenius USA Merger would be 1.15 FMC Ordinary Shares to be issued in
exchange for each share of Fresenius USA Common Stock and that immediately after
the consummation of the Reorganization there would be 217,170,000 outstanding
FMC Ordinary Shares, on a fully diluted basis, resulting in the Fresenius USA
Public Stockholders owning an aggregate of 4.9% of FMC Ordinary Shares
outstanding, on a fully diluted basis, immediately following the Reorganization.
Subsequently it was determined by the parties, pursuant to the Reorganization
Agreement, that there would be 70,000,000 outstanding FMC Ordinary Shares, on a
fully diluted basis, immediately following the Reorganization. The actual
Fresenius USA Public Stockholder Exchange Ratio reflects the proportional
adjustment of the exchange ratio to reflect this change in the number of
outstanding FMC Ordinary Shares. Immediately following the Reorganization the
Fresenius USA Public Stockholders will own an aggregate of 4.9% of the FMC
Ordinary Shares outstanding, on a fully diluted basis, as assumed at the time of
Salomon Brothers' April 25, 1996 presentation. The following is a summary of
such Salomon Brothers presentation. The following quantitative information, to
the extent it is based on market data, is based on market data as it existed at
April 25, 1996, and is not necessarily indicative of current market conditions.

Estimated Fresenius Medical Care Public Market Valuation.  In order to derive an estimated market valuation range for Fresenius Medical Care common stock Salomon Brothers first established estimates of firm value (which includes both equity and net indebtedness) for each of Fresenius Worldwide Dialysis (including Fresenius USA) and NMC, using both a comparable public market company analysis and a discounted cash flow ("DCF") analysis, and then added them together and made certain adjustments to establish an estimate of firm value for Fresenius Medical Care. Based on a review of certain publicly available information and stock market performance of selected publicly traded domestic and international medical product companies (including firm value as a percentage of 1995 revenues and the ratio of firm value to each of price/earnings ratios, 1995 EBITDA, 1995 EBIT, 1995 earnings and certain composite published analyst earnings estimates for 1996), Salomon Brothers established a reference range for the firm value for Fresenius Worldwide Dialysis (including Fresenius USA) of $2.1 billion to $2.5 billion. Applying a similar approach to NMC (except using as comparable companies domestic medical product companies) resulted in a reference range for the firm value of NMC of $3.95 billion to $4.8 billion.

Using a DCF methodology, Salomon Brothers estimated, for each of Fresenius Worldwide Dialysis (including Fresenius USA) and NMC, the present value of its unlevered free cash flows if it were to perform independently in accordance with its management's projections for 1996 through 2000. Unlevered free cash flow represents the amount of cash generated and available for principal, interest and dividend payments after providing for ongoing business operations. For each of Fresenius Worldwide Dialysis and NMC, Salomon Brothers aggregated (x) the present value of the projected unlevered free cash flow through 2000 with (y) the present value of the range of estimated terminal values (representing an estimate of such company's value beyond 2000). Those ranges of terminal values were calculated by applying multiples of 8x to 10x to Fresenius Worldwide Dialysis's estimated EBITDA in 2000 and multiples of 7.5x to 9.5x to NMC's estimated EBITDA in 2000. Using discount ratios of 11% to 15% for Fresenius Worldwide Dialysis and 12% to 14% for NMC, Salomon Brothers computed a range of firm values of $2.1 billion to $3.0 billion for Fresenius Worldwide Dialysis and $3.8 billion to $5.0 billion for NMC. Using narrower ranges (8.5x to 9.5x for Fresenius Worldwide Dialysis and 8.0x to 9.0x for NMC) of terminal multiples and a 13% discount rate, Salomon

54

<PAGE>    79

Brothers computed a narrower range of firm values of $2.4 billion to $2.7 billion for Fresenius Worldwide Dialysis and $4.2 billion to $4.6 billion for NMC.

