this sentence) or (y) the increase that results from crediting such Packco Employee with an additional four years of service, and (C) the accrued benefits of all such Packco Employees, as so increased, shall be fully vested as of the Distribution Date; or (ii) provide additional retirement benefits to such Packco Employees as a group having, in the aggregate, a value substantially equivalent to the increased benefits described in clause (i); provided, that the aggregate expense associated with the benefits described in clause (i) or (ii) (as applicable) shall be limited to the extent necessary so that the Accrued Benefit Obligation, calculated in accordance with FAS 87 ("ABO"), of such benefits does not exceed $15 million. Such ABO shall be determined by Actuarial Sciences Associates ("ASA") in accordance with the actuarial assumptions set forth in Schedule II hereto and in a manner consistent with past practice with respect to the Salaried Retirement Plan.

(c)   Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Salaried Retirement Plan and the SERP, including without limitation for benefits payable thereunder to Packco Participants. Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Union Retirement Plan.

(d)   (i)   Effective immediately after the Effective Time, Grace shall establish, cause to be established or designate a defined benefit pension plan (the "Packco Hourly Non-Union Retirement Plan") to provide benefits and assume liabilities and accept a transfer of assets from the Hourly Non-Union Retirement Plan, as provided for in this Section 4.01(d).

(ii)   As soon as practicable after the Effective Time, following (A) the receipt by New Grace of a copy of a favorable determination letter or Grace's certification to New Grace, in a manner reasonably acceptable to New Grace, that the Packco Hourly Non-Union Retirement Plan is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code, and (B) the receipt by Grace of a copy of a favorable determination letter or New Grace's certification to Grace, in a manner reasonably acceptable to Grace, that the Hourly Non-Union Retirement Plan is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code, New Grace shall direct the trustee of the trust funding the Hourly Non-Union Retirement Plan to transfer to the trustee of the trust established to fund the Packco Hourly Non-Union Retirement Plan the amount described in Section 4.01(d)(iii) below. Such transfer shall be in cash unless otherwise agreed by

-12-

Grace and New Grace.  As of the date of such transfer, and ef-
fective immediately after the Effective Time, the Packco Group
and the Packco Hourly Non-Union Retirement Plan shall assume
all Liabilities for benefits payable to Packco Participants
under the Hourly Non-Union Retirement Plan, and the New Grace
Group and the Hourly Non-Union Retirement Plan shall retain no
Liabilities for such benefits.

        (iii)   The amount transferred pursuant to this
Section 4.01(d) shall be an amount equal to (A) less (B), as
adjusted by (C); where (A) equals a portion of the assets of
the Hourly Non-Union Retirement Plan having a fair market value
equal to the ABO as of the Distribution Date attributable to
Packco Participants; where (B) equals the aggregate payments
made from the trust funding the Hourly Non-Union Retirement
Plan in respect of Packco Participants from the Effective Time
through the date the transfer occurs; and where (C) equals the
amount of the net earnings or losses, as the case may be, from
the Effective Time through the date the transfer occurs, on the
average of the daily balances of the foregoing and based upon
the actual rate of return earned by the Hourly Non-Union Re-
tirement Plan during such period.  All of the foregoing calcu-
lations shall be made by ASA in accordance with the assumptions
set forth on Schedule III hereto.  Grace shall be entitled to
review and comment on such calculations as ASA is in the pro-
cess of performing them.  Notwithstanding the foregoing, how-
ever, in no event shall the amount so transferred be less than
the amount necessary to comply with, nor more than the maximum
amount permitted by, Section 414(l) of the Code and the regu-
lations promulgated thereunder, as determined by ASA.

        (iv)   Grace, New Grace and Grace-Conn. shall, in
connection with the transfer described in this Section 4.01(d),
cooperate in making any and all appropriate filings required
under the Code or ERISA, and the regulations thereunder and any
applicable securities laws, and take all such action as may be
necessary and appropriate to cause such transfers to take place
as soon as practicable after the Effective Time.  New Grace and
Grace-Conn. agree, during the period ending with the date of
the transfer of assets to the Packco Hourly Non-Union Retire-
ment Plan, to cause distributions in respect of Packco Par-
ticipants to be made in the ordinary course from the Hourly
Non-Union Retirement Plan in accordance with applicable law and
pursuant to plan provisions.

        SECTION 4.02  Savings Plans.  (a)  Grace, New Grace
and Grace-Conn. shall take all steps necessary or appropriate
so that, effective no later than the Distribution Date:  (i)
one or more members of the New Grace Group are the sole spon-
sors of the Hourly SIP and the Salaried SIP; and (ii) one or

more members of the Packco Group are the sole sponsors of the
Cypress 401(k) Plans and the Schurpack 401(k) Plan.  Effective
as of the Distribution Date, the Packco Group shall assume all
Liabilities relating to or arising under the Cypress 401(k)
Plans and the Schurpack 401(k) Plan.  Such steps shall include,
without limitation, the appointment or reappointment by New
Grace (by action after the Distribution Date to approve or
ratify such appointment or reappointment) of all named fiducia-
ries, trustees, custodians, recordkeepers and other fiduciaries
and service providers to the Hourly SIP and the Salaried SIP,
and the appointment or reappointment by Grace of all named fi-
duciaries, trustees, custodians, recordkeepers and other fidu-
ciaries and service providers to the Cypress 401(k) Plans and
the Schurpack 401(k) Plan.

        (b)   Each of the transfers provided for in this Sec-
tion 4.02(b) shall be implemented only if both Grace and New
Grace so agree after the Distribution Date.

        (i)   Grace, New Grace and Grace-Conn. shall take
all steps necessary or appropriate in order to transfer to a
Packco Savings Plan and the related trust, as soon as practi-
cable after the Effective Time, all account balances (including
the pre-tax, after-tax and rollover account balances) under
each of the Hourly SIP and the Salaried SIP of all Packco Par-
ticipants.  Such assets shall be transferred in kind, to the
extent elected by New Grace with the consent of Grace (which
consent shall not be unreasonably withheld), and otherwise
shall be made in cash; provided, that in any event, unless the
parties agree otherwise, any outstanding participant loans and
FMC American Depositary Receipts shall be transferred in kind.
It is the intention of Grace, New Grace and Grace-Conn. to
carry out such transfer so as to preserve, to the extent prac-
ticable, the investment elections of participants as in effect
immediately before the transfer, unless the parties agree oth-
erwise.

        (ii)   Grace, New Grace and Grace-Conn. shall co-
operate in making all appropriate filings required under the
Code or ERISA, and the regulations thereunder and any applica-
ble securities laws, implementing all appropriate communica-
tions with participants, maintaining and transferring appro-
priate records, and taking all such other actions as may be
necessary and appropriate to implement the provisions of this
Section 4.02(b) and to cause the transfers of assets pursuant
to this Section 4.02(b) to take place as soon as practicable
after the Effective Time; provided, that each of such transfers
shall take place only after (A) the receipt by New Grace of a
favorable determination letter or Grace's certification, in a
manner reasonably acceptable to New Grace, that the relevant

-14-

Packco Savings Plan is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code, and (B) the receipt by Grace of a favorable determination letter or New Grace's certification, in a manner reasonably acceptable to Grace, that the Hourly SIP or the Salaried SIP, as applicable, is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code.

(c)  If Grace and New Grace agree to implement the transfers provided for in Section 4.02(b), subject to the completion of such transfer and effective as of the Distribution Date, the members of the Packco Group and the SAC Savings Plan shall assume all Liabilities to or relating to Packco Participants relating to or arising under the Hourly SIP and the Salaried SIP.  Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Hourly SIP and the Salaried SIP, including without limitation for benefits payable thereunder to Packco Participants, that are not assumed by the Packco Group and the relevant Packco Savings Plan pursuant to the preceding sentence.

SECTION 4.03  Qualification of Plans.  The New Grace Group shall be responsible for all Liabilities incurred by the Packco Group as a result of the failure of any of the Hourly Non-Union Retirement Plan, the Union Retirement Plan, the Hourly SIP, the Salaried SIP, the Cypress 401(k) Plans or the Schurpack 401(k) Plan to be qualified under Section 401(a) of the Code on or before the date assets are transferred from such Plan to a Packco Benefit Plan, or the date sponsorship of such Plan is assumed by any member of the Packco Group, as applicable.  The Packco Group shall be responsible for all Liabilities incurred by the New Grace Group as a result of the failure of the Packco Hourly Non-Union Retirement Plan or any Packco Savings Plan to be qualified under Section 401(a) of the Code on or before the date assets are transferred to such Plan from a New Grace Benefit Plan.  The parties hereto agree that to the extent any of them becomes aware that any such Plan fails or may fail to be so qualified, it shall notify the other parties and the parties shall cooperate and use best efforts to avoid such disqualification, including using the Internal Revenue Service's Voluntary Compliance Resolution program or similar programs, and taking any steps available pursuant to such program to avoid disqualification, as determined by the party who is made responsible under this Section 4.03 for the Liabilities that would result from such disqualification (and the Liabilities for which such party is responsible shall include all costs and expenses resulting from such steps, including

fines, penalties, contributions, attorneys' fees and expenses
and administrative expenses).

## ARTICLE V

## WELFARE AND OTHER BENEFITS

SECTION 5.01  **Benefits for Active Employees.**  (a)
Grace, New Grace and Grace-Conn. shall take all steps necessary
or appropriate so that, effective no later than the Distribu-
tion Date, one or more members of the Packco Group are the sole
sponsors of the Packco Health Plan.  Such steps shall include,
without limitation, the appointment or reappointment by Grace
of all named fiduciaries, trustees, custodians, recordkeepers
and other fiduciaries and service providers to the Packco
Health Plan, to the extent such appointments or reappointments
are necessary.

(b)  Effective as of the Distribution Date, the New
Grace Group shall assume or retain (as applicable) all Liabil-
ities relating to or arising out of claims for benefits under
U.S. Welfare Plans by New Grace Participants and Terminated
Grace Participants, whenever such claims are incurred, and (ii)
by Packco Participants to the extent such claims are incurred
before the Distribution Date and reported within 365 days
thereafter.  Effective as of the Distribution Date, the Packco
Group shall assume or retain (as applicable) all Liabilities
relating to or arising out of all other claims for benefits
under U.S. Welfare Plans by Packco Participants, except as spe-
cifically provided in Section 5.02.

SECTION 5.02  **Retiree Welfare Benefits.**  Effective as
of the Distribution Date, the New Grace Group shall assume all
Liabilities for providing post-retirement medical and life in-
surance benefits under U.S. Welfare Plans sponsored by Grace or
any of its subsidiaries before the Distribution Date or any
members of the New Grace Group on or after the Distribution
Date, to:  (i) Terminated Grace Participants; (ii) Packco Par-
ticipants who would have been eligible to receive such benefits
if they had retired at any time on or before the first anniver-
sary of the Distribution Date (regardless of when they actually
do retire); and (iii) any New Grace Participants who become
eligible for such benefits after the Distribution Date pursuant
to the Grace Severance Pay Plan as a result of a termination of
employment as of the Distribution Date.  Effective as of the
Distribution Date, the Packco Group shall provide Packco Par-
ticipants who retire after the Distribution Date for whom the
New Grace has not assumed Liabilities for providing post-
retirement medical and life insurance benefits pursuant to the

-16-

preceding sentence with such benefits pursuant to one or more
group insurance or group self-insured programs; provided, that
the Packco Group may require such Packco Participants to bear
the entire cost of such benefits, together with a reasonable
fee for their allocable share of the Packco Group's costs of
administering such programs.

SECTION 5.03  Severance.  The Packco Group shall
adopt, effective as of the Distribution Date, and shall main-
tain in effect without amendment adverse to participants, at
least through the first anniversary of the Distribution Date, a
severance plan providing Packco Employees with severance ben-
efits as outlined in Exhibit A hereto.

SECTION 5.04  Split Dollar Plan; Deferred Compensa-
tion Plan; Salary Protection Plan.  Effective as of the Distri-
bution Date, each Packco Employee who participates in the Split
Dollar Plan, the Deferred Compensation Plan or the Salary Pro-
tection Plan shall be treated as a terminated participant under
such Plan, and shall have the same options with respect to such
Plan as are available to any other participant in such Plan
upon termination of employment, in accordance with the terms of
such Plan as in effect immediately before the Distribution
Date.  Effective as of the Distribution Date, the New Grace
Group shall assume all Liabilities relating to or arising under
the Split Dollar Plan, the Deferred Compensation Plan and the
Salary Protection Plan.

SECTION 5.05  Dependent Care and Medical Expense
Plans.  (a)  Grace, New Grace and Grace-Conn. shall take all
steps necessary or appropriate so that, effective no later than
the Distribution Date, one or more members of the New Grace
Group are the sole sponsors of the Grace Dependent Care Plan
and the Grace Medical Expense Plan, and the New Grace Group
shall assume all Liabilities under such Plans.  Such steps
shall include, without limitation, the appointment or reap-
pointment by New Grace (by action after the Distribution Date
to approve or ratify such appointment or reappointment) of all
named fiduciaries, trustees, custodians, recordkeepers and
other fiduciaries and service providers to such Plans, to the
extent such appointments or reappointments are necessary.

