# EXHIBIT 18

EXPERT REPORT OF JAMES B. SHEIN[1]

1.    I am a professor of Management and Strategy at the Kellogg School of Management at the Northwestern University. I hold a Masters in Business Administration and a Doctorate in BA Organizational Behavior from the Indiana University Graduate School of Business. Attached as Exhibit A is a copy of my curriculum vitae.

2.    I have researched, written and taught courses and seminars on fiduciary duties and organizational behavior of trustees, officers and directors of public companies, private entities, and not-for-profit organizations. I have advised corporate and not-for-profit boards on checks and balances needed to protect stakeholders. I have also chaired governance committees for several for-profit and not-for-profit entities.

3.    I have reviewed the WRG Asbestos PI Trust Agreement (the "Trust Agreement"), the WRG Asbestos PI Trust Distribution Procedures ("TDP"), and the Bankruptcy Rule 2019 verified statements listed on Exhibit B that were filed by the proposed members of the Asbestos PI Trust Advisory Committee ("TAC") identified in the Trust Agreement, or by their law firms. I have also reviewed the other materials that are listed on Exhibit B to this Report.

4.    For my time in preparing this report, I am being paid my current customary fee of $600 an hour.

5.    As I explain below, the proposed members of the TAC, as a result of their responsibilities and powers under the Trust Agreement and the TDP, have the ability to influence, and control in some instances, decision making by the Trustees and owe fiduciary

---

[1]    This Report is being submitted on behalf of several Objecting Insurers: OneBeacon America Insurance Company, Seaton Insurance Company, Government Employees Insurance Company, and Columbia Insurance Company f/k/a Republic Insurance Company; Arrowood Indemnity Company f/k/a Royal Indemnity Company; Federal Insurance Company; Zurich Insurance Company, Zurich International (Bermuda) Ltd., and Maryland Casualty Company; Continental Casualty Company and Continental Insurance Company and affiliated companies; Fireman's Fund Insurance Company (and possibly other related companies) and Allianz S.p.A., f/k/a Riunione Adriatica Di Sicurta.

duties to all beneficiaries of the WRG Asbestos PI Trust ("Trust"). However, as attorneys

representing some (but not all) of the claimants that will be asserting asbestos personal injury

claims against the Trust, the TAC members have conflicting fiduciary duties to a subset of the

claimants making claims against the Trust. The result is that the structure of the Trust creates a

potential for abuse and for the Trustees and TAC to act contrary to the governing principle in the

Trust Agreement that all claimants be treated fairly and equitably in connection with claims

made against the Trust and that the Trust not deplete its assets by paying undeserving claims.

I.     **POWERS OF THE TAC**

  6. Virtually all significant decisions by the Trustees under the Trust Agreement

require consent by or consultation with the TAC and the Asbestos PI Futures Claimants'

Representative (the "Futures Representative"). The TAC therefore will be able to influence, and

potentially control, the administration of the Trust, including amending the procedures for

reviewing and paying claims of PI Claimants, some but not all of whom are or will be clients of

the TAC members.

  7. There are a large number of matters that the TAC and Futures Representative

must consent to before the Trustees can take action including (but not limited to):

- Adopting PI Trust By-Laws, or Amending the Trust Agreement, the TDP or the PI Trust By-Laws  (Trust Agreement §§ 2.2(f)(xi) – (xii), 7.3)

- Changing the Disease Levels, Scheduled, Maximum or Average Values or Medical/Exposure Criteria applicable to claims (Trust Agreement § 2.2(f)(iii), TDP § 5.3(b)(1), (3))

- Redetermining the Payment Percentages (Trust Agreement § 2.2(f)(i), TDP § 2.3)

- Developing separate Medical/Exposure Criteria for Foreign Claims (TDP § 5.3(b)(1))

-2-

- Requiring PI Claimants (including TAC members' clients) to provide additional kinds of medical evidence (Trust Agreement §2.2(f)(v))

- Developing methods for auditing the reliability of medical evidence (TDP § 5.8)

- Establishing both binding and non-binding arbitration procedures (TDP § 5.10(a))

