# EXHIBIT 19

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION of PROFESSOR GEORGE L. PRIEST

I. Statement of Qualifications

1.      I am a professor of law and economics at Yale Law School, teaching courses in insurance, insurance regulation, antitrust, civil procedure, contracts and torts, among other subjects. I have served as a professor at Yale Law School since 1980. I served as the John M. Olin Professor of Law and Economics at Yale Law School from 1986 through 2008.

2.      I received a Bachelor of Arts degree from Yale in 1969 and a law degree from the University of Chicago in 1973.

3.      Throughout my career, my research has been in the field of law and economics. I have published numerous articles in the areas of law, economics, and insurance.

4.      My background includes both the study and knowledge of insurance, the regulation of insurance, and insurance practices. I have taught and published in the fields of insurance and the economics of insurance for many years. I have also conducted

extensive empirical research projects regarding the operation of the property/casualty insurance industry as well as of the effects of the regulation of insurance practices. Many of my articles have appeared in economics journals; others, in insurance journals.

5.      Over the course of my career, I have published articles in the following peer-reviewed economics journals: Journal of Law & Economics, Journal of Legal Studies, Supreme Court Economic Review, Research in Law and Economics, Journal of Law, Economics & Organization, Journal of Economic Perspectives, Journal of Risk & Uncertainty, Geneva Papers on Risk and Insurance, the Italian journal Mercado, concorrenza, regale (Market, competition, regulation), and Journal of Reprints for Antitrust Law and Economics.

6.      I have served as a peer-review referee for the following economics journals: American Economic Review, Economic Inquiry, Journal of Political Economy, Review of Economics and Statistics, Rand Journal of Economics, Journal of Law & Economics, Journal of Legal Studies, and Journal of Law, Economics & Organization. I have also served as a peer-review referee for the National Science Foundation, Law and Social Science, Economics Division, for Law & Society Review, and for the journal Science.

7.      I have held appointments as a Visiting Professor in the Department of Economics, University of Miami and the Department of Economics, University of Toronto.

8.      In 1991, I was elected the first President of the American Law and Economics Association by the Association's members.

2

9.    I have testified many times before Congress, before many state legislatures, and before state and national regulatory commissions.

10.    I have been invited numerous times to present lectures on insurance and the operation of the property/casualty insurance industry as well as on other economics-related issues to state legislators, regulators, and state and federal appellate judges. For many years, I have conducted a regular course on economics subjects, including insurance, for federal appellate judges and federal bankruptcy judges in a federal judicial instruction program managed by George Mason University. I have also conducted courses on economic subjects in an instructional program for state court judges managed by the University of Kansas School of Law.

11.    From 1987 to 1989, I served on the American Bar Association President's Commission to Improve the Liability Insurance System. More recently, in September 2002, I delivered the 26th Annual Geneva Lecture on Insurance sponsored by the Geneva Association for Risk and Insurance Economics.

12.    My experience extends beyond the academic. For the past eighteen years, I have served as a Special Master in the United States District Court for the District of New Jersey in the litigation, McLendon v. The Continental Group, Inc., upon reference by the Honorable H. Lee Sarokin and, subsequently, under the Honorable Dickinson R. Debevoise. The McLendon case is a nationwide class action comprising over 7,000 settlement participants which was settled in 1990 for the sum of $415 million.

13.    I have presented testimony on insurance or other economics subjects either at trial, in deposition or by expert report in the following federal courts: the Northern, Middle and Southern Districts of Alabama, Central and Northern Districts of California,

District of Connecticut, Middle and Southern Districts of Florida, Northern District of Illinois, District of Maryland, District of Nevada, District of New Jersey, Eastern District of New York, Northern District of Ohio, Northern District of Oklahoma, Eastern and Western Districts of Pennsylvania, Middle District of Tennessee, Eastern District of Texas, and the Court of Federal Claims; in Bankruptcy Courts for the District of Delaware, Eastern District of Louisiana, the Southern District of New York and the Western District of Pennsylvania; in state courts in the following states: Alabama, Alaska, Arizona, California, Colorado, Connecticut, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Montana, New Jersey, New Mexico, New York, Ohio, Tennessee, Texas, and West Virginia; and also in Ontario, Canada and Barcelona, Spain.

14.    In my work on insurance, I have studied and written extensively on the economic determinants of the terms of property/casualty insurance policies. In particular, I have studied how insurance policies are structured to provide appropriate incentives to insurers and to policyholders toward the reduction of losses suffered in the society. See, e.g., Priest, Government Insurance versus Market Insurance, 28 Geneva Papers on Risk and Insurance 71 (2003).

15.    I view my expertise on the issues raised in this bankruptcy case to be based upon the following:

a)    my study and research for over 35 years of the economic principles of risk transfer;

b)    my study over the same period of the customs and practices in the field of insurance and my understanding of the bases upon which insurance can be offered for true risks faced by entities in the society;

4

c)  my years of teaching the economic principles of insurance, in particular property/casualty insurance, and the regulation of the property/casualty insurance industry; and

d)  my study of the history of the development of Commercial General Liability ("CGL") policies, umbrella and excess policies as well as of the economic basis for the allocation of rights and responsibilities in such policies.

16.    My publications are listed in my current resume which is attached as Appendix I. A list of all other cases in which I have testified as an expert, at trial or by deposition, during the past four years is attached as Appendix II.

17.    I have been retained by counsel for Government Employees Insurance Company, Columbia Insurance Company f/k/a Republic Insurance Company, and Seaton Insurance Company; Arrowood Indemnity Company f/k/a Royal Indemnity Company; Continental Casualty Company and Continental Insurance Company and affiliated companies; Federal Insurance Company; Fireman's Fund Insurance Company and Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Maryland Casualty Company, Zurich Insurance Company, and Zurich International (Bermuda), Ltd. to prepare this declaration and provide expert testimony in connection with the W.R. Grace & Co., et al. ("Grace") Chapter 11 bankruptcy case. I am being compensated for my time at my customary fee of $800 per hour. The materials I have reviewed appear as Appendix III.

II.  Question Presented and Initial Statement of Opinions

18.    I have been asked to address the economic effects and implications of various features of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the

5

Official Committee of Equity Security Holders dated February 27, 2009 (the "Plan"). As I shall explain, from an economic standpoint, although the Plan states that it incorporates principles of insurance neutrality, various features of the Plan severely affect the rights of Grace's insurers and the economic function of their insurance policies.

19. For reasons I shall present below, Grace's insurance policies—like all typical primary CGL, umbrella, and excess policies—create an economic structure of rights and responsibilities as between the insurer and the policyholder that serves the important societal goal of constraining the economic impact of risks. The provisions of the policies that create that structure include, among others, the right of the insurer to participate in the defense and settlement of covered claims; the obligation of the policyholder to cooperate in the defense of claims; the prohibition of voluntary payments by the policyholder; and the insurer's right to consent to any assignment of its policies. Corollary legal rules such as the prohibition of collusion between the policyholder and a claimant against the insurer reinforces this structure. Here, the terms of the Grace Plan along with the Plan's Asbestos PI Trust Agreement, the Asbestos Insurance Transfer Agreement, and the Trust Distribution Procedures ("TDP") fundamentally upset that economic structure. Thus, as I shall explain, these provisions overturn central contractual rights established in the insurance policies in ways that severely impact the economic ability of Grace's insurers to manage the financial risks which they assumed in the policies issued to Grace.

6

### III.  The Economic Structure of Liability Insurance

20.     The economic function of insurance is to transfer risks in ways that control

and constrain the economic impact of losses suffered in the society.  An insurance

company, by aggregating uncorrelated risks and by structuring the risk transfer through

the terms of the insurance policy, is able to provide coverage for potential losses at much

lower costs than if individual policyholders were compelled to bear those risks

themselves.  The provision of this service by the insurance company serves to lower

societal losses generally by expanding insurance availability.  As I shall explain, the

economic structure of modern insurance policies—including Grace's policies here—

serves that important societal function.

21.     In the context of liability insurance, an insurance policy creates an

economic structure—an economic allocation of responsibilities—to deal most efficiently

with the liability claim process.  Where there is insurance, liability claims involve three

sets of parties: insurers, the policyholder, and claimants.  The provisions of insurance

policies link the interests of insurers and the policyholder and assign responsibilities to

each in order to most effectively deal with liability claims made by claimants against the

policyholder.

22.     As in other contractual contexts, insurance policies are structured to

allocate rights and responsibilities as between parties to the contract—here, insurers and

the policyholder—according to which party is in a superior position to most effectively

bear those responsibilities.  In the context of a liability claim, and according to our

system of tort law, there is an adversarial relationship between insurers and the

policyholder on one side, and claimants on the other.  The structure of the insurance

7

policy establishes economic incentives and responsibilities so that the linked team of the insurer and policyholder can most effectively—fairly but effectively—address liability claims of the claimants.

