IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139(JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**OBJECTIONS OF BNSF RAILWAY COMPANY TO CONFIRMATION OF THE FIRST AMENDED CHAPTER 11 PLAN OF W.R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 3, 2009**

BNSF Railway Company and its predecessors, the Great Northern Railway Company, the Burlington Northern Railroad Company, and the Burlington Northern & Santa Fe Railway Company (collectively, "BNSF"), object to confirmation of the First Amended Chapter 11 Plan of W.R. Grace & Co., et al., The Official Committee of Asbestos Personal Injury Claimants, The Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders (collectively, the "Plan Proponents") Dated February 3, 2009 (the "Plan"), and state as follows:

I.   **FACTUAL BACKGROUND**

    A.   **BNSF's Indemnification and Contribution Claims Against Debtors**

        1.   W.R. Grace & Co. and its predecessors ("Grace") operated a mine in Libby, Montana, at which it mined vermiculite which contained tremolite asbestos.

        2.   Grace's operations at the Libby mine resulted in the release of tremolite asbestos into the community. This allegedly resulted in significant levels of asbestos-related diseases in and around Libby.

3. At least as early as 1942, pursuant to various contracts and leases, BNSF transported vermiculite mined by Grace, and loaded onto rail cars by Grace, over BNSF's rail network.

4. BNSF is defending suits asserting injuries allegedly resulting from vermiculite mined in Libby, loaded by Grace and transported by BNSF. In addition, some cases have been settled by BNSF and settlement payments made, without formal litigation having been brought by the individual claimants.

5. BNSF has been informed by various plaintiffs' counsel that there are a substantial number of additional employee and non-employee claims for which litigation has not yet been filed.

6. The terms of the contracts and leases between Grace and BNSF obligate Grace to indemnify BNSF for claims asserted against BNSF. These provisions require Grace to provide indemnity even if BNSF engaged in negligent conduct (BNSF denies any negligence).[1]

---

[1] For example, the contract between Grace and BNSF dated April 20, 1950, provides:

> [Grace] shall, and hereby does, further agree to indemnify and hold harmless the Railway Company of and from any and all liability, damages, recoveries, judgments, cost, expense or other charges and demands, on account of injuries to or death of one or more persons, or damage to or destruction of the property of one or more persons, resulting from or during the construction, repair, maintenance or operation of said bridge and conveyor belt, or resulting from or during the use of said premises by the Applicant, the applicant's agents, servants, employees, patrons or customers, or by any other persons, whether caused by the negligence of the Railway Company, its agents, servants and employees, or otherwise. The Applicant further agrees to appear and defend in the name of the Railway Company any suits or actions at law brought against it on account of any such personal injuries, death, or damage to property, and to pay and satisfy any final judgment that may be rendered against the Railway Company in any such suit or action. The liability assumed by the Applicant herein shall not be affected or diminished by the fact, if it be a fact, that any such suit or action brought against the Railway Company may arise in whole or in part out of the negligence of the Railway Company, its officers, agents, servants or employees, or be contributed to in whole or in part by such negligence. The foregoing language of this Section 8 shall not be construed as imposing on the Applicant

(continued...)

7.  In addition to BNSF's contractual indemnification rights, BNSF further asserts a right to contribution from Grace as authorized by applicable state common law for claims asserted against BNSF arising out of Grace's operation of the Libby mine together with the transportation of its vermiculite over the BNSF rail network.[2]

**B.  Insurance Policies Purchased By Grace Naming BNSF as the Insured.**

8.  As provided in the lease between Grace and BNSF dated April 20, 1950, covering property in Libby, Grace was obligated to purchase policies of public liability and property damage insurance protecting BNSF. The contract provides:

> [Grace] shall obtain and keep in full force and effect during the continuation of this agreement, at its own sole cost and expense, a policy of public liability and property damage insurance protecting [BNSF] against loss on account of injuries to or death of persons, and loss of or damage to property arising out of the use of said premises or arising out of the construction, maintenance, use and removal of said suspension bridge and conveyor belt. Said policy of insurance shall be submitted to [BNSF] for approval as to the Insurance Company writing the same, the amount, and the form, and shall protect [BNSF] against loss on account of injuries to or death of one person in the sum of $100,000.00, and for injuries to or death of more than one person in any one accident in the sum of $500,000.00, and for damage to property in the minimum amount of $500,000.00. Said policy when approved by [BNSF] shall be delivered to it by [Grace].

