**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | : | |
| | : | Case No. 01-1139 (JKF) |
| Debtors. | : | |
| | : | Jointly Administered |
| | : | |
| | : | Related Doc. No.  20872 |

**<u>FEDERAL INSURANCE COMPANY'S OBJECTIONS
TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION</u>**

Pursuant to the Third Amended Case Management Order ("CMO") entered in these cases [Docket No. 21544], Federal Insurance Company ("Federal"), which issued insurance policies to the Debtors, hereby objects to the First Amended Joint Plan of Reorganization,[1] as amended (the "Plan") [Docket No. 20666], submitted jointly by the Debtors, the Official Committee of Asbestos Personal Injury Claimants ("ACC"), the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative ("FCR") (collectively, "Plan Proponents").[2]

Federal's objections do not provide a full recitation of the operative facts or a complete discussion of the legal support therefor.  Per the CMO, Federal reserves the right to develop its

---

[1] The CMO divides the confirmation process into two phases: Phase I will address, *inter alia*, "whether the Plan improperly affects the rights of Debtors' insurers (in their capacity as insurers, but not creditors)." Phase II will address all issues that do not fall within Phase I.  CMO ¶ 1.  The definition of what constitutes Phase I as opposed to Phase II issues is not entirely clear.  Although they have attempted to do so, the Plan Proponents and the Debtors' insurers, including Federal, have been unable to reach a complete consensus as to what constitutes a Phase I versus a Phase II issue.  Federal's submission therefore identifies all objections that Federal expects to raise in either the Phase I or Phase II confirmation hearings.  Federal is prepared to address the appropriate objections at trial on either Phase I or Phase II issues, as ultimately defined by the Court.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan and Plan Documents.

objections fully in Federal's trial briefs, due on June 1, 2009 and July 13, 2009, with respect to Phase I and Phase II issues, respectively.

## II.    FEDERAL IS A PARTY INTEREST

1.    Federal, an Asbestos Insurance Entity, issued certain insurance policies to the Debtors (the "Federal Policies").  Certain of the Federal Policies are identified as Asbestos Insurance Policies under the Plan.  *See* Plan, Exhibit 6 at Schedule 1.  Under the Plan, the Debtors' Rights under the Federal Asbestos Insurance Policies are to be assigned to the Asbestos PI Trust (the "Trust") pursuant to the Asbestos Insurance Transfer Agreement.  *See* Plan §§ 1.1(140), 7.2.

2.    Federal is a "non-settled" Asbestos Insurance Entity with respect to high level excess Asbestos Insurance Policies issued to the Debtors.  In addition, Federal entered into a settlement agreement with certain Debtors with respect to a sublimit in one of its Asbestos Insurance Policies.  Thus, Federal is also a Settled Asbestos Insurance Company under the Plan.  *See* Plan, Exhibit 5; Plan, Exhibit 6 at Schedule 2.  The rights of the Debtors, Reorganized Debtors and Non-Debtor Affiliates (hereafter "Insurance Contributors") under the Asbestos Insurance Settlement Agreements with Federal are also to be transferred under the terms of the Plan to the Asbestos PI Trust.  *See* Plan § 7.2.

## III.    OBJECTIONS

### A.    The Plan Is Not Insurance Neutral

3.    The CMO provides that Phase I of the confirmation hearings shall address "whether the Plan improperly affects the rights of Debtors' insurers (in their capacity as insurers, but not creditors)."  It is the Plan Proponents' position that the standing of insurers to raise objections to the Plan can be eliminated by making the Plan "insurance neutral."

4.      The notion of "insurance neutrality" is nowhere suggested in the Bankruptcy Code.  The Third Circuit has never held that "insurance neutrality" can be invoked to deprive a party in interest of its statutory right under 11 U.S.C. § 1109(b) to "raise and…be heard on any issue in a case," although it has denied prudential appellate standing under the "person aggrieved" standard to insurers, on an issue-by-issue basis, when a plan leaves unaltered such insurers' claims, defenses, rights or causes of action under subject insurance policies and, by the terms of the plan, those claims, defenses, rights or causes of action pass through the bankruptcy case unaffected by the terms of the plan.  *See Combustion Engineering,* 391 F.3d 190, 218 (3d Cir. 2005).  To be insurance neutral, then, a plan must not impair an insurer's rights under a policy.

5.      If the Plan, including the Plan Documents, the Confirmation Order and the proceedings incident thereto in any way affect the rights, obligations, or liabilities of the insurers under their policies or settlement agreements with Debtors, or under non-bankruptcy laws that govern Federal's rights, duties, and obligations, then the Plan is **not** insurance neutral.

