**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| W.R. Grace & Co., *et al.* | : | Case No. 01-01139 JKF |
| | : | |
| Debtors. | : | **Docket Reference No. 20872** |

**FINAL OBJECTIONS OF GOVERNMENT EMPLOYEES**
**INSURANCE CO. AND REPUBLIC INSURANCE COMPANY**
**N/K/A STARR INDEMNITY & LIABILITY COMPANY TO**
**CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION**

Government Employees Insurance Co. ("GEICO") and Republic Insurance

Company n/k/a Starr Indemnity & Liability Company ("Republic") (together, the

"Insurers") submit the following final objections to confirmation of the Joint Plan of

Reorganization proposed by the Debtors, the Official Committee of Asbestos Personal

Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official

Committee of Equity Security Holders, as amended from time to time (the "Plan"):

## I.      Statement of Interest and Standing

1.      GEICO and Republic are unsettled excess general liability insurers of one

or more of the Debtors.

2.      The policy rights of GEICO and Republic are adversely and improperly

impacted by the Plan, and the so-called "Insurance Neutrality" language in the Plan is

unintelligible and completely inadequate to protect said rights.  As a result, GEICO and

Republic are parties-in-interest with standing to object to confirmation.  *See, e.g., In re*

*Congoleum Corp.*, 362 B.R. 167, 173-75 (Bankr. D. N.J. 2007). They also have standing

insofar as the Plan purports to release, enjoin, or otherwise alter their respective rights

against the Debtors and non-debtor third parties.  *See, e.g., Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1001 (9th Cir. 2005) ("That the Non-Settling Defendants have not articulated the precise nature of the 'indemnity or other[ ]' claims they are barred from asserting does not demonstrate a lack of formal legal prejudice"); *In re Zale Corp.*, 62 F.3d 746, 751 n.13 (5th Cir. 1995) (rejecting argument that injunction did not harm insurer and holding that "the fact that the injunction bars [the insurers] in any way gives them standing to appeal it"); *Alumax Mill Products, Inc. v. Congress Financial Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990) (party stripped of indemnity and contribution rights has standing to object).

## II.    Background

The GEICO Policies

3.    On or about June 18, 1981, GEICO issued an Excess Umbrella Liability Policy bearing Policy No. GXU 30031 to W.R. Grace & Company, *et al.*, for the period 6/30/81 to 6/30/82.  (*See* Ex. "1" (Declaration of Michael J. Powers ("Powers Decl.")) ¶ 4 and Exhibit "A" thereto).[1]

4.    On or about July 6, 1982, GEICO issued an Excess Umbrella Liability Policy bearing Policy No. GXU 30152 to W.R. Grace & Company, *et al.*, for the period 6/30/82 to 6/30/83.  (*See* Ex. "1" (Powers Decl.) ¶ 5 and Ex. "B" thereto).

5.    On or about July 12, 1983, GEICO issued an Excess Umbrella Liability Policy bearing Policy No. GXU 30267 to W.R. Grace & Company, *et al.*, for the period 6/30/83 to 6/30/84.  (*See* Ex. "1" (Powers Decl.) ¶ 6 and Ex. "C" thereto).

---

[1] The exhibits referenced herein are exhibits to the Declaration of Jeffrey M. Boerger, dated May 20, 2009, submitted in support hereof, unless otherwise indicated.

6.      Each GEICO policy contains following form language, incorporating certain terms and conditions of underlying umbrella policies by reference.  For example, GEICO Policy No. 30267 contains a Following Form Endorsement, which provides:

> It is agreed that except only with respect to policy period, premium and limits of liability, this policy is hereby amended to follow all the terms, conditions, definitions and exclusions of the first layer Umbrella policy, (London and various British) KYO17582 and all renewals and replacements thereof.  It is further agreed that all pre-printed terms and conditions hereon are deleted to the extent that they vary from or are inconsistent with the terms and conditions of the first layer Umbrella.

(Ex."1" (Powers Decl.), Ex. "C" (GEICO Policy No. 30267) thereto at Endorsement No. 4 (follow form to London Policy No. KYO 17582)).  *See also* (Ex. "1" (Powers Decl.), Ex. "B" (GEICO Policy No. 30152) Endorsement No. 4 (follow form to London Policy No. KYO 17582)); (Ex. "1" (Powers Decl.), Ex. "A" (GEICO Policy No. 30031) thereto, at Insuring Agreement I (conditional follow form to London Policy 79 DD 1633C)).[2]

7.      Each of the GEICO policies contains an identical anti-assignment provision.  For example, GEICO Policy No. 30031 provides:

> Assignment of interest under this policy shall not bind GEICO until its consent is endorsed thereon.

(Ex. "1" (Powers Decl.), Ex. "A" thereto at Condition I).  Similarly, each of the underlying London policies contains an identical anti-assignment provision.  For example, London Policy No. KYO 17582 provides:

> Assignment of interest under this policy shall not bind Underwriters unless and until their consent is endorsed hereon.

(Ex. "1" (Powers Decl.), Ex. "G thereto, at Condition O)

---

[2] Copies of London Policy No. 79 DD 1633C and London Policy No. KYO 17582 are attached hereto as Exs. "F" and "G," respectively, to Ex. "1" (Powers Decl.).

8.    Each of the GEICO policies contains an identical cooperation provision.

For example, GEICO Policy No. 30031 provides:

> The insured shall cooperate with GEICO and, upon GEICO's request, assist in making settlements, in the conduct of suits, and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury, personal injury, property damage, or advertising injury with respect to which insurance is afforded under this policy; and the insured shall attend hearings and assist in securing and giving evidence and obtaining evidence and obtaining the attendance of witnesses.

(Ex. "1" (Powers Decl.), Ex. "A" thereto, at Condition C(3)).  Similarly, each of the

underlying London policies contains an identical cooperation provision.  For example,

London Policy KYO 17582 provides:

> The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers or both in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

(Ex. "1" (Powers Decl.), Ex. "G" thereto, at Condition H).

9.    Each of the GEICO policies contains an identical provision prohibiting

settlement by the insured without insurer consent.  For example, GEICO Policy No.

30031 provides:

> The insured shall not, except at his own expense, voluntarily make any payment, assume any obligation, or incur any expense.

(Ex. "1" (Powers Decl.), Ex. "A" thereto, at Condition C(5)).  Similarly, each of the

underlying London policies contains an identical provision prohibiting settlement by the

insured without insurer consent. For example, London Policy No. KYO 17582 provides:

> The Assured shall make a definite claim for any loss for which the
> Underwriters may be liable under this policy within twelve (12) months
> after . . . the Assured's liability shall have been fixed and rendered
> certain . . . by written agreement of the Assured, the claimant, and
> Underwriters.

