# EXHIBIT 9

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                    ) Chapter 11
                          )
W. R. GRACE & CO.,        ) Case No. 01-01139 JKF
et al                     )
                          )
        Debtors           )


        Deposition of RICHARD CHARLES FINKE
taken pursuant to notice at the law offices of
Drinker, Biddle & Reath, LLP, 1100 North Market
Street, Suite 1000, Wilmington, Delaware,
beginning at 9:35 a.m., on Monday, March 30,
2009, before Allen S. Blank, Registered Merit
Reporter and Notary Public.


APPEARANCES:

        LISA G. ESAYIAN, ESQUIRE
        KIRKLAND & ELLIS, LLP
        200 East Randolph Drive
        Chicago, IL 60601

            For - Debtors

        DANIEL A. SPEIGHTS, ESQUIRE
        SPEIGHTS & RUNYAN
        200 Jackson Avenue, East
        Hampton, SC 29924

            For - Anderson Memorial Hospital

------------------------------------------
            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

W.R. Grace & Co., et al.

Page 2

1  APPEARANCES: CONTINUED
2     JOHN W. KOZYAK, ESQUIRE
       KOZYAK TROPIN THROCKMORTON
3     2525 Ponce de Leon, 9th Floor
       Miami, FL 33134
4
          For - Anderson Memorial Hospital
5
       MATTHEW I. KRAMER, ESQUIRE
6     BILZIN, SUMBERG, BAENA, PRICE
       & AXELROD, LLP
7     200 S. Biscayne Boulevard, Suite 2500
       Miami, FL 33131-5340
8
          For - PD Committee
9
       ARLENE G. KRIEGER, ESQUIRE
10    STROOCK & STROOCK & LAVAN, LLP
       180 Maiden Lane
11    New York, NY 10038-4982
12       For - Official Committee of
             Unsecured Creditors
13
       ALAN B. RICH, ESQUIRE
14    Elm Place
       1401 Elm Street, Suite 4620
15    Dallas, TX 75202
16       For - PD FCR
17    ELISA ALCABES, ESQUIRE
       SIMPSON, THACHER & BARTLETT, LLP
18    425 Lexington Avenue
       New York, NY 10017-3954
19
          For - Travelers Casualty & Surety
20        Company
21    KATHLEEN A. ORR, ESQUIRE
       ORRICK, HERRINGTON & SUTLIFFE, LLP
22    1152 15th Street, N.W.
       Washington, D.C. 20005
23
          For - David Austern, Asbestos PI
24

Page 3

1  APPEARANCES: CONTINUED
2     MICHAEL F. BROWN, ESQUIRE
       DRINKER, BIDDLE & REATH, LLP
3     One Logan Square
       18th and Cherry Streets
4     Philadelphia, PA 19103-6996
5       For - Government Employees Insurance
             Company, Columbia Insurance,
6             One Beacon America Insurance
             Company and Seaton Insurance
7             Company
8     SHANNON L. GRIFFIN, ESQUIRE
       O'MELVENY & MYERS, LLP
9     Times Square Tower
       7 Times Square
10    New York, NY 10036
11       For - Arrowood Indemnity Company,
             f/k/a Royal Indemnity Co.
12
       MARNIE E. SIMON, ESQUIRE
13    STEVENS & LEE
       1818 Market Street, 29th Floor
14    Philadelphia, PA 19103-1702
            - and -
15    JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
       STEVENS & LEE
16    1105 North Market Street, 7th Floor
       Wilmington, DE 19801
17
          For - Fireman's Fund Insurance
18        Company
19    SHAYNE W. SPENCER, ESQUIRE
       ELIZABETH DeCRISTOFARO, ESQUIRE (VIA
20    TELEPHONE)
       FORD, MARRIN, ESPOSITO, WITMEYER
21    & GLESER, LLP
       Wall Street Plaza
22    New York, NY 10005-1875
23       For - CNA Insurance Company
24

Page 4

1  APPEARANCES: CONTINUED
2     ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
       CUYLER BURK, LLP
3     Parsippany Corporate Center
       Four Century Drive
4     Parsippany, NJ 07054
5       For - Allstate Insurance Company
6     LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
       NEARHOOD LAW OFFICES
7     7537 E. McDonald Drive
       Scottsdale, AZ 85250
8          - and -
       GABRIELLA V. CELLAROSI, ESQUIRE
9     (VIA TELEPHONE)
       ECKERT SEAMANS
10    1747 Pennsylvania Avenue, N.W.
       Suite 200
11    Washington, D.C. 20006-4604
12       For - Maryland Casualty Insurance
             Company and Zurich
13           Insurance Company
14              * * * * * *
15        RICHARD CHARLES FINKE,
16    the deponent herein, having first been
17    duly sworn on oath, was examined and
18    testified as follows:
19              EXAMINATION
20  BY MR. SPEIGHTS:
21    Q.  Would you state your full name, please,
22  sir?
23    A.  Yes.  Richard Charles Finke, F-i-n-k-e.
24    Q.  Mr. Finke, who are you employed by?

