IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W.R. GRACE & CO., *et al.*, | : | Case No. 01-1139 (JKF) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re: D.I. No. 20872** |
| | : | |
| | : | |

**OBJECTION OF LONGACRE MASTER FUND, LTD. AND LONGACRE CAPITAL
PARTNERS (QP), L.P., TO CONFIRMATION OF THE FIRST AMENDED JOINT
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
OF W.R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS'
REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS DATED FEBRUARY 27, 2009**

        Longacre Master Fund, Ltd. and Longacre Capital Partners (QP), L.P. (together,
"Longacre"), by and through its undersigned counsel, hereby objects (the "Objection") to
confirmation of the First Amended Joint Plan Of Reorganization Under Chapter 11 Of The
Bankruptcy Code Of W.R. Grace & Co., Et. Al., The Official Committee Of Asbestos Personal
Injury Claimants, The Asbestos PI Future Claimants' Representative, And The Official
Committee Of Equity Security Holders Dated February 27, 2009 (D.I. 20872) (the "Plan"), and
in support hereof, Longacre respectfully states as follows:

### Background

        1.    On April 2, 2001 (the "Petition Date") the above-captioned debtors and
debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under Chapter 11
of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors are
presently operating their businesses and managing their properties as debtors-in-possession
pursuant to sections 1107 and 1108 of the Bankruptcy Code.

        2.    Throughout these cases, Longacre acquired the claims of several
unsecured creditors, currently totaling in excess of $16.6 million in the aggregate, plus additional

interest, fees and charges (collectively, the "Longacre Claims").[1]  Longacre owns the Longacre

Claims and is entitled to enforce all rights and benefits under such Claims, as the successor-in-

interest to the respective entities that assigned the claims to Longacre.

      3.     Included among the Longacre Claims is the allowed, liquidated claim of

National Union Fire Insurance Company of Pittsburg, PA ("National Union"), which Claim was

assigned claim number 9553 (the "NU Claim") by the Debtors' claims agent in these

proceedings.  National Union originally filed the NU Claim in the amount of $46,971,764.00.

However, the parties entered into that certain Settlement Agreement And Mutual Release (the

"Settlement Agreement"), dated November 13, 2007.[2]  Pursuant to the Settlement Agreement,

the NU Claim was reduced and " . . . allowed in the total amount of $9,806,018, *as an*

*unsecured, pre-petition, non-priority claim.*" (*Settlement Agreement*, ¶ 5) (emphasis added).

The Court entered an Order approving the Settlement Agreement on December 4, 2007.

      4.     The Settlement Agreement specifies that the allowed amount of the NU

claim is based on three components:  (i) first, National Union had issued two surety bonds to

guarantee the Debtors' payment obligations under settlements with certain asbestos personal

injury claimants, and $8,639,890 of the NU Claim represents the amounts National Union was

required to pay (and which Debtors were required to reimburse) under such surety bonds after

drawing down a letter of credit; (ii) second, $432,193 in premium payments that Debtors failed

to pay to National Union; and (iii) third, $733,935 in litigation expenses.  *Id.*  The Settlement

Agreement also provided that:

        "[i]n the event that any plan or plans of reorganization that the

---

[1]    Certain of the Longacre Claims include claims for interest, fees and/or other charges.  Longacre reserves all rights in connection with the Longacre Claims, including without limitation payment in full in accordance with the Bankruptcy Code and applicable law.  Nonetheless, nothing herein is intended to be a Post-Petition Interest Determination Notice, as that term is used in the Plan.

[2]    A copy of the Settlement Agreement is appended hereto as Exhibit "A".

> Debtors, or any of them, may confirm in the bankruptcy cases provides for payment of interest on unsecured, pre-petition, non-priority claims, the National Union Claim in the amount allowed herein, shall bear interest at the rate provided in such plan or plans from and after the Closing Date without regard to the date from which interest accrues under the terms of such plan or plans of reorganization with respect to any other creditor."

*Id.*

5.     On February 27, 2009, the Debtors filed the Plan.  The Plan classifies stakes in the Debtors into eleven classes:  nine classes of creditors and two classes of equity interest holders.  Class 6 includes asbestos personal injury claims, labeled "Asbestos PI Claims" by the Plan.  (Plan, p. 44).  Class 9 includes the claims of general, unsecured creditors.  *Id.* at p. 45.  According to the Plan, the only creditors whose claims are impaired are Class 6 creditors and Class 7B claimants, who hold "US ZAI PD Claims."  *Id.* at p. 44.

