## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | (Jointly Administered) |
| W.R. GRACE & CO., *et al.*, | ) | |
| | ) | Case No. 01-01139 (JKF) |
| Debtors. | ) | |
| | ) | |

## ANDERSON MEMORIAL HOSPITAL'S OBJECTIONS TO
## CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN

Anderson Memorial Hospital ("Anderson"),[1] by and through counsel, submits these objections to confirmation of the Debtors' First Amended Plan of Reorganization ("Plan"), in accordance with the schedule set forth in the Court's Third Amended Case Management Order Related to the First Amended Joint Plan of Reorganization ("Third CMO") (DE#21544). Anderson reserves the right to make any other objections, including objections to feasibility, not asserted herein. In addition, Anderson reserves the right to supplement its objections upon the completion of discovery, in light of the fact that the Third CMO requires parties to submit their objections before discovery has been completed.

The Debtors' Plan cannot be confirmed because it violates the fundamental tenet of "equality of treatment" required of any bankruptcy plan, it fails to afford creditors in the same class the same treatment, it improperly classifies creditors who are subjected to disparate treatment in the same class, it improperly releases third parties, it is not proposed in good faith, and it does not comply with the requirements of the Bankruptcy Code.

---

[1] By this objection, Anderson seeks to protect the interests of itself and the putative class of claimants it has sought to represent, recognizing that the Court has denied Anderson's motion for class certification and that denial is now the subject of a pending appeal.

**BACKGROUND**

On April 3, 2001, the Debtors filed their Chapter 11 petition. At the time, the Debtors faced exposure to present and future personal injury claims from people who had been exposed to asbestos-containing product ("PI Claims). Their liabilities also included present and future claims on behalf of building owners for the recovery of costs associated with the abatement of fireproofing and ceiling products ("Surface Treatment") typically spray or trowel applied to steel frames and ceilings in commercial and governmental buildings and to ceilings in churches and all types of residences ("Traditional PD Claims"); and claims on behalf of homeowners whose attics contained Grace's loose filled vermiculite product, Zonolite Attic Insulation, which was naturally contaminated with asbestos ("ZAI Claims").

**The Anderson Pre-Petition Litigation**

For many years prior to the Grace bankruptcy, Anderson's counsel, Speights & Runyan, had been extensively involved in the prosecution of property damage claims. As the Debtors have acknowledged, "the debtor had a long history with Speights" (DE 9349, pp. 11-12). Commencing in the early 1980s, Dan Speights was among the first lawyers to bring lawsuits on behalf of school districts against Grace and other manufacturers, including an action in which Grace consented to an order conditionally certifying a mandatory nationwide class action, In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part and vacated in part*, 789 F.2d 996 (3d Cir. 1986), *cert. denied*, 479 U.S. 852, 915 (1987). In early 1986, Mr. Speights as lead trial counsel obtained the first asbestos verdict in the nation against Grace for the abatement of Grace's Monokote fireproofing product from the Greenville, South Carolina City Hall. City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), *aff'd*, 827 F.2d 975 (4th Cir. 1987).

In 1992, after Grace obtained a verdict in a North Dakota case determining that the statute of limitations began to run when the building owner should have known that Grace's product contained asbestos and might be hazardous (and before the ruling was reversed by the Eighth Circuit in <u>MDU Resources Group v. W.R. Grace & Co.</u>, 14 F.3d 1274, 1277 (8th Cir. 1994)), Speights & Runyan decided to bring another asbestos property damage class action, essentially on behalf of all commercial building owners.  On December 23, 1992, Anderson Memorial Hospital, with Speights & Runyan as class counsel, filed a class action against Grace and several other former manufacturers of asbestos-containing material on behalf of "all persons, corporations, partnerships, unincorporated associations or other entities which own in whole or in part any building which contains asbestos-containing surfacing materials."

The parties litigated the putative class action in State and Federal Court for more than eight years before Grace's Chapter 11 petition. During the course of the litigation the defendants moved to strike all reference to non-South Carolina class members based upon the South Carolina "Door Closing Statute" (S.C. Code Anno. § 15-5-150).   After hearing, the South Carolina Court issued an order striking out-of-state class members from the Anderson Complaint. Because the order did not conclude the case, it was not subject to immediate appeal and Anderson could only reserve its appellate arguments for the conclusion of the case.

In 1998, Anderson moved for certification of the state class.  The South Carolina circuit court, based on Grace's bankruptcy threat, entered an *ex parte* order conditionally certifying a state-wide asbestos property-damage action against Grace on February 9, 2001.  At the time the order was entered, the class certification motion had been pending for more than three years and the parties were five months removed from a two-day evidentiary hearing on class certification, and the parties had filed their post-hearing briefs.  Resolution of the class certification issue had

been repeatedly delayed by Grace's requests to amend the scheduling order and for post-hearing briefing. Grace was later given an opportunity to brief the propriety of the certification order, and after the close of briefing and a further hearing, the South Carolina circuit court kept the certification order in effect. Grace filed its Chapter 11 petition on April 2, 2001 before any notice to the class could issue.

