**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) ) ) ) ) ) | Chapter 11 |
| W. R. GRACE & CO., et al., | | Case No. 01-01139 (JKF) (Jointly Administered) |
| Debtors. | | |

**BANK LENDER GROUP'S OBJECTION TO**
**CONFIRMATION OF FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Pursuant to the Bankruptcy Court's Third Amended Case Management Order, dated May 5, 2009 [Dkt. No. 21544], certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Lender Group"),[2] by their undersigned counsel, hereby object to the confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, [Dkt No. 20872] (the "Plan")[3] filed by the above-captioned debtors

---

[1]   The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements"). The Credit Agreements are attached as Exs. A and B to the Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., filed August 15, 2008 [Dkt No. 19322].

[2]   The Bank Lender Group includes (i) Anchorage Advisors, LLC; (ii) Allen & Co., (iii) Avenue Capital Group; (iv) Babson Capital Management LLC; (v) Bass Companies; (vi) Caspian Capital Advisors, LLC; (vii) Catalyst Investment Management Co., LLC; (viii) Cetus Capital, LLC, (ix) DE Shaw Laminar Portfolios, LLC; (x) Goldman Sachs & Co. (as ex officio member); (xi) Halcyon Asset Management LLC; (xii) Intermarket Corp.; (xiii) JP Morgan Chase, N.A. Credit Trading Group; (xiv) Loeb Partners Corporation; (xv) MSD Capital, L.P.; (xvi) Normandy Hill Capital, L.P.; (xvii) Onex Debt Opportunity Fund Ltd.; (xviii) P. Schoenfeld Asset Management, LLC; (xix) Restoration Capital Management, LLC; and (xx) Royal Bank of Scotland, PLC. The Bank Lender Group, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

("Grace") along with the Official Committee of Asbestos Personal Injury Claimants, the

Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Holders

(together with Grace, the "Plan Proponents"), and in support thereof, respectfully represent as

follows:

## PRELIMINARY STATEMENT

1.      By the Plan, Grace seeks to maximize value for Grace's shareholders at

the expense of Grace's creditors.  That exercise demonstrates Grace's lack of good faith and

its dereliction of its fiduciary duties to its creditors.  The Plan violates as well the best

interests of creditors test of the Bankruptcy Code section 1129(a)(7) and the absolute priority

rule of Bankruptcy Code section 1129(b).

2.      Absent compelling equitable considerations, a plan must pay a class of

dissenting creditors their contract default interest before shareholders get anything.  Under

Grace's plan, its shareholders will get equity that the Debtors themselves value at between

$430 million and $821 million[4] while simultaneously depriving the Bank Lenders of more

than $91 million of contract default interest which has accrued at 2% over almost nine years

(and counting) on the Bank Lenders' more than $503 million of claims.

3.      To improve the odds of confirming its flawed Plan, Grace has tried to

end-run the heightened confirmation requirements of section 1129(b).  *First*, it attempted to

foist the terms of a "settlement" agreement on the Bank Lenders and all other non-asbestos

unsecured creditors (the so-called "deal") made with the Plan Proponents (which tellingly

---

[4]      *See* Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 27, 2009, at p. 49, § 2.11.2.6 [Dkt No. 20873] (the "Disclosure Statement").

includes the Official Equity Committee, but not the Official Creditors Committee).  The

"deal" requires these creditors to accept a lower, non-contractual interest rate.  The Bank

Lenders were not a party to and never gave anyone any authority to enter into this so-called

"deal" on their behalf.

4.      *Second*, when the Bank Lenders voiced their opposition to the "deal"—

as they had the legal right to do—Grace retaliated by objecting to the Bank Lenders' proof of

claims and requested that this Court rewrite the Credit Agreements (on an expedited basis) to

impose a lower rate of interest. *Finally*, to avoid complying with sections 1129(a) and

1129(b), Grace seeks to disenfranchise the Bank Lenders in violation of section 1124 by

categorizing their claims as "*un*impaired," thereby eliminating the possibility of a "no vote,"

or at a minimum diluting the vote by lumping the Bank Lenders into Class 9 along with non-

similarly situated creditors in violation of section 1122.

5.      This Court should not countenance Grace's attempts to shirk its

statutory burdens under section 1129(b) by depriving creditors of their fundamental right to

vote by misclassifying the claims as "unimpaired" or by lumping them together with

dissimilar claims to dilute the vote.  Nor should this Court permit Grace to elevate equity's

interest over Grace's creditors in violation of Grace's fiduciary duties to creditors and the

good faith requirements of the Bankruptcy Code.

6.      Accordingly, the Court should deny confirmation of the Plan.

## BACKGROUND

7.      Prepetition, Grace entered into the Credit Agreements.  Under them, Grace owes the Bank Lenders $500 million in aggregate principal amount.[5]  The Credit Agreements both matured numerous years ago during the pendancy of these cases.[6]  Both contracts have a non-default interest rate equal to the Prime Rate, with a default rate of Prime Rate plus 2%.  (Credit Agreement §§ 5.1(c), 5.5).  In addition to specifying interest rates, the Credit Agreements provide for payment of facility fees, attorneys' fees, and a specified method for calculating interest which Grace owes the Bank Lenders.  (Credit Agreements §§ 1.1, 5.1, 5.2, 5.7, 5.13.).[7]

8.      After the Petition Date, Grace did not perform its obligations under the Credit Agreements, including monetary payment and non-monetary reporting requirements.  As outlined in the Affidavit of Charles O. Freedgood dated August 14, 2008, which was Exhibit 1 to the Compendium of Exhibits to the Pre-Trial Memorandum of the Bank Lender Group in Opposition to the Debtors' Objection to the Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999 dated September 5, 2008 ("Bank Lenders' Pre-Trial Mem.") [Dkt. No. 19478],[8] the Debtors' failures under the Credit Agreements—which the Debtors have not denied—included, among other things:  failing to

---

[5]   *See* 1998 Credit Agreement, Sch. 1; 1999 Credit Agreement, Sch. 1.

