IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al., | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hearing Dates: June 22-25, 2009 |
| | ) Re: Docket Nos. 20622, 20666, 21544 |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W.R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, DATED FEBRUARY 27, 2009

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of W.R. Grace & Co., et al. (the "Debtors") by and through its undersigned counsel, hereby objects to confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, The Official Committee of Asbestos Personal Injury Claimants (the "Asbestos PI Committee"), the Asbestos PI Future Claimants' Representative (the "FCR") and The Official Committee of Equity Security Holders (the "Equity Committee", and collectively with the Debtors, the Asbestos PI Committee and the FCR, the "Plan Proponents") dated February 27, 2009 (Docket No. 20666) (the "Plan"), and respectfully states as follows:

### PRELIMINARY STATEMENT

The Plan is not confirmable as a matter of law because the Plan improperly designates Class 9 (General Unsecured) Claims as unimpaired. This is a significant flaw, premised on the failure of the Plan to expressly provide for the payment of the full amount of post-petition

interest to the claimants holding Claims[1] in Class 9. First, the Holders of Bank Claims are not being provided with post-petition interest at the applicable default rate under the Pre-petition Credit Facilities, thus leaving their contractual rights altered. Second, as to Holders of non-Bank Claims designated as Class 9 Claims, the Plan is ambiguous as to whether it provides for the payment of the full amount of post-petition interest on these "other" Class 9 Claims that have provisions in their respective agreements for the payment of interest, including default interest or some other late payment amount, or that may be entitled to appropriate state statutory rates of interest in excess of the 4.19% interest rate provided in the Plan.

Section 1124(1) of the Bankruptcy Code requires that the legal, equitable and contractual rights of each claim within the class be unaltered by the plan. Consequently, the impairment of any Claims within Class 9 renders the entire Class impaired. The Plan Proponents have not and cannot meet their burden of overcoming the presumption that each of the Claims in Class 9 is impaired, and, accordingly, Class 9 is impaired as a matter of law.

As a result of the Plan's impairment of Class 9 Claims (and assuming a vote by the Holders of Class 9 Claims against the Plan), the Plan violates the absolute priority rule and is not "fair and equitable" under section 1129(b)(2)(B) of the Bankruptcy Code. The Plan provides for two junior Classes of Equity Interests to retain property under the Plan, while the Holders of Class 9 Claims, a class senior to Classes of Equity Interests, are not paid in full. Indeed, the Disclosure Statement provides for an estimate of the Reorganized Equity Value of the Reorganized Debtors and their Non-Debtor Affiliates, as of December 31, 2009, in a range between $430 million and $821 million. This is value that, by the Debtors' own admission, is

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms by the Plan.

preserved for their shareholders.  By providing such a recovery for the Debtors' Equity Interests at the expense of their General Unsecured Creditors in Class 9, who are not being paid in full, the Plan violates the absolute priority rule and is not confirmable as a matter of law.

Separately, but yet related, the Plan violates sections 1129(a)(1) and 1103 of Bankruptcy Code by attempting to provide for the dissolution of the Creditors' Committee on the Effective Date, notwithstanding that the litigation regarding the Bank Claims may not be concluded at that time.  That provision, § 11.8 of the Plan, purports to apply to all of the official committees, yet is discriminatory because, in application, it can and does apply only to the Creditors' Committee. The Creditors' Committee's participation as a party to that litigation in this Court was not then challenged and the Plan Proponents should not be permitted to do through the Plan what was not done at the appropriate time during the litigation.  The offending section of the Plan should be stricken.

## BACKGROUND

By order dated March 9, 2008 (Docket No. 20944), the Court approved, inter alia, the Disclosure Statement dated as of February 27, 2009 for the Plan and related notices, and established solicitation and confirmation procedures and deadlines regarding the Plan.  The Voting Agent must receive all Ballots accepting or rejecting the Plan by May 20, 2009 for such votes to be counted.  Accordingly, as of the date of this Objection, it is not yet known how the respective Classes of Claims and Equity Interests voted regarding the Plan.

