## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| Debtors. | * | Case No. 01-01139 (JKF) (Jointly Administered) |
| | * | Related Docket Nos. 20666, 21544 |

-----------------------------------------------------x

## FINAL PLAN OBJECTIONS OF CNA COMPANIES TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION

## INTRODUCTION

### A.     Scope of Objections

Pursuant to the Third Amended Case Management Order ("CMO") [Docket No. 21544] entered in these cases, Continental Casualty Company and Continental Insurance Company, on their behalf and on behalf of their predecessor companies, affiliates and subsidiaries which issued insurance policies to the Debtors (individually or collectively "CNA"), hereby submit their Final Objections to the First Amended Joint Plan of Reorganization, as amended (the "Plan") [Docket No. 20666], jointly submitted by the Debtors, the Official Committee of Asbestos Personal Injury Claimants ("ACC"), the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative ("FCR") (collectively, "Plan Proponents").[1]

The CMO divides the confirmation process into two phases. Phase I will address, *inter alia*, "whether the Plan improperly affects the rights of the Debtors' insurers (in their capacity as

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan and Plan Documents.

insurers, but not creditors)." Phase II will address the objections of parties (including insurers) classified under the Plan as Holders of Indirect PI Trust Claims, as well as the Plan's proposed treatment of Asbestos Insurance Reimbursement Agreements. CMO ¶ 1.

This submission indentifies those objections that CNA expects to raise in either the Phase I or Phase II confirmation hearings. While CNA has categorized each particular Objection as either a Phase I or Phase II Objection, CNA submits that the demarcation between Phase I and Phase II is not entirely clear, and in the event that the Court determines that an issue CNA has listed as Phase I should be litigated in Phase II (or vice versa), CNA is prepared to litigate the issue in the Phase determined by the Court to be appropriate.

CNA does not intend by this document to provide a complete recitation of the facts and the law that supports its Objections. These matters (with respect to Phase I Objections) will be further addressed in CNA's trial brief on Phase I issues (due June 1, 2009) and (with respect to Phase II Objections) in its trial brief on Phase II issues (due July 13, 2009). Nor do these Objections discuss the issue of whether CNA has standing to raise each of the Objections that are identified. The legal issue of standing, too, will be addressed in CNA's trial briefs.

## B.    CNA as a Party in Interest

1.    CNA is an Asbestos Insurance Entity that issued certain insurance policies to the Debtors (the "CNA Policies"). Certain of the CNA Policies are Asbestos Insurance Policies under the Plan.[2] *See* Plan § 1.1(11); Plan Exhibit 6 to at Schedule 1. Under the Plan, the rights of the Debtors, Reorganized Debtors and Non-Debtor Affiliates (hereafter "Insurance Contributors") under the CNA Asbestos Insurance Policies are assigned to the Asbestos PI Trust (the "Trust") pursuant to the Asbestos Insurance Transfer Agreement. *See* Plan §§ 1.1(15), 7.2.

---

[2] Certain of the CNA Policies indemnified the Debtors against Workers' Compensation Claims and those CNA Policies are not Asbestos Insurance Policies. *See* Plan § 1.1(11).

2

2.      CNA is a "non-settled" Asbestos Insurance Entity with respect to its high-level excess Asbestos Insurance Policies issued to the Debtors. In addition, however, CNA has entered into several settlement agreements with the Debtors and Non-Debtor Affiliates with respect to other of its Asbestos Insurance Policies, and is thus also a Settled Asbestos Insurance Company under the Plan. *See* Plan Exhibit 5;[3] Plan Exhibit 6 at Schedule 2. The rights of the Insurance Contributors under the Asbestos Insurance Settlement Agreements with CNA are also to be transferred under the terms of the Plan to the Asbestos PI Trust. *See* Plan § 7.2.

3.      CNA has also entered into a Settlement Agreement that constitutes an "Asbestos Insurance Reimbursement Agreement" under the Plan, pursuant to which CNA has settled coverage disputes arising under four excess insurance policies issued to Debtors and agreed to pay the Debtors for certain costs arising from or related to Asbestos PI Claims. The Debtors' and the Non-Debtor Affiliates' rights under the Asbestos Insurance Reimbursement Agreements are also to be assigned to the Asbestos PI Trust under the terms of the Plan. *See* Plan § 7.2; *see also* Plan Exhibit 6 at Schedule 3.

4.      Finally, CNA is a creditor and Claimant of the Debtors in several respects:

        a.      CNA holds claims for retrospective premium, deductible reimbursement and related charges owing under various loss-sensitive programs of insurance issued to one or more of the Debtors and, thus, holds General Unsecured Claims contained in Class 9.

        b.      CNA is a holder of Asbestos PI Claims (including Indirect PI Trust Claims) classified in Class 6 for reimbursement, contribution and indemnity and possible premium adjustments related to those claims. *See* Plan § 1.1(138). Under the Plan, these Claims are to be channeled to the Asbestos PI Trust. *See* Plan § 7.2.

---

[3] CNA believes that Plan Exhibit 5 does not properly reflect all of its Asbestos Insurance Settlement Agreements that qualify it as a Settled Asbestos Insurance Company. See pages 16-17 below.

3

c.     CNA may hold certain Workers' Compensation Claims contained in Class 3 on account of current or future Claims for reimbursement resulting from payments made to or for the benefit of the Debtors' employees under a state-mandated workers' compensation system. *See* Plan § 1.1(221).

## I.     PHASE I OBJECTIONS

### A.     The Requirements for Insurance Neutrality

1.     The CMO provides that Phase I of the confirmation hearings shall address "whether the Plan improperly affects the rights of the Debtors' insurers (in their capacity as insurers, but not creditors)."   Whether the Plan improperly affects the rights of the Debtors' insurers in their capacity as insurers is simply another way of asking if the Plan is insurance neutral.  If the Plan, including the Plan Documents, the Confirmation Order and the proceedings incident thereto in any way affect the rights, obligations, or liabilities of the insurers under their policies or settlement agreements with the Debtors, or under non-bankruptcy laws that govern CNA's rights, duties, and obligations, then the Plan is **not** insurance neutral.

2.     There are several broad categories of rights that CNA would have outside of bankruptcy that are potentially affected by the Plan and the Plan Documents:

a.     The right to have claims asserted against the Debtors investigated and resolved in accordance with the procedures, conditions, and rights set forth in CNA Asbestos Insurance Policies and applicable non-bankruptcy law;

b.     The right to interpose defenses to claims for insurance coverage by the Debtors based on the terms of applicable policies, settlement agreements and non-bankruptcy law;

c.     The right to pursue claims for contribution against (i) Settled Asbestos Insurance Companies where CNA is required under its policies issued to Debtors to provide a

4

defense or coverage for claims asserted against third parties who are co-insureds under these policies; and (ii) Sealed Air Corporation (f/k/a W.R. Grace & Co. and a/k/a Grace-Delaware), which is a party to settlement agreements with CNA pursuant to which it agreed to indemnify CNA against certain liabilities and costs; and

      d.    The right to seek from this Court appropriate injunctive relief, as specified in Section 524(g) of the Bankruptcy Code, where the requirements allowing this Court the discretion to issue such an injunction have been satisfied.

      3.    The Plan purports, in § 7.15, to preserve CNA's and other Asbestos Insurance Entities' rights under their insurance policies, settlement agreements, and non-bankruptcy law, subject to certain exceptions. It provides in part:

> "(a) *Except to the extent provided in this Section 7.15*, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect."
>
> ...
>
> (c) *Except as provided in this Section 7.15*, the rights of Asbestos Insurance Entities shall be determined under the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreements, or Asbestos Insurance Settlement Agreements, as applicable.
>
> ...
>
> (f) *Except as otherwise provided in this Section 7.15*, nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation or consummation of the Plan shall limit the right, if any, of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense." (Emphasis added).

However, several of the "exceptions" to insurance neutrality specified in § 7.15 itself, as well as exceptions contained in the definition of "Asbestos Insurer Coverage Defense" referenced in § 7.15(f), will or could result in an impairment of CNA's rights under policies it issued to the Debtors and thus render the Plan not insurance neutral.  To the extent that the Plan is not insurance neutral, it will result in modification of CNA's rights under its policies that are not authorized by bankruptcy law and violate otherwise applicable state law and thus fail to satisfy the requirements of Sections 1129(a)(1) and (3) of the Bankruptcy Code.

**B.      The Plan Abrogates the Anti-Assignment Provisions In CNA Policies.**

Pursuant to the Plan, all of the Asbestos Insurance Rights of the Debtors and certain non-Debtor affiliates under Asbestos Insurance Policies issued by CNA will be transferred to the Asbestos PI Trust.  A condition of Confirmation is that this Court find that the transfer of the Asbestos Insurance Rights is valid and enforceable against CNA, "notwithstanding any anti-assignment provision in or incorporated into any [of CNA's] Asbestos Insurance Polic[ies]".  Section 7.15(g).  This Insurance Assignment exception in Section 7.15(g) is a violation of the terms of CNA's policies that provide that assignments made without CNA's consent will not bind CNA.  The parties have agreed that resolution of this issue belongs in Phase II, and CNA therefore sets out its position on the assignment issue at pages 36-38 below.

**C.      The Plan Improperly Impairs CNA's Rights Under its Asbestos Insurance Reimbursement Agreement Entered into with the Debtors.**

Another exception to Insurance Neutrality, contained in Section 7.15(j) of the Plan, concerns the Asbestos Insurance Reimbursement Agreement entered into between the Debtors and CNA. This Agreement obligates CNA to reimburse the Debtors for certain costs incurred in defending and settling Asbestos PI Claims brought against the Debtors.  Pursuant to §§ 7.15(j) and 7.2.2(d)(iv) of the Plan, the Asbestos PI Trust's payment of an Asbestos PI Claim pursuant

6

to the Asbestos PI Trust Distribution Procedures ("TDP") would constitute settlement of such claims in full compliance with the Asbestos Insurance Reimbursement Agreement. To the extent that the TDP results in payment of Asbestos PI Claims that would not otherwise be payable under the terms of the Asbestos Insurance Reimbursement Agreement or payable in amounts greater than are allowable under the Agreement, or fails to comply with any other term of the Asbestos Insurance Reimbursement Agreement, this exception to insurance neutrality impairs CNA's rights under the Agreement. The CMO provides that objections on this ground shall be addressed in Phase II. As a result, CNA's discussion of this issue is deferred to pages 26-28 below.

