## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | **Hearing Date:  Phase I: June 22-25, 2009** |
| | ) | **Phase II: September 8-11, 2009** |
| | ) | **Objection Deadline:  May 20, 2009** |
| | ) | |
| | ) | **Ref. Docket Nos. 20872, 21594** |
| | ) | |

## OBJECTION OF GARLOCK SEALING TECHNOLGIES, LLC TO CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W.R. GRACE & CO., ET AL., THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009

Garlock Sealing Technologies, LLC ("Garlock"), through its undersigned counsel, hereby objects to confirmation of the First Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., Et Al., the Asbestos PI Future Claimants' Representative, and The Official Committee Of Equity Security Holders, dated February 27, 2009 (the "Plan").

## BACKGROUND

1.      On April 2, 2001, W.R. Grace & Co. and its affiliated debtors (the "Debtors") commenced petitions for bankruptcy under Chapter 11 of the Bankruptcy Code to resolve (a) hundreds of thousands of claims brought by personal injury plaintiffs against them complaining of exposure to the Debtors' asbestos-containing products and asbestos-related activities and (b) countless similar claims expected to be brought against them in the future.

2.      The Debtors were also subject to present and future cross-claims by co-defendants for contribution and indemnity, and the Debtors likewise brought claims on these theories against co-defendants.  Although individual plaintiffs could attempt to hold any single

defendant or group of defendants responsible for such plaintiff's injuries, through these cross-claims for contribution or indemnity the targeted defendants could join other companies as co-defendants to ensure that each company that caused the plaintiff's injuries would pay its share.

3.    If confirmed, the Plan will provide for the creation and funding of the WRG Asbestos PI Trust (the "Trust").  The two principal purposes of the Trust are to (1) process, liquidate and pay all present and future Asbestos PI Claims in accordance with the WRG Asbestos PI Trust Distribution Procedures (the "TDP"), the WRG Asbestos PI Trust Agreement (the "Trust Agreement") and other Plan documents, and (2) preserve, hold, manage and maximize the assets of the Trust for use in paying Asbestos PI Claims. The Trust will be obligated to process and pay "Direct Claims" brought against the Trust by individuals injured by the Debtors' asbestos-related products and activities.  The Trust will likewise be obligated to process and pay "Indirect Claims" brought by co-defendants that are valid under applicable state law.

4.    To facilitate the Debtors' reorganization, the Plan would require the District Court to issue, pursuant to section 524(g) of the Bankruptcy Code, a permanent channeling injunction (the "Channeling Injunction"), which would permanently enjoin any and all holders of Asbestos Personal Injury Claims from ever pursuing remedies against the Debtors and other protected persons and channel such holders to the Trust for remedies pursuant to the TDP.

5.    Garlock holds and/or will hold in the future Indirect Claims in the form of claims against the Debtors for contribution and indemnity related to asbestos personal injury claims arising from the Debtors' products and operations.  Under the Plan, Garlock would look to the Trust for resolution of its claims pursuant to the TDP.  Garlock objects to confirmation of the Plan, and in support of its objection, shows the Court the following.

## OBJECTIONS

A.    **The TDP are flawed and violate Bankruptcy Code §524(g) because they do not permit the Trust to allow and settle an Indirect PI Trust Claim before the Indirect Claimant pays the Trust's liability to the Direct Claimant, even though the ability of a co-defendant to obtain adjudication of a joint-tortfeasor's shared liability for a tort claim before paying such claim is a valuable right under applicable state law.**

6.    As required by Section 524(g), the proposed Trust will assume and become responsible for all of the Debtors' asbestos-related liability.[1] This liability includes not only claims by plaintiffs who suffered asbestos-related bodily injury, but also claims by Debtors' fellow asbestos defendants for contribution and indemnification, referred to under the Plan as "Indirect PI Trust Claims." ("Indirect Claims")[2] Under the Plan and Trust Agreement, the Trust will assume the Debtor's liability for Indirect Claims, and will then be responsible for liquidating, allowing, and eventually paying valid Indirect Claims. The TDP will govern the liquidation, allowance, and payment process and are supposed to provide an orderly, efficient, and fair process for disposing of valid claims against the Trust. *See* TDP § 2.1 (TDP goal is to "achiev[e] a fair allocation of the PI Trust funds . . . in light of the best available information considering the settlement histories of Grace and the rights claimants would have in the tort system absent the bankruptcy").

