## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | **Related Docket Nos. 19581, 19620, 20872** |

### ARROWOOD'S PHASE II OBJECTIONS TO THE NON-DEBTOR RELEASE AND EXCULPATION PROVISIONS AND THE INJUNCTION IMPAIRING ITS RIGHTS OF CONTRIBUTION, SUBROGATION AND REIMBURSEMENT THAT ARE CONTAINED IN THE AMENDED JOINT PLAN OF REORGANIZATION

QUESTION: "Does the Plan purport to release claims that may exist between insurers and Non-Debtors?" . . .

ANSWER: "Mr. Lockwood: Phrased as broadly as you have, I think the answer is yes."

Lockwood Deposition at page 635.

Garvan F. McDaniel, Esq. (#4167)
BIFFERATO, GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900 Phone
(302) 429-8600 Fax

Carl J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, NY 10017-5639
Telephone: (212) 490-3000

Tancred V. Schiavoni, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York
(212) 326-2267

*Counsel to Arrowood Indemnity
Company, f/k/a Royal Indemnity Company*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................ 1

THE LANGUAGE OF THE NON-DEBTOR RELEASES ...................................... 8

    A.    The exculpation and release provisions are exceptionally broad and materially impair the rights of Arrowood and other Insurers. .................. 8

    B.    The Plan purports to exculpate and release an astounding number of non-debtor third parties. ....................................................................... 11

    C.    The Plan purports to bar Arrowood and others insurers from asserting claims against the released third party non-debtors................. 18

THE LANGUAGE OF THE INJUNCTION ........................................................ 20

ARGUMENT ................................................................................................... 20

POINT I      THE BANKRUPTCY COURT DOES NOT HAVE THE JURISDICTIONAL BASIS TO APPROVE THESE EXCULPATIONS AND RELEASES ................................... 20

POINT II     THE NON-DEBTOR RELEASES IMPROPERLY EXCEED THE PERMISSIBLE SCOPE OF SECTION 524, WHICH IS THE OUTER BOUNDARY OF THIRD-PARTY EXCULPATIONS AND RELEASES IN ASBESTOS CASES ........................... 21

    A.    The Third Party Exculpations and Releases Clearly Fall Outside the Scope of Section 524(g) ............................................................... 21

    B.    Section 524(g) Is the Only Basis for Third Party Exculpations and Releases in Asbestos Cases .......................................................... 23

POINT III    THE NON-DEBTOR RELEASES AND EXCULPATIONS IMPROPERLY IMPAIR ARROWOOD'S RIGHTS AND INTERESTS AND EXCEED THE SCOPE PERMITTED BY THE THIRD CIRCUIT EVEN IN THOSE CASES WHERE SECTION 524 (G) DID NOT APPLY ...................................... 24

    A.    The Non-Debtor Releases and Exculpations In The Plan Fail To Meet The Stringent Requirements For Such Extraordinary Protection ......................................................................................... 24

          1.    *Grace Does Not Have Pre-Confirmation Indemnification Obligations With Most Of The Third Parties It Seeks To Exculpate And The Estate Is Not Impacted By These Exculpated Claims.* .................................................................. 27

          2.    *The Estate Was Not Given Substantial Assets In Exchange For All of The Non-Debtor Releases and Exculpations.* .............. 29

          3.    *The Plan Does Not Channel The Exculpated and Released Claims To The Estate, Grace Has Not Created Any Other Mechanism To Provide Full Payment For The Non-Debtor Claims Grace Seeks To Have Exculpate Nor Has Arrowood Consented To The Loss of Its Rights* .......................................... 30

          4.    *Grace Offers No Justification for the Non-Debtor Releases and Exculpations, Nor Can It.* ................................................... 31

          5.    *The Exculpations and Releases Are Unnecessary for The Reorganization* .......................................................................... 32

## TABLE OF CONTENTS
(continued)

Page

B.  The Non-Debtor Releases And Exculpations In The Plan Also Present A High Potential For Abuse. .......................................... 34

C.  By Exonerating Lawyers Even From Their Own Clients The Exculpations In Section 11.9 Are Against Public Policy And Ethical Norms. ....................................................................... 35

D.  The Releases Are Not Limited to Liability Derivative of the Debtor's. ................................................................................. 36

POINT IV    THE CHANNELING INJUNCTION IMPAIRS ARROWOOD'S RIGHTS AND INTERESTS BY CHANNELING ITS CLAIMS TO AN IMPAIRED CLASS ................................................... 38

POINT V    THE BREADTH OF THE RELEASES AND INJUNCTION, VIEWED IN THE CONTEXT OF THE REORGANIZATION AND COVERAGE ACTION TOGETHER, VIOLATE THE BANKRUPTCY CODE'S GOOD FAITH REQUIREMENT ............... 39

CONCLUSION .................................................................................................. 42

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A&M Bldg. & Condo Maint., Inc. v. Atlas Elec. of Staten Island, Inc.,*
    294 A.D.2d 520 (2d Dep't 2002) ........................................................................ 17-18

*Continental Airlines,*
    203 F.3d 203 (3d Cir. 2000) ............................................................................... passim

*In re A.H. Robins Co.,*
    880 F.2d 694 (4th Cir. 1989) .......................................................................... 30, 32, 37

*In re Chateaugay Corp.,*
    167 B.R. 776 (S.D.N.Y. 1994) ................................................................................... 32

*In re Congoleum, Corp.,*
    362 B.R. 167, 190 (Bankr. D. N.J. 2007), ........................................................... passim

*In re Combustion Engineering, Inc.,*
    391 F.3d 190 (3d Cir. 2004) ............................................................................... passim

*In re Dow Corning,*
    280 F.3d at 658 ........................................................................................................... 31

*In re Drexel Burnham Lambert Group,*
    960 F.2d 285 (2d Cir. 1992) .......................................................................... 30, 32, 37

*In re Elsinore Shore Assocs.,*
    91 B.R. 238 (Bankr. D.N.J. 1988) .............................................................................. 40

*In re Federal Mogul Global, Inc.,*
    300 F.3d 368, 382 (3d. Cir. 2002) ......................................................................... 4, 21

*In re Genesis Health Ventures Inc.,*
    266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................... 25, 29

*In re Heron, Burchette, Ruckert & Rothwell,*
    148 B.R. 660  (Bankr. D.C. 1992) ........................................................................ 32-33

*In re Ionosphere Clubs, Inc.,*
    124 B.R. 635  (S.D.N.Y. 1991) ................................................................................. 32

*In re Johns-Mansville,*
    517 F.3d 52, 68 (2nd Cir. 2008) ..................................................................... 2, 22, 37

*In re Koelbl,*
    751 F.2d 137 (2d Cir. 1984) ...................................................................................... 40

*In re Metromedia Fiber Network,*
    16 F.3d 136, 143 (2d Cir. 2005) .......................................................................... 34, 35

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Monroe Well Serv.*,
  80 B.R. at 329 .................................................................................................... 33

*In re Specialty Equip. Cos.*,
  3 F.3d 1043 (7th Cir. 1993) ........................................................................... 30, 31

*In re Stolrow's Inc.*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988) ...................................................................... 40

*In re Thorpe Insulation Co.*,
  No. CV 08-3711 (DSF), Doc. No. 39 (C.D. Cal. Oct. 8, 2008)........................ 7, 8, 38

*In re Transit Group*,
  286 B.R. 811 (Bankr. D. Fla. 2002)................................................................. 31-32

*In re Zenith Elecs. Corp.*,
  241 B.R. 92, 110 (Bankr. D. Del. 1999).............................................. 25, 26, 27, 31

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988) ............................................................................ 32, 37

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
  354 B.R. 1 (D. Conn. 2006)................................................................................. 40

*Pacor v. Higgins*,
  743 F.2d 984, 994 (3d Cir. 1984) ....................................................................... 20

*People v. Birkett*,
  980 P.2d 912 (Cal. 1999)..................................................................................... 19

*Shepherd v. Truex*,
  No. 43A03-0407-CV-344 2005 WL 517748 (Ind. App. March 7, 2005)................ 18

*State Farm Fire & Casualty Co. v. Sevier*,
  272 Ore. 278 (Or. 1975)...................................................................................... 18

**Statutes**

11 U.S.C. § 1129....................................................................................................... 40

11 U.S.C. § 524.................................................................................................. passim

Cal. Civ. Code § 1572............................................................................................... 18

**Other Authorities**

Fielkow & Eisenberg, *Civil RICO: The Insurers Fight Back*, 21 Tort & Ins. L.J. 1-29
  (1985).................................................................................................................. 18

Kress, *Insurers as RICO Plaintiffs: A Civil Remedy for Fraud*, 16 The Brief – A.B.A.
  SEC Tort & Ins. Prac. 33 (1986) ..................................................................... 18-19

**TABLE OF AUTHORITIES**
(continued)

**Page**

Robert W. Emerson, *Insurance Claims Fraud Problems and Remedies*, 46 U. Mia. L.
Rev. 907 (1992) ................................................................................................................... 18

## PRELIMINARY STATEMENT

The only issue before the Court at the Phase I confirmation hearing is whether the Plan impairs, modifies or in any way changes the rights of insurers.[1]  The Plan[2] provides for an astonishing number of third party non-debtor releases and exculpations that are egregious in their scope and which conflict with the law in this Circuit as well as every single other Circuit.  These non-debtor releases indisputably impair, modify and change Arrowood's rights and impact its interests.  Arrowood has standing to address this issue and should be allowed to be heard in the Phase II confirmation hearing.

