IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

**Hearing Date: June 29, 2009, 10:30 am ET,
Wilmington, DE
Response Deadline: June 12, 2009**

## DEBTORS' SUBSTANTIVE AND NON-SUBSTANTIVE OBJECTION TO CLAIMS FILED BY MADISON COMPLEX, INC.

The above-captioned debtors (the "Debtors" or "Grace") object to Claim Nos. 6079 and 18499, which were filed by Madison Complex Inc. ("Madison Complex") in these bankruptcy cases. In support of their Objection, the Debtors state the following:

### Introduction

Madison Complex has filed two claims in these bankruptcy cases. The first claim (Claim No. 6079) was filed before the Court's March 31, 2003 bar date and asserts a contingent unliquidated claim for potential environmental liabilities to the United States Environmental Protection Agency ("EPA") stemming from Madison Complex's prior ownership of a vermiculite expanding facility in Minnesota, which Madison Complex allegedly purchased from Grace in October 1989 and sold in October 2006. Madison Complex's second claim (Claim No. 18499) was filed almost *five years after* the bar date had passed. While it is styled as an "amendment" to Madison Complex's first claim, Claim No. 18499 seeks entirely new and different damages that are premised upon an entirely new and different set of facts. Specifically, rather than seeking damages related to potential liability for contamination at the property,

Madison Complex seeks economic damages stemming from allegedly diminished rental and sales proceeds, which Madison Complex claims it experienced as a result of prior contamination at the site. Therefore, Claim No. 18499 is not an amendment to Madison Complex's first claim, but rather a new, improperly-filed late-claim, which should be disallowed and expunged as being violative of the Court's bar date order. Further, even if Claim No. 18499 could be considered an "amendment" to Claim No. 6079, Madison Complex could not legally recover for its claim, because it alleges purely economic damages stemming from the rental and sale of the property, rather than damages for existing contamination at the property. As this Court has previously determined, Minnesota law does not allow recovery for such economic damages, because "causing the value of another's property to diminish is not in and of itself a basis for tort liability." *In re W.R. Grace & Co.*, 346 B.R. 672, 677 (Bankr. D. Del. 2006). Thus, the Court should disallow and expunge Claim No. 18499 as being both untimely and as seeking relief which is not allowed under Minnesota law.

The Court should likewise disallow and expunge Claim No. 6079. Madison Complex's second claim admits that EPA has already cleaned the property and that Madison Complex has been released from any potential liability on account of past contamination at the property. Thus, Madison Complex has conceded that the contingency underlying Claim No. 6079 no longer exists, and Madison Complex accordingly could not recover for the allegations in Claim No. 6079. The Debtors therefore ask the Court to disallow and expunge Madison Complex's Claim Nos. 6079 and 18499. To the extent the Court does not disallow and expunge these claims for the reasons above, the Debtors further object to these claims for the reasons described below in Section IV.

2

**Jurisdiction**

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O). The statutory bases for the relief requested herein are 11 U.S.C.§§ 101-1532 (the "Bankruptcy Code") and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure.

**Background**

2.      On December 31, 1966, Grace acquired the property located at 1720 Madison Street, NE, Minneapolis, Minnesota (the "Property") through a merger with Western Mineral Products Company. Grace used the Property as a vermiculite concentrate exfoliating plant from 1967 to 1989.

3.      On or about September 6, 1989, Madison Complex Inc., which was in the process of being formed by three individuals to "purchase and hold" the Property, commissioned Panel Specialties, Inc. ("Panel Specialties"), an affiliated entity with common ownership, to obtain an environmental assessment of the Property. (Claim No. 18499, at pgs. 6-7, attached as Exhibit 2.) The assessment, which was conducted by Twin City Testing Corporation, states that "[n]umerous businesses in the surrounding area are of the type that could generate hazardous wastes and conceivably pose an environmental threat." (Twin City Testing environmental audit, at pg. 2, attached as Exhibit 3.)

