# EXHIBIT 2

# WR Grace
## Property Damage
### Index Sheet

SR00001130

**Claim Number:**    00018499

**Receive Date:**    01/30/2008

## Multiple Claim Reference

Claim Number    __  __

- [ ] MMPOC    Medical Monitoring Claim Form
- [ ] PDPOC    Property Damage
- [ ] NAPO    Non-Asbestos Claim Form
- [ ]         Amended

Claim Number    __  __

- [ ] MMPOC    Medical Monitoring Claim Form
- [ ] PDPOC    Property Damage
- [ ] NAPO    Non-Asbestos Claim Form
- [ ]         Amended

## Attorney Information

**Firm Number:**    00451                **Firm Name:**    Leonard Obrien Spencer Gale & Sayre

**Attorney Number:**    00347            **Attorney Name:**    Chad A Kelsch

**Zip Code:**    55402

**Cover Letter Location Number:**    SR00001130

| Attachments<br>Medical Monitoring | Attachments<br>Property Damage | Non-Asbestos |
|---|---|---|
| [ ] TBD | [ ] TBD | [ ] Other Attachments |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| | [ ] Other Attachments | |

| Other | | |
|---|---|---|
| | [ ] Non-Standard Form | [ ] Amended per Objection |
| | [X] Amended 6079 | Original Claim #: _____ |
| | [ ] Post-Deadline Postmark Date | |

Box/Batch: WRPD0035/WRPD0139                Document Number: WRPD006911

## PART 1: CLAIMING PARTY INFORMATION

**NAME:**

`M A D I S O N` `C O M P L E X ,` `I N C .`

*Name of individual claimant (first, middle and last name) or business claimant*

**SOCIAL SECURITY NUMBER (Individual Claimants):**

*(last four digits of SSN)*

**F.E.I.N. (Business Claimants)**

`0 6` - `1 2 7 5 6 6 1`

**Other names by which claiming party has been known (such as maiden name or married name):**

*First*         *MI*   *Last*

*First*         *MI*   *Last*

**GENDER:**  ☐ MALE   ☐ FEMALE

**Mailing Address:**

`2 3 0 0` `G R E E N V I E W` `D R I V E`

*Street Address*

`S T . P A U L`

*City*

**State (Province):** `M N`

**Zip Code (Postal Code):** `5 5 1 1 2`

*Country*

## PART 2: ATTORNEY INFORMATION

**The claiming party's attorney, if any (You do not need an attorney to file this form):**

**Law Firm Name:**

`L E O N A R D , O ' B R I E N , S P E N C E R , G A L E & S A Y R E , L T D .`

**Name of Attorney:**

`C H A D`     `A`  `K E L S C H`

*First*         *MI*   *Last*

**Mailing Address:**

`1 0 0 S O U T H F I F T H S T R E E T S U I T E 2 5 0 0`

*Street Address*

`M I N N E A P O L I S`

*City*

**State (Province):** `M N`

**Zip Code (Postal Code):** `5 5 4 0 2`

**Telephone:**

( `6 1 2` ) `3 3 2` - `1 0 3 0`

*Area Code*

WR Grace    PD.35 139.6911
**00018499**
SR=1130

9276101

1025314

# PART 3: PROPERTY INFORMATION

## A. Real Property For Which A Claim Is Being Asserted

1. What is the address of the real property for which a claim is being asserted (referred to herein as "the property")?

`1 7 2 0` `M A D I S O N` `S T R E E T` `N . E .`
**Street Address**

`M I N N E A P O L I S`
**City**

**State (Province)** `M N`

**Zip Code (Postal Code)** `5 5 4 1 8`

`U . S . A .`
**Country**

2. Are you completing an Asbestos Property Damage Proof of Claim Form for any other real property other than the one listed at "1" above?

☐ Yes    ☒ No

3. Do you currently own the property listed in Question 1, above?

☐ Yes    ☒ No

4. When did you purchase the property?

`1 0` - `2 4` - `1 9 8 9`
**Month   Day   Year**

5. What is the property used for (check all that apply)
   - ☐ Owner occupied residence
   - ☐ Residential rental
   - ☐ Commercial
   - ☒ Industrial    Specify: At time of ownership, prison equipment manufacturing
   - ☐ Other    Specify:

6. How many floors does the property have?   `0 0 3`

7. What is the approximate square footage of the property?   `3 4 , 0 0 0` `s f`

8. When was the property built?
   - ☒ Before 1969
   - ☐ 1969 - 1973
   - ☐ After 1973

9. What is the structural support of the property?
   - ☐ Wood frame
   - ☐ Structural concrete
   - ☐ Brick
   - ☐ Steel beam/girder
   - ☒ Other    Specify: Combination wood, brick and steel

10. Have you or has someone on your behalf completed any interior renovations on the property which affected any asbestos on the property?

☐ Yes    ☒ No

9276102                        1025314

**A.  Real Property For Which A Claim Is Being Asserted (continued)**

If yes, please specify the dates and description of such renovations.

| | | Description | |
|---|---|---|---|

*Year*

| | | Description | |
|---|---|---|---|

*Year*

| | | Description | |
|---|---|---|---|

*Year*

11.  To the best of your knowledge, have any other interior renovations been completed on the property during any other period of time which affected any asbestos on the property?

☐ Yes     ☐ No

If yes, please specify the dates and descriptions of such renovations.

| | | Description | |
|---|---|---|---|

*Year*

| | | Description | |
|---|---|---|---|

*Year*

| | | Description | |
|---|---|---|---|

*Year*

**B.  Claim Category**

12.  For which category are you making a claim on the property?

☐ Category 1:   Allegation with respect to asbestos from a Grace product in the property

☒ Category 2:   Allegation with respect to one of Grace's vermiculite mining, milling or processing operations

---
- **If you checked Category 1 in question 12, complete section C.**
- **If you checked Category 2 in question 12, complete section D.**
---

**C.  Category 1 Claim: Allegation With Respect To Asbestos From A Grace Product In The Property**

13.  For what alleged asbestos-containing product(s) are you making a claim?

☐ Monokote-3 fireproofing insulation

☐ Other      Specify:

(For a list of the brand names under which Grace manufactured products that may have contained commercially added asbestos, see Exhibit 2 to the Claims Bar Date Notice provided with this Proof of Claim Form.)

14.  When did you or someone on your behalf install the asbestos containing product(s) in the property?

| | | | ☐ I did not install the product(s)

*Year*

15.  If you or someone on your behalf did not install the asbestos containing product(s), to the best of your knowledge, when was/were the product(s) installed?

| | | | ☐ Don't know.

*Year*

9276103

1025314

16. Do you have documentation relating to the purchase and/or installation of the product in the property?

☐ Yes        ☐ No

If Yes, attach all such documents. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

17. If you do not have any such documents, explain why not and indicate who may have possession or control of such documents with respect to the property.

18. When did you first know of the presence of asbestos in the property of the Grace product for which you are making this claim?

☐☐☐☐
Year

Please attach all documents relating or referring to the presence of asbestos in the property for which you are making this claim. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

19. How did you first learn of the presence of asbestos in the property of the Grace product for which you are making this claim?

20. When did you first learn that the Grace product for which you are making this claim contained asbestos?

☐☐☐☐
Year

21. How did you first learn that the Grace product for which you are making the claim contained asbestos?

22. Have you or someone on your behalf made an effort to remove, contain and/or abate the Grace product for which you are making this claim?

☐ Yes        ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

23. If you do not have any such documents, explain why not and indicate who may have possession and control of such documents with respect to the property.

24. If you or someone on your behalf did not make an effort to remove, contain and/or abate the Grace product(s) for which you are making a claim, to the best of your knowledge, did anyone else make such an effort?

☐ Yes        ☐ No

9276104                              1025314

25. If you responded Yes to question 22. or 24. and you have not supplied documents, please specify the dates and descriptions of any such efforts.

| | Description | |
|---|---|---|
| **Year** | | |

| | Description | |
|---|---|---|
| **Year** | | |

| | Description | |
|---|---|---|
| **Year** | | |

26. Have you or anyone on your behalf ever conducted any testing or sampling for the presence of asbestos or other particulates in the property?

☐ Yes    ☐ No    **If Yes, Attach All Documents Related To Any Testing Of The Property.**

27. If you responded Yes to question 26., but you have not provided documents, indicate who may have possession or control of such testing documents or where such documents may be located.

28. If you or someone on your behalf did not conduct any testing or sampling for the presence of asbestos or other particulates on the property, to the best of your knowledge, did anyone else conduct such testing or sampling with respect to the property?

☐ Yes    ☐ No

29. If you responded Yes to question 26. or 28. and you have not supplied related documents, please describe when and by whom and the type of testing and/or sampling (e.g. air, bulk and dust sampling).

| | Company/Individual | |
|---|---|---|
| **Year** | Type of testing: | |

| | Company/Individual | |
|---|---|---|
| **Year** | Type of testing: | |

| | Company/Individual | |
|---|---|---|
| **Year** | Type of testing: | |

30. Has the Grace product or products for which you are making this claim ever been modified and/or disturbed?

☐ Yes    ☐ No

31. If yes, specify when and in what manner the Grace product or products was modified and/or disturbed?

| | Description | |
|---|---|---|
| **Year** | | |

| | Description | |
|---|---|---|
| **Year** | | |

| | Description | |
|---|---|---|
| **Year** | | |

9276105                    1025314

**D. Category 2 Claim: Allegation With Respect To One of Grace's Vermiculite Mining, Milling Or Processing Operations**

32. What is the business address or location of the Grace operation which has led to your claim?

| W | . | R | . | | G | R | A | C | E | | & | | C | O | M | P | A | N | Y | | | | | | | | | | | | | | | |
*Business Name*

| 1 | 7 | 2 | 0 | | M | A | D | I | S | O | N | | S | T | R | E | E | T | | N | . | E | . | | | | | | | | | | | |
*Street Address*

| M | I | N | N | E | A | P | O | L | I | S | | | | | | | | | | | | | | | | | | |
*City*

State (Province): | M | N |

Zip Code (Postal Code): | 5 | 5 | 4 | 1 | 8 |

*Country*

33. If your claim relates to a personal residence, does (or did) anyone living in the household work for Grace?

☐ Yes    ☐ No

34. If yes, specify the following for each such individual:

| **Name of Individual Working at Grace Operation** | **Name of Individual Working at Grace Operation** |
|---|---|
| | |
| **Date of Birth** | **Date of Birth** |
| Month – Day – Year | Month – Day – Year |
| **Occupation(s) of Individual** | **Occupation(s) of Individual** |
| | |
| **Dates Worked at Operation** | **Dates Worked at Operation** |
| From: Year    To: Year | From: Year    To: Year |
| **Name of Individual Working at Grace Operation** | **Name of Individual Working at Grace Operation** |
| | |
| **Date of Birth** | **Date of Birth** |
| Month – Day – Year | Month – Day – Year |
| **Occupation(s) of Individual** | **Occupation(s) of Individual** |
| | |
| **Dates Worked at Operation** | **Dates Worked at Operation** |
| From: Year    To: Year | From: Year    To: Year |

35. When did you first know of the presence of asbestos on your property?    | 2 | 0 | 0 | 0 |
*Year*

9276106                    1025314

36. How did you first learn of the presence of asbestos on your property?

> Excavation of dirt and reports from the Minnesota Pollution Control Agency.

