# EXHIBIT 5

**CLOSING BOOK**

**W. R. GRACE & CO.-CONN. — SALE OF 1719-1720**
**MADISON STREET TO MADISON COMPLEX, INC.**

**October 24, 1989**

W. R. GRACE & CO.-CONN. - SALE OF 1719 MADISON STREET

## LIST OF CLOSING DOCUMENTS

1.  Purchase Agreement

2.  Limited Warranty Deed

3.  Seller's Affidavit

4.  Acknowledgement regarding tenancy of S & P Auto Reconditioning

5.  Assignment of Buyer's rights under the Purchase Agreement to Madison Complex, Inc.

6.  Verification of payment of second half real estate taxes

7.  Twin City Testing's environmental report

8.  Applied Environmental Services, Inc.'s Asbestos Report

9.  Letter from Minneapolis Fire Inspector re: underground storage tank

10. Letter from Determan Welding & Tank Service re: underground storage tank

11. Letter from Northern States Power Company re: transformers

12. Articles of Merger for W. R. Grace & Co.-Conn.

13. Secretary's Certificate re: name change to W. R. Grace & Co.-Conn.

14. Secretary's Certificate re: Execution of Deed

15. Title Insurance Commitment

16. Certificate of Non-Foreign Status

17. Underground Storage Tank Affidavit

18. Closing Statement

19. Proceeds Check

5/26/89

## PURCHASE AND SALE AGREEMENT

AGREEMENT entered into this __16__ day of __August_____,
1989 by and between W. R. Grace & Co.-Conn., a Connecticut
corporation with offices at 62 Whittemore Avenue, Cambridge,
Massachusetts 02140, hereinafter called the SELLER, and Panel
Specialties Inc., a Minnesota corporation with offices at 1828
Jefferson Street, NE, Minneapolis, Minnesota 55418___,
hereinafter called the BUYER.

1.   SELLER agrees to SELL and BUYER agrees to BUY, upon
the terms hereinafter set forth, the following described
premises:  1719-1720 Madison Street, Minneapolis, Minnesota,
and more particularly described in Certificates of Title 183620
and 233307, copies of which are attached hereto as Exhibits I
and II.

Included in the sale as a part of said premises are
the buildings, structures, and improvements now thereon, and
the fixtures belonging to the SELLER but excluding:

[Identify any equipment to be removed.]

Said premises are to be conveyed by a good and
sufficient Special Warranty deed running to the BUYER, or to
the nominee designated by the BUYER by written notice to the
SELLER at least seven (7) days before the deed is to be
delivered as herein provided, and said deed shall convey a good
and clear record title thereto, subject only to:

(a)  the provisions of existing building, zoning and
environmental laws and other statutes or ordinances as may
affect the use, maintenance or ownership of the premises;

(b)  general taxes for the year 1989 and subsequent
years;

(c)  any liens for municipal betterments assessed
against the premises after the date of this Agreement; and

M/14 - 7-A

- 2 -

(d) all easements, restrictions and rights of way, if any, of record or as would be disclosed by visual observation or a survey of the premises.

2.   The agreed purchase price for said premises is One Hundred Seventy-Five Thousand Dollars ($175,000), of which $ ___$ 1000.00___ have been paid as a deposit this day and $ ___$ 174,000.00___ are to be paid at the time of delivery of the deed in cash, or by cashier's, treasurer's or bank check.

3.   The time of closing shall be at __asap__ P.M., local time, on 9-29-89 or sooner if possible 1989 (the "Closing") or on the date, if any, to which such time is extended by reason of any other provision hereof, hereafter becoming operative (whichever date is later), unless subsequently mutually agreed otherwise, at the office of SELLER's attorneys in Minneapolis, Minnesota.

4.   Full possession of said premises free of all tenants and occupants, except the existing tenancy of S. G. Paradise d/b/a S & P Auto, is to be delivered at the time of the delivery of the deed, said premises to be then in the same condition as they now are, reasonable use and wear thereof excepted.

5.   If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then any payments made under this Agreement shall be refunded and all other obligations of the parties hereto shall cease and this Agreement shall be void and without recourse to the parties hereto, unless the SELLER elects to use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty (30) days.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed, any payments made under this Agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto.

- 3 -

6.    Water and sewer use charges, and taxes for the then current years shall be apportioned and fuel value shall be adjusted, as of the day of performance of this Agreement, and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

7.    BUYER shall pay the full amount of any stamp, excise or other taxes imposed or assessed against the transfer of the premises by state, county or local municipal law. BUYER shall also pay all fees for the recording and registering of all instruments of transfer with the appropriate governmental authorities.

