UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Case No. 01-01139(JKF) |
| | . |
| W. R. GRACE & CO., | . 5414 USX Tower Building |
| | . Pittsburgh, PA  15222 |
| Debtors. | . |
| | . May 14, 2009 |
| . . . . . . . . . . . . . | . 9:04 a.m. |

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               LISA ESAYIAN, ESQ.
                               CRAIG BRUENS, ESQ.
                               BRIAN STANSBURY, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               CHRISTOPHER GRECO, ESQ.
                               DEANNA BOLL, ESQ.
                               RASHAD W. EVANS, ESQ.
                               MARC LEWINSTEIN, ESQ.
                               MAGALI LEE, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311 Fax No. (609) 587-3599**

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Official Committee:<br>of Asbestos Personal<br>Injury Claimants: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>      JEFF LIESEMER, ESQ.<br>      NATHAN FINCH. ESQ.<br>      WALTER SLOCOMBE, ESQ.<br>      BERNARD BAILOR, ESQ.<br>      JAMES WEHNER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005<br><br>Caplin & Drysdale, Chartered<br>By:  RITA TOBIN, ESQ.<br>375 Park Avenue<br>New York, NY  10152 |
| For the Unsecured<br>Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE KRIEGER, ESQ.<br>      LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For Official Committee<br>of Unsecured Creditors: | Duane Morris LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Ste 1200<br>Wilmington, DE  19801-1246 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>      SCOTT BAENA, ESQ.<br>      JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |

**APPEARANCES (Contd'):**

For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:                RICHARD WYRON, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


For Maryland Casualty     Connelly Bove Lodge & Hutz, LLP
and Zurich Intl.:         By:  JEFFREY WISLER, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Wilmington, DE  19899


                          Eckert Seamans Cherin & Mellott,
                          LLC
                          By:  EDWARD LONGOSZ, II, ESQ.
                          1747 Pennsylvania Avenue, N.W.
                          Suite 1200
                          Washington, D.C.  20006


For Sealed Air:           Skadden, Arps, Slate, Meagher &
                          Flom, LLP
                          By:  DAVID TURETSKY, ESQ.
                               JAN BAKER, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801


Co-Counsel to Libby       Cohn, Whitesell & Goldberg, LLP
Claimants:                By: DANIEL C. COHN, ESQ.
                              CHRISTOPHER CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110


For the Bank Lenders:     Landis Rath & Cobb, LLP
                          By:  RICHARD S. COBB, ESQ.
                               KERRI KING MUMFORD, ESQ.
                               JAMES GREEN, JR., ESQ.
                          919 Market Street
                          Wilmington, DE  19801


                          Paul Weiss Rifkind Wharton
                          & Garrison, LLP.
                          By:  REBECCA ZUBATY, ESQ.
                          1285 Avenue of the Americas
                          New York, NY  10019

4

**APPEARANCES (Contd'):**

For Continental
Casualty Company:            Ford, Marrin, Esposito,
                             Witmeyer & Gleser, LLP
                             By: ELIZABETH DeCRISTOFARO, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875


For Official Committee       Dies & Hile, LLP
of Asbestos Property         By:  MARTIN DIES, ESQ.
Damage Claimants:            1601 Rio Grande, Suite 330
                             Austin, TX  78701


                             LECG
                             By:  ELIZABETH DEVINE, ESQ.

For Various Claimant         Stutzman, Bromberg, Esserman &
Firms:                       Plifka
                             By:  DAVID J. PARSONS, ESQ.
                                  SANDER L. ESSERMAN, ESQ.
                             2323 Bryan Street
                             Suite 2200
                             Dallas, TX  75201


For Firemen's Fund:          Stevens & Lee, P.C.
                             By:  JOHN DEMMY, ESQ.
                             1105 North Market Street, 7th Fl.
                             Wilmington, DE  19801


For Fireman's Fund:          Stevens & Lee
                             By:  DAVID R. BEANE, ESQ.
                             111 North Sixth Street
                             P.O. Box 679
                             Reading, PA  19603


For Owens-Illinois:          McCarter & English
                             By: KATHARINE MAYER, ESQ.
                             Renaissance Centre, 405 N. King St.
                             Wilmington, DE  19801


For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

**APPEARANCES (Contd'):**

| | |
|---|---|
| For National Union Fire<br>Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MATTHEW RUSSELL, ESQ.<br>     ROBERT GUTTMANN, ESQ.<br>     MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>     JOSHUA CUTLER, ESQ.<br>     JONATHAN GUY, ESQ<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>    MARK SHELNITZ, ESQ.<br>    PAUL NORRIS, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For State of Montana<br>Department of<br>Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**APPEARANCES (Contd'):**

| | |
|---|---|
| For State of Montana: | Christensen, Moore, Cockrell, Cummings & Axelberg, P.C. By:  DALE R. COCKRELL, ESQ. Two Medicine Building 160 Heritage Way, Suite 104 Kalispell, MT  59904 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick By:  ROBERT M. HORKOVICH, ESQ. 1251 Avenue of the Americas New York, NY  10020-1186 |
| For Official Committee ov Asbestos Personal Injury Claimants: | Campbell & Levine By:  MARK T. HURFORD, ESQ. 800 North King Street Suite 300 Wilmington, DE  19701 |
| For CNA: | Goodwin Procter, LLP By:  DANIEL GLOSBAND, ESQ.      BRIAN MUKHERJEE, ESQ. Exchange Place Boston, MA  02109-2881 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker & Rhoads, LLP By:  NATALIE D. RAMSEY, ESQ. 300 Delaware Avenue, Ste. 750 Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A. By:  JOHN C. PHILLIPS, ESQ. 1200 North Broom Street Wilmington, DE  19806

Tre Angeli, LLC By:  JOSEPH RADECKI, ESQ. |
| For David T. Austern: | Piper Jaffray & Co. By:  JASON SOLGANICK |
| For the Property Damage Committee: | Ferry Joseph & Pearce, P.A. By:  THEODORE TACCONELLI, ESQ. 824 Market Street, Suite 19899 Wilmington, DE  19899 |

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Ford, Marin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By: THOMAS BRANDI, ESQ.<br>     TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA,<br>Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For Baron & Budd,<br>et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>     ALAN RUNYAN, ESQ.<br>     MARION FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Anderson Memorial<br>Hospital: | Kozyak, Tropin & Throckmorton PA<br>By:  JOHN KOZYAK, ESQ.<br>2525 Ponce de Leon, 9th Floor<br>Miami, FL |
| For Scotts Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>     ROBERT J. SIDMAN, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Official Committee<br>of Asbestos Property<br>Claimants: | Richardson Patrick Westbrook &<br>Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |

**APPEARANCES (Contd'):**

| | |
|---|---|
| For Official Committee<br>of Asbestos Property<br>Claimants: | Hamilton, Rabinovitz & Alschuler<br>By:  FRANCINE RABINOVITZ, ESQ.<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, CA  93923 |
| | Conway Del Genio, Gries & Co, LLC<br>By:  GREGORY BOYER, ESQ. |
| For Official Committee<br>of Asbestos Property<br>Claimants: | Lieff, Cabraser, Heinmann &<br>Bernstein<br>By:  ELIZABETH J. CABRASER, ESQ.<br>275 Battery Street, Suite 3000<br>San Francisco, CA  94111 |
| | Pryor Cashman LLP<br>By:  RICHARD LEVY, ESQ.<br>410 Park Avenue<br>New York, NY  10022 |
| | Riker, Danzig, Scherer, Hyland<br>& Perretti, LLP<br>By:  CURTIS PLAZA, ESQ.<br>One Speedwell Avenue<br>Morristown, NJ  07962 |
| For W.R. Grace: | WILLIAM SPARKS, ESQ. |
| | DAVID SIEGEL<br>PAUL NORRIS |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Dow Jones<br>News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment<br>Group: | Citadel Investment Group<br>By:  ASHOK VASVANI |
| For Murray Capital<br>Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For ERISA: | Lowenstein Sandler PC<br>By:  IRA LEVEE, ESQ.<br>65 Livingston Avenue<br>Roseland, NJ  07068 |

**J&J COURT TRANSCRIBERS, INC.**

**APPEARANCES (Contd'):**

```
For Morgan Stanley          Katten, Muchin, Rosenman LLP
Senior Funding, Inc.:       By:  NOAH HELLER, ESQ.
                                 MERRITT PARDINI, ESQ.
                                 JEFF FRIEDMAN, ESQ.
                            575 Madison Avenue
                            New York, NY


For Her Majesty the         Office of the Attorney General
Queen in Right of           By:  JACQUELINE DAIS-VISCA, ESQ.
Canada:


For Bank of America:        Richards, Layton & Finger, P.A.
                            By:  JASON MADRON, ESQ.
                            One Rodney Square
                            920 N. King Street
                            Wilmington, DE 19899


For PD/FCR:                 ALAN RICH, ESQ.

For Loan Maker/Long Acre:   Pepper Hamilton
                            By:  DENNIS R. VERY, ESQ.
                            500 Grant Street, 50th Floor
                            Pittsburgh, PA


For Seaton Ins. Co.:        Drinker Biddle & Reath LLP
                            By:  MICHAEL F. BROWN, ESQ.
                                 WARREN PRATT, ESQ.
                            One Logan Square
                            18th & Cherry Streets
                            Philadelphia, PA  19103


For Arrowwood Indemnity     Wilson, Elser, Moskowitz, Edelman
f/k/a Royal Indemnity:      & Dicker, LLP
                            By: CARL PERNICONE, ESQ.
                            New York, NY 10019


                            Bifferato, Gentilotti, Biden
                            & Balick, LLC
                            By:  GARVAN McDANIEL, ESQ.
                            800 N. King Street
                            Wilmington, DE  19899


For Arrowwood Indemnity     O'Melveney & Meyers, LLP
f/k/a Royal Indemnity:      By:  TANCRID SCHIAVONI, ESQ.
                            Times Square Tower, 7 Times Square
                            New York, NY  10036
```

**APPEARANCES (Contd'):**

For JD Capital:                    JD Capital
                                   By:  RYAN DUFFY, ESQ.
                                        TAI CURION

For the Equity Committee:          Kramer, Levin, Naftalis & Frankel,
                                   LLP
                                   By:  DOUGLAS MANNAL, ESQ.
                                        DAVID BLAVEY, ESQ.
                                   1177 Avenue of the Americas
                                   New York, NY  10036

For the Equity                     Kramer Levin Naftalis & Frankel
Committee:                         By:  GREGORY HOROWITZ, ESQ.
                                   919 Third Avenue
                                   New York, NY  10022

For the Blackstone                 The Blackstone Group
Group:                             By:  BRIAN BRESNAHAN

For the U.S. Trustee:              United States Trustee Department
                                   By:  DAVID KLAUDER, AUSA
                                   833 Chestnut Street
                                   Suite 500
                                   Philadelphia, PA  19107

For Fair Harbor Capital            Fair Harbor Capital, LLC
LLC:                               By:  FRED GLASS

For Fresenius Medical              McDermott, Will & Emery
Care Holdings, Inc.:               By:  DAVID S. ROSENBLOOM, ESQ.
                                   227 West Monroe Street
                                   Chicago, IL  60606

For Century Indemnity:             White & Williams, LLP
                                   By:  JOSEPH GIBBONS, ESQ.
                                   1800 One Liberty Place
                                   Philadelphia, PA  19103

For Loeb Partners:                 Paul Weiss Rifkind Wharton
                                   & Garrison, LLP.
                                   By:  ANDREW ROSENBERG, ESQ.
                                   1285 Avenue of the Americas
                                   New York, NY  10019

**APPEARANCES (Contd'):**

For Kaneb Pipe Line            Fulbright & Jaworski
Operating Partnership,         By:  STEVE PEIRCE, ESQ.
et al.:                        300 Convent Street
                               Suite 2200
                               San Antonio, TX  78205


For Bloomberg, LLP             Bloomberg, LLP
                               By:  STEVEN H. CHURCH


For Travelers:                 Simpson, Thacher & Bartlett
                               By:  ELISA ALCABES, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017


For Anderson Hospital:         BUD FERRY, ESQ.


For Certain London Market
Companies:                     Mendes & Mount, LLP
                               By:  ALEXANDER MUELLER, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019-6829


For Certain London Market
Companies:                     Tucker Arensberg, P.C.
                               By:  MICHAEL A. SHINER, ESQ.
                               1500 One PPG Place
                               Pittsburgh, PA  15222


For Everest Reinsurance        Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:       Courtney, P.C.
                               By:  JOHN D. MATTEY, ESQ.
                                    BRIAN KASPRZAK, ESQ.
                               913 North Market St., Suite 800
                               Wilmington, DE  19801


For Everest Reinsurance        Crowell & Moring, LLP
Co. & McKinley Ins. Co.:       By: MARK D. PLEVIN, ESQ.
                                   LESLIE A. EPLEY, ESQ.
                                   LESLIE DAVIS, ESQ.
                               1001 Pennsylvania Avenue, NW
                               Washington, DC  20004


For Borrowers Committee:       Zuckerman Spaeder LLP
                               By:  VIRGINIA GULDI, ESQ.
                               1800 M. Street, N.W. Suite 1000
                               Washington, D.C.  20036

**APPEARANCES (Contd'):**

For SNSF Railway Co:          Pepper Hamilton, LLP
                                 By:  LINDA CASEY, ESQ.
                                 3000 Two Logan Square
                                 18th & Arch Streets
                                 Philadelphia, PA  19103

For Fee Auditor:              Warren H. Smith & Associates PC
                                 By:  WARREN H. SMITH

For Hartford Financial
Service Group:               Wilmer, Cutler, Pickering, Hale
                                 & Dorr LLP
                                 By:  MELANIE DRITZ, ESQ.
                                 399 Park Avenue
                                 New York, NY  10022

For Serengeti:               Vinson & Elkins, LLP
                                 By:  ARI BERMAN, ESQ.
                                 Trammell Crow Center
                                 2001 Ross Avenue, Suite 3700
                                 Dallas, TX  75201

1           MS. YOUNKER:  Parties on the phone and in the

2    courtroom, please identify yourself when you speak so everyone

3    everywhere knows who is speaking.

4           COURT CLERK:  All rise.

5           THE COURT:  Please be seated.  This is the matter of

6    W.R. Grace, Bankruptcy Number 01-1139.  The participants I have

7    listed by phone are Elisa Alcabes, Scott Baena, Janet Baer, Ari

8    Berman, David Bernick, David Blavey, Jeffrey Berger, Peg

9    Brickley, Michael Brown, Christopher Candon, Tiffany Cobb,

10   Jacob Cohn, Andrew Craig, Elizabeth DeCristofaro, John Demmy,

11   Martin Dies, Melanie Dritz, Lisa Esayian, Nathan Finch,

12   MaryBeth Forshaw, Roger Frankel, Theodore Freedman, James

13   Green, Jonathan Guy, Barbara Harding, Robert Horkovich, Gregory

14   Horowitz, Mark Hurford, John Kozyak, Matthew Kramer, Arlene

15   Krieger, Lewis Kruger, Michael Lastowski, Magali Lee, Jeffrey

16   Liesemer, Kevin Mangan, Garvan McDaniel, Alex Mueller, Brian

17   Mukherjee, Kerri Mumford, Marti Murray, James O'Neill, David

18   Parsons, Carl Pernicone, Margaret Phillips, John Phillips,

19   Joseph Radecki, Natalie Ramsey, Alan Rich, Andrew Rosenberg,

20   Alan Runyan, Jay Sakalo, Tancrid Schiavoni, Darrell Scott, Mark

21   Shelnitz, Marnie Simon, Walter Slocombe, Jason Solganick,

22   William Sparks, Daniel Speights, Shayne Spencer, Theodore

23   Tacconelli, David Turetsky, James Wehner, Jennifer Whitener,

24   Richard Wyron and Bernard Bailor.

25           And I'll take entries in court, please.  Good

1  morning.

2          MS. HARDING:  Good morning, Your Honor, Barbara

3  Harding on behalf of the debtors.

4          MS. BAER: Good morning, Your Honor, Janet Baer on

5  behalf of the debtors.

6          MR. FINCH:  Good morning, Your Honor, Nathan Finch

7  and Jeffrey Liesemer on behalf of the Official Committee of

8  Asbestos Personal Injury Claimants.

9          MR. LIESEMER:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. HURFORD:  Good morning, Your Honor, Mark Hurford,

12  Campbell Levine on behalf of the ACC.

13          MR. SCHIAVONI:  Your Honor, Tancrid Schiavoni from

14  O'Melveney for Arrowood.

15          MR. COHN:  Good morning, Your Honor, Daniel C. Cohn

16  for the Libby Claimants.

17          THE COURT:  Excuse me, one second.  All right, thank

18  you.

19          MR. LONGOSZ:  Good morning, Your Honor, Edward

20  Longosz for Maryland Casualty.

21          MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

22  on behalf of Maryland Casualty and Zurich.

23          MR. SHINER:  God morning, Your Honor, Michael Shiner

24  for Certain London Market Companies.

25          THE COURT:  I have a reminder from my staff, folks,

1  before we start with the actual agenda, that I'm getting,

2  again, which didn't happen for awhile, combinations of

3  responses and motions, and the system does not afford

4  appropriate service when that happens.  So, I have to strike

5  the second part of whatever gets filed, in that fashion,

6  because we can't make service of motions attached to responses.

7  So, please, make sure if you're going to file a separate motion

8  that you file it as a motion, not as a part of a response

9  because the system simply can't deal with it in that fashion.

10  So, that's just the first motion.

11         The other thing is, I'm getting very late filed

12  matters.  As a result, things aren't getting into binders and

13  it's getting very difficult at the last minute to prepare, when

14  things come in a day or so before the hearing.  So, please, if

15  you can get back to the point where I get things filed on time,

16  that would be helpful.  Okay.  Let's start with the agenda for

17  this morning.  Ms. Baer?

18         MS. BAER:  Your Honor, before we begin, we have one

19  more housekeeping matter.  We had filed a certification of

20  counsel with respect to a protective order for confidential

21  information not related to medical information.  That was at

22  Docket Number 21403.  It was one of the two matters I mentioned

23  at our last omnibus and you did, in fact, enter the third

24  amended CMO, but this order has not yet been entered and we

25  were wondering if there was an issue or a problem because it

1    implicates our producing certain documents.

2         THE COURT:  I thought there were two orders that were

3    submitted to me and that I told staff to enter them both after

4    I reviewed them, but I was in Delaware, staff wasn't and there

5    may have been some mixup.  Mona, if you can just pull it after

6    this hearing -- after the hearing, Docket 21403, I'll take a

7    look at it after the hearing, make sure that it's the same

8    order that I recollect.  I didn't -- I remember seeing it, I

9    don't remember having an issue with it, but I'll check again.

10        MS. BAER:  Thank you, Your Honor.  And I do have a

11   copy if that would help you.

12        THE COURT:  Oh, well, let me see it now, then,

13   please.  I'll just take care of it now.

14        MS. BAER:  This is the certification of counsel that

15   attached and the order is attached to it.

16                         (Pause)

17        THE COURT:  Okay.  I thought I had instructed this

18   order to get done, but I'll sign it again.  If it hasn't been

19   entered, I'll just sign it today.

20        MS. BAER:  Thank you, Your Honor, we appreciate it.

21        THE COURT:  Mona, I'll just give it to you.  All

22   right, that order will be entered today.

23        MS. BAER:  Thank you, Your Honor.

24        THE COURT:  Okay.

25        MS. BAER:  Your Honor, this morning we have three

1 matters on the agenda and co-counsel, Barbara Harding is going

2 to address these matters.

3          THE COURT:  Okay.  Before you begin, I saw some other

4 people who came in. Did you need to enter appearances, folks?

5 Good morning.

6          MR. STANSBURY:  Brian Stansbury for W.R. Grace.

7          COURT CLERK:  I'm sorry, could you use the

8 microphone.

9          MR. STANSBURY:  Oh, sure.  Brian Stansbury for W.R.

10 Grace.

11          MS. DeCRISTOFARO:  Good morning, Your Honor,

12 Elizabeth DeCristofaro for Continental Casualty Company.

13          THE COURT:  Did I get everyone now?  I think so.

14 Okay, Ms. Harding, thank you.

15          MS. HARDING:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MS. HARDING:  May I approach and just hand you some

18 --

19          THE COURT:  Yes.  Thank you.

20          MS. HARDING:  Good morning, Your Honor, we appreciate

21 you taking the time from your schedule to hear this matter on

22 an expedited basis.  And by way of background, and a short

23 status report on where we stand with respect to discovery, why

24 we're here today, and to give the Court some context as to why

25 the debtors and other plan proponents believe that it was

1 necessary and appropriate to seek the Court's intervention at

2 this time, I'd just like to give you a brief overview of the

3 plan proponents' efforts to provide discovery to the objecting

4 parties in this case.

5           Back in December, late December, plan proponents

6 received their first requests for discovery.  Over the course

7 of several months, I believe that it's accurate to say that the

8 plan proponents have received discovery requests from over 20

9 different objecting parties.  I think it's also fair to say

10 that it has been an extraordinary effort on the part of the

11 plan proponents to respond to this discovery.

12          We filed objections to the discovery where they were

13 appropriate and, indeed, there were many cases where on their

14 face, the requests were not appropriate, but with respect to

15 every discovery request that was propounded on the plan

16 proponents, we attempted to respond substantively.

17          And so, I'd like to give the Court just an overview

18 of just how much discovery has been provided.  And the aim and

19 the goal of the plan proponents, at all times, has been to

20 attempt to give the objecting parties the discovery that they

21 believe they needed, even if the debtors didn't believe that it

22 was necessary or the plan proponents didn't believe that it was

23 necessary to any issue that actually would be in contention at

24 the confirmation hearings.  We attempted to comply with their

25 requests to give them the discovery that they thought that they

1 needed in order to make their arguments.

2        So, first, I'd like to show the Court, as you can

3 see, we've been served 30 separate requests for admission.  So,

4 20 different parties, 30 separate requests for admission, with

5 over six -- I couldn't count them all, between 600 and a

6 thousand different requests for admissions.

7        Interrogatories; 32 separate sets of interrogatories,

8 again with over 600 separate interrogatory requests.  Document

9 requests; 37 separate document requests, again with over 600

10 separate requests for documents.  And, finally, which I think

11 may be unprecedented in bankruptcy litigation, we have received

12 over ten 30(b)(6) deposition notices, with over 100 separate

13 designated topics requested for testimony.

14        The debtors and the plan proponents, instead of

15 seeking the Court's intervention to try to put some limits on

16 the discovery, attempted to substantively respond to all of

17 these requests, including the 30(b)(6) deposition notices.

18        To date, Mr. Lockwood has undergone two depositions,

19 where he responded to over, I think it's over 12 hours, 10 to

20 12 hours of questions from all objecting parties that sought to

21 ask him questions.  Mr. Fink, counsel for W.R. Grace, underwent

22 a 30(b)(6) deposition yesterday for over eight hours, and we've

23 designated two other 30(b)(6) representatives in order to

24 answer questions about the plan and how it operates.  The FCR

25 has designated a 30(b)(6) witness who will testify tomorrow.

1          So, in short, Your Honor, it has been, I think, a

2    very good faith effort on the part of the plan proponents to

3    provide the information that the objecting parties require in

4    order to make their arguments.

5          With respect specifically to the Libby Claimants, the

6    requests there have been the most onerous and the debtors and

7    the plan proponents' attempts to comply with the request and to

8    meet their requests for information, we've gone to

9    extraordinary lengths to meet their requests.

10          They have filed eight separate requests, docket --

11    I'm sorry, interrogatory requests.  They originally filed one

12    that was clearly way over the limit and we objected, spoke with

13    them, so they then filed eight separate interrogatory requests

14    on behalf of eight separate individual claimants.

15          And they also filed a 30(b)(6) deposition notice and

16    designated over 70 separate topics about which they wanted to

17    inquire of the plan proponents.

