# Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-   -   -

In Re:                        : Chapter 11
                              :
                              : Case No.
W.R. GRACE & CO., et al, : 01-01139 JKF
                              :
                              : (Jointly
        Debtors         : Administered)


-   -   -

Thursday, May 7, 2009

-   -   -

        Oral deposition of GEORGE L.

PRIEST, taken pursuant to notice, was

held at the offices of DRINKER BIDDLE &

REATH, Two Logan Square, 18th & Cherry

Streets, Philadelphia, Pennsylvania

19103, commencing at 10:18 a.m., on the

above date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.
-   -   -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103
866.624.6221

Page 30

1    it incorporates principles of insurance
2    neutrality, various features of the Plan
3    severely affect the rights of Grace's
4    insurers and the economic function of
5    their insurance policies."
6            Did I read that correctly?
7        A.   Yes, you did.
8        Q.   Is it fair to read that as a
9    sort of lead-in, a conclusory lead-in to
10   the specific statements that you make
11   later in the report as opposed to being
12   some sort of stand-alone statement?
13       A.   Yes.  It's meant to be a
14   lead-in or a summary description of what
15   is going to follow.
16       Q.   When you use the phrase
17   "insurance neutrality" in that sentence,
18   how are you using that term?  What does
19   it mean?
20       A.   Well, I was using the term
21   to refer to, I think it's, Section or is
22   it Title 7 of the First Amended Plan.
23   But as a economic concept, insurance
24   neutrality means the various features of

Page 31

1    the Plan will have no effect, one way or
2    another, on underlying insurance.
3        Q.   Is insurance neutrality a
4    term used in the economic profession?
5        A.   I don't think it would be
6    unknown in the economic profession.  I
7    wouldn't say it's a concept that's used
8    frequently.
9            Usually, in economics, we
10   talk directly about effects on rather
11   than to summarize it through the word
12   "neutrality."  But I think any economist
13   would understand what is meant here.
14       Q.   But it's not a technical
15   economic term; it's a term that is sort
16   of a nonspecifically defined term in
17   economic literature that you believe
18   economists would understand what it means
19   as a matter of sort of common usage?  Or
20   is it --
21           MR. BROWN:  Object to form.
22           MR. LOCKWOOD:  Let me
23   finish.
24   BY MR. LOCKWOOD:

Page 32

1        Q.   Or does it have some sort of
2    technically understood definition that
3    one could turn to and cite economic
4    literature in which the definition
5    appears?
6        A.   I don't think it's defined.
7    It's not a term used commonly in
8    economics or it's not a term of art in
9    economics.  It's not defined
10   specifically.  Nevertheless, I think any
11   economist would understand that it meant
12   no effect, one way or the other, on the
13   underlying insurance.  But it's not an
14   economic term in that sense.
15       Q.   You made some reference to
16   the usage of the term in the Plan and
17   just to focus a little bit on that.
18           Directing your attention to
19   paragraphs 52 and 53 and 54 of your
20   expert report, is that the portion of
21   your report where the term "insurance
22   neutrality," as you referred to it in
23   paragraph 18, is addressed?
24       A.   Yes.

Page 33

1        Q.   Again, in an effort not to
2    spend time unnecessarily in preliminary
3    matters, with respect to paragraph 19, is
4    it, again, fair that the statements made
5    in paragraph 19 are, in essence, summary
6    and conclusory statements about matters
7    that are discussed in more detail and the
8    bases for which are presented in more
9    detail later in the report?
10       A.   Yes, exactly.  You will see
11   paragraphs 18 and 19 under the section
12   entitled Initial Statements of Opinion.
13   So, yes, it's meant to be an introduction
14   to the remainder of the report.
15       Q.   You make statements under
16   the heading Economic Structure of
17   Liability Insurance in paragraphs 20 and
18   21 and 22 of your report about the
19   economic structure, as you see it, of
20   liability insurance.
21           Is it fair to say that these
22   statements are at a very high level of
23   generality as opposed to, for example,
24   addressing W.R. Grace's relationship with

