# Exhibit D

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
------------------------------------
CHAPTER 11

IN RE:
W.R. GRACE & CO., et al.,
    Debtors.

Case No. 01-1139 (JFK)
Jointly Administered
------------------------------------


DEPOSITION OF
Professor James B. Shein
May 14, 2009
Chicago, Illinois
Lead:  Peter Van N. Lockwood, Esquire
Firm:  Caplin & Drysdale, Chartered


FINAL COPY
JANE ROSE REPORTING 1-800-825-3341

**Page 38**

1   You can answer.
2   THE WITNESS: Right. I don't purport to
3   be a legal expert on this.
4   BY MR. LOCKWOOD:
5   Q. Well, you are an expert on corporate
6   governance, right?
7   A. Okay.
8   Q. And in that capacity -- well, strike that.
9       You also purport to be an expert on
10  governance of trusts if I understand it; is that
11  correct?
12  A. Yes.
13  Q. Is it your opinion that as a matter of
14  either corporate or trust law there is something
15  improper about trying to limit -- well, let me
16  back up. I'm getting ahead of myself.
17      We have three categories of trust
18  fiduciaries in this Trust, don't we? Trustees,
19  the TAC and the futures representative.
20  A. Yes.
21  Q. The trustees have fiduciary obligations to
22  everybody, correct?
23  A. Correct.
24  Q. I mean all the Trust beneficiaries,
25  correct?

**Page 39**

1   A. Correct.
2   Q. The TAC purports to have fiduciary duties
3   only to present claimants under the agreement,
4   correct?
5   A. Correct.
6   Q. And the futures representative purports to
7   have only fiduciary duties to the future
8   claimants, correct?
9   A. Correct.
10  Q. Are you saying that that division of
11  responsibility between the TAC and the futures
12  representative in this document is in some manner
13  or another is in consistent with corporate or
14  trust law?
15  A. I don't know. I don't know what the trust
16  law is.
17  Q. Well, okay, let's assume then -- since
18  you're an expert I can ask you hypotheticals.
19      Let's assume the trust law in the context
20  of this kind of a trust.
21  A. Um-hmm.
22  Q. Would permit you to have separate
23  fiduciaries for these two categories of Trust
24  beneficiaries.
25      Is it your opinion that, notwithstanding

**Page 40**

1   that, the TAC would have a fiduciary duty to
2   future claimants that extends beyond what the
3   Trust document itself purports to create?
4   A. Yes.
5   Q. And why is that?
6   A. Because they effectively are stepping in
7   the shoes of the trustee by ordering control of
8   the trustee.
9   Q. And since we try and keep this in an
10  orderly fashion, with respect to your reference to
11  their control of the trustee, is it fair that
12  subsequent portions of this report identify the
13  nature and scope of the control that you're just
14  referring to?
15  MR. GIANNOTTO: Objection as to form.
16      You may answer.
17      THE WITNESS: I believe it's all through
18  the report.
19  BY MR. LOCKWOOD:
20  Q. We'll come to that then.
21      In the discussion contained in paragraphs
22  14 through 17 of your report, is it fair to say
23  that you view there's a conflict of interest on
24  the part of TAC because, on the one hand, you view
25  them as having fiduciary obligations to all Trust

**Page 41**

1   beneficiaries, and, on the other hand, because
2   they or their law firms represent individual
3   claimants against the Trust, they have a
4   potentially conflicting set of fiduciary duties to
5   the individual claimants that they or their firms
6   represent?
7   A. I think it's more than potentially.
8   Q. Putting aside the word "potentially," that
9   is the conflict between duties to Trust
10  beneficiaries as a whole and duties to individual
11  clients for whom they serve as counsel presenting
12  claims to the Trust.
13  A. Yeah, this is a conflict.
14  Q. Is the nature of the conflict as you see
15  it described in paragraph 16 of your report?
16  A. I believe so. It may be mentioned
17  elsewhere.
18  Q. But this paragraph 16 is sort of the
19  fundamental conflict that you see?
20  MR. GIANNOTTO: Object. Objection as to
21  form.
22      You may answer.
23      THE WITNESS: Again, it may be throughout
24  here, but, yeah, it does talk about it here.
25  BY MR. LOCKWOOD:

Page 42

1  Q. Now, you understand I take it that the
2  purpose of the Trust is to pay claims that are
3  qualified to be paid under the Trust agreement and
4  the TDP, correct?
5  A. I believe so, yes.
6  Q. And so that there's no necessary conflict
7  -- strike that.
8      Given that fact, is it, is it fair to say
9  your view of the conflict is not so much that the
10  TAC member law firms are presenting claims to the
11  Trust, but, rather, that they may be presenting
12  claims to the Trust that are in some manner or
13  another not entitled to payment, and thereby their
14  payment would in some manner or another dilute the
15  amounts available to pay other valid claims?
16  A. I think that's a good summary.
17  Q. And the conflict with the TAC arises
18  because in your view the TAC has some sort of role
19  in the Trust agreement under which they have a
20  duty to make sure that nonmeritorious claims do
21  not get paid?
22  A. That's correct.
23  Q. You're aware that the trustees, the TAC
24  and the futures representative take the Trust
25  documents as they find them when they actually

