information as would be required to be included in a registration statement covering the sale of the Registrable Securities), the Company shall, at such time, promptly give the Trust written notice of such registration.  Upon the written request of the Trust given within twenty (20) days after the Trust's receipt of such notice, subject to <u>Section 4(h)</u>, the Company shall cause to be registered under the Securities Act all of the Registrable Securities that the Trust has requested to be registered.

(h)  In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required under <u>Section 4(g)</u> to include any of Registrable Securities in such underwriting unless the Trust accepts the terms of the underwriting as agreed upon between the Company and the underwriters selected by it (or by other Entities entitled to select the underwriters), and then only in such quantity as the underwriters determine in their reasonable judgment will not jeopardize the success of the offering by the Company.  If the total amount of securities, including Registrable Securities, requested by holders of capital stock to be included in such offering exceeds the amount of securities to be sold other than by the Company that the underwriters determine in their reasonable judgment is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters determine in their reasonable judgment will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling security holders according to the total amount of securities entitled to be included therein owned by each selling security holder or in such other proportions as shall mutually be agreed to by such selling security holders) but in no event shall (i) the amount of securities of the Trust included in the offering be reduced below 25% of the total amount of securities included in such offering or (ii) a greater number of securities from any security holder of the Company other than the Trust be included if any Registrable Securities are excluded.

(i)  Notwithstanding anything to the contrary herein, the Company shall have no obligation to effect more than two (2) Underwritten Offerings.

5.  <u>Expenses</u>.  In connection with the filing of any registration statement under this Registration Rights Agreement and the sale of Registrable Securities pursuant thereto, the Company shall pay for and bear all (i) registration, filing and New York Stock Exchange listing and other fees, listing and other fees of any other securities exchange upon which securities similar to the Registrable Securities are listed, fees and disbursements of printers, counsel and accountants for the Company and (ii) all legal fees and disbursements and other expenses of the Company complying with foreign, state securities or blue sky laws of any jurisdictions in which the securities to be offered are to be registered or qualified and (iii) the expenses incurred by the Company (but not the Trust) in connection with any "road show" undertaken as part of an Underwritten Offering.  For the avoidance of doubt, the Trust shall pay for all its own expenses, including fees and expenses of any counsel retained by it.

6.  <u>Indemnification</u>.

(a)  The Company hereby agrees to indemnify and hold harmless the Trust and each of the Trust's trustees, officers, employees, legal counsel and accountants, and each Entity which controls the Trust within the meaning of the Securities Act, from and against, and agrees

10

to reimburse the Trust, its trustees, officers, employees, legal counsel and accountants and such controlling Entities with respect to, any and all claims, actions (actual or threatened), investigations, proceedings, demands, losses, damages, liabilities, costs and expenses (including all costs of appearing as a witness in any claim, challenge, action, investigation or proceeding) to which the Trust, trustees, legal counsel and accountants may become subject under the Securities Act or otherwise, insofar as such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in a registration statement covering Registrable Securities, any prospectus related thereto (preliminary or final), any Free Writing Prospectus related thereto or any amendment or supplement thereto, (ii) the omission or alleged omission to state therein a material fact necessary to make the statements therein (in the case of a prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any federal or state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal or state securities law in connection with the offering and sale covered by such registration statement; *provided*, *however*, that the Company will not be liable to any such Entity to the extent that any such claim, action, investigation, proceeding, demand, loss, damage, liability, cost or expense is caused by an untrue statement or alleged untrue statement or omission or alleged omission of material fact so made in strict conformity with written information furnished by the Trust, its trustees, legal counsel and accountants, specifically for use in the preparation thereof.  Such indemnification shall remain in full force and effect regardless of any investigation made by or on behalf of the Trust.

(b) The Trust hereby agrees to indemnify and hold harmless the Company, its officers, directors, legal counsel and accountants and each Entity who controls the Company within the meaning of the Securities Act, from and against, and agrees to reimburse the Company, its officers, directors, employees, legal counsel, accountants and controlling Entity with respect to, any and all claims, actions, demands, losses, investigations, proceedings, damages, liabilities, costs or expenses to which the Company, its officers, directors, employees, legal counsel, accountants or such controlling Entity may become subject under the Securities Act or otherwise, insofar as such claims, actions, demands, losses, investigations, proceedings, damages, liabilities, costs or expenses arise out of or are based upon (i) any untrue or alleged untrue statement of any material fact contained in a registration statement covering Registrable Securities, any prospectus  (preliminary or final) related thereto, any Free Writing Prospectus related thereto or any amendment or supplement thereto, or (ii) the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was so made in reliance upon and in strict conformity with written information furnished by the Trust specifically for use in the preparation thereof; *provided*, *however*, that the indemnity agreement contained in this Section 6(b) shall not apply to amounts paid in settlement of any such loss, claim, investigation, proceeding, damage, liability or action if such settlement is effected without the consent of the Trust, which consent shall not be unreasonably withheld or delayed; *provided*, *further*, that the total amounts payable in indemnity by the Trust under this Section 6(b) shall not exceed the net proceeds received by the Trust in the registered sale out of

11

which such claim, action, investigation, proceeding, demand, loss, damage, liability, cost, or expense arises.

(c) Promptly after receipt by a party indemnified pursuant to the provisions of Section 6(a) or Section 6(b) of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party will, if a claim therefore is to be made against the indemnifying party pursuant to the provisions of Section 6(a) or Section 6(b), notify the indemnifying party of the commencement thereof; but the omission so to notify the indemnifying party will not relieve the indemnifying party from any liability which it may have to an indemnified party otherwise than under this Section 6 and shall not relieve the indemnifying party from liability under this Section 6 unless such indemnifying party is actually and materially prejudiced by such omission. In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying parties similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; *provided*, *however*, that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from, conflict with or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel (in which case the indemnifying party shall not have the right to direct the defense of such action on behalf of the indemnified party or parties). Upon the permitted assumption by the indemnifying party of the defense of such action, and approval by the indemnified party of counsel, the indemnifying party shall not be liable to such indemnified party under Section 6(a) or Section 6(b) for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the indemnified party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence, (ii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time, (iii) the indemnifying party and its counsel do not actively and vigorously pursue the defense of such action, or (iv) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party. No indemnifying party shall be liable to an indemnified party for any settlement of any action or claim without the consent of the indemnifying party and no indemnifying party may unreasonably withhold consent to any such settlement. No indemnifying party will consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the indemnified party of a release from all liability with respect to such claim or litigation.

(d) If the indemnification provided for in Section 6(a) or Section 6(b) is held by a court of competent jurisdiction to be unavailable to a party to be indemnified with respect to any claims, actions, demands, losses, damages, liabilities, costs or expenses referred to therein, then each indemnifying party under any such subsection, in lieu of indemnifying such indemnified party thereunder, hereby agrees to contribute to the amount paid or payable by such indemnified party as a result of such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative fault of the

12

indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions which resulted in such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. Notwithstanding the foregoing, the amount the Trust shall be obligated to contribute pursuant to this Section 6(d) shall be limited to an amount equal to the per share sale price multiplied by the number of shares of Registrable Securities sold by the Trust pursuant to the registration statement which gives rise to such obligation to contribute (less the aggregate amount of any damages which the Trust has otherwise been required to pay in respect of such claim, action, investigation, proceeding, demand, loss, damage, liability, cost or expense or any substantially similar claim, action, demand, loss, damage, liability, cost or expense arising from the sale of such Registrable Securities).

(e) No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution hereunder from any person who was not guilty of such fraudulent misrepresentation.

(f) The obligations of the Company and the Trust under this Section 6 shall survive the completion of any offering of Registrable Securities in a registration statement and termination of this Registration Rights Agreement.

7. Stockholder Information.

The Company may request the Trust to furnish the Company with such information with respect to the Trust and the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing and as shall be required by law or by the Commission in connection therewith, and the Trust agrees to promptly furnish the Company with such information.

8. Forms.

All references in this Registration Rights Agreement to particular forms of registration statements are intended to include, and shall be deemed to include, references to all successor forms which are intended to replace, or to apply to similar transactions as, the forms herein referenced.

9. Agreements.

(a) The Trust agrees in connection with any registration of any securities for the account of the Company or any other person that, upon the request of the Company for a period beginning on a date not earlier than five (5) Business Days prior to the date of pricing of any such registration and ending not later than 90 days after the date of such pricing (the "Lock-Up Period"), it shall not directly or indirectly (i) offer, pledge, sell, contract to sell, grant any options for the sale of, seek the redemption of or otherwise transfer or dispose of (including pursuant to a

13

registration statement) any shares of Common Stock (or securities exchangeable or exercisable for any shares of Common Stock) or Warrants, (ii) enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of the shares of Common Stock or Warrants held by it, whether any such aforementioned transaction is to be settled by delivery of shares of Common Stock or such other securities, in cash or otherwise, or (iii) publicly disclose the intention to make any such offer, sale, pledge, transfer or disposition, or to enter into any such transaction, swap, hedge or other arrangement.

(b) The Trust represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on it behalf or use or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of the Common Stock without the prior express written consent of the Company. The Company represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on it behalf or use or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of the Common Stock without the prior express written consent of the Trust in connection with any registration which is effected pursuant to this Registration Rights Agreement.

(c) The Trust agrees to cease selling Registrable Securities pursuant to the Shelf Registration Statement if an event under Section 2(b)(ii) or Section 3(a)(ix) or Section 3(a)(xi) shall occur.

(d) The Company agrees that nothing in this Registration Rights Agreement shall prohibit the Trust, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act. To the extent requested by the Trust, the Company shall take all commercially reasonable steps necessary to assist and cooperate with the Trust to facilitate such sale or transfer.

10. Transfer of Registration Rights.

The rights to cause the Company to register securities granted to the Trust pursuant to this Registration Rights Agreement may not be transferred or assigned to any other Entity.

11. Miscellaneous.

11.1.   Waivers and Amendments.

(a) With the written consent of the Trust, the obligations of the Company and the rights of the Trust under this Registration Rights Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely), and with such consent the Company may enter into a supplementary agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Registration Rights Agreement or of any supplemental agreement or modifying in any manner the rights and obligations hereunder of the Trust and the Company.

14

(b) Neither this Registration Rights Agreement nor any provision hereof may be changed, waived, discharged or terminated orally or by course of dealing, but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.  Specifically, but without limiting the generality of the foregoing, the failure of any party hereunder at any time or times to require performance of any provision hereof by the Company shall in no manner affect the right of such party at a later time to enforce the same.  No waiver by any party of the breach of any term or provision contained in this Registration Rights Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Registration Rights Agreement.

11.2.    Rights of the Trust.  The Trust shall have the absolute right to exercise or refrain from exercising any right or rights which the Trust may have by reason of this Registration Rights Agreement or any Registrable Security, including the right to consent to the waiver of any obligation of the Company under this Registration Rights Agreement and to enter into an agreement with the Company for the purpose of modifying this Registration Rights Agreement or any agreement effecting any such modification.  The Company shall reimburse the Trust for all documented out-of-pocket costs and expenses arising out of, or incurred by the Trust in connection with, any successful action or proceeding brought against the Company by the Trust to enforce any provision in this Registration Rights Agreement

11.3.    Notices.  All notices required or permitted under this Registration Rights Agreement must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 11.3):

| **If to the Company:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP |
| --- | --- | --- |
| W. R. Grace & Co. 7500 Grace Drive Columbia, MD 21044 Attn:  Corporate Secretary Facsimile: (410) 531-4545 | | Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn:  Thomas W. Christopher Facsimile:  (212) 446-4900 |
| **If to the Trust:** | *With copies, which shall not constitute notice, to:* | |
| Asbestos Trust [Notice Street Address] [City], [State] [Zip] Attn:  [ ] | | [Notice Street Address] [City], [State] [Zip] Attn:  [ ] Facsimile: [ ] |

15

Facsimile: [ ]
*(if sending overnight*
*packages use zip code [ ])*


11.4.   Severability.  Whenever possible, each provision of this Registration Rights Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Registration Rights Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Registration Rights Agreement, and this Registration Rights Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein.  The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Registration Rights Agreement with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

11.5.   Specific Performance.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Registration Rights Agreement, the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Registration Rights Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Registration Rights Agreement exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

11.6.   No Third Party Beneficiaries.  Subject to Section 6, there are no third party beneficiaries of this Registration Rights Agreement and nothing in this Registration Rights Agreement, express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

11.7.   Headings.  The headings of the sections, subsections and paragraphs of this Registration Rights Agreement have been inserted for convenience of reference only and do not constitute a part of this Registration Rights Agreement.

11.8.   Choice of Law.  It is the intention of the parties that the internal substantive laws, and not the laws of conflicts, of the State of New York should govern the

16

enforceability and validity of this Registration Rights Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

11.9.    Jurisdiction.  With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Registration Rights Agreement (such claims, suits, actions, proceedings, and other disputes, the "Claims"), each of the parties to this Registration Rights Agreement hereby irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware, or, if neither of such are permitted under applicable law to exercise jurisdiction with respect to the matter in question, then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York (the "Courts") and each of the parties to this Registration Rights Agreement agrees that any and all Claims may be brought, heard and determined in such courts.

11.10.  Venue.  Each of the parties to this Registration Rights Agreement agrees that venue shall be proper if determined pursuant to Section 11.9 and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*.  Each of the parties hereto hereby agrees that all process which may be or be required to be served in respect of any Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Registration Rights Agreement and shall be deemed in every respect effective service of process upon such party when so given.

11.11.  No Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS REGISTRATION RIGHTS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS REGISTRATION RIGHTS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

11.12.  Counterparts.  This Registration Rights Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts (including by facsimile or portable document (pdf)), with the same effect as if all parties had signed the same document.  All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

11.13.  Reports Under the Exchange Act.  In order to provide the Trust the use of Section 2, and so long as there are Registrable Securities outstanding, the Company will (i) file the reports required to be filed by it pursuant to the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, (ii) make and keep public information available,

17

as those terms are understood and defined in Rule 144 under the Securities Act, (iii) will take such further action as the Trust may reasonably request, all to the extent required from time to time to enable the Trust to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 or Rule 144A under the Securities Act, as such rules may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission, and (iv) take such other actions required by the Company's transfer agent to consummate any issuance and sale of Registrable Securities in accordance with such Rule 144 or Rule 144A.  Upon the request of the Trust, the Company will deliver to the Trust a written statement as to whether it has complied with such reporting and information requirements and, to the extent available, with a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company as the Trust may reasonably request in availing itself of any rule or regulation of the Commission allowing a holder to sell securities without registration only if such report is not available at www.sec.gov or on the Company's website.

11.14.   Entire Agreement/Effectiveness.

This Registration Rights Agreement, together with the Warrant Agreement and the Warrants, the Plan of Reorganization and the Confirmation Order, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Trust in respect of the subject matter contained herein, and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

11.15.   Other Remedies.

Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[*Signature page follows*]

18

**[REGISTRATION RIGHTS AGREEMENT SIGNATURE PAGE]**

IN WITNESS WHEREOF, the parties hereto, intending to be bound by the terms of this agreement, have caused this Registration Rights Agreement to be executed by its duly authorized officer as of the date first above written.

W. R. Grace & Co.

By: _____
    Name:
    Title:

The WRG Asbestos Trust

By: _____
    Name:
    Title:

19

[THIS PAGE INTENTIONALLY LEFT BLANK]

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 18 TO EXHIBIT BOOK
## REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES SCHEDULE

### EXHIBIT 18

The Debtors do not presently contemplate the rejection of any Executory Contracts or Unexpired Leases.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 19 TO EXHIBIT BOOK
## RETAINED CAUSES OF ACTION SCHEDULE

**EXHIBIT 19**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**RETAINED CAUSES OF ACTION**
**(ACCOUNTS RECEIVABLE)**

Unicoat Technology
International, Inc.
804 Winkler
South Houston, TX 77587

Landmark Window Systems,
Inc.
806-808 Windsor Street
Hartford, CT 06120

Liberty Miron
282 Rt. 52 East
Liberty, NY 12754

RM Engineered Products
4854 O'Hear Avenue
North Charleston, SC 29405

Charles Redi Mix
P.O. Box 644
Wingate Road
Murphy, NC 28906

Thacker Smyrna
4755 North Church Lane SE
Smyrna, GA 30080

George Nutrients
P.O. Box 247
Canton, GA 30114

Plibrico
1800 N. Kingsbury Street
Chicago, IL 60614

U.S. Aggregates
Western Aggregates
c/o Mohave Concrete
147 West Election Road
Suite 110
Draper, UT 84020

U.S. Aggregates
Western Rock Product Corp.
147 West Election Road
Suite 110
Draper, UT 84020

U.S. Aggregates
Cox Rock Products Co.
P. 0. Box 220289
Centerfield, UT 84622

U.S. Aggregates
A Block Co.
147 West Election Road
Suite 110
Draper, UT 84020

Image Concrete
P.O. Box 1693
Roanoke, TX 76262

Peerless Tube Company
58-76 Locust Avenue
Bloomfield, NJ 07003

Norris Rader, Inc.
P.O. Drawer 10410
New Iberia, LA 70562

Containment Solutions/Hoover
Group
6740 Bay Meadow Drive
Glen Burnie, MD 21060

Warren Electric
2202 S. Battleground Road
P.O. Box 520
La Porte, TX 77571

Skagit Pacific
Building A1
500 Metcalf Street
Sedro Woolley, WA 98284

Irvin H. Whitehouse
P.O. Box 32670
Louisville, KY 40232

Rockland Materials
3636 South 43rd Avenue
Phoenix, AZ 85009

United Concrete Products
P.O. Box 676
Frederick, MD 21705

Hanover Materials
P.O. Box 896
Ashland, VA 23005

Kenny Manta
414 North Orleans Avenue
Suite 801
Chicago, IL 60610

AAA Ready Mix
P.O. Box 729
Reddick, FL 32686

IDC Corporation
11-40 Borden Avenue
Long Island City, NY 11101

Dolle's Hydraulics & Tools
128 S. Miami Avenue
Miamisburg, OH 45342

North American Wire Products
30000 Solon Road
Solon, OH 44139

Abilez Development
21205 S. E. 59th Street
Newalla, OK 74857-8338

Sheldon Concrete (Saboyd
Ents.)
P.O. Box 4787
Bryan, TX 77805

Oklahoma Mobil Mix
P.O. Box 245
Spencer, OK 73084

Norat Environmental
Road 862
KM 1.5 #I22
Bayamon, PR 00959

Site Mix Ready Mix
P.O. Box 60178
Colorado Springs, CO 80960-
0178

Bahl, Inc.
50 8th Street North
Sauk Rapids, MN 56379

Isla Nia Paving
Apartado 1552
Vieques, PR 00765

Dawson Ready Mix
5674 Highway 53 East
Dawsonville, GA- 30534

Jackson Stone
P.O. Box 5398
Jackson, MS 39216

Concretera Del Este
HC-01 BOX 16999
Humacao, PR 00791

Quick-Wright Associated
150 Cooper Road C-7
West Berlin, NJ 08091

D & G Brice Contractors, Inc.
P.O. Box 31846
Baltimore, MD 21207

North Shore Concrete LLC
45 Jefferson Avenue
Salem, MA 01970

MPI Ready Mix
P.O. Box 641
Overton, NV 89040

Advanced Concrete Innovations
15870 Johnson Memorial Drive
Jordan, MN 55352

Allied Ready Mix
106 Industrial Park Loop NE
Rio Rancho, NM 87124

DAC Art Louisiana LLC
6709 Perkins Road
Baton Rouge, LA 70808

Delta Concrete
P.O. Box 1092
Forrest City, AR 72336

Lee's Concrete
4315 N. Foster Drive
Baton Rouge, LA 70805

Rainbow Materials
P.O. Box 18838
Austin, TX 78760

Regional Concrete
Rt. 5, Box 5640
Palestine, TX 75801

Concretera Del Este
HC-01 BOX 16999
Humacao, PR 00791

Royal Cement
State Road 169
Logandale, NV 89021

Dinaso & Sons Building Supply
820 Mount Ephraim Avenue
Camden, NJ 08108

Lassiter Plastering
6939 Amaryllis Court
Elyria, OH 44035

Pro Tec Fireproofing, Inc.
1100 NE 249th Street
Ridgefield, WA 98642

Twisted Pair Communications
2511 Pan Am Blvd.
Elk Grove, IL 60007

P T Hutchins Co, Ltd.
P.O. Box 910916
Los Angeles, CA 90091

Thompson Hancock
Technologies, Inc.
P.O. Box 1963
Burlington, NC 27216

Vines Precast Services
233 Gatewood Circle West
Burleson, TX 76028

Intercat, Inc.
2399 Highway 34, Suite C-I
Manasquan, NJ 08736

Trenton Ready Mix
1017 East 38th Street
Chattanooga, TN 37407

Burks Concrete
P.O. Box 68
Hitchcock. TX 77563

Dump Master/Master Mix of NJ
7 Herrick Avenue
Staten Island, NY 10307

Quality Concrete
810 Fish Road
Tiverton, RI 02878

Southeastern Fireproofing
P.O. Box 101207
2512 Commerce Square West
Birmingham, AL 35210

Toman & Associates
P.O. Box 408
Poteet, TX 78065

2

**RETAINED CAUSES OF ACTION**
**(CLAIMS AGAINST CUSTOMERS)**

Johnson Matthey Catalysts
Formerly ICI/Synetix
Accounts Payable
Two Transam Plaza Drive
Suite 230
Oakbrook Terrace, IL 60181

Kellogg Brown & Root, Inc.
601 Jefferson Avenue
Houston, TX 77001

ConocoPhillips
600 North Dairy Ashford
Houston, TX 772 1 0

Sumitomo Osaka Cement Co., Ltd
6-28, Rokubancho
Chiyoda-Ku
Toyko 1 02-8465
Japan

3

**RETAINED CAUSES OF ACTION
(CLAIMS AGAINST VENDORS)**

DuPont Chemical Solutions
3419 Clearwater Court
Sugar Land, TX 77478

Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

Kansas City Southern/Kansas
City Southern Railway
427 W. 12th Street
Kansas City, MO 64105

Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510

APS Connections CC
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

Phil Smith
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

Antonia Mincheva
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

McAllister Towing of
Philadelphia, Inc.
PNVC, Commandment Building
4900 South Broad Street
Building 6
Philadelphia, PA 19112

Honeywell Burdick & Jackson
Honeywell International, Inc.
101 Columbia Road
Morristown, NJ 07962

Ennis Knupp
10 South Riverside Plaza
Suite 700
Chicago, IL 60606

Fidelity Investments
82 Devonshire Street V5A
Boston, MA 02109

Capital Guardian Trust
Company
1230 Peachtree Street
Suite 2550
Atlanta, GA 30309

Dwight Asset Management
Company
100 Bank Street
Suite 800
Burlington, VT 050401

Northern Trust
50 South LaSalle Street
Chicago, IL 60675

Fidelity Management Trust
Company
82 Devonshire Street
Boston, MA 02109

Wachovia Bank, NA
1 West 4th Street
Winston-Salem, NC 27101

JP Morgan Fleming Asset
Management
522 Fifth Avenue, Floor 11
New York, NY 10036

Barclays Global Investor
Services
45 Fremont Street
San Francisco, CA 94105

Standish Mellon Asset
Management
One Financial Center
Boston, MA 02111

T. Rowe Price
100 East Pratt Street
Baltimore, MD 21202

Penn Bottle & Supply Co.
7 10 E. Third Street
Essington, PA 19029

Ernst & Young
Metro Park
99 Wood Avenue South
Iselin, NJ 08830

Prudential Relocation
225 Crooked Creek Trail
Canton, GA 30115

Runzheimer International
Runzheimer Park
Rochester, WI 53167

Todd Organization
30 Oak Street, 4th Floor
Stamford, CT 06905

Wachovia Bank, NA
1 23 Broad Street
Philadelphia, PA 19109

ORREX
Odessa, TX

Greif Brothers
(Address Unknown)

APS Connections
Burman Road
FCU Building
Deal Party
Port Elizabeth, South Africa

Wachovia Bank, NA
1021 East Carey Street
6th Floor
Richmond, VA 23219

Wells Fargo
2701 Wells Fargo Way
6th Floor
Minneapolis, MN 55408

AON Consulting
1001 Brickell Bay Drive
Miami, FL 33131

4

AON Pension Service Center
1701 Golf Road
Tower 2, Suite 200
Rolling Meadows, IL 60008

Fidelity Institutional Retirement
Services Co.
300 Puritan Way
Marlborough, MA 01752

SystemMed, LLC
100 Parsons Pond Drive
Franklin Lakes, NJ 0741 7

Aetna
1302 Concourse Drive, #402
Linthicum, MD 21090

MetLife
501 US Highway 22
P.O. Box 6891
Bridgewater, NJ 08807

Tufts Member Services
333 Wyman Street
P.O. Box 91 12
Waltham, MA 02454

Palisades Communications, Inc.
800 Palisade Avenue, Suite 201
Ft. Lee, NJ 07024

HMO Illinois
300 East Randolph Street
Chicago, IL 60601

Kaiser of Mid-Atlantic States
2101 East Jefferson Street
Rockville, MD 20852

Kaiser of Northern California
Region
1950 Franklin Street
Oakland, CA 94612

Kaiser of Southern California
1950 Franklin Street
Oakland, CA 94612

Uniprise
450 Columbus Blvd., 11-NA
Hartford, CT 06103
EAP Systems
500 West Cummings Park
Woburn, MA 01801

Marsh USA, Inc.
1166 Avenue of the Americas
New York, NY 10036

Spectera
2811 Lord Baltimore Drive
Baltimore, MD 21244

EBenX, Inc.
5045 Ten Mills Road
Columbia, MD 21 044

Chapman Kelly
100 W. Court Avenue
Suite 200
Jeffersonville, IN 47130

CIGNA Healthcare
1111 Market Street
Chattanooga, TN 37402

Metasa Group - PSMI
164 Lott Court
W. Columbia, SC 29169

MAMSI Health Plans
20 West Rolling Crossroads
Suite 11
Baltimore, MD 21228

Triple S, Inc.
Avenida Roosevelt 1441
San Juan, PR 00920

Health Network America
187 Monmouth Parkway
West Long Branch, NJ 07764

Ceridian
6731 Columbia Gateway Dr.
First Floor
Columbia, MD 21046

Kronos
8850 Stanford Blvd.
Suite 2000
Columbia, MD 21 045

TALX
8600 LaSalle Road
Suite 200
Towson, MD 21286
National Bond and Trust
1725 Eye Street, NW
Suite 300
Washington, DC 20006

Chase Mellon
85 Challenger Road
Ridgefield Park, NJ 07660

Fidelity Investments
300 Puritan Way, MM1L
Marlborough, MA 01752

Merck Serono S.A. (formerly
Serono International S.A.)
9 Chemin des Mines
1211 Geneva 20, Switzerland

Abbott Laboratories
I00 Abbott Park Road
Abbott Park, Illinois 60064-
3500

Wyeth
5 Giralda Farms
Madison, NJ 07940

Biovail Corporation
7150 Mississauga Road
Mississauga, Ontario L5N 8M5
Canada

Biovail Technologies Ltd
700 Route 200/206
Bridgewater, N J 08807

Biovail Pharmaceuticals, Inc
700 Route 202/206
Bridgewater, NJ 08807

Elan Corporation plc.
Treasury Building
Lower Grand Canal Street
Dublin 2, Ireland

Elan Pharmaceuticals, Inc.
40 Parker Drive
Morris Plains, NJ 07950-2439

Teva Pharmaceutical Industries
5 Basel Street
Petach Tikva 49131
Israel

Teva Pharmaceuticals USA, Inc.
1090 Horsham Rd. P.O.B. 7090
North Wales. PA 19454

GlaxoSmithKline
One Franklin Plaza
P.O. Box 7929
Philadelphia, PA 19101

National Union Fire Insurance
Company of Pittsburgh, PA
175 Water Street
New York, NY 10038

Chubb Group of Insurance
Companies
15 Mountain View Road
Warren, NJ 07059

Axis Insurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-
0357

Allied World Assurance
Company, Inc
225 Franklin Street
Boston, MA 02110

6

**RETAINED CAUSES OF ACTION**
**(CLAIMS UNDER FEDERAL OR STATE SECURITIES LAWS)**

Protein Genetics, Inc.
1825 Infinity Drive
DeForest, WI 53532

Avantium Holding BV
Zekeringstraat 29
1014 BV
Amsterdam, The Netherlands

7

**RETAINED CAUSES OF ACTION**
**(CLAIMS FOR BREACH OF CONTRACT)**

Nalco Company
1601 W. Diehl Road
Naperville, IL 60563

Odyssey Logistics & Technology Corporation
39 Old Ridgebury Road
Danbury, CT 06810

Alstom Power Inc./Air Preheater Co.
4525 Weaver Parkway, Suite 250
Warrenville. IL 60555

G.O. Carlson, Inc.
350 Marshallton Thorndale Road
Downingtown, PA 19335

Proforma Global Printing &
Design Solutions, Inc.
2 Winters Lane
Baltimore, MD 21228

8

## RETAINED CAUSES OF ACTION
## (REAL ESTATE CLAIMS)

Cummings Properties
200 West Cummings Park
Woburn, MA 01801

Remington & Vernick Engineers, Inc.
232 Kings Highway East
Haddonfield, NJ 08033

Woolwich Township Planning Board
121 Woodstown Road
Woolwich Township, NJ 08085

Gloucester County Construction Board of Appeals
1 North Broadway
Woodbury, NJ 08097

Town of Acton
Town Hall
472 Main St.
Acton, MA 01720

Sheplers, Inc.
6501 W. Kellogg
Wichita, KS 67209

E. I. Dupont De Nemours and Company
1007 Market St.
Wilmington, DE 19898

9

## RETAINED CAUSES OF ACTION
### (INSURANCE CLAIMS)

Acc & Casualty Ins. of
Winterthur
750 7th Avenue, 2nd Floor
New York, NY 10019

Admiral Insurance
1255 Caldwell Road
P.O. Box 5725
Cherry Hill, NJ 08034

Aetna
1302 Concourse Drive
Linthicum, MD 21090

Aetna Casualty & Surety
c/o Travelers Insurance Co.
1 Tower Square, 2FG
Hartford, CT 06181

AG Belge de 1830
Blvd. Emile Jacqmain, 53
Brussels, 98 B-1000

Allianz Underwriters Ins.
3400 Riverside Drive, Suite 300
Burbank, CA 91505

Allied World Assurance
225 Franklin Street
Boston, MA 02110

American Centennial
3501 Silverside Rd.
203 Naamans Bldg
Wilmington, DE 19810

American Employers
2 Central Square
Cambridge, MA 02139-3311

American Home Assurance
750 7th Avenue, 22nd Floor
New York, NY 10019

American Int'l Underwriter
Excess Casualty Claims
Division
175 Water Street, 22nd Floor
New York, NY 10038

American Manufacturers Mutual
Central Claims Tube Station J- 1
Long Grove, IL 60049

American Reinsurance Co
American Re Plaza
555 College Rd. East
Princeton, NJ 08543-5241

Ancon Ins. Co. (U.K.)
750 7th Avenue, 22nd Floor
New York, NY10019

Andrew Weir Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Argonaut Northwest Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

Assicurazioni Generali S.p.A.
750 7'h Avenue, 22nd Floor
New York, NY 10019

Associated International
21 860 Burbank Blvd. Suite 380
Woodland Hills, CA 91367

Axis Reinsurance Company
Connell Corporate Park
3 Connell Drive
Berkeley Heights, NJ 07922

Bermuda Fire & Marine Ins. Co.
Ltd.
8 Wesley Street Craig Appin
House
Hamilton, BM HM JX

Birmingham Fire Ins Co
Excess Casualty Clms Div
175 Water Street, 22nd Floor
New York, NY 10038

Bishopsgate Ins. Co. Ltd.
7507 Avenue, 22nd Floor
New York, NY 10019

Boston Old Colony Ins Co
1100 Cornwall Road
Monmouth, NJ 08852-0906

British National Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

British Northwestern
60 St. Mary Axe

Bryanston Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Buffalo Reinsurance
c/o Continental Ins. 40 Wall St.
New York, NY 10005

C.A.M.A.T.
750 7th Avenue, 22nd Floor
New York, NY 10019

California Union Ins Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Centennial Ins Co
3 Giralda Farm Three Geralda
Farms
Madison, NJ 07940

Central National Ins Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Century Indemnity Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Chubb & Son, division of
Federal Insurance Company
82 Hopmeadow Street
Simsbury, CT 06070

Cie Europeene D'Ass.
Industrielles
750 7th Avenue, 22nd Floor
New York, NY 10019

CAN Reinsurance of London
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Continental Casualty Co.
333 S. Wabash, 19 South
Chicago, IL 60685

10

Continental. Casualty Company
333 S. Wabash, 19 South
Chicago, UL 60685

Continental Ins Co
1100 Cornwall Road
Monmouth, NJ 08852-0906

Dairyland Insurance Co
750 7th Avenue, 22nd Floor
New York, NY 10019

Dominion Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Eisen Und Stahl
Karl Wiechert Allee
50 Postfach 610369
Hanover, GR D-30603

El Paso Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Employers Comm'l Union
2 Central Square
Cambridge, MA 02139-3311

Employers Mutual Cas Co
c/o Mutual Marine
919 Third Ave-10th Floor
New York, NY 10022

English & American Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

European General
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Federal Insurance Co
2201 Bryan Street, Suite 3400
Dallas, TX 75201 -3068

Fireman's Fund
Asbestos Claim Unit
777 San Marin Drive
Novato, CA 94998

First State Ins Co
150 Federal Street
Boston, MA 02110-1753

Folksam International Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

GEICO
GEICO Plaza
Washington, DC 20076-0001

General Insurance Company of
America
GEICO Plaza
Washington, DC 20076-0001

Gerling Konzern Ins
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Gibraltar Cas. Co.
477 Martinsville Rd.
PO Box 830
Liberty Corner, NJ 0793 8

Granite State Ins
Excess Casualty Claims
175 Water St.- 22nd Floor
New York, NY 10038

Guarantee Insurance Co
650 Naamamf Road, Suite 301
Claymont, DE 19703

Haftpflichtverband
Anchorage House
2 Clove Crescent
Leamouth, London, EG E 14
2BE

Harbor Insurance Co
333 South Wabash, 19 South
Chicago, IL 60685

Hartford Insurance
Hartford Plaza
Hartford, CT 06115

The Hartford
Hartford Plaza C-2-45
Hartford, CT 06115

Highlands Ins. Co.
275 Phillips Blvd.
Trenton, NJ 08618

Home Insurance Co
c/o REM
59 Maiden Lane 5th F1.
New York, NY 10038

Ideal Mutual
123 Williams Street, 7th Fl.
New York, NY 10038

Illinois National
Excess Casualty Claims Div.
175 Water St.- 22nd Floor
New York, NY 10038

INA
1601 Chestnut Street TLP-19-
Long Tern Expos.
Philadelphia, PA 19192-2181

Insurance Co State of PA
Excess Casualty Claims Div
175 Water Street, 22nd Floor
New York, NY 10038

Integrity Insurance Co
Company in Liquidation
49 East Midland Ave
Paramus, NJ 07652-2920

Kraft Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Lexington Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

Lloyds Underwriters
750 7th Avenue, 22nd Floor
New York, NY 10019

London & Edinburgh General
Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

London & Overseas Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

11

London Guarantee & Acc
1100 Cornwall Road
Monmouth, NJ 08852-0906

Louisville Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Ludgate Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Marsh Private Client Services
44 Whippany Road
Morristown, NJ 07962

Maryland Casualty Co.
Claims Division 3910 Keswick
Road
Baltimore, MD 21211

Maryland Casualty Company
Claims Division 3910 Keswick
Road
Baltimore, MD 21211

Mentor Ins. Co. (U.K.) Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Midland Insurance Co.
123 Williams Street, 7th Floor
New York, NY 10038

Minster Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Mission Insurance Co.
Dept of Conser & Liqtn
P.O. Box 26894
San Francisco, CA 94126-0894

Mutual Reinsurance Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

National Casualty Co. of
America
c/o Scottsdale Insurance
8877 N. Gainey Ctr. Dr.
Scottsdale, AZ 85258

National Union Fire Insurance
Company of Pittsburgh
AIG
175 Water Street
New York, NY 10038

Natl. Union Fire Pittsburgh
Excess Casualty Claims Div
175 Water Street, 22nd Floor
New York, NY 10038

New Hampshire Insurance
Excess Casualty Claims
175 Water Street, 22nd Floor
New York, NY 10038

North Atlantic Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

North Star Reinsurance
695 E. Main Street
Stamford, CT 06904-2354

Northbrook Ins. Co
3 Allstate Comm'l Plaza
51 W. Higgins Rd.-T2B
So Barrington, IL 60010

Orion Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Pacific Employers Ins Co
1601 Chestnut Street TLP- 19-
Long Term Expos.
Philadelphia, PA 19192-2181

Protective Nat'l Ins Co
11128 John Galt Blvd. Suite 200
Omaha, NE 68137-6312

Prudential Reinsurance
477 Martinsville Road
Liberty Corner, NJ 07938-0830

Republic Insurance Co
2727 Turtle Creek Blvd.
Dallas, TX 75219

Reunion-Adriatica
C/O Chilington Int'l
I00 Commons Way Ste. 210
Holmdel, NJ 07737

Royal Indemnity Company
750 7th Avenue, 22nd Floor
New York, NY 10019

Royal Insurance Co
9140 Arrowpoint Boulevard,
Suite 440
Charlotte, NC 28273

Royale Belge S.A.
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Sphere Drake Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

St. Helens Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

St. Katherine Ins. Co. Ltd.
750 7th Ave, 22nd Floor
New York, NY 10019

Stronghold Ins. Co. Ltd.
750 7 Avenue, 22nd Floor
New York, NY 10019

Swiss Reinsurance
Myuthenquai 50/60 CH 8022
Zurich

Swiss Union Gen. Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Terra Nova Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Transamerica Ins. Co.
250 Commercial St., Suite 5000
Manchester, NH 03101

Transit Casualty
CNA Plaza 37 South
Chicago, IL 60685

Turegum Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

Twin City Fire Ins. Co.
Hartford Plaza
Hartford, CT 06115

Unigard Security
2 Central Square 2nd Floor
Cambridge, MA 02139

US Fire Insurance Co
305 Madison Avenue
P.O. Box 1973
Morristown, NJ 07960

Walbrook Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Wausau Insurance Co
400 Westwood Drive
P.O. Box 8020
Wausau, WI 54402-8020

Winterthur Swiss Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

World Auxiliary Ins. Cop. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Yasuda Fire & Marine Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Zurich Insurance Co
Anchorage House 2 Clove
Crescent
Leamouth, London EG E 14
2BE

13

**RETAINED CAUSES OF ACTION**
**(CLAIMS AGAINST TAXING AUTHORITIES)**

U.S. Customs and Border
Protection
Thomas A. Smith, Director
National Finance Center
Internal Revenue Service
409 Silverside Road
Wilmington, DE 19809

Internal Revenue Service
7850 SW 6th Court, Room 285
Plantation, FL 33324

Internal Revenue Service
Summit Building, Stop 202-D
Room 1520
401 W. Peachtree Street, N.W.
Atlanta, GA 30365

Internal Revenue Service
Atlanta Service Center
P.O. Box 47-421
Doraville, GA 30362

Attention: Stop 35-Beverly
Steed
Do Not Open In Mail Room
Commissioner
Department of Revenue
4112 Gordon Persons Building
50 N. Ripley Street
Montgomery, AL 36132

Commissioner
Department of Revenue
P.O. Box 110400
Juneau, AK 99811-0400

Director
Department of Revenue
1600 W. Monroe Street
Phoenix, AZ 85007

Commissioner
Dept. of Finance and
Administration
1509 W. 7th
Little Rock, AR 72201

State Controller and FTB Chair
Franchise Tax Board
P.O. Box 942840
Sacramento, CA 94240-0040

Executive Director
Department of Revenue
State Capitol Annex
1375 Sherman Street
Denver, CO 80261

Commissioner
Department of Revenue Services
25 Sigourney Street
Hartford, CT 06106

Director
Division of Revenue
Carve1 State Building
820 N. French Street
Wilmington, DE 19801

Chief Financial Officer
Office of Tax and Revenue
941 North Capitol Street, N.E.
Washington, DC 20002

Executive Director
Department of Revenue
104 Carlton Building
Tallahassee, FL 32399-0100

Commissioner
Department of Revenue
Trinity-Washington Building
270 Washington Street, SW
Atlanta, GA 30334

Director
Department of Taxation
P.O. Box 259
Honolulu, HI 96809-0259

Chairman
State Tax Commission
P.O. Box 36
800 Park Boulevard
Plaza IV
Boise, ID 83722-0036

Director
Department of Revenue
103 West Jefferson Street
Springfield, IL 62702

Commissioner
Department of Revenue
100 North Senate Avenue
Indiana Government Center
North
Indianapolis, IN 46204-2253

Director
Department of Revenue and
Finance
Hoover State Office Building
East 13th and Walnut
Des Moines, IA 50319

Secretary
Department of Revenue
Robert B. Docking State Office
Building
915 S.W. Harrison Street
Topeka, KS 66612-1588

Secretary
Revenue Cabinet
200 Fair Oaks Lane
Frankfort, KY 40620

Secretary
Department of Revenue
Box 3863
330 N. Ardenwood Drive
Baton Rouge, LA 70806

Executive Director
Revenue Services
24 State House Station
Augusta, ME 04333-0024

Comptroller
Goldstein Treasury Building
80 Calvert Street
Annapolis, MD 21404

Commissioner of Revenue
Department of Revenue
51 Sleeper Street, 8th Floor
Boston, MA 02114

State Treasurer
Department of Treasury
Treasury Building
430 W. Allegan Street
Lansing, MI 48922

14

Commissioner
Department of Revenue
600 North Robert Street
St. Paul, MN 55146

Chairman and
Commissioner of Revenue
State Tax Commission
1577 Springridge Road
Raymond, MS 391 54-9602

Director
Department of Revenue
301 West High Street
Jefferson City, MO 65105-0311

Director
Department of Revenue
455 Sam W. Mitchell Building
125 N. Roberts
P.O. Box 5805
Helena, MT 59604-5805

Tax Commissioner
Department of Revenue
301 Centennial Mall South
P.O. Box 94818
Lincoln, NE 68509-4818

Executive Director
Department of Taxation
1550 E. College Parkway
Carson City, NV 89706

Commissioner
Dept. of Revenue
Administration
45 Chennell Drive
P.O. Box 457
Concord, NH 03301

Director
Division of Taxation
50 Barrack Street
P.O. Box 240
Trenton, N3 08646-0240

Secretary
Taxation and Revenue
Department
P. 0. Box 630
1100 S. St. Francis Drive
Santa Fe, NM 87504-0630

Commissioner
Department of Taxation and
Finance
W.A. Harriman Campus
Building #9
Albany, NY 12227-0125

Commissioner of Finance
25 Elm Place
Brooklyn, NY 11201

Secretary
Department of Revenue
501 N. Wilmington Street
P.O. Box 25000
Raleigh, NC 27640-0640

Tax Commissioner
Tax Department
8th Floor
Capitol Building
600 E. Boulevard Avenue
Bismarck, ND 58505-0599

Commissioner
Department of Taxation
30 East Broad Street
P.O. Box 530
Columbus, OH 432 1 6-053 0

Chairman
State Tax Commission
2501 Lincoln Boulevard
Oklahoma City, OK 73194-000
I
Director
Department of Revenue
Revenue Building
955 Center Street, N.E.
Salem, OR 973 10

Acting Secretary
Department of Revenue
1133 Strawberry Square
Harrisburg, PA 17128-1100

Tax Administrator
Division of Taxation
One Capitol Hill
Providence, RI 02908-5800

Director
Department of Revenue
301 Gervais Street
Columbia, SC 29214

Secretary
Department of Revenue
Anderson Building
445 East Capital Avenue
Pierre, SD 57501-3185

Commissioner
Department of Revenue
Andrew Jackson State Office
Building
500 Deaderick Street
Nashville, TN 37242

Comptroller of Public Accounts
LBJ State Office Building
111 E. 17th Street
Austin, TX 78774

Executive Director, Chairman
State Tax Commission
210 North 1950 West
Salt Lake City, UT 84134

Commissioner
Department of Taxes
Pavilion Office Building
109 State Street
Montpelier, VT 05609

State Tax Commissioner
Department of Taxation
2220 W. Broad Street
Richmond, VA 23220-2008

Director
Department of Revenue
4 15 General Administration
Building
Washington Street East
Olympia, WA 98504-0090

Secretary
Department of Tax and Revenue
Building 1
State Capitol Building
Charleston, WV 25305

Secretary
Department of Revenue
P.O. Box 8933
125 South Webster Street
Madison, WI 53708

15

Director
Department of Revenue
Herschler Building
122 W. 25th Street
Cheyenne, WY 82002-0 1 10

Calcasieu Parish Sales and
Use Tax Department
P.O. Box 2050
Lake Charles, LA 70602

Department of the Treasury
Internal Revenue Service
Ogden, Utah 82401

Fresenius Medical Care
Holdings, Inc.
Two Ledgemont Center
95 Hayden Avenue
Lexington, MA 02493

Sealed Air Corporation
200 Riverfront Boulevard
Elmwood Park, NJ 07407

California Franchise Tax Board
P.O. Box 942840
Sacramento, California 94257

Alaska Department of Revenue
State Office Building, 11th Floor
333 Willoughby Avenue
Juneau, Alaska 99811

Arizona Department of Revenue
1600 West Monroe Street
Phoenix, Arizona 85007

District of Columbia Office of
Tax and Revenue
941 North Capital Street, NE
8th Floor
Washington, D.C. 20002

Georgia Department of Revenue
1800 Century Center Boulevard
Atlanta, Georgia 30345

Kentucky Department of
Revenue
200 Fair Oaks Lane
Frankfort, Kentucky 40620

Gamma Holdings, N.V.
Hoogeindsestraat 47
5705 AL Helmond
The Netherlands

Bekaert Textiles, N.V.
Deerlijkseweg 22
B-8790 Waregem
Belgium

Axa Bank Europe N.V.
I 170 Brussels
Vorstlaan 25
Belgium

Linklaters DeBandt
Rue Brederode
13 B-1000
Brussels, Belgium

Cyr Cambier N.V.
Deerlijkseweg 22
B-8790 Waregem
Belgium

Colowyo Coal Company, L.P.
5731 State Highway 13
Meeker, Colorado 81641

Rio Tinto Energy America
505 South Gillette Avenue
(82716)
P.O. Box 3009
Gillette, Wyoming 82717-3009

16

**RETAINED CAUSES OF ACTION**
**(CLAIMS RELATING TO DEPOSITS)**

Amerada Hess
P.O. Box 11510
Newark, NJ 07101-4510

Baltimore Gas & Electric Co.
P.O. Box 1431
Baltimore, MD 21203-143 1

City of Anaheim
P.O. Box 3069
Anaheim, CA 92803-3069

City of E. Chicago
Dept. of Water Works
P.O. Box 423
East Chicago, IN 463 12

Electric Power Bd. Of Chattanooga
P.O. Box 182255
Chattanooga, TN 37422-7255

Reliant Energy/Entex
P.O. Box 2628
Houston, TX 77252

South Carolina Electric & Gas
1426 Main Street
Columbia, SC 29201

17

**RETAINED CAUSES OF ACTION**
**(ENVIRONMENTAL AND PRODUCT LIABILITY CLAIMS)**

Burton Shaffer, Irving Shaffer,
Milton Shaffer, BIM Investment Corp.
Shaffer Realty Nominee Trust
c/o Solomon M. Felman
199 Wells Avenue, Suite 201
Newton. MA 02459

E.I. Du Pont De Nemours and Company
Corporate Real Estate
1007 Market Street
Wilmington, DE 19898

Covidien d/b/a Tyco Healthcare Group LP
675 McDonnell Blvd. 10-3-S
Hazelwood, MO 63042

18

**RETAINED CAUSES OF ACTION**
**(INTELLECTUAL PROPERTY RIGHTS CLAIMS)**

BP America, Inc.
4101 Winfield Road
Warrenville, IL 60555.

Colormatrix
3005 Chester Avenue
Cleveland, OH 44005

Amcor Whitecap Deutschland
GmbH Limited
Hansastrasse 4, D-30419
Hanover, Germany

Fosroc International
Coleshill Road
Tamworth
Staffordshire B78 3TL, England

Sika Technology AG
Branch Zurich
Tuffenweis 16 P.O. Box
CH-8048 Zurich
Switzerland

The Dow Chemical Company
P. 0. Box 1967
Midland, MI 48641 -1 967

Euco Fosroc
Gasteiz Bidea, 11
Spain

Access Business Group LLC
7575 Fulton Street East
Ada, Michigan 49355-0001

Anheuser-Busch
1 Busch Place
St. Louis, MO 631 18

Colgate-Palmolive Company
300 Park Avenue
New York, NY 10022

DA NanoMaterials LLC
2507 West Erie Drive
Tempe, Arizona 85282

Phenomenex
41 1 Madrid Avenue
Torrance, CA 90501

Promega Corporation
2800 Woods Hollow Road
Madison, WI 53711

19

**RETAINED CAUSES OF ACTION**
**(PENDING AND POTENTIAL LITIGATION)**

| Entity | Case No. | Plaintiff/ Case Name | Nature of Proceeding | Court or Agency | Status |
|---|---|---|---|---|---|
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Tax | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace Energy | 979-05135 | Grace Energy v. Kaneb Pipe Line | Contract | Dallas County, TX | Pending |
| W. R Grace Grace Energy | BC222456 | Petro Resources v. N.Y. Hillside | Environmental | Superior Court, Los Angeles County, CA | Pending |
| W. R. Grace-Conn. | 01-769 | Samson Investment | Indemnification | Dallas County, TX | Pending |
| W. R. Grace-Conn. | 97CIV8941 | Uniguard Security Ins. v. W. R. Grace & Co.-Conn. | Insurance | US District Court, S.D.N.Y. | Pending |
| W. R. Grace-Conn. | 98-CV-0838s(F) | W. R. Grace & Co. v. Zotos International, Inc. | Environmental | US District Court, Buffalo, NY | On Appeal |
| W. R. Grace-Conn. | 02CV495 | Estate of Jeffrey B. Chwala, et al. | Wrongful Death | Circuit Court, Eau Claire County, WI | Pending |
| W. R. Grace-Conn. | 88CIV4337 | Maryland Casualty Co. v. W. R. Grace & Co. and Continental Casualty Company | Insurance | US District Court, S.D.N.Y. | Settled |
| Gloucester New Communities Company, Inc. | L-1347-03 | Summit Ventures LLC | Real Estate | Superior Court of New Jersey Law Division Gloucester County | Pending (On Trial) |
| W. R. Grace & Co. W. R. Grace-Conn. | 95-CV-6400L | Seneca Meadows, Inc. Macedon | Environmental | U.S. District Court, W.D.N.Y. | Pending |

20

| | | Homes, Inc. | | | |
|---|---|---|---|---|---|
| W. R. Grace-Conn. Grace SA | | Fosruc Euco, SA | | The Mercantile Court of Bilbao, Spain | Pending |
| Grace Construction & Grace Darex Packaging Technologies | Action No. S036827 | Affordable Housing Charitable Assoc. et al. v. Weber & Associate Architectural Consultant Inc., et al. (Regent Place) | Products Liability | Supreme Court of British Columbia, New Westminster Registry | Pending |
| Grace Construction & Grace Darex Packaging Technologies | Action No. S015358 | Canada Mortgage & Housing Corporation v. Santos Enterprises, Ltd., et al. (Larchway Gardens) | Products Liability | Supreme Court of British Columbia, Vancouver Registry | Pending |
| Grace Construction & Grace Darex Packaging Technologies | CIV 446857 | Miramar Apartments v. Douglas Roses Construction, Inc. | Products Liability | Superior Court, State of California, County of San Mateo | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Anita Terrace Owners, Inc. v. Goldstein Associates Consulting Engineers, PLLC R&L Construction, Inc. et al. | Products Liability | Supreme Court of the State of New York, County of Queens | Pending |
| Grace Construction & Grace Darex Packaging Technologies | MICV2008-02079-J | 241 Boston Post Rd. v. Gleeson Powers, Inc. et al. | Products Liability | Superior Court for Middlesex County, MA | Pending |
| Grace Construction & Grace Darex Packaging Technologies | 08CA3790 | Gregory Dowdy v. River Oaks Dev. Corp., Troy Fans, Inc. et al. | Products Liability | Circuit Court of the 5th Judicial Circuit in and for Lake County, FL | Pending |
| Grace Construction & Grace | BC354827 | Zormaxx Corp., et al. v. Standard | Products Liability | Superior Court of California, County of Los Angeles | Pending |

21

| | | | | | |
|---|---|---|---|---|---|
| Darex Packaging Technologies | | Concrete Products, et al. Standard Concrete v. Grace, et al. | | | |
| Grace Construction & Grace Darex Packaging Technologies | | Ingram Readymix, Inc. v. Southern Contracting, et al. v. W. R. Grace & Co., et al. | Products Liability | District Court, 319th Judicial District of Nueces County, TX | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Scott Blaine Burdett v. Frederick Jordan, et al. | Motor Vehicle | Superior Court of Columbia County, State of Georgia | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Carissa Parker v. James E. Bush, W. R. Grace & Co. and John Doe Company, d/b/a Prudential Leasing | Motor Vehicle and Personal Injury | State Court of Douglas County, State of Georgia | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | The Official Committee of Unsecured Creditors of Kenny Industrial Services, Inc., et al. v. W. R. Grace & Co. | Recovery of Alleged Preference Payments | U.S. Bankruptcy Court for the Northern District of Illinois Eastern Division | Pending |
| W. R. Grace, Inc. | | John Morgan, et al. | Appeal | Commonwealth of Massachusetts Appeals Court | Pending |
| W. R. Grace & Co.-Conn. | 13-C-08-074673 CN | Global Printing & Design Solutions, Inc. d/b/a Proforma Global v. W. R. Grace & Co.-Conn. | | Circuit Court for Howard County, Maryland | Pending |

22

## RETAINED CAUSES OF ACTION
### (CLAIMS AGAINST FORMER PROFESSIONALS)

Henk Vanhulle
LinkIaters De Bandt
Brederodestraat 13
Rue Brederode B-1000
Brussels, Belgium

Jose R. Alvarez
337 Gatewater Court, Apt. 202
Glen Burnie, MD 21060

Beverly J. Artale
3826 Sunflower Circle
Mitchelleville, MD 20721

Lewis R. Barber
200 Riverside Avenue
Chattanooga, TN 37405

Francis T. Bennett
2 Montrose Avenue
Arlington, MA 02174

Jorge Bonilla
7500 Grace Drive
Columbia, MD 21044

Christopher Bull
5525 Charles Street
Bethesda, MD 20814

Richard W. Collins
7733 Cove Ridge Drive
Hixson, TN 37343

Edward F. Connelly
12 Oceanwood Drive
Scarborough, ME 04074

Timothy M. Cremin
3 140 St. James Drive
Boca Raton, FL 33434

Marie C. Dunbar
41 28 Lonicera Loop
Jacksonville, FL 32259
John E. Feery
863 Sun Disk Place
Boynton Beach, FL 33436

Michael Freedman
5266 Fairway Woods Drive
Apt. 4011
Delray Beach, FL 33484

Walter Gregory, Jr.
1 583 Braebum Drive
Atlanta, GA 30316

Annette P. Kassa
494 Erin Garf.h
Severna Park, MD 21146

Apparao T. Lengade
3342 N. Chatham Road
Apt. L
Ellicott City, MD 21042

Roy D. Lyda
P.O. Box 104
Cross Anchor, SC 29331

Gretchen M. Mavrovouniotis
14 Sunliver
Irvine, CA 92614

Mary R. McGrath
25 Lawrence Lane
Arlington, MA 02474

Thomas E. Murray
16 Horseshoe Road
Chelmsford, MA 01 824

Thomas J. Murray
77 Tanya Drive
Mansfield, MA 02048

Charles D. Rabensbuxg
2920 Ozark Road
Chattanooga, TN 3741 5

Richard G. Remmes
1 15 Woolford Road
Wrentham, MA 02093

Ronald E. Ritter
55 Laguna Road
Lake Monticello, VA 22963

Steven M. Rotheim
800 Palisade Avenue, #201
Ft. Lee, NJ 07024

Nile R. Strohman
1 1504 Long Meadow Drive
Glen Allen, VA 23059

Dorothy T. Toohey
19 Cherokee Road
Arlington, MA 02474

Howard J. Troffkin
7808 Ivymount Terrace
Potomac, MD 20854

Robert Turner
30 Heritage Road
Acton, MA 01720

Diane M. Vaughan
50 Knowles Road
Watertown, MA 02472

Henry P. Zerhusen
5055 Dry Well Court
Columbia, MD 21045

23

## RETAINED CAUSES OF ACTION
### (MISCELLANEOUS CONTRACT AND TORT CLAIMS)

Air Liquide Industrial U S LP
158 Barre Way
Dandridge, TN 37725

Ed Slotwinski
Steeb Anwendungssysteme
GMBH
Heilbronner Str.4
74232 Abstattt
Germany

Richard A. Dolan
1716 Tangiers
Henderson, NV 89 102

Dr. Yehuda Shalon
1566 Hamilton Avenue
Palo Alto, CA

Dr. Tidhar Dari Shalon
Pinkas 54, Apt. 63
Tel Aviv 6226 1, Israel

Indopco, Inc.
10 Finderne Avenue
Bridgewater, NJ 08807

Kennecott Colorado Co.
James Belcher
Holland & Hart LLP
25 1 5 Warren Avenue
Suite 450
Cheyenne, WY 82001

Fidelity Management Trust
Company
82 Devonshire Street
Boston, MA 021 09

State Street Global Advisors
Fiduciary Services
Two International Place
Boston, MA 02 1 10

Gamma Holding, N.V.
C/O Mr. Meint Veninga
Hoogeindsestraat 47
5705 AL Helmond
The Netherlands

Bekaert Textiles, N.V.
Deerlijkseweg 22
8790 Waregem
Belgium

Pricewaterhouse Coopers LLP
200 South Biscayne Blvd.
Suite 1900
Miami, FL 33131

Pricewaterhouse Coopers LLP
1301 K Street N.W. 800W
Washington, DC 20005-3333

Lab Vantage
245 Highway 22 West
Bridgewater, NJ 08807

Kvaemer Process Systems US
7909 Parkwood Circle, 6th Floor
Houston, TX 77036

Rohm & Haas
100 Independence Mall West
Philadelphia, PA 191 06-2399

Flexia Corporation
369 Elgin Street
Brantford, Ontario N3S 7P5

Attention: Mr. Edward Bowles
President and CE
Phenomenex
411 Madrid Avenue
Torrance, CA 90501-1430

Promega
2800 Woods Hollow Road
Madison, WI 53711

Intercat, Inc
104 Union Avenue
Manasquan, NJ 08736

Norquay Technology, Inc.
800 West Front Street
Chester, PA 19013

KYSU, Inc.
800 West Front Street
Chester, PA 19013

Robert W. Heldt
c/o Norquay Techology, Inc.
800 West Front Street
Chester, PA 19013

BASELL USA INC.
912 Appleton Road
Elkton, MD 21921

Dr. Dinesh Gopinath Prabhu
C-104 Woodland near Gandhi
Bhavan
Kothrud, Pune 411029
lndia

Mrs. Asha Prabhu
C-104 Woodland near Gandhi
Bhavan
Kothrud, Pune 411029
lndia

Mr. Krishnakumar Dani
1109 Woodland Harmondy near
Gandhi Bhavan
Kothrud, Pune 411029
lndia

Cianbro
One Hunnewell Square
P.O. Box 1000
Pittsfield, ME 04967

SSOE, Inc.
1001 Madison Avenue
Toledo, OH 43604

Warren Environmental, Inc.
P.O. Box 1206
Carver, MA 02330

Engineered Crane Service of
America
2000 McFarland 400 Blvd.
Alpharetta, GA 30004

G. O. Carlson, Inc.
350 Marshalltown Thorndale
Road
Dowington, PA 19335-2063

Acme Industrial Piping
P.O. Box 72936
Chattanooga, TN 37407

Samson Hydrocarbons
Samson Plaza
2 W. 2nd Street
Tulsa, OK 741 03-3103

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 20 TO EXHIBIT BOOK
## SHARE ISSUANCE AGREEMENT

**EXHIBIT 20**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# FORM OF SHARE ISSUANCE AGREEMENT

THIS SHARE ISSUANCE AGREEMENT (this "Share Issuance Agreement") is made and entered into as of [__], 2009 by and between (i) W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 12, "Parent" or the "Obligor"), (ii) WRG Asbestos PD Trust acting on behalf of the Holders of the US ZAI PD Claims and the Holders of Asbestos PD Claims (in such capacity the "Trust (PD/ZAI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined), (iii) WRG Asbestos Trust (the "Trust (PI)" and collectively with the Trust (PD/ZAI), the "Trusts" and each a "Trust"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization, and (iv) the Trust (PI), as representative for the Trusts pursuant to the terms of the Intercreditor Agreement (in such capacity, and together with its permitted successors pursuant to Section 2 of the Intercreditor Agreement, the "Trusts' Representative"). Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

W I T N E S S E T H:

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. For purposes of this Share Issuance Agreement, the following terms shall have the meanings set forth below:

"Common Stock" means the common stock of the Obligor, par value $0.01 per share, and the common stock of any successor corporation thereto pursuant to the terms and conditions of Section 12 or any similar equity ownership interest in any other successor Entity thereto pursuant to the terms and conditions of Section 12.

"Controlled Affiliate" means, as of the relevant date of determination, any Entity (i) in which the Obligor, directly or indirectly, holds at least 10% of the Equity Interests of such Entity, and (ii) which directly or indirectly is subject to the control of the Obligor. For purposes of this definition, "control" as used with respect to any Entity means the possession of the power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of Equity Interests, by agreement or otherwise.

"Deferred Payment" means each of (i) the Deferred Payments (PI) under the Deferred Payment Agreement (PI), (ii) the Deferred Payments (PD) under the Deferred Payment Agreement (PD) and (iii) the Deferred Payments (ZAI) under the Deferred Payment Agreement (ZAI).

"Deferred Payment Agreement" means any of the following agreements, each dated as of the date hereof: (i) the Deferred Payment Agreement between Grace and the Trust (PI), (ii) the Deferred Payment Agreement (Class 7(a) PD) between Grace and the Trust (PD/ZAI) and (iii) the Deferred Payment Agreement (Class 7(b) ZAI) between Grace and the Trust (PD/ZAI).

"Deferred Payment Documents" means, collectively, the Deferred Payment Documents (PD), the Deferred Payment Documents (PI) and the Deferred Payment Documents (ZAI), each as defined in the respective Deferred Payment Agreements.

"Demand for Issuance of the Section 524(g) Shares" means a written notice by the Trusts' Representative delivered to the Obligor in accordance with Section 2 of this Share Issuance Agreement stating that an Event of Default has occurred and is continuing and demanding issuance, transfer and delivery to the Trusts' Representative, on behalf of the Trusts, of the Section 524(g) Shares.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" means any Event of Default as defined in Section 8 of any Deferred Payment Agreement.

"Fair Market Value" means, with respect to each share of Common Stock:

(i)    If traded on the NYSE, NASDAQ or another stock exchange, the average sale price (as of the close of business of each relevant trading date) of the Common Stock on the NYSE, NASDAQ or such other exchange for the 30 trading days immediately prior to the date for which the value is to be determined (or if no sale took place on such trading date the average of the closing bid and ask prices of the Common Stock on such trading date);

(ii)    If traded over-the-counter other than on NASDAQ, the average of the closing bid and ask prices (as of the close of business of each relevant trading date) of the Common Stock for the 30 trading days immediately prior to the date for which the value is to be determined; and

(iii)    If there is no public market for the Common Stock, the fair market value of the Common Stock as of the day immediately prior to the date for which the value is to be determined, as determined by a reputable investment bank or valuation firm selected jointly by the Obligor and the Trusts' Representative (the "Independent Appraiser"). The Obligor and the Trusts' Representative shall instruct the Independent Appraiser to render its decision within thirty days of its acceptance of its selection. The fees and expenses of the Independent Appraiser shall be borne by the Obligor.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

2

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, a government (including any supra-national bodies such as the European Union or the European Central Bank).

"Intercreditor Agreement" means the Intercreditor Agreement dated as of even date herewith among the Trust (PI), the Trust (PD/ZAI), and the Trust (PI), in its capacity as representative of the Trusts, upon the terms and conditions set forth in such Intercreditor Agreement.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"Lien" means any encumbrance, mortgage, pledge, hypothecation, charge or security interest of any kind.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"Parent Guarantee" means any of the following agreements, each dated as of the date hereof: (i) the W. R. Grace & Co. Guarantee Agreement between Parent and the Trust (PI), (ii) the W. R. Grace & Co. Guarantee Agreement (Class 7(a) PD) between Parent and the Trust (PD/ZAI) and (iii) the W. R. Grace & Co. Guarantee Agreement (Class 7(b) ZAI) between Parent and the Trust (PD/ZAI).

"Plan of Reorganization" means that certain Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative, and the Official Committee of Equity Security Holders Dated as of [__], 2008, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Section 524(g) Shares" means _____ shares of Common Stock, equal to fifty and one tenth (50.1) percent of the total number of shares of Common Stock issued and outstanding as of the Effective Date (after giving effect to any issuance of shares of Common Stock on the Effective Date), and all securities issuable in replacement of or in connection with such shares pursuant to an Adjustment Event, or otherwise in accordance with the terms and conditions of this Share Issuance Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority,

3

including without limitation any interest, additions to tax, penalties and any similar liabilities with respect thereto.

"Transaction" means, in respect of a specified Entity, any transaction or series of transactions consisting of or effected by means of merger, consolidation, Transfer of all or substantially all assets of such Entity, business combination, share exchange, reclassification, reorganization or recapitalization.

"Transfer" and "Transferred" means any sale, assignment, transfer, pledge, grant of a security interest, lease, license or other disposition of any property or assets.

"Trusts" has the meaning set forth in the introductory paragraph of this Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the introductory paragraph of this Share Issuance Agreement.

All terms defined in this Share Issuance Agreement in the singular form shall have comparable meanings when used in the plural form and vice versa.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

All references herein to Sections shall be deemed references to Sections of this Share Issuance Agreement unless the context shall otherwise require.

Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

For purposes of the computation of time periods, whenever this Share Issuance Agreement provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

Section 2. Share Issuance Obligation. At any time upon the occurrence and during the continuance of an Event of Default, the Trusts' Representative may (but shall not be obligated to) provide the Obligor with a Demand for Issuance of the Section 524(g) Shares. Promptly upon the receipt by the Obligor of such Demand for Issuance of the Section 524(g) Shares, the Obligor shall issue the Section 524(g) Shares in consideration of a reduction (on a pro rata basis based upon the then outstanding Deferred Payments) of the amount of Deferred Payments as defined in each of the Deferred Payment Agreements, and shall transfer and deliver to the Trusts' Representative such Section 524(g) Shares by issuing, transferring and delivering to the Trusts'

4

Representative one duly issued stock certificate registered in the name of the Trusts' Representative representing the Section 524(g) Shares or, if the shares of Common Stock of the Obligor are at the time of the issuance hereunder permitted to be uncertificated and the Trusts' Representative so requests, the Obligor shall cause the Section 524(g) Shares to be credited to the name and account of the Trusts' Representative on the stock transfer books and records of the Obligor as maintained by the Obligor or its transfer agent.

Section 3.  <u>Deferred Payment Obligations</u>.  (a) The obligation to issue the Section 524(g) Shares shall secure and serve as support and credit enhancement for the prompt and complete payment when due (whether by acceleration or otherwise) of each Deferred Payment (including interest thereon, if any) to the Trusts and pursuant to the Deferred Payment Agreements, each as the same may from time to time be amended, modified, supplemented, extended, renewed, deferred, refinanced, replaced, refunded or restated, in whole or in part, in accordance with the terms and conditions thereof, by operation of Law or otherwise, in each case, with the consent of Parent and the applicable Trust (collectively, the "<u>Deferred Payment Obligations</u>").

(b) To the extent that the Trusts' Representative exercises its rights on behalf of the Trust (PI) under this Share Issuance Agreement and the Section 524(g) Shares are issued and delivered to it on behalf the Trusts, the amount of the remaining Deferred Payments shall be reduced by the Fair Market Value of the Section 524(g) Shares allocated to the Trusts in the manner set forth in Section 4 of the Intercreditor Agreement (as such Section 4 of the Intercreditor Agreement, together with any defined terms used (directly or indirectly) in such Section 4 are in effect as of the date hereof, or as amended or modified from time to time with the consent (not to be unreasonably withheld) of Grace and Parent Guarantor after the date hereof.

Section 4.  <u>Representations and Warranties</u>.  The Obligor hereby represents and warrants to each of the Trusts and to the Trusts' Representative that, as of the Effective Date and as of the time of issuance of the Section 524(g) Shares, the following are true and correct:

(a) The issuance of the Section 524(g) Shares has been duly and validly authorized as of the Effective Date and as of the time of such issuance.

(b) As of the Effective Date, the number of Section 524(g) Shares is equal to fifty and one tenth (50.1) percent of the total number shares of Common Stock issued and outstanding as of the Effective Date (after giving effect to any issuance of shares of Common Stock on the Effective Date).

(c) The rights granted hereunder to the Trusts' Representative for the benefit of each Trust to be issued the Section 524(g) Shares do not and will not conflict in any material respect with the rights granted to other holders of the Obligor's securities under any other agreements.

(d) As of the Effective Date, the Obligor's Board of Directors has approved this Share Issuance Agreement and the transactions contemplated hereby, including the issuance, upon the terms and subject to the conditions set forth in this Share Issuance Agreement, of the Section 524(g) Shares to the Trusts' Representative for the benefit of each Trust, and has taken all actions within its control to ensure that such issuance shall not be subject to the provisions or restrictions of Section 203 of Delaware General Corporation Law or any other business combination, interested stockholder, fair price, control share acquisition, or other Law regulating

5

mergers, acquisitions, change of control transactions, voting rights or share acquisitions which is in effect as of the Effective Date and applicable to such issuance.

Section 5.  Covenants.  The Obligor hereby covenants and agrees, with respect to each Deferred Payment Agreement until such time as the corresponding Deferred Payments Obligations thereunder have been paid in full, as follows:

(a) Upon issuance (if any) of the Section 524(g) Shares pursuant to a Demand for Issuance of Section 524(g) Shares, and assuming compliance by each of the Trusts and the Trusts' Representative with its obligations under the Plan of Reorganization, the Confirmation Order and Section 2 of this Share Issuance Agreement, the Section 524(g) Shares shall be duly authorized, duly and validly issued, fully paid and non-assessable, and free and clear of any Liens and any preemptive or similar rights.  In addition, to the extent permitted by applicable Law and listing requirements and regulations of any Governmental Authority and/or relevant securities exchanges, concurrently with the issuance of Section 524(g) Shares, such shares shall be listed for trading on the New York Stock Exchange (or any successor thereto) and all other securities exchanges upon which the Common Stock is listed or traded.

(b) The Obligor shall reserve and keep available, free from preemptive or similar rights (other than rights created pursuant to this Share Issuance Agreement, the other Deferred Payment Documents or the Plan of Reorganization), for issuance shares of Common Stock in an amount at least equal to the Section 524(g) Shares.  The Obligor shall promptly pay all Taxes, expenses and charges attributable to the issuance or delivery of the Section 524(g) Shares, but any Taxes, expenses or charges in connection with the issuance of such shares in any name other than that of the Trusts' Representative shall be paid by the Trusts' Representative.

(c) Neither the Obligor nor Grace shall create (other than pursuant to this Share Issuance Agreement, the other Deferred Payment Documents or the Plan of Reorganization) any Liens or any preemptive or similar rights on the Section 524(g) Shares).

(d) The Obligor shall take, or cause to be taken, all actions necessary to (i) comply with all applicable requirements of any material Law which may be imposed on the Obligor or any of its Controlled Affiliates with respect to the issuance of the Section 524(g) Shares to the Trusts' Representative; (ii) obtain any material consent, authorization, order or approval of, or any exemption by or from, and shall register or qualify with or provide any notice to, any Governmental Authority or Entity which is required or necessary pursuant to any material Law to be obtained, performed or made by the Obligor or any of its Controlled Affiliates in order to consummate the issuance of the Section 524(g) Shares to the Trusts' Representative on behalf of the Trusts; (iii) to the extent within the control of the Obligor and its Controlled Affiliates (through its or their boards of directors, stockholders, other governing bodies, managements or otherwise), cause the issuance of the Section 524(g) Shares to the Trusts' Representative on behalf of the Trusts not to be subject to and/or not to trigger, as the case may be, any (A) "poison pill," shareholder or stockholder rights plan, other anti-takeover or takeover defense provision contained in the Governing Documents of the Obligor or its Controlled Affiliates, (B) change of control or severance or "golden parachute" agreement, plan or provision of or to which the Obligor or any of its Controlled Affiliates is a party, (C) business combination, interested stockholder, fair price, control share acquisition, or other Law regulating mergers, acquisitions, change of control transactions, voting rights or share acquisitions, and (iv) to the extent within

6

the control of the Obligor and its Controlled Affiliates (through its or their boards of directors, stockholders, other governing bodies, managements or otherwise), cause the Trusts' Representative (acting for the benefit of each of the Trusts) ownership or voting rights with respect to the Section 524(g) Shares not to be limited, qualified, diluted or restricted by any plan, provision, agreement or Law referred to in clauses (iii)(A) through (iii)(C).

(e) The Obligor shall not enter into any agreement with respect to its securities which conflicts with the rights granted to the Trusts' Representative for the benefit of the Trusts pursuant to this Share Issuance Agreement or the provisions hereof. The Obligor will not, by amendment of its Governing Documents or through any Transaction or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Obligor.

(f) Concurrently with the issuance of Section 524(g) Shares, the Obligor shall deliver to the Trusts' Representative an opinion of the Obligor's outside counsel on such customary and appropriate matters concerning due authorization, receipt of approvals, issuance and compliance with the securities laws as the Trusts' Representative may reasonably request.

Section 6. <u>Adjustment Events</u>. (a) If at any time after the date hereof the Obligor shall (a) issue a stock dividend in respect of shares of Common Stock, (b) effect a stock split or reverse stock split in respect of shares of Common Stock, (c) otherwise subdivide or combine shares of Common Stock and/or (d) amend its Governing Documents, or otherwise change or recapitalize its capital structure, in any manner that results in one share of Common Stock being converted into more or less than one share of Common Stock (each a "<u>Mechanical Adjustment Event</u>"), the number of Section 524(g) Shares issuable under this Share Issuance Agreement shall automatically be adjusted such that, upon issuance (if any), the Trusts' Representative shall be entitled to receive a number of Section 524(g) Shares equal to (a) in the case of a stock dividend, the sum of (i) the number of Section 524(g) Shares the Trusts' Representative would have been entitled to receive if the Section 524(g) Shares had been issued immediately prior to the consummation of such Mechanical Adjustment Event (the "<u>Pre-Adjustment Number</u>") <u>plus</u> (ii) the product obtained by multiplying (x) the Pre-Adjustment Number by (y) the number of shares of Common Stock to be issued as a stock dividend in respect of each outstanding share of Common Stock and (b) in the case of any other Mechanical Adjustment Event, the product obtained by multiplying (i) the Pre-Adjustment Number <u>by</u> (ii) the number of shares of Common Stock into which each share of Common Stock shall be converted in such Mechanical Adjustment Event.

(b)     In addition, if at any time after the date hereof the Obligor shall issue or sell any shares of Common Stock, other than Excluded Stock, or any rights (including any (x) options (other than Excluded Options), warrants or other rights to purchase or acquire Common Stock, other than Excluded Stock (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for Common Stock, other than Excluded Stock (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities), for no consideration or for a consideration per share that is less than the Fair Market Value of the Common Stock (a "<u>Dilution Adjustment Event</u>" and collectively with Mechanical Adjustment Events, "<u>Adjustment Events</u>"), the number of Section 524(g) Shares issuable under this Share Issuance Agreement shall automatically be adjusted such that, upon issuance (if any), the Trusts' Representative shall receive the greater of (i) a number of

7

Section 524(g) Shares having a Fair Market Value equal to the number of Section 524(g) Shares the Trust would have received had the Dilution Adjustment Event not occurred or (ii) a number of Section 524(g) Shares equal to the percentage of the total number of issued and outstanding shares of Common Stock the Trusts' Representative, on behalf of the Trusts, would have received had the Dilution Adjustment Event not occurred.  For purposes of this <u>Section 6(b)</u>, (i) "<u>Excluded Stock</u>" means shares of Common Stock issued and sold in a registered firm commitment underwritten public offering pursuant to a registration statement declared effective in accordance with the Securities Act of 1933, as amended, or any successor statute thereto, (ii) "<u>Excluded Options</u>" means options to purchase shares of Common Stock issued to directors, officers, employees and consultants of Obligor or any of its Controlled Affiliates (x) pursuant to an option plan or arrangement approved by either the stockholders of Obligor or the Bankruptcy Court before which the chapter 11 proceedings of Obligor and certain of its affiliates were heard and (y) with an exercise price equal to the average of the high and low trading prices of Common Stock on the New York Stock Exchange (or if the Common Stock is not traded on the New York Stock Exchange, on the principal stock exchange on which it trades) on the date of grant of the option and (iii) Fair Market Value shall be determined as the of the last trading date immediately prior to the date of consummation of the issuance or sale constituting the Dilution Adjustment Event.

(c)    For the avoidance of doubt, and notwithstanding anything to the contrary in <u>Section 6(a)</u> or <u>6(b)</u>, in no event shall any issuance of any shares of Common Stock or other equity securities of the Obligor in any circumstance other than as specified in such immediately preceding two sentences constitute or result in an Adjustment Event, including (i) any sale or other issuance of Common Stock or other equity securities other than pursuant to a Dilution Adjustment Event, (ii) in connection with any purchase or other acquisition by the Obligor of, and/or as consideration for, the equity or debt securities or assets of any other Entity or (iii) in connection with any merger or consolidation of the Obligor or any of its subsidiaries with or into any other Entity.

Section 7.  <u>Registration Rights</u>.  Prior to or concurrently with the issuance of the Section 524(g) Shares, the Obligor shall (i) file a registration statement on the appropriate form to register the Section 524(g) Shares under the Securities Act of 1933 and shall use its reasonable best efforts to have such registration statement declared effective on or as soon as practicable following the date of issuance and (ii) make all necessary filings under and/or obtain all necessary exemptions pursuant to all other applicable United States and all state and foreign securities or blue sky Laws.  In connection with the filing of any such registration statement and the sale of the Section 524(g) Shares pursuant thereto, the Trusts' Representative shall pay for and bear on behalf of the Trusts (and be reimbursed by the Trusts pursuant to Section 8(b) of the Intercreditor Agreement) all (i) registration, filing and stock exchange listing fees, and reasonable fees and disbursements of printers and accountants for the Obligor; (ii) all legal fees and disbursements and other expenses of the Obligor complying with state securities or blue sky laws of any jurisdictions in which the securities to be offered are to be registered or qualified; and (iii) the reasonable fees and expenses of one counsel for the Obligor in connection therewith.

Section 8.  <u>Waiver of Demand, etc.</u>  The Obligor hereby waives demand, payment, notice of dishonor or protest and all other notices of any kind in connection with the Deferred Payment Obligations except the Demand for Issuance of the Section 524(g) Shares and any other notices

8

required by law or by this Share Issuance Agreement or any other agreement between the Obligor and the Trusts' Representative or either Trust.

Section 9.  Expenses.  The Obligor shall reimburse the Trusts' Representative promptly upon demand for all documented out-of-pocket costs and expenses, including all attorney's fees and expenses of legal counsel, arising out of or incurred by the Trusts' Representative in connection with the enforcement of any rights or actions of the Trusts' Representative under this Share Issuance Agreement, but only to the extent that the Trusts' Representative succeeds in enforcing this Share Issuance Agreement.

Section 10.  Modification.  No provision of this Share Issuance Agreement may be amended, supplemented or modified except by a written instrument executed by each of the Trusts' Representative, Parent and Grace.  The Trusts' Representative and the Trusts agree not to amend, supplement or modify Section 2(f) and Section 12 of the Intercreditor Agreement, including any defined terms used therein or underlying defined terms, without the prior written consent of Parent and any amendment in breach of this Section 10 shall be null and void and have no force or effect.

Section 11.  Notices.  Except as otherwise expressly provided herein, all notices and other communications made or required to be given pursuant to this Share Issuance Agreement shall be made in accordance with the provisions of Section 18 of the Deferred Payment Agreement.

Section 12.  Assignment.

(a) This Share Issuance Agreement shall be binding upon the Obligor and upon the successors and permitted assigns of the Obligor and shall inure to the benefit of the Trusts' Representative and the Trusts.  The successors and assigns of the Obligor shall include their respective receivers, trustees or debtors-in-possession.

(b) Neither the Trusts' Representative nor any of the Trusts may Transfer this Share Issuance Agreement or any of its rights, interests, duties, liabilities or obligations under this Share Issuance Agreement without the prior written consent of the Obligor.

(c) Subject to Section 12(d) hereof, the Obligor shall not Transfer this Share Issuance Agreement or any of its rights, interests, duties, liabilities or obligations under this Share Issuance Agreement without the prior written consent of the Trusts' Representative.

(d) Subject to Section 12(e), neither Section 12(c) nor anything else in this Share Issuance Agreement shall prohibit or restrict the ability of the Obligor to undertake any Transaction; provided that, unless the Trusts' Representative otherwise consents in writing, (i) such Transaction shall not violate Section 6(b) of any Deferred Payment Agreement or Section 7(b) of any Parent Guarantee; (ii) no Event of Default (as defined in the Deferred Payment Agreement) and, no event which, with the giving of notice or the passage of time, would constitute an Event of Default, exists at the time of, or would exist immediately following, the consummation of such Transaction; (iii) such Transaction shall not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of the Obligor or the surviving or succeeding Entity that results from such Transaction; and (iv) at least ten (10) business days prior to consummation of such Transaction, the Obligor shall, subject

9

to reasonable confidentiality arrangements between the Trusts' Representative and the Obligor, deliver to the Trusts' Representative written notice of its intention to consummate such Transaction.

(e) If the surviving or succeeding Entity as a result of any such Transaction is not the Obligor, then prior to, or concurrently with, the consummation of any such Transaction, the surviving or succeeding Entity shall, by written instrument substantially in the form of Exhibit A, expressly assume the rights and obligations of the Obligor hereunder (it being expressly acknowledged and agreed by the Obligor, the Trusts and the Trusts' Representative that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Trusts, the Trusts' Representative, the Obligor and such surviving or succeeding Entity whether or not the Trusts' Representative shall have executed such written instrument); provided, however, that the Obligor shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Share Issuance Agreement.  The provisions of Section 12(d) and Section 12(e) hereof shall apply to successive events constituting a Transaction.

(f) The Obligor shall be responsible for, and shall pay promptly upon demand all documented and direct out-of-pocket costs and expenses incurred by the Trusts' Representative (including legal fees and expenses of one legal counsel) in connection with any Transaction proposed by the Obligor if the Trusts' Representative challenges such Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of the Deferred Payment Documents and the Trusts' Representative is successful in such challenge.

(g) Any assignment or transfer in breach of this Section 12 shall be null and void and shall not Transfer any right, interest, duty, liability or obligation in or under this Share Issuance Agreement to any Entity.

Section 13.  Authorization to Disclose Information to Trusts.  The Obligor hereby authorizes the Trusts' Representative to disclose and furnish to the Trusts any information or documentation that the Trusts' Representative receives from the Obligor or any of its Subsidiaries or Affiliates in connection with or related to the Section 524(g) Shares, this Share Issuance Agreement and the other Deferred Payment Documents.

Section 14.  Severability.  Whenever possible, each provision of this Share Issuance Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Share Issuance Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Share Issuance Agreement, and this Share Issuance Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Share Issuance Agreement with an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

10

Section 15.  <u>Further Assurances</u>.  The Obligor at its sole cost and expense shall execute, acknowledge and deliver all such instruments and take all such action as the Trusts' Representative from time to time may reasonably request in order to further effectuate the purposes of this Share Issuance Agreement and to carry out the terms hereof.

Section 16.  <u>Survival of Representations and Warranties</u>.   All representations and warranties contained in this Share Issuance Agreement shall survive the execution and delivery of this Share Issuance Agreement, the Deferred Payment Agreements and the other Deferred Payment Documents.

Section 17.  <u>Not a Security Agreement</u>.  The parties hereto acknowledge and agree that this Share Issuance Agreement does not constitute a security agreement, including without limitation a "security agreement" as defined in the Uniform Commercial Code of any relevant jurisdiction, and nothing herein or in any other Deferred Payment Document constitutes an authorization for the Trusts' Representative or any other Entity (including any Trust) to file a financing statement under the UCC or otherwise seek to perfect a purported security interest against Grace, the Obligor or any other Entity.

Section 18.  <u>Captions</u>.  Captions and headings in this Share Issuance Agreement are for convenience only and in no way define, limit or describe the scope or intent of the provisions hereof.

Section 19.  <u>Termination</u>.  Upon payment in full of the Deferred Payment Obligations (other than indemnities), this Share Issuance Agreement shall automatically terminate and shall become null and void and of no further force and effect, except for such provisions expressly stated to survive such termination.

Section 20.  <u>Conflict</u>.  In the event that there is a conflict between any provision of this Share Issuance Agreement and the Deferred Payment Agreement, the provisions of the Deferred Payment Agreement shall control.

Section 21.  <u>Governing Law; Jurisdiction</u>.

(a) This Share Issuance Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to all claims, suits, actions, proceedings and other disputes arising out of, in respect of or relating to this Share Issuance Agreement (such claims, suits, actions, proceedings, and other disputes, the "<u>Claims</u>") each of the parties to this Share Issuance Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware, or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then, at the sole election of the Trusts' Representative, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York (the "<u>Courts</u>"), and each of the parties to this Share Issuance Agreement agrees that any and all

11

Claims may be brought, heard and determined in such Courts.

(c) Each of the parties to this Share Issuance Agreement agrees that (i) venue shall be proper in such Courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 18 of the Deferred Payment Agreement and shall be deemed in every respect effective service of process upon such party when so given.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SHARE ISSUANCE AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SHARE ISSUANCE AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

Section 22.  <u>Specific Performance</u>.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Share Issuance Agreement, the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to Section 7 of each Deferred Payment Agreement, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Share Issuance Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Share Issuance Agreement exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (z) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief. For the avoidance of doubt, the parties agree that the Trusts' Representative on behalf of each Trust shall be entitled to enforce specifically the terms and provisions of this Share Issuance Agreement to prevent breaches of or enforce compliance with (i) those covenants of the Obligor that require the Obligor to issue the Section 524(g) Shares if the conditions to the Obligor's obligations to issue such shares as set forth in <u>Section 2</u> have been satisfied or waived and (ii) the covenants and agreements of the Obligor set forth in <u>Section 5</u>. The Trusts' Representative's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Trusts' Representative or either Trust may be entitled, including without limitation the right to pursue remedies for liabilities or damages incurred or suffered by the Trusts' Representative or either Trust.

12

Section 23. <u>Complete Agreement</u>.  This Share Issuance Agreement, together with the Deferred Payment Agreements, the Parent Guarantees, the Intercreditor Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

Section 24. <u>Waivers</u>. Any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Share Issuance Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Share Issuance Agreement.  No action taken pursuant to this Share Issuance Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition or agreement contained herein.

Section 25. <u>Execution in Counterparts</u>.  This Share Issuance Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts (including, without limitation, by facsimile or portable document format (pdf)), each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 26. <u>No Third Party Beneficiaries</u>.  There are no third party beneficiaries of this Share Issuance Agreement and nothing in this Share Issuance Agreement, express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

Section 27. <u>Other Remedies</u>.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[Signature page follows]

13

IN WITNESS WHEREOF, the parties hereto have duly executed this Share Issuance Agreement as of the date first above written.

OBLIGOR:     W. R. GRACE & CO.


By: _____
  Name:
  Title:

14

TRUST (PI):                        WRG ASBESTOS PI TRUST


By: _____
      Name:
      Trustee


TRUST (PD/ZAI):                    WRG ASBESTOS PD TRUST,
                                   on behalf of the Holders of the US ZAI PD Claims
                                   and the Holders of Asbestos PD Claims


By: _____
      Name:
      Trustee


TRUSTS' REPRESENTATIVE:            WRG ASBESTOS PI TRUST,
                                   as representative for the Trusts pursuant to the terms
                                   of the Intercreditor Agreement


By: _____
      Name:
      Trustee

EXHIBIT A

ASSUMPTION AGREEMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 21 TO EXHIBIT BOOK
## UNRESOLVED ASBESTOS PD CLAIMS SCHEDULE

**EXHIBIT 21**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Total Remaining Active PD Claims and PD Claims on Appeal**

| **I. Active PD Claims** |
| --- |

| **Speights Canadian Claims** |
| --- |

| | **Claimant Name** | **Claim Number** | **Counsel** | **Firm Name** | **Building Name** | **Property Address** |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 354401 Alberta LTD. C/O Redcliff Realty Management Inc. | 011620 | Daniel A Speights | Speights & Runyan | | 287 Broadway Winnipeg, MB R3c0r9 |
| 2 | Avalon East School Board | 012491 | Daniel A Speights | Speights & Runyan | | 391 Topsail Road St John's, NL A1e2b7 |
| 3 | Calgary Board Of Education | 012454 | Daniel A Speights | Speights & Runyan | James Fowler High | 4004-4th St. Nw Calgary, AB T2k1a1 |
| 4 | Calgary Board Of Education | 012457 | Daniel A Speights | Speights & Runyan | Kingsland Elementary | 7430 5th Street Sw Calgary, AB T2v1b1 |
| 5 | Calgary Board Of Education | 012443 | Daniel A Speights | Speights & Runyan | William Aberhart High | 3009 Morley Trail Nw Calgary, AB T2m4g9 |
| 6 | Calgary Board Of Education | 014885 | Daniel A Speights | Speights & Runyan | Altadore Elementary | 4506 16th Street SW Calgary, AB T2t4h9 |
| 7 | Calgary Board Of Education | 012442 | Daniel A Speights | Speights & Runyan | Wildwood Elementary | 120 45th Street Sw Calgary, AB T3c2b3 |
| 8 | Calgary Board Of Education | 012570 | Daniel A Speights | Speights & Runyan | Balmoral Junior High | 220 16th Avenue Calgary, AB T2m0h4 |
| 9 | Calgary Board Of Education | 012590 | Daniel A Speights | Speights & Runyan | Parkdale Elementary | 728 32nd Street NW Calgary, AB T2n2v9 |
| 10 | Calgary Board Of Education | 012591 | Daniel A Speights | Speights & Runyan | Queen Elizabeth High | 512 18th Street NW Calgary, AB T2n2g5 |
| 11 | Calgary Board Of Education | 012438 | Daniel A Speights | Speights & Runyan | Vincent Massey Junior High | 939 45th St Sw Calgary, AB T3c2b9 |
| 12 | Calgary Board Of Education | 012439 | Daniel A Speights | Speights & Runyan | Viscount Bennett | 2519 Richmond Road Sw Calgary, AB T3e4m2 |
| 13 | Calgary Board Of Education | 012412 | Daniel A Speights | Speights & Runyan | Cambrian Heights Elementary | 640 Northmount Dr Nw Calgary, AB T2k3j5 |
| 14 | Calgary Board Of Education | 012410 | Daniel A Speights | Speights & Runyan | Briar Hill Elementary | 1233 21st Street Nw Calgary, AB T2n2l8 |
| 15 | Canadian Imperial Bank Of Commerce | 012536 | Daniel A Speights | Speights & Runyan | | 215 Water Street St John's, NL A1c6c9 |
| 16 | City Of Edmonton | 012489 | Daniel A Speights | Speights & Runyan | Century Place | 9803 102a Avenue Edmonton, AB T5j3a3 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 17 | City Of Vancouver | 012476 | Daniel A Speights | Speights & Runyan | Q.E. And Playhouse Theatres | 649-695 Cambie Vancouver, BC |
| 18 | City Of Vancouver | 012346 | Daniel A Speights | Speights & Runyan | Parkade | 700 Georgia Street Vancouver, BC |
| 19 | Edmonton Public Schools | 012549 | Daniel A Speights | Speights & Runyan | Wellington School | 13160 127 Street Edmonton, AB T5l1b2 |
| 20 | Edmonton Public Schools | 012557 | Daniel A Speights | Speights & Runyan | Eastglen School | 11430 68 Street Edmonton, AB T5b1p1 |
| 21 | Edmonton Public Schools | 012554 | Daniel A Speights | Speights & Runyan | Woodcroft School | 13750 Woodcroft Avenue Edmonton, AB T5t5x9 |
| 22 | Edmonton Public Schools | 012548 | Daniel A Speights | Speights & Runyan | Victoria School | 10210 108 Avenue Edmonton, AB T5h1a8 |
| 23 | Edmonton Public Schools | 012546 | Daniel A Speights | Speights & Runyan | Strathcona School | 10450 72 Avenue Edmonton, AB T6e0z6 |
| 24 | Edmonton Public Schools | 012542 | Daniel A Speights | Speights & Runyan | North Edmonton School | 6920 128 Avenue Edmonton, AB T5c1s7 |
| 25 | Edmonton Public Schools | 012576 | Daniel A Speights | Speights & Runyan | JA Fife School | 15004 76 Street Edmonton, AB T6c1c2 |
| 26 | Edmonton Public Schools | 012541 | Daniel A Speights | Speights & Runyan | Newton School | 5523 122 Avenue Edmonton, AB T5w1s3 |
| 27 | Edmonton Public Schools | 012394 | Daniel A Speights | Speights & Runyan | Bonnie Doon School | 8205 90 Avenue Edmonton, AB T6c1n8 |
| 28 | Edmonton Public Schools | 012377 | Daniel A Speights | Speights & Runyan | Delton School | 12126 89 Street Edmonton, AB T5b3w4 |
| 29 | Edmonton Public Schools | 012388 | Daniel A Speights | Speights & Runyan | Allendale | 6415 106 Street Edmonton, AB T6h2v5 |
| 30 | Edmonton Public Schools | 012537 | Daniel A Speights | Speights & Runyan | Parkview School | 14313 92 Street Edmonton, AB T5r3b3 |
| 31 | Edmonton Public Schools | 012503 | Daniel A Speights | Speights & Runyan | Sherbrooke School | 12245 131 Street Edmonton, AB T5l1m8 |
| 32 | Edmonton Public Schools | 012500 | Daniel A Speights | Speights & Runyan | Ritchie School | 9750 74 Avenue Edmonton, AB T6j1t4 |
| 33 | Edmonton Public Schools | 012498 | Daniel A Speights | Speights & Runyan | Queen Alexandra School | 7730 106 Street Edmonton, AB T6g0x4 |
| 34 | Edmonton Public Schools | 012496 | Daniel A Speights | Speights & Runyan | Prince Rupert School | 11515 113 Avenue Edmonton, AB T5g0j3 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 35 | Edmonton Public Schools | 012501 | Daniel A Speights | Speights & Runyan | Ross Sheppard School | 13546 111 Avenue Edmonton, AB  T5m2p2 |
| 36 | Fairmall Leasehold Inc | 012396 | Daniel A Speights | Speights & Runyan | Fairview Mall | 1800 Sheppard Ave E, Ste330 P.O. Box 330 Willowdale, ON  M2j5a7 |
| 37 | Great West Life | 012534 | Daniel A Speights | Speights & Runyan | | 199 Bay Street, Commerce Court West Toronto, ON  M5l1e2 |
| 38 | Hamilton District School Board | 011684 | Daniel A Speights | Speights & Runyan | Westview School | 60 Rolston Drive Hamilton, ON  L9c3x7 |
| 39 | Hamilton District School Board | 011682 | Daniel A Speights | Speights & Runyan | Sir John A. Macdonald Secondary School | 130 York Boulevard Hamilton, ON  L8r1y5 |
| 40 | Hamilton District School Board | 011681 | Daniel A Speights | Speights & Runyan | Sir Alan MacNabb School | 145 Magnolia Drive Hamilton, ON  L9c5p4 |
| 41 | Hamilton District School Board | 011680 | Daniel A Speights | Speights & Runyan | Sherwood Heights School | 105 High Street Hamilton, ON  L8t3z4 |
| 42 | Hamilton District School Board | 011678 | Daniel A Speights | Speights & Runyan | Pauline Johnson Public School | 25 Hummingbird Lane Hamilton ON  L9a4b1 |
| 43 | Hamilton District School Board | 011322 | Daniel A Speights | Speights & Runyan | Sherwood Secondary School | 25 High Street Hamilton, ON  L8t3z4 |
| 44 | Hamilton District School Board | 011323 | Daniel A Speights | Speights & Runyan | Scott Park Secondary | 1055 King Street West Hamilton, ON  L8m1e2 |
| 45 | Health Care Corporation Of St.John's | 012493 | Daniel A Speights | Speights & Runyan | | 300 Prince Philip Drive St John's, NL  A1b3v6 |
| 46 | Mc Master University | 012368 | Daniel A Speights | Speights & Runyan | McMaster University | 1280 Main Street West Hamilton, ON  L8s4m3 |
| 47 | Morguard Investments Limited | 012427 | Daniel A Speights | Speights & Runyan | | 55 City Centre Drive Mississauga, ON  L5b1m3 |
| 48 | Oxford Properties Group | 012421 | Daniel A Speights | Speights & Runyan | | 10025-102 Avenue Edmonton, AB  T5j2z1 |
| 49 | Oxford Properties Group | 012422 | Daniel A Speights | Speights & Runyan | Edmonton City Centre East | Between 100/101/102 & 102a St Edmonton, AB  T5j2y8 |
| 50 | Oxford Properties Group | 012423 | Daniel A Speights | Speights & Runyan | | 10088-102 Avenue Edmonton, AB  T5j2z1 |
| 51 | School District 68 Nanaimo-Ladysmith | 011627 | Daniel A Speights | Speights & Runyan | Nanaimo Senior Secondary | 3955 Wakesiah Ave Nanaimo, BC  V9r3k5 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 52 | School District 68 Nanaimo-Ladysmith | 011632 | Daniel A Speights | Speights & Runyan | Woodlands Secondary | 1270 Strathmore Street Nanaimo, BC V9s2i9 |
| 53 | Toronto District School Board | 012304 | Daniel A Speights | Speights & Runyan | Deer Park Junior And Senior School | 23 Ferndale Avenue Toronto, ON M4t2b4 |
| 54 | Atlantic Shopping Centres LTD | 012490 | Daniel A Speights | Speights & Runyan | | 2000 Barrington Street Halifax, NS B3j3k1 |
| 55 | Great West Life - London Life | 012533 | Daniel A Speights | Speights & Runyan | | 2001 University Street Montreal, QC H3a2a6 |

## Speights U.S. Claims

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Anderson Memorial Hospital | 011008 | Daniel A Speights | Speights & Runyan | | 800 North Fant Anderson, SC 29261 |
| 2 | John Muir Hospital | 011026 | Daniel A Speights | Speights & Runyan | | 1601 Ygnacid Valley Road, Walnut Creek, CA 94598 |
| 3 | St. Joseph's Hospital | 011243 | Daniel A Speights | Speights & Runyan | | 555 E. Market Street, Elmira, NY |
| 4 | North Arkansas Regional Medical Center | 010995 | Daniel A Speights | Speights & Runyan | | 620 N. Willow, Harrison, AR 72601 |
| 5 | 211 Main Street Building | 011099 | Daniel A Speights | Speights & Runyan | | 211 Main Street, San Francisco, CA 94105 |
| 6 | Bergdorf Building | 011027 | Daniel A Speights | Speights & Runyan | | 80 Coventry Street, Hartford, CT 06112 |
| 7 | Chicago Historical Society | 011104 | Daniel A Speights | Speights & Runyan | | Chicago, IL |
| 8 | F.F. Thompson Continuing Care Center, Inc. | 006636 | Daniel A Speights | Speights & Runyan | | 350 Parish Street, Canandaigua, NY 14424 |
| 9 | Glen Oak Country Club | 010749 | Daniel A Speights | Speights & Runyan | | 151 Post Avenue, Old Westberry, NY |
| 10 | Gulf Atlantic Properties, Inc. | 006637 | Daniel A Speights | Speights & Runyan | | 100 1st Avenue, South Saint Petersburg, FL 33701 |
| 11 | Hyatt Corporation | 009915 | Daniel A Speights | Speights & Runyan | | 5 Embarcadero, Sam Francisco, CA 94111 |
| 12 | KARK-TV and Morris Multimedia, Inc. | 009912 | Daniel A Speights | Speights & Runyan | | Third and Louisiana Streets, Little Rock, AR 72201 |
| 13 | KARK-TV and Morris Multimedia, Inc. | 009913 | Daniel A Speights | Speights & Runyan | | Third and Center Streets, Little Rock, AR 72201 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 14 | Olympus 555 Properties LLC | 009684 | Daniel A Speights | Speights & Runyan | | 555 Broad Hollow Road, Melville, NY  11747 |
| 15 | Allegheny Center | 011037 and 011036 | Daniel A Speights | Speights & Runyan | | Allegheny Center, Pittsburgh, PA  15212 |
| 16 | Presidential Towers Condo | 011428 | Daniel A Speights | Speights & Runyan | | 1836 Metserott Road, Adelphi, MD  20783 |
| | | | | | | |
| | | | | | | |

**Other U.S. Claim**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Sheldon H Solow, Solow Development Corp., et al. | 007020 | Edward J Westbrook | Richardson Patrick Westbrook & Brickman LLC | | 9 West 57th Street New York, NY  10019 |
| | | | | | | |

**II. PD Claims on Appeal**

**Anderson Memorial Class Claims**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Anderson Memorial Hospital | 009911 | Daniel A. Speights | Speights & Runyan | Various | Various locations worldwide |
| 2 | Anderson Memorial Hospital | 009914 | Daniel A. Speights | Speights & Runyan | Various | Various locations statewide South Carolina |
| | | | | | | |

**State of California Department of General Services**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | State of California Dept of General Services | 010653 | Steven Mandelsberg | Hahn & Hessen, LLP | | 7650 South Newcastle Road Stockton, CA 95213 |
| 2 | State of California Dept of General Services | 010662 | Steven Mandelsberg | Hahn & Hessen, LLP | | 744 P Street Sacramento, CA  95814 |
| 3 | State of California Dept of General Services | 010661 | Steven Mandelsberg | Hahn & Hessen, LLP | | 31 East Channel Street Stockton, CA  95202 |
| 4 | State of California Dept of General Services | 010660 | Steven Mandelsberg | Hahn & Hessen, LLP | | End of Highway 202 at Cummings Valley Tehachapi, CA 93561 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 5 | State of California Dept of General Services | 010659 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1234 East Shaw Ave. Fresno, CA  93710 |
| 6 | State of California Dept of General Services | 010657 | Steven Mandelsberg | Hahn & Hessen, LLP | | 2501 Harbor Blvd. Costa Mesa, CA  92626 |
| 7 | State of California Dept of General Services | 010656 | Steven Mandelsberg | Hahn & Hessen, LLP | | End of Highway 202 at Cummings Valley Tehachapi, CA  93561 |
| 8 | State of California Dept of General Services | 010654 | Steven Mandelsberg | Hahn & Hessen, LLP | | 2501 Harbor Blvd. Costa Mesa, CA  92626 |
| 9 | State of California Dept of General Services | 010655 | Steven Mandelsberg | Hahn & Hessen, LLP | | 5100 O'byrnes Ferry Road, Jamestown, CA 95327 |
| 10 | State of California Dept of General Services | 010652 | Steven Mandelsberg | Hahn & Hessen, LLP | | 714 P Street Sacramento, CA  95814 |
| 11 | State of California Dept of General Services | 010651 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1234 East Shaw Ave. Fresno, CA  93710 |
| 12 | State of California Dept of General Services | 010650 | Steven Mandelsberg | Hahn & Hessen, LLP | | 10333 El Camino Real Atascadero, CA  93423 |
| 13 | State of California Dept of General Services | 010649 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1416 9th Street Sacramento, CA  95814 |
| 14 | State of California Dept of General Services | 010648 | Steven Mandelsberg | Hahn & Hessen, LLP | | 28 Civic Center Plaza Santa Ana, CA  92701 |
| 15 | State of California Dept of General Services | 010658 | Steven Mandelsberg | Hahn & Hessen, LLP | | 3100 Wright Road Camarillo, CA  93010 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 16 | State of California Dept of General Services | 014411 | Steven Mandelsberg | Hahn & Hessen, LLP | | 7650 S. Newcastle Road, Stockton, CA 95213 |
| | | | | | | |
| **Macerich Fresno** | | | | | | |
| 1 | Macerich Fresno Limited Partnership | 012758 | Gerald George | Pillsbury Winthrop LLP | | 645 East Shaw Avenue Fresno, CA   93710 |
| | | | | | | |
| **Speights & Runyan Late Authority Claims** | | | | | | |
| 1 | Mission Towers f/k/a Foxridge Office Building | 010516 | Daniel A. Speights | Speights & Runyan | Mission Towers | 57th Broadmore, Kansas City, KS |
| 2 | Bethesda Rehabilitation Hospital | 010533 | Daniel A. Speights | Speights & Runyan | Bethesda Rehabilitation Hospital | St. Paul, MN |
| 3 | First Tennessee Bank | 010533 | Daniel A. Speights | Speights & Runyan | First Tennessee Bank | Memphis, TN |
| 4 | First Tennessee Bank | 010534 | | | First Tennessee Bank | Memphis, TN |
| 5 | Washington Township Health Care District | 010668 | Daniel A. Speights | Speights & Runyan | Washington Hospital | Fremont, CA |
| 6 | New Hanover Regional Medical Center | 010672 | Daniel A. Speights | Speights & Runyan | New Hanover Regional Medical Center | Wilmington, NC |
| 7 | First Health Montgomery Memorial Hospital | 010673 | Daniel A. Speights | Speights & Runyan | First Health Montgomery Memorial Hospital | Troy, NC |
| 8 | Pierre Laclede Center Nos. 1 & 2 | 010696 | Daniel A. Speights | Speights & Runyan | Pierre Laclede Center Nos. 1 and 2 | Clayton, MO |
| 9 | St. Joseph's Hill Infirmary Nursing Home | 010700 | Daniel A. Speights | Speights & Runyan | St. Joseph's Hill Infirmary Nursing Home | St. Louis, MO |
| 10 | IBM Metro Employees FCU | 010722 | Daniel A. Speights | Speights & Runyan | | Bridge Plaza North at 41st Street, Long Island City, NY |
| 11 | Palos Commmunity Hospital | 011066 | Daniel A. Speights | Speights & Runyan | Palos Community Hospital | Palos, IL |
| 12 | St. Mary's Medical Center | 010746 | Daniel A. Speights | Speights & Runyan | St. Mary's Medical Center | 1st Avenue & 29th Street, Huntingdon, WV |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 13 | Friendly Home Nursing Care & Rehabilitation | 010747 | Daniel A. Speights | Speights & Runyan | | 3156 East Avenue, Rochester, NY |
| 14 | 99 Founders Plaza | 010762 | Daniel A. Speights | Speights & Runyan | 99 Founders Plaza | Gilbert Street, Hartford, CT |
| 15 | Oneida County Office Building | 010767 | Daniel A. Speights | Speights & Runyan | Oneida County Office Building | Oneida, NY |
| 16 | Manor Oak Two | 010789 | Daniel A. Speights | Speights & Runyan | Manor Oak Two | Greentree, PA |
| 17 | Cayuga County Office Building | 010947 | Daniel A. Speights | Speights & Runyan | | Auburn, NY |
| 18 | St. Luke's Hospital | 010998 | Daniel A. Speights | Speights & Runyan | St. Luke's Hospital | Bethlehem, PA |
| 18 | Schuyler Hospital | 011003 | Daniel A. Speights | Speights & Runyan | Schuyler Hospital | Montour Falls, NY |
| 20 | Santa Teresa Medical Office Building | 011018 | Daniel A. Speights | Speights & Runyan | Santa Teresa Medical Office Building | San Jose, CA |
| 21 | Nebraska Skilled Nursing and Rehabilitation | 011046 | Daniel A. Speights | Speights & Runyan | | Omaha, NE |
| 22 | Virtua Health - West Jersey Hospital Voorhees | 011226 | Daniel A. Speights | Speights & Runyan | | Voorhees, NJ |
| 23 | Titusville Area Hospital / Farrell Hospital | 011106 / 011144 | Daniel A. Speights | Speights & Runyan | | Titusville, PA |
| 24 | Hotel Captain Cook - Tower # 2 | 011110 | Daniel A. Speights | Speights & Runyan | Hotel Captain Cook | 5th & K Street, Anchorage, AK |
| 25 | Gundersen Lutheran Medical Center | 011124 | Daniel A. Speights | Speights & Runyan | Gundersen Lutheran Medical Center | Lacrosse, WI |
| 26 | Arkansas Baptist Health Medical Center | 011128 | Daniel A. Speights | Speights & Runyan | Arkansas Baptist Medical Center | Little Rock, AR |
| 27 | Abbeville General Hospital | 011133 | Daniel A. Speights | Speights & Runyan | Abbeville General Hospital | Abbeville, LA |
| 28 | St. Anthony's Regional Hospital & Nursing Home | 011151 | Daniel A. Speights | Speights & Runyan | St. Anthony's Hospital | Carroll, IA |
| 29 | Fulton County Health Center | 011158 | Daniel A. Speights | Speights & Runyan | Fulton County Health Center | S. Snoop Ave., Wausein, OH |
| 30 | Ohio Savings Plaza | 011179 | Daniel A. Speights | Speights & Runyan | | 1801 E. Ninth Street, Cleveland, OH |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 31 | YWCA of Greater Des Moines | 011153 | Daniel A. Speights | Speights & Runyan | | 8th & Grand Ave., Des Moines, IA |
| 32 | Scottish Rite Cathedral | 011200 | Daniel A. Speights | Speights & Runyan | Scottish Rite Cathedral | West & Linden Streets, Allentown, PA |
| 33 | First Tennessee Bank | 011722 | Daniel A. Speights | Speights & Runyan | National Bank Building | Memphis, TN |
| 34 | Panda Prints | 011257 | Daniel A. Speights | Speights & Runyan | | |
| 35 | McKenzie Williamette Medical Center | 011262 | Daniel A. Speights | Speights & Runyan | | Eugene, OR |
| 36 | Keller Building | 011384 | Daniel A. Speights | Speights & Runyan | Keller Memorial Hospital | Fayette, MO |
| 37 | Virtua West Jersey Hospital Marlton | 011389 | Daniel A. Speights | Speights & Runyan | | Evesham Township, NJ |
| 38 | The Homeplace of Mondovi Hospital | 011422 | Daniel A. Speights | Speights & Runyan | Buffalo Memorial Hospital | Mondovi, WI |
| 39 | Dodge County Hospital | 011550 | Daniel A. Speights | Speights & Runyan | | |
| 40 | Carson Pirie Scott Store - Store # 537 | 011555 | Daniel A. Speights | Speights & Runyan | | Waukegan, IL |
| 41 | Harry C. Levy Gardens | 011572 | Daniel A. Speights | Speights & Runyan | | Las Vegas, NV |
| 42 | Jordan Hospital, Inc. | 011689 | Daniel A. Speights | Speights & Runyan | | |
| 43 | University of New England - Westbrook College Campus | 011701 | Daniel A. Speights | Speights & Runyan | | |
| 44 | 1199 SEIU | 011703 | Daniel A. Speights | Speights & Runyan | 310 W. 43rd Street Building | 310 W. 43rd St., New York, NY |

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 22 TO EXHIBIT BOOK
## SEALED AIR SETTLEMENT AGREEMENT

**EXHIBIT 22**

Attached.

---

[1] The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case Nos. 01-1139 through 01-1200 |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION | ) | |
| and CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | Adv. No. 02-2211 |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| FRESENIUS MEDICAL CARE, | ) | |
| HOLDINGS, INC., et al., | ) | This Document Pertains to Adv. No. |
| | ) | 02–2210 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release, dated November 10, 2003, is made by and among the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, Sealed Air Corporation, a Delaware corporation, and Cryovac, Inc., a Delaware corporation.

## I.    **Definitions**

As used in this Agreement, the following capitalized terms shall have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined), unless a paragraph or subparagraph of this Agreement expressly provides otherwise:

a.      "Action" means the suit styled <u>Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al. v. Sealed Air Corporation and Cryovac, Inc.</u>, Adv. No. 02-2210 (D. Del.).

b.      "Actually Realized" shall have the meaning set forth in paragraph VI(h) of this Agreement.

c.      "Affiliate" means with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

d.      "Agreement" means this Settlement Agreement and Release and any exhibits, schedules, and annexes thereto, including, without limitation, the Registration Rights Agreement attached hereto as Exhibit 1 (the "Registration Rights Agreement").

e.      "Announcement" means an "Announcement" (including any successor name to an Announcement) published in the Internal Revenue Bulletin (including any successor publication).

f.      "Anti-Dilution" means the provisions set forth in Article III of this Agreement.

2

g.    "Asbestos Claims" means, collectively, Asbestos Personal Injury Claims, Asbestos Property Damage Claims, and any 'demand' related thereto as the term is defined in section 524(g)(5) of the Bankruptcy Code.

h.    "Asbestos Personal Injury Claims" means any and all Claims, Debts, and Damages for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical or not) caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the presence of or exposure at any time to asbestos or asbestos-containing material or products, mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, and Damages for reimbursement, indemnification, subrogation, or contribution.

i.    "Asbestos Property Damage Claims" means any and all Claims, Debts, and Damages for or arising out of property damage, including, without limitation, the cost of inspecting, maintaining, encapsulating, abating, repairing, decontaminating, removing, or disposing of asbestos or asbestos containing materials or products in buildings or other structures, or other property caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the installation in, presence in, or removal of asbestos or asbestos-containing material or products mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, or Damages for reimbursement, indemnification, subrogation, or contribution.

3

j.    "Asbestos-Related Claims" means any and all Claims, Debts, or Damages based on or arising from, in whole or in part, directly or indirectly:  (i) Asbestos Claims or (ii) Successor Claims based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction.

k.    "Bankruptcy Code" means title 11 of the United States Code as in effect on the date of this Agreement.

l.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

m.    "Bankruptcy Termination Event" means, in the case of either of Sealed Air Corporation or Cryovac, Inc., (a) the filing by such entity of a voluntary petition for relief under the Bankruptcy Code or (b) the pendency against such entity of an involuntary petition for relief under the Bankruptcy Code (i) that has not been dismissed within ninety days of the filing or (ii) upon which an order for relief granting the involuntary petition has been entered.

n.    "CFO Annual Statement" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

o.    "Change in Circumstances" means (i) for U.S. federal income tax purposes, (x) any amendment to the Internal Revenue Code or the final or temporary regulations promulgated under the Internal Revenue Code, (y) a decision by any federal court, or (z) a Revenue Ruling, Notice, Revenue Procedure, or Announcement, which amendment is enacted, promulgated, issued, or announced, or which decision, Revenue Ruling, Notice, Revenue Procedure, or Announcement is issued or announced, in each case, after the Execution Date, and (ii) for financial accounting purposes, any amendment to or change in generally accepted accounting principles, which amendment is issued or announced or, which change occurs, in each case, after the Execution Date.

p.    "Chapter 11 Plan" means a confirmed plan or plans of reorganization of the Debtors.

4

q.      "Claims" means any and all claims, whether direct, indirect, derivative or otherwise, including, without limitation, 'claim' as the term is defined in section 101(5) of the Bankruptcy Code (except that a right to an equitable remedy shall also be considered a claim whether or not the breach gives rise to a right to payment), remedies, or causes of actions, liability, Debts, or Damages, known or unknown, now existing or hereafter arising, that have been, could have been, may be, or could be alleged or asserted now or in the future by any Person against the Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, or the Released Parties, of whatsoever kind or nature, whether alleged or asserted or not, whether founded in law, equity, admiralty, tort, contract, statute, or otherwise, and includes, without limitation, demands, liability, suits, judgments, and all legal or equitable theories of recovery whether arising under the common law or any statute, ordinance, or regulation.  Without limiting the generality of the foregoing, Claims shall include any and all claims, causes of action, Debts, or Damages under or attributable to:  (i) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego liability, agency liability, transferee liability, or other similar claims or causes of action seeking to hold a Person liable for the debts or obligations of another Person; (iii) chapter 176 of title 28 of the United States Code or any other similar statutes; (iv) any debtor-creditor, fraudulent transfer or fraudulent conveyance statutes; or (v) any other similar claims or causes of action (all such Claims, causes of action, Debts, or Damages under or attributable to (i) through (v), collectively, "Successor Claims").

r.      "Confirmation Order" means an order or orders confirming the Chapter 11 Plan.

s.      "Contrary Opinion" means (i) a written opinion from a nationally recognized law firm experienced in Tax matters that states that, as a result of a Change in Circumstances, there is no "reasonable basis", as defined under section 6662 of the Internal Revenue Code (or successor

5

provision thereof), for the taking of, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, or (ii) a written opinion from nationally recognized accounting firm that states that, as a result of a Change in Circumstances, the taking, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, will be inconsistent with generally accepted accounting principles.

     t.    "Court" means the court in which the Action is pending or, if no longer pending, the Bankruptcy Court.

     u.    "Cryovac Cash Amount" shall have the meaning set forth in paragraph II(a) of this Agreement.

     v.    "Cryovac Remaining Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal to the excess, if any, of (i) the Cryovac Total Amount over (ii) the Cryovac 524(g) Trust Amount.

     w.    "Cryovac Total Amount" means the sum of the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, provided, however, that this sum shall be subject to any setoff or reduction pursuant to paragraph II(j) of this Agreement.

     x.    "Cryovac 524(g) Trust Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal in the aggregate to the lesser of (i) the Cryovac Total Amount and (ii) the 524(g) Trust Total Amount less the Grace Specialty Initial Contribution.

     y.    "Cryovac 524(g) Trust" means any 524(g) Trust to which all or a portion of the Cryovac Cash Amount or the Settlement Shares will be directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement.

6

z.     "Cryovac Transaction" means the transfers of assets, the distributions of stock, the merger, and all predecessor, related, and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about February 13, 1998, SEC File No. 333-46281, including all attachments, exhibits, and schedules thereto.

aa.     "Damages" means any and all potential elements of recovery or relief, including, without limitation, those that are known, unknown, certain, uncertain, anticipated, or unanticipated, that have been, could have been, may be, or could be alleged or asserted now or in the future against the Released Parties, whether alleged, unalleged, asserted, or unasserted by Plaintiffs or by any other Person under any legal, regulatory, administrative, or equitable theory against the Released Parties, and includes, without limitation, equitable relief, declaratory relief, actual damages (whether for successor liability, fraudulent transfer, fraudulent conveyance, alter ego liability, agency liability, property damage, environmental liability, Tax liability, economic loss, loss of profits, medical expenses, medical monitoring, personal injury, loss of consortium, wrongful death, survivorship, or compensatory, proximate, consequential, general, incidental, or special damages, or any other liability, loss, or injury), statutory or treble, or multiple or penal or punitive or exemplary damages, attorneys' fees, interest, expenses, and costs of court.

bb.     "Debtors" means W.R. Grace & Co., W.R. Grace & Co.-Conn., and related entities that have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, each of their estates, any trustee or examiner that may be appointed in any of the Debtors' cases under the Bankruptcy Code, and the reorganized Debtors and includes, without limitation, any new corporation or other entity to which the stock or the assets of any of the Debtors,

7

or any combination thereof, are transferred pursuant to the Chapter 11 Plan (other than a 524(g) Trust, or an unrelated third-party that has purchased assets from a Debtor pursuant to section 363 of the Bankruptcy Code).

cc.    "Debts" means any liability or obligation arising from, based on, or attributable to any Claim.

dd.    "Defined Action" means any action, including the filing of any Tax Return, a Protective Claim or other information with respect to Taxes, making any statement in any public or regulatory filing or press release or otherwise, relating to any obligation of a Person set forth or referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, provided, however, that a Defined Action shall not include the making of a statement by any of the Plaintiffs or the Debtors in a court document filed in the Debtors' chapter 11 cases or in an oral statement to the court in the Debtors' chapter 11 cases if, with respect to such Defined Action, such Plaintiff or Debtor has used its best efforts to satisfy its obligations set forth or referred to in paragraphs II(c)(ix), (x), and (xi), VI(b) or VI(g), of this Agreement, and provided, further, that a Defined Action shall not include (x) the preparation and execution of a Grace Protective Claim by the Debtors pursuant to and in accordance with paragraph VI(h) of this Agreement and (y) the pursuit by the Debtors of a Grace Protective Claim pursuant to and in accordance with the third sentence of paragraph VI(i) of this Agreement.

ee.    "Effective Date" means the date that is ten business days after the Confirmation Order becomes a Final Order or, if later, the date by which transfers to the 524(g) Trusts must be made pursuant to the Chapter 11 Plan and Confirmation Order.

8

ff.    "Excluded Fees" means costs and expenses (including lawyer's fees, expert's fees, and accountant's fees) incurred by the Released Parties in defending the Action or any other proceedings or controversies arising out of or based upon Asbestos-Related Claims prior to the Effective Date.

gg.    "Execution Date" means November 10, 2003.

hh.    "Fair Market Value" means (i) with respect to each of the Settlement Shares the last sale price on the New York Stock Exchange of a share of Sealed Air Common Stock, regular way, one business day before the Effective Date, and (ii) with respect to other property, the value assigned to such property in the disclosure statement approved by a Final Order of the Bankruptcy Court pursuant to section 1125(b) of the Bankruptcy Code with respect to the Chapter 11 Plan.

ii.    "Final Determination" means any assessment or resolution of liability for any Tax for any taxable period with respect to a Tax Claim against such Person required to take, or prohibited from taking, a Defined Action pursuant to the provisions set forth or referred to in this Agreement (i) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable or (ii) by any other means (including a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which consent shall not be unreasonably withheld or delayed.

jj.    "Final Order" means an order or judgment, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or to seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or if filed, remains pending.

kk.    "Fresenius" means Fresenius Medical Care Holdings, Inc., its Affiliates, and any and all of their predecessors, successors, and assigns.

9

ll.     "Fresenius Release" means a duly executed release in the form annexed hereto as Exhibit 5, with appropriate insertions thereto.

mm.     "Fresenius Transaction" means the transfer of assets, the distributions of stock, and the merger and all predecessor related and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about August 2, 1996, SEC File No. 333-09497, including all attachments, exhibits and schedules thereto.

nn.     "Government Plaintiff" means the United States of America, acting for and on behalf of the United States Environmental Protection Agency.

oo.     "Government Release" means a release in the form annexed hereto as Exhibit 2, with appropriate insertions therein.

pp.     "Grace New York" means  W.R. Grace & Co., a New York corporation (now  known as Fresenius Medical Care Holdings, Inc.) (Taxpayer Identification Number 13-3461988).

qq.     "Grace New York Group" means that group of corporations, including, without limitation, W.R. Grace & Co.-Conn., Cryovac, Inc., and Sealed Air Corporation, that were members through (and including) September 28, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of section 1504 of the Internal Revenue Code, and the Treasury Regulations, of which Grace New York was the common parent, and, with respect  to Taxes of other jurisdictions (domestic or foreign), that group of corporations that included Grace New York or one or more members of the Grace New York Group with respect to any combined, consolidated, joint, or similar Tax Return under the laws of any jurisdiction (domestic or foreign).

10

rr.     "Grace Protective Claim" shall have the meaning set forth in paragraph VI(h) of this Agreement.

ss.     "Grace Specialty" means W.R. Grace & Co. (formerly known as Grace Specialty Chemicals, Inc.) (Taxpayer Identification Number 65-0773649), or its successor.

tt.     "Grace Specialty Initial Contribution" means, with respect to the 524(g) Trusts in the aggregate, the "voting shares of" and "rights" in (as those terms are used in section 524(g)(2)(B)(i)(III) of the Bankruptcy Code) Grace Specialty or one or more other Debtors to be received by such 524(g) Trusts pursuant to section 524(g)(2)(B)(i)(III)(aa), (bb), or (cc), as the case may be, which voting shares and rights, if exercised, would entitle such 524(g) Trusts to own the lesser of (i) 50.1% of the voting shares of such entity or entities or (ii) the percentage of voting shares of such entity or entities that are to be received by the 524(g) Trusts.

uu.     "Grace Taxes" means all Taxes imposed on or with respect to, or related or attributable to, the Grace New York Group or any member thereof for or attributable to any taxable period (or any portion thereof) ending on or before December 31, 1996.

vv.     "Indemnified Taxes" means all Taxes and other amounts that W.R. Grace & Co.-Conn. or any other Debtor is responsible for or required to pay, or is required to indemnify any Released Party for or in respect thereto, pursuant to the 1998 Tax Sharing Agreement and including, without limitation, all Grace Taxes.

ww.     "Internal Revenue Code" means the Internal Revenue Code of 1986.

xx.     "IRS" means the Internal Revenue Service.

yy.     "Material Draft" means each of (i) the first draft of a Trust Document circulated to any Person who is not in an attorney-client relationship with the draftsman, (ii) the first draft of a Trust Document circulated following the draft of such Trust Document that Cryovac, Inc. or its

11

representatives provided comments with respect thereto, pursuant to and in accordance with the last sentence of paragraph VI(a) of this Agreement (such comments, the "Cryovac Language"), (iii) the first draft of a Trust Document that contains the Cryovac Language (or any variation thereof), (iv) any draft of a Trust Document which contains changes to the Cryovac Language (as the same may be amended or modified), or language inconsistent with the Cryovac Language or paragraphs II(c)(ix), (x), and (xi) of this Agreement, (v) the draft of a Trust Document that the Plaintiffs or the Debtors, as the case may be, reasonably believe is the penultimate draft of such document and (vi) the final draft of a Trust Document.

zz.     "Non-Debtor Affiliates" means the Affiliates of the Debtors that are not debtors or debtors in possession under the Bankruptcy Code.

aaa.     "Notice" means a "Notice" (including any successor name to a Notice) published in the Internal Revenue Bulletin (or successor publication).

bbb.     "Paragraph II(a) Proviso" shall have the meaning set forth in paragraph II(a) of this Agreement.

ccc.     "Paragraph VI(f) Issue" shall have the meaning set forth in paragraph VI(f) of this Agreement.

ddd.     "Person" means any individual, corporation, company, partnership, limited liability company, firm, association, joint venture, joint stock company, trust, estate, business trust, unincorporated organization, any other entity, and any 'governmental unit' (as that term is defined in section 101(27) of the Bankruptcy Code).

eee.     "Plaintiffs" means the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co.

12

fff.    "Preliminary Injunction" means the preliminary injunction issued by the Bankruptcy Court on May 3, 2001, as modified on January 22, 2002, in W.R. Grace & Co. v. Chakarian, Adversary No. A-01-771 (Bankr. D. Del.), staying all actions arising from alleged exposure to asbestos indirectly or directly allegedly caused by Debtors or alleging fraudulent transfer or fraudulent conveyance claims that were filed or pending against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates and staying all such future actions upon filing and service against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates.

ggg.    "Protective Claim" means a Form 1120X (Amended U.S. Corporation Income Tax Return) or similar state or local tax form, which is prominently and clearly labeled on every page thereof with the words "Protective Claim Only" and which clearly and prominently states that the Person filing such form asserts its right to the claimed Tax benefits conditionally or contingently, and only in the event that such Tax benefits are denied in full to Cryovac, Inc. (or the consolidated, combined, unitary or similar group of which Sealed Air Corporation is the common parent) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable, or by a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code entered into by Sealed Air Corporation and the Internal Revenue Service.

hhh.    "Qualified Settlement Fund" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

iii.    "Release" means a release, in the form annexed hereto as Exhibit 3, with appropriate insertions therein.

jjj.    "Released Parties" means Sealed Air Corporation, Cryovac, Inc., and all of their parent corporations, subsidiary corporations, joint venturers, Affiliates, and sister corporations, and

13

any and all of their past, present, and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air Corporation or Cryovac, Inc. for Asbestos-Related Claims), or any of them, including any Person acting on behalf of or at the direction of any of them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all Claims, Damages, or Debts arising out of the Fresenius Transaction), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos-Related Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

kkk.     "Relevant Tax Year" shall have the meaning set forth in paragraph VI(h) of this Agreement.

lll.     "Revenue Procedure" means a "Revenue Procedure" (including any successor name to a Revenue Procedure) published in the Internal Revenue Bulletin (or successor publication).

mmm.   "Revenue Ruling" means a "Revenue Ruling" (including any successor name to a Revenue Ruling) published in the Internal Revenue Bulletin (or successor publication).

nnn.     "Sealed Air Common Stock" means the voting common stock, par value $0.10 per share, of Sealed Air Corporation.

ooo.     "Sealed Air Opinion" means, with respect to any Contrary Opinion obtained by any Plaintiff, Cryovac 524(g) Trust, Debtor, or Non-Debtor Affiliate, as the case may be, with respect to a Defined Action (i) if such Contrary Opinion is with respect to a Tax issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from a nationally recognized law firm experienced in Tax matters that states that there is

14

"substantial authority", as defined under section 6662 of the Internal Revenue Code (or successor provision thereof), for the taking of, or the failure to take, such Defined Action or, (ii) if such Contrary Opinion is with respect to an accounting issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from nationally recognized accounting firm that states that the taking, or the failure to take, such Defined Action will not be inconsistent with generally accepted accounting principles.

ppp.    "Settlement Shares" shall have the meaning set forth in paragraph II(a) of this Agreement.

qqq.    "SOL" shall have the meaning set forth in paragraph VI(h) of this Agreement.

rrr.    "Successor Claims" shall have the meaning set forth in the definition of Claims.

sss.    "Tax" or "Taxes" means all taxes, customs, duties, levies, fees, tariffs, imports, deficiencies, or other charges or assessments of any kind whatsoever, including all net income, gross income, capital gains, gross receipt, property, franchise, sales, use, excise, withholding, payroll, employment, social security, worker's compensation, unemployment, occupation, severance, capital stock, ad valorem, value added, transfer, gains, profits, net worth, asset, transaction, business consumption or other taxes, and any interest, penalties, fines, additions to tax or additional amounts with respect thereto, imposed by any governmental authority (whether domestic or foreign).

ttt.    "Tax Benefit" shall have the meaning set forth in paragraph VI(h) of this Agreement.

uuu.    "Tax Benefit Accountant" shall have the meaning set forth in paragraph VI(j) of this Agreement.

vvv.    "Tax Benefit Dispute Notice" shall have the meaning set forth in paragraph VI(j) of this Agreement.

15

www. "Tax Benefit Report" shall have the meaning set forth in paragraph VI(j) of this Agreement.

xxx. "Tax Benefit Start Date" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

yyy. "Tax Benefit Statement" shall have the meaning set forth in paragraph VI(j) of this Agreement.

zzz. "Tax Claim" shall have the meaning set forth in paragraph VI(c) of this Agreement.

aaaa. "Tax Return" means all returns, reports and information (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax Authority relating to Taxes.

bbbb. "Transfer" shall have the meaning set forth in paragraph VI(h) of this Agreement.

cccc. "Transferor" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

dddd. "Treasury Regulations" means the treasury regulations (including temporary regulations) promulgated pursuant to the Internal Revenue Code.

eeee. "Trust Document" means, for each trust to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement, each of the plan of reorganization of the Debtors, and any document pursuant to which such trust is organized or created (and any amendments thereto).

ffff. "524(g) Trust" means any trust established pursuant to 11 U.S.C. § 524(g), as provided in the Chapter 11 Plan and the Confirmation Order.

gggg. "524(g) Trust Total Amount" means the sum of the aggregate amount of cash and the Fair Market Value of all property to be contributed to all of the 524(g) Trusts, as provided in the Chapter 11 Plan and the Confirmation Order.

16

hhhh.   "1998 Tax Sharing Agreement" means the Tax Sharing Agreement by and among

W.R. Grace & Co., W.R. Grace & Co.-Conn., and Sealed Air Corporation, dated as of March 30,

1998.

## II.     Settlement Agreement and Release of All Claims

a.     On the Effective Date, Cryovac, Inc. shall, subject to paragraph II(j) of this

Agreement, transfer in the aggregate (i) the sum of $512.5 million in cash, plus interest thereon from

December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually (the

"Cryovac Cash Amount"), and (ii) nine million shares of Sealed Air Common Stock, as adjusted for

Anti-Dilution (the "Settlement Shares").  Such transfer shall be made as directed in the Confirmation

Order; provided, however, that each of the Plaintiffs shall use its best efforts to require the Chapter

11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) to provide that

the Cryovac Cash Amount and the Settlement Shares shall be transferred by Cryovac, Inc. directly

to one or more of the 524(g) Trusts for Asbestos Claims, unless the 524(g) Trust Total Amount

reduced by the Grace Specialty Initial Contribution is less than the Cryovac Total Amount, in which

case, the Chapter 11 Plan shall provide that Cryovac, Inc. shall transfer (x) in the aggregate directly

to one or more of the 524(g) Trusts for Asbestos Claims, an amount of cash and shares of Sealed Air

Common Stock equal, in the aggregate, to the Cryovac 524(g) Trust Amount, in the same proportion

that the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, respectively,

bears to the sum of both, and (y) directly to Grace Specialty, an amount of cash and shares of Sealed

Air Common Stock equal, in the aggregate, to the Cryovac Remaining Amount, in such same

proportions (this proviso, the "Paragraph II(a) Proviso").  The provisions of paragraph II(b) of this

Agreement shall apply first with respect to the Plaintiffs' obligations set forth in the Paragraph II(a)

Proviso.  If the Chapter 11 Plan cannot be confirmed in accordance with both the Paragraph II(a)

17

Proviso and paragraph II(b) of this Agreement, then each of the Plaintiffs shall use its best efforts to require that the Chapter 11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) (x) maximize the initial funding of one or more of the 524(g) Trusts from the Cryovac Cash Amount and the Settlement Shares, and provide for the transfer of such funding by Cryovac Inc. directly to such 524(g) Trusts for Asbestos Claims and (y) provide that such amounts not transferred by Cryovac Inc. directly to such 524(g) Trusts will be transferred by Cryovac Inc. directly to Grace Specialty, and paragraph II(b) of this Agreement shall apply anew to these obligations.  If the transfers made pursuant to this paragraph II(a) are directed to more than one 524(g) Trust, then the portion of the entire amount to be transferred to such 524(g) Trusts shall be allocated among each of such 524(g) Trusts pursuant to and in accordance with the Confirmation Order.  Under no circumstances shall any fractional shares of Sealed Air Common Stock be transferred pursuant to this Agreement or any Person be the transferee of less than one thousand shares of Sealed Air Common Stock pursuant to this Agreement, provided, however, that in no event shall the Cryovac 524(g) Trusts incur any costs or expenses associated with such one thousand share limitation, nor shall such limitation affect the apportionment, if any, of the Settlement Shares and the Cryovac Cash Amount that may be allocated between the Cryovac 524(g) Trusts, on the one hand, and Grace Specialty, on the other hand.  Sealed Air Corporation irrevocably, absolutely and unconditionally guarantees the performance of the obligations of Cryovac, Inc. set forth in this paragraph II(a) and the right of the Plaintiffs to enforce this guaranty shall not require the Plaintiffs first to proceed against Cryovac, Inc.

      b.     In furtherance of the Plaintiffs' obligations pursuant to paragraph II(a) of this Agreement, each of the Plaintiffs shall: (i) support the approval of a disclosure statement(s) that relates to a Chapter 11 Plan that satisfies the provisions set forth in paragraph II(a) of this Agreement

18

(such a Chapter 11 Plan, the "Conforming Plan"), as long as the Conforming Plan meets the requirements for confirmation set forth in sections 524 and 1129 of the Bankruptcy Code, regardless of whether confirmation may be obtained under section 1129(a) or (b) of the Bankruptcy Code; (ii) recommend to the creditors and parties in interest the interests of which are represented by it to vote in favor of the confirmation of the Conforming Plan; (iii) oppose the approval of any disclosure statement that relates to a non-Conforming Plan; (iv) recommend to the creditors and parties in interest the interests of which are represented by it to vote against the confirmation of a non-Conforming Plan; (v) not take any action, of whatever kind and nature, to oppose, or designed to prevent confirmation of, the Conforming Plan; and (vi) take any action, of whatever kind and nature, that is necessary, required or appropriate in order to confirm the Conforming Plan, provided, however, that the Plaintiffs shall not be required to support or recommend a Conforming Plan which, in the exercise of Plaintiffs' respective fiduciary obligations, is determined to be unacceptable (other than as to provisions required by the terms of this Agreement), and provided, further, that the Plaintiffs shall not be bound by the provisions of paragraphs II(b)(i) through (vi) of this Agreement if (x) the Bankruptcy Court determines in a Final Order, on a motion brought by a party in interest, and on notice to Sealed Air Corporation and Cryovac, Inc., seeking an order excusing their performance under the provisions contained in paragraphs II(b)(i) through (vi) of this Agreement, that the Conforming Plan cannot meet the confirmation requirements set forth in sections 524 and 1129 of the Bankruptcy Code, or (y) the Bankruptcy Court refuses to confirm the Conforming Plan, except if such refusal relates to issues unrelated to the requirements contained in paragraph II(a) of this Agreement.  The provisions of this paragraph II(b) shall apply as set forth in paragraph II(a) of this Agreement.

19

c.     As a condition to the obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement, each of the Confirmation Order and the Chapter 11 Plan shall expressly provide that:

(i) each of the Plaintiffs and the Debtors shall execute and deliver the Release, and the Government Plaintiff shall execute and deliver the Government Release;

(ii) in consideration of the transfers made pursuant to paragraph II(a) of this Agreement, each of the Non-Debtor Affiliates irrevocably releases, acquits, and forever discharges the Released Parties from any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, that have accrued or been asserted or that hereafter might accrue or be asserted against the Released Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Released Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Person any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction;

(iii) the Action shall be dismissed with prejudice;

(iv) each of the Release and the Government Release is approved;

(v) the Plaintiffs shall deliver the Fresenius Release;

(vi) the Released Parties shall receive the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code, which injunction shall be in form and substance reasonably acceptable to Sealed Air Corporation and Cryovac, Inc. and which injunction shall include, without limitation, provisions enjoining any and all Persons from taking any and all legal or other actions (including, without limitation, the continued prosecution of pending 'Actions' or the commencement of future 'Actions' as such term is defined in the Preliminary Injunction) or making any demand (as such term is defined in section 524(g)(5) of the Bankruptcy Code) for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery or any other relief whatsoever from any of the Released Parties with respect to any and all Asbestos-Related Claims;

(vii) (A) the Debtors shall, jointly and severally, at their sole expense, indemnify, defend, and hold-harmless the Released Parties from and against (1) any and all Asbestos-Related Claims and all Indemnified Taxes, (2) any and all losses, costs, and expenses incurred as a result of any breach of any of the Debtors' or Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order, (3) if any Non-Debtor Affiliate has not executed and delivered a Release, any and all Asbestos-Related Claims based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such Non-Debtor Affiliate and (4)

20

any and all attorneys' fees or costs and expenses attributable to any Indemnity Claim, provided, however, that in each case such indemnification shall not apply to Excluded Fees (such indemnity obligations, collectively, the "Debtors' Indemnity Obligation"; any and all Claims, Debts, or Damages that could be asserted by any of the Released Parties under Debtors' Indemnity Obligation, the "Indemnity Claims"), and provided, further, that nothing in this Agreement shall adversely affect any rights of any Person to file and pursue, or object to, a proof of claim for Excluded Fees in the Debtors' chapter 11 cases, (B) each Debtor shall execute and deliver an indemnity agreement in favor of the Released Parties in the form annexed hereto as Exhibit 6 (the "Indemnification Agreement"), (C) the Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall not be discharged, expunged, estimated, or otherwise adversely affected in the Debtors' bankruptcy cases or by the confirmation of the Chapter 11 Plan, and (D) the Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall continue unaffected as a post-confirmation obligation of each of the reorganized Debtors;

(viii) there shall be established under state law the 524(g) Trusts, each of which shall be subject to the continuing jurisdiction of the Bankruptcy Court;

(ix) if one or more Cryovac 524(g) Trusts is established, then each Cryovac 524(g) Trust shall be established to qualify as a "qualified settlement fund" for federal income tax purposes within the meaning of Treasury Regulations section 1.468B (each, a "Qualified Settlement Fund"), and, unless otherwise required by a Final Determination, the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(ix) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(ix) and (B) shall be prohibited from taking any Defined Action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac, Inc. being treated as a "transferor" (as defined under Treasury Regulations section 1.468B-1(d)) ("Transferor") to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac, Inc. directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(ix) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(ix), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-

21

five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(x) if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes any and all payments by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(x), and (B) shall take all Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(x); provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(x) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(x), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(xi) if one of more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes all payments, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as ordinary income of Grace Specialty, and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(xi) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(xi) and (B) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(xi) or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, Inc.; provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(xi) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(xi), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion; and

(xii) the 1998 Tax Sharing Agreement is an assumed agreement of each of the Debtors (including, without limitation, Grace Specialty and W.R. Grace & Co.-Conn.) pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by this

22

Agreement, the Chapter 11 Plan, or the Confirmation Order shall adversely affect the rights of Sealed Air Corporation or any of its Affiliates under the 1998 Tax Sharing Agreement.

d.      Simultaneously with and in exchange for the transfers contemplated by paragraph II(a) of this Agreement, the Plaintiffs shall deliver to Cryovac, Inc. and Sealed Air Corporation: (i) the Release duly executed by each of the Plaintiffs and the Debtors; (ii) a copy of the Chapter 11 Plan; (iii) a copy of the Confirmation Order; (iv) a duly executed Stipulation of Dismissal With Prejudice of the Action, in the form annexed hereto as Exhibit 4, denying any other recovery against the Released Parties; and (v) the Registration Rights Agreement, in the form annexed hereto as Exhibit 1, with appropriate insertions therein, duly executed by the Initial Holders.

e.      The Released Parties shall not seek indemnity, contribution, or reimbursement for any payments made under paragraph II(a) of this Agreement from any source, including, without limitation, the insurers of the Debtors (but solely to the extent of coverage procured by the Debtors or any of its predecessors).

f.      The transfers made pursuant to paragraph II(a) of this Agreement shall be made in full compromise and settlement of any and all Asbestos-Related Claims against any and all of the Released Parties.

g.      Any order of the Court approving this Agreement shall provide that the Preliminary Injunction shall remain in full force and effect through and including the Effective Date.

h.      Neither this Agreement nor any of the transactions contemplated hereby is, or shall be construed as, an admission of liability, fault or wrongdoing by the Released Parties, who have denied and continue to deny any liability, fault, or wrongdoing, but, instead, is a compromise settlement of disputed claims, made in order to avoid the further substantial expense, burden, and

23

inconvenience of protracted litigation and appeal that may occur in further proceedings relating to these actions or any future actions, by which the Released Parties have forever bought their peace.

      i.      The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates fully understand and agree that Cryovac, Inc. and Sealed Air Corporation have entered into this Agreement in order to settle, release, extinguish, and terminate fully, finally, and forever any and all further controversy respecting any and all Asbestos-Related Claims against any and all of the Released Parties.  The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates acknowledge and agree that this provision is an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished.

      j.      Notwithstanding anything in this Agreement to the contrary, Cryovac, Inc., and Sealed Air Corporation as guarantor, shall have a right of setoff or reduction against, the payments and transfers required by paragraph II(a) of this Agreement or otherwise for, and upon the payment by any of the Released Parties of, the amount of any Indemnified Taxes or any obligation of any of the Debtors or the 524(g) Trusts set forth or referred to in this Agreement, including, without limitation, any Indemnity Obligation required to be provided in the Confirmation Order and Chapter 11 Plan that any of the Debtors has failed to pay to the Released Parties.

      k.      Each of Sealed Air Corporation, Cryovac, Inc., and the Plaintiffs (upon court approval) represents and warrants, as to itself, that this Agreement has been duly authorized, and executed and delivered, constitutes the valid and binding obligation of such party, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy,

24

insolvency (including, without limitation, all laws relating to fraudulent transfers), reorganization, moratorium or other similar laws relating to or affecting enforcement of creditors' rights generally, or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity).

III.    **Anti-Dilution**

a.    In the event Sealed Air Corporation should at any time after the date of this Agreement but prior to the Effective Date fix a record date for (i) the effectuation of a split or subdivision of the outstanding shares of Sealed Air Common Stock, or (ii) the payment of a dividend or making of a distribution on Sealed Air Common Stock in additional shares of Sealed Air Common Stock, then as of such record date, the number of Settlement Shares to be transferred by Cryovac, Inc. on the Effective Date shall be increased in proportion to the increase in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

b.    If the number of shares of Sealed Air Common Stock outstanding after the date of this Agreement but prior to the Effective Date is decreased by a combination of the outstanding shares of Sealed Air Common Stock or a reverse stock split, then following the record date for such combination or reverse stock split, the number of Settlement Shares transferable by Cryovac, Inc. upon the Effective Date shall be decreased in proportion to the decrease in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

c.    In the event Sealed Air Corporation, after the date of this Agreement but prior to the Effective Date, declares a distribution payable to all holders of Sealed Air Common Stock in shares of capital stock of Sealed Air Corporation or its subsidiaries (other than Sealed Air Common Stock), or evidences of its indebtedness or other assets (excluding quarterly cash dividends) or options or rights not referred to in paragraph III(a) above, then in each such case, on the Effective Date, holders

25

of Settlement Shares shall be entitled to any such distribution as if the Effective Date had occurred immediately prior to the record date fixed for the determination of the holders of Sealed Air Common Stock entitled to such distribution.

   d.  In case of any reclassification of the Sealed Air Common Stock, any consolidation of Sealed Air Corporation with another entity, or merger of another entity into Sealed Air Corporation (other than a merger that does not result in any reclassification, conversion, exchange, or cancellation of outstanding shares of Sealed Air Common Stock), or Sealed Air Corporation into another entity,  any sale or transfer of all or substantially all of the assets of Sealed Air Corporation or any compulsory share exchange pursuant to such share exchange, the Sealed Air Common Stock is converted into other securities, cash, or property, then lawful provision shall be made as part of the terms of such transaction, whereby on the Effective Date, holders of Settlement Shares shall be entitled to receive from Cryovac, Inc. the kind and amount of securities, cash, and other property receivable upon the reclassification, consolidation, merger, sale, transfer, or share exchange as if the Effective Date had occurred immediately prior to the reclassification, consolidation, merger, sale, transfer or exchange.  The provisions of this paragraph III(d) shall similarly apply to successive reclassifications, consolidations, mergers, sales, transfers, or share exchanges.

## IV.  <u>Investment Representations</u>

   a.  Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, acknowledges and agrees with Sealed Air Corporation that the Settlement Shares have not been and, upon delivery as provided in (ii) of the first sentence of paragraph II(a) of this Agreement, will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and that the certificates for the Settlement Shares will bear a legend to that effect.  Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, also

26

understands that any transfer of Settlement Shares to the 524(g) Trusts or Grace Specialty is being made pursuant to an exemption from registration contained in the Securities Act, based in part upon their respective representations contained in this Agreement.

b.      The Confirmation Order shall expressly provide that, upon any transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty, the trustee(s) of each such 524(g) Trust or Grace Specialty, as applicable, shall represent and warrant, and agree on behalf of the 524(g) Trust or Grace Specialty with Sealed Air Corporation, that: (i) the 524(g) Trust or Grace Specialty, as applicable, is acquiring the Settlement Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act; and (ii) the 524(g) Trust or Grace Specialty, as applicable, and its respective transferees will comply with all filing and other reporting obligations under all applicable laws which shall be applicable to such 524(g) Trust or Grace Specialty with respect to the Settlement Shares.

c.      Upon delivery of the Settlement Shares, Cryovac, Inc. and Sealed Air Corporation shall represent and warrant to the Plaintiffs and the Debtors (and deliver a certification to that effect upon the transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty) that all adjustments to the Settlement Shares have been made in compliance with the Anti-Dilution provisions of this Agreement.

## V.      **Covenant Not to Sue and Tolling**

a.      Subject to paragraph V(c) of this Agreement, unless ordered otherwise by this Court, none of the Plaintiffs, and any order of the Court approving this Agreement shall provide that none of the Debtors, shall sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit, administrative proceeding, demand, claim or cause of action, whether asserted individually or derivatively against any of the Released Parties for any Asbestos-Related

27

Claims, pending confirmation of a Chapter 11 Plan consistent with the terms of this Agreement. The Final Order approving this Agreement shall provide that the Debtors are bound by the terms of this paragraph.

b.        (i) In the event that the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement are not satisfied, the Plaintiffs (but not Sealed Air Corporation or Cryovac, Inc.) shall have the option jointly to terminate this Agreement by providing written notice thereof to Sealed Air Corporation and Cryovac, Inc.  (ii) Upon the occurrence of a Bankruptcy Termination Event, before the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement have been completely performed, the Plaintiffs may seek relief from the automatic stay to reinstitute the Action in the Court and neither Cryovac, Inc. nor Sealed Air Corporation shall (x) object to such relief being granted, or (y) seek to enforce the terms of this Agreement against the Debtors' estate.  (iii) In the event the Plaintiffs' obligations set forth in paragraph II(a) or the provisions of paragraph II(b), (c), or (d), or VI, of this Agreement are not satisfied, Sealed Air Corporation and Cryovac, Inc. shall have the option jointly to terminate this Agreement by providing written notice thereof to the Plaintiffs.  (iv) Any termination right exercised pursuant to this Agreement, other than upon the occurrence of a Bankruptcy Termination Event, shall become effective on the date (the "Termination Date") ten days following receipt of a notice of intention to terminate by the party exercising such termination right to the other parties to this Agreement, which notice shall specify the reasons for termination; provided, however, that such notice provided by the Plaintiffs shall not become effective if the payment and transfer obligations of Cryovac, Inc. set forth in  paragraph II(a) of this Agreement shall have been satisfied prior to the Termination Date.

28

c.    If this Agreement is terminated by any party, then within 120 days from the Termination Date a proper representative of the Debtors' estate may seek to have the Court reinstate the Action on the active docket, it being expressly agreed that the Court is the appropriate venue in all instances, including, without limitation, upon the occurrence of a Bankruptcy Termination Event. For purposes of statutes of limitation, statutes of repose, and any procedural bars to the prosecution of claims, as long as the Court reinstates the Action, all claims, counterclaims, cross-claims and claims for contribution or indemnity will be deemed to have been tolled during the time period between the date of this Agreement and the Termination Date.

## VI.    <u>Tax Matters</u>

a.    Each of the Plaintiffs shall use its best efforts to, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts to, (i) cause each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement to qualify, and to maintain its status, as a Qualified Settlement Fund, and (ii) structure the transactions contemplated by this Agreement to achieve favorable tax treatment to Cryovac, Inc. and its Affiliates, as set forth in paragraphs II(a) and (b) of this Agreement, <u>provided</u>, <u>however</u>, that nothing herein shall in any way be construed as a representation, warranty, or covenant concerning the treatment for federal income tax purposes of any transfer by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement.  Without limiting the foregoing, each of the Plaintiffs shall use its best efforts to, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts to, cause the constitutive document(s) of each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred pursuant to paragraph II(a) of this Agreement to contain

29

provisions, reasonably satisfactory to Cryovac, Inc., qualifying and maintaining its status as a Qualified Settlement Fund, and providing that Cryovac, Inc. or its designee shall be a Transferor to each such trust. Each of the Plaintiffs shall, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall (i) promptly provide to Cryovac, Inc. all Material Drafts of each Trust Document (but excluding or redacting the claims resolution procedures), provided, however, that any Plaintiff or Debtor shall not be required to provide any draft of a Trust Document that such Plaintiff or Debtor, as the case may be, does not have in its possession, custody, or control, and provided, further, that Cryovac, Inc. shall keep any such Material Draft confidential and shall disclose any such Material Draft only to Sealed Air Corporation, and officers, employees, and advisors of Cryovac, Inc., Sealed Air Corporation, or its Affiliates, and only after such Person agrees to keep such Material Draft confidential, and (ii) incorporate promptly (if such party is the party drafting such Trust Document), or if otherwise, urge the party drafting such Trust Document promptly to incorporate, into any such document each provision with respect to the subject matter set forth or referred to in paragraphs II(c)(ix), (x), and (xi), and VI(g), and clauses (i)(A) through (D) of paragraph VI(c), of this Agreement that are reasonably requested by Cryovac, Inc. Notwithstanding anything to the contrary contained in the immediately preceding sentence, Cryovac, Inc. and officers, employees, advisors and other agents of Cryovac, Inc., Sealed Air Corporation, or its Affiliates may disclose to any and all Persons, without limitation of any kind, the tax treatment and any facts that may be relevant to the tax structure of the transactions contemplated by this Agreement.

b.       Each of the Plaintiffs shall, and shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors and the Non-Debtor Affiliates shall, (i) take all Defined Actions required to be taken pursuant to, or that are reasonably

30

requested by Sealed Air Corporation and consistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement and (ii) be prohibited from taking any Defined Action prohibited from being taken pursuant to, or that is inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this sentence if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(b), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion. Each of the Plaintiffs shall use its best efforts, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts, not to make any statement in a court document filed in the Debtors' chapter 11 cases or in any oral statement to the court in the Debtors' chapter 11 cases that is prohibited by, or inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this sentence if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this sentence, (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not

31

provided such Person with a Sealed Air Opinion. Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall cause each of the Non-Debtor Affiliates to perform and satisfy fully all obligations, covenants, and agreements of such Non-Debtor Affiliate set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order.

c.    Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that (i) each of the Debtors and their Affiliates shall promptly notify Cryovac, Inc. and Sealed Air Corporation upon receipt by any Debtor or any Affiliate of any Debtor of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim involving any Debtor or any Affiliate of any Debtor from any Tax authority or any other Person challenging (A) the qualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund, (B) the qualification of Cryovac, Inc. as a Transferor to any Cryovac 524(g) Trust, (C) the payment by Cryovac, Inc. to one or more 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to such 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and (D) the payment, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as an ordinary and necessary expense of Cryovac, Inc. or as income of Grace Specialty (any such audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim, a "Tax Claim"), (ii) Cryovac, Inc. and Sealed Air Corporation shall be entitled to participate at their expense in the defense or prosecution of any Tax Claim (including to participate in all discussions with the Tax authorities regarding such Tax Claims and to be allowed to provide affirmative suggestions or

32

comments with respect to any written submissions or communications to the Tax authorities regarding such Tax Claims, which comments and suggestions shall be incorporated into such written submissions or communications with the consent of the Debtors, such consent not to be unreasonably withheld), and the Debtors and their Affiliates shall consult with Cryovac, Inc. and Sealed Air Corporation in connection with the defense or prosecution of any such Tax Claim and provide such cooperation and information as Cryovac, Inc. and Sealed Air Corporation shall reasonably request with respect to any such Tax Claim, (iii) each of the Debtors and its Affiliates shall agree to use its best efforts to attempt to sever any Tax Claim from other issues raised in any audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim, (iv) in furtherance of the obligations of the Debtors set forth in this paragraph VI(d), W.R. Grace & Co.-Conn. and W.R. Grace & Co. shall, and shall instruct their respective Chief Executive Officer, Chief Financial Officer, and Director of Taxes, and shall cause each of their Affiliates, to (A) deliver, promptly after the receipt of any document received from the IRS relating to a Tax Claim, a copy of such document to Cryovac, Inc. and Sealed Air Corporation, (B) deliver to Cryovac, Inc. and Sealed Air Corporation any document delivered to the IRS with respect to a Tax Claim promptly after such document is delivered to the IRS, provided, however, that, if such document was prepared in response to a request by the IRS, then prior to the delivery of such document to the IRS, Cryovac, Inc. and Sealed Air Corporation shall be allowed to provide affirmative suggestions or comments with respect to any such document, as provided in paragraph VI(c)(ii) of this Agreement, (C) provide Cryovac, Inc. and Sealed Air Corporation, at least five days prior to any meeting or conference (whether in person or by teleconference) scheduled with the IRS during which a Tax Claim may be discussed, with written notice of such scheduled meeting or conference, and an opportunity to attend the portions of such meeting or conference during which

33

any Tax Claim is discussed, and (D) provide Cryovac, Inc. and Sealed Air Corporation with cooperation and information reasonably requested by Cryovac, Inc. or Sealed Air Corporation in connection with any Tax Claim, including, at Cryovac, Inc.'s or Sealed Air Corporation's request, status updates with respect to all Tax Claims, (v) any document to be provided by the Debtors to Cryovac, Inc. or Sealed Air Corporation in furtherance of the obligations set forth in this paragraph VI(c) may be redacted by the Debtors to exclude information not pertinent to the Tax Claim and (vi) unless otherwise required by a Final Determination, none of the Debtors or any of their Affiliates shall settle or otherwise dispose of any Tax Claim.

d.      The obligations of each Plaintiff contained in paragraphs II(c)(ix), (x), and (xi), and VI(a) and (b) of this Agreement shall survive until such Plaintiff has ceased to exist.

e.      Each of the Plaintiffs shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide an acknowledgment and agreement of each of the Debtors that (i) to the extent that any of the Debtors are required, pursuant to generally accepted accounting principles, to accrue a liability for asbestos which liabilities are satisfied by Cryovac, Inc. by a transfer made by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to this Agreement and such Debtor is required pursuant to generally accepted accounting principles to reverse such accrual, to the extent that there is more than one methodology under generally accepted accounting principles pursuant to which the Debtors are allowed to reverse any such accrual, such Debtor shall adopt the methodology, if any, not inconsistent with the provisions of paragraphs VI(b) and VI(g) of this Agreement, (ii) any payment or transfer by Cryovac, Inc. directly to a 524(g) Trust shall not be treated, for financial accounting purposes, as resulting in an expense or deduction of any Debtor or Non-Debtor Affiliate and (iii) to the extent that any payment or transfer by Cryovac, Inc. directly to a Cryovac 524(g) Trust results, for financial accounting purposes, in income to any Debtor, Debtors

34

shall treat such income as income from the cancellation of indebtedness or liabilities of the Debtors. Sealed Air Corporation and Cryovac, Inc. acknowledge and agree that the obligation of the Debtors to reverse any accrual referred to in paragraph VI(e)(i) of this Agreement shall not be a breach of such Debtor's obligations set forth or referred to in this Agreement.

f.      If any of the Plaintiffs, and each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that if, any of the Debtors, the Non-Debtor Affiliates, or the Cryovac 524(g) Trusts, has determined that an issue (a "Paragraph VI(f) Issue") may exist with respect to its taking, or the failure to take, a Defined Action as required pursuant to paragraph II(c)(ix), (x), or (xi), or VI(b) or VI(g), of this Agreement, then, prior to delivering a Contrary Opinion to Sealed Air Corporation with respect to such Defined Action in accordance with the provisos set forth in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g) of this Agreement, as the case may be, (i) such Person shall provide to Sealed Air Corporation, as promptly as practicable, a written notice identifying such Defined Action and describing in detail the Paragraph VI(f) Issue and (ii) such Person shall, and shall cause its advisors (including accountants and tax attorneys, as the case may be) to,  and Sealed Air Corporation shall, consult and act in good faith to determine and resolve (A) if such issue relates to a Tax issue, whether, as a result of a Change in Circumstances, there is no "reasonable basis", as defined in section 6662 of the Internal Revenue Code (or successor provision thereof ), for the taking of, or the failure to take, such Defined Action by such Person or (B) if such issue relates to an accounting issue, whether, as a result of a Change in Circumstances, the taking, or the failure to take, such Defined Action is inconsistent with generally accepted accounting principles.

g.      Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that:

35

(i) unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of paragraph II(c)(ix) of this Agreement and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of paragraph II(c)(ix) of this Agreement and (B) shall be prohibited from taking any Defined Action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac, Inc. being treated as a Transferor to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac, Inc. directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(i) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(i), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(ii) if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes any and all payments by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and the Debtors and Non-Debtor Affiliates (A) for financial accounting or any other regulatory purpose, shall be prohibited from treating any payment by Cryovac, Inc. directly to a Cryovac 524(g) Trust as a payment by Cryovac, Inc. to any of the Debtors or Non-Debtor Affiliates, or as a payment by any Debtor or Non-Debtor Affiliate to any Person (including any 524(g) Trust) (or treating such payment as, or resulting in, an expense or deduction of any Debtor or Non-Debtor Affiliate), (B) for Tax purposes, shall be prohibited from claiming that any payment by Cryovac, Inc. directly to a Cryovac 524(g) Trust results in or gives rise (directly or indirectly) to the accrual or allowance of a deduction or expense, or income to, or any other transfer of any type to, any Debtor or Non-Debtor Affiliate, (C) shall take all Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph VI(g)(ii), (D) shall not take any position inconsistent with the foregoing on any Tax Return or with any Tax authority, and (E) shall not make any statement in any public or regulatory filing or release or otherwise, or take any other Defined Action, that is inconsistent with the obligations of such Person pursuant to this paragraph VI(g)(ii); provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(ii) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(ii), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation,

36

and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion; and

(iii) unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes all payments, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as ordinary income of Grace Specialty, and the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph VI(g)(iii) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph VI(g)(iii) and (B) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph VI(g)(iii) or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, Inc.; provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(iii) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(iii), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion.

    h.    The Debtors may prepare and execute (but not file with the IRS or other governmental authority, which filing shall be effected only by Cryovac, Inc. pursuant to and in accordance with this Agreement) a Protective Claim (a "Grace Protective Claim") for the taxable year of the Debtors in which the payments and transfers provided in paragraph II(a) of this Agreement (the "Transfer") are made, or for any other prior (solely with respect to a carryback from the taxable year of the Transfer) or subsequent taxable year in which the Tax Benefits realized as a result of such Transfer may be claimed by the Debtors (any such taxable year, a "Relevant Tax Year"), and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for and on behalf of the Debtors, provided, however, that a Grace Protective Claim shall not be required to be filed by Cryovac, Inc. at any time prior to 15 days before the expiration (taking into account all extensions thereof) of the applicable statute of limitations for the Debtors to file an amended return ("SOL") for

37

the Relevant Tax Year, and provided, further, that, notwithstanding anything to the contrary set forth in this paragraph VI(h), the Debtors may prepare and execute a Grace Protective Claim, and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for a Relevant Tax Year, only if each of the following requirements has been previously satisfied:

(i) (A) the Debtors have granted each extension (and each further extension) to the applicable SOL for such Relevant Tax Year that has been requested by the IRS; (B) at the time of each such request by the IRS referred to in this paragraph VI(h)(i), above, to extend (or further extend) the applicable SOL for such Relevant Tax Year, the Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer; (C) in the event that the IRS has not requested the Debtors to extend (or further extend) the applicable SOL for such Relevant Tax Year prior to 180 days prior to the end of such SOL, the Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer, and (D) the Debtors shall have provided to Cryovac, Inc. a written statement by their Chief Financial Officer that each of the requirements set forth immediately above in paragraphs VI(h)(i)(A), (B) and (C) of this Agreement has been satisfied in all respects; and

(ii) each of the Confirmation Order and the Chapter 11 Plan expressly provide the provisions of this paragraph VI(h) in its entirety, the provisions of paragraphs VI(i) through VI(l) set forth below in their entirety, and that: (A) in addition to the obligation of Cryovac, Inc. to file a Grace Protective Claim if required by the Debtors in accordance with and subject to the conditions set forth in this paragraph VI(h), Sealed Air Corporation may file a Grace Protective Claim with the IRS or other taxing authority for a Relevant Tax Year at its election, and in connection therewith, the Debtors shall prepare and execute such Grace Protective Claim; (B) the Debtors shall pay to Cryovac, Inc. in immediately available funds fifty (50) percent of the amount of any Tax Benefit realized as a result of the Transfer no later than ten (10) days after such Tax Benefit has been deemed to have been Actually Realized pursuant to this paragraph VI(h); (C) if requested by Sealed Air Corporation, the Debtors shall use their best efforts to extend (and cause the IRS to agree to extend) the applicable SOL for any Relevant Tax Year; (D) other than any obligation of Cryovac, Inc. expressly set forth in paragraphs VI(h) through VI(l) of this Agreement, no obligations relating to the subject matter set forth in paragraphs VI(h) through (l) shall be undertaken or deemed to be undertaken by Cryovac, Inc. or any of its affiliates pursuant to paragraphs VI(h) through VI(l) of this Agreement or otherwise, and (E) the language to be included in Part II of Form 1120X (or applicable section of any similar state or local tax form) of a Grace Protective Claim shall include the language set forth on Exhibit 7 and only such other language as may be mutually agreed to by the Debtors and Cryovac, Inc.

For purposes of this Agreement, "Tax Benefit" shall mean the amount of any reduction of the actual Tax liability (after giving effect to any alternative minimum or similar Tax) of the Debtors to the

38

appropriate governmental authority for a taxable year as a result of the Transfer (including, without limitation, as a result of a deduction, loss, credit, or exclusion, whether available in the current taxable year, as an adjustment to the taxable income in any other taxable year or as a carryforward or carryback, as applicable, or as an offset or reduction to any assessment), increased by any interest (on an after-Tax basis) received from such governmental authority relating to such reduction in Tax liability; it being understood that the amount of such reduction of the actual Tax liability of the Debtors to the appropriate governmental authority for a taxable year shall take into account, without duplication, the amount of any correlative increase in Tax liability of the Debtors (including as a result of any correlative inclusion, gain, reduction in a credit, or as an increase to any assessment) for such taxable year as a result of the Transfer. For purposes of this Agreement, a Tax Benefit shall be deemed to have been "Actually Realized" at the time any refund of Taxes is actually received or applied against other Taxes due (including all assessments by any governmental authority), or at the time of the filing of a Tax Return (including any Tax Return relating to estimated Taxes) on which a deduction, loss or other Tax item is applied to reduce the amount of Taxes which would otherwise be payable. The determination of any Tax Benefit Actually Realized as a result of the Transfer shall be deemed to have been utilized based on the order that the deductions, losses, credits, exclusions or other Tax items realized as a result of the Transfer are considered to be utilized by the Debtors pursuant to the ordering rules set forth in the Internal Revenue Code and the Treasury Regulations.

i.      The Debtors shall withdraw all Grace Protective Claims upon a Cryovac Final Determination that the Transfer results in a Tax Benefit to Cryovac, Inc. (or the affiliated group filing a consolidated Tax Return of which Sealed Air Corporation is the common parent), and the Debtors shall provide a written statement to Cryovac, Inc. signed by the Chief Financial Officer of the Debtors stating that all Grace Protective Claims have been withdrawn. Cryovac, Inc. shall notify the

39

Debtors to pursue all Grace Protective Claims upon a Cryovac Final Determination that the Transfer results in no Tax Benefit to Cryovac, Inc. (or the affiliated group filing a consolidated Tax Return of which Sealed Air Corporation is the common parent). Upon receipt of such notice referred to in the preceding sentence or if otherwise requested in writing by Cryovac, Inc., the Debtors shall use reasonable best efforts to pursue all Grace Protective Claims, and the Debtors shall keep Cryovac, Inc. fully informed of, and Cryovac, Inc. shall be entitled to participate in, all developments with respect to all such Grace Protective Claims in a manner consistent with the provisions set forth in paragraphs VI(c)(ii) through (vi) of this Agreement. For purposes of this Agreement, "Cryovac Final Determination" means the later of (i) sixty days after the expiration of the statute of limitations (taking into account all extensions thereof) of the Sealed Air Corporation affiliated group filing a consolidated Tax Return for the taxable year in which Cryovac, Inc. makes the Transfer and (ii) if the IRS has challenged the ability of the Sealed Air Corporation affiliated group filing a consolidated Tax Return to claim any deduction or loss as a result of the transactions set forth in or contemplated by this Agreement, sixty days after the final resolution of the last of all such issues by a decision or other order of a court of competent jurisdiction, which has become final and unappealable, or the execution by Sealed Air Corporation of a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code.

j.      For purposes of determining any Tax Benefit that is Actually Realized by the Debtors as a result of the Transfer:

(i)      No later than ten (10) days after the Debtors shall have Actually Realized a Tax Benefit as a result of the Transfer, the Debtors shall provide Cryovac, Inc. with a detailed statement (the "Tax Benefit Statement") specifying (A) the amount of the Tax Benefit that was Actually Realized by the Debtors and any information relevant to the computation thereof (including

40

full access to any applicable Tax Return, non-proprietary work papers and other materials and information of the Debtors and their accountants), (B) the date that such Tax Benefit was Actually Realized, (C) the amount of deduction, loss, credit or exclusion initially claimed by the Debtors as a result of the Transfer (the "Initial Tax Benefit Item"), (D) the amount of the Initial Tax Benefit Item that is utilized by the Debtors to create such Tax Benefit Actually Realized (including as a result of all or a portion of the Initial Tax Benefit Item being carried back or forward), and (E) the amount of the Initial Tax Benefit Item not yet utilized by the Debtors (to create a Tax Benefit Actually Realized) that will be carried forward.

(ii)    No later than 30 days after the Debtors have filed their U.S. federal consolidated income Tax Return for each year beginning the year that includes the Tax Benefit Start Date, the Debtors shall deliver to Cryovac, Inc. an annual statement (the "CFO Annual Statement"), signed by their Chief Financial Officer under penalties of perjury, that sets forth (A) the amount of the Tax Benefits Actually Realized, if any, by the Debtors as a result of the Transfer during the preceding taxable year (including, without limitation, as a result of an amended return for any taxable year, a loss or deduction being utilized for such preceding taxable year, a loss or credit carryback from such preceding taxable year, or a loss or credit carryforward to such preceding taxable year), (B) the date (or dates) such Tax Benefits were Actually Realized during such taxable year, (C) the amount of the Initial Tax Benefit Item, (D) the amount of the Initial Tax Benefit Item that is utilized by the Debtors to create such Tax Benefit Actually Realized, and (E) the amount of the Initial Tax Benefit Item not yet utilized by the Debtors (to create a Tax Benefit Actually Realized) that will be carried forward.  The Debtors shall also provide Cryovac, Inc. with all information relevant to the computation of such Tax Benefits Actually Realized by the Debtors set forth in paragraph VI(j)(ii)(A) of this Agreement (including full access to any applicable Tax Return, the non-

41

proprietary work papers, and other materials and information of the Debtors and their accountants). For purposes of this Agreement, "Tax Benefit Start Date" means the date on which the Debtors are required to pursue all Protective Claims pursuant to the third sentence of paragraph VI(i) of this Agreement.

(iii)    If Cryovac, Inc. disagrees in any respect with the Debtors' computation of the amount of the Tax Benefit Actually Realized that is set forth on the Tax Benefit Statement or the CFO Annual Statement, Cryovac, Inc. may, on or prior to forty-five (45) days after the receipt of either such statement from the Debtors, deliver a notice to the Debtors setting forth in reasonable detail the basis for Cryovac, Inc.'s disagreement therewith ("Tax Benefit Dispute Notice"). If no Tax Benefit Dispute Notice is received by the Debtors on or prior to the forty-fifth (45th) day after Cryovac, Inc.'s receipt of the Tax Benefit Statement or the CFO Annual Statement, as the case may be, from the Debtors, the Tax Benefit Statement or the CFO Annual Statement, as the case may be, shall be deemed accepted by Cryovac, Inc.

(iv)    Within fifteen (15) days after the Debtors' receipt of a Tax Benefit Dispute Notice, unless the matters in the Tax Benefit Dispute Notice have otherwise been resolved by mutual agreement of the parties, the Debtors and Cryovac, Inc. shall jointly select a nationally-recognized independent certified public accountant (the "Tax Benefit Accountant"); provided, however, if the Debtors and Cryovac, Inc. are unable to agree upon the Tax Benefit Accountant within such fifteen (15) day period, then the Debtors and Cryovac, Inc. shall each select a nationally-recognized independent certified public accountant which shall then jointly choose the Tax Benefit Accountant within fifteen (15) days thereafter. The Tax Benefit Accountant shall conduct such review of the work papers and such other materials and information, and the Tax Benefit Dispute Notice, and any supporting documentation as the Tax Benefit Accountant in its sole discretion deems necessary, and

42

the Tax Benefit Accountant shall conduct such hearings or hear such presentations by the parties or obtain such other information as the Tax Benefit Accountant in its sole discretion deems necessary. The Tax Benefit Accountant shall, as promptly as practicable and in no event later than forty-five (45) days following the date of its retention, deliver to the Debtors and Cryovac, Inc. a report (the "Tax Benefit Report") in which the Tax Benefit Accountant shall, after reviewing disputed items set forth in the Tax Benefit Dispute Notice, determine what adjustments, if any, should be made to the amount of the Tax Benefit Actually Realized. The Tax Benefit Report shall set forth, in reasonable detail, the Tax Benefit Accountant's determination with respect to the disputed items or amounts specified in the Tax Benefit Dispute Notice, and the revisions, if any, to be made to the amount of the Tax Benefit Actually Realized, together with supporting calculations. All fees and expenses relating to this work of the Tax Benefit Accountant shall be borne equally by the Debtors and Cryovac, Inc. Absent manifest error, the Tax Benefit Report shall be final and binding upon the Debtors and Cryovac, Inc., and no party shall seek further recourse to courts, other arbitral tribunals or otherwise. The Debtors shall pay to Cryovac, Inc. in immediately available funds no later than five (5) days after delivery of the Tax Benefit Report to the Debtors and Cryovac, Inc. the sum of (x) the excess, if any, of fifty (50) percent of the amount of the Tax Benefit Actually Realized set forth in the Tax Benefit Report over the amount previously paid, if any, by the Debtors to Cryovac, Inc. with respect thereto and (y) interest with respect to any such excess, as provided for in paragraph VI(k) of this Agreement.

(v)     If a loss, deduction, credit or exclusion that resulted in Tax Benefit that was Actually Realized by the Debtors is later denied by a Taxing authority by (x) a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable or (y) any other means (including a closing agreement or accepted offer in compromise under section 7121

43

or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which

consent shall not be unreasonably withheld or delayed, the Debtors shall provide a written statement,

signed under penalties of perjury by the Chief Financial Officer of the Debtors, that states (A) the

amount of such loss, deduction, credit or exclusion that was denied, (B) the amount of the Tax

Benefits Actually Realized that was initially determined and paid by the Debtors to Cryovac, Inc. for

such taxable period, and (C) the revised amount of the Tax Benefit Actually Realized for such

taxable period taking into account the denial of such loss, deduction, credit or exclusion.  The

Debtors shall also provide to Cryovac, Inc. any information relevant to the computation of such

initial and revised amount of the Tax Benefits Actually Realized by the Debtors (including full

access to any applicable Tax Return, the non-proprietary work papers, and other materials and

information of the Debtors and their accountants).  If Cryovac, Inc. disagrees in any respect with the

Debtors' computation of such revised amount of the Tax Benefit Actually Realized by the Debtors

for such taxable period, the principles of the dispute resolution mechanism set forth in paragraphs

VI(j)(iii) and VI(j)(iv) shall apply.  No later than five (5) days after final resolution of the amount

of the revised Tax Benefits Actually Realized for such taxable period, Cryovac, Inc. shall pay to the

Debtors in immediately available funds fifty (50) percent of the excess, if any, of the amount of Tax

Benefits Actually Realized that was initially determined for such taxable period and paid by the

Debtors to Cryovac, Inc. over the amount of the Tax Benefit Actually Realized for such taxable

period as revised.  Any amount that is not paid within the period set forth in this paragraph VI(j)(v)

shall accrue interest in accordance with paragraph VI(k) of this Agreement.

   k.  Notwithstanding anything to the contrary set forth in this Agreement, any amount of

Tax Benefit Actually Realized that is required to be paid by the Debtors to Cryovac, Inc.  pursuant

to this Agreement and that is not paid within the period set forth in paragraph VI(h) of this

44

Agreement shall accrue interest at the prime rate announced from time to time by Bank of America, N.A., compounded annually.

l.      In the event of a conflict between this Agreement and the 1998 Tax Sharing Agreement, this Agreement shall govern and control.

## VII.    General Matters and Reservations

a.      In addition to other conditions set forth in this Agreement, the obligation of the parties to conclude the proposed settlement set forth in this Agreement is subject to and contingent upon the entry of a Final Order by this Court approving this Agreement, pursuant to Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure.

b.      This Agreement (as amended, modified, or supplemented) sets forth the sole and entire agreement among the parties with respect to its subject matter, and may not be waived, amended, modified, or supplemented except by written instrument executed by duly authorized representatives of each of the parties and entitled "Modification of Settlement Agreement and Release." This Agreement supercedes any prior agreement, understanding, or undertaking (written or oral) by and among the parties regarding the subject matter of this Agreement.

c.      All parties agree that the terms of this Agreement were drafted jointly by counsel for the parties following extensive arm's length negotiations. In the event there arises an ambiguity or question of intent or interpretation of this Agreement or any provision thereof, the Agreement (and each of its provisions) shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

45

d.      The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties, and shall not, in any way, define, limit, extend, or otherwise affect the scope, meaning, intent, or interpretation of this Agreement or any provision thereof.

e.      Without affecting any determination as to the law applicable to the Action, this Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to its provisions on conflict of laws).

f.      Nothing in this Agreement shall preclude any action to enforce any of the terms of this Agreement; provided, however, that any such action shall be brought exclusively in this Court, which shall retain jurisdiction of this matter and of the parties to this Agreement for the purposes of enforcing and implementing the terms and conditions of this Agreement and resolving disputes as to the rights and obligations of the parties under this Agreement; provided, further, that section 524(g)(2) shall govern jurisdiction over any proceeding that involves any injunction issued in accordance with this Agreement under section 524(g) of the Bankruptcy Code. The parties to this Agreement submit to the jurisdiction of this Court for these purposes.

g.      This Agreement may be executed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

h.      All parties to this Agreement shall jointly move this Court within thirty days of its execution for full and complete approval of this Agreement, and as applicable agree to enter into the Registration Rights Agreement, the Release, the Indemnity Agreement, and the ancillary documents when and as contemplated in this Agreement.

46

i.    This Agreement shall be binding upon and inure to the benefit of each of the Plaintiffs, each of the Released Parties, and any and all of their respective heirs, legal representatives, administrators, successors and assigns, <u>provided that</u> (i) neither this Agreement nor any substantial right or obligation hereunder may be assigned by Sealed Air Corporation or Cryovac, Inc. without the written consent of the other parties that have signed this Agreement, which consent shall not be unreasonably withheld and (ii) none of the Debtors shall transfer or agree to transfer a substantial part of its assets (in one or a series of transactions, whether or not related) to any Person or Persons without a prior determination of the Court by Final Order that at the time of each such transaction such Debtors, collectively with any such successors who will be jointly and severally liable for the obligations of such Debtors, will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including, without limitation, all Indemnified Taxes and all obligations set forth or referred to in this Agreement, including, without limitation, all such obligations set forth in the Chapter 11 Plan or Confirmation Order, and provided, further, that paragraph VII(i)(ii) of this Agreement shall not apply at any time when the following two conditions in paragraphs VII(i)(ii)(A) and (B) of this Agreement are both satisfied: (A)(1) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the Released Parties (including assessment and collection pursuant to section 6901 of the Internal Revenue Code) is barred by such statutes of limitation and (2) all Indemnified Taxes have been paid by the Debtors in accordance with the 1998 Tax Sharing Agreement and the Released Parties have received from the Debtors (or adequate provision satisfactory to the Released Parties has been made for the payment of) all indemnification and other payments claimed by the Released Parties against any of the Debtors in respect of Indemnified Taxes and related matters in accordance with the 1998 Tax Sharing Agreement; and (B) the injunctions required pursuant to

47

paragraph II(c)(vi) of this Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (1) alleging an Asbestos-Related Claim and seeking to impose liability on one or more of the Released Parties notwithstanding the existence and continuing operative effect of such injunctions or (2) challenging in any manner the continuance and operative effect of such injunctions in respect of the Released Parties.

   j. Without prejudice to any rights or remedies otherwise available to any party to this Agreement, each party to this Agreement acknowledges that damages would be an inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations under this Agreement shall be specifically enforceable.

   k. All notices and other communication hereunder shall be in writing and shall be deemed to have been duly given upon receipt if: (i) mailed by certified or registered mail, return receipt requested, (ii) sent by Federal Express or other express courier, fee prepaid, (iii) sent via facsimile with receipt confirmed, or (iv) delivered personally, addressed as follows or to such other address or addresses of which the respective party shall have notified the other.

   A. If to the Plaintiffs, to:

> Official Committee of Asbestos Property Damage Claimants
> c/o Bilzin Sumberg Baena Price & Axelrod LLP
> 200 South Biscayne Boulevard
> Suite 2500
> Miami, Florida 33131
> Attention: Scott L. Baena
> Telephone: (305) 350-2403
> Facsimile: (305) 374-7593

> -and-

> Official Committee of Asbestos Personal Injury Claimants
> c/o Caplin & Drysdale, Chartered
> One Thomas Circle, NW
> Washington, D.C.  20005

48

Attention: Peter V. Lockwood
Telephone: (202) 862-5000
Facsimile:  (202) 429-3301

B.    If to the Released Parties, to:

Sealed Air Corporation/Cryovac, Inc.
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  General Counsel and Secretary
Facsimile:  (201) 703-4113

with copies to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036-6522
Attention:  Sheila L. Birnbaum
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

49

NOV-11-2003  10:18          SPEIGHTS & RUNYAN                    8039434599   P.02/02

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date

written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: _____
Title: _____

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: Daniel A. Speights
Title: Co-Chair

SEALED AIR CORPORATION

By: _____
Print Name: _____
Title: _____

CRYOVAC, INC.

By: _____
Print Name: _____
Title: _____

50

TOTAL P.02

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date

written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: _Perry Weitz_____
Title: _Co-Chairman_____

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: _____
Title: _____

SEALED AIR CORPORATION

By: _____
Print Name: _____
Title: _____

CRYOVAC, INC.

By: _____
Print Name: _____
Title: _____

50

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: _____
Title: _____

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: _____
Title: _____

SEALED AIR CORPORATION

By: _____
Print Name: David H. Kelsey
Title: Vice President and Chief Financial Officer

CRYOVAC, INC.

By: _____
Print Name: David H. Kelsey
Title: Vice President and Chief Financial Officer

50

**Exhibit 1:  REGISTRATION RIGHTS AGREEMENT**
(The remainder of this page has been intentionally left blank.)

[THIS PAGE INTENTIONALLY LEFT BLANK]

## REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (the "Registration Rights Agreement") is made and entered into as of _____, 200__, by and between SEALED AIR CORPORATION, a Delaware corporation, the Initial Holders (as defined below), and any other Person who later becomes a party to this Registration Rights Agreement by executing and delivering a Joinder Agreement in the form attached as Exhibit A hereto (the "Joinder Agreement"), in connection with the issuance of 9,000,000 shares of Sealed Air Common Stock (as defined below), as more fully set forth in the Settlement Agreement (as defined below).

## ARTICLE I

### Certain Definitions

All capitalized terms not otherwise defined in this Registration Rights Agreement shall have the meanings ascribed thereto in the Settlement Agreement. As used in this Registration Rights Agreement, the following terms shall have the meanings ascribed to them below:

1.1    "Acquisition Blackout Period" shall have the meaning set forth in Section 2.1(e).

1.2    "Blackout Period" shall have the meaning set forth in Section 2.1(e).

1.3    "Commission" shall mean the Securities and Exchange Commission or any federal agency at the time administering the Securities Act.

1.4    "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, or any federal statute then in effect which has replaced such statute.

1.5    "Holder" shall mean any Person, including any Initial Holder, who is a holder of record or beneficial owner of Registrable Securities for so long as such Person is a holder of record or beneficial owner of any Registrable Securities.

1.6    "Holder Post-Effective Amendment" shall have the meaning set forth in Section 2.1(d).

1.7    "Initial Holder" shall mean any Person to whom Cryovac, Inc. transfers the Settlement Shares on or after the Effective Date.

1.8    "Maximum Blackout Period" shall have the meaning set forth in Section 2.1(e).

1.9    "Piggyback Registration" shall have the meaning set forth in Section 2.2(a).

1.10    "Registrable Securities" shall mean the Settlement Shares and any other securities described in Section 8.1(ii); provided that such securities shall cease to be Registrable

1

Securities (i) when a registration statement registering such Registrable Securities under the Securities Act has been declared or becomes effective and such Registrable Securities have been sold or otherwise transferred by the Holder thereof pursuant to such effective registration statement, (ii) when such Registrable Securities are sold pursuant to Rule 144 or such Registrable Securities are eligible to be sold pursuant to paragraph (k) of Rule 144, (iii) on and after the date that is two years after the date that Cryovac, Inc. transfers the Settlement Shares to the Initial Holders, or (iv) when such Registrable Securities shall cease to be outstanding.

      1.11    "<u>Rule 144</u>" shall mean Rule 144 promulgated under the Securities Act.

      1.12    "<u>Sealed Air Common Stock</u>" shall mean the common stock, par value $0.10 per share, of Sealed Air Corporation.

      1.13    "<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended, or any federal statute then in effect which has replaced such statute.

      1.14    "<u>Senior Notes</u>" shall have the meaning set forth in Section 2.2(a).

      1.15    "<u>Shelf Amendment</u>" shall have the meaning set forth in Section 2.1(e).

      1.16    "<u>Shelf Registration Statement</u>" shall have the meaning set forth in Section 2.1(a).

      1.17    "<u>Settlement Agreement</u>" shall mean the Settlement Agreement and Release, dated as of November 10, 2003, of which this Registration Rights Agreement is an exhibit.

      1.18    "<u>Settlement Shares</u>" shall mean the shares of Sealed Air Common Stock issued pursuant to the Settlement Agreement, including any additional securities or securities issued in place of Sealed Air Common Stock upon an anti-dilution or other adjustment made pursuant to Section III of the Settlement Agreement.

      1.19    "<u>Underwritten Holders</u>" shall have the meaning set forth in Section 2.1(f).

ARTICLE II

Registration Rights

    2.1    <u>Shelf Registration</u>.

      (a)    Subject to Section 2.1(e), following the Effective Date, Sealed Air Corporation will use reasonable best efforts to prepare and file with the Commission as soon as reasonably practicable but not later than the date that is 60 days after the Effective Date, a shelf registration statement on Form S-3 or any other appropriate form under Rule 415 of the Securities Act, or any similar rule that may be adopted by the Commission relating to the offer and sale of all of the Registrable Securities by Holders from time to time in accordance with the methods of distribution elected by such Holders and set forth in such shelf registration statement (together with

2

all amendments and supplements to such registration statement, including post-effective amendments, in each case including the prospectus contained therein, all exhibits thereto, and all material incorporated by reference therein (the "Shelf Registration Statement").

(b)    Sealed Air Corporation is obligated to effect one (1) Shelf Registration Statement. A registration shall not count as the Shelf Registration Statement until the Commission has declared the registration statement filed pursuant to Section 2.1(a) effective.

(c)    Subject to Section 2.1(e), Sealed Air Corporation will use reasonable best efforts to file all documents as may be required to cause and to cause the Shelf Registration Statement to be declared effective by the Commission as soon as reasonably practicable in order to permit and facilitate the sale and distribution of the Registrable Securities and to remain effective for a period ending on the date on which there cease to be any Registrable Securities, as contemplated by Section 1.10.

(d)    Each Holder of Registrable Securities that wishes to sell Registrable Securities pursuant to the Shelf Registration Statement and the related prospectus agrees to deliver a notice and questionnaire in the form attached hereto as Exhibit B (a "Notice and Questionnaire") and such other information as Sealed Air Corporation may reasonably require, at least ten (10) business days prior to the intended distribution of such Holder's Registrable Securities under the Shelf Registration Statement. Notwithstanding the foregoing, Holders will use reasonable best efforts to deliver a Notice and Questionnaire to Sealed Air Corporation within 15 days following the Effective Date or the date that such Holder enters into a Joinder Agreement, as the case may be. Provided that the Shelf Registration Statement has been declared effective, Sealed Air Corporation shall, after a Holder has delivered a Notice and Questionnaire and such other information as Sealed Air Corporation may reasonably require, (i) if required by applicable law, file with the Commission a post-effective amendment to the Shelf Registration Statement (a "Holder Post-Effective Amendment") and/or prepare and, if required by applicable law, file a supplement to the related prospectus or amendment to any document incorporated therein by reference or file any other required document so that such Holder is named as a selling security holder in the Shelf Registration Statement and the related prospectus in such a manner as to permit such Holder to deliver such prospectus to the purchaser of the Registrable Securities in accordance with applicable law and, if Sealed Air Corporation shall file a Holder Post-Effective Amendment, use reasonable best efforts to cause such Holder Post-Effective Amendment to be declared effective under the Act, (ii) provide such Holder with such number of copies of any documents filed pursuant to the foregoing as the Holder shall reasonably request, and (iii) notify such Holder after the effectiveness of any post-effective amendment filed hereunder; provided, however, that, if the Notice and Questionnaire is delivered during a Blackout Period, Sealed Air Corporation shall so inform the Holder delivering such Notice and Questionnaire and shall take the actions set forth in clauses (i), (ii) and (iii) above upon expiration of the Blackout Period.

3

(e)    Notwithstanding anything to the contrary contained in this Registration Rights Agreement, Sealed Air Corporation shall have the right to delay the filing or the effectiveness of the Shelf Registration Statement or to suspend the right of a Holder to sell Registrable Securities under an effective Shelf Registration Statement for a period or periods (each, a "Blackout Period") which in the aggregate do not exceed 120 days in any 12 month period (the "Maximum Blackout Period") in the event that (i) Sealed Air Corporation would, in accordance with the reasonable written advice of its counsel, be required to disclose in the prospectus, information not otherwise required by law to be publicly disclosed, or (ii) in the judgment of the Chief Executive Officer of Sealed Air Corporation, there is a reasonable likelihood that such disclosure, or any other action required to be taken in connection with the prospectus, would materially and adversely affect or interfere with any material financing, acquisition, merger, joint venture, disposition of assets (not in the ordinary course of business), corporate reorganization or other similar material transaction involving Sealed Air Corporation, or (iii) a change to the Shelf Registration Statement is required so that, as of such date, the Shelf Registration Statement and prospectus do not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (a "Shelf Amendment"). Sealed Air Corporation shall give the Holders of Registrable Securities included in the Shelf Registration Statement written notice of such determination containing a general statement of the reasons for such postponement and an approximation of the anticipated delay, which delay Sealed Air Corporation shall use its reasonable best efforts acting in good faith to limit to the shortest time practicable; and provided, however, that the implementation of any Blackout Period shall be done in good faith, and not for the purpose or intention of impeding any rights of the Holders. Sealed Air Corporation shall promptly provide written notice to the Holders included in the Shelf Registration Statement when the Blackout Period has ended. Notwithstanding anything to the contrary contained in this Section 2.1(e), one or more Blackout Periods may exceed, in the aggregate, the Maximum Blackout Period, if the Maximum Blackout Period is exceeded by a Blackout Period in connection with, arising out of, or resulting from a significant merger, acquisition or divestiture involving Sealed Air Corporation or any of its subsidiaries (an "Acquisition Blackout Period"); provided, however, that, if the Maximum Blackout Period is exceeded as permitted above, Sealed Air Corporation agrees not to commence any further Blackout Periods during the 12-month period in which the Maximum Blackout Period was exceeded, except for (1) a Holder Post-Effective Amendment, (2) an Acquisition Blackout Period, which in no event will commence until the expiration of 60 days following the last day of the last Blackout Period, or (3) a Blackout Period in reasonable duration in order to effectuate a required Shelf Amendment.

(f)    (i)    Any Holder or Holders who together are the beneficial owners of at least a majority of the then outstanding Registrable Securities and the reasonably anticipated aggregate price to the public, before deducting underwriting commissions, of such Registrable Securities would equal or exceed $75.0 million in the aggregate, may elect to sell such Registrable Securities under the Shelf Registration Statement in an underwritten offering in accordance with the conditions set forth in this Section 2.1(f) (the "Underwritten Holders"). The Underwritten Holders will provide Sealed Air Corporation with written notice of such proposed underwritten offering and in such notice designate a representative for the Underwritten Holders. In any such underwritten offering, the investment banker or bankers and manager or managers that will administer the offering will be selected by, and the underwriting arrangements with respect thereto will be approved by the Underwritten Holders, subject, in each case, to the consent of Sealed Air Corporation, which consent

4

will not be unreasonably withheld or delayed, and the respective Holders will be responsible for all underwriting commissions and discounts with respect to the Registrable Securities sold by such respective Holders in connection therewith. Sealed Air Corporation shall not be obligated to arrange for more than one underwritten offering pursuant to the Shelf Registration Statement. No Holder may participate in such underwritten offering hereunder unless such Holder (i) agrees to sell the Holder's Registrable Securities on the basis provided in any underwriting arrangements approved pursuant hereto, and (ii) completes and executes all other questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, including, but not limited to, custody agreements and lock-up agreements, required under the terms of such underwriting arrangements, so long as all Holders participating in such underwritten offering are required to enter into substantially similar custody agreements or lock-up agreements, as the case may be. Except as otherwise set forth herein, all decisions relating to such underwritten offering, including without limitation, the selection of counsel, shall be made by the Underwritten Holders.

(ii)     Sealed Air Corporation shall as soon as reasonably practical, after receipt of the written notice from the Underwritten Holders pursuant to Section 2.1(f)(i), give written notice of the intended underwritten offering to all other Holders that are beneficial owners of at least 1,000 Registrable Securities and, subject to Section 2.1(f)(iii), the Underwritten Holders shall cause the managing underwriter(s) to include in such underwritten offering all Registrable Securities requested to be included therein pursuant to the written requests of such Holders and received by the representative for the Underwritten Holders within fifteen (15) days after delivery of the written notice from Sealed Air Corporation. Notwithstanding the foregoing, Sealed Air Corporation shall not be required to provide the notice required by this Section 2.1(f)(ii) to beneficiaries of any trust, whether or not such beneficiaries are beneficial owners of Registrable Securities, but only to the trustees of such trust, as provided in Section 8.4.

(iii)     If the managing underwriter(s) for such underwritten offering advises Sealed Air Corporation and the representative for the Underwritten Holders that the amount of Registrable Securities requested to be included therein exceeds the amount of Registrable Securities that can be sold in such underwritten offering or that the number of shares of Registrable Securities proposed to be included in any such underwritten offering would materially and adversely affect the price per share of Sealed Air Common Stock to be sold in such underwritten offering, the number of Registrable Securities to be included in such underwritten offering shall be the number of shares of Registrable Securities which in the opinion of such managing underwriter(s) can be sold. If the number of shares which can be sold is less than the number of shares of Registrable Securities requested to be included in such underwritten offering, the number of shares to be included for each Holder (including the Underwritten Holders) shall be reduced pro rata on the basis of the number of shares requested to be registered by such Holders or as such Holders may otherwise agree.

5

2.2    Piggyback Registration.

(a)    Following the Effective Date, if (i) the number of Registrable Securities then outstanding is at least one percent (1%) of the outstanding Sealed Air Common Stock or all of the outstanding Registrable Securities cannot then be sold at one time under Rule 144, and (ii) Sealed Air Corporation shall determine to register any shares of Sealed Air Common Stock for its own account in a primary underwritten offering or for the account of other holders of Sealed Air Common Stock in a secondary underwritten offering, on any registration form (other than (i) Form S-4 or (ii) S-8 or (iii) other successor forms, or Form S-3, or any successor form, with respect to the registration of shares of Sealed Air Common Stock into which Sealed Air Corporation's 3% Convertible Senior Notes due 2033 (the "Senior Notes") may be converted so long as no other Sealed Air Common Stock is registered thereunder) which permits the inclusion of Registrable Securities held by any Holder (a "Piggyback Registration"), then Sealed Air Corporation will give each Holder that is a beneficial owner of at least 1,000 Registrable Securities written notice thereof and, subject to Section 2.2(c), shall include in such registration all Registrable Securities requested to be included therein pursuant to the written requests of Holders received within 15 days after delivery of Sealed Air Corporation's notice; provided that each such Holder will also provide such additional information as Sealed Air Corporation may reasonably require, including but not limited to a Notice and Questionnaire. Notwithstanding the foregoing, Sealed Air Corporation shall not be obligated to provide the notice required by this Section 2.2 to beneficiaries of any trust, whether or not such beneficiaries are beneficial owners of Registrable Securities, but only to the trustees of such trust, as provided in Section 8.4. Notwithstanding the provisions of this Section 2.2(a), Sealed Air Corporation shall not be required to include any Registrable Securities (i) on a registration statement on Form S-3 if the registration statement solely relates to the issuance and sale by Sealed Air Corporation from time to time of securities of Sealed Air Corporation or any of its subsidiaries pursuant to Rule 415 of the Securities Act, or (ii) on a registration statement in connection with the reclassification, recapitalization, consolidation or an exchange offer of any Sealed Air Corporation securities.

(b)    The right of any Holder to participate in a Piggyback Registration shall be conditioned upon such Holder's participation in such underwriting in accordance with the terms and conditions thereof. Sealed Air Corporation shall have the right to select the managing underwriter(s) for any underwritten Piggyback Registration. All Holders proposing to distribute their Registrable Securities through such underwriting shall (together with Sealed Air Corporation) enter into an underwriting agreement in customary form, and such other agreements, including, but not limited to, custody agreements and lock-up agreements, requested by the managing underwriters, so long as all Holders participating in such underwritten offering are required to enter into substantially similar custody agreements or lock-up agreements, as the case may be.

(c)    If the managing underwriter(s) for such underwritten offering advises Sealed Air Corporation that the amount of securities requested to be included therein exceeds the amount of securities that can be sold in such offering or that the number of shares of Registrable Securities proposed to be included in any such registration would materially and adversely affect the price per share of Sealed Air Common Stock to be sold in such offering, Sealed Air Corporation shall include in such registration only the number of shares of Registrable Securities which in the opinion of such managing underwriter(s) can be sold. If the number of shares which can be sold is

6

less than the number of shares of Registrable Securities requested to be registered, any securities to be sold by Sealed Air Corporation or other holders of Sealed Air Corporation's securities which have initiated such offering shall have priority over any Registrable Securities held by Holders, and the number of shares to be included for each Holder and other holders of Sealed Air Corporation's securities that did not initiate the offering shall be reduced pro rata on the basis of the number of shares requested to be registered by such holders or as such holders may otherwise agree.

(d)     Notwithstanding the provisions of this Section 2.2, Sealed Air Corporation shall have the right at any time after it shall have given written notice to the Holders pursuant to Section 2.2 (irrespective of whether a written request for inclusion of any such securities shall have been made) to elect not to file any such proposed registration statement, to withdraw the same at any time, or to suspend the right of a Holder to sell Registrable Securities under an effective Piggyback Registration; provided, however, that it is suspending the sale of all securities under such Piggyback Registration.

2.3     Registration Procedures.  In the case of each registration effected by Sealed Air Corporation pursuant to this Article II involving the registration of Registrable Securities, Sealed Air Corporation will keep each Holder included in such registration (provided, however, that Sealed Air Corporation shall not be obligated to provide any notice required by this Section 2.3 to beneficiaries of any trust, whether or not such beneficiaries are beneficial owners of Registrable Securities, but only to the trustees of such trust, as provided in Section 8.4, unless such beneficiary is specifically named in the registration statement) advised as to the initiation of such registration and as to the completion thereof.  At its expense, Sealed Air Corporation will use reasonable best efforts to:

(a)     subject to Sections 2.1(e) and 2.2(d), prepare and file any such registration statement and other documents with the Commission and cause such registration statement to be declared effective as soon as reasonably practicable by the Commission; provided, however, that, before filing such registration statement, Sealed Air Corporation will furnish to one counsel selected by the Holders of a majority of Registrable Securities included in such registration statement copies of such registration statement, which registration statement will be subject to the reasonable review and comment of such counsel;

(b)     prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus included therein (including post-effective amendments, prospectus supplements and pricing supplements) as may be necessary, including, in the case of the Shelf Registration Statement, such amendments and supplements as are necessary to effect and maintain the effectiveness of such Shelf Registration Statement for the period specified in Section 2.1(c) and to effectuate the underwritten offering pursuant to Section 2.1(f); provided, however, that before filing such amendments or supplements, Sealed Air Corporation will furnish to one counsel selected by the Holders of a majority of Registrable Securities included in such Shelf Registration Statement copies of such amendments and supplements (but not including any documents incorporated by reference into the Shelf Registration Statement) proposed to be filed, which amendments and supplements will be subject to the reasonable review and comment of such counsel;

7

(c)　　(i) register or qualify the Registrable Securities to be included in such registration statement under such state securities laws or blue sky laws of such jurisdictions as any Holder of such Registrable Securities and each placement or sales agent, if any, therefor and underwriter, if any, thereof shall reasonably request; provided, however, that Sealed Air Corporation shall not be required to take any action to have the Registrable Securities registered with or approved by any governmental agency or authority outside of the United States, and (ii) take any and all other actions as may be reasonably necessary or advisable to enable each such Holder, agent, if any, and underwriter, if any, to consummate the disposition in such jurisdictions of such Registrable Securities; provided, however, that Sealed Air Corporation shall not be required to (1) qualify as a foreign corporation in any jurisdiction wherein it would not otherwise be required to qualify but for the requirements of this Section 2.3(c), or (2) consent to general service of process or taxation in any such jurisdiction;

(d)　　furnish such number of prospectuses and other documents incident thereto, including any amendment of or supplement to the prospectus, as any Holder from time to time may reasonably request;

(e)　　notify the Holders of Registrable Securities included in the registration statement, the sales or placement agent, if any, therefor and the managing underwriter or underwriters, if any, thereof, (i) when such registration statement or the prospectus included therein or any prospectus amendment or supplement or post-effective amendment has been filed, and with respect to such registration statement or any post-effective amendment, when the same has become effective, (ii) of the issuance by the Commission of any stop order suspending the effectiveness of such registration statement, (iii) of the receipt by Sealed Air Corporation of any notification with respect to the suspension of the qualification of the Registrable Securities for the sale in any jurisdiction, (iv) at any time when a prospectus is required to be delivered under the Securities Act, that such registration statement, prospectus, prospectus amendment or supplement or post-effective amendment, or any document incorporated by reference in any of the foregoing, contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, (v) of the occurrence of any Blackout Period; or (vi) the withdrawal of any Piggyback Registration or the suspension of the right of any Holder to sell Registrable Securities under an effective Piggyback Registration;

(f)　　if requested by any managing underwriter or underwriters, any placement or sales agent or any Holder of Registrable Securities included in the registration statement, incorporate in a prospectus supplement or post-effective amendment (i) such information as is required by the applicable rules and regulations of the Commission and as such managing underwriter or underwriters, such agent or such Holder specifies should be included therein relating to the terms of the sale of such Registrable Securities, including, without limitation, information with respect to the principal amount of Registrable Securities being sold by such Holder or agent or to any underwriters, the name and description of such Holder, agent or underwriter, the offering price of such Registrable Securities and any discount, commission or other compensation payable in respect thereof, the purchase price being paid therefor by such underwriters and with respect to any other terms of the offering of the Registrable Securities to be sold by such Holder or agent or to such underwriters, and (ii) such additional information regarding Sealed Air Corporation that would be

8

required if such underwritten offering was made pursuant to a registration statement on Form S-1; provided, however, that the inclusion of such information will only be made following the reasonable request of the managing underwriter(s) of an underwritten offering pursuant to Section 2.1(f);

(g)    cause all Registrable Securities to be listed on the New York Stock Exchange and each other securities exchange, if any, on which the Sealed Air Common Stock is then listed or, if the Sealed Air Common Stock is not listed on any such exchange, to be listed on the National Association of Securities Dealers, Inc. ("NASD") automated quotation system and, if listed on the NASD automated quotation system, use reasonable best efforts to secure designation of all such Registrable Securities covered by the Shelf Registration Statement as a NASDAQ "national market system security" within the meaning of Exchange Act Rule 11Aa2-1 of the Commission or, failing that, to secure NASDAQ authorization for such Registrable Securities;

(h)    in the case of an underwritten offering pursuant to Section 2.1(f) of the Registration Rights Agreement, (i) enter into such customary agreements (including underwriting agreements in customary form) and take such other actions as the underwriters reasonably request in order to expedite or facilitate the disposition of the underwritten Registrable Securities (including, making members of senior management of Sealed Air Corporation available to participate in, and cause them to reasonably cooperate with the underwriters in connection with "roadshow" and other customary marketing activities), (ii) obtain opinions of counsel to Sealed Air Corporation addressed to the underwriters in customary form, covering such matters as are customarily covered by opinions requested in underwritten offerings, and (iii) obtain "comfort" letters and updates thereof from Sealed Air Corporation's independent certified public accountants addressed to the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "comfort" letters to underwriters in underwritten offerings;

(i)    make available for inspection by a representative of the Underwritten Holders, any underwriter of such sale, and any attorney or accountant retained by such Underwritten Holders or underwriters, at reasonable times and places, all financial and other records, information and documents and properties of Sealed Air Corporation, other than those subject to an attorney-client or other privilege, that are pertinent to the registration statement filed in connection with such sale; provided, however, that the foregoing persons shall enter into a confidentiality agreement in form and substance reasonably satisfactory to Sealed Air Corporation (it being agreed that such confidentiality agreement will include an agreement not to buy or sell any securities of Sealed Air Corporation while such person is in possession of material non-public information) with respect to confidential records, information and documents. Sealed Air Corporation will cause its officers and relevant employees to be available at reasonable times and places for discussions regarding the foregoing information and documents (subject to the confidentiality agreement requirements described above) of Sealed Air Corporation with any such representative, underwriter, attorney or accountant in connection with such registration statement and to otherwise reasonably cooperate in connection with the due diligence investigation undertaken by any of them;

(j)    not effect any distribution or public sale of Sealed Air Common Stock during the 60 day period beginning on the date of the underwriting agreement entered into in connection with an underwritten offering pursuant to Section 2.1(f) of this Registration Rights Agreement (except, as part of such underwritten offering if permitted by the managing underwriter(s)

9

of such offering, in their sole discretion, or pursuant to registrations on Form S-8 or S-4 or any successor form thereto, upon the exercise of any convertible securities of Sealed Air Corporation, or in connection with contributions to profit sharing or similar plans, payment for services in shares of Sealed Air Common Stock, or the sale of Sealed Air Common Stock issuable upon conversion of the Senior Notes) unless the managing underwriter(s) for such offering otherwise agree;

(k)     pay all costs and expenses in connection with Sealed Air Corporation's complying with the terms hereof, including, without limitation, all registration and filing fees, exchange listing fees, printing expenses, accounting fees, fees and expenses for listing the Registrable Securities on each securities exchange on which similar securities issued by Sealed Air Corporation are then listed or, if applicable, on the NASD automated quotation system, the expenses of Sealed Air Corporation in providing the notice required by Section 2.1(f)(ii), blue sky fees and expenses, and fees and disbursements of counsel for Sealed Air Corporation, but excluding underwriting discounts and selling commissions relating to the Registrable Securities, and excluding the fees and expenses of any attorney, accountant or any other advisor retained by any Holder or, in an underwritten offering pursuant to Section 2.1(f), by any underwriter of such offering.

(l)     otherwise comply with the Securities Act and all applicable rules and regulations of the Commission and the securities exchange on which the Registrable Securities are listed.

2.4     Delivery of Prospectus Supplement.   In the event that (a) Sealed Air Corporation would be required, pursuant to Section 2.3(e)(iv) above, to notify the selling Holders of Registrable Securities, the placement or sales agent, if any, therefor and the managing underwriters, if any, thereof, or (b) a Holder would be required to notify Sealed Air Corporation and such Holder provides Sealed Air Corporation with the information required by Section 2.5(b), Sealed Air Corporation shall as promptly as practicable prepare and furnish to each such Holder, to each placement or sales agent, if any, and to each underwriter, if any, a reasonable number of copies of a prospectus supplemented or amended so that, as thereafter delivered to initial purchasers of Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.  Each Holder of Registrable Securities agrees that upon receipt of any notice from Sealed Air Corporation pursuant to Section 2.3(e), other than Section 2.3(e)(i), or if such Holder would be required to notify Sealed Air Corporation pursuant to Section 2.5(b), such Holder shall forthwith discontinue the disposition of Registrable Securities pursuant to the registration statement applicable to such Registrable Securities until such Holder shall have received copies of such amended or supplemented prospectus, or until such time as otherwise advised by Sealed Air Corporation, and if so directed by Sealed Air Corporation, such Holder shall deliver to Sealed Air Corporation, all copies, other than permanent file copies, then in such Holder's possession of the prospectus covering such Registrable Securities at the time of receipt of such notice.

2.5     Furnishing Information by the Holders.

(a)     Sealed Air Corporation may require each Holder of Registrable Securities as to which any registration is being effected to furnish to Sealed Air Corporation such

10

information regarding such Holder and such Holder's intended method of distribution of such Registrable Securities and such other information as Sealed Air Corporation may from time to time reasonably request.

(b)     Each such Holder agrees to promptly notify Sealed Air Corporation of any inaccuracy or change in information previously furnished by such Holder to Sealed Air Corporation or of the occurrence of any event as a result of which any prospectus relating to such registration contains or would contain an untrue statement of a material fact regarding such Holder or such Holder's intended method of distribution of such Registrable Securities or omits to state any material fact regarding such Holder or such Holder's intended method of distribution of such Registrable Securities required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, and promptly to furnish information so required so that such prospectus shall not contain, with respect to such Holder or the distribution of such Registrable Securities, an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

2.6     Indemnification.

(a)     Sealed Air Corporation will indemnify each Holder whose Registrable Securities are to be included in a registration pursuant to this Article II, each of such Holder's officers, directors, partners, trustees, agents, employees and representatives and each person controlling such Holder within the meaning of Section 15 of the Securities Act, and each underwriter, if any, of such Registrable Securities and each person who controls such underwriter with respect to each registration, qualification or compliance effected pursuant to this Article II against all expenses, claims, losses, damages and liabilities (or actions, proceedings or settlements in respect thereof) arising out of or based on any untrue statement or alleged untrue statement of a material fact contained in any registration statement, any amendment thereto, or any other document incorporated by reference therein, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or arising out of any untrue statement or alleged untrue statement of a material fact contained in any prospectus, or any amendment thereto, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse such indemnified persons for any reasonable legal and other expenses reasonably incurred in connection with investigating, defending or settling any such claim, loss, damage, liability or action; provided, however, that Sealed Air Corporation will not be liable in any such case to a Holder to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or alleged untrue statement or omission or alleged omission based upon information furnished in writing to Sealed Air Corporation by a Holder and provided for use in such registration statement, prospectus or any other document or the Holder delivered a registration or prospectus in violation of Section 2.4 hereof after written notice was provided by Sealed Air Corporation as provided in Section 2.4. It is agreed that the indemnity agreement contained in this Section 2.6(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of Sealed Air Corporation (which consent shall not be unreasonably withheld or delayed).

11

(b)    Each Holder whose Registrable Securities are included in any registration effected pursuant to this Article II shall indemnify Sealed Air Corporation, each of its directors, officers, agents, employees and representatives, and each Person who controls Sealed Air Corporation within the meaning of Section 15 of the Securities Act, each other such Holder and each of their officers, directors, partners, agents, employees and representatives and each person controlling such Holder, and each underwriter, if any, of such Registrable Securities and each Person who controls any such underwriter, against all expenses, claims, losses, damages and liabilities (or actions, proceedings or settlements in respect thereof) arising out of or based on any untrue statement or alleged untrue statement of a material fact contained in any registration statement, any amendment thereto, or any other document incorporated by reference therein, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or arising out of any untrue statement or alleged untrue statement of a material fact contained in any prospectus, or any amendment thereto, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse such indemnified persons for any reasonable legal or other expenses reasonably incurred in connection with investigating, defending or settling any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such registration statement, prospectus or any other document in reliance upon and in strict conformity with written information furnished to Sealed Air Corporation by such Holder and provided specifically for use therein; provided, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld or delayed); provided, further and notwithstanding anything to the contrary contained herein, that a Holder shall not be obligated to pay (i) any indemnification claims to the extent and after the amount of such indemnification claims in the aggregate paid by such Holder exceeds the gross proceeds in connection with the sale of such Holder's Registrable Securities with respect to which the indemnification claims arose or (ii) more than his, her or its pro rata share of any indemnification claim based upon the gross proceeds in connection with the sale of such Holder's Registrable Securities with respect to which the indemnification claim arose as a percentage of the aggregate gross proceeds received by all of the Holders in connection with such sale.

(c)    Each party entitled to indemnification under this Section 2.6 (the "Indemnified Party") shall give prompt written notice to the party required to provide indemnification (the "Indemnifying Party") after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld or delayed), and the Indemnified Party may participate in such defense with counsel reasonably acceptable to the Indemnifying Party at the Indemnified Party's expense, and provided, further, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2.6 to the extent such failure is not materially prejudicial.  No Indemnifying Party in the defense of any such claim or litigation shall, except with the consent of

12

each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include an unconditional release of such Indemnified Party from all liability in respect of such claim or litigation.  Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and litigation resulting therefrom.

(d)     If the indemnification provided for in this Section 2.6 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions which resulted in such loss, liability, claim, damage or expense as well as any other relevant equitable considerations.  The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  No person guilty of fraudulent misrepresentation (within the meaning of section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.  Notwithstanding the foregoing, a Holder shall not be obligated to pay (i) any contribution claims to the extent and after the amount of such contribution claims in the aggregate paid by such Holder exceeds the gross proceeds in connection with the sale of such Holder's Registrable Securities with respect to which the contribution claims arose or (ii) more than his, her or its pro rata share of any contribution claim based upon the gross proceeds in connection with the sale of such Holder's Registrable Securities with respect to which the contribution claim arose as a percentage of the aggregate gross proceeds received by all of the Holders in connection with such sale.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in an underwriting agreement entered into in connection with an underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

2.7     <u>Non-Affiliate Status</u>.  As of the Effective Date and to the best of Sealed Air Corporation's knowledge, including Sealed Air Corporation's assumption, without any investigation, that no Holder beneficially owns as of the Effective Date any securities of Sealed Air Corporation other than Registrable Securities, Sealed Air Corporation hereby acknowledges and agrees that the Holders' beneficial ownership of the Registrable Securities does not and will not (as of the Effective Date) cause any of the Holders to be an "affiliate" of Sealed Air Corporation as defined in Rule 144.

13

ARTICLE III

Representations, Warranties and Covenants

3.1     Representations, Warranties and Covenants of Holders.

(a)     Each Holder represents and warrants to, and agrees with Sealed Air Corporation that such Holder, if not an individual, has the corporate, limited liability, trust or partnership power and authority, as the case may be, to enter into this Registration Rights Agreement and to perform its obligations hereunder.

(b)     Each Holder represents and warrants to, and agrees with Sealed Air Corporation that all necessary corporate, limited liability, trust or partnership action, as the case may be, has been taken by the such Holder with respect to the execution and delivery of this Registration Rights Agreement and the performance of its obligations hereunder, and this Registration Right Agreement constitutes a valid and binding obligation of such Holder enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally, (ii) the remedy of specific performance and injunctive and other forms of equitable relief which may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be instituted, and (iii) applicable law and public policy as to rights of indemnification and contribution.

(c)     Each Holder represents and warrants to and agrees with Sealed Air Corporation that such Holder will (i) not offer to sell, sell or otherwise dispose of any Registrable Securities except (A) pursuant to an effective registration statement under the Securities Act that covers the Registrable Securities being disposed of, (B) in compliance with Rule 144, or (C) in a transaction that, in the opinion of counsel satisfactory to Sealed Air Corporation, does not require registration of such Registrable Securities under the Securities Act, (ii) during the time when such Holder is offering Registrable Securities for sale, not engage in any stabilization activity in connection with any of Sealed Air Corporation's securities, (iii) cause to be furnished to any purchaser of the Registrable Securities and to the broker-dealer, if any, through whom Registrable Securities may be offered, a prospectus in compliance with and if then required by the Securities Act, (iv) not bid for or purchase any Sealed Air Corporation securities or any rights to acquire such securities, or attempt to induce any person to purchase any such securities or any rights to acquire such securities, in each case, other than as permitted under the Exchange Act, and (v) upon the reasonable request of Sealed Air Corporation from time to time, advise Sealed Air Corporation from time to time of the number of Registrable Securities that such Holder has sold or otherwise disposed of.

(d)     Each Holder represents and warrants to and agrees with Sealed Air Corporation that such Holder is acquiring the Settlement Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act.

(e)     Each Holder represents and warrants to and agrees with Sealed Air Corporation that such Holder and their respective transferees will comply with all filing and other

14

reporting obligations under all applicable laws which shall be applicable to such Holder with respect to the Settlement Shares.

(f)    In the event such Holder makes any disposition of Registrable Securities other than pursuant to an effective registration statement or in compliance with an exemption from registration under the Securities Act, such Holder will indemnify and hold harmless Sealed Air Corporation and each of its directors, officers, agents, employees and representatives, and each person who controls Sealed Air Corporation within the meaning of Section 15 of the Securities Act, from and against all expenses, claims, losses, damages and liabilities (or actions, proceedings or settlements in respect thereof) for which they, or any one of them, shall be or become liable under the Securities Act or otherwise as a result of such disposition, and will reimburse such indemnified persons for any legal or other expenses incurred in connection with investigating or defending any such claim, loss, damage, liability or action arising out of or based on any distribution or resale of such Registrable Securities, or any part thereof, by such Holder in violation of the Securities Act, or in breach of the representations set forth above (it being understood that such Holder shall have the right to participate, at such Holder's expense, in the defense of any such claim).

3.2    Representations, Warranties and Covenants of Sealed Air Corporation.

(a)    Sealed Air Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority (corporate and other) to enter into this Registration Rights Agreement and to perform its obligations hereunder.

(b)    All necessary and appropriate corporate action has been taken by Sealed Air Corporation with respect to the execution and delivery of this Registration Rights Agreement and the performance of its obligations hereunder, and this Registration Rights Agreement constitutes a valid and binding obligation of Sealed Air Corporation enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditor's rights generally, (ii) the remedy of specific performance and injunctive and other forms of equitable relief which may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be instituted, and (iii) applicable law and public policy as to rights of indemnification and contribution.

(c)    There is no claim, litigation, action, suit, proceeding, investigation or inquiry, administrative or judicial, pending or, to the best knowledge of Sealed Air Corporation, threatened against Sealed Air Corporation, at law or in equity, before any federal, state or local court or regulatory agency or other governmental authority which, individually or in the aggregate, is reasonably likely to have, individually or in the aggregate, a material adverse effect on Sealed Air Corporation's ability to perform fully and timely its agreements and obligations hereunder, other than pursuant to, in connection with, or arising out of, the Action or the Debtors' petitions for relief under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.

15

(d)     Neither the execution and delivery of this Registration Rights Agreement by Sealed Air Corporation nor the performance by Sealed Air Corporation of its obligations hereunder will (i) conflict with or result in a breach of any provision of Sealed Air Corporation's certificate of incorporation or bylaws or (ii) require any consent, approval, declaration, order or authorization of, or registration or filing with, any third party, court or governmental body or other agency, instrumentality or authority by or with respect to Sealed Air Corporation, other than filings with the Commission, any filing with or notice to any state securities regulator, and any filing with or notice to the New York Stock Exchange or such other primary exchange or quotations system on which the Sealed Air Common Stock is then listed or quoted, and other than pursuant to, in connection with, or arising out of, the Action or the Debtors' petitions for relief under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.

(e)     Sealed Air Corporation has satisfied all the requirements necessary and is eligible to register the Registrable Securities on Form S-3.

ARTICLE IV

Legends

4.1     Legends.

(a)     Unless (i) Sealed Air Corporation shall have obtained an opinion of counsel reasonably satisfactory to it that such legend is not or is no longer necessary under the Securities Act or to the effect that the Registrable Securities may lawfully be disposed of without registration or qualification or, in connection with the sale of such Registrable Securities, such legend can be removed, or (ii) such Registrable Securities are sold in compliance with Rule 144 and Sealed Air Corporation receives documentation indicating such compliance, or (iii) such Registrable Securities are sold pursuant to an effective registration statement, the certificates representing the Registrable Securities shall bear a legend in substantially the following form:

"The shares represented by this Certificate have not been registered under the Securities Act of 1933, as amended, but have been issued or transferred pursuant to an exemption from registration thereunder.  No transfer or assignment of such shares shall be valid or effective and the issuer shall not be required to give any effect to any transfer of attempted transfer or assignment of these shares, including, without limitation, a transfer by operation of law unless (a) the issuer shall first have obtained an opinion of counsel reasonably satisfactory to it that the shares may be transferred without registration under the Securities Act, (b) the shares are sold in compliance with Rule 144 under such Act and the issuer is given documentation indicating such compliance, or (c) the shares are registered under such Act.

The shares represented by this Certificate are subject to a Registration Rights Agreement dated as of _____, 200__.  Pursuant to such Registration Rights Agreement, the shares represented by this Certificate may not be transferred, distributed or otherwise disposed of to any person or entity, other than pursuant to an effective registration statement or Rule 144, unless the aggregate

16

amount of shares being transferred, distributed or otherwise disposed of to such person or entity equals or exceeds 1,000 shares.  Under no circumstances shall the shares represented by this Certificate be divided into fractional shares."

(b)      Each Holder agrees that Sealed Air Corporation may give stop transfer orders as may be necessary or desirable to its transfer agent to implement or reflect the provisions of this Section 4.1.

## ARTICLE V

### Joinder Agreement

On or after the Effective Date, Cryovac, Inc. shall transfer the Settlement Shares to the Initial Holders.  If at any time thereafter a Holder, including an Initial Holder, desires to sell, transfer, distribute, pledge, encumber or otherwise dispose of such Holder's Registrable Securities other than pursuant to the Shelf Registration Statement, the Piggyback Registration, Rule 144 or such other exemption from registration pursuant to which, in the opinion of counsel to Sealed Air Corporation, the restrictive legend on the certificate representing the Registrable Securities may be removed, then as a condition to such transaction, the recipient of the Registrable Securities shall be required to become a party to this Registration Rights Agreement by executing and delivering a Joinder Agreement to Sealed Air Corporation.  Notwithstanding any other provision contained in this Registration Rights Agreement, (i) in no event will such Holders' Registrable Securities be divided into fractional shares, and (ii) no Holder may transfer, distribute or otherwise dispose of any Registrable Securities to any person or entity, other than pursuant to the Shelf Registration Statement, the Piggyback Registration, Rule 144 or such other exemption from registration pursuant to which, in the opinion of counsel to Sealed Air Corporation, the restrictive legend on the certificate representing the Registrable Securities may be removed, unless the aggregate amount of Registrable Securities so transferred, distributed or otherwise disposed to such person or entity equals or exceeds 1,000 shares.

## ARTICLE VI

### Termination

This Registration Rights Agreement shall terminate immediately following the moment at which there exist no securities that constitute Registrable Securities; provided, however, that Article III and Sections 2.6, 8.5, 8.9 and 8.12 shall survive indefinitely.

## ARTICLE VII

### Rule 144 Requirements

For so long as there are any securities that constitute Registrable Securities, Sealed Air Corporation agrees to: (a) make and keep public information available, as those terms are understood and defined in Rule 144; (b) use reasonable best efforts to file with the Commission in a timely manner all reports and other documents required of Sealed Air Corporation under the

17

Exchange Act; and (c) furnish to any Holder upon its written request, a written statement by Sealed Air Corporation as to its compliance with the information requirements of Rule 144 and of the reporting requirements of the Exchange Act, a copy of the most recent annual or quarterly report of Sealed Air Corporation, and such other publicly available reports and documents of Sealed Air Corporation as such Holder may reasonably request to avail itself of any similar rule or regulation of the Commission allowing it to sell any of the Registrable Securities without registration.

## ARTICLE VIII

### Miscellaneous

8.1    <u>Recapitalization, Exchanges, etc. Affecting the Sealed Air Common Stock</u>. The provisions of this Registration Rights Agreement shall apply to the full extent set forth herein with respect to (i) the Registrable Securities, and (ii) any and all shares of capital stock of Sealed Air Corporation or any successor or assign of Sealed Air Corporation (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution for the Registrable Securities, by reason of any stock dividend, split, reverse split, combination, recapitalization, reclassification, merger, consolidation, subdivision, sale of assets or otherwise. In the event of any change in the capitalization of Sealed Air Corporation as a result of any stock dividend, split, reverse split, combination, recapitalization, reclassification, merger, consolidation, subdivision, sale of assets or otherwise, the provisions of this Registration Rights Agreement shall be appropriately adjusted.

8.2    <u>Joint Authorship; Construction</u>.  All parties agree that the terms of this Registration Rights Agreement were drafted jointly by counsel for the parties following extensive arm's length negotiations.  In the event there arises an ambiguity or question of intent or interpretation of this Registration Rights Agreement or any provision thereof, the Registration Rights Agreement (and each of its provisions) shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Registration Rights Agreement.

8.3    <u>Amendment; Waiver</u>.  No provision of this Registration Rights Agreement may be amended, modified, terminated or supplemented, and waivers or consents to departures from the provisions hereof may not be given without the prior written consent of Holders of a majority of the then outstanding Registrable Securities (as constituted on the date of such amendment, modification, termination or supplement of, or waivers or consents to departures from, the terms hereof); provided, however, that the consent or agreement of Sealed Air Corporation shall be required with regard to any amendment, modification, termination or supplement of, or waivers or consents to departures from, the terms hereof, which affect Sealed Air Corporation's obligations hereunder; and provided, further, that the consent or agreement of the Cryovac 524(g) Trusts that are the beneficial owners of at least 1% of the then outstanding Registrable Securities shall be required with regard to any amendment, modification, termination or supplement of, or waivers or consents to departures from, the terms hereof, if the Cryovac 524(g) Trusts that are the beneficial owners of at least 1% of the then outstanding Registrable Securities are also the beneficial owners, in the aggregate, of at least one-third of the then outstanding Registrable Securities.

18

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

8.4     Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt if (i) mailed by certified or registered mail, return receipt requested, postage paid, (ii) sent by Federal Express or other express courier, fee prepaid, (iii) sent via facsimile with receipt confirmed, or (iv) delivered personally, addressed as follows or to such other address or addresses of which the respective party shall have notified the other pursuant to the terms of this Section 8.4.

> if to Sealed Air Corporation:
>
> Sealed Air Corporation
> Park 80 East
> Saddle Brook, New Jersey 07663
> Attention: General Counsel and Secretary
> Facsimile: (201) 703-4113
>
> with copies to:
> Sealed Air Corporation
> Park 80 East
> Saddle Brook, New Jersey 07663
> Attention: Chief Financial Officer
> Facsimile: (201) 703-4171
> - and -
> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Attention: Robert M. Chilstrom
> Facsimile: (212) 735-2000

if to an Initial Holder, at the address or facsimile set forth on the signature page attached hereto with a copy to such Initial Holder's attorney at the address or facsimile set forth on the signature page attached hereto, and if to a subsequent Holder of Registrable Securities, at the address set forth on such Holder's Joinder Agreement; provided, however, that in the case of any Initial Holder or subsequent Holder that is a trust, such trust shall designate one trustee to receive any and all notices.

8.5     Applicable Law.  This Registration Rights Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to its provisions on conflicts of laws principles thereof.  Nothing in this Registration Rights Agreement shall preclude any action to enforce any of the terms of this Registration Rights Agreement; provided, however, that any such action shall be brought exclusively in the court in which the Action is pending or, if the Action is no longer pending, in the United States Bankruptcy Court for the District of Delaware or, if the United States Bankruptcy Court for the District of Delaware fails to submit to jurisdiction in any such action, then

19

exclusively in any federal or state court within the State of Delaware, and each of the parties hereto agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such jurisdiction and such process.

8.6    Headings.  The article and section headings contained in this Registration Rights Agreement are solely for the purpose of reference, are not part of the agreement of the parties, and shall not, in any way, define, limit, extend, or otherwise affect the scope, meaning, intent, or interpretation of this Registration Rights Agreement or any provision thereof.

8.7    Entire Agreement.  This Registration Rights Agreement (as amended, modified, or supplemented) sets forth the sole and entire agreement among the parties with respect to its subject matter.  This Registration Rights Agreement supersedes any prior agreement, understanding, or undertaking (written or oral) by and between the parties regarding the subject matter of this Registration Rights Agreement.

8.8    Counterparts.  This Registration Rights Agreement may be executed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

8.9    Attorneys' Fees.  The prevailing party in any dispute shall be entitled to recover from the other party all of its costs and expenses incurred in connection with the enforcement of its rights hereunder or thereunder, including reasonable attorneys' and paralegals' fees and costs incurred before and at trial, at any other proceeding, at all tribunal levels and whether or not suit or any other proceeding is brought.

8.10    Severability.  If any term or provision of this Registration Rights Agreement shall to any extent be invalid or unenforceable, the remainder of this Registration Rights Agreement shall not be affected thereby, and each term and provision of this Registration Rights Agreement shall be valid and enforceable to the fullest extent permitted by law.  Upon the determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Registration Rights Agreement so as to effect their original intent as closely as possible in an acceptable manner to the end that the agreements and obligations contemplated hereby are fulfilled to the extent possible.

8.11    Binding Effect.  This Registration Rights Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors, legal representatives, heirs and permitted assigns, including, without limitation, all successors and assigns of Sealed Air Corporation, whether by merger, consolidation, reorganization, sale of assets or otherwise.

8.12    Remedies.  Any Person having rights under any provision of this Registration Rights Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach of any provision of this Registration Rights Agreement and to exercise all other rights granted by law or equity.  The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Registration Rights

20

Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction set forth in Section 8.5 (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Registration Rights Agreement.

\* \* \*

IN WITNESS WHEREOF, the undersigned have executed this Registration Rights Agreement as of the date set forth above.

SEALED AIR CORPORATION

By: _____
   Name:
   Title:

INITIAL HOLDERS:

By: _____
   Name:
   Title:

Address: _____
         _____
         _____

Facsimile: _____

Attorney: _____
         _____
         _____
         _____

21

By: _____
       Name:
       Title:

Address: _____
          _____
          _____

Facsimile: _____

Attorney: _____
          _____
          _____
          _____

By: _____
       Name:
       Title:

Address: _____
          _____
          _____

Facsimile: _____

Attorney: _____
          _____
          _____
          _____

22

EXHIBIT A

## JOINDER AGREEMENT

_____, 200_

Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663

Ladies and Gentlemen:

Reference is made to the registration rights agreement ("Registration Rights Agreement") dated as of _____, 200__ (the "Registration Rights Agreement"), by and between Sealed Air Corporation, a Delaware corporation, the Initial Holders, and any other Person who later becomes a party to the Registration Rights Agreement by executing this joinder agreement (the "Joinder Agreement"), in connection with the issuance of 9,000,000 shares of Sealed Air Common Stock, as more fully set forth in the Settlement Agreement (as defined in the Registration Rights Agreement). All capitalized terms not otherwise defined in this Joinder Agreement shall have the meanings ascribed thereto in the Registration Rights Agreement.

1.    Joinder. The undersigned Holder hereby (i) acknowledges that it has received and reviewed a complete copy of the Registration Rights Agreement, and (ii) agrees that, upon execution of this Joinder Agreement, it shall become a party to the Registration Rights Agreement and shall be fully bound by, and subject to, all of the terms, conditions, representations, warranties and other provisions of the Registration Rights Agreement with all attendant rights, duties and obligations stated therein, with the same force and effect as if the undersigned Holder executed the Registration Rights Agreement on the date thereof.

2.    Representations, Warranties and Agreements of the Holder. The undersigned Holder represents and warrants to, and agrees with Sealed Air Corporation, on and as of the date hereof that such Holder, if not an individual, has the corporate, limited liability, trust or partnership power and authority, as the case may be, to execute and deliver this Joinder Agreement and all corporate, limited liability, trust or partnership action, as the case may be, required to be taken by it for the due and proper authorization, execution, delivery and performance of this Joinder Agreement and the consummation of the transactions contemplated hereby has been duly and validly taken; this Joinder Agreement has been duly authorized, executed and delivered by such Holder and constitutes a valid and legally binding agreement of such Holder enforceable against such Holder in accordance with its terms.

3.    Transfer Registrations. The undersigned Holder acknowledges and agrees that (i) in no event will such Holder's Registrable Securities be divided into fractional shares, and (ii) such Holder may not transfer, distribute or otherwise dispose of any Registrable Securities to any person or entity, other than pursuant to the Shelf Registration Statement, the Piggyback Registration or Rule 144, unless the aggregate amount of such Registrable Securities so transferred, distributed or otherwise disposed to such person or entity, equals or exceeds 1,000 shares.

A-1

4.      Successors and Assigns.  Except as otherwise provided herein, this Joinder Agreement shall bind and inure to the benefit and be enforceable by Sealed Air Corporation and its successors, heirs and assigns and the undersigned Holder and its  successors, legal representatives, heirs and assigns so long as they hold any Registrable Securities.

5.      Applicable Law.  This Joinder Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to its provisions on conflicts of laws principles.

6.      Counterparts.  This Joinder Agreement may be executed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

7.      Amendments.  No amendment or waiver of any provision of this Joinder Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the parties hereto.

8.      Headings.  The section headings contained in this Joinder Agreement are solely for the purpose of reference, are not part of the agreement of the parties, and shall not, in any way, define, limit, extend, or otherwise affect the scope, meaning, intent, or interpretation of this Joinder Agreement or any provision hereof.

If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to us a counterpart hereof, whereupon this Joinder Agreement will become a binding agreement between the undersigned Holder and Sealed Air Corporation in accordance with its terms.

HOLDER

By:      _____
            Name:
            Title:

Number of Registrable Securities:

                    _____
Address:      _____
                    _____
                    _____

Facsimile:  _____

Attorney:    _____
                    _____
                    _____
                    _____
                    _____

A-2

EXHIBIT B

## Selling Securityholder Notice and Questionnaire

The undersigned Holder of shares of Sealed Air Common Stock (as defined in the Registration Rights Agreement, dated as of _____, 200__ (the "Registration Rights Agreement"), by and between Sealed Air Corporation, the Initial Holders (as defined in the Registration Rights Agreement) and any other Person that becomes a party to the Registration Right Agreement by executing and delivering a Joinder Agreement) that are Registrable Securities understands that Sealed Air Corporation has or intends to file with the Securities and Exchange Commission (the "Commission") a registration statement for the registration and resale under the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities.   All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Registration Rights Agreement.

Each beneficial owner of Registrable Securities is entitled to the benefits of the Registration Rights Agreement.  In order to sell or otherwise dispose of any Registrable Securities pursuant to the Shelf Registration Statement or the Piggyback Registration, a beneficial owner of Registrable Securities generally will be required to be named as a selling securityholder in the related prospectus, deliver a prospectus to the purchaser of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions, as described below).  Beneficial owners, who beneficially own Registrable Securities at the time of the filing of the Shelf Registration Statement or the Piggyback Registration, as applicable,  are required to complete and deliver this Notice and Questionnaire prior to the effectiveness of the Shelf Registration Statement or the Piggyback Registration, as applicable, so that such beneficial owners may be named as selling securityholders in the related prospectus at the time of effectiveness.  Upon receipt of a completed Notice and Questionnaire from a Person that enters into a Joinder Agreement following the effectiveness of a registration statement filed pursuant to Article II of the Registration Rights Agreement, Sealed Air Corporation will file such amendments to such registration statement or supplements to the related prospectus as are necessary to name such beneficial owner as a selling securityholder and to permit such Holder to deliver such prospectus to the purchaser of Registrable Securities if such Registrable Securities were initially included in such registration statement.

Certain legal consequences arise from being named as a selling securityholder in the Shelf Registration Statement, the Piggyback Registration and the related prospectus.  Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling securityholder in the Shelf Registration Statement or the Piggyback Registration, as applicable, and the related prospectus.

B-1

**Notice**

The undersigned beneficial owner (the "Selling Securityholder") of Registrable Securities hereby gives notice to Sealed Air Corporation of its intention to sell or otherwise dispose of Registrable Securities beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3) pursuant to the Shelf Registration Statement or the Piggyback Registration, as applicable. The undersigned, by signing and returning this Notice and Questionnaire, understands that it will be bound by the terms and conditions of this Notice and Questionnaire and the Registration Rights Agreement.

The undersigned hereby provides the following information to Sealed Air Corporation and represents and warrants that such information is accurate and complete:

**Questionnaire**

1. (a) Full legal name of Selling Securityholder:

    _____

   (b) Full legal name of registered holder (if not the same as (a) above) through which registrable securities listed in (3) below are held:

    _____

   (c) Full legal name of DTC participant (if applicable and if not the same as (b) above) through which Registrable Securities listed in (3) below are held:

    _____

2. Address for notices to Selling Securityholder:

    _____
    _____

    Telephone:       _____
    Fax:             _____
    Contact Person:  _____

3. Beneficial ownership of Registrable Securities:

   (a) Type and principal amount of Registrable Securities beneficially owned:

    _____
    _____

B-2

(b)    CUSIP No(s). of such Registrable Securities beneficially owned:

_____
_____
_____

4.    Beneficial ownership of Sealed Air Corporation securities owned by the Selling Securityholder:

Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any securities of Sealed Air Corporation other than the Registrable Securities listed above in Item (3).

(a)    Type and amount of other securities beneficially owned by the Selling Securityholder:

_____
_____

(b)    CUSIP No(s). of such other securities beneficially owned:

_____
_____

5.    Relationship with Sealed Air Corporation:

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with Sealed Air Corporation (or their predecessors or affiliates) during the past three years.*

State any exceptions here:

_____
_____

6.    Plan of distribution:

*Except as set forth below, the undersigned (including its donees or pledgees) intends to distribute the Registrable Securities listed above in Item (3) pursuant to the Shelf Registration Statement or the Piggyback Registration, as applicable, only as follows( if at all): such Registrable Securities may be sold from time to time directly by the undersigned or alternatively, through underwriters, broker-dealers or agents. If the Registrable Securities are sold through underwriters or broker-dealers, the Selling Securityholder will be responsible for underwriting discounts or commissions or agent's commissions. Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices. Such sales may be effected in transactions (which may involve block*

B-3

*transactions) (i) on any national securities exchange or quotation service on which the Registrable Securities may be listed or quoted at the time of sale, (ii) in the over-the-counter market, (iii) in transactions otherwise than on such exchanges or services, or in the over-the-counter market, such as privately negotiated transactions, or (iv) through the writing of options. In connection with sales of Registrable Securities or otherwise, the undersigned may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Securities and deliver Registrable Securities to close out such short positions, or loan or pledge Registrable Securities to broker-dealers that in turn may sell such securities.*

State any exceptions here:

_____

_____

The undersigned acknowledges that it understands its obligation to comply with the provisions of the Exchange Act and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering of Registrable Securities pursuant to the Shelf Registration Statement or the Piggyback Registration, as applicable. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

The Selling Securityholder hereby acknowledges its representations, warranties and obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons as set forth therein.

Pursuant to the Registration Rights Agreement, Sealed Air Corporation has agreed under certain circumstances to indemnify the Selling Securityholder against certain liabilities.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law for inclusion in the Shelf Registration Statement or the Piggyback Registration, as applicable, the undersigned agrees to promptly notify Sealed Air Corporation of any inaccuracies or changes in the information provided herein, including but not limited to, if required by law, the identity of any underwriter, broker-dealer or agent involved in the distribution of the Registrable Securities, that may occur subsequent to the date hereof at anytime while the Shelf Registration Statement or the Piggyback Registration, as applicable, remains effective. All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing at the address set forth below.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items (1) through (6) above and the inclusion of such information in the Shelf Registration Statement or the Piggyback Registration, as applicable, and the related prospectus. The undersigned understands that such information will be relied upon by Sealed Air Corporation in connection with the preparation or amendment of the Shelf Registration Statement or the Piggyback Registration, as applicable, and the related prospectus.

B-4

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:

HOLDER

By: _____

Name:
Title:

PLEASE RETURN THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE TO SEALED AIR CORPORATION AT:

Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663
Attention: General Counsel and Secretary
Facsimile: (201) 703-4113

with copies to:
Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey 07663
Attention: Chief Financial Officer
Facsimile: (201) 703-4171
- and -
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention: Robert M. Chilstrom
Facsimile: (212) 735-2000

B-5

## Exhibit 2:  GOVERNMENT RELEASE

All capitalized terms not otherwise defined in this Government Release shall have the meaning ascribed thereto in the Settlement Agreement and Release (the "Agreement") to which this Government Release is made a part.

In consideration of the transfers to be made pursuant to paragraph II(a) of the Agreement, the United States of America hereby releases the Released Parties from, and covenants not to sue the Released Parties with respect to, any and all civil or administrative Claims, Demands, and Damages arising under:  (a) 28 U.S.C. §§ 3304 and 3306 as asserted in the United States' Complaint in Intervention filed in the Action; and (b) theories of successor liability, piercing the corporate veil, or similar claims for which the relief would be the avoidance of all or any part of the Cryovac Transaction or a money judgment for all or any part of the value of the Cryovac Transaction.

This Government Release is conditioned upon the satisfactory performance by Cryovac, Inc. and Sealed Air Corporation of their obligations under the Agreement and extends only to the Released Parties and does not extend to any other person.  This Government Release does not pertain to any matters other than those expressly specified herein.  The United States reserves any and all claims and demands with respect to all other matters (including the treatment of the Cryovac Cash Amount and the Settlement Shares under the Internal Revenue Code), which it or any department or agency may have against any of the Released Parties.  Prior to or simultaneous with

-1-

the transfers contemplated by paragraph II(a) of the Agreement, the United States will deliver to

Cryovac, Inc. and Sealed Air Corporation a duly executed Stipulation of Dismissal With Prejudice

of the Action in the form appended to the Agreement as Exhibit 4.


FOR THE UNITED STATES OF AMERICA:


Date: _____

_____
THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Room 2143
Washington, D.C.  20530


Date: _____

_____
JEREL L. ELLINGTON
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, Suite 945N
Denver, CO 80202
Telephone:  (303) 312-7321


-2-

## Exhibit 3:  RELEASE

All capitalized terms not otherwise defined in this Release shall have the meaning ascribed thereto in the Agreement.

In consideration of the transfers made pursuant to paragraph II(a) of the Agreement, Plaintiffs and Debtors hereby irrevocably release, acquit, and forever discharge the Released Parties from any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, that have accrued or been asserted or that hereafter might accrue or be asserted.

Plaintiffs and Debtors further agree that neither the Plaintiffs, the Debtors, nor their bankruptcy estates shall institute, participate in, maintain, maintain a right to or assert against the Released Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Person any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By:  _____
Print Name:  _____

Sworn to before me
this _____ day of 200_.

_____
Notary Public

-1-

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: _____

Sworn to before me
this _____ day of 200_.

_____
Notary Public

[AS TO EACH OTHER DEBTOR]

By: _____
Print Name: _____

[WILL ADD SIGNATURE LINE FOR EACH DEBTOR]

Sworn to before me
this _____ day of 200_.

_____
Notary Public

-2-

**Exhibit 4:**
**STIPULATION OF DISMISSAL WITH PREJUDICE OF THE ACTION**
(The remainder of this page has been intentionally left blank.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case Nos. 01-1139 through 01-1200 |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION | ) | |
| and CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 02-2211 |
| | ) | |
| -against- | ) | |
| | ) | |
| FRESENIUS MEDICAL CARE, | ) | |
| HOLDINGS, INC., et al., | ) | This Document Pertains to Adv. No. |
| | ) | 02–2210 |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STIPULATION OF DISMISSAL WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by, between, and among the undersigned, the attorneys of record for the parties to the above-captioned action, that the above-captioned action, including, without limitation, the claims asserted by the plaintiffs in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al., and the claims asserted by the United

-1-

States of America in its complaint in intervention, is discontinued and dismissed with prejudice, without costs as to any party as against any other.  This stipulation may be filed without further notice with the Clerk of the Court.

Dated:  _____, 200_

        Skadden, Arps, Slate, Meagher & Flom LLP

        _____

        Four Times Square
        New York, NY  10036-6522
        COUNSEL FOR CRYOVAC, INC.
        AND SEALED AIR CORPORATION

        Caplin & Drysdale, Chartered

        _____

        One Thomas Circle, N.W.
        Washington, D.C.  20005
        COUNSEL FOR THE OFFICIAL COMMITTEE
        OF ASBESTOS PERSONAL INJURY CLAIMANTS

        Bilzin Sumberg Baena Price & Axelrod LLP

        _____

        200 South Biscayne Boulevard
        Suite 2500
        Miami, FL  33131
        COUNSEL FOR THE OFFICIAL COMMITTEE
        OF ASBESTOS PROPERTY DAMAGES CLAIMANTS

        United States Department of Justice

        _____

        999 18th Street
        Denver, CO  80202
        COUNSEL FOR THE UNITED STATES OF AMERICA

**Exhibit 5:**
**FRESENIUS RELEASE**
(The remainder of this page has been intentionally left blank.)

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made as of the _____ day of _____, 200__, by and among Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc. ("FMCH"), National Medical Care, Inc. ("NMC"), Fresenius USA, Inc., Sealed Air Corporation ("Sealed Air") and Cryovac, Inc. ("Cryovac") (collectively the "Parties").

**Whereas,** a dispute has arisen between the Parties and certain claims have been asserted in a lawsuit captioned, *Sealed Air Corporation vs. Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc.; National Medical Care, Inc.; and Fresenius USA, Inc.* (No. 600300/02 N.Y. Sup. Ct.) (the "Indemnity Litigation");

**Whereas,** certain of the Parties are involved in Adversary Proceedings pending in the United States District Court for the District of Delaware (Adv. Nos. 02-2210 and 02-2211) (the "Bankruptcy Litigation");

**Whereas**, the Parties desire to resolve the Indemnity Litigation as part of a global settlement of the claims asserted against them in the Bankruptcy Litigation, without any admission of liability.

**Now, therefore**, in consideration of the obligations and agreements stated herein, the Parties agree as follows:

1.      **Definitions.**  When used in this Agreement, the following terms and words shall be defined as follows (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

A.      "Asbestos-Related Claim" shall mean any claim (including but not limited to personal injury, wrongful death, property damage or medical monitoring) whether sounding in tort, contract, warranty, statute, admiralty, or any other theory of law or equity, based on, relating to, or arising by reason of direct or indirect damages caused or allegedly caused, in whole or in part, by the mining,

-1-

processing, consumption, use, storage, manufacture, design, sale, assembly, distribution, disposal, installation, exposure to, or the presence of asbestos or asbestos containing products or by-products, or products which contain asbestos in any form, consumed, used, stored, manufactured, assembled, distributed, disposed of, or installed by or on behalf of any Grace-Conn. Business.

B.       "Cryovac Transaction" shall mean the transfers of assets, the distribution of stock, the merger, and all predecessor, related, and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under Securities Act of 1933, as amended, on or about February 13, 1998, SEC File No. 333-46281, including all attachments, exhibits, and schedules thereto.

C.       "Debtor" shall mean each of W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace

-2-

Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc.,

Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation,

Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation

Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.),

Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA

Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc.

(f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability

Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &

Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross

Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

      D.      "Grace-Conn. Business" shall mean all of the businesses and operations of Grace-Conn. and its parents or subsidiaries at any time, other than the NMC Business.

      E.      "Grace New York" shall mean W.R. Grace & Co., a New York corporation, now known as FMCH (taxpayer identification number 13-3461988).

      F.      "Grace-Related Claims" shall mean, collectively, all claims (including unknown claims) demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, direct or indirect, whether concealed or hidden, from the beginning of time up to and including the date of this Agreement, asserted or that might have been asserted (including without limitation claims for fraudulent conveyance, successor liability, piercing of corporate veil, negligence, gross negligence, professional negligence, breach of duty of care, breach of duty of loyalty, breach of duty of candor, fraud, breach of fiduciary duty, mismanagement, corporate waste, breach of contract, negligent misrepresentation, contribution, indemnification, any other common law or equitable claims, and violations of any state or federal statutes, rules or regulations), which

-3-

is either an Asbestos-Related Claim or that is based upon, arises out of, or relates in any way to the NMC Transaction, the Cryovac Transaction, or the conduct or operations of any Grace-Conn. Business, including without limitation, any liability or obligation of a Grace-Conn. Business under environmental or tax law, but not including any claims relating to or arising out of sales of goods or services occurring (i) directly between the NMC Parties and the Sealed Air Parties (ii) on or after March 31, 1998.

G.     "NMC Business" shall mean all of the worldwide healthcare business and operations conducted by NMC and the NMC Subsidiaries at any time, whether prior to or after September 29, 1996.

H.     "NMC Parties" shall mean FMCH, NMC, Fresenius Medical Care AG, Fresenius USA, Inc., and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including but not limited to Fresenius AG, but not including the Debtors, Sealed Air, and Cryovac.

I.     "NMC Subsidiaries" shall mean all direct and indirect subsidiaries of NMC through which Grace New York or FMCH conducts or conducted the NMC Business.

J.     "NMC Transaction" shall mean the series of transactions that became effective on September 27 - 30, 1996, whereby, *inter alia,* (i) NMC distributed approximately $2.3 billion in cash and assumed debt to Grace-Conn.; (ii) Grace-Conn. distributed 100% of the common shares of NMC stock to Grace New York; (iii) Grace New York contributed 100% of the common shares of Grace-Conn. stock to W.R. Grace & Co. (now known as Sealed Air); (iv) Grace New York distributed 100% of the common shares of the stock of W.R. Grace & Co. (now known as Sealed Air) to its shareholders; and (v) Grace New York merged with a subsidiary of Fresenius Medical Care AG, all

-4-

of which are more fully described in that certain Distribution Agreement dated as of February 4, 1996, among Grace New York, Grace-Conn. and Fresenius AG, and that certain Contribution Agreement dated as of February 4, 1996, among Fresenius AG, Sterilpharma GmbH, and Grace-Conn.

K.      "Sealed Air Parties" shall mean Sealed Air, Cryovac, and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, but not including the Debtors and the NMC Parties.

2.      **Release of the Sealed Air Parties:**  In consideration for the release described in Paragraph 3 of this Agreement, each of the NMC Parties hereby irrevocably releases, acquits, and forever discharges each and every of the Sealed Air Parties from any and all Grace-Related Claims that the NMC Parties have asserted, could have asserted, or that hereafter might be asserted in any forum.

3.      **Release of the NMC Parties:** In consideration for the release described in paragraph 2 of this Agreement, each of the Sealed Air Parties hereby irrevocably releases, acquits, and forever discharges each and every of the NMC Parties from any and all Grace-Related Claims that the Sealed Air Parties have asserted, could have asserted, or that hereafter might be asserted in any forum.

4.      Within 10 days of the execution of this Agreement, the Sealed Air Parties shall dismiss the Indemnity Litigation with prejudice, with each side to pay its respective fees and costs, and shall not file in the future any claims against the NMC Parties in any manner related to, arising out of or based upon the Indemnity Litigation or the subject matter thereof.

5.      **No Admissions:**  No Party to this Agreement admits any liability of any sort for any or all claims, controversies, actions, causes of action, demands, debts, damages, costs, attorneys'

-5-

fees, monies due on account, obligations, judgments or liabilities of any nature whatsoever at law or in equity, past or present, whether or not known or heretofore known or suspected, or claims against them which is governed by this Agreement.

6.    **No Assignment:**  Each of the Parties to this Agreement respectively warrants and represents that neither such Party nor such Party's subsidiaries or parents has made any assignment or transfer of any of such person's respective rights, claims, demand, and causes of action governed by this Agreement and further represents and warrants that there are no liens, claims for liens, or assignments in law or equity of or against the claims, demands and causes of action governed by this Agreement.

7.    **Choice of Law:**  The Parties agree that the construction, operation and enforcement of this Agreement shall be governed by the laws of the State of Delaware (without giving effect to its provisions on conflict of laws).

8.    **Successors and Assigns:**  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each of the NMC Parties and the Sealed Air Parties, respectively.

This Agreement comprises seven pages, including the signature page, and can be signed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

-6-

FRESENIUS MEDICAL CARE AG

By: _____
Print Name: _____
Print Title: _____

FRESENIUS MEDICAL CARE HOLDINGS, INC.

By: _____
Print Name: _____
Print Title: _____

NATIONAL MEDICAL CARE, INC.

By: _____
Print Name: _____
Print Title: _____

FRESENIUS USA, INC.

By: _____
Print Name: _____
Print Title: _____

SEALED AIR CORPORATION

By: _____
Print Name: _____
Print Title: _____

CRYOVAC, INC.

By: _____
Print Name: _____
Print Title: _____

-7-

**Exhibit 6:  INDEMNIFICATION AGREEMENT**
(The remainder of this page has been intentionally left blank.)

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement is made as of _____, 200__, by and among Sealed Air Corporation, a Delaware corporation, and Cryovac, Inc., a Delaware corporation, on behalf of themselves and the other Released Parties, and W.R. Grace & Co., a Delaware corporation, W.R. Grace & Co.-Conn., a Connecticut corporation, and the other related entities of W.R. Grace & Co. set forth in Schedule 1.

1.    **Definitions**.

All capitalized terms not otherwise defined in this Indemnification Agreement shall have the meaning ascribed thereto in the Settlement Agreement and Release (the "Settlement Agreement"), dated as of November 10, 2003, by and among the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, Sealed Air Corporation, a Delaware corporation and Cryovac, Inc., a Delaware corporation

2.    **Indemnification; Survival**.

a.    <u>Indemnification</u>.  Each of the Debtors shall jointly and severally, at its own expense, indemnify, defend and hold harmless the Released Parties from and against (i) any and all Asbestos-Related Claims and Indemnified Taxes, (ii) any and all losses, costs, and expenses incurred as a result of any breach of any of the obligations, agreements, or covenants of any of the Debtors or Non-Debtor Affiliates set forth or referred to in the Settlement Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor and Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order, (iii) if any Non-Debtor Affiliate has not executed and delivered a Release, any and all Asbestos-Related Claims based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such Non-Debtor Affiliate, and (iv) all attorneys' fees or costs and expenses attributable to any indemnification pursuant to this section 2(a), <u>provided</u>, <u>however</u>, that in each case such indemnification shall not apply to Excluded Fees.

b.    <u>Notice</u>.  Any Released Party entitled to indemnification under section 2(a) of this Indemnification Agreement shall provide W.R. Grace & Co. (formerly known as Grace Specialty Chemicals, Inc.) or the then parent corporation of the reorganized Debtors ("Grace Specialty") prompt written notice (the "<u>Claim</u> <u>Notice</u>") of any Claim against such Released Party by any third party (a "<u>Third</u> <u>Party</u> <u>Claim</u>") of which such Released Party has received notice to which it may be entitled to indemnification hereunder, <u>provided</u>, <u>however</u>, that no Claim Notice shall be required unless and until the Person asserting the Third-Party Claim has advised the Released Party that such Person intends to contest the application of the injunction referred to in paragraph II(c)(vi) of the Settlement Agreement, and <u>provided</u>, <u>further</u>, that the failure of a Released Party to give the Claim Notice (i) will not relieve the Debtors from any liability hereunder unless solely and to the extent (A) all the Debtors were not otherwise aware of such Third Party Claim (including by Claim Notice from any

-1-

other Released Party) and (B) such failure results in the forfeiture by the Debtors of substantial rights and defenses, and (ii) will not in any event relieve the Debtors from any obligations to any Released Party other than with respect to the indemnification obligation that is the subject of the Claim Notice.  In the case of a Claim other than a Third Party Claim, the Released Party shall promptly provide to Grace Specialty a written notice (the "Indemnity Notice") describing in reasonable detail the nature of the Claim and the basis of the Released Party's request for indemnification under this Indemnification Agreement, provided, however, that the failure of the Released Party to provide the Indemnity Notice (i) will not relieve the Debtors from liability hereunder, unless solely and to the extent (A) all the Debtors were not otherwise aware of such Claim (including by Indemnity Notice from any other Released Party) and (B) such failure results in the forfeiture by the Debtors of substantial rights and defenses, and (ii) will not in any event relieve the Debtors from any obligations to the Released Party other than with respect to the indemnification obligation that is the subject of the Indemnity Notice.

c.   Conduct of Defense.

   i.   The Debtors shall have the right, upon written notice to the Released Party (the "Defense Notice") within five (5) days of its receipt from the Released Party of the Claim Notice, to conduct at its expense the defense against a Third Party Claim in its own name, or, if necessary, in the name of the Released Party.  If the Debtors assume the defense of a Third Party Claim in accordance with the preceding sentence, (A) the Released Party shall have the right to approve the defense counsel, which approval shall not be unreasonably withheld, (B) the Released Party shall have the right to participate in the defense of such Third Party Claim assisted by its counsel, (C) the Released Party shall at the Debtors' sole expense cooperate with and make available to the Debtors such assistance, personnel, witnesses, and materials as the Debtors may reasonably request, and (D) the Debtors shall not compromise or settle any such Third Party Claim without the prior written consent of the Released Party, unless the sole relief provided is monetary damages that are paid in full by the Debtors and such compromise or settlement includes a release of each Released Party from any Damages arising out of such Third Party Claim that is reasonably satisfactory to such Released Party.

   ii.   If the Debtors shall fail to provide the Defense Notice with respect to a Claim Notice within the time prescribed by section 2(c)(ii), (A) the Released Party shall have the sole right to conduct the defense of any Third Party Claim that is the subject matter of such Claim Notice and the Released Party may pay, compromise or defend such Third Party Claim and (B) the Debtors shall have the right to participate in the defense of such Third Party Claim assisted by its counsel.

-2-

      iii.    <u>Procedures</u> <u>Relating</u> <u>to</u> <u>Taxes</u>.  Notwithstanding anything to the contrary set forth in section 2(c) of this Agreement, the procedures set forth in section 4.2 and 4.3 of the 1998 Tax Sharing Agreement shall govern and control the procedures relating to indemnification for Indemnified Taxes.

d.    <u>Indemnity</u> <u>Payments</u>.  Any amounts owed by the Debtors to a Released Party pursuant to this Indemnification Agreement ("Indemnity Payments") shall be paid by wire transfer in immediately available funds within five business days after the receipt of a written request from the Released Party entitled to such indemnification, <u>provided</u>, <u>however</u>, that the Debtors shall pay to a Released Party any payment (the "Settlement Payment") that such Released Party is required to make (including as a result of any settlement, compromise, judgment against the Released Party or otherwise) with respect to a Third Party Claim upon notice by the Released Party at least three business days prior to the date that such Settlement Payment is due.  All such Indemnity Payments shall be made to the accounts and in the manner specified by the Released Party.  Any Indemnity Payments that are not paid within the period set forth in this section 2(d) shall accrue interest at the prime rate announced from time to time by Bank of America, N.A., compounded annually.

e.    <u>Survival</u>.  The obligations of each of the Debtors contained in this Indemnification Agreement shall survive indefinitely and shall not be discharged, expunged, estimated, or otherwise adversely affected in the Debtors' bankruptcy cases or by confirmation of the Chapter 11 Plan and the Debtors' indemnity obligations pursuant to this Indemnification Agreement shall continue as a post-confirmation obligation of each of the reorganized Debtors.

3.    **Notices**.

    All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt if:  (i) mailed by certified or registered mail, return receipt requested, (ii) sent by Federal Express or other express courier, fee prepaid, (iii) sent via facsimile with receipt confirmed, or (iv) delivered personally, addressed as follows or to such other address or addresses of which the respective party shall have notified the other.

    If to the Released Parties, to:

    Sealed Air Corporation/Cryovac, Inc.
    Park 80 East
    Saddle Brook, New Jersey  07663
    Attention:  General Counsel and Secretary
    Facsimile:  (201) 703-4113

    with copies to:

-3-

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036-6522
Attention:  Sheila L. Birnbaum
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

If to Grace Specialty or the Debtors, to:

W.R. Grace & Co.
7500 Grace Drive
Columbia, Maryland  21044
Attention:  Secretary
Telephone:  (410) 531-4212
Facsimile:  (410) 531-4783

with copies to:

Kirkland & Ellis
Aon Center
200 East Randolph Drive
Chicago, Illinois 60601-6636
Attention: David M. Bernick
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

4.  **Miscellaneous**.

   a.   Entire Agreement; Amendments.  This Indemnification Agreement (as amended, modified, or supplemented) sets forth the sole and entire agreement among the parties with respect to its subject matter, and may not be waived, amended, modified, or supplemented except by written instrument executed by duly authorized representatives of each of the parties and entitled "Modification of Indemnification Agreement." This Indemnification Agreement supercedes any prior agreement, understanding, or undertaking (written or oral) by and among the parties regarding the subject matter of this Indemnification Agreement.

   b.   All parties agree that the terms of this Indemnification Agreement were drafted jointly by counsel for the parties following extensive arm's length negotiations.  If there arises an ambiguity or question of intent or interpretation of this Indemnification Agreement or any provision thereof, this Indemnification Agreement (and each of its provisions) shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Indemnification Agreement.

-4-

c.    <u>Successor</u> and <u>Assigns</u>.  This Indemnification Agreement shall be binding upon and inure to the benefit of each of each of the Debtors, the Released Parties, and any and all of their respective heirs, legal representatives, administrators, successors and assigns, provided, that (i) neither this Indemnification Agreement nor any substantial right or obligation hereunder may be assigned by any of the Debtors without the written consent of Sealed Air Corporation and Cryovac, Inc. and (ii) none of the Debtors shall transfer or agree to transfer a substantial part of its assets (in one or a series of transactions, whether or not related) to any Person or Persons without a prior determination of the Court by Final Order that at the time of each such transaction such Debtors, collectively with any such successors who will be jointly and severally liable for the obligations of such Debtors, will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including, without limitation, all Indemnified Taxes and all obligations set forth or referred to in the Settlement Agreement or this Indemnification Agreement (including, without limitation, all such obligations set forth in the Confirmation Order or Chapter 11 Plan) and provided, further, that section 4(c)(ii) of this Indemnification Agreement shall not apply at any time when the following two conditions in sections 4(c)(ii)(A) and (B) of this Indemnification Agreement are both satisfied:  (A)(1) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the Released Parties (including assessment and collection pursuant to section 6901 of the Internal Revenue Code) is barred by such statutes of limitation and (2) all Indemnified Taxes have been paid by the Debtors in accordance with the 1998 Tax Sharing Agreement and the Released Parties have received from the Debtors (or adequate provision satisfactory to the Released Parties has been made for the payment of) all indemnification and other payments claimed by the Released Parties against any of the Debtors in respect of Indemnified Taxes and related matters in accordance with the 1998 Tax Sharing Agreement; and (B) the injunctions required pursuant to paragraph II(c)(vi) of the Settlement Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (1) alleging an Asbestos-Related Claim and seeking to impose liability on one or more of the Released Parties notwithstanding the existence and continuing operative effect of such injunctions or (2) challenging in any manner the continuance and operative effect of such injunctions in respect of the Released Parties.

d.    <u>Headings</u>.  The article and section headings contained in this Indemnification Agreement are solely for the purpose of reference, are not part of the agreement of the parties, and shall not, in any way, define, limit, extend, or otherwise affect the scope, meaning, intent, or interpretation of this Indemnification Agreement or any provision thereof.

e.    <u>Applicable</u> <u>Law</u>.  This Indemnification Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to its provisions on conflict of laws).

-5-

    f.    <u>Counterparts</u>.  This Indemnification Agreement may be executed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

IN WITNESS WHEREOF, the parties have executed this Indemnification Agreement as of the date first written above.

SEALED AIR CORPORATION

By: _____
Name: _____
Title: _____


CRYOVAC, INC.

By: _____
Name: _____
Title: _____


W.R. GRACE & CO.

By: _____
Name: _____
Title: _____


W.R. GRACE & CO.-CONN.

By: _____
Name: _____
Title: _____


[AS TO EACH OTHER DEBTOR]

By: _____
Name: _____
Title: _____


[WILL ADD SIGNATURE LINE FOR EACH OTHER DEBTOR]

-6-

## SCHEDULE 1

W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.)
W.R. Grace & Co.–Conn.
A-1 Bit & Tool Co., Inc.
Alewife Boston Ltd.
Alewife Land Corporation
Amicon, Inc.
CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.)
CCHP, Inc.
Coalgrace, Inc.
Coalgrace II, Inc.
Creative Food 'N Fun Company
Darex Puerto Rico, Inc.
Del Taco Restaurants, Inc.
Dewey and Almy, LLC (f/k/a Dewey and Almy Company)
Ecarg, Inc.
Five Alewife Boston Ltd.
G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.)
G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.)
GEC Management Corporation
GN Holdings, Inc.
GPC Thomasville Corp.
Gloucester New Communities Company, Inc.
Grace A-B Inc.
Grace A-B II Inc.
Grace Chemical Company of Cuba
Grace Culinary Systems, Inc.
Grace Drilling Company
Grace Energy Corporation
Grace Environmental, Inc.
Grace Europe, Inc.
Grace H-G Inc.
Grace H-G II Inc.
Grace Hotel Services Corporation
Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.)
Grace Offshore Company
Grace PAR Corporation
Grace Petroleum Libya Incorporated
Grace Tarpon Investors, Inc.
Grace Ventures Corp.
Grace Washington, Inc.
W.R. Grace Capital Corporation
W.R. Grace Land Corporation
Gracoal, Inc.
Gracoal II, Inc.

-7-

Guanica-Caribe Land Development Corporation
Hanover Square Corporation
Hornco International, Inc.
Kootenai Development Company
LB Realty, Inc.
Litigation Management Inc. (f/k/a GHSC Holding, Inc, Grace JVH, Inc, Asbestos Management, Inc.)
Monolith Enterprises, Incorporated
Monroe Street, Inc.
MRA Holdings Corp.. (f/k/a Nestor-BNA Holdings Corporation)
MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.)
MRA Staffing Systems, Inc. (f/k/a/ British Nursing Association, Inc.)
Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp.,
Emerson & Curning, Inc.)
Southern Oil, Resin & Fiberglass, Inc.
Water Street Corporation
Axial Basin Ranch Company
CC Partners (f/k/a Cross Country Staffing)
Hayden-Gulch West Coal Company
H-G Coal Company
Any other Debtor

**Exhibit 7:  LANGUAGE TO BE SET FORTH IN PART II OF FORM 1120X**
**(OR APPLICABLE SECTION OF ANY SIMILAR STATE OR LOCAL TAX FORM)**
(The remainder of this page has been intentionally left blank.)

**PROTECTIVE CLAIM ONLY**

**W.R. GRACE & CO. AND AFFILIATES ASSERT ITS RIGHTS TO THE CLAIMED TAX BENEFITS CONDITIONALLY AND CONTINGENTLY, AND ONLY IN THE EVENT THAT SUCH TAX BENEFITS ARE DENIED IN FULL TO CRYOVAC, INC. (OR THE AFFILIATED, COMBINED, UNITARY OR SIMILAR GROUP OF WHICH SEALED AIR CORPORATION IS THE COMMON PARENT) BY A DECISION, DECREE OR OTHER ORDER BY A COURT OF COMPETENT JURISDICTION, WHICH HAS BECOME FINAL AND UNAPPEALABLE, OR BY A CLOSING AGREEMENT OR ACCEPTED OFFER IN COMPROMISE UNDER SECTION 7121 OR 7122 OF THE INTERNAL REVENUE CODE ENTERED INTO BY SEALED AIR CORPORATION AND THE INTERNAL REVENUE SERVICE**.

This protective claim for refund is filed to preserve the taxpayer's right to a refund for the calendar year [      ], including any statutory interest thereon, which is contingent on certain tax benefits claimed on the consolidated return filed by Sealed Air Corporation, Cryovac, Inc. and their affiliates for the year ended 200[ ] being denied in full by a decision, decree, or other order of a court of competent jurisdiction, which has become final and unappealable, or by a closing agreement, or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code of 1986 entered into by Sealed Air Corporation and the Internal Revenue Service ("Final Determination").

Sealed Air Corporation (formerly, W.R. Grace & Co.) was formerly the parent of an affiliated group of corporations filing a consolidated return, which group included, among others, W.R. Grace & Co., and W.R. Grace & Co-Conn.  This old group effected a reorganization pursuant to which, among other things, W.R. Grace & Co. and W.R. Grace & Co.-Conn. left the group.  After this reorganization, W.R. Grace & Co. and W.R. Grace & Co.-Conn. filed for bankruptcy protection. In addition, after these events, Cryovac, Inc., Sealed Air Corporation, and their affiliates became the subject of many lawsuits by plaintiffs claiming asbestos-related injuries suffered by them during and after the time that W.R. Grace & Co. and W.R. Grace & Co.–Conn. were members of the Sealed Air Corporation affiliated group.  Cryovac, Inc. and Sealed Air Corporation subsequently entered into a settlement agreement with committees representing these plaintiffs.  Pursuant to this settlement agreement, Cryovac, Inc. paid [9,000,000] shares of  Sealed Air Corporation common stock and $[      ] in cash to trusts established for the benefit of plaintiffs claiming asbestos-related injuries.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 23 TO EXHIBIT BOOK
## SEALED AIR SETTLEMENT ORDER

**EXHIBIT 23**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., et al.,<br><br>Debtors. | Chapter 11<br>Case Nos. 01-1139 (JKF)<br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF ASBESTOS<br>PERSONAL INJURY CLAIMANTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SEALED AIR CORPORATION and<br>CRYOVAC, INC.,<br><br>Defendants. | Adversary Proceeding No.<br>02-2210<br>[Lead Docket] |
| OFFICIAL COMMITTEE OF ASBESTOS<br>PERSONAL INJURY CLAIMANTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FRESENIUS MEDICAL CARE<br>HOLDINGS, INC. and<br>NATIONAL MEDICAL CARE, INC.,<br><br>Defendants. | Adversary Proceeding  No.<br>02-2211<br><br><br>This Document Pertains to<br>Adversary Proceeding No. 02-2210 |

**ORDER APPROVING, AUTHORIZING, AND IMPLEMENTING
SETTLEMENT AGREEMENT BY AND AMONG THE PLAINTIFFS,
SEALED AIR CORPORATION AND CRYOVAC, INC.**

This matter having come before the Court pursuant to the January 13, 2005, order

of referral from the District Court, and on the renewed joint motion, dated April 1, 2005

(the "Motion"), of the Official Committee of Asbestos Property Damage Claimants (the

"Property Damage Committee") and the Official Committee of Asbestos Personal Injury

Claimants (the "Personal Injury Committee") (collectively, the "Plaintiffs") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), Sealed Air Corporation ("SAC") and Cryovac, Inc. ("Cryovac," and together with SAC, the "SAC Defendants"), for an order under 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 (the "Order"), approving, authorizing, and implementing the Settlement Agreement and Release, dated November 10, 2003, by and among the Plaintiffs and the SAC Defendants (the "Settlement Agreement"), a copy of which is annexed to the Motion as Exhibit A, in connection with the above-captioned adversary proceeding commenced by the Plaintiffs on behalf of the Debtors' estates against the SAC Defendants (the "SAC Action"); and the Court having considered the Motion, the files and records in these cases, the pleadings filed in connection with the Motion and the arguments, objections and evidence offered at the hearing on the Motion; and after due deliberation thereon; and good and sufficient cause appearing therefore, the Court hereby

FINDS AND DETERMINES AS FOLLOWS:[1]

A. This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. § 1334(a). The SAC Action and Motion give rise to a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

B. Venue of these cases, the SAC Action and the Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[1]   The following shall constitute the Court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052(a). To the extent that findings of fact contain conclusions of law, such findings shall constitute conclusions of law. To the extent that conclusions of law contain findings of fact, such conclusions shall constitute findings of fact.

C. The predicates for the relief granted by this Order are Bankruptcy Code § 105(a) and Bankruptcy Rule 9019(a).

D. Due, proper and sufficient notice of the Motion and the Hearing was given pursuant to Bankruptcy Rules 2002(a)(3) as modified by the Court for cause shown, and 9019(a).

E. The result obtained on behalf of these bankruptcy estates in the Settlement Agreement falls comfortably within the reasonable range of litigation possibilities in the SAC Action.

F. At best, the likely outcome of the SAC Action is uncertain. The Plaintiffs candidly admit to this Court that litigation risks abound, including, without limitation, acknowledgment that proof of the Debtors' alleged insolvency and the applicable standards to be applied to this issue in the Third Circuit are challenging issues and it is impossible to predict how the District Court would resolve the SAC Defendants' Motion to Vacate Standards Opinion.

G. The SAC Action indisputably involves complex legal and factual issues.

H. Prosecuting the SAC Action would create substantial expenses for these bankruptcy estates and the other parties to the proceeding.

I. In light of the amounts involved, even if the Plaintiffs were successful in the prosecution of the SAC Action, there is no assurance as to when and how much the Plaintiffs would be able to collect.

J. Pursuing the SAC Action would also likely entail the commitment of substantial human resources by key personnel of the Debtors. The commitment of such resources and

the duration of the litigation would assuredly result in further delays in developing and confirming a plan of reorganization in the above-captioned cases.

K. Approval of the Settlement Agreement furthers the paramount interest of creditors in the above-captioned cases.

L. Approval of the Settlement Agreement would increase the funds available to fund a plan of reorganization, both through the funds provided by the SAC Defendants and by facilitating settlement with the NMC Defendants, as defined in the Motion.

M. Approval of the Settlement Agreement will continue to allow the Plaintiffs and the Debtors to focus their attention on other pending matters in the Debtors' cases, including the resolution of the Zonolite Attic Insulation science trial, the estimation of the Debtors' asbestos liabilities and confirmation of a plan of reorganization.

N. Approval of the Settlement Agreement may avoid the necessity of having to litigate the Motion to Vacate Standards Opinion.

O. Approval of the Settlement Agreement will avoid continued expense in the SAC Action, thereby resulting in a net economic benefit to these bankruptcy estates and their creditors in the range of $1.2 billion.

P. The Plaintiffs and the SAC Defendants negotiated and entered into the Settlement Agreement in good faith and at arm's length.

Q. Based on all of the foregoing, this Court concludes that the Settlement Agreement is in the best interests of the Plaintiffs, the Debtors, their bankruptcy estates, the creditors thereof and all parties in interest in these cases.

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS
FOLLOWS:

1. The Motion is granted in its entirety, and the Settlement Agreement is hereby
authorized and approved in all respects.[2]

2. The Plaintiffs and the SAC Defendants are hereby authorized, empowered and
directed, and the Debtors are authorized and directed, to take all necessary acts to carry out
and implement the Settlement Agreement in accordance with its terms without further
order of the Court. To the extent they have not yet done so, the Plaintiffs are authorized
and directed to enter into the Settlement Agreement in accordance with the terms and
conditions thereof, all of which are hereby approved.

3. The Plaintiffs, the Debtors, their officers, directors, employees and agents are
authorized to execute such documents and do such acts as are necessary or desirable to
carry out the terms and conditions of, and transactions contemplated by, the Settlement
Agreement.

4. Debtors shall and are hereby directed to comply with the Settlement
Agreement; provided, however, that where the Settlement Agreement obligates Plaintiffs
to use their best efforts to cause the Confirmation Order and Chapter 11 Plan to provide for
Debtors and/or Non-Debtor Affiliates to take or refrain from taking certain actions (*see,*
*e.g.,* Settlement Agreement ¶¶ VI(a), (b), (c), (e), (f), and (g)), Debtors shall take or refrain
from taking such actions, and shall cause the Non-Debtor Affiliates to take or refrain from
taking such actions, as the case may be, provided further, however, that notwithstanding

---

[2]    Capitalized terms used and not defined herein shall have the meaning assigned to them in the
Settlement Agreement.

any other provision in the Settlement Agreement, the Debtors, Non-Debtor Affiliates, Plaintiffs, Cryovac, Inc., and/or Sealed Air Corporation shall not be required to take any action or refrain from taking any action if, solely as a result of a Change in Circumstances, the taking of such action or the failure to take an action would expose such parties or any officer, director, employee or contractor of such parties to potential civil or criminal liability and provided further, however, that for purposes of this Order and the Settlement Agreement, the term Change in Circumstances shall be modified by replacing the words "Execution Date" with "the date an Order is signed approving this Settlement Agreement" as they appear in such definition. In the event of a dispute with respect to the applicability of this provision, the Bankruptcy Court shall retain jurisdiction to make such determination.

5. The terms of the Settlement Agreement and this Order shall not be subject to modification by this or any other Court through any order or judgment, including any order confirming any plan of reorganization in the above-captioned cases, unless the SAC Defendants consent in writing in their absolute discretion to such modification.

6. The terms and provisions of the Settlement Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the creditors, the Plaintiffs and the SAC Defendants and their respective successors and assigns, and any affected third parties including, but not limited to, any trustee, responsible person, estate administrator, representative (including any legal representative(s) appointed to represent the interests of future asbestos claimants) or similar person subsequently appointed for or in connection with the Debtors' estates or affairs in these cases or in any subsequent case(s) under the Bankruptcy Code involving the Debtors.

7. Subject to paragraph V(c) of the Settlement Agreement, unless ordered otherwise by this Court, none of the Plaintiffs and the Debtors, shall sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit, administrative proceeding, demand, claim or cause of action, whether asserted individually or derivatively against any of the Released Parties for any Asbestos-Related Claims, pending confirmation of a Chapter 11 Plan consistent with the terms of the Settlement Agreement.

8. The Preliminary Injunction shall remain in full force and effect through and including the Effective Date.

9. The Settlement Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by all the parties, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

10. To the extent necessary, the Plaintiffs and the SAC Defendants are hereby granted relief from the automatic stay pursuant to Bankruptcy Code § 362(d) to carry out the provisions of this Order and the Settlement Agreement.

11. The Court retains jurisdiction, even after the closing of these chapter 11 cases, to (i) interpret and enforce the terms and provisions of this Order and the Settlement Agreement and to adjudicate, if necessary, any and all disputes relating to the transactions contemplated by the Settlement Agreement; (ii) enter orders in aid or furtherance of the transactions contemplated in the Settlement Agreement; and (iii) re-open the Debtors' chapter 11 cases to enforce the provisions of this Order.

12. Notwithstanding Bankruptcy Rule 6004(g) (to the extent such Rule applies herein), this Order shall take effect immediately upon entry.

Dated: __6/27__, 2005
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 24 TO EXHIBIT BOOK
## WARRANT AGREEMENT

### EXHIBIT 24

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

SETTLEMENT DRAFT SUBJECT TO FRE 408
PRIVILEGED AND CONFIDENTIAL

## FORM OF WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this "Warrant Agreement") is made and entered into as of [ ], 2009 by and among W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 5.3, the "Company"), the WRG Asbestos Trust (the "Trust"), a Delaware statutory trust established pursuant to §524(g) the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined), and [Warrant Agent] (the "Warrant Agent").  Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Warrant Agreement, the following capitalized terms shall have the following respective meanings:

(a) "Appropriate Officer" shall mean, with respect to the Company, the Chief Executive Officer, Chief Financial Officer, President, any Senior Vice President, or Treasurer.

(b) "Business Day" shall mean any day other than a Saturday, Sunday, or other day on which banks in the State of New York are authorized by Law to remain closed.

(c) "Common Stock" shall mean common stock, $.01 par value per share, of the Company and the common stock of any successor thereto pursuant to the terms and conditions of Section 5.3.  For purposes of Article V hereof, references to "shares of Common Stock" shall be deemed to include shares of any other class of stock resulting from successive changes or reclassifications of the Common Stock consisting solely of changes in par value or from no par value to par value and vice versa.

(d) "Common Stock Equivalents" shall mean securities that are convertible into or exercisable for shares of Common Stock.

(e) "Depositary" shall mean the Cede & Co., as the nominee of The Depository Trust Company.

(f) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, and any successor statutes thereto.

(g) "Excluded Options" shall mean options to purchase shares of Common Stock issued to directors, officers, employees and consultants of any Reorganized Debtor (i) pursuant

1

to an option plan or arrangement approved by either the stockholders of the Company or the Bankruptcy Court and (ii) with an exercise price equal to the average of the high and the low trading prices of Common Stock on the NYSE (or if Common Stock is not traded on the New York Stock Exchange, on the principal stock exchange on which it trades) on the date of grant of the option.

(h) "Excluded Stock" shall mean shares of Common Stock issued and sold in a registered firm commitment underwritten public offering pursuant to a registration statement declared effective in accordance with the Securities Act.  Excluded Stock shall not include a private placement of shares, including one which is followed by a public offering thereof.

(i) "Expiration Date" shall mean 5:00 p.m., New York City time, on [calendar day before one year anniversary of the Issue Date], or if such day is not a Business Day, the next succeeding day which is a Business Day; provided, however, that the Expiration Date shall be extended as and to the extent required by Section 4.2(b).

(j) "Governmental Authority" the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governing Documents" means, as to any Person which is an entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Person.

(k) "Law" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances and codes, including the binding interpretations or administration thereof.

(l) "NYSE" shall mean the New York Stock Exchange or any successor stock exchange thereto.

(m) "Plan of Reorganization" means that certain Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

(n) "Person" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated association or organization, any other entity and any Governmental Authority.

2

(o) "SEC" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(p) "Securities Act" shall mean the Securities Act of 1933, as amended from time to time, and any successor statutes thereto.

(q) "Warrants" shall mean the warrants to purchase, in the aggregate, 10,000,000 shares of Common Stock at an exercise price of $17.00 per share.

(r) "Warrant Shares" shall mean Common Stock, Common Stock Equivalents and any other securities (including any securities of any Successor Person) purchased or purchasable upon exercise of the Warrant (and, if the context requires, securities which may thereafter be issued by the Company in respect of any such securities so purchased, by means of any stock splits, stock dividends, recapitalizations, reclassifications or the like).

All terms defined in this Warrant Agreement in the singular form shall have comparable meanings when used in the plural form and vice versa.

Section 1.2    Table of Defined Terms.

| Term | Section Number |
| --- | --- |
| Book-Entry Warrants | Section 3.1 |
| Claims | Section 9.9(b) |
| Company | Preamble |
| Courts | Section 9.9(b) |
| Exercise Amount | Section 4.5 |
| Exercise Form | Section 4.3(a) |
| Exercise Price | Section 4.1 |
| Global Warrant Certificate | Section 3.1(a) |
| Holder | Section 4.1 |
| Independent Auditor | Section 5.1(c) |
| Issue Date | Section 3.1 |
| Organic Change | Section 5.3(a) |
| Organic Change Date | Section 5.3(c) |
| Registered Holder | Section 3.4(d) |
| Special Dividend | Section 5.1(b) |
| Successor Person | Section 5.3(a) |
| Trust | Preamble |
| Warrant Agreement | Preamble |
| Warrant Register | Section 3.4(c) |
| Warrant Statements | Section 3.1 |

3

## ARTICLE II

## APPOINTMENT OF WARRANT AGENT

Section 2.1    <u>Appointment</u>.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the instructions hereinafter set forth in this Warrant Agreement, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the terms and conditions set forth in this Warrant Agreement.

## ARTICLE III

## WARRANTS

Section 3.1    <u>Issuance of Warrants</u>.

(a) Upon the terms and subject to the conditions set forth in this Warrant Agreement and in accordance with the terms of the Plan of Reorganization, on the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, but in any event no later than five (5) Business Days after the Effective Date (such date, the "<u>Issue Date</u>"), the Company shall issue the Warrants to the Trust.  Subject to <u>Section 6.1</u> of this Warrant Agreement, the Warrants shall be issued by the Company to the Trust (i) via book-entry registration on the books and records of the Warrant Agent (the "<u>Book-Entry Warrants</u>") and evidenced by statements issued by the Warrant Agent from time to time to the Registered Holders of the Book-Entry Warrants reflecting such book-entry position (the "<u>Warrant Statements</u>"), in substantially the form set forth in <u>Exhibit A-1</u> attached hereto, and/or (ii) in the form of one or more global certificates (the "<u>Global Warrant Certificates</u>"), with the forms of election to exercise and of assignment printed on the reverse thereof, in substantially the form set forth in <u>Exhibit A-2</u> attached hereto.  Not later than five (5) Business Days prior to the Issue Date, the Trust shall notify the Company in writing of (i) the number of Warrants that shall be issued in the form of Book-Entry Warrants, (ii) the number of Warrants that shall be issued in the form of Global Warrant Certificates and (iii) if there shall be more than one Global Warrant Certificate, the number of Warrants to be issued in the form of each such Global Warrant Certificate.

(b) The number of shares of Common Stock issuable pursuant to the Warrant shall be 10,000,000 shares, as such amount may be adjusted from time to time pursuant to this Warrant Agreement.

Section 3.2    <u>Completion and Deposit of Warrant Instruments</u>.

(a)    The Warrant Statements and Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Warrant Agreement, and may have such letters, numbers, or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any Law or with any rules made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, or, be determined by (i) in the case of Global Warrant Certificates, the

4

Appropriate Officers executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates, or (ii) in the case of a Warrant Statement, any Appropriate Officer, and all of which shall be reasonably acceptable to the Warrant Agent.

(b) The Global Warrant Certificates shall be deposited on or after the Issue Date with the Warrant Agent and registered in the name of the Depositary. Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Warrant Agreement.

Section 3.3    Execution of Global Warrant Certificates.

(a) The Global Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer. Each such signature upon the Global Warrant Certificates may be in the form of a facsimile signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Appropriate Officer.

(b) If any Appropriate Officer who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer before the Global Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Global Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Global Warrant Certificate, although at the date of the execution of this Warrant Agreement any such person was not such Appropriate Officer.

Section 3.4    Registration and Countersignature.

(a) Upon written order of the Company, the Warrant Agent shall (i) register in the Warrant Register the Book-Entry Warrants and (ii) upon receipt of the Global Warrant Certificates duly executed on behalf of the Company, countersign one or more Global Warrant Certificates evidencing Warrants. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Book-Entry Warrants and the number of Warrants that are to be issued as a Global Warrant Certificate. A Global Warrant Certificate shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

(b) No Global Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual signature of the Warrant Agent. Such signature by the Warrant

5

Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder.

(c) The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants as well as any Global Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 6.1 of this Warrant Agreement, all in form satisfactory to the Company and the Warrant Agent. No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Registered Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.

(d) Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Warrant Agreement, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrant is registered upon the Warrant Register (the "Registered Holder" of such Warrant) as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing on a Global Warrant Certificate made by anyone other than the Company or the Warrant Agent), for the purpose of any exercise thereof, any distribution to the Holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

Section 3.5    Takeover Defenses.

(a)    The Company represents and warrants to the Trust that its Board of Directors has approved this Agreement and the transactions contemplated hereby, including the issuance of the Warrants and the Warrant Shares to the Holders, such that none of this Agreement, such transactions or such issuance shall be subject to the provisions or restrictions of Section 203 of the Delaware General Corporation Law or any other business combination, interested stockholder, fair price, control share acquisition, or other Law regulating mergers, acquisitions, change of control transactions, voting rights or share acquisitions.

(b)    The Company represents and warrants to the Trust that the Trust is not an "Acquiring Person" within the meaning of the Amended and Restated Rights Agreement, dated as of March 25, 2008, by and between the Company and Mellon Investor Services, LLC, as rights agent (as amended from time to time, the "Rights Agreement"). The Company shall not lower the Beneficial Ownership percentage in the Rights Agreement's definition of "Acquiring Person" until such time as the Trust no longer owns any Warrants or Warrant Shares. The Company shall take all action within its control (through its Board of Directors, stockholders, other governing bodies, management or otherwise) so that no "poison pill", shareholder or stockholder rights plan or other anti-takeover or takeover defense plan, contract, agreement, instrument or provision adopted or implemented by the Company shall apply to or be triggered by the issuance of the Warrants to the Trust, or the issuance and sale by the Company, and the purchase by the Trust, of the Warrant Shares upon exercise of the Warrants by the Trust.

6

## ARTICLE IV

## TERMS AND EXERCISE OF WARRANTS

Section 4.1    Exercise Price.  On the Issue Date, each Warrant shall entitle (i) in the case of the Book-Entry Warrants, the Registered Holder thereof and (ii) in the case of Warrants held through the book-entry facilities of the Depositary or by or through Persons that are direct participants in the Depositary, any Person who has a beneficial interest in such Warrants (a "Beneficial Holder") ((i) and (ii) collectively, the "Holders"), subject to the provisions of such Warrant and of this Warrant Agreement, to purchase from the Company the number of Warrant Shares, at the price of $17.00 per whole share (as the same may be hereafter adjusted pursuant to Article V, the "Exercise Price") specified in such Warrant.

Section 4.2    Duration of Warrants.

(a) Warrants may be exercised by the Holder thereof at any time and from time to time during the period commencing on the Issue Date and terminating at 5:00 p.m., New York City time, on the Expiration Date.  Any Warrant not exercised prior to 5:00 p.m., New York City time, on the Expiration Date, shall become permanently and irrevocably null and void at 5:00 p.m., New York City time, on the Expiration Date, and all rights thereunder and all rights in respect thereof under this Warrant Agreement shall cease at such time.

(b) Notwithstanding any other provision of this Warrant Agreement or the Warrants, if the Company fails to cause any registration statement to be declared effective when required by the Registration Rights Agreement, dated as of date hereof (the "Registration Rights Agreement"), between the Company and the Trust, to maintain the effectiveness of such registration statement, or if a Suspension Period (as defined in the Registration Rights Agreement) occurs, then the Expiration Date shall be extended by one day for each day that such registration statement is not effective, each day that constitutes a Suspension Period or each day that a Holder is unable to sell Warrants or Warrant Shares due to the lack of an effective or legally compliant registration statement or prospectus.

Section 4.3    Method of Exercise.

(a) Subject to the provisions of the Warrants and this Warrant Agreement, the Holder of a Warrant may exercise such Holder's right to purchase the Warrant Shares, in whole or in part; provided, that if it is exercised in part by the Trust shall be exercised for a minimum of 100,000 Warrant Shares and exercised by any other Holder it shall be exercised for a minimum of 500 Warrant Shares.  A Holder shall exercise such Holder's right to purchase Warrant Shares by: (x) in the case of Persons who hold Book-Entry Warrants, providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit B hereto, properly completed and executed by the Registered Holder thereof, together with payment of the Exercise Amount in accordance with Section 4.5 to the Warrant Agent, and (y) in the case of Warrants held through the book-entry facilities of the Depositary or by or through Persons that are direct participants in the Depositary, providing an Exercise Form (as provided by such Holder's broker) to its broker, properly completed and executed by the Beneficial Holder thereof, together with payment of the Exercise Amount in accordance with Section 4.5.

7

(b) Any exercise of Warrants pursuant to the terms of this Warrant Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(c) The Warrant Agent shall:

(i)    examine all Exercise Forms and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an Exercise Form or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between Exercise Forms received and the delivery of Warrants to the Warrant Agent's account;

(iv)    advise the Company no later than three (3) Business Days after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (B) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise, subject to timely receipt from the Depositary of the necessary information, and (C) such other information as the Company shall reasonably require; and

(v)    subject to Warrant Shares being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depositary, liaise with the Depositary and endeavor to effect such delivery to the relevant accounts at the Depositary in accordance with its customary requirements.

(d) The Company reserves the right to reasonably reject any and all Exercise Forms not in proper form or if acceptance thereof would, in the opinion of the Company, be unlawful.  Such determination by the Company shall be final and binding on the Holders of the Warrants, absent manifest error, provided, however, in connection with any such rejection the Company shall promptly communicate the same to the Trust and concurrently deliver to the Trust a reasonably detailed written explanation of the facts and the Law which supports such rejection.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Forms with regard to any particular exercise of the Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

Section 4.4    Issuance of Warrant Shares.  Upon exercise of any Warrants pursuant to Section 4.3 and clearance of the funds in payment of the Exercise Price, the Company shall promptly at its expense, and in no event later than three (3) Business Days thereafter, cause to be

8

issued to the Holder of such Warrants the total number of whole Warrant Shares for which such Warrants are being exercised (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder as set forth below:

(i)  in the case of a Beneficial Holder who holds the Warrants being exercised through the Depositary's book-entry transfer facilities, by same-day or next-day credit to the Depositary for the account of such Beneficial Holder or for the account of a participant in the Depositary the number of Warrant Shares to which such person is entitled, in each case registered in such name and delivered to such account as directed in the Exercise Form by such Beneficial Holder or by the direct participant in the Depositary through which such Beneficial Holder is acting, or

(ii)  in the case of a Registered Holder who holds the Warrants being exercised in the form of Book-Entry Warrants, a book-entry interest in the Warrant Shares registered on the books of the Company's transfer agent.

Section 4.5    Exercise of Warrant.  Warrants may be exercised by the Holder thereof by delivery of payment to the Warrant Agent, for the account of the Company, by certified or bank cashier's check payable to the order of the Company or by wire transfer of immediately available funds to an account designated by the Company (or as otherwise agreed to by the Company), in lawful money of the United States of America, of the full Exercise Price for the number of Warrant Shares specified in the Exercise Form (which shall be equal to the Exercise Price multiplied by the number of Warrant Shares in respect of which any Warrants are being exercised) and[, only to the extent provided in Section 8.1,] any and all applicable taxes and governmental charges due in connection with the exercise of Warrants and the exchange of Warrants for Warrant Shares (the "Exercise Amount").

Section 4.6    Reservation of Shares.  The Company hereby agrees that at all times there shall be reserved and kept available, free from preemptive or similar rights, for issuance and delivery upon exercise of Warrants such number of Warrant Shares as may be from time to time issuable upon exercise in full of the Warrants.  All Warrant Shares shall be duly authorized, and when issued upon such exercise, shall be validly issued, fully paid and non-assessable, free and clear of any preemptive or similar rights and all liens, security interests, charges and other encumbrances or restrictions on sale and free and clear of all preemptive rights, and the Company shall take all such action as may be necessary or appropriate in order that the Company may validly and legally issue all Warrant Shares in compliance with this sentence and applicable Law.  If at any time prior to the Expiration Date the number and kind of authorized but unissued shares of the Company's capital stock shall not be sufficient to permit exercise in full of the Warrants, the Company will promptly take such corporate action as may be necessary to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes.  The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Shares to issue shares of Common Stock upon the exercise of Warrants.  Without limiting the generality of the foregoing, the Company will not increase the stated or par value per share, if any, of the Common Stock above the Exercise Price in effect immediately prior to such increase in stated or par value.

9

Section 4.7    <u>Fractional Shares</u>.    Notwithstanding any provision to the contrary contained in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of Warrants, and in any case where the Registered Holder would, except for the provisions of this <u>Section 4.7</u>, be entitled under the terms of Warrants to receive a fraction of a share upon the exercise of such Warrants, the Company shall, upon the exercise of such Holder's Warrants, issue or cause to be issued only the largest whole number of Warrant Shares issuable on such exercise (and such fraction of a share will be disregarded); <u>provided</u>, that if more than one Warrant is presented for exercise at the same time by the same Holder, the number of whole Warrant Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Shares issuable on exercise of all such Warrants.

Section 4.8    <u>Listing</u>.    Prior to the issuance of any Warrant Shares upon exercise of Warrants, the Company shall secure the listing of such shares of Common Stock or other Warrant Shares upon the NYSE (or any other principal securities exchange, quotation system and market within the United States, if any, on which securities of the same class and type as the securities to be issued upon exercise of the Warrants are then listed or quoted) and shall maintain, so long as any other shares of Common Stock (or, as applicable, other securities) shall be so listed, such listing of all Warrant Shares from time to time issuable upon the exercise of Warrants.

## ARTICLE V

## ADJUSTMENT OF SHARES OF COMMON STOCK PURCHASABLE AND OF EXERCISE PRICE

The Exercise Price and the number and kind of Warrant Shares shall be subject to adjustment from time to time upon the happening of certain events as provided in this <u>Article V</u>.

Section 5.1    <u>Mechanical Adjustments</u>.

(a) Subject to the provisions of <u>Section 4.7</u>, if at any time prior to the exercise in full of the Warrants, the Company shall (i) declare a dividend or make a distribution on the Common Stock payable in shares of its capital stock (whether shares of Common Stock or of capital stock of any other class or series), (ii) subdivide, reclassify or recapitalize its outstanding Common Stock into a greater number of shares, (iii) combine, reclassify or recapitalize its outstanding Common Stock into a smaller number of shares, or (iv) issue any shares of its capital stock by reclassification of its Common Stock (including any such reclassification in connection with a consolidation or a merger in which the Company is the continuing corporation), the number of Warrant Shares issuable upon exercise of Warrants and/or the Exercise Price in effect at the time of such record date of such dividend, distribution, subdivision, combination, reclassification or recapitalization shall be adjusted so that the Holders shall be entitled to receive the aggregate number and kind of shares which, if their Warrants had been exercised in full immediately prior to such event, the Holders would have owned upon such exercise and been entitled to receive by virtue of such dividend, distribution, subdivision, combination, reclassification or recapitalization. If the Company declares a dividend payable in cash on its Common Stock and shall at substantially the same time offer to its stockholders a right to

10

purchase new shares of Common Stock from the proceeds of such dividend or for an amount substantially equal to the dividend, all new shares so issued shall, for the purposes of this Section 5.1(a), be deemed to have been issued as a share dividend subject to this Section 5.1(a). Any adjustment required by this Section 5.1(a) shall be made successively immediately after the record date, in the case of a dividend or distribution, or the effective date, in the case of a subdivision, combination, reclassification or recapitalization, to allow the purchase of such aggregate number and kind of shares.

(b) If at any time prior to the exercise in full of the Warrants, the Company shall fix a record date for the issuance or making of a distribution to all holders of the Common Stock or any other Warrant Shares for which Warrants are exercisable (including any such distribution to be made in connection with a consolidation or merger in which the Company is to be the continuing corporation) of evidences of its indebtedness, any other securities of the Company or any cash, property or other assets (excluding a combination, reclassification or recapitalization referred to in Section 5.1(a) and regular quarterly cash dividends) or of subscription rights, options or warrants to purchase or acquire Common Stock or Common Stock Equivalents (excluding those referred to in Section 5.1(a)) (any such event being herein called a "Special Dividend"), the Exercise Price shall be decreased immediately after the record date for such Special Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, the numerator of which shall be the then current market price of the Common Stock (as defined in Section 5.1(c)) on such record date less the fair market value (as determined by the Independent Auditor) of the evidences of indebtedness, securities or property, or other assets issued or distributed in such Special Dividend applicable to one share of Common Stock or of such subscription rights or warrants applicable to one share of Common Stock and the denominator of which shall be such then current market price per share of Common Stock (as so determined).  Any adjustment required by this Section 5.1(b) shall be made successively whenever such a record date is fixed and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise Price that was in effect immediately prior to such record date.

(c) For the purpose of any computation under this Section 5.1, the current market price per share of Common Stock at any date shall be deemed to be the average of the daily closing prices for thirty (30) consecutive trading days immediately prior to, but not including, such date.  The closing price for each day shall be the last sale price regular way or, in case no such reported sales take place on such day, the average of the last reported bid and asked prices regular way, in either case on the principal national securities exchange or stock market on which the Common Stock is admitted to trading or listed.  If there is no public market for the Common Stock, then a reputable investment bank or valuation firm shall be selected jointly by the Company and the Trust (such bank or firm, the "Independent Auditor") to determine the fair market value of the Common Stock.  The Company and the Trust shall instruct the Independent Auditor to render its valuation within 30 days of being retained as the Independent Auditor.  All fees and expenses of the Independent Auditor shall be borne by the Company.

(d) From the date hereof through and including the Expiration Date, the Company shall not issue or sell any shares of Common Stock, other than Excluded Stock, or any rights (including without limitation any (x) options (other than Excluded Options), warrants or other rights (whether or not at the time exercisable) to purchase or acquire Common Stock, other than

11

Excluded Stock, (y) securities by their terms convertible into or exchangeable (whether at the time so convertible or exchangeable) for Common Stock, other than Excluded Stock or (z) options (other than Excluded Options), warrants or rights to purchase such convertible or exchangeable securities), for no consideration or for a consideration per share that is less than the current market price per share of the Common Stock determined pursuant to Section 5.1(c) as of the last trading day immediately prior to the time of such issue or sale (with such last trading day being included in the determination of the thirty (30) trading days average closing price referred to in (and notwithstanding) such Section 5.1(c)).

(e) No adjustment in the Exercise Price shall be required unless such adjustment would require an increase or decrease of at least five cents ($0.05) in such price; provided, however, that any adjustments which by reason of this paragraph Section 5.1(e) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Section 5.1 shall be made to the nearest cent ($.01) or to the nearest one-hundredth of a share, as the case may be. Notwithstanding anything in this Section 5.1 to the contrary, the Exercise Price shall not be reduced to less than the then existing par value of the Common Stock as a result of any adjustment made hereunder.

(f) In the event that at any time, as a result of any adjustment made pursuant to Section 5.1(a) or Section 5.3, the Holders thereafter shall become entitled to receive any shares of the Company (or, as applicable, the Successor Person) other than Common Stock, thereafter the number of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Common Stock contained in this Section 5.1.

Section 5.2   Notices of Adjustment. Whenever the number and/or kind of Warrant Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a statement signed by an Appropriate Officer setting forth the adjusted number and/or kind of shares purchasable upon the exercise of Warrants and/or the Exercise Price of such shares after such adjustment, a reasonably detailed statement of the facts, computations and methodology accounting for such adjustment, including a calculation of the revised, if any Exercise Price and number of issuable Warrant Shares, and (ii) cause the Warrant Agent to give written notice to each Holder in the manner provided in Section 9.2, of the record date or the effective date of the event. Such notice shall be given not less than ten (10) Business Days before the earlier of such record date or effective date. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 5.3   Organic Changes.

(a) *Adjustments for Organic Change*. If the Company reorganizes its capital stock, reclassifies its capital stock or consolidates or merges with or into another person or enters into a business combination with another person (in the case of a reorganization, reclassification, consolidation, merger or business combination where the Company is not the surviving Person (such successor or acquiring Person being referred to as the "Successor Person")), or sells, leases, transfers or otherwise disposes of all or substantially all of its property, assets or business to another Person (each, an "Organic Change"), then as a condition of such Organic Change,

12

lawful and adequate provision shall be made whereby the Holder shall have the right to acquire and receive upon exercise of Warrants such shares of stock, securities, cash or other property issuable or payable (as part of the Organic Change) with respect to or in exchange for such number of outstanding shares of Common Stock as such Holder would have been entitled to receive upon exercise of Warrants had it been exercised immediately before such Organic Change, subject to applicable adjustments (as determined in good faith by the Board of Directors).

(b) *Assumption by Successor Person*.  In the event of any Organic Change contemplated by Section 5.3(a), effective provisions shall be made in the Governing Documents of the Successor Person, or in any contract of sale, merger, conveyance, lease, transfer or otherwise, so that the provisions set forth herein for the protection of the rights of the Holders of Warrants shall thereafter continue to be applicable; and any such Successor Person shall expressly assume, by supplemental agreement signed by such Successor Person and the Trust, this Warrant Agreement, including all of the obligations set forth under Section 5.3(a) and the due and punctual performance, and observation of all of the obligations of the Company hereunder and in the Registration Rights Agreement.  The provisions of this Section 5.3 shall apply similarly to all successive events constituting Organic Changes.

(c) *Notices*.  The Company shall promptly notify the Warrant Agent, which in turn shall promptly notify or cause to be notified all Holders at the last address set forth for such Holders in the Warrant Register, in the manner provided in Section 9.2, of the Organic Change whenever an Organic Change is consummated (the "Organic Change Date").  After the Organic Change Date, the Company shall (a) prepare a certificate setting forth the adjustments made under Section 5.3(a), and a brief, reasonably detailed statement of facts, computations and methodology accounting for such adjustment and (b) to provide copies of such certificate to each Holder or record as of the Organic Change Date. No failure of the Warrant Agent to give or cause to be given the foregoing notices or defect therein shall affect the validity of the proceedings for the purchase of Warrants, or limit any Holder's rights hereunder.

(d) *Sale of* Warrants.  In any Organic Change in which holders of capital stock of the Company sell or otherwise assign, transfer or dispose of their shares, the Company shall cause the transaction to be structured to permit the Holders of Warrants to deliver Warrants in connection with any such Organic Change without requirement for exercise thereof as a condition to participation and for consideration not less than the consideration such Holders would have received had such Holders exercised their Warrants immediately prior thereto, less any applicable Exercise Price.

## ARTICLE VI

## TRANSFER AND EXCHANGE OF WARRANTS AND WARRANT SHARES

Section 6.1    Registration of Transfers and Exchanges.

(a) *Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein*.  The transfer and exchange of Global Warrant Certificates or beneficial interests therein

13

shall be effected through the Depositary, in accordance with this Warrant Agreement and the procedures of the Depositary therefor.

(b) *Exchange of a Beneficial Interest in a Global Warrant Certificate for a Book-Entry Warrant*.

(i)  Any Holder of a beneficial interest in a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant.  Upon receipt by the Warrant Agent from the Depositary or its nominee of written instructions or such other form of instructions as is customary for the Depositary on behalf of any person having a beneficial interest in a Global Warrant Certificate, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depositary and Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by the Book-Entry Warrants to be issued in exchange for the beneficial interest of such person in the Global Warrant Certificate and, following such reduction, the Warrant Agent shall register in the name of the Holder a Book-Entry Warrant and deliver to said Holder a Warrant Statement.

(ii)  Book-Entry Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 6.1(b) shall be registered in such names as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver such Warrant Statements to the Persons in whose names such Warrants are so registered.

(c) *Transfer and Exchange of Book-Entry Warrants*.  When Book-Entry Warrants are presented to the Warrant Agent with a written request:

(i)  to register the transfer of the Book-Entry Warrants; or

(ii)  to exchange such Book-Entry Warrants for an equal number of Book-Entry Warrants of other authorized denominations, the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing.

(d) *Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate*.  A Book-Entry Warrant may not be exchanged for a beneficial interest in a Global Warrant Certificate except upon satisfaction of the requirements set forth below.  Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and

14

the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly.  If no Global Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

(e) *Restrictions on Exchange or Transfer of Global Warrant Certificates*. Notwithstanding any other provisions of this Warrant Agreement (other than the provisions set forth in Section 6.1(f)), unless and until it is exchanged in whole for a Book-Entry Warrant, a Global Warrant Certificate may not be transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f) *Book-Entry Warrants*.  If at any time:

(i)     the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice; or

(ii)     the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Book-Entry Warrants under this Warrant Agreement,

then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company, shall register Book-Entry Warrants, in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates.

(g) *Restrictions on Transfer*.  No Warrants or Warrant Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities Laws.

(h) *Cancellation of Global Warrant Certificate*.  At such time as all beneficial interests in Global Warrant Certificates have either been exchanged for Book-Entry Warrants, redeemed, repurchased or cancelled, all Global Warrant Certificates shall be returned to, or retained and cancelled by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

Section 6.2     Obligations with Respect to Transfers and Exchanges of Warrants.

(a) To permit registrations of transfers and exchanges, the Company shall execute Global Warrant Certificates, if applicable, and the Warrant Agent is hereby authorized, in accordance with the provisions of Section 3.4 and this Article VI, to countersign such Global Warrant Certificates, if applicable, or register Book-Entry Warrants, if applicable, as required pursuant to the provisions of this Article VI and for the purpose of any distribution of new Global Warrant Certificates contemplated by Section 7.2 or additional Global Warrant Certificates contemplated by Article V.

15

(b) All Book-Entry Warrants and Global Warrant Certificates issued upon any registration of transfer or exchange of Book-Entry Warrants or Global Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Agreement as the Book-Entry Warrants or Global Warrant Certificates surrendered upon such registration of transfer or exchange.

(c) No service charge shall be made to a Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

(d) So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, will be considered the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Warrant Agreement.  Except as provided in Section 6.1(b) and Section 6.1(f) upon the exchange of a beneficial interest in a Global Warrant Certificate for Book-Entry Warrants, Beneficial Holders will not be entitled to have any Warrants registered in their names, and will under no circumstances be entitled to receive physical delivery of any such Warrants and will not be considered the Registered Holder thereof under the Warrants or this Warrant Agreement.  Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(e) Subject to Section 6.1(b), Section 6.1(c) and Section 6.1(d), and this Section 6.2, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register upon surrender of Global Warrant Certificates, if applicable, representing such Warrants at the Warrant Agent's office as set forth in Section 9.2, duly endorsed, and accompanied by a completed form of assignment substantially in the form of Exhibit C hereto (or with respect to a Book-Entry Warrant, only such completed form of assignment substantially in the form of Exhibit C hereto), duly signed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.  Upon any such registration of transfer, a new Global Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee.

Section 6.3     Fractional Warrants.  The Warrant Agent shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

Section 6.4     Obligations with Respect to Transfers of the Warrant.

(a) The Warrant issued upon any registration of transfer shall be the valid obligation of the Company, entitled to the same benefits under this Warrant Agreement as the Warrant surrendered upon such registration of transfer.

16

(b) No service charge shall be made to a Holder for any registration or transfer but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such registration of transfer.

## ARTICLE VII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 7.1    No Rights or Liability as Stockholder; Notice to Registered Holders. Nothing contained in the Warrants shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  No provision thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.  To the extent not covered by any statement delivered pursuant to Section 5.2, the Company shall give notice to Registered Holders by registered mail if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a) the Company shall authorize the payment of any dividend payable in any securities upon shares of Common Stock or authorize the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b) the Company shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or Common Stock Equivalents or of rights, options or warrants to subscribe for or purchase Common Stock or Common Stock Equivalents or of any other subscription rights, options or warrants;

(c) a dissolution, liquidation or winding up of the Company shall be proposed;

(d) a capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or in the case of any sale or conveyance to another corporation or other entity of the property of the Company as an entirety or substantially as an entirety; or

(e) the Company shall take any other action which would result in an adjustment in the Exercise Price or the number of Warrant Shares issuable upon exercise of the Warrants.

Subject to applicable Law, such giving of notice shall be initiated as soon as is practicable after a final determination thereof is made, and in no event later than the tenth (10th) Business Day prior to the applicable record date or date of the closing of the stock transfer books.  Such notice shall specify (i) such record date or the date of closing the stock transfer books, as the case may be, and (ii) the material facts and terms of any such transaction, action or

17

event together with any information that the Company provides, or intends to provide, to holders of its Common Stock in connection therewith.  Failure to provide such notice shall not affect the validity of any action taken in connection with such dividend, distribution or subscription rights, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 5.1 or Section 5.3 by reason of any event as to which notice is required by this Section 7.1.

Section 7.2    Lost, Stolen, Mutilated or Destroyed Global Warrant Certificates.  If any Global Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue, and the Warrant Agent shall countersign and deliver, in exchange and substitution for and upon cancellation of the mutilated Global Warrant Certificate, or in lieu of and substitution for the Global Warrant Certificate lost, stolen or destroyed, a new Global Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company and the Warrant Agent of the loss, theft or destruction of such Global Warrant Certificate, and an indemnity of the Company and Warrant Agent for any losses in connection therewith, if requested by either the Company or the Warrant Agent, also reasonably satisfactory to them.  Applicants for such substitute Global Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

Section 7.4    No Restrictive Legends.  No legend shall be stamped or imprinted on any stock certificate for Warrant Shares issued upon the exercise of any Warrant and or stock certificate issued upon the direct or indirect transfer of any such Warrant Shares.

Section 7.5    Cancellation of Warrants.  If the Company shall purchase or otherwise acquire Warrants, the Global Warrant Certificates and the Book-Entry Warrants representing such Warrants shall thereupon be delivered to the Warrant Agent, if applicable, and be cancelled by it and retired.  The Warrant Agent shall cancel all Global Warrant Certificates surrendered for exchange, substitution, transfer or exercise in whole or in part.  Such cancelled Global Warrant Certificates shall thereafter be disposed of in a manner satisfactory to the Company provided in writing to the Warrant Agent.

## ARTICLE VIII

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 8.1    Payment of Taxes.  The Company will from time to time promptly pay all taxes and charges that may be imposed upon the Trust, the Company or the Warrant Agent in respect of the issuance or delivery of the Warrant Shares upon the exercise of Warrants, but any taxes or charges in connection with the issuance of Warrants or Warrant Shares in any name other than that of the Holder of the Warrants shall be paid by such Holder; and in any such case, the Company shall not be required to issue or deliver any Warrants or Warrant Shares until such taxes or charges shall have been paid or it is established to the Company's satisfaction that no tax or charge is due.

18

Section 8.2    <u>Resignation, Consolidation or Merger of Warrant Agent</u>.

(a) *Appointment of Successor Warrant Agent*.    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Registered Holder of a Warrant (who shall, with such notice, submit his Warrant for inspection by the Company), then the Registered Holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost.  Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a corporation organized and existing under the Laws of the State of New York in good standing and having its principal office in the Borough of Manhattan, City and State of New York, and shall be authorized under such Laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b) *Notice of Successor Warrant Agent*.    In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such Registered Holder's address appearing on the Warrant Register.  Failure to give any notice provided for in this <u>Section 8.2(b)</u> or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(i)    *Merger, Consolidation or Name Change of Warrant Agent*.    Any corporation into which the Warrant Agent may be merged or with which it may be consolidated or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Warrant Agreement, without any further act or deed, if such person would be eligible for appointment as a successor Warrant Agent under the provisions of <u>Section 8.2(a)</u>.  If any of the Global Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Warrant Agreement, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may

19

countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Warrant Agreement.

(c)  If at any time the name of the Warrant Agent is changed and at such time any of the Global Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Global Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Global Warrant Certificates either in its prior name or in its changed name; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Warrant Agreement.

Section 8.3    Fees and Expenses of Warrant Agent.

(a)  *Remuneration*.  The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent hereunder and will reimburse the Warrant Agent upon demand for all expenditures that the Warrant Agent may reasonably incur in the execution of its duties hereunder. The Trust shall not be responsible under any circumstances for any such remuneration or expenditures.

(b)  *Further Assurances*.  The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 8.4    Liability of Warrant Agent.

(a)  *Reliance on Company Statement*.  Whenever in the performance of its duties under this Warrant Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the Chief Executive Officer or Chairman of the Board of Directors of the Company and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement for any action taken or suffered in good faith by it pursuant to the provisions of this Warrant Agreement.

(b)  *Indemnity*.  The Warrant Agent shall be liable hereunder only for its own negligence, willful misconduct or bad faith.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted by the Warrant Agent in the execution of this Warrant Agreement except as a result of the Warrant Agent's negligence, willful misconduct or bad faith.  Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent.  No provision in this Warrant Agreement shall be construed to relieve the Warrant Agent from liability for its own negligence, willful misconduct or bad faith.

20

(c) *Exclusions*.  The Warrant Agent shall have no responsibility with respect to the validity of this Warrant Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Shares to be issued pursuant to this Warrant Agreement or any Warrant or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

Section 8.5    Acceptance of Agency.  The Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth and, among other things, shall account promptly to the Company with respect to Warrants exercised and concurrently account for and pay to the Company all moneys received by the Warrant Agent for the purchase of Warrant Shares through the exercise of Warrants.

## ARTICLE IX

### MISCELLANEOUS PROVISIONS

Section 9.1    Binding Effects; Benefits.  This Warrant Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent, the Trust and any other Holder and their respective heirs, legal representatives, successors and assigns.  Nothing in this Warrant Agreement, expressed or implied, is intended to or shall confer on any person other than the Company, the Warrant Agent, the Trust or any other Holder, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Agreement. All covenants, conditions, stipulations, promises, and agreements contained in this Warrant Agreement shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holders.

Section 9.2    Notices.  All notices required or permitted under this Warrant Agreement must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 9.2).

if to the Warrant Agent, to:

[Warrant Agent]

21

Attention:
Facsimile:

if to the Company, to:

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
Attn:  Corporate Secretary
Facsimile: (410) 531-4545

with a copy to:
Kirkland & Ellis LLP

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Attention: Thomas W. Christopher
Facsimile: (212) 446-4900

if to the Trust, to:

[Street Address]
[City, State, Zip Code]
Attention:
Facsimile:

with a copy to:
[to follow]

if to Registered Holders, at their addresses as they appear in the Warrant Register.

Section 9.3    Examination of this Warrant Agreement.    A copy of this Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent at [Agent's address], for examination by the Holder of any Warrant.  Prior to such examination, the Warrant Agent may require any such holder to submit his Warrant for inspection by it.

Section 9.4    Counterparts.  This Warrant Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts (including, without limitation, by facsimile or portable document format (pdf)), each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 9.5    Effect of Headings.  The section headings herein are for convenience only and are not part of this Warrant Agreement and shall not affect the interpretation hereof.

Section 9.6    Amendments.

22

(a) Subject to <u>Section 9.6(b)</u>, this Warrant Agreement may not be amended except in writing signed by all parties hereto.

(b) The Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement or the Warrants with the prior written consent of Holders of the Warrants exercisable for a majority of the Warrant Shares then issuable upon exercise of the Warrants then outstanding; <u>provided</u>, <u>however</u>, that no such supplement or amendment shall, without the written consent of each Holder affected thereby, (i) shorten the Expiration Date, (ii) increase the Exercise Price of any Warrant, (iii) change any of the provisions of this <u>Section 9.6(b)</u> or any other provision hereof specifying the number or percentage of Holders required to waive, amend or modify any rights hereunder or required to make any determinations or grant any consent hereunder, or otherwise to act with respect to this Warrant Agreement or any Warrants, or (iv) change any of the provisions of Article IV or Article V hereof. Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed supplement or amendment is in compliance with the terms of this <u>Section 9.6</u> and, provided such supplement or amendment does not change the Warrant Agent's rights, duties, liabilities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment. Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this <u>Section 9.6</u> will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, modification or waiver, the Company shall give prompt notice thereof to all Holders and, if appropriate, notation thereof will be made on all Global Warrant Certificates thereafter surrendered for registration of transfer or exchange.

Section 9.7    <u>No Inconsistent Agreements; No Impairment</u>.  The Company will not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in the Warrants or the provisions hereof.  The Company represents and warrants to the Holders that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrants and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holders against impairment.

Section 9.8    <u>Integration/Entire Agreement</u>.  This Warrant Agreement, together with the Warrants and the Registration Rights Agreement, the Plan of Reorganization and the Confirmation Order, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein, and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

Section 9.9    <u>Governing Law, Etc.</u>

23

(a) This Warrant Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

(b) With respect to all claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Warrant Agreement (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Warrant Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware, or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then, at the sole election of the Trust, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York (the "Courts"), and each of the parties to this Warrant Agreement agrees that any and all Claims may be brought, heard and determined in such Courts.

(c) Each of the parties to this Warrant Agreement agrees that (i) venue shall be proper in such Courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including, without limitation, any pleading, summons or other paper initiating any such suit, action, proceeding, claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Warrant Agreement and shall be deemed in every respect effective service of process upon such party when so given.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS WARRANT AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS WARRANT AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION

Section 9.10   Further Assurances.   The Company shall execute, acknowledge and deliver all such instruments and take all such action as the Trust from time to time may reasonably request in order to further effectuate the purposes of this Warrant Agreement and to carry out the terms hereof.

Section 9.11   Specific Performance.   Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this

24

Warrant Agreement, the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages. It is accordingly agreed that the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Warrant Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Warrant Agreement exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief. Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

Section 9.12  <u>Other Remedies</u>.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by Law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

Section 9.13  <u>Waivers</u>.  Any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Warrant Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Warrant Agreement. No action taken pursuant to this Warrant Agreement, including without limitation any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition or agreement contained herein.

Section 9.14  <u>Termination</u>.  This Warrant Agreement shall terminate on the Expiration Date. Notwithstanding the foregoing, this Warrant Agreement will terminate on any earlier date when all Warrants have been exercised. The provisions of <u>Section 8.4</u> and this <u>Article IX</u> shall survive such termination and the resignation or removal of the Warrant Agent.

Section 9.15  <u>Severability</u>.  Whenever possible, each provision of this Warrant Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Warrant Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Warrant Agreement, and this Warrant Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Warrant Agreement with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

25

Section 9.16  <u>Attorneys' Fees</u>.   The Company shall reimburse the Trust for all documented out-of-pocket costs and expenses arising out of, or incurred by the Trust in connection with, any successful action or proceeding brought against the Company by the Trust to enforce any provision in this Warrant Agreement.

**[**Signature Page Follows**]**

26

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

W. R. GRACE & CO.

By: _____

    Name:
    Title:

WRG ASBESTOS TRUST

By: _____

    Name:
    Title:

[WARRANT AGENT]

By: _____

    Name:
    Title:

27

**EXHIBIT A-1**

## FORM OF WARRANT STATEMENT

**[**As provided by Warrant Agent**]**

1

**EXHIBIT A-2**

FORM OF FACE OF GLOBAL WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [ DATE]

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(a) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co.  or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Article VI of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.

1

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [DATE], 2009, BY AND AMONG THE COMPANY, THE TRUST AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [DATE]

### WARRANT TO PURCHASE

_____ SHARES OF COMMON STOCK OF

# W. R. GRACE & CO.

CUSIP # [   ]
ISSUE DATE:  [Date], 2009

No. _____

This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from W. R. Grace & Co., a corporation incorporated under the Laws of the State of Delaware (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [Date], the number of fully paid and non-assessable shares of Common Stock of the Company set forth above at the Exercise Price (as defined in the Warrant Agreement).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Exercise Price shall be $17.00.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Warrant has been duly executed by the Company under its corporate seal as of the \_\_\_\_ day of _____, 2009.

W. R. GRACE & CO.

By: _____

Print Name: _____

Title: _____

Attest: _____
Secretary

[WARRANT AGENT],
as Warrant Agent

By: _____
    Name:
    Title:

2

Address of Registered Holder for Notices (until changed in accordance with this Warrant):

_____
_____
_____
_____
_____

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

3

## FORM OF REVERSE OF WARRANT

The Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Warrants to purchase _____ shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office.  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants.  All capitalized terms used on the face of this Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Warrant at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities Laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

4

**EXHIBIT B**

# EXERCISE FORM FOR REGISTERED HOLDERS
# HOLDING BOOK-ENTRY WARRANTS

(To be executed upon exercise of Warrant)

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrants, to purchase Warrant Shares herewith tenders payment for _____ of the Warrant Shares to the order of W. R. Grace & Co. in the amount of $_____ in accordance with the terms of the Warrant Agreement and this Warrant.

The undersigned requests that [a statement representing] the Warrant Shares be delivered as follows:

Name _____

Address _____

_____

Delivery Address (if different)

_____

_____

If said number of shares shall not be all the shares purchasable under the within Warrant Certificate, the undersigned requests that a new Book-Entry Warrant representing the balance of such Warrants shall be registered, with the appropriate Warrant Statement delivered as follows:

Name _____

Address _____

_____

Delivery Address (if different)

_____

_____

_____
Social Security or Other Taxpayer
Identification Number of Holder

Signature _____

Note: If the statement representing the Warrant Shares or any Book-Entry Warrants representing Warrants not exercised is to be registered in a name other than that in which the Book-Entry Warrants are registered, the signature of the holder hereof must be guaranteed.

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

Countersigned:
Dated:            , 20

1

[WARRANT AGENT],
as Warrant Agent

Signature _____

       Authorized Signatory

2

**Exhibit C**

FORM OF ASSIGNMENT

(To be executed only upon assignment of Warrant)

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such Warrant to purchase number of Warrant Shares listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Registered Holder under the within Warrant, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrant on the books of the within-named Company with respect to the number of Warrant Shares set forth below, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address | No. of Warrant Shares |
| --- | --- | --- |
| | | |

And if said number of Warrant Shares shall not be all the Warrant Shares represented by the Warrant, a new Warrant is to be issued in the name of said undersigned for the balance remaining of the Warrant Shares registered by said Warrant.

Dated:        , 20__        Signature _____

Note:    The above signature should correspond exactly with the name on the face of this Warrant

1

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

# EXHIBIT 25 TO EXHIBIT BOOK
## CASE MANAGEMENT ORDER FOR CLASS 7A ASBESTOS PD CLAIMS

**EXHIBIT 25**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | **Case No. 01-01139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | |

**CASE MANAGEMENT ORDER FOR
CLASS 7A ASBESTOS PD CLAIMS**

This Case Management Order provides procedures for the resolution of all Class 7A

Asbestos PD Claims other than Class 7A Asbestos PD Claims that have been Allowed as of the

Effective Date pursuant to PD Settlement Agreements.[1]

I.    The procedures with respect to Class 7A Asbestos PD Claims filed prior to the March

2003 Bar Date shall be as follows:

A.    Unresolved Asbestos PD Bar Date Claims, other than Asbestos PD Claims which
either (i) have been disallowed and/or expunged, and for which the Holders of
such Asbestos PD Claims have filed appeals, which appeals are pending as of the
Effective Date; or (ii) class certification has been denied and an appeal from such
denial of class certification is pending as of the Effective Date, will be adjudicated
in accordance with the Amended Order Setting Deadlines Regarding Objections
to Class 7A Asbestos Property Damages ("PD") Claims, entered by the
Bankruptcy Court on _____, 2009 (Dkt. No. ____) ("Amended Order") and
attached hereto as Exhibit A.

B.    With respect to any and all Class 7A Asbestos PD Claims which were filed as of
the March 2003 Bar Date and which either (i) have been disallowed and/or
expunged by the Bankruptcy Court and for which the Holders of such Asbestos
PD Claims have filed appeals, which appeals are pending as of the Effective Date;

---

[1]    Capitalized terms used in this Case Management Order and not otherwise defined shall have the meanings
assigned to them in the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code
of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI
Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February
27, 2009 (the "Plan").

or (ii) as to which class certification has been denied and an appeal from such denial of class certification is pending as of the Effective Date:

1.      The appeals shall proceed to completion.

2.      The Anderson Memorial class claims (Nos. 09911 and 09914) shall remain inactive unless and until there is a final, appealable order with respect to the Anderson Memorial individual claim (No. 011008).

3.      Claims for which appeals are successful, resulting in reversal of the Bankruptcy Court order(s) disallowing and expunging the claims, or denying class certification, shall be remanded to the Bankruptcy Court for proceeding[s] consistent with this PD CMO.  For the avoidance of doubt, Section II of this PD CMO does not apply to such proceedings, and/or any other proceedings ordered by the court(s) of appeal.

II.    The procedures with respect to Class 7A Asbestos PD Claims, other than (i) Asbestos PD Claims that have been allowed pursuant to a PD Settlement Agreement; and (ii) Unresolved Asbestos PD Bar Date Claims, shall be as follows:

A.      **Proof of Claim:**  In order to assert a claim against the Asbestos PD Trust for a Class 7A Asbestos PD Claim, a Class 7A Claimant must file a Proof of Claim (the "POC") with the Asbestos PD Trust.

1.      The POC shall provide the following information to the best of the Class 7A Claimant's knowledge, information or belief:

(A)      Class 7A Claimant's name, the last four digits of the claimant's social security number or FEIN, mailing address, and attorney's name, law firm name, mailing address and telephone number.

(B)      Property address.

(C)      Whether the Class 7A Claimant owned the property on the March 2003 Bar Date and, if not, who owned the property on the March 2003 Bar Date.

(D)      Whether the Class 7A Claimant or someone else on his, her, or its behalf completed any interior repair or renovations on the property that disturbed, dislodged or affected any asbestos-containing product(s) manufactured or distributed by any of the Debtors (hereafter "Asbestos-Containing Products") in the property.  If yes, specify the dates and description of such repair or renovations.

(E)      Whether any other interior repair or renovations were completed on the property during any other period of time that disturbed,

2

dislodged or affected any Asbestos-Containing Product(s) in the property.  If yes, specify the dates and descriptions of such repair or renovations.

(F)     When the Class 7A Claimant or someone on his, her, or its behalf installed Asbestos-Containing Product(s) in the property.

(G)     If the Class 7A Claimant or someone on his, her, or its behalf did not install Asbestos-Containing Product(s) in the property, when such product(s) was/were installed.

(H)     Copies of all documentation relating to the purchase and/or installation of the Asbestos-Containing Product(s) in the property. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession of the document.  If a summary of documents is provided rather than the documents themselves, the Class 7A Claimant is required to consent to the production and release of those documents to Grace upon Grace's further request.

(I)     When the Class 7A Claimant first learned of the presence of Asbestos-Containing Product(s) in the property for which the Class 7A Claimant is making this claim.  Provide copies of all documents relating or referring to the presence of such asbestos or such Asbestos-Containing Product(s).  If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession of the document.  If a summary of documents is provided rather than the documents themselves, the Class 7A Claimant is required to consent to the production and release of those documents to Grace upon Grace's further request.

(J)     When the Class 7A Clamant first learned that the Asbestos-Containing Product for which the claim is being made contained asbestos.

(K)     Whether the Class 7A Claimant or someone else on its behalf made any effort to remove, contain and/or abate the Asbestos-Containing Product(s) in the property for which the Class 7A Claimant is making this claim.  If yes, provide copies of all documents relating or referring to such efforts.  If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession of the document.  If a summary of

3

documents is provided rather than the documents themselves, the Class 7A Claimant is required to consent to the production and release of those documents to Grace upon Grace's further request.

(L) If the Class 7A Claimant or someone on his, her, or its behalf has not made any effort to remove, contain and/or abate the Asbestos-Containing Product(s) in the property for which the Class 7A Claimant is making a claim, whether anyone else made such an effort and, if so, when.

(M) Whether any individual asbestos-related property damage lawsuit or claim has been filed against Grace relating to the property for which the Class 7A Claimant is making the claim.

(N) Whether any individual asbestos-related property damage lawsuit or claim has been filed against any other party relating to the property for which the Class 7A Claimant is making this claim?

(1) If an asbestos-related property damage lawsuit has been filed relating to the property for which the Class 7A Claimant is making the claim, provide the following information about each such lawsuit or attach a copy of the face page of each complaint filed: the caption; the court where the lawsuit was originally filed; the docket number; and the date filed.

(2) If an asbestos-related property damage claim has been filed relating to the property for which the Class 7A Claimant is making the claim, provide the following information about each such claim or attach a copy of the face page of each claim filed: the description of the claim; the date submitted; and the name of entity to whom the claim was submitted.

(O) When the Class 7A Claimant first learned of W. R. Grace's bankruptcy cases?

(P) A list of all newspapers and magazines to which the Class 7A Claimant has subscribed.

(Q) The dollar amount of the Class 7A Claimant's claim.

2. The POC forms shall be maintained by a claims processing agent appointed by the Trust and reasonably satisfactory to Grace, and shall be promptly provided to Grace.

3. Filing a POC shall toll any applicable statutes of limitations. Such tolling shall end at the conclusion of the first business day following the 20th day

4

after entry on the Court's docket of the order permitting the holder of the Asbestos PD Claim identified in the POC to prosecute such claim pursuant to Section II.C of this PD CMO.

4.    Class action claims shall not be permitted.  For the avoidance of doubt, the foregoing prohibition against the filing of class action claims shall not (i) be asserted by Grace as a basis for dismissal of any appeals by Anderson Memorial Hospital of the denial of class certification, (ii) be construed to require the dismissal of, or require any particular ruling with respect to class certification in, any subsequent proceedings on remand, if any, from the pending appeals, and (iii) be construed in a manner which conflicts with any mandates issued by the Third Circuit Court of Appeals in the pending appeals.

**B.    Discharge and Authority to Proceed in Litigation:**

1.    Within 45 days of receipt of the POC from the Asbestos PD Trust, Grace will request any additional information it believes is necessary to evaluate whether to file an Asbestos PD Claim Discharge Motion as set forth herein.

2.    Within 45 days of receiving such request(s) from Grace, a Class 7A Claimant shall provide to Grace the requested information, subject to all applicable objections, privileges or exemptions from discovery.

3.    Not later than 45 days after receipt of such information from the Class 7A Claimant, Grace, on behalf of the Asbestos PD Trust, shall file in the Bankruptcy Court a motion (an "Asbestos PD Claim Discharge Motion") seeking to enjoin or otherwise terminate the prosecution of such claim on the ground that the claim is barred by the discharge granted to Grace pursuant to confirmation of the Plan and the March 2003 Bar Date.

4.    Should Grace choose to file an Asbestos PD Claim Discharge Motion, that Motion shall be heard and decided under the appropriate governing federal laws, rules and Bankruptcy Rules, as applicable.  In its sole discretion, Grace shall be authorized to prosecute an Asbestos PD Claim Discharge Motion on behalf of the Asbestos PD Trust.

5.    Neither Grace nor the Asbestos PD Trust shall file a declaratory judgment action against a Class 7A Claimant who has filed a POC except as a counter-claim.

6.    In the event that the Bankruptcy Court rules that an Asbestos PD Claim is barred by the discharge pursuant to the Plan or the March 2003 Bar Date, (a) the Asbestos PD Trust shall have no liability to pay that barred Asbestos PD Claim and (b) neither (i) Grace, (ii) any of the Sealed Air Indemnified Parties, (iii) any of the Fresenius Indemnified Parties, nor (iv) any other Asbestos Protected Party, solely in its capacity as an Asbestos

5

Protected Party and in no other such capacity, shall have any liability on account of that barred Asbestos PD Claim; provided, however, that Grace shall, consistent with the Case Management Order for Class 7A Asbestos PD Claims and the Asbestos PD Trust Agreement, be responsible to the Asbestos PD Trust for all reasonable costs, including, but not limited to, attorneys' fees, which may be incurred by the Asbestos PD Trust with respect to that barred Asbestos PD Claim.

**C.**    **Litigation of a Class 7A Asbestos PD Claim following resolution of a Class 7A Asbestos PD Claim Discharge Motion:**

1.    In the event: (i) Grace fails to timely file on behalf of the Asbestos PD Trust an Asbestos PD Claim Discharge Motion; or (ii) a final order is entered with respect to an Asbestos PD Claim Discharge Motion finding that the Class 7A Asbestos PD Claim is not barred by the discharge pursuant to the Plan or the March 2003 Bar Date or otherwise permits the claim to go forward, the Class 7A Claimant holding such Class 7A Asbestos PD Claim shall be permitted to prosecute such claim against the Asbestos PD Trust in, but only in, the United States District Court for the District of Delaware or such other United States District Court that has jurisdiction over the action commenced with respect to such claim.

2.    For the avoidance of doubt, in any litigation commenced pursuant to this Section II.C, all applicable Federal statutes, Federal Rules of Civil Procedure, Federal Rules of Evidence and applicable Federal local court rules shall apply.

3.    To the extent set forth in the Asbestos PD Trust Agreement and the Plan, Grace shall be authorized to represent the Asbestos PD Trust in such litigation and shall have sole discretion in the prosecution of such defense.

4.    The Asbestos PD Trust shall pay in Cash the Allowed Amount of such Asbestos PD Claim.

**ORDERED** this ___ day of _____, 2009

_____
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

6

# EXHIBIT A

## AMENDED ORDER SETTING VARIOUS DEADLINES REGARDING ASBESTOS PROPERTY DAMAGE CLAIMS

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | |

**AMENDED ORDER SETTING VARIOUS DEADLINES REGARDING
ASBESTOS PROPERTY DAMAGE CLAIMS**

On October 13, 2006, the Court entered a revised Scheduling Order (Docket No. 13406) to adjudicate Debtors' 15th Omnibus Objections (Substantive) to the nearly 4000 Asbestos Property Damage Claims that had been filed against Debtors in these proceedings. Most of those Asbestos Property Damage Claims have since been resolved. Of the nearly 4000 Asbestos Property Damage Claims initially filed, there remain 57 Asbestos Property Damage Claims that, as of this date, have not been resolved. A list of the unresolved Asbestos Property Damage Claims is attached to this Order as Exhibit A. With respect to these Asbestos Property Damage Claims, the Court hereby enters this revised Scheduling Order.

WHEREFORE, IT IS HEREBY ORDERED THAT:

1.    On or about February 16, 2007, Debtors filed Debtors' Motion and Memorandum for an Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eighty-Eight (88) Time-Barred Canadian Asbestos Property Damage Claims (Docket No. 14597) which covers what now amount to 54 of the Asbestos Property Damage claims listed on Exhibit A for properties located in Canada.

2.    If the Court grants Debtors' pending summary judgment motion, the 54 Canadian claims will be disallowed and expunged and no further proceedings with respect to those claims will be necessary before this Court.

3.     Any of the 54 Canadian claims that are not disallowed and expunged as a result of the Court's rulings on Debtors' pending summary judgment motion shall be scheduled for trial on Debtors' limitation period objections on _____, **2009 commencing at 9:00 a.m. Eastern time each day, in Pittsburgh, Pennsylvania, or as soon thereafter as possible.** The pretrial schedule for the limitation period trial is set forth on Exhibit B to this Order.

4.     Any claims that are not disallowed or expunged as a result of the foregoing limitations period trial shall be set for trial on Debtors' lack of hazard objection **on _____, 2009, commencing at 9:00 a.m. Eastern time, in Pittsburgh, Pennsylvania, or as soon thereafter as possible**.  Debtors' lack of hazard objection to the individual claim filed by Anderson Memorial Hospital (Claim No. 11008) shall also be tried at that time.  The pretrial schedule for the lack of hazard trial is set forth on Exhibit B to this Order.

5.     Motions for summary judgment or to dismiss regarding lack of hazard may be filed by any party at any time **prior to 4:00 p.m., Eastern time, on** _____, **2009**. Responses must be filed **no later than 4:00 p.m., Eastern time, on** _____, **2009**. Replies must be filed **no later than 4:00 p.m. Eastern time, on** _____, **2009.**  Any summary judgment motions or motions to dismiss that are filed shall be heard by the Court **at the Omnibus Hearing on** _____, **2009, or as soon thereafter as possible.**

6.     Any of the foregoing claims that have not been disallowed or expunged after the Court rules on Debtors' lack of hazard objections shall be set for a trial on damages **on _____, 2009, commencing at 9:00 a.m. Eastern time, in Pittsburgh, Pennsylvania, or as soon thereafter as possible.**  The pretrial schedule for the damages trial is set forth on Exhibit B to this Order.

7.     With respect to the claim filed on behalf of Mr. Sheldon H. Solow (Claim No. 7020), the Court hereby lifts the stay so that the parties may proceed with the pre-petition appeal that was filed in the New York Supreme Court, Appellate Division—First Department.

2

8.      This Order supersedes any and all other scheduling orders previously entered by this Court regarding Asbestos Property Damage Claims.

9.      Except with respect to the Solow claim, as discussed in Paragraph 8 above, the Court shall retain jurisdiction over the Asbestos Property Damage Claims listed on Exhibit A of this Order to adjudicate the merits of Debtors' objections to those claims and damages, if any, resulting from those claims after confirmation of a Plan of Reorganization in these proceedings.

10.     Within ten (10) days of entry of this Order, the Debtors will serve this Amended Order on counsel for all claimants listed on Exhibit A to this Order.

Dated: _____, 2009                    _____
                                          Honorable Judith K. Fitzgerald
                                          United States Bankruptcy Judge

3

**EXHIBIT A TO AMENDED ORDER SETTING VARIOUS DEADLINES REGARDING
OBJECTIONS TO ASBESTOS PROPERTY DAMAGE CLAIMS**

| Claimant | Claim No. | Counsel | Firm Name | Building Address | State/Province |
|---|---|---|---|---|---|
| Sheldon H Solow, Solow Development Corp., et al. | 007020 | Edward J Westbrook | Richardson Patrick Westbrook & Brickman LLC | 9 West 57th Street New York, NY 10019 | NY |
| Anderson Memorial Hospital | 011008 | Daniel A Speights | Speights & Runyan | 800 North Fant Anderson, SC 29261 | SC |
| Hamilton District School Board | 011322 | Daniel A Speights | Speights & Runyan | 25 High Street Hamilton, ON L8t3z4 | ON (Canada) |
| Hamilton District School Board | 011323 | Daniel A Speights | Speights & Runyan | 1055 King Street West Hamilton, ON L8m1e2 | ON (Canada) |
| 354401 Alberta LTD. C/O Redcliff Realty Management Inc. | 011620 | Daniel A Speights | Speights & Runyan | 287 Broadway Winnipeg, MB R3c0r9 | MB (Canada) |
| School District 68 Nanaimo-Ladysmith | 011627 | Daniel A Speights | Speights & Runyan | 3955 Wakesiah Ave Nanaimo, BC V9r3k5 | BC (Canada) |
| School District 68 Nanaimo-Ladysmith | 011632 | Daniel A Speights | Speights & Runyan | 1270 Strathmore Street Nanaimo, BC V9s2i9 | BC (Canada) |
| Hamilton District School Board | 011678 | Daniel A Speights | Speights & Runyan | 25 Hummingbird Lane Hamilton ON L9a4b1 | ON (Canada) |
| Hamilton District School Board | 011680 | Daniel A Speights | Speights & Runyan | 105 High Street Hamilton, ON L8t3z4 | ON (Canada) |
| Hamilton District School Board | 011681 | Daniel A Speights | Speights & Runyan | 145 Magnolia Drive Hamilton, ON L9c5p4 | ON (Canada) |
| Hamilton District School Board | 011682 | Daniel A Speights | Speights & Runyan | 130 York Boulevard Hamilton, ON L8r1y5 | ON (Canada) |
| Hamilton District School Board | 011684 | Daniel A Speights | Speights & Runyan | 60 Rolston Drive Hamilton, ON L9c3x7 | ON (Canada) |

| Toronto District School Board | 012304 | Daniel A Speights | Speights & Runyan | 23 Ferndale Avenue Toronto, ON  M4t2b4 | ON (Canada) |
|---|---|---|---|---|---|
| City Of Vancouver | 012346 | Daniel A Speights | Speights & Runyan | 700 Georgia Street Vancouver, BC | BC (Canada) |
| Mc Master University | 012368 | Daniel A Speights | Speights & Runyan | 1280 Main Street West Hamilton, ON L8s4m3 | ON (Canada) |
| Edmonton Public Schools | 012377 | Daniel A Speights | Speights & Runyan | 12126 89 Street Edmonton, AB T5b3w4 | AB (Canada) |
| Edmonton Public Schools | 012388 | Daniel A Speights | Speights & Runyan | - 6415 106 Street Edmonton, AB T6h2v5 | AB (Canada) |
| Edmonton Public Schools | 012394 | Daniel A Speights | Speights & Runyan | 8205 90 Avenue Edmonton, AB T6c1n8 | AB (Canada) |
| Fairmall Leasehold Inc | 012396 | Daniel A Speights | Speights & Runyan | 1800 Sheppard Ave E, Ste330 P.O. Box 330 Willowdale, ON M2j5a7 | ON (Canada) |
| Calgary Board Of Education | 012410 | Daniel A Speights | Speights & Runyan | 1233 21st Street Nw Calgary, AB  T2n2l8 | AB (Canada) |
| Calgary Board Of Education | 012412 | Daniel A Speights | Speights & Runyan | 640 Northmount Dr Nw Calgary, AB T2k3j5 | AB (Canada) |
| Oxford Properties Group | 012421 | Daniel A Speights | Speights & Runyan | 10025-102 Avenue Edmonton, AB T5j2z1 | AB (Canada) |
| Oxford Properties Group | 012422 | Daniel A Speights | Speights & Runyan | Between 100/101/102 & 102a St Edmonton, AB T5j2y8 | AB (Canada) |
| Oxford Properties Group | 012423 | Daniel A Speights | Speights & Runyan | 10088-102 Avenue Edmonton, AB T5j2z1 | AB (Canada) |
| Morguard Investments Limited | 012427 | Daniel A Speights | Speights & Runyan | 55 City Centre Drive Mississauga, ON L5b1m3 | ON (Canada) |
| Calgary Board Of Education | 012438 | Daniel A Speights | Speights & Runyan | 939 45th St Sw Calgary, AB  T3c2b9 | AB (Canada) |

| Calgary Board Of Education | 012439 | Daniel A Speights | Speights & Runyan | 2519 Richmond Road Sw Calgary, AB  T3e4m2 | AB (Canada) |
|---|---|---|---|---|---|
| Calgary Board Of Education | 012442 | Daniel A Speights | Speights & Runyan | 120 45th Street Sw Calgary, AB  T3c2b3 | AB (Canada) |
| Calgary Board Of Education | 012443 | Daniel A Speights | Speights & Runyan | 3009 Morley Trail Nw Calgary, AB  T2m4g9 | AB (Canada) |
| Calgary Board Of Education | 012454 | Daniel A Speights | Speights & Runyan | 4004-4th St. Nw Calgary, AB T2k1a1 | AB (Canada) |
| Calgary Board Of Education | 012457 | Daniel A Speights | Speights & Runyan | 7430 5th Street Sw Calgary, AB  T2v1b1 | AB (Canada) |
| City Of Vancouver | 012476 | Daniel A Speights | Speights & Runyan | 649-695 Cambie Vancouver, BC | BC (Canada) |
| City Of Edmonton | 012489 | Daniel A Speights | Speights & Runyan | 9803 102a Avenue Edmonton, AB T5j3a3 | AB (Canada) |
| Atlantic Shopping Centres LTD | 012490 | Daniel A Speights | Speights & Runyan | 2000 Barrington Street Halifax, NS B3j3k1 | NS (Canada) |
| Avalon East School Board | 012491 | Daniel A Speights | Speights & Runyan | 391 Topsail Road St John's, NL A1e2b7 | NL (Canada) |
| Health Care Corporation Of St.John's | 012493 | Daniel A Speights | Speights & Runyan | 300 Prince Philip Drive St John' NL A1b3v6 | NL (Canada) |
| Edmonton Public Schools | 012496 | Daniel A Speights | Speights & Runyan | 11515 113 Avenue Edmonton, AB T5g0j3 | AB (Canada) |
| Edmonton Public Schools | 012498 | Daniel A Speights | Speights & Runyan | 7730 106 Street Edmonton, AB T6g0x4 | AB (Canada) |
| Edmonton Public Schools | 012500 | Daniel A Speights | Speights & Runyan | 9750 74 Avenue Edmonton, AB T6j1t4 | AB (Canada) |
| Edmonton Public Schools | 012501 | Daniel A Speights | Speights & Runyan | 13546 111 Avenue Edmonton, AB T5m2p2 | AB (Canada) |
| Edmonton Public Schools | 012503 | Daniel A Speights | Speights & Runyan | 12245 131 Street Edmonton, AB T5l1m8 | AB (Canada) |