Combining the total firm values of Fresenius Worldwide Dialysis and NMC and adding the present value of all assumed synergies (based on estimates provided by management of Fresenius USA, Fresenius Worldwide Dialysis, Fresenius AG , NMC and Grace, as adjusted by Salomon Brothers) and subtracting net indebtedness and an assumed amount to reflect certain contingent liabilities, resulted in implied ranges of $15.60 to $23.60 ($16.13 to $24.41 per ADS after adjustment to reflect the final determination by the parties pursuant to the Reorganization Agreement as to the aggregate numbers of FMC Ordinary Shares to be outstanding, on a fully diluted basis, immediately following the Reorganization (the "FMC Actual Capitalization Adjustment")), per FMC Ordinary Share using public market trading comparables and $18.10 to $23.60 ($18.72 to $24.41 per ADS after the FMC Actual Capitalization Adjustment) per FMC Ordinary Share using the DCF analysis. Based on this, Salomon Brothers estimated a reference range of $18 to $22 ($18.61 to $22.75 per ADS after the FMC Actual Capitalization Adjustment) per FMC Ordinary Share. Salomon Brothers noted however that there could be no assurance as to the actual price at which FMC Ordinary Shares would trade and that such stock price would vary over time and would be affected by various factors including uncertainties and developments with respect to contingent liabilities (see "RISK FACTORS"), the extent and timing of actual synergies, Fresenius Medical Care's actual results and other factors affecting Fresenius Medical Care, its business and economic and market conditions generally. Salomon Brothers noted that at the Fresenius USA Public Stockholder Exchange Ratio, this reference range for FMC Ordinary Shares implied a reference range of $20.70 to $25.30 per share of Fresenius USA Common Stock, compared to a Fresenius USA Common Stock market price of $20.50 on April 19, 1996, $19.75 on January 5, 1995 (one month prior to the announcement of the Reorganization) and a weighted average (by trading volume) market price of $17.15 over the 12 months ended April 23, 1996, representing a range of premium of 1% to 23.4%, 4.8% to 28.1% and 20.7% to 47.5%, respectively.

Fresenius USA Public Market Valuation.  Salomon Brothers reviewed certain publicly available information and stock market performance data of selected publicly traded domestic medical product companies with the financial and stock market performance of Fresenius USA. Based on its review of these selected companies' price/earnings ratios and firm value multiples of sales, EBITDA and EBIT, Salomon Brothers established a reference range of estimated equity values per share for Fresenius USA Common Stock of between $17.30 and $21.40 per share, as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock for the FMC Ordinary Shares to be received in exchange therefor.

Fresenius USA Discounted Cash Flow Analysis.  Using a DCF methodology, Salomon Brothers estimated the present value of unlevered free cash flows of Fresenius USA if Fresenius USA were to perform in accordance with Fresenius USA's management's projections for 1996 through 2000. Salomon Brothers aggregated (x) the present value of the projected unlevered free cash flow through 2000 with (y) the present value of the range of estimated terminal values (representing an estimate of Fresenius USA's value beyond 2000). The range of terminal values was calculated by applying multiples of 10x to 14x to

Fresenius USA's estimated EBITDA in 2000. Using discount rates of 11% to 15%, Salomon Brothers computed a range of firm values of $538 million to $845 million and, using a narrower terminal value range of 11x to 13x and a discount of 13%, Salomon Brothers computed a narrower range of firm values of $632 million to $729 million. Using these ranges, Salomon Brothers computed a present value per share of Fresenius USA Common Stock of $16.92 to $27.08 (using the broader range) and $20.00 to $23.30 (using the narrower range), as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock to be received in exchange therefor.