(b)  Grace, New Grace and Grace-Conn. shall take all
steps necessary or appropriate so that, effective no later than
the Distribution Date, one or more members of the Packco Group
are the sole sponsors of the Packco Medical and Dependent Care
Expense Plan, and the Packco Group shall assume all Liabilities
under such Plan.  Such steps shall include, without limitation,
the appointment or reappointment by Grace of all named fiducia-
ries, trustees, custodians, recordkeepers and other fiduciaries

-17-

and service providers to such Plan, to the extent such appoint-
ments or reappointments are necessary.  No employer contribu-
tions to such Plan shall be made or promised with respect to
the 1998 plan year unless the parties otherwise agree.

ARTICLE VI

NON-U.S. PLANS

SECTION 6.01  **Non-U.S. Plans Generally.**  As soon as
practicable after the date of this Agreement, the parties here-
to shall enter into one or more agreements or memoranda of un-
derstanding (collectively, the "<u>Foreign Plans Agreement</u>") re-
garding the treatment and allocation of Liabilities relating to
or arising under Benefit Plans (the "Foreign Plans") for Em-
ployees located outside the United States, including without
limitation expatriates, and to expatriate employees located in
the United States.  The Foreign Plans Agreement shall provide
for the treatment of each Foreign Plan, which treatment may
include (without limitation) (i) the retention or assumption of
such Foreign Plan by the Packco Group, (ii) the retention or
assumption of such Foreign Plan by the New Grace Group, or
(iii) an allocation of the liabilities and assets (if any) of
the Foreign Plan between a Plan (which may include the Foreign
Plan) that is intended to be maintained by the New Grace Group
and a Plan (which may include the Foreign Plan) that is in-
tended to be maintained by the Packco Group, after the Distri-
bution Date; provided, that the insurance contracts funding
each Insured Foreign Pension Plan (and any assets related
thereto) shall be divided between the appropriate Packco Ben-
efit Plan and New Grace Benefit Plan by the insurer in accor-
dance with applicable law, regulation and practice.  Any trans-
fers of assets or liabilities from a Noninsured Foreign Pension
Plan shall be made on the basis of reasonable methods and as-
sumptions determined by the local actuarial firm that is, as of
the date of this Agreement, serving as the actuary for such
Noninsured Foreign Pension Plan (or another actuarial firm if
the parties hereto so agree) (the "<u>Local Actuary</u>"), in ac-
cordance with applicable legal and regulatory requirements,
local practice and the past practice of Grace; provided, that
each of Grace, Grace-Conn. and New Grace shall be entitled to
review such methods and assumptions and object to them if they
are unreasonable, and to review all calculations and determina-
tions of the Local Actuary for accuracy.  It is the intention
of the parties hereto that the Packco Group will assume or re-
tain Liabilities for Packco Employees under Foreign Plans and
that to the extent permitted and practicable under legal and
regulatory requirements and local practice, assets transferred
from Noninsured Foreign Pension Plans pursuant to the Foreign

-18-

Plans Agreement shall equal the Projected Benefit Obligation, calculated in accordance with FAS 87, for the liabilities assumed by Packco Benefit Plans pursuant to the Foreign Plans Agreement.

## ARTICLE VII

### GENERAL

SECTION 7.01  **Preservation of Rights to Amend or Terminate Plans and to Terminate or Change Terms of Employment.** No provision of this Agreement shall be construed as a limitation on the rights of any member of the Packco Group or the New Grace Group to amend or terminate any Benefit Plan or other plan, program or arrangement relating to employees.  No provision of this Agreement shall be construed to create a right in any employee or former employee or beneficiary or dependent of such employee or former employee under a Benefit Plan which such employee or former employee or beneficiary would not otherwise have under the terms of the Benefit Plan itself.  Nothing contained in this Agreement shall confer upon any individual the right to remain an employee of any member of the Packco Group or the New Grace Group or restrain any member of the Packco Group or the New Grace Group from changing the terms and conditions of employment of any individual at any time following the Distribution Date, except as provided in Section 5.03 of this Agreement.

SECTION 7.02  **Other Liabilities; Guarantee of Obligations.**  Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any New Grace Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace or any of its subsidiaries before the Distribution Date or employment by any member of the New Grace Group on or after the Distribution Date.  Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) responsibility for all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any Packco Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace

or any of its subsidiaries before the Distribution Date or em-
ployment by any member of the Packco Group on or after the Dis-
tribution Date.  Notwithstanding the foregoing, this Section
7.02 shall not apply to any Liability that is specifically pro-
vided for elsewhere in this Agreement.

SECTION 7.03  **Assumption of Plans; Termination of
Participation.**  Except as specifically provided otherwise in
this Agreement, Grace, New Grace and Grace-Conn. shall take all
steps necessary or appropriate so that, effective no later than
the Distribution Date, one or more members of the New Grace
Group are the sole sponsors of all Benefit Plans that are, as
of the date of this Agreement, sponsored by Grace, and the New
Grace Group shall assume or retain (as applicable) all Li-
abilities relating to or arising under such Benefit Plans.
Such steps shall include, without limitation and where ap-
propriate, the appointment or reappointment by New Grace (by
action after the Distribution Date to approve or ratify such
appointment or reappointment) of all named fiduciaries, trust-
ees, custodians, recordkeepers and other fiduciaries and ser-
vice providers to such Benefit Plans.  Except as specifically
provided otherwise in this Agreement or in the agreement pro-
vided for in Section 6.01 of this Agreement, the accrual of
benefits by Packco Participants in any New Grace Benefit Plan
shall cease not later than the Distribution Date.

SECTION 7.04  **Information.**  The parties hereto shall,
before the Distribution Date or as soon as practicable thereaf-
ter, provide each other with all information as may reasonably
be requested and necessary to administer each Benefit Plan ef-
fectively in compliance with applicable law.  Such information
shall be provided in the form requested if, at the time of such
request, it exists in such form or can readily be converted to
such form.  If a request would require a party providing infor-
mation to incur any expenses in order to receive advice from
any actuary, consultant or consulting firm, the information
need not be provided unless the requesting party reimburses the
party providing the information for all such expenses.

SECTION 7.05  **Complete Agreement; Coordination with
Tax Sharing Agreement.**  (a)  This Agreement, the Exhibits and
Schedules hereto and the agreements and other documents re-
ferred to herein, shall constitute the entire agreement between
the parties hereto with respect to the subject matter hereof
(other than the Distribution Agreement, the Merger Agreement
and the schedules and exhibits thereto) and shall supersede all
previous negotiations, commitments and writings with respect to
such subject matter.

(b)   This Agreement, and not the Tax Sharing Agreement, constitutes the sole agreement of the parties regarding responsibility for any excise taxes, penalties or similar levies that may be imposed by any taxing authority on, or with respect to, any Benefit Plan, except as otherwise specifically provided in the Tax Sharing Agreement with respect to payroll taxes.

SECTION 7.06   **Governing Law.**   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflict of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies, except to the extent preempted by federal law.

SECTION 7.07   **Notices.**   All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given as provided in the Distribution Agreement.

SECTION 7.08   **Successors and Assigns; No Third-Party Beneficiaries.**   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party (which consent shall not be unreasonably withheld).   Without limiting the generality of the foregoing, it is expressly acknowledged that at the Effective Time, the Certificate of Incorporation of Grace will be amended (the "Newco Amendment") to change the name of Grace to "Sealed Air Corporation" and that references herein to "Grace" include, from and after the Effective Time, such corporation (which is also referred to in the Merger Agreement as Newco). Accordingly, to the extent this Agreement calls for the agreement of "Grace" or of "the parties" from and after the Effective Time, the agreement of Newco (as defined in the Merger Agreement) will be required.   This Agreement is solely for the benefit of the parties hereto and their Subsidiaries and is not intended to confer, nor shall it confer, upon any other Persons (including New Grace Participants and Packco Participants) any rights or remedies hereunder.

SECTION 7.09   **Amendment and Modification.**   This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

SECTION 7.10  **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 7.11  **Interpretation.**  The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

SECTION 7.12  **Indemnity Procedures.**  The provisions of Article IV of the Distribution Agreement shall apply with respect to Liabilities allocated under this Agreement.

SECTION 7.13  **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 7.14  **References; Construction.**  References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement.  Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 7.15  **SAC Reasonable Consent.**  The parties hereto agree that any actions to be taken by Grace, Grace-Conn. or New Grace to implement the terms of this Agreement that are not specifically required herein that relate to Packco or the Packaging Business, and any actions that are to be taken pursuant to this Agreement only by agreement of the parties, must be reasonably satisfactory to SAC.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

W. R. GRACE & CO.

By: _____
Name:   Larry Ellberger
Title: Senior Vice President


W. R. GRACE & CO.-CONN.

By: _____
Name:   Robert B. Lamm
Title: Vice President


GRACE SPECIALTY CHEMICALS, INC.

By: _____
Name:   W.B. McGowan
Title: Senior Vice President

-23-

## SCHEDULE I

### Change in Control Severance Agreements

Change in Control Severance Agremeents with:

Albert J. Costello
Robert H. Beber
Robert J. Bettacchi
Larry Ellberger
Pamela J. Hamilton
James R. Hyde
J. Gary Kaenzig, Jr.
W. Brian McGowan
Kathleen A. Browne
Stephen E. Karinshak
Mary Lou Kromer
Robert B. Lamm
Paul McMahon
William L. Monroe
Bernd A. Schulte
David B. Siegel

52029v2

SCHEDULE II

## W.R. GRACE & CO. RETIREMENT PLAN
## SALARIED EMPLOYEES

### Assumptions Underlying Cost Estimates For Cryovac Plan Participants

1. Interest          7.50%

2. Mortality         1983 Group Annuity Mortality Tables for Males and Females

3. Termination       Sample Rates are as follows:
                     Year of Service from Date of Hire

| Age | 1 | 2 | 3 | 4 | 5 | 6 + Over |
|-----|------|------|-------|-------|-------|----------|
| 25 | 22.0% | 22.0% | 18.2% | 18.4% | 13.0% | 7.0% |
| 35 | 18.4 | 16.5 | 13.6 | 14.5 | 10.7 | 6.8 |
| 45 | 14.4 | 13.8 | 10.8 | 11.7 | 9.2 | 6.3 |
| 55 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

4. Disability        Sample Rates are as follows:

| Age | |
|-----|------|
| 25 | .04% |
| 35 | .06% |
| 45 | .16% |
| 55 | .56% |

5. Retirement        Rates are as follows:

| Age | |
|-------|--------|
| 55-56 | 6.0% |
| 57-59 | 7.0% |
| 60 | 9.0% |
| 61 | 10.0% |
| 62 | 26.0% |
| 63 | 14.0% |
| 64 | 18.0% |
| 65 | 38.0% |
| 66 | 22.0% |
| 67 | 30.0% |
| 68 | 29.0% |
| 69 | 26.0% |
| 70 | 100.0% |

SCHEDULE III



An AT&T Company

Ana Rachel Quesada, A.S.A.
Consulting Actuary

August 6, 1997

Mr. John Forgach
Benefits Counsel
Legal Services Group
W.R. Grace & Co.
One Town Center Road
Boca Raton, FL 33486

Dear John:

As requested, enclosed is a table outlining the assumptions to be used to determine the amount of assets to be transferred for the Formpac Hourly Plan from the W.R. Grace & Co. Retirement Plan for Non-Union Hourly Employees of Subsidiary Corporations (Grace Non-Union Plan).

The qualifications requirements under IRC Section 401(a)(12) require that the spinoff of assets and liabilities from a qualified plan must satisfy IRC Section 414(l). We believe IRC Section 414(l) is satisfied by transferring assets equal to the present value of accrued benefits.

IRS Reg. 1.414(l) - 1(b)(9) states that "...the present value of an accrued benefit must be determined on the basis of reasonable actuarial assumptions". At the 1994 Enrolled Actuaries Meeting, the IRS representatives stated that it is likely that any interest rate within the allowable range for current liabilities, defined as 90% to 110% of the 4 year weighted average of 30 year Treasuries, would be considered reasonable (i.e., 6.18% to 7.56% for June, 1997).

Thus based on current interest rates, as shown on the attached table, we will use an interest rate of 7.5%. All other assumptions shown on the attached table are the assumptions used for the January 1, 1997 actuarial valuation of the Grace Non-Union Plan.

If you have any questions, please call.

Sincerely,

Rachel

cc:     B. Landstrom
        J. Nemeth

ACTUARIAL SCIENCES ASSOCIATES, INC.