- Creating as well as changing the proof of claim forms (TDP § 6.1)

- Determining whether a claimant (including TAC members' clients) must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the Trust (TDP § 6.4)

- Disclosing information to comply with an obligation under an asbestos insurance policy (TDP § 6.5)

- Suspending normal order of payments or limiting them (TDP § 7.3)

- Changing the Claims Payment Ratio (Trust Agreement § 2.2(f)(ii))

- Changing the form of release (Trust Agreement § 2.2(f)(vi))

8.      The Trustees must also consult with the TAC and the Futures Representative on any general implementation and administration issues of the Trust and the TDP (Trust Agreement § 2.2(e)), and must provide the TAC and Futures Representative prompt notice of any decision to sue or be sued, or to participate as a party, in any judicial, administrative or other proceeding. (Trust Agreement § 2.1(f), 2.1(c)(vii)).

9.      The TAC members and the Futures Representative also have roles in determining the continued service of the Trustees, and the Trustees' compensation – which also potentially allows them to influence or control Trustee decision making.

- The Trustees must obtain the consent of the TAC and the Futures Representative in order to change Trustee compensation, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court (Trust Agreement§ 2.2(f)(ix)).

- If there is a vacancy in the position of Trustee, the Trustees must consult with the TAC and Futures Representative concerning the appointment of the successor, and a majority of the TAC or the Futures Representative can veto any successor. Trust Agreement § 4.3(a).

- A Trustee may be removed at the recommendation of the TAC and the Futures Representative with the approval of the Bankruptcy Court for "good cause," which is specifically defined as failing to comply with all the consent and consultation requirements with the TAC. (Trust Agreement § 4.2(c)).

10.    In contrast, nothing in the Trust Agreement appears to give the Trustees the power to remove TAC members or select new TAC members.

- A member of the TAC may be removed only after a recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court. (Trust Agreement § 5.3(c)).

- If prior to termination of service of a member of the TAC other than as a result of removal, he or she has designated a successor in writing, that successor shall be the new member of the TAC. (Trust Agreement § 5.4(a)). If the terminated member of the TAC has not designated an individual to succeed him, his law firm may do so. (Trust Agreement § 5.4(a)).

- The Trustees must obtain the consent of the TAC in order to change the compensation of the TAC members. (Trust Agreement §2.2(f)(ix)).

## II.    CONFLICTING FIDUCIARY DUTIES OF TAC MEMBERS

11.    While the goal of the Trust is to treat all claimants fairly, reasonably and equitably in light of the finite assets of the Trust (Trust Agreement § 1.2, TDP §§ 1.1 and 2.1) and give "substantially similar treatment" for all Trust Claims that may exist now or in the future (TDP § 1.1), the choice of certain claimants' outside counsel as TAC members will create incentives for unfair and unequal treatment.

12.    The Trust Agreement states that the members of the TAC serve in a fiduciary capacity representing all holders of present Trust Claims, and that the Futures Representative

- 4 -

serves in a fiduciary capacity representing the interest of holders of future Trust Claims. (Trust Agreement §§ 5.2, 6.1)

13.    Based upon my review of the Bankruptcy Rule 2019 Statements filed by the proposed members of the TAC or their law firms attached as Appendix B, I understand that the members of the TAC will also serve as attorneys representing individual PI Claimants who expect to make claims against the Trust. My understanding is also that the TAC members expect to receive contingency fees or other payments from their claimant-clients for representing them in connection with their claims against the Trust.

14.    Given their extensive powers under the Trust Agreement, including their ability to influence and potentially control decisions by the Trustees, the members of the TAC must act as fiduciaries to all trust beneficiaries (i.e., all present and future PI Claimants), not merely present PI Claimants (as specified in the Trust Agreement). As attorneys representing individual PI Claimants seeking payments from the Trust, the TAC members also owe separate fiduciary duties to their claimant-clients. These two sets of fiduciary duties create a conflict of interest.