23.    Linking by contract the interests of insurers and the policyholder against the interests of claimants (again, fairly) serves the important societal objective of reducing the impact of losses. Many claims are worthy; other claims are inappropriate (including fraudulent claims) or exaggerated. There is no societal purpose served by compensating inappropriate or exaggerated claims. To the contrary, to the extent that the compensation of such claims must be included in the cost of insurance coverage, insurance becomes more expensive and insurance availability is reduced, to the harm of the society. Thus, the provisions of the insurance policy create an economic structure of rights and responsibilities that serves to constrain unworthy liability claims. This economic structure enhances insurance availability for the society.

24.    In essence, that economic structure gives to the insurers ultimate control over the litigation and settlement of claims brought against the policyholder and requires the policyholder to fully cooperate with the insurers in the defense or settlement of those claims. The economic purpose of the assignment of control to the insurers is straightforward: It is the insurers that must ultimately pay the indemnity from their own funds. Thus, the insurers bring discipline to the evaluation and resolution of claims that may be absent were the policyholder to control those decisions since the policyholder's economic interests are shielded by the insurance. The insurance policies require the policyholder to promptly inform the insurers of claims and to fully cooperate in their resolution. But ultimate control of payouts is put in the hands of the insurers. Toward

8

this end, CGL primary policies typically assign the insurer the duty to provide a defense

of covered claims and give the insurer the right to control the defense of those claims and

the right to approve all settlements.

25.     Typical umbrella and excess policies incorporate provisions that are

similar in that, although the insurer may or may not be assigned the "right and duty" to

defend claims, the policies assign to the insurer authority to approve all settlements and

prohibit unilateral settlements—voluntary payments—by the policyholder. For example,

Grace's London umbrella policy, the terms of which are incorporated by virtue of a

"follow form" endorsement into higher level excess policies by other insurers, provides:

> The Underwriters shall not be called upon to assume charge of the
> settlement or defense of any claim made or suit brought or proceeding
> instituted against the Assured but Underwriters shall have the right and
> shall be given the opportunity to associate with the Assured or the
> Assured's underlying insurers or both in the defense and control of any
> claim, suit or proceeding relative to an occurrence where the claim or suit
> involves, or appears reasonably likely to involve Underwriters . . .
> [London Policy No. KYO 17582 at Conditions, ¶ H.]

In addition to this provision incorporated by following form to the London Policy, certain

of Grace's excess policies, such as those issued by GEICO, also expressly prohibit

voluntary policyholder payments:

> The insured shall not, except at his own expense, voluntarily make any
> payment, assume any obligation, or incur any expense. [GEICO Policy
> No. GXU 30152 at Conditions, ¶ C. (5).]

Umbrella and excess policies issued by other of Grace's insurers contain similar terms.

26.     The allocation of responsibilities in the policies places burdens on the

policyholder as well. The policies require policyholders to notify insurers of claims that

may affect the insurance and require policyholders to cooperate with the insurer in the

investigation and defense of claims. There are equally good economic reasons

underlying a policyholder's duty to cooperate as an ally of the insurer in the defense of

claims. For example, Grace's London umbrella policy (to which other policies follow

form) provides:

> The Underwriters . . . shall have the right and shall be given the
> opportunity to associate . . . in the defense and control of any claim . . . in
> which event the Assured and Underwriters shall co-operate in all things in
> the defense of such claim, suit or proceeding. [London Policy No. KYO
> 17582 at Conditions, ¶ H.]

27.    Provisions such as these, like all other insurance policy terms, place the

risk or the burden of controlling risks on the party in the best position to exercise that

control. The primary insurer has the duty to defend claims against the policyholder, and

is also granted the right to control that defense, to make whatever investigation is

necessary to the defense, and to decide when and on what terms to enter a settlement with

a claimant. The insurer is in the superior position to perform these functions because it is

the insurer that must ultimately pay the indemnity from its own funds. If the policyholder

were to control the defense, especially to control when and on what terms to settle

adverse claims, it may well decide to minimize its own costs by entering rapid or

generous settlements on the expectation of obtaining subsequent indemnity from the

insurer. (This is a particular concern in the context of Grace's current petition for

bankruptcy relief.) To the contrary, it is in the joint interest of the policyholder and the

insurer—and of the society—to vigilantly defend claims, because the vigilant defense of

fraudulent, exaggerated or unmeritorious claims will serve to reduce total costs and make

possible lower insurance premiums. That is the reason that primary CGL policies

prohibit voluntary payments by policyholders and establish clearly a right of the insurer

to control and manage the defense of claims and to approve all settlements and is why Grace's excess policies provide its excess insurers, like London and GEICO, the right to elect to "associate" in the defense and settlement of all claims.

28.    The term "associate" in excess policies is not defined, but in economic terms means that the excess insurer is to be sufficiently brought into the litigation to allow it to evaluate whether a proposed settlement or continued litigation constitutes good judgment, allowing it to provide the value of its expertise to the policyholder or underlying insurer where, if its recommendations are rejected, a coverage defense may arise.

29.    It is significant in this regard that Grace's umbrella and excess policies provide for association by the insurers in the settlement of claims on the insurer's terms, not defined as to whether a settlement entered voluntarily by the policyholder could later have been adjudged as "reasonable" in any respect. Ex-post evaluations by courts as to the "reasonableness" of settlements increase uncertainty and, thus, the costs of providing insurance coverage. The exclusion of insurers from the process of claims settlement will invariably affect settlement results. A settlement may appear "reasonable" in the sense that it is within a range of possible settlement figures. Yet the settlement may be far different, and higher, than it would have been if the party with the most important economic interest in the outcome—the insurer, who is ultimately liable for payment—had been involved in the negotiation.

30.    Finally, provisions prohibiting a policyholder from assigning rights under policies without the approval of their insurers serve a similar end. Requiring insurer consent to assignment ensures that the risks undertaken by the insurer under the policy

11

not be increased by a policyholder's action without the insurer's consent. For example,

*Grace's London umbrella policy provides:*

> Assignment of interest under this policy shall not bind Underwriters unless and until their consent is endorsed hereon. [London Policy No. KYO 17582 at Conditions, ¶ O.]

Similarly, Grace's Republic excess policy provides:

> Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon . . . [Republic Insurance Company Policy No. CDE 749 at Conditions, ¶ 6.]

Grace's other umbrella and excess policies contain similar consent-to-assignment

provisions, either stated expressly or incorporated by reference to underlying policies.

    31.    As explained, these various provisions create a structure of economic

*rights and responsibilities that serves the important societal function of controlling and,* at

best, minimizing the economic effects of losses suffered in the society. The insurer,

because it is the payor, controls the defense and the settlement of claims. The

policyholder, to the extent of a deductible, self-insured retention, retrospective rating

premium or policy limits, faces direct liability costs and so faces incentives to directly

reduce loss. In addition, because the policyholder is the alleged source of the loss, it is in

the best position to forward notice of claims and to cooperate wholly with the insurer in

the defense of them. By separate, but complementary, rules, the policyholder is

prohibited from colluding with claimants against the interests of the insurer. Further, the

policyholder may not assign an interest in the policy without insurer consent in order to

protect the rights of the insurer to only indemnify the risks that it agreed to indemnify.

All of these provisions serve to create economic rights and incentives to reduce or

constrain the effects of losses suffered in the society and, thus, serve the societal goal of expanding insurance availability.

32.    The economic functions of the control of and participation in defense and settlement, notice, cooperation, and consent to assignment provisions are not altered in any way in the context of mass torts where claims against the policyholder amount to tens of thousands, as is the case with Grace. To the contrary, the economic importance of the assignment of rights and responsibilities in the policy is enhanced because the comparative expertise of the insurer in claims settlement becomes more valuable. In the context of tens of thousands of claims, it may not be economically effective to litigate each claim. But the insurer determines which claims to settle and for what amounts. The sheer magnitude of mass tort litigation might overwhelm a policyholder whose business is typically manufacturing, not claims resolution. In contrast, a principal expertise of a liability insurer is to resolve liability claims. Thus, in the context of asbestos, the insurer will confirm, say, that the claims that it will settle are legitimate claims against the policyholder's insurance because:

1) they involve bodily injury suffered during an applicable policy period;

2) they are based upon proven exposure to the policyholder's asbestos-containing product;

3) the claimant in fact suffered actual injury from exposure to the policyholder's product;

4) the amount paid the claimant related to harm from exposure to the policyholder's asbestos-containing product and not from exposure to asbestos of some other manufacturer; and

5) the amount for which the claim is to be settled is the best settlement based upon exposure and injury.

13

Resting upon its insurance claims, the Trust, an entity purporting to discharge the obligations of the policyholder, may not proceed nearly as diligently as its insurers in verifying qualifications for recovery.