9.  In accordance with its contractual obligation, Grace purchased such policies of public liability and property damage insurance for BNSF's behalf. These policies

---

(continued...)
>   liability for any loss or damage to persons or property which would have occurred in the absence of the construction, repair, maintenance, operation or existence of the said suspension bridge, conveyor belt and loading dock and their appurtenances upon the property of the Railway Company.

[2] For voting purposes only, BNSF's claims for contractual indemnification and contribution have been estimated by the Debtors at $1. The total value of its claim is unliquidated.

were issued by Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood"), for policy years 1950 through 1965; by Maryland Casualty Company, Zurich Insurance Company or Zurich International (Bermuda) Ltd. (collectively, "MCC"), for policy years 1965 through 1974; and by Continental Casualty Company ("Continental") for policy years 1974 through 1984.

10. Grace is not a named insured on these policies; BNSF is the named insured.[3]

### C. Grace's Insurance Policies List BNSF as an Additional Insured.

11. In addition to the separate policies described above, the same insurer issued policies in favor of Grace, but which list BNSF as additional insureds.

12. Some of these policies have shared limits while some provide independent limits available to BNSF. Claim against the latter policies will not affect insurance benefits otherwise available to the debtor.

13. Additionally each policy contains a separate, independent duty to defend BNSF.

14. Arrowood issued policies in favor of Grace. These policies begin at March 31, 1953 and last through April 1, 1963. The first two years of these policies contain an

---

[3] Despite diligent searching, BNSF has not been able to locate copies of these policies. However, BNSF has copies of contemporaneous correspondence confirming that such policies were issued, and that the named insured was BNSF. *See e.g.* letter dated May 5, 1961, from J.L. Toot, Account Executive, Detroit Insurance Agency, to James C. Kenady, Land And Tax Commissioner, Great Northern Railway Company, attached as Exhibit A, which provides in relevant part:

> [Y]our files should contain an additional policy issued by the Royal Indemnity Company numbered RLH 021669, which is issued for the period April 20, 1959 to April 20, 1962, specifically naming the Great Northern Railway Company as the insured and covering the construction, maintenance, use and removal of suspension bridges and conveyors. This obligation has been handled in this manner in a separate policy for many years because of Article 9 of your agreement with Zonolite Company [Grace's predecessor] which specifically

(continued...)

unambiguous endorsement under which Royal Indemnity assumes the liability of Zonolite Company to indemnify the railroad arising out of the April 20, 1950 lease quoted in paragraph 8 above. These endorsements are exemplified by the attached **Exhibit B**.

15. Beginning with the policy period April 1, 1955, the endorsement was changed. For those policies, it provided that the contractual liability insurance under the policy applied to the liability assumed by Grace under the same 1950 lease covering property near Libby, Montana. Significantly, this endorsement - which inures only to the benefit of BNSF - contains sub-limits. These endorsements are exemplified in the attached **Exhibit C**.

16. Under the terms of these endorsements, the insurer undertakes to provide coverage to the BNSF for separate bodily injury limits of $200,000 per person. A separate premium was paid for these endorsements. There is no annual aggregate. To the contrary, the endorsement does not state that the overall limits of liability of the policy are applicable to the endorsement. Accordingly, these limits are separate and apart from any other liability limits in the policy. Claims against these liability limits will not affect the benefits to which the debtor is otherwise entitled to under the terms of the policy.

## II.  THE PLAN'S INSURANCE INJUNCTIONS AND TREATMENT OF ASBESTOS CLAIMS

### A.  The Insurance Injunctions

17. The Plan defines "Asbestos Insurance Entity" as:

any Entity, including any insurance company, broker, or guaranty association, that has issued, or that has or had actual or potential

---

(continued...)

    requires that Zonolite Company provide and pay for a Liability policy protecting
    the Railway Company against loss.

> liability, duties or obligations under or with respect to, any Asbestos Insurance Policy.

Plan, Section 1.1, at page 4 (definition number 10).

18. "Asbestos Insurance Policy" is defined as:

> any insurance policy under which any Insurance Contributor has or had insurance coverage with a policy period incepting prior to June 30, 1985, whether known or unknown, that actually or potentially provides insurance coverage for any Asbestos Claim, including the policies listed on schedule 1 attached to Exhibit 6 in the Exhibit Book.