6.      Unlike the one under consideration in *Combustion Engineering*, the Plan here does not even purport to be "insurance neutral."  As set forth below, there are several broad categories of rights that Federal has or would have under the Federal Policies that will or may be affected by the Plan and the Plan Documents in their current form.

### 1.      The Plan's Purported Neutrality.

7.      The Plan purports, in § 7.15, to preserve the Asbestos Insurance Entities' rights under their insurance policies, settlement agreements, and non-bankruptcy law, subject to certain exceptions.

8.      Specifically, Section 7.15 of the Plan provides in part:

"(a) *Except to the extent provided in this Section 7.15*, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect."

...

(c) *Except as provided in this Section 7.15*, the rights of Asbestos Insurance Entities shall be determined under the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements, or Asbestos Insurance Settlement Agreements, as applicable.

...

(f) *Except as otherwise provided in this Section 7.15*, nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense." (Emphasis added).

Several of the "exceptions" to insurer neutrality specified in § 7.15 itself, however, as well as exceptions contained in the definition of "Asbestos Insurer Coverage Defense" referenced in § 7.15(f), will or could result in a material impairment of Federal's rights under policies it issued to the Debtors and, thus, render the Plan not insurance neutral.

### 2.      The Plan Is Not Insurance Neutral Because It Abrogates Anti-Assignment Provisions.

9.      Requiring that an insurer consent to assignment of a policy ensures that the risks undertaken by the insurer will not be increased by a policyholder's unilateral action.  Under applicable non-bankruptcy law and the terms and conditions of the Federal Policies and policies to which the Federal Policies follow form, assignments made without Federal's consent will not bind Federal.

10.    Pursuant to the Plan, however, all of the "Asbestos Insurance Rights" of the Debtors and certain non-Debtor affiliates under policies issued by Federal will be transferred to the Asbestos PI Trust.  Under the Plan, the transfer of such Rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against Federal and other Asbestos Insurance Entities "notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy."  Plan § 7.15(g).

11.    As the Plan Proponents readily admit, Federal has not consented to the transfer of the Asbestos Insurance Rights under its policies to the Asbestos PI Trust.[3]

12.    Nevertheless, the Plan embodies an assignment of all the insured's rights under the Asbestos Insurance Policies.  The definition of Asbestos Insurance Rights includes the right to bring Asbestos Insurance Actions seeking defense and coverage for Asbestos PI Claims against insurers.  The Plan thus effectively transfers the Asbestos Insurance Policies to the Asbestos PI Trust.  Federal should, therefore, be permitted to interpose as a defense that the policies had been assigned without its consent.[4]  The proposed assignment of Asbestos Insurance Rights in violation of Federal's policies violates Sections 1129(a)(1) and (3) of the Code because the assignment is prohibited by applicable non-bankruptcy law and is not authorized by the Bankruptcy Code.

13.    The proposed assignment of Asbestos Insurance Rights also violates Sections 1129(a)(1) and (3) to the extent it imposes on the Asbestos Insurance Entities modifications of contract rights that are not authorized by the Bankruptcy Code and that violate applicable state law.  Specifically, even though the Plan transfers the rights of the Debtors under the Policies to

---

[3] Plan Proponents' Response to Federal's Request for Admission No. 2.

[4] See, e.g., Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165 (2d Cir. 2006); Carle Place Plaza Corp. v. Excelsior Ins. Co., 534 N.Y.S.2d 397 (N.Y. App. Div. 1988).

the Asbestos PI Trust, the Plan fails to clarify whether such assignment will result in the Asbestos PI Trust being bound by the insured's obligations under the Federal Policies. Specifically, § 7.15 of the Plan, when read in conjunction with Plan §§ 7.13 and 8.1.1, creates confusion as to whether, by virtue of the transfer of Asbestos Insurance Rights to the Asbestos PI Trust, the Debtors and the Trust will be relieved of the duties and obligations of the Debtors under the Federal Policies. Nothing in the Bankruptcy Code or in applicable state law permits a unilateral modification of contract rights. *See In re Beeter*, 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994).[5]

14.     Moreover, the proposed assignment of the Asbestos Insurance Policies will deprive Debtors' insurers, including Federal, of the benefit of their bargain. An insurer underwrites each policy on the basis of the specific risks associated with a particular insured. As set forth at length in the expert Declaration of Professor George L. Priest of Yale Law School: "Requiring insurer consent to assignment ensures that the risks undertaken by the insurer under the policy not be increased by a policyholder's action without the insurer's consent." Priest Declaration at 11-12.