(Ex. "1" (Powers Decl.), Ex. "G" thereto, at Condition J).

<u>The Republic Policies</u>

10.     On or about August 1, 1983, Republic issued an Excess Umbrella Policy
bearing Policy No. CDE 749 to W.R. Grace & Company, *et al.*, for the period 6/30/83 to
6/30/84.  (*See* Ex. "1" (Powers Decl.) ¶ 7 and Ex. "D" thereto).

11.     On or about August 1, 1983, Republic issued an Excess Umbrella Policy
bearing Policy No. CDE 750 to W.R. Grace & Company, *et al.*, for the period 6/30/83 to
6/30/84.  (*See* Ex. "1" (Powers Decl.) ¶ 8 and Ex. "E" thereto).

12.     Each Republic policy contains following form language, incorporating
certain terms and conditions of underlying umbrella policies by reference.  For example,
Republic Policy No. CDE 749 contains a Following Form Endorsement, which provides:

> It is agreed that except only with respect to policy period, premium and
> limits of liability, this policy is hereby amended to follow all the terms,
> conditions, definitions and exclusions of the first layer umbrella policy,
> (LONDON AND VARIOUS BRITISH) KYO17582 and all renewals and
> replacements thereof.  It is further agreed that all pre-printed terms and
> conditions hereon are deleted to the extent that they vary from or are
> inconsistent with the terms and conditions of the first layer umbrella.

(Ex. "1" (Powers Decl.), Ex. "D" thereto (Republic Policy No. CDE 749) at Endorsement
S/L 120-1 (follow form to London Policy No. KYO 17582)).  *See also* (Ex. "1" (Powers
Decl.), Ex. "E" (Republic Policy No. CDE 750) thereto, at Endorsement S/L 120-1
(follow form to London Policy No. KYO 17582)).

13.     Each of the Republic policies contains an identical anti-assignment

provision.  For example, Republic Policy No. CDE 749 provides, in relevant part:

> Assignment of interest under this policy shall not bind the Company until
> its consent is endorsed hereon . . . .

(Ex. "1" (Powers Decl.), Ex. "D" thereto, at Condition No. 6).  Similarly, the underlying

London policy contains an identical anti-assignment provision:

> Assignment of interest under this policy shall not bind Underwriters unless
> and until their consent is endorsed hereon.

(Ex. "1" (Powers Decl.), Ex. "G" thereto, at Condition O).

14.     Each of the Republic policies incorporates, by reference, the cooperation

provision set forth in the underlying London policy, which provides:

> The Underwriters shall not be called upon to assume charge of the
> settlement or defense of any claim made or suit brought or proceeding
> instituted against the Assured but Underwriters shall have the right and
> shall be given the opportunity to associate with the Assured or the
> Assured's underlying insurers or both in the defense and control of any
> claim, suit or proceeding relative to an occurrence where the claim or suit
> involves, or appears reasonably likely to involve Underwriters, in which
> event the Assured and Underwriters shall co-operate in all things in the
> defense of such claim, suit or proceeding.

(Ex. "1" (Powers Decl.), Ex. "G" thereto, Condition H).

15.     Each of the Republic policies incorporates, by reference, the provision set

forth in the underlying London policy that prohibits settlement by the insured without

insurer consent, which provides:

> The Assured shall make a definite claim for any loss for which the
> Underwriters may be liable under this policy within twelve (12) months
> after . . . the Assured's liability shall have been fixed and rendered
> certain . . . by written agreement of the Assured, the claimant, and
> Underwriters.

(Ex. "1" (Powers Decl.), Ex. "G" thereto, at Condition J).

Basic Treatment of the GEICO and Republic Policies Under the Plan

16.     Under the Plan, the Debtors purport to transfer all, or nearly all, of their

rights under the GEICO and Republic policies to the Asbestos PI Trust ("Trust").  (*See*

Dkt. No. 20874, Ex. "6" (Asbestos Insurance Transfer Agreement)).  The Asbestos PI

Trust is to be established pursuant to the Asbestos PI Trust Agreement ("Trust

Agreement"), and operated in accordance with the Asbestos PI Trust Distribution

Procedures ("TDP").  (*See* Dkt. No. 20874, Exs. "2" and "4").

17.     Neither the Trust Agreement nor the TDP, nor any other Plan Document,

provides for any role for the Debtors' liability insurers (including GEICO and Republic)

in the handling, defense, or settlement of Asbestos PI Claims submitted to the Trust.  (*See*

Dkt. No. 20874, Exs. "2" and "4"; Ex. "2" (Deposition of David T. Austern ("Austern

Dep.") at 91-92).  Indeed, by their explicit terms, the Trust Agreement and TDP place all

responsibility for the handling, defense, and/or settlement of Asbestos PI Claims squarely

in the hands of the Trust itself.

18.     Although the Plan specifically provides that the Trust will be the assignee

of the Asbestos PI Rights, and that the assignment of such rights will be valid and

enforceable against the Debtors' insurers, the Plan and Plan Documents are absolutely

silent with respect to whether the Trust will assume or comply with the Debtors' duties

and obligations under the Asbestos Insurance Policies, including the GEICO and

Republic policies.  That issue, the Plan Proponents maintain, will be decided later by a

coverage court.

### III.    Plan Objections

**The Plan Is Not "Insurance Neutral" In Any Sense.**

> Section 7.15 of the Plan Entitled "Insurance Neutrality" is Unintelligible.

19.    David T. Austern, the Asbestos PI Future Claimants' Representative, is an attorney who has practiced law for 45 years.  (Ex. "2" ("Austern Dep.") at 205-06). During his long and distinguished career, he has been (a) an assistant district attorney in the New York County District Attorney's Office (four years), (b) an assistant United States attorney in the United States Attorney's Office in Washington, D.C. (four years), (c) a law professor (two years), (d) an attorney in private practice (12 years), and (e) general counsel of the Manville Personal Injury Settlement Trust (21.5 years).  (Ex. "2" (Austern Dep.) at 13-14).  He also serves as Future Claimants' Representative for the Combustion Engineering Asbestos Trust.  (Ex. "2" (Austern Dep.) at 22-24).  In short, Mr. Austern has about as much legal experience as anyone, with a particular emphasis on asbestos bankruptcies.

20.    In preparing for his deposition over a two-week period, Mr. Austern reviewed several Plan Documents, including the Plan itself; he reviewed Mr. Lockwood's deposition transcript; he listened-in on a portion of Mr. Lockwood's deposition; and he met with his own counsel twice.  (Ex. "2" (Austern Dep.) at 14-18).