Page 5

1    A.  W. R. Grace & Co.
2    Q.  How long have you been employed by Grace?
3    A.  Twenty years.
4    Q.  Can you tell me the approximate date you
5  started?
6    A.  No.  I can tell you the exact date I
7  started.  February 27, 1989.
8    Q.  Who do you presently report to?
9    A.  Mark Shelnitz, general counsel of W. R.
10  Grace.
11    Q.  How long have you reported to
12  Mr. Shelnitz?
13    A.  Since he became general counsel, which
14  was three or four years ago.  I forget how long.
15    Q.  Does April 2005 seem about right?
16    A.  It seems about right, yes.
17    Q.  Would you give me the positions you have
18  held at Grace and the approximate dates you held
19  each position?
20    A.  When I was hired, I held the position of
21  senior litigation counsel and I became assistant
22  general counsel for litigation in — it was
23  around March of 2006.
24    Q.  Is that your present position?

2  (Pages 2 to 5)

## Page 158

1  of Japanese and Australian building owners who
2  got fireproofing?
3      A. I am not aware of any.
4      Q. Does the bar date purport to bar those
5  claimants?
6      A. I don't think so.
7      Q. Did Grace sell any asbestos containing
8  materials of any kind outside of the United
9  States and Canada?
10     A. My understanding is we did sell them some
11  Japan and Australia.
12     Q. Are you back to fireproofing now or other
13  products as well?
14     A. My knowledge is limited to asbestos
15  containing fireproofing. We also did ship or
16  there were shipments of Libby Vermiculite to
17  Japan. Although we don't consider that asbestos
18  containing material as defined by U.S. regulatory
19  agencies. Some people might since presumably
20  such shipments contained some small amount of
21  amphibole asbestos.
22     Q. Is Zonolite attic insulation used in
23  facilities other than homes?
24     A. I'm sure it could have been. Offhand,

## Page 159

1  though, I don't recall an example of a building
2  other than a home in which we have found it.
3      Q. Does a bar date for ZAI, whatever
4  Canadian bar date there is, bar Japanese ZAI
5  claims?
6      A. I don't believe so.
7      Q. To your knowledge, has Grace had any
8  communication from the Japanese, the Japanese
9  government or homeowners, et cetera, concerning
10  its ZAI product?
11     A. To my knowledge, no, we have not.
12     Q. What is ZAI known as in Japan?
13     A. I don't even know if ZAI was sold in
14  Japan. There were shipments of Libby Vermiculite
15  sent to Japan. I did not know to what uses that
16  Vermiculite was put.
17     Q. Was the expanding plant in Japan?
18     A. I believe there was. But I don't know
19  that for certain.
20     Q. Do you know whether it still exists?
21     A. I don't.
22     Q. Where would you go to determine the
23  records that exist regarding the shipment of
24  Vermiculite to Japan?

## Page 160

1      A. We would look at our Vermiculite
2  documents.
3      Q. Were those produced to Messrs. Westbrook
4  and Scott during the litigation?
5      A. Yes.
6      Q. So that they would have the ability to
7  look up what shipments were made to Japan, what
8  Vermiculite shipments were made to Japan?
9      A. Assuming such records exist in those --
10  in that document set, yes.
11     Q. Well, do you believe there are records
12  that show shipments to Japan?
13     A. I have no way of knowing or I have no
14  basis to have an opinion one way or the other.
15     Q. Would you agree with me that the Anderson
16  class included residences?
17     A. I don't recall.
18     Q. Does Grace have copies of sales documents
19  showing where its texture products such as
20  Versakote were sold?
21     A. I believe there are some records such as
22  invoices that reflect sales of Versakote. And I
23  would assume that they would have, on the
24  invoice, the location where the Versakote was

## Page 161

1  shipped to.
2      Q. Would those be in the document
3  depository?
4      A. Yes.
5      Q. Other than what's in the documents
6  depository, is there some stash of sales
7  information about texture products? Mr. Egan
8  always said that wasn't under his umbrella.
9      A. There shouldn't be. All those documents
10  should be in Winthrop Square.
11     Q. Have you ever seen the so-called BOMA
12  list of BOMA members in the United States which
13  SBA used for mailouts?
14     A. No, I haven't seen that.
15     Q. Did you know about it?
16     A. I know of BOMA. I assume they have a
17  list of members. But I don't know what list
18  you're referring to specifically.
19     Q. If after the plan of confirmation is
20  confirmed, if that, indeed, happens, and somebody
21  sues a building owner for asbestos disease caused
22  by exposure to ZAI in a home, can the homeowner
23  look to reorganize Grace or the PI trust or
24  somebody, someone else to indemnify it?