6.     The Plan's definition of 'Asbestos PI Claims,' however, goes far beyond individuals who claim personal injury as a result of asbestos exposure causally related to Debtors' operations.  Rather, the Plan includes within such definition (thereby classifying entities falling within such definition as Class 6 claimants) "a Claim . . . or any present or future, debt, liability, or obligation . . . against . . . any of the Debtors or Asbestos Protected Parties, including . . . (y) all cross-claims, contribution claims, subrogation claims, reimbursement claims, and indemnity claims . . . whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), in each case for, based on, or arising out of, resulting from, or attributable to, directly or indirectly . . . [injury resulting from asbestos exposure] . . .".  *Id.* at 12.  As such, under the Plan, it appears that Class 6 includes not only personal injury tort claims, but also any claim of any entity whose claim has any connection whatsoever with an asbestos-related injury, no matter how tangentially and no matter if the claim has nothing to do with the injury itself, but rather is a contract-based claim of an insurer that

-3-

provided liability protection to Debtors.  Upon information and belief, Debtors intend to classify the NU Claim as a Class 6 claim.

7.     Under the Plan, Class 6 Claims can only recover as against assets funded into the Asbestos PI Trust, pursuant to a channeling injunction, and can obtain no further recovery from the Debtors. *Id.* at p. 47.  That is, the Plan provides that "[t]he sole recourse of the Holder of an Asbestos PI Claim on account of such Asbestos PI Claim . . . shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction, the Asbestos IP Trust Agreement, and the Asbestos IP TDP." *Id.*  Upon information and belief, Class 6 Claimants can only expect an approximate 25% - 35% recovery on account of their claims, while general unsecured creditors classified into Class 9 under the Plan will be paid in full, plus some measure of post-petition interest.

### Objection

8.     The Plan cannot be confirmed in its present form to the extent that it classifies the NU Claim, which is an allowed, liquidated contract claim in a fixed amount (and as to which the Debtors have stipulated to allowance of post-petition interest at the same rate as that afforded other holders of allowed unsecured claims), as a Class 6 claim, which class is designed to channel unresolved asbestos personal injury claims into a trust with limited assets.  This classification is improper both pursuant to section 1122(a) of the Bankruptcy Code (because other claims that are substantially similar to the NU Claim are being placed in Class 9 and are being paid in full) and pursuant to the parties' stipulation allowing the NU Claim.  The Plan is also non-confirmable because the procedure pursuant to which post-petition interest will be determined and paid to various Class 9 claimants violates section 1123(a)(4) of the Bankruptcy Code by giving creditors in the same class different treatment.

9.     Section 1122(a) provides, with certain exceptions not applicable here, ". . . a plan may place a claim or an interest in a particular class only if such claim or interest is

#10980224 v4

substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) requires that claims to be classified together in a plan be 'substantially similar.' *In re 222 Liberty Associates*, 108 B.R. 971 (Bankr. E.D. Pa. 1990); *In re White Horse Grain Co.*, 60 B.R. 16 (Bankr. E.D. Pa. 1986); *In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir. 1992). This is among the most fundamental principles of claims classification in a plan. *In re Gibbs*, 230 B.R. 471 (Bankr. D. Conn. 1999).

10.     A proper determination of whether claims are substantially similar or dissimilar focuses on the nature of the claims. *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (*citing In re FF Holdings Corp. & Farm Fresh, Inc.*, 1998 U.S. Dist. LEXIS 10741 *13 (D. Del. Feb. 17, 1998)). "The 'primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is upon that which is held.'" *Coram*, 315 B.R. at 349 (*quoting In re Northeast Dairy Coop. Fed'n. Inc.*, 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987)); *see also In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) (holding that 'substantially similar' means similar in legal nature, character or effect).

11.     It is clear that the NU Claim is substantially similar to Class 9 Claims and is completely dissimilar to the tort claims of individuals who have sustained personal injuries as a result of asbestos exposure. The NU Claim is strictly a contract claim. It is based upon the Debtors' obligations under surety bonds issued by National Union, including Debtors' duties to pay bond premiums and to reimburse National Union for legal expenses and for payouts that were already made several years ago to claimants in connection with the Debtors' litigation settlements. Further, the NU Claim has already been allowed in a fixed, certain dollar amount. In addition, the Settlement Agreement provides that the NU Claim will be treated under the Plan 'as an unsecured, pre-petition, non-priority claim,' and even that it will receive interest in the same manner as the Plan now proposes to provide to Class 9 claimants.

-5-

12.    As such, the nature of the NU Claim stands in stark contrast to claims of asbestos tort claimants in Class 6, most of whom also have claims (and sources of recovery) against numerous defendants in addition to the Debtors.    Under the Plan, Class 6 erects a channeling injunction and provides a procedure pursuant to which personal injury claimants, many of whom possess unliquidated claims, the amounts of which cannot presently be known, can recover only against certain trust assets in a fixed amount.    This procedure is practical as applied to unliquidated tort claimants, so that the Plan can go effective and distributions to other creditors are not delayed pending adjudication of the unresolved Class 6 claims.    It makes no sense, however, with respect to a contract claim such as the NU Claim, which has already been allowed in a fixed amount and which, by Debtors' agreement, has already been determined to be an unsecured, non-priority claim that is entitled to receive interest in the same manner as is contemplated for Class 9 claimants.