### Bankruptcy, Bar Date and Notice Orders

After Grace filed Chapter 11, the Debtors sought a Case Management Order which would impose a bar date for property damage claims. As a component of the proposed bar date, the Debtors also proposed a "Notice Program" which essentially provided for notice by publication without any direct notice to unrepresented building owners who could be reasonably identified through Grace's records.[2] The Bar Date Notice as originally proposed by the Debtors expressly prohibited class proofs of claim, and further sought to inform claimants that they could not rely on class actions to protect their rights in bankruptcy. In a subsequent brief in support of the Bar Date and Notice, the Debtors argued that "class certification can and should be dealt with down the road, after the claims have come in." The Debtors argued against following the procedures for class certification described in In re American Reserve, 840 F.2d 487 (7th Cir. 1987) and that even if the Court did adopt those procedures, "a bar date would still need to be set and a class proof of claim filed."

This Court advised the parties that for class proofs of claim, it would follow Judge Gambardella's opinion in In re Interregional Equity Corp., 227 B.R. 358 (D.N.J. 1998). In so doing, the Court explained that "most of the other Courts that looked at this issue, decided you

---

[2] In contrast, in at least three other asbestos cases in this district, Judge Newsome required direct notice to building owners who could be identified from the Debtors' records: In re Federal-Mogul Global, Inc., Case No. 01-10578; In re U.S. Mineral Products Co., Case No. 01-2471; In re USG Corp., Case No. 01-2094.

do not need the individual claims if you permit the class proof of claim" but that it was "not sure in every given case that you don't also need either an individual claim form or an identification of the Claimant." The Court suggested that class representatives probably needed to supply either individual claim forms for class members **or** a list of class members as a part of the class claim.

The Bar Date Notice which the Court ultimately approved omitted the language prohibiting class proofs of claim, and omitted the language stating that property damage claimants could not rely on a class proof of claim. The Bar Date Order set a March 31, 2003 deadline for filing traditional property damage claims, and contained a provision that "all counsel of record for holders of Asbestos Property Damage Claims" were required to provide the Debtors with certain information about "their clients" who have or may have claims against the Debtors, "so that the Debtors will be able to provide their clients with the Bar Date Package" or a "certification" that counsel "has contacted or attempted to contact all of their clients whom they represent, provided them with the Bar Date Package and advised them regarding their rights to assert a claim against the Debtors and their need to file their proofs of claim on the court-approved Proof of Claim forms by the deadlines set forth herein." The Property Damage Committee sought to appeal the Bar Date Order, but the appeal was rejected as interlocutory.

The Debtors' Notice Plan, as approved by the Court, did not contemplate that the Debtors would provide direct notice to buildings or building owners with asbestos property damage claims who could be identified through the Debtors' sales records and other documents, and indeed the Debtors made no effort to identify asbestos property claimants from their sales records, but instead argued that such an effort would have been "unreasonable."

In contrast to PD Claims, the Debtors have not sought and no claims bar date has been established for the filing of PI Claims against the Debtors.

### Anderson's Claims

In accordance with the requirements imposed in this case, Anderson did what is directed by most courts by timely filing a class proof of claim. In fact, Anderson filed three proofs of claim: a "worldwide" class proof of claim (#9911); a statewide class proof of claim (#9914); and an individual proof of claim (#11008). Anderson also did what this Court indicated class representatives should do, as referenced in <u>Interregional</u>: it attached a list of over 3,000 putative claimants (including 121 South Carolina claimants) to its worldwide class proof of claim form. It also attached an affidavit to its statewide class proof of claim identifying hundreds of shipments of Grace's asbestos products to South Carolina. Anderson later supplemented both class claims with extensive additional information: the index alone for the supplement to the worldwide class was 835 pages, and the index for the supplement to the statewide class was 104 pages. In addition, in an abundance of caution, Speights & Runyan also filed both a Class Proof of Claim and Proof of Claim forms for each claimant/class member it could identify through the Debtors' sales records.

In July of 2005, the Debtors made clear to Anderson's counsel that they had decided to aggressively resist Anderson's claims as part of an overall case strategy to undermine both Anderson's class claims and property damage claims generally. Shortly thereafter, the Debtors objected to Anderson's class proofs of claim. In response, on October 21, 2005 Anderson filed a Motion for Class Certification, consistent with case law recognized by the Debtors holding that a class claimant cannot seek certification until there is a contested matter commenced by the filing of an objection. <u>In re Charter Co.</u>, 876 F.2d 866 (11th Cir. 1989).

On October 31, 2005, the Court, on the Debtors' objection, determined that 535 individual proofs of claim filed by the Speights & Runyan firm should be stricken on the basis that Anderson did not provide the law firm with the authority to file individual claims. Because the Court made it clear that its ruling was without prejudice to the rights of these claimants to seek recovery through Anderson if it later certified a class action, these claimants did not appeal this ruling.

On April 17, 2007, the Court, on the Debtors' objection, determined that 44 individual proofs of claim filed by the Speights & Runyan firm on behalf of claimants who retained the Speights & Runyan firm shortly after the Bar Date should be stricken on the basis that the law firm "failed to establish authority to file as of the March 31, 2003 Proof of Claims Bar Date." That ruling was recently upheld by the Third Circuit Court of Appeals. Again, this ruling was without prejudice to the right of these claimants to seek recovery through Anderson if later certified as a class.

On May 29, 2008, the Court denied Anderson's motion for class certification, holding that only claimants who filed individual proofs of claim could be considered for numerosity purposes. Anderson attempted to appeal the class certification order and was rebuffed on jurisdictional grounds by the District Court. On April 13, 2009, the Court *sua sponte* entered an order which "reduced to zero" the Anderson worldwide class proof of claim and Anderson statewide class proof of claim. Anderson has now filed a notice of appeal of that order which will permit review of the class certification ruling.