[6]   The 1998 Credit Agreement matured on May 16, 2003, and the 1999 Credit Agreement matured on May 2, 2001. (1998 Credit Agreement §§ 1.1, 2.2. and Amendment to 1999 Credit Agreement, dated May 3, 2000, § 1.2).

[7]   The administrative agent of the Credit Agreements submitted proofs of claim nos. 9159 and 9168 dated March 27, 2003 (the "Proofs of Claim") for amounts owed on account of the Credit Agreements.  In addition to post-petition interest, the Proofs of Claim requested payment of facility fees and attorneys' fees.

[8]   The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases. *See* Fed. R. Evid. 201 (a court may take notice of judicially noticed facts "not subject to reasonable dispute"); *Waltz v. County of Lycoming*, 974 F.2d 387, 389 (3d Cir. 1992) (pleadings, motions, and briefs that were part of the record were "subject to judicial notice" without further proof).

pay the principal amount of the loans and notes when due in accordance with the terms

thereof, including upon the stated maturity dates; failing to pay interest on the loans and notes

within five business days after such interest became due in accordance with the terms of the

Credit Agreements; not furnishing to each bank all certificates and other information required

by section 8.2(a)-(c) of the Credit Agreements, not promptly giving notices to JPMorgan

Chase Bank, N.A. as required by section 8.7, and not remedying such breaches within 30

days. (*See* Freedgood Aff. at ¶ 13.)

9.    On or about April 7, 2008, Grace publicly announced its proposed

settlement (the "Proposed Settlement"), embodied in a term sheet for the Plan, which seeks to

pay Bank Lenders post-petition interest at a rate that is less than that provided by the Credit

Agreements.  The Proposed Settlement, incorporated in the Plan, fails to pay the Bank

Lenders post-petition interest pursuant to the method of calculating such interest set forth in

the Credit Agreements, and also fails to pay the facility fees and attorneys' fees due under

such contracts.

10.    On June 13, 2008, Grace objected to the Proofs of Claim to the extent

that such claims sought to include post-petition interest at the contract default rate as part of

the "allowed" amount of the Bank Lenders' claims [Dkt No. 18922] (the "Objection").[9]  The

Court issued its decision and order resolving the Objection on May 19, 2009.[10]

---

[9]    Briefing and argument on the Objection has been completed since September 29, 2008.  All pleadings and arguments filed by the Bank Lender Group are herein incorporated by reference as though fully set forth herein.  *See* Dkt. Nos. 19073, 19478-19487, 19538, and 19601.

[10]    Yesterday, May 19, 2009, this Court entered its decision (the "Decision") on the Objection.  As of this filing, the Bank Lender Group has not fully reviewed the Decision and its ramifications, if any, for their position.  The Bank Lender Group fully reserves all of their rights in respect of the Decision, including the right to seek reconsideration or appellate review of those parts of the Decision that the Bank Lender Group believes are factually or legally erroneous.  To preserve all of its rights, the Bank Lender Group has set forth for the Court's consideration certain facts and legal positions that are relevant to confirmation, but which may also be the subject of the Decision.

11.    On September 19, 2008, Grace filed the first version of the Disclosure Statement and Plan incorporating the Proposed Settlement.  Subsequently, the Disclosure Statement [Dkt. No. 20873] and Plan was revised on February 27, 2009.  The Plan Proponents classify the Bank Lenders' claims as "unimpaired" to establish the irrebuttable presumption that the Bank Lenders have accepted the Plan.  (*See* Plan at §3.1.9(c).)

12.    The Plan, however, does not "leave unaltered the legal, equitable, and contractual rights" of the Bank Lenders under the Credit Agreements and applicable state and federal law.  Instead, it provides for payment in accordance with the unapproved Proposed Settlement.

13.    The Plan provides that each holder of an allowed general unsecured claim shall be paid "the Allowed Amount of its Allowed General Unsecured Claim" with "post-petition interest."  It further provides that post-petition interest on the Bank Lenders' allowed claims is "calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly."  (Plan at §3.1.9(b)(i)(A).)  This is less than the contractual default rate set forth in the Credit Agreements.  Finally, it appears that the Plan deprives the Bank Lenders of the facility fees and attorneys' fees due under their agreements because it fails to recognize such entitlements as part of the "allowed claim."  Thus, there is no dispute that despite the Credit Agreements specifying the legal, equitable, and contractual rights of the Bank Lenders to receive payment of "X," the Plan pays Bank Lenders "X *minus* Y" on account of their claims.  The Bank Lenders are thereby impaired.

## OBJECTIONS

### I.    Plan Violates Section 1129 of the Bankruptcy Code

14.    Section 1129(a)(1) of the Bankruptcy Code requires that, as a condition to confirmation, that the plan must "comply with applicable provisions of this title." The Plan does not satisfy section 1129(a)(1) because it violates:  (a) section 1124(1) because it classifies the Bank Lenders' claims as "unimpaired"; (b) section 1122(a) because it improperly classifies the Bank Lenders' claims with substantially different claims; (c) section 1129(a)(7)'s best interests of creditors test, which requires the payment of interest on allowed claims at the legal rate before equity holders retain any interest; (d) section 1129(b)'s fair and equitable test and absolute priority rule; and (e) section 1129(a)(3) because the Plan is not proposed in good faith.[11]

### II.    Plan Violates Section 1124(1) of the Bankruptcy Code

15.    The Plan violates section 1124(1) of the Bankruptcy Code by improperly classifying the claims of the Bank Lenders as "unimpaired." *See* Plan at §3.1.9(f). The Plan impairs the Bank Lenders' claims because it alters their legal, equitable, and contractual rights by, among other reasons, failing to pay the Bank Lenders' claims in full, in cash, including with post-petition interest at the applicable contract rate set forth in the Credit Agreements, and failing to assure payment of the Bank Lenders' claims in full on the Plan's Effective Date.[12]

---

[11]    The Plan also violates section 1129(a)(11) because it is not feasible; briefing on this issue under the Third Amended Case Management Order is reserved for Phase II of the Confirmation Hearing.