The Court's Second Amended Case Management Order dated January 29, 2009 (Docket No. 2622) established, among other things, that confirmation would occur in two phases.  In Phase I, scheduled to take place from June 22 through 25, 2009, parties will address certain

issues affecting the rights and standing of the Debtors' insurers and "the confirmation objections raised on behalf of and specific to lenders under the Pre-petition Credit Facilities and other Class 9 creditors with respect to impairment." In Phase II, scheduled to take place from September 8, through 12, 2009, parties will address objections of the Libby Claimants and of parties classified as Holders of Indirect PI Trust Claims and Indirect PD Trust Claims and "any other confirmation objections not addressed and resolved in Phase I."

Class 9 consists of over a thousand pre-petition Claims, including those for payment of principal and interest to the bank lenders under the Debtors' Pre-petition Credit Facilities (the "Bank Claims"), for unpaid taxes and principal and interest under drawn letters of credit and for liabilities owing to suppliers of goods and services.[2]

On June 13, 2008, three months prior to the Plan Proponents filing with the Court their initial form of the Plan on September 19, 2008, the Debtors filed an objection (the "Bank Claims' Objection") to the proofs of claim filed on behalf of the Holders of Bank Claims to the extent their Claims sought post-petition interest at the 2% percent default rate provided for by the Pre-petition Credit Facilities.[3] The Court heard argument on the Debtors' Bank Claims' Objection on September 15, 2009 and issued its decision and order resolving the claim objection on May 19, 2009, expressly preserving all confirmation issues for the confirmation hearing.[4]

---

[2] See Disclosure Statement, at 39-40, § 2.9.3; at 69, § 3.2.10.

[3] Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 15, 1999 (Docket No. 19072). Responses were filed in opposition to the contested matter commenced by the Debtors' objection by certain Holders of Bank Claims, the Creditors' Committee and JP Morgan Chase Bank, Inc.

[4] This Court's decision on the Debtor's Bank Claims' Objection was filed the day prior to the deadline for filing this Plan objection. As a result, the Creditors' Committee has not yet had sufficient opportunity to analyze the implications, if any, of the decision upon the confirmation issues and the Creditors' Committee expressly reserves the right to accordingly amend its objections to confirmation.

Under the Plan, the Holders of Bank Claims will not receive payment of the contractual default rates for post-petition interest expressly provided for the banks under the terms of the Pre-petition Credit Facilities, but a lesser amount of interest determined by the Plan Proponents. The Plan also provides in the first instance for Class 9 Claims derived from contracts other than the Pre-petition Credit Facilities to receive either non-default rates of interest, or interest at a rate of 4.19%, again determined by the Plan Proponents, even when such parties' agreements with the Debtors provide for the payment of default rates or other late payment amounts. Other Class 9 Claims not derived from contracts are to receive post-petition interest at the rate of 4.19%, even when another different rate would be applicable.

In connection with negotiations over the Creditors' Committee's objections to the adequacy of the September 19, 2008 form of the Disclosure Statement, the Creditors' Committee proposed that the Debtors modify the treatment in the corresponding form of the Plan to provide the Holders of other Class 9 Claims with the opportunity to dispute the payment of post-petition interest at the 4.19% per annum or contractual non-default rates the Debtors ascribed to such Holders in that prior form of the Plan. The Creditors' Committee suggested that the Debtors consider procedures similar to those post-petition interest rate dispute resolution procedures established in the confirmed plan of reorganization in In re USG Corp., Case No. 01-2094 (JKF) (Bankr. D.Del. March 27, 2006). The Plan currently before this Court does include procedures for other Class 9 Claims to challenge the post-petition interest rate the Plan proposes to provide to such creditors.

The Plan designates Class 9 as unimpaired and, accordingly, Class 9 is deemed to have accepted the Plan. That notwithstanding, in connection with resolving the Creditors'

Committee's objections to the Disclosure Statement,[5] the Creditors' Committee requested and the Debtors ultimately agreed to provisionally solicit the votes of the Holders of Class 9 Claims. Unless the Court determines that Class 9 is impaired, however, the provisional votes actually cast by the Holders of Class 9 Claims will not be given any effect at the time of confirmation of the Plan.

## **ARGUMENT**

Section 1129 of the Bankruptcy Code governs confirmation of a plan of reorganization and sets forth requirements that the plan must satisfy in order for a reorganization plan to be confirmed. The plan proponents bear the burden of establishing the satisfaction of each of the confirmation requirements. In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000). The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of section 1129. In re Lernout & Hauspie Speech Products, N.V., 301 B.R. 651, 656 (Bankr. D.Del. 2003); In re River Village Assoc., 181 B.R. 95, 805 (E.D. Pa. 1995). The Plan Proponents have failed to meet their burden of satisfying sections 1129(a)(1) and 1129(b), the latter if, as expected, Class 9 votes to reject the Plan.