## D.   The Plan Potentially Eliminates Other Coverage Defenses That Would Be Available to CNA Under Its Policies and the Relevant Law.

1.     Even if transfer to the Trust of the Debtors' rights under the Asbestos Insurance Policies is valid and enforceable against CNA, it is not clear that the Debtors' obligations under those policies would be preserved following the transfer. Specifically, § 7.15 of the Plan, when read in conjunction with Plan §§ 7.13 and 8.1.1, creates confusion as to whether, by virtue of the transfer of Asbestos Insurance Rights to the Asbestos PI Trust, the Debtors and the Trust will be relieved of the duties and obligations of the Debtors under the CNA Policies.

2.     CNA's unsettled Asbestos Insurance Policies generally require the Debtors to provide timely notice to CNA of any "occurrence" or "claim" made against it; to cooperate with CNA in investigating claims made against the insured and in defending against those claims; and to refrain from entering into any settlements, or otherwise making any voluntary payments, without the consent of CNA.[4]   Under applicable non-bankruptcy law, these conditions to

---

[4] *See, e.g.*, Policy No. CCP 9023670, a primary policy issued by Continental Casualty Co. for the period June 30, 1973 to June 30, 1976, at 17, which requires that the insured provide "[w]ritten notice to the Company … as soon as practicable after an occurrence, claim or suit is known …."; "cooperate with

coverage are enforceable against the insured, and failure of the insured to satisfy these conditions would give rise to defenses to coverage.[5]

3.       Sections 7.7(tt) and 7.7(uu) of the Plan would require the Court to find that "the duties and obligations of the Asbestos Insurance Entities" are not diminished or reduced by the discharge of the Debtors under the Plan and the transfer of Asbestos Insurance Rights to the Asbestos PI Trust. However, nowhere does the Plan expressly state that the *Debtors'* obligations under the Asbestos Insurance Policies remain undiminished and/or are transferred to the Asbestos PI Trust. To the contrary, Plan §§ 7.13 and 8.1.1 state that, except as otherwise provided in the Plan, any obligations of the Debtors that are not specifically retained are eliminated. CNA presumes that Plan § 7.15 (dealing with insurance neutrality) trumps §§ 7.13 and 8.1.1 with respect to elimination of the Debtors' obligations under the policies, given that § 7.15 states that it applies "notwithstanding anything to the contrary" in the Plan. CNA also presumes that, unless all obligations and conditions have been satisfied under the policies (including the obligations and duties specified above), the Trust would have no "right" to recovery of insurance proceeds, and therefore, again, the Plan cannot be read to eliminate the duties and obligations of the Debtors under the Policies. Nonetheless, to the extent that Plan

---

the Company and upon the Company's request, assist in making settlements, in the conduct of suits and in endorsing any right of contribution or indemnity against any person or organization who may be liable to the insured …"; "attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses"; and "not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for … immediate medical and surgical relief to others at the time of the accident."

[5] *See, e.g., Am. Transit Ins. Co. v. Sartor*, 814 N.E.2d 1189, 1192 (N.Y. 2004) (providing notice is a condition precedent to coverage); *Stradford v. Zurich*, 2002 U.S. Dist. LEXIS 24050, at *15 (S.D.N.Y. Dec. 10, 2002) (insured's cooperation with insurer is a condition precedent to coverage); *Fine Gold Jewelry, Inc., v. Guar. Nat'l Ins. Co.*, 1986 U.S. Dist. LEXIS 29340, at *7 (S.D.N.Y. Feb. 13, 1986)(same); *TLC Beatrice Int'l Holdings, Inc., v. Cigna Ins. Co.*, 2000 U.S. Dist. LEXIS 2917 (S.D.N.Y. Mar. 14, 2000) (insured's settlement of lawsuit without insurer's consent failed to satisfy a condition precedent, therefore insured cannot recover the costs of settling). The Court in *Continental Cas. Co. v. W.R. Grace & Co.*, No. 06-4524 (S.D.N.Y.), has determined that New York law governs CNA's Policies.

§ 7.15 does not trump Plan §§ 7.13 and 8.1.1, the Plan would impair CNA's rights under its policies, including its rights to defend against coverage claims asserted by the Trust based on the failure by the Debtors or the Trust to comply with the insured's obligations under the policies.

        a.        The Plan Documents do not provide any additional comfort on this issue. The Asbestos Insurance Transfer Agreement, between the Debtors and the Asbestos PI Trust (Plan Exhibit 6), is silent on the assumption or performance by the Trust of the insureds' duties and obligations. On the issue of the preservation and availability of books and records of the Debtors that may be necessary to insurers in presenting their coverage defenses, the Asbestos Insurance Transfer Agreement refers to the Cooperation Agreement (Plan Exhibit 10). The Cooperation Agreement will be between the Reorganized Debtors and the Asbestos PI Trust and will make records related to Asbestos PI Claims available to the Asbestos PI Trust. However, there is no mention of the corresponding availability of such records to the insurers or of any obligation of the Reorganized Debtors to cooperate with the insurers on matters pertaining to Coverage Defenses.

        b.        Attempts through written discovery to resolve the possible inconsistency and determine the hierarchy among Section 7.15, on the one hand, and Sections 7.13 and 8.1.1 on the other, were unsuccessful, as the Plan Proponents' responses simply directed CNA to Section 7.15, which is not clear as to the question.[6]

---

    [6] In its first set of interrogatories propounded upon the Debtors, ACC and FCR, CNA asked if, upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust, the Debtors would be relieved of their duties and obligations under the Asbestos Insurance Policies. CNA' Companies' First Set of Interrogatories, Interrogatory No. 9. CNA further inquired if, under the Plan, those duties and obligations would be transferred to the Asbestos PI Trust. *Id.* Interrogatory No. 10. The Plan Proponents provided an identical, vague response to both Interrogatories 9 and 10 as follows:

> "[W]ith respect to non-settled Asbestos Insurance Policies, as set forth in the Asbestos Insurance Transfer Agreement, under the Plan, if confirmed, Asbestos Insurance Rights are being transferred to the Asbestos PI Trust but, as set forth in Sections 7.15(a) and (f) of the Plan and except as otherwise provided in Section 7.15

9

4.     The Plan must make clear that CNA retains all its rights under the Policies and
that the insureds (and the Asbestos PI Trust) retain all of the obligations under the Policies. This
is crucial because the Plan eliminates the rights insurers have under their policies to defend and
resolve claims on behalf of the Debtors in the state tort law system. It instead gives the Trustees
of the Asbestos PI Trust responsibility for resolving Asbestos PI Claims, based upon Asbestos PI
TDP that were drafted without any input from CNA and without its consent—as the Plan
Proponents have admitted in their responses to CNA written discovery.[7]  To the extent that the
Plan eliminates CNA's rights to defend coverage litigation with the Trust on the grounds that
those Trust Distribution Procedures violate the insured's duties under the Policies, the Plan is not
insurance neutral.

5.     Moreover, even if this Court should rule that the Plan does fully protect CNA's
coverage defenses under the CNA Policies, the transfer itself would nonetheless impair CNA's
rights as an insurer. The policies are structured so that the insured and the insurer will cooperate
in investigating, defending against and resolving claims against the insured so that meritorious

> of the Plan, the Plan provides that (i) nothing in the Confirmation Order, the Plan or
> any of the Plan Documents shall in any way operate to, or have the effect of,
> impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if
> any, in any respect; and (ii) nothing in the Plan, the Plan Documents, the
> Confirmation Order, or any finding of fact and/or conclusion of law with respect to
> the confirmation or consummation of the Plan shall limit the right, if any, of any
> Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defenses."

Objections and Responses of the Official Committee of Asbestos Personal Injury Claimants to Discovery
Requests Propounded by the CNA Companies, Responses to Interrogatory Nos. 9-10 (served March 6,
2009) ("ACC's Responses to CNA's Discovery"); Debtors' Response to CNA Companies' First Set of
Requests for Admission, First Set of Interrogatories and First Set of Requests for Documents, Responses
to Interrogatory Nos. 9-10 (served March 6, 2009) ("Debtors' Response to CNA's Discovery"); Asbestos
PI Future Claimants' Representative's Response to CNA Companies' First Set of Requests for
Admission, First Set of Interrogatories and First Set of Requests for Documents, Responses to
Interrogatory Nos. 9-10 (served March 6, 2009) ("FCR's Responses to CNA's Discovery").

[7] Debtors' Responses to CNA's Discovery, Answers to Requests for Admission Nos. 5-10;
ACC's Responses to CNA's Discovery, Answers to Requests for Admission Nos. 5-10; FCR's Responses
to CNA's Discovery, Answers to Requests for Admission Nos. 5-10.

claims can be resolved reasonably and that unmeritorious claims are not paid. By substituting the TDP for procedures and settlements that might otherwise be followed and achieved by the insurers in defending claims, the Plan may put the insurers in the position, in subsequent coverage litigation with the Trust, of having to show that the TDP are unreasonable or breach the insured's obligations under the policies and that the coverage court should therefore wholly deny coverage for a particular claim. It becomes an "all or nothing" situation, where either the Trust wins or the insurer wins—rather than, as envisioned by the policies, where the insured and the insurer mutually cooperate to achieve a reasonable resolution of claims.