---

[1]  *See* 11 U.S.C. § 524(g)(2)(B) (channeling injunction only available if trust "is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products").

[2]  The Plan defines an Indirect PI Trust Claim, in relevant part, as: "any Claim or remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy, liability, or Demand are known or unknown, that is . . . held by . . . any Entity . . . who has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability . . . on account of alleged liability of the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action."

3

7.    The proposed TDP are deficient because they fail to provide an adequate procedure for liquidating the Trust's liability for Indirect Claims. Under the TDP, the Trust is permitted to allow and settle an Indirect Claim only after the Indirect Claimant has paid the Trust's liability to the Direct Claimant. Yet under applicable state law, a tort system defendant has a right to pursue contribution prior to paying a judgment or settlement to the plaintiff, and thus avoid having to bear joint and several liabilities that should be borne by other joint tortfeasors. The provision thus conflicts with Section 524(g), the Plan, and the Trust Agreement, which require the Trust to assume and allow *all* the asbestos-related liability the Debtor has under applicable state law.

8.    Because the TDP abridge Garlock's rights under state law and limit the rights provided to Garlock under Section 524(g), the Plan, and the Trust Agreement, Garlock objects to the Plan, and will continue to object until the TDP provide explicit recognition of an Indirect Claimant's right to have an Indirect Claim against the Trust allowed and settled prior to paying a judgment or settlement to the associated Direct Claimant.

### 1.    Under state law, a defendant has a right to seek contribution prior to paying a judgment or settlement to the plaintiff.

9.    The purpose of the law of contribution and indemnification is to ensure an equitable sharing of damages that tortfeasors jointly caused. It prevents the injustice of one joint tortfeasor having to bear all the plaintiff's damages, simply because the plaintiff happened to sue that defendant. "The general rule is that one who is compelled to pay or satisfy the whole or to bear more than his or her just share of a common burden or obligation upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares. The doctrine is founded not

upon contract, but upon principles of equity, and assists in the fair and just division of losses, preventing unfairness and injustice." 18 Am. Jur. 2d, Contribution § 1.

10.    It would be inconsistent with this equitable rationale to force a joint tortfeasor targeted by a plaintiff to wait until it has suffered a judgment or paid a settlement before having the chance to bring potential contribution defendants into the litigation.  If the original defendant had to wait, it would be forced to bear the plaintiff's entire damages for a substantial period of time, until the original defendant could litigate to conclusion its separate contribution action against the other joint tortfeasors.  *See* 6 Wright & Miller, Federal Practice & Procedure § 1442 (noting that the right to seek contribution in the original tort action avoids a "potentially damaging time lag between a judgment against defendant in one action and a judgment in his favor against the party ultimately liable in a subsequent action").  The defendant would have to bear this burden even if it is responsible for only a small portion of the plaintiff's damages, giving the plaintiff substantial leverage.  Finally, requiring the original defendant to wait is inconsistent with the sound administration of justice, because the separate contribution action would overlap substantially with the issues in the underlying action, and there is no reason not to litigate those issues in the same case.  *See Bd. of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 390 S.E.2d 796, 802 (W. Va. 1990) ("Not only is judicial economy served, but such a procedure also furthers one of the primary goals of any system of justice—to avoid piecemeal litigation which cultivates a multiplicity of suits and often results in disparate and unjust verdicts.").