With regard to Arrowood's standing, the Court need look no further then the testimony of the ACC's senior bankruptcy lawyer who readily acknowledged the obvious fact that the non-debtor releases impair, modify or change Arrowood's rights:

QUESTION: "Does the Plan purport to release claims that may exist between insurers and Non-Debtors?" . . .

ANSWER: "Mr. Lockwood: Phrased as broadly as you have, I think the answer is yes." *See* Ex. A ( Lockwood Deposition) at 635.

Grace's corporate designate witness Richard Finke agreed stating that "any provisions in the Plan that would constitute a release or an injunction, and I would include 11.9 in that language, are binding on the asbestos insurance entities." *See* Exhibit B (Finke Deposition) at

---

[1] Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood") respectfully submits this memorandum of law in support of its Objection to the third party releases and exculpations contained in the Plan. The only issue before the Court at the Phase I confirmation hearing is whether the Plan impairs, modifies or in any way changes the rights of the objectors.  The non-debtor releases by definition indisputably impair, modify and change Arrowood's rights and interests and Arrowood should have standing to address this issue in the Phase II confirmation hearing.  Arrowood's objections to other provisions of the Plan are addressed in a separate submission.

[2] Plan Proponents' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et. al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009 (the "Plan")

80. Mr. Finke also acknowledged that that the insurers received no monetary consideration for

the exculpations and releases. *See* Exhibit C (Priest Deposition) at 81-82.   And a leading

national experts in insurance has also agreed with the ACC's and Debtors' designated witnesses

and is prepared to explain why at the Phase I hearing.  Professor George Priest, in

discussing how the Plan is not insurance neutral, has indeed confirmed that the Plan "certainly

doesn't except the insurers from the operation of the [exculpation] provision." *Id.* at 245.

Furthermore, he testified that the Plan nowhere purports to compensate insurers for their lost

rights.[3]

Arrowood has a right to be heard and present evidence at the Phase II confirmation

hearing on these provisions.  Moreover, when the Court hears evidence on these provisions it

will find that they are deeply flawed.  The Third Circuit has established limitations for the

approval of third-party releases in asbestos bankruptcies under Section 524(g): "As both the

plain language of the statute and its legislative history make clear, § 524(g) provides no specific

authority to extend a channeling injunction to include third party actions against non-debtors

where the liability alleged is not derivative of the debtor." *In re Combustion Engineering, Inc.*,

391 F.3d 190, 228 (3d Cir. 2004).  The non-debtor releases and exculpations in the Plan do not

fall within the narrow definition of Section 524(g).  The non-debtors must be "alleged to be

directly or indirectly liable for the conduct of, claims against, [or] demands on the debtor" for the

third-party releases under Section 524(g).  The Second Circuit has also recently held in *In re

Johns-Mansville*, 517 F.3d 52, 68 (2nd Cir. 2008), *cert. granted sub nom. Travelers Indem. Co. v.

Bailey*, 129 S. Ct. 761, 2008 U.S. Lexis 9124 (Dec. 12, 2008) that "the application of a

channeling injunction to enjoin actions against third parties is limited to situations where a third

---

[3] *Id.* at 236-237. (Mr. Pernicone: "In the course of that careful review of the Plan, did you come across any provision that would purport  to compensate insurers for the release under Section 11.9 of any claims that they might have against  Non-Debtors? . . ." Mr. Priest responded: "No, I did not.")

party has derivative liability for the claims against the debtor." Yet the non-debtor third party exculpations and releases here clearly go way beyond anything that is authorized by Section 524(g), releasing claims against third parties for pre-petition and post-petition conduct having nothing to do with the Debtors' liability.

The Third Circuit has already warned in *In Re Continental Airlines*, 203 F.3d. 203, 215 n. 12 (3d. Cir. 2000), that because bankruptcy jurisdiction is limited, "a court cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party class actions against non-debtors." And in *In re Congoleum Corp.*, 362 B.R. 167, 190 (Bankr. D. N.J. 2007), the court there expressed its own concerns about its jurisdictional power to approve third party non-debtor exculpations and releases while reluctantly not ruling on that basis because the record was insufficient. Here, because the vast majority of the Plan's non-debtor exculpations and releases are not of claims that would directly result in liability for the debtor, they fail to meet the jurisdictional test in the Third Circuit. *See In re Federal Mogul Global, Inc.*, 300 F.3d 368, 382 (3d. Cir. 2002) ("Whether a lawsuit could conceivably have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.")

As Section 524(g) is the only code provision that explicitly provides for third-party non-debtor releases, it is the only appropriate vehicle for third party non-debtor relief in asbestos bankruptcy cases. *See In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). In *Combustion Engineering* the Third Circuit made clear that in asbestos cases, a bankruptcy court may not approve a third-party release that falls outside Section 524(g)'s parameters. *Id.* at 236-37. ("Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of the channeling injunction--and sets out the specific requirements that must be met in

3

order to permit inclusion--the general powers of § 105(a) cannot be used to achieve a result not

contemplated by the more specific provisions of § 524(g).")

Recently, in *In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D. N.J. 2007), the bankruptcy

court similarly noted that the relationship between Section 524(e) and Section 524(g) indicates a

Congressional intent to limit the list of third party releases to those specifically enumerated in the

Code. The Court noted that because Congress carefully created and enacted a provision that

allows for third-party discharges in a limited number of circumstances in enacting § 524(g),

courts may not unilaterally expand third-party discharges to categories outside the bounds of

what is provided in § 524(g). The *Congoleum* Court stated that:

> the Code now provides specific instances when Congress thought
> it appropriate to extend protection to particular non-debtors parties
> in asbestos cases and delineated them in Section 524(g). Congress
> presumably did not intend to include others. Where Congress has
> so carefully crafted a category of entities entitled to exception to §
> 524(e), expansion of those categories would be an abuse of judicial
> authority under § 105. The Court may not unilaterally expand the
> exception to § 524(e) in asbestos cases to include every
> conceivable entity involved in an asbestos case.

*Id.* at 191. (emphasis added).

The non-debtor release and exculpation provisions here go far beyond the limitations

imposed by Section 524(g) and purport to release any and all claims between third-parties for

conduct not derivative of the Debtors' liability. The third-party exculpations and releases

provided under the Plan clearly do not fit within any of Section 524(g)'s enumerated exceptions

to the general principle that third-parties cannot receive discharges riding on a Debtor's coattails.

And because Congress has explicitly expressed its intent by limiting the categories of such third-

party discharges in asbestos cases to four specific instances, other provisions of the bankruptcy

code, such as § 101, should not be used to provide these discharges in asbestos-bankruptcy cases.

4

Yet, even if Section 524(g) did not establish the outer boundary for third-party injunctions in asbestos cases, which it clearly does, the proposed releases would still exceed the scope permitted in this Circuit. In non-asbestos cases, the Third Circuit Court of Appeals has limited the scope and permissibility of third-party non-debtor exculpations to at the very least rare situations, and held out the possibility that they may never be acceptable. *See In Re Continental Airlines*, 203 F.3d. 203, 217 (3d. Cir. 2000).

While Section 11.9 of the Plan uses very vague language to describe the non-debtors released, it is nonetheless clear that a vast array of persons and entities are released for nearly all liability relating to almost all possible conduct regarding, *inter alia*, almost anything that can be cast as constituting prepetition negotiations--when there was no court supervision-- the creation and management of a asbestos trust, and anything "relating to the Chapter 11 case." Moreover, the reach of these releases is not limited to matters relating to the Bankruptcy case, but would reach conduct completely unrelated to the bankruptcy, and to conduct that occurred outside the supervision of the bankruptcy court going back years.

Additionally, Section 8.8.7 of the Plan provides for releases of numerous claims by those voting in favor of the Plan as against certain third-parties. While this provision purports to be a consensual release (and even if it were, it still must be fair to the releasor, for consideration etc., which is not the case here) courts have found such provisions to be non-consensual when based on a mere vote in favor of the Plan. *See Congoleum*, 362 B.R. at 194 ("a consensual release cannot be based solely on a vote in favor of a Plan. For a release to be consensual, the creditor must have unambiguously manifested assent to the release of the non-debtor from liability on its debt . . . Such unambiguous assent is absent here. This is an immensely complicated plan and it would be difficult for the layperson to comprehend its details.") These releases therefore cannot

be considered consensual and are no different in this regard than the third-party releases provided in Section 8.8.8. Thus, the releases are subject to the same test for non-debtor releases in this Circuit. See *Id.*

Nearly all of the non-debtor releases and exculpation in the Plan were not given in exchange for substantial consideration to the estate, none of the claims are channeled to a settlement fund, nor is there any other mechanism created for full payment of these claims. They cannot in any way be said to be fair to the releaser as required by *Continental. See Id.* at 214. These exculpations and releases were given without the consent of the Insurers whose potential claims are eradicated. Furthermore, the scope and breadth of the Plan's exculpation and releases provisions are of mammoth proportions. The duration for which the Plan provides exculpation and release reaches back years before this Court ever had any relationship to this case, and seeks to extend such exculpation for years after. And the scope of the exculpations and releases in terms of the types of claims for which exculpation is sought is unbelievably broad. Finally, as courts must analyze each exculpation and release individually, all of these exculpations and releases must be acceptable under the standards articulated in the Third Circuit, not merely some or most.