4.      On or about October 19, 1989, Panel Specialties, Inc. commissioned Twin City Testing Corporation to perform a second assessment of the Property on behalf of Madison Complex Inc. This environmental audit was performed on October 13 and 16, 1989, and specifically disclosed the presence of asbestos and vermiculite on the property. (Applied Environmental Sciences, Inc. environmental audit, at pgs. 2, 6, which is attached as Exhibit 4.)

5.      On October 24, 1989, Grace sold the Property to Madison Complex for $175,000.

3

The sales agreement gave Madison Complex the right to inspect the Property, and to conduct engineering and environmental studies and/or tests or other investigations on the Property. (Purchase and Sale Agreement, at ¶12, attached as Exhibit 5.)  In addition, the sales agreement expressly provides that Madison Complex assumed any and all liability from its failure to inspect the Property, and that Madison Complex agreed it was not relying on any assertions of Grace in its purchase of the Property.  The sales agreement states:

> It is understood that BUYER has or may inspect the premises and has agreed to purchase it as a result of such inspection and not because of or in reliance upon any statements or representations of any kind made by the SELLER or any other officer, employee, or agent of the SELLER or by a broker, if any and that [BUYER] has agreed to purchase it in its present condition unless otherwise specified herein.  It is further understood that this Agreement contains the entire agreement between the SELLER and the BUYER, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning the sale.  (*Id.* ¶ 16.)

6.      When Madison Complex purchase the Property, it knew that Grace had used the Property as a vermiculite exfoliating plant.  According to Madison Complex, Grace provided Madison Complex with copies of industrial hygiene investigations and air testing that it had performed at the Property during and after its removal of equipment.  (*See* Claim No. 6079 at pg. 6, the "Initial Claim," which is attached as Exhibit 1.)

7.      On April 2, 2001, the Debtors filed their Chapter 11 Bankruptcy Cases.  (Dkt. No. 1.)

8.      According to Madison Complex's proof of claim forms, EPA performed asbestos investigation and cleanup at the Property in 2001 and 2002.  (Ex. 1 and Ex. 2, at 9276108) ("the EPA has. [performed cleanup activities at the Property] see attached tables.")

9.      On April 22, 2002, the Court issued a bar date order (Dkt. No. 1963), which established March 31, 2003 as the deadline for filing pre-petition (a) non-asbestos, (b) asbestos-property damage and (c) medical-monitoring claims.  The bar date order states:

4

ORDERED that any person holding an Asbestos Property Damage Claim, Medical Monitoring Claim or Non-Asbestos Claim who does not file a completed Proof of Claim Form on or before the Bar Date shall be forever barred to the extent of applicable law from (a) participating in the Debtors' estates; (b) voting with respect to any plan of reorganization filed in these cases; and (c) receiving any distribution from the Debtors or any entity created pursuant to or in connection with any confirmed plan or reorganization in these cases. (Dkt. No. 1963, at pg. 6.)

10.     On or about March 26, 2003, Madison Complex filed its first proof of claim, Claim No. 6079. (*See* Exhibit 1.) The Initial Claim asserts a contingent, unliquidated claim for amounts that Madison Complex believed it may have been obligated to pay to EPA and/or the City of Minneapolis and/or the State of Minnesota on account of cleanup and investigation costs associated with the Property. (*Id.* at 12) ("To the extent that the EPA assesses a lien against Madison Complex, Madison Complex asserts a contingent claim for $3,425,123.77, or such lesser amount as may be assessed by the EPA in a lien against the property. The City of Minneapolis and the State of Minnesota have demanded approximately payment of $35,000 for cleanup and investigation costs associated with the Property. As such, Madison Complex asserts an additional liquidated claim for $35,000.00.")

11.     Thereafter, Madison Complex was advised that it no longer faced any potential liability for the amounts identified in its Initial Claim. (Claim No. 18499, at pg. 4, attached as Exhibit 2) ("Subsequent to the filing of its original proof of claim, Madison was advised that it no longer had legal exposure for clean-up costs associated with the Property as outlined in the Proof of Claim. Based on this acknowledgement, Madison has opted to amend its Proof of Claim as reflected herein.").