Attach all documents relating or referring to the presence of asbestos on the property. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

37. If you do not have any documents relating or referring to the presence of asbestos on the property, explain why not and indicate who may have possession or control of any such documents with respect to the property.

38. Have you or anyone on your behalf made an effort to remove, contain and/or abate the asbestos on your property?

☐ Yes     ☒ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

39. If you do not have any documents relating or referring to the removal, containment and/or abatement of the asbestos on your property, explain why not and indicate who may have possession and control of such documents with respect to the property.

40. If you or someone on your behalf did not make an effort to remove, contain and/or abate the asbestos on your property, to the best of your knowledge, did anyone else make such an effort?

☒ Yes     ☐ No

41. If you responded Yes to question 38. or question 40. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| 2 | 0 | 0 | 1 | Description | The EPA has.  See tables attached to original proof of claim form. |
Year

| 2 | 0 | 0 | 2 | Description | The EPA has.  See tables attached to original proof of claim form. |
Year

| | | | | Description | |
Year

42. Have you or anyone on your behalf conducted any other testing or sampling for the presence of asbestos on your property?

☐ Yes    ☒ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

43. If you do not have any documents relating or referring to any other such testing or sampling for the presence of asbestos on your property, explain why not and indicate who may have possession or control of such documents with respect to the property.

44. If you or someone on your behalf did not conduct any other testing or sampling for the presence of asbestos on your property, to the best of your knowledge, did anyone else conduct such testing or sampling?

☒ Yes    ☐ No   URS, MPCA & EPA

45. If you responded Yes to question 42. or question 44. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| | | | | Description | See documents attached to original proof of claim form. |
Year

| | | | | Description | |
Year

| | | | | Description | |
Year

46. Were you aware of the presence of asbestos on your property when you purchased your property?

☐ Yes    ☒ No

47. If you have sold the property, were you aware of the presence of asbestos on your property when you sold your property?

☒ Yes    ☐ No    ☐ Not Applicable, have not sold the property

9276108                    1025314⌐

## C. NON-LAWSUIT CLAIMS

1. If the claiming party has made any claims relating to the property for which you are making a claim (including administrative claims) against anyone, that was not filed with a court of law, please provide the following information for each claim:

a. Description of claim: See original proof of claim

b. Date submitted: 0 3 - 2 6 - 2 0 0 3 ■
   Month   Day    Year

c. Name of entity to whom claim was submitted:
   ☒ Grace
   ☐ Other
   
   *Name of Entity*

---

a. Description of claim: Present Amended Claim. See attached summary

b. Date submitted: 0 1 - 2 9 - 2 0 0 8
   Month   Day    Year                    ■

c. Name of entity to whom claim was submitted:
   ☐ Grace
   ☐ Other
   
   *Name of Entity*

---

a. Description of claim:

b. Date submitted: __ - __ - ____
   Month   Day    Year

c. Name of entity to whom claim was submitted:
   ☐ Grace
   ☐ Other
   
   *Name of Entity*

## PART 5: SIGNATURE PAGE

All claims must be signed by the claiming party.

I have reviewed the information submitted on this proof of claim form and all documents submitted in support of my claim. I declare, under penalty of perjury,* that the above statements are true, correct, and not misleading.

CONSENT TO RELEASE OF RECORDS AND INFORMATION: To the extent that I have produced a summary rather than the documents themselves or indicated who has possession and control of certain documents, I hereby authorize and request that all other parties with custody of any documents or information concerning my property damage or the information contained in this Form, upon the reasonable request of Grace or Grace's representative, with a copy to the claiming party, disclose any and all records to Grace or to Grace's representative.

SIGNATURE OF CLAIMANT          0 1 - 2 9 - 2 0 0 8
                               Month   Day   Year

*The penalty for presenting a fraudulent claim is a fine up to $500,000.00 or imprisonment up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

9276110                                              1025314

Copyright © 2002 NCS Pearson, Inc.  All rights reserved.

## PART 4:  ASBESTOS LITIGATION AND CLAIMS

### A.  INTRODUCTION

1. Has any asbestos-related property damage lawsuit or claim been filed against Grace on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No
   ☐ Yes – lawsuit
   ☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

2. Has any asbestos-related property damage lawsuit or claim been filed against any other party on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No
   ☐ Yes   lawsuit
   ☐ Yes   non-lawsuit claim (other than a workers' compensation claim)

   *If an asbestos-related property damage lawsuit has been filed by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section B. below.*

   *If an asbestos-related property damage non-lawsuit claim has been made by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section C. on the following page.*

### B.  LAWSUITS

1. Please provide the following information about each asbestos-related property damage lawsuit which has been filed relating to the property for which you are making this claim or attach a copy of the face page of each complaint filed.

   a. Caption

   b. Court where suit **originally filed**:     County/State    Docket No.:

   c. Date filed:  Month – Day – Year

   a. Caption

   b. Court where suit **originally filed**:     County/State    Docket No.:

   c. Date filed:  Month – Day – Year

   a. Caption

   b. Court where suit **originally filed**:     County/State    Docket No.:

   c. Date filed:  Month – Day – Year

   (Attach additional pages if necessary.)

1025314

## SUMMARY OF MADISON COMPLEX, INC.'S AMENDED PROOF OF CLAIM

### I.    ORIGINAL PROOF OF CLAIM

On March 25, 2003 Madison Complex, Inc. ("**Madison**") submitted a Proof of Claim Form together with an attached Summary Of Madison Complex, Inc.'s Claim ("**Summary**") to W.R. Grace & Co.'s ("**Grace**") duly appointed agent for service of proofs of claim at Faribault Town Square, 201 South Lyndale, Faribault, Minnesota 55021. Attached and marked as Exhibit 1 is a true and correct copy of the correspondence from Madison's former legal counsel to Kathy Davis dated March 25, 2003, together with a copy of the Proof of Claim Form and Summary. Grace's claim agent acknowledged receipt of the documents on April 6, 2003 and notified Madison that is claim was assigned number 6079 ("**Proof of Claim**"). Attached and marked as Exhibit 2 is correspondence from Michelle Dalsin to Patricia Burke dated April 6, 2003 (month is incorrectly stated as March).

The Proof of Claim as originally filed stemmed from certain asbestos contamination discovered at Madison's real property located at 1720 Madison Street, NE, Minneapolis, Minnesota (the "**Property**"). As outlined in the Summary, according to the U.S. Environmental Protection Agency ("**EPA**") Cost Recovery Team, total site costs incurred by the EPA through June 30, 2002 were approximately $3,424,123.77. Despite the fact that none of the asbestos contamination at the Property resulted from Madison's conduct, the EPA had threatened to attach a lien to the Property for some or all of this amount. Additionally, the City of Minneapolis and the State of Minnesota had demanded approximately $35,000.00 for cleanup and investigation costs associated with the asbestos contamination. Based on this exposure, Madison filed a contingent claim in the amount of $3,424,123.77 and a liquidated claim in the amount of $35,000.00.

## II.    IMPACT OF ASBESTOS CONTAMINATION ON COMMERCIAL TENANTS

As outlined in the Summary, the EPA notified Madison on June 16, 2000 that it believed

a hazardous substance was present at the Property, and that the threat of release of the hazardous

substance into the environment presented an imminent and substantial endangerment to the

public health and welfare. At the time of this notification, Madison was using the Property as a

multi-tenant commercial building.

Subsequent investigations conducted by the EPA and Minnesota regulatory agencies

confirmed the presence of dangerously high levels of asbestos contamination at the Property.

This discovery had a predictably disastrous financial impact on Madison since its sole source of

income from the Property stemmed from rents collected from commercial tenants. As a direct

result of the asbestos contamination, Madison lost rents from the following tenants who vacated

the Property prior to the expiration of their leases:

| | | |
|---|---|---|
| (1) | Matthew Carlson: | $750.00 |
| (2) | Dora Harris: | $3,055.72 |
| (3) | Panel Specialties, Inc.: | $157,926.62 |
| (4) | Serenity Concepts, Inc: | $6,997.16 |
| **TOTAL:** | | **$168,729.50** |

## III.    SALE OF PROPERTY

Based on its inability to retain commercial tenants at the Property given the asbestos

contamination, Madison decided to sell the Property. On October 27, 2006, Madison sold the

Property to Kremer and Young, LLC and Tod J. Lane (collectively referred to as the "**Buyer**")

for $980,000.00. Attached and marked as Exhibit 3 is a true and correct copy of the Settlement

Statement. The asbestos contamination had a tremendous negative effect on the final sales price.

2

Although the Property had a fair market value of approximately $1.5 million at the time Madison

decided to list if for sale, Madison was forced to drop the initial asking price to $1.2 million due

to the pollution. When no interested purchasers came forward at the $1.2 million asking price,

Madison was left with no option but to sell the Property at the significantly reduced $980,000.00

purchase price.

In addition to the reduced purchase price, Madison sustained additional damages flowing

from the asbestos contamination when it was required at closing to deposit $50,000.00 in escrow

to cover costs related to, in part (a) the abatement and removal from the Property of the existing

asbestos-containing material and any other hazardous wastes or contamination identified in the

Phase II investigation for the Property performed on behalf of Buyer and (b) the costs of such

Phase II investigation and any fees paid by Buyer to expedite the processing of such Phase II

investigation and any fees paid by Buyer to expedite the processing of such Phase II

investigation, provided that Buyer's reimbursement for the Phase II investigation fees would not

exceed $5,000.00. Attached and marked as Exhibit 4 is a true and correct copy of the Escrow

Agreement.

## IV.    ATTORNEY'S FEES AND COSTS INCURRED BY MADISON

From the time that the EPA discovered asbestos contamination at the Property to the date

Madison sold the Property to Buyer, Madison incurred significant attorney's fees and costs

related to its efforts to address and remediate the daunting pollution, including fees and costs

associated with recovery in the bankruptcy case. To date, Madison has incurred attorney's fees

and costs as follows:

(1)    Brian Weisberg:    $7,971.72

(2)    Rider Bennett:    $30,166.80

3

|          |             |             |
|----------|-------------|-------------|
| (3)      | LOSGS:      | $2,504.58   |
| **TOTAL:** |           | **$40,643.10** |

## V.    RELEASE FROM ASBESTOS CONTAMINATION LIABILITY

Subsequent to the filing of its original proof of claim, Madison was advised that it no longer had legal exposure for clean-up costs associated with the Property as outlined in the Proof of Claim. Based on this acknowledgment, Madison has opted to amend its Proof of Claim as reflected herein.

## VI.    CLAIM AMOUNT

Madison hereby amends its Proof of Claim in the original contingent amount of $3,425,123.77 and liquidated amount of $35,000, to a general unsecured amount of $779,372.60. This general unsecured amount is broken down as follows:

|       |                                  |              |
|-------|----------------------------------|--------------|
| (1)   | Lost Rents:                      | $168,729.50  |
| (2)   | Escrow Deposit:                  | $50,000.00   |
| (3)   | Diminution in Value of Property: | $520,000.00  |
| (4)   | Attorney's Fees:                 | $40,643.10   |
| **TOTAL:** |                             | **$779,372.60** |

372413

4



**RIDER BENNETT**
**EGAN & ARUNDEL**

Attorneys at Law
A Limited Liability Partnership

333 South Seventh Street
Suite 2000
Minneapolis, MN 55402

Telephone · 612 · 340 · 7951
Fax · 612 · 340 · 7900
www.riderlaw.com

Raphael T. Wallander
(612) 335-3882
rtwallander@riderlaw.com

March 25, 2003

**VIA FEDERAL EXPRESS**
Ms. Kathy Davis
W. R. Grace & Co.
Faribault Town Square
201 South Lyndale
Faribault, MN 55021

   Re: Madison Complex, Inc./W. R. Grace & Co.
     Our File No.: 15065/104

Dear Ms. Davis:

   Enclosed please find and served upon you the Proof of Claim form of Madison Complex, Inc. Pursuant to our telephone conversation, you advised me that sending the Proof of Claim to the street address above via Federal Express was an acceptable and permitted alternative to submitting Proof of Claims to the P. O. Box address listed on the face of the Proof of Claim form. In reliance upon your representations, we have delivered this form to you via Federal Express.