8.    If BUYER fails to fulfill its agreements herein, SELLER shall retain the earnest money deposit hereunder and all interest attributable thereto as liquidated damages for such failure to carry out this Agreement. The parties agree that such damages are to be the sole and exclusive remedy of SELLER for such breach in that, at the time of the execution of this Agreement, it would be impractical and extremely difficult to fix the actual damages that would flow from BUYER's refusal to consummate the transaction.

9.    Time is of the essence of this Agreement.

10.    If, prior to Closing, the improvements on the premises are destroyed or materially damaged by fire or other casualty (insured against or otherwise), other than an act of BUYER, the BUYER may at its option rescind this Agreement and recover all payments made by it.

Should such a loss occur and the transaction contemplated by this Agreement nevertheless be closed, BUYER shall be entitled to settle the loss with the insurer, if any, and collect the full amount thereof to his own use. In such event BUYER shall pay the entire purchase price to SELLER without deduction or set-off for such loss. SELLER shall furnish all necessary proofs of loss, assignments of claim, and other assistance needed.

- 4 -

BUYER shall notify SELLER of his decision to terminate this Agreement or accept possession of the premises within twenty (20) days after receipt of written notice by BUYER from SELLER of occurrence of the fire or other casualty. If BUYER does not so notify SELLER within the aforesaid period, it shall be deemed that BUYER has elected to accept possession of the premises.

11.    Neither SELLER nor BUYER has retained any finder, broker or agent for whose fees the other party will be liable in connection with this Agreement or the consummation of the transactions contemplated hereby.

12.    The SELLER hereby grants the BUYER the right, from time to time after the date of this Agreement, upon not less than two (2) business day's advance notice, to enter upon the premises, during business hours or such other times as SELLER shall agree, with such employees, agents, consultants and equipment as may be reasonably required in order to:  (i) inspect the premises, (ii) perform surface and subsurface tests, borings and measurements, (iii) conduct other engineering and environmental studies and tests, and/or (iv) conduct such other investigations, all as the BUYER may deem reasonably necessary or desirable in connection with its review of the property; provided, however, that:  (1) the BUYER shall use its best efforts to minimize any interference with the use and enjoyment of the premises by the occupants, (2) all such activities shall be conducted as expeditiously as possible, and (3) the BUYER shall restore the premises to the conditions existing immediately prior to any such entry and activity.  The BUYER shall indemnify, defend and hold the SELLER harmless from and against any and all claims, demands, losses, liabilities, damages, costs and expenses, including reasonable attorneys' fees, arising out of any property damage, personal injury or death of any person resulting from any such entry or activity.

13.    The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefor the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against, then the SELLER shall, unless the SELLER has previously restored the premises to their former condition, pay over or assign to the BUYER, on delivery of the deed, all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by the SELLER for any partial restoration.

- 5 -

14.  The acceptance of a deed by the BUYER or his nominee, as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation of Seller herein contained or expressed.

15.  All notice given hereunder shall be in writing by certified mail, return receipt requested with proper postage affixed; and,

> if to SELLER at the following address:
>
>> W. R. Grace & Co.-Conn.
>> 62 Whittemore Avenue
>> Cambridge, MA  02140
>>
>> Attention:  President
>
> if to BUYER at:
>
>> Panel Specialties Inc.
>> 1828 Jefferson Street, NE
>> Minneapolis, Minnesota _____
>>
>> Attention:  President

The mailing of a notice by certified mail, return receipt requested, shall be sufficient service.

16.  It is understood that BUYER has or may inspect the premises and has agreed to purchase it as a result of such inspection and not because of or in reliance upon any statements or representations of any kind made by the SELLER or any other officer, employee, or agent of the SELLER, or by a broker, if any, and that SELLER has agreed to purchase it in its present condition unless otherwise specified herein.  It is further understood that this Agreement contains the entire agreement between the SELLER and the BUYER, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale.  Furthermore, this Agreement shall not be altered, amended, changed or modified, except in writing executed by the parties hereto.

17.  This Agreement shall be binding upon the respective heirs, executors, administrators, successors and, to the extent assignable, on the assigns of the parties hereto, it being expressly understood, however, that the BUYER shall not transfer or assign this Agreement without the written consent of the SELLER being first had and obtained.

- 6 -

THIS INSTRUMENT, executed in duplicate is to be construed as a Minnesota contract, is to take effect as a sealed instrument, and sets forth the entire contract between the parties.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have hereunder set their hands and seals the day and year first above written.

SELLER
W. R. GRACE & CO.—CONN.

By _____
V.P. - Manufacturing & Engineering

BUYER
PANEL SPECIALTIES INC.