18          And, again, instead of seeking the Court's

19    intervention to limit this discovery, which was clearly

20    burdensome and much of it not necessary to any issue that will

21    ever be tried in front of this court, the debtors attempted to

22    comply substantively with all of their requests and to give

23    them the information where we had it and where we could.

24          So, that is the status of where we are today and why

25    -- I just wanted to give the Court some background to

1 understand that we have not come here lightly or quickly, but

2 we've now come before the Court because we think that it has

3 gotten to the point where it's kind of beyond ridiculous.   And

4 now the Libby Claimants have noticed 18 depositions of

5 individual claimants, in Libby, Montana.  They've noticed them

6 as perpetuation depositions, they are now in their papers

7 suggesting they're not perpetuation depositions.  I think that

8 at the end of the day, Your Honor, our concerns and complaints

9 about these depositions, while we think procedurally they're

10 defective and we can talk about it if you want, Your Honor, at

11 the heart of the matter and what's fundamentally -- you know

12 the fundamental problem we have with these today, is that we

13 don't think that there is any conceivable set of facts under

14 which individual claimant testimony will be necessary at the

15 confirmation hearing.

16        So, that is why we brought this to your Court's

17 attention, and we're seeking your intervention to stop those

18 depositions from going forward.

19            I've created a chart, Your Honor --

20            THE COURT:  Well, could I interrupt for a second?

21            MS. HARDING:  Yes.

22            THE COURT:  Way back, very early in the case, I dealt

23 with the issue of the perpetuation.  So, to the extent that

24 there is somebody who is clearly an extremist, then it seems to

25 me that if that standard is met and I thought there have been

1  depositions that have taken place throughout this in other

2  cases, in that circumstance.  If that's the issue, then those

3  depositions should go forward, but there's a burden to meet to

4  substantiate that that's the case.  If the burden is met,

5  frankly, except for maybe one or two, the Court hasn't even

6  been involved after I set up the parameters for those.   The

7  parties have generally agreed that that's the case.  They've

8  had the medical background that indicates that, in fact,

9  somebody is in a condition where the perpetuation deposition

10 needs to take place, but it's not for purposes of plan

11 confirmation it's for purposes of some other litigation that's

12 going on.

13       MS. HARDING:  Your Honor, I completely agree. I think

14 that to the extent that they're seeking perpetuation

15 depositions, under Rule 27, they clearly have not met that

16 burden.  They haven't even filed the appropriate papers to do

17 it.  They haven't given notice.  They haven't proceeded along

18 the course that Your Honor set out.  And if they are seeking

19 those depositions pursuant to that rule, then they clearly have

20 not met that burden and they should not be permitted to go

21 forward until they meet that burden.  And, so, I completely

22 agree with the Court.

23       My understanding from the Libby Claimants' papers,

24 that they are seeking those depositions pursuant to Rule 30.

25 And they're seeking them because they argue that the testimony

1  is relevant, somehow, to the confirmation hearing.  And so, I

2  anticipate that that is the argument that Mr. Cohn, is going to

3  make and I want to make sure that I address that, as well,

4  because I think that's just not the case.

5        THE COURT:  All right

6        MS. HARDING:  So, Your Honor, as I understand the

7  Libby Claimants' papers, they have three general categories of

8  claims of relevance, I'll call them.  The first claim is that

9  they need somehow to do these depositions because they have to

10 establish that they have wrongful death and loss of consortium

11 claims.  Okay.  The bottom line, Your Honor, is that at the end

12 of the day, none of those issues that they're raising in their

13 papers with respect to those claims, are really in dispute and

14 will have any bearing or relevance on the confirmation

15 proceeding.

16        First, with respect to standing to argue that there's

17 some -- that the TDPs don't allow for payment of loss of

18 consortium and wrongful death claims.  There's been nobody in

19 this proceeding that's argued that the Libby Claimants don't

20 have standing to object to those claims.  Like any other

21 personal injury claimant, to the extent that they're allowed by

22 state law, it's conceivable that they might have those claims

23 and nobody is arguing and will argue that it might not be

24 possible that the Libby Claimants have those claims.  So,

25 that's one.

1        Two, the -- so one is standing and two is the

2  existence, the existence of such claims.  Again, we do not

3  argue that they might not have those claims.  It's just not in

4  dispute.

5        The third, does the TDP prevent payment of such

6  claims?  They have made that allegation over and over again.

7  They've stated it in some, I think, some other papers and the

8  bottom line is, they're just incorrect.  And they sat there

9  yesterday with Mr. Fink in a 30(b)(6) deposition, and Mr.

10 Lockwood in a 30(b)(6) deposition, nobody asked that question.

11 They'll be another deposition of Mr. Hughes, maybe they'll ask

12 Mr. Hughes, but that's not the case.  There is -- that is

13 absolutely a possibility, it happens in other trusts, and it's

14 just incorrect.

15       And then finally, there's an argument that somehow

16 that this position about wrongful death and consortium claims

17 is unique to Libby.  It's just not.  Claimants -- personal

18 injury claimants in other jurisdictions depending -- may or may

19 not have those claims.  So, it's just incorrect.

20       So, with respect to that whole category of, we need

21 this, we need these depositions for the plan confirmation

22 hearings, for these purposes, I think, again, there's no set of

23 facts under which that could be correct.

24       And then the second set of claims that they make

25 relate to demonstrating the severity of the Libby Claimants'

077eab481734ac2a

1  disease.  And without getting into the merits of those

2  contentions and the various parties' positions with respect to

3  the Libby Claimants contentions about their disease and the

4  severity of it.

5        The bottom line is that individual claimants cannot

6  offer any testimony that would be relevant to the Court's

7  consideration of that issue with respect to the confirmation of

8  the plan.  I've listed here the claims that they made in their

9  papers, but their medical condition, it's hearsay from a

10 plaintiff to testify about their diagnosis.  The diagnosis has

11 to be made by a qualified doctor or an expert and they have,

12 indeed, put forward experts to talk about those issues.

13       So, again, it would be -- it's inadmissible and also

14 they're not qualified to testify about their medical condition,

15 qualified to assess the severity of their disease.  Again, that

16 is expert testimony.  While they can talk about their symptoms,

17 which are in their medical records, the testimony about

18 severity of disease, as it relates to the biological conditions

19 that you have, again, is expert testimony.  And then -- and,

20 again, they have experts that have been offered for those

21 purposes.

22       Again, finally, with respect to whether their

23 condition and the severity of their condition is caused by

24 their underlying asbestos disease that, again, that's clearly

25 expert testimony.  That is not something that an individual

1  claimant is qualified to testify about.

2          So, Your Honor, to sum up, the debtors, and I believe

3  the other plan proponents, believe strongly that to force the

4  plan proponents to go forward and take these depositions, to

5  spend the resources of the estate to investigate the individual

6  claims of each individual that's going to testify, to get

7  experts to respond to them and to do all of the things that are

8  necessary if an individual is going to testify before the Court

9  in a proceeding, is a clear waste of the assets of the estate.

10  Thank you.

11          THE COURT:  Mr. Finch.

12          MR. FINCH:  May I be heard, Your Honor, briefly?

13          THE COURT:  Yes, sir.

14          MR. FINCH:  Nathan Finch for the Asbestos Claimants

15  Committee.  Just following up on what Ms. Harding said.

16          The main objection that the debtor raised, and the

17  ACC joins in this, is that I don't think any of this testimony

18  will provide evidence that is relevant or admissible to help

19  the Court decide the issues the Court will have to decide for

20  purposes of confirming or not confirming this plan of

21  reorganization.

22          In their papers, the Libby Claimants basically make

23  three arguments as to why testimony from individual claimants

24  is necessary for plan confirmation purposes.  Two of those

25  relate to wrongful death and consortium claims and the last

1 relates to the severity of their diseases.

2        Let's just step back for first principles for a

3 minute.  The plan of reorganization has a channeling injunction

4 that's going to send to the Asbestos PI Trust any kind of

5 asbestos personal injury related claim as that is defined in

6 the plan that fits within that definition and it clearly

7 includes wrongful death and consortium claims, those types of

8 claims are channeled to the trust.

9        The Libby Claimants, as I understand their position,

10 want to argue that the TDP provisions somehow take away rights

11 in a way that is impermissible under the bankruptcy code.  In

12 order to prove up, if you will, the fact that there are

13 wrongful death and consortium claims, they don't need to prove

14 that they have a "valid" wrongful death or consortium claim,

15 all they would need to prove is that they have made those

16 allegations, i.e. through a complaint, because it's basically,

17 once you have a complaint that could survive the state law

18 equivalent of a federal 12(b)(6) motion to dismiss.  Even if it

19 wouldn't survive that motion, if you made that allegation, that

20 claim is going to get channeled to the trust and it's going to

21 have to be dealt with by the trust.

22        And so, for purposes of proof, you don't have to go

23 and, I think it's, (a) not relevant, and (b) unnecessary and

24 burdensome, you don't have to go and take the deposition of the

25 grieving widow or the children or the grandchildren of someone

1 who died from an asbestos-related disease to prove that, in

2 fact, they have made or will make a wrongful death claim or a

3 loss of consortium claim.  You can prove that through the

4 production of a complaint on behalf of that person.

5 　　　　I think, at least speaking for the ACC, I would

6 stipulate to the authenticity of such a complaint, I would

7 stipulate to the admissibility of it for the purposes of

8 proving that the Libby Claimants made such allegations, and

9 once they have that in the record, they have everything they

10 need to argue about the plans' effect and treatment and the

11 TDP's plans effect and treatment of wrongful death and

12 consortium claims.  They don't need to go and prove the

13 elements of the claim that they would be able to satisfy those

14 elements and, in fact, if that was a standard of proof I would

15 respectfully suggest that Your Honor couldn't do it because

16 those are things that you have to prove in front of a jury

17 somewhere, not in front of a bankruptcy court, and it's

18 completely irrelevant for plan confirmation purposes whether

19 they have a valid wrongful death, consortium claim or just that

20 they have one.

21 　　　　So, once they have the complaint, they can make

22 whatever arguments they choose to make about the wrongful death

23 and consortium issues.  I happen to think they're completely

24 wrong about that, the TDP, it's true, doesn't have a special

25 expedited review category for wrongful death and consortium,

1 but whatever the claim is, it ends up at the TDP, the TDP has

2 to deal with it.  If it doesn't settle it somehow, eventually

3 it goes to arbitration.  If it doesn't get arbitrated or

4 agreed, they can eventually end up suing the trust in a place

5 where they have personal jurisdiction over it in the tort

6 system, subject only to the caps on the total amount of

7 judgments that you might be able to get.

8          They can make whatever arguments they make about the

9 confirmability of the plan --

10          THE COURT:  Well, the cap isn't on the judgment, it's

11 on the payment, isn't it?

12          MR. FINCH:  No, there's an absolute -- there's a cap

13 both on the judgment and on the payment.  It's in Section 7.7

14 of the TDP.

15          THE COURT:  Okay.

16          MR. FINCH:  It's basically -- this isn't the time or

17 the place to get into the details but --

18          THE COURT:  Right.  I just need to reread it, that's

19 all.  Okay.

20          MR. FINCH:  -- but there is ultimately -- you can't

21 go and get a $20 million judgment against the trust on a

22 mesothelioma claims.  That would sort of defeat the purposes of

23 524(g) and make it difficult to have a plan function.

24          In any event, the fact is that if the claimants, as

25 we expect them to do, the claimants generally, the class of

1  claimants vote in favor of this plan and vote to adopt what are

2  clearly alternative dispute resolution procedures, I think that

3  ends a lot of the arguments that people have about whether

4  something is or is not permissible.

5       So that, I think, covers some of the Libby Claimants

6  individual depositions, at least the wrongful death and the

7  consortium people.

8       The other group of people they say, well, we want to

9  put on testimony from people who are sick, to demonstrate that

10 the TDP criteria or the severe disabling plural disease

11 arbitrarily exclude them from the ability to be compensated by

12 the trust.  And, again, I think they're wrong about that.  The

13 TDP expedited review criteria basically, they're not saying

14 that claims are valid or invalid, or allowing or disallowing

15 claims, once this bankruptcy case is over, there will be a

16 trust.  There won't be any allowance or disallowance of claims,

17 the claims get channeled to the trust and the trust has to deal

18 with them and it has -- the TDP has a standing settlement

19 offer.  If you meet these set of criteria, we will make you an

20 offer of an amount of money.  If you don't meet that criteria,

21 then there's an individual review process and the arbitration

22 process and so on and so on.

23      And so for purposes of evaluating, I think, the

24 confirmability of the plan, whether or not an individual

25 claimant does or doesn't meet the expedited review criteria, I

1  think, tells you nothing about whether the plan is confirmable

2  or not.

3        Even leaving that aside, though, even if they want to

4  attack the TDP expedited review criteria, per se -- just what

5  I understand they want to do, through the testimony of Dr.

6  Whitehouse, who I think is the only witness they will put

7  forward who will specifically focus on the TDP criteria, and

8  there individual claimant testimony is not going to be relevant

9  or admissible to establish that the eligibility criteria or the

10 settlement criteria, are reasonable or not.

11        I happen to think that if the class of asbestos

12 claimants votes in favor of the plan, and the plan provides for

13 ways in which cases will be resolved administratively or

14 settled, that whether or not those criteria are reasonable or

15 not doesn't really matter because the class as a whole has

16 voted in favor of it.

17        However, even if you were to say, okay, well, maybe

18 there is a reasonableness criteria in the TDP, meaning that you

19 couldn't have a TDP criteria that says, for example, we're only

20 going to pay mesothelioma victims who are left-handed and have

21 red hair.  That would probably be an arbitrary criteria.  But,

22 the question is not whether this doctor is right or that doctor

23 is right, the question is, is there any sort of reasonable

24 basis in the medical literature for the criteria that are in

25 the TDP.  And that question, for purposes of looking at the TDP

1  criteria, is a question that can only be answered by expert

2  testimony about the criteria, the criteria per se.  If I could

3  use the ELMO for just a moment.

4          The TDP criteria for severe plural disease, like any

5  of the non-malignant diseases, they have an X-ray/pathology

6  criteria, they have a PFT criteria and they have an exposure

7  criteria.

8          I don't hear the Libby Claimants, I haven't seen

9  anything that they have filed thus far that criticizes or

10 complains about the exposure criteria in the TDP.  And maybe

11 they will, but I haven't seen it.  And as to the X-ray criteria

12 and the PFT criteria, they are complaining that those are

13 "medically reasonable or medically not reasonable."  There is

14 no way that an individual claimant can offer testimony that a

15 piece of criteria that is written down in the TDP that has an

16 X-ray component and a PFT component -- just for the purposes of

17 the record it's at Page 26 of the TDP -- there's no way an

18 individual claimant can offer testimony about whether or not

19 they have the type of injuries that meet those criteria.

20          So, I don't see how the testimony of a claimant that

21 I feel sick, I have a hard time breathing, I was exposed to

22 asbestos, none of that is relevant to the inquiry of whether

23 this plan is confirmable under the bankruptcy code.  And even

24 if you had to get into a dispute about whether Dr. Whitehouse's

25 view of the medical criteria is right, or Dr. Welch's view of

1 the medical criteria is right, which I don't think you have to

2 do to confirm this plan, it still -- the testimony of

3 individual claimants wouldn't shed any light on that subject.

4         And, so for all those reasons, Your Honor, I join the

5 debtors' motion to preclude the depositions of these individual

6 claimants.  I do think it's a tremendous waste of estate

7 resources.  It doesn't provide any evidence that's likely to be

8 relevant or admissible at the confirmation hearing, at least

9 with respect to the wrongful death and consortium claims,

10 there's a much less burdensome way for them to tee up that

11 issue to litigate that confirmation hearing.  Thank you.

12         MR. SCHIAVONI:  Your Honor, if I could just make four

13 points briefly.  Tank Schiavoni for Arrowood.

14         First of all, this issue that you've heard form both

15 Mr. Finch and Ms. Harding about the relevance of the testimony

16 and its admissibility, I just wanted Your Honor to know that we

17 separately briefed that issue, and we provided in our joinder

18 the Third Circuit authority, that stands for the proposition

19 that a claimants -- the medical diagnosis of a claimant can't

20 be offered by a layperson.  There's a lot of testimony on that,

21 it comes up in personal injury cases, you know, somewhat -- you

22 know, not all the time, but it's an issue that comes up.  A

23 person can testify about their suffering, their pain and

24 suffering and the fact finder can take that in consideration in

25 awarding damages, but a layperson, a claimant, can offer

1  testimony about their actual condition and have that be

2  admissible.

3        The leading case in the Third Circuit on that is

4  Montgomery v. Pinchak that's 294 F.3d 492, and that's a 2002

5  decision.  There's another four or five Third Circuit decisions

6  that we cite for the same proposition.  Fundamentally, we would

7  just take the position that this one is just not admissible,

8  it's not even an issue of relevance, it's fundamentally not

9  admissible.

10        The second point I wanted to make is that Your Honor

11  set a schedule here that required written discovery to be

12  served on January 23rd and then set a date for -- effectively

13  set a date for when physical discovery had to be produced,

14  documents had to be produced, and that date was important

15  because the date then followed for expert reports on March 16

16  and a date for rebuttal expert reports after that.

17        For these -- it's very important you understand

18  what's sort of effectively happening and what's really, I think

19  going on behind the scenes with regard to these 18 deponents.

20        The Libby Claimants didn't produce medical records

21  for these 18 deponents in response to the document requests

22  that were produced to them.  They didn't produce them in

23  connection with the Rule 26 disclosures that they were required

24  to make in connection with their expert on March 16.  They then

25  let the rebuttal date, the date for serving rebuttal reports

1  run, they've only recently, only after the rebuttal date ran,

2  did they produce medical records for these 17 folks.

3       What they apparently intend to do, and this isn't

4  speculation, it's in their papers is, they're going to have

5  these people sort of offer some testimony and then Dr.

6  Whitehouse is somehow going to be offering testimony about

7  their testimony.  This is a sort of way -- and this has all

8  occurred after Judge Molloy in the criminal case has struck Dr.

9  Whitehouse and found him not to be an expert on the core aspect

10 of his expert report.  This is a sort of belated after the fact

11 attempt, after their core expert has been struck, to try to

12 buttress his testimony and come up with a sort of alternative

13 way to offer it to the Court.

14       And it's highly prejudicial to all of us because none

15 of us got the medical records for these folks in time to

16 designate experts to look at them, to offer testimony, offer

17 reports about them or, for that matter, to offer rebuttal

18 reports.  It was sort of just dumped on us in the last couple

19 of weeks after the date for the rebuttal reports to run --

20 actually ran.

21       The third point I wanted to make was about burden.

22 And there's sort of two things I wanted to quickly say about

23 this.  One is just maybe the obvious, Judge, and I mean I

24 attended the two depositions that have taken place the other

25 day.  I mean, you know, what you see happen here is, at

1  minimum, you're going to have -- if you're going to have 18

2  depositions in Libby, Montana, you're going to have somebody,

3  at least one person from Grace there, one person from the FCR,

4  and one person from the ACC, I don't know how you restrain the

5  Property Damage Committee and the Equity Committee, they seem

6  -- they showed up at insurance depositions that seem to have

7  nothing to do with them, let's assume they don't come.  You

8  know, even if they don't come, though, just having the core

9  folks there, you know, we presented just an hour estimate on it

10 and it works out to, you know, literally a very substantial

11 number of hours.  But, just put that aside and say the case has

12 gone on for seven years and who cares about the hours, the real

13 problem with this is, on the burden front anyway, is that to

14 schedule 17 business days between now and the cutoff date for

15 discovery, you know, it's virtually impossible.  Even if they

16 were to take place back-to-back, you know, we would need a

17 solid month just in Libby, Montana, just to do these 17

18 depositions.  And there's no assurance, of course, that we'd be

19 able to do them back-to-back.

20       And then just the last point I'd make to you is, I

21 think an observation that the Court made, that there's been no

22 showing that any of the -- that there's an extremist reason to

23 do any of these depositions, that they're really, truly

24 perpetuation depositions.  There's been no affidavit submitted

25 by independent treating physicians with respect to any of these

1  folks.  You know, we're not -- since we just got the medical

2  records, we're still going through them, I can tell you this

3  though, even just from their papers that they filed, you know,

4  some of these folks are not -- are clearly not an extremist and

5  the most obvious factor of that is, to the extent they're

6  offering people to testify about wrongful death claims, they're

7  obviously not offering the claimant to testify about his

8  wrongful death claim, they're offering the personal

9  representatives in those --

10         THE COURT:  Well, that's true of the loss of

11  consortium, too, isn't it?

12         MR. SCHIAVONI:  I think it is, Your Honor.  So, a

13  number of people fall into that category and although I don't

14  have the papers here, you know, I'm told that, you know, this

15  suggestion even when you look at the medical records, even to a

16  layperson it raises some questions.  There was one of them I

17  looked at that you may hear more about from another lawyer,

18  that looked like he was in Tahiti just very recently, from the

19  file.  So, you know, this is a very --

20         THE COURT:  Tahiti is a lot more glamorous than

21  Pittsburgh, or Delaware, Mr. Schiavoni.

22         MR. SCHIAVONI:  Well, thank goodness Mr. Restivo is

23  not here to debate that point, but thank you, Your Honor, those

24  are my points.

25         MR. GUY:  Your Honor, Jonathan Guy, for the Asbestos

1 Personal Injury Future Claimants rep. on the phone, may I be

2 heard?

3          THE COURT:  Yes, sir.

4          MR. GUY:  Your Honor, I just want to make two points,

5 and I freely admit they're somewhat duplicative and I don't

6 think I could possibly improve upon the eloquence of Mr.

7 Schiavoni.

8          If the Libby Claimants wish to satisfy the showing

9 under the 2004 order concerning perpetuation depositions then,

10 of course, they're free to do so.  I don't believe they've done

11 so here.  If they want to make legal arguments about the

12 treatment of their claims under the plan, on the basis that

13 there are claimants out there that have made certain

14 allegations, they're free to do so, we don't think they need

15 the deposition of individual witnesses to do that.  And, we,

16 too, are concerned about the cost.  There would be a very

17 significant cost involved if we had to go forward with all

18 these depositions.  Thank you, Your Honor.

19          THE COURT:  All right, anyone else on the phone?

20               (No audible response)

21          THE COURT:  Okay.  Good morning.

22          MR. LONGOSZ:  Good morning, Your Honor. Edward

23 Longosz on behalf of Maryland Casualty.  Just for the record,

24 echo the comments made by everybody and we filed a joinder, as

25 well.

1          I can address individual -- the 17 individuals.  We

2    did triage the medical records, it is true, while it may have

3    been a year or two ago, they went to Tahiti, but I think that's

4    -- the medical records that we received, and just a quick

5    review, we only got 23 disks the other day, show that these are

6    truly not individuals that fit the criteria that this Court has

7    laid out several years ago for coming to court and asking, nor

8    are the certifications there.

9          To the extent that Mr. Cohn wants to argue about it,

10   in his argument, I'll just -- I can respond to it at that time.

11         THE COURT:  All right, thank you.

12         MR. LONGOSZ:  Thank you.

13         MS. DeCRISTOFARO:  Thank you, Your Honor, and I'll

14   try not to repeat everyone.  The only thing I would add is, I

15   was in the courtroom, too, when we went through extensive

16   discussion of the requirements Your Honor set for that and it

17   was very clear if any of these were going to proceed, how the

18   Libby Claimants should proceed, and I don't think those could

19   be justified on those bases.

20         With respect to burden, I think everyone has

21   addressed the easier and simpler means, but also the debtors

22   filed initial papers and Your Honor has made this point

23   yourself numerous times that this is a very small portion of

24   the overall asbestos personal injury claimant population and if

25   we were going to do this for everyone, this bankruptcy would be

1 uncontrollable.

2        So, I think that has to be kept in mind.  And the

3 debtors address some of the percentages of how this works.