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 34

1  its insurers specifically.
2       A.  Yes, I think that's fair.
3       Q.  Have you done any
4  investigation or review of the insurance,
5  for want of a better word, what I will
6  call insurance position or status of W.R.
7  Grace under its CGL policies as of the
8  time it filed for bankruptcy?
9            MR. BROWN:  Object to the
10       form.
11            THE WITNESS:  I am not sure
12       what you mean by insurance
13       position or status.
14  BY MR. LOCKWOOD:
15       Q.  Well, okay.  Let me be more
16  specific.
17            Do you have any knowledge as
18  to how Grace and its insurers were
19  handling claims against Grace in the tort
20  system in terms of insurance coverage and
21  insurer involved in that process as of
22  the date that Grace entered bankruptcy?
23            MR. BROWN:  Object to the
24       form.

Page 35

1            THE WITNESS:  I have no
2       personal knowledge of that at all.
3       I believe the attorneys, one or
4       more of the attorneys for whom
5       have retained me, indicated that
6       some insurers have made agreements
7       with Grace for Grace to conduct
8       its own defense.  But that's all.
9       I don't know anything about beyond
10       simply that statement, and I am
11       not sure that statement -- I have
12       no way of verifying or
13       contradicting that statement
14       itself.  But that's all I know
15       about it.
16  BY MR. LOCKWOOD:
17       Q.  So, for example, if Grace
18  was paying out of its own pocket and not
19  through insurance more than 50 percent of
20  the judgment and settlement and defense
21  costs that it was incurring as of the
22  date of bankruptcy because of exhaustion
23  of coverage, gaps in coverage,
24  insolvencies of insurers, you don't know

Page 36

1  anything about that; is that correct?
2       A.  No, I don't have specific
3  knowledge of that at all.
4       Q.  In paragraph 22 of your
5  report, you state, quote, In the context
6  of a liability claim, and according to
7  our system of tort law, there is an
8  adversarial relationship between insurers
9  and the policyholder on one side, and the
10  claimants on the other.
11            What do you mean by that?
12       A.  Just for the record, you
13  added one word to it.
14       Q.  I am sorry.
15       A.  It's not important.
16            What I am is that where a
17  claim of liability is filed against a
18  policyholder who has insurance which may
19  cover that, provide coverage for that
20  claim, the structure of the insurance
21  policy provides that the insurer and the
22  policyholder will look together on one
23  side in response to the claimant on the
24  other side.

Page 37

1       Q.  But there are instances in
2  which on the basis of particular facts,
3  that dichotomy of insurer/insured on the
4  one side and the claimant on the other
5  side does not necessarily hold true, even
6  from an economic perspective, aren't
7  there?
8            MR. BROWN:  Object to the
9       form.
10            THE WITNESS:  I can't think
11       of them to be honest with you.  I
12       am not sure that there are.
13  BY MR. LOCKWOOD:
14       Q.  Well, let's assume that a
15  claim is made under a policy and the
16  insurer believes that it's covered by the
17  policy and the insured believes that it's
18  not.  Are the insurer and insured linked
19  economically with respect to how that
20  claim should be handled?
21       A.  Well, they are once the
22  coverage decision is made.  Certainly, as
23  between an insurer and a policyholder,
24  there can be differences.  But once the

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 74

1    THE WITNESS:  That's fine.
2    That wouldn't affect my answer.
3  BY MR. LOCKWOOD:
4    Q.   Similarly, with respect to
5  paragraph 30 -- strike that.
6    You address a requirement of
7  insurer consent to assignment of policy
8  rights in paragraph 30 of your report,
9  correct?
10   A.   I do.
11   Q.   You are aware that the
12 extent of which that right which on its
13 face in the policy is asserted to be
14 absolute is, in fact, the subject of
15 varying state law decisions in
16 jurisdictions over the circumstances
17 under which assignments can be made by
18 insureds without the consent of insurers,
19 are you?
20   A.   Yes, I am aware of that.
21   Q.   So as to this paragraph, you
22 are simply -- let me ask it this way:
23 First, this paragraph is not intended by
24 you to contain legal opinions about the