Page 43

1  come into their respective offices, and that they
2  don't have any initial role in rewriting them.
3      MR. GIANNOTTO: Objection as to form.
4      THE WITNESS: I'm not sure what you mean.
5  BY MR. LOCKWOOD:
6  Q. Well, okay. I'll rephrase it.
7  A. You got a couple of (indicating.)
8  Q. These Trust documents that you see before
9  you.
10  A. Um-hmm.
11  Q. That you opined about, as of today they're
12  not operative, correct?
13  A. That's correct.
14  Q. And they will not become operative until
15  the W.R. Grace bankruptcy plan is approved by the
16  Court and is implemented.
17  A. That's correct.
18  Q. And, indeed, neither the TAC nor the
19  trustees have yet signed the Trust agreement, and
20  nor are they as yet undertaking any duties under
21  the Trust documents, correct?
22  A. I would assume that's correct.
23  Q. Do you understand that when it comes time
24  to execute the Trust agreement and the TDPs as a
25  result of the fact that they're embedded in a

Page 44

1  bankruptcy plan, those documents themselves in the
2  form that you're looking at them will be binding
3  on the Trust.
4  A. I would assume so.
5  Q. And that the only way that the trustees,
6  the TAC and the futures representative can somehow
7  or another change that would be to go through the
8  process for amending the Trust documents.
9  A. I believe so.
10  Q. Okay. Starting with the existing trust
11  documents and ignoring the amendment process, what
12  is your understanding of the role that the TAC has
13  in determining whether individual claims are or
14  are not recognized as meritorious or valid?
15  A. I think I described several places in my
16  report.
17  Q. Well, this one I'm going to ask you from
18  memory because I don't remember which places
19  you're referring to.
20      What role does the TAC have that, and you
21  can feel free to turn to your report to reference
22  it.
23      What role does the TAC have in individual
24  claims resolution in this Trust agreement?
25  A. Well, they have it effectively, well, I've

Page 45

1  been looking at my report, by the very fact that
2  they have say-so in the definitions of what claims
3  are acceptable.
4      I believe they have influence on the
5  paperwork that's needed, influence on amounts that
6  get paid for the different levels of how much the
7  claimants will receive.
8      If you want I'll go through this whole
9  thing, but there's really a number of ways that
10  can influence it.
11  Q. Well, let's talk about some of the ones
12  you just mentioned.
13      When you say "influence on the amounts
14  that can be paid," are you talking about the
15  provisions in the Trust Distribution Procedures
16  which is Exhibit 4 to Shein Exhibit 2 that lists
17  specifically the values that are applicable to
18  what are called expedited review claims?
19  A. Well, if you want, I'll just go through my
20  report. That might be easier.
21  Q. Well, okay.
22  A. I mean even starting with where they have
23  consent can begin to affect these things, such as
24  the amendment of the Trust agreement, changing the
25  disease levels, the average levels -- values of

Page 90

1  Q. In paragraph 21 of your report, you --
2  page 7, you state in the first sentence:
3      The terms of the Trust agreement create a
4  situation in which the TAC members will likely be
5  violating conflict-of-interest rules applicable to
6  attorneys throughout the country.
7      Do you purport to be an expert on the
8  conflict-of-interest rules applicable to lawyers
9  throughout the country?
10  A. An expert, no. With knowledge, yes.
11  Q. Well, have you done any research as to
12  whether or not any Court or bar association has
13  ruled that the structure employed in the W.R.
14  Grace TDP, which is utilized in multiple other
15  trusts, violates any states' conflict-of-interest
16  rules?
17      MR. GIANNOTTO: Object to form.
18      THE WITNESS: Has there actually been a
19  court ruling on that?
20  BY MR. LOCKWOOD:
21  Q. Or a bar association opinion?
22  A. On those specific kinds of trusts, not to
23  my knowledge.
24  Q. Are you aware of whether anybody has ever
25  filed a complaint with a state bar association

Page 91

1  asserting that the role of the TAC in an existing
2  trust violates the conflict rules of that state?
3  A. I'm not aware of any.
4  Q. Have you made any effort to compare the
5  role of the TAC members in the Trust context with
6  the role of members of the asbestos claimants
7  committee in this bankruptcy?
8  A. No.
9  Q. Are you aware that there is an Official
10  Committee of Asbestos Claimants' Creditors in the
11  W.R. Grace bankruptcy?
12  A. Yes.
13  Q. Are you aware that the individual members
14  of that committee have designated their personal
15  injury lawyers as their sort of attorneys in fact
16  for acting on their behalf in the committee
17  activities?
18  A. Knowing the connection between the members
19  of the --
20  Q. I'll break it down.
21      I'll represent to you that the members of
22  the Asbestos Claims Committee in this case are
23  individual claimants, and the question is:
24      Are you aware that those individual
25  claimants have designated their personal attorneys