Precedent Minority Buyout Transactions. Salomon Brothers reviewed selected transactions since 1984 in which the majority owner of a publicly traded subsidiary corporation acquired the remaining public interest either for stock of the parent corporation, cash or for mixed consideration ("minority buyout transactions"). Salomon Brothers analyzed the premiums of the consideration paid to the market price of the subsidiary's stock one month prior to announcement for each of the three types of consideration. Salomon Brothers noted, among other things, the median and mean premiums in the stock-for-stock minority buyouts were 22.9% and

<div align="center">55</div>

<PAGE>    80

26.0% respectively. Applying a range of market premiums from 22.9% to 26.0% to the April 19, 1996 market price, the January 5, 1996 market price (one month prior to the announcement of the Reorganization Agreement) and the weighted average trading price for the 12 months, 6 months and 3 months ending April 23, 1996, implied stock-for-stock minority buyout prices of $25.15 to $25.83, $24.27 to $24.89, $21.08 to $21.61, $24.17 to $24.78 and $24.75 to $25.38, respectively. From this, Salomon Brothers established a minority buyout reference range for Fresenius USA of $22.00 to $25.00, as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock to be received in exchange therefor.

The foregoing is a summary of the terms of the presentation by Salomon Brothers to the Fresenius USA Independent Committee on April 25, 1996, including all material valuation analyses performed by Salomon Brothers in connection therewith, and does not purport to be a complete description of such presentation or of the analyses performed by Salomon Brothers in connection with the preparation of its opinion. The preparation of a fairness opinion is a complex process involving subjective judgments and is not necessarily susceptible to partial analysis or summary description. In arriving at its opinion Salomon Brothers did not attribute any particular weight to any analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each. Salomon Brothers believes that its analyses must be considered as a whole and that selecting portions of such analyses and the factors considered therein, without considering all factors and analyses, could create an incomplete view of the analyses and the processes underlying Salomon Brothers' opinion. The projections prepared by the management of each of Fresenius USA, Fresenius Worldwide Dialysis, NMC and Grace, and the estimates of synergies, underlying Salomon Brothers' analyses are not necessarily indicative of future results or values, which may be significantly more or less favorable than such projections and estimates. With regard to the comparable public market trading company analyses summarized above, Salomon Brothers selected comparable public companies on the basis of various factors, including the size of the public market trading company and similarity of the line of business; however, no public market trading company utilized as a comparison is identical to Fresenius Worldwide Dialysis, Fresenius or NMC and no other transaction is identical to the Reorganization. Salomon Brothers' evaluation of the results of its analyses, and the selection of ratios, multiples and discount rates to use in its analyses are not mathematical; rather, they involve complex considerations and judgments concerning differences in financial and operating characteristics of the comparable companies and other factors that could affect the public trading value of the comparable companies to which Fresenius Worldwide Dialysis, Fresenius USA and NMC are being compared. Estimates of values of companies do not purport to be appraisals or constitute a prediction of the prices at which companies or their securities actually may be sold. As noted under "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board," the fairness opinion of Salomon Brothers was only one of many factors considered by the Fresenius USA Independent Committee in determining to approve the Reorganization. Salomon Brothers has consented to the inclusion in this Joint Proxy Statement-Prospectus of its opinion delivered to the Independent Committee, a copy of which is attached as Appendix D hereto, and to the references to it and its presentation and analyses as set forth herein. Salomon Brothers' opinion delivered to the Independent Committee was directed only to the Fresenius USA Public Stockholder Exchange Ratio in the Fresenius USA Merger and does not constitute a recommendation to any Fresenius USA stockholder as to how such stockholder should vote at the Fresenius USA Special Meeting.

Salomon Brothers has provided and continues to provide financial advisory and investment banking services to Grace, for which it has received and expects to receive customary compensation. In the ordinary course of business, Salomon Brothers or its affiliates may actively trade the securities of Fresenius USA, Grace and Fresenius AG for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities.

FINANCIAL ADVISORY FEES

Pursuant to a letter agreement dated February 13, 1996, Salomon Brothers was engaged by the Fresenius USA Independent Committee to advise it and assist it in connection with the Reorganization. Pursuant to such engagement letter, Fresenius USA agreed to pay Salomon Brothers the following fees for its

services: (a)