5200 Town Center Circle, Suite 201, Boca Raton, FL 33486
Phone (561) 362-7906  Fax (561) 362-7901

### W.R. GRACE & CO. RETIREMENT PLAN
### FOR NON-UNION HOURLY EMPLOYEES
### OF SUBSIDIARY CORPORATIONS

Spinoff of Assets for Formpac Hourly Plan

I.  Amount of Assets to be Transferred Equals the Present Value of Accrued Benefits

II. Actuarial Assumptions

Interest         7.50%

Mortality        1983 Group Annuity Mortality Tables for Males and Females

Termination      Sample Rates are as follows:

| | | | Year of Service from Date of Hire | | | |
|---|---|---|---|---|---|---|
| Age | 1 | 2 | 3 | 4 | 5 | 6 + Over |
| 25 | 25.6% | 19.8% | 18.5% | 16.3% | 14.9% | 11.3% |
| 35 | 22.5 | 17.7 | 15.8 | 13.5 | 12.9 | 6.0 |
| 45 | 20.0 | 16.0 | 12.9 | 11.4 | 11.0 | 4.0 |
| 55 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

Disability       Sample Rates are as follows:

| Age | |
|---|---|
| 25 | .05% |
| 35 | .08% |
| 45 | .15% |
| 55 | .54% |

Retirement       Rates are as follows:

| Age | |
|---|---|
| 55-59 | 2.5% |
| 60 | 3.5% |
| 61 | 6.0% |
| 62 | 25.0% |
| 63-64 | 10.0% |
| 65 | 40.0% |
| 66 | 25.0% |
| 67-68 | 20.0% |
| 69 | 60.0% |
| 70 | 100.0% |


An AT&T Company

EXHIBIT A

SEVERANCE BENEFITS FOR PACKCO EMPLOYEES

Covered Employees:

All individuals who are Packco Employees as of the
Effective Time and are regular, full-time salaried or non-
union hourly employees, excluding temporary or part-time
employees and employees covered by collective bargaining
agreements.

Effective Date of the Plan:

The date on which the Effective Time occurs.

Entitlement to Benefits:

A Covered Employee is entitled to severance benefits as
set forth below upon any termination of his or her
employment by the Company, other than:

- layoff or leave of absence (paid or unpaid);

- termination by the Covered Employee for any
  reason, including resignation or retirement, prior
  to the Covered Employee's last scheduled
  employment date;

- termination by the Company for (i) misconduct with
  respect to the Covered Employee's obligations to
  the Company, (ii) "Cause" (as defined below),
  (iii) violation of any agreement between the
  Covered Employee and the Company, (iv) failure to
  follow policies, rules or procedures of the
  Company or of the Covered Employee's business
  unit, or similar reasons;

- the Covered Employee refuses to accept an offer to
  transfer to another position at the Company for a
  Base Salary (in the case of a salaried Covered
  Employee) or hourly rate of pay (in the case of a
  non-union hourly Covered Employee) that is not
  less than the Covered Employee's then-current Base
  Salary (as defined below) or then-current hourly
  rate of pay, as applicable, where the principal
  work location of the position is within a
  reasonable commuting distance of the Covered
  Employee's residence;

    °  the Covered Employee fails to follow policies,
      rules or procedures of the Company or of the
      Covered  Employee's business unit or (ii) fails to
      adhere to any agreement between the Covered
      Employee and the Company;

    °  the Covered Employee is entitled to receive long-
      term disability payments under any plan or program
      sponsored by the Company;

OR

    °  the Company sells or transfers all or a portion of
      the stock or assets of a business of the Company
      to another person or entity and the Covered
      Employee becomes an employee of, or is offered
      employment with, such other person or entity.

"Cause" means the willful refusal by the Covered Employee
to substantially carry out his or her assigned duties and
responsibilities, or the Covered Employee engaging in
actions that are injurious to the Company (monetarily or
otherwise).

Severance Benefits:

1-1/2 Weeks' Pay for each Year of Service (subject to a
minimum of 4 Weeks' Pay and a maximum of 52 Weeks' Pay),
plus 13 Weeks' Pay, and, for the same period, continuation
of medical and life insurance benefits, on the same terms
and conditions as would be applicable if the Covered
Employee had remained an active employee.

A "Week's Pay" means, with respect to a salaried Covered
Employee, his or her most current annual Base Salary,
divided by 52, and with respect to a non-union hourly
Covered Employee, his or her most current hourly rate of
pay, multiplied by 40.  "Base Salary" means the regular
earnings paid by the Company to a Covered Employee, and
does not include (a) overtime, commission, incentive,
special, premium or bonus compensation or (b) any amount
attributable to Company-sponsored employee benefit plans,
whether or not such compensation or amount is taxable as
income.  A "Year of Service" means a period of twelve
consecutive months of "Service," and "Service" includes
service with W. R. Grace & Co. and its subsidiaries before
the Distribution Date as well as service with members of
the Packco Group.

Amendment and Termination:

The plan may not be amended or terminated in any manner
that would have adverse effect on any Covered Employee

whose termination of employment occurs on or before the
first anniversary of the Effective Date (as defined above.

**Exhibit D**

## AGREEMENT REGARDING
## FOREIGN PENSION AND EMPLOYEE MATTERS

This AGREEMENT REGARDING FOREIGN PENSION AND EMPLOYEE MATTERS (this "Agreement"), dated as of March 30, 1998, by and among W.R. Grace & Co., a Delaware corporation ("Grace"), W.R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), Grace Specialty Chemicals, Inc., a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace"), and Sealed Air Corporation, a Delaware corporation ("SAC").

## RECITALS

A.   *The Merger Agreement.*  Grace, Packco Acquisition Corp. and SAC have entered into an Agreement and Plan of Merger, dated as of August 14, 1997 (the "Merger Agreement"), pursuant to which, at the Effective Time (as defined therein), a wholly owned subsidiary of Grace will merge with and into SAC, with SAC being the surviving corporation (the "Merger"), and Grace being renamed "Sealed Air Corporation".

B.   *The Distribution Agreement.*  The Distribution Agreement dated as of March 30, 1998, by and among Grace, Grace-Conn. and New Grace (the "Distribution Agreement"), the Employee Benefits Allocation Agreement dated as of March 30, 1998 by and among Grace, Grace Conn. and New Grace (the "EBA") and the Other Agreements (as defined in the Distribution Agreement) set forth certain transactions that SAC has required as a condition to its willingness to consummate the Merger, including the divestiture by Grace of the businesses and operations to be conducted by New Grace and its subsidiaries, including Grace-Conn.

C.   *This Agreement.*  This Agreement sets forth certain agreements of the parties pertaining to foreign pension and employee matters.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

## ARTICLE I

## AMENDMENTS TO DISTRIBUTION AGREEMENT; MAKE-UP PAYMENT

SECTION 1.01  **Definitions.**  Capitalized terms used but not defined in this Article I shall have the meanings ascribed to them in the Distribution Agreement (as amended by this Agreement).

SECTION 1.02  **Amendments to "Net Benefit Amount"
Definition.**  (a)  The definition of "Net Benefit Amount"
contained in Article I of the Distribution Agreement is hereby
amended by deleting the third sentence of the last paragraph
thereof.

(b) The definition of "Net Benefit Amount" contained in
Article I of the Distribution Agreement is hereby further amended
by amending the first sentence of such definition to read in its
entirety as follows:  "the amount (whether positive or negative)
equal to (i) the Foreign Plan Assets minus (ii) the Foreign
Benefit Plan Liabilities (each as defined below)."

(c) The definition of "Net Benefit Amount" contained in
Article I of the Distribution Agreement is hereby further amended
by inserting the following new material at the end thereof:

The Net Benefit Amount shall be calculated by AON,
based upon the actual employee allocations between the
Packco Group and the New Grace Group as of the
Distribution Date, and the actual market value of
retirement plan assets (including any contribution
receivables) as of the Distribution Date.  Such
calculation shall be completed by AON by no later than
May 31, 1998, unless AON and the parties hereto
determine that the calculation cannot be completed by
that date, in which case AON and the parties hereto
shall agree upon a different, subsequent date for such
completion.  All calculations made by AON shall be
subject to the review of New Grace and SAC, and their
respective advisors, and such calculations shall become
final and binding only after New Grace, SAC and their
respective advisors have had an adequate opportunity to
comment thereon.

The Net Benefit Amount, as calculated as set forth
in the preceding paragraph, shall be multiplied by a
fraction, the numerator of which is 21 and the
denominator of which is 58 (the result of such
multiplication being referred to herein as the
"Adjustment Amount").  If the Adjustment Amount is
between $19 million and $23 million (inclusive of $19
million and $23 million), then the parties to this
Agreement shall not make any payments related to the
calculation of the Net Benefit Amount and there shall
be no Adjustment Surplus and no Adjustment Deficit.  If
the Adjustment Amount is greater than $23 million, then
there shall be an Adjustment Surplus equal to the
Adjustment Amount minus $21 million.  If the Adjustment
Amount is less than $19 million, then there shall be an

Adjustment Deficit equal to $21 million minus the Adjustment Amount.

If the amount of the U.S. Plan Assets exceeds the amount of the U.S. Benefit Plan Liabilities (each as defined above), there shall be a U.S. Plan Surplus in an amount equal to such excess. If the amount of the U.S. Benefit Plan Liabilities exceeds the amount of the U.S. Plan Assets, there shall be a U.S. Plan Deficit in an amount equal to such excess. If the amount of the U.S. Plan Assets equals the amount of the U.S. Benefit Plan Liabilities, there shall be no U.S. Plan Surplus or U.S. Plan Deficit. It is understood that U.S. Plan Assets shall include any contribution receivables.

SECTION 1.03  **Amendment to "New Grace Capital Contribution" Definition.**  The definition of "New Grace Capital Contribution" contained in Article I of the Distribution Agreement is hereby amended by deleting the phrase "the Net Benefit Amount" and inserting in its place the following:

$21,000,000, plus the Adjustment Surplus or minus the Adjustment Deficit, whichever (if any) is applicable, plus the U.S. Plan Surplus or minus the U.S. Plan Deficit, whichever (if any) is applicable (each such term as defined in the definition of "Net Benefit Amount" above).

SECTION 1.04  **Post-Distribution-Date Adjustment.**  Since it will not be determined until after the Distribution Date whether there is a U.S. Plan Surplus, a U.S. Plan Deficit, an Adjustment Surplus or an Adjustment Deficit, any change to the New Grace Capital Contribution that may result from such determination shall be reflected by a payment made by the appropriate party as soon as practicable after all necessary calculations have been completed and have become final, in accordance with the provisions of the Distribution Agreement, as amended by this Article I.

## ARTICLE II

### AMENDMENTS TO EBA; FOREIGN PLANS AGREEMENT

SECTION 2.01  **Amendments to Section 6.01.**  (a)  Section 6.01 of the EBA is amended by inserting "(a)" before the first sentence thereof and deleting the last sentence thereof.

(b)  Section 6.01 of the EBA is further amended by inserting additional subsections (b) through (f) at the end thereof, reading in their entirety as follows:

-3-

(b)   The assets of each Noninsured Foreign Pension Plan shall be allocated between a Packco Benefit Plan and a New Grace Benefit Plan that are to be maintained in the same country after the Distribution Date (such Packco Benefit Plan and New Grace Benefit Plan, respectively, a "Packco Mirror Plan" and a "New Grace Mirror Plan"), based upon the methods and assumptions specified by the applicable Local Actuary's letter included in Schedule A hereto (each such letter, a "Local Actuary's Letter").  The basic principle underlying such methods shall be as follows:  (i) the liabilities attributable to Packco Participants shall be allocated to the Packco Mirror Plan, and the liabilities attributable to the New Grace Participants shall be allocated to the New Grace Mirror Plan, in each case as calculated by the applicable Local Actuary as of the Distribution Date; then (ii) a percentage of the actual total assets (if any, and including any contribution receivables), determined as of the Distribution Date, of the Noninsured Foreign Pension Plan, equal to the percentage of such liabilities that are so allocated to the Packco Mirror Plan, shall be allocated for the benefit of the Packco Mirror Plan, and the remainder of such assets shall be allocated for the benefit of the New Grace Mirror Plan.  The appropriate percentage of the assets (if any) of each Noninsured Foreign Pension Plan shall actually be transferred to the Packco Mirror Plan or New Grace Mirror Plan, as appropriate, to which they are so allocated as soon as practicable after the Distribution Date.  Each such transfer shall be in cash, unless the parties agree otherwise or a transfer of cash is not practicable.

(c)  Notwithstanding the definitions of "New Grace Participant" and "Packco Participant" contained in Article I of this Agreement, for purposes of this Article VI, inactive participants in the Noninsured Foreign Pension Plans in Australia, New Zealand, Canada and Ireland (including, but not limited to, retirees, terminated vested participants, disabled participants and dependents of former participants) shall be regarded as "Packco Participants," and inactive participants in other Noninsured Foreign Pension Plans shall be regarded as "New Grace Participants."

(d)  With respect to each Noninsured Foreign Pension Plan, from the Distribution Date and until the assets of such Plan are actually transferred to a Packco Mirror Plan or a New Grace Mirror Plan, as appropriate, pursuant to Section 6.01(b) above, the liabilities and assets allocated for the benefit of the Packco Mirror Plan and the liabilities and assets allocated for the benefit of the New Grace Mirror Plan in accordance with Section 6.01(b)

-4-

shall be accounted for separately, as if they were
liabilities and assets of separate plans, including, without
limitation, for purposes of payments, contributions,
liabilities and earnings allocations.

(e) Notwithstanding the provisions of Section
6.01(b), for purposes of the determination of the allocation
of assets of The Grace UK Pension Plan pursuant to Section
6.01(b), the liabilities of The Grace UK Pension Plan
attributable to the Packco Mirror Plan shall not be
considered to include the liabilities of the Packco Mirror
Plan attributable to the change in the definition of
pensionable compensation pursuant to the Time For Change
Benefit Enhancement Program.  The requirements of this
Section 6.01(e) shall be reflected in the applicable Local
Actuary's Letter.