15.    Fiduciaries have a duty of loyalty to all to whom they owe a fiduciary duty, which in this case includes (in the case of the TAC members) all Trust beneficiaries. As a Trust fiduciary, the members of the TAC are obligated to carry out their duties under the Trust Agreement solely in the interest of the Trust beneficiaries. The TAC (like the Trustees) may not engage in any act that puts their personal interests in conflict with those of any of the Trust beneficiaries.

16.    Because members of the TAC also serve as attorneys for some (but not all) beneficiaries of the Trust, there is an inherent potential for a breach of the duty of loyalty to all Trust beneficiaries. As a fiduciary for all PI Claimants, or even only all present PI Claimants,

- 5 -

the members of the TAC have a duty to ensure that the Trust is administered and implemented, and if appropriate amended, so that the overall interests of all Trust beneficiaries are served and that all such claimants are treated equitably; this means that a member of the TAC must try to ensure that the Trust is administered so that unqualified claims are not paid, thereby leaving more funds available for claims that are entitled to payment under the TDP. On the other hand, as an attorney for a subset of present PI Claimants, a TAC member must act as an advocate and seek the maximum payment possible for his client, even if that client's claim may arguably not be entitled to payment under the TDP.

17.    Fiduciaries also have a duty to try to avoid conflicts of interest, and to not take part in any transaction in which they have an interest adverse to any beneficiary. Again, however, the Trust Agreement establishes built-in conflicts of interest. The members of the TAC, as attorneys for certain PI Claimants, have a duty to their clients to represent them vigorously in connection with their claims against the Trust, even if those claims may not be entitled to payment under the TDP. At the same time, however, members of the TAC have a duty, as fiduciaries to all beneficiaries of the Trust, to ensure that non-meritorious claims are not paid. Also, the members of the TAC will benefit personally from distributions made to their clients (but not to other claimants) under the Trust as a result of contingent or other fees owed by their clients.

18.    A fiduciary also has a duty of impartiality. A Trustee or other Trust fiduciary has a duty to treat each beneficiary impartially. Given the structure of the Trust Agreement, it will be difficult for the members of the TAC to be truly impartial to all beneficiaries, given the aforementioned fact that they have separate duties to certain beneficiaries, *i.e.*, their claimant clients, and will be compensated by those clients.

- 6 -

19.    The conflicting loyalties of the TAC members will also arise to the extent that the Trustees or TAC members may propose, or consider whether to propose, amendments in the various Disease Values, Scheduled or Maximum Values, Medical/Exposure Criteria, or proofs required to recover from the Trust. As attorneys representing certain PI Claimants, members of the TAC must avoid consenting to Trustee proposals that may adversely impact their clients, even if the proposed changes are in the best interest of the Trust beneficiaries as a whole. As attorneys for particular claimants, the members for the TAC have a fiduciary duty to approve changes, or not approve changes, based solely upon how those changes might affect their particular clients.

20.    Fiduciaries have a duty to enforce claims by and defend claims against the Trust. This means they have the duty to ensure that the Trustees take reasonable steps to enforce claims on behalf of the Trust and to defend the Trust against invalid or meritless claims. Here, the TAC members have clear incentives not to have the Trust defend against the claims of their individual clients.

21.    The terms of the Trust Agreement create a situation in which the TAC members will likely be violating conflict of interest rules applicable to attorneys throughout the country. An attorney has a conflict of interest if (i) the representation of one client will be directly adverse to another client or to another party to whom the attorney owes a fiduciary duty, or (ii) there is significant risk that representation of any client(s) will be affected by a personal interest of the attorney. An exception is only if each affected client gives informed consent in writing. In addition, consent to a future conflict cannot be open-ended or general. The very structure of the Trust Agreement results in violation of these conflict of interest rules because members of the TAC, in their role as attorneys for some of the Trust beneficiaries, have an interest in their well-

being to a far greater extent than that of other beneficiaries to whom they also owe fiduciary duties in their role as TAC members.

22.    The Delaware Lawyers Rules of Professional Conduct prohibit an attorney from representing one client when another client is adversely affected. As is normal in most states, a lawyer may not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and each client consents in writing after consultation. The purpose of the rule is to ensure a lawyer's duty of loyalty to the client.