IV.  The Economic Structure of Insurance in the Context of Policyholder Bankruptcy, Especially an Asbestos Bankruptcy

33.    The previous section discussed the economic structure of insurance policies addressing the economic relationships as between insurers and the policyholder on one hand, and liability claimants, on the other. How does the context of a policyholder bankruptcy change those relationships? Most obviously, bankruptcy changes the role of the policyholder. A policyholder in bankruptcy—whether in liquidation or reorganization—does not possess the same incentives to defend against claims because, given the bankruptcy, the costs that it faces from any claim or set of claims are substantially diluted. As a consequence, the economic effects of policy deductibles, self-insured retentions, co-insurance provisions, retrospective rating premiums and policy limits become diluted. The contractual obligations to cooperate in the defense of claims become mere contractual obligations, not economic obligations in the clear interest of the policyholder.

34.    The different economic role of a policyholder with respect to insurance in the context of the policyholder's bankruptcy suggests, in the first instance, that the insurer's role and its powers to control the defense and settlement of claims should increase, in order to preserve the economic and societal benefits from the vigilant defense of claims against the policyholder. If the economic interests of the policyholder in bankruptcy are diminished, it follows necessarily that the economic powers of the insurer to protect now the bankrupt estate against claims should increase.

14

35.    In many—perhaps most—contexts of bankruptcies, this matter has not been of crucial import because the creditors of the policyholder will possess interests similar to those of the policyholder and will take the place of the policyholder, as much as is possible, in the defense of claims. In many bankruptcy contexts, the creditors who take possession of the policyholder's estate are trade creditors, lenders, mortgagees, employees, and the like who, similar to the policyholder, will possess economic interests adverse to claimants that lead them to be as vigilant as the original policyholder in joining with the insurer in the defense of claims. Such creditors, of course, whatever their economic incentives, will not possess information and knowledge of operations equal to that of the policyholder—again, suggesting the need to give greater powers to the insurer—but they will have no interest in allowing claims adverse to the estate and, so, will possess interests similar to those of the original policyholder over some range.

36.    Matters change, however, in the context of an asbestos bankruptcy. In a modern asbestos bankruptcy,[1] the principal creditors of the estate are not trade creditors, lenders, or employees, but claimants against the policyholder and its insurance. Here the fundamental economic relationships established by the insurance policy as among the insurer, policyholder and claimant become substantially altered. Purportedly standing in the shoes of the policyholder are now those parties against whom the policyholder and its insurers were defending liability claims at earlier times.

37.    In a bankruptcy of that nature, the interests of the parties are fundamentally different. There is no reason to believe that claimant-creditors will act as allies of insurers. There is no reason to believe that the claimant-creditors will aid

---

[1] The point is not asbestos per se, but bankruptcies in which claimants are the principal creditors. Asbestos-related bankruptcies are our most common current form of such bankruptcies.

insurers in suppressing unworthy claims. Current claimant-creditors may aid insurers in suppressing unworthy claims brought by totally <u>new</u> claimants whose claims may diminish the existing estate. But, by definition, claimant-creditors are committed to the success of their own claims, whether those claims are worthy from the standpoint of insurance and the society or not. As a consequence, claimant-controlled bankruptcies are inherently and inescapably collusive with respect to claims against the debtor-policyholder's insurance.

38.    Indeed, the context in which the successors to a policyholder in bankruptcy are principally claimants reproduces the forms of economic conflict of interest that legal doctrines prohibiting policyholder-claimant collusion are meant to address. Collusion by a policyholder with a claimant against the policyholder's insurance is universally prohibited. <u>See generally</u>, Jeffrey W. Stempel, <u>Law of Insurance Contract Disputes</u> at § 9.02(b) (2d ed. 2004). The remedy for policyholder-claimant collusion is to void the insurance. Collusion creates a conflict of interest because the policyholder who by contract and for good reasons of public policy is made an ally of the insurer has, through the collusion, become an opponent, aiding the adverse party. This is exactly the situation established by claimant control of a bankrupt's estate, as with that of Grace here.

V.    <u>Problematic Features of the Grace Plan from the Standpoint of Economics</u>

39.    From an economic standpoint, the Grace reorganization Plan has overturned in fundamental ways the basic rights set forth in Grace's insurance policies and the economic relationships established by those policies.

16

40.    The obvious function of the Plan, the PI Trust Agreement, the Asbestos Insurance Transfer Agreement, and the Plan's TDP is to establish a method for settling the tens of thousands of bodily injury claims that remain outstanding and will be asserted in the future against Grace deriving from its use of asbestos. Although, as explained above, Grace's insurance policies grant to the insurers the right to control or participate in the defense and settlement of claims against Grace, I understand that the insurers had no role in the formulation of the Plan, but that the terms of the proposed settlement were worked out between Grace, the policyholder Debtor, and representatives of the claimants filing suit against Grace hopeful of gaining access to Grace's remaining assets, including its insurance.

41.    Why was the Plan drafted by this means? Why were Grace's insurers precluded from negotiation over the terms of the proposed Plan, especially where the terms of the policies provide insurers the right to control all settlements seeking recovery against Grace's insurance? I am not a fact witness and have no internal knowledge about the formulation of the Plan and its related documents. But it is a clear economic inference that this method of formulation of the Plan was designed to give better treatment to claimants against Grace than would have been obtained if the insurers had been involved in the Plan negotiations.

42.    From an economic standpoint, the procedures for the resolution of claims worked out between Grace and claimants against Grace's insurance violate the most central allocation of rights and responsibilities in Grace's insurance policies. Those policies allocated the right to control the defense and participate in defense and settlement to Grace's insurers, not to Grace nor surely to claimants against Grace.

17

43.     First, the Plan establishes that all asbestos claims against Grace are to be resolved according to the terms of the Asbestos PI Trust Agreement and the Asbestos PI TDP. Plan § 5.2. The Trust Agreement, in turn, establishes a management structure consisting of four Trustees, a Trust Advisory Committee, and a Futures Representative, Trust Agreement at §§ 4.1, 5.1, 6.1, none of whom represents insurers; indeed, to the contrary, the Trust Agreement provides that the members of the Trust Advisory Committee "shall serve in a fiduciary capacity representing all holders of present PI Trust Claims." Trust Agreement at § 5.2. Correlatively, the Futures Representative serves as a fiduciary of holders of future PI Trust Claims. Trust Agreement at § 6.1. By these provisions, collusion between the Trust as successor to the policyholder Grace and claimants is made legitimate.

44.     Second, the Plan establishes a payment matrix for claims based somewhat loosely on injury severity that has not been consented to by the insurers. See, TDP at § 5.3(a)(3). The TDP provide that payments to claimants may be subsequently adjusted upwards or downwards at any time by the Trustees with the consent of the Trust Advisory Committee and the Futures Representative. TDP at § 2.3. These provisions are in direct violation of the economic allocation of rights in the policies and violate the economic principle of comparative advantage. Grace's insurers, not Grace, not to mention the parties negotiating the matrix adverse to the insurers, were in the best position to determine claim values over large numbers of claims. That is why the insurance policies allocated the responsibility to control settlements to Grace's insurers, not to Grace or its successor, nor surely to a group comprised of representatives of claimants against the insurance.

18

45.    To violate the principle of insurer control over defense and settlement cannot be defended by the context of a policyholder's bankruptcy. In bankruptcy, the policyholder's creditors are empowered to stand in the shoes of the policyholder. But the policyholder's insurance policies do not grant the policyholder authority to control the defense of claims; that control is granted by agreement (and for good reasons of public policy) to the insurer.

46.    Third, the Plan overturns the economic relationships established in Grace's insurance policies by substituting the contractual obligation of Grace to cooperate with its insurers in the defense of claims for procedures established in the TDP which can be amended at any time, again without insurer consent. TDP at § 8.1. In the context of the filing of claims against insurance, cooperation consists of providing access to documents, providing company witnesses, including F.R.C.P. § 30(b)(6) witnesses, and countless other forms of providing assistance in the defense of claims. There is no assurance that cooperation of this nature will be forthcoming. In this respect it is unclear whether, under the Plan, Grace will be discharged from its duties and obligations under the policies, including the duty to cooperate, and/or whether the Trust will assume such duties and obligations.

47.    To the extent that the Plan is ultimately construed by the Court as discharging or releasing Grace's, or its successor's, obligation to cooperate with its insurers in the defense of claims, it would constitute a fundamental violation of the economic allocation of responsibilities in Grace's insurance policies. The Trust does not possess economic incentives equivalent to those Grace faced prior to its bankruptcy, especially since the Trust is controlled by claimants. A bankruptcy, however, does not

19

eliminate the insurer's and the societal need for policyholder cooperation in the defense of claims.

48.    The insurers here surely cannot rely on the Trust for equivalent cooperation. As mentioned, it is not clear whether Grace's obligations under the policies are assumed by the Trust. But to the extent they are, the initial Trustees have been appointed through agreement between Grace, the claimants, and the Futures Representative, and the Trust Advisory Committee and Futures Representative are charged to serve as fiduciaries for claimants.

49.    Grace's insurers also cannot rely on an ex-post evaluation by a court as to the "reasonableness" of settlements that the Trust might enter. As discussed, the exclusion of insurers from the process of claims settlement will invariably affect settlement results.