Plan, Section 1.1 at page 5 (definition number 11).

19. The Debtors entered into or may in the future enter into settlement agreements with certain of their insurers. The Plan defines the term "Settled Asbestos Insurance Company" as:

> any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement prior to the conclusion of the Confirmation Hearing; *but only* with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 in the Exhibit Book; *provided however*, that (i) each such Asbestos Insurance Settlement Agreement is listed by the Plan Proponents, acting together, in Exhibit 5 and (ii) the Asbestos Insurance Settlement Agreement is approved by the court as sufficiently comprehensive to warrant treatment under section 524(g) of the Bankruptcy Code; and *further provided*, for the avoidance of doubt, that an Asbestos Insurance Entity is a Settled Asbestos Insurance company to the fullest extent, but only to the extent, provided by section 524(g) in respect of any claim that arises by reason of one of the activities enumerated in section 524(g)(4)(A)(ii).

Plan, at Section 1.1, pages 36-37 (definition 199).

20. The Plan provides for a channeling injunction, purportedly pursuant to Section 524(g) of the Bankruptcy Code, that protects Settled Asbestos Insurance Companies, from any asbestos-related personal injury claims as defined in the Plan, including Indirect PI Trust Claims. *See* Plan, at Section 8.2.1, pages 89-90.

-6-

21. No Settled Asbestos Insurance Company is making a contribution to the Asbestos PI Trust in exchange for the channeling injunction.

22. The Plan further provides for an "Asbestos Insurance Entity Injunction," purportedly pursuant to Section 105(a) of the Bankruptcy Code, that enjoins holders of Asbestos PI Claims, including Indirect PI Trust Claims, from asserting such claims against any Asbestos Insurance Entity.

23. No Asbestos Insurance Entity is making a contribution to the Asbestos PI Trust in exchange for the Asbestos Insurance Entity Injunction.

24. If confirmed in its present form, the Plan's channeling injunction and Asbestos Insurance Entity Injunction will enjoin holders of Asbestos PI Claims, including Indirect PI Trust Claims, who assert rights under insurance policies issued by either settled or non-settled asbestos insurance entities, from making claim against the insurers under the applicable policies.

### B. Plan Treatment of BNSF's Claims

25. The Plan classifies BNSF's claims and demands for contribution and indemnification as Class 6, Indirect PI Trust Claims. *See* Plan at Section 1.1, page 28 (definition 137).

26. Indirect PI Trust Claims, which are included in the defined term "Asbestos PI Claims" are channeled to the Asbestos PI Trust. *See* Plan at Section 1.1, pages 11-12 (definition 32); Section 3.16.

27. Claims channeled to the Asbestos PI Trust "shall be resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI TDP." *See* Plan at Section 3.1.6(b)(i).

28. The Asbestos PI Trust Agreement appoints attorneys representing asbestos personal injury claimants as the Trustees of the Asbestos PI Trust. Plan, Exhibit 2, Section 4.1.

### III. OBJECTIONS

#### A. The Plan Cannot Enjoin BNSF From Pursuing Its Contractual Insurance Rights Under Separate Policies Issued to BNSF.

29. BNSF has asserted, and once the court-extended automatic stay is lifted, will pursue coverage claims against Arrowood, MCC and Continental in accordance with the insurance policies purchased by Grace for the benefit of BNSF. The Plan improperly seeks to enjoin such actions.

30. The separate policies purchased by Grace for BNSF do not list Grace as an insured. BNSF alone is the named insured. None of the proceeds of the policies constitute an asset of the estate. 11 U.S.C. § 541(a). Accordingly, this Court does not have jurisdiction to enjoin BNSF from asserting its contractual claims against the insurers. *In re Johns-Manville Corp.*, 517 F. 3d 52 (2d Cir. 2008) *cert granted sub nom Travelers Indem. Co. v. Bailey*, 129 S. Ct. 761 (Dec 12, 2008) *and cert granted sub nom Common Law Settlement Counsel v. Bailey*, 129 S. Ct. 762(Dec 12, 2008) (holding by the Court of Appeals that the bankruptcy court does not have "related to" jurisdiction over direct claims against insurers).