    **3.     The Plan Improperly Assigns the Insurance Rights of Non-Debtor Affiliates to the Asbestos PI Trust.**

15.     Pursuant to the Plan and the Asbestos Insurance Transfer Agreement, the "Insurance Contributors" transfer to the Asbestos PI Trust all of their Asbestos Insurance Rights under and in connection with the Federal Policies. The term "Insurance Contributors" includes

---

[5] Although Federal recognizes that this Court has recently upheld a similar assignment provision in *In re Federal-Mogul Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008), *aff'd,* 2009 U.S. Dist. LEXIS 24302 (D. Del. March 24,2009), *appeal pending,* No. 09-2230 (3d Cir.), the issue is currently being considered by the Third Circuit Court of Appeals in *In re Global Industrial Technologies, Inc.*, No. 08-3650 (3d Cir.). Oral argument on the issue is scheduled for May 21, 2009. Federal raises the objection to the assignment in order to preserve the point in the event that those rulings are set aside by the appellate courts.

not only the Debtors, but also the 124 Non-Debtor Affiliates identified in Exhibit 16 to the Plan. There is no basis for the assignment of Insurance Rights of Non-Debtors. The Third Circuit confirmed that point in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004): "To the extent the subject insurance policies are jointly held by Combustion Engineering and a non-debtor … the § 541 preemption of anti-assignment provisions applies only to Combustion Engineering's interest in the shared policies."

### 4.      The Plan Impairs Other Coverage Defenses Available to Federal Under Its Policies and Applicable Law.

16.      Federal's unsettled Asbestos Insurance Policies impose specific obligations on the Debtors. For instance, the Debtors are required to provide timely notice of any occurrence or claim that may be covered by the pertinent policy. Moreover, Federal has a right to associate in the investigation and defense of claims asserted against the Debtors.

17.      Under applicable non-bankruptcy law, these conditions to coverage are enforceable against the insured, and failure of the insured to satisfy these conditions would give rise to defenses to coverage.

18.      Indeed, an insurer's right to associate in the defense of covered claims is fundamental to the structural and economic relationships that form the basis of an insurance policy. *See* 43 Am. Jur.2d Insurance § 1384; 7C *J. Appleman, Insurance Law and Practice* § 4681 (Berdal rev. 1979). This right is so fundamental that its deprivation will vitiate an insurer's obligation to provide coverage under a policy. *See* 43 Am. Jur.2d Insurance § 1384.

19.      Plan Proponents admit that, under the Plan, Federal will not be allowed to participate in the investigation, defense or settlement of Asbestos PI Claims.[6] Moreover, under

---

[6] Plan Proponents' Response to Federal's Request for Admission No. 9.

the Plan, claimant information is kept secret and undisclosed to insurers such as Federal, notwithstanding the insureds' obligations under the respective policy.  *See* TDP § 6.5.

20.     Sections 7.7(tt) and 7.7(uu) of the Plan would require the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished or reduced by the discharge of the Debtors under the Plan and the transfer of Asbestos Insurance Rights to the Asbestos PI Trust.

21.     The Plan, however, does not purport to transfer the *Debtors'* obligations under the Asbestos Insurance Policies to the Asbestos PI Trust, nor does it provide for those obligations to survive undiminished upon confirmation.   On the contrary, Plan §§ 7.13 and 8.1.1 state that, except as otherwise provided in the Plan, any obligations of the Debtors that are not specifically retained are eliminated.[7]

22.     The Plan Documents do not provide any additional comfort on this issue.   The Asbestos Insurance Transfer Agreement, between the Debtors and the Asbestos PI Trust (Exhibit 6 to the Plan), is silent as to the assumption or performance by the Trust of the insureds' duties and obligations.   On the issue of the preservation and availability of books and records of the Debtors that may be necessary to insurers in presenting their coverage defenses, the Transfer Agreement refers to the Cooperation Agreement (Exhibit 10).   The Cooperation Agreement will be between the Reorganized Debtors and the Asbestos PI Trust and will make records related to Asbestos PI Claims available to the Asbestos PI Trust.   There is no mention, however, of the

---

[7] Although Plan § 7.15 (dealing with insurance neutrality) might be meant to preempt §§ 7.1 and 8.1.1 with respect to elimination of the Debtors' obligations under the policies, such conclusion cannot be drawn from the Plan, as drafted.  Attempts through written discovery to resolve the possible inconsistency and determine the hierarchy among § 7.15, on the one hand, and §§ 7.1 and 8.1.1 on the other, were unsuccessful, as the Plan Proponents' responses simply directed Federal to Section 7.15, which is not clear as to the question. (Plan Proponents' responses to Federal's Interrogatories Nos. 9 and 10).  To the extent that Plan § 7.15 does not preempt §§ 7.1.3 and 8.1.1, the Plan would impair Federal's rights under its policies, including its rights to defend against coverage claims asserted by the Trust based on the failure by the Debtor or the Trust to comply with the insured's obligations under the policies.

corresponding availability of such records to the insurers, including Federal, or of any obligation of the Reorganized Debtors to cooperate with the insurers on matters pertaining to Coverage Defenses.  On the contrary, as explained above, the Plan envisions information being expressly withheld from insurers such as Federal.  TDP § 6.5.