21.    Even with his years of experience and extensive deposition preparation, Mr. Austern – one of the Plan's co-proponents – readily admits he does not understand § 7.15 of the Plan – the so-called "Insurance Neutrality" provision that the Plan Proponents trumpet as purportedly protecting the rights of the Debtors' insurers:

> Q.    . . . Are there particular provisions in the Plan that you don't
>         understand?

A.      Yes.

Q.      Are there any that stick out in your mind in that regard?

A.      Can I look at the Plan for a moment?

Q.      Sure.

A.      By way of example, 7.15 of the document.

Q.      That's one that you don't understand?

A.      Well, it's one I have trouble trying to understand.

Q.      You are in good company.

. . .

Q.      Do you believe Section 7.15 to be unclear?

A.      To me.

(Ex. "2" (Austern Dep.) at 44-48).  When questioned further as to how § 7.15 was

intended to operate, and how it interacts with other Plan provisions, Mr. Austern

frequently and candidly admitted, he did not know:

Q.      So does (b) [*i.e.*, § 7.15(b)] then supersede subsection (a) [*i.e.*, § 7.15(a)]?

A.      I don't know.

. . .

Q.      Okay.  My question is, do you have an understanding as to whether the language in 7.15 (a) supersedes the language in 11.9?

A.      I don't know.

Q.      Do you know whether it's intended to?

A.      No.

. . .

> Q.    My question is, do you have an understanding as to whether
> Section 7.15 entitled Insurance Neutrality preempts Section 7.7
> insofar as the Debtors's [sic] insurers are concerned?
>
> [Objection]
>
> THE WITNESS:  I don't know.
>
> Q.    …. My question is whether the preemptory language that appears
> in Section 7.15(a) preempts the conditions set forth in Section 7.8,
> as [you] understand it?
>
> [Objections]
>
>     THE WITNESS:  I don't know.
>
> ….
>
> Q.    Do you understand 7.15(h) to bind all of the Debtors' insurers to
> all of the releases and injunctions set forth in the Plan?
>
> [Objections]
>
> THE WITNESS:  I don't know.

(Ex. "2" (Austern Dep.) at 48-61).

22.    Richard Finke, the Debtor's Rule 30(b)(6) designee with respect to the

"Scope and operation of Section 7.15 of the Plan entitled 'Insurance Neutrality,' and any

other purported insurance neutrality provisions in the Plan and Plan Documents," testified

that he understands § 7.15.  (Ex. "3" (Deposition of Richard Finke) ("Finke Rule 30(b)(6)

Dep.") at 75-77).  Indeed, when questioned about the interplay between § 7.15 (Insurance

Neutrality) and § 11.9 (Exculpation), Mr. Finke stated that latter trumped the former,

notwithstanding the super-preemptory language in the former.  (*Id.* at 75-86).  He opined

that § 11.9 is encompassed within the language of § 7.15(h), even though there is no

specific reference to § 11.9 in § 7.15(h).  (*Id.* at 80).  He also testified that if an insurer fit

within the undefined phrase "the beneficiaries of the Asbestos PI Trust" that appears in

§ 7.15(b), such as the holder of an "Indemnified Insurer TDP Claim" as used in § 5.13 of

the TDP, then the insurer was, in fact, bound by the Plan, Plan Documents, and

Confirmation Order.  (*Id.* at 86-90).  If Mr. Finke is right, and it appears he could be, then

the Plan is decidedly not "insurance neutral" as to any insurer that holds an "Indemnified

Insurer TDP Claim."  (Compare § 7.15(a) with § 7.15(b)).

23.    Peter van N. Lockwood, the Rule 30(b)(6) designee for the Asbestos PI

Trust ("ACC"), testified that he viewed § 7.15 as being "sort of a for[u]m selection

provision."  (Ex. "4" (Deposition of Peter van N. Lockwood ("Lockwood Rule 30(b)(6)

Dep.") at 58-63).  That, of course, begs the question why § 7.15 is entitled "Insurance

Neutrality."  When asked whether § 11.9 (Exculpation) was preempted by § 7.15, and

whether various releases in the Plan were preempted by § 7.15, Mr. Lockwood provided

equivocal responses.  (*Id.* at 170-76).  With respect to the interaction between § 7.15 and

§ 11.9, for example, at one point he said he did not think § 7.15 would override § 11.9

"because the exculpation provision comes under the heading bankruptcy issues," and

therefore is presumably within the carve-out in the definition of the term Asbestos

Insurance Defenses, only later to testify that the question "is almost impossible to

answer" without more information.  (*Id.* at 171-73).

24.    On its face, and as interpreted by the Plan Proponents, § 7.15 – with its

various subparts, circularity, undefined terms, carve-outs, and otherwise conflicting

provisions – fails to achieve anything approaching clarity or "insurance neutrality."

Rather, it is like an "abstract painting."  Most people who study it, see something

different, while others – like Mr. Austern – candidly admit that they just don't understand

it.  That is little comfort to the Debtors' insurers who are being asked to rely upon it to

protect their rights.

>The Plan Improperly Impacts GEICO's and Republic's Rights Under
>Their Respective Policies By Excluding Them from the Process of
>Evaluating, Defending Against, and Settling Asbestos PI Claims.

25.     Even if § 7.15 were stripped of its confusing exceptions and needlessly

circular language, and otherwise rendered intelligible, true "insurance neutrality" would

not be achieved.  The principal problem is structural.  The Plan eliminates any role for the

insurers in evaluating, defending against, or settling Asbestos PI Claims, which is

fundamentally at odds with GEICO's and Republic rights, and the insured's duties, under

the policies.  (*See* Dkt. No. "20874," Exs. "2" (Trust Agreement) and "4" (TDP); Ex. "2"

(Austern Dep.) at 91-92).  Instead, it is the Asbestos PI Trust, under the watchful eye of

the TAC, that does everything.  The Debtors' insurers play no role, except to have

demands for coverage made against them by the Trust after the fact – with respect to

claims resolved by the Trust pursuant to a Trust Agreement and TDP drafted by the ACC

and FCR (without insurer input or consent) – and, to the extent the insurers dispute such

coverage, to be sued by the Trust.  Once sued, the insurers are left merely to assert

coverage defenses, subject to exceptions negotiated by the Plan Proponents, again

without insurer input.