41 (Pages 158 to 161)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 162

1    A. My understanding is that the homeowner
2    would have a claim against the personal injury
3    trust.
4    Q. Where is that set forth?
5    A. I believe that's in the plan under the
6    definition of indirect PI trust claim. I may not
7    have the exact terminology there.
8    Q. Does the indemnification cover defense as
9    well as payment of the claim?
10   A. That would be set forth in the PI TDP.
11   And I would refer to that document before trying
12   to answer your question. Because I'm not sure of
13   the answer.
14   Q. If somebody had sued Grace in 1979 for
15   exposure to Monokote in the Jordan Hospital in
16   Plymouth, Massachusetts, would someone at Grace
17   have gone to see whether it had any records of
18   Monokote being in the Jordan Hospital?
19   A. This is a hypothetical lawsuit before
20   1979?
21   Q. No. In 1999. I said before the
22   bankruptcy. I meant to say that. I may have
23   misspoken.
24   A. Maybe I misheard it. Okay. I'm sorry.

Page 163

1    Q. 1999. Somebody serves a complaint
2    alleging mesothelioma exposure in the Jordan
3    Hospital in Plymouth, Mass, would the Grace
4    person handling the PI claims check to see if
5    there were any records showing Monokote had been
6    installed in the Jordan Hospital?
7    A. I don't know.
8    Q. Who would be the best person to ask that
9    question to?
10   A. Jay Hughes.
11   Q. Is Mr. Hughes in Columbia or Boca?
12   A. He is based in Cambridge, Massachusetts.
13   MR. SPEIGHTS: That's all I have at
14   this time, Mr. Finke. I reserve my position to
15   be able to pursue those questions which counsel
16   has instructed you not to answer and other
17   questions that flow from that, if I am permitted
18   to proceed along those lines.
19   Would somebody who wants to question
20   the witness like to have this chair or can we do
21   it from wherever you are?
22   MR. BROWN: Does anyone else on the
23   PD side have any questions?
24   Okay. Why don't we take a five

Page 164

1    minute break.
2    (The deposition was recessed from
3    3:46 p.m. to 3:53 p.m.)
4    EXAMINATION
5    BY MR. BROWN:
6    Q. Mr. Finke, my name is Michael Brown and I
7    represent the cast of foreign insurance companies
8    that I identified earlier.
9    I want to go back and fill in some of
10   the blanks in terms of your employment history
11   with Grace. And I want to start by asking the
12   role that you had pre-petition and then go to
13   post-petition.
14   As I understand it, you were senior
15   litigation counsel at the time the petition was
16   filed?
17   A. Yes.
18   Q. And prior to that, your primary
19   responsibility was with PD claims, is that
20   correct?
21   A. Yes.
22   Q. And I think you identified some minimal
23   involvement on the PI side?
24   A. Right. Very sporadic.

Page 165

1    Q. And that was primarily when there was a
2    PD expert, as I understood it, that may have some
3    application to PI claims?
4    A. More or less, yes. Or was involved in
5    some way in a property -- I'm sorry, personal
6    injury case, which might have ramifications for
7    property damage litigation.
8    Q. Okay. And then other than what you
9    described earlier, you had no involvement on the
10   PI side?
11   A. That's right.
12   Q. Okay. Who did have the involvement on
13   the PI side?
14   A. Jay Hughes.
15   Q. And what was Mr. Hughes' title
16   pre-petition?
17   A. I believe it was also senior litigation
18   counsel.
19   Q. Okay. So you were senior litigation
20   counsel on PD, he was senior litigation counsel
21   on PI?
22   A. Correct.
23   Q. And who did you report to at that time?
24   A. When I first started, it was in 1989, it

42 (Pages 162 to 165)

Page 166

1   was Robert Beber.
2       Q. How do you say that?
3       A. Beber. B-e-b-e-r.
4       Q. Okay. Beber?
5       A. Right.
6           I don't recall his title at the time.
7   He was not general counsel. He became general
8   counsel a year to two after that.
9       Q. Okay. And at the time of the petition,
10  that's who you were reporting to?
11      A. At the time of the Chapter 11 petition, I
12  was reporting to David Siegel, general counsel.
13      Q. Okay. Mr. Siegel had replaced Mr. Beber
14  by that point?
15      A. Yes.
16      Q. Okay. And how about Mr. Hughes at the
17  time of the petition? Who did he report to
18  directly?
19      A. Also to Mr. Siegel.
20      Q. And Mr. Siegel was the GC at that time?
21      A. Yes.
22      Q. Did Grace have national coordinating
23  counsel for PI claims pre-petition?
24      A. I don't know if they were actually deemed