13.    The Settlement Agreement unambiguously provides that if other holders of allowed unsecured claims are receiving post-petition interest under a Plan, the NU Claim also is to receive interest from and after the Closing Date under the Settlement Agreement.    As such, the Settlement Agreement clearly contemplated that the NU Claim would be treated under any Plan in the same manner as all other holders of allowed general unsecured claims.    Classification of the NU Claim in Class 6 rather than Class 9 is fundamentally at odds with the Debtors' obligations under the Settlement Agreement regarding the treatment of the NU Claim.

14.    Including the NU Claim within Class 6 would not only be improper under section 1122(a) and the terms of the Settlement Agreement, it also would be inequitable.    The interests of true Asbestos PI Claimants, that is, individuals with tort claims based on personal injury, have been represented throughout these proceedings by a Committee of Personal Injury Claimants and even an "Asbestos PI Future Claimants' Representative."    These appointees have not, however, represented the interests of holders of the claims of entities, such as National

-6-

Union, that are based solely on contract and don't belong in Class 6. National Union (and Longacre as the purchaser of the NU Claim) were entitled to rely upon the language of the Settlement Agreement providing the NU claim was to be treated under the Plan "as an unsecured, pre-petition, non-priority claim."

15.    Given this language, National Union and Longacre had no way of knowing, and had no reasonable basis for assuming, that the NU Claim would be lumped in with totally dissimilar tort claims and would not be paid in full. It would be inequitable, and fundamentally inconsistent with the Settlement Agreement allowing the NU Claim, to force Longacre to accept classification of the NU Claim into Class 6 (with the concomitant reduced distribution) based upon the Debtors' unilateral decision respecting classification. The NU Claim is fixed and allowed, is based upon Debtors' contractual obligations, is *not* based upon tort, and Debtors have already agreed in the Settlement Agreement to treat it as a general, pre-petition, unsecured claim payable with interest to the extent (as is the case here) that other unsecured claims are paid interest. Omitting the NU Claim from Class 9, which is the class where claims that are substantially similar are classified, is not proper. *In re Johnston*, 21 F.3d 323 (9th Cir. 1994) (holding that substantially similar claims, of the type that should be classified together, are claims with similar nature, kind, species or character); *In re Listani Foods, Inc.*, 329 B.R. 491 (D. N.J. 2005) (holding that separate classification for unsecured creditors in a Chapter 11 plan is only justified when the legal character of their claims is such as to accord them a status different from the other unsecured creditors).

16.    The Debtors' recent agreement to reclassify certain other claims from Class 6 to Class 9 suggests that the Debtors themselves recognize the impropriety of classifying claims such as the NU Claim in Class 6. On May 15, 2009, the Debtors filed under certification of counsel a Stipulation with Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") reclassifying from Class 6 to Class 9 certain claims that Morgan Stanley had acquired from Bank

-7-

of America, N.A. (the "Morgan Stanley Claims").[3]   The Morgan Stanley Claims (a) arose from a reimbursement agreement pursuant to which the Debtors had agreed to reimburse Bank of America for draws by National Union on certain standby letters of credit posted by the Debtors as collateral for certain surety bonds issued in favor of the Debtors, and (b) were allowed pursuant to a Stipulation dated November 11, 2005 (the "BofA Stipulation").   Just as with the stipulation allowing the NU Claim, the BofA Stipulation provides for allowance of an unsecured non-priority claim.   Given the substantial similarity between the NU Claim and the Morgan Stanley Claims, there is no rationale basis for classifying one in Class 6 while the others are placed in Class 9.

17.   Since the NU Claim is substantially similar to other contract-based claims that are in Class 9, Debtors must demonstrate a reasonable and proper purpose for placing it in with the tort claimants in Class 6.  *Coram*, 315 B.R. at 349 (*quoting John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158 (3d Cir. 1993)) ("Even though similar claims may be placed in separate classes, plan proponents cannot do so when it would be unreasonable.  The Third Circuit has held that 'it seems clear that the Code was not meant to allow [a plan proponent] complete freedom to place substantially similar claims in separate classes.'");  *In re Cocoran Hosp. Dist.*, 233 B.R. 449 (Bankr. S.D. Cal. 1999) (holding that the requisite business or economic justification for separate classification of unsecured claims cannot consist solely of Chapter 11 debtor's wish to obtain consenting impaired class of creditors voting in favor of the plan);  *In re Boston Post Road Ltd. P'ship.*, 21 F.3d 477 (2d Cir. 1994) (holding that a Chapter 11 debtor must adduce credible proof of a legitimate reason for separate classification of similar claims).  Debtors have not, because they cannot, offered any legitimate reason for including the NU Claim, a liquidated contractual claim,

---

[3] A true and correct copy of the Debtors' May 15, 2009 certification of counsel, with exhibits (D.I. 21722), is attached hereto as Exhibit B.

in Class 6 with unliquidated personal injury claims. The Court should deny confirmation unless the NU Claim is classified in Class 9.