On April 14, 2009, the Court entered an Order disallowing 35 claims filed on behalf of Canadian property damage claimants who had claims encompassed within the Anderson class.

The claims were disallowed as time-barred by the purportedly applicable Canadian limitations periods. That ruling is also presently subject to a pending appeal.

In addition, in accordance with a separate claims process for ZAI Claimants, Anderson also submitted a ZAI proof of claim (#17909) on behalf of all buildings encompassed in its certified statewide class action. Although the ZAI claim was merely a component of the broader class action filed by Anderson in South Carolina, the Court's claims procedures necessitated the filing of a separate claim. In a final certification order (entered after the petition date), the South Carolina court specifically stated that the Anderson statewide class included attic insulation claims.

There were other prepetition ZAI claims asserted by other parties against the Debtors, but there had not been any nationwide class certified in any such litigation prior to the petition date. In late 2001, the ZAI Claimants, represented by Darryl Scott, Esq. and Edward Westbrook, Esq., moved to certify a nationwide class which specifically excluded, *inter alia*, the Anderson claimants. After numerous hearings, this Court determined that a "science trial" should be conducted to determine the hazardousness of ZAI product, before considering a ZAI claims bar date or class certification. The court permitted the ZAI Claimants' counsel to be compensated by the bankruptcy estate as special counsel for conducting that trial. The Court further made clear that the results of the trial would not be binding on any other ZAI claimant. After conducting the trial, the Court found that ZAI does not create an "unreasonable" risk of harm.

Other claimants, and the Property Damage Committee, were excluded from negotiations and mediation in connection with the resolution of the ZAI Claims. When the ZAI Class Settlement was announced, it was not clear that the original commitment to exclude the Anderson claims was still being followed, and ultimately it became clear that it was not.

Moreover, while the ZAI Class Settlement purported to preserve the right of ZAI claimants to opt out of the settlement, the Debtors' proposed Plan and Disclosure Statement were less than clear as to the treatment of opt-out claimants. Normally, it would be assumed that a claimant who opts out of a class settlement would have the opportunity to pursue their claim outside of the settlement and preserve the right to recover in full on their claim if successful.

However, in response to Anderson's objection on this ground, the Debtors made clear that in fact notwithstanding a ZAI claimants' decision to opt out of the ZAI Class Settlement, the claim would nonetheless be treated under the Plan exactly the same as the ZAI Class claims: the claims will be processed and paid only in accordance with the ZAI Trust Distribution Procedures. On April 1, 2009, the Court approved the ZAI Class Settlement, but made clear that the issue of the treatment of opt-outs was a confirmation issue which could be addressed at the appropriate time.

On March 13, 2009, the Debtors filed an objection to Anderson's ZAI claim. Anderson acknowledged to the Court that the claim would be governed by the same ruling on class certification that this Court had made on Anderson's traditional property damage class claims, and on April 27, 2009 the Court entered an order disallowing the Anderson ZAI Claim. That order is now on appeal to the District Court.

The Property Damage Committee in this case is controlled by creditors who have settled their claims with the Debtors, including representatives of the ZAI Class. Anderson's participation as a member in the Property Damage Committee was initially resisted by the Debtors. As a result of its constitution, the Property Damage Committee has not actively represented the interests of the unresolved Property Damage Claimants in this case.

## **Grace's Plan**

Despite its many complexities, the Debtors' Plan with respect to the treatment of property damage claims is, theoretically at least, fairly simple. All property damage claims are included in Class 7. However, Class 7 is sub-divided into Class 7A for "traditional" property damage claims, and Class 7B for "US ZAI PD Claims" asserted by United States claimants arising from Zonalite Attic Insulation product. The Plan purports to provide for the payment of allowed "traditional" property damage claims (classified as Class 7A claims) in full, but without interest, through the Asbestos PD Trust. Class 7B ZAI claims are to be paid in accordance with the terms of a class action settlement negotiated by one group of ZAI claimants, pursuant to which the claimants will received a compromised amount on account of their ZAI claims. Although the class action settlement purported to preserve the opportunity for ZAI claimants to opt out of the ZAI settlement, the treatment of ZAI claims is identical regardless of whether or not the claimant opts out – the claims are to be paid in accordance with the ZAI Trust Distribution Procedures.

Grace has settled virtually all filed property damage claimants other than the claims of Anderson. Indeed, the only other unresolved property damage claim other than Anderson, and two Canadian claimants asserting claims through the Anderson class action, is the claim of Sheldon H. Solow and Solow Development Corp. (the "Solow Claim"). Although not included in the Plan itself, the Plan documents contain other provisions that effectively control how unresolved PD claims will be resolved. Specifically, the Plan references the proposed Class 7A Case Management Order which is Exhibit 25 to the Plan. The Class 7A CMO, in turn, sets forth certain procedures that are directed – either expressly or implicitly – exclusively to Anderson.

In Paragraph 1B of the CMO, the Debtors propose that for any PD claims which have been disallowed and are subject to pending appeals, or for which class certification has been

denied and an appeal of which is pending, (1) the appeals shall proceed to completion; (2) the "Anderson Memorial class claims (Nos. 09911 and 09914) shall remain inactive unless and until there is a final, appealable order with respect to the Anderson Memorial individual claim (No. 011008)"; and (3) any such claims which are reversed on appeal "shall be remanded to the Bankruptcy Court for proceeding[s] consistent with this PD CMO".