[12]    The Plan fails to pay the Bank Lenders in full inasmuch as it (i) pays no interest to the Bank Lenders on the Effective Date of the Plan, including interest that accrued before the Petition Date, if no Final Order resolving the Objection has been entered by such time and (ii) prohibits the accrual after the Effective Date of any interest on past due unpaid amounts of interest.  (*See* Plan at § 3.1.9(d)(3).)

16.    Under section 1124(1) of the Bankruptcy Code, a class of claims is impaired under a plan if such plan alters the legal, equitable or contractual rights to which such claim entitles the holder of such claim.  The legal, equitable, and contractual rights of the Bank Lenders include the right to post-petition interest at the contract default rate and the right to be paid facility fees and attorneys' fees due under such contracts.

17.    The Third Circuit is crystal clear on the law on "impairment."  If the chapter 11 plan does not leave the creditor's legal, equitable, and contractual rights *entirely 'unaltered,'* the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code."  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) (emphasis supplied).  By proposing to pay the Bank Lenders' claims at an interest rate other than the applicable contract rate, the Plan clearly alters the Bank Lenders' rights such that they are impaired and entitled to vote.

18.    What's more, the Third Circuit presumes impairment under a plan.  *Id.* at 203.  A plan proponent can only overcome the presumption and satisfy its burden if it demonstrates that the plan leaves the creditor's legal, equitable, and contractual rights unaltered.  *Id.*  Grace (or any other plan proponent) is unable to do so.

### A.    Congress and Third Circuit Law Reject Grace's Argument that a Claim is Unimpaired Where a Plan Only Pays the Allowed Prepetition Amount of Claim.

19.    Grace argued in its prior pleadings that a creditor is not "impaired" for purposes of voting on a plan if the plan pays a creditor the allowed prepetition amount of its claim in full, but excluding payment of any post-petition interest.[13]  Grace's position is that a claim is unimpaired for purposes of section 1124 even where its plan proposes to not pay a

---

[13]    Grace's Trial Brief, at ¶ 48 [Dkt No. 19476].

creditor any amount of post-petition interest. In sum, Grace considers itself as generous for paying interest as an "extra" to a creditor already unimpaired by virtue of receipt of its "allowed" section 502 prepetition claim.

20.    Grace's approach to impairment resurrects the discredited analysis of *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), a decision that Congress repudiated in its 1994 repeal of section 1124(3). The repealed provision specified that a creditor receiving full payment of an "allowed claim" was not impaired.[14] In *New Valley*, the debtor objected to certain lenders' claims and sought declaratory judgment rulings that (a) payment under the plan of the full amount of the lenders' allowed prepetition claims rendered such claims unimpaired, and (b) the debtor had no obligation to pay post-petition interest on unimpaired claims. 168 B.R. at 74. The conclusion reached by the *New Valley* court rested on the interplay of sections 502(b)(2), 1129(a)(7)(A) and the now-repealed section 1124(3). While acknowledging the reorganization-solvent debtor exception to non-payment of post-petition interest, the bankruptcy court in *New Valley* held that "§ 1124(3) allowed a solvent debtor to pay the 'allowed' claims of unsecured creditors in full, *excluding post-petition interest, without risking impairment*." *PPIE*, 324 F.3d at 205 (citing *New Valley*, 168 B.R. at 77-80) (emphasis supplied).

21.    The *New Valley* decision not only denied unsecured creditors the post-petition interest to which they were entitled, but also deprived them of the opportunity to challenge the fairness of their treatment under the plan at confirmation. To prevent a repeat of

---

[14]    The language of repealed section 1124(3) provided as follows: "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to -(A) with respect to a claim, the allowed amount of such claim . . . ." 11 U.S.C. § 1124(3) (repealed).

the anomalous result reached in *New Valley*, Congress repealed section 1124(3) to make it clear that in a case where the junior equity class is to retain any interest, the failure to pay a creditor post-petition interest in addition to the "allowed" prepetition amount of its claim constitutes impairment as a matter of law. *See PPIE*, 324 F.3d at 206. As reflected in the unambiguous legislative history, Congress's motivation in deleting section 1124(3) was to overturn the *New Valley* decision and "preclude this unfair result in the future." *Id.* at 206 (citing H.R.Rep. No. 103-835, at 47-48 (1994)).

22.     Subsequently, the Third Circuit dispelled any doubt as to Congress' intent in eliminating section 1124(3) in *PPIE* by upholding the lower bankruptcy court's conclusion that in repealing section 1124(3):

> [Congress] intended that to be unimpaired, the claim must receive post-petition interest.

*PPIE*, 324 F.3d at 206 (quoting *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis supplied).

23.     Also, the Third Circuit held that it was understood that a cash payment equal to the allowed prepetition amount of the claim, but without post-petition interest, "could not qualify for nonimpairment under section 1124(1) because the failure to pay post-petition interest does not leave unaltered the contractual or legal rights of the claim." *Id.* at 207 (quoting *PPIE*, 228 B.R. at 352).