**The Plan Incorrectly Designates Class 9
(General Unsecured) Claims As Unimpaired And
Therefore Is Unconfirmable As A Matter of Law**

The Plan cannot be confirmed because it incorrectly and illegally designates the Class of creditors holding General Unsecured Claims (Class 9) as unimpaired. Under this construct, the Class is presumed to have accepted the plan under 11 U.S.C. § 1126(f), and, as a result, the

---

[5]    See Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for An Order Approving Debtors' Disclosure Statement For The Joint Plan of Reorganization Dated As Of September 19, 2008, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief (Docket No. 19779).

actual votes of Class 9 creditors provisionally permitted to be cast on the Plan will be nullified and have no impact on the confirmation process. By deeming Class 9 impaired and denying those claimants the right to vote, the Debtors transparently hope to eliminate the ability of Class 9 creditors to object to the Plan's confirmation on the grounds that the Plan violates the absolute priority rule and is not fair and equitable under 11 U.S.C. § 1129(b)(2)(B).

Section 1124(1) of the Bankruptcy Code, which governs impairment of claims or interests under a plan, provides in relevant part that "a class of claims is impaired ... unless, with respect to each claim, the plan – (1) leaves unaltered the legal, equitable and contractual rights to which such claim ... entitles the holder of such claim ...." By its express terms, "[t]he Bankruptcy Code creates a presumption of impairment 'so as to enable a creditor to vote on acceptance of the plan.'" In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 203 (3d Cir. 2003) (hereafter, "PPI"). The burden of overcoming this presumption rests on the debtor to demonstrate that the plan "leaves unaltered the [creditor's] legal, equitable, and contractual rights." Id. If the plan does not leave the creditor's rights "entirely 'unaltered'," the creditor's claim will be labeled as impaired under 11 U.S.C. § 1124(1) with the result that the creditor has the right to vote. Id. at 202 (citations omitted); see also In re L & J Anaheim Assocs., 995 F.2d 940, 943 (9th Cir. 1993); In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909, at *14 (N.D. Tex. May 24, 2005) ("no impairment is too small to escape the necessity of a vote by the class so affected."); In re Coram Healthcare Corp., 315 B.R. 321, 351 (Bankr. D. Del. 2004) ("if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired.").

Claims are "unimpaired" pursuant to § 1124(1) of the Bankruptcy Code if the plan provides for the payment of the claims in full, in cash, on the effective date of the plan. PPI, 324

F.3d at 206; In re Monclova Care Ctr., Inc., 59 F.App'x 660, 664 (6th Cir. 2003) (claim was "impaired" because debtor's plan failed to include interest payments); In re New Midland Plaza Assocs., 247 B.R 877, 896 (Bankr. S.D. Fla. 2000). Here, under the proposed Plan, not all General Unsecured Claims in Class 9 are being paid in full with the appropriate amount of post-petition interest to which such Claim is entitled. Accordingly, the Plan does not "leave unaltered the [creditor's] legal, equitable, and contractual rights" and consequently, the Class is impaired.

A.    **The Plan Impairs Bank Claims By Failing To Provide Such Claims With The Contractual Default Interest Specified By the Pre-petition Credit Facilities**

Section 3.1.9(b)(i)(A) of the Plan provides that in addition to the Allowed Amount of its Allowed General Unsecured Claim, each General Unsecured Claim arising from the Pre-petition Credit Facilities will be paid post-petition interest "calculated at the rate of 6.09% from the Petition Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly through the Effective Date." Plan at 50-51; § 3.1.9 (b)(i)(A). However, the Debtors' Pre-petition Credit Facilities provide that, in the event of the Debtors' default, interest shall be paid equal to the Prime Rate plus 2% (the "Default Rate"). See Affidavit of Charles O. Freedgood of JPMorgan Chase Bank, N.A., filed August 15, 2008, Docket No. 19322, at Exs. A, B, at §§ 5.1(c), 5.5.[6] The Plan does not propose to pay Bank Claims post-petition interest at this Default Rate. Rather, the Plan proposes to pay post-petition interest on the Bank Claims at a specific rate selected by the Plan Proponents that indisputably has no foundation in the Pre-petition Credit Facilities themselves. As this Court is well aware from