6.       Section 7.15(f) provides additional exceptions to insurance neutrality by its use of the defined term "Asbestos Insurer Coverage Defense." Section 7.15(f) provides that nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and or conclusion of law with respect to confirmation or consummation of the Plan shall limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any "Asbestos Insurer Coverage Defense." The definition of Asbestos Insurer Coverage Defense, however, contains a clause that could potentially swallow insurance neutrality. Specifically, pursuant to Section 1.1(16) of the Plan, Asbestos Insurer Coverage Defenses "do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code…." CNA does not understand the meaning or scope of the exception to Asbestos Insurer Coverage Defenses contained in Clause (i) above.

a.       Clause (i) could create a potential weapon for use by creative counsel for the Asbestos PI Trust to eviscerate or diminish otherwise applicable coverage defenses available to CNA in any subsequent coverage litigation. Section 1129(a)(3) of the Bankruptcy Code provides that the Court cannot enter the Confirmation Order unless it finds that the Plan was

11

proposed in good faith. Counsel for the Trust might argue in subsequent Asbestos Insurance Actions that elimination of any defense that the Plan does not comply with the Bankruptcy Code means that both the terms of the Plan and the TDP represent a reasonable valuation of the Asbestos PI Claims, either individually or as a group, or that resolution of such claims without the insurer's involvement is itself reasonable and/or appropriate.

   b.    In written discovery served upon the Debtors, ACC, and FCR, CNA asked the Plan Proponents the meaning of this phrase. CNA also asked, in its written discovery, whether the Plan Proponents believed that the Plan, if confirmed, would allow the Trust, in any subsequent coverage litigation, to make the types of arguments discussed above in text. In their responses, the Plan Proponents refused to explain the meaning of clause (i) on the ground that it was "clear" and "speaks for itself," and moreover refused to specifically address whether the Plan, if confirmed, would have the effects stated in the two preceding paragraphs. [8]

   c.    Clause (i) could also potentially be used by Trust counsel to argue that this Court has in fact valued, as part of the estimation process or the Plan Confirmation process, the loss that was experienced by the Debtors in connection with Asbestos PI Claims, thereby triggering or accelerating any obligations of any Asbestos Insurance Entity under any Asbestos Insurance Policy. While the Plan Proponents in their written discovery responses have denied that in fact the Plan would have this effect or potential,[9] CNA submits that the Plan should not

---

[8] *See* Debtors' Responses to CNA's Discovery, Answers to Interrogatories Nos. 1, 12; ACC's Responses to CNA's Discovery, Answers to Interrogatories Nos. 1, 12; FCR's Responses to CNA's Discovery, Answers to Interrogatories Nos. 1, 12.

[9] In their responses to written discovery served by CNA, the Plan Proponents denied that confirmation of the Plan will in fact trigger or accelerate any obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies, or that the doctrine stated in *UNR Industries v. Continental Casualty Co.*, 941 F.2d 1101 (7th Cir. 1991) regarding valuation of claims and acceleration of insurer obligations would be applicable. *See* Debtors' Responses to CNA's Discovery, Answer to Interrogatory No. 5; ACC's Responses to CNA's Discovery, Answer to Interrogatory No. 5; FCR's Responses to CNA's Discovery, Answer to Interrogatory No. 5.

contain any ambiguities on that score. As such, the exception to Asbestos Insurer Coverage Defenses that the Plan or Plan Documents do not comply with the Bankruptcy Code should be eliminated, or at least the Plan should make clear that it will not give rise to the scenarios discussed above.

7.     However the Assignment Issue is ultimately resolved, Section 7.15 should be modified as urged in Exhibit A to these objections to make clear that, with the exception of the assignment issue and potentially with respect to Asbestos Insurance Reimbursement Agreements, the Plan is in fact to be insurance neutral.

**E.     The Plan Impairs CNA's Right to Obtain Contribution From Settled Asbestos Insurance Entities With Respect to Payment for Defense or Coverage That CNA May be Required to Make to Third Parties and to Obtain Indemnity from Sealed Air Corporation .**

1.     The Insurance Neutrality section of the Plan (§ 7.15) attempts to deal with situations where a non-settled Asbestos Insurance Entity (such as CNA) may have claims for contribution, indemnity, reimbursement, subrogation or the like arising out of Asbestos PI Claims (collectively, for purposes of these Objections "Contribution Claims") against a Settled Asbestos Insurance Company which is immune from suit for contribution due to the Asbestos PI Channeling Injunction. Section 7.15(i) provides that such Contribution claims may be asserted as a defense or setoff against any claim for coverage brought by the Asbestos PI Trust against the non-settled insurer arising out of the Trust's payment on the same underlying Asbestos PI Claim. The notion underlying this provision appears to be that the non-settled insurer would be made whole inasmuch as any payment due the Trust from the non-settled insurer on account of the underlying Asbestos PI Claim would be reduced by the share that would otherwise have been owing by the Settled Asbestos Insurance Company on the Contribution Claim. Section 7.15(i),

however, does not deal with the situation where a Contribution Claim by non-settled insurer arises independently of any suit by the Trust seeking coverage.

2.    As the Court is aware, The Scotts Company ("Scotts") is claiming that, in light of vendor endorsements, it is an additional insured under policies issued by CNA (and other Asbestos Insurance Entities) to Debtors. Scotts is claiming coverage under such policies due to liabilities it has allegedly incurred as a result of Grace's actions in mining, distributing, and failing to warn about the dangers of asbestos. To the extent that Scotts is successful in obtaining defense costs or coverage under unsettled CNA Asbestos Insurance Policies issued to the Debtors, then, absent the bankruptcy, CNA would have the right, under the "other insurance" clauses of its policies or pursuant to State law, to seek contribution from other insurers that issued policies covering Scotts, including policies issued by other insurers to Grace where Scotts is an additional insured.[10] However, to the extent that the policies issued by other insurers are Settled Asbestos Insurance Policies, then CNA's ability to seek contribution would be cut off by the Asbestos PI Channeling Injunction. Moreover, if the policies were issued by Asbestos Insurance Entities that are not Settled Asbestos Insurance Companies, CNA's ability to seek contribution would be cut off by the Asbestos Insurance Entity Injunction. CNA would not have the ability to be made whole pursuant to a defense or set off in a coverage action by the Trust, since there would be no coverage claim brought by the Trust on account of a claim made by Scotts against the CNA policies in question. In this respect, therefore, the Plan, if confirmed, would impair CNA's rights under its policies and the law to obtain contribution, and the Plan cannot be considered insurance neutral.

---

[10] *See, e.g., Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002); *Penn. Gen. Ins. Co. v. Aetna Cas. & Surety Co.*, 761 N.Y.S.2d 571 (App. Div. 2003); *J.P. Realty Trust v. Pub. Serv. Mut. Ins. Co.*, 476 N.Y.S.2d 325 (App. Div. 1984).

14

3.       CNA is a party to three settlement agreements that were signed by the entities that are now known as Sealed Air Corporation.  Under those agreements, Sealed Air Corporation agreed to indemnify CNA against all liabilities related to claims that were the subject of the settlement agreements.  The Successor Claims Injunction would prevent CNA from seeking the indemnity to which it is entitled and the plan makes no provision for any indemnity claim that CNA has against Sealed Air Corporation.  This too violates insurance neutrality and results in modifications to CNA's settlement agreements that are not authorized by bankruptcy law and violate otherwise applicable state law.

**F.       The Plan Should Be Revised to Provide That It Does Not Modify the Parties' Rights Under Certain Insurance Programs with the Fresenius Indemnified Parties and Sealed Air Indemnified Parties**

The Plan purports to require holders of Claims to release their claims against the Fresenius Indemnified Parties.  Plan § 7.15(h).  Separate estate releases are provided to the Sealed Air Indemnified Parties.  *Id.*  CNA maintains separate insurance programs for certain of the Fresenius Indemnified Parties and Sealed Air Indemnified Parties, and wishes to assure that none of the Plan's releases or exculpations modify the parties' rights under those programs.  To the extent any such modification is proposed, CNA submits that there is no reason or basis for such modification, thereby rendering the Plan unconfirmable under Section 1129(a)(1) of the Bankruptcy Code. To the extent no such modification is proposed, the Plan should be modified to confirm that nothing contained therein shall be deemed to modify, impair, discharge, release or affect in any way CNA's rights and remedies under separate programs of insurance and related agreements maintained for non-Debtor entities.

**G.     The Plan Should Be Modified To Clarify Post-Confirmation Handling of Workers' Compensation Claims.**

The Plan proposes to treat Workers Compensation Claims as unimpaired.  *See* Plan § 3.1.4.  At the same time, the Plan also contains broad injunctions regarding post-confirmation claim handling.  *See generally* Plan Article 8.  Assuming that the Debtors intend for CNA to continue handling, adjusting, litigating, settling and paying Workers' Compensation Claims in the ordinary course, the Plan injunctions need to be expressly modified for that purpose.  Absent such modification and clarification, CNA submits that there is an inconsistency between the non-impairment provision and the injunction provisions.  That inconsistency needs to be clarified prior to confirmation.

**H.     Plan Exhibit 5 Does Not Reflect all of the Asbestos Insurance Settlement Agreements that Qualify CNA as a Settled Asbestos Insurance Company.**

1.     In May 1997, CNA entered into a settlement agreement with W.R. Grace-Conn, W.R. Grace & Co., and Fresenius Medical Holdings, Inc. by which CNA agreed to make payments to the "Grace Group" in connection with asbestos-related claims as costs were incurred by Grace. CNA's payment obligations under the agreement are determined according to a prescribed formula, and conditioned on certain terms in that Settlement Agreement.   That Agreement (which constitutes an Asbestos Insurance Reimbursement Agreement under the Plan) provides an indemnification obligation to the extent that CNA makes those payments. CNA has paid and nearly exhausted all of the coverage under the four policies covered by the Agreement, but the Plan provides no Section 524(g) protection for Asbestos Insurance Reimbursement Agreements, even those with matured indemnification rights.   The Debtors already owe CNA indemnification under that 1997 Agreement and the policies settled thereunder should be scheduled on Plan Exhibit 5 to the extent of the limits which have been exhausted.  Moreover, Plan Exhibit 5 does not reflect the payment, and indemnity obligation, encompassed in an earlier

16

February 18, 1997 Settlement Agreement, pursuant to which the limits of those four policies were also eroded.