11.    For these reasons, the states that recognize a right of contribution acknowledge that the defendant has a right to contribution from the moment the plaintiff sues, and need not wait until after payment.  *See, e.g., Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*,

547 S.E.2d 256, 267 (W. Va. 2001); *Paul v. Bier*, 758 A.2d 40, 46 (D.C. 2000); *Ciccone v. Dominick's Finer Foods, Inc.*, 731 N.E.2d 312, 318 (Ill. 1st Dist. 2000) (right to contribution exists "from the time the person seeking recovery is injured"); *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1072 (La. 1992) ("We, therefore, conclude that at the time of the tort, obligations arise not only between the injured party and the tortfeasors, but also among the tortfeasors themselves."); *Gemco-Ware, Inc. v. Rongene Mold & Plastics Corp.*, 360 S.E.2d 342, 344 (Va. 1987); *Rowland v. Skaggs Companies, Inc.*, 666 S.W.2d 770, 772 (Mo. 1984); *Minneapolis, St. P. & S. S. M. R. Co. v. City of Fond du Lac*, 297 F.2d 583, 585 (7th Cir. 1961) ("The right of contribution between joint tortfeasors arises at the time of the concurring negligent acts."); *La Ferry v. Ajax Truck Rentals*, 161 F. Supp. 707, 710 (E.D. Tenn. 1958) ("The contingent right of a joint tort-feasor to indemnification or contribution, if any, sets up at the same time as the right of the plaintiff against the original defendant."); *see generally* 18 Am. Jur. 2d, Contribution, § 55 ("Generally, a right to be protected against an unfair exaction—an incidental or inchoate right to compel contribution—comes into being and becomes the property right, or interest of, a tortfeasor the instant the joint or concurring acts of the tortfeasors give to the injured person a cause of action against them—in other words, when the common liability arises.").

12.    The cases term the contribution right that exists before payment "inchoate." It is inchoate only in the sense that the original defendant may not *collect* from the contribution defendant until the original defendant actually pays the plaintiff (there is no equitable reason to require burden-sharing of a burden not yet incurred). Even before the original defendant pays, it has the right to assert and fix the amount of contribution, and becomes entitled to payment from the contribution defendant the moment it pays the plaintiff. As a logistical matter, the court most often enters a conditional judgment against a guilty contribution defendant, providing that the

judgment is enforceable as soon as the original defendant pays the plaintiff.  *See* 6 Wright & Miller, Federal Practice & Procedure § 1448.

13.    The right to seek contribution from the moment a plaintiff sues is a valuable one that protects joint tortfeasors from substantial unfairness.  "[T]his inchoate right of contribution is designed to moderate the inequity which existed in our law that enabled the plaintiff to cast the entire responsibility for an accident on one of several joint tortfeasors by deciding to sue only him."  *Bd. of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 390 S.E.2d 796, 801 (W. Va. 1990).  All the federal courts similarly recognize that a joint tortfeasor has the right to sue known contribution defendants before paying a judgment or settlement.  6 Wright & Miller, Federal Practice & Procedure § 1448.  The right protects the original defendant from having to bring a separate action to enforce contribution, and bear plaintiff's entire damages in the interim.

14.    In fact, the policies behind recognizing the inchoate right to contribution are so compelling; many states *require* the original defendant to implead contribution defendants, upon penalty of waiving the right to contribution.  *See Sheetz*, 547 S.E.2d at 267 n.9 ("a defendant who does not invoke the third-party procedures of Rule 14 to implead another defendant who allegedly contributed to the plaintiff's injuries risks forfeiting the right to seek contribution"); *Paul*, 758 A.2d at 46; *Casa Ford, Inc. v. Ford Motor Co.*, 951 S.W.2d 865, 876 (Tex. App. 1997); *Bendar v. Rosen*, 588 A.2d 1264, 1273 (N.J. Super. 1991); *Eberly v. A-P Controls, Inc.*, 572 N.E.2d 633, 639 (Ohio 1991); *Henry by Henry v. St. John's Hosp.*, 563 N.E. 2d 410, 416 (Ill. 1990).  In these states, there is no such thing as a right to contribution after payment of a judgment or settlement: contribution can *only* be enforced in the original action.  These jurisdictions recognize that it would often be unfair to contribution defendants if the original defendant were not required to join them and thus give them notice and an opportunity to defend

against the original claim. *See Paul*, 758 A.2d at 46 ("Fairness dictates that all defendants, whether they choose to settle or litigate, file cross-claims for contribution before the verdict in order to give notice to other defendants that they will be required to pay their fair share of damages to a joint tortfeasor in the event that they are found liable.").