In addition, the Plan provides for exculpations and releases to every lawyer working for the dozens of categories discussed below including a host of plaintiff lawyers. This is contrary to public policy and professional ethical norms because in releasing all lawyers involved in years of unsupervised negotiations, indeed all lawyers involved in any aspect of the Chapter 11 case, the exculpation and release provisions operate as a waiver agreement, and even worse, in this case the clients may not even be aware of the rights they are waiving away. Section 11.9, for example, would operate to prevent clients from suing their lawyers under a variety of legal

6

theories. Putting aside all the other reasons for why the exculpations and releases in the Plan are

contrary to the law in this Circuit, exculpation and release provisions written by lawyers in an

obscure provision of the Plan that severely limits clients' rights of redress against their own

lawyers, presents truly grave ethical problems. Indeed, if non-debtor exculpations and releases

are to be rarely allowed because they are subject to abuse, an exculpation provision in a

reorganization plan written by lawyers that limits their clients' right to sue them, and for which

many, if not most of the clients, have no awareness of the rights they are losing, should never be

allowed.

     Separate and apart from the non-consensual release and exculpation of non-debtors, the

Plan Proponents also seek an injunction that purports to cuts-off the contractual and common law

rights of contribution, subrogation and indemnity that Arrowood and the other insurers hold

against other non-debtor insurers and  (also a non-debtor).  The terms of the injunction has a

direct monetary impact on Arrowood's rights and interest and provide a further basis for

rejecting the Plan.  In, *In re Thorpe Insulation Co.*, another asbestos bankruptcy case, the district

court recently held that "the actual issuance of a Section 524(g) injunction covering [third

parties] could impact [insurers]" and that insurers could "challenge a Section 524(g) injunction

that barred their claims against a party covered under the injunction as the injunction would

detrimentally affect [insurers'] rights against the [third parties]."[4]

     The Plan does not provide the means to satisfy any portion of the non-debtor claims it

seeks to release, exculpate and/or enjoin, much less satisfy them in full, nor does it call for

consideration of any kind from the released or enjoined non-debtors.  Moreover, the tactical

advantage that the Plan Proponents hope to achieve in separate litigation as a result of these and

---

[4] *See In re Thorpe Insulation Co.*, No. CV 08-3711 (DSF), Doc. No. 39 (C.D. Cal. Oct. 8, 2008).

other Plan provisions, is clearly improper.  Were this Court to endorse the exculpations, releases

and injunctions sought by confirming the Plan, it would be rewarding the most brazen and

cynical abuses of the protections afforded by the Bankruptcy Code.

The exculpation and release provisions violate the law in this Circuit, and eliminate some

of Arrowood's most basic legal rights.  Because the undisputed facts demonstrates as a matter of

law that the Plan fails to meet the requirements of Section 11 USC § 1129, Arrowood

respectfully asks the court to deny confirmation of the Plan.

## THE LANGUAGE OF THE NON-DEBTOR RELEASES

**A.     The exculpation and release provisions are exceptionally broad and materially impair the rights of Arrowood and other Insurers.**

The Plan contains a series of provisions that purport to exculpate and release a host of

non-debtor parties.[5]  Section 11.9 of the Plan purports to exculpate not only the Debtors but also

a host of non-debtors from liability to third parties such as Arrowood and the other insurers:

> None of the Reorganized debtors, the Debtors, the Non-Debtor
> Affiliates, the Sealed Air Indemnified Parties, the Asbestos PI
> Trustees of the Asbestos PI Trust, the Trust Advisory Committee,
> the Asbestos PD Trustees of the Asbestos PD Trust, the Asbestos
> PI Committee, the Asbestos PD Committee, the Unsecured
> Creditors Committee, the Equity Committee, the Asbestos PI FCR,
> the Asbestos PD FCR, or any of their respective Representatives
> are to have or incur any liability to any Entity for any act or
> omission in connection with or arising out of the Chapter 11 Cases,
> including the negotiation of this Plan or the settlements provided in
> the Sealed Air Settlement Agreement and the Fresenius Settlement
> Agreement, the pursuit of confirmation of this Plan, the
> consummation of this Plan or the settlements provided in the
> Sealed Air Settlement Agreement or Fresenius Settlement
> Agreement, or the administration of this Plan or the property to be
> distributed under this Plan so long as, in each case, such action, or
> failure to act, did not constitute gross negligence or willful
> misconduct.

Section 8.8.7. the Creditor Release provision states the following:

> Without limiting any other provisions in this Plan, each Holder of a

---

[5] *See, e.g.,* Plan at §§ 11.9, 8.8.7, 8.8.8.

Claim or Equity Interest who votes in favor of this Plan or receives or retains any property under this Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee, Asbestos PI FCR, and the Asbestos PD FCR and each party's Representatives, as of the Effective Date from any and all Claims, SA Claims, SA Damages, obligations, rights, suits, judgments, damages, causes of action, remedies, and liabilities of any nature whatsoever, wether known or unknown, foreseen or unforeseen, matured, or unmatured, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to or pertaining to, the reorganized Debtors, their operations on or before the Effective Date, their respective property, the Chapter 11 cases, or the negotiation, formulation, preparation of this Plan or any related agreements, instruments, or other documents.

This provision purports to release numerous third-parties, and their agents and Representatives, from all liability relating to anything having to do with the Debtor, thus releasing these third parties from their conduct going back decades.

Section 8.8.8 is yet another provision releasing numerous claims against non-debtor third-parties. It states that:

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Debtor, in its individual capacity and as a debtor-in-possession for an on behalf of its estate and its Affiliates, and the Reorganized Debtors on their own behalf and as representatives of their respective estates and their Affiliates, and their respective successors, assigns, and any and all Entities who may purport to claim by, through, for or because of them, *and any third parties*, are hereby deemed to release and waive conclusively, absolutely, unconditionally, irrevocable, and forever each and all of the Debtors and their Non-Debtor Affiliates' Representatives and their respective properties ("the Released Parties"), from any and all Claim, obligations, rights, suits, damages, remedies, liabilities, or causes of action in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the Debtors' property, the Chapter 11 Cases, the purchase sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or

9

> preparation of the Plan and the Disclosure Statement, or related
> agreements, instruments, or other documents, involving any act,
> omission, transaction, agreement, occurrence, or event taking place
> on or before the Effective Date, other than any act or omission of a
> Released Party that constitutes willful misconduct.

(emphasis added). This provision purports to release numerous non-debtor third parties from

claims relating to decades of conduct and a whole array of claims.

The Plan's definition of the term "Representative" is extremely broad, ambiguous, and

difficult to understand. The term Representative is defined in Section 1.160:

> Representatives shall mean with respect to any Entity, the past and
> present directors, officers, employees, accountants (including
> independent registered public accountants), advisors, attorneys,
> consultants, or other agents of that Entity, or any other
> representatives or professionals of that Entity or of any of those
> directors, officers, employees, accountants (including independent
> registered public accountants), advisors, attorneys, consultants, or
> other agents, but only in their capacity as such.

The terms "agents," "consultants," and "advisors," are used numerous times in Section 1.160 but

are left undefined. Indeed, the scope of all the terms and persons in Section 1.160 are left nearly

completely undefined, thus leaving the exact number of persons exculpated under Section 11.9

unclear and unknown because it is not clear who may fit within these undefined categories.

Section 1.160 also seems to indicate when it repeats and says "or any other representatives or

professionals of that Entity or of any of those directors, officers, employees, accountants . . .

advisors, attorneys, consultants, or other agents . . ." that the Representatives of Representatives

are also included within the orbit of Section 1.160 and thus under the exculpation provision of

Sections 11.9 and 8.8.7. This is another critical ambiguity that renders the Plan's exculpation

and releases provisions incomprehensibly vague in scope.

The term "Entity" is defined in Section 1.91 as referring to "any person, individual,

corporation, firm, partnership, association, joint stock company, joint venture, estate, trust,

business trust, unincorporated organization, any other entity, the United States Trustee or any

Governmental Unity or any political subdivision thereof."

Sections 11.9, 8.8.8 and 8.8.7 thus purport to exculpate and release all of these persons,

both identified and in the case of "Representatives," unidentified, for a very broad array of

possible Claims arising from, among other things, any claims relating to the Debtor, any activity

relating to the Bankruptcy, and the many years of negotiations preceding the actual Bankruptcy

filing and the many years following the conclusion of the bankruptcy.  The release and

exculpation provisions, in other words, cover third-party claims, such as those held by Arrowood

and other insurers and a host of other parties, and would prevent Arrowood and other insurers

from asserting their direct claims against these non-debtor third parties.