12.     On October 26, 2006, Madison Complex sold the Property to a third party for $980,000 -- more than five times its $175,000 purchase price from Grace. (Ex. 2.) Along with the sale of the Property, Madison Complex and the third-party purchaser signed an escrow

5

agreement in the amount of $50,000. The escrow agreement covered a myriad of existing and potential problems at the Property, including, *e.g.*, $8,500 for the repair of an elevator on the property and potential environmental costs or investigations that the third party might expend for the Property, and (*See* Exhibit 6, the "Escrow Agreement."). Madison Complex's claim forms do not state whether the purchaser of the Property has drawn down any portion of these escrowed funds.

13.    On January 30, 2008, almost 5 years after the Bar Date had passed, and after Madison Complex had already sold the Property, Madison Complex filed Claim No. 18499 (the "New Claim," which is attached as Exhibit 2). Styled as an "amendment" to Claim No. 6079, the New Claim asserts a liquidated claim in the amount of $779,372.60 for economic damages that Madison Complex allegedly suffered through diminished rental and sales proceeds from the Property. (Ex. 2, at pg. 4.) Specifically, the New Claim alleges damages for: (a) lost rents ($168,729.50), (b) the entire Escrow Agreement ($50,000), (c) lost sales proceeds that Madison Complex allegedly incurred when it sold the Property in 2006 ($520,000), and (d) attorney's fees ($40,643.10). (*Id.*)

14.    The New Claim admits that Madison Complex no longer faces any potential liability for the contingent damages that it asserted in its Initial Claim and apparently withdraws the requests made in the Initial Claim. (*Id.* at 4.)

15.    On June 3, 2008, the Court approved Debtors' settlement with EPA to pay for all of EPA's costs associated with EPA's clean up of Madison Complex and numerous other sites and private residences in Minneapolis as part of Debtors' and EPA's Multi-Site Agreement. (Dkt. No. 18847.)

**Argument**

## I. THE NEW CLAIM IS NOT AN AMENDMENT TO THE INITIAL CLAIM, BUT RATHER A NEW AND UNTIMELY FILED CLAIM.

16.    The New Claim asserts entirely new and different damages that are based upon entirely new facts, and therefore is an untimely filed claim that is barred by the Court's bar date order.  The Initial Claim asserted an unliquidated and contingent claim, which was premised solely upon potential liabilities that Madison County believed that it may have incurred for cleanup of contamination at the Property.  The New Claim, however, is neither contingent nor unliquidated, and it does not relate to any potential liabilities on account of physical injury to the property.  Instead, the facts underlying the New Claim relate solely to allegedly diminished revenues from business transactions that Madison Complex entered into after the Property had already been cleaned by EPA.  Accordingly, the New Claim is a different category of claim, seeks entirely different damages, and is related to a new and different set of underlying facts.  It is therefore not an "amendment" to the Initial Claim, but rather a new and untimely-filed claim.

17.    Courts generally allow a claimant leave to amend a timely-filed claim to plead a new theory of recovery under the facts set forth in the timely claim.  *See e.g.*, *In re Asia Global Crossing, Ltd.*, 324 B.R. 503 (Bankr. S.D.N.Y. 2005).  However, a post-bar date amendment is not permitted when the claimant wishes to assert facts that were not previously alleged.  *In re MK Lombard Group I, Ltd.*, 301 B.R. 812, 817 (Bankr. E.D. Pa. 2003).  Further, "[p]ost-bar date amendments should be scrutinized to ensure that the amendment is not making a new claim against the estate." *In re Clamp-All Corp.*, 235 B.R. 137, 140 (1st Cir. 1999); *see also In re Orion Refining Corp.,* 317 B.R. 660, 664 (Bankr. D. Del. 2004), citing *In re Walls & All, Inc.*, 127 B.R. 115, 118 (W.D. Pa. 1991); *In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir. 1985).