   If you have any questions or concerns, please do not hesitate to contact the undersigned regarding this matter.

       Very truly yours,

       RIDER, BENNETT, EGAN & ARUNDEL, LLP

       By _____
         Raphael T. Wallander

RTW/rm
Enc.
oc: Joseph G. Sedarski, Esq.
  Patricia A. Burke, Esq.

968244-1

**EXHIBIT**
1

# W.R. GRACE & CO.
# ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM

*The United States Bankruptcy Court for the District of Delaware*
*In re: W.R. Grace & Co., et al., Debtors, Case No. 01-01139 (JKF)*
*(Jointly Administered)*

## SUBMIT COMPLETED CLAIMS TO:

**Claims Processing Agent**
**Re: W.R. Grace & Co. Bankruptcy**
**PO Box 1620**
**Faribault, MN 55021-1620**

For a complete list of the Debtors in this case, please see "The Debtors" section of the *General Instructions for Completing Proof of Claim Forms*. The Debtors in this case are collectively referred to in this document as "Grace".

If you have a current claim against Grace for property damage allegedly resulting from asbestos from a Grace product *(other than Zonolite Attic Insulation)*, THIS ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM MUST BE <u>RECEIVED</u> ON OR BEFORE 4:00 P.M. EASTERN TIME ON MARCH 31, 2003, or you will be forever barred from asserting or receiving payment for your claim.

PremierView™ forms by NCS Pearson  MW239276-2   65432   Printed in U S A

# PART 1: CLAIMING PARTY INFORMATION

**NAME:**

| M | a | d | i | s | o | n |   | C | o | m | p | l | e | x | , |   | I | n | c | . |   |   |   |   |   |   |   |   |   |   |   |   |

*Name of individual claimant (first, middle and last name) or business claimant*

**SOCIAL SECURITY NUMBER (Individual Claimants):**

|   |   |   |   |

*(last four digits of SSN)*

**F.E.I.N. (Business Claimants)**

| 0 | 6 | - | 1 | 2 | 7 | 5 | 6 | 6 | 1 |

**Other names by which claiming party has been known (such as maiden name or married name):**

| First | MI | Last |

| First | MI | Last |

**GENDER:** ☐ MALE   ☐ FEMALE

**Mailing Address:**

| 1 | 7 | 2 | 0 |   | N | . | E | . |   | M | a | d | i | s | o | n |   | S | t | r | e | e | t |

*Street Address*

| M | i | n | n | e | a | p | o | l | i | s | , |

*City*

**State (Province):** | M | N |

**Zip Code (Postal Code):** | 5 | 5 | 4 | 1 | 3 |

| U | . | S | . | A | . |

*Country*

# PART 2: ATTORNEY INFORMATION

**The claiming party's attorney, if any (You do not need an attorney to file this form):**

**Law Firm Name:**

| R | i | d | e | r | , |   | B | e | n | n | e | t | t | , |   | E | g | a | n | &amp; | A | r | u | n | d | e | l | , |   | L | L | P |

**Name of Attorney:**

| P | a | t | r | i | c | i | a |

*First*

| A |

*MI*

| B | u | r | k | e |

*Last*

**Mailing Address:**

| 3 | 3 | 3 |   | S | o | . |   | S | e | v | e | n | t | h |   | S | t | r | e | e | t | , |   | S | u | i | t | e |   | 2 | 0 | 0 | 0 |

*Street Address*

| M | i | n | n | e | a | p | o | l | i | s |

*City*

**State (Province):** | M | N |

**Zip Code (Postal Code):** | 5 | 5 | 4 | 0 | 2 |

**Telephone:**

( | 6 | 1 | 2 | ) | 3 | 4 | 0 | - | 7 | 9 | 3 | 3 |

*Area Code*

9276101

1018065

## A: Real Property For Which A Claim Is Being Asserted (continued)

If yes, please specify the dates and description of such renovations.

| Year | Description |
|------|-------------|
|      |             |

| Year | Description |
|------|-------------|
|      |             |

| Year | Description |
|------|-------------|
|      |             |

11. To the best of your knowledge, have any other interior renovations been completed on the property during any other period of time which affected any asbestos on the property?

☐ Yes    ☒ No

If yes, please specify the dates and descriptions of such renovations.

| Year | Description |
|------|-------------|
|      |             |

| Year | Description |
|------|-------------|
|      |             |

| Year | Description |
|------|-------------|
|      |             |

## B. Claim Category

12. For which category are you making a claim on the property?

☐ Category 1:  Allegation with respect to asbestos from a Grace product in the property

☒ Category 2:  Allegation with respect to one of Grace's vermiculite mining, milling or processing operations

---
• If you checked Category 1 in question 12, complete section C.
• If you checked Category 2 in question 12, complete section D.

---

## C. Category 1 Claim:  Allegation With Respect To Asbestos From A Grace Product In The Property

13. For what alleged asbestos-containing product(s) are you making a claim?

☐ Monokote-3 fireproofing insulation

☐ Other    Specify:

(For a list of the brand names under which Grace manufactured products that may have contained commercially added asbestos, see Exhibit 2 to the Claims Bar Date Notice provided with this Proof of Claim Form.)

14. When did you or someone on your behalf install the asbestos containing product(s) in the property?

| Year |   |
|------|---|

☐ I did not install the product(s)

15. If you or someone on your behalf did not install the asbestos containing product(s), to the best of your knowledge, when was/were the product(s) installed?

| Year |   |
|------|---|

☐ Don't know.

9276103                                    1018065

25. If you responded Yes to question 22. or 24. and you have not supplied documents, please specify the dates and descriptions of any such efforts.

| | | | | | Description | |
|---|---|---|---|---|---|---|
Year

| | | | | | Description | |
Year

| | | | | | Description | |
Year

26. Have you or anyone on your behalf ever conducted any testing or sampling for the presence of asbestos or other particulates in the property?

&#9723; Yes          &#9723; No          **If Yes, Attach All Documents Related To Any Testing Of The Property.**

27. If you responded Yes to question 26., but you have not provided documents, indicate who may have possession or control of such testing documents or where such documents may be located.

28. If you or someone on your behalf did not conduct any testing or sampling for the presence of asbestos or other particulates on the property, to the best of your knowledge, did anyone else conduct such testing or sampling with respect to the property?

&#9723; Yes          &#9723; No

29. If you responded Yes to question 26. or 28. and you have not supplied related documents, please describe when and by whom and the type of testing and/or sampling (e.g. air, bulk and dust sampling).

| | | | | Company/Individual | |
|---|---|---|---|---|---|
Year | | | | | Type of testing: |

| | | | | Company/Individual | |
Year | | | | | Type of testing: |

| | | | | Company/Individual | |
Year | | | | | Type of testing: |

30. Has the Grace product or products for which you are making this claim ever been modified and/or disturbed?

&#9723; Yes          &#9723; No

31. If yes, specify when and in what manner the Grace product or products was modified and/or disturbed?

| | | | | Description | |
Year

| | | | | Description | |
Year

| | | | | Description | |
Year

9 2 7 6 I 0 5          1018065

36. How did you first learn of the presence of asbestos on your property?

> Excavation of dirt and reports from the Minnesota Pollution Control
> Agency.

Attach all documents relating or referring to the presence of asbestos on the property. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

37. If you do not have any documents relating or referring to the presence of asbestos on the property, explain why not and indicate who may have possession or control of any such documents with respect to the property.

38. Have you or anyone on your behalf made an effort to remove, contain and/or abate the asbestos on your property?

☒ Yes    ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

39. If you do not have any documents relating or referring to the removal, containment and/or abatement of the asbestos on your property, explain why not and indicate who may have possession and control of such documents with respect to the property.

40. If you or someone on your behalf did not make an effort to remove, contain and/or abate the asbestos on your property, to the best of your knowledge, did anyone else make such an effort?

☒ Yes    ☐ No

1018065

# PART 4: ASBESTOS LITIGATION AND CLAIMS

## A. INTRODUCTION

1. Has any asbestos-related property damage lawsuit or claim been filed against Grace on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No

   ☐ Yes – lawsuit

   ☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

2. Has any asbestos-related property damage lawsuit or claim been filed against any other party on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No

   ☐ Yes – lawsuit

   ☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

   *If an asbestos-related property damage lawsuit has been filed by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section B. below.*

   *If an asbestos-related property damage non-lawsuit claim has been made by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section C. on the following page.*

## B. LAWSUITS

1. Please provide the following information about each asbestos-related property damage lawsuit which has been filed relating to the property for which you are making this claim or attach a copy of the face page of each complaint filed.

   a. Caption ☐

   b. Court where suit originally filed: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐    Docket No.: ☐ ☐ ☐ ☐ ☐ ☐
      *County/State*

   c. Date filed: ☐ – ☐ – ☐
      *Month   Day   Year*

   a. Caption ☐

   b. Court where suit originally filed: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐    Docket No.: ☐ ☐ ☐ ☐ ☐ ☐
      *County/State*

   c. Date filed: ☐ – ☐ – ☐
      *Month   Day   Year*

   a. Caption ☐

   b. Court where suit originally filed: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐    Docket No.: ☐ ☐ ☐ ☐ ☐ ☐
      *County/State*

   c. Date filed: ☐ – ☐ – ☐
      *Month   Day   Year*

   (Attach additional pages if necessary.)

9276109                                        1018065

# SUMMARY OF MADISON COMPLEX, INC.'S CLAIM

## INTRODUCTION

This document provides a summary of information concerning the origin and presence of asbestos at the Madison Complex, Inc. site located at 1720 Madison Street, NE, Minneapolis, MN (the "Property) and Madison Complex, Inc.'s claim against W.R. Grace & Company relating thereto. Included is a limited summary of Hennepin County, Minnesota, property tax and title information concerning the Property, a brief background describes origination of asbestos at the Property, and a description of regulatory involvement and cleanup activities conducted at the Property.

### A.    Hennepin County Property Tax Records

The Property is listed in the Hennepin County Property Tax (HCPT) records as Industrial, Non-Homestead property located within the Cobbs Addition to St. Anthony with Property ID #11-029-24-43-0135. The HCPT records also indicate the Property was first developed in 1902. There was no sale information available in HCPT records concerning the Property.

### B.    Hennepin County Registrar of Titles (Torrens) Records

#### 1.    Certificate of Title #830250 (October 30, 1995)

The Hennepin County Registrar of Titles (Torrens) Office records indicate that Madison Complex, Inc., a Minnesota corporation, is the fee simple owner of the Property. The Certificate of Title indicating this is Certificate No. #830250, which is transferred from Certificate No. 738895. The date the Registrar of Titles sealed this Certificate of Title is October 30, 1995.