By _____
Douglas P O'Brien   8-16-89
Secretary



twin city testing corporation

662 CROMWELL AVENUE
ST. PAUL, MN 55114
PHONE 612/645-3601

September 6, 1989

Panel Specialties
Attn:  Mr. Stefan Litwinczuk
1828 Jefferson Street
Minneapolis, MN  55418

Subj:  Phase I - Preacquisition Site Assessment
       18th Avenue NE and Madison
       Minneapolis, Minnesota
       #4410 89-6628

Dear Mr. Litwinczuk:

Twin City Testing Corporation has performed environmental
assessment services for the above referenced site. We are sending
two copies of our final report to you.

We appreciate the opportunity to have been of service to you on
this project. If you have any questions regarding the information
presented in the report, or if we can be of additional service,
please contact us at 612/649-5500.

Cordially,

Richard C. Knatterud, P.E.
Project Manager
Preacquisition Site Assessment

RCK/klh

## TABLE OF CONTENTS

<u>ITEM</u>                                                          <u>PAGE</u>

INTRODUCTION          .      .      .      .      .      .      .      .      1

WORK SCOPE         .      .      .      .      .      .      .      .      1

SITE RECONNAISSANCE .      .      .      .      .      .      .      1

SITE HISTORY      .      .      .      .      .      .      .      .      2

GEOLOGIC SETTING      .      .      .      .      .      .      .      5

DISCUSSION & RECOMMENDATIONS      .      .      .      .      .      5

STANDARD OF CARE      .      .      .      .      .      .      .      6

<u>LIST OF FIGURES</u>

FIGURE 1 - SITE LOCATION MAP  .
FIGURE 2 - STRATIGRAPHIC COLUMN

<u>LIST OF APPENDICES</u>

APPENDIX A - SANBORN FIRE INSURANCE MAPS AND R.L. POLK'S
             MINNEAPOLIS CITY DIRECTORIES

APPENDIX B - REGULATORY AGENCY CORRESPONDENCE

APPENDIX C - WELL LOG DATA

**PHASE I PREACQUISITION SITE ASSESSMENT
18TH AVENUE NE & MADISON
MINNEAPOLIS, MINNESOTA
#4410 89-6628**

## INTRODUCTION

This report presents the results of the Phase I Environmental Assessment performed by Twin City Testing Corporation (TCT) for Panel Specialties at 18th Avenue NE and Madison in Minneapolis, Minnesota. This work was performed to explore the potential for environmental liabilities associated with soil and groundwater contamination by researching the past and present land use at, and near, the site.

## WORK SCOPE

The scope of our environmental services for the project was limited to the following items:

1.  collecting and reviewing available historical and geological data,

2.  conducting a site reconnaissance, and

3.  preparing a report which includes our data, opinions, and recommendations.

Subsurface work, including sampling and chemical analyses of soil and groundwater, was not requested for this project. Our scope of work also did not include sampling or analyzing suspect asbestos-containing material.

## SITE RECONNAISSANCE

The site was visited by a representative of TCT on August 25, 1989. The purpose of the site reconnaissance was to review present land use at, or near, the property and document any evidence of potential environmental liabilities.

The site is located near 18th Avenue NE and Madison in Minneapolis, Minnesota (see Figure 1). The site contains three buildings; the largest of which is three stories high with a brick facade. Two silos are present near the northeast corner of this building. A two-story building with a masonry block exterior is attached to the west side of the 3-story building. The third building is a small, unattached auto paint and body shop listed at 1719 Madison.

The project site is bordered as follows:

North – Abandoned railroad right-of-way, manufacturing/industrial businesses, a vacant lot with remnants of an old building, and railroad tracks.
East – Railroad tracks , Monroe Street and residential property
South – Manufacturing/industrial businesses, 17th Avenue NE and residential property
West – Jefferson Street, residential property and city storage yard



## SITE RECONNAISSANCE (Continued)

No indicators of underground storage tanks, such as vent or fill pipes, were observed at the project site. There were no unexplained or unnatural depressions or gullies observed at the property. No evidence of unnaturally dying or distressed vegetation was observed at the project site. Debris, including items such as oily equipment and above ground storage tanks, was present in the south parking area. We did not see any evidence of hazardous waste storage during a brief interior walk-through review of the building. We did **not** review the site for asbestos. Three pole-mounted transformers were present along the southeast corner of the 3-story building. Transformers may contain polychlorinated biphenyls (PCBs) which could pose an environmental liability should a leak develop.