4 It's a very small percentage and Your Honor has noted that

5 yourself.  And we join the objections of the other parties.

6        THE COURT:  All right.  Any other objecting parties?

7 Mr. Cohn?

8        MR. COHN:  Apparently, Your Honor, my position is not

9 to prevail by majority vote today.  We've heard a lot and we

10 really need to start again from the top in order to provide

11 some perspective on this issue.

12        You were prepared -- you were provided a chart that

13 shows all this discovery that has supposedly gone on.  You need

14 to understand, Your Honor, that there has been no document

15 discovery yet from the debtors to the Libby Claimants.

16        The whole matter of document discovery has gotten

17 caught up in the issue of protective orders.  You're just

18 entering today the protective order regarding non-medical

19 discovery, later on the agenda we're going to discuss the

20 protective order concerning medical discovery.

21        Rightly or wrongly, parties have taken the position

22 that they are not going to produce documents in the absence of

23 a protective order.  We actually relented on that ourselves,

24 the plan proponents still not having relented on that.  We

25 actually relented on that ourselves, after the April 27

1  telephonic hearing when you indicated that there was going to

2  be a medical protective order and that it would provide for

3  claimants to be identified by number and not name and we, you

4  know, acting in good faith, took that as sufficient so that we

5  produced documents and told everybody that we were relying on

6  the fact that these would be covered by a protective order and

7  we would -- they would be treated as confidential in the

8  meantime.

9          But, that -- but when you hear discussions of, we

10 didn't get this document, we didn't get that document,

11 understand, Your Honor, the Libby Claimants have gotten no

12 documents.  And the process has gotten caught up in the

13 discussion of confidentiality orders.  Later on in the agenda

14 we'll discuss that process, Your Honor, but I'll just say in

15 brief that in February there was the start of a consensual

16 process to develop protective orders and that we thought that

17 process was going to result much sooner, frankly, in the entry

18 of protective orders regarding both medical and non-medical

19 documents, but, unfortunately, it didn't play out that way and

20 where we are is, that on both the medical and non-medical

21 front, we're really just getting to the point where protective

22 orders can be entered.  And I just need to emphasize again,

23 Your Honor, we've received no documents.

24          Later on in the agenda, we're also going to talk

25 about the inadequate responses that the Libby Claimants have

1  gotten to contention interrogatories, but what we see in the

2  response to this motion from the debtor is, we see things that

3  really probably could have been clarified in a proper response

4  by the plan proponents to contention interrogatories.  And I'm

5  referring to the discussion of well, wrongful death and loss of

6  consortium claims, is our standing in dispute?  Well, now they

7  tell us no.  Could have said that in the contention

8  interrogatory response.  Is the existence of such claims in

9  dispute?  Could have said, we don't dispute the existence of

10  such claims.  Does the TDP plan -- I'm sorry, does the TDP ban

11  such claims?  Here they provide us a chart that says, no.

12  Well, nobody has said that to us, to date.  When I asked --

13  finally got a chance to ask about it, at Mr. Lockwood's

14  deposition, he deferred to his partner, Mr. Inselbuch, who is

15  being deposed on June 12th.  And so, we will ask him, but it's

16  not until then that I expect to get any answer on the record,

17  about what the plan proponents' position is on how the TDP

18  treats wrongful death and loss of consortium claims unless,

19  Your Honor, the parties do what they really should do which is,

20  enter into a stipulation that just resolves these issues,

21  because it really does sound like there may be no dispute on

22  the -- well, the issues of standing, if standing is not to be

23  disputed, that we have wrongful death and loss of consortium

24  claims that are valid under Montana law.  That could just be

25  stipulated to.

1              THE COURT:  Well, I think what they said, if I heard

2    it is, that there is -- that they are not disputing -- Mr.

3    Finch said, that if they are not -- that they won't dispute

4    that if a complaint has been filed, making the allegation, they

5    don't dispute that somebody contends that they have that claim.

6    Whether or not it's going to turn out to be valid and,

7    therefore, payable, no one is stipulating to at this time.

8    But, no one disagrees that such claims, if proven, can be

9    treated by the TDP and paid.  That's what they're saying, but

10   you still have a burden of proof to go through and all they're

11   saying is that assuming that you meet the burden of proof, no

12   one disputes the fact that you have the opportunity to meet the

13   burden of proof through the TDP.

14             MR. COHN:  Well, it would be terrific to put that

15   into a stipulation.  I actually heard, unfortunately, different

16   things, and this is probably not the best forum to debate this,

17   but I -- you know, there's something quite different between a

18   chart.  It asks a question and says no, is standing in dispute?

19   No.  You know, is the existence of such claims in dispute?  No.

20   Then I heard -- you know, and then I heard Mr. Finch talk

21   about, well, if there was a complaint, we'd look at it, and we

22   might stipulate to its authenticity and --

23             THE COURT:  Well, but I mean, here's the thing.  In

24   terms of talking about, is the existence of such claims in

25   dispute, you have to talk about each individual claim.  You

1  can't just say, you know, everybody in Libby, Montana, can't

2  possibly have a loss of consortium claim, they can't all be

3  married.  So, it's not possible to look at this chart and say

4  that this is a stipulation, that everybody in Libby, Montana,

5  who has ever been exposed to Grace asbestos, has a loss of

6  consortium claim.

7        MR. COHN:  It doesn't have to be, that's why, Your

8  Honor, what should happen is, the parties should know -- should

9  work together on a stipulation which will simply say, there

10  are.  It doesn't have to say who has them, you don't have to

11  specify whose are valid, whose aren't.

12        THE COURT:  It should say, there can be.

13        MR. FINCH:  Yes.

14        THE COURT:  "There can be," is the issue.

15        MR. FINCH:  We're not going to stipulate that claims

16  are valid.

17        THE COURT:  Right.

18        MR. FINCH:  That's the point.

19        THE COURT:  I understand.

20        MR. FINCH:  But, we will stipulate they exist.  And

21  for his confirmation objections, he can argue about how the TDP

22  treats them or not, but there's no stipulation as to validity

23  of any claim, any claim anywhere in the country.

24        MR. COHEN:  So, all of which would be fine, Your

25  Honor.  First we've heard of it, it's a constructive step and

1  that will eliminate the need for -- assuming that we can

2  actually bring such a stipulation to closure, which it sounds

3  like we should be able to -- that will eliminate the need for

4  the depositions that relate to establishing wrongful death and

5  loss of consortium claims.

6          THE COURT:  But, I don't understand how the

7  individual deponents would establish those claims anyway.

8  Isn't that a matter of law?  I mean, whether or not the --

9  whether or not individuals who live in Montana have the legal

10  right to make such a claim is a matter of law, it's not a

11  matter of stipulation or a matter of fact.  Whether any

12  particular claimant can take advantage of that law depends on

13  the facts of any specific claimant circumstance.

14          For example, to have a loss of consortium claim, you

15  have to be married.  So, if you're not married, then you can't

16  have a loss of consortium claim.  To have a wrongful death

17  claim, you have to have some affiliation with the person who

18  died.  If you don't have that affiliation, you can't have a

19  wrongful death claim.

20          So, the facts have to be dependent, but that's not

21  what the purpose of the plan confirmation is, it's not to

22  determine whether any specific individual has that claim.

23          MR. COHN:  Your Honor --

24          THE COURT:  So, what's the deposition going to do?

25          MR. COHN:  Well, that's what the deposition was going

1  to do if, because we have no -- we had no assurance, based upon

2  the positions taken by the parties, to date, this being the

3  first we've heard the parties are not going to contest

4  standing, that someone isn't going to just stand up and say,

5  well, Your Honor, it may be that theoretically under Montana

6  law, a person could have a wrongful death claim, but it happens

7  that none of the Libby Claimants have been proven to have such

8  claims and, therefore, they have no standing.

9         THE COURT:  But that -- well, no, it's not a standing

10  for purposes of arguing, but whether or not they can meet the

11  burden of proof to substantiate that they have that claim is

12  not something that's going to be relevant for plan

13  confirmation.  That's going to be relevant down the road, when

14  the plan is in effect and people have the opportunity to prove

15  up their claims.

16         MR. COHN:  And that would be fine with us, so long as

17  we can eliminate that as a potential issue.  And I'm hearing

18  that we can, but we were not going to put ourselves in a

19  position where argument that we considered to be an important

20  one, was potentially excluded because we had failed to prove it

21  up.  It's just that simple, Your Honor.

22         THE COURT:  Okay, all right.

23         MR. COHN:  Now that people are providing us a path

24  where you don't need to prove it up, we're fine and we'll

25  proceed down that road.

1              THE COURT:  Okay.  So, I just want to make it clear,

2    so everyone is on the same page.  The parties will agree that

3    to the extent you have clients and represent clients who I will

4    just call in the Libby group, that some or all of those clients

5    may have claims that would include wrongful death and/or loss

6    of consortium claims, and as a result you have standing to

7    raise objections to the plan and to the TDP treatment, whatever

8    it is that's appropriate for plan confirmation purposes on

9    behalf of those entities.  No one is going to challenge the

10   fact that you have standing to raise the issue and no one is

11   going to challenge the fact that those claims may exist.  What

12   they're not challenging -- or, I'm sorry -- what they're not

13   stipulating to is the validity of any such claim.  Those claims

14   will still have to be proven up, just like every other claim

15   will, at an appropriate place and time.

16             MR. COHN:  And, that's fine, Your Honor, that's all

17   that we need.

18             THE COURT:  All right.  Is anybody in disagreement?

19   Because, if so, speak now or forever hold your peace.

20             MS. HARDING:  Your Honor, this is Barbara Harding.

21   I'm not going to stand in the way of resolving this issue and

22   getting it away from the Court and getting it off of our plate,

23   as well, but I will -- I cannot let this go forward without

24   noting that if that is what it takes to resolve this matter,

25   then I presume that all the other arguments that they made

1 about needing these witnesses to testify for all the other

2 reasons, there's just a disingenuousness about the way that

3 this has taken place --

4          THE COURT:  Okay.

5          MS. HARDING:  -- and I object to it and I'm going to

6 go forward.  But, I think that with respect to the other

7 arguments that are coming, I'm not going to respond to Mr.

8 Cohn's claims and allegations about documents and things like

9 that right now, I'll save those to do with respect to the next

10 two motions.

11          THE COURT:  Okay.  Could I just get an answer to my

12 question?  Does anybody have an objection to what I just put on

13 the record with respect to standing to raise these issues on

14 behalf of the Libby Claimants and the fact that people are

15 not going to challenge the fact that some claims may exist but

16 will have to be proven, the validity of such claims will have

17 to be proven at an appropriate place and time and that is not

18 the plan confirmation hearing.

19          MS. HARDING:  Not if that will resolve this issue,

20 Your Honor.  No, we do not have an objection.

21          MR. FINCH:  No objection, Your Honor, for the ACC.

22          MR. GUY:  The FCR has no objection, Your Honor.

23          THE COURT:  Okay.

24          MR. COHN:  So, Your Honor, we'll prepare a draft and

25 circulate it to the other parties and we'll, hopefully, present

1  it to the Court in short order, under certificate of counsel.

2          THE COURT:  Okay.  Get a transcript because I've just

3  stated the way it's supposed to go, everybody has either held

4  their peace, which means they've consented by silence, or

5  they've affirmatively consented on the record and, therefore,

6  Mr. Cohn, it should be easy.

7          MR. GUY:  Your Honor, do we even need a written

8  stipulation in light of what the Court has --

9          THE COURT:  I think it would be a good idea, yes.

10          MR. GUY:  Thank you, Your Honor.

11          THE COURT:  All right.  So, let me just make a note.

12  Regarding standing to raise the objections on behalf of Libby

13  Claimants with possible wrongful death and/or loss of

14  consortium claims, Mr. Cohn will prepare an order and circulate

15  it, and it will be filed on a COC within two weeks.

16          MR. COHN:  Yes.

17          THE COURT:  Okay.  By May 29th.  Okay, fine.

18          MR. FINCH:  Your Honor, can we also have an order

19  that -- or a statement from Mr. Cohn that to the extent -- I

20  think all the depositions should not go forward, but to the

21  extent that any of them are wrongful death or loss of

22  consortium claimants, those, certainly won't be going forward

23  in the next two weeks.

24          MS. HARDING:  Well, I thought that the stipulation

25  was to resolve the issue with respect to all depositions.

1          THE COURT:  It is.

2          MR. FINCH:  No.

3          THE COURT:  Well, it's to resolve the depositions

4  that were on behalf of individuals who were going to attempt to

5  substantiate wrongful death or loss of consortium claims.

6  There's still one issue left and we have to address that issue.

7          So, I don't know how many of the witnesses were for

8  that purpose.  How many?

9          MR. COHN:  Well, unfortunately, Your Honor, this only

10 eliminates two.  There were two wrongful death claimants.  The

11 other ones, what we did, Your Honor, in an attempt to be

12 economical, is rather than depose spouses about their loss of

13 consortium claims, we were deposing the claimants themselves,

14 so that we could cover with one deponent the issue of loss of

15 consortium claim and also the issue of severity of disease.

16         THE COURT:  Okay.  Well, I don't know how the person

17 without the claim can testify to somebody else's claim, but in

18 any event, to the extent that anyone was going to testify about

19 wrongful death or loss of consortium claims, those depositions

20 are no longer necessary and are not allowed.

21         MR. COHN:  We will --

22         THE COURT:  Okay.  Now what's next?

23         MR. COHN:  All right.  So, that brings us, then, to

24 the other reason why we need these depositions, and that is on

25 the issue of severity of disease.

1           Now, the first thing, Your Honor, we need to know is

2  that while the motion has been styled a motion for a protective

3  order and objection to deposition notices, what is going on and

4  I think it did -- I think it was made clear in the argument, is

5  that really what this is all about is whether you're going to

6  exclude certain testimony from the confirmation hearing,

7  because if the testimony is not to be excluded from the

8  confirmation hearing then a fortiori, we're allowed to take

9  discovery that relates to it.  And in the case of these

10 deponents, there's also the practical concern that they are too

11 sick to travel to Pittsburgh or Wilmington and, therefore, to

12 prevent them from being deposed is as a practical matter to

13 prevent them from testifying.

14          THE COURT:  I haven't see anything that meets the

15 criteria that I established several years ago that says these

16 folks are too sick to travel.  I haven't seen it.

17          MR. COHN:  Well, in any event, Your Honor, it is not

18 a requirement to be able to take a deposition for confirmation

19 discovery purposes. It is not a requirement to establish that

20 it would meet the criteria for a perpetuation deposition.  And

21 I do need to clarify, Your Honor, these were -- the notices

22 were styled perpetuation deposition notices, that is not what

23 they are.  We are proceeding under Rule 30, it is in relation

24 to the contested matter, namely the objection to confirmation

25 of the plan, they are not -- they weren't noticed as

1 perpetuation depositions, Your Honor.  In a perpetuation

2 deposition what one would do is notice anyone against whom the

3 claimant might assert a claim because the whole purpose is to

4 have people come in and take the deposition now.  All we did

5 with these depositions is, we noticed people who were on the

6 plan confirmation service list.  This is not an end run around

7 your 2004 order that was --

8          THE COURT:  Then they're not too sick to be here.  If

9 they're not -- if you're not noticing them for purposes of

10 notifying everybody as to whom they may have a claim because

11 they're not so sick that they're an extremist, then they're not

12 too sick to be here.

13          I mean, I don't know how you can have it both ways.

14 Either they're too sick to travel and, therefore, you need to

15 perpetuate the testimony and everybody should have notice, or

16 else they're not too sick to be here and they can be here.

17 But, that's a different issue for travel purposes than the

18 deposition.

19          The issue for the deposition at this point, number

20 one, I'm not sure what they're going to be able to tell me that

21 will be relevant to the confirmation issue, so I'd like to know

22 that, and the second this is, why you need 18 of them.  Because

23 assuming that they have something relevant to say, somewhere in

24 there, there has to be one heck of a lot of cumulative

25 evidence.

1           MR. COHN:  The reason that they're testifying, Your

2  Honor, is because it relates directly to our argument that the

3  terms of the trust distribution procedures discriminate against

4  the Libby Claimants.

5           You might recall several hearings ago you talked

6  about Combustion Engineering, you actually took a recess and

7  brought out to the bench and read into the record the actual

8  statement from Combustion Engineering that requires

9  non-discrimination and we are arguing that the way that the

10 disease criteria had been set up in the TDP discriminates

11 against the Libby Claimants.

12          My purpose today is not to make that argument,

13 obviously, that's for another time and place.  My purpose is

14 only to demonstrate that this evidence is directly relevant to

15 that objection.

16          Now, the way that we're going to prove that objection

17 -- oh, and let me step back and just get some more specificity.

18 One element of the discrimination against the Libby Claimants

19 has to do with the disease category called severe plural

20 disease.  What we have said in our papers, we made no secret

21 about our contentions, what we've said in our papers is that if

22 you apply the medical criteria of the TDP to Libby Claimants

23 who have severe pleural disease, only 18 percent of them will

24 have claims that are -- that the TDP recognizes as being in

25 that category; only 18 percent.

1          People have died, Your Honor.  People have died of

2 severe pleural disease without meeting the TDP criteria for

3 severe pleural disease.  That will be the essence of our case.

4          Now, one way to prove --

5          THE COURT:  But, people have died of all sorts of

6 things without meeting particular disease categories, Mr. Cohn.

7 I mean --

8          MR. COHN:  You die of severe pleural disease without

9 meeting the medical criteria for a claim for severe pleural

10 disease under the TDP.  That certainly indicates something

11 about whether those criteria are a proper measurement of

12 whether somebody has severe pleural disease.

13          THE COURT:  But I don't know why that would

14 discriminate against Libby as opposed to anybody else in that

15 category.

16          MR. COHN:  Because only the Libby Claimants have

17 severe pleural disease, Your Honor.

18          THE COURT:  Oh, my.  You're going to give me a

19 medical expert testimony that tells me that nobody in the

20 entire world that has been subject to Grace asbestos but Libby

21 Claimants have severe pleural disease?

22          MR. COHN:  It is no one, Your Honor -- it is not that

23 no one else could because, you know, as you're aware, Your

24 Honor, the winchite asbestos that was mined in Libby went to

25 other places in the country.  And so, while the exposures there

1  were probably not as intense by and large as the Libby

2  exposures, someone could come forward and having been exposed

3  to that and might show disease symptoms that are similar to the

4  Libby Claimants but, in fact, this whole phenomenon of people

5  suffering from and dying from severe pleural disease is

6  largely, is largely a Libby phenomenon.

7          THE COURT:  But, largely doesn't make a

8  discrimination.

9          MR. COHN:  Well, sure it does, Your Honor.  If it

10 happens that -- you know, if it happens that most asbestos

11 claimants have claims in Categories A, B, C and D, and most

12 Libby Claimants have claims in Category E and the criteria for

13 Categories A, B, C and D are drawn to be inclusive and to let

14 people get paid on a free and easy basis and the criteria for

15 Category E are drawn so strictly that most people who have the

16 disease won't qualify under the medical criteria, yes, Your

17 Honor, that is discrimination.

18         And that is, in any event, the essence of our case.

19 If you want to rule today that's not discrimination, then we

20 obviously --

21         THE COURT:  No, the problem is, I don't see how it's

22 discrimination -- that that category of severe pleural disease

23 discriminates against Libby, because anyone who meets the

24 criteria, whether they live in Libby or don't live in Libby, is

25 treated in that category if they meet the medical criteria.

1  So, I don't see how it can discriminate against Libby claims

2  because everybody with that criteria fit within that category.

3  I'm missing something.

4          MR. COHN:  Well, and, really all I can do is say what

5  I just said, Your Honor, which is that if Libby claimants most

6  of them have a certain type of disease, they are also, by the

7  way, the highest rate of mesotheliomas in the country, but

8  since mesos are something that you see in all types of asbestos

9  disease, we're not -- we have no complaint about how the TDP

10 treats those.  But, the predominant asbestos disease is pleural

11 disease.  And it manifests itself so severely that our medical

12 testimony will be that it will progress in most cases and that

13 most people will die of severe pleural disease, which is

14 unusual in the world of asbestos disease.  And since that is

15 the type of disease that we see in Libby, our assertion is,

16 Your Honor, that the TDP in order not to discriminate against

17 Libby, needs to make provisions that are as adequate for severe

18 pleural disease as it does for the other disease categories.

19         To the extent that it is more strict in how it treats

20 severe pleural disease, to the extent that it excludes more

21 valid claims in that category than the disease criteria in

22 other categories would exclude in those categories, that is

23 discriminatory against the Libby claimants because it

24 discriminates against the type of disease that most of the

25 Libby claimants have.  That is our discrimination argument.

1          THE COURT:  Okay.  I think that maybe I'm

2   misunderstanding the way the TDP is intended to function, but

3   there are numbers of disease levels, if you don't fit within

4   the severe pleural category, you will fit within some other

5   pleural category.

6          MR. COHN:  The next one down, yes, Your Honor.

7          THE COURT:  Or possibly the next one up.  It depends

8   on -- well, maybe not.  It might depend on the diagnosis that

9   you have under certain circumstances.  Maybe you won't, based

10  on the diagnosis, go further up because the severe is the top

11  of the pleural category.

12         MR. COHN:  Correct.

13         THE COURT:  Okay.  So --

14         MR. COHN:  That's the disease they have.

15         THE COURT:  Well, that's the disease at the -- that's

16  the most severe form under this TDP of disease that anybody

17  with a pleural disease can have.

18         MR. COHN:  Okay.

19         THE COURT:  Okay.  So, if you're looking at anybody

20  in a -- any population of people with pleural diseases, the TDP

21  takes them and breaks them into traunches and says if you meet

22  this level of criteria, then you're in the low traunch, if you

23  meet this level, you're in the next high traunch.  If you meet

24  -- and so on until you get to the severe traunch level.

25         MR. COHN:  Yes.

1            THE COURT:  That should by, I would think, I mean I'm

2   going to need some testimony, but I've heard testimony about

3   this in other cases, so, unless something's changed over the

4   last five or six years, and it may have, that should be the

5   narrowest category of pleural diseases.

6            MR. COHN:  Well, first of all, Your Honor, you have

7   not heard testimony in other cases, I don't think.

8            THE COURT:  I have.

9            MR. COHN:  Not on this subject, Your Honor --

10            THE COURT:  I have.

11            MR. COHN:  -- because this category was created for

12   this case.

13            THE COURT:  Well, not -- I'm not talking about the

14   specific words that are used, I'm talking about how the disease

15   progresses and the pleural diseases overall.  So, not

16   specifically about this TDP, obviously, I haven't heard

17   testimony about this TDP.  It hasn't been ripe for adjudication

18   yet.

19            MR. COHN:  No, but again, Your Honor, it's important

20   to understand, this category was created -- in fact, I believe

21   the plan proponents will claim that this was created to address

22   the Libby claimants, or at least to address the Libby's

23   claimants assertions about their claims.  So, I don't believe

24   that you have seen this in other cases, Your Honor.

25            THE COURT:  All right.

1          MR. COHN:  And our assertion is, well, you know, it's

2  fine to say that you have created a disease category that is

3  designed to address severe pleural disease, but then you

4  actually have to do it because with the other disease

5  categories, you are doing it.  You've got your design criteria

6  that permit the vast majority of claims.

7          THE COURT:  Excuse me.  Okay.  Can you get her

8  number, tell her I'll call her right back.

9          UNIDENTIFIED SPEAKER:  She's going to be in a

10 conference the rest of the day.

11          THE COURT:  Oh.  Mr. Cohn, can I interrupt?

12 Apparently I need to take a phone call and it'll be very brief.

13          MR. COHN:  Of course.

14          THE COURT:  About five minutes.

15          MR. COHN:  Of course.

16          THE COURT:  All right.  We'll take a five minute

17 recess.