Page 75

1  extent to which these provisions in CGL
2  policies are or are not enforceable as a
3  matter of state law; is that correct?
4    A.   Absolutely.
5    Q.   And, indeed, this
6  discussion, as you have indicated
7  earlier, has to do with your views as to
8  the economic impact of the provision and
9  the perceived need for it to be
10 enforceable; is that correct?
11   A.   I view the question of
12 enforceability as a legal question.  What
13 I am trying to explain here is the
14 economic basis for the assignment of
15 responsibilities in the way that the
16 policy assigns them.
17   So it's economic analysis,
18 but I don't reach the question of what's
19 enforceable and what isn't enforceable.
20 That's a legal opinion.  That would be
21 calling for a legal opinion.
22   Q.   Well, you have a sentence in
23 here, the second sentence in paragraph 30
24 that talks about or states, quote,

Page 76

1  Requiring insurer consent to assignment
2  ensures that the risks undertaken by the
3  insurer under the policy not be increased
4  by a policyholder's action without the
5  insurer's consent.
6    Have I read that correctly?
7    A.   Yes, you have.
8    Q.   What risks undertaken by the
9  insurer under the policy are you
10 referring to?
11   A.   The risks of paying out
12 liability payments, the risk of paying
13 indemnity.
14   Q.   So it's the risk to the
15 insurer as opposed to the risk to the
16 insured that you are discussing here?
17   A.   Exactly.  It says that, the
18 risks undertaken by the insurer, in the
19 sentence you read.
20   Q.   Well, is it not true that
21 one of the purposes of CGL liability
22 policies is that the insured, in exchange
23 for the payment of a premium, is getting
24 the insurer to agree to, in effect,

Page 77

1  assume the risks of the insured with
2  respect to whatever activities are
3  covered by that policy?
4    A.   Yes.
5    Q.   So, essentially, we have got
6  two kinds of risks:  We have got the risk
7  to the insured that the insurer
8  undertakes to cover; and we have got the
9  risk to the insurer that the agreement to
10 cover the first set of risks will cause
11 the insurer to have to pay money.
12   Is that a fair breakdown of
13 the risks?
14   A.   No, I don't think it's fair.
15   The first part -- I would
16 say the first part of your sentence was
17 fair.  The risk, as I have it -- this is
18 not exact, but the risk to the policy
19 that had insurer has undertaken to cover.
20 That's the risk I am talking about.
21   So it's a risk to the
22 policy, although, which if it's covered,
23 becomes a risk to the insurer.  It's the
24 same risk.  It's not a different risk.  I

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 142

1          off the record at this time.)
2              - - -
3          (There was a luncheon recess
4      from 1:28 p.m. to 2:06 p.m.)
5              - - -
6          AFTERNOON SESSION
7              - - -
8  BY MR. LOCKWOOD:
9      Q.   We talked briefly about
10  paragraph 43 before the break, Professor
11  Priest, and I am going to ask you some
12  questions about the next succeeding
13  paragraphs where you talk about various
14  provisions in the Plan, and specifically
15  let's use paragraph 44 as a starting
16  point.
17          You are discussing there the
18  TDP and its payment matrix and the fact
19  that it hasn't been consented to by the
20  insurers. And you, in substance, say
21  that's a, quote, direct violation of the
22  economic allocation of rights in the
23  policies and violate the economic
24  principle of comparative advantage, close