Page 92

1  to act as their agents in fact on their behalf in
2  committee activities?
3  A. No, but I'm not surprised.
4  Q. Are you aware that in bankruptcy an
5  official committee has fiduciary obligations to
6  act in the interest of all of the creditor
7  interests that are represented on that committee?
8  A. I believe it's supposed to work that way,
9  yes.
10  Q. Isn't it the case that the same conflict
11  of interest exists for a creditors' committee that
12  has individual members with individual interests
13  that is also acting on behalf of all creditors
14  with varying interests?
15  A. If I understand the question, yes.
16  Q. To your knowledge has anybody ever
17  suggested, or, indeed, have you ever suggested
18  that such committees operate under disabling
19  conflicts of interest under state
20  conflict-of-interest laws?
21      MR. GIANNOTTO: Are you asking him if
22  anyone has or if he has, which one?
23      MR. LOCKWOOD: Either.
24      THE WITNESS: I'm sorry. Would you start
25  that again.

Page 93

1  BY MR. LOCKWOOD:
2  Q. Well, have you ever opined that
3  conflicts-of-interest rules that you assert are
4  violated by the TAC here because of the conflicts
5  between the individual interests of the TAC and
6  the collective interests of the constituency it
7  represents apply to unsecured creditors' committee
8  in bankruptcy cases?
9  A. It could happen.
10  Q. The question I asked you is have you ever
11  so opined.
12  A. No.
13  Q. Have you ever even considered the issue
14  prior to today?
15  A. Yes.
16  Q. And what conclusions did you draw or what
17  actions did you take upon that consideration?
18  A. Conclusions I drew was there's that
19  temptation there, but the actions I did was other
20  than to mention that to my students or in seminars
21  that these things exist, and you have to deal with
22  them.
23  Q. When you say "you have to deal with them,"
24  does that include accepting the proposition that
25  in certain types of contexts conflicts of interest

Page 106

1 have that kind of inherent --
2 Q. Are creditors' committees by law prevented
3 from having the creditor put his lawyer on the
4 committee?
5 A. Not that I know of.
6 Q. Are creditors' committees comprised of
7 people from time to time whose claims the validity
8 of which the debtor disputes?
9 A. Don't know.
10 Q. Do you know of any law that would make
11 someone who has a disputed but large claim
12 disqualified from serving on the creditors'
13 committee?
14 A. I don't know. It may influence the U.S.
15 trustees' decision.
16 Q. I'm asking you whether you know of legal
17 prohibition on that.
18 A. No, I don't.
19 Q. I may have asked you this, and if so, I
20 apologize, but do you -- I did ask that. Take
21 that back.
22      In paragraph 22 of your report you refer
23 to the Delaware Lawyers Rules of Professional
24 Conduct.
25      What expertise do you have on the subject

Page 107

1 of the duties and obligations created by the
2 Delaware Lawyers Rules of Professional Conduct?
3 A. I basically referred to those rules as a
4 gut check, because, as I continue to say in there,
5 it's normal in most states -- that I do have
6 knowledge of that it is normal in most states.
7 Certainly have run into it enough as a business
8 person, and, as a gut check I checked -- I admit I
9 checked the Delaware rules to make sure I wasn't
10 coming from level field on that, and, sure enough,
11 Delaware rules fit right into what I knew.
12 Q. Beyond the general principal that you
13 state in the second sentence of paragraph 22,
14 you're not purporting to state how the Delaware
15 Rules of Professional Conduct apply to the TAC
16 members of this case, are you?
17 A. What I'm saying is the Delaware rules fit
18 right into what I did say, which is you can't
19 represent a client if it's directly adverse to
20 another client. I knew that as a business person.
21      That's why they used to come to me for
22 waivers and things like that.
23 Q. And it's your opinion that the interests
24 of the individual clients of a TAC member are
25 directly adverse to the interests of the claimants

Page 108

1 that that TAC member doesn't represent?
2 A. I'm sorry. Say again.
3 Q. It's your opinion that in some manner and
4 other, the clients of a TAC member are directly
5 adverse to all the other claimants against the
6 Trust that the TAC member doesn't represent?
7 A. In other words, this is his signed-up
8 clients versus --
9 Q. Versus everybody else that the TAC has
10 fiduciary duties to.
11      I'm asking -- you talked about directly
12 adverse. I'm asking you is it your legal opinion
13 or some other kind of opinion that the mere fact
14 that there's a group of clients he represents that
15 have claims against the Trust and a group of other
16 clients he doesn't represent against the Trust,
17 that those interests are, quote, directly adverse
18 within the meaning of conflict-of-interest rules?
19 A. I believe they are.
20 Q. Apart from your belief that they are, what
21 sort of research into the question of direct
22 adversity have you undertaken for purposes of
23 rendering your opinion in this case?
24 A. Only to read the rules of professional
25 conduct was the additional research.