56

<PAGE>    81

an initial fee of $100,000 (b) unless the Reorganization shall have been
terminated or withdrawn, or a fee paid pursuant to clause (c) of this paragraph,
a fee of $300,000 per month (less, in the case of the first month, the amount of
the initial fee) payable in arrears for up to five months; plus (c) upon
submission of Salomon Brothers' opinion to the Fresenius USA Independent
Committee or, if the Reorganization were terminated or withdrawn or Salomon
Brothers was not otherwise requested to render its opinion, upon Salomon
Brothers having substantially completed the work that was appropriate to prepare
it to render its opinion, an amount equal to $1,500,000 (less all amounts
previously paid pursuant to clauses (a) and (b) of this paragraph). As a result,
Salomon Brothers has become entitled to receive aggregate fees of $1,500,000.
Fresenius USA has also agreed to reimburse Salomon Brothers for its
out-of-pocket expenses, including reasonable fees and disbursements of counsel.
Fresenius USA has agreed to indemnify Salomon Brothers and certain related
persons against certain liabilities, including certain liabilities under the
federal securities laws, relating to or arising out of its engagement.

57

<PAGE>    82

                              THE REORGANIZATION

     The following describes the material aspects of the proposed
Reorganization. The following summaries of certain aspects of the Reorganization
Agreement, and the agreements attached hereto as Appendices H and I, the Grace
Tax Sharing and Indemnification Agreement and the Fresenius Tax Indemnification
Agreement do not purport to be complete and are qualified in their entirety by
reference to such agreements, which are attached as Appendices to this Joint
Proxy Statement-Prospectus and/or filed as exhibits to the Registration
Statement and are incorporated herein by reference. ALL SHAREHOLDERS ARE URGED
TO READ THE REORGANIZATION AGREEMENT AND THE OTHER AGREEMENTS IN THEIR ENTIRETY.

THE REORGANIZATION AGREEMENT

     The following transactions are to be consummated in connection with the
Reorganization:

     - Fresenius AG will contribute Fresenius Worldwide Dialysis, including its
       shares of Fresenius USA, to Fresenius Medical Care.

     - NMC will enter into the NMC Credit Agreement and, on the Effective Date,
       borrow an amount sufficient to finance the payment to, and the assumption
       of indebtedness of, Grace Chemicals such that the Debt of Grace on a
       consolidated basis, at the Effective Time, will not exceed $2.263
       billion, subject to adjustment as provided in the Reorganization
       Agreement.

     - Grace Chemicals will then distribute the capital stock of NMC to Grace,
       as a result of which Grace Chemicals and NMC will be sister companies.

     - Immediately thereafter, Grace will contribute the capital stock of Grace
       Chemicals to New Grace and effect the Distribution.

     - Immediately following the Distribution, Grace will effect the
       Recapitalization, in which each holder of Grace Common Stock will hold
       thereafter one share of Grace Common Stock and one New Preferred Share
       for each share of Grace Common Stock held.

     - Immediately following the Recapitalization, each of Grace and Fresenius
       USA will merge with wholly owned subsidiaries of Fresenius Medical Care.

     - As promptly as practicable following the Mergers, Fresenius Medical Care
       will contribute Fresenius USA to FNMC.

58

<PAGE>    83
The following chart represents the corporate organization of the parties to the
Reorganization on both pre-transaction and post-transaction bases:

                                  [CHART]


59

<PAGE>    84

CONSIDERATION TO SHAREHOLDERS

     In the Reorganization, Fresenius AG and shareholders of Grace and Fresenius
USA will receive the following consideration:

     Fresenius AG

     - Fresenius Worldwide Dialysis, including all Fresenius USA Common Stock
       held by Fresenius AG or its subsidiaries, will be contributed to
       Fresenius Medical Care in exchange for 35,210,000 FMC Ordinary Shares
       representing approximately 50.3% of all FMC Ordinary Shares outstanding,
       on a fully diluted basis, immediately following the Reorganization.

Grace Common Shareholders

- The closing price of Grace Common Stock in NYSE composite trading on August 1, 1996 was $63 1/4 per share.

- Each holder of Grace Common Stock issued and outstanding at the Time of Distribution will receive one share of New Grace Common Stock in the Distribution.

- Each holder of Grace Common Stock issued and outstanding after the Time of Distribution will receive one New Preferred Share.