(f)  All contributions required to be made to
Noninsured Foreign Pension Plans for any period ending on or
before the Distribution Date shall be made by the New Grace
Group and shall be reflected by the parties in subsequent
calculations and adjustments as if they had been made on or
before the Distribution Date.

SECTION 2.02  **Foreign Plans Agreement.**  Section 2.01(b)
of this Agreement and Schedule A to this Agreement shall be
regarded as comprising the "Foreign Plans Agreement" referred to
in Section 6.01(a) of the EBA.

SECTION 2.03  **Certain Deferred Compensation.**  (a)
Section 3.01 of the EBA is amended by adding a new subsection (c)
at the end thereof, reading in its entirety as follows:

(c)  Notwithstanding Section 3.01(b) above,
effective as of the Distribution Date:  (i) the Packco
Group shall assume all Liabilities under the Grace LTIP
relating to or arising out of the cash awards payable
thereunder to Mr. Kaenzig and Mr. Weinberg with respect to
the 1995-1997 performance period (the "1997 Deferred LTIP
Awards") and the cash award payable thereunder to Mr.
Weinberg with respect to the 1994-1996 performance period
(the "1996 Deferred LTIP Award"), payment of which awards
has been deferred, including without limitation any
Liabilities relating to or arising out of such deferral; and
(ii) in consideration of such assumption, the New Grace
Group shall pay the Packco Group, as promptly as practicable
after the Distribution Date, an amount in cash equal to the
excess of (x) 63% of the amount of the 1997 Deferred LTIP
Awards as accrued through the Distribution Date over (y) the
amount deducted from the amount of cash held by Packco and

-5-

the Packco Subsidiaries pursuant to Section 2.01(a)(v) of
the Supplemental Agreement dated as of March 30, 1998 among
Grace, Cryovac, Inc., Grace-Conn. and New Grace.

    (b)    Section 5.04 of the EBA is amended by inserting
"(a)" at the beginning thereof, deleting all references in the
first paragraph thereof to the "Deferred Compensation Plan," and
adding a new subsection (b) at the end thereof, reading in its
entirety as follows:

        (b)    Effective as of the Distribution Date, the
    Packco Group shall assume all Liabilities to or with respect
    to Packco Employees relating to or arising out of the
    Deferred Compensation Plan (it being understood that the
    deferred stock award of Mr. Kaenzig under the Grace LTIP is
    not a Liability under the Deferred Compensation Plan).  The
    New Grace Group and the Packco Group shall take all steps
    necessary or appropriate so that, as soon as practicable
    after the Distribution Date, one or more members of the
    Packco Group are the owners of any insurance policies
    relating to the Liabilities assumed by the Packco Group
    pursuant to the preceding sentence (such insurance policies,
    the "Transferred Policies").  As soon as practicable
    following the Distribution Date, the New Grace Group shall
    cause the Todd Organization of New York, Inc. (the "Todd
    Organization"), to update its valuation of the Transferred
    Policies and of the Liabilities assumed pursuant to this
    Section 5.04(b) and the 1996 Deferred LTIP Award
    (collectively, the "Assumed Deferred Liabilities") to
    reflect events through the Distribution Date, and to deliver
    such updated valuation to SAC and New Grace.  Such updated
    valuation shall be prepared using the same methodologies as
    were used in preparing the letter dated February 4, 1998
    from Kevin Hicke of the Todd Organization to Barry Levine of
    KPMG Peat Marwick LLP.  If such updated valuation shows that
    the amount of the Assumed Deferred Liabilities exceeds the
    value of the Transferred Policies as of the Distribution
    Date, then New Grace shall promptly pay 63% of the amount of
    such excess in cash to SAC.

### ARTICLE III

### MISCELLANEOUS EMPLOYEE MATTERS

    SECTION 3.01  **Further Amendments**.  The provisions of
this Article III shall apply notwithstanding anything to the
contrary contained in the Merger Agreement, the Distribution
Agreement, the EBA, or any Other Agreement.  Capitalized terms
used but not defined in this Article III shall have the meanings

-6-

ascribed to them in the Distribution Agreement (as amended by this Agreement).

SECTION 3.02  Certain Non-U.S. Employees.  (a) Pursuant to the Contrat d'Apport Partiel d'Actif (Contribution Agreement) dated February 23, 1998, between Grace S.A. and W.R. Grace S.A.S., under which the New Grace Business in France was transferred to W.R. Grace S.A.S., all individuals employed as part of the central computer staff of Grace S.A., including the individuals listed on part 1 of Schedule B hereto (the "Schedule B-1 Employees"), remain employees of Grace S.A. and thus are Packco Employees as defined in the EBA.  If the employment of any Schedule B-1 Employee with Grace S.A. is terminated on or before December 31, 2000 because of the reduction or termination of computer support services provided by Grace S.A. to the New Grace Business after the Distribution, Grace-Conn. shall, or shall cause W.R. Grace S.A.S. to, reimburse Grace S.A., upon receipt of appropriate documentation, for the severance benefits payable to such employees on account of such termination.

(b) Certain other individuals listed on part 2 of Schedule B hereto (the "Schedule B-2 Employees") shall become employees of a member of the Packco Group as of the Distribution Date, and are thus Packco Employees as defined in the EBA.  If the employment of any Schedule B-2 Employee with the Packco Group is terminated on or before December 31, 2000, Grace-Conn. shall reimburse, or shall cause the appropriate member of the Grace Group to reimburse, the appropriate member of the Packco Group, upon receipt of appropriate documentation, for the severance benefits (if any) payable to such employees on account of such termination.

(c) Certain other individuals identified on part 3 of Schedule B hereto (the "Schedule B-3 Employees") shall become employees of a member of the Packco Group as of the Distribution Date, and are thus Packco Employees as defined in the EBA.  If the employment of any Schedule B-3 Employee with the Packco Group is terminated on or before the second anniversary of the Distribution Date, New Grace shall reimburse, or shall cause the appropriate member of the Grace Group to reimburse, the appropriate member of the Packco Group, upon receipt of appropriate documentation, for the severance benefits (if any) payable to such employees on account of such termination; provided, that New Grace and the Grace Group shall not be obligated to reimburse the Packco Group for such severance benefits in excess of $100,000.

SECTION 3.03  Duncan Information Services Center Employees.  All individuals employed, as of the Distribution Date, at the Duncan Information Services Center of Grace located

-7-

in Duncan, South Carolina, other than the individuals listed on Schedule C hereto (the "Schedule C Employees"), shall be Packco Employees as defined in the EBA.  The Schedule C Employees shall be New Grace Employees as defined in the EBA.

SECTION 3.04  **Relocating Employees**.  The individuals listed on Schedule D hereto (the "Schedule D Employees") are Packco Employees who have been, or are being, relocated from Boca Raton, Florida to Duncan, South Carolina pursuant to the terms of the relocation policy of Grace.  SAC shall promptly reimburse New Grace, upon presentation of proper documentation, for all costs and expenses incurred by Grace in connection with such relocations of the Schedule D Employees in accordance with such relocation policy.

SECTION 3.05  **UK Manager**.  (a) The individual listed on Schedule E hereto (the "Schedule E Employee") shall remain an employee of W.R. Grace Limited after the Distribution.  However, the Schedule E Employee will perform certain services for Cryovac U.K. Limited while he is an employee of W.R. Grace Limited, until his date of termination from W.R. Grace Limited or, if sooner, until such date that W.R. Grace Limited notifies Cryovac U.K. Limited that the Schedule E Employee's services are no longer available or Cryovac U.K. Limited notifies W.R. Grace Limited that the Schedule E Employee's services are no longer desired (the "Packco Services Period").  Cryovac U.K. Limited shall pay W.R. Grace Limited a fee with respect to the Schedule E Employee that is equal to the total of the following for the Packco Services Period: (i) salary, wages and other compensation (including, but not limited to, vacation pay) paid by W.R. Grace Limited to the Schedule E Employee; (ii) the amount of taxes, fees or contributions paid to any governmental entity or program by W.R. Grace Limited on behalf of, or with respect to, the Schedule E Employee; and (iii) any contributions that are made by W.R. Grace Limited to any plan or program for benefits provided to on behalf of the Schedule E Employee (collectively, the "Employment Costs").  W.R. Grace Limited shall bill Cryovac U.K. Limited monthly for the amount of the Employment Costs that are attributable to the prior calendar month.  Packco shall pay such bill promptly upon receipt.  Notwithstanding the foregoing, if the Schedule E Employee performs any services for W.R. Grace Limited during any month during the Packco Services Period, then the amount of Employment Costs that are payable by Cryovac U.K. Limited for that month shall be reduced by a percentage that is equal to the estimated percentage of working time that the Schedule E Employee expended to perform services for W.R. Grace Limited during that month.

(b) With respect to services performed for Cryovac U.K. Limited by the Schedule E Employee during the Packco Services

Period, W.R. Grace Limited shall not be liable for any act or omission of the Schedule E Employee, and SAC, Cryovac U.K. Limited and the other members of the Packco Group shall indemnify and hold harmless the Grace Group from and against all liabilities, costs, claims and proceedings arising from or relating to such services, including, but not limited to, damage to or loss of property.

SECTION 3.06 **U.S. Welfare Benefits.** (a) From the Distribution Date through April 30, 1998 (the "Medical Administration Period"), New Grace shall continue to administer the Cryovac/Formpac Basic Medical Plan, including the prescription drug program thereunder (the outside administrators of which Plan are Blue Cross/Blue Shield and, as to the prescription drug program, Medco) and the Cryovac Network Plan (together, the "Cryovac Medical Plans") for eligible Packco Employees in the United States. SAC shall adopt, or shall cause another member of the Packco Group to adopt, a plan (the "Mirror Dental Plan") that is substantially identical to the New Grace dental plan (the outside administrator of which is MetLife) for the benefit of eligible Packco Employees, and New Grace shall administer the Mirror Dental Plan during the Medical Administration Period. SAC shall reimburse New Grace for all claims incurred by Packco Employees under the Cryovac Medical Plans and the Mirror Dental Plan during the Medical Admiministration Period, together with the administrative fees associated with such claims. Such reimbursement shall be made from time to time, promptly upon receipt by Packco of appropriate documentation thereof.

(b) New Grace shall continue to administer the self-insured short-term disability payments under the current payment arrangement administered by MetLife (the "STD Arrangement") for eligible hourly Packco Employees, during the following periods: with respect to such Packco Employees located in Cedar Rapids, Iowa and Reading, Pennsylvania, from the Distribution Date until April 26, 1998; and with respect to such Packco Employees located in Indianapolis, Indiana, from the Distribution Date until April 30, 1998 (each such period, an "STD Administration Period"). SAC shall reimburse New Grace for all short-term disability payments made pursuant to the STD Arrangement during the applicable STD Administration Period. Such reimbursement shall be made from time to time, promptly upon receipt by Packco of appropriate documentation thereof.

SECTION 3.07 **Expatriate Employees.** (a) New Grace shall continue to administer and pay the compensation and housing and other allowances, and to provide other employee benefits, to the individuals listed on part 1 of Schedule F hereto through the earlier of April 30, 1998 or such earlier date as SAC shall

-9-

designate.  SAC shall reimburse Grace, promptly upon receipt of appropriate documentation, for all direct costs and expenses incurred by Grace in complying with the preceding sentence.

(b) New Grace shall continue to administer the housing and other allowances for the individuals listed on part 2 of Schedule F hereto (each of whom is a Packco Employee who is neither a United States citizen nor a permanent resident of the United States, but who is working in the United States for the Packco Group), and for one such employee, to manage his U.K. residence, through the earlier of April 30, 1998 or such date as SAC shall designate.  SAC shall reimburse New Grace, promptly upon receipt of appropriate documentation, for all direct costs and expenses incurred by New Grace in complying with the preceding sentence.

SECTION 3.08 **Miscellaneous.** (a)  For purposes of Section 2.01(a) of the EBA, any individual who is not designated as allocated to the Packco Group shall be deemed to be allocated to the New Grace Group.

(b)  The New Grace Group and the Packco Group shall take all steps that may reasonably necessary or appropriate to implement, as promptly as practicable, the benefit strategies detailed in the report enclosed under cover of a letter dated March 24, 1998 from Robyn Kow of William M. Mercer, Incorporated to Mary Coventry of SAC and Dennis M. Polisner of KPMG Peat Marwick LLP (the "Benefits Strategies").

(c)  Without limiting the generality of the provisions of Section 3.08(b), it is acknowledged that pursuant to the Benefits Strategies, with respect to certain Packco Employees or New Grace Employees who are employed outside the United States and who participate immediately before the Distribution Date in any Plan (as defined in the EBA) that is sponsored by a member of the New Grace Group or of the Packco Group, respectively, immediately after the Distribution Date, if it is not possible for such individuals to be covered by a Plan sponsored by a member of the Packco Group or of the New Grace Group, respectively, immediately after the Distribution Date, the New Grace Group or the Packco Group, respectively, shall continue the pre-Distribution Date coverage of such individuals until such new coverage can be arranged, and the Packco Group or the New Grace Group, respectively, shall reimburse the other for the premium and other costs of such coverage, all as more fully set forth in the Benefits Strategies.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be duly executed as of the date first above written.