23.    An attorney may not have a pecuniary interest adverse to any clients. Such adverse interests are possible under the Trust Agreement because the TAC members will be receiving contingency fees based upon successful claims asserted against the Trust by their clients, and such a contingency fee arrangement will provide the TAC members (as attorneys) with an interest in ensuring that their clients' claims are paid even if they are non-meritorious, to the potential detriment of other present or future PI Claimants who will be claiming against the same limited fund.

24.    As I understand it, pursuant to the Plan and the Trust Agreement, claims may be made to the Trust on behalf of Indirect PI Claimants, including insurance companies who might be held liable to persons for asbestos injuries, and who (absent the bankruptcy) would have had claims for indemnification or contribution against Grace. The members of the TAC have an incentive to ensure that their clients' claims are paid and that Indirect PI Trust claims are not paid.

25.    Section 5.6 of the TDP states that Indirect PI Trust Claims "shall be processed in accordance with procedures to be developed and implemented by the Trustees." Pursuant to the

Trust Agreement and the TDP, these procedures will have to be consented to by the TAC and the Futures Representative since they will be amendments to the TDP. Members of the TAC, as attorneys for certain asbestos personal injury claimants, have an incentive to approve only procedures for Indirect PI Claimants that make it more difficult for such claimants to collect any monies from the Trust, so that more monies are available for the clients of the members of the TAC.

26.    Section 5.13 of the TDP sets forth the procedures for resolving asbestos-related contractual indemnity claims made to the Trust by Settled Asbestos Insurance Companies. As in the case of other Indirect PI Trust Claims made by insurance companies, the members of the TAC have an incentive to ensure that their asbestos personal injury clients' claims are paid and that the contractual indemnity claims of the Settled Asbestos Insurance Companies are rejected by the Trust.

27.    In short, in their role as members of the TAC, the members are being paid by the Trust to treat all Trust beneficiaries equitably (or at least all present PI Claimants). However, as attorneys representing certain claimants, the members of the TAC are being paid (by way of contingency fee or otherwise) to do right by their own clients, even if their clients' interests are not in accord with those of the other Trust beneficiaries.

28.    This conflict in loyalty not only exists with respect to claimants currently represented by members of the TAC, but also any claimants that they may represent in the future.

## III.    EXCULPATION AND INDEMNITY PROVISIONS

29.    The indemnification and exculpation clauses in the Plan and Trust Agreement significantly immunize members of the TAC from any liability resulting from negligent breach of fiduciary duties to the Trust or to their individual clients. Moreover, as described in Paragraph

10 above, there is no effective means for the Trustees to remove a TAC member for breach of fiduciary duty without the consent of the TAC itself.

30.     Under the Trust Agreement, the TAC may not be held liable to the Trust or to any asbestos claimant of the Trust, or to any other person, other than for breach of trust committed in bad faith or for willful misappropriation. (Trust Agreement § 4.4).

31.     Under the exculpation clause of § 11.9 of the Plan, a TAC member cannot incur liability, other than if someone can prove gross negligence or willful misconduct.

32.     These provisions shield the members of the TAC from liability due to exercise of their duties as TAC members in ways that may be in conflict with their duties as attorneys for individual claimants, and vice versa. Under these provisions, individual claimants represented by members of the TAC who believed their attorneys were negligent in connection with representing them before the Trust could not successfully pursue legal malpractice claims against those attorneys. Conversely, beneficiaries of the Trust who are harmed due to a TAC member putting loyalty to his individual client over loyalty to the Trust beneficiaries as a whole would appear unable, under this standard, to hold the member of the TAC accountable to carry out his duties with the interest of all beneficiaries in mind.

33.     The Trustees must indemnify the TAC and Futures Representative to the fullest extent allowed by the laws of the State of Delaware (Trust Agreement § 2.1(c)(xiv)), even if they dissipate Trust assets. The Trustees, the TAC and the Futures Representative actually have a first priority lien upon the Trust assets to secure the indemnification (Trust Agreement § 4.7), which is highly unusual in governance situations.