50.    Fourth, the Plan effects a "transfer" of all Grace policy rights to the Trust, which is prohibited in Grace's policies without consent of affected insurers. The economic function of requiring consent of the insurer to assignment is to preserve the deal made in the insurance policy: If an assignment does not alter risks, the insurer will consent to it; if it enhances risks, the insurer will not—at least without further negotiation on, perhaps, differentially commensurate terms—because such an assignment would violate the agreement the parties made in entering the contract. Here, the assignment of Grace's "policy rights" to the Trust does increase significantly the risk that the insurers may have to bear, because it results in the elimination of the insurers' rights to control defense and settlement of claims, and puts control of the settlement process in the hands

of a Trust whose fiduciaries have every incentive to pay all asbestos claims, regardless of whether they are deserving of payment.

51.    Indeed, the "transfer" of rights envisioned by the Plan may extend far beyond the typical insurance policy assignment anticipated in the consent-to-assignment provision of Grace's insurance policies. A typical assignment involves a transfer from a first policyholder to a second policyholder of the rights that the first policyholder possesses under the policy. When it purchased its policies, Grace (the first policyholder) agreed to insurer consent prior to assignment of its rights under the policy to any subsequent party. By the terms of the Plan here, however, the rights that are transferred to the Trust may constitute not only the rights that the policyholder Grace possessed under the policy, but may purport to include the rights that Grace's insurers possessed under the policy, including the umbrella and excess insurers' rights to associate with the defense and control settlements. If so, the transfer of rights would be dramatically more extensive than merely the assignment of the policyholder's rights which themselves, according to the terms of Grace's policies, require insurer consent.

52.    Reflecting the sensitivity of the drafters to the extent to which the Plan overturns the economic structure of Grace's insurance, the Plan claims to incorporate a policy of "Insurance Neutrality". Thus, § 7.15 provides:

> (a)    Except to the extent provided in this Section 7.15 . . . nothing in the Confirmation Order, the Plan or any of the Plan Documents . . . shall in any way operate to, or have the effect of impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect.

\* \* \*

21

(f)        Except as provided in Section 7.15(g), Section 7.15(j), and Section 7.2.2(d)(iv), nothing in the Plan . . . or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense.[2]

53.    In terms of the economic structure of rights and responsibilities established by Grace's policies, there are multiple problems with the claim that this provision establishes "insurance neutrality" for the Plan. First, the provision is needlessly circular and therefore confusing. For example §7.15(a), quoted above, appears to preserve "any Asbestos Insurance Entity's legal, equitable or contractual rights", but with reservations: "[e]xcept to the extent provided in this Section 7.15". Similarly, § 7.15(f), quoted above, appears to preserve the right of an Asbestos Insurance Entity "to assert any Asbestos Insurer Coverage Defense", but again with reservations: "[e]xcept as provided in Section 7.15(g), Section 7.15(j), and Section 7.2.2(d)(iv)".[3] Since other provisions of Section 7.15 declare the primacy of the Plan, e.g., § 7/15(b), are the insurers contractual rights and coverage defenses preserved or excepted from preservation?

54.    Similarly, subsection (g) of the provision eliminates any insurer claim that the transfer of its policies to the Trust without its consent violates the consent-to-assignment right provided in its policy. Thus, it provides:

---

[2] Similarly, Plan § 7.2.2(d)(ii) provides that "All Asbestos Insurance Rights, and all claims and causes of action asserted or to be asserted in furtherance of or connection therewith shall be preserved for the benefit of the Asbestos PI Trust . . . except that all Asbestos Insurance Coverage Defenses are preserved."

[3] Section 7.15(j) appears to be mislabeled in the current Plan draft.

(e)    Notwithstanding the provisions of this Section 7.15, Asbestos Insurance Entities shall be bound by the Court's findings and conclusions that, under the Bankruptcy Code, the transfer of rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against each Asbestos Insurance Entity notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy . . .

Far from "insurance neutrality", this provision erases contractual rights and coverage defenses otherwise available to insurers.

55.    Even if Plan § 7.15 were interpreted to preserve all contractual rights and coverage defenses of Grace's insurers, the assertion of a contractual right or a coverage defense does not place an insurer in the position for which it bargained to possess control over the settlement of asbestos personal injury claims brought against Grace. If the Plan is confirmed on its current terms, the stakes of subsequent insurance-related litigation increase dramatically. To assert the violation of a fundamental contractual right or to raise a fundamental coverage defense—such as the consent-to-assignment defense—compels the insurer to be claiming that there should be no coverage whatsoever. It becomes all or nothing litigation. The more realistic resolution of these issues is to include Grace's insurers in the working out of the distribution of remaining Grace assets—including its insurance assets—toward the most equitable settlement of the asbestos claims against Grace. Including insurers in the development of a future Plan does not compel an all or nothing resolution. To the contrary, it brings the significant expertise of insurers in claim resolution toward the productive end of successful claims settlement.

23

## VI.  Conclusion

56.    For all of the economic reasons explained above, it is my opinion that the provisions of the Plan and associated Plan documents substantially overturn the economic structure of incentives created by Grace's insurance policies to the severe economic prejudice of its insurers.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and understanding.


Executed on this 31st day of March, 2009.


George L. Priest

24

**APPENDIX I**

Resume                                                                    February, 2009

George L. Priest

Yale Law School                                          Home Office
P.O. Box 208215                                          350 Livingston Street
New Haven, Connecticut 06520-8215                        New Haven, Connecticut  06511
Telephone: (203) 432-1632                                Telephone:  (203) 624-8331
Fax:  (203) 432-7225
e-mail: george.priest@yale.edu

Personal:

Age:   61
Birth: November 24, 1947
Married, four children, six grandchildren

Employment:

Professor of Law and Economics, Yale Law School.  John M. Olin Professor of Law and Economics,
1986-2009.  Professor of Law, Yale University, since 1981.  Director, Program in Civil Liability, Yale
Law School, since 1982.  Director, John M. Olin Center for Studies in Law, Economics and Public
Policy, Yale Law School, 1983-1988; Co-Director, since 1988.

Visiting Professor, Yale University, 1980-81.  Professor of Law, University of California, Los Angeles,
1980-81; Visiting Professor, 1979-80.  Professor of Law, State University of New York, Buffalo, 1979-
80; Associate Professor, 1977-79.  Lecturer and Fellow in Law and Economics, University of Chicago
Law School, 1975-77.  Associate Professor of Law, University of Puget Sound, Tacoma, Washington,
1975-1977 (on leave); Assistant Professor, 1973-75.

Other Visiting Professor Positions:  University of Washington School of Law, 1980; University of Miami
Economics Department and Graduate School of Business, 1982-85; University of Rome, "Law Sapienza,"
Rome, Italy, 1983, 1986; Scuola Superiore, University of Pisa, Italy, 1984, 1986, 1988; University of
Toronto Department of Economics and Law School, 1988; Escuela de Derecho, Universidad de Puerto
Rico, 2007.

Education:

B.A., Yale University (1969); J.D., University of Chicago (1973).

Bibliography:

A.  Published and Committed Articles

1.       Law and Economic Distress: Sangamon County, Illinois 1837-1844, 2 J. Legal Studies 469
         (1973).  Reprinted in Essays in Nineteenth-Century American Legal History (W. Holt, ed., 1976).

2.    The History of the Postal Monopoly in the United States, 18 J. Law & Econ. 33 (1975).

3.    The Common Law Process and the Selection of Efficient Rules, 6 J. Legal Studies 65 (1977).

4.    Cartels and Patent License Arrangements, 20 J. Law & Econ. 309 (1977).  Reprinted in 8 J. Rep. for Antitrust Law & Econ. 357 (1979).

5.    Breach and Remedy for the Tender of Nonconforming Goods under the Uniform Commercial Code:  An Economic Approach, 91 Harv. L. Rev. 960 (1978).  Excerpts reprinted in Economic Readings in Contract Law (Posner & Kronman eds., 1978).

6.    Selective Characteristics of Litigation, 9 J. Legal Studies 399 (1980).

7.    The Structure and Administration of the Magnuson-Moss Warranty Act, in Economic Regulation and Consumer Welfare:  The Federal Trade Commission in the 1970's (Clarkson and Muris eds., Cambridge U. Press, 1981).

8.    The New Scientism in Legal Scholarship:  A Comment on Clark and Posner, in Symposium: "Legal Scholarship: Its Nature and Purposes," 90 Yale L.J. 1284 (1981).

9.    A Theory of the Consumer Product Warranty, 90 Yale L.J. 1297 (1981). Awarded the 1981-82 Prize for Distinguished Scholarship in Law and Economics (University of Miami).  Excerpted and reprinted variously.