31. Nor does the injunction against claims asserted by BNSF for coverage under policies issued to BNSF satisfy the requirements of 11 U.S.C. § 524(g)(4)(A). Section 524(g)(4)(A)(iii) provides that the channeling injunction can extend to claims made against insurers "arising by reason" of their "provision of insurance to the debtor or a related party." The insurers here provided insurance to BNSF, not the Debtors.

32. Because the insurers are not entitled to an injunction enjoining the claims by the express terms of Section 524(g)(A), such an injunction cannot be otherwise supported by resort to the court's "general equitable powers" under 11 U.S.C. § 105(a). *In re Combustion Engineering, Inc.*, 391 F. 3d 190, 233-38 (3d Cir. 2005).

### B. The Plan Cannot Enjoin BNSF From Pursing Its Contractual Insurance Rights Under Policies Issued to Grace.

33. Likewise, the Plan cannot abrogate and enjoin BNSF's contractual rights as a specifically-named additional assured under the policies issued to Grace. *See In re Forty-Eight Insulations, Inc.*, 133 B.R. 973 (Bankr. N.D. Ill. 1991) (holding that contractual rights of named insureds cannot be enjoined by bankruptcy court).

34. As set forth above, based upon discovery completed to date, BNSF has rights in the insurance policies issued to Grace, as a named additional insured, and at least as to some of those policies, the insurers' obligations to BNSF do not deplete the primary policy proceeds available to Grace.

35. In addition, each of the insurance agreements include a duty to defend BNSF as an additional insured. The performance of this duty to defend will in no way affect the estate of the Debtors or reduce any benefits to which the Debtors are entitled under the terms of the policy.

36. The scope of the duty to indemnify or duty to defend in these situations will be governed by the law of the State of Montana. *Kemp v. Allstate Ins. Co.*, 193 Mont. 526, 601 P. 2d 20 (1979); *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, 315 Mont. 281, 68 P. 3d 703. The law of the state of performance of an insurance contract controls as to its legal

-9-

construction and effect. *Id.* The place of performance of a contract is the place where the insured is entitled to receive benefits. *Id.*

37. In Montana, the duty to defend an insured under a liability policy is independent from and broader than a duty to indemnify. *Farmers Union Mut. Ins. Co. v. Rumph*, 2007 MT 249 ¶ 14, 339 Mont. 251, 170 P. 3d 974.

38. This duty to defend is independent of any duties owed to the Debtors and cannot be waived by any entity other than the additional insured, in this case BNSF.

39. None of the policies or endorsements at issue reduce the indemnity benefits by loss-adjusting expenses or defense costs. As a result, BNSF's enforcement of the insurer's duty to defend BNSF by virtue of its status as an additional insured will not deplete the policy benefits otherwise available to the Debtors.

40. Because the duty to defend is independent from the duty to indemnify, no agreement between the insurer and its named insured can affect that additional insured status with regard to the duty to defend.

41. Because BNSF is the express beneficiary of endorsements to Grace's insurance policies, Section 524(g) cannot be used to eliminate BNSF's direct contractual rights against the insurers. *See In re Johns-Manville Corp.*, 517 F. 3d 52.[4] Even if this Court were to rule that Section 524(g) can extend to protect *shared* proceeds under such policies, it cannot be

---

[4] Because BNSF has express contractual rights as an additional assured, claims asserting such rights do not "arise by reason of" the insurers "provision of insurance to the Debtors." Accordingly, Section 524(g)(4)(A)(iii) does not authorize the extension of the channeling injunction to include such claims. In any event, Section 524(g)(4)(A)(iii) cannot be read to extend the injunction to rights of BNSF that do not affect the rights of Grace to recover under the policy. Since BNSF's rights do not diminish the policy proceeds otherwise available to Grace, BNSF's rights must be protected. *See In re Johns-Manville Corp.*, 517 F. 3d 52 (distinguishing cases where courts have "related to" jurisdiction because policy proceeds are shared with the debtor).

used to protect policy proceeds or defense cost obligations that do not erode the policy limits available to Grace. *See Id.*

42.     Nor does the Plan satisfy the minimal requirements for a non-consensual release of third-party claims. In *In re Continental Airlines,* 203 F. 3d 203 (3d Cir. 2000), the Court of Appeals for the Third Circuit recognized that courts generally take one of three approaches to third-party releases: (a) they are never permitted; (b) they are permissible only with the express consent of the non-debtor party whose claims are released; or (c) the release is fair and equitable, given in exchange for fair consideration, and is necessary for the reorganization. *Id.* at 214.