23.    The Plan must make clear that Federal retains all its rights under the Federal Policies and that the insureds retain (and the Asbestos PI Trust will assume) all of the Debtor's obligations thereunder.  This is crucial because the Plan eliminates the rights insurers, such as Federal, have under their policies to defend and resolve claims on behalf of the Debtors in the state tort law system.   The Plan, instead, gives the Trustees of the Asbestos PI Trust responsibility for resolving Asbestos PI Claims, based upon Asbestos PI Trust Distribution Procedures ("TDP").  The TDP were drafted without any input from Federal and without its consent, as the Plan Proponents have admitted in their responses to Federal's discovery.[8]  To the extent that the Plan eliminates Federal's rights to defend coverage litigation with the Trust on the grounds that those Trust Distribution Procedures violate the insured's duties under the Policies, the Plan is not insurance neutral.

24.    Moreover, even if this Court should rule that the Plan fully protects Federal's coverage defenses under the Federal Policies, the transfer itself would nonetheless impair Federal's rights as an insurer.

25.    The policies are structured so that the insured and the insurer will cooperate in investigating, defending against and resolving claims against the insured so that meritorious claims can be resolved reasonably and that unmeritorious claims are not paid.   Permitting

---

[8] *See* Plan Proponents' Responses to Federal's Requests for Admission Nos. 5-7.

assignment of the Federal Policies to from the Debtors to the a trust alters the basic bargain between Federal and its insureds to Federal's material detriment.

26.     The aims and operations of trusts are fundamentally different from those of companies defending themselves in the tort system.

27.     Corporate defendants view asbestos claimants as adversaries. They seek whenever possible to defeat their claims or at least to minimize the amounts paid as compensation.  This adversarial system encourages the rigorous testing of the validity of claims, in turn discouraging the assertion of marginal or spurious claims.

28.     Trusts, on the other hand, do not have officers or shareholders. They instead have trustees and beneficiaries. Claimants are not adversaries but potential beneficiaries. Once a claimant satisfies certain threshold criteria for demonstrating entitlement to compensation, he is recognized as a beneficiary to whom the trustees have a fiduciary obligation as well as a duty to compensate.

29.     By substituting the TDP for procedures that might otherwise be followed and settlements that may be achieved by the insurers in defending claims, the Plan may put the insurers in the position, in subsequent coverage litigation with the Trust, of having to show that the TDP are unreasonable or breach the insured's obligations under the policies and that the coverage court should therefore wholly deny coverage for a particular claim.  It becomes an "all or nothing" situation, where either the Trust wins or the insurer wins—rather than, as envisioned by the policies, where the insured and the insurer work together to defeat unmeritorious claims and minimize the amounts paid to resolve claims.

30.     Section 7.15(f) provides additional exceptions to insurer neutrality by its use of the defined term "Asbestos Insurer Coverage Defense."

31.     Section 7.15(f) provides that nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and or conclusion of law with respect to confirmation or consummation of the Plan shall limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any "Asbestos Insurer Coverage Defense."

32.     The definition of Asbestos Insurer Coverage Defense, however, contains a clause that could potentially swallow insurance neutrality.  Specifically, pursuant to section 1.1(16) of the Plan, Asbestos Insurer Coverage Defenses "do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code…."  Federal's attempts to clarify the scope and meaning of section 1.1(16) of the Plan yielded nothing more from the Plan Proponents than "the Plan is a publicly available document and, being in writing, speaks for itself."[9]

33.     Section 1129(a)(3) of the Bankruptcy Code provides that the Court cannot enter the Confirmation Order unless it finds that the Plan was proposed in good faith.  Counsel for the Trust might argue in subsequent Asbestos Insurance Actions that section 1.1(16) means that both the terms of the Plan and the Asbestos PI TDP represent a reasonable valuation of the Asbestos PI Claims, either individually or as a group, or that resolution of such claims without the insurer's involvement is itself reasonable and/or appropriate.