26.     By way of example only, the TDP call for most Asbestos PI Claims to be

resolved pursuant to the "Expedited Review Process."  (Dkt. No. 20874, Ex. "4" at 21-

27).  That effectively constitutes the Trust's "standing offer" to settle any claim at a

"Scheduled Value" that meets the Trust's "Medical/Exposure Criteria" for a particular

"Disease Level."  (*Id.*).  If an Asbestos PI Claimant accepts the "standing offer," the

Trust will pay the Scheduled Value multiplied by the Payment Percentage.  It is that

simple.  The Debtors' insurers play no role, nor is there any opportunity for them to play any role as the Expedited Review Process is structured.  Nor is there any way that the Asbestos PI Trust or the Debtors could comply with the duty to cooperate under the GEICO or Republic policies because the TDP, by its terms, precludes the insurers from playing any role in the Expedited Review Process.  The same also holds true with respect to the other claims resolution processes set forth in the TDP.

27.    When GEICO and Republic issued their policies to the Debtors, the bargain they struck was not that Debtors – with this Court's approval – would (i) ignore the policy terms (especially the Debtors' duties and obligations), (ii) assign all their interests under the policies to a third-party, (iii) agree that the third-party could settle claims on terms dictated by representatives of asbestos claimants, and (iv) authorize the third-party to sue GEICO and Republic, and thereby leave GEICO and Republic merely with a right to assert certain coverage defenses.  Rather, the deal was that each party would abide by its respective duties and obligations under the Debtors' policies.  To date, both GEICO and Republic have done just that; neither is in breach of its policy obligations.  (*See* Ex. "5" at 51-52).

28.    By contrast, however, the Debtors co-proposed a Plan that by virtue of its structure and terms, as outlined earlier, precludes compliance with the Debtors' duties and obligations under the GEICO and Republic policies.  In fact, as structured, it completely denies the Debtors' insurers any ability to exercise their policy rights – as opposed to simply asserting defenses to coverage.  Despite this scheme, and the many built-in exceptions to "Insurance Neutrality," the Plan Proponents improperly contend that the Plan is "insurance neutral" because the Debtors' insurers will have the right to

assert their Asbestos Insurance Coverage Defenses, which is yet another ill-defined term in the Plan that fails to preserve the terms of the GEICO and Republic policies intact.

29.     This arrangement – in which the Plan adversely impairs GEICO's and Republic's contract rights – fails to comply with 11 U.S.C. §§ 1129(a)(1) and (a)(3).

30.     Putting aside the legal infirmities with this self-serving scheme, from a purely economic standpoint, the procedures for the resolution of asbestos claims set forth in the TDP violate the central allocation of rights and responsibilities in the policies issued to the Debtors by the Insurers.  The Plan overturns the economic relationships established in the policies by substituting the procedures set forth in the TDP for the contractual obligations of the Debtors to cooperate with the Insurers in the defense of claims.  The Plan establishes a payment matrix to which the Insurers have not consented and excludes the Insurers from the process of claims settlement.  Thus, the Plan and TDP fundamentally upset the economic structure of the Debtors' insurance policies and overturn central contractual rights established in those insurance policies in ways that severely impact the economic ability of the Insurers to manage the financial risks that they assumed in issuing the policies.  (*See* Ex. "6" (Declaration of George L. Priest)).

> The Plan Improperly Purports to Assign the Debtor's Interests
> Under the GEICO and Republic Policies to the Trust in
> <u>Violation of the Anti-Assignment Provisions in Those Policies</u>.

31.     Under the Plan, the Debtors purport to transfer all, or nearly all, of their rights under the GEICO and Republic policies to the Trust.  (*See* Dkt. No. 20874, Ex. "6"; *see also* Dkt. No. 20872, at § 7.2.2(d)(ii) (providing for transfer of all "Asbestos Insurance Rights" to the Trust); *id.* at § 1.1(13) (defining "Asbestos Insurance Rights") & § 1.1(140) (defining "Insurance Contributors")).  The Trust is to be established pursuant

to the Trust Agreement, and operated in accordance with the TDP.  (*See* Dkt. No. 20874, Exs. "2" and "4").

32.     This assignment of insurance rights to the Trust violates the anti-assignment provisions contained in the GEICO and Republic policies, which prevent any assignment of insurance rights without the insurers' consent.  (*See, e.g.*, Ex. "1" (Powers Decl.) and Ex. "A" (GEICO Policy No. GXU 30031) thereto, at Condition I; Ex. "1" (Powers Decl.) and Ex. "E" (London Policy No. KYO 17582) thereto, at Condition O). Neither GEICO nor Republic has consented to such transfer of insurance rights under their policies.

33.     Section 1123(a)(5)(B) of the Bankruptcy Code, upon which the Plan Proponents presumably rely, does not preempt these anti-assignment provisions.  The text of the statute provides as follows:

> Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan . . . .

11 U.S.C. § 1123(a)(5)(B).

34.     First, there is a strong presumption against inferring preemption in the bankruptcy context.  *See Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997).  Indeed, absent a "clear and manifest" purpose to the contrary, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law."  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544-45 (1994). Moreover, this presumption is heightened in the insurance context, where Congress has

expressly provided that its other enactments should not be construed implicitly to preempt state regulation of insurance.  *See* 15 U.S.C. § 1012(b).

35.     Second, by its terms, Section 1123(a)(5)(B) does not preempt private contracts, which are separate and distinct from *law*.  *See, e.g.*, *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993).

36.     Third, Section 1123(a)(5)(B) preemption applies only to non-bankruptcy law relating to the financial condition of a debtor, and thus it does not preempt the terms of insurance policies.  *See Pacific Gas & Elec. Co. v. California*, 350 F.3d 932, 949 (9th Cir. 2003).

37.     Other preemption provisions in the Bankruptcy Code are similarly limited and likewise do not preempt the anti-assignment provisions contained in the GEICO and Republic policies.  For example, Section 363(l) does not preempt the contractual anti-assignment provisions because those provisions are not "conditioned on the insolvency or financial condition of the debtor.  Section 365 does not preempt the anti-assignment provisions, as the GEICO and Republic policies are no longer executory contracts.  And Section 1142(a) does not preempt the anti-assignment provisions because those provisions do not relate to the financial condition of a debtor.

38.     To the extent that any Non-Debtor Affiliates purport to assign their rights under the GEICO or Republic policies to the Trust, such assignment clearly violates the anti-assignment provisions contained in those policies, which are not preempted by any provision in the Bankruptcy Code.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218-

19 (3d Cir. 2004). (*See also* Plan Definition No. 140 (defining "Insurance Contributors" to include Non-Debtor Affiliates)).

39.     Moreover, New York law does not justify the proposed assignment of the Debtors' rights and interests under the GEICO and Republic policies under the unusual circumstances of an asbestos bankruptcy case. *See Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 171 (2d Cir. 2006) (applying New York law); *see also Henkel Corp. v. Hartford Accident & Indem. Co.*, 62 P.3d 69, 75-76 (Cal. 2003).