Page 167

1   or considered national coordinating counsel. But
2   the Casner & Edwards law firm in Boston --
3       Q. I'm sorry. What was the name of that?
4       A. Casner & Edwards, C-a-s-n-e-r, & Edwards
5   law firm in Boston performed some of the
6   functions of national coordinating counsel.
7       Q. Okay. Were they also local counsel for
8   the Boston area?
9       A. I believe they were, yes. Yes, in fact,
10  I think they were.
11      Q. Okay. And what were the national
12  coordinating counsel functions that they
13  undertook?
14      A. Supported local counsel throughout the
15  country in terms of providing documents and
16  transcripts, coordinating the use of experts. I
17  think they were also involved in responding to
18  standard discovery requests.
19      Q. And how many sets of counsel around the
20  country did Grace have with respect to the
21  defense of PI claims?
22      A. Probably -- I'm going to say 25. That's
23  just a little bit more than a guess. As I said,
24  I wasn't involved with the litigation of the

Page 168

1   personal injury cases.
2       Q. Okay. Mr. Hughes was the individual who
3   dealt primarily with the outside counsel handling
4   PI claims?
5       A. Yes.
6       Q. Who else at Grace was involved in the
7   handling of PI claims?
8       A. Really, no one else. He had a staff of
9   legal assistants that helped to maintain the
10  files. But Jay was really the only in-house
11  attorney involved with the personal injury cases.
12      Q. What about Mr. Beber?
13      A. He would have been involved as well to
14  the extent of being Jay's superior.
15      Q. And then Mr. Siegel after Mr. Beber?
16      A. After Mr. Beber, right.
17      Q. All right. You I believe testified
18  earlier this morning that you became assistant GC
19  for litigation in March of 2006, is that correct?
20      A. I think so.
21      Q. Was that a new position?
22      A. Yes.
23      Q. Okay. And if I understood your testimony
24  earlier today, that from that point forward,

Page 169

1   Mr. Hughes reported to you rather than reporting
2   to the general counsel?
3       A. Yes.
4       Q. Okay. So from March of 2006 on, is it
5   fair to say you have played some role on the PI
6   side?
7       A. Yes. But I would describe it still as a
8   minor role.
9       Q. Can you describe for me what the role has
10  been?
11      A. More coordination with the other parts of
12  our reorganization effort to make sure that
13  others working on the reorganization such as
14  finance, such as those who prepare our SEC
15  disclosure documents, were kept informed of
16  developments, facts, relating to the personal
17  injury claims in the Chapter 11.
18      Q. I think you used the term you were
19  coordinating the parts. Can you tell me what you
20  mean by the parts?
21      A. Well, yes. When I -- part of the role of
22  assistant general counsel in the Chapter 11 was
23  to coordinate and oversee all of the individuals
24  involved, both at Grace as well as outside

43 (Pages 166 to 169)

W. R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 170

1  counsel as well as certain outside consultants.
2  And in coordinating meetings, making sure
3  essential documents were distributed
4  appropriately. And reporting to management on
5  any developments in the Chapter 11, any issues or
6  problems that were arising or had arisen. All of
7  this was in support of the general counsel who
8  also denoted our chief restructuring officer and
9  had ultimate responsibility for and continues to
10  have ultimate responsibility for the
11  reorganization effort.
12     Q. Okay. When did Mr. Shelnitz become the
13  GC?
14     A. I think it was in the spring of 2005.
15     Q. Okay. And did I hear you right, that he
16  is also the chief restructuring officer?
17     A. Yes.
18     Q. And he is also the secretary of the
19  corporation?
20     A. I believe. Well, I know he was. I think
21  he still is.
22     Q. Does he have any other titles?
23     A. No, I don't think so.
24     Q. So is it fair to say that you and

Page 171

1  Mr. Shelnitz were the point people at Grace for
2  the restructuring effort?
3     A. Yes.
4     Q. Was he primarily responsible for it and
5  you secondarily responsible?
6     A. Yes.
7     Q. And it was in that capacity that you had
8  involvement on the PI side after you became the
9  assistant GC for litigation?
10     A. Yes.
11     Q. Okay. And can you describe for me
12  precisely what role you played on the PI side?
13     A. Essentially, it was participating in
14  numerous conference calls and meetings to stay
15  abreast of issues and problems relating to the
16  personal injury claims and any potential
17  resolution of them and coordinating with outside
18  counsel, make sure that they had what they needed
19  in the way of either information or documents or
20  guidance, to obtain that information, documents
21  or guidance, which, quite frankly, often involved
22  having Jay Hughes either research anything that
23  he didn't know off the top of his head and
24  provide it to whoever needed it since Jay is the