18.    In addition, the Plan cannot be confirmed because, particularly with respect to the proposal for providing post-petition interest on account of Class 9 claims, the Plan violates section 1123 of the Bankruptcy Code, which requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This requirement restates the "cardinal principle" of bankruptcy reorganization that all claims within a class should be treated equally. *In re Huckabee Auto. Co.*, 33 B.R. 141, 148 (Bankr. Ga. 1983); *In re Granada Wines, Inc.*, 26 B.R. 131, 134 (Bankr. D. Mass. 1983). Disparate treatment, for section 1123(a)(4) purposes, can result from payment of claims at different rates. *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986).

19.    The Plan contemplates the payment of post-petition interest to Class 9 creditors and erects a procedure for determining the proper amount of interest. (*See Plan*, § 3.1.9). Specifically, the Plan proposes a standard rate of interest, compounded from the Petition Date through the Effective Date of the Plan, of 4.19%, unless a particular creditor has already agreed to payment of interest at a lesser rate, or none at all. *Id.* at § 3.19(b)(i). In addition, where a Class 9 creditor believes it is entitled to interest in a different amount, the creditor may file a "Post-Petition Interest Determination Notice" (a "PPIDN") or a "Notice of Non-Default Contract Rate of Interest" (each an "Interest Notice" and together, the "Interest Notices") with the Debtors, for subsequent negotiation with Debtors and if necessary, adjudication by the Court. *Id.* at § 3.19(d) and (e). However, if a creditor files a PPIDN, ". . . the Debtors or Reorganized Debtors, as applicable, may assert that the Holder of the General Unsecured Claim is entitled to no post-petition interest under applicable law or that an amount of post-petition interest less than the amount provided for in Section 3.1.9(b) of the Plan [i.e., the 4.19%] should be paid on

-9-

account of such Claim, and the Bankruptcy Court may so find in accordance with any such objection asserted by the Debtors or the Reorganized Debtors." See Plan at § 3.1.9(d)(ii).

20.    Thus, the Plan appears to contemplate that a creditor, merely by following the Interest Notice protocol, risks losing even the standard 4.19% interest afforded to all other holders of allowed general unsecured claims, solely because such creditor acted to preserve the full measure of its claim under its contract with the Debtors. This procedure appears designed to dissuade creditors from asserting rights to contract-rate interest, even though they may be legally entitled to such interest as creditors under a Plan that provides equity holders will retain value. *In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del. 2004).

21.    Because of this procedure, the Plan violates section 1123(a)(4)'s prohibition against disparate treatment of creditors in the same class. That is, creditors that are not entitled to contractual interest, or who are but do not want to risk losing the Plan interest and for such reason do not submit an Interest Notice, will receive the 4.19%. Creditors that do submit an Interest Notice, however, may not be paid even the Plan interest rate, for no reason other than that they attempted to preserve their contractual rights. This discriminatory treatment cannot withstand the requirements of section 1123(a)(4) and should be stricken from the Plan. The Plan should provide that holders of allowed Class 9 claims will receive not less than the Plan rate of 4.19% (absent agreement to a lesser rate), even if such holder files an Interest Notice, and should provide a reasonable period post-confirmation for Interest Notices to be filed. *See, e.g., In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002) (holding that disparate treatment of members of the same class by breast implant manufacturers' Chapter 11 plan, which accorded Canadian governmental players more effective recovery rights than the United States, violated the Bankruptcy Code's equal treatment requirement).

22.    Longacre reserves the right to join in all or any portion of any other objections to confirmation of the Plan.

-10-

#16980224 v4

WHEREFORE, Longacre respectfully requests that the Court deny confirmation of the Plan absent modification to address the deficiencies noted herein.

Dated:  May 20, 2009
       Wilmington, DE

Respectfully submitted,

PEPPER HAMILTON LLP

/s/ Leigh-Anne M. Raport
David M. Fournier (No. 2812)
James C. Carignan (No. 4230)
Leigh-Anne M. Raport (No. 5055)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
(302) 777-6500

- and –

PEPPER HAMILTON LLP
Robert S. Hertzberg, Esq.
100 Renaissance Center, Suite 3600
Detroit, MI 48243-1157
(313) 259-7110

*Counsel to Longacre Master Fund, Ltd. and Longacre Capital Partners (QP), L.P.*

#10980224 v4