Aside from the Anderson related claims, there is one other pending unresolved PD claim – the Solow Claim. That claim was originally filed in state court and was on appeal from a split verdict as of the petition date. Under the plan, the Solow Claim will return to state court for resolution. The Debtors' proposed "Amended Order Setting Various Deadlines Regarding Asbestos Property Damage Claims" (an exhibit to the Class 7A CMO) in Paragraph 7 sets forth that for that claim, "the Court hereby lifts the stay so that the parties may proceed with the pre-petition appeal that was filed in the New York Supreme Court, Appellate Division – First Department". Presumably if that case is remanded for further proceedings, those proceedings will take place in state court.

For any other claims (including future PD claims that may be asserted), the claimants, subject to certain procedures set forth in the Class 7A CMO, are permitted to prosecute such claims in the United States District Court for the District of Delaware or any other United States District Court that has jurisdiction over the action. (Class 7A CMO Paragraph II.C.1.).

The treatment of PI Claims is quite different. The Plan establishes a separate Asbestos PI Trust. The Asbestos PI Trust is presided over by Trustees selected by the personal injury constituency, it is funded by specified initial and subsequent cash contributions from the Debtors, and it observes procedures for simplified resolution of claims that provide for lessened standards of proof and evidentiary burdens.

Anderson is effectively the only asbestos-related claim which, if the denial of class certification is reversed on appeal, will be required to return to the Bankruptcy Court for disposition, notwithstanding that Anderson's action, in which it would be entitled to a trial by jury, had been pending in state court for nearly a decade in South Carolina prior to the petition date.

## OBJECTIONS

In making these objections, Anderson reminds the Court that the plan proponents bear the burden of establishing that the Plan complies with each of the requirements set forth in 11 U.S.C. § 1129(a). In addition, if an impaired class does not vote to accept the Plan, the plan proponents also bear the burden of demonstrating that the Plan satisfies the additional requirements of 11 U.S.C. § 1129(b), including that the Plan does not unfairly discriminate and is fair and equitable with respect to dissenting classes. In re Exide Technologies, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

### 1.    The Plan Does Not Provide Equality of Treatment.

The promise of "equality among creditors" is among the most fundamental tenets of bankruptcy. This promise is explained in detail by the Third Circuit Court of Appeals in In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004). In Combustion Engineering, the debtor asked the court to approve a "two-trust structure" by which it intended to deal with asbestos claims. Prior to bankruptcy, the debtor had reached settlements with several asbestos claimants, and had funded $400 million into the CE Settlement Trust to pay their claims. Payments from the Trust were based on the length of time the creditor's claim had been pending. Creditors who had settled and were awaiting payment would be paid 95% of the full liquidated value of their claim; creditors who had settled or agreed to dispute resolution but were not yet

due payment would be paid 85%; and all other creditors would receive an initial payment of 37.5%, with a promise of up to 75% depending on what funds were available. Another group of creditors who were late to the game agreed to receive a lesser sum. The "stub claim" held by the creditors enabled them to participate in voting on the debtor's plan.

Certain asbestos creditors who had been excluded from the settlement objected that this "two-trust" structure violated the Bankruptcy Code's "equality among creditors" principle, and also that the creation of the "stub claims" violated the Code by "artificially impairing" the claims of the participants in order to manipulate the voting process. The Third Circuit vacated and remanded the order confirming the Combustion Engineering Plan on both grounds.

As to the first issue, the Court in <u>Combustion Engineering</u> explained that the promise of "equality among creditors" is inherent in several provisions of the Bankruptcy Code:

> "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). ... The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims. Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed. Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization. Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class." And § 524(g) states that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."

391 F.3d at 239.

Moreover, in evaluating whether a plan provides "equality among creditors," the Court must consider the "bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted." <u>Id.</u> at 241. This analysis includes consideration of "the totality of circumstances surrounding a reorganization plan" in order to exercise the "informed,

independent judgment which is an essential prerequisite for confirmation of a plan." Id., fn. 55,

citing Am. United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 146 (1940):

> Where such investigation discloses the existence of unfair dealing, a breach of
> fiduciary obligations, profiting from a trust, special benefits for the reorganizers,
> or the need for protection of investors against an inside few, or of one class of
> investors from the encroachments of another, the court has ample power to adjust
> the remedy to meet the need.

Id.  In Combustion Engineering, the Third Circuit remanded out of concern that the plan

structure did not ensure equality among creditors because of the risk that the creditors who were

not favored under the pre-petition settlement would unfairly suffer by receiving an unequal share

of the settlement fund.

The requirement of equality of treatment is more specifically mandated by 11 U.S.C. §

1123(a)(4), which requires that a plan "provide the same treatment for each claim or interest of a

particular class, unless the holder of a particular claim or interest agrees to a less favorable

treatment of such particular claim or interest."  The District Court explained in In re Finova

Group, Inc., 304 B.R. 630 (D. Del. 2004) that § 1123(a)(4) guarantees not "equality of payment"

but rather "equality of treatment."  In Finova, the debtors' plan provided for the payment

provided for the payment of "utilization fees" as a component of interest to certain creditors, but

not to all creditors.  The Bankruptcy Court ruled that the debtors were required to pay such fees

to all lenders as a condition of confirmation under § 1123(a)(4), and the District Court affirmed.

Upon finding that the excluded creditors were similarly situated to the ones who the debtors had

agreed to pay, the District Court held: "To treat [appellees] differently would be to ignore the

economic realities of their Credit Agreements, elevate form over substance and violate the equal

treatment mandate of Section 1123(a)(4)."  Finova, 304 B.R. at 637.