24.     Thus, as made clear in the legislative history of section 1124 and the Third Circuit's decision in *PPIE* that "the presumption of impairment is overcome only if the plan 'leaves unaltered the [creditor's] legal, equitable, and contractual rights,'"[15] a plan must

---

[15]    *PPIE*, 324 F.3d at 203 (quoting section 1124(1)).

pay post-petition interest in accordance with the creditor's contract to be "unimpaired" for

purposes of section 1124.  A plan that provides different treatment violates the law of the

Third Circuit in addition to the unambiguous intent of Congress.

    **B.**    **Section 502(b)(2) Concerns The Allowed Amount of a Claim;
It Does Not Limit or Determine The Legal, Equitable and
Contractual Entitlement to Post-petition Interest**

    25.    *PPIE* dealt with whether a plan improperly classified a landlord's

allowed claim as "unimpaired" where the plan proposed to pay the full amount of the

"allowed" claim as reduced by section 502(b)(6) plus post-petition interest on his allowed

claim.  The creditor contended that his claim was impaired by operation of section 502(b)(6).

*PPIE*, 324 F.3d at 203-04.  The Third Circuit rejected the creditor's "impairment by statue

argument," but at the same time held that a claim must receive post-petition interest on the

allowed prepetition claim, as capped under section 502(b)(6), to be unimpaired.

    26.    By analogy, Grace argues that section 502(b)(2), and not the Plan, is

the source of impairment of the Bank Lenders' legal and contractual rights, and therefore, that

its classification scheme complies with *PPIE*.[16]  However, Grace's section 502(b)(2)

argument fails because section 502(b)(2), like section 502(b)(6), only determines the "allowed

amount" of a creditor's prepetition claim.  It has nothing to do with a creditor's *separate legal*

*and contractual entitlement to post-petition interest on the allowed amount of such creditor's*

*claim* in the circumstances specified in the Bankruptcy Code, as discussed below.  By this

distinction, the Third Circuit on the one hand concluded that full payment of the allowed

prepetition claim as limited by section 502(b)(6) would initially render the claim unimpaired,

---

[16]    Debtors' Corrected Motion to Strike the Bank Lender Group's Sur-Reply or, In The Alternative, Motion for
Leave to File a Sur-Reply [Dkt No. 19622].

but held, on the other hand, that a creditor must receive post-petition interest on the allowed amount of the claim for such claim to be unimpaired. Again, that is why the *PPIE* plan provided for interest on the allowed prepetition claim of the landlord as limited by section 502(b)(6) to render such claim unimpaired.[17]

27.     Section 502(b)(6), as *PPIE* explained, is just the first step: it determines the "allowed amount" of a landlord's prepetition claim. *See PPIE*, 324 F.3d at 205. That provision, though, does not affect the landlord's ability to receive post-petition interest on the "allowed amount" of the landlord's prepetition claim because the entitlement to post-petition interest—the second step—is separate and in addition to the allowed amount of its prepetition claim. *Id.* at 206. Questions regarding whether an impaired creditor is entitled to post-petition interest and at what rate are answered by the applicable contracts, which in this case are the Credit Agreements, other sections of the Bankruptcy Code, like section 1129, and decades of caselaw. A creditor not receiving all that the creditor's contract provides is undeniably impaired.[18]

28.     Therefore, while post-petition interest may be disallowed under section 502(b)(2) as part of the "allowed" prepetition amount of such creditor's claim, section 502(b)(2) does not eliminate, and has nothing to do with, a creditor's entitlement to post-petition interest. As recognized in *PPIE*, the right to post-petition interest is separate *and* in addition to the allowed amount of a creditor's prepetition claim.

---

[17]   The *PPIE* plan paid the complaining creditor post-petition interest in addition to the allowed amount of such creditor's claim as reduced by section 502(b)(6). *See PPIE,* 228 B.R. at 343.

[18]   Grace's own Plan makes it clear that a creditor's entitlement to post-petition interest is in addition to the allowed amount of a creditor's claim. "Each Holder of an Allowed General Unsecured Claims shall be paid the Allowed Amount of its Allowed General Unsecured claim *with post-petition interest . . . Post-petition interest on* Allowed General Unsecured Claims shall be determined as follows: . . ." *See* Plan at §3.1.9(b). (emphasis supplied).

29.     A creditor's right to post-petition interest is preserved under sections 1129(a)(7)[19], 726(a)(5),[20] and section 1129(b)'s "fair and equitable" test.[21]

30.     Disallowance of post-petition interest as part of a creditor's allowed claim under section 502(b)(2) begins, not ends, the inquiry as to the ultimate entitlement to post-petition interest under a plan.

### C.     Grace's Failure to Comply With its Contractual Obligations Post-petition Triggered the Default Interest Rate Under the Credit Agreements

31.     Without its section 502(b)(6) *PPIE* argument, Grace's position boils down to one never accepted by any court: that the Bank Lenders are not impaired because the contract right to default interest, as a result of some type of "ipso facto" protection, somehow does not exist at all in bankruptcy. Thus, taking such contract right to default interest away does not constitute impairment. This is simply wrong as a matter of law.

32.     Under the Credit Agreements, Grace's failure to satisfy its contractual obligations post-petition (including monetary obligations) when due constituted events of default triggering the default interest rate. (*See* Freedgood Aff. at ¶ 13). Notably, Grace has never contested its failure to satisfy these post-petition contractual payment obligations.

---

[19]   Section 1129(a)(7)(A)(ii) of the Bankruptcy Code governs confirmation of a plan and provides that each holder of a claim of such class "will *receive* . . . on account of such claim . . *a value*, as of the effective date of the plan, *that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7* of [the Bankruptcy Code]." (emphasis supplied).

[20]   Section 726(a)(5) is applicable to chapter 11 cases by incorporation through section 1129(a)(7)(A)(ii). Section 726(a)(5) governs distribution of property of the estate and provides for "*payment of interest* at the *legal rate* from the date of the filing of the petition, *on any claim* paid under paragraph (1), (2), (3) of (4) of this subsection. . ." (emphasis supplied). Those sections refer to "allowed claims."