---

[6]    The Court may take judicial notice of pleadings filed on the docket in these bankruptcy cases. See Fed. R. Evid. 201(b) (a court may take notice of judicially noticed facts "not subject to reasonable dispute"); Waltz v. County of Lycoming, 974 F.2d 387, 398 (3d Cir. 1992) (pleadings, motions, and briefs which were part of the record were "subject to judicial notice" without further proof).

prior pleadings filed with the Court[7] and argument, the interest rate selected by the Debtors is

that taken from their now defunct, superseded and replaced joint plan of reorganization filed in

January 2005.[8]

Other terms of the Plan also belie the Debtors' apparent contention that the Plan leaves

unaltered the legal, equitable and contractual rights of Holders of Bank Claims in Class 9, in

accordance with section 1124(1). Most conspicuously is the absence of any statement in the Plan

that Class 9 creditors' legal, equitable and contractual rights are *not* being altered. This is in

sharp contrast to sections of the Plan addressing the treatment of Class 3 (Employee Benefit)

Claims, Class 4 (Workers Compensation) Claims, Class 5 (Intercompany) Claims, and Class 11

(Equity Interests in the Debtors other than the Parent), all of which are Classes designated as

unimpaired by the Plan, but which expressly state that the Plan leaves unaltered the legal,

equitable and contractual rights to which each such claim or interest entitles the Holder. See

Plan at 46, § 3.1.3(b), Plan at 46, § 3.1.4(b), Plan at 47, § 3.1.5(b), and Plan at 55, § 3.1.11(b).

---

[7]    See Response of the Official Committee of Unsecured Creditors to Debtors' Objection to the Unsecured Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 15, 1999 (Docket No.
19072); Response of the Bank Lender Group in Opposition to the Debtors' Objection to the Unsecured Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.
19073); Pre-Trial Memorandum of the Bank Lender Group in Opposition to the Debtors' Objection to Claims
Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No.
19478); Joinder of the Official Committee of Unsecured Creditors in the Pre-Trial Memorandum of the Bank
Lender Group in Opposition to the Debtors' Objection to Claims Asserted Under the Debtors' Credit
Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No. 19477).

[8]    It is of no moment as to whether Class 9 is impaired that the rate designated in the Plan was once agreed to by
the Creditors' Committee, or even by several previous holders of Bank Claims in the applicable 2004 and 2005
period when that now superseded joint plan was negotiated and filed. Indeed, representatives for several
Classes under the Plan; i.e., Classes 7B (US ZAI PD Claims), 8 (CDN Claims) and 10 (Equity Interests in the
Parent) have each agreed to the treatment embodied in the Plan for such Classes, yet such Classes are
designated as impaired under the Plan, and the Holders of Claims or Interests in such Classes have the right to
vote on the Plan. In determining whether creditors holding Bank Claims in Class 9 are impaired, all that matters
is that the Plan alters these creditors' contractual rights.

Further, the Plan contains an express condition to its confirmation that a Final Order shall have been entered determining that the allowed claims for post-petition interest on account of Bank Claims shall be "in amounts that are not in excess of the rates set forth in Section 3.1.9(b) of this Plan." See Plan at 80, § 7.7(xx). Thus, the Plan intends to cap the amount of post-petition interest to be paid to Bank Claims, regardless of what a Court may determine by a Final Order, except to the extent this condition is waived by the Debtors and Equity Committee. Plan at 81 § 7.7. Although the Plan could conceivably provide for Bank Claims to be limited to receiving payment of post-petition interest "to the extent allowed" by applicable law without impairing them, PPI, 324 F.2d, at 204 (internal citation omitted), should Holders of Bank Claims prevail in obtaining a Final Order determining that they are entitled to Default Interest, or indeed any amount in excess of the treatment provided for them by the Plan, the Debtors and Equity Committee maintain the ability to go forward with, or walk away from, the Plan in such circumstances. The Bank Claims are therefore impaired.