2.  Similarly, Plan Exhibit 5 in many instances purports to limit the protection offered to indemnified insurers to "Products" — when in fact the policies and the settlement agreements cover more than "Products." Plan Exhibit 5 is therefore defective. The schedule should not try to re-state complex policy and settlement terms and should instead state that the 524(g) protection is provided co-extensive to the Debtors' indemnity obligations under the settlement agreements. The defects in Plan Exhibit 5 result in a failure of the Plan to properly provide for its implementation in violation of Section 1123(a)(5). To the extent that Plan Exhibit 5 implicitly modifies CNA's rights under its settlement agreements, such modifications are not authorized by bankruptcy law and violate otherwise applicable state law. Consequently, the Plan fails to satisfy the requirements of Section 1129(a)(1) and (3).

## I.   The Plan Impairs CNA's Rights Under its Asbestos Insurance Policies Because Asbestos PI Claims will be Resolved by a Trust with Fiduciaries that have Potential and Actual Conflicts of Interest

1.  Under the Plan, Asbestos PI Claims will be channeled to the Asbestos PI Trust and resolved pursuant to the proposed TDP. Those TDP state that their goal is to provide "fair, equitable and substantially similar treatment for all PI Trust claims," given the finite resources of the proposed Trust, including such treatment for Indirect PI Claims that are held by insurers such as CNA. TDP § 1.1; Trust Agreement § 1.2. As presently structured, however, there is a significant risk that the Trust will not achieve these goals — and instead may end up paying unmeritorious claims or paying meritorious claims in amounts greater than appropriate (to the potential detriment of Asbestos Insurance Entities that may be called upon by the Trust to reimburse the Trust for such payments). This is so because one set of Trust fiduciaries — the members of the Asbestos PI Trust Advisory Committee ("TAC") — have a significant conflicts

17

of interest between the fiduciary duties they owe to the Trust (and the Trust beneficiaries as a whole) and the individual fiduciary duties they owe, pursuant to the relevant Rules of Professional Conduct, to their individual claimant-clients. In addition, the selection of the purportedly neutral Trustees has been dominated by the ACC — in this case and other asbestos-related bankruptcies — such that an appearance is created that the Trustees will not in fact be neutral toward all claimants, and particularly toward insurance companies that are holders of Indirect PI Trust Claims.

2.      By way of background, the ACC, acting in conjunction with the FCR, drafted the proposed Trust Agreement and TDP, with apparently no changes being made at the behest of Grace.[11] CNA and other objecting insurers were entirely excluded from the drafting process, only seeing the proposed Trust Agreement and TDP when filed with the Court.[12]

3.      The Trust Agreement, establishing the Asbestos PI Trust, designates three supposedly neutral individuals to serve as the initial Trustees of the Trust. The Trust Agreement provides that these Trustees have fiduciary duties to all beneficiaries of the Trust. Trust Agreement § 2.1. In addition, the Trust Agreement establishes the TAC, which the Trust Agreement provides will operate as a fiduciary to all present Asbestos PI Claimants. *Id.* § 5.2. Finally, the Trust provides that the FCR will be a fiduciary for all future Claimants to the Trust. *Id.* § 6.1.

---

[11] *See* Deposition of Peter Van N. Lockwood as Rule 30(b)(6) Witness for the ACC, Tr. 5/1/09 at 381 l.12 to 383 ll. 5-21 ("Lockwood Dep. 5/1/09"); Deposition of Peter Van N. Lockwood as Rule 30(b)(6) Witness for the ACC, Tr. 5/4/09 at 637 l. 11 to 642 l. 4 ("Lockwood Dep. 5/4/09")..

[12] *See* Debtors' Response to CNA Request for Admission No. 7; ACC's Response to CNA Request for Admission No. 7; FCR's Response to CNA Request for Admission No. 7.

18

4.      Acting in conjunction with the FCR, the ACC has chosen the proposed Trustees (Messrs. Huge, Sifford, and Trafelet).[13] The ACC has also chosen the proposed members of the TAC (Messrs. Budd, Cooney, Rice, and Weitz) (*see* Plan § 7.2.6). These TAC members are all prominent plaintiffs' asbestos personal injury attorneys. Moreover, all of these proposed TAC members serve on the ACC itself as representatives of their individual personal injury clients with asbestos personal injury claims against the Debtors. Collectively, the law firms of the TAC members represent tens of thousands of claimants to the Trust,[14] and each member of the TAC will be representing claimants submitting claims to the Trust, and receiving contingency fees for their services to their clients.[15] None of the TAC members or their firms, in contrast, represent insurers who may have Indirect PI Trust claims.

5.      The Trust Agreement reposes significant powers in the TAC, including requiring the consent of the TAC before the Trustees can, for example, amend the Medical/Exposure Criteria for payable claims (Trust Agreement § 2.2(f)(iii)); require claimants to provide additional kinds of medical evidence (*id.* § 2.2f(v)); revise the Scheduled, Maximum or Average Values applicable to various categories of claims (*id.* § 2.2(f)(iii)); or disclose information or documents even when need to comply with an obligation under an insurance policy or settlement agreement (*id.* § 2.2(f)(xv)). The TAC is also given influence over Trustee compensation, removal of Trustees, and selection of successor Trustees. Consent of the TAC, along with that of

---

[13] In his Rule 30(b)(6) deposition as counsel to the ACC, Mr. Lockwood, stated that "[t]he ACC and the FCR consulted each other on [the] three prospective individuals and then proposed them to the co-proponents [of the Plan] and the co-proponents accepted them." Lockwood Dep. 5/4/09 at 603 ll. 19-23.

[14] Lockwood Dep. 5/1/09 at 200, ll. 3-8 ("Lockwood Dep. 5/1/09") ("I am sure it's more than 10,000. Again, it could be 20,000; it could be 30,000. I just don't know"); Amended Statement of Baron & Budd, P.C. under Bankruptcy Rule 2019, ¶ 4 (Feb. 25, 2009) ("As of the date of this Amended Statement, the Firm represents thousands of personal injury claimants ....").

[15] ACC's Response to CNA's Request for Admission No. 11.

the FCR, is required before the Trustees can increase their compensation by more than the cost of living (*id.* § 2.2(f)(ix)). Moreover, the TAC and the FCR can, with court approval, remove a Trustee and veto the recommendation of the remaining Trustees as to a replacement Trustee (*id.* §§ 4.2, 4.3(a)). In the light of these powers, members of the TAC must be deemed fiduciaries to all Trust beneficiaries—not merely to present Asbestos PI Claimants. But whether deemed fiduciaries to all Trust beneficiaries, or only the holders of present Asbestos PI Claims, the members of the TAC have actual, significant, and irreconcilable conflicts of interest.

6.    As attorneys representing thousands of individual claimants who will be making claims against the Asbestos PI Trust, the members of the TAC have a fiduciary duty, rooted in Rules of Professional Conduct, to represent those claimants zealously and to take all necessary and appropriate actions to ensure that their claims are paid, and are paid at the highest possible amounts, from the finite funds that will be available from the Trust – even where this might involve proposing or opposing amendments to the Trust or TDP. On the other hand, as fiduciaries to all beneficiaries of the Trust (or even only to present Asbestos PI Claimants), the members of the TAC have fiduciary duties, pursuant to the law of fiduciaries and trusts, to act in the best interests of all beneficiaries to the Trust (at least all present Trust beneficiaries) in allocating the finite Trust funds, even where this would prove detrimental to their individual claimant-clients.[16] As fiduciaries to the Trust, the members of the TAC also owe a duty to

---

[16] *See, e.g., Law v. Law*, 1997 Del. Ch. LEXIS 134, \*7 (Del. Ch. 1997) (Delaware law "clearly requires trustees to consider impartially the interests of all beneficiaries."); *DuPont v. Del. Trust Co.*, 320 A.2d 694, 699 (Del. 1974) (A trustee is under a duty to administer the trust as "to preserve a fair balance between" beneficiaries that are "to a certain extent antagonistic." (quoting Scott on Trusts § 232 (3d ed.)); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d, 1096, 1113 n.68 (Del. Ch. 2008) (listing duties of trustee, including the duty of loyalty); ABA Model Rule of Professional Conduct 1.7, cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."). Applying the District Court's Local Civil Rule 83.6(d), another judge of this Court has held the professional conduct of bar members should be governed by the Model Rules of Professional Conduct of the American Bar Association ("ABA Model Rules"). *In re Kaiser Group Int'l, Inc.*, 272 B.R. 846, 849

ensure that the Trust does not pay unmeritorious claims, and that the Trust defends against such unmeritorious claims; whereas, as attorneys representing individual claimant clients, they have a duty to seek compensation for their clients from the Trust even if they believe that their client-claimants may not in fact be deserving of payment.

7.     This actual conflict of interest of the TAC members is set out, and discussed in detail, in the expert Report of James B. Shein of the Kellogg School of Management at Northwestern University ("Shein Report").     As Professor Shein states in his expert report: "[T]he structure of the Trust creates a potential for abuse and for the Trustees and TAC to act contrary to the governing principle in the Trust that all claimants be treated fairly and equitably with claims made against the Trust and that the Trust not deplete its assets by paying undeserving claims." Shein Report ¶ 5. The TAC's conflict of interest is irreconcilable. Either the TAC members will have to breach their duties as Trust fiduciaries or their duties to their individual clients.     Either way, a Plan should not be approved that contains such built-in conflicts.   The Court should remedy this conflict in obligations by eliminating the role of the TAC or by insisting that the TAC be composed of individuals with no conflicting interests.