15.    The right to contribution before payment of a judgment or settlement is thus a well-recognized one under state law.  It serves an important purpose for tort-system defendants like Garlock.  It permits Garlock to join other culpable parties at an early stage of litigation, and thus avoid having to bear, or fear bearing, liability for which others are responsible.

2.    **The TDP improperly preclude the Trust from allowing and settling Indirect Claims prior to payment of a judgment or settlement to the Direct Claimant.**

16.    The TDP, in their current form, are defective because they prevent the Trust from allowing and settling Indirect Claims before the Indirect Claimant actually pays a judgment or settlement to the Direct Claimant.  Section 5.6 provides that an Indirect Claim is "presumptively valid" only if "the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the 'Direct Claimant')."  Similarly, Indirect Claims that are not presumptively valid are allowable under the TDP only if "the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant as of the Effective Date."  TDP § 5.6.

17.    The TDP thus preclude the Trust from allowing an Indirect Claim filed before the Indirect Claimant has actually paid the Trust's liability to the Direct Claimant in the form of a judgment or settlement.  This is inconsistent with state law's recognition of the inchoate right to contribution, and thus violates the command of § 524(g), the Plan, and the Trust Agreement,

which require the Trust to allow *all* asbestos-related claims against the Debtor that are allowable under state law. It also violates § 524(g) for, among other violations, failing to require that the Trust operate through mechanisms that "[…] provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." Code § 524(g)(2)(B)(i)(V).

18.    Under the Plan, for example, the Trust will assume contribution liability that is "unliquidated," "contingent," and "unmatured," as well as claims held by an entity that "is" or simply "may be" a defendant, not just claims held by defendants who *were at one time* defendants in an asbestos suit. These definitions plainly include the inchoate right to contribution recognized under state law. The TDP's failure to recognize an Indirect Claimant's inchoate right to contribution, which exists from the moment of the plaintiff's injury and can be reduced to judgment in state court before the Indirect Claimant actually pays, is not a result permitted by 524(g), the Plan, or the Trust Agreement.

19.    In addition to being inconsistent with the statute and Plan documents, the arbitrary "payment" condition to allowance of an Indirect Claim will result in pointless burdens on the Indirect Claimants and the assets of the Trust. Once the Trust is compelled to deny an Indirect Claimant's claim because the Indirect Claimant has not yet paid the Direct Claimant, the Indirect Claimant will have the option to pursue nonbinding arbitration against the Trust, followed by an action in state court. TDP § 5.10. In both those forums, the Indirect Claimant will have a viable "inchoate" contribution claim under state law that can be embodied in a judgment conditioned on payment to the Direct Claimant. The "payment" requirement will in this way unnecessarily commit the Trust to disallowing valid Indirect Claims, thus forcing the Indirect Claimant to use the more expensive arbitration and tort-system methods of liquidation, with a consequent effect

on Trust assets.  This violates one of the purposes behind the TDP, which is to provide a cost-effective means to liquidate valid claims against the Trust, and thus preserve the maximum assets for distribution to Direct and Indirect Claimants.

20.     In fact, in states where contribution claims must be brought prior to verdict, Garlock and other Indirect Claimants will arguably *have* to pursue non-binding arbitration and state court litigation after disallowance of their Indirect Claims under the "payment" requirement, or else risk losing those claims for all time.  A procedure that, like Section 5.6, requires the Trust to disallow valid claims during the only period when they *are* valid is terribly flawed, and cannot receive the approval of this Court.