**B.      The Plan purports to exculpate and release an astounding number of
         non-debtor third parties.**

The full array of the non-debtors covered by the exculpation and release provisions are

difficult to discern from the language and organization of the Plan.  This provision often refers to

other provisions, which in turn cross-reference yet additional provisions.  In other instances, the

exculpation provisions rely on defined terms that themselves incorporate other defined terms.  At

a minimum, the list includes the following:

1.      Asbestos Protected Parties and their Representatives.  *See* §§ 8.8.7, 1.160.

2.      Asbestos Insurance Entities and their Representatives.  *See* §§ 8.8.7, 1.160.

3.      Reorganized Debtors.  *See* §§ 11.9, 1.157.

4.      The past and present directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents of

the Reorganized Debtors, or any other representatives or professionals of the Reorganized

Debtors or of any of those directors, officers, employees, accountants (including independent

registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.157, 1.160

5.  The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Debtors, or any other representatives or professionals of the Debtors or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.80

6.  The various Non-Debtor Affiliates. *See* §§ 1.160, 1.136

7.  The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the various Non-Debtor Affiliates, or any other representatives or professionals of the various Non-Debtor affiliates or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 1.160, 1.136, 1.160.

8.  Sealed Air Corporation and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after March 31, 1998. See §§ 11.9, 1.177

9.  The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Sealed Air Corporation (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future

agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after March 31, 1998), or any other representatives or professionals of the Sealed Air Corporation (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Sealed Air after March 31, 1998) or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.177, 1.160.

10.    Cryovac, Inc. and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998. *See* §§ 11.9, 1.177

11.    The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of Cryovac, Inc. (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998), or any other representatives or professionals of Cryovac, Inc. (and all of its parent corporations, subsidiary corporations, joint ventures, Affiliates, and sister corporations, and any and all of their past, present, and future agents, servants, officers, employees, successors,

assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers whose coverage was procured by Cryovac, Inc. after March 31, 1998) or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.177, 1.160.

12.     Fresenius (which under Sections 1.102, 1.103, and 1.104 means Fresenius Medical Care Holdings, Inc and Fresenius National Medical Care and the Fresenius Medical Care Holdings Group) and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG. *See* §§ 11.9, 1.106.

13.     The past and present directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG., or any other representatives or professionals of Fresenius and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including Fresenius Medical Care AG and Fresenius AG., or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.106.

14.     Asbestos PI Trustees of the Asbestos PI Trust. *See* §§ 11.9, 1.137, 1.138, 8.8.7.

15.     The past and present employees, accountants (including independent registered

14

public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI Trustees of the Asbestos PI Trust, or any other representatives or professionals of the Asbestos PI Trustees of the Asbestos PI Trust or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.137, 1.138, 8.8.7.

16.    Trust Advisory Commitee. *See* §§ 11.9, 1.193.

17.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Trust Advisory Committee, or any other representatives or professionals of the Trust Advisory Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160,1.193.

18.    The Asbestos PD Trustees of the Asbestos PD Trust. *See* §§ 11.9, 1.25,1.26, 8.8.7.

19.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PD Trustees of the Asbestos PD Trust, or any other representatives or professionals of the Asbestos PD Trustees of the Asbestos PD Trust or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.60, 1.25,1.26, 8.8.7.

20.    Asbestos PI Committee. *See* §§ 11.9, 1.34, 8.8.7.

21.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI Committee, or any other representatives or professionals of the Asbestos PI Committee or of any

15

of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160 1.34, 8.8.7.

22.    The Asbestos PD Committee. *See* §§ 11.9, 1.19, 8.8.7.

23.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PD Committee, or any other representatives or professionals of the Asbestos PD Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ *See* §§ 11.9, 1.16, 1.19, 8.8.7.

24.    The Unsecured Creditors Committee. *See* §§ 11.9, 1.200, 8.8.7.

25.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Unsecured Creditors Committee, or any other representatives or professionals of the Unsecured Creditors Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160,1.200, 8.8.7.

26.    The Equity Commitee. *See* §§ 11.9, 1.94, 8.8.7.

27.    The past and present employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of the Equity Committee, or any other representatives or professionals of the Equity Committee or of any of those directors, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.94, 8.8.7.

28.    The Asbestos PI FCR (David Austern or any court-appointed successor). *See* §§

16

11.9, 1.35, 1.36, 8.8.7.

29.    The past and present employees, accountants (including independent registered

public accountants), advisors, attorneys, consultants, or other agents of the Asbestos PI FCR

(David Austern or any court-appointed successor), or any other representatives or professionals

of the Asbestos PI FCR (David Austern or any court-appointed successor)or of any of those

directors, officers, employees, accountants (including independent registered public

accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.35, 1.36,

8.8.7.

30.    The Asbestos PD FCR. *See* §§ 11.9, 1.21, 1.22, 8.8.7.

31.    The past and present directors, officers, employees, accountants (including

independent registered public accountants), advisors, attorneys, consultants, or other agents of

the Asbestos PD FCR, or any other representatives or professionals of the Asbestos PD FCR or

of any of those directors, officers, employees, accountants (including independent registered

public accountants), advisors, attorneys, consultants, or other agents. *See* §§ 11.9, 1.160, 1.21,

1.22.

The difficulty in identifying all the non-debtors shielded by the release and exculpation

provisions is further compounded by the fact that they cover very vaguely defined conduct and

claims.

**C.    The Plan purports to bar Arrowood and others insurers from**
**asserting claims against the released third party non-debtors.**

Should a coverage action result in a finding that the agreements, arrangements or other

actions taken pre or post-petition were the product of bad faith or collusion, Arrowood and the

other insurers will have claims against a variety of third parties who purport to be covered by the

broad release and exculpation provisions in the Plan. *See, e.g., A&M Bldg. & Condo Maint., Inc.*

*v. Atlas Elec. of Staten Island, Inc.*, 294 A.D.2d 520, 521-522 (2d Dep't 2002) (attorney could be

liable for collusion where he breached duty not to assist his client in conduct that he knew was

illegal or fraudulent, and where such acts were committed to harass and/or maliciously injure the

plaintiff); *State Farm Fire & Casualty Co. v. Sevier*, 537 P.2d 88, 97 (Or. 1975) ("[I]f collusion

is proven the insurer, after satisfying the injured person's claim, may prosecute a cause of action

against the insured"); *Shepherd v. Truex*, 823 N.E.2d 320 (Ind. Ct. App. 2005) (attorney who is

guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party

to an action or judicial proceeding . . . shall also forfeit to the party injured treble damages,

recoverable in a civil action).

Likewise, to the extent that any non-debtor parties submitted (or caused to be submitted)

invalid claims—because they were time-barred, lacked facts showing exposure, or were

otherwise defective—for payment, Arrowood and the other insurers will have claims against

those parties.[6] The same is true about the presentation of false or misleading claims in the future.

In cases where an insurer discovers that there has been collusion, misrepresentations, or other

misconduct in the presentation of claims, it is well recognized that the law provides for a number

of statutory and common law remedies against all involved.

The types of claims that can potentially be raised by Arrowood include (1) mis-

representation, (2) negligent misrepresentation, (3) tortious interference with contract, (4)

constructive fraud, (5) civil conspiracy, (6) unjust enrichment , (7) conversion,

(8) indemnification and (9) reverse bad faith. *See, e.g.,* Robert W. Emerson, *Insurance Claims*

*Fraud Problems and Remedies*, 46 U. Mia. L. Rev. 907 (1992); *see also* Fielkow & Eisenberg,

*Civil RICO: The Insurers Fight Back*, 21 Tort & Ins. L.J. 1-29 (1985); Kress, *Insurers as RICO*

---

[6] *See, e.g.,* Cal. Civ. Code § 1572

*Plaintiffs: A Civil Remedy for Fraud*, 16 The Brief – A.B.A. SEC Tort & Ins. Prac. 33 (1986). In addition to these claims, insurers that have funded, or may fund, the payment of claims have subrogation rights that may give rise to claims against various released non-debtors. *See People v. Birkett*, 980 P.2d 912, 917 (Cal. 1999).

## THE LANGUAGE OF THE INJUNCTION

The Plan defines claims for contribution, subrogation and reimbursement as "Indirect Asbestos PI Claims," which are included within the broader definition of Asbestos PI Claims and classified in Class 6 under the Plan.[7] Contribution Claims against Grace, and other Protected Parties (which include, by definition, all Settling Asbestos Insurance Entities and Post-Confirmation Settling Asbestos Insurance Entities) are channeled to the Trust via the Asbestos PI Channeling Injunction. *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

Under the Plan, Class 6 is an impaired class. Indeed, the Plan provides no process for an insurer to recover on a claim for contribution, subrogation or reimbursement, as the Plan only contemplates payment to "Indirect Claimants" (i.e., the holder of an Indirect Asbestos PI Claim) who have paid in full the liability and obligation of the Asbestos PI Trust to the individual claimant to whom the Asbestos PI Trust would otherwise have had a liability or obligation under the TDP.[8]

## ARGUMENT

## POINT I

### THE BANKRUPTCY COURT DOES NOT HAVE THE JURISDICTIONAL BASIS TO APPROVE THESE EXCULPATIONS AND RELEASES

---

[7] *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

[8] *See* Plan at §§ 1.31 1.32, 1.123, 3.1, 7.2.