DOCS_DE:148563.1

18.    A claim is considered an amendment, rather than a new claim, if it provides a more detailed allegation of the facts relating to a timely-plead claim, pleads a new theory of recovery under the facts set forth in the timely-plead claim, or seeks to increase the previously articulated damages. *In re Intn'l Horizions Inc.*, 751 F.2d 1213 (11th Cir. 1985); *In re Orion Refining Corp.*, 317 B.R. 660 (Bankr. D. Del. 2004); *In re Candy Braz, Inc.*, 98 B.R. 375 (Bankr. N.D. Ill. 1988); *In re Mitchell,* 82 B.R. 583 (Bankr. W.D. Okla. 1988). Madison Complex does not seek to make any of these changes. Instead, Madison Complex has withdrawn its Initial Claim and freely admits that it no longer faces the possibility of incurring the unliquidated contingent damages that were asserted in the Initial Claim. Having admitted that it no longer faces possible damages from liability relating to physical injury to the Property, Madison Complex now wishes to instead assert economic damages from post-cleanup business transactions involving the Property (*i.e.*, the sale and lease agreements, rather than damages from injury to the property).

19.    Thus, the New Claim is an entirely new category of claim (*i.e.*, a liquidated claim as opposed to an unliquidated, contingent claim), which is based upon new and different facts (*i.e.*, the sale and lease agreements that Madison entered into after the Property was cleaned, rather than damages from any existing injury to the Property), and seeks damages under a new and different theory of law (*i.e.*, equitable restitution, rather than indemnification). Given these changes, the New Claim does not "amend" allegations that were already known to the Debtors through the Initial Claim, as Madison Complex asserts, but rather constitutes a new claim, which was improperly filed almost five years after the Bar Date had passed. [1] *See, e.g., In re Enron*

---

[1] Madison Complex has not asserted or presented any evidence of excusable neglect. Thus, there is no basis for allowing the New Claim under the doctrine of "excusable neglect." *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380 (1993).

*Corp.*, 328 B.R. 75 (Bankr. S.D.N.Y. 2005) (amendment that introduced different factual and legal allegations not be allowed); *In re ChanneLinx, Inc.*, 317 B.R. 694 (Bankr. D.S.. 2004) (same).

## II.    MINNESOTA DOES NOT RECOGNIZE RECOVERY FOR THE ECONOMIC DAMAGES ASSERTED IN THE NEW CLAIM.

20.    The New Claim does not allege any damages from physical injury to the Property. To the contrary, Madison Complex admits in its New Claim that EPA had already cleaned the Property.    Instead, the New Claim seeks purely economic damages on account of allegedly reduced rental and sales proceeds stemming from the knowledge of past contamination at the Property.

21.    As this Court has already recognized in this Case, and in regards to claims brought on account of properties located in the vicinity of the Property, Minnesota law does not recognize recovery for purely economic damages relating to the allegedly diminished value of property that has already been cleaned by the EPA.[2]    That is because, "causing the value of another's property to diminish is not in and of itself a basis for tort liability." *In re W.R. Grace & Co.*, 346 B.R. 672, 677 (Bankr. D. Del. 2006).    Instead, "Minnesota courts allow property damage claims only where the claimant has alleged actual injury or damage to the subject property." *Id.* at 675, *citing Mayavski v. Bemboom*, 1999 WL 343834, at *1 (Minn. Ct. App. 1984).

22.    Therefore, physical damage to the Property must exist before Madison Complex

---

[2] Because the Property is located in Minnesota, Minnesota law substantive law governs the Initial and New Claims. *See, e.g., In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006), *citing Butner v. U.S.*, 440 U.S. 48 (1979).

could recover under Minnesota law. [3]  No such injury existed at the time that Madison Complex allegedly sold or rented the Property.[4]  Instead, as Madison Complex admits in its claims, EPA had already cleaned the Property in 2001 and 2002.  (Ex. 1 and Ex. 2, at 9276108.)