#### 2.    Certificate of Title #738895 (October 24, 1989)

The Hennepin County Registrar of Titles (Torrens) Office records indicate that Madison Complex, Inc., a Minnesota corporation, is the fee simple owner of the Property. The Certificate of Title indicating this is Certificate No. #738895, which is transferred from Certificate Nos. 183620 and 233307. The date the Registrar of Titles sealed this Certificate of Title is October 24, 1989.

#### 3.    Certificate of Title #183620 (April 24, 1952)

The Hennepin County Registrar of Titles (Torrens) Office records indicate that Western Mineral Products Company, a Nebraska corporation duly licensed to do business in Minnesota, is the fee simple owner of the Property. The Certificate of Title indicating this is Certificate No. #183620, which is the first Certificate of Title by order of the District Court Fourth Judicial District, Hennepin County, Minnesota (dated April 22, 1952). The date the Registrar of Titles sealed this Certificate of Title is April 24, 1952.

A Certificate of Merger, registered on January 5, 1967, merging Western Mineral Products Company (a Minnesota corporation) and Western Products Company (a Nebraska

965698-1

corporation) into Western Mineral Products Company (a Minnesota corporation). On January 25, 1967, a Certificate of Merger was registered merging Western Mineral Products Company into W.R. Grace & Company (a Connecticut corporation).

4.    Certificate of Title #233307 (May 11, 1955)

The Hennepin County Registrar of Titles (Torrens) Office records indicate that Western Mineral Products Company, a Nebraska corporation, is the fee simple owner of the Property. The Certificate of Title indicating this is Certificate No. #233307, which is the first Certificate of Title by order of the District Court Fourth Judicial District, Hennepin County, Minnesota (dated May 10, 1955). The date the Registrar of Titles sealed this Certificate of Title is May 11, 1955.

C.    Background

1.    The "Libby Mine", Libby, Montana (1919-1990)

According to various press releases, vermiculite ore that was commingled with asbestos (tremolite) was mined at the Zonolite Mountain (a.k.a. the "Libby Mine") located in Libby, Montana, as early as 1919. Asbestos, which can cause or contributes to causing a variety of lung ailments, is a generic term used to describe a number of fibrous minerals including actinolite, amosite, anthophyllite, chrysotile, crocidolite and tremolite. Tremolite is a rare form of asbestos.

The vermiculite ore was initially mined by the Zonolite Corporation. In 1963, Zonolite Corporation sold the mine to W.R. Grace & Company, which owned and operated the mine until 1990. In 1990 the mine was closed. W.R. Grace & Company sold the mine and two processing plants to Kootenai Development Company and others.

Vermiculite ore taken from the Libby Mine was shipped to at least 60 processing plants in North America and Puerto Rico and to more than 200 facilities, including what is now called the Madison Complex site. The vermiculite ore was used in agricultural, construction, horticultural, and industrial applications, including insulation products. The U.S. Environmental Protection Agency (EPA) estimated that insulation produced from the Libby ore has been placed in 900,000 to 15,000,000 homes nationwide.

2.    Press Releases and Early W.R. Grace & Company and EPA Studies

On February 1, 2000, Environmental News Service (ENS) published an article concerning a class action lawsuit filed against W.R. Grace & Company for alleged unsafe mining operations in Libby, Montana (ENS February 1, 2000 publication titled *Asbestos Tainted Ore Affected Thousands, Suit Charges*"). The article referenced news of November 1999 of at least 192 people dying in Libby, Montana over the past 40 years from asbestos related illnesses linked to the Libby Mine. The article indicated that, according to court documents, company memos, and government papers, federal regulators and W.R. Grace & Company officials were aware of the danger presented by the ore, but took no action to inform and protect the public.



Summary of Asbestos Issues/Madison Complex, Inc. Property
March 19, 2003
Page 3 of 13

A follow-up ENS article published on February 15, 2000, indicated that concerns over the health affects of asbestos contaminated vermiculite products date back to the 1970s (ENS February 15, 2000 publication titled *"Vermiculite Products Could Expose Consumers to Asbestos"*). In a 1991 report, the EPA stated that 188,000 people had been exposed to asbestos contaminated attic insulation, 32 million to garden fertilizer and 74 million to other vermiculite lawn products. The EPA did not draw conclusions regarding the health risks of the exposures, but recommended further studies. According to the article, the studies were never funded.

The article also indicated that in 1981, the EPA concluded that consumers using Zonolite attic insulation "may be particularly vulnerable and unprotected due to ignorance of the potential hazard", but the EPA did not release a public warning about the product until that month (*e.g.* February, 2000). It stated that although the EPA warned W.R. Grace & Company that it might need to add a label to the insulation product warning of the asbestos content, W. R. Grace & Company also did not inform consumers of the possible risk.

On June 1, 2000, the ENS reported that the U.S. EPA knew that asbestos fibers were killing people in Libby, Montana for 15 years before taking action (see ENS June 1, 2000 publication titled *"EPA Knew About Asbestos in Libby for Years"*). An EPA toxicologist, Christopher Weis, was quoted as saying that the dangers of the toxic fibers that contaminate a vermiculite mine in Libby (Montana) were documented in Washington, D.C., but that the national agency (e.g. EPA) never notified its regional offices.

In the mid-1980's, the EPA conducted a study in the W.R. Grace & Company Libby Mine which showed death projections of "almost 100%" for miners there. The study indicated that asbestos could kill almost everyone working in the mine. As early as 1981, EPA tests indicated asbestos levels in the town of Libby (five miles from the mine) were five times the current federal safe levels.

On July 24, 2000, the ENS reported that the EPA admitted that its officials ignored evidence of asbestos contamination in Libby, Montana, and that the EPA began a formal investigation into possible internal mismanagement (see ENS July 24, 2000 publication titled *"EPA Admits Faults, Starts Investigation of Asbestos in Libby"*). The article indicated that the EPA admitted that its officials filed a 1982 EPA report of a study that found significant amounts of tremolite asbestos fibers in vermiculite ore from a mine owned by W.R. Grace & Company outside Libby, Montana; that EPA halted its plans for further studies; and that EPA relied on company (*i.e.*, W.R. Grace & Company) figures showing much lower levels of asbestos contamination at the Libby Mine. The EPA inspector general indicated that the internal EPA investigation would begin that day, based on the 1982 report, records of a 1983 Congressional hearing in which an EPA official downplayed the report's findings, and other materials.

The EPA prepared a toxicology memorandum (September 6, 2000). The subject of the memorandum addressed the rationale for determining that an imminent and substantial endangerment existed to public health at the former Western Mineral Products Factory in Minneapolis, MN. Based on use of the Property, origination of the vermiculite ore that was processed there, exposure pathways, and a risk assessment, the author concluded that the

3                              

˙

˙ ɪ

Summary of Asbestos Issues/Madison Complex, Inc. Property
March 19, 2003
Page 4 of 13

Property posed an imminent and substantial endangerment to public health. The Ph.D./toxicologist who wrote this memorandum recommended appropriate actions be taken to reduce or eliminate exposure to the asbestos mineral fibers at the Property.

The memorandum cites various studies concerning vermiculite tainted with asbestos minerals. One citation was a letter concerning tremolite asbestos that references W.R. Grace & Company (dated May 12, 1983). The letter was from H.A. Eschenbach to Allan Harvey, both of whom presumably worked for W. R. Grace & Company. Two other EPA reports concerned asbestos-contaminated vermiculite (dated June 1980 and February 1985).

### D.    Ownership and Land Use of the Madison Complex, Inc. Property

#### 1.    Northwestern Casket Company (circa 1889 – 1944)

In or around 1889-90, the Northwestern Casket Company used the Property for storing wood for constructing caskets and hearses in a manufacturing facility located adjacent to the Property, according to Sanborn Map information. A portion of the Property was also occupied by a residential dwelling, a wagon shed, wood and lumber piles, and a railroad spur.

Hennepin County property tax information indicates that construction at the Property was first initiated in 1902. In 1912, the Sanborn Map indicates a three-story building on the Property that was used as a hearse factory. It appears that the hearse factory was operated in conjunction with the Northwestern Casket Company. The Property also contained a portion of northeast Madison Street and a railroad spur.

#### 2.    Western Mineral Products Company (circa 1944 - 1967)

Between approximately 1944 and 1989 the Property was used by several insulation manufacturers. The City Directory for 1944 indicates that Western Mineral Products Company ("WMPC") occupied the three-story building and used it to manufacture insulation products.

The Hennepin County title records indicate that WMPC, a Nebraska corporation, owned the Property in fee simple in April 1952. Two silos were constructed at the Property in or sometime prior to 1952, according to historic aerial photographs and the 1952 Sanborn Map. The 1956 City Directory indicates the Property continued to be used by WMPC for manufacturing insulation. In 1964, the existing two-story building at the Property appeared in an historic aerial photograph.

#### 3    W.R. Grace & Company (circa 1967 - 1989)

On January 5, 1967, WMPC, a Nebraska corporation, and Western Mineral Products Company, a Minnesota corporation, merged into Western Mineral Products Company, a Minnesota corporation. Then, on January 25, 1967, Western Mineral Products Company, a Minnesota corporation, merged into W.R. Grace & Company, a Connecticut corporation.

965698-1                                         4                         

The 1966-67, 1975, and 1981-82 City Directories indicates that Zonolite Division Grace & Company operated at the Property and manufactured insulating materials. The 1988-89 City Directory indicates Construction Products (a Division of W.R. Grace & Company) manufactured insulating materials at the Property.

W.R. Grace & Company processed the Libby Mine vermiculite ore at the exfoliating plant at the Property from 1967 to 1989. EPA documents state that the waste ore produced at the Property contained residual vermiculite and asbestos that was stored in piles outside the facility, and that it was used to backfill the driveway and parking areas (see *Western Mineral Industrial Site, Minneapolis, Hennepin County, Minnesota, Emergency Response Letter Report TDD:S05-0108-009*, prepared by Westons Solutions, Inc. for EPA and dated October 1, 2002).

### 4. Pre-1989 Madison Complex, Inc. Purchase of Property (May-June 1989)

In May 1989, while W.R. Grace was dismantling and removing equipment from the former plant at the Property in anticipation of selling the Property, a temporary worker at the Property filed a complaint with the Minnesota Department of Health (MDH). The temporary worker was assisting G&P Industries ("GPI"), the company that W.R. Grace engaged to perform the equipment dismantling and removal work at the closed facility at the Property. The concern covered by MDH's inspection was employee exposure to asbestos fibers.

The MDH conducted an industrial hygiene investigation of the work being conducted by GPI at the Property on May 22, 1989, and prepared a letter report of their findings, dated June 2, 1989 (Report No. 021-9811). In their report, the MDH stated the following:

> "*The plant produced vermiculite (from MICA-based minerals) and Perlite (from quartz-based minerals). The process consists of heating the minerals until the water contained in the molecular structure escapes, causing the mineral to expand greatly into a porous, lightweight, fluffy, bulky material. Vermiculite is known to contain a small amount of tremolite. Tremolite can be asbestiform or non-asbestiform. The asbestiform concentration of tremolite is typically less than 0.1%, so that vermiculite is not ordinarily considered to be an asbestos-containing material (ACM).*"

The MDH observed no exposed surfaces of friable ACM. They observed two pipes on the first floor which they thought might be insulated with asbestos material. The pipe surfaces were well covered with fabric and no exposed surfaces were observed. Since the pipes were not being removed as part of the equipment dismantling and removal work, no samples were collected from the pipes. The MDH also observed a 3' by 4' panel of transite board on the second floor near the former boiler location (the boiler had already been removed).