Numerous businesses in the surrounding area are of the type that could generate hazardous wastes and conceivably pose an environmental threat. Gasoline pump dispensers, which would indicate that underground storage tanks are present, were noted near the project site in 3 locations. These locations included the northwest corner of the Northwestern Casket Company (Jefferson between 17th and 18th Avenues), the south side of the Minneapolis Street Department (18th Avenue between Jefferson and Washington), and Mack's Gas Stop (19th Avenue and Monroe). Three large above ground storage tanks were present on the Street Department property at the northwest corner of Jefferson and 18th Avenue. These tanks have reportedly been out of service for approximately 20 years.

## SITE HISTORY

The following paragraphs present a summary of our site data review:

Aerial photographs obtained in 1945, 1953, 1957, and 1964 were reviewed. These photographs are on file at the Wilson Library at the University of Minnesota. Polk's Minneapolis City Directories for the years 1934, 1944, 1956, 1966-67, 1975, 1981-82 and 1988-89 were reviewed. Sanborn Fire Insurance Maps for the years 1889, 1912 and 1951 were reviewed. Copies of the directory listings and insurance maps are provided in Appendix A. Topographic maps prepared in 1955 and 1967 were also reviewed.

Our earliest records, from the 1889 Sanborn maps, indicated that the project site contained wood storage for the Northwestern Casket Company. A building first appeared on the site in the 1912 Sanborn map and was labelled as a hearse factory. This building is likely the 3-story brick building which presently occupies the site. Western Mineral Products first appeared as the occupant of this building in the 1944 City Directory. Western Mineral Products apparently merged with W. R. Grace & Company in the 1960's. The site remained a W. R. Grace facility which manufactured insulating materials until this past year. The existing 2-story masonry block building first appeared in the 1964 aerial photograph. The two large silos first appeared in the 1953 aerial photograph. Railroad tracks to the north and southwest sides of the site have either been removed or vacated.

Page 2
#4410 89-6628


twin city testing corporation

## SITE HISTORY (Continued)

The surrounding area has been a mix of residential and commercial properties. Past and present businesses have included service stations along Monroe Street, a large seed plant and a food processing facility on Jackson Street, a lumber yard and a farm equipment manufacturer on 19th Avenue, City oil plants on Jefferson Street and 15th Avenue, several automobile repair shops, several plating shops and other various manufacturing businesses.

Federal, state and local regulatory agencies were contacted regarding potential environmental liabilities at or near the project site. Responses from the United States Environmental Protection Agency (USEPA), the Minnesota Pollution Control Agency (MPCA), and the Metropolitan Waste Control Commission (MWCC) are expected through the mail within the next four to six weeks. A copy of this information will be forwarded to you upon receipt.

USEPA data on file at TCT, dated October 17, 1988 and August 2, 1989, indicates that approximately 62 businesses governed by the Resource Conservation & Recovery Act (RCRA) of 1970 are within approximately one mile of the site. RCRA is a federal (USEPA enforced) law which governs the treatment, transportation, storage and disposal of hazardous waste. Businesses are commonly permitted under RCRA as the EPA attempts to track hazardous wastes from "cradle to grave". The project site was not identified on this list.

According to USEPA information on file in our office, dated October 14, 1988 and August 13, 1989, there are two sites governed by the Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS) or "Superfund" within approximately one mile of the project site. CERCLIS is an inventory of potential uncontrolled hazardous waste sites. The project site was not on this list.

A response to our file research request has not yet been received from the MPCA. The MPCA conducts a site specific search of numerous federal and state data bases. An underground storage tank search is also conducted by the MPCA. We understand that a tank was removed from the site and that MPCA personnel were contacted according to a representative of Panel Specialties. These sites can be categorized into one of the files listed below:

EPA:

1.  National Priorities List (NPL): A national listing of hazardous waste sites which represent a significant threat to public health or the environment and are priorities for remedial action. The sites are eligible for Federal Superfund monies. The NPL is usually updated on an annual basis.

2.  Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS): EPA's database of sites which have had or are in need of Federal Superfund investigations. The data base is updated periodically as new sites are discovered.



Page 3
#4410 89-6628

## SITE HISTORY (Continued)

MPCA:

3. **Permanent List of Priorities (PLP):**  A State listing of verified hazardous waste sites which represent a significant threat to public health or the environment and are priorities for remedial action. These sites are eligible for State Superfund monies. The PLP is updated at least annually.

4. **Regulatory Compliance, Hazardous Waste Enforcement Log:** A listing of facilities which are currently receiving elevated levels of enforcement activities by the MPCA Hazardous Waste Program, i.e., Stipulation Agreement, Notice of Violation, Administrative Penalty Order, etc.  Inclusion on this list may be due to administrative ("paperwork") violations as well as those applying to waste storage or disposal.  The Hazardous Waste Enforcement Log is updated monthly.