18                    (Recess)

19          COURT CLERK:  All rise.

20          THE COURT:  Please be seated.  I'm not sure.  Did

21 everybody have a chance to get back?  Okay.  I'm sorry, Mr.

22 Cohn, thank you for the interruption.

23          MR. COHN:  Oh, it's really no problem, Your Honor.

24 So, where we were was, I was outlining the nature of the

25 argument that we are making in our objection to plan

1 confirmation as to which the Libby claimant witnesses, whose

2 depositions have been noticed, will be relevant.

3        And to give you an idea, by the way, of why this

4 matters, Your Honor, the severe pleural category, you pointed

5 out that if, well, if you don't make severe pleural then you

6 can go to the next category down, the difference in the values

7 between the two categories is $50,000 at the severe pleural

8 level, $7500 at the next level down.  So, it matters hugely

9 which category your claim is treated.

10        So, our argument, in sum, Your Honor, is that the

11 medical criteria in the TDP discriminated against the Libby

12 claimants because the type of disease that most Libby claimants

13 have is treated in such a way as to exclude most of the claims,

14 whereas in other disease categories there is not this exclusive

15 effect.  In fact, an overwhelming majority of claimants in

16 other claim categories can be expected, based on experience in

17 other trusts with similar disease categories, an overwhelming

18 number can be expected to be allowed upon expedited review, and

19 never needed to pass individual review.

20        Now, the ACC -- and I don't mean to get into the

21 merits here, but it is going to be relevant to one of the

22 questions that you asked, Your Honor -- the ACC responds in

23 part to this by saying, well, it really doesn't matter whether

24 you pass muster under expedited review because you have these

25 other, in effect, appeal processes.  You can go to individual

1 review and then you can go to arbitration, et cetera.

2          And our response to that is, well, but it's

3 discrimination if what you do is, you force Libby claimants or

4 people with their type of disease, to go through these extra

5 steps and face the uncertainty, really, of whether their valid

6 claims are going to be allowed through these additional

7 processes.

8          The reason that this is important, Your Honor, is

9 because this is -- strike that, Your Honor.  The reason why we

10 need to have a large number of these witnesses, Your Honor, is

11 because it is, in fact, the very number of the witnesses that

12 is important.  To simply try and allow one person or two people

13 or three people, who have severe disease, who, you know, can't

14 get out of bed in the morning without an oxygen mask, and yet

15 are excluded by the TDP criteria from having a claim for severe

16 pleural disease.

17          The response could always be, well, but in any

18 disease category, not everybody is going to meet the disease

19 criteria, there will be outliers and we don't disagree with

20 that, Your Honor.  We do not think it would be reasonable for

21 us to stand here and argue that we have a right to have a

22 hundred percent of Libby pleural disease claims that are severe

23 to necessarily meet the criteria for allowing those claims -- I

24 keep say allowing, but I mean liquidating those claims, at the

25 severe pleural disease category, upon expedited review.  That's

1  not the way the TDPs are supposed to work.

2          On the other hand, when only 18 percent of the claims

3  can thread this gauntlet of hostile medical criteria that have

4  been devised for this TDP, we think that that does constitute

5  discrimination.  And, so, the testimony of these witnesses by

6  showing that claimant after claimant after claimant, whom you

7  will immediately recognize from their testimony as being in

8  severe condition, that claimant after claimant after claimant

9  is excluded by the criteria from a severe pleural disease claim

10  under the TDP.  That's important and we think relevant

11  testimony.

12          Now, I realize that the plan proponents and others

13  who are arguing against the Libby claimants on this matter,

14  take the position that this is a proper subject for expert

15  testimony.  They are certainly right that it is a proper

16  subject for expert testimony, and we are offering the testimony

17  of Dr. Whitehouse and there will be other experts as well, in

18  support of the Libby claimants' objection to plan confirmation.

19          In the case of Dr. Whitehouse, I think you may have

20  noticed that he seems to be under a certain level of attack as

21  to his credibility, his expertise and the substance of his

22  opinions.  In fact, it would appear that they are really the

23  focal point, or the battle, if you will, between the Libby

24  claimants and the plan proponents.  And under those

25  circumstances, Your Honor, we are entitled to present

1  corroborating testimony to Dr. Whitehouse.  Yes, he is -- you

2  need a qualified medical doctor to make a diagnosis, obviously.

3  You need medical testimony about whether a person has asbestos

4  disease.

5        Once you've done that, Your Honor, and the issue is

6  now the severity of the disease and whether a person ought to

7  have a claim that is liquidated at the severe pleural disease

8  level, certainly the claimant's own testimony about the

9  severity of the disease is completely relevant and it's

10 admissible.

11       THE COURT:  But, the TDP's don't put the severity of

12 the disease into fact issues such as, can you walk three steps

13 without breathing into an oxygen mask, can you walk up four

14 flights of steps, can you spend two minutes on a treadmill at

15 two miles per hour.  Those aren't the criteria, those are the

16 things that the fact witness could tell me.  The fact witness

17 can't say to me, I've got pleural scarring that is, you know,

18 so long -- that's hearsay as to that witness.

19       MR. COHN:  Your Honor, you've actually -- you're

20 making the exact point that we're trying to make here, which is

21 that if you develop medical criteria that talk about level of

22 pleural thickening or they talk about blunting of the

23 costrophenic angle, you know, et cetera, et cetera.  You

24 develop those medical criteria and when you add them all up, a

25 person who, without doubt has asbestos disease and, yes, can't

1 get out of bed without an oxygen mask or can't walk across the

2 room unassisted, yet that person is excluded from the severe

3 category, that certainly suggests there's something wrong with

4 the medical criteria for that category because obviously those

5 medical criteria.  Whatever they do, those medical criteria are

6 not measuring whether this claimant has severe disease; severe

7 disabling disease.

8          THE COURT:  Well, I think, Mr. Cohn, even that's the

9 subject of expert testimony, even that point because, you know,

10 and I'm not a medical expert so I'm just going to talk about,

11 you know, probably what we shouldn't do, but I'll talk about a

12 personal experience because I don't know how else to put it

13 into an illustration and all I'm trying to do is get to an

14 illustration.

15          You know, certain people have pain thresholds that

16 are absolutely non-existent.  You know, you can stab them with

17 needles and pens and whatever and they don't feel pain.  Other

18 people you prick them with, you know, a little splinter and

19 it's as though it's the end of the world.  Well, I don't know

20 whether in the case of somebody who has a pleural thickening

21 problem, that something like the equivalent of their pain

22 threshold requires those individuals, in some instances, to

23 need certain types of treatment that other individuals with the

24 same medical criteria would not need.  So, someone's testimony

25 that, you know, he or she can't get out of bed in the morning

1  without an oxygen mask, whereas someone else can, isn't the

2  medical criteria.  That's a symptom that a specific person has,

3  but that's not the medical criteria on which the categories of

4  disease in a population are going to be based.

5       I've never seen, except as anecdotal support in the

6  scientific literature, a base for saying that a disease is

7  based on somebody's symptoms.  That is evidence that somebody

8  may have a particular disease, but it is not the criteria on

9  which the disease itself is based.  I don't think the witnesses

10 --

11      MR. COHN:  Well, these are not -- you know, when

12 you're talking about the ability of someone to function without

13 an oxygen mask, that's a different -- that's certainly a

14 different matter from the subjective experience of pain.

15      THE COURT:  But, even that took a diagnosis.  You

16 don't get an oxygen mask without a diagnosis.  So, that should

17 be the criteria for that, or the testimony about that is the

18 medical base, not the witnesses' testimony.

19      MR. COHN:  But, if a bunch of people who need oxygen

20 masks, Your Honor, are being excluded from the severe pleural

21 disease categories --

22      THE COURT:  That's what the medical expert should

23 tell me.

24      MR. COHN:  That's true, Your Honor, and the medical

25 expert will, but we're offering as corroboration the experience

1  of the actual people who have this disease and who are being

2  excluded by the medical criteria that have been developed by

3  the plan proponents.

4          THE COURT:  I don't think that's relevant or

5  admissible because what they would try to -- what any person in

6  that circumstance would try to tell me is, that based on a

7  doctor's diagnosis that person needs a medical -- or an oxygen

8  mask in order to function.

9          MR. COHN:  No.  That's not what --

10          THE COURT:  Yes.

11          MR. COHN:  -- I'm sorry, that's not what they would

12 say.  What they would say is, I can't physically get enough air

13 into my lungs, Your Honor, to get --

14          THE COURT:  They don't know that.  They don't know

15 that.  What they know is, they feel better with an oxygen mask.

16 It's the doctor who told them they can't get the air into their

17 lungs and, therefore, this oxygen mask will help.  That's the

18 medical base.

19          MR. COHN: I -- Your Honor, that, I would respectfully

20 submit, is just not the way that the -- strike that.  We should

21 be allowed to prove our case in the way that we wish, within

22 reason of course, to prove our case.  And we --

23          THE COURT:  Oh, I agree, but you have to be able to

24 produce relevant and admissible evidence, and I don't -- and

25 the problem that I'm addressing is whether or not that

1 testimony is admissible.  What that person could -- what that

2 witness could say to me is, I use an oxygen mask; period.

3 That's what the person could say; I use an oxygen mask.

4          MR. COHN:  Well, how about, I tried to get out of bed

5 without it and I was so short of breath I thought I was going

6 to die at that very moment?

7          THE COURT:  I was short of breath and I needed an

8 oxygen mask, sure.  I use an oxygen mask.  How did you get it,

9 a doctor told me I needed it.

10          MR. BERNICK:  Your Honor, this is David Bernick, I

11 don't know if I can be heard?

12          THE COURT:  When Mr. Cohn is done, Mr. Bernick.

13          MR. BERNICK:  Thank you.

14          MR. COHN:  Well, on that point, Your Honor, I am

15 done.  I, you know, the -- our papers as we note --

16          THE COURT:  You're going to have to give me some case

17 law before I authorize these depositions.  I don't believe that

18 in the plan confirmation process, that what you're attempting

19 to get to is relevant and admissible.  It may very well be for

20 damages in a trial, on a personal injury action, but that's not

21 what I'm doing in the confirmation process.

22          MR. COHN:  Well, we have -- well, no, we have cited

23 in our papers case law that says that claimants are competent

24 to testify about their own symptoms.

25          THE COURT:  Absolutely.

1          MR. COHN:  I do understand that the authority cited

2 by certain others about what claimants can't testify about, you

3 know, are also true, but claimants can testify about their own

4 symptoms.

5          THE COURT:  Right.  I thought I was attempting to get

6 to that.  They can say, I use an oxygen mask, I'm short of

7 breath.  I agree.

8          MR. COHN:  Right.  And that provides corroboration

9 for medical testimony which says that, yes, that person is very

10 sick, or that person is not very sick.  If you have an expert

11 --

12          THE COURT:  Why do we need it, nobody is challenging

13 it?

14          MR. COHN:  Oh, yes, they are.

15          THE COURT:  Who's challenging it?

16          MR. COHN:  Apparently, the plan proponents are taking

17 the position that the medical criteria for severe pleural

18 disease are adequately inclusive so that you'd have to be the

19 exception rather than the rule to be excluded by those criteria

20 yet actually have severe pleural disease.

21          THE COURT:  But, that's all the basis of expert

22 testimony.  It's going to require -- again, I'm just -- I'm

23 trying to do this by way of illustration not by way of findings

24 and I haven't read all the medical reports, so it's certainly

25 not an analysis of the medical experts, okay.

1          That type of testimony is going to require some

2    medical -- or, I'm sorry, some expert and not necessarily a

3    medical expert, but some expert who can say, these criteria

4    would apply to this category of person, or a person who fits

5    within this category, and another expert who is going to say,

6    but it won't apply to this category and the reason that that's

7    important is because if you add this factor or include this

8    factor that's not included in the criteria, then that is also

9    relevant to these symptoms and here's where either in the

10   medical literature or in the epidemiology studies, or in my own

11   experience in dealing with my patients, or whatever the base is

12   going to be, that's where I get the base of my information to

13   say that these criteria are wrong.

14          MR. COHN:  Yes.

15          THE COURT:  The individual can't tell me that the

16   criteria are wrong.

17          MR. COHN:  I agree the individual cannot tell you

18   that, in that broad sense, that the criteria are wrong.  What

19   the individual can do is offer corroboration to the expert who

20   is saying that the criteria are wrong by showing that they are

21   self-evidently people who are in severe condition.  The expert,

22   of course, will say it's from asbestos disease, and I don't

23   think, by the way, that there's going to be any question but

24   that these people are -- that the disease that these people are

25   suffering is asbestos disease.  But, if somebody wants to

1 challenge that they can.

2          So, then you have somebody out there who actually is

3 suffering from asbestos disease and is incapacitated, and thus,

4 you know, in severe condition and yet you've got some expert

5 taking the stand -- you know, you've got two experts, one of

6 them says, well, that person is not really in severe condition

7 and one that says he is, well, you know, that helps you to

8 judge which expert is correct.

9          THE COURT:  So, then I have to judge whether any

10 particular individual person is in a severe condition, whether

11 all of the symptoms that this person has are clearly related to

12 the exposure to asbestos and not to some other condition that

13 this person may have.  So, I'm going to be trying a

14 mini-personal injury trial as to each individual in order to

15 know whether what they're telling me are their symptoms related

16 to their asbestos exposure, are not in some way related to some

17 other -- I'll use the word "undisclosed" condition like, you

18 know, diabetes, maybe they have diabetes and that doesn't come

19 out in the medical record.  How will I ever know this, Mr.

20 Cohn?

21          MR. COHN:  Well, because you'll have -- because their

22 medical records have been produced and because the other

23 claimants will have -- I'm sorry, the other parties to the case

24 will have the chance to present evidence if there really is any

25 which, of course, there won't be because that's not the

1  experience of these people.

2       THE COURT:  I don't think it's appropriate for this

3  Court to be doing mini-trials on personal injury actions.  This

4  Court has pretty broad jurisdiction to do a lot of things, but

5  the one thing, I can't try a wrongful death and personal injury

6  actions, and that's what I think you're asking me to do.

7  You're asking me, essentially, to do within the broad plan

8  confirmation process, a mini-trial, because it may or may not

9  be contested, of any individual person who is going to come in

10 and say, these are the facts of my condition.  And then

11 somebody else is going to say, oh, but they're not the facts of

12 your condition, because you say they're based on this, but

13 we've got evidence that they're based on that, that's not my

14 function.  That's not the plan confirmation function.

15      MR. COHN:  Well, this is not for the purpose of

16 claims --

17      MS. HARDING:  Your Honor -- I apologize, Mr. Cohn.

18 I'm just wondering if it might be useful to have some response

19 right now --

20      THE COURT:  No.

21      MS. HARDING:  No?  Okay.

22      THE COURT:  Let Mr. Cohn finish, please.

23      MS. HARDING:  All right.

24      THE COURT:  Go ahead.

25      MR. COHN:  Your Honor, this is not for the purpose of

1 claims allowance, the purpose is not to create a mini-trial so

2 that you could rule at the end of the day, this person has or

3 doesn't have a claim.  The whole idea is simply corroborating

4 testimony in relation to dueling experts.

5          And, you know, on the one side you're going to have

6 experts whose opinions have been purchased by the plan

7 proponents, for purpose of demonstrating that these medical

8 criteria are just fine, on the other side you're going to have

9 an expert who is not only someone who is the world's leading

10 authority on asbestos disease in Libby, but is the actual

11 treating physician.

12          THE COURT:  And been purchased by the plaintiffs for

13 that same purpose, if you're going to use those words.

14          MR. COHN:  Well, Your Honor, most of what he does is,

15 he treats patients.  This is incidental to his work of treating

16 patients.

17          THE COURT:  This is not incidental.  He's being --

18 he's not being asked to come in here to talk about the

19 treatment of his patients.  He's being asked to come in to

20 provide evidence on epidemiological matters that this Court is

21 then being asked to adjudicate in connection with the plan

22 confirmation process to figure out whether the TDP is

23 appropriately structured, both to deal with present and future

24 asbestos claims in the construct of this particular plan

25 process.

1          MR. COHN:  Agreed.

2          THE COURT:  That's what he's being asked to do.

3 He's not being asked to tell me that Person A has a particular

4 disease and has two years to live and is going to suffer a very

5 painful death, that's not what he's there to do.

6          MR. COHN:  Agreed, Your Honor, except that part of

7 the strength of this particular expert witness is the fact that

8 he has dealt with real cases, and not just a few.  He's dealt

9 with many of these cases and that's part of the strength of his

10 testimony.  And we're seeking to exploit that strength, if you

11 will, by offering corroborating testimony from people who

12 actually suffer from severe pleural disease.

13          THE COURT:  Okay.  I don't think that their testimony

14 will actually be corroborative in the issues that are relevant

15 to this Court.  That's the problem.  I think the testimony may

16 well be relevant in a -- when you get to an issue as to what

17 disease category a particular person falls within, that may be

18 the issue.  You know, somebody files a claim saying I have

19 severe asbestos disease and the trust says no, you don't, and

20 you go to an issue about whether you do or not.  At that point

21 maybe you need that witness' testimony.  That is clearly

22 relevant.  Can you get out of bed in the morning?  No, I can't.

23 I don't think that's relevant for what I need to do at this

24 stage.  I need expert testimony that supports your view that

25 the plan doesn't appropriately address the category of

1 claimants that you're addressing.  I don't think that the

2 individual claimants will support that effort.

3          MR. COHN:  Well, we disagree, but let's leave it at

4 that, Your Honor.  I really have nothing more to add on the

5 point.

6          THE COURT:  Okay.

7          MR. COHN:  Thank you.

8          THE COURT:  Mr. Bernick?

9          MR. BERNICK:  In light of Your Honor's comments, I'm

10 not really sure that there's anything more to be said.  I think

11 that, really, probably the rule that most clearly speaks to

12 this, and we did go through this fairly extensively in

13 connection with the criminal trial, the very same kinds of

14 issues.  The 702, 703 problem which is that the issue here is

15 the application of diagnostic criteria that is inherently an

16 expert matter, the question is, what kind material is

17 supportive or can be relied upon for expert purposes that would

18 be medical records.  The witness can't corroborate an expert

19 opinion because the witness is not in a position to apply

20 diagnostic criteria as the Court properly has perceived.  And

21 so the only remaining question is whether the testimony, the

22 personal testimony of the witness is the kind of information

23 that reasonably and customarily is relied upon by an expert in

24 the field, under Rule 702 and 703, and I think everybody would

25 say, no, because that's the medical records.

1          So, I just don't see that even if the narrow issue is

2   diagnostics, that this would clear the very, very basic rules

3   under 702, 703, as Your Honor has indicated.  To the extent

4   that the opinion then goes to the issue of, well, how would

5   these criteria work more generally in numbers of people that is

6   epidemiology, is going to be a very serious issue because Judge

7   Molloy in the criminal case ruled that Dr. Whitehouse could not

8   testify about those matters because he wasn't competent in

9   those matters, that's going to be a significant issue.  And all

10  these things, I think, are down the road in light of what Your

11  Honor had said, with which we would agree.

12          THE COURT:  All right.  Ms. Harding?

13          MS. HARDING:  I have nothing further, Your Honor.

14          THE COURT:  Mr. Finch?

15          MR. FINCH:  Your Honor, just for the record, I

16  disagree with much of what Mr. Cohn said about the uniqueness

17  of the Libby pleural disease and the impact of the TDP on them,

18  and whether there's discrimination or not.  However, I don't

19  think I need to address any of that, given Your Honor's clear

20  indication of which way she's going to rule on this motion.

21          THE COURT:  All right.  Anybody else have anything?

22          All right.  Yes, I am going to agree that the

23  depositions should be stricken because they are not calculated

24  to lead to relevant or admissible evidence on the issues that

25  will be tried before me regarding plan confirmation and that's

1 the sole and exclusive base on which I'm making this ruling

2 with respect to these 18 depositions.  I'm, of course,

3 excluding from this ruling the prior ruling that I've already

4 made by the agreement of the parties concerning standing.  That

5 has no part of this, I'm only addressing now the criteria,

6 medical criteria issue in making this ruling.

7          So, I want to make clear on the record I'm not

8 backing off what I did before.  I'm simply supplementing as to

9 the medical criteria issue and making a separate ruling on the

10 medical criteria issue.

11          MS. HARDING:  Your Honor, I have a proposed order,

12 would you like me to bring it to your --

13          THE COURT:  Show it to Mr. Cohn because I want to

14 make sure it doesn't it --

15          MS. BAER:  It was attached.  It was the one attached.

16          THE COURT:  Oh, no, because I want to make sure it

17 excludes -- I need a separate order dealing with the --

18          MR. COHN:  Loss of --

19          MS. HARDING:  Okay.  We'll address that at a break

20 and try to put it together now.

21          THE COURT:  All right.

22          MR. COHN:  I just wanted to clarify, Your Honor, that

23 there are, in addition to the people whose depositions have

24 been noticed, there are others who are on our witness lists who

25 are people who are well enough to travel, whose testimony we

1 intend -- or intended, to produce live at the confirmation

2 hearing.  And I think just in order to spare them the trip and

3 the exclusion of their testimony, that if Your Honor's

4 intention is to exclude all such testimony at the confirmation

5 hearing, that we simply make sure we cover that in the order at

6 this time.

7 　　　　　　　THE COURT:  At this time, Mr. Cohn, I don't see any

8 relevant issue on which they can testify because it seems to me

9 that they cannot corroborate the medical experts and that is

10 the proffer that I am getting from you as to what they would

11 testify about.

12 　　　　　　　MR. COHN:  Yes, Your Honor, that is correct.

13 　　　　　　　THE COURT:  All right.

14 　　　　　　　MR. COHN:  So, yes, so I think what should probably

15 be done is to draft an order that comprehensively addresses

16 that.

17 　　　　　　　THE COURT:  All right.

18 　　　　　　　MR. COHN:  And I will work with the plan proponents

19 to produce such an order.  I would also like, Your Honor,

20 permission to -- because I think I need to, to protect the

21 record -- may I submit a written offer of proof within the

22 next, say, 14 days with respect to these claims?

23 　　　　　　　THE COURT:  As long as I get it before the order is

24 entered because I don't want the order to be entered and then

25 get a proffer that's different from what I'm ruling now.  I

1  mean, I'm ruling based on the submissions that I have so far.

2       MR. COHN:  Yes, Your Honor, then we'll do it more

3  quickly than that.

4       MS. HARDING:  Well, Your Honor, if there's -- I don't

5  want to have to go through this again, so if there is something

6  else -- I mean, I think that we made a motion, that counsel

7  responded, we've had argument.  I don't think there should be

8  any additional submission of proof that Your Honor would have

9  to consider before issuing the order.

10       MR. FINCH:  Actually, Your Honor, I think normally

11  the way this works in the middle of the trial, if I offer a

12  piece of evidence and it's excluded, Your Honor or some other

13  judge says, no you can't do it, then after the order is

14  entered, Mr. Finch, you can't get that in, I say, Your Honor,

15  may I make an offer of proof, and the jury goes out of the room

16  and then you put on the offer of proof.  So, I think the proper

17  way to do this is for Your Honor to enter the order that says

18  he can't call these people, and then he puts in his offer of

19  proof to protect the record.

20       THE COURT:  Well, he can put in an proffer at trial,

21  I'm not at trial.  I'm not taking proffers as to trial

22  testimony now, I'll take them at trial.

23       MR. SCHIAVONI:  Judge I just --

24       MS. HARDING:  Your Honor --

25       MR. SCHIAVONI:  -- I actually was just at a

1 confirmation hearing where all 18 of my witnesses were clients,

2 so I'm sympathetic to you.   The judge wouldn't let any of them

3 -- the proffer was made in that case and it's -- how it's

4 always done in every trial, it's made before, so that the judge

5 can consider it --

6          THE COURT:   Before.   It's before the ruling, of

7 course.