Page 143

1  quote.
2          First, I think you testified
3  earlier that you have no basis for
4  comparing the provisions in the matrix
5  with the criteria and values utilized by
6  Grace and its insurers for settling
7  claims prior to its bankruptcy petition?
8          MR. BROWN:  Object to form.
9  BY MR. LOCKWOOD:
10      Q.   Is that correct?
11      A.   I said I had no factual
12  basis for making that comparison, yes.
13      Q.   So, as far as you know, the
14  TDP matrix could actually be more strict
15  or stringent than the criteria that Grace
16  and its insurers were using prior to the
17  bankruptcy?
18          MR. BROWN:  Object to form.
19          THE WITNESS:  That question
20      misses the nature of my economic
21      analysis.  The economic analysis
22      is that the allocation of economic
23      rights in the policies give the
24      right to the insurer to associate

Page 144

1      with the resolution of these
2      claims.
3          If Grace has worked out a
4      better deal than could be done,
5      than they had been achieving in
6      other contexts, maybe the insurers
7      would agree to the matrix and to
8      the settlement of the claims on
9      that basis. But, again, for good
10      economic reasons, that's their
11      right.
12  BY MR. LOCKWOOD:
13      Q.   So from your perspective,
14  what you are saying is that,
15  economically, the actual outcome of
16  claims resolution under the TDP is
17  irrelevant; what matters is that the TDP
18  by its terms was not presented to and
19  agreed to by the insurers, end of
20  discussion?
21      A.   Not that it's irrelevant.
22  According to the economic analysis, the
23  TDP and the matrix is likely to be
24  different if the insurers were involved

Page 145

1  than if the insurers are not involved.
2  That's what the burden of the report is.
3  So it's not that the outcome of is
4  irrelevant. It's likely to be different
5  for the good economic reasons I present
6  in the report.
7          Now, we don't know because
8  the insurers weren't given an opportunity
9  to become involved. But you can ask a
10  counterfactual question. If Grace is
11  getting such a great deal with this
12  matrix and with the TDPs, why did it not
13  involve the insurers and get their
14  consent, and all of this would have gone
15  away.
16      Q.   Is part of economic analysis
17  consideration of opportunistic behavior?
18      A.   Yes.
19      Q.   And so have you made any
20  analysis of whether or not it would be in
21  the economic advantage of insurers to
22  attempt to adopt an unreasonable position
23  toward consenting to either a settlement
24  or claims handling procedures or an

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 162

1    Q.   Well, to the extent that
2 it's not hortatory, does it express
3 anything more than your personal opinion
4 that settling disputes is better than
5 litigating them?
6    A.   It depends upon the terms.
7 I don't have a personal opinion about the
8 preference of settlement over litigation.
9    Q.   Well --
10    A.   Settlement often is more
11 efficient than litigation.  I am all for
12 that.  Other times, litigation is the
13 appropriate way to resolve cases.
14    Q.   Well --
15    A.   I have just studied the
16 process of settlement and litigation.
17    Q.   Doesn't this sentence say
18 that the more realistic resolution of
19 these issues is to have Grace and the
20 insurers and the other Plan proponents
21 reach some kind of a settlement?
22    A.   Yes.  That's the more
23 realistic resolution from an economic
24 standpoint.

Page 163

1    Q.   But, as you sit here today,
2 you have no personal knowledge or ability
3 to describe what that settlement would be
4 or the likelihood that the parties could
5 agree to it; is that correct?
6    A.   From a factual standpoint,
7 that's correct.  But, again, it's
8 something I view, for good economic
9 reasons, commanded by the insurance
10 policies and something that should have
11 been attempted or perhaps should be
12 attempted in the future.
13    Q.   Is it fair to say that if I
14 asked you similar questions about
15 paragraph 46 of the TDP relating to
16 whether or not the insurance neutrality
17 provisions of the Plan apply to the
18 contractual breach assertions that you
19 make in paragraph 46, that your answers
20 would be the same as we just went through
21 with respect to paragraph 44?
22    MR. BROWN:  Object to the
23    question on the basis of the term
24    "similar questions."  I don't know