Page 109

1 Q. And, as far as you know, the judge in this
2 case could read those rules with the same level of
3 attention that you've read them.
4 A. Probably.
5 Q. In paragraph 23 the first sentence of your
6 opinion says.
7      An attorney may not have a pecuniary
8 interest adverse to any clients. Do you see that?
9 A. Yes.
10 Q. If a personal injury lawyer takes a case
11 on a contingent fee, are there circumstances under
12 which the interests of the lawyer and the client
13 are adverse in the pecuniary interest sense?
14 A. Under normal circumstances maybe not.
15 Q. I didn't ask about normal. I asked about
16 are there some such as, for example, when a lawyer
17 gets a very quick offer to settle a case for a
18 modest amount of money that he hasn't done any
19 work on and the client might be interested in
20 getting more money by doing more work and taking
21 more risk that he wouldn't get any, is there a
22 pecuniary -- are the interests under that
23 hypothetical state of affairs pecuniarily adverse?
24 A. I don't think so.
25 Q. Are you aware of literature discussing the

Page 122

1  A.  Or the property to be distributed under
2  this plan.
3      That in turn was being distributed under
4  the Trust, so I don't think it's that big a jump
5  to go to that.
6  Q.  So it's your interpretation of this
7  provision that the TAC is immunized for
8  postconsummation mishandling of individual claim
9  submissions by claimants to the Trust?
10  A.  Say that again.
11  Q.  Well, I mean I'm trying to figure out
12  whether this -- you're saying that this provision
13  in effect would bar a malpractice claim against a
14  TAC member for somehow mishandling a claim on
15  behalf of a client that was submitted to the Trust
16  after the Trust is up and running.
17  A.  Well, that's certainly going to be with
18  regard to the fiduciary duties of the Trust it
19  seems to me, and, if we go to the Trust itself, to
20  the indemnification portion, 23, 24 actually, I
21  mean you've got here the trustee as a member of
22  the TAC not be liable to the Trust or any
23  individual holding a claim or to any other person
24  except for such individual's own breach of trust
25  committed in bad faith or willful

Page 123

1  misappropriation.
2      That's a pretty high standard to prove
3  willful and bad faith.  Doesn't that go to what
4  somebody's thinking about?  That's a tough one,
5  and you're saying to any individual holding an
6  asbestos claim.
7  Q.  So is that --
8  A.  Go ahead.
9  Q.  No.  No.
10  A.  It seems to me it just splits off the
11  whole malpractice claim between the individual and
12  the lawyer.
13  Q.  So your --
14  A.  If the lawyers on the TAC.  I'm sorry.
15  Q.  Right.  So your interpretation of this is
16  that when a member of the TAC is not acting in his
17  capacity as a TAC member but is acting in his
18  capacity as the individual lawyer submitting a
19  claim to the Trust, two roles that you've already
20  identified in your report as separate and
21  different.
22  A.  Um-hmm.  Well, then if the lawyer --
23  Q.  That this exculpation applies to both
24  capacities, both as a TAC member and as a
25  individual claimant's lawyer submitting a claim to

Page 124

1  the Trust.
2  A.  I read this that indeed that blurs the two
3  roles, and it cuts off.  Because they're a member
4  of one they get a free pass as a member of the
5  other.
6  Q.  So if I told you that to my knowledge you
7  were the first person with a law degree that has
8  ever read this provision that way, would that
9  affect in any way, shape or form your view of the
10  scope of this provision?
11  A.  Maybe I should be proud.
12  Q.  Well, at a minimum what you are telling me
13  is this is your interpretation of this document.
14  A.  Yes.  When I look at that, the whole issue
15  of indemnification -- go on to 4.6, the
16  indemnification portion, so you take the
17  exculpation, you take the lead-in on the -- where
18  was I.  On 23?  You take 4.4, 4.6 of this document
19  coupled with 11.9 of the Plan, and, yes, that's a
20  conclusion I reached.  That effectively changes
21  people's behavior.
22  Q.  This is an important distinction, so let's
23  first talk about it in theoretical terms.
24      Certainly one could have a provision that
25  said:

Page 125

1      In your capacity, and when acting as a
2  member of the Trust Advisory Committee, you will
3  only be liable under certain circumstances and be
4  indemnified for any such liability.
5  A.  Yeah, that could be put in there.
6  Q.  And you could also theoretically have a
7  provision that said:
8      And, in addition, we've got a special rule
9  for TAC members compared with all other lawyers
10  that submit claims to this trust that when the TAC
11  member submits claims on behalf of his clients to
12  the Trust, that TAC member shall not have any
13  negligent malpractice liability to the client
14  whose claims he's mishandling.  That would
15  theoretically be a different provision, right?
16  A.  I think the first one you mentioned given
17  who is the TAC, that's what happens.
18  Q.  You think a lawyer who submits a claim to
19  the Trust on behalf of client X is acting as a TAC
20  member when he submits that claim?
21  A.  No.  I assume not.
22  Q.  So I come back.
23      If he was exculpated for liability for
24  mishandling that claim, that would be different
25  from being exculpated from liability for some act

Page 126

1  he took in his official capacity as a TAC member.
2  A. If they were two different people, yeah.
3  Q. Even if it's the same person.
4  A. No, because you don't have to give a pass
5  to the person who does it as an individual lawyer
6  for his individual client because you've already
7  given a pass -- under these documents it seems to
8  me and all these sections put together, you're
9  already giving him a pass as a member of the TAC.
10 Q. With all due respect I asked you if you
11 could theoretically have two different positions,
12 one that dealt with official acts as a TAC member,
13 and one that dealt with acts as a lawyer
14 submitting claims.
15     Theoretically forget what you think this
16 document says --
17 A. I don't think so. I don't think so.
18     I don't think you can give a free pass to
19 somebody on the committee -- you can't get a
20 blessing from your client. I could never get my
21 lawyer to say -- I don't think I could have gotten
22 him to say:
23     We're going to waive -- I'm sorry. He
24 couldn't have gotten me as a business person to
25 waive malpractice claims against him.

Page 127

1  Q. But you're saying that you think this
2  document does.
3  A. Yes.
4  Q. And that's your legal interpretation as a
5  lawyer reading a contract document.
6  A. No.
7  Q. What is it?
8  A. I take all these things put together,
9  studying with the behavior of people, and I say:
10     I think that's all cut off. Now, you guys
11 can debate the legal end, which is probably going
12 to happen anyway, but, you know, I believe from a
13 behavioral standpoint that's really what's
14 happening here. You can all debate later.
15 Q. I'm having trouble understanding what you
16 mean by "from a behavior standpoint" because you
17 have legal training, do you not?
18 A. I do.
19 Q. You understand that the obligations
20 created by written documents are legal questions,
21 right, of what the document means?
22 A. If it gets to that point, yes, but usually
23 it's business people who are looking, reading
24 these things and behaving in a certain way.
25 Q. This provision applies to lawyers, doesn't

Page 128

1  it?
2  A. Well, it's --
3  Q. Not business people.
4  A. Yes, as though, the, you know, indemnify
5  and defend the trustees and the member of the TAC.
6  Now those could very easily be business people.
7  Q. The members of the TAC --
8  A. Could be business people.
9  Q. But we've already established that they're
10 not, haven't we?
11 A. But we have established the fact that they
12 have to act in a certain way, lawyers or not.
13 Q. So bottom line is you believe using
14 whatever legal, nonlegal, psychological expertise
15 you may have that the Section 4.4 of the Trust
16 agreement, as informed by Section 4.6, and Section
17 11.9 of the Plan is intended to and does exculpate
18 the lawyers serving on a TAC from malpractice
19 liability to their individual clients --
20 A. Yes.
21 Q. -- in the process of submitting claims to
22 the Trust?
23     MR. GIANNOTTO: I'm going to object. He
24 didn't testify anything about anyone's intent to
25 draft this. He testified as to what he thought it

Page 129

1  meant.
2     THE WITNESS: Could happen. And this is
3  what it meant.
4  BY MR. LOCKWOOD:
5  Q. Let me rephrase the question in light of
6  the objection.
7  A. Sorry.
8  Q. Your testimony is that you believe and
9  have asserted in an expert report that Section 4.4
10 of the Trust agreement in conjunction with Section
11 4.6 of the Trust agreement and Section 11.9 of the
12 Plan have the effect of exculpating TAC members
13 from malpractice liability based on negligence to
14 their individual clients for acts committed in the
15 course of submitting individual claims to the
16 Trust once it's up and running, correct?
17 A. If I understand the question, yes.
18 Q. Okay. In the second sentence of paragraph
19 29 you state --
20     MR. GIANNOTTO: We're back to the report
21 again, right, just for the record?
22     MR. LOCKWOOD: Absolutely. You're
23 absolutely right. Absolutely right.
24 BY MR. LOCKWOOD:
25 Q. In the second sentence of paragraph 29 of