- Holders of shares of Grace Common Stock issued and outstanding immediately prior to the Effective Time (other than any shares of Grace Common Stock owned by Fresenius AG or its subsidiaries, Fresenius USA or its subsidiaries or any Grace subsidiary, any shares of Grace Common Stock held in Grace's treasury or any shares of Grace Common Stock dissenting from the Reorganization) and options with respect to Grace Common Stock held by employees of NMC will be allocated 44.8% of the FMC Ordinary Shares outstanding on a fully diluted basis. As of July 15, 1996, there were outstanding 92,001,176 shares of Grace Common Stock, and options with respect to 231,006 shares of Grace Common Stock held by employees of NMC (none of whom is an officer or director of Grace). On this basis, assuming that there are no Grace Common Dissenting Shareholders and that each option with respect to Grace Common Stock held by employees of NMC is converted into an option with respect to 3.7 shares, each share of Grace Common Stock will be converted in the Grace Merger into the right to receive approximately 1.013 ADSs, each such ADS representing one-third of an FMC Ordinary Share.

Grace Preferred Stockholders

- Each share of Grace Preferred Stock and each New Preferred Share issued and outstanding immediately prior to the Effective Time and will remain issued and outstanding as FMNC stock.

Fresenius USA Common Stockholders

- The closing price of Fresenius USA Common Stock in AMEX composite trading on August 1, 1996 was $19 per share.

- Each share of Fresenius USA Common Stock issued and outstanding immediately prior to the Effective Time (other than any shares of Fresenius USA Common Stock owned by Grace or its subsidiaries or by Fresenius AG or its subsidiaries, any shares of Fresenius USA Common ~~Stock held in Fresenius USA's treasury or any shares of Fresenius USA~~ Common Stock dissenting from the Reorganization) will be converted in the Fresenius USA Merger into the right to receive approximately 1.112 ADSs, each such ADS representing one-third of an FMC Ordinary Share, and each holder of options or warrants to purchase Fresenius USA Common Stock (other than Grace or its subsidiaries or Fresenius AG or its subsidiaries) will receive options or warrants to purchase approximately 1.112 ADSs for each share of Fresenius USA Common Stock issuable upon exercise of such options or warrants. As of July 29, 1996, there were outstanding 26,374,218 shares of Fresenius USA Common Stock and options or warrants with respect to 2,636,626 shares of Fresenius USA Common Stock. On this basis, assuming that there are no Fresenius USA Dissenting

60

<PAGE>   85

Stockholders and that each option with respect to Fresenius USA Common Stock is converted into an option with respect to FMC Ordinary Shares, and that Fresenius USA effects certain securities repurchases (see "-- Additional Agreements of Fresenius USA"), holders of shares of (and options and warrants with respect to) Fresenius USA Common Stock will be allocated approximately 4.9% of the FMC Ordinary Shares.

GENERAL

- In lieu of fractional FMC Ordinary Shares or ADSs, each person who would otherwise have been entitled to a fraction of an FMC Ordinary Share or ADS will be paid an amount in cash (without interest) equal to such holder's proportionate interest in the net proceeds from the sale in the open market by the Exchange Agent appointed by Fresenius Medical Care with the approval of Grace and Fresenius AG, on behalf of all such holders, of the aggregate fractional FMC Ordinary Shares or ADSs issued.

- Each share of Grace Common Stock owned by Fresenius AG or its subsidiaries, Fresenius USA or its subsidiaries or any Grace subsidiary, or held in Grace's treasury, will be cancelled and retired without payment of any consideration therefor and will cease to exist. As of July 26, 1996, Fresenius USA owned one share of Grace Common Stock.

- Each share of Fresenius USA Common Stock owned by Grace or its subsidiaries, Fresenius AG or its subsidiaries, or any Fresenius USA subsidiary, or held in Fresenius USA's treasury, will be cancelled and retired without payment of any consideration therefor (except for the consideration set forth above) and will cease to exist. As of July 15, 1996, Grace owned no shares of Fresenius USA Common Stock.

EFFECTIVE TIME