W.R. GRACE & CO.

By: _____
     Name:
     Title:

W.R. GRACE & Co.-Conn.

By: _____
     Name:
     Title:

GENERAL SPECIALTY CHEMICALS, INC.

By: _____
     Name:
     Title:

SEALED AIR CORPORATION

By: _____
     Name:    William V. Hickey
     Title: President

-11-

SCHEDULE A
LOCAL ACTUARIES' LETTERS




Av. Rspública do Chile 230-18° andar
20031-170 Rio de Janeiro, RJ - Brasil
Fone: (021) 210-2101
Fax: (021) 262-6248

Rus Dr. Eduardo de Souza
Aranha, 153, 5° andar
04543-904 São Paulo, SP - Brasil
Fone: (011) 3040-3400
Fax: (011) 829-5966

# Towers Perrin

São Paulo, March 31, 1998

Robyn Kow
William M. Mercer, Inc.
10 South Wacker Drive
Chicago, IL 60606
USA

*Fax.: (312) 902.7626*

*Re:*    <u>*W.R. Grace – Actuary's Letter (Pension Plan)*</u>

Dear Robyn,

Attending your request and in complement of our letter of 02/02/96, we have:

### Background

As per your request the assets split will be in accordance with the Brazilian pension legislation which is proportional to the liabilities i.e., the percentage of the Division (Cryovac) in relation to the total entity liabilities applied to total plan assets.

Packco will be establishing an identical plan for its employees.

### Legal

In accordance with Brazilian Legislation, all process will be necessary to receive formal approval from government, i.e., create a new plan sponsor in Darexprev creation of a new entity, and transference from Darexprev to a new entity.

### Effective Date

March 31, 1998

### <u>Determination of Transfer Amount as of the Effective Date</u>

In this valuation the following methods/assumptions were considered:

| | | |
|---|---|---|
| – | Actuarial Cost Method | Unit Credit |
| – | Mortality Table | GAM – 1971 |
| – | Disability Table | RRB – 1944 |
| – | Turnover | Not considered |
| – | Assumptions: | |
| | ◼ Investment Return | 5% p.a. (real) |
| | ◼ Salary Increase | 3,5% p.a. (real) |
| | ◼ Social Security Increase | Not considered because the plan uses a Step Rates system |
| | ◼ Benefit readjustment | -3,5% p.a. (real) |



Robyn Kow

Page 2.

*Towers Perrin*

### Inactives

The inactives participants will remain in the existing plan.

### Employees Electing Not to Transfer

All involved employees will be transfering to a new plan. It will be possible because the new plan will have the same design.

### Assets Valuation

In accordance, of Brazilian Legislation the assets will be in accordance of Darexprev's account books, that was audit by government.

### Bases of adjusting the asset transfer amount betweem the Effective Date and the actual transfer date

The assets at actuarial valuation date

+ contributions made by on behalf of transfering employees after the effective date;

− benefit payments paid to employees who are identified as transfering employees but who have service prior to the asset transfer date;

− expenses incurred with respect to transfering employees (administration expenses, government process, etc.)

+ actuarial assumption for Investment Return (inflation plus 5% p.a.) applied on the all Itens above. It is in accordance of Brazilian Legislation.

Yours sincerely

Roberto L. Donke
Principal

RLD-071/98
RLD:rt

cc:  Jay Albert – W. R. Grace (Fax.: (561) 362.2637)



WILLIAM M.
MERCER

26 March 1998

Mr John Forgach
Senior Benefits Counsel
W R Grace & Co
One Town Centre Road
Boca Raton
Florida 33486-1010
UNITED STATES OF AMERICA

Dear Mr Forgach

**GRACE MANAGEMENT FUND (GMF)**
**W R GRACE AUSTRALIA EMPLOYEE BENEFIT FUND (GEBF)**
**SALE OF GRACE PACKAGING BUSINESS**

1.   **Background**

We understand that W R Grace is selling its packaging business to Sealed
Air. As a result, those employees of W R Grace Australia who are not part
of the packaging business will transfer their employment to "ChemCo". The
existing Grace entity will then comprise the packaging business ("PackCo")
and its shares will be distributed to Sealed Air on the distribution date.

We further understand that:

• the two superannuation funds operated by Grace Australia will
migrate to Sealed Air. In effect, PackCo would remain as the
Principal Employer for the purpose of the trust deeds governing these
funds;

• the benefit structures of these two funds will be replicated for
employees of ChemCo, most probably as part of a master trust
(multi-employer superannuation fund);

• the assets of each Fund are to be equitably divided between members
employed by ChemCo and PackCo. The proposed apportionment
basis is described later in this letter.

I:\ACTUAL\MERC\JFK\GRACE\GBC143.DOC\mfk

William M. Mercer Pty Ltd         Tel   (03) 9245 5555
ACN 005 315 917                   Fax   (03) 9654 5635
101 Collins Street
Melbourne 3000

Mailing Address:
GPO Box 1926U
Melbourne 8060                                        A March & McLennan Company



WILLIAM M.
**MERCER**

## 2. Legal Considerations

The employees of ChemCo who are members of either GEBF or GMF will
be transferring to a new fund. The relevant provisions in each Fund's trust
deed are as summarised below.

### GEBF

The minimum benefit to be transferred is the benefit to which the Member
would have been entitled if he or she had voluntarily left employment on the
date of transfer. The transfer amount may be increased, at the determination
of the Principal Company, to an amount not exceeding the Member's
equitable share of the Fund.

### GMF

The amount to be transferred is an amount agreed or determined in a manner
agreed by the Trustees and Employer, but not exceeding the Member's
Equitable share.

Equitable Share is defined as "the amount determined by the Trustees, after
obtaining the advice of the Actuary, to be that person's equitable share of the
Fund." In this case we recommend that a Member's equitable share be
determined as that portion of the net assets of the fund equal to the ratio of
the Member's accrued benefit liability to the total accrued benefit liabilities
of all Members.

In essence the provisions are the same under both Funds. That is: each
trustee body and Grace Australia determine the amount of each member's
equitable share on actuarial advice, and that amount can be transferred to
another fund with the consent of the member unless the Successor Fund
approach is adopted. It will therefore be necessary to obtain the approval of
each trustee body to the proposed calculation basis for determining
members' equitable shares.

Each trustee body has been advised of the proposed calculation basis, and we
will assume that approval has been given as no comments have been made to
date.

## 3. Effective Date

We understand that, in those countries such as Australia, where an internal
corporate reorganisation is necessary, the effective date for the
apportionment of each Fund's assets is to be the "reorganisation date". This
is likely to be 31 March 1998.



**WILLIAM M.**
**MERCER**

In this event, unless prior action is taken in good time, ChemCo employees who are members of GEBF or GMF will need to remain in their respective Fund until the transfer to a new fund can be arranged and effected. Their continuing basis of membership may need to be documented in the deed of participation mentioned above.

4.    **Calculation Basis of Equitable Shares at the Reorganisation Date**

A member's equitable share will be calculated in the manner described below. The calculation uses a member's Discounted Accrued Retirement Benefit as a measure of the member's accrued benefit liability. For a calculation of this nature, where the emphasis is on the relative value of liabilities rather than the absolute value, we believe this method (as opposed to a PBO based method), is suitable. The method is also easily understood and perceived as equitable by members.

**GEBF**

We will first calculate a member's Discounted Accrued Retirement Benefit (DARB) as a lump sum equal to the greater of (A) and (B) calculated in the following manner.

(A)    **Actuarial Benefit Value**

This represents an estimate of the present value of the accrued retirement benefit under the Fund, and is calculated as:

*Accrued Retirement Pension Multiple at Reorganisation Date*
*x Commutation Factor x Salary x (1 - Discount Factor)*

where:

Accrued Retirement Pension Multiple is calculated in accordance with Rule 4, 5 or 6, as appropriate, of the Trust Deed

Commutation Factor equals

- 12 in the case of a Pre-1979 Female Member, as defined in the Trust Deed

- the factor determined from the table in part (b) of Table 1 of the Trust Deed in the case of a member who has attained the Normal Retirement Date on the Reorganisation Date, and

- 10 in the case of any other member,

Salary is taken as the member's annual salary rate for superannuation purposes at the Reorganisation Date, and



WILLIAM M.
**MERCER**

Discount Factor is

- zero in the case of a member who has attained their 60th birthday on the Reorganisation Date,

- one-twelfth of 2% for a pre-1971 Member or a Pre-1979 Female Member (as defined in the Trust Deed) for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday,

- for any other member, the sum of:

  o one-twelfth of 3% for each complete month in the period between the later of the Reorganisation Date and the date of the member's 55th birthday, and the date of the member's 60th birthday, and

  o one-twelfth of 2% for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday.

(B)    Vested Benefit

The benefit calculated in accordance with Rule 15 of the Trust Deed for a member who has not attained their 55th birthday on the Reorganisation Date.

Members who are entitled to a deferred pension pursuant to Rule 15.(b) of the Trust Deed will be included in this part of the calculation.

We will then take the value of the net assets of the Fund as at the Reorganisation Date and calculate the Adjusted Net Assets Value as:

total net assets of the Fund at the Reorganisation Date,

minus    the sum of the value of the additional benefits for all members entitled to such a benefit either pursuant to Rule 15A or as a result of having transferred an amount into the Fund pursuant to Rule 3.(1)

Each member's DARB will then be increased in the ratio:

$$\frac{\text{Adjusted Net Assets Value}}{\text{Total DARBs for all members}}$$

to which will be added any additional benefit entitlement pursuant to Rule 15A or roll-over entitlement pursuant to Rule 3.(1) with the resultant amount forming that member's equitable share of the Fund.



WILLIAM M.
**MERCER**

**GMP**

We will first calculate a member's Discounted Accrued Retirement Benefit (DARB) as a lump sum equal to the greater of (A) and (B) calculated in the following manner.

(A)    Actuarial Benefit Value

This represents an estimate of the present value of the accrued retirement benefit under the Fund, and is calculated as:

*Accrued Retirement Benefit Multiple at Reorganisation Date
x Salary x (1 - Discount Factor)*

where:

Accrued Retirement Benefit Multiple is calculated in accordance with Clause 2.5 of the Trust Deed

Salary is taken as the member's annual salary rate for superannuation purposes at the Reorganisation Date, and

Discount Factor is

- zero in the case of a member who has attained their 55th birthday on the Reorganisation Date, and

- in the case of any other member, one-twelfth of 2% for each complete month in the period between the Reorganisation Date and the date of the member's 55th birthday.

(B)    Vested Benefit

The benefit calculated in accordance with Clause 2.7 of the Trust Deed for a member who has not attained their 55th birthday on the Reorganisation Date.

We will then take the value of the net assets of the Fund as at the Reorganisation Date and calculate the Adjusted Net Assets Value as:

total net assets of the Fund at the Reorganisation Date,

minus    the sum of the value of the additional benefits for all members entitled to such a benefit either pursuant to Clause 2.8 or as a result of having transferred an amount into the Fund pursuant to Clause 1.38.



Each member's DARB will then be increased in the ratio:

<u>Adjusted Net Assets Value</u>
Total DARBs

to which will be added any additional benefit entitlement pursuant to Clause 2.8 or roll-over entitlement pursuant to Clause 1.38, with the resultant amount forming that member's equitable share of the Fund.

5.   **Treatment of Inactive Members**

Neither GEBF nor GMF has any current pensioners. However, GEBF has a number of members who elected the deferred pension option on leaving service. It is proposed to treat these deferred pensioners in a similar manner to active members.

6.   **ChemCo Members Electing not to Transfer**

If the Successor Fund approach is not used, then as stated in section 2 above, a ChemCo member's consent will be required to transfer to the new arrangement. If a ChemCo member declines to transfer then:

(i)     that member's appropriate benefit entitlement would be calculated in accordance with the trust deed of the relevant Grace Fund;

(ii)    an amount sufficient to meet that benefit liability will be calculated in accordance with the methodology set out in section 4;

(iii)   this amount will be deducted from that part of the Fund calculated as being attributable to ChemCo members and will be transferred to that part of the Fund calculated as being attributable to PackCo members.

7.   **Method of Valuing Benefits**

Assets of both Funds are invested in pooled superannuation trusts. These assets will be valued using the appropriate unit redemption price at the Reorganisation Date. Any other assets, such as deposits in a bank account, will be valued at their net market value on that date.

Both Funds have a prospective entitlement to shares in the AMP. In this event, although the shares will not have been issued or listed as at the Reorganisation Date, we will make an estimate of the probable value and include this amount in the total net market value of each Fund.



8.   **Adjustment of Asset Transfer Amount**

The actuarial calculations to determine members' equitable shares of the
Fund will not be completed until some time after the Reorganisation Date.
Hence the apportioned amounts will need to be updated to the date on which
the actual transfer of assets is made for ChemCo members.