34.     Exculpatory clauses are generally not looked at with favor in the area of corporate governance -- particularly when there is evidence of overreaching or abuse of duties by a

fiduciary. One measure of overreaching is when the fiduciary drafts the trust documents providing for his own exculpation. I understand that this Trust Agreement was drafted, at least in part, by the asbestos claimants' attorneys that included the TAC members or members of their law firms.

35.    Ordinarily, a beneficiary can hold a fiduciary liable if a fiduciary has an interest in a transaction that could be adverse to any beneficiary. Here there are potential transactions in which the TAC members will have an interest. There should be no exculpation or release prospectively under such broad conditions as exist under the Trust Agreement.

36.    In sum, the conflicting fiduciary obligations of any attorney representing a potential Trust beneficiary should preclude his or her appointment to the TAC. Members of the TAC who have obligations to existing clients with claims against the Trust, and other members of their law firms, must be disqualified because these obligations conflict with their fiduciary duties under the Trust Agreement.

37.    The exculpation and indemnification provisions in the Plan and Trust Agreement should also not be allowed because they shift the costs and risks of misconduct by the Trustees, the TAC members and Futures Representative to the Trust beneficiaries, and permit the dissipation of Trust assets. While trust documents can give certain releases and exculpation, the Trust Agreement goes much too far. It allows for broad release for future improper behavior, and no recourse for malpractice against members of the TAC and for breaches of fiduciary duty. The Trust Agreement effectively eliminates the checks and balances needed for fair and impartial corporate or entity governance.

Date: March 16, 2009

James B. Shein

- 11 -

EXHIBIT A

CURRICULUM VITAE

JAMES B. SHEIN

1100 N. Lake Shore Dr.
Unit 18B
Chicago, IL 60611

Home: (312) 787-5475
Office: (847) 491-2029
j-shein@kellogg.northwestern.edu

**SUMMARY:**

- Professor at Kellogg School of Management
- Previous business career as CEO of several companies
- Years of experience turning around underperforming organizations
- Deemed an 'Expert on Corporate Governance' by a Federal Court
- Director and Chair of the Governance and Compensation Committee of a $600 million company owned by several private equity firms
- Director, Chair of the Governance Committee, and Member of the Audit Committee of a $300 million public company
- Advisor on governance and fiduciary duties to the boards of directors several multi-billion dollar public companies
- Officer at a $1.5 billion public company
- Degrees in engineering, business and law

**EDUCATION:** LOYOLA UNIVERSITY OF CHICAGO SCHOOL OF LAW

Juris Doctorate
Academic Honors:
Cum Laude graduate; six scholastic awards
Lead Articles Editor of the Law Journal

INDIANA UNIVERSITY GRADUATE SCHOOL OF BUSINESS

Doctorate in BA Organizational Behavior
Masters in Business Administration
Academic Honors:
Title IV Fellowship, Beta Gamma Sigma, Sigma Iota Epsilon

PURDUE UNIVERSITY

Bachelor of Science in Engineering
Academic Honors:
Tau Beta Pi, Alpha Pi Mu, Phi Eta Sigma
President's Award; multiple scholarships

**DIRECTOR ROLES:**

Director and Member of the Governance and the Audit Committees of Broadcast Electronics, a manufacturer owned by several lenders and private equity firms. 2008 to present.

Director and Chairman of Lighting Panels LLC, a manufacturer of signage panels privately owned. 2006 to present.

Director, Chair of the Governance & Compensation Committee, and Member of the Audit Committee of Atari, Inc., a Nasdaq listed company. 2007-2008.

Director and Chair of the Governance Committee of Hilex Company, a $600mm manufacturer owned by several private equity firms. 2007-2008.

**EXPERIENCE:**

2002 to Present

KELLOGG SCHOOL OF MANAGEMENT
NORTHWESTERN UNIVERSITY, Evanston, Illinois

Professor of Management & Strategy (2005 to present)
    Courses taught:
        Managing Turnarounds (Techniques for corporate renewal, to restore growth at companies)
        New Venture Creation (Detailed planning for new business ideas / concepts, including from within existing companies)
    Advisor:
        National Restructuring Competition
        Distressed Investing Club
        Development Laboratory, McCormick School of Engineering

Adjunct Professor of Management & Strategy (2002 to 2005)

1997 to Present

McDERMOTT WILL & EMERY LLP, Chicago, Illinois: International law firm.