10.   Punitive Damages and Enterprise Liability, 56 So. Cal. L. Rev. 123 (1982).

11.   The Civil Jury:  Trends in Trials and Verdicts, Cook County, Illinois, 1960-1979 (with Mark Peterson) (Rand Corp., R-2881-ICJ, 1982).  Reprinted 32 Fed. Ins. Counsel Q. 361 (1982).

12.   Will Uniform Legislation Increase or Decrease the Rate of Injuries from Product Defects?, in Product Liability and Tort Law Reform at 7 (Theberge ed., 1982).

13.   Regulating the Content and Volume of Litigation: An Economic Analysis, 1 Sup. Ct. Econ. Rev. 163 (1982).  Reprinted as Rand Corp., R-3084-ICJ (1983).

14.   The Best Evidence of the Effect of Products Liability Law on the Accident Rate, 91 Yale L.J. 1386 (1982).

15.   Social Science Theory and Legal Education:  The Law School as University, 33 J. Leg. Ed. 437 (1983).

16.   The Selection of Disputes for Litigation (with Benjamin Klein), 13 J. Legal Studies 1 (1984). Reprinted as Rand Corp., R-3084-ICJ (1984).

17.   Law and Economics and Law Reform:  A Comment on Barth's Cancer Compensation Proposal, 13 J. Legal Studies 587 (1984).

18.   Gossiping about Ideas, 93 Yale L.J. 1625 (1984).

19.     The Economics of Cost and Fee Rules:  A Primer, In <u>Health-Related Claims:  Can the Tort and Compensation Systems Cope?</u> at 189 (1984).

20.     Reexamining the Selection Hypothesis, 14 <u>J. Legal Studies</u> 215 (1985).

21.     Commentary on the Dodd and Gorton Amendments to S-100 (The Kasten Bill) (with Guido Calabresi), Working Paper #34, Program in Civil Liability, Yale Law School, June 1985.

22.     What Economists Can Tell Lawyers about Intellectual Property, 8 <u>Research in Law & Econ.</u> 19 (1986).

23.     Introduction, "Critical Issues in Tort Law Reform: A Search for Principles" (with Richard A. Epstein), 14 <u>J. Legal Studies</u> 459 (1985).

24.     The Invention of Enterprise Liability: A Critical History of the Intellectual Foundations of Modern Tort Law, 14 <u>J. Legal Studies</u> 461 (1985).  Excerpted and reprinted variously.

25.     Legal and Scientific Concepts of Causation, in <u>Causation and Financial Compensation</u> at 475 (Burger, ed. 1986).

26.     The Personality Theory of Agency Regulation, 3 <u>Yale J. Regulation</u> 391 (1986).

27.     My Greatest Benefactions, 9 <u>U. Puget Sound L. Rev.</u> 457 (1986).

28.     Compensation Systems and Tort Law:  A Preliminary Comparative Approach in <u>Risk, Compensation, and Liability:  The Policy Choices</u> at 161 (C.E.D., 1986).

29.     The Current Insurance Crisis and Modern Tort Law, 96 <u>Yale L.J.</u> 1521 (1987).  Excerpted and reprinted variously.

30.     Puzzles of the Tort Crisis, 48 <u>Ohio L. Rev.</u> 497 (1987).

31.     Modern Tort Law and Its Reform, 22 <u>Valparaiso L. Rev.</u> 1 (1987).  Reprinted as El derecho de la responsabilidad extracontractial moderno y su reforma in <u>La responsabilidad extracontractual</u> at 263 (C.F. Rosenkrantz com. 2005).

32.     The Liability Crisis:  A Diagnosis, Fall 1987 <u>Yale Law Report</u> 2.

33.     The Disappearance of the Consumer From Modern Products Liability Law, in <u>The Frontier of Research in the Consumer Interest</u> at 771 (Maynes ed., 1988).

34.     Measuring Legal Change, 3 <u>J. Law, Econ. & Org.</u> 193 (1988).

35.     The Aims of Privatization, 6 <u>Yale Law & Policy Rev.</u> 1 (1988).

36.     Satisfying the Multiple Goals of Tort Law, 22 <u>Valparaiso L. Rev.</u> 643 (1988).

37.     Products Liability Law and the Accident Rate, in <u>Liability: Perspectives and Policy</u> at 184 (Litan & Winston eds., Brookings Inst. 1988).

38.     Compensation for Personal Injury in the United States, in <u>Compensation for Personal Injury in Sweden and other Countries</u> at 127 (J. Hellner ed., 1988).

39.     Understanding the Liability Crisis, in <u>New Directions in Liability Law</u> (Proceedings of the Academy of Political Science) at 196 (W. Olson ed., 1988).

40.     Statement Dissenting and Concurring, American Bar Association, <u>Report of the Commission to Improve the Liability Insurance System</u> at F-1 (1989).

41.     The Antitrust Suits and the Public Understanding of Insurance, 63 <u>Tulane L. Rev.</u> 999 (1989). Reprinted variously.

42.     Strict Products Liability: The Original Intent, 10 <u>Cardozo L. Rev.</u> 2301 (1989). Reprinted variously.

43.     La Controrivoluzione nel Diritto della Responsibilita' da Prodotti negli Stati Uniti d'America (The Counter-Revolution in Products Liability in the United States), 119 <u>Il Foro Italiano</u> 1 (N.4, March 1989).

44.     Introduction, "Issues in Civil Procedure: Advancing the Dialogue" (with Judyth W. Pendell), 69 <u>Boston U.L. Rev.</u> 467 (1989).

45.     Private Litigants and the Court Congestion Problem, 69 <u>Boston U. L. Rev.</u> 527 (1989).

46.     Insurability and Punitive Damages, 40 <u>Alabama L. Rev.</u> 1009 (1989). Excerpted and reprinted variously.

47.     The Modern Irony of Civil Law: A Memoir of Strict Products Liability in the United States, 9 <u>Tel-Aviv U. Studies in Law</u> 93 (1989).

48.     The Increasing Division Between Legal Practice and Legal Education, 37 <u>Buff. L. Rev.</u> 681 (1989).

49.     Crisis Comes to the Insurers: The Modern Misunderstanding of Insurance Policy, 3 <u>Insurance Law Anthology</u> 13 (1989).

50.     The Continuing Crisis in Liability, 1 <u>Prod. Liability L. J.</u> 243 (1989).

51.     The Deep Justification for Tort Reform, in <u>Product Liability Reform: Debating the Issues</u> at 7 (Chilton ed., Cen. Study Amer. Bus., No. 98, Washington Univ., St. Louis 1990).

52.     The New Legal Structure of Risk Control, 119 <u>Daedalus</u> 207 (1990). Reprinted in <u>Risk</u> at 207 (Burger ed., 1993); forthcoming in <u>The International Library of Essays in Law and Society</u> (Sarat, ed., 2006).

53. L'Assicurazione Obbligatoria per la Circolazione degli Autoveicoli negli Stati Uniti (The Compulsory Automobile Insurance Problem in the United States), 1 Quadrimestre rivista di diritto privato 32 (1990).

54. The Role of the Civil Jury in a System of Private Litigation, 1990 U. Chi. Leg. Forum 161 (1990).

55. Riding the Tide toward Modern Tort Law: William Prosser's "The Assault upon the Citadel (Strict Liability to the Consumer)", 100 Yale L.J. 1470 (1991).

56. Law and Economics after Europe's Revolution, in Economic Analysis of Law: A Collection of Applications (Weigel, ed., 1991).

57. The Modern Expansion of Tort Liability: Its Sources, Its Effects, and Its Reform, 5 J. Econ. Perspectives 31 (1991).

58. Foreword, "Modern Civil Procedure: Issues in Controversy" (with Judyth W. Pendell), 54 Law and Contemp. Probs. 1 (1991).

59. Can Absolute Manufacturer Liability be Defended?, 9 Yale J. on Reg. 237 (1992).

60. The Inevitability of Tort Reform, 26 Valparaiso L. Rev. 701 (1992).

61. The Triumphs or Failings of Modern Legal Scholarship and the Conditions of its Production, 63 Colorado L. Rev. 725 (1992).

62. Justifying the Civil Jury, in Verdict: Assessing the Civil Jury System at 103 (Litan ed., Brookings Institution 1993).

63. The Origins of Utility Regulation and the "Theories of Regulation" Debate, 36 J. Law & Econ. 289 (1993). Reprinted in Transaction Cost Economics (Williamson and Masten eds., 1994).

64. The Growth of Interdisciplinary Research and the Industrial Structure of the Production of Legal Ideas: A Reply to Judge Edwards, 91 Mich. L. Rev. 1929 (1993).

65. Lawyers, Liability, and Law Reform: Effects on American Economic Growth and Trade Competitiveness, 71 Denver U.L. Rev. 115 (1993).

66. Economic Problems of Accidents and Compensation, 15 U. Hawaii L. Rev. 544 (1993).

67. The Ambiguous Moral Foundations of the Underground Economy, 103 Yale L.J. 2259 (1994).

68. Socialism, Eastern Europe, and the Question of the Postal Monopoly in Governing the Postal Service at 54 (American Enterprise Institute, Sidak ed., 1994).