43.     BNSF does not consent to the release of its contractual claims against the insurers. Accordingly, the injunctions fail under this standard. The injunctions further fail under the more lenient standard, as neither the settled nor the non-settled insurers have provided any consideration for the injunction, and in particular, have not provided any consideration for abrogating BNSF's express contractual rights.[5]

44.     Furthermore, BNSF holds a property interest in the insurance policies, which the Plan purports to eliminate without just compensation to BNSF for release of the insurers' obligations. Approving the Plan would violate BNSF's due process rights and constitute a taking of its property without just compensation. U.S. Const., am. 5.

**C.     The Asbestos Insurance Entity Injunction is Impermissible**

---

[5] Nor can the Plan Proponents demonstrate that the extension of the injunctions against BNSF's contractual claims are necessary for the reorganization. The various settlement agreements entered into by Grace with MCC and Arrowood were entered into more than a decade ago, and without BNSF's consent or participation. No additional consideration is being provided by Arrowood or MCC to the Asbestos PI Trust.

45. The Plan includes an "Asbestos Insurance Entity Injunction," that enjoins any third-party actions against non-settling Asbestos Insurance Entities. The Plan Proponents assert that this injunction is necessary to protect the value of the insurance policy proceeds.

46. In *Combustion Engineering,* the Court of Appeals stated that

> The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself. . . . When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed.

391 F. 3d at 236. The Court concluded that, where the requirements for a Section 524(g) injunction have not been met, the plan cannot provide for an injunction supported solely by the thread of Section 105. *Id.*; *In re Congoleum Corp.*, 362 B.R. 198, 201 (Bankr. D.N.J. 2007).

47. Enjoining all third-party actions against non-settling insurers and granting the Asbestos PI Trust the authority to settle any claims against the insurers circumvents the requirement that the injunction afforded under Section 524(g) be examined by the Court and determined to be fair and equitable to future demand holders. *See* 11 U.S.C. § 524(g)(4)(B)(ii).

**D.    The Channeling Injunction is Not Fair and Equitable**

*48.* The Bankruptcy Code requires that the Plan be fair and equitable in light of the benefits the insurers are providing to the trust. 11 U.S.C. §524(g)(4)(B)(ii); *In re Congoleum Corp.*, 362 B.R. 167, 179 & 181 (Bankr. D.N.J. 2007).

49. While the courts have not defined the phrase "fair and equitable" in the context of Section 524(g), a "review of the case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan." *Id.*

50. In the present case, none of the Settled Asbestos Insurers are providing any contribution to the Plan. Although the insurers entered into settlement agreements more than a

decade ago, and have purportedly made payments pursuant to those settlement agreements to the Debtors prior to the bankruptcy proceeding, no contributions are being made by the insurers to the Asbestos PI Trust. As such, the extension of the channeling injunction to the Settled Asbestos Insurers is inappropriate.

51.     Furthermore, there has been no contribution made by any insurer in exchange for the release of BNSF's express contractual rights. It is fundamentally unfair and inequitable for the insurers to obtain broad injunctive relief, effectively releasing BNSF's contractual rights, without providing a contribution to BNSF for such release.[6]

### E. The Plan Cannot Be Confirmed Because it Does Not Extend the Channeling Injunction to All Derivative Claims

52.     The Section 524(g) channeling injunction must extend to derivative claims asserted against BNSF, because any act to recover on such claims against BNSF would constitute an indirect attempt to collect, recover or receive payment with respect to a claim or demand that, under the Plan will to be paid in whole or in part by the Asbestos PI Trust. 11 U.S.C. § 524(g)(1)(B).

53.     In *In re Combustion Engineering, Inc.*, the Court of Appeals stated:

> The Bankruptcy Court entered a channeling injunction under § 524(g) in favor of Combustion Engineering *and also in favor of Basic and Lummus* for their derivative asbestos-related claims. The court correctly found that §524(g) did not authorize a channeling injunction over the independent, non-derivative third-party actions against non-debtors Basic and Luumus.