34.     Similarly, Trust counsel could argue that this Court has valued Debtors' asbestos-related losses in the estimation or Plan Confirmation process, thereby triggering or accelerating any obligations of any Asbestos Insurance Entity under any Asbestos Insurance Policy.  While the Plan Proponents in their written discovery responses have denied that in fact the Plan would

---

[9] *See* Plan Proponents' Response to Federal's Interrogatory No. 1.

have this effect or potential,[10] Federal submits that the Plan should, at the very least, be clarified to avoid any ambiguity.

### 5.  The Plan Impairs Federal's Right to Obtain Contribution From Non-Debtor Entities.

35.    The Insurance Neutrality section of the Plan (§ 7.15) attempts to deal with situations where a non-settled Asbestos Insurance Entity (such as Federal) may have claims for contribution, indemnity, reimbursement, subrogation or the like arising out of Asbestos PI Claims (collectively, for purposes of these Objections "Contribution Claims").

36.    Section 7.15(i) provides that such Contribution claims may be asserted as a defense or setoff against any claim for coverage brought by the Asbestos PI Trust against the non-settled insurer arising out of the Trust's payment on the same underlying Asbestos PI Claim.

37.    Apparently, this provision is intended to allow a non-settled insurer to be made whole, inasmuch as any payment due to the Trust on account of the underlying Asbestos PI Claim would be reduced by the share that would otherwise have been owing by the Settled Asbestos Insurance Company.  Section 7.15(i), however, does not deal with the situation where a Contribution Claim by a non-settled insurer arises independently of any suit by the Trust seeking coverage.  As drafted, the Plan leaves Federal in a state of absolute uncertainty.

---

[10] In responding to Federal's discovery, the Plan Proponents denied that confirmation of the Plan will in fact trigger or accelerate any obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies, or that the doctrine stated in *UNR Industries v. Continental Casualty Co.*, 941 F.2d 1101 (7th Cir. 1991), regarding valuation of claims and acceleration of insurer obligations would be applicable.  *See* Plan Proponents' Responses to Federal's Interrogatory No. 5.  The Plan Proponents' testified to the same effect during their depositions.  *See, e.g.*, Deposition of Richard Finke as Rule 30(b)(6) Witness for the Debtors, Tr. 5/13/09, at 291:20-294:11.

**B.**     **The Plan Impairs Rights Under Federal's Asbestos Insurance Policies Because Asbestos PI Claims Will be Resolved by a Trust with Fiduciaries that Have Potential and Actual Conflicts of Interest**

38.     Under the Plan, Asbestos PI Claims will be channeled to the Asbestos PI Trust and resolved pursuant to the proposed Trust Distribution Procedures ("TDP").  Those TDP state that their goal is to provide "fair, equitable and substantially similar treatment for all PI Trust claims," given the finite resources of the proposed Trust.

39.     As presently structured, however, there is a significant risk that the Trust will not achieve these goals -- and instead may end up paying unmeritorious claims or paying meritorious claims in amounts greater than appropriate (to the potential detriment of Asbestos Insurance Entities, such as Federal, that may be called upon by the Trust to reimburse the Trust for such payments).  This is so, inter alia, because one set of Trust fiduciaries -- the Asbestos PI Trust Advisory Committee ("TAC") -- have a significant conflict of interest between the fiduciary duties they owe to the Trust (and the Trust beneficiaries as a whole) and the individual fiduciary duties they owe, pursuant to the relevant Rules of Professional Responsibility, to their individual claimant-clients.

40.     In addition, the selection of the purportedly neutral Trustees has been dominated by the ACC -- in this case and other asbestos-related bankruptcies -- such that an appearance is created that the Trustees will not in fact be neutral toward all claimants, and particularly toward insurance companies that are holders of Indirect I Trust claims.

41.     By way of background, the ACC, acting in conjunction with the FCR, drafted the proposed Trust Agreement and TDP, with apparently no changes being made at the behest of

Grace.[11]  Federal and other objecting insurers were entirely excluded from the drafting process,
only seeing the proposed Trust Agreement and TDP when filed with the Court.[12]

42.      The Trust Agreement, establishing the Asbestos PI Trust, designates three
supposedly neutral individuals to serve as the initial Trustees of the Trust.  The Trust Agreement
provides that these Trustees have fiduciary duties to all beneficiaries of the Trust.  Trust
Agreement §§ 1.2; 2.1.  In addition, the Trust Agreement establishes a TAC, which the Trust
Agreement provides will operate as fiduciaries to all present Asbestos PI Claimants.  Trust
Agreement § 5.2.  Finally, the Trust provides that the FCR will be a fiduciary for all future
Claimants to the Trust.  Trust Agreement § 6.1.