**The Proposed TAC Members Are Burdened By Irreconcilable
Conflicts of Interest and Should Not Be Approved By The Court.**

40.     Pursuant to the Asbestos PI Trust Agreement (the "Trust Agreement"), the proposed Asbestos PI Trust (the "Trust") – a successor to the Debtors and assignee of the Debtors' Asbestos Insurance Rights under the Plan – is to have three Asbestos PI Trustees (the "Trustees"). The three Trustees are Harry Huge, Lewis Sifford, and Dean Trafelet, each of whom has several years of experience with one or more asbestos bankruptcy trusts. (*See* Ex. "2" ("Austern Dep.")) at 76-80.

41.     In addition to the Trustees, the Trust will also have a "Futures Representative" and a "Trust Advisory Committee." (*See* Dkt. No. 20874, Ex. "2" (Section V and VI). The designated Futures Representative for the Trust is David T. Austern, the same individual appointed by this Court as the statutory "legal representative" under 11 U.S.C. § 524(g)(4)(B)(i). The designated members of the Trust Advisory Committee ("TAC") are Russell W. Budd, Esq. of the law firm Baron & Budd, PC; John D. Cooney, Esq. of the law firm Cooney & Conway; Joseph F. Rice, Esq. of the law firm Motley Rice LLC; and Perry Weitz, Esq. of the law firm Weitz & Luxenberg. (*See* Dkt. No. 20874, Ex. "2" at 43-50). Messrs. Budd, Cooney, Rice, and Weitz were

selected to be the TAC members by the Asbestos PI Committee.  (*See* Dkt. No. 20872, § 7.2.6).  The Asbestos PI Committee – which consists of asbestos personal injury claimants – was appointed on April 13, 2001 by the U.S. Trustee.  (*See* Dkt. 20873 No. at 53).  Each TAC member's law firm has a client on the Asbestos PI Committee, and those clients delegate to the law firm that represents them their duties as a member of Asbestos PI Committee.  (Ex. "4" (Lockwood Rule 30(b)(6) Dep.) at 121-25).  So, as a practical matter, Messrs. Budd, Cooney, Rice, and Weitz were directly involved in their own selection as TAC members.  (*Id.* at 124-25 ("But, at the end of the day, through some sort of nomination or informal self-nomination, speeches, lobbying, discussions, what have you, there came a time at which the committee voted to select these four members.")).

42.     There is no requirement under Bankruptcy Code § 524(g) for the Trust to have a TAC.  Nor is there any requirement for a "Futures Representative" once a § 524(g) trust is formed.  The statute only requires that the Court appoint a legal representative for the purpose of protecting the rights of the holders of future demands in connection with the proceedings leading to the issuance of the channeling injunction, not thereafter.  *See* 11 U.S.C. § 524(g)(4)(B)(i).  Thus, the Trust has a TAC and Futures Representative not because it is statutorily-mandated, but rather merely because the ACC and FCR wanted it, and the other Plan Proponents agreed to it.

43.     Under the Trust Agreement, the TAC wields considerable control and influence over the Trustees and the governance of the Trust.  The Trustees are required to consult with the TAC on a variety of issues including, among others, the general implementation and administration of the Trust and Trust Distribution Procedures

("TDP").  (*See* Dkt. No. "20874", Ex. "2" at § 2.2(e), Ex. "4" ("TDP")).  In addition, the

Trustees are required to obtain the <u>consent</u> of the TAC before they may take any of a

multitude of different actions including, but not limited to, changing the Payment

Percentage, changing Disease Levels, Scheduled Values, and/or Medical/Exposure

Criteria, establishing or changing Claims Materials, settling with any insurer, amending

the Trust Agreement or TDP, complying with the Trust's obligations under insurance

policies, etc.  (*See* Dkt. No. "20874", Ex. "2" at § 2.2(f), Ex. "4" ("TDP")).

44.     The TAC members also play a significant role with respect to the

continued service of the Trustees, and the Trustees' compensation, which gives the TAC

additional control and influence over Trustee decision making. (*See* Dkt. No. "20874,"

Ex. "2" at §§ 2.2(f)(ix), 4.2(c), and 4.3(a)).  By contrast, nothing in the Trust Agreement

gives the Trustees the power to remove TAC members.  The net effect of these structural

features, as well as others, is that the TAC, not the Trustees, have a dominant role in the

affairs of the Trust.

45.     The Trust Agreement states: "The members of the TAC shall serve in a

*fiduciary capacity representing all holders* of present PI Trust Claims." (Dkt. No.

"20874," Ex. "2" at § 5.2) (emphasis added).  The term "PI Trust Claim" in the Trust

Agreement means "Asbestos PI Claim," as defined in the Plan.  (*See* Dkt. No. 20874, Ex.

"2" at 1 n.1).

46.     Each TAC member, however, is also lawyer with a law firm that

represents at least 1,000 individual holders of an Asbestos PI Claim (*i.e.*, "PI Trust

Claims").  (*See* Ex. "7" at 32).  In his capacity as a lawyer for his clients with Asbestos PI

Claims, each TAC member is also bound by the applicable Rules of Professional

Conduct.  Every state, except Texas, has adopted Rule 1.7 of the Model Rules of

Professional Conduct.  Rule 1.7 (entitled "Conflict of Interest: Current Clients") provides,

in part, as follows:

> (a)     Except as provided in paragraph (b), a lawyer shall not represent a
> client if the representation involves a concurrent conflict of
> interest.  A concurrent conflict of interest exists if:
>
> …
>
> (2)     there is a significant risk that the representation of one or
> more clients will be materially limited by the lawyer's
> responsibilities to another client, a former client *or third
> person* or by a personal interest of the lawyer.

Rule 1.7, Model Rules of Professional Conduct (emphasis added).  The Explanatory

Comment to this Rule 1.7 says: "In addition to conflicts with other current clients, a

lawyer's duties of loyalty and independence may be materially limited by responsibilities

to former clients under Rule 1.9 *or by the lawyer's responsibilities to other persons, such

as fiduciary duties arising from a lawyer's service as a trustee*, executor or corporate

director" (emphasis added).

        47.     Here, the fiduciary duties that Messrs. Budd, Cooney, Rice, and Weitz

have under the Trust Agreement as TAC members to the holders of <u>all</u> Asbestos PI

Claims are in direct conflict with their ethical obligations to their respective clients under

Rule 1.7.  As lawyers for their private clients, of course, they get paid, usually pursuant to

a contingent fee arrangement.  The customary contingency fee charged by personal injury

lawyers ranges from 33.33% to 40% of their clients' recoveries.  As lawyers, therefore,

they are both ethically bound and financially motivated to maximize their clients'

recoveries from the Trust.  By contrast, as TAC members, they have a fiduciary duty to

treat all holders of Asbestos PI Claims fairly, not just those for whom they, or their

respective law firm, act as private counsel.  These conflicting roles cannot be reconciled. (*See* Ex. "8" (Expert Report of James B. Shein)).