Page 172

1  I wouldn't say sole source but he is certainly by
2  far the principal source of information relating
3  to not only the personal injury claims
4  litigation, but the settlements that were worked
5  out pre-petition of those claims, dealings with
6  and relationships with outside counsel, both our
7  own as well as plaintiff's counsel. Reviewing
8  any documents, whether they are, you know,
9  pleadings or otherwise. Really relating to most
10  of the issues and proceedings in the
11  reorganization but particularly those relating to
12  asbestos claims, which would include personal
13  injury claims.
14     Q. You mentioned dealing with your own
15  counsel and also dealing with plaintiff's
16  counsel. Which plaintiff's attorneys did you
17  deal with?
18     A. I did not deal with personal injury
19  plaintiffs. Jay had, over the years of managing
20  the outside, managing the personal injury
21  litigation, and he worked on most, if not all, of
22  the settlements that were negotiated with the
23  plaintiff's counsel.
24     Q. You're talking pre-petition now?

Page 173

1     A. Pre-petition, yes.
2     Q. What about post-petition?
3     A. Jay was certainly part of the group that
4  negotiated the resolution of personal injury
5  claims that is embodied in the plan. But that
6  group included others as well.
7     Q. Others within Grace?
8     A. Others within Grace as well as, of
9  course, outside counsel. And I was not directly
10  involved in those discussions or negotiations.
11     Q. With whom did Mr. Hughes negotiate?
12  Which individuals are you talking about?
13     A. The representatives of the personal
14  injury claimant's committee.
15     Q. Do you know the actual names of the
16  attorneys?
17     A. I can make some assumptions. I can't be
18  a hundred percent sure that they are correct.
19  Elihu Inselbuch, Peter Lockwood, Roger Frankel,
20  Rick Wiram and — I feel like I'm leaving some
21  out. But those are the names that come to mind.
22     Q. Did he have any dealings with the
23  individuals that have been designated to be the
24  TAC members?

Page 174

1    A. Pre-petition or post-petition?
2    Q. Post-petition we are talking about. As
3  you were describing his role in the negotiations.
4    A. I don't know.
5    Q. And was your role in dealing with PI
6  issues and the resolution of PI issues indirect
7  in the sense that Mr. Hughes reported to you or
8  did you have any direct involvement?
9    A. It was really indirect.
10   Q. And besides Mr. Hughes, who else was
11 involved in that effort on the Grace side?
12   A. Mark Shelnitz, the general counsel.
13 Robert Tarola.
14   Q. I'm sorry?
15   A. Robert Tarola, T-a-r-o-l-a, the former
16 CFO. The CEO, Fred Festa, had some involvement.
17 And outside counsel, David Bernick. And I
18 believe -- I don't know if Ted Freedman was
19 involved with the negotiations or came in after a
20 deal had been reached.
21   Q. Other than the individuals you have just
22 run through on the Grace side, was there anyone
23 else that you can recall that was on the Grace
24 negotiating team for the resolution of the PI

Page 175

1  claims?
2    A. Pam Zilly was involved in some of the
3  discussions as well. She is with Blackstone.
4  She is our financial advisor.
5    Q. What was her role?
6    A. Beyond being financial adviser, I don't
7  know. I wasn't directly involved.
8    Q. What was Mr. Festa's role?
9    A. I think primarily to ensure that the
10 other parties understood that the Grace
11 representatives they spoke with the full
12 authority of the company, but, again, I was not
13 present at the meetings and discussions that he
14 attended with the personal injury
15 representatives.
16   Q. Were you at any of the meetings with the
17 personal injury representatives?
18   A. No.
19   Q. I gather Mr. Hughes was?
20   A. I believe he was, yes.
21   Q. And Mr. Shelnitz?
22   A. Yes.
23   Q. Okay. I want to shift gears for a second
24 and turn to insurance. And, again, looking at

Page 176

1  the issue pre-petition. Have you had any role or
2  did you have any role in connection with Grace's
3  liability insurance program before the petition
4  date?
5    A. No.
6    Q. Who was responsible for this at Grace?
7    A. Bob Beber handled it from the litigation
8  standpoint. And Jeff Posner was in charge of our
9  risk management function, including insurance.
10   Q. When did Mr. Posner leave Grace?
11   A. I honestly don't know. I don't recall.
12   Q. Was it after the petition date?
13   A. I believe it was before.
14   Q. And his title immediately before he left
15 was risk manager?
16   A. I don't know.
17   Q. But that's the function that he had, was
18 risk manager for Grace?
19   A. Yes.
20   Q. Post-petition, have you had any role in
21 connection with Grace's liability insurance
22 program?
23   A. A limited one. Limited to the extent of
24 motions that have been made or objections