The extension of the "equality of treatment" requirement not merely to payment provisions but to procedural treatment is further demonstrated by In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002). In Dow Corning, the Sixth Circuit found that a plan which put governmental subrogation claims together in one class, and purported to pay that class in full in order to satisfy the "cram down" requirements of 11 U.S.C. § 1129(b)(2)(B), did not demonstrate adequate protection of the full payment requirement and did not comply with § 1123(a)(4) where different governmental units were afforded different procedures to protect their interests under the plan. In Dow Corning, the plan incorporated a settlement with Canadian governmental units that provided for notice to the governmental authority before payment would be made to a beneficiary so that the government could determine if it had a subrogation claim; the payment would not be released until the payee and the governmental unit confirmed they had agreed upon an appropriate allocation. The plan provided no similar mechanism or protections to the United States. The Court held that the failure to do so precluded approval unless the plan afforded the United States with "recovery rights sufficiently similar to the Canadian governmental payers to ensure equal treatment of Class 15 claimants as required by section 1123(a)(4)." Id. at 661. See also In re Dow Corning Corp., 255 B.R. 445, 500-01 (E.D. Mich. 2000) ("As to whether the claim is being treated fairly within the class, the inquiry is whether the claim is subject to the same process in satisfying the claim as the other claims within the class. ... The requirement under 11 U.S.C. § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the *same process* for claim satisfaction.'" Id. (citations omitted, emphasis in original).

Here, the Debtors' Plan singles out Anderson for a treatment not afforded to any other asbestos creditor. Every other asbestos claim either: (1) has been settled and will be paid on the

effective date; (2) is subject to alternative resolution procedures with lowered proof thresholds; or (3) is permitted to litigate in its chosen forum. Only Anderson, of all the asbestos claims filed against the Debtors, is required to litigate its claims in order to be entitled to payment, but is precluded from doing so in the forum it chose nearly a decade before this bankruptcy case was commenced. The disparate treatment of Anderson's claims – which reflects a continuation of the Debtors' intentional and ongoing efforts to undermine Anderson's claims – violates the fundamental principle of "equality of treatment" mandated by the Bankruptcy Code and expressly recognized by the Third Circuit Court of Appeals in <u>Combustion Engineering</u>. As such, the Debtors' Plan can not be confirmed.

### 2.    <u>The Plan Treats Creditors in the Same Class Disparately.</u>

Aside from the general requirement of "equality of treatment" recognized in <u>Combustion Engineering</u>, the Bankruptcy Code specifically requires that a Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Debtors' Plan, for the reasons explained above, clearly does not do so, and accordingly does not satisfy the requirements for confirmation.

Moreover, since the Plan provides disparate treatment for Anderson's claims as distinguished from every other property damage claimant, both present and future, the Plan's classification scheme violates the Bankruptcy Code and cannot be confirmed.

The flaws in the Debtors' classification scheme also render meaningless any vote that is made on the Plan. The Debtors purport to solicit Class 7 only for purposes of the requirement in 11 U.S.C. § 524(g) that to obtain a § 524(g) injunction the Plan must be approved by a 75% vote of "a separate class or classes of the claimants whose claims are to be addressed by a trust."

Since the classification of disparately treated claims together is improper – to say nothing of the improper lumping together of Class 7A (which is supposedly "unimpaired") with Class 7B (the ZAI Claims, which are impaired) for voting purposes – the Debtors cannot establish that they have satisfied the requirements for confirmation.[3]

### 3.    The Plan Does Not Comply With 11 U.S.C. § 524(g).

For the same reasons that the Plan violates the requirement of "equality of treatment," the Plan also fails to satisfy the requirements of 11 U.S.C. § 524(g), pursuant to which the Debtors seek an injunction protecting various settling third parties. Specifically, § 524(g) requires that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner." Since the Plan mandates disparate treatment for similarly situated property damage claims, it does not satisfy the requirements of § 524(g).[4]

---

[3] Anderson notes as well that the entire solicitation process with respect to Class 6 Personal Injury Claims is fundamentally flawed. The Debtors have never sought to establish a claims bar date for Personal Injury Claims. As a result, any vote by the Class 6 claimants is solely by those claimants who have voluntarily elected to file proofs of claim despite the absence of a deadline for doing so. It is unfair and inappropriate to bind an entire class of creditors in this manner where the universe of claimants has not been defined through the establishment of a claims bar date. *See, e.g.*, In re Amster Yard Assocs., 214 B.R. 122, 125 (Bankr. S.D.N.Y. 1997) ("Debtor has not identified any emergent circumstances that warrant expedited action, and as a practical matter, it could not obtain approval of the disclosure statement, solicit votes or confirm a plan until it has determined the outer universe of potentially allowable claims."). Moreover, to the extent the Debtors intend to rely on Class 6 as an impaired, accepting class for purposes of satisfying 11 U.S.C. § 1129(a)(10), Anderson would object because of the flaws in the solicitation process for Class 6.