[21]   Section 1129(b) provides in relevant part that "the court . . .shall confirm the plan notwithstanding the requirements of [section 1129(a)] if the plan does not discriminate unfairly, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." (emphasis supplied).

33.    At the September 29, 2008 hearing on Grace's Objection, the Court questioned whether there could ever be a post-petition default of any kind. If there could never be a post-petition default, the Court asked, then there could never be a right to default interest. The answer is that the Bankruptcy Code does not shield a debtor from default on its obligations. Indeed, debtors can and do default on their obligations post-petition.[22] No provision of the Bankruptcy Code provides that defaults (monetary or non-monetary) somehow disappear or that their consequences may be ignored in bankruptcy. To the contrary, numerous Bankruptcy Code provisions recognize that defaults survive and must be dealt with whether they occurred pre- or post-petition. *See* 11 U.S.C. §§365(b), 1124(2)(A). Among other things, section 1124(2)(A) provides that a claim can only be unimpaired if the plan "*cures any such default that occurred before or after the commencement of the case . . .*". (emphasis supplied).

34.    Instead, section 362 of the Bankruptcy Code merely prevents creditors from immediately enforcing the consequences of a pre or post-petition default; it does not insulate Grace from the occurrence of a default in the first instance. Indeed, as noted above, bankruptcy courts enforce bankruptcy and other default provisions all the time.[23]

---

[22]    *See AM-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F.Supp. 2d 235, 241-43 (S.D.N.Y. 1998) (finding that debtor defaulted on its obligations in the wake of its May 1997 bankruptcy, and that the automatic stay provisions of the Code neither prohibited nor nullified that default and the triggering of such surety's obligations); *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986) (addressing situation in which debtor defaulted on payments of principal and interest while in Chapter 11).

[23]    *See, e.g., Anchor Resolution Corp.* v. *State Street Bank & Trust Co. of Conn. (In re Anchor Resolution Corp.)*, 221 B.R. 330, 336-37 (Bankr. D. Del. 1998) (enforcing a make-whole provision triggered by an event of default, even where the "default" was the filing of a bankruptcy petition); *United Merchants & Mgfs., Inc.* v. *Equitable Life Assurance Co. of the United States (In re United Merchants & Mfrs.)*, 674 F.2d 134, 143-44 (2d Cir. 1982) (enforcing a liquidated damages provision triggered by the filing of a Chapter XI petition rather than by some other event of default).

35.     Courts also do not regard Grace's payment-related default provisions as "ipso facto" clauses (which are not applicable with respect to Grace's post-petition payment defaults in any case because section 365 only concerns the termination or modification of contractual rights under *executory contracts*, which a matured loan agreement certainly is not).  Courts in fact recognize that post-petition defaults are to be enforced, and do enforce such rights in accordance with a creditor's contract.  *See In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524 (7th Cir. 1986).  *Chicago* involved the exact question at issue here: whether certain debenture holders should receive principal plus interest on their bonds where the indenture trustee declared a default after the debtor filed its petition.  *Id.* at 525-26.  The debtor objected to the debenture holders' claims for principal plus interest on principal during the default years, arguing that "repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed."  *Id.* at 526.  The Seventh Circuit upheld the lower court's decision to permit acceleration of the principal and interest in accordance with the terms of the indentures, based on the occurrence of the default declaration after commencement of the bankruptcy case.  *Id.*  If the debtor is solvent, the task for the bankruptcy court is simply to enforce creditors' rights (including defaults) according to the contracts that created those rights; anything else constituted a windfall for the debtors. *Id.* at 527-28.

36.     Significantly, the Seventh Circuit flatly rejected arguments identical to those previously advanced here; the Court summarily dismissed the debtor's argument that it should be excused from the consequences of its default because it could not make payments in bankruptcy and rejected the debtor's "appeal to equity" on those grounds:

> It is not a good answer that, once bankruptcy was declared, a
> default under clause (a) [a payment default] was impossible
> because the debtor could not have repaid the principal
> immediately even if it had wanted to do so. Defaults are often
> involuntary.

*Id.* at 529. The Third Circuit agrees with *Chicago* that the mere fact that "'a [bankruptcy]

proceeding is equitable does not give the judge a free-floating discretion to redistribute rights

…'" *United States* v. *Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quoting *Chicago*, 791

F.2d at 528).

37.    Courts enforce creditors' rights in accordance with their contracts

because the Supreme Court mandates that they must. *See Butner* v. *United States*, 440 U.S.

48, 55 (1979). The Supreme Court held that:

> Property interests are created and defined by state law. *Unless
> some federal interest requires a different result, there is no
> reason why such interests should be analyzed differently simply
> because an interested party is involved in a bankruptcy
> proceeding.* Uniform treatment of property interests by both
> state and federal courts within a State serves to reduce
> uncertainty, to discourage forum shopping, and to prevent a
> party from receiving *"a windfall merely by reason of the
> happenstance of bankruptcy."*

*Id.* (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)) (emphasis supplied).[24]

38.    Despite the numerous pleadings that Grace has filed, it does not and

cannot challenge the Bank Lenders' right to default interest under applicable state law. There

is simply no federal interest and certainly no Bankruptcy Code provision or caselaw

permitting a court to rewrite a contract so as to read valid state law property rights to default

---

[24]    *See First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty), 59 F.3d 423, 427 (3d. Cir. 1995) (citing
Butner and finding that goal must be to ensure that creditor "is afforded in federal bankruptcy court the same
protection [it] would have under state law if no bankruptcy ensued."). *See also Chicago*, 791 F.2d at 527
("It is not the objective of the bankruptcy laws to confer windfalls on debtors."); *In re Cybridge Corp.*, 312
B.R. 262, 272-73 (D.N.J. 2004) (accord).

interest out of a contract entirely, nor is there any authority which holds that as a matter of federal bankruptcy law such state law property rights simply *vanish* in bankruptcy such that a creditor is unimpaired under section 1124 despite being deprived of such property rights. If this Court were to rule otherwise and permit Grace to claim that its creditors' state property rights simply did not exist because of the mere "happenstance of bankruptcy," such a ruling would violate the Supreme Court's mandate in *Butner*.