**B.      The Plan Also Appears To Impair The Holders of Other Class 9 Claims Not Derived From The Pre-petition Credit Facilities**

The legal, equitable and contractual rights of creditors holding "other" General Unsecured Claims in Class 9 – those not derived from the Pre-petition Credit Facilities (the "other Class 9 Claims") – also appear to be impaired by the Plan. Other Class 9 Claims are not of one type, but include Claims for goods and services to which the Debtors and such creditors are parties to various invoices, purchase orders and other contracts and agreements, for tax and environmental liabilities, and for amounts owing under letters of credit. The fundamental starting point for the Plan's treatment of Holders of other Class 9 Claims arising under contracts is to pay them post-petition interest "calculated at the non-default rate of interest provided in

such contract from the Petition Date, compounded annually...." Plan at 50-51, § 3.1.9(b)(i)(C). With respect to other Class 9 Claims not derived from a contract, the Plan proposes to pay such creditors post-petition interest "calculated at the rate of 4.19% ... compounded annually...." Plan at 50-51, §§ 3.1.9(b)(i)(B) and (D).

Although the Plan contains procedures in Section 3.1.9(d) enabling Holders of other Class 9 Claims in Sections 3.1.9(b)(i)(B), (C) and (D) to challenge "the rate or calculation" of post-petition interest the Plan proposes to pay to such creditors, the dispute resolution procedures included in the Plan do not clearly reflect that such creditors with contracts can also raise issues in respect of post-petition interest that would include, among other matters, entitlements to other late or default payment amounts, or interest on interest, which might be appropriate under their contracts, and that creditors without contracts could also raise entitlement to appropriate state statutory rates of interest that exceed the 4.19% interest rate the Plan proposes to pay such creditors.  Given the different types of other Class 9 Claims within the Class, there is uncertainty whether the dispute resolution procedures provided a knowing opportunity for other Class 9 Claims to raise all post-petition payment related issues that are applicable to them and that the Plan would have to satisfy in full in order for such creditors to be treated as unimpaired.[9] Further, because the Plan fails to affirmatively state that the treatment for other Class 9 Claims is to leave unaltered the legal, equitable and contractual rights to which each such creditor is entitled,[10] there is uncertainty whether the Plan, in fact, will fully satisfy all amounts ultimately determined to be due such creditor in order to leave it unimpaired by the Plan.  Under section

---

[9] For example, the Creditors' Committee is advised that a Holder of a number of other Class 9 Claims believes that the litigation protocol set forth in the Plan impairs such creditors for reasons other than those identified herein and that creditor will be filing an objection to confirmation of the Plan setting forth its position in this regard.

[10] See the discussion supra at 9-10.

1124(1), the Plan Proponents have the burden to establish that each of these other Class 9 Claims are unimpaired by the Plan.  They have not met this burden.

C.    **The Impairment of Class 9 Claims Results From The Plan's Treatment of Such Claims**

The impairment of Class 9 is impermissible because it results solely from the treatment provided the Class in the Plan; it is not the result of the application of any provision of the Bankruptcy Code.  The Third Circuit, in <u>PPI</u>, held that a claim is impaired under 11 U.S.C. § 1124 only if the plan of reorganization itself, as opposed to some provision of the Bankruptcy Code, alters the creditor's rights.  324 F.2d at 205.  The Debtors previously argued in connection with its objection to paying the Default Rate on the Bank Claims that the Bank Claims were unimpaired because 11 U.S.C. § 502(b) itself precludes the payment of unmatured (post-petition) interest.  <u>See</u> Debtors' Trial Brief in Support of Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements dated as of May 14, 1998 and May 5, 1999 (Docket No. 19476) at 24-25.  Not only is the Debtors' position wrong as a matter of law, it was exactly the reason Congress revised § 1124 in 1994 to <u>repeal</u> what was then § 1124(3).  As the Third Circuit explained in <u>PPI</u>:

> Before 1994, § 1124(3) specified that a creditor receiving full payment of an "allowed claim" was not impaired . . . . Interpreting this statute in 1994, one bankruptcy court held that § 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding post-petition interest, without risking impairment.  <u>In re New Valley Corp.</u>, 168 B.R. 73, 77-80 (Bankr. D.N.J. 1994) . . . . After the <u>New Valley</u> decision, Congress repealed § 1124(3).

324 F.2d at 205-06.  The Court of Appeals quoted the legislative history: "[a]s a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the

claims, the class would be impaired, entitling creditors to vote for or against the plan of

reorganization." Id. at 206, citing H.R. Rep. No. 103-385, at 47-48 (1994), reprinted in 1994

U.S.C.A.N. 3340, 3356-57. The PPI court agreed with the bankruptcy court below that

> Section 1124(3) created nonimpairment status by a cash payment
> equal to the allowed amount of the claim but without postpetition
> interest. Such treatment could not qualify for nonimpairment
> under § 1124(1) because the failure to pay postpetition interest
> does not leave unaltered the contractual or legal rights of the claim.