8.     The Court should also select new Trustees.   The proposed Trustees (Messrs. Huge, Sifford, and Trafelet) were selected by the ACC and FCR in a process where all other parties representing potential claimants to the Asbestos PI Trust (including insurers) were excluded from the selection process.   Moreover, these same individuals have been selected as trustees of other asbestos bankruptcy trusts by the same plaintiffs' attorneys who selected them here. Because Messrs. Huge, Sifford, and Trafelet owe their Trustee positions to the ACC, there would be an appearance of partiality if they are allowed to remain Trustees.   To remove this

(Bankr. D. Del. 2002).  Given the nationwide scope of this proceeding, it is appropriate for this Court to apply the ABA Model Rules, although the apposite Delaware Rules are identical.

appearance, the Court should select the Trustees itself following an open selection process where all interested parties would be allowed to recommend candidates.

9.     The Trust Agreement would also exculpate and indemnify the Trustees, TAC members, and FCR for breach of their fiduciary duties to the Trust, and, possibly, for breaches of their ethical obligations to their individual claimants-clients, except for breaches of trust "committed in bad faith or willful misappropriation."[17]   The Plan itself also exculpates the Trustees and the TAC broadly for acts concerning "the administration of this Plan or the property to be distributed under this Plan," except in cases of "gross negligence or willful misconduct." Plan § 11.9. Such broad exculpatory provisions in favor of the TAC and Trustees are unjustified in a situation, as here, where the TDP have been drafted by the ACC (on which the TAC members sit as representatives of their claimant-clients), and where the Trustees were selected by the ACC and the FCR.  In a case such as this, the threat of lawsuits for breach of fiduciary obligations is the only meaningful weapon that other claimants have to attempt to ensure that their claims will be treated equally and fairly.  If the Trustees, TAC membership, the Trust Agreement, and the TDP are to remain as proposed, the exculpation and indemnification provisions should be dropped so as to give beneficiaries at least one means of promoting fairness of treatment in the Trust Distribution Procedures.  At the very least, the exculpation clause should be clarified to provide that individuals remain liable, *inter alia*, for "bad faith, including bad faith breach of the covenant of good faith and fair dealing owed to Asbestos PI Trust beneficiaries ..." and "willful misappropriation."  This change incorporates the provision of 12 Del. Code § 3806(e) that a trust agreement cannot immunize a fiduciary for "any act or omission

---

[17] Trust Agreement §§ 4.4, 4.6.

22

that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."

10.     The discriminatory treatment of Indirect PI Trust Claims implicit in the Trust and TAC structure detailed above results in a violation of Sections 1123(a)(4) and §1129(a)(1) of the Bankruptcy Code while the conflicts of interest and overreaching exculpation provisions manifest violations of Section 1129(a)(3).

## J.     The Plan Improperly Impairs CNA's Ability to Obtain Section 524 Injunctive Protection.

1.     Section 524(g)(4)(A)(ii) of the Code expressly provides this Court with the power to enjoin actions by Asbestos PI Claimants against Settled Insurance Companies where the settled insurer is "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such [insurer] arises by reason of ... [the] provision of insurance to the debtor or a related party ...."  Pursuant to this provision, the Plan seeks from the Court an Asbestos PI Channeling Injunction that would protect "Settled Asbestos Insurance Companies."  However, the term "Settled Asbestos Insurance Companies" is defined to mean only an Asbestos Insurance Entity that enters an Asbestos Insurance Settlement Agreement "*prior* to the conclusion of the Confirmation Hearing."  Plan § 1.1(200) (emphasis added).  Moreover, the protection is granted "only with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified ... in Exhibit 5 in the Exhibit Book ...." *Id.*

2.     These limitations on who can qualify as a Settled Asbestos Insurance Company improperly affect the rights of CNA as an insurer to obtain the full protection of an Asbestos PI Channeling Injunction even if it reaches a settlement subsequent to Confirmation.  The Bankruptcy Code contains no "timing" restriction on granting a Section 524(g) channeling

injunction to insurers.  A settlement reached after Confirmation will benefit the Asbestos PI

Trust as much as a pre-confirmation settlement, and reaching a comprehensive settlement of

coverage disputes will be more likely if the insurer knows that it is buying its peace from

asbestos-related claims arising out its having provided insurance to the Debtors.  As has been

done in other bankruptcies,[18] this Court should have the full discretion given it by the

Bankruptcy Code to issue a Channeling Injunction authorized by Section 524(g) to protect

insurers that enter into coverage settlements following Confirmation.

        3.      In addition, the Plan potentially impairs the rights of insurance companies by

limiting the protection of the Asbestos PI Channeling Injunction only to claims "with respect to,

and only to the extent of, any Asbestos Insurance Policy" identified in Plan Exhibit 5.  Plan

§ 1.1(200).  No provision is made for providing injunctive relief to insurers with respect claims

allegedly arising out of liability polices that are the subject of an Asbestos Insurance

Reimbursement Agreement listed in Plan Exhibit 6, Schedule 3 (*see* Plan § 1.1(12)).  Moreover,

the Channeling Injunction does not specifically track the language in Section 524(g) that it

applies to all claims that seek to hold the insurer directly or indirectly liable for the conduct of,

claims against, or demands on the Debtors due to the fact that the insurer provided insurance to

the Debtors.  In this regard, the Libby Claimants maintain that the Channeling Injunction should

be amended to preclude its application to claims that seek to hold an insurer liable on the theory

that the insurer, due to its position of insurer, had an alleged "independent" duty to warn and

protect persons from the dangers posed by the Debtors' asbestos.

---

[18] *See, e.g.*, Fourth Amended Joint Plan of Reorganization (As Modified), Dkt. No. 12620, In re Federal-Mogul Global, Inc., No. 01-10578 (JKF) ("Federal-Mogul") (Bankr. D. Del. Jun. 5, 2007) at §1.1.198 (emphasis added); Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (As Modified), Dkt. No. 13674, Federal-Mogul (Bankr. D. Del. Nov. 8, 2007).

4.     Once again, there is nothing in Section 524(g) of the Code that requires that the Channeling Injunction be so limited. As noted, the statute authorizes an injunction against any and all suits where the insurer "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability ... arises by reason of ... provision of insurance to the debtor." There is nothing in the statute that requires that the Channeling Injunction be applied on a policy-by-policy basis, and the Channeling Injunction can be readily circumvented if plaintiffs are allowed to sue insurance companies by asserting that their claim allegedly arises out of some "independent duty" of insurers but not out of the policies themselves.

5.     The unduly narrow scope of the Plan's proposed Channeling Injunction also constitutes a violation of Section 1123(a)(5) of the Bankruptcy Code. That section requires that a Plan contain adequate means for its implementation. While the Bankruptcy Code provides a list of examples of "adequate means" for plan implementation, the list is not exhaustive. *In re Lisanti Foods, Inc.*, 329 B.R. 491, 506 (D.N.J. 2005). Indeed, where a debtor has significant asbestos-related liabilities, the injunction allowed under Section 524(g) of the Bankruptcy Code is considered a primary means for adequately implementing a plan of reorganization. *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (Bankr. D. Del. 2006). By unduly constraining the Bankruptcy Court's authority to extend the Channeling Injunction to insurers that settle post-confirmation, or not allowing the scope of the Channeling Injunction to be as broad as Section 524(g) permits, non-settled insurers will be less likely to reach settlements with the Trust, or more likely to reach settlements on terms that result in lesser payments to the Trust, than would be the case if they knew that, in return for settlement payments, they could buy their peace by being the beneficiaries of a Section 524(g) injunction.

25

6. To avoid this problem, the Plan should authorize the Court to make the Channeling Injunction insurer-specific, not policy-specific, and should explicitly allow the injunctive protection to be as broad as Section 524(g) allows.

## II.   PHASE II OBJECTIONS

### A.   The Plan Impairs CNA's Rights Under Its Asbestos Insurance Reimbursement Agreement.

1. After litigation, on May 22, 1997, CNA entered into a settlement agreement with Grace that resolved coverage disputes for asbestos-related claims, as defined in the agreement. The May 22, 1997 Agreement (the "1997 Agreement") is listed on Schedule 3 to the Insurance Transfer Agreement (Plan Exhibit 6) and identified by the Plan Proponents as an "Asbestos Insurance Reimbursement Agreement." The Plan expressly carves out Asbestos Insurance Reimbursement Agreements from "Insurance Neutrality." Plan §§ 7.15(j), 7.2.2(d)(iv).

2. Pursuant to the 1997 Agreement, CNA agreed to make payments to Grace reimbursing Grace for a portion of actual costs and expenses it incurs in resolving asbestos claims based on an allocation formula requiring exhaustion of underlying coverage. The 1997 Agreement was premised on CNA's knowledge and understanding that the Insured would continue to vigorously defend itself against such claims. The 1997 Agreement provides that it imposes no obligation on CNA to make payments on Grace's behalf, and is subject to modification only upon consent of both parties. The Plan purports to undermine these fundamental contractual terms by providing: "The Asbestos PI Trust's payment of an Asbestos PI Claim under the PI TDP shall be *deemed* to constitute settlement and payment of such claim by or on behalf of the Debtors or Non-Debtor Affiliates within the meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement." Plan § 7.2.2(d)(iv) (emphasis added.)

26

3.       The 1997 Agreement also imposed on Grace certain obligations—including an obligation to follow a specific payment formula, provide information, allow for inspection of the insured's and its counsel's files, and indemnify CNA to the extent of its payments under the 1997 Agreement.  Prior to the commencement of the Debtors' bankruptcy cases, CNA had made substantial payments under the 1997 Agreement, and Grace's obligation to indemnify CNA was already matured to the extent of tens of millions of dollars.  Although the Plan purports to transfer the rights to remaining payments from CNA under the 1997 Agreement to the Asbestos PI Trust, no provision is made for the Trust to assume the obligations of the Insured under the 1997 Agreement.  Section 7.13  provides that the Debtors or any other of the listed parties:

> "will ***not*** … ***agree to perform***, pay, or indemnify creditors or ***otherwise have any responsibilities for any liabilities or obligations of the Debtors*** or any of the Debtors' past or present Affiliates, ***as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors*** or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date."