21.     Finally, the TDP's failure to recognize the inchoate right of contribution means that only the Direct Claimant will be able to have a claim allowed by the Trust prior to payment by the Indirect Claimant.  The Indirect Claimant will have to resort to the more costly arbitration and state court forums to enforce its contribution rights.  This inequity is inconsistent with the purpose of the inchoate right to contribution, which is to ensure that both plaintiff and defendant have an equal right to bring culpable parties into the litigation to share in bearing the plaintiff's damages.  To the extent the artificial payment requirement treats Garlock and other Indirect Claimants more harshly than Direct Claimants, it deprives Indirect Claimants of a substantial and valuable state law right.

22.     Although Indirect Claimants have an inchoate right to contribution before payment of the Trust's liability to the Direct Claimant, this does not mean the Trust should be forced to disallow such claims before payment: it means only that the Trust should put off *paying* the claims until the Indirect Claimant has paid the Direct Claimant.  Like a state court entering a conditional judgment, the Trust should allow the Indirect Claim, and then defer payment until the

Indirect Claimant has paid the Trust's liability to the Direct Claimant. Alternatively, the Trust may pay the Direct Claimant's claim immediately. The Indirect Claimant will then be able to receive credit for the Trust's payment in any settlement or judgment it eventually pays to the Plaintiff. The purpose of the inchoate right to contribution will be served.

23.    Either procedure—allowing the Indirect Claim and then either holding payment or paying the Direct Claimant—is superior to the current version of Section 5.6. The TDP currently give the Direct Claimant the sole right to have a claim against the Trust allowed before payment by the Indirect Claimant. They also force Indirect Claimants to prosecute their Indirect Claims in arbitration or the tort system, rather than under the liquidation procedures provided in the TDP, with unnecessary cost to Indirect Claimants and the Trust. That result violates 524(g) and is inconsistent with the sound administration of the Trust, as well as state law's recognition of the inchoate right to contribution, the Plan, and the Trust Agreement.

24.    The Trust must have the authority to allow an Indirect Claim prior to payment. The court should deny confirmation until the TDP make clear that Indirect Claims are allowable under the TDP prior to payment of the Trust's liability to the Direct Claimant.

**B.    The Trust Agreement is flawed and violates fundamental principles of bankruptcy and trust law because it permits the service of TAC members who represent and will represent Direct Claimants and will thus have actual and apparent conflicts of interest with the Indirect Claimants they will also be responsible for representing.**

25.    Garlock further objects to confirmation of the Plan because the Trust Agreement countenances the service of Trust Advisory Committee ("TAC") members who will have unconsented actual and apparent conflicts of interest, in violation of fundamental principles of bankruptcy law and the law of trusts and fiduciary relationships. The initial TAC members named in the Trust Agreement are attorneys for large numbers of asbestos plaintiffs, and are known to have numerous pending and prospective asbestos personal injury claims that are likely

11

to give rise to future Direct Claims against the Trust. The Trust Agreement in fact entrenches a TAC composed solely of attorneys for asbestos plaintiffs and Direct Claimants, because it gives each TAC member (or his or her law firm) the power to name his or her successor. Trust Agreement § 5.4.

26.    Yet these TAC members will wield extensive powers, in a "fiduciary capacity," Trust Agreement § 5.2, whose exercise will often actually advantage or appear to advantage Direct Claimants over Indirect Claimants, thereby generating actual and apparent conflicts of interest. The Court should not confirm the Plan until (a) the TAC members named in the draft Trust Agreement are disqualified and members without conflicts are put in their place; (b) the TAC is reduced to an advisory body; or (c) representatives of Indirect Claimants are given representation on the TAC equal to the representation currently enjoyed by Direct Claimants.

27.    Section 2.2(f) of the Trust Agreement gives the TAC its most substantial power to influence the governance and administration of the Trust and its assets. It requires the Trustees to obtain the consent of the TAC before taking certain actions. Some of these actions will affect Direct and Indirect Claimants equally, such as changes in the Payment Percentage and Claims Payment Ratio.