In *Continental*, the court noted "with some concern that the Bankruptcy Court apparently never examined its jurisdiction to release and permanently enjoin Plaintiff's claims against non-debtors . . ." and warned that because bankruptcy jurisdiction is limited, "a court cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party class actions against non-debtors." *Continental*, at 215 n. 12.  In *Congoleum*, the court expressed concerns about its jurisdictional power to approve third party non-debtor exculpations and releases but reluctantly did not rule on that basis because the record was insufficient.  *Congoleum*, 362 B.R. at 190.

Section 28 U.S.C. § 1334(b) confers on district courts "original and exclusive jurisdiction of all cases arising under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Proceedings are "related to" a chapter 11 case under the relevant Third Circuit precedent if the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).  In *In re Combustion Engineering,* 391 F.3d 190, 232 (3d. Cir. 2004), the Court held that there was no related to jurisdiction where there was no unity of interest between the debtor and non-debtors, that is, "when the third party claim would not directly result in liability for the debtor."

Because most of the Plan's non-debtor exculpations and releases are not of claims that would directly result in liability for the debtor, they fail to meet the jurisdictional test in the Third Circuit. *See In re Federal Mogul Global, Inc.*, 300 F.3d 368, 382 (3d. Cir. 2002) ("Whether a lawsuit could conceivably have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit.")

## POINT II

### The Non-Debtor Releases Improperly Exceed the Permissible Scope of Section 524, Which is the Outer Boundary of Third-Party Exculpations and Releases in Asbestos Cases

**A.     The Third Party Exculpations and Releases Clearly Fall Outside the Scope of Section 524(g)**

Section 524(e) provides the general principle that "discharge of debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The only explicit bankruptcy provision brooking the general principle that a bankruptcy court's authority to discharge debt is limited to the bankrupt entity itself is Section 524(g). Section 524(g) provides for third party non-debtor releases in asbestos cases in a limited number of instances and for a limited category of entities. It provides for third-party non-debtor relief for asbestos liability where the liability is based on:

> (I) the third party's ownership of a financial interest in the debtor or a past or present affiliate of the debtor, or a predecessor-in-interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or predecessor-in-interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; [or]
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of the debtor or a related party.

Section 524(g)(4)(A)(ii). The third party non-debtors who are exculpated and released clearly do not fall into the above categories.

Furthermore, for the third-party releases to be acceptable under 524(g), the non-debtors must be alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004) ("As both

the plain language of the statute ands its legislative history make clear, 524(g) provides no specific authority to extend a channeling injunction to include third party actions against non-debtors where the liability alleged is not derivative of the debtor." ) The Second Circuit has also recently held in *Johns-Mansville*, 517 F.3d at 68, that "the application of a channeling injunction to enjoin actions against third parties is limited to situations where a third party has derivative liability for the claims against the debtor." Yet the non-debtor third party exculpations and releases clearly go way beyond anything that is authorized by the only code section that provides for third-party non-debtor relief, Section 524(g).

Clearly, the exculpations and releases provided by the Plan do not fit within the narrow confines of Section 524(g)'s enumerated categories of allowable third-party discharges. Furthermore, the liability exculpated under Section 11.9 is not derivative of the debtors' liability; rather, it is for conduct of the third-parties themselves. As such, the exculpations and releases cannot be based on Section 524(g). These third parties are not the Debtor's' shareholders, officers, directors, insurers, or lenders. Arrowood's claims—and those of others—against the exculpated and released parties are not derivatively related to injuries allegedly caused by the Debtors' in running their asbestos-related businesses. Rather, the claims arise directly from the released parties' conduct, long after the Debtors' ceased using asbestos. The releases directly impair Arrowood's rights and interests, do not satisfy the requirements of Section 524(g), and the Plan does not even attempt to suggest otherwise. Thus, the only congressionally mandated provision for such third-party discharges cannot be used to justify this attempt to provide for the wholesale eradication of claims against these non-debtor exculpated parties.

**B.    Section 524(g) Is the Only Basis for Third Party Exculpations and Releases in Asbestos Cases**

Section 524(g) provides the only congressionally mandated vehicle for third party relief in asbestos cases. And in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), the Third Circuit made clear that in asbestos cases, a bankruptcy court may not approve a third-party release that falls outside Section 524(g)'s parameters. *Id.* at 236-37. (stating that "[b]ecause 524(g) expressly contemplates the inclusion of third parties' liability within the scope of the channeling injunction--and sets out the specific requirements that must be met in order to permit inclusion--the general powers of 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of 524(g).") Thus the Court specifically held that Section 524(g) establishes the outer-limit for releases granted to non-debtors in asbestos bankruptcy cases, such as this.

Additionally, in *In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D. N.J. 2007), the bankruptcy court similarly noted that the relationship between Section 524(e) and Section 524(g)'s exception to the general principle of non-third party discharges, indicates a Congressional intent to limit the list of third party releases to those it has specifically enumerated in the Code. The Court noted that because Congress carefully created and enacted a provision that allows for third-party discharges in a limited number of circumstances, courts may not unilaterally expand third-party discharges to categories outside the bounds of what is provided in 524(g):

> the Code now provides specific instances when Congress thought it appropriate to extend protection to particular non-debtors parties in asbestos cases and delineated them in Section 524(g). Congress presumably did not intend to include others. Where Congress has so carefully crafted a category of entities entitled to exception to § 524(e), expansion of those categories would be an abuse of judicial authority under § 105. The Court may not unilaterally expand the exception to § 524(e) in asbestos cases to include every conceivable entity involved in an asbestos case.

*Id.* at 191. The third-party exculpations and releases provided under the Plan clearly do not fit within any of Section 524(g)'s enumerated exceptions to the general principle that third-parties cannot receive discharges riding a Debtors' coattails. And because Congress has explicitly expressed its intent by limiting the categories of such third-party discharges in asbestos cases to four specific instances, other provisions of the bankruptcy code, such as Section 101, should not be used to provide these discharges in asbestos-bankruptcy cases.

## POINT III

### THE NON-DEBTOR RELEASES AND EXCULPATIONS IMPROPERLY IMPAIR ARROWOOD'S RIGHTS AND INTERESTS AND EXCEED THE SCOPE PERMITTED BY THE THIRD CIRCUIT EVEN IN THOSE CASES WHERE SECTION 524 (G) DID NOT APPLY

**A.    The Non-Debtor Releases and Exculpations In The Plan Fail To Meet The Stringent Requirements For Such Extraordinary Protection**

Even if Section 524(g) did not establish the outer boundary for third-party injunctions in asbestos cases, which it clearly does, the proposed exculpations and releases would still exceed the scope permitted in this Circuit.[9] Courts in this and other Circuits have consistently rejected the expansive nonconsensual third-party releases such as the ones proposed in the Plan, regardless of their position on whether such releases are ever permissible. *See In Re Continental Airlines*, 203 F.3d. 203, 217 (3d. Cir. 2000) (noting that a third-party injunction is an extraordinary protection but declining to say whether a non-consensual third-party release could ever be permissible).[10] In *Continental*, the Court of Appeals held that while third party releases may be appropriate in some circumstances, they are certainly not permissible unless they are fair to the releasor, were given for fair consideration, and are necessary to the reorganization; there

---

[9] The Debtors represented that view issues concerning the priority of the non-debtor releases as entirely legal in nature and stipulated that they would offer no evidence at the Phase II trial in opposition.

[10] *See e.g. In re Lowenschuss*, 67 F.3d 1394, 1401(9th Cir. 1995) (holding that third party releases are never permissible); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143(2d Cir. 2005) (holding that a third party release should not be approved absent a finding of truly unusual circumstances).

must also be specific factual findings to support the conclusion that they are indeed fair and necessary. *See id.* at 214. ("The hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." ). The exculpations and releases provided in the Plan fail to meet the *Continental* court's basic threshold for the possible permissibility of third party discharges.

Lower courts in this Circuit analyzing third-party discharges in non-asbestos cases have also used a factor test articulated in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). The factors are: (1) An identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution of assets to the plan by the non-debtor; (3) the necessity of the injunction to the reorganization to the extent that without the injunction there is little likelihood of success; (4) an agreement by a substantial majority of affected classes to support the injunction; and (5) the payment of all or substantially all of the claims of the creditors and interest holders affected by the injunction. *See also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 n. 15 (Bankr. D. Del. 2001) (noting that "courts in this Circuit frequently look to the tests articulated in Zenith.") However even the *Zenith* Court held that the third-party exculpations and releases must be approved by the affected creditor(s). *See Zenith*, 241 B.R. at 111. ("*This . . . release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected.*") ("emphasis added"). Thus, the *Zenith* factors presuppose that the third parties losing their claims have consented.