23.    Because the Property was cleaned by EPA (using funds which Grace will reimburse pursuant to the Multi-Site Agreement), and the New Claim accordingly alleges nothing more than purely economic damages on account of past contamination, which cannot be recovered under Minnesota law, Madison Complex cannot recover for its allegations in the New Claim.

## III.    THE CONTINGENCY UNDERLYING THE INITIAL CLAIM HAS BEEN RESOLVED.

24.    In its New Claim, Madison Complex admits that "[s]ubsequent to the filing of its original proof of claim, Madison was advised that it no longer had legal exposure for clean-up costs associated with the Property as outlined in the [Initial] Proof of Claim."  (Ex. 2, at pg. 4.)

25.    Therefore, Madison Complex admits that the contingency underlying its Initial Claim has not and will not occur, and the Initial Claim should therefore be expunged and disallowed.

---

[3] Minnesota is not unique in its requirement that a property suffer from physical injury, the majority of other courts that have considered this issue have likewise found that recovery is not allowed for purely economic damages. *See Mercer v. Rockwell Int'l Corp. Corp.*, 24 F. Supp.2d 735 (W.D. Ky. 1998); *Bradley v. American Smelting and Refining Co.*, 635 F. Supp. 1154 (W.D. Wa. 1986); *San Diego Gas & Elec. Co. v. Superior Ct.*, 920 P.2d 669 (Cal. 1996);  *Exxon Corp. v. Yarema*, 516 A.3d 990, 1004 (Md. Ct. App. 1986); *In re Burbank Envtl. Litigation*, 42 F.Supp.2d 976 (C.D. Cal. 1998); *Terra-Prods., Inc. v. Kraft Gen. Foods, Inc.*, 653 N.E.2d 89 (Ind. Ct. App. 1995); *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52 (Ky. 2007); *Stancill v. E.I. DuPont DeNemours & Co.*, 91 F.3d 133 (4th Cir. 1996); *Santa Fe P'ship v. Arco Prods. Co.*, 46 Cal. App. 4th 967 (Cal. Ct. App. 1996).

[4] The New Claim does not state whether Madison Complex's allegedly diminished rents occurred before or after EPA cleaned up the Property.  For purposes of this Objection, the Debtors assume that these alleged damages occurred after the cleanup occurred, because, to the extent that any of the alleged rental terminations took place before EPA cleaned up the Property in 2001 and 2002, then Madison Complex was required to assert such damages when it filed the Initial Claim in May 2003.  Madison Complex did not assert lost rents in its Initial Claim and, therefore, the bar date order precludes Madison Complex from such claims in its New Claim.

## IV.   OTHER OBJECTIONS

26.   Even if Madison Complex's New Claim was considered an amendment to an otherwise properly filed claim, or its alleged damages were recoverable under Minnesota law, the New Claim would still lack merit for the following reasons:

### A.   Madison Complex's Claims of Lost Rental and Sales Proceeds are Unfounded.

27.   Madison Complex presents no evidence that any of its rental or sales proceeds were actually reduced from then-prevailing rates on account of any asbestos or environmental contamination.   Thus, this Court is left only with Madison Complex's unsupported assertions, which are insufficient to establish such remote and speculative damages. *In re Palmer*, 403 B.R. 18, 23 (Bankr. D. Minn. 2009) ("[W]hen a debtor objects to a proof of claim filed in his bankruptcy case, the claimant bears the burden of proof.").