The MDH collected three bulk samples from within the facility at the Property. One sample was of a transite board; the second was of debris found on the second floor "Monokote" area; and, the third was of debris found on the first floor storage area. The laboratory result for the transite board sample indicated 25% chrysotile asbestos, but the MDH did not consider this material to be friable.



The laboratory result for the debris found on the second floor contained less than 0.1% asbestos. The laboratory result for the debris found on the first floor contained about 1% of richerite asbestos, which the MDH indicated was not of a regulated type of asbestos.

The MDH concluded that the work being done did not involve the removal of asbestos and that Minnesota Occupational Health Regulations had not been violated. Subsequent to the MDH's inspection and completion of the equipment dismantling and removal work, W.R. Grace & Company conducted a second evaluation to document the effectiveness of plant clean-up procedures after plant wash down was completed. W.R. Grace & Company engaged CPD Environmental Health Group to collect air samples at various locations within the former plant.

Four air samples were collected from inside the closed plant and one air sample was collected at an ambient, outside location near the plant. The four indoor sample results ranged from 0.0004 to 0.0091 f/cc. W.R. Grace & Company indicated that all air sample results were below the applicable OSHA limits (regulated by 29 CFR 1910.1001), including the 0.1 f/cc 8-hour time weighted average (TWA) Action Level and the 0.2 f/cc 8-hour TWA Permissible Exposure Limit (PEL).

W. R. Grace & Company gave Doug O'Brien, on behalf of Madison Complex, a copy of the MDA inspection report and the W. R. Grace & Company air sampling results on July 26, 1989. The purpose for giving the report to Mr. O'Brien was to demonstrate that asbestos was not a problem at the Property. This was prior to the Property purchase, which occurred in October, 1989.

5.    Madison Complex, Inc. (October 1989 - 1995)

In October 1989, Madison Complex, Inc. ("Madison Complex"), a Minnesota corporation, purchased the Property from W.R. Grace & Company and became fee simple owner, according to property title records. According to Doug O'Brien (an original shareholder of Madison Complex) and Lee Larweck, current owner of Madison Complex, Madison Complex was incorporated as a Minnesota S corporation in 1989. It originally consisted of three individuals who each had equal interest in the corporation. The individuals were Doug O'Brien, Stephan Litwinczuk, and Lynn Wandell.

Mr. O'Brien indicated that Madison Complex was formed to be the business entity which would purchase and hold the former W.R. Grace & Company Property. During the summer of 1989 Mr. O'Brien represented the Property transaction interests of Madison Complex prior to the formation of Madison Complex, Inc. Mr. O'Brien dealt with representatives of W.R. Grace & Company concerning Property transaction issues.

Prior to purchasing the Property, Mr. O'Brien expressed concern to W.R. Grace & Company over equipment, debris, and dust left inside the former plant from past W.R. Grace & Company operations at the Property. W.R. Grace & Company sent Mr. O'Brien a copy of the June 2, 1989 MDH letter report and the results of air sampling that W.R. Grace had also conducted, in a letter dated July 26, 1989. The results of these investigations are discussed above.

6

ì

In 1991, Lee Larweck bought out a 1/3 interest in Madison Complex, Inc. from Mr. Litwinczuk. Also in 1991, Mr. Mark Lewandowski bought out a 1/3 interest in Madison Complex from Lynn Wandell. In 1998, Mr. Larweck bought out the 1/3 interests of Mr. Lewandowski and Mr. O'Brien and became the sole owner of Madison Complex.

Madison Complex, Panel Specialties, Inc. ("Panel Specialties"), and other tenants of Madison Complex at the Property, did not continue former W.R. Grace & Company insulating manufacturing operations, or use the Property to manufacture other insulating materials. Madison Complex developed the Property into a multi-tenant commercial building.

In September 1989, Panel Specialties had a Phase One Preacquisition Site Assessment ("Phase One PSA") performed on the Property (*Phase I Preacquisition Site Assessment for Panel Specialties, Inc.*, report dated September 6, 1989 prepared by Twin City Testing Corporation ("TCT")). According to Mr. O'Brien, Madison Complex had not been formed yet, so Panel Specialties, a business in which Mr. O'Brien was and is a member, had the Phase One PSA conducted. The Phase One PSA was conducted to "explore the potential for environmental liabilities associated with soil and groundwater contamination by researching the past and present land use at, and near, the site".

The Phase One PSA indicated that the Property contained three buildings; a three-story brick facility, a two-story masonry block facility, and a small unattached paint and body shop. It did not indicate whether any of the buildings were occupied at the time of the site visit.

TCT concluded that the past and present usage of the site did not indicate a potential for soil/groundwater liability. TCT stated it based its opinion on a review of the historical and regulatory information, data on file at TCT and site reconnaissance, and that it assumed the former hearse factory at the site was an assembly shop and not a foundry. TCT stated its opinion that no additional environmental assessment was necessary for on-site activities regarding soil/groundwater issues.

TCT also indicated that it did not conduct subsurface work (including sampling and chemical analyses of soil and groundwater) or sampling or analyses of suspect asbestos-containing material within the building. TCT specifically stated they did not review the site for asbestos. Finally, TCT indicated that a potential for soil/groundwater contamination from off-site activities exists.

On November 30, 1989, a tank affidavit was registered on the Property, according to property title records. The tank affidavit indicated an underground storage tank (UST). This information is confirmed in the December 1998 Phase One Environmental Site Assessment report (see below).

6.    Madison Complex, Inc. II (1998 - Present)

As previously stated, in 1998 Mr. Lee Larweck, a 1/3-interest shareholder of Madison Complex, bought out the other shareholders and became the sole owner of Madison Complex, Inc. As such, Mr. Larweck became the sole owner of the Property.

7

On December 24, 1998, Mr. O'Brien authorized Maxim Technologies, Inc. ("Maxim") to conduct a Phase I Environmental Site Assessment ("Phase I ESA") for the Property. This Phase I ESA was likely conducted as part of lender requirements in Mr. Larweck's buy out of the other shares of Madison Complex. As of December 1998, Madison Complex leased portions of the buildings on the Property to Panel Specialties, a manufacturer of prison equipment, Kolstad Supply, Inc., a supplier of water-based finishes, an artist/painter, and an unknown tenant for storage.

The Phase I ESA report indicated that Maxim identified seven (7) recognized environmental conditions ("RECs") at the Property, based on its assessment performed in conformance with the scope and limitations of ASTM Practice 1527-97. Maxim did not observe apparent evidence of solid waste disposal (areas of fill, grading, piles, mounds, depressions, or partially buried debris) on the Property or in the vicinity during the site visit. Maxim did observe miscellaneous garbage strewn across the northern portion of the Property.

### E.    Regulatory Interaction Concerning the Property

#### 1.    Environmental Protection Agency, Minnesota Pollution Control Agency, and Minnesota Department of Health

In June 2000, the EPA, Minnesota Department of Health (MDH), and Minnesota Pollution Control Agency (MPCA) officials spoke to Logan Park neighborhood residents living near the Property about the presence of tremolite asbestos at elevated levels at the former W.R. Grace & Company site. Madison Complex was apparently conducting an earthwork project unaware of the hazards and City of Minneapolis environmental officials stopped them. Upon learning this, Madison Complex agreed to cover areas of the site with suspected unsafe levels of asbestos and restrict access to these areas. The residents were told that the former operator of the Property (Western Mineral Products/W.R. Grace & Company) gave free "stoner-rock" that contained asbestos to neighborhood residents in the past for use in household projects.

On June 16, 2000, EPA sent via certified mail a letter to Mr. Larweck, Madison Complex, Inc., confirming oral statements made by the EPA to Mr. Larweck on June 16, 2000. The EPA's oral statement effectively put Mr. Larweck on notice that the EPA believed a release, or threat of release of hazardous substance, into the environment from the Property presented an imminent and substantial endangerment to the public health and welfare or to the environment. The letter indicated that EPA considers Mr. Larweck a potentially responsible party (PRP) at the Property by virtue of his ownership interest in the Property.

The EPA indicated it would take actions to address the release, or threat of release, at the Property, which could include stabilizing asbestos containing materials at the Property, constructing and maintaining fencing to secure the Property, posting warning signs around the Property, covering asbestos containing soils to prevent airborne asbestos exposure, studying the extent of contamination at the Property, and performing on-site and off-site air sampling to determine airborne asbestos concentrations. The EPA invited Mr. Larweck to voluntarily take the actions described above, prior to EPA doing the work.

8



On July 5, 2000, the MPCA sent a Request for Information letter to Mr. Larweck asking for copies of any environmental studies or reports (referenced in earlier discussions between Madison Complex and the MPCA) regarding the Property at the time of purchase and in 1999, information regarding legal property descriptions, deeds and easements clarifying Madison Complex's ownership and control of the former right-of-way on the north side of the Property, and information regarding any renovations of the building or grounds undertaken by Madison Complex (pursuant to Minn. Stat. §116.07, subd.9, Minn. Stat. §116.091, subd.1, and Section 114 of the Clean Air Act, at 42 U.S.C. §7414).

The MPCA stated it needed this information to determine the origin of asbestos and to further investigate the extent of asbestos at the Property. The MPCA also indicated it had received from the EPA information on soil samples taken from the Property by the EPA which indicated the presence of a significant amount of tremolite and actinolite (asbestos) at the Property.

On July 28, 2000, Mr. Larweck, Madison Complex, and Arnold Gilbertson, owner of property located at 1801 NE Jefferson Street, applied to the MPCA-VIC program with the understanding that W.R. Grace & Company would do the same and would undertake the cleanup and removal action. W.R. Grace & Company was not on the MPCA-VIC program application, but it did take the lead role in investigation and cleanup of asbestos at the Property. In August 2000, W.R. Grace & Company, Electramatic, Inc., and Madison Complex entered into a confidential Joint Defense and Investigation Agreement.

On September 18, 2000, URS Corporation (URS), on behalf of W.R. Grace & Company, sent a revised (tentative) proposed work schedule for asbestos contamination investigation of the Property to the MPCA. This letter details the dates and type of work that URS would conduct at the Property. URS indicated that W.R. Grace & Company entered the MPCA Voluntary Investigation and Cleanup (VIC) program (date not given) and that the work would be performed in accordance with VIC program guidelines.

On October 20, 2000, a Phase I Investigation was completed by URS, on behalf of W.R. Grace & Company, for the Property. In November 2000, a Work Plan was submitted to MPCA-VIC staff. The MPCA-VIC staff approved the Work Plan on November 16, 2000. On December 15, 2000, a Remedial Investigation ("RI") report was submitted to the MPCA for the Property.

On March 21, 2001, MPCA-VIC staff provided comments to the Phase II ESA investigation report (with Phase I ESA Addendum) to W.R. Grace & Company. The Phase II ESA report was dated January 31, 2001. The MPCA indicated that, in addition to its review, the MDH also reviewed and commented on the report. Three outstanding issues concerning the Phase I ESA were discussed. They dealt with a material stored at the Property ("Sunpar 110"), the function of three tunnels in a 1954 addition to the facility, and the time span the waste rock stockpile was present at the Property.

The MPCA indicated there would be a meeting on April 2, 2001, to discuss additional Phase II investigation activities and response actions at the Property.