5. **List of Permitted Solid Waste Facilities:**  A listing of those facilities or areas in the state which have been issued permits for the handling or disposal of solid waste. This list is updated periodically as additional information becomes available.

6. **Hazardous Waste Permit Unit Project Identification List:** A listing of facilities which have received or are in the process of receiving a permit for treatment, storage, and/or disposal of hazardous waste.  The most common permit is for storage and is required for facilities which store their hazardous waste on-site for longer than 90 days.  This list is updated semi-annually.

7. **1980 Metropolitan Area Waste Disposal Site Inventory:** U.S. Geological Survey topographic maps and Hudson's street maps which show the location of abandoned dumps, demolition sites, tree disposal sites, fly ash sites, foundry sand and slag sites, surface impoundments, and some additional types of dumps within the Twin Cities Metropolitan area.  This inventory was compiled in 1980 through various different sources, the most common of which were visual observation and file review.  Because the majority of these sites were discovered prior to the creation of the MPCA and its regulatory authority to deal with open dumps, detailed information regarding the status of these sites is not available.

8. **1980 Statewide Open Dump Inventory:**  Lists and maps which show the locations of municipal waste disposal facilities, industrial surface impoundments, and closed municipal dump sites.  This inventory was conducted and compiled in 1980.

Page 4
#4410 89-6628


twin city testing
corporation

## SITE HISTORY (Continued)

A list of known hazardous waste generators, compiled in December, 1988, was obtained from Hennepin County. Approximately 88 sites were listed within approximately one mile of the project site. The project site was not identified in this list. Nearby businesses on the list included Durkee-Atwood (712 15th Avenue NE), General Mills (1201 Jackson), Northwestern Casket (1707 Jefferson), Nystrom (1701 Madison), Shaughnessy Plating (1737 Adams), and Letourneau Company (1828 Jefferson).

According to MWCC file data, dated May 16, 1989, there are 19 businesses within approximately one mile of the project site permitted to discharge industrial waste into the sanitary sewers. The project site was not identified on this list.

Copies of regulatory agency correspondence are attached as Appendix B. All regulatory responses will be forwarded to you immediately upon receipt.

## GEOLOGIC SETTING

Geotechnical subsurface exploration programs were conducted by our firm in the area in the past. The generalized subsurface condition depicted by the soil boring logs indicates fill or topsoil underlain by coarse alluvium and till.

According to publications of the Minnesota Geological Survey, the site is generally located in an area of upper terrace deposits that consist of sand, gravelly sand and loamy sand. The site is underlain by the St. Peter Sandstone formation to the north and the Platteville and Glenwood formations to the south.

Groundwater flow is likely toward the southwest to the Mississippi River. Deep wells in the area are most often found within the Prairie du Chien Group. The depth to bedrock varied from near the surface to 147 feet.

## DISCUSSION AND RECOMMENDATIONS

It is our opinion that the past and present usage of the site does not indicate a potential for soil/groundwater liability. Our opinions are based on a review of the historical and regulatory information, data on file at TCT and site reconnaissance. Our opinion is also based on the assumption that the hearse factory was an assembly shop and not a foundry. It is our opinion that additional environmental assessment is not necessary for on-site activities regarding soil/groundwater issues.

A potential for soil/groundwater contamination from off-site activities exists. Further environmental assessment work would be necessary to more accurately define this condition, if a higher degree of confidence is desired.

Page 5
#4410 89-6628


twin city testing
corporation

## STANDARD OF CARE

The recommendations contained in this report represent our professional opinions. These opinions were arrived at in accordance with currently accepted hydrogeologic and engineering practices at this time and location. Other than this, no warranty is implied or intended.