8          MR. SCHIAVONI:   -- and take it into account.   The

9 record is closed on this motion.   I don't think it would be

10 appropriate for anything to come in after you rule and I don't

11 think anything should come in after argument and after the

12 briefing on this.

13          THE COURT:   To the extent that there's an issue

14 concerning trial, proffers have to be made at trial, before I

15 make rulings and then I'll rule. I've made a ruling based on

16 the discovery issues that are pending.   You've asked me at this

17 point, do I see a reason why I would permit your witnesses to

18 testify.   Based on what I've heard so far, I don't.   Whether

19 something will happen at trial, I don't know, Mr. Cohn.   You

20 can preserve that proffer for trial.   I may make a different

21 ruling then if something else happens, I don't know.

22          MR. COHN:   Then I think I had better do that, Your

23 Honor.   So, then I take back my request to broaden the order

24 and I'll just work with Ms. Harding to create an appropriate

25 order for just the discovery issue.

1          THE COURT:  All right.

2          MR. COHN:  Thank you, Your Honor.

3          THE COURT:  That's fine.  Okay, what's next?

4          MS. HARDING:  Your Honor, agenda item Number 2 is Mr.

5  Schiavoni's motion with respect to the Whitehouse discovery.

6          MR. SCHIAVONI:  Your Honor, this motion deals with

7  the expert report that was submitted by Dr. Whitehouse, who you

8  heard some reference to in connection with the last argument.

9  I think the basic facts that support the motion are relatively

10  simple and they all flow from the case management schedule that

11  the Court set from Rule 26 and Rule, I think 36, if my rule is

12  right.

13          THE COURT:  I'm sorry, I'm having trouble hearing you

14  Mr. Schiavoni.  Cathy, can you turn that microphone up?

15          MR. SCHIAVONI:  Oh.

16          THE COURT:  No, it doesn't move.  It has to be

17  controlled from here.  We had someone who had spoke very

18  vociferously yesterday, so it was probably turned down a little

19  bit.  Okay, thank you.

20          MR. SCHIAVONI:  Judge, the very basic facts in

21  connection with this motion is, Your Honor set a case

22  management order in December, it was modified slightly in

23  January.  There was a lot of debate in December about how much

24  time should be devoted to things and whether we all consider

25  this a short amount of time or not, there was an effort to sort

1  of logically layout the schedule going forward with each step

2  being tied closely to the intent of the next step.  So that we

3  had as a first step a deadline to serve written discovery, then

4  what flowed from that was, we had -- and that was January 23rd,

5  it was a deadline 30 days afterwards to actually produce

6  documents in connection with that.  Then there was a deadline

7  for doing expert -- for submitting expert reports, that was

8  March 16th, and then a deadline for rebuttal reports.

9          In connection with this issue about Dr. Whitehouse,

10  what happened here was, the written discovery was served on the

11  Libby claimants on January 23rd or before, they provided a

12  response 30 or so days after that.  The minute we got the

13  response we looked at it and we said, well, gee, they're

14  indicating they have all types of materials that they're going

15  to offer at the confirmation hearing and that support,

16  allegedly support, their case and Dr. Whitehouse, but they

17  haven't produced any of them to us.

18          So, we wrote letters immediately, we wrote them on

19  March 10, and we said, look, we'd like everything that's

20  attached.  We got a response back from the Libby claimants,

21  Chris Candon on the 11th, saying they weren't going to give

22  them to us, they engaged in a sort of lengthy exchange about

23  how they wanted to redact all of the documents to mask who the

24  people were that are their clients on the documents.  A

25  protracted exchange went on in connection with that.

1          When the time came, then, for expert reports -- and

2    by the way they didn't seek a protective order as they should

3    have when there was a dispute -- when the time then came for

4    expert reports to be submitted on March 16th, we received,

5    among others, the report of Dr. Whitehouse.  The case

6    management order required that when the reports were tendered,

7    that the parties provide all the documents supporting the

8    report, that support the opinions in the report and, of course,

9    Rule 26 also contains the same exact requirement.  It requires

10   that when an expert report is tendered, that all of the

11   materials that support the opinion or provide grounds for the

12   opinion are tendered.

13          We got the report, we didn't get any of the

14   supporting materials, we didn't get the database, we didn't get

15   copies of any of the medical records.  We wrote the very next

16   day, we said, we got to have this stuff, we didn't get it.

17          The Libby claimants then went ahead with the

18   deposition of their expert, they produced him not on the east

19   coast, but they produced him in Spokane, Washington for

20   deposition.  I flew out there. I will tell you, Your Honor, I

21   travel all the time, Spokane is one of the most difficult

22   places in the Continental United States to get to.  It's a full

23   day there, it's a full day back.  We went out there.  Mr.

24   Stansbury was there, also.  He made requests in advance of this

25   deposition for materials, as well as I did, as is reflected in

1  the debtors' papers.  We got out there, the witness at the

2  deposition confirmed that yes, in fact, he had a database, it's

3  in his testimony.  He also testified about documents that

4  supported his report that were not produced to us.

5       The deposition was unlike professional depositions

6  I've been to.  Halfway through it, about four hours into it,

7  Dr. Whitehouse stood up, said he had had enough and he left.

8  So, there I was in Spokane, after lunch, with no good place to

9  eat dinner and no good options and when I asked the cab driver

10 on the way back to the hotel, should I stay, or -- he said, no,

11 get the first plane to Seattle.  I did, it took me the next 24

12 hours to get back.

13      We then pursued afterwards, please, could we have

14 these documents, we didn't get them.  The next date ran April

15 6th for the submission of rebuttal reports.  No documents

16 produced.

17      We then have since run forward, we ended up, you

18 know, not getting any resolution with this, no protective order

19 being sought by the Libby claimants.  We finally moved, it was

20 only after we filed this motion, after the date for rebuttal

21 expert reports had run, that the Libby claimants started to

22 produce documents.  We got documents the week of May 1st.  We

23 got dumped on us a huge number of documents which I think

24 demonstrate that there was, in fact, a large number of

25 documents required to be produced in connection with this

1  expert report that were not produced.  They weren't produced

2  timely.  We've been prejudiced not just in our inability to

3  have effectively cross examined Dr. Whitehouse, when he was

4  produced in Spokane, but in addition to that, by the fact that

5  the deadline for rebuttal reports had passed.  One might say,

6  well, we could, you know, set a new deadline but, you know,

7  this schedule is so tight that we're dealing with, this does

8  not really lend itself to this sort of situation, of sort of

9  well, let's sort of start everything over, all over again.

10            In addition to that, Your Honor, I say that the

11  production itself that we've gotten is still not complete, and

12  the most troubling thing about the production is the lack, at

13  this point, of the production of any kind of database for this

14  expert.  He is not going to offer testimony, as I understand,

15  just about, you know, Joe -- individual Joe Smith's claim, he

16  is going offer testimony as described in the papers that were

17  submitted in opposition to this motion, that is an

18  epidemiological study in nature.  The quote I have from his

19  report is, "Dr. Whitehouse study fits the definition of

20  epidemiology in that it tracked a patient population over time

21  and applied statistics to it.  It was a study of the

22  distribution and determinants of health-related states or

23  events in specified populations."  That's how they describe in

24  their opposition papers what Dr. Whitehouse did.

25            But, what they produced at this point, belatedly,

1  after the fact, are just actual -- just individual medical

2  records.  There's no production of any database that sets out

3  the tracking of patient populations over time with the

4  application of statistics.

5        Your Honor has heard testimony, I think, in a number

6  of cases from estimation experts like Dr. Peterson, it would be

7  as if Mr. Peterson showed up at trial having just produced the

8  individual claim records but no database showing that, you

9  know, how he had compared these.  We're dealing here with over

10 900 claimants that he's purporting to offer opinions on.

11 That's the population.  And he's supposedly applying statistics

12 to the population to draw conclusions from.  It is, I offer,

13 impossible to keep in your mind all of the 900 people, the

14 progression of their individual diseases, and then draw

15 opinions from it.  The man has to have a database.

16        And in fact when we looked at his report it says on

17 Paragraph 5 of his report for the estimation hearing -- this

18 was just submitted on September 25, 2006 -- and I'm quoting

19 from the report, "Since 1980 I have evaluated or treated over

20 700 patients for asbestos disease from Libby asbestos.  Since

21 about 2000 patient data has been tracked on a database."

22 That's what we would expect from someone who's offering

23 testimony as an epidemiological expert.  That database has not

24 been produced to this day.  We received as part of this

25 exchange the -- a proffer of like six pages of sort of printed

1 material and we were told this is the database.  It can't be

2 the database.

3       We then later got an email from Mr. Heberling who's

4 one of the Libby plaintiff's lawyer who said something -- the

5 email suggests that somehow Dr. Whitehouse may have lost the

6 database, it was corrupted or something, and is now gone.  And

7 then he goes on in the email to say well, he had a copy, too,

8 on his computer, but as luck would have it his was corrupted

9 too, or something.  It's gone.  Whether the database was

10 destroyed, corrupted or doesn't exist there's a very, very core

11 problem here because if this fellow doesn't have a database I

12 think it really shows what Judge Molloy said, he can't testify

13 as an expert just based on, look, I've seen a lot of patients

14 and here's sort of my gut feeling about how the statistics

15 apply over 900 people.  You either have to have to have the

16 database or you're not -- you can't offer expert testimony in

17 this field.

18       So, Judge, what this -- when I -- I sort of said the

19 facts were sort of simple.  Those are the facts.  The law that

20 applies to these facts are Rule 26, it's a mandatory disclosure

21 rule that says that an expert must disclose all of his reliance

22 materials when he produces his report.  In the case management

23 order Paragraph 4 of the order which everyone got, everyone

24 knew about in September and I quoted, said, "Simultaneously

25 with the service of the expert report, the party shall also

1 serve other interested parties with all documents on which the

2 expert relies in forming his or her opinions which are not

3 publicly available.  And the rule that applies to noncompliance

4 with those two -- with Rule 26 and with the case management

5 order is Rule 37(c)(1) which requires a Court to exclude

6 opinions of experts where they fail to comply with their

7 production obligations.  There's authority in the circuit that

8 completely supports the notion that these are mandatory rules,

9 that if you don't apply to them the expert should be struck.

10        The leading Third Circuit case in this is cited in

11 both the debtors' papers and ours.  Its U.S. v. 68.94 Acres of

12 Land.  It's at 918 F.2d 389 and it's a 1990 Third Circuit

13 decision.  And there's a series of decisions that go along as

14 Johnson v. Vanguard and Higgins v. Huey.  Those are all Third

15 Circuit decisions that uphold trial courts in excluding expert

16 testimony where there has not been compliance with Rule 26.

17 The nature of the review for striking an opinion when there has

18 been noncompliance is de novo review.  It's not abuse of

19 discretion because this is a mandatory rule.

20        We can go forward on allowing Mr. Whitehouse to go

21 forward.  If the Whitehouse report isn't struck it's going to

22 cause some chaos with the schedule because of how these

23 documents have not been produced, the fact that we still don't

24 have the database.  We would ask if the Court is so inclined

25 not to strike Dr. Whitehouse, for us to first just simply have

1  an evidentiary hearing on whether or not he's -- what he's done

2  with the database and where we can get it, because we're not

3  going to really be able to effectively cross examine him

4  without it.  And if it was destroyed, under what circumstances

5  it was destroyed, because we think that would bear directly on

6  whether he should ultimately testify.

7           But I think ultimately here the much better course is

8  to deal with this on this flat out, noncompliance issue,

9  otherwise we're going to be going forward both with an extended

10 schedule dealing with this issue and hearing, and you know,

11 Grace has now designated almost an army of experts to basically

12 confirm what Judge Molloy has confirmed about the nature of how

13 this work is put together.  So for all those reasons, Judge,

14 we'd ask that you strike Dr. Whitehouse's expert report.

15          THE COURT:  Ms. Harding.

16          MS. HARDING:  Thank you, Your Honor.  The issue that

17 I think that the -- that we think that the Court needs to

18 address today and that's important, is the -- what the sanction

19 in effect should be for the noncompliance of the Libby

20 claimants with respect to the reliance materials associated

21 with Dr. Whitehouse's report.  Under no circumstances should

22 the Libby claimants or Dr. Whitehouse's noncompliance with

23 their obligations with respect to their expert reports be

24 permitted to impact the schedule that we've all worked so hard

25 to make sure that we maintain.

1          So I think that the question is what do we do about

2    the noncompliance?  And first, Your Honor, I want to just make

3    sure that the Court understands a little bit more precisely

4    what it is that Dr. Whitehouse has done or not done with

5    respect to his reliance materials.  And I put a time line up on

6    the easel so Your Honor can see.  But essentially --

7          UNIDENTIFIED ATTORNEY:  May I please have a copy?

8          THE COURT:  Me, too?

9          MS. HARDING:  Yes.

10          THE COURT:  Thank you.

11          MS. HARDING:  On December 29th -- the Libby claimants

12    submitted Dr. Whitehouse's report, and there were numerous

13    reliance materials not provided with that expert report.  And

14    as Mr. Schiavoni just explained over the course of the next

15    several months, and only in response to the debtors' attempt to

16    finally raise this -- Mr. Schiavoni's attempt to raise this

17    with the Court and the debtors contacting the Court to say we

18    needed probably some kind of an expedited hearing on this, did

19    we start to get actual -- some of the documents that were

20    supportive of Dr. Whitehouse's expert report.  So without going

21    into the history of kind of what's been produced to date, the

22    bottom line is that with respect to a very large portion of the

23    underlying medical records that Dr. Whitehouse relies upon, the

24    Libby claimants to date not only have not produced them, but

25    essentially are saying they cannot produce them in a format

1  that could be usable and relevant to the debtors or anybody

2  else that tries to evaluate his opinions.

3          THE COURT:  Well, then how can he testify?

4          MS. HARDING:  That is my point, Your Honor.  The

5  bottom line is that if the expert doesn't provide the

6  foundation for his expert opinion, then he simply can't provide

7  the opinion to the Court.  And there's no ifs, ands, or buts

8  about it.  There's no way around it.  If he doesn't present and

9  provide the underlying foundation for the opinion he can't

10 present the testimony.  And so it has nothing to do with the

11 record -- with the schedule or anything else.  But he hasn't

12 produced the foundation, and he can't present the opinions.  So

13 I think that -- and as I understand it, it's even -- some

14 extent it's even worse than that, it's that -- it's not the

15 Libby claimants -- well, I'll say this, Dr. Whitehouse is the

16 person that is relying upon these documents, and apparently

17 half, I don't know the exact number, but a large number of

18 them, six, seven, 800 of these patients are not clients of Mr.

19 Heberling apparently.

20          But they are patients of Dr. Whitehouse's and he has

21 purported to rely on their records in forming an opinion that

22 he submitted to this case, to this Court.  And so it is

23 essentially Dr. Whitehouse's reliance materials that are at

24 issue.  It's not an issue with respect to whether they're

25 clients or not of Mr. Heberling.  They are Dr. Whitehouse's

1  reliance materials.  And that's the part of this, Your Honor,

2  that we wanted the Court to focus on, because I don't think

3  that there's anyway for the Libby claimants to fix that at this

4  point.  It is way too late for that, and it should have been

5  resolved before they submitted a report that relied upon all of

6  these documents.  They should have had something in place that

7  would -- that gave them permission -- that gave Dr. Whitehouse

8  permission to use them, gave them permission to produce them to

9  us, and, you know, had something in place that they could have

10  given them to us.  So I think that it's -- at this point in

11  time, Your Honor, the issue is the foundation for his opinions,

12  he hasn't produced the records, and the opinions that are

13  relying upon those records cannot be offered in this case.

14          MR. FINCH:  Your Honor, the ACC will -- joins in the

15  debtors' motion to the extent that it is based on the failure

16  to produce reliance materials.  I'll reserve the balance of my

17  comments for after Mr. Cohn addresses the Court.

18          MR. GUY:  Your Honor, Jonathan Guy for the FCR.  May

19  I be heard very quickly?

20          THE COURT:  Yes, sir.

21          MR. GUY:  We also join.  I don't think the issue here

22  is whether the opinion is admissible because of whether or not

23  Dr. Whitehouse is an expert in epidemiology.  It's really a

24  question as to whether he produced the reliance material.  He

25  didn't and the parties were not allowed to question him fully

1  at his deposition.  He terminated it as is shown in the

2  debtors' papers.  And we join in asking that his will be

3  stricken.  Thank you, Your Honor.

4          THE COURT:  Okay, one second, please.  Okay, Mr.

5  Wisler.

6          MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

7  on behalf of Maryland Casualty Company.  Your Honor, we join

8  the motion to strike, but we don't have anything to add to what

9  counsel has already argued at this point.

10         THE COURT:  All right.  Thank you.  Ms. DeCristofaro.

11         MS. DeCRISTOFARO:  Yes.  Good morning, Your Honor.  I

12 would only like to amplify as an illustration of the real

13 problem that this is, that Mr. Schiavoni was addressing, that

14 almost every time that Mr. Cohn has submitted a motion to Your

15 Honor, he has attached a different report by Dr. Whitehouse.

16 And if you put those side by side and try to figure out the

17 subsets, the numbers, if Your Honor had nothing to do and

18 wanted to do that you would understand what the problem is

19 about not having the database, about whether they're Mr.

20 Heberling's clients, and there are other people that Dr.

21 Whitehouse saw, and what do we do about the people that Dr.

22 Whitehouse saw who are not parties?  It's all very, very

23 convoluted and a mess.

24         And every time Mr. Cohn made a motion to Your Honor

25 there would be another Dr. Whitehouse report.  It might have

1 been predated two years ago, it may not have been.  But you try

2 to reconcile all of those and it's impossible.  And that's why

3 the whole business of not having claimant names or

4 identification or not having a database all makes this fatally

5 defective and a complete mess.  And we join in the other

6 arguments, Your Honor.

7        THE COURT:  Anyone else on the objecting side?  Mr.

8 Cohn.

9        MR. COHN:  Your Honor, may I please have a ten minute

10 recess?

11        THE COURT:  Sure.  We'll take a recess for ten

12 minutes.

13        MR. COHN:  Thank you, Your Honor.

14                    (Recess)

15        THE COURT:  Please be seated.  Mr. Cohn.

16        MR. COHN:  Thank you, Your Honor.  Let's start off

17 with where we are in the process, Your Honor.  As you've heard

18 there was a deposition of Dr. Whitehouse in Spokane and I do

19 sympathize with Mr. Schiavoni's travel woes.  We've all had to

20 travel extensively for these depositions.  I'm going to be

21 going to California next month because there's a deponent who

22 has important family reasons why he can't be far from home.

23 And these are just accommodations that all of us have to make.

24        And in the case of Dr. Whitehouse, you might recall

25 that when we were here a few hearings ago there was discussion

1  of a need to depose him twice and you said that indeed that

2  would be done.  And that has always been the agreement among --

3  since that ruling has been the agreement among the parties that

4  there would be a certain number of hours for the deposition,

5  that it would be divided between two different times.  And so I

6  really regard it as a distraction the fact that Dr. Whitehouse

7  was ill the day of the first deposition.  People had been told

8  that beforehand.  In fact, the deposition had been moved up to

9  an earlier start time because of his illness.  And when it just

10 reached a point where he couldn't continue, he said so, and

11 that was the end of the deposition for that day.  But there

12 will be an opportunity to -- it was always contemplated to be

13 an opportunity for that deposition to continue.  So the issue

14 that we should be focusing on, I would respectfully suggest, is

15 the production of materials that has been the subject of the

16 great focus of the argument that you've heard.

17        Now, Mr. Schiavoni said, you know, where's the

18 database?  And the references that he was making to things

19 being corrupted and disappearing from people's computers and so

20 on, are really quite misleading.  They do not relate to

21 anything that Dr. Whitehouse relied upon.  It was a database,

22 the so-called 550 database which for a while he was trying to

23 build, and did rely upon for purposes of an earlier report, but

24 it proved impossible for that database to be maintained.  And

25 it is not something that he is relying upon for his report

1  concerning plan confirmation.  It is not a reliance material,

2  it is not required to be produced in that regard.

3         When Mr. Schiavoni started making noise about it, we

4  produced it in the best form that we had it, just, you know, so

5  that we could say that we had produced everything that there

6  was.  But it is not a reliance material, it is not something

7  that was required to have been produced, and we produced it

8  really just in order to see whether we could, you know, nip any

9  issue there in the bud.

10         When you look at his motion, and you know, as

11  distinct from what he's argued today, that's what he complains

12  about.  He complains about the lack of the 550 database.  The

13  second thing that he complains about is the -- is a law firm

14  database that he thought he should have access to.  Again, Dr.

15  Whitehouse did not rely upon any law firm database per se.  Dr.

16  Whitehouse did -- there are data on claimants that are in --

17  similar to a law firm -- a law firm database.  All that data

18  has been supplied in connection with his report.

19         And there are other databases that were supplied with

20  his report.  There is a database for his -- the so-called CARD

21  -- CARD by the way, Your Honor, is Center for Asbestos

22  Respiratory Disease in a clinic out of Libby, Montana.  There

23  was a CARD mortality study.  There was database in connection

24  with that which was delivered as Exhibit 7 to his report.  He

25  did a study of mesothelioma cases in Libby.  And that's the so-

1  called Whitehouse 2008 report.  That database was delivered.

2  That's Exhibit 9.  And there's a database for his -- the

3  so-called Whitehouse 2004 study.  And that database was

4  delivered.  Mr. Schiavoni is well aware of all of that.

5       And then the third thing that is complained about in

6  his papers and in Grace's, is the subject of medical records.

7  And that's a serious topic and that's one that we need to --

8  that we do need to address.  We do not regard medical records,

9  per se, as reliance materials.  And apparently none of the

10 experts do.  If you look at, for example, the report of Daniel

11 Henry, who's a Grace expert, when he talks about, you know, how

12 -- let me step back for a second.  When you think about medical

13 experts, Your Honor, how do they acquire their expertise?

14 Well, a lot of it comes from looking at medical record after

15 medical record after medical record.  And so, for example, Mr.

16 Henry says -- Dr. Henry, I'm sorry, says, "By conservative

17 estimate I have interpreted thousands of chests CTs and

18 hundreds of thousands of chests radiographs over my 32 year

19 career as a chest radiologist.  I have interpreted close to

20 2000 chest CTs for pulmonary embolism alone each including HRCT

21 studies of the lungs."  That's where his expertise comes from.

22      Similarly, you have Gail Stockman, MD that's an

23 expert designated by the ACC who says, "During my practice of

24 medicine in Longview, Texas I diagnosed and cared for patients

25 with asbestosis, lung cancer, and malignant mesothelioma in

1  addition to chest injuries, chronic obstructive pulmonary

2  disease, asthma, et cetera.  In addition, I saw large volumes

3  of patients for independent medical evaluations between about

4  1995 and 2005.  Most of these patients had been exposed to

5  asbestos or silica or both."  That's where that doctor's

6  expertise comes from.

7          Where Dr. Whitehouse's expertise comes from is, he

8  has reviewed, I won't say thousands, because the number appears

9  to be about 1800, but about 1800 medical records of Libby

10  asbestos disease victims.  He also has examined perhaps 500

11  records of other patients he's treated with non-Libby asbestos

12  disease.  People who are exposed to chrysotile asbestos which

13  is the less harmful form.  That's where his expertise comes

14  from.

15          Now none of these other experts have produced those

16  medical records that made them into experts.  That were the --

17  that's really the source of their expertise, and those are not

18  reliance materials, per se.  The reliance materials are only

19  the specific things that an expert relies upon in producing a

20  specific report on a specific topic.  Now, there is the issue

21  --

22          THE COURT:  But isn't the difference that what I

23  thought, and maybe I'm just getting this from the pleadings not

24  from his reports, but what I thought the issue was is that he

25  is allegedly going to testify that there is something different

1 about Libby asbestos disease than everybody else's asbestos

2 disease.  And if that is the case and he's basing that on the

3 fact that he's studied the medical history of the Libby

4 asbestos plaintiffs and there is something different in those

5 medical records than there is from everybody else's medical

6 records, that's why the medical records are significant because

7 everybody else's expertise comes from looking at the volume of

8 medical records, but they're not saying Patient A's medical

9 record is significantly different from Patient B's.  And so

10 therefore there's a different -- not a different disease -- as

11 I understood it Dr. Whitehouse is essentially being called to

12 say that there is something -- these are my words, not his --

13 more carcinogenic about Libby asbestos than other asbestos.