Page 164

1 what that means.
2    MR. LOCKWOOD:  Okay.  We
3 will do it the long way.
4    THE WITNESS:  Could I just
5 respond to the question one way?
6 I don't think I refer in paragraph
7 46 to contractual breach, which I
8 regard as a legal opinion.
9 BY MR. LOCKWOOD:
10    Q.   Well, let me put it to you
11 this way:  You say in paragraph 46 that
12 the Plan overturns economic relationships
13 in Grace's insurance policies, and then
14 you go on.
15    When you say the Plan
16 overturns the economic relationships, and
17 putting aside whether that's a legal
18 opinion, but from an economic point of
19 view, even if the insurance neutrality
20 provisions preserve the insurers' rights
21 to argue that they don't have to pay on
22 any of their policies as a result of
23 Section 8.1 of the TDP, you would still
24 be of the view that the Plan was not

Page 165

1 insurance neutral from an economic
2 perspective; is that correct?
3    A.   I see the point of your
4 question.
5    First of all, you began the
6 question with putting aside the legal
7 opinion.  Well, I don't want to put aside
8 the legal opinion.  I don't want to
9 render a legal opinion.  Far from putting
10 it aside, I want to eliminate it from the
11 discussion.
12    When I use the term
13 "overturn the economic relationships," I
14 mean that in an economic sense, not in a
15 legal sense.  A court can decide whether
16 overturning the economic relationships
17 has legal significance.
18    But with regard to the
19 remainder of your question about
20 insurance neutrality and the provision
21 that insurers can have a total coverage
22 defense for the overturning of these
23 relationships, my answer would be the
24 same as we had before.

42  (Pages 162 to 165)

Page 174

1       MR. LOCKWOOD:  I am asking
2    him for whatever opinion in
3    whatever form he feels prepared to
4    express it since I have grave
5    trouble distinguishing between his
6    economic opinions and his legal
7    opinions.
8       THE WITNESS:  I can't answer
9    that.  First, I am not going to
10   answer it as a legal opinion.  I
11   can distinguish between my
12   economic opinions and my legal
13   opinions, and I have been
14   throughout my report and
15   throughout the testimony today.
16      But I certainly wouldn't
17   answer that as a legal opinion.  I
18   will tell you the truth.  I don't
19   know whether that coverage defense
20   would be preserved or not.  I
21   think it would depend to some
22   extent on the nature of the
23   confirmation hearing and the
24   testimony with regard to

Page 175

1    confirmation.  I honestly don't
2    know -- I don't think there is an
3    answer to that question.
4    BY MR. LOCKWOOD:
5       Q.   But, in any event, you are
6    prepared to let Judge Fitzgerald decide
7    that; you are not here to tell her how to
8    decide it?
9       A.   I am certainly not.
10      Q.   In paragraph 50, the last
11   sentence -- strike that.  Let me back up
12   one paragraph.
13      You say, "Grace's insurers
14   also cannot rely on an ex-post evaluation
15   by a court as to the 'reasonableness' of
16   settlements that the Trust might enter.
17   As discussed, the exclusion of insurers
18   from the process of claims settlement
19   will invariably affect settlement
20   results."
21      With respect to the second
22   sentence, the "will invariably affect
23   settlement results," you are not in the
24   position through your examination of

Page 176

1    Grace's pre-petition settlement history
2    and the matrix provisions of the TDP to
3    say whether the exclusion of insurers
4    from the latter will result in more or
5    less money being paid by insurers, are
6    you?
7       A.   As a factual matter, no.  As
8    an economic, analytical matter, yes.
9       Q.   And as an economic and
10   analytical answer you just gave as yes is
11   because you believe that, in principle,
12   the participation of insurers and the
13   economic insurers that incentives have in
14   dealing with claims by definition will
15   always result in some form of different
16   outcome than what would have occurred if
17   the insurers had not participated; is
18   that right?
19      A.   Well, just to clarify the
20   question, I think you meant the economic
21   insurer -- economic incentives that
22   insurers have.
23      Q.   I thought that's what I
24   said, but if I didn't, yes, that's what I