Page 146

1  MR. GIANNOTTO: Is that not on the report?
2  THE WITNESS: No.
3  BY MR. SMITH:
4  Q. What was the date of your law degree?
5  A. Law degree was 1997.
6  Q. Okay. And after you graduated from law
7  school, you immediately started working at
8  McDermott, Will & Emery; is that right?
9  A. Yes, as counsel.
10  Q. And would the opinions you're giving in
11  this case be similar to the type of work you did
12  at McDermott?
13  A. Not really.
14  Q. Okay. And your business school degree
15  before that, do you have any recollection of about
16  when that was?
17  A. Sounds like it was more -- longer than it
18  was.
19  Q. I didn't mean this to be a difficult
20  exam-type question.
21  A. I got the, let's see, my undergrad was
22  '64, my MBA was '66 and my doctorate was '68.
23  That's 19, not 18.
24  Q. Okay. And before you were teaching as a
25  professor at Northwestern, you were listed as an

Page 147

1  adjunct professor; is that correct?
2  A. That's right.
3  Q. What's the distinction in the type of
4  position you have now?
5  A. One's part time, one's full time.
6  Q. Okay. And how did it come about that you
7  were teaching full time?
8  A. I was asked to.
9  Q. Okay. Are you a tenured track professor?
10  A. No.
11  Q. Okay. There's no possibility you could be
12  eligible for tenure?
13  A. There is if I'm willing to undertake a
14  tremendous part of my life in researching.
15  Q. Okay. But you don't have tenure and
16  you're not willing to undertake the research to
17  get tenure; is that right?
18  A. That's correct.
19  Q. And the Loyola law degree, were you
20  working full time while you were getting that?
21  A. No.
22  Q. Okay. Were you in law school full time at
23  that time?
24  A. Yes, but I was working part time.
25  Q. Have you ever worked for any of the

Page 148

1  lawyers in this case before?
2  A. No.
3  Q. Okay. How did you get retained in the
4  case?
5  A. Mr. Giannotto called me.
6  Q. Okay. How did he find out about you?
7  MR. GIANNOTTO: Objection, lack of
8  foundation.
9  THE WITNESS: I have no idea.
10  BY MR. SMITH:
11  Q. Okay. You list some documents that you've
12  considered, such as the Trust agreement and things
13  like that in your report. Who provided you with
14  those documents?
15  A. I think I got some on-line or -- and then
16  I asked Mr. Giannotto to send me copies.
17  Q. Okay. Were the majority of the documents
18  you've relied on provided by the lawyers in this
19  case?
20  A. I think so, yes.
21  Q. Okay. And in order to render your
22  opinions in this case, is it fair to say that you
23  had to interpret various legal documents that are
24  at issue in the case?
25  A. I guess "interpret" is the right word.

Page 149

1  Q. Okay. And, in addition, in order to
2  render your opinions in this case, you had to
3  interpret various rules and statutory provisions
4  you cite in your report; is that right?
5  A. Right. Well, wait. Wait. You know, when
6  you say I had to -- use your words again.
7  Q. Well, why don't I ask another question.
8  Is it fair to say that ultimately these
9  Plan documents, the Trust documents will be
10  interpreted by the Court. Is that fair to say?
11  A. Everything's going to get interpreted by
12  the Court.
13  Q. Okay. And the Court may disagree with the
14  interpretations that you've given to the
15  documents, right?
16  A. Well, I hope the Court sees them in a new
17  light from a business and behavioral standpoint
18  instead of just a legal standpoint because all
19  these documents may be perfectly legal --
20  Q. That's not what I'm asking. I was sitting
21  here today, and I heard, would it be fair to say,
22  there were a lot of disagreements about
23  interpretation of the documents between yourself
24  and Mr. Lockwood. Would that be fair to say?
25  A. I think the disagreement wasn't an

### Page 154

1  it.
2      THE WITNESS: As best as I understand the
3  question, the Court is probably going to rule on
4  the legality.
5  BY MR. SMITH:
6    Q. Okay.
7    A. I am asking the Court to look at:
8      Wait a minute. You got to look past the
9  legality sometimes and see what the impact of any
10  perverse incentives are that may be legal, but,
11  really, under good governance practices shouldn't
12  be allowed to go on.
13    Q. Okay. So you agree with me that the
14  Court's going to make determinations regarding
15  interpretation of the documents you've relied on,
16  right?
17    A. The Court will interpret the legality of
18  those documents.
19    Q. Okay. And also the Court's going to
20  interpret what those documents mean, is that fair?
21    A. From a legal standpoint, yes.
22    Q. Okay. Now, you're not holding yourself
23  out as an expert on a medical expert on asbestos
24  disease, right?
25    A. That's correct.

### Page 155

1    Q. And you're not an expert on what claims
2  have merit or don't have merit?
3    A. That's correct.
4    Q. And you're not an expert on medical
5  criteria that might be used in paying claims.
6    A. No.
7    Q. And you're not I suppose holding yourself
8  out as an expert on the interpretation of legal
9  documents.
10      MR. GIANNOTTO: I'm going to object. I
11  don't even know what that means.
12      Each of these documents are legal
13  document, and he's read them and said what he
14  thinks they said. If the point you're making --
15      MR. SMITH: You're making a speaking
16  objection.
17      MR. GIANNOTTO: I understand because we
18  can't understand what you're talking about.
19      MR. SMITH: He didn't say that. You said
20  that.
21  BY MR. SMITH:
22    Q. Are you holding yourself out as an expert
23  on this case on interpretation of legal documents?
24      MR. GIANNOTTO: And I'm going to object
25  because that question makes no sense.