We envisage that amounts in each Fund attributable to ChemCo members
will be adjusted as follows:

|       | net amount of assets attributable to ChemCo members at the Reorganisation Date |
|-------|---|
| plus  | any member and company contributions made in respect of a period after the Reorganisation Date |
| plus  | any insurance proceeds received in respect of ChemCo members |
| plus  | benefits paid to ChemCo members who leave service after the Reorganisation Date |
| minus | tax, insurance premiums and expenses incurred in respect of ChemCo members after the Reorganisation Date |
| plus  | investment earnings on the above amounts, adjusted for cash flows. |

Subject to practicability, it is our intention to express the ChemCo transfer
amount as units in each pooled superannuation trust as at the Reorganisation
Date using the proportions invested in each trust as at that date. Subsequent
cashflows would also be converted into units at the relevant date using the
same proportions. Hence at the actual transfer date, the net ChemCo transfer
amount for each Fund will be expressed as a number of units in each trust
and that number of units can be redeemed at the then prevailing unit price.
The proceeds can then be transferred to the investment media used under the
new arrangement for ChemCo members.

We would be pleased to provide further detail on any of the issues contained in this
letter.

Yours sincerely

Andrew Sach
Fellow of the Institute of Actuaries of Australia

KMCTIIARPPMGCUIIKVERCTKVERESE742.DOC=fx

7



WILLIAM M.
**MERCER**

Direct    (416) 868-2127

<u>Private & Confidential</u>

March 23, 1998

Mr. John P. Forgach
Benefits Counsel
**W.R. Grace & Co.**
One Town Center Road
Boca Raton, FL
33486-1010

Dear John:

Re:    Canadian Pension Plans - Actuary's Letter

The purpose of this letter is to set out the information requested in Robyn Kow's letter of October 29 concerning the split of the Canadian defined benefit pension plans (the Salaried and Hourly Plans) as a result of the Sealed Air/W.R. Grace transaction.

<u>Background</u>

As a result of the Sealed Air/W.R. Grace transaction, we understand that W.R. Grace of Canada Limited will be internally reorganizing its operations into two divisions Packco (currently Cryovac) and Chemco (all other Grace divisions). · Following the restructuring, the salaried and hourly plans will each be split into two mirror plans, one for Packco and one for Chemco.

The assets of the plan will be split based on an equitable share of the assets (i.e. including surplus). The Packco plan will maintain the liabilities and the assets for most of the non-active participants in the current plans.

The equitable share approach allocates the assets between the two plans based on the proportion of liabilities. The liabilities will be determined from the going-concern basis used for the funding of the pension plans. The guidelines of the Pension Commission of Ontario (PCO) on transfers arising from the sale of a business for plans with surplus provisions like those in the Grace plans, specify that the determination of the amount of transfer be based upon plan's funding liabilities.

William M. Mercer Limited    Tel 416 868 2000
BCE Place, 161 Bay Street, P.O. Box 501
Toronto, Ontario  M5J 2S5



WILLIAM M.
MERCER

March 23, 1998
Page 2

### Regulatory Considerations

The current pension plan will be amended to recognize the reorganization of the plan. Plan amendments must be filed with the Pension Commission of Ontario and Revenue Canada. A new plan document will be created for the Chemco plan (as Packco group is remaining under the current plan). This document will require registration with the provincial and tax authorities.

The fund will be split by transferring assets from the existing plan, which will be retained by Packco, to the Chemco pension fund. This transfer must be approved by the PCO. In addition, any members and former members, affected by the asset transfer and any union representing those members, must be provided with notice that the asset transfer is taking place.

### Effective Date

The reorganization date is March 31, 1998.

### Determination of Asset Transfer Amount as of the Effective Date

As of the effective date of the reorganization, the assets allocated to the respective entities will be determined on the proportion of their funding liabilities determined in accordance with the assumptions contained in Appendix A which summarizes the funding assumptions used to value the plan's liabilities in the last funding valuation. Since both the hourly and salaried plans are expected to be in surplus positions at the effective date, surplus will be included in the transfer.

### Non-Active Participants

Most non-active participants of the pension plan will remain with the Packco entity. Only suspended members of the pension plan who are active employees of Chemco in Canada or outside Canada and members on long term disability will be included in the Chemco group.

### Employee Option

Chemco employees do not have the option as to whether to stay in the Packco plan. It is possible that Chemco or Packco employees could voice objection to the proposed transfer. However, this is unlikely given the equitable share method currently being contemplated. As long as the transfer follows PCO guidelines, the transfer should be approved by the regulators.



WILLIAM M.
**MERCER**

March 23, 1998
Page 3

## Asset Valuation

The assets will be valued at market for the purposes of the asset transfer.

## Asset Adjustments Between Effective Date and Actual Transfer Date

The asset transfer amount will be adjusted following determination on the effective date to the actual transfer date by:

- ➤ crediting employee and company contributions made by or in respect of transferring employees;

- ➤ deducting benefit payments and plan expenses in respect of transferring employees; and

- ➤ crediting the initial transfer amount (i.e. determined on the effective date) and the above cashflows with the actual investment return of the W.R. Grace Canada pension fund, net of investment expenses, from March 31, 1998 or subsequent date of cash flow to the actual transfer date.

## Other Issues

An appropriate adjustment to the value of the plan assets will be made in respect of the transfer of assets and liabilities for former Dearborn members.

If you have any questions, please call Doug or me.

Yours very truly,

Robert  Stapleford

Copies to:    Jay Albert, W.R. Grace
Robyn Kow, William M. Mercer - Chicago
Doug Johnson, William M. Mercer Limited

E:\01\grace\doug\1998\jf-mr23.doc

## Appendix A    -    Summary of Methods and Assumptions

| | |
|---|---|
| Liability valuation: | Accrued benefit actuarial cost method, based on benefits accrued to the valuation date with salary projection. |
| Investment return: | 7% (net of investment and administrative expenses estimated to be 1.0%) |
| Salary increases: | 5.5% per annum |
| YMPE increases: | 4% per annum |
| Maximum pension increases: | No increases in maximum pension of $1722.22 per year of service |
| Mortality: | 1983 Group Annuity Mortality Table with margins |
| Terminations of employment: | Ontario Medium Termination Scale. The scale is age related with rates ranging from 40% per annum at age 18 to about 1.8% at age 52. |
| Retirement rates: | Scale of age related rates, including 5% at age 55, 30% age 62 and 100% age 65. |
| Form of Pension: | 85% of employees are assumed to be married at death or retirement with female spouse three years younger than male spouse. Married members are assumed to elect a joint and 60% survivor pension. Single members are assumed to elect a life guaranteed for 10 years pension. |



# IPT Actuarial Services Limited

25/28 Adelaide Road, Dublin 2
Telephone 01-604 8100.  Facsimile 01-676 4863

23/25 South Terrace, Cork
Telephone 021-317888.  Facsimile 021-314282

**Private & Confidential**                                      **25 March 1998**

Mr. John Forgach,
Senior Benefits Counsel,
W. R. Grace & Co.,
1 Town Centre Road,
Boca Raton,
FL 33486-1010

Dear Mr. Forgach,

### Transfer of Construction Business from
### W. R. Grace (Ireland) Limited and Associated Companies Pension Plan

This is the actuary's letter relating to the transfer of Construction employees from W. R. Grace (Ireland) Limited and Associated Companies Pension Plan.

**Background:**

The pension plan contains members in receipt of pension, deferred members with entitlement to pensions payable in the future and active members.

The active members include one or more employees who will be transferred to a separate Company called Grace Construction Ireland Limited.

The deferred and pensioner members will not be split. They will remain in the existing plan whose principal employer will be W. R. Grace Ireland Limited and will remain the operating Company for Cryovac.

It is intended that the assets would be apportioned in proportion to the liabilities with the exception of former Amicon Ireland Limited employees who consent to transfer from the W. R. Grace (Ireland) Limited and Associated Companies Pension Plan to the "Vermeer Plan". The basis for calculating the transfer amount in respect of the former Amicon employees transferring to Vermeer has already been established and gives a value lower than that which would be calculated using the actuarial assumptions outlined below.

Thus, if the assets less the Amicon liability amount do not exactly match the liabilities (excluding any liability in respect of any transferring Amicon employees) then the share of assets attributed to each section would reflect this position.

The amount to be transferred at the effective date from the W. R. Grace (Ireland) Limited and Associated Companies' Pension Plan in respect of Construction employees would, therefore be the assets attributable to those members representing the proportion of the total assets less the Amicon liability amount which their liabilities (excluding any liability in



A member of the Sedgwick Dineen Group

Directors: M Winn, BSc, FIA (Managing); WJ Bott, BSc, FIA, ASA, FIPMI; JF Brophy, BSc, FIA, APMI; M Madden, FIA; B O'Donovan, FIA; M Whyms, FIA; (Secretary B. Synnott
Associate Directors: GN Farrell, MA, FIPM; AF O'Brien, MA FIPM
Registered in Ireland 154704. Registered Office 25/28 Adelaide Road, Dublin 2.

respect of transferring former Amicon employees) represent as a proportion of the total liabilities.

Similarly the assets attributable to the other active employees and all the deferred members and pensioners would remain behind in the W. R. Grace (Ireland) and Associated Companies Pension Plan.

The new plan for Construction employees would be sponsored by the continuing Grace Company.

Members' consent to transfer will be required.

The consent of the Irish Revenue Commissioners may also be required which may not be forthcoming if a substantial excess over "past service reserve" is to be transferred.

The effective date of the transfer is 31 March 1998.

Determination of Amount to be Transferred as at the Effective Date of the Transfer:

Liabilities will be calculated using the assumptions set out below for all members of the Plan. Consent to transfer will be required. Members who do not consent to transfer will receive deferred pension benefits as if they left service on the effective date of transfer. Their liability will be calculated appropriately.

The amount to be transferred will be calculated as the appropriate proportion of total assets as set out above.

Assets will be valued at market value.

Adjustment Between Effective Date and Asset Transfer Date

The assets shall be adjusted to reflect the period between the effective date of the transfer and Asset Transfer Date by multiplying the Transfer amount as at the Effective Date by the bid price of the Standard Life Managed Fund at the Asset Transfer Date divided by the bid price of the Standard Life Managed Fund at the effective date of the transfer.

Actuarial Assumptions:

| | | |
|---|---|---|
| (a) | Investment return | 7% p.a. |
| (b) | Plan pensionable salary increase | 5% p.a. |
| (c) | Pension increases in retirement | Allowance for discretionary increases at 3% p.a. |
| (d) | Pension commuted for cash | The maximum permitted |

| (e) | Mortality | No mortality allowed for pre-retirement, PMA80 and PFA 80 tables for males and females respectively post-retirement |
|-----|-----------|-----------------------------------------------------------------------------------------------------------------------|
| (f) | Marital Status | All members will be married at retirement age |
| (g) | Leaving Service | No withdrawals are allowed for. |
| (h) | Early Retirement | All members will retire on their 62nd birthday. |

Yours sincerely,

Sean O'Donovan, F.I.A.,
IPT Actuarial Services Limited



## Nippon Life Insurance Company

International Corporate Marketing Department
1-2-2, Yurakic-cho, Chiyoda-ku, Tokyo 100, Japan
Phone: Tokyo (03) 3507-1254  Facsimile: (03) 5251-7304

**NLI**

January 12, 1998


Ms. Robyn Kow
William M. Mercer
Chicago


Dear Ms. Kow:

My reply to your fax of December 27, 1997 is provided below. This letter includes the situation in regard to Grace Japan's tax qualified pension plan and actuarial basis of the New Plan.

<u>The overall philosophy for splitting the assets between entities</u>
The assets of the tax qualified pension plan (TQPP) of a corporation, when the management of that corporation is transferred to or taken over by another corporate entity, are handled in the following manner pursuant to Japanese Corporate Tax Law:

> When employees are transferred and the corporation to which they will be transferred has a TQPP in place, the portion of the TQPP for the transferees at the pre-transfer entity is terminated and the necessary amount for each such employee is transferred to the post-transfer entity where it is applied as PSL premium.

<u>Determining the transfer amount</u>
The necessary amount for each person to be transferred is calculated from the total liability reserves of the Grace TQPP.   This figure is totaled and its percentage value in regard to the total liability reserves ascertained.   It is this percentage of the pension assets of the Grace TQPP which is to be transferred to the New Plan.
If liability reserves under the New Plan equal or exceed the amount to be transferred from the Grace TQPP, the full amount of transferable assets is appropriated to the accumulated funds of the New Plan.   If however, the liability reserves under the New Plan are less than the assets to be transferred from the Grace TQPP, the amount in excess of the liability reserves of the New Plan must be administered under the New Plan to be paid to transferees as an additional payment (at transfer or retirement) separate to

the benefits paid under the New Plan.  This procedure is fixed under Japanese Corporate Tax Law and therefore cannot be altered to meet individual client requirements.

Having said that, given what we know, the current Grace TQPP does not have sufficient funds, and therefore the necessary amount to be transferred is not likely to exceed the amount of the liability reserves of the New Plan.

The New Plan is to be established as of February 1, 1998, and owing to the process that must be followed in accordance with Corporate Tax Law, it is not until after that date (probably mid-March) that we will know the exact transfer amount.  Nonetheless, the process can be outlined as follows: the transferable amount will be calculated based on the assets of the Grace TQPP as of January 31, 1998, and adjustment of the applicable amount between the effective date and the actual transfer date will include interest earned on the assets between these two dates.  Premium payments and contributions between this period will be deferred until the transfer of assets is concluded.