Counsel: Part of the Corporate Group. Advise management and boards of directors of large public and private companies in areas of corporate governance, financial restructurings, balancing of business/legal risks, and fiduciary duties.

1994 to 2001

LOYOLA UNIVERSITY OF CHICAGO, Chicago, Illinois (Two Schools)

Adjunct Professor (1994 to 2001)
    Courses taught in Graduate School of Business:
        Managing Turnarounds and Crises
        Strategy and Organization
        Entrepreneurship
    Courses taught in the School of Law:
        Business Concepts for Lawyers

New Venture Creation

1994-1997          J.S. ASSOCIATES, Northbrook, Illinois: Consulting firm.

President: Corporate Renewal consulting services for turnarounds of public and
private manufacturing and service companies. Clients were CEO's and boards of
directors in the U.S., Japan and the U.K.

1990-1994          R.C. MANUFACTURING, INC., Chicago, Illinois: Manufacturer.

President: Created and ran entrepreneurial venture, manufacturing polymer film
at two plants, primarily for the international food, drug and packaging industries.
Revenue reached $25 million, with 130 employees, then sold.

1979-1990          NORTHBROOK CORPORATION, Chicago, Illinois: A $100 million diversified
company with 1,000 employees.

President and Chief Executive Officer
Responsible for all operations and acquisitions. Products sold in the U.S. and
internationally. Created company, growing shareholders' equity from large
losses to a positive $49,000,000. Manufactured appliance parts, plastic film for
the food, drug and tape industries, and high-speed packaging machinery. Leased
transportation equipment and owned two shortline railroads. Sold company.

1977-1979          PULLMAN STANDARD COMPANY, Chicago, Illinois: A $600 million public
manufacturer and lessor of railroad equipment, marketed internationally to grain,
utility, railroad and chemical companies.

Vice President, Marketing/Planning
Responsible for product managers; set prices, directed international sales and
licensing, created advertising and new product programs.

1971-1977          YOUNGSTOWN SHEET AND TUBE COMPANY, Youngstown, Ohio:
A $1.5 billion publicly held steel and durable goods producer, with 27,000
employees.

Director of Marketing (1974-1977)
Responsible for the marketing and new product programs.

Director of Personnel (1971-1974)
Revamped all personnel areas; reported to CEO.

1968-1971          BOOZ, ALLEN & HAMILTON, INC., Chicago, Illinois:
                   Management consulting firm.

                   <u>Consultant, Top Management Services Group</u>
                   Planned and executed problem solutions for public companies in high-tech,
                   manufacturing, finance and service industries.

## PUBLICATIONS (Selected):

Shein, James B., "Winn-Dixie Stores:  Cleanup on Aisle 11", Kellogg School of Management Press,
Evanston, Ill. (2008)

Shein, James B., "Sara Lee:  Tale of Another Turnaround", Kellogg School of Management Press,
Evanston, Illj. (2008)

Shein, James B., "Trying to Match SOX:  Dealing with New Challenges and Risks Facing Directors", in
<u>The Journal of Private Equity</u>, (Spring, 2005) pp. 20-27.

Shein, James B. (ed:), <u>Cases and Materials in Corporate Renewal</u>, Kellogg School of Management
Press, Evanston, Ill. (2005).

Shein, James B., "Should an Entrepreneur Be Hired as a Turnaround Executive?", in <u>The Presidents'
Forum</u> (2003).

Shein, James B. (ed.), <u>Cases and Materials: Advanced Topics in Management</u>, Loyola University Press,
Chicago, Ill. (1999).

Shein, James B., "A Limit on Downsizing: Varity Corp. v. Howe", 24 Pepperdine Law Review 1, 1996.
(Lead article.)

Shein, James B., <u>Motivational Dimensions of Output Quality</u>, Indiana University Press, Bloomington,
Ind. (1968).