69. Contracts Then and Now: An Appreciation of Friedrich Kessler, 104 Yale L.J. 2145 (1995).

70.    Channeling Civil Litigation: A Comment on Civil Justice Reform in Ontario, in <u>Prospects for Civil Justice</u> at 237, Ontario Law Reform Commission, (1995).

71.    The Government, the Market, and the Problem of Catastrophic Loss, 12 <u>J. Risk & Uncertainty</u> 219 (1996). Reprinted as Les Risques, "Catastrophe": Intervention Publique ou Marchés Concurrentiels?, 34 <u>Risques</u> 69 (Avril-Juin 1998).

72.    Punitive Damages Reform: The Case of Alabama, 56 <u>La. L. Rev.</u> 825 (1996). Reprinted as La reforma del régimen de daños punitivos: el caso de Alabama in <u>La responsabilidad extracontractual</u> at 301 (C.F. Rosenkrantz com. 2005).

73.    Procedural versus Substantive Controls of Mass Tort Class Actions, 26 <u>J. Legal Studies</u> 521 (1997).

74.    Can Privatization Bring Economic Growth to Africa?, in Gerald Bisong Tanyi, <u>Designing Privatization Strategies in Africa: Law, Economics, Practice</u> at ix (1997).

75.    The American Legal System and the Insurability of Environmental Damage and Catastrophic Loss, 83 <u>Geneva Papers on Risk and Insurance</u> 190 (1997).

76.    Antitrust Enforcement in the Information Age, 4 <u>Texas Rev. L. & Pol.</u> 141 (1999).

77.    Henry Manne and the Market Measure of Intellectual Influence, 50 <u>Case Western Reserve L. Rev.</u> 325 (1999).

78.    The Simple Economics of Civil Procedure, 9 <u>Kansas J. of Law & Pub. Pol.</u> 389 (2000).

79.    Economics of Civil Justice Reform Proposals, 9 <u>Kansas J. of Law & Pub. Pol.</u> 401 (2000).

80.    Controversies Surrounding Class Actions, 9 <u>Kansas J. of Law & Pub. Pol.</u> 481 (2000).

81.    Pobreza, inequidad y crecimiento económico. Principios básicos (Poverty, Inequality, and Economic Growth: Simple Principles), SELA 1999 <u>Revista Jurídica de la Universidad de Palermo</u> 157 (2000). Reprinted in <u>Felicidad: Un Enfoqua de Derecho y Economiá</u>, (Roemer compl. 2005).

82.    The Culture of Modern Tort Law, 34 <u>Valparaiso L. Rev.</u> 573 (2000).

83.    Reflexiones Respecto de la Contratación Masiva, in <u>Por Qué Hay Que Cambiar el Código Civil?</u> at p. 155 (Fernando Cantuarias Salaverry, ed. 2001).

84.    A Careful Look at the Drama of *Bush v. Gore*, Summer 2001 <u>Yale Law Report</u> 40.

85.    International Control of Environmental Harm through Regulation and Law, Forward to Lucas Bergkamp, <u>Liability and Environment</u> at xvii (2001).

86.    The Constitutionality of State Tort Reform Legislation and *Lochner*, 31 <u>Seton Hall L. Rev.</u> 683 (2001).

87.   Reanalyzing Bush v. Gore:  Democratic Accountability and Judicial Overreaching, 72 <u>U. Colo. L. Rev.</u> 953 (2001).

88.   Derechos economicos, derechos personales y otras restricciones sobre los resultados de las mayorias, (Economic Rights, Personal Rights, and Other Constraints on Majoritarian Outcomes), <u>Los derechos fundamentales</u>, SELA 2001 at 19.

89.   U.S. v. Microsoft:  A Legal and Economic Analysis of the Settlement, Washington Legal Foundation, Contemporary Legal Notes, Number 41, March, 2002.

90.   The [Punitive Damages] Problem and Efforts to Understand it, in Sunstein, <u>et al.</u>, <u>Punitive Damages:  How Juries Decide</u> at 1 (2002).

91.   L'antitrust negli Stati Uniti e in Europa.  Analisi e psicoanalisi di una divergenza (The Prospects of Convergence of U.S. and European Commission Competition Policies), 4 <u>mercato concorrenza regole</u> 151 (April 2002).

92.   Government Insurance versus Market Insurance, 28 <u>Geneva Papers on Risk and Insurance</u> 71 (2003).

93.   Small Business, Economic Growth, and the Huffman Conjecture, 7 <u>J. of Small and Emerging Business Law</u> 1 (2003).

94.   Flawed Efforts to Apply Modern Antitrust Law to Network Industries, <u>High-Stakes Antitrust</u> at 117 (AEI/Brookings Institute Press, 2003).

95.   The Cumulative Sources of the Asbestos Litigation Phenomenon, 31 <u>Pepperdine L. Rev.</u> 261 (2004).

96.   The Problematic Structure of the September 11th Victim Compensation Fund, 53 <u>DePaul L. Rev.</u> 527 (2004).

97.   Beyond Brown:  Opportunity versus Equality as an Empowerment Norm:  An Essay for Owen Fiss, 58 <u>U. Miami L. Rev.</u> 347 (2004).

98.   The Gentle Genius of Franco Romani in <u>Franco Romani, scienziato sociale 1935-2002</u> at 131 (da Empoli & Pulitini eds., 2004).

99.   What We Know and What We Don't Know about Modern Class Actions, Manhattan Inst., Civil Justice Rep. (2005).

100.  The Rise of Law and Economics:  A Memoir of the Early Years in <u>Law and Economics:  Essays by the Founding Fathers</u> at 350 (Rowley & Parisi, eds.) (2005); reprinted as El surgimiento del análisis económico del derecho:  una memoria de los primeros años, 2 <u>Revista de Economía y Derecho</u> 51 (Autumn 2004).

101. Reexamining the Market for Judicial Clerks and other Assortative Matching Markets, 22 <u>Yale J. Reg.</u> 123 (2005).

102. Reduciendo la Pobreza Global: Teoría, Práctica y Reforma (Reducing Global Poverty: Theory, Practice and Reform), <u>SELA 2005: Law and Poverty</u>.

103. Law and Economics, in <u>American Conservatism: An Encyclopedia</u> at 490 (Frohnen, Beer & Nelson eds. 2006).

104. The Modern Transformation of Civil Law, 54 <u>Buff. L. Rev.</u> 957 (2006).

105. *Aspen Skiing*: Product Differentiation and Preventing Free Riding as Monopolization (with Jonathan Lewinsohn), in <u>Antitrust Stories</u> at 229 (Fox & Crane eds., 2007).

106. Networks and Antitrust Analysis, 1 <u>Issues in Competition Law and Policy</u> 641 (ABA Section of Antitrust Law 2008).

107. Perspectives on the Future Direction of Antitrust, 22 <u>Antitrust</u> 27 (2008).

108. The Abiding Influence of *The Antitrust Paradox*: An Essay in Honor of Robert H. Bork, 31 <u>Harv. Law & Policy Rev.</u> 455 (2008).

109. Francesco Busnelli and the Development of Modern Tort Law in the U.S., Italy, and the European Community, II <u>Liber Amicorum per Francesco D. Busnelli</u> at 437 (2008).

110. Market Share Liability in Personal Injury and Public Nuisance Litigation: An Economic Analysis, forthcoming <u>Sup. Ct. Econ. Rev.</u> (2009).

111. The Illusive Attraction of No Fault, forthcoming ___ <u>Clev. St. L. Rev.</u> ___ .


B.    <u>Current Drafts in Circulation</u>

112. Internalizing Costs (mimeo 1984, 1987, 1989, 1990).

113. The Current Crisis in Compensation Systems for Traffic Accidents in the United States (mimeo 1990).

114. Justifying Tort Reform in our Confused System of Accident Law (mimeo 1991).

115. The Government versus the Market in Protecting against Economic Misfortune (July 1998).


C. <u>Legislative, Executive and Regulatory Testimony</u> (* indicates written report also submitted).

116.*   Modernizing the Regulation of Product Warranties, Federal Trade Commission, 1985.

117.*   "Products Liability Reform and the Dodd and Gorton Amendments to S.100", United States
Senate Committee on Commerce, Science and Transportation, June 25, 1985.

118.*   "A Legal Analysis of the Jurisdiction and Choice of Law Provisions of the Gorton Amendment
No. 1951 to S.1999" (with Professor Perry Dane), United States Senate Committee on
Commerce, Science and Transportation, June 13, 1986.

119.    "Tort Reform and Insurance Regulation", Select Committee on Insurance, California Legislature,
October 20, 1986.

120.    "A Legal Analysis of S.2805, An Act Concerning Product Liability and Punitive Damages",
Committee on the Judiciary, New Jersey Senate, February 9, 1987.