---

[6] Even if this Court were to find that the contribution made by the Debtors to the Asbestos PI Trust includes a contribution on behalf of the Settled Asbestos Insurers, and that such apportioned contribution is fair and equitable in connection with the injunction relating to asbestos personal injury plaintiffs, it is not fair and equitable in relation to BNSF's future demands. BNSF has separate claims against the insurers that would not dilute the proceeds available to the Debtors and to which the Debtors' asbestos plaintiffs could not share. As such, the portion of the contribution attributable to the release of BNSF's claims against any Settled Asbestos Insurer must be preserved solely for the benefit of BNSF.

391 F.3d at 233 (emphasis added).

54. This distinguishes derivative claims (as asserted by claimants in the first instance against BNSF), from independent, non-derivative claims as proscribed by *Combustion Engineering*.

55. The need for the channeling injunction is manifest in a review of the Asbestos PI TDP. The Asbestos PI TDP provides that the Trust is to obtain a release from claimants that would both maximize their ability to recover from third parties while not increasing the amount of indemnification or contribution claims against the Trust. While it is possible that a party, such as BNSF, may have a right to indemnification from the Trust for non-derivative claims asserted against it, the vast majority of claims for contribution or indemnity will arise from derivative claims.

**F.    The Asbesots PI Trust Distribution Procedures Are Not Fair and Equitable.**

56. The Asbestos PI TDP does not adequately protect the rights of Indirect PI Trust Claimholders such as BNSF.

57. Specifically, the Asbestos PI TDP does not provide for the full allowance of all claims to which an Indirect PI Trust Claimholder is entitled. The Asbestos PI TDP limits the allowable amount of the claim paid to the underlying asbestos plaintiff, without inclusion of attorneys fees or other defense costs.

58. The Asbestos PI TDP further requires the Indirect PI Trust Claimant to obtain a full release from the underlying asbestos creditor in order to be granted an allowed claim. Although the Asbestos PI TDP permits the Indirect PI Trust Claimant to engage in non-binding or binding arbitration or to take their claim to the tort system if it does not obtain such a

release, the increased costs incurred in this tortured and bureaucratic process for proving a claim is not justified.

59. In addition, the Asbestos PI TDP provides for a "maximum value" for all Asbestos PI Claims, including Indirect PI Trust Claims. To the extent a judgment is entered against an Indirect PI Trust Claimholder in an amount in excess of the maximum value, the Asbestos PI TDP provides that the "fast track" offer must be no greater than the maximum value. Likewise, in the alternative dispute resolution process, which must be resorted to in the first instance if the Indirect PI Trust Claimholder rejects the offer, the arbitrator is likewise limited to the maximum value provided by the Asbestos PI TDP. Therefore, an Indirect PI Trust Claimholder, who has a judgment entered against it, will nevertheless be forced to participate in non-binding mediation, and then resort to a suit in the tort system, to obtain a judgment against the Asbestos PI Trust in the amount of its already-liquidated claim.

60. The Asbestos PI Trust appoints the attorneys for the underlying asbestos claimholders as the Trustees, pragmatically resulting in an impermissible conflict of interest.

61. The Asbestos PI TDP does not adequately provide for the payment of insurance claims, and does not include any mechanism by which holders of rights against insurance policies issued by non-settling insurers can recover on such claims.

### G. The Plan Violates the Absolute Priority Rule

62. Because general unsecured creditors are receiving payment in full, and equity holders are maintaining their interest, the Plan will violate the absolute priority rule if any class of claims votes to reject it. *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S. Ct. 1411 (1999).

63. Indirect PI Trust Claims are not substantially similar to the underlying asbestos claims, and because the Plan provides for discriminatory treatment of such claims, Indirect PI Trust Claims should be classified separately for voting purposes.

64. If the Indirect PI Trust Claims – or any other plan class – vote to reject the Plan, the absolute priority rule will preclude confirmation as a matter of law.

WHEREFORE, BNSF respectfully requests that this Court deny confirmation of the Plan.

Dated: May 20, 2009
Wilmington, DE

PEPPER HAMILTON LLP

/s/ John H. Schanne, II
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
PO Box 1709
Wilmington, DE 19899-1709
Tel: (302) 777-6500
Fax: (302) 777-6511

Of Counsel:

Edward C. Toole, Jr.
Linda J. Casey
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4000/ Fax: (215) 981-4750

Counsel for BNSF Railway Company