43.      Acting in conjunction with the FCR, the ACC has chosen the proposed Trustees
(Messrs. Huge, Sifford, and Trafelet).[13]  The ACC has also chosen the proposed members of the
TAC (Messrs. Budd, Cooney, Rice, and Weitz) (see Plan § 7.2.6).  These TAC members are all
prominent plaintiffs' asbestos personal injury attorneys.  Moreover, all of these proposed TAC
members serve on the ACC itself as representatives of their individual personal injury clients
with asbestos personal injury claims against the Debtors.  Collectively, the law firms of the TAC
members represent tens of thousands of claimants to the Trust,[14] and each member of the TAC

---

[11] *See* Deposition of Peter Van N. Lockwood as Rule 30(b)(6) Witness for the ACC ("Lockwood Dep."), Tr. 5/1/09 at 381:12 to 383:3-21; Lockwood Dep. 5/4/09 at 637:11 to 642:4.

[12] *See* Plan Proponents' Responses to Federal's Requests for Admission Nos. 5-7.

[13] In his Rule 30(b)(6) deposition as counsel to the ACC, Mr. Lockwood, stated that "[t]he ACC and the FCR consulted each other on [the] three prospective individuals and then proposed them to the co-proponents [of the Plan] and the co-proponents accepted them."  Lockwood Dep., Tr. 5/4/09 at 603:19-23.

[14] Lockwood Dep., Tr. 5/1/09 200:3-8 ("I'm sure it's more than 10,000.  Again, it could be 20,000; it could be 30,000.  I just don't know"); Amended Statement of Baron & Budd under Bankruptcy Rule 2019, ¶ 4 (Feb. 25, 2009) ("As of the date of this Amended Statement, the Firm represents thousands of personal injury claimants ....").

will be representing claimants submitting claims to the Trust, and receiving contingency fees for their services to their clients.[15]

44.     The Trust Agreement reposes significant powers in the TAC.  By way of example only, the TAC has the power to adopt the PI Trust By-Laws and amend them, as well as authority to amend the Trust Agreement and the TDP.  Trust Agreement §§ 2.2(f)(xi)-(xii); 7.3. The TAC has authority to change the Disease Levels, Scheduled, Maximum or Average Values or Medical/Exposure Criteria applicable to claims.  Trust Agreement § 2.2(f)(iii); TDP § 5.3(b)(1), (3).  The TAC can redetermine the Payment Percentages.  Trust Agreement § 2.2(f)(i); TDP § 2.3.  Furthermore, the TAC can develop methods for auditing the reliability of medical evidence, and may establish binding and non-binding arbitration procedures.  TDP §§ 5.8, 5.10(a).  The TAC is also given influence over Trustee compensation, removal of trustees, and selection of successor trustees.  Trust Agreement §§ 2.2(f)(ix), 4.2(c), 4.3(a).

45.     In light of these powers, members of the TAC must be deemed fiduciaries to all trust beneficiaries – not merely to present Asbestos PI Claimants.  But whether deemed fiduciaries to all Trust beneficiaries, or only the holders of present Asbestos PI Claims, the members of the TAC have actual, significant, and irreconcilable conflicts of interest.

46.     As attorneys representing thousands of individual claimants who will be making claims against the Asbestos PI Trust, the members of the TAC have a fiduciary duty, rooted in Rules of Professional Responsibility, to represent those claimants zealously and to take all necessary and appropriate actions to ensure that their claims are paid, and are paid at the highest possible amounts, from the finite funds that will be available from the Trust – even where this might involve proposing amendments to the Trust.

---

[15] *See* Plan Proponents' Responses to Federal's Requests for Admission Nos. 11-12.

47.     However, as fiduciaries to all beneficiaries of the Trust (or even only to present Asbestos PI Claimants), the members of the TAC have fiduciary duties, pursuant to the law of fiduciaries and trusts, to act in the best interests of all beneficiaries to the Trust (including all or at least all present Trust beneficiaries) in allocating the finite Trust funds, even where this would prove detrimental to their individual claimant clients.[16]

48.     As fiduciaries to the Trust, the members of the TAC also owe a duty to ensure that the Trust does not pay unmeritorious claims, and that the Trust defends against such unmeritorious claims; whereas, as attorneys representing individual claimant clients, they have a duty to seek compensation for their clients from the Trust even if they believe that their client-claimants may not in fact be deserving of payment.