48.    If the TAC member fully complies with his fiduciary duties to all holders of Asbestos PI Claims under the Trust Agreement, he will necessarily be compromising his ethical obligations to his individual clients.  Similarly, if the TAC member complies with his ethical obligations to his individual clients, he necessarily will be violating his fiduciary duties as a TAC member to the remaining holders of Asbestos PI Claims for whom he is not private counsel.  Thus, it is not a question of whether he will, or will not, act properly.  There is simply a structural infirmity because the Trust Agreement permits TAC members to represent asbestos claimants.  This is not permitted of the Trustees: "No Trustee shall act as an attorney for any person who holds an asbestos claim."  (*See* Dkt. No. "20874," Ex. "2" at § 4.9).  There is a good reason for this prohibition, as noted by the Asbestos PI FCR David Austern: "Well, you are a trustee of a Plan paying somebody; you shouldn't be paying your client."  (*See* Ex. "2" (Austern Dep.) at 80).  If the Trust is going to have a TAC, the same prohibition should apply to the TAC, especially given the undue influence its members wield over the Trustees and Trust affairs as outlined earlier.

49.    These are not just a theoretical concerns; they are real concerns, regardless of the specific individual asbestos personal injury lawyers chosen to be TAC members. The concern, however, is even more heightened with respect to four TAC members that self-selected themselves to serve in this case, *i.e.*, Messrs. Budd, Cooney, Rice, and Weitz.  Each has already been involved in one or more asbestos bankruptcy cases in which a court found that they acted in a manner that advanced their own clients' interests to the detriment of asbestos claimants that they did not represent.  *See, e.g.*, *In re*

*ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) (finding that a "pre-petition asbestos

plaintiffs committee" that included Messrs. Budd, Cooney, Rice, and Weitz engaged in

"obvious self-dealing" to the detriment of claimants that were not their clients); *In re:*

*Congoleum Corporation*, Bankruptcy Case No. 03-51524, Slip Op. (Bankr. D. N.J. 2009)

(ruling that a § 524(g) plan, negotiated by Messrs. Weitz and Rice, was unconfirmable

because it failed to achieve equality of distribution among creditors).

50.     These structural defects and built-in conflicts of interest are further

exacerbated by the indemnification and exculpation provisions contained in the Plan and

Trust Agreement.  Those provisions significantly immunize members of the TAC from

any liability resulting from negligent breach of their fiduciary duties to the Trust, its

beneficiaries, and to their individual clients.  (*See* Ex. "8" (Shein Report) at ¶¶ 29-37).

51.     The foregoing structural defects of the Trust, violate Bankruptcy Code

§§ 1129(a)(3) and 1129 (a)(5)(A)(ii).

52.     In addition, the provisions of the Trust Agreement and TDP empowering

the TAC to exercise control over the management of the Trust improperly purport to

legitimize the same forms of economic conflict of interest condemned by legal doctrines

prohibiting policyholder-claimant collusion.  (*See* Ex. "9" (Priest Decl.) at pp. 15-16, 18).

*See also Elliot v. Metropolitan Cas. Ins. Co. of N.Y.*, 250 F.2d 680, 683-84 (10th Cir.

1957) and *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 627-

28 (2d Cir. 1996) (applying New York law).

53.     GEICO and Republic have standing to object to the Trust's structural

defects and built-in conflicts of interest as Asbestos Insurance Entities.  *See In re*

*Congoleum Corp.*, 426 F.3d 675, 685-87 (3d Cir. 2005) ("we are persuaded that, in the

circumstances here, the insurers and their attorneys have standing to present this

appeal"); *In re Pittsburgh Corning Corp.*, 308 B.R. 716, 721 (Bankr. W.D. Pa. 2004)

("Lumbermens' counsel has standing to object to the application to employ GHR"), *aff'd*,

*In re Pittsburgh Corning Corp.*, Case No. 04-1199 (W.D. Pa. 2005) (objecting insurers

"had standing to object to the application to employ GHR and have standing to defend

the order denying that application").

### The Plan Does Not Comply With § 524(g)'s Requirements.

54.     Bankruptcy Code § 524(g) has strict trust funding requirements:

The requirements of this subparagraph are that –

(i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization –

…

> (II) is to be funded in whole or in part by the *securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends*;
>
> (III) *is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of* –
>
>> (aa) each such debtor;
>>
>> (bb) the parent corporation of each such debtor; or
>>
>> (cc) a subsidiary of each such debtor that is also a debtor …

11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) (emphasis added).  The Plan fails to comply with

these funding requirements.

55.     The Asbestos PI Trust will not be funded in whole or in part by the

*securities of 1 or more debtors involved in such plan and by the obligation of such debtor*

*or debtors to make future payments, including dividends*.  The Plan Proponents argue that

both the Warrants and the Asbestos PI Deferred Payment Agreement purportedly qualify as "securities" as that term is used in § 524(g)(2)(B)(i)(II). (*See* Ex. "4" (Lockwood Rule 30(b)(6) Dep.) at 126-27). They are, no doubt, relying upon the definition of "security" set forth in § 101(49), which includes both a "warrant" and a "note." 11 U.S.C. § 101(49). However, neither the Warrant nor the Asbestos PI Deferred Payment Agreement qualifies as "securities" as that term is used in § 524(g).

56.    In the Third Circuit, the term "securities" as used in § 524(g) has been construed to mean equity in the debtor. *See Congoleum*, 426 F.3d at 680 ("***Notably, neither Congoleum nor related entities were required to contribute equity to the trust***") (emphasis added); *In re Congoleum Corp.*, 362 B.R. 167, 175 (Bankr. D. N.J. 2007) ("Despite the express requirements of § 524(g), and the explicit concern expressed by the Third Circuit, it was not until the Seventh Modified Joint Plan was filed on February 3, 2006, that the Debtors and ABI proposed contributing any ***equity*** toward the Plan Trust") (emphasis added); *see also Combustion Eng'g*, 391 F.3d at 248 ("[t]he implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an *'evergreen' funding source* for future asbestos claimants") (emphasis added).