Page 177

1  asserted by insurance. To the extent an issue is
2  being litigated, I have been involved in
3  reviewing motion papers and related documents,
4  participating in conference calls on strategy.
5    Q. For dealing with the insurance?
6    A. For dealing with the insurance. Some of
7  the insurance issues. Certainly not all of them.
8    Q. Can you tell me which issues you're
9  talking about?
10   A. Issues related to the claims by Keneb
11 pipeline that they believe they are entitled to
12 insurance coverage. In connection with
13 remediation costs or potential responsibility for
14 remediation costs in connection with the Otis
15 pipeline.
16      There were a few others. I'm just
17 drawing a blank right now.
18   Q. Have you had any role in the Scotts
19 adversary proceeding?
20   A. Yes. Thank you. Yes, I have reviewed
21 the papers, not that there have been much --
22 there has been much recently. But I did review
23 the adversary proceeding papers when Scotts first
24 commenced its adversary proceeding. And, again,

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

---

Page 178

1   participated in conference calls relating to
2   their claim that they are entitled to coverage.
3       Q. And with whom were these conference calls
4   that you participated?
5       A. Outside counsel from Kirkland & Ellis.
6   And Mr. Posner is often on those calls. I think
7   that's -- and it's usually the same group.
8       Q. Did you play any role in the manner in
9   which insurance is handled under the plan?
10      A. No.
11      Q. Who did?
12      A. Other than Kirkland & Ellis, I don't know
13  who else was involved.
14      Q. Other than what you have just described,
15  have you had any role in the manner in which
16  insurance, unsettled insurance, is handled under
17  the plan?
18      A. No.
19      Q. How about any role in connection with the
20  manner in which settled insurance is handled
21  under the plan?
22      A. No.
23      Q. Did anyone replace Mr. Posner as the risk
24  manager?

---

Page 179

1       A. No. He basically still serves the same
2   function but as an outside consultant.
3       Q. Okay. Thank you.
4           (Finke Deposition Exhibit No. 12
5   was marked for identification.)
6   BY MR. BROWN:
7       Q. Mr. Finke, you have what's been marked
8   Exhibit 12. If you would take a few moments to
9   look at it. My first question is going to be
10  whether you have ever seen it before?
11      A. Yes, I have seen it before.
12      Q. Can you identify it for me?
13      A. It's Form 8K that Grace filed with the
14  SEC announcing its agreement in principle with
15  the personal injury committee and others to
16  resolve present and future asbestos related PI
17  claims.
18      Q. When did you first see it?
19      A. I believe it was shortly after it was
20  filed. A day or two after it was filed.
21      Q. Had you seen drafts of it before it was
22  filed?
23      A. I don't believe I did. But I -- I cannot
24  be a hundred percent sure I didn't see a draft.

---

Page 180

1   But I don't think that I did.
2       Q. Do you know, if it wasn't you, do you
3   know who was involved at Grace in the preparation
4   of this document?
5           And just for clarification, it's an
6   8-K. It has attachments to it. You probably
7   noted.
8       A. Right.
9       Q. One is a pre release and the other is a
10  terms sheet. So we can probably take -- why
11  don't we take them one by one.
12      A. Typically, the 8-K's are prepared by an
13  in-house attorney, Michael Conron, who obtains
14  input and facts from persons who are involved
15  firsthand with the events being reported. In
16  this case, I believe he would have obtained the
17  details from Mark Shelnitz since Mr. Shelnitz was
18  personally involved in the negotiations.
19      Q. Did he receive any information from you?
20      A. No.
21      Q. Okay. How about the press release that's
22  attached to it? There is a couple of names at
23  the top from media relations and investor
24  relations. But do you know who prepared the

---

Page 181

1   press release?
2       A. Where are you at? I'm not finding it.
3       Q. I think it's probably page five it starts
4   at.
5       A. Okay. Okay. There we go. William
6   Corcoran is -- I forget if he is executive
7   vice-president or senior vice-president. And he
8   is in charge of media relations, among other
9   things. Typically, Mr. Corcoran prepares press
10  releases. In the same manner as I described, I
11  described Mr. Conron preparing 8-K's. He would
12  have obtained the information from whoever was
13  personally involved.
14      Q. And would that have been Mr. Shelnitz or
15  someone else?
16      A. I'm pretty confident it would have been
17  Mr. Shelnitz.
18      Q. But it was not you?
19      A. Correct.
20      Q. Let's go to the terms sheet, which
21  appears to begin on page eight.
22      A. Um-hmm.
23      Q. Had you seen this terms sheet prior to
24  the filing of the 8-K?