[4] Anderson notes as well that §524(g) does not provide support for the multiple-trust structure proposed by the Debtors in their Plan. The Plan establishes an Asbestos PI Trust and a separate Asbestos PD Trust, each of which deal separately with the respective personal injury and property damage liabilities. However, all references in § 524(g) are to a single-trust structure:

> The requirements of this subparagraph are that – the injunction is to be implemented in conjunction with *a trust* that, pursuant to the plan of reorganization ... is to assume the liabilities of a debtor ... as part of the process of seeking confirmation of the plan ... a separate class or classes of the claimants

Moreover, for purposes of Class 7A claimants, the Asbestos PD Trust is not a genuine "trust" in any meaningful sense. Rather, the "Trust" is simply a conduit for the payment of funds by the Debtors or Reorganized Debtors, inserted primarily if not exclusively to obtain the benefits of the § 524(g) injunction. Under the Plan, the Asbestos PD Trust will be funded on the Effective Date with enough money to pay the settled Property Damage Claims. If additional unresolved PD Claims are subsequently allowed, or if future PD Claims are successfully asserted, once again the Trust simply looks to the Reorganized Debtors to fund the Trust with a sufficient amount to pay the claims as they are subsequently determined. It is effectively the Reorganized Debtors and not the Trust that are assuming the liabilities, without any trust mechanisms or procedures for determining or valuing claims. Instead, unresolved claims and future claims are simply re-directed back into litigation (pursuant to the Class 7A CMO, in whatever forum the Debtors may have designated for the particular claim), the defense of which is controlled by the Reorganized Debtors. The Asbestos PD Trust effectively operates as nothing other than a check-writing facility for Class 7A Claimants.

Indeed, there is a fundamental illogic to extending § 524(g) to claims which are supposedly "unimpaired" under the Plan. If indeed PD Claims are unimpaired and are to be paid 100% upon successfully prosecuting their claims in litigation with the Reorganized Debtors, what is the purpose of channeling such claims to a trust? *See, e.g.*, Barliant, Karcazes & Sherry, "From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies," 12 Amer. Bankr. Inst. L. Rev. 441, 453 (Winter 2004):

> whose claims are to be addressed by *a trust* described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and ... *the trust* will operate through mechanisms ... that provide reasonable assurance that *the trust* will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

But there is no such justification for channeling future claims to a limited trust when a company can afford to pay 100 cents on the dollar to all future claimants as their claims arise. Exchanging the right to pursue all of a company's assets (and the right to take ownership of the company, since creditor claims have absolute priority over equity interests) for the right to pursue a thinly-capitalized trust could be detrimental to future claimants, if the trust assets later prove to be insufficient. ... Given this critical divergence from the facts of the Johns-Manville on which section 524(g) was based, that statute should be narrowly construed to apply only to situations where a company demonstrates that it cannot continue to pay asbestos-related claims. Indeed, the fact that the channeling injunction is available only in the context of a chapter 11 bankruptcy plan signifies this relief should be limited to companies with a legitimate need for bankruptcy protection and reorganization. Otherwise, the good faith of the debtor must be seriously questioned.

The Debtors' Plan represents an impermissible misuse of § 524(g) as applied to the Class 7A Claims.

### 4.    The Plan Impairs Class 7A Claimants.

A claim is unimpaired under a plan if the plan "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Contrary to the Debtors' assertion that Class 7A is unimpaired, however, Class 7A claims are impaired in at least two ways.

First, as explained in the Disclosure Statement, Class 7A claimants are not entitled to recover interest: "No interest shall be payable on account of Asbestos PD Claims Allowed as of the Effective Date except to the extent provided in a PD Settlement Agreement." (Disclosure Statement, p. 8). Since the Debtors' Plan provides for equity holders to retain their interests, in order for Class 7A to be unimpaired, claimants must be entitled to receive interest on their claims. In analyzing the 1994 amendments to § 1124, this Court noted that the amendments clarified that "to be unimpaired, the claim must receive postpetition interest." In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 352 (Bankr. D. Del. 1998), citing In re Rocha, 179 B.R. 305, 307 n. 1 (Bankr. M.D. Fla. 1995) ("[A] solvent debtor must now pay post-petition and pre-

confirmation interest on a claim to have a class considered 'unimpaired.'"); In re Coram
Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004).  While settling Class 7A claimants may
have agreed to waive any assertion of a right to interest, Anderson has not done so.  Second,
Anderson's claims in particular are impaired as a result of the Class 7A CMO's denial of
Anderson's ability to pursue its claim in its chosen forum, which among other things has the
effect of denying Anderson a right to trial by jury.  Coram Healthcare, 315 B.R. at 351 ("if the
proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the
creditor's claim is impaired.").

Since Class 7A Claims are in fact impaired (at least those that have not waived a right to
interest or are being denied substantive rights by virtue of the Plan or the Class 7A CMO), this
raises the issue of the manner in which Class 7A should be permitted to vote on the Plan.
Anderson submits that it is fundamentally unfair to permit the settling Class 7A Claimants, who
will be paid exactly what they settled for under the Plan, to determine the fate of unresolved
Class 7A claims – which almost exclusively refers to the Anderson claims.  The issue is
comparable to the concerns with "artificial impairment" that has previously been recognized by
this Court.  As explained in Combustion Engineering, "artificial impairment" occurs when a plan
imposes "an insignificant or de minimus impairment on a class of claims to qualify those claims
as impaired under § 1124."  Combustion Engineering, 391 F.3d at 243.  The Third Circuit
recognized that "The chief concern with such conduct is that it potentially allows a debtor to
manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code
while avoiding opposition to reorganization by truly impaired creditors."  Id.