39.    Because they are impaired and entitled to vote, unless the Bank Lenders vote in favor of the Plan or consent to different treatment, Grace must satisfy the cramdown standards of section 1129.

**III.    Plan Violates Section 1122(a)**

40.    The Plan's classification scheme is improper. The Plan violates section 1122 because it groups the Bank Lenders' claims under the Credit Agreement with substantially dissimilar claims of other unsecured creditors arising under different agreements, which may or may not provide for default interest. In yet another attempt to silence the Bank Lenders, this improper classification operates to dilute the Bank Lenders' votes.

41.    Section 1122 provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). A classification structure satisfies section 1122 of the Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar. *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 159 (D. Del. 2006). A chapter 11 plan proponent must demonstrate that there is a reasonable basis for the plan's classification scheme and must establish that all claims within a class are substantially similar. *See In re Drexel Burnham*

*Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). Courts have defined

"substantially similar claims" as those claims "that share a common priority status and other

legal rights against the debtor's assets." *In re Lisanti Foods, Inc.*, 329 B.R. 491, 510 (D.N.J.

2005). Therefore, if claims are not "substantially similar," the claims must be separately

classified pursuant to the plain language of section 1122(a). *See In re Coram Healthcare*

*Corp.,* 315 B.R. 321, 348 (Bankr. D.Del. 2004); *In re Bloomingdale Partners*, 170 B.R. 984,

996-97 (Bankr. N.D. Ill. 1994).

        42.     The Third Circuit described the factors that should be considered in

determining whether a classification scheme is reasonable in *John Hancock Mutual Life*

*Insurance Co.* v. *Route 37 Business Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993). The

Court explained:

> "it seems clear to us that [a reasonableness] determination must be informed by
> the two purposes that classification serves under the Code: voting to determine
> whether a plan can be confirmed (*see* 11 U.S.C. § 1129(a)(8), (10) (1988)) and
> treatment of claims under the plan (*see* 11 U.S.C. § 1123(a)(4) (1988)). Thus,
> where, as in this case, the sole purpose and effect of creating multiple classes is
> to mold the outcome of the voting, it follows that the classification scheme
> must provide a reasonable method for counting votes. In a "cram down" case,
> this means that each class must represent a voting interest that is sufficiently
> distinct and weighty to merit a separate voice in the decision whether the
> proposed reorganization should proceed. Otherwise, the classification scheme
> would simply constitute a method for circumventing the requirement set out in
> 11 U.S.C. § 1129(a)(10) (1988)."

*Id.*

        43.     As evidenced by Grace's calculated decision to object to the Bank

Lenders' proof of claim and the Bank Lenders' avid opposition to the Objection, the Bank

Lenders clearly "represent a voting interest that is sufficiently distinct and weighty to merit a

separate voice in the decision whether the proposed reorganization should proceed." *Id.* In an

unabashed attempt to mold the outcome of the voting, the Plan lumps four distinct categories

of claims into Class 9 despite the fact that the claims are based on different types of contracts with different legal entitlements. The mere fact that the claims in Class 9 are all unsecured is not sufficient to satisfy section 1122. The Third Circuit has approved separate classification of unsecured claims when the legal entitlements of the claimants are substantially different and the classes received different treatment. *In re Jersey City Med. Ctr.*, 817 F.2d at 1061 (approving classification of general unsecured creditors into different classes: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims).

      44.    Separate classification is required in these cases as the Plan Proponents themselves admit the fact that the Plan proposes to pay each of the four different types of claims in Class 9 different post-petition interest rates as follows:

> "(A) for General Unsecured Claims arising from the Pre-petition Credit Facilities, post-petition interest shall be calculated at the rate of 6.09% and thereafter at floating prime, in each case compounded quarterly through the Effective Date;
>
> (B) for General Unsecured Claims arising from Environmental Claims that include a liquidated amount for post-petition or future cleanup liability, post-petition interest shall be calculated at the rate of 4.9% from the date specified in any order allowing the Environmental Claim . . ., compounded annually through the Effective Date or the date of payment of the General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date;
>
> (C) for General Unsecured Claims arising from an existing contract that specifies payment of interest at a non-default rate of interest, post-petition interest shall be calculated at the non-default rate of interest provided in such contract from the Petition Date, compounded annually through the Effective Date or the date of payment of the General Unsecured Claim if it becomes an Allowed General Unsecured Claim after the Effective Date; or
>
> (D) for all other General Unsecured Claims, post-petition interest shall be calculated at the rate of 4.19% from the Petition

> Date, compounded annually through the Effective Date or the
> date of payment of the General Unsecured Claim if it becomes
> an Allowed General Unsecured Claim after the Effective Date;
> . . ."

Plan at § 3.1.9(b) (i)(A) through (D).

45.     Because the claimants in each of the four different categories of claims have separate and different legal, equitable, and contractual rights with respect to post-petition interest, the Plan's classification scheme directly implicates the concerns raised by the Third Circuit in *John Hancock* because it dilutes the votes of each category of creditors. Accordingly, the Plan violates section 1122 and cannot be confirmed.