324 F.3d at 207 (citing In re PPI Enters., 228 B.R. 339, 352 (Bankr. D. Del. 1998)) (emphasis

added).

     Accordingly, because the Plan does not provide for payment of post-petition default

interest to Class 9 creditors with contracts, Class 9 is impaired. It is as a result of the Plan's

provisions – and not as the result of the application of any provision of the Bankruptcy Code –

that neither the Bank Claims nor the other Class 9 Claims are proposed to be paid post-petition

interest at the default rate contained in their respective contracts. No provision of the Code

enables the Debtors to propose a specific interest rate not found in the creditors' respective

contracts. Although creditors holding Bank Claims and other Class 9 Claims are to be paid some

post-petition interest under the Plan, the rates applied to both groups here is of the Plan

Proponents' making. The Plan Proponents' choice of an interest rate significantly alters the legal

or contractual rights of creditors in Class 9. Class 9 is therefore impaired and the votes

provisionally permitted to be cast on the Plan must be given effect and counted for all purposes

in connection with Plan confirmation.

**The Plan Violates The Absolute Priority Rule
And Is Not Fair And Equitable As Required by
11 U.S.C. § 1129(b) As Equity Interests Are Retaining
Property Without Class 9 Claims Being Paid In Full**

The Plan violates the absolute priority rule and cannot be confirmed.  The United States

Court of Appeals for the Third Circuit described the absolute priority rule in its initial form as

requiring that "creditors . . . be paid before the stockholders could retain [equity interests] for any

purpose whatever."  In re Armstrong World Indust., Inc., 432 F.3d 507, 512 (3d Cir.

2005)(quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 LaSalle St. P'ship, 526 U.S. 434,

444 (1999))(ellipsis in original).  The absolute priority rule was later codified as part of the "fair

and equitable" requirement of 11 U.S.C. § 1129(b).  Under this provision of the Bankruptcy

Code, "a plan is fair and equitable with respect to an impaired, dissenting class of unsecured

claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior

claims or interests to receive or retain any property under the plan 'on account of' such claims or

interests."  Id.; 11 U.S.C. § 1129(b)(2)(B)(i)-(ii).  Thus, in its simplest terms, the absolute

priority rule "requires that senior classes receive full compensation for their claims before other

[junior] classes can participate."  In re Websci Techs., Inc., 234 F.App'x 26, 30 (3d Cir. 2007)

(holding that under 11 U.S.C. § 1129(b)(2)(B)(ii), because a shareholder "would have been

junior to all claimants, he could not have retained the stock or any rights arising from its

ownership."); In re Insilco Techs., Inc., 480 F.3d 212, 218 n.10 (3d Cir. 2007) ("Even in the

flexible world of Chapter 11 reorganizations, the absolute priority rule, 11

U.S.C.§ 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid

in full.").

Moreover, "a settlement presented for approval as part of a plan of reorganization,

because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in

the sense of conforming to the absolute priority rule." <u>In re Iridium Operating LLC</u>, 478 F.3d 452, 463 (2d Cir. 2007) (citing <u>Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968)). Indeed, in <u>Iridium</u>, the Second Circuit held that creditor groups may not, through a pre-plan settlement, provide recoveries to junior classes unless senior classes are paid in full. <u>Id.</u>

The Plan as structured fails to satisfy the fair and equitable standard of 11 U.S.C.§ 1129(b)(2)(B). Class 9 is a class senior to that of the two Classes of Equity Interests under the Plan, Class 10 (Equity Interests in the Parent) and Class 11 (Equity Interests in the Debtors Other than the Parent). As discussed above, the Plan fails to provide for the payment of the full amount of post-petition interest at the Default Rate to the Holders of Bank Claims and may not provide the full amount of post-petition interest to other Class 9 Claims. The Plan, meanwhile, provides for the more junior Class, Class 10, Holders of Equity Interests in W. R. Grace & Co., the Parent, to retain their interests, "subject to the issuance of the Warrant, the terms of the Share Issuance Agreement, and the Stock Trading Restrictions Term Sheet." Plan at 55, § 3.1.10(b). The Plan's second junior Class of Equity Interests, Class 11, consists of the Equity Interests in the Debtors other than the Parent. The Plan expressly leaves unaltered the legal, equitable and contractual rights to which each Equity Interest in Class 11 entitles the Holder of such Equity Interest. Plan at 55, § 3.1.11(b).