Plan § 7.13 (emphasis added).  Similarly, the Insurance Transfer Agreement (Plan Exhibit 6) purports to transfer the rights to collect under the Settlement Agreement to the Trust, but makes no provision for the transfer of the obligations.  With no assumption by the Trust of the obligations under the 1997 Agreement, and the discharge of the Debtors, the Plan leaves CNA's rights under the 1997 Agreement in limbo.  Since the Plan Proponents do not provide for insurance neutrality for Asbestos Insurance Reimbursement Agreements, it does not provide for protection of CNA's rights under the 1997 Agreement, or its right to assert breach of the 1997 Agreement.

4.       Finally, to the extent that CNA may assert an Indirect PI Trust Claim arising from the indemnity obligation under the 1997 Agreement, the treatment of that claim is subject to all

of the same infirmities discussed elsewhere in these Objections, including the discriminatory treatment of Indirect PI Trust Claims under the TDP and the administration of those claims under a structure rife with conflicts of interest.

5.    The modifications of CNA's rights under the 1997 Agreement are not authorized by bankruptcy law and violate otherwise applicable state law.  Consequently, the Plan fails to satisfy the requirements of §1129(a)(1) and (3).

**B.**    **The Trust Advisory Committee Has Inappropriate Conflicts of Interest.**

This objection is set out in the Phase I objections.  To the extent that the Court determines that it belongs in Phase II, CNA respectfully refers the Court to those objections.

**C.**    **The TDP Improperly Discriminate Against Holders of Indirect PI Trust Claims.**

1.    Under the Plan, CNA is the holder of at least three types of Indirect Asbestos PI Trust Claims:

a.    First, CNA has been sued by Libby Claimants who maintain that CNA, in its capacity as an insurer of the Debtors, is somehow responsible for their injuries arising out of the Debtors' product and operations.  The pending suits against CNA have been stayed by this Court.  CNA expects, based upon statements made by counsel for the Libby Claimants, that, though meritless, the Libby Claimants will attempt to revive such suits once the Plan is confirmed.  Absent this bankruptcy, CNA would have common law indemnity and contribution rights against the Debtors, given that Grace was the primary (indeed, the sole) wrongdoer in causing the Libby Claimants' injuries, or at the very least must be called upon to contribute its share to their damages.[19]  Pursuant to the Plan, if CNA is held liable to the Libby Claimants, it

---

[19] *See* Mont. Code Ann. § 27-1-703(4) ("On motion of a party against whom a claim is asserted for negligence resulting in death or injury to person or property, any other person whose negligence may have contributed as a proximate cause to the injury complained of may be joined as an additional party to

would be the holder of an Indirect PI Trust Claim for indemnity or contribution against the Asbestos PI Trust. *See* Plan § 1.1(138) (defining Indirect PI Trust Claim).

           b.       The Scotts Company has asserted in an adversary proceeding initiated in this Court that it is entitled to coverage under policies issued by CNA to the Debtors, pursuant to so-called vendor endorsements.[20] Several of the policies in question are the subject of a 1990 settlement agreement between CNA and the Debtors, such that the Debtors are obligated to indemnify CNA should any claims be made on those policies. Absent this bankruptcy, CNA would have a contractual claim for indemnification against Grace. Under the Plan, this would also constitute an Indirect PI Trust Claim. *See* Plan § 1.1(138).

           c.       BNSF Railway Company ("BNSF") has been named as a defendant in various actions brought by Libby Claimants, claiming that BNSF engaged in tortious conduct with respect to its handling of Debtors' asbestos-containing materials. BNSF has claimed that it is entitled to insurance from Grace's insurers and has included in that claim the policy number of one of CNA's primary policies issued to the Debtors. That policy is subject to a settlement agreement between the Debtors and CNA, such that were BNSF to successfully obtain defense costs or coverage under that policy, CNA would be entitled to contractual indemnification from the Debtors. These contractual indemnification claims would also be classified as Indirect PI Trust Claims under the Plan. *See* Plan § 1.1(138).

           2.       Pursuant to Article 3 of the Plan, all Asbestos PI Claims, including Indirect PI Trust Claims, are classified in Class 6, to be channeled to the Asbestos PI Trust, and to be resolved in accordance with the Asbestos PI TDP. Plan § 3.1.6. The Plan, however, fails to

---

the action...."); *Consolidated Freightways Corp. of Del. v. Osier*, 605 P.2d 1076, 1081 (Mont. 1979) (indemnity available when defendants are not *in pari delicto*).

    [20] *Scotts Co. v. American Employers Ins. Co. et al.*, No. 04-ap-55083-JFK (Bankr. D. Del. filed Sept. 2, 2004).

"provide the same treatment for each claim or interest" in Class 6 and fails to value and pay "present claims and future demands that involve similar claims [in Class 6] in substantially the same manner" as required by Code Sections 1123(a)(4) and 524(g), respectively.

       3.      CNA's state law rights to join Grace to litigation as the responsible (or jointly responsible) party to lawsuits such as those being pursued by the Libby Claimants, Scotts and BNSF are abrogated by the Plan. Instead, CNA's rights are at best converted to Indirect PI Trust Claims and at worst not provided for in any way.

       4.      To the extent that CNA has Indirect PI Trust Claims, those claims are discriminated against in favor of "Direct" Asbestos PI Claims (*i.e.*, those seeking recompense for personal injury). Direct Claims are paid from the Trust upon a showing that the claimant satisfies the disease and exposure requirements set forth in the TDP (which purport to be surrogates for the showing that would have been required in the State law tort system). Indirect PI Trust Claimants (such as CNA), on the other hand, cannot be paid on their rights to contribution or indemnity under State law; instead they must also prove that they fully paid a liability for which Grace, and not the Indirect PI Trust Claimant, is liable and that they obtained a release for the benefit of the Trust before they can be paid. *See* TDP § 5.6. To avoid this discriminatory result, the TDP should be modified to adopt the procedures adopted for the Manville Trust, which were negotiated in a process that included input from co-defendants.[21] Implementing a Manville trust distribution process here would give Indirect PI Claimants the option either (i) to pursue a contribution claim against the Trust under the TDP or (ii) receive a credit against any verdict in the tort system that would treat the Trust (standing in the Debtors'

---

[21] The current Manville TDP was approved at *In re Joint E.&S. Dist. Asbestos Litig.*, 237 F. Supp. 2d 297 (E.D. & S.D. N.Y. 2002), and is reproduced at http://www.mantrust.org/FTP/C&DTDP.pdf. An earlier version of that TDP is appended to *In re Joint E.&S. Dist. Asbestos Litig.*, 878 F. Supp. 473, 580-613 (E.D. & S.D. N.Y. 1995).

stead) as a settled tortfeasor. In the latter case, the TDP would provide that the Trust will appear in a case at the request of a defendant for the limited purpose of being on verdict forms. In its current discriminatory form, the Plan violates Section 1123(a)(4) of the Bankruptcy Code and, consequently, Section 1129(a)(1).

5.   Certain Indirect PI Claims are also placed in a less favorable position in the FIFO queue for being paid than are Direct PI Claims. Post-Effective Date Direct PI Claims are placed in the FIFO Queue as of the date they are filed (TDP § 5.1(a)(1)), while Insurance-Related TDP claims and Indemnified Insurer TDP Claims are only placed in the FIFO Queue after an agreement is reached with the Trust as to the amount due or after an ADR award is made. *See* TDP §§ 5.1(a)(1), 5.12, 5.13. This treatment results in the Plan violating Sections 1123(a)(4) and 1129(a)(1).

6.   The Plan may also discriminate against Indirect PI Trust Claims by making them subject to disallowance by the Court on the ground, among others, that they constitute Demands (as opposed to Claims) under the Bankruptcy Code because they are contingent and unliquidated on the date of Plan confirmation. No such disallowance procedure is permitted with respect to Direct Asbestos PI Claims, including those that are likewise contingent and unliquidated on the date of Confirmation. To the extent that the Plan is construed to permit disallowance of Indirect PI Trust Claims on this ground, it would discriminate against such Claims and in favor of Direct Claims in contravention of Sections 1123(a)(4) and 524(g)(2)(B)(ii)(V). Either violation would render the Plan unconfirmable under Section 1129.

7.   Witnesses for the Plan Proponents, in their deposition testimony, have stated that Indirect PI Claims are not subject to disallowance on the above grounds. Nonetheless, concern remains by reason of the Debtors' Objection To Proofs of Claim for Contractual indemnity

Claims Filed By Maryland Casualty Company (the "Objection to MCC Claim"). [Docket No. 21345]. MCC's claims arise from lawsuits against it by Asbestos PI Claimants, and in particular by Libby Claimants (including lawsuits that also name CNA as a defendant). Objection to MCC Claim ¶ 21. In the Objection to MCC Claim, the Debtors assert that the MCC claims should be disallowed even though MCC's claims fall within the definition of Indirect PI Trust Claims. In light of the Objection to MCC Claim, it thus appears possible that the Debtors would assert (and consequently, the Asbestos PI Trust could also assert) that claims (including future Demands) for contribution and indemnity by Entities such as MCC and CNA might not be within the definition of Indirect PI Trust Claims or might be disallowed by the Bankruptcy Court. If the former were the case, then the Plan would fail to provide for such claims at all, a more egregious result than the discriminatory treatment of such claims discussed above. If the latter (disallowance by the Bankruptcy Court) were the case, then claims for indemnity and contribution would be discriminated against since no other Class 6 claims are to be allowed or disallowed by the Court but rather are to be channeled to and paid from the Asbestos PI Trust. Plan § 3.1.6. That result would violate Sections 1123(a), §524(g) and §1129(a) of the Code. Unless clarified to provide equal treatment for Direct and Indirect Claimants, the Plan is objectionable and should not be confirmed.