28.    Many actions requiring TAC consent will, however, often involve a conflict between the interests of Direct and Indirect Claimants. For every Direct Claimant, there is an Indirect Claimant who is or once was the opponent of the Direct Claimant in the tort system. Countless issues of Trust governance and administration could advantage or disadvantage Direct Claimants over Indirect Claimants, or vice versa, with consequent effects on settlement values in cases still in the tort system. The artificial "payment" requirement referenced in Garlock's first objection is an example of a TDP provision that makes it more difficult for Indirect Claimants to

12

prosecute their valid claims against Trust assets. The TAC members, who currently represent only Direct Claimants, will be able to use their veto to leverage similar outcomes. They will thus equip their Direct Claimant clients with weapons they can use to acquire leverage in asbestos cases against Indirect Claimants in the tort system.

29.    TAC members have the veto power in numerous instances where they will be able to favor Trustee actions that benefit Direct Claimants at the expense of Indirect Claimants. Such actions requiring TAC consent include:

- "[T]o establish and/or change the Claims Materials to be provided to holders of PI Trust Claims under Section 6.1 of the TDP" (Trust Agreement § 2.2(f)(iv)). The TAC will be able to wield its veto to force the Trustees to impose more onerous Claims Materials requirements on Indirect Claimants.

- "[T]o change the form of release to be provided pursuant to Section 7.8 of the TDP" (2.2(f)(vi)). The TAC will be able to force the Trustees to adopt a release that benefits Direct Claimants at the expense of Indirect Claimants under the contribution laws of the various states.

- "[T]o adopt the PI Trust Bylaws in accordance with Section 2.2(a) above or thereafter to amend the PI Trust Bylaws in accordance with the terms thereof" (2.2(f)(xi)). The TAC will be able to use its veto power to force the Trustees to adopt provisions that favor Direct Claimants at the expense of Indirect Claimants.

- And similarly, the TAC must consent to the Trustees' decision "to amend any provision of this PI Trust Agreement or the TDP in accordance with the terms thereof" (2.2(f)(xii)), which will likewise enable them to favor Direct Claimants over Indirect Claimants.

30.    Furthermore, Section 2.2(e) of the Trust Agreement requires the Trustees to "consult with the TAC" on "the general implementation and administration of the PI Trust," "the general implementation and administration of the TDP," and "such other matters as may be required under this PI Trust Agreement and the TDP." The proposed TAC members will have

13

2223459

an actual and apparent conflict of interest whenever they are asked to consult on actions that will benefit Direct Claimants at the expense of Indirect Claimants.

31.     The Trust Agreement can easily be amended to ameliorate the conflict.  First, the Trust Agreement could simply require that TAC members be neutral, unconflicted parties with no connection to any Direct or Indirect Claimants.  Second, the Trust Agreement could reduce the TAC to an advisory role, and remove its ability to veto Trustee actions that could affect Direct and Indirect Claimants differently.  Finally, the Court could require the TAC to have an equal number of representatives of Indirect Claimants, to remove the ability of the TAC to favor Direct Claimants over Indirect Claimants.

32.     Unless one of these cures is implemented, the governance structure established by the Trust agreement will inevitably give rise to actual and apparent conflicts of interest on the part of Garlock's fiduciaries, the TAC members, and thereby violate fundamental principles of bankruptcy law and the law of trusts and fiduciary relationships.  The court should deny confirmation until the Trust Agreement is amended to prevent these conflicts.

## CONCLUSION

33.     WHEREFORE, Garlock respectfully requests that this Court deny confirmation of the Plan unless the TDP and Trust Agreement are amended to address Garlock's objections and for all other relief the Court deems just and proper.

[signature page to follow]

14

2223459

Dated:  May 20, 2009

**MORRIS JAMES LLP**

_____
Brett D. Fallon (DE Bar No. 2480)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  302.888.6800
Facsimile:  302.571.1750
Email:  bfallon@morrisjames.com

-and-

Garland S. Cassada
Richard C. Worf
ROBSINSON BRADSHAW & HINSON, P.A.
101 North Tyron Street, Suite 1900
Charlotte, North Carolina  28246
Telephone:  704.377.2536
Facsimile:  704.378.4000
Email:  gcassada@rbh.com
          rworf@rbh.com

*Attorneys for Garlock Sealing Technologies, LLC*

2223459