The factors articulated in *Continental* are the absolute minimum requirement for third-party exculpations, but are not by themselves necessarily sufficient. In fact, the *Continental* court reserved for another the day the question of whether, and when, third party releases might ever be approved, implying that even if the requirements expressed in *Continental* are met, it is

still not necessarily sufficient for approval; rather, the court held, anything less was definitely not approvable. *See Continental*, 203 F.3d at 214 ("we need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible. Establishing a rule would provide guidance prospectively, but would be ill advised when we can rule on Plaintiffs' appeal without doing so. . . we conclude that the provision in the Continental Debtors' plan releasing and permanently enjoining Plaintiffs' lawsuits against the non-Debtor . . .defendants does not pass muster under the most flexible tests for the validity of non-debtor releases.")

The Release Provision in Section 8.8.7 of the Plan is subject to the same requirements even if it purports to be consensual. *See Congoleum*, 362 B.R. at 194 ("a consensual release cannot be based solely on a vote in favor of a Plan. For a release to be consensual, the creditor must have unambiguously manifested assent to the release of the non-debtor from liability on its debt . . . Such unambiguous assent is absent here. This is an immensely complicated plan and it would be difficult for the layperson to comprehend its details.") These releases are not consensual. Furthermore, these releases are subject to the same test for non-debtor releases in this Circuit. *See Id.* (applying the *Zenith* factors to the Creditor Release Provision.) Finally, the reach of these releases is not limited to matters relating to the Bankruptcy case, but would reach conduct completely unrelated to the bankruptcy, and to conduct that occurred outside the supervision of the bankruptcy court.

Finally, in analyzing the third party exculpations and releases, each exculpation and release, including as to each party and category, must be analyzed individually and separately. *See In re Adelphia Comm. Corp.,* 368 B.R. 140, 363 (Bankr. S.D.N.Y. 2007) ("its plain that [releases] have to be analyzed individually, as the relevant factors apply to different situations in

26

different ways.") It is clear that the exculpations and releases provided in the Plan cannot meet fully meet the requirements articulated by the Third Circuit in *Continental*--fairness, consideration, necessity to the reorganization and specific factual findings-- nor the non-rigid factor test used by some Delaware bankruptcy courts that includes the *Continental* factors.

1.   ***Grace Does Not Have Pre-Confirmation Indemnification Obligations With Most Of The Third Parties It Seeks To Exculpate And The Estate Is Not Impacted By These Exculpated Claims.***

There is no identity of interest between Grace and all the exculpated parties such that a suit against the third parties will deplete the resources of the estate. *See In re Congoleum*, 362 B.R. 167, 192 (Bankr. D. N.J. 2007) (whether a suit would "implicat[e] the Debtors is not the focus of the first Zenith test; rather it is whether a suit against the third party would 'deplete assets' of the estate.") Furthermore, because the non-debtor releases and exculpations are not approved as a matter of right but are rather rarely and infrequently granted and subject to a strict analysis, it is the Plan Proponents' obligation to show which released parties are subject to pre-Plan indemnification agreements, something it failed to do in its Disclosure Statement.

Because the Plan exculpates and releases so many non-debtor parties, including all "agents," of the exculpated and released parties for example, most of these exculpated and released individuals and entities do not have pre-Plan indemnification agreements with Grace. Furthermore, even as to parties that may have pre-Plan indemnification agreements with Grace, the exculpations must be congruent with the exculpated conduct, and the burden is on the Plan Proponents to show this. And since Grace must justify these exculpations individually as to party and conduct, it must show that every single exculpate and released person, including, amongst others, all agents, lawyers, advisors, financial representatives, various law firms, and

27

asbestos groups, has a pre-existing indemnification agreement with it and that the exculpations

and releases reach only claims subject to Grace's indemnification obligation.

Even more importantly, the Third Circuit in rejecting the third-party releases, stated that:

> we do not dispute that, some day in the future, the reorganized
> Continental Debtors may face litigation or experience some
> financial ramification based on liabilities of the [exculpated
> parties] as a result of the indemnity obligation . . . *[h]owever, we
> cannot accept the District Court's conclusion that a purported
> identity of interest between the Continental Debtors and the non-
> debtor defendants . . .  established the necessity of releasing and
> permanently enjoining Plaintiffs' claims, nor does this identify of
> interest speak to the fairness of the release and permanent
> injunction that we construe [case law] . . .[to] require.*

(emphasis added).  Thus, even as to the parties Grace can show an indemnification agreement,

that alone does not mean that the exculpation is appropriate.  And as courts have made clear, this

is not a matter of factors or prongs.  *See Master Mortgage Investment Fund, Inc.*, 168 B.R. 930,

935 (Bankr. W. D. Mo. 1994) (holding that no rigid factor test should be applied in every

circumstance, but rather a fact specific review, weighing the equities in each case.)  However,

the key factors--fairness, consideration, necessity to the reorganization, as articulated by the

Circuit court must be found in order for the releases to be valid--this is an absolute minimum for

such exculpations to even be considered, let alone approved.  *See Continental*, 213 F.3d at 214.

Thus, even as to those exculpated parties that the debtor did agree to indemnify, the fact that

there is an indemnification agreement that may or may not require the reorganized debtor to pay

some indeterminate amount at some indeterminate point in the future is insufficient to make a

particular exculpation and release, and all the concerns and possibilities of abuse that come along

with it, not to mention the loss of rights by third parties, approvable.

2.    *The Estate Was Not Given Substantial Assets In Exchange For All of The Non-Debtor Releases and Exculpations.*

The estate did not receive substantial consideration from most of the persons and entities exculpated and released. And insofar as the exculpated and released parties might argue they gave up rights in exchange for the exculpations, "the give ups that the parties made were rights to recover that were subject to fair debate," and they were "merely striking the kinds of deals that with respect to their shares of the pie that chapter 11 contemplates." *Adelphia*, 368 B.R. at 268. Furthermore, the argument that some of the third-parties "made meaningful contribution[s] to the reorganization by designing and implementing the operation restructuring of the companies, and negotiating the financial restructuring with parties in interest" has already been rejected. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001) (rejecting an expansive definition of "substantial assets" because the third parties "[had] already been compensated for their contributions, and the management functions they performed do not constitute contributions of "assets" to the reorganization"); *See Congoleum*, 362 B.R. 167 at 195 ("the Court does not consider the work done by the parties towards confirmation to be a contribution of assets to the estate.") This is not a case where even most of the non-debtors are exculpated and released gave substantial consideration to the estate. Furthermore, even as to parties that may have given consideration, this does not mean that their exculpation is lawful. As the *Continental* court made clear, there are basic requirements which must be met regardless. *See Continental*, 203 F.3d at 214.

**3.** **The Plan Does Not Channel The Exculpated and Released Claims To The Estate, Grace Has Not Created Any Other Mechanism To Provide Full Payment For The Non-Debtor Claims Grace Seeks To Have Exculpate Nor Has Arrowood Consented To The Loss of Its Rights.**

The involuntary, third-party releases of non-debtor claims also not fair to the releasors since no consideration is provided. *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). "As to the fairness of the releases[,] . . . the issue is whether non-consenting creditors were given reasonable consideration in exchange for the release." *In re Genesis Health Ventures Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001); *see also Continental Airlines*, 203 F.3d at 215; *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1044-45 (7th Cir. 1993) (approving release of non-debtor in a plan that provided for payment in full of priority and general unsecured claims); *In re A.H. Robins*, 880 F.2d 694, 697 (4th Cir. 1989) (allowing release of non debtor in a plan that created a fund estimated to pay in full all third-parties affected by injunction);

Here, Arrowood will receive nothing in exchange for the release of claims, much less full compensation under the Plan or a third-party funded pool of assets. *Continental Airlines*, 203 F.3d at 215 ("the Continental Airlines Debtor's have not disputed Plaintiffs' contention that Plaintiffs received no consideration in exchange for having their lawsuits permanently enjoined. On this basis alone, *Manville*, *Drexel*, and *A.H. Robins* are inapplicable.") This, alone, is sufficient to doom the releases, because the Insurers will lose their direct claims against the parties who orchestrated the transactions and their policy defenses will be truncated.

To satisfy the "compensation" requirement, the parties forced to give the releases must receive, in exchange, reasonable consideration. *Continental Airlines*, 203 F.3d at 215. In this case, Arrowood and the other Insurers have been offered no compensation at all from any source under the Plan.

Furthermore, this is not a situation where Arrowood or any of the other insurers have voluntarily agreed to accept a waiver of their claims and defenses in exchange for the benefits of the Plan. *Specialty Equip.*, 3 F.3d at 1047; *See Zenith*, 241 B.R. at 111 ("This . . . release of third party claims . . . cannot be accomplished without the affirmative agreement of the creditor affected"). Rather, Arrowood and the other insurers expressly oppose the exculpations and releases set forth in the Plan. Again, the failure to compensate the insurers or anyone else for their claims and defenses (in the face of their opposition) compels rejecting the releases. To satisfy the "compensation" requirement, the parties forced to give the releases must receive, in exchange, reasonable consideration. *Continental Airlines*, 203 F.3d at 215. In this case, Arrowood and the other Insurers have been offered no compensation at all from any source under the Plan. This alone means that these exculpations are unlawful under the *Continental* standard.