28.   Far from experiencing diminished rental or sales proceeds on account of any contamination, it appears as though Madison Complex was actually the direct benefactor of EPA's cleanup efforts, and experienced *increased* sales and rental proceeds as a result. Specifically, Madison Complex purchased the Property in 1989 for only $175,000, at a time when it knew of the Property's past use as a vermiculite exfoliating plant and the presence of asbestos and vermiculite on the Property, and pursuant to a sales agreement that required Madison Complex to take the premises subject to those conditions and in its then-existing condition.   Therefore, Madison Complex's purchase price reflected the risk of its knowing assumption of these potential problems and liability.   Importantly, Madison Complex had no right under the sale agreement to hold Grace accountable for any such contamination.   EPA subsequently cleaned up the Property, using funds that Grace will be reimbursing.   Thus, through EPA's actions, Madison Complex received cleanup benefits that it would not otherwise have been entitled to under the sales agreement.   Then, in 2006, after the Property had been cleaned up by EPA, Madison Complex sold the improved Property for $980,000, or 560% more than its

11

purchase price. Therefore, far from suffering economic damages, Madison Complex has already received financial benefits that it was not otherwise entitled to under its sales agreement with Grace.

**B.    Minnesota Statute of Limitations Period Has Expired.**

29.    To the extent that Madison Complex asserts damages for alleged physical damage to the Property, Madison Complex knew or should have known of any such injury before it purchased the Property on October 24, 1989.  Madison Complex retained two environmental consulting firms to perform audits and inspections of the Property prior to its purchase of the Property.  The first audit reported that numerous businesses in the surrounding area were of the type that could generate hazardous wastes and could pose an environmental threat to the Property.  (Ex. 3, at 2.)  Thus, Madison Complex knew that the Property was at an increased risk of environmental contamination. The second environmental audit specifically disclosed the presence of asbestos and vermiculite on the Property.  (Ex. 4, at 6)  Therefore, Madison Complex knew of the potential and actual contamination at the Property when it purchased the Property.

30.    Minnesota law provides for a 6 year statute of limitations for both tort and indemnification claims.  Minn. Stat. § 541.05; *Johnson v. Steele-Waseca Co-op. Elec.*, 469 N.W.2d 517 (Minn. Ct. App. 1991) (tort); *State Farm v. Liberty Mut. Ins. Co.*, 678 N.W.2d 719 (Minn. Ct. App. 2004) (indemnification).  Under Minnesota law, a cause of action accrues and the statute of limitations begins to run when the "plaintiff discovers or should have discovered the injury/damages." *State ex rel. Hatch v. Employers Ins. of Wasau*, 644 N.W. 2d 820, 829 n.3 (Minn. Ct. App. 2002).

31.    Therefore, regardless of whether Madison Complex's claims are considered to lie in tort or indemnification, the statute of limitations for Madison County's claims expired by at least October 24, 1995, 6 years after the time when Madison Complex purchased the Property

12

and knew of the alleged contamination.

### C.    Assumption of Liability.

32.    According to the sales agreement that Madison Complex signed with Grace in 1989, Madison Complex: had the right to inspect the Property; explicitly assumed the risk of any environmental problems that may have been present at the Property; and agreed that it was not relying upon any representations of Grace in making its decision to purchase the Property. Specifically, Paragraph 16 of the sales agreement states:

> It is understood that BUYER has or may inspect the premises and has agreed to purchase it as a result of such inspection and not because of or in reliance upon any statements or representations of any kind made by the SELLER or any other officer, employee, or agent of the SELLER or by a broker, if any and that [BUYER] has agreed to purchase it in its present condition unless otherwise specified herein.  It is further understood that this Agreement contains the entire agreement between the SELLER and the BUYER, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning the sale.  (Ex. 5, Purchase and Sale Agreement, ¶ 16.)

Therefore, to the extent that any environmental liabilities were present, Madison Complex assumed responsibility for those liabilities and agreed to hold Grace harmless.