Summary of Asbestos Issues/Madison Complex, Inc. Property
March 19, 2003
Page 10 of 13

On June 22, 2001, the MPCA-VIC issued a Kickout Warning Letter to W.R. Grace & Company, Madison Complex, and Electromatic for the properties located at 1719 and 1720 Madison Street N.E., and 1801 and 1815 Jefferson Street N.E. in Minneapolis. The Kickout Warning Letter indicated that until recently investigation and cleanup of asbestos releases were proceeding under the MPCA-VIC program, with a W.R. Grace & Company taking the lead in implementing response actions.

On June 29, 2001, the MPCA-VIC staff issued a Site Transfer letter to the U. S. EPA Region V for the properties located at 1719 and 1720 Madison Street N.E., and 1801 and 1815 Jefferson Street N.E. in Minneapolis. This letter indicated that the MPCA was terminating work on the site under the VIC program, the MPCA was transferring this site to the EPA because response actions appeared to have ceased at the site.

On August 3, 2001, the EPA sent a letter to the PRPs, including W.R. Grace & Company, Madison Complex, and Electramatic, requesting assistance and giving notice of general liability for contamination at the Property. The letter indicates that the EPA was planning to spend public funds to investigate and control these releases, under CERCLA, unless it would be done by a responsible party or parties.

The EPA indicated the industrial portion of the site was referred to them to conduct a time-critical removal action at the site. The EPA indicated that it planned to do a number of steps at the site, including securing the site, stabilizing and investigating the nature and horizontal/vertical extent of asbestos at the site, excavate asbestos-containing material (ACM) and asbestos contaminated soil to a maximum depth of 18 inches but only until no asbestos was present, analyze air/soil samples for asbestos to determine if removal was complete, install synthetic liner at bottom of excavation prior to backfilling, handle and dispose of removed ACM material at an EPA-approved off-site disposal facility, perform personal air sampling and ambient air sampling during response actions, and implement engineering controls to manage dust and minimize air emissions during the cleanup.

On August 13, 2001, Bob Jaskowiak, of Rider Bennett, responded on behalf of Mr. Larweck, Madison Complex, to the EPA's August 3, 2001 letter. Mr. Jaskowiak indicated that he contacted Thomas Krueger, EPA Office of the General Counsel, on August 8, 2001, to discuss this issue. The letter indicated that Madison Complex would not be able to perform, finance, or reimburse the EPA for response actions that were or would be taken by the EPA at the site.

The response letter indicated that Madison Complex: (i) was a small real estate holding company (the Property being its only asset); (ii) has not agreed to assume responsibility for any part of the necessary remediation and cannot afford to do so; and, (iii) it was not responsible for historic operations at the site which resulted in asbestos or other hazardous substance contamination on the site and in the surrounding area.

The letter stated that Madison Complex had, however, executed an unrestricted access agreement with the EPA, that it would allow space on-site for EPA's staging requirements, and



that it would continue to take reasonable action to assist with on-going remediation of the site and not interfere with the EPA's work.

The letter indicated that Madison Complex is a party to a confidential Joint Defense and Investigation Agreement with Arnold Gilbertson (Electramatic property owner) and W.R. Grace & Company (former site owner and operator). Madison Complex indicated it would be willing to waive its right to confidentiality, but that it could not waive those rights held by W.R. Grace & Company or Mr. Gilbertson. The letter reemphasized that Madison Complex has never agreed to assume any liability or responsibility for the asbestos cleanup at the site.

      2.    Environmental Protection Agency Proposed Lien

The CERCLA Lien Filing Record ("LFR") contained seven (7) items as of January 9, 2003. Each of these items are briefly discussed below.

      *(a)    Action Memorandum dated August 21, 2001.*

Fredrick Micke, EPA On-Scene Coordinator, wrote this memorandum requesting approval to expend up to $1,344,675 to conduct a time-critical removal action at the site, involving removal of contaminated soil to mitigate immediate health threats associated with asbestos in soil at the site. Mr. William Muno, the EPA Superfund Division Director, approved this request on August 21, 2001.

      *(b)    Phase II Polrep #4 – Final dated May 8, 2002*

This is the EPA's Pollution Report ("Polrep") for the Western Mineral Products Industrial Site Cleanup (Site ID # B5P2). It gives a brief summary of the site background, site description, EPA response information, cost information, disposition of waste, and other information (*e.g.*, sample results).

The EPA began response action at the site on September 18, 2001 and ended on October 25, 2001.

The EPA listed costs through February, 2002, to be $615,997 (for ERRS crew) and $47,329 (for START crew). The cost ceiling for ERRS was listed as $1,000,000, and for START as $53,576.

      *(c)    Itemized Cost Summary Report dated July 3, 2002.*

The EPA Cost Recovery Team, Program Accounting and Analysis Section prepared this memorandum outlining all of the cumulative expenditures for the Western Mineral Products Site. The total site costs were $3,424,123.77 through June 30, 2002. As previously discussed, EPA costs through February, 2002, totaled $663,326.00. From February through June 2002, the EPA expended $2,760,797.70 at the site.

11



Summary of Asbestos Issues/Madison Complex, Inc. Property
March 19, 2003
Page 12 of 13

        *(d)    Notice of Intention to File Lien dated July 16, 2002*

     The EPA sent a notice of its intention to file a lien on the property at 1720 Madison Street NE and 1815 Jefferson Street NE to secure cleanup costs incurred by the EPA at these sites. The lien notice indicated the EPA believed Madison Complex is liable to the U.S. government under CERCLA for cleanup costs as owner and operator of the site property, and the property is subject to, or affected by, a removal and/or remedial action under CERCLA.

        *(e)    Madison Complex, Inc. Objection to Notice of Intention to File Lien dated August 16, 2002*

     On behalf of Madison Complex, Inc., Rider Bennett provided formal written objection to the proposed EPA lien on the Property. The objection was based on the belief that Madison Complex was entitled to liability defenses available under CERCLA § 107(b).

        *(f)    Madison Complex, Inc. Objection to Notice of Lien dated September 13, 2002*

     On behalf of Madison Complex, Inc., Rider Bennett provided additional information concerning liability defenses within 42 U.S.C.A. § 9607(b). The letter indicated ten items, which essentially indicated that Madison Complex is an "innocent landowner" concerning asbestos found in soil at the Property that was deposited by the previous operator and landowner of the Property.

        *(g)    EPA Region V Regional Judicial Officer Letter dated December 19, 2002*

     Regina Kossek, Regional Judicial Officer, EPA, notified Madison Complex that it had an opportunity to appear before a neutral U.S. EPA officer to present information as to why EPA does not have a reasonable basis to perfect a CERCLA lien, prior to perfection of the proposed lien. Ms. Kossek indicated she is the Regional Judicial Officer (the neutral EPA official) who will conduct this informal proceeding.

## CONCLUSION

     According to the EPA Cost Recovery Team, total site costs incurred by the EPA through June 30, 2002 are approximately $3,424,123.77. Despite the fact that none of the asbestos contamination at the Property resulted from the conduct of Madison Complex, the EPA has threatened to attach a lien to the Property for some or all of this amount. Upon information and belief, W.R. Grace & Company had paid all such costs prior to filing its Chapter 11 Bankruptcy Case, and all of the EPA's unpaid were incurred post-petition. To the extent that the EPA assesses a lien against Madison Complex, Madison Complex asserts a contingent claim for $3,425,123.77, or such lesser amount as may be assessed by the EPA in a lien against the Property. The City of Minneapolis and the State of Minnesota have demanded approximately payment of $35,000 for cleanup and investigation costs associated with the Property. As such, Madison Complex asserts an additional liquidated claim for $35,000.00.



Summary of Asbestos Issues/Madison Complex, Inc. Property
March 19, 2003
Page 13 of 13

13



**TABLE 1**

Documents Regarding Asbestos at Madison Complex, Inc. Property
1720 Madison Street N.E., Minneapolis, MN
March 24, 2003

| Item No. | Date | Type of Correspondence | Title of Correspondence |
|---|---|---|---|
| 1 | June 1980 | EPA Report concerning asbestos-contaminated vermiculite | EPA Report |
| 2 | May 12, 1983 | Letter concerning tremolite asbestos from H.A. Eschenbach to Allan Harvey, both of W.R. Grace & Co. | W.R. Grace & Company Letter |
| 3 | February, 1985 | EPA Report concerning asbestos-contaminated vermiculite | EPA Report |
| 4 | June 2, 1989 | Letter Report prepared by the Minnesota Department of Health | Report No. 021-9811 |
| 5 | July 26, 1989 | Evaluation and report documenting effectiveness of plant clean-up procedures/letter prepared by W.R. Grace & Company | W.R. Grace & Co. Air Sampling Result |
| 6 | September 6, 1989 | Phase One PSA prepared by Twin City Testing Corp. | Phase I Preacquisition Site Assessment for Panel Specialties, Inc. |
| 7 | December 24, 1998 | Phase I ESA prepared by Maxim Technologies, Inc. | Phase I Environmental Site Assessment for Madison Complex, Inc. |
| 8 | March, 2000 | EPA Region V field inspection checklist for vermiculite processing sites | EPA Field Inspection Checklist |
| 9 | June, 2000 | Speaking to Logan Park neighborhood residents about tremolite asbestos presence at former W.R. Grace & Co. site | Minnesota Pollution Control Agency and Minnesota Department of Health |
| 10 | June 16, 2000 | Certified Mail Letter from EPA Region V to Madison Complex, Inc. | Notice of endangerment to public health and welfare or environment |
| 11 | July 5, 2000 | Letter from MPCA to Mr. Larweck at Madison Complex | Request for Information |
| 12 | July 21, 2000 | Letter | EPA Letter Report |
| 13 | July 28, 2000 | MPCA-VIC Application | MPCA-VIC program application |
| 14 | August, 2000 | Confidentiality Agreement between W.R. Grace & Co., Electramatic, Inc. and Madison Complex | Joint Defense and Investigation Agreement |

Table 1
Page 2 of 3

| 15 | September 6, 2000 | Toxicology Memorandum from Region V EPA | Western Minerals Products Site, Minneapolis, Minnesota, Memo re Exposure to Asbestos Fiber Contamination |
|----|----|----|----|
| 16 | September 18, 2000 | Letter to MPCA from URS Corporation, on behalf of W.R. Grace & Company | Proposed Work Schedule for Asbestos Contamination Investigation of the Property |
| 17 | October 20, 2000 | URS Report, on behalf of W.R. Grace & Company | Phase I ESA Investigation |
| 18 | November, 2000 | URS Work Plan, on behalf of W.R. Grace & Company | URS Work Plan |
| 19 | November 9, 2000 | MPCA-VIC Comments | MPCA-VIC Staff Comments to URS Phase I ESA Investigation Report |
| 20 | December 15, 2000 | URS Report, on behalf of W.R. Grace & Company | Remedial Investigation Report to MPCA |
| 21 | January 31, 2001 | URS Report, on behalf of W.R. Grace & Company | Phase II ESA Report with Phase I ESA Addendum |
| 22 | February 16, 2001 | Citation from Minnesota Department of Labor and Industry (MDLI) to Panel Specialties | MDLI Citation |
| 23 | March 21, 2001 | MPCA-VIC Letter to W.R. Grace & Co. | Comments to Phase II ESA Report from MPCA-VIC staff |
| 24 | May 9, 2001 | Report prepared by MN Dept. of Health under Cooperative Agreement with Agency for Toxic Substances and Disease Registry | Health Consultation Report re Western Mineral Products Site, Minneapolis, Hennepin Co., MN, EPA facility ID: MNN000508056 |
| 25 | May 15, 2001 | Letter to MPCA from URS, on behalf of W.R. Grace & Company | Visual and Analytical Surface Sampling Results of Geoprobe Locations GP-5 and GP-6 at 1801 Jefferson St. NE site |
| 26 | June 22, 2001 | Letter to W.R. Grace & Co. and Electramatic from MPCA-VIC | Kickout Warning Letter |
| 27 | June 29, 2001 | Letter from MPCA-VIC staff to EPA Region V | Site Transfer Letter re 1719 and 1720 Madison Street NE and 1801 and 1815 Jefferson Street NE properties |
| 28 | August 3, 2001 | Letter from EPA Region V to W.R. Grace, Madison Complex, Electramatic & others | Notice of general liability for contamination and request for assistance |
| 29 | August 13, 2001 | Letter from Madison Complex attorneys to EPA | Response to EPA's 8/3/01 Letter |
| 30 | August 21, 2001 | Memorandum from EPA On- | Action Memorandum |