TWIN CITY TESTING CORPORATION

Richard C. Knatterud, P.E.
Project Manager
Preacquisition Site Assessment

David A. Luick, P.E.
Supervisor
Preacquisition Site Assessment

RCK/DAL/klh



twin city testing
corporation

## GEOLOGIC COLUMN

| System | Rock Unit | Approx. thickness (in feet) | General Description | Graphic Column | Water-Bearing Characteristics |
|---|---|---|---|---|---|
| Quaternary | Undifferentiated glacial deposits | 0-500 | Glacial till, outwash, and valley train sand and gravel, lake deposits, and alluvium of stream ages and several pre-recent; vertical and horizontal distribution of zones is complex | | Distribution of aquifers and confining beds is poorly known; sand and gravel aquifers that yield moderate to large amounts of water are common in buried bedrock valleys |
| Ordovician | Decorah Shale | 90 | Shale, greenish-gray, flanks to blocky; includes thin discontinuous lenses of fossiliferous limestone that increase in abundance upward | | Aquifer: Low yields from fractures in shale and solution cavities in limestone |
| | Platteville Formation | to 35 | Dolomite, light-gray to buff, thin- to med.-bedded, shaly | | |
| | Glenwood Formation | to 5 | Shale, greenish-gray, flanks, sandy | | Confining bed |
| | St. Peter Sandstone | 150 | Sandstone, light-gray, massively bedded, well sorted, med.-gr., poorly cemented, quartzose; approx. 20-ft.-thick silty to shaly bed near base | | Aquifer: moderate yields |
| | Prairie du Chien Group — Shakopee Formation | 50 | Dolomite, buff, thin- to thick-bedded, silt- and sand-rich, med.-gr., thin sandstone beds near base | | Confining bed |
| | Prairie du Chien Group — Oneota Dolomite | 100 | Dolomite, buff, fine- to thick-bedded, vuggy, med.-gr., silt-and dolomite matrix | | Aquifer: high yields from fractures in dolomite and from poorly cemented sandstone; principal aquifer of the Twin City basin |
| Cambrian | Jordan Sandstone | 90 | Sandstone, light-gray, massively bedded, med.- to coarse-gr., well sorted, poorly cemented, quartzose | | |
| | St. Lawrence Formation | 50 | Dolomite, gray to tan, silty or sandy, 'argillaceous'; glauconitic in upper part | | Confining bed |
| | Franconia Formation | 155 | Sandstone, greenish-gray, thin-bedded, fine- to coarse-gr., silty to dolomitic commonly glauconitic in upper aquifer (Reno) is a fine-gr. sandstone | | Aquifer: low yields |
| | | | | | Confining bed |
| | Ironton Sandstone | 30 | Sandstone, light-gray, poorly to well sorted, med.-gr., silt-rich, quartzose | | |
| | Galesville Sandstone | 35 | Sandstone, light-gray, well sorted, fine- to med.-gr., quartzose | | Aquifer: moderate to high yields |
| | Eau Claire Formation | to 130 | Sandstone, red, fine- to med.-gr., silty, glauconitic; interbedded with grayish-green to red, fissile shale | | Confining bed |
| | Mt. Simon Sandstone | 160 | Sandstone, light-gray, fine- to coarse-gr., quartzose; thin shale beds in upper part | | Aquifer: moderate to high yields; second most important aquifer of Twin City basin |
| Keweenawan | Hinckley Sandstone | 75 | Sandstone, tan, med.- to coarse-gr., arkosic | | |
| | Fond du Lac Formation and older sedimentary rocks | to 4,000 | Sandstone and siltstone, fine-gr., well cemented, arkosic; interbedded with red to green micaceous shale | | Confining bed |
| | Metamorphic and Igneous Rocks | to 20,000 | Mostly mafic, lava flows with thin interflow sediment | | |

* COLUMN TAKEN FROM: RUDOLF K. HOGBERG, "GROUNDWATER RESOURCES IN MINNESOTA,"
IN GEOLOGY OF MINNESOTA (MINNESOTA GEOLOGICAL SURVEY, 1972)



# A·E·S

## APPLIED ENVIRONMENTAL SCIENCES, INC.

ENVIRONMENTAL HEALTH SURVEY REPORT
PANEL SPECIALTIES
MADISON COMPLEX

ASBESTOS SURVEY
MINNEAPOLIS, MN

Conducted by: Ed Peterson, IH Technician

Jerry Anderson, Project Technician

Report Prepared by: Patrick DiBartolomeo, CIH,CSP

Certification #2204

Management Contact: Doug Obrien, Panel Specialties

F89.303

10-19-89

Minneapolis Business & Technology Center □ Box 220 □ 511 11th Avenue South □ Minneapolis, MN 55415 □ (612) 339-5559

ENVIRONMENTAL HEALTH SURVEY REPORT

**PANEL SPECIALTIES**
**MADISON COMPLEX**

**ASBESTOS SURVEY**
**MINNEAPOLIS, MN**

EXECUTIVE SUMMARY

AES, Inc. was retained by Panel Specialties to perform an asbestos inventory of the Madison Complex at 1720 Madison St. NE. The survey was performed to identify asbestos containing materials in the structure.  The survey was conducted on October 13 and 16, 1989.