14 And the only way you can get to that is to look at the data

15 that he looked at and have somebody else's expert evaluate that

16 data.

17          MR. COHN:  I understand, Your Honor.  I'm just saying

18 -- I'm saying though that to ask him to -- that to produce what

19 amounts to his entire career's worth of medical records is not

20 necessarily -- well, first of all it's not -- in most expert's

21 cases it wouldn't be practical because the records are all over

22 the place.  But there's also a legal problem, a severe legal

23 problem which has to do with the privacy laws protecting

24 patients.  Now, as it happens, Your Honor, in his case, when

25 you talk about the 1800, approximately, cases of Libby asbestos

1  disease where he's looked at medical records, about half of

2  those people are Libby claimants in the sense that they're

3  represented here today.  And that takes away the -- that takes

4  away the issue of -- that takes away the legal bar to

5  disclosure, because the privacy statutes do not protect a

6  plaintiff who places his own medical condition at issue.

7          And there were requests for production of documents

8  that were put out there.  And in response to those we have now

9  produced medical records for the Libby claimants.  And so --

10 now, we can talk about -- there's been a lot of discussion

11 about the timeliness of it, and while I don't like in general

12 to pursue the sort of, who shot John, kinds of exercises in

13 court, in this case, to the extent that we're being challenged

14 on the timeliness of it, I think it's important for you to

15 understand the history of the confidentiality order process.

16         THE COURT:  Okay, but what about the other 900 first?

17         MR. COHN:  Well, the other -- the problem with the

18 other 900 is that we have no way legally to produce those.

19 They are not our clients.

20         THE COURT:  But then he can't rely on the opinion

21 based on the fact that he's examined that data and says that

22 those records fall within the same population, and based on

23 this large population which is virtually everybody in Libby

24 with some form of this particular type of disease, they have a

25 different disease than everybody else who has a similar disease

1 not based on living in Libby.

2        MR. COHN:  Well, Your Honor, first of all 900

3 patients, which is the population of the Libby claimant, in

4 other words, our client database, that's a huge amount of data

5 for one of these studies.  Most medical studies are not going

6 to be based on anything nearly like that.  And all of the

7 phenomenon that Dr. Whitehouse says are associated with

8 asbestos disease in Libby, manifest themselves in the clients

9 and therefore are present in the client medical records which

10 have been produced.

11        THE COURT:  But Mr. Cohen --

12        MR. COHEN:  So why people need the other records is,

13 you know --

14        THE COURT:  Because it's a self-selecting database.

15 I mean, the problem is that from an epidemiological study you

16 draft things from a scientific methodology.  You don't back

17 into it picking the database first in a self-selected form.

18 You do it from a scientific methodology where you set the

19 hypothesis in a -- it doesn't necessarily, I guess, have to be

20 a blind study, although that would certainly be better.  This

21 is clearly not a blind study.  This is self-selecting the

22 population and then figuring out with the criteria that you've

23 set, whether that population fits.  And then saying that, and

24 oh, by the way, none of the rest of the world fits this.  But

25 you haven't examined the rest of the world.  So you have to

1  produce the database.

2         MR. COHN:  Well, Your Honor, we're not -- I first

3  need to make it clear that we have no objection, per se, to

4  producing it if we could produce it.  If we could produce it

5  then we would.  The problem that we have -- and by the way,

6  this was briefed back in the estimation proceeding at Docket

7  Number 12065.  There's an extensive discussion of the privacy

8  statute that we have to deal with in Montana as well as the

9  Federal HIPAA statute.  But the Montana statute actually has

10 its own requirements.  And essentially those requirements would

11 necessitate notifying each of the patients who are not clients

12 so therefore we can't speak for them to permit their medical

13 records to be disclosed.  And that's, you know, that, as a

14 practical matter, Your Honor, that cannot be done, and no other

15 expert is being asked to do that.

16        THE COURT:  Because no other expert is opining that

17 the database that they've used is somehow exclusive or

18 inclusive of a particular subset of claims.  That's the

19 problem.  He's --

20        MR. COHN:  Well, this is what -- I'm sorry, Your

21 Honor, he is an expert -- he is an expert in asbestos disease

22 and in particular in Libby asbestos disease.

23        THE COURT:  But there's the assumption, and that's

24 the problem.  You're making an assumption that there is Libby

25 asbestos disease.  I don't know that there's Libby asbestos

1 disease as opposed to the rest of the world asbestos disease.

2 And he's apparently the person who's going to tell me that.  In

3 order for me to evaluate his opinion I need to know what he

4 relied on.  And the reliance is going, at large part it appears

5 to be based on the medical records that he evaluated -- these

6 are all his patients, first of all, so he's the one apparently

7 who made the diagnosis, now he's doing the study, as I

8 understand it.

9          MR. COHN:  Yes.

10          THE COURT:  If I'm wrong -- okay.  So he's doing the

11 study.  And then he's applying some criteria, which I don't

12 know about yet, to determine whether there is such a thing as

13 Libby asbestos disease.  Well, I can't evaluate that until I

14 know what it is that he's basing this opinion on.  And if he's

15 being called as an expert he knows he has to disclose the

16 underlying data.  He should have taken care of that issue

17 before he relied on it.  I mean --

18          MR. COHN:  Well, Your Honor, in light of the

19 statutory bar I'm not sure that we have a solution.  Possibly

20 the data could be produced in redacted form.  That is to say --

21 and let me back up for a second.  What we've talked about in

22 terms of a protective order regarding Libby claimant medical

23 data is that in testimony, or that which will go into the

24 record, they will be identified by number rather than name in

25 order to protect their privacy.

1         THE COURT:  Correct.  That's fine.

2         MR. COHN:  Right.  However, those -- the medical

3  records are being produced and have been produced in their raw

4  form, if you will, with the personal identifying information --

5         THE COURT:  Confidentiality stipulation.

6         MR. COHEN:  -- on them.  Yes.

7         THE COURT:  Yes.

8         MR. COHN:  The problem with the non-Libby medical

9  data is that apart from going through this very cumbersome

10 procedure which probably -- where we probably wouldn't succeed

11 in getting the patient's permission or at least, you know, any

12 kind of unanimity of patient permission, then there's no way to

13 do it -- there's no way to produce this in nonredacted form

14 because then it's personally identified medical information

15 which is just forbidden by law from being disclosed.  And there

16 are huge fines for this, Your Honor.  This is not, you know,

17 this is serious stuff.  And so --

18        THE COURT:  Which is one reason why you don't usually

19 have the treating physician be the epidemiologist.

20        MR. COHN:  Your Honor --

21        THE COURT:  But that's the choice.

22        MR. COHN:  Right.  Well, it's not -- you know, you

23 could say it's a choice, Your Honor.  This happens -- this is

24 the situation that we have in Libby.  And we are not -- we

25 don't have the resources of, you know, a multi-million dollar

1  corporation.  We don't have the resources of these insurance

2  companies to go out and just hire experts at the drop of a hat.

3  What we have is the person who's treated them and who has

4  published peer reviewed work on the subject of Libby disease in

5  -- I'm sorry, asbestos disease in Libby.  This is what we have.

6  This is the reality, Your Honor.  And if the fact that that's

7  all that we have, and I would respectfully suggest that in some

8  ways what we have should be more persuasive than the kind of

9  standard medical expert reports that you're familiar with, but

10 if that's to prevent us from -- and it's going to relegate --

11 if that's to relegate the Libby claimants to a position where

12 they're discriminated against under the trust distribution

13 procedures because the one way by which we would prove the

14 nature of that discrimination is going to be barred to us, then

15 you've really left us in a position where --

16         THE COURT:  I haven't left you anywhere, Mr. Cohn.

17 The Libby claimants have chosen to proceed in this fashion.

18 They don't need the medical -- their treating physician to be

19 their epidemiological expert.  If they do choose to do that, I

20 didn't make the rules either.  I live by them just like

21 everybody else does.  They're binding on the Court like they're

22 binding on everybody else.  This Court hasn't put any party in

23 any position.  The parties have chosen the positions that

24 they've picked, and the rules are binding on the parties.  So

25 the rules say that you have to disclose the databases.  Now, he

1    asked -- or the underlying documents on which you've relied.

2         If he's relied on this information to come up with

3    the theory, and again, I'm only going from the pleadings.  So

4    if I'm incorrect about the theory then stop me, because this is

5    what I understand this issue to be about.  If he is going to

6    opine that there is something special about Libby asbestos

7    disease that separates it from the rest of the asbestos claims

8    that are likely to come through this trust distribution

9    process, and the reason he's gotten to that opinion is because

10   he's looked at this population of the 1800 -- whatever the

11   number is -- 1800 claims and in that population he's identified

12   whatever these factors are, then that population database has

13   to be disclosed so that other people can take a look at it.

14        They may agree with it at the end of the day.  They

15   may disagree with it, but they have the opportunity to assess

16   how Dr. Whitehouse came to his conclusion as an expert using

17   that database.  That's the point, they've got the right to do

18   it.  Just like if you want to see what they relied on you've

19   got the right to ask for it.  And they've got to disclose it.

20        MR. COHN:  Well, apparently not, because their

21   experts are not disclosing any medical records whatsoever.

22        THE COURT:  If they've reviewed medical records and

23   relied on medical records performing their opinions in these

24   cases and you want them they have to disclose them.

25        MR. COHN:  Well --

1           THE COURT:  What's good for the goose is good for the

2 gander.  They've relied on them and you want them, you get

3 them.

4           MR. COHN:  Well, Your Honor, the distinction that I'm

5 offering to you, and you know, I understand that you see some

6 difficulties with it, but we have offered the underlying

7 databases for the studies that he has done, but it is

8 inevitably the fact that in rendering his expert opinion he is

9 relying upon his entire career's worth of examination of

10 medical records and that includes these non-patient -- sorry,

11 non-claimant records.

12          THE COURT:  Well, I thought -- I'm sorry, maybe I am

13 missing something.  I thought that the database that had been

14 provided which you've described as the 550 database, you said

15 he was not relying on.

16          MR. COHN:  Correct.

17          THE COURT:  Okay.  So what database has been produced

18 on which he is relying?

19          MR. COHN:  I'm sorry, Your Honor, I described the

20 three of them which was the database for the CARD mortality

21 study which is a --

22          THE COURT:  Okay.  But those are different opinions

23 that he's rendered than the current opinion which is the one

24 they want the database for.

25          MR. COHN:  Well, no, those are all -- those are the

1 -- it's just a subset.

2          MR. SCHIAVONI:  Those are -- it's a very small subset

3 of the overall population.

4          MR. COHN:  It is certainly true that it's a subset of

5 the population, Your Honor, but those are the databases on

6 which he has relied in rendering his opinions.  There are no

7 other databases upon which he has relied.  We're not

8 withholding a database.  There is no -- there is literally

9 physically no database in any computer anywhere that we have

10 not produced.

11          THE COURT:  Provided.

12          MR. COHN:  Yes.  There are, however, the medical

13 records.  And that's the issue that's being raised here.  What

14 people want are the medical records of non-Libby claimants.

15          MS. HARDING:  Your Honor, could I be heard, perhaps?

16          THE COURT:  If this is going to clarify something,

17 yes, go ahead.

18          MS. HARDING:  I hope it will.

19          THE COURT:  I'll hear the rest of your argument, Mr.

20 Cohn.  I'm wrestling with the issue. I'm trying to get my hand

21 around the issue.  So I'm not having a rebuttal argument, Ms.

22 Harding, I'm just trying to get clarification.

23          MS. HARDING:  I'll just try to give clarification and

24 then I'll sit down and save my rebuttal argument.

25          THE COURT:  All right.

1          MS. HARDING:  Your Honor, I'm just going to put on

2   the screen this -- what I've drawn.  Just a box with 1800.  And

3   you are absolutely correct, Your Honor, self-selected group of

4   patients essentially.  And Dr. Whitehouse has stated in his

5   report, the Libby claimants have stated in their pleadings, and

6   he testified under oath in his deposition that in forming the

7   opinions that he reached in this case, that he relied upon his

8   diagnosis treatment and review of this group of 1800 patients.

9   And he also purports to have formed what can only be called

10  epidemiologically based opinions based on this population of

11  1800 people.  And without producing any database because

12  they're saying it doesn't exist.

13          So there's never been a database of the 1800 people

14  into which, for a typical epidemiological study, you would have

15  entered the data, entered the people.  Are they male, are they

16  female?  What is their age?  What were their exposures?  What

17  is their disease?  What are their other exposures?  The types

18  of data that would be compiled in a database from which you can

19  perform an epidemiological analysis.  So Your Honor was right

20  on exactly what would be expected.  That does not exist.  Okay.

21  The debtors believe that without question Dr. Whitehouse is

22  incapable of forming opinions -- epidemiological opinions based

23  on that group of people.  So that very fact alone --

24          THE COURT:  Okay, but that should be the subject of a

25  Daubert hearing.

1           MS. HARDING:  No, no, and I'm just trying to set it

2    up for Your Honor, because what I'm trying to get at, Your

3    Honor, is having said all that what they're telling us is that

4    -- so we said, you know what, just give us the underlying

5    records so we at least understand where your opinions are

6    coming from.  And so we've now gotten over the course of this

7    several months, some of them.  We've had some of them before.

8    And what they're basically telling us is, half of them you

9    simply can't have.  So the half of the population from which he

10   purports to have formed epidemiological opinions, is not

11   available for a review in any form whatsoever.  And so that is

12   the problem.  He simply cannot -- that's why I was trying to

13   make the point earlier, Your Honor.

14           If there are certain limited opinions in Dr.

15   Whitehouse's report that relate to a particular study, his

16   progression study, he has produced that and we were perfectly

17   willing to take that on with respect -- if there's something

18   else.  I don't think there is.  But to the extent that there

19   is, that's fine, but he has testified under oath that his

20   opinions about the Libby claimants, he's expressing here and

21   that he intends to testify to in this hearing, are based on his

22   epidemiological analysis of this group.  And we're saying he

23   cannot offer those opinions having not provided that database.

24           THE COURT:  Okay.

25           MS. HARDING:  And the fact that they can't be

1  produced, I think is -- I will save that part.  Because the

2  bottom line is they didn't have authority to use them in this

3  type of a setting and he shouldn't have.  And we don't want --

4          THE COURT:  Well, that's a different issue.

5          MS.  HARDING:  -- we don't want redacted copies of

6  medical records that they don't have permission to turn over.

7          THE COURT:  Yes, that's a different issue.  Whether

8  he had the authority to do what he did with them as a treating

9  physician rather than as an expert witness without their

10 authority is a different issue.  I don't need to go there.

11 I've got problems of my own to deal with in this case.  I'll

12 just take my own on.  Thank you.  Okay, Mr Cohn.

13         MR. COHN:  I would say to characterize that as a

14 self-selected population is not quite right.  I guess they're

15 self-selected in a sense that anybody who has asbestos disease,

16 you know, and starts coughing is self-selected because they

17 went to the doctor.  But the 1800 are people who --

18         THE COURT:  They went to this doctor and he's only

19 used his patients.  That's the problem.  He hasn't done an

20 epidemiological study in the sense that he has looked at every

21 person within a, you know, a five mile city-wide radius.  He's

22 looked at the patients who came to him.

23         MR. COHN:  No, no, I'm sorry, Your Honor.  He's

24 looked at -- there were screenings in Libby and the patients

25 basically -- the 1800 patients are people who were diagnosed

1  with asbestos disease at the CARD clinic.  And he's not the

2  only doctor at the CARD clinic, Your Honor.  He does have

3  access to all of those records because he's a doctor who is

4  affiliated with the CARD clinic.  But these are not -- it would

5  not be fair to say that this is a self-selected population in

6  the sense of these are people who are Dr. Whitehouse's

7  patients.

8          THE COURT:  Oh, well, then if they're not even his

9  patients then he has to have had some database somewhere

10  because he can't possibly have had access to their medical

11  records unless he's gotten them from somebody with authority.

12  So he has --

13         MR. COHN:  Well, he practices --

14         THE COURT:  -- if they're not even his patients he's

15  not even a percipient fact witness with respect to them.

16         MR. COHN:  Well, he practices at the CARD clinic,

17 Your Honor, and all doctors rely on medical records that are

18 maintained by other doctors.  So that's not --

19         THE COURT:  They do for treatment and diagnosis.  But

20 you're offering him as an expert, and I don't disagree that an

21 expert looking for some medical treatment is going to rely on

22 another doctor's medical history or information in the file.

23 But that's not what you're producing him for.  I don't see

24 anyway out of getting the underlying data.  If there is no

25 database in which the information that would typically support

1 a study of this nature is -- exists then I don't see anyway out

2 of giving the underlying data.

3          Now, it can be produced in a fashion that deletes,

4 for example, you know, name, uses -- the type of thing that we

5 did for the 2019 reports if necessary, use the last four digits

6 of the Social Security Number so that there can be patient

7 privacy protection and limit it, certainly, only to the use for

8 plan confirmation purposes.  That's what it's for, nothing

9 more.  We can build those protections in, but it has -- the

10 database has to be produced or I don't see how there is an

11 underlying foundation that assesses Dr. Whitehouse's opinion.

12          MR. COHN:  You said database, but I think you meant

13 underlying medical records, right?

14          THE COURT:  Because there is no database.  Yes.  I'm

15 sorry.

16          MR. COHN:  Right.  Well, Your Honor, then I'm going

17 to -- I'm just going to need to check whether there is a way

18 around this.  And the -- it involves, as I said, not just Dr.

19 Whitehouse, but it involves the CARD clinic and I think it

20 involves the hospital in Libby because I think that's where

21 some of the records are.  And so we just need to see whether a

22 court order from you saying they shall be produced, but, you

23 know, with those privacy protections will essentially -- well,

24 when I say pass muster with them I mean, you know, I am told in

25 the past they have gone to court in Montana to get protective

1  orders.  And we certainly don't want that.  So we should --

2          THE COURT:  Well, if they want to go to a state court

3  and tell a state court that the federal preemption statutes

4  don't apply they can do that.

5          MR. COHN:  No, no, I think it would be in district

6  court in Montana.

7          THE COURT:  Oh, fine.

8          MR. COHN:  But as I say, I think it would be better

9  to develop a solution that would not provoke that.  So that's

10 the best I could do, Your Honor, is to try and see whether I

11 can --

12         THE COURT:  Okay, I want to go back to something you

13 said earlier.  You said there was a screening and these

14 patients somehow or other passed the screening and then they

15 were sent to the CARD clinic and that's where this database

16 came from.

17         MR. COHN:  Again, you say database.

18         THE COURT:  Data of patients.  This group of

19 patients.  I'm sorry.

20         MR. COHN:  That's largely correct.  I cannot say -- I

21 mean, obviously there were some people who were screened who

22 just never, you know, just like never followed up.  So I can't

23 -- it's not 100 percent correlation between somebody being

24 screened, told they had asbestos disease, and seeking treatment

25 at the CARD clinic.  Obviously people can bury their heads in

1 the sand.

2          THE COURT:  Okay.  So --

3          MR. COHN:  And also, Your Honor, I guess, you know,

4 some people.  It's not a large turnover population, but some

5 people do leave.

6          MS. HARDING:  Your Honor --

7          MR. COHN:  There are some of those people, too.

8          MS. HARDING:  I just need to correct the record, Your

9 Honor.  This is -- because I don't want to spend too much time,

10 and I've spent a lot of time on this so I'm fairly certain that

11 I'm accurate when I say this.  The ATSDR, which is the federal

12 agency that responded to Libby and has performed

13 epidemiological analysis on the population of Libby, has

14 conducted an epidemiological analysis of the Libby community

15 with respect to whether there is disease in the community as

16 opposed to within the worker population.  And that is an

17 epidemiological study upon which Dr. Whitehouse chooses not to

18 rely.

19          There is also a separate screening study which Your

20 Honor is already familiar, with which is not an epidemiological

21 study upon which some people were screened and found

22 abnormalities and were -- and some of them absolutely did go

23 see Dr. Whitehouse and perhaps went to see other people, we

24 don't know.  But that has -- there is, as far as I know, and I

25 think there would be no dispute about this, there's no

1 suggestion that the 1800 patients of Dr. Whitehouse is somehow

2 related whatsoever with respect to the 1800 or I don't know

3 actually, 2300.  I don't know how many people were actually

4 screened in Libby.

5          So there may be some patients of Dr. Whitehouse's

6 that were -- I'm sure there are, some patients that were

7 screened of Dr. Whitehouse's and some that were not.  And I

8 don't know if counsel is trying to suggest that there's somehow

9 some relationship epidemiologically to, you know, Dr.

10 Whitehouse's population of, you know, quote, 1800 people or

11 patients and some other population that the ATSDR dealt with.

12 So I just wanted to make sure that the Court wasn't confusing

13 those two.

14          MR. COHN:  I don't believe I said anything about the

15 ATSDR, Your Honor.

16          MR. SCHIAVONI:  There was testimony at the deposition

17 that some of these people were just simply referred to Dr.

18 Whitehouse by the plaintiff's lawyers.  I mean, --

19          MR. COHN:  Yes.  Several of them, Your Honor, and of

20 course Mr. Schiavoni wishes to point that out.  But, Your

21 Honor, the suggestion here is not that the -- that there's 100

22 percent, you know, correlation between the screening and the

23 patient base at the CARD clinic.  If that was the -- and I

24 don't think I said that, but --

25          THE COURT:  Well, that's what I inferred.  Maybe you

1 didn't say it, but that's where I was going with it.  So all

2 right.

3         MR. COHN:  Well, then I'm glad we did make the

4 correction.

5         THE COURT:  All right.  Thank you.  All right, so

6 what are you suggesting, Mr. Cohn?

7         MR. COHN:  Well, I'm suggesting, Your Honor, the best

8 I can do, and I will undertake to do it, is to see whether it

9 will be feasible to produce on a reasonably quick basis,

10 because obviously everybody is sensitive about time, redacted

11 medical records for the non-clients who are among the 1800

12 patients of Dr. Whitehouse.

13         THE COURT:  Okay.  When you say redacted what I'm

14 talking about is taking out a name and assigning a number --

15         MR. COHN:  Yes.

16         THE COURT:  -- so that everybody knows what the

17 records are, for example.

18         MR. COHN:  Right.  It's making it anonymous, but not

19 otherwise -- not changing any of the data or withholding any of

20 the data.

21         THE COURT:  That's correct.

22         MR. COHN:  Yes.

23         THE COURT:  All right.  Ms. Harding.

24         MS. HARDING:  Your Honor, I don't -- the first thing

25 I want to say is that -- is what I alluded to at the beginning

1 of my first argument which is that we are five months into

2 discovery in this case which is cut off on June 15th, and that

3 Dr. Whitehouse's report was issued at the end of December.  And

4 I think that -- I don't think it's an adequate remedy for the

5 noncompliance to simply allow them to produce them now without

6 any sanction.  So that's first.

7        THE COURT:  Well, it seems to me that if the

8 information is produced that some additional discovery is going

9 to be required, that's obvious.  And one of those things, I'm

10 sure, will be a followup deposition of Dr. Whitehouse.  For

11 that purpose, Dr. Whitehouse is going to have to either travel

12 or do it by video conference, if that's feasible, or something

13 where the parties do not have to travel to Spokane, because the

14 extraordinary expense to this estate in doing that is not

15 warranted under these circumstances.  This data should have

16 been produced with the report.  And it is -- I think the

17 Court's bending over backwards, forwards, and every other which

18 way that any entity could possibly bend to get this information

19 available to the parties at this stage of the game.