Page 177

1    meant.
2       A.   You said insurer incentives
3    that economic -- I think you meant it the
4    other way.
5       Q.   What I meant was because of
6    the -- let me rephrase it.
7       You can't tell whether the
8    results would be greater or less because
9    you haven't done a factual analysis; your
10   economic opinion is that the results
11   would be effective because you believe
12   that participation by insurers with the
13   economic incentives that insurers have
14   that you have testified about will
15   invariably produce a different result
16   from a settlement from which those
17   insurers are excluded?
18      A.   Correct.
19      Q.   Is it also your testimony
20   that from an economic perspective that
21   different result will always be less
22   favorable to insurers?
23      A.   I would say generally less
24   favorable to insurers.  I don't know

45  (Pages 174 to 177)

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 178

1  always in an empirical sense but
2  generally less favorable to insurers.
3       See, here is our difference.
4  I am starting to see this now what's
5  going on here. We know there are some
6  set of insurers that are objecting to the
7  matrix and to the settlement and to the
8  Plan.
9       Now, if this were so much
10 better a deal than they could have gotten
11 if Grace had not sought bankruptcy and
12 continued to litigate, my question would
13 be why are they objecting to this? Now
14 your answer appears to be, well, they are
15 engaged in opportunistic behavior, and
16 they are trying to exploit the
17 circumstance of the insolvency to get a
18 yet even better deal. That's our
19 difference.
20      So I am not -- I don't see
21 the evidence of opportunistic behavior,
22 and so barring the presentation of that
23 evidence, I think my economic analysis
24 that it would be less favorable to the

Page 179

1  insurers than if the insurers were
2  involved continues to hold.
3       Q.  But your inability to see
4  evidence is, in large part, the result of
5  your failure to have examined any
6  evidence, one way or the other; you are
7  just making economic assumptions about
8  the generalities of insurer conduct and
9  the generalities of insured's conduct and
10 the economic incentives you associate
11 with those generalities? Isn't that
12 true?
13      A.  Yes, I am presenting -- I
14 was asked to present a general economic
15 analysis of the situation, yes.
16      Q.  Turning to paragraph 50, the
17 last sentence of this and the last clause
18 in the last sentence of paragraph 50
19 states that the assignment of Grace's
20 policy rights to the Trust, quote, puts
21 control of the settlement process in the
22 hands of the Trust whose fiduciaries have
23 every incentive to pay all asbestos
24 claims, regardless of whether they are

Page 180

1  deserving of payment.
2       Now, you are aware from
3  reading the Plan, I take it, and the
4  Disclosure Statement that the Trust is
5  going to have a limited amount of assets
6  to begin with, correct?
7       A.  Yes.
8       Q.  And you are also aware that
9  it is contemplated that those assets will
10 have to be divided between people who
11 presently have claims against Grace and
12 people who will have claims in the
13 future, correct?
14      A.  Correct.
15      Q.  And you are aware that the
16 amount, number, and value of the future
17 claims cannot be determined as of now,
18 correct?
19      A.  Correct. I expect it. I am
20 sure it's true.
21      Q.  And you are aware that the
22 Trust does not propose to pay one hundred
23 cents on the dollar to claims presented
24 to it by present claimants, correct?