### Page 156

1      If you can understand it, answer it.
2      THE WITNESS: I'm not interpreting
3  anything.
4      What I'm saying is I read these documents
5  and I say:
6      This is the mischief it could cause.
7  BY MR. SMITH:
8    Q. Okay. So you're not holding yourself out
9  as an expert on the interpretation of legal
10  documents, correct?
11    A. That's correct.
12    Q. Okay.
13    A. If I understand your question.
14    Q. Now, you're not a psychologist, correct?
15    A. I have a Ph.D. in organizational behavior,
16  which we had to get into a lot of psychology and
17  sociology under a business setting.
18    Q. Okay. Are you holding yourself out as an
19  expert in psychology?
20    A. Only as that part of the motivational part
21  in a business setting.
22    Q. Have you ever done any empirical research
23  where you've collected data from subjects
24  regarding human behavior?
25    A. Yes.

### Page 157

1    Q. What was that?
2    A. For my dissertation.
3    Q. And since your dissertation have you ever
4  done any empirical research on human behavior?
5    A. No, having read substantial amounts.
6    Q. Have you ever published any research on
7  human behavior in a peer review publication?
8    A. No.
9    Q. You've never held yourself out as an
10  expert in litigation on Trust procedures, correct?
11    A. That's correct.
12    Q. And you've never held yourself out as an
13  expert in litigation on trust governance, correct?
14      MR. GIANNOTTO: I'm going to object. I
15  don't know what "litigation on trust governance"
16  as opposed to "trust governance" means.
17  BY MR. SMITH:
18    Q. In a lawsuit have you ever held yourself
19  out as an expert on trust governance before?
20    A. No.
21      MR. GIANNOTTO: Wait, wait, wait, wait.
22  I'm going to object to that. He already testified
23  that he --
24      MR. SMITH: You're telling us what his
25  testimony is, not objecting.

Page 158

1  MR. GIANNOTTO: He's already testified
2  that he was held as an expert in the Thorpe case.
3  If that's what you mean by "trust governance," I
4  don't know what you mean by "trust governance."
5  MR. SMITH: Okay. Fine. You don't know
6  what I mean.
7  MR. GIANNOTTO: Neither does anyone else.
8  BY MR. SMITH:
9  Q.  Are you holding yourself out as an expert
10 on asbestos trusts?
11 A.  Only as to what I've testified here and in
12 the Thorpe case.
13 Q.  Well, the Thorpe case, did that involve an
14 asbestos trust?
15 A.  Yes.
16 Q.  Oh, it did?  Okay.
17    Well, you've never published anything in
18 any kind of scholarly journal on asbestos trusts,
19 have you?
20 A.  No.
21 Q.  Okay.  And you know though that there's
22 been a lot of experience with asbestos trusts,
23 correct?
24 A.  Yes.
25 Q.  In fact, there have been asbestos trusts

Page 159

1  around for decades.
2  A.  I understand that.
3  Q.  And do you know what the first asbestos
4  trust was?
5  A.  Are you going to tell me?
6  Q.  No. I'm asking you.
7  A.  No.
8  Q.  Can you identify any other asbestos trust
9  that exists other than the proposed one for Grace?
10 A.  Thorpe.
11 Q.  Any other asbestos trusts?
12 A.  Armstrong, all the ones I read about in
13 addition.
14 Q.  Do you know how many asbestos trusts are
15 in existence?
16 A.  No.
17 Q.  Can you identify any instance in which an
18 expert has been allowed in court to give testimony
19 such as yours regarding the propriety of an
20 asbestos trust?
21    MR. GIANNOTTO: I'm going to object.
22 That's just so irrelevant to anything.
23    Go ahead if you know anything.
24    THE WITNESS: No, I don't know why I would
25 know.

Page 160

1  BY MR. SMITH:
2  Q.  Okay.  Can you identify any expert who
3  shares your opinions regarding the Grace trust?
4     MR. GIANNOTTO: Object.
5     THE WITNESS: I have not tried.
6  BY MR. SMITH:
7  Q.  And can you identify any expert that
8  shares your opinions regarding the structure of
9  the Grace trust or any similarly structured trust?
10    MR. GIANNOTTO: I'm going to object.
11    Go ahead.
12    THE WITNESS: I cannot off the top of my
13 head.
14 BY MR. SMITH:
15 Q.  Okay.  Other than that insurance case
16 where there was an issue about standing, have your
17 opinions ever been barred in part or in whole by
18 any Court?
19    MR. GIANNOTTO: Hold on a second. He did
20 not testify his opinion was barred. He held that
21 the insurance companies could not raise the issue
22 because the insurance companies lacked standing.
23 There was no testimony that the Court said he
24 couldn't testify because he wasn't qualified to
25 testify. In fact, he testified the Court said he