Grace TQPP actuarial assumptions

A periodical actuarial valuation (every 5 years) is just now being carried out on the Grace TQPP, and the actuarial assumptions of the plan are being reviewed.  This procedure is in line with Corporate Tax Law requirements and is planned to be completed by the end of February 1998.

The new actuarial assumptions for the Grace TQPP will be as follows.
1.   Funding Method:   Entry Age Method (specified age of 24)
2.   Interest Rate: 5.5%
3.   Assumed Mortality Rate: 85% of the Fifteenth Japanese National Life Table for men
4.   Assumed Withdrawal Rate: based on Grace's experience, an average rate of 3.15%
5.   Salary Index: based on Grace's salaries, an average increase rate of 3.78%

New Plan actuarial assumptions
Although the New Plan will be identical to that of the Grace TQPP, some of the actuarial assumptions will differ for the following reasons.

Japanese TQPP's are categorized into those with over 100 participants and those with under 100 participants.  The funding method used and assumed withdrawal rate differ depending on which of these two categories applies.  In Grace's case the New Plan is likely to have less than 100 participants and as such, the assumptions will be determined as follows:

1. **Funding Method**

   Normal premium is calculated for those benefits required at normal retirement using an assumed mortality rate and an assumed withdrawal rate. However, as is the case with the existing insurance, it is calculated for benefits required by those reaching normal retirement only. In other words, normal premium does not accumulate resources for the payment of midterm withdrawal or death retirement benefits. Therefore, when a survivors pension rider is in place, a survivors' pension rider premium is calculated at the beginning of each year to provide the funds for death benefit payments over a one year period.

2. **Assumed Withdrawal Rate**

   When participants number less than 100, an assumed withdrawal rate calculated from the experience of one plan alone would fluctuate dramatically with every actuarial valuation. Owing to this, it is usual for a model withdrawal rate (the average of all such plans) to be used.

The following are the actuarial assumptions for the New Plan:

1. Funding Method: Entry Age Method plus Unit Credit Method
2. Interest Rate: from 3.1% ~ 5.5%, determined upon discussion between Grace Japan and Nippon Life
3. Assumed Mortality Rate: 85% of the Fifteenth Japanese National Life Table for men
4. Assumed Withdrawal Rate: model withdrawal rate
5. Salary Index: N/A. An annually calculated lump sum amount is paid as premium to account for salary increases.

Actuarial calculation is now in process based on the assumptions stated above.

I believe that I have provided all the information you require herein and will be happy to answer any further questions that you may have.

Yours sincerely,

Hideyuki Tomita
Manager
International Corporate Marketing Department

## Towers Perrin

January 21, 1998

Mr. John Forgach
Senior Benefits Counsel
W.R. Grace & Co.
One Town Center Road
Boca Raton, FL 33486-1010

Dear Mr. Forgach:

GRACE PACKAGING MEXICO - RETIREMENT PROGRAM SPIN OFF

Regarding the reorganization and sale process your company is facing on a worldwide basis, this document sets out the principles on which the defined benefit retirement plan assets will be split between the new Grace's entities in Mexico.

Background

As a part of a global transaction process, Sealed Air is going to acquire Grace Packaging division in Mexico, whose employees are provided with a local defined benefit pension plan.

On the other hand, New ChemCo entity was created for retaining just Grace Davison and Construction's assets, being their employees transferred to Grace Container.

As apart of the business transaction, Sealed Air will retain the pension plan for the Packaging group of employees while New ChemCo Grace division will establish a new identical plan for the rest of the employees.

Since Grace has created a local pension fund in Mexico according to the Mexican pension regulations, the fund will be split between both resulting entities: Packaging Co. and New Chemical Co. divisions on an equitable shared basis. Thus, the corresponding retirement liabilities and assets of the active employees acquired by Sealed Air will be transferred to such company.

It is important to mention that there are no inactive employees receiving pension benefits in Mexico.

Mr. John Foh
January 21, 1998
Page 2.

*Towers Perrin*

### Legal Issues

There are no specific legal requirements or plan regulations to be met related to the assets split. Nevertheless, the financial institution in charge of the fund investment (Banamex, S.A.) should be informed in advance about the assets split in order to reallocate the pension financial resources into each fund.

### Effective Transference Date

The effective date of the assets split will take place on December 31, 1997 since it has been scheduled as the reorganization date.

### Calculation Basis of the Transfer Amount

To determine the assets transfer amount as of the effective reorganization date, the employees pension accrual liabilities will be determined through an actuarial valuation under the following assumptions.

- **Cost Method:** Projected Unit Credit

  This funding method is currently being used for local accounting purposes according to Bulletin D-3, which is the Mexican FAS-87 counterpart of accounting principles in the US.

- **Economic Assumptions**

  | | |
  |---|---|
  | - Discount Rate | 5.0% |
  | - Salary Increases | 2.0% |
  | - Minimum Wage Increses | 0.0% |
  | - Commutation Rate of Interest | 9.0% |

- **Demographic Assumptions:**

  | | | |
  |---|---|---|
  | - Mortality | GAM-83 | |
  | - Disability | Hunter | |
  | - Turnover | Mexican Experience | |
  | - Retirement | TP 60-65 | |
  | - Retirement Age | Normal: | 65 |
  | | Early: | 60 |

- **Assets valuation** Fair market value

Mr. John Forgach
January 21, 1998
Page 3.

*Towers Perrin*

Representative rates for each table are as follows:

| Age | Mortality | Dissmisal | Turnover | | Age | Retirement |
|-----|-----------|-----------|----------|---|-----|------------|
| 20 | .00062 | .0003 | .240 | | 60 | .12 |
| 30 | .00099 | .0004 | .136 | | 61 | .14 |
| 40 | .00200 | .0009 | .069 | | 62 | .19 |
| 50 | .00648 | .0031 | .011 | | 63 | .24 |
| 60 | .01556 | .0098 | .000 | | 64 | .48 |
| 65 | .02442 | .0270 | .000 | | 65 | .99 |

Since the assets split approach will be done on an equitable shared basis, the pension fund will be divided according to the projected benefit obligation (accrued liability under the projected unit credit method) on a proportional basis as of the reorganization date.

To adjust the assets transfer amount between the effective reorganization and the actual transfer dates, the following components should be considered for both resulting funds to calculate the corresponding balance amounts as of the actual transfer date:

- Balance amount as of the reorganization date, plus

- Actual company contributions made to the fund, minus

- Benefits paid from the fund, minus

- Trustee's administration expenses, plus

- Actual return on assets earned by the fund

The actuarial assumptions used to perform the latest actuarial valuation of the plan's liabilities to be transferred are the same as those used to split the assets. Therefore, the cost method and valuation assumptions used for the calculation of the transfer amount are also the same as those used for the funding purposes.

Mr. John French
January 21, 1998
Page 4.

*Towers Perrin*

Finally, once the reorganization process is concluded, Sealed Air will not be responsible of recognizing neither retirement nor termination benefits to those employees who start collaborating with ChemCo division.

Should you have any questions or need additional information, do not hesitate to contact us.

Sincerely,

Enrique Marin
Senior Consultant

cc:   Kyle Tebbs — Grace de Mexico
      Gilberto Pacheco — Grace de Mexico
      Martha Camacho — Towers Perrin Mexico



*Aon Consulting*

*Actuaries & Consultants*

JOHN ERRINGTON

Director & Actuary
Direct Dial : 474 7351
errington@aonmail.co.nz

29 January 1998

Mr J Forgach
Senior Benefits Council
W.R. Grace & Co
1 Town Centre Road
Boca Raton, FL 33486-1010
USA

Dear John

SALE TO SEALED AIR – NEW ZEALAND

The purpose of this letter to set out the actuarial aspects regarding the sale and the W.R. Grace (N.Z.) Limited Superannuation Scheme.

*Background*

The Scheme is a defined benefit pension scheme with approximately 120 active members and 20 pensioners. The four active members who work in the chemical operations will continue working for W.R. Grace. The remaining active members will be employed by Sealed Air and control of the Scheme will also pass to Sealed Air.

The reorganisation and sale of companies will take place as follows:

(a)     Grace N.Z. establishes a subsidiary company – ChemCo.

(b)     The chemical employees cease working for Grace N.Z. and commence working for ChemCo on the Reorganisation Date (yet to be finalised).

(c)     The ownership of ChemCo is changed from Grace N.Z. to the parent company in the United States.

(d)     Grace N.Z.'s name is changed to PackCo.

(e)     The ownership of PackCo is transferred to Sealed Air.

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 2, 108 The Terrace • Tel: ((64-4) 474 7530 • Fax: (64-4) 472 0100 • E-mail: wellington@aon.co.nz



**Aon Consulting**

*Actuaries & Consultants*

In terms of the Scheme the process will be as follows:

(a) ChemCo establishes a scheme for its future employees (the ChemCo scheme).

(b) On or before the Reorganisation Date, the prospective ChemCo members are given notice of the opportunity to transfer their benefits to the ChemCo scheme. NZ law requires at least one month's notice and also specifies that each member must consent to the transfer of his or her benefits.

(c) The ChemCo members who have agreed to the transfer will be admitted to the ChemCo scheme with membership commencing on the Reorganisation Date and will have their Transfer Amounts (see below) paid to that scheme. Those who do not consent will not be admitted to the ChemCo scheme and will be paid their resignation benefits (calculated as at the Reorganisation Date).

(d) When the ownership of PackCo is transferred to Sealed Air, control of the Scheme will automatically pass to Sealed Air.

*Legal*

The above structure ensures that the legal process and any associated problems are kept to a minimum. In terms of the Scheme the relevant provision of the Trust Deed is Clause A10.17.which states:

"(1) If a full Member is transferred in his employment to an Affiliate Company and becomes a member of any other superannuation arrangement Instituted by such Affiliate Company no amount shall be payable to the Member on his leaving the Scheme In these circumstances and from the date of such transfer contributions to the Fund by that Member shall cease and the provisions of Sub-clause (2) of this Clause shall apply.

(2) The Trustee shall in its absolute discretion either:

(i) pay to the trustees of any such aforementioned superannuation arrangement for the benefit of that Member the Member's equitable share of the Fund at his date of transfer as determined by the Actuary based on projected Final Average Salary in a uniform and equitable manner, or

(ii) (provisions for retaining the Member's benefit in the Fund)"

An Affiliate Company is defined as WR Grace and Co – Conn. or one of its subsidiaries other than the Principal Company or an Associated Company.

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 1, 108 The Terrace • Tel: (64-4) 474 7550 • Fax: (64-4) 473 0100 • Email: wellington@aonconsulting.co.nz

Page 2 of 4



*Aon Consulting*

*Actuaries & Consultants*

*Determination of Transfer Amount as at the Reorganisation Date*

It is proposed that the Transfer Amounts be calculated in accordance with the following formula:

Transfer amount in respect of a ChemCo member =

$$\frac{\text{actuarial reserve in respect of ChemCo member} \times \text{market value of assets}}{\text{total actuarial reserve}}.$$

All values are determined as at the Reorganisation Date. The assumptions underlying the actuarial reserve calculation are given in the Appendix and are the same as those used for the last actuarial review of the Scheme (as at 31 December 1994).

*Inactives*

We note that, in accordance with our recommendation, all inactive participants of the Scheme will remain in the Scheme, the control of which will pass to Sealed Air.

Yours sincerely

John Errington

C:\CLIENTS\8014\Let17F17.doc

*Aon Consulting New Zealand Limited • Formerly The Alexander Consulting Group Limited*
PO Box 2764, Wellington, New Zealand • Level 1, 105 The Terrace • Tel. (64-4) 474 7530 • Fax (64-4) 472 1100 • E-mail: wellington@aon.co.nz

*Aon Consulting*

## APPENDIX

The actuarial reserve is calculated on the basis of benefits accrued in respect of service to date.

*Economic Assumptions*

| | |
|---|---|
| After tax investment return: | 5% per annum net of tax and expenses |
| Salary increases: | 3% plus salary scale* |
| Pension increases: | 1% per annum |

*salary scale equals 1% per annum compound for male monthly paid members and nil otherwise.

*Demographic Assumptions*

Death in service:    New Zealand 1990-92 Total Population Life Tables reduced by two years in age

Disablement and Resignation:    Sample decrement rates are:

| Age | Disablement % | Resignation % |
|-----|-----|-----|
| 20 | .02 | 10.70 |
| 30 | .05 | 7.10 |
| 40 | .10 | 3.80 |
| 50 | .22 | 1.70 |
| 60 | .82 | 0.00 |

Retirement:    All members are assumed to retire at age 65

Pension:    Mortality assumption is the same as that for death in-service.  Value of pension of $1 per annum at age 65 is $12.11 for males and $13.63 for females.



## ALEXANDER FORBES

*Consulting Actuaries*

Robyn Kow                                    26 January 1998
William M Mercer
10 South Wacker Drive
Chicago, Illinois

Tel:  269 0760

**Fax 091 312 9027626**

Dear Robyn

**GRACE AFRICA PENSION FUND**
**TRANSFER OF MEMBERS TO "PACKCO"**

The Grace Africa Pension Fund is valued using the actuarial basis set out below.