Shein, James B., "Selected Factors Influencing Motivation of R&D Personnel", in <u>Research Systems
and Technology</u> 43 (Lewis N. Goslin, ed., 1967).

## SPEECHES & EXECUTIVE EDUCATION: (Selected)

Speaker, "Buying a Distressed Company", Entrepreneurs' Conference, Chicago, IL. November, 2008.

Keynote Speaker, Summit on the Media Industry in Crisis, Washington, DC, November, 2008.

Moderator, Panel on "International Outsourcing", Shanghai, China, October, 2008.

Moderator, Panel on "The Economic Outlook For 2009", Turnaround Management Association,
Chicago, IL, September, 2008.

Chairman, Conference on Corporate Renewal, Kellogg School of Management, Evanston, Illinois,
April, 2008.

Moderator, Panel on "Leadership In Turnarounds", Leadership Conference at the Kellogg School of Management, Evanston, Illinois, October, 2007.

Speaker, "Ethics", 2007 AIRA Annual Conference, Chicago, Illinois, June, 2007.

Moderator, Panel on "Alternative Financial Sources", Entrepreneurship Conference at the Kellogg School of Mangagement, Evanston, Illinois, May, 2007.

Speaker, "The Role of Operations in Private Equity/ M&A", Manufacturing Business Conference, Chicago, IL, May, 2007.

Chairman and Creator of the "Turnaround Management Conference – Leading Corporate Renewal" at the Kellogg School of Management, Evanston, IL, April, 2007.

Co-Creator and Committee Member for the "Distressed Investing Conference", Las Vegas, Nevada, January, 2007.

Presenter, "International Restructuring Outlook", International Bar Association Annual Convention, Chicago, Illinois, September, 2006.

Moderator, Panel on "The Effect of the Liquidity Wave", Global Management Summit, Chicago, Illinois, June, 2006.

Moderator, Panel on "Buying Distressed Companies", Entrepreneurship Conference at the Kellogg School of Management, Evanston, Illinois, May, 2006.

Quoted in "Ask Inc.", Inc. Magazine, February, 2006.

Moderator, Panel on "How Rainmakers Make It Pour," Turnaround Management Association, Chicago, Illinois, November, 2005.

Moderator, Panel on "Making Tough Decisions and Leading Personnel to Overcome Crisis", Kellogg Global Leadership Conference, November, 2005.

Quoted (and featured) in "The Turnaround Template", Forrester Magazine, 2005.

Presenter, "Asset Protection", Annual Conference of the United States College of Cardiology, Hamilton, Bermuda, June, 2005.

Presenter, "Turnaround Theory and Practice", University of Chicago GSB, Chicago, Illinois, October, 2004.

Program Chair, "Advanced Education Workshop on Corporate Turnarounds and Renewal", two-day program at the University of Toronto, Toronto, Canada, June, 2004.

Quoted in: M. Hopkins & C. Scinta, "More Bankruptcy Advisors are Coming", Wall Street Journal, October 20, 2004, p. B2F.

Quoted in: S. Begin, "New MBA Focuses on Turning Businesses Around", Crain's Detroit Business, June 7, 2004.

Quoted as turnaround expert in:  K. Richardson, "Back From the Brink", Kellogg World, Summer, 2004.

Vice President of International Program, "Maximizing Corporate Renewal Opportunities in a Transitioning Economy", Dallas, Texas, March, 2004.

Chairman, "Rebuilding Corporate Value Worldwide", TMA Conference, San Francisco, California, October, 2003.

Presenter, "Final Phases of a Turnaround", TMA Program, Chicago, Illinois, April, 2003.

Vice President of Program, "The Future for Corporate Renewal", Orlando, Florida, March, 2003.

Creator and Moderator, Panel on "Acquiring a Distressed Business", Association for Corporate Growth, Chicago, Illinois, November, 2002.

Creator and Lecturer, "Keeping a Company on a Growth Track", BET/Viacom Program, Washington, D.C., October, 2002.

Lecturer, "Early Warning Signs of Trouble", Executive Enterprises, Chicago, Illinois, June, 2002.