121.*   "Joint and Several Liability: The Issues and Remaining Questions", Ontario Law Reform
Commission, March 23, 1987.

122.    "Products Liability Reform and the Insurance Crisis", Committee on the Judiciary, Louisiana
Senate, June 9, 1987.

123.*   "An Analytical Critique of the United States' No-Fault Automobile Experience", Inquiry into
Motor Vehicle Accident Compensation in Ontario (Osborne Inquiry), June 30, 1987.

124.*   "Hearings on the Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of
the United States", Committee on the Judiciary, United States Senate, 100th Congress, 1st
Session 2439-2444 (1987).

125.*   "The Liability Crisis, the Antitrust Suits and the McCarran-Ferguson Act", Subcommittee on
Antitrust, Monopolies and Business Rights, Committee on the Judiciary, United States Senate,
June 14, 1988.

126.*   "Allowing Drivers a Choice between No-Fault and Fault-Based Auto Insurance: An Analytical
Critique", Ontario Automobile Insurance Board, May 24, 1989.

127.    "Alternative Compensation Systems and the Problems of Modern Tort Law", Minnesota Injury
Compensation Study Commission, June 21, 1989.

128.*   "The Costs of Regulation Given the Role of the Insurance Industry in Modern Society",
Consolidated Hearings before the Insurance Commissioner of the State of California, January 9,
1990.

129.*   "The Successes and Failures of Threshold No-Fault Systems in the United States", Standing
Committee on General Government, Parliament of Ontario, January 17, 1990.

130.*   "The Effects of Proposition 103 on Consumers and on Competition in Property/Casualty
Insurance", Comment on Proposed Regulations, Department of Insurance, State of California,
April 8, 1991.

9

131.* "Confiscatory Regulation and the Effects of Proposition 103's Rollback Orders on Consumers and on Competition in Property/Casualty Insurance", Department of Insurance, State of California, November 21, 1991.

132.* "Internalizing the Costs of Nuclear Power", Ontario Court (General Division), April 23, 1993.

133. Economic Function of Life Insurance Agency Commissions and the Effects on Consumers of Mandatory Rebates," Department of Insurance, State of California, October 18, 1993.

134.* "How to Privatize Intelsat".

135.* McCarran-Ferguson Reform, State Regulation and the Consumer Interest, National Conference of Insurance Legislators, New York, November 12, 1994.

136.* "Statement Concerning H.R. 10", Common Sense Legal Reforms Act of 1995, Committee on the Judiciary, 104th Congress, February 13, 1995.

137.* "Statement Concerning Punitive Damages Tort Reform," Committee on the Judiciary, United States Senate, April 4, 1995; and "Response to Statement of [Clinton] Administration Policy of April 25, 1995," May 2, 1995.

138. "Punitive Damages Reform in Historical Perspective," Hearing on S.1554, "Fairness in Punitive Damages Awards Act," Committee on the Judiciary, United States Senate, July 29, 1998; and Response to Senator Orrin G. Hatch, Chairman, United States Senate Committee on the Judiciary Re: S.1554, "Fairness in Punitive Damages Award Act," September 3, 1998.

139. "The Antitrust Implications of the Cable Bills," New Jersey State Assembly, February 3, 2003; New Jersey State Senate, March 10, 2003.

140. Securing Our Economic Future: The White House Conference on the Economy, The High Costs of Lawsuit Abuse, December 15, 2004, http://www.whitehouse.gov/news/releases/2004/12/print/20041215-11.html

D. Journalism

141. "The Benefits of Tort Reform--Sense & Nonsense", Wall Street Journal, February 11, 1987 at 26.

142. "USA, Cartelli in Rimonta" in Dossier Antitrust at 23, Il Sole 24 Ore, 29 January 1988, Roma, Italia.

143. Commentary, "The (Pop-Gun) War Against the Insurers", Hartford Courant, June 26, 1988 at C1.

144. "Tort Law, Insurance, and the Insurance Crisis", in Tort Law and the Insurance Crisis, The World & I at 522 (Criner ed., February, 1989).

145. "How to Control Liability Costs", Fortune, April 24, 1989 at 323.

146.  "The Antitrust Suit Counteroffensive to Tort Reform", <u>Legal Backgrounder</u>, Washington Legal Foundation, May 12, 1989.

147.  "Negli States la Privatizzazione si Chiama Deregulation", <u>L' Opinione</u>, 21 March 1989 at 57, Roma, Italia.

148.  "Will Argentina Simply Replace One Monopoly With Another?", <u>Wall Street Journal</u>, September 22, 1989 at A13.

149.  "What Bork and Sarokin Have in Common", (letter) <u>Wall Street Journal</u>, August 22, 1994 at A15.

150.  "The Punitive Damages Problem in Alabama", <u>Birmingham News</u>, December 29, 1996 at 1C.

151.  "The Supreme Court Passes the Buck on Asbestos", <u>Wall Street Journal</u>, July 2, 1997 at A15.

152.  "True Conservatism and Satellite Competition", <u>Space News</u>, May 11, 1998 at 21; reprinted <u>Congressional Record</u>, May 20, 1998 at E908.

153.  "The Stakes in the Case against Microsoft", <u>Wall Street Journal</u>, May 19, 1998 at A22; "The Dangers of Attack on Microsoft" (response to Robert H. Bork), <u>Wall Street Journal</u>, June 8, 1998 at A23.

154.  "The Conservative Delusion over Auto Choice", <u>Wall Street Journal</u>, July 21, 1998 at A14. Reprinted in "On the Issues," American Enterprise Institute, August, 1998; Louisiana Advocates at 4 (September, 1998).

155.  "Why Clinton Lied", <u>Wall Street Journal</u>, September 23, 1998 at A22.

156.  "Trial by State," review of Richard A. Posner, *An Affair of State* in <u>The Wall Street Journal</u>, September 14, 1999 at A20.

157.  "Judge Jackson's Case against Microsoft," <u>Wall Street Journal</u>, November 8, 1999 at A50.

158.  Dialogue with Jonathan Zittrain: "The False Epic of the Microsoft Decision," November 24, 1999; "Judge Jackson's Case More Carefully Considered," November 30, 1999; "General Rules, the Remedy in Microsoft, and the Role of Judge Posner," December 1, 1999, <u>Slate Magazine</u>, www.slate.com/dialogues

159.  "Don't Count on a Breakup," <u>Wall Street Journal</u>, April 26, 2000 at A26; reprinted in the <u>Toronto Financial Post</u>, April 28, 2000 at C19.

160.  "On Character Assassination," <u>Yale Docket</u>, May 2000 at p. 3.

161.  "Some Kind of Remedy," <u>The New York Times</u>, June 9, 2000 at A31.

162.  "Letter to Larry," <u>The Industry Standard</u>, July 3, 2000 at 122.

163.  "Community Impact Evaluation Needed," <u>The Denver Post</u>, August 12, 2000 at 7B.

164.    "It's Not Just Alabama," <u>Reader's Digest</u>, October 2000 at 156.

165.    "The Deeper Scandal of the Clinton Pardons," (with Minor Myers III), <u>The Christian Science Monitor</u>, February 26, 2001 at 9.

166.    "A Ruling for 'Predators'–and Consumers," <u>The Wall Street Journal</u>, May 3, 2001 at A18.

167.    "The GE/Honeywell Precedent," (with Franco Romani), <u>The Wall Street Journal</u>, June 20, 2001 at A18.

168.    "Justice Bows to Reason," <u>The Wall Street Journal</u>, September 7, 2001 at A14.

169.    "Microsoft Wins . . . Sort Of," <u>The Wall Street Journal</u>, November 2, 2001 at A14.

170.    "Microsoft and the Courts," (response to Larry Lessig) <u>The New York Times</u>, November 16, 2001 at A24.

171.    "The End of the Microsoft Case," <u>The Wall Street Journal</u>, November 4, 2002 at A14; reprinted in the <u>National Post</u>, November 5, 2002 at FP15.

172.    "Class Warfare," <u>The Wall Street Journal</u>, May 5, 2003 at A14; reprinted in the <u>National Post</u>, May 6, 2003 at FP15.

173.    "An Expensive Game to Play," April 12, 2004, <u>Tech Central Station</u>, www.techcentralstation.com/041204E.html

174.    "Supreme Wisdom," <u>The Wall Street Journal</u>, June 18, 2004 at A10.

175.    "Tackling Tort Reform," February 11, 2005, <u>National Review Online</u>, http://www.nationalreview.com/comment/priest200502111122.asp

176.    "Globalization and the Olympics," (with Minor Myers III), <u>The Wall Street Journal</u>, August 25, 2008 at A11.


<u>Distinguished Lectureships</u>:

Olin Distinguished Lecture Series, University of California at Los Angeles School of Business (Inaugural Lecture, 1985).

Monsanto Lecture in Tort Law and Jurisprudence, Valparaiso Law School (Inaugural Lecture, 1987).

Distinguished Visiting Professor in Legal Theory, University of Toronto Faculty of Law and Department of Economics, Michelmas Term, 1988.