49.     This actual conflict of interest of the TAC members is set out, and discussed in detail, in the expert Report of James B. Shein of the Kellogg School of Management at Northwestern University.  As Professor Shein states in his expert report:  "[T]he structure of the Trust creates a potential for abuse and for the Trustees and TAC to act contrary to the governing principle in the Trust that all claimants be treated fairly and equitably with claims made against the Trust and that the Trust not deplete its assets by paying undeserving claims."  Shein Report at 2.

---

[16] See, *e.g.*, *Law v. Law*, 1997 Del. Ch. LEXIS 134, *7 (Del. Ch. 1997) (a "'trustee is under a duty so to administer the trust as to preserve a fair balance between [beneficiaries that are to some extent antagonistic].");  *DuPont v. Delaware Trust Co.*, 320 A.2d 694, 699 (Del. 1974) (quoting Scott on Trusts § 232 (3d ed.));  *Cargill, Inc. v. JWH*, 959 A.2d at 1113 & n.68 (listing duties of trustee, including the duty of loyalty);  ABA Model Rule 1.7, cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").  Applying the District Court's Local Civil Rule 83.6(d), another judge of this Court has held the professional conduct of bar members should be governed by the Model Rules of Professional Conduct of the American Bar Association ("ABA Model Rules").  *In re Kaiser Group Int'l, Inc.*, 272 B.R. 846, 849 (Bankr. D. Del. 2002).  Given the nationwide scope of this proceeding, it is appropriate for this Court to apply the ABA Model Rules, although the apposite Delaware Rules are identical.

50.    The TAC's conflict of interest is irreconcilable.  The TAC members will have to breach their duties as Trust fiduciaries or their duties as counsel to their individual clients.  Either way, a Plan should not be approved that contains such built-in unnecessary conflicts.  The Court should remedy this conflict in obligations by eliminating the role of the TAC or by insisting that the TAC be composed of individuals with no conflicting interests.

51.    The Court should also select new trustees.  The proposed trustees (Messrs. Huge, Sifford, and Trafelet) were selected by ACC and FCR in a process where all other parties representing potential claimants to the Asbestos PI Trust were excluded from the selection process.  Moreover, these same gentlemen have been selected as Trustees of other asbestos bankruptcy Trusts by the same plaintiffs' attorneys who selected them here.  Because those individuals will owe their jobs to the ACC here, as they do in other cases, there would be an appearance of partiality if they are allowed to become trustees.  To remove this appearance, the Court should select the trustees itself, following an open selection process.

52.    The Trust Agreement would also exculpate, and indemnify the Trustees, TAC members, and FCR for breach of their fiduciary duties to the Trust, and, possibly, for breaches of their ethical obligations to their individual claimants-clients, except for breaches of trust "committed in bad faith or willful misappropriation."[17]  The Plan itself also exculpates the Trustees and the TAC broadly for acts concerning "the administration of this Plan or the property to be distributed under this Plan," except in cases of "gross negligence or wilful misconduct." Plan § 11.9.

53.    Such broad exculpatory provisions in favor of the TAC and Trustees are unjustified in a situation where, as here, the TDP has been drafted by the ACC (on which the

---

[17] Trust Agreement §§ 4.4, 4.6.

TAC members sit as representatives of their claimant-clients), and where the Trustees were selected by the ACC and the FCR.  In a case such as this, the threat of lawsuits for breach of fiduciary obligations is the only meaningful weapon that other claimants have to attempt to ensure that their claims will be treated equally and fairly.  If the Trustees, TAC membership, the Trust Agreement, and the TDP are to remain as proposed, the exculpation and indemnification provisions should be dropped so as to give beneficiaries at least one means of promoting fairness of treatment in the Trust Distribution Process.

### C.    The Plan Improperly Impairs Federal's Ability to Obtain Protection Under Section 524(g).

54.    Section 524(g)(4)(A)(ii) of the Code expressly provides this Court with the power to enjoin actions by Asbestos PI Claimants against Settled Insurance Companies where the settled insurer is **"**alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such [insurer] arises by reason of ... [the] provision of insurance to the debtor or a related party ...."

55.    Pursuant to this provision, the Plan seeks from the Court an Asbestos PI Channeling Injunction that would protect "Settled Asbestos Insurance Companies."  However, the term "Settled Asbestos Insurance Companies" is defined to mean only an Asbestos Insurance Entity that enters an Asbestos Insurance Settlement Agreement "**prior** the conclusion of the Confirmation Hearing."  Plan § 1.1(200).  (Emphasis supplied).