57.    The Third Circuit's reading of the "securities" requirement contained in § 524(g)(2)(B)(i)(II) is not only correct, it is the only rational reading in light of the statute's legislative history. Congress modeled § 524(g) on the plan of reorganization in *Johns-Manville*. *See* 140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994). Its purpose was to remove lingering uncertainty concerning the validity of the Johns-Manville plan of reorganization, as well as to provide a statutory basis for other asbestos companies to

structure their own plans.  *See Id.*  In *Johns-Manville*, the Second Circuit observed:

> The cornerstone of the Plan is the Asbestos Health Trust (the "Trust"), a
> mechanism designed to satisfy the claims of all asbestos health victims,
> both present and future.  The Trust is funded with the proceeds from
> Manville's settlements with its insurers; certain cash, receivables, and
> *stock of the reorganized Manville Corporation*; long term notes; and the
> right to receive up to 20% of Manville's yearly profits for as long as it
> takes to satisfy all health claims.

843 F.2d at 640 (emphasis added).

58.    The legislative history of § 524(g) underscores precisely what Congress

had in mind in enacting the statute – namely, a trust-funding mechanism that includes

stock.  Indeed, the Congressional Committee that recommended adoption of § 524(g)

said:

> Asbestos claimants would have a stake in Johns-Manville's successful
> reorganization, because the company's success would *increase both the
> value of the stock held by the trust* and the company profits set aside for it
> . . . the Committee also recognizes that the interests of future claimants are
> ill-served if Johns-Manville *and other asbestos companies* are forced into
> liquidation and lose their ability to *generate stock value* and profits that
> can be used to satisfy claims.

140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) (emphasis added).  This legislative

intent was also evident in the Senate:

> [T]he proposed amendment would codify a court's existing authority to
> issue a permanent injunction to channel claims to an independent trust
> *funded by the securities and future earnings of the debtor*.  In plain
> English, this means that when an asbestos-producing company goes into
> bankruptcy and is faced with present and future asbestos-related claims,
> the bankruptcy court can set up a trust to pay the victims.  *The underlying
> company funds the trust with securities* and the company remains viable.
> Thus, the company continues to generate assets to pay claims today and
> into the future.  In essence, *the reorganized company becomes the goose
> that lays the golden egg by remaining a viable operation and maximizing
> the trust's assets to pay claims*.
>
> Without a clear statement in the code of a court's authority to issue such
> injunctions, *the financial markets tend to discount the securities of the*

> *reorganized debtor. This in turn diminishes the trust's assets and its resources to pay victims. The amendment is intended to eliminate that speculation so that the marketplace values the trust's assets fairly.*
>
> *This amendment is about growing the pie available to victims. The result could be significant. In the case of one such trust, for instance, every dollar increase in the value of the reorganized company's stock translates to $96 million more for compensating victims.*

140 Cong. Rec. S4522, S4523 (daily ed. Apr. 20, 1994) (emphasis added). The same

legislative intent was echoed by Senator Heflin:

> To qualify under the statute, such a trust is to be funded in whole or in part by the securities of the reorganized company, *which at some time could be borrowed against, or more likely sold outright, to raise cash to pay claims*; and the reorganized obligation to make future payments, including dividends, to the asbestos victims' trust. . . . Mr. President, this statutory affirmation of the court's existing injunctive authority is designed to help asbestos victims receive maximum value. It does so by assuring investors, lenders, and employees that the reorganized debtor has indeed emerged from Chapter 11 free and clear of all asbestos-related liabilities other than those defined in the confirmed plan of reorganization, and that all asbestos-related claims and demands must be made against the court-approved trust. *This added certainty will ensure that the full value of such trust's assets – the securities upon which it relies in order to generate resources to pay asbestos claims – can be realized.*

140 Cong. Rec. S14,464 (daily ed. Oct. 6, 1994) (emphasis added).

59.     Nowhere does the legislative history discuss the use of a warrant or

deferred payment agreement, in lieu of stock, as a funding source for an asbestos trust.

Rather, the references are either to stock or to securities. And, where the latter term is

used, the context makes clear that stock was intended.

60.     With the backdrop of *Johns-Manville*, the legislative intent of Congress is

obvious. It wanted a statutory scheme to legitimize the concept of the channeling

injunction to deal with future demands. That would eliminate the lingering doubts in the

financial markets as to whether Manville would remain free of asbestos liability. That, in

turn, would enable the Manville Trust to realize the full value of the Manville stock it

owned in order to satisfy future claims.  The statutory scheme represents a delicate

balance pursuant to which future claimants have their rights against the debtor cut off in

exchange for, *inter alia*, an equity stake in and, therefore, potential upside in the company

that injured them, which by virtue of the injunction is free of its asbestos liability.

   61. The Warrants are, of course, not stock.  Rather, they are a right to

purchase stock at a given price (*i.e.*, the strike price) within a given period of time.  Here,

the Warrant Agreement provides for Warrants to purchase in the aggregate, 10,000,000

shares of common stock of W.R. Grace & Co. at a strike price of $17.00 per share.  (Dkt.

No. "20874," Ex. "24" at 3).  The Warrants have a term of one year from the Issue Date.

(*Id.* at 2).  The share price of W.R. Grace & Co. stock is currently well below the $17.00

strike price.  On April 7, 2008, the day after the Plan Proponents executed their "Term

Sheet for Resolution of Asbestos Personal Injury Claims," which included the Warrants

with a $17.00 strike price, Grace stock closed at $26.83 per share.  (*See* Ex. "9" at 179-

84, Ex. "12" thereto).  By contrast, yesterday, the stock closed at $12.95 per share.  Thus,

the Warrants are currently well "out of the money" and, as a practical matter, are of little

economic value to the Asbestos PI Trust.  (*See* Ex. "10" (Expert Report of H. Sean

Mathis)).  Moreover, even if the Warrants have value, it is still unlikely that the $17.00

strike price will be reached within the one year term.  As a consequence, the Warrants

will likely expire without ever being exercised by the Asbestos PI Trust.  (*Id.*).  If they

are not exercised, the Asbestos PI Trust will not be funded with "securities" (*i.e.*, stock)

of Grace.  Nor will the Asbestos PI Trust be funded with "dividends" because dividends

would only be paid to the Asbestos PI Trust if it owned Grace stock.  As a result, the

Warrants do not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).

62.     Likewise, the Asbestos PI Deferred Payment Agreement does not qualify

as "securities" of the Debtors.  It has a set value – *i.e.*, the present value of $1.55 billion

in future payments.  (Dkt. No. 20874, Ex. "11" at 12-13).  No matter how well Grace

does in the future – once freed of its asbestos liabilities – the payments Grace is obliged

to make under the Asbestos PI Deferred Payment Agreement will not change.  Nor will

the Asbestos PI Deferred Payment Agreement generate any interest income during its

term.  In short, the Asbestos PI Deferred Payment Agreement does not qualify as

"equity" and, therefore, does not satisfy the funding requirements of § 524(g)(2)(B)(i)(II).

*See Congoleum*, 426 F.3d at 680.