---

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Page 182

1    A. I believe I did.
2    Q. When?
3    A. I think I saw it in a prior draft.
4    Within a few days of the final, the final
5    version.
6    Q. Were you involved in preparing any of the
7    drafts?
8    A. No, I was not.
9    Q. Do you know who was?
10   A. No, I don't. I believe Mr. Shelnitz was
11   involved along with outside counsel.
12   Q. How about Mr. Hughes?
13   A. I don't know.
14   Q. Do you know who was involved for the
15   other constituencies that are a party to the
16   terms sheet?
17   A. No, I do not.
18   Q. In the first line of the text, it says,
19   this term sheet sets forth certain of the
20   principal terms and conditions.
21        Are there other principal terms and
22   conditions that are not reflected or were not
23   reflected in the terms sheet?
24   A. I don't know. I wasn't involved in the

Page 183

1    discussions. I don't know if there were other
2    principal terms and conditions that have been
3    agreed upon at that time and not included.
4    Q. Were any of Grace's insurers involved in
5    the discussions that led up to the execution of
6    the terms sheet?
7    A. Not to my knowledge. But, again, I
8    wasn't personally involved in the discussions.
9    Q. Do you know whether Grace's insurers were
10   purposely left out of any discussions leading up
11   to the terms sheet?
12   A. Not that I know of.
13   Q. Who would be the individual at Grace, to
14   your knowledge, that would know the answer to
15   those questions?
16   A. Mr. Shelnitz.
17   Q. If you look on the first page down at
18   I.A.1.b, titled, Insurance?
19   A. Yes.
20   Q. There is a reference there to the
21   assignment of insurance policies and all
22   insurance proceeds. Do you see that?
23   A. Yes.
24   Q. Did Grace, to your knowledge, seek the

Page 184

1    consent of any of its insurers prior to agreeing
2    to that term with the other constituencies to the
3    terms sheet?
4    A. I don't know.
5    Q. Who would know?
6    A. Mr. Shelnitz.
7    Q. If you turn to the next page on page nine
8    under v. I want to direct your attention to the
9    second paragraph that begins with the word,
10   provided.
11   A. Okay.
12   Q. Do you understand what's being referred
13   to in that section?
14   A. No, I'm not sure what's being referred
15   by the foregoing.
16        (Finke Deposition Exhibit Nos. 13 and
17   14 were marked for identification.)
18   BY MR. BROWN:
19   Q. Mr. Finke, you have two documents that
20   have been marked Exhibit 13 and one is Exhibit 14
21   in front of you. Can you just identify them both
22   for me?
23   A. Exhibit 13 is debtor's preliminary list
24   of witnesses that they intend to call during the

Page 185

1    confirmation hearing and is dated March 13, 2009.
2        Exhibit 14 is the second amended case
3    management order related to the first amended
4    joint plan of reorganization and was ordered on
5    January 29, 2009.
6    Q. Would I be correct if I said that you
7    have seen both of these documents before?
8    A. Yes, you would.
9    Q. If you look at the witness list, you'll
10   note that your name appears first?
11   A. Yes.
12   Q. As someone who, at least on a preliminary
13   basis, is going to testify in Phases I and II of
14   the confirmation hearing?
15   A. Um-hmm.
16   Q. About company information.
17        What is the company information that
18   you possess relevant to plan confirmation?
19        MS. ESAYIAN: Objection to the form
20   of the question. You can answer, if you can.
21        THE WITNESS: I was asked by outside
22   counsel to be available to testify at one or both
23   of the confirmation hearings to the extent they
24   needed someone to present their basic company

47 (Pages 182 to 185)

W. R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 186

1  information, such as anything from the nature of
2  our businesses to number of employees and more
3  specifically with respect to our asbestos
4  litigation and claims, both historical, meaning
5  pre-petition litigation history relating to
6  asbestos claims, as well as the asbestos related
7  claims filed in the Chapter 11.
8        The only thing I wanted to add was,
9  in a subsequent discussion, it was decided that
10 Jay Hughes would most likely handle any issues
11 relating or testimony relating to personal
12 injury -- asbestos personal injury claims and
13 issues.
14 BY MR. BROWN:
15       Q. That was going to be my question. You
16 used the generic term asbestos litigation. Did
17 you mean PD asbestos litigation?
18       A. Well, initially the discussion was
19 generic. But, as I say, subsequently it was
20 narrowed to property damage and attic insulation
21 within my purview.
22       Q. To your knowledge, you're not going to be
23 proffering any testimony on PI issues?
24       A. That is my understanding, yes.