In Combustion Engineering, the debtor settled with several asbestos claimants pre-
petition under terms by which those creditors agreed to receive payment of a substantial portion

of their claims (generally between 85-95%), and preserve a small "stub claim" which enabled them to participate in the bankruptcy proceedings and vote on the plan.  The Court was sufficiently concerned that the debtor's "pre-petition side arrangement with a privileged group of asbestos claimants, who as a consequence represented a voting majority despite holding, in many cases, only slightly impaired 'stub claims,'" id. at 244, ran a significant risk of interfering with the requirements and intentions of the Bankruptcy Code.  This concern was heightened because "a disfavored group of asbestos claimants, including the future claimants and the Certain Cancer Claimants, were not involved in the first phase of this integrated settlement."  Id. at 245.  As a result, the Third Circuit remanded the confirmation order for further consideration on the issue of "artificial impairment."

The Debtors' Plan here provides with respect to Class 7A that all allowed property damage claims will be paid in full, but without interest.  Class 7A consists overwhelmingly of creditors who have already settled with the Debtors.  Indeed, the only unresolved Class 7A claims are the claims of Anderson, and the Solow Claim.  To the extent that settled Class 7A claims are permitted to vote and thereby control the Class 7 vote, and thereby control the fate of the disparately treated Anderson claims, the Plan's classification scheme is flawed and cannot be approved.  Moreover, if Anderson – as effectively the only unresolved property damage claim subjected to the particular treatment described in the Class 7A CMO, were separately classified, it would reject the Plan and the Debtors would be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to the Anderson claims under 11 U.S.C. § 1129(b).  Anderson submits that the Debtors could not satisfy those requirements.

5.      **The Plan Provides No Meaningful Opt Out Option for ZAI Claimants.**

In an earlier proceeding, Anderson – whose class claims include claims for ZAI – expressed its concern with provisions in the US ZAI Class Settlement regarding the treatment of opt-outs. Specifically, although the ZAI settlement purports to provide for opt-out rights for claimants who elect not to participate in the class settlement, those rights are effectively illusory because under the Plan, opt-out ZAI claimants are subject to the same exact treatment as the ZAI class members. As clarified in Section 2.7.3 of the Disclosure Statement (in response to Anderson's objection), "Notwithstanding a decision by a Holder of a US ZAI PD Claim to opt out of the class for purposes of the US ZAI Settlement, such Claimant remains a member of Class 7B for purposes of the Plan and will be treated as such." As a result, such claims are to be paid in accordance with the ZAI Trust Distribution Procedures, which provide for recovery of only a fraction of the creditors' claims.

By denying ZAI opt-outs the ability to assert their claims outside of the ZAI Trust Distribution Procedures, the Plan strips them of any meaningful "opt out" option. To the extent that the ZAI settlement is in effect a *sub rosa* mandatory class, the standards for approval would be substantially different and have not been addressed by the Debtors or by ZAI Counsel. *See, e.g.*, Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999); In re School Asbestos Litigation, 789 F.2d 996 (3d Cir. 1986). Anderson raised these issues at the hearing on approval of the ZAI settlement and was advised by the Court that this issue was properly raised at confirmation:

> If ZAI claimants believe that they have an opt out issue, and ought to be in a different class under the plan, that's a classification issue and their rights to either vote against the plan, or to seek classification are still preserved. That's not a settlement issue, that's a plan confirmation issue.

Transcript of April 1, 2009 hearing, P. 39 L. 20-25. In order to treat ZAI opt outs – who have not consented to the treatment provided under the class settlement – the same as other Class 7

creditors, the Plan must permit those claimants to assert their claims outside of the ZAI Trust

Distribution Procedures and be paid in full if their claims are allowed.

### 6.   <u>The Plan Should Not Improperly Release Third Parties.</u>

Section 8.8.7 of the Plan provides a broad release by "each Holder of a Claim or Equity

Interest who votes in favor of the Plan" in favor of all of the "Asbestos Protected Parties," the

various committees, representatives and counsel in the case.   The Section further provides that

"In addition to the foregoing, each Holder of a Claim or Equity Interest who receives or retains

any property under this Plan shall also be deemed to unconditionally release the Fresenius

Indemnified Parties to the same extent as the release in the preceding sentence."   To the extent

the second quoted sentence purports to extend the broad release of the Asbestos Protected

Parties, committees, representatives and counsel to any person receiving property under the Plan

(and not merely those who affirmatively vote in favor of the Plan), it would violate restrictions

on non-consensual third-party releases through a Plan.

The limitations on a debtors' ability to provide for releases to third parties, including its

own professionals and the professionals of other interested parties, was alluded to by the Third

Circuit Court of Appeals in <u>In re United Artists Theater Co.</u>, 315 F.3d 217 (3d Cir. 2003).   In

<u>United Artists</u>, the Court was asked to consider whether objections to a financial advisor's

retention which provided for exemption from liability for ordinary negligence, were rendered

moot by the provisions of the confirmed plan which released the debtors and their professionals

from potential negligence claims.   The Court expressed skepticism as to the effectiveness of the

plan provisions in doing so absent specific findings to support such relief:

> Debtors and their professionals can not exempt themselves from liability to non-
> consenting parties merely by saying the word. The "hallmarks of permissible non-
> consensual releases" are "fairness, necessity to the reorganization, and specific
> factual findings to support these conclusions." *In re Continental Airlines*, 203

> F.3d 203, 214 (3d Cir. 2000). Added to these requirements is that the releases
> "were given in exchange for fair consideration." _Id._ at 215.

Id. at 227. Absent specific factual findings to support the releases – and even though the releases were approved in the "conclusions of law" portion of the confirmation order – the Court found that the plan provisions could not render moot a subsequent challenge to the terms of a professionals' retention regarding indemnification rights. Id.