## IV.   Plan Violates Section 1129(a)(7)'s Best Interests of Creditors Test

46.     The Plan violates the best interests of creditors test of section 1129(a)(7), which requires the payment of interest on allowed claims at the legal rate before equity holders retain any interest.

47.     Grace maintains that under the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code, the federal judgment rate constitutes the only interest rate available to the Bank Lenders.[25]  (Objection ¶¶ 28-30.)  Grace's argument that the Bank Lenders can only receive the federal judgment rate of interest under the "best interest of creditors" test of section 1129(a)(7) is simply wrong.

48.     The "best interests of creditors" test of section 1129(a)(7):

> requires that an impaired claim-holder who does not accept the
> proposed plan must "receive ... under the plan ... property of a
> value ... that is not less than the amount that such holder would
> ... receive ... if the debtor were liquidated under chapter 7."

---

[25]   It is unclear why Grace raised this issue since it stated in its Objection that it only seeks to disallow default interest, not the non-default contract rate.

*In re Dow Corning Corp.*, 244 B.R. 678, 686 (Bankr. E.D. Mich. 1999). In chapter 7 cases, section 726(a)(5) entitles creditors to interest calculated "at the legal rate from the date of the filing of the petition" before the debtor can receive any excess liquidation proceeds. Some courts have recognized that while creditors of a solvent chapter 7 estate may not receive less than post-petition interest based on the federal judgment rate under 28 U.S.C. §1961(a), that rate is by no means the maximum rate in a chapter 11 solvent debtor case. *Id.*; *see also PPIE*, 324 F.3d at 206 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand post-petition interest under the 'fair and equitable' test of § 1129(b)(2).").[26]

49.   It is simply incorrect to read, even in the context of a chapter 7 case, section 726(a)(5) as some courts recently have (*see, e.g., Cardelucci*, 285 F.3d at 1234-35) as evidence of Congressional intent to override state law with a uniform federal post-petition interest rate. When Congress enacted the Bankruptcy Code in 1978, no uniform "federal" judgment rate existed;[27] the "legal rate" under section 762(a)(5) meant either a state statutory rate or the applicable contractual default rate.[28] Consistent with caselaw under the

---

[26]   While Grace cites three cases for the proposition that courts have "consistently interpreted the 'legal rate' of interest to be the federal judgment rate," (Objection ¶ 29) none of these cases impose a ceiling on recovery. *See Coram*, 315 B.R. at 346 (stating that "we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11" and *rejecting* the proposition that the section 1129(b) requires post-petition interest at the federal judgment rate); Bench Ruling at 13-14, *In re Adelphia Commc'ns*, No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006) (Objection Ex. D) (holding that under the "fair and equitable test" of section 1129(b), the court had the discretion to determine the equitable rate of pendency interest and that under the facts of that case, an adjusted contract rate was permitted); *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002) (reasoning that the federal judgment rate was an appropriate rate for post-petition interest on a state court judgment, where there *was no* otherwise applicable contract rate). As for *Cardelucci*, the recent Ninth Circuit ruling in *General Electric Capital Corp.* v. *Future Media Productions*, 547 F.3d 956 (9th Cir. 2008), confirms that *Cardelucci* only establishes the legal rate in the Ninth Circuit under section 726(a)(5) and has no applicability to section 1129(b)'s fair and equitable test.

[27]   *Northrop Corp.* v. *Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).

[28]   *See Realty Assocs. Secs. Corp.*, 163 F.2d 387, 391 (2d Cir. 1947), *cert. denied*, 332 U.S. 835 (1947) (enforcing the 5% contractual default rate instead of the 6% New York judgment rate where there were "no equities to override the bargain which the parties made for themselves"). Application of a higher state statutory rate could be justified if the debtor was solvent, *id.* at 392 (Clark, J., dissenting), and application of

21

Bankruptcy Act, during at least the first twenty-plus years of practice under the Bankruptcy Code (including when the Credit Agreements were executed) "the majority of cases follow[ed] a state law approach by providing that when a creditor seeks interest on a claim, the bankruptcy courts apply the [credit] agreement's interest rate." *In re Carter*, 220 B.R. 411, 415 (Bankr. D.N.M. 1998).

50.    The 1982 amendment to 28 U.S.C. § 1961 (imposing a uniform postjudgment interest rate on *money judgments* obtained in federal courts) does not alter this conclusion.  Section 1961(c)(4 ) expressly states that it "shall not be construed to affect the interest on any judgment of any court not specified in this section."  The existence of a prima facie valid proof of claim is *not* a money judgment obtained in a district court; nor does the filing of a bankruptcy petition constitute in any sense a money judgment.

51.    Absent evidence that Congress sought to impose a uniform rate of post-petition interest, and absent the furtherance of a legitimate federal policy, this Court should respect, not displace, state law.[29]  Because Grace's argument that Bank Lenders can only receive the federal judgment rate of interest under the "best interests of creditors" test is wrong, the Plan may not be confirmed because Grace has failed to satisfy its burden under section 1129(a)(7).

---

a lower statutory rate if the contract rate was usurious. *Johnson* v. *Norris*, 190 F. 459, 463-64 (5th Cir. 1911).  Both New York's postjudgment rate of 9% and Delaware's postjudgment rate of 5% above the federal rate well exceed the default rate under the Credit Agreements. *See* N.Y. C.P.L.R. §§ 5003, 5004; DEL. CODE ANN. tit. 6, § 2301(a).

[29]    "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts." *Atherton* v. *FDIC*, 519 U.S. 213, 218 (1997).

**V.   Plan Violates Section 1129(b)'s Absolute Priority Rule and
"Fair and Equitable" Requirement**

52.   The Bank Lender Group believes that the voting report that Grace or
the Plan Proponents must file will establish that at least one impaired class—Class 9—will
vote to reject the Plan.   As such, the Plan Proponents must satisfy the requirements of section
1129(b) of the Bankruptcy Code including the absolute priority rule which mandates that
"senior classes receive full compensation for their claims before other [junior] classes can
participate."  *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 30 (3d Cir. 2007); *In re
Insilco Technologies, Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007).