The Disclosure Statement makes clear that the Plan is providing a substantial recovery to Equity Interests. Even taking at face value the Debtors' determination that the estimated Reorganized Enterprise Value of the Reorganized Debtors and their Non-Debtor Affiliates as of December 31, 2009 is approximately $2.1 billion to $2.5 billion, and fully accepting the Debtors' assumptions and then deductions from that determination to calculate the Reorganized Equity

Value, the Debtors' estimate that the Reorganized Equity Value of the Reorganized Debtors and their Non-Debtor Affiliates ranges from $430 million to $821 million. Disclosure Statement at 47, § 2.11.1, id. at 50; § 2.11.6. It is therefore undisputed that the Debtors' Equity Interests will retain these very valuable Equity Interests post-emergence.

By retaining property with substantial value for their Equity Interests at the expense of unsecured creditors who are not being paid in full, the Plan violates the absolute priority rule and, in a cram down situation against a rejecting Class 9, is not fair and equitable and cannot be confirmed. As the Sixth Circuit explained in In re Dow Corning, when the debtor is solvent, a chapter 11 plan that fails to pay the contract default rate of interest to creditors is not "fair and equitable." 244 B.R. 678, 695-96 (6th Cir. 2006). In In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006), a class of unsecured commercial debt holders holding approximately $1 billion in debt objected to a plan proposed by the solvent debtor and the tort claimants' committee that proposed paying the principal amount of all of the unsecured debt along with post-petition interest at the federal judgment rate rather than the contract default rate. The unsecured creditors argued that:

> the bankruptcy court's imposition of the federal judgment interest rate, as opposed to the rates required by the debt contracts, means that Class 4 was not being paid the full interest it was owed, while Dow Corning's two shareholders, both in a class undisputedly junior to Class 4, were retaining millions of dollars in equity.

Id. at 672 (emphasis added). The bankruptcy court had previously held that the plan was not "fair and equitable" under section 1129(b) because it provided equity holders with a recovery of millions of dollars while the claims of the class of unsecured creditors were not paid in full under the absolute priority rule, which meant post-petition interest at the contract default rate. See In re Dow Corning Corp., 244 B.R. 678, 695-96 (Bankr. E.D. Mich. 1999). In plain and simple terms,

the bankruptcy court held that "[i]n this context, the rationale for use of the contract rate of interest is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so." <u>Id.</u> at 695.

Although the bankruptcy court in <u>Dow Corning</u> ultimately excused the debtor from having to pay the default rate based on its view that "no effect is to be given to contractual provisions which purport to define as a default the filing of a voluntary petition for bankruptcy relief," <u>id.</u> at 696, on further appeal, the Sixth Circuit reversed and remanded. The Sixth Circuit held that:

> [I]n solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor. . . . When a debtor is solvent, then, the <u>presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interests is significantly reduced.</u>

> Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract. To do otherwise (i.e., to interpret the amended plan as not requiring the payment of default interest), they argue, <u>would violate § 1129(b)'s fair and equitable standard</u>. We agree. Default interest rates are intended to transfer some of the risk of default from creditors to the debtor. By interpreting the plan as allowing interest only at the non-default rate, the bankruptcy court effectively transferred that risk back to the Class 4 creditors. <u>Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.</u>

Dow Corning, 456 F.3d at 679 (emphasis added) (citations omitted).  Thus, in solvent debtor

cases, the "fair and equitable" requirement of section 1129(b) means full protection for creditors'

contractual rights, including post-petition interest at the default rate.

As previously argued to this Court in connection with the Debtors' objection to the

payment of the Default Rate to the Bank Claims,[11] in these circumstances there are no

"compelling equitable factors" that would justify ignoring any Class 9 creditors' contractual right

to receive post-petition default interest on its Allowed Claims.  Nor are there any "compelling

equitable factors" that would justify ignoring any Class 9 creditors' right to be paid post-petition

interest on its Allowed Claims at appropriate statutory interest rates in excess of 4.19% per

annum.  Accordingly, the Plan's failure to provide for payment of contractual default rates and

statutory interest rates in excess of that proposed by the Plan to general unsecured creditors in

Class 9 in the face of the Debtors' solvency dooms the Plan.[12]  The Plan therefore cannot be

confirmed.