**D.**     **The Plan Fails To Comply With the Funding Requirements Contained in Section 524(g) of the Code.**

       1.     The Plan fails to comply with the requirements of Sections 524(g)(2)(B)(i)(II) and (III) of the Code. Pursuant to Section 524(g)(2)(B)(II), a Trust must be "funded in whole or in part by the securities of one of more debtors involved in such plan [of reorganization] and by the obligation of such debtors to make future payments, including dividends." The Plan Proponents purport to satisfy this requirement by funding the Asbestos PI Trust with: (a) a Warrant for ten

million shares of Reorganized Grace common stock, with an exercise price of $17 per share and an expiration date of approximately one year from the Effective Date of the Plan; and (b) an agreement to make deferred payments of $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024. Neither the warrant nor the deferred payment agreement satisfy the requirement that the Trust be funded by "securities" of the Debtors.

2.     While the Code does define the term "security" to include a "warrant" (Code § 101(49))(A)(xv)), the Plan Proponents are unable to establish with any certainty that the Warrant that will be transferred to the Asbestos PI Trust is not worthless. The expert report submitted on behalf of CNA and certain other insurers concludes that the Warrant will have no economic value to Asbestos PI Trust prior to its expiration. Expert Report of H. Sean Mathis, Docket No. 21019.[22] Plan Proponents cannot carry their burden that the Warrant satisfies the "securities" requirement in Section 524(g).

3.     Nor does the Asbestos PI Deferred Payment Agreement qualify as a "security" for purposes of Section 524(g). The legislative intent of Section 524(g), which was modeled on the Plan approved by the bankruptcy court in *In re Johns-Manville Corp.*, clearly evidences a delicate balance pursuant to which future asbestos claimants have their rights against the debtor cut off in exchange for, *inter alia*, an equity stake in and, therefore, potential upside in, the company that injured them.[23] By contrast, the Asbestos PI Deferred Payment Agreement has a

---

[22] CNA has designated Mr. Mathis as a Phase I witness and reserves the right to call him at the Phase I hearing.

[23] *See, e.g.*, 140 Cong. Rec. H10,764 (daily ed., Oct. 4, 1994) (note to proposed bill) ("Asbestos claimants would have a stake in Johns-Manville's successful reorganization, because the company's success would increase both the value of the stock held by the trust and the company profits set aside for it."). Essentially, Congress intended that the reorganized debtor would "become[] the goose that lays the golden egg by remaining a viable operation and *maximizing* the trust's assets to pay claims." 140 Cong. Rec. S4521-01, S4523 (daily ed., Apr. 20, 1994) (statement of Sen. Brown) (emphasis added).

fixed value that cannot increase no matter how well Reorganized Grace does in the future. Asbestos Claimants will thus be excluded from any upside of Reorganized Grace's successful reorganization. Again, therefore, the deferred payment agreement cannot be deemed to satisfy the "securities" requirement of § 524 (g)(2)(B)(II) of the Code.

4.      Pursuant to Section 524(g)(2)(B)(III) of the Code, a Trust must also own, or by the exercise of rights granted under such plan of reorganization be entitled to own if specified contingencies occur, a majority of the voting shares of the debtor or certain named affiliates of the debtor. The Plan purports to satisfy this requirement by giving the Asbestos PI Trust, in conjunction with the Asbestos PD Trust, the right to obtain jointly 50.1% of the common stock of Reorganized Grace if Grace defaults on the deferred payments due under its deferred payment agreements to these entities. This purported mechanism fails to satisfy Section 534(g)(2)(B)(i)(III).

a.      First, the "contingency" that must occur for the Trusts jointly to own greater than 50% of the voting shares of the Debtor or an affiliate is the Reorganized Debtor's default on its deferred payment obligation. That contingency would not be realized unless and until the Reorganized Debtor was unable to pay its obligations and therefore *in extremis*. At that point the common stock that could be obtained by the Trust would be worthless. A Plan that provides for greater than 50% control only under such circumstances does not satisfy the requirements of Section 524(g)(2)(B)(III). *See In re Congoleum Corp.,* 362 B.R. 167, 175-79 (Bankr. D.N.J. 2007).

b.      Second, Section 524(g)(2)(B)(i)(III) provides that, upon occurrence of a contingency, the Trust must be entitled to own a majority of the voting shares of the Debtor or an affiliate. The Asbestos PI Deferred Payment Agreement provides for future payments to the

Asbestos PI Trust and is secured against payment default by 50.1% of the common stock of Reorganized Grace. Plan § 1.1(36). There is, however, a second such agreement for the benefit of the Asbestos PD Trust and its beneficiaries, the Class 7A Asbestos PD Claimants and the Class 7B Asbestos PD Claimants (holders of US ZAI PD Claims) (together, the "Deferred Payment Agreements"). Plan §§ 1.1(27), 3.1.7. Both Deferred Payment Agreements are secured by the same 50.1% of Parent Common Stock so that in no case would a single trust ever gain control, contrary to the requirements of Section 524(g).

           c.       Third, the Deferred Payment Agreements are between the subsidiary W.R. Grace & Co.-Conn. ("Grace-Conn.") and the respective Trusts. Grace-Conn.'s obligations under the Deferred Payment Agreements are deeply subordinated to all other obligations of the Reorganized Debtors so that obligations to the Trusts cannot be satisfied until all senior indebtedness has been satisfied. Plan Exhibit 11, § 7. Although the obligations of Grace-Conn. to the Trusts are guaranteed by the parent, W.R. Grace & Co., the parent's obligations to the Trusts are also deeply subordinated such that, in the event of the parent's insolvency, exercise of default remedies will be stayed and the Trusts will be unable to demand issuance of the shares. *See* Plan Exhibit 15. The likelihood that the Parent Common Stock will provide value to the Trusts under the Plan is accordingly highly speculative, and the proposed funding of the Trust fails to satisfy the requirements of Section 524(g).

## E.    The Plan Improperly Eliminates CNA's Contractual Indemnity Rights With Respect to Claims Other Than Asbestos PI Claims.

Pursuant to settlement agreements reached between CNA and the Debtors, CNA has rights to be indemnified with respect to costs and liabilities that it might incur to third parties with respect to claims in addition to Asbestos PI Claims, including Asbestos PD Claims and non-Asbestos Claims. The pending request for relief from stay by Kaneb Pipe Line Operating

Partnership, L.P., et al ("Kaneb") is an example of an attempt by a plaintiff to seek recovery from CNA for alleged environmental liabilities of the Debtors in a context where CNA has been indemnified by the Debtors under a settlement agreement. [Docket No. 20538]. The Plan, however, does not make provision for payment of any such liabilities that CNA may incur. Claims against CNA for which CNA has indemnity rights or rights to premium adjustments against the Debtors should be separately and specifically enjoined under Section 105 of the Bankruptcy Code and the Plan should be clear that CNA can recover for any liability it incurs from the Reorganized Debtor if such claims are not successfully enjoined. The failure to provide such injunctive protection and claim treatment is a failure to provide adequate means for the Plan's implementation and violates Section 1123(a)(5). In addition, the modifications of CNA's rights under its settlement agreements to indemnity for non-asbestos claims are not authorized by bankruptcy law and violate otherwise applicable state law. Consequently, the Plan fails to satisfy the requirements of sections 1129(a)(1) and (3).

## F.    The Plan Abrogates the Anti-Assignment Provisions of CNA's Policies.

1.    Pursuant to the Plan, all of the "Asbestos Insurance Rights" of the Debtors and certain non-Debtor affiliates under policies issued by CNA will be transferred to the Asbestos PI Trust. Under the Plan, the transfer of such Rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against CNA and other Asbestos Insurance Entities "notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy." Plan § 7.15(g)

2.    Transfer of the Asbestos Insurance Rights to the Trust without CNA's consent violates the terms of CNA's policies. The relevant CNA Asbestos Insurance Policies provide that assignments made without CNA's consent will not bind CNA. This restriction on assignment is typically stated as follows: "Assignment of interest under this policy shall not

bind the Company until its consent is endorsed hereon."[24] CNA has not consented to the transfer of the Asbestos Insurance Rights under its policies to the Asbestos PI Trust — a fact that Debtors (and the other Plan Proponents) have admitted in their responses to CNA's Requests for Admission.[25] If a coverage action were brought against CNA under these policies by the Debtors or the Asbestos PI Trust, CNA would interpose as a defense that the policies had been assigned without its consent — a defense that would be upheld under the applicable state law (New York) governing the interpretation and enforcement of CNA's policies.[26]

3.      The proposed assignment of Asbestos Insurance Rights in violation of CNA's policies violates Sections 1129(a)(1) and (3) of the Code because the assignment is prohibited by applicable non-bankruptcy law and is not authorized by the Bankruptcy Code. While there are circumstances where the *proceeds* of an insurance policy can be assigned without an insurer's consent, the Plan does not purport to assign only insurance proceeds. To the contrary, the Plan embodies an assignment of all the insured's rights under the Asbestos Insurance Policies. The definition of Asbestos Insurance Rights includes the right to bring Asbestos Insurance Actions against insurers seeking defense and coverage for Asbestos PI Claims. The Plan thus effectively transfers the Asbestos Insurance Policies to the Asbestos PI Trust.

4.      The proposed assignment of Asbestos Insurance Rights also violates Sections 1129(a)(1) and (3) to the extent it imposes on the Asbestos Insurance Entities modifications of contract rights that are not authorized by the Bankruptcy Code and that violate applicable state law. As discussed above, while the Plan transfers the rights of the Debtors under the Policies to

---

[24] *See, e.g.*, Harbor Insurance Policy No. 12034.