4.    ***Grace Offers No Justification for the Non-Debtor Releases and Exculpations, Nor Can It.***

Grace fails to articulate any reason to grant the non-debtor releases. The Plan and the Disclosure Statement are conspicuously silent. Such an omission is fatal to the non-debtor releases. *See Continental Airlines*, 203 F.3d at 214 ("the order confirming the Continental Debtor's' plan of reorganization and releasing and permanently enjoining Plaintiffs' claims was not accompanied by any findings that the release was fair to the Plaintiffs and necessary to the Continental Debtor's' reorganization. Without such findings, a release and permanent injunction cannot stand on their merits under any of the standards set forth in the case law of other circuits."); *In re Dow Corning*, 280 F.3d 648, 658 (6th Cir. 2002) ("record produced by the bankruptcy court in this case does not support a finding of 'unusual circumstances' such that we can endorse enjoining non-consenting creditors' claims against a non-debtor."); *In re Transit*

*Group*, 286 B.R. 811, 821 (Bankr. D. Fla. 2002) (holding that the third-party non-debtor releases and related injunctions for the debtor's current officers and a number of the members of the unsecured creditors' committee were not supported by any factual findings).

### 5.    *The Exculpations and Releases Are Unnecessary for The Reorganization*

Courts approving non-consensual releases of lawsuits against non-debtors outside of the scope of Section 524(g) have required, in addition to compensation for the rights forsaken, that the plan proponent demonstrate that the releases were necessary to make the plan feasible. *Continental Airlines*, 203 F.3d at 214 (holding that "[t]he hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 293 (2d Cir. 1992), as amended. (a non-debtor funding a reorganization plan may be released from liability to a third party if such release "plays an important part in the debtor's reorganization plan"); *In re Chateaugay Corp.*, 167 B.R. 776, 780-81 (S.D.N.Y. 1994) (bankruptcy court has authority to release claims against non-debtors pursuant to § 105(a), if the discharge is essential to success of the plan); *In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (injunction necessary for successful reorganization).[11]

Here, the non-debtor releases and exculpations are granted to a host of claimant lawyers and others that are paying nothing for them.[12] These releases are purely gratuitous, having been

---

[11] As explained in section III(E), section 524(g) codified these cases.

[12] The co-liable third parties released in *A.H. Robins*, *Drexel Burnham* and *Johns-Manville* contributed hundreds of millions of dollars to the Debtor's' reorganization plans to compensate claimants and to make the Debtor's' plans feasible. *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989) (third-party insurer contributed assets to claimant fund); *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 289, n.2 (2d Cir. 1992) (allowing a creditor and debtor to pool their rights and collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988) 837 F.2d 89 (2d Cir. 1988), Writ of certiorari denied *MacArthur Co. v. Johns-Manville Corp.*, 488 U.S. 868, 109 S. Ct. 176, 102 L. Ed. 2d 145, 1988 U.S. LEXIS 3881 (1988) (calling the contributions of non-debtor insurance companies a "cornerstone" of reorganization, where third-party insurers contributed $770 million to a claimant fund). *See also In re Heron,*

demanded by the claimant lawyers who orchestrated the plan process. Most of the exculpated

and released parties did not fund the Plan or make any contribution in exchange for the releases.

As a result, not only will certain of the exculpated and released Parties be paid generously for

their involvement in the case, but these parties will receive substantial sums if the Plan is

confirmed.

Furthermore the Third Circuit in Continental has already stated that "even if the . . .

[exculpated party] defendants' obligations . . . were identifiable, the fact that the reorganized

Continental Airlines might face an indemnity claim sometime in the future, in some unspecified

amount, does not make the release and permanent injunction of Plaintiffs' claims necessary to

ensure the success of the Continental Debtors' reorganization" *Id.* at 216

Furthermore, the argument that the exculpations and releases were necessary to

reorganization because the parties might not have made the deal otherwise has already been

rejected by other courts as a matter of law. *See Congoleum*, 362 B.R. at 196 ("to allow this 'but

for' justification to be the sole factor in favor of allowing the exculpation would be to set a

dangerous precedent."); *Adelphia*, 368 B.R. at 269 ("it would set the law on its head if the parties

could get around [the illegality of the releases] by making a third party release a *sine qua non* of

their deal, to establish a foundation for an argument that the injunction is essential to the

reorganization, or even "an important part" of the reorganization."). Nor can it be said that the

possibility of intercreditor bickering is unique. *Id.* at 267. ("many of the large chapter 11 cases. .

. have intercreditor bickering and threats, aimed at each other and at debtor board members and

management, that gives the targets of those threats a legitimate fear that they will be sued. But

---

*Burchette, Ruckert & Rothwell*, 148 B.R. 660, 665-66 (Bankr. D.C. 1992) (noting that the plan reorganization was funded almost exclusively by contributions of non-debtors); *In re Monroe Well Serv.*, 80 B.R. 324, 329 (Bankr. E.D. Pa. 1987) (the largest creditor contributed $6.45 million and other creditors paid more Grace $1 million to fund plan)

unfortunately, that can't be said to be unique either."). And because third party releases cannot
be approved unless they are necessary to the reorganization, the third party exculpations and
releases in the Plan cannot be approved as a matter of law.

**B.      The Non-debtor Releases and Exculpations In The Plan Also Present
         A High Potential For Abuse.**

           Courts have noted that there are at least two reasons why non-debtor release and
exculpations provisions are highly problematic, and why they are only allowed in the rarest of
cases.  First, the only explicit authorization for non-debtor releases is under Section 524(g), the
application of which is subject to very specific criteria.  And even under the general authority to
issue orders necessary to effectuate the code provisions provided by 11 USC § 105(a),  that
section nonetheless does not "create substantive rights that are otherwise unavailable under
applicable law." *Continental*, 203 F.3d at 211. Secondly, a non-debtor release "is a device that
lend itself to abuse" and "in effect. . . may operate as a bankruptcy discharge arranged without
filing and without the safeguards of the Code."  *In re Metromedia Fiber Network*, 16 F.3d 136,
143 (2d Cir. 2005).  Here, Grace has sought to exculpate and release conduct that was
completely unsupervised by the court.  It spent years negotiating a multi-million dollar deal with
numerous parties.  In the Plan it seeks to exculpate and releases dozens of categories of persons
for all their conduct relating to anything to do with itself, these negotiations, the Plan, the
Chapter 11 case, or the creation and operation of the Asbestos PI Trust.  They are essentially
seeking a get out of court free card, immunizing their conduct from legal scrutiny, and taking
away the rights of other persons to redress their injuries.  The exculpations and releases in the
Plan thus pose a great threat of possible abuse, and indeed, as one court has worded it, these
releases and exculpations "lend themselves to abuse." *Id.*

34

Furthermore, "the potential for abuse is heightened when releases afford blanket immunity." *Id.* Here the releases and exculpations reach almost every type of legal wrongdoing imaginable. Section 11.9, for example, limits all liability, except for two specific exceptions, for anything relating to, *inter alia*, the negotiations, the bankruptcy, and the creation and management of the trust. The blanket use of the term "all liability" indicates the breadth of the exculpation provision, and only heightens the already existing potential for abuse that is inherent in third party exculpations and releases. Releases and exculpations for pre-petition conduct such as the years of negotiation before Grace filed bankruptcy create much more potential for abuse. *See Adelphia*, 368 B.R. at 267 ("plainly there is less potential for abuse if only postposition events are covered."). The breadth and temporal duration of the Plan's non-debtor exculpations and releases create the highest potential for abuse and implicates all the concerns courts have had with these provisions.

## C.    By Exonerating Lawyers Even From Their Own Clients The Exculpations In Section 11.9 Are Against Public Policy And Ethical Norms.

The non-debtor release and exculpation provisions include all "representatives" of all the exculpated and released parties. One of the categories of representatives are the "lawyers" for all the other exculpated and released parties and entities, including the lawyers for all the asbestos claimants committees, the future representatives committee, and all the other entities listed above. Section 11.9, for example, exculpates these lawyers from nearly all liability (except gross negligence as opposed to regular negligence, as well as willful misconduct) arising out of the Chapter 11 case, including the years of unsupervised negotiations, for any Claims relating to the chapter 11 case, and during the years during which the trust would be operating. The exculpation does not include a carve out for clients; rather, it extends to prevent clients from

suing their own lawyers under many of the causes of action that might be available to them,
including a malpractice claim based on something less Grace "gross negligence".

The Plan, in effect, contains a waiver of liability that prevents clients from suing their
own lawyers, and does so, not through an explicit agreement with the client, but through a tiny
provision hidden in a complex and verbose Plan. Such provisions, if accepted, would be a
violation of ethical norms in our profession. And even if no code discusses the exact scenario
existing here, that is, a waiver of liability pushed through via a reorganization Plan, the general
ethical principles found in Professional Responsibility codes clearly indicate that these kinds of
actions are unethical. See ABA Model Code of Professional Responsibility DR 6-102(A) (a
lawyer "shall not attempt to exonerate himself from or limit his liability to his client for
professional malpractice.) ABA Model Rules of Professional Conduct Rule 1.8(h) (prohibits
lawyers from making an agreement prospectively limiting the lawyer's liability to a client for
malpractice unless the client has independent, and separate representation, in making that
agreement; and it prohibits lawyers from settling a claim or potential claim for malpractice
unless the lawyer advises the client in writing that it is desirable to seek independent
representation and gives the person a reasonable opportunity to do so).