### D.    Madison Complex's Escrow Damages Are Remote and Speculative.

33.    Madison Complex incorrectly suggests that the Escrow Agreement was issued solely on account of potential asbestos liabilities; the Escrow Agreement is not so limited. Instead, the Escrow Agreement states that it is for a myriad of identified and potential problems with the Property, including repairs to an elevator at the Property.  (Escrow Agreement, Ex. 6.) Thus, the amounts contained in the Escrow Agreement were issued for any potential problems that may arise at the Property.  It would be impossible to determine which specific portion, if any, of the Escrow Agreement was actually attributable to asbestos.  And, given that Madison

13

Complex admits that EPA already cleaned the Property, no portion of the Escrow Agreement should have been attributable to asbestos contamination at the Property. Therefore, any damages on account of the Escrow Agreement are not recoverable because they are remote and speculative. *See, e.g., Jackson v. Reiling*, 311 Minn. 562, 563 (1977) ("[D]amages which are remote and speculative cannot be recovered.").

34.     Further, the New Claim fails to state that the purchaser has actually drawn any funds from the escrow account, on account of asbestos contamination or otherwise. To the extent that any remaining funds are returned to Madison Complex, as is standard with most escrow agreements relating to the sale of real estate, Madison Complex will reclaim these funds. Therefore, Madison Complex has failed to allege any financial loss related to the Escrow Agreement.

35.     Finally, the Escrow Agreement appears to have been an economic incentive by Madison Complex to sell the Property to the third party. Thus, like the sales prices of the Property, the escrow is part of the economic terms of that agreement and, absent a showing that the escrow funds have been drawn to address actual asbestos contamination, such funds are not recoverable as purely economic damage under Minnesota law.

### E.     Almost All of Madison Complex's "Lost Rents" Relate to Lease Agreements With An Affiliated Entity.

36.     The New Claim asserts "lost rents" in an aggregate amount of $168,729.50 on account of "tenants who vacated the Property prior to the expiration of [its] lease[]." (Ex. 2, at pg. 2.) Of this amount, $157,926.62 (or 93.5%) allegedly relates to lost rents from "Panel Specialties, Inc." (*Id.*) Based upon the facts asserted in the Initial Claim, Panel Specialties and Madison Complex are related corporate entities.

37.     According to the Initial Claim, Doug O'Brien, a shareholder of Panel Specialties,

14

acted on behalf of Madison Complex in its purchase of the Property from Debtors on October, 24

1989, and was also an original and principal shareholder of Madison Complex. (Ex. 1, Initial

Claim, claim summary, at pg. 6.) Further, before Madison Complex was formed for the purpose

of "purchasing and holding" the Property and leasing it to Panel Specialties, Panel Specialties

acted as the agent of then yet-to-be-created company (by, *e.g.*, obtaining the pre-purchase

assessments that are attached as Exhibits 2 and 3). (*See, e.g.*, Ex. 2, at pg. 7) ("In September

1989, Panel Specialties had a Phase One Preacquisition Site Assessment ("Phase One PSA")

performed on the Property ... According to Mr. O'Brien, Madison Complex had not been formed

yet, so Panel Specialties, a business in which Mr. O'Brien was and is a member, had the Phase

one PSA conducted.").

38.    Therefore, given that Madison Complex was apparently formed with the purpose

and intent of purchasing the Property and leasing it to Panel Specialties; had the same

shareholders as Panel Specialties; and was represented in it pre-formation actions by and through

both Panel Specialties and its joint shareholders, Panel Specialties is not independent from

Madison Complex, and Madison Complex therefore cannot recover for any lost rents from this

affiliated entity, because such "rents" did not represent an actual economic transaction between

separate parties, but rather a bookkeeping entry within its own corporate structure. Further, any

claims based upon business transactions between these entities cannot be presumed to be arms

length and should be scrutinized accordingly.

## F.    Madison Complex Failed to Prosecute and/or Debtors Are Entitled to Set Off for Alleged Lost Rents.

39.    To the extent that any of Madison Complex's tenants did in fact, "vacate[] the

Property prior to the expiration of their leases," after EPA had cleaned up the Property, then

Madison Complex should have sought recovery from those tenants for breaching their respective

lease agreements.

40.     To the extent that Madison Complex did seek such recovery, then any amounts that it has recovered should be set off against any amounts that it may be awarded for its New Claim.  To the extent that Madison Complex did not seek such recovery, then its failure to pursue its claims against those tenants should be construed as a waiver by Madison Complex, and likewise bar any recovery against the Debtors in these bankruptcy cases.