RB
RIDER BENNETT
EGAN&ARUNDEL

Table 1
Page 3 of 3

| | | | |
|---|---|---|---|
| | | Scene Coordinator to EPA Region V Superfund Division Director requesting approval of clean-up expenditures | |
| 31 | November 6, 2001 | Memorandum from MPCA-VIC staff to Madison Complex attorneys | Asbestos sampling results of soil samples |
| 32 | May 8, 2002 | Final EPA Pollution Report for Western Mineral Products Industrial Site Cleanup | Phase II Polrep #4 |
| 33 | July 3, 2002 | EPA Memorandum re cumulative expenditures for Western Mineral Products Site | Itemized Cost Summary Report |
| 34 | July 16, 2002 | Letter from EPA Region V to Lee Larweck, owner of Madison Complex | Notice of Intention to File Lien |
| 35 | August 14, 2002 | Letter from Madison Complex attorneys | Request for Extension of Time to File Written Objections to Proposed EPA Lien on Property |
| 36 | August 16, 2002 | Letter from Madison Complex attorneys | Objection to Notice of Intention to File Lien |
| 37 | September 13, 2002 | Letter from Madison Complex attorneys | Additional Objections to Notice of Intention to File Lien |
| 38 | October 1, 2002 | Letter Report prepared by Westons Solutions, Inc. for EPA | TDD:S05-0108-009 |
| 39 | December 19, 2002 | Letter from EPA Region V Judicial Officer | Notice of Opportunity to Appear Before Neutral US EPA Officer |

Note: Rider Bennett does not have a copy of each of the documents listed in this table.



**TABLE 2**
Documents Regarding Removal, Containment, Abatement, etc. of
Asbestos from Madison Complex, Inc. Property
1720 Madison Street N.E., Minneapolis, MN
March 24, 2003

| Item | Date | Type of Correspondence | Title of Correspondence |
|------|------|------------------------|-------------------------|
| 1 | June 2, 1989 | Letter report prepared by Minnesota Department of Health (MDH) of work being conducted by GPI at the Property on May 22, 1989 | Report No. 021-9811 |
| 2 | July 26, 1989 | Inspection report documenting plant clean-up procedures at Property | W.R. Grace & Co. air sampling results and letter report |
| 3 | March, 2000 | EPA Field inspection checklist for vermiculite processing sites for Western Mineral Products Industrial site | EPA Field Inspection Checklist |
| 4 | July 29, 2000 | MPCA-VIC notification to EPA that MPCA terminating work at Site | Termination Notification |
| 5 | September 18, 2000 | Letter from URS Corporation, on behalf of W.R. Grace & Company, to MPCA | URS Corporation proposed work schedule for asbestos contamination investigation of Property |
| 6 | October 20, 2000 | URS Report, on behalf of W.R. Grace & Company | Phase I Investigation |
| 7 | November, 2000 | Work Plan submitted by URS on behalf of W.R. Grace & Company to MPCA-VIC staff; approved by MPCA/VIC staff 11/16/2000 | MPCA-VIC Work Plan |
| 8 | November 9, 2000 | MPCA-VIC comments to Phase I Investigation Report | Comments to Phase I Investigation |
| 9 | December 15, 2000 | Remedial Investigation Report submitted by URS on behalf of W.R. Grace & Company to MPCA for Property | RI Report |
| 10 | January 31, 2001 | URS Report on behalf of W.R. Grace & Company | Phase II ESA Report |
| 11 | February 16, 2001 | Citation from MN Dept. of Labor and Industry (MDLI) to Panel Specialties | MDLI Citation |
| 12 | March 21, 2001 | Letter from MPCA-VIC Staff to W.R. Grace & Co. | MPCA Comments to Phase II ESA Report |

**Table 2**
Page 2 of 2

| 13 | May 15, 2001 | Letter to MPCA from URS indicating proper locations of sampling results of geoprobe locations GP-5 and GP-6 | MPCA Sampling Locations Letter |
|---|---|---|---|
| 14 | August 21, 2001 | EPA Memorandum requesting approval to remove contaminated soil at site | Fredrick Micke EPA Memorandum |
| 15 | November 6, 2001 | MPCA-VIC Memo to Madison Complex attorneys regarding asbestos sampling results at Mineral Products Site | MPCA-VIC Memorandum |
| 16 | May 8, 2002 | Final EPA Pollution Report for Western Mineral Products Industrial Site Cleanup (Site ID #B5P2) | Phase II Polrep #4 |
| 17 | July 3, 2002 | Memorandum outlining all cumulative expenditures for Western Mineral Products Site | Itemized Cost Summary Report |
| 18 | October 1, 2002 | Letter Report prepared by Westons Solutions, Inc. for EPA | Western Mineral Industrial Site, Minneapolis, Hennepin Co., MN, Emergency Response Letter Report TDD:S05-0108-009 |

Note:  Rider Bennett does not have a copy of each of the documents listed in this table.



**TABLE 3**

Date of Asbestos Work Performed at
Madison Complex, Inc. Property
1720 Madison Street N.E., Minneapolis, MN
March 24, 2003

| Item No. | Date | Party | Work Performed |
|---|---|---|---|
| 1 | 1967-1989 | W. R. Grace & Company | Processed Libby mine vermiculite ore at the exfoliating plant at the Property |
| 2 | May 22, 1989 | Minnesota Department of Health | Conducted an industrial hygiene investigation of equipment dismantling and removal work being conducted by G&P Industries (hired by W.R. Grace to perform such work) |
| 3 | May-July, 1989 | W. R. Grace & Company; CPD Environmental Health Group | Grace conducted a second evaluation to document effectiveness of plant clean-up procedures; CPD collected air samples |
| 4 | September 18, 2000 | URS Corporation, on behalf of W.R. Grace & Company | Proposes work schedule for asbestos contamination investigation of the Property to MPCA |
| 5 | October 20, 2000 | URS Corporation, on behalf of W.R. Grace & Company | Completes Phase I Investigation of Property |
| 6 | November 9, 2000 | MPCA/VIC Staff | Provides comments to October 20, 2000 Phase I Investigation Report |
| 7 | November 2000 | URS Corporation, on behalf of W.R. Grace & Company | Work plan submitted to MPCA-VIC staff |
| 8 | November 16, 2000 | MPCA-VIC | Approves URS/W.R. Grace Work Plan |

967003-1

| 9 | December 15, 2000 | URS Corporation, on behalf of W.R. Grace & Company | Remedial Investigation Report submitted to MPCA for the Property |
|---|---|---|---|
| 10 | February 16, 2001 | Minnesota Department of Labor and Industry, Occupational Safety and Health Division | Cites Panel Specialties for violation of 29CFR1910.1001(j)(7)(iv) |
| 11 | May 15, 2001 | URS Corporation, on behalf of W.R. Grace & Company | Sends letter to MPCA with revised figure re geoprobe locations near 1801 Jefferson Street NE site |
| 12 | November 6, 2001 | MPCA-VIC Staff | Sends memorandum with asbestos sampling results to Rider Bennett |
| 13 | August 21, 2001 | Fredrick Micke, EPA Region V On-Scene Coordinator | Requests approval of expenditures to conduct time-critical removal action at site |
| 14 | September 18, 2001 to October 25, 2001 | EPA Region V, with assistance of ERRS and START contactors | Conducted removal of asbestos-contaminated soil and debris at the Property. Work summarized in EPA Pollution Report (PolRep) for Western Mineral Products Industrial Site Cleanup (Site ID #B5P2), dated May 8, 2002. |
| 15 | May 8, 2002 | EPA Region V | Issues Phase II Polrep #4 |



**TABLE 4**

List of Parties Involved With Asbestos Testing and Sampling
At Madison Complex, Inc. Property
1720 Madison Street N.E., Minneapolis, MN
March 24, 2003

| Item No. | Party |
|----------|-------|
| 1 | W. R. Grace & Company and associated contractors |
| 2 | Minnesota Pollution Control Agency |
| 3 | U.S. Environmental Protection Agency, Region V |
| 4 | Minnesota Department of Health |
| 5 | Hennepin County Environmental Protection Division |
| 6 | City of Minneapolis |

966998-1

**WR GRACE BANKRUPTCY**
OFFICE OF THE CLAIMS AGENT
P.O. BOX 1620
FARIBAULT, MN 55021-1620
1-800-432-1909

*File*
*5065/10.1*

March 6, 2003

PATRICIA A BURKE
RIDER BENNETT EGAN & ARUNDEL
333 S SEVENTH ST
STE 2000
MINNEAPOLIS MN 55402

Re:    **W. R. Grace & Co., et al Bankruptcy Claim Acknowledgement**

Dear Counsel:

We have received completed Property Damage Proofs of Claim form, filed by either you
or your client, for the claimants listed on the attached report.

Please call our office if you have any questions about the listed clients' claims or other
claims you have filed.