The results of the survey are as follows:

1.  AES took 30 bulk material samples in the building and analyzed 14 of the samples.

2.  AES located asbestos containing ceiling plaster in warehouse #1, 9x9 floor tiles and mastic, aircell pipe insulation, ceiling plaster in the general offices, 1x1 floor tile and mastic.  Estimated quantities are as follows:

> Ceiling Plaster -  2822 SQ. FT.
> Floor Tile/Mastic -  506 SQ. FT.
> Aircell Pipe Insulation - 100 FT.

3.  Bulk sampling results are in Appendix I, diagrams with bulk sampling locations are in Appendix II.

Additional information on the survey can be found in the following report.

## METHODS

### Survey Approach

Our approach to this survey was to identify, assess, and sample
all suspect asbestos containing materials. Only accessible
materials were sampled. Materials inside walls, doors, ducts,
roofs, or other areas that would require destructive entry were
not sampled.

The supplied building diagrams were used to assign each room
a discrete number (functional space #). This number was used
for coding all further data collection. The diagrams with
functional space #'s are included in Appendix # II.

The suspect material in each functional space was assessed.
The quantity of the assessed material was estimated.

### Bulk Asbestos Sampling

The sampling strategy that was used is based on the EPA AHERA
model. Similar systems and materials are grouped into
"homogeneous areas." Random samples were taken of each type
of material.

Samples were collected by carefully removing a small
representative sample of the suspect material and sealing it
in a plastic bag. Water was used to control dust during
sampling. The sample and sample point were identified with a
sample number. Where possible, sampling points were tagged
with a strip of yellow tape with the sample number recorded
on the tape. All "wounds" where suspect materials were
sampled were sealed. Sample locations are on the diagram in
Appendix II.

### Bulk Asbestos Analysis

Bulk asbestos was analyzed using the polarized light/dispersion
staining - EPA Method. Bulk samples were viewed under a
stereoscope at 40X magnification. Fiber samples were then taken
for examination under the polarizing microscope. The fibers were
evaluated under crossed polars (100X) for extinction angle, sign
of elongation, and morphology. The fibers were then analyzed
under a Leitz dispersion staining objective to observe
characteristic colors in various orientations and Cargille
refractive index oils. Mineral identification was based the
observation of each mineral's unique optical characteristics under
the polarizing microscope.

### Qualifications

AES is a successful participant in the NIOSH Proficiency in
Analytical Testing (PAT) program. Our laboratory is accredited by

the American Industrial Hygiene Association (AIHA certificate 290). AES is also accredited by the Environmental Protection Agency (EPA) for bulk asbestos analysis and has received perfect scores on all test rounds of this program. All laboratory and field work is supervised by Board Certified Industrial Hygienists.

STANDARDS REGULATING ASBESTOS

Presently, for commercial buildings, there are no federal standards which dictate to how "in place" asbestos must be treated (i.e. removed, encapsulated, enclosed). There are also no ambient air levels, other than the OSHA "Action level" of 0.1 F/cc , which are federally mandated for commercial buildings.

## Minnesota

The state of Minnesota has recently passed two asbestos related rules. One rule states that friable asbestos containing materials must be maintained in a good state of repair. The second rule states that an inspection survey for asbestos must be done before a renovation or demolition project is undertaken, where there is reason to suspect that asbestos might be present. These rules are enforced by Minnesota OSHA.

## EPA

The EPA has specific rules governing the disposal of asbestos containing materials (ACM), removal of ACM before building demolition, disposal of ACM, and notification before removal of ACM. These rules are enforced by the Minnesota Pollution Control Agency.

EPA's Asbestos Hazard Emergency Response Act (AHERA), which regulates asbestos in schools, states that any material containing 1% or more of asbestos, must be inspected and controlled.

## OSHA

Occupational exposures to airborne asbestos are regulated by the OSHA Asbestos Standards (29CFR 1926.58 & 1910.1001).

Maintenance workers who work with asbestos containing materials are regulated by the OSHA asbestos standard (1926.58). Current standards state that an individual working with asbestos cannot be exposed to airborne levels in excess of 0.2 F/cc (fibers longer than 5 micrometers as an 8 hour time weighted average). If workers are exposed to levels above the "action level" of 0.1 F/cc (8 hr. TWA), the medical, training, and air monitoring provisions of the OSHA standards must be implemented.

RESULTS

Results of the bulk sampling/analysis are listed in Appendix I.

Diagrams are in Appendix II.

Results are listed in a database format.  Information listed for each sample includes:

The information is grouped in columns as follows:

HOMOG.AREA - the number of the homogeneous area sampled.
SAMP TAKEN - the number of samples taken in the area.
SAMPLES ANALYZED - the number of samples analyzed.
FUNCT SPACE - a number assigned to each area of the building.
FLOOR - the floor on which the area is located
DESCRIPTION - description of the homogeneous area material.
PERCENT AND TYPE ASBESTOS - lab results.  NAFS = no asbestos fibers seen.