20        So, yes, followup discovery obviously will be

21 authorized, and I'll have to simply work with you to find out

22 where.  But the cost of that discovery, to the extent that it's

23 going to involve a deposition, will not involve travel to where

24 Dr. Whitehouse is.  It will involve Dr. Whitehouse, if travel

25 is necessary, traveling to where the parties are.

1          MS. HARDING:  Your Honor, I'm not going to --

2          THE COURT:  And if he does not appear, I will not

3  permit his testimony.  I want to make it clear that if there is

4  necessary -- if it is necessary for a followup deposition as

5  the result of these documents, and I am assuming that parties

6  will want to follow up deposition as a result, I'm making that

7  assumption.  If you don't, fine.  You can say you don't.  But

8  if the parties do, then that cost of travel is -- Dr.

9  Whitehouse's cost of his travel is the responsibility of the

10  Libby plaintiffs not of the parties and he is to go to a

11  reasonable location where the other parties can travel to.  Or

12  if you agree to do it by video deposition, you may agree to

13  that.

14          MS. HARDING:  Okay.  Your Honor, the one thing I want

15  to clarify though is the Court -- I understand what the -- I

16  understand that the Court is not ordering, there will be no

17  change to the CMO and to the schedule as result of the Libby

18  claimants' actions, correct?

19          THE COURT:  I'm not ordering a change to the

20  schedule.  The only problem is you're going to have rebuttal

21  reports that may have to be due and we'll have to build a date

22  in for that.

23          MS. HARDING:  Well, here's what I suggest, Your

24  Honor.  To the extent the Libby claimants can provide the

25  material in time for review under the current schedule and in

1  time for it to be utilized, that's fine.  But I don't think

2  that our right to -- I think that we should still retain our

3  right to argue to the Court that his opinions that rely upon

4  this data that was not produced, should not be admissible at

5  the point in time when you're going to take his testimony to

6  the extent that we have not had adequate time to review and

7  prepare and rebut them.

8          THE COURT:  I would certainly consider that argument,

9  but I think what I need is the time limit now within which they

10  need to be produced, too.  Because, for example, your discovery

11  ends June 15th.  If you don't get these documents within a week

12  you have no hope of making use of them.

13          MS. HARDING:  That's exactly right.  And so I was

14  going to suggest that if they can get them to us within a week

15  -- I'm not suggesting that we can -- that we will have time to

16  review and adequately -- in order to do anything with them, but

17  if they get them to us within a week we will make the best

18  attempt.  But I don't think that their neglect over the past

19  five months should become our burden.

20          THE COURT:  I agree.

21          MS. HARDING:  So I just want to make sure that that's

22  clear and that we do not -- and then I also want to reserve and

23  make sure that we have the opportunity to make the arguments to

24  the Court that they have not -- they did not provide the

25  adequate foundation for those opinions and did not provide

1  adequate time for review of that -- of those documents.

2        THE COURT:  Well, I'm wondering whether the schedule

3  with respect only to supplemental reports -- I'm saying

4  supplemental, I guess it's rebuttal actually, but additional

5  expert reports on behalf of the parties opposing Dr.

6  Whitehouse's view can -- if that deadline can be extended

7  without extending the rest of the schedule, I just don't know.

8  But it's possible -- the evidentiary hearing isn't going to

9  start for a couple of months so the question is whether you can

10 -- we can build in some additional time to look at these

11 documents assuming they're produced within a week.

12       If they're not produced in a week then I'm going to

13 say that it's prima facie evidence that any later production is

14 too late for anybody to make reasonable use of the additional

15 information, because it's already very late when you're trying

16 to look at medical records as opposed to a database.  But I

17 understand the problem that the Libby claimants have faced.

18 They should have dealt with it earlier, they didn't.

19 Nonetheless there are a couple of months 'til trial so I'll

20 give them this last chance.  But it has to be produced within a

21 week.  So.  Now, having said that, is there some flexibility to

22 getting the rebuttal reports just for purposes of this issue,

23 Dr. Whitehouse's opinion pushed back?

24       MR. FINCH:  Can I confer with Ms. Harding about that

25 before we address the Court?

1          MS. HARDING:  I was just going to say --

2          THE COURT:  Yes.

3          MR. FINCH:  And not -- just like two minutes.

4  Everybody stay here --

5          THE COURT:  Yes.

6          MR. FINCH:  -- so we don't leave.

7          MR. SCHIAVONI:  Can I be heard, Your Honor, while --

8          THE COURT:  Yes.  Well, you may want to wait until,

9  or don't you care?

10                         (Pause)

11          THE COURT:  Ms. Harding.

12          MS. HARDING:  Your Honor, I'm sorry to report that

13  it's -- we find it almost impossible to figure out a way to

14  kind of -- to deal with this because the schedule is tight and

15  there's so much going on between now and the close of discovery

16  and then feasibility discovery is still going on after that as

17  well.

18          THE COURT:  You'll figure out a way.  How much time

19  do you need to get the rebuttal reports done assuming you get

20  the documents this week?  What's the last date by which

21  anything has to happen in this case in order to get the

22  information filed with the Court before trial?

23          MS. HARDING:  Well, Your Honor, you're just talking

24  about reports from us then.

25          THE COURT:  I'm talking about anybody who wants to

1  file a rebuttal report in response to Dr. Whitehouse's opinion

2  based on the fact that the information wasn't previously

3  disclosed.  Knowing that, you're probably going to want to take

4  another deposition of Dr. Whitehouse in the meantime.

5          MS. HARDING:  Right.  Well, then, Your Honor, what I

6  suggest then if it's the parties that will be taking the

7  deposition of Dr. Whitehouse we'll confer and we'll submit a

8  date if we get the documents by -- in the next week.

9          THE COURT:  Yes.  If you don't get the documents

10 within the week it's a moot point.

11         MS. HARDING:  Okay.  All right.  Then I think we'll

12 pursue that course.

13         THE COURT:  All right.

14         MS. HARDING:  Because then we can look at the

15 information that comes in and determine, you know, how large it

16 is once we get it.

17         THE COURT:  Okay.  So then the order that I will

18 enter when I get it just concerning the schedule, not

19 concerning the confidentiality issue, just concerning the

20 schedule is that the documents are to be produced within a week

21 from today.  Failure to do so is going to bar Dr. Whitehouse's

22 opinion concerning any epidemiological studies he purports to

23 have conducted or on which he's purporting to offer an opinion

24 based on those documents.  And if the document is produced then

25 incorporated within this order, the parties also will extend

1  the schedule for producing Dr. Whitehouse for deposition and a

2  rebuttal -- or I should say rebuttal reports concerning his

3  opinion within the CMO allotted times.

4          MS. HARDING:  Your Honor, can I clarify one thing?  I

5  just want to make sure, and I think I'm correct about this, but

6  the -- even if they are able to provide the documents the

7  debtors' position is that Dr. Whitehouse is not and has not

8  performed an epidemiological analysis.

9          THE COURT:  I understand.

10          MS. HARDING:  Okay.

11          THE COURT:  I think you need a Daubert hearing on

12  that.

13          MS. HARDING:  Yes, that's correct.

14          THE COURT:  That's not the subject for this discovery

15  motion.

16          MS. HARDING:  Okay.  Thank you, Your Honor.

17          MR. SCHIAVONI:  Judge, the related point I wanted to

18  be heard on is as I understand it, in essence, the Rule 37

19  issue that I brought up on this motion we'll have the ability

20  to bring that same -- we're not dispositively dealing with this

21  issue.  We're going to see how things sort of happen going

22  forward and I'll be able to bring back before the Court the

23  Rule 37 issue in connection with any Daubert hearing as an

24  alternative ground for Your Honor to rule with regard to Dr.

25  Whitehouse.

1          THE COURT:  I'm not issuing any sort of sanctions

2    orders now.  I'm setting up a discovery schedule that I hope is

3    going to accommodate the needs of the parties.  It may be moot

4    if these documents can't produce within a week.  So I don't

5    need to trudge down that road right now.

6          MR. SCHIAVONI:  Okay.  I understand you're not

7    sanctioning, but you're also not adjudicating the motion on its

8    merits.  You're not denying it on the merits.  We'll hear that

9    in connection with the Daubert if the issue is still alive at

10   that point.  That's how I --

11         THE COURT:  I think -- I just said that I was barring

12   any testimony in the event that the documents aren't produced

13   within a week.  That's granting the motion as I understand it.

14         MR. SCHIAVONI:  And, Your Honor, just there are two

15   other points.  This thing about the database it's -- look, you

16   know, what I heard from Mr. Cohn is well, he's not relying on

17   it, he doesn't have to give it to us.  I -- fundamentally, I

18   mean, this would be like Mr. Peterson coming in and saying well

19   --

20         THE COURT:  No, he said it doesn't exist.

21         MR. SCHIAVONI:  Could you read the email, please that

22   we got from Mr. Heberling.  He copied Mr. Stansbury.  He's got

23   a copy of it on his computer.

24         THE COURT:  Okay.  I apologize for interrupting, but

25   I just heard from Mr. Cohn that everything they have has been

1 produced.  So, okay.

2          MR. STANSBURY:  This is the email dated --

3          COURT CLERK:  Speak into the microphone.

4          MR. STANSBURY:  Sure.

5          THE COURT:  You can sit down, so that --

6          MR. STANSBURY:  Brian Stansbury for W.R. Grace.  This

7 is an email from Jon Heberling dated May 4th, 2009.  "Dear Tank

8 and Nate, I understand you have requested the database in

9 electronic form.  I do not have it in electronic form.  I sent

10 what I had in a file.  Since initially receiving it I had a

11 computer crash.  Dr. Whitehouse was unable to find it in his

12 computer.  He has had crashes also and probably lost it.  As he

13 has testified he has not used it for quite some time now, Jon."

14          MR. SCHIAVONI:  Judge, this is not about Mr. Cohn --

15 obviously Mr. Cohn has no personal knowledge about this, and

16 I'm in no way impugning his representation to the Court.  I

17 just don't think he personally knows one way or the other.

18 It's just -- you've heard the email.  This is just not

19 plausible, the guy doesn't have -- he either has no ability to

20 testify as an expert in this case or he prepared a database and

21 he hasn't adequately conducted a search for it.  I just ask for

22 the ability of -- if he can't find it in his computer we can

23 send an expert over and we can look in his computer.

24          THE COURT:  I thought I just heard from Mr. Cohn that

25 this is the, quote, 550 database that has been produced by Mr.

1 Cohn in the fashion in which it exists.  Mr. Cohn, am I missing

2 something?

3          MR. SCHIAVONI:  They produced six pages of paper.

4          MR. COHN:  Excuse me.  And that is what --

5          COURT CLERK:  Use the mic.  Please don't talk until

6 you use the mic.

7          MR. COHN:  Excuse me.  Yes.  And that is what Mr.

8 Heberling's email says.  It says that in electronic form it no

9 longer exists which is completely understandable since nobody

10 has maintained it for several years.  It is not, once again I

11 have to say, it is not anything upon which Dr. Whitehouse is

12 relying for the opinions that he has offered in his expert

13 reports.  And so I would respectfully submit that that database

14 is simply irrelevant.  But nevertheless, we have produced it

15 and we have produced what we have relating to the 550 database.

16          MR. SCHIAVONI:  What the email says is that Dr.

17 Whitehouse probably doesn't have it.  And there's no affidavit

18 from Dr. Whitehouse one way or the other on it.

19          THE COURT:  Fine.  Let's get an affidavit from Dr.

20 Whitehouse as to what does or doesn't exist and if he had it

21 and doesn't have it any longer, let's get an explanation as to

22 why and what happened to it.  If it's some electronic crash and

23 the computer still exists, it can probably be recreated.

24          MR. SCHIAVONI:  And, Judge, just a very last point

25 I'd make --

1          THE COURT:  But if he's not relying on it you're not

2    entitled to it.

3          MR. SCHIAVONI:  Judge, the last point is this issue

4    about redacting the names of the people that we're dealing

5    with.  I understood why this made sense in the context of the

6    estimation hearing, because basically in the case of the

7    individual files you were listing data about just simply data,

8    you know, numbers, when they settled, this and that.  You know,

9    we saw very first hand in that, you know, the four hours of

10   examination of Dr. Whitehouse, what it was like when you

11   presented them with a file where the names were redacted.

12         Basically we got no testimony at all because he said

13   he couldn't tell you who the person was that we were presenting

14   him with information on.  And this was materially important

15   because one of the files, for instance, that he was cross

16   examined on was someone that he had said had an asbestos

17   related disease and there was good reason to believe that this

18   particular person had an entirely different disease and ended

19   up committing suicide.  And it was impossible to cross him

20   because he could simply sit back and say well, I don't know who

21   this is.  And that's exactly what happened.  I just ask you to

22   --

23         THE COURT:  But what difference does the individual

24   person make in this context?  What you're looking at, as I

25   understand it, is to figure out for epidemiological purposes

1 whether the standards that are set up in the TDP recognized

2 from Dr. Whitehouse's perspective, that is, whether there is in

3 fact a unique disease attributable to people who live in Libby

4 and whether the data that he's collected, because he doesn't

5 have a database, that's informed by the underlying patients'

6 records is somehow different from the data that has now been

7 collected and is available in summary form by your

8 epidemiologist who are going to say, I take it, that there is

9 no -- nothing unique about the examination of these patients'

10 databases when you aggregate it all and put it into a database

11 than there was from anybody else's.  It doesn't matter who the

12 patient is.

13         MS. HARDING:  Your Honor, if I could respond to that.

14 I can represent to the Court right now having attempted to

15 analyze past medical records of Libby claimants to the extent

16 that we had them, that the debtors, and I'm certain other

17 parties in this case, will not be able to assemble a database

18 of these records and perform an epidemiological evaluation on

19 it which we believe would not be proper to begin with because

20 of the fact that it's self-selected.

21         THE COURT:  Well, then that's going to be part of

22 your Daubert motion.

23         MS. HARDING:  That's right, but I just --

24         THE COURT:  Okay.

25         MS. HARDING:  -- wanted to make sure that the Court

1  was aware that the only reason we even think that these records

2  are -- at the fundamental level the records cannot support, in

3  and of themselves, cannot support an epidemiological analysis.

4          THE COURT:  Well, then you don't need to know who the

5  person is for that purpose.

6          MS. HARDING:  Well, except that, Your Honor, to the

7  extent that we contest Dr. Whitehouse's claims that these

8  people are exposed solely to exposure Libby --

9          THE COURT:  Then you're opening up what Mr. Cohn

10  wants which is the depositions.  You go down this road he's

11  entitled to do the depositions.  You folks pick.  You can't

12  have it one way and not the other.  You choose.

13          MS. HARDING:  No, no, no, Your Honor.

14          THE COURT:  Yes, Ms. Harding, you choose.

15          MS. HARDING:  I understand what you're saying.  I

16  just think that maybe I've confused you, Your Honor.

17          MR. SCHIAVONI:  Judge, this may come out -- I would

18  just ask you to sort of keep an open mind on this when we get

19  to the Daubert hearing because you're going to see how we were

20  prejudiced by this.  Because among other things it's not a

21  matter of one record --

22          THE COURT:  I don't want to know how I'm prejudicing

23  you then.  I want to know how you're prejudiced now.

24          MR. SCHIAVONI:  Well, I'm telling you.  I'm going to

25  tell you right now.  This is exactly how.  It's not just --

1  unlike the estimation hearing, there isn't one record, this is
2  what they settled for, this is the dollar amount, you pull it
3  all out of there.  He's drawing opinions about how quickly they
4  got sick.  Once they got exposed he's saying that this is a
5  unique disease because they get -- the impairment happens much
6  faster.  So he's taking a group of medical records that take
7  place over multiple years and he's making comparisons within
8  them.  To the extent you're sitting there with a whole group of
9  records that are all redacted you've got problems about
10 comparing them.

11             THE COURT:  Well, the only thing you've got that's
12 redacted is that if my name, Judith K. Fitzgerald, is on that
13 medical record I'm going to be identified as A.  If your name
14 is on that medical record you're going to be identified as B.
15 So instead of saying my name as A on the medical record -- or
16 as Judith K. Fitzgerald on the medical record I'm going to be
17 known as A.  And that's the only change that's going to be made
18 to the medical record.  Now, Dr. Whitehouse will have the whole
19 record there, and he's going to have the list of patients that
20 he can match up.  So if you show him Exhibit A, he can look at
21 his chart and say, hmm, okay, I know who A is, it was Judith K.
22 Fitzgerald.  Now, is he going to put that on the record?  He
23 doesn't have to.  But can he then go through the analysis and
24 say, oh, yes, I see what the issue was with respect to why I
25 think that she had severe pleural disease and it's this.  Yes,

1  he can do that.  And you folks, I see no reason why you need to

2  know who the individual plaintiff is.  You're telling me you

3  need to see the medical records because you don't have a

4  database.  I'm agreeing with you.  But that doesn't mean you

5  need all of the data that is going to cause a conflict for the

6  doctors from HIPAA violation purposes and Montana State

7  violation purposes.

8           Now, I don't understand it one bit.  If you can tell

9  me why that name is of crucial significance when the doctor can

10 know who it is, and you can ask him about it, and the doctor

11 can still answer every single question, and why the doctor

12 didn't answer it from that perspective when he had that

13 information available, I don't know, maybe you should have

14 raised that issue during the deposition.

15          MR. SCHIAVONI:  Well, we did actually.  We cited

16 those portions of the transcript.  I mean, here's another

17 example of a way that we had problems with him.

18          THE COURT:  Well, wait.

19          MR. SCHIAVONI:  It said --

20          THE COURT:  Mr. Schiavoni, how could you raise it

21 when he's got the list?  He knows who patient A is because he's

22 the person who's redacting, or somebody on his behalf is.  He

23 can't claim that he doesn't know who A is.  He's got the list

24 of who A is.

25          MR. SCHIAVONI:  Well, actually he did claim he didn't

1  know who they were and he didn't have the list with him.

2           THE COURT:  Then you challenge his credibility at a

3  trial if that's the case.  Mr. Cohn, you make sure the doctor

4  has the complete list of who the redacted people are for any

5  and every proceeding in which he's called to testify in the

6  future.  That's part of this order.

7           MR. GUY:  Your Honor, it's Jonathan Guy from the FCR.

8  May I be heard for ten seconds?

9           THE COURT:  No, Mr. Schiavoni isn't finished yet or

10 unless it's on this issue.

11          MR. SCHIAVONI:  Judge, I'll make one last point.  But

12 I see I've tried your patience so I'm going to be very, very

13 quick.

14          THE COURT:  No, it's not trying my patience.  It's

15 that I don't understand why, you know, you're getting

16 everything you're asking for and you're shooting yourself in

17 the foot.  Okay.

18          MR. SCHIAVONI:  That might be a good cue to not say

19 anything else.  Judge, thank you very much.

20          THE COURT:  No, no, go ahead you had another.

21          MR. SCHIAVONI:  Thank you, Judge.

22          THE COURT:  Mr. Schiavoni, I was not attempting to

23 stop you from raising your last issue.

24          MR. SCHIAVONI:  I didn't interpret it that way.  I'm

25 exercising my own free will.

1            THE COURT:  All right.  Mr. Guy.

2            MR. GUY:  Yes, Your Honor.  I would just ask that if

3  -- because I see troubled waters ahead, that we have a firm

4  date by which the follow on deposition of Dr. Whitehouse will

5  take place.  I know that we have to work with the plan

6  proponents on the rebuttal report issue once we've had the --

7  got the data or the medical reports, but, you know, we

8  obviously like to move that deposition forward as quickly as we

9  can because we don't want to delay anything.

10           THE COURT:  Well, can you know that until you see the

11 content of the reports?  If so, I'm happy to give you a date.

12 But, Ms. Harding --

13           MR. GUY:  Well, the idea, I think, is that we're

14 going to get these reports in a week, and if we don't then the

15 whole issue is moot?

16           THE COURT:  Yes.

17           MR. GUY:  I mean, really it's to the debtors to speak

18 to that issue because they're the most familiar with the

19 medical information.  But I do think we need a firm date

20 because otherwise we could be dragging this out for --

21           MS. HARDING:  Your Honor, we intended -- we're

22 intended -- we think that we should, and Dr. Whitehouse should

23 be required to provide that deposition within the dates that

24 are already set up in the CMO by June 15th.  So we'll work with

25 Mr. Cohn to try to make sure that -- to set up a date.  But we

1 would like to stay within the CMO and have it before June 15th.

2          THE COURT:  All right.  That's fine.

3          MR. FINCH:  Your Honor, I would just add that we

4 would, you know, for the convenience of a particular witness or

5 a particular lawyer, it has to spill over a week or something,

6 we'll be flexible about that.  But we definitely want to get

7 this done within the deadlines of the CMO.  And as far as the

8 location of the deposition I think the most convenient and cost

9 effective place for the estate to have it is in Washington, DC

10 where I'm located and Ms. Harding is located and Mr. Stansbury

11 is located.  Which would be the people who will be taking that

12 deposition.

13          THE COURT:  All right, Mr. Guy.

14          MR. GUY:  That's fine, Your Honor.  That's exactly

15 what I was looking for.

16          THE COURT:  All right.  So, right now, on or before

17 June 15th in Washington, DC.  Ms. DeCristofaro.

18          MS. DeCRISTOFARO:  Your Honor, just one simple little

19 point that I think everyone was sort of hinting to Your Honor

20 is, even if the medical records were to be supplied, there may

21 be additional issues regarding the deficiency of Dr.

22 Whitehouse's opinion and the sufficiency of his basis for that

23 opinion that we --

24          THE COURT:  That's the subject of a Daubert hearing.

25          MS. DeCRISTOFARO:  Right.  Exactly.  And then we're

1  just saying that that may not be resolved by this.  And that

2  was my only point.

3          MS. HARDING:  I think it -- the party asserted that

4  we do not think it will be resolved, but we will take that up

5  at the Daubert proceeding, Your Honor.

6          MR. COHN:  Your Honor, just to clarify because we've

7  gone quite far with this notion to producing these records

8  within a week.  You know, what I spoke before was not a

9  representation that they could be produced at all --

10          THE COURT:  I understand.

11          MR. COHN:  -- never mind in a week.  So I just -- I

12  really want that to be understood.  And in that context, I

13  would like to reserve the Libby claimants' rights in the sense

14  that we do object to that order and believe that Dr.

15  Whitehouse's report should not be stricken for the reasons that

16  I've argued and I will not argue again.

17          The other thing I think that we should cover, Your

18  Honor, is -- because we just did, was the only remaining issue

19  in terms of the form of the protective order relating to

20  medical information, was the names versus numbers.

21          THE COURT:  Yes.

22          MR. COHN:  There was an additional provision relating

23  to use of the medical information in the criminal trial which

24  is obviously mooted by the completion of the criminal trial.

25  So under those circumstances, I would request that the form of

1  protective order that was submitted with the Libby claimants'

2  response to the Arrowood motion, should be entered so as to

3  protect the privacy of medical information going forward.

4          MS. HARDING:  Your Honor, I think that that was the

5  order that was stricken by the Court last week because it came

6  in as an affirmative request attached to a response.

7          THE COURT:  Yes.

8          MS. HARDING:  But in light of the Court's order about

9  the production we will obviously enter a protective order to

10 allow the provision of the documents as the Court has ordered.

11 So we will do that.  I don't have the order in front of me so I

12 don't want to look at it, but I think it's a very short order.

13         MR. COHN:  There's a whole -- I'm sorry, did you want

14 to finish?

15         MS. HARDING:  I mean, we'll do what the Court said.

16 We will -- the documents should be redacted with respect to

17 names.  They should be assigned an identifying number or letter

18 and then --

19         MR. COHN:  I'm sorry, there are two different orders.

20 Maybe I should be clear on this.

21         UNIDENTIFIED ATTORNEY:  Non-clients only.

22         MR. COHN:  Exactly.  What Ms. Harding was referring

23 to is that with respect to non-clients we would produce the

24 information in redacted form in just the way that you

25 described.