Page 181

1       MR. BROWN:  Could you just
2  read that back?
3       (The reporter read from the
4  record as requested.)
5       MR. BROWN:  Object to the
6  form.
7       THE WITNESS:  Yes, I am
8  aware of that.
9  BY MR. LOCKWOOD:
10      Q.  And you have stated
11 elsewhere that the trustees of the Trust
12 are fiduciaries, correct?
13      A.  Yes, especially members of
14 the Trust Advisory Committee.
15      Q.  But you have acknowledged as
16 to the latter that they do not have any
17 role in the resolution of individual
18 claims, correct?
19      A.  Except as it comes -- as I
20 understand it, except with regard to an
21 amendment of the TDPs.
22      Q.  Dealing with the TDPs as
23 they presently exist, is it not true that
24 the trustees have an obligation to

23636f60-98d2-40fb-b3f5-a8ecc1592966

**Page 210**

1   other subsections of the same section?
2   Do you think those are inconsistent?
3       A.   It could be drafted in a way
4   that they are consistent.  But what does
5   this mean, notwithstanding the provisions
6   of this Section 7.15?  (G) is one of the
7   provisions of 7.15.
8       Q.   So you think it's a
9   plausible, reading that, that lead-in
10  essentially vitiates the subsection that
11  it's contained in?
12      A.   I hope it's not.  I hope
13  it's not interpreted that way.  But I
14  think it's confusing.  It would have been
15  clearer to say notwithstanding provisions
16  of 7.15(a) through whatever that aren't
17  affected by 7.15(g).  But it wasn't done
18  that way.
19       So you have got
20  notwithstanding the provisions of Section
21  7.15, including 7.15(g), here is what
22  7.15(g) does.  That seems, to me, to be,
23  with all respect, a style that could be
24  improved.

**Page 211**

1       Q.   Putting aside whether it
2   could be improved, which I don't want to
3   debate with you, do you really think
4   anybody could read that lead-in as
5   saying, notwithstanding the provisions of
6   this section, 7.15(g), which is the
7   section in which the language is
8   appearing, this language applies; so it's
9   simultaneously creates the language, and
10  then tells you that you get to ignore it?
11  You are not really, as an economic
12  expert, telling me that that you think is
13  a fair reading of that section, are you?
14      A.   It would not be the reading
15  I would insist upon, but there are many
16  contexts in insurance coverage disputes
17  where exceptions in policies are
18  basically ignored because they are
19  exceptions to say an exclusion or they
20  are provisions of exclusions that from
21  which there is some slight exception.
22       Do you know litigation over
23  the attorneys fees in an exclusion cases
24  where there is an exclusion of coverage

**Page 212**

1   of the insurance -- of attorneys fees
2   with an exception -- it's not an
3   exception.  There is another provision
4   that says something about especially no
5   coverage of the policyholders staff
6   attorneys fees where a policyholders have
7   argued the exception to the exception
8   means it's covered.
9       This is -- again, this is
10  the least of our worries, the style
11  problems.  I think ambiguity is a real
12  problem in 7.15, but I think the
13  substitution of the coverage defense for
14  the other ways of resolving rights and
15  responsibilities under the policy are
16  what's most at stake here.
17      Q.   Okay.  I think I have one
18  more question related to paragraph 56,
19  which is your conclusion.
20       You basically refer in the
21  end of that paragraph to, quote, the
22  severe economic prejudice of its
23  insurers, close quote.
24       Just for the record, you

**Page 213**

1   haven't made any attempt to quantify what
2   you mean by the severe economic prejudice
3   of its insurers?
4       A.   Correct.  This is analytical
5   statement.
6       MR. LOCKWOOD:  I have no
7   further questions.
8        - - -
9        EXAMINATION
10       - - -
11  BY MS. ESAYIAN:
12      Q.   My name is Lisa Esayian, and
13  I represent W.R. Grace in these
14  proceedings.  Just a couple of questions.
15       Very earlier today in
16  describing work that you had done for
17  insurance companies, I believe one of the
18  things you mentioned was work-related to
19  estimating risks related to the expansion
20  of tort liabilities.
21       I was wondering if you could
22  expound upon that a little bit in terms
23  of the work that you did.
24      A.   Yes.  As I indicated in my

23636f60-98d2-40fb-b3f5-a8ecc1592966