Page 161

1  was qualified.
2  BY MR. SMITH:
3  Q.  Have your opinions -- my only question is
4  have your opinions ever been the subject of any
5  attempt to bar your opinions?
6  A.  Yeah, they just -- in the Thorpe case.
7  Q.  In the Thorpe case.
8  A.  Because of the standing of the proponent
9  which was the insurance carriers.
10 Q.  But has there ever been any litigation
11 saying that your particular expert opinions should
12 be excluded by a court?
13 A.  Yeah, the Thorpe case.
14 Q.  Well, see, your lawyer's made a
15 distinction here between the standing of the
16 people you were working for in the Thorpe case and
17 actually challenging the substance of your
18 opinions or whether you should be allowed to
19 testify.
20    Has there ever been any litigation
21 challenging you personally, your ability to
22 testify or seeking to bar your specific opinions
23 you were offering?
24 A.  Barring me because I'm me?
25 Q.  Yeah, or the opinions that you're

Page 162

1  offering?
2  A. Yeah. Nobody's ever done that before.
3  Q. Okay. And was the Thorpe case the only
4  case in which you've testified as an expert?
5      MR. GIANNOTTO: I object. He didn't say
6  testify.
7      MR. LOCKWOOD: I object.
8      He didn't testify. He tried to.
9      MR. SMITH: Oh, yeah, that's right. I've
10  been confused by all these objections. That's my
11  excuse. I'm sticking with it.
12  BY MR. SMITH:
13  Q. How many cases have you testified as an
14  expert in?
15  A. The only other one I believe was Itel.
16  Q. Okay. So there was one case in which you
17  actually testified as an expert, right?
18  A. Yes, which is probably good. I'm not a
19  professional expert.
20  Q. Do you agree that there's a body of law
21  governing corporate governance?
22  A. Yes.
23  Q. And there's a body of law governing trust
24  governance?
25  A. Yes.

Page 163

1  Q. And do you know what law on trust
2  governance the Court will apply in this case?
3  A. I'm told from the documents it's Delaware.
4  Q. Okay. Do you identify any Trust
5  procedures in your expert report that you believe
6  would be superior to the Trust procedures proposed
7  for Grace?
8      MR. GIANNOTTO: Object, reports speaks for
9  itself.
10      THE WITNESS: I don't understand that.
11  You lost me.
12  BY MR. SMITH:
13  Q. Have you identified any procedures that
14  you believe should be implemented to replace the
15  Trust procedures that have been proposed for
16  Grace?
17      MR. GIANNOTTO: Object, same grounds, the
18  document speaks for itself.
19      THE WITNESS: Big problem is just who
20  those people are.
21  BY MR. SMITH:
22  Q. Yeah. Is that your only objection to the
23  Trust procedures, who the individuals involved
24  are?
25  A. It's the conflicts that exist.

Page 164

1  Q. Okay.
2  A. Which arise because of individuals.
3  Q. So that's a yes?
4  A. If I understand the question, that's a
5  yes.
6  Q. Okay. You've never been asked to
7  participate in the design of an asbestos trust,
8  correct?
9  A. That's correct.
10  Q. And you've never been sought out as an
11  expert on asbestos trust design.
12  A. That's correct.
13  Q. Can you identify any instance in which
14  similar Trust procedures to those proposed here
15  have been found to be improper in any way?
16  A. Not without looking at case law which I
17  haven't looked at at all.
18  Q. So the answer is you're not aware of any
19  such instance.
20  A. I didn't look at case law.
21  Q. So you're not aware of it, right?
22  A. Yeah. I can't be if I didn't look at the
23  cases. When you say "finding," I assume you mean
24  a legal finding.
25  Q. And you're not aware of any instance in

Page 165

1  which the sort of Trust procedures that you
2  critique in your report have actually resulted in
3  the sorts of problems you identify in your report,
4  are you?
5  A. I told the gentleman next to you that I
6  was not aware of that.
7  Q. All right.
8      MR. GIANNOTTO: He's referring to Mr.
9  Lockwood.
10      MR. SMITH: I think that might be it for
11  me, too.
12      MR. GIANNOTTO: Mr. Rich, do you have any
13  questions.
14      MR. RICH: I have a couple of questions, I
15  just can't help myself. I've been listening
16  quietly all day long.
17          EXAMINATION
18  BY MR. RICH:
19  Q. I believe you told Mr. Lockwood that if
20  the TAC members were personal injury lawyers that
21  did not have clients with claims against W.R.
22  Grace that you wouldn't have any problem with them
23  being TAC members; is that right?
24  A. I'm assuming they'd have no other
25  conflicts.