In respect of past service liabilities (and Transfer Values), the liability for each member is the present value of the accrued benefits in terms of the Grace Africa Pension Fund Rules in respect of service prior to the effective date with no allowance for any future service deficit or surplus arising from future contribution shortfalls or excesses.

**Actuarial Assumptions**

The valuation is conducted on the basis of the following assumptions:

1.  **Interest**

    It was assumed that the Fund would earn 15% per annum on its investments including capital appreciation.  This rate was reduced to 5½% in respect of the period after retirement in order to make some allowance for increases to pensioners.

2.  **Mortality**

    | | | |
    |---|---|---|
    | Post-retirement | : | PA (90) ult. |
    | Pre-retirement | : | SA 72/77 ult (rated down three years for females). |

...../2

IB P O Box 787246, Sandton, 2146
Alexander Forbes House, 61 Katherine Street, Sandown, Telephone (011) 269-0000, Telefax (011) 269-3333, http://www.afonline.co.za

A Division of Forbes Financial Services Group (Pty) Limited and Managers for Forbes Financial Services Group (Pty) Limited  Registration Number 83/2006/007
Actuaries
RE Bennett  GF Brown  RE Chalut  JH Clark  JCH Cryer  RE Gordon  NJQC Oosthuy  CPV Herbert  CPV Kerrigan  F Knowles  RJ Kachiany  LD Lewis  MJ Lloyd  PH Martin
A Nkwe  EL Nevutt  JD Patrick  SJB Peder  AR Pioneer  T Sargeant  RV Tommy  M van den Berg  LK van Zyl  H Walker  AD Welan  EBB Wood
Directors of Forbes Financial Services Group (Pty) Ltd
PL Helena
ams (Chairman & Managing Director) RR Addison  DJ Sargeant  GvR Donnelly  LGI Helwengw  CPV Kerrigan  LD Lewis  MT Makola  PJ van der Walt  JV Victory  Pratik Zitelenbman

- 2 -

3.  **Salary Increases**

    It was assumed that salary increments would be at a rate of 13,5% per annum.

4.  **Withdrawals**

    It was assumed that withdrawals would be in accordance with the following table:

    | Age Group | Annual Rate of Withdrawal | |
    |---|---|---|
    | | Males | Females |
    | 20 – 24 | 15% | 20% |
    | 25 – 29 | 10% | 15% |
    | 30 – 34 | 7% | 10% |
    | 35 – 39 | 4% | 6% |
    | 40 – 44 | 2% | 3% |
    | 45  + | Nil | Nil |

5.  **Proportion Married**

    It was assumed that, at Normal Retirement Date, 90% of all members would be married to wives four years younger (males) or husbands four years older (females).

6.  **Early Retirements**

    It has been assumed that all members who reach retirement age will retire on that date. No allowance has been made for ill-health early retirements in view of the existence of a reassured Disability Income Continuance Scheme.

7.  **Minimum Reserves**

    For each Member on the transfer date, a minimum reserve will be set up equal to the member's withdrawal benefit at that date.

    No credit will be taken for a Member's future contributions in excess of the cost of benefits accruing in the future.

8.  **Market Value Adjustment**

    No market value adjustment will be required as it is the intention to allocate the appropriate assets and transfer them into whichever portfolio or portfolios the Sealed Air management require.

.../3

- 3 -

9.    **Calculation of Transfer Values**

The rationale and approach in calculating the transfer value to a Packco arrangement is to provide a proportion of the total assets in relation that the liabilities of the Packco members of the Grace Africa Pension Fund bear to the total liabilities of the Grace Africa Pension Fund.   The transfer value will consist of the transferring members' full actuarial reserves, determined on the basis of the methods and assumptions employed for the most recent statutory actuarial valuation of the Grace Africa Pension Fund enhanced by a proportion of the surplus as described above.

Assets equal to the transfer value (the total of the Packco members' share of the Grace Africa Pension Fund) will be segregated at the Transfer Date and maintained in a separate portfolio until such time as the local Packco Fund is established.   The transfer value will be increased by the yield on the segregated assets between the Transfer Date and the eventual date of transfer.

10.    **Pension Increases**

The W R Grace Pension Fund has granted increases in the past having regard for the Fund earnings and the inflation rate in South Africa.   These have been as high as 15% (1990 and 1992) and as low as 7% (1996).   The average since 1988 has been 11,11%.

Yours sincerely

**P N MARTIN**
*Fellow of the Institute of Actuaries*
*Fellow of the Faculty of Actuaries*
*Valuator of the Fund and employee of*
*Alexander Forbes Consulting Actuaries*



## Sedgwick Noble Lowndes

Sedgwick Noble Lowndes Limited
St Martin's House, 31-35 Clarendon Road, Watford, Hertfordshire WD1 1JA
Telephone 01923-24491 • Facsimile 01923-243226

**Private and Confidential**

Mr John Forgach
Senior Benefits Counsel
W R Grace & Co
One Town Center Road
Boca Raton
FL33486-1010

31 March 1998

Dear Mr Forgach

Transfer of Cryovac from the Grace UK Pension Plan

Background

The pension plan contains pension members, deferred members with entitlement to pensions payable in the future, and active members. The active members include employees who will be transferred to PackCo, a subsidiary of Sealed Air, and those who will remain with the new Grace companies which may well be renamed. The first group of active members includes those transferring to PackCo but who work outside the UK and have deferred pensions in the Grace Plan.

The deferred and pensioner members will not be split. They will remain in the existing plan, whose principal employer will become one of the continuing companies remaining in the Grace Group of Companies. It is intended to set up a mirror image plan to receive the assets and liabilities from the Grace UK Pension Plan for the Cryovac transferring members.

It is intended that the assets would be apportioned in proportion to the liabilities. Thus if the assets do not exactly match the liabilities - on most acceptable measures of funding the Grace UK Pension Plan has assets in excess of liabilities - then the share of assets attributed to each section would reflect this position.

The Transfer Amount at the Effective Date from the Grace UK Pension Plan in respect of the Cryovac members would, therefore, be the assets attributable to those members representing the proportion of the total assets which their past service liabilities represent as a proportion of the total liabilities.

Similarly the assets attributable to the other active employees, and all the deferred and pensioner members would remain behind in the Grace UK Pension Plan.

There will be an adjustment in relation to the "Time for Change" Programme. In accordance with a separate agreement, the cost of the improvement is to be met by Sealed Air, and thus the transfer amount will be adjusted as set out in the following paragraphs.

The new mirror image plan would be sponsored by PackCo, a subsidiary of Sealed Air.

A member of the Sedgwick Group
Registered office, Sedgwick House, Aldgate Road, Croydon CR9 3JB
Registered in England number 467418
Regulated by the Personal Investment Authority

U:\WR\EBCL\NPLAC\NACTCOR\NEXDESP.DOC

1

The proportion transferred out of the Grace Plan will be in accordance with Clause 15 (in particular 15(8)) of the Second Schedule of the Trust Deed of the Grace UK Pension Plan dated 24 February 1988. Before the transfer takes place, the trustees must have the amount calculated in accordance with that Clause, and the Inland Revenue Pensions and Superannuation Office must give the consent for the bulk transfer to take place. The members transferring would have given their consent to such a transfer, and a discharge of the ongoing Grace UK Pension Plan trustees from any further liability for their benefits. In the event that this consent process takes place, no further certification by the Grace UK Pension Plan actuary is required.

**Effective Date**

The intended effective date for the establishment of the Cryovac mirror image plan is 31 March 1998. Members would start accruing benefits in respect of post transfer service in that plan from that date, and that date would be used as the effective date for calculations for the bulk transfer calculation.

**Determination of Transfer Amount as at the Effective Date**

Liabilities will be calculated using the assumptions set out below for all members of the Plan. Plan Salaries for those transferring active Cryovac members included in the "Time for Change" exercise will be their plan salaries at 31 March 1997 increased by the assumed rate of salary growth set out later in this letter, rather than actual salary. Consent to transfer will be required. Members who will have indicated that they do not want to transfer, will receive deferred benefit entitlements as if they were leaving active service on 31 March 1998. Their liability will be calculated appropriately. The Transfer Amount will be calculated as the appropriate portion of the total assets as described above, after deduction of the value as at 31 March 1998 of any bulk transfer values due to be paid out of the Grace Plan due to previous business sales.

**Asset Valuation**

Assets for transfer will be calculated on a proportionate basis as described above. There is, therefore, no reason for valuing assets in any other way at the effective date other than at market value. The amount calculated for transfer at the effective date will be the relevant proportion of the market value of assets on that date.

**Adjustment between Effective Date and Asset Transfer Date**

The Assets transferred shall be adjusted to reflect the period between Effective Date and Asset Transfer Date by multiplying the Transfer Amount as at the Effective Date by the FT-SE Actuaries All Share Total Return Index ("the Index") on the day before Asset Transfer Date and dividing by the Index on the day before the Effective Date.

The Value of Benefit will be calculated using the assumptions set out below. These assumptions are consistent with those in the most recent funding valuation.



## Summary of Assumptions

| | | | |
|---|---|---|---|
| (a) | Investment return | : | 9.0% p.a. |
| (b) | Plan Salary Increases | : | 7.0% p.a. |
| (c) | Pension Increase in Retirement | : | 4.0% p.a on all pension up to State Pension Age and after State Pension Age on pension in excess of the GMP; 3.0% p.a. on GMP accrued after 6 April 1988; 0% p.a. on GMP accrued before 6 April 1988. |
| (d) | Revaluation of pension in excess of GMP after withdrawal up to Retirement | : | 4.5% p.a. |
| | Revaluation on GMP | : | 6½% p.a. |
| (e) | Pension commuted for cash | : | The maximum allowed in each case. |
| (f) | Mortality | : | PMA80 Table for males and PFA80 Table for females. |
| (g) | Marital status at death or retirement | : | 90% of male members and 75% of female members will be married. On average wives will be 3 years younger than the member, and husbands 2 years older. |
| (h) | Leaving Service | : | A specific allowance has been made; sample rates are given below: |

| Age | Men % | Women % |
|---|---|---|
| 20 | 15.0 | 15.0 |
| 25 | 10.4 | 18.4 |
| 30 | 6.9 | 12.4 |
| 35 | 3.5 | 5.6 |
| 40 | 1.7 | 2.1 |
| 45 | 0.6 | 1.8 |

| | | | |
|---|---|---|---|
| (i) | Early Retirements from active status | : | 20% of female members who joined after 1 October 1990 and all male members retire early at each age between 60 and 64. All other female members will retire at 60. No retirement at normal pension age. |
| (j) | Retirements of Deferreds | : | At Normal Retirement Age of member on exit. |

Yours sincerely

David B Martin
Fellow of the Faculty of Actuaries

**SCHEDULE B**
**CERTAIN NON-U.S. EMPLOYEES**

Part 1:

Terence J. Kennett
Lee Frot
Bruno Vicente
Peter Leyland
Frederic Amiet
Philippe Simon
Georges Ermakoff
Isabelle Bodet
Guy Brou
Jean Paragot
Frederic Barrier
Bruno Leret
Miereille Gallerne
Marie-France Mallinger
Didier Ladone

Part 2:

Cheryl Hubbard
Pauline Behan
Elaine Thorpe
Sarah Maud
David Line
Peter Cannon
Paul Bird
Leslie Daniel
Patricia Saunders
Gus Franck
Yves Barrault

Part 3:

See attached.

Part 3:

| | Position | Country | (1) Severance | (2) |
|---|---|---|---|---|
| (1) | Factory Assistant | Chile | $ | 2,633 |
| (2) | Factory Assistant | Chile | | 2,800 |
| (3) | Accounting Analyst | Chile | | 4,867 |
| (4) | Accounting Analyst | Chile | | 5,000 |
| (5) | Accounting Chief | Chile | | 9,069 |
| (6) | Collector | Chile | | 4,818 |
| (7) | | | | 26,588 |
| (8) | System Administrator | Mexico | | 10,000 |
| (9) | Voice / Data | Mexico | | 20,000 |
| (10) | Systems Analyst | Argentina | | 3,500 |
| (11) | Systems Analyst | Argentina | $ | 3,750 |
| (12) | Systems Analyst | Brazil | | 18,139 |
| (13) | Systems Programer | Brazil | | 9,237 |
| (14) | | | | 64,625 |
| (15) | Total All | | $ | 93,213 |

SCHEDULE C
CERTAIN EMPLOYEES AT DUNCAN, S.C.

Jim Hansen
Henry Lyons

**SCHEDULE D**
**CERTAIN RELOCATING EMPLOYEES**

Clarence Wittenburg
Jerry Witkowski

**SCHEDULE E**

Robert Green, UK



**SCHEDULE F**
**CERTAIN EXPATRIATE EMPLOYEES**

Part 1. US Expatriates:

Mark Becker
Sean Dempsey
Gary Hayes
Betsy Kuo
Chin-lin Lo
Peter Luxemburger
John Mark
David Newsome
James Oddo, Jr.
Stephen Ostercamp
M. Henry Piedra
Phillip Su
Kyle Tebbs

Part 2. Non-US "Inpatriates":

Fernando Guzman
Mauro Kernkraut
Alejandro Nigro
Amanda Wong
Christopher Woodbridge