Moderator, Panel on "Acquiring a Distressed Business", Kellogg Alumni Club, Evanston, Illinois, May, 2002.

Moderator, Panel on "Managing Turnarounds", University of Chicago, GSB, Chicago, Illinois, May, 2002.

Moderator, "Turning Around High-Tech Companies", M.I.T. Enterprise Forum, Chicago, Illinois. October, 2001.

Creator, Chairman, and presenter, "National Conference on Workout Strategies For Banks and Borrowers", Chicago, Illinois. April, 2001.

Presenter, "Financing a Turnaround", Chicago Bar Association, Chicago, Illinois. September, 2000.

Panelist, "Commercial Loan Workouts," The Banking Law Institute, Chicago, Illinois. June, 2000.

Co-Chairman, panel on "Business Turnarounds," Executive Enterprises, Chicago, Illinois. June, 1999.

Moderator, panel on "Deflation in International Basic Industries: The Effect on The Overall Business Climate", Federal Reserve Bank of Chicago. May, 1999.

Creator and Chairman, panel on "Downsizing and Its Aftermath", Turnaround Management Association, Chicago, Illinois. January, 1999.

Presenter, "Early Warnings That an Organization Is In Trouble", Banking Lending Institute, Las Vegas, Nevada. November, 1998.

Expert Commentator, National Public Radio, "Downsizing": First broadcast on May 5, 1997, then repeat appearances since.

## PRIMARY PROFESSIONAL AFFILIATION

<u>Turnaround Management Association</u>:  International organization with 8000 members, devoted to Corporate Renewal of public and private companies.

> Board of Directors
> Member of Executive Committee
> Responsible for:
>> International education conferences
>> Executive education for officers and directors of public companies
>> Advanced Education Workshops for management
> Chairman of the Trendwatch Surveys

## OTHER AFFILIATIONS: (Selected)

> Advisor on governance and fiduciary duties to the Board of Armstrong World Industries
> Advisor on governance and fiduciary duties to the Board of Directors of Breed Technologies
> Board of Advisors of Vision Point of Sale LLC
> Admitted to Illinois Bar
> Producer, "Gauguin The Musical"
> Member, Association for Corporate Growth

## COMMUNITY SERVICE: (Selected)

> Founder and advisor, Entrepreneurs Pro Bono Clinic
> Member, Fallen Angels: Volunteer consulting work to turn around not-for-profits in trouble
> Fundraiser and expert pot scrubber for Good News Soup Kitchen

## PERSONAL

Participate in advanced and rescue scuba diving and screenwriting.

CHI99 5084470-1.T04046.0010

## EXHIBIT B

1. First Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of W.R. Grace & Co., et. al., The Official Committee Of Asbestos Personal Injury Claimants, The Asbestos PI Future Claimants' Representative, And The Official Committee Of Equity Security Holders dated February 27, 2009.

2. WRG Asbestos PI Trust Agreement.

3. WRG Asbestos PI Trust Distribution Procedures.

4. Supplemental Verified Statement In Connection With The Representation Of Creditors As Required By Fed. R. Bankr. P. Rule 2019, filed By Cooney And Conway (March 2, 2009).

5. Amended Statement Of Baron & Budd, P.C. Under Bankruptcy Rule 2019 (February 25, 2009).

6. Third Amended Verified Statement In Connection With The Representation Of Creditors As Required By F.R.B.P. Rule 2019, filed By Weitz And Luxenberg (August 7, 2006).

7. Eleventh Amended Verified Statement Pursuant To Fed. R. Bankr.P. 2019 Filed By Motley Rice LLC (February 20, 2009).

8. The Delaware Lawyers' Rules Of Professional Conduct.

9. Delaware Code §§ 3303, 3313, 3314, 3323.

10. *What It Means To Be A Trustee: A Guide For Clients*, Fiduciary Matters Subcommittee Of The ACTEC Practice Committee (March 22, 2005).

11. S. Sterk, *Trust Protectors, Agency Costs, And Fiduciary Duty*, 27 Cardozo L. Rev. 2761 (2006).