Martin P. Miller Centennial Lecture, University of Denver College of Law, 1992.

Fifty-Sixth Cleveland-Marshall Fund Lecture, Cleveland-Marshall College of Law, 1993.

Twenty-Sixth Geneva Lecture on Insurance, Geneva Association, 2002.

Twentieth Higgins Distinguished Visiting Professor, Lewis & Clark Law School, 2003.

Distinguished Economist Lecture, Bureau of Competition, Federal Trade Commission, 2004.

Other Awards:

Templeton Honor Rolls for Education in a Free Society, 1997.

Profesor Honorario, Universidad Peruana de Ciencias Aplicadas, Lima, Peru, 2003.

Teaching:

Recent courses:  Antitrust; Advanced Antitrust: Network Industries; Civil Procedure; Insurance and Public Policy; Regulated Industries; Constitutional Law; Federalism; Capitalism; Campaign Finance Regulation; Products Liability; Advanced Antitrust; Torts; Advanced Torts; Democracy or Capitalism? (seminar).

Other offerings:  Contracts; Commercial Law; Price Theory; Remedies; Criminal Case Settlement (seminar); Theories of the Common Law (seminar).

Journal Referee:

American Economic Review; Economic Inquiry; Journal of Health Politics, Policy and Law; Journal of Japanese Studies; Journal of Law & Economics; Journal of Law, Economics & Organization; Journal of Legal Studies; Law and Society Review; Law and Policy; Journal of Political Economy; Rand Journal of Economics; National Science Foundation (Law and Social Sciences) (Economics); Review of Economics and Statistics; Science.

Consultantships:

Institute for Civil Justice, The Rand Corporation, since 1980;

Federal Trade Commission, 1984-85; 2001-03.

Other Professional Service:

President's (U.S.) Commission on Privatization, 1987-88.

American Bar Association, President's Commission to Improve the Liability Insurance  System, 1987-89.

13

Special Master, <u>McLendon v. The Continental Group, Inc., et. al.</u>, U.S. District Court, District of New Jersey, 1989-  .

President, American Law and Economics Association, 1991-92.

Council of Academic Advisers, American Enterprise Institute, 1994-  .

14

**APPENDIX II**

George L. Priest
350 Livingston Street
New Haven, Connecticut 06511
(203) 562-8467
FAX (203) 562-7692

March 31, 2009

Cases in which I have provided Expert Testimony by Trial or Deposition over the past four years:

In re Congoleum Corporation, et al., U.S. Bankruptcy Court, D. N.J., Case No. 03-51524-KCF (deposition);

LeMasters v. Specialty Risk Services, et al., Circuit Court, Ohio County, West Virginia, Civil Action No. 02-C-267 (deposition);

St. Paul Fire and Marine Ins. Co. vs. A.P.I., Inc., County of Ramsey, MN, No. C9-02-8084 (deposition);

Consolidated Edison Company of New York, Inc. v. American Home Assurance Co., et al., County of New York, New York, Index No. 600527/01 (deposition);

In re: Skinner Engine Company, Inc., U.S. Bankruptcy Court, W.D. Penn., Case Nos. 01-23987 (MBM) and 01-23988 (MBM) (deposition);

U.S. Filter Corp., et al. v. Allstate Ins. Co., et al., Marion County, Indiana, Cause No. 49D010409PL001745 (deposition);

United States Fidelity and Guaranty Co. v Soco West, Inc., et al., D. MT, Case No. CV-04-29-BLG-RFC (deposition);

BASF AG vs. Great American Assurance Co., et al., N.D. Ill., No. 04 C 6969 (deposition);

Steadfast Insurance Co. v. The Purdue Frederick Company, et al., Sup. Ct. Stamford, CT, X08 CV 02 0191697 (deposition);

J.T. Thorpe, Inc. vs. Federal Insurance Company, et al., C.D. Cal., Case No. LA02-14216-BB (deposition);

Chance v. United States Tobacco Company, et al., Seward County, Kansas, Case No. 05-CV-112 (trial);

Gray v. Ford Motor Co., Sacramento County, CA, Case No. BC2979458 (deposition);

E.I. Du Pont de Nemours and Company v. Travelers Casualty and Surety Company, Jefferson County, Texas, Cause No. B-176143 (deposition);

General Motors Corporation vs. Royal & Sun Alliance Insurance Group, PLC, et al., Oakland County, Michigan, Case No. 05C-063863-CK (deposition);

RPM, INC. et al. v. Hartford Accident and Indemnity Company, et al., N.E.D. Ohio, Case No. 1:03 CV 1322 (deposition);

U.S. ex rel. Tyson, et al. v. Amerigroup Illinois, Inc., et al., N.D. Ill., No. 04 C 6074 (deposition);

Brown Group Retail, Inc. v. Allstate Insurance Co., et al., Denver County, CO, Case 03CV1410 (deposition);

Foster Wheeler, LLC v. Affiliated FM Insurance Company, et al., New York County, NY, Index No. 600777/01 (deposition);

Continental Casualty Company, et al. v. City of Jacksonville, et al., M.D. Florida, Case No. 3:04-cv-1170-J-20MCR (deposition).

St. Paul Mercury Insurance Co., et al. v. Northern States Power Co., et al., Hennepin County, MN, Case No. CT. 03-17809 (deposition);

Simon Wrecking Co., Inc., et al. v. AIU Insurance Co., et al., E.D. PA, Civil Action No. 03-CV-3231 (deposition);

Bank of America Corporation, et al., v. SR International Business Insurance Co., LTD., Mecklenburg County, NC, 05 CVS 5564 (deposition);

Bettendorf, et al. v. Microsoft Corporation, Milwaukee County, WI, Case No. 05-CV-010927 (deposition);

American Optical Corp., et al. v. Admiral Ins. Co., et al., Union County, NJ, Docket No. UNN-L-2502-01 (deposition);

Singh, et al. v. Edwards Lifesciences Corp., et al., Snohomish County, WA, Cause No. 05-2-12213-5 (deposition);

IMO Industries v. Transamerica Corp. et al., Mercer County, NJ, Docket No. MER-L-2140-03 (deposition);

The Travelers Indemnity Company vs. Orange and Rockland Utilities, Inc., et al., New York County, NY, Index No. 603601-02 (deposition);

United States Fire Insurance Company, et al. v. Bunge North America, Inc. et al. D. Kan., Case No. 05-CV-2192 JWL/DJW (deposition);

E.I. du Pont de Nemours & Co. v. Allstate Insurance Company, et al., New Castle, County, Del., C.A. No. 99C-12-253-HLA (deposition).

<u>Poplawski, et al. v. Nationwide Mutual Fire Insurance Co.</u>, Marshall County, West Virginia, Civil Action No. 06-C-25M (deposition);

<u>Stewart vs. Union Carbide Corporation</u>, County of Los Angeles, Central District, California, Case No.: BC 384224 (deposition);

<u>Familias de Dinislamov Dinis Rafaelevich, et al. v. Honeywell International, Inc., et al.</u>, No. 00000424/2007, Barcelona, Spain (testimony).

**APPENDIX III**

In re: W.R. Grace & Co., *et al.*

Materials I have reviewed in the preparation of this Declaration:

First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009 (with Exhibits).

Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009.

Unigard Policy No. 1-2517.
GEICO Policy No. GXU 30031.
GEICO Policy No. GXU 30152.
GEICO Policy No. GXU 30267.
Republic Policy No. CDE 749.
Republic Policy No. CDE 750.
London Policy No. 79 DD 1633C/ Cover Note No. PY 107779.
London Policy No. KYO 17582.
CNA Policy No. CCP 9023670.
CNA Policy No. CCP 2483440.
CNA Policy No. CCP 2483440.
Fireman's Fund Policy No. XLX – 120 29.
Fireman's Fund Policy No. XLX – 129 95 53.
Fireman's Fund Policy No. XLX – 136 29 55.
Fireman's Fund Policy No. XLX – 137 04 26.
Fireman's Fund Policy No. XLX – 143 70 61.
Fireman's Fund Policy No. XLX – 143 70 60.
Fireman's Fund Policy No. XLX – 148 14 91.
Fireman's Fund Policy No. XLX – 148 14 92.
Fireman's Fund Policy No. XLX – 148 14 90.
Fireman's Fund Policy No. XLX – 153 24 75.
Fireman's Fund Policy No. XLX – 153 24 74.
Fireman's Fund Policy No. XLX – 153 22 28.
Fireman's Fund Policy No. XLX – 153 22 27.
Fireman's Fund Policy No. XLX – 168 80 67.
Fireman's Fund Policy No. XLX – 137 04 27.
Riunione Adriatica Di Sicurta Policy No. EL 2046.
Riunione Adriatica Di Sicurta Policy No. EL 2787.

Riunione Adriatica Di Sicurta Policy No. EL 79 4416.
Royal Insurance Policy No. ED 102071.