56.    These limitations on who can qualify as a Settled Asbestos Insurance Company improperly affect the rights of Federal as an insurer to obtain the full protection of an Asbestos PI Channeling Injunction in the event that it reaches a settlement subsequent to Confirmation.

57.    The Bankruptcy Code contains no "timing" restriction on granting a § 524(g) channeling injunction to insurers.  A settlement reached after Confirmation will benefit the

Asbestos PI Trust as much as a pre-confirmation settlement, and reaching a comprehensive settlement of coverage disputes will be more likely if the insurer knows that it is buying its peace from asbestos-related claims arising out its having provided insurance to the Debtors.

58.    Much like the case of other bankruptcies,[18] this Court should have the full discretion given it by the Bankruptcy Code to issue a Channeling Injunction authorized by section 524(g) to protect insurers that enter into coverage settlements following Confirmation.

59.    The scope of the Plan's proposed Channeling Injunction also constitutes a violation of Section 1123(a)(5) of the Bankruptcy Code.    That section requires that a Plan contain adequate means for its implementation.    While the Bankruptcy Code provides a list of examples of "adequate means" for plan implementation, the list is not exhaustive.    *In re Lisanti Foods, Inc*., 329 B.R. 491, 506 (D.N.J. 2005).    Indeed, where a Debtor has significant asbestos-related liabilities, the injunction allowed under section 524(g) of the Bankruptcy Code is considered a primary means for adequately implementing a plan of reorganization.    *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (Bankr. D. Del. 2006).

60.    By unduly constraining the Bankruptcy Court's authority to extend the Channeling Injunction to insurers that settle post-confirmation, non-settled insurers will be less likely to reach settlements with the Trust, or more likely to reach settlements on terms that result in lesser payments to the Trust.    The situation would be different if insurers knew that, in return for settlement payments, they could buy their peace by being the beneficiaries of a Section 524(g) injunction.

---

[18] *See*, *e.g*., Fourth Amended Joint Plan of Reorganization (As Modified), Dkt. No. 12620, In re Federal-Mogul Global, Inc., No. 01-10578 (JKF) ("Federal-Mogul") (Bankr. D. Del. Jun. 5, 2007) at §1.1.198 (emphasis added); Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (As Modified), Dkt. No. 13674, Federal-Mogul (Bankr. D. Del. Nov. 8, 2007).

61.     To avoid this problem, the timing component should be eliminated and the Plan should authorize the Court to make the Channeling Injunction as broad as allowed under Section 524(g).

**D.     The Plan Improperly Eliminates Federal's Contractual Indemnity Rights With Respect to Claims Other Than Asbestos PI Claims.**

62.     Pursuant to settlement agreement reached between Federal and the Debtors, Federal has rights to be indemnified with respect to costs and liabilities that it might incur to third parties with respect to claims in addition to Asbestos PI Claims, including Asbestos PD Claims and non-Asbestos Claims.  The Plan, however, does not make provision for payment of any such liabilities that Federal may incur.

63.     Claims against Federal for which it has indemnity rights against the Debtors should be separately and specifically enjoined under Section 105 of the Bankruptcy Code and the Plan should be clear that Federal can recover for any liability it incurs from the Reorganized Debtor if such claims are not successfully enjoined.  The failure to provide such injunctive protection and claim treatment is a failure to provide adequate means for the Plan's implementation and violates Section 1123(a)(5).

**E.     Incorporation by Reference of Other Objections.**

64.     Federal hereby adopts and incorporates by reference any objections made by other Asbestos Insurance Entities to the Plan to the extent such objections may also be applicable to Federal.

**IV.    RESERVATION OF RIGHTS**

65.     Federal expressly reserves all of its rights, defenses, limitations and/or exclusions in connection with the Federal Policies, applicable law or otherwise.  Nothing in this Objection

shall be deemed to expand any alleged coverage that may otherwise be available under any insurance policies or any alleged rights to payment under any settlements.

66.    Federal also reserves its right to amend, modify or supplement this Objection in response to, or as a result of any discovery or investigation being conducted in connection with confirmation of the Plan and/or any submission in connection with the Plan or this case filed by any party-in-interest.

Dated: May 20, 2009

COZEN O'CONNOR


/s/ *Barry Klayman*
Barry M. Klayman (DE  No. 3676)
1201 N. Market Street
Suite 1400
Wilmington, DE 19801
(302) 295-2035 Telephone
(215) 701-2209 Facsimile

- and -

William P. Shelley (PA ID 40875)
Jacob C. Cohn (PA ID 54139)
Ilan Rosenberg (PA ID 89668)
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000 Telephone
(215) 665-2013 Facsimile

Attorneys for Federal Insurance Company