63.     The Plan also fails to comply with 11 U.S.C. § 524(g)(2)(B)(i)(III).  The

Plan calls for two separate and distinct § 524(g) trusts – namely, the Asbestos PI Trust

and the Asbestos PD Trust.  (*See* Dkt. No. 20874, Exs. "2" and "3").  Each is to be

governed pursuant to a different trust agreement, and each trust will have its own trustees,

TAC, Futures Representative, and TDP (or its equivalent).  Each of these trusts must, of

course, comply with the funding requirements of § 524(g)(2)(B)(i)(III), but because there

are to be two separate and distinct trusts, neither can comply.  There can be, for example,

no "specified contingency" that would entitle each of the Asbestos PI Trust and the

Asbestos PD Trust to own a majority of voting shares of Grace because, for each to have

a majority, the total would have to exceed 100%.  In the event of a default under the

Asbestos PI Deferred Payment Agreement, it appears that – at best – the Asbestos PI

Trust and the Asbestos PD Trust might share ownership of a majority of the voting shares

of Grace.  (*See* Dkt. No. 20874, Ex. "26").  This funding scheme does not satisfy

§ 524(g)(2)(B)(i)(III).

64.     The Plan may also fail to satisfy § 524(g)(2)(B)(II)(I), (II), and (III), as there appears be to little or no evidence that the Debtors will face asbestos-related "future demands" involving property damage.  (*See* Dkt. No. 20872, § 7.7(j); Ex. "4" (Lockwood Rule 30(b)(6) Dep.) at 642-44).

65.     The Plan Proponents' failure to comply with the funding requirements, and other requirements, of § 524(g) impacts the fairness of the Plan, an issue on which the Debtor's insurers have standing.  *See In re Congoleum Corp.*, 426 F.3d 675, 685 (3d Cir. 2005) (debtor's insurers have standing to be heard on matters that "will affect the fairness of the entire bankruptcy proceeding").  In addition, GEICO and Republic – as targeted sources of funding to pay for Asbestos PI Claims submitted to the Trust and as parties subject to the Plan's channeling injunctions – have standing to object to the Plan's non-compliance with the statute.  *See Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158 (D.N.J. 2005); *see also, e.g., In re Berkshire Foods, Inc.*, 302 B.R. 587, 588-90 (Bankr. N.D. Ill. 2003); *Marcus Hook Dev. Park, Inc. v. Lampl, Sable & Makoroff*, 153 B.R. 693, 700 (Bankr. W.D. Pa. 1993); *In re Peter DelGrande Corp.*, 138 B.R. 458, 459 (Bankr. D.N.J. 1992).

**The Plan Has Impermissibly Overbroad Release and Exculpation Provisions.**

66.     The release and exculpation provisions set forth in the Plan are overly broad and illegal.  For example, the Plan's Exculpation provision provides broad immunity from liability to the "Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties," and various official committees and professionals, and to their respective "Representatives."

(*See* Dkt. No. 20872, § 11.9).  Meanwhile, the term "Representatives" is broadly defined

in the Plan to include, *inter alia*, past and present directors, officers, employees,

accountants, advisors, attorneys, consultants, or other agents of the various referenced

entities.  (*See* Dkt. No. 20872 at § 1.1(177)).  This exculpation provision is overly broad,

and there is no factual support to justify it.  *See Congoleum*, 362 B.R. at 190, 195-96; *In

re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001).

      67.    Indeed, the Exculpation provision goes even further, seeking to confer

immunity from liability not only for activities related to the prosecution of the bankruptcy

case and related proceedings, but also for activities related to "administration of this Plan

or the property to be distributed under this Plan," which includes the post-Effective Date

administration of the Asbestos PI Trust and Asbestos PD Trust.  This prospective

immunity from liability is plainly improper.

      68.    The Plan also provides for certain illegal non-debtor releases as well.  For

example, § 8.8.7 of the Plan provides that:

> In addition to the foregoing, each Holder of a Claim or Equity Interest
> who receives or retains any property under this Plan shall also be deemed
> to unconditionally release the Fresenius Indemnified Parties  . . . .

(*See* Dkt. No. 20872, § 8.8.7).

      69.    This release is illegal on its face.  In *Congoleum*, the bankruptcy court

held that "a consensual release cannot be based solely on a vote in favor of a plan.  For a

release to be consensual, the creditor must have 'unambiguously manifested assent to the

release of the nondebtor from liability on its debt."  *See Congoleum*, 362 B.R. at 194.

Mere inclusion of a statement in plan documents that voting to accept the plan constitutes

consent to a release is not sufficient.  *See id.*  This release is even further from being

consensual, because it is triggered by the Claim Holder's receipt of a distribution under the Plan, which may occur even over the Claim Holder's vote against the Plan.

70.    Moreover, this Court has held that releases of non-derivative third-party claims against a non-debtor generally "cannot be accomplished without the affirmative agreement of the creditor affected."  *See In re Zenith Elec. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999); *see also Genesis Health Ventures*, 266 B.R. at 607-608 (recognizing that only in "rare" and "exceptional circumstances may a non-consensual release be validated, and only provided that the release is necessary to the feasibility of the plan, and that the non-consenting creditors receive fair consideration in exchange for the release).  Here, there has been no showing that the § 8.8.7 release is necessary to the feasibility of the Plan.  And, for their part, GEICO and Republic definitively state that they have not, and do not, consent to the release of any claims they have, or may have, against the released parties, nor have they received any, let alone "fair," consideration in exchange for this, and other, non-consensual releases.

***********

Insurers hereby join in the final plan objections of other parties-in-interest, to the extent pertinent (although Insurers take no position here concerning the validity or amount of any claim that other parties may have asserted against the Debtors, or any question of insurance coverage relating to policies issued by other insurers).  In addition, pursuant to the Third Amended Case Management Order, Insurers will file a Trial Brief

in support of their Phase I objections on or before June 1, 2009 and a Trial Brief in

support of their Phase II objections on or before July 13, 2009.


Dated:  May 20, 2009                    Respectfully submitted,

                                        */s/ David P. Primack*
                                        _____
                                        Warren T. Pratt (4334)
                                        David P. Primack (4449)
                                        DRINKER BIDDLE & REATH LLP
                                        1100 N. Market Street, Suite 1000
                                        Wilmington, DE  19801-1254
                                        Telephone:  302-467-4200


                                        Michael F. Brown
                                        Jeffrey M. Boerger
                                        DRINKER BIDDLE & REATH LLP
                                        One Logan Square
                                        Philadelphia, PA  19103-6996
                                        Telephone:  215-988-2700

                                        Counsel for Parties-in Interest
                                        GEICO and Republic