Page 187

1        Q. Would your answer be the same with
2  respect to insurance related issues?
3        A. Yes.
4        Q. How about with the manner in which
5  indirect asbestos PI trust claims are handled
6  under the plan?
7        A. I would expect that Jay Hughes would
8  handle that.
9        Q. Okay. If you can look at what's been
10 marked as Exhibit 14, the second amended case
11 management order. I want to direct your
12 attention specifically to paragraph two.
13       The second sentence in paragraph two
14 talks about the first phase of the confirmation
15 hearing. Do you see that?
16       A. Yes.
17       Q. And there are three Romanettes in that
18 sentence.
19       Do I understand you correctly that
20 you are not, to your knowledge, being proffered
21 to offer any testimony relevant to i or ii?
22       A. That's correct.
23       Q. And if you go to the next sentence, which
24 talks about the topics to be addressed in the

Page 188

1  second phase of the confirmation hearing, are
2  you, to your knowledge, being proffered to offer
3  any testimony with respect to i or iii?
4        A. I think that's unknown at this point.
5        Q. Is that true for both i and iii?
6        A. Yes.
7        Q. Okay. I want to go back to the
8  preliminary witness list. And I think most of
9  these individuals on here we have already
10 identified in terms of what their acknowledge is.
11 Pam Zilly, she is with the Blackstone Group, she
12 is the financial person?
13       A. Correct.
14       Q. I believe you said Denise Martin is a PD
15 expert?
16       A. Yes, she is an expert. She'll offer
17 expert testimony concerning the likelihood that
18 future property damage and ZAI claims will be
19 brought.
20       Q. Okay. I believe I heard earlier the name
21 Hudson LaForce. Who is that?
22       A. He is our current chief financial
23 officer.
24       Q. And Derrick Tay?

Page 189

1        A. He is a Canadian restructuring attorney
2  who represents Grace in Canada concerning the
3  Canadian ZAI claimants.
4        Q. And Mr. Dunbar, he is an outside
5  modelling consultant?
6        A. Yes, I believe that's right.
7        Q. Mr. Hughes we have talked about.
8        What about all the doctors?
9        A. Can you be more specific what you're
10 asking?
11       Q. What's the area? Have each of the other
12 witnesses listed here starting with I guess
13 Dr. Florence, are they all experts?
14       A. Other than Jay Hughes, yes.
15       Q. And they have all submitted reports at
16 this point?
17       A. I presume so.
18       (Finke Deposition Exhibit No. 15 was
19 marked for identification.)
20 BY MR. BROWN:
21       Q. All right. Mr. Finke, you have before
22 you a document marked Exhibit 15. The first
23 question is, can you identify it?
24       A. Exhibit 15 is debtors' response to

48  (Pages 186 to 189)

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

1-13953                          65-0773649
(Commission File Number)        (IRS Employer Identification No.)
7500 Grace Drive                                           21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

(410) 531-4000



(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---------------------------------------------------------------------------

W. R. GRACE & CO.

FORM 8-K

CURRENT REPORT


Item 7.01.                    Regulation FD Disclosure.


On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.   Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.   The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.


The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.


Item 9.01.                    Financial Statements and Exhibits.


(d)  Exhibits


99.1                          Press Release


99.2                          Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008


2

-------------------------------------------------------------------------------

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008



3
--------------------------------------------------------------------------------

Exhibit 99.1

Grace News #2919

Media Relations:              Investor Relations:
William Corcoran              Bridget Sarikas
T +1 410.531.4203             T +1 410.531.4194
Ewilliam.corcoran@grace.com   Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

- Cash in the amount of $250 million;

- Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

- Rights to proceeds under Grace's asbestos-related insurance
coverage;

- The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court. The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1
--------------------------------------------------------------------------------

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*     *     *     *     *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries. For more information, visit Grace's web site at www.grace.com.

\*   \*   \*   \*   \*

This announcement contains forward-looking statements, that is, information related to future, not past, events.  Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions.  For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.  Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect.  Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance.  Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

### 

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

Exhibit 99.2


W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)


TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS



This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.


I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence. On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.              Cash Payment: $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.              Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

----------------------------------------------------------------------------

ii.              Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

ii.              Any proceeds of all settlements with all insurance companies

8

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.             Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.              The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.              Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.              Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.              Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.              Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace.  Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

--------------------------------------------------------------------------------
added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.              Other Classes

1.              Administrative Claims: 100% of allowed amount in cash.

2.              Priority Tax Claims: 100% of allowed amount in cash.

3.              Priority Non-Tax Claims: 100% of allowed amount in cash.

4.              Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.              Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.              Workers Compensation Claims: 100% by reinstatement.

7.              Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.         ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                          Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

--------------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law.  The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.              Confidentiality.

The parties shall treat all negotiations regarding this Term Sheet as confidential.  Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein.  Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants.  Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

-----------------------------------------------------------------------

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                               /s/ Fred Festa
Name:                             Fred Festa
Title:                            Chairman, President and Chief Executive
                                  Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                               /s/ R. Ted Weschler
Name:                             R. Ted Weschler
Title:                            Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                               /s/ Elihu Inselbuch
Name:                                                    Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                               /s/ Roger Frankel
Name:                                                    Roger Frankel

5

-----------------------------------------------------------------------