The United Artists decision made reference to the Third Circuit's earlier decision in In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000). In Continental Airlines, the Court noted that the release of non-debtor third parties was generally inconsistent with 11 U.S.C. § 524(e), which specifies that "Except as provided in subsection (a)(3) of this section, discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." After reviewing the applicable case law, the Third Circuit, without adopting a particular standard or even affirmatively stating that such third-party releases were ever permissible, enunciated the baseline standard cited in United Artists above.

Lower courts within this district have defined narrow parameters within which such third-party releases may be considered. In In re Exide Technologies, 303 B.R. 48 (Bankr. D. Del. 2003), the Court recognized, citing Continental Airlines, that non-consensual releases of non-debtors may be approved only in "extraordinary cases." Id. at 72. Citing to In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999), it identified several factors which may be considered:

> (1)    such an identity of interests between the debtor and non-debtor releasee that a suit against the non-debtor is in essence a suit against the debtor;
>
> (2)    substantial contribution by the non-debtor to the reorganization;
>
> (3)    the essential nature of the injunction to the reorganization;
>
> (4)    support by an overwhelming majority of creditors for the injunction;

(5)    provision for payment of all claims affected by the injunction.

Id. The Exide Court found that such extraordinary circumstances did not exist in that case to permit release of the debtors' officers, directors and professionals.

Here, the broad scope of the Debtors' proposed releases of non-debtor third parties, to the extent applied to non-consenting parties, fails to satisfy the baseline standard of being supported by fairness, necessity to the reorganization, and having been given in exchange for fair consideration, all supported by specific factual findings.

**7.    The Plan Is Not Filed in Good Faith.**

In Combustion Engineering, the disparate treatment of similarly situated asbestos creditors, and the risk of artificial impairment in order to control voting on the plan, caused the court to express concern that the plan did not comply with the "good faith" requirement of 11 U.S.C. § 1129(a)(3) and remand for further consideration. The "good faith" requirement was further explained in In re ACandS, Inc., 311 B.R. 36 (Bankr. D. Del. 2004). In ACandS, the debtors sought approval of a plan which memorialized a prepetition settlement between the debtors and certain asbestos claimants who were part of a "prepetition committee". The settlement provided for payment of asbestos claims in a descending order of priority, with "Category A" having been paid pre-bankruptcy, "Category B" and "Category C" being fully secured by assets of the debtors, "Category D" claims being partially secured up to 75% of their claims, and entitled to recover up to 50% of available insurance proceeds, and the remaining 50% of the insurance proceeds reserved for future claims. Anyone not in one of those categories was treated as unsecured. The court noted that "members of the prepetition committee appear prominently in all of the secured categories." Id. at 40.

The Court found that the disparate treatment of similar asbestos claims based on the election to afford preferential treatment to certain claimants violated the requirements of § 524(g) and § 1129(a)(1).  Further, the Court found that even if the requirements of §524(g) and § 1129(a)(1) were met, the court would deny confirmation of the plan "as not having been proposed in good faith under § 1129(a)(3)."  Id.  The standard enunciated by the Court was that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code ... with the most important feature being an inquiry into the fundamental fairness of the plan."  Id. at 43 (internal citations omitted).

In so finding, the Court noted that the plan was, by and large, drafted by and for the benefit of the prepetition committee to the exclusion of other claimants, which subsequently exercised "continued influence" from its majority status on the post-petition creditors committee.  As a result, the Court held that "it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code."  Id. at 43.  The Court went further and said "It is also impossible to conclude that this plan is imbued with fundamental fairness."  Although the plan might satisfy the "technical classification requirements of § 1122 and § 1129(b)," the Court found it to be "fundamentally unfair" that similarly situated creditors might be treated differently under the plan's structures:  "Both should be compensated based on the nature of their injuries, not based on the influence and cunning of their lawyers."

The Plan's treatment of the Anderson claims here is likewise imbued with the same lack of good faith.  The Plan's proposed treatment of the Anderson claim represents the culmination of the Debtors' efforts to suppress Anderson's ability to pursue class claims on behalf of property damage claimants, and to disenfranchise the class Anderson seeks to represent.  The

Plan's singling out of Anderson for disparate treatment, coupled with the Debtors' conduct during the course of the case, evidence that the Plan is not proposed in good faith. Accordingly, the Plan violates § 1129(a)(3) and cannot be confirmed.

**8.     The Plan Does Not Comply With the Bankruptcy Code.**

For the reasons described herein, the Debtors' Plan does not comply with the provisions of the Bankruptcy Code and accordingly cannot be confirmed under 11 U.S.C. § 1129(a)(1).

### CONCLUSION

For all of the foregoing reasons, the Court should deny confirmation of the Debtors' Plan.

DATED:  May 20, 2009

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:   (302) 654-0248
Facsimile:   (302) 654-0728
E-mail:        loizides@loizides.com

Daniel A. Speights (SC Fed. ID No. 4252)
C. Alan Runyan (SC Fed ID No. 3683)
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
Post Office Box 685
Hampton, SC  29924
Telephone:  (803) 943-4444
Facsimile:  (803) 943-4599

John W. Kozyak (FL Bar No. 200395)
David L. Rosendorf (FL Bar No. 996823)
KOZYAK TROPIN & THROCKMORTON PA
2525 Ponce de Leon, 9th Floor
Coral Gables, FL  33134
Telephone:  (305) 372-1800
Facsimile:  (305) 372-3508

*Counsel for Anderson Memorial Hospital*