53.   Under the absolute priority rule, equity cannot retain any interest if an
impaired dissenting class of senior creditors does not receive payment in full, including post-
petition interest—even in the context of a purported "settlement."  *See In re Armstrong World
Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005); 140 Cong. Rec. H 10,768 (daily ed. Oct. 4,
1994) ("[I]n order for a plan to be fair and equitable, unsecured and undersecured creditors'
claims must be paid in full, including post-petition interest, before equity holders may
participate in any recovery."); *PPIE*, 324 F.3d 197, 206 n. 14 (3d Cir. 2003) ("An impaired
creditor in a solvent debtor case can demand post-petition interest under the 'fair and
equitable' test of § 1129(b)(2).").

54.   The Plan violates the absolute priority rule and the "fair and equitable"
requirement of section 1129(b) of the Bankruptcy Code because it provides for Grace's equity
interest holders to retain value without first providing payment in full to more senior creditors,
including the Bank Lenders.  (*See* Plan at §§ 3.1.9, 3.1.10, and 3.1.11.)  As set forth in the
Bank Lender Group's pleadings filed in connection with the Objection, the Plan fails to pay
Bank Lenders in full because it pays them less than the rate set forth in the Credit

Agreements.[30]  Moreover, the Plan fails to provide payment in full inasmuch as it (i) pays no

interest to the Bank Lenders on the Effective Date of the Plan, including interest that accrued

before the Petition Date, if no Final Order resolving the Objection has been entered by such

time and (ii) prohibits the accrual after the Effective Date of _any_ interest on past due unpaid

amounts of interest.  (_See_ Plan at § 3.1.9(d)(3).)  Accordingly, because the Plan seeks to pay

equity anything before paying non-consenting more senior creditors in full, the Plan fails to

comply with the absolute priority rule and should not be confirmed.

55.    Any assertion by Grace that the equities nevertheless justify the

proposed distribution to the Bank Lenders must be rejected.  That Grace reached a settlement

with certain creditors does not justify deviation from the priority scheme of the Bankruptcy

Code as to other creditors.[31]  There is simply no reason why the interest due to the Bank

Lenders should be a "key component" to the Proposed Settlement as Grace claims,

particularly when the Bank Lenders were not even invited to the negotiating table.[32]  Nor have

the Bank Lenders engaged in conduct that would justify modification of their rights or

evidence their consent to the proposed treatment under the Plan.[33]

## VI.    Plan Violates Section 1129(a)(3) Because it Was Not Proposed in Good Faith

56.    The Plan violates section 1129(a)(3) because by Grace proposing a plan

that seeks to maximize value for equity at the expense of its creditors, the Plan represents a

---

[30]  _See_ Response of the Bank Lender Group in Opposition to the Debtors' Objection to Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999 dated July 11, 2008 ("Bank Lenders' Opposition Mem.") [Dkt No. 19073], at pp. 19-27; Pre-Trial Mem. of the Bank Lender Group in Opposition to the Debtors' Objection to the Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999 dated September 5, 2008 ("Bank Lenders' Pre-Trial Mem.") [Dkt. No. 19478], at pp. 23-28.

[31]  _See_ Bank Lenders' Opposition Mem. at pp. 38-40; Bank Lenders' Pre-Trial Mem. at pp. 14-20, 42-43.

[32]  _See_ Objection at p. 10; Bank Lenders' Opposition Mem. at p. 13.

[33]  _See_ Bank Lenders' Opposition Mem. at pp. 34-38; Bank Lenders' Pre-Trial Mem. at pp. 30-41.

breach of Grace's fiduciary duties to its creditors and thus was not proposed in good faith.

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means

forbidden by law.  This generally means that there is a reasonable likelihood that the plan will

fairly achieve a result consistent with the Bankruptcy Code, in light of the particular facts and

circumstances.  *See In re PW Holdings Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re Leslie*

*Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).

57.    "A paramount duty of a trustee or debtor in possession in a bankruptcy

case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors." *In re*

*Cybergenics*, 226 F.3d 237, 243 (3d Cir. 2000); *In re Global Crossings*, 295 B.R. 726, 745

(Bankr. S.D.N.Y 2003) (noting that "it is well established that when a corporation gets into

the zone of insolvency, the fiduciary duties of its board expand from the corporation's

stockholders to its creditors").

58.    The Plan permits equity to "ride through" and retain between $430

million and $821 million in value while at the same, it seeks to deprive its creditors, the Bank

Lenders, of over $91 million by paying such creditors less than the interest rate set forth in the

Credit Agreements.  By seeking confirmation of a plan that benefits shareholders at the

expense of creditors, and also by seeking to deprive creditors of their right to vote on the Plan

and to dilute their votes, Grace has failed to comply with its fiduciary duties to act on behalf

of creditors.  Accordingly, the Plan cannot be confirmed because the Plan Proponents have

not proposed it in good faith as required by section 1129(a)(3).

## **RESERVATION OF RIGHTS**

59.    The Bank Lender Group repeats and expressly reserves its right to

object further to confirmation of the Plan on any and all grounds, including those set forth

herein.  In addition, the Bank Lender Group expressly reserves the right to brief and

supplement the foregoing objections and any of the Bank Lenders' additional objections to the

Plan (as amended from time to time).

Dated:  Wilmington, Delaware       LANDIS RATH & COBB LLP
        May 20, 2009

Richard Cobb (No. 3157)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 1800
Post Office Box 2087
Wilmington, Delaware  19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
*Attorneys for The Bank Lender Group*