**The Plan Does Not Provide For
A Sufficient Post-Effective Date
Role For the Committee**

Separately, the Plan violates section 1129(a)(1) of the Bankruptcy Code as it improperly

attempts to force the Creditors' Committee's dissolution on the Effective Date, notwithstanding

that the Creditors' Committee continues to be a party to the default interest litigation commenced

by the Debtors against the Bank Claims that is likely to still be pending on the Effective Date by

way of appeals.  Section 11.8 of the Plan provides in relevant part that, "[o]n the Effective Date,

---

[11]  See the pleadings identified supra, at fn 7.

[12]  The Creditors' Committee recognizes that this Court's May 19, 2009 decision held that solvency has not yet
been determined for purposes of confirmation.

... the Unsecured Creditors' Committee ... shall ... be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and [the committee] shall be deemed dissolved." Plan at 114, § 11.8. Although this Plan section allows for the official committees to continue in existence and have standing and capacity post-Effective Date to "continue any ... claim objection, appeal, or other proceeding that was in progress prior to the Effective Date[,]" it further provides for an exception, transparently added solely to impact the Creditors' Committee, limiting their post-Effective Date existence to only "where such services are for the benefit of ... creditors and do not serve the direct interests of the creditor or equity interest class which such Entity is appointed to represent." In fact, the exception to this permitted post-Effective Date activity is nothing but a not-well-disguised attempt to preclude the Creditors' Committee from continuing its participation in the Bank Claims' default interest litigation, in which the Creditors' Committee has been a party from the beginning and regarding which no party sought to preclude the Creditors' Committee's participation when the litigation was commenced in this Court.

Section 1103 of the Bankruptcy Code provides for a creditors' committee to have wide ranging powers and duties including to "investigate . . . any [] matter relevant to the case or the formulation of a plan," 11 U.S.C. § 1103(c)(2), and to "perform other [] services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). As reflected above, the same fundamental legal issues are involved in evaluating the propriety of the treatment under the Plan of Bank Claims and other Class 9 Claims. Consequently, the Creditors' Committee believes that the issues it raises through its participation in the pending default interest litigation are applicable to and in the interests of Class 9 Claims as a whole. As such, Section 11.8 of the Plan is contrary to section 1103 of the Bankruptcy Code and violates section 1129(a)(1) of the Bankruptcy Code.

Consequently, the objectionable language must be removed.  The Creditors' Committee should remain in existence and have standing and capacity to act post-Effective Date with respect to the pending default interest litigation against the Bank Claims and any appeals from orders ruling on such litigation.

## <u>RESERVATION OF RIGHTS</u>

The Creditors' Committee expressly reserves all of its rights to amend, modify or supplement this Objection and to object to Plan confirmation on grounds other than those set forth herein, if the Plan is amended, or if appropriate to respond to the decision issued by the Court in the Bank Claims' default interest litigation dated May 19, 2009.  The Committee shall file its objection to the Plan on feasibility issues in accordance with the provisions of the Third Amended CMO dated May 5, 2009 (Docket No. 21544).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**WHEREFORE**, the Creditors' Committee respectfully requests that the Court hold that (1) the Plan improperly designates Class 9 as an unimpaired Class, (2) the votes cast provisionally on the Plan must be given effect for all purposes in connection with confirmation of the Plan, (3) in the event Class 9 rejects the Plan, the Plan violates the absolute priority rule and is not fair and equitable with respect to Class 9 and (4) the Plan cannot be confirmed, unless Section 11.8 of the Plan is amended in the manner described in this Objection, and that the Court grant the Creditors' Committee such other and further relief as may be just and proper.

Dated:  May 20, 2009

Respectfully submitted:

**STROOCK & STROOCK & LAVAN LLP**

Lewis Kruger
Kenneth Pasquale
(Members of the Firm)
180 Maiden Lane
New York, New York  10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

and

**DUANE MORRIS LLP**

Michael R. Lastowski (DE I.D. 3892)
William S. Katchen
Richard W. Riley (DE I.D. 4052)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel: (302) 657-4942
Fax: (302) 657-4901

*Counsel for the Official*
*Committee of Unsecured Creditors*

DM3\1015354.1