[25] *See* Debtors' Response to CNA Request for Admission No. 1; ACC's Response to CNA Request for Admission No. 1; FCR's Response to CNA Request for Admission No. 1.

[26] *See, e.g.*, *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165 (2d Cir. 2006); *Carle Place Plaza Corp. v. Excelsior Ins. Co.*, 534 N.Y.S.2d 397 (App. Div. 1988).

the Asbestos PI Trust, it is not clear that the attendant obligations of the Debtors remain with them or are also transferred. Nothing in the Bankruptcy Code or in applicable state law permits a unilateral modification of contract rights. *See In re Beeter,* 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994). Moreover, the Bankruptcy Code contains no provision allowing modification or assignment of *non-executory* contracts. CNA's policies are non-executory and non-assignable.

5.      CNA acknowledges that this Court has recently upheld a similar assignment provision in *In re Federal-Mogul Global Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008), *aff'd,* 2009 U.S. Dist. LEXIS 24302 (D. Del. Mar. 24, 2009), *appeal pending,* No. 09-2230 (3d Cir.). The issue is also raised in another case pending in the Court of Appeals. *In re Global Indus. Techs., Inc.*, No. 08-3650 (3d Cir.) (scheduled for argument May 21, 2009). As a result, CNA raises the objection to the assignment in order to preserve the point in the event that those other rulings are set aside on appeal.

**G.      The Plan Improperly Assigns the Insurance Rights of Non-Debtor Affiliates to the Asbestos PI Trust.**

Pursuant to the Plan and the Asbestos Insurance Transfer Agreement, the "Insurance Contributors" transfer to the Asbestos PI Trust all of their Asbestos Insurance Rights under and in connection with CNA's policies. The term "Insurance Contributor" includes not only the Debtors, but also the 124 Non-Debtor Affiliates identified in Plan Exhibit 16. *See* Plan § 1.1(140). There is no basis for the assignment of Insurance Rights of Non-Debtors. The Third Circuit so held in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004) ("To the extent the subject insurance policies are jointly held by Combustion Engineering and a non-debtor … the § 541 preemption of anti-assignment provisions applies only to Combustion Engineering's interest in the shared policies.").

## III.  INCORPORATION BY REFERENCE OF OTHER OBJECTIONS

CNA hereby incorporates by reference any Phase I or Phase II objections made by other

Asbestos Insurance Entities to the Plan.

### CONCLUSION

For the reasons set forth above, CNA respectfully requests that the Court not confirm the

Plan unless the Plan is modified to satisfy these objections, and that it provide such further relief

as is just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _____

Edward B. Rosenthal (*Bar No. 3131*)
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
FACSIMILE: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Michael S. Giannotto (*pro hac vice*)
Brian H. Mukherjee (*pro hac vice*)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
facsimile: (617) 523-1231

FORD MARRIN ESPOSITO WITMEYER &
GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
FACSIMILE: (212) 344-4294

WILDMAN, HARROLD, ALLEN & DIXON
LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone: (312) 201-2662
FACSIMILE: (312) 416-4524

*Counsel for Continental Casualty Company,*
*Transportation Insurance Company*
*and their American insurance affiliates*

Dated: May 20, 2009

APPENDIX A

REVISED INSURANCE NEUTRALITY PROVISION

a.    Neither (I) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, (III) any judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, made on or off the record) made by the Bankruptcy Court or issued or affirmed by the District Court pursuant to 11 U.S.C. § 524(g)(3), nor (IV) any estimation or valuation of Asbestos PI Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Asbestos PI Claims or any value attributed to the Asbestos PI Trust Assets) in the Chapter 11 Cases or otherwise, shall, with respect to any Asbestos Insurance Entity  (including on the basis of the decision in UNR Industries, Inc. v. Continental Casualty Co., 942 F. 2d. 1101 (7th Cir. 1991)), constitute a trial or hearing on the merits or an adjudication or judgment; or trigger or accelerate the obligations, if any, of any Asbestos Insurance Entity under its Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Settlement Agreements or Asbestos Insurance Reimbursement Agreements, as applicable; or be used as evidence in any forum to prove:

i.    that any of the Debtors, the Reorganized Debtors, the Asbestos PI Trust, or any Asbestos Insurance Entity is liable for, or otherwise obligated to indemnify or pay with respect to, any individual Asbestos PI Claim or Demand;

ii.    that the procedures established by the Plan, including without limitation the Trust Distribution Procedures, for evaluating and paying Asbestos PI Claims and Demands

(including the medical, causation or exposure criteria and disease values) are reasonable or appropriate;

iii.     that the procedures established by the Plan, including without limitation the Trust Distribution Procedures, for evaluating and paying Asbestos PI Claims and Demands (including the medical, causation or exposure criteria and disease values) are consistent with any procedures that were used to evaluate or settle Asbestos PI Claims against the Debtors before the Petition Date;

iv.     that the settlement of, or the value assigned to, any individual Asbestos PI Claim pursuant to the Trust Distribution Procedures was, is or will be reasonable and/or otherwise appropriate;

v.     that any of the Asbestos Insurance Entities participated in the negotiation of and/or consented to the Plan or any of the Plan Documents including without limitation, the Trust Distribution Procedures;

vi.     that any of the Debtors or the Asbestos PI Trust has suffered an insured loss with respect to any Asbestos PI Claim or Demand;

vii.     (A) the liability of the Debtors, the Reorganized Debtors, or the Asbestos PI Trust for Asbestos PI Claims or Demands, whether such Asbestos PI Claims or Demands are considered individually or on an aggregate basis; or (B) the value of such Asbestos PI Claims or Demands, individually or in the aggregate;

viii.     that the conduct of the Debtors, the Reorganized Debtors or the Asbestos PI Trust in connection with the negotiation, development, settlement, confirmation and/or implementation of the Plan, the other Plan Documents, or any related agreements was, is or will be reasonable, appropriate, in good faith, or consistent with the terms and conditions of any

2A

Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Settlement Agreements or Asbestos Insurance Reimbursement Agreements, as applicable; or

ix.    that any Asbestos Insurance Entity did not have, does not have or will not have a reasonable, good-faith basis to withhold consent to the settlement, allowance or liquidation of, assignment of any value to and/or payment of (including any presentation to any Asbestos Insurance Entity for payment of) any Asbestos PI Claim, including under or in connection with the Plan or any of the Plan Documents, or any related agreement.

b.    Nothing in the Plan, the Plan Documents or the Confirmation Order shall impose, or shall be deemed or construed to impose, any obligation on any Asbestos Insurance Entity to provide a defense for, settle, or pay any judgment or liability with respect to, any Asbestos PI Claim; rather, an Asbestos Insurance Entity's obligations, if any, with respect to defending, settling, or paying any Claim, including an Asbestos PI Claim, shall be determined solely by and in accordance with the Asbestos Insurance Policies, Asbestos In-Place Insurance Coverage, Asbestos Insurance Settlement Agreements or Asbestos Insurance Reimbursement Agreements, as applicable.

c.    The Asbestos Insurance Entities have not consented to the Plan or the Plan documents, including without limitation the Trust Distribution Procedures applicable to the WRG Asbestos PI Trust, and have not consented to the payment of any monies by the Trust with respect to any Asbestos PI Claims.

d.    Notwithstanding anything to the contrary in the Plan or the Plan Documents including the provisions of Section 7.15(h) of this Plan, (i) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that tenders a Claim to an Asbestos Insurance Entity shall be responsible, for purposes of such Claim, for any retrospective insurance

3A

premium, self-insured retention, deductible, or similar obligation of the insured under the Asbestos Insurance Policies with respect to which such Claim is tendered; (ii) with respect to any self-insured retention, deductible or similar obligation, any Asbestos Insurance Entity to which such Claim is tendered may seek to establish, as one of its Asbestos Insurer Coverage Defenses, that such tendering entity has not fulfilled the obligations of the insured under the Asbestos Insurance Policies in respect of which such Claim was tendered; and (iii) with respect to any retrospective insurance premium or similar obligation, any Asbestos Insurance Entity to which such Claim is tendered may offset the amount of such retrospective insurance premium or similar obligation against any amount otherwise payable by such Asbestos Insurance Entity on account of such Claim under its Asbestos Insurance Policies on account of such Claim.

e.      Except as provided in Section 7.15(g), nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any Reorganized Debtor, any non-Debtor Affiliate or any entity (including the Trust) that is or claims to be entitled to defense or indemnity under an Asbestos Insurance Policy from the duty to comply with the terms and conditions of such Asbestos Insurance Policy or under applicable law applicable to the insured, including any terms or conditions (1) requiring provision of timely notice to an Asbestos Insurance Entity of accidents, occurrences or claims, (2) requiring cooperation with the Asbestos Insurance Entity, or (3) precluding voluntary payments or settlement without the Asbestos Insurance Entity's consent.

f.      Any demand for payment made to any Asbestos Insurance Entity shall only be based on, and can only be brought for, the amount of the actual payments (aggregate or otherwise) made by the Asbestos PI Trust to any holders of Asbestos PI Claims and Demands, and may not be based upon, inter alia, any payment not yet actually made to the holders of

4A

Asbestos PI Claims and Demands, nor payments or amounts that will, or might, be paid at some point in the future to the holders of Asbestos PI Claims and Demands, but which have not yet actually been paid,

        g.     Notwithstanding the definition of "Settled Asbestos Insurance Company" as set forth in definition 200 of the Plan, the injunctive protection afforded to a Settled Asbestos Insurance Company shall be extended to any Asbestos Insurance Entity that is added to Exhibit 5 (including following entry of the Confirmation Order) and any other Asbestos Insurance Entity that enters into an Asbestos Insurance Settlement Agreement that is determined by the District Court to justify treating such Asbestos Insurance Company as an Asbestos Protected Party.

LIBC/3582678.11

5A