Furthermore, Section 11.9 creates a grave risk of abuse, because the lawyers operating
the trust, or having other involvement in the case now or later, will know that they cannot be
sued for any basic negligence. A reorganization plan that removes this deterrent, and operates to
waive retrospective and prospective liability of lawyers to their clients is a plan that cannot be
confirmed.

**D.      The Releases Are Not Limited to Liability Derivative of the Debtor's.**

As discussed above, in *Combustion Engineering* the Third Circuit made clear that any
injunction against third-party claims in a Section 524(g) case would have to comply with the

limitations of that section, including that the injunction bar only claims for liability that is

derivative of the debtor's. *See Combustion Engineering* 391 F.3d at 228 ("As both the plain

language of the statute ands its legislative history make clear, 524(g) provides no specific

authority to extend a channeling injunction to include third party actions against non-debtors

where the liability alleged is not derivative of the debtor." ); *See Johns Mansville*, 517 F.3d at 68

("the application of channeling injunction to enjoin actions against third parties is limited to

situations where a third party has derivative liability for the claims against the debtor.") (internal

citations ommited.)   The third-party injunctions approved by the courts outside of the Third

Circuit have typically likewise involved derivative liability, and not direct liability as proposed

by the Plan in this case. *See, e.g., A.H. Robins Co.,* 880 F.2d at 702 (third party insurer

contributed assets to claimant fund); *Drexel Burnham*, 960 F.2d at 289, n.2 (allowing a creditor

and debtor to pool their rights and collect judgments from the debtor's former officers and

director into a $1.3 billion dollar fund); *MacArthur Co.*, 837 F.2d at 90 (third party insurer

contributed $770 million to a claimant fund to resolve its own claims). In *A. H. Robins, Drexel*

*Burnham* and *MacArthur Co.*, the insurance companies were allowed to make a cash

contribution to a plan trust in order to settle their derivative liability on claims against the debtor.

*See e.g., id.* In essence, the litigation against such third parties is an adjunct to the direct claims

against the debtor.  When Congress codified these cases through the passage of section 524(g), it

kept this requirement.  Only claims in which non-debtors are "alleged to be directly or indirectly

liable for the conduct of, claims against, demands on the debtor" may be released.  11 U.S.C. §

524(g).

*          *          *

Courts in this Circuit and District have refused to impose nonconsensual third-party exculpation and releases, such as the ones proposed in the Plan. Arrowood, other insurers and creditors have not consented to the releases of their claims against non-debtor third parties. Nor did Grace give even the claimants a chance to reject the releases, as the ballots distributed by the Debtor's did not contain this option, absent rejecting the entire Plan. These are truly involuntary exculpations and releases as to Arrowood, the other insurers and creditors generally.

**POINT IV**

**THE CHANNELING INJUNCTION IMPAIRS
ARROWOOD'S RIGHTS AND INTERESTS BY CHANNELING
ITS CLAIMS TO AN IMPAIRED CLASS**

In addition to the non-consensual releases of non-debtors to be imposed on Arrowood and the other insurers, the Plan Proponents also seek an injunction that purports to cuts-off the contractual and common law rights of contribution, subrogation and reimbursement that Arrowood's and the other insurers hold against other non-debtor insurers. The terms of the injunction incorporated in the Plan have a direct monetary impact on Arrowood's rights and interest and provide a further basis for Arrowood's standing to be heard with regard to the Plan. In another asbestos bankruptcy case, *In re Thorpe Insulation Co.*, the district court recently held that "the actual issuance of a Section 524(g) injunction covering [third parties] could impact [insurers]" and that insurers could "challenge a Section 524(g) injunction that barred their claims against a party covered under the injunction as the injunction would detrimentally affect [insurers'] rights against the [third parties]."[13]

---

[13] *See In re Thorpe Insulation Co.*, No. CV 08-3711 (DSF), Doc. No. 39 (C.D. Cal. Oct. 8, 2008). A copy of this decision is attached to Certain Insurers' brief as Exhibit A.

Even if a non-settling insurer is held to have valid defenses to coverage, and thus no (or reduced) liability to the Trust, it may still have a right to contribution from Grace, Settling Asbestos Insurance Entities or Post-Confirmation Settling Asbestos Insurance Entities for costs incurred in defending against Grace and the Asbestos PI Trust's claims for coverage. Thus, Arrowood has rights to contribution, subrogation and reimbursement against the non-debtor parties that the Plan Proponents have made the subject to Asbestos PI Channeling Injunction. Moreover, Arrowood's rights to defense from other non-debtors cannot be left unimpaired by set-off or judgment reduction.

By channeling these claims to the Trust and then classifying them as Class 6 claims, the Plan impairs Arrowood's rights and interests.

### POINT V

#### The Breadth Of The Releases and Injunction, Viewed In the Context of the Reorganization and Coverage Action Together, Violate the Bankruptcy Code's Good faith Requirement

When viewed in the context of the reorganization and coverage action, and how the various Plan provisions that implicate both work together, the good faith of the Plan is called into question. Because of this "any attempt to segregate one confirmation issue" from other objections "is both doomed to failure and unlikely to meet constitutional muster." *In re Congoleum Corp.*, Case No. 03-51524, Tr. at 14 (Bankr. D.N.J. March 26, 2008).

While the Debtor's envision getting a full release from all asbestos liability, they also build into the Plan provisions that purport to release all of the representatives, as well as the very attorneys for the asbestos claimants who hatched the Plan and will receive millions of dollars as a result of its confirmation. By attempting to rush to confirmation *before* a State Court trial, the Plan Proponents seek to secure full releases for themselves and everyone else involved before the

claims and defenses of Arrowood and the other insurers' can be adjudicated.  As a result,

Arrowood and the other insurers may be left with their claims eliminated, while the Debtor's,

their representatives, and the claimants' counsel could walk away with full releases from any

liability. Gaining a tactical advantage in separate litigation is not a plan objective sanctioned by

the Code.

The result that the exculpations, releases and channeling injunction seek to achieve is

plainly inconsistent with the objectives and purposes of the Bankruptcy Code.  It is therefore

contrary to Section 1129(a)(3) and demonstrates a lack of fundamental fairness. *In re Koelbl*,

751 F.2d 137,139 (2d Cir. 1984) (analyzing §1129(a)(3) and stating that "[t]his court has defined

the good faith standard in the bankruptcy context as requiring a showing that the plan was

proposed with honesty and good intentions. . . [and] good faith has been found to be lacking if

the plan was proposed for ulterior motives.") (internal citations omitted); *In re Elsinore Shore*

*Assocs.*, 91 B.R. 238, 260 (Bankr. D.N.J. 1988) (holding that in "the context of reorganization

under Chapter 11, a plan is proposed in good faith if there is a reasonable likelihood that the plan

will achieve a result consistent with the standards prescribed under the Code.");  *Capital Corp. v.*

*Milford Conn. Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006) (holding that "[a] plan must be

proposed in good faith. . . . [and] good faith is generally interpreted to mean that there exists a

reasonable likelihood that the plan will achieve a result consistent with the objectives and

purposes of the Bankruptcy Code.") (internal citations omitted); *In re Stolrow's Inc.,* 84 B.R.

167, 172 (B.A.P. 9th Cir. 1988) ("[g]ood faith requires a fundamental fairness in dealing with

one's creditors"); *see also In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970)

("[g]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the

statutory process to effect a plan of reorganization and not merely as a device to serve some

sinister or unworthy purpose").

## CONCLUSION

For all the reasons stated above, therefore, Arrowood respectfully requests that this court

find the Plan uncomfirmable as a matter of law. [14]

Dated: May 20, 2009
      Wilmington, Delaware

/s/ Garvan F. McDaniel
Garvan F. McDaniel, Esq. (#4167)
BIFFERATO, GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, DE 19801
(302) 429-1900 Phone
(302) 429-8600 Fax

-and-

Carl J. Pernicone, Esq.
WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, NY 10017-5639
Telephone: (212) 490-3000

-and-

Tancred Schiavoni, Esq.
Gary Svirsky, Esq.
O'MELVENY & MYERS LLP
7 Times Square
New York, New York
(212) 326-2267

*Counsel to Arrowood Indemnity
Company, f/k/a Royal Indemnity Company*

---

[14] Because the Plan Proponents were uncooperative in responding to Arrowood's Interrogatories and Document Requests relating these particular issues, Arrowood has had to limit itself to the Plan documents and other sources in undertaking its analysis of these provisions. This memorandum of law, therefore, is based on the terms of the Plan itself and such information as Arrowood has been able to obtain through other sources. Yet even without the benefit of adequate discovery and co-operation from the Plan Proponents on these issues, it is abundantly clear that they fail to pass muster under the standards set forth in this or any other circuit.