41.     In particular, the information contained in the Initial and New Claims suggests that any premature termination by Panel Specialties would have been improper, and Madison Complex should have sought recovery from Panel Specialties.

42.     Panel Specialties is the entity that obtained environmental audits on behalf of Madison Complex before Madison Complex purchased the Property.  (*See* Ex. 3; Ex. 4.)  Those environmental audits, which are attached to Madison Complex's proofs of claim, specifically identify asbestos on the Property, and also the risk of contamination due to the uses of the surrounding lands.   Because Panel Specialties obtained those assessments before Madison Complex purchased the Property, then it necessarily knew or should have known of any contamination before its lease commenced and took the Property subject to those existing conditions; therefore, Panel Specialties would not have been entitled to terminate its lease on account of any such existing or prior contamination.

## G.     Attorney's Fees Are Not Recoverable.

43.     Finally, this Court should disallow Madison Complex's request for attorney's fees, because there is no legal authority for granting attorneys fees under the present facts.

44.     There is no bankruptcy code provision that resolves the issue of whether a claimant can recover attorney's fees incurred while litigating issues of bankruptcy law.  *See*

16

*Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 127 S.Ct. 1199, 1206 (2007) ("[T]he Code says nothing about unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law."). While the Supreme Court has interpreted the Bankruptcy Code so as to permit attorney's fees in some cases, the claimant must show that there is some contractual or statutory obligation to recover attorneys fees under an applicable non-bankruptcy law. *Id.* Madison Complex has provided no such contractual or statutory basis to support its claim for attorney's fees.

45.     Even if Madison Complex was successful on its claims, it would not be entitled to attorneys' fees under Minnesota law. Under Minnesota law, attorney's fees are not damages, and a prevailing party can only recover attorney's fees if such fees are specifically authorized by statute. *St. Paul Professional Emp. Ass'n v. City of St. Paul*, 303 Minn. 106, 109 (1975) ("[w]e reverse, however, so much of the trial court's order as awards plaintiff the sum of $1,128.88 for its attorneys fees and expenses in this litigation. Counsel fees and expenses are not damages. The general and well-established rule is that attorneys fees are not allowed in civil actions unless authorized by statute."). Thus, even if it was successful on its claims, Madison Complex would not be entitled to attorneys fees.

### Notice

46.     The Debtors will serve copies of this Objection (with all exhibits) on (a) the Office of the United States Trustee, (b) Madison Complex, (d) Madison Complex's attorney, and (d) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002. The Debtors submit that notice of this Objection is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

17

### Compliance With Rule 3007-1

This Objection and related exhibits attached hereto, complies with Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

### No Previous Request

47.     No previous request for the specific relief set forth herein has been made to this or any other court.

### Reservation

48.     The Debtors hereby reserve the right to object in the future to any of the Proofs of Claim listed in this Objection on any ground, and to amend, modify and/or supplement this Objection, including, without limitation, to object to amended claims and newly-filed claims and to file all other objections relating to these Proofs of Claim.  Separate notice and hearing will be scheduled for any such objection.

### Conclusion

**WHEREFORE**, the Debtors respectfully request that the Court (i) disallow the Initial Claim, because it is a contingent claim, which Madison Complex has withdrawn due to removal of the underlying contingency, and (ii) disallow the untimely filed New Claim, because it asserts entirely new claims after the Bar Date had already lapsed, and seeks recovery for damages that are not supported in fact and not allowed under Minnesota law (a proposed order is attached as Exhibit 7).

Dated: May 22, 2009                 Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Samuel L. Blatnick
Andrew B. Fromm
300 N. LaSalle St.
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

The Law Offices of Janet S. Baer P. C.,
70 W. Madison St., Suite 2100,
Chicago, IL 60602.
Phone: 312-641-2162
Fax: 312-641-2165

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

DOCS_DE:148563.1