Sincerely,

Michelle Dalsin
Sr. Project Administrator

Enclosure



RECEIVED

APR 1 8 2003

RIDER, BENNETT, EGAN
& ARUNDEL, LLP

**EXHIBIT**

2

00290 - 00162

# W. R. Grace Co., et al Bankruptcy
## Claim Acknowledgement

| Type Code | Claim Number | Receipt Date | Claimant Name | SSN or FIN # | Attorney Name |
|---|---|---|---|---|---|
| PD | 00006079 | 3-26-2003 | MADISON COMPLEX INC | | PATRICIA A BURKE |



**First American Title Insurance Company**
**National Commercial Services**

*Settlement Statement*

Property:    1926 Madison Street NE, Minneapolis, MN

File No.    NCS-238729-MPLS
Officer:    Beth A. Ghedman
New Loan No.
Settlement Date:
Disbursement Date:
Print Date:

Buyer:    First American Exchange (Kremer & Young Sixty American Exchange)
Address:    2208 California Street No rthern, Minneapolis MN 55418
Seller:    Madison Computer, Inc.
Address:

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | **Consideration:** | | |
| 982,000.00 | | Total Consideration | | 982,000.00 |
| | | | | |
| | | **Deposits in Escrow:** | | |
| | 10,000.00 | Receipt No. 59-9935 as of ... | | |
| | 927,774.69 | Receipt No. 9932989 as of ... | | |
| | 150,725.10 | Receipt No. 192989 as of ... Exchange (Kremer & Young) | | |
| | | | | |
| | | **Adjustments:** | | |
| | | Deposit Due Buyer | 2,490.00 | |
| | | Escrow To Trust Water Bill | 1,500.00 | |
| | | Price Tax Charge | 1,600.00 | |
| | | | | |
| 2,573.96 | | **Prorations:** | | 2,573.96 |
| | | 2008 property taxes less assessment 10/01/06 to 12/31/06 | | |
| | | .0234/12 days | | |
| | 42.26 | October Rent 10/10/06 to 10-31-06 $32.21/day | 161.76 | |
| | | | | |
| | | **New Loan(s):** | | |
| | | Lender: Franklin National Bank | | |
| 3,453.56 | | Attorney Fees - Aarsvold & Associates PA | | |
| 30.00 | | Mortgage on Kremer - Franklin National Bank | | |
| | | | | |
| | | **Payoff Loan(s):** | | |
| | | Lender: Franklin National Bank | | |
| | | Payoff to Oct 10 2006    Franklin National Bank | 511,597.73 | |
| | | | | |
| | | **Title/Escrow Charges to:** | | |
| | | Assessment Search - First American Title Insurance | 30.00 | |
| | | Company National Commercial Services | | |
| | | Settlement Exam - First American Title Insurance Company | 600.00 | |
| | | National Commercial Services | | |
| 575.00 | | Closing Fee - First American Title Insurance Company | 275.00 | |
| | | National Commercial Services | | |
| 1,127.00 | | Policy-Extended ALTA 1992 Owners - First American Title | | |
| | | Insurance Company National Commercial Services | | |
| 50.00 | | Tie Down Endorsement (Lender) - First American Title | | |
| | | Insurance Company National Commercial Services | | |
| 50.00 | | Update Search to Close (Lender) - First American | | |
| | | Title Insurance Company National Commercial Services | | |
| 140.00 | | Record Warranty Deed (abstract and torrens)  First | | |
| | | American Title Insurance Company National Commercial | | |
| | | Services | | |
| | | Conservation Fee (Deed) - First American Title Insurance | 5.00 | |
| | | Company National Commercial Services | | |
| 140.00 | | Record Mortgage Document (abstract and torrens) - First | | |
| | | American Title Insurance Company National Commercial | | |
| | | Services | | |
| | | Record Fee (torrens) ... First American Title Insurance | 150.00 | |
| | | Company National Commercial Services | | |
| | | State Deed Tax - First American Title Insurance Company | 3,232.00 | |
| | | National Commercial Services | | |

Initials:

EXHIBIT

3

12/18/2007 15:24 FAX 6123396591          SIEGEL BRILL                    ☑003

Continued From Page 1

*Settlement Statement*

Settlement Date:  09/27/2006
Print Date:       10/27/2006

File No.:  NCS-224120-MPLS
Officer:   Beth A. Cheumaning

| Buyer Charge | Buyer Credit | Charge Description | Seller Charge | Seller Credit |
|---|---|---|---|---|
| | | Disbursements Paid: | | |
| | | Earnest Money Paid of Seller to Chicago Company, Inc. | | 2,500.00 |
| | | 2006 2nd half taxes to Hennepin County Treasurer | | 821.22 |
| | | Payoff of Escrow As evidenced by City of Minneapolis | | 14.43 |
| | 273,561.32 | Cash (X From, ) To) Borrower | | |
| | | Cash (X To, ) From) Seller | 475,193.74 | |
| 957,010.40 | 957,010.96 | Totals | 65,473.96 | 957,273.96 |

DEC 16 07 TUE 03:57 PM  SIEGEL BELL  GREUFNER        FAX NO. 612:336041              P. 02

## ESCROW AGREEMENT

**THIS AGREEMENT** is made as of the 27th day of October, 2006, by and among Kremer and Young, LLC, a Minnesota limited liability company, and Tod I. Lane (jointly, the "Buyer"), Madison Complex, Inc., a Minnesota corporation ("Seller"), and First American Title Insurance Company, a _____ ("Escrow Agent").

## RECITALS

A.        Buyer and Seller are parties to that certain Commercial Industrial Purchase Agreement dated April 13, 2006, as amended by that certain First Amendment to Purchase Agreement dated September ___, 2006 (as amended, the "Purchase Agreement") providing for the purchase and sale of certain real estate located at 1720 Madison St. NE in the City of Minneapolis, Minnesota legally described in the Purchase Agreement (the "Property")

B.        The First Amendment to the Purchase Agreement requires the Seller to deposit $50,000 of Seller's sales proceeds into an escrow account (the "Environmental Escrow") to be held by Escrow Agent to reimburse Buyer for certain environmental expenses related to the Property.

C        Buyer and Seller have also agreed to provide for the payment of certain elevator repairs from the Environmental Escrow.

D.        The parties wish to establish the escrow described above.

**NOW, THEREFORE**, in consideration of Seller's deposit of the $50,000 (the "Escrow Amount") with the Escrow Agent, the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.        Escrow Deposit.  The parties acknowledge and agree that Seller has deposited with Escrow Agent the sum of Fifty Thousand and no/100 Dollars ($50,000.00) to be held, in an interest bearing account, by Escrow Agent pursuant to the terms of this Agreement.  All interest shall be added to the Environmental Escrow.

2.        Disbursement of Escrow Amount.  The Escrow Agent shall reimburse Buyer from the Environmental Escrow up to an aggregate of $50,000 together with any interest earned on such amount, in costs related to (a) the abatement and removal from the Property of the existing asbestos-containing material and any other hazardous wastes or contamination identified in the Phase II investigation for the Property performed on behalf of Buyer; and (b) the costs of such Phase II investigation and any fees paid by Buyer to expedite the processing of such Phase II investigation provided that Buyer's reimbursement for the Phase II investigation fees shall not exceed $5,000, and (c) costs incurred by Buyer to repair the existing elevator on the Property as required by the City of Minneapolis, provided that Buyer's reimbursement for such elevator repair expenses shall not exceed $8,500.  Buyer shall not be entitled to reimbursement for remediation or abatement made necessary in order to comply with the tenant improvement plans of any particular tenant or prospective tenant of the Property. Buyer's receipt

2531046 1


EXHIBIT
4

of the reimbursement of the elevator repair expense from the Environmental Escrow satisfies all of Seller's obligations under the Purchase Agreement with respect to the condition of the elevator. Such reimbursement shall occur promptly following Buyer's submission to Escrow Agent of invoices for such expenses.

3.       Final Disposition of Escrow Amount.  All requests for disbursements from the environmental Escrow must be submitted by Buyer to Escrow Agent within ninety days following the Minnesota Pollution Control Agency's issuance of a site closure letter for the Property or June 30, 2008, whichever is earlier. Any funds remaining in the Environmental Escrow 120 days following the issuance of such a closure letter or July 31, 2008, whichever is earlier shall promptly be paid to Seller. Buyer shall send to Seller and to Escrow Agent immediately upon receipt a copy of the site closure letter obtained by Buyer.

4        Public Funding of Environmental Expenses.  Buyer agrees to submit applications to the City of Minneapolis, the Metropolitan Council, the State of Minnesota and any other governmental entities under any available programs that provide funding for the environmental remediation activities described in Section 2 above and diligently pursue such funding. Any costs related to preparing and submitting such applications shall be reimbursable from the Environmental Escrow.  Any and all proceeds from such a grant application shall be applied, first, to reimburse Buyer for unreimbursed environmental remediation and clean-up expenses in excess of the Escrow Amount, and, second, to reimburse Seller for any reimbursements previously obtained by Buyer from the Environmental Escrow.

5.       Escrow Agent Obligations  Buyer and Seller hereby release Escrow Agent from any liability relating to Escrow Agent's administration of the Escrow Deposit pursuant to this Agreement except liability based on the negligence or malfeasance of Escrow Agent. Buyer and Seller agree to hold Escrow Agent harmless from any claims or defenses arising out of this Agreement, except for Escrow Agent's failure to account for the funds held pursuant to this Agreement  Escrow Agent shall be entitled to assume (i) the accuracy and truth of any written instrument, notice, certificate or opinion given to it and (ii) the authenticity of any signatures thereon. without any further investigation  The parties acknowledge and agree that Escrow Agent is acting as the agent of Buyer and Seller under this Agreement.

6.       Severability.  The unenforceability, invalidity, or illegality of any provision shall not render the other provisions unenforceable, invalid, or illegal.

7.       Waiver.  No consent or waiver, express or implied, by either party to this Agreement of any breach or default by the other in the performance of any obligation under this Escrow Agreement shall be deemed or construed to be a consent to or waiver of any other breach or default by such party hereunder. Failure on the part of any party hereto to complain of any act or failure to act of the other party or to declare the other party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such party hereunder.

8.       No Modifications.  This Agreement may not be modified or amended without the prior written consent of all parties

1599896                                                   2

9.    General. All of the terms and provisions of this Agreement shall be binding upon
and inure to the benefit of and be enforceable by the parties hereto and their respective heirs,
successors, legal representatives and assigns.

10.    Counterparts. This Agreement may be executed in counterparts, each of which
shall be deemed an original, and which together shall constitute a single, integrated contract.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first
set forth above.

KREMER AND YOUNG, LLC

By: _____
Its  Chief Manager
      - President

_____
Tod J. Lane

MADISON COMPLEX, INC.

By: _____
Its _____

FIRST AMERICAN TITLE INSURANCE
COMPANY

By: _____
Its  Escrow Officer

# LEONARD, O'BRIEN
# SPENCER, GALE & SAYRE

Thomas W Newcome**
Brian F Leonard+
Eldon J Spencer, Jr. +
Michael R O'Brien‡
Edward W Gale
Grover C Sayre, III+‡
Thomas W Newcome III*
Michelle McQuarrie Colton
Joseph J Deubs, Jr
Thomas C Atmore +
Ernest F Peake
Matthew R Burton
James M Jorissen~
Peter F Sajevic, III§

**Attorneys at Law**
**A Professional Association**

100 South Fifth Street
Suite 2500
Minneapolis, Minnesota 55402-1234
Telephone (612) 332-1030
Fax (612) 332-2740

Internet: *www.losgs.com*

January 29, 2008

Andrea M Hauser ●
Scott S Payzant~
Jennifer K Eggers+§
Chad A Kelsch∆†
Jordan W Sayre
Patrick J Lindmark

Of Counsel
   George B Ingebrand, Jr.
   Randall I. Seaver

● Also admitted in Arizona
~ Also admitted in California
● Also admitted in Illinois
′· Also admitted in Iowa
† Also admitted in Missouri
‡ Also admitted in Montana
∆ Also admitted in North Dakota
+ Also admitted in Wisconsin
§ Qualified Neutral (Rule 114)
* Certified Real Property Law Specialist
   (Minnesota State Bar Association)
** Retired Status

Kathy Davis
Project Manager
Rust Consulting, Inc.
201 South Lyndale Avenue
Faribault, MN 55021

Re:     Madison Complex, Inc./W.R. Grace & Co.

Dear Ms. Davis:

Enclosed for filing please find Madison Complex, Inc.'s Amended Proof of Claim in the above-referenced matter. I am requesting that you contact me upon receipt to confirm that the Amended Claim has been properly received and filed.

I appreciate your attention to this matter.

Very truly yours,

LEONARD, O'BRIEN
SPENCER, GALE & SAYRE, LTD.

By _____

Chad A. Kelsch
Email:   *ckelsch@losgs.com*

CAK/jlt
Enclosures
374309
CC: Lee Larweck

REC'D JAN 3 0 2008

WR Grace     PD.35.139.6911
**00018499**
SR=1130