10-19-89                    PANEL SPECIALTIES
                            BULK DATABASE

| HOMOG. SAMPLE | # TAKEN # ANALYZED | FUNC. SPACE FLOOR | LOCATION DESCRIPTION | PERCENT & TYPE ASBESTOS |
|---|---|---|---|---|
| 1 | 3 1 | 1 1 | WAREHOUSE #1 PLASTER, 1/8", WHT, HARD, ON CEILING | 1-5 CHRYSOTILE |
| 2 | 3 1 | 2 1 | OFFICE AREA F. TILE, 9X9, RED W/BRN & WHT STREAKS | 5-10 CHRYSOTILE |
| 3 | 3 3 | 2 1 | OFFICE AREA MASTIC FOR # 2 | 1-5 CHRYSOTILE |
| 4 | 3 1 | 2 1 | OFFICE AREA PIPE INSUL, 3", WHT & BRN, RAD HEAT | 40-50 CHRYSOTILE |
| 5 | 3 1 | 2 1 | OFFICE AREA PLASTER, 1/8", WHT, HARD, ON CEILING | 1-5 CHRYSOTILE |
| 6 | 3 3 | 4 1 | ELEVATOR SHAFT SHEETROCK, BRN/WHT LAYERS | <1 CHRYSOTILE <1 ACTINOLITE BOTH SUSPECTED |
| 7 | 3 1 | 5 1 | WAREHOUSE #2 PIPE INSUL, AIRCELL, 3", WHT & BRN, DEBRIS | 40-50 CHRYSOTILE |
| 8 | 3 1 | 6 1 | GENERAL OFFICE PLASTER, WHT/BRN LAYERS, SOFT, 3/4", CEILING | 5-10 CHRYSOTILE |
| 9 | 3 1 | 6 1 | GENERAL OFFICE F TILE, 1X1, TAN W/DK BRN STREAKS | 1-5 CHRYSOTILE |
| 10 | 3 1 | 6 1 | GENERAL OFFICE MASTIC FOR #9 | 1-5 CHRYSOTILE |



1ˢᵗ FLOOR PLAN

MADISON COMPLEX  1720 MADISON ST NE    FL?LS FN

## Sample Locations ⊘

## Functional Space ≠ Locations ⬡



# A·E·S APPLIED ENVIRONMENTAL SCIENCES, INC.

10-24-89

**Panel Specialties**
1828 Jefferson
Minneapolis, MN  55418

Attn: Doug Obrien

RE:  Supplementary Information - Madison Complex

Dear Doug,

Due to a miscommunication we did not survey the attached garage of
the Madison Complex for our report of last week.  This was brought
to our attention yesterday.

Rob Mickelson visited the garage yesterday to complete the survey
for asbestos.  Two suspect materials were seen, textured paint
similar to the material in the main building and vermiculite
insulation in the walls.

The textured paint sample contained asbestos (1 to 5% chrysotile
asbestos).

The vermiculite sample from the wall cavity was complex.  The
vermiculite itself had a trace of actinolite asbestos, the sample
contained a concrete like material which was negative, there was
also a small amount of soft plaster-like material which contained
chrysotile asbestos (however as part of the matrix it was less
than one percent).  The soft plaster leads us to believe that
there may be some old plaster behind the walls which may contain
asbestos at the one to five percent level.

The original field survey form and lab results are attached.
Include this information with the survey report delivered last
week.

We are faxing you this information for the closing this morning,
the original will be mailed.

If you have any questions please call.

Sincerely,

Patrick DiBartolomeo, CIH,CSP

APPLIED ENVIRONMENTAL SCIENCES, INC.

CLIENT: Panel Specialties

DATE: 10-23-89

F89-303

PAGE 1 OF 1

LAB USE ONLY. APPR. BY: SW

| SAMPLE | AREA | FLOOR | LOCATION | PHOTO | DESCRIPTION | COND-ITION | ACCESS-IBILITY | FRIA-BILITY | AIR MOVE. | LAB RESULTS |
|--------|------|-------|----------|-------|-------------|------------|----------------|-------------|-----------|-------------|
| (10698) 1 | Garage | 1 | Bathroom | | Textured sheet-rock | | RUSH | | | 5% Chrysotile |
| (10698) 2 | " | " | North wall | | Vermiculite (SP) spray-in fireproofing | | | | | <1% Chrysotile <1% Actinolite |

NAFS = NO ASBESTOS FIBERS SEEN

BULK ASBESTOS SURVEY WORKSHEET.1

SIGNED _____