1              THE COURT:  Right.

2              MR. COHN:  That, I think, is a separate order which

3   still needs to be drafted.  What is already available for entry

4   is the protective order concerning medical information of the

5   Libby claimants.  That information has been produced in

6   unredacted form and is currently being used by the parties

7   based on the assumption that there was going to be a --

8              THE COURT:  Protective order.  Right.

9              MR. COHN:  -- protective order issued in short order.

10  The difference is between our protective order and the one that

11  Mr. Schiavoni submitted were only those two points that I

12  mentioned.  One being the criminal trial which is now moot, the

13  other point being names versus numbers on which he said names,

14  we said numbers.  So ours is now the correct, and I believe,

15  agreed upon form of the protective order and would ask that it

16  be entered.  And on the procedural point that the cross motion

17  was struck the paper itself is still in the record.  It was

18  just that -- and it's legitimate to respond to a request for a

19  protective order to say, yeah, please enter it, Your Honor, but

20  here's a slightly different form.  So, I don't think that we --

21  that that should stand in the way of entry of the protective

22  order.

23             THE COURT:  I just -- I don't know that I have it

24  here.

25             MS. HARDING:  And, Your Honor, I would request that

1  in light of the hearing today and the Court's orders an

2  opportunity to review it to determine and make sure that it's

3  consistent with the Court's orders today.  And we'll be happy

4  to try to do that in the next 24 hours and submit it to the

5  Court.

6           THE COURT:  All right, that's fine.

7           MR. COHN:  That would be —-

8           THE COURT:  I'll wait 24 hours.  If I don't get

9  something I want a protective order entered.  If I have to

10 create one of my own, I will.  Don't make me go there.

11          MS. HARDING:  That's fine, Your Honor.  We will

12 submit something by the end of the day tomorrow.

13          MR. COHN:  Right.  And just to, I think, keep the

14 record clear that will be a protective order that just governs

15 medical information as opposed to governing the specific issue

16 of the one week deadline and the redaction of the non-Libby

17 claimant --

18          THE COURT:  That's right.

19          MR. COHN:  -- information which should be a separate

20 order.

21          THE COURT:  But actually, I'm not sure that the terms

22 of the order on the confidentiality side, the protective order

23 side are different between the medical and the non -- I'm sorry

24 between the Libby clients that you represent and the non-

25 clients from Libby.  The information, I think, needs to be

1 protected in the same way.

2          MR. COHN:  Exactly.  Exactly, Your Honor.  So we use

3 the same mechanism --

4          THE COURT:  It's just that some has already been

5 produced and some hadn't.  And that's the issue.

6          MR. COHN:  Yes.  And being produced in unredacted

7 form.  So that's -- so it is, in effect, a different provision

8 because it has to do with how it's to be used --

9          THE COURT:  I see.

10          MR. COHN:  -- as opposed to how it's to be produced.

11          THE COURT:  Yes.  If it's to be used, then it should

12 be used in some fashion that protects the name of the

13 individual so that you can assign, I'm saying a number, you

14 know.  But again, I want Dr. Whitehouse to make sure that in

15 the event that he's asked about it he knows who that number

16 relates to.

17          MR. COHN:  Absolutely.  There has to be a key.  In

18 fact, with respect to the Libby claimants, Your Honor, it would

19 be a key that all parties have.

20          THE COURT:  Exactly.  That's fine.  I think that

21 makes perfect sense.  It's just that for the public record

22 purposes that key should not be spread on the public record.

23          MR. COHN:  Correct.  Thank you very much, Your Honor.

24          MS. HARDING:  And, Your Honor, I do want to make

25 clear that all costs related to the production of these

1 documents and anything related to the redaction and all of that

2 is to be borne by the Libby claimants, correct?

3          THE COURT:  Yes. Yes. I mean, that's what the rule

4 would require.  Yes.  All right, so I'm going to get how many,

5 one or two protective orders?  Is it just going to be one order

6 that will deal with both Libby clients and non-clients?

7          MS. HARDING:  I think we could do one order, Your

8 Honor.

9          MR. COHN:  Your Honor, with respect, since the one

10 order is already drafted dealing with the Libby claimants, I

11 think we should just submit that one and then separately submit

12 since it will not be the subject of an agreement it will be

13 submitted over our protest, if you will, the one about Dr.

14 Whitehouse.  It would just make a clearer record that way, Your

15 Honor.

16          THE COURT:  All right, that's fine.

17          MR. COHN:  Thank you.

18          THE COURT:  Two orders to come in.

19          THE COURT:  And who am I going to get that order

20 from?  I know Mr. Cohn's already drafted one and Ms. Harding's

21 going to look at it, but who's actually going to submit it,

22 the debtor on the COC?

23          MS. HARDING:  Your Honor, we'll submit the order that

24 you ordered today with respect to the non-client records.  We

25 will draft and submit -- get Mr. Cohn's agreement with it and

1  submit it to you.

2           THE COURT:  All right.

3           MS. HARDING:  It probably makes sense for Mr. Cohn to

4  submit the other one since he's already drafted it.

5           MR. COHN:  And we'd be happy to, Your Honor.

6           THE COURT:  Okay.  So you're going to run it by Ms.

7  Harding --

8           MR. COHN:  Oh, yes.

9           THE COURT:  -- then you'll submit a new one on a COC.

10          MR. COHN:  Right.  She already has it.  She just, as

11 she said needs to look at it in light of whatever.

12          THE COURT:  Yes.  But you're going to resubmit it.

13          MR. COHN:  Oh, yes.

14          THE COURT:  That's all I wanted.  All right.  Fine.

15          MR. SCHIAVONI:  And me, too.

16          MR. COHN:  Yes.  And Mr. Schiavoni.

17          THE COURT:  I'm sure everybody wants to see it.  So

18 just send it around and let everybody have a chance to see it.

19 And can I expect to get that by Monday?  Both orders?

20          MS. HARDING:  Yes, Your Honor.  Yes.  I see no reason

21 why we can't.

22          MR. COHN:  Yes, Your Honor.  But I do -- what I want

23 to say to the people who are in the courtroom is that the Libby

24 claimants' proposed form of protective order is the order that

25 was submitted and that they have been served with and that they

1 already have.  And so what I'm expecting from them is not for

2 them to wait to get something new from me, but rather they

3 should send whatever comments they have to me over the next 24

4 hours so that I can --

5          THE COURT:  And that's ordered.  They've already got

6 it.  They should comment to you within the next 24 hours so

7 that if there is some further modification to that order you

8 know about it and can redraft.

9          MR. COHN:  Correct.

10          THE COURT:  Otherwise if you don't hear a thing from

11 anybody by the close of business tomorrow resubmit a new order

12 on Monday.  Or the same order on Monday on a COC.

13          MR. COHN:  Right.  Thank you, Your Honor.

14          THE COURT:  Okay.  I think I've dealt with the

15 protective orders.  I believe I have addressed the Dr.

16 Whitehouse deposition, and I've addressed the Dr. Whitehouse

17 discovery requests for the documents, and I've looked at the 18

18 other deposition issues.  Are there any other matters today?

19 Another one?

20          MS. BAER:  Your Honor, the last matter, matter Number

21 3 on the agenda is the Libby claimants' motion to amend the

22 case management order and postpone the confirmation hearing.

23          THE COURT:  All right.  Mr. Cohn.

24          MR. COHN:  Yes, Your Honor.  This motion was brought

25 because we have -- we're now, as you've heard, really, you

1  know, halfway through the process of getting from the beginning

2  to the plan confirmation, and we have yet to receive a set of

3  meaningful responses to our contention interrogatories, or for

4  that matter by any other means to have had disclosed to us just

5  exactly what the position of the plan proponents are on the

6  Libby claimants' objections.  You might recall the Libby

7  claimants' objections were put forward in detailed form back at

8  the disclosure statement stage.  And we then filed in

9  accordance with the CMO, a bullet point preliminary plan

10 objection which referred, in effect, to the earlier very

11 detailed set of objections that we have filed.  So people have

12 been on notice really since last fall of what the Libby

13 claimants' objections are, or of most of Libby claimants'

14 objections to the plan.

15        Now, as part of the negotiation of the CMO, one of

16 the things that we asked for and did not achieve, was to have a

17 response, albeit a preliminary response, to preliminary plan

18 objections.  What we were told was that, oh, you can just do

19 contention interrogatories, that would be a fine way to get --

20 to find out what the parties' positions are in response to your

21 objections.  And so that was the way that we agreed to proceed.

22 And the result has been to leave us still, really, entirely in

23 the dark about the contentions of the plan proponents.  And you

24 saw an example of that earlier today, Your Honor, when we found

25 out for the first time what the plan proponents' contentions

1 were in relation to wrongful death and loss of consortium

2 claims.

3         We have submitted, Your Honor, with our motion,

4 copies of the contention interrogatory responses that we

5 received from the plan proponents.  You know, a typical example

6 of this is to, you know, is I'm sure you look through them,

7 they will refer us either to an expert report.  And by the way,

8 in some cases referring to the expert report has been helpful

9 in terms of understanding responses to contentions.  And then

10 other cases refer us to, well, expert reports that do not

11 exist.  For example, we're referred to a report by Mr. Dunbar

12 and then we're referred to reports by Mr. Florence on a subject

13 that it was -- again, it was wrongful death and loss of

14 consortium where he doesn't say anything about those things.

15         And we're referred to -- and we've been, you know,

16 told that we can have the opportunity to take 30(b)(6)

17 depositions.  And so -- and we did indeed, by the way, prepare

18 a detailed list of 30(b)(6) deposition topics.  And what

19 happens?  Well, first of all the case of Mr. Lockwood.  On a

20 number of key issues he deferred to Mr. Inselbuch of his firm.

21 Mr. Inselbuch's deposition is scheduled for June, either 12th

22 or 15th, right at the end of the deposition.

23         UNIDENTIFIED ATTORNEY:  12th.

24         MR. COHN:  12th.  Yeah, June 12th right at the end of

25 the deposition period.  And so I guess the proposal is for us

1  to wait until the very end of the oral deposition period in

2  order to find out really, again, for the first time what the

3  contentions of the plan proponents are.  So what we propose as

4  a solution, Your Honor, is that they ought to either provide

5  proper responses to contention interrogatories or in some other

6  form provide us very quickly with responses that state in

7  detail what their contentions are in response to each of the

8  plan objections that we have filed.  I won't go so far as to

9  say it has to be a precisely equivalent detail, because we were

10  very detailed, but it should be in enough detail for us to

11  understand what position they're taking on these key issues.

12          And we've also suggested that really there just isn't

13  going to be enough time for the whole process to work out and

14  so according to the confirmation hearing it should be put off

15  for two months.

16          THE COURT:  Ms. Harding.

17          MR. COHN:  Thank you.

18          MS. HARDING:  May I approach, Your Honor?

19                  (Pause)

20          MS. HARDING:  Your Honor, with all due respect to Mr.

21  Cohn, I do believe that this particular motion can be dispelled

22  of fairly quickly.  I've got a time line here.  The Libby

23  claimants filed their contention interrogatories on December

24  23rd, 2008.  Under the rules in the CMO they were due 60 days

25  later and thus were due February 23rd, 2009.  The debtors did

1 not even file their final plan and disclosure statement until

2 February 27th, 2009.  So the contention that interrogatories

3 are premature, and we did attempt to answer them as best we

4 could.  We provided names of witnesses that we expected that

5 would testify, pointed them to the plan, different documents,

6 things like that.  But they were places where they were just

7 premature aside from the fact that they have all kinds of

8 problems with respect to whether they're appropriate and proper

9 contention interrogatories.

10        The Libby claimants did not file a motion to compel

11 with respect to the contention interrogatories.  So I think

12 that procedurally it's -- that their motion as it stands right

13 now is just inappropriate.  They never filed a motion to

14 compel, and quite frankly, the notion that they have not had an

15 opportunity to understand what the plan proponents' contentions

16 are or how the plan operates and how it would impact the Libby

17 claimants, at this point I find to be just not credible.  Not

18 from Mr. Cohn's contention, Your Honor, but just the amount of

19 information that's out there that they've had the opportunity

20 to review and to learn, and indeed themselves have had the

21 opportunity to take the 30(b)(6) depositions of Mr. Lockwood,

22 of Mr. Finch.  We've got depositions that are coming that are

23 scheduled which they did not object to the scheduling of those

24 depositions on those dates.  So I just don't -- I think that

25 the contention interrogatories were premature.  They were -- we

1  responded to them and they did not file a motion to compel.

2  We've responded to all kinds of other discovery from the Libby

3  claimants and other plan proponents.

4         The assertion earlier today which I decide -- I just

5  have waited to respond to -- that the Libby claimants have not

6  been provided any documents, I don't know whether Mr. Cohn is

7  just simply not aware, but the Libby claimants have been

8  provided access like all of the other objectors to the virtual

9  database.  They've been offered password like all other

10  objectors.  There's thousands, and probably millions of pages

11  of documents available on that -- through that process which

12  was agreed to by all the parties and they didn't object to.  So

13  we simply don't understand the context of this.  We don't

14  understand why it was brought.  And there's clearly no

15  foundation or basis for it.  There's still plenty of

16  opportunity.  If they still don't understand certain provisions

17  we've got at least three 30(b)(6) depositions that remain, and

18  other discovery as well.  So, Your Honor, if you have any

19  questions I'm happy to answer them, Your Honor.  But I think

20  that the -- that the motion is just not grounded in any real

21  factual basis that would require some kind of movement of the

22  schedule.

23         THE COURT:  All right.

24         MS. HARDING:  Thank you.

25         THE COURT:  Mr. Finch.

1          MR. FINCH:  Your Honor, I think it'll be useful to

2  look at the contention interrogatories.  They're Exhibit C to

3  the Libby claimants' papers.  And what they -- normally -- and

4  the debtor pointed out in his paper, normally contention

5  interrogatories are proper only at the close of discovery after

6  all of the evidence has been developed through identification

7  of witnesses, review of documents, taking depositions.  Then it

8  might be appropriate to say list for us all the bases on which

9  the plaintiff believes that the defendant engaged in securities

10 fraud or something like that.  And even there the courts, as we

11 pointed out in our papers say the contention interrogatories

12 are not a proper vehicle and cannot be used to basically

13 require a party to give a laundry list of everything that it

14 might prove at trial with respect to a particular point.  The

15 Libby claimants' contention interrogatories, and I -- we quoted

16 some of them in our papers, and I'll just give you a flavor.

17          "Please state in detail your contentions what proof

18 you may offer at trial to prove such contentions and witnesses

19 concerning the Libby claimants' objection that the TDP excludes

20 legitimate claims of the Libby claimants by creating disease

21 criteria that are not consistent with standard medical

22 practice."  Well, we answered that interrogatory by saying,

23 "Subject to our not having to provide you with rebuttal

24 opinions at this juncture, we're going to have an expert

25 testify as to why the TDP criteria are consistent with standard

1  medical practice.  And that expert is Dr. Laura Welsh and

2  you're going to get a report from her."  And we have provided

3  the Libby claimants with almost 400 pages of expert witness

4  reports in large response both to the -- and we identified the

5  experts that were going to testify, and identified them in our

6  responses to contention interrogatories.

7          They have questions about explain why -- provide your

8  contentions about whether or not the Libby claims are paid

9  court system value.  We said look at the expert report of Dr.

10 Mark Peterson.  We're going to have Dr. Mark Peterson testify.

11 He's got his report here and his report from the estimation

12 case which is sort of a background to his report here.  You can

13 go look at that.  The backup materials on which our experts

14 rely if you were actually to print all that material out

15 including the publicly available medical records which we don't

16 have to recopy, but also the databases -- historical claims

17 database that Grace made available in the data room would

18 literally probably fill this room.

19          So the argument that they haven't been provided with

20 a lot of information to allow them to understand the plan

21 proponents' contentions about the plan is a bit disingenuous.

22 For every of their contention interrogatories, the ACC, to the

23 extent we understand it, said this is the evidence on which we

24 will rely to rebut your objection or deal with your objection

25 that, for example the plan discriminates you because it

1  eliminates punitive damages.  There we referred them directly

2  to the testimony of Mr. Inselbuch.  We answered these

3  contention interrogatories at the end of February.  They agreed

4  to the dates when we produced people for depositions.

5          They had the opportunity to ask Mr. Lockwood in a

6  30(b)(6) deposition, which is a highly unusual procedure, and

7  frankly the way we did it is because you ordered Mr. Lockwood

8  to sit for deposition in other cases where people say I don't

9  understand what the plan means, or I don't understand how the

10 plan is going to affect me.  We think that the plan documents

11 are, although complex, are fairly -- and comprehensive -- are

12 clear and unambiguous and do lay out what's going to happen to

13 the Libby claims.  Mr. Cohn's argument that they don't

14 understand the plan proponents' position on wrongful death

15 claims, I believe, is a bit disingenuous given a) the plan says

16 that wrongful death claims are a channel to the trust, and b)

17 there is a TDP.  And no, the TDP doesn't spell out in detail

18 exactly how every potential claim might be provided for, but

19 the TDP is the TDP and the trust is going to have to deal with

20 those claims.

21          And moreover, more to the point the Libby claimants

22 have had dialogue with my partner, Mr. Inselbuch, both in

23 writing and on the telephone about what the TDP does and what

24 the TDP doesn't do.  So I think it's a little bit unfair for

25 them to say they don't understand the ACC or the plan

1 proponents' position about various items of the TDP which the

2 vast majority of these contention interrogatories relate to.

3 　　　　　So I think there is absolutely no basis for them to

4 complain about the level of information they have been given in

5 discovery.  I think that there is absolutely no basis to move

6 back the deadlines in this case or certainly to move the

7 confirmation hearing.  I mean, there are a lot of other plan

8 objectors, there are a lot of insurance companies who have, you

9 know, armies of lawyers scouring this plan and had all kinds of

10 interesting and creative questions for Mr. Lockwood.  But you

11 don't hear any of them coming in and saying, oh, gee, we'd like

12 to push back the confirmation hearing.  I mean, insurance

13 companies I'm sure would love to push off the confirmation

14 hearing for years and years.  But they're not doing it.  So

15 that, I think, tells you something about whether there really

16 is a valid basis for delay here.  I'd suggest to you that there

17 isn't, submit to you there isn't.

18 　　　　　I submit to you that we have properly answered

19 contention interrogatories early in discovery which in the

20 ordinary course would not be proper until the end of discovery.

21 Your Honor has set forth a pretrial schedule where there'll be

22 an exchange of trial briefs which will marshal the evidence and

23 the law in support of the plan and the time frame submitted by

24 the CMO.  And therefore, for all those reasons I suggest -- or

25 request that you deny the Libby claimants' motion.

1          THE COURT:  Mr. Guy, are you taking a position on

2     this?

3          MR. GUY:  The same position as the debtors and the

4     ACC, Your Honor.

5          THE COURT:  Anyone else wish to be heard?

6          MR. SCHIAVONI:  Judge, I don't have an army of

7     lawyers.  That's all I can say.

8          THE COURT:  Only half an army.  Is a battalion

9     smaller than army?  Yes.  Battalion.  Right.

10         MS. PHILLIPS:  Your Honor, this is Margaret Phillips

11    of Paul, Weiss, Rifkin, Wharton & Garrison on behalf of certain

12    bank lenders.  We filed a very limited objection.  There's

13    really nothing I can add that already hasn't been argued with

14    respect to not pushing back the confirmation hearing by another

15    60 days.

16         THE COURT:  All right.  Okay, I think, Mr. Cohn, that

17    this request is premature.  And I know the rest of the parties

18    won't like that, but that's my view.  I think at this time and

19    in the stage of the discovery that you're in with the 30(b)(6)

20    depositions not finished, that there is plenty of opportunity

21    to get the contentions that Libby is asking for, responded to,

22    to the extent that you feel that the responses have been

23    inadequate.  I did take a look at the contention

24    interrogatories and to the responses.  I thought given the

25    stage at which they were filed and the stage at which they were

1  required to be answered, that they were pretty inclusive.  They

2  are not required to be supplemented because it's not that form

3  of discovery.  And so I think at the stage at which they were

4  proposed they did state what the parties thought the

5  contentions would be and the responses would be.

6        To the extent that there is something more that will

7  be added in the pretrial statements that will be required to be

8  filed you'll find out about it there because that's the whole

9  purpose for building that process into the CMO in the first

10 place.  So I think that at this stage there is still time for

11 Libby, if it really doesn't understand what these contentions

12 are and what the plan proponents' evidence is expected to be,

13 to ferret that out through the discovery process.  And so I

14 don't think that this motion is really brought in a proper time

15 frame at this time.

16        So I'm denying this motion now.  To the extent that

17 it comes up and it's relevant at a later time at the close of

18 the discovery, I'll hear it from parties who want to raise that

19 issue if they want to raise it then.  But I don't think it's

20 relevant -- or I shouldn't say that.  I don't think it's

21 appropriate to be -- to push back the confirmation schedule

22 now.  It seems to me that the issues that have been addressed

23 today should get the parties moving quite expeditiously.  To

24 the extent that there is the data room and it's available to

25 all parties, that should contain quite a bit of data.  I don't

1 know how much of it Libby wants to access, but it's certainly

2 there.

3        To the extent that your clients do feel some need to

4 access that information, if you haven't and need a password,

5 maybe there was some miscue or whatever, I don't know.  But to

6 the extent that you need that information and don't have it,

7 talk to Ms. Harding because you can certainly get a password

8 and access to that information.

9        So for now I'm denying the motion without prejudice.

10        MR. FINCH:  Thank you, Your Honor.

11        MS. HARDING:  Thank you, Your Honor.

12        THE COURT:  Ms. Baer.

13        MS. BAER:  Your Honor, on that motion, I assume you

14 wanted an order?

15        THE COURT:  Please.

16        MS. BAER:  Because it's been denied without prejudice

17 the debtors are happy to prepare that unless Mr. Cohn has a

18 strong desire to do so.

19        THE COURT:  That's all that it needs to say.  Is that

20 it's denied without prejudice.

21        MS. BAER:  Okay.

22        THE COURT:  So, Mr. Cohn, I'll just take it from the

23 debtor on a COC?

24        MR. COHN:  Absolutely.  Of course run it by me, but

25 we'll respond very quickly.

1              THE COURT:  All right, that's fine.

2              MS. BAER:  Thank you.  Your Honor, there's just one

3 matter we wanted to bring to the Court's attention and it

4 related to Phase I which is set to go forward on June 22nd

5 through the 25th.  As you might recall, Your Honor, one of the

6 issues in Phase I is, and I'll quote from the third amended

7 CMO, "The confirmation objections raised on behalf of, and

8 specific to lenders under the prepetition credit facilities..."

9              THE COURT:  Yes.  I hoped to get an opinion out on

10 that next week.

11             MS. BAER:  We appreciate, Your Honor, and that's why

12 we wanted to bring it to your attention because that has a

13 significant impact on it and in fact that is the issue in Phase

14 I that we need to address.

15             THE COURT:  You probably will be addressing some

16 issues in Phase I about that.  But I will get an opinion out

17 next week.

18             MS. BAER:  Thank you, Your Honor.  We appreciate it.

19             THE COURT:  Okay.

20             MS. BAER:  I think that concludes the matters that

21 are up today.

22             THE COURT:  Anybody else?  Okay, we're adjourned.

23 Thank you.

24             THE ATTORNEYS:  Thank you, Your Honor.

25                        *  *  *  *  *

# C E R T I F I C A T I O N

We, ELAINE HOWELL, and KIMBERLY UPSHUR, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Elaine Howell                    DATE:  May 21, 2009
ELAINE HOWELL

/s/ Kimberly Upshur
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.